**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

_____

|  |  |  |
|---|---|---|
| | ) | |
| OHIO A. PHILIP RANDOLPH INSTITUTE, | ) | |
| LEAGUE OF WOMEN VOTERS OF OHIO, | ) | |
| LINDA GOLDENHAR, DOUGLAS BURKS, | ) | |
| SARAH INSKEEP, CYNTHIA LIBSTER, | ) | |
| KATHRYN DEITSCH, LUANN BOOTHE, | ) | |
| MARK JOHN GRIFFITHS, LAWRENCE | ) | |
| NADLER, CHITRA WALKER, RIA MEGNIN, | ) | |
| ANDREW HARRIS, AARON DAGRES, | ) | **COMPLAINT** |
| ELIZABETH MYER, ERIN MULLINS, TERESA | ) | |
| THOBABEN, and CONSTANCE RUBIN, | ) | No. |
| | ) | |
| Plaintiffs, | ) | Three-Judge Court Requested |
| | ) | Pursuant to 28 U.S.C. § 2284(a) |
| v. | ) | |
| | ) | |
| JOHN KASICH, Governor of Ohio, | ) | |
| JON HUSTED, Secretary of State of Ohio, | ) | |
| KIRK SCHURING, Speaker Pro Tempore of | ) | |
| the Ohio House of Representatives, and LARRY | ) | |
| OBHOF, President of the Ohio Senate, in their | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

<u>INTRODUCTION</u>

1.      This case is a challenge to Ohio's current United States congressional redistricting plan (the "plan" or "map") as an unconstitutional partisan gerrymander that violates the First Amendment, the Fourteenth Amendment, and Article I of the United States Constitution.

2.      The current Ohio map is one of the most egregious gerrymanders in recent history.  The map was designed to create an Ohio congressional delegation with a 12 to 4 Republican advantage—and lock it in for a decade.  It has performed exactly as its architects planned, including in 2012, when President Barack Obama won the state.  In statewide and national elections, Ohio typically swings from Democrats to Republicans.  In this decade, Republicans have secured 51% to 59% of the total statewide vote in congressional elections.  For example, in 2012, the Republicans received 51% of the congressional vote.  Yet the challenged map has consistently given Republicans 75% of the congressional seats.  This 12-4 map prevents large portions of Ohio's voting population from ever having their votes meaningfully deployed to count, much less see their democratic will reflected, in their congressional delegation.

3.      The Ohio map, created in the redistricting that followed the 2010 Census, was drawn by the Republicans in Ohio, with the support and assistance of the national Republican Party.  The goal was to design a map that would establish a 12-4 Republican to Democratic seat ratio throughout the decade for Ohio's U.S. congressional delegation.  The 12-4 map was drawn in secret in a hotel room, nicknamed "the bunker" by the map drawers, to which only Republicans had access.  Versions of the map had to be approved by national Republicans, despite no official role in Ohio's redistricting statutes for the national Republican Party.  The tightly controlled process worked as planned.

4.     The mapmakers were able to accomplish their goal by drawing a map that privileges partisan outcomes, often at the expense of traditional districting criteria.  Many of the resulting districts, including the 1st District, the 3rd District, the 4th District, the 9th District, the 11th District, the 13th District, and the 16th District, have highly irregular, sprawling shapes with borders that defy explanation by any political boundary or geographical feature.

5.     Consider, for example, the 1st District.  It is drawn with two barely connected wings, containing portions of Hamilton County and Warren County.  This district was newly drawn in the 2011 redistricting cycle and converted a district that had once been competitive to a solidly Republican district.

6.     The map splits Ohio's major cities, including Cincinnati, and 23 counties into different districts.  Despite the fact that the 2011 map has fewer districts than the previous map, it produces more splits in Ohio's counties, including urban counties.  For example, Summit County, where Akron is located, is split in four in the 2011 map, but previously only in three, and Lorain County, which is part of the greater Cleveland area, is split in three in the 2011 map, but previously only in two.

7.     Such gerrymandering not only violates democratic principles but is unconstitutional.  As Defendant Ohio Governor John Kasich recently stated in an amicus brief filed with the Supreme Court, "partisan gerrymanders are unconstitutional, are harming our republican government, and readily can be identified and addressed by courts."  Brief of Republican Statewide Officials as Amici Curiae In Support of Appellees at 1, *Gill v. Whitford*, No. 16-1161 (U.S. Sept. 25, 2017) [hereinafter, "Kasich *Gill* Amicus"].

8.     Democratic self-government is predicated upon the electorate choosing among candidates in free and fair electoral competitions that reflect the voters' judgments, not those of

2

the state.  Partisan gerrymandering violates "the core principle of republican government . . . that the voters should choose their representatives, not the other way around."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (quoting Mitchell Berman, *Managing Gerrymandering*, 83 Tex. L. Rev. 781 (2005)); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 590 (2000) (Kennedy, J., concurring).  Rather than reflecting voters' dynamic or evolving preferences, elections under gerrymandered systems systematically lock in candidates from the legislators' preferred party and discourage electoral competition.  In Ohio's case, this ensures that Republicans vastly outnumber Democrats in Ohio's congressional delegation.

9.     Partisan gerrymandering violates several provisions of the Constitution.  By entrenching the party in power and insulating it from meaningful accountability to the electorate, partisan gerrymandering substantially burdens voters' fundamental rights, including (1) their First Amendment right to associate for the advancement of political beliefs, to express political views, and to participate in the political process, *see Anderson v. Celebrezze*, 460 U.S. 780, 787–88 (1983); (2) their First and Fourteenth Amendment right to "cast a meaningful vote," *Burdick v. Takushi*, 504 U.S. 428, 445–46 (1992) (Kennedy, J., dissenting); and (3) their Fourteenth Amendment right to equal protection and treatment under the law, *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012).  *See also* Kasich *Gill* Amicus at 5 ("By specifically targeting voters on the basis of political affiliation and stripping them of political power, that action goes beyond mere partisan wrestling and violates both the First and the Fourteenth Amendments.").  Not only does partisan gerrymandering violate citizens' rights under the Constitution, it also goes beyond the powers granted to states under Article I.

3

10.     The Supreme Court has acknowledged that the practice is constitutionally problematic.  *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality op.) (conceding "the incompatibility of severe partisan gerrymanders with democratic principles"); *id*. at 316 (Kennedy, J., concurring) (acknowledging that "partisan gerrymandering that disfavors one party is [not] permissible"); *id*. at 326 (Stevens, J., dissenting) ("State action that discriminates against a political minority for the sole and unadorned purpose of maximizing the power of the majority plainly violates the decisionmaker's duty to remain impartial."); *id*. at 345 (Souter, J., dissenting) ("increasing efficiency of partisan redistricting has damaged the democratic process to a degree that our predecessors only began to imagine").

