## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, | ) | |
| LEAGUE OF WOMEN VOTERS OF OHIO, | ) | |
| THE OHIO STATE UNIVERSITY COLLEGE | ) | |
| DEMOCRATS, NORTHEAST OHIO YOUNG | ) | |
| BLACK DEMOCRATS, HAMILTON COUNTY | ) | |
| YOUNG DEMOCRATS, LINDA GOLDENHAR, | ) | |
| DOUGLAS BURKS, SARAH INSKEEP, | ) | |
| CYNTHIA LIBSTER, KATHRYN DEITSCH, | ) | |
| LUANN BOOTHE, MARK JOHN GRIFFITHS, | ) | |
| LAWRENCE NADLER, CHITRA WALKER, | ) | |
| TRISTAN RADER, RIA MEGNIN, | ) | |
| ANDREW HARRIS, AARON DAGRES, | ) | |
| ELIZABETH MYER, BETH HUTTON, | ) | |
| TERESA THOBABEN, | ) | |
| and CONSTANCE RUBIN, | ) | No. 1:18-cv-00357-TSB |
| | ) | |
| Plaintiffs, | ) | Judge Timothy S. Black |
| | ) | Judge Karen Nelson Moore |
| v. | ) | Judge Michael H. Watson |
| | ) | Magistrate Judge Karen L. Litkovitz |
| RYAN SMITH, Speaker of the Ohio House | ) | |
| of Representatives, LARRY OBHOF, | ) | |
| President of the Ohio Senate, and | ) | |
| JON HUSTED, Secretary of State of Ohio, | ) | |
| in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### DEFENDANTS' MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., Defendants hereby move to dismiss plaintiffs' Second Amended Complaint. All of plaintiffs' claims should be dismissed with prejudice.

A memorandum of law supporting this motion follows.

This the 20th day of July, 2018.

MICHAEL DEWINE
Ohio Attorney General

By: /s/Phillip J. Strach
Phillip J. Strach**
N.C. State Bar No. 29456
*Lead and Trial Counsel*
Michael McKnight**
N.C. State Bar No. 36932
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Tel.: (919) 787-9700
Facsimile: (919) 783-9412
phil.strach@ogletree.com
michael.mcknight@ogletree.com
*Attorney for Defendants Smith & Obhof*

***pro hac vice pending*

/s/Steven T. Voigt
Steven T. Voigt (0092879)
Principal Assistant Attorney General
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872
Fax: (614) 728-7592
Steven.Voigt@OhioAttorneyGeneral.gov
*Attorney for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

|  |  |  |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, | ) | |
| LEAGUE OF WOMEN VOTERS OF OHIO, | ) | |
| THE OHIO STATE UNIVERSITY COLLEGE | ) | |
| DEMOCRATS, NORTHEAST OHIO YOUNG | ) | |
| BLACK DEMOCRATS, HAMILTON COUNTY | ) | |
| YOUNG DEMOCRATS, LINDA GOLDENHAR, | ) | |
| DOUGLAS BURKS, SARAH INSKEEP, | ) | |
| CYNTHIA LIBSTER, KATHRYN DEITSCH, | ) | |
| LUANN BOOTHE, MARK JOHN GRIFFITHS, | ) | |
| LAWRENCE NADLER, CHITRA WALKER, | ) | |
| TRISTAN RADER, RIA MEGNIN, | ) | |
| ANDREW HARRIS, AARON DAGRES, | ) | |
| ELIZABETH MYER, BETH HUTTON, | ) | |
| TERESA THOBABEN, | ) | |
| and CONSTANCE RUBIN, | ) | No. 1:18-cv-00357-TSB |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Timothy S. Black |
| v. | ) | Judge Karen Nelson Moore |
| | ) | Judge Michael H. Watson |
| | ) | Magistrate Judge Karen L. Litkovitz |
| RYAN SMITH, Speaker of the Ohio House | ) | |
| of Representatives, LARRY OBHOF, | ) | |
| President of the Ohio Senate, and | ) | |
| JON HUSTED, Secretary of State of Ohio, | ) | |
| in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

**INTRODUCTION**

In the 2010 election, Republicans won 13 congressional seats in Ohio, compared to five

seats for Democrats.  In the 2012 election, after Ohio lost two congressional seats because of the

decennial census and the districts were redrawn, Republicans won 12 congressional seats to

Democrats' four seats.  This unremarkable turn of events forms the basis of plaintiffs' partisan gerrymandering claims and epitomizes the speciousness of this lawsuit.

That the claims are meritless is underscored by how long plaintiffs waited to bring them. Despite knowing the district boundaries in 2011 and watching elections take place in those districts in 2012, 2014, and 2016, plaintiffs waited until May 23, 2018—nearly seven years—to file this action.  Meanwhile, Ohio voters and candidates have relied upon the existing congressional districts for three elections (four elections by the time this case would be tried). Plaintiffs also waited until after Ohio voters approved a new bipartisan process for drawing congressional districts beginning in 2021.  Plaintiffs would have Ohioans vote in the current congressional districts in 2018, new districts (presumably of plaintiffs' liking) in 2020, and a third set of districts drawn under the state's newly-adopted redistricting process in 2022.  Such an outcome—three different sets of congressional districts over roughly four calendar years—is manifestly unfair to Ohio's voters.  Accordingly, laches bars plaintiffs' belated claims.

