# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*, <br>     Plaintiffs, <br><br> v. <br><br> RYAN SMITH, *et al.*, <br><br>     Defendants. | No. 1:18cv357 <br><br> ORDER DENYING MOTION TO DISMISS (DKT. 46) |

**Before: Moore, Circuit Judge; Black and Watson, District Judges.**

On July 11, 2018, the plaintiffs filed their Second Amended Complaint alleging that Ohio's U.S. congressional districts violate the First Amendment, the Fourteenth Amendment, and Article I of the U.S. Constitution. Dkt. 37 (2d Amend. Compl. ("Compl.") at ¶ 1) (Page ID #287). Now pending before this Court is the defendants' motion to dismiss (Dkt. 46). For the ensuing reasons, we **DENY** the motion.

## I.     BACKGROUND

Following the 2010 Census, the Ohio General Assembly began the process of redrawing Ohio's congressional districts.[1] Dkt. 37 (Compl. at ¶ 50–51) (Page ID #302). Under then-applicable law, the Republican-controlled General Assembly had "primary authority" over redistricting, with advice provided by the six-person, bipartisan Joint Legislative Task Force on Redistricting, Reapportionment, and Demographic Research ("Task Force"). *Id.* at ¶¶ 42, 46 (Page ID #300–01).

---

[1] These facts are drawn from the plaintiffs' complaint. Because we are considering the defendants' motion to dismiss, we presume all factual allegations in the complaint to be true.

The Republican members of the Task Force and other Republican officials responsible for drafting the 2011 map allegedly worked in a partisan way during the redistricting process, deliberately excluding non-Republicans from much of the drafting process. *Id.* at ¶¶ 44–58, 62–84 (Page ID #300–03, 305–09). The plaintiffs further allege that the Republicans who worked on the 2011 redistricting process aimed to draw a congressional map that "provide[d] for and maintain[ed] Republican control." *Id.* at ¶ 59 (Page ID #304). They therefore crafted a congressional map that "would virtually guarantee" that Republicans won twelve districts and Democrats won four districts. *Id.* at ¶ 61. To do so, the Republican drafters purportedly "packed" Democratic voters into four districts, and then "cracked" Democratic voters across the district lines of the twelve remaining districts. *Id.* at ¶ 60.

The 2011 map has now been used for three congressional elections: 2012, 2014, and 2016. *Id.* at ¶ 86 (Page ID #310). In each election, the Republicans have won the same twelve districts and the Democrats have won the same four districts. *Id.* at ¶¶ 86–87 (Page ID #310). Although each party's number of seats has remained constant across the three elections, the statewide vote share for each party has fluctuated. *Id.* at ¶ 86 (Page ID #310). The plaintiffs allege that these electoral results are the product of partisan gerrymandering. *Id.* at ¶ 85 (Page ID #309). The 2011 map will be in use for two more election cycles: 2018 and 2020. *Id.* at ¶ 42 n.1 (Page ID #300).

In May 2018, the plaintiffs filed suit against Ryan Smith, the Speaker of the Ohio House of Representatives; Larry Obhof, the President of the Ohio Senate; and Jon Husted, the Secretary of State of Ohio, in their official capacities.[2] Dkt. 1 (Initial Compl.) (Page ID #1–44). The plaintiffs can be categorized into two groups. First, there are five organizational plaintiffs: the

---

[2] The plaintiffs also initially named John Kasich, the Governor of Ohio, in his official capacity as a defendant, *see* Dkt. 1 (Initial Compl.) (Page ID #1), but did not name him as a defendant in their Second Amended Complaint, *see* Dkt. 37 (Compl.) (Page ID #286).

2

Ohio A. Philip Randolph Institute ("APRI"), the League of Women Voters of Ohio ("LWVO"), the College Democrats at the Ohio State University ("OSU College Democrats"), the Northeast Ohio Young Black Democrats ("NEOYBD"); and the Hamilton County Young Democrats ("HCYD").  Dkt. 37 (Compl. at ¶¶ 17–21) (Page ID #292–94).

