UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*, | ) ) ) | No. 1:18cv357 |
| Plaintiffs, | ) ) | ORDER GRANTING IN PART, AND DENYING IN |
| v. | ) ) | PART, PLAINTIFFS' MOTION TO COMPEL |
| RYAN SMITH, *et al.*, | ) ) | COMPLIANCE WITH SUBPOENAS SERVED ON |
| Defendants. | ) ) | EDWARD GILLESPIE AND JOHN MORGAN |

**Before: Moore, Circuit Judge; Black and Watson, District Judges.**

This case is before the Court on Plaintiffs' motion to compel compliance with subpoenas served on third-parties Edward Gillespie and John Morgan as well as the parties' responsive memoranda.[1]

## I.   INTRODUCTION
**A.   Background.**

This case is a challenge to Ohio's current United States congressional redistricting plan ("Map") and each of its component districts. Plaintiffs allege the Map is an

---

[1] Plaintiffs' motion ("Motion" or "Mtn.")—which was filed in the United States District Court for the District of Columbia before its transfer here—was originally opened in this Court as Doc. 1 in Case No. 18-mc-30. The parties have filed the following responsive pleadings: (1) Respondents' Brief in Opposition ("Memo. in Opp.," filed in Case No. 1:18-mc-30 at Doc. 4), (2) Plaintiffs' Reply (filed in Case No. 1:18-mc-30 at Doc. 6) and (3) Respondents' Supplemental Memorandum Opposing Plaintiffs' Motion (filed in this case at Doc. 90).

unconstitutional partisan gerrymander that violates the First Amendment, the Fourteenth Amendment, and Article I of the United States Constitution.

Plaintiffs allege that, in anticipation of the 2010 Census, the Republican State Leadership Committee ("RSLC"), a national organization designed to elect Republicans to state-level offices, formulated a strategy to solidify and increase Republican control of state legislatures in states where the congressional redistricting process would be controlled by those legislative bodies. (Second Amended Complaint at ¶ 44). To implement this strategy, the RSLC organized and implemented the REDistricting Majority Project ("REDMAP"). (*Id.* at ¶ 45). REDMAP aimed to control the redistricting process in certain states to have the greatest impact on determining how both state legislative and congressional district boundaries would be drawn, to solidify conservative policymaking at the state level, and to maintain a Republican stronghold in the U.S. House of Representatives for the next decade. (*Id.* at ¶ 45).

Plaintiffs allege Ohio was one of the states targeted by the RSLC under REDMAP and that the RSLC spent nearly $1 million on races for the Ohio House of Representatives in advance of the 2010 election. (Second Amended Complaint at ¶ 46). In 2010, the Republican Party "captured" the Ohio House of Representatives, bringing Ohio under single-party control of the Republican Party. (*Id.*)

After the November 2010 elections, Plaintiffs allege, the Republican Party shifted its focus to help state map drawers in their efforts to capture more seats through redistricting. They did this in part by utilizing the single-party control of the Ohio General Assembly to dictate the drawing of Ohio's U.S. congressional map. (*Id.* at ¶ 47).

Plaintiffs claim the Republican party engaged Republican operatives Ray Dirossi, Heather Mann, Tom Whatman, and Adam Kincaid to undertake research and other activities deemed necessary for drafting the congressional map. (*Id.* at ¶¶ 52, 55). Plaintiffs assert the redistricting operations were based out of a secretly-rented hotel room at the DoubleTree Hotel in Columbus, Ohio, referred to as "the bunker" by Republicans involved in the redistricting. (*Id.* at ¶ 57).

Plaintiffs allege Ohio's congressional map was designed to maintain and increase Republican control by packing Democrats into four districts, and cracking Democratic voters across the remaining 12 districts, to ensure Republicans would maintain a 12-4 advantage in Congress. (Second Amended Complaint at ¶¶ 59-61). Governor Kasich signed the initial Map, HB 319, into law on September 26, 2011. (*Id.* at ¶ 69). On December 14, 2011, Republican Senator Keith Faber introduced a revised Map in the Ohio Senate. (*Id.* at ¶ 83). On December 15, 2011, Governor Kasich signed the revised map, HB 369, into law. (*Id.* at ¶ 84).

