# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*, | ) ) ) | No. 1:18cv357 |
| Plaintiffs, | ) ) | ORDER GRANTING PLAINTIFFS' MOTION TO |
| v. | ) ) | COMPEL COMPLIANCE WITH SUBPOENAS SERVED |
| RYAN SMITH, *et al.*, | ) ) | ON THE REPUBLICAN NATIONAL COMMITTEE, |
| Defendants. | ) ) ) ) ) ) | THE NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, AND ADAM KINCAID |

**Before: Moore, Circuit Judge; Black and Watson, District Judges.**

This case is before the Court on Plaintiffs' motion ("Motion") to compel compliance with subpoenas served on third-parties the Republican National Committee ("RNC"), National Republican Congressional Committee ("NRCC") and Adam Kincaid (collectively, "Respondents"), as well as the parties' responsive memoranda.[1]

---

[1] The Motion was initially filed in a miscellaneous civil action in the United States District Court for the District of Columbia. The action was transferred to this Court, opened as 1:18-mc-31, and consolidated with this case. The Motion, Respondents' Memorandum in Opposition ("Memo. in Opp") and Plaintiffs' Reply are filed in Case No. 1:18-mc-31 as Docs. 1, 11, and 14, respectively. The parties filed additional, supplemental memoranda in this case at Docs. 96, 97, 112, and 126.

## I.     INTRODUCTION

### A.     Background.

This case is a challenge to Ohio's current United States congressional redistricting plan ("Map") and each of its component districts. Plaintiffs allege the Map is an unconstitutional partisan gerrymander that violates the First Amendment, the Fourteenth Amendment, and Article I of the United States Constitution.

Plaintiffs allege that, in anticipation of the 2010 Census, the Republican State Leadership Committee ("RSLC"), a national organization designed to elect Republicans to state-level offices, formulated a strategy to solidify and increase Republican control of state legislatures in states where the congressional redistricting process would be controlled by those legislative bodies. (Second Amended Complaint at ¶ 44). To implement this strategy, the RSLC organized and implemented the REDistricting Majority Project ("REDMAP"). (*Id.* at ¶ 45). REDMAP aimed to control the redistricting process in certain states to have the greatest impact on determining how both state legislative and congressional district boundaries would be drawn, to solidify conservative policymaking at the state level, and to maintain a Republican stronghold in the U.S. House of Representatives for the next decade. (*Id.* at ¶ 45).

Plaintiffs allege Ohio was one of the states targeted by the RSLC under REDMAP and that the RSLC spent nearly $1 million on races for the Ohio House of Representatives in advance of the 2010 election. (Second Amended Complaint at ¶ 46). In 2010, the Republican Party "captured" the Ohio House of Representatives, bringing Ohio under single-party control of the Republican Party. (*Id.*)

After the November 2010 elections, Plaintiffs allege, the Republican Party shifted its focus to help state map drawers in their efforts to capture more seats through redistricting. They did this in part by utilizing the single-party control of the Ohio General Assembly to dictate the drawing of Ohio's U.S. congressional map. (*Id.* at ¶ 47).

Ohio's General Assembly has the primary authority for drawing Ohio's U.S. congressional districts. (Second Amended Complaint at ¶ 42); Ohio Rev. Code § 103.51. However, Plaintiffs allege the Map was actually drawn by Ohio Republican operatives Ray DiRossi and Heather Mann, who were provided with the RNC's redistricting training materials and who worked in coordination with national Republican operatives including Adam Kincaid and Tom Whatman. (*Id.* at ¶¶ 52-55). Mr. Kincaid is the Redistricting Coordinator of the NRCC. (*Id.* at ¶ 55). Mr. Whatman was the executive director of "Team Boehner"—named after then-Speaker of the House John Boehner—which was created to work in concert with the RNC and NRCC to expand the Republican majority in the U.S. House of Representatives. (*Id.*)

Plaintiffs allege Ohio's congressional map was designed to pack Democrats into four districts, and crack Democratic voters across the remaining 12 districts, to ensure Republicans would maintain a 12-4 advantage in Ohio's congressional seats. (Second Amended Complaint at ¶¶ 59-61). Plaintiffs argue that the Map burdens their rights under the First and Fourteenth Amendments and exceeds the state's power under Article I of the U.S. Constitution because it is a product of partisan gerrymandering.

