# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

OHIO A. PHILIP RANDOLPH INSTITUTE, )
LEAGUE OF WOMEN VOTERS OF OHIO, )
THE OHIO STATE UNIVERSITY COLLEGE )
DEMOCRATS, NORTHEAST OHIO YOUNG )
BLACK DEMOCRATS, HAMILTON COUNTY )
YOUNG DEMOCRATS, LINDA GOLDENHAR, )
DOUGLAS BURKS, SARAH INSKEEP, )
CYNTHIA LIBSTER, KATHRYN DEITSCH, )
LUANN BOOTHE, MARK JOHN GRIFFITHS, )
LAWRENCE NADLER, CHITRA WALKER, )
TRISTAN RADER, RIA MEGNIN, )
ANDREW HARRIS, AARON DAGRES, )
ELIZABETH MYER, BETH HUTTON, )
TERESA THOBABEN, )
and CONSTANCE RUBIN, )    No. 1:18-cv-00357-TSB
                                      )
     Plaintiffs, )    Judge Timothy S. Black
                                      )    Judge Karen Nelson Moore
v.                              )    Judge Michael H. Watson
                                      )    Magistrate Judge Karen L. Litkovitz
RYAN SMITH, Speaker of the Ohio House )
of Representatives, LARRY OBHOF, )
President of the Ohio Senate, and )
JON HUSTED, Secretary of State of Ohio, )
in their official capacities, )
                                        )
     Defendants. )
_____ )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants[1] respectfully

move this Court for Summary Judgment on the grounds that there are no genuine issues of

material fact, and Defendants are entitled to judgment in their favor as a matter of law as to all

---

[1] Given the recent change in House leadership, a motion will soon be filed substituting names in the
caption to reflect the change.

claims alleged in the Second Amended Complaint. The reasons supporting this Motion are detailed in the attached Memorandum of Law.

This the 8th day of January, 2019.

MICHAEL DEWINE
Ohio Attorney General

By: /s/Phillip J. Strach
Phillip J. Strach*
N.C. State Bar No. 29456
phil.strach@ogletree.com
*Lead and Trial Counsel

By: /s/Michael D. McKnight
Michael McKnight
N.C. State Bar No. 36932
michael.mcknight@ogletree.com

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Tel.: (919) 787-9700
Facsimile: (919) 783-9412
Attorneys for Defendants Smith & Obhof

/s/Steven T. Voigt
Steven T. Voigt (0092879)
Principal Assistant Attorney General
Nicole M. Koppitch
Ohio State Bar No. 0082129
Ann Yackshaw
Ohio State Bar No. 0090623
Ohio Attorney General's Office
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872
Fax: (614) 728-7592
steven.voigt@ohioattorneygeneral.gov
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, | ) | |
| LEAGUE OF WOMEN VOTERS OF OHIO, | ) | |
| THE OHIO STATE UNIVERSITY COLLEGE | ) | |
| DEMOCRATS, NORTHEAST OHIO YOUNG | ) | |
| BLACK DEMOCRATS, HAMILTON COUNTY | ) | |
| YOUNG DEMOCRATS, LINDA GOLDENHAR, | ) | |
| DOUGLAS BURKS, SARAH INSKEEP, | ) | |
| CYNTHIA LIBSTER, KATHRYN DEITSCH, | ) | |
| LUANN BOOTHE, MARK JOHN GRIFFITHS, | ) | |
| LAWRENCE NADLER, CHITRA WALKER, | ) | |
| TRISTAN RADER, RIA MEGNIN, | ) | |
| ANDREW HARRIS, AARON DAGRES, | ) | |
| ELIZABETH MYER, BETH HUTTON, | ) | |
| TERESA THOBABEN, | ) | |
| and CONSTANCE RUBIN, | ) | No. 1:18-cv-00357-TSB |
| | ) | |
| Plaintiffs, | ) | Judge Timothy S. Black |
| | ) | Judge Karen Nelson Moore |
| v. | ) | Judge Michael H. Watson |
| | ) | Magistrate Judge Karen L. Litkovitz |
| RYAN SMITH, Speaker of the Ohio House | ) | |
| of Representatives, LARRY OBHOF, | ) | |
| President of the Ohio Senate, and | ) | |
| JON HUSTED, Secretary of State of Ohio, | ) | |
| in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................. 1

ARGUMENT ....................................................................................................... 1

    I.    Plaintiffs' claims are nonjusticiable................................................... 1

        A.    Plaintiffs Failed To Identify a Manageable Standard ...................... 4

        B.    The Defects in Plaintiffs' Case Defeat All Their Causes of Action ........................... 9

    II.    Plaintiffs lack standing.................................................................... 11

        A.    Plaintiffs demonstrate only generalized grievances about legislative decisions. ................................................. 14

        B.    There is no evidence that Plaintiffs' self-described "packed" or "cracked" districts caused them legal injury. ............................. 16

        C.    Plaintiffs fail to offer any evidence of individualized injury under the First Amendment, Fourteenth Amendment, or Article I under a vote dilution theory. ................................................. 19

        D.    Plaintiffs fail to offer any evidence of individualized injury under the First Amendment under a right-of-association theory. ............................... 24

        E.    Redressability/Prudential Standing .......................................... 26

CONCLUSION .................................................................................................. 30

CERTIFICATE OF SERVICE ......................................................................... 32

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
    135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015) ...............................................................2

*Baker v. Carr,*
    369 U.S. 186 (1962) ...............................................................................................11,12,21

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ...............................................................................................16, 18

*Crawford v. Marion Cty. Election Bd.,*
    553 U.S. 181 (2008) ...............................................................................................10

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ...............................................................................................11

*Davis v. Bandemer,*
    478 U.S. 109 (1986) ...............................................................................................18, 19, 21

*Fletcher v. Peck,*
    10 U.S. (6 Cranch) 87 (1810) ...............................................................................................9

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ............................................................................... *passim*

*Harris v. Cooper,*
    No. 16-166, 2018 WL 3148263 (U.S. June 28, 2018) ...............................................2, 3

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ...............................................................................................10

*League of United Latin American Citizens v. Perry,*
    548 U.S. 399 (2006) ...............................................................................................4, 8, 9

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................11, 15

*Marbury v. Madison,*
    1 Cranch 137, 2 L.Ed. 60 (1803) ...............................................................................................2

*McCray v. United States,*
    195 U.S. 27 (1904) ...............................................................................................9

*McGlone v. Bell*,
    681 F.3d 718 (6th Cir. 2012) ......................................................................... *passim*

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018) ............................................................................................ 17

*Quilter v. Voinovich*,
    507 U.S. 146 (1993) ................................................................................................ 17

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ................................................................................................ 21

*Session v. Perry*,
    298 F. Supp. 2d 451 (E.D. Tex. 2004) ................................................................... 10

*Shaw v. Reno*,
    509 U.S. 630 (1993) ................................................................................................ 17

*Sonzinsky v. United States*,
    300 U.S. 506 (1937) .................................................................................................. 9

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ........................................................................................... 16, 17

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ................................................................................................ 10

*U.S. v. Richardson*,
    418 U.S. 166 (1974) ................................................................................................ 15

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982) ................................................................................................ 15

*Vieth v. Jublierer*,
    541 U.S. 267 (2004) ...................................................................................... 9, 18, 19

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) ........................................................................................ 20, 21, 22

*White v. Register*,
    412 U.S. 755 (1973) ................................................................................................ 16

**Statutes**

Voting Rights Act Section 2 ........................................................................................ 16

# SUMMARY OF ARGUMENTS

Pursuant to L.R. 7.2(a)(3), Legislative Defendants provide the following summary of arguments contained in their memorandum in support of Motion for Summary Judgment:

**I. Plaintiffs' claims are nonjusticiable** ..................................................................1

Plaintiffs' so-called partisan gerrymandering claims are nonjusticiable. A majority of the Supreme Court recently acknowledged that it has not decided the "threshold question[]" of "whether [partisan gerrymandering] claims are justiciable" at all. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). Consistent with the current state of the law, the Supreme Court also summarily affirmed a three-judge court's refusal to entertain partisan gerrymandering claims on the basis that the claims were nonjusticiable. *Harris v. Cooper*, No. 16-166, 2018 WL 3148263, *1 (U.S. June 28, 2018). In its previous order denying Defendants' Motion to Dismiss, the Court explained that the "thread" that runs through the Supreme Court's prior partisan gerrymandering cases "is that they may be justiciable if there is a justiciable standard by which to resolve the plaintiffs' partisan gerrymandering claims." (Doc. 61, Page ID 657 (internal citations and quotations omitted)). Plaintiffs have failed to provide such a standard, and consistent with the reasoning of this Court and the Supreme Court, the Plaintiffs' claims should be dismissed on the record evidence to date.

**A. Plaintiffs failed to identify a manageable standard** ............................................4

It is Plaintiff's burden to propose and establish a manageable standard to apply to their claims. Only then can the case proceed to the merits. All of Plaintiffs' experts are either unable or refuse to provide the court the point at which partisanship becomes "too much." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 419-20 (2006) ("*LULAC*").

