## EXHIBIT 1- PROPOSED STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The 2012 Plan

1.    The Ohio General Assembly enacted H.B. 369, Ohio's current congressional redistricting plan, on December 14, 2011.  (Second Amended Complaint ("SAC") ¶ 84; Answer ¶ 84).  Governor John Kasich signed H.B. 269 into law the following day, December 15, 2011.  (*Id.*).

2.    The Plan was adopted by a bipartisan vote of both the Ohio House of Representatives and the Ohio Senate.  (Exhibit 2, Deposition of William Cooper ("Cooper Dep.") Dep. 19:9-17; Exhibit 3, Deposition of Matthew Szollosi at 65:12-66:5; Exhibit 4, Deposition of Keith Faber at 25:17-26:14).   A majority of Democrats in both houses of the Ohio General Assembly voted for H.B. 369.  (Exhibit 5, Deposition of M.V. Hood, III at 7:23-8:1; Exhibit 6, Hood Exhibit 1, p.3); *see also* (Ohio General Assembly Archives webpage at http://archives.legislature.state.oh.us/votes.cfm?ID=129_HB_369).

3.    Ohio's current congressional plan was first used in the 2012 election cycle, (SAC ¶ 86; Answer ¶ 86), and is hereinafter referred to as the "2012 Plan."

4.    The 2012 Plan contains 16 districts.  (SAC ¶ 86; Answer ¶ 86).

### B. Plaintiffs' Proposed Remedial Plan

5.    Plaintiffs hired an expert, William Cooper, to draft a "remedial plan" to "undo the partisan gerrymander."  (Cooper Dep. at 11:10-15; Exhibit 38, Cooper Exhibit 1).  Cooper's goal in creating the plan was to give "Democratic voters" who he defined as "people who cast ballots for Democrats" (but "not necessarily" in every election) a "better opportunity to elect their candidates of choice [than] under the 2012 Plan."  (Cooper Dep. at 25:5-16).  Cooper conceded, however, that he could not quantify how much better of an opportunity Democrats would have to

elect their candidates of choice under his Proposed Remedial Plan as compared to the 2012 Plan. (*Id*. at 90:11-21).

6. In drawing his plan, did not meet with any of the Individual Plaintiffs. (*Id*. at 37:12-16). Also in drawing his plain, he Cooper used data from congressional elections that took place in 2012, 2014, 2016 that was not available to the Ohio General Assembly when it enacted the 2012 Plan. (*Id*. at 26:1-6; Cooper Ex. 1). But when Cooper evaluated the 2012 Plan under the 2008 congressional election results, which were available to the Ohio General Assembly, his analysis found that Democrats would have had a majority of the vote share in seven districts while Republicans would have had a majority of the vote share in nine districts. (*Id*. at 108:5-14).

7. Cooper testified that he relied primarily upon "traditional redistricting principles" to draw his plan but ended up with only one more Democratic-leaning district than was contained in the 2012 Plan. (*Id*. at 29:9-16; 30:23-31:3). When evaluated using congressional election results from the 2012, 2014, and 2016 election cycles, Cooper testified that his proposed remedial plan "would create at least one additional district that would be Democratic-leaning and a couple more competitive districts." (*Id*. at 27:16-25). Cooper defines a "competitive district" as one where the vote share for both Democrats and Republicans in "head-to-head contests" is between 47.5 and 52.5 percent. (*Id*. at 70:25-71:24).

8. Cooper admitted that when trying to give Democratic voters a "better opportunity" to elect their candidates of choice, "in some instances Democratic voters could be shifted into a Republican district and vice versa for sure" but that he was "looking at it from a statewide perspective, not at the micro level." (*Id*. at 30:7-18). Cooper also admitted that in making some districts more competitive in his Proposed Remedial Plan, he made other districts less competitive

than they were under the 2012 Plan. (*Id*. at 94:18-95:4) ("[O]ne would expect some districts to become less competitive if others became more competitive.").

9.      Cooper admitted that only two Plaintiffs (Griffiths and Hutton) would be moved from a district in the 2012 Plan where the Democratic vote share is under 50 percent to a district in his Proposed Remedial Plan where the Democratic vote share is above 50 percent in any of the three congressional election cycles referenced in his report. (*Id*. at 213:20-214:9). Two other Plaintiffs (Walker and Rader) would be moved from the Ninth District in the 2012 Plan where Democrats received a majority of the vote share under each election cycle to the Ninth District in Cooper's Proposed Remedial Plan where Republicans received a majority of the vote share in two of the three election cycles references in his report. (*Id*. at 208:3-20).

10.      Using the results from the 2012 congressional elections, Cooper opined that under his Proposed Remedial Plan, Democrats would have won a majority of the vote share in six districts while Republicans would have won a majority of the vote share in ten districts. (*Id*. at 89:3-15; Cooper Exhibit 1, Figure 8). However, Cooper stated that this analysis does not mean that Democrats would have actually won six seats if his Proposed Remedial Plan had been in effect in 2012 because he "can't go back in time and resurrect new candidates in different districts or that sort of thing." (*Id*. at 89:19-21.) Cooper conceded that it was possible that his map might also have elected four Democrats and twelve Republicans just as the 2012 Plan did during the 2012 election cycle. (*Id*. at 89:12-90:3).

11.      Using the results from the 2014 congressional elections, Cooper opined that under his Proposed Remedial Plan, Democrats would have a majority of the vote share in four districts while Republicans would have won a majority of the vote share in twelve districts. (*Id*. at 91:4-

91:12; Cooper Exhibit 1, Figure 8).  This hypothetical result mirrors the actual partisan breakdown of Ohio's congressional delegation following the 2014 election cycle under the 2012 Plan.

12.    Using the results referenced from the 2016 congressional elections, under his Proposed Remedial Plan, Cooper opined that Democrats would have a majority of the vote share in five districts while Republicans would have won a majority of the vote share in eleven districts. (*Id*. at 93:5-7; 93:15-24; Cooper Exhibit 1, Figure 8).

13.    On November 30, 2018, Cooper submitted an "errata" to his report and a "corrected" Proposed Remedial Plan to fix an error that would have paired former Speaker of the House John Boehner (and his successor Congressman Warren Davidson) with Congressman Jim Jordan, a scenario Cooper admitted would have been unlikely under any plan adopted by the Ohio General Assembly.  (*Id*. at 131:19-133:16; Exhibit 8, Cooper Exhibit 6).  None of the changes Cooper made to fix this double-bunking would have changed the hypothetically likely political outcomes in any of the districts in his Proposed Remedial Plan.  (*Id*. at 135:8-136:16; 137:13-140:24).

14.    In addition to his "corrected" Proposed Remedial Plan, Cooper drew two additional "hypothetical" redistricting plans in which he purported to take into account the residences of the 2011 incumbents in Ohio's congressional delegation but, in doing so, he did not attempt to pair the *same* incumbents as were paired by the Ohio General Assembly under the 2012 Plan.  (*Id*. at 165:10-18).  When asked why he didn't try to draw a plan pairing the *same* incumbents, Cooper responded:  "Because I might have ended up with the 2012 Plan."  (*Id*. at 165:19-166:4).

Based upon the information contained in his report, the political outcomes among Cooper's Proposed Remedial Plan and his "hypothetical" plans are the same:  there were no differences between either of the "hypothetical" plans Cooper drew and either of his Proposed Remedial Plans

with respect to which political party had a majority of the vote share under the 2012, 2014, or 2016 election cycles using the congressional election results Cooper included in his report. (*Id*. at 163:1-164:7).

15.     Cooper ignored political factors considered by the General Assembly and all public input provided as to the makeup of the congressional districts when drawing Plaintiffs' proposed remedial plan.  Cooper did not review or take into account any comments submitted by the public before the 2012 Plan was enacted as to how they wanted Ohio's congressional districts to be drawn. (*Id*. at 51:20-52:2; 52:9-19).  Cooper also did not take into account any requests or preferences of members of the Ohio General Assembly or of members of Ohio's congressional delegation in drawing his districts.  (*Id*. at 52:20-25).

16.     As with the testimony from the Plaintiffs and their other experts, Cooper offered criticisms of the 2012 Plan but could not articulate any measurable standards by which a redistricting plan should be judged.  For example, Cooper criticized the 2012 Plan for splitting too many counties and political subdivisions but could not provide a maximum number of acceptable county or political subdivision splits for a congressional plan in Ohio.  (*Id*. at 17:25-18:4; 18:17-19:4).  He also could not provide specific parameters or measures for determining whether districts are compact.  (*Id*. at 40:17-41:6).  Rather, Cooper believed his proposed plans would comply "with relevant provisions of the Ohio constitution, U.S. Constitution and federal law" only because "the lawyers have signed off on this."  Cooper admitted, "[B]ut I'm not in a position to interpret federal law." (*Id*. at 39:6-12.)

C.  **Congressional Districts and Individual Plaintiffs**

**First District – Linda Goldenhar**

17. Dr. Linda Goldenhar has resided in Ohio's First Congressional District in Cincinnati for 17 years. (Exhibit 7, Deposition of Linda Goldenhar ("Goldenhar Dep.") at 7:5-12). While Dr. Goldenhar is a Democrat and has always voted for Democrats, she would consider voting for a Republican candidate if that candidate supports the policies and ideals she supports. (*Id.* at 13:4-10, 13:16-14:4).

18. Dr. Goldenhar's current representative, Steve Chabot, is a Republican. (*Id.* at 11:7-19). Mr. Chabot has represented the First Congressional District continuously since 1994, except for one term where the district was represented by Democrat Steve Driehaus. (*Id.* at 11:7-19). While Representative Chabot was not her candidate of choice, he has represented Dr. Goldenhar for nearly all of her time living in Cincinnati, including before the 2012 Plan was enacted. (*Id.* at 11:7-19; 54:19-20).

19. Dr. Goldenhar was asked by ACLU employee Laurie Briggs to be a plaintiff in this lawsuit. (*Id.* at 16:3-17:3). Ms. Briggs knows Dr. Goldenhar socially, and sent Dr. Goldenhar an email stating that the ACLU's research showed the map was unfair and that the ACLU was seeking a plaintiff from each district. (*Id.* at 17:4-12; 24:17-25:16).

