# Exhibit 15

1         MARK GRIFFITHS
2      IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF OHIO
3
4   Case No. 1:18-cv-00357-TSB-KNM-MHW
    --------------------------
5   OHIO A. PHILIP RANDOLPH    )
    INSTITUTE, et al.,         )
6                              )
            Plaintiffs,        )
7                              )
         vs.                   )
8                              )
    RYAN SMITH, Speaker of     )
9   the Ohio House of          )
    Representatives, et al.,   )
10                             )
            Defendants.        )
11  --------------------------
12
13
14      DEPOSITION OF MARK GRIFFITHS
15         Cleveland, Ohio
16      Thursday, December 6, 2018
17         - - - - -
18
19
20  Reported by:
21  JILL A. KULEWSKY, RPR
22  JOB NO. 151952
23  Thursday, December 6, 2018, 1:00 p.m.
24
25

MARK GRIFFITHS

1

2 organization.  It falls under the

3 umbrella of the Bishop of Cleveland.  At

4 the time that I was there, there were

5 about 800 to 1,000 employees, probably 40

6 or 50 different sites.

7     Q.    And what did that organization

8 primarily do?

9     A.    Social service.  There was

10 chemical dependency counseling, daycare,

11 child care, counseling, employment and

12 training.  So a wide variety of human

13 services.

14     Q.    And then what was the

15 geographic range?  Was it limited to the

16 Cleveland Diocese?

17     A.    Yes, which is made up of eight

18 counties in Northeast Ohio.

19     Q.    Mr. Griffiths, what is your

20 current address?

21     A.    33137 Hawks Nest Court in

22 North Ridgeville.

23     Q.    And how long have you lived at

24 the Hawks Nest Court address?

25     A.    15 years.

MARK GRIFFITHS

1

2      Q.    Where did you reside prior to

3  the Hawks Nest Court address?

4      A.    3106 Standish Avenue in Parma.

5      Q.    And how long did you live at

6  the Parma address?

7      A.    I think it was about 26 years.

8      Q.    And what county is the Hawks

9  Nest Court address in?

10     A.    That is Lorain County.

11     Q.    And the Parma address?

12     A.    Cuyahoga County.

13     Q.    What congressional district do

14  you live in?

15     A.    District 7.

16     Q.    And do you know who your

17  congressional representative is?

18     A.    Bob Gibbs.

19     Q.    Is Bob Gibbs a Republican or a

20  Democrat?

21     A.    Republican.

22     Q.    Mr. Griffiths, when did you

23  first register to vote in the State of

24  Ohio?

25     A.    Whenever I was first eligible.

Page 12

                    MARK GRIFFITHS

1

2   Probably the age of 21.

3        Q.    Okay.

4        A.    I don't recall exactly when

5   the Constitutional Amendment was passed

6   to make it 18.  I think I was 21.

7        Q.    Do you know about what year

8   that was?

9        A.    I was born in '49, '69, so

10  probably about 1970.

11       Q.    Do you remember the first

12  election that you voted in?

13       A.    I'm afraid I do not.

14       Q.    Did you vote in the most

15  recent congressional election --

16       A.    Yes, I did.

17       Q.    -- in 2018?

18             And who did you vote for?

19       A.    Ken Harbaugh.

20       Q.    And did you vote in the 2016

21  congressional election?

22       A.    Yes.

23       Q.    Do you remember who you voted

24  for?

25       A.    Roy Rich.

1          MARK GRIFFITHS

2     Q.    And backing up, is Ken

3 Harbaugh a Republican or a Democrat?

4     A.    Democrat.

5     Q.    And is Roy Rich a Republican

6 or a Democrat?

7     A.    Democrat.

8     Q.    Did you vote in the 2014

9 congressional election?

10     A.    I voted in that election, but

11 I believe Bob Gibbs was unopposed.

12     Q.    And did you vote for --

13     A.    I did not vote.  I just didn't

14 vote then for that.

15     Q.    When you say you didn't vote,

16 you just left that race blank and voted

17 in the other races?

18     A.    Correct.

19     Q.    And do you remember voting in

20 the 2012 congressional election?

