# APPENDIX A

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

**TABLE OF CONTENTS**

I.    **Plaintiffs' Proposed Uncontroverted Facts** ............................................................. 1

   A.    Redistricting in Ohio ............................................................................................. 1

   B.    Ohio was a centerpiece of a national Republican plan to maximize Republican control of the U.S. House of Representatives. ............................................................. 1

   C.    Ohio Republicans sought and obtained assistance from national Republicans in their redistricting efforts. ............................................................................................. 3

   D.    The map drawers and legislative staff briefed the Republican legislative leadership on the proposed districts. ......................................................................... 5

   E.    National Republicans were also heavily involved in the drafting of Ohio's map. ......... 6

   F.    The legislative history of HB 319. ................................................................................ 7

   G.    The legislative history of HB 369. ................................................................................ 8

   H.    The Ohio Map has had the effect of advantaging Republicans and disadvantage Democrats as demonstrated by both election results and partisan bias metrics. ......... 10

   I.    Plaintiffs' Proposed Remedial Plan ............................................................................. 16

   J.    The Plaintiffs are Ohio organizations and voters ....................................................... 18

      1.    Ohio A. Philip Randolph Institute ............................................................. 18

      2.    League of Women Voters of Ohio ............................................................. 19

      3.    Northeast Ohio Young Black Democrats ................................................... 20

      4.    Hamilton County Young Democrats .......................................................... 21

      5.    The Ohio State University Democrats ....................................................... 22

      6.    Individual Plaintiffs ................................................................................... 23

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

I.      **Plaintiffs' Proposed Uncontroverted Facts**

        A. **Redistricting in Ohio**

1.      Under Ohio law, the state General Assembly has the primary authority for

drawing Ohio's U.S. congressional districts, and the bipartisan Joint Legislative Task

Force on Redistricting, Reapportionment, and Demographic Research ("Task Force") is

tasked with advising the General Assembly.  The Task Force is a six-person bipartisan

committee, with three members appointed by the Speaker of the Ohio House of

Representatives and three by the President of the Ohio State Senate.

2.      In Ohio, the congressional map must be approved by a majority of both the Ohio

House of Representatives and the Ohio State Senate, and then signed into law by the

Governor of Ohio.

        B. **Ohio was a centerpiece of a national Republican plan to maximize
           Republican control of the U.S. House of Representatives.**

3.      The Republican State Leadership Committee ("RSLC") is a national Republican

political organization dedicated to electing Republicans in "down-ballot" state offices,

including state legislatures.

4.      During the 2010 election, the RSLC sought to gain Republican control of the state

legislatures across the country that would have the greatest impact on redistricting

during the 2011 redistricting cycle.

5.      The RSLC stated that drawing congressional districts to ensure reliably

Republican districts would relieve Republicans of the burden of competing with

Democrats in contested elections.

6.      The RSLC told donors that investing in state races in 2010 was a cheaper

alternative to spending money on competitive congressional elections over five election

1

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

cycles. According to the RSLC, Republicans could save millions of dollars by creating 20-25 new Republican congressional districts through redistricting by investing a relatively modest $31.5 million on state legislative races in 2010, instead of spending an estimated $255 million over 10 years winning those 20-25 seats in competitive, swing, or Democratic-leaning congressional districts.

7. In support of that goal, the RSLC began raising money for an initiative known as the REDistricting Majority Project ("REDMAP") in mid-2010. Ohio's House of Representatives was a key target of national Republicans, since Republicans only needed to "flip" four seats to have a majority and Ohio's Senate was already controlled by Republicans.

8. In Ohio, the congressional map must be approved by a majority of both the Ohio House of Representatives and the Ohio State Senate, and then signed into law by the Governor of Ohio.

9. To help Republicans win control of the Ohio House, the RSLC spent approximately $1 million, initially targeting 12 seats before focusing its spending on six seats—five of which were ultimately won by Republicans.

10. Republicans won control of the Ohio House and governorship and increased their majority in the Ohio Senate in 2010.

11. As the RSLC later reported, the GOP effectively controlled the redrawing of Ohio's 16 congressional districts the following year. Indeed, the RSLC later stated that their $1 million investment in Ohio House races in 2010 built a Republican firewall through redistricting that "allowed a 12/4 Republican majority to return to the U.S.

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

House of Representatives [in 2012]—despite voters casting only 52 percent of their vote for Republican congressional candidates."

12.     The RSLC, following up on its success through REDMAP, encouraged state legislators to take advantage of a redistricting team retained by the Republican National Committee ("RNC") and the State Government Leadership Foundation ("SGLF"), a 501(c)(4) organization affiliated with the RSLC.

13.     The team was led by Thomas Hofeller, a seasoned redistricting expert who spent years working for the RNC and on behalf of Republicans.

14.     The team's services were offered to state legislative leaders for free.

15.     The National Republican Campaign Committee ("NRCC") hired Adam Kincaid as its redistricting coordinator in February 2011.

### C. Ohio Republicans sought and obtained assistance from national Republicans in their redistricting efforts.

16.     In May 2010, several Ohio Republicans who would later be responsible for redistricting attended the RNC's "Redistricting and Election Law Seminar" in Washington, D.C.

17.     Mike Lenzo, Chief Legal Counsel for the Ohio House Republican Caucus, attended this seminar at the instruction of William Batchelder, then the Ohio House Minority Leader.

18.     Matt Schuler, Chief of Staff of Senate President Thomas Niehaus, attended as well. So did Ray DiRossi, an Ohio Republican operative, who was later retained by the Republican caucus as a map drawer.

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

19.     At the May 2010 conference, Ohio Republicans made connections with key national Republican redistricting operatives, including Mark Braden, Thomas Hofeller, and John Morgan.

20.     Lenzo attended a training session on redistricting called "Drawing the Lines" by John Morgan, a Republican map drawing expert. The first substantive screen of the PowerPoint presentation was titled "keep it secret, keep it safe." The presentation detailed measures that map drawers should use such as "controlled access to location (a door with a key.)" and "machine…plan...and personnel security." It stated that state map drawers should involve counsel in the map drawing process. It instructed map drawers to "score the plans" and determine "the likely partisan outcome."



24.     In January 2011, Lenzo, Schuler, and DiRossi again attended a national redistricting seminar organized by the National Conference of State Legislatures (NCSL). They were joined by several other Ohio Republicans responsible for redistricting, including then-State Representative Matt Huffman and Heather Mann (now Heather Blessing), the other Ohio Republican operative who was later retained by the Republican caucus as a map drawer.

### APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

25.    Hofeller also attended the conference and spoke on several panels. He presented on the need for secrecy and to "never travel without counsel" in addition to other advice for Republican map drawers.

   **D. The map drawers and legislative staff briefed the Republican legislative leadership on the proposed districts.**

26.    Mann and DiRossi were the two Republican staffers who worked on drawing the maps.

27.    Schuler and Judy, two of the highest-ranking Republican staffers in the state, engaged DiRossi and Mann as consultants to undertake research and other activities deemed necessary for drafting the congressional map.

28.    DiRossi and Mann were not engaged to consult with or assist the bipartisan Task Force; they were retained exclusively by the Republican members of that Task Force, and rendered services strictly to those Republican members.

29.    According to Batchelder, Mann's job was to draw "friendly" districts.

30.    It was Republican operatives, DiRossi and Mann, along with national Republicans, rather than any members of the Ohio General Assembly or the Task Force, who drafted the congressional map.

31.    Mann directly reported to Batchelder, who had selected her as the Redistricting Director. She would report to Batchelder about progress of her work and share draft maps for review.

32.    Mann would also share progress updates with Judy. Judy also reviewed draft maps.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

33.     Mann also shared progress updates and draft maps with Huffman. Huffman was part of Republican leadership in the Ohio House, and he sponsored both redistricting bills.

34.     DiRossi reported to Niehaus. He would share with him progress of his work and send draft maps for review.

35.     DiRossi would also update Schuler on the progress of his work and share draft maps.

**E. National Republicans were also heavily involved in the drafting of Ohio's map.**

36.     Six national Republican figures were actively involved in the drawing of Ohio's map: Braden, Morgan, Clark Bensen, Hofeller, Tom Whatman, and Kincaid.

37.     Braden and his law firm, Baker Hostetler, were retained in June 2011 by the General Assembly to provide legal services on redistricting issues.

38.     Braden retained Bensen and Morgan to help the Republicans in their redistricting efforts.

39.     Morgan helped Mann and DiRossi with the initial set up so that they could start drawing maps.

40.     Morgan made a trip to Ohio on July 25-26, 2011, to provide follow-up assistance to the map drawers, including technical support on the map drawing software. Morgan also drew districts.

41.     Bensen was retained to provide election results data to Ohio Republican map drawers for their use in scoring proposed congressional districts.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

42.     Specifically, Bensen provided Mann, DiRossi, Morgan, and Braden with election results data in 2011 in a form that could be loaded into Maptitude, the software used by Republicans to draw maps in 2011.

**F. The legislative history of HB 319.**

43.     HB 319, the bill that included the first enacted congressional map, was introduced two days before the full Ohio House voted on the bill on September 15, 2011, and just eight days before its final passage on September 21, 2011.

44.     On September 8, 2011, the House State Government and Elections Committee issued a notice that indicated that the committee might hear testimony on the yet-to-be introduced bill. The bill was considered at hearings of the House State Government and Elections Committee on September 13 and 14. Huffman gave sponsor testimony at the September 13 hearing. At the September 14 hearing, the committee voted HB 319 out of committee to the full House by a vote of 14 to 8 on a straight party line vote.

45.     The bill was debated on the floor of the House on September 15, 2011, and approved the same day with a 56-36 vote.

46.     Huffman gave testimony in favor of the map. In his testimony, he discussed the traditional redistricting criteria, and stated that protection of incumbents was "subservient" to other criteria.

47.     In the House, Democrats gave testimony against the map. They argued that the two days between the map being introduced and voted on was insufficient. Democrats introduced an amendment where the maps would be discussed at public hearings around the state.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

48.       On September 20, 2011, the Senate Committee on Government Oversight and Reform, chaired by Senator Keith Faber, held a hearing on the proposed congressional map.

49.       On September 21, 2011, the Senate Committee on Government Oversight and Reform held a second hearing and added an amendment to include a $2.75 million appropriation for local boards of elections, which was added in order to make HB 319 immediately effective and to shield the law from the possibility of a voter referendum. After adding the appropriation, the Committee then voted to approve the map on a straight party line vote.

50.       Faber—on the floor of the Senate—said that an effect of the appropriation was that "if the appropriation is included in a bill, it becomes effective immediately and is not subject to referendum."

51.       Senate Democrats, including Edna Brown and Nina Turner, argued that the map was a 12-4 Republican map.

52.       HB 319, as amended with the appropriation added, passed the Senate later that same day—September 21, 2011—by a vote of 24-7.

53.       HB 319, as amended with the appropriation added, returned to the House for a vote on September 21, without going to any committee. The House passed the amended bill with a 60-35 margin on September 21, 2011.

54.       HB 319 was signed into law by Governor Kasich on September 26, 2011.

**G. The legislative history of HB 369.**

55.       Huffman introduced HB 369 in the House on November 3, 2011.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

56.     HB 369 was sent to the House Rules and Reference Committee for consideration, not to the House State Government and Elections Committee, which had heard testimony regarding HB 319.

57.     On November 9, 2011, Huffman gave sponsor testimony before the House Rules and Reference Committee.

58.     The Ohio House voted on the final map on December 14, 2011. Nine Democratic members of the Ohio House spoke out against the bill.

59.     They stated that the proposed map was not materially different from HB 319, since it did nothing to change the ratio of Republican districts to Democratic districts. These Democratic legislators noted that, like HB 319, HB 369 would entrench a 12-4 advantage for Republicans. Representative Ron Gerberry, the ranking Democrat on the State Government and Elections Committee, complained that he had only been shown the map one hour before the vote and that more people should have been involved in the map drawing process.

60.     Other Democratic members of the Ohio House complained about how the lines had been drawn in heavily minority communities, including Cuyahoga and Lorain counties. These members were especially concerned by the splits of these counties, as well as the partisan tilt of the map as a whole.

61.     On December 14, 2011, the map was introduced in the Ohio Senate by Faber. As in the Ohio House, Ohio Democratic Senators spoke out against the map.

62.     HB 369 also changed the primary system in Ohio by consolidating two primary election dates (one for state, local, and U.S. Senate elections and the other for the U.S.

9

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

House and presidential elections) into a single primary date. This change was projected to save the State approximately $15 million per year.

