# APPENDIX C

**APPENDIX C: Plaintiffs' Contested Facts**

## TABLE OF CONTENTS

I.    Plaintiffs' Contested Facts .................................................................................... 1

    A.    Republican congressional leadership sought a 12-4 map. ............................... 1

    B.    The Ohio state Republican leadership was committed to a 12-4 map. ........................ 2

    C.    The national Republicans provided political data for the Ohio map drawers. .............. 3

    D.    A key part of the national Republican work and strategy was the Franklin County Sinkhole. ........................................................................................... 4

    E.    The map drawers evaluated the districts that were drawn through the use of political indices. ..................................................................................... 5

    F.    The map drawers used Maptitude to track changes to the partisan scoring of each district. ..................................................................................... 7

    G.    Political indices were shared with Ohio legislators at the "Bunker" and digitally. ........ 7

    H.    Members of Congress and national Republicans also received updates of the political composition of draft maps. .................................................... 9

    I.    Prior to introducing a map, Republicans knew it would be a 12-4 map based on the political index work. ............................................................... 9

    J.    While local and national Republican lawmakers were receiving updates about the status of draft maps, the map was kept from the public and even from members of the General Assembly until September 13, 2011. ................................... 10

    K.    Republicans provided lawmakers with little time to debate the merits of the proposed plan. ...................................................................................... 11

    L.    The Ohio Supreme Court's ruling on the referendum pressured Republicans to begin negotiating, but they retained the position that the map had to be 12-4 in favor of Republicans. .............................................................. 11

    M.    HB 369 is introduced, and negotiations continue, but Democrats are unable to change the partisan breakdown of the map. ................................................. 12

    N.    Contemporaneous Republican documents demonstrated that HB 369 would be a 12-4 map. ........................................................................................... 14

    O.    The contemporaneous Democratic analysis of HB 369 concluded that the Republicans achieved their 12-4 map. ............................................................ 15

    P.    Republicans and Democrats openly acknowledge that the Republicans secured their 12-4 objective because they had the raw political power to achieve their goal. ................................................................................................ 16

    Q.    The work of Dr. David Niven supports a finding that Ohio's map was drawn with an intent to advantage Republicans and disadvantage Democrats. ..................... 17

    R.    The work of Dr. Wendy K. Tam Cho supports a finding that Ohio's map was drawn with an intent to advantage Republicans and disadvantage Democrats. ........... 17

**APPENDIX C: Plaintiffs' Contested Facts**

S.      Voting Rights Act compliance does not explain the 12-4 map. ................................. 18

T.      It was known at the enactment of the map that it was not drawn to comply with the Voting Rights Act. ............................................................................. 19

U.     Traditional redistricting criteria do not explain the map. ............................... 20

V.     The Partisan Bias Measures Illustrate That Ohio Was Gerrymandered .................. 22

W.    The Plaintiffs have been harmed by the Republican gerrymander. ............................. 23

    1.     Ohio A. Philip Randolph Institute .................................................. 23

    2.     League of Women Voters of Ohio .................................................. 24

    3.     Northeast Ohio Young Black Democrats "NEOYBD" ............................ 26

    4.     Hamilton County Young Democrats .................................................. 27

    5.     The Ohio State University Democrats .................................................. 28

    6.     Individual Plaintiffs .................................................. 30

**APPENDIX C: Plaintiffs' Contested Facts**

I.    **Plaintiffs' Contested Facts**

   A.  **Republican congressional leadership sought a 12-4 map.**

1.  John Boehner, then-Speaker of the U.S. House of Representatives, directed his political team to engage in Ohio's map drawing process.

2.  In 2011, Boehner assigned Tom Whatman, the Executive Director of Boehner's political operation (called "Team Boehner"), to work on restricting in Ohio. Among other things, he was tasked with serving as a liaison between Ohio's Republican members of Congress and Republicans in Ohio.

3.  Whatman spoke to Ohio's Republican members of Congress about what new districts might look like in Ohio following redistricting. He used that information to formulate proposals for the new Ohio congressional map.

4.  Whatman provided instructions on the preferred shapes of districts to Kincaid, who made changes to the draft maps.

5.  Under the pre-2011 congressional map, the Republicans held between 8 and 13 seats. The 1st, 6th, 15th, 16th, and 18th districts all flipped between Republican and Democrats in the previous redistricting cycle.

6.  2010 was considered a wave election for Republicans. That year, Republicans won seats in the 1st, 6th, 15th, 16th, and 18th districts that had previously been held by Democrats, making the delegation 13-5 in favor of Republicans.

7.  In 2011, Republicans considered drafting a new congressional map with a 13-3 Republican advantage (a "13-3 map"), thus preserving the seats of all 13 Republican members of Congress elected in 2010.

1

## APPENDIX C: Plaintiffs' Contested Facts

8. However, doing so would result in a smaller margin of victory in several Republican-held districts, which would risk those districts becoming competitive during a strong Democratic election year and falling into Democratic control.

9. Republicans settled on drawing a map that would "lock down" a solid 12-4 Republican advantage (a "12-4 map").

10. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

### B. The Ohio state Republican leadership was committed to a 12-4 map.

11. The Ohio Legislative leadership would not enact anything that was contrary to Boehner's wishes.

12. Prior to the enactment of HB 319, Batchelder spoke with Boehner approximately once per month regarding the redistricting process.

13. Speaker Batchelder's office sent out a memo explaining that the map would be a 12-4 map.

14. Based on various conversations, Batchelder developed "an idea" of what Boehner wanted in a map. Batchelder then relayed Boehner's requests to Mann.

15. When negotiating HB 369, Batchelder was not in communication with Boehner, although at that point he knew what Boehner wanted in a map and so he did not need to talk to Boehner about it.

16. Batchelder does not recall enacting any congressional redistricting map that went against Boehner's wishes.

17. Senate President Niehaus was also committed to ending up with a map approved by Boehner, and he accepted input directly from Whatman.

APPENDIX C: Plaintiffs' Contested Facts

18. Niehaus told Whatman on September 11, 2011, that "I am still committed to ending up with a map that Speaker Boehner fully supports."

19. As a result, Whatman understood that "the Ohio legislature wanted to come up with a map that Speaker Boehner supported."

### C. The national Republicans provided political data for the Ohio map drawers.

20. The election results data used to create the maps had been initially generated by an effort orchestrated with the help of the RNC. "[A]n outside group that the RNC was working with" oversaw the conversion of precinct-level election results estimated down to the census-block level—"the Project." This outside group generated this data set for a number of states—"including Ohio"—in 2011.

21. Hofeller was the main contact" between the RNC and those working on The Project.

22. Bensen received the block-level data from The Project for Ohio. He ran validation checks and then loaded it onto Maptitude.

23. The data Bensen provided to the map drawers included data on individual elections and "election averages" data based on two-party vote share, which could be viewed within Maptitude by labels hovering over a congressional district, at the Census Block Level. The data included elections going back to 2002.

24. Whatman, Kincaid, and Hofeller were directly involved in the drafting and approval of Ohio's districts. Their work on Ohio's draft districts started as early as January 2011.

25. Whatman and Kincaid were conduits between national Republicans and the local Ohio Republicans, including Mann and DiRossi.

26. Whatman collected input from Ohio's Republican members of congress on drafts and suggested changes to the draft map. Kincaid then implement Whatman's suggestions and then send back a draft of a map. After finishing the proposed map, Whatman sought

3

APPENDIX C: Plaintiffs' Contested Facts

Boehner's sign-off. Once Boehner signed off on the draft map, Whatman showed the proposed draft to Ohio's Republican members of Congress.

27. By July 2011, Kincaid was already using various political indices to "score" the political leanings of proposed congressional district maps to determine the best way to achieve a 12-4 map.

28. Kincaid sent Republican members of Congress analyses, in the form of Excel spreadsheets, showing how a Republican was expected to perform in their new districts, based on a series of partisan metrics. For example, ██████████████████████ ███████████████████████████████████████████████████ ██████████████████

29. DiRossi and Mann emailed Whatman about changes to the map and Whatman indicated his opinion of them.

30. Whatman's proposals carried a great deal of weight with the map drawers. For example, the evening before HB 319 was introduced in the Ohio House, Whatman requested that the boundaries of 16th District be altered slightly to encompass the headquarters of a Republican donor. Kincaid responded to Whatman's eleventh hour request by changing the boundaries of 16th District late in the evening on September 12, 2011.

