**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **OHIO A. PHILIP RANDOLPH INSTITUTE,** *et al.*<br><br>**Plaintiffs,**<br><br>v.<br><br>**LARRY HOUSEHOLDER, Speaker of the Ohio House of Representatives,** *et al.*<br><br>**Defendants.** | No. 1:18-cv-00357-TSB-KNM-MHW<br><br>Judge Timothy S. Black<br>Judge Karen Nelson Moore<br>Judge Michael H. Watson<br>Magistrate Judge Karen L. Litkovitz |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO INTERVENORS'
MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF
DR. LISA HANDLEY**

**INTRODUCTION**

Intervenors seek to exclude Dr. Handley's district-specific, functional-analysis—the only analysis of this kind submitted in this case—as irrelevant. Dr. Handley's analysis will aid the trier of fact in determining whether the legislature drew District 11 to contain 52% black voting age population ("BVAP") in order, as Intervenors represent in their motion, "to protect the minority equal electoral opportunity the Act guarantees by creating a majority-minority district in northeast Ohio." Ints.' Mem. in Support of Mot. To Exclude the Expert Report and Testimony of Dr. Lisa Handley ("Ints.' Mem.") at 3 (Jan. 18, 2019), ECF No. 152-1 at 3. Intervenors and Defendants cannot use VRA as a shield against liability by professing compliance with federal law, without allowing plaintiffs to disprove the validity of this justification. Moreover, as Dr. Handley's analysis encompasses both election prior to and after the drawing of the challenged map, it can be used to address VRA compliance at various points in time. Finally, Intervenors' position, based on one court opinion, that ecological inference estimates must be accompanied

by confidence intervals is incorrect. Dr. Handley provided a measure of uncertainty for her ecological inference estimates, just not the one on which Intervenors apparently insist. Intervenors do not correctly present the reliability standard under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Dr. Handley's methodologies—well-established and well-accepted in racial bloc voting analysis—are reliable. Her report and testimony should be admitted.

## ARGUMENT

**A. Dr. Handley's analysis is relevant.**

Expert testimony is relevant, and therefore admissible under Rule 702, not only when it relates directly to the claims of the case, but when it is "helpful to the trier of fact." *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205, 1210 (E.D. Tenn. 2000) (citing *Daubert*, 509 U.S. at 591). While intervenors correctly read Dr. Handley's report to make no mention of partisan gerrymandering, that does not mean her report is not relevant in a lawsuit about partisan gerrymandering. This is especially true in light of what Intervenors made transparent in their *Daubert* motion: they argue that District 11, drawn to contain 52% BVAP, "was a result of the General Assembly's choice to comply with the Voting Rights Act." Ints.' Mem. at 3.[1] In other words, Intervenors and Defendants themselves contend that complying with the Voting Rights Act is a justification for drawing Congressional District 11 to contain 52% BVAP. Dr. Handley's district-specific, functional analysis, including elections from both before and after

---

[1] In discovery, Plaintiffs have identified emails among the map drawers that are picking BVAP for District 11 out of thin air, suggesting that the concern was not for identifying the BVAP actually functionally needed to ensure the minority population an equal opportunity to elect candidates of choice. *See, e.g.*, Declaration of Emily R. Zhang in Support of Plaintiffs' Opposition to Intervenors' Motion to Exclude Dr. Handley ("Zhang Decl.), Ex. D.

redistricting, speaks directly to the validity of such a justification. Dr. Handley's analysis also assists the Court in considering the Plaintiffs' Proposed Remedial Map and simulations.

1) <u>Dr. Handley's analysis aids the trier of fact in evaluating the state's justification of VRA compliance.</u>

Intervenors' contention that Dr. Handley's analysis does not "fit" this litigation because it does not discuss the "partisan motive" of the legislature is patently untenable. Ints.' Mem. at 8. Dr. Handley's analysis does "shed [] light" on whether the challenged plan and specifically District 11 are unconstitutional partisan gerrymanders by probing the purported basis for drawing a district with 52% BVAP. *Id*. As such, Dr. Handley's report does, in fact, "bear on *partisan* intent or effect in some way, shape, or form." Ints.' Mem. at 9 (emphasis in original).

