**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

_____
                                                            )
OHIO A. PHILIP RANDOLPH                    )
INSTITUTE, *et al.*                                   )
                                                            )
       Plaintiffs,                                )    No. 1:18-cv-00357-TSB-KNM-MHW
                                                            )
                                                            )
v.                                                           )    Judge Timothy S. Black
                                                            )    Judge Karen Nelson Moore
LARRY HOUSEHOLDER, Speaker of the )    Judge Michael H. Watson
Ohio House of Representatives, *et al.*        )    Magistrate Judge Karen L. Litkovitz
                                                            )
       Defendants.                             )
_____)


**<u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO</u>**
**<u>DEFENDANTS' AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

ARGUMENT ........................................................................................................... 3

    A. Plaintiffs' Claims Are Justiciable and There Are Manageable Standards for
       Deciding Their Claims ................................................................................... 3

       1. Four three-judge panels have recently held that partisan gerrymandering
          claims are justiciable ................................................................................. 3

Defendants and Intervenors revive Defendants' claims on non-justiciability from
Defendants' motion to dismiss the complaint. This argument fails for two reasons: (1)
controlling precedent is that partisan gerrymandering cases are justiciable and (2) Plaintiffs have
provided a manageable standard. Partisan gerrymandering claims are justiciable as found by
three federal three-judge panels since this Court ruled on the motion to dismiss. *See League of
Women Voters of Michigan v. Johnson*, No. 2:17-CV-14148, 2018 WL 6257476, at *4 (E.D.
Mich. Nov. 30, 2018); *Benisek v. Lamone*, No. 1:13-cv-03233-JKB, 2018 WL 5816831, at *1–2
(D. Md. Nov. 7, 2018); *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 838 (M.D.N.C. 2018).
The legal standard offered by Plaintiffs is that partisan gerrymandering runs afoul of the
constitution when a party seeks to entrench its majority against all likely electoral outcomes by
packing and cracking opposing party voters. This standard is judicially manageable. It is
informed, but not dictated, by social science research and empirical analysis. It is not the role of
experts to tell the Court when partisanship becomes too much. Rather, the legal standard
determines when political data and partisanship has been used for an invidious purpose and is
thus barred by the Constitution. Experts provide evidence to support the legal test.

       2. Plaintiffs propose a manageable standard to adjudicate their claims under
          the Equal Protection Clause ................................................................... 8

Partisan gerrymandering claims are justiciable under the Equal Protection Clause of the
Fourteenth Amendment. "Partisan gerrymandering runs afoul of the Equal Protection Clause
because, by seeking to diminish the electoral power of supporters of a disfavored party, a
partisan gerrymander treats individuals who support candidates of one political party less
favorably than individuals who support candidates of another party." *Rucho*, 318 F. Supp. 3d at
860–61. The test for finding an Equal Protection violation proceeds as follows: The first prong is
(1) whether the legislature acted with an improper legislative *intent* to discriminate in favor of
the state's preferred political party by securing partisan advantage on its behalf, *i.e.*, whether
intent to discriminate was a motivating factor and (2) whether the resulting map had an
impermissible *effect* of entrenching partisan advantage against likely changes in voter preference.
If these two elements are satisfied, then (3) the burden shifts to the state to demonstrate that the
impairment of Equal Protection rights is necessary to advance legitimate state interests.

3. There are sufficient facts in the record from which this Court could find that Plaintiffs' right to equal protection were infringed by Ohio's U.S. Congressional map......................................................................................... 10

Here, Plaintiffs claim meets the test for finding a denial of their rights under the Equal Protection Clause. The Republican map drawers acted with an intent to advantage Republican voters and disadvantage Democratic voters, as illustrated by direct and circumstantial evidence. The Ohio U.S. congressional map has had the effect of disadvantaging Democratic voters. There is no justification for the map's effects, as neither the Voting Right Act nor traditional redistricting criteria explains Ohio's U.S. congressional map.

a) There are sufficient facts in the record from which the Court could find that Defendants acted with a discriminatory intent......................................... 10

b) There is sufficient evidence in the record to find that Plaintiffs also met the predominance test. .................................................................................. 17

c) There are sufficient facts in the record from which the Court could find that Ohio's congressional map had a discriminatory effect............................ 20

d) There are sufficient facts in the record from which the Court could find that Defendants lacked justification............................................................... 26

4. Plaintiffs propose a manageable standard to adjudicate their claims under the First Amendment and there are sufficient facts in the record to find that Plaintiffs meet this test..................................................................................... 29

Partisan gerrymandering claims are justiciable under the First Amendment, which protects the rights of voters to associate with and advocate for a political party, to vote for their candidate of choice, to express their political views, and to participate in the political process. All four federal district panels to recently consider partisan gerrymandering claims have found them justiciable under the First Amendment. *LWV-Michigan*, 2018 WL 6257476, at *18; *see also Benisek*, 2018 WL 5816831, at *1–2; *Rucho*, 318 F. Supp. 3d at 929; *Whitford v. Gill*, 218 F. Supp. 3d 837, 884 (W.D. Wisc. 2016), *rev'd on other grounds*, 138 S. Ct. 1919 (2018). Plaintiffs propose that the same test of intent, effects and lack of justification used under the Fourteenth Amendment also be used under the First Amendment. As discussed *supra*, Plaintiffs have met the requirement for the three-prong test that Plaintiffs propose that the Court adopt. The drawing of Ohio's congressional district boundaries was done to privilege the state's preferred political party, and to burden the state's disfavored political party. Plaintiffs and their members were "deprived of their natural political strength by a partisan gerrymander," and hence suffered a violation of their First Amendment right to associate. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (citing *Vieth*, 541 U.S. at 315 (Kennedy, J., concurring)).

5. There are sufficient facts in the record from which the Court could find that Plaintiffs' First Amendment rights were infringed under the *LWV-Michigan* and *Rucho* standard. .............................................................................................. 30

Recent panels have adopted a slightly different three-part test to determine if a redistricting plan violates the First Amendment as a partisan gerrymander. As articulated by the court in *LWV-Michigan*: The first prong is that "districts [were drawn] with the 'specific intent' to 'burden individuals or entities that support a disfavored candidate or political party.'" *LWV-Michigan*, 2018 WL 6257476, at *18 (citing *Shapiro v. McManus*, 203 F. Supp. 3d 579, 597 (D. Md. 2016); *Rucho*, 318 F. Supp. 3d at 929. The second prong is that "the challenged districting plan actually caused an injury, *i.e.*, 'that the districting plan in fact burdened the political speech or associational rights of such individuals or entities.'" *Id.* (quoting *Rucho*, 318 F. Supp. 3d at 929). The last prong is causation. *Id.* There are sufficient facts in the record from which this court could find that Plaintiffs' First Amendment rights were infringed by Ohio's U.S. Congressional map using this alternative test.

6.  Plaintiffs propose and meet a manageable standard to adjudicate their claims that their right to vote has been infringed by Ohio's U.S. Congressional map. ............................................................................................... 32

Plaintiffs assert a legally cognizable claim with manageable judicial standards that their fundamental right to vote has been denied in violation of the Fourteenth Amendment, in the form of an unconstitutional dilution of their voting rights. That is, Plaintiffs have been unconstitutionally denied the opportunity to elect the candidates of their choice and to influence elections. Here, Plaintiffs' right to vote has been unconstitutionally diluted by virtue of their placement in particular districts in Ohio's congressional map, under a three-part test that is similar to, but distinct from, the three-part test for Plaintiffs' Equal Protection Claim. Plaintiffs must first establish a burden on their fundamental right to vote. They have done so by demonstrating that (1) Defendants acted with an intent to dilute the votes of Democratic voters by cracking and packing them; and that (2) the map had the effect of cracking and packing Democratic voters. This effect is evident by Plaintiffs' remedial plan which would provide more opportunity to elect Democrats in certain districts. Where, as here, there is a substantial burden on a fundamental right, heightened scrutiny must be met. *See, e.g.*, *Cal. Democratic Party*, 530 U.S. at 581–82; *Norman v. Reed*, 502 U.S. 279, 288–89 (1992). The Ohio General Assembly's actions cannot meet this test. There is and was no legitimate state interest in enacting a gerrymandered map featuring districts that deny Democratic voters an opportunity to elect their preferred candidates.

7.  Plaintiffs propose and meet and manageable standard that the Ohio General Assembly exceeded its power under Article 1 when it gerrymandered Ohio's U.S. congressional map. ................................................... 35

States are given limited power to regulate federal elections under Article I of the Constitution. The court in *Rucho* found that a state exceeds its power under Article I when it draws congressional districts in an "effort to 'dictate electoral outcomes' and 'disfavor a class of candidates.'" *Rucho*, 318 F. Supp. 3d at 937 (quoting *Thornton*, 514 U.S. at 833–34). As discussed above, since Ohio's map was drawn in an "effort to 'dictate electoral outcomes' and 'disfavor a class of candidates,'" *see supra*, it exceeds the state's power under Article I of the Constitution.

B. Plaintiffs have demonstrated standing for their Equal Protection, First Amendment and Article I claims. ................................................................. 36

1. Plaintiffs have standing to challenge each district for vote dilution under the Equal Protection Clause. ................................................................. 37

The direct and circumstantial evidence adduced in this case is more than sufficient to confer standing upon Plaintiffs for their vote-dilution claims. Plaintiffs submitted 1) testimonial evidence distinct from what the Court found inadequate in *Gill* and analogous to what the courts in Michigan and North Carolina deemed adequate; 2) evidence on hypothetical districts that un-crack or un-pack the challenged districts, in particular, a proposed remedial map that underscores that remedying cracked and packed districts is eminently possible; and 3) Plaintiff-specific analysis based on simulated maps that indicate not only whether a district is cracked or packed, but aids this Court in quantifying the degree of cracking and packing of each district.

a) *Gill* requires district-specific injury to support standing to challenge districts under the Equal Protection Clause. .................................................. 38

b) The Michigan and North Carolina partisan gerrymandering decisions flesh out the Gill standing requirement. ............................................ 39

c) Evidence adduced in this case is sufficient for a finding that Plaintiffs have standing to challenge each district. ........................................... 43

(1) Plaintiffs' testimony .................................................................. 43

(2) Hypothetical districts and plan ................................................. 45

(3) Simulated maps ....................................................................... 48

2. Plaintiffs Have Standing to Pursue Their First Amendment Claims. ................... 51

Plaintiffs have standing to bring their First Amendment claims. There are at least two distinct First Amendment injuries caused by partisan gerrymandering. First, it "purposefully dilut[es] the weight of certain citizens' votes to make it more difficult for them to achieve electoral success because of the political views they have expressed through their voting histories and party affiliations." *Shapiro*, 203 F. Supp. 3d at 595 (three-judge panel) (emphases omitted); *see also Rucho*, 318 F. Supp. 3d at 829. Partisan gerrymandering also burdens the "ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects." *Gill*, 138 S. Ct. at 1939. Based on these two distinct forms of harm, there are ample facts in the record that demonstrate First Amendment standing for each of the individual and organizational.

a) The Individual Plaintiffs Have Standing to Pursue Their First Amendment Claims. ..................................................................... 53

b) The Organizational Plaintiffs Have Standing to Pursue Their First Amendment Claims. ..................................................................... 57

(1) Plaintiff Organizations Have Standing in Their Own Right .................... 57

(2) Plaintiff Organizations Have Associational Standing on Behalf of Their Members. ........................................................................................ 61

3.  Plaintiffs Have Standing to Pursue Their Article I Claims. ................................. 64

In *Rucho*, the three-judge panel determined that the Plaintiffs also made out statewide injuries based on Article I. Plaintiffs in the instant case invoke Article I along the same lines— that is, the congressional map exceeds the Ohio legislature's "authority under the Elections Clause and usurps the power of 'the People' to elect their representatives." *Rucho*, 318 F. Supp. 3d at 831. Individuals have standing to bring such claims when litigants, as Plaintiffs here, have adduced evidence to support dilutionary and "additional non-dilutionary injuries, including injuries to their associational rights." *Rucho*, 318 F. Supp. 3d at 833.

4.  Plaintiffs' Injuries Are Fairly Traceable to the Challenged Map. ........................ 66

Defendants flatly ignore the proof offered by Plaintiffs in an effort to argue that the injuries suffered by Plaintiffs are not fairly traceable to the challenged congressional map. The Plaintiffs have consistently testified to the fact that it was the composition of the congressional map and the specific district lines at issue that caused the burden on their constitutional rights.

5.  Plaintiffs' Injuries Are Likely to Be Redressed By a Favorable Order of the Court ............................................................................................................. 66

"An injury is redressable if a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018). If this Court orders a new congressional map, it will clearly redress the injuries suffered by the Plaintiffs. Plaintiffs, of course, are not guaranteed a particular outcome when they cast their votes or seek to associate with likeminded voters. But this is also not what Plaintiffs seek to have redressed. What Plaintiffs seek is to have a map that treats voters fairly and does not penalize voters on the basis of their political preferences.

CONCLUSION .................................................................................................................... 67

# TABLE OF AUTHORITIES

## Cases

*Ala. Leg. Black Caucus v. Alabama*,
   135 S. Ct. 1257 (2015) ................................................................................ 10

*Allen v. State Bd. of Elections*,
   393 U.S. 544 (1969) .................................................................................... 33

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,
   389 F.3d 536 (6th Cir. 2004) ...................................................................... 57

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ................................................................ 2, 32, 34, 56

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) ............................................................................ 1, 8

*Baker v. Carr*,
   369 U.S. 186 (1962) .................................................................................... 36

*Bartlett v. Strickland*,
   556 U.S. 1 (2009) ................................................................................. 33, 34

*Benisek v. Lamone*,
   No. 1:13-cv-03233-JKB, 2018 WL 5816831 (D. Md. Nov. 7, 2018) ........... 3, 30, 35

*Bible Believers v. Wayne Cty.*,
   805 F.3d 228 (6th Cir. 2015) ...................................................................... 52

*Bond v. United States*,
   564 U.S. 211 (2011) .................................................................................... 65

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ...................................................................................... 2

*Bush v. Vera*,
   517 U.S. 952 (1996) .................................................................................... 11

*Cal. Democratic Party v. Jones*,
   530 U.S. 567 (2000) .................................................................................... 34

*City v. Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,
   538 U.S. 188 (2003) .................................................................................... 10

*Common Cause v. Rucho*,
   318 F. Supp. 3d 777 (M.D.N.C. 2018) ............................................... passim

*Common Cause/Georgia v. Billups,*
   554 F.3d 1340 (11th Cir. 2009) .......................................... 37

*Cook v. Gralike,*
   531 U.S. 510 (2001) ............................................................ 35

*Cooper v. Harris,*
   137 S. Ct. 1455 (2017) ................................................. 10, 11

*Crawford v. Marion Cty. Election Bd.,*
   553 U.S. 181 (2008) ............................................................ 32

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ............................................................ 51

*Davis v. Bandemer,*
   478 U.S. 109 (1986) ......................................................... 4, 9

*Doe v. DeWine,*
   910 F.3d 842 (6th Cir. 2018) ............................................. 66

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................ 29

*Evans v. Cornman,*
   398 U.S. 419 (1970) ............................................................ 34

*Fair Elections Ohio v. Husted,*
   770 F.3d 456 (6th Cir. 2014) ............................................. 57

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
   204 F.3d 149 (4th Cir. 2000) ............................................. 37

*Friends of Tims Ford v. Tennessee Valley Auth.,*
   585 F.3d 955 (6th Cir. 2009) ........................................ 45, 61

*Gaffney v. Cummings,*
   412 U.S. 735 (1973) .............................................................. 8

*Georgia v. Ashcroft,*
   539 U.S. 461 (2003) ............................................................ 34

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ............................................... passim

*Harris v. Ariz. Indep. Redistricting Comm'n,*
   136 S. Ct. 1301 (2016) ....................................................... 27

*Harris v. Cooper*,
  138 S. Ct. 2711 (2018) ................................................................................. 5

*Harris v. McCrory*,
  No. 1:13-cv-949, 2016 WL 3129213 (M.D.N.C. June 2, 2016) ................................. 5

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................. 57

*Hazelwood Sch. Dist. v. United States*,
  433 U.S. 299 (1977) ................................................................................. 7

*Ill. State Bd. of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979) ................................................................................. 26

*In re Commercial Money Ctr., Inc.*,
  737 F. Supp. 2d 815 (N.D. Ohio 2010) ........................................................... 6

*Innovation Ventures, LLC v. NVE, Inc.*,
  90 F. Supp. 3d 703 (E.D. Mich. 2015) ........................................................... 6

*Jenness v. Fortson*,
  403 U.S. 431 (1971) ................................................................................. 8

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ................................................................................. 46

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
  266 F.3d 164 (3d Cir. 2001) ..................................................................... 37

*Karcher v. Daggett*,
  462 U.S. 725 (1983) ................................................................................. 8

*LaFleur v. Whitman*,
  300 F.3d 256 (2d Cir. 2002) ..................................................................... 37

