**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.* | |
| Plaintiffs, | No. 1:18-cv-357 |
| v. | Judge Timothy S. Black |
| | Judge Karen Nelson  Moore |
| LARRY HOUSEHOLDER Speaker of the Ohio House of Representatives, *et al.* | Judge Michael H. Watson |
| Defendants. | Magistrate Judge Karen L. Litkovitz |

## PLAINTIFFS' RESPONSE TO PROPOSED UNDISPUTED FACTS

Plaintiffs Ohio A. Philip Randolph Institute, League of Women Voters of Ohio, the Ohio State University College Democrats, Northeast Ohio Young Black Democrats, Hamilton County Young Democrats, Linda Goldenhar, Douglas Burks, Sarah Inskeep, Cynthia Libster, Kathryn Deitsch, Luann Boothe, Mark John Griffiths, Lawrence Nadler, Chitra Walker, Tristan Rader, Ria Megnin, Andrew Harris, Aaron Dagres, Elizabeth Myer, Beth Hutton, Teresa Thobaben, and Constance Rubin ("Plaintiffs") submit this response to Defendants' and Interveners' statement of material facts regarding their motion for summary judgment (ECF No. 136-1).  The numbering of the paragraphs in Section I below correspond to those in Defendants' and Interveners' Proposed Statement of Undisputed Material Facts.

# I.    PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF FACTS

## A.    The 2012 Plan

1.    The Ohio General Assembly enacted HB 369, Ohio's current congressional redistricting plan, on December 14, 2011. (Second Amended Complaint ("SAC") ¶ 84; Answer ¶ 84). Governor John Kasich signed HB 369 into law the following day, December 15, 2011. (*Id.*).

**Response**: Undisputed.

2.    The Plan was adopted by a bipartisan vote of both the Ohio House of Representatives and the Ohio Senate. (Exhibit 2, Deposition of William Cooper ("Cooper Dep.") Dep. 19:9-17; Exhibit 3, Deposition of Matthew Szollosi at 65:12-66:5; Exhibit 4, Deposition of Keith Faber at 25:17-26:14). A majority of Democrats in both houses of the Ohio General Assembly voted for H.B. 369. (Exhibit 5, Deposition of M.V. Hood, III at 7:23-8:1; Exhibit 6, Hood Exhibit 1, p.3); see also (Ohio General Assembly Archives webpage at http://archives.legislature.state.oh.us/votes.cfm?ID=129_HB_369).

**Response**: Disputed as incomplete.  Ohio's original redistricting plan, HB 319, was adopted without support from the majority of Democrats in the Ohio General Assembly.  Second Amended Complaint ¶¶ 66-69; Defs.' Answer ¶¶ 66-69.  Without passage of H.B, 369, HB 319 would have been the operative districting map.  There is minimal difference in the partisan projections between HB 319 and HB 369.  Ex. A (Ex. 1 to Cooper Dep. ("Cooper Decl.")) ¶¶ 52-57 & Fig. 9.

3.      Ohio's current congressional plan was first used in the 2012 election cycle, (SAC ¶ 86; Answer ¶ 86), and is hereinafter referred to as the "2012 Plan."

**Response**: Undisputed.

4.      The 2012 Plan contains 16 districts. (SAC ¶ 86; Answer ¶ 86).

**Response**: Undisputed.

### B.      Plaintiffs' Proposed Remedial Plan

5.      Plaintiffs hired an expert, William Cooper, to draft a "remedial plan" to "undo the partisan gerrymander." (Cooper Dep. at 11:10-15; Exhibit 38, Cooper Exhibit 1). Cooper's goal in creating the plan was to give "Democratic voters" who he defined as "people who cast ballots for Democrats" (but "not necessarily" in every election) a "better opportunity to elect their candidates of choice [than] under the 2012 Plan." (Cooper Dep. at 25:5-16). Cooper conceded, however, that he could not quantify how much better of an opportunity Democrats would have to elect their candidates of choice under his Proposed Remedial Plan as compared to the 2012 Plan. (*Id*. at 90:11-21).

**Response**: Undisputed as to the first sentence.  Disputed as incomplete and misleading as to the remainder.  Mr. Cooper testified that he used actual election results as opposed to party affiliation in registration to identify "Democratic voters."  Ex. B (Deposition of William Cooper ("Cooper Dep.")) at 25:5-13.  He testified that he went about doing this by "creat[ing] at least one additional district that would be Democratic-leaning and a couple more competitive districts."  *Id.* at 27:16-25.  Mr. Cooper testified that he could not identify "how much better of an opportunity" because he would have to compile data to present a trend and give "historical analysis."  *Id.* at 89:3-90:21.  He further testified that looking at the historical election results "if you look at these percentages, you would say it is probably more likely that a Democrat would – the Democrats would have a better opportunity – in the Proposed Remedial Plan than in the 2012 Plan."  *Id.* at 90:13-18.  Mr. Cooper testified that he was presenting the historical data, the interpretation of which would be for others.  *Id.* at 72:5-8; 87:16-88:23.  He testified that political scientists would be the right experts to opine on the efficacy of the Proposed Remedial Plan.  *Id.* at 90:23-24.  Plaintiffs' expert Christopher Warshaw assessed the Proposed Remedial Plan and

found "virtually no bias in the remedial plan." Ex. C (Warshaw Dep. Ex. 1 ("Warshaw Report")) at 32-33; Ex. D (Warshaw Dep. Ex. 6 ("Warshaw Rebuttal")) at 12-13; Ex. E (December 28, 2018 Warshaw 2018 Supplemental Report ("Warshaw Supplemental")) at 14-15.

6.      In drawing his plan, did not meet with any of the Individual Plaintiffs. (*Id*. at 37:12- 16). Also in drawing his plain, he Cooper used data from congressional elections that took place in 2012, 2014, 2016 that was not available to the Ohio General Assembly when it enacted the 2012 Plan. (*Id*. at 26:1-6; Cooper Ex. 1). But when Cooper evaluated the 2012 Plan under the 2008 congressional election results, which were available to the Ohio General Assembly, his analysis found that Democrats would have had a majority of the vote share in seven districts while Republicans would have had a majority of the vote share in nine districts. (*Id*. at 108:5-14).

**Response**: Undisputed and immaterial as to the first sentence. Disputed as incomplete and misleading as to the remainder. Mr. Cooper also used 2008 and 2010 election results data. Cooper Dep. at 21:23-22:16. Mr. Cooper presented the historical election results data for both HB 319 and HB 369, *id*. at 107:3-14; to the extent that Defendants mean something further by "Mr. Cooper evaluated the 2012 Plan," it is disputed. Using the 2008 congressional election results, in which Democratic candidates took 52% of the statewide two-party vote, a Democrat was elected in 7 of 16 Districts. Using the 2010 data, Democrats had a majority in four districts, and Republicans had a majority in 12. *Id*. at 108:5-24.

7.      Cooper testified that he relied primarily upon "traditional redistricting principles" to draw his plan but ended up with only one more Democratic-leaning district than was contained in the 2012 Plan. (*Id*. at 29:9-16; 30:23-31:3). When evaluated using congressional election results from the 2012, 2014, and 2016 election cycles, Cooper testified that his proposed remedial plan "would create at least one additional district that would be Democratic-leaning and a couple more competitive districts." (*Id*. at 27:16-25). Cooper defines a "competitive district" as one where the vote share for both Democrats and Republicans in "head-to-head contests" is between 47.5 and 52.5 percent. (*Id*. at 70:25-71:24).

**Response**: Disputed as to the first sentence. Undisputed as to Mr. Cooper's testimony in the second sentence. Disputed as incomplete as to the third sentence. Mr. Cooper testified that in 2012 there were six Democratic districts and two additional closely competitive districts under the Proposed Remedial Plan. Cooper Dep. at 89:3-8; 28:7-11. Mr. Cooper testified that he

considered the 47.5 to 52.5 percent vote share to be "competitive" as his "own rule of thumb, because it's close to 50. So one could come to the conclusion that that's a potentially competitive district." *Id.* at 73:14-18.

8.       Cooper admitted that when trying to give Democratic voters a "better opportunity" to elect their candidates of choice, "in some instances Democratic voters could be shifted into a Republican district and vice versa for sure" but that he was "looking at it from a statewide perspective, not at the micro level." (*Id.* at 30:7-18). Cooper also admitted that in making some districts more competitive in his Proposed Remedial Plan, he made other districts less competitive than they were under the 2012 Plan. (*Id.* at 94:18-95:4) ("[O]ne would expect some districts to become less competitive if others became more competitive.").

**Response**: Undisputed as to Mr. Cooper's testimony.

9.       Cooper admitted that only two Plaintiffs (Griffiths and Hutton) would be moved from a district in the 2012 Plan where the Democratic vote share is under 50 percent to a district in his Proposed Remedial Plan where the Democratic vote share is above 50 percent in any of the three congressional election cycles referenced in his report. (*Id.* at 213:20-214:9). Two other Plaintiffs (Walker and Rader) would be moved from the Ninth District in the 2012 Plan where Democrats received a majority of the vote share under each election cycle to the Ninth District in Cooper's Proposed Remedial Plan where Republicans received a majority of the vote share in two of the three election cycles references in his report. (*Id.* at 208:3-20).

**Response**: Disputed as incomplete and misleading. Mr. Cooper testified only to the content of a demonstrative exhibit put together by Intervenors' counsel. Cooper Dep. at 199:2-214:14. Mr. Cooper also testified that a number of the Plaintiffs' new districts were much more competitive than their district under the challenged congressional map. *Id.* at 201:6-7, 15. Mr. Cooper also testified to the fact that many of the Plaintiffs' remedial districts were more rational and voter-friendly than under the challenged congressional map. *Id.* at 206:10-18; 207:5-6; 201:16-211:16. Moreover, an additional remedial district (District 16 in 2014) had a majority of the Democratic vote share when the uncontested elections results were imputed. Warshaw Rebuttal at 13. Using the 2018 election results, Democrats had a majority of the two-party vote share in Remedial Districts 1, 3, 5, 9, 11, 12, 13, and 16. Ex. F (December 28, 2018 Cooper Declaration ("Cooper Third Suppl. Decl.")) at 3. Mr. Cooper also testified that it was possible to

draw one map that improves the chances for all of the Plaintiffs in cracked districts to elect their candidate of choice.  Cooper Dep. at 224:23-225:4.

10.     Using the results from the 2012 congressional elections, Cooper opined that under his Proposed Remedial Plan, Democrats would have won a majority of the vote share in six districts while Republicans would have won a majority of the vote share in ten districts. (*Id*. at 89:3-15; Cooper Exhibit 1, Figure 8). However, Cooper stated that this analysis does not mean that Democrats would have actually won six seats if his Proposed Remedial Plan had been in effect in 2012 because he "can't go back in time and resurrect new candidates in different districts or that sort of thing." (*Id*. at 89:19-21.) Cooper conceded that it was possible that his map might also have elected four Democrats and twelve Republicans just as the 2012 Plan did during the 2012 election cycle. (*Id*. at 89:12-90:3).

**Response**: Undisputed as to the first sentence.  Disputed as incomplete and misleading as to the remainder.  With respect to the 2012 election cycle, Mr. Cooper testified "it would be unusual but certainly possible under certain circumstances," Cooper Dep. at 89:22-90:3, but that "if you just look at these percentages, you would say it's probably more likely that a Democrat would – the Democrats would have a better opportunity – in the Proposed Remedial Plan than in the 2012 Plan."  *Id*. at 90:13-18.  Mr. Cooper testified that he was presenting the historical data, the interpretation of which would be for others.  *Id*. at 72:5-8; 87:16-88:23.

11.     Using the results from the 2014 congressional elections, Cooper opined that under his Proposed Remedial Plan, Democrats would have a majority of the vote share in four districts while Republicans would have won a majority of the vote share in twelve districts. (*Id*. at 91:4-91:12; Cooper Exhibit 1, Figure 8). This hypothetical result mirrors the actual partisan breakdown of Ohio's congressional delegation following the 2014 election cycle under the 2012 Plan.

**Response**: Disputed as incomplete and misleading.  Mr. Cooper further testified that this was "not exactly" the same outcome as the challenged plan because in Remedial Districts 1 and 16 it was a competitive race, unlike under the challenged plan.  Cooper Dep. at 91:13-23.  Moreover, an additional remedial district (District 16 in 2014) had a majority of the Democratic vote share when the uncontested elections results were imputed.  Warshaw Rebuttal at 13.

12.     Using the results referenced from the 2016 congressional elections, under his Proposed Remedial Plan, Cooper opined that Democrats would have a majority of the vote share

in five districts while Republicans would have won a majority of the vote share in eleven districts. (*Id.* at 93:5-7; 93:15-24; Cooper Exhibit 1, Figure 8).

      **Response**: Disputed as incomplete and misleading. Mr. Cooper further testified that under the Proposed Remedial Plan there was also "a much more competitive Hamilton County district, congressional District 1" and a competitive District 9, which "was leaning Democratic and potentially could have elected in a competitive contest a Democrat." Cooper Dep. at 93:8-94:8.

      13.    On November 30, 2018, Cooper submitted an "errata" to his report and a "corrected" Proposed Remedial Plan to fix an error that would have paired former Speaker of the House John Boehner (and his successor Congressman Warren Davidson) with Congressman Jim Jordan, a scenario Cooper admitted would have been unlikely under any plan adopted by the Ohio General Assembly. (*Id.* at 131:19-133:16; Exhibit 8, Cooper Exhibit 6). None of the changes Cooper made to fix this double-bunking would have changed the hypothetically likely political outcomes in any of the districts in his Proposed Remedial Plan. (*Id.* at 135:8-136:16; 137:13- 140:24).

      **Response**: Disputed as incomplete and misleading.  Representative Boehner was not in office at the time of the drawing of the Proposed Remedial Plan, so he was not an incumbent that would have been paired.  Cooper Dep. at 132:15-133:14.  Mr. Cooper did not opine on what the General Assembly would have done, but testified, "in this case it would have been unlikely -- it would be unlikely for the court in the future in a potential remedial plan to pair -- to pair Representative [Davidson] in 8 with Representative Jordan in 4 and leaving 4 open. I mean, that would make no sense."  *Id.* at 133:7-16.

      14.    In addition to his "corrected" Proposed Remedial Plan, Cooper drew two additional "hypothetical" redistricting plans in which he purported to take into account the residences of the 2011 incumbents in Ohio's congressional delegation but, in doing so, he did not attempt to pair the *same* incumbents as were paired by the Ohio General Assembly under the 2012 Plan. (*Id.* at 165:10-18). When asked why he didn't try to draw a plan pairing the *same* incumbents, Cooper responded: "Because I might have ended up with the 2012 Plan." (*Id.* at 165:19-166:4).  Based upon the information contained in his report, the political outcomes among Cooper's Proposed Remedial Plan and his "hypothetical" plans are the same: there were no differences between either of the "hypothetical" plans Cooper drew and either of his Proposed Remedial Plans with respect to which political party had a majority of the vote share under the

2012, 2014, or 2016 election cycles using the congressional election results Cooper included in his report. (*Id*. at 163:1- 164:7).

    **Response**: Disputed as incomplete and misleading.  In response to why he did not pair the same 2011 incumbents as in the challenged plan, Mr. Cooper testified that he did not pair the same incumbents as the 2012 Plan because "to pair Kaptur and Kucinich, as is done in the 2012 Plan, you have to draw the 'Snake on the Lake.' You have to combine Toledo with Cleveland in that elongated district. So you're breaking traditional redistricting principles, I think, in terms of compactness and communities of interest. That's what I think. So it's a mistake to try to pair two Democratic incumbents who live that far apart when it would have been very easy to draw a plan, as I've drawn."  Cooper Dep. at 152:12-25.  Mr. Cooper's hypothetical maps were drawn "in response" to Dr. Hood's report, *id*. at 155:17-18; 166:10-23, which discussed pairing as follows: "one paired district featured two Republicans, one two Democrats, and the last a Democrat and a Republican," Ex. G (November 12, 2018 Report of M.V. Hood ("Hood Report")) at 4.  And so Mr. Cooper "operated under the guidelines that the state legislature imposed that there would be two Democrats paired, two Republicans, and then a Democrat and Republican paired."  Cooper Dep. at 162:5-8.  He further testified, "The point was to do what the 2012 Plan does, and that was to pair two Democrats and pair two Republicans and have one Democrat/Republican challenge."  *Id*. at 165:23-166:2.  Mr. Cooper also testified that he prioritized traditional redistricting criteria in creating the hypothetical plans and that he "never" would have paired Representative Kaptur and Kucinich based on traditional redistricting criteria. *Id.* at 224:6-18.

    15.    Cooper ignored political factors considered by the General Assembly and all public input provided as to the makeup of the congressional districts when drawing Plaintiffs' proposed remedial plan. Cooper did not review or take into account any comments submitted by the public before the 2012 Plan was enacted as to how they wanted Ohio's congressional districts to be drawn. (Id. at 51:20-52:2; 52:9-19). Cooper also did not take into account any requests or

preferences of members of the Ohio General Assembly or of members of Ohio's congressional delegation in drawing his districts. (Id. at 52:20-25).

**Response**: Disputed as incomplete and misleading. There are no facts in the record as to the particular requests of members of Congress or members of the public. Mr. Cooper testified that he did not know if any elected officials actually requested anything with respect to the map. Cooper Dep. at 223:15-20.

16. As with the testimony from the Plaintiffs and their other experts, Cooper offered criticisms of the 2012 Plan but could not articulate any measurable standards by which a redistricting plan should be judged. For example, Cooper criticized the 2012 Plan for splitting too many counties and political subdivisions but could not provide a maximum number of acceptable county or political subdivision splits for a congressional plan in Ohio. (Id. at 17:25-18:4; 18:17- 19:4). He also could not provide specific parameters or measures for determining whether districts are compact. (Id. at 40:17-41:6). Rather, Cooper believed his proposed plans would comply "with relevant provisions of the Ohio constitution, U.S. Constitution and federal law" only because "the lawyers have signed off on this." Cooper admitted, "[B]ut I'm not in a position to interpret federal law." (Id. at 39:6-12.)

**Response**: Disputed as incomplete and misleading. Mr. Cooper repeatedly testified to traditional redistricting criteria, Cooper Dep. at 15:18-22; 44:11-49:8; 60:4-61:4, which have regularly been recognized by the courts as quantifiable and measurable standards, *see e.g.*, 14:14-15:22; 30:23-31:8; 44:11-49:8;. Equipopulation is a constitutional requirement that Mr. Cooper followed in creating his maps, Cooper Dep. at 44:19-46:21, as is contiguity, *id.* at 46:22-47:19. Mr. Cooper stated that while he could not identify the minimum possible number of county or political subdivision splits in an Ohio congressional map, it would at most be 14 counties and 27 political subdivisions. *Id.* at 17:25-18:16. He also testified that while the courts have not identified a bright-line rule with respect to compactness, courts do use those metrics, at least one of the court cases considered a .20 Roeck score as indicating non-compactness, and that any Polsby-Popper score under .1 is a "sign that you got problems." *Id.* at 40:17-41:14; 47:20-48:9. Each of the compactness metrics are on a scale of 0 to 1, Cooper Report at ¶ 37 & nn. 10-11, so plainly as the score is closer to zero, districts are less compact.

### C. Congressional Districts and Individual Plaintiffs

### First District – Linda Goldenhar

17.      Dr. Linda Goldenhar has resided in Ohio's First Congressional District in Cincinnati for 17 years. (Exhibit 7, Deposition of Linda Goldenhar ("Goldenhar Dep.") at 7:5-12). While Dr. Goldenhar is a Democrat and has always voted for Democrats, she would consider voting for a Republican candidate if that candidate supports the policies and ideals she supports. (*Id.* at 13:4-10, 13:16-14:4).

**Response:** The first sentence is undisputed. The second sentence is disputed as incomplete and thus mischaracterizing as to the cited testimony.  Dr. Goldenhar testified that she is a Democrat and has always voted Democratic.  Ex. H (Deposition of Linda Goldenhar ("Goldenhar Dep.")) at 13:2-24.  When asked whether she would vote for a "hypothetical . . . . Independent candidate that shared the majority of [her] views," she answered that such a "hypothetical . . . . has never happened" but that she could not see herself doing so "unless [the candidate] had the full, not like one issue or two issues, but it would have to be the comprehensive package," which includes "reproductive rights[,] LGBTQ, right[s], voting rights, workers' rights, health and safety issues, environmental concerns," etc.  *Id.* at 14:7-15:3.

18.      Dr. Goldenhar's current representative, Steve Chabot, is a Republican. (*Id.* at 11:7-19). Mr. Chabot has represented the First Congressional District continuously since 1994, except for one term where the district was represented by Democrat Steve Driehaus. (*Id.* at 11:7-19). While Representative Chabot was not her candidate of choice, he has represented Dr. Goldenhar for nearly all of her time living in Cincinnati, including before the 2012 Plan was enacted. (*Id.* at 11:7-19; 54:19-20).

**Response:** Undisputed but immaterial.

19.      Dr. Goldenhar was asked by ACLU employee Laurie Briggs to be a plaintiff in this lawsuit. (*Id.* at 16:3-17:3). Ms. Briggs knows Dr. Goldenhar socially, and sent Dr. Goldenhar an email stating that the ACLU's research showed the map was unfair and that the ACLU was seeking a plaintiff from each district. (*Id.* at 17:4-12; 24:17-25:16)

**Response**: Disputed as mischaracterizing the cited testimony. Dr. Goldenhar testified that Ms. Briggs is an ACLU Board Member, not an ACLU employee.  Goldenhar Dep. at 16:3-17:3.  Dr. Goldenhar also did not testify that Ms. Briggs's email to her stated that "the ACLU's

research showed the map was unfair and that the ACLU was seeking a plaintiff from each

district." Rather, she recalled being approached by Ms. Briggs through a short email "about

gerrymandering in Ohio." *Id.* at 24:17-22. When asked what Dr. Goldenhar took Ms. Briggs to

mean when "she said it was going to be about gerrymandering in Ohio," Dr. Goldenhar testified

that "the ACLU was – had done research and looked at the way the map was drawn and that they

felt it wasn't drawn fairly." *Id.* at 25:8-13. She "assume[d] that's how we got to this point," her

deposition in this case, "and that they wanted a plaintiff from each of the districts." *Id.* at 25:14-

16.

20.     While Dr. Goldenhar believes that individuals choose to live in an area
surrounded by like-minded people and that her urban vote is "diluted" by rural Republican votes,
(Id. at 43:2-44-13), she admits that when she votes, her vote, is in fact, counted (Id. at 41:13-17).

**Response**: Disputed as mischaracterizing the cited testimony. Dr. Goldenhar testified

that her vote is "diluted" because "[r]ather than having a district drawn where it – the votes of the

people voting in that district would represent some sense of community underpinnings of the

people who live there, Hamilton County, Cincinnati, has been split up so that rather than coming

with a representative that represents Hamilton County, it's representing a piece of Hamilton

County, Cincinnati with a lot of Warren County. So then my vote becomes diluted with much

more rural population and views." Goldenhar Dep. at 43:2-12. When asked whether voters in

Warren County "tend to be Republican," she said that was her "sense." *Id.* at 43:17-21. When

asked whether her opinion is that the "solution to the problem . . . [would] be to remove

Republicans from congressional District 1," she responded that it is "not possible" and not what

she wants. *Id.* at 43:22-44:4. She discussed people "choos[ing] to live in areas for certain

reasons" in saying that "the whole point is the drawing and let the cards fall where they may

within a county." *Id.* at 44:5-13.

21.     Dr. Goldenhar also believes that the map is unfair because of the way it looks, in that urban areas like Cincinnati, Columbus, and Cleveland are split. (Id. at 30:8-23) However, Dr. Goldenhar did not know the reasons for splitting those urban areas, and did not know if each Congressional district needed to have a certain, equal, population. (Id. at 40:7-17).

**Response**: Disputed as mischaracterizing the cited testimony. Dr. Goldenhar testified that

the current map does not "take into account communities of interest or where people live" due to

the splitting of "Cleveland, Columbus and Cincinnati, the most Urban of the whole state of

Ohio." Goldenhar Dep. at 30:8-23. Dr. Goldenhar testified that she did not know the "specific

population requirements" regarding whether "Hamilton County could be its own congressional

district," and not whether other cities like Cleveland and Columbus had to be split. *Id.* at 40:7-

17. She testified that even if the exact county lines could not be followed, it "surely would be

more – closer to keep it as much together as possible, whereas now it's just broken up." *Id.* at

40:11-17.

22.     Moreover, Dr. Goldenhar has no suggestions on how to fix the current congressional maps and would simply like to know "why" the legislature drew them in that manner. (Id. at 46:15-47:13)

**Response:** Disputed as mischaracterizing the cited testimony. Dr. Goldenhar disclaimed

any expertise in drawing maps, but indicated that the treatment of county lines indicated

"something fishy" about them. Goldenhar Dep. at 46:6-14. That is why she indicated a desire to

"sit down with whoever drew the map." *Id.* at 46:15-23.

23.     Dr. Goldenhar has reviewed Cooper's proposed map and prefers it to the current plan because it looks "fairer." (Id. at 47:22-48:14, 49:4-11). Specifically, Dr. Goldenhar likes the way that the districts around Cincinnati, Columbus, and Cleveland are drawn but did not provide more specific details. (Id. at 48:5-14).

**Response**: Disputed as incomplete and thus mischaracterizing as to the cited testimony.

Dr. Goldenhar has reviewed Cooper's proposed map and believes it to be "drawn much more

fairly, again, with respect to, in particular, Cincinnati, Columbus and Cleveland," referencing her

earlier testimony about the splitting up of those urban areas in the current map. Goldenhar Dep.

at 48:5-14. She also testified that the "map as a whole, you again see more contiguous counties and areas as opposed to some reaching into others." *Id.* at 15:17.

24. While Dr. Goldenhar claims the 2012 Plan harms her because it splits Hamilton County, she prefers the Proposed Remedial Map even though it also splits Hamilton County. (Id. at 49:12-16).

**Response**: Undisputed but irrelevant and/or immaterial.

25. Under the Proposed Remedial Plan, Dr. Goldenhar would be placed in the First District where Republicans have a majority of the vote share under the three elections cited in Cooper's report. (Cooper Dep. at 199:23-201:7; Cooper Exhibit. 6-Ex. S; Exhibit 9, Cooper Exhibit 12). This is the same result as under the 2012 Plan. (Id.)

**Response**: Disputed as incomplete and thus mischaracterizing as to the cited testimony after the first clause of the first sentence. In Remedial District 1, the estimated Democratic vote share based on historical congressional elections results are 48.5%, 44.3%, 48.3% and 57.2% in 2012, 2014, 2016 and 2018 respectively. Warshaw Rebuttal at 13 (Table 4) (for 2012 and 2014 imputed election results; Cooper Decl. at 20 (Figure 8) (for 2016 results); Cooper Third Suppl. Decl. at 4 (Figure 2) (for 2018 results). These estimates differ from the actual vote share in challenged District 1: 39.5%, 36.7%, 40.7% and 47.8% in those respective years. Cooper Decl. at 20 (Figure 8) (for vote share in 2012, 2014, and 2016); Cooper Third Supp. Decl. at 4 (Figure 2) (for 2018 vote share).

### Douglas Burks- Second District

26. Douglas Burks has lived in Hamilton County in Ohio's Second Congressional District since 1979. (Exhibit 10, Deposition of Douglas Burks "Burks Dep." at 7:23-8:17). He is represented by Representative Brad Wenstrup, a Republican. (Id. at 8:18-8:20). Dr. Burks is a Democrat. (Id. at 18:23-19:7). He acknowledged that the Second District has been a majority Republican district for "a very long time." (Id. at 31:8-31:11).

**Response**: Undisputed, but the last sentence is immaterial or irrelevant.

27. Dr. Burks became a plaintiff in this lawsuit after being asked by Paul Moke at the ACLU. (Id. at 11:12-14:16; 15:11-16). He would never have considered filing a lawsuit on his own if he had not been approached by the ACLU. (Id. at 16:11-16:16).

**Response**: Undisputed but immaterial.

28.     Dr. Burks is a member of an advocacy organization called the Friends Committee on National Legislation ("Friends"). (Id. at 33:13-33:20). As part of his work with the Friends, Mr. Burks has lobbied and met with numerous politicians, including Congressman Wenstrup. (Id. at 35:22-38:14; 76:1-93:23). He believes he has "been listened to" by the Republican congressmen who have represented him in the Second District. (Id. at 74:15-74:25, 75:1-75:16).

**Response**: The first two sentences are not disputed.  The third sentence is disputed as

incomplete and thus mischaracterizing as to the cited testimony.  While Dr. Burks has felt that he

has been "listened to" during his lobbying efforts of Republican congresspersons, he also stated

that "each time I have left -- I'll use a sports term -- I have been told to go pound salt."  Ex. I

(Deposition of Douglas Burks ("Burks Dep.")) at 74:15-75:4. "[W]hat you say you would like to

see done is not going to be done."  *Id.*

29.     Dr. Burks has engaged in election activity in his district such as canvassing and distributing campaign material and admits that nothing about the 2012 Plan prohibited him from engaging in election activities on behalf of Democrats. (Id. at 93:24-94:23; 95:25-96:6).

**Response**: Undisputed but immaterial.

30.     In his canvassing efforts, he claims to have encountered people who were apathetic and said they did not plan to vote but he admits that nothing about the 2012 Plan kept those voters from casting votes and that any failure to do so by them "was a personal choice." (Id. at 119:14- 119:23). He has also participated in protests in Ohio and nothing about the 2012 Plan has kept him from doing that. (Id. at 119:24-120:10).

**Response**: Undisputed but immaterial.

31.     Through this lawsuit, Dr. Burks believes he is challenging what he perceives to be an uneven split between Republicans and Democrats in the makeup of Ohio's statewide congressional delegation.  (Id. at 38:15-42:4; 45:23-47:16). He also feels that Democratic votes are "wasted" in Ohio because of the way the Republican legislature "rigged" the 2012 Plan but could not state at what point a district becomes "rigged." (Id. at 42:5-42:23).

**Response**: The first sentence is undisputed.  The second sentence is disputed,

mischaracterizing the cited testimony.  Dr. Burks declined to provide expert testimony on how to

measure partisan gerrymanders, but testified that the districts have been "rigged" by lines that

looks like they were drawn by a "third grader . . . squiggling around areas where you know you have concentration of Democrats and Republicans."  Burks Dep. at 42:10-43:5.

32.     Dr. Burks believes that mapdrawers, in crafting a "fair" map, should consider keeping counties intact, keeping areas of "shared concerns" intact, and compactness of districts but does not know whether the Ohio General Assembly considered these requirements when enacting the 2012 Plan. (Id. at 51:5-17; 52:3-52:14).

**Response:** Undisputed but immaterial.

33.     Dr. Burks has a problem with the shape of his district because it includes both rural areas and urban and suburban areas. (Id. at 52:15-53:21) But he admits that the suburban area in which his resides, Norwood, has been in the Second District along with the same rural areas prior to the enactment of the 2012 Plan. (Id. at 54:11-56:21; 57:13-57:17). He thinks Democrat voters have been "cracked" in both the First and Second District but that the Democrat voters in these districts were "cracked" prior to the enactment of the 2012 Plan, starting in 2000. (Id. at 58:13- 59:4; 59:5-59:13). He does not have an opinion about how his district should be drawn so that it is not allegedly "cracked." (Id. at 60:12-60:17).

**Response**: Except the second and third sentences, which are not disputed, this paragraph is disputed as mischaracterizing the cited testimony.  Dr. Burks believes that a problem with District 2 is that it divides people and communities who have shared concerns.  Burks Dep. at 51:5-52:19.  District 2 divides the urban-suburban area that Dr. Burks resides in, creating "a kind of a peninsula coming into that area to cover the area," and includes "highly rural" and "Appalachian rural" areas.  *Id.* at 52:22-53:12.

In the portion of the deposition testimony cited about Dr. Burks' opinion about how to draw his district so that it is not "cracked," Dr. Burks referred to his earlier testimony about drawing the lines not along partisan lines, but on "different factors."  *Id.* at 59:9-23.  These would include taking into consideration "demographic factors such as maybe keeping counties intact, looking at types of areas, urban, urban-suburban, suburban rural because of shared concerns . . . . to the extent possible, terms of land area not super large, super small, . . . Not having lines go and cut unusually in what seems to be a natural area."  *Id.* at 51:8-17.  He noted these factors, all while making clear that these are based on his "armchair speculation" and

urging consultation of "experts out there" and the "rich literature" on the topic.  *Id.* at 51:22-52:2.

34.    Under the Proposed Remedial Plan, Dr. Burks would be placed in the First District with Dr. Goldenhar where Republicans have a majority of the vote share under the three congressional elections cited in Cooper's report. (Cooper Dep. at 199:23-201:7; Cooper Exhibit 6- Ex. S; Cooper Exhibit 12). Dr. Burks prefers the Proposed Remedial Plan because it places him in the First District and does not care that the Proposed Remedial Plan makes the Second District even more Republican than it is under the 2012 Plan (Burks Dep. at 60:18-65:18; 66:10-66:12).

**Response**: Disputed as incomplete and thus mischaracterizing as to the cited testimony except as to the fact that Dr. Burks, like Dr. Goldenhar, would be in Proposed Remedial District 1.  As noted in the response to Paragraph 21 pertaining Proposed Remedial District 1, the estimated Democratic vote share based on historical congressional elections results are 48.5%, 44.3%, 48.3% and 57.2% in 2012, 2014, 2016 and 2018 respectively.   Warshaw Rebuttal  at 13 (Table 4) (for 2012 and 2014 imputed election results; Cooper Decl. at 20 (Figure 8) (for 2016 results); Cooper Third Supp. Decl. at 4 (Figure 2) (for 2018 results).  These estimates differ from the actual vote share in challenged District 1: 39.5%, 36.7%, 40.7% and 47.8% in those respective years.  Cooper Decl. at 20 (Figure 8) (for vote share in 2012, 2014, and 2016); Cooper Third Supp. Decl. at 4 (Figure 2) (for 2018 vote share).

As to Proposed Remedial District 2, Dr. Burks merely testified to not knowing whether the "percentage of Republicans" increased in the Proposed District 2 compared to the current District 2.  Burks Dep. at 64:18-65:12.  Even if Proposed Remedial District 2 became more Republican, Dr. Burks still believed the map is a "fairer map" because it does not split urban and rural communities such that even if he were in Proposed Remedial District 2, he would still consider it to be fair.  *Id.* at 65:14-66:12.

**Sarah Inskeep – Third District**

35.    Ms. Inskeep has resided in Ohio's Third Congressional District in Columbus since May 2016.  (Exhibit 11, Deposition of Sarah Inskeep "Inskeep Dep." at 6:19-7:2).  Ms. Inskeep is a Democrat and has always voted Democrat but would "absolutely consider" voting for a Republican or an independent candidate who supports policies that she supports.  (Id. at 65:20-66:19)

**Response:** Disputed as incomplete and thus mischaracterizing as to the cited testimony after the first sentence.  Ms. Inskeep testified that she is a Democrat and has always voted Democratic.  Ex. J (Deposition of Sarah Inskeep ("Inskeep Dep.")) at 53:23-54:2; 65:20-23.  When asked whether she "could never vote for an Independent or never vote Republican," she answered by saying that she would consider voting for a Republican or Independent candidate who supports policies that she supports, but she is "not going to waver on the issues that [she] feel[s] firmly on.  And right now in this current political climate, especially in the state of Ohio, that's a select few Democrats."  *Id.* at 66:10-67:2.

