UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*, | ) ) ) | |
| **Plaintiffs,** | ) ) | No. 1:18-cv-00357 |
| v. | ) ) | ORDER DENYING MOTION FOR |
| LARRY HOUSEHOLDER, *et al.*, | ) ) | PROTECTIVE ORDER AND GRANTING IN PART |
| **Defendants.** | ) ) ) ) ) | MOTION TO LIMIT THE SCOPE OF THE DEPOSITION |

**Before: Moore, Circuit Judge, Black and Watson, District Judges.**

This case is before the Court on the Republican National Committee ("RNC"), the National Republican Congressional Committee ("NRCC"), and Adam Kincaid's Emergency Motion for Protective Order.[1] They request a protective order halting Kincaid's deposition, or alternatively, an order limiting the scope of the deposition to questions specific to Ohio redistricting. We **DENY** the motion for a protective order. However, we **GRANT** in part the motion to limit the scope of the deposition to questions that pertain in any way to the redistricting process in Ohio.

---

[1] Although the RNC, NRCC, and Kincaid together style themselves as "Movants" in seeking the protective order, Kincaid is the only movant whose compliance for his deposition is sought by the Plaintiffs and who would be directly impacted by our grant or denial of the motion for a protective order. Doc. 165 (Kincaid's Mot. for Protective Order at 1–2) (Page ID #7366–67). As Kincaid himself is one of the three Movants seeking the protective order, we only note this fact and need not decide its import.

1

## I. BACKGROUND

Adam Kincaid is the current executive director of the National Republican Redistricting Trust ("NRRT") and Fair Lines America. He avers that "NRRT was established in September 2017 to act as a hub for the coordination and collaboration of 2020 redistricting efforts for the Republican Party." Doc. 165-1 (Kincaid Suppl. Aff. at 2) (Page ID #7384). From 2011 to 2012, Kincaid worked as the Redistricting Coordinator at the NRCC. *Id*. Kincaid avers that "the NRCC's primary function is to help elect Republicans to the House of Representatives." *Id.* at 3 (Page ID #7385). The Plaintiffs allege and point to documents that indicate that Kincaid was closely involved in the process of developing the Ohio congressional district maps that were adopted in 2011, and which they challenge as an unconstitutional partisan gerrymander in the instant suit.

Kincaid was previously deposed on December 4, 2018. During that deposition, Kincaid refused to answer a significant number of questions, claiming that various privileges, including the First Amendment privilege, protected him from having to answer. *See* Doc. 183-8 (Kincaid Dec. 4, 2018 Dep. Tr.) (Page ID #10776). The Plaintiffs also subpoenaed Kincaid, the RNC, and the NRCC to produce documents pertaining to this litigation. Kincaid asserted the First Amendment privilege, attorney-client privilege, and work-product protection over many of the documents. The Plaintiffs moved to compel Kincaid to produce the documents, and this Court determined that Kincaid had not sufficiently established that any privilege protected the documents from disclosure and ordered them produced in its December 21, 2018 Order. Doc. 128 (Order Granting Pl. Mot. to Compel Compliance) (Page ID #3465). Kincaid filed an interlocutory appeal in the Sixth Circuit, seeking review of this decision. Doc. 130 (Notice of Appeal) (Page ID #3502). During a January 15, 2019 status conference, this Court ordered

2

Kincaid to appear for his scheduled January 17, 2019 reopened deposition. Doc. 142 (Jan. 15, 2019 Status Conf. Tr. at 9) (Page ID #4619). Kincaid informed the Court that he would not appear at the January 17 deposition and was prepared to suffer contempt. *Id.* at 7, 11 (Page ID #4617, 4621). The Sixth Circuit dismissed the appeal for lack of jurisdiction on the following day, January 18, 2019. *Ohio A. Philip Randolph Institute, et al. v. Larose, et al.*, No. 18-4258 (6th Cir. Jan 18, 2019). Kincaid and the other movants have since produced documents and thus appear to have complied with the Court's prior Order in that regard.

