# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*, | ) ) | No. 1:18-cv-357 |
| | ) | |
| **Plaintiffs,** | ) | ORDER DENYING MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| v. | ) | |
| | ) | |
| LARRY HOUSEHOLDER,[1] *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**Before: Moore, Circuit Judge; Black and Watson, District Judges.**

On August 15, 2018, this Court denied the Defendants' motion to dismiss the Plaintiffs' Second Amended Complaint (Dkt. 37). *See Ohio A. Philip Randolph Inst. v. Smith* ("*OAPRI*"), 335 F. Supp. 3d 988 (S.D. Ohio 2018). The case has then proceeded through discovery. On January 8, 2019, the Defendants moved for summary judgment and filed a brief in support of their motion. Dkt. 136 (Mot. for Summ. J.). The Intervenors joined that motion and filed their own supplemental brief. Dkt. 140, 140-1 (Intervenors' Suppl. Mot. for Summ. J. & Mem.). The Plaintiffs filed a response. Dkt. 177 (Pls.' Opp'n to Summ. J.). Then the Defendants and Intervenors each filed a reply, completing the briefing. Dkt. 190 (Defs.' Reply); Dkt. 189 (Intervenors' Reply). For the reasons that follow, we **DENY** the motion for summary judgment.

## I.     BACKGROUND

The Plaintiffs in this litigation include seventeen individual Ohio residents and five organizations based in Ohio. The individual Plaintiffs are Linda Goldenhar, Douglas Burks, Sarah

---

[1] Mr. Householder became the Speaker of the Ohio House of Representatives on January 7, 2019 and has been substituted for Ryan Smith as a Defendant. *See* FED. R. CIV. P. 25(d); *see also* Dkt. Notation Order of 2/11/2019.

Inskeep, Cynthia Libster, Kathryn Deitsch, LuAnn Boothe, Mark John Griffiths, Lawrence Nadler, Chitra Walker, Tristan Rader, Ria Megnin, Andrew Harris, Aaron Dagres, Elizabeth Myer, Beth Hutton, Teresa Thobaben, and Constance Rubin.  All the individual Plaintiffs affiliate with the Democratic Party and vote for Democratic candidates.  The organizational Plaintiffs, which include nonpartisan groups as well as groups affiliated with the Democratic Party, are:  the Ohio A. Philip Randolph Institute ("OAPRI"), the League of Women Voters of Ohio ("LWVO"), The Ohio State University College Democrats ("OSU College Democrats"), the Northeast Ohio Young Black Democrats ("NEOYBD"), and the Hamilton County Young Democrats ("HCYD").

Under Ohio law, the State General Assembly has the primary authority for drawing the State's U.S. congressional districts.  A bipartisan "legislative task force on redistricting, reapportionment, and demographic research" ("Task Force") has the role of advising the General Assembly in this task.  *See* OHIO REV. CODE § 103.51.  A version of the 2012 redistricting plan (the plan at issue here) first passed as H.B. 319.  Later, that bill was updated slightly in H.B. 369.  H.B. 369 passed both houses of the General Assembly, and Governor Kasich signed the bill into law on December 15, 2011.  The map approved in H.B. 369 has been used in the 2012, 2014, 2016, and 2018 elections of U.S. congressional representatives from Ohio.

The Plaintiffs allege that the bipartisan Task Force did not actually draw the 2012 map.  Rather, according to the Plaintiffs, the 2012 redistricting plan was drawn by both state-level and national Republican operatives.  These operatives and other Republican staffers conducted much of the map drawing in a hotel room in the Columbus DoubleTree Hotel that was converted into an office, which they called the "Bunker," from July 2011 to October 2011.  These individuals analyzed different versions of the map for their likely partisan outcomes based on indices created from historical election data.  The Plaintiffs maintain that "Ohio's congressional districts were

drawn for the purpose of locking in a Republican supermajority impervious to normal electoral swings." Dkt. 177 (Pls.' Opp'n to Summ. J. at 1) (Page ID #8277). Specifically, the districts were drawn so that Ohio would consistently elect twelve Republican representatives and four Democratic representatives (and, in fact, such results have been accomplished in every election held under the 2012 redistricting plan). At trial, the Plaintiffs aim to support their version of the facts, and thus their claims, through a combination of lay witness testimony, documentary evidence, expert testimony and reports, and an alternative map called the Proposed Remedial Plan. In their opposition to the motion for summary judgment, the Plaintiffs point to specific pieces of record evidence that support their allegations. At this stage, we draw reasonable inferences from this evidence in the Plaintiffs' favor, but we form no opinion on the credibility or weight of the evidence.

The Defendants and Intervenors, in turn, either entirely dispute the facts and evidence offered by the Plaintiffs or contest their relevance. The Defendants and Intervenors move for summary judgment, raising two arguments: (1) the Plaintiffs' claims are nonjusticiable; and (2) the Plaintiffs have failed to produce sufficient evidence to establish standing, an argument that, at times, seems to blend with an argument against the Plaintiffs' claims on the merits. Dkt. 136 (Mot. for Summ. J. at 1) (Page ID #3546). The Intervenors focus their supplemental brief on the issue of justiciability. Dkt. 140-1 (Intervenors' Suppl. Mem. at 1) (Page ID #4590).

## II.    ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the

nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). At this stage, the Court draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). If, after reviewing the record as a whole, "a rational trier of fact [could] find for the non-moving party," then there is a genuine issue for trial. *Id.* at 587. But if a trier of fact could not find for the nonmoving party, or if the nonmoving party cannot show more than "some metaphysical doubt as to the material facts[,]" then there is no genuine issue for trial and the moving party is entitled to judgment as a matter of law. *Id.* at 586–87.

## A.  Justiciability & The Substantive Standards

The Supreme Court has recognized that partisan gerrymandering is incompatible with democratic principles. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015); *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality); *Vieth*, 541 U.S. at 316 (Kennedy, J., concurring in the judgment); *see also id.* at 331 (Stevens, J., dissenting) ("The problem, simply put, is that the will of the cartographers rather than the will of the people will govern."); *id.* at 345–46 (Souter, J., dissenting) ("[T]he increasing efficiency of partisan redistricting has damaged the democratic process to a degree that our predecessors only began to imagine.") (collecting sources); *id.* at 355 (Breyer, J., dissenting) ("Sometimes purely political 'gerrymandering' will fail to advance any plausible democratic objective while simultaneously threatening serious democratic harm."). As the Supreme Court has stated, "the core principle of republican government [is] that the voters should choose their representatives, not the other way around." *Ariz. State Legislature*, 135 S. Ct. at 2677 (quoting Mitchell Berman, *Managing Gerrymandering*, 83 TEX. L. REV. 781 (2005)); *see also Powell v. McCormack*, 395 U.S. 486, 547 (1969) ("A fundamental principle of our representative democracy is, in Hamilton's words, 'that

the people should choose whom they please to govern them.'") (citation omitted). Partisan gerrymandering goes against these foundational principles. The issue raised in the motion for summary judgment is whether the courts have a role in adjudicating challenges to such alleged partisan gerrymanders.

The Supreme Court has held that partisan gerrymandering claims are justiciable. *Davis v. Bandemer*, 478 U.S. 109, 125 (1986). In *Bandemer*, the Supreme Court considered an allegation that "Indiana Republicans had gerrymandered Indiana's legislative districts 'to favor Republican incumbents and candidates and to disadvantage Democratic voters' through what the plaintiffs called the 'stacking' (packing) and 'splitting' (cracking) of Democrats." *Gill v. Whitford*, 138 S. Ct. 1916, 1927 (2018). Drawing on racial gerrymandering doctrine as well as one-person, one-vote ("OPOV") equal protection cases, the *Bandemer* majority held that the partisan gerrymander case before it did *not* present a non-justiciable political question. *Bandemer*, 478 U.S. at 122–25; *see also Vieth*, 541 U.S. at 310 (Kennedy, J., concurring in the judgment) ("Our willingness to enter the political thicket of the apportionment process with respect to one-person, one-vote claims makes it particularly difficult to justify a categorical refusal to entertain claims against [partisan] gerrymandering."). The Supreme Court, importantly, has not overturned *Bandemer*'s central holding. *See Gill*, 138 S. Ct. at 1927–29 (reviewing post-*Bandemer* cases).

In *Bandemer*, however, the Supreme Court did not "settle on a standard for what constitutes an unconstitutional partisan gerrymander." *See Gill*, 138 S. Ct. at 1927. Indeed, a majority of the Supreme Court has not yet settled on an appropriate standard for these claims, though various plaintiffs and amici have pressed for several theories at the Court in the years since *Bandemer*. *See id.* at 1926–29 (discussing partisan gerrymandering precedent); *see also* Samuel Issacharoff & Pamela Karlan, *Where to Draw the Line?: Judicial Review of Political Gerrymanders*, 153 U. PA.

L. Rev. 541, 541–43 (2004). While *Bandemer* is partisan gerrymandering's *Baker v. Carr*, 369

U.S. 186, 209 (1962) (holding that malapportionment claims are justiciable), such claims do not

yet have their *Reynolds v. Sims*, 377 U.S. 533, 568 (1964) (articulating what is now known as the

one-person, one-vote principle ("OPOV") for state legislative redistricting); *see also Wesberry v.

Sanders*, 376 U.S. 1, 7–8 (1964) (same for congressional redistricting).

One concern about allowing courts to adjudicate partisan gerrymandering claims is that the

courts would be "dictat[ing] political winners." *See, e.g.*, Dkt. 136 (Defs.' Mot. for Summ. J. at

18) (Page ID #3563). For now, we have two responses. First, the fact is that courts are already

hearing these types of cases through OPOV challenges, *see infra* footnote 3, and racial

gerrymandering cases, *see, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017) ("[P]olitical and

racial reasons are capable of yielding similar oddities in a district's boundaries. That is because,

of course, 'racial identification is highly correlated with political affiliation.'" (quoting *Easley v.

Cromartie*, 532 U.S. 234, 243 (2001))). It makes more sense for the legal system to address what

the Plaintiffs argue is actually wrong: that sometimes a district (or an entire map) is antidemocratic

because of the partisan intent and effect. Second, as mentioned, the core concern about partisan

gerrymandering is that representatives choose their voters and not vice-versa—that is, when

partisan gerrymandering amounts to a constitutional violation, the winners and losers are often

already predetermined by those in power. *Cf. Gill*, 138 S. Ct. at 1941 (Kagan, J., concurring)

(explaining that, with the advance of technology, "[g]errymanders have . . . become ever more

extreme and durable, insulating officeholders against all but the most titanic shifts in the political

tides."). Rather than dictating outcomes in these cases, courts are only fixing *the process* by which

voters enact political change. *See* John Hart Ely, Democracy and Distrust 102–03 (1980)

(explaining that in our system of government "[m]alfunction occurs when . . . the ins are choking

off the channels of political change to ensure that they will stay in and the outs will stay out," and that judges "are conspicuously well situated" to correct such malfunction). If courts find a constitutional violation and fix it, then *the voters* pick the winners and losers in districts that adhere to the Constitution.

