Confidential

1              S. Chabot

2        IN THE UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF OHIO

4      CIVIL ACTION NO: 1:18-cv-00357-TSB-KNM-MHW

5    OHIO A. PHILIP RANDOLPH

6    INSTITUTE, et al.

7            Plaintiffs,

8        vs.

9    RYAN SMITH, Speaker of the Ohio

10   House of Representatives, et al.

11           Defendants.

12   _____/

13            ***CONFIDENTIAL***

14       DEPOSITION OF STEVEN J. CHABOT

15            WASHINGTON, D.C.

16        Monday, December 3, 2018

17

18

19

20

21

22

23

24   REPORTED BY: Ronda J. Thomas, RPR, CRR

25   Job No. 149790

Confidential

Page 2

1                          S. Chabot

2

3

4

5

6                  Monday, December 3, 2018

7                      10:30 a.m.

8

9          The deposition of STEVEN J. CHABOT was

10    held on Monday, December 3, 2018 at the Law Offices

11    of Baker & Hostetler LLP, 1050 Connecticut Avenue,

12    N.W., Washington, D.C. 20036, before Ronda J.

13    Thomas, Registered Professional Reporter, Certified

14    Realtime Reporter and Notary Public of the District

15    of Columbia, and State of Maryland.

16

17

18

19

20

21

22

23

24

25

Confidential

Page 3

1                     S. Chabot

2    APPEARANCES:

3          ON BEHALF OF PLAINTIFFS:

4              THERESA LEE, ESQUIRE

5              American Civil Liberties Union

6              125 Broad Street

7              New York, NY 10004

8

9          ON BEHALF OF LEGISLATIVE DEFENDANTS:

10            MICHAEL MCKNIGHT, ESQUIRE

11            (via telephone)

12            Ogletree, Deakins, Nash, Smoak & Stewart

13            4208 Six Forks Road

14            Raleigh, NC 27609

15

16         ON BEHALF OF THE INTERVENORS:

17            KATHERINE MCKNIGHT, ESQUIRE

18            Baker & Hostetler

19            1050 Connecticut Avenue, NW

20            Washington, DC 20036

21

22

23

24

25

Confidential

Page 4

1                          S. Chabot

2                    P R O C E E D I N G S

3    Whereupon,

4                    STEVEN J. CHABOT,

5    called as a witness, having been first duly sworn to

6    tell the truth, the whole truth, and nothing but the

7    truth, was examined and testified as follows:

8                         EXAMINATION

9    BY MS. LEE:

10       Q      Congressman, thank you.  My name is Theresa

11   Lee.  I'm an attorney for the plaintiffs in Ohio A.

12   Philip Randolph Institute versus Smith, a case in the

13   Southern District of Ohio in which you have intervened.

14              Also here today we have --

15              MS. MCKNIGHT:  Yes, good morning.  We have

16   Kate McKnight for Baker Hostetler on behalf of the

17   congressman.

18              MS. LEE:  And on the phone?

19              MR. MCKNIGHT:  Yes, ma'am.  It's Michael

20   McKnight, attorney with Ogletree Deakins law firm in

21   Raleigh, North Carolina on behalf of the legislative

22   defendants.

23   BY MS. LEE:

24       Q      Congressman, could you please state your

25   full name and residential address for the record?

Confidential

Page 5

                          S. Chabot

1

2       A       Steven, with a V, J. Chabot, C-H-A-B-O-T.

3    3025 Daytona Avenue, Cincinnati, Ohio 45211.

4       Q       You've just been sworn in.  Do you

5    understand that you're testifying under oath here

6    today?

7       A       Yes.

8       Q       And do you understand that the oath you've

9    sworn to is the same as if you were testifying in a

10   court of law?

11      A       Yes.

12      Q       Have you ever been deposed before?

13      A       I don't remember.  I've deposed other

14   people.

15      Q       Okay.  Do you recall if you've ever

16   testified under oath before?

17      A       I don't remember to be honest with you.

18      Q       That's fine.

19      A       I put a lot of other people under oath when

20   they've testified in courtrooms.  I've had civil trials

21   and criminal trials and other things.

22      Q       Understood.  I would like to go over a few

23   ground rules with you for today to ensure that

24   everyone's on the same page.

25              Please make sure you give a verbal response

Confidential

Page 6

S. Chabot

1  

2 to each question as opposed to nodding your head or any

3 gestures that obviously we have a court reporter here

4 with us today, just so we can ensure that she can take

5 down all of your response.

6      A      Okay.

7      Q      Also, to make her life a bit easier and a

8 clear record for all of us, let's do our best not to

9 speak over one another.  Please wait until I finish

10 asking the question, even if you think you know where

11 I'm headed, before giving your answer.

12            Can you agree to that?

13     A      Yes.

14     Q      Great.  I will try to do the same.  I'll

15 try not to begin the next question until you have

16 finished speaking as well.

17     A      Okay.

18     Q      If you don't hear what I've asked, please

19 just say so and I'll be happy to repeat myself.  If you

20 don't understand a question or even any part of a

21 question, please say so and I'll rephrase.  Can you

22 agree to that?

23     A      Yes.

24     Q      And is it fair that if you do answer a

25 question I can take that to mean you understood what

Confidential

1                     S. Chabot

2    I've asked?

3         A      Yes.

4         Q      And if at any time you need a break, please

5    just say so.  I will ask that if I have a question open

6    you answer it first and then take a break right after.

7    Can you agree to that?

8         A      Yes.

9         Q      And if at any time you need to consult with

10   your attorney regarding the disclosure of potentially

11   privileged information, please just state that's the

12   reason and we can take a break for you to consult with

13   her.  Can you agree to that as well?

14        A      Yes.

15        Q      Great.  And your attorney or attorneys for

16   defendants, though he's on mute, so perhaps not, might

17   object at some point to a question I asked.  Even if

18   they object, you should still answer the question

19   unless Kate directs you not to answer.  Do you

20   understand that?

21        A      Yes.

22        Q      And is there anything that would prevent

23   you from answering my questions honestly and fully

24   today?

25        A      No.

Confidential

Page 8

S. Chabot

1

2      Q      And throughout this deposition I may refer

3   to the Ohio redistricting, the 2011 redistricting.

4   Unless I specify otherwise, I'm referring to the

5   redistricting for Ohio's congressional map that

6   occurred in 2011.

7            Do you understand that?

8      A      Yes.

9      Q      And also throughout I may refer to the

10  congressional map or just shorthand to the map, and

11  unless I specify otherwise, I'm referring to the map

12  that was put in place as a result of the 2011

13  congressional redistricting in Ohio.

14           Do you understand that as well?

15     A      Yes.

16     Q      Great.  Did you do anything to prepare for

17  today's deposition?

18     A      I met last Friday with Kate.  I think we

19  met for the first time then.

20     Q      Okay.  Great.  In addition to Kate, was

21  anyone else present in the room at the time?

22     A      There was another attorney there at the

23  beginning of the meeting and he left.

24     Q      Okay.  Did you review any documents as part

25  of your preparation?

Confidential

Page 9

1                          S. Chabot

2        A       Nope.

3        Q       Have you, prior to that preparation,

4   reviewed the complaint in this case?

5        A       No.

6        Q       And did you review the motion to intervene

7   that was filed on behalf of you, the other members of

8   the congressional delegation and other Ohio voters?

9        A       No.

10       Q       Did you review the Requests For Production

11  that were served on you through your counsel?

12       A       No.

13               MS. LEE:  I'd like to mark as Exhibit 1

14  this document here.

15               (Chabot Exhibit 1, Requests for Production

16  marked for identification as of this date)

17       Q       And these are the Requests For Production

18  that plaintiffs served on you through your counsel.

19  You're not familiar with this document?  You've not

20  seen it before?

21       A       I know that it was served.  I don't recall

22  how we got it.  I've never sat down and read it.

23       Q       Understood.  Okay.  And from communicating

24  with your counsel or communicating with staff members

25  who communicated with your counsel, as I know your

Confidential

Page 10

1                          S. Chabot

2    schedule must be quite full to say the least, was it

3    your understanding that we were seeking documents

4    related to the 2011 redistricting and other issues

5    surrounding it?

6          A       Could you define "we"?

7          Q       The plaintiffs in this case?

8          A       Yes.

9          Q       And did you review any documents that were

10   going to be produced in response to these requests?

11         A       Could you say that question again?

12         Q       Did you review any documents that were

13   going to be produced in response to this request?

14         A       When you say "review," did I sit down and

15   read documents or anything?  I didn't do that.  I know

16   there were things that we had to respond to.

17                 I've got staff people that pretty much took

18   care of that for me and we talked about a few things,

19   but you also need to understand that the last couple of

20   months we had elections going on and my principal

21   focus, other than being the best Congress person I

22   could, representing my people, was to focus on the

23   campaign.

24                 And so I knew this lawsuit was going on but

25   I didn't pay a lot of attention to it to be quite

Confidential

Page 11

1                              S. Chabot

2     honest with you.  So...

3          Q       Okay.

4          A       But I'm pretty -- I'm somewhat familiar

5     with what it's about and those types of things, but I

6     haven't devoted considerable brain power on this thing.

7          Q       Okay.  Understood.  Absolutely.  And who on

8     your staff did you understand to be sort of in charge

9     of dealing with these requests?

10         A       Brian Griffith.

11         Q       Okay.

12         A       And Jamie Schwartz to a probably lesser

13    degree.

14         Q       And are they members of your congressional

15    staff?

16         A       Brian is now.  Jamie was years ago.  He now

17    has a consulting -- political consulting company.  I

18    think it's called Fountain Square something.

19                 And so our campaign has him and their

20    people on retainer.  We have for quite a few years.

21                 And so Jamie and Brian are the two most

22    familiar with what's going on here.  Probably Brian

23    mostly because he's still on my official staff and he's

24    an attorney and Jamie is not.

25         Q       Okay.  Understood.  What email addresses

Confidential

Page 12

1                      S. Chabot

2    did you use in 2011?

3         A       SteveChabot11@gmail.com.

4         Q       Do you have an official congressional email

5    address?

6         A       Yes, I think we do.  If we do I never use

7    it.  My staff uses that stuff but I really don't.  I

8    think we have a campaign, too, but again I don't use

9    that.

10        Q       So there may well be other email addresses

11   that are technically assigned to you, but you don't

12   send or receive emails with those addresses?

13        A       Yes, that's correct.

14        Q       Okay.  Understood.

15        A       For all I know there may be others, too,

16   that I don't know about.  I'm not the most

17   technologically advanced.  I'm 65 years old.  My kids

18   understand this stuff but, you know.

19        Q       Absolutely.  I think I have some dead email

20   addresses still hanging out there myself.

21        A       But the one I use is

22   SteveChabot11@gmail.com.  That's the one I use.

23        Q       Very good.  Understood.

24                You've, at this point, run for office many

25   times.

Confidential

Page 13

1                       S. Chabot

2        A       Yes.

3        Q       Have you in general used the same website

4   or the same set of servers across time that you've run

5   for office since 2010?

6        A       Oh, since 2010?

7        Q       Yes.

8        A       I first ran for office in 1979 so but since

9   2010, yes, I think so.

10       Q       Okay.  Do you have a general practice

11  regarding how long you keep emails in your Steve Chabot

12  11 Gmail account?

13       A       If we do, I'm not aware of it.

14       Q       Does anyone else have access to that email

15  account?

16       A       Many people have access to it, yes.

17       Q       Does anyone ever send emails from that

18  account where you are not the sender of the email?

19       A       I have no idea.

20       Q       Okay.

21       A       I wouldn't be surprised but I -- if they

22  didn't, I wouldn't be surprised with that either.

23       Q       Okay.  Understood.  And who in general

24  would you say had access to that email account in 2011?

25       A       Some of my staff.  I don't know which ones.

Confidential

Page 14

S. Chabot

1   My wife, probably my kids, campaign people, lots of

2   people know about it because if you had a problem they

3   would come in and solve it.  So there are other people

4   that do, yes.

5       Q    Okay.  Understood.  And do you keep

6   electronic calenders of any kind, whether through

7   Outlook calender or Google or Apple have calenders?

8       A    On my official staff Lisa is my scheduler

9   and she handles my schedule.  So and it's partially

10  electronic and she gives me a hard card that I carry

11  around all the time.  So I don't know if that answers

12  your question but...

13      Q    It does.

14      A    Yes.

15      Q    You don't have then any other personal

16  calenders that you keep electronically; is that

17  correct?

18      A    Not that I'm aware of, no.

19      Q    And do you know if there's a general

20  practice for how long the content of those calenders is

21  kept and stored that your scheduler runs?

22      A    No, I don't.

23      Q    Who were the main members of your staff

24  that you interfaced with most directly or who carried

Confidential

1                           S. Chabot

2     out the most tasks for you in 2011?

3          A       Could you rephrase that question or...

4          Q       Who were the key members of your staff in

5     2011?

6          A       Could you define staff, too?  I have

7     official staff.  I have campaign staff.

8          Q       Well, let's break them out into two

9     separate questions then.

10         A       Okay.

11         Q       For your official congressional staff in

12    2011, who were the staff members?

13         A       In 2011?  I was just thinking of my chief

14    of staff but she wasn't my chief of staff in 2011.  My

15    chief of staff in 2011 was Mark Wellman who is not my

16    chief of staff now.

17         Q       Understood.

18         A       He's a professor at the Naval Academy.  But

19    he was my chief of staff then.  Mike Cantwell was my

20    district director.  But Mike's about as technologically

21    advanced as I am and he's even a month older than me.

22    He's 65.  So he sort of heads up the Cincinnati office.

23              But Brian Griffith is the one who, in the

24    office who -- he's my attorney.  He's the attorney on

25    staff there.  He's important.

Confidential

Page 16

S. Chabot

2      You want me to go through my whole staff?

3  You said the primary?

4      Q      The primary?

5      A      Mike wouldn't know anything about this

6  stuff.  Brian would be the main person.  Lisa is my

7  scheduler.  I don't remember if she was my scheduler

8  back then or not.  Katy was.  Not Katy (indicating) but

9  Katy was a different one.

10      Q      And for Lisa and Katy, do you recall their

11  last names.

12      A      I should.  Katy's last name was Moore.

13  Lisa just got married a few months ago.

14      Q      It's not a memory test.

15      A      She's just my scheduler.  I don't think

16  she's going to know the stuff either.  I'm happy to try

17  to be helpful.

18      Q      No, I'm trying to understand the universe

19  of people.

20      A      I've got six or seven or eight people in my

21  Washington office.

22      Q      Okay.

23      A      My current chief of staff is Stacy Barton.

24  But she wasn't my chief of staff back then and she's

25  really not political.  Doesn't handle this kind of

Confidential

Page 17

1                        S. Chabot

2    stuff.  I've got six, seven, eight.  And we've got

3    interns.

4              I'm chairman of the House of Small Business

5    Committee and we've got another 18 people on staff

6    there.

7              My Cincinnati office and my Warren County

8    office we've got another half dozen or so.  I don't

9    think you want me to go through the whole universe of

10   the people that were there.

11        Q    No, no, no.

12        A    Especially back in 2011.  I'm not trying to

13   be difficult.  Really not.  I'm just trying to answer

14   your question.

15        Q    No, absolutely understood.  And I think it

16   sounds like you've described the primary staff members.

17             Mike Cantwell as the district director,

18   he's overall in charge of both the Cincinnati and the

19   Warren County offices?

20        A    Yes.  Mike told me he's retiring, though.

21   He's going to be retiring in a week to go deer hunting

22   and other fun stuff so...

23        Q    And just confirming, Lisa your current

24   scheduler was not your 2011 scheduler?

25        A    That's correct, she wasn't.  Katy was, I

Confidential

Page 18

1                        S. Chabot

2    think.  I'm pretty sure she was.  I don't know.  I've

3    had so many folks over the years.

4              I've been in Congress 22 years and I first

5    ran in '79.  That was over 40 years ago.  I ran 21

6    times so far.  I counted them up.  That's how I know

7    that.

8         Q     And Brian Griffith was also on your staff

9    in 2011; is that correct?

10        A     He was.  In fact, he might have been my

11   chief of staff at that time because he was chief of

12   staff for about six months in 2011.  Then I hired Mark

13   Wellman and Mark Wellman was chief of staff and now

14   Stacy is but Brian may have been.  But I'm not sure.

15        Q     Understood.  Did you ever send text

16   message, iMessages, BlackBerry messenger, depending on

17   what type of phone you had, with members of your staff?

18   Is that a way you communicate with them?

19        A     Yes.

20        Q     And have you had the same phone number for

21   your cell phone, smartphone since 2010?

22        A     I don't know.  I think so.  Some of it has

23   been.  I've got a lot of different phone numbers, too.

24   I'm trying to think if -- I'm not absolutely sure.

25        Q     Okay.  And do you have separate phones for

Confidential

Page 19

1                    S. Chabot

2    your official congressional business, your personal

3    business and campaign business?  Are those all separate

4    cell phones or cell phone numbers?

5         A        I think so.

6         Q        As to those three numbers, would you send

7    text messages from your official phone with members of

8    your staff?

9         A        Could you repeat that question?

10        Q        So the text messages or iMessages, whatever

11   type they are that you've communicated that way with

12   members of your staff, do you ever do that from your

13   official congressional cell phone?

14        A        Yeah, that's -- the only text messages that

15   I send, I think, are 202, whatever the heck the number

16   is 225-9611, I think it is.  And that's the way I send

17   texts on there.

18        Q        And for a campaign phone or a personal

19   phone, you don't ever send text messages from that

20   phone to members of your staff?  Just --

21        A        I don't know what you just said.

22        Q        So the 202 number we've just discussed, is

23   that the only one of your phones that you use to send

24   text messages?

25        A        That's the only one -- you told me not to

Confidential

Page 20

1                    S. Chabot

2  interrupt you.  I apologize.

3       Q       That's okay.

4       A       I think that's the only one I text on, I

5  think.  I haven't texted before until relatively

6  recently.  My kids used to laugh about that.  Because I

7  used to email everything when I emailed.  So...

8       Q       Understood.  Understood.

9               What type of paper files do you keep?

10      A       What type of paper files do I keep?  I

11  don't think I keep any paper files that I can think of

12  now.

