1                UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                        *   *   *

4   OHIO A. PHILIP RANDOLPH

5   INSTITUTE, et al.,

6          Plaintiffs,              CASE NO.

7          vs.                1:18-cv-00357-TSB-KNM-MHW

8   RYAN SMITH, Speaker of

9   the Ohio House of

10  Representatives, et al.,

11         Defendants.

12                        *   *   *

13          Deposition of RAYMOND E. DiROSSI,

14  Witness herein, called by the Plaintiffs for

15  cross-examination pursuant to the Rules of Civil

16  Procedure, taken before me, Christine Gallagher,

17  a Notary Public in and for the State of Ohio,

18  at the offices of the Ohio Attorney General,

19  30 East Broad Street, 14th Floor, Columbus,

20  Ohio, on Monday, the 22nd day of October, 2018,

21  at 9:20 a.m.

22                        *   *   *

23

24

25  Job No. 149781

1          EXAMINATION CONDUCTED     PAGE

2    BY MS. THOMAS-LUNDBORG................   17

3

4          EXHIBITS MARKED

5    (Thereupon, Plaintiffs' Exhibit     20

6    Number 1, Subpoena to Testify at a

7    Deposition in a Civil Action, was

8    marked for purposes of identification.)

9    (Thereupon, Plaintiffs' Exhibit     35

10    Number 2, Subpoena to Produce

11    Documents, Information, of Objects or

12    to Permit Inspection of Premises in a

13    Civil Action, was marked for purposes

14    of identification.)

15    (Thereupon, Plaintiffs' Exhibit     40

16    Number 3, Documents Bates Stamped

17    LWVOH_00004033-4034, was marked for

18    purposes of identification.)

19    (Thereupon, Plaintiffs' Exhibit     59

20    Number 4, Document Bates Stamped

21    LWVOH_00009711, was marked for

22    purposes of identification.)

23

24

25

1   (Thereupon, Plaintiffs' Exhibit          59

2   Number 5, Document Bates Stamped

3   DIROSSI_0000017, was marked for

4   purposes of identification.)

5   (Thereupon, Plaintiffs' Exhibit          63

6   Number 6, Document Bates Stamped

7   DIROSSI_0000018, was marked for

8   purposes of identification.)

9   (Thereupon, Plaintiffs' Exhibit          67

10  Number 7, Document Bates Stamped

11  DIROSSI_0000019, was marked for

12  purposes of identification.)

13  (Thereupon, Plaintiffs' Exhibit          71

14  Number 8, Document Bates Stamped

15  LWVOH_00010555, was marked for

16  purposes of identification.)

17  (Thereupon, Plaintiffs' Exhibit          74

18  Number 9, Documents Bates Stamped

19  LWVOH_00005475-5477, was marked for

20  purposes of identification.)

21  (Thereupon, Plaintiffs' Exhibit          90

22  Number 10, Document Bates Stamped

23  DIROSSI_0000527, was marked for

24  purposes of identification.)

25

1    (Thereupon, Plaintiffs' Exhibit          99

2    Number 11, Document Bates Stamped

3    DIROSSI_0000020, was marked for

4    purposes of identification.)

5    (Thereupon, Plaintiffs' Exhibit

6    Number 12, Document Bates Stamped       100

7    DIROSSI_0000021, was marked for

8    purposes of identification.)

9    (Thereupon, Plaintiffs' Exhibit

10   Number 13, Document Bates Stamped       101

11   LWVOH_00009706, was marked for

12   purposes of identification.)

13   (Thereupon, Plaintiffs' Exhibit         117

14   Number 14, Document Entitled Keep it

15   Secret - Keep it Safe, was marked for

16   purposes of identification.)

17   (Thereupon, Plaintiffs' Exhibit         121

18   Number 15, Document Bates Stamped

19   DIROSSI_0000038, was marked for

20   purposes of identification.)

21   (Thereupon, Plaintiffs' Exhibit         145

22   Number 16, Document Bates Stamped

23   LWVOH_00018254, was marked for

24   purposes of identification.)

25

1    (Thereupon, Plaintiffs' Exhibit          149

2    Number 17, Document Bates Stamped

3    DIROSSI_0000051, was marked for

4    purposes of identification.)

5    (Thereupon, Plaintiffs' Exhibit          151

6    Number 18, Document Bates Stamped

7    DIROSSI_0000051, was marked for

8    purposes of identification.)

9    (Thereupon, Plaintiffs' Exhibit          169

10   Number 19, Documents Bates Stamped

11   DIROSSI_0000139-0000141, was marked

12   for purposes of identification.)

13   (Thereupon, Plaintiffs' Exhibit          200

14   Number 20, File Produced in Native

15   Format Bates Stamped DIROSSI_0000526,

16   was marked for purposes of

17   identification.)

18   (Thereupon, Plaintiffs' Exhibit          219

19   Number 21, Documents Bates Stamped

20   DIROSSI_0000470-472, was marked for

21   purposes of identification.)

22   (Thereupon, Plaintiffs' Exhibit          232

23   Number 22, Document Bates Stamped

24   DIROSSI_0000010, was marked for

25   purposes of identification.)

Page 6

1

2    (Thereupon, Plaintiffs' Exhibit       244

3    Number 23, Document Bates Stamped

4    DIROSSI_0000142, was marked for

5    purposes of identification.)

6    (Thereupon, Plaintiffs' Exhibit       248

7    Number 24, Documents Bates Stamped

8    GOVPR_008278-8280, was marked for

9    purposes of identification.)

10    (Thereupon, Plaintiffs' Exhibit       250

11    Number 25, Document Bates Stamped

12    DIROSSI_0000039, was marked for

13    purposes of identification.)

14    (Thereupon, Plaintiffs' Exhibit       253

15    Number 26, Documents Bates Stamped

16    LWVOH_00018302-18308, was marked for

17    purposes of identification.)

18    (Thereupon, Plaintiffs' Exhibit       258

19    Number 27, Document Bates Stamped

20    DIROSSI_0000040, was marked for

21    purposes of identification.)

22    (Thereupon, Plaintiffs' Exhibit       259

23    Number 28, Document Bates Stamped

24    DIROSSI_0000043, was marked for

25    purposes of identification.)

1

2     (Thereupon, Plaintiffs' Exhibit       260

3     Number 29, Document Bates Stamped

4     DIROSSI_0000044, was marked for

5     purposes of identification.)

6     (Thereupon, Plaintiffs' Exhibit       261

7     Number 30, Document Bates Stamped

8     DIROSSI_0000045, was marked for

9     purposes of identification.)

10     (Thereupon, Plaintiffs' Exhibit       263

11     Number 31, Document Bates Stamped

12     LWVOH_00018310, was marked for

13     purposes of identification.)

14     (Thereupon, Plaintiffs' Exhibit       268

15     Number 32, Document Bates Stamped

16     LWVOH_00018297, was marked for

17     purposes of identification.)

18     (Thereupon, Plaintiffs' Exhibit       274

19     Number 33, Documents Bates Stamped

20     LVWOH_00018298-18301, was marked for

21     purposes of identification.)

22     (Thereupon, Plaintiffs' Exhibit       280

23     Number 34, Document Bates Stamped

24     LWVOH_00018320, was marked for

25     purposes of identification.)

Page 8

1

2      (Thereupon, Plaintiffs' Exhibit        288

3      Number 35, Documents Bates Stamped

4      LWVOH_00018322-18325, was marked for

5      purposes of identification.)

6      (Thereupon, Plaintiffs' Exhibit        296

7      Number 36, Document Bates Stamped

8      DIROSSI_0000046, was marked for

9      purposes of identification.)

10     (Thereupon, Plaintiffs' Exhibit        298

11     Number 37, Document Bates Stamped

12     LWVOH_00018321, was marked for

13     purposes of identification.)

14     (Thereupon, Plaintiffs' Exhibit        310

15     Number 38, Documents Bates Stamped

16     SOS_001010-1011, was marked for

17     purposes of identification.)

18     (Thereupon, Plaintiffs' Exhibit        312

19     Number 39, Document Bates Stamped

20     DIROSSI_0000061, was marked for

21     purposes of identification.)

22     (Thereupon, Plaintiffs' Exhibit        314

23     Number 40, Document Bates Stamped

24     DIROSSI_0000499, was marked for

25     purposes of identification.)

Page 9

1

2    (Thereupon, Plaintiffs' Exhibit          316

3    Number 41, File Produced in Native

4    Format Bates Stamped DIROSSI_0000525,

5    was marked for purposes of

6    identification.)

7    (Thereupon, Plaintiffs' Exhibit          323

8    Number 42, File Produced in Native

9    Format Bates Stamped DIROSSI_0000518,

10   was marked for purposes of

11   identification.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:
 2        On behalf of the Plaintiffs:
 3            American Civil Liberties Union
             Foundation
 4
          By:  T. Alora Thomas-Lundborg
 5            Attorney at Law
             125 Broad Street
 6            New York, New York 10004
 7
 8        By:  Freda Levenson
             Attorney at Law
 9            4506 Chester Avenue
             Cleveland, Ohio 44103
10
11
             Covington & Burling
12        By:  Robert Fram
             Attorney at Law
13            One Front Street
             San Francisco, CA 94111
14
15
          On behalf of the Defendants:
16
             Ogletree, Deakins, Nash, Smoak &
17            Stewart
18        By:  Phillip Strach
             Attorney at Law
19            4208 Six Forks Road
             Raleigh, North Carolina 27609
20
21
22
23
24
25
```

```
1          Ohio Attorney General
2     By:  Steven Voigt
           Principal Assistant Attorney General
3          30 East Broad Street
           Columbus, Ohio 43215
4

5
           The Ohio Senate
6
      By:  Frank Strigari
7          Chief Legal Counsel
           Statehouse - Room 205
8          Columbus, Ohio 43215
9

10    On behalf of the Intervenors:
11         Baker & Hostetler
12    By:  Robert Tucker
           Attorney at Law
13         200 Civic Center Drive
           Columbus, Ohio 43215
14

15
      ALSO PRESENT:
16
           Robert L. Miller, Videographer
17
                      *    *    *
18

19

20

21

22

23

24

25
```

1          THE VIDEOGRAPHER:  We're on the

2     record.

3          MS. THOMAS-LUNDBORG:  My name is

4     Alora Thomas, I'm from ACLU National, representing

5     the plaintiffs.

6          MR. FRAM:  Robert Fram, Covington &

7     Burling, representing the plaintiffs.

8          MS. LEVENSON:  Freda Levenson, ACLU

9     of Ohio, plaintiffs.

10          MR. STRACH:  Phil Strach, Ogletree

11     Deakins, representing the legislative defendants.

12          MR. VOIGT:  Steve Voigt, the Ohio

13     Attorney General's office, representing the

14     defendants.

15          MR. TUCKER:  Rob Tucker, Baker

16     Hostetler, representing the intervenors.

17          MR. STRIGARI:  Frank Strigari, legal

18     counsel for the Senate, on behalf of the

19     legislative defendants.

20          MR. VOIGT:  Okay.  And before we

21     begin, counsel had -- we had some discussions

22     about some logistical aspects, and I'm just going

23     to articulate what I think we agreed to, and then

24     Mr. Fram and Ms. Thomas can correct me or let me

25     know if their understanding is different.

1        So for this deposition and all

2 depositions going forward, the only objections

3 that are waived at the deposition are -- well,

4 actually, it would be different. Let's say for

5 discovery depositions. We might have a different

6 set of rules for a trial deposition. But the only

7 -- actually, maybe for that, too, I don't know.

8        For discovery depositions, let's just

9 focus on that, discovery depositions, the only

10 objection that would be waived, if not made here,

11 would be an objection to form, and so an example

12 of that would be objection, compound question.

13 Now, it is also acceptable under the rules of

14 civil procedure to simply say objection, form, and

15 then if the counsel asking questions wants further

16 specification they're certainly welcome to ask for

17 it.

18        Now, objections that are preserved

19 and do not need to be made are objections to

20 substance. So, for example, objection, relevance,

21 we do not need to make relevance objections today.

22 Those are preserved until trial.

23        What was the other point we were

24 going to talk about?

25        MR. STRACH: Time.

1          MR. VOIGT:  Oh, timing, okay, yes.

2     And we've also agreed that objections do not count

3     toward each side's allotted time, so each side in

4     this case has been allotted a certain amount of

5     time.  If Mr. Strach makes an objection today, and

6     let's say there's some discussion about that that

7     lasts five minutes, that five-minute time does not

8     count toward the plaintiffs' overall time.  Same

9     thing the other way around, when -- if we are on

10    Cross-Examination and the plaintiffs' attorneys

11    are making an objection, that objection does not

12    count toward the defendants' allotted time.

13          Does that accurately --

14          MS. THOMAS-LUNDBORG:  Yes, it does.

15          MR. FRAM:  As far as there are two

16    additions, though, that I wanted to throw in.

17          So Redirect by a party representing

18    the witness or by an intervenor would not count

19    against the party taking the deposition's time and

20    be charged against the other side's time.  That's

21    the first thing.

22          And, second, I would ask that the

23    rule on preserving objections apply to all

24    depositions so that we don't disrupt the

25    depositions.  Even if someone is calling something

1   a trial deposition, I think we should just agree

2   that there will be a time to submit relevance and

3   hearsay objections after the fact.  They're not

4   particularly curable at the deposition anyway.

5   They are what they are.

6                And that way, say, if Phil is asking

7   a question of a witness, I don't have to sit there

8   and object all day on relevance or hearsay.  We

9   can just put that on paper to the court down the

10  road at a given time.

11               MR. VOIGT:  Let's cross that bridge

12  when we get --

13               MR. FRAM:  Okay.  It's coming up

14  soon, though, because if I'm going to do it for

15  next week's deposition of Ms. Blessing, it would

16  be good to know in advance.  My preference is not

17  to be -- not to be objecting all the time like

18  that.

19               MR. VOIGT:  I understand, but Phil

20  and I -- I would like to talk about that

21  beforehand, but right now we have a discovery

22  deposition.

23               MR. FRAM:  I would appreciate it if

24  you could let me know on Wednesday at the

25  conclusion of the Blessing deposition so we can

1   plan in advance for Day 2.

2           MR. VOIGT:  Understood, understood.

3   And everything else that you said is accurate from

4   my perspective.

5           MR. STRACH:  All right.  Let me make

6   one more.  So this is Phil Strach.  The only other

7   thing I wanted to put on the record is we have

8   sent an email to the plaintiffs asking for their

9   consent to amend the protective order to protect

10  the videotape that's taken in these depositions

11  from being used outside the case.  The plaintiffs

12  have not had a chance yet to get back to us on

13  that, and so to err on the side of caution, we're

14  designating this deposition as confidential under

15  the protective order and we will do the same for

16  Wednesday's deposition depending on the status of

17  that discussion.

18          MS. THOMAS-LUNDBORG:  I think we're

19  ready to swear in the witness.

20          Can you please state your name for

21  the -- just swear in the witness.

22          THE NOTARY:  If you'll raise your

23  right hand, please.

24          RAYMOND E. DiROSSI

25  of lawful age, Witness herein, having been first

```
 1              RAYMOND E. DiROSSI
 2    duly cautioned and sworn, as hereinafter
 3    certified, was examined and said as follows:
 4                  CROSS-EXAMINATION
 5    BY MS. THOMAS-LUNDBORG:
 6          Q.    Good morning.
 7          A.    Good morning.
 8          Q.    Please state your name for the
 9    record.
10          A.    Raymond Edward DiRossi.
11          Q.    And what is your address?
12          A.    5732 Springburn Drive, Dublin,
13    Ohio, 43017.
14          Q.    And do you understand that you're
15    under oath today?
16          A.    I do.
17          Q.    And you understand that's the same
18    oath that you would take at a trial?
19          A.    I do.
20          Q.    Okay.  We've already introduced
21    ourselves for the record, so we'll skip over
22    that part.
23                Have you been deposed before?
24          A.    Yes.
25          Q.    And when was that?
```

1          RAYMOND E. DiROSSI

2          A.   2012.

3          Q.   And what case was that in?

4          A.   I believe -- I'm not an attorney,

5     but I believe it was Wilson v. Kasich.

6          Q.   Okay.  So let's go through --

7     you're probably aware of the rules of

8     deposition from your prior deposition, but

9     let's just go through some of the ground rules

10    very quickly.

11              I need a verbal response from you

12    for any question.  Do you understand that?

13         A.   Yes.

14         Q.   Also, so the record is clear,

15    let's not talk over one another.  And if you

16    don't understand a question of mine, just ask

17    me to repeat it and I will repeat or rephrase

18    the question.

19         A.   Okay.  Thank you.

20         Q.   If you need to take a break, just

21    tell me, and there may be certain questions

22    that your counsel instructs you not to answer

23    today.  You should answer my question, if you

24    can, unless it's a question of privilege.

25         A.   Okay.

1          RAYMOND E. DiROSSI

2          Q.   Okay.   Throughout the deposition

3     --

4               All right.   Is there any reason

5     why you can't testify today, anything that is

6     hindering your ability to testify truthfully?

7          A.   No.

8          Q.   Are you on any medications, any

9     medications that would affect your ability to

10    testify?

11         A.   No.

12         Q.   Throughout the deposition I'll be

13    referring to the Ohio redistricting.   Unless I

14    specify otherwise, I'm referring to the

15    redistricting that happened in 2011.   Do you

16    understand that?

17         A.   You're talking about congressional

18    redistricting, not --

19         Q.   Congressional redistricting, yes.

20         A.   -- legislative, okay.

21         Q.   Did you meet with your lawyers to

22    prepare today?

23         A.   Yes.

24         Q.   Did you do anything else to

25    prepare?

RAYMOND E. DiROSSI

1

2      A.   I produced documents at the

3 request of either you or the court.  I reviewed

4 some of those documents.  I met with attorneys.

5      Q.   Okay.  Great.  Do you understand

6 that you're here pursuant to a subpoena?

7      A.   Yes.

8            (Thereupon, Plaintiffs' Exhibit

9 Number 1, Subpoena to Testify at a Deposition in a

10 Civil Action, was marked for purposes of

11 identification.)

12 BY MS. THOMAS-LUNDBORG:

13      Q.   If we could turn to Number 1 in

14 your exhibit book.  I'm having this document

15 marked as Exhibit 1.  It is the subpoena for

16 the testimony of Raymond DiRossi.  If you take

17 a quick moment to review, is this subpoena the

18 one that you understand that you're here for?

19      A.   Is this the one that I signed?

20      MR. STRACH:  No, this is different.

21 BY MS. THOMAS-LUNDBORG:

22      Q.   This is just a subpoena for your

23 testimony.  Did you see it before today?

24      A.   I mean, I was delivered one --

25      Q.   Okay.

1           RAYMOND E. DiROSSI

2         A.   -- and I signed it.  This doesn't

3  have a signature on it, so I don't know if this

4  is exactly the one I signed.

5         Q.   Okay.  Fair enough.  We'll move

6  on.  It's already been marked for the record.

7           So let's just go a little bit into

8  your background.  I know you've been deposed

9  before, so you should be used to this question.

10  Could you give us a brief summary of your

11  educational background?

12         A.   I went to Firestone High School in

13  Akron, Ohio, where I was born and raised, four

14  years in high school.  Left Akron to go to Ohio

15  State University, pursued degrees in finance

16  and marketing in the business college, and

17  graduated in '94 with a double major in finance

18  and marketing.

19         Q.  Did you do any education after

20  your degrees that you just mentioned in finance

21  and marketing?

22         A.   No.

23         Q.  Do you hold any special

24  certifications?

25         A.   Such as like --

1        RAYMOND E. DiROSSI

2        Q.   Such as an accounting

3   certification, a certification for like a CPA,

4   anything that would be a special designation.

5        A.   Do not.

6        Q.   What jobs have you held since

7   graduating from Ohio State?

8        A.   Well, at the time of graduating

9   and during school I was employed in the

10  legislature in a number of capacities, so

11  following graduation I was employed as a

12  legislative aide in the Ohio Senate for a

13  senator from the Dayton area, Montgomery

14  County.

15       Q.   And who was that senator?

16       A.   Senator Charles Horn.

17       Q.   And which party is Charles Horn

18  from?

19       A.   He is a -- he was a member of the

20  Republican party.

21       Q.   Okay.  And after working for

22  Senator Horn, what did you do next?

23       A.   I was promoted, I guess you would

24  say, and moved to the caucus staff where I

25  worked on tax policy and economic development

1            RAYMOND E. DiROSSI

2    policy.   Then I became the deputy finance

3    director in the Ohio Senate working on, again,

4    tax policy, budget policy and economic

5    development policy.

6                    I left the Ohio Senate in 2005 --

7            Q.    May I interrupt you for a second?

8            A.    Sure.

9            Q.    Before leaving the Ohio Senate,

10   during those two jobs that you just mentioned

11   at the Senate, which party were you working

12   for?

13           A.    I was working for the majority

14   caucus.

15           Q.    And the majority caucus at the

16   time was?

17           A.    Republican caucus.

18           Q.    Okay.   You may proceed.

19           A.    I went to work -- there was an

20   opportunity to be a budget director in the

21   House of Representatives and so I took that

22   position for four years from 2005 through 2000

23   and -- 5, 6, 7 and 8.

24           Q.    And who were you working for at

25   the time?

1           RAYMOND E. DiROSSI

2               A.   That would have been the Speaker

3    of the Ohio House.

4               Q.   And who was that at the time?

5               A.   Jon Husted.

6               Q.   And which party is Mr. Husted

7    from?

8               A.   Republican.

9               Q.   And after working for the speaker,

10   what did you do next?

11              A.   Well, the -- the legislature

12   changed hands after the 2008 elections and the

13   Democrats took control of the Ohio House, so my

14   services were no longer needed and so I left

15   and formed my own LLC.

16              Q.   And what is the name of that LLC?

17              A.   Capital Advantage, LLC.

18              Q.   And what did you do as Capital

19   Advantage, LLC?

20              A.   I engaged in consulting --

21   consulting business in and around Capitol

22   Square.

23              Q.   Okay.   And what type of consulting

24   did you do?

25              A.   I was initially hired to be a

Page 25

1          RAYMOND E. DiROSSI

2   fundraiser for the campaign arm of the Senate.

3          Q.    And what did you do as a

4   fundraiser for the campaign arm of the Senate?

5   And by --

6          A.    Raising dollars for the campaign

7   committee to run elections.

8          Q.    And which campaign committee is

9   this?

10         A.    Would have been the Republican

11  Senate Campaign Committee.

12         Q.    And how long did you do that?

13         A.    Well, so it's kind of some starts

14  and stops, so it's kind of hard to say exactly.

15         Q.    To the best of your recollection.

16         A.    The question was how long did I do

17  that for?  What was your question?  Sorry.

18         Q.    How long did you work for the

19  fundraising arm as a consultant?

20         A.    Let's see --

21         Q.    You said you started in 2008.

22         A.    I had starts and stops where I

23  wasn't doing that anymore, but I stopped doing

24  that in 2015, in December of '14.

25         Q.    Okay.

1              RAYMOND E. DiROSSI

2              A.    And then in January of '15 I

3    resumed my -- or started my current position

4    with the Ohio Senate.

5              Q.    So let me ask you a question about

6    these starts and stops.  When you would stop

7    working for the campaign arm, what did you do

8    during those periods?

9              A.    That was when the -- well, the

10   State of Ohio was going through its

11   apportionment and redistricting processes that

12   it goes through once every decade.

13             Q.    Is that the only time that you

14   stopped?

15             A.    Yes.

16             Q.    And then after you stopped to do

17   apportionment and redistricting, at what point

18   did you start your campaign finance work again?

19             A.    I don't recall the specific date

20   of when I started up.  It was a very atypical

21   process that didn't have really a defined

22   stopping point.

23             Q.    In your recollection did you start

24   immediately after the campaign redistricting

25   and apportionment work was done going back to

1              RAYMOND E. DiROSSI

2    finance, or was there a break in between those

3    two periods?

4              A.   I don't remember the specific

5    dates.  Sorry.

6              Q.   Okay.  And you said since 2015

7    you've been in the Senate; is that correct?

8              A.   Yes.

9              Q.   And what have you been doing

10   there?

11             A.   The position was open to be the

12   budget director in charge of the finance tax

13   policy and budgets with the --

14             Q.   And who do you work -- I'm so

15   sorry.

16             A.   With the Ohio Senate.

17             Q.   And is that a job with a

18   particular caucus or is that for the Senate in

19   general?

20             A.   It's a job with the Senate

21   majority caucus.

22             Q.   And who is that --

23             A.   Who is --

24             Q.   -- for the record, please?

25             A.   Who is?

Page 28

1          RAYMOND E. DiROSSI

2          Q.    Who is the Senate majority caucus

3    currently that you're working for?

4          A.    The president is Larry Obhof.

5          Q.    Larry Obhof.  And which party is

6    that?

7          A.    I believe he's -- he's a

8    Republican.

9          Q.    Thank you.

10          Have you ever worked for a

11    Democrat?

12          A.    Yeah, so I -- at one point when I

13    was between everything we just talked about, I

14    was appointed to work for the -- as a board and

15    commission member for the Department of

16    Transportation.

17          Q.    And when was that?

18          A.    Sitting here, I don't recall the

19    specific dates.  It was over four years and the

20    director was Director Janet Molitoris, who was

21    appointed by the -- by Governor Strickland, a

22    Democrat.

23          Q.    And so you said you had that

24    position for four years?

25          A.    More or less.  Not specifically

1            RAYMOND E. DiROSSI

2    four years, but more or less four years.

3            Q.    Was that before or after you did

4    apportionment and redistricting?

5            A.    I think technically it was before,

6    during and after.

7            Q.    Before, during and after?

8            A.    Yes.

9            Q.    Okay.    And were you appointed to

10   this position or did you apply and then were --

11   gained the position that way?

12           A.    I was appointed.

13           Q.    And who were you appointed by?

14           A.    The Senate president.

15           Q.    And who was the Senate president

16   at the time?

17           A.    President Bill Harris.

18           Q.    And which party is Bill Harris

19   from?

20           A.    He was a member of the Republican

21   party, now deceased.

22           Q.    Thank you.

23                 So we've talked a little bit about

24   the jobs that you had and we've talked about

25   the break that you took from consulting.

1          RAYMOND E. DiROSSI

2    Actually, strike that.

3              Going back to this Department of

4    Transportation position that you had, did you

5    work on consulting while you were in that

6    position or did you take a break from

7    consulting during it?

8          A.   While.

9          Q.   You were consulting while you were

10   in that position, okay.

11              So we've talked about the break

12   that you took from consulting when you were

13   working on redistricting and apportionment in

14   2011.  Did you work on redistricting and

15   apportionment at any other period?

16              A.   In the previous decade I worked on

17   both.

18              Q.   Okay.  And so is that the 2001

19   redistricting effort?

20              A.   Yes.

21              Q.   And can you describe some of the

22   work that you did as part of that effort?

23              A.   Sure.  I mean, very, very similar

24   effort against -- I'm trying not to mix, as you

25   said, the apportionment and the redistricting

1          RAYMOND E. DiROSSI

2    because they're kind of intertwined.

3    Constitutional restrictions that applied to the

4    apportionment, very specific, so in order to

5    produce all of the necessary documentation for

6    the apportionment board to consider to complete

7    its constitutional obligations, and then also

8    preparing proposals for the districts for the

9    legislature to consider in the redistricting.

10          Q.    And while you were doing that

11   work, were you working on behalf of a

12   particular party or were you working on a

13   bipartisan basis in 2001?

14          A.    I was a member of -- I was a

15   member of the Senate staff, so I was a state

16   employee at the time.

17          Q.    And you were a member of the

18   Senate staff.  Which position was that that you

19   held at the time?  You held several positions.

20          A.    Yeah, I don't recall my specific

21   title at the time.

22          Q.    Do you recall -- and I believe

23   your Senate work was for the majority caucus,

24   though; is that correct, in 2001?

25          A.    Yes.

1          RAYMOND E. DiROSSI

2          Q.    And that was the Republican caucus

3    at the time?

4          A.    (Witness nodded head up and down.)

5          Q.    Did you receive any training prior

6    to the 2001 redistricting effort regarding

7    redistricting or apportionment?

8          A.    I attended a two- or three-day

9    seminar to learn about GIS software and how we

10   would be using GIS software for the coming

11   decennial processes.

12         Q.    Did you have any other training?

13   And again, I'm just talking about the 2001

14   period.

15         A.    No.

16         Q.    For the 2011 period did you

17   receive any additional training in

18   redistricting and apportionment?

19         A.    No.

20         Q.    Do you recall that you attended an

21   NCSL training at some point?

22         A.    Which decade are you talking

23   about?

24         Q.    I believe, and this is just based

25   on prior testimony that you've given, that you

Page 33

1          RAYMOND E. DiROSSI

2    attended a training in 1998.  Is that the

3    training, the two- or three-day training?

4          A.   1998, I believe, was when I was

5    trained on the GIS software.

6          Q.   Okay.

7          A.   That was not NCSL.

8          Q.   That was not NCSL.  Who gave that

9    training?

10         A.   I don't recall.  Boy, that's a

11   long time ago, 20 years ago.

12         Q.   Did you ever attend an NCSL

13   training?

14         A.   Yeah.  Well, I've attended NCSL

15   conferences, but I guess I wouldn't call them

16   training.

17         Q.   And have any of those conferences

18   been on redistricting and apportionment?

19         A.   Yes.

20         Q.   Do you recall which ones?

21         A.   I remember attending -- going to

22   Vermont during the '01 process for seminars and

23   speeches and presentations, and that's the only

24   specific one I remember the location of.

25         Q.   But there are others that you're

Page 34

1          RAYMOND E. DiROSSI

2     just not recalling today or do you believe that

3     was the only one that you've attended?

4          A.    There are others I cannot recall

5     the locations of.

6          Q.    Do you have an idea of roughly how

7     many other NCSL conferences related to

8     redistricting and apportionment that you

9     attended?

10          A.    Three, four.

11          Q.    And when do you think the latest

12     one of those was?

13          A.    Would have been sometime prior to

14     the 2011 process.

15          Q.    Do you think it was in 2011 or

16     earlier?

17          A.    I couldn't say.

18          Q.    And on those NCLS (sic)

19     conferences, were there subjects other than GIS

20     that you learned about or was it just GIS?

21          A.    There were other -- other subject

22     matters.

23          Q.    Do you recall what they would have

24     been?

25          A.    Presentations by the Census Bureau

1                    RAYMOND E. DiROSSI

2        on how various states were getting ready for

3        the census, if there were any changes that were

4        happening at the federal level on how census

5        data was being collected or disseminated to the

6        states.  Endless presentations on what the

7        current legal cases might be that would affect

8        the various states, whether it was their

9        apportionment or redistricting processes.

10            Q.   Okay.  Were there any other

11   conferences or trainings that you attended

12   where you learned about apportionment or

13   redistricting?

14            A.   None that I recall.

15            Q.   At any of these trainings did you

16   discuss Ohio constitutional issues or were they

17   only federal in nature?

18            A.   I mean, I can't -- I can't recall

19   specifically if any of the presentations were

20   specific -- mentioned Ohio.

21            Q.   Okay.

22            A.   I don't recall.

23            Q.   At any of these trainings did you

24   discuss gerrymandering that you recall?

25            A.   No.

1            RAYMOND E. DiROSSI

2                  (Thereupon, Plaintiffs' Exhibit

3    Number 2, Subpoena to Produce Documents,

4    Information, of Objects or to Permit Inspection of

5    Premises in a Civil Action, was marked for

6    purposes of identification.)

7    BY MS. THOMAS-LUNDBORG:

8            Q.    I would like to show you a

9    document that I'm having marked as Exhibit 2

10   for the record.    It is a subpoena for documents

11   dated July 13th, 2018.    Do you recall having

12   received this subpoena?

13           A.    This one looks a little more

14   familiar because I recognize that my address is

15   incorrect.

16           Q.    Okay.  Did you provide documents

17   in response to this subpoena?

18           A.    Yes.

19           Q.    Now, the subpoena specifically

20   requested documents relating to the 2011

21   redistricting.  Did you provide documents

22   related to the 2011 redistricting?

23           A.    Yes.

24           Q.    Did you retain any emails from

25   that period?

1          RAYMOND E. DiROSSI

2          A.    Any that I had in the various

3   electronic and hard copy resources that I

4   searched to be responsive, I turned over.

5          Q.    And what email addresses did you

6   search?

7          A.    The only one that I would have had

8   at the time, which would be my Gmail, my

9   personal Gmail account.

10         Q.    And can you state what that

11  address is for the record, please?

12         A.    Sure.   RayDiRossi@Gmail.com.

13         Q.    As you sit here today do you

14  recall having retained any emails from that

15  period?

16         A.    So you're talking from, seven,

17  eight years ago?

18         Q.    That's correct.

19         A.    That decade?

20         Q.    Everyone has different email

21  policies.  I just want to know what yours are.

22         A.    Yeah, and I searched and any

23  documents that I had I turned over, but --

24         Q.    So my question was, do you recall

25  having had any emails from that period?

Page 38

1              RAYMOND E. DiROSSI

2          A.   When I was complying with the

3    subpoena?

4          Q.   Yes, that's correct.

5          A.   I don't believe so, no.

6          Q.   Okay.  Did you retain any notes

7    from that period?

8          A.   I don't know what you mean by

9    notes.

10         Q.   However you would define notes.

11         A.   Anything that I had --

12         Q.   Collections of your thoughts.

13         A.   Anything that I had from the

14   various sources that I reviewed, I turned over.

15         Q.   My question is, do you recall

16   having in your possession notes from that

17   period?

18              MR. STRACH:  Objection to form.

19              Go ahead.

20              THE WITNESS:  What I think of as

21   notes is like handwritten notes.  I didn't have

22   anything like that.

23   BY MS. THOMAS-LUNDBORG:

24         Q.   Did you have any notes on your

25   computer from that period?

1              RAYMOND E. DiROSSI

2                   MR. STRACH:  Objection.  Form.

3                   THE WITNESS:  I mean, if I had it, I

4    turned it over.

5    BY MS. THOMAS-LUNDBORG:

6         Q.   Again, do you recall having notes

7    on your computer?

8                   MR. STRACH:  Objection to form.

9                   THE WITNESS:  Yeah, I mean, what I

10   think of notes, I did not have notes on my

11   computer.

12   BY MS. THOMAS-LUNDBORG:

13        Q.   Okay.  Did you retain any draft

14   maps from that period?

15        A.   Yes.

16        Q.   Do you recall how many draft maps

17   you had?

18        A.   I don't recall the number.  They

19   were turned over.

20        Q.   Did you retain any political

21   indices from that period?

22        A.   Any documents that I had that

23   related to redistricting, if they included any

24   aspect of redistricting, including any

25   historical election data that I had, I turned

```
 1              RAYMOND E. DiROSSI
 2   over.
 3              Q.    So my question is, do you recall
 4   having in your possession when you received the
 5   subpoena indices?
 6              A.    I believe so, yes.
 7              Q.    Did you retain any other
 8   documentation related to redistricting, and if
 9   you did, can you describe it?
10              MR. STRACH:  Objection to form.
11              THE WITNESS:  Can you restate your
12   question?  I'm sorry.
13   BY MS. THOMAS-LUNDBORG:
14              Q.    So did you have any other
15   documentation that I haven't already listed
16   related to redistricting in your possession
17   when you received the subpoena?
18              A.    I mean, I had some calendars,
19   calendar items which were produced, I had a
20   number of copies of historical maps and current
21   maps that were produced.  Some spreadsheets and
22   Word documents that I had created that I used
23   to help me understand and retain information,
24   those were produced.
25              (Thereupon, Plaintiffs' Exhibit
```

