CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO

2                      - - - - -

3

     Ohio A. Philip Randolph      :
4    Institute, et al.,
                                  :
5              Plaintiffs,
                                  :
6        vs.                          Case No.
                                  :   1:18-cv-00357
7    Ryan Smith, Speaker of           -TSB-KNM-MHW
     the Ohio House of            :
8    Representatives, et al.,
                                  :
9              Defendants.
10                 **  REVISED  **
11     CONFIDENTIAL DEPOSITION OF CONGRESSMAN WILLIAM JOHNSON
12                     - - - - -
13

              Taken at Baker & Hostetler
14             200 Civic Center Drive
               Columbus, Ohio 43215
15          December 19, 2018, 8:34 a.m.
16
17
18
19
20
21
22
23
24
25   Job No. 153105

CONFIDENTIAL

1                    A P P E A R A N C E S
2

     ON BEHALF OF THE PLAINTIFFS:
3

             American Civil Liberties Union Foundation
4            125 Broad Street
             New York, New York 10004
5            By Theresa Lee, Esq.
6

     ON BEHALF OF THE DEFENDANTS:
7

             Ogletree, Deakins, Nash, Smoak & Stewart
8            4208 Six Forks Road
             Raleigh, North Carolina 27609
9            By Alyssa Riggins, Esq.   (Via telephone)
10

     ON BEHALF OF THE WITNESS:
11

             Baker & Hostetler
12           1050 Connecticut Avenue N.W.
             Washington, D.C. 20036
13           By Katherine McKnight, Esq.
                Erika Prouty, Esq.
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

1          Wednesday Morning Session

2          December 19, 2018, 8:34 a.m.

3              - - - - -

4         It is stipulated by counsel in

5    attendance that the deposition of Congressman

6    William Johnson, an Intervenor herein, called by

7    the Plaintiffs for cross-examination, may be taken

8    at this time by the notary pursuant to notice and

9    agreement, that said deposition may be reduced to

10   writing in stenotypy by the notary, whose note may

11   thereafter be transcribed out of the presence of

12   the witness; that proof of the official character

13   and qualification of the notary is waived.

14              - - - - -

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 4

1                          I N D E X
2    Examination By                                    Page
3    Ms. Lee - Cross                                      7
4
5    Plaintiff's Exhibits                              Page
6    Exhibit 1  - Plaintiff's First Request for
                  Production of Documents to
7                 Intervenor Bill Johnson               13
8    Exhibit 2  - Memorandum in Support of Motion
                  of Republican Congressional
9                 Delegation, Ohio Voters, and
                  Republican Party Organizations
10                to Intervene                          19
11   Exhibit 3  - Reply in Further Support of
                  Motion of Republican Congressional
12                Delegation, Ohio Voters, and
                  Republican Party Organizations
13                to Intervene                          33
14   Exhibit 4  - Johnson mailer                        45
15   Exhibit 5  - E-mail to Johnson from Mark
                  Weaver with trail, 11-16-10           51
16
     Exhibit 6  - Congressman Bill Johnson Political
17                Meetings                              56
18   Exhibit 7  - E-mail to Johnson from Palich with
                  trail, 11-17-10                       61
19
     Exhibit 8  - E-mail to Angela Weaver, Dole,
20                Smullen, and Mark Weaver from
                  Hashem with trail, 3-22-11            79
21
     Exhibit 9  - E-mail to Weaver from Dole,
22                4-13-11                               82
23   Exhibit 10 - E-mail to Johnson, Hashem, Mark
                  Weaver, Van Blargan, and Locke
24                from Smullen, 4-25-11                 83
25

CONFIDENTIAL

1             I N D E X (Cont'd.)

2    Plaintiff's Exhibits                        Page

3    Exhibit 11 - E-mail to Crandall, Johnson, and
                 Smullen from Anderson, 4-29-11    85
4

     Exhibit 12 - Communications Counsel Memorandum,
5                 July 20                          87

6    Exhibit 13 - E-mail to Johnson and Mark Weaver
                 from Smullen with trail, 7-2-11   91
7

     Exhibit 14 - Communications Counsel Memorandum,
8                 August 1, 2011                   95

9    Exhibit 15 - E-mail to Johnson from Smullen
                 with trail, 7-14-11               97
10

     Exhibit 16 - E-mail to Johnson from Mark
11                Weaver with trail, 7-18-11       99

12   Exhibit 17 - E-mail to Johnson from Hashem,
                 7-27-11                          102
13

     Exhibit 18 - E-mail to Smullen and Johnson from
14                Mark Weaver with trail, 8-4-11  106

15   Exhibit 19 - E-mail to Smullen and Johnson from
                 Mark Weaver with trail, 8-15-11  107
16

     Exhibit 20 - E-mail to Johnson from Smullen
17                with trail, 11-2-11             110

18   Exhibit 21 - NRCC Presentation              112

19   Exhibit 22 - Ohio U.S. House Redistricting
                 Map, 2012 plan                   116
20

     Exhibit 23 - Blow up of Ohio U.S. House
21                Redistricting Map, 2012 plan    117

22   Exhibit 24 - Ohio U.S. House Proposed Remedial
                 Plan                             119

23

24

25

CONFIDENTIAL

1                      I N D E X (Cont'd.)

2      Plaintiff's Exhibits                            Page

3      Exhibit 25 - Ohio U.S. House Zero Deviation
                   Hypothetical Plan 1A               121
4

       Exhibit 26 - Ohio U.S. House Zero Deviation
5                   Hypothetical Plan 2A               121

6      Exhibit 27 - E-mail to Mark Weaver and
                   Johnson with trail, 7-7-11          125
7

       Exhibit 28 - E-mail to Johnson from Mark
8                   Weaver, 12-2-11                    127

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 7

1          CONGRESSMAN WILLIAM JOHNSON,

2     being first duly sworn, as hereinafter certified,

3     deposes and says as follows:

4                    CROSS-EXAMINATION

5     BY MS. LEE:

6     Q.          Good morning, Congressman.

7     A.          Good morning.

8     Q.          I just introduced myself, but my name

9     is Theresa Lee, and I'm an attorney for Plaintiffs

10    in Ohio A. Philip Randolph v. Smith, a case in the

11    Southern District in Ohio in which you've

12    intervened.

13               I'll ask the other counsel to please

14    state their names for the record.

15               MS. McKNIGHT:  Good morning.  Katherine

16    McKnight, Baker Hostetler, on behalf of the

17    Congressman.

18               MS. PROUTY:  Erika Dackin Prouty, Baker

19    Hostetler, on behalf of the Congressman.

20               MS. McKNIGHT:  Ms. Riggins, would you

21    like to announce your presence?

22               MS. RIGGINS:  Yes, please.  I just

23    wanted to make sure everyone had done because I

24    can't see who's in the room.  I'm Alyssa Riggins,

25    Ogletree Deakins, representing the Legislative

CONFIDENTIAL

1            CONGRESSMAN WILLIAM JOHNSON

2    Defendants.

3            MS. LEE:  Thank you.

4    Q.            Congressman, could you please state

5    your full name and address for the record.

6    A.            Sure.  William L. Johnson, and 519

7    Fifth Street, Marietta, Ohio, 45750.

8    Q.            And did you live at that same address

9    in 2011?

10    A.            Part of 2011.

11    Q.            And at what other address did you live

12    in 2011, if you recall?

13    A.            I lived in Poland, Ohio, up until April

14    of 2011.

15    Q.            Okay.  Thank you, Congressman.  And

16    you've just been sworn in.  Do you understand that

17    you're testifying here under oath today?

18    A.            Yes.

19    Q.            And do you understand that the oath

20    you've sworn is the same as if you were testifying

21    in a court of law?

22    A.            Yes.

23    Q.            Have you been deposed before?

24    A.            No.

25    Q.            Have you ever testified under oath not.

CONFIDENTIAL

Page 9

1          CONGRESSMAN WILLIAM JOHNSON

2    at a deposition?

3    A.          I don't recall.  I did some things in

4    the military that I think I was under oath for,

5    but I don't really recall.

6    Q.          Okay.  That's fine.  I'd like to just

7    go over a few ground rules for today so we're all

8    on the same page.  Please make sure that you give

9    a verbal response to each question.  As you can

10   see, we have a court reporter taking everything

11   down --

12   A.          Okay.

13   Q.          -- and she cannot record nods of the

14   head and the like.  Do you understand that?

15   A.          Yes.

16   Q.          And to make the court reporter's life a

17   bit easier and so we have a clear record, let's

18   try and not speak over one another.  Please wait

19   until I finish a question even if you think you

20   know where it's headed before giving your answer.

21   Can you agree to that?

22   A.          Yes.

23   Q.          Great.  And I will try to do the same

24   and wait until you finish speaking before asking

25   another question.

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2                If you do not hear what I have asked,

3     please say so and I will repeat myself.  If you do

4     not understand a question or even some part of it,

5     please say so and I will rephrase.  Can you agree

6     to that?

7     A.        Yes.

8     Q.        Wonderful.  And if you answer, I will

9     take that to mean you've understood the question

10    I've asked.  Can you agree with that?

11    A.        Yes.

12    Q.        Very good.  If at any time you need a

13    break, please say so.  I'll just request that if I

14    have asked a question, you please answer it and

15    then we will take a break.  Can you agree to that?

16    A.        Yes.

17    Q.        And if at any time you need to consult

18    with your attorney concerning the disclosure of

19    potentially privileged information, please state

20    that is the reason you need to take a break and

21    we'll allow for one to be taken for that

22    consultation.  Do you understand that?

23    A.        Yes.

24    Q.        Okay.  Very good.  And your attorney or

25    attorneys for the Defendants might object at some

CONFIDENTIAL

Page 11

CONGRESSMAN WILLIAM JOHNSON

1
2    point once I have asked a question.  Even if they
3    do object, you should still answer the question
4    unless they have directed you not to.  Do you
5    understand that?
6    A.        Yes.
7    Q.        Okay.  Is there anything that would
8    prevent you from answering my questions honestly
9    and completely today?
10   A.        No.
11   Q.        Thank you.  And throughout this
12   deposition, I may refer to the Ohio redistricting,
13   the 2012 redistricting, the 2011 redistricting.
14   Unless I specify otherwise, I am referring to the
15   redistricting of Ohio's Congressional districts
16   that took place in 2011.  Do you understand that?
17   A.        Yes.
18   Q.        And if I refer to the map or to the
19   Congressional map or to particular districts under
20   that map, I'm referring to the current map that
21   was put in place as a result of that 2011
22   redistricting.  Do you understand that?
23   A.        Yes.
24   Q.        Okay.  Very good.  Did you do anything
25   to prepare for today's deposition?

CONFIDENTIAL

Page 12

1          CONGRESSMAN WILLIAM JOHNSON

2    A.          Other than speaking with counsel, no.

3    Q.          Okay.  And with whom did you meet to

4    prepare for the deposition?

5    A.          With Erika and -- I'm terrible with

6    names.

7    Q.          It's okay.  Another counsel from Baker

8    Hostetler?

9    A.          Yes.

10   Q.          Okay.

11   A.          I'm embarrassed.

12   Q.          It's quite all right.

13   A.          I can't remember my name on most days.

14   Q.          And besides counsel, was anyone else

15   present?

16   A.          No.

17   Q.          Okay.  Did you review any documents as

18   part of your preparation?

19   A.          Yes.

20   Q.          And what documents were those?

21              MS. McKNIGHT:  I'll object to that as

22   exploring privileged information, and I'll direct

23   the witness not to answer.

24   Q.          Okay.  Have you reviewed the complaint

25   in this matter?

CONFIDENTIAL

Page 13

1                  CONGRESSMAN WILLIAM JOHNSON

2       A.         No.

3       Q.         Have you reviewed your motion to

4       intervene?

5       A.         I've seen it, but I haven't reviewed

6       it.

7       Q.         Okay.  Did you review the request for

8       production that was served on you through counsel

9       at some point in this matter?

10      A.         No.

11                 MS. LEE:  Okay.  I'd like to mark as

12      Exhibit 1 and ask the court reporter to please

13      hand it to the witness.

14                         - - - - -

15                 Thereupon, Plaintiff's Exhibit 1 is

16      marked for purposes of identification.

17                         - - - - -

18      Q.         Have you seen this document before?

19      A.         I don't recall.

20      Q.         Okay.  Are you aware that Plaintiffs

21      submitted requests for certain documents from you

22      and your office in this matter?

23      A.         Yes.

24      Q.         Okay.  And did you review the documents

25      that were produced in response to these requests?

CONFIDENTIAL

Page 14

1                    CONGRESSMAN WILLIAM JOHNSON

2       A.          I saw the documents.  I did not review

3       them in detail as they were produced.

4       Q.          Okay.  And do you know how your

5       documents were collected?

6       A.          Yes.

7       Q.          And how is that?

8       A.          In collaboration with counsel and a

9       third-party vendor searching my e-mail.

10      Q.          Okay.  And did any members of your

11      staff work on the document collection?

12      A.          No.

13      Q.          Okay.  You first ran for political

14      office in 2010; is that correct?

15      A.          That's correct.

16      Q.          And was your first elected office as a

17      congressperson?

18      A.          Yes.

19      Q.          In each election that you won, have you

20      done so as a Republican?

21      A.          Yes.

22      Q.          Do you communicate with the leadership

23      of the Ohio Republican Party?

24      A.          Yes.

25      Q.          How regularly?

CONFIDENTIAL

Page 15

1                    CONGRESSMAN WILLIAM JOHNSON

2       A.          I'd estimate less than five times a

3       year.

4       Q.          Okay.  And at the time of the

5       redistricting in 2010 or 2011, did you ever

6       communicate with the leadership of the Ohio

7       Republican Party?

8       A.          Would you ask that again, please.

9       Q.          At the time of the redistricting either

10      in 2010 or 2011, did you communicate with the

11      leadership of the Ohio Republican Party?

12      A.          Yes.

13      Q.          And do you recall the substance of any

14      of those communications?

15      A.          General election kinds of discussions.

16      I was very new, so they were -- they were general

17      discussions about what the election would be like.

18      My first indoctrination to elected office was a

19      candidate training class put on by the Ohio

20      Republican Party way back in 2007.

21      Q.          And did you communicate with the Ohio

22      Republican Party about what the Congressional map

23      would potentially look like?

24      A.          No.

25      Q.          Okay.  Do you communicate with the

CONFIDENTIAL

Page 16

1                    CONGRESSMAN WILLIAM JOHNSON

2       elected leaders in the Ohio General Assembly?

3       A.          Ask that again, please.

4       Q.          Do you communicate with the elected

5       leaders in the Ohio General Assembly?

6       A.          Yes.

7       Q.          Does that include with the Speaker of

8       the House?

9       A.          Yes.

10      Q.          And with the Senate president?

11      A.          Yes.

12      Q.          At the time of the redistricting in

13      2010 or 2011, did you communicate with the elected

14      leaders of the Ohio General Assembly?

15      A.          Yes.

16      Q.          And did that at the time include the

17      Speaker of the house?

18      A.          Yes.

19      Q.          And did it include the Senate

20      President?

21      A.          Yes.

22      Q.          Did you have any communications with

23      them regarding the redistricting?

24      A.          Only in a very general context, that it

25      was going to occur.

CONFIDENTIAL

Page 17

1                CONGRESSMAN WILLIAM JOHNSON

2      Q.           Did you communicate with either the

3      Speaker of the House or the Senate President

4      regarding what your district might look like?

5      A.           No.

6      Q.           All right.   And did you communicate

7      with any other staffers or members of the Ohio

8      General Assembly?

9      A.           Let me re-qualify that last answer.   We

10     speculated that it was going to change

11     because -- all districts were going to change

12     because we knew at that point that we were going

13     to be losing two Congressional seats, but there

14     were no specifics about what the district would

15     contain or not contain.

16     Q.           Okay.   And would that same answer be

17     true for communications with any other members of

18     the Ohio General Assembly or their staff?

19     A.           Yes.

20     Q.           Okay.   And do you communicate with the

21     Governor of Ohio?

22     A.           Yes.

23     Q.           And at the time of the redistricting,

24     did you communicate with the Governor?

