1            JAMES DANIEL JORDAN

2        IN THE UNITED STATES DISTRICT COURT

3          FOR THE SOUTHERN DISTRICT OF OHIO

4    ---------------------------------- )
     OHIO A. PHILIP RANDOLPH INSTITUTE;  )
5    LEAGUE OF WOMEN VOTERS OF OHIO;      )
     THE OHIO STATE UNIVERSITY COLLEGE    )
6    DEMOCRATS; NORTHEAST OHIO YOUNG      )
     BLACK DEMOCRATS; HAMILTON COUNTY     )
7    YOUNG DEMOCRATS; LINDA GOLDENHAR;    )
     DOUGLAS BURKS; SARAH INSKEEP;         )
8    CYNTHIA LIBSTER; KATHRYN DEITSCH;    )
     LUANN BOOTHE; MARK JOHN GRIFFITHS;   )
9    LAWRENCE NADLER; CHITRA WALKER;      )
     TRISTAN RADER; RIA MEGNIN;           )
10   ANDREW HARRIS; AARON DAGRES;         )
     ELIZABETH MYER; BETH HUTTON;         )
11   TERESA THOBABEN; and CONSTANCE RUBIN)
                                          )
12              Plaintiffs,        )Case No.
          vs.                      )1:18-cv-00357
13                                 )TSB
     RYAN SMITH, Speaker of the Ohio      )
14   House of Representatives; LARRY       )
     OBHOF, President of the Ohio Senate;)
15   and JON HUSTED, Secretary of State   )
     of Ohio, in their official           )
16   capacities,                          )
                                          )
17              Defendants.        )
     ---------------------------------- )
18

19          DEPOSITION OF JAMES DANIEL JORDAN
20                Washington, D.C.
21                December 3, 2018
22                 CONFIDENTIAL
23

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR
25   Job No. 149801

CONFIDENTIAL

1           JAMES DANIEL JORDAN

2        Deposition of JAMES DANIEL JORDAN, held at

3    the offices of:

4

5            Baker & Hostetler

6            1050 Connecticut Avenue, NW

7            Washington, D.C. 20036

8

9        Taken pursuant to notice before Tina M.

10   Alfaro, a Notary Public within and for the District

11   of Columbia.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

```
1              JAMES DANIEL JORDAN
2    APPEARANCES:
3         ON BEHALF OF THE PLAINTIFFS:
4         AMERICAN CIVIL LIBERTIES UNION
5         BY: ALORA THOMAS-LUNDBORG, ESQ.
6             125 Broad Street
7             New York, New York 10004
8
9
10        ON BEHALF OF THE LEGISLATIVE DEFENDANTS:
11        OGLETREE, DEAKINS, NASH, SMOAK & STEWART
12        BY: ALYSSA RIGGINS, ESQ.
13            4208 Six Forks Road
14            Raleigh, North Carolina 27609
15
16
17        ON BEHALF OF THE INTERVENOR DEFENDANTS:
18        BAKER & HOSTETLER
19        BY: RICHARD RAILE, ESQ.
20            1050 Connecticut Avenue, NW
21            Washington, DC 20036
22
23
24
25
```

CONFIDENTIAL

```
 1                   JAMES DANIEL JORDAN
 2                       I N D E X
 3                      EXAMINATION
 4    WITNESS                               PAGE
 5    JAMES DANIEL JORDAN
 6         By Ms. Thomas-Lundborg          6
 7         By Mr. Railes                   119
 8         By Ms. Thomas-Lundborg          125
 9                      EXHIBITS
10    JORDAN EXHIBITS                      PAGE
11    Exhibit 1                            9
         First request for production of
12       documents
13    Exhibit 2                            25
         Motion to intervene
14
      Exhibit 3                            61
15       Reply in Further Support of Motion of
         Republican Congressional Delegation Ohio
16       Voters and Republican Party
         Organizations to Intervene
17
      Exhibit 4                            72
18       E-mail
19    Exhibit 5                            72
         E-mail
20
      Exhibit 6                            82
21       E-mail
22    Exhibit 7                            85
         Article
23
      Exhibit 8                            92
24       Facebook post
      Exhibit 9                            94
25       LexisNexis document
```