11.     Federal courts across the country have considered the issue of partisan gerrymandering in the last two years, and have found manageable standards for determining that partisan gerrymandering violates the Constitution.  *See Common Cause v. Rucho*, 279 F. Supp. 3d 587 (M.D.N.C. 2018), *appeal docketed*, No. 17-1295 (U.S. Mar. 14, 2018); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wisc. 2016), *appeal docketed*, 137 S. Ct. 2289 (2017); *Shapiro v. McManus*, 203 F. Supp. 3d 579 (D. Md. 2016).

12.     Plaintiffs seek a declaration from this Court that the map is unconstitutional in violation of the First Amendment, the Fourteenth Amendment, and Article I of the United States Constitution, and an order enjoining any further elections under the map and requiring that a new map be implemented.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to the United States Constitution.  The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and

42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C.

§§ 2201 and 2202, to grant declaratory relief requested.

14.     Pursuant to 28 U.S.C. § 2284(a), a three-judge court should be convened to hear this case.

15.     This Court has personal jurisdiction over each Defendant because each is a citizen of Ohio.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because events giving rise to these claims occurred in the Southern District of Ohio, at least six of the Plaintiffs live and vote in the Southern District of Ohio, and each Defendant conducts business in this district.

## PARTIES

### Plaintiffs

17.     Plaintiff Ohio A. Philip Randolph Institute ("APRI") is the Ohio chapter of the A. Philip Randolph Institute, a national organization for African-American trade unionists and community activists, established in 1965 to forge an alliance between the civil rights and labor movements. It has ten chapters across Ohio, including in Columbus, Cleveland, and Cincinnati, and has members throughout the state; its activities are funded in part by membership dues. While APRI supports a variety of charitable ventures unrelated to voting, the bulk of APRI's work is focused on voter education, registration, civic engagement, and outreach efforts. The gerrymandered congressional map impairs APRI's work by making it more difficult to engage voters through its education, registration, and outreach efforts, and by deterring and discouraging its members and other Ohio voters from engaging in the political process. APRI is suing on its

5

own behalf as well as in its capacity as representative of its members in order to seek a constitutional map.

18.      Plaintiff League of Women Voters of Ohio ("LWVO") is the Ohio chapter of the League of Women Voters of the United States, founded in May 1920 before the ratification of the Nineteenth Amendment granting women's suffrage.  LWVO is a non-profit, non-partisan membership organization dedicated to empowering citizens and ensuring an effective democracy.  LWVO has 29 local Leagues and 3 state units with 2,732 members, the vast majority of whom are registered Ohio voters.  The LWVO has members in each of Ohio's congressional districts.  LWVO aims to shape public policy, educate the public about policy issues and the functioning of our democracy, and works to protect and expand Ohioans' access to elections and their government.  Individual LWVO members invest substantial volunteer time in voter education, civic engagement, and voter registration.  Prior to the 2011 redistricting cycle, LWVO helped sponsor a competition for citizens to draw redistricting maps that privileged good governance aims over partisan ends.  The gerrymandered congressional map impairs LWVO's work by making it more difficult to engage voters through its education, registration, and outreach efforts, and by deterring and discouraging its members and other Ohio voters from engaging in the political process.  LWVO is suing on its own behalf as well as in its capacity as representative of its members in order to seek a constitutional map.

19.      Linda Goldenhar is a United States citizen, registered to vote in the State of Ohio, and an active voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future.  Plaintiff Goldenhar currently resides in Ohio's 1st Congressional District.

20.     Douglas J. Burks is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  He is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Burks currently resides in Ohio's 2nd Congressional District.

21.     Sarah Inskeep is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Inskeep currently resides in Ohio's 3rd Congressional District.

22.     Cynthia Rodene Libster is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future.  Plaintiff Libster currently resides in Ohio's 4th Congressional District.

23.     Kathryn Deitsch is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Deitsch currently resides in Ohio's 5th Congressional District.

24.     Luann Boothe is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Boothe currently resides in Ohio's 6th Congressional District.

25.     Mark John Griffiths is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  He is a Democratic voter, has supported Democratic candidates

for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Griffiths currently resides in Ohio's 7th Congressional District.

26. Lawrence Nadler is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. He is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Nadler currently resides in Ohio's 8th Congressional District.

27. Chitra Walker is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Walker currently resides in Ohio's 9th Congressional District.

28. Ria Megnin is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Megnin currently resides in Ohio's 10th Congressional District.

29. Andrew Harris is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. He is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Harris currently resides in Ohio's 11th Congressional District.

30. Aaron Dagres is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. He is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Dagres currently resides in Ohio's 12th Congressional District.

31.     Elizabeth Myer is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Myer currently resides in Ohio's 13th Congressional District.

32.     Erin Mullins is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Mullins currently resides in Ohio's 14th Congressional District.

33.     Teresa Anne Thobaben is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future.  Plaintiff Thobaben currently resides in Ohio's 15th Congressional District.

34.     Constance Rubin is a United States citizen, registered to vote in the State of Ohio and an active Ohio voter.  She is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. Plaintiff Rubin currently resides in Ohio's 16th Congressional District.

## Defendants

35.     Defendant John Kasich is the Governor of Ohio and is sued in his official capacity.

36.     Defendant Jon Husted is the Ohio Secretary of State and is sued in his official capacity.  He is the chief election officer in Ohio responsible for overseeing election administration pursuant to Ohio Rev. Code Ann. § 3501.04.

37.     Defendant Kirk Schuring is the Speaker Pro Tempore of the Ohio House of Representatives and is sued in his official capacity.

38.     Defendant Larry Obhof is the President of the Ohio State Senate and is sued in his official capacity.

## STATEMENT OF FACTS

39.     Under current Ohio law,[1] the state General Assembly has the primary authority for drawing Ohio's U.S. congressional districts, and the Joint Legislative Task Force on Redistricting, Reapportionment, and Demographic Research ("Task Force") is tasked with advising the General Assembly.  *See* Ohio Rev. Code § 103.51.  The Task Force is a six-person bipartisan committee, with three members appointed by the Speaker of the Ohio House of Representatives and three by the President of the Ohio State Senate.  *Id.*

40.     The congressional map must be approved by a majority of both the Ohio House of Representatives and the Ohio State Senate, and then signed into law by the Governor of Ohio.

*Genesis of the Ohio Map*

41.     In anticipation of the 2010 Census, the Republican State Leadership Committee ("RSLC"), a national organization, formulated a strategy to solidify and increase Republican control of state legislatures in states where the congressional redistricting process could be controlled by those legislative bodies.

42.     To implement this strategy, the RSLC implemented and organized the REDistricting Majority Project ("REDMAP").  According to REDMAP documents, its rationale was "straightforward."  It took aim at

---

[1] A constitutional amendment that will make changes to the redistricting process was approved on May 8, 2018.  The amendment will not affect any election until the 2022 election cycle, following the next decennial census.  *See infra* ¶¶ 120-24.