In any event, plaintiffs' so-called partisan gerrymandering claims are nonjusticiable.  A majority of the Supreme Court recently acknowledged that it has *not* decided the "threshold question[]" of "whether [partisan gerrymandering] claims are justiciable" at all.  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).   Consistent with the current state of the law, the Supreme Court also summarily affirmed a three-judge court's refusal to entertain partisan gerrymandering claims on the basis that the claims were nonjusticiable.  *Harris v. Cooper*, No. 16-166, 2018 WL 3148263, *1 (U.S. June 28, 2018).   This Court should therefore dismiss these claims.  If plaintiffs want the Supreme Court to reverse course, they will have ample opportunity to make that argument on appeal.   *Cf. Shaw v. Reno*, 509 U.S. 630 (1993) (deciding the scope and extent of racial gerrymandering claim following dismissal by district court).

Finally, plaintiffs have not alleged facts sufficient to demonstrate standing.  Instead, plaintiffs have simply recycled allegations and social science theories from prior cases that are not only insufficient, but are similar to those rejected by the Supreme Court in *Gill*.  Plaintiffs' conclusory allegations about undefined notions of "packing" and "cracking" are insufficient to confer standing.  Accordingly, plaintiffs' claims should be dismissed.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs in this case include multiple individuals as well as sophisticated state, national, and local organizations that have litigated numerous election cases in this state.  *See, e.g., League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008); *League of Women Voters of Ohio v. Blackwell*, 2006 U.S. Dist. LEXIS 23437 (N.D. Ohio Mar. 23, 2006); *Dunkle v. Brown*, 590 F.2d 334 (6th Cir. 1978); *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018); *Ohio State Conf. of the NAACP v. Husted*, 43 F. Supp. 3d 808 (2014), *stayed*, 135 S. Ct. 42 (2014), *vacated*, 2014 U.S. App. LEXIS 24472 (6th Cir. Oct. 1, 2014).

The congressional districts at issue in this case were enacted in December 2011.  Second Amended Complaint ("Sec. Am. Comp.") ¶ 84.  The initial complaint in this case was not filed until May 23, 2018, nearly seven years after enactment of the plans.[1]  Plaintiffs concede that the political results they blame on the congressional map came to light as early as the 2012 election.  Sec. Am. Comp. ¶ 85.

The second amended complaint alleges purported partisan gerrymandering claims under the Equal Protection Clause, First Amendment, and Article I of the United States Constitution.  Plaintiffs do not propose a standard for these claims.  Instead, plaintiffs rely on "metrics for measuring partisan asymmetry."  Sec. Am. Comp. ¶¶ 121-30.    These include a purported

---

[1] An amended complaint was filed on June 26, 2018 following the *Gill* decision.  A second amended complaint dismissing Governor Kasich as a party was filed on July 11, 2018.

"efficiency gap," the mean-median difference, and alleged measures of "partisan bias."  *Id.* at ¶ 121.  Plaintiffs concede that these measures rest on a notion of group rights rather than individual rights: "that the map should give voters of both parties a similar opportunity to elect their candidates of choice."  *Id*. at ¶ 122.  To that end, the allegations of the complaint focus primarily on the so-called "partisan skew" of the entire "map" as opposed to specific districts.  *Id.* at ¶ 126.

Plaintiffs make pro forma allegations regarding the sixteen congressional districts.  For instance, each individual plaintiff recites that he or she is a "Democratic voter," who has "supported Democratic candidates" for Ohio's congressional districts in the past as well as a general summary of the extent of his or her political activity aside from voting.  None of the plaintiffs allege facts regarding specific candidates they have supported, whether they have ever voted for a candidate other than a Democrat for Congress, or whether their "support" for Democrats extends to elections other than congressional contests.

The individual plaintiffs base their allegations of injury solely on the purported "packing" or "cracking" of congressional districts.  Plaintiffs Inskeep, Walker, Rader, Harris, and Myer claim that they reside in so-called "packed" districts in which more "Democratic voters" are placed in a district than a number allegedly needed to secure the election of a candidate that matches that plaintiff's partisan preference.  Plaintiffs who reside in "packed" districts have purportedly been harmed because "concentrating Democratic voters into [the "packed" districts] reduce[s] their power throughout the rest of the state."  Sec. Am. Comp. ¶ 88.  These plaintiffs claim that their vote carries "less weight" (Sec. Am. Comp. ¶¶ 91, 93, 95, 96), but do not explain how their vote has less weight in their own district as opposed to other districts "throughout the rest of the state."