Second, there are seventeen individual plaintiffs who are Democratic voters living in Ohio and who, collectively, reside in all sixteen congressional districts: Linda Goldenhar (1st District), Douglas J. Burks (2nd District), Sarah Inskeep (3rd District), Cynthia Rodene Libster (4th District), Kathryn Deitsch (5th District), Luann Boothe (6th District), Mark John Griffiths (7th District), Lawrence Nadler (8th District), Chitra Walker (9th District), Tristan Rader (9th District), Ria Megnin (10th District), Andrew Harris (11th District), Aaron Dagres (12th District), Elizabeth Myer (13th District), Beth Hutton (14th District), Teresa Anne Thobaben (15th District), and Constance Rubin (16th District).  *Id.* at ¶¶ 22–38 (Page ID #294–99).

The plaintiffs raise four claims.  First, plaintiffs argue that the 2011 map burdens their First Amendment rights because the map was designed purposefully to disfavor them based on their political views.  *Id.* at ¶¶ 136–48 (Page ID #328–30) (Count I).  Next, plaintiffs claim that the 2011 map substantially burdens their right to vote in violation of the Fourteenth Amendment.  *Id.* at ¶¶ 149–55 (Page ID #331–32) (Count II).  Third, the plaintiffs allege that the 2011 map intentionally discriminates against them by drawing district lines to dilute their votes on the basis of political association in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at ¶¶ 156–64 (Page ID #333–35) (Count III).  Finally, the plaintiffs allege that the 2011 map exceeds the state's power under Article I of the U.S. Constitution to run elections because it is a product of partisan gerrymandering.  *Id.* at ¶¶ 165–69 (Page ID #335–36) (Count IV).

The defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 46 (Mot. to Dismiss) (Page ID #448–71). They raise three arguments: (1) the plaintiffs' claims are nonjusticiable; (2) the plaintiffs have failed to allege sufficient facts to establish standing; and (3) laches bars the plaintiffs' claims. *Id.* at 2–3 (Page ID #451–52).

## II. ANALYSIS

The defendants have moved under Rule 12(b)(1) for dismissal for lack of subject matter jurisdiction, arguing that the plaintiffs' claims are nonjusticiable and that the plaintiffs lack standing. "A Rule 12(b)(1) motion for lack for subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). When, as here, the defendants raise a facial attack, "the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.*

Additionally, the defendants move to dismiss the complaint pursuant to Rule 12(b)(6), arguing that the plaintiffs' claims are barred by laches. When analyzing a complaint under Rule 12(b)(6), the Court "construe[s] the complaint in the light most favorable to the plaintiff[s], accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff[s]." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).

### A. Justiciability

The defendants argue that all of plaintiffs' claims are per se nonjusticiable. Dkt. 46 (Mot. to Dismiss at 6–11) (Page ID #456–60). They principally rely upon the Supreme Court's recent decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), and summary affirmance in *Harris v. Cooper*, 138 S. Ct. 2711 (2018). *Id.* at 7–8 (Page ID #456–57). But neither decision, nor any other Supreme

4

Court case cited by the defendants, stands for the proposition that partisan gerrymandering claims are per se nonjusticiable.

The Supreme Court explicitly left open in *Gill* the question of whether partisan gerrymandering claims, brought under any theory of harm, are justiciable. 138 S. Ct. at 1929, 1931. In that decision, the Supreme Court recounted its past decisions in partisan gerrymandering cases in which it had grappled with the question of justiciability. *Id.* at 1926–29 (citing *Gaffney v. Cummings*, 412 U.S. 735 (1973); *Davis v. Bandemer*, 478 U.S. 109 (1986); *Vieth v. Jubelirer*, 541 U.S. 267 (2004); *League of United Latin Am. Citizens v. Perry ("LULAC")*, 548 U.S. 399 (2006)). The Court noted that its "considerable efforts in *Gaffney*, *Bandemer*, *Vieth*, and *LULAC* leave unresolved whether such claims may be brought in cases involving allegations of partisan gerrymandering." *Id.* at 1929. But the thread that runs through these cases is that they may be justiciable if there is a "justiciable standard by which to resolve the plaintiffs' partisan gerrymandering claims." *Id.* at 1928; *see also Vieth*, 541 U.S. at 312 (Kennedy, J., concurring) ("[I]n another case a standard might emerge that suitably demonstrates how an apportionment's *de facto* incorporation of partisan classifications burdens rights of fair and effective representation (and so establishes the classification is unrelated to the aims of apportionment and thus is used in an impermissible fashion.)"); *Gill*, 138 S. Ct. at 1941 (Kagan, J., concurring) ("Over fifty years ago, we committed to providing judicial review in the redistricting arena, because we understood that a denial of constitutionally protected rights demands judicial protection. Indeed, the need for judicial review is at its most urgent in these cases." (internal citation and quotation marks omitted)); *cf. Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015).