Plaintiffs argue that the Map burdens their rights under the First and Fourteenth Amendments and exceeds the state's power under Article I of the U.S. Constitution because it is a product of partisan gerrymandering.

### B. Plaintiffs' subpoenas and the third parties' responses.[2]

On June 15, 2018, counsel for Plaintiffs prepared subpoenas to be served on Mr. Gillespie and Mr. Morgan. (Declaration of Michael Baker ("Baker Dec.") at ¶ 8).[3] Mr. Gillespie was served with the subpoena on June 18, 2018, and Mr. Morgan was served on June 22, 2018. (*Id.*)

#### 1. Mr. Gillespie.

Mr. Gillespie is a Republican who has actively supported his political party for more than thirty years. (Declaration of Edward Gillespie ("Gillespie Dec.") at ¶ 3).[4] Among other things, he has served as Counselor to the President of the United States for President George W. Bush, chaired the Republican Party of Virginia and the Republican National Committee, was a Republican nominee for Governor and the United States Senate in his home state of Virginia, and advised a number of candidates seeking election to state and federal office. (*Id.*)

On February 4, 2011, Mr. Gillespie was elected to the Board of Directors of the RSLC and became Chairman of the Board on that date. (Gillespie Dec. at ¶ 4). Prior to February 4, 2011, Mr. Gillespie served as Honorary Chairman to the RSLC beginning in 2010. (*Id.*) The RSLC is a political organization designed to elect Republicans to state

---

[2] Many of the facts that follow are drawn from several declarations submitted by the parties in this matter. The Court's recitation of these facts here does not resolve any factual disputes the parties might have, and nothing herein is meant to foreclose further exploration of these assertions by the parties.

[3] The Declaration of Michael Baker is filed in Case No. 1:18-mc-30 at Doc. 1-2.

[4] Mr. Gillespie's Declaration is filed in Case No. 1:18-mc-30 at Doc. 4-1.

level offices. (*Id.* at ¶ 5). As part of his work as Chairman of the RSLC, Mr. Gillespie supported fundraising for RSLC projects, including project REDMAP, which sought to win majorities in state legislative chambers so Republicans could control the redistricting process in their states. (*Id.* at ¶ 6). Mr. Gillespie was not a staff member of RSLC, so whenever he conducted work related to RSLC via email, he would copy staff or other employees of RSLC who were responsible for the day-to-day operations of RSLC as a regular practice. (*Id.* at ¶ 7).

Mr. Gillespie states that he was not involved in drawing Ohio's congressional districts in 2011, he did not "guid[e] state Republican officials in creating a map to maximize the Republican share of Ohio's congressional delegation," he was not a participant (much less a "central" participant) in creating Ohio's 2011 congressional map, and he did not have an "intent to entrench a Republican majority in Ohio's congressional delegation through unconstitutional means." (Gillespie Dec. at ¶¶ 10-14).

    2.  <u>Mr. Gillespie's response to Plaintiffs' subpoena</u>.

Mr. Gillespie claims that, because he was not involved in drawing Ohio's congressional districts in 2011, he did not think he would have any documents related to it. (Gillespie Dec. at ¶ 14). Mr. Gillespie relied on an electronic discovery vendor to search two e-mail accounts and locate documents that could be related to redistricting in Ohio in 2011. (*Id.*) Mr. Gillespie searched his electronic files for documents created between February 1, 2011 and December 31, 2011, using the following search parameters: "Ohio" OR "redistrict!". (McKnight Dec. at ¶ 6); Mem. in Opp. at 5; (Baker Dec. at ¶ 12). None of the documents pulled from that search were related to drawing

5

Ohio's congressional map in 2011. (Gillespie Dec. at ¶ 14). Mr. Gillespie states that he searched his physical files as well and did not find any documents related to the drawing of Ohio's congressional map in 2011. (*Id.* at ¶ 15).

The two email accounts Mr. Gillespie searched were:
(1) ed@edgillespiestrategies.com, and (2) a Yahoo account. (Gillespie Dec. at ¶ 14). These were the only email accounts Mr. Gillespie used in 2011. (*Id.* at ¶ 10). Mr. Gillespie previously had an email account with AOL but stopped relying on that email account around the time he accepted a position in the White House in June of 2007. (*Id.* at ¶ 8). Mr. Gillespie does not know how to access his AOL account today. (*Id.*)

      3. <u>Mr. Morgan</u>.