### B.     Plaintiffs' subpoenas and the Respondents' responses.

Plaintiffs served subpoenas on Mr. Kincaid, the RNC, and the NRCC on June 28, 2018, July 2, 2018, and July 2, 2018 respectively.  (Declaration of Theresa Lee ("Lee Dec.") at ¶ 2).[2]

Respondents ran search terms provided by Plaintiffs and retrieved 23,687 documents.  (Declaration of Shawn Sheehy ("Sheehy Dec.") at ¶ 5).[3]  Of those documents, 22,915 were non-responsive to Plaintiffs' subpoenas.  (*Id.*)  Respondents withheld 236 documents pursuant to various privileges and produced the remaining 75 documents.  (*Id.* at 5).

There are three privileges at issue.  First, Respondents contend some of the documents at issue are shielded from discovery by the First Amendment privilege.  In support of this claim, Respondents submitted the declarations of Chris Winkelman (general counsel of the NRCC), Dalton Oldham (national redistricting counsel for the RNC), and Mr. Kincaid.  All three affidavits state the documents they are withholding pursuant to the First Amendment privilege were intended to assist Republican candidates in winning elections, and disclosure of those documents would "drastically and adversely affect" how they communicated in the future.  (Declaration of Dalton Oldham ("Oldham

---

[2] Theresa Lee's Declaration is filed in Case No. 1:18-mc-31 at Doc. 1-2, PID # 31.

[3] Shawn Sheehy's Declaration is filed in Case No. 1:18-mc-31 at Doc. 11-1.

4

Dec.") at ¶¶ 7-11; Declaration of Chris Winkleman ("Winkleman Dec.") at ¶¶ 9-14; Declaration of Adam Kincaid ("Kincaid Dec.") at ¶¶ 14-19).[4]

Second, the RNC argues that documents identified on its privilege log are shielded from discovery by the attorney-client privilege and the work-product doctrine. (Doc. 1-3 at PID # 165).

To evaluate Respondents' privilege claims, the Court ordered Respondents to produce the contested documents for in camera review. (Docs. 101, 116). The Court has reviewed all of the documents at issue, with the exception of several documents that can only be viewed on mapdrawing software the Court does not have, and rules as follows.

## II.    STANDARD

Pursuant to the Federal Rules of Civil Procedure, parties may "obtain discovery regarding any _nonprivileged_ matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the party's resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1) (emphasis supplied).

---

[4] Dalton Oldham's Declaration is filed in Case No. 1:18-mc-31 at Doc. 1-3, PID # 158

Adam Kincaid's Declaration is filed in Case No. 1:18-mc-31 at Doc. 1-3, PID # 191.

Chris Winkleman's Declaration is filed in Case No. 1:18-mc-31 at Doc. 1-3, PID # 173.

The sole question before the Court is whether the documents withheld by Respondents fall outside the scope of Rule 26 because they are protected by the First Amendment privilege, the attorney-client privilege, and/or the work-product doctrine.

### III.  ANALYSIS

#### A.  The First Amendment Privilege.

Respondents argue that some documents in their possession, and responsive to Plaintiffs' subpoenas, are shielded from discovery by the First Amendment privilege because disclosure would result in a chilling effect on Respondents' protected speech. (Memo. in Opp. at PID # 407-34).  Plaintiffs argue the First Amendment privilege does not apply, and even if it does, Plaintiffs' interest in the information sought outweighs the potential for a chilling effect.   (Motion at PID # 10-25).

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S. Ct. 1163, 2 L.Ed. 2d 1488 (1958).  The "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1159 (9th Cir. 2010) (citation omitted) (internal quotation marks omitted).  "Given the right to freedom of association, disclosure of information may be inappropriate when such disclosure will adversely affect an organization's ability 'to pursue [] collective efforts to foster beliefs' and may 'induce members to withdraw' or 'dissuade others from joining . . . .'" *Tree of Life Christian Sch. v. City of Upper Arlington*, Case No. 2:11-cv-00009,

2012 U.S. Dist. LEXIS 32205, at * 5 (S.D. Ohio Mar. 12, 2012) (quoting *NAACP*, 357 U.S. at 462-63).

Assessing a claim of First Amendment privilege is a two-step process. First, the party asserting the privilege must make an initial showing of an "arguable first amendment infringement." *Tree of Life*, 2012 U.S. Dist. LEXIS 32205 at ** 6-7 (citing Perry, 591 F.3d at 1160) (internal quotation marks omitted). A party meets this prima facia burden by demonstrating "an objectively reasonable probability that disclosure will chill associational rights." *Id.* (citation omitted) (internal quotation mark omitted). "The existence of a prima facie case turns not on the type of information sought, but on whether disclosure of the information will have a deterrent effect on the exercise of protected activities." *Perry*, 591 F.3d at 1162.