**B. The defects in Plaintiffs' case defeat all their causes of action** .........................9

The defects in Plaintiffs' case—their failure to identify and attempt to prove any relevant standard and their failure to adduce evidence at least exceeding the evidence rejected in binding precedent—cut across all of Plaintiffs' claims because the lack of a manageable standard identifying a burden on *any* rights necessarily means no rights exist under the Equal Protection Clause, the First Amendment, or Article I, § 4. The failure to identify a standard doomed the plaintiffs under the Equal Protection Clause and Article I § 4 in *Vieth v. Jubelirer*, 541 U.S. 267, 305 (2004), and the First Amendment in *LULAC*, 548 U.S. at 416. The result must be the same here. Further, because Article I, § 4 is an affirmative grant of authority, not a guarantee of individual rights, the court's power is limited to determining whether legislation exceeded that grant, which, in turn, rules out any review of hidden legislative motive. *See, e.g., Sonzinsky v. United States*, 300 U.S. 506, 513 (1937); *McCray v. United States*, 195 U.S. 27, 56 (1904); *see also Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130 (1810). Review is limited to what the law accomplishes on its face. So, only if, as in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–36 (1995), the improper motive were codified in the statutory text would that motive result in the legislature's exceeding the delegation of power—or even create a basis of federal-court

review. Because the 2012 Plan merely "classifies tracts of land, precincts, or census blocks," *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999), and clearly sets the "Places" and "Manner" of elections, it plainly falls within the delegation of Article I, § 4. *Cf. Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203–04 (2008) (finding partisan intent did not impact the question whether a voter identification requirement was an impermissible burden on the right to vote). In all events, Plaintiffs' claim under Article I, § 4 should be rejected.

## II.    Plaintiffs lack standing .................................................................................................11

Article III's "case" or "controversy" requirement demands that a plaintiff have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). To establish Constitutional standing, a plaintiff first must demonstrate "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and some internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 41–42. The threshold question of what is necessary to show standing in a case, where the plaintiffs allege a political gerrymandering claim based on vote dilution, is whether an individual has shown "disadvantages to themselves as individuals." *Gill v. Whitford*, 138 S.Ct. 1916, 1929 (2018). The undisputed evidence in this case demonstrates that Plaintiffs here have not forecast any evidence of any individual, district-specific harm.

### A.    Plaintiffs demonstrate only generalized grievances about legislative decisions ........................................................................................................ 14

Plaintiffs present evidence that they disagree with Ohio's current districting plan, but disagreeing with generally applicable legislation is not a legal injury. For purposes of Article III standing, an injury cannot be based on a "generalized grievance" that "no more directly and tangibly" affects the plaintiff "than it does the public at large." *Lujan*, 504 U.S. at 574-75. Plaintiffs' grievances here are merely general complaints about legislative action and public policy decisions that constitute "generalized grievances" or a general desire for good governance that are not sufficient to convey standing. *See, e.g., Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982) (no standing where taxpayer sued Department of Health, Education and Welfare for allegedly discounted conveyance of government property to a Christian college); *U.S. v. Richardson*, 418 U.S. 166 (1974) (holding taxpayers' challenge to the government's failure to disclose CIA expenditures was a "generalized grievance"); *Lujan*, 504 U.S. at 577-78 (no standing where environmental advocacy organization challenged rule promulgated by Secretary of the Interior, ruling that plaintiffs had alleged an injury to the species in question, but not themselves.). None of the Plaintiffs, individual or organizational, articulated any individual, district-specific harm. At most, the Plaintiffs

expressed generalized grievances with the statewide political results of the congressional plan. Such grievances are not enough to establish standing.

**B.** **There is no evidence that Plaintiffs' self-described "packed" or "cracked" districts caused them legal injury** ................................................... 16

In an attempt to create the impression of district-specific injury where no such injury exists, Plaintiffs use the terms "packing" and "cracking" as a substitute for demonstrable legal injury. They are incorrect. No Supreme Court opinion has ever defined these terms in the context of a partisan gerrymandering case. Merely invoking these words does not demonstrate injury or confer standing which, as made clear by *Gill*, is not "dispensed in gross." *Gill*, 138 S. Ct. at 1934. The terms "packing" and "cracking" come from cases alleging unconstitutional racial discrimination or violations of Section 2 of the Voting Rights Act against a minority group, not an individual plaintiff. To prove racial "packing" or "cracking," the minority group must show that it constitutes a majority in a geographically compact area, that it is politically cohesive, and that it cannot elect its preferred candidate of choice in the challenged district because of racial bloc voting by the majority. *White v. Register*, 412 U.S. 755 (1973); *Thornburg v. Gingles*, 478 U.S. 30, 35, 50-51 (1986); *Bartlett v. Strickland*, 556 U.S. 1, 14-18 (2009); *Quilter v. Voinovich*, 507 U.S. 146, 153-54 (1993). "Cracking" and "packing" as defined in racial discrimination cases cannot be applied to so-called partisan gerrymandering. The rights protected in racial vote dilution cases belong to the minority group. Racial gerrymandering claims arise from plaintiffs' allegations that they have been "separat[ed] ... into different districts on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 649, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). "Resolution of such claims will usually turn upon 'circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing' the lines of legislative districts.*" North Carolina v. Covington*, 138 S. Ct. 2548, 2552–53, 201 L. Ed. 2d 993 (2018) (quoting *Miller v. Johnson,* 515 U.S. 900 (1995)). In contrast, after *Gill*, it is clear that a partisan gerrymandering claim must be brought by an individual, not a political group such as a political party, and not by individuals making the same generic claim as a political party. There is no cause of action for political groups whose members have been allegedly "packed" or "cracked." *Gill*, 138 S. Ct. at 1933 (the effect that an alleged gerrymander has "on the fortunes of political parties" is irrelevant). Further, Plaintiffs have not shown that "Democratic voters" are "cohesive" for vote dilution purposes, nor could they. This is because "a person's politics is rarely discernable – and never permanently discerned – as a person's race." *Vieth*, 541 U.S. at 287. "Political affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." *Id.* Thus, many voters who vote for a Republican candidate in one election can and do change their minds, and vote for the Democratic candidate in the next, and vice versa— like many of the Plaintiffs in this case have. Plaintiffs here have not attempted to provide a framework for "packing" and "cracking" that comports with *Gill* or other Supreme Court precedent and, consequently, they cannot demonstrate an "injury" for standing purposes in this context.

**C.** **Plaintiffs fail to offer any evidence of individualized injury under the First Amendment, Fourteenth Amendment, or Article I under a vote dilution theory** ................................................................................................. 19

There is also no evidence that Plaintiffs' or Plaintiffs' members' votes have been "diluted" in violation of the First Amendment, Fourteenth Amendment, or Article I. The concept of vote "dilution" comes from the Supreme Court's malapportionment cases. In those cases, an individual's vote was deemed "diluted" if the district into which he was placed included a greater absolute number of voters in comparison to others district in his state. *See e.g. Wesberry v. Sanders,* 376 U.S. 1, 2 (1964). Plaintiffs here are not actually complaining about the "weight" of their vote. This is not a malapportionment case, in which the weight of a vote of a voter living in an overpopulated district is undeniably and mathematically lower than the weight of a vote of a voter living in an underpopulated district. *Reynolds v. Sims*, 377 U.S. 533, 561 (1964). Instead, some, but not all, of the plaintiffs here complain that they have been unable to vindicate their partisan preference in recent congressional elections. But the Supreme Court has previously explained that "the mere fact that a particular [redistricting] makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." *Davis v. Bandemer*, 478 U.S. 109, 131 (1986).

### D. Plaintiffs fail to offer any evidence of individualized injury under the First Amendment under a right-of-association theory ................................... 24

Plaintiffs have failed to show that the current districting plan has hindered their ability to affiliate in a political party and carry out the activities of their preferred political party, thereby infringing on their First Amendment right of association. Plaintiffs have admitted that they continue to engage in the political process, coordinate their political activities with like-minded people, and vote for and campaign for their preferred candidates. Not one Plaintiff has claimed that the current districting plan has prevented them, or anyone they know, from engaging in political activity. Plaintiffs have also failed to point to any evidence that the character of their association with like-minded people would be any different if their district were drawn differently.

### E. Redressability/Prudential Standing ................................................................ 26

Standing also requires each Plaintiff to demonstrate that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan*, 504 U.S. 561 (quoting *Simon*, 426 U.S. at 41–42). A "plaintiff must assert [her] own legal rights and interests, without resting the claim on the rights or interests of third parties." *McGlone*, 681 F.3d 718, 729 (6th Cir. 2012). The testimony of Plaintiffs and their own expert witness forecloses standing. The Proposed Remedial Plan put forward by the Plaintiffs only improves the ability of two Plaintiffs to elect a candidate of their choice while having the reverse effect for two others, and making it more difficult for multiple other Plaintiffs to elect a candidate of their choice as compared to the 2012 Plan. For the most part, each Plaintiff ends up in a district with a political makeup that is very similar to the district in which he or she resides under the 2012 Plan. This demonstrates not only the lack of any individual injury, but the inability of the Plaintiff's Proposed Remedial Plan to redress the supposed "cracking" and "packing" of the 2012 Plan. Accordingly, Plaintiffs lack standing and their claims should be dismissed.