20. While Dr. Goldenhar believes that individuals choose to live in an area surrounded by like-minded people and that her urban vote is "diluted" by rural Republican votes, (*Id.* at 43:2-44:13), she admits that when she votes, her vote, is in fact, counted (*Id.* at 41:13-17).

21. Dr. Goldenhar also believes that the map is unfair because of the way it looks, in that urban areas like Cincinnati, Columbus, and Cleveland are split. (*Id.* at 30:8-23) However, Dr. Goldenhar did not know the reasons for splitting those urban areas, and did not know if each Congressional district needed to have a certain, equal, population. (*Id.* at 40:7-17).

22.     Moreover, Dr. Goldenhar has no suggestions on how to fix the current congressional maps and would simply like to know "why" the legislature drew them in that manner. (*Id.* at 46:15-47:13).

23.     Dr. Goldenhar has reviewed Cooper's proposed map and prefers it to the current plan because it looks "fairer." (*Id.* at 47:22-48:14, 49:4-11). Specifically, Dr. Goldenhar likes the way that the districts around Cincinnati, Columbus, and Cleveland are drawn but did not provide more specific details. (*Id.* at 48:5-14).

24.     While Dr. Goldenhar claims the 2012 Plan harms her because it splits Hamilton County, she prefers the Proposed Remedial Map even though it also splits Hamilton County.  (*Id.* at 49:12-16).

25.     Under the Proposed Remedial Plan,[1] Dr. Goldenhar would be placed in the First District where Republicans have a majority of the vote share under the three congressional elections cited in Cooper's report.  (Cooper Dep. at 199:23-201:7; Cooper Exhibit. 6-Ex. S; Exhibit 9, Cooper Exhibit 12).  This is the same result as under the 2012 Plan.  (*Id.*)

**Douglas Burks- Second District**

26.     Douglas Burks has lived in Hamilton County in Ohio's Second Congressional District since 1979. (Exhibit 10, Deposition of Douglas Burks "Burks Dep." at 7:23-8:17). He is represented by Representative Brad Wenstrup, a Republican. (*Id.* at 8:18-8:20). Dr. Burks is a Democrat. (*Id.* at 18:23-19:7). He acknowledged that the Second District has been a majority Republican district for "a very long time." (*Id.* at 31:8-31:11).

---

[1] All references to the Proposed Remedial Plan are to the "corrected" Proposed Remedial Plan which Cooper testified that he intended to be the "operative" Remedial Plan for Plaintiffs after he submitted it on November 30, 2018.  (Cooper Dep. at 136:9-15).

27.    Dr. Burks became a plaintiff in this lawsuit after being asked by Paul Moke at the ACLU. (*Id.* at 11:12-14:16; 15:11-16).  He would never have considered filing a lawsuit on his own if he had not been approached by the ACLU. (*Id.* at 16:11-16:16).

28.    Dr. Burks is a member of an advocacy organization called the Friends Committee on National Legislation ("Friends"). (*Id.* at 33:13-33:20). As part of his work with the Friends, Mr. Burks has lobbied and met with numerous politicians, including Congressman Wenstrup. (*Id.* at 35:22-38:14; 76:1-93:23).  He believes he has "been listened to" by the Republican congressmen who have represented him in the Second District. (*Id.* at 74:15-74:25, 75:1-75:16).

29.    Dr. Burks has engaged in election activity in his district such as canvassing and distributing campaign material and admits that nothing about the 2012 Plan prohibited him from engaging in election activities on behalf of Democrats.  (*Id.* at 93:24-94:23; 95:25-96:6).

30.    In his canvassing efforts, he claims to have encountered people who were apathetic and said they did not plan to vote but he admits that nothing about the 2012 Plan kept those voters from casting votes and that any failure to do so by them "was a personal choice." (*Id.* at 119:14-119:23). He has also participated in protests in Ohio and nothing about the 2012 Plan has kept him from doing that.  (*Id.* at 119:24-120:10).

31.    Through this lawsuit, Dr. Burks believes he is challenging what he perceives to be an uneven split between Republicans and Democrats in the makeup of Ohio's statewide congressional delegation. (*Id.* at 38:15-42:4; 45:23-47:16). He also feels that Democratic votes are "wasted" in Ohio because of the way the Republican legislature "rigged" the 2012 Plan but could not state at what point a district becomes "rigged."  (*Id.* at 42:5-42:23).

32.    Dr. Burks believes that mapdrawers, in crafting a "fair" map, should consider keeping counties intact, keeping areas of "shared concerns" intact, and compactness of districts

but does not know whether the Ohio General Assembly considered these requirements when enacting the 2012 Plan. (*Id.* at 51:5-17;52:3-52:14).

33.     Dr. Burks has a problem with the shape of his district because it includes both rural areas and urban and suburban areas. (*Id.* at 52:15-53:21) But he admits that the suburban area in which his resides, Norwood, has been in the Second District along with the same rural areas prior to the enactment of the 2012 Plan. (*Id.* at 54:11-56:21; 57:13-57:17). He thinks Democrat voters have been "cracked" in both the First and Second District but that the Democrat voters in these districts were "cracked" prior to the enactment of the 2012 Plan, starting in 2000. (*Id.* at 58:13-59:4; 59:5-59:13). He does not have an opinion about how his district should be drawn so that it is not allegedly "cracked." (*Id.* at 60:12-60:17).

34.     Under the Proposed Remedial Plan, Dr. Burks would be placed in the First District with Dr. Goldenhar where Republicans have a majority of the vote share under the three congressional elections cited in Cooper's report. (Cooper Dep. at 199:23-201:7; Cooper Exhibit 6- Ex. S; Cooper Exhibit 12). Dr. Burks prefers the Proposed Remedial Plan because it places him in the First District and does not care that the Proposed Remedial Plan makes the Second District even more Republican than it is under the 2012 Plan (Burks Dep. at 60:18-65:18; 66:10-66:12).

### Sarah Inskeep- Third District

35.     Ms. Inskeep has resided in Ohio's Third Congressional District in Columbus since May 2016. (Exhibit 11, Deposition of Sarah Inskeep "Inskeep Dep." at 6:19-7:2). Ms. Inskeep is a Democrat and has always voted Democrat but would "absolutely consider" voting for a Republican or an independent candidate who supports policies that she supports. (*Id.* at 65:20-66:19)

36.     Ms. Inskeep is currently represented in Congress by Representative Joyce Beatty. (*Id.* at 11:25-12:7). Representative Beatty is a Democrat and Ms. Inskeep testified that she wants to live in a district that is represented by Democrat because they "support the values that [she] share[s]." (*Id.* at 56:11-56:17; 63:16-64:5).

37.     Prior to May 2016, Ms. Inskeep lived in Cincinnati, Ohio in Ohio's First Congressional District. (*Id.* at 7:3-8:19; 27:19-28:10). She prefers living in the Third Congressional District where she is represented by a Democrat over living in the First Congressional District where she was represented by a Republican. (*Id.* at 57:6- 16). She believes Representative Beatty has been a "wonderful representative" and that she has "made herself available" to the people in her district. (*Id.* at 57:10-57:16).

38.     Ms. Inskeep was asked by an employee of the ACLU, Ann Ruege, to be a plaintiff in this lawsuit. (*Id.* at 29:15-32:11). She would not have filed this lawsuit on her own if she had not been recruited by the ACLU. (*Id.* at 32:12-32:15).

39.     Ms. Inskeep works at Planned Parenthood where she is tasked with crafting all internal and external messaging of the organization's political arm. (*Id.* at 9:3-9:15). She also participates in electoral activity on the organization's behalf. (*Id.* at 9:3-9:15; 10:13-11:19; 13:3-13:24; 14:6-21:19; 80:12-87:13). She raised money for the organization's Super PAC, ran door-to-door canvassing, ran phone bank operations, and directed voter contact operations. (Id.) In 2018, Planned Parenthood's political arm endorsed Joyce Beatty, Marcia Fudge, and Tim Ryan, all Democratic victorious congressional candidates in Ohio. (*Id.* at 11:20-13:2).

40.     Ms. Inskeep complained that the 2012 Plan negatively impacted Planned Parenthood's decision on where its PAC should spend election money. (*Id.* at 93:9-93:13). Specifically, the PAC chose not to contribute to Representative Beatty in the Third District because

it was believed to be a foregone conclusion that she would win. (*Id.* at 93:17-93:24).  Ms. Inskeep admitted, however, that had the PAC become involved in the Third District, it would have been to support Representative Beatty. (*Id.* at 94:14-95:8). Ms. Inskeep could not explain how she was harmed by the PAC's decision not to become involved in the Third District since her candidate of choice, Representative Beatty, won the election. (*Id.* at 94:14-95:10).

41.     Ms. Inskeep wants a map "that gives voters an opportunity to feel like their vote matters and that they feel like they're participating in a democratic process." (*Id.* at 39:6-40:5). She believes that one way to show that a district is not fair is when it splits communities of interest but she could not identify any communities that she believes should be included in her district under the 2012 Plan but are not. (*Id.* at 42:22-45:5, 45:23-47:2;74:23-75:6). Ms. Inskeep believes that the 2012 Plan has increased voter apathy, but admits that voter apathy existed prior to 2012 and could not articulate how the 2012 Plan has actually increased voter apathy.  (*Id.* at 90:8-93:7).

42.     Ms. Inskeep believes that the current congressional map as a whole is "unfair and not competitive" and believes that she lives in a "packed" district and that her vote is not "weighed the same" but admitted that all votes are counted equally regardless of whether they are cast by a Democrat or a Republican. (*Id.* at 33:13-34:2; 51:1-12).

43.     Ms. Inskeep believes she is in a "packed" district because her "district looks like a box" and because it is a majority Democratic district. (*Id.* at 70:10-70:24; 73:5-73:15).  She does not believe that every district that is a majority Democratic district is unfair or noncompetitive and does not have any specific suggestions on how to "fix" the alleged problem she identified in her district. (*Id.* at 73:16-74:21; 97:7-100:15). She also does not have any opinion on when a district becomes "packed." (*Id.* at 78:16-80:9).