21     A.    I'm sure that I did, yes.

22     Q.    Do you remember who you voted

23 for?

24     A.    I do not.  I believe there was

25 a Democrat who ran.  I believe I voted

1          MARK GRIFFITHS

2     for that person.

3          Q.    And in all these elections

4     that we spoke of from 2012 to 2018, did

5     Bob Gibbs win each of those congressional

6     elections?

7          A.    Yes, he did.

8          Q.    And do you know the last time

9     you haven't voted?  I know you don't

10    remember your first election, but to the

11    best of your knowledge, have you voted in

12    every congressional election for which

13    you were eligible to vote?

14         A.    Yes, I did.  I'm sure I did.

15         Q.    And have you in any election

16    ever voted for a Republican or an

17    independent candidate?

18         A.    Yes, I have.

19         Q.    And can you tell me about the

20    times that you voted for a Republican or

21    independent?

22         A.    I voted for a Republican for

23    U.S. Senate on one occasion.

24         Q.    Who was that?

25         A.    Rob Portman.

                    MARK GRIFFITHS

1

2      Q.    And you've never voted for an

3    independent candidate or third-party

4    candidate; is that correct?

5      A.    No.

6      Q.    At any level?

7      A.    No.

8      Q.    And in the future, would you

9    vote for -- in a future congressional

10   race, would you vote for a Republican?

11            MS. ROMERO:  Objection to

12        form.  You can answer.

13            THE WITNESS:  I'm sorry?

14            MS. ROMERO:  You can answer

15        the question.

16      A.    It's possible.

17      Q.    Under what circumstances?

18      A.    If I felt a Republican was a

19   better candidate, and if the Democrat, if

20   there is something flawed in that

21   candidate, I would consider it.

22      Q.    What would make you consider a

23   Republican a better candidate?  What

24   factors?

25      A.    Background and experience

Page 17

MARK GRIFFITHS

1
2    compared to who he or she would be
3    running against.
4        Q.    In addition to background and
5    experience, do you consider any other
6    factors when you choose the candidates
7    that you vote for?
8        A.    Well, certainly I look at
9    their positions on issues and their
10   values and how they align with mine.  So
11   more often than not, I'm probably going
12   to lean towards a Democratic candidate
13   because of that.
14       Q.    If a Republican candidate or a
15   third-party or independent candidate
16   shared your positions and values, would
17   you vote for that candidate over a
18   Democrat?
19           MS. ROMERO:  Objection.
20       Speculation.  You can answer.
21       A.    It's possible.
22       Q.    Mr. Griffiths, have you always
23   lived in the 7th Congressional District?
24       A.    No.  I think previously before
25   2012 the district had a different number.

Page 22

MARK GRIFFITHS

1

2      A.     Yes.   Yes.

3      Q.     And did you participate in any

4 signature drives other than the members

5 of Indivisible?

6      A.     Yes.   While we -- each member

7 of our group circulated petitions, but

8 circulating petitions is sort of an

9 individual process, it's not something

10 you really do in a mass or a group.   My

11 wife also participated in that, and she

12 and I went to a number of different

13 events and circulated petitions.

14      Q.     Do you recall about how many

15 signatures you were able to obtain for

16 Issue 1?

17      A.     I'm guessing 3 or 400

18 signatures, something like that.

19      Q.     Other than your work with Fair

20 Districts=Fair Elections on the

21 gerrymandering issue, have you done any

22 other work with Indivisible?

23      A.     With the Indivisible group in

24 Wellington, we met -- we had a sit-down

25 meeting with Bob Gibbs to talk about our

Page 23

1                    MARK GRIFFITHS

2    issues related to health care.  So that

3    we did as a group.

4         Q.    And how was that meeting

5    organized?

6         A.    The head of our Indivisible

7    group was in contact with Bob Gibbs'

8    office in Ashland, and they were able to

9    secure a date and time to meet with him.

10        Q.    Do you remember when this

11   meeting took place?

12        A.    It was in the first or second

13   week of April 2017.