63.     Both houses of the General Assembly voted to enact HB 369 on December 14, 2011.  HB 369 was then signed into law by Governor Kasich on the following day, December 15, 2011.

**H.  The Ohio Map has had the effect of advantaging Republicans and disadvantage Democrats as demonstrated by both election results and partisan bias metrics.**

64.     Republicans have won 12 (75%) of Ohio's U.S. congressional seats in the last four election cycles held under the map.

65.     Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2012 with 51% of the congressional vote.

66.     Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2014 with 59% of the congressional vote.

67.     Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2016 with 57% of the congressional vote

68.     Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2018 with 52% of the congressional vote.

69.     Republicans won the same 12 districts in all four election cycles: the 1st, 2nd, 4th, 5th, 6th, 7th, 8th, 10th, 12th, 14th, 15th, and 16th Districts.

70.     Democrats have won only four (25%) of Ohio's U.S. congressional seats in the last four election cycles held under the map.

71.     Democrats won only four (25%) of Ohio's U.S. congressional seats in 2012 although they obtained 47% of the congressional vote.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

72.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2014 although they obtained 39% of the congressional vote.

73.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2016 although they obtained 41% of the congressional vote.

74.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2018 although they obtained 47% of the congressional vote.

75.    Democrats won the same four districts in all four election cycles: the 3rd, 9th, 11th, and 13th Districts.

76.    In all four election cycles, voters in the 3rd, 9th, 11th, and 13th Districts cast many more votes for the Democratic congressional candidate above and beyond the 50%+1 majority needed to win each district.

77.    In the 3rd District, the Democratic candidate won by 68.8% in 2012, 64.05% in 2014, 68.57% in 2016, and 73.6% in 2018.

78.    In the 9th District, the Democratic candidate won by 73.04% in 2012, 67.74% in 2014, 68.89% in 2016, and 67.8% in 2018.

79.    In the 11th District, the Democratic candidate was unchallenged in 2012 and won by 79.45% in 2014, 80.25% in 2016, and 82.2% in 2018.

80.    In the 13th District, the Democratic candidate won by 72.77% in 2012, 68.49% in 2014, 67.73% in 2016, and 61.0% in 2018.

81.    There are four commonly used metrics to measure partisan bias: the efficiency gap, mean-median, declination, and the Gelman-King asymmetry measure.

82.    The efficiency gap is defined as "the difference between the parties' respective wasted votes, divided by the total number of votes cast in the election." All of a party's

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

votes are wasted if they lose the election. When a party wins an election, the wasted votes are those above 50%+1 needed to win. The efficiency gap aggregates both kinds of wasted votes for each party. According to the efficiency gap analysis, the ratio of the parties' excess votes reveals the discrepancy between how the map treats the parties.

83.     The efficiency gap can be pro-Republican or pro-Democrat.  A pro-Republican efficiency gap is denoted with a negative number and a pro-Democrat with a positive number.

84.     Ohio had a pro-Republican efficiency gap in every election held under the map.

85.     Ohio's pro-Republican efficiency gap was -22.4% in 2012, -9% in 2014, -8.7% in 2016, and -20% in 2018.

86.     The 2012 efficiency gap in Ohio was more extreme than 98% of previous plans in states with more than six seats over the past 45 years, and it was more Republican-leaning than 99% of previous congressional districting plans.

87.     The 2018 efficiency gap in Ohio was -20%. This was more extreme than 96% of previous plans in states with more than six seats over the past 45 years, and it was more Republican-leaning than 98% of previous congressional districting plans.

88.     The mean-median gap is the difference between a party's vote share in the median district and their average vote share across all districts.

89.     If a party wins more votes in the median district than in the average district, they have an advantage in the translation of votes to seats.

90.     Ohio has a mean-median gap in all four elections, which shows an advantage for Republicans in the congressional election.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

91.     Ohio's mean-median gap in 2012 was 7.8%. The mean-median difference in 2012 was larger than in 83% of previous elections and more pro-Republican than the mean-median difference in 92% of previous congressional elections.

92.     Ohio's 2012 mean-median gap of 7.8% was a sharp increase from Ohio's mean-median gap in 2010, which was 1.7%.

93.     Ohio had a gap between the mean and median district of 5.0% in 2018. Ohio's mean-median gap in 2018 was more extreme than the mean-median difference in 62% of previous elections and more pro-Republican than the mean-median difference in 81% of previous elections.

94.     The symmetry metric captures whether each party receives the same share of seats for identical shares of votes.

95.     Gelman and King propose two ways to measure partisan bias in the symmetry of the vote-seat curve. First, it can be measured using counter-factual election results in a range of statewide vote shares between .45 and .55. Across this range of vote shares, each party should receive the same number of seats when they obtain the same vote share. The Symmetry measure captures any departures from the standard that each party should receive the same seat share across this range of plausible vote shares. Second, symmetry can be measured based on the seat share that each party receives when they split the statewide vote 50-50. In an unbiased system, each party should receive 50% of the seats in a tied statewide election. Here, the partisan bias statistic is the "expected proportion of the seats over 0.5 that the Democrats receive when they receive exactly half the average district vote."

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

96.     Both partisan symmetry measures indicate a pro-Republican advantage in all four elections under the map.

97.     Measure 1: Based on the standard that each party should receive the same seat share across a range of plausible vote shares, the asymmetry between Democrats and Republicans was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years.

98.     Measure 2: In hypothetically tied statewide elections, the level of bias in Ohio's 2012 election was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years.

99.     Measure 1: Ohio's 2018 elections were more asymmetric than 92% of previous elections and more pro-Republican than 94% of previous U.S. congressional elections over the past 45 years.

100.    Measure 2: The level of bias in 2018 was more extreme than 95% of previous elections and more pro-Republican than 96% of previous U.S. congressional elections over the past 45 years.

101.    The declination metric treats asymmetry in the vote distribution as indicative of partisan bias in a redistricting plan. If all the districts in a plan are lined up from the least Democratic to the most Democratic, the mid-point of the line formed by one party's seats should be about as far from the 50 percent threshold for victory on average as the other party's victory.

102.    The declination metric can be quantified using a number between -1 and 1 (positive values favor Democrats and negative values favor Republicans.)

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

103.    All four declination metrics in the last four election cycles show a pro-Republican advantage.

104.    The 2012 congressional election in Ohio had a more extreme declination than 99% of previous elections and a more pro-Republican declination than any previous U.S. congressional election over the past 45 years.