31. Hofeller also helped to draft districts. ████████████████████████ ████████████████████████████

**D. A key part of the national Republican work and strategy was the Franklin County Sinkhole.**

32. On September 7, 2011, Whatman sent Niehaus and Judy talking points informing him that Republicans were seeking to "lock down" 12 Republican seats. These talking points were also shared with Mann and Batchelder.

**APPENDIX C: Plaintiffs' Contested Facts**

33. Whatman came up with a key proposal to enable a 12-4 map: creating a new congressional district in the city of Columbus (what would become 3rd District). The new district packed Democrats in Democrat-leaning Franklin County into a single congressional district.

34. Absorbing so many Democrats into a single district was essential for creating a 12-4 map, because doing so bolstered Republican control of adjacent 12th and 15th Districts.

35. The strategy was referred to as the "Franklin County Sinkhole" and the impact of this strategy was well known among Republicans at the time. For example, on September 2, 2011, Kincaid sent and circulated to Mann, DiRossi, and Whatman a "Franklin County Sinkhole" spreadsheet he created that shows the political scoring effects of creating a new district in the Franklin County area.

36. Parts of Franklin County were considered undesirable to the Republicans, given the number of Democrats that lived in those parts. So for example, ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████ ███████████████████████████████ ████████

   **E. The map drawers evaluated the districts that were drawn through the use of political indices.**

37. The use of the election results data in the map drawing process enabled Republicans to execute the Franklin County Sinkhole strategy and ensure a 12-4 map.

38. Mann and DiRossi were interested in viewing election results data.

## APPENDIX C: Plaintiffs' Contested Facts

39. Political indices were the data Mann's "principals," Batchelder and Judy, were most interested in receiving regarding the maps being drawn. Political indices blend together data from different races to more accurately predict the voting tendencies of voters in proposed congressional districts.

40. The political indices for each individual congressional district were relied on during the map drawing process and distributed at meetings, including those attended by Batchelder and Huffman.

41. Map drawers created the Unified Index to guide decision making.

42. The Unified Index was composed of results from the following five races: 2004 President, 2006 Auditor, 2006 Attorney General, 2008 President, and 2010 Governor.

43. At the legislative leadership level, choosing an index was Huffman's assignment.

44. At the operational level, DiRossi created the Unified Index, using results from the five elections, which were then averaged to reflect the two-party vote share.

45. The Unified Index scoring for a district would change any time the map drawers would make a change to the boundaries of any district.

46. The Unified Index is more Democratic than the actual vote share in the decade preceding the redistricting. Using a more Democratic index allowed the map drawers to be confident that districts would not switch to Democratic control when there was a year that favored Democratic candidates.

47. In addition to the Unified Index, some Republicans preferred to use McCain '08 election results in Ohio as an index. The McCain '08 numbers were included in indices, draft maps and other work product.

**APPENDIX C: Plaintiffs' Contested Facts**

48. Since it was based President Obama's defeat of John McCain in 2008, the McCain '08 index also reflected a strong Democratic outcome. Using this more Democratic metric allowed the map drawers and stakeholders to be confident that districts would not switch to Democratic control when there was a year that favored Democratic candidates.

49. National Republicans also used the Partisan Vote Index ("PVI"), to score districts. For example, Kincaid preferred PVI values.

50. The map drawers included PVI, the Unified Index, and the McCain '08 index in their work product, including indices rating maps and draft districts.

   **F.  The map drawers used Maptitude to track changes to the partisan scoring of each district.**

51. Maptitude enables a map drawer to generate color coded maps of a district, showing the specific scorings of sub-portions of the district and its relative Republican or Democratic strength, which could be viewed by map drawers.

52. Maptitude could produce an output on data sets for a particular map, including data sets of the "various indexes," including the Unified Index.

53. Maptitude would calculate the elections data in real time for each district as it was drawn. The data could be viewed on the screen in a table.

54. The election results data provided by Bensen was loaded into Maptitude and was used by the map drawers. The election results data included for statewide elections going back to 2002. (They also loaded the Unified Index, which had a code "EA 12").

55. DiRossi also created charts scoring congressional districts using various indices.

   **G.  Political indices were shared with Ohio legislators at the "Bunker" and digitally.**

56. The map drawers knew that the Ohio legislative leaders were interested in how changes to the map impacted the partisan makeup of the map.

7

**APPENDIX C: Plaintiffs' Contested Facts**

57. Beginning in July 2011, the redistricting operations were based out of a secretly-rented hotel room at the DoubleTree Hotel in Columbus, Ohio. DiRossi nicknamed the room "the Bunker" and it was generally referred to by that name. No Democratic officials or operatives were able to access the bunker, and the meetings regarding the map drawing there were limited to Republican operatives and officials.  There were three computers in the Bunker. Mann and DiRossi each worked on one and Judy worked on a third. Mann, Judy, and DiRossi were the only persons with passwords to the computers. Maptitude was running on the computers. The Unified Index scorings for each district was always on the computer screen. Judy would discuss them with Mann.

58. Batchelder, Niehaus, Huffman, Mann, DiRossi, Judy, Lenzo, and Braden all attended meetings at the Bunker where draft maps and political data were shared.

59. The political index data was reviewed by legislative leaders during in-person meetings by viewing it on the computer screens and printouts. For example, Judy discussed the partisan leanings of proposed districts with Batchelder between two to five "ad hoc" meetings at the Bunker and in the Speaker's Office prior to the introduction of HB 319. At these meetings, spreadsheets that contained the Unified Index information about the districts under consideration were handed out.

60. Niehaus also would ask for political index information. DiRossi would inform Niehaus, Faber, and Schuler of the impact of any changes to the index based on any "tweaks" to the map.

61. Republicans continued to share political data among themselves as they worked on HB 369. For example, as regards to HB 369, Judy circulated and recalled reviewing spreadsheets that included Unified Index information and having them at meetings.

APPENDIX C: Plaintiffs' Contested Facts

### H.  Members of Congress and national Republicans also received updates of the political composition of draft maps.

62. In addition to the updates that were provided to Republicans in the Ohio legislature, information was shared with Republican members of the U.S. Congress as draft maps were being drawn.

63. Kincaid created spreadsheets that scored districts based on index values and this information was conveyed to the members of Congress.

64. Whatman and ▇▇▇▇▇ received Excel spreadsheets from Kincaid with political information regarding the map, including PVI and unified index data.

65. The spreadsheets used PVI values to score the districts. And Kincaid had PVI scorings for the final map as enacted.

66. The spreadsheets also scored the districts based on the Unified Index's average of five elections (2004 President, 2006 Attorney General, 2006 Auditor, 2008 President, and 2010 Governor).

67. The spreadsheets were shared with the Republican members of Congress.

### I.  Prior to introducing a map, Republicans knew it would be a 12-4 map based on the political index work.

68. Kincaid created and circulated an analysis comparing HB 319 with the pre-redistricting map. The analysis, which was generated in Maptitude and then exported into an Excel spread sheet, scored the two maps using PVI scorings as well as the "Ohio GOP Average" based on the five elections in the Unified Index.

69. Kincaid's analysis demonstrates clear Republican PVI gains in specific districts: a gain of 7 points in District 1; a gain of 11 points in District 12; and a gain of 8 points in District 15.

**APPENDIX C: Plaintiffs' Contested Facts**

70. These scorings were communicated to DiRossi, who used them to create his own analyses. DiRossi's spreadsheet confirmed that Republican strength increased in Districts 12 and 15 because, among other reasons, Democrats in Franklin County were packed into newly created District 3. The PVI scorings illustrated that the Republicans obtained 11 "likely" seats that were five points in favor of Republicans (R+5) and one additional seat that would also likely elect a Republican because it was plus 3 points for Republicans (R+3).

71. The outcome of the analysis was shared with other Republicans.

72. 