An analogy to the non-VRA case cited by Intervenors, *Harris v. Arizona Independent Redistricting Commission*, 136 S. Ct. 1301 (2016), proves instructive.[2] *Harris* involved a redistricting challenge "on the ground that the plan's districts are insufficiently equal in population." *Id*. at 1305. Plaintiffs in that case alleged that the population deviations reflected "the Commission's political efforts to help the Democratic Party," while the Redistricting Commission ultimately proved that it in fact reflected "efforts to achieve compliance with the federal Voting Rights Act." *Id*. at 1307. That *Harris* was centrally about malapportionment did not make motives "to secure political advantage for one party," *id*., or to comply with the Voting Rights Act any less "relevant" to the litigation. Likewise, Defendants' and Intervenors' ability to

---

[2] A similar analogy can be made in the racial gerrymandering context. The claim in a racial gerrymandering case is that race predominated the drawing of district lines. Often, the state defends itself against such a claim by stating that race was taken into consideration in order to comply with the Voting Rights Act. *See, e.g.*, *Bethune-Hill v. Virginia State Board of Elections*, 137 S. Ct. 788, 801 (2017). In those cases, certainly Voting Rights Act compliance is relevant to the litigation. And whether the compliance was genuine and valid is a central issue of dispute that the trier of fact must resolve. *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (finding that legislature's view that the BVAP in the district had to exceed 50 to avoid § 2 liability to be "at war with our § 2 jurisprudence").

demonstrate that District 11 was actually drawn to comply with the Voting Rights Act, and not simply pay lip service to it, is a relevant—and indeed crucial—component of this case. Dr. Handley's analysis of what the Voting Rights Act actually requires could not be anything but relevant.

Intervenors then claim that Dr. Handley's analysis is irrelevant because "the law did not require the Ohio General Assembly to conduct an 'analysis' like hers before drawing a majority-minority district." Ints.' Mem. at 10. The law certainly did not permit the map drawers to just pick a BVAP without any grounding in what would be required for compliance with the VRA. Intervenors are free to rely on their mistaken interpretation of what Section 2 of the Voting Rights Act requires. But their reading of Section 2 does not dictate the admissibility of Dr. Handley's report and testimony. Dr. Handley's racial-bloc voting analysis, the touchstone of the *Gingles* preconditions, is central to Section 2 liability, *Thornburg v. Gingles,* 478 U.S. 30 (1986). And as Section 2 liability is apparently now the professed justification, Dr. Handley's analysis is relevant and should be admitted.

Neither of the Supreme Court cases Intervenors cite, *Voinovich v. Quilter*, 507 U.S. 146 (1993), or *Bartlett v. Strickland*, 556 U.S. 1 (2009), hold that "there is no independent requirement that states assess any Voting Rights Act criteria before choosing to draw a majority-minority district," Ints.' Mem. at 11. Plaintiffs in *Voinovich* sued over the creation of majority-minority districts because a "larger number of 'influence' districts—districts in which black voters would not constitute a majority but in which they could, with the help of a predictable number of cross-over votes from white voters, elect their candidates of choice"—could be drawn. *Voinovich*, 507 U.S. at 150. The Court rejected plaintiffs' "packing claim" after determining that plaintiffs "failed to demonstrate *Gingles*' third precondition—sufficient white

4

majority bloc voting to frustrate the election of the minority group's candidate of choice." *Id*. at 158. Far from not requiring states to "assess any Voting Rights Act criteria before choosing to draw a majority-minority district," Ints.' Mem. at 11, *Voinovich* reminds states that Voting Rights Act liability will be determined by the effect the drawn district has on minority voters' opportunity to elect. If anything, *Voinovich* reaffirms the importance of conducting a racial-bloc voting analysis, as liability under Section 2 depends "exclusively on the consequences of apportionment:" whether it has "the *effect* of denying a protected class the equal opportunity to elect its candidate of choice." *Voinovich*, 507 U.S. at 155 (emphasis in original).