*Lance v. Coffman*,
  549 U.S. 437 (2007) ................................................................................. 65

*League of United Latin American Citizens v. Perry*,
  548 U.S. 399 (2006) ............................................................................. 19, 20

*League of Women Voters of Mich. v. Johnson*,
  No. 2:17-cv-14148, 2018 WL 6257476 (E.D. Mich. Nov. 30, 2018) ....................... passim

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ..................................................................... 65

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................ 36

*Luna v. Cty. of Kern*,
   291 F. Supp. 3d 1088 (E.D. Cal. 2018) ........................................... 6

*Mayor of Phila. v. Educ. Equal. League*,
   415 U.S. 605 (1974) .......................................................................... 7

*McCutcheon v. Fed. Election Comm'n*,
   572 U.S. 185 (2014) .................................................................... 8, 29

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
   725 F.3d 571 (6th Cir. 2013) ........................................................ 57

*Ne. Fla. Chapter of AGC of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993) .................................................................. 52, 67

*Norman v. Reed*,
   502 U.S. 279 (1992) ........................................................................ 34

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ...................................................... 2, 8

*Pacheco v. Johnson*,
   No. 3:11-cv-00221, 2017 WL 3149580 (M.D. Tenn. July 25, 2017) .................. 6

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ........................................................................ 33

*Shapiro v. McManus*,
   203 F. Supp. 3d 579 (D. Md. 2016) ............................................... 51

*Sierra Club v. Franklin Cty. Power of Ill., LLC*,
   546 F.3d 918 (7th Cir. 2008) ........................................................ 37

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) ........................................................ 37

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*,
   73 F.3d 546 (5th Cir. 1996) .......................................................... 37

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986) ........................................................................ 52

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ........................................................ 65

x

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995)..................................................................................... 35, 64

*United States v. City of Euclid*,
580 F. Supp. 2d 584 (N.D. Ohio 2008)................................................................ 6

*United States v. Euclid City Sch. Bd.*,
632 F. Supp. 2d 740 (N.D. Ohio 2009)................................................................ 7

*Vieth v. Jubelirer*,
541 U.S. 267 (2004)............................................................................... passim

*Warth v. Seldin*,
422 U.S. 490 (1975)..................................................................................... 37

*Whitford v. Gill*,
218 F. Supp. 3d 837 (W.D. Wisc. 2016)..................................................... 4, 9, 30

*Williams v. Rhodes*,
393 U.S. 23 (1968)................................................................................... 32, 52

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)................................................................................... 32

## Rules

Fed. R. Civ. P. 56 ........................................................................................ 3

## Statutes

52 U.S.C. § 10304 ...................................................................................... 34

Ohio Rev. Code § 103.51 .............................................................................. 14

## Other Authorities

U.S. Const. art. I, § 2, cl. 1 .......................................................................... 35

U.S. Const. art. I, § 4, cl. 1 .......................................................................... 35

Pursuant to Federal Rules of Civil Procedure 56, Plaintiffs respectfully submit this memorandum of law in support of their opposition to Defendants' and Intervenors' motions for summary judgment.  Defendants and Intervenors are moving for summary judgment on the grounds that Plaintiffs' claims are non-justiciable and that Plaintiffs lack standing to bring their claims.  None of their arguments have merit, and their motions should be denied.

## INTRODUCTION

Ohio's congressional districts were drawn for the purpose of locking in a Republican supermajority impervious to normal electoral swings.  The map has had precisely that effect: despite significant swings in the two major parties' statewide share of votes for U.S. Congress, a 12-4 Republican to Democratic supermajority has remained frozen in place.  This kind of partisan gerrymandering violates "the core principle of republican government . . . that the voters should choose their representatives, not the other way around."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (internal quotation marks omitted). Rather than reflecting voters' dynamic or evolving preferences, elections under gerrymandered systems, like Ohio's congressional map, systematically lock in candidates from the legislators' preferred party, and discourage electoral competition.  "Put differently, by intentionally seeking to entrench a favored party in power and make it difficult—if not impossible—for candidates of parties supporting disfavored viewpoints to prevail, partisan gerrymandering 'seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.'" *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 800–01 (M.D.N.C. 2018) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994)).

Partisan gerrymandering violates several provisions of the Constitution.  By entrenching the party in power and insulating it from meaningful accountability to the electorate, partisan

gerrymandering substantially burdens voters' fundamental rights, including (1) the Fourteenth Amendment right to equal protection and treatment under the law, *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012); (2) the First Amendment right to associate for the advancement of political beliefs, to express political views, and to participate in the political process, *see Anderson v. Celebrezze*, 460 U.S. 780, 787, 793-94 (1983); and (3) the First and Fourteenth Amendment right to "cast a meaningful vote," *Burdick v. Takushi*, 504 U.S. 428, 445 (1992) (Kennedy, J., dissenting). Not only does partisan gerrymandering violate citizens' rights under the Constitution, it also goes beyond the powers granted to states under Article I.

Defendants and Intervenors make two primary arguments in support of their summary judgment motion. The first is that Plaintiffs have failed to define a manageable standard for their partisan gerrymandering claims and therefore their claims are non-justiciable. This argument fails since, partisan claims are justiciable and there are manageable standards by which courts can and have adjudicated them. As more fully outlined below, Plaintiffs' proposed standard is straightforward: the Constitution is violated when a party seeks to entrench its seat share against all likely outcomes by cracking and packing opposition party voters. In this case, where the Republicans have obtained 75% of the seats, even as their vote share has fluctuated between 51% and 59% over four election cycles, there is no question that this standard is met. Their second argument is that Plaintiffs lack standing to bring their claims. This argument also fails. During discovery, Plaintiffs adduced ample evidence for the Court to find that they have standing to bring both their district specific claims (denial of Equal Protection and denial of the right to vote) and their state-wide claims (violation of the First Amendment and violation of Article 1).

"When evaluating a motion for summary judgment, the court must 'view[ ] [the evidence] in the light most favorable to the party opposing the motion.'" *League of Women*

*Voters of Mich. v. Johnson* ("*LWV-Michigan*"), No. 2:17-cv-14148, 2018 WL 6257476, at *4

(E.D. Mich. Nov. 30, 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986)) (alterations in original).  "The Court must also 'draw all reasonable

inferences' in favor of the non-moving party."  *Id.*  (quoting *Babcock & Wilcox Co. v.

Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017)).  Summary judgment is only granted when

there are no genuine issues of material fact and the movant is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  Defendants and Intervenors fail to meet such a high burden and their

motion should be denied.

## ARGUMENT

### A.    Plaintiffs' Claims Are Justiciable and There Are Manageable Standards for Deciding Their Claims

#### 1.    Four three-judge panels have recently held that partisan gerrymandering claims are justiciable

Defendants and Intervenors revive Defendants' claims on non-justiciability from

Defendants' motion to dismiss the complaint.  *See* ECF No. 46.  The law has not changed in

Defendants' favor since they last made this claim:  The Supreme Court still has not held that

partisan gerrymandering claims are non-justiciable, and several federal courts have recently

found such cases to be justiciable.  Since Defendants made the same argument in their motion to

dismiss over the summer, three separate federal three-judge panels have found partisan

gerrymandering claims to be justiciable.  *See LWV-Michigan*, 2018 WL 6257476, at *14 ("The

Court finds that Plaintiffs' Fourteenth Amendment and First Amendment partisan

gerrymandering claims are justiciable because judicially manageable standards exist to

adjudicate these claims."); *Benisek v. Lamone*, No. 1:13-cv-03233-JKB, 2018 WL 5816831, at

*1–2 (D. Md. Nov. 7, 2018) (holding that plaintiffs had proved as a matter of law "that

Maryland's 2011 redistricting law violates the First Amendment by burdening both the plaintiffs'

3

representational rights and associational rights"); *Rucho*, 318 F. Supp. 3d at 838 (holding that "under controlling Supreme Court precedent, a challenge to an alleged partisan gerrymander presents a justiciable case or controversy"). Another three-judge panel in Wisconsin's Western District previously found partisan gerrymandering claims to be justiciable. *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wisc. 2016), *rev'd on other grounds*, 138 S. Ct. 1916 (2018). Thus, a total of four separate three-judge panels in courts across this country have found partisan gerrymandering claims to be justiciable and for the claims to be judicially manageable.

In the recent *LWV-Michigan* and *Rucho* decisions, the courts explicitly addressed the question of whether Supreme Court precedent foreclosed partisan gerrymandering claims as non-justiciable for lack of a manageable standard, and both courts found that under "controlling Supreme court precedent" that partisan gerrymandering claims are justiciable. *Rucho*, 318 F. Supp. 3d at 838; *see also LWV-Michigan*, 2018 WL 6257476, at *14 ("The Supreme Court has never overturned *Bandermer*'s [sic] holding that political gerrymandering claims are justiciable."). As these courts rightly found, the Supreme Court's central holding in *Davis v. Bandemer*, that partisan gerrymandering claims are justiciable, has not been overturned. 478 U.S. 109, 113 (1986). In *Vieth v. Jubelirer*, while Justice Kennedy concurred in the judgment that the plaintiffs in the case could not make a claim of partisan gerrymandering, he did not concur in the opinion. 541 U.S. 267, 316 (2004). Justice Kennedy in his opinion stated that *Bandemer* was "controlling precedent on the question of justiciability." *Id.* at 310 (Kennedy, concurring in the judgment). He was joined in this opinion by four other justices on the court. *See id.* at 317 (Stevens, J., dissenting) ("[F]ive Members of the Court . . . share the view that, even if these appellants are not entitled to prevail, it would be contrary to precedent and

profoundly unwise to foreclose all judicial review of similar claims that might be advanced in the future.").[1]

In *Gill v. Whitford*, the Supreme Court expressly declined to address the question of justiciability of partisan gerrymandering claims. 138 S. Ct. 1916, 1929 (2018); *see also Rucho*, 318 F. Supp. 3d at 837–38 ("And the Supreme Court's most recent partisan gerrymandering decision, *Gill*, expressly declined to address the justiciability of such claims.") As they did in their motion to dismiss, Defendants once again misconstrue the Supreme Court's summary affirmance in *Harris v. Cooper*, 138 S. Ct. 2711 (2018). As Plaintiffs argued in their Opposition to Defendants' Motion to Dismiss, *see* ECF No. 54, *Harris* was limited to the particular facts and posture of that case. *Harris* did not stand for any categorical proposition that partisan gerrymandering claims are non-justiciable. The court was explicit that it denied "plaintiffs' objections <u>as presented to this Court</u>," and that the denial "<u>does not</u> constitute or imply an endorsement of, or foreclose any additional challenges to, the Contingent Congressional Plan." *Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 3129213, at *1 (M.D.N.C. June 2, 2016), *aff'd sub nom. Harris v. Cooper*, 138 S. Ct. 2711 (emphasis in original). Under controlling Supreme Court precedent, partisan gerrymandering claims are justiciable and as outlined further below, Plaintiffs propose manageable standards to adjudicate their claims.

The judicially manageable standards are legal standards to the Plaintiffs' claims and not metrics based on social science research and empirical analysis, as suggested by Defendants and Intervenors. The metrics themselves serve as *evidence* to support Plaintiffs' claims. *LWV-Michigan*, 2018 WL 6257476, at *16 ("Plaintiffs provide social science analyses as evidence to support their constitutional claims."). *LWV-Michigan* and *Rucho* also considered whether it is

---

[1] Even the plurality opinion written by Justice Scalia found partisan gerrymandering to be "incompatib[le] . . . with democratic principles." *Vieth*, 541 U.S. at 292 (plurality op.).

the role of experts to propose a manageable standard for adjudicating these claims, and both

rejected the contention.  *Id.* ("At this stage in the case, the Court is similarly unpersuaded by

Johnson's argument that Plaintiffs cannot show a judicially manageable standard because they

rely on social science data to support their claims."); *Rucho*, 318 F. Supp. 3d at 855 (finding

defendants' contention that plaintiffs' experts social science and empirical evidence had failed to

provide a judicially manageable standard "fail[ed] as a matter of fact and law").  These courts'

holdings are well within federal precedent.

First, experts are barred from offering legal conclusions.  Courts routinely strike expert

testimony for providing legal opinion rather than factual expert opinion.  *See, e.g.*, *Pacheco v.

Johnson*, No. 3:11-cv-00221, 2017 WL 3149580, at *2 (M.D. Tenn. July 25, 2017) (holding that

the expert may not "opine as to any ultimate conclusions"); *Innovation Ventures, LLC v. NVE,

Inc.*, 90 F. Supp. 3d 703, 722 (E.D. Mich. 2015) (finding that the expert will not "be permitted to

opine on the ultimate issue in this case"); *In re Commercial Money Ctr., Inc.*, 737 F. Supp. 2d

815, 830 (N.D. Ohio 2010) ("[T]his Court will not permit expert witnesses to express legal

conclusions, or opine as to ultimate issues of fact.").

Second, courts routinely use empirical analysis as evidence to support litigants' claims.

For example, three different statistical tests are used in racial vote dilution cases: homogeneous

precinct analysis, ecological regression, and ecological inference.  *United States v. City of

Euclid*, 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008) ("Statistical evidence of racial bloc voting

may be established by three analytical models: homogenous precinct analysis ('HPA'), bivariate

ecological regression analysis ('BERA'), and King's ecological inference method ('King's EI

method')."); *see also Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1117–18 (E.D. Cal. 2018)

("Courts have relied on three statistical methodologies to determine whether minority voters vote

cohesively: homogeneous precinct analysis, ecological regression, and ecological inference."). Courts have routinely relied on all three tests when determining whether the second *Gingles* precondition of racial cohesion has been met; *cf. United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 746 n.6 (N.D. Ohio 2009) (stating that ecological inference and ecological regression are often both used by courts).  Also, courts regularly use empirical metrics as evidence of discriminatory effect and discriminatory intent.  *See Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 620 (1974) ("Statistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination in access to service on governmental bodies."); *LWV-Michigan*, 2018 WL 6257476, at *16 ("[T]he Supreme Court has relied on statistical and social science evidence as proof that a government action was motivated by discriminatory intent or had a discriminatory effect." (quoting *Rucho*, 318 F.Supp.3d at 853); *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) (finding evidence of "gross statistical disparities" between the challenged conduct and neutral conditions can constitute prima facie evidence of discriminatory intent and discriminatory effect).

Last, it is not the role of experts to tell the Court when partisanship becomes too much. Rather as the court found in *LWV-Michigan* and *Rucho*, the legal standard determines when political data and partisanship has been used for an invidious purpose and is thus barred by the Constitution.  *LWV-Michigan*, 2018 WL 6257476, at *14 (holding that the appropriate question is not "how much politics is too much in redistricting?" but rather whether partisanship was used for "the sole purpose of diminishing the electoral power of voters who supported or are likely to support a disfavored party or candidate."  (quoting *Rucho*, 318 F. Supp. 3d at 844, 851)). Plaintiffs contend that entrenching a political party's seat share against all likely electoral outcomes is an invidious purpose and never acceptable.  *Cf. Ariz. State Legislature v. Ariz.*

*Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) ("[P]artisan gerrymandering [is] the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power."). Plaintiffs' proposed entrenchment standard asks in essence, whether a redistricting plan has made it virtually impossible for voters to "throw the bums out." An entrenched system is "invidiously discriminatory" when district lines "are employed 'to minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973) (citations omitted).

The entrenchment standard limits judicial intervention to only those instances where it is necessary to protect the "responsiveness [that] is key to the very concept of self-governance through elected officials." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 227 (2014). It prohibits legislatures from enacting plans with the intent and effect of "freez[ing] the status quo . . . [against] the potential fluidity of American political life," *Jenness v. Fortson*, 403 U.S. 431, 439 (1971). This standard is manageable.

> **2. Plaintiffs propose a manageable standard to adjudicate their claims under the Equal Protection Clause**

Courts have long held that a "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Obama for Am.*, 697 F.3d at 428 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). "If [district lines] serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection." *Karcher v. Daggett*, 462 U.S. 725, 748 (1983). "Partisan gerrymandering runs afoul of the Equal Protection Clause because, by seeking to diminish the electoral power of supporters of a disfavored party, a partisan gerrymander treats individuals who support candidates of one

political party less favorably than individuals who support candidates of another party." *Rucho*, 318 F. Supp. 3d at 860–61.

In *Bandemer*, the Supreme Court found partisan gerrymandering claims justiciable under the Equal Protection Clause. 478 U.S. at 113. Since then, three separate three-judge panels have found partisan gerrymandering claims justiciable under the Fourteenth Amendment's Equal Protection Clause, using a three-part test. *LWV-Michigan*, 2018 WL 6257476, at *15–*16 (describing the three-part test for partisan gerrymandering claims under the Equal Protection Clause); *see also Rucho*, 318 F. Supp. 3d at 838 (discussion of justiciability and equal protection claims); *Gill*, 218 F. Supp. 3d at 884 (finding that plaintiffs could bring a partisan gerrymandering claim under the Equal Protection Clause). Plaintiffs respectfully submit that this Court should adopt a similar three-prong test. The first prong is (1) whether the legislature acted with an improper legislative *intent* to discriminate in favor of the state's preferred political party by securing partisan advantage on its behalf, *i.e.*, whether intent to discriminate was a motivating factor[2] and (2) whether the resulting map had an impermissible *effect* of entrenching partisan advantage against likely changes in voter preference. If these two elements are satisfied, then (3) the burden shifts to the state to demonstrate that the impairment of Equal Protection rights is necessary to advance legitimate state interests.