36.    Ms. Inskeep is currently represented in Congress by Representative Joyce Beatty.  (Id. at 11:25-12:7).  Representative Beatty is a Democrat and Ms. Inskeep testified that she wants to live in a district that is represented by Democrat because they "support the values that [she] share[s]."  (Id. at 56:11-56:17; 63:16-64:5).

**Response:**  Disputed as incomplete and thus misleading as to the cited testimony after the first sentence.  Ms. Inskeep testified that she "just want[ed] the [redistricting] process to be fair and competitive" and that she is "not out there to say that [she] want[s] Democrats," but her personal preference for a congressional representative would be a Democrat since they "support[ ] the values that [she] share[s]."  Inskeep Dep. at 55:22-56:17.

37. Prior to May 2016, Ms. Inskeep lived in Cincinnati, Ohio in Ohio's First Congressional District. (Id. at 7:3-8:19; 27:19-28:10). She prefers living in the Third Congressional District where she is represented by a Democrat over living in the First Congressional District where she was represented by a Republican. (Id. at 57:6-16). She believes Representative Beatty has been a "wonderful representative" and that she has "made herself available" to the people in her district. (Id. at 57:10-57:16).

**Response:** Disputed as incomplete and misleading as to the cited testimony after the first sentence. When asked Ms. Inskeep testified that she did not prefer the representation she received from Congressman Chabot when she lived in the First Congressional District to the representation she currently receives from Congresswoman Beatty in the Third Congressional District but "it's a different district." Inskeep Dep. at 57:6-16. Ms. Inskeep further testified that while she thinks Congresswoman Beatty is a "wonderful representative" who "has made herself available," she thinks her vote in the Third Congressional District has been "diluted" and that "the way that the current map is drawn, that it's manipulating one party over the other." *Id.* at 57:6-16; 89:10-90:2.

38. Ms. Inskeep was asked by an employee of the ACLU, Ann Ruege, to be a plaintiff in this lawsuit. (Id. at 29:15-32:11). She would not have filed this lawsuit on her own if she had not been recruited by the ACLU. (Id. at 32:12-32:15).

**Response:** Undisputed but immaterial.

39. Ms. Inskeep works at Planned Parenthood where she is tasked with crafting all internal and external messaging of the organization's political arm. (Id. at 9:3-9:15). She also participates in electoral activity on the organization's behalf. (Id. at 9:3-9:15; 10:13-11:19; 13:3-13:24; 14:6-21:19; 80:12-87:13). She raised money for the organization's Super PAC, ran door-to-door canvassing, ran phone bank operations, and directed voter contact operations. (Id.) In 2018, Planned Parenthood's political arm endorsed Joyce Beatty, Marcia Fudge, and Tim Ryan, all Democratic victorious congressional candidates in Ohio. (Id. at 11:20-13:2).

**Response:** Undisputed.

40.    Ms. Inskeep complained that the 2012 Plan negatively impacted Planned Parenthood's decision on where its PAC should spend election money.  (Id. at 93:9-93:13).  Specifically, the PAC chose not to contribute to Representative Beatty in the Third District because it was believed to be a foregone conclusion that she would win.  (Id. at 93:17-93:24).  Ms. Inskeep admitted, however, that had the PAC become involved in the Third District, it would have been to support Representative Beatty.  (Id. at 94:14-95:8).  Ms. Inskeep could not explain how she was harmed by the PAC's decision not to become involved in the Third District since her candidate of choice, Representative Beatty, won the election.  (Id. at 94:14-95:10).

**Response:** Disputed as incomplete and misleading as to the cited testimony.  Ms. Inskeep testified that the current way the Third Congressional District is drawn caused Planned Parenthood to decide not to invest its super PAC funds in the Third Congressional District since it was a foregone conclusion that Congresswoman Beatty would win the election.  Inskeep Dep. at 88:11-89:9; 93:9-24.  When asked why that was a "bad thing," Ms. Inskeep said that she "wouldn't necessarily say it's a bad thing" but "it's unfortunate that we have gotten to a place in our democratic process that we have to be strategic with how we invest our dollars, because it's seen that they are going to win anyway, that you know, it's not competitive or fair to have . . . a level playing field with all the congressional districts."  *Id.* at 93:25-94:12.  When asked how she was harmed by Planned Parenthood's decision to not invest its super PAC funds in the Third Congressional District, Ms. Inskeep testified that she thought she was "harmed in the fact that there's less political activity and investment in [her] district to run a fair and competitive electoral cycle for voters."  *Id.* at 94:14-21.

41.    Ms. Inskeep wants a map "that gives voters an opportunity to feel like their vote matters and that they feel like they're participating in a democratic process."  (Id. at 39:6-40:5).  She believes that one way to show that a district is not fair is when it splits communities of interest but she could not identify any communities that she believes should be included in her district under the 2012 Plan but are not.  (Id. at 42:22-45:5, 45:23-47:2; 74:23-75:6).  Ms. Inskeep believes that the 2012 Plan has increased voter apathy, but admits that voter apathy existed prior to 2012 and could not articulate how the 2012 Plan has actually increased voter apathy.  (Id. at 90:8-93:7).

**Response:** Undisputed that Ms. Inskeep testified as such with respect to the first sentence.  Disputed as incomplete and thus misleading as to the cited testimony with respect to

the second and third sentences.  Ms. Inskeep testified that she was "not an expert with drawing maps."  Inskeep Dep. at 40:19-20.  When asked whether she thought one thing that should be considered in trying to create fair districts is to keep communities of interest together, Ms. Inskeep said "yeah, more or less."  *Id.* at 44:19-24.  When asked whether "there are pieces of that community that aren't in the district that you would like to see in the district," Ms. Inskeep responded "I can't speak to that specifically.  I don't – off the top of my head, I don't know.  *Id.* at 46:20-47:2.  Ms. Inskeep testified that through her electoral work, she has encountered apathetic voters who feel like their vote does not matter as a result of the drawing of the current congressional map.  *Id.* at 39:21-40:5; 42:16-20; 53:17-22; 54:21-55:6; 58:8-25; 87:21-88:10; 90:8-91:13; 92:11-22.  Ms. Inskeep said that she thought the current congressional map increased voter apathy.  *Id.* at 87:21-88:10.  When asked how much the plan increased voter apathy, Ms. Inskeep testified that while she couldn't give a "quantifiable number," when talking to voters she has heard people say "the lines are drawn poorly in a way that doesn't, you know, benefit my voting, or that it's stacked against them."  *Id.* at 90:12-92:22.

42.    Ms. Inskeep believes that the current congressional map as a whole is "unfair and not competitive" and believes that she lives in a "packed" district and that her vote is not "weighed the same" but admitted that all votes are counted equally regardless of whether they are cast by a Democrat or a Republican.  (Id. at 33:13-34:2; 51:1-12).

**Response:** Disputed as mischaracterizing the cited testimony.  Ms. Inskeep testified that the current congressional map is "unfair and not competitive as a result of partisan gerrymandering" and that she lives in a "packed" district where her vote is not "weighed the same" as other voters.  Inskeep Dep. at 33:13-34:2.  Ms. Inskeep explained that while she "is not an expert," it was her understanding that each person gets one vote and "the count is there," but "the weight of which that, let's say, Democrat vote, had it been in a different district, would have [been] weighted differently."  *Id.* at 40:19-21; 51:2-52:5.

43.     Ms. Inskeep believes she is in a "packed" district because her "district looks like a box" and because it is a majority Democratic district.  (Id. at 70:10-70:24; 73:5-73:15).  She does not believe that every district that is a majority Democratic district is unfair or noncompetitive and does not have any specific suggestions on how to "fix" the alleged problem she identified in her district.  (Id. at 73:16-74:21; 97:7-100:15).  She also does not have any opinion on when a district becomes "packed."  (Id. at 78:16-80:9).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony.  Ms. Inskeep testified that she believes she lives in a "packed" district that is "heavily Democratic" and that had her vote "been somewhere else in a different district, let's say if it was a line over, that [her vote] could be weighted differently if it wasn't so packed."  Inskeep Dep. at 51:22-52:5; 71:13-72:2.  Ms. Inskeep testified that fixing packed districts like Ohio's Third Congressional District was "not [her] expertise.  [She] would leave that to the folks that draw the map" and that she would just draw the map so "there's a fair shot for either candidate, whether it be Democratic or Republican, to have an opportunity to get elected by the people that are voting for them."  *Id.* at 73:16-74:21.

44.     Under the Proposed Remedial Plan, Ms. Inskeep remains in the Third District, a safe Democratic seat.  (Cooper Dep. 201:25-202:8, Cooper Exhibit 12).

**Response:** Undisputed.

### Cynthia Libster – Fourth District

45.     Cynthia R. Libster lives in Marion County, Ohio which is located in Ohio's Fourth Congressional District. (Exhibit 12, Deposition of Cynthia Libster "Libster Dep." at 10:12-21). She has lived in this district for almost thirty years. (Id.). Her representative since 2006 has been Jim Jordan, a Republican. (Id. at 10:21-11:25). Previously, Ms. Libster was represented by Republican Congressman Mike Oxley since the 1980s. (Id. at 10:21-11:25)

**Response:** Undisputed.

46. Ms. Libster's husband was contacted by an acquaintance asking him if he would be interested in participating in a lawsuit regarding the alleged gerrymandering in Ohio. (Id. at 15:16- 17:2). He declined because he felt that his former position as a legal aid attorney made it inappropriate, however, he asked his wife, Ms. Libster if she wanted to participate. (Id. at 15:16-21). She was then interviewed by the ACLU and joined the lawsuit. (Id. at 15:16-17:2). Prior to joining the lawsuit, she had no intention of filing a lawsuit related to redistricting in Ohio. (Id. at 17:10-14).

**Response:** Undisputed but immaterial.

47. Ms. Libster wants her "district to have an opportunity for both Democrats and Republicans to run equally." (Id. at 23:24-24:6). However, she does not know how what such a district would look like. (Id. at 23:24-25:11). She admits that her district is "very Republican" and that a Republican has represented her district for the last thirty years. (Id. at 26:24-27:21; 48:21- 49:9). She testified she believes her district has been cracked in some areas, but could not say specifically how. (Id. at 72:15-21).

**Response:** The last sentence is disputed as incomplete and misleading as to the cited testimony. Ms. Libster did testify that she believes her district has been cracked, Ex. K (Deposition of Cynthia Libster ("Libster Dep.")) at 72:15-18. She previously testified that in her non-expert opinion, *id.* at 72:23, "[c]racking, as I understand it, is when redistricting – when certain votes, Democratic votes in this particular case, are taken away from an area, cracked off, if you would, placed in a different area." *Id.* at 72:8-12. She subsequently testified that, for example, her district splits a Democratic-voting piece of Lorain County. *Id.* at 72:23-73:23. She testified multiple times that her testimony was confined to her experience as a voter, and that she was not an expert in map-drawing. *Id.* at 20:16-18; 24:9-25:11; 30:9-17; 44:7-9; 72:23-73:4.

48. While Ms. Libster criticized an alleged nonappearance by Representative Jordan's at a forum put on by the League of Women Voters, she admitted that she was unsure as to whether Representative Jordan had a conflict that prohibited him from attending the forum. (Id. at 30:19- 33:18). In any event, Ms. Libster chose not to attend the candidate forum (Id. at 30:21-22).

**Response:** Disputed as incomplete and misleading as to the cited testimony and mischaracterizing the testimony. Ms. Libster testified that in her view, her Representative,

Jim Jordan, has such a "safe" seat that he does not have to listen to or engage with Democratic constituents like her. Libster Dep. at 33:18-34:4; 77:3-21. As one "example" of this, *id.* at 30:17, Ms. Libster testified about a recent instance—a week before her deposition—where her local League of Women Voters hosted a candidate forum and Representative Jordan neither appeared at the forum, nor answered a candidate questionnaire in the alternative. *Id.* at 30:9-37:13. Ms. Libster testified that for this forum "I was out of town but my husband went. I asked him how it went . . . ." *Id.* at 30:19-25.

49.     Although Ms. Libster admitted that her district was "solidly Republican," she testified that "I don't want to feel like every time I go vote for the Democrat they're going to get pounded by thirty percent, forty percent." (Id. at. 28:24-29:12).

**Response:** Disputed as mischaracterizing the cited testimony. In this excerpt Ms. Libster testified that for Republicans, her district "is one of the safest seats in America." Inskeep Dep. at 28:7-9. She testified this in the context of talking about partisan gerrymandering. *Id.* The context for the second statement Defendants quote above is: "I want my voter to matter. I don't want to be disenfranchised as a voter. I don't want to feel like every time I go to vote for the Democrat they're going to get pounded by thirty percent, forty percent, okay." *Id.* at 29:7-12. The quotation Defendants include in the above paragraph, "solidly Republican," appears nowhere in Ms. Libster's deposition testimony.

50.     Under the Proposed Remedial Plan, Ms. Libster remains in the Fourth District, a solidly Republican District, but the district has an even higher Republican vote share under the Proposed Remedial Plan than under the 2012 Plan. (Cooper Dep. at 202:9-25).

**Response:** Undisputed.

51.     Cooper testified that this outcome "really doesn't matter" because "effectively, a Republican district is a Republican district" and "[y]ou can't placate all [of the] plaintiffs at once" because it is "[j]ust not geographically possible." (Id. at 202:13-22).

**Response:** Undisputed that Mr. Cooper testified as such.

**Kathryn Deitsch - Fifth District**

52.     Plaintiff Kathy Deitsch has resided in Mercer County and Celina, Ohio since 2013. (Exhibit 13, Deposition of Kathy Deitsch "Deitsch Dep." at 10:21-23; 11:7-8). Before 2013, Ms. Deitsch lived in another state.  (Id. at 11:16-18).

**Response:** Undisputed.

53.     Ms. Deitsch's address is in Ohio's Fifth Congressional District, and her current representative is Bob Latta, a Republican.  (Id. at. 14:3-10).

**Response:** Undisputed.

54.     Representative Latta has served as Ms. Deitsch's congressional representative since her move to Ohio in 2013 and represented the Fifth District before the 2012 Plan. (Id. at 14:16- 19).

**Response:** Undisputed.

55.     Although Ms. Deitsch does not support Representative Latta, she has voted for Republican candidates in the past. (Id. at 16:14-24). She also would consider voting for Republicans in the future if she believed they represented "responsible government." (Id. at. 18:24-25). Despite not supporting Mr. Latta, Ms. Deitsch could not specify anything Representative Latta had said or done that made her feel that he lacked knowledge of or concern for Mercer County. (Id. at. 82:14-19).

**Response:** Disputed as incomplete and mischaracterizing the cited testimony.

Regarding her voting history, Ms. Deitsch testified that at one time in her life, while working

for the Women's Caucus in Texas, she voted for Texas candidates "that weren't always

Democrats."  Ex. L (Deposition of Kathryn Deitsch ("Deitsch Dep.")) at 16:14-17:16.

Otherwise, she only recalls ever voting Democrat.  *Id.*  Ms. Deitsch answered "I don't know"

twice when asked about whether she would vote for a Republican in certain hypothetical

circumstances.  *Id.* at 18:12-17; 18:18-19:2.  When asked about whether she would support a

hypothetical independent candidate, she said "hard to say."  17:17-18:5.

Regarding her testimony about Representative Latta, Defendants asked Ms. Deitsch

whether she could "think of anything specifically that Bob Latta *said* that is indicative that he

doesn't know anything about Mercer County or about your area?"  *Id.* at 82:14-17 (emphasis

added). As to "specific[]" things the Representative has "said," Ms. Deitsch answered

"[r]ight off the top of my head I could not." *Id.* at 82:8-19. She testified multiple times that

she feels Congressman Latta does not listen to or understands concerns of hers or of similar

constituents. *Id.* at 56:5-59:3; 81:9-82:13. For example, she testified that despite trying to

contact Congressman Latta, including through writing, phone calls, and voicemails, she

never reached him or received a response. *Id.* at 95:25-97-23. And that "he needs to come

participate and listen and answer questions and see what we want, what we expect of a

congressperson from District 5." *Id.* at 98:8-15.

56.    Despite alleging in the complaint that she lives in a cracked district, Ms. Deitsch could not define the term "cracked" or state why she believed she lived in a cracked district. (Id. at 65:7-8). She testified that she had heard the terms "cracking and packing," but could only describe packing as what "you put things in." (Id. at 65:14).

**Response:** Disputed as incomplete and misleading.

57.    Although Ms. Deitsch suspects that the division of Mercer County contributes to voter confusion and voter apathy, Ms. Deitsch noted that she has consistently been able to help voters figure out what districts they live in. (Id. at 53:15-23).

**Response:** Disputed as incomplete and misleading.

58.    Since moving to Ohio in 2013, Ms. Deitsch has been able to vote and campaign for Democrat candidates of her choice in every congressional election. (Id. at 15:12-16:13; 48:5-8; 30:25-31:6). In fact, Ms. Deitsch believes that the 2012 map has "encouraged" some of her efforts to recruit Democrat candidates and engage in Get Out the Vote efforts. (Id. at 84:6-24; 86:24- 87:5).

**Response:** Disputed as incomplete and mischaracterizing testimony. When told,

"[y]ou'll agree that you had a choice between a Republican and a Democrat candidate in

every congressional election since you moved back to Ohio," Deitsch Dep. at 47:23-48:2,

Ms. Deitsch testified that "[c]ertainly those existed, but you would go and knock on the door

and somebody would say to you it doesn't make any difference who I vote for, they're not

going to win or I'm not going to give you money because they're not going to win. They're

not in contention." *Id.* at 48:3-14. Ms. Deitsch testified that she has only been able to

fundraise for candidates of her choice on "a limited basis." *Id.* at 84:25-85: 8. When asked

several times whether the 2012 map "*prevented*" her from fundraising for candidates of her

choice, she said "I don't know how to answer that." *Id.* at 85:9-23. When asked again, she

said, "I can fundraise for whomever I want to. Now, a caveat to that would be why do you

want to if your candidate isn't going to win when you could be raising money for a candidate

that could?" *Id.* at 86:4-8.

59. Ms. Deitsch testified that Mercer County is in a reliably conservative part of
the state and described the area as "Trumpland" and as "a really predominant, strong
Republican rural area." (Id. at 13:19-14:2; 35:8-9; 106:21-107:25).

**Response**: Undisputed only that Ms. Deitsch testified as such.

60. Under the Proposed Remedial Plan, Ms. Deitsch would be assigned to the
Fourth District, which, like the Fifth District under the 2012 Plan, is a "safe" Republican
district. (Cooper Dep. 203:2-7, Cooper Exhibit 12).

**Response:** Undisputed.

### Sixth District – Luann Boothe

61. Ms. Boothe has lived in Jefferson County in Ohio's Sixth Congressional
District for 64 years, her entire life. (Exhibit 14, Deposition of Luann Booth "Boothe Dep."
at 7:25-9:4).

**Response:** Undisputed.

62. Ms. Boothe became a plaintiff in this lawsuit after a law school friend of her
son, Kyle Hutnick, referred the ACLU to her. (Id. at 9:14-14:7). Ms. Boothe did not have
any plans to file a lawsuit until she was contacted by the ACLU. (Id. at 93:21-94:7).

**Response:** Undisputed but immaterial as to the first sentence; disputed as

mischaracterizing testimony as to the second. Ms. Boothe did not testify that she would not

have sued but for the ACLU contacting her, but rather that she did not know that filing a

lawsuit against the state to get the map changed could be done. Ex. M (Deposition of Luann

Boothe ("Boothe Dep.")) at 93:7-94:7.

63.     Ms. Boothe is a Democrat, but has voted for Republicans in the past, and admits that she could potentially vote Republican in the future. (Id. at 49:8-49:10; 49:25-50:18; 103:15- 103:18).  She is not always a "straight ticket" voter. (Id. at 52:23-53:8).

**Response:** Undisputed.

64.     Ms. Boothe does not like how Republican her district has become and believes it was more competitive when she was growing up in the 1970s than it is now. (Id. at 19:21-22:6). But Ms. Boothe did not recall the electoral results in her district during the time in which she lived in it and didn't know if her area of the state has become more Republican since her childhood as a result of factors other than the 2012 Plan. (Id. at 36:8-36:25, 40:4-41:19; 54:23-55:24).).

**Response**: Disputed as incomplete and misleading.  Ms. Boothe testified to a 30-year understanding of her community and its political dynamics.  Boothe Dep. at 38:5-38-18, 40:4-43:5.  She was unable to respond to several particular trivia questions, including who her Representative was between 1960 and 1993.  *Id.* at 36:10-36:22.  In response to questioning about why she feels her district has "become more Republican since her childhood," she testified, "I am just focusing on this [2012] map, because this is when I saw it and was, like, involved.  And I really didn't go backward and try to read about what had happened prior to this.  I was just, like, taken back, because I am so insulted that this happened to my community, and I just didn't know about it.  This is major, this is big." *Id.* at 54:23-55:9.

65.     Ms. Boothe believes that her community of interest includes Jefferson, Harrison, Carroll, and Belmont counties, all of which are included in the Sixth District under the 2012 Plan. (Id. at 58:19-59:20; 68:2-69:15; 70:18-70:21).

**Response:** Undisputed that Ms. Boothe testified as such.

66. Ms. Boothe claims that her current congressional representative, Republican, Bill Johnson, is not as responsive as her previous Democratic Representative, Charlie Wilson. (Id. at 38:5-8; 41:20-41:23). But she admits that she has not tried to contact Representative Johnson recently. (Id. at 42:13-42:15). She also has not written Representative Johnson any letters or tried to visit him at his offices. (Id. at 43:9-43:14). She admits that nothing about the 2012 Plan prevents her from trying to contact Congressman Johnson. (Id. at 43:15-43:21).

**Response:** Disputed as incomplete and misleading. Ms. Boothe testified that she has tried to contact Congressman Johnson in the past, including leaving messages on his voicemail, but neither he nor his staff has returned her calls. Boothe Dep. at 41:20-43:8. She testified that the 2012 map itself is not "keeping" her from "going to *try* to see [Rep. Johnson] in his office or get an appointment to meet with him in DC." *Id.* at 43:18-21 (emphasis added).

67. Ms. Boothe thinks the 2012 Plan has caused her harm because she believes her district is too partisan and people were "rude and obnoxious" to her when she canvassed. (*Id.* at 16:5-18:19). Ms. Boothe, however, admitted that she could not say whether her experiences were the result of the 2012 plan or other factors such as national political attitudes and does not know the political affiliation of the individuals who were "rude and obnoxious" to her when she canvassed. (*Id.* at 19:2-19:20, 72:2-73:5, 94:8-98:15).

**Response:** Disputed as incomplete and misleading. As to the first piece of testimony quoted above, Ms. Boothe testified this in the context of explaining what it was like campaigning for Hillary Clinton in her neighborhood; she was not referring to the 2012 map at all at that point. Boothe Dep. at 16:5-18:19. As to the additional testimony referenced here, Defendants asked Ms. Boothe whether she "think[s] that this negative environment that's taken hold in your district, do you think that is caused by the redistricting process?" to which she answered, "[w]ell, I do . . ." *Id.* at 19:21-25.

68.    Ms. Boothe admitted that she has always been able to cast a valid ballot under the 2012 Plan. (*Id.* at 29:20-30:10). She admitted that voting under the 2012 Plan "requires an effort like it always did" prior to the enactment of the plan and that she "will make the effort to vote." (*Id.* at 30:4-30:10). She also admits that the current Plan has not prevented her from engaging in organizing or other election-related activities in her district. (*Id.* at 57:11-57:13; 64:18-66:15).

**Response:** Disputed as mischaracterizing testimony. Defendants asked Ms. Boothe

to agree that "nothing about the 2011 [sic] plan actually prevented you from being able to

campaign" for Democrats, and she answered literally, "[j]ust uncomfortable." Boothe Dep.

at 57:11-13. She did not testify that the 2012 Map "has not prevented" her from engaging

in elections work, but that "nothing is actually physically preventing" her from doing so. *Id.*

at 65:9-11.

69.    Ms. Boothe believes her vote "doesn't carry any weight" because she lives in a majority Republican district. (*Id.* at 53:9-53:13). But she admits that both Republican and Democrat votes are counted equally when they are cast in her district. (*Id.* at 53:14-53:18) She does not know what percentage of Democrat voters would need to be placed into her district in order for her to feel the district was "competitive." (*Id.* at 58:25-59:7; 75:7-75:11).

**Response:** Undisputed as to Ms. Boothe's testimony. Ms. Boothe testified

repeatedly that she did not know how to draw congressional district maps. Boothe Dep.

at 63:5-8; 63:17-23; 68:17-20; 69:15-21; 84:6-14; 85:3-6; 86:4-10.

70.    Ms. Boothe was unsure of whether she wanted the Court to adopt the Proposed Remedial Plan. (*Id.* at 60:18-64:12). Under the Proposed Remedial Plan, Ms. Boothe is assigned to the Sixth District just as she is under the 2012 Plan, however, the Democratic Party vote share in the Sixth District under the Proposed Remedial Plan would be lower than under the 2012 Plan when evaluated under the election statistics cited in Cooper's report and the Republican vote share in the District would remain majority Republican. (Cooper Dep. 203:17-204:21, Ex. 12).

**Response:** Disputed as incomplete and misleading as to Ms. Boothe's testimony. Ms.

Boothe testified repeatedly that she is not an expert in map drawing. Boothe Dep. at 63:5-8;

63:17-23; 68:17-20; 69:15-21; 84:6-14; 85:3-6; 86:4-10. Undisputed as to Mr. Cooper's

testimony, although it was made prior to the availability of 2018 data. At his deposition,

Mr. Cooper testified that Ms. Boothe's vote share under the Proposed Remedial Map "drops two points." Cooper Dep. 204:8-10. Mr. Cooper's Third Declaration filed in this supplementing his initial analysis with 2018 data demonstrates that the Democratic vote share in Proposed Remedial District 6 would be higher than that in current District 6. Cooper Third Decl. at 4 (Figure 2).

### Seventh District – Mark Griffiths

71. Mark Griffiths has resided in Lorain County and North Ridgeville, Ohio for fifteen years. (Exhibit 15, Deposition of Mark Griffiths "Griffiths Dep." at 10:21-25; 11:8-10). Since 2012, this address has been in Ohio's Seventh Congressional District. (*Id.* at 11:13-15). Republican Bob Gibbs has represented the Seventh District since that time.

**Response:** Undisputed.

72. Mr. Griffiths did not vote for Representative Gibbs in any election from 2012 through 2018, choosing to abstain from the 2014 congressional election when Representative Gibbs ran unopposed. (*Id.* at 12:14-25; 13:8-14:1).

**Response:** Undisputed.

73. Despite Mr. Griffiths' opposition to Representative Gibbs, Mr. Griffiths has voted for a Republican in the past, including Senator Rob Portman, and would consider voting for Republicans in the future, "if [he] felt a Republican was a better candidate" in terms of background, experience, and positions on issues. (*Id.* at 14:22-25; 16:8-17:10).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony. Mr. Griffiths is a Democratic voter and has supported Democratic candidates for Ohio's congressional delegation in the past. Ex. N (Deposition of Mark Griffiths ("Griffiths Dep.")) at 12:14-14:2; 19:3-13. He voted for a Republican on one occasion when he voted for Senator Rob Portman. *Id.* at 14:15-15:25. Mr. Griffiths said that he would consider voting for a Republican if the person was a better candidate or the Democratic candidate was "flawed." *Id.* at 16:8-17:13. But he testified that he intended to vote for every Democratic candidate in future congressional elections. *Id.* at 113:8-11.

74. Mr. Griffiths believes he lives in a "cracked" district in which the mapmakers separated the Democrats in Lorain County into three districts. (*Id.* at 100:10-22). Mr. Griffiths would prefer to live in a district in which Lorain County remains intact but admitted that he doesn't "think it's practical" to do so given the equal-population demands of redistricting. (*Id.* at 52:14-25).

**Response:** Undisputed as to the first sentence. Disputed as incomplete and thus misleading as to the cited testimony with respect to the second sentence. Mr. Griffiths said that he would prefer to live in a district in which Lorain County remains intact and that under the current congressional map it is split into three different districts "strictly for purposes of maintaining part of its partisan position." Griffiths Dep. at 51:18-52:9. He said that while districts have to have equal populations, he thought a compact district is one that "respects county boundaries, municipal boundaries to the largest extent possible, and that reflects some community of interest of people in the district." *Id.* at 52:14-53:17.

75. Mr. Griffiths believes that maps should "reflect[] some community of interest of people in the district" but was unable to identify any communities of interest that should be in the Seventh District but are not. (*Id.* at 53:12-55:3).

**Response:** Undisputed as to the first clause of the sentence. Disputed as incomplete and thus misleading as to the cited testimony with respect to the second clause of the sentence. When asked what community of interest is not in District 7 that should be, Mr. Griffiths testified that "District 7 is made up of . . . seven or eight counties, and it goes from urban to rural to suburban to rural to urban. It's really a configuration that does not make much sense." Griffiths Dep. at 53:22-54:3.

76. Mr. Griffiths testified that Representative Gibbs fails to respond to the issues that the "few Democrats" in Seventh District might raise. (*Id.* at 61:11-13). But he admitted that he doesn't "expect a Congressman to always agree with [his] views," so long as the Congressman "take[s] [his] views into account and pay[s] attention to them." (*Id.* at 63:4-8).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony. Mr. Griffiths testified that the fact that multiple people he knows have received responses from

Congressman Gibbs unrelated to the issues they raised with him showed him that Congressman

Gibbs "doesn't really care what we think or don't think, whether we vote or not vote.  He is in a

position, and still is in a position, that he's going to get re-elected.  So therefore, the issues that

we few Democrats might raise aren't really anything that he needs to respond to."  Griffiths Dep.

at 59:20-61:13.  Mr. Griffiths further testified that he "wouldn't expect a Congressman to always

agree with [his] views.  But [he] would expect [his] Congressman to take my views into account

and pay attention to them, and I don't think that's going on now."  *Id.* at 63:3-9.

77.    Mr. Griffiths described several occasions on which Representative Gibbs met with Democrats and Democratic organizations, including Mr. Griffiths, to hear Democrats' views.  First, the local chapter of Indivisible arranged an in-person meeting with Representative Gibbs on healthcare issues in April 2017, when the group expressed concerns to Representative Gibbs about the Republicans' proposed healthcare plans.  (*Id.* at 22:23-24:5).  Additionally, Mr. Griffiths attended a meeting with Representative Gibbs in Canton to discuss healthcare issues and later dropped off correspondence at Representative Gibbs' office regarding an immigration issue.  (*Id.* at 73:1-24; 76:10-18).  Mr. Griffiths acknowledged that Representative Gibbs' multiple meetings with these groups showed that Representative Gibbs took Mr. Griffiths' and Democrats' views into account.  (*Id.* at 63:10-15).

**Response:** Undisputed as to the first three sentences that Mr. Griffiths visited

Congressman Gibbs' offices on three different occasions.  Disputed as incomplete and thus

misleading as to the cited testimony with respect to the fourth sentence.  Mr. Griffiths testified

that an example of a congressperson taking his views into account would be meeting with him to

discuss an issue but also being responsive, which Mr. Griffiths said Congressman Gibbs failed to

do.  Griffiths Dep. at 63:10-19.  Mr. Griffiths also testified that he has contacted Congressman

Gibbs through emails, letters, calls, and voicemails on a number of occasions.  *Id.* at 69:11-72:7.

When Mr. Griffiths has called Congressman Gibbs' office, he has asked Congressman Gibbs'

aides to have the congressman call him back.  However, Mr. Griffiths never received a call from

the congressman.  *Id.* at 70:15-71:8.  When Mr. Griffiths contacted Congressman Gibbs through

his website on one or two occasions, he also did not receive a response.  *Id.* at 71:19-72:7.

78.     Mr. Griffiths also believes that the 2012 map prevents him from connecting with volunteers in other counties within the Seventh District.  (59:20-60:5)  But Mr. Griffiths admitted that it was his personal preference—not any hindrance from the map itself—to volunteer and canvass in and near Lorain County.  (*Id.* at 64:21-65:12).  Mr. Griffiths identified just one instance in which poor weather caused him not to participate in a campaign activity with other Democrats.  (*Id.* at 66:7-16).

**Response:**  Disputed as mischaracterizing the cited testimony.  Mr. Griffiths testified that the current congressional map has made it "difficult to connect with other volunteers just because of the geographic space" in Ohio's Seventh Congressional District.  Griffiths Dep. at 59:20-60:25; 64:9-20.  As an example, Mr. Griffiths said that he did not drive to Knox County to help with canvassing because of the geographic distance.  *Id.* at 64:21-65:3.  As another example, Mr. Griffiths said that he didn't participate in a phone banking activity for Democratic Congressional Candidate Ken Harbaugh because the event took place in Huron County which would have required a 60 to 75 mile drive in bad weather.  *Id.* at 65:14-66:25.

79.     According to Mr. Griffiths, the 2012 Plan has hampered the identification of Democrat candidates to run against Representative Gibbs.  But Mr. Griffiths also acknowledged that he voted for Democrat candidates of his choice in the 2012, 2016, and 2018 congressional elections.  (*Id.* at 12:14-25; 13:8-14:1).  In 2014, when Representative Gibbs ran unopposed, Mr. Griffiths did not run against him or locate or encourage any other Democrat to do so.  (*Id.* at 67:2-18).

**Response:**  Undisputed as to the first and second sentences.  Disputed as incomplete and thus misleading as to the cited testimony with respect to the third sentence.  When Congressman Gibbs ran unopposed in 2014, Mr. Griffiths testified that he did not personally run against him or encourage anyone to run.  Griffiths Dep. at 67:2-18.  However, Mr. Griffiths testified that he heard conversations that no one was willing to run against Congressman Gibbs in 2014 because "people saw it as a gerrymandering situation and nobody came forward to [run]."  *Id.* at 67:2-68:18.  Mr. Griffiths also testified that he spoke with Roy Rich when he ran against Congressman Gibbs in the 2016 election about "how difficult that [it] was to campaign in that

district because of the size of the district and trying to get around to different people." *Id.* at 67:19-68:6.