The parties rescheduled the reopened Kincaid deposition for January 31, 2019. Kincaid claims that he has filed the present Motion for a Protective Order to preserve his appellate rights on the First Amendment privilege issue given the Sixth Circuit's comments that Kincaid's failure to file such a motion precluded its review of the issue. *See* Doc. 165 (Kincaid Mot. for Protective Order at 2 n.1) (Page ID #7367) ("The RNC, NRCC, and Kincaid otherwise file this motion to preserve their appellate rights *after this Court issues a final order* in the case.") (emphasis added). The Plaintiffs assert that Kincaid has made representations that he will not take an interlocutory appeal of this Court's decision regarding the First Amendment privilege and its implications for his scheduled January 31 deposition.

Our December 21, 2018 Order Granting Plaintiffs' Motion to Compel Compliance with Subpoenas Served on the RNC, NRCC, and Kincaid discussed the First Amendment privilege and its application to various subpoenaed documents over which the Movants asserted the privilege. *See* Doc. 128 (Order Granting Pl. Mot. to Compel Compliance at 6–12) (Page ID #3470–76). We return to that analysis here in the context of Kincaid's assertion of the privilege to preclude his own testimony.

3

## II. FIRST AMENDMENT PRIVILEGE

*NAACP v. Alabama* is the foundational case for the First Amendment privilege asserted by Kincaid. 357 U.S. 449 (1958). In the context of the burgeoning Civil Rights Movement in the segregated South, the State of Alabama sued the NAACP's Alabama branch for acting as an organization in the state without having complied with the state's registration and authorization procedures. *Id*. at 451–53. Alabama sought to compel the NAACP to disclose its list of members, explaining that it needed the member list in order to "determine whether [the NAACP] was conducting intrastate business in violation of the Alabama foreign corporation registration statute." *Id*. at 464. The Supreme Court saw no reason as to why the member lists were necessary to establish this element of Alabama's claim. *Id*. at 464–65. The Court weighed Alabama's proffered justification against the impairment of First Amendment rights that the NAACP would suffer if required to disclose their member lists. The NAACP had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members ha[d] exposed th[o]se members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id*. at 462. The Court concluded that disclosure of the list was

> likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs . . . in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

*Id.* at 462–63. The Court also noted that the NAACP had substantially complied with most other components of the order; the member list was the only request that it continued to resist. *Id*. at 465–66. Balancing the need for disclosure against the threat to First Amendment rights, the

Court overturned the judgment of civil contempt that had resulted from the NAACP's noncompliance. *Id*. at 466.

In *Marshall v. Bramer*, the Sixth Circuit considered the plaintiffs' motion to compel a non-party to produce a list of the names of his fellow members of the local Ku Klux Klan ("KKK") in order to gain insight into who might have firebombed plaintiffs' house. 828 F.2d 355, 358 (6th Cir. 1987). First, the Sixth Circuit distinguished *Marshall* from *NAACP* because a private litigant rather than a state actor was seeking the membership list.[2] *Id*. at 360. Second, the Sixth Circuit highlighted that the protective order under which the list would be produced would significantly minimize any potential harm to the KKK's membership, noting that the contemplated disclosure in *NAACP* had been public. *Id*. Balancing these factors, the Sixth Circuit held that disclosure of the membership list was appropriate. *Id*.

In *Black Panther Party v. Smith*, the D.C. Circuit also used a "balancing inquiry" to evaluate the assertion of a claim of First Amendment privilege. 661 F.2d 1243, 1266 (D.C. Cir. 1981), *judgment vacated*, 458 U.S. 118 (1982). The Black Panther Party, which had sued various government officials, asserted the First Amendment privilege in refusing to respond to the government's discovery requests seeking lists of Black Panther Party members who were not already publicly associated with the Party. *Id*. at 1264. The D.C. Circuit held that one party's "First Amendment claim should be measured against [the other party's] need for the information sought." *Id*. at 1266. The court counseled that "[t]he need for First Amendment protection should be carefully scrutinized. . . . The argument in favor of upholding the claim of privilege will ordinarily grow stronger as the danger to rights of expression and association increases." *Id*. at 1267. The court noted that the party asserting the privilege "need not prove to a certainty that

---

[2] In *Perry v. Schwarzenegger*, however, the Ninth Circuit asserted that it made no difference whether the party seeking disclosure was a state actor or a private litigant. 591 F.3d 1147, 1160 n.5 (9th Cir. 2010).