Moreover, in *Vieth*, four justices thought that the Supreme Court's and the lower courts' inability to shape a substantive standard counseled against the justiciability of partisan gerrymandering claims. *Vieth*, 541 U.S. at 278–79 (plurality). Indeed, the *Vieth* plurality focused its discussion on *Baker v. Carr*'s lack of a manageable-standard test to support its conclusion. *See id.* at 277–78. Our discussion that follows will show that lower courts have since shaped such standards.

As we previously stated, "the thread that runs through [the Supreme Court's] cases is that [partisan gerrymandering claims] may be justiciable if there is a 'justiciable standard by which to resolve the plaintiffs' . . . claims.'" *OAPRI*, 335 F. Supp. at 995 (quoting *Gill*, 138 S. Ct. at 1928). In the absence of direction from the Supreme Court, federal district court panels[2] have established justiciable standards. *See, e.g.*, *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 860–68 (M.D.N.C. 2018) (establishing the elements of an equal protection partisan gerrymandering claim as (1) discriminatory intent, (2) discriminatory effect, and (3) the lack of a legitimate justification or neutral explanation), *appeal docketed* No. 18-422, --- S. Ct. ---, 2019 WL 98539 (Jan. 4, 2019); *id.* at 929 (requiring that, for a First Amendment partisan gerrymandering claim, plaintiffs prove "(1) that the challenged districting plan was intended to burden individuals or entities that support

---

[2] State Supreme Courts, too, have established judicially manageable standards by which to evaluate compliance with their own state constitutions. *See, e.g.*, *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018); *see also id.* at 816 (noting that the standards articulated "also comport with the minimum requirements for congressional districts guaranteed by the United States Constitution, as interpreted by the United States Supreme Court.") (citing *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964)).

a disfavored candidate or political party, (2) that the districting plan in fact burdened the political speech or associational rights of such individuals or entities, and (3) that a causal relationship existed between the governmental actor's discriminatory motivation and the First Amendment burdens imposed by the districting plan."); *Whitford v. Gill*, 218 F. Supp. 3d 837, 884 (W.D. Wis. 2016) ("[T]he First Amendment and the Equal Protection clause prohibit a redistricting scheme which (1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds."), *vacated and remanded*, 138 S. Ct. 1916 (2018); *Shapiro v. McManus*, 203 F. Supp. 3d 579, 596–97 (D. Md. 2016) (similarly requiring intent, injury, and causation to state First Amendment and Article I, § 2 partisan gerrymandering claims, and further noting that, "the State can still avoid liability by showing that its redistricting legislation was narrowly tailored to achieve a compelling government interest.").[3]

Thus, the federal courts that have adjudicated partisan gerrymandering claims have converged considerably on common ground in establishing standards for determining whether a

---

[3] *Cf. Larios v. Cox*, 300 F. Supp. 2d 1320, 1347–53 (N.D. Ga. 2004) (per curiam), *aff'd mem.*, 542 U.S. 947 (2004) (concluding that a state legislative plan violated one-person, one-vote ("OPOV"), relying on the fact that the plan protected only Democratic incumbents and pitted many Republican incumbents against each other and that "the defendant ha[d] not attempted to justify the population deviations because of compactness, contiguity, respecting the boundaries of political subdivisions, or preserving the cores of prior districts."); *Hulme v. Madison County*, 188 F. Supp. 2d 1041, 1047–52 (S.D. Ill. 2001) (concluding that a plan violated OPOV, similarly relying on evidence of excessive partisanship as the reason for a deviation of 9.3% and on the state's failure to offer another justification).

*Larios* and *Hulme*, which were Equal Protection OPOV claims (not pure partisan gerrymandering claims), thus represent examples of courts developing "a 'second-order' judicial check on partisan gerrymandering through the one person, one vote doctrine." Michael Kang, *Gerrymandering and the Constitutional Norm Against Government Partisanship*, 116 Mich. L. Rev. 351, 384 (2017). These cases, and others post-*Vieth*, demonstrate that when partisanship predominates, it is not a traditional districting criterion. *Id.* at 384–90; *see also Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1307 (2016) ("Appellants' basic claim is that deviations in their apportionment plan from absolute equality of population reflect the Commission's political efforts to help the Democratic Party. We believe that appellants failed to prove this claim because, as the district court concluded, the deviations predominantly reflected Commission efforts to achieve compliance with the federal Voting Rights Act, not to secure political advantage for one party. Appellants failed to show to the contrary."); *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 345 (4th Cir. 2016) ("Plaintiffs have proven that it is more probable than not that the population deviations at issue here reflect the predominance of a[n] illegitimate reapportionment factor—namely an intentional effort to create a significant . . . partisan advantage.") (internal quotations and citations omitted).

partisan gerrymander is unconstitutional. Namely, plaintiffs must show: (1) partisan intent, (2) partisan effect, and (3) must demonstrate causation or the lack of a legitimate justification for the challenged district's design. The prevailing difficulty in these cases seems to be evaluating partisan effect, or, in Justice Kennedy's words, "how much partisan dominance is too much." *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 420 (2006) (Kennedy, J.); *see also Vieth*, 541 U.S. at 344 (Souter, J., dissenting). In short, although courts have established general justiciable legal frameworks for partisan gerrymandering, courts also need evidentiary metrics that determine when partisan considerations and effects become too extreme and thereby cross a constitutional line—that is, to help determine "how much is too much."

Here, the Plaintiffs propose various tests that are essentially the same as those adopted by other three-judge panels. We will address each test in turn, followed by the evidentiary metrics that the Plaintiffs offer to support their claims.

### 1. Fourteenth Amendment Claims

For their equal-protection claim, the Plaintiffs propose a three-pronged standard:

> (1) whether the legislature acted with an improper legislative *intent* to discriminate in favor of the state's preferred political party by securing partisan advantage on its behalf, *i.e.*, whether intent to discriminate was a motivating factor and (2) whether the resulting map had an impermissible *effect* of entrenching partisan advantage against likely changes in voter preference. If these two elements are satisfied, then (3) the burden shifts to the state to demonstrate that the impairment of Equal Protection rights is necessary to advance legitimate state interests.

Dkt. 177 (Pls.' Opp'n to Summ. J. at 9) (Page ID #8285) (footnote omitted). The Plaintiffs note that their standard differs slightly from those adopted by some three-judge panels. Specifically, the Plaintiffs do not suggest the adoption of a "predominant purpose" standard—i.e., proof that the Defendants' alleged partisan intent was the predominant factor in determining the way that the district lines were drawn. Instead, they advocate for a "motivating factor" standard, which would merely require them to prove that partisan intent was one factor that influenced the Defendants'

drawing of the challenged districts. The Plaintiffs, however, argue that they could satisfy the "predominant purpose" standard, too, based on the record evidence. *Id.* at 9 n.2.

At trial, the Plaintiffs should prove their equal-protection claim by showing (1) a discriminatory partisan intent in the drawing of each district and (2) a discriminatory partisan effect on those allegedly gerrymandered districts' voters. Then (3) the State will have the opportunity to justify each district on other, legitimate legislative grounds. We reiterate that this equal-protection standard, to the extent that it is based on vote dilution, "is district specific." *See Gill*, 138 S. Ct. at 1930.

At this time, we do not need to choose between the "predominant purpose" and the "motivating factor" tests. We observe that district courts have not uniformly adopted one approach. *Compare League of Women Voters of Mich. v. Johnson*, --- F. Supp. 3d ---, No. 2:17-cv-14148, 2018 WL 6257476, at *15–16 (E.D. Mich. Nov. 30, 2018) (predominant purpose test), *and Rucho*, 318 F. Supp. 3d at 860–68 (same), *with Whitford v. Gill*, 218 F. Supp. 3d at 887 (motivating factor test). In prudence, the Plaintiffs should demonstrate at trial that partisanship was the predominant factor considered when the districts were drawn, and not rest on showing simply that partisanship was a motivating factor.

As to what satisfying discriminatory effect entails, we turn to *Gill* and *Arizona State Legislature* for guidance. *See Rucho*, 318 F. Supp. 3d at 866–67. In *Gill*, the Supreme Court noted that the harm of vote dilution "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." 138 S. Ct. at 1931. In other words, when partisanship predominates in the redistricting process, the resulting effect (and harm) tends to be the packing and cracking of the disfavored party's voters, which dilutes their votes. Specifically, this harm

occurs in one of two ways. First, map-drawers "pack" voters by creating districts that contain far more supporters of the disfavored party than would be necessary to elect a candidate from that party, thus causing many votes to be "wasted." Second, conversely, map-drawers "crack" voters by creating districts that carve off supporters of the disfavored party such that the disfavored party's voters are divided into separate districts in which they essentially can never elect a candidate of their party. Furthermore, *Arizona State Legislature* defined partisan gerrymandering as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power." 135 S. Ct. at 2658. Discriminatory effect, therefore, may also be evidenced by entrenchment. Evidence of entrenchment adds more weight to an individual voter's dilution claim because an entrenched district is impervious to "the potential fluidity of American political life." *Jenness v. Fortson*, 403 U.S. 431, 439 (1971); *cf. Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994) (explaining that, in the Voting Rights Act ("VRA") context, "[o]ne may suspect vote dilution from political famine"). Entrenchment makes it potentially impossible to "throw the rascals out" and freezes the status quo, *see, e.g.*, *Vieth*, 541 U.S. at 356 (Breyer, J., dissenting), further diluting the votes of individual voters.

Next, if the Plaintiffs prove these first two prongs, then the Defendants may present evidence that legitimate legislative grounds provide a basis for the way in which each challenged district was drawn. These legitimate justifications may include, for example, "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives[,]" and, "[a]s long as the criteria are nondiscriminatory, these are all legitimate objectives that on a proper showing could justify" the drawing of each district. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (internal citation omitted). These justifications are traditional redistricting criteria, along with "preserving the

integrity of political subdivisions, maintaining communities of interest," *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016), and compliance with the VRA, *see Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017) ("As in previous cases, . . . the Court assumes, without deciding, that the State's interest in complying with the Voting Rights Act [is] compelling."); *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1273–74 (2015) (holding that, when a state invokes the VRA to justify the use of race in the districting process, the state must have a "strong basis in evidence" for the position that the state would otherwise be violating the VRA if it failed to take race into account as it did).

Somewhat distinct from their vote-dilution claim under the Equal Protection Clause, the Plaintiffs also appear to argue that a sort of *Anderson-Burdick* balancing test applies because their fundamental right to vote is burdened. *See generally* Dkt. 177 (Pls.' Opp'n to Summ. J. at 32–35) (Page ID #8308–11) (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008); *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983)); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Under the normal *Anderson-Burdick* balancing standard:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). The Supreme Court has applied this test to a variety of laws. *See, e.g.*, *Crawford*, 553 U.S. 181 (upholding a voter ID law); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) (upholding Washington's blanket primary law); *Calif. Democratic Party v. Jones*, 530 U.S. 567 (2000) (striking down California's blanket primary law); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)

(upholding a ban on "fusion" candidates). *Anderson* and *Burdick* themselves were ballot access cases. *Burdick*, 504 U.S. at 434–38 (upholding a prohibition on write-in voting); *Anderson*, 460 U.S. at 788–90 (striking down an early filing deadline for independent candidates). But the Supreme Court has not formally applied this test to redistricting.