13      Q       Okay.

14      A       I used to years ago when I -- I was a sole

15  practitioner for almost two decades.  I had all kinds

16  of paper files then.  But I don't think I have anything

17  like that anymore.  And I stopped doing that 20 years

18  ago.

19      Q       Okay.

20      A       But now I can't think of any paper files

21  that I would keep.  My -- my staff gives me papers

22  sometimes and will do something and then when I'm done

23  they go or my staff gets rid of them or whatever.

24      Q       Okay.

25      A       So I don't think I have anything like that

Confidential

Page 21

1                      S. Chabot

2    anymore.

3         Q        Okay.  Understood.  Do you ever take

4    handwritten notes?

5         A        Yes.

6         Q        Do you keep those?

7         A        No.

8         Q        Do you ever keep handouts or printouts that

9    you might receive at a meeting?

10        A        I might keep something for a short period

11   of time until whatever it is I was preparing for is

12   over and then I wouldn't have them anymore.

13        Q        Understood.  Do you, separate from the

14   printout card that you mentioned that Lisa creates, do

15   you ever keep paper calenders or agendas otherwise?

16        A        No.

17        Q        And did you -- other than your solo

18   practitioner files, did you ever keep any other paper

19   files?

20        A        I don't think so.

21        Q        Okay.  Are you aware if your staff has a

22   general practice regarding the papers they take from

23   you, whether they keep them or there's a certain

24   retention period?

25        A        No.

Confidential

Page 22

1                                  S. Chabot

2          Q        Do you know if your campaign has any,

3     across time, has had any retention policies?

4          A        I don't know what they do.

5          Q        Okay.  With respect to the Request For

6     Production, do you know where Brian and -- I've now

7     forgot --

8          A        Jamie.

9          Q        -- and Jamie, where Brian and Jamie looked

10    to collect documents?

11         A        Where they looked to collect documents?

12         Q        Yes.

13         A        I don't know how they did it.

14         Q        So of the various types of documents that

15    I've been asking you about, you would not have any

16    knowledge of which type of documents, text messages,

17    emails or paper documents that Brian and Jamie looked

18    for; is that correct?

19                  MS. MCKNIGHT:  Objection as to form.

20                  Let me take this moment, we've been

21    operating in these depositions under an agreement as

22    stipulation as to objections that all objections but

23    for the form objection are reserved.

24                  Do I understand correctly that we're

25    operating under that same stipulation here?

Confidential

Page 23

1                        S. Chabot

2             MS. LEE:  Yes, we are.

3             THE WITNESS:  Could you repeat the

4    question?

5    BY MS. LEE:

6        Q     Do you have any knowledge of whether Brian

7    and Jamie sought to collect emails?

8        A     Sought to collect emails?  I don't know

9    exactly what that means.

10       Q     Do you have any knowledge whether Brian and

11   Jamie searched your Gmail account for documents

12   responsive to these requests?

13       A     My understanding is that they were working

14   with the attorneys to make sure that we complied with

15   everything here and that's all I really know --

16       Q     Okay.

17       A     -- is that they were working with these

18   folks and I'm referring to my attorney who's next to me

19   here.  And that there were words that they wanted to

20   search and I don't remember what they were anymore but

21   that we were cooperating completely in that effort.

22   That's what I know.

23       Q     Okay.  Perfect.  So to sort of put this set

24   of questions aside, as to any of the particulars of

25   that you wouldn't have knowledge; is that correct?

Confidential

Page 24

1                         S. Chabot

2        A       No, no.  I do remember them talking about

3   some of the words and things that there were and I said

4   whatever they're asking, you know, let them have it,

5   give it to them.  That's what they were doing.  That's

6   all I know.

7        Q       Okay.  Do you keep any social media

8   accounts?

9        A       Do I keep any social -- you're talking

10  about Facebook and stuff like that?

11       Q       Facebook or Twitter?

12       A       When you say keep them, we have that both

13  on our campaign website and we have that also on our

14  official website.  So if that's what you mean by keep,

15  yes, we have that kind of stuff.

16       Q       Do you know when in time you began for your

17  campaign having social media accounts?

18       A       Now, when you say campaign, do you mean one

19  campaign in particular or ever?

20       Q       The various campaigns you've had over time,

21  do you know what year you would have first begun --

22       A       No.

23       Q       -- having social media accounts?

24       A       No, I don't know that.  I know it's a lot

25  more important now than it used to be and I know we do

Confidential

Page 25

1                         S. Chabot

2       it.  But I don't really know when we started.

3           Q       Okay.  Understood.  And would the same be

4       true for your official social media accounts?  Do you

5       know when those began?

6           A       The same is true that I don't know exactly

7       when it happened, yes.

8           Q       Do you oversee the posting on -- on your

9       campaign social media accounts?

10          A       I don't oversee it.  I see it sometimes and

11      usually, you know, my people are working on that stuff.

12      Sometimes I'll get pictures to them.  They have what's

13      called throwback Thursday and we have done those.

14      Oftentimes it's cute pictures of me when I was a little

15      kid and stuff like that.  So I'm involved in that.

16                  But typically what happens is people

17      nowadays use that and just like attack you viciously no

18      matter what you put up there, you know, and so we're

19      more careful about putting stuff up anymore online

20      because they just attack you.  It's pretty vicious out

21      there now in the social media nowadays.

22          Q       Do you or your staff ever reply to comments

23      on those social media accounts?

24          A       I don't know if we do or not.  I think

25      sometimes but usually you don't, I think, because when

Confidential

Page 26

1                          S. Chabot

2   you do it can be this, why didn't you respond to mine

3   and so you end up in this endless -- so I don't think

4   we respond very often on social media, I don't think.

5        Q      Understood.  Do you know how it is

6   determined whether a post is going to be made on your

7   social media accounts?

8        A      I do when I have something and I suggest.

9   Like, on Thanksgiving, I went on and found what I

10  thought was a nice thing.  I said why don't we put this

11  up for Thanksgiving and, voila, there it was and it

12  worked.  So, you know, sometimes I'm involved.  I would

13  say most of the time probably not.  But sometimes yes.

14       Q      Do you or your staff ever answer direct

15  messages, those that are not posted publicly on the

16  wall but that are sent directly, there tends to be

17  messaging functions in both Twitter and Facebook?

18       A      In my official office, when we get

19  information we respond to those kinds of things.  If

20  somebody has a request or if they say that I'm for this

21  or that or I'm against this or that.  In my official

22  office, you know, they handle those kinds of things.

23  It's part of my functioning as a member of Congress and

24  responding to things.

25              So I'm not sure if that's what you're

Confidential

Page 27

                          S. Chabot

1

2    asking, but if you are, we do respond to that kind of

3    stuff.

4        Q      Yes, that's what I'm asking.  Thank you.

5        A      Okay.

6        Q      Do you know if your campaign social media

7    also responds to direct messages that are sent?

8        A      I don't know.  But I think probably not as

9    much.  But I'm not sure about that.

10       Q      And is all of, as far as you know, the

11   content of your accounts publicly available, it's

12   outward facing?

13              MS. MCKNIGHT:  Objection.  Form.

14       A      If you could repeat.  I'm not even sure

15   what you're saying.

16       Q      Do you know if all of the content of your

17   social media accounts is publicly available?

18       A      I still don't know what you mean by that.

19   I'm sorry.

20       Q      No.  That's okay.

21       A      Are you asking like on Facebook and stuff

22   if the people go on there, can the public see it?  Is

23   that what you're asking me?

24       Q      Yes.  So there's no content that's kept

25   private or only open to a certain set of people?

Confidential

Page 28

S. Chabot

1

2      A      As far as I know, that's correct, what

3   you're saying here.  When it's up there, everybody can

4   see it, as far as I know.

5      Q      So changing gears a little here.  So you

6   first ran for Cincinnati city council as an independent

7   candidate in 1979; is that correct?

8      A      Yes.

9      Q      And then in 1983 you ran again for that

10  office as a Republican; is that correct?

11     A      That's correct.

12     Q      Why did you switch from being an

13  independent candidate to being a Republican?

14     A      Because it's very difficult to win as an

15  independent.  I found that out by coming in 16th out of

16  26 back in 1979.  You had to be in the top nine and I

17  didn't make it.

18     Q      Understood.

19     A      Can I elaborate on this?

20     Q      Please, go ahead.

21     A      I had three -- I had run a pretty good race

22  as an independent and I had all three parties reached

23  out to me, Republicans reached out to me and the -- we

24  have a charter party in Cincinnati, which is kind of

25  like the reform party.  So they reached out too.

Confidential

Page 29

S. Chabot

2      And the Democrat reached out to me, too.
3  They reached out to me and took me out for lunch and
4  they were trying to convince me to become a Democrat.
5  You know who that was?  Jerry Springer.  That's why I
6  wanted to elaborate a bit, Jerry Springer.
7      Q      Was he the mayor at the time?
8      A      I'm trying to think.  Had he been mayor
9  already?  I think he had been mayor.  But anyway, I did
10  not become a Democrat.  Not that I had anything against
11  Jerry, although he does contribute to my opponents,
12  maxes them out every year.
13      I think, gee whiz, Jerry.  Sorry to go in
14  such detail there.  I thought that was worth telling
15  you.  Kind of an interesting story.
16      Q      It's worth the story, exactly.
17      You were later elected to the city council?
18      A      In '85, yes.
19      Q      And did you hold any other elected
20  positions before you were elected to U.S. Congress?
21      A      Besides city council?
22      Q      Besides city council?
23      A      Yes, I was a county commissioner, also.
24      Q      Were you a county commissioner up until the
25  time you were first elected to Congress?

Confidential

Page 30

1                        S. Chabot

2        A        Yes.

3        Q        And is it correct you were first elected in

4   1994?

5        A        To Congress?

6        Q        To Congress.

7        A        I was elected in '94, yes.

8        Q        And at that time you were representing also

9   the first district of Ohio; is that correct?

10        A        It was called the first district of Ohio,

11   yes, and I still represent the first district.

12        Q        Okay.  Understood.  Do you recall the shape

13   of your district when you were first elected in 1994?

14        A        Vaguely in my mind.  I have a hard time

15   drawing a map of it, but yeah.

16        Q        And was that district wholly within

17   Hamilton County?

18        A        It was at that time.

19        Q        And as we've discussed, you've been holding

20   elected office since 1985 and you were elected to

21   Congress in 1994, assuming office in 1995.  Is that all

22   correct?

23        A        Yes, I think so.

24        Q        And in each election that you've won,

25   you've done so as a Republican; is that correct?

Confidential

Page 31

1                          S. Chabot

2       A       Yes.

3       Q       And as such, do you regularly communicate

4  with the leadership of the Ohio Republican Party?

5       A       Could you define regularly and Republican

6  Party of Ohio?  Do you mean Republicans --

7       Q       We'll start at the top.  There's an

8  organization known as the Ohio Republican Party; is

9  that correct?

10      A       I think that's what they call themselves.

11  To be honest with you, I'm not absolutely sure.  It is

12  the Ohio party and I guess it's the Ohio Republican

13  Party.

14      Q       So there's generally someone who's the

15  official leader of that Republican Party?

16      A       Yes, yes.

17      Q       Have you ever communicated with that

18  individual?

19      A       Yes.

20      Q       Across time?

21      A       Yes.

22      Q       And how often would you say you've

23  communicated?

24      A       You know, believe it or not, you may not

25  believe this, but she called me, not about this, but

Confidential

Page 32

S. Chabot

1  when I was in my car at the airport driving over here.

2  Her name is Jane Timken.  She called me to say

3  congratulations for winning the election.  That's kinda

4  nice.

5

6          We talked about how we lost seats here and

7  there and Aetna all that well.  But I thought it was

8  nice she called.

9          She said she was going to be running again

10 for re-election to her position as head of the Ohio

11 Republican Party and so that's -- so you asked me if

12 I've talked to her, and I just talked to her on the way

13 over.  And prior to that I hadn't talked to her since

14 before the election.

15     Q     In 2011 did you communicate with the head

16 of the Ohio Republican Party?

17     A     In 2011?  I don't remember.

18     Q     Okay.

19     A     I don't remember who the head of the party

20 was at that time either really.  Bob Bennett was for a

21 while.  That was his name, Bob Bennett, and then others

22 have been so I don't know.

23     Q     And do you communicate with the elected

24 leaders of the Ohio General Assembly?

25     A     Sometimes but, yeah, sometimes.

Confidential

Page 33

1                              S. Chabot

2          Q        And do you recall communicating with any of

3     the members of the Ohio General Assembly in 2011?

4          A        I don't have any recollection of it.

5          Q        And have you communicated with the Governor

6     of Ohio?

7          A        The current governor?

8          Q        The current governor.

9          A        I'm sure we've talked but I don't recall

10    when exactly.  We served in Congress together here for

11    a number of terms.

12         Q        And, of course, you're now a member of the

13    16 person congressional delegation from Ohio.  Do you

14    regularly communicate with each of the other members of

15    the delegation?

16         A        Yes.

17         Q        And in 2011 you were a member of the then

18    18 person congressional delegation.  At the time did

19    you regularly communicate with the members of that

20    delegation?

21         A        Yes.

22         Q        Would it be fair to say that you more

23    regularly communicate with the Republican members of

24    the delegation than with the Democratic members of the

25    delegation?

Confidential

Page 34

S. Chabot

1

2    A       That would be fair, yeah.  Although I do

3    communicate with the Democrats, too.

4    Q       Understood.  And do you communicate at all

5    with the leadership of the National Republican Party?

6    A       That's even harder to define the National.

7    Because there's the NRCC and then there's -- what do

8    they call the other institution over there?  But, I

9    mean, I communicate with people more on the NRCC than

10   the one that you mentioned.

11   Q       Than the Republican National --

12   A       That's the more presidential.  I always get

13   that mixed up.  But I think the one that's national has

14   more to do with the presidential races.  And the NRCC

15   is what we do.  And then there's the NRSC, National

16   Republican Senatorial Committee, and then there's a

17   DCCC for the Democrats.

18   Q       And for the National Republican

19   Congressional Committee, the NRCC, what individuals do

20   you communicate with at the NRCC?

21   A       Staff people mainly.  And then members that

22   are involved in it one way or the other.  So, I mean, I

23   don't know exactly how to answer your question.

24   Q       Do you recall any specific communications

25   with individuals at the NRCC related to redistricting?

Confidential

Page 35

1                          S. Chabot

2       A       No.

3       Q       And you, along with others, have intervened

4  in this case; is that correct?

5       A       I think that's correct, yes.  We're part --

6  yes, we did intervene.

7               MS. LEE:  And I'm having marked as

8  Exhibit 2.

9               MS. MCKNIGHT:  Off the record.

10  BY MS. LEE:

11              (Chabot Exhibit 2, Memorandum in Support of

12  Motion of Republican Congressional Delegation Ohio

13  Voters and Ohio Republican Party Organizing to

14  Intervene, marked for identification as of this date)

15      Q       So I have handed you what has been marked

16  as Exhibit 2, the Memorandum in Support of Motion of

17  Republican Congressional Delegation Ohio Voters and

18  Ohio Republican Party Organizations to Intervene.

19              This was filed along with a cover motion

20  with the court in this case so that you and the others

21  could join the case as an intervenor.

22              Have you seen this document before?

23      A       I'm aware that we intervened.  I don't

24  think I've read the document but I was aware that it

25  occurred.

Confidential

Page 36

S. Chabot

1

2     Q     Okay.  And so do you understand that your

3  attorneys filed this document with the court on your

4  behalf?

5     A     Yes.

6     Q     And do you understand that in this document

7  your attorneys make statements on your behalf?

8     A     Yes.

9     Q     Could you please turn to page 3 of

10  Exhibit 2?

11     A     Yes.

12     Q     To the section just below the bold header

13  in the middle of the page reading Proposed Intervenors.

14         The first sentence reads:  "The intervenor

15  applicants represent a diverse coalition of registered

16  voters, county political parties and congressional

17  representatives, all whose interests will be directly

18  impacted by the relief plaintiffs are pursuing in this

19  action."

20         Do you agree that you are included in this

21  statement as one of the congressional representatives?

22     A     Yes.

23     Q     The next paragraph begins referring to the

24  member intervenor applicants.  Do you see that?

25     A     Yes, I do see it.

Confidential

Page 37

S. Chabot

1

2      Q       And these member intervenor applicants are

3   identified as incumbent representatives of Ohio's first

4   and the rest of the congressional districts.  Do you

5   see that as well?

6      A       I see that, yes.

7      Q       And it is correct you're included within

8   the group of member intervenor applicants as the

9   incumbent representative of Ohio's first district?

10     A       If that's the question, yes.

11     Q       And in the next sentence:  "These member

12  intervenor applicants are further defined."  Still on

13  page 3 there.  "They are all members of the Republican

14  Party, all registered voters in the district and all

15  intend to run for election as representative of those

16  districts in 2018 and 2020."

17             Do you agree that is correct?

18     A       I agree that I intend to run in 2020.  I

19  can't speak for all the other people that they're going

20  to run in 2020 and I actually haven't thought about

21  that much but -- I haven't said I'm not running.

22     Q       Okay.  Understood.  And in the very next

23  sentence, you are personally identified there.  Do you

24  see that?

25     A       No.  I don't know where you're pointing to.

Confidential

Page 38

1                    S. Chabot

2      Q       Sorry.  Still on page 3?

3      A       Three.

4      Q       Just the third sentence of the last

5  paragraph on the page:  "Representative Steve Chabot is

6  the member of the United States House of

7  Representatives for the Ohio 1 district."

8      A       Yeah, I thought we had already referred to

9  that.  So I thought there was something else you were

10  referring me to.

11      Q       No, just --

12      A       I do see that and that is me.

13      Q       Great.  Just that one.

14      A       Yes.

15      Q       Could you please turn with me now in the

16  same document to page 9?

17      A       Yes.

18      Q       In the second full paragraph on this page

19  that begins:  "The member intervenor applicants."  Do

20  you see that?

21      A       Do I see that.

22      Q       And it lists interests that you all have in

23  the district; is that correct?

24      A       I'd have to read it.  Do you want me to

25  take the time to read it?

Confidential

Page  39

1                           S. Chabot

2        Q        Sure.

3        A        I'm not sure what it says.  I believe you

4    but I haven't read it.