```
 1            RAYMOND E. DiROSSI
 2       Number 3, Documents Bates Stamped
 3    LWVOH_00004033-4034, was marked for purposes
 4    of identification.)
 5    BY MS. THOMAS-LUNDBORG:
 6            Q.   All right.  I'm going to show you
 7    an exhibit that I'm having marked as Exhibit 3
 8    for the record.  It bears Bates number LV -- or
 9    LWVOH-0004033.  It is a letter from the Ohio
10    Campaign for Accountable Redistricting.  It's
11    dated October 7th, 2011.  It is from Jim
12    Slagle.
13            So I would like to point you to
14    the second paragraph.  In it, Mr. Slagle says
15    -- oh, and do you see that this letter is --
16    strike the last part.
17            Do you see at the top this letter
18    is addressed to yourself and another person?
19            A.   I do.
20            Q.   Okay.
21            MR. STRACH:  Can I interrupt for one
22    second?  Do you need time to look at this?
23            THE WITNESS:  Yeah, I mean, if you're
24    going to ask me any questions about it.
25            MS. THOMAS-LUNDBORG:  Well, I will
```

Page 42

RAYMOND E. DiROSSI

1  direct him to any portion that I'm going to ask.

2  If you would like to quickly just flip to see that

3  this is a document that is addressed to you and is

4  signed at the back.

5           MR. STRACH:  Yeah, I would like him

6  -- if he needs it, I would like him to have a

7  chance to review the exhibit before he answers

8  questions about it, if he needs it.

9           MS. THOMAS-LUNDBORG:  Okay.  Again, I

10  think anything that I'm going to have him answer

11  to he'll be directed to specifically.

12           MR. STRACH:  And that's fine, so long

13  as he's had a chance to review it, and then you

14  can direct him wherever you like.

15           Let her know when you're ready.

16           THE WITNESS:  Okay.  Depending on

17  your question I might need a little more time, but

18  I'm generally familiar with it now.

19  BY MS. THOMAS-LUNDBORG:

20       Q.   Okay.  You have all the time that

21  you need.

22           So I would like to direct you to

23  the second paragraph.  In it, Mr. Slagle says,

24  in preparation for this report I'm requesting

Page 43

1    RAYMOND E. DiROSSI

2    that you provide copies of the following public

3    records which pertain to the recently completed

4    redistricting or reapportionment process.

5              Do you recall having received a

6    public records request back in October of 2011?

7         A.   I do.

8         Q.   Okay.   Did you provide documents

9    in response to this public records request?

10        A.   I did.

11        Q.   Did you provide emails in response

12   to this public record request?

13        A.   I did.

14        Q.   And what email address did you

15   use?

16        A.   The only one I had,

17   RayDiRossi@Gmail.com.

18        Q.   And what method did you use to

19   produce email at that time; do you recall?

20        A.   I don't recall the specific

21   method.  I don't recall.

22        Q.   Were you generally responsible for

23   helping to coordinate documents related to the

24   public records request, the production of

25   documents?

1          RAYMOND E. DiROSSI

2               MR. STRACH:  Objection to form.

3               You can answer if you can.

4               THE WITNESS:  Yeah, I don't know what

5     you mean.  I mean, I was asked to provide them so

6     I obviously searched my records to be responsive,

7     but I -- I don't know.  I wasn't the coordinator.

8     BY MS. THOMAS-LUNDBORG:

9          Q.   Okay.  Who was the coordinator?

10         A.   I think the staff of the -- the

11    staff of the Ohio House was serving as the

12    coordinator for public records requests.

13         Q.   Okay.  So let's go over just the

14    documents that were requested at the time.  If

15    you look at the second bullet - I'm just going

16    to skip over the ones that deal with

17    apportionment - it requests all written

18    communication, including emails, with members

19    of the apportionment board or their staffs

20    relevant to redistricting or apportionment

21    during the period from July 1st, 2011 to

22    October 5th, 2011.  Do you see that?

23         A.   I do.

24         Q.   Did you give documents responsive

25    to this request?  Just this bullet that we were

Page 45

1        RAYMOND E. DiROSSI

2    talking about.

3        A.   Yeah, again, I don't -- I provided

4    emails.  I don't know if they were specifically

5    because of this bullet or some of -- any of the

6    other bullets on here.

7        Q.   Well, did you provide emails with

8    the apportionment board or their staff that

9    related to redistricting?

10       A.   So you're using the apportionment

11   board or the redistricting, which I'm confused

12   as to --

13       Q.   I'm just going with the bullet

14   because the bullet asks for communications with

15   members of the apportionment board or their

16   staffs, but related to redistricting and

17   apportionment.

18       A.   Okay.  You're just tripping me up

19   because you said you wanted to ignore the

20   apportionment stuff.

21       Q.   This particular bullet asked for

22   documents relating to redistricting and

23   apportionment, but it does mention the

24   apportionment board.  So did you provide emails

25   that you had with any members of the

1            RAYMOND E. DiROSSI

2    apportionment board related to redistricting?

3            A.   I'm sorry.  You're mixing the two.

4    I do not believe the way you're asking the

5    question I would have had any emails

6    specifically to your question.

7            Q.   Okay.  I'm just asking the

8    question just in the bullet.

9            A.   I know there's a lot of common

10   terms and they're used interchangeably, but

11   they mean certain things obviously.

12           Q.   Okay.  Did you provide emails to

13   the members of the governor's staff related to

14   redistricting?

15           A.   Can you ask that question again,

16   state that again?

17           Q.   Did you provide emails with the

18   governor's staff related to redistricting?

19           A.   I can't recall.

20           Q.   Okay.  Did you provide emails with

21   the Secretary of State staff related to

22   redistricting?

23           A.   I can't recall.  It was a long

24   time ago.

25           Q.   Did you provide emails with the

1           RAYMOND E. DiROSSI

2   president of the Senate staff related to

3   redistricting?

4         A.   That I -- that I would have, yes.

5         Q.   Okay.  Did you provide emails with

6   the Speaker of the House's staff related to

7   redistricting?

8         A.   Yes.

9         Q.   Did you provide emails with the

10 Senate minority leader related to

11 redistricting?

12         A.   You're asking specifically about

13 emails?

14         Q.   Yes.

15         A.   No.

16         Q.   Did you provide emails with the

17 House minority leader related to redistricting?

18         A.   No.

19         Q.   Okay.  The next bullet asks for -

20   and I'm turning to the next page of the exhibit

21   - all written communication, including emails,

22   with members of the Ohio legislature or their

23   staffs relevant to redistricting or

24   apportionment during the period from July 1,

25   2011 to October 5th, 2011.  Do you see that?

Page 48

1           RAYMOND E. DiROSSI

2                A.    I do.

3                Q.    Did you provide emails responsive

4      to this request?

5                A.    Yes.

6                Q.    The next bullet asks for all

7      documentation, including letters, emails, memos

8      and notes, of comments, suggestions, requests

9      for changes or other input on proposed

10     legislative districts, draft redistricting maps

11     or final maps, other than which was provided

12     during public hearings or meetings.    Do you see

13     that request?

14               A.    I do.

15               Q.    Did you provide documents

16     responsive to this request?

17               MR. STRACH:    Objection.    Form.

18               THE WITNESS:    Yes.

19     BY MS. THOMAS-LUNDBORG:

20               Q.    Okay.  I'm going to skip the next

21     bullet because it's not relevant.   Then the

22     following bullet says copies of all draft maps

23     and redistricting or apportionment plans,

24     whether for the entire state, portions of the

25     state or individual districts, which were

1              RAYMOND E. DiROSSI

2    prepared by you or others.  Do you see that?

3              A.    I do.

4              Q.    Did you provide documents in

5    response to this request?

6              A.    Again, documents could mean many,

7    many things.

8              Q.    Just as it's defined in the

9    bullet.

10             A.    Well, that's not exactly precise.

11   I did provide redistricting maps.

12             Q.    Okay.  The last bullet asks for

13   all documentation pertaining to the

14   dissemination of draft maps or plans and all

15   documentation regarding any response to draft

16   maps or plans.   Do you see that?

17             A.    I do.

18             Q.    Did you provide documents in

19   response to that request?

20             A.    Again, at the time in 2011,

21   anything that would have been responsive to any

22   of these bullet points, the ones you mentioned

23   or the ones you skipped, I turned over.   I

24   don't recall if I specifically turned anything

25   over with regard to this last bullet.

1                RAYMOND E. DiROSSI

2          Q.    Okay.   At the time in 2011 did you

3    retain more documents related to redistricting

4    than you have now?

5          A.    Can you say that again, please?

6          Q.    Yes.   When you received this

7    request, did you have more documents in your

8    possession related to redistricting than you do

9    now?

10         A.    Yes.

11         Q.    Going back to the first page, the

12   letter says the Ohio Campaign for Accountable

13   Redistricting will be preparing a transparency

14   report regarding the recently completed

15   congressional and state legislative

16   redistricting process.

17              At the time that you received this

18   request did you understand that the documents

19   you were providing might make it into a report?

20         A.    I didn't even think about it.   It

21   was a public records request and so I provided

22   whatever was responsive.

23         Q.    Did you read the letter before

24   providing the documents?

25         A.    Yes.

1          RAYMOND E. DiROSSI

2          Q.    And the letter states that the

3    documents are for a transparency report,

4    correct?

5          A.    Yeah.   I don't know what that

6    means.   At the time I didn't know what that

7    meant.

8          Q.    Okay.   But you did read the

9    letter?

10         A.    Uh-huh.

11         Q.    If you could turn the page,

12    please, to the last page.   The letter copies a

13    Michael Lenzo.   Do you know Michael Lenzo?

14         A.    I do.

15         Q.    Who is Michael Lenzo?

16         A.    The majority legal counsel in the

17    House.

18         Q.    And what was Michael Lenzo's role

19    in the redistricting process?

20         A.    He was the majority legal counsel

21    in the House.

22         Q.    Okay.   Did he have any specific

23    job duties during the redistricting process?

24         A.    Not that I could speak to that I

25    would know.

1          RAYMOND E. DiROSSI

2          Q.    Okay.   You mentioned that you were

3    deposed in the past and that that deposition

4    was Wilson v. Kasich; is that right?

5          A.    Yes.

6          Q.    And did that deposition regard

7    apportionment or redistricting?

8          A.    It was apportionment.

9          Q.    And were there any overlaps

10   between apportionment and redistricting at the

11   time?

12         A.    Please clarify in which way

13   overlaps.

14         Q.    Did you use any of the same

15   processes as part of apportionment and

16   redistricting as far as drawing the map, for

17   example?

18              MR. STRACH:   Objection to form.

19              Go ahead.

20              THE WITNESS:   Yeah, you have to

21   clarify a little more.   Like I used the same

22   computers.

23   BY MS. THOMAS-LUNDBORG:

24         Q.    You used the same computers.   Did

25   you use the same software?

1          RAYMOND E. DiROSSI

2          A.    You're talking about this current

3    decade?

4          Q.    I'm talking about 2011.

5          A.    Yes.

6          Q.    Did you use the same political

7    indices?

8                MR. STRACH:   Objection to form.

9                THE WITNESS:   Yeah, that's -- we had

10   historical election data that we had available to

11   us.

12   BY MS. THOMAS-LUNDBORG:

13         Q.    Okay.   For both processes?

14         A.    For both processes.

15         Q.    Were --

16         A.    But everybody used and everybody

17   had their own opinion about what historical

18   information was relevant, so it really was

19   messy.

20         Q.    Were the maps drawn in the same

21   location, apportionment and redistricting?

22         A.    Technically, no, because there

23   were multiple maps.

24         Q.    Okay.   We'll get to that.

25                During the -- during the

Page 54

1                  RAYMOND E. DiROSSI

2       deposition, the prior deposition, were you

3       represented by counsel?

4                   A.    I was.

5                   Q.    And were you shown documents at

6       that deposition?

7                   A.    I was.

8                   Q.    And some of those documents were

9       marked as exhibits?

10                  A.    I believe so.

11                  Q.    So kind of moving on from

12      documents, I would like to go back to

13      redistricting and talk a little bit in more

14      detail about the 2011 redistricting.  Okay?

15                  When did you start working on

16      redistricting in 2011?

17                  A.    What do you mean by working on?

18                  Q.    When did you start thinking about

19      and doing things in preparation for the 2011

20      cycle?

21                  MR. STRACH:  Objection to form.

22                  THE WITNESS:  Yeah, so when did I

23      start thinking about it?  I mean, I --

24      BY MS. THOMAS-LUNDBORG:

25                  Q.    And doing things in preparation,

1          RAYMOND E. DiROSSI

2    so not just thinking in the abstract, but

3    actually putting some of your thoughts into

4    action.

5              MR. STRACH:  Objection to form.

6              THE WITNESS:  Yeah, there was a lot

7    of logistical thought that went into the processes

8    for both apportionment and redistricting that

9    would be forthcoming that would have happened in

10   2011.

11   BY MS. THOMAS-LUNDBORG:

12        Q.   And when did those start?

13        A.   I don't recall specific dates,

14   months, timelines.

15        Q.   Okay.  Do you recall whether it

16   started in early 2011, let's say January and

17   February of 2011?

18              MR. STRACH:  Objection to form.

19              THE WITNESS:  I couldn't be that

20   specific.

21   BY MS. THOMAS-LUNDBORG:

22        Q.   Okay.  Do you recall having

23   attended an NCSL seminar in 2011?

24        A.   I attended an NCSL, but I do not

25   recall if it was in 2011 or earlier.

1          RAYMOND E. DiROSSI

2          Q.   Okay.  This is -- and I'm not

3    putting this in the record.  This is your prior

4    deposition in Wilson v. Kasich.  If you can

5    turn to page 42 and I'm looking at lines 10

6    through 11.

7          A.   You said page -- I'm sorry, which

8    page?

9          Q.   Page 42.

10         A.   Okay.

11         Q.   So you were asked a series of

12   questions here and this is about apportionment,

13   but as we said, there's been some overlap

14   between the two, and so just read the question

15   starting at 7 down through the answer on 12.

16   If you want to read the full answer, you can.

17         A.   Okay.

18         Q.   Does this refresh your

19   recollection about whether you attended an NCSL

20   training in 2011?

21         A.   Well, so obviously this was seven

22   years ago, so I obviously had better

23   recollection of when and where that NCSL was.

24   So in 2011 when I gave this deposition, January

25   of 2012, if I said it was in Washington D.C. in

1          RAYMOND E. DiROSSI

2  January, then that's most likely when it was.

3          Q.   Okay.   Do you recall whether you

4  were paid to go to the seminar?

5              MR. STRACH:   And if you need to take

6  time to read forward a little bit --

7              THE WITNESS:   Yeah.

8              MR. STRACH:   -- feel free to do that.

9  BY MS. THOMAS-LUNDBORG:

10          Q.   You can start at page 43, line 12,

11  and then I think the answer continues on page

12  44 up to line 2.

13          A.   It sounds like that's your answer.

14          Q.   Well, I need the answer for the

15  record.   Were you paid to go to the NCLS (sic)

16  training?

17              MR. STRACH:   Objection to form.   Be

18  sure and distinguish what you remember now versus

19  what you remembered then, if there's any

20  difference.

21              THE WITNESS:   Yeah, I mean, I don't

22  have a specific recollection of that now, but I'm

23  obviously looking at a deposition that I gave

24  seven years ago, so it's -- I mean, I don't recall

25  right now how the -- sitting here without this aid

1          RAYMOND E. DiROSSI

2     that you gave me, I don't recall how the travel

3     was paid for, if I paid for it, if it was

4     reimbursed or who did.

5     BY MS. THOMAS-LUNDBORG:

6              Q.    So this does not refresh your

7     recollection about whether you were paid to go

8     to this training?

9              A.    Well, now looking at the

10    deposition, I said seven years ago I don't

11    specifically recall if I paid for it and was

12    reimbursed or if it was paid for on my behalf,

13    so this does not help refresh my recollection.

14             Q.    Well, you've read part of it for

15    the record, so I'll go on and read the rest of

16    it.  Would it have been a representative

17    organization or some other, is that fair to

18    say, this is the bottom of page 43, and then on

19    the following page, 44, yeah, I believe it was

20    the Republican Senate Campaign Committee.

21             You said at the time that you were

22    a consultant for the Republican Senate Campaign

23    Committee?

24             A.    When is this?  This is 2000 and --

25             Q.    '11.

1          RAYMOND E. DiROSSI

2              A.    '11, yes.

3              Q.    Okay.

4              A.    I mean, I said -- seven years ago
5   I said I believe, so that was the best
6   recollection of that that I had then.  I don't
7   have any better recollection of it now.

8              Q.    But you were working for the
9   Republican Senate campaign at the time as a
10  consultant, correct?

11             A.    Yes.

12             (Thereupon, Plaintiffs' Exhibit
13  Number 4, Document Bates Stamped LWVOH_00009711,
14  was marked for purposes of identification.)

15  BY MS. THOMAS-LUNDBORG:

16             Q.    I'm having marked for the record a
17  document that I'm having marked as Exhibit 4.
18  It bears Bates numbers LWVOH-0008711, and at
19  the top it says discussion points for Mark
20  Braden meeting, Thursday, May 12th, 2011.

21             Do you recall attending a
22  redistricting meeting in May 2011?

23             A.    I do not.

24             (Thereupon, Plaintiffs' Exhibit
25  Number 5, Document Bates Stamped DIROSSI_0000017,

Page 60

1              RAYMOND E. DiROSSI

2   was marked for purposes of identification.)

3   BY MS. THOMAS-LUNDBORG:

4          Q.   I would like to move to the next

5   exhibit that I'm having marked for the record.

6   It bears Bates number DIROSSI-000017.  It is

7   what purports to be a calendar entry, subject,

8   Redistricting:  Software Demo - Maptitude.  Do

9   you see that?

10         A.   I do see that.

11         Q.   Is this Bates number the number

12  convention, to your knowledge, for documents

13  that you produced?

14         A.   I don't know what Bates -- I don't

15  know what that means.

16         Q.   The number at the bottom.  Does

17  this look like a document that you produced to

18  us?

19         MR. STRACH:  I can tell you it was.

20  He has no idea how we Bates numbered them.

21         MS. THOMAS-LUNDBORG:  Okay.  Thank

22  you.

23  BY MS. THOMAS-LUNDBORG:

24         Q.   So this purports to be a May 31st,

25  2011 calendar entry.  Do you see that?

1              RAYMOND E. DiROSSI

2              A.    Yes.

3              Q.    Do you recall attending a

4   redistricting software demo in May 2011?

5              A.    I don't specifically remember for

6   sure attending this.

7              Q.    Okay.  This is your calendar

8   entry, correct?

9              A.    It is.

10             Q.    What is Maptitude?

11             A.    It's a -- it's a GIS based

12  software.

13             Q.    And did you use Maptitude as part

14  of the redistricting process?

15             A.    In 2011, yes.

16             Q.    Do you recall who would have given

17  a training like this in May 2011?

18             MR. STRACH:  Objection.

19             THE WITNESS:  I don't recall.

20  BY MS. THOMAS-LUNDBORG:

21             Q.    Okay.  Do you recall whether you

22  were officially retained at this point to work

23  on redistricting?

24             A.    I was not.

25             Q.    If you did attain -- did attend

1                RAYMOND E. DiROSSI

2       the training, was that something that you would

3       have been paid for?

4                     MR. STRACH:  Objection.

5                     THE WITNESS:  You're asking me

6       hypothetically if I had been retained?  I don't

7       understand your question.

8       BY MS. THOMAS-LUNDBORG:

9                Q.   No, I'm asking you -- we have a

10      calendar entry here from your calendar that

11      says there was a training.  If you attended the

12      training as your calendar says, would you have

13      been paid to attend that?

14                     MR. STRACH:  Objection.

15                     THE WITNESS:  Yeah, I mean, first of

16      all, just because it was on my calendar doesn't

17      mean it happened.  There's plenty of things on my

18      calendar that didn't happen.

19      BY MS. THOMAS-LUNDBORG:

20               Q.   Right.  And so my question is, if

21      you attended a training, which you may or may

22      not remember, would you have been paid to do

23      it?

24                     MR. STRACH:  Objection.

25                     THE WITNESS:  Yeah, I mean, there's

Page 63

1          RAYMOND E. DiROSSI

2     like four different levels of hypothetical there.

3     I can't answer that.

4                    (Thereupon, Plaintiffs' Exhibit

5     Number 6, Document Bates Stamped DIROSSI_0000018,

6     was marked for purposes of identification.)

7     BY MS. THOMAS-LUNDBORG:

8          Q.    Okay.  Let's turn to the next

9     exhibit that I'm having marked for the record.

10    It is DIROSSI_000018.  I'm having it marked as

11    Exhibit 6.  It is another calendar entry.

12              This one says Confirmed:

13    Legislative Task Force on Redistricting, and

14    the start date of this calendar entry is June

15    16, 2011.  Do you see that?

16         A.    I do.

17         Q.    Now, this entry says confirmed.

18    If an entry is confirmed in your calendar is it

19    more likely that you actually attended it?

20         A.    No.

21         Q.    Okay.  Do you know what the

22    legislative -- legislative task force on

23    redistricting was?

24         A.    Absolutely.

25         Q.    Okay.  And what was that?

1          RAYMOND E. DiROSSI

2          A.   This is the bipartisan task force

3    that was formed in Ohio law to prepare the

4    State of Ohio for both the apportionment and

5    the redistricting processes every decade.

6          Q.   And who was a part of that task

7    force?

8          A.   There are six members by statute

9    on the board.   I don't recall at the times the

10   names of the members who were members of it,

11   but I do know the statute requires that

12   legislative leaders of opposing political

13   parties always are the bipartisan co-chairs of

14   it so that any action the entity takes is

15   bipartisan.

16          Q.   And were you a member of the task

17   force?

18          A.   When I worked in the Ohio House I

19   was a member of this task force for four years,

20   but at the time of this I was not.

21          Q.   You were not.   Were you -- so at

22   the time of this, just to be clear for the

23   record, are you talking about in June or for

24   the whole 2011 redistricting cycle?

25          A.   That -- I'm sorry.

Page 65

1          RAYMOND E. DiROSSI

2          Q.    I just want to clarify.  You said
3    you were not a member of the task force.  Are
4    you talking about in June of 2011, which is the
5    calendar entry, or for the whole 2011 cycle?
6          A.    I was not a member during the
7    whole 2011 cycle.
8          Q.    Did you attend any meetings of the
9    task force during the 2011 cycle?
10         A.    Not that I recall.
11         Q.    I'm not going to mark this yet for
12   the record.
13              MR. STRACH:  What exhibit number is
14   this?
15              MS. THOMAS-LUNDBORG:  It's not an
16   exhibit.  It's currently just a document to
17   refresh his recollection.
18              MR. STRACH:  Okay.
19   BY MS. THOMAS-LUNDBORG:
20         Q.    Have you had a chance to review
21   the document?
22         A.    I am continuing to review it, but
23   I still don't know what it is.
24         Q.    So if you look at the block code,
25   it says legislature task force on redistricting

1          RAYMOND E. DiROSSI

2    and then there are a number of names here,

3    including your name.  And my question to you

4    is, does this document refresh your

5    recollection about whether you attended any

6    legislative task force and redistricting

7    meetings?

8          A.   So thank you for giving me this

9    document.  I think it's -- it's a little

10   clearer, but I think you're confused.  The

11   legislative task force on redistricting is a

12   public body made up of elected officials.  It

13   is the mechanism by which the state prepares

14   for the process.  It has money appropriated to

15   it by the General Assembly.

16              One of the things that this is, is

17   as people attended public hearings throughout

18   the state on apportionment and redistricting,

19   they were reimbursed for mileage.  So if the

20   apportionment board or a redistricting

21   committee of the legislature had a regional

22   hearing or a hearing outside of the Statehouse,

23   those were meetings not of the task force, but

24   they were reimbursed for mileage from the task

25   force.

Page 67

RAYMOND E. DiROSSI

1

2      Q.    Okay.

3      A.    So I think you're confusing the

4 two.

5      Q.    So you're saying that this

6 document is just about reimbursement and not

7 about --

8      A.    Based on my review of the

9 documents you've provided, that's -- that's my

10 understanding.

11            (Thereupon, Plaintiffs' Exhibit

12 Number 7, Document Bates Stamped DIROSSI_0000019,

13 was marked for purposes of identification.)

14 BY MS. THOMAS-LUNDBORG:

15      Q.    Okay.  I would like to move to

16 what I'm having marked as Exhibit 7.  This

17 document, for the record, has Bates number

18 DIROSSI_000019, and the subject matter is

19 Confirmed:  President Niehaus call with

20 Congressman LaTourette, and the date is July

21 7th, 2011.  Do you see that?

22            MR. STRACH:  Just one correction,

23 it's July 5th.

24            MS. THOMAS-LUNDBORG:  Oh, I'm sorry,

25 July 5th.  Thank you.

1           RAYMOND E. DiROSSI

2              THE WITNESS:  I do see the document.

3    BY MS. THOMAS-LUNDBORG:

4         Q.    Do you recall having calls with

5    President Niehaus at this time in July, early

6    July 2011?

7         A.    That I had phone calls with him?

8         Q.    Yes.  Did you have phone calls

9    with President Niehaus in July of 2011?

10        A.    I mean, I spoke to him.  I don't

11   know if they were by phone or -- I mean, I

12   can't recall a specific phone call.

13        Q.    But did you have phone calls in

14   general with the president at this time?  Just

15   in general in early July did you talk to the

16   president on the phone?

17              MR. STRACH:  Objection.

18              THE WITNESS:  I don't -- I don't

19   recall a specific thing, and if I did, it may not

20   have had anything to do with redistricting.

21   BY MS. THOMAS-LUNDBORG:

22        Q.    Okay.  Do you know who Congressman

23   LaTourette is?

24        A.    I do.  He's now deceased.

25        Q.    And who was Congressman

1           RAYMOND E. DiROSSI

2     LaTourette?

3           A.    He was a congressman from Ohio.

4           Q.    Did you have any conversations at

5     any point with Congressman LaTourette about

6     redistricting?

7           A.    None that I can recall.

8           Q.    Is it possible that you had any

9     phone calls with him you're not remembering?

10          MR. STRACH:  Objection.

11          THE WITNESS:  I don't recall any

12    specific ones.

13    BY MS. THOMAS-LUNDBORG:

14          Q.    Do you recall if in early July

15    there were -- there was a draft map for the

16    Ohio's congressional districts?

17          A.    I don't recall.

18          Q.    At the time in early July of 2011

19    did you have phone calls with any sitting

20    congresspeople that you recall?

21          A.    I don't recall.  I don't recall

22    any specific ones in July.

23          Q.    Is it possible that you had calls

24    with sitting congresspeople at that time?

25          MR. STRACH:  Objection.

1       RAYMOND E. DiROSSI

2           THE WITNESS:  I don't recall any

3  specific phone calls.

4  BY MS. THOMAS-LUNDBORG:

5           Q.   Not any in particular, just in

6  general, do you recall having any conversations

7  with sitting congresspeople?

8           A.   What time -- what time frame?  I'm

9  sorry.

10          Q.   Early July.

11          A.   I don't.

12          Q.   At any point later in the

13  redistricting cycle do you recall?

14          A.   There were a few -- a few

15  instances that I remember -- can remember that

16  far back where I would have had phone calls

17  with sitting congressmen.

18          Q.   And what were those instances?

19          A.   In House Bill 369, which was the

20  congressional map that was adopted, I remember

21  having a number of calls with Congressman Steve

22  Austria telling him that the legislative

23  leaders had decided that the request by the

24  Democratic members of the legislature to have

25  an amendment to the redistricting plan to unify

1                RAYMOND E. DiROSSI

2    Montgomery County was happening.  And I had a

3    number of conversations with him about that,

4    that the leaders had decided to go with what

5    the Democrats and the legislature had asked

6    for.

7          Q.    Do you recall any other

8    conversations?

9          A.    With --

10         Q.    Sitting congresspeople.

11         A.    By congresspeople, you're saying

12   the congressmen and women?

13         Q.    Yes, I am.

14         A.    Everybody is looking at me.  None

15   that I -- none that I recall.

16         Q.    You're the witness.

17         A.    I understand.  None more that I

18   can recall sitting here at this moment, no.

19         Q.    Okay.  Let's --

20              (Thereupon, Plaintiffs' Exhibit

21   Number 8, Document Bates Stamped LWVOH_00010555,

22   was marked for purposes of identification.)

23   BY MS. THOMAS-LUNDBORG:

24         Q.    For completeness, let's look at

25   what I'm having marked as Exhibit 8.  It bears

1          RAYMOND E. DiROSSI

2     Bates number LWVOH_00010555.  It is a calendar

3     entry with, it looks like, an email, from you

4     to Heather N. Mann.  Do you see that?

5          A.   I do.

6          Q.   Okay.  If you just take a minute

7     to look over the text.  In it there's a

8     discussion of a July 7th, 2011 meeting.  Do you

9     see that?

10          A.   I see July 7th, 2011, but I don't

11     know what it's -- I'm still trying to -- I see

12     the words July 7th, 2011.

13          Q.   Well, the subject says, Re:  Hold

14     for Redistricting Software Meeting and then

15     that hold seems to be for a July 7th, 2011

16     meeting, if I'm looking at this correctly,

17     which was sent to you by Heather Mann.  You

18     respond accepted, and then I am free from 10:30

19     for the Yost meeting and free the rest of the

20     day as needed, Ray.

21          A.   Okay.  I see that.

22          Q.   Do you recall there being a

23     meeting in early July regarding redistricting?

24          A.   I don't recall.

25          Q.   Okay.  When were you officially

1              RAYMOND E. DiROSSI

2       retained?

3              A.    I believe my contract was signed

4       the first few days of August.

5              MR. STRACH:  Can we take a quick

6       break?  We've been going about an hour.

7              MS. THOMAS-LUNDBORG:  Sure.

8              THE VIDEOGRAPHER:  We're off the

9       record.

10             (Recess taken.)

11             THE VIDEOGRAPHER:  We're on the

12      record.

13             MR. TUCKER:  Before we get started

14      again, I just want to memorialize the parties'

15      agreement that an objection made by one attorney

16      on one side is good for all parties on that side.

17      So, example, if the intervenors object to a

18      question, that objection is good for defendants,

19      and vice-versa.

20      BY MS. THOMAS-LUNDBORG:

21             Q.  All right.  Mr. DiRossi, I would

22      like to go back to something we talked about in

23      the very beginning.  You said you reviewed

24      documents in preparation for the deposition.

25      Which documents did you review?

Page 74

RAYMOND E. DiROSSI

1

2      A.   Any of the documents that I

3  produced, so that would have been -- well, any

4  documents that I produced.

5      Q.   Okay.  So you reviewed the whole

6  production set?

7      A.   Well, I mean, I looked through

8  them.  There's a lot.

9              (Thereupon, Plaintiffs' Exhibit

10  Number 9, Documents Bates Stamped

11  LWVOH_00005475-5477, was marked for purposes

12  of identification.)

13  BY MS. THOMAS-LUNDBORG:

14      Q.   I would like to now turn to a

15  document that I'm having marked as Exhibit 9.

16  It's 9 in your binder.  For the record, this

17  document begins with Bates number

18  LWVOH_0005475.  At the top it says Consulting

19  Agreement.  Can you turn to the last page,

20  please?

21      A.   (Witness complied.)

22      Q.   Do you recognize this signature at

23  the bottom as your signature?

24      A.   I do.

25      Q.   And if you take a moment to review

1          RAYMOND E. DiROSSI

2    the document, is this the consulting agreement

3    that you entered into when you began work on

4    redistricting?

5          A.    It is.

6          Q.    Do you recall who retained you to

7    work on redistricting?

8          A.    I guess I don't understand the

9    question.  Do you mean like who I signed the

10   contract with or what are you asking?

11         Q.    Yes.  Do you recall -- let me ask

12   it more specifically.  Do you recall being

13   retained by the Republican caucus to work on

14   redistricting?

15         A.    Well, so this is another example

16   -- we were talking about the legislative task

17   force on redistricting and demographic

18   research.  So that is something that has been

19   part of law for a number of decades and it's

20   set up specifically so that each of the two

21   caucuses, the Republican caucus and the

22   Democratic caucus, are each able to make

23   expenditures using the dollars attributed to

24   them in equal amounts for anything necessary

25   for them to go through this very unique

Page 76

1              RAYMOND E. DiROSSI

2     process.

3              Q.    And were you paid by the

4     Republican portion of that money?

5              A.    Yes.

6              Q.    So getting to the money part, if

7     just give me one second.    Sorry.    Oh, yeah.    So

8     if you look at the contract in paragraph --

9     numbered paragraph 3 it says consulting

10    payments, and then it says in consideration for

11    the services performed by Capital Advantage

12    pursuant to this agreement, the task force

13    agrees to pay Capital Advantage the sum total

14    of $75,000.    Do you see that?

15             A.    I do.

16             Q.    And did you understand that that

17    was half of the Republican money at the time?

18             A.    I don't have that specific

19    recollection.    I don't think that's accurate.

20             Q.    You don't think 75,000 is

21    accurate?

22             A.    It's definitely the number here,

23    but you were asking whether it was half of

24    something else and I --

25             Q.    Yes, half of the money allocated

1                RAYMOND E. DiROSSI

2    to the Republicans, as you explained.

3              A.    I don't -- I can't speak to that.

4         Q.    I'm not entering this at this

5    time.  I have put in front of you a document

6    that you produced, and again it's not being

7    entered for the record, but it is

8    DIROSSI_000495.

9              If you look at the second

10   paragraph, numbered paragraph here, does this

11   refresh your recollection of whether you were,

12   at least in this contract, allocated half of

13   the Republican money?

14        A.    Well, yeah, I just think you -- I

15   just don't think that's --

16        Q.    I believe it was later increased.

17   I'm just talking about at the time that you

18   signed the contract, was that half of the

19   Republican bucket?  Not what it eventually was.

20        A.    Yeah, because this is dated June

21   and the contract was in August, and there were

22   changes that were agreed to by the minority

23   leader of the Ohio Senate and the Speaker of

24   the Ohio House that changed those allocations,

25   so I don't --

Page 78

1        RAYMOND E. DiROSSI

2        Q.   Okay.  So I think this is -- at

3   least as far as the production, I'm going to

4   show you another document to refresh your

5   recollection.  Now, this is the only change

6   document I've seen and it's dated October and

7   it is retroactive.

8            Does this refresh your

9   recollection of at the time that you signed

10  your contract, were you going to be paid half

11  of the Republican allotment?

12       A.   I'm sorry.  Is this the new one

13  you gave me?

14       Q.   I think the new one is dated

15  October 12th, 2011.

16       A.   Okay.  Could you repeat what your

17  specific question is?

18       Q.   So the question is, at the time

19  that you signed your consulting agreement were

20  you being paid half of the Republican money?

21       A.   I don't know the answer, but based

22  on what I'm seeing here I do not believe that

23  -- no.

24       Q.   So even though this document --

25  the document that you've just looked at

1              RAYMOND E. DiROSSI

2    postdates your agreement, you believe that

3    there was more money when you signed this

4    contract in August 2011?

5              MR. STRACH:  Objection to form.

6              THE WITNESS:  Yeah, can you rephrase

7    that, specifically what you're asking?

8    BY MS. THOMAS-LUNDBORG:

9         Q.   My question is, there's -- you

10   believe there was more money in August 2011

11   allocated to the Republican caucus?

12        A.   Well, any allocation that would

13   have been made to either caucus would have been

14   made to both caucuses.  It was always being

15   done by a Republican and Democrat, which is the

16   way that this entity is set up in the -- so it

17   never would have been that one caucus got money

18   that the other caucus didn't get money.

19        Q.   That part is understood.  My

20   question is about your specific payment,

21   whether it was half of the Republican caucus

22   money or whether there was more money at the

23   time allocated to the Republican caucus.

24             MR. STRACH:  Objection to form.

25             THE WITNESS:  Yeah, I mean, I've

1          RAYMOND E. DiROSSI

2    answered it a couple different times.  Based on

3    what I'm seeing here, I do not believe that to be

4    the case.  This is my contract, that is the amount

5    that I was paid, but I mean, you're asking me to

6    -- I don't believe that that's what this is.

7    BY MS. THOMAS-LUNDBORG:

8          Q.   Okay.  Do you have an

9    understanding of how much money was allocated

10   to Republicans at the time that you signed your

11   contract?

12         A.   I do not.  At the time I signed my

13   contract, I do not.

14         Q.   Do you have any documentation

15   related to how much money was allotted to

16   Republicans at the time that you signed your

17   contract?

18         A.   I mean, any -- you're handing me

19   documents that I handed to you by preparing

20   them.  So, I mean, these are the documents that

21   I have.

22         Q.   Okay.

23         A.   This is what I have.

24         Q.   Do you have any other documents

25   related to the money allocated to the

1              RAYMOND E. DiROSSI

2    Republicans at the time that you signed your

3    contract?

4          A.   Anything that I would have had I

5    would have turned over.

6          Q.   Okay.  Going back to the end of

7    the document where the signatures are --

8          A.   Yes.

9          Q.   -- we've already identified your

10   signature.  The top signature is a person by

11   the name of Matthew T. Schuler.  Do you know

12   who that is?

13         A.   I do.

14         Q.   And who is that?

15         A.   He at the time was the chief of

16   staff of the Ohio Senate.

17         Q.   Okay.  And was he associated with

18   any particular party?

19         A.   He was a member of the Republican

20   caucus.

21         Q.   And the next name is Troy Judy.

22   Do you know who Troy Judy is?

23         A.   I do.

24         Q.   And what was Troy Judy's position

25   at the time?

1          RAYMOND E. DiROSSI

2              A.    At the time he was the chief of

3    staff of the House of Representatives.

4              Q.    Okay.   And was Troy Judy

5    associated with any particular party?

6              A.    Yes, so he was a member of the

7    Republican caucus.

8                    And, as I mentioned before in

9    response to one of your questions, as was the

10   way this was set up by the minority leader of

11   the Ohio House Democrat, the Speaker of the

12   Ohio House Republican, there would be equal

13   amounts of money given to both caucuses, and

14   any contracts, equipment, software, or anything

15   that needed to be expended would be -- you

16   would have to get the signatures of either the

17   two Republican chiefs of staff or the two

18   Democratic chiefs of staff.   So that's what

19   this is.

20             Q.    What was your understanding of the

21   role that you would play in redistricting when

22   you signed this contract?

23             A.    Well, for the redistricting, that

24   we had to produce a constitutional map and that

25   there were timelines associated with it and

1          RAYMOND E. DiROSSI

2   that I was going to be working on providing

3   that.

4          Q.   And you said working on providing

5   that.  What specifically did you do to help

6   work on providing the map?

7          A.   So the -- the legislative

8   congressional -- the redistricting, the

9   congressional redistricting, excuse me, is a

10  legislative bill that goes through the Ohio

11  House and the Ohio Senate and is signed by the

12  Governor.  So we would be working to make

13  suggestions on what that bill could be so that

14  it could go through the traditional legislative

15  process.

16         Q.   And you said suggestions on what

17  that bill could be.  What do you mean by

18  suggestions on what that bill could be?

19         A.   Anything that affected the design

20  of the map.  The fact that the state -- the

21  State of Ohio was losing two congressional

22  districts was causing significant problems,

23  population deviations of districts, districts

24  were growing, districts were contracting.

25  Anything to produce a map that was

Page 84

1                 RAYMOND E. DiROSSI

2   constitutional.

3              Q.    Did you work on drawing a map?

4              A.    Yes.

5              Q.    Okay.   And how did you go about

6   drawing the map?

7              A.    Using the computers and software

8   that we had and using the data that the

9   legislative task force had contracted with

10  Cleveland State to provide to everyone in the

11  state, we produced boundaries of districts and

12  what could be used.

13             Q.    And the software that you used,

14  was that Maptitude?

15             A.    In the 2011 process it was

16  Maptitude, yes.

17             Q.    And you said we used the software.

18  By we, who are you referring to?

19             A.    Primarily Heather -- Heather and

20  I, Heather Mann.

21             Q.    Did anyone else --

22             A.    Heather Mann at the time, Heather

23  Blessing now.

24             Q.    Thank you.

25             A.    Sorry.

1            RAYMOND E. DiROSSI

2            Q.   That's fine.  Did anyone else work

3    on the software with you in addition to Heather

4    Mann, now Ms. Blessing?

5            A.   I believe Troy Judy used the

6    software as well.

7            Q.   Did anyone else use the software?

8            A.   I mean, a lot of -- those are the

9    people that I have knowledge of that used the

10   software that we purchased.  Other people in

11   the state may have been using it.

12           Q.   Okay.  Did you talk to anyone at

13   the time who was inputting data in the software

14   while you were using it?

15           A.   Help me understand that question a

16   little bit.

17           Q.   So you said that Troy Judy,

18   Heather Mann and yourself used the software.

19   And so my question is, was anyone else working

20   with you who was making inputs into the

21   software?

22           A.   And by inputs into the software,

23   what do you mean?

24           Q.   I mean making changes on maps in

25   the Maptitude software.

Page 86

1        RAYMOND E. DiROSSI

2            A.   Well, we were getting input from
3   the legislative leaders.

4            Q.   Okay.

5            A.   But myself, Heather and Troy were
6   really the only ones sitting at computers to my
7   knowledge.

8            Q.   And you said you were getting
9   inputs from legislative leaders.   By
10  legislative leaders, who are you talking about
11  specifically?

12           A.   For me, I would say it was
13  President Niehaus.

14           Q.   Anyone else?

15           A.   Well, I'm sure every legislator,
16  both Republican and Democrat, had ideas, so at
17  what level are you --

18           Q.   I'm talking about people who gave
19  you suggestions that then you inputted into the
20  software.

21           A.   Because there are plenty of
22  instances where people gave suggestions that we
23  did not do, so --

24           Q.   I'm talking about people who gave
25  you suggestions that then you took and put into