25     A.           I don't ever recall a conversation with

CONFIDENTIAL

Page 18

1                CONGRESSMAN WILLIAM JOHNSON

2      Governor Kasich at the time.

3      Q.          Okay.   And of course you are now a

4      member of a 16-person Congressional delegation.

5      Do you communicate with each of those

6      Congresspeople?

7      A.          Yes.

8      Q.          Do you more regularly communicate with

9      the Republican members of the delegation than with

10     the Democratic members?

11     A.          I think that's fair to say, yes.

12     Q.          Do you communicate with the leadership

13     of the National Republican Party?

14     A.          Yes.

15     Q.          And did you communicate with the

16     leadership of the National Republican Party at the

17     time of redistricting?

18     A.          No.

19     Q.          Okay.  Does the National Republican

20     Party in your estimation include the Republican

21     National Committee?

22     A.          Yes.

23     Q.          Okay.  And does it include the National

24     Republican Congressional Committee?

25     A.          No.

CONFIDENTIAL

Page 19

1                    CONGRESSMAN WILLIAM JOHNSON

2       Q.          Okay.

3       A.          I thought you were talking about the

4    RNC.  The NRCC, to me, is something very

5    different.

6       Q.          Okay.

7       A.          It's more localized.

8       Q.          Okay.  And do you communicate with the

9    NRCC?

10      A.          Yes.

11      Q.          And did you communicate with the NRCC

12   at the time of redistricting?

13      A.          I don't ever recall a conversation with

14   the NRCC at the time of redistricting.

15      Q.          Okay.  And you, along with the other

16   Congressmen, have intervened in this case; is that

17   correct?

18      A.          Yes.

19                  MS. LEE:  I'm having -- going to ask

20   the court reporter to please mark as Exhibit 2 and

21   hand to the witness.

22                              - - - - -

23                  Plaintiff's Exhibit 2 marked for

24   purposes of identification.

25                              - - - - -

CONFIDENTIAL

Page 20

1                CONGRESSMAN WILLIAM JOHNSON

2      Q.          I'm having marked as Exhibit 2 the

3   "Memorandum in Support of Motion of Republican

4   Congressional Delegation, Ohio Voters, and

5   Republican Party Organizations to Intervene."

6           I'll represent to you that this was

7   filed, along with a cover motion, in the Southern

8   District of Ohio so that you and others could join

9   this case as an Intervenor.

10          Have you seen this document before?

11     A.          I've seen the document.

12     Q.          And do you understand that your

13  attorneys have filed this document with the court

14  on your behalf?

15     A.          Yes.

16     Q.          And do you understand in this document

17  your attorneys make statements on your behalf?

18     A.          Yes.

19     Q.          Okay.  I'll ask you to please turn to

20  page 3 with me.  And in the section below the bold

21  header in the middle of the page, "The Proposed

22  Intervenors," the first sentence reads, "The

23  Intervenor Applicants represent a diverse

24  coalition of registered voters, county political

25  parties, and congressional representatives, all.

CONFIDENTIAL

Page 21

1                    CONGRESSMAN WILLIAM JOHNSON

2      whose interests will be directly impacted by the

3      relief Plaintiffs are pursuing in this action?"

4              Do you agree that you're included

5      within this statement as one of the Congressional

6      representatives?

7      A.        Yes.

8      Q.        And the next paragraph referring to the

9      Member Intervenor Applicants as incumbent

10     representatives of Ohio's 1st, 2nd, 4th, 5th, 6th,

11     7th, 8th, 10, 14th, and 15th districts.  Do you

12     see that?

13     A.        Yes.

14     Q.        And is it correct that you are included

15     in that group as the incumbent representative of

16     Ohio's 6th district?

17     A.        Yes.

18     Q.        These Member Intervenor Applicants are

19     further defined in the very next sentence.  "They

20     were all members of the Republican Party, all

21     registered voters in the district, and all intend

22     to run for election as representatives of those

23     districts in 2018 and 2020."

24              Do you agree that is correct?

25     A.        Yes.

CONFIDENTIAL

Page 22

1          CONGRESSMAN WILLIAM JOHNSON

2     Q.         Okay.  Please turn with me to page 9.

3                In the last paragraph that begins on

4     this page, it refers to elected representatives

5     having a "personal interest" in their district.

6                Do you see that?

7     A.         Let me read that statement.

8     Q.         Sure.

9     A.         Yes.

10    Q.         Do you think that is true?

11    A.         Do I think what is true?

12    Q.         Do you think that incumbents have a

13    personal interest in their district?

14    A.         Yes.

15    Q.         And what is your personal interest in

16    your district?

17    A.         To represent the voters that have

18    elected me.  I have a responsibility to them.

19    Q.         And do you have a specific personal

20    interest in how that district is composed?

21    A.         Truthfully, no.  There's 721,000 people

22    in a district.  I represent the people, not the

23    geography.

24    Q.         Okay.  And one direct interest that is

25    described in this document is your continued.

CONFIDENTIAL

Page 23

1          CONGRESSMAN WILLIAM JOHNSON

2    incumbency.   Do you think you have an interest in

3    your continued incumbency in office?

4    A.          Yes.

5    Q.          How so?

6    A.          I want to continue representing the

7    people that I serve.

8    Q.          Okay.  And did you have an interest in

9    continued incumbency in this district in 2011

10   before the lines were drawn?

11   A.          Are we talking about the current

12   district or the district that I had then?

13   Q.          What is now the current district.

14   A.          No, because I didn't know what the

15   current district was going to be.

16   Q.          Sure.

17   A.          I had a -- I had a - what was the term

18   you used - personal interest in my incumbency as

19   it related to the twelve counties that I was

20   representing at the time.  I had no idea what the

21   ultimate redistricting would look like.

22   Q.          Okay.  Let's look further at the

23   reasons stated for your interest in this document.

24             Could you please turn to page 11.

25   A.          Okay.

CONFIDENTIAL

Page 24

CONGRESSMAN WILLIAM JOHNSON

1

2  Q.        It says, begins at the second line in

3  the top, "the Member Intervenor Applicants have

4  invested considerable time and money building

5  coalitions of supporters in their districts,

6  learning their districts, serving the needs of

7  their constituents, raising and spending money on

8  electioneering activities, among other

9  activities."

10          Do you see that?

11  A.        Yes.

12  Q.        Okay.  So let's take some of these one

13  at a time.

14          Do you agree that you've invested

15  considerable time and money building coalitions of

16  supporters in your district?

17  A.        Yes.

18  Q.        Can you describe some of these

19  activities or money spends?

20  A.        Whether it's meeting with seniors,

21  veterans, students, business owners, school

22  officials, elected officials.  Anyone that is a

23  constituent of mine I spend a lot of time and

24  effort and money to meet with them and understand

25  what their issues and challenges are as it relates

CONFIDENTIAL

Page 25

1                    CONGRESSMAN WILLIAM JOHNSON

2      to federal policy.

3      Q.          And do your coalition-building examples

4      include Democrats?

5      A.          Yes.

6      Q.          Can you describe how so?

7      A.          I don't know who my constituents are.

8      There's never a question in my district about a

9      person's party affiliation.  We never query a

10     business about whether they are Republican or

11     Democrat or a veteran or a senior.  In fact, I

12     meet with Democrats, Republicans, and

13     Independents.

14     Q.          Do you ever do outreach to groups that

15     specifically identify as Democrats?

16     A.          I'm not sure I understand that

17     question, because there are groups that more

18     closely aligned with Democrats, but they don't

19     necessarily advertise we're a Democrat

20     organization.

21     Q.          And you meet with those groups?

22     A.          Yes.

23     Q.          And what are some of those that you

24     have --

25     A.          Labor groups that traditionally have.

CONFIDENTIAL

Page 26

CONGRESSMAN WILLIAM JOHNSON

2 been more closely aligned with Democrat support;

3 seniors groups.  And in my district, party

4 affiliation is more of a geographic area.  Some

5 people from some parts of my district, depending

6 on whether it's a suburban or urban area versus a

7 very rural area, some areas are more organized

8 along political lines than others.

9 But there's never a differentiation in

10 my office or in the conduct of my office what

11 party affiliation a person is a part of.

12 Q.        And do you ever do outreach to groups

13 that specifically identify as Republican?

14 A.        Yes.

15 Q.        And can you describe some of that

16 outreach?

17 A.        It's all of my constituents.  So I

18 don't know whether a person is -- when you

19 say -- when you ask me if I'm reaching out to

20 Republicans, the answer has to be yes, because I

21 reach out to 721,000 people, and so there are

22 Republicans in that group, Democrats in that

23 group, and Independents in that group.  But I

24 don't -- I don't target a Republican group or a

25 Democrat group.

CONFIDENTIAL

1                    CONGRESSMAN WILLIAM JOHNSON

2       Q.          Okay.  So are you testifying that you

3       don't ever have meetings or do outreach with

4       groups that are specifically identified as

5       Republican?

6                    MS. McKNIGHT:  Objection; form.

7                    You may answer.

8       A.          Ask that question again.

9       Q.          Are you testifying that you don't -- do

10      not ever do outreach or meet with groups that are

11      specifically identified as Republican?

12                   MS. McKNIGHT:  Same objection.

13      A.          I would have to say yes, because each

14      of my counties has a Republican Party, and I

15      occasionally meet with the officials and those

16      members of that county Republican Party, yes.

17      Q.          And do you ever meet with the officials

18      or members of the county Democratic Parties?

19      A.          I have offered, but very seldom have I

20      been taken up on that offer.

21      Q.          Okay.  And in the phrase, "very

22      seldom," does that mean sometimes you've been

23      taken up on that offer?

24      A.          There are Democrats that come to many

25      of the outreach efforts that I do and they

CONFIDENTIAL

Page 28

1                    CONGRESSMAN WILLIAM JOHNSON

2         identify themselves as Democrats.

3         Q.          Okay.  In this same paragraph, the last

4    sentence of the paragraph at the top of this page,

5    it goes on to say, "if a remedial plan is ordered

6    in this case, the remedial plan could pair two or

7    more of the Member Intervenor Applicants in the

8    same district, which would impede their ability to

9    run for their seats."

10                   Do you see that?

11        A.          I see that, yes.

12        Q.          Okay.  Is that a concern that you have?

13        A.          And that's the list of Member

14   Intervenor Applicants that we talked about

15   earlier, correct?

16        Q.          Yes.

17        A.          Well, certainly, because nobody wants

18   to spend their resources on a primary.  I wouldn't

19   want to do that, but I'm not in charge of drawing

20   the lines.

21        Q.          Sure.  Would the pairing of incumbents,

22   was that a concern of yours in 2011 as well?

23        A.          No.  I was brand new in 2011 and I

24   didn't even know what redistricting was until

25   after I got elected.

CONFIDENTIAL

Page 29

1                CONGRESSMAN WILLIAM JOHNSON

2    Q.        Okay.  Were you aware that with the

3    loss of --

4    A.        I knew that it could happen.

5    Q.        Okay.

6    A.        I'm sorry.  I knew that a pairing could

7    happen because of the 18 to 16.  So I knew that

8    that was a possibility, but I didn't worry about

9    it.  It wasn't a concern.  It was an awareness.

10   Q.        Okay.  Understood.  At the time, did

11   you think there was a particular solution for the

12   needed pairing?

13   A.        No.

14   Q.        Okay.  Were you aware of what solution

15   was settled upon?

16   A.        No.

17   Q.        At the time, what did you think of

18   the --

19   A.        Not until after it occurred.

20   Q.        Okay.  Understood.  And what did you at

21   the time think of the pairing of representatives

22   Turner and Austria?

23   A.        I didn't have an opinion.

24   Q.        When did you become aware of that

25   pairing?

CONFIDENTIAL

Page 30

1                  CONGRESSMAN WILLIAM JOHNSON

2     A.          I don't recall the exact date.

3     Q.          Was it before or after, if you recall,

4     the legislation being passed in the fall of 2011?

5                  MS. McKNIGHT:  Objection; form.

6                  You may answer.

7     A.          I don't recall the exact date.

8     Q.          Okay.  Do you recall how you became

9     aware of that pairing?

10    A.          I don't recall exactly how I became

11    aware, either.

12    Q.          Do you have an understanding of why

13    that was decided upon?

14    A.          No.

15    Q.          Okay.  What did you think of the

16    pairing of Representatives Kaptur and Kucinich?

17    A.          Didn't have an opinion.

18    Q.          When did you become aware of that

19    pairing?

20    A.          I don't recall that, either.

21    Q.          Okay.  And at the time, would you agree

22    that there were many more representatives

23    throughout the State who are geographically closer

24    to each other than were Representatives Kaptur and

25    Kucinich?

CONFIDENTIAL

Page 31

1                     CONGRESSMAN WILLIAM JOHNSON

2                     MS. McKNIGHT:   Objection; form.

3                     You may answer.

4       A.            Ask that question again, please.

5       Q.            Were you aware that there were many

6       more representatives in the State who were

7       geographically closer to one another than were

8       Representatives Kaptur and Kucinich?

9                     MS. McKNIGHT:   Same objection.

10      A.            I didn't really look at the geography

11      other than how it pertained to me.  We speculated

12      based on the districts that I bordered, if there

13      was a pairing that involved me, who that pairing

14      might be, but it was a logical -- it

15      was -- because Jean Schmidt was on my southern

16      border.  I butted up against Steve Stivers and Pat

17      Tiberi.  I also butted up against Jim Renacci and

18      Bob Gibbs.  I also butted up against Tim Ryan.  So

19      the speculation was if I were to be paired with

20      anyone, it would be one of those simply because

21      their districts joined mine.

22                    But I did not look at the geography or

23      the possible pairings of others and didn't recall

24      having any discussions about that.

25      Q.            Okay.  Do you have any understanding of

CONFIDENTIAL

Page 32

1              CONGRESSMAN WILLIAM JOHNSON

2    why the pairing of Representatives Kaptur and

3    Kucinich was decided upon?

4    A.          No.

5    Q.          What did you think of the pairing of

6    Representative Sutton and Renacci?

7    A.          I had no opinion.

8    Q.          Do you recall when you became aware of

9    that pairing?

10   A.          I do not.

11   Q.          And do you recall how you may have

12   become aware of that pairing?

13   A.          No.

14   Q.          Do you have any understanding of why

15   that pair was decided upon?

16   A.          No.

17   Q.          Would you agree that going from 18 to

18   16 seats only required the pairing of two sets of

19   incumbents?

20              MS. McKNIGHT:  Objection; form.

21              You may answer.

22   A.          No.

23   Q.          Would you agree that there was a loss

24   of two seats?

25   A.          Yes.

CONFIDENTIAL

1                CONGRESSMAN WILLIAM JOHNSON

2    Q.        And so at a minimum there would be a

3    loss of two incumbents?

4    A.        Yes.

5    Q.        And so if the mapmakers were trying to

6    minimize the number of lost incumbents, they would

7    have only paired two sets of incumbents?

8              MS. McKNIGHT:  Objection; form.

9    A.        I don't know what was going through the

10    minds of those that were drawing the maps.

11    Q.        Okay.  Did you ever have an

12    understanding of why three pairs of incumbents?

13    A.        No.

14              MS. LEE:  I'm asking the court reporter

15    to mark as Exhibit 3 and please hand to the

16    witness.

17                    - - - - -

18              Thereupon, Plaintiff's Exhibit 3 is

19    marked for purposes of identification.

20                    - - - - -

21              MS. McKNIGHT:  Counsel, before you

22    proceed, I'd just like to note for the record that

23    in this case we've been operating under the

24    understanding that all objections in depositions

25    are reserved except for the objection on form.  As

CONFIDENTIAL

Page 34

1          CONGRESSMAN WILLIAM JOHNSON

2    I understand it, we're operating under that same

3    understanding in this deposition; is that right?

4          MS. LEE:  Yes, we are.

5          MS. McKNIGHT:  Thank you, Counsel.

6    Q.          So, Congressman, I've had marked as

7    Exhibit 3 the "Reply in Further Support of Motion

8    of Republican Congressional Delegation, Ohio

9    Voters, and Republican Party Organizations to

10   Intervene."

11          This was filed by your attorneys in

12   further support of your request and the request of

13   the other Congressmen to join this case.