CONFIDENTIAL

Page 5

```
 1              JAMES DANIEL JORDAN
 2                   EXHIBITS
                    (Cont'd)
 3
    JORDAN EXHIBITS                        PAGE
 4
    Exhibit 10                             103
 5     Picture of current ohio districts
 6  Exhibit 11                             112
       Remedial map proposed by Plaintiffs
 7
    Exhibit 12                             114
 8     Map
 9  Exhibit 13                             117
       Hypothetical district map
10
    Exhibit 14                             117
11     Hypothetical district map
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2                       (Witness sworn.)

3    WHEREUPON:

4                    JAMES DANIEL JORDAN,

5    called as a witness herein, having been first duly

6    sworn, was examined and testified as follows:

7                       EXAMINATION

8    BY MS. THOMAS-LUNDBORG:

9         Q.  Please state your full name for the record.

10        A.  James Daniel Jordan.

11        Q.  And what's your address?

12        A.  We have two addresses.  170 -- our home is

13   1709 South State Route 560, Urbana, Ohio.

14        Q.  And do you understand that you're under

15   oath today?

16        A.  I do.

17        Q.  And that's the same oath that you would

18   take in court; do you understand that?

19        A.  I do.

20        Q.  My name is Alora Thomas.  I'm representing

21   the Plaintiffs.  I'm from the ACLU Voting Rights

22   Project.  I would ask for everyone else to please

23   identify themselves.

24             MS. RIGGINS:  Alyssa Riggins from Ogletree

25   Deakins representing the Legislative Defendants.

CONFIDENTIAL

Page 7

1          JAMES DANIEL JORDAN

2          MR. RAILE:  Richard Raile from Baker &

3   Hostetler representing the Congressional Intervenor

4   Defendants, including Congressman Jordan.

5   BY MS. THOMAS-LUNDBORG:

6          Q.  Have you ever been deposed before,

7   Congressman Jordan?

8          A.  I have not.

9          Q.  Do you prefer to be called Congressman

10  Jordan, Mr. Jordan?

11         A.  You can call me Jim.

12         Q.  Let's go through a few ground rules today

13  for the deposition.  So that the record is clear,

14  please let's try not to talk over one another.  So I

15  will try not to interrupt you when you're in the

16  middle of a sentence, and I ask that you wait until

17  I complete a question before answering.

18         A.  Fine.

19         Q.  Please make sure that all of your answers

20  are verbal.  The court reporter can't get uh-huhs,

21  nods of the head.  If it's an affirmative or

22  negative answer, just make sure it's a yes or no

23  even if that's the totality of the answer.

24             If you don't understand a question you can

25  ask me to repeat it at any time, which I'm happy to

CONFIDENTIAL

Page 8

JAMES DANIEL JORDAN

1

2  do.  If you want to take a break, just tell us and

3  we're happy to take a break for any length of time

4  that you need.  I will be regularly taking breaks

5  throughout this process, about every hour or so.

6      A.  Okay.

7      Q.  If you need a break to consult with your

8  counsel, again, just let me know and we can take

9  that break.

10      Your counsel may object to questions that

11  are being asked today.  Unless you're instructed not

12  to answer, you're to answer all questions.

13      Is there anything that would prevent you

14  from answering my questions today honestly and

15  accurately?

16      A.  No.

17      Q.  Are you on any medications that would

18  prevent your ability to answer?

19      A.  No.

20      Q.  Throughout this deposition I'm going to be

21  using -- I'll be referring to the Ohio

22  redistricting.  Unless I specify otherwise, I'm

23  talking about the 2011 redistricting process.

24      A.  Okay.

25      Q.  Did you do anything today to prepare for

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2    this deposition?

3         A.  I met with Richard on Friday.

4         Q.  Okay.  Did you review any documents?

5         A.  I did not.

6         Q.  Have you reviewed the complaint in this

7    case?

8         A.  No.

9         Q.  Have you reviewed the intervention papers

10   in this case?

11        A.  No.

12        Q.  Did you review the document subpoena for

13   your documents?

14        A.  No.

15        Q.  Have you seen that document subpoena?

16        A.  No.

17                      (Jordan Exhibit 1 was marked as

18                       requested.)

19   BY MS. THOMAS-LUNDBORG:

20        Q.  I'm going to mark for the record Exhibit 1.

21   I just marked as Exhibit 1 Plaintiffs' first request

22   for production of documents to Intervenor Jim

23   Jordan.  Do you see that document?

24        A.  Uh-huh.

25             THE REPORTER:  Yes?

CONFIDENTIAL

Page 10

JAMES DANIEL JORDAN

1

2          THE WITNESS:  Yes.

3    BY MS. THOMAS-LUNDBORG:

4       Q.  So let me just ask you a couple questions

5    about your own document production.  I'll first

6    start with some background questions about your

7    document retention procedures.

8            What e-mail addresses did you use during

9    2011?

10      A.  We have our office e-mail address and then

11   we have a home e-mail address.

12      Q.  And what is your office e-mail address,

13   please?

14      A.  It would be Jordan.mail.house.gov.  Maybe

15   it's JDJ.  I forget.  I never really use it.  My

16   staff does.

17      Q.  And then you said you had a home e-mail

18   address.  What is that?

19      A.  JJ@CTCN.NET.

20      Q.  Do you have any other e-mail addresses that

21   you used in 2011?

22      A.  I don't believe so.

23      Q.  Do you have a practice regarding how long

24   you keep e-mails?

25      A.  I think on the CTCN account we keep them

CONFIDENTIAL

Page 11

JAMES DANIEL JORDAN

1

2    for -- it's mostly my wife runs that e-mail -- uses

3    that e-mail.  So I don't know.  We keep them for

4    years in some cases.

5        Q.  And on your House account?

6        A.  I'd have to talk to the staff.  I don't

7    know.

8        Q.  Who from the staff handles the house.gov

9    account?

10       A.  I'm not sure.  Ultimately it would be our

11   chief of staff I would think.

12       Q.  And who's that?

13       A.  Kevin Eichenger, E-I-C-H-E-N-G-E-R.

14       Q.  And was that your chief of staff in 2011?

15       A.  No.

16       Q.  Who was that?

17       A.  Ray Yonkura, Y-O-N-K-U-R-A.

18       Q.  And did you have -- have you had any chiefs

19   of staff in between Eichenger and Yonkura?

20       A.  No.

21       Q.  And how long was Ray Yonkura your chief of

22   staff?

23       A.  Ten years, ten and a half years.

24       Q.  And what period was that?

25       A.  From the time I started in Congress, which

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2      would have been January 2007, until approximately a

3      year and a half ago.

4          Q.  Until 2017 we'll say?

5          A.  Yes.

6          Q.  And did Mr. Yonkura have his own e-mail

7      address?

8          A.  I don't know for sure, but I assume so.  I

9      don't know.

10         Q.  Do you know if he conducted business on

11     your behalf on another e-mail address?

12         A.  I don't know.

13         Q.  In preparing documents for the subpoena did

14     you talk to Mr. Yonkura or anyone else regarding

15     Mr. Yonkura's documents that might be relevant to

16     the subpoena?

17         A.  I did not talk to him about that.  I talked

18     to both Ray and Kevin about what our office would

19     have to supply to -- for any type of document

20     production.

21         Q.  Could you just describe a little bit that

22     conversation.

23         A.  We knew there was going to be this lawsuit

24     and that we were supposed to work with our counsel

25     to get documents.  I don't really recall much more

CONFIDENTIAL

Page 13

1                    JAMES DANIEL JORDAN

2   than that because I wasn't the guy going to be

3   getting the documents.  They were going to working

4   with our counsel to find what may be on our House

5   account that they would need.

6          Q.  And so you said that it was Mr. Yonkura and

7   Mr. Eichenger who did the search for your documents;

8   is that correct?

9          A.  I think Baker Hostetler did the search.  We

10  just made it available.  I'm not sure exactly how

11  that worked.

12         Q.  And what account did you make available?

13         A.  I think the accounts I talked about.

14         Q.  So you made both the house.gov account and

15  the CTCN account available?

16         A.  I believe so.

17         Q.  Do you keep electronic calendars?

18         A.  Our office does, yeah.

19         Q.  And are those calendars linked to the two

20  accounts that we discussed?

21         A.  No.  Well, the mail.house.gov -- well, I'm

22  not sure how it works.  I just know that I get the

23  weekly, daily appointments and calendar on my phone

24  from our office.  What my wife Polly gets from the

25  office is I think she gets an update saying he's

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2    going to be doing certain things throughout the week

3    so she sort of knows what I'm doing, appointments I

4    may have in the district and appointments I have in

5    D.C.

6        Q.  Do you know if those calendars were made

7    available for search?

8        A.  I don't know.  I don't know.

9        Q.  Who would know whether those calendars were

10   made available?

11       A.  I assume our -- I don't know.  I guess our

12   chief.

13       Q.  And that's Mr. Ikner?

14       A.  Eichenger, yes.

15       Q.  Eichenger.  Sorry.

16           Do you have a general practice for how long

17   calendars are kept on your account?

18       A.  I have no idea.

19       Q.  Do you currently have calendar items that

20   you have access to from the past?

21       A.  I mean, I can look on my phone, the

22   government phone that we're issued, I can look on

23   that and see where I was last week and what's coming

24   up this week and anything else that's been scheduled

25   out on the schedule.

CONFIDENTIAL

Page 15

JAMES DANIEL JORDAN

1

2      Q.  But you don't know if, for example, you

3  would have calendar entries from 2011?

4      A.  I don't know.

5      Q.  And who would know that?

6      A.  Our office would know.

7      Q.  Other than Mr. Yonkura who else was a

8  member of your staff in 2011?

9      A.  So in 2011 Kevin was also a member, Kevin

10  Eichenger was also a member in 2011.

11      Q.  And what was his position?

12      A.  I don't even know.  He handled certain

13  committee work for us.

14          So we had Jared Dilley, who's legislative

15  director.  Do you want all the staff members?

16      Q.  Yes, please.

17      A.  Jared Dilley, D-I-L-L-E-Y I believe.  I

18  have to go back and look who all they were.  I know

19  our scheduler was -- Missy was our scheduler and I'm

20  drawing a blank on her last name right now.  Then

21  who else did we have?  I don't know when people came

22  on and when they left.  There's several people, but

23  I don't know if they were here in '11.

24      Q.  To the best of your recollection.  It

25  doesn't have to be --

CONFIDENTIAL

Page 16

1                    JAMES DANIEL JORDAN

2          A.   Certainly Jared Dilley because he's been

3    with us the entire time.   Certainly Missy, Melissa

4    because she was with us until about a year or so

5    ago.   So she would have been here in '11.   I'm

6    focused on the D.C. staff.   Did you want the Ohio

7    staff as well?   We've got several -- we've got 15

8    different people who at any point in time are

9    working for us approximately.

10         Q.   I think anyone who would have interacted

11   with your e-mail accounts, with your documents it

12   would be helpful to know who was in a position in

13   2011 both in D.C. and Ohio.

14         A.   Certainly the scheduler Melissa, she just

15   does the scheduling, and certainly the chief of

16   staff because they have ultimate say on how the

17   schedule is going to play out in any given week.

18   Short of that it would be district staff making

19   recommendations to the D.C. staff on here's an

20   event, you know, do you think it's worthwhile for us

21   to go to this event, making those scheduling

22   decisions, but ultimately the decisions would be

23   made from the D.C. staff.

24         Q.   Who in your Ohio staff would be suggesting

25   events to your D.C. staff?

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2          A.   District directors and we would have had at

3     the time -- it would have been most likely Cam

4     Warner who runs our Lima office.   I'm just trying to

5     remember when he officially took over.   It's Cam

6     Warner or Cory Noonan.   Cory Noonan is now a county

7     commissioner.   So I think at that time Mr. Warner

8     had assumed those duties and not Cory.   I'd have to

9     go back and look when Cory got elected as county

10    commissioner.   Then in our other office -- I'd have

11    to go back and look who was running our Mansfield

12    office at the time.   We no longer have a Mansfield

13    office because the districts were redrawn and we now

14    have an office in (indecipherable).   So I have to go

15    back and look.

16         Q.   Do you know of your -- you talked a little

17    bit about Kevin Eichenger as your current chief of

18    staff.   Do you know if his e-mails from that period

19    were searched or collected?

20         A.   I don't know.

21         Q.   What about Missy last name unknown at the

22    time, do you know if her --

23         A.   Melissa Evans, it just came to me.

24         Q.   Do you know if her e-mails were searched?

25         A.   I don't know.

CONFIDENTIAL

Page 18

1                    JAMES DANIEL JORDAN

2        Q.  And then your Lima office, either Cam

3   Warner or Cory Noonan, do you know if their e-mails

4   were searched?

5        A.  I don't know.

6        Q.  And then your Mansfield office -- you said

7   director; is that correct -- do you know if their

8   e-mails were searched?

9        A.  I don't know.

10       Q.  Is there anyone else who would have been

11  handling scheduling or e-mailing on your behalf?

12       A.  I'm not sure exactly how the process works,

13  but it would run through -- in a general sense it

14  would run through district directors in their

15  respective district offices up through the chief of

16  staff and the scheduler as I've described.

17       Q.  Did you ever send text messages to members

18  of staff?

19       A.  Don't know.

20       Q.  You don't know if you sent text messages to

21  your --

22       A.  I do from time to time to our chief of

23  staff.  Are you talking about in that time period?

24       Q.  In that time period.

25       A.  If I did it would be very few, frankly,

CONFIDENTIAL

Page 19

1              JAMES DANIEL JORDAN

2    because I used a flip phone until about probably two

3    years ago.  The flip phone you have to hit

4    everything three times to get the letter you want.

5    So it's easier to call people.

6         Q.  And when you changed phones did you retain

7    any text messages?

8         A.  I don't think so, but I don't know.

9         Q.  And was that a government-issued phone?

10        A.  No, no, no.  I had a flip phone for

11   personal and then I had a government phone that

12   was -- back in those days I don't know if it was a

13   BlackBerry or iPhone.  I don't know when we

14   switched, but still the practice was just to call

15   people.

16        Q.  What types of paper files do you keep?

17        A.  For?

18        Q.  For your government work.

19        A.  I'm not -- I mean, we keep a record of any

20   phone call, letter, e-mail.  Any way constituents

21   communicate with us there's a record of that kept

22   because we want to respond to every constituent who

23   contacts us.  I'm sure there's a record of all that.

24   As far as the files I personally keep, those are

25   largely relative to committee work, and I'll keep my

CONFIDENTIAL

Page 20

1                    JAMES DANIEL JORDAN

2    notes, certain information we receive in preparation

3    for what I call big committee hearings, when we're

4    having a hearing with -- as an example, we're having

5    a hearing with Mr. Comey, former FBI director, or

6    when we had a hearing with Secretary Clinton when I

7    was on the Benghazi committee, I'll keep those notes

8    and file for what I used to prepare for that

9    particular hearing.  What our staff keeps and how

10   they do it I don't know.  Although I know we focus

11   on -- any constituent communication we're going to

12   keep that so that we can respond to constituents.

13        Q.  Do you know if the paper files that are

14   kept, either these constituent files or other files

15   that your staff may have, do you know whether those

16   were turned over?

17        A.  Don't know.

18        Q.  Do you keep written calendars or agendas?

19        A.  Yes.  I get a card each day that I'm in

20   Washington from our scheduler and the card is simply

21   the same thing that's on the electronic schedule for

22   that day just in a card form.

23        Q.  Do you know if those cards are kept or

24   discarded after you're done with them?

25        A.  I pitch them because they're mine.

CONFIDENTIAL

Page 21

1          JAMES DANIEL JORDAN

2  Normally I keep it because I can put a handwritten

3  note on them during the course of the day, but

4  typically the handwritten note is something I want

5  to communicate to staff.  That's just for me because

6  I'm sort of old fashion and want something to jot

7  something down on.  Frankly, what I use them mostly

8  for is I have a speech that day the back of the card

9  becomes the quick notes that I'm going to use to

10  make a speech.

11       Q.  So looking back at Exhibit 1, which is the

12  document subpoena request, the subpoena asks for --

13  I won't read any item in particular, but you're

14  welcome to look through it.  Actually before I do

15  that, sir, do you keep a social media account?

16       A.  Yeah.  I mean, our staff does.

17       Q.  Okay.  And which accounts do you keep?

18       A.  We have Twitter and Facebook.

19       Q.  Do you oversee posts of the social media

20  accounts?

21       A.  I will make recommendations for certain

22  Twitter posts, but that, frankly, is only a practice

23  that we have started this summer where I get more

24  involved in the type of Tweets we're going to do.

25  As far as what goes on Facebook, no.

CONFIDENTIAL

Page 22

1                     JAMES DANIEL JORDAN

2      Q.  Has anything ever been posted to one of

3  your social media accounts to which you did not

4  approve, meaning that you were unhappy with the

5  content?

6          MR. RAILE:  Objection.  You can answer.

7  BY THE WITNESS:

8      A.  I don't recall.  I mean, we have

9  communication staff who will post things on

10  Facebook.  I don't know that I've ever said I wish

11  you wouldn't have done that because, frankly, I

12  don't look at our Facebook page very often.

13      Q.  Okay.  Is all of the content on your social

14  media accounts publicly available?

15      A.  I think so.

16      Q.  Going back to the subpoena, it requests

17  documents related to your -- related to the 2011

18  redistricting of Ohio's congressional districts.  Do

19  you know what was done to collect documents pursuant

20  to this subpoena?  We've talked about it a little

21  bit, but I'd like to get your recollection of

22  everything you know was done.

23          MR. RAILE:  Objection.  You can answer.

24  BY THE WITNESS:

25      A.  I think our chief of staff in consultation

CONFIDENTIAL

Page 23

1           JAMES DANIEL JORDAN

2   with legal counsel searched all appropriate mediums

3   to -- with the search terms that were provided to

4   get information that was then presented.

5        Q.  And would that be the same for documents

6   related to Project Red Map, which is also a subject

7   of the subpoena?

8            MR. RAILE:  Objection.  You can answer.

9   BY THE WITNESS:

10       A.  I don't even know what Project Red Map is.

11  I've never heard the term.

12       Q.  So you don't know what was done to search

13  documents related to it?

14       A.  I don't.  I'm just telling you I've never

15  heard of Project Red Map.

16       Q.  Okay.

17           Could you give us a brief overview of your

18  educational background, please.

19       A.  I graduated from Graham High School, Graham

20  local schools in Ohio in 1982.  I graduated from the

21  University of Wisconsin in 1986.  Graduate degree

22  from Ohio State University in -- I forget what year,

23  '90, '91, somewhere along in there.  Then I have a

24  law degree but never took the Bar exam.  I got a law

25  degree from Capital University in I forget what

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2    year.

3         Q.   2001?

4         A.   2001, yeah.

5         Q.   Do you hold any special certifications,

6    CPA?

7         A.   No.

8         Q.   What jobs have you held since your

9    graduation from the University of Wisconsin?