[c]ontrolling the redistricting process in these states [to] have the greatest impact on determining how both state legislative and congressional district boundaries would be drawn. Drawing new district lines in states with the most redistricting activity presented the opportunity to solidify conservative policymaking at the state level and maintain a Republican stronghold in the U.S. House of Representatives for the next decade.[2]

43.     Ohio was one of the states targeted by the RSLC under REDMAP. Following its plan, upon information and belief, the RSLC spent nearly $1 million on races for the Ohio House of Representatives in advance of the 2010 election. The plan worked: it flipped control of that body to the Republican Party following the wave election in 2010. With the capture of the Ohio House of Representatives, Ohio came under the single-party control of the Republican Party.

44.     Following the November 2010 elections, the Republican Party, including through its RSLC/REDMAP initiative, shifted its focus to help state map drawers in their efforts to capture more seats through redistricting. This included utilizing the single-party control of the Ohio General Assembly to dictate the drawing of Ohio's U.S. congressional map. Thus, in a letter to all Republican state legislative leaders nationwide, including those in Ohio, Chris Jankowski, then President and Chief Executive Officer of the RSLC, wrote:

> We know the ongoing redistricting process will impact the legislative lines that we will have to defend in 2012 and beyond. Therefore, we have taken the initiative to retain a team of seasoned redistricting experts that we will make available to you at no cost to your caucus for assistance. We urge you to use them as a key resource for technical advice as you undergo this process.[3]

45.     Mr. Jankowski assured the state legislative leaders that "the entirety of this effort" would be paid for through the RSLC's 501(c)(4) arm, the State Government Leadership Foundation.

---

[2] The RLSC Redistricting Majority Project, *2012 REDMAP Summary Report*, http://www.redistrictingmajorityproject.com/?p=646 (Jan. 4, 2013).

[3] Exhibit 430 to Hofeller Dep., *Dickson v. Rucho*, No. 11 CVS 16896 (N.C. Super. Ct. June 28, 2012).

46. In May 2010, the Republican National Committee ("RNC") conducted a training session on redistricting led by John Morgan, a national Republican operative. The theme was "keep it secret, keep it safe." The training was attended by the Chief Legal Counsel for the Ohio House Republican Caucus.

47. Following the 2010 Census, Ohio lost two congressional seats, reducing the size of its delegation to 16 seats, from the 18 seats it had been apportioned following the previous decennial census.

48. While the process for drawing Ohio's congressional map was charged to the Ohio General Assembly with the advice and assistance of the bipartisan Task Force, Ohio's 2011 congressional map was not created by this official legislative process, but instead in covert, backroom dealings among various national and Ohio Republican officials and operatives.

49. The Chief of Staff to the Ohio Senate and the Chief of Staff to the Ohio House of Representatives, two of the highest-ranking Republican staffers in the state, engaged two Ohio Republican operatives, Ray DiRossi and Heather Mann, as consultants to undertake research and other activities deemed necessary for drafting the congressional map. These operatives were not engaged to consult with or assist the bipartisan Task Force; they were retained exclusively *by* the Republican members of that Task Force, and rendered services strictly to those Republican members. Ultimately, it was Republican operatives, DiRossi and Mann, rather than any members of the Ohio General Assembly or the Task Force, who drafted the congressional map.

50. To support and guide their drafting activities, DiRossi and Mann were both provided with the RNC's redistricting training materials.

51. National Republican operative John Morgan, the presenter of "keep it secret, keep it safe," also advised DiRossi and Mann in their work on the Ohio congressional map.

52.     In addition to DiRossi, Mann, and Morgan, two other national Republican party operatives were engaged in drawing the 2011 Ohio congressional map: Adam Kincaid, Redistricting Coordinator of the National Republican Congressional Committee ("NRCC") and Tom Whatman, the Executive Director of "Team Boehner."  John Boehner was the then-Speaker of the U.S. House of Representatives.  Team Boehner was created to work in concert with the NRCC and the RNC to expand the Republican majority in the U.S. House of Representatives.

53.     In order for the congressional map to be finalized for presentation for a vote by the General Assembly, Whatman first had to approve the map.  DiRossi and Mann would email Whatman about changes to the map.  Whatman would then indicate whether or not he approved. Upon information and belief, the map drawers made changes at Whatman's direction, without ever seeking approval from the Republican elected officials who had the official authority to draw the map.

54.     Beginning in July 2011, the redistricting operations were based out of a secretly-rented hotel room at the DoubleTree Hotel in Columbus, Ohio, tellingly referred to as "the bunker" by the Republican operatives and officials engaged in the redistricting, rather than in the offices of the General Assembly.  Upon information and belief, no Democratic officials or operatives were able to access the bunker.

55.     The map drawers and Ohio Republican officials often used their personal, rather than official, e-mail addresses to conduct and discuss the state business of drawing Ohio's congressional map.

56.     Ohio's congressional map was designed to provide for and maintain Republican control.  This was accomplished by relying upon two partisan indices to guide the drawing.  The first index was based upon the percentage of each precinct's vote for John McCain, the

Republican presidential candidate in 2008.  The second was based upon the percentage of each precinct's vote for the Republican candidates in the 2004 presidential race, the 2006 state-wide attorney general and auditor races, the 2008 presidential race, and the 2010 governor's race.  By using these indices to draw district lines, the map was designed to guarantee Republican control throughout the decade.

57.     The map drawers used the indices to design districts that would maximize the number of congressional districts in which a Republican would consistently win by manipulating the boundaries around populations.  They planned to allow Democrats to win 4 districts, but carefully crafted the other 12 districts to ensure Republican wins that would endure across election cycles in all of the other districts.

58.     The map drawers considered drafting a congressional map with a stronger, 13-3, Republican advantage, but, upon information and belief, they decided that drafting such a map could result in smaller margins of victory in some Republican districts, which could risk those districts becoming competitive during a strong Democratic election year and give rise to the possibility of a seat falling to Democratic control.  They settled on drawing a map that would confer a slightly less aggressive advantage, but that would virtually guarantee a solid, 12-4 Republican advantage.

*Development of the Initial Map, HB 319*

59.     The drafting of the initial map occurred primarily in July and August 2011, but it was kept from the public and even from members of the General Assembly until September 13, 2011, two days before the full Ohio House voted on the bill and just eight days before its final passage on September 21, 2011.

60.     There was a so-called "road show" around the state, purportedly for public input on the redistricting maps, on July 20-21 and August 2, 2011, but no maps were published or available for review either before or at any of those sessions.

61.     The map drawers planned to have a completed map by mid-August 2011 for only themselves to see, and resolved to "keep it in the can" until hours before the votes in the Ohio House of Representatives and Senate, almost one month later.

62.     The first congressional map passed by the General Assembly in 2011, enacted as part of HB 319, was debuted and voted on over the course of nine days.