4

Plaintiffs Goldenhar, Burks, Libster, Deitsch, Boothe, Griffiths, Nadler, Megnin, Dagres, Hutton, Thobaben, and Rubin claim that they reside in so-called "cracked" districts in which not enough "Democratic voters" are placed into a district to secure the election of a candidate who meets that plaintiff's partisan preference.  In these districts plaintiffs claim that "Democrats" "use up" their votes such that "[n]one of their votes "go towards" electing "Democratic candidates of choice."  Sec. Am. Comp. ¶ 97.  They claim that these votes carry "less weight" or "consequence" because the votes are not "contributed towards" electing Democratic candidates.  Sec. Am. Comp. ¶¶ 98, 100, 158.  Further, these plaintiffs concede that Republicans were often if not exclusively elected in these so-called cracked districts prior to enactment of the congressional map at issue in this case.  Sec. Am. Comp. ¶¶ 102, 108.

Plaintiffs' first claim is an alleged violation of the First Amendment right to freedom of speech and association.  Plaintiffs claim that the challenged map "burdens" their First Amendment rights to "associate and participate in the political process."  Moreover, plaintiffs allege that the map burdens the state's "disfavored political party" because it has been "deprived" of its "natural political strength."  Sec. Am. Comp. ¶ 146.

Plaintiffs' second claim is an alleged denial of the right to vote under the Fourteenth Amendment.  They do not, however, allege that they were prevented from voting in congressional elections.  Rather, plaintiffs claim that their "exercise" of the right to vote has been "burdened."  Sec. Am. Comp. ¶ 152.  They contend that the map should fail "heightened" scrutiny because it was allegedly enacted with partisan intent, "entrench[es]" partisan advantage against "likely changes in voter preference" and makes Democratic votes have "less consequence" than those of Republicans.  Sec. Am. Comp. ¶ 155.

Plaintiffs' third claim is an alleged denial of equal protection under the Fourteenth Amendment. Again, plaintiffs do not allege that they were denied their right to vote, but rather contend that their vote supposedly carries "less weight or consequence" under the challenged map. Sec. Am. Comp. ¶ 158. Plaintiffs also allege that the map has the "effect" of "cracking and packing" the plaintiffs which "dilute[d]" the "power" of their votes. Sec. Am. Comp. ¶ 162. But plaintiffs contend that Democrats only in "cracked" districts lacked "an opportunity to elect their congressional candidates of choice, and/or a meaningful opportunity to influence congressional elections, absent special circumstances." Sec. Am. Comp. ¶ 164.

Finally, plaintiffs bring claims under Article I. This claim is subsumed by plaintiffs' other claims in that they claim the challenged map "exceeds the state's power under Article I" because it "has both the intent and effect of a partisan gerrymander." Sec. Am. Comp. ¶ 169.

All of plaintiffs' claims should be dismissed for the reasons discussed below.

## ARGUMENT

### I.    Plaintiffs' claims are nonjusticiable.

In its most recent pronouncement on so-called partisan gerrymandering claims, a majority of the Supreme Court acknowledged that it has *not* decided the "threshold question[]" of "whether those claims are justiciable." *Gill v. Whitford*, 138 S. Ct. at 1929. The Court surveyed its cases in this area and concluded that its "considerable efforts in *Gaffney*, *Bandemer*, *Vieth*, and *LULAC* leave *unresolved* whether [partisan gerrymandering] claims may be brought." *Id.* (emphasis added). *See also Id.* at 1932 (noting that certain evidence on remand may be relevant but only if "such claims present a justiciable controversy"); *Id.* at 1934 (noting that *Gill* involves "an unsettled kind of claim this Court has not agreed upon"; *Id.* (the "contours and *justiciability*" of partisan gerrymandering claims are "*unresolved*") (emphasis added).

Nor was the justiciability issue resolved by *Davis v. Bandemer*, 478 U.S. 109 (1986). Instead, in reviewing *Bandemer*, the *Gill* Court described it as a majority of the Court agreeing only "that the case before it" was justiciable, not that partisan gerrymandering is itself in general a justiciable claim. *Gill*, 138 S. Ct. at 1927. The *Gill* majority also cast doubt on the justiciability of these claims in recounting *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*") and *Vieth v. Jubelirer*, 541 U.S. 267 (2004). The Court specifically found that in *LULAC*, "[a]s in *Vieth*, a majority of the Court could find no justiciable standard" for partisan gerrymandering claims. *Gill*, 138 S. Ct. at 1928. Thus, it is clear that the most recent majority of the Supreme Court does not view the justiciability of partisan gerrymandering claims as established.[2]

It is not surprising, then, that the Supreme Court this Term also summarily affirmed a three-judge court's refusal to entertain partisan gerrymandering claims on the basis that the claims were nonjusticiable. *Harris v. Cooper*, No. 16-166, 2018 WL 3148263, *1 (U.S. June 28, 2018).