The Supreme Court's summary affirmance in *Harris* is in harmony with the teaching of *Gill*. *Harris* stands for the proposition that, when plaintiffs propose no standard for adjudicating a claim of partisan gerrymandering brought under the Equal Protection Clause of the Fourteenth Amendment, the claim is nonjusticiable. *Harris*, 138 S. Ct. 2711; *Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 3129213, at * 2 (M.D.N.C. June 2, 2016); *see also* Pls.' Objs at 30–39, *Harris*, No. 1:13-cv-949 (M.D.N.C. Mar. 3, 2016), ECF No. 157. Thus, to the extent that the defendants rely upon *Harris* to argue that the Supreme Court has held that all partisan gerrymandering claims are nonjusticiable, they vastly overstate their case. *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1800 (2015) ("[A] summary affirmance . . . has 'considerably less precedential value than an opinion on the merits.'" (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180–81 (1979))); *see also Ill. State Bd. of Elections*, 440 U.S. at 182–83 ([T]he precedential effect of a summary affirmance can extend no farther than the precise issues presented and necessarily decided by those actions. A summary affirmance affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment. Questions which merely lurk in the record are not resolved, and no resolution of them may be inferred." (internal citations and quotation marks omitted)).

Here, the plaintiffs propose three metrics that could be incorporated alone or together into a viable legal standard to adjudicate partisan gerrymandering claims. Dkt. 37 (Compl. at ¶¶ 121–129) (Page ID #323–27) (discussing the "efficiency gap," "mean-median difference," and "partisan bias" metrics). In their reply brief, the defendants argue in a conclusory fashion that the plaintiffs have not provided a judicially manageable standard. Dkt. 58 (Mot. to Dismiss Reply Br. at 3–5) (Page ID #613–15). But the defendants make no specific arguments contesting the viability of the plaintiffs' proposed tests. At this stage of the litigation, we cannot decide whether these

proposed frameworks are meritorious, and we will not hold that the plaintiffs' claims are nonjusticiable merely on the possibility that their proposed tests may ultimately prove unworkable. We therefore hold that all of the plaintiffs' claims are justiciable.[3] *See Common Cause v. Rucho*, 279 F. Supp. 3d 587, 636 (M.D.N.C.) (finding plaintiffs' claims that a partisan gerrymander violated the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and Article I of the U.S. Constitution were justiciable), *vacated and remanded*, 138 S. Ct. 2679 (2018); *Shapiro v. McManus*, 203 F. Supp. 3d 579, 600 (D. Md. 2016) (holding justiciable plaintiffs' claims that a partisan gerrymander violated the First Amendment and Article I of the U.S. Constitution).

**B. Standing**

The defendants also argue that the plaintiffs lack standing. Dkt. 46 (Mot to Dismiss at 15–20) (Page ID #464–69).

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, the plaintiff must show: (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and (3) "that the injury will be redressed by a favorable decision." *Id.* at 560–61 (internal quotation marks omitted). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

---

[3] Defendants have argued that the "Court should be circumspect of plaintiffs' invitation to go so far beyond existing precedent" and that a claim of partisan gerrymandering "should be first recognized by the Supreme Court . . . .." Dkt. 46 (Mot. to Dismiss at 9) (Page ID #458). Until the Supreme Court either adopts a manageable test for the constitutionality of a partisan gerrymander or definitively states that no such test exists, it is incumbent on the trial courts to continue evaluating whether standards proposed by litigants are manageable.

1. First Amendment Claim

In Count I, the plaintiffs allege that the 2011 map violates their First Amendment rights. Dkt. 37 (Compl. at ¶¶ 136–48) (Page ID #328–30).

> First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views.  In the context of partisan gerrymandering, that means that First Amendment concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights.