Mr. Morgan is a professional demographer and regularly provides services to states and localities responsible for drawing electoral maps. (Declaration of John Morgan ("Morgan Dec.") at ¶ 3).[5] These map drawing services include technical support in using complex redistricting software programs. (*Id.*)

In the 2011-2012 cycle, following the release of 2010 Census data, Mr. Morgan provided services related to congressional, legislative, and local plans in eleven different states: Connecticut, Indiana, Kansas, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, South Carolina, and Virginia. (Morgan Dec. at ¶ 6). The services Mr. Morgan provided varied by locality. (*Id.*)

---

[5] The Declaration of John Morgan is filed in Case No. 1:18-mc-30 at Doc. 4-3.

In Ohio, Mr. Morgan provided technical and map drawing redistricting services—for efforts related to both legislative and congressional redistricting—in July, August, and September of 2011. (Morgan Dec. at ¶ 7). Mr. Morgan visited Ohio twice in July to provide in-person, on-site training and guidance to the map drawers. (*Id.* at ¶ 8). Beyond those two visits, Mr. Morgan states that his work supporting Ohio's redistricting efforts was extremely limited, amounting to fewer than 30 hours over the span of three months. (*Id.* at ¶ 9). Of the time Mr. Morgan worked for Ohio, more time was spent supporting legislative redistricting efforts than congressional redistricting efforts because of complications with the geographic data required for legislative redistricting. (*Id.*)

Mr. Morgan claims it is unlikely that he would use email to provide technical support remotely because it is much easier and more efficient to provide support by telephone or through a "go to meeting" arrangement where participants can log into the meeting via the internet and view the maps at issue and the software commands necessary to resolve any problems. (Morgan Dec. at ¶ 11). The Ohio congressional map produced after the 2010 Census was not drawn using Mr. Morgan's computer, and he does not have any "draft maps" on his computer. (*Id.* at ¶ 12).

    4. <u>Mr. Morgan's response to Plaintiffs' subpoena</u>.

In the regular course of his business, Mr. Morgan maintains paper and electronic files related to projects. (Morgan Dec. at ¶ 13). In order to respond to Plaintiffs' subpoena, Mr. Morgan searched his personal files—paper and electronic—for materials related to his work supporting the Ohio congressional redistricting in 2011. (*Id.* at ¶ 14). Mr. Morgan states that he produced all materials related to his work for Ohio's

congressional redistricting following the 2010 census, including all invoices for his work and data files. (*Id.* at ¶ 15).

Mr. Morgan searched his project files and email records from 2011. He focused on his contacts for the work in Ohio and identified only one email relating to his work supporting redistricting in Ohio in 2011. (Morgan Dec. at ¶ 16). That email related to supporting the redistricting of Ohio's legislative plan, not the congressional plan at issue in this lawsuit. (*Id.* at ¶ 17). Mr. Morgan claims he does not have: (1) written communications with national Republican operatives concerning his work with Republican mapdrawers in Ohio regarding the congressional map, (2) written communications indicating that his fees were paid for by national Republican organizations, consistent with Mr. Janikowski's letter to state legislative leaders, or (3) written communications with Republican mapdrawers in Ohio indicative of their intent to entrench a Republican majority in the state's congressional delegation through unconstitutional means. (*Id.* at ¶ 18).

To date, Mr. Morgan has produced 11 documents as well as a set of data. (Baker Dec. at ¶ 20).

## II. STANDARD

Pursuant to the Federal Rules of Civil Procedure, parties may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the party's resources, the importance of the discovery in resolving the issues, and whether

the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Rule 37 authorizes a party to "move for an order compelling an answer, designation, production, or inspection" if, *inter alia*, "a party fails to answer an interrogatory submitted under Rule 33," or "a party fails to produce documents or fails to respond that inspection will be permitted . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(b)(iii)-(iv). A district court enjoys broad discretion in managing discovery, and, accordingly, denials of motions to compel are reviewed only for an abuse of discretion. *See Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993).