If the party asserting the privilege makes an initial showing of First Amendment infringement, the burden shifts to the party seeking discovery to demonstrate an interest in obtaining the information it seeks that is sufficient to justify the deterrent effect on the constitutionally protected free exercise of association. *See Tree of Life*, 2012 U.S. Dist. LEXIS 32205 at * 8. The Court is required to "balance the burdens imposed on individuals and associations against the significance of the . . . interest in disclosure." *Id*. (citing *Perry*, 591 F.3d at 1161) (internal quotation marks omitted). In balancing the parties' competing interests, courts will look to a variety of factors, including the importance of the litigation, the relevance of the evidence, whether the information is available from less intrusive sources, and the substantiality of the First Amendment rights at stake. *See Perry*, 591 F. 3d at 1161; *Tree of Life*, 2012 U.S. Dist. LEXIS 32205 at * 8.

"Importantly, the party seeking the discovery must show that the information sought is highly relevant to the claims or defense in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Perry*, 591 F.3d at 1161.

        1.    <u>Respondents have made a prima facie showing of First Amendment infringement</u>.

Respondents describe the documents they withheld pursuant to the First Amendment privilege as: (1) internal communications and meeting minutes updating party staff, members, and members' staff about the redistricting progress and redistricting process nationwide both before and after the Ohio map was passed, and internal analysis concerning the political ramifications of redistricting nationwide; (2) internal talking points used to prepare members for interviews regarding redistricting nationwide; and (3) internal analysis of the contours and composition of Ohio's enacted Congressional districts and draft maps. (Memo. in Opp. at PID # 405).

Respondents argue these documents were withheld because they contained mental impressions and analysis and were intended to develop strategies to assist Republican House Members win their elections. (*Id.*) Respondents contend that the primary purpose of Republican national political organizations is to assist Republicans in winning their elections, and to do so, they must know the contours and composition of districts. (*Id.*) Respondents claim compelled disclosure would drastically and adversely affect how the RNC, NRCC, and Mr. Kincaid communicate their analysis and mental impressions in

8

the future and would frustrate the ability of the RNC and NRCC to formulate effective advocacy strategies.  (*Id.* at PID # 405-06).

The Court finds Respondents have met their prima facie burden, that is, that Respondents have shown an "arguable First Amendment infringement."  *See Tree of Life*, 2012 U.S. Dist. LEXIS 32205 at ** 6-7.  Disclosure of the types of internal documents at issue here may have a deterrent effect on the free flow of information within campaigns. *See Perry*, 591 F.3d 1147.  Because the right to exchange ideas and formulate strategy in private is implicit in the right to associate with others to advance shared political beliefs, these types of documents are protected by the First Amendment.  *Id.*

> 2. <u>Plaintiffs' interest in the information sought outweighs the deterrent effect of disclosure</u>.

Having found a prima facie showing of First Amendment infringement, the Court next balances the Respondents' burden of disclosure against Plaintiffs' interest in the information.  The Court finds Plaintiffs have shown that their interest in the information sought justifies the potential deterrent effect of disclosure.

First, this lawsuit, which alleges Ohio's U.S. congressional map is a partisan gerrymander, is important.  The Supreme Court has expressly stated partisan gerrymanders "are incompatible with democratic principles."  *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658, 192 L.Ed. 2d 704 (2015) (citing *Vieth v. Jubelirer*, 541 U.S. 267, 292, 124 S. Ct. 1769, 158 L.Ed. 2d 546 (2004) (internal brackets omitted)).

Second, Plaintiffs seek the documents at issue for the purpose of proving political intent, which is an essential element of their claim. *See Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (requiring proof of discriminatory intent in partisan gerrymandering cases); *see also League of Women, Voters of Michigan v. Johnson*, Case No. 17-14148, 2018 U.S. Dist. LEXIS 86398, at \*\* 9-10 (E.D. Mich. May 23, 2018) ("Intent is an element of Plaintiffs' [redistricting related] First Amendment and Equal Protection claims."). The documents sought by Plaintiffs are relevant to their claim that the Map was drawn, not by the Ohio legislature, but by state and national Republican operatives acting with an intent to lock in a Republican majority in Ohio's U.S. congressional seats. (Second Amended Complaint at ¶¶ 52-55).