## INTRODUCTION

After the parties in this case exchanged hundreds of thousands of pages of documents, conducted dozens of depositions, and tendered no less than ten expert reports, Plaintiffs are no closer to establishing the fundamental prerequisites of their claims now than when this Court addressed Defendants' Motion to Dismiss in August of last year.  As to justiciability, Plaintiffs failed to heed the warning from this Court in its Order on the Motion to Dismiss regarding the need to identify a standard by which the Court could assess Plaintiffs' constitutional claims.  As to standing, the testimony of each Plaintiff and their own Proposed Remedial Plan not only fails to establish standing, the evidence affirmatively undermines it.  Accordingly, Plaintiffs' Second Amended Complaint ("SAC") (D.E. 37) should be dismissed.

## STATEMENT OF FACTS

In accordance with this Court's local rules, Defendants have prepared a Proposed Statement of Undisputed Material Facts ("PUMF").  That statement is attached as Exhibit 1 and is incorporated herein by reference.

## ARGUMENT

### I.  Plaintiffs' claims are nonjusticiable.

Plaintiffs' so-called partisan gerrymandering claims– challenging the redistricting plan adopted by a *bi*partisan majority of the Ohio General Assembly, including *a majority of Democrats* in both houses (PUMF ¶ 2)– are nonjusticiable.  A majority of the Supreme Court recently acknowledged that it has *not* decided the "threshold question[]" of "whether [partisan gerrymandering] claims are justiciable" at all.  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). Consistent with the current state of the law, the Supreme Court also summarily affirmed a three-judge court's refusal to entertain partisan gerrymandering claims on the basis that the claims

were nonjusticiable.  *Harris v. Cooper*, No. 16-166, 2018 WL 3148263, *1 (U.S. June 28, 2018).[2]

This Court's Order denying Defendants' Motion to Dismiss on the basis of nonjusticiability confirms that Plaintiffs' claims should be dismissed on the record evidence to date.  In its Order, the Court explained that the "thread" that runs through the Supreme Court's prior partisan gerrymandering cases "is that they may be justiciable if there is a justiciable standard by which to resolve the plaintiffs' partisan gerrymandering claims." (Doc. 61, PageID

---

[2]    Some critics of "partisan gerrymandering" contend it should be deemed a justiciable matter out of necessity. For example, in *Gill*, the plaintiffs argued that the Court "*can* address the problem of partisan gerrymandering because it *must*." 138 S. Ct. at 1929. They urged the Supreme Court to "exercise its power" in that case "because it is the 'only institution in the United States' capable of 'solv[ing] this problem.'" *Id.* Justice Kagan in her concurring opinion in *Gill* raised a similar alarm, declaring that "only the courts can do anything to remedy the problem, because gerrymanders benefit those who control the political branches." *Id.* at 1935 (Kagan, J., concurring).

But the *Gill* plaintiffs and Justice Kagan were wrong on two counts. First, even assuming for argument's sake that "only courts" *could* "solv[e] the problem" of partisan gerrymandering, that fact alone would not give courts the *authority* to "solv[e] the problem." As the *Gill* majority explained in rejecting the plaintiffs' argument:

> Our power as judges to "say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), rests not on the default of politically accountable officers, but is instead grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right.

*Gill*, 138 S. Ct. at 1929.

Second, the *Gill* plaintiffs and Justice Kagan were also wrong as a matter of fact. Recent history confirms that the political process and political branches are willing and able to make policy choices regarding district design. There is no better example of this than in Ohio. As Plaintiffs allege, Ohio voters recently approved Ballot Issue 1, which creates a new procedure for congressional districting going forward. (SAC ¶¶ 131-35). Plaintiffs thus admit that a political change is occurring in Ohio on the issue of districting. They note that Ohio's "Ballot Issue 1 was the result of a process of negotiation among Republicans and Democrats in the General Assembly, along with advocacy groups, and implemented requirements intended to limit either party's ability to gerrymander congressional districts." (SAC ¶ 132).

Ohio is not the only state to address districting choices in its constitution. In *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2662. (2015), the Supreme Court upheld an amendment to Arizona's Constitution that removed redistricting authority from the Arizona Legislature and vested it in an independent commission. The fact is that the political process can and does address the important policy choices that come with alternative districting approaches just as intended under the Constitution.

657 (internal citations and quotations omitted)). Consistent with that reasoning, the Court explained that, under *Harris*, partisan gerrymandering claims are nonjusticiable where "plaintiffs propose no standard for adjudicating a claim" of partisan gerrymandering. (Doc. 61, PageID 658 (internal citations and quotations omitted)). As explained below, despite this notice from the Court, the Plaintiffs have proposed no such standard and their claims should therefore be dismissed.

To the extent that Plaintiffs rely on mathematic "metrics" to establish a justiciable standard, their claims fare no better. At the Motion to Dismiss stage, this Court was not willing to dismiss the claims where there was no alleged explanation by Defendants of the viability of these proposed metrics. But the evidence now demonstrates conclusively that these metrics do not identify a *legal* standard for judging the lawfulness of a so-called partisan gerrymander. (PUMF ¶ 16).

In fact, this Court warned Plaintiffs in its Order on the Motion to Dismiss that "even if the plaintiffs demonstrate that there was political asymmetry or a lack of efficiency in the political map that diluted their right to vote, they will need to articulate a test that allows the Court to determine whether the level of asymmetry or inefficiency rises to an unconstitutional level." (Doc. 61, PageID 666, n.4). Plaintiffs and their experts have not only failed to follow this instruction from the Court they have expressly disclaimed any attempt to develop such a standard. (See, e.g., PUMF ¶ 16 (expert admitting that he believed his alternative proposed plan would be lawful only because "the lawyers have signed off on this" and that he is "not in a position to interpret federal law")). Thus, regardless of whether partisan gerrymandering claims may be justiciable in theory, Plaintiffs in this case have made no attempt to follow this Court's directives in establishing justiciable standards and these claims should therefore be dismissed.

### A.       Plaintiffs Failed To Identify a Manageable Standard

Although the Court's motion-to-dismiss ruling was correct that no single Supreme Court decision "stands for the proposition that partisan gerrymandering claims are per se nonjusticiable," (Doc. 61, PageID 666, 4–5), it does not follow that Plaintiffs' claims are justiciable or that they are entitled to relief. Quite the opposite, as the Court already indicated, this uncertainty places the additional burden on Plaintiffs to propose and establish a manageable standard to apply to their claims. Only then can the case proceed to the merits.

Instead, Plaintiffs' experts have all refused to provide such a standard. As outlined below, each and every expert is unable or refuses to provide the Court the point at which partisanship becomes "too much." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 419-20 (2006) ("*LULAC*"). Accordingly, no manageable standard has been identified, and the claims must be dismissed.

Plaintiffs' expert Dr. Warshaw offers several state-wide metrics to evaluate the so-called partisan bias in the 2012 Plan, including efficiency gap, mean-median, partisan symmetry (rejected in *LULAC*), and declination. But he cannot draw a line using any of these metrics to show where the partisan bias is too much. As Dr. Warshaw testified at his deposition:

> Q. In reading your report I did not see anywhere where you provide a cutoff point like they did where a plan would become presumptively a gerrymander. Do you provide any such cutoff in your report?
> A. I don't. I don't provide any bright-line in my report. I use multiple metrics to provide a holistic evaluation of Ohio and other maps, but I view the development of a bright-line as more of a legal conclusion than one I'm comfortable making.

(Exhibit 32, Deposition of Christopher Warshaw "Warshaw Dep." at 63:10-19). In particular, he has no bright-line rule using the efficiency gap alone to characterize a plan as a gerrymander. (*Id.* at 134: 16-24). Likewise, he cannot identify where the symmetry bias becomes unacceptable or extreme. (*Id.* at 140:9-13). Dr. Warshaw calls the 2012 Plan a "historical outlier" because the

4

partisan bias is "extreme" relative to the universe of all previous congressional elections in the U.S. (*Id.* at 63:20-65:11). But again, Dr. Warshaw cannot provide a definition of when a redistricting plan becomes extreme. (*Id.* at 65:5-11). While he offers numerous statistics on the percentage of historical plans that have less partisan bias under his various metrics, he cannot articulate when that percentage reaches the point where a plan becomes an outlier. (*Id.* at 66:9-68:10). And when specifically asked if he could provide the Court with a line on where a plan becomes too extreme, he would not offer one. (*Id.* at 65:5-66:23).

Moreover, Dr. Warshaw opines that Democrats would win between one and four more seats absent the purported partisan bias in the 2012 Plan. (*Id.* at 74:6-15). But he cannot opine on how many additional seats Republicans have gained based upon the purported partisan bias. (*Id.*). He cannot even say if the number would be closer to one or four. (*Id.* at 141:25-143:5). And of these purported extra seats the Republicans have purportedly gained, he cannot say how much is due to intentional gerrymandering versus other factors. (*Id.*).