44.     Under the Proposed Remedial Plan, Ms. Inskeep remains in the Third District, a safe Democratic seat.  (Cooper Dep. 201:25-202:8, Cooper Exhibit 12).

### Cynthia Libster- Fourth District

45.     Cynthia R. Libster lives in Marion County, Ohio which is located in Ohio's Fourth Congressional District. (Exhibit 12, Deposition of Cynthia Libster "Libster Dep." at 10:12-21). She has lived in this district for almost thirty years. (*Id.*).  Her representative since 2006 has been Jim Jordan, a Republican. (*Id.* at 10:21-11:25). Previously, Ms. Libster was represented by Republican Congressman Mike Oxley since the 1980s. (*Id.* at 10:21-11:25)

46.     Ms. Libster's husband was contacted by an acquaintance asking him if he would be interested in participating in a lawsuit regarding the alleged gerrymandering in Ohio. (*Id.* at 15:16-17:2).   He declined because he felt that his former position as a legal aid attorney made it inappropriate, however, he asked his wife, Ms. Libster if she wanted to participate. (*Id.* at 15:16-21).  She was then interviewed by the ACLU and joined the lawsuit.  (*Id.* at 15:16-17:2). Prior to joining the lawsuit, she had no intention of filing a lawsuit related to redistricting in Ohio. (*Id.* at 17:10-14).

47.     Ms. Libster wants her "district to have an opportunity for both Democrats and Republicans to run equally." (*Id.* at 23:24-24:6).  However, she does not know how what such a district would look like. (*Id.* at 23:24-25:11).  She admits that her district is "very Republican" and that a Republican has represented her district for the last thirty years.  (*Id.* at 26:24-27:21; 48:21-49:9). She testified she believes her district has been cracked in some areas, but could not say specifically how.  (*Id.* at 72:15-21).

12

48.     While Ms. Libster criticized an alleged nonappearance by Representative Jordan's at a forum put on by the League of Women Voters, she admitted that she was unsure as to whether Representative Jordan had a conflict that prohibited him from attending the forum. (*Id.* at 30:19-33:18). In any event, Ms. Libster chose not to attend the candidate forum (*Id.* at 30:21-22).

49.     Although Ms. Libster admitted that her district was "solidly Republican," she testified that "I don't want to feel like every time I go vote for the Democrat they're going to get pounded by thirty percent, forty percent."  (*Id.* at. 28:24-29:12).

50.     Under the Proposed Remedial Plan, Ms. Libster remains in the Fourth District, a solidly Republican District, but the district has an even higher Republican vote share under the Proposed Remedial Plan than under the 2012 Plan.  (Cooper Dep. at 202:9-25).

51.     Cooper testified that this outcome "really doesn't matter" because "effectively, a Republican district is a Republican district" and "[y]ou can't placate all [of the] plaintiffs at once" because it is "[j]ust not geographically possible."  (*Id.* at 202:13-22).

### **Kathy Deitsch - Fifth District**

52.     Plaintiff Kathy Deitsch has resided in Mercer County and Celina, Ohio since 2013. (Exhibit 13, Deposition of Kathy Deitsch "Deitsch Dep." at 10:21-23; 11:7-8).  Before 2013, Ms. Deitsch lived in another state.  (*Id.* at 11:16-18).

53.     Ms. Deitsch's address is in Ohio's Fifth Congressional District, and her current representative is Bob Latta, a Republican.  (*Id.* at. 14:3-10).

54.     Representative Latta has served as Ms. Deitsch's congressional representative since her move to Ohio in 2013 and represented the Fifth District before the 2012 Plan.  (*Id.* at 14:16-19).

55.     Although Ms. Deitsch does not support Representative Latta, she has voted for Republican candidates in the past.  (*Id.* at 16:14-24).  She also would consider voting for Republicans in the future if she believed they represented "responsible government."  (*Id.* at. 18:24-25). Despite not supporting Mr. Latta, Ms. Deitsch could not specify anything Representative Latta had said or done that made her feel that he lacked knowledge of or concern for Mercer County.  (*Id.* at. 82:14-19).

56.     Despite alleging in the complaint that she lives in a cracked district, Ms. Deitsch could not define the term "cracked" or state why she believed she lived in a cracked district.  (*Id.* at 65:7-8).  She testified that she had heard the terms "cracking and packing," but could only describe packing as what "you put things in."  (*Id.* at 65:14).

57.     Although Ms. Deitsch suspects that the division of Mercer County contributes to voter confusion and voter apathy, Ms. Deitsch noted that she has consistently been able to help voters figure out what districts they live in.  (*Id.* at 53:15-23).

58.     Since moving to Ohio in 2013, Ms. Deitsch has been able to vote and campaign for Democrat candidates of her choice in every congressional election.  (*Id.* at 15:12-16:13; 48:5-8; 30:25-31:6).  In fact, Ms. Deitsch believes that the 2012 map has "encouraged" some of her efforts to recruit Democrat candidates and engage in Get Out the Vote efforts.  (*Id.* at 84:6-24; 86:24-87:5).

59.     Ms. Deitsch testified that Mercer County is in a reliably conservative part of the state and  described the area as "Trumpland" and as "a really predominant, strong Republican rural area."  (*Id.* at 13:19-14:2; 35:8-9; 106:21-107:25).

60. Under the Proposed Remedial Plan, Ms. Deitsch would be assigned to the Fourth District, which, like the Fifth District under the 2012 Plan, is a "safe" Republican district. (Cooper Dep. 203:2-7, Cooper Exhibit 12).

**Sixth District – Luann Boothe**

61. Ms. Boothe has lived in Jefferson County in Ohio's Sixth Congressional District for 64 years, her entire life. (Exhibit 14, Deposition of Luann Booth "Boothe Dep." at 7:25-9:4).

62. Ms. Boothe became a plaintiff in this lawsuit after a law school friend of her son, Kyle Hutnick, referred the ACLU to her. (*Id.* at 9:14-14:7). Ms. Boothe did not have any plans to file a lawsuit until she was contacted by the ACLU. (*Id.* at 93:21-94:7).

63. Ms. Boothe is a Democrat, but has voted for Republicans in the past, and admits that she could potentially vote Republican in the future. (*Id.* at 49:8-49:10; 49:25-50:18; 103:15-103:18). She is not always a "straight ticket" voter. (*Id.* at 52:23-53:8).

64. Ms. Boothe does not like how Republican her district has become and believes it was more competitive when she was growing up in the 1970s than it is now. (*Id.* at 19:21-22:6). But Ms. Boothe did not recall the electoral results in her district during the time in which she lived in it and didn't know if her area of the state has become more Republican since her childhood as a result of factors other than the 2012 Plan. (*Id.* at 36:8-36:25, 40:4-41:19; 54:23-55:24).).

65. Ms. Boothe believes that her community of interest includes Jefferson, Harrison, Carroll, and Belmont counties, all of which are included in the Sixth District under the 2012 Plan. (*Id.* at 58:19-59:20; 68:2-69:15; 70:18-70:21).

66. Ms. Boothe claims that her current congressional representative, Republican, Bill Johnson, is not as responsive as her previous Democratic Representative, Charlie Wilson. (*Id.* at 38:5-8; 41:20-41:23). But she admits that she has not tried to contact Representative Johnson

recently. (*Id.* at 42:13-42:15). She also has not written Representative Johnson any letters or tried to visit him at his offices. (*Id.* at 43:9-43:14). She admits that nothing about the 2012 Plan prevents her from trying to contact Congressman Johnson. (*Id.* at 43:15-43:21).

67. Ms. Boothe thinks the 2012 Plan has caused her harm because she believes her district is too partisan and people were "rude and obnoxious" to her when she canvassed. (*Id.* at 16:5-18:19). Ms. Boothe, however, admitted that she could not say whether her experiences were the result of the 2012 plan or other factors such as national political attitudes and does not know the political affiliation of the individuals who were "rude and obnoxious" to her when she canvassed. (*Id.* at 19:2-19:20, 72:2-73:5, 94:8-98:15).

68. Ms. Boothe admitted that she has always been able to cast a valid ballot under the 2012 Plan. (*Id.* at 29:20-30:10). She admitted that voting under the 2012 Plan "requires an effort like it always did" prior to the enactment of the plan and that she "will make the effort to vote." (*Id.* at 30:4-30:10). She also admits that the current Plan has not prevented her from engaging in organizing or other election-related activities in her district. (*Id.* at 57:11-57:13; 64:18-66:15).

69. Ms. Boothe believes her vote "doesn't carry any weight" because she lives in a majority Republican district. (*Id.* at 53:9-53:13). But she admits that both Republican and Democrat votes are counted equally when they are cast in her district. (*Id.* at 53:14-53:18) She does not know what percentage of Democrat voters would need to be placed into her district in order for her to feel the district was "competitive." (*Id.* at 58:25-59:7; 75:7-75:11).

70. Ms. Boothe was unsure of whether she wanted the Court to adopt the Proposed Remedial Plan. (*Id.* at 60:18-64:12). Under the Proposed Remedial Plan, Ms. Boothe is assigned to the Sixth District just as she is under the 2012 Plan, however, the Democratic Party vote share in the Sixth District under the Proposed Remedial Plan would be lower than under the 2012 Plan

16

when evaluated under the election statistics cited in Cooper's report and the Republican vote share in the District would remain majority Republican.  (Cooper Dep. 203:17-204:21, Ex. 12).

### Seventh District – Mark Griffiths

71.     Mark Griffiths has resided in Lorain County and North Ridgeville, Ohio for fifteen years.  (Exhibit 15, Deposition of Mark Griffiths "Griffiths Dep." at 10:21-25; 11:8-10).  Since 2012, this address has been in Ohio's Seventh Congressional District.  (*Id.* at 11:13-15).  Republican Bob Gibbs has represented the Seventh District since that time.