14        Q.    And this meeting was with

15   Congressperson Gibbs himself, correct?

16        A.    Yes.

17        Q.    And what did you tell

18   Congressperson Gibbs?

19        A.    Again, the focus was on health

20   care, and at that time the Republicans

21   were working on an alternative health

22   care plan, and we all had a number of

23   concerns about that, expressed those

24   concerns.  That was right around the time

25   that President Trump had made the remark

1          MARK GRIFFITHS

2    about health care, who knew it was so

3    complicated, or something to that effect,

4    and with Bob Gibbs we talked about what a

5    complicated issue this was.

6              Toward the conclusion of the

7    meeting, we could see we weren't

8    really -- we weren't getting very far,

9    that he wasn't changing our minds, and we

10   weren't changing his mind on anything,

11   and I suggested to him that given how

12   complicated this was, and I had a strong

13   background in employee benefits and Human

14   Resources, I suggested that I would be

15   willing, if he wanted to pull people

16   together to form kind of a study group,

17   to work on this issue on his behalf,

18   essentially do research, advise, develop,

19   you know, whatever, and that offer was

20   not accepted.

21        Q.    Do you know why?

22        A.    No.

23        Q.    And what did Congressperson

24   Gibbs say to you about his position on

25   health care?

Page 52

MARK GRIFFITHS

1

2          I think to have a district

3     that is in Northeast Ohio, Lorain County,

4     for example, as a whole, right now Lorain

5     County is split into three different

6     districts.  So the Democrats are cracked

7     in that instance, and I think it's been

8     done strictly for purposes of maintaining

9     part of its partisan position.

10          Q.    I have a few followups to

11     that.  You mentioned that Lorain County

12     is split into three districts?

13          A.    Yes.

14          Q.    Do you think you have a right

15     to live in a district in which your

16     county is whole?

17               MS. ROMERO:  Objection to

18          form.  You can answer.

19          A.    That would be my preference.

20     I don't think it's practical.  I do

21     understand that counties, in order to

22     achieve the balance that you need based

23     on population, there's probably going to

24     be some split of counties, but I think

25     that should be minimized.

                   MARK GRIFFITHS

1

2      Q.    So you agree that you don't

3    have a right to live in a district in

4    which your county is whole?

5            MS. ROMERO:  Objection.  You

6        can answer.

7      A.    No.  I think I have a right to

8    be in a district that is a compact,

9    geologically logical configured district.

10     Q.    What is a compact, logical

11   district?

12     A.    A district that is compact in

13   terms of size, that respects county

14   boundaries, municipal boundaries to the

15   largest extent possible, and that

16   reflects some community of interest of

17   people in the district.

18     Q.    And what community of interest

19   is not in District 7 that should be?

20           MS. ROMERO:  Objection to

21       form.  Go ahead.

22     A.    District 7 is made up of, I

23   don't recall, seven or eight counties,

24   and it goes from urban to rural to

25   suburban back to rural to urban.  It's

Page 54

1          MARK GRIFFITHS

2    really a configuration that does not make

3    much sense.

4             When I was circulating

5    petitions on this issue, and, of course,

6    you won't be surprised that nine people

7    out of 10 don't know what gerrymandering

8    is, but when we would show them the

9    congressional map, they clearly, many,

10   many people, most people would look at it

11   and say, "This map doesn't make any

12   sense.  This is my district?"

13            And it wouldn't make any

14   difference.  We would collect signatures

15   at Lorain Community College.  So we would

16   talk to people who were in Jim Jordan's

17   district or Bob Gibbs' district or Marcy

18   Kaptur's district, all these different

19   districts, and people would look at the

20   map and say, "Why is it this way, this

21   doesn't make sense?"

22            So that's what I mean.  It

23   just doesn't pass the sense in terms of

24   any kind of logic.  I don't think anybody

25   that would design a map would ever draw

MARK GRIFFITHS

1

2 District 7 in any -- for any kind of

3 logical reason.

4     Q.   What do you think is a logical

5 reason or a logical way to draw a map?

6     A.   I would draw it in terms of,

7 again, compactness.  So I would start out

8 trying to make sure if Lorain County was

9 a district, and if there weren't enough

10 people in Lorain County to make up a

11 district, then I would add a piece of

12 Cuyahoga County or maybe Medina County

13 where it closes in on Medina County, but

14 somehow make it compact so that it's not

15 running its way through seven or eight

16 different counties.