105.    Ohio's 2018 congressional election had a declination score of -0.69. This was more extreme than 98% of previous elections and more pro-Republican than 99% of previous U.S. congressional elections.

106.    Ohio's congressional elections grew less competitive after the 2011 plan went into place.

107.    None of Ohio's congressional elections were competitive in 2014 and 2016, meaning no candidate won their election by less than 55%.

108.    In 2018, Ohio had only two competitive elections, meaning the candidates won their elections by less than 55%.

109.    The responsiveness of a map indicates how many seats change hands as vote shares rise and fall.

110.    An unresponsive map ensures that the bias in a districting plan toward the advantaged party is insulated against changes in voters' preferences, and thus is durable across multiple election cycles.

111.    Gelman and King propose a technique that measures responsiveness based on uniform swings in two parties' counterfactual vote shares.

112.    Ohio's post-2011 districting plans had some of the least responsive election results in the country.

15

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

113.     Performing a uniform swing analysis based on the 2018 election results, Republicans win 75% of the seats across most of the range of plausible election swings.

### I. Plaintiffs' Proposed Remedial Plan

114.     Plaintiffs' Proposed Remedial Plan betters the Ohio congressional map on all traditional redistricting criteria.

115.     The Proposed Remedial Plan splits 14 counties; the Ohio congressional map splits 23 counties.

116.     The Proposed Remedial Plan splits 27 municipal civil divisions; the Ohio congressional map splits 73 municipal civil divisions.

117.     The Proposed Remedial Plan is more compact than the Ohio congressional map.

118.     The Proposed Remedial Plan has a Voting Rights Act-compliant district in its District 11.

119.     Under the Proposed Remedial Plan, District 3 has a Black Voting Age Population of 30.31%.

120.     Under the Proposed Remedial Plan, District 1 has a Black Voting Age Population of 26.74%.

121.     The Proposed Remedial Plan complies with the requirements of Issue 1.

122.     The Proposed Remedial Plan has the following Democratic congressional vote percentages of the two-party vote:

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

| CD | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| | Proposed Plan | 2012 Plan | Proposed Plan | 2012 Plan | Proposed Plan | 2012 Plan | Proposed Plan | 2012 Plan |
| 1 | 48.5% | 39.5% | 44.2% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.6% | 41.4% | 25.4% | 34.1% | 25.0% | 33.5% | 31.1% | 41.7% |
| 3 | 66.9% | 71.4% | 58.2% | 63.6% | 63.1% | 68.2% | 68.3% | 73.6% |
| 4 | 29.6% | 38.5% | 24.2% | 32.3% | 22.3% | 31.7% | 26.6% | 34.7% |
| 5 | 62.3% | 40.6% | 51.2% | 30.4% | 52.6% | 28.8% | 54.3% | 36.1% |
| 6 | 44.4% | 46.8% | 33.7% | 39.8% | 28.6% | 29.4% | 33.0% | 30.8% |
| 7 | 39.3% | 43.6% | 21.2% | 0.3% | 28.5% | 31.4% | 35.5% | 41.3% |
| 8 | 2.0% | 0.0% | 29.2% | 28.9% | 28.5% | 28.2% | 34.0% | 33.4% |
| 9 | 59.4% | 76.0% | 44.6% | 67.7% | 48.9% | 68.6% | 55.1% | 67.8% |
| 10 | 37.8% | 38.6% | 32.7% | 32.6% | 33.9% | 33.8% | 43.0% | 43.0% |
| 11 | 95.7% | 99.7% | 81.5% | 79.2% | 81.7% | 80.3% | 83.5% | 82.3% |
| 12 | 39.7% | 36.6% | 33.3% | 29.0% | 38.4% | 31.7% | 54.3% | 47.9% |
| 13 | 62.6% | 72.9% | 54.4% | 68.4% | 54.2% | 67.6% | 51.4% | 61.0% |
| 14 | 48.6% | 41.8% | 27.0% | 34.4% | 37.5% | 37.4% | 43.8% | 44.8% |
| 15 | 42.3% | 38.6% | 35.8% | 34.1% | 31.2% | 33.7% | 33.9% | 40.5% |
| 16 | 59.1% | 48.0% | 48.5% | 36.2% | 51.0% | 35.2% | 55.8% | 43.3% |

123.     Imputed election results for the uncontested races in 2012 and 2014 give the following results in the Proposed Remedial Plan:

| CD | 2012 | 2014 |
|---|---|---|
| 1 | 48.5% | 44.3% |
| 2 | 30.6% | 25.2% |
| 3 | 66.9% | 59.1% |
| 4 | 29.6% | 24.2% |
| 5 | 62.3% | 51.3% |
| 6 | 44.4% | 36.6% |
| 7 | 39.3% | 29.6% |
| 8 | 2.0% | 29.2% |
| 9 | 59.4% | 47.4% |
| 10 | 37.8% | 32.7% |
| 11 | 95.7% | 81.5% |
| 12 | 39.7% | 32.5% |
| 13 | 62.6% | 59.7% |
| 14 | 48.6% | 41.4% |
| 15 | 42.3% | 35.8% |
| 16 | 59.1% | 51.6% |

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

124.    With these imputations calculated, in 2012, there were 6 districts with a

Democratic majority, plus two additional competitive districts. In 2014, there were 5

districts with a Democratic majority, plus one additional competitive district. In 2016,

there were 5 districts with a Democratic majority, plus two additional competitive

districts. In 2018, there were 8 districts with a Democratic majority, with no additional

competitive districts.

125.    Under the correction to the Proposed Remedial Plan, the only changes to these

election results are between .03-.04% difference in the Democratic two-party vote share

between District 4 and District 8. The rest of the proposed districts remain the same.

126.    Under the correction to the Proposed Remedial Plan, incumbents are not paired

except for Representatives Chabot and Wenstrup. These incumbents are only paired to

keep the city of Cincinnati whole and thus comply with Issue 1.

### J.  The Plaintiffs are Ohio organizations and voters.

#### 1.  Ohio A. Philip Randolph Institute

127.    Ohio A. Philip Randolph Institute ("APRI") is the Ohio chapter of the A. Philip

Randolph Institute.

128.    It has eight chapters across Ohio—in Columbus, Cleveland, Cincinnati, Toledo,

Warren, Youngstown, Akron/Canton, and Dayton, seven of which are currently active,

and has members living in nearly every congressional district throughout the state.