**J.** **While local and national Republican lawmakers were receiving updates about the status of draft maps, the map was kept from the public and even from members of the General Assembly until September 13, 2011.**

73. There were five public hearings held by the Senate Select Committee on Redistricting and the House Committee on Redistricting, with Faber and Huffman chairing the respective committees. These hearings were held in July and August 2011.

74. No maps were considered at the public hearings regarding congressional redistricting. Nor were any maps or indices available at the hearings. Further, the committees had no responsibility beyond hearing testimony at these hearings.

10

APPENDIX C: Plaintiffs' Contested Facts

### K. Republicans provided lawmakers with little time to debate the merits of the proposed plan.

75. The map was, according to plan, "held in the can" after it was drafted until September 13, 2011.

76. Members of the General Assembly—even Republican members—were largely kept in the dark about the content of the maps until the end of the process.

77. There were no negotiations between Democrats and Republicans regarding HB 319. The Democratic Minority Leader in the Ohio House, Armond Budish stated that "the map was drawn by Republicans in secret behind closed doors with no meaningful input whatsoever from members of the public, and now the map is being rammed through the House in just a couple of days in order to prevent any meaningful input from anyone else. . . ." Other Democrats also complained about how the map was introduced.

78. Not only did the Democratic leadership not have any input into the map, but many of Ohio's Republican legislators had little input into the map. Faber was given, at the last minute, a map that he was asked to support.

79. The proposed map was shared with the Democratic leadership just before it was introduced.

### L. The Ohio Supreme Court's ruling on the referendum pressured Republicans to begin negotiating, but they retained the position that the map had to be 12-4 in favor of Republicans.

80. On October 14, 2011, the Ohio Supreme Court authorized a referendum to challenge HB 319. However, the Supreme Court declined to extend the 90-day period during which to collect signatures in support of the referendum, giving opponents of HB 319 until December 25, 2011, to collect the requisite number of signatures.

**APPENDIX C: Plaintiffs' Contested Facts**

81. Negotiations began in mid-October 2011 soon after the Ohio Supreme Court ruled that the referendum effort could proceed.

82. The threat of a public referendum on HB 319 was the primary reason why HB 319 was repealed and replaced.

83. The Republicans approached the Democrats about a replacement proposal after the process was started for a citizen's referendum on 319.

84. Democrats proposed a map that would allow for 6 competitive districts.

85. Republicans proposed a map that did not change the 12-4 partisan outcome. This map was introduced as HB 369 on November 3, 2011.

86. Huffman told Democrats that Republicans "weren't going to draw less than 12 [seats]."

87. Judy told Democrats that if they presented a map that had less Republican seats, there was nothing to discuss.

88. During the negotiations, Republicans would let Democrats massage things here or there, but they could not touch the allocation of seats.

> **M. HB 369 is introduced, and negotiations continue, but Democrats are unable to change the partisan breakdown of the map.**

89. After the introduction of HB 369, negotiations between Democrats and Republicans continued.

90. McCarthy recalled that negotiations between Republicans and Democrats reached an impasse around November 18, 2011.

91. The impasse was still in effect as of November 30, 2011.

92. To put a referendum on the ballot, the Democrats needed more than 200,000 signatures.

93. The Democrats experienced difficulties in collecting the requisite number of signatures.

**APPENDIX C: Plaintiffs' Contested Facts**

94. Initially, Republicans believed that the chance of obtaining the requisite number of signatures seemed likely.

95. The Republicans, however, became aware of the problems that the Democrats were experiencing in collecting the requisite number of signatures.

96. Publicity regarding the difficulties in obtaining the requisite number of signatures affected negotiations regarding HB 369, weakening the Democrats' ability to push for a fairer map.

97. The Republicans also brought a state court lawsuit to force the enforcement of HB 319, putting further pressure on the Democrats.

98. At some point, Batchelder came to the conclusion that the referendum effort would not gather enough signatures.

99. The proposed changes by Democrats and the Black Caucus were then pushed aside.

100. Budish stated at the time, with respect to HB 369, "[w]e've tried to talk to [R]epublican leadership, to negotiate and to compromise, but unfortunately we've been refused. Leadership has refused to talk directly with democratic leadership." Instead, he said, Republicans decided to try to cut secret backroom deals with individual democratic members.

101. 

102. HB 369 unified certain counties that were split in HB 319, but without changing the electoral tilt of the districts.

APPENDIX C: Plaintiffs' Contested Facts

### N. Contemporaneous Republican documents demonstrated that HB 369 would be a 12-4 map.

103.  Contemporaneous Republican analyses show no material change in the partisan composition of the districts included in the replacement map.

104.  For instance, a contemporaneous spreadsheet created by map drawers shows:  (1) Four districts not changed at all (6th, 11th, 13th, and 14th Districts); (2) Two districts experienced "negligible" changes (7th and 16th Districts); (3) Eight districts experienced small changes (between 0.24% and 1.9%), which were the 1st, 2nd, 3rd, 4th, 5th, 9th, 12th, and 15th Districts; (4) Only two districts experienced a Unified Index change of 2 percentage points or greater: 8th District (2.60%) and 10th District  (3.82%).  However, neither of these changes altered the partisan lean of the district in question.

105.  Kincaid also circulated spreadsheets that showed that HB 369 remained a 12-4 map.

106.  Kincaid helped create the content of a redistricting PowerPoint presentation celebrating Republicans' successful efforts to move formerly competitive districts (1st, 12th and 15th Districts) "out of play."

107.  For instance, the PowerPoint presentation states that for Ohio 12th District that the "R + 8 scoring" means that "Tiberi would have been elected in a D plus 1 seat in 2010 and then in 2012 was running for re-election in an R + 8 district . . . which was 9 points more Republican than the district he was elected in in 2010."  And the reason that District 12 became more Republican was, in part, because "Tiberi had portions of Columbus in his district previously that he did not have in the district after they were redrawn in 2011 which would be why the PVI had changed, a part of why the PVI had changed."

**APPENDIX C: Plaintiffs' Contested Facts**

108.     It also states that for Ohio's 1st District the scoring meant that "Chabot ran for election in 2010 in a D + 1 seat and would be run[sic] for re-election in an R + 6 district"—and so a net gain of 7 points for the Republicans. And the reason that District 1 became more Republican was because Warren County was added to the district and portions of Hamilton County were drawn out of the district.

109.     Kincaid confirmed that for the 15th District "Stivers was elected in a D plus 1 district and running for reelection in a R plus 6 district" for a net gain of 7 points. And the reason that District 15 became more Republican was also because a new district was created in Franklin County so that District 15 no longer contained Democratic portions of Columbus.

110.     As a result of redistricting, Representative Johnson's district, 6th District, became an R+5 district on the PVI scale, increasing 3 points from the prior map.

**O. The contemporaneous Democratic analysis of HB 369 concluded that the Republicans achieved their 12-4 map.**

111.     Immediately after the passage of HB 369, the Democrats analyzed the differences between HB 319 and HB 369. The analyses was performed by Randall Routt, a Democratic staffer with a hybrid role of policy and IT-related work, and Christopher Glassburn, a former Democratic staffer, and communicated to other Democratic staff.

112.     Routt's district-by-district analysis demonstrates that with one exception (the 10th District) the differences between HB 319 and HB 369 were trivial when it came to the partisan tilt of districts.

113.     Glassburn performed a contemporaneous analysis of HB 369 and concluded that the Republicans achieved their 12-4 map when HB 369 was enacted.

APPENDIX C: Plaintiffs' Contested Facts

114.    His analysis was based on data provided by the Cleveland State University. He relied primarily on 2008 presidential and 2010 governorship races.

115.    Glassburn concluded that Districts 3, 9, 11, and 13 favor Democrats and the rest favor Republicans.

116.    Glassburn's district-by-district analysis confirms the basis for the contemporaneous view that HB 369 was a 12-4 map.

**P.    Republicans and Democrats openly acknowledge that the Republicans secured their 12-4 objective because they had the raw political power to achieve their goal.**

117.    Defendant Larry Obhof, who was in the Ohio Senate at the time has stated: "While a lot of Democrats voted for the current map, they really didn't have a lot of negotiating power at that stage, because there was always the opportunity to say hey work with us and we'll do a slightly better map, or we'll do what we want and pass it with 51% of the vote."