It is especially hard to see why and how *Bartlett* might support the legislature's decision not to conduct any analysis to determine whether the lines it drew had "the effect of denying a protected class the equal opportunity to elect its candidate of choice." *Voinovich* at 155. *Bartlett* clarified that Section 2 does not "require state officials to draw election-district lines to allow a racial minority to join with other voters to elect the minority's candidate of choice, even where the racial minority is less than 50 percent of the voting-age population in the district to be drawn." *Bartlett*, 556 U.S. at 6. But nowhere in the opinion did the Court disturb the validity of the three *Gingles* factors and their centrality to establishing a Section 2 violation. *Id*. at 11-12 (describing development of *Gingles* factors and treating them as current). The legislature in this case may have decided to throw caution to the wind when it came to the Voting Rights Act, but they cannot claim that the Court, either in *Voinovich or Bartlett*, gave them permission to do so.

The City of Euclid cases Intervenors cite, Ints.' Mem. at 12, also do not justify exclusion of Dr. Handley's analysis, nor do they support the legislature's failure to conduct *any* racial-bloc voting analysis. The City of Euclid's liability in its *school board and city council* races does nothing to undermine Dr. Handley's analysis of *federal and statewide* election results in her

5

report. Moreover, if the *Euclid* cases gave the Ohio legislature, as Intervenors insist, "good reason to fear Voting Rights Act liability," *id.*, the legislature had all the more "good reason" to conduct an analysis to determine whether the district it drew had "the *effect* of denying a protected class the equal opportunity to elect its candidate of choice." *Voinovich* at 155 (emphasis in original).

The final reason Intervenors claim that Dr. Handley's analysis is irrelevant is that "more than half the elections Dr. Handley cites *postdate* the redistricting." Ints.' Mem. at 12.[3] This ignores the utility of Dr. Handley's analyses for other purposes, *see infra* Section A.2, and also betrays a lack of understanding of Dr. Handley's analysis.

As detailed in Dr. Handley's report, she conducted "a district-specific, functional analysis of voting patterns by race to ascertain the black voting age population necessary to provide black voters with an opportunity to elect their candidates of choice in the vicinity of the 11th Congressional District of Ohio." Declaration of Emily R. Zhang in Support of Plaintiffs' Opposition to Intervenors' Motion to Exclude Dr. Handley ("Zhang Decl."), Ex. A ("Handley Rep.") at 1. Her determination that a "45% black VAP district offers black voters a realistic opportunity to elect their candidates of choice to represent the 11th Congressional District" is based principally on Tables 10 and 11 in her report. *Id.* at 16-17.

In reaching her recommendation, Dr. Handley took a lowest-common denominator approach: she ensured that under all the elections analyzed, black voters have a realistic opportunity to elect their candidates of choice. Concretely, in Table 10, the estimated vote share

---

[3] This argument also further undermines Intervenors' (perhaps, and Defendants') argument that that District 11, drawn to contain 52% BVAP, "was a result of the General Assembly's choice to comply with the Voting Rights Act." Ints.' Mem. at 3. Looking only at the analysis of election results available at the time of the 2011 redistricting indicates that compliance with the VRA could have required an even lower BVAP than the 45% Dr. Handley identifies (and lower still than the 52% that the map drawers grabbed out of thin air).

of black candidates-of-choice under the second to last column—"percent of vote [Black-preferred] cand[idate] would have received if district was 45% black VAP"—all exceeded 50%. By contrast, at 40% BVAP, the last column, "the results for one of the contests (the 2014 gubernatorial general election contest . . . , the black-preferred candidate would receive 50.6% of the vote) would be razor sharp." Handley Rep. at 15.