---

[2] The courts in *Common Cause v. Rucho* and *League of Women Voters of Michigan v. Johnson* adopted a "predominant purpose standard." *See supra* Section A.3.(b). For reasons outlined below, Plaintiffs do not advocate that a predominant purpose standard be adopted by this Court. Nevertheless, under the facts in the record, Plaintiffs can meet both the standard they propose here and the predominant purpose standard proposed in *Rucho* and *LWV-Michigan*.

3.     **There are sufficient facts in the record from which this Court could find that Plaintiffs' right to equal protection were infringed by Ohio's U.S. Congressional map.**

a)     *There are sufficient facts in the record from which the Court could find that Defendants acted with a discriminatory intent.*

As a threshold matter, *Rucho* explicitly allowed the plaintiffs to adduce both statewide and district specific evidence in support of their claims that the redistricting plans violated the Equal Protection Clause.  *Rucho*, 318 F. Supp. 3d at 868 ("Plaintiffs can—and do—rely on statewide evidence to prove their partisan vote dilution claims.").  This finding is consistent with Supreme Court precedent in other areas where courts use statewide evidence to support district specific claims.  *See, e.g.*, *Ala. Leg. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) ("Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district.").  This finding is also consistent with Justice Kagan's opinion in *Gill*.  *Gill*, 138 S. Ct. at 1937 (Kagan, J., concurring) (stating that the district court "can consider statewide (as well as local) evidence" in deciding the equal protection claim)

The intent to secure partisan advantage can be established through direct and circumstantial evidence.  Contemporaneous statements have been used by the Supreme Court as evidence of an improper purpose.  *See Cooper v. Harris*, 137 S. Ct. 1455, 1468–69, 1475–75 (2017); *see also City v. Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196–97 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative."); *Rucho*, 318 F. Supp. 3d at 862 ("[T]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)).  Use of

demographic data, including partisanship data, may be probative of partisan intent. *See Vieth*, 541 U.S. at 322 (Stevens, J., dissenting) (noting that "excessive weight on data concerning party voting trends" during the redistricting process can be evidence of discriminatory intent); *cf. Bush v. Vera*, 517 U.S. 952, 970–71 (1996) (relying on the legislature's use of detailed racial data in the districting process to affirm a finding of discriminatory intent). "'The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes,' including whether the legislative process involved '[d]epartures from the normal procedural sequence.'" *Rucho*, 318 F. Supp. 3d at 862 (quoting *Arlington Heights*, 429 U.S. at 266)); *see also Cooper*, 137 S. Ct. at 1469 (relying on evidence of procedural irregularities in affirming the district court's conclusion regarding the mapmaker's intent—specifically, that the mapmaker "deviated from the districting practices he otherwise would have followed" to carry out legislators' instructions). Multiple pieces of evidence in the record suggest that Ohio's congressional map was drawn with an intent to entrench a Republican majority.

First, contemporaneous statements in the record support a finding that Ohio's map was drawn with an intent to entrench a Republican majority in Ohio's congressional delegation. ██

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ On September 7, 2011, prior to the introduction of Ohio's first congressional map, national Republicans circulated talking points to Ohio Senate President, Thomas Niehaus, stating that Republicans were seeking to "lock down" 12 Republican seats, and these talking points were circulated among other Ohio legislators and staffers as well. Pls.' Resp. ¶ 215.

On the floor of the General Assembly, prior to the passage of HB 369, Democratic legislators noted that the map would entrench a 12-4 advantage for Republicans and complained that the lines had been drawn in a manner that divided heavily minority communities, including Cuyahoga and Lorain counties. Pls.' Resp. ¶ 242. These members were concerned with both the splits of these counties and the partisan tilt of the map as a whole. *Id.* Democrats in the Ohio Senate similarly spoke out against HB 369 when it was introduced in the Senate on December 14, 2011. *Id.*

Second, the map drawers' use of partisan data suggests an intent to entrench the Republican majority. The map drawers were provided with election results data by national Republicans, and this data was uploaded to the map drawing software and used by the map drawers to create political indices. Pls.' Resp. ¶ 223. By July 2011, national Republican operatives working on the map were already using various political indices to "score" the political leanings of proposed congressional district maps. *Id.* ¶ 214. The scoring of these districts would have indicated to Republicans at the time that their proposed districts would withstand even unfavorable election cycles. *Id.* ¶¶ 218–19.

In scoring the maps, the map drawers used several Democratic leaning indices so that they could be confident that districts would not switch over to Democratic control during a year that favored Democratic candidates. *Id.* ¶¶ 218–19. The first was called the Unified Index. *Id.* It was composed of results from the following five races: 2004 President, 2006 Auditor, 2006 Attorney General, 2008 President, and 2010 Governor. *Id.* ¶ 218. This particular selection of races tilted more Democratic than the complete set of elections that took place over the full decade preceding the redistricting. *Id.* In addition to the Unified Index, McCain '08 election results in Ohio were used as an index. *Id.* ¶ 219. Since it was based on President Obama's

12

defeat of John McCain in 2008, the McCain '08 index reflected a strong Democratic outcome. *Id.* Last, national Republicans also used the Partisan Vote Index ("PVI") to score districts. *Id.* ¶ 220.

Republicans used a program called Maptitude to draw the congressional map. *Id.* ¶ 221. Maptitude enables a map drawer to see the specific scorings of sub-portions of a draft district, as well as its relative Republican or Democratic strength, as the district is being drawn. As Republicans made changes to draft maps in Maptitude, they could see, in real time, scoring of the proposed districts and share the scoring widely among both national and Ohio Republicans. *Id.* ¶ 222.

Charts were also created that reflected the scoring of draft congressional districts using the various indices. *Id.* ¶ 223. Political scoring of the draft maps was given to local Ohio Republicans and to national Republicans, including Republican incumbents from Ohio's U.S. congressional districts. *Id.* ¶ 224. Political data was shared for both the initial Ohio congressional map (HB 319) and the final Ohio congressional map (HB 369). *Id.*; *see also* Second Am. Compl., ECF No. 37 (providing a description of the passage of Ohio's congressional map). Prior to its enactment, Republicans shared comparisons of HB 319 and HB 369. *Id.* The analysis illustrated that HB 369 would be a 12-4 map, like HB 319 had been. *Id.*

Third, the sequence of events leading up to the enactment of HB 369 suggests that the intent was to entrench a Republican majority. Ohio's congressional map was drawn in secret by a combination of in-state Republican operatives and national Republican actors. Under Ohio law, the state General Assembly has the primary authority for drawing Ohio's U.S. congressional districts, and the bipartisan Joint Legislative Task Force on Redistricting, Reapportionment, and

Demographic Research ("Task Force") is tasked with advising the General Assembly.  *See* Ohio Rev. Code § 103.51.  The Task Force is a six-person bipartisan committee, with three members appointed by the Speaker of the Ohio House of Representatives and three by the President of the Ohio State Senate.  *See id.*  Despite no official role for national Republicans in the drawing of Ohio's congressional map, national Republicans, especially then-Speaker John Boehner and his designee Tom Whatman, communicated their specific objectives to the leadership of the Ohio legislature—who indicated their desire to accommodate those objectives.  Pls.' Resp. ¶¶ 210–212.  The map drawers also took direction that was informed by the analysis of national Republican operatives including John Morgan, Adam Kincaid and Thomas Hofeller.  *Id.*

Not only was the map exclusively drawn by Republicans, it was done largely in secret. Beginning in July 2011, the redistricting operations were based out of a -rented hotel room at the DoubleTree Hotel in Columbus, Ohio.  *Id.* ¶¶ 226–27.  The room was nicknamed "the bunker" by the map drawers, and access was restricted to three local Republican operatives and their Republican invitees. *Id.*  It is in the "bunker" where the first version of the map, passed as HB 319 was initially drawn.[3]  *Id.*  Republican lawmakers were invited to come to the bunker and attend meetings where drafts of the map and the accompanying political data were shared.  *Id.*

There were five public hearings held by Ohio's Senate Select Committee on Redistricting and Ohio's House Committee on Redistricting.  *Id.* ¶¶ 230–31.  These hearings were held in July and August 2011, after work on draft maps had begun in the bunker.  *Id.*  No maps were considered at the public hearings regarding congressional redistricting.  *Id.*  Nor were any maps or indices available at the hearings.  *Id.*  Further, the committees had no responsibility beyond hearing testimony at these hearings.  *Id.*

---

[3] The bunker was only used in the drawing of HB 319.  However, since there were only minor changes from HB 319 to HB 369, the lions' share of Ohio's map was drawn in the bunker.

The map was "held in the can" after it was drafted until September 13, 2011.  *Id.* ¶ 233.

Members of the General Assembly—even Republican members—were largely kept in the dark

about the content of the maps until the end of the process.  *Id.* ¶ 232There were no negotiations

between Democrats and Republicans regarding HB 319.  *Id.* ¶ 234.  The Democratic Minority

Leader in the Ohio House, Armond Budish stated that "the map was drawn by Republicans in

secret behind closed doors with no meaningful input whatsoever from members of the public,

and now the map is being rammed through the House in just a couple of days in order to prevent

any meaningful input from anyone else. . . ."  *Id.*  Other Democrats also complained about how

the map was introduced, with a vote scheduled only two days after the map was introduced.  *Id.*

Not only did the Democratic leadership not have any input into the map, but many of Ohio's

Republican legislators had little input into the map.  Keith Faber, the Senate floor manager of HB

319, testified that he was given, at the last minute, a map that he was asked to support.  *Id.* ¶ 236.

The proposed map was shared with the Democratic leadership just before it was introduced.  *Id.*

¶ 235.

  The creation and passage of HB 369 shared many of the same procedural irregularities as

HB 319.  *Id*. ¶ 238.  Like HB 319, HB 369 was drawn by Republicans and only shared with the

public after it was introduced in November 2011.  *Id.*.  While there were some limited

negotiations with Democrats over HB 369 after its introduction, these negotiations did not result

in material changes to the partisan breakdown of HB 369.  *See id.* ¶ 239.  HB 369 was a 12-4

map when it was introduced into General Assembly and when it was passed by the General

Assembly.  *Id.*  Democrats were hampered in negotiations because they did not have sufficient

votes to defeat the map.  Defendant Larry Obhof, who was in the Ohio Senate at the time has

stated: "While a lot of Democrats voted for the current map, they really didn't have a lot of

negotiating power at that stage, because there was always the opportunity to say hey work with us and we'll do a slightly better map, or we'll do what we want and pass it with 51% of the vote." *Id.* ¶ 240; *see also id.* ¶ 241 (Batchelder has stated that "Their theory was somehow or another that they could overcome a majority of people who were in the other party, and I don't know how that would have happened."). Accordingly, during the course of the negotiations the Republicans made clear that the 12-4 split was non-negotiable. Further, Democrats spoke out against the map, including Representative Ron Gerberry, the ranking Democrat on the House State Government and Elections Committee, who complained that more people should have been involved in the map drawing process. *Id.* ¶ 242. The facts support a finding that Ohio's congressional map was drawn with intent to advantage and entrench the Republican majority.

Courts have recognized that expert testimony about the partisan skew of a map can also constitute circumstantial evidence of discriminatory intent. For example, changes in the partisan bias numbers before and after redistricting can be evidence of discriminatory intent. *See, e.g.*, *Rucho*, 318 F. Supp. 3d at 895 (discussing Dr. Simon Jackman's finding that the "efficiency gaps" under the new redistricting plan "were significantly higher than those exhibited" by the old plan). Running many computer simulations to determine whether the enacted plan is an outlier and thus could only have resulted from an intent to advantage a particular political party also has been found to be evidence of discriminatory intent. *Id.* at 852–53 (agreeing with plaintiffs that "extreme statistical outlier" helps prove that the legislature "intended to burden voters who supported non-Republican candidates").

Here, multiple pieces of expert evidence support a finding of discriminatory intent. First, Dr. Niven's analysis illustrates that Republicans mapmakers split political subdivisions and communities of interest to crack and pack Democratic voters to optimize Republican seats in

Congress. Pls.' Resp. ¶¶ 244–46.  His analysis shows that census tracts are split by congressional district lines 59% more times than in the previous map.  *Id.* ¶ 245.  His analysis also shows that there is a specific pattern in HB 369 of splitting Democratic-leaning cities, neighborhoods, and counties and incorporating the pieces in the creation of Republican congressional districts.  *Id.*  Second, Dr. Warshaw's analysis further supports a finding of partisan intent.  *Id.* ¶ 246.  Dr. Warshaw finds that four different partisan bias metrics all became significantly more pro-Republican in 2012 after HB 369 went into effect, suggesting an intent to advantage Republicans.  *Id.*  Third, Dr. Cho's analysis demonstrates that it is highly unlikely that a map reflecting as much extreme partisan unfairness as the challenged map could have been produced unintentionally.  *Id.* ¶¶ 247–50.  Dr. Cho uses a computer algorithm to generate simulated congressional maps that adhered to the traditional, nonpartisan districting principles.  *Id.* ¶ 247.  The algorithm generated a sample set of over three million viable simulated congressional maps, each of which was drawn without the influence of partisan intent.  *Id.* ¶ 248.  By comparing the challenged map against the simulated maps, Dr. Cho "determine[d] whether the partisan effect of the challenged map is to be expected given the underlying geography and population settlement patterns or if it is unusual among the set of non-partisan maps."  *Id.* ¶ 249.  The expert evidence, thus, further supports a finding that Ohio's map was drawn with the intent to advantage Republicans.

> b)     *There is sufficient evidence in the record to find that Plaintiffs also met the predominance test.*

In *LWV-Michigan* and *Rucho*, the courts adopted the predominant purpose test for the intent prong, "under which 'a congressional district amounts to an unconstitutional partisan gerrymander only if the legislative body's predominant purpose in drawing the district was to subordinate the interests of supporters of a disfavored party and entrench a representative from a

favored party in power.'" *LWV-Michigan*, 2018 WL 6257476, at *16 (quoting *Rucho*, 318 F. Supp. 3d at 852). However, as the court in *Rucho* noted, there are precedential reasons not to adopt the predominance test. The Supreme Court in *Bandamer* did not require predominant purpose to establish a partisan gerrymandering case. *Rucho*, 318 F. Supp. 3d at 863 (noting that in *Bandemer* the Supreme Court "required proof of 'intentional discrimination against an identifiable political group'" and not predominance (quoting *Bandamer*, 478 U.S. at 127)). Also, predominance is not required under the *Arlington Heights*-line of equal protection cases. *Id.* ("[T]he Supreme Court held that a plaintiff generally need not prove that a legislature took a challenged action with the 'sole,' 'dominant,' or 'primary' purpose of discriminating against an identifiable group" (quoting *Arlington Heights*, 429 U.S. at 265–66)). Also, the predominance standard comes from racial gerrymandering cases and the Supreme Court has found these cases to be analytically distinct from vote dilution claims. *Id.* ("[T]he Supreme Court expressly has characterized Shaw-type racial gerrymandering claims as "'analytically [distinct]' from a vote dilution claim." (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). For these reasons, Plaintiffs assert that predominance should not be required.

Nevertheless, Plaintiffs can meet the predominance standard. There is ample evidence in the record that the predominant purpose of the Ohio congressional plan was to intentionally advantage Republicans and disadvantage Democrats. As discussed above, Dr. Cho's simulated map analysis is a strong indicator that partisan advantage was the primary explanation for HB 369. The record is also replete with evidence that the Republicans wanted a 12-4 map and subordinated other interests in order to meet this goal. Since Ohio was losing two congressional seats only two sets of incumbents had to be paired. Pls.' Resp. ¶ 339. The plan, however, paired three sets of incumbents instead of two. *Id.* ¶ 340. A key to ensuring Republican control and a

12-4 map was the creation of the "Franklin Sinkhole." *Id.* ¶¶ 228–29.  A new Democratic district without an incumbent was created in Franklin county.  *Id.*  It was done to increase the Republican lean of neighboring districts and thus ensuring that those districts did not become competitive.  *Id.*  The Democratic parts of the county from which this new district was made was referred to by one of the Republican operatives drafting and consulting on Ohio's map as "dog meat" territory.  *Id.*  With the creation of a new district with no incumbent in Franklin County, three sets of incumbents rather than two sets of incumbents had to be paired.  Thus, the HB 369 map paired one set of Democratic incumbents in the 9th District, one set of Republican incumbents in the 10th District, and a Republican and Democratic incumbent in the 16th District. The Franklin Sinkhole is just one example of how the partisan goal of entrenching a 12-4 majority predominated over other criteria.