80.     Finally, Mr. Griffiths stated that the 2012 Plan injured him because Representative Gibbs sent his wife correspondence that misidentified the issue in her initial letter. (*Id.* at 68:19-69:4).  But Mr. Griffiths admitted that he never received a mismatched response from Representative Gibbs himself and, in fact, "could think of one time [he] wrote to him, and [he] got a response that responded to the issue that [he] raised." (*Id.* at 69:11-13).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony.  Mr. Griffiths testified that the fact that multiple people he knows, including his wife, have received responses from Congressman Gibbs unrelated to the issues they raised with him showed him that Congressman Gibbs "doesn't really care what we think or don't think, whether we vote or not vote.  He is in a position, and still is in a position, that he's going to get re-elected.  So therefore, the issues that we few Democrats might raise aren't really anything that he needs to respond to." Griffiths Dep. at 59:20-61:13.  Mr. Griffiths testified that he has never personally received a mismatched response from Congressman Gibbs and could think of one time that he receive a response to his letter addressing the issue he raised.  *Id.* at 69:5-24.  Mr. Griffiths also testified that he has contacted Congressman Gibbs through emails, letters, calls, and voicemails on a number of occasions.  *Id.* at 69:11-72:7.  When Mr. Griffiths has called Congressman Gibbs' office, he has asked Congressman Gibbs' aides to have the congressman call him back.  However, Mr. Griffiths never received a call from the congressman.  *Id.* at 70:15-71:8.  When Mr. Griffiths contacted Congressman Gibbs through his website on one or two occasions, he also did not receive a response.  *Id.* at 71:19-72:7.

81. As a remedy, Mr. Griffiths asks the Court to adopt the remedial map drawn by Mr. Cooper. (*Id.* at 98:11-14). He believes the map will allow him to elect a Democrat representative and testified that he would prefer to live in a district that elects Democrat representatives. (*Id.* at. 99:3-8; 90:14-91:6). Overall, Mr. Griffiths is looking for a map that is "close to proportion[al]" to the makeup of Republican and Democrat voters in the state. (*Id.* at 104:15).

**Response:** Undisputed as to the first sentence. Disputed as incomplete and thus misleading as to the cited testimony with respect to the second and third sentences. Mr. Griffiths testified that he believes Mr. Cooper's map is competitive, and he thought a Democrat could be elected under Mr. Cooper's map, which is his personal preference. Griffiths Dep. at 90:24-91:6; 98:23-99:8. When asked whether a "lawful" map "need[s] to be proportional to the party affiliation of the voters in the state," Mr. Griffiths said he didn't "know about proportional, but it certainly needs to close to proportion[al], otherwise I think you could infer that there was a partisan intent behind the design." *Id.* at 104:13-17. Mr. Griffiths testified that his issue with the current congressional map and his district in particular is that it is "drawn strictly as a partisan exercise to keep Republicans in control of that district and without regard to any kind of geographic boundaries that would make sense." *Id.* at 51:12-25.

82. Under the Proposed Remedial Plan, Mr. Griffiths is placed in the Ninth Congressional District. (Cooper Dep. 204:22-205:10, Cooper Exhibit 12). Although Democrats would have a majority of the vote share in the Ninth District in the Proposed Remedial Plan during the 2012 election cycle, Republicans would have a majority of the vote share in the 2014 and 2016 election cycles using the election results relied upon by Cooper in his report. (*Id.* at 205:11-24)

**Response:** Second sentence disputed as incomplete and hence mischaracterizing the evidence. In Mr. Cooper's Third Declaration updating his initial analyses with 2018 data, he estimates that Democrats would have the majority of the vote share in the 2018 election. Cooper Third Suppl. Decl. at 4 (Figure 2).

**Eighth District – Larry Nadler**

83.     Mr. Nadler has lived in Oxford, Ohio, in the Eighth District for 28 years. (Exhibit 16, Deposition of Larry Nadler "Nadler Dep." at 6:18-7:15). Mr. Nadler is a Democrat, who has voted for Democrats, with one exception, during his time in the Eighth District. (*Id.* at 8:4-20). However, Mr. Nadler stated that he doesn't "blindly" vote by party, and would consider voting for candidates other than Democrats under the right circumstances. (*Id.* at 11:7-25).

**Response:** Undisputed.

84.     Mr. Nadler is currently represented by Representative Warren Davidson, a Republican, who was not his candidate of choice. (*Id.* at 29:12-19). A Republican has also represented Mr. Nadler in the Eighth District for the last 28 years, including former Speaker of the House John Boehner. (*Id.* at 31:24-33:24) Mr. Nadler admits that a Republican has represented Ohio's Eighth Congressional District since 1939. (*Id.* at 31:24-33:24). Mr. Nadler further admits that Representative Davidson is involved in his community and sends a congressional aide to his town every month to hear constituent concerns, which Mr. Nadler and his wife routinely attend. (*Id.* at 29:18-30:4).

**Response:** Undisputed as to the first three sentences. Disputed as mischaracterizing testimony in the last sentence. Mr. Nadler testified that Representative Warren "does go through some motions" including sending an aide to his district whom he and his wife try to speak with. Ex. O (Deposition of Larry Nadler ("Nadler Dep.")) at 29:18-24. Mr. Nadler immediately followed this by testifying that each time this aide comes, he asks "to have some type of meeting with our representative, a town hall, a discussion, whatever the label is not important. Every month he says, well, I'll run it by him and every month when he comes back, there's no answer." *Id.* at 30:5-11. Mr. Nadler then testified about Rep. Warren, "his unwillingness to meet with us is concerning, and it's concerning because it's very clear he not only feels that he doesn't need to, he knows he doesn't need to." *Id.* at 30:23-31:1.

85.     Mr. Nadler was asked to be a plaintiff in this lawsuit by an executive board member of the Oxford League of Women Voters, Jenny Fisher, and Counsel for the ACLU. (*Id.* at 12:20- 13: 14). Mr. Nadler did not seek out an opportunity to become a plaintiff, and in fact, was not specifically targeted as the plaintiff for the Eighth District, as Ms. Fisher sent an email to multiple individuals seeking participation in this lawsuit. (*Id.* at 15:3-16:3).

**Response:** Undisputed but immaterial.

86.     Mr. Nadler has been concerned about gerrymandering "for a long time" because "it's been around for a long time." (*Id.* at 25:9-15). Mr. Nadler believes that the districts, including his own district, should be indicative of the area they represent, but admits that he has no constitutional right to be represented by someone who holds his same values. (*Id.* at 43:8-23; 48:11-14). In fact, Mr. Nadler admits that his current Republican representative was elected "fair and square." (*Id.* at 40:25-41:15).

**Response:** Undisputed as to the first two sentences, but disputed as to the last

sentence, which is mischaracterizing and misleading. Mr. Nadler also said, as part of this

same piece of testimony, "I understand the point, the way where I live, that has been drawn.

And given the composition of people, based on the way it has been drawn, has for a long

time produced the same outcome in terms of Republicans winning office. But, I also know

that what they illustrated in 2011 is you could draw things any way you want to, they don't

have to make logical sense, they don't have to fit any logical model." Nadler Dep. at 45:5-

14.

87.     Mr. Nadler believes that he is harmed by the 2012 Plan due to the way other districts in the state are drawn, including around Columbus, and Cincinnati. (*Id.* at 43:20-44:8; 55:9-19; 81:14-82:8).

**Response:** Undisputed as to Mr. Nadler's testimony.

88.     Mr. Nadler could not identify any concern with his district that would be resolved by the Proposed Remedial Plan. (*Id.* at 66:22-67:9)

**Response**: Disputed as incomplete and therefore misleading. Mr. Nadler testified

that in his view, the Proposed Remedial Plan was "a vast improvement, and a map that I

would be comfortable with." Nadler Dep. at 66:6-15. He additionally testified that he

believed the Proposed Plan would make a difference in his district over time.  *Id.* at 66:22-

69:21.

89.     Under the Proposed Remedial Plan, Mr. Nadler remains in the Eighth District in  which Republicans received a majority of the vote share. (Cooper Dep. 205:25-206:5, Cooper  Exhibit 12; Nadler Dep. at 65:13-67:9).

**Response:** Undisputed.

### Ninth District – Tristan Rader

90.     Plaintiff Tristan Rader resides in Lakewood, Ohio, in Cuyahoga County. (Exhibit 17, Deposition of Tristan Rader "Rader Dep." at 8:16-9:21).  He has resided in Lakewood since 2012.  (*Id.* at 8:16-9:21).

**Response:** Undisputed.

91.     Mr. Rader lives in Ohio's Ninth Congressional district, and his candidate of choice, Marcy Kaptur, represents him.  (*Id.* at 14:11-13).  Mr. Rader is a Democrat, and has generally always voted Democratic.  (*Id.* at 18:14-20).  Mr. Rader has campaigned for numerous Democrats including for Hillary Clinton, Ted Strickland, and Bernie Sanders during the 2016 election cycle.  (*Id.* at 30:4-14; 31:3-6).  Mr. Rader also identifies as a Democratic Socialist. (*Id.* at 39:15-17).

**Response:** Undisputed as to the first, second, and third sentences.  Disputed as

incomplete and thus misleading as to the cited testimony with respect to the fourth sentence.  Mr.

Rader is a part of a group called the Democratic Socialists of America, which he considers to be

a "group under the umbrella of the Democratic Party."  Ex. P (Deposition of Tristan Rader

("Rader Dep.") at 39:6-9; 119:11-20.

92.     Mr. Rader was contacted about becoming a plaintiff in this lawsuit by a friend, Ihaab Syed, who works for the ACLU.  (*Id.* at 57:9- 58:5).  Mr. Rader believes that the decision for him to become a plaintiff in this lawsuit was entirely the ACLU's.  (*Id.* at 62:21- 63:4)  In fact, Mr. Rader testified that the decision "had nothing to do with what I wanted" and "was on [the ACLU]."  (*Id.* at 62:21- 63:4).

**Response:** Undisputed but immaterial as to the first sentence.  Disputed as

mischaracterizing the cited testimony with respect to the second and third sentences.  After Mr.

Rader testified that he was not yet officially a plaintiff in this lawsuit after his second

conversation with the ACLU, he was asked why he didn't want to become a Plaintiff after speaking with the ACLU for the second time. Rader Dep. at 61:22-63:4. Mr. Rader testified that he had given them information and the ACLU "had to make decisions." *Id.* at 62:24-63:4. He testified that after his third conversation with the ACLU, he was an official plaintiff in the lawsuit. *Id.* at 63:5-7.

93.    Mr. Rader testified that he was harmed by the 2012 Plan because he lives approximately 100 miles from where his congressional representative is located. (*Id.* at 66:10- 67:19). He preferred being represented by Dennis Kucinich who resided in the Cleveland area. (*Id.* at 67:20-68:18). Despite complaining about the size of the Ninth District, Mr. Rader acknowledged that from 2002 to 2012, the Ninth District spanned from Toledo to Lorain, where Mr. Rader resided with his parents prior to 2012 and is only about 20 miles away from where he currently lives. (*Id.* at 73:20-74:4; 80:10-11).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony. Mr. Rader testified that he was challenging the current congressional map, and in particular Ohio's Ninth Congressional District, because the current congressional map "is unfairly drawn to . . . diminish [his] vote" and places him in a district where his representative is "more than 100 miles away from where [he] live[s]." Rader Dep. at 66:10-67:19. Mr. Rader testified that he was previously represented by Congressman Dennis Kucinich who resided in Cleveland and thus understood his area better than Congresswoman Marcy Kaptur who resides in Toledo. *Id.* at 67:8-68:18. Mr. Rader testified that he thought he was aware that Ohio's Ninth Congressional District included Lorain between 2002 and 2012, but he wasn't sure of "what the district was or the shape of it or who Marcy [Kaptur] represented exactly then." *Id.* at 73:20-74:14. He further testified that "[e]ven if [he] lived in Lorain, when her district supposedly reached into Lorain, it's much, much closer to Toledo than Cleveland and Lakewood. . . . [He i]s from Lorain. [His] parents live in Lorain. It's 23 miles from [his] house. It's quite a distance." *Id.* at 79:25-80:12.

94.     Mr. Rader believes the size of his district infringes upon his First Amendment Right to Freedom of Speech, as the distance to Ms. Kaptur's office headquarters makes it difficult for him to go to her office to engage in protests.  (*Id.* at 111:4-15).  Mr. Rader, however, concedes that nothing in the current districting plan prevents him from going and protesting in front of her office in Toledo and that nothing about the 2012 Plan prevents him from protesting in front of her smaller office in Cleveland.  (*Id.* at 111:16-112:23).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony.

Mr. Rader testified that he was not an attorney and was not familiar with the particulars of constitutional claims.  Rader Dep. at 130:10-16.  While Mr. Rader testified that he thought the current plan was unconstitutional because it infringed on his right to free speech, he explained that his issue was that he lives "in a district that has a representative that doesn't have to really have to campaign for her position" and he has "to travel 130 miles to her [main] office in Toledo."  *Id.* at 93:6-8; 110:11-112:5.  Mr. Rader testified that he thought distance between his residence and Congresswoman Kaptur's main office in Toledo made it difficult for him to organize his constituents in Lakewood to go visit her at her main office, even though there weren't "people that would keep [him] from literally going out in front of her office."  *Id.* at 111:16-112:15.

95.     Mr. Rader also testified that he is harmed because he is "packed" in a district with other Democratic voters and that Democratic candidates win by a "40 point spread" and that his vote does not count.  (*Id.* at 97:22-98:4).  He is disappointed that his vote is not "able to determine the outcome of an election."  (*Id.* at 77:5-78:2).  However, Mr. Rader could not provide criteria for how his district could not be "packed" and did not have any basis for determining how many Democrats or Republicans should make up a district so that it is not "packed."  (*Id.* at 110:5-10).  Despite Mr. Rader's concern that his vote does not "determine the outcome" of an election, Mr. Rader admits that his candidate of choice, Representative Kaptur, represents him.  (*Id.* at 77:21-23).

**Response:** Undisputed as to the first and second sentences.  Disputed as incomplete and thus misleading as to the third and fourth sentences.  When asked whether he had "any thoughts on how many Democrats should be allowed to be in a district before it can be considered packed," Mr. Rader said that he wasn't "an expert on that, so [he] couldn't tell you."  Rader Dep.

at 110:5-10.  Mr. Rader said that he voted for Congresswoman Kaptur, but he also said he was

"somewhat" dissatisfied with Congresswoman Kaptur because she lives 100 miles away and thus

is unfamiliar with issues in his neighborhood.  *Id.* at 77:21-78:2; 67:8-19.

96.     Mr. Rader believes that voters in his district are apathetic because the district
is not competitive but acknowledges that he has no right as a citizen to live in an area where
people volunteer or engage politically at a level he deems appropriate and could not identify
any person who has refused to volunteer on a campaign or to vote as a result of the 2012
Plan.  (*Id.* at 123:16-19; 124:25-125:24; 129:19- 130:3.)

**Response:** Undisputed that Mr. Rader testified that he does not think he has a legal right

to live in an area where people volunteer or engage politically at a level he deems appropriate.

Rader Dep. at 125:10-125:24.  Disputed as incomplete and thus misleading as to the cited

testimony with respect to the remaining information.  Mr. Rader testified that the current

congressional map "discourages people from voting" by creating voter apathy.  *Id.* at 122:22-

123:18.  Specifically, Mr. Rader said that voters have said "'Why should I vote because it

doesn't matter?  There's nothing I can do about it, so I don't care."  *Id.* at 123:11-15.  During his

deposition, Mr. Rader could not think of a specific name of someone who has refused to

volunteer on a campaign or vote because of the current congressional map.  *Id.* at 129:19-130:3.

97.     Under the Proposed Remedial Plan, Mr. Rader would be assigned to the
Ninth Congressional District in which Democrats would receive a majority of the vote share
under the 2012 elections referenced in Cooper's report but Republicans would receive a
majority of the vote share under the 2014 and 2016 elections referenced in Cooper's report.
(Cooper Dep. 206:6-208:20).  In his deposition, Cooper dismissed a question regarding
whether Mr. Rader was "worse off" under his Proposed Remedial Plan and pointed out that
his version of the Ninth District was more compact than the version in the 2012 Plan.  (*Id.*)

**Response:** Disputed as incomplete and hence mischaracterizing the evidence as to the

first sentence.  In Mr. Cooper's Third Declaration in this case updating his estimates of

Democratic vote share in the remedial districts with 2018 data, Democrats would receive a

majority of the vote share in Proposed Remedial District 9.  Cooper Third Decl. at 4 (Figure 2).

Disputed as mischaracterizing the cited testimony with respect to the second sentence. In his deposition, Mr. Cooper said that Plaintiffs Rader and Walker would be living in a district that was "competitive" and that district could "potentially" elected a Republican. Cooper Dep. at 208:3-16.

98.     Mr. Rader testified that he "would not be okay" if the Proposed Remedial Plan placed him in a Republican majority district even if that district were more compact. (Rader Dep. at 91:21-92:7).

**Response:** Disputed as mischaracterizing the cited testimony. When asked hypothetical question of whether it would be okay with him if Mr. Cooper placed him in a "district where the representative was closer to [him], where he didn't split as many municipalities or counties in half and what you thought were competitive elections, but [he] continued to be represented by a Republican for the next 10 years," Mr. Rader answered "[i]t would not be okay with me. I would continue to work to elect Democrats in my district if that were the case." Rader Dep. at 91:21-92:10. When asked whether this district would be unconstitutional, Mr. Rader testified "I wouldn't know - - without knowing exactly where the district fell, without knowing a lot, just very granular details about the district, I couldn't tell you whether it was constitutional or not." *Id.* at 92:11-22.

### Ninth District – Chitra Walker

99.     Plaintiff Chitra Walker has resided in Lakewood, Ohio in Cuyahoga County since at least 2008. (Exhibit 18, Deposition of Chitra Walker "Walker Dep." at 8:12-9:12). Ms. Walker currently resides in Ohio's Ninth Congressional District and is represented by Marcy Kaptur, a Democrat. (*Id.* at 83:16-85:3). Ms. Walker recalls voting for Representative Kaptur every year she has been on her ballot. (*Id.* at 83:16-85:3).

**Response:** Undisputed.

100.     Ms. Walker registered to vote after becoming a United States Citizen in 1987 and considers herself to be a Democrat. (*Id.* at 10: 20-11:25).

**Response:** Undisputed.

101.    Despite a strong preference for Democrats, Ms. Walker admits that there could be circumstances where she would vote for a Republican or independent congressional candidate.  (*Id.* at 55:9-17).

**Response:** Disputed as mischaracterizing the cited testimony.  Ms. Walker testified that she has never voted for a Republican candidate for Congress.  Ex. Q, Walker Dep. at 55:9-11.  When asked whether there were any circumstances where she would consider voting for a Republican or independent candidate for congress, Ms. Walker said "[m]y preference is Democratic, but if there was a situation where the candidate was qualified, in my opinion, or something he had done, say sexual harassment, or something like that" she might vote for a Republican or independent candidate.  *Id.* at 55:12-21.

102.    Ms. Walker became a plaintiff in this lawsuit after being recruited by an ACLU Cleveland board member, Erik Meinhardt.  (*Id.* at 35:14-24)  Ms. Walker believes Mr. Meinhardt asked her to be a plaintiff in the suit because she's "a member of the Democratic club…"  (*Id.* at 36:21-37:3).  Prior to her discussions with Mr. Meinhardt, Ms. Walker had not previously expressed any interest in challenging the current districting plan.  (*Id.* at 37:4-8).

**Response:** Undisputed but immaterial as to the first and third sentences.  Disputed as mischaracterizing the cited testimony as to the second sentence.  Ms. Walker testified that she thought Mr. Meinhardt thought she might be interested in being a plaintiff because she is a "member of the Democratic Club, and [she] help[s] in all their activities."  Walker Dep. at 36:21-37:3.

103.    When asked about her problems with the 2012 Plan, Ms. Walker stated that her "concern is for all of Ohio…" and that her "objection is to the map in general."  (*Id.* at 40:2-6; 46:3-8).  Ms. Walker said she would "like to see a map that's based on the population of the state…" and that the map should be "more equitable" between Republicans and Democrats.  (*Id.* at 46:25-47:7; 48:8-10).  Ms. Walker believes there should be more Democratic districts than there are currently but does not know how many more there should be.  (*Id.* at 48:17-49:5).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony.  Ms. Walker testified that her concern was "for all of Ohio and all of our citizens that their wish, and

in this case, our democratic wish, has been manipulated by a gerrymandered map." Walker Dep. at 40:2-9. She further explained that the map in general is not democratic because "they consistently are going to have 12 districts that are [R]epublican for sure and 4 districts that are [D]emocrat." *Id.* at 46:8-15. She testified that she was also concerned for herself as well since she is "packed in as a Democrat . . . into [her] district." *Id.* at 40:10-21. Ms. Walker testified that she was not an expert map drawer. *Id.* at 49:12-15. When asked whether she wanted to "see a map that split the seats between [R]epublicans and [D]emocrats in a way that mirrors both percentages of [R]epublicans and [D]emocrats in the state," Ms. Walker said that she would "like to see a map that's based on the population of the state, the density of the population, et cetera, and ethnicity, perhaps, community interests." *Id.* at 46:20-47:4. When asked whether she wanted a "map to reflect how the people voted, that 59 percent Republican vote, they should get 59 percent of the seats," Ms. Walker said that "I don't think there's a perfect map, but it should be more equitable, more fair." *Id.* at 48:3-10. When asked whether she thought "there should be more Democratic majority districts than there are," Ms. Walker said yes but said she wasn't sure how many more because she was "not an expert in any of this." *Id.* at 48:17-23.

104.    Despite her issues with the 2012 plan as a whole, Ms. Walker is "concerned for [herself] as well." (*Id.* at 40:2-17). Ms. Walker's concern about her district is that she is "packed" or "squeezed" in her district with other Democrats. (*Id.* at 49:6- 15). However, Ms. Walker does not have any ideas on how to fix this issue and cannot say what percentage of Democrats or Republicans makes a district "packed." (*Id.* at 49:6-15; 74:21-75:10).

**Response:** Undisputed as to the first and second sentences. Disputed as incomplete and thus misleading as to the cited testimony with respect to the third sentence. When asked "by percentage, when do you believe that the district becomes too packed, or packed, I guess would be the right way to say it," Ms. Walker answered said that she was "not an expert." Walker Dep. at 74:12-20. When asked how a packed district should be fixed, Ms. Walker explained that she was "not an expert in map drawing for this particular purpose." *Id.* at 49:6-15.

105.    Because she lives in a heavily Democrat district, Ms. Walker complains that her vote is "diluted" or that it "does not count as much as it should" but concedes that her vote is actually counted and that nothing in the 2012 Plan has kept her, or anyone else she knows from casting a ballot.  (*Id.* at 56:18-57:24).  Further, Ms. Walker notes that nothing in the 2012 Plan has prevented her from campaigning for her preferred candidates, donating to the candidate of her choice, or engaging in any voter education activities.  (*Id.* at 56:18-57:24).

**Response:** Undisputed as to the first sentence. Disputed as incomplete and thus misleading as to the cited testimony with respect to the second sentence.  Ms. Walker testified that nothing prevents her from campaigning or engaging in voter education activities.  Walker Dep. at57:3-13.  However, Ms. Walker also testified that the geographic distances between areas in Ohio's Ninth Congressional District make it more difficult to campaign for Democratic candidates.  *Id.* at 42:24-43:5.  Ms. Walker testified that she thinks the current congressional map makes it harder to fundraise for her candidates of choice because people believe that the "candidate's going to win anyway."  *Id.* at 44:20-22; 87:2-5.  Ms. Walker testified that she thinks the current congressional map has hurt her ability to educate voters because voters feel like their "vote is going to be manipulated in some way."  *Id.* at 92:13-19.

106.    Ms. Walker believes that she is harmed because Representative Kaptur lives in Toledo and cannot "adequately" represent her views 100 miles away from Lakewood but is happy with the way Representative Kaptur represents the district and is pleased that Representative Kaptur votes the way Ms. Walker would like her to vote on issues before Congress.  (*Id.* at 40:20-24; 41:4-13; 41:23-42:2).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony.  Ms. Walker testified that she believes the geographic distances between areas in Ohio's Ninth Congressional District make it difficult for Congresswoman Marcy Kaptur to adequately represent all her constituents.  Walker Dep. at 41:7-13.  For example, Ms. Walker testified that she had not seen Congresswoman Kaptur in her neighborhood.  *Id.* at 41:18-19.  But Ms. Walker said that she did not think "Marcy Kaptur [was] doing a bad job in congress" and she is pleased with the way Congresswoman Kaptur votes on issues in congress.  *Id.* at 41:20-42:2.

107.     Ms. Walker testified that Representative Kaptur is responsive to her when she contacts her office and that she is able to attend meetings with Representative Kaptur. (*Id.* at 42:3-19).

**Response:** Disputed as incomplete and thus misleading as to the cited testimony. Ms. Walker testified that she has written Congresswoman Kaptur and her office has responded to her. Walker Dep. at 42:3-7. She also testified that she goes to meetings at which Congresswoman Kaptur is present when Congresswoman Kaptur is in town. *Id.* at 42:8-12.

108.     Under the Proposed Remedial Plan, Ms. Walker, like Mr. Rader, would be assigned to the Ninth Congressional District in which Democrats would receive a majority of the vote share under the 2012 elections referenced in Cooper's report but Republicans would receive a majority of the vote share under the 2014 and 2016 elections referenced in Cooper's report. (Cooper Dep. 206:6-208:20, Cooper Exhibit 12).

**Response:** Disputed as incomplete and hence mischaracterizing the evidence. As referenced in paragraph 97, Democrats would receive a majority of the vote share in Proposed Remedial District 9 in 2018. Cooper Third Decl. at 4 (Figure 2).

**Tenth District - Ria Megnin**

109.     Ria Megnin has resided in Dayton, Ohio in Ohio's Tenth Congressional District since December of 2010. (Exhibit 19, Deposition of Ria Megnin "Megnin Dep." at 9:4-10:4; 13:5- 10). Ms. Megnin is a Democrat but agrees with Republicans on certain issues and thinks "it's perfectly possible to agree with Republicans and people of any party background on specific issues." (*Id.* at 34:3-36:4; Exhibit 20, Megnin Exhibit 1)

**Response:** The first sentence is undisputed. The second sentence is disputed as incomplete and misleading. Ms. Megnin testified at length that she is a Democrat, and that she almost always votes Democrat. R (Deposition of Ria Megnin ("Megnin Dep.")) at 67:13-72:15.

110.     Ms. Megnin's current representative, Mike Turner, is a Republican who has represented the District for 16 years. (*Id.* at 13:11-19).

**Response:** Undisputed.

111.    Although Ms. Megnin's does not believe that Representative Turner is responsive enough to citizens in the area, she admits that when she has called Mr. Turner's office, someone has always returned her calls. (*Id.* at 17:5-8, 19:6-20:23, 28:2-19). She also could not identify an email that was sent to Representative Turner that was not responded to. (*Id.* at 25:6-9). Further, she cannot identify any communications sent by any of the groups that she associates with that Representative Turner did not respond to. (*Id.* at 33:6-22).

**Response:** Disputed as incomplete and misleading. Ms. Megnin testified that "Mike Turner has not held a town hall meeting for his local constituents in his sixteen years as a congressional representative," Megnin Dep. at 17:5-8, and that he is so absent in her community, a group she is affiliated with was, at the time of her testimony, planning to put skeleton statutes outside of his office saying, "We're Dying to See Our Congressman." *Id.* at 26:5-24.

112.    Ms. Megnin is the regional representative for Region 7 of the National Association of Social Workers, Ohio chapter. (*Id.* at 36:13-20). The political action representative of this region reached out to her sometime in April of 2018 and told her that the ACLU was looking for plaintiffs for a gerrymandering case. (*Id.* at 36:13-37:14). Ms. Megnin then called Ebony Speakes-Hall at the ACLU to learn more about the potential lawsuit. (*Id.* at 36:13-37:14). She admits that, prior to this contact, she had not considered filing a lawsuit related to gerrymandering. (*Id.* at 38:18-39:14).

**Response:** Undisputed but immaterial.

113.    Ms. Megnin also testified that during her canvassing efforts, she encountered voters who stated that they would contribute more money to the campaign races in the district if not for the gerrymandering because they feel that there is not a chance for their candidate to succeed. (*Id.* at 88:10-91:3). However, Ms. Megnin admitted that in her canvassing efforts, she was only "door knocking" on areas that had a "strong record" of "voting Democrat" in the past. (*Id.* at 109:14- 110:21). Ms. Megnin further admitted that no law has ever prevented her from canvassing or otherwise volunteering or campaigning for any candidate. (*Id.* at 83:15-25).

**Response:** Disputed as incomplete and misleading. Ms. Megnin testified that she believes no law has ever prevented her from canvassing, campaigning, or protesting. Megnin Dep. at 83:23-88:6. She also testified that in her experience, "because of the gerrymandering" she could not run for anything but local office herself, *id.* at 84:14-19 and

that because of the map, for Democrats, "there isn't as much of a chance.  There's just this

hopelessness. [The voters] don't see themselves ever finding their vote translated into

adequate representation."  *Id.* at 88:7-88:20.

114.    Ms. Megnin believes that her district is cracked because it includes certain areas such as Greene County that do not reflect Dayton or the majority of the people who live in Dayton or the other surrounding suburbs. (*Id.* at 49:10-50:4; 51:14-54:9). Ms. Megnin did not know if the Dayton area and suburbs are large enough to constitute a congressional district on their own. (Id. at 101:25-102:10)

**Response:** Undisputed as to Ms. Megnin's testimony.

115.    Under the Proposed Remedial Plan, Ms. Megnin would remain assigned to the Tenth District. (Cooper Dep. 208:21-209:7; Cooper Exhibit 12). Although Ms. Megnin testified  that she believed Democrats would have a much better chance to vote out Representative Turner  under the Proposed Remedial Plan (Megnin Dep. at 64:20-65:4), the election results relied upon  by Cooper in his reports are within a single percentage point of the election results under the 2012  Plan and Cooper admitted that the Tenth District would be "a safe Republican district" under both  maps (Cooper Dep. 208:21-209:7; Cooper Exhibit 12).

**Response:**  The first sentence is undisputed.  The second sentence is disputed as

incomplete.  In Mr. Cooper's supplemental declaration using 2018 election results, he

estimates Proposed Remedial District 10 to have the same Democratic vote share as current

District 10.  Cooper Third Suppl. Decl. at 4 (Figure 2).

**Eleventh District – Andrew Harris**

116.    Plaintiff Andrew Harris has resided in Cleveland in the Eleventh Congressional  District his entire life. (Exhibit 21, Deposition of Andrew Harris "Harris Dep." at 7:4-8:17). Mr.  Harris is a registered Democrat who has always voted for Democrats. (*Id.* at 10:9-13).

**Response**: Undisputed, except that Mr. Harris has also resided in the suburbs of

Cleveland.  Ex. S (Deposition of Andrew Harris ("Harris Dep.")) at 7:4-8:17.

117.    Marcia Fudge, a Democrat, represents Mr. Harris in the Eleventh District. (*Id.* at 10:2-8). Despite voting for Representative Fudge, Mr. Harris testified that Representative Fudge is not his ideal candidate and wishes that Cleveland was represented by a more moderate, pro- business Democrat. (*Id.* at 16:25-18:20).

**Response:** Disputed as incomplete and misleading as to the cited testimony. Mr. Harris testified that he preferred to be represented by a candidate who was "allowed to be more moderate . . . Fudge is forced to be to the left of where I consider myself to be. Harris Dep. at 17:12-18

118.    Despite being a Democrat, Mr. Harris' chief complaint with the current Eleventh District is the inclusion of Akron, Ohio in the district along with that area's "liberal" Democrats. (*Id.* at 19:25-21:8). Mr. Harris believes that Akron's brand of Democrats and Cleveland's brand of Democrats are different, and that despite characterizing many of his friends in the Cleveland area as more liberal than him, believes that a congressional district drawn without Akron would result in a more moderate district. (*Id.* at 20:20- 21:8; 26:14-19; 28:2-30:12).

**Response:** Disputed as incomplete. Mr. Harris testified that his other chief complaints include that he wishes to be represented by a more pro-business representative, Harris Dep. at 16:25-18:20, and that his packed district forces his representative "to be to the left of where I consider myself to be." *Id.* 17:16-18

119.    Mr. Harris directly relates his harm from the current plan to being placed in a district with other Democrats whose beliefs are "not representative of …[his] perspective politically" as he has different beliefs that do not relate to those "different brand[s] of liberalism." (*Id.* at 21:4-8).

**Response**: Disputed as being incomplete and thus mischaracterizing as to the cited testimony. Mr. Harris does not believe that he is harmed by *being in* a district with other Democrats whose beliefs are different, but that because the district is *packed*, the representation gravitates to the left of where he is. Harris Dep. at 17:16-18, *id.* at 16:5-20; 19:25-20:12.

120.     Mr. Harris also believes that he is in a "packed" congressional district, and because the district is "packed", that his vote is "diluted" and does not count. (*Id.* at 15:22- 16:20). Mr. Harris believes that "packing" occurs when there is intent to place Democrats in one area together for the purpose of diluting their vote. (*Id.* at 16:5-20; 34:9-21). Mr. Harris believes his vote is "diluted" because he is "surrounded by an inordinate number of democratic voters" therefore his vote is not necessary for a Democrat to win the election. (*Id.* at 16:5-20; 19:25-20:12). However, Mr. Harris cannot point to a percentage of votes required for a district to be "packed", or for his district not to be "diluted" with an "inordinate amount" of Democrats. (*Id.* at 19:17-21; 21:9-14).

     **Response:** Undisputed, except that the last sentence is incomplete and misleading.

The reason that Mr. Harris cannot point to a percentage of votes required for a district to be

deemed to be packed is that he is not an expert.

121.     Despite his contentions regarding his district, Mr. Harris agrees that his vote is, in fact, counted by the board of elections and he does not know anyone who has been prevented from voting or who has refused to vote as a result of the 2012 Plan. (*Id.* at 22:9-12; 16:21-17:6). Mr. Harris further admits that the candidate he cast his vote for, Representative Fudge, has routinely been elected. (*Id.* at 16:21-17:6).

     **Response:** Undisputed but immaterial.

122.     Under the Proposed Remedial Plan, Mr. Harris would remain in the Eleventh District which Cooper agreed would continue to be "a very safe Democratic district." (Cooper Dep. 209:8-18; Cooper Exhibit 12).

     **Response:** Undisputed.

### Twelfth District – Aaron Dagres

123.     Aaron Dagres has resided in Ohio's Twelfth Congressional District since 2010. (Exhibit 22, Deposition of Aaron Dagres "Dagres Dep." 10:6-11; 11:15-17). The Twelfth District is currently represented by Troy Balderson, a Republican first elected during a special election on August 7, 2018. (*Id.* at 11:18-22). Prior to the special election, the district was represented by Pat Tiberi, a Republican, since 2001. (*Id.* at 12:4-11).

     **Response:** Undisputed.

124.     Mr. Dagres serves as the President of the Licking County Democratic Club PAC as well as a Central and Executive Committee member of the Licking County Democratic Party. (*Id.* at 84:12-20). He did not vote in the 2013 or 2014 elections. (*Id.* at 40:18-41:12).

     **Response:** The first sentence is admitted. The second sentence is undisputed but

immaterial.