5

its First Amendment rights will be chilled by disclosure," but rather demonstrate "that there is some probability that disclosure will lead to reprisal or harassment." *Id*. at 1267–68. Such reprisals and harassment might include "economical reprisal, loss of employment, threat of physical coercion, and other manifestations of physical hostility." *Id*. at 1268 n.148 (quoting *NAACP*, 357 U.S. at 462). The court also evaluated the other party's need for the information: whether the party "[m]ere[ly] speculat[es] that information might be useful" or the information "goes to 'the heart of the matter'" and "whether the litigants seeking disclosure have pursued alternative sources" for the information. *Id*. at 1268. After discussing the factors to be balanced, the D.C. Circuit concluded that the district court had conducted insufficient analysis of these factors and remanded the issue to the district court. *Id*. at 1269–70.

The Ninth Circuit adopted a more rigid balancing test for evaluating the applicability of the First Amendment privilege in *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010). Unlike in *NAACP*, *Marshall*, and *Black Panther Party*, the party asserting the First Amendment privilege in *Perry* did not seek to protect only the identities of an organization's previously undisclosed members. In assessing the privilege, the Ninth Circuit stated that "the party asserting the privilege must demonstrate . . . a prima facie showing of arguable first amendment infringement." *Perry*, 591 F.3d at 1160 (internal quotation marks omitted). To do so, the party opposing disclosure must "demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Id*. (internal quotation marks and brackets omitted). However, "[a] protective order limiting the dissemination of disclosed associational information may mitigate the chilling effect and could weigh against a showing of infringement." *Id*. at 1160 n.6.

6

Under the Ninth Circuit's test, once the prima facie showing is made, the burden shifts to the party seeking disclosure, who must demonstrate that its interest in disclosure is sufficiently strong to justify infringing on the other party's First Amendment rights. *Id*. at 1161. The Ninth Circuit requires a showing "that the information sought is highly relevant to the claims or defenses in the litigation" and "[t]he request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable." *Id*. The Ninth Circuit suggests that in its balancing, the court consider "the importance of the litigation, the centrality of the information sought to the issues in the case, the existence of less intrusive means of obtaining the information, and the substantiality of the First Amendment interests at stake." *Id*. (citations omitted).

In *Tree of Life Christian Schools v. City of Upper Arlington*, a district court opinion from within the Sixth Circuit, the defendant (a state actor) moved to compel Tree of Life's disclosure of its biggest donor, who had pledged millions of dollars for the construction of a school with the condition that he remain anonymous. 2012 U.S. Dist. LEXIS 32205 (S.D. Ohio 2012), at *2. The defendant sought the anonymous donor's identity to be able to depose the donor about his ability to pay the pledged amount and whether he would go through with the donation if the school were relocated, which the defendant's actions had made necessary. *Id*. at *3. These lines of questioning sought to develop *possible* theories that *might* undermine an element of the plaintiff's claim. *Id*. The district court ruled that the possible chilling effect that disclosure might have on the plaintiff, the donor, and potential future donors overcame the defendant's interest in disclosure of the donor's identity. The interest in disclosure was based on the defendant's pure speculation and sought information that was not "crucial" to defendant's case. *Id*. at *11.

7

### III. DISCUSSION

*A. First Amendment Interest*

Kincaid asserts that his associational rights will be harmed by being forced to testify at a deposition. He asserts that "if [he] were required to disclose [his] mental impressions and communications to the Plaintiffs, it would both drastically and adversely affect how [he] communicate[s] internally in the future . . . with the NRCC, as well as NRRT, and Fair Lines America." Doc. 165-1 (Kincaid Suppl. Aff. at 3) (Page ID #7385).

Conducting the balancing prescribed in *NAACP* and partly drawing from the Ninth and D.C. Circuits' cases, we first examine the asserted speech-chilling threat posed by disclosure. Although *NAACP*, *Marshall*, *Black Panther Party*, and *Tree of Life* consider the speech and association chilling effects of the disclosure of membership or donor lists, *Perry* expands that analysis to encompass the disclosure of internal communications.