Here again, however, the Plaintiffs frame the burden on their right to vote in terms of dilution and explain that the "three-part test" that they must satisfy for this claim "is similar to, but distinct from, the three-part test for [their] Equal Protection Claim." Dkt. 177 (Pls.' Opp'n to Summ. J. at 33) (Page ID #8309). The Plaintiffs argue that because of the partisan intent and the partisan effect on the districts, "there is a substantial burden on" their right to vote, and thus "heightened scrutiny must be met." *Id.* at 34 (Page ID #8310). The Plaintiffs then argue that "[t]here is and was no legitimate state interest in enacting a gerrymandered map[.]" *Id.*

In fact, though the Plaintiffs cite cases like *Crawford* and *Anderson*, the actual test that they argue for on this "burden on a fundamental right" claim is essentially the same as their equal-protection and First Amendment claims. It appears that the only nuance added is that the Plaintiffs argue that the burden on the right to vote is substantial, and because of that substantial burden, some sort of "heightened scrutiny" applies to reviewing the stated interests and justifications. In short, the Plaintiffs argue that the Defendants' partisan intent and each district's partisan effect substantially burden the right to vote, and therefore, when a court turns to prong three, heightened scrutiny applies.

After hearing and weighing the evidence at trial, the Court will consider how substantial the burden is on the Plaintiffs' right to vote, and consequently, what level of scrutiny applies to the Defendants' proffered legitimate justifications. We note that, when other three-judge panels have addressed the question of whether a redistricting scheme is subject to some form of

heightened scrutiny, the issue arose in the *First Amendment* context. *See, e.g.*, *Rucho*, 318 F. Supp. 3d at 929 & n.49 (without resolving the issue, the panel "assume[d] that the Supreme Court would review First Amendment partisan gerrymandering claims in accordance with the intermediate scrutiny standard applied in retaliation cases and challenges to election regulations that do not impose a 'severe' burden on voting rights."); *Shapiro*, 203 F. Supp. 3d at 597 ("Of course, as consistent with First Amendment jurisprudence, the State can still avoid liability by showing that its redistricting legislation was narrowly tailored to achieve a compelling government interest."). We need not resolve this particular issue at this time. For now, however, we note that in *Karcher*, the Supreme Court required that the traditional districting objectives be applied in a "nondiscriminatory" manner, and that the Supreme Court also stated that courts should analyze "the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests." *Karcher*, 462 U.S. at 740–41.

### 2. *First Amendment Claims*

The Plaintiffs propose the same three-part test for their First Amendment claim as they do for their equal-protection claim. Dkt. 177 (Pls.' Opp'n to Summ. J. at 30) (Page ID #8306). They state that their proposed test is "slightly different" but "similar to" the First Amendment standard adopted by other three-judge panels. *See id.* at 30–31 (Page ID # 8306–07). Nonetheless, the Plaintiffs argue that they can also satisfy the First Amendment standard outlined by those other panels. *Id.*

Again, we see no reason to depart from the justiciable standards already outlined by other three-judge panels. (The Plaintiffs are correct, however, that there is not much difference between the Fourteenth Amendment and the First Amendment tests, as they pertain to vote dilution

specifically.)  Accordingly, at trial, the Plaintiffs may prove their First Amendment claim by showing:

> (1) that the challenged districting plan was intended to burden individuals or entities that support a disfavored candidate or political party, (2) that the districting plan in fact burdened the political speech or associational rights of such individuals or entities, and (3) that a causal relationship existed between the governmental actor's discriminatory motivation and the First Amendment burdens imposed by the districting plan.

*Rucho*, 318 F. Supp. 3d at 929; *see also LWV-Michigan*, 2018 WL 6257476, at *17.

Indeed, this test essentially mirrors the intent, effect, and lack-of-justification test that applies to the equal-protection claim.  Much of the same evidence can be used to prove these elements for both claims.  This makes sense because when the government purposefully dilutes an individual's vote (by packing or cracking particular districts) in the partisan gerrymandering context, it does so "*because of* the political views" expressed by voters.  *See Shapiro*, 203 F. Supp. 3d at 595 (citing *Vieth*, 541 U.S. at 314–15 (Kennedy, J., concurring in the judgment)).  In the partisan gerrymandering context, the Equal Protection Clause's concern about vote dilution is related to the First Amendment concerns about viewpoint discrimination, "laws that disfavor a particular group or class of speakers[,]" and retaliation.  *See Rucho*, 318 F. Supp. 3d at 924–26; *see also Benisek v. Lamone*, --- F. Supp. 3d ---, No. 1:13-cv-03233, 2018 WL 5816831, at *14 (D. Md. Nov. 7, 2018) (concluding that citizens "have a right under the First Amendment not to have the value of their vote diminished because of the political views they have expressed through their party affiliation and voting history.  Put simply, partisan vote dilution, when intentionally imposed, involves the State penalizing voters for expressing a viewpoint while, at the same time, rewarding voters for expressing the opposite viewpoint."), *appeal docketed* No. 18-726, --- S. Ct. ---, 2019 WL 98540 (Jan. 4, 2019).  In this way, partisan gerrymandering is a double-barreled constitutional issue.

The First Amendment, as we noted previously, also implicates an "associational harm": "the injury arising under this theory of harm is 'that the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects.'" *OAPRI*, 335 F. Supp. 3d at 997 (quoting *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring)). This "associational harm of a partisan gerrymander is distinct from vote dilution." *See Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). Therefore, at trial, in addition to pursuing district-specific vote-dilution claims under the First Amendment, the Plaintiffs "could make use of statewide evidence and seek a statewide remedy[,]" *id.* at 1934, based on this other First Amendment associational harm. The complaint alleges such harms, Dkt. 37 (Second Am. Compl. at ¶¶ 137–38, 144–46) (Page ID #328–30), and the Plaintiffs have continued to argue that such harms exist, Dkt. 177 (Pls.' Opp'n to Summ. J. at 29–30, 52) (Page ID # 8305–06, 8328).

### 3. Article I Claim

Under Article I, § 4 of the United States Constitution, states generally have the authority to draw district lines. U.S. CONST. art. I, § 4 ("The Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations"). But "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote, or . . . the freedom of political association." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (citing *Wesberry*, 376 U.S. at 6–7); *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995). In *Thornton*, the Supreme Court further explained that, at the Founding, "proponents of the Constitution noted: '[T]he power over the manner only enables them to determine *how* these electors shall elect . . .'" and that "[t]he constitution expressly provides that the choice shall be by the people, which cuts off both from the general and state

Legislatures the power of so regulating the mode of election, as to deprive the people of a fair choice." *Thornton*, 514 U.S. at 833 & n.47 (citations omitted).

Article I, § 2 provides: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States." The Supreme Court has recognized that "[a] fundamental principle of our representative democracy is, in Hamilton's words, 'that the people should choose whom they please to govern them.'" *Powell v. McCormack*, 395 U.S. 486, 547 (1969) (citation omitted). The Elections Clause in Article I, § 4 does not hinder the people's ability to ensure that they "choose their representatives, not the other way around," *Ariz. State Legislature*, 135 S. Ct. at 2677 (citation omitted), and neither does it hinder the courts' ability to police the state's power to regulate elections under Article I, *see, e.g.*, *Thornton*, 514 U.S. at 828–29; *Tashjian*, 479 U.S. at 217 (recognizing that the State's authority under the Elections Clause "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.").

The Plaintiffs rely on the Article I theory adopted by the three-judge panel in *Rucho*. We see no reason to disavow the *Rucho* panel's approach at this time. In *Rucho*, the three-judge panel concluded that the redistricting plan at issue exceeded the State's authority under the Elections Clause for three reasons: "(1) the Elections Clause did not empower State legislatures to disfavor the interests of supporters of a particular candidate or party in drawing congressional districts;" (2) the plan violated the First Amendment, the Fourteenth Amendment Equal Protection Clause, and Article I, § 2; and (3) the plan "represents an impermissible effort to 'dictate electoral outcomes' and 'disfavor a class of candidates.'" *Rucho*, 318 F. Supp. 3d at 937 (quoting *Thornton*, 514 U.S. at 833–34); *see also Shapiro*, 203 F. Supp. 3d at 595 (reasoning that "the requirement of Article I, § 2, that one person's vote in a congressional election 'is to be worth as much as another's,'

provides the premise for recognizing vote 'dilution' as a burden on citizens' representational rights, since dilution compromises the equal value requirement." (quoting *Wesberry*, 376 U.S. at 7)).

As to the first two reasons, however, this theory is not truly distinguishable from the other claims. That the Elections Clause does not give a State the power to disfavor particular voters or a political party only invites an inquiry into whether the State has, in fact, disfavored those voters or a party. We answer that inquiry by looking to see if either the First or Fourteenth Amendments, which police the State's power under the Elections Clause, has been violated. That brings us back to the standards for analyzing those claims, outlined earlier. As for Article I, § 2, if the people are unable to choose their congressional representatives (because the state representatives are effectively choosing for them through their gerrymandered drawing of congressional districts), it occurs because the people's votes have been improperly diluted. *See Rucho*, 318 F. Supp. 3d at 940 ("[B]y favoring supporters of Republican candidates over supporters of non-Republican candidates, the [redistricting plan] 'defeat[s] the principle solemnly embodied in the Great Compromise [i.e., Article I, § 2]' because it reflects a successful effort by the General Assembly to 'draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman [or Congresswoman] than others.'" (quoting *Wesberry*, 376 U.S. at 14)). Once again, that returns us to the same principles and standards that underly the Fourteenth Amendment and First Amendment claims.

*Rucho*'s third reason that the State exceeded its power under the Elections Clause, however, reveals an important nuance. This reason rests on a theory that the redistricting law, here H.B. 369, itself "amounts to a successful effort by the [State] to 'disfavor a class of candidates' and 'dictate electoral outcomes.'" *See Rucho*, 318 F. Supp. 3d at 940 (quoting *Thornton*, 514 U.S. at

833–34).  This echoes the intent ("disfavor a class of candidates") and effect ("dictate electoral outcomes") prongs of the previously described tests, but this theory also challenges the entire districting plan.  In this sense, therefore, the Article I claim is a "statewide" claim, rather than a district-by-district challenge.

Accordingly, to support this specific claim at trial, the Plaintiffs may rely on statewide evidence about the intent and effect of the redistricting plan as a whole.  As with the other claims, the Defendants can put forward other legitimate justifications for the plan.

### 4.  The Evidentiary Metrics

The Plaintiffs also propose four evidentiary metrics that can be incorporated to help the Court decide the merits of their partisan gerrymandering claims.  Dkt. 177 (Pls.' Opp'n to Summ. J. at 21–25) (Page ID #8297–8301) (discussing the efficiency gap, the mean-median gap, the Gelman-King asymmetry measure, and the declination metric).  It is important to clarify that the judicially manageable standards about which we are concerned for justiciability are *legal standards*.  These evidentiary metrics, however, are a separate matter—these measures help prove the elements of the underlying claims (e.g., partisan intent and effect).  This is nothing new.  Courts routinely utilize statistical analyses in other contexts, including the similar context of racial vote-dilution cases under the VRA.  *See, e.g.*, *Rural W. Tenn. African-Am. Affairs Council v. Sundquist*, 209 F.3d 835, 844 (6th Cir. 2000) (affirming the district court and explaining that the district court "ably considered a complex body of statistical and anecdotal evidence to determine that [a state house reapportionment plan] unlawfully dilutes African–American voting strength in rural west Tennessee."); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008) ("Statistical evidence of racial bloc voting may be established by three analytical models: homogenous precinct analysis ('HPA'), bivariate ecological regression analysis ('BERA'), and

King's ecological inference method ('King's EI method').");  *see also Rucho*, 318 F. Supp. 3d at 853–58 (discussing courts' reliance "on statistical and social science analyses as evidence that a defendant violated a standard set forth in the Constitution or federal law" and surveying caselaw).