5        Q        Yes.

6                 (Witness reading.)

7        A        Okay.  I've read it now.

8        Q        And it states that:  "The member intervenor

9    applicants have a substantial interest in the subject

10   matter of this case as it involves the legality of the

11   district they were elected to represent."  Is that

12   correct?

13       A        It's correct that that's what it says.  Is

14   that what you're asking?

15       Q        Yeah.

16       A        It does.

17       Q        And do you agree with that statement?

18       A        I think I do agree with that statement,

19   yes.

20       Q        And in the very last sentence on this page

21   it says, the very last paragraph, excuse me, as

22   numerous courts have recognized --

23       A        I'm sorry, I'm not following where you're

24   at.

25       Q        Just the last paragraph.

Confidential

Page 40

1                              S. Chabot

2       A       You mean this one here (indicating)?

3       Q       Yes.  "As numerous courts have recognized

4  elected members from a challenged district may

5  intervene as a matter of right under Rule 24 due to

6  inter alia their personal interest in their office."

7               Do you think you have a personal interest

8  in your office?

9       A       Apparently the attorneys who represent us

10 believe that we do and so I would -- it's hard for me

11 to answer that question from a legal perspective or

12 from any other perspective so I honestly don't know.

13      Q       Okay.  And so do you, from just a factual

14 perspective, think that you have a personal interest in

15 the first congressional district?

16              MS. MCKNIGHT:  Objection.

17      A       I think I've already answered the question.

18 I don't know.  I think a court would have to determine

19 that.

20      Q       Sure.  And do you think you have -- do you

21 have any interest in where the lines were drawn

22 defining the district?

23      A       Yes.

24      Q       Okay.  And what would that interest be?

25      A       You say do we have any interest in how the

Confidential

Page 41

1                         S. Chabot

2    lines are drawn?

3         Q       Do you have an interest in how the lines

4    are drawn defining the first direct?

5         A       Yes.

6         Q       And what is that interest?

7         A       Because it determines what people who are

8    in your district that you have the opportunity to

9    represent.

10        Q       So another interest that is referenced,

11   still continuing on page 9, is an interest in continued

12   incumbency?

13        A       I see it says that there.

14        Q       Do you think you have an interest in

15   continued incumbency in your seat?

16        A       I really don't know if we have an interest

17   in that or not.  I think the court would have to

18   determine that.  I guess it's being alleged here, so...

19        Q       And prior to the time that a district is

20   drawn at each decennial redistricting, do you think the

21   incumbents have an interest in remaining incumbents?

22        A       You're not referring to this anymore?

23        Q       No, I'm not referring to this document.

24        A       Could you repeat that?

25        Q       At each decennial redistricting, do you

Confidential

Page 42

1                              S. Chabot

2    think the incumbents who are in office under the

3    previous map have a continued interest in remaining in

4    office under the new map?

5                    MS. MCKNIGHT:  Objection.  Form.

6         A      I don't -- I don't know if we have an

7    interest in that or not.  I think a court would have to

8    determine that.

9         Q      Okay.  So let's look further at the reasons

10   stated by your counsel for the personal interest of you

11   and the other congressional intervenors.

12                   If you turn to page 11 of this document?

13        A      (Witness complies.)

14        Q      Beginning the second line from the top, it

15   states:  "The member intervenor applicants have

16   invested considerable time and money building

17   coalitions of supporters in their districts, learning

18   their districts, serving the needs of their

19   constituents, raising and spending money on

20   electioneering activities among other activities."

21                   Do you see that?

22        A      I do see that.

23        Q      Let's take some of these one at a time.  Do

24   you agree that you have invested considerable time and

25   money building coalitions of supporters in your

Confidential

Page 43

1              S. Chabot

2     district?

3          A        Yes.

4          Q        Can you describe some of those activities?

5          A        Well, I'm going to have to think about

6     that.

7          Q        Okay.

8          A        I will do that now.  Well, coalitions are

9     groups of people that have some common interest and so

10    you interact as a member of Congress with those people

11    throughout your time in that district.

12              And relative to money, it's kinda vague to

13    me as to what they're referring to.

14              I assume they mean -- I don't know if they

15    mean you spent time running television commercials or

16    send out direct mail pieces through a campaign.  Or if

17    they mean money that has been sent out in your official

18    office responding to their response and asking you

19    about something or letting you know what their point of

20    view is on an issue and you responding on that.  Maybe

21    that's what it's meant.

22              But other than that, those are what I would

23    assume is meant by that.

24         Q        And, in general, do you agree that it's

25    true that you've undertaken activities to build

Confidential

Page 44

1                          S. Chabot

2    coalitions of supporters, specifically of you in

3    office?

4         A        Well, there are people that support me and

5    don't support me and we spend the same resources in the

6    official office.

7         Q        And have you undertaken any efforts within

8    your district with your constituents to build

9    coalition, coalitions with Democrats?

10        A        We do with all constituents.  We don't ask

11   them whether they're Democrats or Republicans.  They're

12   in my district and they have some interest, whether

13   they're farmers or teachers or whatever they may be.

14   You know, it's something we wouldn't know necessarily

15   what they are, what their political background is.

16        Q        And do you agree, referring back to the

17   same sentence, that you've invested time learning your

18   district?

19        A        Yes.

20        Q        And what have you done to undertake

21   learning your district?

22                 MS. MCKNIGHT:  Objection.  Form.

23                 You can answer.

24        A        I'm in my district whenever I'm not in

25   Washington, unless I happen to be out of the country or

Confidential

Page 45

1                          S. Chabot

2      something on congressional business or something like

3      that.

4                     So I'm interacting with my people on a

5      regular basis and so I learn every day about the people

6      in my district and interact with them and handle the

7      issues and handle their -- their interactions with the

8      Federal Government in my official capacity.  They have

9      a problem with Social Security, they have a problem

10     with Medicare or Social Security or Veteran's benefits

11     or whatever.  So I'm interacting with them.  Sometimes

12     it's through staff, but I'm learning in that process

13     all the time.

14          Q      Would it be true that regardless of the

15     lines of your district you would learn from the

16     constituents that were in it in the same way that you

17     do now?

18                     MS. MCKNIGHT:  Objection.

19          A      Everything except the last part in the same

20     way.  I couldn't speculate as to how I would learn but

21     you certainly would interact with your constituents

22     however the lines were drawn and try to represent them

23     to the best of your ability.

24          Q      And do you agree that you've invested, you

25     and obviously the members of your staff, have invested

Confidential

Page 46

1                    S. Chabot

2    time serving the needs of your constituents?

3        A        Yes.

4        Q        And can you describe some of the

5    constituent services that you or your staff members

6    have undertaken?

7        A        Yeah, it's some of the things that I just

8    mentioned.  Constituent services.  We interact on their

9    behalf with the Federal Government.  It's all kinds of

10   parts of the Federal Government.  They may call or they

11   may write us a letter.  They may email us something

12   asking our help and then we take care of that matter

13   with the Federal Government on their behalf.  That's

14   specifically constituent services.

15              Then they also want to tell us as their

16   representative in Congress, you know, when I vote they

17   want to tell me what they think about things.  If

18   they're for or against something.  Could be potential

19   legislation, they like it or they don't like it.  So

20   that's another aspect that we interact with our

21   constituents.

22              I'll leave it there.

23       Q        That sounds good.  Do you always or members

24   of your staff always respond to requests for

25   constituent help?

Confidential

Page 47

1                    S. Chabot

2       A       Yes, unless something falls through the

3  cracks and sometimes it does.  I'll run into somebody

4  on the street.  They will say, "Hey, I sent a letter to

5  you and I never heard anything about."

6             I'll try to get their name and contact my

7  folks and say, "Hey, look into this."

8             I'm not saying that sometimes somebody

9  doesn't screw up because it does happen but it's not

10  supposed to.  And I always tell them if they screw up,

11  the buck stops with me because it's my fault

12  ultimately.  My staff forgets to do something it's on

13  me, as far as I'm concerned.

14       Q       And if Democratic elected officials within

15  your district reach out to you or your office seeking

16  to serve the needs of your constituents, do you or your

17  office meet those requests that come through that third

18  party?

19       A       Yes.

20             MS. MCKNIGHT:  Objection.  Form.  Go ahead.

21             You may answer.

22       A       Yes.

23       Q       Then just returning to this sentence.  Do

24  you also agree that you've invested considerable time

25  and money raising and spending money on electioneering

Confidential

Page 48

1                          S. Chabot

2      activities within the district?

3          A      Yes.

4          Q      And can you describe these activities?

5          A      Could you repeat the question?  I just want

6      to make sure I answer exactly what you asked.

7          Q      Sure.  So you've invested time and money on

8      electioneering activities, is that true?

9          A      Yeah.

10         Q      And can you describe electioneering

11     activities that you've undertaken in your district?

12                MS. MCKNIGHT:  Objection.

13         A      I would assume what that means is sending

14     out literature pieces, going door to door, being

15     involved in debates, putting up yard signs.  All those

16     types of things and you generally try to restrict them

17     as much as possible to your district so you're not

18     wasting time and effort into other parts of the state

19     that aren't in your district.

20                Like on television, you try to put them on

21     the stations -- that's where there's an overlap mostly

22     where you may not get in your district.  Because I'm in

23     the corner of the state and you run the TV ad and the

24     people in Kentucky can see it.  I'd like to just be in

25     Ohio and you can't do that.

Confidential

S. Chabot

But when you're sending out a direct mail piece, it's much easier to limit it to your area. Or if you're doing a town hall telephone meeting, although that's not necessarily political, unless you run it through your campaign, you can call phone numbers. You know, they're in your district so you know that.

Those are the types of things that you can do.

Q     Okay. And on this same page, the last sentence in that first paragraph it states: "In addition there's a possibility that if a remedial plan is ordered in this case, the remedial plan could pair two or more of the member intervenor applicants in the same district which would impede their ability to run for their seats".

Is that correct?

A     That's what it says.

Q     And is that a concern that you have?

A     I don't know that I've ever thought of that before but I guess it would be a problem if they redrew -- and it does happen where they put two in the same district. They both can't win so...

Q     And in the 2011 redistricting, was it personally a concern of yours that you would be paired

Confidential

Page 50

1                          S. Chabot

2      with another incumbent in the map?

3          A      I don't recall.

4          Q      And now with the loss of two seats going in

5      2011, that was absent some retirements, it was going to

6      happen that certain incumbent Congress people would be

7      paired; is that correct?

8                  MS. MCKNIGHT:   Objection.

9          A      Just by mathematics that would be true

10     because there were 18 districts and then you were going

11     to have 16.  So you would only have 16 members, but it

12     would depend on if there were retirements or whatever

13     so...

14         Q      And at the time what did you think was a

15     solution for the needed pairing?

16         A      What did I think the solution was?

17         Q      Yes, if you thought of anything.

18         A      I don't really recall having, you know, a

19     plan myself.

20         Q      Sure.  What did you think of the eventual

21     pairing of Representatives Turner and Austria?

22         A      On a personal human level I felt kinda bad

23     for them.  Especially Austria because he ultimately was

24     not in Congress as a result of that.  And I felt bad

25     for Dennis Kucinich because the same thing happened to

Confidential

Page 51

1                    S. Chabot

2   him, too.

3        Q      Other than on a personal level, did you

4   think anything of the pairing of Representatives Turner

5   and Austria?

6        A      No, it was personal.  I mean, I knew them

7   both and I like them both and I liked Dennis Kucinich

8   and I'm trying to remember -- oh, it was Marcy Kaptur.

9   She won and Dennis didn't and he was a friend.  I liked

10  him.

11       Q      When did you become aware of the pairing of

12  Representatives Turner and Austria in the process?

13       A      I don't remember.

14       Q      Did you have any understanding why it was

15  decided upon that Representatives Turner and Austria

16  would be paired?

17       A      No.

18       Q      Other than what you've just said about

19  Representative Kucinich, did you think anything else of

20  the pairing of Representatives Kaptur and Kucinich at

21  the time?

22       A      I just felt bad that one of them would lose

23  because I know them both and they're both good people.

24       Q      Do you have any recollection of when you

25  became aware of that pairing?

Confidential

Page 52

S. Chabot

1

2      A       No.

3      Q       At the time would you agree that there were

4 many more representative, yourself even included, who

5 were geographically much closer to each other than

6 Representatives Kaptur and Kucinich?

7      A       I don't know what that -- could you repeat

8 that?

9      Q       Were you aware that there were many more

10 representatives of the 18 person delegation at the time

11 who were geographically located much closer to each

12 other?

13      A       No, I had no idea where any of them lived.

14      Q       Okay.  What was your understanding of why

15 it was decided upon that Representative Kaptur and

16 Kucinich would be paired?

17      A       I don't know.

18      Q       What did you think at the time of the

19 pairing of Representatives Sutton and Renacci?

20      A       Were they paired, too?

21      Q       They were paired as well.

22      A       I didn't remember that.  I didn't think

23 much of it.  It's Renacci by the way.

24      Q       Oh, okay.

25      A       Everybody mispronounces his name.  One of

Confidential

Page 53

1                              S. Chabot

2    the reasons he didn't win this year.

3        Q        Maybe I should have known it from the two

4    Ns instead of two Cs.

5        A        Trump mispronounces my name, as does Bush.

6    They all did.

7        Q        Hopefully at least I've gotten that right

8    today.

9                 (Laughter.)

10                So as you seem not to recall that, do you

11   then not have any recollection of what you thought of

12   that pairing in 2011?

13       A        No.  I don't.  I don't have any

14   recollection.

15       Q        And would you agree that with the

16   delegation going from 18 to 16 seats only two sets of

17   incumbents needed to be paired?

18                MS. MCKNIGHT:  Objection.

19       A        I just don't have any thoughts about that

20   really.

21       Q        Okay.  Did you have any understanding at

22   the time why instead three sets of incumbents were

23   paired in the 2011 redistricting?

24       A        No, I forgotten it had happened to be

25   honest with you.

Confidential

Page 54

1                           S. Chabot

2              MS. LEE:  I am now having marked as

3    Exhibit 3 the Reply in Further Support of the Motion of

4    Republican Congressional Delegation Ohio Voters and

5    Republican Party Organizations to Intervene.

6              (Chabot Exhibit 3, Reply in Further Support

7    of the Motion of Republican Congressional Delegation

8    Ohio Voters and Republican Party Organizations to

9    Intervene marked for identification as of this date)

10        Q      This was filed by your attorneys in further

11   support of your and the other members' requests to join

12   this case.

13              Much like the document we just reviewed in

14   Exhibit 2, in this document your attorneys are making

15   representations to the court on your behalf; is that

16   correct?

17        A      I believe that is correct.

18        Q      And can you please turn with me to page 5

19   of this exhibit?

20        A      Yes.

21        Q      And beginning four lines above the

22   footnote, it reads:  "Members of Congress have ongoing

23   and working relationships with these constituents and

24   constituent groups who turn to members of Congress for

25   a variety of needs from ministerial to substantive

Confidential

Page 55

1                      S. Chabot

2    lobbying."

3                Is that correct?

4        A       It's correct that it says that.

5        Q       Do you think this would include all of the

6    things you previously described with respect to

7    constituent services?

8                MS. MCKNIGHT:   Object to form.

9        A       I really don't know what you mean by that.

10       Q       Do you believe that the content of the

11   sentence we've just read is true?

12       A       Members of Congress had ongoing and working

13   relationship with --

14               (Witness reading.)

15       A       Yes, I think that's probably true.

16       Q       And in the first district, can you give

17   examples of ongoing and working relationships you have

18   with your constituents and constituent groups?

19       A       With constituents, you know, you

20   oftentimes, for example, if it's a veteran's benefit

21   claim, they can go on literally for years and years or

22   you represent somebody on this matter and they come

23   back for a long time.  That would be an example of an

24   individual that you, you know, have a relationship

25   with.  And you have to relearn and they have to get to

Confidential

1                          S. Chabot

2      know the member of Congress's staff all over again if

3      you change things around on them.

4                  As far as a group, we have lots of groups

5      that we have a relationship with and come in and meet

6      with us, you know, every year for a variety of things.

7      Just the different groups that come in so you get to

8      know the people and sometimes they're the same people

9      but then they have turnover like we all do.

10                 But it helps to know who they are and you

11     have the issues and you have got a file from the last

12     time they were in.

13                 So you have relationships that are ongoing.

14     And sometimes the issues are new and sometimes they're

15     not.  But...

16          Q      Do any of these constituent groups include

17     Democrats?

18          A      Sure.

19          Q      Are any of these constituent groups

20     specifically Democratic organizations?

21          A      Not specifically Democratic organizations,

22     nor would they be Republican organizations either.  I

23     mean, they're groups of people that you don't think if

24     they're Democrats and Republicans.  When I say they're

25     Democrats, I don't know, and I assume that a whole lot

Confidential

Page 57

S. Chabot

1

2 are Democrats because we don't ask that question.

3          Q       So is it correct then to say that it's not

4 specifically political groups that are ever meeting

5 with you?

6          A       That's exactly right.  Yeah, we wouldn't

7 have a Republican such-and-such come into my official

8 office and meet with us, nor would we have the Democrat

9 group come in and meet with us so it's just not

10 something that comes up.

11          Q       Sure.  And can you now turn with me to page

12 7 also in this exhibit?

13          A       Yes.

14          Q       In the first line, the first full sentence

15 at the top of the page, it says: "Doing their job well

16 requires unrelenting fundraising efforts that begin the

17 day they are elected to office and continue until they

18 step down or are voted out."

19                  Is that correct?

20                  MS. MCKNIGHT:  Objection.

21          A       It says unrelenting from the day they enter

22 the office.  I don't know that I was out making phone

23 calls to raise money the day I was elected to office.

24 So I don't recall that myself.  I can't speak for

25 others.

Confidential

Page 58

1                          S. Chabot

2        Q       Sure.

3        A       It is something you do spend time raising

4   money.  And you have -- the Democrats go over to the

5   Democratic campaign committee and the Republicans go to

6   the republican campaign committee.  And they literally

7   have offices, little cubby holes in there where you

8   make phone calls for an event you have.  Both sides do

9   it throughout the time.  But I don't think I did it the

10  day I went in there.  Probably the week I went in

11  there, maybe the month.  But I'm not exactly sure.