1          RAYMOND E. DiROSSI

2     the software.  Can you name those people?

3          A.   Well, President Niehaus.  I know

4     that Speaker Batchelder had input.  But in many

5     cases they were reacting to suggestions that we

6     were making, so it was more of a two-way street

7     than them telling us what to do.  It was more

8     of an information exchange.

9          Q.   Okay.  So just to circle back to

10    the contract, if you look at the numbered

11    paragraph 1, during the term of this agreement

12    Capital Advantage shall make available Raymond

13    E. DiRossi to render such consulting services

14    as may be needed or requested by the Republican

15    members of the task force to carry out their

16    duties, and then there is a code cited R.C. 10

17    -- 103.51.  Do you see that?

18         A.   I do.

19         Q.   And so was your understanding that

20    Capital Advantage was being retained on your

21    behalf?

22         A.   Yes, I'm the only -- I'm the owner

23    and only employee of Capital Advantage at the

24    time.

25         Q.   Okay.  And I think we've already

1                RAYMOND E. DiROSSI

2    discussed this, but was your understanding that

3    you were being retained by the Republican

4    members of the task force as outlined here in

5    this paragraph?

6            A.   Well, again, as I mentioned

7    before, it was a bipartisan process that was

8    put in place for those contracts, but the

9    legislative task force on redistricting and

10   demographic research is the entity that is

11   supposed to set the table for redistricting and

12   apportionment in the state.  They don't really

13   have a role in the effectuation of districts or

14   the adoption of districts.  The apportionment

15   board would adopt districts for the legislative

16   districts.  The state legislature and the

17   Governor would adopt districts for the

18   congressional districts.

19              So they don't really have a role

20   in adopting districts.  They do all the

21   logistical stuff to prepare the state for it.

22           Q.   Okay, understood.  So you were, in

23   fact, retained by the Republican members.

24              Going to the next paragraph, term,

25   it says the term of this agreement will

Page 89

1          RAYMOND E. DiROSSI

2    commence on August 1st, 2011, and shall expire

3    on December 31st, 2011, unless terminated in

4    accordance with the provisions of Section 8 of

5    this agreement or extended by the task force by

6    agreement of Capital Advantage.  Do you see

7    that?

8          A.    I do.

9          Q.    Okay.  Was it your understanding

10   that your term would last from August to

11   December?

12         A.    Yeah, I mean, if that's what the

13   contract says, yes, yes.

14         Q.    Do you recall whether you, in

15   fact, worked through December of 2011?

16         A.    Well, again, so this contract --

17   so here's where we're mixing.  This contract

18   obviously is for apportionment and

19   redistricting.  So through December 2011, yes,

20   I was still working, because within 30 days of

21   the apportionment map being adopted there were

22   lawsuits that were filed and depositions and

23   document production that lasted through --

24   through that time, as well as, as we talked

25   earlier, about there being two maps for the

Page 90

1          RAYMOND E. DiROSSI

2  congressional districts that extended into

3  December as well.

4              (Thereupon, Plaintiffs' Exhibit

5  Number 10, Document Bates Stamped DIROSSI_0000527,

6  was marked for purposes of identification.)

7  BY MS. THOMAS-LUNDBORG:

8          Q.    I would like to move to the next

9  exhibit that I'm having marked as Exhibit 10.

10  It is -- it has Bates number DIROSSI_0000527,

11  and the top of the document says Termination

12  Agreement.  Do you see that?

13              And this agreement --

14          A.    I do.

15          Q.    This agreement says that it's

16  pursuant to the termination provision of the

17  contract entered into between the Republican

18  Senate Campaign Committee, RSCC, and Capital

19  Advantage.  Do you see that?

20          A.    I do.

21          Q.    And what is the Republican

22  campaign committee, Senate campaign committee?

23          A.    That was the entity that I was

24  engaged with prior to the redistricting and

25  apportionment under my contract.

1          RAYMOND E. DiROSSI

2          Q.    And what do they do?

3          A.    They are -- they run elections.

4          Q.    What do you mean, they run

5     elections?

6          A.    They run elections dealing with

7     Republican Senate candidates.

8          Q.    Do you mean that they do the

9     physical logistics of running elections or are

10    they actually campaigning for elections?

11         A.    Well, I don't control what they do

12    obviously, but --

13         Q.    I'm just asking what they do.

14         A.    Yeah.

15         Q.    Because you said they run

16    elections.  I just want clarity on what you

17    mean by they run elections.  Are they doing the

18    logistics; i.e., setting up polls, making

19    elections run, or are they campaigning for

20    elections?

21         A.    Yeah, they are a legislative

22    campaign fund under Ohio law and they raise

23    money and engage in Republican Senate campaign

24    campaigns.

25         Q.    Okay.  And what did you do for

1                RAYMOND E. DiROSSI

2      them specifically?

3           A.    Prior to terminating pursuant to

4    this, I raised money for the Republican Senate

5    Campaign Committee.

6           Q.    And how did you go about that?

7           A.    Providing logistical support to

8    the members and candidates of the Republican

9    Senate Campaign Committee in setting up

10   fundraising events in Columbus or in their

11   districts.

12          Q.    And I don't have the agreement

13   that this is terminating.  Do you still have

14   that in your possession?

15          A.    Sitting here, I don't know.  I

16   would have to look.

17          Q.    Okay.  I'm going to request on the

18   record that you do look for that agreement, and

19   if it's in your possession that it be produced.

20               Do you recall why your agreement

21   with the RSCC was terminated on August 1st,

22   2011?

23          A.    Yeah, this was -- this was after

24   consulting with some of the ethics folks that

25   operate in and around Capitol Square.  It was

1          RAYMOND E. DiROSSI

2    recommended that there be a termination of all

3    contracts that I had in place and that I focus

4    solely on the redistricting and apportionment.

5    So this is the bright line of terminating

6    everything and letting the new contracts take

7    effect.

8          Q.    And did you have an understanding

9    of why it was -- why you should terminate all

10   of your existing contracts?

11         A.    I don't know.   It was the

12   recommendation of the joint legislative

13   inspector general -- joint legislative ethics

14   officer, apologies.

15         Q.    And whose decision was it to ask

16   the ethics individual about whether or not you

17   should terminate your --

18         A.    I sought -- I sought his guidance.

19         Q.    And why did you do that?

20         A.    I just wanted to make sure that I

21   did this correctly.   I had been through this in

22   2001, as we talked about, and there were

23   immediately lawsuits after the 2001 process and

24   I just wanted to make sure that I did

25   everything correctly.

Page 94

RAYMOND E. DiROSSI

2          Q.    And staying on the contract that

3   this is terminating, were you paid under your

4   RSCC contract?

5          A.    Yes.

6          Q.    Do you have a recollection of how

7   much you were paid?

8          A.    I don't sitting here.

9               MR. STRACH:  Insert an objection to

10   that question.

11   BY MS. THOMAS-LUNDBORG:

12          Q.    So we've seen a number of

13   documents and we've already kind of talked

14   about Heather Mann, also known as Heather

15   Blessing.  Who is Ms. Blessing?

16          A.    Who is she now?  Who was she then?

17          Q.    Who was she during the

18   redistricting process?

19          A.    She was -- for the redistricting

20   process, she was somebody that the -- I can't

21   remember what her title was in the legislature,

22   but she was somebody that was designated to

23   work on the redistricting on behalf of the

24   Speaker of the House.

25          Q.    Okay.  And did you work with

1          RAYMOND E. DiROSSI

2     Ms. Blessing directly?

3          A.    Yes.

4          Q.    And what was the nature of your

5     working relationship together?

6          A.    And what do you mean by that?

7          Q.    Did you guys -- between the two of

8     you did you have roles that were designated

9     that you performed certain tasks and she

10    performed other tasks?

11         A.    No.    I mean, we were working

12    simultaneously on both the apportionment and

13    the redistricting, and so we were sometimes

14    working on the same concepts or the same

15    processes and at other times different.

16         Q.    Was there anything that you worked

17    on specifically that she did not work on?

18         A.    Not that I could recall

19    specifically.

20         Q.    Is there anything that she worked

21    on specifically that you did not work on?

22              MR. STRACH:  Objection to form.

23              THE WITNESS:  You can ask her.

24    BY MS. THOMAS-LUNDBORG:

25         Q.    To your recollection do you recall

Page 96

                    RAYMOND E. DiROSSI

1

2    her doing something that you were not involved

3    in?

4                    MR. STRACH:  Objection to form.

5                    THE WITNESS:  I do not recall

6    specifics.

7    BY MS. THOMAS-LUNDBORG:

8              Q.   Do you recall whether Ms. Blessing

9    was paid $75,000 in her contract?

10             A.   Her contract and mine were, I

11   believe, identical.

12             Q.   Do you recall whether the

13   combination of your contract and Ms. Blessing's

14   contract was the money that was allotted to the

15   Republican caucus?

16             A.   Can you say that again, please?

17             Q.   Do you recall whether the money

18   that you were paid and the money that she was

19   paid was the sum total of the money that was

20   allotted to the Republican caucus?

21             A.   I don't think that's accurate.

22             Q.   And what do you recall other money

23   being allotted for?

24             A.   Software, computers, office space,

25   mileage reimbursements, toner, paper, ink, all

1              RAYMOND E. DiROSSI

2     of those things necessary to produce the maps

3     for the apportionment and the redistricting.

4              Q.   Okay.   Was money allotted to pay

5     anyone else a salary?

6              A.   I don't recall.   I don't recall if

7     that was true or if Heather and I were the only

8     ones.

9              Q.   All right.   I would like to --

10    actually, before we get to the exhibit, do you

11    recall there being any meetings in early July

12    of 2011 related to redistricting?

13             A.   Are you specifically asking

14    meetings that I attended or just meetings that

15    other people were having?

16             Q.   Meetings that you would have

17    attended.

18             A.   In July?

19             Q.   In July.

20             A.   Yeah, as we just discussed, my

21    contract wasn't in effect until -- and signed

22    until August.   I don't recall, sitting here,

23    any meetings in July.

24             Q.   Is your recollection that you did

25    any work related to redistricting in July?

Page 98

1              RAYMOND E. DiROSSI

2              A.   Well, I was definitely thinking

3    about the logistics.  Having been the one

4    person who had been through this the previous

5    decade, I was thinking a lot about the

6    logistics of what we would do, but that was

7    with myself.

8              Q.   Did you attend any meetings in

9    July related to redistricting?

10             A.   None that I can specifically

11   recall.

12             Q.   Did you do anything else besides

13   thinking to yourself about redistricting in

14   July of 2011?

15             A.   Yeah, I'm sure I had conversations

16   with the president of the Senate, Matt Schuler,

17   basically saying these processes are coming,

18   these are once-a-decade processes, they have,

19   especially for the apportionment, timelines

20   that are imbedded in the Constitution that we

21   have to adhere to, and we need to be thinking

22   about all of the logistical things that need to

23   be done to get ready for this.  So I'm sure I

24   would have been having conversations along

25   those lines.

1          RAYMOND E. DiROSSI

2          Q.    Would you have had conversations

3    with anyone else in July?

4          A.    With anyone else other than --

5          Q.    Niehaus and Schuler you just

6    mentioned.

7          MR. STRACH:   Objection to form.

8          THE WITNESS:   I would have talked to

9    Heather about it, I'm sure.

10   BY MS. THOMAS-LUNDBORG:

11         Q.    Anyone else?

12         A.    I'm sorry.   Who have we named so

13   far?

14         Q.    I believe, and your counsel can

15   correct me, we've named President Niehaus and I

16   believe you named Schuler and you just named

17   Ms. Blessing.

18         A.    Yeah, no other specific

19   conversations that I can recall and give you

20   names -- names of people right now.

21         Q.    Okay.   So let's look at some

22   documents and they may or may not refresh your

23   recollection.

24              (Thereupon, Plaintiffs' Exhibit

25   Number 11, Document Bates Stamped DIROSSI_0000020,

1              RAYMOND E. DiROSSI

2      (was marked for purposes of identification.)

3      BY MS. THOMAS-LUNDBORG:

4              Q.   Let's look at what I'm going to

5      have marked as Exhibit 11.  It bears DIROSSI --

6      I'll just say DIROSSI_20 for shorthand.  This

7      is an exhibit that you produced to us.  The

8      subject is, 2:45 p.m. Confirmed:  Redistricting

9      Training.  Do you see that?

10             A.   I do.

11             Q.   And it looks like this event is

12     scheduled to start on July 7th, 2011.  Do you

13     see that?

14             A.   I do.

15             Q.   Okay.  I'm going to just move on

16     to the next document to mark for the record to

17     be efficient.

18             (Thereupon, Plaintiffs' Exhibit

19     Number 12, Document Bates Stamped DIROSSI_0000021,

20     was marked for purposes of identification.)

21     BY MS. THOMAS-LUNDBORG:

22             Q.   This is DIROSSI_21 and the subject

23     is Confirmed:  Redistricting Training.  Do you

24     see that?

25             A.   I do.

1          RAYMOND E. DiROSSI

2               Q.    And its date is July 8th, 2011.

3    Do you see that?

4               A.    I do see that.

5               Q.    All right.  And as the kind of

6    last --

7               A.    Just if I could say, I mean, just

8    because it says confirmed doesn't mean that I

9    attended it.  That's my way of saying that I

10   believed it was confirmed and was going to

11   happen.  But whether or not I attended it, I

12   can't say.

13              Q.    Understood.

14              (Thereupon, Plaintiffs' Exhibit

15   Number 13, Document Bates Stamped LWVOH_00008706,

16   was marked for purposes of identification.)

17   BY MS. THOMAS-LUNDBORG:

18              Q.    To finish out our trio, I would

19   like to have marked as Exhibit 13 LWVOH_8706.

20   And at the top it says Redistricting Meeting

21   Agenda, Thursday, July 7th, 2011, and Friday,

22   July 8th, 2011.  Do you see that?

23              A.    Yes.

24              Q.    Okay.  So just flipping back to

25   Exhibit 11, it looks like there is a

1          RAYMOND E. DiROSSI

2    redistricting training for 2:45 to 5:00 p.m.

3    That seems to coincide with a 2:45 to 5:30 p.m.

4    training on this agenda in Exhibit 13.  Do you

5    see that?

6              A.   I'm sorry.  Help me again.  You're

7    referring to Number 12?

8              Q.   Number 11.

9              A.   Number 11, I'm sorry.

10             Q.   So there's a 2:45 to 5:00 p.m.

11   training.  Do you see that?

12             A.   Number 11, yes.

13             Q.   Yes.  And then if you look at

14   Number 13, the second to last meeting on the

15   agenda is 2:45 to 5:30 p.m.  Do you see that?

16             A.   I do.

17             Q.   Okay.  And then on --

18             A.   The times aren't exact, but I --

19   yeah.

20             Q.   I think we're going to look at

21   another one that's not quite exact.  If you

22   look at Exhibit 12, there is a Friday meeting

23   from 8:00 a.m. to 10:30, and then it looks like

24   on the agenda there's an 8:00 a.m. to 11:00

25   a.m. training.  Do you see that?

Page 103

1          RAYMOND E. DiROSSI

2          A.    Yes.

3          Q.    Okay.   As you look at this agenda
4    -- I know you said when you looked at the
5    calendar entries alone you have no recollection
6    of going to the meetings.   Looking at the
7    agenda, do you have any recollection of
8    attending any of these meetings?

9          A.    I do have a recollection of
10   attending something, but I can't say if it was
11   one or -- one or something different.

12         Q.    Okay.   The agenda lists a number
13   of people, including Mark Braden.   Do you see
14   that?

15         A.    I do.

16         Q.    Do you know who Mark Braden is?

17         A.    I do.

18         Q.    Who is Mark Braden?

19         A.    He was the legal counsel that
20   represented us in the apportionment lawsuit.

21         Q.    By legal counsel that represented
22   us in the apportionment lawsuit, who is us?

23         A.    The apportionment board members.

24         Q.    Okay.   And was it your
25   understanding that he represented all

                    RAYMOND E. DiROSSI

1    apportionment board members?

2           A.    I don't know that -- I wouldn't

3    know the specifics of that.  I don't know.

4           Q.    Okay.  This meeting, July 7th,

5    predates the apportionment board lawsuit.  Do

6    you have any recollection of Mr. Braden doing

7    any work prior to the lawsuit?

8           A.    What do you mean by work that he

9    did?

10          Q.    I mean work related to

11   redistricting.

12                MR. STRACH:  Objection.

13                THE WITNESS:  Yeah, we might have

14   sought his -- his guidance on legal matters, but I

15   --

16   BY MS. THOMAS-LUNDBORG:

17          Q.    Do you have any recollection of

18   speaking to Mr. Braden prior to the filing of

19   the lawsuit?

20          A.    Yes.

21          Q.    And when was that?

22          A.    When was the lawsuit filed?

23          Q.    No.  When did you speak to him

24   prior to the filing of the lawsuit?

1          RAYMOND E. DiROSSI

2          A.    Well, it would have been during

3    the process, during the apportionment and

4    redistricting process.

5          Q.    So do you have a recollection of

6    speaking to him during the redistricting and

7    apportionment process?

8          A.    Yes.

9          Q.    Do you have any recollection of

10   when those conversations would have taken

11   place, in the summer, in the fall?

12         A.    We inter -- or I interacted and

13   sought his guidance numerous times through that

14   process, but I can't -- I don't know a specific

15   like date or time or general month or anything.

16         Q.    Okay.

17         A.    It was kind of throughout.

18         Q.    And is it possible that you spoke

19   to him in July of 2011?

20              MR. STRACH:  Objection.

21              THE WITNESS:  Yeah, I mean, I -- I

22   can't speculate.  I can't recall a specific July

23   conversation that I had with him.

24   BY MS. THOMAS-LUNDBORG:

25         Q.    All right.  The other name listed

1        RAYMOND E. DiROSSI

2    here is a John Morgan.   Do you know who John

3    Morgan is?

4              A.    Generally, yes.

5              Q.    And who is that?

6              A.    He was somebody who -- who was a

7    resource to us if we had questions specifically

8    about software.   As we talked about before, in

9    2001 we used AutoBound software.   In 2011 we

10   were switching and using Maptitude software, a

11   software that I had not been trained on and was

12   not familiar with, and there was a lot of

13   things that I just could not understand how

14   this new software ten years later worked.

15              John seemed to have an in-depth

16   knowledge of how the software worked and so he

17   was -- he was a resource to, at least me, on

18   software issues.

19              Q.    And do you recall when you were

20   introduced to Mr. Morgan?

21              A.    I don't recall.

22              Q.    Do you recall how you were

23   introduced to him?

24              A.    I believe it was by email, email

25   and phone.

1          RAYMOND E. DiROSSI

2          Q.    And who sent that email?

3          A.    I can't recall.

4          Q.    You said that he was a resource to

5    you.  By you, who do you mean?

6          A.    I'm sorry, by who do I --

7          Q.    Who was John Morgan a resource

8    for?

9          A.    Me.

10          Q.    You specifically.  Did he work

11   with anyone else to your knowledge?

12          A.    I had -- I did witness him talking

13   to Heather and I jointly.

14          Q.    Are you aware of him having

15   conversations with anyone else related to

16   redistricting in Ohio?

17          A.    I am not, no.

18          Q.    Were you aware of who was paying

19   John Morgan to do his work?

20          A.    I was not.

21          Q.    Did John Morgan make any inputs

22   into the Maptitude software?

23              MR. STRACH:  Objection.

24              THE WITNESS:  Yeah, so this is -- you

25   kind of said inputs into the software and I guess

1                    RAYMOND E. DiROSSI

2       I'm struggling what that means.  Like he would be

3       the resource -- when I didn't know how to use the

4       software to do things, he would help with that,

5       but that's not inputs.  So I don't know what you

6       mean by inputs into the software again.

7       BY MS. THOMAS-LUNDBORG:

8            Q.    Okay.  My question is, did he make

9       any substantive changes to the map while you

10      were working with him?

11           A.    None that I can recall.

12           Q.    Did he make any technical changes

13      to the map?

14                 MR. STRACH:  Objection.

15                 THE WITNESS:  Yeah, none that I can

16      specifically recall.

17      BY MS. THOMAS-LUNDBORG:

18           Q.    Mark Braden and John Morgan are

19      listed on a number of these entries together.

20      Did you understand that there was any

21      relationship between the two?

22           A.    I can't recall.

23           Q.    During your time working on

24      redistricting, did you ever talk to someone

25      named Adam Kincaid?

1          RAYMOND E. DiROSSI

2          A.    I -- excuse me, I exchanged emails

3    with him.

4          Q.    Okay.   And who was Adam Kincaid?

5          A.    I believe he was with the RNC,

6    RNCC.   I'm not exactly sure how many Cs.

7          Q.    Fair enough.   There are a lot of

8    Cs around.

9                And what was your understanding of

10   Adam Kincaid's job at the time?

11         A.    I guess I don't know what his job

12   was.   I mean, I know that he was somebody that

13   I could bounce ideas off of or exchange

14   information with.

15         Q.    And what kinds of ideas were you

16   exchanging with Adam Kincaid?

17         A.    Yeah, so as I mentioned in the

18   congressional redistricting, we were losing two

19   seats and we were having to significantly

20   change a number of the districts in the state

21   to accomplish those, and other -- other goals

22   that had been kind of set out.   And just we

23   were dealing with a lot of people that had to

24   be put into different districts and so it was

25   just a resource for me on how that might work.

1          RAYMOND E. DiROSSI

2               Q.   Okay.  Did you talk to him about

3    substantive lines at any point, changing a line

4    here or there?

5               A.   I don't know if we -- I don't know

6    about a line, but we talked about the

7    configuration of some districts, the

8    geographical configuration of the districts.

9               Q.   Did you talk about anything else

10   beyond geographical configuration of districts?

11              A.   Well, again, at any -- at any

12   point in any particular district there are a

13   number of factors that you might be looking at.

14   So in some instances there would have been

15   minority populations of the district, whether

16   those be African American populations or

17   Hispanic populations, population -- population

18   deviations, how many political subdivisions

19   were being split, how many counties were being

20   split, and, you know, all of those -- all of

21   those types of things.

22              Q.   Did you ever talk about partisan

23   makeup of districts with Mr. Kincaid?

24              A.   So now you're getting into where

25   -- the historical election data that we had

1          RAYMOND E. DiROSSI

2    available that I helped try to devise so that

3    everybody would use one set of numbers.

4    Everybody that we dealt with, especially when

5    you're talking about the redistricting and not

6    the apportionment, had their own methodology to

7    how to look at the historical election data,

8    and Adam was no different.

9          Q.   So you said Adam was no different

10   and everyone had a different kind of viewpoint.

11   What was your understanding of Adam Kincaid's

12   viewpoint at the time?

13              MR. STRACH:   Objection.

14              THE WITNESS:   With regards

15   specifically to --

16   BY MS. THOMAS-LUNDBORG:

17         Q.   With regards to your statement

18   that everyone had a different opinion about the

19   historical data and Adam was no different.

20         A.   Yeah.

21         Q.   What was your understanding of his

22   opinion?

23         A.   Yeah, so the one thing I learned

24   from the history of this whole -- whole process

25   from 2001 and through 2011 is that everybody

1          RAYMOND E. DiROSSI

2    had their own ideas of how to look at

3    historical political data or election data.

4    And we had put in place, or I had worked to try

5    to come up with a unified index, which were

6    five historical statewide races that could be

7    used to look at historical election results.

8              And Adam -- if you talk to any

9    member of Congress, if you talk to any member

10   of the press, if you talk to any member of the

11   legislature, if you talk to anybody, everybody

12   else seemed to have their own way of looking at

13   election data.  And so when I said Adam was no

14   different, they had their own way of

15   calculating historical election data that I

16   wasn't familiar with and am still not really

17   familiar with.

18        Q.    Okay.  So you mentioned this

19   unified index of five historical state

20   elections.  Is that something that you came up

21   with by yourself or did you come up with it in

22   conjunction with Ms. Blessing?

23        A.    Yeah, it was not something that I

24   did myself, although it's the same exact

25   process generally that we used in the previous

1            RAYMOND E. DiROSSI

2      decade where we came up with five statewide

3      nonjudicial races and we chose them to try to

4      determine the historical election results of

5      the state.

6                   And so in 2011 we identified five

7      races.  There were two that the Democrats had

8      won, statewide election results, there were two

9      that the Republicans had won, and there was one

10     that the Republicans won, but did not receive a

11     plurality of the votes.  And so we put them

12     altogether in what I called the unified index

13     and then we weighted it to 50/50.  And that was

14     -- that was my best guess of how to handle

15     historical election results.

16                   Q.   So in your answer you've

17     referenced we a few times.  By we, who do you

18     mean?

19                   A.   So it would have been Heather and

20     I.

21                   Q.   Did anyone else help put together

22     the index?

23                   A.   Yeah, we sought input from some

24     people who had more knowledge of historical

25     election results.

1          RAYMOND E. DiROSSI

2          Q.    And who were those people?

3          A.    Well, it was Vaughn Flasher.

4          Q.    And who is that?

5          A.    He was somebody who had been

6    involved in campaign activities in the state

7    for a long period of time.

8          Q.    And who did he work for at the

9    time?

10          A.    I think he had -- I think he had

11    his own business.  He had his own business.

12          Q.    And you said he was involved in

13    campaign activities in the state.  Do you know

14    if that was for Republicans or Democrats?

15          A.    It would have been -- well, some

16    of it was statewide campaigns that are

17    nonpartisan, so, I mean, I guess it all

18    depended on who at the time he was working for.

19          Q.    Were you aware of him working for

20    any Democrat at the time?

21          A.    Not to my knowledge.

22          Q.    Okay.  So you mentioned

23    Mr. Flasher, Ms. Mann -- Ms. Blessing, excuse

24    me.  Was there anyone else who helped work on

25    the indices issue?

1                    RAYMOND E. DiROSSI

2              A.    There was also somebody in the

3    House that had -- with similar background as

4    Vaughn did in the Senate, and I sought his

5    guidance was well.

6              Q.    And who was that?

7              A.    I knew you were going to ask that.

8    I just had it.   I'm sorry.   The name escapes

9    me.

10             Q.    Okay.   But you said similar

11   background.   Was that someone who also worked

12   with Republicans?

13             A.    Well, statewide campaigns, had a

14   knowledge of the history of elections in the

15   state, and if you were trying to come up with a

16   -- some type of way to measure historical

17   election results they would have good insight

18   to say use this race in it and don't use that

19   race.

20             Q.    And this person, to the extent

21   that you recall their background, did this

22   other person work for Democrats to your

23   recollection?

24             A.    I don't know.

25             Q.    If you do recall the name at any

1                RAYMOND E. DiROSSI

2    point --

3             A.   Sure, yes.

4             Q.   -- like if we go to lunch and we

5    come back, tell me.

6             A.   I'll blurt it out.

7             Q.   So going back to this everyone had

8    different opinions on how to put together the

9    political data, you mentioned that Mr. Kincaid

10   had a different opinion.

11            Do you recall anyone else having a

12   different opinion on how to put together the

13   historical data?

14            A.   Every member of the press that we

15   interacted with had their own ideas.  You

16   mentioned Mr. Slagle with OCAR, the Campaign

17   for Accountable Redistricting.  He had his own

18   methodology that he wanted to use.  Even some

19   of the Democratic members of Congress that we

20   were having conversations with, they had their

21   own scoring system that they used.  And, like I

22   said, literally everybody we talked to seemed

23   to have a different way of looking at

24   historical election results.

25            Q.   And so how did you ultimately

1                RAYMOND E. DiROSSI

2  decide which way you were going to adopt?

3               MR. STRACH:  Objection.

4               THE WITNESS:  So help me understand

5  which way we were going to adopt.

6  BY MS. THOMAS-LUNDBORG:

7        Q.   Well, you said you came up with a

8  unified historical index of five --

9        A.   Correct.

10       Q.   -- races and you've named some of

11 the people involved.  How did you determine

12 which five races you were going to select?

13       A.   We just decided that those were

14 the five best.

15       Q.   And what do you mean by best?

16       A.   Those were the five that would

17 represent historically statewide nonjudicial

18 election results.

19       Q.   Okay.  We may come back to this

20 subject a little bit later, but --

21       A.   Sure.

22       Q.   -- I would like to move on.  I am

23 -- if you could turn to the next exhibit.

24               (Thereupon, Plaintiffs' Exhibit

25 Number 14, Document Entitled Keep it Secret - Keep

1                 RAYMOND E. DiROSSI

2    it Safe, was marked for purposes of

3    identification.)

4    BY MS. THOMAS-LUNDBORG:

5              Q.   This is an exhibit that I'm having

6    marked as Exhibit 14.  This may be slightly

7    confusing in that it has an exhibit sticker on

8    it already.  It bears the number Exhibit 3 and

9    this is from the deposition that you priorly

10   took in Wilson v. Kasich.

11             A.   Okay.

12             Q.   At the top of the document it says

13   Keep it Secret, Keep it Safe.  Now, I've

14   mentioned you were shown this at a prior

15   deposition.  But prior to that deposition do

16   you recall having seen this document?

17             A.   So prior to the deposition seven

18   years ago had I -- do I recall having seen it?

19             Q.   Yes.

20             MR. STRACH:  Objection.

21             Go ahead and answer if you can.

22             THE WITNESS:  Yeah, I mean, I think

23   at my deposition I said that I did not recall this

24   document and then when I was asked to provide

25   records pursuant to the public records request I

1              RAYMOND E. DiROSSI

2    came across it and provided it.

3    BY MS. THOMAS-LUNDBORG:

4          Q.    Okay.

5          A.    And that was the first

6    recollection of seeing it.

7          Q.    And you said that you provided the

8    document as part of the public records request?

9    A.    Yes.

10         Q.    How did the document come to be in

11   your possession?

12             MR. STRACH:   Objection to -- when you

13   say document, it's my understanding this was part

14   of a larger presentation.   Are you referring

15   simply to this slide or the entire presentation?

16             MS. THOMAS-LUNDBORG:   I'm referring

17   to the slide that we're currently looking at.

18             MR. STRACH:   All right.   Go ahead and

19   answer it.

20             THE WITNESS:   Could you restate that,

21   please?   I'm sorry.

22   BY MS. THOMAS-LUNDBORG:

23         Q.    Yes.   So you said that as part of

24   the public records request you provided this

25   document.   How did the document come to be in

1              RAYMOND E. DiROSSI

2      your possession?

3              A.   It was emailed to me.

4              Q.   And do you recall who it was

5      emailed by?

6              A.   I do not recall.

7              Q.   Do you recall when it was emailed

8      to you?

9              A.   I do not.

10             Q.   Just going back to your question

11     -- to my question about who sent you the

12     document, if you could - and you can have this

13     version - turn to page 21, and I'm looking at

14     lines 4 through 6.  And you can read around it

15     if you want to just refresh your recollection

16     with what's being asked here.

17             A.   Okay.

18             Q.   Looking at your prior testimony,

19     does this refresh your recollection of who

20     would have forwarded the document to you?

21                  MR. STRACH:  Objection to the

22     document, but go ahead and answer it.

23                  THE WITNESS:  Yeah, I mean, I said

24     seven years ago in this deposition that I believed

25     the email was forwarded to me, and obviously I say

1          RAYMOND E. DiROSSI

2    by Heather, but sitting here today I don't have

3    that specific recollection.

4    BY MS. THOMAS-LUNDBORG:

5            Q.   Okay.  Going back to Exhibit 14,

6    at the bottom of the exhibit it says presenter

7    John Morgan.  Do you see that?

8            A.   I do.

9            Q.   Is it your understanding that's

10   the same John Morgan that we were previously

11   discussing?

12           A.   Yes, that would be my

13   understanding.

14               (Thereupon, Plaintiffs' Exhibit

15   Number 15, Document Bates Stamped DIROSSI_0000038,

16   was marked for purposes of identification.)

17   BY MS. THOMAS-LUNDBORG:

18           Q.   Okay.  Moving on, I would like to

19   look at an exhibit that I'm having marked as

20   Exhibit 15.  It's DIROSSI_38 for the record.

21   It is a calendar entry from August 30, 2011,

22   and the subject is Confirmed:  Meet with Tom

23   Whatman.  Do you see that?

24           A.   I do.

25           Q.   Who is Tom Whatman?

1          RAYMOND E. DiROSSI

2          A.   So he was - I don't know if he

3  still is, I assume not - somebody that was

4  close to the Speaker of the United States House

5  of Representatives, John Boehner.

6          Q.   And you said he was close to

7  Speaker Boehner.  Do you know what the

8  relationship was between Mr. Whatman and

9  Mr. Boehner?

10          A.   I don't.

11          Q.   And how did you know that -- or

12  what was your understanding of -- strike that.

13          Why do you say that he was close

14  to Speaker Boehner?

15          A.   He was another person who was a

16  resource or could -- you know, I could email

17  ideas to or he might email me ideas about the

18  congressional redistricting.

19          Q.   My question is, why did you say he

20  was close to Speaker Boehner?

21          A.   Just because he was the person --

22  if we wanted feedback, that's who I would have

23  emailed or --

24          Q.   And feedback --

25          A.   He either worked for him in his

1        RAYMOND E. DiROSSI

2  congressional office or he worked for him in

3  other capacities.

4           Q.   Okay.  And you said you would

5  email ideas to Mr. Whatman.  What type of

6  ideas?

7           A.   Again, so there were a lot of --

8  as we were going through this process, we were

9  confronted with a lot of big issues that we had

10  to work through.  The loss of two seats was a

11  significant challenge for us in reconfiguring

12  the districts.  We had a district in Northeast

13  Ohio that was represented by Congresswoman

14  Fudge who we wanted to make sure that the

15  district was drawn to her liking, so we were,

16  you know, communicating back and forth with her

17  and people around her.

18              There was also an intention to --

19  since we were losing two districts, we thought

20  -- or it was thought that we should absorb one

21  Republican incumbent and one Democratic

22  incumbent, and so there was a lot of

23  conversation about how that would happen.

24              There was also the desire among

25  some of the individuals, like Speaker

1              RAYMOND E. DiROSSI

2    Batchelder, for the first time in the state to

3    create a new district in Franklin County, as it

4    turned out, that could elect a second minority

5    member to Congress.

6              And so there were a lot of big,

7    big issues -- those were big issues that kind

8    of were the overarching concepts that we were

9    working through.  So I just said them in a

10   couple of rambling sentences, but those were

11   big deals, and so I was looking for a lot of

12   interaction and feedback and ideas on how to

13   achieve that.

14         Q.   And you requested interaction on

15   those ideas that you just listed from

16   Mr. Whatman?

17         A.   I don't recall if I specifically

18   asked for that, but those were a number of the

19   things we would have been talking about.

20         Q.   And those are the types of

21   conversations, to be clear for the record, that

22   you would have had with Mr. Whatman?

23         A.   I'm not saying exclusively, but

24   yes, that would have been --

25         Q.   And what was your understanding of

1                RAYMOND E. DiROSSI

2    why Mr. Whatman was involved in the

3    redistricting process?

4                MR. STRACH:  Objection.

5    BY MS. THOMAS-LUNDBORG:

6          Q.    Your understanding of why.

7          A.    I mean, the Speaker of the United

8    States House of Representatives was a

9    congressman from Ohio, and so President Niehaus

10   cared what his thoughts were.

11         Q.    So you said there was a concern

12   about what the speaker's thoughts were.  Was

13   there any concern about the thoughts of any

14   other sitting congresspeople at the time?

15               MR. STRACH:  Objection.

16               Answer if you know.

17               THE WITNESS:  Yeah, so --

18   BY MS. THOMAS-LUNDBORG:

19         Q.    You said that President Niehaus

20   was concerned with the speaker's thoughts on

21   redistricting, and my question is was there any

22   concern about any of the other sitting

23   congresspeople?

24         A.    Well, as I said, we were losing

25   two seats, so I think every member of Congress

1              RAYMOND E. DiROSSI

2    was eagerly anticipating what the legislature

3    was going to enact.

4              Q.   And did you have any conversations

5    with any of these people -- with any of the

6    sitting congresspeople?

7              A.   I would have talked to -- as we

8    previously mentioned, I had talked on a number

9    of occasions with Congressman Austria.

10             Q.   Okay.  Do you know who Steve

11   Strivers is?

12             A.   Yes.

13             Q.   And who is that?

14             A.   He is a former state senator and

15   he -- I don't know if at the time he was a

16   sitting member of Congress.

17             Q.   Okay.

18             A.   And he currently is a member of

19   Congress.

20             Q.   And which party is he from?

21             A.   He's a Republican.

22             Q.   And do you recall any

23   conversations with Steve Strivers at the time?

24             A.   In reviewing documents that I

25   submitted, I think there was an email from me

1             RAYMOND E. DiROSSI

2      to him, but I don't -- I don't recall

3      specifically sitting here without looking at it

4      what that was.

5             Q.   Okay.  Do you know who Jim Jordan

6      is?

7             A.   I do.

8             Q.   Who is Jim Jordan?

9             A.   He's a former state senator and a

10     current member of the Ohio Congressional

11     Delegation.

12            Q.   Did you have any conversations

13     with Jim Jordan?

14            A.   I do not believe so, no.

15            Q.   Okay.  Did you have any

16     conversations about Jim Jordan's district that

17     you recall?

18            A.   Well, I had -- as I said, we had

19     18, we were going to 16, so I would have had

20     conversations about every district because

21     every district had to change.

22            Q.   What about Steve Chabot, do you

23     know who that is?

24            A.   I do.

25            Q.   And who is that?

Page 128

1          RAYMOND E. DiROSSI

2          A.   He's a current member of the Ohio

3    Congressional Delegation.

4          Q.   And do you recall if he was a

5    member then?

6          A.   I don't recall.  That's a district

7    that had bounced back and forth between

8    Republicans and Democrats and I can't recall at

9    the time who was the sitting member.

10         Q.   Do you recall having any

11   conversations with Mr. Chabot about

12   redistricting?

13         A.   None that I recall.

14         Q.   Do you recall having any

15   conversations with anyone else that we haven't

16   mentioned about redistricting?

17              MR. STRACH:   Objection.

18   BY MS. THOMAS-LUNDBORG:

19         Q.   And by anyone else, I mean sitting

20   congresspeople.

21         A.   We had a lot of conversations with

22   Congresswoman Fudge, Marcy Kaptur, Joyce

23   Beatty, but --

24         Q.   Was Joyce Beatty in Congress at

25   that point?

Page 129

RAYMOND E. DiROSSI

1

2      A.   Yeah, she was not.  She is now,

3  but she was not at the time.

4      Q.   And you had conversations with

5  her?

6      A.   Yeah, I'm trying to remember --

7  I'm trying to remember your previous question.

8      Q.   My question is, at the time in

9  2011 do you recall having any conversations

10  with sitting congresspeople?

11      A.   No, none that I can recall right

12  now, other than what we've spoken about.

13      Q.   Okay.  And I don't think this was

14  clear on the record, so if we could just go

15  back to Exhibit 7.  This exhibit references a

16  call with now departed Congressman LaTourette.

17      Do you recall having any

18  conversations with Congressman LaTourette at

19  the time?

20      A.   No.  As I mentioned, just because

21  it says confirmed that means that I believe

22  that the call happened, doesn't necessarily

23  mean that I was part of it.

24      Q.   That's fair.  I'm asking a

25  separate question, which is do you recall

1          RAYMOND E. DiROSSI

2    having any conversation?  It doesn't have to be

3    the one in the calendar entry.

4          A.    Yeah, no, I do not.

5          Q.    Okay.  And then by conversation

6    I'm also referring to email.  If you could just

7    turn to tab 27.  I don't think I'm going to

8    enter it yet, but I just want to know if this

9    -- actually, it's not tab 27.  Sorry.  I will

10   tell you in a minute which tab it is.  Yeah,

11   37.  If you could turn to tab 37 for a second.

12         A.    Sure.

13         Q.    We'll enter it later.

14               Does this document refresh your

15   recollection of whether you had conversations,

16   either on phone or by email, with any other

17   sitting congresspeople?

18         A.    Yeah, this email -- I am not the

19   sender of this email so it does not -- it does

20   not refresh my recollection.

21         Q.    You were copied on this email,

22   though, correct?

23         A.    Yes.

24         Q.    And your email appears at the top

25   left corner, correct?

1          RAYMOND E. DiROSSI

2          A.    Yeah, so you asked if I had

3    conversations with other congress --

4          Q.    Or were part of conversations in

5    which they were involved.

6          A.    Oh, I understood that you asked if

7    I had conversations with them.

8          Q.    Were you part of any conversations

9    that we haven't discussed where you were

10   involved and other people were involved with

11   sitting congresspeople?

12         A.    I mean, if you're including are

13   there any instances where I was cc'd on an

14   email and that satisfies it, obviously you're

15   showing me an email that I assume is

16   legitimate.  So I was cc'd on this email.  I

17   don't recall it.

18         Q.    Okay.

19               MR. STRACH:  Can we take another

20   break?  We've been going another hour.

21               MS. THOMAS-LUNDBORG:  Do we want to

22   just break for lunch?

23               MR. STRACH:  Can we go off the record

24   and have that discussion?

25               THE VIDEOGRAPHER:  We're off the

1          RAYMOND E. DiROSSI

2    record.

3               (Lunch recess taken.)