14          And, again, would you agree that, just

15   like the document we reviewed in Exhibit 2, in

16   this document here your attorneys are making

17   representations to the Court on your behalf?

18   A.          Yes.

19   Q.          Okay.  Please turn with me to page 5 of

20   this exhibit.  Beginning four lines above the

21   footnote, it says, "Members of Congress have

22   ongoing and working relationships with these

23   constituents and constituent groups, who turn to

24   members of Congress for a variety of needs from

25   ministerial to substantive lobbying."

CONFIDENTIAL

Page 35

1          CONGRESSMAN WILLIAM JOHNSON

2     A.          Let me read that.

3     Q.          Sure.

4     A.          Yes.

5     Q.          Can you please describe some examples

6  of working relationships with constituents on

7  substantive lobbying issues?

8     A.          Let's take, for example, coal miners

9  who are in a multi-employer pension fund.  Those

10  multi-employer pension funds are in default and

11  over a period of time those pensions and/or at one

12  time the health benefits were not going to be

13  available.  So those constituents would come to me

14  advocating for solutions to -- policy solutions

15  that would remedy their loss of their pensions

16  that they had worked so hard for, whether it was

17  through the PBGC or through some other legislative

18  means.  That's one example.

19          Oil and gas business owners or other

20  energy developers, whether they are coal companies

21  or oil and gas companies that are trying to

22  develop projects that are being impeded by federal

23  policies or regulations from the EPA or the Army

24  Corps, they would come and talk to me about

25  potential policy solutions regarding that.

CONFIDENTIAL

Page 36

1              CONGRESSMAN WILLIAM JOHNSON

2              The Army Corps of Engineers that

3    maintain the river bank along the Ohio River and

4    the Muskingum River in my district, the erosion

5    issues that occur, mayors and city councils and

6    county commissioners and county engineers come to

7    me advocating for federal policies that would make

8    sure that their erosion issues are adequately

9    addressed by the Army Corps.

10             Those are three examples of those kinds

11   of things.

12   Q.         Sure.  And do any of these examples

13   include Democratic groups?

14   A.         I don't know who they were when they

15   come in.  I don't ask them whether they're

16   Democrats or Republicans.

17   Q.         Please turn to the top of page 7 in the

18   same document.  Beginning on the first line, it

19   reads, "Doing their job well requires unrelenting

20   fundraising efforts that begin the day they are

21   elected to office and continue until they step

22   down or are voted out."  Is that correct?

23   A.         Unfortunately, yes.

24   Q.         Okay.  Continuing in this same

25   paragraph, the next sentence reads, "These

CONFIDENTIAL

Page 37

1     CONGRESSMAN WILLIAM JOHNSON

2 fundraising efforts would be wasted if district

3 lines were changed and a member was paired with

4 another incumbent or moved from a favorable to

5 unfavorable district."

6     Do you see that?

7 A.    I do see that.

8 Q.    What is a "favorable district"?

9 A.    My interpretation of this would be my

10 district right now would be favorable to me

11 because I have built those coalitions.

12     A district that has different lines

13 would -- I would have to go back and start from

14 square one, step one in building fundraising

15 alliances and coalitions and getting those voters

16 in those areas that I had not previously

17 represented to get my message out to them to help

18 them understand what kind of representative I

19 would be on their behalf so that they would be

20 more inclined to support me financially, to help

21 me raise the resources to run a campaign.

22 Q.   Do you think a "favorable district" has

23 to do with the partisan composition of the

24 district?

25    MS. McKNIGHT:  Objection to form.

CONFIDENTIAL

Page 38

1           CONGRESSMAN WILLIAM JOHNSON

2               You may answer.

3     A.          No, because if you look at my election

4     process, in 2010 I ran in a predominantly

5     Democratic district and I didn't consider the

6     partisan makeup of that district when I ran.  I

7     ran to serve.  Excuse me.  I ran to serve, and so

8     it didn't matter to me what party the people came

9     from.

10              I would visit -- at that time in my

11    first election I represented Athens County, all of

12    Athens County, which included the City of Athens.

13    I spent a lot of time in Athens talking to college

14    students and professors that I learned afterwards

15    probably would never support me.  But that didn't

16    matter to me.  It was my job to represent them.

17    And so having an open line of communication with

18    them would help me gain the resources that I need

19    to run a campaign.

20    Q.          Would you agree that your district

21    lines will be redrawn following the 2020 census?

22    A.          Yes.

23    Q.          And does a congressman have any say in

24    how those lines are going to be drawn?

25    A.          No.

CONFIDENTIAL

Page 39

1                    CONGRESSMAN WILLIAM JOHNSON

2      Q.            Continuing on in this document, please
3      turn to page 10, if you would.  In the second
4      paragraph, beginning under heading B, the second
5      sentence, it says, "But Plaintiffs ignore the
6      reality that redistricting is a zero-sum game."
7                    Do you see that?
8      A.            In the second paragraph under B?
9      Q.            Yes.
10     A.            "But Plaintiffs ignore the
11     reality" -- okay.
12     Q.            Do you agree that "redistricting is a
13     zero-sum game"?
14                   MS. McKNIGHT:  Objection; form.
15     A.            I don't know what you mean by a
16     "zero-sum game."  Can you rephrase that?
17     Q.            I don't think I can, as this is from a
18     filing to the Court where your attorneys were
19     making representations on your behalf.  Certainly
20     read in the paragraphs around that if you think
21     that would help.
22     A.            Let's see.  That doesn't help.  I'm not
23     sure I understand what -- in this context what a
24     "zero-sum game" means.
25     Q.            Okay.  In intervening in this case,

your attorneys have described how your and the other Congressmen's interests are different from the other Defendants, which include the leaders of the Ohio General Assembly and the Ohio Secretary of State.

Before turning to those particular differences, who's responsible for drawing the Congressional map?

A. I don't know.

Q. Okay. Who's responsible for administering elections in Ohio?

A. Secretary of State.

Q. Okay. Do you agree that you have a different interest in the Congressional map than does the Ohio General Assembly?

MS. McKNIGHT: Objection; form.

You can go ahead and answer.

A. I don't know what the Ohio General Assembly's interest is, so I don't know whether my interest would differ from theirs or not.

Q. Okay. Do you agree that you have a different interest in the Congressional map than the Ohio Secretary of State?

A. I don't know what his interest is, so I

CONFIDENTIAL

Page 41

1                    CONGRESSMAN WILLIAM JOHNSON

2      don't know whether mine would differ.

3      Q.          Okay.  Please turn with me to page 14

4      of Exhibit 3.

5      A.          14?

6      Q.          Yes.

7      A.          Okay.

8      Q.          In the first paragraph at the top,

9      beginning in the second sentence, it says, "the

10     governmental defendants are not charged - and

11     should not be charged - with assisting the

12     Intervenor Applicants in maintaining any

13     particular type or level of electoral

14     participation."  They --

15     A.          I don't see that.  Where --

16     Q.          It begins on the third --

17     A.          Oh.  "To the contrary."

18     Q.          Yes.

19     A.          Okay.

20     Q.          And so the next sentence begins, "They

21     represent 'all citizens,' and, even if they take a

22     view in defense of the law, their representation

23     of all Ohio citizens' competing electoral

24     interests, including Plaintiffs', does not

25     adequately represent Intervenor Applicants'

CONFIDENTIAL

Page 42

1                 CONGRESSMAN WILLIAM JOHNSON

2    particular interests."

3                 Do you see those sentences?

4    A.        Yes, I see the sentences.

5    Q.        Okay.  Do you agree that Ohio citizens

6    have "competing electoral interests"?

7                 MS. McKNIGHT:  Objection; form.

8    A.        What is a "competing electoral

9    interest"?

10   Q.        Again, it's a representation made by

11   your counsel in this filing.  I think it perhaps

12   means that citizens have different and potentially

13   competing interests in elections and the outcomes

14   of elections in Ohio.

15   A.        Yes.

16   Q.        Okay.  And do you agree that

17   Plaintiffs, individual Plaintiffs, Ohio citizens,

18   in this case, have certain interests?

19   A.        Yes.

20   Q.        And do they have certain electoral

21   interests?

22   A.        They're citizens of Ohio, so I'm sure

23   they do.

24   Q.        Okay.  And we have covered that you

25   have a personal interest in your district,

CONFIDENTIAL

Page 43

1                CONGRESSMAN WILLIAM JOHNSON

2      correct?

3                     MS. McKNIGHT:   Objection.

4      A.          Yes.

5      Q.          And do you have certain electoral

6      interests in Ohio as well?

7      A.          Yes.

8      Q.          Okay.  Lou Ann Booth, a Plaintiff in

9      this case, is a constituent who lives in your

10     district.  Is your interest in your district at

11     odds with hers?

12     A.          I don't know what her interests are.

13     Q.          Okay.  One of the interests discussed

14     to support intervention in this case is

15     fundraising; is that correct?

16     A.          Ask that again, please.

17     Q.          Is one of the interests discussed in

18     support of your intervention in this case

19     fundraising?

20     A.          I'd have to go back and look and

21     refresh on what those --

22     Q.          Sure.  So if we can flip back to the

23     top of page 7 in this same Exhibit 3 --

24     A.          Yes.

25     Q.          -- the first two sentences here, "Doing

CONFIDENTIAL

Page 44

1          CONGRESSMAN WILLIAM JOHNSON

2    their job well requires unrelenting fundraising

3    efforts that begin the day they are elected to

4    office?"

5    A.        Yes.

6    Q.          Okay.  And that, "These fundraising

7    efforts would be wasted if district lines were

8    changed and a member was paired with another

9    incumbent or moved from a favorable to unfavorable

10   district."

11   A.        Yes.  Yes.

12   Q.          So you agree that one of the interests

13   to support intervention was fundraising?

14   A.        Yes.

15   Q.        Okay.  Have you ever used the prospect

16   of redistricting in your fundraising efforts?

17   A.        Ask that again.

18   Q.        Have you ever used the prospect of

19   redistricting in your fundraising efforts?

20   A.        I don't know if this would qualify as

21   using the prospects of redistricting in

22   fundraising specifically.  I believe that we noted

23   in some of our fundraising efforts that

24   redistricting was going to occur and, therefore,

25   in my fundraising efforts, getting those who would

CONFIDENTIAL

Page 45

1            CONGRESSMAN WILLIAM JOHNSON

2    favorably commit to supporting my efforts with

3    financial contributions to understand that for me

4    to get my message out as to what kind of member I

5    was going to be representing the people that I

6    represent, that I would need their support in

7    doing that.   But I had no role in drawing the

8    district lines, so it's not a direct link.

9    Q.         Understood.   On page 7 where we had

10   just looked back to, it states that if the lines

11   were changed, "fundraising efforts would be

12   wasted."   Why would that be?

13   A.          Well, many people, many people

14   contribute to seeing their particular member of

15   Congress elected or reelected, not someone else's.

16   So if they were outside of my district, they might

17   be less inclined to support financially.

18             MS. LEE:   Okay.   I'd like to have the

19   court reporter mark as Exhibit 4, and please pass

20   to the witness.

21                      - - - - -

22             Thereupon, Plaintiff's Exhibit 4 is

23   marked for purposes of identification.

24                      - - - - -

25             MS. LEE:   Kate, the Bates is chopped

CONFIDENTIAL

Page 46

1                    CONGRESSMAN WILLIAM JOHNSON

2    off a little bit here, but it's Johnson 0000, four

3    zeros, 65.

4                    MS. McKNIGHT:   Thank you.

5    A.              Okay.

6    Q.              Congressman, do you recognize this

7    document?

8    A.              Yes.

9    Q.              And what is it?

10   A.              It looks -- it looks like a mailer.

11   Q.              What was the purpose of this document?

12   A.              To inform the people of my district

13   that -- what kind of representation I was bringing

14   to the table.  Yeah, to inform the people in my

15   district what kind of representation that I would

16   be bringing to the table.

17   Q.              Okay.  And on the second page of this

18   document, maybe the third column over, titled "The

19   Battle Ahead" --

20   A.              Right.

21   Q.              -- "Congressional Geography 101," do

22   you recall what the purpose of this particular

23   section was?

24   A.              To make sure my constituents knew that

25   district lines would be changing, because we were

CONFIDENTIAL

Page 47

1                    CONGRESSMAN WILLIAM JOHNSON

2    going to be losing two seats.

3    Q.            And in the second paragraph here, it

4    begins, "During this process it'll be important to

5    look at geography."  Do you see that?

6    A.            Correct.

7    Q.            And what was your consideration in

8    including this in the mailer?

9    A.            Well, regardless of who does it, I

10   mean, this is -- this is eight years after the

11   first redistricting effort.  I've learned a lot

12   about our state.  Geography plays a really big

13   role in drawing district lines in Ohio because of

14   the population centers and where those population

15   centers exist relative to the geography.

16              If you go -- I mean, the formula for

17   drawing district lines is very, very simple in

18   concept.  You take the national census.  You

19   divide by 435.  You come up with a number.  That's

20   721,000.  You divide 721,000 into the population

21   of Ohio.  You come up with a number.  It was 16

22   after the 2010 census, so we knew we were going to

23   be losing two seats.

24              So the question, then, is how do you

25   get out of those city centers, Cincinnati,

CONFIDENTIAL

Page 48

1                    CONGRESSMAN WILLIAM JOHNSON

2      Columbus, and Cleveland, and get all the way over

3      to the river, to Appalachia, to the rural parts of

4      our state and keep your districts with 721,000

5      people.

6                    And so the point we were making,

7      there's always going to be a swath along the Ohio

8      River that someone's going to have to represent.

9      And I'm a country boy, and so I was trying to make

10     the case I'm the guy to represent you.  That's the

11     purpose of this mailer.

12     Q.      Okay.  Thank you.  Back in 2010 and

13     2011, did you have familiarity with the

14     redistricting process?

15     A.      Very little.  I knew it was happening.

16     Q.      Do you know who -- what party was in

17     the majority in the Ohio Senate in 2011?

18     A.      I knew it was the Republicans, yes.

19     Q.      And do you know what party was in the

20     majority in the Ohio House in 2011?

21     A.      Yes.

22     Q.      And what party was that?

23     A.      The Republicans.

24     Q.      Okay.  And do you know who the Governor

25     was in 2011?

CONFIDENTIAL

1              CONGRESSMAN WILLIAM JOHNSON

2      A.          Yes.   John Kasich.

3      Q.          And what party was he from?

4      A.          Republican.

5      Q.          What was your understanding at the time

6  as to how the redistricting process was taking

7  place?

8      A.          I didn't have an understanding at the

9  time.

10     Q.          Did you know who was organizing it?

11     A.          No.

12     Q.          Did you know who had final approval on

13  the map before it went to the floor of the General

14  Assembly?

15     A.          No.

16     Q.          Are you aware that two versions of the

17  redistricting map were passed?

18     A.          No.

19     Q.          Were you aware of a referendum

20  occurring at the time?

21     A.          I vaguely remember the referendum,

22  because I knew that it was in the courts up until

23  late in the year.

24     Q.          Who is Mark Weaver?

25     A.          Mark Weaver is my general consultant,

CONFIDENTIAL

Page 50

1                    CONGRESSMAN WILLIAM JOHNSON

2        political consultant.

3        Q.        And is he the principal at

4        Communications Counsel?

5        A.        Yes.

6        Q.        And who is Mike Smullen?

7        A.        He's my chief of staff.

8        Q.        And did he work on your political

9        campaign in 2011, excuse me, in 2010?

10       A.        No.

11       Q.        And he's presently your chief of staff?

12       A.        Yes.

13       Q.        And he was your chief of staff at the

14       time of the redistricting?

15       A.        I don't remember the date that he came

16       on, but he came on early in 2011.  So yes.

17       Q.        Okay.  And who is Matt Dole?

18       A.        Matt Dole works for Mark Weaver.  He's

19       a staff member of Communication Counsel.

20       Q.        Is it fair to say that Mark Weaver is a

21       trusted advisor of yours?

22       A.        Yes.

23       Q.        And is it fair to say that Mike Smullen

24       is a trusted advisor of yours?