10        A.   Assistant wrestling college Ohio State

11   University, state representative, state senator,

12   U.S. Congress.  During several -- during that time

13   for several years I worked for my brother at his

14   wrestling -- summer wrestling camp.

15        Q.   So let's start with your first elected

16   office position.  You were elected to Ohio General

17   Assembly in 1994; is that correct?

18        A.   Yes.

19        Q.   And you served three terms in the Ohio

20   General Assembly; is that correct?

21        A.   Correct.

22        Q.   And then you moved to the Ohio Senate in

23   2000; is that correct?

24        A.   Correct.

25        Q.   And then in 2007 you became a U.S.

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2   congressperson; is that correct?

3        A.   Correct.

4        Q.   Any other positions that we haven't

5   discussed yet?

6             MR. RAILE:  Objection.  You can answer.

7   BY THE WITNESS:

8        A.   I mean, I worked at summer wrestling camps,

9   sometimes I would do clinics, but it wasn't a --

10  you're just almost like an independent contractor

11  just doing a coach's clinic or working at a

12  wrestling camp, but primarily the camp I worked for

13  was my brother's camp.

14                      (Jordan Exhibit 2 was marked as

15                       requested.)

16  BY MS. THOMAS-LUNDBORG:

17       Q.   I'm going to have marked Exhibit 2.  I

18  understood you to say that you haven't reviewed this

19  document as part of your preparation for today, but

20  have you ever seen the motion to intervene in this

21  case?

22            MR. RAILE:  Objection.  You can answer.

23  BY THE WITNESS:

24       A.   I don't believe so.

25       Q.   Okay.  We're going to walk through it today

CONFIDENTIAL

Page 26

1                    JAMES DANIEL JORDAN

2   and get your reaction to some of the statements

3   here.  Do you understand that this motion was filed

4   on your behalf?

5        A.  Yes.

6        Q.  If you could please turn to page 3.  I'm on

7   the section that is titled "Proposed Intervenors";

8   do you see that?

9        A.  Yes.

10        Q.  I'm going to read the first sentence under

11   that statement.  "The intervenor applicants

12   represent the diverse coalition of registered

13   voters, county political parties, and congressional

14   representatives, all whose interests will be

15   directed impacted by the relief Plaintiffs are

16   pursuing in this action."  Did I read that

17   correctly?

18        A.  Yes.

19        Q.  Do you understand based on this definition

20   that you are an intervenor applicant as a

21   congressional representative?

22        A.  Yes.

23        Q.  Okay.  I'm going to go on to the next

24   sentence.  "The member intervenor applicants are

25   incumbent representatives of Ohio's 1st, 2nd, 4th,

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2   5th, 6th, 7th, 8th, 10th, 14th, and 15th districts";

3   do you see that?

4        A.  Yes.

5        Q.  And based on this definition not only are

6   you an intervenor applicant, but you are a member

7   intervenor applicant?

8        A.  Understood.

9        Q.  The section goes on to read "They are all

10  members of the Republican party, all registered

11  voters in the district, and all intend to run for

12  re-election as representatives of those districts in

13  2018 and 2020"; do you see that?

14       A.  Yes.

15       Q.  Is that statement true on your behalf?

16       A.  I don't know.

17       Q.  Did you run for re-election in 2018?

18       A.  Yeah, but I mean, it says we're going to

19  run for re-election in '18 and '20.  I don't know

20  who's going to run for re-election in 2020.

21       Q.  I'm just asking as far as it pertains to

22  you.

23       A.  Yes, but I don't -- again, I don't --

24       Q.  I don't want you to speak on behalf of any

25  of the other intervenors.  When I ask you questions

CONFIDENTIAL

Page 28

1                   JAMES DANIEL JORDAN

2    about this document, it's just how this document

3    relates to you.  You don't have to speak on behalf

4    of any of the other congresspeople today.

5         A.  So you're asking me if I'm going to run for

6    re-election in 2020?

7         Q.  That's what it says here, that you're

8    planning to run for re-election in 2020.

9              MR. RAILE:  Okay.  Answer to the best of

10   your ability.

11   BY THE WITNESS:

12        A.  I guess I plan to now, but I don't know for

13   sure if I'm going to run for re-election in 2020.

14   You don't know until you actually get signatures and

15   pay the fee and file with the Board of Elections.

16        Q.  You're a member of the Republican party; is

17   that correct?

18        A.  Yes.

19        Q.  And you're registered to vote in your

20   district; is that correct?

21        A.  Yes.

22        Q.  So the only equivocation is whether or not

23   you plan to run for re-election in 2020?

24             MR. RAILE:  Objection.  You can answer to

25   the best of your ability.

CONFIDENTIAL

Page 29

1           JAMES DANIEL JORDAN

2   BY THE WITNESS:

3        A.  As I sit here now I plan to but --

4        Q.  Okay.

5        A.  -- again, I don't know for sure.

6        Q.  Then I'm skipping down two lines.  "Rep Jim

7   Jordan is the member of the United States House of

8   Representatives for the Ohio 4th District"; do you

9   see that?

10       A.  Yes.

11       Q.  And that's correct?

12       A.  Yes, it is.

13       Q.  I'm now turning to page 9.  I am at the

14  bottom of the page --

15           MR. RAILE:  Just to clarify the record,

16  Counsel, you just want him to focus on the

17  particular sections you're drawing his attention to

18  and not to review the entire document?

19           MS. THOMAS-LUNDBORG:  That is correct.

20  There's no need to review the entire document.  If

21  you feel the need to ask him additional questions

22  after I'm done, I'm happy with that.

23           MR. RAILE:  I just want the record to be

24  clear on that.  Thank you, Counsel.

25  BY MR. THOMAS-LUNDBORG:

CONFIDENTIAL

Page 30

1          JAMES DANIEL JORDAN

2     Q.  So I'm at the bottom of the page and I'm

3  looking at the last paragraph.  I'm going to skip

4  over the first sentence -- or the first part of that

5  sentence because it's a legal question which I'm not

6  asking you about, but I believe the second part is a

7  factual question that I'd like to get your response

8  to.

9          "Elected members from a challenged district

10  may intervene as a matter of right" and then it says

11  "Due to their 'personal interest' in their office,

12  their interests in the timing and form of relief,

13  and in their continued incumbency."

14          So my first question to you is do you

15  consider --

16     A.  I didn't see where you're reading from.

17     Q.  I'm at the bottom.  I'll just read the full

18  sentence so the record is clear.

19          "As numerous courts have recognized,

20  elected members from a challenged district may

21  intervene as a matter of right under Rule 24 due to,

22  inter alia, their 'personal interest' in their

23  office, their interests in the timing and form of

24  relief, and in their continued incumbency."

25          My question to you is do you consider

CONFIDENTIAL

Page 31

1                    JAMES DANIEL JORDAN

2    yourself to have a personal interest in your office?

3              MR. RAILE:  Objection.  You can answer.

4    BY THE WITNESS:

5         A.  Yes.

6         Q.  And could you describe that interest to me?

7         A.  I mean, I have a personal interest in

8    representing the families and taypayers across the

9    4th District, doing that in a way that is consistent

10   with what I told them I was going to do when I ran

11   for the office.  I mean, you have a personal

12   interest I think just because that's your job is

13   you're a representative, and I take that

14   responsibility very seriously and I take it

15   personally.

16        Q.  Do you have a specific -- does your

17   interest extend not only to your position but also

18   to your district?

19             MR. RAILE:  Objection.  You can answer.

20   BY THE WITNESS:

21        A.  Yes, in that you have developed

22   relationships with communities, with families, with

23   businesses, with taypayers across your district and

24   there's a bond that I think is formed.  So yes, that

25   is -- being able to continue that is important.

CONFIDENTIAL

Page 32

1          JAMES DANIEL JORDAN

2     Q.  Is your personal interest in your

3 district -- do you have a specific personal interest

4 in your district's composition?

5          MR. RAILE:  Objection.  You can answer.

6 BY THE WITNESS:

7     A.  I think it's more basic than that.  I'm

8 going to represent the district that I have, plain

9 and simple.  Regardless of the composition,

10 regardless of the geographic makeup of that district

11 I'm going to represent it, but you just wouldn't

12 be -- I mean, it's obvious that when you have --

13 when there's an existing district and you represent

14 that you develop relationships with certain -- with

15 all the communities and with all the various

16 geographic areas of the district.

17     Q.  One articulated reason for personal

18 interest in this sentence that we read is -- it's

19 stated -- the last part of the sentence refers to

20 continued incumbency.  Do you consider yourself to

21 have an interest in your continued incumbency?

22     A.  I have an interest -- if, in fact, I file

23 and choose to run for election and/or re-election I

24 have an interest in winning, but it's not about

25 continued incumbency.  It's about if you put your

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2     name on the ballot the goal is to win so you can go

3     represent the folks in your district, the people in

4     your district, the taypayers, the business owners,

5     the families in your district, plain and simple.

6     It's not about I want to continue to be a member of

7     Congress.  It's I want to continue to represent the

8     folks that I get the privilege of representing if I

9     win.

10          Q.  And is that how you thought of the process

11     in 2011?

12               MR. RAILE:  Objection.  You can answer.

13     BY THE WITNESS:

14          A.  I thought of the process just the way I

15     described it.  The district I'm going to have is the

16     district -- the district that's there is the

17     district I'll run in and the district I'll represent

18     if, in fact, I win.

19          Q.  If you could please turn to page 11.  I'm

20     looking at the first paragraph, it's not the full

21     paragraph, and the second full sentence starting

22     with "Intervenor applicants."  Have you found it?

23          A.  Got it.

24          Q.  Okay.  Great.

25               "Intervenor applicants have invested

CONFIDENTIAL

Page 34

1                    JAMES DANIEL JORDAN

2      considerable time and money building coalitions of

3      supporters in their districts, learning their

4      districts, serving the needs of their constituents,

5      raising and spending money on electioneering

6      activities among other activities"; do you see that?

7          A.  Yes.

8          Q.  Did I read that correctly?

9          A.  Yes, you did.

10         Q.  So let's just take the sentence apart

11     because it has a few components to it.  Would you

12     agree that you've invested considerable time and

13     money on building coalitions of supporters in your

14     district?

15         A.  Yes.

16         Q.  Can you describe some of those activities?

17         A.  Every week when we're home in the district,

18     every day when we're home almost you're out and

19     about doing your job.  You can't represent people if

20     you don't go talk to them.  So you're touring

21     businesses, visiting schools, talking with

22     constituents, having townhalls, giving speeches,

23     you're doing all that.

24         Q.  And when you're out and about talking to

25     people are they people located close to your home in

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2     Urbana or are they people all over the district?

3          A.   All over the district.

4               MR. RAILE:   Objection.

5     BY MS. THOMAS-LUNDBORG:

6          Q.   And do you as part of this coalition-

7     building activity ever visit members of political

8     parties?

9          A.   Of course.

10         Q.   Can you describe some of those activities?

11         A.   I get invited to Republican events all the

12    time and we attend them all the time.

13         Q.   Okay.   Can you just give us a brief

14    description of the types of Republican events you

15    get invited to and attend?

16         A.   Lincoln Day dinners.   My guess is I've been

17    to Lincoln Day dinners in every one of the counties

18    I get the privilege of representing one time or

19    another and probably multiple times and other type

20    of Republican picnics and those kinds of activities.

21         Q.   Do you ever attend Democrat events?

22         A.   Well, I don't get invited to Democrat

23    events.   Do I attend bipartisan events or

24    nonpartisan events?   Certainly.

25         Q.   And what type of bipartisan events have you

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2    attended?

3         A.  I mean, debates, I've been to League of

4    Women Voter events.

5         Q.  Do you consider League of Women Voters

6    partisan?

7         A.  No.  You asked what kind of bipartisan or

8    nonpartisan events did I attend?

9         Q.  I did not ask for nonpartisan.  I just

10   asked for bipartisan, please.

11        A.  Oh.  So I guess that's what I was

12   answering.  I would consider -- okay.  Well,

13   nonpartisan, not bipartisan.

14        Q.  Could you please answer the question I

15   asked.  Which of the bipartisan events have you

16   attended?

17        A.  That would be like Chamber of Commerce

18   events, other types of community development events.

19        Q.  And you consider those bipartisan

20   organizations?

21        A.  Oh, yeah.  I mean, they'll invite Democrat

22   elected members as well as Republican elected

23   members to those events.

24        Q.  Please proceed.

25        A.  Just community events.

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2          Q.   Bipartisan events, please.

3          A.   I'm saying community events where there

4    will be both Democrat elected officials and

5    Republican elected officials that show up.

6          Q.   Can you give me an example of one of those?

7          A.   I represent a number of small towns.

8    Sometimes they'll have events associated with their

9    community days or some kind of municipal ground-

10   breaking ceremony where you'll have the Republican

11   officials and Democrat officials there.   I'm

12   thinking of those types of events which are fairly

13   common on our schedule.

14         Q.   And when you attend these events that

15   you've described as bipartisan do you see yourself

16   there as representing the Republicans in that there

17   are Republican representatives and Democratic

18   representatives?

19         A.   No.   I see myself there as the state rep,

20   the state senator, or the United States congressman

21   representing that community.

22         Q.   Now, other than these bipartisan events

23   that you've discussed where Republicans and

24   Democrats are invited, are there any other

25   bipartisan events that you can think of that you've

CONFIDENTIAL

Page 38

1                    JAMES DANIEL JORDAN

2    attended?

3              MR. RAILE:  Objection.  You can answer.

4    BY THE WITNESS:

5          A.  I think I said debates earlier which are

6    certainly represented by both parties, I've

7    obviously been involved in a number of those over

8    the years.  Again, I don't look at them as partisan,

9    nonpartisan, or bipartisan.  We get invited to

10   various meetings and events across the district.  I

11   don't -- we don't ask is this a Democrat event or is

12   this a Republican event, is this a bipartisan event,

13   a nonpartisan event.  It's just an event we've been

14   invited to and then we'll make a decision based on

15   our schedule if we can go to that event.

16         Q.  I'd like to go back to the sentence that we

17   were reading in this document, the one that I

18   previously read.  It says "In addition to time and

19   money spent building coalitions, there is time

20   spent" -- I'm looking at the last part of the

21   sentence -- "raising and spending money on

22   electioneering activities"; do you see that?

23         A.  Yes.

24         Q.  Do you agree that you spend time and money

25   raising -- or that you spend time -- sorry.  The

CONFIDENTIAL

Page 39

1                    JAMES DANIEL JORDAN

2   sentence is a little awkward.  I'm trying not to

3   misstate it, but I'll kind of restate it.  Do you

4   spend time and money on electioneering activities?

5        A.   Yes.

6        Q.   Can you describe some of those for me,

7   please.

8        A.   I mean, we have fundraising events in the

9   district, we have fundraising events outside the

10  district, but yes, we've have fundraising events.

11       Q.   Okay.  How often do you have fundraising

12  events?

13       A.   Depends on the year.

14       Q.   In an election year how often will you have

15  fundraising events?

16       A.   The last few years we've done -- we do

17  three main ones the last couple years, three main

18  events that we do within about a 24-, 48-hour time

19  period.

20       Q.   In addition to these three main fundraising

21  events are you doing other activities related to

22  fundraising?

23       A.   We do direct mail -- yes.

24       Q.   And what are those?

25       A.   We'll do direct mail fundraising, we'll do

CONFIDENTIAL

1        JAMES DANIEL JORDAN

2    fundraising here in Washington, fundraising events

3    here.

4         Q.   So the three main events that you stated

5    that you have, are those in Ohio?

6         A.   They are.

7         Q.   Are those bipartisan events?

8         A.   No.

9         Q.   Are those Republican events?

10         A.   Yes.

11         Q.   And then of the D.C. fundraising events how

12    many of those do you have?

13         A.   Several in the course of a year.

14         Q.   Are those bipartisan events?

15         A.   Don't know.

16         Q.   You don't know if the D.C. fundraising

17    events are bipartisan or not?

18         A.   We have lobbyists or folks who want to

19    attend your event, I don't know if they're Democrat

20    or Republican, but the event is to raise money for

21    Jim Jordan for Congress.

22         Q.   Are there other electioneering activities

23    that you're engaged in other than fundraising?

24         A.   I don't -- I guess I don't view it as

25    electioneering.  I view I as doing my job which is

CONFIDENTIAL

1            JAMES DANIEL JORDAN

2    going out and visiting the folks I get the privilege

3    of representing, whether that's in a meeting,

4    touring their business, stopping by a school, giving

5    a speech to 8th graders or juniors and seniors in

6    their economics and government class.  So I don't

7    view that as electioneering.  I just view that as

8    doing our job.

9        Q.  Do you have other electioneering activities

10   that you do?

11       A.  When I first ran for the job before I was a

12   member of Congress that first campaign I was out

13   campaigning, knocking on people's doors, you know,

14   doing the things you do in the course of a campaign.

15       Q.  You no longer knock on doors?

16           MR. RAILE:  Objection.

17   BY THE WITNESS:

18       A.  Yeah.  We haven't done that I don't believe

19   since the first campaign.

20       Q.  What about ads?

21       A.  Oh, yeah, we've done paid advertisement.

22       Q.  Can you describe your paid advertisement

23   activities?

24       A.  This past election, which is the most

25   recent, you know, fresh in my mind we did TV ads in

CONFIDENTIAL

Page 42

1                        JAMES DANIEL JORDAN

2      most of the major markets that cover our district.

3           Q.   How many ads?

4           A.   One ad that ran in -- well, one ad we did.

5           Q.   And what time did you spend personally in

6      putting together that ad?

7           A.   We did -- I don't know how much time it

8      was, but we have to film it.  So you have the crew

9      and we've got some people who were there when they

10     filmed the ad and got the footage for it.

11          Q.   And how long does that take?

12          A.   We did it in one day.

13          Q.   Was there preparation going into it?

14          A.   Not for me other than rounding up some

15     people to be there, but it was one day.  It started

16     in the morning and we were done by the afternoon.

17          Q.   Did your staff put preparation into the ad?

18          A.   Nope.  Political team, but not our

19     personal -- not our government staff.

20          Q.   Do you know how much time your political

21     team put into the ad?