63.     On September 12, 2011, the House State Government and Elections Committee issued a notice that indicated that the committee might hear testimony on the still yet-to-be seen map with the new districts at the committee's hearing the next day.  On September 13, 2011, the HB 319 map was revealed to the full committee for the first time at the hearing.  On September 14, 2011, the committee approved the map on a straight party line vote, and the next day, September 15, 2011, the map was approved by the full Ohio House, 56-36.

64.     On September 20, 2011, the Senate Committee on Government Oversight and Reform held a hearing on the proposed congressional map.  On September 21, 2011, the Committee held a second hearing and added an amendment to include a $2.75 million appropriation for local boards of election.  This amendment was appended in order to make HB 319 immediately effective and to shield the law from the possibility of a voter referendum, since appropriation bills are not subject to the referendum process.  The Government Oversight and Reform Committee then voted to approve the map on a straight party line vote, and the map was passed by the full Senate by a 24-7 margin.

65.     Later that day, the amended bill was passed by the House with a 60-35 margin.

66.     Governor Kasich signed HB 319 into law on September 26, 2011.

*Rejection of Any Alternative Maps*

67.     There were no changes to the Republican map in the nine days in which the bill was before the General Assembly.

68.     While certain alternative maps were submitted to the legislature prior to and during the debates, the General Assembly failed to seriously consider them.

69.     The General Assembly could have seriously considered maps from the Ohio Campaign for Accountable Redistricting ("OCAR") competition. OCAR held a competition where private citizens drew their own congressional maps. Upon information and belief, the map Ohio enacted was worse than the one that came in last place in the contest, when judged on the basis of the number of split counties, compactness, competitiveness, and representational fairness (*i.e.*, the degree to which a plan favored one party over another).

70.     On August 30, 2011, the Ohio House State Government and Elections Committee requested that proposed maps be submitted three days later on September 2, 2011.

71.     An OCAR competition map was submitted on September 2, 2011 to the Ohio House State Government and Elections Committee, and additional alternative maps were discussed at the House State Government and Elections Committee meeting on September 6, 2011. None of these maps were reflected in the map debuted to the Ohio House on September 12, 2011.

72.     At the hearing before the full House on September 15, 2011, Democratic Representative Matt Lundy advocated that the legislature send the map back to the Ohio House State Government and Elections Committee and have public hearings so that the final map could be fully vetted by the public. His request was ignored.

73.     On September 19, 2011, Democratic Senator Tom Sawyer introduced SB 225, which proposed adopting the district lines drawn by one of the OCAR competition maps.  The Senate never held any hearings on SB 225.

74.     On September 21, 2011, the same day as the Senate vote on the HB 319, Senator Sawyer introduced an amendment to that bill.  His amendment would have replaced the Republican map with an OCAR competition map.  The Senate voted to table his amendment and never voted on the substance of the OCAR competition map.

*The Referendum Attempt and the Final Map, HB 369*

75.     After HB 319 passed, Democratic leaders announced that they would seek a referendum to give voters an opportunity to repeal HB 319.  An advocacy group called Ohioans for Fair Districts filed a mandamus action in state court seeking to compel the state to accept the referendum petition.  On October 14, 2011, the Ohio Supreme Court ruled that a referendum could proceed if there were signatures of 6% of state electors collected by December 25, 2011.

76.     Upon information and belief, as a result of the threat of a referendum that would cause the map to be redrawn to reflect the will of Ohio voters, the Republicans introduced a second map.  The slightly revised second map was introduced as HB 369 to the Rules Committee on November 3, 2011.  The revisions to the map did nothing to change the partisan skew of any of the proposed districts nor did the revisions change the entrenched 12 to 4 Republican to Democrat ratio in Ohio's U.S. congressional delegation.

77.     In addition to introducing a revised, but still gerrymandered map, HB 369 also changed the primary system in Ohio by consolidating two primary election dates (one for state, local, and U.S. Senate elections and the other for the U.S. House and presidential elections) into a single primary date.  This change was projected to save the State approximately $15 million per year.

17

78.     Upon information and belief, as with HB 319, the process for drawing the HB 369 map was tightly controlled by the Republicans.  It was introduced in the House Rules Committee and not the State Government and Elections Committee, which typically has responsibility for drawing the map.

79.     The Ohio House voted on the final map on December 14, 2011.  Nine Democratic members of the Ohio House spoke out against the bill.  They stated that the proposed map was not materially different from HB 319, since it did nothing to change the ratio of Republican districts to Democratic districts.  These Democratic legislators noted that, like HB 319, HB 369 would entrench a 12-4 advantage for Republicans.  Representative Ron Gerberry, the ranking Democrat on the State Government and Elections Committee, complained that he had only been shown the map an hour before the vote and that more people should have been involved in the map drawing process.  Other Democratic members of the Ohio House complained about how the lines had been drawn in heavily minority communities, including Cuyahoga and Lorain counties. These members were especially concerned by the splits of these counties.

80.     The map was introduced in the Ohio Senate on December 14, 2011 by Republican Senator Keith Faber.  As in the Ohio House, Ohio Democratic Senators spoke out against the map as a partisan gerrymander.

81.     Despite these protests, both houses of the General Assembly voted to enact HB 369 on December 14, 2011.  HB 369 was then signed into law by Governor Kasich on the following day, December 15, 2011.

*The 2011 Redistricting Map*

82.     The results from the elections subsequently held under the 2011 map confirm that its engineering of a 12-4 seat split was effective and durable.  It consistently produced the intended seat split, even during the 2012 election cycle that heavily favored Democrats.

18

83.     The following table shows how, despite fluctuations in the statewide vote share between the parties,[4] Republicans consistently retained 75% (12 out of 16) of the seats in all three congressional election cycles held under the map:[5]

| Year | Statewide vote share | | Seat share | |
|------|-----------|-------------|-----------|-------------|
|      | Democrats | Republicans | Democrats | Republicans |
| 2012 | 47%       | 51%         | 25%       | 75%         |
| 2014 | 39%       | 59%         | 25%       | 75%         |
| 2016 | 41%       | 57%         | 25%       | 75%         |

84.     Not only did the statewide seat split between the parties remain constant: Republicans and Democrats maintained the same seats, in the same districts, throughout these three election cycles.

85.     Packing of Democrats—concentrating Democratic voters into just four districts to reduce their power throughout the rest of the state—is evident from the large winning margins in each of the four Democratic districts.  In all three election cycles, voters in those districts cast many more votes for the Democratic congressional candidate above and beyond the 50%+1 majority needed to win the district.  The following table presents the percentage of the vote won by the Democratic candidate in each of the four packed Democratic districts across the 2012-2016 elections:[6]

| District | Percentage of votes of winning Democratic candidate | | |
|----------|-------|-------|-------|
|          | 2012  | 2014  | 2016  |
| District 3  | 68.29%        | 64.05% | 68.57% |
| District 9  | 73.04%        | 67.74% | 68.89% |
| District 11 | (uncontested) | 79.45% | 80.25% |
| District 13 | 72.77%        | 68.49% | 67.73% |

---

[4] The percentage of the statewide vote share in this table includes two uncontested elections (District 8 and 11) in 2012, and one uncontested election (District 7) in 2014.  Such elections overstate the support the party with an unopposed candidate would receive if there had been a contested election.