In *Harris*, plaintiffs challenged North Carolina's 2016 congressional plan as a partisan gerrymander. The *Harris* plaintiffs contended that partisan gerrymandering is "unconstitutional" and that under *any* standard for partisan gerrymandering the 2016 congressional plan was unlawful. *Plaintiffs' Objections and Memorandum of law Regarding Remedial Redistricting Plan* at *13, *Harris v. McCrory*, No. 1:13-CV-00949, 2016 WL 3537185 at *13 (M.D.N.C. Mar. 3, 2016) (emphasis added). Like plaintiffs in this case, the *Harris* plaintiffs assailed the alleged "cracked" or "packed" districts in the 2016 congressional plan as unconstitutional. *Id.* at *14.

---

[2] *Gill* included claims brought under the equal protection clause of the Fourteenth Amendment as well as the First Amendment. *Gill*, 138 S. Ct. at 1923, 1924, 1925. The Supreme Court's refusal to recognize the justiciability of these claims extends here to plaintiffs' Article I claims since those claims as pled are coextensive with plaintiffs' First and Fourteenth Amendment claims.

They went so far as to assert that "if the circumstances here do not present grounds for striking down a map as a partisan gerrymander, *nothing ever will*." *Id.* at *15-16 (emphasis added).

The *Harris* three-judge district court rejected these claims. The court explained that the plurality in *Vieth* held partisan gerrymandering claims "nonjusticiable." *Harris*, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016). The court specifically acknowledged that "in light of the plurality holding in *Vieth*, *the Court's hands appear to be tied*." *Id.* at *2 (emphasis added). The court conceded that "politics" is a legitimate and traditional redistricting criterion, and that the Supreme Court had not yet defined when the use of politics would go "too far." *Id.* Nor had the *Harris* plaintiffs identified a justiciable standard by which such a determination could be made. *Id.* On June 28, 2018, the Supreme Court affirmed this judgment, a ruling that now has precedential value. *Hicks v. Miranda,* 422 U.S. 332, 344 (1975).

Thus, after *Gill*, there is simply no basis for this Court to predict whether even a single Justice of the Supreme Court might agree that plaintiffs' complaint alleges claims upon which relief can be granted. Plaintiffs cannot cite a single case where the Supreme Court has upheld a determination that a legislative or congressional plan or district was an unconstitutional partisan gerrymander, and *Gill* has cast a considerable shadow over these claims. In fact, the only case this Term involving partisan gerrymandering that was affirmed by the Supreme Court was *Benisek v. Lamone*, 266 F.Supp.3d 799 (D. Md. 2017) where the lower court denied relief on the plaintiffs' claim. Every other case was vacated and remanded. *Gill*, 138 S. Ct. at 1934; *Common Cause v. Rucho*, 279 F.Supp.3d 587 (M.D.N.C. 2018) *vacated*, No. 17-1295, __ S. Ct. __, 2018 WL 1335403, *1 (U.S. Jun. 25, 2018). Under these circumstances, this Court would have to invent a new theory of partisan gerrymandering for these plaintiffs' claims to survive.

8

This Court should be circumspect of plaintiffs' invitation to go so far beyond existing precedent. If such a claim does exist, it should be first recognized by the Supreme Court, given its recent rejection of similar claims and the absence of any precedent supporting the invention of a justiciable standard for evaluating partisan gerrymanders. *See Shaw v. Reno*, 509 U.S. 630 (1993) (deciding the scope and extent of racial gerrymandering claim following dismissal by district court).[3]

While *Gill* involved claims under the First and Fourteenth Amendments, the lack of justiciability extends to claims under Article I of the Constitution as well. The Supreme Court in *Gill* repeated its recognition that redistricting is an inherently partisan process and that partisan considerations will always be a part of any redistricting effort. *Gill*, 138 S. Ct. at 1926-29; *Vieth*, 541 U.S. at 286 (plurality opinion); *see Vieth*, 541 U.S. at 307 (Kennedy, J. concurring); *Vieth*, 541 U.S. at 343 (Souter and Ginsburg, J. J., dissenting) ("some intent to gain political advantage is inescapable whenever political bodies devise a district plan"); *Vieth*, 541 U.S. at 358 (Breyer, J., dissenting) ("political considerations will likely play an important, and proper, role in the drawing of district boundaries"); *Gaffney v. Cummings*, 412 U.S. 735, 752 (1973).

It would be illogical to conclude that evidence failing to establish standing for plaintiffs bringing claims under the First or Fourteenth Amendments could nevertheless be used to establish standing under an unprecedented interpretation of Article I of the Constitution. *See, e.g., Vieth*, 541 U.S. at 305 (2004) (plurality opinion) (dismissing claims under Article I, Section 2 and 4); *Pope v. Blue*, 809 F. Supp. 392, 398 (W.D.N.C. 1992), *sum. aff'd*, 506 U.S. 801 (1992)

---

[3] Indeed, if the Court dismisses these claims now, this case could be ripe for Supreme Court review this Term, along with cases on remand out of Wisconsin, Maryland, and North Carolina. This would increase the chance that this case could be resolved (or at least litigated with fresh substantive guidance from the Supreme Court) prior to the 2020 election cycle—which is what plaintiffs claim they want.