*Vieth*, 541 U.S. at 314 (Kennedy, J., concurring).

    a. Injury-In-Fact

In her concurrence in *Gill*, Justice Kagan—joined by three other Justices—explained the standing requirements for a partisan gerrymandering First Amendment claim.  Justice Kagan stated that the injury arising under this theory of harm is "that the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects."  *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring).  "Because on this . . . theory, the valued association and the injury to it are statewide, so too is the relevant standing requirement."  *Id.*

Here, the plaintiffs have alleged that the 2011 map burdens the ability of the "individual [p]laintiffs, OSU College Democrats, NEOYBD, HCYD, and Democratic members of the organizational plaintiffs" to "associate and participate in the political process."  Dkt. 37 (Compl. at ¶ 144) (Page ID #329–30).  They allege that the map "burdens or penalizes voters who choose to support the Democratic Party or Democratic candidates based upon the voters' past participation in the political process, their voting history, their association with a political party, and their expression of their political views."  *Id.*  Furthermore, they allege that "[t]here was no legitimate

8

state interest in this partisan manipulation of district boundaries, much less a compelling one, nor was the gerrymander narrowly tailored to achieve any state interest." *Id.* at ¶ 148 (Page ID #330).

The individual plaintiffs have each alleged specific facts demonstrating a "concrete and particularized" injury. *Lujan*, 504 U.S. at 560. They each "emphasize their membership in [the Democratic] party, or their activities supporting it." *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring); *see* Dkt. 37 (Compl. at ¶¶ 22—38) (Page ID #294–99). And the individual plaintiffs allege that they have suffered "tangible associational burdens—[in other words,] ways the gerrymander ha[s] debilitated their party or weakened its ability to carry out its core functions and purposes." *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring); *see* Dkt. 37 (Compl. at ¶¶ 140, 144–46) (Page ID #329–30).

The organizational plaintiffs have also all alleged injuries-in-fact on their own behalf. The OSU College Democrats, NEOYBD, and HCYD each allege that the 2011 map burdens their ability to carry out their partisan activities by specifically disfavoring the Democratic party. *Id.* at ¶¶ 19–21, 140, 144–46 (Page ID #293–94, 329–30); *see Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). APRI and LWVO allege that the 2011 map "weaken[s] [their] ability to carry out [their] core functions and purposes," *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring), because the map "mak[es] it more difficult to engage voters through [their] education, registration, and outreach efforts, and by deterring and discouraging [their] members and other Ohio voters from engaging in the political process," Dkt. 37 (Compl. at ¶¶ 17–18) (Page ID #292–93). *See also League of Women Voters of Michigan v. Johnson*, No. 2:17-cv-14148, slip op. at 13 (E.D. Mich. May 16, 2018), ECF No. 54 ("[T]he League's mission of increasing engagement in the political process could be plausibly impaired if, as the League alleges, Defendant retaliated against a large segment of the populace for participating in the political process.").

Finally, all of the organizational plaintiffs have standing to bring the First Amendment claim on behalf of their members.

> An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The organizational plaintiffs allege that the 2011 map burdens the First Amendment rights of their Democratic members. Dkt. 37 (Compl. at ¶ 144) (Page ID #329–30). These members would otherwise have standing to sue in their own right, as Democrats involved in activities supporting either the Democratic party directly or through voter outreach. *See infra*. And these claims are connected to the respective missions of the organizational plaintiffs. Dkt. 37 (Compl. at ¶¶ 17–21) (Page ID #292–94). Finally, the relief requested by the organizational plaintiffs does not require the participation of the individual members. *Id.* at ¶¶ A–J (Page ID #336–38).

In sum, all of the plaintiffs have sufficiently pleaded an injury-in-fact that satisfies the standards articulated in Justice Kagan's concurrence in *Gill*.

Alternatively, a three-judge district court panel in the District of Maryland has advanced and applied a different theory of the injury-in-fact a plaintiff must establish to assert a partisan gerrymandering claim premised on a violation of the First Amendment. *Shapiro*, 203 F. Supp. 3d at 595–98. The plaintiffs have satisfied the injury-in-fact standard articulated under this theory as well. The *Shapiro* panel held that to establish injury "the plaintiff must show that the challenged map diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect. In other words, the vote dilution must make some practical difference." *Shapiro*, 203 F. Supp. 3d at 597. This is because:

> [W]hat implicates the First Amendment's prohibition on retaliation is not the use of data reflecting citizens' voting history and party affiliation, but the use of such data for the purpose of making it harder for a particular group of voters to achieve electoral success because of the views they had previously expressed.