### III.    ANALYSIS

**A.    Mr. Gillespie.**

Plaintiffs argue Mr. Gillespie's response to the subpoena is deficient because Mr. Gillespie's search was too limited in its temporal scope, Mr. Gillespie's search terms were inadequate, and Mr. Gillespie failed to search all of his email accounts.

     1.    <u>Temporal scope</u>.

The Requests for Production in Plaintiffs' subpoena to Mr. Gillespie do not contain date limitations. (*See* Mtn. at Ex. G). Mr. Gillespie limited his search for documents to files and documents created between February 1, 2011, and December 31, 2011. (Baker Dec. at ¶ 12). Mr. Gillespie argues this timeframe is reasonable, as it would capture any responsive materials pre-dating the release of Census data by over a month as well as responsive materials through the end of the year after the Map was signed into law. (Memo. in Opp. at PID # 240).

Plaintiffs respond that, by limiting his search to documents created on or after February 1, 2011, Mr. Gillespie has excluded from his review the entire first phase of REDMAP during which Plaintiffs allege the RSLC sought to win Republican control of the Ohio General Assembly for the express purpose of controlling the redistricting process. (Mtn. at PID # 18). Plaintiffs also argue that, by failing to include documents created after December 2011, Mr. Gillespie's search excludes documents pertaining to the first election that occurred under the new map in 2012. (Reply at PID # 284).

The Court agrees with Plaintiffs. Documents created prior to February 2011 and responsive to Plaintiffs' subpoena are relevant to Plaintiffs' allegations pertaining to the first step of REDMAP, *i.e.*, that Defendants intended to, and did, gain control of the Ohio redistricting process by "flipping" the Ohio House of Representatives in the November 2010 election. (*See* Second Amended Complaint at ¶¶ 45-47). Documents created between December 2011 and December 2012 and responsive to Plaintiffs' subpoena are relevant to whether the Map worked as intended. *See Common Cause v. Rucho*, 318 F. Supp. 3d 777, 803 (M.D. N.C. 2018), *appeal docketed* (U.S. Supreme Court, No. 18-422) (citing project REDMAP as part of the map drawing process in North Carolina's 2016 congressional maps).

The parties' correspondence indicates Plaintiffs offered to limit the temporal scope of their requests on several occasions prior to filing the motion to compel. The Court finds Plaintiffs' most recent proposal—that Mr. Gillespie search for responsive documents created on or after January 1, 2010 to December 31, 2012—to be appropriate and proportionate to the needs of the case. (*See* Mtn. at Ex. P).

2. <u>Search Terms</u>.

Plaintiffs argue Mr. Gillespie's search for responsive documents was deficient because Mr. Gillespie used only two search terms, "Ohio" and "redistrict!". Plaintiffs contend Mr. Gillespie's search would overlook documents that do not expressly state Mr. Gillespie and state party officials are discussing the 2011 Ohio redistricting process. (Mtn. at PID # 18). Mr. Gillespie claims this search constitutes a good faith effort to respond to Plaintiffs' subpoena. (Memo. in Opp. at PID # 252).

"[A]n individual served with a subpoena duces tecum has an obligation to conduct a reasonable search to ensure that non-privileged documents that are relevant . . . are produced." *Alexander v. FBI*, 186 F.R.D. 21, 38 (D. D.C. 1998).

"[K]eyword searching permits a party to efficiently identify documents containing a specific word or combination of words." *L-3 Commc'ns Corp. v. Sparton Corp.*, 313 F.R.D. 661, 666 (M.D. Fla. 2015) (citations omitted). "While the utility of keyword searching is widely accepted, keyword searches are not a perfect tool for distinguishing relevant documents from irrelevant ones." *Id.* "The effectiveness of keyword searches can be measured by several metrics," the most basic of which are "precision"—the percentage of documents retrieved by the methods that are relevant—and "recall"—the percentage of all relevant documents in the search universe that are retrieved by that search method. *Id.* (citing <u>The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery</u>, 8 Sedona Conf. J. 189, 237 (2008)).