Respondents argue they should not have to produce the documents at issue because the Supreme Court stated in *Bandemer*, 478 U.S. at 129, that "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." (Memo. in Opp. at PID # 402). This argument is not availing. Analyzing intent "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). Documents in the possession of the entities and individuals alleged to have participated in or influenced the Map drawing process are circumstantial evidence of the validity (or invalidity) of Plaintiffs' claims.

As the Court explained in a prior Order, documents that are not related to Ohio's redistricting (or fundraising for the same) are not relevant or proportional to the needs of

10

this lawsuit. (Doc. 102 at 18). Along those lines, Plaintiffs have not demonstrated a need for documents pertaining exclusively to states other than Ohio that is sufficient to justify the potential infringement of Respondents' First Amendment rights. To the extent any of the documents withheld by Respondents pursuant to the First Amendment privilege pertain <u>only</u> to states other than Ohio, Respondents need not produce them.

Third, Plaintiffs cannot obtain these documents elsewhere. Plaintiffs have engaged in an extensive effort to obtain relevant documents from other sources. Plaintiffs have, *inter alia*: (1) served Rule 34 discovery requests on three Defendants and seven Intervenors; (2) served Rule 45 subpoenas on 37 people and organizations, including Ohio legislators, Ohio staff members, the RSLC, and State Government Leadership Foundation, and other national republicans; and (3) submitted public records requests to the offices of members of the Ohio General Assembly who played an identifiable role in Ohio's 2011 redistricting. (Lee Dec. at ¶¶ 21-22). Despite these efforts, Plaintiffs have not obtained the documents Respondents are withholding pursuant to privilege. (*Id.* at ¶ 25).[5]

Fourth, in balancing the parties' respective First Amendment interests, the Court notes that while Respondents have shown the <u>existence</u> of interests protected by the First Amendment, they have not shown that those interests are particularly strong. That is,

---

[5] The fact that public records requests have not resulted in production of the documents evidencing a discriminatory intent is not surprising in light of the fact that "officials seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate" against a particular group. *See League of Women*, 2018 U.S. Dist. LEXIS 86398, at * 12 (internal quotation mark omitted) (quoting *Bethune-Hill*, 114 F. Supp. 3d at 341).

11

Respondents have not convincingly shown that disclosure of the documents at issue in this case is likely to have a significant chilling effect on protected speech.

Initially, while disclosure of internal political documents like those withheld by Respondents *can* have a chilling effect on the exercise of protected activities, that threat is "far less compelling than the evidence presented in cases involving groups whose members had been subjected to violence, economic reprisals, and police or private harassment[.]" *AFL-CIO v. FEC*, 333 F.3d 168, 177 (D.C. Cir. 2003).

Most importantly, however, Respondents have not set forth any argument explaining why disclosure of any one of the numerous documents withheld pursuant to First Amendment privilege would require them to change the way they communicate, nor have they attempted to explain how that change would frustrate their organizations' advocacy goals. Instead, Respondents attempt to shield five bankers' boxes of documents from discovery by stating in boilerplate fashion that disclosure would adversely affect the way they communicate. The Court finds Plaintiffs' interest in obtaining these documents to support a crucial element of their partisan gerrymandering claim simply outweighs Respondents' sweeping and conclusory claims of privilege.

### B. The Attorney-Client Privilege.

Respondents argue that the documents listed on the RNC's privilege log are shielded from discovery by the attorney-client privilege. (Memo. in Opp. at PID # 434-36). Plaintiffs argue Respondents have not established the applicability of the privilege. (Motion at PID # 26-27).

The attorney-client privilege is based on two related principles. First, subjecting lawyers to routine examinations of their clients' confidential communications would offend the loyalty that forms an intrinsic part of the relationship between a lawyer and client. *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998) (citation omitted). "The second principle is that the privilege encourages clients to make full disclosure to their lawyers. A fully informed lawyer can more effectively serve his client and promote the administration of justice." *Id.*

The Sixth Circuit has set forth the essential elements of the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by his legal adviser, (8) unless the protection is waived.

*Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992) (citing *United States v. Goldfarb*, 328 F.2d 280 (6th Cir. 1964)).

The burden of establishing the existence of the attorney-client privilege rests with the person asserting it. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999) (citation omitted).

The Court finds Respondents have not met that burden. First, the Court has reviewed the documents listed on the RNC's privilege log in camera. The Court cannot conclude, from the face of the documents, that they are confidential communications

between client and attorney pertaining to legal advice.  <u>Some of the documents do not even appear to be communications between clients and attorneys</u>.[6]

Second, and similarly, Respondents have not set forth <u>any</u> evidence that <u>any</u> particular document on the privilege log is a confidential communication, pertaining to legal advice, between client and attorney.  Neither of the declarations submitted by Mr. Oldham—an attorney for the RNC—explains how any document on the RNC's privilege log is protected by the attorney-client privilege.[7]

## C.  **The Work-Product Doctrine.**

Respondents argue the documents listed on the RNC's privilege log are shielded from discovery by the work-product doctrine.  (Memo. in Opp. at PID # 436-439).  Plaintiffs argue Respondents have not demonstrated that these documents were prepared because of an anticipation of litigation.  (Motion at PID # 27-28).

"The work-product doctrine protects an attorney's trial preparation materials from discovery to preserve the integrity of the adversarial process." *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-

---

[6] For example, REV_00023175 is a communication between Kevin DeWine and Tom Hofeller, who Respondents contend is a "redistricting expect" (Memo. in Opp. at PID # 409).  There is no evidence that Mr. DeWine or Mr. Hofeller are attorneys, nor is there any evidence that they were in an attorney-client relationship.  Similarly, REV_00023166 is a communication between Mike Wild,  Robert Bennett, and Mr. Hofeller.  Again, there is no evidence that any of these people are attorneys, much less that they were in an attorney client relationship.  <u>Respondents do not even offer any argument as to how these particular documents are privileged</u>.

[7] Mr. Oldham submitted a second declaration ("Second Oldham Dec.") that attempts to advocate for the applicability of the work-product doctrine (Doc. 96-1), but that declaration does not state that any document listed on the RNC's privilege log was a confidential communication between client and attorney pertaining to legal advice.

14

14, 67 S. Ct. 385, 91 L. Ed. 451(1947)). The work-product doctrine shields from discovery (1) documents and tangible things; (2) prepared in anticipation of litigation or for trial, (3) by or for another party or its representative. *Id.* (citing Fed. R. Civ. P. 26(b)(3)).

"To determine whether a document has been prepared 'in anticipation of litigation,' and is thus protected work product, we ask two questions: (1) whether that document was prepared 'because of' a party's subjective anticipation of litigation, as contrasted with ordinary business purpose, and (2) whether that subjective anticipation was objectively reasonable." *In re Professionals Direct Ins. Co.*, 578 F.3d at 439 (quoting *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006)). "[D]ocuments prepared in the ordinary course of business . . . or for other nonlitigation purposes, are not covered by the work product privilege." *Roxworthy*, 457 F.3d at 593 (citing Fed. R. Civ. P. 26(b)(3) advisory committee's notes (1970)). "Thus, a document will not be protected if it would have been prepared in substantially the same manner irrespective of the anticipated litigation." *Roxworthy*, 457 F.3d at 593-94 (citing *United States v. Aldman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).

As with the attorney-client privilege, "[a] party asserting the work product privilege bears the burden of establishing that the documents he or she seeks to protect were prepared 'in anticipation of litigation.'" *Roxworthy*, 457 F.3d at 593 (quoting *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006)). "Where an 'undisputed affidavit . . . is specific and detailed to indicate that the documents were prepared in

15

anticipation of litigation or trial,' then the party claiming work product protection has met its burden." *Id.* at 597 (quoting *Toledo Edison Co. v. G.A. Techs., Inc.*, 847 F.2d 335 341 (6th Cir. 1988)). "However, application of the privilege will be rejected where the 'only basis' for the claim is an affidavit containing 'conclusory statement[s].'" *Id.* (quoting *Guardsmark, Inc. v. Blue Cross & Blue Shield of Tenn.*, 206 F.R.D. 202, 209 (W.D. Tenn. 2002)).