Dr. Warshaw offers what he describes as a holistic approach using several of his various partisan bias metrics to evaluate the 2012 Plan. (*Id.* at 109:15-110:24). But he cannot and will not offer any opinions on how much partisan bias is too much. Dr. Warshaw's opinions not only fail to assist this Court in evaluating whether any particular amount of partisan bias in the 2012 Plan renders it unconstitutional, it likewise fails to assist the Ohio legislature in identifying the standards they must comply with in future redistricting cycles. Dr. Warshaw admits that there is no way for a legislature to know in advance where the line is between a constitutional and unconstitutional partisan gerrymander because he "couldn't sit here and say there's a particular level that [he] would be looking for." (*Id.* at 109:15-110:24). That does not provide a manageable standard for either this Court or the state legislature in Ohio.

Plaintiffs' expert Dr. Cho employs a complex algorithm and a quarter-billion dollar supercomputer to simulate billions of potential maps redistricting the state of Ohio using the geography from the 2010 census. She then outputs a sample of those maps in her report based upon specific parameters she employed in her algorithm and compares the simulated maps to the enacted map using various metrics including the total number of seats for Democrats versus Republicans, competitiveness, biasedness, and the seat vote curve. (*See* Exhibit 34, Expert Report of Dr. Wendy Cho "Cho Rep." at 32-40). But like Dr. Warshaw, Dr. Cho cannot identify under any of the metrics she employs when the consideration of politics is too much. (Exhibit 33, Deposition of Wendy Cho "Cho Dep." at 259:4-19, 264:22-25, 267:22-25).

For example, Dr. Cho compares the proportion of votes to seats in the enacted map versus each of her final three million simulated maps and opines that "large discrepancies may indicate there is a cause for concern since large discrepancies might emerge from electoral maps that are a partisan gerrymander." (Cho Dep. 258:12-25; Cho Rep. 31). But Dr. Cho will not opine on how large that discrepancy must be or even if there is a concern at all. (Cho Dep. at 259:4-19). Dr. Cho also compares the competitiveness of the enacted map with each of her three million simulated maps but likewise testified that there is no line where she would consider the lack of competitiveness to be unconstitutional. (*Id.* at 264:22-25). In fact, she does not believe there is *any* line where a district becomes competitive versus noncompetitive. (*Id.* at 295:8-23). Nor can she identify when a district becomes non-responsive to voters. (*Id.* at 295:24-296:9). Finally, Dr. Cho compares the biasedness in her simulations with the enacted map but similarly testified that she has no opinions on how much bias is unconstitutional. (*Id.* at 267:11-25; Cho Rep. at 40).

Dr. Cho recognizes that politics are an inherent part of the redistricting process in Ohio that cannot be removed. As Dr. Cho testified: "We wouldn't want to draw a map and not know anything about a state. So in this sense you wouldn't want to say a monkey should draw the map because a monkey doesn't know anything about political context. So in that way, I think you can actually never draw a map without using political considerations." (Cho Dep. 95:3-25). But Dr. Cho provides no guidance on what and how much politics can be considered. Thus, Dr. Cho's report and testimony offer no answer to the seminal question in this case: how much politics is too much?

Plaintiffs' expert Dr. Niven's report purports to highlight examples of cracking and packing in the 2012 Plan and how it disregards certain communities of interest. (Exhibit 35, Expert Report of David Niven "Niven Rep." at 2). He concludes that the 2012 Plan "needlessly divide[s] Ohio communities and inhibit[s] representation." (*Id.* at 2). Yet, Dr. Niven does not and cannot provide any manageable standard for identifying when and where a congressional plan is unconstitutionally "cracked" and "packed."

For example, while Dr. Niven criticizes the number of county and municipality splits in the 2012 Plan, he admits there is no inherent upper or lower limit. (Exhibit 36, Deposition of David Niven "Niven Dep." at 29:21-30:20). In his words: "there's no absolute number because it's going to depend on the variable of how many towns you have and how many districts you have." (*Id.*). He also admits that sometimes a state may have to split more than the mathematically minimum number to meet other requirements. (*Id.* at 122:4-16). As an example, he criticizes splitting Summit County four ways when, by its population, it could not have been contained entirely in one district. (*Id.* at 136:24-138:14). But Dr. Niven does not provide any opinions on a workable standard for determining when the decision to split a county would be

unconstitutional. He has not even calculated the minimum number of county splits required for a congressional redistricting plan in Ohio. (*Id.* at 121:12-122:16).

Dr. Niven also attempts to study whether census tract splits were pursued beyond what was necessary to gain a political advantage. (*Id.* at 71:17-24). But similarly, Dr. Niven cannot opine on how many census tract splits are necessary in an Ohio redistricting plan let alone how many would be constitutionally permissible. (*Id.* at 184:18-85:8).

In the end, Dr. Niven provides an analysis of where and how he believes the 2012 Plan "packed" and "cracked" Democratic voters. But he offers no standard or test for the Court to employ in determining when such "cracking" or "packing" is unconstitutional.

Plaintiffs' expert Professor Cooper draws a proposed remedial map and analyzes how his proposed map compares to the 2012 Plan on a number of factors including compactness, county and municipality splits and political fairness. Mr. Cooper expressly testified that he is not offering any opinions about the constitutionality of the 2012 Plan. (Deposition of William Cooper "Cooper Dep." at 168:14-17). And specifically, he stated that he is not offering any objective criteria for the court to adopt to determine whether districts are unconstitutionally cracked or packed. (*Id.* at 228:13-29:9).[3]

Because none of Plaintiffs' experts provides a "standard for deciding how much partisan dominance is too much," *LULAC*, 548 U.S. at 420, their claim is no better off than the claim *LULAC* rejected. All Plaintiffs' experts have done is show that, in some sterilized, hypothetical universe, Ohio could be redistricted in a way to give Democratic Party candidates more seats.

---

[3] Plaintiffs also offer the expert report and opinions of Dr. Lisa Handley. Dr. Handley, however, only performs "a district-specific, functional analysis of voting patterns by race to ascertain the black voting age population necessary to provide black voters with an opportunity to elect their candidates of choice in the vicinity of the 11th Congressional District of Ohio." (Exhibit 37, Expert Report of Lisa Handley "Handley Rep." at 1). She likewise does not offer any standard or test for evaluating whether a congressional plan is an unconstitutional partisan gerrymander.

But there is no constitutional right to a map to maximize or benefit any party's perceived strategic advantages. And, because the federal courts are no more "responsible for vindicating generalized partisan preferences" in adjudicating the merits of equal-protection and free-speech claims than they are in identifying injury-in-fact under standing doctrine, this defect defeats Plaintiffs' claim on the merits.

### B. The Defects in Plaintiffs' Case Defeat All Their Causes of Action

The defects in Plaintiffs' case—their failure to identify and attempt to prove any relevant standard and their failure to adduce evidence at least exceeding the evidence rejected in binding precedent—cut across all of Plaintiffs' specific causes of action because the lack of a manageable standard identifying a burden on *any* rights necessarily means no rights exist under the Equal Protection Clause, the First Amendment, or Article I, § 4. Consequently, the failure to identify a standard doomed the plaintiffs under the Equal Protection Clause and Article I § 4 in *Vieth v. Jublierer*, 541 U.S. 267, 304-305 (2004), and the First Amendment in *LULAC*, *see* 548 U.S. at 416. The result must be the same here.

And Article I, § 4 is a particularly bad vehicle for Plaintiffs' claims because it *empowers* a *political* body—the state legislature—to set the "Times, Places and Manner" of congressional elections and thus to draw congressional districts; it in no way purports to *eliminate* or *curtail* its political discretion in the process, which is why the *Vieth* plurality cited the provision as *favoring*, not cutting against, nonjusticiability. *Vieth*, 541 U.S. at 285 ("The Constitution clearly contemplates districting by political entities, *see* Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics.").

Moreover, because Article I, § 4 is an affirmative *grant* of authority, not a guarantee of individual rights, the courts' power is limited to determining whether legislation exceeded that grant, which, in turn, rules out any review of *hidden* legislative motive. *See, e.g.*, *Sonzinsky v.*

*United States*, 300 U.S. 506, 513 (1937); *McCray v. United States*, 195 U.S. 27, 56 (1904); *see also Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130 (1810). Review is limited to what the law accomplishes on its face. So only if, as in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–36 (1995), the improper motive were codified in the statutory text would that motive result in the legislature's exceeding the delegation of power—or even create a basis of federal-court review.[4] Because the 2011 Ohio plan merely "classifies tracts of land, precincts, or census blocks," *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999), and clearly sets the "Places" and "Manner" of elections, it plainly falls within the delegation of Article I, § 4. *Cf. Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203–04 (2008) (finding partisan intent did not impact the question whether a voter identification requirement was an impermissible burden on the right to vote). In all events, the claim under Article I, § 4 should be rejected.