72.     Mr. Griffiths did not vote for Representative Gibbs in any election from 2012 through 2018, choosing to abstain from the 2014 congressional election when Representative Gibbs ran unopposed.  (*Id.* at 12:14-25; 13:8-14:1).

73.     Despite Mr. Griffiths' opposition to Representative Gibbs, Mr. Griffiths has voted for a Republican in the past, including Senator Rob Portman, and would consider voting for Republicans in the future, "if [he] felt a Republican was a better candidate" in terms of background, experience, and positions on issues. (*Id.* at 14:22-25; 16:8-17:10).

74.     Mr. Griffiths believes he lives in a "cracked" district in which the mapmakers separated the Democrats in Lorain County into three districts.  (*Id.* at 100:10-22).  Mr. Griffiths would prefer to live in a district in which Lorain County remains intact but admitted that he doesn't "think it's practical" to do so given the equal-population demands of redistricting.  (*Id.* at 52:14-25).

75.     Mr. Griffiths believes that maps should "reflect[] some community of interest of people in the district" but was unable to identify any communities of interest that should be in the Seventh District but are not.  (*Id.* at 53:12-55:3).

76.     Mr. Griffiths testified that Representative Gibbs fails to respond to the issues that the "few Democrats" in Seventh District might raise. (*Id.* at 61:11-13). But he admitted that he doesn't "expect a Congressman to always agree with [his] views," so long as the Congressman "take[s] [his] views into account and pay[s] attention to them." (*Id.* at 63:4-8).

77.     Mr. Griffiths described several occasions on which Representative Gibbs met with Democrats and Democratic organizations, including Mr. Griffiths, to hear Democrats' views. First, the local chapter of Indivisible arranged an in-person meeting with Representative Gibbs on healthcare issues in April 2017, when the group expressed concerns to Representative Gibbs about the Republicans' proposed healthcare plans. (*Id.* at 22:23-24:5). Additionally, Mr. Griffiths attended a meeting with Representative Gibbs in Canton to discuss healthcare issues and later dropped off correspondence at Representative Gibbs' office regarding an immigration issue. (*Id.* at 73:1-24; 76:10-18). Mr. Griffiths acknowledged that Representative Gibbs' multiple meetings with these groups showed that Representative Gibbs took Mr. Griffiths' and Democrats' views into account. (*Id.* at 63:10-15).

78.     Mr. Griffiths also believes that the 2012 map prevents him from connecting with volunteers in other counties within the Seventh District. (59:20-60:5) But Mr. Griffiths admitted that it was his personal preference—not any hindrance from the map itself—to volunteer and canvass in and near Lorain County. (*Id.* at 64:21-65:12). Mr. Griffiths identified just one instance in which poor weather caused him not to participate in a campaign activity with other Democrats. (*Id.* at 66:7-16).

79.     According to Mr. Griffiths, the 2012 Plan has hampered the identification of Democrat candidates to run against Representative Gibbs. But Mr. Griffiths also acknowledged that he voted for Democrat candidates of his choice in the 2012, 2016, and 2018 congressional

18

elections. (*Id.* at 12:14-25; 13:8-14:1). In 2014, when Representative Gibbs ran unopposed, Mr. Griffiths did not run against him or locate or encourage any other Democrat to do so. (*Id.* at 67:2-18).

80.     Finally, Mr. Griffiths stated that the 2012 Plan injured him because Representative Gibbs sent his wife correspondence that misidentified the issue in her initial letter. (*Id.* at 68:19-69:4). But Mr. Griffiths admitted that he never received a mismatched response from Representative Gibbs himself and, in fact, "could think of one time [he] wrote to him, and [he] got a response that responded to the issue that [he] raised." (*Id.* at 69:11-13).

81.     As a remedy, Mr. Griffiths asks the Court to adopt the remedial map drawn by Mr. Cooper. (*Id.* at 98:11-14). He believes the map will allow him to elect a Democrat representative and testified that he would prefer to live in a district that elects Democrat representatives. (*Id.* at. 99:3-8; 90:14-91:6). Overall, Mr. Griffiths is looking for a map that is "close to proportion[al]" to the makeup of Republican and Democrat voters in the state. (*Id.* at 104:15).

82.     Under the Proposed Remedial Plan, Mr. Griffiths is placed in the Ninth Congressional District. (Cooper Dep. 204:22-205:10, Cooper Exhibit 12). Although Democrats would have a majority of the vote share in the Ninth District in the Proposed Remedial Plan during the 2012 election cycle, Republicans would have a majority of the vote share in the 2014 and 2016 election cycles using the election results relied upon by Cooper in his report. (*Id*. at 205:11-24)

**Eighth District – Larry Nadler**

83.     Mr. Nadler has lived in Oxford, Ohio, in the Eighth District for 28 years. (Exhibit 16, Deposition of Larry Nadler "Nadler Dep." at 6:18-7:15). Mr. Nadler is a Democrat, who has voted for Democrats, with one exception, during his time in the Eighth District. (*Id.* at 8:4-20).

However, Mr. Nadler stated that he doesn't "blindly" vote by party, and would consider voting for candidates other than Democrats under the right circumstances. (*Id.* at 11:7-25).

84.    Mr. Nadler is currently represented by Representative Warren Davidson, a Republican, who was not his candidate of choice. (*Id.* at 29:12-19). A Republican has also represented Mr. Nadler in the Eighth District for the last 28 years, including former Speaker of the House John Boehner. (*Id.* at 31:24-33:24) Mr. Nadler admits that a Republican has represented Ohio's Eighth Congressional District since 1939. (*Id.* at 31:24-33:24). Mr. Nadler further admits that Representative Davidson is involved in his community and sends a congressional aide to his town every month to hear constituent concerns, which Mr. Nadler and his wife routinely attend. (*Id.* at 29:18-30:4).

85.    Mr. Nadler was asked to be a plaintiff in this lawsuit by an executive board member of the Oxford League of Women Voters, Jenny Fisher, and Counsel for the ACLU. (*Id.* at 12:20-13: 14). Mr. Nadler did not seek out an opportunity to become a plaintiff, and in fact, was not specifically targeted as the plaintiff for the Eighth District, as Ms. Fisher sent an email to multiple individuals seeking participation in this lawsuit. (*Id.* at 15:3-16:3).

86.    Mr. Nadler has been concerned about gerrymandering "for a long time" because "it's been around for a long time." (*Id.* at 25:9-15). Mr. Nadler believes that the districts, including his own district, should be indicative of the area they represent, but admits that he has no constitutional right to be represented by someone who holds his same values. (*Id.* at 43:8-23; 48:11-14).  In fact, Mr. Nadler admits that his current Republican representative was elected "fair and square." (*Id.* at 40:25-41:15).

87.     Mr. Nadler believes that he is harmed by the 2012 Plan due to the way other districts in the state are drawn, including around Columbus, and Cincinnati. (*Id.* at 43:20-44:8; 55:9-19; 81:14-82:8).

88.     Mr. Nadler could not identify any concern with his district that would be resolved by the Proposed Remedial Plan. (*Id.* at 66:22-67:9)

89.     Under the Proposed Remedial Plan, Mr. Nadler remains in the Eighth District in which Republicans received a majority of the vote share.  (Cooper Dep. 205:25-206:5, Cooper Exhibit 12; Nadler Dep. at 65:13-67:9).

### Ninth District – Tristan Rader

90.     Plaintiff Tristan Rader resides in Lakewood, Ohio, in Cuyahoga County. (Exhibit 17, Deposition of Tristan Rader "Rader Dep." at 8:16-9:21). He has resided in Lakewood since 2012. (*Id.* at 8:16-9:21).

91.     Mr. Rader lives in Ohio's Ninth Congressional district, and his candidate of choice, Marcy Kaptur, represents him. (*Id.* at 14:11-13). Mr. Rader is a Democrat, and has generally always voted Democratic. (*Id.* at 18:14-20). Mr. Rader has campaigned for numerous Democrats including for Hillary Clinton, Ted Strickland, and Bernie Sanders during the 2016 election cycle. (*Id.* at 30:4-14; 31:3-6). Mr. Rader also identifies as a Democratic Socialist. (*Id.* at 39:15-17).

92.     Mr. Rader was contacted about becoming a plaintiff in this lawsuit by a friend, Ihaab Syed, who works for the ACLU. (*Id.* at 57:9- 58:5). Mr. Rader believes that the decision for him to become a plaintiff in this lawsuit was entirely the ACLU's. (*Id.* at 62:21- 63:4) In fact, Mr. Rader testified that the decision "had nothing to do with what I wanted" and "was on [the ACLU]." (*Id.* at 62:21- 63:4).

93.     Mr. Rader testified that he was harmed by the 2012 Plan because he lives approximately 100 miles from where his congressional representative is located. (*Id.* at 66:10-67:19). He preferred being represented by Dennis Kucinich who resided in the Cleveland area. (*Id.* at 67:20-68:18).   Despite complaining about the size of the Ninth District, Mr. Rader acknowledged that from 2002 to 2012, the Ninth District spanned from Toledo to Lorain, where Mr. Rader resided with his parents prior to 2012 and is only about 20 miles away from where he currently lives. (*Id.* at 73:20-74:4; 80:10-11).

94.     Mr. Rader believes the size of his district infringes upon his First Amendment Right to Freedom of Speech, as the distance to Ms. Kaptur's office headquarters makes it difficult for him to go to her office to engage in protests. (*Id.* at 111:4-15). Mr. Rader, however, concedes that nothing in the current districting plan prevents him from going and protesting in front of her office in Toledo and that nothing about the 2012 Plan prevents him from protesting in front of her smaller office in Cleveland. (*Id.* at 111:16-112:23).

95.     Mr. Rader also testified that he is harmed because he is "packed" in a district with other Democratic voters and that Democratic candidates win by a "40 point spread" and that his vote does not count. (*Id.* at 97:22-98:4). He is disappointed that his vote is not "able to determine the outcome of an election." (*Id.* at 77:5-78:2). However, Mr. Rader could not provide criteria for how his district could not be "packed" and did not have any basis for determining how many Democrats or Republicans should make up a district so that it is not "packed." (*Id.* at 110:5-10). Despite Mr. Raider's concern that his vote does not "determine the outcome" of an election, Mr. Rader admits that his candidate of choice, Representative Kaptur, represents him. (*Id.* at 77:21-23).