17     Q.   Part of Medina County is

18 currently in Congressional District 7?

19     A.   Right.  Yes.

20     Q.   Do you know, are there enough

21 people in Lorain County to form a

22 district?

23     A.   I would guess not, but I'm not

24 positive of that.

25     Q.   I believe you testified that

Page 59

MARK GRIFFITHS

Q.    And if you lived in a district

that was compact in terms of size,

respected communities of interest, didn't

violate any federal laws regarding

minority participation but still

consistently elected a Republican

candidate, do you think you would still

have a constitutional claim about that

district?

MS. ROMERO:  Objection.

Incomplete hypothetical.  Calls for

a legal conclusion.  You can

answer.

A.    And your question was would I

have a claim in that instance?

Q.    Yes.  Would you have a

constitutional claim about that district?

A.    I don't think so.

Q.    Mr. Griffiths, how do you

think you've been injured by the 2011

congressional map?

A.    It has been very difficult to

identify candidates willing to take on

Bob Gibbs in this case because of how

Page 60

MARK GRIFFITHS

1  heavily gerrymandered the district is.

2  It has been difficult to connect with

3  other volunteers just because of the

4  geographic space involved in this, and I

5  believe my vote or my non-vote in support

6  of Bob Gibbs does not really factor into

7  his thinking, and that's how I explained

8  him not being interested in following

9  through on a study group on the medical

10 issue, health care issue.

11         My wife had written to him,

12 and I'm sorry, I don't remember the

13 specific issue, but she wrote to him

14 about, I'll say as an example, concerns

15 about health care, and received a letter

16 back from Bob Gibbs that said something

17 like "Thank you for your concerns about

18 the Farm Bill."  And again, I may have

19 the two issues mixed, but it was a

20 complete non-secretory.

21         She shared that response with

22 other members of our Wellington

23 Indivisible group, and a number of them

24 had experienced the same thing.

Page 61

MARK GRIFFITHS

Q.    When you say "the same thing," you mean the response from Congressperson Gibbs does not match to the --

A.    Yes, correct.  And that said to us that this guy doesn't really care what we think or don't think, whether we vote or not vote.  He is in a position, and still is in a position, that he's going to get re-elected.  So therefore, the issues that we few Democrats might raise aren't really anything that he needs to respond to.

Q.    I want to follow up on these injuries that you identified.  You said the first was your vote in opposition to Gibbs is a non-issue, and again, you're not contending that your vote is in fact not counted?

A.    No, I'm not.  I'm sure it's counted.

Q.    When you say "non-issue," what do you mean?

A.    It's a non-issue to him.  Whether or not I support him is not an

Page 63

MARK GRIFFITHS

1    form.

2        A.    I expect that the Congressman

3    and I would disagree.  I wouldn't expect

4    a Congressman to always agree with my

5    views.  But I would expect my Congressman

6    to take my views into account and pay

7    attention to them, and I don't think

8    that's going on now.

9        Q.    So would an example of a

10   Congressperson taking your views into

11   account be meeting with you to discuss an

12   issue, such as health care?

13       A.    Yes, but also being

14   responsive.

15       Q.    And Congressperson Gibbs did

16   in fact meet with you to discuss the

17   issue of health care?

18       A.    Yes, but was not responsive.

19       Q.    And would you agree that it's

20   the responsibility of a Congressperson to

21   represent the views of the majority of

22   voters in their district?

23       A.    Yes.

24       Q.    And so then Congressperson

Page 64

MARK GRIFFITHS

1
2  Gibbs should be representing the views of
3  the majority of voters in Congressional
4  District 7, which you said are Republican
5  voters?
6           MS. ROMERO:  Objection to
7      form.
8      A.    Yes.
9      Q.    You said that one way that you
10  think that the map injures you is that it
11  prevents you from connecting with other
12  volunteers?
13      A.    Yes.
14      Q.    How has the map prevented you
15  from connecting with other volunteers?
16      A.    It's difficult geographically
17  because of the distances that have to be
18  traveled within the various parts of
19  District 7 that makes it a more difficult
20  challenge.
21      Q.    Could you give me an example
22  of an instance in which you've been
23  unable to connect with a volunteer
24  because of geographic distance?
25      A.    I was not willing to drive to,

1          MARK GRIFFITHS

2   say, Knox County to help with canvassing

3   activities.