129.    APRI's activities are funded in part by membership dues.

130.    The bulk of APRI's work consists of voter education, voter registration, civic

engagement, voter outreach, and encouraging people to vote.

18

### APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

131.    APRI's executive board, all of its chapters, and representatives from each chapter unanimously made the decision to join the lawsuit. The goal was to obtain fair congressional districts, to put an end to the practices of packing and cracking.

132.    APRI's state executive board endorsed Ballot Issue 1.

133.    Andre Washington has been the President of APRI for ten years and was the organization's Rule 30(b)(6) designee.

134.    Stephanie White is a member of APRI. She is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is Vice President of APRI's Toledo Chapter.

### 2.  League of Women Voters of Ohio

135.    League of Women Voters of Ohio ("LWVO" or "the League") is the Ohio chapter of the League of Women Voters of the United States, founded in May 1920.

136.    The LWVO is a non-partisan membership organization with 2,700 to 2,800 members.

137.    Its members join by paying annual membership dues. There are LWVO dues-paying members residing in each of Ohio's congressional districts.

138.    "In its core function," the LWVO "is about democracy," and "fair maps and fair districts are key to that democracy." The League's work "is making our democracy function for every voter."

139.    Much of the League's mission is carried by volunteers.

140.    The LWVO works to educate voters about voting, candidates and issues, to register voters, to get out the vote, and to empower and educate voters in a nonpartisan way.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

141.  Fair districts is a priority issue for the LWVO, specifically voted upon by member delegates at its biennial convention.

142.  The decision to join this lawsuit was made by the LWVO's elected board.

143.  LWVO Executive Director Jennifer Miller was designated as the group's Rule 30(b)(6) witness.

144.  John Fitzpatrick is a member of LWVO. He is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. He is Treasurer of the League of Women Voters of the Akron Area.

145.  The LWVO ran a citizen map making contest in 2011, utilizing significant resources.

146.  The LWVO published a report on Ohio's 2011 redistricting process, documenting the lack of transparency in the process and the partisan gerrymander that resulted, titled The Elephant in the Room. It later produced a sequel, The Elephant in the Room II.

147.  The LWVO supported Ballot Issue 1.

### 3. Northeast Ohio Young Black Democrats

148.  Plaintiff Northeast Ohio Young Black Democrats ("NEOYBD") is a regional organization dedicated to "mentor, empower and recruit the next generation of young people of color who want to be involved in the political process" in Northeast Ohio.

149.  NEOYBD is a Democratic organization that supports Democratic candidates for all offices for which their membership is eligible to vote, including the U.S. House of Representatives. It is a chapter of the Ohio Young Black Democrats.

150.  NEOYBD has about sixty members, all Democrats and regular voters, who currently live in 9th, 11th, 13th, and 14th Districts.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

151.    Central to NEOYBD's mission is "voter education, training, and information-sharing," including "informing voters on important issues and candidates in ways that they can get involved."

152.    This includes canvassing, phone banking, and social media engagement to get out the vote and support Democratic issues in Northeast Ohio communities. It also includes training other Democrats and progressives on organizing tools including fundraising and running for office, and holding events to support Democratic candidates.

153.    For example, in 2018, NEOYBD, through its board, members, and volunteers, held four training events to educate people about organizing for Democratic candidates; monthly phone banks to support Democratic candidates; and regular canvassing including in conjunction with other Democratic groups for the same purpose.

154.    NEOYBD supported Ballot Issue 1 and canvassed to get it on the ballot in 2017.

155.    NEOYBD's board unanimously voted to become a Plaintiff in this litigation. Based on the "conversations we've had with our community," the board believed "[t]he current map does not represent us, and we don't have a fair, equal voice."

#### 4. Hamilton County Young Democrats

156.    Hamilton County Young Democrats is a Democratic organization that engages young people to be involved in politics and elections.

157.    Hamilton County Young Democrats is a membership organization, in which members self-identify as Democrats.

158.    Hamilton County Young Democrats has approximately 150 members, who pay dues to be a member of the organization.

159.    Hamilton County Young Democrats does not know who each of its members has voted for, but has no concern that the organization is infiltrated by non-Democrats.

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

160.     Nathaniel Simon has been the President of the Hamilton County Young Democrats since 2017 and was the organization's Rule 30(b)(6) designee.

161.     The members of Hamilton County Young Democrats live in the 1st and 2nd Districts.

162.     Hamilton County Young Democrats does voter engagement and education, holds events with candidates and on issues important to Young Democrats, and works on behalf of Democratic candidates, including for Congress.

163.     Hamilton County Young Democrats conducts voter registration and canvassing, including canvassing for Democratic candidates running for Congress.

164.     The members of the Hamilton County Young Democrats support Democratic candidates for office, including for Congress.

165.     The Board of the Hamilton County Young Democrats makes decisions on behalf of the organization, including becoming a party in this suit.

### 5. The Ohio State University Democrats

166.     The Ohio State University College Democrats ("OSU College Democrats") is a student organization at the Ohio State University whose aim is to "advocate, educate, and engage people on the Ohio State campus in alignment with the [Democratic] party platform."

167.     The OSU College Democrats is chartered with the Ohio Democratic Party, Ohio College Democrats, and College Democrats of America.

168.     The OSU College Democrats is a membership organization made up of OSU students who self-identify as Democrats. Students who have attended at least thirty percent of the meetings in a year are "voting members" of the organization.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

169.     The OSU College Democrats does not know who each of its members has voted

for, but has no concern that the organization is infiltrated by non-Democrats.

170.     Alexis Oberdorf was the President of the OSU College Democrats from

December 2017 to December 2018 and was the organization's Rule 30(b)(6) designee.

171.     The members of the OSU College Democrats generally live in the 3rd, 12th or

15th Districts. While some members are registered to vote at their home address, the

bulk of the members are registered to vote at their school addresses.

172.     The OSU College Democrats does voter engagement and education, works to

register students to vote for the first time or to have them update their voter registration

to their current address, canvasses on behalf of candidates including for Congress, hosts

events with Democratic candidates, including for congressional office, and has done

phone banking, including on behalf of the Democratic-coordinated campaign which

works on behalf of, among other offices, congressional candidates.

173.     The members of the OSU College Democrats support Democrats running for

office, including for Congress. For example, the Danny O'Connor campaign for

Congress in the 12th District was a key focus for 2018.