118.    Batchelder has stated that "Their theory was somehow or another that they could overcome a majority of people who were in the other party, and I don't know how that would have happened."

119.    Glassburn stated that the Republican leverage was based on the fact that they "held all the cards."

120.    Senator Turner said: "To say that this map is bipartisan is laughable, no matter how many democrats in the House decided to tow the party line and vote for a map that is still 12 to 4."

121.    Senator Tavares said: "What this map does is basically cherry-pick" areas to achieve a partisan aim. She continued: "Just like the people are not 12-4, they're more

APPENDIX C: Plaintiffs' Contested Facts

like 50/50. We never believed we were going to get eight Democratic districts and eight Republican, but it should have been a little more even."

**Q. The work of Dr. David Niven supports a finding that Ohio's map was drawn with an intent to advantage Republicans and disadvantage Democrats.**

122.     The manner and extent to which the Republicans mapmakers split political subdivisions and communities of interest, with resulting partisan gain, demonstrates their objective to crack and pack Democratic voters to optimize Republican seats in Congress.

123.     Analysis of the map shows that census tracts are split by congressional district lines 59% more times than in the previous map.

124.     For over 3.3 million Ohioans—more than a quarter of the state—the closest congressional district office is in another district.

125.     The map reveals patterns of splitting Democratic-leaning cities, neighborhoods, and counties and incorporating the pieces in the creation of Republican congressional districts.

126.     The systematic drawing of districts that disregard political boundaries and split communities of interest—and the partisan impact of these decisions: dilution of the opposite party's vote—can only be explained by a strategic commitment to partisan gerrymandering on the part of the map makers.

**R. The work of Dr. Wendy K. Tam Cho supports a finding that Ohio's map was drawn with an intent to advantage Republicans and disadvantage Democrats.**

127.     Dr. Wendy K. Tam Cho used a computer algorithm to generate simulated congressional maps that adhered to the traditional, nonpartisan districting principles described in her report. This algorithm did not take into account any voting or

**APPENDIX C: Plaintiffs' Contested Facts**

demographic data when drawing the maps. Each map was constructed by combining Ohio voting precincts into different congressional districts, and only maps that met the traditional, nonpartisan districting criteria were deemed viable.

128.     With the above-described process, the algorithm generated a sample set of over three million viable simulated congressional maps, each of which was drawn without the influence of partisan intent.

129.     By comparing the challenged map against the simulated maps, Dr. Cho "determine[d] whether the partisan effect of the challenged map is to be expected given the underlying geography and population settlement patterns or if it is unusual among the set of non-partisan maps."

130.     Dr. Cho's analysis demonstrates that it is highly unlikely that a map reflecting as much extreme partisan unfairness as the challenged map could have been produced unintentionally.

**S.    Voting Rights Act compliance does not explain the 12-4 map.**

131.     Current 11th District is the successor district to the first majority black congressional district created in Ohio in 1968, which has consistently elected African-Americans to Congress since.

132.     Dr. Lisa Handley conducted a district-specific, functional analysis of voting patterns by race to ascertain the black voting age population necessary to provide black voters with an opportunity to elect their candidates of choice in the vicinity of the 11th District.

133.     Dr. Handley's district-specific, functional analysis relies on three statistical techniques to estimate voting patterns by race: homogenous precinct analysis, ecological regression, and ecological inference.

18

**APPENDIX C: Plaintiffs' Contested Facts**

134.     Her analysis demonstrates that a 45% black voting age population ("BVAP") district offers black voters a realistic opportunity to elect their candidates of choice to represent the 11th District.

135.     It also demonstrates that current 11th District contains far more minorities than is necessary to elect the minority preferred candidate.

**T. It was known at the enactment of the map that it was not drawn to comply with the Voting Rights Act.**

136.     The Republican intent was to pack Democrats, not protect minority voters.

137.     There is no indication that Republicans engaged in the kind of analysis necessary to determine how many African Americans were needed at the time to create a Voting Rights Act compliant district. There are only ungrounded discussions of various percentage cutoffs of the BVAP.

138.     There is evidence in the record that Republicans were primarily concerned with partisanship and not opportunities to elect minority representatives. For example, the Republican Chair of Summit County was willing to have three Summit County wards placed into District 11 because "they were mostly black democrats [sic]" and this "helped the other districts in Summit County be more Republican."

139.     District 11 was primarily drawn to pack Democratic voters for Republican gains in neighboring districts and not to advantage Democrats in general nor at the request of Democratic incumbent, nor to advantage black voters in Ohio.

140.     The packing of Democrats was the reason for the creation of District 3, not a Republican desire to create a "minority opportunity" district.

141.     A minority opportunity district could have been created in Franklin County under a different configuration of the map.

APPENDIX C: Plaintiffs' Contested Facts

### U.  Traditional redistricting criteria do not explain the map.

142.     The map drawers just eye balled compactness and did not do any analysis of districts to make sure they were compact

143.     Communities of interest are not kept intact with the map.

144.     Communities of interest are often fractured by county and municipal splits.

145.     The map needlessly splits counties and municipalities.  It is possible to create a map with far fewer splits.

146.     The location of the 2011 incumbents did not require the Ohio congressional map to be structured as it was.

147.     Congressional plans, which pair the same number of incumbents with the same match-up of political parties as under the Ohio congressional map, are still better than the Ohio congressional map on traditional redistricting criteria and partisan symmetry.

148.     Hypothetical maps that pair two 2011 Democratic incumbents, two 2011 Republican incumbents, and one 2011 Democratic with one 2011 Republican incumbent are better the Ohio congressional map on traditional redistricting criteria.

149.     Two such hypotheticals split only 14 counties; the Ohio congressional map splits 23 counties.

150.     One such hypothetical splits 36 municipal civil divisions, and another splits 34 municipal civil divisions; the Ohio congressional map splits 73.

151.     Both of these hypothetical maps are more compact that the Ohio congressional map.

152.     Both of these hypothetical maps have a Voting Rights Act compliant district in its 11th District.

**APPENDIX C: Plaintiffs' Contested Facts**

153.     Under both of these hypotheticals, District 15 has a Black Voting Age Population

of 30.17%.

154.     Under both of these hypotheticals, District 1 has a Black Voting Age Population

of 26.74%.

155.     One hypothetical has the following Democratic congressional vote percentages of

the two-party vote:

| CD | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| | Hypothetical Plan 1A | 2012 Plan | Hypothetical Plan 1A | 2012 Plan | Hypothetical Plan 1A | 2012 Plan | Hypothetical Plan 1A | 2012 Plan |
| 1 | 48.4% | 39.5% | 44.2% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.2% | 41.4% | 28.4% | 34.1% | 26.8% | 33.5% | 31.9% | 41.7% |
| 3 | 37.7% | 71.4% | 25.5% | 63.6% | 27.2% | 68.2% | 34.0% | 73.6% |
| 4 | 25.9% | 38.5% | 24.0% | 32.3% | 22.0% | 31.7% | 26.4% | 34.7% |
| 5 | 39.1% | 40.6% | 22.4% | 30.4% | 28.5% | 28.8% | 35.0% | 36.1% |
| 6 | 49.4% | 46.8% | 42.9% | 39.8% | 33.6% | 29.4% | 34.2% | 30.8% |
| 7 | 37.8% | 43.6% | 32.7% | 0.3% | 33.8% | 31.4% | 43.0% | 41.3% |
| 8 | 10.0% | 0.0% | 26.2% | 28.9% | 26.7% | 28.2% | 32.5% | 33.4% |
| 9 | 62.3% | 76.0% | 51.2% | 67.7% | 52.6% | 68.6% | 54.9% | 67.8% |
| 10 | 59.4% | 38.6% | 44.5% | 32.6% | 48.9% | 33.8% | 55.0% | 43.0% |
| 11 | 95.7% | 99.7% | 81.5% | 79.2% | 81.7% | 80.3% | 83.5% | 82.3% |
| 12 | 39.3% | 36.6% | 32.8% | 29.0% | 37.9% | 31.7% | 53.8% | 47.9% |
| 13 | 59.3% | 72.9% | 48.6% | 68.4% | 51.1% | 67.6% | 55.8% | 61.0% |
| 14 | 61.0% | 41.8% | 52.6% | 34.4% | 52.6% | 37.4% | 50.5% | 44.8% |
| 15 | 67.1% | 38.6% | 58.6% | 34.1% | 63.4% | 33.7% | 68.9% | 40.5% |
| 16 | 49.2% | 48.0% | 27.9% | 36.2% | 37.7% | 35.2% | 44.1% | 43.3% |