Notably, she analyzed general and primary elections from 2008 to 2016, therefore including elections from both before the challenged map was drawn and after. While the recommendation noted in her report is based on the totality of all the data analyzed, her Tables 10 and 11 provide all the analysis needed to make a similar determination based on any subset of the data. For instance, if Intervenors want to learn what percentage Black VAP is necessary for minority voters to elect their candidates of choice based purely on data available in 2011, they have only to refer to Tables 10 and 11. Handley Rep. at 16-17.

2) <u>Dr. Handley's analysis aids the trier of fact in evaluating other evidence in this litigation.</u>

As Plaintiffs are cognizant that the Voting Rights Act's requirements implicate many aspects of this litigation, Dr. Handley's analysis has correspondingly been applied in other evidence in this litigation. As such, it is not only relevant for evaluating the validity of the state's VRA compliance justification for District 11, but also for evaluating Plaintiffs' Proposed Remedial Map and Dr. Cho's simulated maps.

Dr. Handley's analysis aids the trier of fact in evaluating the validity of Plaintiffs' Proposed Remedial Map. Plaintiffs submitted a proposed remedial map in this case. The district in the Cleveland area, also numbered District 11, has 47.48% BVAP. Zhang Decl., Ex. B ("Cooper Decl.") ¶ 42. The proposed remedial map is, as its name suggests, a forward-looking proposal. As such, Dr. Handley's analyses, incorporating data post-2011, aids this Court in

7

ensuring that the remedial map is drawn compliant with the Voting Rights Act and hence does not have the effect of denying minority voters of an opportunity to elect their candidates of choice.  Dr. Handley's analysis also aids the trier of fact in evaluating whether Dr. Cho's simulated maps against which to compare the challenged map are compliant with the Voting Rights Act.

    **B.  Dr. Handley's analysis is reliable.**

The reliability inquiry under *Daubert* is whether "the reasoning or methodology underlying the testimony is scientifically valid."  *Daubert*, 509 U.S. at 592-593.  There is no doubt that the three (not two, as indicated by Intervenors, Ints.' Mem. at 4) tried and true techniques that Dr. Handley employed in her report are scientifically valid.  These three methodologies combined are the epitome of reliability under the factors enumerated in *Daubert*, including "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community."  *U.S. v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001).  As Dr. Handley noted in her report, homogeneous precinct analysis and ecological regression (ER) were credited in the Supreme Court's opinion in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and ecological inference (EI) has been widely accepted by courts since.  Handley Rep. at 7; *id*. at n.10 (providing source that lists cases using EI).  Indeed, it is hard to imagine a set of methodologies more well-tested and accepted in the federal courts.

Intervenors do not claim that Dr. Handley used unconventional or incorrect methodology to conduct her district-specific, functional analysis, nor do they claim that Dr. Handley applied any of these methodologies incorrectly.  Indeed, in Appendix B of her report, Dr. Handley included the entire output that her statistical programs produced, including the standard errors, the "known or potential rate of error," *Daubert*, 509 U.S. at 594, for each of the EI estimates, that

8

Intervenors are free to consult for their particular desired "measure of statistical certainty," Ints.' Mem. at 4. Intervenors assert that Dr. Handley does not provide "any measure of statistical certainty." *Id*. This is patently false. Dr. Handley provides the entire output of her EI analysis, including the standard error. App'x B to Handley Rep. at 26-33. Standard errors, which Dr. Handley presents, are a measure of certainty just as confidence intervals are, contrary to what Intervenors endeavor to claim.