While two courts have adopted a predominance standard, no courts have adopted a "sole" factor standard.  There is no basis for Intervenor's overreaching suggestion that the only way that the intent prong satisfied is if it is the "sole" factor that determines how "every line" in a map is drawn.  In *League of United Latin American Citizens v. Perry* ("*LULAC*"), Justice Kennedy explicitly rejected plaintiffs proposed test, which he described thusly:  "A rule, or perhaps a presumption, of invalidity when a mid-decade redistricting plan is adopted solely for partisan motivations is a salutary one, in appellants' view, for then courts need not inquire about, nor parties prove, the discriminatory effects of partisan gerrymandering—a matter that has proved elusive since *Bandemer*."  548 U.S. 399, 417 (2006).  Instead Justice Kennedy stated: "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: show a burden, as measured by a

reliable standard, on the complainants' representational rights." *Id*. at 418. As discussed *infra*, Plaintiffs test does what Kennedy required.

> c) *There are sufficient facts in the record from which the Court could find that Ohio's congressional map had a discriminatory effect.*

Plaintiffs have offered several pieces of evidence of discriminatory effects. First, the actual election results are probative evidence of discriminatory effects, as demonstrated by the map keeping its 12-4 Republican to Democrat seat share, despite changes in overall vote received by each party. Second, the partisan bias metrics also show discriminatory effects. These metrics show that Ohio's map has consistently had a pro-Republican bias as measured by four different metrics in all four elections held under the map. Third, the simulations by Dr. Cho show the discriminatory effects of Ohio's congressional plan. Dr. Cho's simulations show that Plaintiffs could have been placed in districts where they would have had more opportunity to elect candidates of their choice.

First, Ohio's elections have illustrated the discriminatory effect of HB 369. Pls.' Resp. ¶¶ 251–65. Republicans have won the same 12 districts in all four election cycles. *Id.* Their seat share consistently has been 75%, despite winning far less than 75% of Ohio's congressional vote. *Id.* The following table shows how, despite fluctuations in the statewide vote share between the parties,[4] Republicans consistently retained 75% (12 out of 16) of the seats in all three congressional election cycles held under the map:

---

[4] The percentage of the statewide vote share in this table includes two uncontested elections (District 8 and 11) in 2012, and one uncontested election (District 7) in 2014. Such elections overstate the support the party with an unopposed candidate would receive if there had been a contested election.

| | Statewide vote share | | Seat share | |
|---|---|---|---|---|
| Year | Democrats | Republicans | Democrats | Republicans |
| 2012 | 47% | 51% | 25% | 75% |
| 2014 | 39% | 59% | 25% | 75% |
| 2016 | 41% | 57% | 25% | 75% |
| 2018 | 47% | 52% | 25% | 75% |

*Id.*

Packing of Democrats—concentrating Democratic voters into just four districts to reduce their power throughout the rest of the state—is evident from the large winning margins in each of the four Democratic districts.  In all three election cycles, voters in those districts cast many more votes for the Democratic congressional candidate above and beyond the 50%+1 majority needed to win the district.  *Id.*  The following table presents the percentage of the vote won by the Democratic candidate in each of the four packed Democratic districts across the 2012–2016 elections:

| | Percentage of votes of winning Democratic candidate | | | |
|---|---|---|---|---|
| District | 2012 | 2014 | 2016 | 2018 |
| District 3 | 68.29% | 64.05% | 68.57% | 73.61% |
| District 9 | 73.04% | 67.74% | 68.89% | 67.79% |
| District 11 | (uncontested) | 79.45% | 80.25% | 82.24% |
| District 13 | 72.77% | 68.49% | 67.73% | 60.99% |

*Id.*  Thus, in a total of 15 contested elections held in the four Democratic districts, a Democratic candidate only received less than 65% of the vote twice, and none of the Democratic candidates ever received less than 60% of the vote.  *Id.*  Not only did the statewide seat split between the parties remain constant: Republicans and Democrats maintained the same seats, in the same districts, throughout these four election cycles. *Id.*

Partisan bias metrics, also illustrate the discriminatory effect of Ohio's map.  The four measures commonly used by political scientists to detect and measure the effects of partisan gerrymandering (the efficiency gap, the mean-median, the Gelman-King asymmetry measure,

and the declination).  Pls.' Resp. ¶ 267.  These measures are used to determine when one party is systematically advantaged in the translation of votes to seats.  These measures indicate that Ohio's Republicans have been systematically advantaged in their ability to translate Republican votes into seats in the U.S. Congress.

The efficiency gap is defined as "the difference between the parties' respective wasted votes, divided by the total number of votes cast in the election." *Id.* ¶ 267.  All of a party's votes are wasted if they lose the election. *Id.* ¶ 267.  When a party wins an election, the wasted votes are those above 50%+1 needed to win.  The efficiency gap aggregates both kinds of wasted votes for each party. *Id.*  According to the efficiency gap analysis, the ratio of the parties' excess votes reveals the discrepancy between how the map treats the parties. *Id.*  The efficiency gap can be pro-Republican or pro-Democrat. *Id.* ¶ 268.  A pro-Republican efficiency gap is denoted with a negative number and a pro-Democrat with a positive number. *Id.*  Ohio had a pro-Republican efficiency gap in every election held under the map. *Id.* ¶ 270.  Ohio's pro-Republican efficiency gap was -22.4% in 2012, -9% in 2014, -8.7% in 2016, and -20% in 2018. *Id.* ¶ 271.  Compared to plans in states with more than six seats over the past 45 years, including plans that are pro-Republican and pro-Democrat, the 2012 efficiency gap in Ohio was more extreme than 98% of them. *Id.* ¶ 272.  Ohio's plan was more Republican-leaning than 99% of previous congressional districting plans in states with more than six seats over the past 45 years. *Id.*  The 2018 efficiency gap in Ohio was -20%. *Id.* ¶ 273.  Compared to plans in states with more than six seats over the past 45 years, including plans that are pro-Republican and pro-Democrat, Ohio's 2018 plan was more extreme than 96% of previous plans in states with more than six seats over the past 45 years. *Id.*  It was more Republican-leaning than 98% of previous congressional districting plans in states with more than six seats over the past 45 years. *Id.*

The mean-median gap is the difference between a party's vote share in the median district and their average vote share across all districts.  Pls.' Resp. ¶¶ 274–79.  If a party wins more votes in the median district than in the average district, they have an advantage in the translation of votes to seats.  *Id*. ¶ 275.  Ohio has a mean-median gap in all four elections, which shows an advantage for Republicans in the congressional election.  *Id*. ¶ 276.  Ohio's mean-median gap in 2012 was 7.8%.  *Id*. ¶ 277.  The mean-median difference in 2012 was larger than in 83% of previous elections and more pro-Republican than the mean-median difference in 92% of previous congressional elections.  *Id*.  Ohio's 2012 mean-median gap of 7.8% was a sharp increase from Ohio's mean-median gap in 2010, which was 1.7%.  *Id*. ¶ 278.  Ohio had a gap between the mean and median district of 5.0% in 2018.  *Id*. ¶ 279.  Ohio's mean-median gap in 2018 was more extreme than the mean-median difference in 62% of previous elections and more pro-Republican than the mean-median difference in 81% of previous elections.  *Id*.

The symmetry metric captures whether each party receives the same share of seats for identical shares of votes.  *Id.* ¶ 280.  Gelman and King propose two ways to measure partisan bias in the symmetry of the vote-seat curve.  *Id.* ¶ 281.  First, it can be measured using counter-factual election results in a range of statewide vote shares between .45 and .55.  *Id.*  Across this range of vote shares, each party should receive the same number of seats when they obtain the same vote share.  *Id.*  The Symmetry measure captures any departures from the standard that each party should receive the same seat share across this range of plausible vote shares.  *Id.*  Second, symmetry can be measured based on the seat share that each party receives when they split the statewide vote 50-50.  *Id.*  In an unbiased system, each party should receive 50% of the seats in a tied statewide election.  *Id.*  Here, the partisan bias statistic is the "expected proportion of the seats over 0.5 that the Democrats receive when they receive exactly half the average district

vote." *Id.* Both partisan symmetry measures indicate a pro-Republican advantage in all four elections under the map. *Id.* ¶ 282.

Based on the standard that each party should receive the same seat share across a range of plausible vote shares, the asymmetry between Democrats and Republicans was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 283. Ohio's 2018 elections were more asymmetric than 92% of previous elections and more pro-Republican than 94% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 285.

In hypothetically tied statewide elections, the level of bias in Ohio's 2012 election was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 284. The level of bias in 2018 was more extreme than 95% of previous elections and more pro-Republican than 96% of previous U.S. congressional elections over the past 45 years. *Id.*

The declination metric treats asymmetry in the vote distribution as indicative of partisan bias in a redistricting plan. Pls.' Resp. ¶ 287. If all the districts in a plan are lined up from the least Democratic to the most Democratic, the mid-point of the line formed by one party's seats should be about as far from the 50 percent threshold for victory on average as the other party's victory. *Id.* The declination metric can be quantified using a number between -1 and 1 (positive values favor Democrats and negative values favor Republicans). *Id.* ¶ 288. The declination metrics in the last four election cycles show a pro-Republican advantage. *Id.* ¶ 289. The 2012 congressional election in Ohio had a more extreme declination than 99% of previous elections and a more pro-Republican declination than any previous U.S. congressional election over the past 45 years. *Id.* ¶ 291. Ohio's 2018 congressional election had a declination score of -0.69.

*Id.* ¶ 292. This was more extreme than 98% of previous elections and more pro-Republican than 99% of previous U.S. congressional elections. *Id.*

The fact that Ohio's partisan bias measures sharply increased in 2012 and have remained pro-Republican throughout the redistricting cycle suggests that Ohio's map in effect has been gerrymandered. As a result, Democrats have been less able to translate their votes into representation.

There is also evidence that the effect of partisan advantage for Republicans has been durable as the Republicans have successfully entrenched their majority. Ohio's congressional elections grew less competitive after the 2011 plan went into place. *Id.* ¶ 293. None of Ohio's congressional elections were competitive in 2014 and 2016, meaning no candidate won their election by less than 55%. *Id.* ¶ 294. In 2018, Ohio had only two competitive elections, meaning the candidates won their elections by less than 55%. *Id.* ¶ 295.

The map also became less responsive after 2011. *Id.* ¶¶ 296–300. An unresponsive map ensures that the bias in a districting plan toward the advantaged party is insulated against changes in voters' preferences, and thus is durable across multiple election cycles. Gelman and King propose a technique that measures responsiveness based on uniform swings in two parties' counterfactual vote shares. *Id.* ¶ 298. Ohio's post-2011 districting plans had some of the least responsive election results in the country. *Id.* ¶ 299. Performing a uniform swing analysis based on the 2018 election results, Republicans win 75% of the seats across most of the range of plausible election swings. *Id.* ¶ 300.

Another means of illustrating a map's discriminatory effect is the use of simulated maps. The panels in *LWV-Michigan* and *Rucho* used the fact that simulated maps could place the plaintiffs in districts where their votes were not diluted as evidence of discriminatory effect.

*LWV-Michigan*, 2018 WL 6257476, at *16 ("Plaintiffs have also presented evidence of discriminatory effect; they have produced a large number of simulations for each challenged district, drawn using traditional non-partisan criteria, in which their votes would not be diluted.").  The work of Dr. Cho illustrates that Plaintiffs could have been placed in simulated districts where their votes were not diluted.  Pls.' Resp. ¶¶ 301–02.

"[W]hen a variety of different pieces of evidence, empirical or otherwise, all point to the same conclusion—as is the case here—courts have greater confidence in the correctness of the conclusion because even if one piece of evidence is subsequently found infirm other probative evidence remains."  *Rucho*, 318 F. Supp. 3d at 858.  Here, the overwhelming evidence illustrates that Ohio's congressional map has had the effect of entrenching a Republican majority against electoral changes.

> d)　　There are sufficient facts in the record from which the Court could find that Defendants lacked justification.

Once plaintiffs have established a prima facie case of partisan entrenchment, the burden shifts to the state to establish that the redistricting plan was necessary to meet legitimate state interests.  *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979) ("[A] State may not choose means that unnecessarily restrict constitutionally protected liberty.") (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58–59 (1973)); *see also Vieth*, 541 U.S. at 307 (Kennedy, J., concurring) (partisan gerrymandering may violate the Constitution when political classifications are "applied in an invidious manner or in a way unrelated to any legitimate legislative objective").  The Supreme Court has identified a set of legitimate interests in the redistricting context, including "traditional districting principles such as compactness and contiguity," "maintaining the integrity of political subdivisions," or maintaining "the competitive balance among political parties."  *Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301,

1306 (2016) (citations and internal quotation marks omitted); *see also Rucho*, 318 F. Supp. 3d at 850–51 (discussing legitimate interests in redistricting).  Furthermore, complying with the Voting Rights Act ("VRA") is a legitimate government interest.  There is sufficient evidence in the record to find that Defendants cannot meet the justification prong.

Other than equal population, there is little evidence in the record that the map drawers considered traditional redistricting criteria.  *See* Pls.' Resp. ¶¶ 329–44.  According to the testimony of one of the primary map drawers, they just eye balled compactness and did not do any analysis of districts to make sure they were compact. *Id.* ¶ 329.  The work of Dr. Niven illustrates that communities of interest are not kept intact with the map.  *Id.* ¶ 331.  Communities of interest are often analyzed by the number of municipal and county splits.  *Id.* ¶ 332.  HB 369 unnecessarily splits counties and municipalities.  As the work of Mr. Cooper illustrates, it is possible to create a map with far fewer splits.  *Id.* ¶ 335.

Also, there is little evidence to support a finding that incumbency protection explains HB 369.  *See id.* ¶¶ 338–44.  As discussed *supra* in Section A.3(b), only two sets of incumbents had to be paired to account for the loss of two seats, and yet HB 369 pairs three incumbents.  *Id.* ¶¶ 339–40.  Representative Matt Huffman, the sponsor of HB 319 and HB 369, gave testimony in favor of the map.  *Id.*  In his testimony, he discussed the traditional redistricting criteria, and stated that protection of incumbents was "subservient" to other criteria.  *Id.* ¶ 338.

The work of Mr. Cooper also illustrates that traditional redistricting criteria do not explain HB 369.  *See* Pls.' Resp. ¶¶ 341–44.  Mr. Cooper was able to draw congressional plans, which pair the same number of incumbents with the same match-up of political parties as under the Ohio congressional map, and are still better than the Ohio congressional map on traditional redistricting criteria and partisan symmetry.  *Id.* ¶ 342.  Mr. Cooper was able to draw maps with

the same number of incumbents paired, but which split only 14 counties; the Ohio congressional map splits 23 counties. *Id.* ¶ 341. He created two hypothetical maps: One such hypothetical splits 36 municipal civil divisions, and another splits 34 municipal civil divisions; the Ohio congressional map splits 73. *Id.* ¶ 342. Both of these hypothetical maps are more compact that the Ohio congressional map. *Id.*

While complying with the VRA is a legitimate government interest, the moniker of VRA cannot be used a shield to mask illegal partisan gerrymandering. In *Rucho*, the panel rejected claims that one reason for the map was that districts had to be drawn to comply with the VRA. *Rucho*, 318 F. Supp. 3d at 804. The Court found that the North Carolina map "further concentrate[d] black voters, who are more likely to vote for Democratic candidates, into" two districts, as part of a larger plan to "concentrate Democratic voting strength." *Id.*

Here, there is sufficient evidence in the record from which the Court could find that the Defendants intention was to crack and pack Democratic voters and not to comply with the VRA. Based on the 2010 Census data, theblack voting age population of the 11th District in Cuyahoga County is 52.37%. Pls.' Resp. ¶ 317. Dr. Lisa Handley conducted a district-specific, functional analysis of voting patterns by race in Ohio's Cuyahoga County, where the 11th District is located, to ascertain how that district should be drawn to comply with the VRA. *Id.* ¶ 318. Her analysis demonstrates that a 45% black voting age population ("BVAP") district offers black voters a realistic opportunity to elect their candidates of choice to represent the 11th District. *Id*. ¶ 320. It also demonstrates that current 11th District contains far more minorities than is necessary to elect the minority preferred candidate. *Id*. ¶ 321. There is no evidence in the record that Defendants ever conducted a comparable analysis and determined that a different BVAP was required in order to comply with the VRA. There is evidence in the record that Republicans

were primarily concerned with partisanship and not opportunities to elect minority representatives. *Id.* ¶ 325. For example, the Republican Chair of Summit County was willing to have three Summit County wards placed into District 11 because "they were mostly black democrats [sic]" and this "helped the other districts in Summit County be more Republican." *Id.*

Further, the evidence in the record supports a finding that composition of the 3rd District was intended to pack Democratic voters and not create a "minority opportunity district." █

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ Also, the work of Mr. Cooper illustrates that a map could have been drawn with a different configuration that created a minority opportunity district. *Id.* ¶ 327. Last, it was possible to draw a district in Cincinnati in Hamilton County with a higher BVAP than in either current 1st or 2nd District. *Id.* ¶ 328.