125.    Mr. Dagres received a phone call from the ACLU asking him to join this lawsuit.  (*Id.* at 19:14-24).  Prior to being contacted, Mr. Dagres was not contemplating filing a lawsuit over  political gerrymandering. (*Id.* at 106:20-107:9).

**Response:** Undisputed but immaterial.

126.    Although the Twelfth District has consistently been represented by a Republican, Mr. Dagres believes that his vote has been diluted and "watered down through a cracking and  packing gerrymandering" and "that representation is truly inexistent." (*Id.* at 27:21-28:4).  However, Mr. Dagres admitted that, since 1939, there has been only one Democratic congressional  representative from this district. (*Id.* at 72:24-25). He also could not state how the district could  be drawn so that it is not "cracked." (*Id.* at 53:8-19)

**Response:** Disputed as incomplete and misleading as to the cited testimony.  Mr.

Dagres stated that he could not state how the district could be drawn so that it is not cracked

because he is not an expert.  Ex. T (Deposition of Aaron Dagres ("Dagres Dep.")) at 55:13-

15.

127.    Although Mr. Dagres  complained about split counties under the 2012 Plan, he  admitted that his home county, Licking, remains split between two Congressional Districts under  the Proposed Remedial Plan and that he would remain in the Twelfth District under the Proposed  Remedial Plan. (*Id.* at 61:14-62:5; 162:23-163:3). In addition, despite Mr. Dagres's belief that  the Twelfth District would "be a more competitive district based off of historicals" (*Id.* at 65:7-20), Cooper agreed that the Twelfth District in the Proposed Remedial Plan would be a "very safe"  district for a Republican.  (Cooper Dep. 209:19-25; Cooper Exhibit 12).

**Response:** The first sentence is not disputed.  The second sentence is disputed as

incomplete and a mischaracterization of the evidence.  At the time of Mr. Cooper's

deposition, he had not yet submitted his Third Declaration analyzing the remedial map with

2018 election results.  According to his estimates, Democrats would have won a majority of

the votes in Proposed Remedial District 12 in 2018.  Cooper Third Suppl. Decl. at 4 (Figure

2).

## Thirteenth District – Dr. Elizabeth Myer

128.    Dr. Myer has lived in Trumbull County in Ohio's Thirteenth Congressional District for the past 22 years. (Exhibit 23, Deposition of Liz Myer "Myer Dep." at 10:2-11:2). She is a Democrat and her representative in the Thirteenth Congressional District is Congressman Tim Ryan, a Democrat. (*Id.* at 11:3-11:6; 12:7-12:10; 15:15-15:18).

**Response:** Undisputed.

129.    Dr. Myer's congressional district has been a majority Democrat district since "at least way back into probably the '70s." (*Id.* at 19:14-20:4). Dr. Myer wants to be represented by a Democrat. (*Id.* at 31:10-31:16; 37:9-37:10). A Democrat is her candidate of choice and she has been successful in electing a candidate of her choice. (*Id.* at 45:4-45:11).

**Response:** Undisputed.

130.    She has mainly voted for Democrats but has voted for Republicans in the past. (*Id.* at 13:2-15:14). She would also consider voting for Republican or Independent candidates in the future who represented her values. (*Id.* at 16:19-17:7).

**Response:** Undisputed.

131.    Dr. Myer was asked by her daughter, who knew someone at the ACLU, to become a plaintiff in the lawsuit. (*Id.* at 25:11-27:16).

**Response:** Undisputed but immaterial.

132.    Dr. Myer likes her current congressperson, Democrat Tim Ryan. (*Id.* at 31:20-32:2).

**Response:** Disputed as incomplete and misleading. Dr. Myer testified that "I like Tim Ryan" Ex. U (Deposition of Elizabeth Myer ("Myer Dep.")) at 32:2 in the context of discussing his shortcomings as a representative as a result of the 2012 map, including that "we've had the same representative for quite some time . . . I don't think they necessarily have to be concerned about our concerns to get reelected;" *id.* at 30:12-19; that "[n]o one really challenges [Ryan], it doesn't really give us a choice" *id.* at 31:2-9; and that she wishes "he would be concerned about local levels important to my district and my region as opposed to maybe having other interests." *Id.* at 46:25-46:5.

133.    Dr. Myer admits that she lives in a "very Democratic area" and that she does not know whether or not she lives in an area of the state that has enough Republican voters for her to reside in a district that could elect a Republican representative. (*Id.* at 35:20-36:7; 39:3-39:4).

**Response:** Undisputed as to Dr. Myer's testimony. Dr. Myer testified repeatedly that she is "not a gerrymandering or a political district map expert that I can really say how that map should be drawn." Myer Dep. at 43:5-9; *see also* 56:13-15; 73:13-17.

134.    Dr. Myer said she felt like the way the district was drawn could make Congressman district but could not describe any specific instances where Congressman Ryan had actually been unresponsive to her. (*Id.* at 51:25-53:10)

**Response:** Disputed as incomplete and misleading. Dr. Myer testified that she could not remember ever receiving a responsive email from her Representative's office despite sending them and that she could not remember ever having spoken to anyone despite calling. Myer Dep. at 51:25-53:10.

135.    Under the Proposed Remedial Plan, Dr. Meyer would remain in the Thirteenth District which Cooper described as "certainly leaning strongly Democratic." (Cooper Dep. 210:2- 15; Cooper Exhibit 12).

**Response:** Undisputed.

**Fourteenth District – Beth Hutton**

136.    Plaintiff Beth Hutton resides in Mentor, Ohio, in Lake County, where she has lived for 34 years. (Exhibit 24, Deposition of Beth Hutton "Hutton Dep." at 8:21-9:6). Ms. Hutton resides Ohio's Fourteenth District, which during her time living in Mentor, "has basically stayed the same, but it's gotten bigger as the number of representatives has decreased in Ohio" (*Id.* at 9:22-10:16).

**Response:** Disputed as mischaracterizing the cited testimony except as to the first sentence. Ms. Hutton was asked about her current address and whether, in the 34 years that she's resided at that address, whether it has "always been the 14th District, or has it been in other districts as well." Ex. V (Deposition of Beth Hutton ("Hutton Dep.")) at 9:23-10:8. She responded that "[t]he district has basically stayed the same," indicating that her address has

always been in the 14th District, without making any claims about whether the *shape* of the district has always been the same. *Id.* at 10:9-12.

137. She is a registered Democrat, but often votes for Republicans at the local level. (*Id.* at 12:21-13:23). In deciding who to vote for, Ms. Hutton testified that she considers individuals and their stances, rather than just party membership. (*Id.* at 16:6-25).

**Response**: Disputed as mischaracterizing cited testimony or citing incomplete testimony except as to second sentence. Ms. Hutton testified that she votes for Republican candidates at the local level "fairly often." Hutton Dep. at 13:2-12. She could not recall voting for a Republican or independent candidate for a state position. *Id.* at 14:9-21. At the federal level, she only recalled voting for one candidate for the U.S. House. *Id.* at 14:22-15:6.

138. Ms. Hutton testified that the Fourteenth District is a majority Republican district. (*Id.* at 26:23-27:4).

**Response**: Undisputed.

139. Representative David Joyce, a Republican, represents Ms. Hutton in the Fourteenth district. (*Id.* at 25:12-20). Previously, Ms. Hutton was represented by another Republican, Steven LaTourrette. (*Id.* at 26:7-20). Ms. Hutton voted for Representative LaTourrette at least once. (*Id.* at 14:22-15:22).

**Response**: Undisputed.

140. Ms. Hutton became a plaintiff in this lawsuit after the previous Fourteenth District plaintiff withdrew. (*Id.* at 27:5- 28:22). Ms. Hutton was approached by a cousin who told her the ACLU was looking for a new plaintiff in her district. (*Id.* at 27:5-28:14).

**Response**: Undisputed but immaterial.

141. Ms. Hutton believes the lawsuit is challenging the statewide map. (*Id.* at 37:23- 38:11). Her chief complaint is that the 16 districts are "predictable" in that they usually elect 12 Republicans and four Democrats. (*Id.* at 39:22-41:12; 43:15-18). She thinks that breakdown is unfair "because it doesn't give the Democrats the kind of voice and representation that they should have based on being a swing state" and that the statewide congressional delegation should closely mirror the split between Democrat and Republican voters in the state. (*Id.* at 40:9-41:2)

**Response**: Disputed as incomplete and misleading as to the cited testimony. Ms. Hutton believes the lawsuit is challenging the statewide map, and that she is challenging the shape of her

district. Hutton Dep. 37:23-38:6. For the challenge to the statewide map, Ms. Hutton

understood the lawsuit to be challenging the way in which the map was drawn "behind closed

doors." *Id.* at 38:12-21. She additionally testified to the "uneven representation" produced by

the map statewide. *Id.* at 39:22-41:24.

142.    Ms. Hutton also believes that Democrats tend to reside in more concentrated urban areas and are not evenly spread throughout the state. (*Id*. at 41:25-42:5).

**Response**: Undisputed but immaterial.

143.    Ms. Hutton believes that, because of the predictability of the districts, her vote is sometimes "wasted" but concedes that she knows her vote is actually counted by the board of elections. (*Id*. at 47:17-48:2; 58:17-59:11).

**Response**: Undisputed.

144.    Despite her belief that her vote is "wasted", Ms. Hutton has continued to vote in each election and says that she doesn't know anyone who has not voted because of the 2012 Plan. (*Id*. at 47:21-48:7).

**Response**: Undisputed.

145.    Ms. Hutton also wants the districts to be more competitive. (*Id*. at 48:22-49:11). She defines competition as "two people coming in with an equal chance to succeed." (*Id*. at 49:6-11). But she could not identify any percentage of Republicans or Democrats in a district that would make it competitive, or how to make each district more competitive. (*Id*. at 49:12-50:14). She further states that she doesn't think it's possible for each district in the state to be competitive. (*Id*. at 50:5-14).

**Response**: Disputed as mischaracterizing cited testimony. Ms. Hutton did not provide

testimony on a generalized desire for competitive elections. In response to a question in her

deposition about "any other things besides you thinking that people might feel like it's a waste to

show up that you feel are harms to voters because they know how a district is going to vote one

way or another," Ms. Hutton testified that she believed "competition creates better candidates,

and without competition, you don't necessarily get the best candidates." Hutton Dep. at 48:16-

25.

She did define the way she was using the word "competition" as "two people coming in with an equal chance to succeed." *Id.* at 49:6-11. She did not think there was a particular percentage that could be used to make "all the district competitive." *Id.* at 49:17-21. As for whether it is possible to make each districts more competitive, Ms. Hutton offered her opinion that it was "probably not" possible, but that the districts could be drawn to avoid "splitting counties . . . [and] municipalities." *Id.* at 50:5-22.

146. Under the Proposed Remedial Plan, Ms. Hutton would be moved to the Thirteenth District in which Democrats had a majority of the vote share in each of the three elections cited in Cooper's report. (Cooper Dep. 211:22-212:12; Cooper Exhibit 12).

**Response**: Undisputed as to the Proposed Remedial District that Ms. Hutton would be voting in. Disputed as incomplete as to the estimated Democratic vote share in Proposed Remedial District 13. Mr. Cooper, in his supplemental declaration using 2018 election results, estimated that Democrats would win the majority of the votes in Proposed Remedial District 13. Cooper Third Decl. at 4 (Figure 2).

## Fifteenth District- Teresa Thobaben

147. Ms. Thobaben has resided in Clinton County in Ohio's Fifteenth Congressional District for the past 37 years. (Exhibit 25, Deposition of Teresa Thobaben "Thobaben Dep." at 8:12-9:2). She is represented by Steve Stivers, a Republican. (*Id.* at 9:3-9:8).

**Response:** Undisputed.

148. Ms. Thobaben is a Democrat but has voted for Republicans in the past. (*Id.* at 11:5-11:22).

**Response:** Undisputed but immaterial as to her past voting history.

149. Ms. Thobaben was asked to be a plaintiff in this lawsuit by a friend, Paul Moke, who is on the board of the ACLU. (*Id.* at 24:19-25:12).

**Response:** Undisputed but immaterial.

150.    While Ms. Thobaben believes her vote is "diluted" because it "doesn't matter if  [she] votes for Democrats…because there are so many Republican votes," (*Id.* at 29:3-29:9), she  admitted that a Democrat did not have to be elected as her representative for her to feel that her  vote "counted" but could not describe any scenarios, other than a Democrat winning, where she  would feel her vote "counted."  (*Id.* at 29:10-29:18).

**Response:** Disputed as mischaracterizing testimony.  Ms. Thobaben testified: "My vote doesn't count because the district has been drawn in such a way that it dilutes my vote," and that "[i]t doesn't matter if I vote for Democrats.  They don't count."  Ex. W (Deposition of Teresa Thobaben ("Thobaben Dep.")) at 28:24-29:6. She then testified at length about ways in which, if her district and her representation changed, she would feel her vote had more weight. *E.g., id.* at 30:10-37:25.

151.    Ms. Thobaben agrees that her vote as a Democrat is counted equally as those cast  by Republican voters. (*Id.* at 34:19-35:4).

**Response:** Disputed as misleading. In this instance Defendants asked Ms. Thobaben a very specific question: "You're not actually contending that your vote is not getting counted by the Board of Elections, are you?"  Thobaben Dep. at 34:19-24.  She did not testify that her vote carried the same weight as a Republican vote in her district.  She did testify that "where the district goes, it's been engineered so that my vote is diluted."  *Id.* at 37:23-25.

152.    She does not know what other areas of counties should be added to her district so  that it would have enough Democrat voters to elect a Democrat. (*Id.* at 38:7-38:11).

**Response:**  Disputed as incomplete.  After being asked repeatedly about map-drawing and what factors should be considered during map drawing, Ms. Thobaben said, "we have experts that are supposed to determine that."  Thobaben Dep. at 38:11-12.

153.    Ms. Thobaben admits that she "would have to move" to live in a district that was not a majority Republican district. (*Id.* at 40:11:40:13). Ms. Thobaben testified that she did not believe there was any way to draw her district where "you could have it not be a majority Republican" district because she lives in an area of the state where a lot of Republican voters reside. (*Id.* at 40:14-40:23).

**Response:** Disputed as mischaracterization of testimony. Ms. Thobaben testified that she was "not sure" how a map-drawer could create a differently composed district for her, and that regarding factors for drawing maps, "I don't know. I mean, I know there are a lot of factors that go into it, but that's not my area of expertise." Thobaben Dep. at 40:17; 41:8-11. She did not testify that she did not believe there was any way to draw her district differently.

154.    Ms. Thobaben also believes she is "harmed" because she "doesn't feel represented by" Representative Stivers because he lives in a part of the district that is not where she resides. (*Id.* at 29:20-30:4). But she admits that groups she has been a part of have protested at his office, that she has written letters and received responses back, and that she has his office "on speed dial" and regularly communicates with his staff. (*Id.* at 30:5-32:14). She has never tried to set up a meeting with Congressman Stivers. (*Id.* at 32:15-32:18).

**Response:** Disputed as incomplete and misleading as to Ms. Thobaben's testimony about her interaction with her Representative. Ms. Thobaben testified that "I don't feel represented by Steve Stivers." Thobaben Dep.. at 29:24-25. She testified that she tries to interact with her Representative, for example, by trying to petition, write, and call him. *Id.* at 30:5-23. And she testified that "he rarely comes to Clinton County," that she has only received "the form letter thank you for your communication" in response to her writing him, and that although she "ha[s] him on speed dial," she has only had a "substantive" conversation with his office one time. *Id.* at 30:4-32:14.

155.    Ms. Thobaben admitted that she doesn't know whether or not Representative Stivers has considered the views and opinions that she has voiced to his staff prior to voting on issues in Congress. (*Id.* at 57:15-58:12).

**Response:** Undisputed that Ms. Thobaben testified she does not "know for sure"

58

what Congressman Stivers has thought about. Thobaben Dep. at 58:8-12.

156. Ms. Thobaben has canvassed for a number of politicians including Barack Obama, Hillary Clinton, Ted Strickland, and Scott Warden for U.S. Congress in both 2012 and 2016. (*Id.* at 19:17-20:17). All of her campaign activities have taken place in Clinton County where she lives. (*Id.* at 21:2-21:4). Nothing about the 2012 Plan has prevented her from taking part in these activities. (*Id.* at 47:8-47:13).

**Response:** Disputed as incomplete and misleading as to the third sentence above.

Ms. Thobaben testified that the 2012 map has not "kept" her from engaging in elections

work but "it has made it much more difficult." Thobaben Dep. at 47:8-13.

157. Ms. Thobaben claimed that the 2012 Plan makes Democrat voters in Clinton County "timid or afraid" to be involved in politics, but later admitted that she had no way of knowing if their lack of involvement could be attributed to the 2012 Plan or just the fact that they live in a heavily Republican area of the state. (*Id.* at 46:15-50:2). No Democratic voters have told her that they are reluctant to participate in the political process as Democrats in her district because of the 2012 Plan. (*Id.* at 60:18-61:12).

**Response:** Disputed as mischaracterizing testimony. Ms. Thobaben testified that

she "believe[s] that the redistricting has – of 2012 in particular has polarized people so they

are reluctant to come out and say they are for the Democratic candidate . . . to participate."

Thobaben Dep. at 60:8-12. She testified that she does not "know for sure exactly why

people in [her] area are reluctant to come out and say they are a Democrat" and that no one

had "told [her] that specifically." *Id.* at 60:24-61:11.

158. Under the Proposed Remedial Plan, Ms. Thobaben would be moved to the Second District which Cooper agreed was a "very safe Republican district." (Cooper Dep. 212:8-212:12; Cooper Exhibit 12).

**Response:** Undisputed.

**Sixteenth District – Constance Rubin**

59

159.    Constance Rubin resides in North Canton, Ohio, in Stark County, where she has lived for over thirty years. (Exhibit 26, Deposition of Constance Rubin "Rubin Dep." at 7:16-8:15). She has been a Democrat since at least 1984, but previously identified as a Republican. (*Id.* at 16:14-17; 24:4-12-25:2). While Ms. Rubin believes that it is "highly doubtful" that she would ever vote for a Republican again, she believes that a candidates policy positions are more important than party affiliation when deciding for whom to vote for. (*Id.* at 24:4-26:4).

**Response:** Disputed as incomplete and misleading as to the cited testimony. First of

all, the question as to whether Ms. Rubin would vote for a person with "policies . . . that

[she] agreed with that weren't a democrat, would you be able to vote for that individual"

was objected to as being hypothetical. Ex. X (Deposition of Constance Rubin ("Rubin

Dep.")) at 26:5-9. Second, Ms. Rubin answered that, "Everything being equal, I'd vote for

the democrat." *Id.* at 26:10-11; 25:3-22.

160.    Ms. Rubin resides in the Sixteenth District and has been represented by Republican Jim Rennaci since 2011. (*Id.* at 8:11-25). Previously, Ms. Rubin was represented by Republican Ralph Regula for all of her time living in North Canton, except for one term where she was represented by John Boccieri. (*Id.* at 9:2-10:6). After the 2018 election, the Sixteenth District is represented by Anthony Gonzalez, a Republican.

**Response:** Undisputed.

161.    Ms. Rubin was asked to become a plaintiff in this suit by ACLU attorney Freda Levenson, due to Ms. Rubin's testimony about her concerns with the 2012 statewide congressional plan, in front of a group of state legislators. (*Id.* at 10:7-11:4).

**Response:** Undisputed but immaterial.

162.    Despite her complaints about the current congressional plan, Ms. Rubin believes that she and the League of Women Voters have remained effective in their voter education efforts, and believes nothing about the current plan has prevented voters from educating themselves about their districts, or preventing the League of Women Voters from conducting education efforts. (*Id.* at 13:10-14:18).

**Response:** Disputed as incomplete and misleading and as having mischaracterized

the cited testimony. Ms. Rubin testified that the current way the Sixteenth District is drawn

interferes with her ability to educate voters about issues because "I would ask voters if they

knew who their congressman was; most of them did not, but that's not their fault; I believe it's the fault of the gerrymandered district that I and they live in. . . . After the gerrymander we [Stark County] were divided between three different districts . . . ." Rubin Dep. at 27:5-23; 28:22-29:2; 29:25-30:24,

163. Ms. Rubin also believes that her vote has been diluted in every election Republican Ralph Regula won since 1972. (*Id.* at 54:9-57:3). However, Ms. Rubin admits that she continued to participate and vote despite being represented by Representative Regula for over thirty years. (*Id.* at 77:7-78:2).

**Response:** Undisputed as to the second sentence, but disputed as to the first because Ms. Rubin testified that she believes that her vote may have been possibly diluted in every election that Congressman Regula won since 1972. Rubin Dep. at 56:25-57:12.

164. Ms. Rubin believes that her district is "100 percent predictive" in its outcome statewide, which causes voters to be apathetic. (*Id.* at 63:11-64:24; 90:14-91:16). However, Ms. Rubin admits that she has no right to engage with apathetic voters "all the time" and that she has no right to engage with voters in who are as politically involved as she would like them to be. (*Id.* at 90:14- 91:6).

**Response:** Undisputed as to the first sentence, but disputed as to the second as mischaracterizing Ms. Rubin's testimony because, first of all the question was objected to as calling for a legal conclusion, Rubin Dep. at 89:25- 90:6, and Ms. Rubin is not an attorney. Secondly the question was specifically whether the Constitution grants Ms. Rubin a right not to engage with apathetic voters. *Id.* at 90:25-91:6

165. Ms. Rubin believes the solution to fixing her harm under the current congressional plan is to make the districts "more fairly divided so that either party has an opportunity to win that district." (*Id.* at 61:17-23). She ideally would like that fair divide to be "as close to 50/50 as possible" but, she also admits that is "probably statistically unreasonable." (*Id.* at 62:14-63:3). Ms. Rubin admits that her ultimate goal in a new map is to have the statewide outcome be "closer to a 50/50 outcome of congressional representatives for Republicans and Democrats." (*Id.* at 72:20- 73:18).

**Response:** Undisputed but immaterial. Ms. Rubin is not an expert witness.

166.    Under the Proposed Remedial Plan, Ms. Rubin would be moved to the Fourteenth District.  (Cooper Dep. 212:13-19; Cooper Exhibit 12).  Under the three elections cited by Cooper  in his report, Republicans would have a majority of the vote share in both the Fourteenth District  in the Proposed Remedial Plan and in the Sixteenth District in which Ms. Rubin resides under the  2012 Plan.  (Id. at 212:13-213:19; Cooper Exhibit 12).

**Response:** Disputed as incomplete.  Mr. Cooper, in his supplemental declaration using 2018 results, estimated that Republicans would have a majority of the vote share in Proposed Remedial District Fourteen.  Cooper Third Decl. at 4 (Figure 2).

### D.    Organizational Plaintiffs

### League of Women Voters of Ohio

167.    Jen Miller, the executive director of the League of Women Voters of Ohio since  May 2018 was designated as the group's Rule 30(b)(6) witness.  (Exhibit 27, Deposition of League of Women Voters of Ohio "LWVO Dep." at 11:19; 22:18-22). The Board of the League, which is elected by League members, decided to file this suit. (*Id.* at 51:18-22). The League did not  consult with its members about its participation in this lawsuit. (*Id.* at 52:7-9). The League's  concerns in this litigation are the same concerns that existed eight years ago in 2011. (*Id.* at 107:16- 19). The League spoke with lawyers in 2013 about a potential lawsuit but did not file at that time. (*Id.* at 109:15-110:10).

**Response:** The first and second sentences are undisputed. The third sentence, stating that the League "did not consult with its members about its participation in this lawsuit," is disputed because it is distorting.  Having fair congressional districts is a priority issue for the LWVO, and it is specifically voted upon by member delegates at its biennial convention. Ex. Y (Deposition of Jennifer Miller ("Miller Dep.")) at 51:2-7.  Furthermore, the decision to join this lawsuit was made by the LWVO's elected board.  *Id*. at 51:18-22, and the board has the authority to represent its members in this decision.  *Id.* at 51:24-52:2.  The third and fourth sentences are not disputed, but are immaterial.

168.     Members join the League by paying annual membership dues. (*Id.* at 25:20-24). By paying the fee, a person becomes a member of the local, state, and national League of Women Voters. (*Id.* at 26:3-7). Currently, the League in Ohio has 2,700 to 2,800 members, with the membership total increasing since 2008. (*Id.* at 36:24-37:6; 39:15-22). Members need not agree with the League's policy positions on redistricting principles to join or remain in the organization. (*Id.* at 48:3-6). Ms. Miller testified that the League has never polled its members on their support of its redistricting principles. (*Id.* at 49:21-25).

**Response:** The first four sentences are undisputed. The last sentence of this paragraph, that the League has "never polled its members on their support of its redistricting principles" is immaterial, and mischaracterizes Ms. Miller's testimony. She testified that. in fact, the issue of fair districts is specifically voted upon by the League's member delegates at its biennial convention. Miller Dep. at 51:2-7. Furthermore, the decision to join this lawsuit was made by the LWVO's elected board. *Id.* at 51:18-22, and the board has the authority to represent its members in this decision. *Id.* at 51:24-52:2.

169.     The League publishes voter guides for every primary and general election, which are available online and in print. (*Id.* at 27:9-28:1). Ms. Miller stated that the guide, which covered every primary and general election since the 2011 redistricting, is "absolutely" an effective tool for voter education. (*Id.* at 28:13-19).

**Response:** Undisputed.

170.     The League also registers voters, educates voters on voter ID laws, hosts candidate forums, and recruits poll workers. (*Id.* at 28:22-29:18). It engages in GOTV efforts, including voter education about deadlines and early voting. (*Id.* at 30:6-17). Ms. Miller testified that the League has engaged in these efforts both before and after the 2011 redistricting and opined that the League is "one of the most nonpartisan effective organizations" in those efforts. (*Id.* at 34:1- 35:1; 40:20-23).

**Response:** Undisputed.

171.     Ms. Miller admitted that many factors influence the outcome of an election, including GOTV efforts, policy platforms, incumbency, and other factors. (*Id.* at 76:15-19).

**Response:** The first sentence is disputed because it mischaracterizes the cited testimony. Ms. Miller instead testified: "In our current congressional districts incumbents win again because there was an explicit goal of cementing in the results of elections." Miller

Dep at 76:20-23. Furthermore, when asked, "[A]nd so you're saying that despite the importance of get out the vote, despite the importance of policy positions, despite a particular candidate's background, despite their organizational efforts, despite their position on policies, none of that really matters, it is all predetermined?" Ms. Miller in fact responded: "What I'm saying is that the map makers of this congressional map, the majority party, the party in control at the time, did a very good job of achieving their goal of a twelve/four map and that is a miscarriage of our representative democracy." *Id.* at 77:21-78:9."

172.    Ms. Miller contended that decisions by candidates to skip congressional forums hosted by the League also injures the League and its members and Ms. Miller traces this behavior to the 2012 Plan. (*Id.* at 58:11-17). Ms. Miller identified Steve Stivers and Jim Jordan as candidates who did not participate in League forums. (*Id.* at 94:10-14). Although Ms. Miller attributed their absence to what she described as "safe" districts, she could not identify any statement from Mr. Stivers or Mr. Jordan to that effect, and she admitted that both candidates attended other voter forums. (*Id.* at 95:9-21; 96:6; 99:13-16).

**Response:** The first two sentences are admitted. The third sentence is disputed as mischaracterizing the cited testimony. Ms. Miller explained why she could not identify any statement by Stivers or Jordan as to why they would not participate in League forums: she explicitly pointed out that they, of course, would not make any statement to that effect "because nobody wants to get the backlash of the media or even their own donors for saying something that transparent but unwise publically." Miller Dep. at 99:13-16. And further, "They don't want to be quoted as saying that they don't have to listen to their constituents." *Id.* at 65:6-8. The other forums that Stivers and Jordan do attend are "staying with their sweet spot . . . orchestrated by them, planned by them, controlled by them." *Id.* at 97:5-18.

173. Despite contending that candidates in gerrymandered districts don't "have to listen to their constituents because they feel secure in their ability to win," Ms. Miller could not identify any particular statement by a congressperson espousing this attitude. (*Id.* at 64:13-18), 65:6-8)

**Response:** Disputed as mischaracterizing the cited testimony. Ms. Miller explained

why she could not identify any statement by Stivers or Jordan as to why they would not

participate in League forums: she explicitly pointed out that they, of course, would not make

any statement to that effect "because nobody wants to get the backlash of the media or even

their own donors for saying something that transparent but unwise publically." Miller Dep.

at 95:7-10. And further, "They don't want to be quoted as saying that they don't have to

listen to their constituents." *Id.* at 65:6-8. The other forums that Stivers and Jordan do attend

are "staying with their sweet spot . . . orchestrated by them, planned by them, controlled by

them." *Id.* 97:5-18.

174. Ms. Miller contended that the 2012 Plan had forced the League to divert resources from voter-education efforts to attempts to pass redistricting reform to ensure fair maps. (*Id.* at 93:18-94:7). But she conceded that the League has worked on redistricting efforts since the middle of the 20th century, in addition to its voter-education mission. (*Id.* at 100:5-15). Ms. Miller could not quantify the effect of this so-called diversion of resources. (*Id.* at 186:3-11).

**Response:** The first two sentences are undisputed. The third sentence is disputed

because it mischaracterizes the cited testimony. The question posed to Ms. Miller was

whether she *had a document quantifying volunteer time* diverted due to the congressional

map. Ms. Miller responded said that she does not currently have such a document, but

could create one. She said "we could look at, for example, the staff notes of the number of

calls. I can get, you know, the calls in the 866-OUR-VOTE if you wanted and I could tell

you how many of those calls there were, and we could probably do some back of the

envelope calculating. At this moment, no, I do not have that document." Miller Dep.

at 186:12-23. The questioner then declined to take her up on her offer to create such a

document: "Q: Okay, I have no further questions." *Id.* 187:7-8.

175.    The League believes that the 2012 Plan creates voter apathy but admitted that the League has not studied voter apathy in Ohio; nor could she identify any external study on the phenomenon. (*Id.* at 135:15-24 137:22-23).

**Response**: Admitted that the plan creates voter apathy, but immaterial that the

League has not made a study of voter apathy in Ohio or identified any such external study.

### Ohio State University College Democrats

176.    Alexis Oberdorf serves as the President of the Ohio State University College Democrats and was designated as the group's Rule 30(b)(6) representative. (Exhibit 28, Deposition of Ohio State University College Democrats "OSUCD Dep." at 8:19-21). The OSU College Democrats meet weekly, with "around 55" people in attendance at each meeting. (*Id.* at 42:18-19). Ms. Oberdorf confirmed that the number rose in 2018, from around 25 weekly attendees to more than 50. (*Id.* at 43:10-14).

**Response**: Undisputed as to the first two sentences.  Disputed as incomplete and

misleading as to the remainder.  Ms. Oberdorf testified that there were more attendees in 2018

than in 2017 because "[a]ttendance depends on whether it's an election year or not."  Ex. Z

(Deposition of Alexis Oberdorf ("Oberdorf Dep.")) at 44:4-5.  Ms. Oberdorf also testified that

attendance in 2016 was higher than in 2018.  *Id.* at 44:7-8.

177.    The OSU College Democrats "advocate, educate, and engage" people at OSU in alignment with the Democratic Party's platform. (*Id.* at 13:14-19). The organization communicates with its members and the public primarily through email, as well as its Facebook and Twitter accounts. (*Id.* at 50:23-51:2). Ms. Oberdorf testified that the OSU College Democrats increased their Twitter following over the past two years. (*Id.* at 27:25-28:4).

**Response**: Undisputed as to the first sentence.  Undisputed and immaterial as to the

remainder.

178.    The organization receives programming funds from Ohio State and raises additional funds through fundraisers conducted by the organization itself. (*Id.* at. 29:10-16).

**Response**: Undisputed but immaterial.

179.    The organization participates in election activities, including voter registration. Within one month in 2018, it completed more than 500 voter registrations. (*Id.* at 35:8-16).

**Response**: Undisputed.

180.    The group held a fundraiser with Twelfth Congressional District Democrat candidate Danny O'Connor at a local bar. (*Id.* at 37:5-13).

**Response**: Undisputed.

181.    The OSU College Democrats canvassed for the 2018 congressional election and organized phone banks in prior election years. (*Id.* at 78:25-79:7)

**Response**: Undisputed.

182.    Ms. Oberdorf estimated that the club spent 30% of its resources in the 2018 election on the Twelfth Congressional District race. (*Id.* at 89:16-22). While Ms. Oberdorf testified that Danny O'Connor's loss in the Twelfth District dampened enthusiasm among the OSU College Democrats, she could not quantify the loss of enthusiasm or name a single member who left the organization as a result. (*Id.* at 120:20-121:3).

**Response**: Disputed as incomplete and misleading.  Ms. Oberdorf testified that the OSU College Democrats "didn't ha[d] a normal club event" since the November 2018 election at the time of her deposition, and that they would know the evening following her deposition "who quit and why."  Oberdorf Dep. at 120:22-121:3.  Moreover, Ms. Oberdorf testified that her members had done outreach among their friends shortly before the election to identify why they were not voting "and the most popular answer was I feel like my vote doesn't matter."  *Id.* at 70:5-71:8.

183.    The executive board unanimously approved the decision to join the lawsuit, and Ms. Oberdorf confirmed with the university's legal department that the organization could participate. (*Id.* at 53:24-54:5). The board informed the group's membership of the lawsuit only after deciding to join the case. (*Id.* at 58:2-9).

**Response**: Undisputed but immaterial.

184.    The OSU College Democrats believe that the 2012 Plan has harmed them by creating voter apathy and voter confusion, with members living across the Third, Twelfth, and Fifteenth Districts. (*Id.* at 62:19-25). Ms. Oberdorf failed to identify any specific member of the OSU College Democrats who failed to vote due to voter apathy. (*Id.* at 72:15-21).

**Response**: Disputed as incomplete and misleading.  Ms. Oberdorf testified that her members had done outreach among their friends shortly before the election to identify why they were not voting "and the most popular answer was I feel like my vote doesn't matter."  Oberdorf Dep. at 70:5-71:8.

185.    Ms. Oberdorf acknowledged that the OSU College Democrats could educate members and the public about their voting locations by directing them to the Secretary of State's website. (*Id.* at 74:19-25).

**Response**: Disputed as incomplete and misleading.  Ms. Oberdorf testified that the OSU College Democrats did provide tools for their members to find polling locations, but that this only reached those already engaged with the organization, the reach of which was inhibited by the congressional map.  Oberdorf Dep. at 68:21-69:6.  She further testified that "it would be easier" for the College Democrats "to disseminate information" if its constituency were within a single congressional district.  As it is, the College Democrats deal with "students who just assume that they can vote in the same area that their friends can."  *Id.* at 69:11-17.

186.    Ms. Oberdorf stated that the Proposed Remedial Map would place the OSU campus area into a single district but conceded that many students do not vote according to their campus addresses. (*Id.* at.107:8-20).

**Response**: Disputed as incomplete and misleading.  Ms. Oberdorf testified that while "some" student voters cast an absentee ballot from their home address, the "majority" updated their voter registration so they can vote from their campus address.  Oberdorf Dep. at 66:14-67:2.