We conclude that Kincaid has not demonstrated any threat that participating in the deposition would subject him to retaliation or harassment of the type contemplated by *NAACP*. *See NAACP*, 357 U.S. at 462–63. The chilling effect threatened by requiring Kincaid's deposition is considerably less substantial than that in *NAACP*, *Black Panther Party*, and *Perry*. In *NAACP*, disclosure would have meant the public revelation of the names of Civil Rights activists in Alabama in the mid-1950s. The Supreme Court's opinion notes that the chilling effect was of special concern because members of the NAACP were voicing then-unpopular views. *Id*. at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."); *see also Black Panther Party,* 661 F.2d at 1265 ("Privacy is particularly important where the group's cause is unpopular; once the participants lose their anonymity,

intimidation and suppression may follow.") Record evidence established that those known to be NAACP members had been subjected to threats, economic retribution, and violence. The disclosure of membership lists would have exposed some who previously had no outward association with the NAACP.

Here, however, Kincaid was employed as and publicly acknowledged as a Republican working toward the election of other Republicans through redistricting efforts. His deposition testimony will not associate him with an organization with which he previously had no public ties. We also find it difficult to believe that efforts by the Republican Party (or any Party for that matter) to control redistricting will truly be chilled in the sense required by *NAACP* by mandating that someone who had an influence on the drawing of the map at issue must answer questions pertaining to the redistricting at a deposition. The political parties have an acute interest in influencing the district maps, and this is not a situation in which "without [the] privacy [provided by the First Amendment privilege], there is a chance that there may be no association and, consequently, no expression of the ideas that association helps to foster." *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 479 (10th Cir. 2011). Moreover, Kincaid has not expressed any concern that his deposition might subject him to harassment or retaliation— the kinds of chilling effects with which the First Amendment privilege doctrine is primarily concerned. His affidavit, the sole piece of evidence offered to support his claim of a chilling effect, offers only conclusory speculations that the requirement that he testify would chill the associations' speech. *See id.* at 491–92 (questioning the sufficiency of the single affidavit submitted as evidence of the First Amendment chill threatened). Finally, to be clear: this case does not concern a First Amendment privilege over the private communications between national political parties' operatives to assist their members in crafting campaign messaging and strategy.

9

*Cf. Perry*, 591 F.3d at 1152–53.  We express no opinion on the potential First Amendment implications of a situation in which that kind of information is sought.

It is possible that requiring Kincaid to disclose internal communications might cause him and members of his organizations to be more cautious about candidly expressing their thoughts and plans.  "[C]hilling participation and [ ] muting the internal exchange of ideas" could conceivably result from denying Kincaid's motion for a protective order; he has therefore established that his First Amendment interests are arguably implicated to some extent.  *See Perry*, 591 F.3d at 1163.  But we note again what exactly is at issue here:  communications and deposition testimony related to the process of and factors involved in drawing the district lines themselves, which are centrally at issue in this case, not purely internal communications about a candidate's campaign strategy and the like.

We further note that the concept of the "association" whose First Amendment rights Kincaid's motion seeks to protect goes far beyond that seen in the relevant caselaw.  Kincaid's affidavit asserts that he believes that his deposition would damage NRRT and Fair Lines America's abilities to hire and retain data analysts and will hinder "full and honest discussion within the NRCC, NRRT, and Fair Lines America about redistricting."  Doc. 165-1 (Kincaid Suppl. Aff. at 3) (Page ID #7385).  Although Kincaid, an individual, is the party resisting a deposition, he argues that his deposition would damage the First Amendment interests of a sprawling set of organizations—the NRCC, the NRRT, and Fair Lines America.  Doc. 165-1 (Kincaid Suppl. Aff. at 3–5) (Page ID #7385–86).  Kincaid does not even assert that he had a relationship with NRRT or Fair Lines America during the time period relevant to this litigation.  *See* Doc. 165-1 (Kincaid Suppl. Aff. at 2–3) (Page ID #7384–85).