At this stage of the litigation, it would be reasonable to conclude from these proposed metrics, along with the Plaintiffs' other evidence of the actual election results, the simulated maps, and their Proposed Remedial Plan, that the elements of these various claims are met.  *See infra* Section II.B.–C.  It is true, as the Defendants repeatedly insist, that the Plaintiffs' experts themselves do not set a benchmark for when partisan intent and effects reach an unconstitutional level.  That, however, is a legal determination for this Court to make.  The Plaintiffs will be able to present their experts and evidence at trial, and the Defendants will be able to mount a challenge through cross-examination and evidence of their own.  After the benefit of trial, we will return to the Plaintiffs' proposed metrics as applied to this case, evaluate the credibility and persuasiveness of the parties' experts and other evidence, and determine whether the Plaintiffs' experts and evidence, in fact, prove that each district (or, for some claims, the plan as a whole) constitutes an unconstitutional partisan gerrymander under the justiciable legal standards outlined above.

The Defendants take issue with the Plaintiffs' evidence and argue that it supports only a statewide claim, rather than district-specific claims.  To be sure, the Plaintiffs admittedly rely on some statewide evidence.  We previously stated that such evidence alone would not be enough to prove their Fourteenth Amendment claims, *OAPRI*, 335 F. Supp. 3d at 1000 n.4, but we never declared such evidence to be wholly irrelevant.  *See Ala. Legislative Black Caucus*, 135 S. Ct. at 1265 ("Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district.").  The important point is that whatever evidence is used, it must support a district-specific harm for Fourteenth Amendment and First Amendment vote-dilution claims.

Indeed, the Plaintiffs put forth a variety of statewide and district-specific evidence to support those claims.

### B. Evidence Applied to the Standards in this Case

The Plaintiffs have set forth sufficient facts to survive the motion for summary judgment because, viewing the record as a whole and in the light most favorable to the Plaintiffs, a rational trier of fact could find that they have satisfied the elements of their causes of action. We survey some of that evidence here, and again later when we address standing.

#### 1. Partisan Intent

Partisan intent is the first element of both the Fourteenth Amendment and First Amendment claims. The Plaintiffs' evidence, if credited, could satisfy this element and the predominance standard, should the Court choose to adopt it.

The Plaintiffs point to testimonial and documentary evidence that indicates that national Republican operatives took part in drawing the Ohio congressional map. A reasonable trier of fact could find that the national Republicans' involvement in the drawing of the Ohio map indicates partisan motivations behind the configuration of congressional district lines. For example, Tom Whatman worked for Speaker of the U.S. House of Representatives John Boehner as a member of "Team Boehner." Dkt. 178-5 (Whatman Dep. at 25) (Page ID #9657). "Team Boehner was the name given to the speaker's political operation." *Id*. Whatman was "the liaison with the Republican members of the congressional delegation." *Id*. at 29 (Page ID #9658). It was his responsibility "to have conversations with them about what new districts might look like in Ohio, and to take that information back and try and formulate a proposal for a congressional map in Ohio." *Id*. at 29–30 (Page ID #9658–59).

Whatman also testified that Adam Kincaid, the redistricting coordinator at the National Republican Campaign Committee ("NRCC"), was working on drawing the maps and lines for the Ohio congressional districts. *Id.* at 30 (Page ID #9659). Whatman "would have suggestions . . . about what a district might look like and . . . pass those on to Mr. Kincaid." *Id.* Kincaid would then "send back a draft of a district which was a map." *Id.* Raymond DiRossi (a Republican consultant) testified that Kincaid wanted to use "the PVI [Partisan Vote Index] or R plus 1, D plus 1 system." Dkt. 178-7 (DiRossi Dep. at 334) (Page ID #9718). Whatman testified that they used the PVI system to evaluate the political leanings of various maps. Dkt. 178-5 (Whatman Dep. at 163–64) (Page ID #9668–69).

On the ground in Ohio, DiRossi worked with Heather Mann (formerly Heather Blessing) (another Republican consultant) to use historical statewide Ohio election results to create a "Unified Index" and to "work to get the [Ohio U.S. congressional] districts put together in a legislative form so that it could go through the legislative process." Dkt. 178-7 (DiRossi Dep. at 112–13, 163) (Page ID #9683–84, 9696); *see also* Dkt. 178-13 (Judy Dep. at 48) (Page ID #9747) (agreeing that "[w]hen new versions of a map came along [Troy Judy, the House Republican Caucus Chief of Staff] would have a new spreadsheet for that unified index for the districts"). They worked at an office set up in a room at the DoubleTree Hotel in Columbus, Ohio, after having the beds taken out and computers installed. Dkt. 178-8 (Morgan Dep. at 51) (Page ID #9724). They referred to the hotel room as the "Bunker." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 80) (Page ID #8425). DiRossi testified that he never saw "anyone who could be identified as a Democrat in the hotel room" where they worked on drawing the map. Dkt. 178-7 (DiRossi Dep. at 149) (Page ID #9690). However, various state Republicans such as Tom Niehaus, the President of the Ohio State Senate, and Matt Schuler, the Ohio State Senate chief of staff, would

visit those working on the map-drawing at the DoubleTree.  Dkt. 178-13 (Judy Dep. at 74–75) (Page ID #9748–49).  A reasonable trier of fact could find that the Republicans' domination of the map-drawing process and the exclusion of Democrats indicates that partisan concerns motivated the map-drawing.

DiRossi also stated that he exchanged information with Whatman during the process of drawing the 2012 map.  Dkt. 178-7 (DiRossi Dep. at 257) (Page ID #9714).  John Morgan assisted with DiRossi and Mann's map drawing, showing them "how to access election data in Maptitude" and training them in how to use the Maptitude program, which enabled them to create color-coded draft congressional maps and to evaluate various characteristics of those drafts, including the anticipated partisan effects of various districting schemes.  Dkt. 178-8 (Morgan Dep. at 48–51) (Page ID #9721–24); Dkt. 178-13 (Judy Dep. at 104) (Page ID #9751).  As the map-drawers drew districts in Maptitude, "as [they] move[d] the district lines around," they could "see what the vote totals would have been for that district" as the program allowed the "numbers [to] recalculate in real time."  Dkt. 178-13 (Judy Dep. at 103–04) (Page ID #9750–51).  Communications between involved parties could also be understood to indicate partisan intent in the redistricting process.  For example, on September 7, 2011, Whatman emailed talking points to Niehaus, stating that they were "trying to lock down 12 Republican seats" in the redistricting process.  Dkt. 178-11 (Ex. KK at 1) (Page ID #9737).

The fact that national Republicans were apparently heavily involved in a process with which the Ohio State Legislature and its Task Force are statutorily tasked raises a genuine dispute about partisan intent in the work of the map-drawers.  Viewed in the light most favorable to the Plaintiffs, such evidence shows that the task of drawing the maps was farmed out to the national

Republican Party and that the bipartisan Task Force was shut out of the process. This evidence, if credited as presented at trial, helps satisfy the partisan intent element.

Moreover, the Plaintiffs plan to offer expert testimony that will, in part, go to proving partisan intent. The Plaintiffs argue that the "manner and extent to which the Republican mapmakers split political subdivisions and communities of interest, with resulting partisan gain, demonstrates their objective to crack and pack Democratic voters to optimize Republican seats in Congress." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 84) (Page ID #8429). Plaintiffs' expert William Cooper states that the districts as drawn under the 2012 map "are not compact. Far too many counties and political subdivisions are split." Dkt. 177-4 (Cooper Dep. at 15) (Page ID #8535). Cooper drew a Proposed Remedial Plan that splits significantly fewer counties and municipal civil divisions than the 2012 map. Dkt. 177-3 (Cooper Report at 11–14) (Page ID #8519–22). Dr. Niven, another expert, will testify that the 2012 map split 322 census tracts, whereas the map in effect before the 2012 map's introduction split only 209 census tracts. Dkt. 179-8 (Niven Report at 5) (Page ID #9926). Dr. Niven also explores several specific examples of district lines being drawn in a way that could indicate partisan intent. For example, Niven explains how the 2012 map divides Franklin County into three different congressional districts—the 3rd, 12th and 15th. *Id*. at 19–27 (Page ID #9940–48). The 3rd district concentrated (packed) Democratic-leaning voters, creating a district nearly certain to elect a Democratic representative. *Id*. at 26 (Page ID #9947). The 12th and 15th districts, however, chipped away (cracked) voters and merged them into districts that contained many Republican-leaning voters, thereby creating two districts that could be expected to elect Republican representatives. *Id*. at 22–25 (Page ID #9943–46). Dr. Niven's report states that the differences between the partisan leanings of the voters in the 3rd district and those in the 12th and 15th districts are statistically

significant. *Id*. at 27 (Page ID #9948). Further, Dr. Niven highlights several examples of highly irregular district borders drawn into the 2012 map, from which a reasonable fact-finder could infer partisan intent. *See, e.g.*, *id*. at 10 (Page ID #9931). Dr. Niven concludes that "the districts have strategically targeted and divided populations" based on analysis of the extent to which census tracts are split under the present map. *Id*. at 4 (Page ID #9925).

Furthermore, Dr. Wendy K. Tam Cho used a computer algorithm to generate over three million simulated congressional maps informed only by traditional districting principles such as contiguity, compactness, and city and county boundary preservation. Dkt. 179-11 (Cho Dep. at 129) (Page ID #10032); Dkt. 179-10 (Cho Report at 40) (Page ID #10025). Dr. Cho then compared the 2012 map to the non-partisan maps within her dataset to determine the extent to which they diverged. She found that none of her over three million simulated maps produced the same 12-4 seat share as the 2012 map. Dkt. 179-10 (Cho Report at 40) (Page ID #10025). Dr. Cho found that "none of the simulated maps . . . had the same partisan fairness metric of the challenged map" and that "[t]he responsiveness of the challenged map occurs in a very small number of [her] simulated maps." *Id*. The Plaintiffs argue that Dr. Cho's simulations provide additional evidence of the partisan intent on the part of the map-drawers.

From this evidence, along with other testimony, emails, and the like, a reasonable fact-finder could infer that a predominantly partisan intent informed the drawing of the congressional districts in the 2012 plan.

## 2. *Partisan Effect and Statewide Associational Harm*

The second element of the Fourteenth Amendment claim and non-associational First Amendment claim is partisan effect. The evidence presented for these claims must be district-specific. On this particular effect element, then, the evidence required for satisfying the

substantive claim blends with the evidence required to establish standing. Accordingly, we detail the evidence on this particular claim when we address the individual Plaintiffs' standing. *See infra* Section II.C.1.a. As shown, at this stage, the Plaintiffs have enough evidence to establish an injury in fact for standing purposes, and likewise, to lead a rational finder of fact to conclude that the partisan effect element is satisfied.