12       Q       Okay.  Understood.  And continuing in this

13  same paragraph the next sentence reads:  "These

14  fundraising efforts would be wasted in district lines

15  were changed and a member was paired with another

16  incumbent or moved from a favorable to unfavorable

17  district."

18               Do you see that?

19       A       I see that.

20       Q       What is a favorable district?

21       A       I can't answer that question.

22       Q       Do you know what an unfavorable district

23  would be?

24       A       Nope, can't answer that either.

25       Q       So this sentence here, do you think that

Confidential

Page 59

1                         S. Chabot

2    would apply then to you?

3        A     I'm not sure exactly what they mean by

4    favorable and unfavorable.  So I can't really venture

5    an opinion as to whether it applies to me.

6        Q     Okay.  Continuing on in this document,

7    could you please turn to page 10.  In the second

8    paragraph under section B in the second sentence of

9    that paragraph, it says:  "But plaintiffs ignore the

10   reality that redistricting is a zero sum game."

11             Do you see that sentence?

12       A     I see that sentence.

13       Q     Do you agree that redistricting is a zero

14   sum game?

15             MS. MCKNIGHT:  Objection.

16       A     I'm not sure exactly what they mean by that

17   either.

18       Q     Okay.  And turning from the document for

19   one moment.  In intervening in this case your attorneys

20   have described how your and the other members'

21   interests are different than those of the defendants,

22   which include the leaders of the Ohio General Assembly

23   and also the Secretary of State of Ohio.

24             Before turning to those particular

25   differences, who's responsible for drawing the

Confidential

Page 60

1                    S. Chabot

2    congressional map in Ohio?

3              MS. MCKNIGHT:  Objection.

4         A     As far as I know, the legislature is

5    responsible for that.

6         Q     Okay.  Do you agree that in general you

7    have a different interest in the congressional map than

8    the Ohio General Assembly?

9              MS. MCKNIGHT:  Objection.

10        A     That I have a different -- could you repeat

11   that again?

12        Q     Do you have a different interest in the

13   Ohio congressional map than does the Ohio General

14   Assembly?

15             MS. MCKNIGHT:  Objection.

16        A     Well, I represent the people in that

17   district.  I'm the only person that represents all of

18   those people in that district so it's different from

19   anybody.  They represent different districts, for

20   example.  So I think it's different to some degree so

21   yes.

22        Q     Please turn with me to page 14 of the

23   document in front of you.

24        A     Okay.

25        Q     In the first paragraph it says, beginning

Confidential

Page 61

1                      S. Chabot

2   in the second sentence there:  "The governmental

3   defendants are not charged --

4       A      Could you -- you've lost me.  You said the

5   first paragraph?

6       Q      The first paragraph.

7       A      On page 14?

8       Q      On page 14.  The second sentence.

9       A      But I'm --

10      Q      The second sentence begins, "To the

11  contrary" --

12      A      Yeah.

13      Q      And then it says, "the governmental

14  defendants" --

15      A      Okay.

16      Q      -- "are not charged and should not be

17  charged with assisting the intervenor applicants in

18  maintaining any particular type or level of electoral

19  participation.

20             "They," referring to the governmental

21  defendants, "represent all citizens and even if they

22  take a view in defense of the law, their representation

23  of all Ohio citizens competing electoral interests,

24  including plaintiffs, does not adequately represent

25  intervenor applicants' particular interests."

Confidential

Page 62

                        S. Chabot

1

2          Do you see those two sentences?

3     A     I see that it says that.  I'm not sure

4  exactly what all that means.

5     Q     Do you agree with the general proposition

6  that Ohio citizens have competing electoral interests

7  from each other?

8     A     I don't really know the answer to that

9  question.

10     Q     Okay.  Do you agree that plaintiffs in this

11  case have certain interests?

12          MS. MCKNIGHT:  Objection.

13     A     And the plaintiffs are -- am I one of those

14  people?

15     Q     No, you're the intervenor.  The

16  plaintiffs --

17     A     You're talking about the other groups.

18  What's the question again?

19     Q     Do you agree that the plaintiffs have

20  particular electoral interests?

21          MS. MCKNIGHT:  Objection.

22     A     I mean, they filed a lawsuit, they're

23  parties to a complaint.  So they have some interest in

24  something because they're in this suit so they have

25  some interest.  I wouldn't venture to define what those

Confidential

Page 63

1                           S. Chabot

2    interests are.

3          Q        And we've earlier covered that you have a

4    personal interest in your district as the

5    representative of that district; is that correct?

6                MS. MCKNIGHT:   Objection.

7          A        I think we have some interest, yes.

8          Q        Okay.  And you also are an Ohio citizen and

9    a Ohio voter and you -- so you have certain personal

10   electoral interest as well; is that correct?

11               MS. MCKNIGHT:   Objection.

12         A        That would be true, yes.

13         Q        And Linda Goldenhar, who's a plaintiff in

14   this case, is one of your constituents, lives in the

15   first district.  And many of the Hamilton County Young

16   Democrats who are also plaintiffs in this case are

17   constituents who live in the first district.

18               Is your interest in the first district at

19   odds with theirs?

20               MS. MCKNIGHT:   Objection.

21         A        I don't have an answer to that.  I'm not

22   quite sure what you mean by that.  Is my interest at

23   odds with theirs?  I'm sure we agree on some things and

24   we disagree on some things.

25         Q        Okay.  The Hamilton County Young Democrats

Confidential

Page 64

1                         S. Chabot

2    are an organization aimed at supporting young democrats

3    and seeking the election of Democratic candidates.  Do

4    you think it is true that their interests are different

5    than yours as a Republican elected official?

6              MS. MCKNIGHT:  Objection.

7        A     Again, I don't know the answer to that

8    question.  I'm guessing if they're the Young Democrats

9    they probably don't vote for me too often.  Maybe some

10   of them do, but I don't know.

11       Q     So one of the interests we discussed that

12   was described by your attorney supporting intervention

13   in this case was fundraising that you have to

14   undertake; is that correct?

15             MS. MCKNIGHT:  Objection.

16       A     I think it is correct that that was talked

17   about.

18       Q     Okay.  Have you ever used the prospect of

19   redistricting in your fundraising efforts?

20       A     I don't recall.

21       Q     One of the sentences we just went over in

22   your papers supporting intervention stated that if the

23   lines of the districts were changed fundraising efforts

24   would be wasted.  Do you think that's true?

25             MS. MCKNIGHT:  Objection.

Confidential

Page 65

1                    S. Chabot

2      A      I don't know.

3      Q      Do you primarily fundraise from

4  constituents within your district?

5      A      I think that's accurate.  I think we -- I

6  know we primarily fundraise.  And I think most of what

7  we get is from within our district, I think.  I

8  really -- I just don't know.

9      Q      Who is Dick Farmer?

10     A      Who is Dick Farmer?  Dick Farmer was the

11 head of Cintas.  I think he's retired.  He may still be

12 involved.

13     Q      Do you know where Cintas is located?  Where

14 its headquarters are located?

15     A      Yeah, they're off of 71 or 75, 71 in Warren

16 County.

17     Q      Do you know where Dick Farmer lives?

18     A      I think he's a resident of Florida now.  He

19 may not be.  I'm not sure where he maintains his

20 residence.

21     Q      In 2011, do you know where Mr. Farmer

22 lived?

23     A      No.

24     Q      Prior to the 2011 redistricting, had you

25 ever communicated with Mr. Farmer?

Confidential

Page 66

1                          S. Chabot

2        A       Yes.

3        Q       Do you recall what about?

4        A       No.  I mean, I've known Dick for, I don't

5    know, 30 years maybe.

6                MS. LEE:  Let's look at an exhibit that I'm

7    having marked as Exhibit 4.

8                (Chabot Exhibit 4, Email String, marked for

9    identification as of this date)

10       Q       This is a document we received from your

11   attorneys in this case, one of just a few documents

12   that was produced.  Looking at this document, if you

13   look at sort of the earliest of the emails in the chain

14   it goes in reverse chronological order.  You're writing

15   to Mr. Farmer or someone from your account is writing

16   to Mr. Farmer and it says:  "I hope this email finds

17   you well.  Do you have a few minutes" --

18       A       I'm not sure where you're at.  I see,

19   "Thank you very much."

20       Q       The next one down, the chain is in reverse

21   chronological order, sort of mid page from Steve --

22       A       I'm not sure where --

23               MS. MCKNIGHT:  She's asking here.

24       A       Where it says "I hope"?

25       Q       Yes.

Confidential

Page 67

1                           S. Chabot

2       A        Gotcha.

3       Q        In this email to Mr. Farmer, it says:  "I

4  want to give you an update on redistricting now that it

5  is in full swing and we now have an idea of what the

6  maps could look like next year."

7                Do you see that?

8       A        I do see it.

9       Q        Is this one of the only times you've ever

10  communicated regarding redistricting?

11               MS. MCKNIGHT:  Objection.

12      A        I have no idea and I don't remember doing

13  this.  My guess is probably somebody did this on my

14  behalf but...

15      Q        Okay.  And above it indicates Susan Towns.

16  Do you know who Ms. Towns is?

17      A        I think she works for Cintas.  I think she

18  may still work there.  I'm not really sure.  But she's

19  a person that works there.

20      Q        And in this email, in response to the

21  original email that's indicated, you or whoever sent

22  it, wanted to give an update on redistricting.

23  Ms. Towns writes back to you, says: "Congressman

24  Chabot, Mr. Farmer asked me to get in touch with you

25  regarding your note below.  He is out of the country

Confidential

Page 68

1                          S. Chabot

2     until the middle of October.  Per your conversation

3     with me last week, Mr. Farmer is sending a check for

4     $5,000 to your campaign prior to September 30th.  I've

5     also shared with him the information regarding

6     redistricting.  If there is anything further you need

7     to discuss with him prior to October 30th, please let

8     me know, and I will have Rick Roeding get in touch with

9     you on Mr. Farmer's behalf."

10              Do you know who Mr. Roeding is?

11        A       I assume he works there but I'm not sure

12     who he is.

13        Q       Do you recall if you spoke with Mr. Roeding

14     regarding redistricting?

15        A       No.

16        Q       Okay.  Do you know if you eventually

17     communicated with Mr. Farmer regarding redistricting

18     when he returned to the country?

19        A       I don't recall.

20        Q       In this original email you sought to speak

21     with him on September 19th, 2011.  This was before the

22     2011 redistricting plan was passed; is that correct?

23        A       I don't know.

24        Q       Do you know why you wanted to talk to him

25     about what the map would look like?

Confidential

Page 69

S. Chabot

1

2     A      I don't remember.  I mean, they're in

3 Warren County.  They're located there.  Other than

4 that, I don't know.

5     Q      And Cintas is a very large company, it's in

6 the Fortune 1000; is that correct?

7            MS. MCKNIGHT:  Objection.

8     A      I don't know.  I know they're a big

9 company.  I have no idea the size.

10    Q      Were you concerned with ensuring Cintas

11 Corporation was within your district?

12           MS. MCKNIGHT:  Objection.

13    A      Not that I recollect.

14    Q      We can put that document to the side.

15           As we've discussed, you were first elected

16 to Congress in November 1994.  Before you were in

17 Congress did you have any knowledge of the

18 redistricting process in Ohio?

19    A      I don't know when I first knew that every

20 10 years after a census the lines were redrawn.  But

21 I've had some knowledge about that maybe since high

22 school or college, but I'm not really sure.

23    Q      Sure.  And once you were in Congress, is it

24 fair to say that you took more of an interest in what

25 the congressional district lines were going to look

Confidential

Page 70

1                    S. Chabot

2   like?

3             MS. MCKNIGHT:  Objection.

4   A      Since I was in Congress, that would be

5   accurate, yeah.

6   Q      Following the 2000 census, did you have any

7   personal familiarity with the 2001 redistricting

8   process?

9   A      Yes.

10  Q      And what was that familiarity?

11  A      The same, that -- that every 10 years the

12  lines are redrawn, so...

13  Q      And do you know who the Ohio Senate

14  majority leader was in 2001?

15  A      2001, no.

16  Q      And do you know which party was in the

17  majority in the Ohio Senate in 2001?

18  A      I think the Republicans were, but I'm not

19  absolutely positive.  I think they were.

20  Q      And do you know which party was the

21  majority in the Ohio House in 2001?

22  A      I think Republicans were as well.

23  Q      Do you know who the governor of Ohio was in

24  2001?

25  A      I think it was Bob Taft, I think.

Confidential

Page 71

1                            S. Chabot

2        Q        Do you know which political party he was

3    from?

4        A        He's a Republican.

5        Q        After the 2001 redistricting, the first

6    congressional district included a portion of Butler

7    County and a larger portion of Hamilton County; is that

8    correct?

9             MS. MCKNIGHT:  Objection.

10       A        It contained a portion -- you mean a larger

11   proportion of Hamilton County than Butler County?

12       Q        Yes.

13       A        Yes.

14       Q        Okay.

15       A        I didn't know if you meant a larger portion

16   then than it does now and that's what I was trying to

17   think because I'm not really sure but I see what you

18   mean.

19       Q        Yes, okay.  Great.

20                Could the entire first congressional

21   district have been within Hamilton County in the 2001

22   redistricting?

23       A        I don't know.

24       Q        And following the 2010 census, did you have

25   any personal familiarity with the 2011 redistricting

Confidential

Page 72

1                           S. Chabot

2    process?

3         A        Yes.

4         Q        And what was that?

5         A        When you say familiarity, I mean, that it

6    was happening.  We were aware of it happening, yes.

7         Q        And beyond the general that it was

8    occurring, did you have any familiarity with the

9    ongoing nature of that process, what was being

10   discussed?

11                  MS. MCKNIGHT:  Objection.

12        A        Familiarity?

13        Q        Yes.

14        A        Yes, I had familiarity with it, yes.

15        Q        And what do you recall being discussed

16   around that redistricting?

17        A        What do I recall being discussed?  I don't

18   recall specifically what was discussed, but I'm sure we

19   did discuss that type of thing.

20        Q        Do you know who was the majority in the

21   Ohio Senate in 2011?

22        A        Is it Keith Faber?  I'm not sure.  I think

23   it might have been him.  He just got elected statewide

24   to a different office but I don't recall if he was then

25   or not.  So I think he might have been but I'm not

Confidential

Page 73

1            S. Chabot

2    sure.

3        Q    And just which political party was the

4    majority in the Ohio Senate?

5        A    Republican.

6        Q    Which party was the majority in the Ohio

7    House?

8        A    Republican.

9        Q    The governor at the time was John Kasich?

10       A    Yes, it would be Kasich.

11       Q    And what party was he from?

12       A    He's Republican as well, we think.

13       Q    Was there anything materially different

14   about the government control in Ohio from 2001 to 2011?

15            MS. MCKNIGHT:  Objection.

16       A    I don't know what materially -- I don't

17   know what that means.  We had different people there,

18   you had different governors, yeah, it was something

19   different.

20       Q    Was there anything different legislatively

21   about the process between 2001 and 2011?

22            MS. MCKNIGHT:  Objection.

23       A    I'm not sure.  I don't know.  There had

24   been several lawsuits filed in the past and I don't

25   think they had passed.  They may have made changes but

Confidential

Page 74

                        S. Chabot

1   I'm not sure.  I really don't know.

3       Q      No problem.  In general, are meetings of

4   the Ohio congressional delegation ever held?

5       A      Ohio congressional -- yes.

6       Q      Do these meetings include both the

7   Democratic and the Republican members of the

8   delegation?

9       A      In the Ohio Republican delegation?

10      Q      The Ohio congressional delegation.

11      A      Oh, I thought you said Ohio Republican

12  delegation.

13             Sometimes we all get together but it's more

14  often not together when you do that, when we get

15  together.

16      Q      And so is it correct that it's more often

17  that it is just the Republican members of the Ohio

18  congressional delegation meeting?

19      A      And just the Democrats --

20      Q      Yes, as well.

21      A      Yeah, it's more common for but we do

22  sometimes all get together.

23      Q      And for the meetings of just the Republican

24  members of the Ohio congressional delegation, what

25  would be the purpose of such meetings?

Confidential

Page 75

1                      S. Chabot

2       A       To discuss relevant matters.

3       Q       And in general how would such meetings be

4  called?

5       A       Now or back then?

6       Q       In 2011.

7       A       In 2011?  How would they be called?  I

8  think Boehner was speaker at the time so I'm trying to

9  remember if I was dean at the time.  I think I was, but

10  I'm not absolutely sure if I was.  I think I was.

11              So usually my chief of staff would say,

12  "Hey, Steve, you know, we should do a thing, you know,

13  a meeting."

14              So we'd send out that or she'd work with

15  Boehner's office to send out something to all the

16  members and make sure it was convenient on their

17  schedules.  And they get together with their schedulers

18  and we have a meeting.

19       Q       Okay.  And prior to the 2011 redistricting

20  being passed, was there ever a meeting of the

21  Republican members of the delegation held to discuss

22  redistricting?

23       A       I don't remember.

24       Q       And do you recall if redistricting was ever

25  discussed by the entire delegation, both the Democratic

1                          S. Chabot

2    and Republican members?

3         A      I don't recall.  I don't think so.  I would

4    guess that Republicans and Democrats didn't talk about

5    it.  I don't remember a time where we all got together

6    in one forum.

7              We've had dinner a few times, all of us get

8    together, Republicans and Democrats.  We may have

9    talked about it then.  I just don't really remember.

10   It's possible but I'm not sure.

11        Q      Okay.  Sure.

12              I'm now having an exhibit marked as

13   Exhibit 5.

14              (Chabot Exhibit 5, 11/17/2010 Email to

15   Susan Towns from Steve Chabot marked for identification

16   as of this date)

17        A      If I could supplement one of my answers

18   here, I'm trying to be completely accurate.

19        Q      Please go ahead.

20        A      I think there were a number of times the

21   governor would come in, I don't remember if it was

22   Kasich or Taft or who was governor, but we would have

23   the entire delegation together and we would talk about

24   a whole range of things and both sides would be there

25   along with the governor.  So we did that a number of

Confidential

Page 77

1                      S. Chabot

2    times during the years, over the years.  Some years

3    more than other years so...