4               THE VIDEOGRAPHER:  We're on the

5    record.

6               MS. THOMAS-LUNDBORG:  Thank you.

7    BY MS. THOMAS-LUNDBORG:

8          Q.   Good afternoon.

9          A.   Good afternoon.

10         Q.   So I would like to follow up on

11   some of the things that we spoke about earlier

12   this morning.

13         A.   Okay.

14         Q.   You mentioned having conversations

15   with Congressman Austria.  Do you recall that?

16         A.   I do.

17         Q.   What were the nature of those

18   conversations?

19         A.   So in House Bill 319, which was

20   the first map that was adopted by the General

21   Assembly, Congressman Austria and Congressman

22   Turner were put into one of -- the same

23   district.  As I had mentioned, the state was

24   losing two congressional districts and so we

25   needed to get rid of two, or absorb two -- not

1            RAYMOND E. DiROSSI

2    get rid of, but absorb two.

3                    In the first map House Bill 319,

4    Congressman Austria and Turner were both in a

5    district where roughly 50 percent of their old

6    district was in the new district, so basically

7    it would be a fair fight for them as they -- if

8    they both chose to run against each other.  In

9    House Bill 369 -- now, as you can imagine,

10   Congressman Austria, nor Turner, were excited

11   about that.

12                   But in 369, in order to get the

13   map through the legislative process, the

14   Democrats in the legislature specifically made

15   a number of requests to make changes to the map

16   in order to provide votes to support the new

17   map House Bill 369, and specifically the

18   request of the Montgomery County Democrats was

19   that all of Montgomery County be in the 10th

20   district.

21                   This obviously upset the

22   geographical balance being 50 percent from

23   Turner's old district and 50 percent of

24   Austria's old district, and so I was conveying

25   multiple times in multiple conversations with

Page 134

1          RAYMOND E. DiROSSI

2    Congressman Austria that, in order to get votes

3    from the legislative Democrats, that we were

4    going to adopt this request and it was changing

5    the district in a way that would not be

6    beneficial to him for his previous district;

7    and that that was a decision that the speaker

8    and the president had made in order to secure

9    votes from legislative Democrats, which we

10   ultimately did get a number of from the

11   Montgomery County delegation.

12              And so obviously I was relaying

13   that to Congressman Austria, that that change

14   had occurred and that decision had been made by

15   the speaker and the president, and that it

16   wouldn't be -- wouldn't be good for him.

17         Q.   Now, when you refer to speaker,

18   was that Speaker Batchelder?

19         A.   Batchelder (pronouncing), yes.

20         Q.   Batchelder, excuse me.

21         A.   Thank you for clarifying, yes.

22         Q.   Did you have any conversations

23   with Tom Whatman about the changes to

24   Congressman Austria's district?

25         A.   I don't recall any specific

                RAYMOND E. DiROSSI

1  conversations about that with Tom.

2       Q.   Did you have any conversations

3  with Adam Kincaid about changing Congressman

4  Austria's district?

5            MR. STRACH:  Objection.  Do you mean

6  throughout the entire process or as it relates to

7  this House 369 change?

8            MS. THOMAS-LUNDBORG:  Throughout the

9  whole process.

10           THE WITNESS:  Okay.  Could you repeat

11 it again?

12 BY MS. THOMAS-LUNDBORG:

13      Q.   Did you have any discussions with

14 Adam Kincaid about Congressman Austria's

15 district?

16      A.   None that I can specifically

17 recall exact conversations with him.

18      Q.   Did you have any emails, either

19 where you sent it, received it or were copied,

20 with Adam Kincaid about Congressman Austria's

21 district?

22      A.   None that I can recall

23 specifically here.

24      Q.   And did you have any emails where

1          RAYMOND E. DiROSSI

2    you either sent, received or were copied about

3    Congressman Austria's district with Tom

4    Whatman?

5          A.   None that I can specifically

6    recall sitting here.

7          Q.   Going back to President Niehaus,

8    you said that you received suggestions

9    throughout the process, not just in 369, from

10   him.  What were the nature of those

11   suggestions?

12         A.   So it was -- as I mentioned before

13   and mentioned the big -- the big pillars of

14   what the districts were going to look like,

15   losing two districts, trying to make sure the

16   11th congressional district of Northeast Ohio

17   was proposed in a certain way, these were --

18   those were conversations that he and I were

19   having about how -- what we were going to try

20   to do to achieve those.

21         Q.   And the same question for the

22   Speaker of the Ohio House.

23         A.   Yeah, I -- I worked more closely

24   with the president and the Senate so I don't

25   recall any specific conversations I had with

1           RAYMOND E. DiROSSI

2    the Speaker of the Ohio House on those topics.

3           Q.    And when the decision was made to

4    change Congressman Austria's district, was

5    anyone else involved in that decision besides

6    the president and the speaker that you recall?

7           A.    Well, the -- the genesis for the

8    change came from the legislative Democrats that

9    ultimately provided their votes to do it, so

10   that's where it would have originated.  So they

11   would have been involved because they were the

12   ones asking for the change.

13          Q.    And outside of those individuals,

14   the legislative Democrats, was anyone else

15   involved in that decisionmaking process?

16          A.    I can't recall the decisionmaking

17   process of who else would have been involved

18   other than the people I articulated.

19          Q.    So going back, I would like to go

20   to the kind of map drawing process --

21          A.    Sure.

22          Q.    -- and we've discussed a little

23   bit Ms. Blessing.  Do you recall when you first

24   met Ms. Blessing?

25          A.    I've known Heather a long time

1                    RAYMOND E. DiROSSI

2    before this process, but I cannot recall when I

3    first met her.

4              Q.    And then you said earlier this

5    morning that prior to you being retained you

6    had conversations with President Niehaus and

7    that you were talking about what was needed to

8    get redistricting done.

9                    What were the types of things that

10   needed to be done?

11             A.    We needed to figure out who was

12   going to be involved in the process, we needed

13   to have hearings of the legislative task force

14   on redistricting and demographic research, we

15   needed to make sure that there was money

16   available to both the Republican and Democratic

17   caucuses so that they could hire consultants,

18   buy equipment, purchase software.

19                   We needed to make sure that

20   Cleveland State University and Ohio University,

21   the ones that were contracted with to provide

22   the data to all of the State of Ohio, was

23   happening -- was happening in a timely manner

24   pursuant to that contract, and we had to start

25   thinking about - specifically on the

1          RAYMOND E. DiROSSI

2    congressional redistricting, since it is a bill

3    that the legislature would have to adopt - when

4    the legislature would have hearings, when the

5    legislature would have votes, and when they

6    could actually pass a bill.  Those types of

7    logistical issues.

8          Q.    Okay.  Now, you listed a number of

9    things.  Did any of those things happen before

10   August 1, 2011?

11         A.    Are you referring to conversations

12   about those or are you actually saying those --

13   did those specific things happen?

14         Q.    Did any of those specific things

15   happen before August of 2011?  Would you like

16   to take them in turn?

17         A.    Sure, that would be helpful.

18         Q.    Okay.  A decision about who would

19   be involved in redistricting?

20         A.    Well, and you're asking if a

21   decision on that happened before the contract

22   was put in place?

23         Q.    Yes.

24         A.    Well, so the contract made that

25   decision, so that kind of happened -- the

1        RAYMOND E. DiROSSI

2   contract kind of decided who were going to be

3   the hired people to do that.

4        Q.   Okay.  A decision about hearing

5   dates and when hearings would take place?

6        A.   I can't recall if that was -- was

7   finalized before or after.

8        Q.   A decision about money to the

9   caucuses?

10       A.   I don't recall.  You provided some

11  documents that had dollar amounts and

12  supplemental dollar amounts.  I'm not sure I

13  understand those timelines yet fully.

14       Q.   Okay.  A decision about Cleveland

15  State's provision of data?

16       A.   That, the decision to hire

17  Cleveland State and OU, who also provided the

18  data and were the contractors in '01, had been

19  made prior to my contract being signed in

20  August.  Well before, years before.

21       Q.   Okay.  But you had decisions (sic)

22  about that in 2011 with the president?  You had

23  conversations with the president about that in

24  2011?

25       A.   Well, those conversations in 2011

1          RAYMOND E. DiROSSI

2     would have been about the ongoing whether or

3     not they were going to meet their timelines and

4     contractual obligations, but the decision to

5     hire them had happened many years before.

6          Q.    And those -- the conversations

7     about whether they were going to meet their

8     timeline, did that happen before August?

9          A.    I couldn't say specifically.

10    Those happened over a long period of time,

11    maybe -- I can't recall the specific

12    conversations.

13          Q.    And then the decision about when

14    the legislature -- the House and the Senate

15    would actually have the map, did those

16    conversations happen before August?

17          A.    There were conversations about it,

18    but I do not believe a decision would be made

19    -- was finally made.

20          Q.    Okay.  Now, we discussed Maptitude

21    earlier this morning.  Did you get licenses to

22    use Maptitude?

23          A.    We did.

24          Q.    Were there -- was there one

25    license or was there more than one?

1          RAYMOND E. DiROSSI

2          A.   I don't specifically recall.  I

3    don't specifically recall how the licenses were

4    done.  I don't recall.

5          Q.   Okay.  You mentioned that you

6    worked in Maptitude, Ms. Blessing worked in

7    Maptitude and you said Troy Judy also worked in

8    Maptitude?

9          A.   (Witness nodded head up and down.)

10         Q.   And so to Troy Judy, was he

11   actually in the software changing district

12   lines or what was the nature of his

13   involvement?

14              MR. STRACH:  Objection.

15              THE WITNESS:  Yeah, he would be

16   better to answer that.

17   BY MS. THOMAS-LUNDBORG:

18         Q.   Well, do you recall whether he was

19   changing district lines or not?

20         A.   I don't recall.

21         Q.   When it came to the map, where was

22   the map drawn?  And let's first start with 319.

23   Where was that drawn?

24         A.   Well, the computers that we had

25   purchased through the legislative task force

1          RAYMOND E. DiROSSI

2    were the computers at which Heather and I spent

3    our time.  So on those computers would have

4    been the -- where we were putting together the

5    proposed districts.

6              Q.   And where were those computers

7    located?

8              A.   In our office.

9              Q.   And where was your office?

10             A.   The office was at the DoubleTree

11   hotel.

12             Q.   Okay.  And why did you decide to

13   put your office in the DoubleTree hotel?

14             A.   Yeah, it's actually the same place

15   that the previous decade we had chosen.  It

16   came from my experience the previous decade, as

17   we talked about, when I worked for the House.

18   The redistricting and apportionment process is

19   very unique to the State of Ohio, it's unique

20   to every state, and it happens once every

21   decade.  And the amount of time and the hours

22   that I knew that we would need to put into this

23   process, I did not feel that in the Ohio House

24   or in the Senate there was office space that

25   would be conducive to that environment.

Page 144

1            RAYMOND E. DiROSSI

2            Specifically having been the

3   budget director in the House in the summer when

4   we were doing budgets, I know that after about

5   6:00 every day the Ohio Building Authority

6   turns off the air-conditioning, and if you want

7   to run air-conditioning on a floor you have to

8   pay about $300 an hour to run air-conditioning.

9            And so we looked at trying to find

10  office space in the Riffe Center or in the

11  Statehouse and we just did not feel that,

12  either in 2001 or in 2010, that that was

13  conducive to that -- the needs that we had.

14  So we looked for office space on Capitol Square

15  that we could use and that's how we made the

16  decision both decades to use the DoubleTree.

17      Q.    Okay.    At different points in your

18  answer you said you and we.    Who participated

19  in the decision to have the office at the

20  DoubleTree?

21      A.    In this decade, Heather and I were

22  the ones that went and looked at -- those are

23  the people that I remember, we went and looked

24  at what the offices would look like and to see

25  if it would be conducive to what our needs

1              RAYMOND E. DiROSSI

2      were.

3                    (Thereupon, Plaintiffs' Exhibit

4      Number 16, Document Bates Stamped LWVOH_00018254,

5      was marked for purposes of identification.)

6      BY MS. THOMAS-LUNDBORG:

7              Q.    Okay.  I would like to show you an

8      exhibit that I'm having marked as Exhibit 16.

9      It has Bates number LWVOH_18254.  Do you see

10     that?

11             A.    I do.

12             Q.    Okay.  And at the top it says

13     DoubleTree Suites and Invoice.  Do you see

14     that?

15             A.    I do.

16             Q.    And under the name of the

17     customer, the name is Mr. DiRossi.  Do you see

18     that?

19             A.    I do.

20             Q.    Is that your name?

21             A.    It is.

22             Q.    Do you recall being the one who

23     was responsible for getting the room at the

24     DoubleTree?

25             A.    I mean, my name is on the invoice.

1       RAYMOND E. DiROSSI

2       I remember talking to Carrie, who was the

3       coordinator for long-term stays, and I

4       obviously was the one who signed the invoice.

5              Q.    Okay.   And here the date is under

6       miscellaneous, 7/12/2001 (sic).   Do you see

7       that?

8              A.    Yes.

9              Q.    Do you recall getting the room, at

10      least in place, for the DoubleTree in early

11      July of 2011?

12             A.    Yes.

13             Q.    And then if we look at the first

14      line of quantity, it says one room, guest room,

15      July 17th through October 15th, 2011.   Do you

16      see that?

17             A.    I do.

18             Q.    Do you recall having the room from

19      July 17th through October 15th, 2011?

20             A.    I do.

21             Q.    Do you recall who had keys to the

22      hotel room?

23             A.    I know for sure that I had a key

24      and I know that Heather had a key, and beyond

25      that, I do not recall.

1      RAYMOND E. DiROSSI

2        Q.   If you could look at page 26 of

3   your prior deposition, and I'm looking at the

4   answer that starts at line 10.  If you could

5   read that and let me know if that refreshes

6   your recollection regarding who had keys to the

7   hotel room.

8        A.   You want me to read it?

9        Q.   You don't have to read it for the

10  record.  You can just read it to yourself and

11  tell me if that refreshes --

12       A.   I didn't know if you wanted me to

13  read it out loud or -- thank you.

14            Okay, I've read it.

15       Q.   Does that refresh your

16  recollection regarding who had keys to the

17  hotel room?

18       A.   Well, yeah, it definitely confirms

19  that Heather and I had swipe cards or keys and

20  then I also say I think other -- a couple other

21  people had keys as well.

22       Q.   Okay.  And who were the other

23  people who had keys?

24       A.   Yeah, so sitting here today I'm

25  not sure I can remember specifically if they

1          RAYMOND E. DiROSSI

2     had keys or not.

3          Q.    Okay.

4          A.    So did that answer your question?

5     I'm sorry.

6          Q.    That answers it.   Let me just ask

7     some names.

8          At any point did -- at any point

9     did the minority leader for the House have keys

10    to the hotel room?

11         A.    No.

12         Q.    At any point did anyone on the

13    minority leader's staff have keys -- and by

14    minority leader I'm just talking about House,

15    have keys to the hotel room?

16         A.    No.

17         Q.    At any point did the minority

18    leader of the Senate have keys to the hotel

19    room?

20         A.    No.

21         Q.    At any point did a member of the

22    minority leader's staff have keys to the hotel

23    room?

24         A.    No.   I should be saying not to my

25    knowledge.   I didn't -- I did not personally

1              RAYMOND E. DiROSSI

2     give any of the people you named keys.  But as

3     I mentioned, there were a few other keys, so I

4     mean, I guess I should be clear that somebody

5     else could have given them one, but I did not.

6          Q.   Did you ever see any of the

7     individuals that we just named in the hotel

8     room?

9          A.   No.

10         Q.   Did anyone who could be identified

11    as a Democrat have a key to the hotel room?

12              MR. TUCKER:  Objection to form.

13              THE WITNESS:  Yeah, I mean, I've

14    listed the two people that I know for sure had

15    keys, in my previous deposition I mentioned two

16    other people that might have.  Other than that, I

17    don't -- I don't know if they at any time would

18    have given keys to other people.  I don't know.

19    BY MS. THOMAS-LUNDBORG:

20         Q.   Did you ever see anyone who could

21    be identified as a Democrat in the hotel room?

22         A.   I did not.

23              (Thereupon, Plaintiffs' Exhibit

24    Number 17, Document Bates Stamped DIROSSI_0000051,

25    was marked for purposes of identification.)

1        RAYMOND E. DiROSSI

2    BY MS. THOMAS-LUNDBORG:

3        Q.    Okay.   I'm going to have marked as

4    Exhibit 17 DIROSSI_51, and the subject is

5    Confirmed:   Meet with Niehaus at the bunker,

6    location is redistricting office, and it's

7    September 15th, 2011.   Do you see that?

8        A.    I do.

9        Q.    What is the bunker?

10        A.    Well, that was just the name that

11    I gave the redistricting office.   As you just

12    read in the email, I referred to the DoubleTree

13    hotel by a number of names, including

14    redistricting office and many other things.

15        Q.    And so you were responsible for

16    the name bunker?

17        A.    Yes.

18        Q.    And how did you come up with that

19    name?

20        A.    Sorry.   The previous decade, 2001,

21    that is actually where I was on September 11th

22    working on the 2001 apportionment, and I

23    referred to it, as -- as there was so much

24    happening in the country and the state, as a

25    bunker, and so I used that term again the next

1          RAYMOND E. DiROSSI

2    decade.

3               But as you can see, I referred to

4    it as the hotel, I referred to it as the

5    office, I referred to it as the redistricting

6    office, I referred to it as off site, I

7    referred to it as bunker on occasions.  I mean,

8    I referred to this physical place by a number

9    of names.

10         Q.   Understood.

11              (Thereupon, Plaintiffs' Exhibit

12    Number 18, Document Bates Stamped DIROSSI_0000051,

13    was marked for purposes of identification.)

14    BY MS. THOMAS-LUNDBORG:

15         Q.   I would like to change to Exhibit

16    18.  So this, again, it's going to be a little

17    confusing because this already has an exhibit

18    sticker 17.  The exhibit sticker is from your

19    prior deposition.  It's also a number of

20    documents put together that I did not

21    disaggregate since they were put together in

22    that deposition.  And so let's start with the

23    first document, but we'll go through all three

24    hopefully very quickly.

25              Do you see that this first

1          RAYMOND E. DiROSSI

2    document on -- I'll just say the first page of

3    the exhibit since there are different page

4    numbers at the bottom, an email that's from

5    line is RayDiRossi@Gmail.com?

6          A.    Yes.

7          Q.    Is that your email address?

8          A.    RayDiRossi@Gmail.com?

9          Q.    Yes.

10         A.    Yes, it is.

11         Q.    Okay.  And the email is to a

12   Clinton Morefield.  Do you see that?

13         A.    I do.

14         Q.    Who is that?

15         A.    He at the time was the -- either

16   the IT or the -- the IT person for the Ohio

17   Senate.

18         Q.    Okay.  And then the other person

19   that this is to is Heather Mann.  We've

20   discussed her, but do you recognize that email

21   address, HeatherMann@Gmail.com?

22         A.    Yes.

23         Q.    And was that Heather Mann's, now

24   Heather Blessing's, Gmail address?

25         A.    At least at the time it was one

1              RAYMOND E. DiROSSI

2    that I used for her, yes.

3              Q.   Okay.  The email then copies a Jon

4    Cook.  Do you see that?

5              A.   I do.

6              Q.   Who is that?

7              A.   He would be the IT director - I'm

8    sure I'm getting his title right - him, along

9    with Clint, of the Ohio House.

10             Q.   Okay.  And then in the text of the

11   email you say, We're at the actual hearing at

12   2:30 in Senate finance.  We'll be back at the

13   bunker later today after the hearing is over.

14   Do you see that?

15             A.   I do.

16             Q.   Let's turn to the next page.

17   Again, this was put together by prior counsel,

18   so you can't blame me for that.  Do you see in

19   the top right corner your email address?

20             A.   We're looking at this one?

21             Q.   Yes, we are.

22             A.   Yes, I do.

23             Q.   Okay.  And then do you see in the

24   -- what seems to be the from line your email

25   address?

1              RAYMOND E. DiROSSI

2          A.    Yes.

3          Q.    And then the email to Matt

4    Schuler, do you see that?

5          A.    I do.

6          Q.    And who was Matt Schuler?

7          A.    He was the chief of staff in the

8    Senate at the time.

9          Q.    Okay.   And then the text of the

10   email says, I'm free all day today at the

11   bunker.  Do you see that?

12         A.    I do.

13         Q.    Moving to the next page --

14         A.    This is the same email that refers

15   to -- the headline and subject of the email is

16   Meeting Tuesday at the Redistricting Office.

17   So again, this is -- the meeting was at the

18   redistricting office and it was me just calling

19   it by another name in the body of the email.

20         Q.    I see that.

21               Going to the next page, do you see

22   your email in the top right corner of this

23   document?

24         A.    Yes.

25         Q.    And then it looks like your email

Page 155

RAYMOND E. DiROSSI

1

2 is in the from line. Do you see that?

3     A. My email is in the from line.

4 Okay. I see that.

5     Q. Okay. And this is to a

6 Vaughn@CapitalStrategiesGroup.com. Do you see

7 that?

8     A. I do.

9     Q. Who is Vaughn?

10     A. Vaughn Flasher, who we mentioned

11 earlier.

12     Q. And Vaughn Flasher, you said,

13 helped put together the indices?

14     A. He helped provide guidance on what

15 statewide nonjudicial election races might be

16 good to use for putting together historical

17 election data.

18     Q. And did Vaughn Flasher have any

19 other involvement in redistricting?

20     A. None that I recall. None that I

21 recall here.

22     Q. Okay. And then Matt Schuler is

23 copied here; is that correct?

24     A. That's true.

25     Q. And that's the same Matt Schuler

1          RAYMOND E. DiROSSI

2    we just referenced?

3          A.   Yes.

4          Q.   And then just going down -- so

5    there's the top email and there's another email

6    below it, so I'm going to focus on that, with

7    all the same people involved.  And then it

8    says, I am meeting with Senator Manning at the

9    bunker today at 3:30 p.m. today if the Senate

10   session is over.  Do you see that?

11         A.   I do.

12         Q.   So now we've looked at three

13   different emails to various individuals where

14   you've used the term bunker; is that correct?

15         A.   Yes.

16              MR. STRACH:  Objection.

17   BY MS. THOMAS-LUNDBORG:

18         Q.   Was the term bunker commonly used

19   during that period?

20         A.   I think, as I said, I referred to

21   this office by a number of names.  I just kind

22   of used them interchangeably.

23         Q.   Well, you didn't define the term

24   bunker in any of the emails that we looked at,

25   did you?

1          RAYMOND E. DiROSSI

2          A.   I don't know what you mean by

3    define it.

4          Q.   Well, did you say in any of the

5    emails I'm at the bunker, aka the redistricting

6    office?

7          A.   Well, I mean, like in the email we

8    just looked at, the subject is Tuesday at

9    Redistricting Office and then I say I'll be

10   over in the bunker --

11         Q.   Okay.  What about the --

12         A.   -- so I'm using them

13   interchangeably.

14         Q.   What about the first document, do

15   you refer to the redistricting office here?

16         A.   Are you looking at 18 or 17?

17         Q.   17.  I mean, it is our Exhibit 18,

18   but it has the 17 sticker on it.  But I'm

19   looking at this email to Clint Morefield,

20   Heather Mann and Jon Cook.  Do you refer to the

21   redistricting office in this email?

22         A.   I don't see that I did in this

23   particular instance.

24         Q.   Okay.  Going to the last page of

25   the exhibit, do you refer to the redistricting

1            RAYMOND E. DiROSSI

2      office in this email?  This is the email to

3      Vaughn and Matt Schuler.

4            A.    I did not.

5            Q.    Okay.  So we've talked about who

6      had keys to the hotel room.  Who actually

7      visited the hotel room to your recollection?

8            A.    You're specifically asking about

9      the congressional redistricting process?

10           Q.    Yes, or whoever visited the hotel

11     room at the time.

12           A.    Dave Yost, who was I believe the

13     auditor, was there, President Niehaus was

14     there, Speaker Batchelder, obviously Heather

15     and I and Troy were there.

16           Q.    What about Matt Schuler, was he

17     there?

18           A.    I don't recall if Matt was ever

19     there.  I can't recall.

20           Q.    What about Tom Whatman?

21           A.    I can't recall if Tom was ever

22     there.

23           Q.    What about Adam Kincaid?

24           A.    I cannot recall if he was ever

25     there.

1          RAYMOND E. DiROSSI

2          Q.   Was anyone else on President

3     Niehaus' staff at the hotel room?

4          A.   Clarify for me what you mean by

5     President Niehaus' staff.

6          Q.   Anyone who worked with President

7     Niehaus.

8          A.   Okay.  I do believe, from this

9     previous email, that Clint Morefield came over

10    to help us install the plotter so that we could

11    print and he would have been a member of the

12    Senate staff.  Other than that, I cannot recall

13    anybody specifically who would have been there.

14         Q.   Okay.  What about anyone on the

15    Speaker of the Ohio's House staff?

16         A.   I'm trying to remember - this was

17    so long ago - of who was actually members of

18    the staff at the time.  Nobody comes to mind.

19         Q.   Okay.  What about anyone on the

20    Governor's staff?

21         A.   Beth Hansen was there at least on

22    one occasion where I was present.

23         Q.   What about anyone on the auditor's

24    staff?

25         A.   Other than I mentioned the auditor

1          RAYMOND E. DiROSSI

2    himself, I do not recall any members of his

3    staff.

4              Q.    What about the Secretary of State?

5              A.    The Secretary of State was there

6    once personally, but I cannot remember any

7    members of his staff being present.

8                    And again, I just would maybe

9    point out, a lot of these -- I kind of fell

10   into the trap.   A lot of these are

11   apportionment and are not redistricting, so I

12   apologize if I jumped back and forth there.

13   The Governor, the auditor, the Secretary of

14   State are apportionment board members, and so

15   in many instances when I was referring to them

16   being there, they weren't there to have

17   anything to do with redistricting, they were

18   there for apportionment.   Apologies.

19             Q.    Okay.   Fair enough.

20                   What about Mark Huffman?

21             A.    Mark Huffman?

22             Q.    Do you know who Mark Huffman is?

23             A.    That name does not sound familiar.

24             Q.    Do you recall there was a Mark

25   Huffman in the Ohio House at the time?

1                RAYMOND E. DiROSSI

2          A.   As a state representative?  That

3  name is not familiar.

4          Q.   Do you recall who the sponsor of

5  319 was?

6          A.   I think I do, but it's not Mark

7  Huffman, no.

8          Q.   Who is the sponsor that you're

9  thinking of?

10         A.   I don't want to -- I don't want to

11  guess.  I don't want to guess.

12         Q.   Okay.  Oh, sorry.  I've been

13  corrected.  Do you know a Matt Huffman?

14         A.   Oh, state -- current state

15  senator, former state representative, okay,

16  yes, I do know Matt Huffman.

17         Q.   Okay.  And was Matt Huffman ever

18  at the hotel room?

19         A.   None that I can specifically --

20  not that I can specifically recall.

21         Q.   And was Matt Huffman the sponsor

22  of 319?

23         A.   I believe he was, yes.

24         Q.   And was Matt Huffman --

25         A.   In fact, he was, he was.

Page 162

                    RAYMOND E. DiROSSI

1

2          Q.    And was Matt Huffman the sponsor

3    of 369?

4          A.    I don't know for sure.  I can't

5    speak to that.

6          Q.    Okay.  Do you know a Keith Faber?

7          A.    I do.

8          Q.    And who is Keith Faber?

9          A.    He was a state senator at the

10   time.

11         Q.    And was Keith Faber ever at the

12   hotel room?

13         A.    Yes, he was.

14         Q.    And how many times?

15         A.    I couldn't tell you specifically

16   how many times.

17         Q.    Okay.  Was it more than once?

18         A.    Yes.

19         Q.    And was Keith Faber the Senate

20   sponsor of the bill?

21         A.    I can't answer that.  I don't know

22   whether that senator sponsored the bill or not.

23         Q.    Did he sponsor the bill in the

24   Senate?

25         A.    I can't answer that.  I don't

1          RAYMOND E. DiROSSI

2    know.  I don't know.

3          Q.   Okay.  Did you work on the Senate

4    legislative process in your role?

5          A.   Can you help me understand the

6    Senate?  You mean --

7          Q.   Did you work on the bill, any of

8    the processes or procedures of getting the bill

9    moved through Senate?

10         A.   Very -- very little.  Like I said,

11   my role was to work to get the districts put

12   together in a legislative form so that it could

13   go through the legislative process.  Once that

14   started with 319 and 369, I didn't have really

15   much of a role.

16         Q.   Okay.  Was John Morgan ever at the

17   hotel room?

18         A.   I can't recall if he was ever

19   physically there.

20         Q.   Was Mark Braden ever in the hotel

21   room?

22         A.   Yes.

23         Q.   And how many times?

24         A.   I don't recall a specific number

25   of times.

Page 164

1           RAYMOND E. DiROSSI

2           Q.    More than once?

3           A.    Yes.

4           Q.    And then you mentioned that Troy

5    Judy was there and working on the maps.  Do you

6    recall how many times he was at the hotel room?

7           A.    In terms of a specific number, I

8    do not.

9           Q.    Was it more than once?

10          A.    Yes.

11          Q.    And in this hotel room, just so

12   the record is clear, did you work on both the

13   redistricting congressional map and the

14   apportionment map for the Ohio legislature?

15          A.    Yes.

16          Q.    Okay.

17          A.    But if I could clarify that --

18          Q.    Sure.

19          A.    -- as we talked about earlier, not

20   exclusively, because there were two maps, 319

21   and 369, and by the time 369 was moving through

22   the legislature we were no longer in the

23   redistricting office.

24          Q.    Okay.  Where were you when 369 was

25   being worked on?

1      RAYMOND E. DiROSSI

2          A.    In the Statehouse.

3          Q.    Okay.  And where in the

4    Statehouse?

5          A.    In the Senate annex building.

6          Q.    And was that room available when

7    you were working on 319?

8          A.    I don't -- no, it was not.

9          Q.    And why wasn't it available?

10          A.    It was housing all of the public

11    records documents from the previous decades and

12    they all had to be moved out to make room.

13          Q.    And when were those moved?

14          A.    I don't recall the specific

15    timeline.

16          Q.    Was it your understanding that

17    those were moved specifically so you could use

18    that room?

19          A.    Yes.

20          Q.    Okay.  Regarding the hotel room,

21    did you go to the hotel room every day when you

22    were working on the map?

23          A.    No.

24          Q.    How often were you in the hotel

25    room?

1          RAYMOND E. DiROSSI

2          A.   Often.

3          Q.   Was it a few times a week, once a

4    week?

5               MR. STRACH:  I'm just going to object

6    and ask if you will clarify, when you say the map

7    do you mean the legislative map or the

8    congressional map?

9               MS. THOMAS-LUNDBORG:  I'm talking

10   about the congressional map.

11              THE WITNESS:  And your question was

12   how often did I --

13   BY MS. THOMAS-LUNDBORG:

14          Q.   How often were you in the hotel

15   room?  During --

16          A.   Often.

17          Q.   During a given week, how many

18   times were you in the hotel room?

19              MR. STRACH:  Objection.

20              THE WITNESS:  It would depend on the

21   week.  I mean, there were some weeks when we

22   weren't there a lot and there were other weeks

23   where we were there every day.  It would vary

24   depending on the --

25   BY MS. THOMAS-LUNDBORG:

1          RAYMOND E. DiROSSI

2          Q.   And when you say we were there

3    every day, who would be there if you were there

4    every day?

5          A.   I'm referring to Heather and I.

6          Q.   Was anyone else in the hotel room

7    as often as you were?

8          A.   No, other than Heather.

9          Q.   When you went to the hotel room,

10   how long would you be in there typically?

11         A.   Well, typically is -- nothing

12   about this was typical, so it was very extended

13   periods of time.  I'm sorry, do you have --

14   what is the question?

15         Q.   The question was how long would

16   you be in the hotel room when you were there?

17         A.   I mean, a long time.

18         Q.   And what is your definition of a

19   long time since everyone will define it

20   differently?

21         A.   Well, I'm sure there were times

22   with -- other than going out for lunch or

23   dinner, that I was there 24 hours straight, and

24   I'm sure there were other times when I wasn't

25   there for any time during a 24-hour period.

1          RAYMOND E. DiROSSI

2          Q.    And other than Heather Mann, was

3     anyone in the hotel room for an extended period

4     of time, like 24 hours?

5          A.    I would -- I would say Heather and

6     I were the two -- the two people that were

7     there the most --

8          Q.    And how --

9          A.    -- on that question.

10          Q.    I'm sorry.   How many computers did

11     you have to work on while you were there?

12          A.    Three.

13          Q.    And how often were three people

14     working on the computers at any given time?

15          A.    How do you want me to quantify

16     that?   I mean --

17          Q.    You could say once a week, twice a

18     week, three times a week.

19          A.    It varied so -- it varied so much,

20     I mean, I don't know if I could pin that down

21     specifically.

22          Q.    Okay.   Who else used the computers

23     in the hotel room?

24          A.    I had a computer that I used,

25     Heather had a computer that she used, and then

1        RAYMOND E. DiROSSI

2   there was another computer that was there as

3   needed, that Troy probably -- Troy Judy would

4   have used when he was there.

5          Q.    Did anyone other than Troy Judy

6   use the third computer?

7          A.    Not to my knowledge.

8          Q.    Other than the computer, did you

9   have other equipment installed at the hotel

10   room?

11          A.    We had a plotter.  We had a

12   plotter so that we could print maps in color so

13   that the legislative leaders could share those

14   maps with who they wanted to share maps with.

15   We had a network -- we had a networking switch

16   that allowed the computers to be connected

17   directly, and, you know, that was the extent of

18   the equipment.

19          Q.    Were the computers connected to

20   the worldwide web?

21          A.    They were not.

22          (Thereupon, Plaintiffs' Exhibit

23   Number 19, Documents Bates Stamped

24   DIROSSI_0000139-0000141, was marked for purposes

25   of identification.)

Page 170

RAYMOND E. DiROSSI

BY MS. THOMAS-LUNDBORG:

Q. I would like to show you a document that I'm having marked as Exhibit 19, and for identification the first page is DIROSSI_139. And I'm going to skip the first page, we'll come back to that. If you could move to the second page of the document, please.

And at the top of the second page it says Congressional Redistricting Timeline. Do you see that?

A. I do.

Q. The first entry is Wednesday, July 20th, 2011. Do you see that?

A. I do.

Q. And let me first ask you -- actually, let me strike the last question.

Do you recognize this document?

A. I do.

Q. Is this a document you created?

A. It is.

Q. Okay. And why did you put this document together?

A. Which piece of it are you

1          RAYMOND E. DiROSSI

2    referring to?

3          Q.   Well, let's deal with this second

4    page.  Why did you put the second page

5    together?

6          A.   As we had talked about, one of the

7    things that I was concerned about were the

8    logistical and the timelines for producing --

9    the legislature to produce a -- pass a bill

10   that would become the congressional districts,

11   and so this was just putting on paper some of

12   those timelines, including some of the proposed

13   dates where the legislators would be traveling

14   the state to get public input.

15         Q.   Okay.  So the first entry, it

16   looks like, was July 20th, 2011; is that

17   correct?

18         A.   It appears to be, yes.

19         Q.   So does this document predate July

20   20th, 2011?

21         A.   I don't recall specifically when I

22   made it.

23         Q.   Okay.  The first entry is a series

24   of two meetings, one is 9:00 a.m. to 12:00 p.m.

25   in Columbus, and then 3:00 p.m. to 6:00 p.m. in

1           RAYMOND E. DiROSSI

2     Zanesville.  What were these meetings?

3                A.    These were the five locations and

4     dates for the public hearings that the Senate

5     committee on redistricting was going to be

6     having.

7                Q.    Okay.  The first meeting is July

8     20th, 2011.  To your knowledge was there a

9     draft map at that point?

10               A.    So when you say -- help me

11    understand a draft map.  What does that mean?

12               Q.    Had anyone started to put together

13    a map at that point?

14               A.    Well, I can't speak for did

15    anyone.  I did not.

16               Q.    Okay.  Had you seen a draft map at

17    that point?

18               A.    I don't recall if I had seen

19    anybody else's ideas on July 20th.

20               Q.    Do you know whether any maps were

21    shared at this July 20th meeting?

22               A.    I honestly can't tell you if I

23    attended these.  I don't recall.

24               Q.    You don't recall whether you

25    attended them?

1          RAYMOND E. DiROSSI

2          A.   I don't recall.

3          Q.   Okay.  We'll start with this one.

4     And we can go through a number of these, but

5     I'll try to keep the number as low as possible.

6     So I'm not entering it in the record.  It's

7     just to refresh your recollection.  It's a

8     document, DIROSSI_2225 that you produced to us.

9               Does this document refresh your

10    recollection about whether you attended any of

11    these hearings?

12         A.   It does not.

13         Q.   Okay.  I'm showing you another

14    document that is DIROSSI_147, again I'm not

15    entering it, and it's the announcement of the

16    committee hearings.  Does this document refresh

17    your recollection about whether you attended

18    any of the hearings?

19         A.   It does not.

20         Q.   Okay.  I'm showing you a document,

21    it's marked DIROSSI_00020.  It is a witness

22    information form from 7-20-11, Jim Slagle.  It

23    appears to correspond with one of the hearings.

24    Does this document refresh your recollection?

25               MR. STRACH:  And just to be clear,

Page 174

1           RAYMOND E. DiROSSI

2    it's actually DIROSSI_202.

3              MS. THOMAS-LUNDBORG:  Oh, sorry, 202.

4              THE WITNESS:  No, it does not.

5    BY MS. THOMAS-LUNDBORG:

6         Q.   Okay.  I think this will be the

7    last.  Sorry, I'm just looking for one other.

8    I'll just add one more document, I think.  So

9    I'll just represent -- I have a number of

10   these, but I'll just hand you one now.

11             This is a calendar entry and there

12   are calendar entries corresponding with all of

13   the hearings listed here.  Does this document

14   refresh your recollection about whether you

15   attended the hearings?

16        A.   No.  As I said before, just

17   because it says confirmed just meant that I --

18   the hearing was happening, not that I was

19   necessarily attending.

20        Q.   Okay.  Were you aware of the

21   hearings as they were happening?

22        A.   I was -- I was aware that the

23   hearings were going to be held.

24        Q.   Okay.  Did you get any feedback,

25   if you didn't attend the hearings, about what

1           RAYMOND E. DiROSSI

2     happened at each hearing?

3           A.   I don't -- I don't recall.  I

4     mean, Jim Slagle with the Ohio Campaign for

5     Accountable Redistricting and I had a couple of

6     conversations throughout this process and I'm

7     sure he would have articulated his --

8     reiterated some of the points of his testimony.

9     But other than that, I don't have any specific

10    recollection.

11          Q.   Okay.  Do you recall why you held

12    on to so many documents related to the hearing?

13          A.   Because having been through this

14    the decade before, I knew that lawsuits would

15    be coming and they were public records, and so

16    I kept a lot of this stuff.

17          Q.   To your knowledge did any of the

18    feedback from the hearings make it into

19    anything that you worked on?

20          A.   Well, and not to mix, but in the

21    apportionment map, absolutely, and in the

22    congressional map, I don't -- since I can't

23    recall specifically if I got that feedback

24    directly at the hearings, I mean, I couldn't

25    recall a specific instance.

1          RAYMOND E. DiROSSI

2               A lot of the feedback that we were

3     getting about -- again, apologies, we're

4     dealing with the legislative process for the

5     congressional map as opposed to the

6     apportionment process with the apportionment

7     board.  A lot of the feedback that we were

8     getting on the congressional map revolved

9     around requests by Democrats in the Ohio House

10    and the Ohio Senate that they wanted to see

11    changes in order for the map to be approved by

12    them, that they would support the map.  So

13    that's how we were primarily getting feedback

14    from proposed changes, it was through the

15    elected officials of the citizens.

16         Q.   Okay.  I just want to stick on the

17    hearings, though, because there's a

18    congressional hearing timeline and then the

19    next page is an apportionment board timeline.

20         A.   Yes.

21         Q.   So for the congressional only

22    hearings, did any of that feedback make it into

23    your map?

24         A.   I can't say because I don't recall

25    if I attended and heard directly what that --

1        RAYMOND E. DiROSSI

2   what that testimony was.

3        Q.   Okay.  But to your knowledge did

4   you, whether you were there or someone else

5   told you, make changes based on public opinion

6   to the map at these hearings?

7        A.   Well, right, public feedback we

8   were getting through a number of ways.  I don't

9   believe any of the legislative Democrats chose

10  to testify at these hearings to make their

11  requests known.  Those were happening through

12  legislative lines of communication through the

13  minority leaders, the leaders of the chambers

14  and other avenues.  It wasn't happening through

15  these hearings.

16       Q.   Okay.  You've said you were the

17  author of this document.  At the bottom of the

18  document it says, and this is the third to last

19  line, hold it in the can until the legislature

20  comes -- comes back in September 13th, 14th.

21            What does hold it in the can mean?

22       A.   Yeah, so it was my -- my words

23  basically saying, as we talked about the

24  process and the logistical problems involved in

25  getting the legislature to produce a map, at

Page 178

1          RAYMOND E. DiROSSI

2    the time that I put this document together the

3    legislature didn't have session dates scheduled

4    in order that they would be here to vote to