25       A.        Yes.

CONFIDENTIAL

Page 51

1                CONGRESSMAN WILLIAM JOHNSON

2    Q.            And is it fair to say that Matt Dole is

3    a trusted advisor or yours?

4    A.            Yes.

5    Q.            Did Communications Counsel advise you

6    regarding the Congressional redistricting?

7    A.            We talked about it in very general

8    terms, but I had no role in it, so they didn't

9    advise me other than how do we put out a message

10   that would tell my constituents what kind of

11   representative that I would be.

12                 And, also, I didn't even know who the

13   stakeholders were that would be making this

14   decision, but I knew that they were out there.  I

15   just didn't know who they were.  So that was part

16   of our messaging strategy was to let everybody, my

17   constituents and those that would be drawing the

18   district maps, know what I bring to the table.

19   Q.            Understood.

20                 MS. LEE:  I'm going to ask the court

21   reporter to mark as Exhibit 5 and hand to the

22   witness.

23                      - - - - -

24                 Thereupon, Plaintiff's Exhibit 5 is

25   marked for purposes of identification.

CONFIDENTIAL

Page 52

1          CONGRESSMAN WILLIAM JOHNSON

2                  - - - - -

3    Q.          Congressman, do you recognize this
4    document?  It begins on the reverse side of the
5    page in terms of chronological order.
6    A.          Okay.
7    Q.          Do you recognize this document?
8    A.          Well, it's an e-mail.  It's been a long
9    time since I've seen it, but --
10   Q.          Okay.  I'd just like to discuss a
11   couple of things in this e-mail.
12   A.          Okay.
13   Q.          If you flip to the reverse side, which
14   is the first e-mail chronologically in the chain,
15   this appears to be an e-mail from you to Mark
16   Weaver; is that correct?
17   A.          Right.
18   Q.          Okay.  And in the third paragraph,
19   you're referring to a meeting you had with Dave
20   Hobson throughout this e-mail.  Who's Dave Hobson?
21   A.          Dave Hobson is a former member of
22   Congress from down around the Dayton area.
23   Q.          Okay.  And in the third paragraph it
24   states, "he asked me a question that I did not
25   know the answer to...i.e., what am I doing to

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2    prepare to defend against getting redistricted

3    out?"

4              Do you see that?

5    A.        I do.

6    Q.        And do you recall that being a concern

7    in 2010?

8    A.        You mean being redistricted out?

9    Q.        Yes.

10   A.        I became aware after I learned there

11   were going to be two seats eliminated that I could

12   be paired with someone, yes.  I knew it was a

13   possibility.

14   Q.        Okay.  And then if you flip to the

15   first side of the page, Mark Weaver's response to

16   you in the e-mail at the bottom of this page, in

17   the second paragraph it states, "Remember, the

18   decision is ultimately up to the General Assembly

19   and that depends a lot on the relationship with

20   those leaders."

21              Was that your understanding of what was

22   important in order to ensure against getting

23   redistricted out?

24   A.        Is what my understanding?

25   Q.        A relationship with the General

CONFIDENTIAL

Page 54

1                    CONGRESSMAN WILLIAM JOHNSON

2    Assembly's leaders.

3    A.          I don't know what Mark Weaver meant by

4    his comment there.

5    Q.          Okay.  And then in your response

6    e-mail, the one immediately above that one,

7    your -- the first paragraph begins, "Agree,

8    totally.  That's really the specific question I

9    have.  How do I begin now to establish a

10   relationship with those state legislature

11   leaders...before they form their opinions on who

12   should stay or go?"

13                    Do you see that?

14   A.          I do.

15   Q.          And do you --

16   A.          I do.

17   Q.          Do you recall seeking to establish a

18   relationship with State legislature leaders in

19   2010 and 2011?

20   A.               Yes, for many different reasons, not

21   solely because of redistricting.   My constituents

22   have issues and concerns that are not federal

23   issues, and so knowing who to contact within the

24   State legislature and the State agencies to refer

25   them to is important.

CONFIDENTIAL

Page 55

1          CONGRESSMAN WILLIAM JOHNSON

2               So the general answer to your question

3     is yes, I did go about building relationships with

4     State officeholders so I could better represent

5     the people that elected me.

6     Q.        And was part of the reason in

7     establishing a relationship with those State

8     legislature leaders around their opinions on

9     redistricting?

10    A.        Well, keep in -- yes.  However, keep in

11    mind what I said down below in the first

12    paragraph.  I didn't -- or at the beginning of

13    this e-mail thread.  He asked me a question that I

14    did not know the answer to, what am I doing to

15    defend against getting redistricted out.  I didn't

16    know that I needed a defense plan to keep from

17    getting redistricted out.  And so I thought I

18    needed to let somebody know who I was and that

19    hey, I'm living over here in eastern and

20    southeastern Ohio.  This is what I bring to the

21    table.

22               Keep in mind, if you draw Ohio in a

23    quadrant, I am the only federal elected

24    representative of any -- at any level in the

25    southeastern quadrant of the State.  Everyone else

CONFIDENTIAL

Page 56

1          CONGRESSMAN WILLIAM JOHNSON

2    is up there.   So Appalachia is oftentimes at the

3    back of everybody's mind in Columbus and even

4    further at the back of everybody's mind in

5    Washington, D C.  And so I knew that going in.  So

6    that's what that answer was referring to, how do I

7    let those folks know, that I'm going to have to

8    work with, who I am and what I am.

9    Q.          Understood.

10              MS. LEE:  I'm going to ask the court

11   reporter to mark as Exhibit 6 and then hand to the

12   witness.

13                    - - - - -

14              Thereupon, Plaintiff's Exhibit 6 is

15   marked for purposes of identification.

16                    - - - - -

17              THE WITNESS:  Before we ask another

18   question, can we take a quick break?

19              MS. LEE:  Absolutely.

20              (A recess was taken.)

21              MS. LEE:  Back on.

22   Q.          Okay.  Congressman, you've just been

23   handed Exhibit 6, which is a document that we

24   received from Communications Counsel.

25              Do you recognize this document?

CONFIDENTIAL

Page 57

1                    CONGRESSMAN WILLIAM JOHNSON

2       A.              Yes.

3       Q.              And do you recall the purpose of this

4    document?

5       A.              As I recall, these are -- these are

6    some of the folks that I was mentioning earlier.

7    These are recommendations of people that I should

8    try and get to meet to better represent my

9    constituents when I needed to refer them to State

10   officeholders.

11      Q.              Okay.  Great.  I'd like to -- in the

12   first section, "Party Insiders," do you see the

13   fourth item down, "Jim Tilling, former staff

14   member of re-apportionment board.  Helped draw the

15   maps previously."

16      A.              Uh-huh.

17      Q.              Do you recall the purpose of meeting

18   with Jim Tilling?

19      A.              I do not know.  And I didn't prepare

20   this document, so I don't know what -- I don't

21   know what the purpose of meeting with Jim Tilling

22   is and I don't ever recall meeting with Jim

23   Tilling.

24      Q.              Okay.  Do you recall meeting with any

25   individuals in Ohio who previously drew

CONFIDENTIAL

Page 58

CONGRESSMAN WILLIAM JOHNSON

2    Congressional maps?

3    A.          No.

4    Q.          And if you would please turn to the

5    last page --

6    A.          Yes.

7    Q.          -- of the document, "DC Political

8    Meetings."  Do you see that section?

9    A.          Yes.

10   Q.          The first individual listed here is

11   "Tom Whatman.  Arrange through NRCC."

12   A.          Yes.

13   Q.          Do you know Mr. Whatman?

14   A.          Yes.

15   Q.          And do you recall what his role was in

16   2011?

17   A.          I do not know.  I know that -- I know

18   that Tom was on John Boehner's team, John being

19   the Speaker of the House.  And so I knew Tom.  I

20   saw him when we would have delegation meetings or

21   meetings over at the NRCC, yes.

22   Q.          Okay.  And so your answer sort of

23   presaged my next question.  In general, are there

24   meetings of the Ohio Congressional delegation

25   held?

CONFIDENTIAL

Page 59

1              CONGRESSMAN WILLIAM JOHNSON

2      A.          Yes.

3      Q.          And do the meetings include both the

4  Democratic and the Republican members of the

5  delegation?

6      A.          Yes.

7      Q.          Are there ever meetings held just of

8  the Republican members of the delegation?

9      A.          Yes.

10     Q.          What is the purpose of these meetings?

11     A.          To talk about legislative priorities.

12  Obviously John Boehner, being the Speaker of the

13  House, from Ohio, believes strongly that Ohio

14  played a critical role in advancing the priorities

15  of the House, and so making sure that we were all

16  informed so that we could make informed decisions

17  about our votes on policy issues and such.

18     Q.          In general, how would meetings of the

19  Republican members of the delegation be called?

20     A.          How would they be called?  At what

21  time, today, then, now?

22     Q.          Sure; excellent clarification.  How

23  would they be called in 2010 and 2011?

24     A.          As I recall, a notice would go out from

25  the dean of the delegation to -- through their

CONFIDENTIAL

Page 60

1                    CONGRESSMAN WILLIAM JOHNSON

2       chief of staff to all of the members' chiefs of

3       staffs and/or schedulers and we'd be notified that

4       there'd be a delegation meeting.

5       Q.          And at the time of the redistricting,

6       who was the dean of the delegation?

7       A.          Steve LaTourette.

8       Q.          Prior to the 2011 redistricting being

9       passed, was there ever a meeting of the Republican

10      members of the delegation held to discuss

11      redistricting?

12      A.          Redistricting was a topic of discussion

13      at delegation meetings.  I don't recall a specific

14      redistricting meeting that was focused totally on

15      that.

16      Q.          Okay.  Was there ever a meeting in

17      which redistricting was one of the topics that

18      included both the Republican and the Democratic

19      members of the delegation?

20      A.          I don't recall a meeting like that.

21      Q.          Okay.  Do you recall the nature of the

22      conversation surrounding redistricting by the

23      Republican members of the delegation?

24      A.          They were very general, speculative.

25      Everybody knew that we were going to lose two

CONFIDENTIAL

Page 61

1          CONGRESSMAN WILLIAM JOHNSON

2     congressional seats so, as you might imagine,

3     everybody was speculating about how that was going

4     to happen and how it might involve them.

5     Q.          Understood.

6               MS. LEE:   Okay.   I'm going to ask the

7     court reporter to mark as Exhibit 7 and please

8     hand to the witness.

9                              - - - - -

10              Thereupon, Plaintiff's Exhibit 7 is

11     marked for purposes of identification.

12                             - - - - -

13     Q.          Do you recognize this document?

14     A.          I do.

15     Q.          And what was the purpose of this

16     document?

17     A.          It was to notify us of a delegation

18     meeting.

19     Q.          And is it correct that the meeting is

20     listed as with Congressman LaTourette because, as

21     dean, he was calling the meeting?

22     A.          That's correct.

23     Q.          And so in mid November 2010, is it

24     correct you'd been elected to office, but you were

25     not yet sworn in as a Congressman?

CONFIDENTIAL

Page 62

CONGRESSMAN WILLIAM JOHNSON

1

2      A.          That is correct.

3      Q.          And did you attend this meeting?

4      A.          I don't recall.

5      Q.          Does this appear to be a meeting that

6      you likely would have attended?

7      A.          Can I confer with counsel?

8      Q.          Is it regarding privilege?

9      A.          Well, I don't know.  I don't know what

10     privilege is.

11     Q.          Is it regarding attorney-client

12     privilege?

13              MS. McKNIGHT:  Why don't we take a

14     moment?  Please answer that question.  Pardon me.

15     A.          I didn't miss any of the activities

16     around orientation.  Looking at the date of

17     the -- when the meeting was going to be, I believe

18     that it was during orientation, so I would have

19     been in D.C.  So even though I don't remember the

20     meeting specifically, I'm fairly confident that I

21     would have been at the meeting.

22     Q.          Understood.  Do you want to take a

23     break?

24     A.          No.

25     Q.          No?  You're okay?

CONFIDENTIAL

Page 63

CONGRESSMAN WILLIAM JOHNSON

1

2    A.        I'm good.

3    Q.        Perfect.  And the meeting agenda here

4    is just sort of the mid to bottom of the page

5    including four items.

6              Do you see that?

7    A.        Yes.

8    Q.        And one of the items is "committee

9    assignments."

10   A.        Right.

11   Q.        Would Representative LaTourette as dean

12   or would Speaker Boehner be the one in charge of

13   committee assignments?

14   A.        The committee assignment process was

15   actually a steering committee, a Republican

16   conference steering committee process.

17   Q.        Okay.

18   A.        Now, I didn't understand that then.  We

19   were asked as new members -- there were five new

20   members that year, Chabot, Renacci, Stivers,

21   Gibbs, and me.  And we were asked what committees

22   we wanted to be on.  I wouldn't know I didn't get

23   the committees I asked for.  So it was a steering

24   committee decision, the Speaker having some number

25   of votes as the Speaker in that steering committee

CONFIDENTIAL

Page 64

1        CONGRESSMAN WILLIAM JOHNSON

2   process.   And that still exists that way today.

3   Q.        Okay.   And another agenda item here is

4   "redistricting."

5   A.        Yes.

6   Q.        Would this be the sort of meeting you

7   referred to earlier where redistricting was one of

8   the topics --

9   A.        Yes.

10  Q.        -- but not the only topic discussed?

11  A.        Yes.

12  Q.        And do you have any recollection of

13  discussions surrounding redistricting during the

14  orientation period?

15  A.        Other than it was going to happen, no.

16  Q.        Okay.   Putting aside the document we

17  just reviewed, did you ever talk about

18  redistricting with then Speaker Boehner?

19  A.        In a one-on-one conversation?

20  Q.        Let's start there.

21  A.        No.

22  Q.        Okay.   And did you ever talk about

23  redistricting with Speaker Boehner in a larger

24  conversation than one on one?

25  A.        Only in the context of a meeting like

CONFIDENTIAL

Page 65

1                CONGRESSMAN WILLIAM JOHNSON

2   this where we were talking in general about

3   redistricting is going to occur.

4   Q.        Okay.  Did you understand

5   Speaker Boehner to have some control in the area

6   of redistricting in Ohio?

7   A.          I didn't assume that Speaker Boehner

8   would have any control because he's not part of

9   the process.  District lines are drawn by State

10  officials.  He was a federal official.  So I

11  didn't assume anything.

12  Q.        Did you ever come to understand that

13  Speaker Boehner had some control in the area of

14  redistricting?

15  A.          Again, I did not know what

16  Speaker Boehner's control would have been, role

17  would have been, because he's not a -- he's not a

18  State official.

19  Q.        Okay.  Is it your understanding that

20  Speaker Boehner played no role in Ohio's

21  redistricting?

22  A.          Redistricting is handled by the laws of

23  the State and, as such, Speaker Boehner had no

24  formal role in redistricting in 2011.

25  Q.          Did he have any informal role?

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     A.          We talked about it in general and

3     he -- being the senior member of our delegation,

4     he was not the dean.  That was Steve LaTourette.

5     He couldn't be both dean and Speaker of the House.

6     So in the context of being the senior member of

7     the State of Ohio, he was the most knowledgeable

8     about redistricting because he had been through it

9     several times before.

10    Q.          And did you ever understand that

11    Speaker Boehner or members of his staff had

12    decision-making authority in the drawing of the

13    maps?

14    A.          I did not assume that they had

15    decision-making authority because they weren't

16    State officials.

17    Q.          Did you ever come to learn that they

18    had decision-making authority?

19    A.          No, because I didn't think that they

20    had decision-making authority.

21    Q.          And it is -- is it still your

22    understanding today that they did not have

23    decision-making authority in the --

24    A.          That is correct.

25    Q.          Other than Speaker Boehner, did you

CONFIDENTIAL

Page 67

1                    CONGRESSMAN WILLIAM JOHNSON

2    have -- and the general meetings like the one

3    we've just discussed, did you ever have

4    conversations about redistricting with any other

5    Republican members of the Ohio Congressional

6    delegation?

7    A.          Everybody was talking about the what

8    ifs, you know, is it going to be me and you, is it

9    going to be you and them, is it -- you know, how

10   is this all going to work out.  I mean, there

11   was -- there was a lot of uncertainty and cloud

12   hanging over the redistricting process.