22          A.   All I know is the day we filmed it was one

23     day.

24          Q.   I'm in the same paragraph and I'm skipping

25     the next sentence and going to the following

CONFIDENTIAL

Page 43

JAMES DANIEL JORDAN

1

2    sentence.  I will read the full sentence for the

3    clarity of the record.  "In addition"; do you see

4    that?  Same paragraph that we were in, top

5    paragraph, last sentence.

6        A.  Uh-huh.

7        Q.  Is that a yes?

8        A.  The last sentence, got it.  Okay.

9        Q.  "In addition, there's a possibility that if

10   a remedial plan is ordered in this case the remedial

11   plan could pair two or more of the member intervenor

12   applicants in the same district, which would impede

13   their ability to run for their seats."  Did I read

14   that correctly?

15       A.  Yes.

16       Q.  And as we've discussed before, member

17   intervenor applicants are the Republican incumbents?

18       A.  Yes.

19       Q.  Is that a concern of yours that you'll be

20   paired in a district with another Republican

21   incumbent?

22       A.  No.

23       Q.  Why not?

24       A.  I mean, I guess my main concern is what we

25   talked about earlier.  I have a district, I

CONFIDENTIAL

Page 44

1                   JAMES DANIEL JORDAN

2    represent that district, I know the communities, I

3    know the people, you form a relationship with the

4    folks you get the privilege of serving, and if that

5    changes then that relationship's no longer there and

6    you're going to have to develop them new.  That

7    would be my bigger concern.  Is there a chance you

8    get put in with some other colleague -- with one of

9    your colleagues I should say?  Yeah, that's a

10   concern, but it's not a big concern in my mind,

11   frankly.

12        Q.  Okay.  You said it is a concern, but it's

13   not a big concern.  Can you articulate the nature of

14   the concern?

15        A.  If the districts are redrawn, two incumbent

16   members are put in the same district and both decide

17   to run, then you're running against a colleague,

18   which is -- you know, which is what it is.  You have

19   a relationship with your colleague.  I consider my

20   colleagues in the Ohio delegation as friends and

21   just that, colleagues.  So that would be, you know,

22   obviously something that would be a little different

23   if you had to do that.

24        Q.  Was that a concern in 2011?

25        A.  I think it's a concern any time the

CONFIDENTIAL

Page 45

1                    JAMES DANIEL JORDAN

2      districts are being redrawn.

3           Q.  In 2011 Ohio went from 18 to 16 seats.  So

4      incumbents most likely would be paired; do you

5      recall that?

6           A.  Yes.

7           Q.  Do you recall discussions around the

8      pairing -- possible pairing of incumbents because

9      Ohio's going from 18 to 16 seats?

10              MR. RAILE:  Objection.  You can answer.

11     BY THE WITNESS:

12          A.  Yes.

13          Q.  Can you describe that concern in more

14     detail, the changing of 18 to 16?

15          A.  Just what I said earlier, you know, there's

16     the potential that you may be put in a district with

17     a colleague and that is not -- that would just be a

18     new situation that you hadn't dealt with before.

19          Q.  Did you have any discussions about the

20     change from 18 to 16 seats?

21          A.  Yes.

22              MR. RAILE:  Objection.

23     BY MS. THOMAS-LUNDBORG:

24          Q.  And who did you have discussions with about

25     the change from 18 to 16?

CONFIDENTIAL

Page 46

1              JAMES DANIEL JORDAN

2          MR. RAILE:  Objection.  You can answer.

3    BY THE WITNESS:

4          A.   A couple colleagues and a couple of friends

5    of mine in the general assembly.

6          Q.   Now, you said a couple colleagues.  By

7    "colleagues" do you mean Republican members of the

8    U.S. Congress?

9          A.   Yes.

10         Q.   And who were those?

11         A.   I remember conversations with

12   Mr. LaTourette and Mr. Latta.

13         Q.   And what was -- let's start with

14   Mr. LaTourette.  What did you and Mr. LaTourette

15   discuss?

16         A.   Just possible scenarios that were being

17   talked about how the map would look.

18         Q.   And what were those scenarios?

19         A.   If I remember right, there was one -- there

20   was a discussion about the 4th District being a sort

21   of -- going from kind of straight north and straight

22   south, more from Clark County, Springfield area

23   towards the Toledo area, and then there was a

24   discussion at some point about a map that looked

25   closer to what the district is now that I get to

CONFIDENTIAL

Page 47

1                    JAMES DANIEL JORDAN

2    represent.

3           Q.   And what was said in those conversations?

4           A.   The conversation I remember having I think

5    was near the end and I can't remember if it was when

6    they were moving from the first description I gave

7    you towards the second, but I don't recall the

8    details.  I just know that I talked with Congressman

9    LaTourette about it briefly because I was speaking

10   at an event in northeast Ohio.  He and I were both

11   speaking at this event in the Akron area.  So after

12   the event we talked about it briefly.

13          Q.   And what was that event?

14               MR. RAILE:  Objection.  You can answer.

15   BY THE WITNESS:

16          A.   I think I was speaking at the Summit County

17   Republican dinner, if I remember right.

18          Q.   And how did you feel about the proposed

19   district -- the proposals for the 4th District?

20          A.   The 4th District has historically been a

21   west central Ohio-based district and, you know,

22   either scenario that I remember being talked about

23   the 4th District was still going to be largely a

24   west central Ohio-based district.  So, you know, I

25   preferred it to stay how it was, but I knew that

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2    wasn't going to be the outcome.  So I was just -- as

3    long as it was largely a west central Ohio-based

4    district which is what it historically had always

5    been I was going to be fine with it.

6         Q.  You also mentioned conversations

7    with Mr. -- Congressman Latta.  Can you describe

8    that, please.

9         A.  I think it was just -- I just recall one.

10   I don't know that we specifically talked about this.

11   The maps that were being talked about Congressman

12   Latta and I were basically swapping some counties.

13   So we talked about that.

14        Q.  And when did that conversation occur?

15        A.  I don't recall.  I mean, in the course of

16   all this happening, whenever this time frame was

17   this was happening.

18        Q.  And what was said during that conversation?

19        A.  Just that.  We talked about I was going to

20   be -- I think under the current map I now represent

21   Seneca and Sandusky Counties and Bob represents

22   Harden, Wyandot, and Hancock and I had

23   represented -- it was a flip.  Although the Wyandot

24   County I think in the previous -- before '11 -- or

25   before the 2012 election Wyandot County we were

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2   split, he had half, I had half.  He was getting all

3   of it plus two counties I had, I was getting two

4   counties he had.  So it was just a swap.

5        Q.  Okay.  Do you recall any specifics about

6   the conversation other than it was a swap?

7        A.  I think we talked about is there a way that

8   we could keep more of what we currently had just

9   because we had represented that.  It turned out we

10  couldn't, they did the swap the way it was being

11  proposed.

12       Q.  Do you recall any other conversations with

13  members of Congress during that time?

14       A.  I do not recall any specific conversations.

15       Q.  Is it possible that you had other

16  conversations?

17       A.  Sure.

18       Q.  I think we'll table that portion of it for

19  a moment.

20          You mentioned that you also spoke to

21  friends in the General Assembly.  Who did you speak

22  to?

23       A.  Two that I know because they're two good

24  friends.  One is Representative Huffman.

25       Q.  Matt Huffman?

CONFIDENTIAL

Page 50

1                    JAMES DANIEL JORDAN

2          A.  Yes.  And Senator Faber.  I forget what

3   roles they had at the time.  Keith Faber I believe

4   at the time was my state senator.  Matt Huffman was

5   state representative and he represented Allen

6   County, which is in our congressional district.

7          Q.  Do you recall that Representative Huffman

8   was the sponsor of both redistricting bills in 2011?

9          A.  Yes.

10         Q.  Do you recall that Senator Faber was the

11  Senate sponsor of both redistricting bills in 2011?

12         A.  Yes.

13         Q.  What was the nature of your conversation

14  with Representative Huffman?

15         A.  I don't recall all we talked about.  We

16  talked a few times about this.  I guess my general

17  feeling was Matt understood the history of the 4th

18  District and understood that it was a west central

19  Ohio-based district.  So I wasn't too concerned

20  about how the ultimate map turned out.

21         Q.  But you said you guys talked a few times.

22  Can you describe those conversations, please.

23         MR. RAILE:  Objection.  You can answer.

24  BY THE WITNESS:

25         A.  I mean, just what I talked about.  I mean,

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2     Matt Huffman from our part of the state was the

3     representative sponsoring and putting together the

4     legislation.  He had a good history of what the 4th

5     District had historically been and he's a smart

6     capable individual who I thought was going to do a

7     good job under tough circumstances, the idea that we

8     were losing two seats, and I trusted he would do

9     good work.

10          Q.  Did you talk to him about the history of

11     the 4th District?

12          A.  I think it was understood.  I'm sure we

13     talked about the nature of the 4th District.  I

14     don't recall in what detail we discussed that.

15          Q.  Did you express any preferences during

16     those conversations?

17          A.  I wanted the district, as I said before, to

18     stay as close as to what it currently was because

19     that's, again, the relationships and friendships

20     that you had made across the district in its current

21     configuration.  So I was hoping it would stay

22     exactly like it was, but obviously it wasn't going

23     to do that.

24          Q.  And Senator Faber, can you describe those

25     conversations?

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2       A.  I don't recall.  Probably similar, but I'm

3  sure I talked to Representative Huffman more than I

4  talked to Senator Faber.

5       Q.  You said you spoke to Representative

6  Huffman a few times?

7       A.  Uh-huh.

8       Q.  How many times did you speak to

9  Representative Faber -- or Senator Faber?  Excuse

10  me.

11       A.  Probably the same thing, a handful of

12  times.  My guess is, as I said, I talked to Matt

13  more often.

14       Q.  How often would you talk to Representative

15  Huffman during this period?

16          MR. RAILE:  Objection.  You can answer.

17  BY THE WITNESS:

18       A.  I talk to Matt a lot because he's -- our

19  relationship goes clear back to 1999 when he first

20  helped me run for state Senate.  So he is a friend

21  that I talk to and a colleague, you know, a friend

22  in the political world that I talk to about lots of

23  issues.  So my guess is during this time period I

24  was talking to Matt about other issues as well

25  because we talk fairly often.

CONFIDENTIAL

Page 53

1                JAMES DANIEL JORDAN

2       Q.   And how often is fairly often?

3       A.   Depends.   I would say -- I mean, I haven't

4 talked with him in several weeks now, but we talk

5 fairly often just to catch up on what's happening in

6 Ohio politics, he wants to know what's happening

7 here.   Matt's a friend, we talk as friends.

8       Q.   Just so the record is clear, about how

9 often you would talk to Representative Huffman in

10 2011?   Would you say you talked once a month, once a

11 week just so we know how often is fairly often?   It

12 can change from person to person.

13         MR. RAILE:   Objection.   You can answer.

14 BY THE WITNESS:

15       A.   I would say it was fairly often.   Again,

16 when I first came to Congress, you know, the first

17 several years I felt like I talked to Matt a lot

18 just to bounce ideas off of Matt.   So my guess is it

19 was fairly often.   It's less often now, but I

20 obviously still talk to him.

21       Q.   Is fairly often once a week, once a month?

22         MR. RAILE:   Objection.

23 BY THE WITNESS:

24       A.   I couldn't say.   I would say probably more

25 than once a month back in those days, but I'm not

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2     sure.

3          Q.  But not once a week?

4          A.  Yeah, I'm not sure.

5               MS. THOMAS-LUNDBORG:    If we want to take a

6     break we can take break now.

7                    (A short break was had.)

8     BY MS. THOMAS-LUNDBORG:

9          Q.  Congressman Jordan, when we went on break

10    we were talking about conversations that you had

11    with members of the Ohio Senate and the Ohio General

12    Assembly and you mentioned Representative Huffman

13    and Senator Faber.  Did you talk to anyone else in

14    the Ohio legislature about the map?

15         A.  I don't recall.

16         Q.  I'm going to put out a name, Tom Niehouse.

17    Do you know Tom Niehouse?

18         A.  Yes.

19         Q.  Who is that?

20         A.  I believe he's in the Senate.  He may have

21    been president at the time or -- yeah, I think he

22    was president before Keith, before Faber was.  I

23    forget.  So I may have talked to Tom, yeah, I may

24    have talked to Tom, but I don't -- I don't know for

25    sure.  I mean, like I said, I talked primarily with

CONFIDENTIAL

Page 55

1                    JAMES DANIEL JORDAN

2     the guys from our district, one was my state

3     senator, Senator Faber.  So if I was going to talk

4     to people I may have talked to him, but I may have

5     talked to Tom.

6         Q.    What about Bill Batchelder?

7         A.    I served with Bill as well.  I may have

8     talked to Bill, but I'm not sure.

9         Q.    And do you know who he was at the time?

10        A.    Oh, sure.  Everyone knows Bill.

11        Q.    Do you know what position he held at the

12    time?

13        A.    He was -- I think he was Speaker, if not

14    then he became Speaker.  I believe he was Speaker

15    and Matt was Speaker pro tem or whatever the number

16    two position is, majority leader, but I served with

17    Bill in my time when I was in the state House.

18        Q.    And do you recall whether you talked to him

19    at the time about the map?

20            MR. RAILE:  Objection.  You can answer.

21    BY THE WITNESS:

22        A.  I don't recall.  I may have.  I mean, I

23    know I talked to Matt about it, but I don't know if

24    I talked to Bill.

25        Q.  Before break we were talking about the

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2    pairing of incumbents that Ohio is going from 18 to

3    16 districts; do you recall that?

4          A.  Yes.

5          Q.  Did you have an opinion about how

6    incumbents should have been paired in 2011?

7          A.  Not that I recall.

8          Q.  And ultimately Austria and Turner were

9    paired, correct?

10          A.  Yes.

11          Q.  Did you have an opinion about that pairing?

12          A.  Not really.  It was what it was.  You know,

13    the districts wound up being drawn in a way that put

14    Congressman Turner and Congressman Austria together.

15    It's unfortunate, but that's what happens I guess

16    when you're losing two seats in your state.

17          Q.  Did you talk to anyone about the pairing of

18    Congressman Turner and Congressman Austria?

19          A.  I'm sure it came up in conversations with

20    colleagues.  You know, I'm in the world of politics.

21    You're going to talk about two sitting U.S.

22    congressmen have to run against each other in the

23    primary, that's going to come up in conversations,

24    but who specifically I don't know.

25          Q.  Were you aware at the time that they were

CONFIDENTIAL

Page 57

1                    JAMES DANIEL JORDAN

2    going to be paired?

3        A.  I mean, I was aware of it when it happened.

4    Before there were all kinds of things being talked

5    about.  So I don't know when I became aware of it.

6    I was aware of it when it was, you know, a fact.

7        Q.  Do you know if you became aware of it

8    before the map was public?

9        A.  Don't know.

10       Q.  In addition to the pairing of Congressman

11   Austria and Congressman Turner, Congresswoman Kaptur

12   and Congressman Kasinich were paired; is that

13   correct?

14       A.  Yes.

15       Q.  Did you have any opinions about that

16   pairing?

17       A.  Same as the Republican, you know, pairing,

18   it is what it is.

19       Q.  Did you have any conversations about that

20   pairing?

21       A.  I'm sure I did.  Dennis Kasinich is a

22   friend of mine.  So I'm sure I talked to Dennis

23   about it.

24       Q.  Do you recall any specific conversation

25   with congressman Kasinich about the pairing?

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2       A.   If I remember, I think it was probably we

3    just talked about he's going to have to run against

4    Marcy now and, you know, that was happening, but I

5    talked to Dennis -- I mean, Dennis and I had coffee

6    a few months okay in Cleveland.  I count him as a

7    friend.  So I'm sure I talked to him.  I don't know

8    what we may or may not have discussed, but I'm sure

9    we talked.

10      Q.   Then the last pairing was Sutton and

11   Renacci.  I may be pronouncing that incorrectly.

12   Did you have any opinions about that pairing?

13      A.   Again, that's the rules, those are the

14   maps.  I would be for Jim Renacci when he's running

15   against Betty.  It is what it is.  I served with

16   Betty, I served with Betty in Congress and I served

17   with her in the state House.  I like Representative

18   Sutton.  So it's just another race where you've got

19   two incumbents running.  This one, of course, is

20   Republican against Democrat.

21      Q.   Did you have any conversations with anyone

22   about that pairing?

23      A.   I may have.  I don't know.

24      Q.   Instead of two incumbents being paired --

25   or two sets of incumbents being paired three sets of

CONFIDENTIAL

Page 59

1                     JAMES DANIEL JORDAN

2    incumbents were paired.  Did you have any opinion

3    about going from two incumbents that had to be

4    paired, going from 18 to 16, to three sets actually

5    being paired?

6              MR. RAILE:  Objection.  You can answer.

7    BY THE WITNESS:

8         A.  I don't -- I mean, like I said, the map

9    became -- you know, the map was what it was.  Two,

10   three, four, 18 -- there couldn't have been 18, but

11   multiple.  I didn't think about it that much.  These

12   are the maps, here are the districts, this is what

13   the final map looked like.

14        Q.  So you didn't have an opinion about the

15   fact that three sets of incumbents were paired?

16        A.  I mean, you knew when you were losing seats

17   that there were going to be changes.  How that

18   manifested itself I wasn't sure how it was going to

19   turn out.  It came to where it was three sets of

20   colleagues were actually going to be put in the same

21   district.

22        Q.  Did you have any understanding at the time

23   of why three sets instead of two sets of incumbents

24   were paired?

25        A.  No.

CONFIDENTIAL

Page 60

1              JAMES DANIEL JORDAN

2        Q.  Did the Republican members of Ohio's

3    delegation ever have meetings?

4        A.  We have delegation meetings from time to

5    time.  So my guess is we did.  Do I recall

6    specifically when they were, no.

7        Q.  Do you ever recall a delegation meeting

8    where redistricting was discussed?

9        A.  Sure.

10       Q.  And what do you recall?

11       A.  That it was discussed.  I mean, we've had

12   multiple meetings where we talked about -- where

13   this subject comes up in an agenda full of all kinds

14   of things that we we're looking at as a delegation.

15       Q.  Do you recall the nature of those

16   discussions?

17       A.  No, not totally, but I do know we talked

18   about -- there were discussions about -- I'm

19   forgetting the details here, but legislation at the

20   General Assembly that may go to the ballot that

21   would set up a different -- that would amend and

22   change the way -- the process for how maps were

23   drawn in the future.  So I do recall having some --