[5] The election returns information in the table is retrieved from the official election results and data from the Ohio Secretary of State's website.

[6] *See supra* note 5.

86. As the table shows, in all four districts in all three years, the Democrats had at least 64% of the vote, and in one case as much as 80% of the vote—an excess of 14 to 30 percentage points above the 50%+1 threshold needed to win.  The packing of Democrats is most extreme in District 11.  Democrats never had less than 79% of the vote in that district, 29 percentage points more than needed to win.  Democratic voters were radically concentrated into these four districts.

87. The packing of Democratic voters is accomplished by the drawing of barely contiguous districts with boundaries that cannot be explained by neutral redistricting criteria.



88.    Consider the four Democratic districts in turn.  District 3 is shaped like a snowflake and fractures Franklin County and the city of Columbus.



89.    District 9, the "Snake on the Lake," eats its way across the southern border of Lake Erie, ingesting portions of five counties (none in its entirety) and fragments of two of Ohio's major cities, Cleveland and Toledo.



90.    Plaintiff Walker lives in Lakewood, a city that is part of the Greater Cleveland Metropolitan area, on the very eastern tip of the district.  Instead of belonging to the same district as those living in Cleveland, Plaintiff Walker shares a district with those residing in the city of Toledo, which is 108 miles away.

91.    District 11 resembles a detached shoulder blade with a robotic arm that reaches out from a shoulder of Cleveland into Akron.



92.    Plaintiff Harris lives in the Cleveland area (noted as a red dot on the map above). His district includes parts of the core of the city of Akron and the Akron Fulton International Airport (purple dot), which is almost an hour drive away from his house on one of the most far-reaching robotic fingers.  However, his district does not contain the Cleveland Hopkins International Airport (blue dot), which is 15 minutes away from his house.

93. District 13 collects the remains of Akron that District 11 leaves behind, and appends it to the jigsaw puzzle piece of the rest of the district.



94. By contrast, cracking—the practice of splitting Democratic voters into districts to dilute their votes—is evident from the number of Democratic votes cast for the losing candidate in Republican-winning districts. Democrats in these districts use up their votes in numbers that were calculated to be large, but never sufficient to win. None of the Democratic votes cast in these districts go towards successfully electing Democratic candidates of choice. The percentage of votes that Democrats cast in each of the twelve Republican-winning districts in each election is depicted in the following table:[7]

---

[7] *See supra* note 5.

| | Percentage of votes cast for Democratic candidate | | |
|---|---|---|---|
| District | 2012 | 2014 | 2016 |
| District 1 | 37.6% | 36.78% | 40.77% |
| District 2 | 41.37% | 34.04% | 32.82% |
| District 4 | 36.49% | 32.33% | 32.01% |
| District 5 | 39.16% | 28.92% | 29.10% |
| District 6 | 46.75% | 38.58% | 29.32% |
| District 7 | 43.6% | (Uncontested) | 28.96% |
| District 8 | (Uncontested) | 27.36% | 26.97% |
| District 10 | 37.49% | 31.53% | 32.67% |
| District 12 | 36.53% | 27.75% | 29.84% |
| District 14 | 38.73% | 33.02% | 37.37% |
| District 15 | 38.44% | 33.98% | 33.84% |
| District 16 | 47.95% | 36.26% | 34.67% |

95.    As the table indicates, in most districts, although Democrats routinely cast over 30% of the votes, none of these votes ever contributed towards electing any of their candidates of choice.

96.    The contorted shapes of some of these districts also make clear the length the map drawers had to go to in order to achieve their political goals.

97.    Consider District 1, where Plaintiff Goldenhar lives: it is made up of two barely-connected wings of Hamilton County and Warren County.



24

98.     It includes a large part of Cincinnati, which is part of Hamilton County, but not the whole city—the other part of Cincinnati is found in District 2:



99.     The 2011 redistricting significantly changed District 1's shape and added heavily-Republican Warren County to the district.  Prior to the 2011 redistricting, the district was competitive and swung back and forth between Republican and Democratic Representatives.  For example, a Democrat won the district in 2008.  Since the 2011 redistricting, it has been a solidly Republican district.

100.    Consider District 4, where Plaintiff Libster resides, an approximately S-shaped district that spans a little less than half the state both in length (103 miles) and width (92 miles).



101.    Also consider District 16, where Plaintiff Rubin lives.  Various barely contiguous, odd shapes on jagged stalks sprout from a square area. In particular, the northernmost chunk of the district is barely connected to the rest of the district by highway 80 and thin slivers on either side of the highway.



26

102.    Despite the fact that the Ohio congressional delegation decreased from 18 seats to 16 seats, the current map splits some counties and municipalities more than the previous map did.

103.    Cuyahoga County is split among four congressional districts.  The following graphic, produced by the Cuyahoga County Board of Elections, shows how the map fractures Cuyahoga County:



104.    The portion of Cuyahoga County in District 9 contains two radial protrusions from Cleveland.  Similarly, there are portions of Cuyahoga County that protrude into the District 14 and District 16.

105.    Summit County is split among four congressional districts.  Under the previous map, Summit County was split among three congressional districts.  The following graphic, produced by the Summit County Board of Elections, shows just how the map fractures Summit County:



106.    Within Summit County, District 14 sends several tendrils into District 13.  And the portions of District 16 within Summit County are not contiguous: there is an orphan parcel of the district (in orange) in the southeast part of the county.  Districts 11 and 13 are locked in mortal combat: District 13 closes in on District 11 in various places, but District 11 manages to make several significant incursions deep into District 13 territory.

107.    Stark and Lorain counties are each split among three congressional districts. Under the previous map, Stark County was kept intact, and Lorain County was split between two districts.

108.    Municipal splits also make clear that the map is an extreme gerrymander. In addition to the splitting of Cleveland, Akron, and Cincinnati, as shown in the graphics above, Columbus is fractured across Districts 3, 12 and 15.



109.    As noted previously, District 3 factures not only the city of Columbus but also Franklin County.  District 3 is selective in which Columbus neighborhoods it permits within its boundaries and many of its appendages are barely attached to the rest of the district (see zoomed in graphics above).  Both Districts 12 and 15 contain tendrils that pick up those neighborhoods that District 3 failed to include.