(*citing Washington v. Finley*, 664 F.2d 913, 927-28 (4th Cir. 1981) (First Amendment provides no more protection in vote dilution case than that afforded by the Fourteenth and Fifteenth Amendments)).

It is well established that Article I, Section 2 of the United States Constitution only requires that congressional districts consist of equal population. *Karcher v. Daggett*, 462 U.S. 725, 734 n.6 (1983); *Kirkpatrick v. Preisler*, 394 U.S. 526, 534 (1969); *Pope*, 809 F. Supp. at 397-98; *Badham v. March Fong Eu*, 694 F. Supp. 664, 673-75 (N.D. Ca. 1988), *aff'd* 488 U.S. 1024 (1989).  No precedent exists for a gerrymandering standard under Section 4 of Article I, much less one that has a different standing standard than what would be required by *Gill*. Federal district courts have already rejected gerrymandering claims under both Section 2 and Section 4 of Article I.  *Shaw v. Barr*, 808 F. Supp. 461, 468-69 (E.D.N.C. 1992) (three-judge court) (racial gerrymandering).  The three-judge court was unanimous as to these claims and this ruling was not disturbed by the Supreme Court.  *Shaw v. Reno*, 509 U.S. 630 (1993); *see also Shaw v. Hunt*, 861 F. Supp. 408, 420 (1994), *rev'd on other grounds*, 517 U.S. 899 (1996) (noting that the panel's Article I judgment was "undisturbed" by the Supreme Court).

This rejection makes sense in light of *Vieth*.  The plurality there *cited* Section 4 of Article I in recognizing that the Constitution "clearly contemplates districting by political entities" which "unsurprisingly [] turns out to be root-and-branch a matter of politics." *Vieth*, 541 U.S. at 285-86.  The plurality noted that plaintiffs' Article I claims were "fleeting" and that Article I contains no "judicially enforceable limit" for politics in redistricting. *Id*. at 305.  *None* of the concurring or dissenting Justices in *Vieth* disagreed with the plurality's interpretation of Article I and its inapplicability to partisan redistricting claims.

It is unsurprising that there is a dearth of case law supporting plaintiffs' position.  Article I recognizes that decisions about districting are inherently political and thus places only one substantive limit on those decisions—that they must be single-member districts.  The alternative rejected by Congress—at-large elections for Congress—is the baseline against which Congress mandated single-member districts.  Of course, as recognized by the Supreme Court, "[t]he very essence of districting is to produce a different—a more 'politically fair'—result than what would be reached with elections at large, in which the winning party would take 100% of the [congressional] seats."  *Gaffney*, 412 U.S. at 753.  If Ohio congressional elections had been held at large in 2012, 2014, and 2016, Republicans would have won *all 16 seats*, not just 12 seats.  *See* Sec. Am. Comp. ¶ 2 (noting that Republican candidates won at least 51% of the total statewide vote in Ohio congressional elections from 2012-2016).  Thus, whatever Article I may hold for redistricting purposes, it imposes no "fairness" standard beyond allowing Congress to regulate congressional elections to prevent entire congressional delegations from swinging back and forth between political parties in at-large elections.

## II.      Plaintiffs' claims are barred by laches.

Plaintiffs' seven-year wait to file this case is inexcusable.  If the current map were constitutionally infirm—and it is not—plaintiffs should have filed a challenge years ago.  Instead, they bring belated claims when they will affect, at most, one election before the next redistricting process.  The remedy they seek would result in three different congressional maps in four years, causing certain confusion and prejudice to the state of Ohio and its citizens.  This Court should dismiss these claims as untimely.

"Laches arises from an extended failure to exercise a right to the detriment of another party," *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009).   It is well-

established that in election-related matters, "*extreme diligence and promptness are required*." *McClafferty v. Portage County Bd. of Elections,* 661 F.Supp.2d 826, 839 (N.D. Ohio 2009) (emphasis added). And when a party fails to exercise diligence in seeking relief in an election-related matter, laches may bar the claim. *Id.* (citing *State ex rel. Demaline v. Cuyahoga County Bd. of Elections,* 90 Ohio St.3d 523, 526 (2000)). This is true here, where plaintiffs allege a constitutional violation, as constitutional challenges "'can become time-barred just as any other claim can.'" *Michigan Chamber of Commerce v. Land,* 725 F.Supp.2d 665, 680 (W.D. Mich. July 23, 2010) (quoting *U.S. v. Clintwood Elkhorn Min. Co.,* 553 U.S. 1, 9 (2008)).

Normally, a party asserting laches must show (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. *Land,* 725 F.Supp.2d at 680. The Ohio Supreme Court has held that when laches is raised in an election case "*[t]he party challenging the election* bears the burden of demonstrating that 'they acted with the requisite diligence.'" *Id.* at n.10 (emphasis added) (quoting *McClafferty,* 661 F.Supp.2d at 839; *State ex rel. Demaline,* 90 Ohio St.3d at 526); *see also Purcell v. Gonzalez*, 549 U.S. 1 (2006) (finding that an injunction was not warranted to avoid voter confusion, given the "inadequate time to resolve the factual disputes" and due to the "necessity [to] allow the election to proceed"); *SEIU Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored").