*Id.*

The individual plaintiffs in the instant case have sufficiently pleaded an injury-in-fact that satisfies this standard. They have alleged that the 2011 map deliberately diluted the votes of Democrats, either by packing or cracking them, to such an extent that even though Democrats have won between 39% to 47% of the statewide vote share in the last three congressional elections, they have only ever won 25% of the congressional seats. Dkt. 37 (Compl. at ¶¶ 86–90) (Page ID #310–11). Similarly, the OSU College Democrats, NEOYBD, and HCYD have alleged that the 2011 map has tangibly burdened their efforts to achieve electoral success on behalf of the Democratic party because the map was designed to disfavor that party. *Id.* at ¶¶ 19–21 (Page ID #293–94). Likewise, APRI and LWVO have alleged that the vote dilution has had the adverse effect of discouraging its members and other voters from "engaging in the political process," thereby hampering the organizations' missions to promote civic engagement. *Id.* at ¶¶ 17–18 (Page ID #292–93); *see also League of Women Voters of Michigan*, No. 2:17-cv-14148, slip op. at 13. Finally, the organizational plaintiffs also have associational standing to assert the individual First Amendment claims of their members, who are allegedly individually harmed by the vote dilution in the same ways the individual plaintiffs and the organizations themselves are harmed. *See* Section II.B.2 *infra*.

  b. Traceability

The plaintiffs must also plead sufficient facts alleging that the injury they have suffered "is fairly traceable to the challenged action of the defendant." *Friends of the Earth*, 528 U.S. at 180. They have done so. The plaintiffs have alleged facts that, if true, would show that the state drew

11

the map with the express purpose of burdening a disfavored party and that they succeeded in accomplishing this purpose. Dkt. 37 (Compl. at ¶¶ 44–58, 62–84, 86–87) (Page ID #300–03, 305–10).

        *c. Redressability*

Finally, the plaintiffs have established that a favorable decision would redress their alleged First Amendment injury because they seek an injunction that prohibits the state from drafting congressional maps with the purpose of burdening a group's representational rights on the basis of "their political beliefs, political party membership, registration, affiliations or political activities, or voting histories." *Id.* at ¶ G (Page ID #338).

    2. <u>Fourteenth Amendment Claims</u>

In Counts II and III of their complaint, the plaintiffs assert vote dilution partisan gerrymandering claims, alleging that their Fourteenth Amendment rights have been violated. *Id.* at ¶¶ 149–64 (Page ID #331–35).

        *a. Injury-In-Fact*

In *Gill*, the Supreme Court held that the injury in a vote dilution case arises "from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931; *see also Gill*, 138 S. Ct. at 1935–36 (Kagan, J., concurring) ("[P]acking and cracking are the ways in which a partisan gerrymander dilutes votes. . . . When a voter resides in a packed district, her preferred candidate will win no matter what; when a voter lives in a cracked district, her chosen candidate stands no chance of prevailing. But either way, such a citizen's vote carries less weight—has less consequence—than it would under a neutrally drawn map.").

Therefore, at the motion-to-dismiss stage, the individual plaintiffs must allege sufficient facts establishing that they live in a packed or cracked district and thus their votes have been diluted. *Cf. Gill*, 138 S. Ct. at 1932, 1934 (reversing and remanding on the basis that the plaintiffs failed to prove standing at the trial stage because "it appears that not a single plaintiff sought to prove that he or she lives in a cracked or packed district"). Analogously, the organizational plaintiffs must show that some of their membership lives in packed or cracked districts and have thereby suffered vote dilution in order to establish associational standing. *Cf. Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1268–70 (2015).

Plaintiffs Inskeep (3rd District), Walker (9th District), Rader (9th District), Harris (11th District), and Myer (13th District) all allege that they live in packed districts and consequently their vote has been diluted. Dkt. 37 (Compl. at ¶¶ 24, 30–31, 33, 88–96) (Page ID #295, 297–98, 310–14). Plaintiffs Goldenhar (1st District), Burks (2nd District), Libster (4th District), Deitsch (5th District), Boothe (6th District), Griffiths (7th District), Nadler (8th District), Megnin (10th District), Dagres (12th District), Hutton (14th District), Thobaben (15th District), and Rubin (16th District) all allege that they live in cracked districts and consequently their vote has been diluted. *Id.* at ¶¶ 22–23, 25-29, 32, 34, 36–38, 97–120 (Page ID #295–299, 314–23). For purposes of the motion to dismiss, we must assume it is true that each individual plaintiff lives in the district he or she claims as a residence and that each district is either packed or cracked; the plaintiffs will need to prove these factual allegations at a later stage. *See Gill*, 138 S. Ct. at 1932, 1934.[4]