11

Designing search terms to be used to produce emails or other electronically stored information requires "careful thought, quality control, testing, and cooperation with opposing counsel." *William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 134 (S.D.N.Y. 2009). Additionally, because "[t]he party responsible for production will usually be most familiar with its own records . . . [e]fficiently crafting search terms requires 'input from . . . custodians as to the words and abbreviations they use.'" *See L-3 Commc'ns Corp.*, 313 F.R.D. at 667 (citing *William A. Gross*, 256 F.R.D. at 136). Lawyers should not design "keyword searches in the dark, by the seat of the pants without adequate . . . discussion with those who wrote the emails." *William A. Gross*, 256 F.R.D. at 135.

Importantly, "the party selecting the methodology must be prepared to explain the rationale for the method chosen to the court, demonstrate that it is appropriate for the task, and show that it was properly implemented." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 262 (D. Md. 2008).

Here, there is no evidence as to who crafted the search terms used to search Mr. Gillespie's files. If the search terms were crafted by Mr. Gillespie's counsel, or the third-party vendor who conducted the search, there is no evidence that the terms were drafted with input from Mr. Gillespie as to the words and abbreviations that he uses. The search terms were not negotiated with opposing counsel. There is no evidence before the Court, in the form of quality control or other testing, to suggest these were appropriate search terms. Simply put, Mr. Gillespie has not sufficiently explained the rationale for the search terms he used, nor has he demonstrated that these terms are an appropriate method

for locating documents responsive to Plaintiffs' subpoena. Accordingly, the Court finds Mr. Gillespie did not conduct a reasonable search for documents responsive to Plaintiffs' subpoena.

That Mr. Gillespie's search terms are inadequate is demonstrated by the fact that his search would not have found an email from Chris Jankowski, the former RSLC president, sent on June 15, 2010 to, *inter alia*, Mr. Gillespie, discussing fundraising related to REDMAP, and referencing "Tier 1" states, including Ohio.[6] (Mtn. at Ex. E). Mr. Jankowski's email does not use either "Ohio" or any form of the word "redistrict" and shows that individuals could, and did, communicate about Ohio's 2011 redistricting without using either of those terms.

Having determined Mr. Gillespie's search was inadequate, the Court must decide what to do about it. Ordinarily, the Court "is loathe to decide the search terms to be used because the parties are far better positioned to do so." *Saliga v. Chemtua Corp.*, Case No. 3:12cv832, 2013 U.S. Dist. LEXIS 167019, at *10 (D. Conn. Nov. 25, 2013). But the parties here have tried, and failed, to resolve the issue, so the Court must do so. *Id.* at *11. Upon review, the Court finds Plaintiffs' most recent set of proposed search terms—set forth in Plaintiffs' Reply Brief—to be appropriate.[7]

---

[6] Ohio is a Tier 1 state. (Mtn. at PID # 93).

[7] Plaintiffs' Reply lists a set of search terms that were listed in an August 24, 2018, letter. (Reply at PID # 290). The Court notes that the search terms in Plaintiffs' Reply Brief contain more limiting terms than the search terms listed in Plaintiffs' August 24, 2018, letter. The Court finds the list set forth in Plaintiffs' Reply Brief to be the most appropriate list of search terms.

13

The subject matter specific search terms "Bunker," "HB 369," "HB 319," and "REDMAP" are all expressly referenced in the Complaint. (Second Amended Complaint at ¶¶ 3, 45, 65, 79).[8] The Court finds that documents containing these terms are likely to be responsive to the subpoena served on Mr. Gillespie, including but not limited to Requests for Production 1, 3, 5, and 13, relevant to Plaintiffs' claims, and proportionate to the needs of this case.

Plaintiffs represent that the remaining subject matter specific search term, "Timken," was proposed to identify documents discussing a last-minute request by the executive director of a political organization affiliated with John Boehner to move the headquarters of the Timken Company into Representative Jim Renacci's district to preserve a source of campaign donations. (Mtn. at PID # 14, n. 2). The Court finds documents containing this term are likely to be responsive to the subpoena served on Mr. Gillespie, including but not limited to Request for Production 6, relevant to Plaintiffs' claims, and proportionate to the needs of this case.