"Because documents are not protected if they were created for nonlitigation purposes, regardless of content, '[d]etermining the driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question.'" *Roxworthy*, 457 F.3d at 595 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir.1992)). Consequently, the Court must examine "the circumstances surrounding the documents' creation." *Id.*

Here, Respondents have not adequately shown that the documents on the RNC's privilege log are shielded from discovery by the work-product doctrine. First, the Court has reviewed the documents in camera. The Court cannot conclude, from the face of the documents, that they were prepared in anticipation of litigation.

Second, Respondents have not submitted evidence sufficient to establish that any particular document was prepared in anticipation of litigation. Mr. Oldham declares that he believes "[e]very communication he reviewed marked 'work-product' on the privilege log" to have been created in anticipation of partisan gerrymandering (or other) litigation. (Second Oldham Dec. at ¶ 12). This conclusory, sweeping statement pertaining to <u>every document</u> marked "work-product" is not the kind of "specific and detailed" evidence

16

required to invoke the privilege.[8]  *Roxworthy*, 457 F.3d at 597.  Respondents have simply failed to establish that "the driving force" behind any particular document was the anticipation of litigation as opposed to the ordinary course of business.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel compliance with subpoenas served on the Republican National Committee, National Republican Congressional Committee, and Adam Kincaid is **GRANTED**.  Respondents shall produce, immediately, the following documents:

1. Entries REV_00023166 through REV_00023195, and entries REV_00023200 through REV_00023257 on the RNC's privilege log (filed in Case No. 1:18-mc-31 at Doc. 1-3, Ex. G);

2. The documents listed in Paragraph 7(a)-(d), (f)-(g) of Dalton Oldman's Declaration dated September 30, 2018 (filed in Case No. 1:18-mc-31 at Doc. 1-3, Ex. F);

3. The documents listed in Paragraphs 9(a), (e), (g)-(i), and (l)-(n) of Chris Winkleman's Declaration dated September 28, 2018 (filed in Case No. 1:18-mc-31 at Doc. 1-3, Ex. I); and

---

[8] The breadth of Mr. Oldham's conclusory assertion that all documents marked "work product" (i.e., every single document on the RCN privilege log) were prepared in anticipation of litigation is troubling.  For example, REV_00023166 is an email between Mr. Wild, Mr. Bennett, and Mr. Hofeller.  There is no indication that any of these people are attorneys or that they were acting on behalf of an attorney, there is no explanation as to what role these individuals played, if any, in preparing the RNC for litigation, and there is no indication that potential litigation was the driving force behind this communication.  That Respondents withheld this document pursuant to the work-product doctrine, but failed to set forth any argument at all as to why the doctrine would apply, gives the Court reason to question the veracity of Mr. Oldham's broad, conclusory claim.

    4.    The documents listed in Paragraph 14 of Adam Kincaid's Declaration dated September 28, 2018 (filed in Case No. 1:18-mc-31 at Doc. 1-3, Ex. M),

to the extent such documents are relevant to Ohio's redistricting (or fundraising for the same).

Documents and files produced in response to this Order temporarily shall be designated "Attorneys' Eyes Only." Documents so designated may be shared only with attorneys representing the Parties in this case or those attorneys' consulting or testifying experts who agree to be bound by the protective order. If this Order is reversed on appeal, the Parties' attorneys will immediately destroy or return to Respondents' counsel all copies of the documents and files, as well as any work product that resulted in whole or in part from the Attorneys-Eyes-Only documents, and will direct any consulting or testifying expert who has received a copy of the documents or files to destroy those documents or files and work product resulting therefrom. During the pendency of any review by an appellate court of this Order, if a Party seeks to file an Attorneys-Eyes-Only document with this Court, or use it as an exhibit at trial, the Party will seek leave of this Court before doing so. If a reviewing court affirms this Order, then any document or file produced pursuant to this Order will no longer be designated "Attorneys' Eyes Only" or fall under any other provisions of the protective order. Moreover, if Respondents fail to appeal this Order within **SEVEN DAYS**, the Panel will vacate this Order and the documents and files produced in response to this Order will no longer be designated "Attorneys' Eyes Only."

**IT IS SO ORDERED.**

Date:   12/21/18                          /s/ *Timothy S. Black*
                                          Timothy S. Black
                                          United States District Judge

                                          /s/ *Karen Nelson Moore*
                                          Karen Nelson Moore
                                          United States Circuit Judge

                                          /s/ *Michael H. Watson*
                                          Michael H. Watson
                                          United States District Judge