Although the Court may be correct that "it is incumbent on the trial courts to continue evaluating whether standards proposed by litigants are manageable," (Doc. 61, PageID 666, 7 n.3), there are better and worse ways of doing that. Allowing a claim to proceed to trial under circumstances where the litigants have little to no idea of what must be proved is both uneconomical and harmful to the integrity of the judiciary. Moreover, Plaintiffs bear the burden of identifying the applicable standard. If Plaintiffs are unable to identify the line that Defendants purportedly crossed—and their experts concede they cannot identify such a line—the Court should enter summary judgment against all claims now and place the burden on Plaintiffs to appeal and secure approval from the Supreme Court of their theory before needlessly pressing forward, placing the State of Ohio and its taxpayers at great expense to try a doomed case under no legal standard.

---

[4] For further reasons *U.S. Term Limits v. Thornton* is not applicable, *see Session v. Perry*, 298 F. Supp. 2d 451, 462 (E.D. Tex. 2004).

## II.     Plaintiffs lack standing.

Article III's "case" or "controversy" requirement demands that a plaintiff have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). In the Sixth Circuit, a plaintiff must meet Article III standing requirements and prudential standing requirements in order to proceed with their case. *McGlone v. Bell*, 681 F.3d 718, 728–29 (6th Cir. 2012). Plaintiffs bear the burden of establishing standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

To establish Constitutional standing, a plaintiff first must demonstrate "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and some internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561, 112 S.Ct. 2130 (quoting *Simon*, 426 U.S. at 41–42).

To establish prudential standing requirements: "(1) a plaintiff must assert [her] own legal rights and interests, without resting the claim on the rights or interests of third parties; (2) the claim must not be a 'generalized grievance' shared by a large class of citizens; and (3) in

11

statutory cases, the plaintiff's claim must fall within the 'zone of interests' regulated by the statute in question." *McGlone*, 681 F.3d at 729.

In *Gill*, the Supreme Court addressed the "threshold" question, asking "what is necessary to show standing in a case" where the plaintiffs allege a political gerrymandering claim based on vote dilution? *Gill*, 138 S.Ct. at 1929. The Court focused on the "foremost" requirement of standing—injury in fact. *Id.* The Supreme Court noted that it had "long recognized that a person's right to vote is 'individual and personal in nature.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). Accordingly, individuals must show "disadvantage to themselves as individuals" to establish standing. *Id.* (quoting *Baker,* 369 U.S. at 206).

The *Gill* Court explained that when plaintiffs allege that their voting power has been unconstitutionally diluted because they have been placed in "packed" or "cracked" districts, "that injury is district specific." *Id.* at 1930. This is because "[t]he boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Id.* Therefore, any injury a voter suffers from vote dilution "results from the boundaries of the particular district in which he resides." *Id.* And any remedy must also be specific to the voter's individual harm, i.e., "revision of the boundaries of the individual's own district." *Id.*

The plaintiffs in *Gill* argued that "their legal injury is not limited to the injury that they have suffered as individual voters, but extends also to the statewide harm to their interest in their collective representation in the legislature, and in influencing the legislature's overall composition and policymaking." *Id.* at 1931 (internal quotations and citations omitted). The Supreme Court rejected the plaintiffs' argument. As the Court explained, the plaintiffs' statewide injury theory was "the kind of undifferentiated, generalized grievance about the conduct of

12

government that we have refused to countenance in the past." *Id.* (internal quotation marks and citation omitted).

The Supreme Court unanimously held that the plaintiffs failed to establish standing because they asserted statewide injuries rather than district-specific harms. The Supreme Court explained that "[f]our of the plaintiffs" had sufficiently "pleaded a particularized burden" to their individual right to vote by alleging that the challenged districting scheme "'dilut[ed] the influence' of their votes as a result of packing or cracking in their legislative districts." *Id.* (alteration in original) (citations omitted). But, as the Supreme Court explained, "[t]he facts necessary to establish standing ... must not only be alleged at the pleading stage, but also proved at trial." *Id.* After the pleading stage, "the plaintiffs failed to meaningfully pursue their allegations of individual harm." *Id.* at 1932. In fact, "not a single plaintiff sought to prove that he or she lives in a cracked or packed district." *Id.* Instead, the plaintiffs "rested their case at trial— and their arguments before [the Supreme] Court—on their theory of statewide injury to Wisconsin Democrats" which did not demonstrate harm to an individual voter in that voter's district. *Id.*

The Supreme Court explained why the evidence presented by plaintiffs in that case failed to establish standing. The plaintiffs in *Gill* had presented three types of evidence in an attempt to show standing: (1) the testimony of a Professor Whitford, the lead plaintiff; (2) evidence of the partisan intent of the mapmakers; and (3) social scientific data indicating that the statewide maps were gerrymandered to favor Republicans. *Id.* at 1932–33. The plaintiffs' first theory failed because it was undisputed that the challenged plan had not affected Whitford's individual situation or the weight of his vote because under the plaintiffs' own Demonstration Plan, his district would continue to elect a Democrat. *Id.* at 1925, 1932, 1933. The plaintiffs' second

13

theory failed because evidence about the mapmakers' partisan motivations pointed only to intent—not effect—and therefore did not demonstrate an actual injury to any particular plaintiff. *Id.* The plaintiffs' final theory failed because the plaintiffs' social scientific evidence of statewide gerrymandering only provided "an average measure" that "d[id] not address the effect that a gerrymander has on the votes of particular citizens." *Id.* at 1933. The Supreme Court concluded that the "plaintiffs' case as presented on this record ... is a case about group political interests, not individual legal rights." *Id.* Because the plaintiffs failed to present any evidence of individual injury or district-specific harm, they failed to establish standing. *Id.*

As shown below, the undisputed evidence in this case demonstrates that Plaintiffs here have not forecast any evidence of any individual, district-specific harm.

**A.    Plaintiffs demonstrate only generalized grievances about legislative decisions.**

Determining the shape, size, and composition of districts involves numerous policy decisions by the political branches. Plaintiffs' own expert, William Cooper, acknowledged that in preparing his alternative maps, he similarly had to make numerous discretionary decisions. (See, e.g., PUMF ¶¶ 5 (expert's goal was to create more districts where Democrats would be competitive), PUMF ¶6 (expert defined what makes a district "competitive"), PUMF ¶7 (expert chose to make some districts less competitive to achieve his statewide goal), PUMF ¶¶13-14 (expert admitted that in practice the shape of districts may be affected by the identity of incumbents), & PUMF ¶15 (expert chose to ignore some political factors and public input in drawing is proposed districts)). Plaintiffs and Cooper fail to show that any of the discretionary policy decisions made by him would be compelled by the law. (PUMF ¶ 16). Plaintiffs only present evidence that they disagree with Ohio's current districting plan and with the discretionary policy decisions made by the General Assembly, but disagreeing with generally

applicable legislation is not a legal injury.

For purposes of Article III standing, an injury cannot be based on a "generalized grievance" that "no more directly and tangibly" affects the plaintiff "than it does the public at large." *Lujan*, 504 U.S. 555 at 574. Cases assessing "generalized grievances" typically involve citizens challenging the propriety of governmental action. *Id.* at 573, 576. For example, the cases the *Lujan* court used to illustrate what is meant by "generalized grievance" involved taxpayer lawsuits. *See, e.g., Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982) (no standing where taxpayer sued Department of Health, Education and Welfare for allegedly discounted conveyance of government property to a Christian college); *U.S. v. Richardson*, 418 U.S. 166 (1974) (holding taxpayers' challenge to the government's failure to disclose CIA expenditures was a "generalized grievance"). *Lujan* itself involved a suit by an environmental advocacy organization challenging a rule promulgated by the Secretary of the Interior, ruling that plaintiffs had alleged an injury to the species in question, but not to themselves. 504 U.S. at 577-78.

Plaintiffs' grievances here, despite their efforts to dress them up as individualized, are merely general complaints about legislative action and public policy decisions. Under Plaintiffs' theory, *nearly every voter in Ohio would be injured by the districting plan*. Each district that Democratic voters might complain is "packed," Republican voters might complain is "cracked," and vice versa. Under Plaintiffs' theory, both Democratic and Republican voters in every one of Ohio's sixteen district would be equally injured, and every voter would equally have standing to challenge the districts. Such a claim under which nearly the entire voting public is "injured" does not involve individualized injury; such a claim involves only a generalized grievance that does not support standing. *McGlone*, 681 F.3d at 729 (no prudential standing for "a 'generalized

grievance' shared by a large class of citizens").

None of the plaintiffs, individual or organizational, articulated any individual, district-specific harm.  At most the plaintiffs expressed generalized grievances with the statewide political results of the congressional plan.  Such grievances fail to establish standing.

### B. There is no evidence that Plaintiffs' self-described "packed" or "cracked" districts caused them legal injury.

In an attempt to create the impression of district-specific injury where no such injury exists, Plaintiffs use the terms "packing" and "cracking" as a substitute for demonstrable legal injury.  They are incorrect.  The Supreme Court has never defined these terms in the context of a partisan gerrymandering case. Indeed, no definition exists in this context.  Nor did *Gill* provide a definition.  The majority opinion did not endorse any formulation of "packing" or "cracking" in the partisan gerrymandering context and instead went out of its way to cast doubt on the future viability of any such claim.  Plaintiffs find their refuge on this issue in the *Gill* concurrence, not in the majority opinion.  But the majority made it clear that the *majority* opinion was the *only* opinion that expressed the opinion of the court on these issues.  *Gill*, 138 S. Ct. at 1931 ("the reasoning of this Court with respect to the disposition of this case is set forth in this opinion and *none other*.") (emphasis added).  Merely invoking these words does not demonstrate injury or confer standing which, as made clear by *Gill*, is not "dispensed in gross." *Id*. at 1934.