96.     Mr. Rader believes that voters in his district are apathetic because the district is not competitive but acknowledges that he has no right as a citizen to live in an area where people volunteer or engage politically at a level he deems appropriate and could not identify any person who has refused to volunteer on a campaign or to vote as a result of the 2012 Plan. (*Id.* at 123:16-19; 124:25-125:24; 129:19- 130:3).

97.     Under the Proposed Remedial Plan, Mr. Rader would be assigned to the Ninth Congressional District in which Democrats would receive a majority of the vote share under the 2012 elections referenced in Cooper's report but Republicans would receive a majority of the vote share under the 2014 and 2016 elections referenced in Cooper's report. (Cooper Dep. 206:6-208:20). In his deposition, Cooper dismissed a question regarding whether Mr. Rader was "worse off" under his Proposed Remedial Plan and pointed out that his version of the Ninth District was more compact than the version in the 2012 Plan. (*Id.*)

98.     Mr. Rader testified that he "would not be okay" if the Proposed Remedial Plan placed him in a Republican majority district even if that district were more compact. (Rader Dep. at 91:21-92:7).

**Ninth District – Chitra Walker**

99.     Plaintiff Chitra Walker has resided in Lakewood, Ohio in Cuyahoga County since at least 2008. (Exhibit 18, Deposition of Chitra Walker "Walker Dep." at 8:12-9:12). Ms. Walker currently resides in Ohio's Ninth Congressional District and is represented by Marcy Kaptur, a Democrat. (*Id.* at 83:16-85:3). Ms. Walker recalls voting for Representative Kaptur every year she has been on her ballot. (*Id.* at 83:16-85:3).

100.     Ms. Walker registered to vote after becoming a United States Citizen in 1987 and considers herself to be a Democrat. (*Id.* at 10: 20-11:25).

23

101.    Despite a strong preference for Democrats, Ms. Walker admits that there could be circumstances where she would vote for a Republican or independent congressional candidate. (*Id.* at 55:9-17).

102.    Ms. Walker became a plaintiff in this lawsuit after being recruited by an ACLU Cleveland board member, Erik Meinhardt. (*Id.* at 35:14-24) Ms. Walker believes Mr. Meinhardt asked her to be a plaintiff in the suit because she's "a member of the Democratic club…" (*Id.* at 36:21-37:3). Prior to her discussions with Mr. Meinhardt, Ms. Walker had not previously expressed any interest in challenging the current districting plan. (*Id.* at 37:4-8).

103.    When asked about her problems with the 2012 Plan, Ms. Walker stated that her "concern is for all of Ohio…" and that her "objection is to the map in general." (*Id.* at 40:2-6; 46:3-8). Ms. Walker said she would "like to see a map that's based on the population of the state…" and that the map should be "more equitable" between Republicans and Democrats. (*Id.* at 46:25-47:7; 48:8-10). Ms. Walker believes there should be more Democratic districts than there are currently but does not know how many more there should be. (*Id.* at 48:17-49:5).

104.    Despite her issues with the 2012 plan as a whole, Ms. Walker is "concerned for [herself] as well." (*Id.* at 40:2-17). Ms. Walker's concern about her district is that she is "packed" or "squeezed" in her district with other Democrats. (*Id.* at 49:6- 15). However, Ms. Walker does not have any ideas on how to fix this issue and cannot say what percentage of Democrats or Republicans makes a district "packed." (*Id.* at 49:6-15; 74:21-75:10).

105.    Because she lives in a heavily Democrat district, Ms. Walker complains that her vote is "diluted" or that it "does not count as much as it should" but concedes that her vote is actually counted and that nothing in the 2012 Plan has kept her, or anyone else she knows from casting a ballot. (*Id.* at 56:18-57:24).  Further, Ms. Walker notes that nothing in the 2012 Plan has

24

prevented her from campaigning for her preferred candidates, donating to the candidate of her choice, or engaging in any voter education activities. (*Id.* at 56:18-57:24).

106.    Ms. Walker believes that she is harmed because Representative Kaptur lives in Toledo and cannot "adequately" represent her views 100 miles away from Lakewood but is happy with the way Representative Kaptur represents the district and is pleased that Representative Kaptur votes the way Ms. Walker would like her to vote on issues before Congress. (*Id.* at 40:20-24; 41:4-13; 41:23-42:2).

107.    Ms. Walker testified that Representative Kaptur is responsive to her when she contacts her office and that she is able to attend meetings with Representative Kaptur. (*Id.* at 42:3-19).

108.    Under the Proposed Remedial Plan, Ms. Walker, like Mr. Rader, would be assigned to the Ninth Congressional District in which Democrats would receive a majority of the vote share under the 2012 elections referenced in Cooper's report but Republicans would receive a majority of the vote share under the 2014 and 2016 elections referenced in Cooper's report.  (Cooper Dep. 206:6-208:20, Cooper Exhibit 12).

### **Tenth District - Ria Megnin**

109.    Ria Megnin has resided in Dayton, Ohio in Ohio's Tenth Congressional District since December of 2010. (Exhibit 19, Deposition of Ria Megnin "Megnin Dep." at 9:4-10:4; 13:5-10). Ms. Megnin is a Democrat but agrees with Republicans on certain issues and thinks "it's perfectly possible to agree with Republicans and people of any party background on specific issues." (*Id.* at 34:3-36:4; Exhibit 20, Megnin Exhibit 1)

110.    Ms. Megnin's current representative, Mike Turner, is a Republican who has represented the District for 16 years. (*Id.* at 13:11-19).

111. Although Ms. Megnin's does not believe that Representative Turner is responsive enough to citizens in the area, she admits that when she has called Mr. Turner's office, someone has always returned her calls. (*Id.* at 17:5-8, 19:6-20:23, 28:2-19). She also could not identify an email that was sent to Representative Turner that was not responded to. (*Id.* at 25:6-9). Further, she cannot identify any communications sent by any of the groups that she associates with that Representative Turner did not respond to. (*Id.* at 33:6-22).

112. Ms. Megin is the regional representative for Region 7 of the National Association of Social Workers, Ohio chapter. (*Id.* at 36:13-20). The political action representative of this region reached out to her sometime in April of 2018 and told her that the ACLU was looking for plaintiffs for a gerrymandering case. (*Id.* at 36:13-37:14). Ms. Megnin then called Ebony Speakes-Hall at the ACLU to learn more about the potential lawsuit. (*Id.* at 36:13-37:14). She admits that, prior to this contact, she had not considered filing a lawsuit related to gerrymandering. (*Id.* at 38:18-39:14).

113. Ms. Megnin also testified that during her canvassing efforts, she encountered voters who stated that they would contribute more money to the campaign races in the district if not for the gerrymandering because they feel that there is not a chance for their candidate to succeed. (*Id.* at 88:10-91:3). However, Ms. Megnin admitted that in her canvassing efforts, she was only "door knocking" on areas that had a "strong record" of "voting Democrat" in the past. (*Id.* at 109:14-110:21). Ms. Megnin further admitted that no law has ever prevented her from canvassing or otherwise volunteering or campaigning for any candidate. (*Id.* at 83:15-25).

114. Ms. Megnin believes that her district is cracked because it includes certain areas such as Greene County that do not reflect Dayton or the majority of the people who live in Dayton or other surrounding suburbs (*Id.* at 49:10-50:4; 51:14-54:9). Ms. Megnin, did not know if the

Dayton area and suburbs are large enough to constitute a congressional district on their own. (*Id.* at 101:25-102:10)

115.    Under the Proposed Remedial Plan, Ms. Megnin would remain assigned to the Tenth District.  (Cooper Dep. 208:21-209:7; Cooper Exhibit 12).  Although Ms. Megnin testified that she believed Democrats would have a much better chance to vote out Representative Turner under the Proposed Remedial Plan (Megnin Dep. at 64:20-65:4), the election results relied upon by Cooper in his reports are within a single percentage point of the election results under the 2012 Plan and Cooper admitted that the Tenth District would be "a safe Republican district" under both maps (Cooper Dep. 208:21-209:7; Cooper Exhibit 12).

### Eleventh District – Andrew Harris

116.    Plaintiff Andrew Harris has resided in Cleveland in the Eleventh Congressional District his entire life. (Exhibit 21, Deposition of Andrew Harris "Harris Dep." at 7:4-8:17). Mr. Harris is a registered Democrat who has always voted for Democrats. (*Id.* at 10:9-13).

117.    Marcia Fudge, a Democrat, represents Mr. Harris in the Eleventh District. (*Id.* at 10:2-8).  Despite voting for Representative Fudge, Mr. Harris testified that Representative Fudge is not his ideal candidate and wishes that Cleveland was represented by a more moderate, pro-business Democrat. (*Id.* at 16:25-18:20).

118.    Despite being a Democrat, Mr. Harris' chief complaint with the current Eleventh District is the inclusion of Akron, Ohio in the district along with that area's "liberal" Democrats. (*Id.* at 19:25-21:8).  Mr. Harris believes that Akron's brand of Democrats and Cleveland's brand of Democrats are different, and that despite characterizing many of his friends in the Cleveland

area as more liberal than him, believes that a congressional district drawn without Akron would result in a more moderate district. (*Id.* at 20:20- 21:8; 26:14-19; 28:2-30:12).

119.   Mr. Harris directly relates his harm from the current plan to being placed in a district with other Democrats whose beliefs are "not representative of …[his] perspective politically" as he has different beliefs that do not relate to those "different brand[s] of liberalism." (*Id.* at 21:4-8).

120.   Mr. Harris also believes that he is in a "packed" congressional district, and because the district is "packed", that his vote is "diluted" and does not count. (*Id.* at 15:22- 16:20). Mr. Harris believes that "packing" occurs when there is intent to place Democrats in one area together for the purpose of diluting their vote. (*Id.* at 16:5-20; 34:9-21). Mr. Harris believes his vote is "diluted" because he is "surrounded by an inordinate number of democratic voters" therefore his vote is not necessary for a Democrat to win the election. (*Id.* at 16:5-20; 19:25-20:12). However, Mr. Harris cannot point to a percentage of votes required for a district to be "packed", or for his district not to be "diluted" with an "inordinate amount" of Democrats. (*Id.* at 19:17-21; 21:9-14).