4        Q.    Did nothing prevent you from

5   driving to Knox County to volunteer?

6        A.    No, except for the -- yeah,

7   it's just a difficult thing to do.

8        Q.    So it was a choice that you

9   made not to drive to Knox County --

10            MS. ROMERO:  Objection to

11       form.

12       A.    Yes.

13       Q.    -- to volunteer?

14            Is there anything else you can

15   think of other than geographic distance

16   that prevents you from connecting with

17   other volunteers in CD-7?

18       A.    No, except for the fact that I

19   think the way the district is drawn,

20   Democrats in District 7 are spread out

21   pretty far from each other, and

22   therefore, what might be a more natural

23   being able to get together with people,

24   it's more difficult to do because we're

25   spread over the seven or eight counties

Page 66

MARK GRIFFITHS

1   that make up District 7.

2       Q.    Could you think of an example

3   of where you haven't been able to meet

4   with Democrats because of the geographic

5   distance?

6       A.    There was a phone banking

7   activity for Ken Harbaugh that was held,

8   I believe it was in Huron County, that I

9   was supposed to participate in, but it

10  was -- the weather was very difficult, it

11  was a day like this, actually coming down

12  worse, but it would have been difficult

13  to make that drive.  That's one I could

14  think of off the top of my head that

15  occurred earlier this year.

16      Q.    Any other instances in which

17  you've been unable to connect with

18  volunteers as a result of the map?

19      A.    That's the one I could think

20  of, yeah.

21      Q.    About how far is Huron County

22  from Lorain County?

23      A.    I would guess it was about 60,

24  75 miles, something like that.

MARK GRIFFITHS

1

2     Q.    You said that the 2011 map has

3     injured you in making it difficult to

4     identify candidates willing to run in

5     Congressional District 7.  Could you give

6     me an example of a time that you've been

7     unable to identify a candidate?

8     A.    Well, 2014 I believe Gibbs was

9     unopposed, there was no one willing to

10    take him on.

11    Q.    Did you encourage anyone to

12    run against Bob Gibbs?

13    A.    No.  But I did hear

14    conversation that nobody in fact was

15    coming forward to do that.

16    Q.    But you didn't encourage

17    anyone to run in 2014?

18    A.    No.

19    Q.    Can you think of any other way

20    in which Congressional District 7 has

21    made you unable to identify candidates?

22    A.    I would say in 2016 Roy Rich

23    ran, I've had several conversations with

24    him, and he talked to me about how

25    difficult that was to campaign in that

MARK GRIFFITHS

1

2  district because of the size of the

3  district and trying to get around to

4  different people.  So I know from

5  personal experience from him that that

6  was very difficult.

7      Q.    But nothing about the map

8  prevented him from running against Bob

9  Gibbs?

10     A.    No, but the map made it

11 difficult to do.

12     Q.    Was there anything about the

13 map that prevented a Democrat from

14 running in 2014?

15     A.    Not to my knowledge

16 specifically, except that people saw it

17 as a gerrymandering situation and nobody

18 came forward to do that.

19     Q.    And I believe the fourth and

20 final injury you identified as a result

21 of the map is that your wife wrote to

22 Congressperson Gibbs about an issue,

23 maybe health care, and that she received

24 a response from Congressperson Gibbs that

25 thanked her for her concerns about the

Page 69

MARK GRIFFITHS

1 Farm Bill; is that correct?

2     A.    Yes.  It was a non-secretory.

3 I might have the wrong issue.

4     Q.    Right.  Have you ever written

5 to Congressperson Gibbs and received,

6 we'll call it a mismatched response?

7     A.    A mismatched response, is that

8 what you said?

9     Q.    Yes.

10     A.    No.  I could think of one time

11 I wrote to him, and I got a response that

12 responded to the issue that I raised.

13     Q.    Do you know what that issue

14 was?