174.     The "small executive board" makes decisions for the OSU College Democrats,

including the vote to join this lawsuit.

175.     The OSU College Democrats is concerned about congressional redistricting, and

has held events and collected petition signatures for the fair districting initiative.

### 6. Individual Plaintiffs

176.     Linda Marcy Goldenhar resides in the 1st District.

177.     Ms. Goldenhar is a U.S. citizen registered to vote in Ohio and is an active voter

who has voted in every congressional and presidential election since moving to and

23

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

registering to vote in Ohio in 1992, and in each of these elections, she voted for a

Democratic candidate.

178.     Ms. Goldenhar only votes in Democratic primary elections.

179.     Ms. Goldenhar has canvassed and held fundraisers for Democratic candidates.

180.     In the 2018 elections, Ms. Goldenhar was a part of a group of acquaintances who

wrote postcards to Democratic voters encouraging them to get out and vote.

181.     Douglas John Burks resides in the 2nd District.

182.     Dr. Burks is a U.S. citizen registered to vote in Ohio and is an active voter.

183.     In the almost 40 years Dr. Burks has resided at his current address, he has been in

both the 1st and 2nd Districts.

184.      Steve Chabot, incumbent Representative for District 1, represented Dr. Burks in

the 2000s.

185.     Since the early 1980s, Dr. Burks has always voted and exclusively for Democratic

candidates in federal, state and local elections.

186.     Dr. Burks works with the Friends Committee on National Legislation, a non-

partisan advocacy group that aims to move government to support Quaker values, to

lobby representatives. As a part of his work with the Friends Committee on National

Legislation, Dr. Burks has lobbied Ohio Representatives Steve Chabot, Brad Wenstrup,

and Senators Rob Portman and Sherrod Brown.

187.     Dr. Burks lobbied Representative Wenstrup on the War Powers Act;

Representative Wenstrup did not sponsor the legislation.

188.     Dr. Burks protested Jean Schmidt, a previous Representative for District 2, over

the war in Iraq.

24

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

189.    Sarah Marie Inskeep resides in the 3rd District.

190.    Ms. Inskeep is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every congressional election since 2012.

191.    Ms. Inskeep is a Democratic voter and has supported Democratic candidates for Ohio's congressional delegation in the past.

192.    Ms. Inskeep is politically active and has participated in electoral activities in both her personal and professional capacities.

193.    During the 2016 election, as part of work at Planned Parenthood, Ms. Inskeep ran "door-to-door canvassing, phone bank operations, [and] direct voter contact operations with volunteers."

194.    During the 2018 election, as part of her work with the super PAC, Planned Parenthood Voters Ohio, Ms. Inskeep engaged in voter education on reproductive rights issues.

195.    Also during the 2018 election, in her personal capacity, Ms. Inskeep canvassed every weekend.

196.    Cindy Libster resides in the 4th District.

197.    Ms. Libster is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in almost every election she can recall, including elections for U.S. Congress.

198.    Ms. Libster is a "lifelong Democrat," and has voted for a Democrat in almost every election she can recall, including always having voted for a Democratic U.S. congressional representative.

199.    Ms. Libster's current representative is Republican Jim Jordan.

25

### APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

200.  As a Democrat, Ms. Libster has both campaigned for and held office herself, and has been involved in canvassing and GOTV efforts for presidential and local elections for almost 30 years.

201.  Despite calling and emailing Representative Jordan's office to express her concerns over his policy positions, Ms. Libster has never spoken to or seen Jim Jordan. She is aware of a League of Women Voters bipartisan candidate forum that happened in her community that he did not attend despite an invitation.

202.  Kathy Deitsch resides in the 5th District.

203.  Ms. Deitsch is a U.S. citizen registered to vote in Ohio and is an active voter.

204.  Ms. Deitsch has always identified as a Democrat since she was "first able to vote," and has voted for a Democrat in almost every election she can recall, including always having voted for a Democratic U.S. congressional representative.

205.  Ms. Deitsch's current representative is Republican Bob Latta.

206.  Ms. Deitsch has been involved in Democratic organizing for many years, has campaigned for office herself, and regularly works to get out the vote, fundraise, and support other Democratic candidates. She has also canvassed to put partisan gerrymandering reform on the Ohio ballot in 2017 and educate voters about gerrymandering.

207.  LuAnn Boothe resides in the 6th District.

208.  Ms. Boothe is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every election she can recall including elections for U.S. Congress.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

209.     Ms. Boothe identifies as a Democrat, and has voted for a Democrat in almost

every election she can recall, including always having voted for a Democratic U.S.

congressional representative.

210.     Ms. Boothe's current representative is Republican Bill Johnson.

211.     Ms. Boothe has been involved in Democratic politics, including canvassing in

support of the Clinton campaign, since 2012.

212.     Mark John Griffiths resides in the 7th District.

213.     Mr. Griffiths is a U.S. citizen registered to vote in Ohio and is an active voter,

having voted in every congressional election since 2012 except for 2014 when the

Republican congressional candidate Bob Gibbs was unopposed.

214.     Mr. Griffiths is a Democratic voter and has supported Democratic candidates for

Ohio's congressional delegation in the past.

215.     Mr. Griffiths is a member of a number of several civic and political organizations.

216.     As a member of the Indivisible group, Mr. Griffiths has visited Congressman Bob

Gibbs's offices on three occasions.

217.     The first time, Mr. Griffiths met with Congressman Gibbs as part of the

Indivisible Wellington group at the congressman's office in Canton to discuss healthcare

and the opioid epidemic. During this meeting, Congressman Gibbs joked that Mr.

Griffiths and his wife had travelled the furthest to attend the meeting.

218.     The second time Mr. Griffiths met with Congressman Gibbs as part of the

Indivisible Wellington group was in April 2017 to discuss healthcare at the

congressman's Ashland office. During this meeting, Mr. Griffiths offered to participate

in a "study group" on healthcare to "research, advise, develop" policies related to

27

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

healthcare given his background in employee benefits and human resources, but his

offer was not accepted by Congressman Gibbs.

219. The third time, Mr. Griffiths just dropped off a letter advocating against the

deportation of an immigrant on behalf of the HOLA organization within the Indivisible

group. The immigrant ended up getting deported.

220. As a member of the Indivisible group in Wellington, Mr. Griffiths has sent letters

advocating for automatic voter registration in Ohio.