156.     Another hypothetical has the following Democratic congressional vote

percentages of the two-party vote:

| CD | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| | Hypothetical Plan 2A | 2012 Plan | Hypothetical Plan 2A | 2012 Plan | Hypothetical Plan 2A | 2012 Plan | Hypothetical Plan 2A | 2012 Plan |
| 1 | 48.5% | 39.5% | 44.2% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.3% | 41.4% | 28.4% | 34.1% | 26.8% | 33.5% | 31.9% | 41.7% |
| 3 | 37.7% | 71.4% | 25.5% | 63.6% | 27.2% | 68.2% | 34.0% | 73.6% |

21

**APPENDIX C: Plaintiffs' Contested Facts**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4 | 25.9% | 38.5% | 24.0% | 32.3% | 22.0% | 31.7% | 26.4% | 34.7% |
| 5 | 39.1% | 40.6% | 22.4% | 30.4% | 28.5% | 28.8% | 35.0% | 36.1% |
| 6 | 49.4% | 46.8% | 42.9% | 39.8% | 33.6% | 29.4% | 34.2% | 30.8% |
| 7 | 37.8% | 43.6% | 32.7% | 0.3% | 33.9% | 31.4% | 43.0% | 41.3% |
| 8 | 10.0% | 0.0% | 26.2% | 28.9% | 26.7% | 28.2% | 32.5% | 33.4% |
| 9 | 62.3% | 76.0% | 51.2% | 67.7% | 52.6% | 68.6% | 54.9% | 67.8% |
| 10 | 59.7% | 38.6% | 45.2% | 32.6% | 49.6% | 33.8% | 55.7% | 43.0% |
| 11 | 92.0% | 99.7% | 77.6% | 79.2% | 78.7% | 80.3% | 81.5% | 82.3% |
| 12 | 39.3% | 36.6% | 32.8% | 29.0% | 37.9% | 31.7% | 53.8% | 47.9% |
| 13 | 61.2% | 72.9% | 50.3% | 68.4% | 51.8% | 67.6% | 55.5% | 61.0% |
| 14 | 61.0% | 41.8% | 52.6% | 34.4% | 52.6% | 37.4% | 50.5% | 44.8% |
| 15 | 67.1% | 38.6% | 58.6% | 34.1% | 63.4% | 33.7% | 68.9% | 40.5% |
| 16 | 49.2% | 48.0% | 27.9% | 36.2% | 37.7% | 35.2% | 44.1% | 43.3% |

## V. The Partisan Bias Measures Illustrate That Ohio Was Gerrymandered

157.     Election results show that Democrats were successfully packed into four districts, thus, ensuring that they won their districts by large margins.

158.     The four measures commonly used by political scientists to detect and measure the effects of partisan gerrymandering (the efficiency gap, the mean-median, the Gelman-King asymmetry measure, and the declination) make clear that the Ohio map is an extreme partisan gerrymander.

159.     The partisan bias measures suggest that Ohio was gerrymandered. This suggestion is consistent with political science literature which has found that when one party controls the redistricting process, the partisan bias measures shift in favor of that party.

160.     This finding is also consistent with the big shift in Ohio's partisan bias measures from 2010 to 2012. In 2010, prior to the new map Ohio's partisan bias measures were less pro-Republican than they were in 2012, after Republicans enacted the new map.

APPENDIX C: Plaintiffs' Contested Facts

## W. The Plaintiffs have been harmed by the Republican gerrymander.

### 1. Ohio A. Philip Randolph Institute

161.    Ohio's gerrymandered congressional map impedes APRI's work and requires it to divert resources from its efforts by making it more difficult to engage voters through its education, registration, and outreach efforts, and by deterring and discouraging its members and other Ohio voters from engaging in the political process.

162.    The current congressional map causes APRI to suffer diversion of resources in accomplishing its mission, causing it to "hav(e) to divert resources to work harder to convince people and educate people that their vote does count and they should exercise their right to vote."

163.    The congressional map causes voter confusion and apathy, which require APRI to divert its resources from its work to register and engage voters. "Because of the way these [congressional district] lines are drawn, people get confused, they're frustrated. You could be in a county that's split down the middle or split in three different ways and they don't know where to vote or who to vote for so they get frustrated, they get confused, they get discouraged and they just don't know what to do so…(they) do nothing. So we're – you know, we have to spend time and resources to work this out"

164.    But for the gerrymandered map, APRI could use its resources to register more people to vote.

165.    Mr. Washington has to work to overcome voter apathy in his own home district, District 12, where "every third door I knock on people are saying my vote doesn't count in this district, it doesn't matter, the same person is going to get back in office."

166.    APRI's members are personally affected by the map as well. APRI has Democratic members in cracked and packed districts who feel "the person that I'm

**APPENDIX C: Plaintiffs' Contested Facts**

voting for doesn't have to work for my vote because they know that they're going to win anyway so it doesn't matter if I vote or not, there's no competition in there."

167. APRI member Ms. White is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. She is active in voter outreach, education, and get out the vote ("GOTV") efforts for APRI, the Democratic Party, and as a union organizer. Ms. White currently resides in Ohio's 5th District, where Democratic voters are cracked under the current map, and her vote is diluted.

## 2. League of Women Voters of Ohio

168.  Members of the League who are Democrats are injured by the congressional map because they live in congressional districts where Democrats are cracked or packed, diluting their votes.

169. The LWVO's members believe that, especially in Ohio's congressional districts, citizens' votes are diluted because the map is manipulated to guarantee an outcome.

170. The current congressional map has impaired the League's operations and diverted its resources across the decade because of the confusion created by the map's "messy" district lines.

171. This confusion requires the League to set up robust operations to answer calls from voters, confused by the district lines, to determine their polling location. The League has "hundreds of volunteers who are volunteering on election day to answer phone banks …and the reason why we need to have hundreds of volunteers is because people are confused about their congressional districts . . ."

172. For example in the recent special election in District 12, the League "had to stop what (they) were supposed to be doing . . . so (they) could help voters understand if they

24

**APPENDIX C: Plaintiffs' Contested Facts**

were in 12 or not." Voters in Clintonville and Grandview were within a couple of blocks of District 3, 15, and 12, in any direction, and were confused as to whether they could vote.

173.     The Ohio congressional map causes the LWVO to divert resources because congressional candidates across the state, secure of reelection, will not agree to participate in candidate forums hosted by the League.

174.     Two examples are Congressman Stivers and Congressman Jordan, both of whom have missed League candidate forums.

175.     ███████████████████████████████████████████████
███████████████████████████████

176.     This wastes a lot of the LWVO's time and energy: the League will have reserved the room, paid for the sound, and made multiple calls; then the LWVO must tell the opposing candidate that they cannot come and speak either, thus impairing the League in the performance of its work.

177.     Although Congressmen Stivers and Jordan are two examples; it "happens all over the state."

178.     The voter apathy caused when people feel that their votes do not count makes it harder for the League to perform its work getting out the vote.

179.     If the League did not have to divert resources to work on the problems caused by the current congressional map, it would be able to work more on voter education, outreach efforts, getting young people excited about government and registered, putting on candidate forums, and getting out the vote.

APPENDIX C: Plaintiffs' Contested Facts

180.    If the League did not need to have hundreds of volunteers to help with district line confusion on Election Day, it could reassign these volunteers to help ease the shortages of poll workers on Election Day.

181.    LWVO member Mr. Fitzpatrick is a Democratic voter, has supported Democratic candidates for Ohio's congressional delegation in the past, and plans to support such candidates in the future. He is active in voter outreach and education both with the League and as a Democrat. Mr. Fitzpatrick currently resides in Ohio's 14th District, where Democratic voters are cracked under the current map, and his vote is diluted.