Despite that, Intervenors invent a problem with Dr. Handley's report out of whole cloth: that she did not provide confidence intervals. Yet they cite no precedent where a court *excluded* expert testimony of EI estimates for want of confidence intervals. What they do cite are cases that discuss confidence intervals or statistical uncertainty, but with one exception, do so without any indication of whether confidence intervals are required or indeed dispositive. The totality of these cases do not indicate any consensus on whether confidence intervals are required for EI estimates, let alone confer authority to exclude Dr. Handley's report for not including them.

Intervenors cite *Hall v. Louisiana*, 108 F. Supp. 3d 419 (M.D. La. 2015), only for proposition that courts favor EI over ER. A closer look at the opinion (finding a Section 2 violation) reveals that the court did not in any way require confidence intervals in EI analyses, nor is there any suggestion in the opinion that the EI estimates the court credited in its findings included any confidence intervals. In *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 766 (S.D. Tex. 2013), the confidence intervals were derived from a "regression" analysis, not EI, and there is no indication from the opinion that the court credited the confidence intervals in its analysis or relied on them in any way. Similarly, in *Montes v. City v. Yakima*, 40 F. Supp. 3d 1377, 1405 (E.D. Wash. 2014), and *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 725 (N.D.

9

Tex. 2009), the courts discussed a dispute between the experts about confidence intervals, but did not require them to be included with EI point estimates or rely upon them in any way.

In *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (2018), the court included a discussion of confidence intervals in explaining why it did not credit the testimony of one of the experts, without holding that confidence intervals must be included or relying on them in any way. The expert who the court declined to credit was Dr. M.V. Hood III, who is also serving as an expert for Defendants in this case. *Id*. at 178 n.60. Dr. Hood had claimed that one of plaintiffs' experts failed to accompany his estimates "by a degree or range of uncertainty" when in fact plaintiffs' expert "expressly included confidence intervals in all of his statistical estimates." *Id*. Moreover, the court noted the irony in Dr. Hood including "no such measures of uncertainty" (i.e., an error rate of any kind, not necessarily confidence intervals) in his own ecological inference results. *Id*. The citation to *Bethune-Hill* only demonstrates Dr. Hood's unreliability through his incorrect allegation regarding the failure to include confidence intervals, concurrent with his own failure to do so. *See also* Pls.' Mot. to Exclude Testimony and Reports of M.V. Hood III (Jan. 18, 2019), ECF No. 150.

*Missouri NAACP v. Ferguson-Florissant School District*, 201 F. Supp. 3d 1006 (M.D. Mo. 2016), is the only case Intervenors cite that contains language seeming to mandate inclusion of confidence intervals with EI estimates. Specifically, the case quotes the testimony of the two competing experts who testified at that trial regarding the inclusion of confidence intervals (it does not issue a holding requiring the use of confidence intervals in all cases). *Id.* at 1042. And one case is a far cry from it being so "widely known that courts have issued opinions attesting to

their importance." Ints.' Mem. at 15.[4]  Furthermore, in *Missouri NAACP*, the court did not even mention EI standard error, 201 F. Supp. 3d 1006, which is the error rate for the EI estimates that Dr. Handley presented.  It is not even clear that the court—in the single case relied upon by Intervenors—would have required confidence intervals (specifically) if the experts there presented error rate in another fashion.

Moreover, in *Missouri NAACP*, the court's discussion of confidence intervals for EI estimates occurred in its opinion issued *post-trial*, after all the evidence, including those with only point estimates and not confidence intervals, *id*. at 1044, were fully aired at a six-day trial, *id*. at 1016.[5]  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" for Intervenors to attack any purported uncertainty in Dr. Handley's results.  *Daubert*, 509 U.S. at 596.  Intervenors could have retained an expert—like Defendants did in *Montes City*, *Benavidez*, and *Bethune-Hill*—to demonstrate any unreliability in Dr. Handley's estimates.  They elected not to do so.  And they could have asked any number of the experts Defendants and Intervenors did retain to respond to Dr. Handley's analysis.  *See, e.g.*, Zhang Decl., Ex. C (Brunell Rep.) at Curriculum Vitae 16 (Intervenors' expert provided expert testimony at least once in a Voting Rights Act