### 4. Plaintiffs propose a manageable standard to adjudicate their claims under the First Amendment and there are sufficient facts in the record to find that Plaintiffs meet this test.

The First Amendment, which protects the rights of voters to associate with and advocate for a political party, to vote for their candidate of choice, to express their political views, and to participate in the political process, "has its fullest and most urgent application . . . to the conduct of campaigns for political office," *McCutcheon*, 572 U.S. at 191-92 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). These rights constitute the "core of those activities protected by the First Amendment" without which a representative democracy cannot function. *Elrod v. Burns*, 427 U.S. 347, 356 (1976). Burdening, penalizing, or retaliating against citizens "because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views" is highly disfavored. *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring).

All four federal district panels to recently consider partisan gerrymandering claims have found them justiciable under the First Amendment.  *LWV-Michigan*, 2018 WL 6257476, at *18 ("[T]he Court finds that a judicially manageable standard exists for adjudicating First Amendment partisan gerrymandering claims. A plaintiff must satisfy three elements."); *see also Benisek*, 2018 WL 5816831, at *1–2; *Rucho*, 318 F. Supp. 3d at 929; *Gill*, 218 F. Supp. 3d at 884.

Plaintiffs propose that the same test that intent, effects and lack of justification used under the Fourteenth Amendment also be used under the First Amendment.  As discussed *supra* in Section A.3, Plaintiffs have met the requirement for the three-prong test that Plaintiffs propose that the Court adopt.  The drawing of Ohio's congressional district boundaries was done to privilege the state's preferred political party, and to burden the state's disfavored political party. The party and its members were "deprived of their natural political strength by a partisan gerrymander," a violation of their First Amendment right to associate.  *Gill*, 138 S. Ct. at 1938 (2018) (Kagan, J., concurring) (citing *Vieth*, 541 U.S. at 315 (Kennedy, J., concurring)).

> **5.    There are sufficient facts in the record from which the Court could find that Plaintiffs' First Amendment rights were infringed under the *LWV-Michigan* and *Rucho* standard.**

Recent panels have adopted a slightly different three-part test to determine if a redistricting plan violates the First Amendment as a partisan gerrymander.  As articulated by the court in *LWV-Michigan*: The first prong is that "districts [were drawn] with the 'specific intent' to 'burden individuals or entities that support a disfavored candidate or political party.'"  *LWV-Michigan*, 2018 WL 6257476, at *18 (citing *Shapiro v. McManus*, 203 F. Supp. 3d 579, 597 (D. Md. 2016); *Rucho*, 318 F. Supp. 3d at 929).  The second prong is that "the challenged districting plan actually caused an injury, *i.e.*, 'that the districting plan in fact burdened the political speech or associational rights of such individuals or entities.'"  *Id.*  (quoting *Rucho*, 318 F. Supp. 3d at

929). The last prong is causation. *Id.* There are sufficient facts in the record from which this court could find that Plaintiffs' First Amendment rights were infringed by Ohio's U.S. Congressional map.

The discriminatory intent inquiry in the first prong of the *LWV-Michigan* First Amendment test is similar to the intent prong proposed by Plaintiffs. *Id.* ("[T]he plaintiff must demonstrate that those who drew the districts did so with the 'specific intent' to "burden individuals or entities that support a disfavored candidate or political party."). As discussed *supra* in Section A.3(a), there are sufficient facts in the record from which this Court could find that the Ohio's congressional map was drawn with an intent to advantage Republicans and disadvantage Democrats.

There are also sufficient facts in the record from which the Court can determine that the map has had the effect of burdening plaintiffs First Amendment rights. The inquiry in this prong under *LWV-Michigan*, is similar to the standing inquiry. It requires plaintiffs to "presented evidence that the Apportionment Plan has injured their First Amendment rights, either by diluting their votes through packing or cracking (Individual Plaintiffs) or by damaging their ability to carry out their organizational mission ([organizational plaintiffs])." *LWV-Michigan*, 2018 WL 6257476, at *18. As discussed *infra* Section B.2, Plaintiffs can illustrate that they have been harmed by the packing and cracking of their votes.

Last, there are also sufficient facts in the record from which the Court can determine that there is a causal relationship between the map's intent and effects. *LWV-Michigan* does not describe in detail this particular prong, however, *Rucho* explained that the causal inquiry is similar to the justification inquiry. *Rucho*, 318 F. Supp. 3d at 935 ("[U]nder the causation prong, a challenged districting plan that burdens political speech and associational rights nonetheless

passes First Amendment muster if legitimate state interests, unrelated to the redistricting body's intent to burden the rights of supporters of a disfavored party, justify the First Amendment burdens imposed by the plan.") Since as discussed *supra* in Section A.3(d), there is no justification for the map's discriminatory effects, a causal link can be established satisfying this prong.

> ### 6. Plaintiffs propose and meet a manageable standard to adjudicate their claims that their right to vote has been infringed by Ohio's U.S. Congressional map.

Plaintiffs assert a legally cognizable claim with manageable judicial standards that their fundamental right to vote has been denied in violation of the Fourteenth Amendment, in the form of an unconstitutional dilution of their voting rights. That is, Plaintiffs have been unconstitutionally denied the opportunity to elect the candidates of their choice and to influence elections.

The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "However slight [the] burden" imposed on the right to vote "may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008). Critically, the right to vote encompasses not only the right to cast a ballot, but to cast a *meaningful* one: The right of "qualified voters, regardless of their political persuasion, to cast their votes effectively . . . rank[s] among our most precious" rights. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also Anderson*, 460 U.S. at 787 (finding the right to cast a meaningful vote to be fundamental). Citizens have an "inalienable right to full and effective participation in the political process [ ] . . ." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). That right "can be denied by a debasement . . . of a citizen's vote just as effectively as by wholly

prohibiting the free exercise of the franchise." *Id*. at 555.  Indeed, the "right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969).

Here, Plaintiffs' right to vote has been unconstitutionally diluted by virtue of their placement in particular districts in Ohio's congressional map, under a three-part test that is similar to, but distinct from, the three-part test for Plaintiffs' Equal Protection Claim.

First, as described *supra* in Section A.3(a) & (b), Defendants acted with the intent to freeze 12 districts as Republican, impervious to shifts in voter preference, by "cracking" Democratic voters across these districts and thereby denying voters residing in these districts of an opportunity to elect their preferred candidates or exert any meaningful influence on elections in these districts.  Second, Defendants' map had precisely that effect.  Most significantly, in all 12 of these cracked Districts, Democratic voters have been unsuccessful in electing their preferred candidates for as long as the current map has been in effect.  *Cf. Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (minority voters who have been "submerg[ed]" into an electoral arrangement with a "white majority" have been "den[ied] . . . an opportunity to elect a candidate of their choice.").

But this does not have to be the case.  For example, as described, *infra*, Plaintiffs' Proposed Remedial Plan would provide more opportunity to elect candidates of Plaintiffs' choice.  In the map, four districts could be reconfigured to afford Democratic voters an opportunity to elect their preferred candidates: the 1st, 5th, 12th, and 16th (with a consistent opportunity to elect in the 5th and 16th, and a reasonable chance to elect in the 1st and 12th). There is a "special significance, in the democratic process, of a majority," such that "it is a special wrong when a minority group" that "could constitute a compact voting majority . . . is not

put into a district." *Id*. at 19.  The remedial map illustrates that Ohio's districts could be reconfigured.

The Proposed Remedial Plan does not only affect these four districts; Democratic candidates' vote shares would generally be higher in eight districts, affording Democratic voters greater influence in elections in those particular districts.  The Supreme Court has defined "influence" as the ability to "exert a significant—if not decisive—force in the election process." *Georgia v. Ashcroft*, 539 U.S. 461, 461 (2003), superseded by statute 52 U.S.C. § 10304(b). And, overall, the proposed remedial map provides Democratic voters greater influence on a statewide basis.  As noted *supra*, Democratic voters have been packed into four districts where they can elect their preferred candidates, but have little influence elsewhere; Plaintiffs' proposed map remedies that.  *Cf. Georgia*, 539 U.S. at 499 (noting that reducing the percentage of a group in a particular district "may have positive or negative consequences for the [group's] statewide electoral strength").

Third, given the evidence of Defendants' intent to deny Plaintiffs' opportunity to elect their preferred candidates and influence elections, and the clear dilutive effect of the current map, the Court must engage in "close constitutional scrutiny" of the map.  *Evans v. Cornman*, 398 U.S. 419, 422 (1970).  Where, as here, there is a substantial burden on a fundamental right, heightened scrutiny must be met.  *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581–82 (2000); *Norman v. Reed*, 502 U.S. 279, 288–89 (1992); *Anderson*, 460 U.S. at 789.  Ohio's actions cannot meet this test.  There is and was no legitimate state interest in enacting a gerrymandered map featuring districts that deny Democratic voters an opportunity to elect their preferred candidates.  Section B.1 *infra*.  The map and each component district, therefore, must

be found unconstitutional as a violation of individual Plaintiffs', Democratic members of the

organizational Plaintiffs', and similarly situated citizens' right to vote.

> **7.     Plaintiffs propose and meet and manageable standard that the Ohio General Assembly exceeded its power under Article 1 when it gerrymandered Ohio's U.S. congressional map.**

States are given limited power to regulate federal elections.  Specifically, the Elections

Clause, Article I, section 4, clause 1, confines states' power to the regulation of the time, place,

and manner of elections.  U.S. Const. art. I, § 4, cl. 1 ("[T]he Times, Places and Manner of

holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature

thereof; but the Congress may at any time by Law make or alter such Regulations.").  The power

granted under Article I has been interpreted by courts to limit states to the enactment of neutral

procedural regulations.  *See Cook v. Gralike*, 531 U.S. 510, 532 (2001) (Rehnquist, J.,

concurring); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 808–10 (1995); *Rucho*, 318 F.

Supp. 3d at 936–37.

States cannot use this limited power to constrain the free choice of the people.  Article I,

section 2 provides that the "House of Representatives shall be composed of Members chosen . . .

by the People."  U.S. Const. art. I, § 2, cl. 1.  As the Supreme Court in *Thornton* found: "[t]he

constitution expressly provides that the choice shall be by the people, which cuts off both from

the general and state Legislatures the power of so regulating the mode of election, as to deprive

the people of a fair choice.'"  *Thornton*, 514 U.S. at 833 n.47 (quoting *The Republican,

Connecticut Courant* (Hartford, Jan. 7, 1788), 1 Bailyn 710, 713).  Courts have further held that

"the Elections Clause does not 'immunize state congressional apportionment laws which debase

a citizen's right to vote.'"  *Rucho*, 318 F. Supp. 3d at 937 (quoting *Wesberry v. Sanders*, 376

U.S. 1, 7 (1964)); *see also Benisek*, 2018 WL 5816831, at *12 (citing *Wesberry*, 376 U.S. at 6–

7).  In fact, the Supreme Court has found that the Elections Clause in Article I was "intended to

act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate." *Ariz. State Legislature*, 135 S. Ct. at 2672 (2015).

The court in *Rucho* found that a state exceeds its power under Article I, when it draws congressional districts in an "effort to 'dictate electoral outcomes' and 'disfavor a class of candidates.'" *Rucho*, 318 F. Supp. 3d at 937 (quoting *Thornton*, 514 U.S. at 833–34).  As discussed above, since Ohio's map was drawn in an "effort to 'dictate electoral outcomes' and 'disfavor a class of candidates,'" *see supra* in Section A.3(a), it exceeds the state's power under Article I of the Constitution.

### B.    Plaintiffs have demonstrated standing for their Equal Protection, First Amendment and Article I claims.

Plaintiffs in this case have standing, that is, "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).  To make this showing, of course, Plaintiffs must first demonstrate "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'  Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal alterations and citations omitted).

The first element of standing—injury in fact—does not impose a particularly heavy burden on plaintiffs. "The Supreme Court has rejected the argument that an injury must be 'significant'; a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973)).[5]

Each of the plaintiffs in this case alleged injuries under the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, and Article I.  Second Am. Compl., ECF No.  37, ¶¶ 136-69.  As such, standing should be assessed for each Plaintiff under each claim.  *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (standing turning not on the "merits of the plaintiffs' contention" but rather the "nature and source of the claim asserted").

### 1.    Plaintiffs have standing to challenge each district for vote dilution under the Equal Protection Clause.

Defendants and Intervenors rightly identify the *Gill* majority opinion as setting out the proper standing inquiry for vote dilution claims, but neglect to mention the opinions on standing in *LWV-Michigan* and *Rucho*.  Both three-judge panels engaged in lengthy discussions not only of the *Gill* standard, but also how that standard might be met by evidence adduced through

---

[5] *See also Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 988 (8th Cir. 2011) ("Injury in fact necessary for standing 'need not be large[;] an identifiable trifle will suffice.'") (internal citation omitted); *Sierra Club v. Franklin Cty. Power of Ill.*, *LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (explaining that the "injury-in-fact necessary for standing need not be large" and that "an identifiable trifle will suffice") (internal quotation marks and citation omitted); *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) ("[A]n identifiable trifle will suffice" to demonstrate injury in fact for purposes of standing) (internal quotation marks and citation omitted); *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 177 (3d Cir. 2001) ("All that the Article III's injury-in-fact element requires is 'an identifiable trifle' of harm.") (internal citation omitted); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) ("The claimed injury need not be great or substantial; an identifiable trifle, if actual and genuine, gives rise to standing.") (internal quotation marks and citation omitted); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 557 (5th Cir. 1996) (recognizing that "an identifiable trifle will suffice" to establish the "low threshold requirement" for injury in fact) (internal quotation marks and citation omitted).

discovery.  An analysis of the Court's opinion in *Gill*, informed by how it was interpreted and applied in the sister partisan gerrymandering cases in Michigan and North Carolina, make clear that the direct and circumstantial evidence adduced in this case is more than sufficient to confer standing upon Plaintiffs for their vote-dilution claims.  Plaintiffs submitted 1) testimonial evidence distinct from what the Court found inadequate in *Gill* and analogous to what the courts in Michigan and North Carolina deemed adequate; 2) evidence on hypothetical districts that un-crack or un-pack the challenged districts, in particular, a proposed remedial map that underscores that remedying cracked and packed districts is eminently possible; and 3) Plaintiff-specific analysis based on simulated maps that indicate not only whether a district is cracked or packed, but aids this Court in quantifying the degree of cracking and packing of each district.

> a)  *Gill requires district-specific injury to support standing to challenge districts under the Equal Protection Clause.*

The Court's opinion in *Gill* and the three-judge panel opinions in Michigan and North Carolina provide instructive points of comparison, including both negative examples (what was deemed insufficient by the Court in *Gill*) and positive ones (what the courts deemed sufficient in Michigan and North Carolina).

Plaintiffs in *Gill* alleged a vote dilution injury under the Fourteenth Amendment.  The Supreme Court's opinion applied the well-articulated standing requirements under Article III to the partisan gerrymandering context and made clear that "[t]o the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific."  *Gill*, 138 S. Ct. at 1930.  To demonstrate district-specific injury, a plaintiff must present evidence of "disadvantage to [the voter] as [an] individual[]," resulting "from the boundaries of the particular district in which he resides" and "the composition of its voters."  *Id*. (alterations in original) (citing *Baker v. Carr*, 369 U.S. at 206).

After making clear the requirement that plaintiffs demonstrate district-specific injury, the Supreme Court turned to the state of the evidence post-trial in *Gill* and found it wanting.  There, Plaintiffs' only supporting evidence of standing were 1) testimony of lead plaintiff "merely" of "his hope of achieving a Democratic majority in the legislature," *Id.* at 1932; 2) intent "evidence regarding the mapmakers' deliberations as they drew district lines," *id.*; and 3) a "single statewide" measure of "partisan asymmetry," *id.* at 1932-33.

However, here, Plaintiffs adduce evidence of their particular injuries, evidence comparing Plaintiffs' electoral opportunities with hypothetical maps, a proposed remedial map, and simulated maps of the sort that were credited in the courts' opinions in Michigan and North Carolina.

> b)      *The Michigan and North Carolina partisan gerrymandering decisions flesh out the Gill standing requirement.*

In the Michigan and North Carolina partisan gerrymandering cases, the courts accepted similar—though not identical—evidence in determining that plaintiffs had standing.  This evidence included a mix of testimonial evidence from plaintiffs about the boundaries of their district, as well as objective evidence of vote dilution through the use of hypothetical maps and large numbers of simulated maps.

The Michigan case proceeded slightly ahead of this case.  In that case, the defendants and intervenors filed for summary judgment on standing.  *LWV-Michigan*, 2018 WL 6257476, at *1.  The court issued its opinion and order in November of last year (hence, prior to the filing of summary judgment by Defendants and Intervenors in this case).  *Id.*  In its opinion, the Michigan court applied the *Gill* standing requirements to the facts adduced in that case.  And the evidence the Michigan court found sufficient to confer standing on plaintiffs is almost identical to that

adduced in this case.  Yet neither Defendants nor Intervenors make any mention of *LWV-Michigan* in their arguments against Plaintiffs' standing in this case.