187.    The group claims that the map has made it more difficult to reach out to candidates. Ms. Oberdorf stated that Representative Joyce Beatty has declined to speak at their meetings because, Ms. Oberdorf believes, the Third Congressional District is "safe." (*Id.* at 103:22-104:5). Ms. Oberdorf admitted that no one from Representative Beatty's office told her this and she was speculating. (*Id.* at 105:3-12).

**Response**: Disputed as incomplete and misleading.  Ms. Oberdorf testified that OSU College Democrats do not receive responses from the Representatives in the 3rd, 12th, and 15th Congressional Districts.  Oberdorf Dep. at 103:14-104:13.  This included not receiving responses from the Representatives in the 12th and 15th District when the College Democrats "have done coordinated call campaigns for bills that [they] oppose," *id.* at 103:14-21, as well as not receiving responses from Representative Beatty when compared to other Democratic elected officials and candidates "who are running competitive elections" and who want to engage with the College Democrats to have "the college vote to push them over the edge," *id.* at 104:6-13.

### Ohio A. Philip Randolph Institute

188.    Andre Washington has served as the state president for the Ohio A. Philip Randolph  Institute for ten years and was the organization's Rule 30(b)(6) designee.  (Exhibit 29, Deposition  of Ohio A. Phillip Randolph Institute "APRI Dep." at 12:2-6).

**Response:**  Undisputed.

189.    APRI has existed for around 27 years, and Mr. Washington testified that it has  grown in recent years.  (*Id.* at 51:16-25).

**Response:**  Undisputed.

190.    The ACLU approached Mr. Washington about joining the lawsuit. (Washington  Dep. 81:7-8.) APRI did not seek approval from the national APRI organization before joining this  suit.  (*Id.* at 20:13-14).  It consulted with representatives from each regional chapter of APRI before   joining the lawsuit, but it did not poll its members individually.  (*Id.* at 47:4-15). Mr. Washington  does not know whether anyone from APRI provided input to public officials when Ohio was  drawing its lines and seeking public input.  (*Id.* at 44: 4-14). Aside from suing, APRI has never  notified any public official that it opposes the current map.  (*Id.* at 44:15-20).

**Response:** The first sentence is undisputed.  The second two sentences are disputed because they are incomplete and misleading as to the cited testimony, which is that APRI's

executive board, all of its chapters, and representatives from each chapter unanimously made the decision to join the lawsuit. Ex. AA (Deposition of Andre Washington ("Washington Dep.")) at 18:9-12, 47:4-15, 48:8-15, 63:11-15. The fourth and fifth sentences are undisputed but immaterial.

191.    Mr. Washington testified that the 2012 Plan harms APRI and its members because  the members feel that their votes don't matter but could not identify a member of APRI who did not vote for this reason. (*Id.* at 67:5-9, 68:21-23). But APRI also does not know whether its  members vote or do not vote in congressional elections. (*Id.* at 69:5-15).

**Response:** Undisputed in that the 2012 Plan harms APRI and its members because the members feel that their votes don't matter. Disputed as to Mr. Washington not being able to identify a member of APRI who did not vote for this reason, because this statement is incomplete and misleading. In fact, Mr. Washington testified that the reason he could not remember specific names is because there are so many of them. Washington Dep. at 127:20-128:10. The last sentence is not in dispute but is immaterial.

192.    Additionally, Mr. Washington contended that the map complicates voter-education  efforts because APRI has to expend additional resources to make voters feel that their votes matter. (*Id.* at 70:13-18). But he could not quantify these redirected resources in any way. (*Id.* at 72:7-9).

**Response**:  The first sentence is not disputed.  The second sentence is not disputed, but it is not material.

193.    Mr. Washington believed that the injuries inflicted by the 2012 Plan could be cured  by drawing "fair lines," but he had no opinion on what those lines should be. (*Id.* at 36:2-9).

**Response:** This statement is disputed because it is incomplete and misleading as to the cited testimony.  Mr. Washington testified that he is "a layman," and . . . "[t]hat answer is more suited for someone that has experience in drawing lines."  Washington Dep. at 36:6-9.

194. Since enactment of the 2012 Plan, APRI has successfully engaged in election activities, including voter registration, voter education, and GOTV efforts. (*Id.* at 53:17-19). These are APRI's primary roles with respect to voting. (*Id.* at 53:17-25). APRI agrees that political positions are not necessarily defined by a person's party affiliation (*Id.* at 69:21-25) and individuals can be motivated to vote based on issues unrelated to congressional races. (Washington Dep. 61:2-7). Mr. Washington considers the organization effective in these efforts, all with the current map in place. (*Id.* at 54:15, 25; 55:17).

**Response:** The first two sentences are not disputed. The third sentence is disputed as incomplete and misleading as to the cited testimony. Mr. Washington expressly testified that "it's rare to hear a Democrat vote for a Republican so they usually vote for a Democrat." Washington Dep. at 128:18-22. The last sentence is not disputed but is immaterial.

### Northeast Ohio Young Black Democrats

195. Northeast Ohio Young Black Democrats ("NEOYBD" or "Organization") was represented by Gabrielle Jackson, its President for the last two years. (Exhibit 30, Deposition of Northeast Ohio Young Black Democrats "NEOYBD Dep." at 7:12-8:6). Ms. Jackson became a member of the Organization in 2014 and prior to serving as president, served as treasurer. (*Id.*)

**Response:** Undisputed.

196. NEOYBD is a group that "looks to mentor, empower and recruit the next generation of young people of color who want to be involved in the political process." (*Id.* at 8:9-12). The organization engages in advocacy work, including voter education, training and information sharing. (*Id.* at 8:7-9:22). The organization also supports democratic candidates and would prefer to be in districts represented by a Democrat. (*Id.* at 43:3-18).

**Response:** Undisputed.

197. The organization has members living in Congressional Districts 9, 11, 13, and 14. (*Id.* at 41:15-42:7; 45:12-16). Members living in Congressional Districts 9, 11, and 13 are all represented by Democrats. (*Id*).

**Response:** Undisputed.

198.    NEOYBD became a plaintiff in this lawsuit after being contacted by Erik Meinhardt at the ACLU. (*Id.* at 35:2-37:7). The organization's membership at large was not involved in the decision to become a plaintiff in this lawsuit, as the decision was made by NEOYBD's four-member board. (*Id.* at 38:8-40:12). Despite admitting that the membership was  not consulted, and did not consent to becoming plaintiffs in this suit, Ms. Jackson testified that the  organization intends for all its members to be bound by the outcome of this case. (*Id.* at 38:8-  40:12).

**Response:** Disputed as incomplete and misleading.  Ms. Jackson testified that her

board unanimously voted to become a plaintiff in the litigation.  The board made this

decision as a result of the "conversations we've had with our community."  Ex. BB

(Deposition of Gabrielle Jackson ("Jackson Dep.")) at 39:5-12.  Ms. Jackson did testify that

the organization—which is an incorporated nonprofit—intends for its members to be bound

by the decision of the board of directors.  *Id.* at 26:15-17; 40:3-6.

199.    NEOYBD believes that it has been harmed by the 2012 Plan because the plan  makes it harder to recruit members and raise money for their organizations and candidates. (*Id.* at  10:25-1:13; 42:18-44:3) Despite this contention, NEOYBD admits that its membership has grown  since 2012, and that the organization raised more money this past year, than ever before. (*Id.* at  20:2-13; 27:5-22).

**Response:** Undisputed as to Ms. Jackson's testimony.

200.    NEOYBD also believes that the 2012 Plan had harmed the organization because  their members, and members the meet in the community "don't feel like their votes matter." (*Id.*  at 42:18-44:3) Despite believing that votes don't matter, NEOYBD admits that votes of their  members are actually counted, and that no one has been prohibited from voting in any election.  (*Id.* at 66:17-67:4). NEOYBD also admits that members living in Congressional Districts 9, 11,  and 13, are all represented by Democrats, which the organization prefers to be represented by, and  that District 9 representative Marcy Kaptur "represents [the organization's] interests." (*Id.*  at  44:12-45:13; 48:10-18; 53:22-54:2)

**Response:** Disputed as incomplete and misleading.  Ms. Jackson testified that she

does not believe her members' "votes are literally not being counted."  Jackson Dep.

at 66:21-24.  She also testified that while "no one has prohibited" her members from

"actually voting in any election," "this map, the way it's currently drawn, our voices are

diluted, because of the packed district that we talked about earlier and recently . . . [s]o this

2012 plan, as we're calling it, is completely disenfranchising." *Id.* at 66:25-67:12. Further,

regarding representation by Marcy Kaptur, Ms. Jackson testified that "she represents our

interests, but we would like to have a direct connection to her" and that "[t]he point in

representation; it's not about physical proximity. It's about making sure they represent our

interests. And that even if she – the expectation's not to live across the street from your

representative, but it's for them to be in your community and be communicating with folks

all around the whole district." *Id.* at 54:2-14.

201. Finally, NEOYBD believes that it is harmed by the 2012 Plan because
when members are out canvassing and conducting voter outreach efforts, the community, feel
like it does not have to vote, or that they will not vote. (*Id.* at 42:18-44:3; 69:3-70:2)
However, the organization also admits that nothing about the 2012 Plan has prevented
NEOYBD from engaging in voter-registration activities, providing training for democratic
leaders or from being able to hold candidate forums. *Id.* at (84:7-85:17). Furthermore, Ms.
Jackson stated that the organization was a "millennial- focused group" and that "millennials
are not voting because of "[j]obs, job training, education, [and] affordable education" not
the 2012 Plan. (*Id.* at 10:7-20).

**Response:** Disputed as misleading and mischaracterizing testimony. Ms. Jackson

testified that the 2012 plan did not "actually prohibit[]" her from "trying to engage in" voter

registration and other core NEOYBD mission activities. Jackson Dep. at 84:14-87:18. She

testified that the map "hasn't physically prohibited us, but it has created an added barrier and

harmed our organization and harmed our membership." *Id.* 85:17-20. Further, Ms. Jackson

testified about the interests of millennial voters in response to the question, "what are some

of the community issues that you reach out to people about?" *Id.* at 10:7-13. She did not

testify that the 2012 map is not a contributor to millennial voter apathy; in fact she testified

repeatedly that the map does contribute to voter apathy and harms her membership. *E.g.*, *id.*

at 10:19-24; 86:24-87:6.

**Hamilton County Young Democrats**

202.    Hamilton County Young Democrats ("HCYD" or "organization") was represented by Nathaniel Simon, its President since October 2017. (Exhibit 31, Deposition of Hamilton County Young Democrats "HCYD Dep." at 7:25-8:6). Its headquarters is located in Cincinnati in Ohio's 2nd Congressional District. (*Id.* at 8:16-8:21).

**Response**: Undisputed.

203.    It is a Democratic organization with about 150 members whose goal is to "involve and educate young individuals who are interested in Democratic politics." (*Id.* at 8:22-9:8; 9:8- 9:25).

**Response**: Undisputed.

204.    The organization was asked by an ACLU attorney to become a plaintiff in this lawsuit. (*Id.* at 10:13-11:17). The HCYD's decision to become a plaintiff was made by the organization's four-member executive board without input from its membership as a whole. (*Id.* at 11:18-14:2). The organization admits that it might have members that have voted for Republicans in congressional elections. (*Id.* at 15:13-16:8; 57:20-57:22).

**Response**: Undisputed and immaterial as to the first two sentences.  Disputed as incomplete and misleading as to the third sentence.  Mr. Simon further testified that his members "self-identify[]" as Democrats and that he has no concern that his members are not Democrats. Ex. CC (Deposition of Nathaniel Simon ("Simon Dep.")) at 78:22-79:8.

205.    The organization feels like it is harmed by having to split its resources between two congressional districts because Hamilton County is split between two congressional districts. (*Id.* at 17:6-16). The organization admitted, however, that the same issue will exist if the Proposed Remedial Plan drawn by Cooper is adopted because Hamilton County is still split between two congressional districts and that organization still have to split its resources under the Proposed Remedial Plan. (*Id.* at 18:6-21:14.)

**Response**: Disputed as incomplete and misleading.  Mr. Simon testified that under the Proposed Remedial Plan the Hamilton County Young Democrats would "focus" its resources on electing the congressional candidate in the First District "because that's where most of the population reside in Hamilton County," and that the Hamilton County Young Democrats "could get more members and financial backing."  Simon Dep. at 79:9-23.  Mr. Simon also testified that the splitting of the City of Cincinnati was a large problem with the current congressional map,

74

which was remedied by the Proposed Remedial Plan. *Id.* at 20:15-24; 33:12-16; 35:20-24; 48:21-49:10; 79:9-23; 82:10-15.

206. The organization believes that if they "organize, knock doors, and get people out to vote, [they] can be competitive in traditionally red districts" like the First Congressional District even under the 2012 Plan. (*Id.* at 30:17-31:15). Nothing about the 2012 Plan has prevented the organization from successfully educating its members about where they are supposed to vote. (*Id.* at 32:22-35:16). The organization has never had a situation where it was unable to determine where a member was supposed to go vote. (*Id.* at 36:4-36:13).

**Response**: Disputed as incomplete and misleading. The quoted language in the first sentence is from a Facebook posting about canvassing in Ohio's Twelfth Congressional District. Ex. DD (Ex. 5 to Simon Dep.); Simon Dep at 30:17-31:15. As to the second sentence, Mr. Simon testified that "to a degree, no," the Hamilton County Young Democrats were not successful in educating its members about where to vote, due to the way the City of Cincinnati is split under the congressional map. Simon Dep. at 33:3-16. He further testified that "the State's actions have made it more complicated to learn exactly where you are. I have members on one side of the street who are in Congressional District 2 and on the other side [it's] Congressional District 1. It's just made the whole education process more complicated than it should be." *Id.* at 33:24-34:6. Mr. Simon also testified that district lines "just made the whole effort to educate our members and prospective members much more challenging and burdensome." *Id.* at 35:13-16; *see also id.* at 35:17-24.

207. The organization also feels like it has been harmed by the 2012 Plan because it has made its members apathetic about voting. (*Id.* at 17:17-17:25). The organization admits that nothing about the 2012 Plan has prevented them from engaging in get-out-the-vote efforts or engaging voters to try and flip the First District in the most recent election. (*Id.* at 29:10-30:14; 83:18-83:22).

**Response**: Undisputed as to first sentence. Disputed as incomplete and misleading as to second sentence. With respect to each of the citations in the second sentence, Mr. Simon testified that the congressional map has made each of those efforts more burdensome. Simon

Dep. at 30:13-16 ("It hasn't prevented us from engaging in these efforts, however, it's made it a lot tougher and puts [a] burden on [our] organizations and its members."); *id*. at 83:23-84:5 ("I feel like the candidates for the 1st and 2nd Congressional District have more barriers to overcome, especially regarding voter apathy, and that's especially why they are using social media in a very upbeat tone to try to energize Democrats and voters who might support them."); *see also id.* at 31:16-21 ("It hasn't prevented us from engaging in get out the vote activities, however, it's made it a lot tougher."); *id.* at 35:10-16 (district lines "just made the whole effort to educate our members and prospective members much more challenging and burdensome").

208.    The organization claims that it has been harmed because it has received less funds from fundraising as a result of the enactment of the 2012 Plan. (*Id.* at 55:11-57:14). However, the organization had no knowledge of how much money it raised in any election cycle prior to the enactment of the 2012 Plan. (*Id.* at 63:18-65:4).

**Response**: Disputed as incomplete and misleading.  Mr. Simon testified that "fewer people volunteer or give money because – and they have stated that it's because of just feeling apathetic and that it won't – them volunteering or contributing anything will actually meaningfully effect change."  Simon Dep. at 56:5-14.  Mr. Simon did not testify regarding an amount raised, but specifically testified to the number of people being engaged.

## II.    Disputed Issues of Material Fact

### A.    Redistricting in Ohio

209.    Under Ohio law, the state General Assembly has the primary authority for drawing Ohio's U.S. congressional districts, and the bipartisan Joint Legislative Task Force on Redistricting, Reapportionment, and Demographic Research ("Task Force") is tasked with advising the General Assembly.  *See* Ohio Rev. Code § 103.51; Answer of Intervenors, Republican Congressional Delegation, Ohio Voters, and Republican Party Organizations to Plaintiffs' Second Amended Complaint (Dkt. No. 65) ("Intervenors' Answer") at ¶ 42. The

76

Task Force is a six-person bipartisan committee, with three members appointed by the Speaker of the Ohio House of Representatives and three by the President of the Ohio State Senate.  *See* Ohio Rev. Code § 103.51; Intervenors' Answer at ¶ 42.

### B.   Ohio's map was drawn with the assistance of national Republicans

210.    In 2011, John Boehner, then-Speaker of the U.S. House of Representatives, assigned Tom Whatman, the Executive Director of his political operation (called "Team Boehner"), to work on restricting in Ohio. Among other things, Whatman was tasked with serving as a liaison between Ohio's Republican members of Congress and Republicans in Ohio.  Ex. EE (Deposition of Tom Whatman ("Whatman Dep.")) at 25:18-21, 29:15-30:03.

211.    Whatman worked with Adam Kincaid, who the National Republican Campaign Committee ("NRCC") had hired as its redistricting coordinator in February 2011. Whatman Dep. at 30:8-22; Ex. FF (Deposition of Adam Kincaid ("Kincaid Dep.")) at 51:17-23, 60:5-9.

212.    Republican map drawers took direction from Whatman, which was informed by the analysis of Kincaid, as well as other national Republican operatives including John Morgan and Thomas Hofeller.  Ex. GG (Deposition of Raymond DiRossi ("DiRossi Dep.")) at 109:7-14, 257:5-258:2; Ex. HH (Deposition of John Morgan ("Morgan Dep.")) at 48:13-55:2; Ex. II (REV_00023234).

██   ███████████████████████████████████

████████████████████████████████████████████

██████████████████████

214.    By July 2011, Republicans were using various political indices to "score" the political leanings of proposed congressional district maps to determine the best way to achieve a 12-4 map.  Whatman Dep. at 67:9-69:16; 157:11-164:267:9-69:16.

215.    On September 7, 2011, Whatman sent Senate President Thomas Niehaus and House Republican Caucus Chief of Staff Troy Judy talking points informing him that Republicans were seeking to "lock down" 12 Republican seats. These talking points were also shared with Ohio Republican legislators and their staff.  Ex. KK (LWVOH_0052431).

### C.    The map drawers evaluated the districts that were drawn through the use of political indices.

216.    The use of the election results data in the map drawing process enabled Republicans to ensure a 12-4 map.  *See* Kincaid Dep. at 152:14-153:12.

217.    Political indices blend together data from different races to more accurately predict the voting tendencies of voters in proposed congressional districts.  Ex. LL (Deposition of Heather Blessing ("Blessing Dep.")) at 85:04-17. The political indices for each individual congressional district were relied on during the map drawing process and distributed at meetings.  Ex. MM (Deposition of Troy Judy ("Judy Dep.")) at 43:08-44:25, 47:10-14, 47:23-48:25.

218.    Several indices were used by the Republicans.  One they created the Unified Index.  DiRossi Dep. at 112:04-112:07, 112:23-113:15.  The Unified Index was composed of results from the following five races: 2004 President, 2006 Auditor, 2006 Attorney General, 2008 President, and 2010 Governor.  Whatman Dep. at 207:14-213:11; Kincaid Dep. at 160:06-161:16, 238:21-241:06.  The Unified Index is more Democratic than the actual vote share in the decade preceding the redistricting.  *See* Ex. NN (Deposition of M.V. Hood ("Hood Dep.")) at 131:23-139:25; Ex. OO (Ex. 15 to Hood Deposition).  Using a more Democratic index would have enabled map drawers to be confident that districts would not switch to Democratic control when there was a year that favored Democratic candidates.  *See id.*

219.    In addition to the Unified Index, McCain '08 election results were used. DiRossi Dep. at 203:14-204:03; 319:21-320:4. Since it was based on President Obama's defeat of John McCain in 2008, the McCain '08 index also reflected a strong Democratic outcome. *Compare* Ex. PP (Ex. 10 to Blessing Dep.) *with* Hood Dep. at 131:23-139:25; Ex. 15 to Hood Deposition.  Using this more Democratic metric would allow the map drawers and stakeholders to be confident that districts would not switch to Democratic control when there was a year that favored Democratic candidates. *Id.*

220.    Finally, Republicans used the Partisan Vote Index ("PVI"), to score districts. Kincaid Dep. at 159:7-161:13.  PVI was preferred by certain National Republicans, including Kincaid.  DiRossi Dep. at 334:06-334:12.

**D.    The map drawers used Maptitude to track changes to the partisan scoring of each district.**

221.    Republicans used a program called Maptitude to draw the congressional map. Maptitude enables a map drawer to generate color coded maps of a district, showing the specific scorings of sub-portions of the district and its relative Republican or Democratic strength, which could be viewed by map drawers.  Whatman Dep. at 180:23-181:09.

222.    As Republicans made changes to draft maps in Maptitude, they could see real time scoring of the proposed districts and share the scoring widely among both national and Ohio Republicans. Judy Dep. at 103:24-105:08.

223.    Political scoring of the draft maps was given to local Ohio Republicans and to national Republicans, including Republican incumbents from Ohio's U.S. congressional districts.  *See* Kincaid Dep. Ex. 27.  Political data was shared for both the initial Ohio congressional map (HB 319) and the final Ohio congressional map (HB 369).  *See* Ex. QQ

(Ex. 27 to Kincaid Dep.); Ex. 10 to Blessing Dep. The analyses for HB 369 showed that it would be a 12-4 map like HB 319 had been.  Ex. 10 to Blessing Dep

224.    Charts scoring congressional districts using various indices were also created and distributed.  DiRossi Dep. at 232:24-233:16; Ex. RR (Ex. 22 to DiRossi Dep.).

**E.    Political indices were shared with Ohio legislators at the "Bunker" and digitally.**

225.    Ohio's congressional map was drawn in secret by a combination of in-state Republican operatives and national Republican actors.  The map drawers knew that the Ohio legislative leaders were interested in how changes to the map impacted the partisan makeup of the map.  *See* DiRossi Dep. at 246:25-247:15.

226.    Beginning in July 2011, the redistricting operations were based out of a secretly-rented hotel room at the DoubleTree Hotel in Columbus, Ohio.  DiRossi nicknamed the room "the Bunker" and it was generally referred to by that name.  Defs.' Answer ¶ 57; DiRossi Dep. at 142:21-143:11; 146:18-149:22; 158:5-164:3.  It is in the "bunker" where the first version of the map, passed as HB 319, was initially drawn.  Ex. SS (Deposition of Thomas Niehaus ("Niehaus Dep.")) at 66:14-66:21.

227.    No Democratic officials or operatives were able to access the bunker, and the meetings regarding the map drawing there were limited to Republican operatives and officials.  Batchelder, Niehaus, Huffman, Mann, DiRossi, Judy, Lenzo, and Braden all attended meetings at the Bunker where draft maps and political data were shared.  DiRossi Dep. at 142:21-143:11; 146:18-149:22; 158:5-164:3; Niehaus Dep. at 43:16-21; 67:17-68:2; Ex. TT (Deposition of Keith Faber ("Faber Dep.")) at 58:15-58:25; Judy Dep. at 74:14-75:3.

**F.      A key part of the national Republican work and strategy was the Franklin County Sinkhole.**

228.    One key proposal that enabled a 12-4 map was the creation of a new congressional district in the city of Columbus (what would become Congressional District 3).  Whatman Dep. at 50:18-51:21. The strategy was referred to as the "Franklin County Sinkhole" and the impact of this strategy was well known among Republicans at the time. Kincaid Dep. at 152:14-153:12; Ex. UU (Ex. 8 to Kincaid Dep.); Ex. VV (Ex. 10 to Braden Dep.).

229.    The new district packed Democrats in Democrat-leaning Franklin County into a single congressional district.  Ex. WW (Deposition of Christopher Glassburn ("Glassburn Dep.")) at 171:16-173:21. ███████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████ The Democratic parts of Franklin County, which was referred to as "dog meat" territory by one of the Republican operatives drafting and consulting on Ohio's map, were stripped from those congressional districts and combined into the new congressional district in Franklin County.  REV_00023234.

**G.      Republicans provided lawmakers with little time to debate the merits of the proposed plan.**

230.    There were five public hearings held by the Senate Select Committee on Redistricting and the House Committee on Redistricting, with Faber and Huffman chairing the respective committees. Ex. XX (Deposition of Matthew C. Huffman ("Huffman Dep.")) at 33:19-35:9; Faber Dep. 21:9-24.  These hearings were held in July and August 2011.  Ex. YY (Ex. 4 to Huffman Dep.); Ex. ZZ (Ex. 6 to Faber Dep.).

231.    No maps were considered at the public hearings regarding congressional redistricting. Nor were any maps or indices available at the hearings.  Further, the committees had no responsibility beyond hearing testimony at these hearings.  Judy Dep. at 145:18-146:10; Huffman Dep. 45:23-46:4; Huffman Dep. 46:23-47:3; Ex. AAA (Ex. 7 to Huffman Dep.) at 38:2- 39:5.

232.    The map was, according to plan, "held in the can" after it was drafted until September 13, 2011.  DiRossi Dep. at 176:16-178:18; Ex. BBB (Ex. 19 to DiRossi Dep.).

233.    Members of the General Assembly—even Republican members—were largely kept in the dark about the content of the maps until the end of the process.  Faber Dep. at 50:15-51:14, 57:15-58:8, 174:17-175:17.

234.    There were no negotiations between Democrats and Republicans regarding HB 319.  The Democratic Minority Leader in the Ohio House, Armond Budish stated that "the map was drawn by Republicans in secret behind closed doors with no meaningful input whatsoever from members of the public, and now the map is being rammed through the House in just a couple of days in order to prevent any meaningful input from anyone else."  Ex. 7 to Huffman Dep. at 67:23-68:4.  Other Democrats also complained about how the map was introduced.  *Id.* at 23:13-21; 75:8-76:2.

235.    The proposed map was shared with the Democratic leadership just before it was introduced.  Ex. CCC (Deposition of William Batchelder ("Batchelder Dep.") at 57:11-57:16.

236.    Not only did the Democratic leadership not have any input into the map, but many of Ohio's Republican legislators had little input into the map. Faber was given, at the

last minute, a map that he was asked to support.  Faber Dep. at 50:15-51:14, 57:15-58:8, 174:17-175:17.

237.    HB 319, the bill that included the first enacted congressional map, was introduced two days before the full Ohio House voted on the bill on September 15, 2011, and just eight days before its final passage on September 21, 2011.  Ex 7 to Huffman Dep.

238.    The creation and passage of HB 369, the bill that included the second and final congressional map, shared many of the same procedural irregularities as HB 319. Huffman introduced HB 369 in the House on November 3, 2011.  Ex. DDD (Ex. 17 to Huffman Dep.); Defs.' Answer ¶ 79.

239.    While there were some limited negotiations with Democrats after HB 369 after its introduction, these negotiations did not result in materially changes to the partisan breakdown of HB 369.  Glassburn Dep. at 175:13-19, 176:10-20, 203:9-204:16.

240.    Defendant Larry Obhof, who was in the Ohio Senate at the time, explained: "While a lot of Democrats voted for the current map . . . they didn't really have a lot of negotiating power at that stage, because there was always the opportunity to say hey work with us and we'll do a slightly better map, or we'll do what we want and pass it with 51% of the vote."  Ex. EEE (Def. Obhof Resp. to Pls.' Second Set of RFA).

241.    Similarly, Batchelder said, "Their theory was somehow or another that they could overcome a majority of people who were in the other party, and I don't know how that would have happened."  Batchelder Dep. at 115:24-116.

242.    The Ohio House voted on HB 369 on December 14, 2011.  Defs.' Answer ¶ 82; Intervenors' Answer ¶ 84.  Again, Democratic members of the Ohio House spoke out against the bill.  Ex. GGG (12/14/11 House Session Transcript) at 12:8-44:10.  They stated

that the proposed map was not materially different from HB 319, since it did nothing to change the ratio of Republican districts to Democratic districts. These Democratic legislators noted that, like HB 319, HB 369 would entrench a 12-4 advantage for Republicans.  Representative Ron Gerberry, the ranking Democrat on the State Government and Elections Committee, complained that he had only been shown the map one hour before the vote and that more people should have been involved in the map drawing process. 12/14/11 House Session Transcript at 37:10-38:1.  Other Democratic members of the Ohio House complained about how the lines had been drawn in heavily minority communities, including Cuyahoga and Lorain counties. These members were especially concerned by the splits of these counties, as well as the partisan tilt of the map as a whole.  12/14/11 House Session Transcript at 12:8-25, 16:11-24, 22:9-22:20, 23:21-27:23, 28:4-30:8, 34:8-35:6, 35:11-36:3, 39:14-44:10.

      **H.**    **Expert analysis suggests that HB 369 was drawn with an intent to gerrymander.**

243.  The partisan bias measures suggest that Ohio was gerrymandered. This finding is also consistent with the big shift in Ohio's partisan bias measures from 2010 to 2012. In 2010, prior to the new map Ohio's partisan bias measures were less pro-Republican than they were in 2012, after Republicans enacted the new map.  Ex. FFF (Deposition of Dr. Christopher Warshaw ("Warshaw Dep.")) at 72:19-73:14.

244.  The manner and extent to which the Republicans mapmakers split political subdivisions and communities of interest, with resulting partisan gain, demonstrates their objective to crack and pack Democratic voters to optimize Republican seats in Congress. Ex. GGG (Ex. 1 to Niven Dep. ("Niven Report")) at 2; Ex. HHH (Deposition of Dr. David

Niven ("Niven Dep.")) at 35:12-37:13; 79:22-80:10-87:9; 95:3-98:18; 102:7-16; 108:11-111:11; 116:9-120:25.

245.     Analysis of the map shows that census tracts are split by congressional district lines 59% more times than in the previous map.  Niven Report at 6; Niven Dep. at 35:12-37:13; 79:22-80:10-87:9; 95:3-98:18; 102:7-16; 108:11-111:11; 116:9-120:25.

246.     The map reveals patterns of splitting Democratic-leaning cities, neighborhoods, and counties and incorporating the pieces in the creation of Republican congressional districts.  Niven Report at 18; Niven Dep. at 35:12-37:13; 79:22-80:10-87:9; 95:3-98:18; 102:7-16; 108:11-111:11; 116:9-120:25.

247.     Dr. Wendy K. Tam Cho used a computer algorithm to generate simulated congressional maps that adhered to the traditional, nonpartisan districting principles described in her report.  This algorithm did not take into account any voting or demographic data when drawing the maps.  Each map was constructed by combining Ohio voting precincts into different congressional districts, and only maps that met the traditional, nonpartisan districting criteria were deemed viable.  Ex. JJJ (Ex. 2 to Cho. Dep. ("Cho Report")) at 3-11.

248.     With the above-described process, the algorithm generated a sample set of over three million viable simulated congressional maps, each of which was drawn without the influence of partisan intent.  Cho Report at 3-11; Ex. KKK (Deposition of Dr. Wendy K. Tam Cho ("Cho Dep.")) at 128:14-130:24.

249.     By comparing the challenged map against the simulated maps, Dr. Cho "determine[d] whether the partisan effect of the challenged map is to be expected given the

underlying geography and population settlement patterns or if it is unusual among the set of non-partisan maps." Cho Report at 4.

250.    Dr. Cho's analysis demonstrates that it is highly unlikely that a map reflecting as much extreme partisan unfairness as the challenged map could have been produced unintentionally. Cho Report at 40.

**I.      HB 369 had the effect of disadvantaging Democrats**

251.    Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2012 with 51% of the congressional vote. *See* Official Secretary of State Election Return Data for 2012 General Election (Statewide and Congressional Races) (hereinafter "2012 Official Election Results"), *available at* https://www.sos.state.oh.us/elections/election-results-and-data/2012-elections-results/ (last visited Jan. 23, 2019) (summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

252.    Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2014 with 59% of the congressional vote. *See* Official Secretary of State Election Return Data for 2014 General Election (Statewide and Congressional Races) (hereinafter 2014 "Official Election Results"), *available at* https://www.sos.state.oh.us/elections/election-results-and-data/2014-elections-results/ (last visited Jan. 23, 2019) (summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

253.    Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2016 with 57% of the congressional vote. *See* Official Secretary of State Election Return Data for 2016 General Election (Statewide and Congressional Races) (hereinafter "2016 Official Election Results"), *available at* https://www.sos.state.oh.us/elections/election-results-and-

data/2016-elections-results/ (last visited Jan. 23, 2019) (summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

254.    Republicans won 12 (75%) of Ohio's U.S. congressional seats in 2018 with 52% of the congressional vote.  *See* Official Secretary of State Election Return Data for 2018 General Election (Statewide and Congressional Races) (hereinafter "2018 Official Election Results", *available at* https://www.sos.state.oh.us/elections/election-results-and-data/2018-elections-results/(summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

255.    Republicans won the same 12 districts in all four election cycles: the 1st, 2nd, 4th, 5th, 6th, 7th, 8th, 10th, 12th, 14th, 15th, and 16th Districts.  *See* 2012 Official Election Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

256.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2012 although they obtained 47% of the congressional vote.  *See* 2012 Official Elections Results (summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

257.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2014 although they obtained 39% of the congressional vote.  *See* 2014 Official Elections Results (summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

258.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2016 although they obtained 41% of the congressional vote.  *See* 2016 Official Elections Results

(summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

259.    Democrats won only four (25%) of Ohio's U.S. congressional seats in 2018 although they obtained 48% of the congressional vote. *See* 2018 Official Elections Results (summary statistics can be derived by adding up the total votes for Republicans and Democrats in the U.S. congressional results).

260.    Democrats won the same four districts in all four election cycles: the 3rd, 9th, 11th, and 13th Districts. *See* 2012 Official Election Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

261.    In all four election cycles, voters in the 3rd, 9th, 11th, and 13th Districts cast many more votes for the Democratic congressional candidate above and beyond the 50%+1 majority needed to win each district. *See* 2012 Official Election Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

262.    In the 3rd District, the Democratic candidate won by 68.29% in 2012, 64.05% in 2014, 68.57% in 2016, and 73.6% in 2018. *See* 2012 Official Election Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

263.    In the 9th District, the Democratic candidate won by 73.04% in 2012, 67.74% in 2014, 68.89% in 2016, and 67.8% in 2018. *See* 2012 Official Election Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

264.    In the 11th District, the Democratic candidate was unchallenged in 2012 and won by 79.45% in 2014, 80.25% in 2016, and 82.2% in 2018. *See* 2012 Official Election

Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

265.    In the 13th District, the Democratic candidate won by 72.77% in 2012, 68.49% in 2014, 67.73% in 2016, and 61.0% in 2018.   *See* 2012 Official Election Results, 2014 Official Election Results, 2016 Official Election Results, and 2018 Official Elections Results.

266.    There are four commonly used metrics to measure partisan bias: the efficiency gap, mean-median, declination, and the Gelman-King asymmetry measure. Warshaw Report at 5-14.