In *NAACP*, the NAACP sought to protect its own membership lists. In *Marshall*, a member of the KKK sought to protect the membership list of his KKK chapter. In *Tree of Life,* a school sought to protect its own donor list. In *Perry*, "the official proponents of Proposition 8 and the official Proposition 8 campaign committee" sought to protect their own "internal campaign communications relating to campaign strategy and advertising." *Perry*, 591 F.3d at 1152–53. However, in footnote twelve of *Perry*, the Ninth Circuit emphasized that the First Amendment privilege protected only "private, internal campaign communications concerning the formulation of campaign strategy and messages . . . among the core group of persons engaged in the formulation of campaign strategy and messages" and "[l]eft it to the district court . . . to determine the persons who logically should be included in light of the First Amendment associational interests the privilege is intended to protect." *Perry*, 591 F.3d at 1165 n.12 (emphasis omitted); *but see AFL-CIO v. FEC*, 333 F.3d 168, 175–78 (D.C. Cir. 2003) (conceptualizing an arguably broader First Amendment associational privilege in the context of evaluating the constitutionality of an FEC regulation that provided for public disclosure of thousands of pages of investigatory files).

Kincaid's assertion of the First Amendment privilege to protect internal communications and hiring prospects of three organizations in their entirety—the NRCC, NRRT and Fair Lines America—goes far beyond the precedent established in *Perry*. First, Kincaid attempts to assert First Amendment associational privilege over his own "mental impressions." Kincaid has cited no precedent that extends the First Amendment associational privilege to personal mental impressions, and we do not see how preventing him from testifying about his mental impressions protects his associational rights or those of the three organizations he mentions. Second, Kincaid does not attempt to shield from disclosure testimony about his communications with a "core

11

group of persons" engaged in the relevant redistricting activity. *Perry*, 591 F.3d at 1165 n.12. Rather, he casts his threatened associational rights quite broadly—bringing within them the rights of three organizations. Finally, the information likely to be sought in Kincaid's deposition differs considerably from that protected in *Perry*. Kincaid's testimony would likely not be so much about substantive political campaign messaging (the campaign playbook), but instead will likely relate or pertain to the formulation of the districts in which subsequent campaigns will take place (the setting of the playing field). These two types of communications could be considered distinct: the former is possibly internal speech that could be chilled, the latter concerns a task that the Ohio Legislature is obligated to undertake (subject to constitutional constraints) and ultimately results in a public law passed by the Legislature and signed by the Governor.

  B. *Interest in Disclosure*

Having identified Kincaid's First Amendment interest (albeit insubstantial) in preserving the confidentiality of certain information, this Court must turn to evaluate and balance the Plaintiffs' interest in his testimony. The Plaintiffs argue that the information sought is central to the claims litigated in the suit. They must ultimately prove that the defendants acted with partisan intent in drawing the Ohio maps in question. *Davis v. Bandemer*, 478 U.S. 109, 127 (1986); *Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) (Kagan, J., concurring). The Plaintiffs argue that the Ohio legislators worked closely with Kincaid in drawing the maps and assert that Kincaid actually took the lead in the map-drawing. They specifically assert that Kincaid was one of the "primary draftsmen on the Ohio congressional map." Case No. 1:18-mc-00031, Doc. 14 (Reply Mem. in Supp. of Mot. to Compel at 8). The Plaintiffs point to various documents supporting their assertion that Kincaid was involved in designing and analyzing the Ohio

12

congressional district maps. Doc. 183 (Pl. Opp. to Mot. for Protective Order at 8) (Page ID #10715).

Kincaid counters that he "had minimal communications with members of the Ohio legislative staff" and that "[t]o the best of [his] recollection, [he] never communicated with a member of the Ohio Legislature in any format." Doc. 165-1 (Kincaid Suppl. Aff. at 3) (Page ID #7385). He argues that "[t]he vast majority of [his] conversations were with members of the Ohio Republican Congressional Delegation and internal to the NRCC and RNC themselves." Doc. 165 (Kincaid Mot. for Protective Order at 13) (Page ID #7378).

Among other things, Plaintiffs are entitled to probe what Kincaid means by "minimal" and to inquire about the communications that Kincaid did have with the Ohio legislative staff and officials. We are unpersuaded by Kincaid's assertion that "[t]he Plaintiffs *allege* that the national Republicans drew the map. This allegation is not the same as the *claim* that the Plaintiffs must prove, which is that their First and Fourteenth Amendment rights were violated by the *state government*." Doc. 165 (Kincaid Mot. for Protective Order at 13) (Page ID #7378). The "state government" would not be excused from potential constitutional violations simply because it asked the national Republicans to take care of the heavy lifting. And it is true that the Plaintiffs *allege* that the national Republicans drew the map—at trial they will likely attempt to prove this key piece of their claim using information gathered during Kincaid's deposition.