The First Amendment associational claim, however, rests on separate, statewide evidence. The Plaintiffs point to record evidence outlined below that could support an associational harm. *See also infra* Section II.C.1.b.

Prior to the 2011 redistricting, Ohio had eighteen U.S. congressional districts. Due to population changes, the 2012 map had to be reduced to sixteen U.S. congressional districts. Dkt. 178-5 (Whatman Dep. at 159) (Page ID #9664). The current congressional districting plan was first used in the 2012 election cycle. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 3) (Page ID #8348). Every election in which it has been used has resulted in the election of twelve Republican representatives and four Democratic representatives, with each district consistently electing a candidate from the same party. The 1st, 2nd, 4th, 5th, 6th, 7th, 8th, 10th, 12th, 14th, 15th, and 16th Districts have consistently elected Republicans while the 3rd, 9th, 11th, and 13th have elected Democrats. *Id.* at 87–88 (Page ID #8432–33). In each of these elections, 75% of the representatives elected in the State of Ohio were Republicans. But in the 2012 election, Republicans won only 51% of the state-wide vote. In 2014, they won only 59% of the state-wide vote. In 2016, they won only 57% of the state-wide vote. In 2018, they won only 52% of the state-wide vote. *Id.* at 86–87 (Page ID #8431–32).

The 2012 map created the 3rd congressional district, a new heavily-Democratic district that some Republican map-drawers referred to as the "Franklin County Sinkhole." *Id.* at 81 (Page ID

#8426).  In the 3rd district, Democratic candidates have won significantly more votes than were required to beat their opponents.  In 2012, the Democratic candidate was elected with 68.29% of the vote, in 2014 with 64.05% of the vote, in 2016 with 68.57% of the vote, and in 2018 with 73.6% of the vote.  *Id*. at 88 (Page ID #8433).  Democratic candidates in the 9th, 11th, and 13th districts have won by similarly high margins.  *Id*. at 88–89 (Page ID #8433–34).

The Plaintiffs plan to offer expert testimony to prove the partisan effect of the 2012 map.  Dr. Christopher Warshaw states that since the enactment of the 2012 redistricted map partisan bias measures have increased.  Dkt. 179-6 (Warshaw Dep. at 72–73) (Page ID #9875–76).  Dr. Warshaw presents four measures of partisan effect.  First, the efficiency gap is one "commonly used metric[] to measure partisan bias."  Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 89) (Page ID #8434).  The efficiency gap is:

> the difference between the parties' respective wasted votes, divided by the total number of votes cast in the election.  All of a party's votes are wasted if they lose the election.  When a party wins an election, the wasted votes are those above 50%+1 needed to win.  The efficiency gap aggregates both kinds of wasted votes for each party.  According to the efficiency gap analysis, the ratio of the parties' excess votes reveals the discrepancy between how the map treats the parties.

*Id.* (quotation marks omitted).  Dr. Warshaw explains that Ohio's efficiency gap increased considerably between 2010 and 2012.  Dkt. 177-5 (Warshaw Report at 23) (Page ID #8613).  His report states that there were pro-Republican efficiency gaps in the 2012, 2014, 2016, and 2018 elections, and that the 2012 and 2018 efficiency gaps were particularly large.  *Id*.; Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID #8672).  Dr. Warshaw also states that the efficiency gaps under the 2012 redistricting plan are extreme compared to the efficiency gaps in other states.  Dkt. 177-5 (Warshaw Report at 21–23) (Page ID #8611–13).

The second measure of partisan effect is the mean-median gap.  "If the party wins more votes in the median district than in the average district, they have an advantage in the translation

of votes to seats," which is reflected by the mean-median gap measure. Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID #8672). Dr. Warshaw found that after the 2012 plan was implemented, there was a "sharp increase" in Ohio's mean-median gap. Dkt. 177-5 (Warshaw Report at 24) (Page ID #8614).

The third measure is declination. Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID #8672). As explained by Dr. Warshaw:

> The declination metric starts from the assumption that a plan that advantages one party will arrange the distribution of district vote shares in a way that treats the 50 percent threshold for victory differently than other vote values. The declination metric can be quantified using a number between -1 and 1 (positive values favor Democrats and negative values favor Republicans).

*Id.* (citation omitted). The 2018 election resulted in a declination of -.69, which Dr. Warshaw concludes "was more extreme than 98% of previous elections and more pro-Republican than 99% of previous U.S. congressional elections." *Id.* Dr. Warshaw also found that "Ohio's post-2011 plans had some of the most extreme declinations in Ohio's history." Dkt. 177-5 (Warshaw Report at 25–26) (Page ID #8615–16).

Finally, Dr. Warshaw utilizes a partisan symmetry metric. Dkt. 177-7 (Warshaw Suppl. Report at 3) (Page ID #8672). This measures "whether each party receives the same share of seats for identical shares of votes." *Id.* Dr. Warshaw found that "Ohio's 2018 elections were more asymmetric than 92% of previous elections and more pro-Republican than 94% of previous U.S. congressional elections over the past 45 years." *Id.* at 4 (Page ID #8673). He ran analyses on hypothetical elections in Ohio under the 2012 redistricting plan and found that they were more biased than comparable elections in other states. Dkt. 177-5 (Warshaw Report at 26–27) (Page ID #8616–17). He also found that "Ohio's post-2011 elections were more asymmetric than previous congressional elections in Ohio" and that the 2012 election had more extreme asymmetry "than

96% of previous elections and [was] more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years." *Id*. at 27 (Page ID #8617).

In addition to these four metrics, Dr. Warshaw analyzes the competitiveness of elections and "the responsiveness of each party's seat shares to uniform swings in the statewide vote share." *Id*. at 28 (Page ID #8618). He considers an election competitive if "the winning party received less than 55% of the two-party vote." *Id*. Dr. Warshaw found that "Ohio's congressional elections grew less competitive after the 2011 plan went into place." *Id*. He also found that "Ohio's post-2011 districting plan had some of the least responsive election results in the country." *Id*. at 29 (Page ID #8619). At this stage, drawing all inferences in favor of the non-moving party, the Plaintiffs have put forth sufficient record evidence to defeat the motion for summary judgment based on the partisan effect factor.

### 3. *Lack of a Legitimate Justification and Causation*

The third and final elements of the Plaintiffs' First and Fourteenth Amendment claims blend together. To illustrate: the Defendants may come forward with other legitimate justifications for the map, such as traditional redistricting criteria that include compactness and maintaining municipal and county boundaries, etc. If credited, this showing would indicate that a district's partisan effect is caused by, for example, the map-drawers' adherence to the State's pre-existing municipal and county subdivision boundaries and *not* by the Defendants' alleged predominantly partisan intent.

Although the Defendants contend that the map-drawers were focused on traditional districting criteria, the Plaintiffs' experts and arguments counter this contention. For example, the Plaintiffs argue that one reasonable inference that could be drawn from their evidence of partisan intent and the extreme partisan effect of the map could be that traditional districting criteria were

not part of the map-drawers' calculus.  The presence of contradictory evidence proffered by each side indicates that there is a genuine issue of material fact on this element, and thus granting summary judgment would be inappropriate.  The Plaintiffs' offer of evidence to rebut any possible justifications, detailed below, is sufficient to survive summary judgment.

The Plaintiffs plan to offer expert testimony to prove that the 2012 map's partisan leanings are not the result of the drawers' attempts to comply with traditional redistricting criteria.  Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 99–102) (Page ID #8444–47).  Cooper has drafted a Proposed Remedial Plan that attempts to "undo the partisan gerrymander," Dkt. 177-4 (Cooper Dep. at 25) (Page ID #8450), while still honoring traditional redistricting criteria such as one-person-one-vote, compactness, contiguity, incumbent protection, compliance with the VRA, and the preservation of communities of interest, Dkt. 177-3 (Cooper Report at 3) (Page ID #8511).  Cooper also drew his plan in compliance with the requirements of Ohio's 2018 Ballot Initiative.  *Id.*  Cooper's Proposed Remedial Plan splits only 14 counties whereas the 2012 map splits 23 counties.  *Id*. at 11, 14 (Page ID #8519, 8522).  The Proposed Remedial Plan splits 27 municipal civil divisions whereas the 2012 map splits 73 municipal civil divisions.  *Id*.  Cooper's Proposed Remedial Plan also uses more compact districts than those in the 2012 map.  *Id*. at 15–17 (Page ID #8523–25).  The Proposed Remedial Plan, had it been in effect for the 2012-2018 elections, arguably would have produced more Democratic representatives than the 2012 map.  Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 97) (Page ID #8442).

The Plaintiffs also point to deposition testimony that indicates that concerns beyond traditional redistricting criteria factored into the drawing of the 2012 map's lines.  For example, DiRossi stated that the map-drawers did not use any system other than visual inspection to ensure that the districts they were drawing were compact.  Dkt. 178-7 (DiRossi Dep. at 212) (Page ID

#9705). DiRossi also testified that "when you [are] doing redistricting and apportionment the first things that everybody want[s] from you [are] maps and indexes, maps and indexes . . . the first thing that people wanted were historical political indexes and maps." *Id.* at 233 (Page ID #9711).

The Defendants attempt to undercut any finding of partisan effect (and relatedly, intent) by arguing that because Democratic members of both the Ohio House of Representatives and State Senate voted for H.B. 369, any partisan effects of the map cannot be attributed to partisan intent. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 2) (Page ID #8347). The Plaintiffs assert that even though Democrats did vote for H.B. 369, many expressed their discontent with the bill and the way in which it was enacted arguably without sufficient time for parties to process and discuss its impact. They also argue that because Democrats were outnumbered in both the Ohio House and Senate, they did not have the ability to stop the enactment of the bill and therefore had power only to request minor tweaks to the plan. *Id.* at 83–84 (Page ID #8428–29) (noting that Republican State Senator Larry Obhof stated, "While a lot of Democrats voted for the current map . . . they didn't really have a lot of negotiating power at that stage," and further noting similar comments by then-Speaker of the State House William Batchelder). We conclude that a reasonable fact-finder could determine that, despite some Democrats having voted to approve H.B. 369, the map was drawn and enacted with partisan intent, and that it had a partisan effect.

Lastly, to rebut any contention that the VRA provides a justification for District 11, the Plaintiffs rely on expert Dr. Lisa Handley. *See generally* Dkt. 179-13 (Handley Report). Ohio's "[c]urrent 11th District is the successor district to the first majority black congressional district created in Ohio in 1968, which has consistently elected African-Americans to Congress since." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 98) (Page ID #8443). The Supreme Court recently explained that:

When a State invokes the VRA to justify race-based districting, it must show (to meet the "narrow tailoring" requirement) that it had "a strong basis in evidence" for concluding that the statute required its action. Or said otherwise, the State must establish that it had "good reasons" to think that it would transgress the Act if it did *not* draw race-based district lines. That "strong basis" (or "good reasons") standard gives States "breathing room" to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed.