4         Q      Sure.

5         A      Those were other times when we all got

6    together, both Republicans and Democrats.

7                Did you just hand me this?

8         Q      I did.  I'd like to now show you a document

9    being marked Exhibit 5.  This document was not produced

10   by you but by your colleague, Congressman Johnson,

11   another intervenor in the case.  This document came to

12   us through your counsel who was in possession of it as

13   well and this has been marked confidential.

14                So while we object to a designation of the

15   meeting as confidential, but for the purposes of this

16   deposition, however, I'll also mark this part of the

17   deposition as confidential until the parties can agree

18   to the confidentiality of the document or testimony

19   related to it or until we get resolution from the court

20   if that's necessary.

21                So turning to the document that has now

22   been marked as Exhibit 5.  It's an appointment.  It

23   appears to be from an Outlook calender.  The subject,

24   the fourth line from the top states, "Ohio delegation

25   meeting with Congressman La Tourette Ohio 14."

Confidential

Page 78

1                    S. Chabot

2          Do you see that?

3     A     I do see that.

4     Q     Did you know Congressman La Tourette?

5     A     Yes.

6     Q     Did you participate in any meetings with

7 Congressman La Tourette?

8     A     He's a member of the Ohio delegation or

9 was, he's since passed away but, yes, we've been in

10 meetings together many times.

11    Q     And so does this appear to be a meeting

12 that you likely would have been invited to?

13         MS. MCKNIGHT:  Objection.

14    A     I have no recollection at all.

15    Q     Okay.

16    A     If it says Ohio delegation, I would

17 probably be there.  That's what this is called, the

18 delegation.  He wasn't the ranking member, so I'm not

19 sure why La Tourette would be calling a meeting so I

20 just don't know.

21    Q     Okay.  And when your scheduler is setting

22 up your calender, do you know if she, in general, would

23 receive a similar type of calender invitation

24 electronically?

25         MS. MCKNIGHT:  Objection.

Confidential

Page 79

1                      S. Chabot

2        A       I don't know.

3        Q       And it would be correct that you would not

4    know whether Jamie and Brian searched for such calender

5    invitations when they were responding to the subpoena?

6                MS. MCKNIGHT:   Objection.

7        A       I just don't know.

8        Q       Okay.  No problem.

9                Now, this calender invitation indicates

10   that the meeting will be held in Speaker Boehner's

11   leadership office.  Do you see that?

12       A       I do see that.

13       Q       And do you know why Congressman La Tourette

14   would have been calling a meeting to be held in the

15   speaker's office?

16       A       No.

17       Q       In the meeting agenda here --

18       A       Let me just -- when we held delegation

19   meetings we oftentimes, when Boehner was speaker, we

20   would meet in his office.  So that's where we met

21   oftentimes.

22       Q       Okay.

23       A       Because it was convenient for him because

24   he was speaker and he had things he had to do in the

25   Capital building.

Confidential

Page 80

1                          S. Chabot

2          Q       And the meeting agenda here, towards the

3     second half of the page, contains four items.  Do you

4     see that?

5          A       I see that.

6          Q       And one of the agenda items is committee

7     assignments; is that correct?

8          A       It says that.

9          Q       Okay.  Would Representative La Tourette

10    have power over committee assignments?

11         A       My recollection is that at the time he was

12    a representative on the steering committee and the

13    steering committee is the group of us that puts us on

14    committees and the Democrats have the same thing for

15    them.  So he has a vote among, you know, all the

16    different people that vote on that.

17                 So I'm assuming that that's what -- what --

18    so he has some power because he's on the steering

19    committee or was.

20         Q       And at the time would Speaker Boehner be on

21    the steering committee as well?

22         A       Yes.

23         Q       And as speaker, did he have an equal vote

24    to everyone else on the committee or did --

25         A       He has more votes.  I think -- I don't know

Confidential

Page 81

S. Chabot

1

2    what it was at the time.  I think the speaker currently

3    gets, like, four votes and other people get one vote.

4    There may be, the whip might get two or something like

5    that.  There may be others that get more than one but

6    the speaker gets the most.

7        Q        Understood.

8        A        Because he or she is speaker.

9        Q        Yes.  And back to the agenda, the third

10   item listed here is redistricting.  Do you see that?

11       A        I see that.

12       Q        And do you recall redistricting ever being

13   discussed in the delegation meeting in Speaker

14   Boehner's office?

15       A        I don't recall it, no.

16       Q        Okay.  I'll putting that document aside.

17   Did you ever talk about redistricting with then Speaker

18   Boehner?

19       A        I don't recall specifically but I wouldn't

20   be surprised if we discussed it at some point.

21       Q        Would it be correct that you don't have any

22   recollection of the substance of those conversations?

23       A        That's correct.

24       Q        Did you understand then Speaker Boehner to

25   have some control in the area of redistricting?

Confidential

Page 82

S. Chabot

1

2     A      He had four votes.  Wait, excuse me, that's
3  not right.  That's the steering committee.
4            As speaker, he probably had some more --
5  what was the word you used?
6     Q      I said have some control.
7     A      Control, yeah.  I was thinking control or
8  power or whatever.  But he had more control over it
9  than the rest of us.  I would, again, I'm just assuming
10  that because he's speaker.
11     Q      Sure.  And in 2010 or 2011 did you ever
12  have conversations about redistricting with any other
13  Republican members of the Ohio congressional
14  delegation?
15     A      I don't recall, but I'm sure we probably
16  talked about it on occasion.
17     Q      And do you recall ever having conversations
18  about redistricting with Democratic members of the
19  delegation at the time?
20     A      I don't recall but I think we probably did.
21     Q      And do you recall ever talking about
22  redistricting to other Congress people, meaning those
23  who are not within the Ohio delegation?
24     A      I'm sure we have conversations because they
25  have the same things going on in their states and

Confidential

Page 83

1                          S. Chabot

2      people talk about that kind of stuff occasionally.  I

3      don't specifically remember them but that's the kind of

4      stuff you talk about.

5          Q       Sure.

6              MS. MCKNIGHT:  Counsel, if it's convenient,

7      we've been going about an hour and a half now.  It may

8      make sense to take a break.  Could we go off the

9      record?

10             (There was a discussion held off the

11     record.)

12     BY MS. LEE:

13         Q       Congressman, did you, in 2010 or 2011, ever

14     email with any other Congress people about

15     redistricting that you recall?

16         A       Not that I recall.

17         Q       And at that time did you regularly use text

18     or other messages to communicate with other Congress

19     people?

20         A       I don't think I used text at all back then.

21         Q       Okay.

22         A       That was a pretty recent development on my

23     part.

24         Q       Understood.  And we've touched on this a

25     little bit but is it the case that your staff people

Confidential

1                        S. Chabot

2    communicate with others on your behalf?

3        A       They do.

4        Q       And do you know if any members of your

5    staff communicated with other congressional staffers

6    about the Ohio redistricting?

7        A       Not that I'm aware of.

8        Q       Did you ever have any member of your staff

9    reach out to any members of Speaker Boehner's staff

10   about redistricting?

11       A       Not that I'm aware of.

12       Q       Did you ever discuss where the lines in

13   your district might be drawn for the 2011

14   redistricting?

15       A       I don't recall.

16       Q       Have you ever heard of Project Red Map?

17       A       No.  I don't recall ever hearing that

18   before.  I'm definitely aware of Act Blue.  That's a

19   color that we heard a whole lot about over the years

20   but especially this year.

21       Q       Understood.  Do you know Tom, and I may

22   well pronounce his last name incorrectly as well,

23   Niehaus?

24       A       Tom, yes.

25       Q       And who is he?

Confidential

Page 85

S. Chabot

1

2     A      I'm trying to remember.  I don't recall if

3  he was in the Senate or the state.  I forget his

4  position, but I think he was actually one of the

5  leaders in one or the other.  He was a state rep or

6  state senator.

7     Q      And do you know if Mr. Niehaus was involved

8  in Ohio's congressional redistricting?

9     A      I don't know.

10     Q      Did you have any conversations with Tom

11  Niehaus in 2011 regarding Ohio's redistricting?

12     A      I don't recall.

13     Q      Do you know if you had any of your staffers

14  communicate with Tom Niehaus regarding Ohio's

15  redistricting?

16     A      I don't recall.

17     Q      Do you know Bill Batchelder?

18     A      Yes.

19     Q      Who is he?

20     A      He was the speaker, I don't remember if it

21  was that time, but I think he was speaker of the House.

22     Q      And do you have any understanding of his

23  involvement with Ohio's congressional redistricting?

24     A      No, but I assume in that capacity that he

25  would have had some involvement.

Confidential

Page 86

S. Chabot

1

2  Q      Do you recall any conversations you had

3  with him regarding Ohio's redistricting?

4  A      No.

5  Q      Did you know Bob Bennett?

6  A      He was the head of the party.  I don't

7  remember if it was at that time and he's since

8  depart -- he's deceased now.

9  Q      Yes.  Do you know anything about his

10 involvement in Ohio's congressional redistricting?

11 A      No.

12 Q      Do you know if any of your staffers had any

13 conversations with Mr. Bennett or members of his staff

14 regarding Ohio's redistricting?

15 A      Not that I'm aware of.

16 Q      Do you know Heather Mann, last name is now

17 Blessing?

18 A      I know some Blessings.  I don't know if I

19 know Heather Blessing.

20 Q      Do you have any knowledge of her

21 involvement in Ohio congressional redistricting?

22 A      No.

23 Q      Do you know Ray DiRossi?

24 A      No.

25 Q      Did you know Tom Hofeller?

Confidential

Page 87

S. Chabot

2  A      It doesn't ring a bell.

3  Q      Do you know Mark Braden?

4  A      Yes, he's the attorney -- I don't know if

5  he's this firm but he's a very good attorney from what

6  I understand.

7  Q      Okay.

8  A      Been around for a long time.

9  Q      Do you know if Mr. Braden had any

10 involvement in Ohio's congressional redistricting?

11 A      I don't recall.

12 Q      Do you know John Morgan?

13 A      Doesn't ring a bell.

14 Q      Do you know Adam Kincaid?

15 A      Doesn't ring a bell either.

16 Q      And for each of the names that you don't

17 remember and doesn't ring a bell, to sort of save us

18 all time, I'm not marching through the rest of the

19 questions, but would it be fair to say that for each of

20 the individuals you don't recall, you equally don't

21 recall any conversations with them had by you or your

22 staff?

23 A      That's correct.

24 Q      Do you know Tom Whatman?

25 A      I know Tom, yes.

Confidential

Page 88

1                      S. Chabot

2      Q       And who is he?

3      A       I don't know, he's been around politics for

4  a long time.  I'm not really sure what his capacity is.

5      Q       Okay.  And did Mr. Whatman have any

6  involvement in Ohio's redistricting that you're aware

7  of?

8      A       You know, I don't know.  I remember his

9  name being talked about.  May have been in press

10 reports and things.

11     Q       In 2011 did you have any particular

12 understanding of Speaker Boehner's relationship with

13 the Ohio redistricting?

14     A       His relationship of redistricting?  He was

15 involved as speaker of the house.  He had been in the

16 state legislature himself prior to that, too.  So he

17 was kind of familiar with the process.

18     Q       Sure.  Do you know if Speaker Boehner

19 communicated with any members of the Ohio General

20 Assembly about the congressional map?

21     A       I don't know if he did or didn't.  But I'd

22 be surprised if he didn't as Speaker of the House.

23     Q       Sure.  Did you ever discuss with Speaker

24 Boehner what you wanted your district to look like?

25     A       I don't recall specifically.  I'm sure we

Confidential

Page 89

1                        S. Chabot

2    had some conversations about it.  Our districts were

3    adjacent to each other.  But I don't recall the

4    specifics of it.

5         Q      And through his role as speaker at the

6    time, is it your understanding that Mr. Boehner was

7    then the head of the NRCC?

8         A      I don't think he was the head of the NRCC.

9    There's a chairman who's the head of it, I think.  But

10   he's the head of -- so I guess it's head of -- it's

11   hard -- I don't think he's the head of the NRCC.

12              There's a person that's called the chairman

13   of the NRCC and it's not Boehner.  There's somebody

14   that specifically has that role.  He's probably over

15   them but...

16        Q      That would be --

17        A      Sorry for the long answer.

18        Q      No --

19        A      On one hand, but on the other hand.

20              (Laughter.)

21        Q      And that would be because of his role as

22   speaker, not -- whoever had the role of speaker would

23   have that position?

24        A      Would be kind of over all the rest of the

25   stuff.  But the NRCC is its own entity and they have a

Confidential

Page 90

                          S. Chabot

1  chairman who's in charge of that.

2      Q       Okay.  And what is your understanding of

3  the role of the NRCC with respect to the Republican

4  members of Congress?

5      A       It's our political organization.  They

6  raise money.  They target races.  They try to defend

7  ones that we think are vulnerable and they try to

8  target Democratic members who they think are vulnerable

9  and so that's what they do.  And that's a DCCC,

10 Democratic Congressional Campaign that basically serves

11 the same function on the other -- for the other party.

12     Q       Have you ever attended any presentations by

13 the NRCC related to redistricting?

14     A       Not that I recall.

15     Q       Do you recall ever reviewing any materials

16 by the NRCC related to redistricting?

17     A       Not that I recall.

18     Q       And has anyone on your staff attended

19 presentations by the NRCC related to districting that

20 you're aware of?

21     A       Not that I'm aware of.

22     Q       Did anyone on your staff ever report back

23 to you regarding an NRCC redistricting presentation?

24     A       Not that I recall.

Confidential

Page 91

1                       S. Chabot

2      Q       In general, is it usually the case that

3   incumbents are elected?

4              MS. MCKNIGHT:  Objection.

5      A       I think the percentages, if you look at

6   them historically, generally Republicans are more

7   likely to be elected than not.  Did I say incumbents?

8   Incumbents are elected.  I wanted to say the right

9   thing.  Sometimes I just say the wrong word.

10             (Laughter.)

11     Q       Do you have any knowledge of why incumbents

12  might not be reelected?

13     A       Why incumbents might not be reelected?

14  Because there's a better candidate or better funding,

15  or they may have a scandal.

16             There's a whole range of reasons incumbents

17  can lose.  A lot of them are friends of mine.  In New

18  Jersey there were four out of five Republicans who

19  lost.  Now we're down to one Republican and we had

20  five.

21             In California there are 53 members of

22  Congress and there are going to be 46 Democrats and 7

23  Republicans.  So that shows you, you know, it can kind

24  of go both ways.

25     Q       But the Ohio delegation did not shift other

Confidential

Page 92

1                          S. Chabot

2     than Mr.  -- I'm going to butcher it -- Renacci,

3     Mr. Renacci not running for office in the 16th; is that

4     correct?

5                 MS. MCKNIGHT:  Objection.

6          A     I'm not sure exactly what the question is.

7          Q     So you're referring to delegation changes

8     in New Jersey and California.  Is it true that after

9     this last election the Ohio delegation did not change

10    in composition?

11                MS. MCKNIGHT:  Objection.

12         A     I don't think it changed the competition in

13    Ohio this election.

14         Q     After you were elected --

15         A     Although that's not true either.  We had

16    several retirements and they were replaced by other

17    people so it did change somewhat.

18         Q     But did the party breakdown change at all?

19         A     I don't think the party changed, no.

20         Q     After being elected in 1994 you held your

21    seat until you were defeated by Steve Driehaus in 2008;

22    is that correct?

23         A     Unfortunately, Steve Driehaus did defeat me

24    in 2008.

25         Q     Why do you think you lost to Mr. Driehaus?

Confidential

Page 93

S. Chabot

1

2      A      Why do I think I lost to Mr. Driehaus?  Not

3  to be flippant, but he got more votes than I did.

4  That's how you lose races.  So you want to get more

5  votes than your opponent does.

6      Q      Do you have any thoughts on what the cause

7  of Mr. Driehaus getting more votes than you was?

8      A      Well, that year candidate Obama beating

9  candidate McCain by 11 percent and I lost that year.

10  So the next year candidate Obama, who was then

11  President Obama wasn't on the ballot.  The district was

12  exactly the same and I won the next time against the

13  same person that had beat me.

14          So you can kind of make arguments about it.

15  I hadn't really changed and Driehaus hadn't really

16  changed.  He did vote for Obamacare or the so-called

17  Affordable Care Act, some people call it the

18  unAffordable Care Act.

19          So there were issues that were out there.

20  But he beat me and then I beat him.  And we're the same

21  people in the same district.  The district had not been

22  redrawn or anything else.

23          I generally attributed it to increased

24  turnout for Barack Obama that year that I lost.  I

25  think that's probably what it was more than anything

Confidential

Page 94

1                          S. Chabot

2   else.

3         Q       At the time that Mr. Driehaus prevailed in

4   the November 2008 election, did you communicate with

5   anyone regarding why you might have lost that election?

6         A       I'm sure I did.

7         Q       Would any of those communications have

8   occurred over email or text messages?

9         A       I doubt it.

10        Q       And in 2008 Mr. Driehaus defeated you with

11  52 percent of the vote to 48 percent.  Do you recall

12  that?

13        A       Yeah, it was approximately that.  Thanks a

14  lot.

15        Q       Well, here you go.

16        A       Yeah, it was around that.

17                (Laughter.)

18        Q       And then in 2010 you came back and defeated

19  Mr. Driehaus garnering 52 percent of the vote, the same

20  as he had in the previous year?

21        A       I thought it was a little more than that,

22  but if that's what you're saying.  I thought he beat me

23  by 5 the first time and I beat him by 5 and a half the

24  second time.  But then you have absentees that come in

25  and some provisional ballots and stuff.  That tends to

S. Chabot

1  go more Democratic by a percent or so.  Yours are

2  probably more accurate because I'm remembering on

3  election night and you're probably the actual results

4  after more Democratic votes came in.  So, again, thanks

5  a lot.

6      Q      And that 2010 election in which you won,

7  was the last one under the previous congressional map;

8  is that correct?

9      A      That is correct.  But I would like to make

10  the point that he beat me under that old map and I beat

11  him in the same district.  So we both beat each other

12  in that same district.  The district had not changed.

13      Q      Yes.  And then in 2012, which was under the

14  new congressional map where the district had changed --

15      A      That's right.

16      Q      -- you won your seat with 58 percent of the

17  vote; is that correct?