5    approve a map.

6              So as we were working

7    simultaneously on the apportionment map, as

8    well as the congressional redistricting, we

9    might have to come up with a proposal that the

10   legislature could consider, but wait until they

11   came back so we could have sessions and

12   hearings, and that's what I meant by hold it in

13   the can.

14        Q.    Okay.   And the it referred to here

15   a draft map?

16        A.    Yes, the it here is the proposal

17   of what the congressional redistricting could

18   be.

19             MS. THOMAS-LUNDBORG:  So I believe we

20   need to take a break so the DVD can be changed,

21   and we'll take a ten-minute break and come back?

22             MR. STRACH:  Yeah, five or ten is

23   fine.

24             THE VIDEOGRAPHER:  We're off the

25   record.

Page 179

1          RAYMOND E. DiROSSI

2               (Recess taken.)

3               THE VIDEOGRAPHER:  We're on the

4     record.

5               MS. THOMAS-LUNDBORG:  Okay.  Thank

6     you.

7     BY MS. THOMAS-LUNDBORG:

8          Q.   Good afternoon.

9          A.   Hello again.

10          Q.   Hello again.

11               I would like to ask you a couple

12     of follow-up questions regarding what we talked

13     about earlier.

14          A.   Sure.

15          Q.   You said in our last session that

16     Montgomery County was kept whole in 369 as a

17     concession to the Democrats?

18          A.   Yes.

19          Q.   Were there any other concessions

20     that were made?

21          A.   Yeah, a number.  As we discussed,

22     in Montgomery County we were dealing with the

23     loss of two congressional districts.  This will

24     take a little explaining.  Apologies.  We were

25     dealing with the loss of two congressional

1           RAYMOND E. DiROSSI

2    districts, and the decision was that we were

3    going to pair two Republicans together and two

4    Democrats together.

5                The two Republicans that

6    ultimately were selected to be paired together

7    were Turner and Austria, which had Montgomery

8    County as its base.  The two Democrats that

9    were chosen to be paired together were

10   Congresswoman Kaptur and Dennis Kucinich, which

11   had a district that had a base in Toledo and in

12   the west side of Cleveland.

13               And in 319 the 9th congressional

14   district, which is the one up in the north

15   along the lake, was designed so that there was

16   roughly 50 percent of the territory of

17   Congresswoman Kaptur's district in the new 9th

18   and 50 percent of the home territory of Dennis

19   Kucinich's old congressional district in the

20   9th, and there was some in the middle that

21   neither of them had represented which was kind

22   of viewed as neutral territory.  So that was

23   two big components of 319.

24               The Democrats, between the passage

25   of 319 and the ultimate passage of 369,

1           RAYMOND E. DiROSSI

2    requested a number of changes that were coming

3    from Congresswoman Kaptur through a number of

4    channels to us.  They wanted to tilt the favor

5    so that more and more of the territory of

6    Kaptur's old district would be in the new

7    district, and that involved making the

8    connecters between Cleveland and Toledo

9    skinnier and moving more portions of Toledo

10   into the district at Kaptur's request, and less

11   of the population of Dennis Kucinich's area in

12   the district.  This was an effort so that --

13   they wanted to tip the scales so that the

14   geography of the district at least favored

15   Kaptur, and that was another major concession

16   in 369.

17            In fact, that one I remember very

18   vividly.  That brought forward four votes, one

19   in the Senate, Senator Brown then voted for 369

20   where she previously opposed the 319, and

21   Representative Fedor, Representative Szollisi,

22   who was the number two -- was the minority

23   leader of the House of Representatives, and

24   another Democrat, I believe Representative

25   Ashford.  All four people who had voted against

1          RAYMOND E. DiROSSI

2    319 then were able to cast their vote for 369.

3    So that was another major concession that was

4    happening through the legislative process that

5    brought Democratic votes to 369, the final map.

6              There were others throughout the

7    district, specifically in Franklin County, if

8    you want to go through those as well.

9         Q.   I would like to hear what they all

10   were.   You can go ahead.

11        A.   So in Franklin County in 319 there

12   was the proposed creation of a new district,

13   the hope of which was would elect for the first

14   time a second minority member to Congress,

15   whereas the state has historically had no

16   minority representatives or, at the most, one.

17              And in 319 to 369 there were

18   requests that were coming to us through a

19   number of channels from Joyce Beatty.   She

20   specifically wanted geography that was in 319

21   out of 369 because one of her potential primary

22   opponents resided in that district, a Franklin

23   County Commissioner, Mary Jo Kilroy.   There

24   were also some other geography changes that she

25   had asked for.

1          RAYMOND E. DiROSSI

2              She also wanted to make sure that

3    we redrew the district so that the percentage

4    of non-Hispanic African American -- voting age

5    African American population was higher than it

6    was in 319, and she also wanted to make sure --

7    and again, I'm going to use the word index, but

8    this is her interpretation of what an index

9    was, not mine.  She wanted to make sure that

10   the index was better for a Democrat, was more

11   favorable for her.

12          Q.   And what was her position at the

13   time since she wasn't yet in --

14          A.   She had a position at Ohio State.

15   I do not recall the title of it.  She was

16   working for Ohio State, I believe, at the time,

17   and I knew who she was.

18          Q.   And who were those conversations

19   with?  Were you having conversations directly

20   with Joyce Beatty or with intermediaries?

21          A.   Well, they came through a number

22   of sources.  Again, as we talked about, we're

23   dealing with a legislative process, so my -- I

24   really had two primary ways that I was

25   receiving feedback.  One was through President

1          RAYMOND E. DiROSSI

2    Niehaus as the leader of the chamber, but I was

3    also working with Bob Bennett, who was the

4    former chairman of the Republican party, who

5    wasn't at the time, but had a number of

6    longstanding relationships with people,

7    Democratic members of the party infrastructure

8    or Democratic elected officials.

9              And I was working extensively with

10   him between 319 and 369 being adopted and we

11   were -- he was giving me this feedback that he

12   was getting directly from those congressmen,

13   congresswomen or people around them in their

14   campaign operations.

15        Q.   Did you have conversations

16   directly with anyone who could be termed a

17   Democrat at this time?

18        A.   In the congressional

19   redistricting, you're asking?

20        Q.   Yes, about 319 or 369.

21        A.   Yeah, I was -- I was getting that

22   information from other people, so I was -- I

23   wasn't the one having those conversations.  But

24   that was the feedback that I was getting and so

25   that's why I was making those proposals and

1          RAYMOND E. DiROSSI

2   those changes and those recommendations for the

3   map, which we ultimately did, and then we

4   ultimately got -- I think at the end of the day

5   we got -- I shouldn't say we got.  There were,

6   I think, 20 members of the Ohio House minority

7   caucus that voted for the final map, which was

8   -- of the members that were present from the

9   Democratic caucus was more than half of them.

10          And in 319 I think there were four

11   Democrats that voted for the map in the House

12   and Senate combined.  I think that number

13   swelled to almost 25 votes after we made all of

14   these changes, so --

15       Q.   And were you getting any of this

16   feedback when you were working on 319 or was

17   this feedback just about 369?

18       A.   Yeah, most of the feedback -- or

19   everything that I just described was very

20   inherent in 369.  That was -- obviously the

21   legislative Democrats approached the leadership

22   and said this is what it's going to take for us

23   to provide votes to approve this map, and so

24   that was all post 319 and 369.

25       Q.   Okay.

RAYMOND E. DiROSSI

A.    There were -- in 319, as I mentioned, in the 9th congressional district, there were a lot of conversations that were happening.  Congresswoman Fudge, as the map rolled out, was -- it had been relayed to me by a number of people that she did not want to be paired with Dennis Kucinich in a district.  She did not want to run against him in a primary by drawing a district completely inside Cuyahoga County.

And so during 319's rollout and passage, there were conversations that were happening directly with her or with other people around her about what her preferences were for the 11th congressional district.  And as I mentioned before, that's a very important district for the state because it's the only district we have in the entire state that has in recent memory elected a minority member to Congress.

Q.    Now, you just said there were conversations directly with Congresswoman Fudge.  Did you have those conversations with Congresswoman Fudge?

1              RAYMOND E. DiROSSI

2              A.    I did not.

3              Q.    Do you know who had those

4    conversations?

5              A.    I was working with Bob Bennett and

6    I know that other members, I believe Speaker

7    Batchelder -- or I know Speaker Batchelder was

8    talking to a number of folks and contacts that

9    he had in Northern Ohio about what

10   Congresswoman Fudge wanted.

11              And I do specifically remember

12   preparing two draft maps that we were sending

13   to her through intermediaries that said we can

14   draw the 11th district all in Cuyahoga County,

15   but it will no longer be a majority/minority

16   district, or we can bring the district down

17   into Summit County and retain it as a

18   majority/minority district.  And if we kept it

19   in Cuyahoga County she would be paired with

20   Dennis Kucinich, and the feedback that came

21   back down was she would prefer that the

22   district go down into Summit County, which was

23   done in 319 as it was introduced and retained

24   in 369.

25              Q.    Okay.   You've mentioned Bob

1               RAYMOND E. DiROSSI

2    Bennett a couple of times.

3         A.   Yes.

4         Q.   What was his role in redistricting

5 other than being an intermediary?

6         A.   Well, he was not -- he was a

7 former chairman of the Republican party and so

8 he just had been involved in -- I have been now

9 involved in two decennial redistricting and

10 apportionments.  Mr. Bennett, as we said now

11 deceased, probably had been involved in four or

12 five.  He had great contacts throughout the

13 state, both Republican and Democrat, some great

14 relationships that he had, and he had the

15 ability to reach across party lines and get

16 feedback from both sides of the political

17 spectrum about what people wanted to see in the

18 legislative bill.

19         Q.   Did he ever visit the hotel room

20 that the map was drawn in?

21         A.   To my knowledge, no.

22         Q.   Other than talking to people, did

23 he do anything else related to the map other

24 than talking to all these people that you've

25 mentioned?

1          RAYMOND E. DiROSSI

2          A.    Can you say that again?  I'm

3    sorry, other than --

4          Q.    So you've mentioned that he served

5    as an intermediary.

6          A.    Oh, that he did or that I did?

7    I'm sorry.

8          Q.    That he did.  He was an

9    intermediary to Democrats and Republicans all

10   over the state.

11         A.    And you're asking if he --

12         Q.    Did anything else related to

13   redistricting.

14         A.    I mean, I worked directly with him

15   on all the things I just articulated.  What

16   else he was doing, I couldn't say.

17         Q.    Okay.  I would like to just turn

18   back to Exhibit 19 for a second.  It should

19   still be in front of you.  You were on the

20   right page.

21         A.    I'm sorry.

22         Q.    That's fine.

23         A.    I had it.  There we go.

24         Q.    And there was a question I hadn't

25   had a chance to ask you yet.  So there is a

1          RAYMOND E. DiROSSI

2    reference here to August 19th.  Do you see

3    that?

4          A.   Yes.

5               Q.   And it says target date to get the

6    bill equivalency file to the LSC.  What is the

7    LSC?

8               A.   Okay.  So that is the Legislative

9    Service Commission.  It is the entity that

10   produces bills, proposed laws for the General

11   Assembly.  It's a nonpartisan entity.  And as

12   we had previously discussed, since the

13   legislative congressional redistricting is a

14   bill that goes through the legislature, we had

15   to get to LSC what we wanted the congressional

16   redistricting bill to look like and that's what

17   that is a reference to.

18               Q.   Okay.  And what is a bill

19   equivalency file?

20               A.   So now you're getting down in the

21   technical stuff, but it's basically --

22               Q.   Yes.

23               A.   It's basically the equivalency

24   files that says what census blocks of counties

25   and the geography of the state would be

1          RAYMOND E. DiROSSI

2    assigned to which districts so that you could

3    put that into a legal form.

4          Q.    And you used census blocks to draw

5    the district lines?

6          A.    Well, we used a lot of units of

7    geography, but I think that the common

8    denominator was census blocks.  The lowest

9    common denominator was census blocks.

10          Q.    In addition to census blocks, what

11    did you use?

12          A.    Yeah, so you had census blocks,

13    census tracks, you had political subdivisions,

14    whether it be a precinct of a city, a precinct

15    of a township, whole townships, municipalities,

16    wards, counties.  All the units of geography

17    that the Census Bureau tracks population data

18    for.

19          Q.    And was there any particular

20    reason why you were using census blocks, which

21    you said was the common denominator?

22          A.    Yeah, the -- to the best of my

23    knowledge, the court, the U.S. Supreme Court

24    still said that you had to draw congressional

25    districts down to zero population deviation.

1            RAYMOND E. DiROSSI

2    And obviously if you're trying to use a larger

3    unit of geography, the chances that you could

4    ever come up with 16 congressional districts

5    that all had literally identical population or

6    plus or minus one, depending on how many people

7    there were, without going down to that lowest

8    unit of geography you would never be able to

9    achieve the required constitutional population

10   deviations.

11           Q.   Was there any other reason that

12   you were using census blocks?

13           A.   No, that's the -- no.

14           Q.   Okay.  Did you get any benefit

15   other than the one person, one vote that you

16   mentioned from using census blocks?

17           A.   No, we got a lot of headaches

18   because we got in -- there was a lot of -- when

19   you get down to a unit that small, you run into

20   a ton of inherent software issues with what is

21   called split -- split blocks.  And that is

22   where you have a geography unit that maybe

23   crosses the boundary of a census block, and if

24   there are two people in that block you have to

25   figure out, okay, are these two people both in

1                    RAYMOND E. DiROSSI

2      this part of the split block or in this part of

3      the split block.  So actually going down to

4      that level caused a lot of headaches.

5              Q.    Okay.  And generally how were you

6      able to resolve those headaches?

7              A.    We relied on our Cleveland State

8      and OU database and also the -- this probably

9      would have been one instance or this was one

10     instance where we would have used John Morgan's

11     technical expertise on software and -- I'm

12     sorry, I misspoke, I said the wrong name.  It

13     was Clark Benson who we used on these, not John

14     Morgan.

15             Q.    Did anyone else other than Clark

16     Benson help you resolve these issues?

17             A.    That's the name that I remember.

18             Q.    Okay.  So we've spent some time

19     talking about Congresswoman Fudge's district

20     and we've talked about majority/minority

21     districts.  Were you concerned about

22     majority/minority districts because of the

23     Voting Rights Act?

24             A.    Yes.

25             Q.    And what is your understanding of

1          RAYMOND E. DiROSSI

2  what the Voting Rights Act requires?

3               MR. STRACH:   Objection.

4               THE WITNESS:   Yeah, I'm obviously not

5  an attorney, but in 2001 the district was drawn so

6  that it was more than 50 percent voting age

7  non-Hispanic African American population.   And

8  once we started to get up and running and look at

9  some congressional redistricting ideas, one of the

10 first things that I was looking at was, with the

11 significant population loss that Cleveland was

12 experiencing, when you reconfigured the 11th

13 district was it possible to still draw a district

14 that would be more than 50 percent non-Hispanic

15 voting age African American population.

16               And I mentioned before the way that I

17 had seen the data and was working with it, if the

18 district had stayed in Cuyahoga County that would

19 not have been obtainable.   The district would have

20 fallen to somewhere around 48 percent.   So that

21 was my understanding of the factors that we were

22 dealing with with regards to the 11th.

23 BY MS. THOMAS-LUNDBORG:

24          Q.   Okay.   You said you're not an

25 expert on VRA.   Did you receive any -- and by

1              RAYMOND E. DiROSSI

2    VRA, I mean Voting Rights Act.  Did you receive

3    any training on what the VRA requires at any

4    point?

5              MR. STRACH:  And I'm going to object.

6    If you had any training by non-lawyers, you can

7    testify about that, but --

8              MS. THOMAS-LUNDBORG:  I think he can

9    testify to training by a lawyer, too.  He doesn't

10   have to say what it was, but he can say, yes, I

11   met with lawyers and they told me what it

12   requires.

13             MR. STRACH:  No, no, he's not going

14   to testify about that.  I'm going to instruct him

15   not to say anything about any training, meetings

16   or otherwise, about the VRA with lawyers.  If

17   there was any training, meetings or otherwise

18   about the VRA with non-lawyers, I'll allow him to

19   answer that.

20             MS. THOMAS-LUNDBORG:  I mean, the

21   question is not to the substance of what he was

22   told, lawyers said he had to do.  The question is

23   did a lawyer tell you there are VRA requirements

24   and that is not a privileged question.

25             MR. STRACH:  That is a substantive

1          RAYMOND E. DiROSSI

2    question about what he was being told by lawyers,

3    so no, we're not going to answer that.

4                MS. THOMAS-LUNDBORG:  I'm not asking

5    what he was told by lawyers.  I'm asking did he

6    have conversations with his lawyers.

7                MR. STRACH:  You can ask if he had a

8    conversation with a lawyer, period, but not did he

9    have a conversation with a lawyer about the VRA.

10   We will not answer that question.

11               MS. THOMAS-LUNDBORG:  All right.

12   BY MS. THOMAS-LUNDBORG:

13        Q.   You can go ahead.

14        A.   Can you ask the question again?

15   I'm sorry.

16        Q.   So there's two questions.  One is

17   did you have any non-lawyer trainings about

18   VRA?

19        A.   Did I have any non-lawyer

20   training?  Again, depending on what training

21   means, other than attending those NCSL things

22   we talked about where there might have been

23   presentations about the Voting Rights Act, I

24   did not have any training with non-lawyers.

25        Q.   Okay.  And then did you have any

Page 197

1           RAYMOND E. DiROSSI

2    conversations with lawyers at this time?

3           A.    Specifically about --

4                MS. THOMAS-LUNDBORG:  Your attorney

5    has instructed you not to answer about the

6    specifics of did you have conversations with

7    lawyers.

8                MR. STRACH:  Did you have

9    conversations with lawyers, as she said, at this

10   time, period.

11               THE WITNESS:  And, I'm sorry --

12   BY MS. THOMAS-LUNDBORG:

13          Q.    At this time, we're talking about

14   the 2011 redistricting period.  We can break

15   the question up into 319 and 369.

16               THE WITNESS:  And I'm supposed to

17   answer?

18               MR. STRACH:  So the question is did

19   you have conversations with lawyers at the time of

20   the redistricting.

21               THE WITNESS:  Yes.

22   BY MS. THOMAS-LUNDBORG:

23          Q.    Okay.  Prior to the 2011

24   redistricting period did you have any

25   experience drawing VRA compliant districts?

Page 198

1          RAYMOND E. DiROSSI

2          A.   In the 2001 apportionment, both in

3    apportionment and redistricting, we were

4    drawing a number of districts that were covered

5    by the Voting Rights Act.

6          Q.   Okay.  Are you at all familiar

7    with the requirements of what the -- of what a

8    VRA compliant district -- sorry, let me strike

9    that.

10          Are you familiar with determining

11    the requirements of whether or not a VRA

12    district should be drawn?

13          MR. STRACH:  Objection.

14          MS. THOMAS-LUNDBORG:  I'm asking

15    about his own personal knowledge.

16          MR. STRACH:  Well, he's not a lawyer,

17    so it's not -- it's not that simple.

18          MS. THOMAS-LUNDBORG:  Well, he did

19    work on drawing the districts.  He may or may not

20    have personal knowledge to this, which he is free

21    to answer that he does or does not.

22          MR. STRACH:  But he doesn't have

23    lawyer personal knowledge.

24          MS. THOMAS-LUNDBORG:  I'm asking

25    about his personal knowledge as the person drawing

1          RAYMOND E. DiROSSI

2   the district, how did he determine, and if he says

3   I have no personal knowledge then that is his

4   answer.

5              MR. STRACH:  All right.  If you have

6   strictly personal knowledge you can answer that

7   question, but if it requires you to act like a

8   lawyer then you're not to act like a lawyer.

9              THE WITNESS:  If we were drawing --

10  and again, I'm in apportionment mostly because in

11  the congressional there's only one district, but

12  in the apportionment there are dozens.  If we were

13  working in an area where there were Voting Rights

14  Act impacted districts, I would have sought legal

15  advice as to how to proceed.

16  BY MS. THOMAS-LUNDBORG:

17      Q.   Okay.  Are you at all familiar

18  with the term racially polarized voting?

19              MR. STRACH:  Objection.

20              MS. THOMAS-LUNDBORG:  I'm asking if

21  he's familiar with it.

22              THE WITNESS:  I've heard the term,

23  but I am -- I'm not conversant in it in any way.

24  BY MS. THOMAS-LUNDBORG:

25      Q.   Are you at all familiar --

1           RAYMOND E. DiROSSI

2   actually, let's just go to a document.

3                   (Thereupon, Plaintiffs' Exhibit

4   Number 20, File Produced in Native Format Bates

5   Stamped DIROSSI_0000526, was marked for purposes

6   of identification.)

7   BY MS. THOMAS-LUNDBORG:

8           Q.   This I'm having marked as Exhibit

9   20.  This was produced in native format, which

10  was an Excel file, so you'll see the first page

11  is the produced in native cover sheet.  It's

12  DIROSSI_526.  Do you see that?

13          A.   Yes.

14          Q.   And then the second page is a

15  Excel spreadsheet.  Do you see that?

16          A.   Yes.

17          Q.   Okay.  Based on your recollection,

18  are you the author of this document?

19          A.   Yes.

20          Q.   The first set of -- and this is an

21  Excel spreadsheet, so in the left most column

22  there is text that says comply with the Voting

23  Rights Act CD 11.  Do you see that?

24          A.   I do.

25          Q.   And then underneath the first kind

1                RAYMOND E. DiROSSI

2    of populated percentage column it says 22.63

3    percent unified index is 50/50.  Do you see

4    that?

5              A.    I do.

6              Q.    And what does the 26.63 represent

7    here?

8                   MR. STRACH:  22.63.

9                   MS. THOMAS-LUNDBORG:  Yes, 22.63.

10                  THE WITNESS:  It would have been the

11   -- based on the unified index that we spoke about

12   earlier, the numerical representation of all of

13   the historical election results for those five

14   races that we talked about earlier.

15   BY MS. THOMAS-LUNDBORG:

16             Q.    And is this the percentage of

17   Republican or what is the 22 percent?

18                  MR. STRACH:  Objection.  Asked and

19   answered.

20                  Answer it again.

21                  MS. THOMAS-LUNDBORG:  He didn't

22   answer whether it was Republican or Democrat.  I

23   still don't know what 22.63 is.

24                  MR. STRACH:  He just said what 22.63

25   percent was and he'll say it again if you want him

1          RAYMOND E. DiROSSI

2    to.

3    BY MS. THOMAS-LUNDBORG:

4          Q.   Can you tell me, is this 22.63

5    Republican or Democrat winning the percentage

6    of the election?

7          A.   It would be Republican.

8          Q.   Thank you.

9               And then I'm going to skip down,

10   it says draw new minority opportunity district,

11   Franklin County.  Do you see that?

12         A.   I do.

13         Q.   And it's CD O3.  What is -- and

14   then the next line is 37.83 percent.  Do you

15   see that?

16         A.   I do.

17         Q.   And is that the Republican

18   percentage in CD 03?

19         A.   Using -- using that scoring of the

20   unified index, yes.

21         Q.   Then the last column, and it's not

22   populated, is Slagle/OCAR, state is 52-48 in

23   favor of R's.  Do you see that?

24         A.   Yes.

25         Q.   What is the purpose of this column

1          RAYMOND E. DiROSSI

2    here?

3          A.   Yeah, so this document, I created

4    this in response to a media inquiry.  And

5    again, it goes back to -- it goes back to

6    everybody had their own way of looking at

7    indexes or historical election results.  I

8    obviously was trying to use the unified index.

9    A number of people were looking at presidential

10   index.  Mr. Slagle at OCAR had his own scoring

11   methodology.  And the question was being asked

12   of once you draw these two districts, what does

13   the rest of the state look like historically.

14          Q.   And you said a number of people

15   were using the presidential index.  Do you

16   recall who those people were?

17          A.   Yeah, mostly people who cared

18   about national elections or congressional

19   elections, so Republican and Democratic

20   congressmen and Republican and Democratic

21   congresswomen, the NRCC, the DS -- or the DRCC

22   or whatever their name is.  The people who run

23   national congressional and national elections

24   tend to look at presidential results and their

25   own scoring system and really kind of looked

1          RAYMOND E. DiROSSI

2    with this favor upon what I was using as the

3    unified index.

4          Q.   Okay.  And why were you looking at

5    these two districts in particular?

6          A.   It was a media request so I was

7    just trying to be responsive.  As I mentioned,

8    at any moment in time what somebody cares

9    about, whether it's geography, how many

10   incumbents are paired together, an election

11   data number, how big a district was, you know,

12   Heather and I were the ones that people were

13   coming to to ask those questions, and so this

14   is just one document I created.  It doesn't

15   even look like I finished it.  So it was just

16   --

17         Q.   Okay.  And do you recall which

18   media entity you got the request from?

19         A.   I don't.  I don't.

20         Q.   Do you recall any other specifics

21   about the request?

22         A.   I don't.  Nope, I don't, sorry.

23         Q.   Actually, don't flip it yet.

24   During your various trainings, aside from

25   trainings that you had with a lawyer, did any

1          RAYMOND E. DiROSSI

2    of your trainings talk about one person, one

3    vote, also known as equal population?

4          A.   I don't know what -- I mean,

5    trainings, I was trained on software --

6          Q.   Conferences.

7          A.   -- two decades ago.  Yeah, but I

8    wouldn't call those trainings.  I mean, they're

9    just like listening to people pontificate about

10   what they know, and most of it isn't even

11   relevant to Ohio.

12          So can you restate the question,

13   please?

14          Q.   So conferences or trainings, did

15   any of them deal with equal population, also

16   known as one person, one vote?

17          A.   Nothing specifically that I can

18   recall.

19          Q.   Okay.  Did you take one person,

20   one vote into consideration when you were

21   drawing your map?

22          A.   All of the districts that were

23   drawn for the congressional redistricting were

24   balanced to the person.  I believe of the 16

25   districts, eight of them were plus one person

1          RAYMOND E. DiROSSI

2    above the ratio of representation and the

3    others were right on the number.  So, I mean, I

4    took that into account that the districts had

5    to be drawn with absolute population, zero

6    deviation.

7          Q.   Did equal population affect the

8    substance of any lines that were drawn?

9          A.   Help me understand what you mean

10   by substance.

11         Q.   Did you move a line from one

12   location to another location because of equal

13   population?

14         A.   Absolutely.

15         Q.   Okay.  And do you recall as you

16   sit here which lines were moved based on equal

17   population?

18         A.   I chuckle because it's -- if

19   you've ever drawn a map like that, you may have

20   a district in the northeast corner of the state

21   of Ohio that is unfortunately three people too

22   many and you have to balance it out, and

23   because of the way the map is all

24   interconnected you may end up having to move

25   people in Southwest Ohio, two or three people

Page 207

1          RAYMOND E. DiROSSI

2     to achieve that.

3               And so every district I would have

4     made -- Heather and/or I would have made some

5     change very small to the lines in order to

6     achieve zero population deviation.  Every

7     single district we would have had to do that

8     in.

9          Q.   Beyond these small changes of two

10    or three people, do you recall any large

11    changes that were made based on equal

12    population?

13         A.   I mean, I recall like the 11th

14    congressional district, it was after losing two

15    seats and I think the districts had to grow by

16    almost 72,000 people, more or less, and I

17    remember that district having lost significant

18    population, tens of thousands, maybe even

19    approaching a hundred thousand, that

20    significant population changes had to be made

21    to bring that district in particular up to its

22    target population.

23               I don't think I -- I don't think

24    any other district was quite that extreme in

25    how many people it needed to be adjusted.

RAYMOND E. DiROSSI

1

2      Q.   Okay.  So in addition to equal

3  population and voting rights compliance, did

4  you consider any other factors when you were

5  drawing the map?

6      A.   Well, as I mentioned before, there

7  were some high-level points that Speaker

8  Batchelder and President Niehaus wanted to

9  achieve in this legislative map, and that was

10  the elimination of two districts, the pairing

11  of two Republican congressmen or women, the

12  pairing of two Democratic congressmen or women,

13  proposing an 11th congressional district that

14  was to the satisfaction of Congresswoman Fudge,

15  the creation of a new district in Franklin

16  County that would give a minority candidate the

17  ability to be elected.  I mean, those were the

18  big -- the big overarching goals.  Then making

19  sure the map was balanced and achieve zero

20  population deviation.  Those were the main --

21  main components.

22      Q.   Okay.  Did you consider

23  communities of interest when you were drawing

24  the map?

25      A.   So that is a term -- obviously I

1           RAYMOND E. DiROSSI

2    have heard that term for decades and I think it

3    means a lot of different things to a lot of

4    different people.  So you'll have to help me --

5    tell me what you are suggesting it means so

6    that I can try to answer your question.

7           Q.   Well, I guess my question back to

8    you is what would you suggest that it means?

9    What is your understanding of what a community

10   of interest is?

11          A.   Well, it could be -- it could be a

12   lot of things and in certain parts of the state

13   we have a very diverse population.  We have an

14   extreme -- we have a large number of rural

15   areas of the state.  We have major water, Lake

16   Erie and we also have the Ohio River.  We have

17   Southwest Ohio that has a lot of communities of

18   interest.  We have minority communities of

19   interest in certain areas, mostly urban areas.

20   We have at least eight major urban areas.  I

21   mean, so community of interest in any part of

22   the state could mean a very different thing.

23          Q.   Understood.  Did any of those

24   definitions make it into your considerations

25   when you were drawing the map?

1          RAYMOND E. DiROSSI

2          A.   I was certainly aware of the ones

3    that I was aware of as we were drawing the map.

4          Q.   And what effect did that have on

5    any of your map drawing?

6          A.   Well, whenever we -- depending on

7    if there were other goals that conflicted with

8    it, we would try to preserve those communities

9    as best possible to achieve the other stated

10   goals that I mentioned.

11         Q.   What about compactness, are you

12   familiar with the term compactness?

13         A.   I'm familiar with the term, I am

14   unfamiliar with anybody's definition of what it

15   -- what it means.

16         Q.   What is your understanding of what

17   compactness is?

18         A.   That you have a district that is

19   relatively compact.  I'm sorry to use the word

20   in the definition of the word, but that would

21   be my understanding.

22         Q.   Did your understanding of

23   compactness affect your map drawing?

24         A.   Again, Ohio is very diverse.  Look

25   at the 3rd congressional district that was

1          RAYMOND E. DiROSSI

2    created in Franklin County.  The footprint of

3    that was 720 some odd thousand people, it's

4    very compact, it is, you know, all within

5    Franklin County; in Southeast Ohio where we

6    have a tremendous number of mostly rural areas

7    where we have entire counties that have a total

8    of 12 or 13,000 people; we have another

9    district that is the same exact population

10   size, but it covers 14, 15 or 16 counties, and

11   it is a very significant geographical area.

12                So, I mean, I would say they're

13   both compact because that's where people in

14   Ohio have chosen to live, but I didn't use any

15   measure.

16           Q.    Okay.  So when you were drawing

17   the map, though, were you thinking about

18   compactness in drawing the lines?

19           A.    I was aware of the concept, yes.

20           Q.    Was it operationalized into your

21   map drawing?

22           MR. STRACH:  Objection.

23           THE WITNESS:  Yeah, I need to

24   understand what you mean by --

25   BY MS. THOMAS-LUNDBORG:

1          RAYMOND E. DiROSSI

2            Q.    Did you have any system by which

3    you were making sure districts were compact?

4                 MR. STRACH:   Objection.

5                 THE WITNESS:   No, other than visual.

6    BY MS. THOMAS-LUNDBORG:

7            Q.    What about county splits, do you

8    know what -- how would you define county

9    splits?  I think it's fairly self-evident, but

10   I just want to understand your understanding.

11           A.    Yeah, it gets a little tricky in

12   the apportionment, but in the congressional

13   redistricting if you have a district that

14   crosses a county boundary and is not

15   encompassing an entire county, I could

16   understand why somebody would say a county is

17   split.

18           Q.    Okay.  And did county splits --

19   what role, if any, did county splits play in

20   your map drawing?

21           A.    Well, we're certainly aware of

22   where we were doing it.  We had a few unique

23   instances around the state where, due to the

24   geography of the State of Ohio, we have some

25   cities -- I'll use my home city as an example.

1                 RAYMOND E. DiROSSI

2     I live in Dublin, Ohio, as I said earlier.  The

3     city of Dublin is actually a municipal

4     corporation, but it is in three specific

5     counties; it is in Union County, Franklin

6     County and Delaware County.  It's right where

7     the three of them come together.

8                    And this presents sometimes a

9     challenge.  You could try to keep the community

10    of interest that is Dublin together, but you

11    would be splitting three counties, or you could

12    try to keep the three counties in three

13    separate districts, but then you're splitting

14    Dublin three different ways.

15                    So I was always drawing -- that

16    happens in Northern Ohio, too, with the city

17    of, I believe, Fremont is in three, if not

18    four, counties.  I always kept that in mind

19    when we were -- when I was drawing districts --

20         Q.    Okay.

21         A.    -- or proposing -- drawing

22    proposals.

23         Q.    And did you do anything in your

24    map drawing to limit the number of county

25    splits?

1          RAYMOND E. DiROSSI

2              A.   Generally it was something we were

3     trying to do, but as I mentioned before,

4     eliminating two districts, the method by which

5     we were absorbing two districts, trying to, you

6     know, protect the 11th congressional district

7     and create a new one in the third, and pairing

8     incumbents together, those were more important

9     to our goals than if we split a couple extra

10    counties.

11              Obviously, as I said before, the

12    Democrats in some of the areas made requests to

13    unify a couple counties, in Montgomery County

14    specifically.  But to do that I think we had to

15    unify Montgomery County to satisfy the request,

16    but then we split another county because you

17    had to have zero population deviation.  So

18    sometimes it was a mixed bag.

19              Q.   Okay.  What about municipal

20    splits?  What do you understand that term to

21    mean?

22              A.   Very similar to counties where you

23    have a district that does not include all of

24    the territory of a municipal corporation.

25              Q.   And did municipal splits play any

1               RAYMOND E. DiROSSI

2       role in your map drawing?

3               A.    Well, again, all districts had to

4       be balanced to either plus or minus one person

5       or zero population deviation, so you were going

6       to have to split counties, you were going to

7       have to split cities, you were going to have to

8       split townships and other units of geography to

9       make those districts balance out.  So that was

10      done.

11              Q.    Okay.  Are you familiar with the

12      term incumbency?

13              A.    Yes.

14              Q.    Are you familiar with the term

15      incumbency protection?

16              A.    I've heard the term, but it could

17      be --

18              Q.    What is your --

19              A.    -- could mean different things.

20              Q.    Oh, okay, sorry.

21              A.    That's okay.

22              Q.    I don't mean to speak over you.

23                    What does incumbency mean to you?

24              A.    So at any point in time who is the

25      incumbent of any particular district is what

1          RAYMOND E. DiROSSI

2    incumbency means to me.

3          Q.    Okay.  And an incumbent is?

4          A.    The residing -- the residing

5    office holder of a district.

6          Q.    Okay.  And did incumbency play any

7    role in your map drawing?

8          A.    As I mentioned, we were losing two

9    congressional districts, so the decision was

10   that we would pair two incumbent Democrats

11   together and two incumbent Republicans together

12   forcing them to have a primary and let the

13   voters decide.

14          Q.    Outside of this consideration to

15   pair incumbents, did you look at incumbency in

16   any other way?

17          A.    Yes, we generally try to avoid

18   pairing districts.  I mentioned to you before

19   that it had been sent -- or the information had

20   gotten to me that Congresswoman Fudge did not

21   want to be paired with Dennis Kucinich, then

22   Congressman Dennis Kucinich, and so the

23   district that we drew intentionally did not do

24   that, so yes.

25          I also mentioned Joyce Beatty

1           RAYMOND E. DiROSSI

2    where she specifically wanted to have somebody

3    who she thought might run against her drawn out

4    of the district, and so we also did that in

5    order to get votes.

6           Q.    But was she an incumbent?

7           A.    She was not an incumbent at the

8    time.

9           Q.    Were there any other incumbents

10   that you considered during this time?

11          A.    Well, I was aware of where every

12   incumbent, every Republican, every Democratic

13   lived, so we intentionally -- or didn't

14   unintentionally pair them together.

15          Q.    And how did you do that?

16          A.    I think either through -- well,

17   let me -- I shouldn't say I think.  We were

18   able to obtain the home addresses of all 18

19   congressmen and women in the state, which we

20   used.

21          Q.    And how did you use them?

22          A.    We used them with our software to

23   do what is called geocoding so that you could

24   put in their address into the software and it

25   would put a marker on the map so you could mark

1            RAYMOND E. DiROSSI

2    where specifically a member of Congress

3    resided.

4            Q.    Did partisan makeup of the

5    districts play any role in your map drawing?

6            A.    So the historical election

7    information that we had talked about before was

8    one of the things that was in the software just

9    as the population variations, the Hispanic

10   percentages of the district, the African

11   American percentages of the district.  We also

12   had incorporated into that the historical

13   election data.  So it was one of the things we

14   had.

15           Q.    Okay.  You had it.  Did you use

16   it?

17           A.    Yes, it was one of the things that

18   we would have looked at as we were proposing

19   districts, along with all of the other things I

20   just mentioned.

21           Q.    Okay.  So outside of VRA and equal

22   population, were any of the other factors you

23   considered legally required to your knowledge?

24           A.    You said the VRA and what was the

25   other one?

1          RAYMOND E. DiROSSI

2          Q.    Equal population.

3          A.    Equal population.    The districts

4    had to be contiguous.    That would have been a

5    requirement.

6          Q.    Did you have any hierarchy to

7    determine which factors were going to be more

8    important or less important as you were drawing

9    the map?

10          A.    I did not.

11          Q.    How did you determine which

12    factors were going to play a role in any

13    particular district?

14          A.    Well, using those big pillars that

15    we talked about and then interacting with, for

16    me, President Niehaus, and making sure that he

17    could get the votes of the Republicans and

18    Democrats in the legislature, that was the

19    process.

20              (Thereupon, Plaintiffs' Exhibit

21    Number 21, Documents Bates Stamped

22    DIROSSI_0000470-472, was marked for purposes of

23    identification.)

24    BY MS. THOMAS-LUNDBORG:

25          Q.    Let's go to what I'm having marked

1          RAYMOND E. DiROSSI

2     as Exhibit 21.  This is a document I actually

3     put together, but it's consecutively Bates

4     stamped, so hopefully it's not an issue and

5     they all seem to be relatively the same.  I'm

6     having this marked as Exhibit 21.  It's

7     DIROSSI_470.

8               And this appears to be a series,

9     three to be exact, of competition maps.  Is

10    that your understanding of what this exhibit

11    is?

12          A.   Yes.

13               MR. STRACH:  Do you know if these

14    came in color originally or if this is how they --

15               MS. THOMAS-LUNDBORG:  This is how

16    they were produced to us.  I copied everything as

17    produced.

18               MR. STRACH:  Okay.

19    BY MS. THOMAS-LUNDBORG:

20          Q.   So I'm not going to ask too many

21    questions about this.  My first question is,

22    when did you -- when did you get these maps to

23    your best recollection?

24          A.   I don't recall when I would have

25    first had these maps in my possession.  I don't

1          RAYMOND E. DiROSSI

2   recall.

3          Q.   Would it have been prior to the

4   introduction of 319?

5          A.   It was.

6          Q.   Okay.  And did anything from the

7   competition maps make it into your map drawing?

8   And it doesn't have to be these maps in

9   particular.  Just in general.

10         A.   Yeah.  Well, again, apologies for

11  the long -- the long answer, but there's --

12  there are some things in here that did end up

13  in the maps in concept, maybe not identical to

14  the person.

15         Q.   Okay.

16         A.   But these maps also have some very

17  significant structural problems that rendered

18  them, unfortunately, almost useless to me.

19         Q.   Which concepts made it into the

20  319 map?

21         A.   So on the third map that says Tim

22  Clark from Avon Lake, congressional - one of

23  the winning maps, you notice you have generally

24  this concept of a district in Northern Ohio,

25  the 11th congressional district that comes down

1          RAYMOND E. DiROSSI

2    into Summit County like we've been talking

3    about.  So that is not identical, but that

4    general concept is something that Congresswoman