13               Most of us, even the new members, even

14   the returning members, because they hadn't been

15   there long enough except for maybe LaTourette,

16   maybe Tiberi at the time, had ever been through a

17   redistricting process.  So we were all very, very

18   naive as to the process and how it worked.  So

19   there was a lot of discussion about what ifs.

20   What if it's you?  What if it's me?  What do we

21   do?

22   Q.          Do you recall any particular

23   discussions?

24   A.          No.

25   Q.          Okay.  Did you ever have conversations

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2    about redistricting with any of the Democratic

3    members of the Ohio Congressional delegation?

4    A.          Yes.

5    Q.          And what do you recall of those?

6    A.          Same kind of discussions.  Tim Ryan and

7    I are close friends.  Well, I'm actually friends

8    with all of the Democratic members.  I was friends

9    with Dennis Kucinich, as well.  So we would

10   have -- on the floor it would be more humor and

11   laughing, you know, what if it's the two of us?

12   What if it's the two of them?  How is this all

13   going to work?  It was those kind of discussions.

14   Q.          Do you recall any discussions with

15   Democratic members that were not of the humorous

16   variety you've just described, but that were

17   regarding the substance of what the redistricting

18   would look like?

19   A.          No.

20   Q.          Did you ever talk about redistricting

21   with other members of Congress, meaning those who

22   are not from Ohio?

23   A.          Not that I recall.

24   Q.          Okay.  Did you ever e-mail with any

25   Congresspeople about redistricting?

CONFIDENTIAL

Page 69

CONGRESSMAN WILLIAM JOHNSON

1

2    A.        I don't recall.

3    Q.        Okay.  Do you use text messaging or SMS

4    messaging?

5    A.        Yes.

6    Q.        And did you at the time in 2011?

7    A.        I don't recall.

8    Q.        Do you recall ever texting with any of

9    your staff members about redistricting?

10   A.        I don't recall.

11   Q.        Do you recall ever texting with any

12   other members of Congress about redistricting?

13   A.        I do not recall.

14   Q.        Okay.  Do your staff people communicate

15   on your behalf?

16   A.        Yes.

17   Q.        Okay.  Do you know if any members of

18   your staff communicated with other congressional

19   staffers about Ohio's redistricting?

20   A.        I don't know.

21   Q.        Do you know if any members of your

22   staff communicated with any other elected

23   officials in Ohio about redistricting?

24   A.        I don't know.

25   Q.        Okay.  Did you ever have any member of

CONFIDENTIAL

Page 70

1          CONGRESSMAN WILLIAM JOHNSON

2    your staff reach out to any members of

3    Speaker Boehner's staff about redistricting?

4    A.        I don't recall.

5    Q.        Do you recall ever having any

6    discussions with any other Congresspeople at the

7    time about where the lines for your district were

8    going to be drawn?

9    A.        I had no idea what the lines were going

10   to be, so no.

11   Q.        Okay.  And as we discussed earlier,

12   you've communicated with other elected officials

13   in Ohio, correct?

14   A.        About a specific topic?

15   Q.        Just in general.

16   A.        Just in general?  Yes.

17   Q.        Okay.  Do you know Tom Niehaus?

18   A.        Yes.

19   Q.        And who is he?

20   A.        At the time he was the president of the

21   Senate.

22   Q.        And do you know what Tom Niehaus's

23   involvement in Ohio's Congressional redistricting

24   was?

25   A.        No.

CONFIDENTIAL

1                CONGRESSMAN WILLIAM JOHNSON

2      Q.         Did you have any conversations with

3      Mr. Niehaus in 2011 regarding Ohio's

4      redistricting?

5      A.         Only to the extent that it was going to

6      happen.

7      Q.         And do you know if any of your staff

8      members had any conversations with Senate

9      President Niehaus or his staff regarding Ohio's

10     redistricting?

11     A.         I don't recall.

12     Q.         Do you know Bill Batchelder?

13     A.         Yes.

14     Q.         And who is he?

15     A.         He was the Speaker of the Statehouse.

16     Q.         And what was Bill Batchelder's

17     involvement in Ohio's Congressional redistricting?

18     A.         I do not know.

19     Q.         Okay.  Did you have any conversations

20     with Bill Batchelder in 2011 regarding Ohio's

21     redistricting?

22     A.         Only in the context that it was going

23     to happen.

24     Q.         And do you know if any of your staff

25     members had any conversations with

CONFIDENTIAL

Page 72

1              CONGRESSMAN WILLIAM JOHNSON

2       Speaker Batchelder or his staff regarding Ohio's

3       redistricting?

4       A.          I do not know.

5       Q.          Did you know Bob Bennett?

6       A.          I did.

7       Q.          And who is Bob Bennett?

8       A.          Bob Bennett at the time that I was

9       elected was -- well, no.  I can't -- he was the

10      chairman of the Ohio Republican Party, but I'm not

11      sure he was when I was elected or if he had

12      already left the post.  He was there for a while,

13      then he left, and then he came back for an interim

14      period under Governor Kasich.  So he had two

15      different tenures, so I'm not sure what his dates

16      were.

17      Q.          Okay.  And what was Bob Bennett's

18      involvement in Ohio's Congressional redistricting?

19      A.          As the Ohio Republican Party chairman,

20      he didn't have a role.  I don't know who in the

21      State, what their roles were, but I know as a

22      State official issue, he's not a State official.

23      So I knew that he had no formal role in

24      redistricting.

25      Q.          Did you know if he had any informal

CONFIDENTIAL

Page 73

CONGRESSMAN WILLIAM JOHNSON

1

2  role in redistricting?

3  A.        I do not know.

4  Q.        Did you have any conversations with Bob

5  Bennett in 2011 regarding Ohio's redistricting?

6  A.        Not that I recall.

7  Q.        And do you know if any of your staff

8  members had any conversations with Bob Bennett or

9  members of his staff in 2011 regarding Ohio's

10 redistricting?

11 A.        I do not know.

12 Q.        Do you know Kevin DeWine?

13 A.        I do.

14 Q.        And who is Kevin DeWine?

15 A.        Kevin DeWine became the Ohio Republican

16 Party chairman after Bob Bennett.

17 Q.        And what was Kevin DeWine's involvement

18 in Ohio's Congressional redistricting?

19 A.        He had no formal role, same reason Bob

20 Bennett did not.

21 Q.        And do you know if he had any informal

22 role in Ohio's Congressional redistricting?

23 A.        I do not.

24 Q.        Did you have any conversations with

25 Kevin DeWine regarding Ohio's redistricting?

CONFIDENTIAL

Page 74

1                    CONGRESSMAN WILLIAM JOHNSON

2      A.           Only in a general context that it was

3      going to happen, much like Niehaus and Batchelder.

4      Q.           And do you know Heather Mann Blessing?

5      A.           No.

6      Q.           Do you have any knowledge of her

7      involvement in Ohio's Congressional redistricting?

8      A.           No.

9      Q.           Do you know Ray Dirossi?

10     A.           No.

11     Q.           Do you have any knowledge of his

12     involvement in Ohio's redistricting?

13     A.           No.

14     Q.           Did you know Tom Hofeller?

15     A.           Who?

16     Q.           Dr. Thomas Hofeller?

17     A.           No.

18     Q.           Do you know if he had any role in

19     Ohio's redistricting?

20     A.           No.

21     Q.           Do you know Mark Braden?

22     A.           No.

23     Q.           Do you know if Mark Braden had any role

24     in Ohio's redistricting?

25     A.           No.

CONFIDENTIAL

Page 75

1                    CONGRESSMAN WILLIAM JOHNSON

2      Q.          Do you know John Morgan?

3      A.          No.

4      Q.          Do you know if John Morgan had any role

5      in Ohio's Congressional redistricting?

6      A.          No.

7      Q.          Do you know Adam Kincaid?

8      A.          No.

9      Q.          Do you know if Adam Kincaid had any

10     role in Ohio's Congressional redistricting?

11     A.          No.

12     Q.          And we earlier discussed that you know

13     Tom Whatman; is that correct?

14     A.          I do.

15     Q.          Do you know what Tom Whatman's role was

16     at the time of the redistricting?

17     A.          He was a member of John Boehner's

18     political team in Washington, D.C.

19     Q.          Okay.  And do you know if Mr. Whatman

20     had involvement in Ohio's Congressional

21     redistricting?

22     A.          I do not know.

23     Q.          Did you ever have any conversations

24     with Mr. Whatman regarding redistricting?

25     A.          Only in a very general context.  He

CONFIDENTIAL

Page 76

CONGRESSMAN WILLIAM JOHNSON

2    would be present at some of those delegation

3    meetings, and to the extent that redistricting was

4    happening, that was the extent of it.

5    Q.        Did you ever have any conversations

6    with Mr. Whatman about what your redrawn district

7    might look like?

8    A.        No.  And I might point out, John

9    Boehner was very tight lipped.  He didn't tell

10   stuff like that.  He did not talk.  If there was

11   anything to tell, he didn't tell.  He didn't -- I

12   mean, if you were to go to John and say John, I

13   want to be on this committee, his response to you

14   would be I think you'd make an excellent member of

15   that committee, but he wouldn't commit.  Whatman

16   did not talk about specifics.

17             So in both Boehner's instance and Tom

18   Whatman's interest, any conversations that were

19   about redistricting were at a very general level,

20   the fact that it was happening, that we were going

21   to lose two congressional seats, and that was

22   pretty much the extent of what I knew.

23   Q.        Okay.  And do you know if any of your

24   staff members or advisors had conversations with

25   Mr. Whatman regarding Ohio's Congressional

CONFIDENTIAL

Page 77

1                    CONGRESSMAN WILLIAM JOHNSON

2      redistricting?

3      A.          I do not recall.

4      Q.          Do you know if Speaker Boehner

5      communicated with the members of the Ohio General

6      Assembly about the congressional map?

7      A.          I do not know.

8      Q.          Did you ever discuss with

9      Speaker Boehner what you wanted your district to

10     look like?

11     A.          No.

12     Q.          And at the time --

13     A.          I just told him I wanted one.

14     Q.          And at the time of the redistricting,

15     did you have particular thoughts about what you

16     wanted your district to look like?

17     A.          No.

18     Q.          In his role of Speaker at the time, was

19     Mr. Boehner the head of the NRCC?

20     A.          No.

21     Q.          Okay.  And what was Speaker Boehner's

22     relationship to the NRCC?

23     A.          He was the Speaker of the House.  We

24     had an NRCC chairman.  That was Representative

25     Pete Sessions from Texas.

CONFIDENTIAL

Page 78

1          CONGRESSMAN WILLIAM JOHNSON

2    Q.          And what is your understanding of the

3    role of the NRCC with respect to Republican

4    members of Congress?

5    A.          They are the political arm of the

6    Republican conference.  So they advise on

7    elections, provide resources, like campaign

8    strategy, polling information, those kinds of

9    things.  So they're sort of the political -- or

10   much like the ORP is the Ohio Republican Party,

11   the NRCC serves the same type of function, only

12   for the Republican conference, much like the DCC,

13   the Democrat Congressional campaign committee,

14   does for the Democrat party.

15   Q.          And have you ever attended any

16   presentations by the NRCC related to

17   redistricting?

18   A.          Yes.

19   Q.          And do you recall when those

20   presentations were?

21   A.          No.

22   Q.          Do you recall how many presentations

23   you attended?

24   A.          No.

25   Q.          Do you recall the content of any of

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     those presentation?

3     A.          They were very, very general.  These

4     are the states that are going to be going through

5     redistricting.  There were occasions when we would

6     be informed that -- that a redistricting challenge

7     had been levelled in the courts and that it might

8     be a while before we know what the district lines

9     are going to look like for the next election;

10    very, very general.

11    Q.          Have you ever reviewed any materials

12    put together by the NRCC related to redistricting?

13    A.          Not that I recall.

14    Q.          Okay.  Has anyone on your staff

15    attended any presentations by the NRCC related to

16    redistricting?

17    A.          I do not know.

18    Q.          Has anyone on your staff ever reviewed

19    materials by the NRCC related to redistricting?

20    A.          I do not know.

21          MS. LEE:  I'd like to mark as Exhibit 8

22    and then please hand to the witness.

23                - - - - -

24          Thereupon, Plaintiff's Exhibit 8 is

25    marked for purposes of identification.

CONFIDENTIAL

1                   CONGRESSMAN WILLIAM JOHNSON

2                        - - - - -

3      Q.          Congressman, do you recognize this

4      document?

5      A.          Let's see.  Yes.

6      Q.          And what is this document?

7      A.          It's a string of e-mails from Matt Dole

8      starting out and then responses by members on the

9      address list.

10     Q.          And is it correct that you are added to

11     this e-mail chain in the last --

12     A.          The very top one.

13     Q.          The very top e-mail?

14     A.          Yes.

15     Q.          And is Angela Weaver a member of your

16     staff?

17     A.          She was at that time.  She was my

18     scheduler.

19     Q.          Okay.  Understood.  And in this office

20     e-mail at the top, it's from Pamela Hashem.

21     A.          Right.

22     Q.          And who is Ms. Hashem?

23     A.          She was my fundraiser at the time.

24     Q.          And the e-mail states, "All, I have

25     just met with Chairman DeWine and he would like to

CONFIDENTIAL

Page 81

CONGRESSMAN WILLIAM JOHNSON

1    see Bill tomorrow as well.  He asked that we have

2    our Clegg meeting at the ORP and he can join us?"

3            And is Chairman DeWine referenced here

4    in this sentence, Kevin DeWine; is that correct?

5    A.        Yes.

6    Q.        Okay.  And what is your "CLEGG

7    meeting"?

8    A.        I have no clue.

9    Q.        Okay.

10   A.        I don't ever recall -- I don't even

11   know who Clegg is.

12   Q.        Okay.  And if we just look a little bit

13   down --

14   A.        Sure.

15   Q.        -- to the full schedule update, it says

16   1:00 p.m., it's the fifth item down, "1:00 p.m.,

17   also at the Hyatt:  Bob Clegg.  Bob is the ORP's

18   liaison to the redistricting process."

19           Do you see that?

20   A.        I do see that.

21   Q.        And so do you understand that the

22   sentence to be that Bob Clegg, the meeting would

23   not occur at the Hyatt, but would instead occur at

24   the ORP in the top e-mail?

CONFIDENTIAL

Page 82

1                    CONGRESSMAN WILLIAM JOHNSON

2      A.          Yes.

3      Q.          Okay.  It states, "He would also like

4      to" underlined, "show us maps they've drawn and

5      talk to Bill about his ideas."

6      A.          I see that.

7      Q.          Okay.  Did you go to such a meeting at

8      the ORP?

9      A.          I do not recall such a meeting.

10     Q.          And do you recall Chairman DeWine or

11     any other members of the ORP showing you potential

12     maps that they've drawn?

13     A.          No.

14                 MS. LEE:  I'd like to ask the court

15     reporter to mark as Exhibit 9 and please hand to

16     the witness.

17                          - - - - -

18                 Thereupon, Plaintiff's Exhibit 9 is

19     marked for purposes of identification.

20                          - - - - -

21     A.          Keep in mind, if I might expand, this

22     was a recommendation from Matt Dole, and by the

23     time I was copied on it by Pamela Hashem at the

24     top, she says is this possible or is the possible.

25     I don't -- I don't ever recall that series of

CONFIDENTIAL

Page 83

CONGRESSMAN WILLIAM JOHNSON

1
2  meetings.

3  Q.        Okay.  And if you'll take Exhibit 9.

4  A.        Sure.

5  Q.        Do you recognize this document?

6  A.        Let's see.  This is from Matt Dole to

7  Mark Weaver.

8  Q.        Okay.  Do you have any understanding as

9  to why Mr. Dole and Mr. Weaver were running

10  scenarios for redistricting?

11          MS. McKNIGHT:  Objection.

12  A.        I have no idea what Matt Dole and Mark

13  Weaver were doing.  I don't know.

14  Q.        Okay.  Do you know who "bir" would be

15  in reference to?

16  A.        No.

17  Q.        Okay.  You can put that exhibit to the

18  side.