24   you know, talking about that subject.  I don't know

25   in what detail we discussed it, but that came up in

CONFIDENTIAL

Page 61

1                   JAMES DANIEL JORDAN

2    meetings.

3         Q.  In 2011 did redistricting ever come up?

4         A.  I'm sure it did.

5         Q.  Now, you mentioned that there would be

6    delegation meetings.  Were there calendar

7    invitations for those meetings?

8         A.  I don't know.  There may have been.

9         Q.  How did you become aware of these meetings?

10        A.  My chief of staff told me that the

11   delegation was getting together and it would be put

12   on the schedule and we'd go to that meeting.

13        Q.  Do you retain your schedule from 2011 that

14   would have had these meetings on it?

15        A.  I don't know, but, I mean, our staff would

16   know.

17                      (Jordan Exhibit 3 was marked as

18                       requested.)

19   BY MS. THOMAS-LUNDBORG:

20        Q.  I'm going to introduce a new exhibit.  This

21   is going to be Exhibit 3.  I just marked for the

22   record as Exhibit 3 "Reply in Further Support of

23   Motion of Republican Congressional Delegation Ohio

24   Voters and Republican Party Organizations to

25   Intervene."  This is another paper that was filed by

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2      your attorneys on your behalf in support of your

3      intervention in this case.

4              If you could please turn to page 5.

5              MR. RAILE:  Counsel, just to clarify for

6      the record, you just want him to look at the parts

7      you're showing him; is that correct?

8              MS. THOMAS-LUNDBORG:  That is correct.

9              MR. RAILE:  Very good.

10     BY MS. THOMAS-LUNDBORG:

11        Q.  I am at the bottom of the page and it is

12     the last full sentence on the page which begins with

13     "Members of Congress have ongoing."  Have you found

14     that?

15        A.  Yes.

16        Q.  "Members of Congress have ongoing and

17     working relationships with these constituents and

18     constituent groups who turn to members of Congress

19     for a variety of needs from ministerial to

20     substantive lobbying"; do you see that?

21        A.  Yes.

22        Q.  Do you have examples of times that

23     constituents have turned to you for either

24     ministerial or -- ministerial requests or

25     substantive lobbying requests?

CONFIDENTIAL

Page 63

                    JAMES DANIEL JORDAN

1

2          MR. RAILE:  Objection.  You can answer.

3    BY THE WITNESS:

4          A.  Yes.

5          Q.  Can you give me some examples?

6          A.  We'll have veterans groups talk to us about

7    things they are working on, talk to us about

8    legislation.  Sometimes it could be as simple a

9    request as I want a flag for some presentation

10   they're doing for a veteran or their family.  I

11   mean, that's the first example that popped into mind

12   is dealing with veterans organizations.  I'm sure

13   there are others.

14        Q.  Do you have any examples that include

15   requests from constituents in Democratic groups?

16          MR. RAILE:  Objection.  You can answer.

17   BY THE WITNESS:

18        A.  I don't know, but I assume so.  I mean,

19   there are -- well, I know an example would be during

20   President Obama's inauguration helping people get

21   tickets to come -- the ability to come to the

22   inauguration, my guess is we worked with Democrat

23   constituents in assisting -- in helping people, you

24   know, get to President Obama's inauguration.

25        Q.  Do you have any substantive examples from

Page 64

1               JAMES DANIEL JORDAN

2      Democratic groups?

3               MR. RAILE:  Objection.  You can answer if

4      you can.

5      BY THE WITNESS:

6           A.  I'm sure we could go back and look, but

7      nothing comes to mind right now.

8           Q.  Please turn to page 7 of the document in

9      front of you.  I'm at the first full sentence at the

10     top which I'll read for the record.  "Doing their

11     job well requires unrelenting fundraising efforts

12     that begin the day that they are elected to office

13     and continue until they step down or are voted out."

14     Did I read that correctly?

15          A.  Yes, you did.

16          Q.  We've talked a little bit about

17     fundraising.  Do you agree with this description of

18     fundraising activities?

19               MR. RAILE:  Objection.  You can answer.

20     BY THE WITNESS:

21          A.  I would say for the most part -- I don't

22     know that "unrelenting" is the term I would use.

23     Fundraising is part of the job, but it certainly

24     doesn't -- it certainly doesn't consume -- I don't

25     know that it consumes the amount of time that is I

CONFIDENTIAL

Page 65

1                    JAMES DANIEL JORDAN

2    think sort of conveyed in the sentence you read.

3         Q.  Okay.

4         A.  It's definitely important.

5         Q.  I'm going to read the next sentence.

6    "These fundraising efforts would be wasted if

7    district lines were changed and a member was paired

8    with another incumbent or moved from a favorable to

9    unfavorable district."  Did I read that correctly?

10        A.  Yes.

11        Q.  Do you agree with this statement?

12             MR. RAILE:  Objection.  You can answer if

13   you can.

14   BY THE WITNESS:

15        A.  Again, I don't know that I would use the

16   term "wasted," but changing the district lines I

17   think is problematic for the reasons I stated

18   earlier.  The relationships and friendships and the

19   bonds you've developed with constituents in

20   communities would all be lost when you move to a

21   different district.

22        Q.  I'm going to move on to page 10.  I'm in

23   section B and the second full paragraph, second

24   sentence.  I'm just going to ask you about this

25   sentence.  "Plaintiffs ignore the reality that

CONFIDENTIAL

Page 66

1                    JAMES DANIEL JORDAN

2    redistricting is a zero sum game."  Did I read that

3    correctly?

4          A.   Yes.

5          Q.   Would you agree that redistricting is a

6    zero sum game?

7               MR. RAILE:   Objection.   You can answer.

8    BY THE WITNESS:

9          A.   Again, I wouldn't characterize it that way.

10   Zero sum game implies that, you know, there are --

11   just the fact of redrawing the lines there are

12   winners and loser.  I don't know that I would

13   characterize it in that fashion.

14         Q.   How would you characterize it?

15         A.   I would characterize it as just what it is.

16   In Ohio we have a system where if the voters of the

17   state in three state-wide offices depending on who

18   they elect, who the people of Ohio elect to those

19   three positions, those three positions, Secretary of

20   State, governor and auditor, determine the lines for

21   the state House and state Senate.  Then those

22   individuals in the state House and state Senate who

23   are elected by the people determine the lines for

24   Congress.  I don't know that that's a zero sum game.

25   I think that is we the people in the State Of Ohio

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2     through their elected representatives putting

3     together districts for those representatives.

4          Q.  So you've mentioned how the process works

5     in Ohio.  Do you know how the process works because

6     of your work in the Ohio legislature?

7          A.  I'm not sure what you're asking.

8          Q.  Okay.  Let me ask it a different way, then.

9     In 2001 you were in the Ohio Senate, correct?

10          A.  Yes.

11          Q.  Did you vote on the redistricting bill in

12     2001?

13          A.  I'm sure I did.

14          Q.  Okay.  Did you have any other involvement

15     on the redistricting bill in 2001?

16          A.  I don't recall.

17          Q.  Did you work on any of its drafting?

18          A.  I'm not -- I wasn't on the -- I think it

19     came -- I think the bill goes through the elections

20     committee, which I'm trying to think who was -- I

21     don't know who was chairing that.  So I don't -- I

22     never chaired on the elections committee and I

23     believe that's where it goes through.  So I don't

24     believe I'd have direct involvement in the drafting

25     of the legislation.

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2          Q.  Do you recall if you voted in favor of the

3   bill in 2001?

4          A.  I assume I would, yes.

5          Q.  Now, you mentioned that the bill is drawn

6   by the Ohio legislature for the U.S. Congressional

7   District, correct?

8          A.  Yes.

9          Q.  Who was the Senate majority leader in 2001?

10         A.  So Dick Feinan would have been the head of

11   the Senate.

12         Q.  What party does he represent?

13         A.  Republicans.

14         Q.  And which party was the majority in the

15   Ohio Senate in 2001?

16         A.  Republican.

17         Q.  And which party was the majority in the

18   Ohio Assembly in 2001?

19         A.  Republican.

20         Q.  Do you recall who the Speaker was in 2001?

21         A.  It would have still been Joanne Davidson I

22   believe.  I'm trying to remember all this.  Yeah, I

23   believe it was still Joanne because she took over in

24   '94.  No, no, it wouldn't have been.  No.  Excuse

25   me.  We had passed term limits in '92.  So it would

CONFIDENTIAL

Page 69

1                    JAMES DANIEL JORDAN

2    have been Larry Householder.

3         Q.  In 2001?  I believe it was Joanne Davidson.

4         A.  Was it?  Okay.

5              MR. RAILE:  Counsel wants you to speculate

6    So...

7    BY MS. THOMAS-LUNDBORG:

8         Q.  But you know that the Republicans had the

9    majority in 2001?

10        A.  Yeah.  I forget who took over when.

11        Q.  Okay.

12             And then you mentioned that the governor

13   has a relationship to the bill, is that correct, the

14   redistricting bill?

15             MR. RAILE:  Objection.  You can answer.

16   BY THE WITNESS:

17        A.  In our state the auditor, Secretary of

18   State, and the governor, the three state-wide

19   offices draw the districts for state House and state

20   Senate, and then the general assembly, the state

21   House and state Senate put together the legislation

22   for congressional districts and that bill like any

23   other bill is signed by the governor.

24        Q.  Do you know who the governor was at the

25   time?

CONFIDENTIAL

Page 70

JAMES DANIEL JORDAN

2          MR. RAILE:  Objection.

3   BY THE WITNESS:

4          A.   So we had --

5          Q.   Do you recall that Bob Taft was the

6   governor at the time?

7          A.   Yes.  I was trying to think when Taft was

8   done and Strickland came in.  It would have been

9   Governor Taft.

10         Q.   And what party is he from?

11         A.   Republican.

12         Q.   Now I'm moving to --

13         A.   Although I'm pretty sure it was not Joanne,

14   it was Larry Householder who was Speaker.  At least

15   I think so.

16         Q.   Okay.

17         A.   Or who came in in 2001.

18         Q.   Fair enough.

19              Do you know -- I'm now moving from 2001 to

20   2011.  Do you know who's the majority in the Ohio

21   Senate in 2011, the majority party?

22              MR. RAILE:  Objection.

23   BY THE WITNESS:

24         A.   I believe Republicans.  I know Republicans

25   in the Senate.

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2          Q.   Do you know who was the majority party in

3    the Ohio Assembly in 2011?

4          A.   Republicans.

5          Q.   Do you know who the governor was in 2011?

6          A.   John Casey.

7          Q.   And what party is he from?

8          A.   Republican.

9          Q.   Is there anything materially different

10   about government control in Ohio from 2001 to 2011?

11          MR. RAILE:  Objection.

12          MS. THOMAS-LUNDBORG:   As far as what party

13   controlled the Government in 2001 and 2011.

14          MR. RAILE:  Objection.  You can answer.

15   BY THE WITNESS:

16          A.   The same party controlled.  The big

17   difference between -- well, the same party

18   controlled.

19          Q.   Okay.

20          We talked a little bit about fundraising.

21   Have you ever discussed fundraising -- sorry.

22   Strike that.

23          Have you ever discussed redistricting in

24   your fundraising efforts?

25          A.   Maybe.  I don't know.  I don't know.

CONFIDENTIAL

Page 72

1                    JAMES DANIEL JORDAN

2        Q.   Okay.

3                         (Jordan Exhibit 4 and

4                          Exhibit 5 were marked as

5                          requested.)

6   BY MS. THOMAS-LUNDBORG:

7        Q.   I'm going to hand you two documents.  Let's

8   just do this one at a time.  So this first document

9   will be Exhibit 4.  Unfortunately this is one that I

10  didn't staple, but we're only going to look at the

11  first page.  I'm going to hand you at the same time

12  what I'm having marked Exhibit 5.

13              I just handed you Exhibit 4 and Exhibit 5.

14  These are two documents that were produced to us

15  from your office and they're both e-mails about

16  fundraising events.  So I will take each in turn.

17  If you'd look at Exhibit 4, please.

18        A.   Uh-huh.

19        Q.   Now, we mentioned some people on this list.

20  So I think I already know who some of them are.

21  There's Ray Yonkura and that was your chief of staff

22  at the time, correct?

23        A.   Yes.

24        Q.   And then there's your e-mail address,

25  correct?

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2          A.   Yep.

3          Q.   And that's the personal e-mail address that

4    we've discussed?

5          A.   Yes.

6          Q.   Then there's a person named Adam Hewitt.

7    Who's that?

8          A.   Adam worked for us for approximately ten

9    years in the district and basically drove me

10   everywhere.  I mean, drove me to a lot of events and

11   worked in our district office and coordinates stuff

12   in certain counties in our district and many times

13   drove me to different events.

14         Q.   Okay.  And then Cory Noonan, I think we've

15   discussed him before.  He was the district office

16   manager?  I forget what the correct title is.

17         A.   At the time he would have been district

18   director.  I remember earlier I was trying to figure

19   out when he ran for county commissioner.  It must

20   have been in 2012 because he's still working as

21   district director it looks like here.

22         Q.   And then there's a person named Jenna

23   McNulty.  Who's that?

24         A.   She was our fundraiser at the time.

25         Q.   Looking at the body of the e-mail there is

CONFIDENTIAL

Page 74

1                    JAMES DANIEL JORDAN

2  Auglaize --

3          A.  Auglaize, yeah.

4          Q.  -- county event and the other names are

5  Cecilia -- oh, I'll state for the record this

6  document has been marked confidential information.

7  You've produced it to us.  Our position is that this

8  should not be marked confidential because there's

9  nothing confidential.  The only confidential

10  information seems like it's already been redacted,

11  which would be the residential address, but for the

12  purposes of this deposition I'll mark this section

13  of the deposition confidential.

14              MR. RAILE:  Great.  We obviously take the

15  position that it is and we can deal with that

16  off-line.

17  BY MS. THOMAS-LUNDBORG:

18          Q.  So who are Cecilia and Ernie Risner?

19          A.  Constituents of ours in Wapakoneta, Ohio,

20  which is an Auglaize County.

21          Q.  Do you recall a fundraiser event that they

22  were responsible for?

23          A.  Yes.

24          Q.  Under "Discussion points" towards the

25  bottom of the page, it's right under the redacted

CONFIDENTIAL

1                JAMES DANIEL JORDAN

2       text of "Venue" there are three discussion points,

3       "Debt ceiling, "Role as RFC chairman," and

4       "Redistricting"; do you see that?

5            A.  Yes.

6            Q.  Do you recall having a fundraiser event

7       where redistricting was a discussion point?

8            A.  I don't recall specifically, but those

9       three things were three big issues that were being

10      discussed in 2011 and I was the RFC chairman in

11      2011.

12           Q.  Okay.  What was the nature of discussions

13      that you would have at -- well, before I ask this

14      question let me strike that.  Let me move on to the

15      next document, which is another document that has

16      been marked as confidential.  We have the same

17      objection to the confidential designation, but I

18      will also mark this part of the deposition as

19      confidential.

20           So it looks like this e-mail has many of

21      the same people or all the same people we've seen

22      before, Jenna McAnulty, yourself, Adam Hewitt and

23      Ray Yonkura, and this is for an event titled "Morrow

24      County, Pat and Dick Miller," correct?

25           A.  Yes.

CONFIDENTIAL

Page 76

1          JAMES DANIEL JORDAN

2          MR. RAILE:  Objection.

3    BY MS. THOMAS-LUNDBORG:

4          Q.   Who are Pat and Dick Miller?

5          A.   Constituents of ours in Morrow County.

6          Q.   And do you recall a fundraising event that

7    they were responsible for?

8          A.   Yes.

9          Q.   And if you look again under the redacted

10   text, which is "Venue," there are discussion points

11   and the third discussion point is "Redistricting";

12   is that correct?

13         A.   Yes.

14         Q.   So now thinking about these two documents,

15   two different fundraising events; is that correct?

16         A.   Yes.

17         Q.   So there were two different fundraising

18   events where redistricting was discussed.  Generally

19   what was the nature of the conversations that you

20   would have about redistricting?

21         MR. RAILE:  Objection.  You can answer.

22         MS. THOMAS-LUNDBORG:  As it relates to

23   fundraising.

24         MR. RAILE:  Objection.

25   BY THE WITNESS:

CONFIDENTIAL

1                  JAMES DANIEL JORDAN

2         A.   Yeah.   I don't think it related to

3    fundraising.   I think I was giving an update to our

4    constituents about the state of play as we knew it

5    at the time, to what degree we may have known at the

6    time about redistricting.   They were hearing about

7    it, there were stories in the paper about

8    congressional districts were going to change, Ohio

9    was going to lose two seats.   It was just a point of

10   interest for our constituents as was the debt

11   ceiling debate which was big at the time and, of

12   course, my new responsibilities I had assumed in

13   that Congress as the Republican study committee

14   chairman.

15        Q.   Now, you said redistricting you would give

16   updates.   Can you describe those updates a little

17   bit more?

18        A.   There are going to be new lines, we don't

19   know what they're going to be, I hope they stay the

20   same because I obviously enjoyed representing the

21   current -- you know, the current communities in the

22   district.   That kind of update, I would think that's

23   what I would have told constituents.

24        Q.   Going back to these documents, these are

25   the only two documents, I think there are a couple

CONFIDENTIAL

Page 78

1                    JAMES DANIEL JORDAN

2    copies that were produced in this case about your

3    office about redistricting.  Do these represent the

4    only times that you ever communicated about

5    redistricting?

6              MR. RAILE:  Objection.

7    BY THE WITNESS:

8         A.  I don't know.

9         Q.  Well, you've mentioned some conversations

10   that you had about redistricting.  Do you recall

11   whether any other e-mails about redistricting were

12   circulated?

13        A.  Again, I don't know.

14        Q.  Going back to the conversations that you

15   had with congresspeople about redistricting, you

16   mentioned Congressman LaTourette and Congressman

17   Latta.  Did you talk to any other congressmen in or

18   out of Ohio's delegation about redistricting?

19        A.  Probably.  I don't recall specific

20   conversations, but, you know, the whole country's

21   going through redistricting.  My guess is it

22   probably came up in a conversation with colleagues,

23   you know, here in D.C., but I don't recall specific

24   conversations.

25        Q.  Did you e-mail with any of the

CONFIDENTIAL

1           JAMES DANIEL JORDAN

2    congresspeople about redistricting?

3           MR. RAILE:  Objection.

4    BY THE WITNESS:

5       A.  I hardly e-mail anybody about anything.  So

6    I would say, you know, I don't recall, but I would

7    doubt it.

8       Q.  Other than Congressman Kasinich, did you

9    talk to anyone in Ohio's Democratic caucus about

10   redistricting?

11      A.  I may have in a -- you know, I just don't

12   recall specific conversations.  I mean, I don't