*Metrics for Measuring Partisan Asymmetry in the Congressional Redistricting Plan*

110.    All measures commonly used by political scientists to detect and measure the effects of partisan gerrymandering make clear that the Ohio map is an extreme partisan gerrymander.  These measures—including the efficiency gap, the mean-median difference, and partisan bias—have been relied upon by courts in recent cases striking down partisan gerrymanders.  *See Whitford*, 218 F. Supp. 3d at 903–10 (finding the map of the Wisconsin State

29

House to be an unconstitutional gerrymander in part by relying on the efficiency gap); *Rucho*, 279 F. Supp. 3d at 658–66 (relying on all three metrics in finding that the North Carolina congressional map had discriminatory effects).

111.    The intuition behind each of these measures is the principle of partisan symmetry: that the map should give voters of both parties a similar opportunity to elect their candidates of choice.

112.    Partisan symmetry does not require proportional representation, either explicitly or implicitly.  Proportional representation would require the percentage of votes earned to match the percentage of seats earned.  In contrast, partisan symmetry is a less restrictive concept: it requires only that the map treat voters of both parties equally.  A plan may have partisan symmetry and not provide proportional representation: for example, the plan might require both parties to obtain the same results if they earned a certain percentage of the vote.  So for example, if the Republicans obtained 65% of the seats if they won 55% of the vote, then the same should be true for Democrats.

113.    One metric of partisan asymmetry is the "efficiency gap," which measures the difference between the two parties' excess votes.[8]  There are two kinds of excess votes, each capturing one of the two classic partisan gerrymandering tactics: packing and cracking.  Both tactics force the votes of those from the opposing party to be used inefficiently, by placing the opposing party's voters in districts where their votes will not have any impact on the outcome.  Excess votes from "packing" are those votes cast in excess of the 50%+1 needed for the party to win the district.  Excess votes from "cracking" are all votes cast for a losing candidate.  The efficiency gap aggregates both kinds of excess votes for each party.  The ratio of the parties'

---

[8] *See* Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015).

excess votes reveals the discrepancy between how the map treats the parties. This ratio can then be multiplied by the number of congressional districts in the state to quantify the efficiency gap in terms of a number of seats.

114.    The Brennan Center for Justice ("Brennan Center"), a non-partisan organization, calculated that, in the 2012, 2014, and 2016 elections, the gerrymandered Ohio congressional map produced an efficiency gap of 3.93, 1.77, and 1.6 extra seats for Republicans in those respective elections.[9]  Another non-partisan organization, PlanScore, calculated the efficiency gap for congressional districting plans nationwide dating back to 1972.[10]  It found that the current Ohio map is more skewed than 93% of the maps it analyzed across the nation for the entire period.[11]

115.    The "mean-median difference" is a typical statistical test of asymmetry and can be applied in the redistricting context to measure the partisan skew of a map. It is calculated by subtracting a given party's <u>mean</u> district vote percentage from its <u>median</u> district vote percentage in the same election. This difference reveals the degree of asymmetry in electoral outcomes for the parties. The statistical significance of the mean-median difference is then calculated to determine whether the difference is meaningful.

116.    Using the mean-median metric, the Brennan Center calculated that in the 2012, 2014, and 2016 elections, the Ohio map produced uniformly statistically significant measures of partisan gerrymandering at significance levels of 2.59, 2.47, and 2.60 respectively.[12]  All of these

---

[9] Laura Royden & Michael Li, *Brennan Center for Justice: Extreme Maps* at 22 (2017), https://www.brennancenter.org/sites/default/files/publications/Extreme%20Maps%205.16_0.pdf.
[10] PlanScore, *Partisan Gerrymandering Historical Data*, https://planscore.org/#!2016-ushouse (last visited May 22, 2018).
[11] PlanScore, *Ohio 2012-2016 Redistricting Plan*, Efficiency Gap, https://planscore.org/ohio/#!2016-plan-ushouse-eg (last visited May 22, 2018).
[12] Royden & Li, *supra* note 9, at 28.

levels exceed the threshold of 1.75 for statistical significance under the mean-median methodology.[13]  PlanScore calculated the mean-median difference for congressional districting plans nationwide dating back to 1972.[14]  It found that the current Ohio map is more skewed than 85% of the plans it analyzed nationwide for the entire period.[15]

117.    A third way to measure a plan's asymmetry is through the "partisan bias" metric, which works "by taking the two parties' statewide vote share in a particular election, and then imposing a uniform swing of the magnitude necessary to make the parties split the statewide vote equally." *Rucho*, 279 F. Supp. 3d at 664.  One can then calculate the number of seats each party would win under the uniform swing assumption.  If a party garners 50% of the votes but wins *over* 50% of the seats, the map is biased *in favor* of that party; if a party garners 50% of the votes but wins *less than* 50% of the seats, the map is biased *against* that party.  *Id*. at 664–65.

118.    PlanScore calculated the partisan bias of the 2011 Ohio congressional redistricting plan, and found that across the 2012, 2014, and 2016 elections, Republicans would have won 25% extra seats in a hypothetical, perfectly tied election.[16]  PlanScore also calculated the partisan bias for congressional districting plans nationwide dating back to 1972.[17]  It found that the Ohio map is more skewed than 97% of the plans it analyzed nationwide for the entire period.[18]

119.    All of these tests agree:  Ohio's map is an extreme partisan gerrymander.

---

[13] *Id*.
[14] PlanScore, *Historical Data*, *supra* note 10.
[15] PlanScore, *Ohio 2012-2016 Redistricting Plan*, Mean-Median, https://planscore.org/ohio/#!2016-plan-ushouse-mm (last visited May 22, 2018).
[16] PlanScore, *Ohio 2012-2016 Redistricting Plan*, Partisan Bias, https://planscore.org/ohio/#!2016-plan-ushouse-pb (last visited May 22, 2018).
[17] PlanScore, *Historical Data*, *supra* note 10.
[18] PlanScore, Partisan Bias, *supra* note 16.

*Ballot Issue 1*

120.    Ohio voters deplore the extreme gerrymandering in their State.  On May 8, 2018, they went to the polls and approved, with nearly 75% of the vote, Ballot Issue 1, a reform measure that will govern the congressional redistricting process in Ohio following the next decennial census.

121.    Ballot Issue 1 was the result of a process of negotiation among Republicans and Democrats in the General Assembly, along with advocacy groups, and implemented requirements intended to limit either party's ability to gerrymander congressional districts.

122.    Ballot Issue 1 sets up a multistep process.  The General Assembly may pass a district map if three-fifths of the members of each house vote to approve it, as long as at least one-half of the minority party members vote in favor.  If the General Assembly is unable to adopt a map, a commission would then have an opportunity to draw a map.  The commission would consist of seven members: the governor, state auditor, secretary of state, and four legislators, two of whom would have to come from the minority party of each of the General Assembly chambers.  A majority of the commission members, including two members belonging to the minority party, would have to agree on a map.  If the commission is unable to agree on a map, the process reverts back to the General Assembly.  The General Assembly could then adopt a map if it is approved by three-fifths of its members, including one-third of the minority party.