Plaintiffs cannot meet their burden of demonstrating diligence and lack of prejudice to Ohio voters. The opposite is true. First, the organizational plaintiffs in this case are sophisticated litigators which have engaged in high profile, significant litigation in Ohio throughout this decade and in prior decades. *League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008); *League of Women Voters of Ohio v. Blackwell*, 2006 U.S. Dist. LEXIS 23437

(N.D. Ohio Mar. 23, 2006); *Dunkle v. Brown*, 590 F.2d 334 (6th Cir. 1978); *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018); *Ohio State Conf. of the NAACP v. Husted*, 43 F. Supp. 3d 808 (2014), *stayed*, 135 S. Ct. 42 (2014), *vacated*, 2014 U.S. App. LEXIS 24472 (6th Cir. Oct. 1, 2014). Moreover, their state and national counterparts have engaged in similar litigation outside of Ohio this decade. *See, e.g., Common Cause v. Rucho*, 279 F.Supp.3d 587 (M.D.N.C. 2018) (consolidated with case brought by League of Women Voters of North Carolina). At least three cases this decade alleging nearly identical claims as this action were initiated, tried (one to a preliminary injunction motion, two to trial) and subjected to Supreme Court review this Term, all before this case was even filed. The organizational plaintiffs and counsel in this case were surely aware of their ability to bring this challenge well before 2018.

Second, the complaint in this case demonstrates that these plaintiffs were aware at least as early as 2012 of the alleged basis they would assert for these claims. Numerous allegations throughout the complaint recite alleged events that occurred in 2010 and 2011. The complaint relies on documents and exhibits from cases in other states that occurred as early as 2012 (Sec. Am. Comp. ¶ 47 n.3) and documents obtained from the Internet as early as 2013 (Sec. Am. Comp. ¶ 45 n.2). Plaintiffs recite numerous events that occurred during the process of enacting the challenged map, all of which occurred in 2011. Sec. Am. Comp. ¶¶ 44-84. They also candidly admit that as of 2012, plaintiffs viewed the 2011 map as an alleged "effective and durable" partisan gerrymander. Sec. Am. Comp. ¶ 85. There can be no doubt that the plaintiffs in this matter sat on their hands and on their presumed rights for nearly a decade without justification and filed these claims only after Ohio voters approved redistricting reform.

The prejudice to the state's voters after this much time has elapsed is palpable. Ohio's voters have voted in the existing districts for three election cycles, with a fourth election in just a

few months.  Voters have become habituated to their districts and elected representatives for the better part of a decade.  Candidates and elected Members of Congress have invested incalculable time and resources into learning the contours of each district, getting to know their constituents, and planning campaigns in the district.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (states have strong interests in election "efficiency" and the "stability of their political systems").

Ordinarily the disruption occasioned by even a timely lawsuit of this nature is confusing.  But the delay here compounds confusion.  If this Court ultimately grants relief to these plaintiffs, the voters of Ohio will have to vote under three different congressional district maps in three elections.  First, voters will vote in 2018 in the current districts.  Then in 2020 voters would vote in any new map produced as a result of this litigation.  Finally, in 2022, the map will change yet again because of the decennial census, and voters will have to learn new districts for a third time.  All of this confusion could have been avoided if plaintiffs had brought these claims in 2012 when plaintiffs suspected the challenged map of being an "effective and durable" partisan gerrymander.  Plaintiffs slept on their rights and should not now be permitted to disrupt and confuse the public over congressional districts they have grown accustomed to over nearly a decade.

Importantly, the Supreme Court's recent decision in *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) counsels in favor of the application of laches to this case.  In *Benisek*, a preliminary injunction case, the Supreme Court found that the plaintiffs had not acted with "reasonable diligence" where they waited until 2016 to assert the claims for which they sought injunctive relief.  *Benisek*, 138 S. Ct. at 1945.  This was particularly true where waiting three election cycles was due to circumstances "within plaintiffs' control."  *Id.*; *See also Fishman v. Schaffer*,

429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers) (denying relief where plaintiffs were aware of statute for more than a year but waited to take action). And it was especially important in an election case where "due regard" must be taken for the "public interest in orderly elections." *Benisek*, 138 S. Ct. at 1944-45.

This case falls squarely within the precedent of *Benisek*, and the plaintiffs here waited even longer than the plaintiffs in that case. The practical effect of plaintiffs' delay is that the Ohio voting public will be subjected to possibly three different congressional maps in the next three elections. Because this is untenable, plaintiffs' claims should therefore be dismissed.