---

[4] We note that the metrics proposed by the plaintiffs for measuring partisan gerrymandering—and thus the packing and cracking of districts—are mainly framed in statewide terms. *See, e.g.*, Dkt. 37 (Compl. at ¶ 124) (Page ID #325) ("[The efficiency gap] ratio can then be multiplied by the number of congressional districts in the state to quantify the efficiency gap in terms of a number of seats."); *id.* at ¶ 125 (Page ID #325) (describing one calculation of how many "extra" congressional seats may have been won by Republicans statewide because of the 2011 map); *id.* at ¶ 126 (Page ID #325) (stating that the "mean-median difference" looks at a party's mean district vote percentage compared to its median district vote percentage to determine if there is a meaningful asymmetry); *id.* at ¶ 128 (Page ID #326) (describing the "partisan bias" metric as "taking the two parties' statewide vote share in a particular election, and then imposing a uniform swing of the magnitude necessary to make the parties split the statewide vote equally.");

The organizational plaintiffs have also each alleged that they have members who live in packed or cracked districts and who are burdened by vote dilution. Dkt. 37 (Compl. at ¶¶ 17–21, 120, 155, 163–64) (Page ID #292–94, 323, 332, 335). The defendants argue that the organizational plaintiffs have failed to identify specific members who live in cracked or packed districts and thus cannot show associational standing. Dkt. 46 (Mot. to Dismiss at 19) (Page ID #468). But, at the motion-to-dismiss stage, the organizational plaintiffs do not need to provide a membership list if a "common sense inference" supports their factual allegation that they have members in cracked or packed districts. *Ala. Legislative Black Caucus*, 135 S. Ct. at 1269. Such an inference can be drawn here. The organizational plaintiffs have members who are Democratic voters in Ohio. Dkt. 37 (Compl. at ¶¶ 17–21, 120, 155, 163–64) (Page ID #292–94, 323, 332, 335). As the plaintiffs allege that every district in Ohio is either cracked or packed, *id.* at ¶¶ 88, 98 (Page ID #310, 315), the "common sense inference" is that the members of the organizational plaintiffs who are Democratic voters are burdened by vote dilution, either by living in a cracked district or in a packed district. *Cf. League of Women Voters of Michigan*, No. 2:17-cv-14148, slip op. at 15. Again, the plaintiffs will ultimately have to prove that this reasonable inference is true, but their pleadings are sufficient at this stage of the litigation.

Finally, the organizational plaintiffs also have pleaded sufficient facts to establish injury-in-fact on their own behalf. They allege that the substantial burden imposed on voters through

---

*but see id.* at ¶ 124 (Page ID #325) ("Though the efficiency gap is a statewide measure, just like a redistricting plan, it is made up of the votes from each separate district. The process of calculating the efficiency gap readily shows which districts have been cracked and which have been packed."). Consistent with *Gill*, the plaintiffs will be required to show "the effect that [the alleged] gerrymander has on the votes of particular citizens," not simply "the effect that [the alleged] gerrymander has on the fortunes of political parties." *Gill*, 138 S. Ct. at 1933. Average statewide measures will not suffice. *Id.* Furthermore, even if the plaintiffs demonstrate that there was political asymmetry or a lack of efficiency in the political map that diluted their right to vote, they will need to articulate a test that allows the Court to determine whether the level of asymmetry or inefficiency rises to an unconstitutional level. *See* Section II.A. *supra*.

14

vote dilution hampers their own voter-outreach missions to engage voters in the political process. Dkt. 37 (Compl. at ¶¶ 17–21) (Page ID #292–94).

### b. Traceability

The defendants argue that none of the plaintiffs have established that their injuries are "fairly traceable" to the 2011 map. Dkt. 46 (Mot. to Dismiss at 19) (Page ID #468). Instead, the defendants argue, any injury suffered by the plaintiffs "is traceable to voting decisions voters made in 2010 and then continued to make in 2012 and thereafter." *Id.* at 20 (Page ID #469).

In essence, the defendants are arguing that Ohio's sixteen congressional districts neither pack nor crack Democratic voters and that the results of the elections utilizing this map are not evidence of partisan gerrymandering, but rather reflect the democratic process. The defendants' argument goes to the merits of this case, however, and not to whether the plaintiffs have sufficiently pleaded standing. Taking the factual allegations in the complaint as true, the plaintiffs have sufficiently pleaded facts showing that Democratic voters in Ohio have suffered vote dilution—either via packing or cracking—and that this dilution is causally connected to the 2011 map and the process by which it was created. Dkt. 37 (Compl. at ¶¶ 44–58, 62–84, 86–88, 98) (Page ID #300–03, 305–10, 315).