The names "Mann," "DiRossi," "Kincaid," "Whatman," and "Faber" are expressly referenced in the Complaint as individuals involved in and/or with knowledge of the facts and events alleged therein. (Second Amended Complaint at ¶¶ 52, 55, 83). The Court finds documents containing these names, with the limiting terms provided in the list in Plaintiffs' Reply, are likely to be responsive to the subpoena served on Mr. Gillespie,

---

[8] Plaintiffs also propose the search term "Ohio AND (redistrict* OR map OR draw! OR congress!). (Doc. 6 at PID # 289, n. 5). Mr. Gillespie need not run this search, as it would be duplicative of his prior search, "Ohio" OR "redistrict!".

14

including but not limited to Request for Production 9, relevant to Plaintiffs' claims, and proportionate to the needs of the case.

Additionally, the names "Judy," "Batchelder," "Lenzo," "Schuler," and "DeWine" are expressly referenced in Request for Production 9 as persons with whom Mr. Gillespie may have had communications regarding the redistricting of the Ohio congressional maps following the 2010 census, and Mr. Gillespie indicated that he would respond to that request. The Court finds documents containing these names, with the limiting terms provided in the list in Plaintiffs' Reply, are likely to be responsive to the subpoena served on Mr. Gillespie, including but not limited to Request for Production 9, relevant to Plaintiffs' claims, and proportionate to the needs of the case.

Finally, Plaintiffs assert "ohr.state.oh.us" is the email domain of the Ohio General Assembly and propose the following search term: "ohr.state.oh.us AND (redistrict* OR map OR draw* OR congress*)." (Reply at PID # 290). The Court finds that documents containing the Ohio General Assembly email domain in combination with the additional limiting terms are likely to be responsive to the Subpoena served on Mr. Gillespie, including but not limited to Request for Production 9, relevant to Plaintiffs' claims, and proportionate to the needs of the case.

Accordingly, Mr. Gillespie is **ORDERED** to run the searches listed in Plaintiffs' Reply (Reply at PID # 289-290), for the time period of January 1, 2010 through December 31, 2012, and produce any responsive documents found as a result of the searches.

### 3. Mr. Gillespie's AOL email address.

Plaintiffs argue Mr. Gillespie's search was deficient because he did not search all of his personal email accounts. (Mtn. at PID # 19-20). Plaintiffs argue Mr. Gillespie should be required to search his AOL email address which is listed as a recipient of the June 15, 2010 email from Chris Jankowski. (Mtn. at PID # 18-19). Mr. Gillespie responds that he stopped relying on his AOL email account in June of 2007, "does not know how to access it" today, and is not responsible for searching documents that "no longer exist." (Gillespie Dec. at ¶ 8; Memo. in Opp. at PID # 253-54).

Mr. Gillespie is correct that he is not required to produce documents that no longer exist. However, there is no evidence before the Court that information in Mr. Gillespie's AOL email account no longer exists (or has been destroyed); the evidence is that Mr. Gillespie "does not know how to access it." It is unclear whether finding out the answer to that question requires simply using the "forgot password" function, working with AOL to restore the account, or some other method. Absent that information, the Court cannot determine whether Mr. Gillespie has conducted a reasonable search and/or whether requiring Mr. Gillespie to gain access to the AOL email account would be unduly burdensome. Moreover, the June 2010 email submitted by the Plaintiffs provides some evidence that Mr. Gillespie's AOL account was, at the very least, receiving email after 2007—and there is no evidence that this email to the AOL account bounced back, which would definitively indicate that the AOL email was no longer in use. Finally, the June 2010 email reveals Mr. Gillespie's AOL email address, which means that his username is

16

known and, therefore, that Mr. Gillespie may well be able to use the "forgot password" function because the password is all he needs to access the account.

Accordingly, Mr. Gillespie is **ORDERED** to docket a pleading in seven (7) days, supported by a declaration, listing the efforts he has taken thus far to access the AOL email account and stating what he understands, based on his efforts, is required to gain access to the account. Before docketing said pleading, and to the extent he has not already done so, Mr. Gillespie is **ORDERED** to immediately attempt to access the account via the "forgot password" feature. If Mr. Gillespie is able to utilize that feature to access the account, he shall perform the searches discussed above and state in his pleading and declaration that he has accessed the account and is complying with Plaintiffs' motion to compel in a manner consistent with this Opinion and Order. To the extent Mr. Gillespie has already attempted to access the account via the "forgot password" feature, or his subsequent attempt to do so is unsuccessful, he shall detail those unsuccessful efforts in the upcoming pleading and declaration.