The terms "packing" and "cracking" come from cases alleging unconstitutional racial discrimination or violations of Section 2 of the Voting Rights Act against a minority *group*, not an individual plaintiff. To prove racial "packing" or "cracking," the minority group must show that it constitutes a majority in a geographically compact area, that it is politically cohesive, and that it cannot elect its preferred candidate of choice in the challenged district because of racial bloc voting by the majority.  *White v. Register*, 412 U.S. 755 (1973); *Thornburg v. Gingles*, 478

16

U.S. 30, 35, 50-51 (1986); *Bartlett v. Strickland*, 556 U.S. 1, 14-18 (2009). "Cracking" occurs when a geographically compact minority group is distributed in multiple districts so that it cannot constitute a majority in any district. "Packing" occurs when the minority group is packed into one district in such high numbers to prevent the creation of a second district in which the minority group could be the majority. *Thornburg*, 478 U.S. and 46; *Quilter v. Voinovich*, 507 U.S. 146, 153-54 (1993).

"Cracking" and "packing" as defined in racial discrimination cases cannot be applied to so-called partisan gerrymandering. The rights protected in racial vote dilution cases belong to the minority group. Racial gerrymandering claims arise from plaintiffs' allegations that they have been "separate[d] ... into different districts on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 649, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). "Resolution of such claims will usually turn upon 'circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing' the lines of legislative districts." *North Carolina v. Covington*, 138 S. Ct. 2548, 2552–53 (2018) (quoting *Miller v. Johnson*, 515 U.S. 900 (1995)).

In contrast, after *Gill*, it is clear that a partisan gerrymandering claim, assuming such claims are justiciable, must be brought by an individual – not a political group such as a political party, and not by individuals making the same generic claim as a political party. There is no cause of action for political groups whose members have been allegedly "packed" or "cracked." *Gill*, 138 S. Ct. at 1933 (the effect that an alleged gerrymander has "on the fortunes of political parties" is irrelevant). Plaintiffs here have not attempted to provide a framework for "packing" and "cracking" that comports with *Gill* and, consequently, they cannot demonstrate an "injury"

for standing purposes in this context. Simply uttering the words "packing" and "cracking" is not enough.

Because Plaintiffs do not provide the Court with a framework for determining when "packing" or "cracking" demonstrates a legal injury in this context, this Court must reject their claims. Courts are ill-equipped to make "political judgments" of this nature, assuming they have the constitutional authority to dictate political winners in congressional districts. *Bartlett*, 556 U.S. at 17-18 (quoting *Holder v. Hall*, 512 U.S. 874, 894 (1994)). Plaintiffs here have not shown that "Democratic voters" are "cohesive" for vote dilution purposes, and nor could they. This is because "a person's politics is rarely discernable – and *never* permanently discerned – as a person's race." *Vieth*, 541 U.S. at 287. Moreover, "[p]olitical affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." *Id.* Thus, many voters who vote for a Republican candidate in one election can and do change their minds and vote for the Democratic candidate in the next, and vice versa. Indeed, many of the Plaintiffs here admitted that they had or would vote for Republican candidates under the right circumstances. (PUMF ¶¶ 17, 35, 55, 63, 73, 83, 101, 109, 130). At least one Plaintiff previously identified as a Republican. (PUMF ¶ 159 (Rubin)).

The impossibility of articulating a specific standard to prove standing in a partisan gerrymandering case—other than making conclusory allegations about "packing" and "cracking"—demonstrates the wisdom of Justice O'Connor's concurring opinion in *Davis v. Bandemer*, 478 U.S. 109, 131 (1986) (O'Connor, J., concurring in judgment) (once districting is turned over to the courts it is predictable that they will move away from "nebulous" standards to some rough form of proportional representation). Plaintiffs here can offer nothing more than "nebulous" standards based upon conclusory arguments without explaining *how* their districts

18

were "packed" or "cracked." Nor have they alleged a judicially manageable standard explaining how a court could "unpack" or "uncrack" allegedly illegal districts, without resorting to statewide statistics and imposing proportional representation. This is not an acceptable option for establishing standing.  *Gill*, 138 S. Ct. at 1933; *Bandemer*, 478 U.S. at 132; *Vieth*, 541 U.S. at 288, 308 (Kennedy, J. concurring), 338 (Stevens, J. dissenting).

In short, plaintiffs have not forecast evidence of a concrete or particularized legal injury. Moreover, as shown below in Section E, despite Plaintiffs' allegations of living in "packed" or "cracked" districts, Plaintiffs' own Proposed Remedial Plan would consign nearly all of them to similar districts.  Plaintiffs' efforts fall woefully short of proving individual injury sufficient to demonstrate standing.

### C. Plaintiffs fail to offer any evidence of individualized injury under the First Amendment, Fourteenth Amendment, or Article I under a vote dilution theory.

There is also no evidence that Plaintiffs' or Plaintiffs' members' votes have been "diluted" in violation of the First Amendment, Fourteenth Amendment, or Article I.

As an initial matter, the individual Plaintiffs failed to identify during their depositions any district-specific injury-in-fact that the 2012 Plan allegedly caused them. They testified only that they did not think the 2012 Plan looked "fair" to them, that they did not like the shapes of some of the districts, that they would prefer different maps that looked more "fair" to them, and they would prefer to elect more Democratic candidates.  (PUMF ¶¶ 21-24; 31-33, 41-43, 47, 49, 56, 64-66, 83-85, 90, 95-96, 102, 112-114, 123, 145, 152, 156).[5]

---

[5] Some Plaintiffs also testified to other theories of injury that fail on their face to constitute actionable harm. (See e.g.,PUMF ¶ 40 (Inskeep speculated that the 2012 Plan caused Planned Parenthood not to donate to the Democratic candidate in her district who nevertheless won); ¶48 (Libster complained that her Republican representative did not attend a candidate forum of the League of Women Voters that she also did not attend), ¶67 (Boothe thinks the 2012 Plan caused her harm because she believes people were "rude and obnoxious" to her when she canvassed but did not know their party); ¶¶118-119 (Harris

But none of these preferences identifies a legal injury. It is telling that nearly all of the individual Plaintiffs admit they were solicited to join this case rather than motivated to seek a remedy for some perceived individual injury. (PUMF ¶¶ 19 (Goldenhar), 27 (Burks), 38 (Inskeep), 46 (Libster), 62 (Boothe), 85 (Nadler), 92 (Rader), 102 (Walker), 112 (Megin), 131 (Myer); 140 (Hutton), 149 (Thobaben)). And some Plaintiffs testified that although they joined the case opposing the 2012 Plan, they actually like their districts under the 2012 Plan, which commonsense dictates is not an injury under any possible theory. (*See, e.g.,* PUMF 37 (Inskeep prefers her new district under 2012 Plan to district she lived in before moving); *see also* ¶ 95 (although Rader claims he does not like his district, he admits that his candidate of choice, Representative Kaptur, represents him)).

In the absence of any individual district-specific injuries-in-fact identified by the Plaintiffs themselves, Plaintiffs' counsel apparently intend to rely on a theory of harm by vote dilution. The concept of vote "dilution" comes from the Supreme Court's malapportionment cases. In those cases, an individual's vote was deemed "diluted" if the district into which he was placed included a greater absolute number of voters in comparison to others district in his state. In *Wesberry v. Sanders*, 376 U.S. 1, 2 (1964), for example, one Georgia district had a population of 823,680, whereas the average population of the state's ten districts was 394,312, and one district had as few as 272,154 people. The Court concluded that "[s]ince there is only one Congressman for each district, this inequality of population means that the Fifth District's Congressman has to represent from two to three times as many people as do Congressmen from some of the other Georgia districts." A voter in one district thus had only a 1/823,680th of a voice in Congress compared to a voter in another district having 1/272,154th of a voice due to

objected to his district containing "liberal" Democrats when he would prefer more "pro-business" Democrats, which is an intra-party dispute); ¶151 (Thobaben believed the only way her vote would "count" in an election would be if a Democrat won)).

the malapportionment of their districts. The Court ruled that it was unconstitutional for state legislatures to "draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." *Id.* at 15.

Plaintiffs here are not actually complaining about the "weight" of their vote. No such complaint can be made based on longstanding Supreme Court precedent. This is not a malapportionment case, in which the weight of a vote of a voter living in an overpopulated district is undeniably and mathematically lower than the weight of a vote of a voter living in an underpopulated district. *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) (an individual's right to vote is "individual and personal in nature"). "The injury in a malapportionment case is 'a gross disproportion of representation to voting population.'" *Common Cause v. Rucho*, 279 F.Supp.3d 587, 611 (M.D.N.C. 2018) (quoting *Baker,* 369 U.S. at 207). Such numerical disproportion is a true dilutionary harm. *Reynolds*, 377 U.S. at 568. The plaintiffs in this case have not alleged, and in fact could not show, that their votes are similarly diluted.