121.   Despite his contentions regarding his district, Mr. Harris agrees that his vote is, in fact, counted by the board of elections and he does not know anyone who has been prevented from voting or who has refused to vote as a result of the 2012 Plan. (*Id.* at 22:9-12; 16:21-17:6). Mr. Harris further admits that the candidate he cast his vote for, Representative Fudge, has routinely been elected. (*Id.* at 16:21-17:6).

122.   Under the Proposed Remedial Plan, Mr. Harris would remain in the Eleventh District which Cooper agreed would continue to be "a very safe Democratic district."  (Cooper Dep. 209:8-18; Cooper Exhibit 12).

### **Twelfth District – Aaron Dagres**

123.    Aaron Dagres has resided in Ohio's Twelfth Congressional District since 2010. (Exhibit 22, Deposition of Aaron Dagres "Dagres Dep." 10:6-11; 11:15-17). The Twelfth District is currently represented by Troy Balderson, a Republican first elected during a special election on August 7, 2018. (*Id.* at 11:18-22).  Prior to the special election, the district was represented by Pat Tiberi, a Republican, since 2001. (*Id.* at 12:4-11).

124.    Mr. Dagres serves as the President of the Licking County Democratic Club PAC as well as a Central and Executive Committee member of the Licking County Democratic Party. (*Id.* at 84:12-20). He did not vote in the 2013 or 2014 elections.  (*Id.* at 40:18-41:12).

125.    Mr. Dagres received a phone call from the ACLU asking him to join this lawsuit. (*Id.* at 19:14-24).  Prior to being contacted, Mr. Dagres was not contemplating filing a lawsuit over political gerrymandering. (*Id.* at 106:20-107:9).

126.    Although the Twelfth District has consistently been represented by a Republican, Mr. Dagres believes that his vote has been diluted and "watered down through a cracking and packing gerrymandering" and "that representation is truly inexistent." (*Id.* at 27:21-28:4). However, Mr. Dagres admitted that, since 1939, there has been only one Democratic congressional representative from this district. (*Id.* at 72:24-25).  He also could not state how the district could be drawn so that it is not "cracked." (*Id.* at 53:8-19).

127.    Although Mr. Dagres complained about split counties under the 2012 Plan, he admitted that his home county, Licking, remains split between two Congressional Districts under the Proposed Remedial Plan and that he would remain in the Twelfth District under the Proposed Remedial Plan.  (*Id.* at 61:14-62:5; 162:23-163:3).  In addition, despite Mr. Dagres's belief that the Twelfth District would "be a more competitive district based off of historicals" (*Id.* at 65:7-

20), Cooper agreed that the Twelfth District in the Proposed Remedial Plan would be a "very safe" district for a Republican.  (Cooper Dep. 209:19-25; Cooper Exhibit 12).

### Thirteenth District – Liz Myer

128.    Dr. Myer has lived in Trumbull County in Ohio's Thirteenth Congressional District for the past 22 years. (Exhibit 23, Deposition of Liz Myer "Myer Dep." at 10:2-11:2). She is a Democrat and her representative in the Thirteenth Congressional District is Congressman Tim Ryan, a Democrat. (*Id.* at 11:3-11:6; 12:7-12:10; 15:15-15:18).

129.    Dr. Myer's congressional district has been a majority Democrat district since "at least way back into probably the '70s." (*Id.* at 19:14-20:4). Dr. Myer wants to be represented by a Democrat. (*Id.* at 31:10-31:16; 37:9-37:10). A Democrat is her candidate of choice and she has been successful in electing a candidate of her choice. (*Id.* at 45:4-45:11).

130.    She has mainly voted for Democrats but has voted for Republicans in the past. (*Id.* at 13:2-15:14).  She would also consider voting for Republican or Independent candidates in the future who represented her values. (*Id.* at 16:19-17:7).

131.    Dr. Myer was asked by her daughter, who knew someone at the ACLU, to become a plaintiff in the lawsuit. (*Id.* at 25:11-27:16).

132.    Dr. Myer likes her current congressperson, Democrat Tim Ryan. (*Id.* at 31:20-32:2).

133.    Dr. Myer admits that she lives in a "very Democratic area" and that she does not know whether or not she lives in an area of the state that has enough Republican voters for her to reside in a district that could elect a Republican representative. (*Id.* at 35:20-36:7; 39:3-39:4).

134.    Dr. Myer said she felt like the way the district was drawn could make Congressman Ryan unresponsive to voters because his reelection was allegedly assured by the shape of the

district but could not describe any specific instances where Congressman Ryan had actually been unresponsive to her.  (*Id.* at 51:25-53:10)

135.    Under the Proposed Remedial Plan, Dr. Meyer would remain in the Thirteenth District which Cooper described as "certainly leaning strongly Democratic."  (Cooper Dep. 210:2-15; Cooper Exhibit 12).

### Fourteenth District – Beth Hutton

136.    Plaintiff Beth Hutton resides in Mentor, Ohio, in Lake County, where she has lived for 34 years. (Exhibit 24, Deposition of Beth Hutton "Hutton Dep." at 8:21-9:6). Ms. Hutton resides Ohio's Fourteenth District, which during her time living in Mentor, "has basically stayed the same, but it's gotten bigger as the number of representatives has decreased in Ohio" (*Id.* at 9:22-10:16).

137.    She is a registered Democrat, but often votes for Republicans at the local level. (*Id.* at 12:21-13:23). In deciding who to vote for, Ms. Hutton testified that she considers individuals and their stances, rather than just party membership. (*Id.* at 16:6-25).

138.    Ms. Hutton testified that the Fourteenth District is a majority Republican district. (*Id.* at 26:23-27:4).

139.    Representative David Joyce, a Republican, represents Ms. Hutton in the Fourteenth district. (*Id.* at 25:12-20). Previously, Ms. Hutton was represented by another Republican, Steven LaTourrette.  (*Id.* at 26:7-20).  Ms. Hutton voted for Representative LaTourrette at least once. (*Id.* at 14:22-15:22).

140.    Ms. Hutton became a plaintiff in this lawsuit after the previous Fourteenth District plaintiff withdrew. (*Id.* at 27:5- 28:22). Ms. Hutton was approached by a cousin who told her the ACLU was looking for a new plaintiff in her district. (*Id.* at 27:5-28:14).

141.    Ms. Hutton believes the lawsuit is challenging the statewide map. (*Id.* at 37:23-38:11). Her chief complaint is that the 16 districts are "predictable" in that they usually elect 12 Republicans and four Democrats. (*Id.* at 39:22-41:12; 43:15-18).  She thinks that breakdown is unfair "because it doesn't give the Democrats the kind of voice and representation that they should have based on being a swing state" and that the statewide congressional delegation should closely mirror the split between Democrat and Republican voters in the state. (*Id.* at 40:9-41:2).

142.    Ms. Hutton also believes that Democrats tend to reside in more concentrated urban areas and are not evenly spread throughout the state. (*Id.* at 41:25-42:5).

143.    Ms. Hutton believes that, because of the predictability of the districts, her vote is sometimes "wasted" but concedes that she knows her vote is actually counted by the board of elections. (*Id.* at 47:17-48:2; 58:17-59:11).

144.    Despite her belief that her vote is "wasted", Ms. Hutton has continued to vote in each election and says that she doesn't know anyone who has not voted because of the 2012 Plan. (*Id.* at 47:21-48:7).

145.    Ms. Hutton also wants the districts to be more competitive. (*Id.* at 48:22-49:11). She defines competition as "two people coming in with an equal chance to succeed." (*Id.* at 49:6-11). But she could not identify any percentage of Republicans or Democrats in a district that would make it competitive, or how to make each district more competitive. (*Id.* at 49:12-50:14). She further states that she doesn't think it's possible for each district in the state to be competitive. (*Id.* at 50:5-14).

146.    Under the Proposed Remedial Plan, Ms. Hutton would be moved to the Thirteenth District in which Democrats had a majority of the vote share in each of the three elections cited in Cooper's report. (Cooper Dep. 211:22-212:12; Cooper Exhibit 12).

**Fifteenth District- Teresa Thobaben**

147.    Ms. Thobaben has resided in Clinton County in Ohio's Fifteenth Congressional District for the past 37 years. (Exhibit 25, Deposition of Teresa Thobaben "Thobaben Dep." at 8:12-9:2). She is represented by Steve Stivers, a Republican. (*Id.* at 9:3-9:8).

148.    Ms. Thobaben is a Democrat but has voted for Republicans in the past. (*Id.* at 11:5-11:22).

149.    Ms. Thobaben was asked to be a plaintiff in this lawsuit by a friend, Paul Moke, who is on the board of the ACLU. (*Id.* at 24:19-25:12).

150.    While Ms. Thobaben believes her vote is "diluted" because it "doesn't matter if [she] votes for Democrats…because there are so many Republican votes," (*Id.* at 29:3-29:9), she admitted that a Democrat did not have to be elected as her representative for her to feel that her vote "counted" but could not describe any scenarios, other than a Democrat winning, where she would feel her vote "counted."  (*Id.* at 29:10-29:18).

151.    Ms. Thobaben agrees that her vote as a Democrat is counted equally as those cast by Republican voters. (*Id.* at 34:19-35:4).

152.    She does not know what other areas of counties should be added to her district so that it would have enough Democrat voters to elect a Democrat. (*Id.* at 38:7-38:11).

153.    Ms. Thobaben admits that she "would have to move" to live in a district that was not a majority Republican district. (*Id.* at 40:11:40:13). Ms. Thobaben testified that she did not believe there was any way to draw her district where "you could have it not be a majority Republican" district because she lives in an area of the state where a lot of Republican voters reside. (*Id.* at 40:14-40:23).