15     A.    I wrote to him about the

16 Summit President Trump had in Helsinki

17 with Vladimir Putin and my concerns about

18 that, and he wrote back.

19     Q.    Did you ask to receive a

20 response when you wrote to him?

21     A.    I don't recall that I did.  I

22 might have, I don't recall, but I did get

23 a response.

24     Q.    Do you recall what his

MARK GRIFFITHS

1    attend.  So my wife and I attended that

2    meeting in Canton.

3        Q.    And during that meeting, did

4    you -- were you able to speak to

5    Congressperson Gibbs?

6        A.    I spoke with him.  We actually

7    were the first ones there.  I spoke with

8    him, just kind of some small talk before

9    the meeting started.  He made a joke to

10    the fact that we were the ones that had

11    come the furthest to this meeting, and we

12    actually had to pay a toll to come.

13            The meeting was -- as I came

14    to find out, it was somewhat scripted.

15    The different members of Indivisible had

16    personal stories to share with regard to

17    health care, and I think they had a set

18    period of time, an hour or so, and then

19    each person would tell their story and

20    Gibbs would give some response, and then

21    there was a little bit of back and forth

22    discussion, maybe five or 10 minutes that

23    other people had.

24        Q.    Was any topic other than

                    MARK GRIFFITHS

1    Canton and one meeting --

2         A.    The first meeting I described

3    to you actually took place in his Ashland

4    office.

5         Q.    So one meeting in Canton, one

6    meeting in Ashland?

7         A.    Yes.

8         Q.    The third meeting?

9         A.    The third time was not a

10   meeting, but it was in support of an

11   immigration activity, and there was an

12   ask from the HOLA organization within our

13   Invisible group to advocate for a

14   particular immigrant that was facing

15   deportation.  That was a matter of just

16   stopping in his office and dropping off a

17   letter.

18        Q.    You did not meet with

19   Congressperson Gibbs at that time?

20        A.    Correct.  I think he was in

21   Washington at the time.

22        Q.    Did you speak to an aide?

23        A.    I did.  They were just

24   surprised we were there and said, "Okay,

Page 90

MARK GRIFFITHS

1

2    Lorain County has a majority of

3    Democratic voters?

4             MS. ROMERO:  Objection.  Asked

5        and answered.

6        A.    I don't know.

7        Q.    Then how do you know that

8    Lorain County, the Democratic voters

9    could elect a member of congress?

10            MS. ROMERO:  Objection.

11       Mischaracterizes his testimony.

12       A.    Because I don't think it

13   necessarily would only be Democrats

14   voting for Democrats.

15            I think -- again, I'm basing

16   this on Sherrod Brown and Betty Sutton,

17   and I could be wrong, but I think most of

18   that district was Lorain County at that

19   time, and they were successful.

20       Q.    But you don't know whether or

21   not that district also included Medina,

22   Summit and Cuyahoga Counties?

23       A.    I don't recall.

24       Q.    Would you prefer a

25   congressional map that would allow you to

Page 91

MARK GRIFFITHS

1   elect a Democrat?

2           MS. ROMERO:  Objection to

3       form.  Incomplete hypothetical.

4       You can answer.

5   A.    Yes.

6   Q.    Do you think you have a right

7   to a district in which you could elect a

8   Democratic representative?

9           MS. ROMERO:  Objection to

10      form.

11  A.    I have a right to a

12  congressional district that would allow

13  my vote to matter and it could be

14  competitive, be it Democrat or

15  Republican.  I felt like the vote would

16  matter.

17  Q.    So you think you have a right

18  to a competitive district?

19          MS. ROMERO:  Object to form.

20  A.    Yes.

21  Q.    What's a competitive district?

22  A.    One that is drawn without

23  regard to the partisan nature or to

24  advantage one political party over the

1      MARK GRIFFITHS

2   expert to draw an alternative map or

3   remedial map?

4        A.    Yes.

5        Q.    And are you aware that that

6   expert's name is William Cooper?

7        A.    Yes.

8        Q.    Have you seen the remedial

9   map?

10        A.    Yes.

11        Q.    Are you asking the court in

12   this lawsuit to adopt that map for the

13   2020 election?