221. As a member of the Indivisible group in Wellington, Mr. Griffiths researched

gerrymandering, educated the group about gerrymandering, and circulated petitions to

members of the group to get the fair districting initiative on the ballot.

222. Mr. Griffiths along with his wife circulated pamphlets on gerrymandering

provided by the League of Women Voters and gathered signatures in their community to

place the fair districting initiative on the ballot.

223. As a member of Lorain County Rising, Mr. Griffiths participated in a candlelight

vigil in Oberlin during the Charlottesville riots and attended a demonstration organized

by the Moms Against Gun Violence.

224. Mr. Griffiths worked to revitalize the North Ridgeville Democratic Club.

225. As part of the North Ridgeville Democratic Club, Mr. Griffiths phone banked and

sent postcards on behalf of Democratic congressional candidate Ken Harbaugh. Mr.

Griffiths also worked a booth at the North Ridgeville Corn Festival to support

Democratic candidates.

226. Mr. Griffiths also volunteered for Democratic candidate Ken Harbaugh's

campaign in his personal capacity and engaged in door-to-door canvassing and phone

### APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

banking. In addition, Mr. Griffiths organized a meet-and-greet and a food pantry drive with the Indivisible group in Wellington on behalf of Mr. Harbaugh.

227. As a member of the League of Women Voters' Oberlin Chapter, Mr. Griffiths was involved in voter registration activities.

228. Mr. Griffiths has contacted Congressman Gibbs through emails, letters, calls, and voicemails on a number of occasions.

229. When Mr. Griffiths has called Congressman Gibbs' office, he has asked Congressman Gibbs' aides to have the Congressman call him back. However, Mr. Griffiths never received a call from the Congressman.

230. When Mr. Griffiths contacted Congressman Gibbs through his website on one or two occasions, he did not receive a response

231. Mr. Griffiths and his wife sent letters to Senator Larry Obhof and Cliff Rosenberger urging them to get involved in redistricting reform.

232. On January 24, 2018, Mr. Griffiths and his wife gave a statement against political gerrymandering to the Government Oversight and Reform Committee.

233. Mr. Griffiths and his wife wrote a Letter to the Editor that was published in the Elyria Chronicle on November 3, 2017 criticizing political gerrymandering. Mr. Griffiths testified that he was "moved to write this letter" after attending a hearing by the Congressional Redistricting Reform Working Group where he heard a number of people speak against political gerrymandering.

234. Larry Nadler resides in the 8th District.

235. Mr. Nadler is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every election he can recall including elections for U.S. Congress.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

236.    Mr. Nadler identifies as a Democrat, and has voted for a Democrat in almost

every election he can recall, including always having voted for a Democratic U.S.

congressional representative.

237.    Mr. Nadler's current representative is Republican Warren Davidson.

238.    Mr. Nadler is active with the Democratic Party in multiple ways, including as "a

member ... involved in a couple of PACs ... I have done everything from ... standing

outside at a protest ... to the women's march, to signing petitions, to writing letters, op-

ed-type pieces that appeared in a couple of places."

239.    Mr. Nadler is also a precinct executive in Oxford, Ohio, and a member of the

Democratic Party's Central Committee for Butler County.

240.    Chitra Muliyil Walker resides in the 9th District.

241.    Ms. Walker is a U.S. citizen registered to vote in Ohio and is an active voter; she

believes she has voted in every congressional election since 2008 except when she was

out of the country.

242.    Ms. Walker is a Democratic voter and has supported Democratic candidates for

Ohio's congressional delegation in the past.

243.    Ms. Walker is a member of a number of several civic and political organizations.

244.    As a member of the Lakewood Democratic Club, Ms. Walker has voted to

endorse Democratic candidates for political office.

245.    As a member of the League of Women Voters' Lakewood Chapter, Ms. Walker

participated in voter registration efforts, organized candidate nights, educated voters on

various issues, and petitioned for Issue 1.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

246.     As a member of the Cuyahoga Women's Democratic Caucus, Ms. Walker attends

meetings and supports Democratic candidates.

247.     As part of the executive committee for the Cuyahoga Democratic Party, Ms.

Walker votes on whether to support candidates for political office.

248.     Ms. Walker served as the treasurer for Democrat Cindy Marx's 2013 and 2017

campaigns for Lakewood City Council At-Large.

249.     Ms. Walker sends Congresswoman Kaptur letters and attends Congresswoman

Kaptur's constituent meetings.

250.     Tristan Rader resides in the 9th District.

251.     Mr. Rader is a U.S. citizen registered to vote in Ohio and is an active voter,

having voted in every congressional election at least since moving to his current

residence in October 2013.

252.     Mr. Rader is a Democratic voter and has supported Democratic candidates for

Ohio's congressional delegation in the past.

253.     Mr. Rader has worked on numerous campaigns for Democratic candidates,

including his own campaign for Lakewood City Council.

254.     Mr. Rader ran for Lakewood City Council in 2017. Mr. Rader has served on

Lakewood City Council since January 2018.

255.     As part of his work for MoveOn.org, Mr. Rader conducted volunteer recruitment

and field organizing on behalf of the Unite Against Hate campaign's Democratic slate of

candidates, which included Hillary Clinton for President and Ted Strickland for Senate.

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

256.     As part of his work for the Bernie Sanders 2016 presidential campaign, Mr. Rader was responsible for making sure that Senator Sanders was on the ballot in every county in New Jersey and Ohio.

257.     Mr. Rader worked on Democrat Mitch Fallis's campaign for Mayor of the city of Lorain.

258.     Mr. Rader worked on Democrat Michael Skindell's campaign for Mayor of the city of Lakewood.

259.     Mr. Rader worked on Democrat Keith Mundy's campaign for Congress in the 16th District.

260.     Mr. Rader worked on Democrat John Wisniewski's campaign for governor of New Jersey. As part of this campaign, Mr. Rader engaged in field organizing and volunteer recruitment.

261.     Mr. Rader also has worked for and is a member of a number of different civil and political organizations.

262.     As part of his work at the AIDS Healthcare Foundation, Mr. Rader organized a national phone bank campaign to persuade voters to support a drug cost savings initiative.

263.     As part of his work with SEIU, Mr. Rader organized volunteers and paid canvassers for the Democratic slate of candidates supported by the organization.