### 3. Northeast Ohio Young Black Democrats "NEOYBD"

182.    Ohio's gerrymandered congressional map forces NEOYBD to divert resources from its mission by making it more difficult to get out the vote and keep Democratic voters engaged.

183.    The voter apathy that the map produces makes it more difficult for NEOYBD to fundraise and get members involved.

184.    NEOYBD's membership itself is harmed by the voter apathy and confusion that the map creates: "why would [members] join the organization? Why would they get involved? Why would they talk to their neighbors about us? Because they feel their vote doesn't count."

185.    NEOYBD President Gabrielle Jackson, the President of NEOYBD for the past two years and the organization's representative in this litigation, lives in the 9th District. She has experience working against voter apathy and confusion in the packed district where she lives: "It's also known as the Snake on the lake. My representative is Congresswoman Marcy Kaptur. I live in Lakewood, Ohio. She lives in Lucas County. And it's literally a thin line – the way this current map is drawn, it's literally a thin line

APPENDIX C: Plaintiffs' Contested Facts

that goes along Lake Erie. There's no adequate way for me, living on the west side of

Cleveland to be represented the same as someone living in Lucas County."

186.     But for the gerrymandered congressional map, NEOYBD could spend more of its

resources more effectively to get out the vote, fundraise, and otherwise support

Democratic candidates.

### 4.  Hamilton County Young Democrats

187.     The votes of the members of the Hamilton County Young Democrats have been

diluted due to the construction of the 1st and 2nd Districts.

188.     These members have each been deprived of their opportunity to elect candidates

of choice in Districts 1 and 2.

189.     The way Hamilton County, and particularly the City of Cincinnati, is split

between the 1st and 2nd Districts burdens Hamilton County Young Democrats.

190.     The way the lines are drawn burdens Hamilton County Young Democrats and its

members by creating confusion about which district someone lives in.

191.     This voter confusion causes young voters to become less engaged.

192.     The way the lines are drawn causes young voters to be apathetic about voting and

convinced that being engaged in the process does not matter.

193.     This burdens Hamilton County Young Democrats by hampering its ability to

associate with young people who could be potential members.

194.     Hamilton County Young Democrats encounters young people who decline to

become engaged in the political process or to donate funds to the organization or to

Democratic candidates because they believe the system is rigged based on the

construction of the congressional map.

27

**APPENDIX C: Plaintiffs' Contested Facts**

195.     The congressional lines make it so that Hamilton County Young Democrats must divide their resources and focus between the 1st and 2nd Districts, instead of allowing them to focus on a district that contains the bulk of Hamilton County and the whole of Cincinnati.

196.     The Congressmen that represent Districts 1 and 2 are not responsive to the Hamilton County Young Democrats.

197.     Members of the Hamilton County Young Democrats have not received responses from Congressmen Chabot and Wenstrup.

198.     The President and Vice President of the Hamilton County Young Democrats have attempted to seek constituent services for residents of Hamilton County through their roles in the Office of the County Commissioner and in the Office of the Mayor of the City of Cincinnati. Congressmen Chabot and Wenstrup routinely do not reply to these requests.

199.     The Hamilton County Young Democrats expended resources on the campaign of Aftab Pureval in 1st District in 2018 as they felt that "he ha[d] the best chance [to win] in quite some time."

200.     Mr. Pureval did not win the 2018 election.

201.     Under Plaintiffs' Proposed Remedial Plan, the percentage of the two-party vote for the Democratic candidate in District 1 was over 57% based on 2018 election results.

### 5. The Ohio State University Democrats

202.     The votes of the members of the OSU College Democrats have been diluted due to the construction of the 3rd, 12th, and 15th Districts.

203.     The OSU College Democrats and its members have found that the Congress people representing the 3rd, 12th, and 15th Districts are not responsive to them.

28

**APPENDIX C: Plaintiffs' Contested Facts**

204.     By diluting the members' votes, the congressional map, and specifically the construction of the 3rd, 12th, and 15th Districts, impairs the OSU College Democrats ability to carry out its purpose.

205.     Because the larger constituency of young voters is split up across these three districts, it impairs the effectiveness of the voting bloc.

206.     The way the lines are drawn burdens OSU College Democrats and its members by creating confusion about which district someone lives in.

207.     This voter confusion causes young voters to become frustrated and less likely to become or remain engaged with the OSU College Democrats.

208.     This was illustrated in summer 2018 during the 12th District Special Election. Many individuals who engage with OSU College Democrats were confused about whether they were supposed to vote on Special Election Day, and OSU College Democrats had to expend it volunteer resources to engage with these voters, instead of on Get Out the Vote activity directed only at the 12th District.

209.     The locked up nature of the congressional map causes members of the OSU community to believe that their votes do not matter and to become apathetic.

210.     The apathy from young voters caused by the map impairs OSU College Democrats' associational rights.

211.     In 2018, OSU College Democrats focused their resources on the Danny O'Connor campaign, both the Special Election and on the November 2018 General Election.

212.     Mr. O'Connor did not win the November 2018 election despite a 31.6 percent shift for the Democratic candidate.

**APPENDIX C: Plaintiffs' Contested Facts**

213.     Under Plaintiffs' Proposed Remedial Plan, the percentage of the two-party vote for the Democratic candidate in District 12 was over 54% based on 2018 election results.

### 6.  Individual Plaintiffs

214.     Ms. Goldenhar's vote has been diluted through cracking Democratic voters in the 1st District.

215.     Ms. Goldenhar testified that the way the challenged map is drawn burdens her ability to associate and participate in the political process with other Democratic voters in the state of Ohio.

216.     Ms. Goldenhar has reached out to her representative, Mr. Chabot, multiple times via email and phone, and has never received a response.

217.     Dr. Burks canvassed, put out yard signs and donated money for Jill Schiller's campaign for 2nd District in the 2018 elections. In the course of canvassing, Dr. Burks encountered several individuals who said that "they were not going to vote because it wasn't worth it because they had a strong feeling of what the outcome would be." Given the way in which District 2 is drawn, Jill Schiller's campaign faced an "uphill battle."

218.     Dr. Burks testified that his vote has been diluted through cracking Democratic voters in the 2nd District.

219.     Dr. Burks testified that the way the challenged map is drawn burdens his ability to associate and participate in the political process with other Democratic voters in the state of Ohio.

220.     Dr. Burks testified that the current congressional map made it more difficult for him to elect his candidate of choice.

**APPENDIX C: Plaintiffs' Contested Facts**

221.     Ms. Inskeep testified that her vote has been diluted through packing Democratic

voters into the 3rd District.

222.     Through her electoral activities, Ms. Inskeep has encountered apathetic voters

who feel like their vote does not matter as a result of the drawing of the current

congressional map.

223.     Ms. Inskeep testified that Planned Parenthood decided not to invest resources in

Ohio's 3rd District because the Democratic candidate was going to win anyway due to

the way the district was drawn.

224.     Ms. Inskeep testified that the current congressional map has caused there to be

"less political activity and investment in [her] district."

225.     Ms. Libster's vote is diluted in Ohio's 4th District, where Democratic voters are

cracked under the current Ohio map.

226.     Through Ms. Libster's canvassing and fundraising efforts and by talking to her

neighbors, she has experienced how the 4th District's design and the congressional map

as a whole contribute to voter apathy in her community.

227.     Ms. Libster has attempted to fundraise for Democratic candidates including 5th

District congressional candidate Janet Garret, but cannot amass support because of the

voter apathy caused by the map. Voters are discouraged because Garret loses by "a thirty

percent whapping all the time. It's never ever – my vote – when I go in there to vote for

Janet Garrett as a Democrat, it's never going to happen. Snowball's chance."

228.     From her experience educating voters and talking to her neighbors, Ms. Libster is

also aware of the voter confusion caused by the gerrymandered map. For instance, she

## APPENDIX C: Plaintiffs' Contested Facts

has "friends. . . who live three miles away who are in the 12th District and didn't even realize they were in the 12th District until we talked about it."

229. Ms. Libster's Congressman, Jim Jordan, does not represent her interests as a voter because his district is so safe that he does not need to: "He doesn't care about my vote. He doesn't care about representing me."