---

[4] Intervenors ignore court cases from this Circuit (including ones in which Dr. Handley herself was an expert) where the court credited the use of, among other metrics, EI and did not require the presentation of confidence intervals.  *See, e.g.*, *United States v. City of Euclid*, 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008) (holding that "statistical evidence of racial bloc voting may be established by three analytical models: homogenous precinct analysis ('HPA'), bivariate ecological regression analysis ("BERA"), and King's ecological inference method ('King's EI method')," crediting Dr. Handley's expert opinion, and not requiring confidence intervals); *see also, e.g.*, *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 746 n.6 (N.D. Ohio 2009) (crediting both ER and EI, noting that the metrics are "in fact, increasingly employed together," and not requiring confidence intervals).

[5] Looking at the point-estimate approach that was presented in *Missouri NAACP*, 201 F. Supp. 3d at 1044, in comparison to Dr. Handley's Tables 10 and 11 and full EI output in Appendix B, Handley Report at 16-17, 26-33, demonstrates that Dr. Handley presented a much more fulsome functional analysis than the expert in *Missouri NAACP*, including through presentation of standard error.

case). They elected not to do so either. Dr. Handley also produced all of her EI output, including standard errors, along with all of her underlying data.

Intervenors have offered nothing that even suggests that including the standard error is an improper way to present the error rate for an EI estimate. Intervenors' reliance on the discussion of expert trial testimony specific to a single out-of-district case does not demonstrate that this is insufficient under *Daubert*. Should Intervenors determine that any of Dr. Handley's estimates are inaccurate, they are free to explore them on cross-examination. But this Court should not exclude Dr. Handley's testimony, which relies on iron-clad and well-established methodologies, on the grounds that she did not report confidence intervals—statistical ranges that only a single court has indicated it may require with EI estimates—and reported error rate in another fashion.

## CONCLUSION

For all of the reasons discussed above, Intervenors' motion to exclude the report and testimony of Dr. Lisa Handley should be denied.

January 25, 2019

Respectfully submitted,

*/s/ Freda J. Levenson*, trial attorney
Freda J. Levenson (0045916)
American Civil Liberties Union of Ohio Fdtn.
4506 Chester Avenue
Cleveland, OH 44103
Tel.: (216) 472-2220
Facsimile: (216) 472-2210
flevenson@acluohio.org

T. Alora Thomas-Lundborg
Dale E. Ho
Theresa J. Lee
Emily Rong Zhang
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
athomas@aclu.org
dho@aclu.org
tlee@aclu.org
erzhang@aclu.org

Robert Fram
Nitin Subhedar
Jeremy Goldstein

Michael Baker
Perrin Cooke
Peter Rechter

| | |
|---|---|
| Alexia Romero<br>Covington & Burling LLP<br>One Front Street<br>San Francisco, CA 94111<br>Tel.: (415) 591-6000<br>rfram@cov.com<br>nsubhedar@cov.com<br>jgoldstein@cov.com<br>aromero@cov.com | Robert Day<br>Covington & Burling LLP<br>850 Tenth Street, NW<br>Washington, DC 20001<br>Tel.: (202) 662-6000<br>mbaker@cov.com<br>pcooke@cov.com<br>prechter@cov.com<br>rday@cov.com |
| Kyunghoon John Woo**<br>Covington & Burling LLP<br>1999 Avenue of the Stars<br>Los Angeles, CA 90067<br>Tel.: (424) 332-4800<br>jwoo@cov.com | |

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Freda J. Levenson, hereby certify that this Memorandum in Opposition to Intervenors' Motions to Exclude Dr. Handley was served upon all counsel of record in this case via ECF.

*/s/ Freda J. Levenson*
Trial Attorney for Plaintiffs