The Michigan court discussed standing in terms of the three all-too-familiar prongs under the standing inquiry: injury-in-fact, causation and redressability.  In finding that plaintiffs there established injury-in-fact, the court credited two kinds of connecting evidence: 1) simulated maps that plaintiffs' expert Dr. Jowei Chen drew based on algorithm that takes into account traditional redistricting criteria without reliance on political data, *LWV-Michigan*, 2018 WL 6257476, at *7–8, and 2) comparison of the partisanship of plaintiffs' current district with that of plaintiffs' districts in the simulated maps, *id*. at *8–9.

Plaintiffs in Michigan first used the simulated maps to identify a set of districts that are "partisan-outliers." *Id.* at *7.[6]  The court then looked to additional evidence of election outcomes under simulated maps for each plaintiff in that case.  It found that such evidence "tends to establish the crucial link between the gerrymandered districts identified by Dr. Chen and the district-specific harm to each Plaintiff."  *Id.* at *8.  The evidence was presented in the form of charts that "visually depict how partisan a particular Plaintiff's current district is compared to all

---

[6] In determining which districts are "partisan outliers," Dr. Chen ranked the districts in the simulated maps from least to most Democratic and used the ranking to determine which simulated district to compare to each of the challenged districts. On the basis of such comparison, Dr. Chen identified a partisan-outlier district "as a district whose 'partisanship,' based on all statewide elections held between 2012 and 2016, falls outside 'the middle 95% range of the simulated geographically overlapping districts.'" *LWV-Michigan*, 2018 WL 6257476, at *7 (citation omitted). "In other words, these districts are more partisan than 95% of simulated districts drawn using traditional non-partisan criteria." *Id.* (citation omitted).

While Plaintiffs in this case also presented expert reports on simulated maps, they have not presented the simulated maps in the same way as Dr. Chen did in Michigan. Simulated districts ranked the same in Democratic vote share as the challenged map might not in fact be the relevant analogues. For instance, the least Democratic district in the simulated map might not occur in the same part of the state as the least Democratic district under the challenged map. In any case, Plaintiffs in this case do not require an initial partisan-outlier analysis to determine which districts are packed and cracked. The plaintiff-specific analysis based on the simulated maps, *see infra* Section B.1(b), is sufficient not only in identifying which districts are cracked and packed, but also the degree of the packing and cracking.

the simulated districts that contain that Plaintiff's same address." *Id*. The court concluded that with such evidence, plaintiffs have "asserted, with sufficient proof under rule 56, district-specific harms, injuries to themselves 'as individuals,' and 'the effect that [the] gerrymander has on the votes of particular citizens.'" *Id*. at *9 (citing *Gill*, 138 S. Ct. at 1929, 1933). Additionally, the court was satisfied that the second and third prongs of the standing inquiry were also met. *Id*.

On the basis of the evidence, the Michigan court found standing both for plaintiffs living in cracked and packed districts. *Id*. at *7–9. It determined cracked and packed district based on a similar inquiry, just different sides of the same coin. It found that packed districts are ones that "packs Democrats together more tightly than any" of the simulated districts, *id*. at *8, and cracked districts are those whose simulated analogues "would be more partisan competitive or perhaps even a slightly Democratic-leaning district.'" *Id*.

The North Carolina court confronted and credited similar evidence, although it spent particular attention parsing the *Gill* court's analogy to racial gerrymandering cases in deciding that plaintiffs' injury under the Fourteenth Amendment clause should be district-specific. *Rucho*, 318 F. Supp. 3d at 816. It observed that "[i]n a *Shaw*-type racial gerrymandering case, a plaintiff can establish that the lines of her district were drawn on the basis of race "through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id*. (citing *Cooper*, 137 S. Ct. at 1464). Therefore, "like *Gill*'s reference to 'hypothetical district[s],' a plaintiff in such a racial gerrymandering case can establish a burden on her Fourteenth Amendment rights by introducing an alternative districting plan, which conforms to a legislature's legitimate districting objectives and traditional redistricting criteria, under which the plaintiff's vote would not have been diluted based on her race." *Id*. (quoting

41

*Gill*, 138 S. Ct. at 1931; also citing *Cooper*, 137 S. Ct. at 1478–81; *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)).

As such, the North Carolina court found that plaintiffs had standing to challenge all of the districts because "all of those Plaintiffs identified at least one alternative districting plan—and in many cases hundreds of alternative districting plans—that more effectively conforms to the General Assembly's non-partisan redistricting criteria, but nonetheless places the Plaintiff in a district in which the Plaintiff's vote would "carry [more] weight." *Id.* at 820 (citing *Gill*, 138 S. Ct. at 1931). In making specific findings with respect to each district, the court credited a mixture of testimonial and objective evidence based either on a hypothetical district, or the simulated maps. In some of these districts, the court found standing in part because plaintiffs in those districts proved that a hypothetical map could be drawn that assigns the plaintiff "to a district that is more favorable to Democratic candidates." *Id.* at 825 (noting that in challenged District 10, which had a Republican vote share of 58.17% in the 2016 election, a hypothetical district could be drawn with a Republican vote share of 52.62%). The court made clear that the hypothetical district in which plaintiffs would have a better opportunity to elect their candidates-of-choice did not violate traditional criteria, and remedied the geographic division of certain counties as alleged by plaintiffs. *Id.* It also credited the use of simulated maps along the lines of what was presented and discussed by the Michigan court in its decision. *See, e.g.*, *id.* at 821 (for packed district, noting that in that all but three of the simulated maps, the plaintiff in challenged District 1 would have been placed in a "less Democratic-leaning district"), *id.* at 821–22 (for cracked district, noting that "over 99 percent of the simulated districting plans generated by Dr. Chen," including a specific hypothetical plan submitted, "would have assigned" the plaintiff in challenged District 2 "to a more Democratic-leaning district").

The North Carolina court also credited detailed testimony provided by plaintiffs in the case about how the boundaries of the district at issue cause injury to the plaintiff voting in it.  For instance, among the evidence the court relied upon in finding that plaintiffs in challenged District 9 had standing, it cited the Plaintiff in District 9's testimony about the division of Mecklenburg County and the absorption of Bladen County "along the state line" to render the district less competitive for Democrats.  *Id.* at 818–19.  However, the court rejected standing for several plaintiffs who testified, like the sole testifying plaintiff in *Gill*, only to desires for Democratic representation statewide, and not to any injury from their own district.  *Id*. at 827–28.

> c)      *Evidence adduced in this case is sufficient for a finding that Plaintiffs have standing to challenge each district.*

Plaintiffs have presented each and every kind of evidence the Michigan and North Carolina courts, applying *Gill*, have relied upon in finding that plaintiffs in those cases have standing.  These include both "direct and circumstantial evidence that 'the particular composition of the voter's own district . . . caus[ed] his [or her] vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district.'"  *Id.* at 826–27 (citing *Gill*, 138 S. Ct. at 1931 (alteration in original)).

> (1)      Plaintiffs' testimony

Plaintiffs' testimonial evidence from both individual Plaintiffs and representatives of the organizational Plaintiffs differs greatly from that offered in *Gill* of generalized grievance at not achieving a Democratic majority in the legislature.  Rather, the Plaintiffs' testimony resembles, in great detail, the evidence that the North Carolina court credited in its findings of standing for each district.  At base, all of the Plaintiffs testified to their current address and previous addresses since 2011 and the district they have voted in.  *See, e.g*., Pls.' Resp. ¶¶ 345, 353, 363, 374, 385,

43

391, 399, 430–32, 440, 456, 483, 490, 498, 513, 521, 528, 537. They also testified to being Democratic voters who cast ballots in congressional election held under the challenged plan. *See, e.g.*, *id*. ¶¶ 346, 354–55, 364, 375, 385, 390, 400, 431, 442, 458, 482, 491, 499, 514, 521, 529, 538. And all of the Plaintiffs testified to injuries resulting from the specific boundaries of their district.

For instance, Plaintiff Goldenhar in District 1 testified to the dilution of her vote achieved through "all of Warren County [mixing] with half of Hamilton Country," which split up not only the county but also the city of Cincinnati. *Id. ¶* 350; *see also id.* (answering question on how vote is diluted by the splitting of Hamilton County and the addition of voters from Warren County and reiterating the dilution of her vote through the splitting of Hamilton County and inclusion of Warren County). Plaintiff Burks in District 2—across the line dividing Hamilton County between Districts 1 and 2—testified to the dilution of his vote through lines that create a "kind of peninsula" in Hamilton County to capture an urban population, that is then paired with Clermont, Highland and other rural and "Appalachian rural" counties. *Id.* at ¶ 33; *see also id.* ¶ 353 (testifying that Hamilton County was previously either entirely in District 1, or the line was drawn more straightly in Hamilton County). He testified that Democratic voters in Hamilton County had been "cracked": the lines were drawn "so that Democrats would be divided into the – into two different districts, so as to dilute their voting power." *Id.* ¶ 360. The "drawing lines . . . [to] put more individuals with one viewpoint into that mix" causes his vote to be "wasted." *Id.* Plaintiff Harris from District 11 testified to his vote being "surrounded by an inordinate number of Democratic votes in a district that's drawn in a way such that it encompasses broadly Democratic areas, without any room for nuance on that ground." *Id.* ¶ 119. As a result, his vote "is not as impactful as it would be if additional candidates were forced to

address the various perspectives of their constituents, because there aren't that many as a result." *Id.*[7]

An organization has associational standing when: "(1) the organization's 'members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Friends of Tims Ford v. Tennessee Valley Auth.*, 585 F.3d 955, 967 (6th Cir. 2009) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Here, the organizational Plaintiffs testified to their members living and voting in particular congressional districts. *See* Pls.' Resp. ¶¶ 557, 584, 588, 602, 612, 624, 627, 640, 643. They also testified to their members being Democratic voters who vote in congressional elections under the challenged plan. *Id.* Each of the organization's 30(b)(6) representative (in this case the President of each of the respective organization) is themselves a member of the organization, so their testimony with their own experience of vote dilution meets the requirements for making out associational standing. Moreover, John Fitzpatrick, a member of LWVO living outside of Akron, and Stephanie White a member of APRI, living outside of Toledo, both have suffered vote dilution injuries. *Id.* ¶¶ 571–79; 613–21.

(2)     Hypothetical districts and plan

Plaintiffs also presented evidence relating to hypothetical maps that could be drawn, including a proposed remedial map. At a most basic level, in isolation, each Plaintiff in a

---

[7] Additional testimony of district-specific injury from plaintiffs abound. For the sake of brevity, *see also* Plaintiffs' Response to Proposed Undisputed Facts ("Pls.' Resp.") ¶¶ 369–72 (Plaintiff Inskeep in District 3); ¶¶ 376, 379–84 (Plaintiff Libster in District 4); ¶¶ 387–89 (Plaintiff Deitsch in District 5); ¶¶ 393–95, 398 (Plaintiff Boothe in District 6); ¶¶ 420–21, 426 (Plaintiff Griffiths in District 7); ¶¶ 432–35, 437–39 (Plaintiff Nadler in District 8); ¶¶ 450–51 (Plaintiff Walker in District 9); ¶ 475 (Plaintiff Rader in District 9); ¶ 483 (Plaintiff Megnin in District 10); ¶ 501 (Plaintiff Dagres in District 12); ¶¶ 519–20 (Plaintiff Myer in District 13); ¶¶ 526–27 (Plaintiff Hutton in District 14); ¶¶ 534–36 (Plaintiff Thobaben in District 15); ¶¶ 543–44, 547 (Plaintiff Rubin in District 16).

cracked district in this case can be drawn into a district that would have a higher expected Democratic vote share than under the challenged map; similarly, it is possible to draw districts for cracked Plaintiffs where elections would be more competitive. Moreover, it is also possible to draw a single map that improves the chances of all Plaintiffs in cracked district electing their candidate of choice. *Id.* ¶ 9. But Plaintiffs have not proposed such a map as their remedial plan as it would amount to a reverse gerrymander. All that Plaintiffs seek is a fair map. *Cf. Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994) ("One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast."). And Plaintiffs have proposed one such possibility in this case: Plaintiffs' Proposed Remedial Plan.

To be sure, Plaintiffs' Proposed Remedial Plan is not *the* remedial map, but one possible remedy based on Plaintiffs' alleged constitutional violations. The actual remedy depends on the actual violations found by a court. *Gill*, 138 S. Ct. at 1930 (noting that a legal remedy "must be 'limited to the inadequacy that produced [the plaintiffs'] injury in fact'") (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). But it is nevertheless instructive for purposes of providing objective evidence of cracking and packing: of "harm [that] arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Id.* at 1931. The partisan composition of Plaintiffs' remedial districts, based on congressional elections from 2012-2018, are as follows[8]:

---

[8] The estimates in this table are taken from Mr. Cooper's affidavits in this case, with the exception of the results from 2012 and 2014, which are taken from Dr. Warshaw's rebuttal report. Dr. Warshaw calculated these estimates as the 2012 and 2014 congressional elections involved uncontested elections and hence needed to be imputed. *See* Pls. Resp. ¶¶ 311–12.

| CD | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| | Proposed Plan | 2012 Plan | Proposed Plan | 2012 Plan | Proposed Plan | 2012 Plan | Proposed Plan | 2012 Plan |
| 1 | 48.6% | 39.5% | 44.3% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.6% | 41.4% | 25.3% | 34.1% | 25.0% | 33.5% | 31.1% | 41.7% |
| 3 | 67.6% | 71.4% | 58.4% | 63.6% | 63.1% | 68.2% | 68.3% | 73.6% |
| 4 | 29.9% | 38.5% | 24.2% | 32.3% | 22.3% | 31.7% | 26.6% | 34.7% |
| 5 | 62.3% | 40.6% | 51.2% | 30.4% | 52.6% | 28.8% | 54.3% | 36.1% |
| 6 | 44.4% | 46.8% | 36.6% | 39.8% | 28.6% | 29.4% | 33.0% | 30.8% |
| 7 | 39.2% | 43.6% | 29.6% | 0.3% | 28.5% | 31.4% | 35.5% | 41.3% |
| 8 | 33.9% | 0.0% | 29.2% | 28.9% | 28.5% | 28.2% | 34.0% | 33.4% |
| 9 | 58.7% | 76.0% | 47.6% | 67.7% | 48.9% | 68.6% | 55.1% | 67.8% |
| 10 | 38.7% | 38.6% | 32.7% | 32.6% | 33.9% | 33.8% | 43.0% | 43.0% |
| 11 | 85.4% | 99.7% | 81.5% | 79.2% | 81.7% | 80.3% | 83.5% | 82.3% |
| 12 | 39.0% | 36.6% | 33.2% | 29.0% | 38.4% | 31.7% | 54.3% | 47.9% |
| 13 | 62.6% | 72.9% | 59.7% | 68.4% | 54.2% | 67.6% | 51.4% | 61.0% |
| 14 | 48.8% | 41.8% | 41.5% | 34.4% | 37.5% | 37.4% | 43.8% | 44.8% |
| 15 | 42.3% | 38.6% | 35.8% | 34.1% | 31.2% | 33.7% | 33.9% | 40.5% |
| 16 | 55.0% | 48.0% | 51.5% | 36.2% | 51.0% | 35.2% | 55.8% | 43.3% |

Defendants fixate on the remedial map's inability to deliver a higher chance of electing Democrats in certain districts to Plaintiffs residing in them. Defs.' Br. at 22–23. However, Plaintiffs' Proposed Remedial Plan would provide opportunity for Plaintiffs to elect a candidate of their choice in at least four of the cracked districts (1st, 5th, 12th, and 16th Districts), as the table indicates. Notably, Remedial District 5, where at least one member of APRI would live, Pls.' Resp. ¶ 621, is a reliably Democratic district, as is Remedial District 16, where at least one member of LWVO would live, id. ¶ 579. Remedial District 1 would have an enhanced Democratic vote share, hovering between above 48% in 2012 and 2016, dipping to 44% in 2014, and up to 57% in 2018. This would be the remedial district for two of the individual Plaintiffs, Goldenhar and Burks (both of whom live in the Cincinnati, but currently split across District 1 and District 2), as well as for the members of the Hamilton County Young Democrats, who currently live in both Districts 1 and 2, id. ¶ 640. And Remedial District 12, where Plaintiff Dagres and members of APRI and OSU College Democrats would live under the Proposed Remedial Plan, has an estimated Democratic vote share of below 40% in 2012, 2014 and 2016, but soars to 54.3% in 2018, giving Plaintiff Dagres and members of the organizational Plaintiffs

47

a robust opportunity to elect their candidate-of-choice under the Proposed Remedial Plan. And Plaintiff Griffiths currently lives in District 7, but under the Plaintiffs' Proposed Remedial Plan, would live in District 9, which has a Democratic vote share above 50% in two of the four election cycles.