267.    The efficiency gap is defined as "the difference between the parties' respective wasted votes, divided by the total number of votes cast in the election." All of a party's votes are wasted if they lose the election. When a party wins an election, the wasted votes are those above 50%+1 needed to win. The efficiency gap aggregates both kinds of wasted votes for each party. According to the efficiency gap analysis, the ratio of the parties' excess votes reveals the discrepancy between how the map treats the parties.  *Id.* at 6-8.

268.    The efficiency gap can be pro-Republican or pro-Democrat.  *Id.* at 6. A pro-Republican efficiency gap is denoted with a negative number and a pro-Democrat with a positive number.  *Id.*

269.    There was a sharp increase Ohio's efficiency gap from 2010 to 2012. Warshaw Report at 23; Warshaw Dep. at 72:3-72:14; 75:3-18.

270.    Ohio had a pro-Republican efficiency gap in every election held under the map.  Warshaw Report at 21-23.

271.    Ohio's pro-Republican efficiency gap was -22.4% in 2012, -9% in 2014, -8.7% in 2016, and -20% in 2018.  Warshaw Report at 21-23; Warshaw Supplemental at 2-3.

272.    "The 2012 efficiency gap in Ohio was more extreme than 98% of previous plans in states with more than six seats over the past 45 years, and it was more Republican-leaning than 99% of previous congressional districting plans."  *See also* Warshaw Rebuttal at 4-5.

273.    The 2018 efficiency gap in Ohio was -20%. This was more extreme than 96% of previous plans in states with more than six seats over the past 45 years, and it was more Republican-leaning than 98% of previous congressional districting plans.  Warshaw Report at 21-23; Warshaw Supplemental at 3.

274.    The mean-median gap is the difference between a party's vote share in the median district and their average vote share across all districts. Warshaw Report at 8-10.

275.    If a party wins more votes in the median district than in the average district, they have an advantage in the translation of votes to seats.  *Id* at 8.

276.    Ohio has a mean-median gap in all four elections, which shows an advantage for Republicans in the congressional election. Warshaw Report at 24-25; Warshaw Dep. at 101:23-103:5.

277.    Ohio's mean-median gap in 2012 was 7.8%. The mean-median difference in 2012 was larger than in 83% of previous elections and more pro-Republican than the mean-median difference in 92% of previous congressional elections. Warshaw Report at 24-25; *see also* Warshaw Rebuttal at 5.

278.    Ohio's 2012 mean-median gap of 7.8% was a sharp increase from Ohio's mean-median gap in 2010, which was 1.7%.  Warshaw Report at 24-25.

279.    Ohio had a gap between the mean and median district of 5.0% in 2018. Ohio's mean-median gap in 2018 was more extreme than the mean-median difference in 62% of previous elections and more pro-Republican than the mean-median difference in 81% of previous elections.  Warshaw Supplemental at 3.

280.    The symmetry metric captures whether each party receives the same share of seats for identical shares of votes.   Warshaw Report at 10-12.

281.    Gelman and King propose two ways to measure partisan bias in the symmetry of the vote-seat curve. First, it can be measured using counter-factual election results in a range of statewide vote shares between .45 and .55. Across this range of vote shares, each party should receive the same number of seats when they obtain the same vote share. The symmetry measure captures any departures from the standard that each party should receive the same seat share across this range of plausible vote shares. Second, symmetry can be measured based on the seat share that each party receives when they split the statewide vote 50-50. In an unbiased system, each party should receive 50% of the seats in a tied statewide election. Here, the partisan bias statistic is the "expected proportion of the seats over 0.5 that the Democrats receive when they receive exactly half the average district vote." *Id.*

282.    Both partisan symmetry measures indicate a pro-Republican advantage in all four elections under the map.  Warshaw Report at 26-27.

283.    Measure 1: Based on the standard that each party should receive the same seat share across a range of plausible vote shares, the asymmetry between Democrats and Republicans was more extreme than 96% of previous elections and more pro-Republican

than 97% of previous U.S. congressional elections over the past 45 years. Warshaw Report at 26-27; *see also* Warshaw Rebuttal at 5.

284.     Measure 2: In hypothetically tied statewide elections, the level of bias in Ohio's 2012 election was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years. Warshaw Report at 26-27; *see also* Warshaw Rebuttal at 5.

285.     Measure 1: Ohio's 2018 elections were more asymmetric than 92% of previous elections and more pro-Republican than 94% of previous U.S. congressional elections over the past 45 years.  Warshaw Supplemental at 3-4

286.     Measure 2: The level of bias in 2018 was more extreme than 95% of previous elections and more pro-Republican than 96% of previous U.S. congressional elections over the past 45 years. Warshaw Supplemental at 3-4

287.     The declination metric treats asymmetry in the vote distribution as indicative of partisan bias in a redistricting plan. If all the districts in a plan are lined up from the least Democratic to the most Democratic, the mid-point of the line formed by one party's seats should be about as far from the 50 percent threshold for victory on average as the other party's victory. Warshaw Report at 12-13.

288.     The declination metric can be quantified using a number between -1 and 1 (positive values favor Democrats and negative values favor Republicans.).  *Id.*

289.     All four declination metrics in the last four election cycles show a pro-Republican advantage. Warshaw Report at 25-26; Warshaw Dep. at 100:8-101:22.

290.     The declination measure became more pro-Republican in 2012 after redistricting.  Warshaw Dep. at 100:8-101:22.

291.     The 2012 congressional election in Ohio had a more extreme declination than 99% of previous elections and a more pro-Republican declination than any previous U.S. congressional election over the past 45 years.  Warshaw Report at 25-26; *see also* Warshaw Rebuttal at 5.

292.     Ohio's 2018 congressional election had a declination score of -0.69. This was more extreme than 98% of previous elections and more pro-Republican than 99% of previous U.S. congressional elections. Warshaw Supplemental at 3.

293.     Ohio's congressional elections grew less competitive after the 2011 plan went into place. Warshaw Report at 28-30; *see also* Warshaw Dep. at 153:5-155:20.

294.     None of Ohio's congressional elections were competitive in 2014 and 2016, meaning no candidate won their election by less than 55%.  *Id.*

295.     In 2018, Ohio had only two competitive elections, meaning the candidates won their elections by less than 55%. Warshaw Supplemental at 11.

296.     The responsiveness of a map indicates how many seats change hands as vote shares rise and fall.  Warshaw Report at 14-16; *see also* Warshaw Dep. at 153:5-155:20.

297.     An unresponsive map ensures that the bias in a districting plan toward the advantaged party is insulated against changes in voters' preferences, and thus is durable across multiple election cycles.  Warshaw Report at 14-16; *see also* Warshaw Dep. at 153:5-155:20.

298.     Gelman and King propose a technique that measures responsiveness based on uniform swings in two parties' counterfactual vote shares.  Warshaw Report at 15-16.

299.     Ohio's post-2011 districting plans had some of the least responsive election results in the country.  Warshaw Report at 28-30; *see also* Warshaw Dep. at 153:5-155:20.

300.    Performing a uniform swing analysis based on the 2018 election results, Republicans win 75% of the seats across most of the range of plausible election swings. Warshaw Supplemental at 10-14.

301.    Dr. Cho was provided with the home addresses for each Plaintiff.  She then located where each Plaintiff lived on the current electoral map and where they would live on her simulated maps.  In her initial report, using historic election results from statewide elections from 2008 to 2010, she computed the average Democratic vote share using the two-party vote for races from 2012 to 2016.  *See* Cho Report at 11-30; *see* Cho Dep. 226:17-227:11; 237:7-240:22; 296:21-297:22.

302.    In Dr. Cho's supplemental report on the 2018 elections, Dr. Cho located where each Plaintiff lived on the current electoral map and where they would live on her simulated maps.  For this report she computed the average Democratic vote share using the two-party vote for 2018 statewide midterms.  Her simulated maps placed Plaintiffs in districts where they had more opportunity to elect a candidate of their choice. The results are as follows:

| District | Plaintiff | Predicted Democratic Vote Share in Simulated Districts (2018) | | | | Actual Democratic Vote Share in 2018 |
|---|---|---|---|---|---|---|
| | | Min | Max | Mean | Median | |
| 1 | Goldenhar | 0.33891 | 0.60108 | 0.529295 | 0.55591 | 0.47117 |
| 2 | Burks | 0.3377 | 0.60108 | 0.540557 | 0.5563 | 0.4453 |
| 3 | Inskeep | 0.3028 | 0.68516 | 0.599077 | 0.60702 | 0.71735 |
| 4 | Libster | 0.27289 | 0.63229 | 0.413547 | 0.38056 | 0.36218 |
| 5 | Deitsch | 0.26099 | 0.50376 | 0.319251 | 0.30508 | 0.40218 |
| 6 | Boothe | 0.35368 | 0.49682 | 0.415917 | 0.39295 | 0.35699 |
| 7 | Griffiths | 0.37979 | 0.79666 | 0.504524 | 0.52278 | 0.3978 |
| 8 | Nadler | 0.28552 | 0.53669 | 0.374592 | 0.36985 | 0.34296 |
| 9 | Walker | 0.40141 | 0.82468 | 0.635391 | 0.56849 | 0.64197 |
| 9 | Rader | 0.3938 | 0.82488 | 0.631049 | 0.56782 | 0.64197 |
| 10 | Megnin | 0.29103 | 0.49942 | 0.434581 | 0.43727 | 0.47551 |
| 11 | Harris | 0.48134 | 0.82488 | 0.787024 | 0.79351 | 0.82004 |
| 12 | Dagres | 0.32868 | 0.61811 | 0.389666 | 0.383 | 0.46446 |
| 13 | Myer | 0.46442 | 0.56045 | 0.492574 | 0.48706 | 0.58182 |
| 14 | Hutton | 0.46465 | 0.80294 | 0.49508 | 0.4889 | 0.47708 |
| 15 | Thobaben | 0.27255 | 0.5178 | 0.373328 | 0.3673 | 0.45775 |
| 16 | Rubin | 0.37519 | 0.56285 | 0.446909 | 0.42306 | 0.45349 |

Ex. LLL (Dec. 28, 2018 Report of Dr. Cho ("Cho Supplemental")) at 7.

**J.      Plaintiffs' Proposed Remedial Plan**

303.    Plaintiffs' Proposed Remedial Plan betters the Ohio congressional map on all traditional redistricting criteria. Cooper Decl. ¶¶ 22-51.

304.    The Proposed Remedial Plan splits 14 counties; the Ohio congressional map splits 23 counties. *Id.* ¶¶ 32, 25.

305.    The Proposed Remedial Plan splits 27 municipal civil divisions; the Ohio congressional map splits 73 municipal civil divisions. *Id.* ¶¶ 32, 25.

306.    The Proposed Remedial Plan is more compact than the Ohio congressional map. *Id.* ¶ 38 & Fig. 7.

307.    The Proposed Remedial Plan has a Voting Rights Act-compliant district in its District 11. *Id.* ¶ 42; Ex. MMM (Ex. 1 to Handley Dep. (Oct. 5, 2018 Expert Report of Dr. Handley ("Handley Report"))) at 1, 15, 17.

308.    Under the Proposed Remedial Plan, District 3 has a Black Voting Age

Population of 30.31%.  Cooper Decl. ¶ 43.

309.    Under the Proposed Remedial Plan, District 1 has a Black Voting Age

Population of 26.74%.  *Id.* ¶ 44.

310.    The Plan complies with the requirements of Issue 1.  *Id.* ¶ 5.

311.    The Proposed Remedial Plan has the following Democratic congressional

vote percentages of the two-party vote:

| | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| **CD** | **Proposed Plan** | **2012 Plan** | **Proposed Plan** | **2012 Plan** | **Proposed Plan** | **2012 Plan** | **Proposed Plan** | **2012 Plan** |
| 1 | 48.5% | 39.5% | 44.2% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.6% | 41.4% | 25.4% | 34.1% | 25.0% | 33.5% | 31.1% | 41.7% |
| 3 | 66.9% | 71.4% | 58.2% | 63.6% | 63.1% | 68.2% | 68.3% | 73.6% |
| 4 | 29.6% | 38.5% | 24.2% | 32.3% | 22.3% | 31.7% | 26.6% | 34.7% |
| 5 | 62.3% | 40.6% | 51.2% | 30.4% | 52.6% | 28.8% | 54.3% | 36.1% |
| 6 | 44.4% | 46.8% | 33.7% | 39.8% | 28.6% | 29.4% | 33.0% | 30.8% |
| 7 | 39.3% | 43.6% | 21.2% | 0.3% | 28.5% | 31.4% | 35.5% | 41.3% |
| 8 | 2.0% | 0.0% | 29.2% | 28.9% | 28.5% | 28.2% | 34.0% | 33.4% |
| 9 | 59.4% | 76.0% | 44.6% | 67.7% | 48.9% | 68.6% | 55.1% | 67.8% |
| 10 | 37.8% | 38.6% | 32.7% | 32.6% | 33.9% | 33.8% | 43.0% | 43.0% |
| 11 | 95.7% | 99.7% | 81.5% | 79.2% | 81.7% | 80.3% | 83.5% | 82.3% |
| 12 | 39.7% | 36.6% | 33.3% | 29.0% | 38.4% | 31.7% | 54.3% | 47.9% |
| 13 | 62.6% | 72.9% | 54.4% | 68.4% | 54.2% | 67.6% | 51.4% | 61.0% |
| 14 | 48.6% | 41.8% | 27.0% | 34.4% | 37.5% | 37.4% | 43.8% | 44.8% |
| 15 | 42.3% | 38.6% | 35.8% | 34.1% | 31.2% | 33.7% | 33.9% | 40.5% |
| 16 | 59.1% | 48.0% | 48.5% | 36.2% | 51.0% | 35.2% | 55.8% | 43.3% |

Cooper Third Suppl. Decl. ¶ 5.

312.    Imputed election results for the uncontested races in 2012 and 2014 give the

following results in the Proposed Remedial Plan:

| CD | 2012 | 2014 |
|----|------|------|
| 1 | 48.6% | 44.3% |
| 2 | 30.6% | 25.3% |
| 3 | 67.6% | 58.4% |
| 4 | 29.9% | 24.2% |
| 5 | 62.3% | 51.2% |
| 6 | 44.4% | 36.6% |
| 7 | 39.2% | 29.6% |
| 8 | 33.9% | 29.2% |
| 9 | 58.7% | 47.6% |
| 10 | 38.7% | 32.7% |
| 11 | 85.4% | 81.5% |
| 12 | 39.0% | 33.2% |
| 13 | 62.6% | 59.7% |
| 14 | 48.8% | 41.5% |
| 15 | 42.3% | 35.8% |
| 16 | 55.0% | 51.5% |

Warshaw Rebuttal at 13.

313.    With these imputations calculated, in 2012, there were 6 districts with a Democratic majority, plus two additional competitive districts.  In 2014, there were 5 districts with a Democratic majority, plus one additional competitive district.  In 2016, there were 5 districts with a Democratic majority, plus two additional competitive districts.  In 2018, there were 8 districts with a Democratic majority, with no additional competitive districts.  *See supra* at ¶¶ 311-12.

314.    Under the correction to the Proposed Remedial Plan, the only changes to these election results are between .03-.04% difference in the Democratic two-party vote share between District 4 and District 8. Ex. NNN (November 30, 2018 Errata Report of Mr. Cooper ("Cooper Errata")) at ¶ 9, Errata Exhibit S.  The rest of the proposed districts remain the same.  Cooper Errata at ¶ 4.

315.    Under the correction to the Proposed Remedial Plan, incumbents are not paired except for Representatives Chabot and Wenstrup. These incumbents are only paired

to keep the city of Cincinnati whole and thus comply with Issue 1.  Cooper Decl. at ¶¶ 6, 36; Cooper Errata at ¶¶ 2-3.

**K.**    **Voting Rights Act compliance does not explain the 12-4 map.**

316.    Current 11th District is the successor district to the first majority black congressional district created in Ohio in 1968, which has consistently elected African-Americans to Congress since. Handley Report at 2.

317.    Based on the 2010 Census data, the black voting age population of the 11th District in Cuyahoga County is 52.37%.  Ex. OOO (Exhibit D-2 to Cooper Decl.).

318.    Dr. Lisa Handley conducted a district-specific, functional analysis of voting patterns by race to ascertain the black voting age population necessary to provide black voters with an opportunity to elect their candidates of choice in the vicinity of the 11th District.  Handley Report at 1; Ex. PPP (Deposition of Dr. Lisa Handley ("Handley Dep.")) at 106:22-107:19

319.    Dr. Handley's district-specific, functional analysis relies on three statistical techniques to estimate voting patterns by race: homogenous precinct analysis, ecological regression, and ecological inference. Handley Report at 7; Handley Dep. at 87:13-88:9.

320.    Her analysis demonstrates that a 45% black voting age population ("BVAP") district offers black voters a realistic opportunity to elect their candidates of choice to represent the 11th District.  Handley Report at 1, 15.

321.    It also demonstrates that current 11th District contains far more minorities than is necessary to elect the minority preferred candidate.  *See id.* at 12, 15; Handley Dep. at 106:22-107:19.

322.    Using 45% BVAP as a threshold maps could have been drawn with a different configuration that were Voting Rights Act compliant. Dr. Cho was able to draw over 3 million maps with a 45% BVAP. *See* Cho Report at 8, 10, 40.

323.    The remedial map drawn by Mr. Cooper has a district in Cuyahoga County that meets the 45% BVAP threshold. *See* Cooper Decl. at ¶ 42.

324.    Mr. Cooper also drew two additional hypothetical maps which have a Voting Rights Act compliant district in its 11th District. Ex. QQQ (Ex. 9 to Cooper Dep. ("Cooper Second Suppl.") at ¶¶ 25, 45.

325.    There is evidence in the record that Republicans were primarily concerned with partisanship and not opportunities to elect minority representatives. For example, the Republican Chair of Summit County was willing to have three Summit County wards placed into District 11 because "[t]hey were mostly black democrats [sic]" and this "helped the other districts in Summit County be more Republican." Batchelder Dep. at 95:1-96:25.

326.    The packing of Democrats was the reason for the creation of District 3, not a Republican desire to create a "minority opportunity" district. Glassburn Dep. at 171:23-174:21.

327.    A minority opportunity district could have been created in Franklin County under a different configuration of the map. *See* Cooper Decl. at ¶ 43; Cooper Second Suppl. at ¶¶ 26, 46.

328.    BVAP could have been increased in district located in Cincinnati, in Hamilton County. *See* Cooper Decl. ¶ 44; Cooper Second Suppl. at ¶¶ 27, 47.

**L.    Traditional redistricting criteria do not explain the map.**

329.    The map drawers just eye balled compactness and did not do any analysis of districts to make sure they were compact. DiRossi Dep. at 210:11-212:5.

330.    It was possible to draw districts that were more compact than the districts in HB 369.  Mr. Cooper as part of his expert report was able to draw two different hypothetical maps, both of which are more compact that the Ohio congressional map.  See Exhibit *See* Cooper Decl. at ¶¶ 37-41; Cooper Second Suppl. at ¶ 10,

331.    Communities of interest are not kept intact in the map.  Niven Report at 2.

332.    Communities of interest are often fractured by county and municipal splits. Niven Report at 2.

333.    One of the map drawers testified that they had more important goals than minimizing county and municipal splits.  DiRossi Dep. at 212:18-215:10.

334.    It is possible to create a map with far fewer splits.  Ex. RRR (Deposition of Thomas Brunell ("Brunell Dep.")) at 181:18-25.

335.    For example the remedial map drawn by Mr. Cooper splits less communities interests and has less county and municipal splits.  Cooper Decl. ¶¶ 23-32

336.    Mr. Cooper also drew hypothetical maps that split fewer communities.  Two such hypotheticals split only 14 counties; the Ohio congressional map splits 23 counties. Cooper Second Suppl. ¶¶ 22-24, 42-44.

337.    One such hypothetical splits 36 municipal civil divisions, and another splits 34 municipal civil divisions; the Ohio congressional map splits 73.  *See* Cooper Second Suppl. at Exs. O-2, O-3.

338.    Incumbency was not a primary consideration of the map drawers.  *See* Ex. 7 to Huffman Dep. at 18-19; (testifying that incumbency was "subservient" to other traditional criteria); *see also* Huffman Dep. at 58:4-60:23.

339. Ohio lost two congressional districts in the 2011 redistricting cycle. DiRossi Dep. at 216:6-13; Cooper Second Suppl. ¶ 6.

340. Three sets of incumbents were paired rather than the two sets of incumbents. See Cooper Second Suppl. ¶ 7.

341. The location of the 2011 incumbents did not require the Ohio congressional map to be structured as it was. Mr. Cooper was able to draw two hypothetical maps that pair two 2011 Democratic incumbents, two 2011 Republican incumbents, and one 2011 Democratic with one 2011 Republican incumbent are better the Ohio congressional map on traditional redistricting criteria. Cooper Second Suppl. ¶¶ 5-7.

342. Congressional plans, which pair the same number of incumbents with the same match-up of political parties as under the Ohio congressional map, are still better than the Ohio congressional map on traditional redistricting criteria and partisan symmetry. *See generally* Cooper Second Suppl.; *see also* Warshaw Rebuttal at 12-13.

343. One hypothetical has the following Democratic congressional vote percentages of the two-party vote:

| CD | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| | Hypothetical Plan 1A | 2012 Plan | Hypothetical Plan 1A | 2012 Plan | Hypothetical Plan 1A | 2012 Plan | Hypothetical Plan 1A | 2012 Plan |
| 1 | 48.4% | 39.5% | 44.2% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.2% | 41.4% | 28.4% | 34.1% | 26.8% | 33.5% | 31.9% | 41.7% |
| 3 | 37.7% | 71.4% | 25.5% | 63.6% | 27.2% | 68.2% | 34.0% | 73.6% |
| 4 | 25.9% | 38.5% | 24.0% | 32.3% | 22.0% | 31.7% | 26.4% | 34.7% |
| 5 | 39.1% | 40.6% | 22.4% | 30.4% | 28.5% | 28.8% | 35.0% | 36.1% |
| 6 | 49.4% | 46.8% | 42.9% | 39.8% | 33.6% | 29.4% | 34.2% | 30.8% |
| 7 | 37.8% | 43.6% | 32.7% | 0.3% | 33.8% | 31.4% | 43.0% | 41.3% |
| 8 | 10.0% | 0.0% | 26.2% | 28.9% | 26.7% | 28.2% | 32.5% | 33.4% |
| 9 | 62.3% | 76.0% | 51.2% | 67.7% | 52.6% | 68.6% | 54.9% | 67.8% |
| 10 | 59.4% | 38.6% | 44.5% | 32.6% | 48.9% | 33.8% | 55.0% | 43.0% |
| 11 | 95.7% | 99.7% | 81.5% | 79.2% | 81.7% | 80.3% | 83.5% | 82.3% |
| 12 | 39.3% | 36.6% | 32.8% | 29.0% | 37.9% | 31.7% | 53.8% | 47.9% |
| 13 | 59.3% | 72.9% | 48.6% | 68.4% | 51.1% | 67.6% | 55.8% | 61.0% |
| 14 | 61.0% | 41.8% | 52.6% | 34.4% | 52.6% | 37.4% | 50.5% | 44.8% |
| 15 | 67.1% | 38.6% | 58.6% | 34.1% | 63.4% | 33.7% | 68.9% | 40.5% |
| 16 | 49.2% | 48.0% | 27.9% | 36.2% | 37.7% | 35.2% | 44.1% | 43.3% |

Cooper Third Suppl. at 5.

344. Another hypothetical has the following Democratic congressional vote percentages of the two-party vote:

| CD | 2012 | | 2014 | | 2016 | | 2018 | |
|----|------|------|------|------|------|------|------|------|
| | Hypothetical Plan 2A | 2012 Plan | Hypothetical Plan 2A | 2012 Plan | Hypothetical Plan 2A | 2012 Plan | Hypothetical Plan 2A | 2012 Plan |
| 1 | 48.5% | 39.5% | 44.2% | 36.7% | 48.3% | 40.7% | 57.2% | 47.8% |
| 2 | 30.3% | 41.4% | 28.4% | 34.1% | 26.8% | 33.5% | 31.9% | 41.7% |
| 3 | 37.7% | 71.4% | 25.5% | 63.6% | 27.2% | 68.2% | 34.0% | 73.6% |
| 4 | 25.9% | 38.5% | 24.0% | 32.3% | 22.0% | 31.7% | 26.4% | 34.7% |
| 5 | 39.1% | 40.6% | 22.4% | 30.4% | 28.5% | 28.8% | 35.0% | 36.1% |
| 6 | 49.4% | 46.8% | 42.9% | 39.8% | 33.6% | 29.4% | 34.2% | 30.8% |
| 7 | 37.8% | 43.6% | 32.7% | 0.3% | 33.9% | 31.4% | 43.0% | 41.3% |
| 8 | 10.0% | 0.0% | 26.2% | 28.9% | 26.7% | 28.2% | 32.5% | 33.4% |
| 9 | 62.3% | 76.0% | 51.2% | 67.7% | 52.6% | 68.6% | 54.9% | 67.8% |
| 10 | 59.7% | 38.6% | 45.2% | 32.6% | 49.6% | 33.8% | 55.7% | 43.0% |
| 11 | 92.0% | 99.7% | 77.6% | 79.2% | 78.7% | 80.3% | 81.5% | 82.3% |
| 12 | 39.3% | 36.6% | 32.8% | 29.0% | 37.9% | 31.7% | 53.8% | 47.9% |
| 13 | 61.2% | 72.9% | 50.3% | 68.4% | 51.8% | 67.6% | 55.5% | 61.0% |
| 14 | 61.0% | 41.8% | 52.6% | 34.4% | 52.6% | 37.4% | 50.5% | 44.8% |
| 15 | 67.1% | 38.6% | 58.6% | 34.1% | 63.4% | 33.7% | 68.9% | 40.5% |
| 16 | 49.2% | 48.0% | 27.9% | 36.2% | 37.7% | 35.2% | 44.1% | 43.3% |

*Id.* at 6.

## M.    Individual Plaintiffs

### First District - Linda Marcy Goldenhar

345. Ms. Goldenhar has lived and voted in the First Congressional District for over twenty years.  Goldenhar Dep. at 7:5-22; 11:3-6.

346. Ms. Goldenhar has voted in every congressional and presidential election since moving to and registering to vote in Ohio in 1992, and in each of these elections, she voted for a Democratic candidate. *Id.* at 11:24-13:10.

347. Ms. Goldenhar only votes in Democratic primary elections. *Id.* at 12:22-13:6.

348. Ms. Goldenhar has canvassed and held fundraisers for Democratic candidates. *Id.* at 18:17-21:10.

349.    For the 2018 election, Ms. Goldenhar was a part of a group of acquaintances who wrote postcards to Democratic voters encouraging them to get out and vote. *Id.* at 17:4-18:16.

350.    Ms. Goldenhar testified that her vote has been diluted through cracking Democratic voters in Ohio's First Congressional District. *Id.* at 37:15-39:13; 40:23-43:21. She testified that the dilution of her vote was achieved by "all of Warren County [mixing] with half of Hamilton Country," which split up not only the county but also the city of Cincinnati.  *Id.* at 38:15-39:13; *see also id.* at 42:24-43:16 (answering question on how vote is diluted by the splitting of Hamilton County and the addition of voters from Warren County); *id.* at 58:11-25 (reiterating the dilution of her vote through the splitting of Hamilton County and inclusion of Warren County).

351.    Ms. Goldenhar testified that the way the challenged map is drawn burdens her ability to associate and participate in the political process with other Democratic voters in the state of Ohio. *Id.* at 26:13-32:3; 34:14-37:10.

352.    Ms. Goldenhar has reached out to her representative, Mr. Chabot, multiple times via email and phone, and has never received a response. *Id.* at 63:6-69:6.

**Second District - Douglas John Burks**

353.    In the almost 40 years Dr. Burks has resided at his current address, he has been in both the 1st and 2nd Congressional Districts. Burks Dep. at 7:21-8:5; 8:21-9:11; 20:2-8. Steve Chabot, incumbent Representative for District 1, represented Dr. Burks in the 2000s.  *Id.* at 57:21-58:7.  Dr. Burks testified that Hamilton County previously was either in District 1, or the border between Districts 1 and 2 was more of a straight line in Hamilton County.  *Id.* at 57:3-11; 43:22-44:11.

354.    Dr. Burks has voted in each congressional election in the Second Congressional District under the challenged plan. *Id*. at 28:9-29:8.

355.    Since the 1980s, Dr. Burks has always voted and exclusively for Democratic candidates in federal, state, and local elections. *Id.* at 19:4-22.

356.    Dr. Burks works with the Friends Committee on National Legislation, a non-partisan advocacy group that aims to move government to support Quaker values, to lobby representatives. *Id*. at 33:13-35:8. As a part of his work with the Friends Committee on National Legislation, Dr. Burks has lobbied Ohio Representatives Steve Chabot, Brad Wenstrup, Rob Portman, and Sherrod Brown. *Id*. at 35:22-36:23.

357.    Dr. Burks lobbied Representative Wenstrup on the War Powers Act; Representative Wenstrup did not sponsor the legislation. *Id*. at 113:6-115:12.

358.    Dr. Burks canvassed, put out yard signs and donated money for Jill Schiller's campaign for Congressional District 2 in the 2018 elections. *Id*. at 93:24-94:18. In the course of canvassing, Dr. Burks encountered several individuals who said that "they were not going to vote because it wasn't worth it because they had a strong feeling of what the outcome would be." *Id*. at 106:9-107:6. Given the way in which District 2 is drawn, Jill Schiller's campaign faced an "uphill battle." *Id.* at 107:8-19.

359.    Dr. Burks protested Jean Schmidt, a previous Representative for District 2, over the war in Iraq. *Id.* at 117:11-21.

360.    Dr. Burks' vote has been diluted through cracking Democratic voters in Ohio's 2nd Congressional District. *Id.* at 52:22-53:22. He testified that Democratic voters in Hamilton County had been "cracked": the lines were drawn "so that Democrats would be divided into the – into two different districts, so to dilute their voting power." *Id*. at 58:13-

24. The "drawing lines . . . [to] put more individuals with one viewpoint into that mix" causes his vote to be "wasted." *Id.* at 41:2-13.

361. The way the challenged map is drawn burdens Dr. Burks' ability to associate and participate in the political process with other Democratic voters in the state of Ohio. *Id.* at 38:15-40:25; 41:10-42:4.

362. The current congressional map made it more difficult for Dr. Burks to elect his candidate of choice. *Id.* at 104:20-106:8.

**Sarah Marie Inskeep – District 3**

363. Ms. Inskeep lives in the Third Congressional District and has voted in every congressional election since 2012. Inskeep Dep. at 12:5-7; 28:19-29:10.

364. Ms. Inskeep is a Democratic voter and has supported Democratic candidates for Ohio's congressional delegation in the past. *Id.* at 53:23-54:2; 65:20-23.

365. Ms. Inskeep is politically active and has participated in electoral activities in both her personal and professional capacities. *Id.* at 10:13-22; 54:17-18.

366. During the 2016 election, as part of work at Planned Parenthood, Ms. Inskeep ran "door-to-door canvassing, phone bank operations, [and] direct voter contact operations with volunteers." *Id.* at 14:6-16.

367. During the 2018 election, as part of her work with the super PAC, Planned Parenthood Voters Ohio, Ms. Inskeep engaged in voter education on reproductive rights issues. *Id.* at 10:13-11:12; 13:3-12.

368. Also during the 2018 election, Ms. Inskeep, in her personal capacity, canvassed every weekend. *Id.* at 25:2-11.

369. Ms. Inskeep's vote has been diluted through packing Democratic voters into Ohio's Third Congressional District. *Id*. at 33:20-22; 47:4-11; 51:15-52:5; 71:18-73:10; 78:16-19; 89:14-90:2; 96:24-97:5.

370. Through her electoral activities, Ms. Inskeep has encountered apathetic voters who feel like their vote does not matter as a result of the drawing of the current congressional map. *Id*. at 39:21-40:5; 42:16-20; 53:17-22; 54:21-55:6; 58:8-25; 87:21-88:10; 90:8-91:13; 92:11-22.

371. Planned Parenthood decided not to invest resources in Ohio's Third Congressional District because the Democratic candidate was going to win anyway due to the way the district was drawn. *Id*. at 88:17-89:9; 93:17-94:21.

372. The current congressional map has caused there to be "less political activity and investment in [Ms. Inskeep's] district." *Id*. at 94:17-21.

**Cynthia Libster – Fourth District.**

373. Cynthia Libster has voted in almost every election she can recall including elections for U.S. Congress. "[M]y most important thing I do is vote." Libster Dep. at 29:21.

374. Ms. Libster has lived and voted in the Fourth Congressional District for nearly forty years. *Id*. at 10:22-12:7.

375. Ms. Libster is a "lifelong Democrat," *id*. at 55:4, and has voted for a Democrat in almost every election she can recall, including always having voted for a Democratic U.S. congressional representative. *Id.* at 46:15-48:19; 50:4-12. She would prefer to live in a Democratic district. *Id.* at 49:17-24.

376.    Ms. Libster lives in Ohio's Fourth Congressional District, where Democratic voters are cracked under the current Ohio map. *Id*. at 10:19-21; 72:17-73:23.

377.    As a Democrat, Ms. Libster has both campaigned for and held office herself, and has been involved in canvassing and GOTV efforts for presidential and local elections for almost 30 years. *Id.* at 56:8-57:25.

378.    Through her canvassing and fundraising efforts and by talking to her neighbors, she has experienced how the Fourth District's design and the congressional map as a whole contribute to voter apathy in her community. *Id*. at 60:9-24; 62:9-63:7.

379.    She has attempted to fundraise for Democratic candidates including Fifth District Congressional candidate Janet Garrett, but cannot amass support because of the voter apathy caused by the map. Ms. Libster testified that voters are discouraged because Garrett loses by "a thirty percent whapping all the time. It's never ever – my vote – when I go in there to vote for Janet Garrett as a Democrat, it's never going to happen. Snowball's chance." *Id*. at 39:16-20; *see id.* at 75:13-25; 76:9-19.

380.    From her experience educating voters and talking to her neighbors, Ms. Libster is also aware of the voter confusion caused by the gerrymandered map. For instance, she has "friends . . . who live three miles away who are in the 12th District and didn't even realize they were in the 12th district until we talked about it." *Id*. at 21:19-22.

381.    Ms. Libster feels that her congressman, Jim Jordan, does not represent her interests as a voter because his district is so safe that he does not need to. "He doesn't care about my vote. He doesn't care about my vote. He doesn't care about representing me." *Id*. at 37:3-5.

382.     She feels the 2012 map makes her district so safe for Representative Jordan that she and other Democratic voters like her feel their votes have no power. Libster Dep. at 29:4-12; 52:4-15 ("I want my vote to matter. I don't want to be disenfranchised as a voter. I don't want to feel like every time I go vote for the Democrat they're going to get pounded by thirty, forty percent.").

383.     Despite calling and emailing his office to express her concerns over his policy positions, Ms. Libster has never spoken to or seen Jim Jordan—for example, she is aware of a League of Women Voters bipartisan candidate forum that happened in her community that he did attend despite an invitation. *Id*. at 30:9-36:9.