The mere fact that "[t]he vast majority of [Kincaid's] conversations were with members of the Ohio Republican Congressional Delegation and internal to the NRCC and RNC themselves" is not dispositive. If, for example, the Plaintiffs sought to question Kincaid about a conversation that he had with another NRCC employee, directing that employee what to tell members of the Ohio legislative staff about how to draw the map to maximize Republican

13

success, that would be a conversation internal to the NRCC. However, it would be highly relevant to an element of the Plaintiffs' claim. To the extent that Kincaid might have engaged in internal conversations that had *nothing* to do with redistricting in Ohio, such conversations appear to be irrelevant to this lawsuit. The Plaintiffs' interest in such conversations is clearly outweighed, and requiring Kincaid to testify about such topics would be improper. We will further discuss this below when addressing Kincaid's motion in the alternative to limit the scope of Kincaid's deposition.

The Plaintiffs also assert that they have satisfied their obligation first to consult and exhaust other sources from which the same information could be attained prior to seeking disclosure that arguably treads on Kincaid's First Amendment rights. They have deposed other parties who are alleged to have worked in concert with Kincaid on the Ohio redistricting, but those depositions did not produce the pertinent information. The Plaintiffs claim that the newly produced documents indicate that Kincaid worked closely with Dr. Thomas Hofeller in drawing the Ohio maps; Hofeller has since died and, therefore, cannot be deposed. We conclude that the Plaintiffs have sufficiently demonstrated that they have attempted to procure the desired information from other sources prior to seeking the deposition that may impact Kincaid's First Amendment rights.

## IV. SCOPE OF THE DEPOSITION

Although the deposition will go forward as scheduled, we grant in part Kincaid's request to limit its scope. This limitation follows naturally from the First Amendment balancing just discussed. Where certain information is not central or highly relevant to the Plaintiffs' claims, the Plaintiffs have a lesser interest in disclosure that does not weigh as heavily against any First Amendment interest that Kincaid might have.

Kincaid requests that the Plaintiffs be prohibited from "ask[ing] questions about the RNC's, NRCC's, and Kincaid's communications and impressions regarding redistricting *generally*." Doc. 165 (Kincaid Mot. for Protective Order at 15) (Page ID #7380) (emphasis added). The litigation concerns the redistricting process in Ohio. The deposition of Kincaid should center on issues related to proving the various elements of specific claims at issue in this case—understanding Kincaid and his associates' roles in designing, drafting, directing, consulting on, or in any way influencing the congressional district maps in Ohio. That said, we warn the parties not to parse this limitation too finely. General conversations may be highly relevant to redistricting in Ohio. A conversation or mental impression is not out of bounds merely because it was not "to or about the Ohio state *legislative apparatus*" as narrowly construed, for example. *Id*. at 13 (Page ID #7378). Furthermore, simply because certain conversations or mental impressions encompassed efforts involving both Ohio and other states together does not mean they are not appropriate for exploration at this deposition.

Finally, we note that this Court imposed essentially the same limitation in its prior Order that compelled the production of various documents from the Movants (including Kincaid). *See* Doc. 128 (Order Granting Pl. Mot. to Compel Compliance) (Page ID #3482) (requiring the production of documents "to the extent such documents are relevant to Ohio's redistricting (or fundraising for the same)."). Importantly, the Movants appear to have complied with that Order. Now the Plaintiffs sensibly seek to question Kincaid partly about the additional information gleaned from that production.

## V. CONCLUSION

For the above reasons, we **DENY** Kincaid's Motion for a Protective Order and **GRANT** in part his motion to limit the scope of the January 31, 2019 deposition.

**IT IS SO ORDERED.**

Date:   1/30/2019                             */s/ Timothy S. Black*
                                                                      Timothy S. Black
                                                                      United States District Judge

                                                                      */s/ Karen Nelson Moore*
                                                                      Karen Nelson Moore
                                                                      United States Circuit Judge

                                                                      */s/ Michael H. Watson*
                                                                      Michael H. Watson
                                                                      United States District Judge