*Cooper*, 137 S. Ct. at 1464 (internal citations omitted). In this case, § 2 of the VRA would apply.

To establish a vote-dilution claim under § 2, a party must satisfy three threshold conditions, known as the *Gingles* preconditions. *See Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). We need not dive too deep into this line of cases at this time, but the most important precondition here is the third: "a district's white majority must 'vote [ ] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *See Cooper*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 51). "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district." *Id.*

Dr. Handley notes that the current Black Voting Age Population (BVAP) of District 11 is 52.4%, Dkt. 179-13 (Handley Report at 6 n.7) (Page ID #10057), but she concludes that a 45% BVAP would allow "the black-preferred candidate [to] carry the district easily in all of the contests [that Dr. Handley] analyzed" in her report, *id.* at 15 (Page ID #10066). Dr. Handley reaches this conclusion because "[a] substantial percent of white voters, though not a majority, tended to 'crossover' and support the black-preferred candidate." *Id.* at 11 (Page ID #10062). For example, "[t]he 2014 gubernatorial contest was the only election in which less than a third of white voters supported the black-preferred candidate." *Id.* Moreover, Dr. Handley's analysis indicates "that support for [Congresswoman Marcia] Fudge is very high among both black and white voters." *Id.* at 3 n.3 (Page ID #10054).

A plurality of the Supreme Court in *Bartlett v. Strickland*, and then a majority in *Cooper*, reasoned that, "'[i]n areas with substantial crossover voting [i.e., white voters voting with black

voters],' § 2 plaintiffs would not 'be able to establish the third *Gingles* precondition' and so 'majority-minority districts would not be required.'" *Cooper*, 137 S. Ct. at 1472 (quoting *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009)). Therefore, "[t]o have a strong basis in evidence to conclude that § 2 demands [the] race-based steps [taken by Ohio in drawing District 11 as it did], the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures." *Id.* at 1471. At this stage, we conclude that Dr. Handley's analysis could, if credited at trial, rebut any evidence that the Ohio Legislature, in fact, had good reasons to believe that the State would be subject to § 2 liability with a BVAP under 50% and therefore that VRA compliance justified their drawing of the 11th district, which the Plaintiffs allege was intentionally packed for partisan reasons.

## C. Standing

"[A] plaintiff seeking relief in federal court must first demonstrate that he has standing to do so." *Gill*, 138 S. Ct. at 1923. Summarizing the applicable standing principles for vote-dilution claims in *Gill*, the Supreme Court explained that "the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a 'cracked' or 'packed' district." *Id.* at 1931. In other words, to establish standing for their vote-dilution claims, the Plaintiffs here (the individuals and the organizations) must each establish that they (or an organization's member) live in an alleged gerrymandered district just as in the racial gerrymandering context. *See id.* at 1930 ("A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.'" (quoting *United States v. Hays*, 515 U.S. 737, 745 (1995))). In pursuing these claims, we recognize that, as in other redistricting cases, "[v]oters, of course, can present statewide

*evidence* in order to prove . . . gerrymandering in a particular district." *Ala. Legislative Black Caucus*, 135 S. Ct. at 1265.

Additionally, the alleged separate associational harm under the First Amendment is a statewide injury. Accordingly, statewide standing principles apply. *Gill*, 138 S. Ct. at 1938–39 (Kagan, J., concurring). As mentioned, the Plaintiffs have not relied solely on First and Fourteenth Amendment vote-dilution theories, and thus, we will address whether they have standing under this additional associational theory as well.[4]

The Plaintiffs have put forward sufficient evidence to establish standing at this stage. We will address the individual and organization Plaintiffs successively.

### 1. *Individual Plaintiffs*

To establish standing, the individual Plaintiffs must show: (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). At least one "plaintiff must demonstrate standing for each claim . . . press[ed] and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see also Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). These requirements ensure that plaintiffs who invoke a federal court's jurisdiction have "a personal stake in the outcome of the controversy," *Baker*, 369 U.S. at 204, and that the federal court does not become "a forum for generalized grievances," *Lance v. Coffman*, 549 U.S. 437, 439 (2007).

---

[4] The same statewide analysis applies to the individual Plaintiffs' Article I claim, too. *See infra* Section II.C.1.c.

### a. Fourteenth Amendment Claims

To establish their vote-dilution claims, the Plaintiffs rely on individual lay and expert testimony, simulated maps, and a Proposed Remedial Plan map. Dkt. 177 (Pls.' Opp'n to Summ. J. at 43–51) (Page ID #8319–27). Based on this proffered evidence, the individual Plaintiffs have made a sufficient showing, at summary judgment, that they live in packed or cracked districts in which their votes are diluted.

<u>Injury-In-Fact</u>

First, the Defendants do not dispute each individual Plaintiff's address or where they vote. *See* Dkt. 136-1 (Defs.' Prop. Statement of Undisputed Material Facts at 5–36) (Page ID #3583–3614). Thus, there is no dispute over whether the individual Plaintiffs reside and vote in the districts alleged to be cracked or packed.

Second, of course, the individual Plaintiffs are not contending that their votes are not counted in a literal sense, *see, e.g.*, Dkt. 177-10 (Goldenhar Dep. at 41) (Page ID #8794), and the Defendants repeatedly note the fact that the Plaintiffs make no such claim. The individual Plaintiffs' claim is of another nature: they argue that their votes count less than they should, or are diluted, because of aggressive partisan efforts to configure district lines in a way that intentionally "wastes" their votes. *See, e.g.*, *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."); *see also Gaffney v. Cummings*, 412 U.S. 735, 754 (1973) (noting that it may violate the Fourteenth Amendment if a political group's "voting strength [is] invidiously minimized."); Dkt. 177-10 (Goldenhar Dep. at 41–42) (Page ID #8794–95) (Plaintiff Goldenhar stating that her "sense is [her] vote doesn't matter as much in terms of how [she] would be represented by a representative" and that her "views tend not to be represented,

because the outcome of the elections are more predetermined based on how the map is drawn.").[5] Accordingly, we evaluate the Plaintiffs' standing by turning to the evidence put forward by the Plaintiffs to support their vote-dilution claims and allegations of packing and cracking Democratic voters.

First, Dr. Cho's map simulations represent district-specific evidence to support each individual Plaintiff's standing. Dr. Cho was provided each Plaintiff's home address. Dkt. 179-10 (Cho Report at 11) (Page ID #9996). From that, she was "able to determine which district the plaintiff would reside in in each simulated map." *Id.* Dr. Cho "compute[d] the average Democratic vote share for the plaintiff's current district . . . from 2012 to 2016[,]" and then "calculate[d] the average Democratic vote share for the plaintiff's district in the simulated maps with the 2008-2010 statewide election data." *Id.* As a result, Dr. Cho presents "a comparison of the average Democratic vote share of each plaintiff's current district with the calculated set of average Democratic vote shares for each plaintiff's set of simulated districts." *Id.* The sample of simulated maps "is comprised of 3,037,645 map draws that adhere to . . . traditional redistricting principles . . . (population deviation, contiguity, compactness, the creation of a 45+% BVAP [Black Voting Age Population] district, and city and county preservation)[,]" but the simulated maps were not generated using "partisan or electoral information"—they are completely devoid of partisan intent. *Id.* at 10 (Page ID #9995).

Dr. Cho's report shows that each individual Plaintiff's current district is either substantially more Republican than the vast majority of, or all of, the 3-million-plus hypothetical, alternate districts that they could live in (i.e., cracked), or that the current district is substantially more

[5] We quote Plaintiff Goldenhar's deposition by way of example. Other examples of how individual Plaintiffs articulate this point abound. *See generally* Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 10–61) (Page ID #8355–8406); Dkt. 177 (Pls.' Opp'n to Summ. J. at 43–45) (Page ID #8319–21) (summarizing the individual Plaintiffs' deposition testimony).

Democratic than the vast majority of, or all of, the alternate districts (i.e., packed).  *See id.* at 13–29 (Page ID #9998–10014).  Some specific examples provide a better illustration.  Take Plaintiff Rubin, who lives in District 16.  Dr. Cho concludes that "[a]mong the set of simulated maps, 100% of them would have placed Plaintiff Rubin in a district that would have provided a higher likelihood of electing a Democrat."  *Id.* at 29 (Page ID #10014).[6]  For all the Plaintiffs in other allegedly cracked districts (except one, Plaintiff Thobaben in District 15, *id.* at 28 (Page ID #10013) (79.28%)), Dr. Cho concluded that, among the simulated maps, 95% or more would have placed the Plaintiffs in a district that would have a higher likelihood of electing a Democrat.  This is not to say that the Plaintiffs in these districts have a right to elect a Democrat; this evidence, however, helps to show that a district is cracked.

On the other end of the spectrum are individual Plaintiffs who assert that their injury is having been packed into heavily Democratic districts.  One such example is Plaintiff Inskeep, who lives in District 3.  Dr. Cho concludes that, "[a]mong the set of simulated maps, none of them would have placed Plaintiff Inskeep in a district that would have provided a higher likelihood of electing a Democrat."  *Id.* at 15 (Page ID #10000).  Plaintiff Harris, in District 11, and Plaintiff Myer, in District 13, are in the same camp.  *Id.* at 24, 26 (Page ID #10009, 10011).  Lastly, Plaintiffs Walker and Rader each live in District 9, and only 15.91% and 13.55% of the simulated maps, respectively, would provide them with a higher likelihood of electing a Democrat.  *Id.* at 21–22 (Page ID #10006–07).  Again, this evidence could be understood to indicate that a district has been packed.

---

[6] *See also id.* at 18–20 (Page ID #10003–05) (same for Plaintiff Boothe in District 6, Plaintiff Griffiths in District 7, and Plaintiff Nadler in District 8); *id.* at 25, 27 (Page ID #10010, 10012) (same for Plaintiff Dagres in District 12 and Plaintiff Hutton in District 14).

After generating the simulated maps, Dr. Cho analyzed that universe of alternative feasible maps for competitiveness, responsiveness, and partisan bias and compared that analysis to the same measures for the current map. *See id.* at 30–40 (Page ID #10015–25). This analysis allowed Dr. Cho to assess the comparative partisan bias and effect of the current map. She concluded that "on an array of partisan metrics that seek to measure either competitiveness or biasedness, the current plan exhibits more partisan unfairness than most of the simulated maps." *Id.* at 40 (Page ID #10025). For example, Dr. Cho explains that "[w]hen voters are 'packed and cracked' into districts, the districts are safe and not competitive[,]" and concludes that "it seems that competitiveness was almost a non-existent factor if one at all in the construction of the enacted map since the current districts lean so heavily toward one party." *Id.* at 32, 37 (Page ID #10017, 10022).

We conclude that Dr. Cho's analysis supports the individual Plaintiffs' standing. As the Supreme Court explained in *Gill*, for partisan gerrymandering claims, the harm of vote dilution "arises from the particular composition of the voter's own district, which causes his [or her] vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1930–31. Dr. Cho's report could be interpreted to show just that, on a district-by-district basis, for each individual Plaintiff, which is sufficient to establish their standing at this juncture.