18      A      I did, against a guy that spent zero money

19  on the race and said he had no chance of winning and

20  didn't run a campaign at all.

21      Q      In 2012 was another presidential election

22  year in which President Obama was on the ballot, much

23  like one of the reasons you said that Mr. Driehaus

24  defeated you.  Do you have any opinion as to why that

Confidential

Page 96

1                          S. Chabot

2     didn't cause the same effect in 2012?

3          A     Well, Driehaus probably spent 2 million

4     dollars and this guy spent zero.

5          Q     Okay.  And you do agree that the District

6     1, your district changed between the 2010 election and

7     the 2012 election?

8          A     Yes.

9          Q     Do you think that your district became more

10    favorable with that redistricting?

11         A     It depends on what your definition of

12    favorable would be.

13         Q     From your personal perspective, did you

14    think the district was more favorable to you as a

15    candidate when it happened?

16         A     I think they were both great districts.

17         Q     Have you ever heard of congressional

18    districts being ranked as plus or minus some number

19    with respect to each of the main political parties?

20         A     I have heard that before.

21         Q     And this ranking is sometimes referred to

22    as a partisan index or partisan voting index or PVI.

23    Does that sound familiar?

24         A     It sounds familiar, yes.

25               MS. LEE:  I'm now having marked as

Confidential

Page 97

1                           S. Chabot

2    Exhibit 6 a Presentation of the National Republican

3    Congressional Committee from 2012.

4                   (Chabot Exhibit 6, Presentation of the

5    National Republican Congressional Committee from 2012,

6    marked for identification as of this date)

7                   MS. LEE:  Counsel, for reference this is

8    NRCC 000031 as the Bates is not visible on this

9    document because the first version with the Bates was

10   pretty illegible.

11   BY MS. LEE:

12       Q       Have you seen this presentation before?

13   Does it look familiar to you?

14       A       It doesn't look familiar to me.

15       Q       Can you flip with me to the fourth page of

16   this presentation?

17       A       Yes.  Am I on the right page?

18       Q       The next one.  This slide is titled "R for

19   Republican Seats Moved Out of Play."  Do you see that?

20       A       I see that, yes.

21       Q       That's the title.  And then underneath that

22   line it indicates that a number in parentheses

23   indicates the shift in Republican favor.

24                   If you look in the second column the third

25   entry down it says, "Ohio 1 Chabot R plus 6."  And in

Confidential

Page 98

S. Chabot

1

2  parentheses it says "plus 7."  Do you see that?

3      A      I see that.

4      Q      So is this presentation by the NRCC

5  indicating there was a 7 point shift in favor of

6  Republicans in your district by the 2011 redistricting?

7              MS. MCKNIGHT:  Objection.

8      A      I don't know what it means.  Why is the one

9  6 and one 7?

10     Q      So the slide indicates that the number in

11 parentheses indicates the shift in Republican favor.

12     A      Oh, I see what you're saying.  Okay.  Okay.

13 I understand what it means now.  I didn't really

14 understand before exactly what it was.  I have not seen

15 this before that I'm aware of but I do see it now.

16     Q      Okay.  And is this slide by the NRCC, which

17 you indicated was the political arm for the Republican

18 members of Congress, indicating there was a 7 point

19 shift in Republican favor in your district?

20     A      If that's what it says, apparently that's

21 what they're trying to portray here.  I'm not aware of

22 that.  I wouldn't specifically say myself that's true

23 or that's what it means.  But according to you that's

24 what that is supposed to indicate.

25     Q      Okay.  And in 2012, before the 2012

Confidential

Page 99

1                          S. Chabot

2  election, did you have any knowledge of what the

3  partisan index or partisan voting index or PVI ranking

4  of your district was?

5        A      Before the 2012?

6        Q      After the 2011 redistricting but before the

7  2012 election, did you have any knowledge of the PVI of

8  your district?

9        A      I'm sorry, I still don't understand that

10  question.  Could you repeat that again?

11        Q      So after the 2011 redistricting?

12        A      After the redistricting, okay.

13        Q      So the new District 1, the shape that it's

14  currently in, did you have any knowledge of what

15  voting, partisan voting index or PVI was then assigned

16  to your district?

17        A      I recall a number similar to this that I

18  heard that I don't remember who told me or where I saw

19  it, but I remember something about that.

20        Q      And do you recall that being a number more

21  in Republican favor than it had been under the previous

22  congressional map?

23        A      Yes.

24        Q      Did you have conversations with anyone at

25  the time about your district becoming more favorable

Confidential

Page 100

1                    S. Chabot

2    through measurements such as this due to the

3    redistricting?

4        A     I don't recall any conversations about this

5    in my district.  I recall having -- I don't recall

6    specifically but I can't imagine I wouldn't have talked

7    to people about my district, you know, when you're

8    doing redistricting.

9        Q     Sure.  Do you have any understanding of why

10   your district was improved in Republican favor, the

11   cause behind it being drawn that way?

12                MS. MCKNIGHT:  Objection.

13       A     Not really, I mean I assume that -- not

14   really.

15       Q     Okay.  Changing gears here a little bit.

16   Is it your perspective that people have the best

17   understanding of their home community?

18       A     Yes.

19       Q     Do you find that people all over have a

20   unique perspective on their own hometown?

21                MS. MCKNIGHT:  Objection.

22       A     I would assume that's the case.

23       Q     Those who live in a certain town know it

24   better than the outsiders?

25       A     I would assume that's the case, yes.

Confidential

Page 101

S. Chabot

1

2      Q      Do you think it is a fair characterization

3  of Congressional District 1 in the time that you've

4  been its representative that the anchor of the district

5  has been Hamilton County?

6           MS. MCKNIGHT:  Objection.

7      A      I mean, it's contained more of Hamilton

8  County than any other area.  But if you're in Warren

9  County or if you're in those parts of Butler County, to

10  them you're a part of that community is every bit as

11  important to them.

12      Q      But is it fair to say that across those

13  redistrictings Hamilton County is the only county that

14  has always been part of District 1, is that true?

15      A      Yes.

16      Q      And would you agree that the county seat of

17  Hamilton County is the city of Cincinnati?

18      A      The county seat's in Cincinnati, I think.

19  That's where the courthouse is and the city.  There's

20  more people in Cincinnati than any other part of

21  Hamilton County.  Although there's more people outside

22  the city in Hamilton County than there are inside the

23  city.

24      Q      Is it true that Cincinnati is the largest

25  city in southwest Ohio?

Confidential

1                          S. Chabot

2      A       Yes.

3      Q       Would you agree that Cincinnati has had

4  particular development projects over the years?

5      A       Yes.

6      Q       Is the revitalization of the waterfront

7  along the Ohio River one of those projects?

8      A       Yes.

9      Q       All right.  And you're from Cincinnati; is

10 that correct?

11     A       I am.  I live in the city and have for

12 about 60 years.

13     Q       What neighborhood do you live in?

14     A       Westwood.

15     Q       Am I correct that neighborhoods in

16 Cincinnati have more of an official function than just

17 naming of an area as in other cities?

18             MS. MCKNIGHT:  Objection.

19     A       I mean, there are community councils and

20 things like that in those -- it's about 53

21 neighborhoods or so in Cincinnati so they have some --

22 some power.  I mean, they might get a little bit of

23 money, the community council, for some project in the

24 community.

25     Q       Let's turn then to the first district

Confidential

Page 103

1                           S. Chabot

2    specifically.  I'm having marked here as Exhibit 7.

3                    (Chabot Exhibit 7, Congressional Districts

4    Map for Ohio, marked for identification as of this

5    date)

6         Q       Congressman, do you recognize what is

7    depicted here?

8         A       Yes.

9         Q       What is this?

10        A       These the congressional districts

11   throughout Ohio.

12        Q       And looking at the map, is there anything

13   that you view as notable about it?

14        A       There's 16 districts and one of them is

15   mine, the one I have the honor to represent.

16        Q       Is there anything else that you would say

17   stands out about the -- about the map in your opinion?

18        A       I think it's the greatest state of the 50

19   states that are in the United States.

20        Q       Okay.  And now let's zoom into the first

21   district.

22                 I'm having marked a document as Exhibit 8.

23                 (Chabot Exhibit 8, First Congressional

24   District of Ohio Map, marked for identification as of

25   this date)

Confidential

Page 104

1                       S. Chabot

2       Q       Do you recognize what's depicted here in

3  Exhibit 8?

4       A       I do.  That's the First Congressional

5  District of Ohio.

6       Q       Would you agree that in Hamilton County,

7  the first district and the second district kind of wrap

8  around each other?

9               MS. MCKNIGHT:  Objection.

10      A       I don't know what that means.

11      Q       Would you agree that starting on the

12  westerly-most part of Hamilton County you're in the

13  first district and coming straight across the county

14  across the city of Cincinnati you then enter the second

15  district?

16      A       I guess I don't understand.  Are you

17  talking about this part here (indicating)?

18      Q       Yes.

19      A       So what -- I'm happy to answer your

20  question.

21      Q       Sure.  So would you agree that the first

22  district in Hamilton County comes around, bounds the

23  second district on two sides within the county?

24      A       There is a small portion of it that does

25  there, if that's what you're getting at.  I would agree

Confidential

Page 105

1                          S. Chabot

2     that this part is around this part.  But it's not

3     around all that other part out there.

4         Q      Sure.  What would you say is the purpose of

5     this configuration of the two districts within Hamilton

6     County?

7         A      What would I say the purpose of that is?

8     To show the lines between the two districts.

9         Q      What would you say the reason for Hamilton

10    County being split up in this way would be?

11        A      Well, I can tell you what I've heard but

12    it's hearsay.  But what I understand --

13        Q      Please.

14        A      -- is we were losing two seats in Ohio.  We

15    were going from 18 to 16.  So a number of the new

16    districts had to pick up people, including mine.  We

17    had to pick up about a hundred thousand new people.

18               And the way our district is -- so we had to

19    pick up about 100,000, might have been 130,000 new

20    people or something like that.

21               So if you're picking up people, you're

22    going to go in one direct or another to pick these

23    people up.  We couldn't go south because that's

24    Kentucky.  We can't pick up Kentucky people.

25               We couldn't go west, because that's

Confidential

1                          S. Chabot

2    Indiana.  So we either go this way or this way.

3                 Now, north was the Speaker of the House.

4    Butler County up here had been divided.  It had been

5    divided into -- I had a little bit of Butler County up

6    here and Boehner had the rest and then some.  So this

7    county of the made as one.

8                 Now, east you've got another member of

9    Congress's district here.  It was Jean Schmidt at the

10   time.  It's now Brad Wenstrup.

11                This county, Warren County, was divided

12   like Butler County was divided.  Warren County was

13   divided into two parts, too.

14                One of the things they tried to do is if

15   you can have all of the county be in a district, do

16   that.

17                So my understanding what I heard afterwards

18   is they made Butler County one whole county, one

19   district.  They made Warren County whole.

20                So rather than this one being split into

21   two parts and this one being split into two parts, they

22   made those both whole.  They impacted other districts

23   much less by doing it the way they did it.  That's what

24   I heard after the fact.

25                I don't remember who told me that.  Brian

Confidential

Page 107

S. Chabot

1

2  may have told me that he heard that.  I just don't

3  recall who it was.

4          And what I heard was that the reason they

5  cut this part out of Hamilton County instead of just

6  draw a line straight up is you would have drawn

7  African-Americans out of the district by doing it this

8  way and they would have been adversely impacting the

9  interest of African-Americans if they just cut the line

10  straight.

11          So they drew out these areas here which

12  were not African-Americans in general.  That's what I

13  heard but I don't know if that's accurate or not.

14          They were trying to keep African-Americans

15  in my district is my understanding or at least there

16  was some interest in doing that.  So that's just what I

17  heard.

18      Q      Sure.

19      A      It's all hearsay and it's stuff I heard

20  over the years in different capacities.

21      Q      Absolutely.  And we touched on -- then the

22  whole of Warren County is part of this district?

23      A      Correct.

24      Q      And do you think that the two portions of

25  the Cincinnati waterfront that are split into District

Confidential

Page 108

                            S. Chabot

1 and District 2 have more in common with one another

than do the west side of Cincinnati and Warren County?

        MS. MCKNIGHT:   Objection.

    A      I couldn't venture a guess as to that.

    Q      So you couldn't venture a guess as to

whether two halves of the city of Cincinnati have more

in common with each other than does half the city of

Cincinnati and Warren County?

        MS. MCKNIGHT:   Objection.

    A      Yes.  To further add to what I remember

what I heard, there had always been -- down in our area

we always had two representatives in Hamilton County.

        It's always been city of Cincinnati has

two, although they won't after the next time around

because the city's gonna be whole.  So we've always had

two representatives down our way.

        I think people like having two people

representing them rather than just one.  If you put the

county together as one, you only have one person

representing them.  I think the city's idea was we'll

have more power if we have two down our way.

        So, again, I don't know how much truth

there is in any of that, but this is stuff you pick up

over the years that people say.

Confidential

Page 109

S. Chabot

1

2      Q      In February of this year you spoke at the

3  annual Ohio GOP Lincoln Reagan Day Dinner; is that

4  correct?

5      A      I did.

6      Q      At that time did you state, "Thanks to

7  great state representation, Warren County came into my

8  district"?

9      A      I think I did say that, yeah.

10      Q      What did you mean that it was great state

11  representation that put Warren County into your

12  district?

13      A      Well, there was one finally, I represented

14  it and I really liked Warren County a lot and I

15  appreciated it.

16      Q      Why is it that you really like Warren

17  County a lot?

18      A      They're great people and they're really

19  nice.  The people in Hamilton County are great, too.

20  I've got the best congressional district in Ohio.

21      Q      And if the city of Cincinnati was whole,

22  and as you say it will be in the 2020 redistricting,

23  would those people on the east side of Cincinnati be

24  equally great people as those in Warren County?

25      A      Not until they get into my district, then

Confidential

1                        S. Chabot

2    they will be.

3        Q      So would it be the case that you would be

4    equally happy if in the 2011 redistricting you did not

5    have Warren County added to your district, provided

6    Warren County was kept whole otherwise and the first

7    district was confined to Hamilton County?

8            MS. MCKNIGHT:  Objection.

9        A      No, it wouldn't be.  I want to keep Warren

10   County.  I love Warren County.

11       Q      And why is that?

12       A      Because they're great people.

13       Q      And in 2011, did you advocate to anyone

14   that Warren County be added to your district?

15       A      Not that I recollect.

16       Q      And so around the 2011 redistricting, did

17   you have any opinion about what your district would be

18   drawn to be?

19       A      Could you repeat that?

20       Q      In around the 2011 redistricting, did you

21   have any opinion about how the lines of your district

22   would be drawn?

23       A      I had an opinion to some degree, yeah.  I

24   mean, I wanted a district that I could continue to

25   represent.

Confidential

Page 111

S. Chabot

Q       And what do you mean by a district you
could continue to represent?

A       I could get elected in it and continue to
give them, I think, the great representation that they
have.

Q       And at the Lincoln Reagan Day dinner, did
you further say that, "Democrats run up the vote in the
city part of the district and so we," I take it you're
referring to Republicans as you're speaking at a GOP
dinner, "have to run up the vote in the county
portion," referring to Warren County"?

A       I don't recall saying that.  But I wouldn't
have been just referring to Warren County.  I mean,
there's -- I do much better in this part of the
district outside the city than I do in the city.  I
mean, there's no question about that.

        So if I was talking about Warren County, I
was talking about all the areas.  I don't specifically
remember saying it, but if you have a quote there and I
said it then I'm not saying I didn't.

Q       After you won in the most recent election,
a little less than a month ago, on election night did
you say that you didn't expect to do as well in some of
the urban areas but that because of Warren County you

Confidential

Page 112

S. Chabot

1

2    thought you could overcome that deficit from the urban

3    areas?

4        A       I don't remember saying that, no.

5        Q       Does that sound like something you would

6    think to be the case about the first district?

7                MS. MCKNIGHT:   Objection.

8        A       The urban areas tend to be more Democratic

9    and the more suburban rural areas tend to be more

10   Republican.  So, I mean, it makes political sense to me

11   but I don't recall saying it.

12       Q       Are you familiar with the News 5 in

13   Cincinnati?

14       A       News 5, Channel 5, the news, yeah, I'm

15   familiar with them.

16       Q       And would it surprise you to learn that

17   they reported that this is what you said on election

18   night?

19       A       It doesn't surprise me.  I just don't

20   recall saying that specifically.

21       Q       Are you familiar with the fact that the

22   plaintiffs, as part of their case, have submitted a

23   remedial map?

24       A       No.

25       Q       I would now like to show you a document I'm

Confidential

Page 113

1                      S. Chabot

2   having marked as Exhibit 9.

3                (Chabot Exhibit 9, Remedial Map Submitted

4   by Plaintiffs, marked for identification as of this

5   date)

6        Q      And this document is the remedial map that

7   plaintiffs have submitted in this case.

8                In this map would you agree that Butler

9   County is kept whole within a district?

10       A      Yep.

11       Q      And would you also agree that Warren County

12  is kept whole within a district?

13       A      According to this map it is, yes.

14       Q      And those are two of the things that you

15  had testified to that were important about how the 2011

16  redistricting put the map together; is that correct?

17       A      Yes.

18       Q      And in this map, the District 1 is confined

19  to Hamilton County; is that correct?

20       A      All of District 1 you have in Hamilton

21  County.

22       Q      Yes.  And would it surprise you to learn

23  that this District 1 has a higher percentage of

24  African-Americans keeping the whole of Cincinnati

25  together than does District 1 under the current

Confidential

Page 114

1                        S. Chabot

2      congressional map?

3          A      It wouldn't surprise me or I wouldn't say

4      it's not true either.  I just don't know.

5          Q      Just don't know.

6                 And you had stated that you had previously

7      heard that one of the reasons that District 1 was not

8      drawn to the east side of Cincinnati was about

9      preserving African-American representation; is that

10     correct?