5    Fudge had indicated generally she was

6    interested in.

7              If you note, the other two maps

8    draw the district of the 11th completely in

9    Cuyahoga County, which was something that I was

10   being told she explicitly did not want.  So

11   that was one of the main pillars that these

12   maps violated.

13             Same thing on the maps on the 3rd

14   district.  One of them, I think the first map

15   in your series, has the general concept of a

16   district inside Franklin County.  I'm thinking

17   it's -- it's somebody's attempt at getting to a

18   second minority district.  The map that was

19   adopted is not identical to that, but it kind

20   of refines that concept after we were having

21   conversations with Joyce Beatty about how she

22   would want the district to look.

23             Do you want me to keep going

24   through it, or do you just want me to --

25             Q.   I'll have questions, but if there

1          RAYMOND E. DiROSSI

2    are other things that you remember I would love

3    to hear it.

4          A.    Maybe more will come to me, but

5    those are the two specific ones that jump out

6    at me.

7          Q.    Okay.  Regarding the 11th

8    congressional district, and you referenced Tim

9    Clark's map --

10         A.    Yes.

11         Q.    -- is it your recollection that

12   the idea came from this map or did the idea

13   come from somewhere else?

14         A.    I don't know.  I can't

15   specifically answer that.  I don't specifically

16   know the timelines, as I mentioned, of when I

17   got these and the conversations that were

18   already underway about -- I can't answer that.

19         Q.    Okay.  About the first map, which

20   is the Mike Fortner map, you mentioned the 3rd

21   district.  Is your recollection that the idea

22   came from this map or did the idea come from

23   somewhere else?

24         A.    For the 1st district, you said?

25         Q.    3rd.

Page 224

RAYMOND E. DiROSSI

1

2      A.    3rd.

3      Q.    I think this is the map you said

4  that Franklin County --

5      A.    I thought you said 1st.

6  Apologies.  Yeah, same question, I don't -- I

7  can't recall the timelines of when I received

8  these and when we were coming up with our own

9  alternatives.

10      Q.    Okay.

11      A.    But it's worth noting that all

12  three of these maps are drawn by taking the

13  liberty of they're not to zero population

14  deviation.  Every one of these maps based on

15  the data -- underlying data that was provided

16  to me by Mr. Slagle, who I think was in charge

17  of the contest, along with the League of Women

18  Voters and other entities, people were drawing

19  these maps that were plus or minus thousands of

20  people, and obviously that's a no-no with

21  respect to zero population deviation.

22              So that was something, just one

23  thing which jumps out at me, my specific

24  recollection of problems that all of these maps

25  had.  They took a lot of liberties that I

1          RAYMOND E. DiROSSI

2     didn't have the luxury of taking.

3          Q.   Okay.   There are three maps here.

4     Did you receive more than three maps or did you

5     only receive three of the competition maps?

6          A.   There were at least 50 maps that

7     were part of the competition, but I believe

8     these were the three winning maps that Slagle

9     -- these were the three winning maps that

10    Slagle provided me.

11         Q.   Did you only -- so to clarify my

12    question, did you only receive three maps or

13    did you receive more than three?

14         A.   I received three.

15         Q.   And did you receive them directly

16    from Mr. Slagle or did you get them from some

17    other source?

18         A.   I don't -- I don't recall.

19         Q.   So going to the map drawing

20    process, I think you mentioned that you used

21    Maptitude, correct?

22         A.   Correct.

23         Q.   When did you start inputting data

24    into Maptitude?

25         A.   I don't recall the dates.   I was

1          RAYMOND E. DiROSSI

2     not doing that.  That was being done for us and

3     so I do not recall the dates.

4          Q.    Who was putting the data for you

5     into Maptitude?

6          A.    Clark Benson.

7          Q.    When did you start working in

8     Maptitude?

9          A.    I don't recall a specific date

10    when we started.

11         Q.    We looked at the invoice for the

12    bunker which started -- let me just go back to

13    it so we're not both working off of our

14    memories, it's Exhibit 16 -- which started on

15    July 17th.  Would you have been working in

16    Maptitude on July 17th?

17         A.    No way.

18         Q.    Would you have been working on

19    Maptitude a few days after July 17th?

20         A.    I don't recall when.  It was a

21    very -- first of all, it was a long time ago,

22    it was very chaotic, and we had a ton of

23    problems getting the software and the data to

24    interact, and so I can't recall specific dates

25    of when we started.

Page 227

1          RAYMOND E. DiROSSI

2          Q.   Okay.  Do you have a sense of how

3    long it took to have the data inputted?  You

4    said there were a ton of problems.

5          A.   It was a lengthy time and it was

6    an ongoing process.  We would get -- we would

7    get data that we thought was working and then

8    we would be told, nope, those split blocks and

9    some of the other things were still

10   problematic, and we would have to wait and get

11   another round of data.  And so that happened

12   over a significant period of time.

13         Q.   Were you working in the data

14   before all these problems were resolved or did

15   you have to wait until after they were

16   resolved?

17         A.   We were able to turn the computers

18   on, but then I think we had to start over.  We

19   had to start over.  The data wasn't correct and

20   wasn't working.

21         Q.   But did you start the process of

22   working on maps prior to the data being fixed?

23         A.   We tried.

24         Q.   And do you recall when that was

25   happening?

1           RAYMOND E. DiROSSI

2           A.   I don't.

3           Q.   When you were working in the data,

4    when did you finally have a kind of map that

5    was ready to be shared; do you recall?

6           A.   Again, I wasn't working in the

7    data.  That is not my background or expertise

8    to understand how to make the data function.

9    I'm an end user of the software, not the data

10   person, so --

11          Q.   Okay.  Do you recall -- when the

12   data was ready, how long did it take you to get

13   a kind of final map?

14          A.   I don't recall.  We were working

15   on the apportionment and redistricting

16   simultaneously.  I don't recall.

17          Q.   Was it a matter of days or weeks?

18          A.   I mean, it was not days.  It took

19   a while to have all of these conversations.

20          Q.   Okay.  And do you recall when the

21   map was ready to be shared with anyone outside

22   of you, Ms. Blessing and Troy Judy?

23          A.   I don't recall when that was.

24          Q.   Do you recall who you showed the

25   map to first?

1           RAYMOND E. DiROSSI

2                MR. TUCKER:  I'm just going to object

3    to the phrase map.

4                THE WITNESS:  I don't recall.

5                MR. STRACH:  Is this a good time to

6    take a quick break?

7                MS. THOMAS-LUNDBORG:  Sure.

8                MR. STRACH:  It's been about an hour.

9    Thanks.

10               THE VIDEOGRAPHER:  We're off the

11   record.

12               (Recess taken.)

13               THE VIDEOGRAPHER:  We're on the

14   record.

15               MS. THOMAS-LUNDBORG:  Great.

16   BY MS. THOMAS-LUNDBORG:

17        Q.   I would like to go back to Exhibit

18   19, if you would.  So the first time we went

19   through this exhibit we skipped this first

20   page, and I would like to take some time to

21   look at it now.

22               You've testified before that you

23   used the unified political index, correct?

24        A.   Correct.

25        Q.   Does this document represent the

1          RAYMOND E. DiROSSI

2     unified political index that you used, the

3     races?

4              A.    Yes, it does.

5              Q.    Okay.  And where did you get the

6     data to put together this political index?

7              A.    These numbers are publicly

8     available from the Secretary of State, on the

9     Secretary of State's website about who -- what

10    the vote totals were.

11             Q.    And did you download the data from

12    the Secretary of State's website?

13             A.    Again, I didn't -- I didn't do the

14    data.

15             Q.    Okay.  Who in your understanding

16    was the person who downloaded the data from the

17    Secretary of State's website?

18             A.    Well, I -- I got the top line

19    information from the Secretary of State's

20    website.  I believe -- or Clark Benson would

21    have been the one who was doing the data, and

22    whether or not he got it from the Secretary of

23    State's website I couldn't speak to.

24             Q.    Okay.  And you said that you also

25    had a contract with Cleveland State and OU.

1          RAYMOND E. DiROSSI

2    Was there a reason that Clark Benson got this

3    data for you instead of OU and Cleveland State?

4          A.   So the contract with Cleveland

5    State and OU was entered into by the

6    legislative task force on redistricting that we

7    talked about, that bipartisan entity.  And so

8    their job was to take the geography of the

9    State of Ohio and, working with all of the ADA

10   county boards of elections that maintain their

11   precinct, ward and municipal boundaries, and

12   putting together the census data and marrying

13   those two pieces of data.  That is the role of

14   Cleveland State and OU.

15         Q.   Did you specifically contract with

16   Clark Benson or how did he come to work on the

17   historical data?

18         A.   I did not contract with him.  I

19   don't know how.

20         Q.   How were you introduced to Clark

21   Benson?

22         A.   I had known Clark from the

23   previous decade when he performed the same

24   function.

25         Q.   And how did he come to work in the

1          RAYMOND E. DiROSSI

2    2011 redistricting cycle?

3          A.   I can't remember specifically how

4    he was reintroduced to me as, hey, Clark is

5    going to be available to help you again.

6          Q.   Do you know how he was paid?

7          A.   I do not.

8          Q.   I would like to look at Exhibit 22

9    -- or it actually hasn't been introduced yet,

10   but if you turn to tab 22.

11             (Thereupon, Plaintiffs' Exhibit

12   Number 22, Document Bates Stamped DIROSSI_0000010,

13   was marked for purposes of identification.)

14   BY MS. THOMAS-LUNDBORG:

15             Q.   I'm having marked for the record

16   as Exhibit 22 DIROSSI_10.   This is a series of

17   charts here.   Do you recognize this document?

18             A.   I do.

19             Q.   Are you the author of this

20   document?

21             A.   I am.

22             Q.   Okay.   And why did you create this

23   document?

24             A.   As we talked about before, from my

25   historical interactions with the redistricting

1          RAYMOND E. DiROSSI

2    and apportionment in the previous decade, I

3    recalled that when you were doing redistricting

4    and apportionment the first things that

5    everybody wanted from you were maps and

6    indexes, maps and indexes.  It doesn't matter

7    if you were talking to the press, if you were

8    talking to legislative senators, state

9    representatives, congressmen, people

10   testifying, citizens, whoever, the first thing

11   that people wanted were historical political

12   indexes and maps.

13            And so this was a document I

14   created trying to keep the -- the political

15   indexes, the historical election stuff straight

16   so that I could answer those questions.

17        Q.   Okay.  Am I correct that this top

18   chart seems to show the 18 house districts as

19   they existed from 2002 to 2012?

20        A.   Right, so that's a very, very good

21   point.  These are the 18 congressional

22   districts from the previous decade using the

23   unified index and some other measures from

24   2011.

25        Q.   Okay.  So let's start with this

1      RAYMOND E. DiROSSI

2  first column.  It says current districts.  Do

3  the names here represent the congresspeople as

4  they were at the time in those districts?

5      A.   The vast majority of them I'm sure

6  are the incumbents, but I can't speak to

7  whether or not they all are.  I can't say.

8      Q.   Okay.  And then the next column is

9  McCain '08.  Is it correct that this would be

10 how much McCain would have gotten in those

11 districts in 2008?

12     A.   Yes.

13     Q.   Okay.  And then Bush '04, is that

14 how much Bush would have gotten in 2004 in

15 those districts?

16     A.   Yes.

17     Q.   And then Governor Kasich 2010, is

18 that the percentage that Governor Kasich would

19 have gotten in those districts?

20     A.   Yes.

21     Q.   And then DeWine 2010 AG, is that

22 the number that DeWine would have gotten in

23 each of those districts?

24     A.   Yes.

25     Q.   Then '06 AG Montgomery, is that

1          RAYMOND E. DiROSSI

2     the number that Montgomery would have gotten in

3     those districts in 2006?

4          A.   Yes.

5          Q.   And then 2006 AUD, I'm assuming

6     that's auditor --

7          A.   Correct.

8          Q.   -- Taylor, is that the percentage

9     that Taylor would have gotten in those

10    districts?

11         A.   Yes.

12         Q.   Are all the individuals that we

13    just named Republicans?

14         A.   They are.

15         Q.   Okay.  Included in this chart is

16    DeWine AG 2010.  It doesn't appear in 19.  You

17    can look back if you would like to refresh your

18    recollection.

19         A.   Yeah, that's what I was looking

20    for.  Oh, there it is.  Yes, I thank you for

21    that.  I would point out that on this document,

22    19, I had both the Republican and the

23    Democratic people who participated in that

24    election.  But I remember that was too much

25    information to get into those little cell

1          RAYMOND E. DiROSSI

2   headers, so I chopped down and abbreviated the

3   races.  That's why those are all the Republican

4   names.

5               Q.   Okay.  So my question for you is,

6   do you recall why DeWine was part of this

7   document and not part of 19?

8               A.   Yeah, as I mentioned, everybody

9   had their own way of looking at a political

10  index or historical election data.  I had said

11  and come to the conclusion that these were the

12  five races that we should be looking at.  Other

13  people wanted to look at pieces and parts of

14  these five exclusively, specifically the '08

15  McCain numbers.  Other people wanted to include

16  the 2010 Attorney General race as a barometer

17  of the historical election results.

18               And so this is me trying to put

19  all of that information into one document so

20  that I could answer all of those questions that

21  I was being bombarded with after the districts

22  were put out.  This document was created after

23  319 was adopted by the legislature when we were

24  getting media and member onslaughts of

25  questions.

1           RAYMOND E. DiROSSI

2               Q.    Okay.   There is a column called

3     unified average.   Is that the unified index?

4               A.    It is.

5               Q.    And would the unified index be the

6     five races or would it also include DeWine?

7               A.    It would have been the five races

8     and then weighted to 50/50 as Exhibit 19 had.

9               Q.    Okay.   The last column refers to

10    PVI.   What is PVI?

11              A.    So this is how the national

12    congressional Democrats and Republicans

13    calculate indexes.   They don't use numbers,

14    they use R plus this and D plus this.   So I

15    don't know how those are calculated, but I

16    wanted to try to have at my disposal the

17    language that they were talking about so when I

18    was asked about districts I could respond to --

19    in that language.   So that is the congressional

20    methodology, which I cannot explain what it is.

21              Q.    Okay.   Do you recall whether you

22    got this information from the Cook's PVI or did

23    you get it somewhere else?

24              A.    I don't know what the Cook's PVI

25    is.

1          RAYMOND E. DiROSSI

2          Q.    Okay.

3          A.    Yeah.

4          Q.    Do you recall where you got the

5    PVI from?

6          A.    I don't -- I don't recall.  I

7    would be guessing.

8          Q.    Okay.  At the bottom of this first

9    chart it says R plus 5 is likely Republican.

10   Do you see that?

11         A.    I do see that.

12         Q.    And do you recall where this R

13   plus 5 is likely Republican came from?

14         A.    Yeah, again, so this deals with

15   the R plus, D plus language, and so this would

16   have come from somebody I was talking to at the

17   national -- the national level of how they

18   would look at districts.

19              And again, as you pointed out,

20   everything on the top of this chart deals with

21   districts that are -- they're the districts

22   from 2001 with 2010 election data and 2001

23   population data.  So they're not real, they're

24   just -- they're this weird point in time that

25   aren't really valid.

1       RAYMOND E. DiROSSI

2              As we've talked about, some of

3    these districts were tens of thousands, if not

4    hundreds of thousands of people away from the

5    targets, so another reason why these indexes

6    are just kind of almost meaningless.  But

7    again, that's what everybody asks for, so I was

8    trying to have it.

9         Q.   Well, just sticking on this first

10   chart -- and this is the current districts as

11   they stood at the time, right?  This isn't a

12   hypothetical district that you're looking at?

13        A.   It's the districts from 2001 that

14   over the decade from 2001 to 2011 had grown --

15   some had contracted and some had grown in

16   population and so -- not to mention that we

17   were losing two districts, and so the district

18   targets of their population had to change by 70

19   some thousand people.

20              So yes, they are the district

21   boundaries, but the underlying data that's

22   generating these is not even really relevant to

23   anything because they're just not legitimate.

24        Q.   But the underlying data is for the

25   districts as they stood at the time, correct?

Page 240

1          RAYMOND E. DiROSSI

2          MR. STRACH:  Objection.

3          (Witness nodded head up and down.)

4     BY MS. THOMAS-LUNDBORG:

5          Q.   Okay.  Moving on, it says up to R

6     plus 5 is swing.  Do you see that?

7          A.   I do.

8          Q.   Where does that come from?

9          A.   Same source as the language above

10    it.  This is -- everything that is R plus and D

11    plus is the federal language of how you look at

12    districts and their historical election

13    returns, and so that would have come from the

14    same source as the language above it.

15         Q.   And was that source Adam Kincaid?

16         A.   I can't say for sure.  I can't

17    remember.

18         Q.   Okay.  And then if you look over,

19    there's R plus 5 is likely Republican.  Number

20    of districts R plus 5 is 7.  Do you see that?

21         A.   I do.

22         Q.   Does that mean that there were 7

23    districts that were R plus 5?

24         A.   Yes.

25         Q.   And then it says up to R plus 5 is

1                    RAYMOND E. DiROSSI

2       swing, number of districts that are R plus 3 -

3       I wonder if that's a typo - is 9.

4                A.    Yeah, I see that and I see that

5       discrepancy and I'm not sure why -- I don't

6       know how I made -- I don't know why I made that

7       error, if that's material to this whole thing

8       or not.

9                Q.    Okay.

10               A.    But yeah, that does not seem to be

11      consistent.

12               Q.    But does it appear, just looking,

13      eyeballing the chart, that there are 9

14      districts that are R plus 3?

15               A.    Yeah, so there are only 8

16      districts that are R plus 5 and there are 9

17      districts that are R plus 3, so I'm not sure

18      which one of those is correct.

19               Q.    Okay.  Going to the next chart,

20      this appears to be the kind of pairing of

21      incumbents that we talked about before.  Is

22      your understanding that this was 319?

23               A.    Yes, that's my understanding.

24      This is 319 as enacted.

25               Q.    Okay.  And so the first columns

1                    RAYMOND E. DiROSSI

2   all seem to be the same as the top column.

3   There is one new column here which is titled

4   Delta.  Do you see that?

5            A.   I do.

6            Q.   What is the Delta?

7            A.   Well, this would have been

8   information that was provided to me from that

9   national source that uses that language.  You

10  know, I was -- I was going to say it's the

11  difference between the PVI and the bottom chart

12  to the top chart, but then as I did some spot

13  checking it doesn't match up, so I --

14           Q.   Which one doesn't match?

15           A.   I just started at the bottom and

16  the first one I looked at, the 18th district in

17  the top chart Gibbs is R plus 7, whatever that

18  means, and then this bottom -- oh, I see, 18 is

19  not 18 at the bottom.  No, there's not 18 in

20  the bottom.

21           Q.   What about starting from the top?

22  It might be easier to match.  I think there are

23  more of them that --

24           A.   It just goes to show, I don't know

25  what -- I mean, I never really looked at this

1             RAYMOND E. DiROSSI

2   when I got it.  I don't know.

3         Q.   I thought you said you were the

4   author of this document.

5         A.   I am, but this information came to

6   me from somebody else because I don't know what

7   these scoring things, how you would calculate

8   them, so I would have just got them and typed

9   them into the cell in my spreadsheet to produce

10   this document.

11         Q.  Okay.  Well, let's go through a

12   few of them.  So the first one is Chabot 1 and

13   the top line it's D plus 1 and then in the

14   following chart it's R plus 6, the Delta is

15   plus 7.  Does that look like it's Republicans

16   have gone up plus 7?

17           MR. STRACH:  Objection.

18           THE WITNESS:  Yeah, I mean, I think

19   you could -- R is Republican, but again, I don't

20   know what 7 -- I don't know what that means.  I

21   don't know that scoring system.

22   BY MS. THOMAS-LUNDBORG:

23         Q.  Okay.  So R plus 13 on the top for

24   Schmidt and then on the bottom it's R plus 8

25   and the Delta is negative 5.  Do you see that?

1        RAYMOND E. DiROSSI

2            A.   I do.

3            Q.   And you have no understanding of

4    whether the Delta negative 5 is R plus 13 minus

5    R plus 8?

6            A.   I mean, that would seem logical,

7    but since I'm not the source of that

8    information, I --

9            Q.   Okay.

10               (Thereupon, Plaintiffs' Exhibit

11   Number 23, Document Bates Stamped DIROSSI_0000142,

12   was marked for purposes of identification.)

13   BY MS. THOMAS-LUNDBORG:

14           Q.   I would like to move on to a

15   document that I'm having marked as Exhibit 23,

16   and for identification it's DIROSSI_142.

17           A.   Yes.

18           Q.   And it has HB 319 unified indexes,

19   proposal unified indexes.  Do you see that?

20           A.   I do.

21           Q.   Do you recognize this document?

22           A.   Yes.

23           Q.   What is it?

24           A.   It's yet another document that I

25   created so that I could be prepared when I

1              RAYMOND E. DiROSSI

2    received inquiries about election results about

3    districts from any source that I would be able

4    to answer.

5              Q.   Okay.  And this document is a

6    little hard to read.  Excuse me.  This is just

7    the best copy that we received.  The column

8    that says HB 319 unified indexes, is that the

9    unified index that we've been discussing?

10             A.   It is.

11             Q.   And what is the proposal unified

12   indexes; do you know?

13             A.   So this document is House Bill 369

14   as introduced.

15             Q.   Okay.  And at the bottom of the --

16   the last column in the first chart says

17   assuming 52.5 percent and higher is a safe R.

18   Do you see that?

19             A.   I do.

20             Q.   Where did the assumption come from

21   that 52.5 is a safe R?

22             A.   So there was a lot of debate, both

23   in the press, the media and among legislators,

24   about districts and historical political

25   indexes.  And specifically the -- Jim Slagle

1          RAYMOND E. DiROSSI

2   and the Campaign for Accountable Redistricting

3   was saying that using his own set of election

4   data and his own scoring, that there were a

5   lack of competitive districts.  And so I was

6   trying to use -- trying to show House Bill 319

7   versus House Bill 369 as introduced just

8   generally what those indexes would be here.

9          Q.   Okay.  But where did the

10  assumption come from that 52.5 percent was safe

11  R?

12         A.   I can't say for -- I can't say for

13  certain.

14         Q.   And then it goes on to say 47.5

15  percent and lower is safe D.  Do you know where

16  that assumption came from?

17         A.   Yeah, that is Jim Slagle's -- I

18  was restating what he had been saying in the

19  press about districts.

20         Q.   Now, you testified a minute ago

21  that you created these, Exhibit 24 -- I mean,

22  sorry, Exhibit 22 and Exhibit 23 for media.

23  Did you use a political indices at all prior to

24  the introduction of HB 319?

25         A.   Well, it wasn't just for media.

1          RAYMOND E. DiROSSI

2     It was for anybody at any moment in time that

3     might ask.  As I pointed out, there were

4     congressmen and women who had asked for that

5     information, there were aspiring candidates to

6     run for Congress in the future when we talked

7     about now Congresswoman Joyce Beatty who

8     specifically made a request about indexes of

9     the 3rd congressional district.  There were

10    members of the Senate leadership team that were

11    asking, members of the legislature that were

12    asking, President Niehaus who was then asking

13    me, and so all of these documents are

14    me-created so that I could have them handy so

15    that I could answer those questions.

16         Q.   And did you create -- sorry,

17    strike that.

18              Did you use any of the historical

19    data prior to HB 319 being introduced?

20         A.   I mean, I used it in the -- we had

21    that same election data available to us for the

22    apportionment.

23         Q.   Did you use it in the drawing of

24    your maps?  Did you ever look at a map and see

25    how -- its measurement on the unified index?

RAYMOND E. DiROSSI

1

2      A.    Okay.   You said -- okay, I thought

3  you said before 319.

4           Q.    Yes, before 319 was introduced, so

5  while you were working on drawing the map did

6  you look at the indices?

7           A.    Well, the way that we were set up,

8  whenever we would make a change to any

9  district, whether we were working on the whole

10  state or an individual district, the population

11  would change, the African American population

12  would change, the Hispanic population would

13  change, the unified index would change.

14           All these other variables that

15  people were interested changed simultaneously.

16  So we never used any one exclusively, they were

17  all just changing every time we made any type

18  of change.

19           Q.    Okay.   So you did have the unified

20  index to look at when you were drawing the

21  maps?

22           A.    Yeah, along with everything else

23  that I articulated.

24                (Thereupon, Plaintiffs' Exhibit

25  Number 24, Documents Bates Stamped

1         RAYMOND E. DiROSSI

2    GOVPR_008278-8280, was marked for purposes of

3    identification.)

4    BY MS. THOMAS-LUNDBORG:

5         Q.   Okay.  I would like to mark for

6    the record Exhibit 24.  It's in tab 24.  For

7    identification, the Bates number is GOVPR_8278.

8    This is something that was produced by the

9    Governor.  I'm just going to ask you a kind of

10   quick question.  It is the -- it purports to be

11   the bill signing of HB 218 and HB 319.  You'll

12   see your name appears as a participant and next

13   to your name it says Senate Redistricting

14   Director.  Do you see that?

15        A.   I do.

16        Q.   What was your role as the Senate

17   Redistricting Director?

18        A.   Yeah, so that's probably somebody

19   preparing a document that really doesn't know

20   what was happening.  I did not hold such a

21   title or role.

22        Q.   Okay.  In your work on

23   redistricting you said you talked to President

24   Niehaus.  Between you and Ms. Blessing, was

25   there a division of labor between the Senate

1              RAYMOND E. DiROSSI

2    and the House?

3              A.    Nothing specific, no.

4              Q.    Okay.  Did you both equal -- have

5    equal amounts of conversations with President

6    Niehaus, for example?

7              A.    I don't know what conversations

8    she might have had with him, so I can't compare

9    the two.

10                   (Thereupon, Plaintiffs' Exhibit

11   Number 25, Document Bates Stamped DIROSSI_0000039,

12   was marked for purposes of identification.)

13   BY MS. THOMAS-LUNDBORG:

14             Q.    Okay.  I'm having marked for the

15   record Exhibit 25.  It's DIROSSI_39 --

16             A.    39?

17             Q.    I'm sorry, that's the name of the

18   Bates.  It's Exhibit 25.

19             A.    Got you.

20             Q.    And the subject is Confirmed:

21   Meet with Leadership on Redistricting Bill from

22   September 2nd, 2011.  Do you see that?

23             A.    I do.

24             Q.    When here it refers to a meeting

25   with the leadership, do you recall who would

1          RAYMOND E. DiROSSI

2    have been included in leadership meetings that

3    you attended at the time?

4          A.    Well, President Niehaus was the

5    president of the Senate, so obviously he was a

6    member of leadership, the president.  I would

7    be guessing at the other members of leadership

8    specifically.  I can't recall his other members

9    of leadership.

10         Q.    Okay.  Would Democrats have been

11   included in members of leadership?

12         A.    The Democrats had the Democratic

13   leadership, so --

14         Q.    Would they have been included in

15   meetings that you attended on redistricting?

16         A.    If they had asked.

17         Q.    Do you recall any specific

18   meetings that you attended with Democrats?

19         A.    I did attend a meeting at the

20   request of the Democrats for the -- during one

21   of their caucuses, but I can't say with

22   certainty whether it was for the congressional

23   redistricting bill or if it was when we were

24   working with them to change the process by

25   which we do apportionment districts in the

Page 252

RAYMOND E. DiROSSI

1

2   state, the constitutional amendment that was

3   just adopted.  But I did attend one caucus at

4   their invitation.

5            Q.   Okay.  Other than that one meeting

6   that you just mentioned, do you recall

7   attending other -- any other meetings with the

8   Democratic caucus?

9            A.   With the Democratic caucus?

10           Q.   Or leadership.

11           A.   Caucus, no other.  Obviously,

12   apologies, during the apportionment Leader

13   Budish was a member of the apportionment board

14   and I did attend all of the apportionment board

15   meetings, and specifically spoke with him

16   extensively about apportionment.

17           Q.   If those meetings had been put in

18   your calendar would they have been put in your

19   calendar as apportionment board or meetings

20   with leadership on redistricting bill?

21           A.   Probably apportionment board.  If

22   it was an actual date that the apportionment

23   board met, I would have -- I would have put it

24   on my calendar as an apportionment board

25   meeting.

1          RAYMOND E. DiROSSI

2              Q.    Okay.

3              A.    I know Leader Budish and I shared

4    maybe a two-hour discussion during that

5    apportionment board meeting about districting

6    and some of the principles.

7              Q.    Okay.  Other than that

8    conversation you had with Leader Budish during

9    the apportionment board, do you recall any

10   other conversations with Leader Budish

11   regarding redistricting?

12             A.    I do not.

13                  (Thereupon, Plaintiffs' Exhibit

14   Number 26, Documents Bates Stamped

15   LWVOH_00018302-18308, was marked for purposes of

16   identification.)

17   BY MS. THOMAS-LUNDBORG:

18             Q.    I would like to show you a

19   document that I'm having marked as Exhibit 26,

20   and the first page has the Bates number of

21   LWVOH_18302, and in the top left-hand -- sorry,

22   right-hand corner is your email.  Do you see

23   that?

24             A.    I do.

25             Q.    And then the from line appears to

1                    RAYMOND E. DiROSSI

2    be from Adam Kincaid.   Do you see that?

3            A.    I do.

4            Q.    Do you recognize the email address

5    next to it as Adam Kincaid's email address?

6            A.    I mean, sitting here that would be

7    his email.

8            Q.    Okay.   And the to line is your

9    email address, we've already established that,

10   and Heather Mann's, we've established that.

11   There's then an email address for Tom Whatman

12   which is TWhatman@TeamBoehner.com.   Do you see

13   that?

14           A.    Yes, Boehner.

15           Q.    Sorry, Boehner.   Do you recognize

16   that as Tom Whatman's email address?

17           A.    Looking at it on this piece of

18   paper I would recognize it as his email

19   address, but I --

20           Q.    Okay.   So the email from Adam

21   Kincaid, as we were discussing, says revised

22   attached, let me know your thoughts and I'll

23   work on it some more in the morning if needed.

24   Do you see that?

25           A.    Yes.

1          RAYMOND E. DiROSSI

2          Q.    And then there appears to be an

3    attachment which says New Map Idea Redraft.zip.

4    Do you see that?

5          A.    I do.

6          Q.    Did you receive from Adam Kincaid

7    at this point ideas by email?

8          A.    Do you know, is this all one email

9    chain?

10         Q.    It appears to be, only because it

11   says Gmail New Idea Draft page 1 of 8, and then

12   you have page 2 of 8, page 3 of 8, page 4 of 8,

13   so on and so forth.

14         A.    Yeah.

15         Q.    And that's an internal pagination

16   to the document.

17         A.    Okay.  And your specific question

18   again?  I'm sorry.

19         Q.    It's a general question about

20   whether you were receiving ideas from Adam

21   Kincaid at this point.

22         A.    Well, with this document in front

23   of me, he sent me something called New Idea

24   Redraft.  I can't recall if it was at my

25   request of him or he was sending it to me, but

1          RAYMOND E. DiROSSI

2    obviously on September 2nd at the date and time

3    here, he sent me that email, this email.

4          Q.   Okay.  Generally do you recall

5    receiving feedback from Adam Kincaid on the

6    draft map?

7               MR. STRACH:  Objection.

8               THE WITNESS:  Yeah, I recall sharing

9    information and ideas with Adam, but I don't

10   recall the specifics of them.

11   BY MS. THOMAS-LUNDBORG:

12         Q.   Okay.  What types of ideas would

13   you be sharing with Mr. Kincaid at this point?

14         A.   Well, again, I don't remember any

15   specific ones, but if any member of the

16   legislature, Republican or Democrat, was asking

17   for something and I felt I wanted his opinion

18   on it, I would have asked him for his opinion

19   on it.

20         Q.   If you turn to the third page of

21   this document, and I'm in the middle of the

22   page, there's an email from Tom Whatman.  We've

23   already established that email address.  And in

24   it he says, Adam, all looks good on the

25   surface, key is whether we can improve CD 1 and

1        RAYMOND E. DiROSSI

2   CD 14 at block level while keeping concepts

3   intact.  Do you see that?

4          A.   I do.

5          Q.   Do you recall whether at this

6   point Tom Whatman was providing suggestions to

7   the draft map?

8          A.   Yeah, so this is an email from Tom

9   to Adam that I'm cc'd on, I guess.

10         Q.   I think it's to you, but obviously

11  --

12         A.   But it's from Tom to -- yeah, I

13  don't recall.  You can ask Tom what he meant by

14  that.  I don't know.

15         Q.   I'm not asking what he meant in

16  this email.  I'm just asking you generally were

17  you receiving feedback from Tom Whatman on the

18  draft map?

19         A.   Tom was another resource that we

20  could -- I could have an information exchange

21  with.

22         Q.   And were you exchanging

23  information at this point in the process?

24         A.   I would -- yes, because the bill

25  was within a couple of weeks of being

Page 258

1            RAYMOND E. DiROSSI

2    introduced and voted on, so yes.

3                 (Thereupon, Plaintiffs' Exhibit

4    Number 27, Document Bates Stamped DIROSSI_0000040,

5    was marked for purposes of identification.)

6    BY MS. THOMAS-LUNDBORG:

7         Q.   Okay.  I would like to move on to

8    an exhibit I'm having marked as Exhibit 27.

9    For the record, it's DIROSSI_40, and the

10   subject is Confirmed:  Meet with Speaker and

11   Others re:  Redistricting, and it's from

12   September 5th, 2011.  Do you recall meeting

13   with the speaker generally during this period?

14        A.   I do remember a meeting, but I

15   don't know if -- I don't know anything about

16   this one.  I can't remember what this one was

17   --

18        Q.   And if the meeting -- the meeting,

19   just to be clear, would have been with Speaker

20   Batchelder or would it have been with someone

21   else?

22             MR. STRACH:  Objection.

23             THE WITNESS:  Which one, the one that

24   I recall or this one?

25   BY MS. THOMAS-LUNDBORG:

1        RAYMOND E. DiROSSI

2            Q.    The one that you recall.

3            A.    The one that I recall, which I

4    don't know if it is this one, was with Speaker

5    Batchelder.

6            Q.    Okay.  Do you recall anyone else

7    being at that meeting?

8            A.    President Niehaus.

9            Q.    Anyone else?

10           A.    Myself, Heather.

11           Q.    Anyone else?

12           A.    Those are the four that I

13    remember, including myself.

14           Q.    And what was the subject of that

15    meeting that you recall?

16           A.    Generally it was congressional

17    redistricting and where we were in the process

18    and how we were moving forward.

19           Q.    Okay.  And where were you at that

20    point in the process?

21           A.    Well, again, we're talking about a

22    hypothetical meeting -- or a meeting that I

23    don't remember when it was.  So where we were

24    in the process, I couldn't say.

25                 (Thereupon, Plaintiffs' Exhibit

1               RAYMOND E. DiROSSI

2    Number 28, Document Bates Stamped DIROSSI_0000043,

3    was marked for purposes of identification.)

4    BY MS. THOMAS-LUNDBORG:

5               Q.   Okay.  I would like to turn to an

6    exhibit I'm having marked as Exhibit 28.  It's

7    DIROSSI_43, for the record, and it says

8    Confirmed:  Meet with President Niehaus re:

9    Apportionment and Redistricting, Tuesday,

10   November -- sorry, September 6th.  Do you see

11   that?

12               A.   I do.

13               Q.   Do you recall having a meeting

14   with President Niehaus around this time?

15               A.   I mean, so September is right in

16   the heart of the apportionment constitutional

17   timeline that had to be done, the redistricting

18   was also ongoing, so I -- I do remember meeting

19   and talking to President Niehaus a lot.

20               (Thereupon, Plaintiffs' Exhibit

21   Number 29, Document Bates Stamped DIROSSI_0000044,

22   was marked for purposes of identification.)

23   BY MS. THOMAS-LUNDBORG:

24               Q.   Okay.  I would like to move to an

25   exhibit I'm going to have marked as Exhibit 29.

1                RAYMOND E. DiROSSI

2       It is Confirmed:  Senate Leadership Meeting,

3       and it's DIROSSI_44, for the record.

4                      And, to be efficient, I'm also

5       marking for the record Exhibit 30.  It's

6       DIROSSI_45.  It's another Confirmed:  Senate

7       Leadership Meeting from September 9th.

8                      (Thereupon, Plaintiffs' Exhibit

9       Number 30, Document Bates Stamped DIROSSI_0000045,

10      was marked for purposes of identification.)

11      BY MS. THOMAS-LUNDBORG:

12             Q.   As you sit here today, do you

13      recall whether you had two separate meetings

14      with the Senate leadership or if this is one

15      meeting with multiple entries?

16             A.   Okay.  Apologies.  You're looking

17      at 30 and 31?  I'm sorry.

18             Q.   I'm looking at 29 and 30.

19             A.   And your question is did these

20      meetings happen?

21             Q.   Do you recall whether there were

22      two separate meetings with the Senate

23      leadership or was there just one meeting?

24             A.   I mean, I just don't -- I don't

25      recall if these meetings happened, I don't

1          RAYMOND E. DiROSSI

2     recall if we did one and not the other.  It's

3     just too long ago.  I don't recall.

4          Q.   Okay.  And we've already discussed

5     a little bit about meetings with leadership.

6     Do you recall whether these meetings would have

7     been with Democrats or with Republicans?

8               MR. STRACH:  Objection.

9     BY MS. THOMAS-LUNDBORG:

10          Q.   As planned, at the minimum there

11     was a planned meeting?

12          A.   Well, as I said, President Niehaus

13     was having those conversations with the members

14     of the Democratic Senate, and so there was

15     really no need for me to have that level of

16     interaction.  Any information that was

17     relevant, like the requests from the

18     legislative Democrats that we did in 369, were

19     being relayed to me through other -- other

20     channels.

21          Q.   If you received a meeting

22     invitation, would that meeting have been for a

23     meeting with Republicans and Democrats or just

24     Republicans?

25               MR. STRACH:  Objection.

1          RAYMOND E. DiROSSI

2                THE WITNESS:  I mean, it could have

3    been -- it could have been both.

4                (Thereupon, Plaintiffs' Exhibit

5    Number 31, Document Bates Stamped LWVOH_00018310,

6    was marked for purposes of identification.)

7    BY MS. THOMAS-LUNDBORG:

8          Q.   I'm moving to what I'm having

9    marked as DiRossi 31.  It has Bates stamp LWVOH

10   and it's 18310.  And do you see your email

11   address at the top right corner?

12         A.   I do.

13         Q.   And then do you see your email

14   address in the from line at the top of the

15   email?

16         A.   I do.

17         Q.   In the to line it says Senator

18   Keith Faber.  Do you see that?

19         A.   Yes.

20         Q.   And who -- do you recognize this

21   email address?

22         A.   Yes.

23         Q.   And whose email address is this?

24         A.   I believe it is Senator Keith

25   Faber's.

1              RAYMOND E. DiROSSI

2              Q.    And then in the cc line it is Matt

3    Schuler.  Do you recognize this as Matt

4    Schuler's email address?

5              A.    Yes.

6              Q.    And in the email the top line says

7    Senator Faber, here is your concept put into a

8    map.  Do you see that?

9              A.    Yes.

10             Q.    At any point in the redistricting

11   process did you receive ideas from Senator

12   Faber?

13             A.    Verbally, yes.

14             Q.    And what were the nature of his

15   verbal ideas?

16             A.    So he lives in -- resides in

17   Mercer County and in House Bill 319 and 369 you

18   have multiple congressional districts that were

19   being proposed to come together and balance out

20   on population in Mercer County.

21                   And do you have copies of the maps

22   that I can -- I can use?  We keep referring to

23   all these maps and I --

24             Q.    You know, I have a copy of 369, I

25   believe.  Would this be helpful to you?

1          RAYMOND E. DiROSSI

2              A.    Yes.   So as I was saying -- thank

3    you for that, that's very helpful.   As I was

4    saying, in Mercer County you have three

5    congressional districts that are coming

6    together and are really being balanced out down

7    to that block level, and he, residing in Mercer

8    County, was very interested about what

9    geography was going to be in what district, and

10   so those were the nature of the verbal

11   interactions that I had with him.

12         Q.   Okay.   I'm going to skip a line.

13   And then the email goes on to, if the other

14   idea that Huffman worked on - we need to get

15   something that you and Huffman agree to by

16   tomorrow when Speaker Batchelder and President

17   Niehaus get together.   Do you see that?

18         A.    I do.

19         Q.   Do you recall there being a

20   disagreement between Mr. Huffman and Mr. Faber?

21         A.    I do not recall any disagreement

22   between them.

23         Q.   Okay.   Do you recall a time where

24   there were discussions between members of the

25   House and members of the Senate about the

1          RAYMOND E. DiROSSI

2    redistricting bill?

3          A.   So you're asking me if I was part

4    of any conversations with -- I'm sorry.

5          Q.   With members of the House and

6    members of the Senate about the bill.

7          A.   Well, this -- this would be one

8    example where Senator Faber, senator, Matt

9    Huffman, House member, and I were talking

10   about, my recollection Mercer County, and how

11   the map could be proposed.

12         Q.   Okay.  Do you recall if at this

13   point in September -- on September 10th if the

14   map had been introduced yet?

15         A.   I should know that.  I don't

16   recall.  I don't recall.

17         Q.   The next line of the email says DC

18   is increasingly -- is pushing to put the lid on

19   this.  Do you see that?

20         A.   I do.

21         Q.   Do you recall what the reference

22   to DC is?

23         A.   I don't -- I don't recall.

24         Q.   What about put the lid on this,

25   what does that mean?