19          MS. LEE:  I'd like to ask the court

20  reporter to mark as Exhibit 10 and please hand to

21  the witness.

22                          - - - - -

23          (Plaintiff's Exhibit 10 marked for

24  purposes of identification.)

25                          - - - - -

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     Q.          Okay.  And, Congressman, do you

3     recognize this document?

4     A.          It's a document from my chief of

5     staff --

6     Q.          And --

7     A.          -- to our political team.  Yeah.

8                 MS. PROUTY:  Can I get a copy?  Is

9     there not a copy?  I may not have made it.  The

10    water interrupted us.  Apologies.

11    Q.          And you were a recipient of this e-mail

12    as well, correct?

13    A.          Yes.

14    Q.          Okay.  Do you have an understanding

15    of -- so the subject line listed here is

16    "redistricting/fundraising talking point."

17                Do you see that?

18    A.          Yes.

19    Q.          How was the fundraising related to

20    redistricting?

21    A.          I have no clue.  It is not unusual at

22    all after an FEC filing to compare our results

23    with other members to learn lessons learned, are

24    they doing better, are they doing worse, how can

25    we help, how can they help us.  So that's -- I

CONFIDENTIAL

Page 85

CONGRESSMAN WILLIAM JOHNSON

1

2  didn't even look at the subject line initially.

3  That's what this appeared to be to me.

4  Q.      Okay.  Did you ever have an

5  understanding that if a member of Congress was

6  good at fundraising, the delegation would prefer

7  that he stayed a member of Congress?

8          MS. McKNIGHT:  Objection; form.

9  A.      No.  And it's a dad burn good thing,

10  because if that were the case, I would have been

11  gone a long time ago.

12  Q.      Okay.  But in this e-mail, based on the

13  content, it appears that your filing was better

14  comparatively than these members.

15  A.      That particular quarter.

16          MS. LEE:  Okay.  I'd like to ask the

17  court reporter to mark as Exhibit 11 and please

18  hand to the witness.

19                    - - - - -

20          Thereupon, Plaintiff's Exhibit 11 is

21  marked for purposes of identification.

22                    - - - - -

23  A.      Okay.

24  Q.      Do you recognize this document?

25  A.      I do.

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     Q.          And what is it?

3     A.          It's a -- it is an e-mail from Andrew

4     Anderson, who was a staff member for Pamela Hashem

5     and her consulting group - remember, Pamela was my

6     fundraiser - to our -- Gary Crandall is the

7     chairman of my finance committee, and Mike Smullen

8     and me.

9     Q.          Okay.  And if you see in the first

10    paragraph, it's second sentence, it says, "As of

11    now Bob Murray has agreed to call Kasich, Boehner,

12    Niehaus and Batchelder on Bill's behalf to discuss

13    redistricting according to Congressman Johnson's

14    e-mail on 4-28-11," and it proceeds to quote an

15    e-mail from you, at least from the face of this

16    document.

17                Do you see that?

18    A.          I see.  Yes.

19    Q.          Okay.  Who is Bob Murray?

20    A.          Bob Murray is a constituent of mine.

21    He runs a coal company.

22    Q.          Okay.  And do you recall having him

23    reach out to these Ohio Republicans about

24    redistricting?

25    A.          I was having him reach out to lots of

CONFIDENTIAL

Page 87

1                   CONGRESSMAN WILLIAM JOHNSON

2       people to demonstrate to them, to tell them that I

3       was the kind of representative that he wanted

4       representing him.  But certainly some of those key

5       State officeholders that I, too, had to deal with

6       on behalf of him and my other constituents, yes.

7       Q.        And part of the purpose of that

8       outreach was to discuss the upcoming

9       redistricting?

10      A.        Again, yes.  Again, to demonstrate the

11      kind of representative that I was going to be.

12                MS. LEE:  Okay.  I'd like to ask the

13      court reporter to mark as Exhibit 12 and hand to

14      the witness.

15                    - - - - -

16                Thereupon, Plaintiff's Exhibit 12 is

17      marked for purposes of identification.

18                    - - - - -

19      Q.        So this document is three pages long,

20      if you'd --

21      A.        Okay.

22      Q.        -- like to familiarize yourself with

23      it.

24                Do you recognize this document?

25      A.        It appears to be a memorandum from

CONFIDENTIAL

Page 88

1      CONGRESSMAN WILLIAM JOHNSON

2      Communications Counsel regarding redistricting

3      hearings around the state.

4      Q.        Okay.   And do you recall what the

5      purpose of this memorandum was?

6      A.        No.   I mean, I can read through it and

7      do all kinds of guessing, but --

8      Q.        Sure.   So based on the face of the

9      document, on the sort of bottom of the first page,

10     after indicating the planned hearings across the

11     state, Communications Counsel recommends, or

12     "suggestion is to identify a few different

13     citizens to attend."

14     A.        Right.

15     Q.        "They will share their thoughts about

16     how important it is to keep southeast Ohio intact

17     as a legislative district, as well as to reinforce

18     the value of the outreach efforts Bill's put

19     forth."

20              Do you see that?

21     A.        I do.

22     Q.        And then if you turn to the next page,

23     it appears that there are offered redistricting

24     talking points.  Would you agree to that?

25     A.        I'd agree that this document offers

CONFIDENTIAL

Page 89

1                    CONGRESSMAN WILLIAM JOHNSON

2     some talking points, yes.

3     Q.          And it appears to -- scratch that.

4                 And so in the second subheading,

5     "Importance of Voice for all of Southeast Ohio,"

6     do you see that?

7     A.          I see, yes.

8     Q.          And does this section offer reasons why

9     southeast Ohio should be kept together in a

10    Congressional district?

11    A.          I don't know what Mark Weaver's

12    intention was when he put these talking points

13    together.

14    Q.          Do you see the bullet, "Southeast Ohio

15    citizens have repeatedly been pawns to

16    gerrymandering and political games."

17    A.          Yes.

18    Q.          Do you have any understanding of what

19    was meant by that?

20    A.          No.

21    Q.          Sitting here today, do you have any

22    understanding of what was meant by that?

23    A.          No.

24    Q.          Do you see the sub bullet, "Crazy river

25    district build for Ted Strickland"?

CONFIDENTIAL

Page 90

CONGRESSMAN WILLIAM JOHNSON

1

2    A.         I do see that.

3    Q.         Who is Ted Strickland?

4    A.         Former Governor and former member of

5    Congress from the 6th district.

6    Q.         Do you have any understanding of what

7    "crazy river district" means in this bullet point?

8    A.         We talk about the Appalachian district

9    along the Ohio River as being crazy because of its

10   geography.  It takes six and a half hours to drive

11   from one end of the district to the other.  I can

12   get from my house to Washington, D.C. quicker than

13   I can drive from one end of my district to the

14   other.  It's one of the larger districts east of

15   the Mississippi.  And the way it meanders along

16   the Ohio River, there's no easy way to get

17   anywhere.  It's time consuming, a lot of

18   windshield time sitting in the car.  So

19   that's -- when we talk internally about us having

20   a "crazy river district," that's what we're

21   referring to.

22   Q.         And do you understand this talking

23   point to be critical of the 2002 drawn shape of

24   District 6?

25   A.         I do not know what Mark Weaver intended

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2    this talking point to mean.

3              MS. LEE:  Okay.  Going to ask the court

4    reporter to mark as Exhibit 13.

5                    - - - - -

6              Thereupon, Plaintiff's Exhibit 13 is

7    marked for purposes of identification.

8                    - - - - -

9    Q.        Do you recognize this document,

10   Congressman?

11   A.        This is an e-mail from Mike Smullen to

12   Mark Weaver and me.

13   Q.        Okay.  And the second e-mail down

14   appears to be an e-mail that you wrote on July

15   2nd, 2011.

16             Do you see that?

17   A.        Let's see.

18   Q.        It's just the second line down.

19   A.        On Saturday, July 2nd, 2011?  Yes.

20   Q.        Okay.  And this e-mail chain appears to

21   be discussing an article that Mark Weaver sent the

22   link for the previous afternoon, and the last

23   sentence in the e-mail that you wrote on July 2nd,

24   says, "This article also jives with what Whatman

25   said about our new district potentially being an

CONFIDENTIAL

Page 92

1                CONGRESSMAN WILLIAM JOHNSON

2    R+5 district?"

3                    Do you see that?

4    A.          I do see that.

5    Q.          And do you have an understanding of

6    what "R+5" means?

7    A.          Yes.  It's the PBI index.

8    Q.          Okay.  And does that mean that there's

9    a plus five lean in favor of Republicans?

10   A.          Yeah.  It would be a -- it would be a

11   Republican-leaning district by five points.

12   Q.          Okay.  Understood.  And do you have any

13   recollection of Mr. Whatman saying the new

14   district potentially would be an R+5 district?

15   A.          I don't recall that statement.

16   Obviously.  I wrote it in this e-mail.  I don't

17   know whether I heard someone say that, Whatman say

18   it or whether I heard it directly from Whatman.  I

19   don't recall.

20   Q.          Okay.

21   A.          "Potentially" is the operative word

22   there, because no matter which direction you would

23   go with my district, because it was presumed the

24   geography of the district would get even bigger

25   because we were shrinking from 18 members to 16

CONFIDENTIAL

Page 93

CONGRESSMAN WILLIAM JOHNSON

1

2    members, that -- that there were very few

3    directions that it could go that would increase

4    the Democrat population of northeastern Ohio.  The

5    areas that it could potentially grow into were

6    more Republican areas, conservative areas.  In

7    general, we knew that by the population.

8    Q.         Okay.  And in the second paragraph of

9    your e-mail, the July 2nd e-mail --

10   A.         Yes.

11   Q.         -- the second sentence begins, "But,

12   we'd be wise to assume the worse, continue our

13   strategy of working hard and courting the decision

14   makers, and be thankful if it does not happen."

15   A.         Right.

16   Q.         "David Locke is putting two $1,000

17   donations in the mail to Neihaus (sic) and

18   Batchelder this week."

19   A.         Right.

20   Q.         Who is David Locke?

21   A.         David Locke was my district director at

22   that time.

23   Q.         Okay.  And would these $1,000 donations

24   be coming personally from Mr. Locke?

25   A.         I honestly do not know what that

CONFIDENTIAL

Page 94

1                    CONGRESSMAN WILLIAM JOHNSON

2    statement means, because David Locke did not have

3    any interaction with my finances.  If he made

4    donations himself personally, that would have been

5    his business.  I'm not aware of that.  But I would

6    have not had David Locke do anything in regards to

7    writing checks on my behalf to anyone, let alone

8    to a decision maker.  So I'm not really sure what

9    I meant by that at that particular point in time.

10   Q.          And do you have any recollection of

11   such donations being made to the Speaker of the

12   House and the Senate president?

13   A.          We contributed to State Republican

14   organizations in general.  I don't recall.  I'd

15   have to go back and look at my FEC reports whether

16   I made any personal contributions to their

17   campaigns.  I don't know when Tom Niehaus was up

18   for reelection or Bill Batchelder was up for

19   reelection.  I've made personal contributions to

20   State office seekers, candidates, as well as

21   federal.  So I don't know.

22   Q.          Sitting here today, do you have any

23   understanding of these contributions being related

24   to redistricting?

25   A.          No.

CONFIDENTIAL

Page 95

1          CONGRESSMAN WILLIAM JOHNSON

2               MS. LEE:  I'd like to ask the court

3     reporter to mark as Exhibit 14 and please hand to

4     the witness.

5                    - - - - -

6               Thereupon, Plaintiff's Exhibit 14 is

7     marked for purposes of identification.

8                    - - - - -

9     Q.        We received this document in its

10    redacted form from Communications Counsel.  They

11    redacted all materials not related to

12    redistricting from the memorandum.

13              With that caveat, do you recognize this

14    document?

15    A.        I recognize it as a memo from Mark

16    Weaver and Matt Dole, but I don't know who it went

17    to.

18    Q.        If you'll flip with me to the last page

19    in the conclusion --

20    A.        Right.

21    Q.        -- it states, "The leadership update

22    mailer was widely hailed as a pivotal piece during

23    the re-districting process."

24              Do you understand the "update mailer"

25    to be the document you reviewed in Exhibit 4?

CONFIDENTIAL

Page 96

CONGRESSMAN WILLIAM JOHNSON

1

2    A.        I do not know what Mark Weaver meant by

3    that statement.

4    Q.        Did Communications Counsel or Mark

5    Weaver put together the mailer in Exhibit 4?

6    A.        Yes.

7    Q.        Okay.

8    A.        And early -- that is a mailer.  I don't

9    know if it's the mailer that you're referring to

10   here.

11   Q.        Yes.  "And early aggressive outreach

12   (and donations) to legislative leaders and others

13   involved in the re-districting process no doubt

14   impacted decision-making."

15             Do you see that sentence?

16   A.        I do see that.

17   Q.        And do you have an understanding of

18   what Mr. Weaver and Mr. Dole meant by that?

19   A.        I have no idea what they meant by that.

20   Q.        And sitting here today, do you have any

21   understanding what they meant by that?

22   A.        No.

23             MS. LEE:  And I'd like to ask the court

24   reporter to please mark as Exhibit 15.

25                       - - - - -

CONFIDENTIAL

Page 97

1      CONGRESSMAN WILLIAM JOHNSON

2              Thereupon, Plaintiff's Exhibit 15 is

3      marked for purposes of identification.

4                    - - - - -

5      Q.        Congressman, do you recognize this

6      document?

7      A.        This is an e-mail trail from me to Mark

8      Weaver and Mike Smullen.

9      Q.        Okay.  Great.  And in the first e-mail

10     in the chain from you on July 14th, 2011 --

11     A.        Right.

12     Q.        -- the subject line is "Redistricting";

13     is that correct?

14     A.        Yes.

15     Q.        And the first paragraph reads, "We are

16     certainly going to keep mum about this, but the

17     word from credible sources last might," I assume

18     it means night, "is that the deal has done...and

19     we have survived.  We may even get a sneak,

20     informal view of the new, supposedly much safer

21     district as early as today."

22              Do you have a recollection of this

23     consideration of districts in July 2011?

24     A.        I do not.

25     Q.        And --

CONFIDENTIAL

Page 98

1                    CONGRESSMAN WILLIAM JOHNSON

2    A.         I mean, I knew redistricting was going

3    on and it was a work in progress during that whole

4    time.

5    Q.         And do you have any recollection of who

6    the "credible source" is referred to?

7    A.         I do not.

8    Q.         Did you ever view a draft of what your

9    district might look like prior to the time the

10   redistricting legislation was passed?

11   A.         I do not recall ever seeing a draft.

12   Q.         And in the second paragraph here, it

13   says, "Mark, I've heard repeated accolades on our

14   Leadership Update political piece...the word

15   'brilliant' has been used numerous times to

16   describe it."

17              Do you know if that's a reference to

18   the document reviewed in Exhibit 4, the mailer,

19   Ohio leadership briefing?

20   A.         I do not know.

21   Q.         Do you have any recollection of any

22   other mailers sent in 2011 that would have been

23   identified as a leadership update?

24   A.         I do not, no.

25              MS. LEE:    I'm going to ask the court

CONFIDENTIAL

Page 99

CONGRESSMAN WILLIAM JOHNSON

1

2      reporter to please mark as Exhibit 16 and hand to

3      the witness.

4                            - - - - -

5                Thereupon, Plaintiff's Exhibit 16 is

6      marked for purposes of identification.

7                            - - - - -

8      Q.         Do you recognize this document?

9      A.         Yes.

10     Q.         And what is this?

11     A.         This is an e-mail from me to Mark

12     Weaver and Mike Smullen.

13     Q.         Okay.  And the original e-mail in the

14     chain is sent on Monday, July 18th, 2011?

15     A.         Right.

16     Q.         And the subject line is "Tom Neihaus";

17     is that correct?

18     A.         Right.

19     Q.         The first sentence is "Talked to Tom

20     today."  Would that be a reference to Senate

21     President Niehaus?

22     A.         Yes.

23     Q.         And it relates, "He confirmed that he

24     and Batchelder have committed that Boehner has the

25     lead on the redistricting map...they are going to

CONFIDENTIAL

1                    CONGRESSMAN WILLIAM JOHNSON

2      support his desires?"