13   know.

14      Q.  I'll ask it somewhat more specifically.  Do

15   you recall any conversations with Congresswoman

16   Kaptur about redistricting?

17      A.  I don't.

18      Q.  Congresswoman Fudge?

19      A.  No, I don't.  I mean, I talk to all these

20   folk.  So did redistricting ever come up?  I don't

21   know.  It may have, but I don't recall.

22      Q.  Okay.

23           Then Congresswoman Beatty was not in

24   office.  Did you know her at the time?

25      A.  I'm sure we had met.  I knew her husband

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2   better because I served with Otto Beatty in the

3   General Assembly.  I'm sure I met Joyce at some

4   point because she did lobbying work for Ohio State

5   University.

6          Q.  Do you recall any conversations with her

7   about redistricting at the time?

8          A.  I do not.

9          Q.  Did you ever talk to Congressman Boehner

10  about redistricting?

11         A.  I don't think so, but I don't recall.

12         Q.  Back in 2011 what was your relationship

13  like with Congress- -- excuse me -- Speaker Boehner?

14         A.  I mean, fine.  Although we had a big debate

15  that summer on the debt ceiling issue and it got

16  pretty intense, but I think the relationship was

17  fine.

18         Q.  Now, you mentioned there was a big debate

19  about the debt ceiling in the summer of 2011,

20  correct?

21         A.  Yes.

22         Q.  Do you recall whether there were any rumors

23  in 2011 about your debt ceiling position affecting

24  your district?

25         A.  Yes.

CONFIDENTIAL

1                JAMES DANIEL JORDAN

2          Q.  Can you describe that, please.

3          A.  It was in the press, in the Columbus

4    Dispatch, a story that -- you know, something to the

5    effect that Jim Jordan's opposition to the debt

6    ceiling increase without the spending cuts that we

7    were pushing for could somehow impact the type of

8    district, character of the district that would be

9    drawn in the upcoming redistricting process.

10         Q.  And what was your reaction to the Columbus

11   Dispatch article?

12         A.  Frankly, if you're being criticized in the

13   press because you want to cut spending, I mean,

14   quite frankly, once you get past the initial

15   headline on the front page of the paper, our

16   reaction was this is great news, you're being

17   criticized by, you know, these political consultants

18   or whoever it was, I forget who was quoted or

19   whoever was the anonymous source, you're being

20   criticized for standing up and doing what you told

21   the voters you were going to do.  I'll take those

22   headlines any day.

23         Q.  Did you think there was any validity to the

24   rumor that your district might be affected?

25         A.  I didn't know.

CONFIDENTIAL

1                        JAMES DANIEL JORDAN

2        Q.  Did you do anything to ascertain whether it

3   was true?

4        A.  No.  Frankly, I wasn't that worried.

5        Q.  Did you have any response to the article?

6        A.  I kept doing what we said, fighting for

7   spending cuts.

8                        (Jordan Exhibit 6 was marked as

9                         requested.)

10  BY MS. THOMAS-LUNDBORG:

11       Q.  I'd like to look at that a little bit more

12  specifically.  I'm going to have marked as

13  Exhibit 6 -- and I'm designating this portion of the

14  transcript as confidential -- a document that's

15  confidential information.  It was not produced by

16  your office.  It was produced by Representative

17  Johnson.  Again, it's one that we would object to

18  the confidentiality since it is a news article that

19  has been forwarded without any other text.  So it's

20  a public document.

21           This is an article that has been forwarded

22  by Joe Hallett, H-A-L-L-E-T-T, from Thursday,

23  July 28, 2011.

24           MR. RAILE:  Counsel, just for clarity, are

25  you going to go ahead with the last documents and

CONFIDENTIAL

Page 83

1               JAMES DANIEL JORDAN

2    just mark it confidential on the transcript for the

3    sake of argument?

4               MS. THOMAS-LUNDBORG:  Yes.

5               MR. RAILE:  Okay.  Very good.  Thank you.

6    by MS. THOMAS-LUNDBORG:

7        Q.  We won't spend too much time on this

8    version just for clarity.  I have another version

9    that hasn't printed as well.  So we can use this as

10   a check about whether or not the version that I have

11   is, in fact, completely public is correct.  Let's

12   first establish what is in front of you.

13              So the title of the document that's being

14   sent is titled "Payback coming for congressman's

15   disloyalty"; do you see that?

16       A.  Yes.

17       Q.  And this document has come from Mike

18   Smullen and it's being sent to, among others, Bill

19   Johnson; do you see that?

20       A.  Yes.

21       Q.  And do you know who Bill Johnson is?

22       A.  Yes.

23       Q.  And who is he?

24       A.  It's Congressman Bill Johnson.

25       Q.  And it's an article by Joe Hallett; do you

CONFIDENTIAL

Page 84

1                   JAMES DANIEL JORDAN

2    see that?

3         A.  Yes.

4         Q.  And this article appears to be from the

5    Columbus Dispatch; do you see that?

6         A.  Yes.

7         Q.  And the first sentence reads "U.S. Rep Jim

8    Jordan's open defiance of Speaker Boehner's efforts

9    to solve the debt ceiling crisis could cost the

10   Urbana Republican his safe seat in next year's

11   election"; do you see that?

12        A.  Yes.

13        Q.  So this appears to be an article discussing

14   the rumor about a change to your district?

15             MR. RAILE:  Objection.

16   BY THE WITNESS:

17        A.  Yes.

18        Q.  If you want to spend some more time looking

19   at the article, that's fine.

20        A.  No, I'm good.

21        Q.  We've mentioned the Columbus Dispatch

22   previously.  Are you familiar with the Columbus

23   Dispatch?

24        A.  Yes.

25        Q.  Okay.

CONFIDENTIAL

1            JAMES DANIEL JORDAN

2        MS. THOMAS-LUNDBORG:  I would like to move

3    on from the confidential designation to another

4    version of this article, and I'm having this marked

5    as Exhibit 7.

6                 (Jordan Exhibit 7 was marked as

7                      requested.)

8        MS. THOMAS-LUNDBORG:  Just so the record is

9    clear, if you look at the second page -- third page,

10   one reason it is marked is on the third page there

11   is this other article that has been interposed into

12   the printing of this article.  So I have crossed out

13   the irrelevant text, but if you compare it to the

14   confidential document you'll see that my marking --

15   my extraction of text is correct and once we decide

16   on the confidentiality of the document I would like

17   to use it.  Hopefully for trial this will all be

18   resolved

19        MR. RAILE:  I'll just throw an objection on

20   the record for the odd state of the document.

21        MS. THOMAS-LUNDBORG:  Fair enough.

22        MR. RAILE:  But you can proceed, Counsel.

23        MS. THOMAS-LUNDBORG:  Understood.  If I

24   could use the confidential one and have this

25   discussion outside of the confidentiality

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2 designation I would, but for now I'd like to have an

3 open discussion about this document.

4 BY MS. THOMAS-LUNDBORG:

5     Q.  Exhibit 7 that you have in front of you is

6 an article by Joe Hallett; do you see that?

7     A.  Yes.

8     Q.  And it's from the Columbus Dispatch; do you

9 see that?

10     A.  Yes.

11     Q.  And I will note for the record there's a

12 slight difference in date.  If you turn to page 2

13 this document seems to be dated July 29th, 2011; do

14 you see that?

15     A.  Yes.

16     Q.  So let's look at the first page.  The text

17 on the left-hand side reads "Two Republican sources

18 say Representative Jim Jordan's disloyalty to House

19 Speaker John Boehner could cost him his

20 congressional seat by next year.  Ohio's

21 congressional districts will be cut from 18 to 16."

22 Do you see that?

23     A.  Yes.

24     Q.  Did you have a fear at this point that you

25 would be singled out when the congressional

CONFIDENTIAL

Page 87

1              JAMES DANIEL JORDAN

2    districts changed?

3         A.   Not really.

4         Q.   And what do you mean by "not really"?

5              MR. RAILE:   Objection.   You can answer.

6    BY THE WITNESS:

7         A.   To be quite honest, I had had -- when I

8    first ran for state Senate I had John Boehner

9    support my opponent in the Republican state Senate

10   primary, he did TV ads for my opponent, the governor

11   of the state did TV ads for my opponent, and it

12   didn't matter.   We wound up winning and winning big.

13   As I said earlier today, the 4th District has always

14   been a west central Ohio-based district and I

15   thought it would probably stay in that direction

16   and, frankly, wasn't all that worried about how it

17   all shook out.

18        Q.   So let's look at the page, taking your

19   attorney's objection about what the possible change

20   was, and I'm on page 3.   So I'm right above the

21   crossed out text on your document and it starts with

22   "GOP sources."

23        A.   Uh-huh.

24        Q.   If you bear with me, it's a somewhat long

25   section I'm going to read.   "The GOP sources

CONFIDENTIAL

Page 88

1                    JAMES DANIEL JORDAN

2    separately described virtually the same plan being

3    considered for breaking up Jordan's district which

4    currently includes all of Allen, Auglaize, Shelby,

5    Hancock, Hardin, Logan, Champaign, Marion, Morrow

6    and Richland Counties, and the eastern half of

7    Wyandot County.  The new district would put Jordan's

8    home county" -- now I'm skipping the crossed out

9    text -- "in a district with Madison County and

10   roughly half of Franklin County, including parts of

11   the county and Columbus with large populations of

12   African-Americans who traditionally vote

13   Democratic."  Do you see that?

14        A.  Yes.

15             MR. RAILE:  I'll just object.  The

16   "Champaign" word somehow -- I'm not exactly sure how

17   it fits in, but it was missed.  You can go ahead

18   with your questioning, Counsel.

19             MS. THOMAS-LUNDBORG:  I compared it to the

20   confidential document and I think the Champaign is

21   incorrectly put in this document.

22             THE WITNESS:  Okay.

23   BY MS. THOMAS-LUNDBORG:

24        Q.  So do you recall conversations about having

25   part of Franklin County included in your district?

CONFIDENTIAL

Page 89

1                JAMES DANIEL JORDAN

2     A.  I don't recall conversations per se.  I

3 mean, I recall discussing this news story with our

4 staff.

5     Q.  And what was your opinion about Franklin

6 County being included in your district?

7     A.  Again, I didn't think it was going to

8 happen.  Our takeaway from this news article was,

9 frankly, this is great news.  You're being

10 criticized in the paper for standing up and fighting

11 in the United States Congress for the very thing you

12 campaigned on and that you told the voters you were

13 going to do, which is reducing spending, and now

14 they're trying to -- I think they use the term

15 "punish" in here somewhere -- now they're trying to

16 punish you for doing what you said.  It's not a bad

17 thing in the political world.

18     Q.  Why didn't you think it was going to

19 happen?

20     A.  I just didn't.

21     Q.  Did you have any basis for that belief?

22     A.  I mean, I guess I've said it several times.

23 I felt there was a big block of counties in west

24 central Ohio that are going to be put together in a

25 congressional district.  Historically that has just

CONFIDENTIAL

Page 90

1          JAMES DANIEL JORDAN

2    always been the case and I felt that that was going

3    to happen again.

4          Q.   Would you consider Franklin a central Ohio

5    district?

6          A.   Franklin's obviously central Ohio.

7          Q.   Okay.   And why did you believe that it

8    wouldn't be put with the other west central Ohio

9    districts?

10         A.   I just didn't think it would.

11         Q.   I'm going to go on back to the document and

12   reading the next sentence.   "'In doing so you put

13   Jordan in a district that is competitive for both

14   parties and he will have a very, very hard time

15   winning,' said one of the sources."   Do you think

16   putting Franklin in your district would have made it

17   more competitive?

18              MR. RAILE:   Objection.   You can answer.

19   BY THE WITNESS:

20         A.   Depends on what parts of Franklin County.

21         Q.   Which parts of Franklin County would have

22   made your district more competitive?

23         A.   The Democrat parts.

24         Q.   You ended up responding to this article or

25   at least your office did, correct?

CONFIDENTIAL

Page 91

JAMES DANIEL JORDAN

A.  We may have.  I'm not sure.  I'm sure we got asked by someone in the press.  I don't recall what we said.

Q.  If you look at the bottom of page 2 of the document that you have before you or towards the bottom, it says "Meghan Snyder, Jordan's spokeswoman said, 'We would hope that standing strong in favor of lowering spending and balancing the federal budget would not be a reason to eliminate the district of a sitting member of Congress'"; do you see that?

A.  Sure do.

Q.  Who's Meghan Snyder?

A.  She was our press person at the time.

Q.  Do you recall her making this statement?

A.  I'm sure that's what I said because that's what I was saying to you earlier before I read this. I know that's how we would -- you know, that's how he would respond.  So...

Q.  One of the words that she used here is "eliminating the district."  What does it mean to eliminate the district?

A.  I'm not sure technically how you would define it, but I'd probably use the definition of

CONFIDENTIAL

Page 92

1          JAMES DANIEL JORDAN

2    the folks who are being quoted in this article are

3    saying where you take just a very small part of the

4    district that I currently represent but happen to

5    reside in and put it with an area outside the

6    district.

7         Q.  In addition to the statement there was a

8    Facebook post.

9         A.  Okay.

10                     (Jordan Exhibit 8 was marked as

11                      requested.)

12   BY MS. THOMAS-LUNDBORG:

13        Q.  Let's just look at it so we're not talking

14   in hypotheticals.  This will be Exhibit 8.  I will

15   represent to you that what I've put in front of you

16   and marked as Exhibit 8 is a post from your public

17   Facebook account that I downloaded with your name

18   dated July 28, 2011.

19            MR. RAILE:  I'll just object as this

20   appears not to be complete, but you can proceed.

21            MS. THOMAS-LUNDBORG:  By "complete" you

22   mean all of the comments?

23            MR. RAILE:  Yes.

24            MS. THOMAS-LUNDBORG:  Okay.

25            MR. RAILE:  I mean, at least that.  I've

CONFIDENTIAL

Page 93

1                   JAMES DANIEL JORDAN

2    not reviewed this myself, but it does appear to have

3    many, many comments that are not here.

4              MS. THOMAS-LUNDBORG:  Fair enough.

5    BY MS. THOMAS-LUNDBORG:

6         Q.  I'll represent when you go to your Facebook

7    page looking at this post this is immediately what

8    becomes available and I did not further copy all the

9    comments, but there's no text from the post written

10   by you that is missing from this document.

11             The Facebook post reads "I'd be very

12   interested to hear your comments on this article

13   suggesting that my vote will result in my

14   congressional district being eliminated," and then

15   there's a link to a Dispatch article titled "Payback

16   may be coming for congressman's disloyalty."

17        A.  Yes.

18        Q.  That seems to be the article that we've

19   been discussing, at a minimum the one that is marked

20   confidential that was --

21        A.  Okay.

22        Q.  Again, the term being used here is

23   "eliminated"; do you see that on the Facebook post?

24        A.  I do.

25        Q.  And is that version of "eliminated" the

CONFIDENTIAL

Page 94

1                    JAMES DANIEL JORDAN

2     same that you just gave me a minute ago?

3          MR. RAILE:  Objection.  You can answer.

4     BY THE WITNESS:

5          A.  I would think so.

6          Q.  And at the time was there any concern that

7     led your team to post this on Facebook?

8          A.  We posted this on Facebook as a response to

9     the Dispatch story.

10          Q.  Okay.  Was this same comment also posted on

11     Twitter?

12          A.  I do not know.

13          Q.  Okay.

14          If you look back at Exhibit 7, which is the

15     article, back to the second page, right underneath

16     the section discussing Meghan Snyder there's a

17     statement that you made a statement both on Facebook

18     and Twitter.

19          A.  Okay.

20          Q.  Does that appear to be accurate?

21          A.  I don't know.  I assume if it says we did

22     we did.

23                    (Jordan Exhibit 9 was marked as

24                     requested.)

25     BY MS. THOMAS-LUNDBORG:

CONFIDENTIAL

Page 95

1                    JAMES DANIEL JORDAN

2        Q.   I'm having marked for the record Exhibit 9.

3    I will represent to you that Exhibit 9 is a document

4    from LexisNexis, which is a repository of lots of

5    things including news articles and interviews.  The

6    title of this is "An interview with Ohio Congressman

7    Jim Jordan."

8        A.   Okay.

9        Q.   If you turn the page to the kind of actual

10   first page of content, it's an "Interview with

11   Congressman Jordan, Fox News Network, Your World

12   with Neil Cavuto."  Do you know Neil Cavuto?

13       A.   Yes.

14       Q.   Have you ever given interviews with Neil

15   Cavuto?

16       A.   Yes.

17       Q.   Do you recall giving an interview on or

18   about July 29, 2011?

19       A.   Not specifically.

20       Q.   Do you have any reason to doubt that you

21   gave this interview on this date?

22       A.   No.

23       Q.   I'm turning to the second page.  To orient

24   us on the page there's a "cross-talk," another

25   "cross-talk," and a third "cross-talk"; do you see

CONFIDENTIAL

Page 96

1                   JAMES DANIEL JORDAN

2  that?

3        A.  Yes.

4        Q.  I'm on the section right below the third

5  "cross-talk."

6        A.  Okay.

7        Q.  It states "Jordan:  Well, the Speaker and I

8  talked on the phone yesterday and we actually talked

9  about a different issue that is relative to our

10  districting in our -- in the state of Ohio"; do you

11  see that?

12        A.  Yes.

13        Q.  Do you recall talking to Speaker Boehner

14  about redistricting in Ohio?

15        A.  Yes.

16        Q.  And what was the nature of that discussion?

17        A.  I wouldn't characterize it as a call about

18  redistricting -- well, I would characterize it as a

19  call about the article.

20        Q.  Okay.  And what was said in that

21  conversation?

22        A.  This is actually one I do remember

23  distinctly because I was in the middle of a workout

24  in the congressional gym running on the treadmill

25  and one of the gym staff members walked in and said

CONFIDENTIAL

Page 97

1                    JAMES DANIEL JORDAN

2      the Speaker would like to talk with you and he's on

3      the line now.  Got off the treadmill, walked over,

4      picked up the phone, and the Speaker said that he

5      had nothing to do with the article or something to

6      that effect.

7          Q.  Was anything else said on that call?

8          A.  I think I told him -- I think I said

9      something to the effect like, you know, Mr. Speaker,

10     I've never criticized you in any way publicly and

11     will continue to follow that rule.  He just said

12     that he or his team had nothing to do with the

13     article.  It was a relatively short conversation.

14         Q.  Okay.  Did you have any other conversations

15     with Speaker Boehner about redistricting?

16         A.  I do not recall any others.

17         Q.  Did Speaker Boehner attend any of the

18     delegation meetings --

19         A.  Can I back up?  Again, I didn't

20     characterize -- I wouldn't characterize that

21     conversation we had as necessarily about

22     redistricting.  It was about the story in the paper,

23     that that's why he called me and felt it was

24     important enough to get ahold of me in the middle of

25     a workout.

CONFIDENTIAL

Page 98

1          JAMES DANIEL JORDAN

2     Q.  Fair enough.  I was using your words here

3  from the other day, but I take your statement that

4  it was a call about the article.

5          So outside of the delegation meetings that

6  you've already discussed -- sorry.  Strike that.

7          Did Speaker Boehner attend these delegation

8  meetings that we discussed earlier today?

9     A.  Some he did, some he didn't.  There were

10 times when he was there.  There were times when --