123.    However, if the General Assembly is unable to adopt a map with a three-fifths vote, then a map agreed upon by a simple majority in each house would be implemented, even without any minority votes in favor.  Such a map would last for four years.

124.    Ballot Issue 1 will put in place a process that begins after the next census, with map-drawing to start in 2021.  It will not affect any election until the year 2022.

33

## CLAIMS FOR RELIEF

## Count I: First Amendment

**(Violation of the First Amendment Right to Freedom of Speech and Association Pursuant to 42 U.S.C. § 1983)**

125.    Plaintiffs rely upon and incorporate the facts alleged in paragraphs 1-124 of this Complaint.

126.    The First Amendment, which protects the rights of voters to associate with and advocate for a political party, to vote for their candidate of choice, to express their political views, and to participate in the political process, "has its fullest and most urgent application . . . to the conduct of campaigns for political office," *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1441 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).  These rights constitute the "core of those activities protected by the First Amendment" without which a representative democracy cannot function.  *Elrod v. Burns*, 427 U.S. 347, 356 (1976).

127.    Burdening, penalizing, or retaliating against citizens "because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views" is highly disfavored.  *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring).

128.    Abridgment of these rights is subject to strict scrutiny.  *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008); *United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 111 (1982).

129.    Where state officials intentionally seek to skew electoral outcomes to freeze their advantage and insulate their majority from changes in voter preferences and are successful in effectuating that intent, their actions violate the First Amendment.  Just as the First Amendment requires the government to remain neutral when it regulates the competition of ideas that takes

place in a public forum, so, too, it demands neutrality in the administration of the ideological competition of an electoral contest.

130.    While states have authority to regulate elections to ensure that they are "fair and honest" and that "some sort of order, rather than chaos accompanies the democratic processes," they also have a "responsibility to observe the limits established by the First Amendment." *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231, 227, 222 (1989) (internal quotations omitted).

131.    For a democracy to function, electoral contests must reflect the voters' judgments, not those of the state.  "In a free society the State is directed by political doctrine, not the other way around." *Cal. Democratic Party*, 530 U.S. at 590 (Kennedy, J., concurring).

132.    Partisan gerrymandering is thus barred by the First Amendment and is "incompatible with democratic principles." *Ariz. State Legislature*, 135 S. Ct. at 2658 (quoting *Vieth*, 541 U.S. at 292).

133.    The Ohio 2011 congressional map burdens the First Amendment rights of voters to associate and participate in the political process.  It severely burdens or penalizes voters who choose to support the Democratic Party or Democratic candidates based upon their past participation in the political process, their voting history, their association with a political party, and their expression of their political views.

134.    The drawing of Ohio's congressional district boundaries was based on data about voters who previously chose to support the Democratic Party or Democratic candidates.  These voters were placed into particular congressional districts so that they would be prevented from meaningfully participating in the political process.  The map drawers were successful in their

goal.  The burden on these voters was intentional, and in fact was an objective of the 2011 map's drafters.

135.    Defendants' actions cannot meet strict scrutiny and therefore the map must be found unconstitutional.

136.    There was no legitimate state interest in this partisan manipulation of district boundaries, much less a compelling one, nor was the gerrymander narrowly tailored to achieve any state interest.

<u>**Count II: Right to Vote**</u>

**(Denial of the Right to Vote under the Fourteenth Amendment Pursuant to
42 U.S.C. § 1983)**

137.    Plaintiffs rely upon and incorporate the facts alleged in paragraphs 1-124 of this Complaint.

138.    The right of "qualified voters, regardless of their political persuasion, to cast their votes effectively . . . rank[s] among our most precious" rights.  *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *see also Anderson*, 460 U.S. at 787 (finding the right to cast a meaningful vote to be fundamental); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society").  The right to vote is fundamental and is protected by the Fourteenth Amendment.  *Obama for Am.*, 697 F.3d at 428–29 ("The Equal Protection Clause applies when a state . . . places restrictions on the right to vote.") (citations omitted).  That right "can be denied by a debasement . . . of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Reynolds*, 377 U.S. at 555; *see also* Kasich *Gill* Amicus at 8.

139.    Since the right to vote is a fundamental right, before it "can be restricted," the Court must engage in "close constitutional scrutiny" of the restriction.  *Evans v. Cornman*, 398

U.S. 419, 422 (1970).  The question that the Court "must answer is what the 'character and magnitude of the asserted injury' on the right to vote is here." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 663 (6th Cir. 2016) (citing *Anderson*, 460 U.S. at 789).

140.    Partisan gerrymandering substantially burdens the right to vote.  A voter is "depriv[ed] . . . of the opportunity to cast a meaningful ballot" since the legislature constrains voters' ability to "vote for the candidate of their choice." *Burdick*, 504 U.S. at 447 (Kennedy, J, dissenting); *see also* Kasich *Gill* Amicus at 7 (noting that partisan gerrymandering "burden[s] citizens' fundamental voting rights on the basis of their expressed ideological beliefs") (citing *Vieth*, 541 U.S. at 312 (Kennedy, J., concurring)).  In order to show a burden, a voter does "not need to show that they were legally prohibited from voting." *Obama for Am.*, 697 F.3d at 431; *see also Mich. State A. Philip Randolph Inst.*, 833 F.3d at 663 (finding increased waiting times and voter confusion to be burdens on the right to vote).  All a voter need show is that his or her exercise of the right to vote has been burdened. *Id.*

141.    The Supreme Court has found similar burdens on the right to vote to be substantial.  For example, in *Williams*, the Court found that electoral regulations that effectively created a state-sanctioned monopoly on political contests where a "vote may be cast only for one of two parties" to be a substantial burden on the right to vote. *Williams*, 393 U.S. at 30–31.  Such a substantial burden on voting was found to be unconstitutional.

142.    Where, as here, there is a substantial burden on a fundamental right, heightened scrutiny must be met. *See, e.g.*, *Cal. Democratic Party*, 530 U.S. at 581–82; *Norman v. Reed*, 502 U.S. 279, 288–89 (1992); *Anderson*, 460 U.S. at 789.

143.    Ohio's actions cannot meet heightened scrutiny and therefore the map must be found unconstitutional.  Ohio's actions fail heightened scrutiny because the map was enacted

with (1) an improper legislative *intent* to secure a partisan advantage, and (2) an impermissible *effect* of entrenching partisan advantage against likely changes in voter preference.  There is and was no legitimate state interest in enacting a gerrymandered map.  The map, therefore, must be found unconstitutional as a violation of Plaintiffs' and similarly situated citizens' right to vote.