### III. Plaintiffs lack standing.

Plaintiffs' claims must be dismissed for lack of standing. Standing "is a threshold question in every federal case" and "[t]he burden of establishing standing is on the party seeking federal court action." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012) (internal quotations omitted). Plaintiffs have not and cannot establish standing here.

The "irreducible constitutional minimum of standing" has three requirements which the plaintiff must plead and prove: (1) that he has suffered a "concrete and particularized injury" that (2) is "fairly traceable to the challenged conduct" and (3) is likely to be redressed by a favorable decision by the courts. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). A "'generalized grievance' shared in substantially equal measure by all or a large class of citizens" is not sufficient to confer standing. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Moreover, harm cannot be proved by plaintiffs' "speculation" about what might happen. *Simon v. E. Kent. Welfare Rights Organization*, 426 U.S. 26, 44 (1976). Injury-in-fact must instead be "both real and immediate."

*City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Plaintiffs here have not pled facts sufficient to satisfy the requirements for standing.

### A. No injury-in-fact

#### (i) Plaintiffs in alleged packed districts

Plaintiffs residing in Districts 3, 9, 11, and 13 allege that their districts have been "packed" such that the "power" of their vote in other districts has been reduced. Under *Gill*, this does not demonstrate standing and plaintiffs' complaint appears to concede this fact.

The plaintiffs in these districts are all similarly situated to the lead *Gill* plaintiff, Professor Whitford. Professor Whitford could not credibly allege a claim that his vote had been diluted because of cracking or packing because he resides in a district that regularly elected his candidate of choice. *Gill*, 138 S. Ct. at 1933. Like Professor Whitford, the plaintiffs in districts 3, 9, 11, and 13 also have been able to elect their candidates of choice. Thus, none of these individual plaintiffs have themselves been "disadvantaged" and therefore have not suffered a "concrete and particularized" injury. *Id.*

Plaintiffs appear to concede this fact. In their prayer for relief, they do not include the plaintiffs living in so-called packed districts in their request to declare that plaintiffs have been denied an opportunity to elect candidates of choice. The requested declaration is limited to plaintiffs in "Districts 1, 2, 4, 5, 6, 7, 8, 10, 12, 14, 15, and 16"—all allegedly "cracked" districts. This concession first appeared in plaintiffs' First Amended Complaint, which was filed after the Supreme Court criticized plaintiff Whitford's standing in *Gill*. (D.E. 33, p. 51) Accordingly, even plaintiffs appear to agree that residing in "packed" districts is insufficient to confer standing, and any challenge to these districts should be dismissed.

(ii)    <u>Plaintiffs in alleged cracked districts</u>

The plaintiffs residing in the remaining individual districts also lack standing.  Plaintiffs claim that their injury is a "diluted" vote that has less "weight" or "consequence."

Plaintiffs are not actually complaining about the "weight" of their vote.  No such complaint can be made based on longstanding Supreme Court precedent.  This is not a malapportionment case, in which the weight of a vote of a voter living in an overpopulated district is undeniably and mathematically lower than the weight of a vote of a voter living in an underpopulated district.  *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) (an individual's right to vote is "individual and personal in nature").  "The injury in a malapportionment case is 'a gross disproportion of representation to voting population.'" *Common Cause*, 279 F.Supp.3d at 611 (quoting *Baker v. Carr*, 369 U.S. 186, 207 (1962)).  Such numerical disproportion is a true dilutionary harm.  *Reynolds*, 377 U.S. at 568.  The plaintiffs in this case have not alleged, and in fact could not show, that their votes are similarly diluted.

Instead, plaintiffs here have been unable to vindicate their *partisan preference* in recent congressional elections.  But the weight of one's actual *vote* is not the equivalent of the weight of one's partisan *preference*.  For instance, plaintiffs allege that the votes of "Democrats" are "used up" before their partisan candidate can be elected.  They incorrectly suggest that their votes do not "go towards" electing Democratic candidates.  But these are not concerns about the weight of their votes.  Plaintiffs make no allegations showing that their votes are in fact not counted or do not "go towards" the vote totals of their preferred candidate.  Their votes are not "used up" in an election; they are simply not enough in that election (depending on turnout and any innumerable other factors) to elect a candidate these plaintiffs want to elect.

17

The Supreme Court has taken pains to explain that "the mere fact that a particular [redistricting] makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." *Bandemer*, 478 U.S. at 131. Indeed, the "power to influence the political process is not limited to winning elections" and this is "true even in a safe district where the losing group loses election after election." *Id*. at 132.

Moreover, plaintiffs do not allege that but for the alleged "cracking," their preferred candidate would have won any of the elections they complain about. Plaintiffs are simply assuming that if the district boundary had zigged one way instead of zagging another, their candidate would have been elected. But they are not confident enough in their assumption to allege it as an actual fact.