### c. Redressability

Lastly, the plaintiffs have established that a favorable decision would redress their alleged Fourteenth Amendment injuries because they seek an injunction that prohibits the state from utilizing the 2011 map in future elections and for this Court to establish a congressional map that is not a partisan gerrymander that dilutes their vote if the state fails to do so. *Id.* at ¶¶ D–F (Page ID #337).

3. Article I Claim

In Count IV, the plaintiffs allege that the 2011 map violates Article I of the U.S. Constitution. *Id.* at ¶¶ 165–69 (Page ID #335–36).

"[T]he requirement of Article I, § 2, that one person's vote in a congressional election 'is to be worth as much as another's' provides the premise for recognizing vote 'dilution' as a burden on citizens' representational rights, since dilution compromises the equal value requirement." *Shapiro*, 203 F. Supp. 3d at 595 (internal citation omitted) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964)). And dilution can happen not only through malapportionment, but also through gerrymandering. *Id.*

The three-judge district court panel in *Shapiro* applied the same theory of injury to the plaintiffs' Article I claims as to their First Amendment claims. *Id.* at 597. As we have already analyzed the plaintiffs' standing to bring First Amendment claims under the theory articulated in *Shapiro* and concluded that they do have standing, *see* Section II.B.1 *supra*, we hold that the plaintiffs also have standing to bring their Article I claims for the same reasons.

**C. Laches**

Lastly, the defendants move to dismiss under Rule 12(b)(6), arguing that all of the plaintiffs' claims are barred by laches. Dkt. 46 (Mot to Dismiss at 11–15) (Page ID #460–64).

"Where a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *ACLU of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004). However, "[l]aches only bars damages that occurred before the filing date of the lawsuit." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002). "It does not prevent plaintiff[s] from obtaining injunctive relief or post-filing damages." *Id.*; *accord Danjaq LLC v.*

*Sony Corp.*, 263 F.3d 942, 959–60 (9th Cir. 2001) ("Laches stems from prejudice to the defendant occasioned by the plaintiff's past delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's ongoing behavior that threatens future harm."); *see also Concerned Citizens of S. Ohio, Inc. v. Pine Creek Conservancy Dist.*, 429 U.S. 651, 653, 656 (1977) (allowing a party to proceed with its constitutional challenges against a conservation district over a dissenting opinion in which Justice Rehnquist argued that the case should have been barred by laches because the district was formed in 1966 and the lawsuit was not filed until 1975); *cf. Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) ("A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time" by a statute of limitations.).[5]

Here, the plaintiffs are seeking declaratory and injunctive relief. Dkt. 37 (Compl. at ¶¶ A–J). There are not seeking a remedy for any harm that they alleged occurred prior to the filing of their lawsuit, but seek prospective relief only. Consequently, the plaintiffs' suit is not barred by laches. *Nartron Corp.*, 305 F.3d at 412.

### III. CONCLUSION

For the foregoing reasons, we **DENY** the defendants' motion to dismiss (Dkt. 46).

ENTERED: **8/15/18**

S/ Karen Nelson Moore
Signed for and on behalf of the panel:

---

[5] The defendants implicitly suggest that this Court should apply the doctrine of laches as articulated by state law—here, Ohio—rather than federal law. Dkt. 46 (Mot. to Dismiss at 12) (Page ID #461). Which law of laches this Court should apply to U.S. constitutional claims asserted under 42 U.S.C. § 1983 appears to be unsettled. *Cf. Teamsters & Emps. Welfare Tr. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881 (7th Cir. 2002); *Shropshear v. Corp. Counsel of City of Chicago*, 275 F.3d 593, 595–96 (7th Cir. 2001). We need not definitively decide this issue, however, because there is no significant difference between the doctrine of laches as applied by the Sixth Circuit and the Ohio Supreme Court in cases such as this. *See Wilson v. Kasich*, 963 N.E.2d 1282, 1284 (Ohio 2012) (declining to apply laches to bar parties' suit against an apportionment plan that was to be used in future elections that were not imminent).

                        HONORABLE KAREN NELSON MOORE
                        United States Circuit Judge

                        HONORABLE TIMOTHY S. BLACK
                        United States District Judge

                        HONORABLE MICHAEL H. WATSON
                        United States District Judge