    4. <u>Documents unrelated to Ohio</u>.

Finally, Mr. Gillespie objects to Plaintiffs' requests inasmuch as they seek documents unrelated to Ohio, such as "All Documents relating to any attempt to solicit donations or support for the purpose of influencing congressional maps, including Ohio's, as a result of the 2010 statewide elections." (Memo. in Opp. at PID # 259). Mr. Gillespie argues that documents which are not related to Ohio are not relevant to this lawsuit. (*Id.* at PID # 258-59).

The Court agrees with Mr. Gillespie that documents not related to Ohio's redistricting (or fundraising for the same) are not relevant or proportional to the needs of this lawsuit. Though the Court finds Plaintiffs' proposed search terms to be tailored to finding Ohio-specific documents, to the extent they return documents pertaining only to other states, Mr. Gillespie need not produce them.

**B.     Mr. Morgan.**

Plaintiffs argue Mr. Morgan's response is insufficient because he has not shared the parameters of his search, including his method for searching for responsive documents, search terms used (if any), and the timeframe in which he searched. (Mtn. at PID # 20).

The Court agrees. When parties do not agree on search terms, and questions subsequently arise about the adequacy of document production, "common sense dictates that the party conducting the search must share information regarding the universe of potentially relevant documents being preserved, and those that no longer exist, as well as the search terms used in collecting relevant documents and the identities of the custodians from whom the documents were retrieved." *Commins v. NES Rentals Holdings, Inc.*, No. 3:16-cv-00608-GNS, 2018 WL 3186983, at *3 (W.D. Ky. June 28, 2018) (citation omitted).

Here, Mr. Morgan has refused to provide that information. Instead, Mr. Morgan argues his sworn statement that he produced "all materials related to [Mr. Morgan's] work for Ohio's congressional redistricting following the 2010 census" is sufficient. (Memo. in Opp. at PID # 248). It is not. Mr. Morgan's vague blanket response to the

18

Plaintiffs' 12 separate Requests for Production of Documents does not demonstrate a reasonable search for documents responsive to each of Plaintiffs' requests. Similar to Mr. Gillespie, Mr. Morgan's response seems to demonstrate that he may have taken an unduly restrictive approach to his search.

Again, courts are typically hesitant to dictate search terms for the parties. In light of Mr. Morgan's refusal to share the parameters of his search, and in light of the fact that his conclusory description of his search efforts does not evidence a reasonable effort to search for documents responsive to each of Plaintiffs' requests, Plaintiffs' motion to compel is well-taken. For the reasons set forth in Section III(A)(2), *supra*, Mr. Morgan is **ORDERED** to run each of Plaintiffs' most recent proposed search terms (set forth in Plaintiffs' Reply at PID # 289-90) for the period January 1, 2010 to December 31, 2012, and to produce any responsive documents found as a result of the searches.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel (Doc. 1) is **GRANTED IN PART** and **DENIED IN PART** as explained herein. Specifically:

1. Mr. Gillespie and Mr. Morgan are **ORDERED** to run each of Plaintiffs' most recent proposed search terms, set forth in Plaintiffs' Reply at PID # 289-90, for the period January 1, 2010 to December 31, 2012, and to produce any responsive documents found as a result of the searches; and

2. Mr. Gillespie is **ORDERED** to docket a pleading in seven (7) days, supported by a declaration, listing the efforts he has taken thus far to access the AOL email account and stating what he understands, based on his efforts, is required to gain access to the account.

**IT IS SO ORDERED.**

Date:     12/3/18                        /s/ *Timothy S. Black*
                                         Timothy S. Black
                                         United States District Judge

                                         /s/ *Karen Nelson Moore*
                                         Karen Nelson Moore
                                         United States Circuit Judge

                                         /s/ *Michael H. Watson*
                                         Michael H. Watson
                                         United States District Judge