Instead, some, but not all, of the plaintiffs here have been unable to vindicate their *partisan preference* in recent congressional elections. The Supreme Court has taken pains to explain that "the mere fact that a particular [redistricting] makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." *Bandemer*, 478 U.S. at 131. Indeed, the "power to influence the political process is not limited to winning elections" and this is "true even in a safe district where the losing group loses election after election." *Id*. at 132. Otherwise, every district that "packs" or "cracks" one party's supporters, regardless whether this allegedly occurs "naturally" or "intentionally," would be deemed to injure the other party's supporters.

Plaintiffs attempt to extend the notion of vote dilution from malapportionment cases to partisan gerrymandering cases.[6] But such an extension makes no sense as the undisputed facts demonstrate. Living in a district that is "cracked" or "packed" based on partisanship does not give an individual less of a political voice under the rationale of *Weberry* and similar malapportionment cases. In contrast to *Wesberry*, it is undisputed that each of Ohio's sixteen districts has roughly the same number of voters according to the 2010 census. As a result, Plaintiffs' votes, no matter what district they live in, are equally "weighted" to the votes of others.[7]

Moreover, voting preferences are not immutable characteristics. A voter who votes Democratic in one election can vote Republican in the next. Logically, that person's vote "weighs" the same in both elections, regardless of the district that person lives in and regardless of which candidate that person votes for. And the evidence here shows that the individual Plaintiffs admit that they are willing to vote for Republican candidates. *See supra* at 18.

Plaintiffs' also fail to explain why "vote dilution" would be an actionable harm in districts that they alleged are intentionally "packed" or "cracked" but not in districts that are drawn according to "traditional redistricting principles" where one party's voters remain concentrated or dispersed. Multiple Plaintiffs admit that they live in districts that were majority-Republican before the 2012 Plan and/or would likely remain majority-Republican under Plaintiffs' Proposed Remedial Plan. (PUMF ¶¶ 18, 25, 26, 34, 45, 50-51, 59-60, 70, 127, 146, 158, 166). Other Plaintiffs admit that they live in districts that were majority-Democratic before

---

[6] In *Gill*, the Supreme Court did not hold that "vote dilution" is a viable theory of harm in a partisan gerrymandering case. Rather, the Court reasoned that even if "vote dilution" were a cognizable injury in this context, "the plaintiffs failed to meaningfully pursue their allegations of individual harm." 138 S. Ct. at 1932.

[7] There is no dispute that the individual Plaintiffs vote, and their votes are counted. (PUMF ¶¶ 20, 42, 69, 105, 121, 143, 151, 200).

the 2012 Plan and/or would likely remain majority-Democratic under Plaintiffs' Proposed Remedial Plan. (PUMF ¶¶43, 44, 122, 135). For those Plaintiffs who live in districts where their votes would be "diluted" or "wasted" regardless of the districting plan, it is clear that the 2012 Plan could not be deemed to cause these Plaintiffs any alleged district-specific injury and that Plaintiffs' Proposed Remedial Plan would not remedy any alleged district-specific injury. (See, e.g., PUMF ¶¶ 8 (the Proposed Remedial Plan would make some of Plaintiffs' districts less competitive, which is not a remedy under Plaintiffs' own theory), ¶70 (the Democratic share of the vote in Booth's district would likely be lower under the Proposed Remedial Plan than under the 2012 Plan), ¶84 (Nadler admits that a Republican has represented his district, the Eighth, since 1939), ¶89 (Nadler would remain in a Republican district under Plaintiffs' Proposed Remedial Plan); ¶122 (Harris would remain in the Eleventh District which Cooper agreed would continue to be "a very safe Democratic district")). And some Plaintiffs would be less likely to see their preferred candidate win election in their districts under the Proposed Remedial Plan. (*E.g.*, ¶¶ 9 (under Plaintiffs' Proposed Remedial Plan, Rader would have been more likely to be represented by a Republican than under the 2012 Plan); ¶9 (Walker; same); ¶¶126-27 (Dagres admitted that, since 1939, there has been only one Democratic congressional representative from his district and he could not state how the district could be drawn so that it is not "cracked," and Cooper agreed the district was a "very safe" Republican district); ¶135 (under the Proposed Remedial Plan, Meyer would remain in the Thirteenth District which Cooper described as "certainly leaning strongly Democratic")). Accordingly, Plaintiffs have failed to show a cognizable injury-in-fact that could be remedied and thus fail to establish standing under a vote dilution theory.

23

**D.      Plaintiffs fail to offer any evidence of individualized injury under the First Amendment under a right-of-association theory.**

Plaintiffs apparently intend to argue that their First Amendment right of association is injured because Ohio's current districting plan "has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects." *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring).

As an initial matter, Justice Kagan's concurring opinion is not the law. *Gill*, 138 S. Ct. at 1931 (noting the unanimous opinion was the sole opinion of the Court "and none other"). But Plaintiffs cannot meet the hypothetical standing requirement suggested by Justice Kagan in any event. There is no evidence that Plaintiffs have suffered any concrete legal injury or that Ohio's current districting plan has impeded Plaintiffs' ability to associate with likeminded citizens.

None of the Plaintiffs offer any evidence that Ohio's current district have burdened their ability to affiliate with like-minded people or to carry out their preferred activities and objectives. To the contrary, Plaintiffs admit that they continue to engage in the political process, to coordinate their political activities with like-minded people, and to vote for and campaign for their preferred candidates. (PUMF ¶ 28-30 (Burke is member of Friends Committee on National Legislation, has lobbied and met with numerous politicians, has engaged in election activity in his district such as canvassing and distributing campaign material, and has participated in protests); PUMF ¶ 39 (Inskeep works for Planned Parenthood's political arm, raising money, canvassing, running phone back, and directing voter operations); PUMF ¶ 58 (Deitsch has voted and campaigned for Democrat candidates of her choice in every congressional election); ¶77-78 (Griffiths attended various meetings with his Representative and volunteered and canvassed in and near Lorain County), ¶84 (Nadler regularly attends meetings with his Representative's aides); ¶105 (nothing in the 2012 Plan has prevented Walker from campaigning for her preferred

24

candidates, donating to the candidate of her choice, or engaging in any voter education activities); ¶124 (Dagres serves as the President of the Licking County Democratic Club PAC as well as a Central and Executive Committee member of the Licking County Democratic Party); ¶144 (Hutton has continued to vote in each election and does not know anyone who has not voted because of the 2012 Plan); ¶¶154-155 (Thobaben admits that groups she has been a part of have protested at her Representative's office, that she has written letters and received responses back, that she has his office "on speed dial" and regularly communicates with his staff, and that she canvassed for her preferred candidates in 2012 and 2016)).

Some Plaintiffs speculate that the 2012 Plan might create confusion or apathy among other voters, but none of the Plaintiffs can point to evidence that any such alleged confusion or apathy exists or, if it did, that it was caused by the 2012 Plan. (See, e.g., PUMF ¶¶ 30, 41, 57, 96, 164, 175, 184, 207). And some Plaintiffs testify that the 2012 Plan appears to have increased political activity among Democrats. (See, e.g., PUMF ¶ 58 (Deitsch believes that the 2012 map has "encouraged" some of her efforts to recruit Democrat candidates and engage in Get Out the Vote efforts); ¶96 (Rader believes voters in his district are apathetic but cannot identify any person who has refused to volunteer on a campaign or to vote as a result of the 2012 Plan); ¶162 (Rubin believes that she and the League of Women Voters have remained effective in their voter education efforts, that nothing about the 2012 Plan has prevented voters from educating themselves about their districts or the League of Women Voters from conducting education efforts)).

Indeed, Plaintiffs have not, and cannot, point to any evidence that the character of their association with like-minded people would be any different if their district were drawn differently. In any event, any such purported difference would be purely speculative and

hypothetical. (PUMF ¶ 10 (Cooper explaining that actual outcomes under proposed alternative maps are "speculative hypothetical")).

### E. Redressability/Prudential Standing

Standing also requires each Plaintiff to demonstrate that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan,* 504 at 561, 112 S.Ct. 2130 (quoting *Simon*, 426 U.S. at 41–42). Moreover, under prudential standing principles, a "plaintiff must assert [her] own legal rights and interests, without resting the claim on the rights or interests of third parties." *McGlone*, 681 F.3d at 729. The testimony of Plaintiffs and their own expert witness, including his Proposed Remedial Plan, forecloses standing.

To begin with, under the Proposed Remedial Plan created by Plaintiffs' own expert, William Cooper, the overall partisan makeup of Ohio's congressional districts would have been very similar, and identical in one year, to the partisan makeup of the districts under the 2012 Plan. Using the election results referenced by Cooper in his report from the 2012 congressional elections, under his Proposed Remedial Plan, Democrats have a majority of the vote share in six districts while Republicans have a majority of the vote share in ten districts. (PUMF ¶10). When asked about these results, Cooper admitted that he could not say how many Democratic or Republican members of congress his map would have elected in 2012 had it been in place and conceded that it was possible that his map could have elected four Democrats and 12 Republicans as the 2012 Plan did during the 2012 election cycle. (PUMF ¶10).