154.    Ms. Thobaben also believes she is "harmed" because she "doesn't feel represented by" Representative Stivers because he lives in a part of the district that is not where she resides. (*Id.* at 29:20-30:4). But she admits that groups she has been a part of have protested at his office, that she has written letters and received responses back, and that she has his office "on speed dial" and regularly communicates with his staff. (*Id.* at 30:5-32:14). She has never tried to set up a meeting with Congressman Stivers. (*Id.* at 32:15-32:18).

155.    Ms. Thobaben admitted that she doesn't know whether or not Representative Stivers has considered the views and opinions that she has voiced to his staff prior to voting on issues in Congress. (*Id.* at 57:15-58:12).

156.    Ms. Thobaben has canvassed for a number of politicians including Barack Obama, Hillary Clinton, Ted Strickland, and Scott Warden for U.S. Congress in both 2012 and 2016. (*Id.* at 19:17-20:17). All of her campaign activities have taken place in Clinton County where she lives. (*Id.* at 21:2-21:4).   Nothing about the 2012 Plan has prevented her from taking part in these activities.  (*Id.* at 47:8-47:13).

157.    Ms. Thobaben claimed that the 2012 Plan makes Democrat voters in Clinton County "timid or afraid" to be involved in politics, but later admitted that she had no way of knowing if their lack of involvement could be attributed to the 2012 Plan or just the fact that they live in a heavily Republican area of the state. (*Id.* at 46:15-50:2).  No Democratic voters have told her that they are reluctant to participate in the political process as Democrats in her district because of the 2012 Plan. (*Id.* at 60:18-61:12).

158.    Under the Proposed Remedial Plan, Ms. Thobaben would be moved to the Second District which Cooper agreed was a "very safe Republican district."  (Cooper Dep. 212:8-212:12; Cooper Exhibit 12).

### Sixteenth District – Constance Rubin

159.     Constance Rubin resides in North Canton, Ohio, in Stark County, where she has lived for over thirty years. (Exhibit 26, Deposition of Constance Rubin "Rubin Dep." at 7:16-8:15). She has been a Democrat since at least 1984, but previously identified as a Republican. (*Id.* at 16:14-17; 24:4-12-25:2). While Ms. Rubin believes that it is "highly doubtful" that she would ever vote for a Republican again, she believes that a candidates policy positions are more important than party affiliation when deciding for whom to vote for. (*Id.* at 24:4-26:4).

160.     Ms. Rubin resides in the Sixteenth District and has been represented by Republican Jim Rennaci since 2011. (*Id.* at 8:11-25). Previously, Ms. Rubin was represented by Republican Ralph Regula for all of her time living in North Canton, except for one term where she was represented by John Boccieri. (*Id.* at 9:2-10:6). After the 2018 election, the Sixteenth District is represented by Anthony Gonzalez, a Republican.[2]

161.     Ms. Rubin was asked to become a plaintiff in this suit by ACLU attorney Freda Levenson, due to Ms. Rubin's testimony about her concerns with the 2012 statewide congressional plan, in front of a group of state legislators. (*Id.* at 10:7-11:4).

162.     Despite her complaints about the current congressional plan, Ms. Rubin believes that she and the League of Women Voters have remained effective in their voter education efforts, and believes nothing about the current plan has prevented voters from educating themselves about their districts, or preventing the League of Women Voters from conducting education efforts. (*Id.* at 13:10-14:18).

163.     Ms. Rubin also believes that her vote has been diluted in every election Republican Ralph Regula won since 1972. (*Id.* at 54:9-57:3). However, Ms. Rubin admits that she continued

---

[2] The 2018 election results are a matter of public record, and can be found here on the Secretary of State's website: https://www.sos.state.oh.us/elections/election-results-and-data/2018-official-elections-results/

to participate and vote despite being represented by Representative Regula for over thirty years. (*Id.* at 77:7-78:2).

164.    Ms. Rubin believes that her district is "100 percent predictive" in its outcome statewide, which causes voters to be apathetic. (*Id.* at 63:11-64:24; 90:14-91:16). However, Ms. Rubin admits that she has to engage with apathetic voters "all the time" and that she has no right to engage with voters in who are as politically involved as she would like them to be. (*Id.* at 90:14-91:6).

165.    Ms. Rubin believes the solution to fixing her harm under the current congressional plan is to make the districts "more fairly divided so that either party has an opportunity to win that district." (*Id.* at 61:17-23). She ideally would like that fair divide to be "as close to 50/50 as possible" but, she also admits that is "probably statistically unreasonable." (*Id.* at 62:14-63:3). Ms. Rubin admits that her ultimate goal in a new map is to have the statewide outcome be "closer to a 50/50 outcome of congressional representatives for Republicans and Democrats." (*Id.* at 72:20-73:18).

166.    Under the Proposed Remedial Plan, Ms. Rubin would be moved to the Fourteenth District.  (Cooper Dep. 212:13-19; Cooper Exhibit 12).  Under the three elections cited by Cooper in his report, Republicans would have a majority of the vote share in both the Fourteenth District in the Proposed Remedial Plan and in the Sixteenth District in which Ms. Rubin resides under the 2012 Plan.  (Id. at 212:13-213:19; Cooper Exhibit 12).

D.  **Organizational Plaintiffs**

1.  **League of Women Voters**

167.    Jen Miller, the executive director of the League of Women Voters of Ohio since May 2018 was designated as the group's Rule 30(b)(6) witness.  (Exhibit 27, Deposition of League

of Women Voters of Ohio "LWVO Dep." at 11:19; 22:18-22). The Board of the League, which is elected by League members, decided to file this suit. (*Id.* at. 51:18-22). The League did not consult with its members about its participation in this lawsuit. (*Id.* at 52:7-9). The League's concerns in this litigation are the same concerns that existed eight years ago in 2011. (*Id.* at 107:16-19). The League spoke with lawyers in 2013 about a potential lawsuit but did not file at that time. (*Id.* at 109:15-110:10).

168.     Members join the League by paying annual membership dues. (*Id.* at 25:20-24). By paying the fee, a person becomes a member of the local, state, and national League of Women Voters. (*Id.* at 26:3-7). Currently, the League in Ohio has 2,700 to 2,800 members, with the membership total increasing since 2008. (*Id.* at 36:24-37:6; 39:15-22). Members need not agree with the League's policy positions on redistricting principles to join or remain in the organization. (*Id.* at. 48:3-6). Ms. Miller testified that the League has never polled its members on their support of its redistricting principles. (*Id.* at 49:21-25).

169.     The League publishes voter guides for every primary and general election, which are available online and in print. (*Id.* at 27:9-28:1). Ms. Miller stated that the guide, which covered every primary and general election since the 2011 redistricting, is "absolutely" an effective tool for voter education. (*Id.* at 28:13-19).

170.     The League also registers voters, educates voters on voter ID laws, hosts candidate forums, and recruits poll workers. (*Id.* at 28:22-29:18). It engages in GOTV efforts, including voter education about deadlines and early voting. (*Id.* at 30:6-17). Ms. Miller testified that the League has engaged in these efforts both before and after the 2011 redistricting and opined that the League is "one of the most nonpartisan effective organizations" in those efforts. (*Id.* at 34:1-35:1; 40:20-23).

37

171.    Ms. Miller admitted that many factors influence the outcome of an election, including GOTV efforts, policy platforms, incumbency, and other factors.  (*Id.* at 76:15-19).

172.    Ms. Miller contended that decisions by candidates to skip congressional forums hosted by the League also injures the League and its members and Ms. Miller traces this behavior to the 2012 Plan.  (*Id.* at 58:11-17).  Ms. Miller identified Steve Stivers and Jim Jordan as candidates who did not participate in League forums.  (*Id.* at 94:10-14).  Although Ms. Miller attributed their absence to what she described as "safe" districts, she could not identify any statement from Mr. Stivers or Mr. Jordan to that effect, and she admitted that both candidates attended other voter forums.  (*Id.* at 95:9-21; 96:6; 99:13-16).

173.    Despite contending that candidates in gerrymandered districts don't "have to listen to their constituents because they feel secure in their ability to win," Ms. Miller could not identify any particular statement by a congressperson espousing this attitude.  (*Id.* at 64:13-18), 65:6-8).

174.    Ms. Miller contended that the 2012 Plan had forced the League to divert resources from voter-education efforts to attempts to pass redistricting reform to ensure fair maps.  (*Id.* at 93:18-94:7).  But she conceded that the League has worked on redistricting efforts since the middle of the 20th century, in addition to its voter-education mission.  (*Id.* at 100:5-15).  Ms. Miller could not quantify the effect of this so-called diversion of resources.  (*Id.* at 186:3-11).

175.    The League believes that the 2012 Plan creates voter apathy but admitted that the League has not studied voter apathy in Ohio; nor could she identify any external study on the phenomenon.  (*Id.* at 135:15-24 137:22-23).

## 2.  Ohio State University College Democrats

176.    Alexis Oberdorf serves as the President of the Ohio State University College Democrats and was designated as the group's Rule 30(b)(6) representative.  (Exhibit 28,

Deposition of Ohio State University College Democrats "OSUCD Dep." at 8:19-21). The OSU College Democrats meet weekly, with "around 55" people in attendance at each meeting. (*Id.* at 42:18-19). Ms. Oberdorf confirmed that the number rose in 2018, from around 25 weekly attendees to more than 50. (*Id.* at 43:10-14).

177. The OSU College Democrats "advocate, educate, and engage" people at OSU in alignment with the Democratic Party's platform. (*Id.* at 13:14-19). The organization communicates with its members and the public primarily through email, as well as its Facebook and Twitter accounts. (*Id.* at 50:23-51:2). Ms. Oberdorf testified that the OSU College Democrats increased their Twitter following over the past two years. (*Id.* at 27:25-28:4).

178. The organization receives programming funds from Ohio State and raises additional funds through fundraisers conducted by the organization itself. (*Id.* at. 29:10-16).

179. The organization participates in election activities, including voter registration. Within one month in 2018, it completed more than 500 voter registrations. (*Id.* at 35:8-16).