14        A.    Yes.

15        Q.    Would you prefer the district

16   that Mr. Cooper has placed you in --

17        A.    Yes.

18        Q.    -- in the remedial map as

19   opposed to the current map?

20        A.    Yes.  I think it would be

21   District 9; is that correct?  Yeah,

22   whatever the number is.

23        Q.    And do you consider the

24   district that he's placed you in to be a

25   competitive district?

MARK GRIFFITHS

1

2          A.     Yes.

3          Q.     Do you think that you would be

4      able to elect a Democratic representative

5      under that map?

6                 MS. ROMERO:   Objection to

7            form.   Speculation.

8          A.     I think so.

9          Q.     Did you provide any input to

10     Mr. Cooper in drafting a remedial map?

11         A.     No, I did not.

12         Q.     Did Mr. Cooper ask you for any

13     input in the remedial map?

14         A.     No.

15         Q.     And what do you think a

16     mapmaker should consider in drawing maps?

17         A.     Again, I would look at trying

18     to draw -- pay attention to compactness,

19     pay attention to county and municipal

20     boundaries, pay attention to the Voting

21     Right Act requirements.   Those would be

22     the three criteria off the top of my

23     head.

24         Q.     Do you think mapmakers should

25     consider incumbency protection?

MARK GRIFFITHS

1
2          A.     No.

3          Q.     You don't think that's

4   permissible?

5                 MS. ROMERO:  Objection.  Calls

6          for a legal conclusion.

7          A.     It may be permissible, it may

8   be legal, but I don't think it's

9   something they should do.

10         Q.     Do you believe that you live

11  in a cracked district?

12         A.     Yes.

13         Q.     What is a cracked district?

14         A.     If you look at the geographic

15  area of, say, Lorain County and the

16  number of Democrats that are in Lorain

17  County, rather than keep them all in one

18  district, you split them into three

19  districts as we have now, and that

20  essentially spreads Democrats over three

21  districts, thereby diluting the power of

22  that party.

23         Q.     Do you know what other

24  districts Lorain County is in, other than

25  Congressional District 7?

                    MARK GRIFFITHS

1    affiliation, and if the effect of

2    cracking is -- if the impact of this

3    split is to greatly distort the

4    percentages of the parties, then I think

5    it's being done for partisan purpose.

6        Q.    So in your view, to be a

7    lawful map, does the outcome need to be

8    proportional to the party affiliation of

9    the voters in the state?

10              MS. ROMERO:  Objection.  Calls

11          for a legal conclusion.

12       A.    Yeah, I don't know about

13   proportional, but it certainly needs to

14   be close to proportion, otherwise I think

15   you could infer that there was a partisan

16   intent behind the design.

17       Q.    How close does the split have

18   to be?

19              MS. ROMERO:  Objection.

20       A.    That I don't know.  I wouldn't

21   know.

22       Q.    Are you seeking a proportional

23   map in this case that roughly

24   approximates the party affiliation of the

Page 117

```
 1                    MARK GRIFFITHS
 2      STATE OF OHIO,     ) SS:
 3      COUNTY OF          )
 4      CUYAHOGA.
 5
 6          I, Jill A. Kulewsky, a Notary Public
        within and for the State of Ohio, duly
 7      commissioned and qualified, do hereby
        certify that MARK GRIFFITHS, was first duly
 8      sworn to testify the truth, the whole truth
        and nothing but the truth in the cause
 9      aforesaid; that the testimony then given by
        him was by me reduced to stenotypy in the
10      presence of said witness, afterwards
        transcribed on a computer/printer, and that
11      the foregoing is a true and correct
        transcript of the testimony so given by him
12      as aforesaid.
13          I do further certify that this
        deposition was taken at the time and place
14      in the foregoing caption specified.  I do
        further certify that I am not a relative,
15      counsel or attorney of either party, or
        otherwise interested in the event of this
16      action.
17          IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my seal of office
18      at Cleveland, Ohio, on this 17th day of
19      December, 2018.
20
21
22          -------------------------------
23          Jill A. Kulewsky, Notary Public
            within and for the State of Ohio
24          My Commission expires August 31,
            2020.
25
```