264.     Mr. Rader re-activated Cleveland State University's Young Democrats chapter. As a member of this organization, Mr. Rader tabled around the school and organized an event for an Ohio Senate candidate.

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

265.     As a member of the Cuyahoga County Progressive Caucus, Mr. Rader campaigned against a county initiative to rehab the Q Arena in Cleveland.

266.     Mr. Rader spoke at a meeting of the League of Women Voters about Issue 1.

267.     Mr. Rader also campaigned on behalf of Issue 1 by posting on social media and he supported those individuals collecting signatures to place the fair districting initiative on the ballot.

268.     Ria Megnin lives in the 10th District.

269.     Ms. Megnin is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every election she can recall including elections for U.S. Congress.

270.     Ms. Megnin identifies as a Democrat. She almost always votes Democrat, including having voted for a Democratic U.S. congressional representative in every election in her recent memory.

271.     Ms. Megnin's U.S. congressional Representative is Republican Michael Turner.

272.     Ms. Megnin is "part of various groups, loosely, that have raised concerns with [Turner] in the past and have shared that he has not responded to them." For example, a faith group she is a part of planned a rally "outside of Congressman Turner's office and it is called We're Dying to See Our Congressman, again, because he has not held a town hall in sixteen years. There's going to be skeletons sitting in cars."

273.     Andrew Harris has resided, during the last 10 years, at 3 addresses in the 11th District.

274.     Mr. Harris is a U.S. citizen registered to vote in Ohio and is an active voter. He registered to vote in the State of Ohio when he turned 18 in 2008, as a Democrat. He is an active Ohio voter and votes "Democrats up and down the ballot."

33

APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

275.     Aaron Dagres resides in the 12th District; he is a U.S. citizen registered to vote in Ohio and is an active voter.

276.     Mr. Dagres registered to vote in the State of Ohio in 1997. Mr. Dagres is a Democratic voter and has always voted for the Democratic candidates Congress.

277.     He has always affiliated with the Democratic Party, except in 2012 when he pulled a Republican ballot in the primary in order to vote for a Republican underdog in order to extend the Republican primary process.

278.     Mr. Dagres was the President of the Licking County Democratic Club PAC from January 1, 2018 to January 1, 2019, and he is a Central and Executive Committee member of the official party within Licking County.

279.     Mr. Dagres has been closely involved in numerous Democratic campaigns, including his own pursuit of his party's nomination to Congress in 2008. He helps support candidates who run for office. He raises money for Democratic candidates, including for Danny O'Connor, the recent Democratic candidate for Congress in District 12. He was very involved in canvassing for Danny O'Connor's campaign for Congress in the August 2018 special election.

280.     Mr. Dagres recruits other people to vote for Democratic candidates through personal conversations, phone banking, door-to-door canvassing, mailings, and other avenues. He also registers voters.

281.     Mr. Dagres voted in support of Issue 1.

282.     Liz Myer lives in the 13th District.

283.     Dr. Myer is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every election she can recall including elections for U.S. Congress.

### APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts

284.   She identifies as a Democrat, and has voted for a Democrat in most elections she can recall, including always having voted for a Democratic U.S. congressional representative.

285.   Dr. Myer's U.S. Congressional Representative is Democrat Tim Ryan.

286.   Dr. Myer is active in Democratic Party organizing. For example, she has canvassed, phone banked, and attended fundraisers in her district and the surrounding area for both Clinton and Obama presidential campaigns and for GOTV efforts.

287.   Beth Ann Blewitt Hutton resides in the 14th District.

288.   Ms. Hutton is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every single election since registering to vote around 1971. She has always voted for a Democratic candidate in statewide races. With the exception of Representative Steve LaTourette, Ms. Hutton has always voted for Democratic candidates at the federal level.

289.   Ms. Hutton only votes in Democratic primary elections.

290.   Since around 1983, Ms. Hutton has been actively involved with the League of Women Voters, serving as President of the Lake County League several times and has served, for the last 12 years, as the Voter Service Chair.

291.   One of Ms. Hutton's main responsibilities as Voter Services Chair for the League is to put together the Voter Service Guide, which collects information from questionnaires sent to all candidates. The Republican candidate for District 14 did not respond to the League's survey.

292.   As Voter Services Chair for the League, Ms. Hutton also hosts candidate forums. In the 2018 election cycle, Ms. Hutton invited both the Democratic and Republican

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

candidates for District 14 to attend the forum. Both candidates attended one forum, although the Republican candidate did not RSVP.

293.    Terri Thobaben lives in Clinton County in the 15th District.

294.    Ms. Thobaben is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every election she can recall including elections for U.S. Congress.

295.    Ms. Thobaben identifies as a Democrat, and has voted for a Democrat in most elections that she can recall, including always having voted for a Democratic U.S. congressional representative.

296.    Ms. Thobaben's Congressional Representative is Republican Steve Stivers.

297.    Ms. Thobaben is a member of the Democratic Party and is on the Clinton County Party Executive Committee. She testified that through this affiliation, "[w]e help to run the elections in the–in the county. We support candidates. The committee helps to raise money at our dinners."

298.    Ms. Thobaben has also canvassed, "door to door and did literature drops, some phone calls" for several political campaigns for presidential and local Democratic candidates, and she herself ran as a Democrat for Clinton County Commissioner in 2008 and 2010.

299.    Constance Rubin has resided, during the last 10 years, at two addresses in the 16th District.

300.    Ms. Rubin is a U.S. citizen registered to vote in Ohio and is an active voter. She registered to vote in Ohio in 1973, at which time she voted Republican. She voted Republican a number of times in that era, but is now a Democrat, who finds it "highly doubtful" that she would ever vote for a Republican again.

**APPENDIX A: Plaintiffs' Proposed Uncontroverted Facts**

301.    Ms. Rubin is a member of the League of Women Voters of Ohio, and has been since 1973. She was co-president from June 2011 to January 2014.

302.    She has been a member of the Stark County Democratic Party since 1984, and a member of the Central Committee from 2004 to 2010, and from 2016 to the present.

303.    Ms. Rubin has been a member of the Northern Stark County Democratic Club since 2006, was president from 2008 to 2010, first vice president from 2015 to February 2017, and vice president again from March 2016 to March 2016. She is currently the second vice president.

304.    Ms. Rubin has supported Democratic candidates over many election cycles, and was the Party's 2014 nominee for the State Senate in her district, District 29.