230. The 2012 map makes Ms. Libster's district so safe for Representative Jordan that she and other Democratic voters like her feel their votes have no power. She has stated: "I want my vote to matter. I don't want to be disenfranchised as a voter. I don't want to feel like every time I go vote for the Democrat they're going to get pounded by thirty, forty percent."

231. Ms. Libster's district covers so many communities and so much geographic space that she feels her representative could not effectively represent her even if he felt compelled to: "I mean, how do I go to my representative when he's clear down in Urbana? If I live in Oberlin, how does that happen? That's a long drive."

232. Ms. Deitsch lives in the 5th District, where Democratic voters are cracked under the current map, and her vote is diluted.

233. Ms. Deitsch's experience from canvassing, being involved in politics, and talking to her neighbors is that because the gerrymandered map makes elections a foregone conclusion, voters feel their votes do not matter. "[Y]ou would go and knock on the door and somebody would say to you it doesn't make any difference who I vote for, they're not going to win or I'm not going to give you money because they're not going to win."

234. Based on the same experience, Ms. Deitsch knows that because the 2012 Map splits her "small county" between "three different [congress]people," voters in her

32

### APPENDIX C: Plaintiffs' Contested Facts

community are often confused about which congressional district they are in. This contributes to their disengagement from the political process.

235.     Like other Democratic voters in her district, Ms. Deitsch's own vote does not matter. She feels that Bob Latta does not represent her interests as a voter because his district is so safe, that he does not need to. For example, despite inviting Representative Latta to events, and trying many times to contact his office personally, he has never responded to her or her neighbors.

236.     Ms. Boothe lives in Ohio's 6th District where Democratic voters are cracked under the current map, and her vote is diluted.

237.     Through canvassing and talking to her friends and neighbors, Ms. Boothe has heard that Democratic voters in her area "feel that their vote is monopoly money" and "said it didn't count." This kind of apathy has made it more difficult for her to successfully organize with the Democratic Party.

238.     In Ms. Boothe's experience, Representative Johnson is not responsive to her or her fellow Democrats in the 6th District. For example, she has not seen or heard back from Representative Johnson despite trying to call him.

239.     In Ms. Boothe's experience, "[n]obody comes to the district. It's so Republican that they don't have to. The Republicans don't have to come because they are going to win anyhow. And nobody that's Democrat wants to run in that area, because you're going to spend a lot of money and lose anyhow."

240.     The geographic spread of Ms. Boothe's district exacerbates these problems.

241.     Representative Johnson does not represent Ms. Boothe's interests as a voter because his district is so safe, that he does not need to. For example, in the last election,

33

**APPENDIX C: Plaintiffs' Contested Facts**

she did not see him campaign anywhere near her, and she believes his opponent had no chance to win.

242.     As a result of the gerrymandered map, in Ms. Boothe's district, "[her] vote is like monopoly money; you can cast it, but you can't buy anything for it, because it's too week."

243.      Mr. Griffiths testified that his vote in Ohio's 7th District has been diluted through the cracking of Democratic voters.

244.     Mr. Griffiths testified that the current congressional map made it more difficult for him to recruit volunteers and campaign for candidates of his choice. He explained that "a number of voters told [him and his wife] when [they] were circulating the [Issue 1] petition that they don't feel like it made a difference if they voted or not voted because the system is such that it wasn't going to make a difference." Mr. Griffiths also testified that he knew "a number of people that [he and his wife] talked to said that they don't vote for that reason."

245.     Mr. Griffiths testified that "it has been very difficult to identify candidates willing to take on Bob Gibbs in this case because of how heavily gerrymandered the district is."

246.     For example, Mr. Griffiths noted that in 2014 Congressman Gibbs ran unopposed in the congressional election, and he heard conversations that no one was willing to run against Congressman Gibbs.

247.     As another example, Mr. Griffiths noted that he spoke with Roy Rich when he ran against Congressman Gibbs in the 2016 election about "how difficult that [it] was to campaign in that district because of the size of the district and trying to get around to different people."

APPENDIX C: Plaintiffs' Contested Facts

248.     Mr. Griffiths testified that his wife wrote to Congressman Gibbs on a specific issue but received a letter in response from Congressman Gibbs on a completely different issue. Mr. Griffiths testified that his wife shared this information with members of the Indivisible group in Wellington, and other members had experienced the same situation with Congressman Gibbs.

249.     Mr. Griffiths testified that the mismatched letters situation demonstrated that Congressman Gibbs "doesn't really care what we think or don't think, whether we vote or not vote" because "[h]e is in a position, and still in a position, that he's going to get re-elected" because of the way the district is drawn "whether or not he appeals to any small group of us Democrats that are scattered throughout the district."

250.     Mr. Griffiths testified that "[i]t has been difficult to connect with other volunteers just because of the geographic" distance between areas that compose the 7th District.

251.     For example, Mr. Griffiths testified that the geographic distance between his home and Knox County caused him not to participate in certain canvassing activities.

252.     As another example, Mr. Griffiths testified that the geographic distance between his home and Huron County caused him not to participate in phone banking for Democratic congressional candidate Ken Harbaugh.

253.     Mr. Nadler lives in Ohio's 8th District where Democratic voters are cracked under the current map and his vote is diluted.

254.     Through his political engagement including canvassing, Mr. Nadler testified that "there are people that I personally have encountered, who feel that it's not worth their time to vote . . . because it's not going to make any difference."

**APPENDIX C: Plaintiffs' Contested Facts**

255.    Because of this voter apathy, Mr. Nadler's ability to get out the vote for Democratic candidates in his area is inhibited.

256.    Congressman Warren Davidson does not have to care about Mr. Nadler's vote, because he is sure to be reelected.

257.    For example, every month Mr. Nadler asks one of Representative Davidson's aides if Davidson will come to his area of the district for a town hall, but he has never seen him. Mr. Nadler identified many instances in which he and others tried to reach out to Davidson and received no response.

258.    Mr. Nadler also testified that because the map makes his district so safe for a Republican, his representative is farther to the right than he would otherwise be. "[I]f [Davidson] were listening to people, providing an open forum or multiple meetings for people to be heard, that it could moderate his views a little bit . . . . To be honest with you, I think he doesn't do it because he knows he doesn't have to do it."

259.    Ms. Walker's vote in the 9th District has been diluted through the packing of Democratic voters.

260.    Ms. Walker testified that she knows Democratic voters who feel like their vote doesn't matter because of the way the current congressional map has been gerrymandered.

261.    Ms. Walker believes the geographic distances between areas in the 9th District make it difficult for Congresswoman Marcy Kaptur to adequately represent all her constituents. For example, Ms. Walker testified that she had not seen Congresswoman Kaptur in her neighborhood.

### APPENDIX C: Plaintiffs' Contested Facts

262.     Ms. Walker also testified that the geographic distances between areas in the 9th District make it more difficult to campaign for Democratic candidates.

263.     Ms. Walker testified that she thinks the current congressional map makes it harder to fundraise for her candidates of choice because people believe that the "candidate's going to win anyway."

264.     Ms. Walker testified that she thinks the current congressional map has hurt her ability to educate voters because voters feel like their "vote is going to be manipulated in some way."

265.     Ms. Rader's vote in the 9th District has been diluted through the packing of Democratic voters.

266.     Mr. Rader testified that the geographic distances between areas in the 9th District has hampered constituent services and made it difficult for Congresswoman Marcy Kaptur to adequately represent her constituents.

267.     Mr. Rader testified that the fact that the congressional races in the 9th District are not competitive has caused Congresswoman Kaptur to "not draw in good competition" and as a result, "she doesn't have to be out there as someone running in a more competitive race."

268.     Mr. Rader testified that the geographic distance between areas in the 9th District has made it more difficult for him to organize constituents to visit Congresswoman Kaptur's office in Toledo.

269.     Mr. Rader testified that the current congressional map has hurt his ability to campaign for Democratic candidates. As an example, Mr. Rader said that it was difficult

APPENDIX C: Plaintiffs' Contested Facts

to campaign for Democratic congressional candidate Keith Mundy in the 16th District because voters felt that the "district is already staked or the outcome is predetermined."