Many of Defendants' critiques are aimed at the packed districts (highlighted in gray in the foregoing table). Defs.' Br. at 22-23 (noting the outcome under the remedial map for Plaintiffs Rader and Walker in District 9, Plaintiff Harris in District 11, and Plaintiff Myer in District 13). Unpacking a packed district would necessarily *reduce*, rather than enhance, the estimated Democratic vote share in that district. Indeed, that is the core of the packing claim: that Plaintiffs were unnecessarily aggregated with other Democratic voters such that their votes are diluted.

(3)    Simulated maps

Plaintiffs also submitted analysis of simulated maps—anchored to each individual Plaintiff—which supports their standing. Crucially, this evidence highlights much more than a binary indicator of whether a district is cracked or packed or neither; it permits this Court to determine the *degree* of cracking and packing for each Plaintiff. It summarizes the partisan composition of each of the simulated districts, and indicates not only whether the Democratic vote share is likely to be higher or lower than under the challenged map, but also by how much. The following table summarizes the plaintiff-specific simulated map analysis based on the most recent data available from 2018:

| District | Plaintiff | Predicted Democratic Vote Share in Simulated Districts (2018) | | | | Actual Democratic Vote Share in 2018 |
|---|---|---|---|---|---|---|
| | | Min | Max | Mean | Median | |
| 1 | Goldenhar | 0.33891 | 0.60108 | 0.529295 | 0.55591 | 0.47117 |
| 2 | Burks | 0.3377 | 0.60108 | 0.540557 | 0.5563 | 0.4453 |
| 3 | Inskeep | 0.3028 | 0.68516 | 0.599077 | 0.60702 | 0.71735 |
| 4 | Libster | 0.27289 | 0.63229 | 0.413547 | 0.38056 | 0.36218 |
| 5 | Deitsch | 0.26099 | 0.50376 | 0.319251 | 0.30508 | 0.40218 |
| 6 | Boothe | 0.35368 | 0.49682 | 0.415917 | 0.39295 | 0.35699 |
| 7 | Griffiths | 0.37979 | 0.79666 | 0.504524 | 0.52278 | 0.3978 |
| 8 | Nadler | 0.28552 | 0.53669 | 0.374592 | 0.36985 | 0.34296 |
| 9 | Walker | 0.40141 | 0.82468 | 0.635391 | 0.56849 | 0.64197 |
| 9 | Rader | 0.3938 | 0.82488 | 0.631049 | 0.56782 | 0.64197 |
| 10 | Megnin | 0.29103 | 0.49942 | 0.434581 | 0.43727 | 0.47551 |
| 11 | Harris | 0.48134 | 0.82488 | 0.787024 | 0.79351 | 0.82004 |
| 12 | Dagres | 0.32868 | 0.61811 | 0.389666 | 0.383 | 0.46446 |
| 13 | Myer | 0.46442 | 0.56045 | 0.492574 | 0.48706 | 0.58182 |
| 14 | Hutton | 0.46465 | 0.80294 | 0.49508 | 0.4889 | 0.47708 |
| 15 | Thobaben | 0.27255 | 0.5178 | 0.373328 | 0.3673 | 0.45775 |
| 16 | Rubin | 0.37519 | 0.56285 | 0.446909 | 0.42306 | 0.45349 |

*Id.* ¶ 302.

The packed districts are indicated in gray; the rest are cracked districts. The middle columns present summary statistics on the partisan composition of each Plaintiff's districts in the simulated maps. Starting with the cracked districts, consider Plaintiff Goldenhar in District 1. In her district in the simulated maps, Plaintiff Goldenhar's district is reliably Democratic: both the mean and median vote share of her district are above 50% Democratic. Contrast this with the rightmost column indicating what happened under the challenged map in 2018: her actual electoral chances are lower than the expected chances under the simulated maps. Indeed, they change dispositively: whereas Republicans won her current district, Democrats are estimated to win her simulated districts in 2018.

Not all cracked districts are cracked to the same extent. Next, consider Plaintiff Deitsch in District 5. While there is at least one simulated map in which her district would exceed 50% in Democratic vote share, the mean and median Democratic vote share in her districts under the

simulated maps are far below what the Democratic candidate would need to win (31.9% and 30.5%). Indeed, both the mean and median are below her actual vote share in the 2018 elections. (40.2%). By contrast, Plaintiff Hutton in District 14 has a fighting chance in the simulated maps while failing to elect a representative of choice in her present district. The mean and median Democratic vote share of her district in the simulated maps are 49.5% and 48.9%, respectively. It is important to note that these percentages are calculated on the basis of historic election results from statewide elections: in Dr. Cho's supplemental report on the 2018 elections, Dr. Cho analyzed her maps using statewide election results from the 2018 midterms. She used statewide elections in order to estimate underlying partisanship statewide without the interfering variable of different candidates. In other words, her estimates do not determine definitively whether a Democrat would or would not win in the districts in her simulated maps. Nevertheless, based in historical elections voted in by Ohioans, they are the best estimates of the likely partisan composition of the simulated districts. And a district that is estimated at 49.5% or 48.9% Democratic based on composite 2018 statewide elections is possibly won by Democrats. At the very least, it would give Plaintiff Hutton not only a better chance of electing her representative of choice, but also a fighting one.

The packed districts can also be analyzed using the same table. Consider Plaintiff Myer in District 13. The mean and median estimated Democratic vote share of her district in the simulated maps are 49.3% and 48.7%, respectively: her simulated districts are quite similar in composition to the set of districts which give Plaintiff Hutton a fighting chance. However, under the challenged map, she lives in a district that Democrats win by almost 60% of the vote. Indeed, a vote share of 58.1%, the one that Democrats actually received in District 13, does not occur in any of Plaintiff Myer's districts in Dr. Cho's over 3 million simulated maps.

50

Dr. Cho's Plaintiff-specific, simulated map analysis similarly permits differentiation among the Plaintiffs in packed districts. Consider Plaintiff Inskeep in District 3. Her current district has a very high Democratic vote share: in 2018, it was 71.7%. This is even higher than the maximal Democratic vote share in her simulated districts of 68.5%. Her simulated districts continue to have a very high Democratic vote share: averaging 59.9% (mean) and 60.7% (median). This same review can easily be undertaken for each of the individual Plaintiffs based upon the summary table above.

Together, just as in *LWV-Michigan* and *Rucho*, Plaintiffs' testimony of injury tied specifically to the boundaries of their districts, Plaintiffs' Proposed Remedial Plan and Plaintiff-specific simulated maps analysis establish standing for each of the Plaintiffs in this case.

### 2. Plaintiffs Have Standing to Pursue Their First Amendment Claims.

Defendants misconstrue what the Supreme Court said in *Gill* with respect to standing to support a claim of vote dilution under the Equal Protection Clause, and then compound their error by applying the same mis-analysis to each of the other claims advanced by Plaintiffs. Of course, Plaintiffs "must demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Partisan gerrymandering implicates the "the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment). As further explained in Justice Kagan's concurrence in *Gill*, "significant 'First Amendment concerns arise' when a State purposely 'subject[s] a group of voters or their party to disfavored treatment.'" *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (internal citation omitted).

51

There are at least two distinct First Amendment injuries caused by partisan gerrymandering. First, it "purposefully dilut[es] the weight of certain citizens' votes to make it more difficult for them to achieve electoral success because of the political views they have expressed through their voting histories and party affiliations." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 595 (D. Md. 2016) (three-judge panel) (emphases omitted); *see also Rucho*, 318 F. Supp. 3d at 829. As detailed above, at least one Plaintiff in each District has adequately alleged such dilutionary injuries and adduced facts demonstrating their standing for this sort of claim. The same dilutionary injuries arise from the violation of the Plaintiffs' First Amendment rights.

Partisan gerrymandering also implicates "distinct," non-dilutionary First Amendment injuries. *Gill*, 138 S. Ct. at 1939; *Rucho*, 318 F. Supp. 3d at 829. This distinct associational injury occurs where "the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects." *Gill*, 138 S. Ct. at 1939. The Supreme Court has "repeatedly held that freedom of association is protected by the First Amendment." *Williams*, 393 U.S. at 30. This right expressly includes "the right of individuals to associate for the advancement of political beliefs." *Id.* "The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986).

There are ample facts in the record that demonstrate First Amendment standing for each of the Plaintiffs. The individual Plaintiffs are personally injured by the challenged map, and the organizational Plaintiffs are personally injured in their own rights and when standing in the shoes of their members. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the [disadvantaged] group seeking to challenge the barrier need not allege that he would have

obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter of AGC of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  The injury-in-fact when such a barrier burdens First Amendment rights is not the "ultimate inability to obtain the benefit," *cf. id*., but that the government has favored citizens holding certain views (in this case, support for the Republican Party), and burdened citizens holding opposing views (in this case, support for the Democratic Party).  *See Bible Believers v. Wayne Cty.*, 805 F.3d 228, 247–48 (6th Cir. 2015) ("It is a fundamental precept of the First Amendment that the government cannot favor the rights of one private speaker over those of another." (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995))).

> a)    *The Individual Plaintiffs Have Standing to Pursue Their First Amendment Claims.*

Individual Plaintiffs testified to legally cognizable non-dilutionary injuries to their First Amendment associational rights fairly traceable to the Ohio congressional map, which would likely be remedied by a favorable decision, particularly one that put a new congressional map in place.  Each of the individual Plaintiffs self-identifies as a Democrat or a Democratic voter, and votes to support Democrats for Congress, as well as for other elective offices.  Pls.' Resp. ¶¶ 346–47, 355, 364, 375, 385, 390, 400, 431, 442, 458, 482, 491, 499, 514, 521, 529, 540.  The Plaintiffs testified to their decreased ability to engage other Ohio citizens, including ones who would otherwise support Democratic candidates, because the congressional map caused these individuals to think that their vote did not matter.  Many of the individual Plaintiffs canvass on behalf of Democratic candidates and have their ability to mobilize voters severely burdened by the congressional map.

For example, in the course of canvassing for the District 2 congressional candidate, Plaintiff Burks encountered several individuals who said that "they were not going to vote

because it wasn't worth it because they had a strong feeling of what the outcome would be." *Id.* ¶ 358.  Plaintiff Inskeep (in District 3) testified that voters in her District feel like their vote does not matter as a result of the drawing of the current congressional map.  *Id.* ¶ 370.  Plaintiff Deitch (in District 5) testified that because the gerrymandered map makes elections a foregone conclusion, voters feel their votes do not matter: "[Y]ou would go and knock on the door and somebody would say to you it doesn't make any difference who I vote for, they're not going to win or I'm not going to give you money because they're not going to win." *Id.* ¶ 387.  And Plaintiff Boothe (in District 6) has observed that would-be Democratic voters in her area "feel that their vote is monopoly money" and observed that their votes "didn't count." *Id.* ¶ 393. Plaintiff Griffiths (in District 7) testified to this same decreased ability to mobilize would-be voters.  *Id.* ¶ 421.  Similarly, Plaintiff Nadler (in District 8) testified that "there are people that I personally have encountered, who feel that it's not worth their time to vote . . . because it's not going to make any difference."  *Id.* ¶ 435.  Because of this voter apathy, Mr. Nadler's ability to get out the vote for Democratic candidates in his area is inhibited.  *Id.* ¶ 436.  Plaintiffs Walker and Rader (both in District 9) separately testified to the difficulty of engaging would-be Democratic voters because of the way the map is gerrymandered.  *Id.* ¶¶ 451, 481.  Plaintiff Megnin (in District 10) regularly canvasses for Democratic candidates and issues.  *Id.* ¶ 484. Because of the voter apathy caused by the map, she has a difficult time gathering support for Democratic candidates in her district. *Id.*  Plaintiff Dagres (in District 12) testified that "when [he] talk[s] to other voters through the community who say that why should they vote when their votes don't matter, when there's no opportunity for success." *Id.* ¶ 506.  In Plaintiff Myer's experience talking to voters and prospective voters in her area (District 13), the gerrymandered map has made people less likely to engage with her efforts because they feel their votes do not

matter. *Id.* ¶ 516.  Plaintiff Thobaben (in District 15) testified that "a lot of people that I have talked to" say they feel like "the probability of Democrats being able to get through any of their candidates is pretty remote" and that their votes do not count. *Id.* ¶ 532.  This has made it more difficult to canvass for and elect Democratic candidates. *Id.* ¶ 533.  And Plaintiff Rubin (in District 16) testified to the same difficulties, as "[v]oters who continually vote for candidates who never win eventually get discouraged and stop participating." *Id.* ¶ 545.  Plaintiff Rader, who lives in District 9, has also worked to engage Democratic voters in District 16 and faced similar burdens. *Id.* ¶ 479; *see also id.* ¶¶ 351 (testifying regarding same in District 1), 361 (in District 2), 372 (in District 3), 378 (in District 4), 388 (in District 5); 427 (in District 7), 455 (in District 9), 497 (District 11), 526 (in District 14).

The map further inhibits various Plaintiffs' abilities to recruit Democratic candidates to run for office.  For example, as recent former President of the Licking County Democratic Club PAC and a Central and Executive Committee member of the Licking County Democratic Party, Plaintiff Dagres has tried to recruit candidates to run for office, but due to the nature of the district, "people do not see running as a legitimate opportunity for them because they feel the race is not winnable or competitive.  It makes it very difficult to recruit candidates to run." *Id.* ¶¶ 507–08.  He testified that these were "highly qualified individuals who would do a superb job if elected," but that they "are unwilling to come forward and put themselves out there knowing that there is no opportunity for them to win." *Id.* ¶ 508.  Plaintiff Rubin, who has held leadership roles in the Northern Stark County Democratic Club since 2008, testified that she has a "difficult time finding candidates who are willing to run in districts whose outcome is preconceived.  Elections cost a lot of money and a lot of time, and it's hard to find people principled enough to run if they know their possibility of loss is a hundred percent." *Id.* ¶¶ 541, 546.  Plaintiff

Griffiths testified that in District 7 "it has been very difficult to identify candidates willing to take on Bob Gibbs in this case because of how heavily gerrymandered the district is." *Id*. ¶¶ 422–23. And Plaintiff Megnin testified that she would consider running for local office, but is inhibited from "going beyond local because of the gerrymandering." *Id.* ¶ 485.

Individual Plaintiffs have also been harmed by the map as it inhibits their ability to raise money for Democratic candidates. Plaintiff Libster has attempted to fundraise for Democratic candidates including Fourth District Congressional candidate Janet Garrett, but cannot amass support because of the voter apathy caused by the map. Pls.' Resp. ¶ 379. She testified that voters are discouraged because Garrett loses by "a thirty percent whapping all the time. It's never ever – my vote – when I go in there to vote for Janet Garrett as a Democrat, it's never going to happen. Snowball's chance." *Id*. Plaintiff Rader testified that the current congressional map has hurt his ability to fundraise and recruit volunteers for Democratic candidates. *Id*. ¶ 480. As an example, Mr. Rader said that it was difficult to raise funds or recruit volunteers for Democratic congressional candidate Keith Mundy in Ohio's 16th Congressional District because voters "don't want to give or get involved because they think the way that the districts are drawn, again, like I said, a predetermined outcome." *Id*. ¶ 479. Plaintiff Dagres testified that it is also hard to raise funds or gain financial support for Democratic candidates in District 12 because of the perception that "it is unwinnable so why should I donate." *Id*. ¶ 509. Plaintiff Rubin testified to the same in District 16, *id*. ¶ 546, and Plaintiff Walker testified that the current congressional map makes it harder to fundraise for the Democratic candidate because people believe that the "candidate's going to win anyway," *id.* ¶ 454.

The Supreme Court has recognized that these types of non-dilutionary harms constitute cognizable First Amendment injuries. Plaintiffs may be injured by an election law that makes

"[v]olunteers . . . more difficult to recruit and retain, media publicity and campaign contributions . . . more difficult to secure, and voters . . . less interested in the campaign." *Anderson*, 460 U.S. at 792.  As Justice Kagan recognized in *Gill*, "Members of the 'disfavored party' in the State, deprived of their natural political strength by a partisan gerrymander, may face difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Gill*, 138 S. Ct. at 1938.  Each of the individual Plaintiffs plainly have standing to pursue their First Amendment claim, both the dilutionary harm at the district level and the other non-dilutionary harms, statewide.

> b)  *The Organizational Plaintiffs Have Standing to Pursue Their First Amendment Claims.*

> (1)  Plaintiff Organizations Have Standing in Their Own Right

An organization has standing in its own right when it alleges the same facts as an individual would: "(1) an injury in fact; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) that the requested relief will redress the injury." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013).  "[A]n association may have standing to assert an injury to itself regardless of whether its members also have standing." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (internal citation omitted).  An organization suffers an injury in fact when its mission is "perceptibly impaired" by the challenged action, which it may show through a "demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 462 (6th Cir. 2014) ("An organization may have standing to sue if its interests are directly impaired.").  Plaintiff

organizations APRI, LWVO, North East Ohio Young Black Democrats ("NEOYBD"), Ohio

State University College Democrats ("OSU College Democrats") and Hamilton County Young

Democrats ("HCYD") each suffer associational injuries attributable to the challenged

congressional map.  Each of these organizations have established that the challenged plan's

invidious partisan discrimination burdens their various missions.  The respective President of

each organization testified that the map makes it more difficult to engage voters, use additional

resources, and impairs the efficacy of their work.