384.     Her district covers so many communities and so much geographic space that he feels her representative could not effectively represent her even if he felt compelled to. "I mean, how do I go to my representative when he's clear down in Urbana? If I live in Oberlin, how does that happen? That's a long drive." *Id*. at 23:13-16.

**Kathryn Deitsch – Fifth District.**

385.     Kathy Deitsch has always identified as a Democrat since she was "first able to vote," and has voted for a Democrat in almost every election she can recall, including always having voted for a Democratic U.S. congressional representative. Deitsch Dep. at 19:14-20. She lives in Ohio's Fifth Congressional District, where Democratic voters are cracked under the current map. *Id*. at 10:21-23.

386.     Ms. Deitsch has been involved in Democratic organizing for many years, has campaigned for office herself, and regularly works to get out the vote, fundraise, and support other Democratic candidates. *Id.* at 21:20-33:9. She has also canvassed to put

partisan gerrymandering reform on the Ohio ballot in 2017 and educate voters about gerrymandering. *Id.* at 36:18-44:9.

387.     Ms. Deitsch's experience from canvassing, being involved in politics, and talking to her neighbors is that because the gerrymandered map makes elections a foregone conclusion, voters feel their votes do not matter. "[Y]ou would go and knock on the door and somebody would say to you it doesn't make any difference who I vote for, they're not going to win or I'm not going to give you money because they're not going to win." *Id.* at 48:8-13; *see id.* at 85:25-86:8; 90:4-12.

388.     Based on the same experience, Ms. Deitsch knows that because the 2012 Map splits her "small county" between "three different [congress]people," voters in her community are often confused about which congressional district they are in. This contributes to their disengagement from the political process. *Id.* at 53:21-55:15; 67:24-68:3.

389.     Ms. Deitsch feels that, like other Democratic voters in her district, her own vote does not matter. She feels that Bob Latta does not represent her interests as a voter because his district is so safe, he does not need to. For example, despite inviting Latta to events, and trying many times to contact his office personally, he has never responded to her or her neighbors. *Id.* at 56:4-59:3, 78:21-79:6; 96:2-97:23.

**LuAnn Boothe – Sixth District**

390.     LuAnn Boothe is an active voter, having voted in every election she can recall, including elections for U.S. Congress; Ex. SSS (Boothe Responses to Defendants' First Set of Interrogatories) at 1(a)-(e). She identifies as a Democrat, and has voted for a Democrat in almost every election she can recall, including always having voted for a

Democratic U.S. congressional representative. Deposition of LuAnn Boothe "Boothe Dep" at 21:8-10; 49:8-24; 90:16-17.  Ms. Boothe lives in Ohio's Sixth Congressional District where Democratic voters are cracked under the current map. *Id*. at 8:3-20.

392.    Ms. Boothe has been involved in Democratic politics beyond voting, including canvassing in support of the Clinton campaign, since 2012. *Id.* at 16:7-18; 66:18-25; 67:15-19.

393.    Through canvassing and talking to her friends and neighbors, she has heard that Democratic voters in her area "feel that their vote is monopoly money" and "said it didn't count." *Id.* at 26:11-15; *see id.* at 52:19-23. This kind of apathy has made it more difficult for her to successfully organize with the Democratic Party. *Id.* at 88:4-15.

394.    In Ms. Boothe's experience Representative Johnson is not responsive to her or her fellow Democrats in the Sixth District.  *Id*. at 41:20-42:4. For example, she has not seen or heard back from Representative Johnson despite trying to call him. *Id.*; *see also id.* at 91:2-16.

395.    In Ms. Boothe's experience, "[n]obody comes to the district. It's so republican that they don't have to. The republicans don't have to come because they are going to win anyhow. And nobody that's democrat wants to run in that area, because you're going to spend a lot of money and lose anyhow." *Id.* at 20:16-21.

396.    The geographic spread of Ms. Boothe's district exacerbates these problems. *Id.* at 51:5-16.

397.    She feels that Johnson does not represent her interests as a voter because is district is so safe, that he believes he does not need to. For example, in the last election, she

did not see him campaign anywhere near her, and she believes his opponent had no chance to win. *Id*. at 39:19-40:3; 46:23-47:2; 48:11-18.

398.    Ms. Boothe feels that as a result of the gerrymandered map, in her district, "my vote is like monopoly money; you can cast it, but you can't buy anything for it, because it's too weak." *Id.* at 51:2-4; 53:9-13.

**Mark John Griffiths – Seventh District**

399.    Mark John Griffiths resides in Ohio's Seventh Congressional District, which is cracked under the 2012 map.  Griffiths Dep. at 10:19-22; 11:13-15; 100:10-22.  Mr. Griffiths has voted in every congressional election since 2012 except for 2014 when the Republican congressional candidate Bob Gibbs was unopposed.  *Id*. at 12:14-14:2; 113:4-11.

400.    Mr. Griffiths is a Democratic voter and has supported Democratic candidates for Ohio's congressional delegation in the past.  *Id*. at 12:14-14:2; 19:3-13.

401.    Mr. Griffiths is a member of a number of several civic and political organizations.  Ex. TTT (Griffiths Responses to Defendants' First Set of Interrogatories at 10).

402.    As a member of the Indivisible group, Mr. Griffiths has visited Congressman Bob Gibbs's offices on three occasions.  Griffiths Dep. at 72:12-15.

403.    The first time, Mr. Griffiths met with Congressman Gibbs as part of the Indivisible Wellington group was at the congressman's office in Canton to discuss healthcare and the opioid epidemic.  *Id*. at 72:16-75:15.  During this meeting, Congressman Gibbs joked that Mr. Griffiths and his wife had travelled the furthest to attend the meeting. *Id*. at 73:10-13; 105:13-108:15; Ex. UUU (Ex. 8 to Griffiths Dep.).

404.    The second time Mr. Griffiths met with Congressman Gibbs as part of the Indivisible Wellington group was in April 2017 to discuss healthcare at the congressman's Ashland office.  Griffiths Dep. at 22:19-26:9; 76:3-5.  During this meeting, Mr. Griffiths offered to participate in a "study group" on healthcare to "research, advise, develop" policies related to healthcare given his background in employee benefits and human resources, but his offer was not accepted by Congressman Gibbs.  *Id*. at 24:11-20.

405.    The third time Mr. Griffiths just dropped off a letter advocating against the deportation of an immigrant on behalf of the HOLA organizations within the Indivisible group.  *Id*. at 76:9-77:7.  The immigrant ended up getting deported.  *Id*. at 77:3-7.

406.    As a member of the Indivisible group in Wellington, Mr. Griffiths has sent letters advocating for automatic voter registration in Ohio.  *Id*. at 26:10-16.

407.    As a member of the Indivisible group in Wellington, Mr. Griffiths researched gerrymandering, educated the group about the gerrymandering, and circulated petitions to members of the group to get the gerrymandering initiative that would become Issue 1 on the ballot.  *Id*. at 19:14-22:2.

408.    Mr. Griffiths along with his wife circulated pamphlets on gerrymandering provided by the League of Women Voters and gathered signatures in their community to get the gerrymandering initiative that would become Issue 1 on the ballot.  *Id*. at 22:3-18; 36:19-25.

409.    As a member of Lorain County Rising, Mr. Griffiths participated in a candlelight vigil in Oberlin during the Charlottesville riots and attended a demonstration organized by the Moms Against Gun Violence.  *Id*. at 28:8-18.

410. Mr. Griffiths worked to revitalize the North Ridgeville Democratic Club. Griffiths Dep. at 28:19-29:20.

411. As part of the North Ridgeville Democratic Club, Mr. Griffiths phone banked, sent postcards on behalf of Democratic congressional candidate Ken Harbaugh. *Id*. at 29:21-30:4. Mr. Griffiths also worked a booth at the North Ridgeville Corn Festival to support Democratic candidates. *Id*. at 30:4-9.

412. Mr. Griffiths also volunteered for Democratic candidate Ken Harbaugh's campaign in his personal capacity and engaged in door-to-door canvassing and phone banking. *Id*. at 27:2-13; 34:16-18. In addition, Mr. Griffiths organized a meet-and-greet and a food pantry drive with the Indivisible group in Wellington on behalf of Mr. Harbaugh. *Id*. at 33:11-16; 34:2-10.

413. As a member of the League of Women Voters' Oberlin Chapter, Mr. Griffiths was involved in voter registration activities. *Id*. at 32:8-33:16.

414. Mr. Griffiths has contacted Congressman Gibbs through emails, letters, calls, and voicemails on a number of occasions. *Id*. at 69:11-72:7.

415. When Mr. Griffiths has called Congressman Gibbs' office, he has asked Congressman Gibbs' aides to have the congressman call him back. However, Mr. Griffiths never received a call from the congressman. *Id*. at 70:15-71:8.

416. When Mr. Griffiths contacted Congressman Gibbs through his website on one or two occasions, he did not receive a response. *Id*. at 71:19-72:7.

417. Mr. Griffiths and his wife sent letters to Senator Larry Obhof and Cliff Rosenberger urging them to get involved in redistricting reform. *Id*. at 38:13-39:14; Ex. VVV (Ex. 3 to Griffiths Dep.).

418.     On January 24, 2018, Mr. Griffiths and his wife gave a statement against political gerrymandering to the Government Oversight and Reform Committee.  Griffiths Dep. at 41:14-42:23; Ex. WWW (Ex. 4 to Griffiths Dep.).

419.     Mr. Griffiths and his wife wrote a Letter to the Editor that was published in the *Elyria Chronicle* on November 3, 2017, criticizing political gerrymandering.  Griffiths Dep. at 46:8-23; Ex. XXX (Ex. 6 to Griffiths Dep.).  Mr. Griffiths testified that he was "moved to write this letter" after attending a hearing by the Congressional Redistricting Reform Working Group where he heard a number of people speak against political gerrymandering.  Griffiths Dep. at 46:24-47:24.

420.     Mr. Griffiths testified that his vote in Ohio's 7th Congressional District has been diluted through the cracking of Democratic voters.  *Id*. at 78:17-79:7; 100:10-12.

421.     Mr. Griffiths testified that the current congressional map made it more difficult for him to recruit volunteers and campaign for candidates of his choice.  *Id*. at 114:6-19.  He explained that "a number of voters told [him and his wife] when [they] were circulating the [Issue 1] petition that they don't feel like it made a difference if they voted or not voted because the system is such that it wasn't going to make a difference."  *Id*. at 45:10-16.  Mr. Griffiths also testified that he knew "a number of people that [he and his wife] talked to said that they don't vote for that reason."  *Id*.  at 45:24-46:3.

422.     Mr. Griffiths testified that "[i]t has been very difficult to identify candidates willing to take on Bob Gibbs in this case because of how heavily gerrymandered the district is."  *Id*. at 59:20-60:2.

114

423.    For example, Mr. Griffiths noted that in 2014 Congressman Gibbs ran unopposed in the congressional election, and he heard conversations that no one was willing to run against Congressman Gibbs.  Griffiths Dep. at 67:2-15.

424.    As another example, Mr. Griffiths noted that he spoke with Roy Rich when he ran against Congressman Gibbs in the 2016 election about "how difficult that [it] was to campaign in that district because of the size of the district and trying to get around to different people."  *Id*. at 67:19-68:6.

425.    Mr. Griffiths testified that his wife wrote to Congressman Gibbs on a specific issue but received a letter in response from Congressman Gibbs on a completely different issue.  *Id*. at 60:12-21.  Mr. Griffiths testified that his wife shared this information with members of the Indivisible group in Wellington, and other members had experienced the same situation with Congressman Gibbs.  *Id*. at 60:22-25.

426.    Mr. Griffiths testified that the mismatched letters situation demonstrated that Congressman Gibbs "doesn't really care what we think or don't think, whether we vote or not vote" because "[h]e is in a position, and still in a position, that he's going to get re-elected" because of the way the district is drawn "whether or not he appeals to any small group of us Democrats that are scattered throughout the district."  *Id*. at 61:5-62:6.

427.    Mr. Griffiths testified that "[i]t has been difficult to connect with other volunteers just because of the geographic" distance between areas that compose Ohio's 7th Congressional District.  *Id*. at 60:3-5; *see id.* at 64:9-20; 65:14-66:2; 82:6-9; 114:11-14.

428.    For example, Mr. Griffiths testified that the geographic distance between his home and Knox County caused him not to participate in certain canvassing activities.  *Id*. at 64:21-65:7.

429.     As another example, Mr. Griffiths testified that the geographic distance between his home and Huron County caused him not to participate in phone banking for Democratic congressional candidate Ken Harbaugh.  Griffiths Dep. at 66:3-16.

**Lawrence Nadler – Eighth District**

430.     Lawrence Nadler is a U.S. citizen registered to vote in Ohio and is an active voter, having voted in every election he can recall including elections for U.S. Congress. Nadler Dep. at 8:14-19; 10:18-11:6.

431.     He identifies as a Democrat, and has voted for a Democrat in almost every election he can recall, including always having voted for a Democratic U.S. congressional representative. *Id*. at 8:4-19.

432.     Mr. Nadler lives in Ohio's Eighth Congressional District where Democratic voters are cracked under the current map. *Id*. at 6:15-7:6.

433.     Mr. Nadler is active with the Democratic Party in multiple ways, including as "a member . . . involved in a couple of PACs . . . . I have done everything from . . . standing outside at a protest . . . to the women's march, to signing petitions, to writing letters, op-ed-type pieces that appeared in a couple of places." *Id*. at 16:18-17:5.

434.     He is also a precinct executive in Oxford, Ohio, *Id*. at 18:19-20, and a member of the Democratic Party's Central Committee for Butler County. *Id.* at 19:12-15.

435.     Through his political engagement including canvassing, Mr. Nadler testified that "there are people that I personally have encountered, who feel that it's not worth their time to vote . . . because it's not going to make any difference." *Id.* at 28:6-12; *see id.* at 47:10-17; 70:10-71:5.

436.    Because of this voter apathy, Mr. Nadler's ability to get out the vote for Democratic candidates in his area is inhibited. Nadler Dep. at 28:13-20; 29:3-7; 36:8-19; 90:17-91:16.

437.    Mr. Nadler feels that his representative, Warren Davidson, does not have to care about his vote, because he is sure to be reelected. *Id.* at 41:20-42:-25.

438.    For example, every month Mr. Nadler asks one of Davidson's aides if Davidson will come to his area of the district for a town hall, but he has never seen him. *Id.* at 30:5-16; 30:23-31:12. Mr. Nadler identified many instances in which he and others tried to reach out to Davidson and received no response.  *Id.* at 92:3-93:8.

439.    Because the map makes Mr. Nadler's district so safe for a republican, his representative is farther to the right than he would otherwise be. *Id.* at 68:19-69:21. "[I]f [Davidson] were listening to people, providing an open forum or multiple meetings for people to be heard, that it could moderate his views a little bit . . . . To be honest with you, I think he doesn't do it because he knows he doesn't have to do it." *Id.*; *see id.* at 94:17-95:15.

### Chitra Muliyil Walker – Ninth District

440.    Chitra Muliyil Walker resides in Ohio's Ninth Congressional District, which is packed under the 2012 map.  Walker Dep. at 8:12-15; 9:13-17; 23:12-24; 40:20-41:3; 57:17-58:15; 85:18-86:15.

441.    Ms. Walker believes she has voted in every congressional election since 2008 except when she was out of the country.  *Id*. at 16:2-10; 82:18-85:10.

442.    Ms. Walker is a Democratic voter and has supported Democratic candidates for Ohio's congressional delegation in the past.  *Id*. at 11:22-25; 91:4.

443.     Ms. Walker is a member of a number of several civic and political organizations.  Ex. YYY (Ex. 1 to Walker Dep.)at 10; Ex. ZZZ (Ex. 2 to Walker Dep.) at 10.

444.     As a member of the Lakewood Democratic Club, Ms. Walker has voted to endorse Democratic candidates for political office.  Walker Dep. at 19:24-20:6.

445.     As a member of the League of Women Voters' Lakewood Chapter, Ms. Walker participated in voter registration efforts, organized candidate's nights, educated voters on various issues, and petitioned for Issue 1.  *Id.* at 20:21-22:15; 67:16-21.

446.     As a member of the Cuyahoga Women's Democratic Caucus, Ms. Walker attends meetings and supports Democratic candidates.  *Id.* at 26:9-27:2.

447.     As part of the executive committee for the Cuyahoga Democratic Party, Ms. Walker votes for candidates for political office.  *Id.* at 28:6-20.

448.     Ms. Walker served as the treasurer for Democrat Cindy Marx's 2013 and 2017 campaigns for Lakewood City Counsel At-Large.  *Id.* at 25:10-18.

449.     Ms. Walker sends Congresswoman Kaptur letters and attends Congresswoman Kaptur's constituent meetings.  *Id.* at 42:3-12.

450.     Ms. Walker testified that her vote in Ohio's Ninth Congressional District has been diluted through the packing of Democratic voters.  *Id.* at 23:12-24; 40:20-41:3; 57:17-58:15; 85:18-86:15.

451.     Ms. Walker testified that she knows Democratic voters who feel like their vote doesn't matter because of the way the current congressional map has been gerrymandered.  *Id.* at 88:14-23; 89:16-25.

452.     Ms. Walker believes the geographic distances between areas in Ohio's 9th Congressional District make it difficult for Congresswoman Marcy Kaptur to adequately represent all her constituents.  Walker Dep. at 41:7-13.  For example, Ms. Walker testified that she had not seen Congresswoman Kaptur in her neighborhood.  *Id*. at 41:18-19.

453.     Ms. Walker also testified that the geographic distances between areas in Ohio's 9th Congressional District make it more difficult to campaign for Democratic candidates.  *Id*. at 42:24-43:5; 93:21-25.

454.     Ms. Walker testified that she thinks the current congressional map makes it harder to fundraise for her candidates of choice because people believe that the "candidate's going to win anyway."  *Id*. at 44:20-22; 87:2-5.

455.     Ms. Walker testified that she thinks the current congressional map has hurt her ability to educate voters because voters feel like their "vote is going to be manipulated in some way."  *Id*. at 92:13-19.

**Tristan Rader – Ninth District**

456.     Tristan Rader resides in Ohio's Ninth Congressional District, which is packed under the 2012 congressional map.  Rader Dep. at 8:20-9-25; 13:14-17; 66:19-24; 74:15-75:10; 93:9-25; 97:25-98:4; 98:24-99:4.

457.     Mr. Rader has voted in every congressional election at least since moving to his current residence in October 2013.  *Id*. at 8:23-9:6; 17:6-23.

458.     Mr. Rader is a Democratic voter and has supported Democratic candidates for Ohio's congressional delegation in the past.  *Id*.  at 18:14-20; 120:5-15.

459.     Mr. Rader has worked on numerous campaigns for Democratic candidates, including his own campaign for Lakewood City Council.  *Id*. at 29:23-30:15; 31:3-32:21;

50:6-9; 119:21-120:4; Ex. AAAA (Rader Responses to Defendants' First Set of Interrogatories ("Rader Interrogatory Responses")) at 8, 10; Ex. BBBB (Rader Amended and Supplemental Responses to Defendants' First Set of Interrogatories ("Rader Suppl. Responses")) at 10.

460.    Mr. Rader ran for Lakewood City Council in 2017.  Mr. Rader has served on Lakewood City Council since January 2018.  Rader Dep. at 19:22-20:12; Rader Interrogatory Responses at 8, 10; Rader Suppl. Responses at 10.

461.    As part of his work for MoveOn.org, Mr. Rader conducted volunteer recruitment and field organizing on behalf of the Unite Against Hate campaign's Democratic slate of candidates, which included Hillary Clinton for President and Ted Strickland for Senate.  Rader Dep. at 29:23-30:15.

462.    As part of his work for the Bernie Sanders 2016 Presidential Campaign, Mr. Rader was responsible for making sure that Senator Sanders was on the ballot in in every county in New Jersey and Ohio.  Rader Dep. at 31:3-32:21; Rader Interrogatory Responses at 10; Rader Suppl. Responses at 10.

463.    Mr. Rader worked on Democrat Mitch Fallis's campaign for mayor of the city of Lorain.  Rader Dep. at 50:10-16; Rader Interrogatory Responses at 10; Rader Suppl. Responses at 10.

464.    Mr. Rader worked on Democrat Michael Skindell's campaign for mayor of the city of Lakewood.  Rader Dep. at 50:17-22; Rader Interrogatory Responses at 10; Rader Suppl. Responses at 10.

465.    Mr. Rader worked on Democrat Keith Mundy's campaign for Congress in Ohio's 16th Congressional District.  Rader Dep. at 50:25-51:8; Rader Interrogatory Responses at 10; Rader Suppl. Responses at 10.

466.    Mr. Rader worked on Democrat Mitch Fallis's campaign for mayor of the city of Lorain.  Rader Interrogatory Responses at 10; Rader Suppl. Responses at 10.

467.    Mr. Rader worked on Democrat John Wisniewski's campaign for governor of New Jersey.  Rader Dep. at 27:20-29:3; Rader Interrogatory Responses at 10; Rader Suppl. Responses at 10.  As part of this campaign, Mr. Rader engaged in field organizing and volunteer recruitment.  Rader Dep. at 28:3-19.

468.    Mr. Rader also has worked for and is a member of a number of different civil and political organizations.  Rader Interrogatory Responses at 8, 10; Rader Suppl. Responses at 10.

469.    As part of his work at the AIDS Healthcare Foundation, Mr. Rader organized a national phone bank campaign to persuade voters to support a drug cost savings initiative. Rader Dep. at 22:3-11.

470.    As part of his work with SEIU, Mr. Rader organized volunteers and paid canvassers for the Democratic slate of candidates supported by the organization.  *Id*. at 23:21-25:19.

471.    Mr. Rader re-activated Cleveland State University's Young Democrats Chapter.  *Id*. at 37:23-38:14.  As a member of this organization, Mr. Rader tabled around the school and organized an event for an Ohio Senate candidate.  *Id*. at 38:22-39:5.

472.    As a member of the Cuyahoga County Progressive Caucus, Mr. Rader campaigned against a county initiative to rehab the Q Arena in Cleveland.  *Id*. at 46:9-47:25.

473.    Mr. Rader spoke at a meeting of the League of Women Voters about Issue 1. Rader Dep. at 52:16-53:22.

474.    Mr. Rader also campaigned on behalf of Issue 1 by positing on social media and supported those individuals the collecting of signatures to get Issue 1 on the ballot.  *Id*. at 56:9-17.

475.    Mr. Rader's vote in Ohio's Ninth Congressional District has been diluted through the packing of Democratic voters.  *Id*. at 66:19-24; 74:15-75:10; 93:9-25; 97:25-98:4; 98:24-99:4.

476.    The geographic distances between areas in Ohio's Ninth Congressional District have hampered constituent services and made it difficult for Congresswoman Marcy Kaptur to adequately represent her constituents.  *Id*. at 66:24-67:19; 72:12-21.

477.    The fact that the congressional races in Ohio's Ninth Congressional District are not competitive has caused Congresswoman Kaptur to "not draw in good competition" and as a result, "she doesn't have to be as out there as someone running in a more competitive race."  *Id*. at 77:10-20; 80:16-25.

478.    The geographic distance between areas in Ohio's Ninth Congressional District has made it more difficult for him to organize constituents to visit Congresswoman Kaptur's office in Toledo.  *Id*. at 111:9-112:10.

479.    The current congressional map has hurt Mr. Rader's ability to campaign for Democratic candidates.  *Id*. at 121:6-24.  As an example, Mr. Rader said that it was difficult

to campaign for Democratic congressional candidate Keith Mundy in Ohio's 16th Congressional District because voters felt that the "district is already stacked or the outcome is predetermined." *Id*. at 121:12-16.

480. The current congressional map has hurt Mr. Rader's ability to fundraise and recruit volunteers for Democratic candidates. Rader Dep. at 121:10-122:12. As an example, Mr. Rader said that it was difficult to raise funds or recruit volunteers for Democratic congressional candidate Keith Mundy in Ohio's 16th Congressional District because voters "don't want to give or get involved because they think the way that the districts are drawn has created, again, like I said, a predetermined outcome." *Id*. at 121:11-20.

481. The current congressional map "discourages people from voting" by creating voter apathy. *Id*. at 122:22-123:18. Specifically, Mr. Rader said that voters have said "Why should I vote because it doesn't matter? There's nothing I can do about it, so I don't care." *Id*. at 123:11-15.

## **Ria Megnin – Tenth District**

482. Ria Megnin is an active Ohio voter, having voted in every election she can recall including elections for U.S. Congress. Ex. CCCC (Megnin Responses to Defendants' First Set of Interrogatories) at 1(a)-(e). She identifies as a Democrat. Megnin Dep. at 71:18-19. She almost always votes Democrat, including having voted for a Democratic U.S. congressional representative each election in her recent memory. *Id.* at 67:17-69:15.

483. Ms. Megnin in Ohio's Tenth U.S. Congressional District, where Democratic voters are cracked under the current map. *Id*. at 13:2-15; 101:18-24.

484. Ms. Megnin is "someone who does regular voter canvassing" for Democratic candidates and issues. *Id*. at 57:15-16; 71:23-24. Because of the voter apathy caused by the map, she has a difficult time gathering support for Democratic candidates in her district. *Id.* at 59:17-60:21; 88:10-89:20; 106:10-23. "[N]o matter how many doors we knocked on, how many campaign supports we did, how much strategizing we did, our structure guarantees that the people would not be able to be competitive in being represented." Megnin Dep. at 78:9-13.

485. She herself would consider running for local office, but does not believe she "would have a chance of going beyond local because of the gerrymandering." *Id.* at 84:14-19.

486. Ms. Megnin feels that as a Democrat in District 10, her Representative does not engage with her or other "residents of Dayton itself or other communities that might not be fully supportive of his views." *Id.* at 17:13-16. For example, "Mike Turner has not held a town hall meeting for his local constituents in his sixteen years as a congressional representative." *Id.* at 17:5-8; *see id.* at 17:5-18:11; 62:16-63:24.

487. She has tried to call Congressman Turner's office "around a dozen" times over the past several years without receiving a response, *Id*. at 18:17-22:3, and has had a similar experience with email and electronic petitions. *Id.* at 23:3-25:5.

488. Ms. Megnin is "part of various groups, loosely, that have raised concerns with [Turner] in the past and have shared that he has not responded to them." *Id.* at 26:5-8. For example, a faith group she is a part of planned a rally "outside of Congressman Turner's office and it is called We're Dying to See Our Congressman, again, because he has not held

a town hall in sixteen years. There's going to be skeletons sitting in cars." *Id.* at 26:10-20; *see id.* at 45:9-46:2.

489.     The gerrymandered map has made Ms. Megnin's district so safe for Congressman Turner that "[t]here's no reason for the representative to have to listen to the citizens in order to keep their job." *Id.* at 40:18-20; 47:15-24.

## **Andrew Harris – Eleventh District**

490.     Andrew Harris has resided during the last ten years in the Eleventh Congressional District.  Harris Dep. at 7:7-8:19.

491.     Mr. Harris registered to vote in the State of Ohio when he turned 18 in 2008, as a Democrat. *Id.* at 10:9-13.  He is an active Ohio voter and votes "Democrats up and down the ballot." *Id.* at 11:8-11.

492.     District 11 is a packed district, and as a result Mr. Harris' vote is diluted and is not as impactful as it would be otherwise. *Id.* at 15:24-16-20. Mr. Harris believes that "packing" occurs when there is intent to place Democrats in one area together  for the purpose of diluting their vote. *Id.* at 16:5-20; 34:9-21.

493.     His congressional representative is a Democrat, Congresswoman Marcia Fudge, but she is not the candidate of his choice. She is too far to the left, and she opposes Fast Track Authority and free trade generally.  Free trade is extremely important to Mr. Harris. *Id.* at 17:7-18:3.  He is pro-business, and Congresswoman Fudge's views in these areas do not align with his.  *Id.* at 18:18-20.  On social issues, they agree more. *Id.* at 18:23-19:2.

494.     Congresswoman Fudge is forced to be to the left of where Harris consider himself to be. *Id*. at 17:16-18.  She is not allowed to be more moderate,  *id*. at 17:12-15, because in a packed district, she has to pass the ideological purity test. *Id.* at 21:15-18.

495.     Congresswoman Fudge is "from a far more liberal wing of the party that does not reflect local values, which is going to be what happens when you're in a firm, reliably blue district." *Id*. at 25:10-15.  There would be more room for nuance in a district drawn along neutral lines.  *Id*. at 28:13-16.

496.     Cleveland's economy is not the same as Akron's economy; the current congressional map forces two very different communities into the same congressional district.  Harris Dep. at 20:20-21:3; 37:25-38:13.

497.     His Democratic friends are discouraged from voting because there is no meaningful choice in the Eleventh District.   *Id*. at 23:19-24:18.

**Aaron Dagres – Twelfth Congressional District**

498.     Aaron Dagres resides in Ohio's Twelfth Congressional District, which is cracked under the 2012 map.  Dagres Dep. at 10:6-8; 11:15-17; 144:2-5.

499.     He registered to vote in the State of Ohio in 1997. *Id.* at 34:16-19. Mr. Dagres is a Democratic voter and has always voted for the Democratic candidates Congress. *Id*. at 41:24-25.

500.     He has always affiliated with the Democratic Party, except in 2012 when he  pulled a Republican ballot in the primary in order to vote for a Republican underdog in order to extend the Republican primary process.  *Id.* at 38:12-25.

501.     Mr. Dagres is injured by the current Congressional map because the way that the Twelfth Congressional district was drawn dilutes his vote, and his voice. *Id.* at 27:17-20;

49:21-50:5; 51:6-10; 167:23-168:5. His vote, and the votes of other Democrats in his district, are "watered down." *Id*. at 27:21-28:4.

502.     Mr. Dagres does not claim to be an expert, and for that reason he cannot personally say how the district should be redrawn so that it is not cracked. *Id*. at 53:13-15.

503.     The drawing of the district lines in the current map "took chunks -- large chunks of Franklin County out of the Twelfth Congressional District and added additional voters in Muskingum, Richland, Morrow, and [another one]." *Id*. at 51:13-19.

504.     Mr. Dagres complains that four out of the seven counties in his district are split under the current map.  Dagres Dep. at 163:4-6.

505.     Democrats are "unheard" in Mr. Dagres' district. The district's previous long-time congressman, a Republican, "would not hold any public forums, would not respond oftentimes to requests from the public to be heard." *Id*. at 28:12-15; 29:6-10.

506.     He testified that "when I talk to other voters through the community who say that why should they vote when their votes don't matter, when there's no opportunity for success." *Id*. at 28:17-24.

507.     Mr. Dagres was the President of the Licking County Democratic Club PAC from January 1, 2018 to January 1, 2019, and he is a Central and Executive Committee member of the official party within Licking County. *Id*. at 77:7-8; 82:21-25; 84:15-21; 85:13-19; 161:17-21.

508.     As such, he has tried to recruit candidates to run for office, but due to the nature of the district, "people do not see running as a legitimate opportunity for them because they feel the race is not winnable or competitive.  It makes it very difficult to recruit candidates to run." *Id*. at 73:4-10.  "[H]ighly qualified individuals who would do a

superb job if elected to their roles . . . are unwilling to come forward and put themselves out there knowing that there is no opportunity for them to win." *Id.* at 165:14-18. This happened with specific individuals, including "Mitch Lerner, a professor . . . at Ohio State University." These people will not run because the race is not winnable because of the way the district is drawn. *Id.* at 166:25-167:17.

509. It is also hard to raise funds or gain financial support for Democratic candidates in District Twelve because of the perception that "it is unwinnable so why should I donate." Dagres Dep. at 166:6-11; 165:15-166:14.

510. Mr. Dagres has been closely involved in numerous Democratic campaigns, including his own pursuit of his party's nomination to Congress in 2008. *Id.* at 70:21-71:2. He helps support candidates to run for office. *Id.* at 162:2-7. He raises money for Democratic candidates, including for Danny O'Connor, the recent Democratic candidate for Congress in District Twelve. *Id.* at 86:5-87:14. He was very involved in canvassing for Danny O'Connor's campaign for Congress in the August 2019 special election. *Id.* at 88:12-18.

511. Mr. Dagres recruits other people to vote for Democratic candidates through personal conversations, phone banking, door-to-door canvassing, mailings, and other avenues. *Id.* at 78:22-79:13; 81:15-21. He also registers voters. *Id.* at 81:18-21.

512. Mr. Dagres voted in support of Issue I. *Id.* at 141:16-17.

**Elizabeth Myer – Thirteenth District**

513. Dr. Myer lives in Ohio's Thirteenth Congressional District, where Democratic voters are packed under the current map. Myer Dep. at 10:2-11:6. She has voted in every election she can recall, including elections for U.S. Congress. *Id.* at 12:4-20.

514.    She identifies as a Democrat, and has voted for a Democrat in most elections she can recall, including always having voted for a Democratic U.S. congressional representative. *Id.* at 13:2-14:25; 15:15-18; 17:21-24. She lives in a Democratic district, which is her preference. *Id.* at 37:9-17.

515.    Dr. Myer is active in Democratic Party organizing. For example, she has canvassed, phone banked, and attended fundraisers in her district and the surrounding area for both Clinton and Obama presidential campaigns and for GOTV efforts. Myer Dep. at 20:12-23:18.

516.    In her experience talking to voters and prospective voters in her area, the gerrymandered map has made people less likely to engage with her efforts because they feel their votes do not matter. *Id.* at 49:25-50:17.

517.    Dr. Myer feels that since her district spans such a large geographic area including Youngstown, Akron, and the rural northeast of the state, "people in this district aren't necessarily interested in the same things or don't have the same concerns." *Id.* at 29:23-25; *see id.* at 30:2-7; 67:7-16.

518.    Because her "district is one of the most crazy looking things you've ever seen crawling across the map towards the west and a little stripe to pick up Akron," where voters "don't have the same concerns as people in my area," she feels her representative cannot respond to her concerns. *Id.* at 38:13-19.

519.    Because Democrats are packed into her district, in Dr. Myer's experience, her representative, Tim Ryan, is less responsive to what even Democratic voters want because he knows he will always be reelected. *Id.* at 30:12-31:9; 32:18-33:12; 34:6-21.

520. Dr. Myer feels that in the Thirteenth District her vote is less valuable because "to put all the Democrats, as you well know, together, you know, it dilutes any power of our influence because we're all lumped together." *Id.* at 41:6-9; *see id.* at 55:24-56:9; 69:9-19; 70:6-16; 71:13-18.

**Beth Ann Blewitt Hutton – Fourteenth District**

521. Beth Ann Blewitt Hutton, who resides in Ohio's Fourteenth Congressional District, Hutton Dep. at 8:21-24; 9:23-10:4, has voted in every single election since registering to vote around 1971. *Id.* at 11:23-12:17. She has always voted for a Democratic candidate in statewide races. *Id.* at 14:9-17. With the exception of Representative Steve LaTourette, Ms. Hutton has always voted for Democratic candidates at the federal level. *Id.* at 14:22-15:17. Ms. Hutton only votes in Democratic primary elections. *Id.* at 12:18-25.