Dr. Warshaw's report provides additional support for the Plaintiffs' injuries in fact. Dr. Warshaw employs four partisan bias metrics—the efficiency gap, the mean-median gap, symmetry in the vote-seat curve across parties, and declination—to measure the partisan advantage of the current plan. Dkt. 177-5 (Warshaw Report at 5–13) (Page ID #8595–8603). Based on these measures, Dr. Warshaw concludes that "Democratic voters in Ohio are efficiently packed and

cracked across districts . . . . As a result, Ohio's elections are unresponsive to normal shifts in voters' preferences within the historical range of congressional election results in Ohio." *Id.* at 4 (Page ID #8594). Dr. Warshaw's analyses constitute statewide evidence that bolsters Dr. Cho's district-specific evidence.

The Plaintiffs also propose an alternative map called the Proposed Remedial Plan. *See* Dkt. 177-3 (Cooper Report at 13) (Page ID #8521). This Proposed Remedial Plan, in part, lends further support to establishing the individual Plaintiffs' injuries in fact as well as the third requirement for standing—redressability. As Dr. Warshaw concludes, using the same partisan-bias metrics that he used to analyze the current map, "the remedial plan . . . displays very low levels of partisan bias and high levels of responsiveness. Thus, [Dr. Warshaw] believe[s] that the remedial plan would improve the representational link between voters and Ohio's members of Congress." Dkt. 177-5 (Warshaw Report at 43) (Page ID #8633). In other words, the Proposed Remedial Plan aims to present concrete examples of other possible districts in which the Plaintiffs' votes would carry more weight than they do under the current districts by unpacking and uncracking those voters. *See Gill*, 138 S. Ct. at 1931.

In sum, the Plaintiffs have presented evidence that they actually live in packed or cracked districts and, consequently, that they have suffered injuries in fact. After trial, if this Court accepts this evidence and these experts' conclusions, the Plaintiffs could establish sufficient evidence to maintain standing. *See id.* ("The facts necessary to establish standing . . . must . . . [be] proved at trial.").

Causation

The individual Plaintiffs have presented evidence from which a trier of fact could conclude that their current districts caused their individual injuries. For example, Dr. Cho states that "*none*

39

of [her simulated maps] had the same 12-4 seat share as in the challenged map." Dkt. 179-10 (Cho Report at 40) (Page ID #10025) (emphasis added); *see also id.* at 33–37 (Page ID #10018–10022) (analyzing competitiveness and concluding that the simulated maps are more competitive than the current map, thus providing evidence that the current map packs and cracks voters). Moreover, Plaintiffs' expert Cooper provides evidence that the current districts cause the individual Plaintiffs' injuries. *See generally* Dkt. 177-3 (Cooper Report). Specifically, Cooper drew a Proposed Remedial Plan that splits fewer counties and adheres to traditional redistricting principles ("one-person-one-vote, incumbent non-pairing where possible, compactness, contiguity, the non-dilution of minority voting strength, and respect for communities of interest"). *See id.* at 11, 14–18 (Page ID #8519, 8522–26). Cooper further shows that his Proposed Remedial Plan "undoes the partisan gerrymander by giving Democratic voters a better opportunity to elect their candidates of choice than under the 2012 Plan." *Id.* at 18 (Page ID #8526); *see also id.* at 20 (Page ID #8528) (Figure 8: comparing, district-by-district, 2012-2016 elections results under the 2012 plan with what the results may have been under the Proposed Remedial Plan). As mentioned, Dr. Warshaw's report bolsters this conclusion. *See* Dkt. 177-5 (Warshaw Report at 43) (Page ID #8633).

<u>Redressability</u>

Finally, the Plaintiffs have established for the purposes of summary judgment that a favorable decision would redress their injuries because they seek an injunction that prohibits the State from conducting future elections under the current map and, in its place, the implementation of a non-gerrymandered map that does not dilute their votes. *See* Dkt. 37 (Second Am. Compl. at 51 – 52) (Page ID #337–38). The Proposed Remedial Plan offers one possible example of how such a non-gerrymandered map might be drawn.

### b. First Amendment Claims

For the individual Plaintiffs' standing to bring their First Amendment claims, we first note that, to the extent that the First Amendment theory is based upon vote dilution, the same analysis applies as in the Fourteenth Amendment context. *See, e.g.*, *Benisek*, 2018 WL 5816831, at *14 ("[Voters] have a right under the First Amendment not to have the value of their vote diminished *because of* the political views they have expressed through their party affiliation and voting history. Put simply, partisan vote dilution, when intentionally imposed, involves the State penalizing voters for expressing a viewpoint while, at the same time, rewarding voters for expressing the opposite viewpoint."). We therefore conclude that, for purposes of summary judgment, the individual Plaintiffs have established standing for their First Amendment vote-dilution claim.

A separate analysis, however, applies to the First Amendment associational claim. In her *Gill* concurrence, Justice Kagan explained why the plaintiffs in that case failed to establish standing under this theory: "[The plaintiffs] did not emphasize their membership in [the Democratic] [P]arty, or their activities supporting it. And they did not speak to any tangible associational burdens—ways the gerrymander had debilitated their party or weakened its ability to carry out its core functions and purposes." *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring). Accordingly, to establish standing on their associational claim, the individual Plaintiffs must (1) point to evidence of their membership in and activities supporting the Democratic Party, and (2) to establish an injury in fact, the Plaintiffs must demonstrate that the allegedly gerrymandered map weakened their party's ability to carry out its core functions and purposes.

The remainder of this section will focus on the individual Plaintiffs' standing to bring this First Amendment associational claim. We conclude that they have put forward sufficient evidence to establish standing.

<u>Injury in Fact & Causation</u>

First, the individual Plaintiffs self-identify as Democrats or Democratic voters and actively support the Democratic Party. *See generally* Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 102–34) (Page ID #8447–79). The individual Plaintiffs describe numerous examples of how the allegedly gerrymandered districts hinder their ability to engage in a variety of political activities—from voter apathy disrupting the party's mobilization and candidate recruitment efforts, to decreased fundraising, to both a general decline in political activity in districts (such as candidates not appearing at forums) and an inability meaningfully to influence representatives because the election results are essentially predetermined. *See id.*; *see also* Dkt. 177 (Pls.' Opp'n to Summ. J. at 53–56) (Page ID #8329–32) (citing and highlighting some specific examples). In short, as a threshold matter, the individual Plaintiffs here have done what the *Gill* plaintiffs failed to do.

Second, the individual Plaintiffs back up their testimonial evidence with data on asymmetric election results. Importantly, "statistical metrics [of partisan asymmetry] measure . . . a gerrymander's effect on the fortunes of political parties and those associated with them." *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring) (quotation marks to the majority opinion omitted). "[E]vidence of partisan asymmetry well fits a suit alleging associational injury." *Id.*

Here, the Plaintiffs have presented evidence of asymmetry to establish both an injury in fact and causation. *See generally* Dkt. 177-5 (Warshaw Report at 43) (Page ID #8633) (analyzing the current plan using the efficiency gap, the mean-median gap, declination, and partisan symmetry metrics, and concluding that "[t]he pro-Republican advantage in congressional elections in Ohio causes Democratic voters to be effectively shut out of the political process in Congress."); Dkt. 177-7 (Warshaw Suppl. Report at 1) (Page ID #8670) (applying these metrics to the 2018 election

results and concluding that there is strong evidence of partisan bias and that bias "has been durable between the 2012 and 2018 elections."); *see also* Dkt. 177-3 (Cooper Report at 20) (Page ID #8528) (comparing the 2012-2016 elections results under the current plan with what the results may have been under the Proposed Remedial Plan and showing that Democratic candidates likely would have won more seats or have been more competitive). Moreover, the Plaintiffs point out that, despite Democrats winning between 39% and 47% of the state-wide vote, Democratic candidates have won only 25% of Ohio's congressional elections under the current map; meanwhile, the Republican state-wide vote share has fluctuated between 51% and 59%, but Republican candidates have won 75% of those elections. Dkt. 177 (Pls.' Opp'n to Summ. J. at 21) (Page ID #8297). Part of Dr. Cho's analysis provides additional support. *See* Dkt. 179-12 (Cho Suppl. Report at 3) (Page ID #10045) ("In each of the simulation analyses [using data from the 2008-2018 election cycles], 9 Republican seats is the common and expected outcome of a non-partisan map creation process.").

We recognize that the Defendants present experts and evidence of their own, which attempt to discredit and undermine the Plaintiffs' case. At summary judgment, however, we must draw all reasonable inferences in the Plaintiffs' favor, and we do not find that any of the Defendants' evidence so undermines the evidence put forth by the Plaintiffs that reasonable inferences in the Plaintiffs' favor could not be made. Adhering to that standard, we conclude that the Plaintiffs have sufficiently established an injury in fact and causation under this theory of standing.

<u>Redressability</u>

As with the Fourteenth Amendment claims, the individual Plaintiffs satisfy redressability as well. *See supra* Section II.C.1.a. (Redressability).

### c. Article I Claims

We previously applied the same standing analysis to the Plaintiffs' Article I claim as their First Amendment claims, *OAPRI*, 335 F. Supp. 3d at 1001, and in this opinion, we have explained further that both claims share a statewide harm in common, *see supra* Section II.A.3. Accordingly, as with the First Amendment claims, the Plaintiffs have established standing for this claim as well.

### 2. Organizational Plaintiffs

We note that the Defendants' motion for summary judgment, which discusses standing at length, does not break out its challenge to the organizational Plaintiffs' standing from that of the individual Plaintiffs. We discuss the organizational Plaintiffs' standing separately, however, because the injuries that they allege are somewhat different in nature. An organization has standing in its own right when it can show the same three elements that the individual Plaintiffs need to establish. *See Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013). Moreover, an organization has associational standing when: "(1) the organization's 'members would otherwise have standing in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 967 (6th Cir. 2009) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). When the Plaintiffs' standing is challenged in a motion for summary judgment, "the plaintiffs must, in the words of [Federal Rule of Civil Procedure 56], set forth specific facts, in affidavits or through other evidence, demonstrating that each element of standing is satisfied." *Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 537 (6th Cir. 2005) (internal quotation marks omitted).

The Plaintiffs assert that they have associational standing for their vote-dilution claim.  Dkt. 177 (Pls.' Opp'n to Summ. J. at 45) (Page ID #8321).  The Plaintiffs also assert that they have associational standing, as well as standing in their own right, to pursue their First Amendment claims.  *Id*. at 57, 61 (Page ID #8333, 8337).  They have put forth the deposition testimony of the various organizational Plaintiffs to substantiate their assertion of standing.  Each organization's evidence to support standing will be addressed in turn.

*OAPRI*

OAPRI's activities include "voter education, voter registration, civic engagement, voter outreach, and encouraging people to vote."  Dkt. 177 (Pls.' Opp'n to Summ. J. at 58) (Page ID #8334).  Andre Washington, the state president of OAPRI, is the organization's Rule 30(b)(6) representative.  At his deposition, Washington testified that Ohio's congressional lines meant that OAPRI had "to use more resources to . . . educate people on the importance of voting . . . to explain to people that your vote does count."  Dkt. 178-1 (Washington Dep. at 70) (Page ID #9589).  He stated that "if the districts weren't so gerrymandered, we could use our resources to register more people."  *Id*. at 126 (Page ID #9600).  He further stated that

> with this gerrymandered map, candidates don't come out to forums.  We hold forums and they don't show up because they don't need to because they're either in a packed or cracked district and they just don't think that they need to be held accountable to the voters because they're going to win regardless.