11                MS. MCKNIGHT:  Objection.

12         A      That was to keep it in our district.

13     That's what I had heard.  That's what I heard.

14         Q      Okay.  Now let's zoom in on proposed

15     remedial District 1 which I'm having now marked as

16     Exhibit 10.

17                (Chabot Exhibit 10, Map of Proposed

18     District 1, marked for identification as of this date)

19         Q      Looking at this map of Proposed District 1,

20     do you observe any problem with this map such that the

21     court shouldn't institute it?

22                MS. MCKNIGHT:  Objection.

23         A      I don't think it's -- it's in my place to

24     tell the court what they should or shouldn't do.

25         Q      And do you think there's anything

1           S. Chabot

2   problematic with District 1 wholly being within, within

3   Hamilton County as it is here in this proposed remedial

4   district?

5           MS. MCKNIGHT:  Objection.

6       A     You have very little representation by a

7   second member of Congress really.  You've got a little

8   bit on the east side there but that's it.  And I think

9   the people of our area are used to having two people

10  they can go to.  And one would have a minimal interest

11  at all in Hamilton County.

12      Q     And you've brought it up before, you're

13  familiar with Issue 1, the ballad initiative that was

14  passed with an overwhelming majority in May of this

15  year?

16          MS. MCKNIGHT:  Objection.

17      A     When I think of Issue 1 now, I think of the

18  drug thing that went down.  What was Issue 1?  I don't

19  remember.

20      Q     The Issue 1 in the May 2018 election?

21      A     That's the new thing that the legislature

22  did.

23      Q     Yes.

24      A     I recall it somewhat.

25      Q     So it was passed by the legislature and it

Confidential

1                           S. Chabot

2       was then placed on the ballad and voted in by the

3       citizens of Ohio.

4            A       All right.  That, yes.

5            Q       And under that mandate, Cincinnati will

6       have to be kept whole within a congressional district,

7       'is that true?

8                 MS. MCKNIGHT:  Objection.

9            A       Cincinnati would have to be, right, the

10      city of Cincinnati.

11           Q       Once that occurs, will that cause

12      Congressional District 1 to be kept within Hamilton

13      County to have that population of the city within one

14      congressional district?

15                MS. MCKNIGHT:  Objection.

16           A       No.

17           Q       And why not?

18           A       Because it doesn't have to be in one -- one

19      county.

20           Q       Once the city of Cincinnati is kept whole,

21      what other portions of southwest Ohio do you think will

22      be within the congressional district?

23           A       I have absolutely no idea.

24           Q       Are there any portions of southwest Ohio

25      that you think make the most sense to be included in a

Confidential

Page 117

S. Chabot

2 congressional district with the whole of the city of
3 Cincinnati?

4     A    I don't know at this time.  We'll have to
5 wait and see what the legislature does and how they
6 look at this.

7     Q    Is it your understanding -- you've said
8 that Democrats tend to garner more votes within the
9 urban areas.  Would those urban areas include the city
10 of Cincinnati?

11         MS. MCKNIGHT:  Objection.

12     A    Some of them.

13     Q    And would you agree that keeping the city
14 of Cincinnati whole within District 1 would make a more
15 competitive district for a Democratic challenger
16 running against you?

17         MS. MCKNIGHT:  Objection.

18     A    Depends on what the rest of the district
19 looks like.  I won by four points this last time.
20 Sounds like a pretty competitive election to me.

21     Q    And we have talked about the city part and
22 then other parts referred to as the county parts of the
23 district.  Do you think it makes sense for the city of
24 Cincinnati to be kept in one district so those
25 residents can have their particular interests

Confidential

Page 118

1                          S. Chabot

2    represented?

3         A       I think one could argue either way.  You

4    could argue it makes sense.  You could also say the

5    city should be split and have two representative as it

6    has had for I think the last 200 years.

7         Q       And would you agree that currently the

8    eastern half of the city of Cincinnati in District 2 is

9    connected to a number of other counties that are much

10   more rural than the city?

11        A       Could you repeat that?  I didn't quite

12   catch it.

13        Q       Sure.  In the current congressional map, if

14   you want to flip back I think it's Exhibit 7.

15        A       Okay.

16        Q       Would you agree that the eastern half of

17   the city of Cincinnati that's in District 2 --

18        A       The eastern half of the city of Cincinnati?

19        Q       Yes.  Which is in District 2?

20        A       Yes.

21        Q       It's that portion of District 2 that comes

22   into Hamilton County, is connected to a number of much

23   more rural districts -- excuse me, much more rural

24   counties than the city of Cincinnati is?

25        A       I think that's probably true.

Confidential

S. Chabot

1

2      Q      And have you faced any issues in Congress

3  where the interests of the residents of the city of

4  Cincinnati are much different than the interests of the

5  residents of Warren County and the more rural persons

6  of the district?

7              MS. MCKNIGHT:  Objection.

8      A      I don't really have -- I'd have to have

9  some specific comment on it.

10     Q      And do you recall the vote related to

11 federal funding of the Cincinnati street car project?

12     A      I do remember that.

13     Q      And how did you vote on that issue?

14     A      I'm not sure if we had a -- was there a

15 congressional vote on that?  I don't recall that.

16     Q      As far as I understand it there was a

17 question of federal funding for that project.

18     A      I think that happened when Driehaus was

19 there and Driehaus voted for it I think.  But I'm not

20 absolutely positive.

21     Q      Okay.

22     A      I wasn't a big fan of the street car.  Most

23 of the residents of the city in Cincinnati that I

24 talked to aren't big fans and they're even less fans

25 now that we actually have it because it's a complete

Confidential

Page 120

1                    S. Chabot

2    disaster.

3        Q     Okay.  And do you think if the city of

4    Cincinnati would be kept whole that would allow the

5    congressional representative for that district to take

6    into account views of everyone, of all of the residents

7    of the city of Cincinnati as opposed to splitting the

8    east side from the west side?

9                MS. MCKNIGHT:  Objection.

10       A     I would hope that whoever represents

11   whatever portions they represent try to represent the

12   views of all the people within the areas that he or she

13   represents.

14               MS. LEE:  Can we go off the record.

15               (Off the record discussion.)

16   BY MS. LEE:

17       Q     So turning back to Exhibit 10, which is the

18   proposed remedial District 1.  And so the portions of

19   Hamilton County that are added into this district to

20   create this proposed remedial District 1, do you know

21   what the constituents in that area look like?  What

22   type of region it is that's been added?

23               MS. MCKNIGHT:  Objection.

24       A     Not really.  I don't know exactly what you

25   mean what they look like.

Confidential

Page 121

S. Chabot

1  

2     Q     So is it largely an urban portion has been

3 added that is not currently in District 1 that's in

4 Hamilton County?

5          MS. MCKNIGHT: Objection.

6     A     It's a mixture. There's some urban,

7 there's some that's not urban. You've got Blue Ash,

8 you've got Deer Park and Kenwood, Madeira. Those are

9 all, you know, more suburban areas and then you've

10 probably got areas that isn't identified in the city

11 which are more urban so it's kind of a mixture.

12     Q     If this was your district, could you

13 represent the constituents in this district?

14     A     I hate to speculate, but I would try to do

15 my best for whoever I'm representing. I always do.

16     Q     And in this proposed remedial district do

17 you have an idea of what your electoral prospects would

18 look like?

19          MS. MCKNIGHT: Objection.

20     A     Not really. I would have to sit down and

21 go through the numbers and all that sort of thing and

22 I've never looked at this district before to my

23 knowledge.

24     Q     And we had discussed earlier about the

25 speech at the Lincoln Reagan Day Dinner and the

Confidential

Page 122

S. Chabot

1 reporting on election night that you had said that the

2 Democrats tend to run up the vote in the urban areas

3 and you do better in the county portions of the

4 district; is that right?

5 MS. MCKNIGHT:  Objection.

6 A      I said something like that apparently and

7 I'm not saying I didn't.  I just don't recall exactly

8 what I said.

9 Q      And does that -- does the substance of that

10 sound to be true?

11 A      The substance of that sounds to be true.

12 Generally urban areas tend to be more Democratic,

13 nonurban areas tend to be more Republican.  But, again,

14 more Republican -- depends on what state you're in,

15 too.

16 Q      And in the southwest portion of Ohio in the

17 proposed remedial district, this has increased the

18 urban areas that are included in the district from its

19 current composition.  Would you agree with that?

20 MS. MCKNIGHT:  Objection.

21 A      It does do that.  If it contains all of

22 Cincinnati by definition it would have more urban

23 areas.

24 Q      And in those areas a Democratic candidate

Confidential

Page 123

S. Chabot

1

2  you think would be more likely to be supported than a

3  Republican candidate; is that true?

4          MS. MCKNIGHT:  Objection.

5      A      I think in general that would be true.

6      Q      And do you think in a district like this a

7  Democratic candidate would then be more competitive

8  running against you?

9          MS. MCKNIGHT:  Objection.

10     A      When you say they'd be more competitive, I

11 think you would also have to look and see could a

12 Republican candidate be at all competitive in a

13 district like this.  I don't know.  Again, we would

14 have to look at the numbers.

15     Q      We had spoken earlier about constituent

16 groups that you've met with; is that correct?

17     A      I remember that coming up, yes.

18     Q      And do you ever speak to constituent groups

19 that are invited to speak at particular -- do you ever

20 speak at events that you've been invited to by your

21 constituents?

22     A      Yes.

23     Q      Have you ever been invited to a League of

24 Women Voters Voter Forum?

25     A      The League of Women Voters were involved in

Confidential

Page 124

1                         S. Chabot

2    the debate we just had.  They were one of the

3    representative groups that reached out to put that all

4    together and I agreed to appear in the debate or forum

5    or whatever you want to call it.  They also do the -- I

6    think it's called the who and what or something, the

7    paper that they put together that goes to the library

8    in different places and we participate in that, answer

9    their questions and put -- they put it out to the

10   public.  So, yes.

11       Q       And have you ever been invited to an event,

12   a voter engagement event hosted by the League of Women

13   Voters that you did not attend?

14       A       I don't recall.  We attended the debate

15   this time.  You know, we usually do a few debates each

16   campaign, usually three.  I don't recall how they were

17   involved in the past.

18       Q       Okay.

19       A       I've generally done those -- the election

20   things that they put out, the materials that the League

21   of Women Voters puts out, I've generally participated

22   in that.  I don't specifically remember not doing

23   something that they wanted but it's possible.

24       Q       And do you have any recollection of

25   Hamilton County Young Democrats reaching out to you and

Confidential

Page 125

1                        S. Chabot

2    your office regarding issues surrounding gun control?

3        A         They may have.   I mean, I've had people

4    reach out to me relative to so-called gun control but I

5    don't recall it being the Young Democrats.   They may

6    have.   There may have been some of them that were in

7    with a group or something.

8        Q         And do you have any recollection of an

9    event this past March that took place throughout the

10   country called the March For Our Lives?

11       A         I don't remember something called that but

12   I know there was some large events that took place but

13   I don't remember what they were called.

14       Q         And do you recall large events, largely

15   organized and hosted by young people throughout the

16   country surrounding the issue of gun violence,

17   particularly in schools?

18                 MS. MCKNIGHT:   Objection.

19       A         Yes, I do remember that, yeah.

20       Q         And do you remember you or your office ever

21   being reached out to regarding that issue specifically?

22       A         When you say that issue, do you mean gun

23   control?

24       Q         I mean the issue of gun violence

25   particularly within schools.

Confidential

1          S. Chabot

2      A          Yes, I remember people reaching out about
3  that, yes.

4      Q          And what has your response been to
5  constituents who have reached out concerned about that
6  issue?

7      A          I introduced legislation which addressed
8  that issue.  It became law.

9      Q          What legislation is that?

10     A          After the Parkland shooting, there was an
11  effort by Congress to act, actually put something
12  together that would reduce gun violence and
13  vulnerability of kids in the schools.

14            So I met with the head of the FOP in
15  Cincinnati and said, "Hey, look, is there something we
16  could actually do," and we crafted legislation and
17  introduced it along with John Rutherford.  He's a
18  congressman from Florida.  He was a sheriff prior to
19  coming to Congress.  It became part of the, I forget
20  the exact name of the bill, but it was a safety in the
21  schools type legislation.

22            And we introduced it in the House.  It
23  passed.  They combined his bill and my bill together
24  and passed House and the Senate and President Trump
25  signed it into law.  That was specifically in response

Confidential

1                    S. Chabot

2    to the violence that we had seen in our schools.

3        Q        Is representative Rutherford a Democrat or

4    Republican?

5        A        He's a Republican.

6        Q        Do you recall having stated in the past

7    that on all legislation that you introduce you intend

8    to have a Democratic co-sponsor?

9                 MS. MCKNIGHT:   Objection.

10       A        I oftentimes do, I try to.  So, yes, I

11   usually do have a Democrat.  I don't -- there may have

12   been -- well, there were Democrats I think that voted

13   for it this time.  But, yes, I oftentimes do have the

14   Democrat co-sponsor the legislation that I introduce.

15       Q        And did you seek a Democratic co-sponsor

16   for the safety in schools bill that we were just

17   discussing?

18       A        I think we did.  I'm not absolutely

19   positive.  Usually my staff takes care of reaching out

20   with their staffs.  There may have been Democratic

21   representatives that did co-sponsor it.

22                I remember John Rutherford in particular.

23       Q        Do you recall what the content of that bill

24   was, what it accomplished?

25       A        Yeah, it did a couple of things.  It,

Confidential

Page 128

1          S. Chabot

2    principally, it -- the schools are kind of soft targets

3    out there.

4              What it did was it gave additional federal

5    funding to any school districts that wanted to take up

6    the funding and the funding had to be for certain

7    things.  And it was basically to make the school safer.

8              It was training for teachers and guidance

9    counselors and school personnel.

10             It's how to find those kids that have shown

11   any kind of signals or warning signs out there that

12   they may be dangerous, that they may have some mental

13   issues that ought to be dealt with before, you know,

14   tragedy happens.  It taught them how to do that and

15   what to do about it and how the schools internally do

16   it.

17             There was also equipment, metal detectors,

18   training as to what you do in an active shooter

19   situation.

20             It allowed money to go for retired police

21   officers, for school resource officers.  That was the

22   specific part -- that was the main involvement that I

23   had.  Because I was meeting with the FOP head, his name

24   is Dan Hills.  He's the head of the FOP in Cincinnati.

25   He had said our people retire after 25 years of

Confidential

1              S. Chabot

2    service.  They're in the early 50s.  They're the best

3    trained people.  They're looking for jobs, security

4    jobs and this and that.  They would make great school

5    resource officers.  Not all of them but a lot of them.

6    So this allows money to go for that.

7            That's what the legislation did in general.

8    There are other things, too, but that was the main

9    point of it.

10        Q      Is it the case that that legislation did

11   not specifically target access to guns but was about

12   resources within the schools themselves?  Is that a

13   fair description?

14        A      I'd say that's a fair description of it.

15        Q      Are you familiar with the local chapters of

16   the A. Philip Randolph Institute?

17        A      The A. Philip Randolph Institute?  Doesn't

18   ring a bell.

19        Q      It is an organization of largely

20   African-American trade unions.  Does that ring any bell

21   at all?

22        A      Not really.  I know what African-Americans

23   are and I know what trade unions are.  I don't remember

24   an organization being associated with that.

25        Q      Okay.  So you have no recollection of being

Confidential

Page 130

S. Chabot

1
2 reached out to or being invited to any events or sought
3 a meeting with you by the local chapter of the A.
4 Philip Randolph Institute?

5     A     Not specifically.  Oftentimes I'm aware of
6 it because it's on my schedule.  My staff get all kinds
7 of invitations.  They first have to figure, am I going
8 to be in town, do I have something else that's
9 conflicting with that and that kind of thing.  I
10 usually don't -- there are very few things I'll decide,
11 yeah, I'll put that in the schedule.  Usually they put
12 it on there.

13     Q     And if you were invited to some sort of
14 constituent or voter engagement event and were also
15 invited to a Republican Party fundraising event, how's
16 the decision made which of the two events you would
17 attend in your schedule?

18     A     It would depend whether we accepted one
19 event or another.  We try not to conflict things like
20 that.  On a Republican fundraising event we would
21 generally be setting it up ourselves.  So we wouldn't
22 put it in a time where it would conflict with somebody
23 else's things.  So we generally try to minimize those
24 kinds of conflicts so we can attend both.

25     Q     And is Lisa, who you mentioned earlier as

Confidential

Page 131

1                            S. Chabot

2    your scheduler, sort of the point person for managing

3    the calender with issues such as conflicts like that?

4        A       That's right.  Now, we generally have a

5    person on the campaign that's handling campaign events.

6    She doesn't really handle that kind of stuff but she's

7    allowed to put it on the schedule.  You have to make

8    sure that you're not using official resources for a

9    political campaign, even in scheduling things.

10                    They're a little more understanding because

11   you've got to, they have to coordinate with each other.

12                    So we generally have somebody on the

13   campaign that works with her to handle those kinds of

14   things.  So it's not just Lisa, but ultimately she's

15   the main person.

16       Q       Okay.  A couple final questions.

17                    Turning back to Exhibit 9, which is the

18   proposed -- the whole proposed map not just District 1?

19       A       Let's see.  I see it.

20       Q       Is there some reason that you think this

21   map wouldn't work as the congressional map for the

22   state of Ohio?

23                    MS. MCKNIGHT:  Objection.

24       A       I can't speak to all the other districts

25   but just looking at mine, I think that the biggest flaw

Confidential

Page 132

S. Chabot

1 is basically for the most part Hamilton County has one

2 vote in the Congress rather than two. So I think their

3 interests are adversely impacted by that.

4

5 Q      And following the 2020 redistricting

6 because the city of Cincinnati has to be kept whole, do

7 you think that will, again, be the case for District 1?

8         MS. MCKNIGHT:  Objection.

9 A      I think that adversely impacts but it's

10 happened so I'm not -- I mean, it's going to happen.  I

11 think it does adversely impact the city of Cincinnati

12 itself.  But it's the law so it's the law so we'll

13 follow it.

14         But I don't think just because you did one

15 dumb thing that you have to do another dumb thing to

16 the entire county and have just one basic vote there

17 because that's what you would be doing if you went with

18 this map here.

19         Hamilton County would lose considerable

20 power when we're trying to get federal grants, get

21 federal attention.  There would be one of us doing it

22 rather than two.  Yes, you would have a little bit over

23 here.  But everybody would know that this is a really

24 small part of his or her job.