```
 1              RAYMOND E. DiROSSI

 2              A.    Well, it's to get a map proposed

 3   and enacted.

 4              Q.    Were you getting pressure from

 5   anyone to get a map proposed and enacted at

 6   this point?

 7              A.    Well, people were getting pressure

 8   from me because we were right in the heart of

 9   the constitutionally mandated timeline for the

10   apportionment, which had to be done by

11   September 31st, and I was personally very

12   concerned that we were still working on the

13   congressional redistricting at the same time we

14   were trying to do the apportionment and that we

15   were just -- it was too much.

16              Q.    I understand that you were

17   pressuring people, but this DC, at a minimum,

18   is a reference to someone who is not you,

19   correct?

20              MR. STRACH:    Objection.

21   BY MS. THOMAS-LUNDBORG:

22              Q.    Do you refer to yourself in the

23   third person?

24              A.    Not usually, but I'm sure I have.

25              Q.    Do you refer to yourself by DC?
```

Page 268

1           RAYMOND E. DiROSSI

2       A.   No.

3       Q.   So, at a minimum, this was someone

4 outside of you?

5         MR. STRACH:  Objection.

6         THE WITNESS:  Yeah, I don't remember

7 the specifics of who I was referring to here in

8 this -- you know, obviously an email from almost

9 seven years ago.

10         (Thereupon, Plaintiffs' Exhibit

11 Number 32, Document Bates Stamped LWVOH_00018297,

12 was marked for purposes of identification.)

13 BY MS. THOMAS-LUNDBORG:

14       Q.   All right.  I'm going to move on

15 to an exhibit I'm having marked as 32 and it is

16 LWVOH_18297, and the subject line is

17 Redistricting Tweaks.  Do you see your email

18 address in the top right corner?

19       A.   I do.

20       Q.   Then there is an email in the from

21 line.  Do you recognize this email address?

22       A.   Are you referring to Senator

23 Niehaus?

24       Q.   Yes.

25       A.   Yes, I do recognize that.

1              RAYMOND E. DiROSSI

2              Q.    And whose email address is that?

3              A.    Senator Niehaus'.

4              Q.    And in the to line there is a

5    Whatman@sppgrp.com.  Do you see that?

6              A.    I do.

7              Q.    Do you recognize that email

8    address?

9              A.    You know, I really don't because

10   we just looked at -- you asked me before about

11   a Tom Whatman email and that was the one I

12   recognized.  This one is a different one.  I

13   don't recognize this one.

14             Q.    Okay.  Did you email any Whatmans

15   at more than one email address?

16             A.    Boy, I don't recall.

17             Q.    Okay.

18             A.    I don't recall.

19             Q.    Do you recognize your email

20   address in the other to line?

21             A.    I do.  That is mine.

22             Q.    Okay.  In the first line it says

23   sorry about the last-minute tweaks from Faber

24   and Widener.  Do you see that?

25             A.    I do.

Page 270

1              RAYMOND E. DiROSSI

2         Q.   Did you have an understanding or

3    do you know of who Faber is?

4         A.   I don't think I ever said I didn't

5    know who Faber was.

6         Q.   I'm asking who is Faber referenced

7    here?

8              MR. STRACH:  Objection.

9              You can answer that if you can.

10             THE WITNESS:  It sounds like a simple

11   question, but I didn't understand it.  Apologies.

12   BY MS. THOMAS-LUNDBORG:

13        Q.   Yeah.  Who is the Faber referenced

14   here?

15        A.   Senator Faber.

16        Q.   And who is the Widener referenced

17   here?

18        A.   Senator Widener.

19        Q.   And I'm skipping to the next line.

20   It says, I'm still committed to getting --

21   committed to ending up with a map that Speaker

22   Boehner fully supports with or without the

23   votes from two members in leadership.  Do you

24   see that?

25        A.   Yes.

1          RAYMOND E. DiROSSI

2          Q.   Do you recall at the time there

3    being discussions about Speaker Boehner's

4    support of the map?

5          A.   Yeah, I mean, this -- obviously

6    this is an email from Senator Niehaus that I

7    may have received, but I didn't send, so I

8    don't know what -- I mean --

9          Q.   Again, I'm not asking you about

10   this email specifically.  I'm asking do you

11   recall there being any discussions which you

12   were a part of where there was talk about

13   Speaker Boehner's support of the map?

14         A.   Well, it was -- it was clear to me

15   from conversations with President Niehaus that

16   President Niehaus was interested in Speaker

17   Boehner's input and thoughts on the map.  But

18   ultimately, as we've talked about, this was a

19   bill that was going through the legislature,

20   and anybody who had thoughts or ideas of the

21   map, if we couldn't get -- I shouldn't say we,

22   because I'm not a member of the legislature, if

23   the president and the speaker of the Ohio House

24   can't get the votes in the legislature, it's

25   irrelevant.

Page 272

1          RAYMOND E. DiROSSI

2              So yes, it was made clear to me

3     that he was interested in feedback and what

4     Speaker Boehner thought, but he still had the

5     responsibility to work with the Democrats in

6     the legislature and get a bill passed.

7          Q.    Okay.  At the time when 319 was

8     passed did it have Democratic support?

9          A.    I believe it did.  It had much

10    less support than 369, where, as I said, I

11    think there were 25 members of the Democratic

12    House and Senate that voted in support of it,

13    but there were members of the Senate Democratic

14    caucus who voted for 319.  They spoke very

15    passionately about the map on the floor of the

16    Ohio Senate.  And there were a handful of

17    members of the Ohio House that voted in support

18    of 319 on the Ohio House and who also spoke

19    very eloquently about it on the floor of the

20    House.

21          Q.    So your recollection is that

22    Democrats spoke in favor of the map, and by the

23    map I mean 319, on the floor of the House?

24          A.    The ones who voted for it, yes,

25    some of them did speak to it on the floor of

1        RAYMOND E. DiROSSI

2    the House and Senate respectively.

3        Q.    And when was that?

4        A.    I don't recall the specific date

5    that 319 was on the floor of the House and

6    Senate, but whatever date it was.

7        Q.    At the bottom of this email it

8    says I spoke with Strivers Sunday morning and

9    know he does not support the Widener changes

10   putting him over to Wright-Patt.  Do you see

11   that?

12       A.    I do.

13       Q.    Do you recall there being

14   discussions at the time with Congressman

15   Strivers?

16       A.    Again, this is not an email that I

17   generated.  I received it, but I didn't

18   generate it, so I -- if there are

19   conversations, I wasn't having them.

20       Q.    Okay.

21       A.    That's not what I was --

22       Q.    So you did not have any

23   conversations with Congressman Strivers at this

24   time?

25       A.    None that I can specifically

1          RAYMOND E. DiROSSI

2    recall.

3          Q.   Okay.

4          A.   I do remember in producing

5    documents there was an email that I believe he

6    and I exchanged, but I cannot recall the

7    specifics of it.

8          Q.   Do you recall at all there being a

9    particular concern with Congressman Strivers at

10   this time regarding the draft map?

11         A.   You're talking about 319 or 369 or

12   both?

13         Q.   319 because we're in early

14   September.

15         A.   319.  Your question again?

16         Q.   Do you recall there being any

17   concerns that Congressman Strivers had about

18   319?

19         A.   None that I can articulate or

20   recall.

21              (Thereupon, Plaintiffs' Exhibit

22   Number 33, Documents Bates Stamped

23   LVWOH_00018298-18301, was marked for purposes of

24   identification.)

25   BY MS. THOMAS-LUNDBORG:

Page 275

```
 1              RAYMOND E. DiROSSI
 2              Q.   Okay.  I'm going to turn to a
 3    document I'm having marked as Exhibit 33 and
 4    it's LWVOH_18298.  And do you see your email
 5    address in the top right corner?
 6              A.   I do.
 7              Q.   And then in the from line, is that
 8    your email address?
 9              A.   Yes, it is.
10              Q.   And then in the to line, is that
11    President Niehaus' email address?
12              A.   You know, once again, the previous
13    email that we looked at for his was at fuse dot
14    net and this one is not.  That is an email I am
15    unfamiliar with.
16              Q.   Okay.
17              A.   I'm not sure why there's a
18    different one there.
19              Q.   And we've already talked about the
20    other two email addresses.  You recognize Keith
21    Faber and Matt Schuler's email address,
22    correct?
23              A.   I do.
24              Q.   The timestamp of this email is
25    1:00 a.m. on September 12th.  Do you see that?
```

1          RAYMOND E. DiROSSI

2          A.    I do.

3          Q.    Do you recall working late during

4    this period?

5          A.    Yes.

6          Q.    As part of your work during this

7    period were you emailing with President

8    Niehaus?

9          A.    Well, this email was from me to

10   him at 1:06 a.m.

11         Q.    Okay.    And were you -- we've seen

12   other emails from Keith Faber.    Were you

13   emailing with him during this period?

14         A.    This period being this time of

15   night or this period meaning --

16         Q.    Meaning we've seen a couple of

17   emails starting with September 10th.    This is

18   September 12th.    Do you recall in this period

19   in September emailing with Keith Faber?

20         A.    I recall mid September is the time

21   where the first map House Bill 319 was close to

22   being enacted and it was also the final two

23   weeks of the apportionment, so we would be

24   working around the clock on both -- both items

25   simultaneously.    So conversations with

Page 277

1           RAYMOND E. DiROSSI

2     President Niehaus about apportionment and

3     redistricting would be very commonplace.

4           Q.   What about with Matt Schuler, were

5     you emailing with him regularly during this

6     period?

7           A.   Not as regular.  I enjoyed a

8     luxury -- as I mentioned to you before, I had

9     been a part of this process the decade before.

10    I was really the only person that had some

11    historical interaction with this process

12    before.  So I was largely, by Matt, who had not

13    been through this process, by President

14    Niehaus, to some extent as well, who had not

15    been through this process, I was -- they knew

16    that I understood the logistical and time

17    frames and everything and so they -- I did not

18    get a whole lot of direction from them.

19          Q.   Do you recall if the map had been

20    introduced yet at this point?

21          A.   I don't recall.

22          Q.   Now, looking at the text of the

23    email, you state index for Latta fell two

24    one-hundredth of a point to 51.33.  Who is

25    Latta?

1          RAYMOND E. DiROSSI

2                A.   He would have been a congressman,

3    former state senator and congressman from the

4    5th congressional district.

5                Q.   And which party was he part of?

6                A.   He was a member of the Republican

7    party.

8                Q.   And then the next line says index

9    for Jordan rose three one-hundredths of a

10   point, 53.26.  Do you see that?

11               A.   I do.

12               Q.   And who was Jordan?

13               A.   He is a former state senator,

14   current member of the Ohio Congressional

15   Delegation.

16               Q.   And is that Jim Jordan who we've

17   referenced in the past?

18               A.   It is.

19               Q.   Okay.  And is the index referred

20   to here the same political index that we

21   discussed earlier?

22               A.   It's the unified index that I was

23   using or I was trying to use, even though that

24   others wanted to use other --

25               Q.   Okay.

Page 279

1      RAYMOND E. DiROSSI

2         A.   -- other indexes.

3         Q.   And was it your practice at the

4    time that when you were making changes to the

5    map that you would reference the index?

6         A.   Well, as I've said, at any moment

7    in time what people would ask about might be

8    geography, might be indexes, might be

9    incumbency, might be a number of things.  The

10   very next line in this email that you didn't

11   mention yet, I'm sure you would have, is the

12   geographical changes to the districts for those

13   two things.

14         So I was mentioning the amount of

15   people in Lucas County that each of these two

16   congressional districts would contain in the

17   4th and 5th congressional district, and then I

18   was also showing the effect on the historical

19   political index simultaneously.

20         Q.   Going to the next email in the

21   chain, this one is 7:44 a.m., a more decent

22   time of morning, from President Niehaus to you

23   directly, and it says did Whatman sign off.  Do

24   you see that?

25         A.   I do.

1          RAYMOND E. DiROSSI

2          Q.   Did you have an understanding of

3    who Whatman was?

4          A.   Yes.

5          Q.   Was that Tom Whatman?

6          A.   Yes.

7          Q.   And why was Whatman's sign-off

8    discussed here?

9               MR. STRACH:  Objection.

10              Go ahead and answer.

11              THE WITNESS:  Yeah, I mean, this is

12   an email from Niehaus, so you can ask him - I'm

13   sure you will - of what he was looking for.  But,

14   as I said before, Tom was somebody that I was

15   exchanging information on or with.

16   BY MS. THOMAS-LUNDBORG:

17        Q.   Sorry, I'm just going to continue

18   and we may get to --

19        A.   That's fine.

20        Q.   I'm just going to move on.  I

21   think the question my colleague has will be

22   relevant.  I'm moving on to exhibit -- what I'm

23   going to have marked as Exhibit 34 and it's

24   LWVOH_18320.

25              (Thereupon, Plaintiffs' Exhibit

1          RAYMOND E. DiROSSI

2    Number 34, Document Bates Stamped LWVOH_00018320,

3    was marked for purposes of identification.)

4    BY MS. THOMAS-LUNDBORG:

5          Q.    And do you see your email address

6    in the top right corner?

7          A.    I do.

8          Q.    And then do you see your email

9    address in the to line?

10         A.    I do.

11         Q.    And the subject is Stivers Map and

12   this is from that same date, Monday, the 12th,

13   and this again is a -- a more natural time of

14   morning, 11:22 a.m.  Do you see that?

15         A.    I do.

16         Q.    And who is this email to?

17         A.    To Tom Whatman.

18         Q.    And this is the email address that

19   you recognize as his email address?

20         A.    Yes.

21         Q.    And in the text of the email it

22   says Strivers '08 Pres goes from 52.64 to 53.1.

23   Do you see that?

24         A.    I do.

25         Q.    Is that another reference to the

1          RAYMOND E. DiROSSI

2     unified index?

3          A.    It is.

4          Q.    And then it says Stivers --

5          A.    I'm sorry.  Did you say 52.64 to

6     53.31?

7          Q.    Yes.

8          A.    Okay.  I misspoke.  That is not

9     the unified index.

10         Q.    What is that?

11         A.    52.64 to 53.31 was the '08

12    presidential numbers.  And again, this goes to

13    the inherent conflict where I thought

14    historically we should be looking at one

15    number, and other people, federal folks,

16    congressmen, congresswomen had different

17    numbers they wanted to look at.

18         Q.    Okay.  And then this says Stivers

19    unified index goes from 55.02 to 55.72.  Is

20    that a reference to the unified index?

21         A.    It is.

22         Q.    Okay.  Thank you for that

23    clarification.

24              The next line is Schmidt 08 Pres

25    goes from 54.62 to 53.99.  Who is Schmidt?

1          RAYMOND E. DiROSSI

2          A.    Congresswoman Schmidt was a -- she

3    is no longer, but she was an incumbent from one

4    of the Southern Ohio congressional districts.

5          Q.    And which party was she from?

6          A.    Republican.

7          Q.    And is this reference to the

8    presidential '08 index that we discussed?

9          A.    It is, yeah, the one that's going

10   down, right.  So this is -- this is a great

11   example of any time you make these changes in

12   the map, one index might be going up, another

13   one might be going down.  So, you know, in this

14   case one set of numbers were going up, another

15   one was going down.

16          Q.    And the next line says Stivers

17   unified index goes from 57.64 to 56.96.  Is

18   that a typo?  Do you think that's Schmidt?

19          A.    I think I probably made many typos

20   in these emails.  Yeah, that probably would

21   have been Schmidt is what I would have meant

22   there.

23          Q.    And would this have been a

24   reference to the unified index that we

25   discussed?

1            RAYMOND E. DiROSSI

2            A.    Yes.

3            Q.    And then you say I can send the

4    equivalency file if necessary.   Do you see

5    that?

6            A.    I do.

7            Q.    Did you have a practice of sending

8    the equivalency files to Tom Whatman at this

9    point?

10           A.    I wouldn't call it a practice.

11   Sometimes I did, sometimes I didn't.

12               MS. THOMAS-LUNDBORG:  Okay.  I think

13   we have to go off the record to change the DVD.

14               THE VIDEOGRAPHER:  We're off the

15   record.

16               (Recess taken.)

17               THE VIDEOGRAPHER:  We're on the

18   record.

19               MS. THOMAS-LUNDBORG:  Thank you.

20   BY MS. THOMAS-LUNDBORG:

21           Q.   Good afternoon.

22           A.   Hello again.

23           Q.   We're almost there, I promise.

24               I would like to go back to the

25   unified index.  Did you share the unified index

1          RAYMOND E. DiROSSI

2    numbers with President Niehaus prior to the map

3    being introduced?

4          A.    You mean how I came to suggest the

5    specific races that made -- did I talk to him

6    about its composition or --

7          Q.    I'm talking about the unified

8    index numbers for districts.  Did you share

9    those numbers with President Niehaus prior to

10   the introduction of HB 319?

11         A.    I don't recall if I did.

12         Q.    Let's look back at Exhibit 33.

13   And this is an email, to refresh your

14   recollection, from you to President Niehaus,

15   and as we discussed, in the body of the email

16   you reference Latta and Jordan numbers.  Do you

17   see that?

18         A.    Yes.

19         Q.    Does this refresh your

20   recollection about whether you shared unified

21   indices numbers with President Niehaus prior to

22   the introduction of HB 319?

23         A.    Well, with regards to this

24   specific email, I mentioned the unified index,

25   I mentioned the geography changes for that --

1          RAYMOND E. DiROSSI

2    those two specific districts.  I thought you

3    were asking about all of the districts.

4          Q.   Is your recollection that you only

5    shared the unified index number for Latta and

6    Jordan?

7          A.   Before you pointed me to this, I

8    didn't recall -- I mean, I obviously sent him

9    this email, but I don't recall any other

10   instances when I would have -- specific

11   instances where I would have shared that

12   information.

13         Q.   Would you have shared that

14   information with anyone that you recall?

15         A.   Well, again, primarily they were

16   -- if anybody asked me, I would have shared

17   them, but I don't recall.

18         Q.   Okay.  Do you recall anyone from

19   the leadership, being the Republican

20   leadership, asking for the unified index

21   numbers prior to the introduction of HB 319?

22         MR. STRACH:  Objection.

23         THE WITNESS:  I don't recall.  I

24   think I had lost this battle in the index numbers,

25   the historical election information that I wanted

1          RAYMOND E. DiROSSI

2   to look at, nobody else really seemed to want to

3   look at.  They wanted to look at their own --

4   their own numbers.

5   BY MS. THOMAS-LUNDBORG:

6          Q.   Okay.  So when you look at Exhibit

7   33, that's your index, correct?

8          A.   I don't specifically reference

9   that it's the unified index, I just refer to it

10  as an index.  So I don't recall if it was the

11  unified index or it was one of the other

12  components thereof or one of the other things

13  that people had asked to look at.

14          Q.   Okay.  What were the other indices

15  that this could have been in Exhibit 33?

16          A.   Like we talked about in some of

17  the other documents, it could have been the '08

18  presidential numbers that a lot of people

19  wanted to use, because these were federal

20  elections so they wanted to use presidential

21  election results.  It could have been any of

22  the individual components of the unified index

23  that somebody wanted to look at.  We talked

24  about a document where there were some people

25  that said you should be looking at the 2010 AG

1          RAYMOND E. DiROSSI

2    race, a race that I didn't want -- or didn't

3    think we should include in the unified index.

4    So unless I specified the unified index, I

5    can't remember which one that is for.

6              Q.   Okay.   Looking at Exhibit 34,

7    which we've already gone through, there is a

8    reference to presidential index and unified

9    index.   Is the unified index discussed here the

10   unified index --

11             A.   Yes.

12             Q.   -- that you created?

13             A.   Yes, so this one I specifically

14   said what the numbers came from.

15             Q.   Okay.

16                  (Thereupon, Plaintiffs' Exhibit

17   Number 35, Documents Bates Stamped

18   LWVOH_00018322-18325, was marked for purposes of

19   identification.)

20   BY MS. THOMAS-LUNDBORG:

21             Q.   I would like to mark what is going

22   to be Exhibit 35 and it has LWVOH_18322.   Do

23   you see that?

24             A.   18 -- 18322?

25             Q.   Yes, sorry, I'm just marking it

1                RAYMOND E. DiROSSI

2    for the record.

3              A.    Oh, yes, I see.

4              Q.    And do you see your email address

5    in the top right-hand corner?

6              A.    I do.

7              Q.    And then do you see your email

8    address in the from line?

9              A.    Yes.

10             Q.    Okay.  And the email is to Adam

11   Kincaid.  Do you recognize that address?

12             A.    I do.

13             Q.    And then it's copying the Heather

14   Mann address that you recognize, correct?

15             A.    Yes.

16             Q.    And the Tom Whatman email address

17   that you recognize?

18             A.    Yes.

19             Q.    Okay.  In the text of the email it

20   says we are working to get sign-off from

21   Speaker Batchelder and President Niehaus on

22   this Stivers edit and then we will be done.  Do

23   you see that?

24             A.    I do.

25             Q.    Do you recall there being a

1          RAYMOND E. DiROSSI

2     Stivers edit at the time?

3          A.   I don't recall.  I mean, the title

4     of this email is Possible Stivers Addition.  I

5     can't recall what it was or if it was included

6     or not.

7          Q.   Okay.  I would like to turn to the

8     next page.  I'm sorry, the next page in the

9     same exhibit.  This is an email from Tom

10    Whatman at an address that we've already said

11    for the record you recognize, to you, Adam

12    Kincaid and Heather Mann, and the text of the

13    Tom Whatman email says, guys, really sorry to

14    ask, but can we do a small carveout of 77 in

15    Canton and put Timken HQ in the 16th.  Do you

16    see that?

17          A.   I do.

18          Q.   Do you recall receiving a request

19    from Tom Whatman at this time?

20          A.   I do.

21          Q.   And what was the nature of that

22    request?

23          A.   He was asking, very much as the

24    text reads here, of whether or not we could

25    make a geography change and include some

291 of 349

1          RAYMOND E. DiROSSI

2    geography that wasn't currently proposed in the

3    16th into the 16th.

4          Q.    And did you have an understanding

5    of why that request was being made?

6          A.    I mean, other than what I just

7    said, he wanted to include this area in the

8    16th.

9          Q.    And you had no understanding of

10   why?

11         A.    No.

12         Q.    Did you make that change?

13         A.    I believe later in the email I

14   asked Adam Kincaid if he would make the change

15   and send me an equivalency file so that I could

16   review it to understand it a little better.

17         Q.    Was it your practice to make

18   changes to geography that you didn't

19   understand?

20              MR. STRACH:    Objection.

21              THE WITNESS:    I mean, we didn't make

22   the change.  Based on this email, they -- I asked

23   them to make the change and send it to me so that

24   I could review it, and then with doing that we

25   made the change.

1              RAYMOND E. DiROSSI

2    BY MS. THOMAS-LUNDBORG:

3              Q.    Okay.   And why did you make the

4    change?

5              A.    Well, this is not -- this was,

6    again, not uncommon that we would make changes

7    for geography at the request of either

8    congressmen or congresswomen to add geography

9    or add territory into the district.   This was

10   kind of a common request.

11             Q.    Okay.   And at any point when you

12   received requests like this, did you question

13   why you were receiving the request?

14             A.    In some cases.

15             Q.    Do you recall any specific cases?

16             A.    I recall -- I recall that we had a

17   specific request from Congresswoman Kaptur to

18   include physical property in the 9th

19   congressional district.   She wanted

20   specifically for the NASA Lewis Research Center

21   in Cleveland and Brook Park, Ohio to be

22   included in the district.   She also wanted the

23   Plum Brook Station that was in Sandusky, Ohio

24   to be included in her district.   And I did not

25   understand the reason for that and so I asked,

1          RAYMOND E. DiROSSI

2     and I got an answer and then I recommended the

3     change.

4          Q.   Okay.  Are there any other changes

5     to geography that you recall making?

6          A.   We may have talked about it

7     before, but in the 3rd congressional district,

8     not congresswoman at the time, but Joyce Beatty

9     specifically asked for some territory to be

10    excluded from 319 into what became 369.  And I

11    didn't really appreciate or understand the

12    reason why, and after asking some questions it

13    was relayed to me the reason why and then we

14    made that change.

15         Q.   Are there any other requests that

16    you recall?

17         A.   Those three are the three specific

18    ones I recall about very specific geographical

19    areas.  There were generally people who said

20    put this county in a district, take this county

21    out of a district, but those were the three

22    very, very specific geography ones that we

23    received, and I think all three of them we did.

24         Q.   Okay.  You just mentioned there

25    were requests about putting counties in certain

1          RAYMOND E. DiROSSI

2     districts.  Do you recall any of those?

3          A.    There was -- Clark County, I

4     remember there being a lot of conversations

5     about making Clark County whole when it was

6     proposed in 319 to be split between two

7     districts, and 319 as it was adopted did not do

8     that change.  But later when we did 369, the

9     map that we've talked a little bit about, Clark

10    County was made whole in the 8th -- in the 8th

11    congressional district.

12         Q.    And who was the congressperson in

13    the 8th?

14         A.    That was Speaker Boehner.

15         Q.    And did that request come directly

16    from Speaker Boehner?

17         A.    No, the request was from Senator

18    Widener who wanted to see Clark County made

19    whole in one district.  He really didn't

20    specify which, but he wanted Clark County to be

21    whole, didn't want it to be split.

22         Q.    And which party was Senator

23    Widener part of?

24         A.    Widener was a Republican member of

25    the state Senate.

1          RAYMOND E. DiROSSI

2          Q.   Do you recall any other requests

3    related to counties?

4          A.   Well, we've talked about -- you

5    mean a whole county or just geography?

6          Q.   I'm talking about geography.

7          A.   So we talked a little bit about

8    them, but the --

9          Q.   Separate from what we've already

10   discussed, any other ones that you recall.

11         A.   Okay.  Let's see, we talked about

12   the Congresswoman Kaptur, changes for Lucas

13   County and Cuyahoga County, we talked about

14   Fudge changes for the 11th.

15              Oh, I do specifically remember

16   Congresswoman Schmidt from Southern Ohio, she

17   lived in Loveland, Ohio, which she lived in

18   Clermont County in Loveland.  And I think one

19   of the earlier questions that you asked me was

20   about communities of interest and I gave

21   examples about political subdivisions like

22   cities that cross -- cross county boundaries.

23   This was one instance where she lived in

24   Loveland in Clermont County, but Loveland also

25   extended into Hamilton County, and so at her

1          RAYMOND E. DiROSSI

2     request she wanted Loveland to be whole in the

3     congressional district.  And so in -- I believe

4     in 319 and 369 we unified the city of Loveland

5     even though they were across political

6     subdivision boundaries -- or across county

7     boundaries, I apologize.

8          Q.   Okay.  Anything else that you

9     recall separate from what we've already

10    discussed?

11         A.   Nothing -- nothing else that jumps

12    out at me.  Those were the big ones that were

13    focused on geography.  Some Republicans, some

14    Democrat.

15         Q.   Okay.

16              (Thereupon, Plaintiffs' Exhibit

17    Number 36, Document Bates Stamped DIROSSI_0000046,

18    was marked for purposes of identification.)

19    BY MS. THOMAS-LUNDBORG:

20         Q.   I would like to mark what is going

21    to be Exhibit 36.  It's DIROSSI_46 for

22    identification.  The subject is Confirmed:

23    Meet at the Bunker about Rollout, and it's from

24    September 12th, 2011.

25              Do you recall whether the map was

Page 297

1          RAYMOND E. DiROSSI

2     public in September -- on September 12th?

3               A.    That is close to the date that I

4     believe that the map was adopted, 319 was

5     adopted.   I don't know specifically if it was

6     public by then, but it's close to that date.

7               Q.    Do you recall whether the map was

8     introduced on the 13th?

9               A.    I don't recall.

10              Q.    Okay.

11              A.    And again, this email is funny

12    because it's almost the opposite of a previous

13    email that you asked me to look at where in

14    this one I say the location of this meeting is

15    in the redistricting office, but in the subject

16    matter I say we're having a meeting at the

17    bunker about the rollout.   In the previous

18    email the location was the bunker, but the

19    subject matter was redistricting office.   So I

20    just used those interchangeably.

21              Q.    Do you have any recollection of

22    what rollout would have been referenced here?

23              A.    Yeah, this may have been about the

24    process -- it could have been -- well, I guess

25    I should stop.   This could have been about

1              RAYMOND E. DiROSSI

2       apportionment or it could have been about

3       redistricting, so I'm not totally sure which

4       one it's about.

5              Q.   Okay.  During this time in the

6       process were you working on the rollout for the

7       apportionment map?

8              A.   So the apportionment map

9       constitutionally had to be adopted by the end

10      of September.  And so I can't remember the

11      exact timelines of when the proposed maps

12      rolled out, but they were in September.

13             Q.   Okay.

14             A.   They were around this time.  So

15      I'm not sure which one is which here.

16                  (Thereupon, Plaintiffs' Exhibit

17      Number 37, Document Bates Stamped LWVOH_00018321,

18      was marked for purposes of identification.)

19      BY MS. THOMAS-LUNDBORG:

20             Q.   Okay.  I'm going to move on to

21      what I'm having marked as Exhibit 37.  It's

22      LWVOH and it's 18321 for the record.  Do you

23      see your email address in the top right corner?

24             A.   I do.

25             Q.   And then in the from line it

1           RAYMOND E. DiROSSI

2    appears to be an email from Heather Mann at the

3    email address that you recognize, correct?

4              A.    Yes.

5              Q.    And then who is in the to line?

6    Do you recognize that email?

7              A.    That was an email address for Jim

8    Renacci.

9              Q.    And who is that?

10             A.    He was a congressman from Northern

11   -- Northeast Ohio.

12             Q.    And then your email address is

13   copied; is that correct?

14             A.    Yes, I am cc'd.

15             Q.    And in the text of the email it

16   says, per your request, here are the population

17   numbers and percentages of Congresswoman

18   Sutton's current district that would be

19   contained in the proposed districts.    Do you

20   see that?

21             A.    I do.

22             Q.    Who is Congresswoman Sutton?

23             A.    She is also a -- at the time was a

24   sitting incumbent of a Northeast Ohio

25   congressional district.

1          RAYMOND E. DiROSSI

2          Q.   Okay.   To the extent that you

3    know, why was -- why were the percentages from

4    Congressman (sic) Sutton's district being

5    shared with Congressman Renacci?

6          A.   Well, obviously this is an email

7    from Heather to Congressman Renacci and I was

8    just cc'd, so I don't know the specific genesis

9    of it or what specifically she was trying to

10   convey.

11         Q.   Okay.   At any point did you share

12   numbers like this with sitting congresspeople?

13         A.   I don't recall.   If asked, I would

14   have, but I can't recall.   You know this --

15   maybe I should say, a lot of this in Northeast

16   Ohio has to do -- I guess call it the ripple

17   effect.   When the decision was made with

18   Congresswoman Fudge that the 11th district

19   would be structured in a way that started in

20   Cuyahoga and came down to Summit County, it

21   really kind of split Northeast Ohio into two

22   separate halves, and so there were a lot of

23   geographical changes that were happening in

24   Northeast Ohio because of the configuration of

25   the 11th.

1          RAYMOND E. DiROSSI

2               And this is one of the districts

3     that was kind of absorbed into six or seven

4     different surrounding districts, but it all

5     kind of started with the decision to draw the

6     11th district the way that it was drawn.

7          Q.   Okay.

8          A.   So that's the background.

9          Q.   And were you a part of those

10    conversations about the changes to this section

11    of the map?

12         A.   Heather and I would have worked

13    jointly on those throughout the process.

14         Q.   And this is an email to a

15    particular congressperson.  Were there emails

16    or phone conversations with other

17    congresspeople about this section of the map?

18               MR. STRACH:  Objection.

19               THE WITNESS:  You're asking if I or

20    Heather or --

21    BY MS. THOMAS-LUNDBORG:

22         Q.   Let's take it in two parts.

23         A.   Okay.

24         Q.   As far as you're aware, were there

25    other emails with sitting congresspeople about

1          RAYMOND E. DiROSSI

2    this portion of the map that you just

3    described?

4          A.   I can't say there weren't, but

5    none that I specifically recall.

6          Q.   Okay.  Were there phone

7    conversations about this portion of the map

8    with sitting congresspeople?

9               MR. STRACH:  Objection.

10              THE WITNESS:  None that I recall

11   having.

12   BY MS. THOMAS-LUNDBORG:

13         Q.   Okay.  Do you recall having any

14   conversations with the members of the staff of

15   sitting congresspeople about this portion of

16   the map?

17         A.   None that I can specifically

18   recall.

19         Q.   We've gone through a lot of

20   calendar entries.  Did you produce all of the

21   calendar entries that you retained from that

22   period?

23         A.   Yes.

24         Q.   Were you part of the process of

25   revising the map after 319 in preparation for

1          RAYMOND E. DiROSSI

2   369?

3          A.    Yes.

4          Q.    And what was your role in that

5   process?

6          A.    So at this point we had moved out

7   of the redistricting office and I was working

8   in the Statehouse, as we talked about earlier,

9   and so there were, especially in 369 -- the map

10  for 319 for a number of reasons, we can discuss

11  them if you want, had stalled and it was

12  obvious that it wasn't going to be enacted.

13  There were a lot of conversations happening at

14  multiple levels with the Democrats in the

15  Senate and in the House of Representatives

16  about what changes would need to be made to 369

17  in order to get the votes necessary to pass the

18  map.

19              And so as that information was

20  filtering back down to me from a number of

21  sources, I was working independently of

22  Heather, as she was working independently of

23  me, to try to put those together in a map that

24  would balance out the population and try to

25  adhere to as many of these other principles as

1            RAYMOND E. DiROSSI

2    I've articulated, and that's what we were doing

3    in preparation for 369 to be adopted.

4          Q.   And you said you were working

5    independently of Heather?

6          A.   Yes.

7          Q.   Is that different than the process

8    during 319?

9          A.   Well, in 319 -- well, for most of

10   the process in 319, if not all of the process,

11   we worked together in the redistricting office.

12   Once we had closed the redistricting office

13   when 319 had been adopted and we thought that

14   would be the map, we thought we were done, and

15   so we both kind of went our separate ways.

16         But then when a second map needed

17   to be done, she was working out of her office

18   and I was working out of the Statehouse, and by

19   independently I meant physically apart from

20   each other.

21      Q.   Okay.  Were you having

22   conversations about the work that you were

23   doing?

24        A.   Some.  Not nearly as much as

25   before, but Heather and I did talk

Page 305

1           RAYMOND E. DiROSSI

2    occasionally, yes.

3           Q.    And when you separated your work,

4    were you given individual responsibilities?

5    How was the work divided between you and

6    Ms. Blessing?

7           A.    There was no delineation of you do

8    this, I do this.   It was we're both working on

9    what our leaders, for me President Niehaus, and

10   for her Speaker Batchelder, thought we needed

11   to do to get the appropriate number of

12   Democratic votes to pass a map.

13          Q.    Okay.   And when it came to drawing

14   district lines did you work together or

15   separately?

16          A.    Mostly separately, but on occasion

17   we would have talked and shared what are you

18   working on, this is what I'm working on.

19          Q.    And at the end of the process did

20   you have two separate maps or was it combined

21   into one map?

22          A.    Well, at the very end of the

23   process House Bill 369 was introduced in the

24   Ohio House, so she would have been the one who

25   sent the final map to the Legislative Service

1        RAYMOND E. DiROSSI

2    Commission to be drafted into a bill so that it

3    could undergo the hearing process.  But we

4    would have had to put any pieces and parts of

5    what we had been working on together for her to

6    do that.

7        Q.   Okay.  And when did the process of

8    putting it together happen?

9        A.   You know, I don't recall.  There

10   was a long period of time after the adoption of

11   319 where there was just no movement on -- on

12   the map and we were just kind of stuck in

13   neutral.  And then we were able to get House

14   Bill -- enough Democratic input that we could

15   get 369 introduced, and we thought that we had

16   enough to move the bill and we didn't, and then

17   we were back into neutral.

18            And then finally there was a

19   breakthrough, probably more that Heather was

20   involved in than I, that kind of broke -- broke

21   through and the deal was struck that the

22   legislative Democrats were comfortable, and

23   then we moved forward with the process and the

24   map was adopted.

25        Q.   Going back to 369 prior to

1           RAYMOND E. DiROSSI

2    introduction and the two separate maps, you had

3    a map and Heather had a map, correct?

4           A.   Well, I don't know if we had full

5    maps.  We obviously had 319 because that's

6    where we left off, but I think -- well, I

7    shouldn't speak for her.  I was having

8    conversations -- oops, sorry if I hit the

9    microphone.  I was having conversations with

10   Bob Bennett, I was having conversations with

11   Tom Niehaus, he was having conversations with

12   anybody who was giving me input about what the

13   requests of the Democrats in the House and

14   Senate were in order for them to provide their

15   votes.  And so I was working on -- maybe not a

16   whole map, maybe I was just working on one

17   district to try to make the changes to

18   accommodate the Democratic requests.

19           Q.   And then at some point the changes

20   you made and the changes that Ms. Blessing made

21   were integrated, correct?

22           A.   Yes, they would have been to

23   produce House Bill 369 as introduced.

24           Q.   Okay.  And do you recall when that

25   took place?

RAYMOND E. DiROSSI

1

2      A.   I don't.  I don't recall when it

3  was introduced.

4      Q.   And when you were working on

5  combining the pieces that you were working --

6  that you each were separately working on, did

7  you have a process of deciding what would

8  happen if there was a conflict?

9      A.   We didn't have a set process and I

10  can't recall any conflicts that arose.  I mean,

11  I think when the Democrats were making a

12  request like we talked about in Montgomery

13  County, that request was being made to the --

14  the House and the Senate kind of together and

15  so there wasn't a conflict.  It was kind of

16  like we're either doing what they want to do or

17  we're not.

18      Q.   Okay.  And you mentioned after 369

19  was introduced it stalled and then there was a

20  breakthrough.  What was that breakthrough?

21      A.   And again, so here's where I

22  wasn't as involved.  That was more on the House

23  side.  But I think it all -- or I know it all

24  revolved around Joyce Beatty making some final

25  requests, last-minute changes to the 3rd

1           RAYMOND E. DiROSSI

2    congressional district.  And once those were

3    made, the votes were secure and the map could

4    proceed.

5           Q.   Okay.  And you don't recall what

6    the change was to the 3rd district?

7           A.   I mean, I can speak to -- I

8    couldn't speak to the specific geography, but I

9    know specifically she wanted to change a little

10   bit of the geography, and I'm referring to

11   Joyce Beatty, so that one of her potential

12   primary opponents wouldn't be in the 3rd

13   district and they would be in one of the other

14   Franklin County districts.  So there was some

15   geography changes that Heather would be able to

16   speak to to accomplish -- to accomplish that

17   request.

18          Q.   Okay.  And your recollection is

19   that happened after HB 369 was introduced?

20          A.   Yes, those were the final changes.

21   369 was then amended and then passed.  She also

22   wanted to ensure that the -- the non-Hispanic

23   African American voting age population of the

24   3rd congressional district, to see if it could

25   be made higher, and she also wanted to make

```
 1              RAYMOND E. DiROSSI

 2    sure that the index - and again, that's the

 3    index that she was looking at, not necessarily

 4    the unified index - was as favorable to her as

 5    possible.