3                      What did you mean in this e-mail?

4      A.           You know, I don't recall writing this

5      e-mail.  And, again, the discussions that we had

6      with -- with Boehner were very, very generic,

7      nonspecific.  So I don't know whether I was

8      talking about informing the delegation about the

9      redistricting process -- and it wasn't unusual at

10     the time for us to talk about the redistricting

11     process using the term redistricting map.  We knew

12     that the process was going to culminate in a map.

13     And so I think I was talking about the process,

14     not a specific drawing of a document.

15                    I know what it says, but I'm -- I don't

16     recall writing it and I don't recall what I meant

17     when I said it.

18     Q.           No.  I understand what you mean by

19     referring -- that redistricting map captured more

20     than just one specific map.  What did you mean by

21     "Boehner has the lead on" what would have then

22     been the redistricting process?

23     A.           Again, he was the -- as the senior

24     member of the Ohio delegation and having gone

25     through redistricting before, making sure that

CONFIDENTIAL

1    CONGRESSMAN WILLIAM JOHNSON

2    members of the Ohio delegation were kept informed

3    to the extent there was anything to inform us

4    about what the redistricting process was, where it

5    was in the phase, you know, when it would likely

6    be finished, et cetera.  Because everybody, again,

7    was guessing at how it might impact them, was it

8    going to change the filing deadline, would the

9    primary stay the same as it had, as it was

10   originally scheduled.  Those kinds of questions

11   were coming up because they were -- they were

12   pertinent to our managing our process of getting

13   petitions signed and ready for filing and those

14   kinds of things.  So having updates from John on

15   what -- what was happening and how it might -- how

16   it might impact our schedule of things to be able

17   to be ready when the maps -- the map was

18   finalized.

19   Q.          And so Senate President Niehaus and

20   Speaker Batchelder as leaders of the Ohio General

21   Assembly would be in charge of the legislature

22   that --

23   A.          I do -- they certainly would have

24   probably played a role, but, again, I don't know

25   the process at the State level.

CONFIDENTIAL

1                    CONGRESSMAN WILLIAM JOHNSON

2     Q.           Okay.  And the last statement here

3     referring back to Speaker Boehner's lead on the

4     redistricting map, "they," referring to Tom

5     Niehaus and Speaker Batchelder, "are going to

6     support his decision."  Did you have an

7     understanding of what you meant by that, what they

8     meant by that?

9     A.           I have no idea what John's desires

10    were, because he never shared them with me.

11    Q.           But from your conversation referenced

12    here with Senate President Niehaus, was it then

13    your understanding that they were going to support

14    his desires even if you didn't know what those

15    particular desires were?

16    A.           They were going to support his desires.

17    I said in this e-mail they're going to support his

18    desires about something, but I don't know what

19    that something is and I don't know what his

20    desires were as it relates to redistricting.

21               MS. LEE:  I'm going to ask the court

22    reporter to please mark as Exhibit 17.

23                    -  -  -  -  -

24               Thereupon, Plaintiff's Exhibit 17 is

25    marked for purposes of identification.

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2                    - - - - -

3      Q.          Okay.  Do you recognize this document?

4      A.          This is an e-mail from Pam Hashem to me

5  and Mike Smullen and Andy Anderson, Andrew

6  Anderson, who worked for Pam at the time.

7      Q.          Okay.  And what is this e-mail

8  regarding?

9      A.          It seems like Speaker Boehner was going

10  to come to Ohio to host a fundraising event for

11  me, and we were looking at asking Dave Johnson to

12  see if he would be willing to host the event at

13  either his restaurant or another facility.

14              Bob Sebo is mentioned there.  He has a

15  very nice home there in Columbiana County.

16      Q.          Okay.  And are Dave Johnson and Bob

17  Sebo both constituents in the 6th district?

18      A.          Yes.

19      Q.          Okay.  In the last sentence of the last

20  paragraph, Ms. Hashem says, "Your commitment to

21  the Speaker will (HAS) also pay off in

22  redistricting."

23              Do you see that?

24      A.          Yes.

25      Q.          What did you understand this to mean?

CONFIDENTIAL

Page 104

CONGRESSMAN WILLIAM JOHNSON

1

2   A.        Let's see.  Let me read that entire

3   paragraph.

4            Now, your question?  I'm sorry.

5   Q.        The last sentence there, "Your

6   commitment to the Speaker will (HAS) also pay off

7   in redistricting."  What did you understand that

8   to mean?

9   A.        I don't know what Pam meant when she

10  wrote that.

11  Q.        Okay.  Sitting here today, do you have

12  any understanding of what it means?

13  A.        No.

14  Q.        So this e-mail, we've been going

15  chronologically, and the ones we're looking at is

16  about nine days after the previous e-mail we

17  looked at in Exhibit 16, do you have any

18  understanding that a congressional map was close

19  to being drawn at that time?

20  A.        No, because I didn't know the status of

21  the congressional map.  Keep in mind, there was a

22  lot of information coming out in the media at that

23  time not just in general discussions among our

24  delegation, but the media was doing extensive

25  speculating about what was going to happen and the

CONFIDENTIAL

Page 105

CONGRESSMAN WILLIAM JOHNSON

1  redistricting process.  So there was a lot of

2  guessing and anticipating what the eventual

3  outcome might be.

4  Q.        Did you ever see any draft of the

5  Congressional -- the first Congressional

6  redistricting map that was passed prior to its

7  passage in the Ohio General Assembly?

8  A.        You know, I saw things come out in the

9  media, but I don't know if it was the map prior to

10  introduction into the State Legislature.  I do not

11  know.

12  Q.        And other than through the media, did

13  you ever receive a Congressional redistricting map

14  from any members of your staff prior to its

15  introduction?

16  A.        Not that I recall.

17  Q.        Did you ever receive prior to its

18  introduction in the General Assembly a

19  Congressional map from the Ohio Republican Party?

20  A.        Not that I recall.

21  Q.        Did you ever see a Congressional map

22  prior to its introduction in the General Assembly

23  from any elected officials in Ohio?

24  A.        Not that I recall.

CONFIDENTIAL

1       CONGRESSMAN WILLIAM JOHNSON

2           Could I trouble you to take another

3   restroom break?

4           MS. LEE:  Perfect.

5           (A recess was taken.)

6           MS. LEE:  Back on the record.

7           I'm going to ask the court reporter to

8   please mark Exhibit 18 and hand it to the witness.

9                   - - - - -

10          Thereupon, Plaintiff's Exhibit 18 is

11  marked for purposes of identification.

12                  - - - - -

13  Q.      Congressman, do you recognize this

14  document?

15  A.      I do.

16  Q.      And what is it?

17  A.      It is an e-mail from Mike Smullen to

18  Mark Weaver and me.

19  Q.      Okay.  And the subject line here is

20  "Whatman."

21  A.      Right.

22  Q.      Is this e-mail in reference to Tom

23  Whatman from Speaker Boehner's team?

24  A.      I presume so.  Mike Smullen wrote it,

25  so I don't know what he meant if not that.

CONFIDENTIAL

Page 107

1                  CONGRESSMAN WILLIAM JOHNSON

2       Q.         Okay.  And it says, this e-mail reads,

3       "Just talked to Tom and told him what happened

4       night...he actually laughed and said 'no big

5       deal.'  He said as this gets closer to becoming

6       public they expect this type of thing to happen

7       but appreciated the heads up."

8                  Do you have any idea what this e-mail

9       is regarding?

10      A.         I do not.

11      Q.         Okay.  Do you know if it was in

12      reference to the Congressional map that was being

13      drawn?

14      A.         I do not.

15                 MS. LEE:  I'd like to ask the court

16      reporter to please mark Exhibit 19 and hand it to

17      the witness.

18                             - - - - -

19                 Thereupon, Plaintiff's Exhibit 19 is

20      marked for purposes of identification.

21                             - - - - -

22      Q.         Congressman, do you recognize this

23      document?

24      A.         Yes.

25      Q.         And what is it?

CONFIDENTIAL

1    CONGRESSMAN WILLIAM JOHNSON

2    A.          It is an e-mail from Mike Smullen to

3    Mark Weaver and me.

4    Q.          Okay.  And the first e-mail on Monday,

5    August 15th, the subject line is,

6    "Austria - Whatman meeting."  Is that a reference

7    to then Representative Austria and Tom Whatman?

8    A.          Yes.

9    Q.          And it states, "I'm not supposed to

10   know this, but Whatman met with Austria this

11   morning and told Austria that he'll be running

12   against Turner."

13               And is that a reference to

14   Representative Mike Turner?

15   A.          Yes.

16   Q.          "Austria is apparently furious.  Most

17   importantly, Boehner's team has officially

18   delivered that message."

19               Do you understand -- what did you

20   understand this e-mail to mean?

21   A.          I didn't write this e-mail, so I don't

22   know what Mike Smullen meant.

23   Q.          And upon receiving it, what did you

24   understand him to mean?

25   A.          I couldn't speculate, because I don't

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     know what Mike meant.

3     Q.        Okay.  And sitting here now, do you

4     have any understanding as to what this e-mail

5     means?

6     A.        Well, at some point Austria and Turner

7     found out that they were going to be running

8     against each other.  I don't know when that was or

9     how that information got disseminated.

10    Q.        Okay.  And Mike Smullen is your chief

11    of staff; is that correct?

12    A.        Yes.

13    Q.        And he was your chief of staff in

14    August of 2011; is that correct?

15    A.        Yes.

16    Q.        And do you understand this e-mail to be

17    informing you of Turner and Austria learning that

18    they would be running against each other?

19    A.        I understand what's what it says, yes.

20    Q.        Do you have any understanding of what

21    it means that, "Most importantly, Boehner's team

22    has officially delivered that message"?

23    A.        I don't know what Mike meant by that.

24    Q.        And do you understand that to mean

25    anything upon reading the e-mail?

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     A.          No.

3               MS. LEE:  Okay.  I'd like to ask the

4     court reporter to please mark as Exhibit 20 and

5     hand to the witness.

6                    - - - - -

7               Thereupon, Plaintiff's Exhibit 20 is

8     marked for purposes of identification.

9                    - - - - -

10    Q.          Do you recognize this document?

11    A.          Let's see.  This is an e-mail string

12    between Mike Smullen and me.

13    Q.          Okay.  And what is it regarding?

14    A.          It -- let's see.  I think

15    we're -- we're talking about -- the subject of the

16    e-mail is a speaker event.  We're still trying to

17    get John Boehner to come and do a fundraising

18    event for me.

19    Q.          Okay.  And this e-mail is from November

20    2nd, 2011.  Do you see that?

21    A.          Yes.

22    Q.          And did you understand this to occur

23    after the original Congressional redistricting map

24    was done?

25    A.          Say that again.

CONFIDENTIAL

1        CONGRESSMAN WILLIAM JOHNSON

2    Q.        And do you understand this to have

3    occurred after the Congressional redistricting map

4    was passed?

5    A.        I do not know when the Congressional

6    redistricting map was passed, so I can't say.

7    Q.        Okay.  And in the second bullet point

8    down in Mr. Smullen's e-mail, it says, "Boehner

9    and staff have had our back in redistricting."

10            Do you see that?

11   A.        Yes.

12   Q.        What did you understand that to mean?

13   A.        I don't know what Mike Smullen meant by

14   that.

15   Q.        Sitting here now, do you have any

16   understanding what it means?

17   A.        Outside of the context of he kept us

18   informed on the process so that we knew what was

19   happening in terms of timeline.  That's all I

20   know.

21   Q.        Have you ever heard of project red map?

22   A.        No.

23   Q.        And I believe you referenced this

24   measurement before, but have you heard of

25   congressional districts being ranked as plus or

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     minus some number?

3     A.          Yes.

4     Q.          Okay.  And that's referred to as the

5     PBI, which I believe you referenced before.

6     A.          Right.

7                 MS. LEE:  Okay.  I'm going to ask the

8     court reporter to please mark as Exhibit 21 and

9     hand to the witness.

10                      - - - - -

11                Thereupon, Plaintiff's Exhibit 21 is

12    marked for purposes of identification.

13                      - - - - -

14                MS. LEE:  This is a 2012 presentation

15    by the NRCC that we received in discovery,

16    Counsel.  For reference it's NRCC 000031.

17    A.          Okay.

18    Q.          Have you seen this presentation before?

19    A.          I do not recall.  I'd have to go

20    through it in detail, but I do not recall.

21    Q.          You can please flip through it if that

22    will refresh your recollection.

23    A.          I mean, I've seen hundreds and hundreds

24    and hundreds of presentations.  This looks to be

25    just a general political climate update that we

CONFIDENTIAL

Page 113

1          CONGRESSMAN WILLIAM JOHNSON

2  would have gotten at the NRCC.

3    Q.         Okay.

4    A.         But I don't recall seeing it.

5    Q.         Sure.  And across the top, do you see

6  there's four items listed?

7    A.         Yeah.

8    Q.         "Redistricting, Re-elect" --

9    A.         Right.

10   Q.         -- "Recruitment," and "Resources."  And

11 as to the first, let's see, six pages,

12 "Redistricting" is in blue and the other items are

13 in white.

14            Do you see that?

15   A.         Ask the question again.

16   Q.         At the top -- yeah.  Just that as these

17 first six pages, the word "Redistricting" of those

18 four items are in blue and the other three are in

19 white.

20   A.         Yes.

21   Q.         And then if you could flip with me to

22 page -- the sixth page.  I apologize.  They're not

23 numbered.

24   A.         Okay.

25   Q.         This slide is entitled, "Competitive R

CONFIDENTIAL

1          CONGRESSMAN WILLIAM JOHNSON

2     Seat Improved."  Do you see that?

3     A.          I do.

4     Q.          And in the first column, the third

5     entry down says, "OH-6 Johnson R+5 (+3)."

6                 Do you see that?

7     A.          Yes.

8     Q.          What do you understand the slides mean

9     with respect to Ohio 6?

10    A.          I don't know.  I don't know the date of

11    this presentation and I don't know where they're

12    getting that PVI and the results from, so I don't

13    know.

14                I mean, I'm not trying to bleed

15    ignorance.  I know that what it -- what it's

16    attempting to say is that something happened that

17    improved the PVI or that they presumed would

18    improve the PVI by three points.

19    Q.          And bringing it to plus five, is that

20    correct, or plus five?

21    A.          That appears to be so.

22    Q.          Okay.  And I'd like to turn back

23    briefly to one of the other exhibits.  I

24    apologize.  Could you turn back to Exhibit 13,

25    please.

CONFIDENTIAL

Page 115

1                     CONGRESSMAN WILLIAM JOHNSON

2        A.              Yes.

3        Q.              Okay.  And in that last sentence of the

4    first paragraph from Saturday, July 2nd, said,

5    "The article jives with what Whatman said about

6    our new district potentially being an R+5

7    district."

8                        Do you see that?

9        A.              Yes.

10       Q.              Does that refresh your recollection as

11   to what was meant in slide 6 of the presentation?

12       A.              No.  I don't -- I don't know that I can

13   draw a correlation between those being connected,

14   because neither -- neither Tom Whatman, John

15   Boehner, I, nor anybody else determines what the

16   PVI is.  The PVI is totally objective, as I

17   understand it, based on the analysis of pollsters

18   and analysts like Charlie Cook, Stuart Rothenberg,

19   Sabado, and others.  So I don't know where they

20   would have gotten this information from.

21       Q.              And do you understand the PVI set by

22   those outside groups and individuals that you've

23   mentioned is used by the political parties to

24   assess the strength of Congressional districts?

25       A.              Yes.

CONFIDENTIAL

Page 116

1                    CONGRESSMAN WILLIAM JOHNSON

2      Q.          Did you have any conversations with

3      anyone at the time of redistricting about your

4      district becoming more favorable in terms of PVI?

5      A.          No.

6      Q.          Okay.

7      A.          Other than speculation that, again,

8      because of where my district was located and where

9      it might grow geographically, that was the only

10     context in which it was guessed.

11                 MS. LEE:  Okay.  I'm going to ask the

12     court reporter to please mark as Exhibit 22 and

13     hand to the witness.