11 he's the Speaker of the House.  He doesn't always

12 make it to every delegation meeting.  If he wasn't

13 there I'm sure he had a representative, his chief of

14 staff or someone.

15    Q.  And did anyone on your staff talk to anyone

16 on Speaker Boehner's staff about redistricting?

17    A.  Don't know.

18    Q.  Is it possible those conversations

19 occurred?

20    A.  It's possible, but I don't know.

21    Q.  Do you know if any members of your staff

22 had any conversations with any of the other

23 congresspeople about redistricting?

24    A.  I would doubt that our staff would be

25 talking with members.

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2        Q.   Did they talk to any of the other members'

3    staff about redistricting?

4        A.   That may have happened, but I don't know.

5             MS. THOMAS-LUNDBORG:  Looking at my outline

6    I think I probably have an hour left.

7             MR. RAILE:  Do we want to break now and

8    maybe just go through and not have to spend lunch

9    here?  What do you think?

10            THE WITNESS:  I would much prefer that.  I

11   prefer to get done -- it's up to you obviously, but

12   I prefer to get done as soon as possible.

13            MS. THOMAS-LUNDBORG:  Let's take a break,

14   but it can be a 10-minute break and we can come back

15   and try to finish before lunch.

16                    (A short break was had.)

17   BY MS. THOMAS-LUNDBORG:

18       Q.   Congressman Jordan, we are going to try to

19   get you out of here, but before we can do that I

20   have at least two other topics I'd like to talk to

21   you about.  The first one is just going through some

22   people who are involved in redistricting at

23   different levels and seeing if you know them or knew

24   them at the time.

25            Do you know Ed Gillespie?

CONFIDENTIAL

Page 100

1                 JAMES DANIEL JORDAN

2        A.  I've shaken hands with him once.

3        Q.  What about Chris Jankowski?

4        A.  No, that doesn't ring a bell.

5        Q.  Did you know Bob Bennett?

6        A.  Yes.

7        Q.  Who's Bob Bennett?

8        A.  He was party chair.

9        Q.  Party chair for what?

10       A.  Wait.  Am I thinking of the right?  No, Bob

11  Bennett the lawyer?

12       Q.  No.  I am talking about Bob Bennett, party

13  chair.

14       A.  Party chair in Ohio, yeah.  He's passed on.

15       Q.  And the party chair of which party?

16       A.  Republican party.

17       Q.  Okay.  And did you know him?

18       A.  Yes.

19       Q.  Did you have any conversations with him

20  about Ohio's redistricting?

21       A.  Don't know.

22       Q.  Do you know if he was involved at all in

23  Ohio's redistricting?

24       A.  I don't know.  I wouldn't think directly,

25  but I don't know.

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2          Q.  Do you know someone named Heather -- who

3     was named at the time Heather Mann and is now named

4     Heather Blessing?

5          A.  No.

6          Q.  Did you -- do you know Ray DiRossi?

7          A.  Yes.

8          Q.  Who is Ray DiRossi?

9          A.  I knew Ray when I was in the Ohio Senate

10    because he was a staff -- he was staff in the Ohio

11    Senate and I forget his title.

12         Q.  Did you have any conversations with him in

13    2011 about redistricting?

14         A.  I don't know.  Maybe.  I don't recall.

15         Q.  Do you know if he had any involvement in

16    redrawing Ohio's map?

17         A.  Don't know.  He may have, but I don't know.

18         Q.  Did you know Tom Hofeller?

19         A.  It doesn't ring a bell.

20         Q.  Did you know Mark Braden -- or do you know

21    Mark Braden?

22         A.  It doesn't -- I don't believe so.

23         Q.  Do you know John Morgan?

24         A.  I don't think so.

25         Q.  Do you know Adam Kincaid?

CONFIDENTIAL

Page 102

JAMES DANIEL JORDAN

2    A.  Again, doesn't ring a bell.

3        Q.  Do you know Tom Whatman?

4        A.  Yes.

5        Q.  Who's Tom Whatman?

6        A.  Tom is -- I think he's a political

7    consultant, lobbyist, but Tom is -- I forget when I

8    met Tom, but he's from -- he was from the 4th

9    District, the previous 4th District.  He's from

10   Mansfield, Richland County, I should say.

11       Q.  Did Tom Whatman work for Speaker Boehner?

12       A.  I believe so.  I believe so.  I don't know

13   in what capacity for sure.  I'm not sure exactly

14   what his responsibilities were, but I believe he

15   did.

16       Q.  Did you have any conversations with

17   Mr. Whatman in 2011 about redistricting?

18       A.  I may have.  I don't know for sure, but I

19   may have.

20       Q.  Do you know if anyone on your staff had

21   conversations with Mr. Whatman about redistricting?

22       A.  They may have.  I mean, I know our previous

23   chief of staff, you know, he knew Thomas well.

24       Q.  And that's Mr. Yonkura?

25       A.  Yes.

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2          A.  Do you know if any e-mails were circulated

3     between you and Mr. Whatman?

4          A.  I don't know.  I would doubt it, but I

5     don't know.

6          Q.  And do you know if anyone on your staff

7     e-mailed with Mr. Whatman?

8          A.  Don't know.

9                         (Jordan Exhibit 10 was marked

10                         as requested.)

11     BY MS. THOMAS-LUNDBORG?

12          Q.  So let's just spend some time talking about

13     the district.  I'm having marked as Exhibit 10 a

14     picture of the current Ohio districts.  So, again,

15     marked as Exhibit 10 is a picture of the current

16     Ohio districts and marked with a red dot and an

17     arrow is roughly your address in Urbana?

18          A.  Yes.  Okay.

19          Q.  So we're just going to use this document as

20     a reference.  We've established you live in Urbana,

21     correct?

22          A.  Yes.

23          Q.  And that's in Champaign County, correct?

24          A.  Yes.

25          Q.  How often do you get home?

CONFIDENTIAL

1             JAMES DANIEL JORDAN

2        A.   Most weekends and then, you know, we're

3    home when we're not in session.   Weeks that we're

4    not in session in D.C. we're typically in Urbana as

5    well.

6        Q.   And as we've discussed, when you're at home

7    you visit constituents; is that right?

8        A.   Yes.

9        Q.   Now, as I counted, your district currently

10   has nine counties including Allen, Auglaize, Shelby,

11   Logan, Champaign, Union, Crawford, Seneca, and

12   Sandusky; is that right?

13       A.   Yes.

14       Q.   You also have five partial counties,

15   Marion, Huron, Erie, and Lorain; is that right?

16       A.   Yes.  And a small section of Mercer.

17       Q.   That's right.  So six partial counties

18   then.

19       A.   All a part of 14 counties.  I think you

20   were right in your first assessment.  Nine full,

21   five partial, Lorain, Huron, Erie, Marion are the

22   partials.

23       Q.   Eight full counties and --

24       A.   Nine full counties, five partials.  The

25   five partials are Lorain, Erie, Huron, Marion, and

CONFIDENTIAL

Page 105

1           JAMES DANIEL JORDAN

2    Mercer.

3        Q.  That I count as six.

4        A.  Lorain County is one, Erie County is two,

5    Huron is three, Marion is four, Mercer is five.

6        Q.  Sorry.  You're right.

7            Where are your offices?

8        A.  Lima and Norwalk.

9        Q.  Do you also have an office in Crawford

10   County?

11       A.  We do.  A couple days a week I believe we

12   have a staff member come from the Norwalk office

13   come down and spend the day in the city building

14   there there in Bucyrus in Crawford County.  She has

15   an office a few days a week I believe.

16       Q.  And who's that?

17       A.  Deedee.  What's Deedee's last name.  I'm

18   drawing a blank on Deedee's last name.

19       Q.  So your Lima office is in Allen County; is

20   that correct?

21       A.  Yes.

22       Q.  And is someone there five days a week?

23       A.  Oh, yeah.  We have staff there every day.

24       Q.  And then your Norwalk office is in Huron

25   County; is that right?

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2      A.  Yes.

3      Q.  And how often is someone there?

4      A.  Every day.

5      Q.  And how often do you make it to each

6  office?

7      A.  Not that often because I meet with

8  constituents out and about in their areas.  Our

9  staff jokes I've been to every Bob Evans multiple

10 times across our district.  We'll have meetings at

11 restaurants and we'll be out touring businesses.  We

12 do have meetings from time to time at the offices,

13 but I don't go there that often.

14     Q.  Are any of your three offices considered

15 your main office?

16     A.  The two main offices would be the ones I

17 talked about earlier, the one in Lima and the one in

18 Norwalk.

19     Q.  And why do you have three offices?

20     A.  To serve the constituents of the district.

21     Q.  And how did you decide where to locate your

22 offices?

23     A.  There's always been an office in Lima in

24 the 4th District.  It's one of the larger cities in

25 the district.  It's actually the largest city in the

CONFIDENTIAL

Page 107

1                    JAMES DANIEL JORDAN

2      western portion of our district.  So there's

3      historical precedent, there's the fact that it's a

4      large -- it's our second largest county in the

5      district.  So it's always been there.

6              Norwalk serves the northern and eastern

7      part of the district.  It's sort of centrally

8      situated between Erie which is -- that portion of

9      Erie County that I have in our district is the

10     actually largest population center, slightly bigger,

11     just a few thousand people bigger than what we have

12     in Allen County.  Then Sandusky and Seneca County,

13     Norwalk's about equal distance between those areas

14     in the north and more eastern part of the district.

15         Q.  And then how did you choose to locate your

16     office in Crawford County?

17         A.  It is that full county kind of in between,

18     sort of in the center, and we've just developed a

19     strong relationship with the elected officials there

20     in Crawford and Bucyrus.  We felt it made sense to

21     have a presence there as well.  At least one day a

22     week I believe is what we do.

23         Q.  Now, several of the counties that you

24     represent are close to your home county of

25     Champaign; isn't that right?

CONFIDENTIAL

Page 108

1                    JAMES DANIEL JORDAN

2         A.   I think that's fair to say.

3         Q.   And would you consider -- I'll name these

4    counties and you can tell me if I've left some off

5    that you would consider close.  Logan, Union,

6    Shelby, and Auglaize are close counties to you?

7         A.   Yeah, that's fair.

8         Q.   And how often do you visit the counties

9    that I just named that are close?

10        A.   A lot.

11        Q.   What is a lot?

12        A.   We did an analysis -- I mean, I don't

13   recall, but we did an analysis for this past

14   campaign we're in and the number of visits in the

15   district I forget how many hundreds of visits we had

16   done across the district and, you know, where those

17   were, but, you know, I think it's -- you're not

18   being a good representative if you don't go out and

19   talk to the people you get the privilege of

20   representing.  So we do that a lot.

21        Q.   You said you did an analysis of your visits

22   to the district and where they were.  Do you know

23   how many of them were in the four counties that I

24   just named?

25        A.   I don't know off the top of my head.  I

CONFIDENTIAL

Page 109

1          JAMES DANIEL JORDAN

2  don't know.

3          Q.  Now, you mentioned -- or we've mentioned

4  that Lorain County is also part of your district,

5  correct?

6          A.  Correct.

7          Q.  And Lorain County also includes Oberlin; is

8  that right?

9          A.  Yes.

10         Q.  And Oberlin is 150 miles away from where

11  you're located in Urbana?

12         A.  It's a trek, yeah.

13         Q.  How many times do you get there?

14         A.  I've been there several times.  I get to

15  Lorain County several times.  I don't know the

16  number.

17         Q.  Is that several times this year?

18         A.  I have to go back and look.  I'm not sure.

19         Q.  Okay.  Do you recall being there this year?

20         A.  Yes.

21         Q.  Do you recall how many times this year?

22         A.  No.

23         Q.  Do you recall when the last time was that

24  you were there?

25         A.  I do not.

CONFIDENTIAL

1            JAMES DANIEL JORDAN

2        Q.   And then you mentioned you also have Erie

3    County and that's one of your largest populations

4    centers?

5        A.   No.   Lorain is.

6        Q.   Oh, Lorain is.   Okay.

7        A.   Lorain's first, Allen's second.

8        Q.   Okay.   Erie County, though, you do have

9    Erie County?

10       A.   I've got a portion of Erie County.

11       Q.   A portion of Erie County.

12       A.   Southern townships across the bottom.

13       Q.   And how often do you visit Erie County?

14       A.   Again, I don't know how often.   I do know

15   if you talk with constituents around the district

16   they'll tell you that we're out and about across the

17   district a lot.

18       Q.   When was the last time you were in Erie

19   County?

20       A.   Probably -- I was going to give you the

21   date because we had a debate at Monroeville High

22   School in the course of the campaign.   So just a few

23   weeks ago we were in Monroeville, and then we did

24   other events up there in that part of the district

25   I'm sure that day we probably had some other stops

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2    in and around the time of the debate.

3         Q.  And prior to the debate do you recall when

4    the last time was that you were in Erie County?

5         A.  I don't know for sure.

6         Q.  Were you in Erie County again sometime this

7    year?

8         A.  Probably, but I can't give you the day.

9         Q.  Were you there more than one other time

10   this year?

11        A.  Probably, but I don't know definitively.

12   This year?

13        Q.  This year.

14        A.  Oh, I'm sure of that.

15        Q.  Do you recall how many times that would

16   have been?

17        A.  I don't know.

18        Q.  Do you know what the partisan breakdown is

19   of Lorain County?

20        A.  It leans Democrat I'm sure.  I don't know

21   the percentages.

22        Q.  Do you know what the partisan makeup is of

23   Erie County?

24        A.  I don't know.

25        Q.  Do you know if Erie County went for

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2    President Obama in 2008?

3         A.  I don't know.

4              (Jordan Exhibit 11 was marked

5              as requested.)

6    BY MS. THOMAS-LUNDBORG:

7         Q.  I'm having marked as Exhibit 11 a proposed

8    remedial map proposed by Plaintiffs in this case.

9    Again, we have marked for the record your location

10   in your home county.

11        A.  Uh-huh.

12        Q.  This map changes the shape of your

13   county -- of your district, as you can see, and you

14   go from representing 14 counties here to seven

15   counties.  My first question is would it be easier

16   to visit seven counties than 14?

17        A.  I suppose so.

18        Q.  Now, the majority of counties in this new

19   map are whole counties, but you do still have two

20   partial counties; do you see that?

21             MR. RAILE:  Objection.  You can answer.

22   BY THE WITNESS:

23        A.  Yes.

24        Q.  As you sit here today, are you aware of any

25   reasons why the Court shouldn't order this new

CONFIDENTIAL

Page 113

1                   JAMES DANIEL JORDAN

2    configuration?

3               MR. RAILE:  Objection.

4    BY THE WITNESS:

5        A.  I mean, I don't think I'm prepared to

6    speculate on what the Court may or may not do.

7        Q.  Do you have any opinions about the

8    composition of this proposed county --

9        A.  Just saw it when you handed it to me.

10              MR. RAILE:  Objection.

11   BY MS. THOMAS-LUNDBORG:

12       Q.  Understood, but you know the counties in

13   your state, correct?

14       A.  Well, I know there are 88 of them.  I don't

15   know that I've been to every single one.  I've been

16   to probably most of them, but I know the ones in

17   west central Ohio and in the 4th Congressional

18   District better than other parts of the state

19   certainly.

20       Q.  So the proposed counties here are

21   Champaign, which we've discussed as your home

22   county.  Have you been to Clark County?

23       A.  Sure.

24       Q.  As you sit here today, do you have see any

25   reason why Clark County shouldn't be a county that

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2      you represent?

3              MR. RAILE:  Objection.

4      BY THE WITNESS:

5          A.  Again, I don't -- this is the first time

6      I've seen the map.  I know Clark County, I've been

7      there several times.

8          Q.  Do you know Miami?

9          A.  Yes.  Born in Miami County.

10          Q.  Darke County?

11          A.  Yes, I know Darke County.

12          Q.  The writing here is a little --

13          A.  Prieble.

14          Q.  You knew I was going to butcher that one.

15      Do you know Prieble?

16          A.  Yes.

17          Q.  And do you know Butler?

18          A.  Yes.  I haven't been to Butler -- well, I

19      know Butler.

20                        (Jordan Exhibit 12 was marked

21                         as requested.)

22      BY MS. THOMAS-LUNDBORG:

23          Q.  I'm having marked for the record

24      Exhibit 12.  So for the record I will identify this

25      document.  When we were looking at your district and

CONFIDENTIAL

Page 115

1                    JAMES DANIEL JORDAN

2    other districts we realized that the proposed

3    remedial map that we just saw in Exhibit 11 paired

4    you with Representative Davison.  So we made a

5    slight change to the lines and this has you in

6    another District 4.  Do you see the location on the

7    map?

8         A.  Yes.

9         Q.  And this was disclosed to your counsel on

10   Friday as part of an errata report to our map

11   drawer.  So in this version you keep many of the

12   counties that you already have, Allen, Auglaize,

13   Logan, Champaign, Union, Marion, and part of Shelby;

14   do you see that?

15        A.  I do.

16        Q.  And then additional districts are added; do

17   you see that?

18        A.  Additional counties are added.

19        Q.  Sorry, counties are added.

20        A.  Yes.

21        Q.  And in this version you would have two

22   split counties instead of the five that you

23   currently have; do you see that?

24        A.  I do.

25        Q.  As you sit here today, are you aware of any

CONFIDENTIAL

Page 116

1                     JAMES DANIEL JORDAN

2      reasons that you couldn't represent these counties?

3              MR. RAILE:  Objection.

4      BY THE WITNESS:

5          A.  No.

6          Q.  And let's go through some of the new

7      counties.  Are you familiar with Williams County?

8          A.  Yes.

9          Q.  Are you familiar with Fulton County?

10         A.  I mean, I don't know what you mean by

11     "familiar."  Do I know they exist?  Certainly.

12         Q.  Have you been there?

13         A.  I'm sure I have at some point or other in

14     my life.

15         Q.  Are you aware of their general composition?

16         A.  I mean, they're largely rural,

17     agricultural, manufacturing counties just like I

18     currently represent in the 4th District, yes.

19         Q.  So I will reserve those answers for

20     Williams and Fulton which I just asked you about.

21     Is the same true for Defiance?

22         A.  Yes.

23         Q.  Is the same true for Henry?

24         A.  Yes.

25         Q.  Paulding?

CONFIDENTIAL

1                    JAMES DANIEL JORDAN

2        A.   Yes.

3        Q.   Putnam?

4        A.   Yes.

5        Q.   Van Wert?

6        A.   Yes.

7        Q.   Madison?

8        A.   Yes.

9                   (Jordan Exhibit 13 and

10                   Exhibit 14 was marked as

11                   requested.)

12   BY MS. THOMAS-LUNDBORG:

13        Q.   I'm going to have two documents marked at

14   the same time.  The first one is 13, the second is

15   14.  I've put in front of you two documents,

16   Exhibit 13 and 14, and I will represent for the

17   record these are two hypothetical district maps that

18   could have been drawn at the time that were

19   disclosed as part of our rebuttal expert report for

20   William Cooper.  I will also represent to you -- and

21   you can look to make sure that it's true -- that for

22   purposes of this exercise your district is the same

23   in the two hypotheticals.  Other districts change,

24   but your district remains the same.

25        A.   Okay.

CONFIDENTIAL

Page 118