## Count III: Equal Protection

### (Denial of Equal Protection under the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983)

144.    Plaintiffs rely upon and incorporate the facts alleged in paragraphs 1-124 of this Complaint.

145.    "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise."  *Obama for Am.*, 697 F.3d at 428 (quoting *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008)); *see also Mich. State A. Philip Randolph Inst.*, 833 F.3d at 662.  Courts have long held that a "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Obama for Am.*, 697 F.3d at 428 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

146.    The map as a whole and each district contained therein violates the Equal Protection Cause because the map was enacted with an intent to disfavor Democratic voters on the basis of their political affiliation, with no legitimate, let alone compelling, reason to do so. The map also had the "invidiously discriminatory" effect of "minimiz[ing] or cancel[ing] out the voting strength of . . . political elements of the voting population."  *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973).

147.    "If [district lines] serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a

particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection." *Karcher v. Daggett*, 462 U.S. 725, 748 (1983); *see also Rucho*, 279 F. Supp. 3d at 637 ("Partisan gerrymandering potentially runs afoul of the Equal Protection Cause because, by seeking to diminish the electoral power of supporters of a disfavored party, a partisan gerrymander treats individuals who support candidates of one political party less favorably than individuals who support candidates of another party.").

148.   The individual Plaintiffs and Democratic members of the organizational Plaintiffs belong to a politically salient class—supporters of the Democratic Party and Democratic candidates—and are sufficiently ascertainable in their geographical distribution that they can be taken into account in drawing district boundaries.  In the 2012-2016 elections, between 39-47% votes statewide were cast for Democrats.

149.   The legislature intended to discriminate against the individual Plaintiffs, Democratic members of the organizational Plaintiffs, and their political class in enacting the map and drawing each district the way it did.  The Equal Protection Clause protects citizens from laws that can "be traced to a . . . discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240 (1976); *see also Davis v. Bandemer*, 478 U.S. 109, 127 (1986); *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017).

150.   The "totality of the relevant facts" surrounding the adoption of the map make clear its "invidious discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977) (pointing to evidence such as the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and "legislative or administrative history").  *See supra* ¶¶ 41-81.

151.    The map had the effect of cracking and packing the individual Plaintiffs,

Democratic members of the organizational Plaintiffs, and their political class into districts so as

to dilute the power of their votes.  *See supra* ¶¶ 85-101.

## Count IV: Article I

**(Violation of Article I, Section II and Article I, Section IV of the Constitution Pursuant to
42 U.S.C. § 1983)**

152.    Plaintiffs rely upon and incorporate the facts alleged in paragraphs 1-124 of this

Complaint.

153.    Article I limits states' power in running elections.  *Rucho*, 279 F. Supp. 3d at 684

("[U]nless the Elections Clause or another constitutional provision delegates to the States the

authority to impose a particular type of election law or regulation, 'such a power does not

exist.'") (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995)).  States are

given limited power to regulate federal elections.  Specifically, the Elections Clause, Article I,

section 4, clause 1, confines states' power to the regulation of the time, place, and manner of

elections.  U.S. Const. art. I, § 4, cl. 1 ("[T]he Times, Places and Manner of holding Elections

for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the

Congress may at any time by Law make or alter such Regulations.").  The power granted under

Article I has been interpreted by courts to limit states to the enactment of neutral procedural

regulations.  *See Cook v. Gralike*, 531 U.S. 510, 532 (2001) (Rehnquist, J., concurring);

*Thornton*, 514 U.S. at 808–10; *Rucho*, 279 F. Supp. 3d at 684–85.

154.    States cannot use this limited power to constrain the free choice of the people.

Article I, section 2 provides that the "House of Representatives shall be composed of Members

chosen . . . by the People."  U.S. Const. art. I, § 2, cl. 1.  As the Supreme Court in *Thornton*

found: "[t]he constitution expressly provides that the choice shall be by the people, which cuts

off both from the general and state Legislatures the power of so regulating the mode of election, as to deprive the people of a fair choice.'" *Thornton*, 514 U.S. at 833 n.47 (quoting *The Republican*, Connecticut Courant (Hartford, Jan. 7, 1788), 1 Bailyn 710, 713). Courts have further held that "the Elections Clause does not 'immunize state congressional apportionment laws which debase a citizen's right to vote.'" *Rucho*, 279 F. Supp. 3d at 685 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 6 (1964)).

155. Partisan gerrymandering is a non-neutral government regulation whereby the state and not the people select government representatives. Partisan gerrymandering "turn(s) republican government upside down, with politicians choosing their voters instead of voters electing their politicians." Kasich *Gill* Amicus at 6.

156. As discussed above, since Ohio's map has both the intent and effect of a partisan gerrymander, it exceeds the state's power under Article I of the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that the 2011 Ohio U.S. congressional redistricting statute, HB 369, and each of the sixteen districts created by that statute are unconstitutional partisan gerrymanders;

B. Permanently enjoin Defendants, their agents, officers and employees, including clerks in all Ohio counties, from administering, preparing for, or moving forward with any future elections of Ohio U.S. congressional members using the plan enacted in HB 369;

C.      Establish a congressional districting plan that complies with the United States Constitution and all federal and state legal requirements, if the Ohio State Legislature and/or Governor fail to enact a new and constitutional plan in a timely manner;

D.      Permanently enjoin the Ohio General Assembly and Defendants from creating any future legislative districts with the purpose or effect of burdening or penalizing an identifiable group, a political party, or individual voters based on their political beliefs, political party membership, registration, affiliations or political activities, or voting histories;

E.      Make any and all orders that are just, necessary, and proper to preserve Plaintiffs' constitutional rights to equally participate in elections of congressional representatives;

F.      Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e); and

G.      Grant any and all other relief this Court deems just and proper.

Respectfully submitted,

*/s/ Freda J. Levenson*, trial attorney

T. Alora Thomas-Lundborg**
Dale E. Ho**
Theresa J. Lee**
Emily Rong Zhang**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
athomas@aclu.org
dho@aclu.org
tlee@aclu.org
erzhang@aclu.org

Freda J. Levenson (0045916)
American Civil Liberties Union of Ohio Fdtn.
4506 Chester Avenue
Cleveland, OH 44103
Tel.: (216) 472-2220
Facsimile: (216) 472-2210
flevenson@acluohio.org

Paul Moke (0014099)
Cooperating Attorney for ACLU of Ohio
Wilmington College*
1252 Pyle Center
Wilmington, OH 45177
Tel.: 937-725-7501
paul.moke@gmail.com
* Institutional affiliation for the purpose of identification only

Robert Fram**
Nitin Subhedar**
Jeremy Goldstein**
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel.: (415) 591-6000
rfram@cov.com
nsubhedar@cov.com
jgoldstein@cov.com

Michael Baker**
Perrin Cooke**
Peter Rechter**
Isaac Wood**
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
iwood@cov.com

**\*\*pro hac vice* application forthcoming
*Attorneys for Plaintiffs*

Dated:   May 23, 2018

43