Instead, plaintiffs in the "cracked" districts are really complaining about the perceived loss of voting power by their political party of choice—here, the Democrats—and not their individual vote. This alleged harm is foreclosed by *Gill*. The Supreme Court rejected a theory of harm grounded in the "effect that a gerrymander has on the fortunes of political parties." *Gill*, 138 S. Ct. at 1933. And it stated clearly that it is "*not responsible for vindicating generalized partisan preferences*." *Id*. (emphasis added). Plaintiffs' claims seek to vindicate a "collective political interest, not an individual legal interest." *Id*. at 1932. The Court's decision in *Gill* makes clear that this is a "generalized grievance" which is not sufficient to confer standing.

        (iii)     <u>Organizational plaintiffs</u>

An organization has standing to sue on behalf of its members where (1) its members would otherwise have standing to sue in their own right, (2) the interests the organization seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the

18

relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333 (1977); *see also Ala. Legislative Black Caucus v. Alabama,* 135 S. Ct. 1257, 1268 (2015). An organization must also show that its members will be *personally* injured by the challenged action. *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972) (emphasis added).

Here, the organizational plaintiffs have not identified *any* specific members much less how those members will be personally injured by the challenged congressional map.[4] Accordingly, claims by the organizations must be dismissed. *Gill,* 138 S. Ct. at 1932 (the injury-in-fact in partisan gerrymandering cases, if justiciable, is personal and individual, not a group injury).

### B.    Fairly traceable harm

Standing also requires each plaintiff to demonstrate that the injury-in-fact is "fairly traceable" to the challenged redistricting plan. *Gill,* 138 S. Ct. at 1929 (citing *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016)). Plaintiffs have made no attempt to allege facts demonstrating that the injury they claim is caused by the challenged congressional map and not the "result [of] the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560.

For example, plaintiffs have not alleged that but for the challenged district lines, the election results they complain about "would not have happened." *Benisek,* 266 F.Supp.3d at 810. In the redistricting context, the map "is only 'injurious' if it actually alters the outcome of an election." *Id.* at 811. If an "election result is not engineered through a gerrymander but is

---

[4] Nor would merely identifying specific members remedy plaintiffs' lack of organizational standing. Those members would still need to prove individual standing by demonstrating a "concrete and particularized injury" that is "fairly traceable to the challenged conduct" and is likely to be redressed by a favorable decision by the courts. *See Lujan,* 504 U.S. at 560-61.

instead the result of neutral forces and voter choice, then no injury has occurred." *Id*. A loss due to voter choice is not a fairly traceable injury—it "is *democracy*." *Id*. at 812.

In this case, it is undisputed that in 2010 (under the state's prior congressional map), 13 of Ohio's congressional seats went to Republicans while five went to Democrats. It is also undisputed that in the elections following the 2011 redistricting (in which Ohio had lost two congressional seats due to apportionment), one less seat went to Republicans and one less seat went to Democrats. On its face, this is not an "injury" and it is certainly not an injury "fairly traceable" to the congressional map. At worst it is traceable to an apportionment in which Ohio lost two seats. In reality, it is traceable to voting decisions voters made in 2010 and then continued to make in 2012 and thereafter. Plaintiffs have not alleged facts that if proven would tend to show it was the map and not "voter choice" that caused the political result they now complain about. Unlike race, and the vote dilution and gerrymandering cases that address race, "[e]xperience teaches that voter preferences are mutable and that American democracy is characterized by a degree of volatility and unpredictability." *Id*. at 813 (citing *Bandemer*, 478 U.S. at 160) (O'Connor, J., concurring in the judgment) ("To allow district courts to strike down apportionment plans on the basis of their prognostications as to the outcome of future elections or future apportionments invites 'findings' on matters as to which neither judges nor anyone else can have any confidence."); *Bartlett v. Strickland*, 556 U.S. 1, 17 (2009) (courts are "inherently ill-equipped to make decisions based on highly political judgments" in drawing districts (citing *Holder v. Hall*, 512 U.S. 874, 894 (1994) (Thomas, J., concurring)). Accordingly, plaintiffs have failed to adequately allege standing and their claims should be dismissed.

## CONCLUSION

Based on the foregoing, plaintiffs' Second Amended Complaint should be dismissed with prejudice.

This the 20th day of July, 2018.

MICHAEL DEWINE
Ohio Attorney General

By: /s/Phillip J. Strach
Phillip J. Strach**
N.C. State Bar No. 29456
*Lead and Trial Counsel*
Michael McKnight**
N.C. State Bar No. 36932
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Tel.: (919) 787-9700
Facsimile: (919) 783-9412
phil.strach@ogletree.com
michael.mcknight@ogletree.com
*Attorney for Defendants Smith & Obhof*

***pro hac vice pending*

/s/Steven T. Voigt
Steven T. Voigt (0092879)
Principal Assistant Attorney General
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872
Fax: (614) 728-7592
Steven.Voigt@OhioAttorneyGeneral.gov
*Attorney for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2018, the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by e-mail or facsimile upon all parties for whom counsel has not yet entered an appearance and upon all counsel who have not entered their appearance via the electronic system.

*s/ Steven T. Voigt*
STEVEN T. VOIGT (0092879)
Principal Assistant Attorney General