Moreover, using the election results referenced by Cooper in his report from the 2014 congressional elections, under his Proposed Remedial Plan, Democrats have a majority of the vote share in four districts while Republicans would have a majority of the vote share in twelve

districts. (PUMF ¶11). This result is *identical* to the actual partisan breakdown of Ohio's congressional delegation following the 2014 election cycle under the 2012 Plan.

Finally, using the election results referenced by Cooper in his report from the 2016 congressional elections, under his Proposed Remedial Plan, Democrats have a majority of the vote share in five districts while Republicans have a majority of the vote share in eleven districts. (PUMF ¶12).

Next, evaluating Plaintiffs' own Proposed Remedial Plan on a plaintiff-by-plaintiff basis reveals that only two Plaintiffs (Griffiths and Hutton) would be moved from a district in the 2012 Plan where the Democratic vote share is under 50 percent to a district in his Proposed Remedial Plan where the Democratic vote share is above 50 percent in any of the three congressional election cycles referenced in his report. (PUMF ¶ 9). Yet, two other Plaintiffs (Walker and Rader) would be moved from the Nine District in the 2012 Plan where Democrats received a majority of the vote share under each election cycle to the Ninth District in Cooper's Proposed Remedial Plan where Republicans received a majority of the vote share in two of the three election cycles references in his report. (*Id*). Thus, only two Plaintiffs would even arguably be "better off" under the Remedial Plan while at least two other Plaintiffs would be worse off.

For example, under the Proposed Remedial Plan, Plaintiffs Goldenhar and Burks would be placed in the First District where Republicans have a majority of the vote share under the three congressional elections cited in Cooper's report. (PUMF ¶25). This is the same result as under the 2012 Plan. (*Id*.)

Plaintiff Thobaben, who is in the Fifteenth District under the 2012 Plan, would be moved to the Second District which Cooper agreed was a "very safe Republican district." (PUMF ¶ 158). The political makeup of both districts is the same.

Plaintiff Inskeep remains in the Third District, a safe Democratic seat.  (PUMF ¶ 44).

Plaintiff Libster remains in the Fourth District, a solidly Republican District, under the Proposed Remedial Plan but the district has an even higher Republican vote share under the Proposed Remedial Plan than under the 2012 Plan.  (PUMF ¶51).  Cooper testified that this outcome "doesn't really matter" because "effectively, a Republican district is a Republican district" and "[y]ou can't placate all of the plaintiffs at once" because it is "[j]ust not geographically possible." (*Id.*).

Plaintiff Deitsch would be also assigned to the Fourth District, which, like the Fifth District to which she is assigned under the 2012 Plan, is a "safe" Republican district.  (PUMF ¶60).

Plaintiff Boothe is assigned to the Sixth District just as she is under the 2012 Plan, however, the Democratic Party vote share in the Sixth District under the Proposed Remedial Plan would be lower than under the 2012 Plan when evaluated under the election statistics cited in Cooper's report.  (PUMF ¶70).

Plaintiffs Griffiths, Rader, and Walker, who were assigned to the Seventh and Ninth Districts, respectively under the 2012 Plan, are all placed in the Ninth District under the Proposed Remedial Plan.  (PUMF ¶¶ 82, 97, 108).  Although Democrats would have a majority of the vote share in the Ninth District in the Proposed Remedial Plan during the 2012 election cycle, Republicans would have a majority of the vote share in the 2014 and 2016 election cycles using the election results relied upon by Cooper in his report.  (*Id.*).

Plaintiff Nadler remains in the Eighth District under the Proposed Remedial Plan in which Republicans received a majority of the vote share.  (PUMF ¶ 89).

Plaintiff Mengin would remain assigned to the Tenth District under the Proposed Remedial Plan. (PUMF ¶ 115). Although Ms. Megnin testified that she believed Democrats would have a much better chance to vote out the incumbent Republican under the Proposed Remedial Plan (*Id.*), the election results relied upon by Cooper in his reports are within a single percentage point of the election results under the 2012 Plan and Cooper admitted that the Tenth District would be "a safe Republican district" under both maps (*Id.*).

Plaintiff Harris would remain in the Eleventh District under the Proposed Remedial Plan which Cooper agreed would continue to be "a very safe Democratic district." (PUMF ¶122).

Plaintiff Dagres would remain in the Twelfth District under the Proposed Remedial Plan. (PUMF ¶ 127). In addition, despite Mr. Dagres' belief that the Twelfth District would "be a more competitive district based off of historicals" (*Id.*), Cooper agreed that the Twelfth District in the Proposed Remedial Plan would be a "very safe" district for a Republican. (*Id.*).

Plaintiff Meyer would remain in the Thirteenth District which Cooper described as "certainly leaning strongly Democratic." (PUMF ¶ 135).

Plaintiff Hutton would be moved from the Fourteenth District in the 2012 Plan to the Thirteenth District in which Democrats had a majority of the vote share in each of the three elections cited in Cooper's report. (PUMF ¶ 146).

Finally, Plaintiff Rubin would be moved to the Fourteenth District under the Proposed Remedial Plan. (PUMF ¶166). Under the three elections cited by Cooper in his report, Republicans would have a majority of the vote share in both the Fourteenth District in the Proposed Remedial Plan and in the Sixteenth District in which Ms. Rubin resides under the 2012 Plan. (*Id.*).

Thus, when viewed through the lens of the outcome for each individual Plaintiff, at best, the Proposed Remedial Plan which was purportedly drawn based upon "traditional redistricting principles" improved the ability of only two Plaintiffs to elect a candidate of their choice while having the reverse effect for two others and making it more difficult for multiple others to elect a candidate of their choice as compared to the 2012 Plan. *Cf. Gill*, 138 S. Ct. at 1925. For the most part, each Plaintiff ends up in a district with a political makeup that is very similar to the district in which he or she resides in under the 2012 Plan. *Cf. Gill*, 138 S. Ct. at 1933. This demonstrates not only the lack of any individual injury, but the inability of the Plaintiff's Proposed Remedial Plan to redress the supposed "cracking" and "packing" of the 2012 Plan. To the contrary, when viewed as a whole, the Proposed Remedial Plan undermines the stated goals of the Plaintiffs in this litigation and demonstrates that redistricting is a zero-sum game better left to the political branches of government. Accordingly, Plaintiffs lack standing and their claims should be dismissed.

## CONCLUSION

Based on the foregoing, plaintiffs' Second Amended Complaint should be dismissed with prejudice.

This the 8th day of January, 2019.

MICHAEL DEWINE
Ohio Attorney General

By: /s/Phillip J. Strach

30

Phillip J. Strach*
N.C. State Bar No. 29456
phil.strach@ogletree.com
*Lead and Trial Counsel

By: /s/Michael D. McKnight
Michael McKnight
N.C. State Bar No. 36932
michael.mcknight@ogletree.com

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Tel.: (919) 787-9700
Facsimile: (919) 783-9412
*Attorneys for Defendants Smith & Obhof*


/s/Steven T. Voigt
Steven T. Voigt (0092879)
Principal Assistant Attorney General
Ohio State Bar No. 0092879
Nicole M. Koppitch
Ohio State Bar No. 0082129
Ann Yackshaw
Ohio State Bar No. 0090623
Ohio Attorney General's Office
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872
Fax: (614) 728-7592
steven.voigt@ohioattorneygeneral.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Michael D. McKnight, hereby certify that I have this day filed the foregoing document with the CM/ECF system which will provide notice to all counsel of record in this matter including the following:

T. Alora Thomas-Lundborg
Dale E. Ho
Theresa J. Lee
Emily Rong Zhang
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
athomas@aclu.org
dho@aclu.org
tlee@aclu.org
erzhang@aclu.org

Freda J. Levenson (0045916)
American Civil Liberties Union of Ohio Fdtn.
4506 Chester Avenue
Cleveland, OH 44103
Tel.: (216) 472-2220
Facsimile: (216) 472-2210
flevenson@acluohio.org

Paul Moke (0014099)
Cooperating Attorney for ACLU of Ohio
Wilmington College*
1252 Pyle Center
Wilmington, OH 45177
Tel.: 937-725-7501
paul.moke@gmail.com
* Institutional affiliation for the purpose of identification only

Robert Fram
Nitin Subhedar
Jeremy Goldstein
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel.: (415) 591-6000
rfram@cov.com
nsubhedar@cov.com
jgoldstein@cov.com

Michael Baker
Perrin Cooke
Peter Rechter
Isaac Wood
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
iwood@cov.com

*Attorneys for Plaintiffs*

By: /s/Michael D. McKnight
Michael McKnight
N.C. State Bar No. 36932
michael.mcknight@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Tel.: (919) 787-9700
Facsimile: (919) 783-9412
*Attorney for Defendants Smith & Obhof*

36921910.1