180. The group held a fundraiser with Twelfth Congressional District Democrat candidate Danny O'Connor at a local bar. (*Id.* at 37:5-13).

181. The OSU College Democrats canvassed for the 2018 congressional election and organized phone banks in prior election years. (*Id.* at 78:25-79:7)

182. Ms. Oberdorf estimated that the club spent 30% of its resources in the 2018 election on the Twelfth Congressional District race. (*Id.* at 89:16-22). While Ms. Oberdorf testified that Danny O'Connor's loss in the Twelfth District dampened enthusiasm among the OSU College Democrats, she could not quantify the loss of enthusiasm or name a single member who left the organization as a result. (*Id.* at 120:20-121:3).

183.    The executive board unanimously approved the decision to join the lawsuit, and Ms. Oberdorf confirmed with the university's legal department that the organization could participate.  (*Id.* at 53:24-54:5).  The board informed the group's membership of the lawsuit only after deciding to join the case.  (*Id.* at 58:2-9).

184.    The OSU College Democrats believe that the 2012 Plan has harmed them by creating voter apathy and voter confusion, with members living across the Third, Twelfth, and Fifteenth Districts.  (*Id.* at 62:19-25).  Ms. Oberdorf failed to identify any specific member of the OSU College Democrats who failed to vote due to voter apathy.  (*Id.* at 72:15-21).

185.    Ms. Oberdorf acknowledged that the OSU College Democrats could educate members and the public about their voting locations by directing them to the Secretary of State's website.  (*Id.* at 74:19-25).

186.    Ms. Oberdorf stated that the Proposed Remedial Map would place the OSU campus area into a single district but conceded that many students do not vote according to their campus addresses.  (*Id.* at.107:8-20).

187.    The group claims that the map has made it more difficult to reach out to candidates. Ms. Oberdorf stated that Representative Joyce Beatty has declined to speak at their meetings because, Ms. Oberdorf believes, the Third Congressional District is "safe."  (*Id.* at 103:22-104:5). Ms. Oberdorf admitted that no one from Representative Beatty's office told her this and she was speculating.  (*Id.* at 105:3-12).

### 3.  A Phillip Randolph Institute

188.    Andre Washington has served as the state president for the Ohio A. Philip Randolph Institute for ten years and was the organization's Rule 30(b)(6) designee.  (Exhibit 29, Deposition of Ohio A. Phillip Randolph Institute "APRI Dep." at 12:2-6).

40

189.    APRI has existed for around 27 years, and Mr. Washington testified that it has grown in recent years.  (*Id.* at 51:16-25).

190.    The ACLU approached Mr. Washington about joining the lawsuit.  (Washington Dep. 81:7-8).  APRI did not seek approval from the national APRI organization before joining this suit.  (*Id.* at 20:13-14).  It consulted with representatives from each regional chapter of APRI before joining the lawsuit, but it did not poll its members individually.  (*Id.* at 47:4-15).  Mr. Washington does not know whether anyone from APRI provided input to public officials when Ohio was drawing its lines and seeking public input.  (*Id.* at 44: 4-14).  Aside from suing, APRI has never notified any public official that it opposes the current map.  (*Id.* at 44:15-20).

191.    Mr. Washington testified that the 2012 Plan harms APRI and its members because the members feel that their votes don't matter but could not identify a member of APRI who did not vote for this reason.  (*Id.* at 67:5-9, 68:21-23).  But APRI also does not know whether its members vote or do not vote in congressional elections.  (*Id.* at 69:5-15).

192.    Additionally, Mr. Washington contended that the map complicates voter-education efforts because APRI has to expend additional resources to make voters feel that their votes matter.  (*Id.* at 70:13-18).  But he could not quantify these redirected resources in any way.  (*Id.* at 72:7-9).

193.    Mr. Washington believed that the injuries inflicted by the 2012 Plan could be cured by drawing "fair lines," but he had no opinion on what those lines should be.  (*Id.* at 36:2-9).

194.    Since enactment of the 2012 Plan, APRI has successfully engaged in election activities, including voter registration, voter education, and GOTV efforts.  (*Id.* at 53:17-19).  These are APRI's primary roles with respect to voting.  (*Id.* at 53:17-25).  APRI agrees that political positions are not necessarily defined by a person's party affiliation (*Id.* at 69:21-25) and individuals can be motivated to vote based on issues unrelated to congressional races.

(Washington Dep. 61:2-7). Mr. Washington considers the organization effective in these efforts, all with the current map in place.  (*Id.* at 54:15, 25; 55:17).

### 4.    <u>Northeast Ohio Young Black Democrats</u>

195.    Northeast Ohio Young Black Democrats ("NEOYBD" or "Organization") was represented by Gabrielle Jackson, its President for the last two years. (Exhibit 30, Deposition of Northeast Ohio Young Black Democrats "NEOYBD Dep." at 7:12-8:6).  Ms. Jackson became a member of the Organization in 2014 and prior to serving as president, served as treasurer. (*Id.*)

196.    NEOYBD is a group that "looks to mentor, empower and recruit the next generation of young people of color who want to be involved in the political process." (*Id.* at 8:9-12).    The organization engages in advocacy work, including voter education, training and information sharing. (*Id.* at 8:7-9:22). The organization also supports democratic candidates and would prefer to be in districts represented by a Democrat. (*Id.* at 43:3-18)

197.    The organization has members living in Congressional Districts 9, 11, 13, and 14. (*Id.* at 41:15-42:7; 45:12-16). Members living in Congressional Districts 9, 11, and 13 are all represented by Democrats. (*Id*).

198.    NEOYBD became a plaintiff in this lawsuit after being contacted by Erik Meinhardt at the ACLU. (*Id.* at 35:2-37:7). The organization's membership at large was not involved in the decision to become a plaintiff in this lawsuit, as the decision was made by NEOYBD's four member board. (*Id.* at 38:8-40:12). Despite admitting that the membership was not consulted, and did not consent to becoming plaintiffs in this suit, Ms. Jackson testified that the organization intends for all its members to be bound by the outcome of this case. (*Id.* at 38:8-40:12).

199.    NEOYBD believes that it has been harmed by the 2012 Plan because the plan makes it harder to recruit members and raise money for their organizations and candidates. (*Id.* at 10:25-1:13; 42:18-44:3) Despite this contention, NEOYBD admits that its membership has grown since 2012, and that the organization raised more money this past year, than ever before.  (*Id.* at 20:2-13; 27:5-22)

200.    NEOYBD also believes that the 2012 Plan had harmed the organization because their members, and members the meet in the community "don't feel like their votes matter." (*Id.* at 42:18-44:3) Despite believing that votes don't matter, NEOYBD admits that votes of their members are actually counted, and that no one has been prohibited from voting in any election. (*Id.* at 66:17-67:4). NEOYBD also admits that members living in Congressional Districts 9, 11, and 13, are all represented by Democrats, which the organization prefers to be represented by, and that District 9 representative Marcy Kaptur "represents [the organization's] interests." (*Id.* at 44:12-45:13; 48:10-18; 53:22-54:2)

201.    Finally, NEOYBD believes that it is harmed by the 2012 Plan because when members are out canvassing and conducting voter outreach efforts, the community, feel like it does not have to vote, or that they will not vote. (*Id.* at 42:18-44:3; 69:3-70:2)   However, the organization also admits that nothing about the 2012 Plan has prevented NEOYBD from engaging in voter-registration activities, providing training for democratic leaders or from being able to hold candidate forums. *Id.* at (84:7-85:17). Furthermore, Ms. Jackson stated that the organization was a "millennial- focused group" and that "millennials are not voting because of "[j]obs, job training, education, [and] affordable education" not the 2012 Plan. (*Id.* at 10:7-20).

## 5. **Hamilton County Young Democrats**

202. Hamilton County Young Democrats ("HCYD" or "organization") was represented by Nathaniel Simon, its President since October 2017. (Exhibit 31, Deposition of Hamilton County Young Democrats "HCYD Dep." at 7:25-8:6). Its headquarters is located in Cincinnati in Ohio's 2nd Congressional District. (*Id.* at 8:16-8:21).

203. It is a Democratic organization with about 150 members whose goal is to "involve and educate young individuals who are interested in Democratic politics." (*Id.* at 8:22-9:8; 9:8-9:25).

204. The organization was asked by an ACLU attorney to become a plaintiff in this lawsuit. (*Id.* at 10:13-11:17). The HCYD's decision to become a plaintiff was made by the organization's four-member executive board without input from its membership as a whole. (*Id.* at 11:18-14:2). The organization admits that it might have members that have voted for Republicans in congressional elections. (*Id.* at 15:13-16:8; 57:20-57:22).

205. The organization feels like it is harmed by having to split its resources between two congressional districts because Hamilton County is split between two congressional districts. (*Id.* at 17:6-16). The organization admitted, however, that the same issue will exist if the Proposed Remedial Plan drawn by Cooper is adopted because Hamilton County is still split between two congressional districts and that organization still have to split its resources under the Proposed Remedial Plan. (*Id.* at 18:6-21:14.)

206. The organization believes that if they "organize, knock doors, and get people out to vote, [they] can be competitive in traditionally red districts" like the First Congressional District even under the 2012 Plan. (*Id.* at 30:17-31:15). Nothing about the 2012 Plan has prevented the organization from successfully educating its members about where they are supposed to vote. (*Id.*

at 32:22-35:16). The organization has never had a situation where it was unable to determine where a member was supposed to go vote. (*Id.* at 36:4-36:13).

207.    The organization also feels like it has been harmed by the 2012 Plan because it has made its members apathetic about voting. (*Id.* at 17:17-17:25). The organization admits that nothing about the 2012 Plan has prevented them from engaging in get-out-the-vote efforts or engaging voters to try and flip the First District in the most recent election. (*Id.* at 29:10-30:14; 83:18-83:22).

208.    The organization claims that it has been harmed because it has received less funds from fundraising as a result of the enactment of the 2012 Plan. (*Id.* at 55:11-57:14). However, the organization had no knowledge of how much money it raised in any election cycle prior to the enactment of the 2012 Plan. (*Id.* at 63:18-65:4).

36881847.1