270. Mr. Rader testified that the current congressional map has hurt his ability to fundraise and recruit volunteers for Democratic candidates. As an example, Mr. Rader said that it was difficult to raise funds or recruit volunteers for Democratic congressional candidate Keith Mundy in the 16th District because voters "don't want to give or get involved because they think the way that the districts are drawn, again, like I said, a predetermined outcome."

271. Mr. Rader testified that the current congressional map "discourages people from voting" by creating voter apathy. Specifically, Mr. Rader said that voters have said "Why should I vote because it doesn't matter?  There's nothing I can do about it, so I don't care."

272. Ms. Megnin lives in the 10th District, where Democratic voters are cracked under the current map, and her vote is diluted.

273. Ms. Megnin is "someone who does regular voter canvassing" for Democratic candidates and issues. Because of the voter apathy caused by the map, she has a difficult time gathering support for Democratic candidates in her district. "[N]o matter how many doors we knocked on, how many campaign supports we did, how much strategizing we did, our structure guarantees that the people would not be able to be competitive in being represented."

274. Ms. Megnin herself would consider running for local office, but does not believe she "would have a chance of going beyond local because of the gerrymandering."

**APPENDIX C: Plaintiffs' Contested Facts**

275.　　As a Democrat in District 10, Ms. Megnin's Representative does not engage with her or other "residents of Dayton itself or other communities that might not be fully supportive of his views." For example, "Mike Turner has not held a town hall meeting for his local constituents in his sixteen years as a congressional representative."

276.　　Ms. Megnin has tried to call Congressman Turner's office "around a dozen" times over the past several years without receiving a response, and has had a similar experience with email and electronic petitions.

277.　　The gerrymandered map had made Ms. Megnin's district so safe for Congressman Turner that "[t]here's no reason for the representative to have to listen to the citizens in order to keep their job."

278.　　Mr. Harris testified that District 11 is a packed district, and as a result his vote is diluted and is not as impactful as it would be otherwise.

279.　　Mr. Harris's congressional Representative is a Democrat, Congresswoman Marcia Fudge, but she is not the candidate of his choice. She is too far to the left, and she opposes Fast Track Authority and free trade generally. Free trade is extremely important to Mr. Harris. He is pro-business, and Congresswoman Fudge's views in these areas do not align with his. On social issues, they agree more.

280.　　According to Mr. Harris, Congresswoman Fudge is "from a far more liberal wing of the party that does not reflect local values, which is going to be what happens when you're in a firm, reliably blue district."

281.　　Mr. Harris testified that Cleveland's economy is not the same as Akron's economy; that the current congressional map forces two very different communities into the same congressional district.

**APPENDIX C: Plaintiffs' Contested Facts**

282.    Mr. Harris's Democratic friends are discouraged from voting because there is no meaningful choice in the 11th District.

283.    Mr. Dagres testified that he is injured by the current congressional map because the way that the 12th District was drawn dilutes his vote, and his voice. His district is cracked. His vote, and the votes of other Democrats in his district, is "watered down."

284.    The systematic drawing of the district lines in the current map "took chunks, large chunks of Franklin County out of the 12th District and added additional voters in Muskingum, Richland, Morrow, and (another one)."

285.    Democrats are "not heard" in Mr. Dagres's district. The district's previous, long-time Congressman, a Republican, "would not hold any public forums, [and] would not respond oftentimes to requests from the public to be heard."

286.    Mr. Dagres talks "to other voters through the community who say that why should they vote when their votes don't matter, when there's no opportunity for success."

287.    Mr. Dagres was the President of the Licking County Democratic Club PAC from January 1, 2018 to January 1, 2019, and he is a Central and Executive Committee member of the official party within Licking County.

288.    As such, Mr. Dagres has tried to recruit candidates to run for office, but due to the nature of the district, "people do not see running as a legitimate opportunity for them because they feel the race is not winnable or competitive. It makes it very difficult to recruit candidates to run," including "highly qualified individuals who would do a superb job if elected to their roles who are unwilling to come forward and put themselves out there knowing that there is no opportunity for them to win."

**APPENDIX C: Plaintiffs' Contested Facts**

289.     Mr. Dagres knows specific individuals who did not run because the race is not winnable because of the way the district is drawn.

290.     It is also hard to raise funds or gain financial support for Democratic candidates in District 12 because of the perception that "it is unwinnable so why should I donate."

291.     Dr. Myer lives at in the 13th District, where Democratic voters are packed under the current map, and her vote is diluted.

292.     In Dr. Myer's experience talking to voters and prospective voters in her area, the gerrymandered map has made people less likely to engage with her efforts because they feel their votes do not matter.

293.      Dr. Myer feels that since her district spans such a large geographic area including Youngstown, Akron, and the rural northeast of the state, "people in this district aren't necessarily interested in the same things or don't have the same concerns."

294.     Because Dr. Myer's "district is one of the most crazy looking things you've ever seen crawling across the map towards the west and a little stripe to pick up Akron" where voters "don't have the same concerns as people in my area" she feels her representative cannot respond to her concerns..

295.     Because Democrats are packed into her district, in Dr. Myer's experience, Tim Ryan is less responsive to what even Democratic voters want because he knows he will always be re-elected.

296.     Dr. Myer feels that in the Thirteenth District her vote is less valuable because "to put all the Democrats, as you well know, together, you know, it dilutes any power of our influence because we're all lumped together."

**APPENDIX C: Plaintiffs' Contested Facts**

297.     Ms. Hutton lives in the Fourteenth District which is cracked under the congressional map, and her vote is diluted.

298.     Ms. Hutton contacted Representative Joyce's office within the past 5 years, likely related to a gun issue. She received a form letter in response. She has not contacted his office since because she knows "how he's going to vote."

299.     Ms. Hutton testified that the way the challenged map is drawn burdens her ability to associate and participate in the political process with other Democratic voters in the state of Ohio.

300.     Ms. Hutton testified that the current congressional map made it more difficult for her to elect her candidate of choice.

301.     Ms. Thobaben lives in the 15th District, where Democratic voters are cracked under the current map, and her vote is diluted.

302.     Ms. Thobaben testified that "a lot of people that I have talked to" say they feel like "the probability of Democrats being able to get through any of their candidates is pretty remote" and that their votes do not count. This has made it more difficult to canvass for and elect Democratic candidates.

303.     Ms. Thobaben testified that "[my] vote doesn't count because the district has been drawn in such a way that it dilutes my vote . . . It doesn't matter if I vote for Democrats. They don't count."

304.     Ms. Thobaben does not "feel represented by Steve Stivers . . . he rarely comes to Clinton County."

42

**APPENDIX C: Plaintiffs' Contested Facts**

305.     Ms. Thobaben contacts her Congressman often using emails, texts, and she also "ha[s] him on speed dial." But she has either received no response or only form responses.

306.     Ms. Rubin lives in the 16th District, where Democratic voters are cracked under the current map. Due to the way her district is drawn, Ms. Ruben's vote is diluted.

307.     Ms. Rubin is injured by the current congressional map because, as a Democrat in District 16, she has "no influence whatsoever on how (her) congressman votes or even considers (her) point of view."

308.     The current congressional map divides Stark County up into three different districts. Ms. Rubin's political advocacy activity is burdened because, due to this gerrymandered district, most voters she asks "do not know who their congressman is." When she attempts to help them determine this, it is difficult because "the boundaries on that [congressional] map do not adhere to political boundaries."

309.     Ms. Rubin's advocacy activities are also affected by the fact that Democrats can't win in District 16: "Voters who continually vote for candidates who never win eventually get discouraged and stop participating."

310.     Ms. Rubin has a "difficult time finding candidates who are willing to run in districts whose outcome is preconceived. Elections cost a lot of money and a lot of time, and it's hard to find people principled enough to run if they know their possibility of loss is a hundred percent." And it's hard for her party to raise money or advocate effectively.

311.     Ms. Rubin has no opportunity to influence how her Congressperson votes on legislation because he "knows he does not owe his allegiance to the voters; he only owes

43

**APPENDIX C: Plaintiffs' Contested Facts**

it to the party who helped put him there and who drew the district lines to assure that he would win."

312.    Ms. Rubin's Congressman will not participate in public forums. He only meets with business owners and employees of a business.