APRI engages in voter education, voter registration, civic engagement, voter outreach,

and encouraging people to vote.  Pls.' Resp. ¶ 604.  Due to a lack of voter interest due to the

gerrymandered map, APRI is burdened in its mission as it is more difficult to engage voters

through its education, registration, and outreach efforts, and its members and other Ohio voters

are deterred and discouraged from engaging in the political process.  *Id*. ¶ 605.  The President of

APRI, Andre Washington, testified that the gerrymandered congressional map impeded the

organization from accomplishing its mission by causing APRI to have "to divert resources to

work harder to convince people and educate people that their vote does count and they should

exercise their right to vote."  *Id.*  The congressional map causes voter confusion and apathy,

which require APRI to divert its resources from its work to register and engage voters.  "Because

of the way these lines are drawn, people get confused, they're frustrated.  You could be in a

county that's split down the middle or split in three different ways and they don't know where to

vote or who to vote for so they get frustrated, they get confused, they get discouraged and they

just don't know what to do so . . . (they) do nothing."  *Id.* ¶ 610.  Thus, APRI has to "spend time

and resources to work this out."  *Id.*  Accordingly, APRI has established that the challenged map

burdens its own mission.  *See Rucho*, 318 F. Supp. 3d at 831.

"In its core function," the LWVO "is about democracy," and "fair maps and fair districts are key to that democracy."  Pls.' Resp. ¶ 552.  The League's work "is making our democracy function for every voter."  *Id*.  The confusion and apathy caused by the challenged congressional map burdens the League's key mission.  *Id.* ¶¶ 559–60.  The voter apathy caused when people feel that their votes do not count makes it harder for the League to perform its work getting out the vote.  *Id.* ¶ 565.  And because candidates are secure in their prospect of re-election, they will not appear at League forums, thus further stymieing the League's ability to offer voters the opportunity to interact with candidates for office.  *Id.* ¶ 562.  Nearly identical injuries were found to establish standing for the League of Women Voters of North Carolina and the League of Women Voters of Michigan to challenge those state's gerrymandered congressional maps, *Rucho*, 318 F. Supp. 3d at 381; *LWV-Michigan*, 2018 WL 6257476, at *13, and so too here, the LWVO has established that the Ohio congressional map burdens its own mission.

The three other organizational Plaintiffs are expressly Democratic organizations.  These "related organizations" are just the type for whom Justice Kagan opined that the associational injuries that befall party members would impact "triply."  *Gill*, 138 S. Ct. at 1938.  The NEOYBD is burdened by the congressional map which makes it more difficult to get out the vote and to keep Democratic voters engaged.  President of NEOYBD, Gabrielle Jackson, testified about the organization's difficulty in engaging and turning out voters in Lake County: "the amount of enthusiasm and willingness to get involved and make their voices heard in that area, because it is a cracked district, is not where it needs to be.  And so we've had to spend extra resources trying to build momentum, trying to get information out there because of the way that that district is drawn and the way that the map is drawn in our region."  Pls.' Resp. ¶ 630.  Ms. Jackson also testified that the voter apathy caused by the map makes it more difficult for

NEOYBD to fundraise and to get members actively involved with the organization. *Id.* ¶¶ 631, 634.

The OSU College Democrats' associational rights are also burdened by the congressional map. OSU College Democrats does voter engagement and education, works to register students to vote for the first time or to have them update their voter registration to their current address, canvasses on behalf of candidates including for Congress, hosts events with Democratic candidates, including for congressional office, and has done phone banking, including on behalf of the Democratic coordinated campaign which works on behalf of, among other offices, congressional candidates. *Id.* ¶ 585. The area containing OSU's campus and surrounding off campus housing is split between three congressional districts. The way the lines are drawn burdens OSU College Democrats and its members by creating confusion about which district someone lives in. *Id.* ¶ 592. This voter confusion causes young voters to become frustrated and less likely to be or remain engaged with the OSU College Democrats. *Id.* ¶ 593. This was illustrated in summer 2018 during the Twelfth District Special Election. Many individuals who engage with OSU College Democrats were confused about whether they were supposed to vote on Special Election Day, and OSU College Democrats had to expend volunteer resources to engage with these voters, instead of on Get Out the Vote activity directed only at the Twelfth District. *Id.* ¶ 594. The locked-up nature of the congressional map causes members of the OSU community to believe that their votes do not matter and to become apathetic. *Id.* ¶ 595. In 2018, OSU College Democrats focused their resources on the Danny O'Connor campaign, both the Special Election and on the November 2018 General Election. *Id.* ¶ 598. Mr. O'Connor did not win the November 2018 election despite a 31.6 percent shift for the Democratic candidate. *Id.*

¶ 599.  Under Plaintiffs' Proposed Remedial Plan, the percentage of the two-party vote for the Democratic candidate in District 12 was over 54% based on 2018 election results.  *Id*. ¶ 600.

The congressional map burdens Hamilton County Young Democrats and its members by creating confusion about which district someone lives in.  Pls.' Resp. ¶ 648.  This voter confusion causes young voters to become less engaged.  *Id*. ¶ 649.  The way the lines are drawn causes young voters to be apathetic about voting and convinced that being engaged in the process does not matter.  *Id*. ¶ 650.  This burdens HCYD by hampering its ability to associate with young people who could be potential members. *Id*. ¶ 651.  HCYD encounters young people who decline to become engaged in the political process or to donate funds to the organization or to Democratic candidates because they believe the system is rigged.  *Id*. ¶ 652. HCYD expended resources on the campaign of Aftab Pureval in Congressional District 1 in 2018 as they felt that "he ha[d] the best chance [to win] in quite some time."  *Id*. ¶ 657.  Mr. Pureval did not win the 2018 election.  *Id*.  Under Plaintiffs' Proposed Remedial Plan, the percentage of the two-party vote for the Democratic candidate in District 1 was over 57% based on 2018 election results.  *Id*. ¶ 658.

(2)     Plaintiff Organizations Have Associational Standing on Behalf of Their Members.

Associational standing "is met when: (1) the organization's 'members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Friends of Tims Ford*, 585 F.3d at 967 (citation omitted).  Each of the organizational Plaintiffs is a membership organization.  Pls.' Resp. ¶¶ 550, 582, 602, 624, 636.  As amply detailed above, Democratic voters throughout Ohio have their First Amendment associational rights burdened by the congressional map, and would

have standing in their own right to pursue these claims.  The interests of Democratic voters as Democrats are clearly central to the missions of NEOYBD, OSU College Democrats, and HCYD.  And the interest in voter engagement and fair district lines is central to the missions of APRI and LWVO.  Finally, the claims asserted and the relief requested do not require the participation of individual members in the present lawsuit, and Defendants and Intervenors do not even attempt to argue otherwise.

For example, as President of APRI, Mr. Washington is also a member of the organization.  He testified that personally in District 12, "every third door I knock on people are saying my vote doesn't count in this district, it doesn't matter, the same person is going to get back in office."  *Id.* ¶ 609.  This voter apathy impairs Mr. Washington's personal ability to associate with voters in Ohio.  And Stephanie White, the Vice Present of the Toledo Chapter of APRI, lives in District 5, just outside of Toldeo, and interacts with voters in both District 5 and District 9.  *Id.* ¶ 615, 617–18.  These Democratic voters are apathetic and "due to the understanding that the outcomes of many elections, particularly for Congress, are preordained. For example, many residents of these districts have expressed to me that their vote does not count and it is not worth it for them to get engaged in politics. As a result, they do not see any point in voting, and many ultimately do not register or vote."  *Id.* ¶ 620.  In Ms. White's experience in District 5, "because Congressman Latta is sure to win, people who support the Democratic Party and Democratic candidates are even less likely to mobilize and vote in response to [her] efforts."  *Id.*  She has observed that her political activities are "more difficult and less effective than they would be otherwise" because "voters in District 5 and District 9 feel that their vote doesn't matter."  *Id.*

John Fitzpatrick is the Treasurer of the League of Women Voters of the Akron Area (LWVAA).  Pls.' Resp. ¶ 574.  He lives in District 14, in the suburbs of Akron.  *Id.* ¶ 573.  In his activities with the League, Mr. Fitzpatrick "traveled all over [his] region, including in Congressional Districts 11, 13, 14, and 16, talking to voters and prospective voters."  *Id.* ¶¶ 575–76.  Many people he "talked to felt their vote could not change the outcome of a race because of how the 2012 Map was drawn, and so, felt there was no point in voting."  *Id.* ¶ 576.  Mr. Fitzpatrick is a Democrat and works to elect Democrats to office, including to Congress.  *Id.* ¶¶ 572, 576.  Due to the congressional map, Mr. Fitzpatrick has trouble engaging Democratic voters, who often feel that "there is no reason to get involved."  *Id.*  He regularly "hear[s] from [his] District 14 neighbors that they feel their votes don't matter because a Republican will always be elected as our representative."  *Id.*  Likewise, other members of the League are Democrats who are also injured by the congressional map.  *Id.* ¶ 557.

The members of NEOYBD live in the 9th, 11th, 13th, 14th, and 16th Congressional District.  *Id.* ¶ 624.  As a Democratic organization, its members are self-identified Democrats who try to engage and activate voters for Democratic campaigns, including for Congress.  *Id.*  Similar to the experiences described above, these members' associational rights are burdened as the congressional map makes it harder to engage voters.  As President, Ms. Jackson is also a member of NEOYBD.  She has personally experienced working against voter apathy and confusion in the packed district where she lives.  *Id.* ¶ 633.

Likewise, the members of HCYD live in the First and Second Congressional Districts.  *Id.* ¶ 640.  The way Hamilton County, and particularly the City of Cincinnati, is split between the First and Second Congressional Districts burdens HCYD.  *Id.* ¶ 647.  The President and Vice President of the Hamilton County Young Democrats have attempted to seek constituent services

for residents of Hamilton County through their roles in the Office of the County Commissioner and in the Office of the Mayor of the City of Cincinnati. Congressmen Chabot and Wenstrup routinely do not reply to these requests. *Id.* ¶¶ 655–56. Members of HCYD have volunteered on other congressional campaigns throughout the state, such as the special election in District 12. In these other locations, HCYD members have faced the same difficulty of engaging Democratic voters and turning out unaffiliated voters. And the members of OSU College Democrats generally live in the Third, Twelfth or Fifteenth Congressional Districts. *Id.* ¶ 584. While some members are registered to vote at their home address, the bulk of the members are registered to vote at their school address. *Id.* Members of the OSU College Democrats canvass on behalf of Democratic candidates for Congress and have been burdened in their ability to turn out their party's base voters and to convince others to get engaged in the political process. *Id.* ¶¶ 585, 595–96.

The injuries experienced by the members of the Plaintiff organizations are just the type of non-dilutionary cognizable First Amendment injuries recognized by the Supreme Court. *Anderson*, 460 U.S. at 792. These associational interests lie at the heart of the mission of each of the Plaintiff organizations. Pls.' Resp. ¶¶ 552, 580, 604, 622, 635. And the claims asserted and the relief requested do not require the participation of individual members in the present lawsuit, and Defendants and Intervenors do not even attempt to argue otherwise. For all of these reasons, each of the organizational Plaintiffs has associational standing to pursue their claims in this case.

### 3. Plaintiffs Have Standing to Pursue Their Article I Claims.

In *Rucho*, the three-judge panel determined that the Plaintiffs also made out statewide injuries based on Article I. Plaintiffs in the instant case invoke Article I along the same lines— that is, the congressional map exceeds the Ohio legislature's "authority under the Elections

Clause and usurps the power of 'the People' to elect their representatives." *Rucho*, 318 F. Supp. 3d at 831. The Article I claim is premised on federalism. *Id.* at 832.

"[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Thornton*, 514 U.S. at 833–34. Plaintiffs seek redress of a structural harm in their Article I claim. "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Bond v. United States*, 564 U.S. 211, 222 (2011).

While, of course, pursuing a structural harm does not relieve litigants from having to demonstrate particularized injuries, *see Lance v. Coffman*, 549 U.S. 437, 440 (2007) (per curiam); *Rucho*, 318 F. Supp. 3d at 832–33, here, the Plaintiffs have identified numerous individualized injuries, *see supra* Section B.1–2. As amply discussed by the three-judge panel in North Carolina, so too here, "at least one Plaintiff residing in each district . . . alleges and offers proof of the type [of] individualized dilutionary injuries the Court recognized in *Gill*," and the Plaintiffs here also allege and adduce proof of "additional non-dilutionary injuries, including injuries to their associational rights." *Rucho*, 318 F. Supp. 3d at 833. Other courts have relied on associational injuries when finding organizations had standing to assert claims under Article I. *Id.*; *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006). These injuries are sufficient injuries-in-fact, fairly traceable to the congressional map, and likely to be redressed by a favorable decision in this case in order to support Plaintiffs' standing in this case. And while the Supreme Court did not consider standing expressly in *Thornton*, it reached the merits. Article III standing is of course

65

jurisdictional, to be considered even if not raised by the parties.  The Supreme Court would not have ruled unless the litigants had standing.

### 4. Plaintiffs' Injuries Are Fairly Traceable to the Challenged Map.

Though already identified in Sections B.1–3 above, it is worth expressly noting that Defendants flatly ignore the proof offered by Plaintiffs in an effort to argue that the injuries suffered by Plaintiffs are not fairly traceable to the challenged congressional map.  Defs.' Br. at Section II.  The Plaintiffs have consistently testified to the fact that it was the composition of the congressional map and the specific district lines at issue that caused the burden on their constitutional rights. *See, e.g.*, Pls.' Resp. ¶¶ 351, 360–61, 370, 372, 557-59, 379, 382, 387, 393, 421, 435, 439, 450–53, 475–78, 484, 492, 497, 501, 506, 516, 526, 528, 532, 544, 590, 610, 630, 647.  Defendants do not contend with these facts, and instead seek to sweep them under the rug. Plaintiffs have adduced facts that the state drew the congressional map with the express purpose of burdening a disfavored party and that they succeeded in accomplishing this purpose.  When the state acts to burden the First Amendment associational rights of a certain group it is plain that this burden is traceable to the state's discriminatory aim.

### 5. Plaintiffs' Injuries Are Likely to Be Redressed By a Favorable Order of the Court.

"An injury is redressable if a judicial decree can provide 'prospective relief' that will 'remove the harm.'"  *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018).  "Redress is sought *through* the court, but *from* the defendant. This is no less true of a declaratory judgment suit than of any other action. The real value of the judicial pronouncement . . . is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff." *Id.* (citation omitted). Plaintiffs do not seek only a judgment, but the entry of a new congressional map for the 2020 elections.  If this Court orders a new congressional map this will clearly redress the injuries

suffered by the Plaintiffs.  Plaintiffs, of course, are not guaranteed a particular outcome when they cast their votes or seek to associate with likeminded voters.  But this is also not what Plaintiffs seek to have redressed.

Where, as here, "the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the [disadvantaged] group . . . need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case [or a First Amendment case] . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of AGC of Am.*, 508 U.S. at 666.  Likewise, the relief is not the guarantee of obtaining the benefit, it is the equal treatment resulting from removing the improper barrier.

## CONCLUSION

Defendants and Intervenors have failed to meet their burden of establishing that they are entitled to summary judgment on Plaintiffs' claims as a matter of law.  This Court should therefore deny their summary judgment motions.

January 25, 2019                                   Respectfully submitted,

                                                   */s/ Freda J. Levenson*, trial attorney
T. Alora Thomas-Lundborg                           Freda J. Levenson (0045916)
Dale E. Ho                                         David Carey (0088787)
Theresa J. Lee                                     Elizabeth Bonham (0093733)
Emily Rong Zhang                                   American Civil Liberties Union of Ohio Fdtn.
American Civil Liberties Union Foundation          4506 Chester Avenue
125 Broad Street, 18th Floor                       Cleveland, OH 44103
New York, NY 10004                                 Tel.: (216) 472-2220
Tel.: (212) 549-2500                               Facsimile: (216) 472-2210
athomas@aclu.org                                   flevenson@acluohio.org
dho@aclu.org                                       dcarey@acluohio.org
tlee@aclu.org                                      ebonham@acluohio.org
erzhang@aclu.org

Robert Fram
Nitin Subhedar
Jeremy Goldstein
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel.: (415) 591-6000
rfram@cov.com
nsubhedar@cov.com
jgoldstein@cov.com

Kyunghoon John Woo**
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel.: (424) 332-4800
jwoo@cov.com

Michael Baker
Perrin Cooke
Peter Rechter
Robert Day
Kaitlyn Demers
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
rday@cov.com
kdemers@cov.com

## CERTIFICATE OF SERVICE

I, Freda J. Levenson, hereby certify that the foregoing document was served upon all counsel of record in this case via ECF.

*/s/ Freda J. Levenson*
Counsel for Plaintiffs