522. Since around 1983, Ms. Hutton has been actively involved with the League of Women Voters, serving as President of the Lake County League several times and has served, for the last 12 years, as the Voter Service Chair. *Id.* at 17:2-19.

523. One of Ms. Hutton's main responsibilities as Voter Services Chair for the League is to put together the Voter Service Guide, which collects information from questionnaires sent to all candidates. *Id.* at 18:11-19:8. The Republican candidate for District 14 did not respond to the League's survey. *Id.* at 22:3-23:15.

524. As Voter Services Chair for the League, Ms. Hutton also hosts candidate forums. *Id.* at 19:9-22:2. In the 2018 election cycle, Ms. Hutton invited both the Democratic and Republican candidates for District 14 to attend the forum. *Id.* at 20:14-21. Both candidates attended one forum, although the Republican candidate did not RSVP. *Id.* at 20:22-21:4.

525. Hs. Hutton contacted Representative Joyce's office within the past 5 years, likely related to a gun issue. *Id.* at 67:13-68:8. She received a form letter in response. *Id.* at 68:9-15. She has not contacted his office since because she knows "how he's going to vote." *Id.* at 67:13-19.

526. The way the challenged map is drawn burdens Ms. Hutton's ability to associate and participate in the political process with other Democratic voters in the state of Ohio. Hutton Dep. at 39:22-42:12; 45:19-46:12; 47:7-20.

527. The current congressional map made it more difficult for Ms. Hutton to elect her candidate of choice. *Id.* at 53:21-55:17; 58:6-59:6

### Theresa Thobaben – Fifteenth District

528. Theresa Thobaben lives in Ohio's Fifteenth U.S. Congressional District, where Democratic voters are cracked under the current map. Thobaben Dep. at 8:12-9:8. She is an active Ohio voter, having voted in every election she can recall including elections for U.S. Congress. *Id.* at 9:20-11:4.

529. Ms. Thobaben identifies as a Democrat, and has voted for a Democrat in most elections that she can recall, including always having voted for a Democratic U.S. congressional representative. *Id.* at 11:5-22.

530. Ms. Thobaben is a member of the Democratic Party and is on the Clinton County Party Executive Committee. *Id.* at 12:6-8. Through this affiliation, she "help[s] to run the elections in the – in the county. We support candidates. The committee helps to raise money at our dinners." *Id.* at 13:8-11.

531. She has also canvassed, "door to door and did literature drops, some phone calls" for several political campaigns for presidential and local Democratic candidates, *Id.* at

19:17-21:6, and she herself ran as a Democrat for Clinton County Commissioner in 2008 and 2010. *Id.*

532.    Ms. Thobaben testified that "a lot of people that I have talked to" say they feel like "the probability of Democrats being able to get through any of their candidates is pretty remote" and that their votes do not count. Thobaben Dep. at 38:2-6.

533.    This has made it more difficult to canvass for and elect Democratic candidates. *Id.* at 46:21-47:7; 60:8-12.

534.    Ms. Thobaben testified that "[m]y vote doesn't count because the district has been drawn in such a way that it dilutes my vote . . . . It doesn't matter if I vote for Democrats. They don't count." *Id.* at 28:21-29:6; *see id.* at 36:15-17; 37:5-10.

535.    She does not "feel represented by Steve Stivers . . . . He rarely comes to Clinton County." *Id.* at 29:24-30:4.

536.    She contacts her congressman often using emails, texts, and she also "ha[s] him on speed dial." *Id.* at 31:3; 30:10-13; 33:22-24. But she has either received no response, or form responses. *Id.*

**Constance Rubin – Sixteenth District**

537.    Constance Rubin resides Stark County, in the Sixteenth U.S. Congressional District. Rubin Dep. at 8:7; 8:14-15.  Due to the way her district is drawn, Ms. Rubin's vote is diluted. *Id.* at 56:23-24; 57:23-58:5.

538.    Ms. Rubin registered to vote in Ohio in 1973, at which time she voted Republican.  *Id.* at 23:21-24:9.  She voted Republican a number of times in that era, but is now a Democrat, and finds it "highly doubtful" that she would ever vote for a Republican again. *Id.* at 24:23-25:2.

539.     Ms. Rubin is a member of the League of Women Voters of Ohio, and has been since 1973.  She was co-president from June 2011 to January 2014.  Rubin Dep. at 12:23-13:10.

540.     She has been a member of the Stark County Democratic Party since 1984, and a member of the Central Committee from 2004 to 2010, and from 2016 to the present. *Id*. at 16:14-25.

541.     Ms. Rubin has been a member of the Northern Stark County Democratic Club since 2006, was president from 2008-2010, first vice president from 2015-February 2017, and vice president again from March 2016 to March 2016.  *Id.* at 18:13-19:3. She is currently the second vice president.  *Id.* at 9:4-6.

542.     Ms. Rubin has supported Democratic candidates over many election cycles, and was the Party's 2014 nominee for the State Senate in her district, District 29. *Id.* at 21:8-11.

543.     Ms. Rubin is injured by the current Congressional map because, as a Democrat in District 16, she has no "influence whatsoever on how [her] congressman votes, ultimately, or even considers [her] point of view."  *Id.* at 26:18-23.

544.     The current congressional map divides Stark County up into three different districts. *Id.* at 27:14-19.  Ms. Rubin's political advocacy activity is burdened because, due to this gerrymandered district, most voters she asks "do not know who their congressman is." *Id.* at 27:5-13.  When she attempts to help them determine this, it is difficult because "the boundaries on that [Congressiona] map do not adhere to political boundaries."  *Id.* at 30:8-13.

545.    Her advocacy activities are also affected by the fact that Democrats can't win in District 16. "[V]oters who continually vote for candidates who never win eventually get discouraged and stop participating."  Rubin Dep. at 40:4-7.  It is difficult for her to engage with apathetic voters. *Id.* at 90:20-21.

546.    She has a "difficult time finding candidates who are willing to run in districts whose outcome is preconceived.  Elections cost a lot of money and a lot of time, and it's hard to find people principled enough to run if they know their possibility of loss is a hundred percent."  *Id.* at 40:14-21; 76:6-9; 78:3-6.  And it's hard for her party to raise money or advocate effectively.  *Id.* at 76:6-9.

547.    She has no opportunity to influence how her Congressperson votes on legislation because he "knows he does not owe his allegiance to the voters; he only owes it to the party who helped put him there and who drew the district lines to assure that he would win." *Id.* at 44:7-14; 57:25-58:5.

548.    Ms. Ruben's Congressman will not participate in public forums. He only meets with business owners and employees of a business. *Id.* at 45:2-12.

### N.    Organizational Plaintiffs

### League of Women Voters of Ohio

549.    The League of Women Voters of Ohio ("LWVO" or "the League") is the Ohio chapter of the League of Women Voters of the United States, founded in May 1920. Miller Dep. at 18:8-18.

550.    The LWVO is a non-partisan membership organization with 2,700 to 2,800 members.  *Id.* at 20:25-21:1; 36:24-37:6; 39:15-22.

551.    There are LWVO dues-paying members residing in each of Ohio's congressional districts. *Id.* at 42:24-43:2.

552.    "[I]n its core function," the LWVO "is about democracy," and "fair maps and fair districts are key to that democracy." *Id.* at 19:14-17. The League's work "is making our democracy function for every voter." *Id.* at 24:24-25:2.

553.    Much of the League's mission is carried by volunteers. *Id*. at 36:10-12.

554.    The LWVO works to educate voters about voting, candidates and issues, *id.* at 28:10-15, to register voters, *id.* at 28:22-25, to get out the vote, *id.* at 29:24-30:2, and to empower and educate voters in a nonpartisan way, *id*. at 33:4-7.

555.    Fair districts is a priority issue for the LWVO, specifically voted upon by member delegates at its biennial convention. *Id.* at 51:2-7. The LWVO's members believe that, especially in Ohio's Congressional districts, citizens' votes are diluted because the map is manipulated to guarantee an outcome. *Id.* at 58:2-10.

556.    The decision to join this lawsuit was made by the LWVO's elected board. *Id.* at 51:18-22. The board has the authority to represent its members in this decision. *Id.* at 51:24-52:2.

557.    Members of the League who are Democrats are injured by the Congressional Map because they live in Congressional districts where Democrats are cracked or packed, diluting their votes. *Id.* at 141:8-24; 177:2-11. These members have been suffering this injury consistently for eight elections. *Id.* at 177:2-11.

558.    "In our current congressional districts incumbents win again because there was an explicit goal of cementing in the results of elections." *Id.* at 76:20-23. Despite efforts to get out the vote, despite candidates' policy positions or background, despite the League's organizational efforts, election results are predetermined. "The map makers of this congressional map, the majority party, the party in control at the time, did a very good job of

achieving their goal of a twelve/four map and that is a miscarriage of our representative democracy." *Id.* at 78:4-79:9.

559.    The current Congressional map has impaired the League's operations and diverted its resources across the decade because of the confusion created by the map's "messy" district lines. *Id.* at 187:14-188:9.

560.    This confusion requires the League to set up robust operations to answer calls from voters, confused by the district lines, to determine their polling location. *Id.* 179:2-25.  The League has "hundreds of volunteers who are volunteering on election day to answer phone banks …and the reason why we need to have hundreds of volunteers is because people are confused about their congressional districts . . . ." *Id.* at 184:18-185:7.

561.    For example in the recent special election in District 12, the League "had to stop what [they] were supposed to be doing . . . so [they] could help voters understand if they were in 12 or not." *Id.* at 179:15-18. 183:20-25. Voters in Clintonville and Grandview were within a couple of blocks of District 3, 15, and 12, in any direction, and were confused as to whether they could vote. *Id.* at 82:2-16.

562.    The Ohio congressional map causes the LWVO to divert resources because congressional candidates across the state, secure of reelection, will not agree to participate in candidate forums hosted by the League. *Id.* at 97:10-18.  Two examples are Congressman Stivers and Congressman Jordan. *Id.* at 94:8-14. Neither has participated for several elections. *Id.* at 95:24-96:2. This wastes a lot of the LWVO's time and energy: the League will have reserved the room, paid for the sound, and made multiple calls; then the LWVO must tell the opposing candidate that they cannot come and speak either, thus impairing the League in the performance of its work. *Id.* at 94:8-22; 96:3-97:18.

██     ████████████████████████████████████

████████████████████████████████████████████████

██████████

564.    Although Congressmen Stivers and Jordan are two examples; it "happens all over the state."  Miller Dep. at 97:22-23.

565.    The voter apathy caused when people feel that their votes do not count makes it harder for the League to perform its work getting out the vote.  *Id.* at 135:15-24

566.    The LWVO ran a citizen map-making contest in 2011, utilizing significant resources. *Id.* at 101:2-4.

567.    The LWVO published a report on Ohio's 2011 redistricting process, documenting the lack of transparency in the process and the partisan gerrymander that resulted, titled The Elephant in the Room. *Id.* at 127:13-128:7.  It later produced a sequel, The Elephant in the Room II.

568.    If the League did not have to divert resources to work on the problems caused by the current congressional map, it would be able to work more on voter education, outreach efforts, getting young people excited about government and registered, putting on candidate forums, and getting out the vote.   *Id.* at 134:2-24; 94:2-7.

569.     If the League did not need to have hundreds of volunteers to help with district line confusion on Election Day, it could reassign these volunteers to help ease the shortages of poll workers on Election Day.  *Id.* at 185:2-6.

570.    The LWVO supported Ballot Issue 1.  *Id.* at 90:6-9.

571.    LWVO member John Fitzpatrick is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. Declaration of John C. Fitzpatrick ("Fitzpatrick Decl.") ¶¶ 1, 5.

572.    He is a Democratic voter who has supported Democratic candidates for Ohio's congressional delegation in the past and plans to support such candidates in the future. He would prefer to live in a Democratic district. *Id.* ¶ 6.

573.    He lives at ███████████████████ in Summit County. This is in Ohio's Fourteenth U.S. Congressional District, where Democratic voters are cracked under the current map.  His current representative is Republican Dave Joyce. *Id.* ¶ 2-4.

574.    Mr. Fitzpatrick is the Treasurer of the Ohio League of Women Voters of the Akron Area (LWVAA).  *Id.* ¶ 7.

575.    He has seen the voter apathy and confusion that Ohio's gerrymandered map produces by talking to voters through his own political canvassing, and through his GOTV and voter education activities with the League.  *Id.* ¶¶ 12, 14-16.

576.    For example, in canvassing for Democratic candidates including Hillary Clinton, John has heard from voters in District 14 and also Districts 16, 13, and 11—all of which are within a few blocks of his home—that they feel there is no point in voting, because the congressional race in each district is a foregone conclusion. *Id.* ¶¶ 15, 19.

577.    In his participation with LWVAA, he has had to spend about 80% of his volunteer time working on education around partisan gerrymandering. *Id.* at 11. He believes that this and his other voter engagement efforts with the League require a diversion of

resources that could go to voter registration and empowerment, but for the 2012 Map. *Id.* ¶ 10-11.

578.    Mr. Fitzpatrick also believes the power of his own vote is diluted in his district. *Id.* ¶ 17. "Representative Joyce does not represent my community's interests, and he does not have to care about us, because given the 2012 Map he will be elected no matter what." *Id.* ¶ 18.

579.    Mr. Fitzpatrick would live in Congressional District 16 under the Proposed Remedial Plan, Declaration of Theresa J. Lee ("Lee Decl.") ¶ 5, for which the percentage of the two-party vote for the Democratic candidate was over 50% in each of the 2012, 2014, 2016, and 2018 elections. *See supra* ¶¶ 311-12.

### The Ohio State University College Democrats

580.    The Ohio State University College Democrats ("OSU College Democrats") is a student organization at the Ohio State University that's aim is to "advocate, educate, and engage people on the Ohio State campus in alignment with the [Democratic] party platform." Oberdorf Dep. at 13:12-19.

581.    The OSU College Democrats is chartered with the Ohio Democratic Party, Ohio College Democrats and College Democrats of America. *Id.* at 14:4-15:5; 33:22-24.

582.    The OSU College Democrats is a membership organization made up of OSU students who self-identify as Democrats. Oberdorf Dep. 119:3-6. Students who have attended at least thirty percent of the meetings in a year are "voting members" of the organization. *Id.* at 45:20-46:21.

583.    The OSU College Democrats does not know who each of its members has voted for, but has no concern that the organization is infiltrated by non-Democrats. *Id.* at 119:7-16.

584.    The members of the OSU College Democrats generally live in the Third, Twelfth or Fifteenth Congressional Districts. While some members are registered to vote at their home address, the bulk of the members are registered to vote at their school address. *Id.* at 65:24-67:2; Ex. EEEE (Ex. 5 to Oberdorf Dep.) at 6.

585.    The OSU College Democrats does voter engagement and education, works to register students to vote for the first time or to have them update their voter registration to their current address, canvasses on behalf of candidates including for Congress, hosts events with Democratic candidates, including for congressional office, and has done phone banking, including on behalf of the Democratic coordinated campaign which works on behalf of, among other offices, congressional candidates. Oberdorf Dep. at 34:3-15; 35:17-36:21; 78:13-80:5; Ex. 5 to Oberdorf Dep. at 4-5, 7-11.

586.    The members of the OSU College Democrats support Democrats running for office, including for Congress. For example, the Danny O'Connor campaign for Congress in the Twelfth Congressional District was a key focus for 2018. Oberdorf Dep. at 5:19-86:3; 87:21-88:17; 113:25-114:15; 119:7-16.

587.    The "small executive board" makes decisions for the OSU College Democrats, including the vote to join this lawsuit. *Id.* at 53:20-54:11; 58:15-59:2.

588.    The votes of the members of the OSU College Democrats have been diluted due to the construction of the Third, Twelfth, and Fifteenth Congressional Districts. *Id.* at 64:5-16; 65:16-23.

589.    The OSU College Democrats and its members have found that the Congresspeople representing the Third, Twelfth, and Fifteenth Congressional Districts are not responsive to them.  *Id.* at 103:14-104:13

590.    By diluting the members' votes, the congressional map, and specifically the construction of the Third, Twelfth, and Fifteenth Congressional Districts, impairs the OSU College Democrats ability to carry out its purpose.  *Id.* at 65:2-10; 75:2-20; 103:4-13; 118:18-119:2.

591.    Because the larger constituency of young voters is split up across these three districts, it impairs the effectiveness of the voting bloc.  *Id.* at 117:21-118:17.

592.    The way the lines are drawn burdens OSU College Democrats and its members by creating confusion about which district someone lives in.  *Id.* at 63:16-64:4; 68:5-69:17.

593.    This voter confusion causes young voters to become frustrated and less likely to be or remain engaged with the OSU College Democrats.  *Id.* at 81:16-25.

594.    This was illustrated in summer 2018 during the Twelfth District Special Election.  Many individuals who engage with OSU College Democrats were confused about whether they were supposed to vote on Special Election Day, and OSU College Democrats had to expend it volunteer resources to engage with these voters, instead of on Get Out the Vote activity directed only at the Twelfth District.  *Id.* at 63:16-25; Oberdorf Dep. Ex. 5 at 11.

595.    The locked up nature of the congressional map causes members of the OSU community to believe that their votes do not matter and to become apathetic.  *Id.* at 62:17-63:15; 69:18-71:4; 119:24-120:19.

596.     The apathy from young voters caused by the map impairs OSU College Democrats associational rights.  *Id.* at 119:24-120:19.

597.     The OSU College Democrats is concerned about congressional redistricting, and has held events and collected petition signatures for the fair districting initiative.  *Id.* at 55:6-22.

598.     In 2018, OSU College Democrats focused their resources on the Danny O'Connor campaign, both the Special Election and on the November 2018 General Election.  *Id.* at 85:19-86:3; 87:21-88-17; 113:25-114:15.

599.     Mr. O'Connor did not win the November 2018 election despite a 31.6 percent shift for the Democratic candidate.  *Id.* at 63:9-10; 114:19-24; 117:4-14.

600.     Under Plaintiffs' Proposed Remedial Plan, the percentage of the two-party vote for the Democratic candidate in District 12 was over 54% based on 2018 election results.  Cooper Third Supplemental Decl. ¶ 5, Fig. 1.

**Plaintiff Ohio A. Philip Randolph Institute**

601.     The Ohio A. Philip Randolph Institute ("APRI") is the Ohio chapter of the A. Philip Randolph Institute.  Washington Dep. at 16:14-25.

602.     It has eight chapters, across Ohio, in Columbus, Cleveland, Cincinnati, Toledo, Warren, Youngstown, Akron/Canton, and Dayton, *id.* at 22:20-23:6-10, seven of which are currently active, Ex. FFFF (Ex. 12 to Washington Dep. (APRI Responses to Defendants' First Set of Interrogatories)) at 1(c), and has members living in nearly every congressional district throughout the state, Washington Dep. at 61:13-24, 62:12-15.

603.     APRI's activities are funded in part by membership dues. *Id.* at 49:18-20.

604. The bulk of APRI's work consists of voter education, voter registration, civic engagement, voter outreach, and encouraging people to vote. *Id.* at 53:14-19, 97:16-21, 98:8-12.

605. Ohio's gerrymandered congressional map impedes APRI's work and requires it to divert resources from its efforts by making it more difficult to engage voters through its education, registration, and outreach efforts, and by deterring and discouraging its members and other Ohio voters from engaging in the political process. *Id.* at 70:13-18, 70:24--71:8.

606. APRI's executive board, all of its chapters, and representatives from each chapter unanimously made the decision to join the lawsuit. *Id.* at 18:9-12, 47:4-13, 48:8-12, 63:11-15. The goal was to obtain fair congressional districts; to put an end to the practices of packing and cracking. *Id.* at 37:17-21.

607. APRI's state executive board endorsed Ballot Issue I. *Id.* at 4:21-25, 42:2-4.

608. The current Congressional map causes APRI to suffer diversion of resources in accomplishing its mission, causing it to "hav[e] to divert resources to work harder to convince people and educate people that their vote does count and they should exercise their right to vote." *Id.* at 75:20-25-76:1-2.

609. Mr. Andre Washington, APRI's president, has to work to overcome voter apathy in his own home district, District 12, where "every third door I knock on people are saying my vote doesn't count in this district, it doesn't matter, the same person is going to get back in office." *Id.* at 73:7-12.

610. The congressional map causes voter confusion and apathy, which require APRI to divert its resources from its work to register and engage voters. "[B]ecause of the

way these [congressional district] lines are drawn, people get confused, they're frustrated. You could be in a county that's split down the middle or split in three different ways and they don't know where to vote or who to vote for so they get frustrated, they get confused, they get discouraged and they just don't know what to do so . . . they) do nothing.  So we're – you know, we have to spend time and resources to work this out . . . ." *Id*. at 99:24-100:11.- APRI "spend[s] more time to work with a voter that's discouraged, confused, frustrated at the way these lines are drawn, and they don't know what to do or where to go." *Id.* at 101:5-9.

611.    But for the gerrymandered map, APRI could use its resources to register more people to vote.  *Id.* at 126:11-25

612.    APRI's members are personally affected by the map as well.  APRI has democratic members in cracked and packed districts who feel "the person that I'm voting for doesn't have to work for my vote because they know that they're going to win anyway so it doesn't matter if I vote or not, there's no competition in there."  *Id.* at 106:20-107:3.

613.    APRI member Stephanie White is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. Declaration of Stephanie M. White ("White Decl.") ¶¶ 1, 4.

614.    She is a Democratic voter who has supported Democratic candidates for Ohio's congressional delegation in the past and plans to support such candidates in the future. She would prefer to live in a Democratic district.  *Id.* ¶ 5.

615.    Ms. White lives at ███████████████████████ in Lucas County. This is in Ohio's Fifth U.S. Congressional District where Democratic voters are cracked under the current Ohio map. Her current representative is Republican Bob Latta.  *Id.* ¶¶ 2-3.

616. Ms. White is the Vice President of the Toledo Chapter of the Ohio A. Philip Randolph Institute, and has been since 2017. Previously she was the Secretary. *Id. ¶* 6.

617. Ms. White has seen the voter apathy and confusion that Ohio's gerrymandered map produces by talking to voters through her own political and union canvassing, and through her GOTV and voter registration work with APRI. *Id. ¶¶* 9-10.

618. For example, she works to register and mobilize voters near Toledo, much of which is in District 9, rather than her own District 5. Many District 9 voters have told her "that they feel their vote is pointless because the outcome of the race is a foregone conclusion." *Id.* Democratic voters in Districts 5 and 9 are apathetic and "due to the understanding that the outcomes of many elections, particularly for Congress, are preordained. For example, many residents of these districts have expressed to me that their vote does not count and it is not worth it for them to get engaged in politics. As a result, they do not see any point in voting, and many ultimately do not register or vote." *Id.* ¶ 14.

619. Based on her experience, Ms. White believes this voter apathy burdens APRI's mission, because "when people choose not to vote because they feel that their votes do not count, the time and resources that I and APRI spend are wasted." *Id.* ¶ 12.

620. Ms. White also believes that the value of her own vote in District 5 has been diluted by the 2012 Map. *Id.* at 13. Despite being very engaged in Democratic, union, and APRI organizing activities, she has never met or interacted with her representative. *Id.* ¶ 14. "Congressman Latta is confident that he will win re-election regardless of his opponent or circumstances in any given year, as a result of the gerrymandering scheme." *Id.* Ms. White has observed that in District 5, "because Congressman Latta is sure to win, people who support the Democratic Party and Democratic candidates are even less likely to

mobilize and vote in response to [her] efforts." *Id.* ¶ 20. She has observed that her political activities are "more difficult and less effective than they would be otherwise" because "voters in District 5 and District 9 feel that their vote doesn't matter." *Id.* ¶ 21.

621. Ms. White would live in Congressional District 5 under the Proposed Remedial Plan, Lee Decl. ¶ 7, for which the percentage of the two-party vote for the Democratic candidate was over 50% in each of the 2012, 2014, 2016, and 2018 elections. *See supra* ¶¶ 311-12.

### Northeast Ohio Young Black Democrats

622. Plaintiff Northeast Ohio Young Black Democrats ("NEOYBD") is a regional organization dedicated to "mentor, empower and recruit the next generation of young people of color who want to be involved in the political process" in Northeast Ohio. Jackson Dep. at 8:9-12.

623. NEOYBD is a Democratic organization that supports Democratic candidates for all offices for which their membership is eligible to vote including the U.S. House of Representatives. *Id.* at 14:6-10. It is a chapter of the Ohio Young Black Democrats. *Id.* at 28:18-20.

624. NEOYBD has about sixty members, all Democrats and regular voters, who currently live in Ohio U.S. Congressional Districts 9, 11, 13, and 14. *Id.* at 26:5-11; 40:25-41:18; 44:12-18.

625. Central to NEOYBD's mission is "voter education, training, and information-sharing," including "informing voters on important issues and candidates in ways that they can get involved." *Id.* at 8:17-18, 21-22.

626. This includes canvassing, phone banking, and social media engagement to get out the vote and support Democratic issues in Northeast Ohio communities. *Id.* at 9:2-15. It also includes training other Democrats and progressives on organizing tools including fundraising and running for office, and holding events to support Democratic candidates. Jackson Dep. at 12:5-14:10.

627. For example, in 2018, NEOYBD, through its board, members, and volunteers, held four training events to educate people about organizing for Democratic candidates, *id.* at 12:16-17, monthly phone banks to support Democratic candidates, *id.* at 19:21, and regular canvassing including in conjunction with other Democratic groups for the same purpose, *id.* at 16:8-23.

628. NEOYBD supported Ballot Issue 1 and canvassed to get it on the ballot in 2017. *Id.* at 34:12-35:19.

629. NEOYBD's board unanimously voted to become a plaintiff in this litigation. Based on the "conversations we've had with our community," the board believed "[t]he current map does not represent us, and we don't have a fair, equal voice." *Id.* at 39:7-17.

630. Ohio's gerrymandered congressional map forces NEOYBD to divert resources from its mission work by making it more difficult to get out the vote and keep Democratic voters engaged. "So, for instance, we have a member that lived in Lake County. We are the Northeast Ohio Young Black Democrats. And the amount of enthusiasm and willingness to get involved and make their voices heard in that area, because it is a cracked district, is not where it needs to be. And so we've had to spend extra resources trying to build momentum, trying to get information out there because of the way that that district is drawn and the way that the map is drawn in our region." *Id.* at 10:19-11:13. Ms. Jackson

has personally experienced working against voter apathy and confusion. *Id.* at 7:12-8:6; 46:10-24.

631.    The voter apathy that the map produces makes it more difficult for NEOYBD to fundraise and get members involved. "[W]e also have to fundraise for our organization itself. And it's been challenging based on the way this map is currently drawn, because folks have been feeling like, you know, there [sic] voices aren't being heard. So it's causing us to use more of our resources, when we have a hard time bringing in resources." Jackson Dep. at 23:17-24.

632.    NEOYBD's membership itself is harmed by the voter apathy and confusion that the map creates: "why would [members] join the organization? Why would they get involved? Why would they talk to their neighbors about us? Because they feel their vote doesn't count." *Id.* at 87:2-6.

633.    NEOYBD President Gabrielle Jackson, the President of NEOYBD for the past two years, lives in Ohio's Ninth Congressional District. Jackson Dep. at 7:12-8:6. She has experience working against voter apathy and confusion in the packed district where she lives: "It's also known as the Snake on the lake. My representative is Congresswoman Marcy Kaptur. I live in Lakewood, Ohio. She lives in Lucas County. And it's literally a thin line – the way this current map is drawn, it's literally a thin line that goes along Lake Erie. There's no adequate way for me, living on the west side of Cleveland to be represented the same as someone living in Lucas County. That's what I mean when I say that our voices aren't really being counted, our voices aren't being heard, and we don't have a direct connect to our congressional representative." *Id.* at 46:10-24.

634. But for the gerrymandered congressional map, NEOYBD could spend more of its resources more effectively to get out the vote, fundraise, and otherwise support Democratic candidates. *Id.* at 48:22-49-22; 55:13-15; 64:18-65:3; 69:3-70:2; 74:8-24; 83:22-84:13; 85:14-87:6.

### Hamilton County Young Democrats

635. Hamilton County Young Democrats is a Democratic organization that engages young people to be involved in politics and elections. Simon Dep. at 8:24-9:7.

636. Hamilton County Young Democrats is a membership organization, in which members self-identify as Democrats. *Id.* at 9:8-10; 78:22-79:3.

637. Hamilton County Young Democrats has approximately 150 members, who pay dues to be a member of the organization. *Id.* at 9:11-20.

638. Hamilton County Young Democrats does not know who each of its members has voted for, but has no concern that the organization is infiltrated by non-Democrats. *Id.* at 57:20-22; 79:4-8.

639. Nathaniel Simon has been the President of the Hamilton County Young Democrats since 2017 and was the organization's Rule 30(b)(6) designee. *Id.* at 1; 8:4-6.

640. The members of Hamilton County Young Democrats live in the First and Second Congressional Districts. *Id.* at 34:2-4; 39:6-8; 39:24-40:4; 41:5-7; 43:5-10; Ex. GGGG (Ex. 6 to Simon Dep.) at 6; Ex. HHHH Hamilton County Young Democrats Supplemental Responses to Defandants' First Set of Interrogatories ("HCYD Suppl. Responses") at 3.

641. Hamilton County Young Democrats does voter engagement and education, holds events with candidates and on issues important to Young Democrats, and works on

behalf of Democratic candidates, including for Congress. Simon Dep. at 9:3-7; 32:22-33:2; 37:14-16; Ex. 6 to Simon Dep. at 4, 6-9; HCYD Suppl. Responses at 2, 3-4.

642. Hamilton County Young Democrats conducts voter registration and canvassing, including canvassing for Democratic candidates running for Congress. Simon Dep. at 17:21-25; 27:9-24; Ex. 6 to Simon Dep. at 4, 6-9; HCYD Suppl. Responses at 2, 3-4.

643. The members of the Hamilton County Young Democrats support Democratic candidates for office, including for Congress. Ex. 6 to Simon Dep. at 4, 6-9; HCYD Suppl. Responses at 2, 3-4.

644. The Board of the Hamilton County Young Democrats makes decisions on behalf of the organization. Simon Dep. at 12:5-10.

645. The votes of the members of the Hamilton County Young Democrats have been diluted due to the construction of the First and Second Congressional Districts. *Id.* at 17:9-14; 22:18-21; 23:10-13; 49:11-16.

646. These members have each been deprived of their opportunity to elect candidates of choice in Districts 1 and 2. Simon Dep. at 17:9-14.

647. The way Hamilton County, and particularly the City of Cincinnati, is split between the First and Second Congressional Districts burdens Hamilton County Young Democrats. *Id.* at 17:14-16; 18:16-23; 20:15-24; 21:10-14; 22:7-11; 30:8-16; 31:16-21; 32:5-7; 35:13-24; 48:4-11; 55:3-10.

648. The way the lines are drawn burdens Hamilton County Young Democrats and its members by creating confusion about which district someone lives in. *Id.* at 18:23-25; 33:10-34:6; 36:14-37:18.

649.     This voter confusion causes young voters to become less engaged. *Id.* at 32:15-21.

650.     The way the lines are drawn causes young voters to be apathetic about voting and convinced that being engaged in the process does not matter.  Simon Dep. at 17:17-21; 18:2-5; 36:14-37:18; 38:2-19; 45:19-46:2; 46:12-23; 50:23-51:24.

651.     This burdens Hamilton County Young Democrats by hampering its ability to associate with young people who could be potential members. *Id.* at 17:21-25; 18:2-5; 36:14-37:18; 38:2-19; 45:19-46:2; 46:12-23; 50:23-51:24.

652.     Hamilton County Young Democrats encounters young people who decline to become engaged in the political process or to donate funds to the organization or to Democratic candidates because they believe the system is rigged. *Id.* at 36:14-37:18; 38:2-19; 55:11-16; 56:2-14; 83:23-84:5.

653.     The congressional lines make it so that Hamilton County Young Democrats must divide their resources and focus between the First and Second Congressional District, instead of allowing them to focus on a district that contains the bulk of Hamilton County and the whole of Cincinnati. *Id.* at 17:14-16; 18:16-23; 20:15-24; 21:10-14; 22:7-11; 30:8-16; 31:16-21; 32:5-7; 35:13-24; 79:9-24.

654.     The Congressmen that represent Districts 1 and 2 are not responsive to the Hamilton County Young Democrats. *Id.* at 38:13-41:7.

655.     Members of the Hamilton County Young Democrats have not received responses from Congressmen Chabot and Wenstrup. *Id.* at 38:13-42:16; 43:5-44:13

656.     The President and Vice President of the Hamilton County Young Democrats have attempted to seek constituent services for residents of Hamilton County through their

roles in the Office of the County Commissioner and in the Office of the Mayor of the City

of Cincinnati.  Congressmen Chabot and Wenstrup routinely do not reply to these requests.

*Id.* at 42:12-43:4; HCYD Suppl. Responses at 4.

657.    The Hamilton County Young Democrats expended resources on the

campaign of Aftab Pureval in Congressional District 1 in 2018 as they felt that "he ha[d] the

best chance [to win] in quite some time."  Simon Dep. at 66:21-25.  Mr. Pureval did not win

the 2018 election.

658.    Under Plaintiffs' Proposed Remedial Plan, the percentage of the two-party

vote for the Democratic candidate in District 1 was over 57% based on 2018 election

results.  Cooper Third Suppl. ¶ 5, Fig. 1.


January 25, 2019                                    Respectfully submitted,

                                                    */s/ Freda J. Levenson*, trial attorney
T. Alora Thomas-Lundborg                            Freda J. Levenson (0045916)
Dale E. Ho                                          David Carey
Theresa J. Lee                                      Elizabeth Bonham
Emily Rong Zhang                                    American Civil Liberties Union of Ohio Fdtn.
American Civil Liberties Union Foundation           4506 Chester Avenue
125 Broad Street, 18th Floor                        Cleveland, OH 44103
New York, NY 10004                                  Tel.: (216) 472-2220
Tel.: (212) 549-2500                                Facsimile: (216) 472-2210
athomas@aclu.org                                    flevenson@acluohio.org
dho@aclu.org                                        dcarey@acluohio.org
tlee@aclu.org                                       ebonham@acluohio.org
erzhang@aclu.org

Robert Fram                                         Michael Baker
Nitin Subhedar                                      Perrin Cooke
Jeremy Goldstein                                    Peter Rechter
Alexia Romero                                       Robert Day
Covington & Burling LLP                             Covington & Burling LLP
One Front Street                                    850 Tenth Street, NW
San Francisco, CA 94111                             Washington, DC 20001
Tel.: (415) 591-6000                                Tel.: (202) 662-6000
rfram@cov.com                                       mbaker@cov.com

nsubhedar@cov.com
jgoldstein@cov.com
aromero@cov.com

pcooke@cov.com
prechter@cov.com
rday@cov.com

Kyunghoon John Woo**
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel.: (424) 332-4800
jwoo@cov.com

*Attorneys for Plaintiffs*