*Id*.  Washington testified that in District 12, he has "knocked on doors and it seems like every third door that [he] knock[s] on people are saying my vote doesn't count in this district, it doesn't matter, the same person is going to get back in office."  *Id*. at 73 (Page ID #9591).  He testified that he himself is "in a cracked district where sometimes [he] feel[s] like [his] vote doesn't matter because it's diluted in this big sea."  *Id*. at 106 (Page ID #9599).

LWVO "registers voters, educates voters on voter ID laws, hosts candidate forums, and recruits poll workers." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 63) (Page ID #8408). It also "engages in [get-out-the-vote] efforts, including voter education about deadlines and early voting." *Id*. The organization has 2,700 to 2,800 members. *Id*. Jennifer Miller, the executive director of LWVO, is the group's Rule 30(b)(6) representative. At her deposition, Miller testified that "every two years there is a State convention where [LVWO's] priorities are brought to the floor for [its] member delegates to vote on and fair districts is a long-standing topic in those conventions that is supported by [its] membership." Dkt. 177-27 (Miller. Dep. at 51) (Page ID #9491). Miller further stated that LWVO planned congressional candidate forums that Congressman Steve Stivers and Congressman Jim Jordan did not attend and that "if [Stivers and Jordan] were worried about the outcome of an election, they would take the opportunity to talk to voters directly." *Id*. at 94–95 (Page ID #9501–02). She testified to planning these events but "having to tell the other candidate that they can't speak to the constituents either" because some candidates chose not to attend which caused "a lot of wasted time, a lot of wasted energy." *Id*. at 94 (Page ID #9501). Miller further testified that "the 2012 Plan had forced the League to divert resources from voter-education efforts to attempts to pass redistricting reform to ensure fair maps." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 65) (Page ID #8410).

## *NEOYBD*

NEOYBD is a group that "looks to mentor, empower and recruit the next generation of young people of color who want to be involved in the political process." Dkt. 178-2 (Jackson Dep. at 8) (Page ID #9606). The organization educates people on "why [their] vote matters, why [they] should be voting," and "concrete issues that are on the ballot." *Id*. at 9 (Page ID #9607).

"NEOYBD has about sixty members, all Democrats and regular voters, who currently live in Ohio U.S. Congressional districts 9, 11, 13, and 14." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 146) (Page ID #8491). Gabrielle Jackson, the president of the organization, was its Rule 30(b)(6) representative. Jackson testified that her group fundraises for candidates and for the group itself. She stated that "it's been challenging based on the way this map is currently drawn, because folks have been feeling like, you know, [their] voices aren't being heard. So it's causing us to use more of our resources, when we have a hard time bringing in resources." Dkt. 178-2 (Jackson Dep. at 23) (Page ID #9614). Jackson testified that the current map means that members of her group's "voices are diluted, because of the packed district . . . [as are] our voice and representation and accessibility to candidates." *Id.* at 67 (Page ID #9629). Jackson testified that while canvassing and phone-banking with her organization, she spoke with people who expressed apathy about voting and said that they did not believe that their votes mattered. *Id.* at 69 (Page ID #9630). Jackson further testified that the current map limits the locations where the organization chooses to have fundraisers. She stated that "in certain parts, for example, in District 14, we don't have fundraisers there, because there is no reach there." *Id.* at 85 (Page ID #9634).

### *OSU College Democrats*

The OSU College Democrats "advocate, educate, and engage people at OSU in alignment with the Democratic Party's platform." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 66) (Page ID #8411) (internal quotation marks omitted). "The organization participates in election activities, including voter registration," canvassing and phone-banking, and held a fundraiser for Danny O'Connor, who was a Democratic candidate for Congress in the Twelfth Congressional District. *Id.* at 67 (Page ID #8412). Alexis Oberdorf is the President of the OSU College Democrats and is the group's Rule 30(b)(6) representative. *Id.* at 66 (Page ID #8411). Oberdorf

testified that members of her organization did informal outreach to their friends in the lead-up to election and the most common reason that they identified for not planning to vote was that they felt that their votes did not matter. Dkt. 177-28 (Oberdorf Dep. at 70–71) (Page ID #9548–49). Oberdorf testified that OSU students living near campus reside in the 3rd, 12th, and 15th congressional districts. *Id.* at 103 (Page ID #9560). She testified that having students split among the three different districts made it more difficult to "disseminate information on elections" and caused confusion among students "who just assume that they can vote in the same area that their friends can." *Id.* at 69 (Page ID #9547). She testified that her organization has "done coordinated call campaigns for bills that [it] oppose[s]" to representatives from those districts and has found "it challenging especially to contact or get . . . a response from those individuals." *Id.* at 103 (Page ID #9560). For example, Oberdorf testified that her organization has had trouble getting Joyce Beatty, the representative from the 3rd district, to speak at their meetings, observing that Beatty has "won her elections by huge, huge leads" and that there is therefore "no . . . pull for her to come speak to College Democrats." *Id.* at 103–04 (Page ID #9560–61).

### *HCYD*

HCYD is composed of around 150 members who live in the First and Second Congressional Districts. Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 149) (Page ID #8494). Nathaniel Simon is HCYD's Rule 30(b)(6) representative. At his deposition, Simon testified that he believes that under the Plaintiffs' Proposed Remedial Plan "it would be much easier to engage voters and members about which district they live in and which candidates to advocate for" because under the current map "the City of Cincinnati is split, and so there's a lot of confusion regarding which candidate represents which individual and which area." Dkt. 178-3 (Simon Dep. at 20) (Page ID #9639). He further stated that, although the current map "hasn't

prevented [HCYD] from engaging in get out the vote activities, . . . it's made it a lot tougher." *Id.*
at 31 (Page ID #9641). He also stated that the organization has "seen less—fewer people volunteer
or give money because—and they have stated that it's because of just feeling apathetic and that it
won't—them volunteering or contributing anything will [not] meaningfully effect any change."
*Id.* at 56 (Page ID #9647).

***

For purposes of summary judgment, the organizational Plaintiffs have put forth sufficient
evidence to establish standing for their First Amendment claim.[7] *See Gill*, 138 S. Ct. at 1938–39
(Kagan, J., concurring). As to the organizational Plaintiffs' standing in their own right, they
generally characterize their injury as a harmed ability to associate—"the map mak[ing] it more
difficult to engage voters, [requiring them to] use additional resources, and impair[ing] the efficacy
of their work." Dkt. 177 (Pls.' Opp'n to Summ. J. at 58) (Page ID #8334). As catalogued above,
they offer testimonial evidence that raises a question of fact as to whether there is a "causal
connection between the injury and the challenged conduct"—that the districts in the enacted map
are at least in part responsible for the associational difficulties that the organizations face. *Miami
Valley*, 725 F.3d at 576. Finally, the organizational Plaintiffs have also raised a genuine issue of
fact as to whether "the requested relief will redress the injury"—whether redrawing the districts,
for example in the manner advocated by the Proposed Remedial Plan, would allow the parties to
allocate resources more efficiently and to engage with voters in a more effective manner or whether
more competitive districts would decrease the voter apathy that hinders the organizations' work.

At this stage in the litigation, the organizational Plaintiffs have established associational
standing on behalf of their members for the vote-dilution claims (both under the First Amendment

---

[7] As noted, essentially the same analysis applies to the Article I claim. *See supra* Section II.A.3.

and the Equal Protection Clause) as well. They have shown that "the organization's 'members would otherwise have standing to sue in their own right.'" *Friends of Tims Ford*, 585 F.3d at 967 (quoting *Hunt*, 432 U.S. at 343). The Democratic organizations' members are Ohio Democratic voters, and the Plaintiffs have pointed to evidence from which it could be inferred that such voters were intentionally placed in packed and cracked districts where the power of their votes would be diluted. We have detailed this evidence in the context of the individual Plaintiffs above. More particularly, the OSU College Democrats "generally live in the Third, Twelfth or Fifteenth Congressional Districts" and "the bulk of the members are registered to vote at their school address." Dkt. 177-1 (Pls.' Resp. to Proposed Undisputed Facts at 140) (Page ID #8485). The OSU College Democrats therefore claim that "[t]he votes of the members of the OSU College Democrats have been diluted due to the construction of the Third, Twelfth, and Fifteenth Congressional Districts." *Id.* NEOYBD has around sixty members who vote for Democratic candidates and live in four different U.S. congressional districts. *Id.* at 146 (Page ID #8491). HCYD's approximately 150 Democratic members live in the First and Second Congressional Districts. *Id.* at 149 (Page ID #8494). OAPRI "has members living in nearly every congressional district throughout the state [of Ohio]." *Id.* at 142 (Page ID #8487). For example, Andre Washington, the organization's president, lives in District 12, which is alleged to encompass a part of a cracked Democratic population center. *Id.* at 143 (Page ID #8488). Stephanie White, another OAPRI member who identifies as a Democrat, lives in the Fifth Congressional District. *Id.* at 144 (Page ID #8489). She believes that the Fifth Congressional District cracks Democrats and thereby dilutes her vote. *Id.* at 144–45 (Page ID #8489–90). Finally, LWVO has 2,700 to 2,800 members in Ohio, some of whom reside in each of Ohio's sixteen U.S. congressional districts, which they

claim are packed or cracked, resulting in dilution of their votes. *Id.* at 134–35 (Page ID #8479–80).

The organizational Plaintiffs have also established that the interests that they seek to protect in this litigation "are germane to the organization's purpose." *Friends of Tims Ford*, 585 F.3d at 967 (quoting *Hunt*, 432 U.S. at 343). NEOYBD, OSU Democrats, and HCYD seek to organize Democratic voters to elect Democratic candidates. They point to testimony from which a reasonable fact-finder could infer that these aims are hindered by the current district map. Additionally, OAPRI and LWVO seek to engage and educate voters and they argue that these efforts are hampered by packed or cracked districts that dilute people's votes, which in turn causes voter apathy and confusion. In fact, all of the organizational Plaintiffs have stated that voter confusion and apathy have resulted from the current map's alleged packing and cracking of voters, making the organizations' work more difficult and forcing them to expend greater resources to counteract these results. The organizations have averred that the uncompetitive races in certain districts resulting from the current districting mean that candidates and representatives are less responsive to the organizations and less likely to attend voter forums that they organize. Lastly, the Defendants do not argue that "[]either the claim asserted []or the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Hunt*, 432 U.S. at 343); *see* Dkt. 136 (Mot. for Summ. J. at 11–30) (Page ID #3556–75); Dkt. 190 (Defs.' Reply at 13–16) (Page ID #11159–62).

## III.    CONCLUSION

For the foregoing reasons, we **DENY** the motion for summary judgment (Dkt. 136, 140).

ENTERED: **February 15, 2019**

s/ *Karen Nelson Moore*
HONORABLE KAREN NELSON MOORE
United States Circuit Judge

s/ *Timothy S. Black*
HONORABLE TIMOTHY S. BLACK
United States District Judge

s/ *Michael H. Watson*
HONORABLE MICHAEL H. WATSON
United States District Judge