25 Q      And previously you had said that one thing

Confidential

Page 133

1                         S. Chabot

2    that was sought to have happen after the 2011

3    redistricting was to keep Butler County whole and to

4    keep Warren County whole.  As to each of those

5    districts, wouldn't that, each of those counties,

6    excuse me, wouldn't it then be the case that for each

7    of those counties there would be a single congressional

8    representative?

9        A       It does but we have 88 counties in the

10   state.  You know, we have 16 representatives.  So

11   you're gonna try to have a number of the counties

12   grouped together and that's so -- it makes sense there.

13              When you have a large county like Hamilton

14   County it doesn't make sense because you really --

15   really, the county is losing power there.  They're

16   losing a lot of the ability they have to get resources

17   at the federal level.

18              Right now they have Brad Wenstrup has a lot

19   to say about Hamilton County right now.  He'd have much

20   less input on what the county would get here, or

21   whoever's in the district down the road.

22       Q       So you think it's sort of materially

23   different if it's a large county or a county with less

24   population that's going to be linked to other counties

25   within a district?

Confidential

Page 134

1                          S. Chabot

2              MS. MCKNIGHT:  Objection.

3       A       I do, yes, absolutely.

4       Q       And can you expand on why that might be?

5       A       Well, you don't have much choice when

6   you've got smaller counties.  They're gonna be -- you

7   can't come anywhere near putting a congressional

8   district in one of the counties that has 50,000 people

9   in it or whatever they have.  So they're gonna have to

10  be joined together.  So it makes some sense to have

11  those counties as one.  That can be a goal.

12             But you're also not going to have one here

13  in any event, you're gonna have two.  So if you're

14  gonna have two representations you might as well have

15  something where both are going to have some clout here

16  in Washington on their behalf.  This basically takes

17  that away.

18             That's why they probably shouldn't have

19  done it for the city either but the city sometimes does

20  dumb things, like the street car and I would argue

21  making itself a sanctuary city, I think that's a

22  mistake.  They've done it.

23             Now, this is something the legislature did,

24  not the city.  Although the city may have had some

25  involvement in that, I don't know.

Confidential

Page 135

S. Chabot

1

2      Q      Do you understand that Issue 1, the

3 redistricting Issue 1 from May, was passed by the

4 entirety of the Ohio citizens through initiative

5 process?

6      A      I'm aware of that.

7      Q      So it wasn't just the city of Cincinnati

8 that decided it should be put together.

9      A      Certainly not.  The legislature ultimately

10 passed it and the people voted up or down and my guess

11 is that one tiny part of the issue probably was never

12 thought of by the vast majority of the voters.  That

13 was one minor thing in a bigger thing.

14          They wanted to reform Ohio.  I voted for

15 it, too.  I wanted to reform Ohio.  When I say voted

16 for it, I mean as a citizen.

17          But there were things in it which I think

18 were not good, which is fairly common in legislation.

19 We have things pass up here and have a thousand things

20 in here and I like 900 of them and there's a 100 I

21 don't.  So do I vote against it because I didn't like

22 the 100 or do I vote for it because -- so these are

23 decisions that we all have to make.

24      Q      Sure.  In Representative Wenstrup's current

25 district do you know how much of his district is within

Confidential

Page 136

1                          S. Chabot

2    Hamilton County?

3        A       I don't.  I mean, you can look at a map and

4    say how much.  I don't know what percentage it is or

5    anything like that.

6        Q       Okay.

7                MS. LEE:  That's all I have.  Thank you

8    very much for your time, Congressman.

9                MS. MCKNIGHT:  I just have a few redirect.

10                        EXAMINATION

11   BY MS. MCKNIGHT:

12       Q       In your role as a congressman, do

13   constituents contact you?

14       A       Yes.

15       Q       And how do you respond to constituents when

16   they contact you?

17       A       We try to help them.  Try to assist them in

18   whatever it is they're contacting us about.  Oftentimes

19   it's, you know, could be a matter has to do with the

20   IRS or Social Security or Medicare, a whole range of

21   federal issues.  Or they may be wanting to bring their

22   family to Washington and have a tour of the Capital

23   building or school groups come up here.  So they

24   contact us and we try to assist them.

25       Q       Does your office respond to phone calls?

Confidential

1              S. Chabot

2       A       Yes.

3       Q       Does your office respond to emails?

4       A       Yes.

5       Q       And when constituents contact your office,

6  do you or does your office know if they're a Democrat

7  or a Republican?

8       A       No.  We wouldn't know that.

9       Q       And does it matter?

10      A       No.

11      Q       And when constituents contact your office,

12  do you know if they voted for you or not?

13      A       No.

14      Q       Does it matter?

15      A       No.

16      Q       Do you participate in candidate debates?

17      A       Yes.

18      Q       Do you participate in candidate nights?

19      A       Yes.

20      Q       Do you participate in candidate forums?

21      A       Yes.

22      Q       How do you decide which of these events to

23  participate in?

24      A       Well, scheduling more than anything else

25  because I'm in Washington usually four days a week and

Confidential

Page 138

1                              S. Chabot

2    I go back to my district when I'm not here and so the

3    first thing would be am I going to be up here or back

4    there.  If I'm going to be back there, we try to make

5    as many of them as possible.

6                    The only reason we wouldn't make something

7    in general is if there's a conflict or we have

8    something else scheduled or I've told my wife that I

9    was going to do something with the family or something

10   like that.

11                   So we make them based upon our ability to

12   get there and that sort of thing.

13        Q        And if two different candidates nights were

14   scheduled on the same night, how would you choose

15   between the two?

16        A        I generally try to make them both.  You

17   know, I try to get the beginning of one and then the

18   tail end of the other.  I try to do -- I would try to

19   do them both which wouldn't be at all unusual because I

20   oftentimes will hit several different things.  It could

21   be three, four, five events sometimes.

22        Q        Does your office fill out the League of

23   Women Voters candidate questionnaire?

24        A        Yes.  Now, when you say office, it would be

25   my campaign that would do it.  Not my official office.

Confidential

1                              S. Chabot

2    The campaign would fill it out because it's a campaign

3    type thing.

4        Q       How often are you present in your district?

5        A       Every weekend and then part -- usually

6    we're up here, in a month, you have four weeks, I know

7    it's a little bit more than that, but in a typical

8    month if you have four weeks, usually there's three

9    weeks we're up here and the one week we're back home.

10              Then the weeks we're up here, we're usually

11   up here Monday through Thursday or Tuesday through

12   Friday so it's usually four days up here and three days

13   back there in general.

14              Now, I'm on the Foreign Affairs Committee

15   where there might be some weekend I'm in Pakistan or

16   something on official congressional business, but in

17   general when I'm not here, I'm back at my district

18   keeping in touch with the people that I represent.

19       Q       How many different offices do you have?

20       A       I've got my official office here in the

21   Rayburn Building.  I've got my official office in

22   Cincinnati, it's in a building called the Carew Tower

23   in downtown Cincinnati.  Carew is C-A-R-E-W.

24              And then in Warren County, right in the

25   heart of Warren County in a place called Lebanon, I

Confidential

Page 140

1                          S. Chabot

2    have an office there in Lebanon also.

3                    Those are my three official offices, one

4    here, two back in the district, one in each county.

5                    And then I have a campaign office.  Right

6    now we have two but we're going to be down to one

7    because the election is over.

8        Q        Can constituents visit any one of those

9    offices?

10       A        Yeah, constituents would usually come to

11   one of the official offices.  If it was a campaign

12   matter they would come to one of the campaign offices.

13       Q        And do they go to those offices?

14       A        Yeah, very -- even if I'm not there because

15   then my staff would be meeting with them.  But if I'm

16   there, I'll meet with them.  Although my staff takes

17   care of a lot of things.

18                    Typically what happens is if it's a

19   constituent matter, my staff takes care of it and if

20   there's a problem and a phone call from me to the IRS

21   or Social Security or something will help or, you know,

22   with an embassy for that matter.

23                    Sometimes they've got a family member

24   that's stranded over somewhere and they're trying to

25   get back or it could be a immigration case.  So they

Confidential

Page 141

1                          S. Chabot

2    can come in, meet with me, but my staff oftentimes

3    takes care of a lot of this stuff.  That's why we have

4    staffs.  If it's a problem then they'll tell me and

5    I'll step in.

6         Q       And the help you just described that either

7    you give or your staff gives, is that contingent on the

8    constituent being a Republican?

9         A       Not at all, no.  We would do the same thing

10   no matter -- I would not -- 99 in 99/100ths percent of

11   the time I would have no idea whether they were

12   Republican or Democrat and I would care less.

13        Q       If a Democratic voter contacted you, would

14   you listen to their views?

15        A       Absolutely.

16        Q       About how many people are in your district?

17        A       It's approximately 730,000.  So

18   three-quarters of a million approximately, little less

19   than that.  When they do the census, you know, it's

20   going to change during the course of the year.  We're

21   getting a little into the census now.  It's a little

22   harder to say what it is now.  It's about 550 or so

23   thousand people in Hamilton County in my district and

24   about 220 or 30 or so from in Warren County, they're in

25   my district.

Confidential

Page 142

1                         S. Chabot

2        Q        Would you agree that it's your job to

3   represent all members of your district regardless of

4   party affiliation?

5        A        Yes, absolutely.

6                 MS. MCKNIGHT:  Thank you, Congressman.  No

7   further questions.

8                         EXAMINATION

9   BY MS. LEE:

10       Q        As always.  I just have a couple more.

11                So regarding constituent contact, you had

12  testified earlier that once in a while certain things

13  may fall through the cracks.  Is that true?

14       A        Yeah, I'd like to say it's not true but it

15  is.

16       Q        We're all human.  So if the office of the

17  mayor of Cincinnati contacted your office with a

18  constituent service need, would your office respond to

19  that?

20       A        We would, even though he's run against me

21  twice for Congress.  I beat him both times.

22       Q        And you had just said a little bit ago if

23  you happened to be in the district you may meet with

24  constituents who come?

25                MS. MCKNIGHT:  Objection.

Confidential

1                        S. Chabot

2        A        Sure, yeah.

3        Q        How do you determine whether you meet with

4   someone or whether your staff meets with them?

5        A        My staff puts it on the schedule and I

6   follow my schedule basically.  And if it's constituents

7   that I'm meeting with, I meet with them.  If the

8   staff's taking care of it, then I oftentimes wouldn't

9   know, you know, that it's going on because they're

10  handling it.  They're really good.

11       Q        And do you think it's the case that your

12  staff puts on your schedule meetings that they consider

13  more important for you to take than the ones they

14  handle themselves?

15                 MS. MCKNIGHT:  Objection.

16       A        Could you repeat that?

17       Q        Do you think it's the case that your staff

18  puts on your schedule meetings that they think it is

19  important that you take?

20                 MS. MCKNIGHT:  Objection.

21       A        I think that's the case, yes.

22       Q        And then they can handle other things on

23  their own without putting it on your schedule?

24       A        That's accurate, I think, if I understand

25  what you're saying.  The more important things you do

Confidential

1          S. Chabot

2  and the less important things you don't have the time

3  for because you're doing more important things.

4      Q        Yes.

5      A        So and the staff oftentimes determines

6  that.

7      Q        We had looked at an email earlier where you

8  had been emailing with Ms. Towns, the executive

9  assistant to Mr. Farmer.  Do you recall that?

10     A        I do recall that.

11     Q        And you had reached out to Mr. Farmer using

12  your Steve Chabot 11 Gmail address; is that correct?

13     A        I don't recall what -- I think that's what

14  it was but I don't recall if it was that.  Is that what

15  it was?

16     Q        If we want to flip back, it's Exhibit 4 in

17  the pile in front of you?

18     A        If that's what it says it was, I don't

19  remember what it was.

20     Q        Would you agree that most of your

21  constituents don't have access to you through your

22  Gmail address?

23     A        That's probably the case but I don't know.

24     Q        Do you have any idea how it's determined

25  which constituents might have access to your Gmail

Confidential

1                      S. Chabot

2    address?

3        A        Not exactly.  I mean, no, I mean, I don't

4    know.

5        Q        Do you think it's at all related to the

6    amount they've given in fundraising to your campaigns?

7        A        That might be why that's a personal email

8    because if you're talking -- we don't talk about money

9    on our government stuff.  We just wouldn't.  It sounds

10   like, you know, it was campaign related and therefore

11   it was on my email I guess because we didn't want it to

12   be on official, I'm guessing.

13               I'm assuming that there must have been a

14   fundraising letter sent to them at some point and they

15   responded to that because it sounds like there's two

16   separate things being talked about there.

17               One is, it says something about districting

18   and the other says, oh, by the way, there's $5,000.  So

19   I'm assuming that one was campaign and the other things

20   whatever.  But I don't recall because I don't recall

21   either one of them.

22       Q        So you don't think the fundraising and the

23   redistricting matters were linked together at all?

24       A        No, I don't.  I think that -- when I saw

25   that I'm trying -- what is it?  That's the only thing I

Confidential

1                         S. Chabot

2    can figure out.  I must have had a fundraising letter

3    and we were talking about something or somebody on my

4    behalf apparently was talking about -- was it saying

5    meeting with him or something?  I forget what it said.

6         Q      You asked if he had a few minutes to talk

7    this week and it is signed thanks, Steve, but?

8         A      I'm guessing, just guessing.  I told you

9    there's a whole bunch of people that have my email that

10   are staff people.  The campaign people have my email,

11   too.

12          What I'm guessing, this is strictly me --

13   the only thing that makes sense to me here is one of

14   the people on the campaign has my email stuff and they

15   know it can't be on the government, so sent an email

16   from me kind of reaching out to somebody about -- about

17   that.  You know, I guess.  But I just don't know

18   because it's not on our official stuff.  It's on a

19   personal thing from me which is what you should do.

20          You don't want to have your official office

21   reaching out on something like that.  It's for me but I

22   don't recollect because I have a number of people that

23   have that and I'm guessing one of the campaign people

24   did it.  And I'm guessing that we send the fundraising

25   letters out a number of times a year and we have events

Confidential

1                          S. Chabot

2     where we have a fundraiser and we sent out stuff and

3     said hey, I've got fundraiser coming up.

4            And apparently -- Dick Farmer, I know he's

5     a supporter, I know who he is.  And he's been a

6     contributor to us and virtually every other Republican

7     and probably a lot of Democrats, too.

8            I'm thinking there were two things going on

9     and that's why they kept it on the one because it --

10    but, again, I was surprised at that as you all are as

11    far as when I saw it and heard about it.  That's all I

12    can make of it.

13    Q       And do you think it's the case that

14    individuals who give low dollar amounts to your

15    campaign, $20, $100, wouldn't be receiving emails from

16    your personal email address?

17    A       I don't know.  I didn't send that one.

18    Apparently that one went out under my name but I don't

19    recall sending that myself.

20    Q       And when your staffers send email from your

21    Gmail address, do they sign your name off on it?

22    A       Oh yeah, yeah.  And I think, again, I think

23    that was a campaign person that sent that, when you say

24    staffer.  I think that was a campaign person that sent

25    it out.  So, I mean, but, again, I'm just trying to

Confidential

1                     S. Chabot

2    figure it out.

3        Q        Sure.

4        A        I'm not saying that is what happened.  It's

5    the only thing that makes any sense to me.

6        Q        Gotcha.

7                 MS. LEE:  Thank you.

8                 MS. MCKNIGHT:  No further questions.

9                 Except, for the record, we would like to

10   designate the entire transcript as confidential

11   pursuant to the protective order.  We can deal with any

12   issues outside the deposition.

13                We would like to read and sign, please.

14   And, on the record, we would like to order an expedited

15   transcript.

16                (Deposition adjourned at 1:41 p.m.)

17

18                _____

19                STEVEN J. CHABOT

20

21   Subscribed and sworn to before me

22   this _____ day of _____, 2018.

23

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____

Confidential

Page 149

1                         S. Chabot

2     DISTRICT OF COLUMBIA, to wit:

3         I, RONDA J. THOMAS, a Notary Public of the

4     District of Columbia, do hereby certify that the

5     within-named witness personally appeared before me

6     at the time and place herein set out, and after

7     having been duly sworn by me, according to law, was

8     examined by counsel.

9         I further certify that the examination was

10    recorded stenographically by me and this transcript

11    is a true record of the proceedings.

12        I further certify that I am not related to any

13    of the parties, nor in any way interested in the

14    outcome of this action.

15        As witness my hand this 7th day of

16    December, 2018.

17

18    _____

19                          RONDA J. THOMAS

20                          Notary Public

21

22

23

24    My Commission Expires:

25    October 14, 2023

Confidential

Page 150

1                          S. Chabot

2                           INDEX

3                      December 3, 2018

4

5    WITNESS                  EXAMINATION BY        PAGE

6    Steve J. Chabot      Ms. Lee                    4

7                         Ms. McKnight              136

8                         Ms. Lee                   142

9

10   Exhibit No.                              Marked

11   Exhibit 1    Requests for Production          9

12   Exhibit 2    Memorandum in Support of Motion of  35

13                Republican Congressional Delegation

14                Ohio Voters and Ohio Republican Party

15                Organizing to Intervene

16   Exhibit 3    Reply in Further Support of the    54

17                Motion of Republican Congressional

18                Delegation Ohio Voters and Republican

19                Party Organizations to Intervene

20   Exhibit 4    Email String                      66

21   Exhibit 5    11/17/2010 Email to Susan Towns   76

22                from Steve Chabot

23   Exhibit 6    Presentation of the National      97

24                Republican Congressional Committee

25                from 2012

Confidential

Page 151

1                    S. Chabot

2       INDEX (cont.)

3       Exhibit 7    Congressional Districts Map of    103

4                    Ohio

5       Exhibit 8    First Congressional District of    104

6                    Ohio Map

7       Exhibit 9    Remedial Map Submitted by    113

8                    Plaintiffs

9       Exhibit 10   Map of Proposed District 1    114

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential

Page 152

1                          S. Chabot

2   NAME OF CASE:

3   NAME OF WITNESS:

4   Reason Codes:

5          1.  To clarify the record.

6          2.  To conform to the facts.

7          3.  To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                        _____