 6              Q.   Okay.  Do you know which index she

 7    was looking at?

 8              A.   You know, I don't know.

 9              Q.   Okay.  And you said none of those

10    conversations happened directly with you?

11              A.   That is correct.

12              Q.   And how did you learn of those

13    conversations?

14              A.   From conversations with Heather,

15    from conversations with Bob Bennett and

16    conversations with Tom Niehaus.

17                   (Thereupon, Plaintiffs' Exhibit

18    Number 38, Documents Bates Stamped

19    SOS_001010-1011, was marked for purposes of

20    identification.)

21    BY MS. THOMAS-LUNDBORG:

22              Q.   Okay.  I don't think we're going

23    to spend that much time on this.  I just want

24    to look at Exhibit -- what I'm going to have

25    marked as Exhibit 38, and it's SOS_1010 for the
```

1                    RAYMOND E. DiROSSI

2      record.

3                         Do you see your email address at

4      the top?

5                A.    I do.

6                Q.    And then this is to Halle Pegler

7      (sic).  Do you see that?

8                A.    Halle Pelger (pronouncing).

9                Q.    Sorry.

10               A.    That's okay.  If you're not from

11     Ohio, you wouldn't know who she is.  No

12     problem.

13               Q.    Well, who is she?

14               A.    She worked for the Secretary of

15     State's office.

16               Q.    And did she have any involvement

17     in the redistricting process?

18               A.    So her only involvement for the

19     redistricting process was after the maps were

20     adopted, the Secretary of State in Ohio is in

21     charge of obviously effectuating the elections.

22     And one of the things that needed to be done in

23     both decades, and always needs to be done, is

24     people need to file -- take out petitions to

25     file to run for office.

1          RAYMOND E. DiROSSI

2                  And in a congressional district

3     the Ohio law is that you have to file in the

4     most populus county in your district.  So if

5     you -- if you wanted to run in a district that

6     was in two counties, depending on which county

7     had the most population in your congressional

8     district is which county Board of Elections you

9     would need to file on.

10                 The Secretary of State was

11    responsible for letting all 88 county Board of

12    Elections know for congressional districts

13    where candidates would need to file, and this

14    was happening very quickly on the heels of

15    these maps.  So my interaction with her, with

16    Halle as a representative of the Secretary of

17    State's office, was letting her know here are

18    the population breakdowns of the district --

19          Q.    Okay.

20          A.    -- so that they could do that

21    process in a timely manner.

22                 (Thereupon, Plaintiffs' Exhibit

23    Number 39, Document Bates Stamped DIROSSI_0000061,

24    was marked for purposes of identification.)

25    BY MS. THOMAS-LUNDBORG:

Page 313

1        RAYMOND E. DiROSSI

2              Q.    Okay.   Let's move on to an exhibit

3    I'm going to have marked as Exhibit 39.   It's

4    DIROSSI_61 and the subject is Confirmed:   Brief

5    Leadership on Congressional Maps.   Its date is

6    November 2nd, 2011.  Do you see that?

7              A.    I do.

8              Q.    Do you recall whether you had any

9    briefings with leadership at this time on

10   congressional maps?

11             A.    I don't recall if this one -- if I

12   attended this one, but I do recall having

13   meetings with the leadership to update them on

14   where we were in this process.

15             Q.    And would you have had those

16   meetings before HB 369 was introduced?

17             MR. STRACH:   Objection.

18             THE WITNESS:   Yeah, I can't recall.

19   BY MS. THOMAS-LUNDBORG:

20             Q.    Okay.

21             A.    I definitely had meetings with the

22   leadership as 369 was pending, but I don't know

23   about before it was introduced.

24             Q.    Okay.  When you met with the

25   leadership would that have been the Republican

1           RAYMOND E. DiROSSI

2    leadership and the Democratic leadership?

3           A.    This would have been with the

4    Republican leadership.   Obviously if the

5    Democrats had asked, at this point we were

6    working very closely with them in the House and

7    in the Senate to change the map for their --

8    for their requests.   So if they had asked, I

9    would have obviously met with them.

10                (Thereupon, Plaintiffs' Exhibit

11   Number 40, Document Bates Stamped DIROSSI_0000499,

12   was marked for purposes of identification.)

13   BY MS. THOMAS-LUNDBORG:

14          Q.    Okay.  I would like to move on to

15   an exhibit I'm going to have marked as Exhibit

16   40.  It's DIROSSI_499.  Do you see that?

17          A.    Yes, I do.

18          Q.    Okay.  So this was an exhibit that

19   you produced.   It says that it's provided by

20   Gongwer.

21          A.    Gongwer (pronouncing).

22          Q.    And it's Political Indexes -

23   Proposed Congressional Districts.  Do you

24   recognize this document?

25          A.    Generally.

1          RAYMOND E. DiROSSI

2          Q.    And what is it?

3          A.    Well, I am not the source of this

4    document.  I produced it because I had it in my

5    possession, but I am not the author or the

6    creator of it.

7          Q.    And how did it come to be in your

8    possession?

9          A.    Gongwer is a Statehouse news

10   service reporting agency that reports on

11   happenings in and around the Statehouse, and at

12   some point this document would have been in

13   Gongwer and I would have thought it to be of

14   some value and so I would have kept a copy of

15   it in my files.

16          Q.    Okay.  Do you recall having seen

17   this document before?

18          A.    Until I produced it again, I

19   really didn't remember that I had it.

20          Q.    Do you know what political indices

21   was being used here?

22          A.    Yeah, so the source of this is --

23   Jim Slagle and the Ohio Campaign for

24   Accountable Redistricting, as I mentioned, he

25   had his own methodology and so I can't speak to

1          RAYMOND E. DiROSSI

2    what he -- I can't speak to how the methodology

3    he was using.

4                (Thereupon, Plaintiffs' Exhibit

5    Number 41, File Produced in Native Format Bates

6    Stamped DIROSSI_0000525, was marked for purposes

7    of identification.)

8    BY MS. THOMAS-LUNDBORG:

9          Q.   Okay.  I would like to turn to an

10   exhibit that I'm going to have marked as

11   Exhibit 41.  This is another exhibit that was

12   produced in native, it's an Excel file.  So

13   there is the cover sheet which says it was

14   produced in native and it's DIROSSI_525.  And

15   because it's an Excel sheet, unfortunately the

16   columns break onto different pages.

17               And are you familiar with the term

18   metadata?

19         A.   I have heard -- I have heard the

20   term.  I've heard the term.

21         Q.   Okay.  Do you understand that when

22   you produce something in native there is a --

23   there's data associated with when the document

24   was created?

25         A.   Yeah, I'm not familiar with

1         RAYMOND E. DiROSSI

2    native.  I'm sorry.

3              Q.   So this says that the file was

4    produced in native format, meaning we received

5    an Excel spreadsheet.

6              A.   Oh, okay, so -- okay, thank you.

7              Q.   So I think there's no point in us

8    kind of having a back and forth about what

9    metadata means, but I will represent for the

10   record that the metadata says that this

11   document was created on November 2nd, 2011.

12             Does that generally seem right to

13   you, that you would have been working on

14   documents like this in early November?

15             A.   You said November of 2011?

16             Q.   Yeah, November 2nd, 2011.

17             A.   I mean, generally this is yet

18   another example of a document that I would have

19   created because at any moment in time who knows

20   what question I would be asked.  This one, for

21   whatever reason at the time, I was going back

22   to 2001 and trying to show two decades of

23   changes.  That's what threw me, that there's 18

24   districts here in the first column, but --

25             Q.   Okay.  I just want to go through

1          RAYMOND E. DiROSSI

2      each of these columns to make sure I understand

3      what they mean.  The first column is 2001

4      member districts.  Do you see that?

5              A.   I do.

6              Q.   And what is your understanding of

7      what this column is?

8              A.   Yeah, without -- without saying I

9      was accurate, I assume what I was saying is who

10     were the incumbent members of each of the 18

11     congressional districts in 2001.

12             Q.   Okay.  And 2001 unified index, do

13     you see that?

14             A.   I do.

15             Q.   Is that the index that you

16     created?

17             A.   Yes, but I can't recall, to be

18     honest, if it was the unified index that I

19     created in 2001 or if it was the unified index

20     I created in 2011 superimposed on 2001

21     districts.

22             Q.   Okay.  2011 member districts, do

23     you see that?

24             A.   I do.

25             Q.   And is this the proposal for the

1                RAYMOND E. DiROSSI

2    districts for 319 or 369?

3         A.   Yeah, that is a great question.

4    This is the first example where in this

5    document I can't recall -- you said November of

6    '11?

7         Q.   Yes.  I'm just talking about this

8    column, members and districts.

9         A.   Yeah, but you asked if it was from

10   319 or 369.

11        Q.   Right.  Were there any changes in

12   the pairing of members and districts between

13   319 and 369?

14        A.   No.

15        Q.   Okay.  Then it says 2011 unified

16   index.  Do you see that?

17        A.   I do.

18        Q.   Would that have been the unified

19   index that you created?

20        A.   Sounds right, yes.

21        Q.   And then 2008 Pres index with 2011

22   districts.  Do you see that?

23        A.   Yes.

24        Q.   And would that be the 2008

25   presidential index that we've been discussing?

1        RAYMOND E. DiROSSI

2              A.    Yeah, that was an alternative that

3    other people wanted to use, so I was including

4    it on my documents so I could have it handy.

5              Q.    And then the next column is 2011

6    VA AA.  Do you see that?

7              A.    I do.

8              Q.    What does that column represent?

9              A.    It would be 2011 voting age

10   African American population percentages.

11             Q.    Okay.  And then the next column is

12   2011 NHB VA AA.  What does that column

13   represent?

14             A.    That's non-Hispanic black voting

15   age African American population percentages.

16             Q.    Okay.  So the first -- the prior

17   column includes Hispanic blacks and then the

18   following column is non-Hispanic blacks?

19             A.    Yes.

20             Q.    Okay.  Then there's a column

21   entitled REDRAW 2011 unified index.  Do you see

22   that?

23             A.    I do.

24             Q.    And what does that column

25   represent?

1          RAYMOND E. DiROSSI

2          A.   That's a good question.   I cannot

3  remember what REDRAW meant and why I have it

4  capitalized, if that mean --

5          Q.   So it possible that this is the

6  change from 319 to 369?

7          A.   It's possible, but I can't say

8  that it is.   I don't -- I don't know in this

9  last column what I was trying to compare.   I

10  can't say.

11          Q.   Okay.  Going to the last page, the

12  first column is just a continuation of the

13  first column we saw on the first page, and then

14  the following column is change 2011 unified

15  index.  Do you see that?

16          A.   I do.

17          Q.   Just correct me if I'm wrong.

18  Does that appear to be the change between the

19  2011 unified index on this page and the REDRAW

20  2011 unified index?

21          A.   If I take a second and try to get

22  oriented.

23          Q.   Sure.

24          A.   Okay.  I'm sorry.  I was just

25  trying to get oriented.  Your question again

1          RAYMOND E. DiROSSI

2    was?

3          Q.   Oh, whether this change unified --

4    2001 unified index, if this column represents

5    the difference between 2011 unified index and

6    the REDRAW 2011 unified index.

7               So, for example, if you look at

8    the first -- the first row of Chabot, does that

9    appear to be the difference between 2011

10   unified index and REDRAW 2011 unified index?

11              MR. STRACH:  Objection.

12              THE WITNESS:  I'm just trying to

13   remember.  I can't remember what the REDRAW meant.

14   BY MS. THOMAS-LUNDBORG:

15          Q.   That's not my question.  My

16   question is, is this --

17          A.   It would help me understand --

18   understand this document and why I even created

19   it.  Okay.

20          Q.   Okay.  I'm just asking, looking at

21   the numbers themselves, does 2011 unified

22   index, REDRAW 2011 unified index, the

23   difference between the two appear to be a

24   change 2011 unified index?

25              MR. STRACH:  Objection.

Page 323

1          RAYMOND E. DiROSSI

2              THE WITNESS:  Yeah, I can't remember.

3      It's possible, but I can't say for sure that

4      that's what it is.

5                    (Thereupon, Plaintiffs' Exhibit

6      Number 42, File Produced in Native Format Bates

7      Stamped DIROSSI_0000518, was marked for purposes

8      of identification.)

9      BY MS. THOMAS-LUNDBORG:

10          Q.    Okay.  I would like to move on to

11      a document I'm having marked as Exhibit 42.

12      It's another document that you produced in

13      native, meaning we got the Excel sheet, which

14      is why we have file produced in native cover

15      sheet, and it's DIROSSI_518, for the record,

16      and the metadata for this document is November

17      15th, 2011.

18                  Are you the author of this

19      document?

20          A.    You know, this one I'm not sure if

21      -- I can't say for certain like all the other

22      ones that I am the author of this one.  This

23      one does not look like the style that I would

24      have created.

25          Q.    Okay.

1          RAYMOND E. DiROSSI

2          A.    It's similar, but I can't say that

3    I am the author.

4          Q.    If you weren't the author, who

5    would you have received this document from?

6              MR. STRACH:   Objection.

7              THE WITNESS:   You said I produced it?

8    BY MS. THOMAS-LUNDBORG:

9          Q.    Yes, you produced it in native,

10   meaning you produced an Excel spreadsheet to

11   us.

12         A.    I can't recall who would have

13   given this to me.   I don't know.

14         Q.    Do you recall having looked at a

15   document like this?

16         A.    Until I turned the page, it did

17   not look familiar.

18         Q.    Okay.   Do you recall during the

19   time that you were working on drafting HB 369,

20   did you look at the unified index?

21         A.    Yeah, as we talked about before,

22   on -- the way we had our computers set up,

23   whenever a geographic change was made in the

24   map the population data would change, the

25   Hispanic concentrations of the district would

1                    RAYMOND E. DiROSSI

2    change, the African American populations would

3    change and the unified index would change.  And

4    we also included, I think, the '08 presidential

5    number as a standalone late in the process

6    because a lot of people were saying you're

7    wrong, you've got to use this one.  So any time

8    we made a change, all of those things would

9    have changed.

10            Q.    Okay.  Do you recall when you were

11   working on HB 369 before it was enacted whether

12   any district changed significantly on the

13   unified index?  And it's however you would

14   define significant.

15                  MR. STRACH:  Objection.

16                  THE WITNESS:  In 369?

17   BY MS. THOMAS-LUNDBORG:

18            Q.    Yes, from 369 as enacted to 319,

19   were there any significant changes on the

20   unified index?

21                  MR. STRACH:  Objection.  I think you

22   mean from 319 to 369.

23                  MS. THOMAS-LUNDBORG:  From 319 to

24   369, yes.

25                  THE WITNESS:  Well, the 10th district

1          RAYMOND E. DiROSSI

2   specifically, I remember that that was a function

3   of the legislative Democrats in Montgomery County

4   asking that Montgomery County be made whole

5   significantly changed the index of that district.

6   BY MS. THOMAS-LUNDBORG:

7          Q.   And what was the change, if you

8   recall?

9          A.   It was about three and a half

10   points.

11          Q.   Okay.  Did any other district

12   change significantly?

13          A.   That's the one -- that's the one

14   example that I can remember sitting here today.

15          Q.   Okay.  Do you recall whether there

16   was between -- we just talked about 369 as

17   introduced.  Do you recall whether there were

18   any significant changes between 319 as passed

19   and 369 as passed to the unified index?

20          A.   Well, from 319 to 369 as

21   introduced?

22          Q.   We've already discussed 369 as

23   introduced.  Now I'm asking 369 as passed.

24          A.   Compared to --

25          Q.   319.

1          RAYMOND E. DiROSSI

2          A.    369 as passed to 319, okay.   And

3    you're specifically asking if the unified index

4    changed in any of those?

5          Q.    In any significant way.

6          A.    Well, obviously the 10th, as we

7    just talked about, changed.

8          Q.    Yes.

9          A.    There was significant geography

10   changes to the 9th congressional district that

11   we talked about that Congresswoman Kaptur was

12   asking for.   I can't recall if those impacted

13   the unified indexes, but they were significant

14   geography changes, tens of thousands, if not

15   hundreds of thousands of people moving in and

16   out of those districts.

17               The changes we talked about in the

18   3rd were not substantial geography size

19   changes, so I can't imagine that those would

20   have changed the unified index.   So I think the

21   10th and potentially the 9th would be the two

22   that could fit that that would have had

23   significant changes.

24          Q.   Okay.   So before I introduce this

25   document, I just want to ask you a question and

1          RAYMOND E. DiROSSI

2    then we'll decide if it gets introduced or not.

3              Do you recognize this document?

4          A.   I have a vague recollection of

5    this document.

6          Q.   Are you the author of this

7    document?

8          A.   I don't believe -- I don't believe

9    that I am.

10         Q.   Okay.  Did you see this document

11   before you prepared for your testimony today?

12         A.   I did not.

13         Q.   Okay.  So then I'll just ask you

14   general questions.  You talked about the

15   changes in the numbers of African Americans in

16   the 3rd district, for example.  Do you recall

17   by what percentage African American numbers

18   changed from 319 to 369?

19              MR. STRACH:  Objection.

20              THE WITNESS:  From 319 to 369?

21   BY MS. THOMAS-LUNDBORG:

22         Q.   Yes.

23         A.   I don't recall.

24         Q.   Do you recall what numbers the

25   African American percentage changed in CD 9

1              RAYMOND E. DiROSSI

2    from 319 to 369?

3              A.    I don't recall for the 9th either.

4              Q.    Okay.  Do you recall any other

5    district where --

6              A.    There's a much more significant

7    African American population in the 3rd than in

8    the 9th, so I'm not sure there's -- the 9th is

9    in west Cleveland and goes to Toledo and

10   doesn't have all of Toledo, so there's not a

11   significant African American population.

12             Q.    Okay.

13             A.    So I don't think there would have

14   been significant changes.

15             Q.    Do you recall whether the

16   percentage of African Americans changed in

17   district 11 from 319 to 369?

18             A.    I don't recall any changes to the

19   geography of 11 at all specifically after 319

20   was introduced.  I got the impression that

21   Congresswoman Fudge was very happy with how the

22   district was proposed in 319.  As we talked

23   about, she specifically didn't want to be in

24   Cuyahoga County and paired with Dennis Kucinich

25   and she wanted it to remain a majority/minority

1          RAYMOND E. DiROSSI

2    district.  So I don't -- I don't believe we

3    made any changes to the 11th from 319 to 369 as

4    enacted.

5          Q.  Okay.  Did the African American

6    population change from 319 to 369 in any other

7    district that we haven't discussed?

8          A.  Did it change at all, you're

9    asking?  Did it change at all?  Again, you're

10   asking from 319 to 369?

11         Q.  Yes.

12              MR. STRACH:  Objection.  369 as

13   introduced or as passed?

14              THE WITNESS:  That's a good point,

15   yeah.

16   BY MS. THOMAS-LUNDBORG:

17         Q.  If there are changes from it as

18   introduced we can start there and then we can

19   go to as passed.

20         A.  So before you asked if there were

21   significant as I defined it, and now you're

22   asking for any --

23         Q.  Yes.

24         A.  -- any change?  Okay.  I just want

25   to make sure I have that right.

1          RAYMOND E. DiROSSI

2                    I mean, I believe the 10th, the

3     10th district, as we talked about, from 319 to

4     369 as introduced and 369 as enacted would have

5     had changes to the minority population after

6     the change that the legislative Democrats asked

7     for.

8              Q.    And do you recall what was the

9     nature of that change as introduced?

10             A.    You mean am I able to quantify the

11    change?

12             Q.    Yes.

13             A.    I am not, not offhand.

14             Q.    And as enacted?

15             A.    No.

16             Q.    Are there any other districts

17    where the African American population changed?

18             A.    We talked about the 11th, we

19    talked about the 9th, we talked about the 3rd,

20    we talked about the 10th.  I mean, it is

21    possible anywhere there was any legislative

22    change, obviously there could have been a very

23    insignificant change, small change in those,

24    but I've articulated the ones I can recall.

25             MS. THOMAS-LUNDBORG:  Okay.  I think

1          RAYMOND E. DiROSSI

2     I've gone through my major questions, so maybe if

3     we just take a five-minute break and I might have

4     something short.

5                    MR. STRACH:  Okay.

6                    THE VIDEOGRAPHER:  We're off the

7     record.

8                    (Recess taken.)

9                    THE VIDEOGRAPHER:  We're on the

10    record.

11    BY MS. THOMAS-LUNDBORG:

12         Q.   We're almost done.  Good evening,

13    I think it is now.

14         A.   Good evening.

15         Q.   So I would like to just ask you a

16    few follow-up questions about things that you

17    testified to earlier.

18                    We talked a lot about the unified

19    index and you said that at some point you lost

20    the war over the unified index.  Could you

21    clarify the war regarding the unified index?

22         A.   Yeah, so probably a poor choice of

23    words.  It was the -- from my experience the

24    previous decade, that was the index when we

25    were looking at historical election data that I

1              RAYMOND E. DiROSSI

2    thought we should use.  But especially using --

3    when we were in congressional redistricting,

4    everybody else had their own standard and

5    nobody really thought necessarily that the

6    unified index was the best one.

7                I still tried to use it, but

8    anybody at the national level, the congressmen

9    and women that we were dealing with that were

10   incumbents or aspiring candidates, they had

11   their own -- they had their own standard, and

12   then many people wanted to use the '08

13   presidential as a single race to look at races,

14   and I just was kind of wanting to use the

15   unified index.

16         Q.    Okay.  Let's take those in kind of

17   pieces.  Did President Niehaus have a different

18   index that he wanted to use?

19         A.    Not that he ever conveyed to me,

20   no.

21         Q.    Did Speaker Batchelder have

22   another index that he wanted to use?

23         A.    No.

24         Q.    What about Matt Huffman, did he

25   have another index that he wanted to use?

1            RAYMOND E. DiROSSI

2            A.    Not to my recollection.

3            Q.    What about Keith Faber, did he

4    have another index that he wanted to use?

5            A.    No.

6            Q.    You mentioned national people had

7    different indexes.  Did Adam Kincaid have

8    another index that he wanted to use?

9            A.    Yes.

10           Q.    And what index was that?

11           A.    That was the PVI or R plus 1, D

12   plus 1 system.

13           Q.    Okay.  And did he tell you why he

14   wanted to use that system?

15           A.    I guess that is a common -- common

16   used national -- national description of

17   districts.

18           Q.    And did you share with him PVI

19   numbers prior to the introduction of HB 319?

20           A.    So I would never be able to share

21   with anybody PVI because I don't know how to

22   calculate it or couldn't generate it on my own.

23   It would have to be something that was provided

24   by somebody else and given to me.

25           Q.    Did you have discussions with Adam

Page 335

RAYMOND E. DiROSSI

1    Kincaid about the PVI prior to the introduction

2    of HB 319?

3        MR. STRACH:  Objection.

4        THE WITNESS:  Yeah, not that I -- not

5    that I recall.

6    BY MS. THOMAS-LUNDBORG:

7        Q.   Okay.  Did you have discussions

8    with Adam Kincaid about the PVI prior to the

9    introduction of HB 369?

10        MR. STRACH:  Objection.

11        THE WITNESS:  Yeah, I don't recall.

12    BY MS. THOMAS-LUNDBORG:

13        Q.   Okay.  What about Tom Whatman, did

14    he have a system that he wanted to use?

15        A.   None that he particularly

16    articulated to me, but I just got the

17    impression he didn't think the unified index

18    was the -- was the best way to look at those

19    districts.

20        Q.   Okay.  Did he make suggestions

21    about other ways to look at those districts?

22        A.   I can't recall specifically.  I

23    can't recall specifically if he suggested -- if

24    he was the one that suggested using '08

1          RAYMOND E. DiROSSI

2     presidential numbers.

3          Q.   Okay.  Did you receive any

4     suggestions from President Niehaus regarding

5     the partisan composition of districts --

6               MR. STRACH:  Objection.

7     BY MS. THOMAS-LUNDBORG:

8          Q.   -- prior to the introduction of HB

9     319?

10              MR. STRACH:  Objection.

11              THE WITNESS:  None -- none that I

12    recall.

13    BY MS. THOMAS-LUNDBORG:

14         Q.   Did you receive any -- strike

15    that.

16              Did you share draft maps with

17    President Niehaus prior to the introduction of

18    HB 319?

19         A.   I'm sure I did.

20         Q.   And did you share draft maps with

21    President Niehaus of HB 369 prior to its

22    introduction?

23         A.   I'm sure I would have and did.

24         Q.   Did you -- and do you recall how

25    many draft maps you would have shared with him?

1              RAYMOND E. DiROSSI

2         A.    I don't recall.

3         Q.    Did you have a process for sharing

4    draft maps with President Niehaus?

5         A.    Did not have a process.

6         Q.    Did you share any draft maps with

7    Speaker Batchelder prior to the introduction of

8    HB 319?

9         A.    Heather and I together would have.

10        Q.    And do you recall how many draft

11   maps you shared with him?

12        A.    I don't recall.  And again, to

13   clarify draft maps, when you're saying that in

14   my mind I'm thinking the maps that became House

15   Bill 319 as introduced, the maps that became

16   House Bill 369 as introduced.  They weren't

17   necessarily drafts of like other iterations.

18   The ones that I'm specifically recalling are

19   sharing with them the maps that ended up being

20   the introduced versions.

21        Q.    Okay.  Did you share -- I think we

22   talked about the speaker related to HB 319.

23   Did you share drafts of HB 369?

24        A.    With Speaker Batchelder?

25        Q.    Yes.

1          RAYMOND E. DiROSSI

2               A.   I would -- I believe Heather and I

3     would have, absolutely.

4               Q.   And when you were sharing drafts

5     with President Niehaus and Speaker Batchelder,

6     what information was included in those drafts?

7               A.   Well, Speaker Batchelder is an

8     amazing individual.  He asked us to fax him

9     copies of maps.  And so I believe your specific

10    question is about Speaker Batchelder, we would

11    have -- Heather and/or I, or another member of

12    his staff, would have faxed him maps.  It would

13    have been the maps is my recollection of what

14    we would have shared with him, which we all

15    joked was worthless because the maps were going

16    to print out at the other end of the fax

17    machine in black and white and you would not be

18    able to tell what you were looking at.

19               Q.   And were you just sharing the

20    picture of the map or were you sharing any

21    underlying data regarding the map?

22               A.   We were faxing him the maps.

23               Q.   So the picture of the map?

24               A.   The picture of the map is

25    specifically what I recall.

1              RAYMOND E. DiROSSI

2              Q.   Okay.  And President Niehaus, what

3  were you sharing with him?

4              A.   He would have been potentially

5  over at the office so he could actually see the

6  map on the screen that we were talking about.

7  And then so obviously all of the demographic

8  data that I mentioned before that would be on

9  the screen for any map that we were working on

10  would have been available for him to look at.

11             Q.   And the demographic data that

12  would be available is demographic data and you

13  said also the index would be available?

14             A.   Yeah, population data, minority

15  concentrations, population deviations, indexes,

16  yes.

17             Q.   Okay.  And Mark Huffman, did you

18  share drafts --

19             A.   Matt.

20             Q.   I'm sorry, Matt.

21             A.   No problem.

22             Q.   Matt Huffman, did you share drafts

23  of the map with Matt Huffman --

24             MR. STRACH:  Objection.

25  BY MS. THOMAS-LUNDBORG:

Page 340

1        RAYMOND E. DiROSSI

2            Q.    -- prior --

3                MR. STRACH:  Sorry, I just want to

4    make clear you're still working off of his

5    definition of draft, which is draft of the map as

6    introduced.

7                MS. THOMAS-LUNDBORG:  Yes, of HB 319.

8                THE WITNESS:  Yeah, I remember

9    sharing a map that became 319 with Representative

10   Huffman.

11   BY MS. THOMAS-LUNDBORG:

12       Q.    Okay.  To your counsel's

13   clarification, were there any iterations of

14   versions of the map that were shared that

15   predate the map that was introduced?

16                MR. STRACH:  Objection.

17                THE WITNESS:  I'm trying to recall

18   what specific ones those would be.  I just -- I

19   just can't remember that far back of what

20   specifically would have been shared.

21   BY MS. THOMAS-LUNDBORG:

22       Q.    Okay.  With Matt Huffman you did

23   share a draft of HB 319?

24       A.    Yes, because I believed he was

25   going to be the sponsor, so I believe Heather

1          RAYMOND E. DiROSSI

2    specifically had said that we needed to make

3    sure that he had an understanding of what he

4    would be introducing to start the legislative

5    process.

6          Q.   And did you share a draft of HB

7    369 with Matt Huffman before it was introduced?

8               MR. STRACH:  I'm sorry, objection.

9    Of the as introduced version before it was

10   introduced or of something different than the as

11   introduced version?

12              MS. THOMAS-LUNDBORG:  He can define

13   in his answer what draft and what it was that was

14   shared with Matt Huffman.

15              THE WITNESS:  So in all of these

16   questions I'm referring to the map that became the

17   introduced versions.  I have specific

18   recollections of sharing the maps that became the

19   introduced versions.  I don't have specific

20   recollections of other ideas, concepts or drafts

21   that ended up not being the introduced versions.

22   BY MS. THOMAS-LUNDBORG:

23          Q.   Okay.  So with Matt Huffman do you

24   have a recollection of sharing the map as

25   you're defining it of 369?

1          RAYMOND E. DiROSSI

2          A.    Yes.

3          Q.    Okay.   And Keith Faber, did you

4    share a version of the map, and you can clarify

5    in your answer what you mean, of HB 319 prior

6    to introduction?

7          A.    I don't specifically recall with

8    Senator Faber.   I don't recall.   The bill was

9    being introduced in the house, not the Senate.

10   So there was more focus on the House members.

11         Q.    Okay.   Do you recall whether a

12   version of HB 369 was shared with Senator Faber

13   prior to its introduction?

14         A.    As we discussed earlier, he and I

15   did spend some time at the office looking at

16   specifically the geography in Mercer County

17   where we have three congressional districts

18   coming together, so, you know, some of those

19   versions may have found their way into 319

20   and/or 369 and some of them may not have.

21         Q.    Okay.   So just to go back to make

22   sure the record is clean, with Senator Faber

23   did you discuss the map in draft form prior to

24   the introduction of 319?

25         A.    I don't have a specific

RAYMOND E. DiROSSI

1

2    recollection of that.

3          Q.    Okay.  When we looked at -- and we

4    can go back to the exhibit --

5          A.    Other than the Mercer County --

6    other than the Mercer County geography issue

7    that we just talked about.

8          Q.    Okay.  Did you share a draft map

9    with anyone else prior to the introduction of

10   HB 319?  And you can define what draft means in

11   your answer.

12               MR. STRACH:  Objection.  You need to

13   define whatever you're talking about.

14               THE WITNESS:  Yeah, yeah, I mean it's

15   -- you know, the people I've articulated I have

16   specific memories of sharing the maps with them

17   that were introduced and, you know, we've talked

18   today about some of the other people who had

19   looked at maps.  I think I've exhausted every --

20   all of the people that I can specifically remember

21   sharing maps with.

22   BY MS. THOMAS-LUNDBORG:

23         Q.    Okay.  In regards to HB 369, do

24   you recall sharing the map with anyone else?

25               MR. STRACH:  Same objection, same

1          RAYMOND E. DiROSSI

2    instruction.

3              THE WITNESS:  Yeah, I mean, the only

4    person, Bob Bennett.  Bob Bennett and I, I mean,

5    I've said his name before, but he would have

6    looked at maps that became House Bill 369, at

7    least pieces of -- pieces of it.

8    BY MS. THOMAS-LUNDBORG:

9              Q.  Did he look at maps that would

10   have become 319?

11             A.  I don't -- I don't have those

12   recollections.  I don't recall.

13             Q.  Oh, I'm getting --

14             MR. FRAM:  We're improving.

15   BY MS. THOMAS-LUNDBORG:

16             Q.  You said that you shared the maps

17   as defined as the map as introduced.  Did you

18   share any of the demographic data with anyone

19   prior to the introduction of HB 319?

20             MR. STRACH:  Objection.

21   BY MS. THOMAS-LUNDBORG:

22             Q.  And I'm using your term

23   demographic data that you used in a prior

24   response.

25             A.  Well, I mean, like I said, the

1                RAYMOND E. DiROSSI

2    people that were at the office would have seen

3    it on the screen, the people that we were

4    faxing maps to would not have had access to it.

5    I don't recall -- I mean, that is just such a

6    hectic, crazy time, and I don't recall any more

7    details about who we would have shared it with,

8    who I would have shared it with and what I

9    would have shared, other than what I've said.

10           Q.   Okay.  As you sit here today is

11   your recollection that the primary way that you

12   shared demographic data was by showing it on

13   the computer screens in the office?

14                MR. STRACH:  Objection.

15                THE WITNESS:  I mean, that was -- if

16   people were there, that was certainly the easiest

17   way to share it with them, but we've gone through

18   a couple examples where it was done by email.

19                MS. THOMAS-LUNDBORG:  Okay.  I have

20   no further questions at this point.

21                MR. STRACH:  All right.  We don't

22   have any -- this is Phil Strach.  We don't have

23   any questions at this time.

24                MR. TUCKER:  Intervenors don't have

25   any questions at this time.

Page 346

1          RAYMOND E. DiROSSI

2              MR. STRACH:  Are we off the record?

3              MS. THOMAS-LUNDBORG:  We're off the

4    record.  Good night, everyone.

5              THE VIDEOGRAPHER:  Off the record.

6              (Thereupon, signature was not waived

7    by the witness.)

8              (Thereupon, the deposition was

9    concluded at 6:10 p.m.)

10                       *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 347

1        I, RAYMOND E. DiROSSI, do hereby certify

2   that the foregoing is a true and accurate

3   transcription of my testimony.

4

5

6              _ _ _ _ _ _ _ _ _ _ _ _ _

7

8         Dated _ _ _ _ _ _ _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF OHIO        )

2   COUNTY OF MONTGOMERY  )  SS: CERTIFICATE

3           I, Christine Gallagher, a Notary

4   Public within and for the State of Ohio, duly

5   commissioned and qualified,

6           DO HEREBY CERTIFY that the

7   above-named RAYMOND E. DiROSSI, was by me first

8   duly sworn to testify the truth, the whole truth

9   and nothing but the truth.

10          Said testimony was reduced to

11   writing by me stenographically in the presence

12   of the witness and thereafter reduced to

13   typewriting.

14          I FURTHER CERTIFY that I am not a

15   relative or Attorney of either party, in any

16   manner interested in the event of this action,

17   nor am I, or the court reporting firm with which

18   I am affiliated, under a contract as defined in

19   Civil Rule 28(D).

20         IN WITNESS WHEREOF, I have hereunto set my

21   hand and seal of office at Dayton, Ohio, on this

22   31st day of October, 2018.

23          _____

            CHRISTINE GALLAGHER

24          NOTARY PUBLIC, STATE OF OHIO

25          My Commission expires 8-28-2023

Page 349

1                        ERRATA SHEET

2     Case Name:

3     Deposition Date:

4     Deponent:

5     Pg.  No.  Now Reads       Should Read  Reason

6     ____  ____  _____    _____  _____

7     ____  ____  _____    _____  _____

8     ____  ____  _____    _____  _____

9     ____  ____  _____    _____  _____

10    ____  ____  _____    _____  _____

11    ____  ____  _____    _____  _____

12    ____  ____  _____    _____  _____

13    ____  ____  _____    _____  _____

14    ____  ____  _____    _____  _____

15    ____  ____  _____    _____  _____

16    ____  ____  _____    _____  _____

17    ____  ____  _____    _____  _____

18    ____  ____  _____    _____  _____

19    ____  ____  _____    _____  _____

20

                                  _____

21

                                  Signature of Deponent

22

      SUBSCRIBED AND SWORN BEFORE ME

23    THIS _____ DAY OF _____, 2018.

24    _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____