14                          - - - - -

15                 Thereupon, Plaintiff's Exhibit 22 is

16     marked for purposes of identification.

17                          - - - - -

18     Q.          Do you recognize what's depicted here?

19     A.          Yes.  This appears to be -- I mean, I

20     can't say 100 percent for sure, but it's pretty

21     close to what my current district looks like.

22     Q.          Okay.  And I'll represent to you that

23     it is the current Ohio Congressional map.

24     A.          Okay.

25     Q.          Looking at the map, is there anything

CONFIDENTIAL

Page 117

1                    CONGRESSMAN WILLIAM JOHNSON

2    you view as notable about it?

3    A.          Notable?  My district's big.

4    Q.          Fair enough.

5    A.          It's long.  There are other districts

6    that are big, also, but it's long.  That northwest

7    district is also very big.

8                    MS. LEE:  And I'm going to ask, we'll

9    zoom in and ask the court reporter to please mark

10   as Exhibit 23.

11                    - - - - -

12                    Thereupon, Plaintiff's Exhibit 23 is

13   marked for purposes of identification.

14                    - - - - -

15   Q.          And, Congressman, do you recognize

16   what's depicted here?

17   A.          It is a map.

18   Q.          Okay.  And what is it a map of?

19   A.          It is a map highlighting a district

20   that looks similar to mine.

21   Q.          Okay.  And I'll represent to you that

22   this is in fact the current map of the

23   Congressional district.

24                    Do you have an understanding of why the

25   district was configured in this way?

CONFIDENTIAL

Page 118

1                    CONGRESSMAN WILLIAM JOHNSON

2       A.          I have absolutely no idea.

3       Q.          Okay.  And do you have an understanding

4       that within your district you have five split

5       counties?

6       A.          I do.

7       Q.          And in general, in redistricting, do

8       you have any understanding of efforts to keep

9       counties and municipalities together?

10      A.          I don't know the redistricting process

11      so I don't know what the discussions are.  I mean,

12      I've seen -- I've seen the recommendations of

13      various types of redistricting processes that

14      would advocate for that, but I do not know what

15      the redistricting process is and what their

16      considerations are.

17      Q.          Okay.  And in your current district,

18      would you say this is the same sort of "crazy

19      river district" that was referred to in the

20      earlier communications?

21      A.          Oh, yes.  This is definitely a crazy

22      river district.

23      Q.          Are you familiar with the fact that

24      Plaintiffs as part of their case have submitted a

25      remedial map to the court?

CONFIDENTIAL

Page 119

1            CONGRESSMAN WILLIAM JOHNSON

2     A.          No.

3            MS. LEE:  I'm now going to have marked

4     and show you a document that shows that remedial

5     map that was submitted.

6                    - - - - -

7            Thereupon, Plaintiff's Exhibit 24 is

8     marked for purposes of identification.

9                    - - - - -

10    Q.          So the remedial map has been marked as

11    Exhibit 24.  Do you know which district you would

12    be located in under this map?

13    A.          Yeah.  It would be the 15th District.

14    Q.          Okay.  And does this district contain a

15    number of counties that are in your current

16    district as well?

17    A.          Yes.

18    Q.          And is the 15th District in the

19    remedial map more compact than the crazy river

20    district?

21    A.          What do you mean by "compact"?  Is it

22    not as long?

23    Q.          Yes.

24    A.          It is less long.

25    Q.          Okay.  As you sit here today, do you

CONFIDENTIAL

Page 120

1              CONGRESSMAN WILLIAM JOHNSON

2     know of any reason why the Court should not order

3     this new configuration?

4     A.          I don't have an opinion as to whether

5     the Court should go with this or not.

6     Q.          Okay.  Do you have any opinions about

7     the composition of this particular District 15?

8     A.          No.

9     Q.          Okay.  Do you know the counties that

10    are included in this proposed district?

11    A.          When you say, "know the counties," I

12    know they exist, but -- but they -- they border my

13    current district.  Some of them do.  Not all of

14    them, but some of them border my current district.

15    Q.          And as you sit here today, are you

16    aware of any reason that you could not represent

17    this district?

18    A.          I can represent any district.

19    Q.          Are you familiar with the fact that the

20    Plaintiff's expert also drew additional

21    hypothetical maps?

22    A.          No.

23              MS. LEE:  Okay.  I'm going to ask, and

24    I'll mark two at the same time, the court reporter

25    to please mark Exhibits 25 and 26 and then hand

CONFIDENTIAL

Page 121

1              CONGRESSMAN WILLIAM JOHNSON

2    them to the witness.

3                   - - - - -

4         Thereupon, Plaintiff's Exhibit 25 and

5    26 are marked for purposes of identification.

6                   - - - - -

7    A.        I didn't know we had an Ottawa county

8    in Ohio.  Okay.  I'm looking at 25 and 26.

9    Q.        Okay.  And these are two hypothetical

10   maps that were submitted to your counsel last

11   month with the supplemental reports of one of our

12   experts.

13             I'll also represent to you that

14   District 6 remains the same between these two

15   maps.  Some of the other districts change, but

16   District 6 --

17   A.        Okay.

18   Q.        -- remains the same.

19             Are you aware of any reason at the time

20   of the redistricting that the map drawers could

21   not have drawn either of these maps?

22   A.        No.  I don't know the process, so I

23   don't know.

24   Q.        And do you see anything on the face of

25   this map, of these maps, that suggest that they

CONFIDENTIAL

Page 122

1          CONGRESSMAN WILLIAM JOHNSON

2    could not have been drawn?

3    A.        I wouldn't have an opinion.  I don't

4    know the criteria, so I don't know whether they

5    could or not.

6    Q.        Okay.  And as you sit here today, can

7    you think of any reason why you could not

8    represent the 6th District that's depicted in

9    these maps?

10   A.        No.

11   Q.        Okay.  What e-mail address did you use

12   during 2011, do you recall?

13   A.        I used two of them.  I used

14   Bill@billJohnsonleads.com and

15   Johnson@billjohnsonleads.com.

16   Q.        And in our production I've seen e-mails

17   with both of those addresses.  So is it your

18   understanding that in the document collection both

19   of those were searched?

20   A.        Oh, absolutely.

21   Q.        Okay.  Do you keep electronic

22   calendars?

23   A.        Do I keep an electronic calendar?  Only

24   an official calendar.  I don't keep a personal

25   calendar.

CONFIDENTIAL

Page 123

1        CONGRESSMAN WILLIAM JOHNSON

2    Q.        And did you keep a personal electronic

3    calendar in 2011?

4    A.        No.  I only kept an official calendar.

5    My scheduler maintained that.

6    Q.        Okay.  And we'd already discussed that

7    you have sent text messages, iMessages, Blackberry

8    Messenger, sort of whatever type your phone would

9    use; is that correct?

10             MS. McKNIGHT:  Objection; form.

11             You can answer.

12   A.        Yes.  You know, I'm an IT person, but I

13   am the world's worst for adopting new technology,

14   so I don't recall when I started texting.

15   Q.        Okay.

16   A.        I honestly don't recall.

17   Q.        Do you know if your text message

18   accounts were searched in response to the request

19   for production in this case?

20   A.        They were not.

21   Q.        Do you keep paper files?

22   A.        No.

23   Q.        Do you ever take handwritten notes?

24   A.        Very seldom.

25   Q.        Okay.  Do you ever keep handouts or

CONFIDENTIAL

Page 124

                    CONGRESSMAN WILLIAM JOHNSON

1   printouts that you've received at meetings?

2   A.          No, because it accumulates and I -- if

3   they're official, I give them back to my official

4   team.  If they're political, they change so

5   quickly I don't keep them.

6   Q.          Did you ever keep a paper calendar or

7   agenda?

8   A.          No, not that I recall.

9              MS. LEE:  Can we take five minutes, and

10  then I may be done or close to done.

11             (A recess was taken.)

12             MS. LEE:  Back on the record.

13  Q.          I just have a few others.  Do you,

14  Congressman, keep any social media accounts?

15  A.          I -- not personal, no.

16  Q.          And do you ever see the posts on your

17  official social media?

18  A.          Yes.

19  Q.          Do you know if you've ever had any

20  posts on your social media regarding

21  redistricting?

22  A.          Certainly not on my official, because

23  that would be a violation of the separation

24  between official and political.  No, not on my

CONFIDENTIAL

Page 125

1          CONGRESSMAN WILLIAM JOHNSON

2  official.

3  Q.        Okay.  And do you have political or

4  campaign-specific social media accounts?

5  A.        I do.

6  Q.        And do you know if you've ever had any

7  posts on redistricting on those accounts?

8  A.        I do not know --

9  Q.        Okay.

10 A.        -- but -- I don't think so, but I don't

11 know.

12 Q.        Okay.  And do you generally oversee the

13 posts on your accounts?

14 A.        Yes.

15 Q.        Okay.  I just wanted to mark a couple

16 more things.

17           MS. LEE:  I'll have marked as Exhibit

18 27 and please hand to the witness.

19                - - - - -

20           Thereupon, Plaintiff's Exhibit 27 is

21 marked for purposes of identification.

22                - - - - -

23 Q.        This is the cover e-mail, I believe,

24 that conveyed Exhibit 12 to you.

25 A.        Let me find -- got you.

CONFIDENTIAL

Page 126

1          CONGRESSMAN WILLIAM JOHNSON

2     Q.          Okay.  Does this at all refresh your

3     recollection of having reviewed this memorandum?

4     A.          I'm sorry.  Your question again?

5     Q.          So the cover e-mail from Matt Dole

6     indicates it was sent both to you and Mark Weaver.

7     Does this refresh your recollection of having

8     reviewed the underlying memorandum?

9               MS. McKNIGHT:  Objection; form.

10              You may answer.

11    A.          Okay.  Let me read from the bottom up

12    here and see what I'm talking about.

13    Q.          Sure.

14    A.          Okay.  Now your question?  I'm sorry.

15    Q.          Does this refresh your recollection of

16    having reviewed the redistricting hearings memo?

17              MS. McKNIGHT:  Objection; form.

18              You may answer.

19    A.          If it was attached to this e-mail, I

20    would have reviewed it.

21    Q.          Okay.  But you don't recall necessarily

22    having reviewed it?

23    A.          No.

24              MS. LEE:  Okay.  And I'd like to have

25    the court reporter please mark as Exhibit 28.

CONFIDENTIAL

Page 127

1    CONGRESSMAN WILLIAM JOHNSON

2              - - - - -

3         Thereupon, Plaintiff's Exhibit 28 is

4    marked for purposes of identification.

5              - - - - -

6    Q.        Do you recognize this document?

7    A.        It is a document from Mark Weaver

8    or -- well, I write something on December 1st,

9    2011, and then Mark Weaver responds.

10   Q.        Okay.  And the initial e-mail appears

11   to be Mark Weaver sending along a news article,

12   and then your December 1st, 2011, response

13   indicates, "According to LaTourette, this is not

14   true."

15        And I assume -- is that referring to

16   Steve LaTourette, who was Dean of the

17   delegation at that time?

18   A.        Steve LaTourette, yes.

19   Q.        Okay.  And then states, "Apparently the

20   GOP is doing some jockeying to confuse the issue

21   and make it" - excuse me - "and make it even more

22   difficult for the Dems to get their signatures for

23   the referendum."

24        What did you mean by that?

25   A.        I don't recall.  I mean, obviously I

Page 128

1             CONGRESSMAN WILLIAM JOHNSON

2   wrote it, but I don't recall at the time which GOP

3   I'm talking about and I don't -- without having

4   the article in front of me, I don't know what I

5   was referring to.

6   Q.      Okay.  Do you have an

7   understanding -- scratch that.

8          Earlier you had discussed when the

9   primary was going to be set.  Do you recall that?

10   A.      Right, because it differs in

11   presidential election cycles versus the off-year

12   election cycles.

13   Q.      Do you have any recollection of the

14   date of the federal primary being changed in the

15   same legislation as the Congressional

16   redistricting?

17   A.      I know it changed.  I don't know if it

18   changed in the same legislation.

19   Q.      Okay.  Do you have any understanding of

20   what referendum you were referring to here in this

21   e-mail?

22   A.      No.

23   Q.      Okay.

24   A.      I mean, I knew it was a referendum

25   regarding the redistricting process, because it

CONFIDENTIAL

Page 129

1              CONGRESSMAN WILLIAM JOHNSON

2    was going through the Supreme Court, the Ohio

3    Supreme Court --

4    Q.          Okay.

5    A.          -- but I don't know the context of it.

6              MS. LEE:  Okay.  Thank you for your

7    time, Congressman.  I have nothing further.

8              MS. McKNIGHT:  Thank you, Counsel.  We

9    have no further questions.

10             We would like to designate this

11   transcript as confidential pursuant to the

12   governing protective order and we'll leave it at

13   time.

14             MS. LEE:  Read and sign?

15             MS. McKNIGHT:  Yes.  We would like to

16   read and sign.  Thank you.

17             THE REPORTER:  And you are ordering at

18   this time?

19             MS. LEE:  Yes.

20             THE REPORTER:  Now, are you ordering a

21   copy of the transcript at this time?

22             MS. McKNIGHT:  Yes.

23             THE REPORTER:  Counsel on the phone, do

24   you wish to order a copy at this time?

25             MS. RIGGINS:  Yes, please.  Ogletree

CONFIDENTIAL

Page 130

1          CONGRESSMAN WILLIAM JOHNSON

2     has a standing order.

3               THE REPORTER:  I just wanted to check

4     that.  Thank you.

5               (Signature was not waived.)

6                    - - - - -

7               (Thereupon, the foregoing proceedings

8     concluded at 11:25 a.m.)

9                    - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     ///

25     ///

CONFIDENTIAL

Page 131

1          I, William Johnson, do hereby certify

2     that the foregoing is a true and accurate

3     transcription of my testimony.

4

5

6

7

8

9                    _____

                          William Johnson

10

11          Dated: _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 132

1    State of Ohio        :        C E R T I F I C A T E

2    County of Franklin :  SS

3              I, Reva Chafin Mundy, a Notary Public
     in and for the State of Ohio, do hereby certify

4    the within named Congressman William Johnson, was
     by me first duly sworn to testify to the whole

5    truth in the cause aforesaid; testimony then given
     was by me reduced to stenotypy in the presence of

6    said witness, afterwards transcribed by me; the
     foregoing is a true record of the testimony so

7    given; and this deposition was taken at the time
     and place as specified on the title page.

8

              I do further certify I am not a
9    relative, employee or attorney of any of the
     parties hereto, and further I am not a relative or
10   employee of any attorney or counsel employed by
     the parties hereto, or financially interested in
11   the action.

12             IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office at Columbus,
13   Ohio, on this 31st day of December, 2018.

14

15

16

17

18   _____
     REVA CHAFIN MUNDY, RPR, RMR, CRR
19   NOTARY PUBLIC, STATE OF OHIO

20
              My commission expires on 01-21-2021.
21

22

23

24

25

# CONFIDENTIAL

## ERRATA SHEET

### PLEASE DO NOT WRITE ON THE TRANSCRIPT

Any changes to the transcript in form or substance should be entered upon this errata sheet.

Case Name:  Ohio A. Philip Randolph Institute, et al. v. Ryan Smith, et al.

Deposition  Date: December 19, 2018

Deponent:  William Johnson

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| Page 8 | Line 25 | Remove stray period | |
| Page 20 | Line 25 | Remove stray period | |
| Page 22 | Line 25 | Remove stray period | |
| Page 25 | Line 25 | Remove stray period | |
| Page 78 | Line 12 | Change "DCCC" to "DCC" | |
| Page 92 | Line 7 | Change "PBI" to PVI" | |
| Page 94 | Line 6 | Change "Have not had" to "not have had" | |
| Page 112 | Line 5 | Change "PBI" to "PVI" | |
| Page 114 | Line 14 | Change "bleed" to "plead" | |

Date: _1/30/19_         Signature: _William Johnson_
                                    William Johnson

Subscribed and sworn before me this _30th_ day of _January_, 2019.

_____
                        Notary Public

My Commission Expires: _07/31/2023_____