```
 1              JAMES DANIEL JORDAN

 2       Q.   Now, this hypothetical you keep many of the

 3  same districts that you represent today, Champaign,

 4  Union, Logan, Shelby, Auglaize, Allen and part of

 5  Marion; do you see that?

 6       A.   I do.

 7       Q.   And in this version you have three partial

 8  counties instead of five as you currently have; do

 9  you see that?

10       A.   I do.

11       Q.   Are you aware of any reasons why the map

12  drawers couldn't have drawn this district for you?

13            MR. RAILE:  Objection.

14  BY THE WITNESS:

15       A.   No.

16       Q.   As you sit here today, can you think of any

17  reasons why you couldn't represent any of the

18  counties in this district?

19            MR. RAILE:  Objection.

20  BY THE WITNESS:

21       A.   No.

22            MS. THOMAS-LUNDBORG:  I think I might be

23  done.  If we could take a short five-minute break.

24            MR. RAILE:  Just so you know, I have about

25  maybe five minutes of questions.
```

CONFIDENTIAL

Page 119

1              JAMES DANIEL JORDAN

2         MS. THOMAS-LUNDBORG:  I may have additional

3    questions then after yours.

4         MR. RAILE:  Of course.

5                   (A short break was had.)

6         MS. THOMAS-LUNDBORG:  So Plaintiffs are

7    done asking questions for the moment reserving the

8    right to ask a few follow-up questions after

9    intervenor's counsel.

10                   EXAMINATION

11   BY MR. RAILE:

12      Q.  Congress Jordan, as I stated at the

13   beginning, I'm Richard Raile.  I represent the

14   congressional intervenors.  Just a few questions.

15           Do constituents of your district

16   communicate with you?

17         A.  Yes.

18         Q.  Do constituents of your district

19   communicate with your office or individuals who work

20   for you?

21         A.  Yes.

22         Q.  How do you respond to communications by

23   constituents?

24         A.  In whatever form -- we respond to all

25   communications from the district in typically

CONFIDENTIAL

1            JAMES DANIEL JORDAN

2    whatever format they come to us.  So if they text

3    us -- not text us, but e-mail us we'll e-mail them I

4    guess.  If they call we'll call back.  If they send

5    a letter we'll respond in letter form.  We make a

6    point to any and all constituents who contact us

7    they get a response back from our office.

8         Q.  When you say "we," do you include both you

9    and those who work for you?

10        A.  Yes.

11        Q.  When a constituent communicates with you or

12   those who work for you do you or those who work for

13   you ask the constituent if that person is a Democrat

14   or a Republican?

15        A.  No.

16        Q.  Do you or those who work for you have any

17   way of knowing if that constituent is a Democrat or

18   Republican?

19        A.  Only if they tell us.  Sometimes you can

20   tell they don't like me by the nature of their call.

21   Other times they're calling to compliment some vote

22   or some speech or some TV appearance that they've

23   seen me on.

24        Q.  Does it matter to you whether a constituent

25   who reaches out to you or those who work for you is

CONFIDENTIAL

Page 121

1            JAMES DANIEL JORDAN

2    a Democrat or a Republican or a member of some other

3    group?

4          A.   No.

5          Q.   Is that information -- and by "information"

6    I mean whether the constituent is a Democrat or

7    Republican or a member of some other group --

8    something that you or those who work for you take

9    into account in any way in responding or handling

10   the constituent communication?

11            MS. THOMAS-LUNDBORG:   Objection.

12   BY THE WITNESS:

13         A.   No.   That would be wrong.

14         Q.   Do you participate in candidate forums?

15         A.   Yes.

16         Q.   How often?

17         A.   This past election we were in three with

18   our opponent.   There were a couple other

19   opportunities, but just scheduling conflicts

20   prevented us from doing it.   I think our opponent

21   actually asked for five, but we did three.

22         Q.   How do you decide whether to participate in

23   a candidate forum or not?

24         A.   Schedule.   I mean, if we're voting in

25   Washington, D.C. -- some of the days they initially

CONFIDENTIAL

1                     JAMES DANIEL JORDAN

2    proposed in the example I'm giving we were actually

3    scheduled to be here in D.C. doing legislative work

4    in Washington, but we had two debates and a

5    candidate forum, one in Erie County, one in Allen

6    County and one in Auglaize county.

7         Q.   Have you ever participated in a candidate

8    forum sponsored by a group called the League of

9    Women Voters?

10        A.   Yes.

11        Q.   When was that?

12        A.   A few years ago.   The first year that

13   Oberlin got drawn -- or Erie County and therefore

14   part of Oberlin, which is part of Erie County, so

15   that would be 2012 election, the first time it was

16   drawn into our district we had a candidate forum

17   there in Oberlin sponsored by the League of Women

18   Voters.

19        Q.   To be clear, you participated in that?

20        A.   Yes.

21        Q.   Has there ever been an instance where you

22   have turned down an invitation to participate in a

23   candidate forum sponsored by the League of Women

24   Voters?

25        A.   Yes, actually this year.   We had a

CONFIDENTIAL

1          JAMES DANIEL JORDAN

2   scheduling conflict, but I know there's another one

3   in the '14 election I believe we were back in

4   Oberlin at a League of Women Voters event.  I just

5   remember it's the church there on campus where they

6   have these events.  This year we couldn't because I

7   was scheduled to do another event in Columbus.

8          Q.  So for this year, the one that you didn't

9   attend, was there any reason you did not attend

10  other than the scheduling conflict?

11         A.  No.  I mean, we had another event we were

12  going to.

13         Q.  You represent the 4th District -- Ohio's

14  4th Congressional District; is that correct?

15         A.  Yes.

16         Q.  Which constituents of that district do you

17  consider yourself to represent?

18         A.  All of them.

19         Q.  Is that members of all political parties?

20         A.  Yes, and not affiliated as well.

21         Q.  Now, counsel for Plaintiffs showed you some

22  different maps illustrating different ways Ohio

23  could be divided into congressional districts.  Do

24  you remember those maps?

25         A.  Yes.

CONFIDENTIAL

1                   JAMES DANIEL JORDAN

2          Q.   Do you remember those questions?

3          A.   Yes.   Somewhat, yes.

4          Q.   Do you think it's possible that Ohio could

5     be drawn up in ways that are in other maps that you

6     were not shown today?

7          A.   Of course.

8          Q.   Do you have any idea how many different

9     ways Ohio could be drawn up into maps -- into

10    congressional districts?

11         A.   11 million people, 16 districts, I assume

12    the possibilities are almost infinite.

13         Q.   You testified earlier that you have

14    familiarity with how redistricting of congressional

15    districts is done in Ohio; did I hear you correctly?

16         A.   Yes.

17         Q.   What institutions -- institution or

18    institutions are responsible in Ohio for drawing the

19    congressional districts?

20         A.   The General Assembly and then obviously

21    like any other bill it would have to be signed by

22    the governor to become law.

23         Q.   Can you think of any other reasons sitting

24    here today why the map drawn by the General Assembly

25    according to Ohio law in 2011 should be replaced by

CONFIDENTIAL

1              JAMES DANIEL JORDAN

2     any map drawn by a court?

3          A.  No.

4          MR. RAILE:  Those are all my questions.

5              FURTHER EXAMINATION

6   BY MS. THOMAS-LUNDBORG:

7      Q.  I have one follow-up question.

8              You mentioned that there was a Columbus

9   event this year?

10         A.  Uh-huh.

11         Q.  Which was the reason that you missed the

12  League of Women Voters candidate forum.  Do you

13  recall what that event was?

14         A.  Political event.

15         Q.  Could you further define what you mean by

16  "political event"?

17         A.  It was -- I think it was a fundraising

18  event for the party.

19         Q.  By "the party" what do you mean?

20         A.  By the Republican party.

21         MS. THOMAS-LUNDBORG:  I have no further

22  questions.

23         MR. RAILE:  Nor do I.

24  (Whereupon, at 12:40 p.m. the taking of the

25   instant deposition ceased.)

CONFIDENTIAL

Page 126

1                              J U R A T

2

3       I,                  , do hereby certify under

4       penalty of perjury that I have read the foregoing

5       transcript of my deposition taken on                    ;

6       that I have made such corrections as appear noted

7       herein in ink, initialed by me; that my testimony as

8       contained herein, as corrected, is true and correct.

9

10      DATED this _____ day of _____, 20  ,

11      at _____,         .

12

13

14

15

16

17      _____

18                   SIGNATURE OF WITNESS

19

20

21

22

23

24

25

CONFIDENTIAL

Page 127

1                              ERRATA SHEET

2      Case Name:

3      Deposition Date:

4      Deponent:

5      Pg.   No. Now Reads        Should Read   Reason

6      ____  ____ _____     _____   _____

7      ____  ____ _____     _____   _____

8      ____  ____ _____     _____   _____

9      ____  ____ _____     _____   _____

10     ____  ____ _____     _____   _____

11     ____  ____ _____     _____   _____

12     ____  ____ _____     _____   _____

13     ____  ____ _____     _____   _____

14     ____  ____ _____     _____   _____

15     ____  ____ _____     _____   _____

16     ____  ____ _____     _____   _____

17     ____  ____ _____     _____   _____

18     ____  ____ _____     _____   _____

19     ____  ____ _____     _____   _____

20

21                                      _____

22                                      Signature of Deponent

       SUBSCRIBED AND SWORN BEFORE ME

23     THIS ____ DAY OF _____, 2018.

24     _____

25     (Notary Public)   MY COMMISSION EXPIRES:_____

CONFIDENTIAL

Page 128

1          JAMES DANIEL JORDAN

2      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

3            I, TINA M. ALFARO, Registered Professional

4    Reporter, Certified Realtime Reporter, and Notary

5    Public, the officer before whom the foregoing

6    deposition was taken, do hereby certify that the

7    foregoing transcript is a true and correct record of

8    the testimony given; that said testimony was taken

9    by me stenographically and thereafter reduced to

10   typewriting under my direction; that reading and

11   signing was requested; and that I am neither counsel

12   for, related to, nor employed by any of the parties

13   to this case and have no interest, financial or

14   otherwise, in its outcome.

15           IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 12th day of

17   December, 2018.

18

19   My Commission expires October 31, 2020.

20

21            _Tina M. Alfaro_

22   _____

23   NOTARY PUBLIC IN AND FOR THE

24   DISTRICT OF COLUMBIA

25