Page 1

1                  ADAM PERRY KINCAID

2            IN THE UNITED STATES DISTRICT COURT

3              FOR THE SOUTHERN DISTRICT OF OHIO

4    ----------------------------------- )
     OHIO A. PHILIP RANDOLPH INSTITUTE;  )
5    LEAGUE OF WOMEN VOTERS OF OHIO;      )
     THE OHIO STATE UNIVERSITY COLLEGE    )
6    DEMOCRATS; NORTHEAST OHIO YOUNG      )
     BLACK DEMOCRATS; HAMILTON COUNTY     )
7    YOUNG DEMOCRATS; LINDA GOLDENHAR;    )
     DOUGLAS BURKS; SARAH INSKEEP;        )
8    CYNTHIA LIBSTER; KATHRYN DEITSCH;    )
     LUANN BOOTHE; MARK JOHN GRIFFITHS;   )
9    LAWRENCE NADLER; CHITRA WALKER;      )
     TRISTAN RADER; RIA MEGNIN;           )
10   ANDREW HARRIS; AARON DAGRES;         )
     ELIZABETH MYER; BETH HUTTON;         )
11   TERESA THOBABEN; and CONSTANCE RUBIN)
                                          )
12                   Plaintiffs,          ) Case No.
             vs.                          ) 1:18-cv-00357-TSB
13                                        )
     RYAN SMITH, Speaker of the Ohio      )
14   House of Representatives; LARRY      )
     OBHOF, President of the Ohio Senate;)
15   and JON HUSTED, Secretary of State  )
     of Ohio, in their official          )
16   capacities,                         )
                                          )
17                   Defendants.          )
     ----------------------------------- )

18

19           DEPOSITION OF ADAM PERRY KINCAID

20                  Washington, D.C.

21                  December 4, 2018

22

23

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

25   JOB NO: 149802

1               ADAM PERRY KINCAID

2          Deposition of ADAM PERRY KINCAID, held at

3     the offices of:

4

5               Covington & Burling

6               850 10th Street, NW

7               Washington, D.C. 20001

8

9          Taken pursuant to notice before Tina M.

10    Alfaro, a Notary Public within and for the District

11    of Columbia.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     ADAM PERRY KINCAID

2    APPEARANCES:

3         ON BEHALF OF THE PLAINTIFFS:

4         COVINGTON & BURLING

5         BY: ROBERT FRAM, ESQ.

6              ROBERT DAY, ESQ.

7              One Front Street

8              San Francisco, CA 94111

9

10

11        ON BEHALF OF THE LEGISLATIVE DEFENDANTS:

12        OGLETREE DEAKINS NASH SMOAK & STEWART

13        BY: ALYSSA RIGGINS, ESQ.

14             4208 Six Forks Road

15             Raleigh, NC 27609

16

17

18        ON BEHALF OF THE INTERVENOR DEFENDANTS:

19        BAKER HOSTETLER

20        BY: KATHERINE McKNIGHT, ESQ.

21             1050 Connecticut Avenue Northwest

22             Washington, DC 20036

23

24

25
```

```
 1                    ADAM PERRY KINCAID

 2    APPEARANCES:  (Cont'd)

 3         ON BEHALF OF THE DEPONENT:

 4         HOLTZMAN VOGEL JOSEFIAK TORCHINSKY

 5         BY: SHAWN SHEEHY, ESQ.

 6              PHILLIP GORDON, ESQ.

 7              JASON TORCHINSKY, ESQ.

 8              45 North Hill Drive

 9              Warrenton, VA 20186

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                ADAM PERRY KINCAID

 2                    I N D E X

 3                   EXAMINATION

 4   WITNESS                          PAGE

 5   ADAM PERRY KINCAID

 6      By Mr. Fram                   8

 7                    EXHIBITS

 8   KINCAID EXHIBITS                 PAGE

 9   Exhibit 1                        68
        Affidavit
10
     Exhibit 2                        106
11      PowerPoint

12   Exhibit 3                        127
        Spreadsheet, TIBERI-000039
13
     Exhibit 4                        127
14      Metadata

15   Exhibit 5                        134
        Spreadsheet, NRCC-000012
16
     Exhibit 6                        134
17      Metadata

18   Exhibit 7                        144
        E-mail
19
     Exhibit 8                        152
20      Spreadsheet, BRADEN-001387

21   Exhibit 9                        152
        Metadata
22
     Exhibit 10                       159
23      Screenshot of Exhibit 8

24   Exhibit 11                       161
        JPEG, BRADEN-001388
25
```

1              ADAM PERRY KINCAID

2                 EXHIBITS
                  (Cont'd)

3

KINCAID EXHIBITS                     PAGE

4

Exhibit 12                     161
5     Metadata

6    Exhibit 13                167
     JPEG, BRADEN-001389
7

Exhibit 14                 167
8     Metadata

9    Exhibit 15                170
     JPEG, BRADEN-001390
10

Exhibit 16                 170
11    Metadata

12   Exhibit 17                171
     JPEG, BRADEN-001391
13

Exhibit 18                 171
14    Metadata

15   Exhibit 19                173
     JPEG, BRADEN-001392
16

Exhibit 20                 173
17    Metadata

18   Exhibit 21                186
     Spreadsheet, LWVOH-00018333
19

Exhibit 22                 191
20    Spreadsheet, LWVOH-00018480

21   Exhibit 23                191
     Metadata
22

Exhibit 24                 194
23    Spreadsheet, LWVOH-00018481

24   Exhibit 25                194
     Metadata
25

```
 1                    ADAM PERRY KINCAID

 2                         EXHIBITS
                          (Cont'd)
 3
     KINCAID EXHIBITS                        PAGE
 4
     Exhibit 26                              199
 5       Email, LWVOH-00018322

 6   Exhibit 27                              216
         Spreadsheet, NRCC-000013
 7
     Exhibit 28                              216
 8       Metadata

 9   Exhibit 29                              226
         Spreadsheet, DIROSSI-0000010
10
     Exhibit 30                              226
11       Metadata

12   Exhibit 31                              228
         Map, BLESSING-0012635
13
     Exhibit 32                              234
14       Spreadsheet, DIROSSI-0000525

15   Exhibit 33                              234
         Metadata
16
     Exhibit 34                              235
17       Spreadsheet, BLESSING-0013212

18   Exhibit 35                              235
         Metadata
19
     Exhibit 36                              236
20       Spreadsheet, NRCC-000014

21   Exhibit 37                              236
         Metadata
22
     Exhibit 38                              238
23       Formula

24   Exhibit 39                              243
         Spreadsheet, DiROSSI-0000142
25
```

1                          ADAM PERRY KINCAID

2                               EXHIBITS
                              (Cont'd)
3
  KINCAID EXHIBITS                                    PAGE
4
  Exhibit 40                                          243
5      Metadata

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ADAM PERRY KINCAID

 2                       (Witness sworn.)

 3   WHEREUPON:

 4                    ADAM PERRY KINCAID,

 5   called as a witness herein, having been first duly

 6   sworn, was examined and testified as follows:

 7                       EXAMINATION

 8   BY MR. FRAM:

 9      Q.  My name's Robert Fram.  I represent the

10   Plaintiffs in this case.

11           Could you please state your full name for

12   the record.

13      A.  Adam Perry Kincaid.

14           MR. FRAM:  Do you want to have others state

15   their appearances?

16           MR. SHEEHY:  Shawn Sheehy on behalf of

17   Mr. Kincaid.

18           MR. GORDON:  Phillip Gordon on behalf of

19   Mr. Kincaid.

20           MR. SHEEHY:  Mr. Torchinsky will be joining

21   us shortly, but he will be here also on behalf of

22   Mr. Kincaid.

23           MS. RIGGINS:  Alyssa Riggins on behalf of

24   the legislative Defendants.

25           MS. McKNIGHT:  Kate McKnight on behalf of
```

1              ADAM PERRY KINCAID

2    intervenor Defendants.

3    BY MR. FRAM:

4        Q.  Mr. Kincaid, have you ever been deposed

5    before?

6        A.  No.

7        Q.  Well, I'd like to go over a few sort of

8    basics in terms of the process.  It might help

9    things go more smoothly.  Of course, you're here

10   under oath.  It seems informal, but it's actually a

11   formal legal proceeding.

12            The court reporter's taking down a

13   transcript, creating a little booklet of everything

14   we say, and the important part about that is unlike

15   a lot of conversations in life where people fill in

16   each other's sentences it's sometimes what we'll

17   bluntly call interrupting, which we try not to do

18   that here the best we can.  I'll do my best and ask

19   you to do yours.  It's easier for other people to

20   read the booklet later.

21            Now, I try to ask clear questions but don't

22   always succeed.  If something I ask isn't clear,

23   sometimes your counsel may object, but even if he

24   doesn't object please tell me, I'm sorry, would you

25   please clear that up and I'll try harder.

1                   ADAM PERRY KINCAID

2          There are two different things counsel tend

3    to say in depositions.  I won't speak for your

4    counsel here because I'm bad at predictions, but

5    they tend to do two different things.  They tend to

6    make objections and they tend to make instructions.

7    They're different.

8          Unlike in court proceeding where someone --

9    most likely on television or in movies there's an

10   objection and the witness waits until the judge

11   rules and there's a lot of drama.  In a deposition

12   objections are made to preserve a record, but

13   questions still have to get answered.

14          Instructions are different.  When counsel

15   instructs you not to answer, then you should not

16   answer.  If we wind up disagreeing with your

17   counsel's instruction we'll take that up with the

18   judge at a later time.  We try to keep those short,

19   we try not to get into speeches on both sides, we

20   try to move things alone, not waste your time, but

21   those are the big differences.

22          Do you understand what I've said so far?

23   A.   Yep.

24   Q.   Feel free to take a break any time you need

25   one.  There's one request I make which is to please

1               ADAM PERRY KINCAID

2    not to take a break when I've asked -- when a

3    question I've asked is still out there unless,

4    unless you think you need to talk to your counsel

5    about a question of privilege.  Usually it's

6    attorney-client privilege, but there might be some

7    other privilege.  If you need legal advice before

8    you can answer a question that's different, but if

9    I've asked you a question and you feel like it's

10   time for a break, I appreciate if you could answer

11   the question and then we can take a break.

12        A.  Yep.

13        Q.  Is there any reason you can't give full,

14   complete, and truthful testimony today?

15        A.  No.

16        Q.  Medications of any kind that might be of

17   concern?

18        A.  No.

19        Q.  Any questions about anything I just said?

20        A.  No.

21        Q.  You received a subpoena for documents; do

22   you recall that?

23        A.  Yes.

24        Q.  Did you go look for some documents after

25   you got them?

1                    ADAM PERRY KINCAID

2          A.  I did.

3          Q.  And what did you do?

4          A.  I did a keyword search for documents

5     relating to the Ohio congressional map.

6          Q.  And where did you look?

7          A.  I looked on my computer and on an external

8     hard drive.

9          Q.  And did you look at any hard copy files or

10    just the computer and the hard drive?

11         A.  I don't have any personal hard copy files.

12         Q.  Let's take one at a time and let's talk

13    about the computer for a bit.  Was this a computer

14    that you were working with back in 2011?

15         A.  No.

16         Q.  Is this a computer that you later

17    transferred 2011 files to?

18         A.  It would have, yes, a few files from 2011.

19         Q.  Were you in a different job then?

20         A.  Yes.

21         Q.  So you were able to take some of those

22    files to your present job; is that right?

23         A.  Yes.

24         Q.  I should back up.  Is this computer a work

25    computer or a personal computer?

Page 14

1                    ADAM PERRY KINCAID

2        A.  Work computer.

3        Q.  Did you find any documents on your work

4   computer from 2011?

5        A.  Yes.

6        Q.  What kind of documents did you find?

7             MR. SHEEHY:  I'm going to object there

8   since we have withheld documents as privileged under

9   the First Amendment.  We've given you the affidavit

10  describing in general subject matter terms what

11  those documents are, but I'm going to instruct the

12  witness -- unless you can answer the question in the

13  same general subject matter terms, I'm going to

14  instruct the witness not to answer the question or

15  reveal the substance of any of those documents.

16            MR. FRAM:  Let me see if I can sharpen the

17  question a little and help us get past this because

18  I wasn't actually asking about the substance, but

19  thank you for that.

20  BY MR. FRAM:

21       Q.  I was asking about the kind of documents

22  you found.  Were they -- for example, did you find

23  any Maptitude files?

24            MR. SHEEHY:  You can answer the question.

25            THE WITNESS:  I'm just trying to think.

```
1                    ADAM PERRY KINCAID

2              MR. SHEEHY:  If you know.

3      BY THE WITNESS:

4              A.  There was -- yes, I have Maptitude -- well,

5      I have census data from 2010 from Ohio which I would

6      have used in Maptitude and then a block assignment

7      file from the enacted map.

8              Q.  Anything else?

9              A.  In regards to Maptitude, is that what

10     you're asking?

11             Q.  Yes, please.

12             A.  Yes, that's all.

13             Q.  You called it a block assignment file.

14     What is a block assignment file?

15             A.  A block assignment file is a file that

16     matches census geography to a district.  So it would

17     be a block code that's created from the Census

18     Bureau.  It's two columns basically, if you think

19     about it as an Excel document, where one column is

20     the district number and one column is the block, the

21     census block, and that's all it is.

22             Q.  For this -- I take it you take this file

23     and you can load it into Maptitude; is that right?

24             A.  You would be able to load it into

25     Maptitude.
```

1                    ADAM PERRY KINCAID

2        Q.  And then if you drew district lines around

3   a census block -- a group of census blocks you could

4   see which census blocks would be in the district

5   or --

6             MR. SHEEHY:  I'm just going to make sure.

7   You're asking just in general?

8             MR. FRAM:  I'll start with in general.

9   BY THE WITNESS:

10       A.  Yes.  If you loaded a map into Maptitude,

11  following your questions, then yes, you would be

12  able to see which blocks are in which districts in

13  Maptitude.

14       Q.  And was that the case in 2011?  Maptitude's

15  evolved.  I just want to make sure we've got the

16  functionality date lined up.

17       A.  Maptitude has not changed that ability.

18  You could look at blocks within districts in 2011.

19       Q.  And did you do that in 2011 as regards

20  Ohio?

21             MR. SHEEHY:  I'm going to object but ask

22  for clarification.  Regards to Ohio --

23             MR. FRAM:  Congressional district map in

24  Ohio, did you do that?

25             MR. SHEEHY:  In regards to the -- sorry,

1              ADAM PERRY KINCAID

2    we've had this issue before.  The Ohio congressional

3    map from the legislature or any other draft map

4    that --

5    BY MR. FRAM:

6         Q.  Very helpful.  Let's just start out with

7    the broadest possible lens and then we'll narrow it

8    on down, which your counsel has suggested would be

9    helpful.

10              So in any way, at any time in 2011 as

11   regards Ohio did you draw maps around different

12   census blocks?

13        A.  Yes.

14        Q.  Now we'll break it apart.  Did you do it

15   for any draft maps?

16              MR. SHEEHY:  Objection, ambiguous.  What

17   draft maps?

18   BY MR. FRAM:

19        Q.  Well, there were -- well, let me ask a

20   question.  Do you recall there being maps prior to

21   the final enacted map in Ohio?

22        A.  Yes.

23        Q.  You remember, in fact, there were two maps

24   that were enacted in Ohio; do you remember that?

25        A.  Yes.

1              ADAM PERRY KINCAID

2        Q.  If I use the number HB319 for the first, is

3   that consistent with your recollection?

4        A.  I don't remember the actual bill number.

5        Q.  Okay.  Well, I'll call it -- there's the

6   first one, which I'll state for the record is HB319,

7   and there's a second one, which I'll state for the

8   record was HB369.

9            So do you recall there being drafts for the

10  map that ultimately was enacted as the first map,

11  what I'm calling HB319?

12       A.  Draft maps for HB319, yes.

13       Q.  And do you remember there being drafts for

14  the second map which I've identified as HB369?

15       A.  I don't recall drafts for 369.

16       Q.  So just starting with the 319 map, do you

17  recall there being maps -- do you recall drafting

18  any of those -- let me back up.  Bad question.

19           Do you recall creating any draft maps for

20  the map that was finally enacted as 319?

21           MR. SHEEHY:  Again, just a clarification.

22  Official maps or are we talking about a proposed

23  map?

24           MR. FRAM:  Well --

25           MR. SHEEHY:  Official legislative drafts or

Page 19

1                    ADAM PERRY KINCAID

2    proposals?

3    BY MR. FRAM:

4         Q.  Did you do any -- did you create any

5    drafts -- we can try to get more information about

6    what was made of them in some way.  Did you

7    create -- did you do any draft -- did you draft any

8    maps as part of the process of the generation of the

9    319 map in any way?

10        A.  Yes.

11        Q.  And we'll get around to what use was made

12   of those maps, but do you recall about when you

13   started doing that?

14             MR. SHEEHY:  Objection, ambiguous.

15   BY MR. FRAM:

16        Q.  When you started drafting -- the "that" in

17   my question meant the drafting of the maps.

18        A.  You're talking specifically about Ohio?

19        Q.  Yes, please.

20        A.  I don't remember when I started working on

21   anything for Ohio specifically.

22        Q.  Do you recall -- putting aside the exact

23   start date, I'm not asking that, but do you recall

24   generally were you working on it during the summer

25   of 2011?

1          ADAM PERRY KINCAID

2          MR. SHEEHY:  Objection, calls for the

3     witness to speculate.

4          MR. FRAM:  Just if you remember.

5     BY THE WITNESS:

6        A.  I don't remember when I started working on

7     any draft maps for Ohio.

8        Q.  Regardless of when you started, were you

9     working on it in the summer of 2011?

10       A.  Yes, I would have been.

11       Q.  And were you working on them in September

12    2011?

13       A.  Yes.

14       Q.  Were you still working on draft maps in

15    Ohio as you moved into the fall, say in October?

16          MR. SHEEHY:  I'm just going to object

17    again, just ambiguous on the term "draft map."

18    BY THE WITNESS:

19       A.  Are you referring to draft maps for 369 at

20    this point?

21       Q.  Well, either one.  First of all, I want to

22    ask you whether you did it for anything and then we

23    can break it down as to which one it might have

24    been.

25       A.  The reason I'm asking the question is I

1                    ADAM PERRY KINCAID

2    don't recall the exact date 319 was passed and I

3    know that the process for 369 began after that.  So

4    I don't have any recollection of any draft maps for

5    369.  So whatever that date was after 319, I don't

6    have any recollection of any drafts after that

7    point.

8         Q.  I think you said you also looked at a hard

9    drive?

10        A.  Yes.

11        Q.  External hard drive, I think?

12        A.  Yes.

13        Q.  And was this something that you were able

14   to have files from your work in 2011 exported to?

15        A.  Yes.

16        Q.  And do you have that -- do you keep that

17   hard drive in your office or do you keep it at home?

18        A.  I keep it on my person usually.

19        Q.  On your person?

20        A.  Uh-huh.

21        Q.  And what files, if any, did you find on

22   that hard drive?  Again, not going into the content,

23   just the kind of documents.

24             MR. SHEEHY:  And just for the record, I'll

25   issue an objection on First Amendment grounds with

1             ADAM PERRY KINCAID

2    the instruction not to reveal the substance of any

3    of those documents, but you may answer the question

4    as to the general subject matter.

5    BY THE WITNESS:

6       A.  I do not remember the specific files that I

7    took off of -- that I found on the computer versus

8    the external hard drive, but generally speaking, the

9    files would have related to Ohio congressional

10   districts.

11      Q.  Was there any election result data on the

12   files either on the computer or on the hard drive?

13          MR. SHEEHY:  I think at that point I'm

14   going to instruct the witness not to answer the

15   question as that's going into the substance of

16   what's in the documents.

17          MR. FRAM:  Well, so our record's clear, I'm

18   not asking you about the content, just about the

19   general subject matter, whether they had any

20   election results.

21          MR. SHEEHY:  Sorry, Mr. Fram.  Would you

22   mind asking the question again.

23          MR. FRAM:  Sure.  I'm not asking about

24   which elections, I'm not asking about which results.

25   I'm just asking whether or not the general subject

1                    ADAM PERRY KINCAID

2    matter concerned election results in any of the

3    files.

4          MR. SHEEHY:  I think I'm going to maintain

5    my instruction.

6          MR. FRAM:  Okay.

7    BY MR. FRAM:

8       Q.  Now, do you recall if any of the files you

9    had either on your hard drive or your computer

10   included any documents or computer information that

11   you received from Clark Benson of Polidata?

12      A.  Could you be more specific?  You're

13   speaking in regards to the Ohio redistricting or are

14   you talking generally?

15      Q.  Just the Ohio redistricting.

16      A.  I do not recall having any files from Clark

17   Benson.

18      Q.  As regards the Ohio redistricting, did you

19   have any files from Mr. Mark Braden?

20          MR. SHEEHY:  You can answer that specific

21   question.

22   BY THE WITNESS:

23      A.  No.

24      Q.  Shifting over from what you did to look --

25   anything else you did to look for documents I've not

1                    ADAM PERRY KINCAID

2    asked you about?

3        A.  Those would be the only places I could

4    look.  So no.

5            MR. SHEEHY:  I'm sorry.  Are you going to

6    change subjects to something else?

7            MR. FRAM:  I was going to just -- well, not

8    in any profound way.  I was going to ask about

9    preparation for the deposition and go on to

10   something else.  Do you need --

11           MR. SHEEHY:  If you want to go ahead and

12   ask about how he prepared for the deposition that's

13   fine.  I just want to consult for a moment on your

14   election results question.

15           MR. FRAM:  Okay.

16           MR. SHEEHY:  Why don't you go ahead and

17   complete your --

18           MR. FRAM:  Six of one, half dozen the

19   other.

20           MR. SHEEHY:  Go ahead and complete your

21   examination on how he prepared.  That's fine.

22   BY MR. FRAM:

23       Q.  Did you do anything to prepare for this

24   deposition?

25       A.  I met with my attorneys yesterday.

1              ADAM PERRY KINCAID

2        Q.   For about how long?

3        A.   Three or four hours.

4        Q.   Did you review any documents during the

5   course of that meeting?

6        A.   No.

7        Q.   Since the time you gathered documents from

8   your computer or your hard drive have you had a

9   chance to look at any documents regarding Ohio 2011

10  redistricting?

11       A.   In my possession or in the public sphere?

12       Q.   In any way.

13       A.   Yes.

14       Q.   Okay.  And did any of those help you

15  remember something you hadn't remembered before you

16  looked at them?

17       A.   No.

18       Q.   Do you recall what those documents were?

19       A.   Yes.

20       Q.   What were they, please?

21       A.   I went back and looked at a story on an

22  e-mail exchange that happened during the drafting of

23  the Ohio map.

24       Q.   Do you recall the publication, if any, that

25  it was --

1                          ADAM PERRY KINCAID

2         A.   I don't remember the publication, no.

3         Q.   Do you recall what it was about?

4         A.   Ohio congressional redistricting.

5         Q.   And do you recall was it written before the

6    bills were enacted or at some later date?

7         A.   After.

8         Q.   Do you recall about when they were written?

9         A.   Sometime in 2012.

10        Q.   And do you recall what the subject matter

11   was?

12        A.   An e-mail exchange between Tom Whatman, Ray

13   DiRossi, Heather Mann, and myself.

14        Q.   And what do you recall about the content of

15   that document -- or publication?

16        A.   It regarded a change that Mr. Whatman had

17   requested that I facilitate for him.

18        Q.   Just so I understand correctly what we're

19   talking about here, was this something published in

20   the press or was this --

21        A.   It was written about in the press, yes, and

22   it was also -- I think it might have been the League

23   of Women Voters or some group that had published it

24   publicly in 2012.

25        Q.   Was this about the location of the Timken

Page 27

1                    ADAM PERRY KINCAID

2    headquarters?

3         A.  Yes.

4         Q.  We'll get around to that.

5              MR. FRAM:  If you folks need to talk a

6    little bit.

7              MR. SHEEHY:  Just give us five minutes,

8    that's fine.

9                        (A short break was had.)

10              MR. SHEEHY:  Mr. Fram, thank you for the

11    break.  We'll go ahead and withdraw our objection on

12    your question concerning the documents that he

13    reviewed and whether or not they had election

14    results.  If you want to reask your question.

15    BY MR. FRAM:

16         Q.  Did any of the documents you reviewed have

17    election results?

18         A.  Yes.

19         Q.  And we'll ask the next question, which is

20    which elections?

21              MR. SHEEHY:  Go ahead.

22    BY THE WITNESS:

23         A.  I think the documents I reviewed had

24    presidential election results, some statewide

25    constitutional office election results, and I

1                    ADAM PERRY KINCAID

2    believe that's it from my recollection.

3        Q.  Did any of them have what -- let me ask

4    this.  Have you ever heard the phrase "index" used

5    in connection with election results?

6        A.  Yes.

7        Q.  What's your understanding of the word

8    "index"?

9        A.  It's become a nebulous term.  My definition

10   in this context would be a rating of a performance

11   of some sort of geography, whether it be a precinct

12   or a district or a state.

13       Q.  And that could be one election or more than

14   one?

15       A.  It's typically a combination of multiple

16   elections.

17       Q.  But you could pick one, for example, just

18   the 2008 presidential to pick one out of the blue?

19       A.  I wouldn't call that an index.

20       Q.  In your use of the term an index is where

21   you're combining more than one election to do a

22   scoring of a district?

23       A.  Right.

24       Q.  We have a good working term there.  Were

25   there any indices in the files you looked at?

1                ADAM PERRY KINCAID

2       A.   Yes.

3       Q.   For Ohio in 2011 congressional district,

4  correct?

5       A.   Yes.

6       Q.   Do you recall what that index was?

7            MR. SHEEHY:  Can you rephrase the question?

8  I'm not sure what you mean by what the index was.

9            MR. FRAM: You said you saw some index

10  information.  So I'm trying to find out what index,

11  or indices if more than one.

12           MR. SHEEHY:  So you're asking what type of

13  index; is that the question?

14           MR. FRAM:  I was actually asking -- going

15  straight for a question like he said he saw some

16  index information and I just want to know which

17  index or indices.  It could be more than one.  I

18  won't put words in your mouth, maybe it was more

19  than one, but that's what I'm trying to find out.

20           MR. SHEEHY:  You can answer that precise

21  question.

22  BY THE WITNESS:

23       A.   In the documents I reviewed I saw two

24  indices.  One was a PVI, which is the Cook political

25  reports, Parson Voting Index, and the other one was

1                    ADAM PERRY KINCAID

2    an Ohio-specific index.

3         Q.  Let's talk about them one at a time.  PVI

4    is a public piece of information, so hopefully

5    there's no privilege around that.  As you understand

6    it, what is PVI?

7         A.  The PVI is a -- it's a district-specific

8    metric that you'd apply based off of a national

9    result.  So you would take the election results from

10   a district, say, Donald Trump got 56 percent in the

11   seat, and you're only looking in the Cook PVI at the

12   two-party vote, you're not looking at the, you know,

13   actual vote.  It's just the two parties.  They take

14   out everything but Republicans and Democrats and

15   they compare -- technically with the PVI they

16   actually don't look at the Republican vote, they

17   look at the Democrat vote.  Say they would look at

18   the Clinton percentage in a district, compare that

19   to the national number, and then they would look

20   back -- if you're doing it, say, today, you would

21   also look at the 2012 elections.  So you would look

22   at the Obama vote versus Mitt Romney in a district

23   compared to a national number.

24        Q.  Let me see if I understand it right.  The

25   national number is the national number for the

1                    ADAM PERRY KINCAID

2    candidate in the election you described.  So, for

3    example, 2016 for Clinton national number; is that

4    right?

5         A.  That's right.

6         Q.  And you compare how Clinton did nationally

7    versus how Clinton did in a particular Ohio

8    district; is that right?

9         A.  Yes.

10        Q.  And if Clinton did, let's say, better in an

11   Ohio district, let's say up around Cleveland than

12   they did nationally, let's say, by a certain number

13   of percentage points, it would be D plus whatever

14   percentage points she did better in that district;

15   is that right?

16        A.  Not off of one.  PVI uses two different

17   elections.

18        Q.  So you take the two elections, okay, and

19   then you average out how the Democrats did

20   nationally; is that what you do?

21        A.  Roughly.  I can walk you through the

22   formula if you want me to.

23        Q.  It's not an average, they do something

24   else?

25        A.  They take the two elections, average those

1                      ADAM PERRY KINCAID

2    together, positive numbers are D plus, negative

3    numbers are R plus, and then it's a decimal.  So you

4    typically multiply by a hundred and that's your

5    actual number.

6        Q.  And then they compare that national number

7    to how that candidate did in the district itself; is

8    that right?

9        A.  Stepping back, yes.

10       Q.  Let's take it a step at a time.  They

11   calculate a national number using two elections; is

12   that right?

13       A.  That's right.

14       Q.  And then they compare that national number

15   to the district number; is that right?

16       A.  Yes.

17       Q.  And the district number is that also based

18   upon two elections?

19       A.  Yes.  It would only be -- yes, it's two

20   elections.  Technically you compare the 2016

21   election to itself and the 2012 election to itself.

22       Q.  Oh, okay.  So you're not averaging 2012 and

23   2016.  You're comparing 2012 to 2012 for national

24   and district; is that right?

25       A.  Let's take a step back.  What you would do

1                    ADAM PERRY KINCAID

2   is you would take the 2016 results in the district

3   and nationally.  So say Hillary Clinton got

4   40 -- well, if you're doing the Cleveland district

5   we'll say 60 percent in some district in Cleveland

6   and got -- what was her national number, 50 point

7   something percent, so we'll say 50 percent, and then

8   in that same district Barack Obama got 75 percent

9   and got 52 percent nationally.

10        Q.  Okay.

11        A.  So you would take the Clinton numbers, the

12  60 minus the 50, so you have plus 10, and you have

13  the Obama number, which would be 75 minus 52, so you

14  get 23, you add those together you get 33, divide

15  that by 2, and that's your PVI, D plus 16.5.

16        Q.  Got it.  Thank you so much.

17        A.  If it's .50001 then it goes to 14 or 13 and

18  then --

19        Q.  There you go.  So you had some PVI data

20  either on your computer or on your hard disk; is

21  that right?

22        A.  I had just the PVI number, not the

23  calculations.

24        Q.  Okay.  But you had the PVI numbers for each

25  congressional district; is that right?

1                    ADAM PERRY KINCAID

2          A.   Yes.

3          Q.   And you had it for the map as enacted?

4          A.   Yes.

5          Q.   Did you have any PVI numbers for any draft

6     maps?

7               MR. SHEEHY:  I'm going to interpose an

8     objection on just vague.  Again, just going back to

9     our ambiguity previously, are we talking about

10    official Ohio maps drawn by the legislature or are

11    we talking about a proposed map?

12    BY MR. FRAM:

13         Q.   We'll start out with any and then we can

14    talk about official.  Did you do any -- other than

15    the final enacted map for which you had PVI

16    information, did you have any draft maps?

17              MR. SHEEHY:  Go ahead.

18    BY THE WITNESS:

19         A.   I haven't reviewed the document since I --

20    you know, since we found them.  So I don't recall

21    having any PVI's for draft maps in my possession --

22         Q.   Now, just in terms of the source of the

23    information, can you get this PVI information for

24    each district from Cook or do you get it from

25    somebody else?

1                  ADAM PERRY KINCAID

2          A.  You can get the final PVI data for a

3    district from the Cook political report.  They make

4    that public.

5          Q.  What about for draft maps, can you get them

6    from somebody else?

7              MR. SHEEHY:  I'm going to pose an objection

8    on the First Amendment.  The question's going to

9    identities of anybody in the association.  Unless

10   you can answer the question without violating the

11   privilege, I'll instruct you not to answer the

12   question.

13   BY THE WITNESS:

14         A.  Could you rephrase the question?

15         Q.  Let me ask the question a different way.

16   Have you ever used PVI information for draft maps in

17   any context, not just Ohio?

18         A.  Yes.

19         Q.  Did you ever do it in any way for Ohio?

20             MR. SHEEHY:  So you're asking him if he did

21   the calculations?

22             MR. FRAM:  Did you ever look at PVI

23   information in Ohio -- regardless of who did the

24   calculation, have you ever looked at PVI information

25   for draft maps in Ohio in 2011.

1                    ADAM PERRY KINCAID

2          MR. SHEEHY:  I'm going to object on the

3    grounds of the First Amendment because that's going

4    to what informed his mental impressions and how he

5    communicated internally within the association.

6    BY MR. FRAM:

7          Q.  So we have an instruction here from your

8    counsel and the way lawyers sometimes do it -- I'll

9    do it this one time.  Are you going to follow your

10   lawyer's instruction not to answer the question?

11         A.  Yes.

12         Q.  You said there was an Ohio-specific index

13   also?

14         A.  Yes.

15         Q.  Do you recall what that was?

16         MR. SHEEHY:  Let me have a moment to

17   consult with him just to protect the privilege.

18         MR. FRAM:  Sure.

19                    (A short break was had.)

20         MR. SHEEHY:  If you could ask your question

21   again.

22         MR. FRAM:  Why don't we go back to the last

23   question before we broke because I have another

24   question in my head which might be better.  If you

25   could please read back the last question.

1                      ADAM PERRY KINCAID

2                    (Record read as requested.)

3           MR. FRAM:  That's pretty much the question

4    I'd like to ask.

5           MR. SHEEHY:  Can you be more specific do

6    you recall what that was because that might help.

7           MR. FRAM:  Do you recall what the index

8    was?

9           MR. SHEEHY:  I'm going to maintain a First

10   Amendment objection because that goes to the mental

11   impressions as to what informed him and his internal

12   communications.

13   BY MR. FRAM:

14      Q.  Have you ever heard of something called the

15   unified index in Ohio in 2011?

16      A.  I don't recall that term.

17      Q.  Do you recall an index of five elections,

18   averaging five elections and a two-party vote in

19   Ohio in 2011?

20           MR. SHEEHY:  I think the answer one way or

21   another is still going to reveal his mental

22   impressions and what formed his mental impressions

23   within the association and his communications within

24   the association.  So I'm going to maintain the First

25   Amendment privilege objection.

1                    ADAM PERRY KINCAID

2            MR. FRAM:  And you're following your -- he

3    called it an objection, but I think he meant an

4    instruction.

5            MR. SHEEHY:  An instruction.

6    BY MR. FRAM:

7        Q.  Are you going to follow that instruction?

8        A.  Yes.

9        Q.  Anything else you can remember about that

10   Ohio index information which you saw in your files?

11           MR. SHEEHY:  I'm going to issue the same

12   instruction on the same grounds of the First

13   Amendment privilege.

14   BY MR. FRAM:

15       Q.  Do you recall if you provided any of those

16   documents to your counsel that had the Ohio index in

17   them?

18           MR. SHEEHY:  You can answer.

19   BY THE WITNESS:

20       A.  Yes.

21       Q.  Do you know whether or not they were

22   produced in this case or not?

23           MR. SHEEHY:  You can answer.

24   BY THE WITNESS:

25       A.  I don't believe anything has been produced

1                    ADAM PERRY KINCAID

2    in this case.

3        Q.  Do you recall how many documents you found

4    that you provided to counsel?

5        A.  I don't recall.

6        Q.  More than five?

7            MR. SHEEHY:  We have his affidavit that was

8    submitted to you that had the document numbers

9    listed.

10           MR. FRAM:  Okay.  Well, I have it here.

11   Then we know the number?

12           MR. SHEEHY:  Yes.

13           MR. FRAM:  That's fair enough.

14   BY MR. FRAM:

15       Q.  Why don't we change subjects a little bit

16   and talk about your personal background.  Your

17   education since high school, if you could please

18   describe that.

19       A.  I went to Florida State University for

20   undergrad, got a bachelor's degree, double majored

21   in history and religion, graduated in 2003.  Then I

22   earned my master's degree at the University of

23   Georgia where I studied public administration

24   specializing in public policy.

25       Q.  Where were you in Georgia, which campus?

Page 40

1                    ADAM PERRY KINCAID

2          A.   Athens.

3          Q.   Did you work with Professor Hood down

4    there?

5          A.   I did.

6          Q.   Did you do any work together on any

7    redistricting projects?

8          A.   No.   I'm sorry.   While I was at UGA?

9          Q.   While you were there, yeah.

10         A.   No.

11         Q.   Have you worked with him since?

12              MR. SHEEHY:   I'm just going to object as to

13   vague, work with him --

14              MR. FRAM:   On redistricting projects.

15              MR. SHEEHY:   Thank you.   You can answer

16   that question.

17   BY THE WITNESS:

18         A.   I've spoken to him about redistricting

19   since.

20         Q.   Did you speak with him at all about Ohio

21   redistricting?

22              MR. SHEEHY:   There I'm going to object on

23   the grounds of First Amendment privilege as Dr. Hood

24   has been involved in various litigation with the

25   Republican party.

Page 41

1                    ADAM PERRY KINCAID

2    BY THE WITNESS:

3         A.  I'm not done with my education if you want

4    me to keep going.

5         Q.  I appreciate that.

6         A.  I also spent one semester at the College of

7    William and Mary in law school.

8         Q.  Did you do any work in computer science in

9    any of your formal education?

10        A.  I had one undergraduate course in computer

11   science, and then in my master's program we worked

12   on SPSS, which is a software package on statistics,

13   and received some training on that and also one day

14   in a GIS lab.  That would be the extent of my

15   computer science education.

16        Q.  When was that GIS lab day?

17        A.  It was in a class.  I don't remember what

18   the class was and I don't remember what day it was.

19        Q.  Do you remember what year it was?

20        A.  I was only in Georgia for two years.  I

21   don't remember which of the two years I had that

22   course.

23        Q.  Did you receive any subsequent training in

24   any GIS software?

25        A.  Could you specify what type of training

1                    ADAM PERRY KINCAID

2    you're talking about?

3         Q.  Did you go to any seminars, lectures,

4    webinars, on-line training, any training whatsoever.

5         A.  Let me take those one at a time.  I never

6    did any webinars or conferences or seminars to learn

7    how to use GIS software.

8         Q.  Did you ever go to any training provided by

9    the Caliper Company?

10        A.  I never went to a Caliper training.

11        Q.  Did you ever get any training of any kind

12   in Maptitude?

13        A.  I taught myself how to use Maptitude.

14        Q.  And did you ask anybody any questions while

15   you were training yourself in Maptitude?

16        A.  Yes.

17        Q.  And who did you ask?

18        A.  Dr. Tom Hofeller and Mike Wild.

19        Q.  When were you having those conversations

20   about Maptitude?

21        A.  I'm sorry?

22        Q.  Around when?

23        A.  That would be February, March of 2011.

24        Q.  Was that your first -- was that when you

25   were learning Maptitude was in February and March

1                    ADAM PERRY KINCAID

2     2011?

3          A.   Yes.

4          Q.   You hadn't worked on it before that?

5          A.   No.

6          Q.   Have you worked on it since 2011?

7          A.   Yes.

8          Q.   Have you worked on other redistricting

9     projects since 2011 in which you used Maptitude?

10         A.   Yes.

11         Q.   How many times?

12         A.   I would have to speculate.   I have no

13    idea.

14         Q.   More than five?

15              MR. SHEEHY:   Objection asking the witness

16    to speculate.

17    BY THE WITNESS:

18         A.   Yes.

19         Q.   I'm not asking for an exact number.   I

20    understand that might be speculation.   I'm trying to

21    get basic parameters here.   More than ten?

22         A.   Yes.

23              MR. SHEEHY:   Same objection.

24    BY MR. FRAM:

25         Q.   More than 20?

1                    ADAM PERRY KINCAID

2              MR. SHEEHY:  Same objection.

3    BY THE WITNESS:

4         A.  Yes.

5         Q.  More than 30?

6              MR. SHEEHY:  Same objection.

7    BY THE WITNESS:

8         A.  Yes.

9         Q.  More than 40?

10             MR. SHEEHY:  Same objection.

11   BY THE WITNESS:

12        A.  Yes.

13        Q.  More than 50?

14             MR. SHEEHY:  Same objection.

15   BY THE WITNESS:

16        A.  Can I ask a little bit more -- since we're

17   getting higher I want to clarify what we're --

18        Q.  Sure.

19        A.  You're talking about projects.  Can you

20   specify what you mean by projects?

21        Q.  Well, that's a good clarification or

22   question on your part.  You've worked on

23   redistricting in different states since 2011; is

24   that right?

25        A.  Yes.

Page 45

1            ADAM PERRY KINCAID

2      Q.   About how many different states?

3           MR. SHEEHY:  I'm just going to pose an

4   objection as to ambiguous on the previous question

5   as to "work" and what you meant by "work."

6   BY MR. FRAM:

7      Q.   Let me break it down a little bit.  What

8   kinds of work have you done in redistricting since

9   2011?

10     A.   What kinds of work?  Are you speaking again

11  specifically about projects, redistricting projects,

12  or are you talking globally about redistricting?  I

13  mean, they are two different things.

14     Q.   What do you mean by "globally"?  When you

15  say that what do you mean?

16     A.   You asked a question have I worked on

17  redistricting in how many states and what has my

18  work been on redistricting, but you were following

19  up on asking about specific projects.  So I'm trying

20  to understand if you're asking about how many states

21  have I done specific projects for or are you asking

22  what work generally have I done on redistricting?  I

23  think they're two different --

24     Q.   Fair enough.  How many states have you done

25  specific redistricting projects on since 2011?

Page 46

1                          ADAM PERRY KINCAID

2        A.   Again, I'm going to ask for some

3   clarification on that.  When you say "projects," can

4   you define what you would call a project?

5        Q.   Since I don't know what you did it's kind

6   of hard for me to do that, isn't it?  I guess what

7   I'm asking is what have you done for different

8   states on redistricting since 2011?

9             MR. SHEEHY:  I think -- if the question is

10  that broad I think I need to assert the First

11  Amendment privilege because now you're asking about

12  internal workings of the association and what those

13  internal -- what the association was doing.

14            MR. FRAM:  I haven't gotten yet to ask what

15  states and what you did.  I'm just asking how many

16  states you worked on for redistricting.

17            MR. SHEEHY:  So I'll issue the instruction

18  if you can answer the question in the general

19  subject matter without revealing the specific

20  internal communications or internal workings.

21  BY THE WITNESS:

22       A.   I cannot honestly answer how many projects

23  I've done on redistricting.

24       Q.   Do you recall even how many states you

25  worked on?

Page  47

1                    ADAM PERRY KINCAID

2          MR. SHEEHY:  Same instruction.

3    BY THE WITNESS:

4        A.  I do not recall.

5        Q.  Do you recall whether or not you worked on

6    more than ten states?

7          MR. SHEEHY:  I'll object to speculation.

8    You can answer.

9    BY THE WITNESS:

10       A.  I think, again, I'm going to ask for some

11   clarification because we still don't know what

12   you're looking for as far as projects.  So if you're

13   speaking projects in -- I just need to know what you

14   mean by "projects."

15       Q.  Well, that's the thing, you seem to be very

16   focused on the word "project" and that wasn't in my

17   question.  I was asking whether or not you did any

18   work in any states on redistricting since 2011?  I'm

19   not using the word "project."

20       A.  I thought you used "project" in your

21   questions.

22       Q.  I did, but I stopped using it because you

23   didn't like it so much.  So now I'm trying to ask

24   you just about the work you did without using that

25   word "project."  It seems to trip us up a little.

1              ADAM PERRY KINCAID

2    So what work did you do -- in how many states did

3    you do redistricting work since 2011?

4              MR. SHEEHY:  That precise question is fine.

5    BY THE WITNESS:

6         A.   50 states.

7         Q.   And do you recall which election cycles you

8    did work on since 2011?  We've had 2012, 2014, 2016,

9    now 2018.  Did you work on -- did you do

10   redistricting work on all those cycles?

11             MR. SHEEHY:  Objection, vague, but go

12   ahead.

13   BY THE WITNESS:

14        A.   Have I been -- so I can understand your

15   question, redistricting -- when you say

16   redistricting work every cycle you mean on

17   different -- I'm trying to understand what that

18   means.

19        Q.   I'm not asking whether you worked on all 50

20   states in every cycle.  I mean, if you did you

21   should tell me.  Did you work on all 50 states in

22   every cycle?

23        A.   No.

24        Q.   But you did work on some states in every

25   cycle?

Page 49

1                    ADAM PERRY KINCAID

2       A.  Yes.

3       Q.  In the work you did did you actually ever

4  draw maps?

5            MR. SHEEHY:  I'm going to issue an

6  objection on First Amendment privilege grounds

7  because now you're getting into the internal

8  workings of the association.

9            MR. FRAM:  I think your counsel is

10 instructing you.  He said objection, but I think he

11 meant instruction.  I don't want to put words in his

12 mouth.

13           MR. SHEEHY:  I'm sorry.  You're right.

14 Objection to protect the First Amendment privilege.

15 Your question is asking for the internal association

16 workings that Mr. Kincaid did for the association,

17 and I'm going to instruct the witness not to answer

18 that question.

19 BY MR. FRAM:

20      Q.  Are you going to follow your counsel's

21 instruction?

22      A.  Yes.

23      Q.  Let's go back to what you did after you

24 finished your studies at the university.  What was

25 your first job after that?

```
1                    ADAM PERRY KINCAID

2        A.   My first job after which?

3        Q.   You had a bachelor's and you also had a

4   master's, if I recall?

5        A.   Right.

6        Q.   Did you have a job right after your

7   bachelor's?

8        A.   Yes.

9        Q.   What was that job?

10       A.   I was a staff director for campus ministry

11  in Tallahassee, Florida for one year after

12  graduation.  I also had that job while in school.

13       Q.   And after that what happened next?  Did you

14  have another job after that?

15       A.   I was a teaching assistant at the

16  University of Georgia.  I received a stipend.

17       Q.   And what was your next job after that?

18       A.   I went and worked with the Georgia

19  Republican party when I graduated in May of 2006.

20       Q.   What did you do there?

21       A.   I was the voter programs director.

22       Q.   What was your next job after that?

23       A.   I was the deputy political director and

24  director of policy and research at the Republican

25  Governors Association.
```

1                        ADAM PERRY KINCAID

2         Q.  What were your job responsibilities there?

3         A.  Everything from polling analysis to state

4    profiles to election analysis.  I did policy

5    research.  Since I had a policy degree I figured I'd

6    use that.  I did some opposition research, the job

7    included events.  It was a lot of different

8    responsibilities.

9         Q.  Did you do anything related to

10   redistricting?

11        A.  The last year I was at the Republican

12   Governors Association we produced a guide to

13   redistricting for the new governors that we had

14   elected in 2010.  None of them had been through a

15   redistricting cycle before and we wanted to give

16   them a one-pager on the process in their states.

17        Q.  After working for the Republican Governors

18   Association what did you do next?

19        A.  I went and worked with the National

20   Republican Congressional Committee as their

21   redistricting coordinator.

22        Q.  And when did you start that job?

23        A.  February 2011.

24        Q.  And that's here in Washington?

25        A.  Yes.

1                    ADAM PERRY KINCAID

2          Q.  And the office is over here on 1st

3   Southeast?

4          A.  Yes.

5          Q.  It's like a four-story building or so,

6   something like that?

7          A.  It's a four-story building.

8          Q.  Do you recall what floor you were on?

9          A.  Second floor.

10         Q.  And so Mr. Whatman was on the floor under

11  you, the 1st floor; is that right?

12         A.  Yes.

13         Q.  The late Dr. Hofeller, did he work in that

14  building?

15         A.  Yes.

16         Q.  Was he on your floor?

17         A.  No.

18         Q.  Do you recall what floor he was on?

19         A.  The third floor.  He might have moved up to

20  the fourth floor later in the cycle.  I can't

21  remember when they moved.

22         Q.  You mentioned Mr. Wild; do I have that

23  right?

24         A.  That's correct.

25         Q.  Did he also work in that building?

Page 53

1                    ADAM PERRY KINCAID

2        A.   He did.

3        Q.   Do you recall which floor he was on?

4        A.   Third floor.   He would have worked wherever

5   Tom was working.

6        Q.   Okay.

7             Do you recall who in that building was

8   working on redistricting in 2011?

9        A.   In the entire building?

10       Q.   In the four floors, yeah.

11       A.   Can you be more specific when you say

12   "working on redistricting"?

13       Q.   Were they involved with any particular

14   state redistricting effort?

15       A.   I'm going to ask for some more

16   clarification again.  When you say "involved in any

17   state redistricting effort," what specifically are

18   you talking about?

19       Q.   I don't know what they were doing so I can

20   only start out with a broad question.  If you knew

21   someone down the hall or upstairs that were working

22   on redistricting in some state.

23             MR. TORCHINSKY:  I think we want to object

24   to relevance on this question.  In 2011 was

25   redistricting across the country?  Every state in

Page 54

```
 1                    ADAM PERRY KINCAID

 2    the country was going through redistricting and

 3    every political person who worked at the RNC would

 4    have at least seen some news report about

 5    redistricting.  So I think our objection goes to

 6    kind of relevance of the question because it was a

 7    nationwide redistricting.

 8              MR. FRAM:  Just so I understand the

 9    resources that were available in the building to

10    work on redistricting, and then we'll follow up with

11    what communications he had with them, if any, about

12    Ohio.

13              MR. TORCHINSKY:  Then ask him what

14    resources were available.

15              MR. FRAM:  First let me ask the question

16    I'm asking and then I'll ask him the next question.

17    BY MR. FRAM:

18         Q.   My first question is who else in the

19    building was working on redistricting in a

20    particular state?  Not reading stuff in the

21    newspaper, but just working on redistricting for

22    particular states?

23              MR. SHEEHY:  You can answer the question to

24    the extent you know.

25    BY THE WITNESS:
```

1                    ADAM PERRY KINCAID

2          A.   As far as staff in the building who had the

3    word "redistricting" in their titles, that would

4    have been Tom Hofeller, Mike Wild, and myself.

5          Q.   Did you communicate with anybody else in

6    the building about Ohio redistricting in 2011?

7          A.   I'm sorry.  I'm going to amend that one.

8    Dale Oldham was also the redistricting counsel at

9    the RNC.

10         Q.   Putting aside the question of who had it in

11   their title and didn't have it in their title, do

12   you recall communicating with anybody in 2011 about

13   Ohio redistricting, people who worked in that

14   building?

15            MR. SHEEHY:   Objection to the form.

16   BY THE WITNESS:

17         A.   Yes.

18         Q.   And who?

19            MR. SHEEHY:   You can answer.

20   BY THE WITNESS:

21         A.   I spoke with a lot of people in my job as

22   the redistricting coordinator in regards to

23   redistricting in Ohio.  My job included advising

24   people as well as other things.  I would have spoken

25   to every member of senior staff at the NRCC about

Page 56

1              ADAM PERRY KINCAID

2    redistricting of Ohio in 2011 or 2012.

3         Q.  Why don't we start listing their names.

4    Who did you talk to?

5         A.  Executive director Guy Harrison; general

6    counsel Jessica First, now Jessica First-Johnston;

7    political director Mike Shields; deputy political

8    director Brock McCleary; likely the communications

9    director Paul Lindsey.  Then after that I couldn't

10   tell you specifically who else would have been -- I

11   would have talked to about Ohio redistricting at the

12   NRCC.

13        Q.  Guy Harrison, what did you talk with Guy

14   Harrison about?

15             MR. SHEEHY:  We're going to object on the

16   grounds of First Amendment privilege, that would

17   reveal internal communications within the

18   association.  I'll instruct the witness to not

19   answer the question unless there's a way that you

20   can answer the question in a general -- you know,

21   give the general subject matter, but beyond that no

22   substance -- I'm going to instruct you not to reveal

23   the substance of any communication.  I will pose the

24   same instruction for everyone Mr. Kincaid just

25   listed.

1              ADAM PERRY KINCAID

2          MR. FRAM:  Can we just assume for the

3   record that I've asked what he talked with each one

4   of them about and you've so instructed?

5          MR. SHEEHY:  Yes.

6   BY MR. FRAM:

7       Q.  And you're following your counsel's

8   instruction for all of them?

9       A.  Yes.

10          MR. SHEEHY:  Again, part of that

11  instruction was if you can answer the question in

12  general -- general subject matter that's fine, but

13  if you can't answer the question that way, then I

14  instruct you not to answer.

15  BY MR. FRAM:

16      Q.  Can you answer the question as to the

17  general subject matters as to any of those

18  individuals?

19      A.  General subject matter would be

20  redistricting.

21      Q.  Can you say anything more specific than

22  that?

23      A.  I don't believe so.

24      Q.  Guy Harrison, did he have an assistant at

25  the time, do you recall, who worked with computers?

1                    ADAM PERRY KINCAID

2         A.   An assistant who worked with computers?

3         Q.   Well, who had a computer, an assistant who

4    had a computer at his or her desk.

5         A.   I'm sure he did.

6         Q.   Do you recall the name of that person?

7         A.   He had two assistants while I was there.  I

8    don't remember the name of the first woman who was

9    his assistant.  The second one I know was Sarah

10   Binion.

11        Q.   Do you recall whether Sarah Binion ever

12   created Excel spreadsheets concerning redistricting

13   in Ohio that you used?

14             MR. SHEEHY:  Objection.  That's going into

15   the internal workings of the association and I'll

16   instruct the witness not to answer the question on

17   First Amendment privilege grounds.

18   BY MR. FRAM:

19        Q.   The same question regarding the other

20   unnamed assistant or Mr. Harrison, do you know

21   whether or not they ever generated spreadsheets that

22   you used in redistricting work in Ohio in 2011?

23             MR. SHEEHY:  Same objection, same

24   instruction.

25             THE REPORTER:  Can we take a quick break?

1                    ADAM PERRY KINCAID

2           MR. FRAM:  Sure.  Let's take a little

3    break.

4                        (A short break was had.)

5    BY MR. FRAM:

6           Q.  In 2011 you were the redistricting

7    coordinator for the National Republican

8    Congressional Committee; is that right?

9           A.  Yes.

10          Q.  Were there people who reported to you?

11          A.  No.

12          Q.  Did you have a team that you worked with?

13          A.  A team that I worked with -- can you be

14   more specific about what you mean?

15          Q.  I don't know.  I don't know how you were

16   organized.  That's why I'm asking.

17          A.  I did not have other staff working with me

18   on redistricting.

19          Q.  How long did you hold that job?

20          A.  That title I had for about a year and a

21   half.

22          Q.  Did you take another title at the NRCC?

23          A.  Yes.

24          Q.  What was that title?

25          A.  I became a southeast regional political

Page 60

1                    ADAM PERRY KINCAID

2     director.

3          Q.  And how long did you have that job?

4          A.  I don't recall.

5          Q.  But during the whole time the Ohio

6     redistricting was going on in 2011 you held the

7     title as the redistricting coordinator for the NRCC;

8     is that right?

9          A.  That's correct.

10         Q.  Then after -- how long were you at the NRCC

11    in your next job?

12         A.  I was there -- I started at the RNC in

13    April 2013.  So I left the NRCC to go to the RNC at

14    that point.

15         Q.  RNC, okay.  And are you still at the RNC?

16         A.  No.

17         Q.  How long were you at the RNC?

18         A.  Until November of 2017.

19         Q.  And then what did you do?

20         A.  I became the executive director of the

21    National Republican Redistricting Trust.

22         Q.  Is that independent from the RNC?

23         A.  Yes.

24         Q.  Back in 2011 -- we mentioned Tom Whatman

25    down there on the first floor of the building.  So

```
 1                  ADAM PERRY KINCAID
 2      you knew Tom Whatman back in 2011?
 3           A.  Yes.
 4           Q.  When's the first time you met Tom Whatman?
 5           A.  Sometime in the summer of 2011.
 6           Q.  In the summer of 2011, not before?
 7           A.  Yes.
 8           Q.  Do you recall how long he'd been in the
 9      building before the summer?
10           A.  No.
11           Q.  Do you recall the circumstances under which
12      you met?
13           A.  No.
14           Q.  Do you recall why you met?
15           MR. SHEEHY:  Objection on First Amendment
16      privilege grounds.  I will instruct the witness to
17      not answer the question unless there's a way you can
18      answer the question without revealing the internal
19      communications of the association.
20      BY THE WITNESS:
21           A.  Can you repeat the question?
22           Q.  Do you recall why you met Tom Whatman in
23      the summer of 2011?
24           A.  I do not recall why I first met Tom Whatman
25      in 2011.
```

Page 62

1                    ADAM PERRY KINCAID

2        Q.  Did you have conversations with Tom Whatman

3   in 2011 about Ohio redistricting?

4        A.  Yes.

5        Q.  Do you recall the content of any of those

6   conversations?

7            MR. SHEEHY:  I'll issue a cautionary

8   instruction.  I think you can answer the precise

9   question asked and we'll take it from there.  Do not

10  reveal any substance of the communications under the

11  First Amendment privilege.

12  BY THE WITNESS:

13       A.  Do I remember the --

14       Q.  Content of any of your communications with

15  Tom Whatman in 2011 regarding Ohio redistricting.

16       A.  Yes.

17       Q.  What do you recall about the content of

18  those communications?

19            MR. SHEEHY:  With that I will issue the

20  instruction on the First Amendment privilege to not

21  reveal any of the internal communications within the

22  association.

23  BY MR. FRAM:

24       Q.  Do you recall -- by the way, so we're clear

25  about communications, I'm including voice-to-voice

1                    ADAM PERRY KINCAID

2    communications, in-person communications, or e-mail

3    communications.  Do you understand?

4         A.  Yes.

5         Q.  And I'm asking whether you recall the

6    content of any of those communications as I've

7    broadly defined them?

8              MR. SHEEHY:  Same instruction.

9    BY THE WITNESS:

10        A.  Yes.

11        Q.  And can you tell me about the content of

12   any of those communications?

13             MR. SHEEHY:  Same instruction to not reveal

14   any of the substance of the internal communications

15   of the association.

16   BY MR. FRAM:

17        Q.  Was Mr. Whatman a member of the NRCC in

18   2011?

19             MR. SHEEHY:  Objection, lack of foundation.

20   BY MR. FRAM:

21        Q.  Well, do you recall what organization

22   Mr. Whatman was working for in 2011?

23        A.  Yes.

24        Q.  What was that?

25        A.  He worked with Team Boehner.

Page 64

```
 1                    ADAM PERRY KINCAID

 2        Q.  And do you know did Team Boehner -- what

 3   Team Boehner's relationship was with the NRCC?

 4        A.  I don't know the nature of their

 5   relationship.

 6        Q.  Was Mr. Whatman an employee of the NRCC?

 7            MR. SHEEHY:  Objection, lack of foundation.

 8   BY MR. FRAM:

 9        Q.  Were there employees of the NRCC?

10        A.  Yes.

11        Q.  Were you an employee of the NRCC?

12        A.  Yes.

13        Q.  Was Mr. Whatman an employee of the NRCC?

14            MR. SHEEHY:  Objection, lack of foundation.

15            MR. FRAM:  If you know.

16            MR. SHEEHY:  You may answer.

17   BY THE WITNESS:

18        A.  I don't know.

19        Q.  Do you know who paid Mr. Whatman in 2011?

20        A.  I don't know.

21        Q.  When you were talking with Mr. -- when you

22   were communicating with Mr. Whatman about

23   redistricting in Ohio in 2011 was it your

24   understanding you were communicating with someone

25   who was a member of the NRCC?
```

1               ADAM PERRY KINCAID

2       A.   Can you clarify "member"?

3       Q.   Well, your counsel has instructed several

4  times about communications among the association.

5  Were there members of the association?

6       A.   Yes.

7       Q.   Was he one of them?

8       A.   Again, I think there's some -- you need to

9  clarify.  Are you talking about the association -- I

10  think we need some clarification on the association

11  broadly versus the association meaning the NRCC.

12            MR. SHEEHY:  And I'll just pose the

13  objection asking for a legal conclusion.

14  BY MR. FRAM:

15       Q.   Do you have an understanding what the

16  association is broadly beyond the NRCC itself?

17       A.   Yes.

18       Q.   What is that?

19       A.   The association broadly being Republicans.

20            MR. FRAM:  Counsel, so our record's clear

21  in terms of communication, you've instructed many

22  times now about communications among the association

23  and I don't want to have an unclear record.  Are you

24  talking about communications among Republicans?

25            MR. SHEEHY:  I would refer you, Mr. Fram,

Page 66

ADAM PERRY KINCAID

1

2  to the affidavit that Mr. Kincaid has submitted as

3  well as the affidavit that Mr. Winkleman has

4  submitted.  Mr. Winkleman in his affidavit defines

5  the association as including Team Boehner,

6  communications with Mr. Whatman within the NRCC, as

7  well as -- Mr. Winkleman's affidavit defines the

8  parameters of the association.

9          MR. FRAM:  Thank you.  I just wanted that

10  clear on the record.

11          MR. TORCHINSKY:  Let me also include in

12  that John Boehner at the time was the Speaker of the

13  House and a member of the NRCC by virtue of being a

14  Republican elected member of Congress.

15          MR. SHEEHY:  And that is spelled out in

16  Mr. Winkleman's affidavit.

17  BY MR. FRAM:

18      Q.  Do you have any understanding as to why

19  Mr. Whatman was working on redistricting in Ohio in

20  2011?

21          MR. SHEEHY:  You can answer the precise

22  question asked.

23  BY THE WITNESS:

24      A.  Yes.

25      Q.  And why?  Why was he working on it?

1                ADAM PERRY KINCAID

2        A.  My understanding was that he was designated

3    as the point person for liaising with the Ohio

4    legislature on behalf of Team Boehner.

5        Q.  Let's go back to the work you were doing

6    regarding Ohio redistricting in 2011.

7        A.  Okay.

8        Q.  We'll break it down in terms of specific

9    tasks in a little bit, but just to set the table,

10   what kinds of work were you doing?

11            MR. SHEEHY:  I'm going to instruct the

12   witness on the grounds of the First Amendment

13   privilege not to reveal the substance of the work

14   that you were doing that would reveal the internal

15   workings of the association.  You may answer the

16   question if you can on the general subject matter.

17   BY THE WITNESS:

18       A.  I think I'll refer back to my affidavit

19   where I talked about informing members of Congress

20   on the contours of their districts.  I don't have it

21   in front of me so I don't have the specific

22   language, but I would refer you to that explanation

23   of what I was doing at the NRCC.

24       Q.  Did you draw any maps?

25            MR. SHEEHY:  Objection, vague as to what

1              ADAM PERRY KINCAID

2    maps.

3              MR. FRAM:  Any congressional district maps.

4              MR. SHEEHY:  Still vague, objection.

5              MR. FRAM:  You can answer if there's been

6    no instruction.

7              MR. SHEEHY:  Objection as to what

8    congressional maps, that's the vagueness objection.

9              MR. FRAM:  Did you draw any congressional

10   district maps in Ohio in 2011?

11             MR. SHEEHY:  You can answer.

12   BY THE WITNESS:

13        A.  Yes.

14                  (Kincaid Exhibit 1 was marked

15                   as requested.)

16   BY MR. FRAM:

17        Q.  Why don't we have marked as our first

18   exhibit here a document you referred to a few times,

19   which is your affidavit.  It's entitled "Affidavit

20   of Nonparty Adam Kincaid in Support of his Assertion

21   of First Amendment Privilege" filed in the United

22   States District Court for the Southern District of

23   Ohio and appears to have been signed on

24   September 28, 2018.

25                  I'll start with that last page.  Is that

1                    ADAM PERRY KINCAID

2   your signature?

3        A.  Yes, it is.

4        MR. SHEEHY:  Can we give the witness a

5   moment to sort of review it before you ask your

6   questions.

7   BY MR. FRAM:

8        Q.  Well, When's the last time you read this?

9        A.  September 28, 2018.

10       Q.  Take another look at it.  Take your time.

11  I'm only going to ask about one paragraph, paragraph

12  13 on page 3.

13                    (Witness reviewing document.)

14  BY MR. FRAM:

15       Q.  Do you see that paragraph there?

16       A.  Yes.

17       Q.  When you say "As part of my normal duties

18  as redistricting coordinator I conducted, among

19  other things, analyses of draft redistricting maps

20  and final redistricting maps"; do you see that?

21       A.  Yes.

22       Q.  And that included Ohio congressional

23  district maps in 2011, correct?

24       A.  Yes.

25       Q.  It says here you conducted analyses of

1              ADAM PERRY KINCAID

2  draft redistricting maps.  What analyses did you

3  conduct?

4          MR. SHEEHY:  Objection on the grounds of

5  the First Amendment privilege.  I instruct the

6  witness not to answer the question unless you can

7  answer it in a general subject matter way and not

8  reveal the internal workings of the association.

9  BY THE WITNESS:

10      A.  I think I would refer back to my affidavit,

11  then, in the other section where I've defined it.

12  Since we have it in front of us we might as well

13  look at it.  I wish I had the control F function so

14  I could find in here what I'm looking for.

15          There it is.  Paragraph 12 above, the

16  analyses would have included beneficial assistance

17  to members regarding the contours of their

18  districts.

19      Q.  What did you tell members about the

20  contours of their districts?

21          MR. SHEEHY:  Objection.  I instruct the

22  witness not to answer the question or reveal the

23  substance of any communications within the

24  association.

25  BY MR. FRAM:

Page 71

1                    ADAM PERRY KINCAID

2        Q.  Are you going to follow that instruction?

3        A.  Yes.

4             MR. SHEEHY:  You asked him earlier about

5    the association.  Mr. Winkleman's affidavit pointed

6    out the congressional members are members of the

7    NRCC and therefore part of the association.

8    BY MR. FRAM:

9        Q.  I'm not asking about the content now.  I'm

10   just asking how you communicated with them.  Did you

11   send them spreadsheets?

12            MR. SHEEHY:  That's still the content,

13   you're getting into the content.  So same

14   instruction.

15   BY MR. FRAM:

16       Q.  Did you -- and you're going to follow that

17   instruction?

18       A.  Yes.

19       Q.  Did you have phone calls with them?

20       A.  "With them," are you referring to the

21   members of Congress?

22       Q.  Yes, please.

23       A.  In Ohio?

24       Q.  Yes.

25       A.  No.

ADAM PERRY KINCAID

1

2    Q.  You said you provided analyses in paragraph

3  13 and you say you did that so that the members

4  would know the contours of their districts?

5    A.  Right.

6    Q.  So my question is how did you communicate

7  that information?  I'm not asking what you

8  communicated but how did you communicate it?

9    A.  With the members, in person.

10    Q.  Did you ever communicate with them in

11  writing in any way?

12    A.  Yes.

13    Q.  What kind of writing?  Don't give me the

14  content.  What kind of writing did you give them?

15    A.  Again, I would refer back to analyses of

16  draft maps and final maps.

17    Q.  And those analyses of the maps would that

18  include an actual map?

19    MR. SHEEHY:  You're getting into the

20  content of the communications.  Same instruction on

21  the grounds of First Amendment privilege.

22  BY MR. FRAM:

23    Q.  I understand your counsel has instructed

24  you not to disclose whether you provided

25  spreadsheets or maps.  Did you provide any

1                    ADAM PERRY KINCAID

2    memoranda?

3         A.   I do not recall drafting any memos for

4    members of Congress.

5         Q.   How about e-mails?

6         A.   I do not recall sending e-mails to any

7    members of Congress.

8         Q.   How about to any of their staff?

9         A.   Yes.

10        Q.   So you did provide e-mails to members of --

11   to staff members for members of Congress; is that

12   right?

13        A.   Yes.

14        Q.   And does that include Mr. Whatman?

15        A.   Yes.

16        Q.   Did you provide any memoranda to

17   Mr. Whatman?

18        A.   Could you define "memoranda"?

19        Q.   Well, a piece of paper that's got some

20   words on it, let's start with that.

21        A.   Yes.

22        Q.   Okay.  And I'll take -- you've already said

23   you gave them e-mails.  Now you gave them some other

24   documents with words on it to Mr. Whatman?

25        A.   Yes.

1                    ADAM PERRY KINCAID

2        Q.  And that concerned Ohio redistricting in

3   2011?

4        A.  Yes.

5        Q.  Do you recall any of those words?

6            MR. SHEEHY:  Objection, same instruction on

7   the First Amendment privilege not to reveal the

8   content of communications, the internal

9   communications of the association.

10  BY MR. FRAM:

11       Q.  Did you ever provide -- do you know what a

12  block equivalency file is?

13       A.  It's another word for block assignment

14  file, yes.

15       Q.  Did you ever provide any of those to

16  Mr. Whatman?

17           MR. SHEEHY:  Objection, this is going to

18  the communications of the association, same

19  instruction on the grounds of the First Amendment

20  privilege.

21  BY MR. FRAM:

22       Q.  Did you ever use the phrase "shape file"?

23       A.  Yes.

24       Q.  What's a shape file?

25       A.  A shape file is a -- it's a polygon layered

Page 75

1                    ADAM PERRY KINCAID

2     within -- typically used with Esri software, but can

3     also be used within Maptitude or other GIS software.

4          Q.  Did you ever work with any shape files as

5     regards Ohio redistricting in 2011?

6          A.  I don't recall working with shape files in

7     Ohio.  I'm sorry.  Let me clarify that.  When an

8     Ohio map would have been finalized I would have

9     exported a shape file from Maptitude for the

10    archives of the NRCC, but I would not have worked

11    with a shape file at any point before that.

12         Q.  Did you ever export data in Excel form from

13    Maptitude?

14         A.  Ever?

15         Q.  Ever.

16         A.  Yes.

17         Q.  Did you ever do it in Ohio in 2011?

18         A.  Yes.

19         Q.  Do you recall the contents of any of those

20    Excel sheets?

21             MR. SHEEHY:  You can answer the precise

22    question.

23    BY THE WITNESS:

24         A.  Yes.

25         Q.  Did it include election results in that

Page 76

1                    ADAM PERRY KINCAID

2    information?

3              MR. SHEEHY:  I'm going to pose the First

4    Amendment privilege objection and instruct the

5    witness not to answer the question as it goes to the

6    substance of communications within the association.

7    BY MR. FRAM:

8         Q.  Are you going to follow that instruction?

9         A.  Yes, sir.

10        Q.  Did it include any PVI information?

11             MR. SHEEHY:  Same objection, same

12   instruction.

13   BY MR. FRAM:

14        Q.  Did it include any index information?

15             MR. SHEEHY:  Same objection, same

16   instruction.

17   BY MR. FRAM:

18        Q.  Have you ever met a person named John

19   Moore?

20        A.  Yes.

21        Q.  Have you ever worked with him on

22   redistricting projects, that project word?

23        A.  Yes.

24        Q.  Did you work with him at all concerning

25   redistricting in Ohio in 2011?

1               ADAM PERRY KINCAID

2       A.  No.

3       Q.  Have you ever met someone called Mark

4  Braden?

5       A.  Yes.

6       Q.  Did you ever do any work with him regarding

7  redistricting in Ohio in 2011?

8          MR. SHEEHY:  I'm going to pose an

9  objection.  I think you can answer the precise

10  question asked.

11  BY THE WITNESS:

12      A.  Could you clarify what you mean by "work

13  with"?

14      Q.  Did you ever talk to him?

15      A.  I never spoke with Mark Braden about

16  redistricting in Ohio in 2011.

17      Q.  How about e-mail, did you ever e-mail each

18  other about it?

19      A.  Yes.

20      Q.  Did you ever attend any meetings where he

21  was present where the subject was redistricting in

22  Ohio in 2011?

23      A.  I don't recall being in any meetings with

24  Mark Braden.

25      Q.  Did you ever share any maps with him in

1                    ADAM PERRY KINCAID

2    2011 about Ohio redistricting?

3              MR. SHEEHY:  I'm going to object on the

4    grounds of the First Amendment privilege and

5    instruct the witness not to answer the question as

6    it would refer to communications within the

7    association.

8              MR. FRAM:  This may be covered by one of

9    your instructions.  I apologize in advance if this

10   is asked and answered.

11             MR. SHEEHY:  I forgive in advance.

12   BY MR. FRAM:

13        Q.  Can you tell me about the contents of those

14   e-mails?

15             MR. SHEEHY:  Objection, same instruction on

16   the grounds of the associational privilege under the

17   First Amendment.

18   BY MR. FRAM:

19        Q.  Dr. Hofeller, the late Dr. Hofeller --

20        A.  That's right.

21        Q.  -- did you communicate with him about

22   redistricting in Ohio in 2011?

23        A.  Yes.

24        Q.  What do you recall about those

25   conversations -- those communications?

1                    ADAM PERRY KINCAID

2          MR. SHEEHY:  I'll issue an instruction to

3    not reveal the substance of the communications on

4    the grounds of the associational privilege under the

5    First Amendment.  If you can answer the question as

6    to the general subject matter, you may.

7    BY THE WITNESS:

8          A.  We would talk about redistricting generally

9    and sometimes -- I asked Tom a lot of questions

10   about how to talk to members of Congress about

11   redistricting.  That was a lot of what I talked to

12   Tom about in Ohio, more style than substance.

13          Q.  What style questions do you recall being

14   pertinent to redistricting in Ohio in 2011?

15          MR. SHEEHY:  Same objection and same

16   instruction.  If you can answer just in general

17   subject matter without revealing the internal

18   communications of the association.

19   BY THE WITNESS:

20          A.  I would request advice from Tom on how to

21   best communicate information to members of Congress

22   when meeting with them about the contours of their

23   districts, how to approach those sorts of meetings

24   and how to brief them both effectively and also -- I

25   know this will sound odd, but in a empathetic/

Page 80

ADAM PERRY KINCAID

1

2      sympathetic way and not -- Tom was very good at

3      that.  He was good at communicating that kind of

4      information.

5          Q.  Any particular conversations with any

6      particular members of Congress that you recall being

7      the subject of your conversation with Dr. Hofeller?

8              MR. SHEEHY:  Same objection and

9      instruction.  I think given the question asks for

10     particular, the instruction is not to answer the

11     question.

12     BY MR. FRAM:

13         Q.  Did you communicate with any members of the

14     RNC about redistricting in Ohio in 2011?

15         A.  This is a semantic clarification.  Are you

16     asking about the members of the RNC as a technical

17     term are the 168 members of the Republican National

18     Committee?  Is that what are you referring to?  Are

19     you referring to employees?

20         Q.  That's a very good request for

21     clarification.  Thank you.  Let's start with the

22     actual members themselves and then we'll get to

23     their staff second.  Did you talk to any of the

24     actual members of the RNC about Ohio redistricting

25     in 2011?

Page 81

1                    ADAM PERRY KINCAID

2          A.  I do not recall talking to any of the

3     members of the RNC.

4          Q.  Do you recall talking to any of their

5     staff?

6          A.  Yes.

7          Q.  Who, please?

8          A.  Tom Hofeller and Mike Wild and Dale Oldham.

9          Q.  What do you recall about the conversations

10    with Mr. Wild?

11              MR. SHEEHY:  Objection on the grounds of

12    the First Amendment privilege revealing internal

13    associational communications, and I instruct you to

14    not to reveal the substance of those communications.

15    If you can answer the question with general subject

16    matter, you may.

17    BY THE WITNESS:

18          A.  I would have spoken to Mike Wild about

19    technical issues, things about how to use Maptitude

20    software.

21          Q.  What about how to use Maptitude software,

22    what were those communications?

23              MR. SHEEHY:  Objection to the specific

24    question.  So I'm going to instruct the witness not

25    to answer the question on the grounds of the First

1                    ADAM PERRY KINCAID

2    Amendment privilege.

3    BY MR. FRAM:

4        Q.  Is there anything you can tell me about the

5    general conversations -- general topic of the

6    conversations with Mr. Wild about Maptitude?

7        A.  Mr. Wild was an expert in Maptitude.  He

8    knew how to do things in it that nobody else really

9    knew outside of Caliper it seemed.  So sometimes

10   when I needed help trying to figure out how to

11   export or import something or run a report within

12   Maptitude I would ask Mike for help how to do that.

13       Q.  Did you ever ask him for help on how to

14   export an Excel file?

15       A.  No.  I could figure that out on my own.

16       Q.  And did you?

17       MR. SHEEHY:  Objection on First Amendment

18   privilege grounds and the internal workings of the

19   association.

20   BY MR. FRAM:

21       Q.  Did you ever export an Excel file

22   regarding -- strike that.  Let me start over.

23           In 2011 did you ever export an Excel file

24   regarding congressional districting in Ohio?

25       MR. SHEEHY:  Same objection, same

1                    ADAM PERRY KINCAID

2   instruction on the First Amendment privilege.

3            MR. FRAM:  To make this go further along

4   maybe we could just have a standing -- for this

5   deposition understanding that when you instruct the

6   witness he's following your instruction so I don't

7   have to keep asking if he's following the

8   instruction.  Is that acceptable?

9            MR. SHEEHY:  That's acceptable to me.

10  BY MR. FRAM:

11       Q.  Of course, if you don't want to follow the

12  instruction let us know, but then you better take it

13  outside with him.

14       A.  I'll be following my attorney's

15  instructions.

16       Q.  Okay.

17            Any other staff members of the RNC?

18       A.  I'm sorry.  That I spoke with about the

19  Ohio redistricting in 2011?

20       Q.  Correct.

21       A.  I can't remember who all was on staff at

22  the RNC in 2011, to be honest with you.

23       Q.  Okay.

24       A.  So I couldn't tell you specific staff at

25  the RNC I would have spoken with about

Page 84

1                    ADAM PERRY KINCAID

2    redistricting.

3         Q.  Did I ask you what you recall about those

4    conversations?  I may have missed that one.

5         A.  You haven't asked that question.

6         Q.  Let me ask it, then.  What do you recall

7    about your conversations with Mr. Oldham?

8              MR. SHEEHY:  I'll issue the same

9    instruction on the grounds of the First Amendment

10   privilege.  Do not reveal the communication -- the

11   internal communications within the association.  You

12   may answer the question if you can in a general

13   matter about the subject matter of the

14   communications.  I'd also remind that you Mr. Oldham

15   was redistricting counsel at the RNC and do not

16   reveal any attorney-client communications as well.

17   BY THE WITNESS:

18        A.  I didn't talk to Dale a lot in 2011.  He

19   typically worked with Tom and was running around the

20   country being Dale.  So as far as specific

21   conversations I had with Dale, I don't recall what

22   those conversations would have been about.

23        Q.  Are you familiar with an organization

24   called the RLSC?

25        A.  I don't know an organization call the RLSC.

1               ADAM PERRY KINCAID

2     Q.  I'm sorry.  The RSLC.  I apologize.

3     A.  Yes.

4     Q.  What's that?

5     A.  The RSLC is the Republican State Leadership

6  Committee.

7     Q.  And did you talk to anybody at that

8  organization about redistricting in Ohio in 2011?

9     A.  I don't recall talking to anyone at the

10  RSLC about redistricting in Ohio in 2011.

11     Q.  Did you ever talk to any Ohio state

12  political representatives about redistricting in

13  Ohio in 2011?  Let me be very clear.  When I say

14  redistricting here I'm talking about congressional

15  redistricting.

16     A.  When you say "state political

17  representatives" I can tell you're trying to be

18  precise, but I'm not quite sure what the means.

19     Q.  Any members of the Ohio General Assembly

20  whether House or Senate.

21     A.  I didn't speak to any members of the Ohio

22  General Assembly or Senate.

23     Q.  Did you ever communicate with -- let me

24  back up.

25     A.  To my recollection.

1                    ADAM PERRY KINCAID

2         Q.  Did you ever know someone named Bob Bennett

3    in Ohio?

4         A.  I did meet Bob Bennett a few times.

5         Q.  Did you ever communicate with him about

6    congressional redistricting in Ohio in 2011?

7         A.  Only after the fact.

8         Q.  What do you recall about that conversation?

9              MR. SHEEHY:  Objection on the First

10   Amendment privilege grounds.  I instruct the witness

11   to not answer the question if it reveals the

12   internal associational communications of the

13   association.  If you can answer the question in just

14   the general subject matter, that's fine.

15   BY THE WITNESS:

16        A.  I met Mr. Bennett at an event in 2012, I

17   believe.  I can't remember who put the event on, but

18   I just remember meeting him and talking with him.

19        Q.  What do you recall about the conversation?

20             MR. SHEEHY:  Same objection, same

21   instruction.

22   BY MR. FRAM:

23        Q.  Did you ever -- did you ever meet someone

24   named Ray DiRossi?  Let me back up.  Did you ever

25   communicate with someone named Ray DiRossi?

1          ADAM PERRY KINCAID

2      A.  Yes.

3      Q.  In 2011 regarding redistricting in Ohio?

4      A.  Yes.

5      Q.  What do you recall about those

6  communications?

7      A.  Only what I've seen in the press.  We had

8  an e-mail exchange toward the end of the process of

9  drafting the initially passed map in Ohio.  Apart

10  from that I don't have any other recollections of

11  any conversations with Mr. DiRossi.

12      Q.  Did you ever communicate with Heather Mann

13  now Heather Blessing?

14      A.  I didn't know that.  I would say the same

15  thing, the exact same answer for Heather Mann.  I

16  have no recollection apart from what I've seen in

17  the e-mail chain which was made public about

18  communicating with her on Ohio redistricting.

19      Q.  And that e-mail chain concerned the

20  relocation of the Timken headquarters; is that

21  right?

22      A.  It was regarding the Timken headquarters,

23  yes.

24      Q.  I don't mean relocation.  That's a bad

25  question.  The district in which the Timken

1                    ADAM PERRY KINCAID

2    headquarters would be located.

3         A.  Yes, sir.

4         Q.  I'll ask you a few more names if they ring

5    a bell.  In connection with Ohio redistricting in

6    2011, I'll keep my questions narrow there, John

7    Barron?

8         A.  John Barron?  I don't recall that name.

9         Q.  Mike Lenzo?

10        A.  I recall the name, but I don't remember

11   talking to him about redistricting in Ohio in 2011.

12        Q.  Matt Schuler?

13        A.  I don't remember that name.

14        Q.  Troy Judy?

15        A.  Same answer as Mr. Lenzo, I recall the name

16   but I don't remember talking to that person about

17   redistricting in Ohio in 2011.

18        Q.  Beth Hansen?

19        A.  That name sounds familiar.  I know I've

20   talked to that person before I believe, but I don't

21   recall the content of that conversation or whether

22   it pertained to Ohio redistricting in 2011 or not.

23        Q.  Now, you mentioned some members of Congress

24   before as a general group?

25        A.  Yes.

Page 89

1                    ADAM PERRY KINCAID

2        Q.  I want to ask you about individual names

3    and see if you recollect you had a communication

4    with them or not.  Then I'll ask you about the

5    specific content.  Then we'll have an instruction

6    and we'll have a nice record.

7        A.  Okay.

8        Q.  Jim Jordan?

9        A.  I did not meet with Jim Jordan.

10       Q.  Did you communicate with him in any way?

11       A.  Not to my recollection.

12       Q.  Jim Renacci?

13       A.  Yes.

14       Q.  How did you communicate with him?

15       A.  I met with him in person.

16       Q.  What do you recall about that meeting?

17            MR. SHEEHY:  I'm going to instruct the

18   witness to not reveal the substance of the

19   communications as those go to the internal

20   association under the First Amendment privilege.

21   However, if you can answer the question in a general

22   manner just giving the subject matter, then go

23   ahead.

24   BY THE WITNESS:

25       A.  And I'll refer you to paragraph 12 of my

```
 1                    ADAM PERRY KINCAID

 2   affidavit where I would have assisted in providing

 3   him with the contours of his district.

 4        Q.  What do you recall that you talked to him

 5   about regarding the contours of his district?

 6            MR. SHEEHY:  Same objection on the grounds

 7   of the First Amendment privilege, and I think

 8   because it's a more specific question I'm going to

 9   instruct the witness not to answer the question.

10   by MR. FRAM:

11        Q.  What about Steve Austria?

12        A.  Yes.

13        Q.  Was that an in-person meeting or on the

14   phone or by e-mail?

15        A.  In person.

16        Q.  Where was that?

17        A.  NRCC.

18        Q.  And did you meet with him more than once?

19        A.  I don't recall.

20        Q.  Do you recall around when you met with him?

21        A.  Likely -- not specifically, no.

22        Q.  What do you recall about the conversation?

23            MR. SHEEHY:  I'm going to instruct the

24   witness not to answer the question or provide the

25   substance of those communications on the grounds of
```

1                    ADAM PERRY KINCAID

2    the First Amendment privilege as answering the

3    question would reveal internal associational

4    communications.  If you can answer the question by

5    giving general subject matter, you may.

6    BY THE WITNESS:

7         A.  I would have met with Mr. Austria to go

8    over the contours of the district that he would have

9    been drawn into.

10        Q.  And what about those contours do you recall

11   discussing with Mr. Austria?

12             MR. SHEEHY:  Same objection and same

13   instruction.  It's a more specific question.  So

14   I'll instruct you to not answer the question.

15   BY MR. FRAM:

16        Q.  What about Mr. Mike Turner, did you

17   communicate with him?

18        A.  Yes.

19        Q.  In person or --

20        A.  In person.

21        Q.  And here in Washington?

22        A.  Yes.

23        Q.  Do you recall about when you met with him?

24        A.  It would have been around the same time,

25   late summer, early fall.  August-ish, how about

Page 92

1                    ADAM PERRY KINCAID

2    that.

3         Q.   Did these communications with Mr. Turner

4    and Austria in any way concern the fact that they

5    might be paired with each other in the new map?

6              MR. SHEEHY:  I'm going to instruct the

7    witness to not reveal the substance of those

8    communications as they go to the internal

9    association protected under the First Amendment.  If

10   you can reveal the general subject matter of those

11   communications, you may.

12   BY THE WITNESS:

13        A.   My conversations with Mr. Turner and

14   Mr. Austria would have included the contours of

15   their districts.  I think I'll leave it at what the

16   affidavit says.

17        Q.   What about Mr. Steve Stivers?

18        A.   Yes.

19        Q.   Did you meet with him?

20        A.   Yes.

21        Q.   What do you recall about that conversation?

22             MR. SHEEHY:  Same objection and instruction

23   under the First Amendment associational privilege.

24   Again, you can reveal -- if you can answer the

25   question you can provide the general subject matter

1              ADAM PERRY KINCAID

2   of the communication, but not the substance of the

3   communication.

4   BY THE WITNESS:

5         A.   I'll refer you back to paragraph 12 of the

6   affidavit.

7         Q.   That just says you talked about the

8   contours of his district, right?

9         A.   That's right.

10        Q.   That's what you mean when you refer me to

11   the paragraph?

12        A.   Yes, sir.

13        Q.   And now I'm asking you what about the

14   contours?

15            MR. SHEEHY:   Same objection and

16   instruction.

17   BY MR. FRAM:

18        Q.   What about Steve Chabot, C-H-A-B-O-T?

19        A.   Yes.

20        Q.   Did you meet with him in person?

21        A.   Yes.

22        Q.   Here in Washington?

23        A.   Yes, sir.

24        Q.   And more than once about the redistricting

25   in 2011?

1                    ADAM PERRY KINCAID

2          A.   Yes.

3          Q.   Do you recall around when?

4          A.   Around the same timeline, probably August.

5          Q.   Do you recall why you met with him more

6    than once?

7          A.   Yes.

8          Q.   Why?

9               MR. SHEEHY:  I'm going to instruct the

10   witness to not answer the question if answering the

11   question would reveal the substance, the inner

12   workings of the association on the grounds of the

13   First Amendment privilege.

14   BY MR. FRAM:

15        Q.  Did you ever talk to Mr. Chabot about

16   inclusion of Warren County in his district?

17              MR. SHEEHY:  Objection on the grounds of

18   the First Amendment privilege and instruct the

19   witness not to answer the question as that would

20   reveal internal communications within the

21   association.

22   BY MR. FRAM:

23         Q.   What about Mr. Bob Gibbs?

24         A.   Yes.

25         Q.   Did you meet with him in person?

1              ADAM PERRY KINCAID

2         A.   Yes.

3         Q.   Also here in Washington?

4         A.   Yes.

5         Q.   Also in August 2011?

6         A.   Again, I don't want to say August.  Between

7    probably late summer, early fall, around August.

8         Q.   Fair enough.  What do you recall about that

9    conversation?

10             MR. SHEEHY:  Objection on the grounds of

11   the First Amendment privilege and instruct the

12   witness not to reveal the substance of the

13   communication within the association.  If you can

14   answer with general subject matter, you may.

15   BY THE WITNESS:

16        A.   My meeting with Mr. Gibbs would have

17   covered the contours of his district.

18        Q.   Can you tell me anything about what you

19   said about the contours of his district?

20             MR. SHEEHY:  Same objection and

21   instruction, and this time I'll instruct you not to

22   answer the question as that goes to the substance.

23   BY MR. FRAM:

24        Q.   What about Mr. Bob Latta, did you meet with

25   him?

Page 96

```
 1                    ADAM PERRY KINCAID

 2         A.  I believe so, but I don't have any

 3   recollection of meeting with Mr. Latta.

 4         Q.  What about Mr. Steve LaTourette?

 5         A.  Yes.

 6         Q.  In person here in Washington?

 7         A.  Yes.

 8         Q.  What do you recall about that conversation?

 9              MR. SHEEHY:  And I'm going to instruct the

10   witness on the grounds of the First Amendment

11   privilege not to reveal the internal communications

12   within the association.  If you can answer the

13   question without revealing the internal

14   communications of the association, you may.

15   BY THE WITNESS:

16         A.  You asked me about the conversation I had

17   with Mr. LaTourette?

18         Q.  Yes, please.

19         A.  Which conversation?

20         Q.  How many did you have?

21         A.  Multiple.

22         Q.  And how many times?

23         A.  I don't know how many times.

24         Q.  But you met with him more than twice?

25         A.  Often.
```

```
 1                 ADAM PERRY KINCAID

 2        Q.   More than five times?

 3        A.   Yes.

 4        Q.   More than ten times?

 5        A.   Yes.

 6        Q.   More than 20 times?

 7        A.   I don't know.

 8        Q.   Somewhere between 10 and 20?

 9            MR. SHEEHY:  Objection, calling for the

10   witness to speculate.

11            MR. FRAM:  Your best recollection.

12            MR. SHEEHY:  Same objection.  Go ahead.

13   BY THE WITNESS:

14        A.   More than 15, less than 30.

15        Q.   Fair enough.

16             This is in that August, September time

17   frame?

18        A.   Yes, sir.

19        Q.   Were all these in person or some on the

20   phone?

21        A.   Those were all in person.

22        Q.   And they were all about Ohio redistricting;

23   is that right?

24        A.   Yes, sir.

25        Q.   What do you recall about any of those
```

Page 98

1                     ADAM PERRY KINCAID

2      conversations?

3                 MR. SHEEHY:  Same instruction and

4      objection.  If you can answer the question without

5      revealing internal communications within the

6      association, you may.

7      BY THE WITNESS:

8           A.  Mr. LaTourette was responsible for -- let

9      me rephrase that.  Mr. LaTourette would meet with

10     Democrat members of the Ohio delegation and get

11     their input on the Ohio congressional map and would

12     communicate information back to them as well.

13          Q.  And what do you recall about those

14     communications with the Democrats?

15                 MR. SHEEHY:  Objection on the grounds of

16     the First Amendment privilege.  If you can answer

17     the question without revealing the internal

18     communications of the association, you may.

19     BY THE WITNESS:

20          A.  Can you repeat your question?

21          Q.  What did Mr. LaTourette say about what the

22     Democrats were saying about the map?

23                 MR. SHEEHY:  Objection, hearsay.

24                 MR. FRAM:  That's preserved.  We're not

25     doing that here.

```
 1                    ADAM PERRY KINCAID

 2          MR. SHEEHY:  If you can answer the question

 3    without revealing the substance of the

 4    communications as the question is specifically

 5    asking for internal associational communications,

 6    you can answer the question.

 7    BY THE WITNESS:

 8          A.  The Democrats would give Mr. LaTourette

 9    information on precincts or communities that they

10    would like to be in their districts.  Ms. Kaptur and

11    Mr. Kucinich who had been drawn together in a

12    district were interested in the makeup of their

13    parts of those districts, specifically the DMA's,

14    which are the designated market areas of Toledo and

15    Cleveland and how much of each was inside their

16    districts -- their district.  I know Congresswoman

17    Fudge was interested in the precincts and

18    communities that were included in her district, as

19    was Mr. Ryan.

20          Q.  What was Congressperson Fudge interested

21    in?  You said she was interested in what would be

22    her district.

23          A.  Ms. Fudge wanted a district that ran from

24    Cleveland to Akron.

25          Q.  Do you recall what was said back to
```

```
 1                    ADAM PERRY KINCAID

 2   her -- let me back up.  Did she communicate that in

 3   a written request or or through a person?  How was

 4   that communicated?

 5        A.  My understanding is that that was

 6   communicated multiple ways through multiple avenues.

 7        Q.  To whom?

 8        A.  My understanding is that what she wanted

 9   was communicated to the state legislature as well as

10   to Mr. LaTourette.

11        Q.  And do you recall what the response was to

12   her request?

13            MR. SHEEHY:  Objection.  If you can answer

14   the question without revealing internal

15   communications within the association, you may.

16   Objection on First Amendment privilege If you're

17   unable to answer the question.

18   BY THE WITNESS:

19        A.  Could you repeat the question?

20        Q.  Do you recall what the response was to

21   Congressperson Fudge's request to include Akron in

22   her district?

23        A.  I recall that she probably stated she was

24   thrilled by the district that was passed out of the

25   Ohio legislature.  She may not have used the word
```

1           ADAM PERRY KINCAID

2    thrilled but that she was pleased with the district

3    that she was drawn into.

4         Q.  Let me try and be more precise.  Do you

5    recall what the response was by any Republicans to

6    to Ms. Fudge's request to have Akron included in her

7    district?

8              MR. SHEEHY:  I think there I'm going to

9    object on the grounds of First Amendment privilege

10   and instruct you to not answer the question as

11   that's going to the specific communications within

12   the association.

13   BY MR. FRAM:

14        Q.  Do you recall any communications regarding

15   the effect of including Akron in Congressperson

16   Fudge's district on Congressperson Sutton?

17             MR. SHEEHY:  I'm sorry.  Can you repeat the

18   question?

19             MR. FRAM:  Do you recall any communications

20   regarding the impact on Congressperson Sutton of

21   including Akron in Congressperson Fudge's district?

22             MR. SHEEHY:  Objection on the grounds of

23   the First Amendment privilege.  I instruct the

24   witness to answer the question if you can but not

25   reveal any internal associational communications if

1                    ADAM PERRY KINCAID

2    you can answer.

3    BY THE WITNESS:

4         A.   I don't know of any external to the

5    association communications regarding Congresswoman

6    Sutton.

7         Q.   Were there internal communications?

8              MR. SHEEHY:  You can answer that precise

9    question.

10   BY THE WITNESS:

11        A.   Yes.

12        Q.   Can you please tell me what those internal

13   communications were?

14             MR. SHEEHY:  Objection on the grounds of

15   the First Amendment privilege and I instruct the

16   witness not to answer the question as it would

17   reveal internal associational communications.

18   BY MR. FRAM:

19        Q.   Do you recall anything else about your

20   communications with Representative LaTourette

21   regarding congressional redistricting in Ohio in

22   2011?

23             MR. SHEEHY:  And I, again, instruct the

24   witness on the grounds of the First Amendment

25   privilege to not answer the question if doing so

1                    ADAM PERRY KINCAID

2    reveals the internal associational communications.

3    BY THE WITNESS:

4         A.  I'm just thinking.  I don't recall anything

5    additional than what I've already discussed with

6    you.

7         Q.  What about Congressman Jean Schmidt, any

8    communications with Congressperson Schmidt?

9         A.  Yes.

10        Q.  And what did that -- what did those

11   communications concern, please?

12             MR. SHEEHY:  Objection on the grounds of

13   the First Amendment privilege and instruct you to

14   not reveal the substance of any internal

15   associational communications.

16   BY THE WITNESS:

17        A.  And I refer you back to paragraph 12 where

18   I talk about meeting with the members to go over the

19   contours of their districts.

20        Q.  And what do you recall talking with

21   Congressperson Schmidt about as regards the contours

22   of the district?

23             MR. SHEEHY:  Same objection and this time

24   I'll instruct you to not answer the question as

25   doing so would reveal internal associational

1                    ADAM PERRY KINCAID

2    communications.

3    BY MR. FRAM:

4        Q.  What about Congressperson Bill Johnson?

5        A.  Yes.

6        Q.  Did you meet in person with Congressperson

7    Johnson?

8        A.  Yes.

9        Q.  More than one time?

10       A.  I don't recall meeting with him more than

11   once.

12       Q.  Do you recall any conversations as to

13   whether or not he would be paired with

14   Congressperson Gibbs?

15           MR. SHEEHY:  Objection on the grounds of

16   the First Amendment privilege and instruct the

17   witness not to answer the question as it involves

18   substantive internal communications.

19   BY MR. FRAM:

20       Q.  Can you tell me anything about the

21   conversations with Congressperson Johnson about the

22   contours of his district?

23           MR. SHEEHY:  Objection -- same objection,

24   same instruction.

25   BY MR. FRAM:

1              ADAM PERRY KINCAID

2        Q.  What about Congressperson Pat Tiberi?

3        A.  Yes.

4        Q.  Did you meet in person?

5        A.  Yes.

6        Q.  More than once?

7        A.  I believe so.

8        Q.  How many times?

9        A.  I don't recall.

10       Q.  What do you recall about the conversations

11  of those communications?

12            MR. SHEEHY:  Objection on the grounds of

13  the First Amendment privilege and instruct the

14  witness to not reveal the internal communications of

15  the association.  You may answer the question if in

16  answering you don't reveal those internal

17  communications and provide the general subject

18  matter.

19  BY THE WITNESS:

20       A.  As stated in my affidavit, I would have

21  gone over the contours of his district.

22       Q.  And what do you recall about the

23  conversation with Representative Tiberi regarding

24  the contours of his district?

25            MR. SHEEHY:  Same objection and I will

1               ADAM PERRY KINCAID

2    instruct the witness to not answer the question as

3    it's a specific question about the substance of the

4    internal associational communications.

5                        (Kincaid Exhibit 2 was marked

6                         as requested.)

7    BY MR. FRAM:

8         Q.   We're going to mark next as Exhibit 2 a

9    document that's got Bates number -- well, actually

10   it's a multiple-page document with only one Bates

11   number on it because I think it was produced to

12   us -- it may have been electronically in native

13   form.  I'll tell you the number.  It's NRCC-0000,

14   that's four zeros, 31.  So I'll have to refer to the

15   different pages of the document without different

16   Bates numbers.

17        My first question to you, Mr. Kincaid, is

18   whether you've ever seen this PowerPoint before?

19   It's a PowerPoint, I should say for the record, that

20   says at the top "The National Republican

21   Congressional Committee" and there are a series of

22   what might be tabs across the top.  The far left is

23   "Redistricting" and that's the one that's

24   highlighted in this set.  Have you ever seen this

25   before?

1              ADAM PERRY KINCAID

2                  (Witness reviewing document.)

3    BY THE WITNESS:

4         A.  I'm certain I did.

5         Q.  You'll see at the bottom of the first page

6    "Strengthening the majority in 2012"; do you see

7    that?

8         A.  Yes.

9         Q.  In 2011, 2012 you were the redistricting

10   coordinator for the Republican -- the National

11   Republican Congressional Committee, correct?

12        A.  Yes, sir.

13        Q.  Do you recall whether you had any input

14   into this document, the creation of this document?

15        A.  Yes.

16        Q.  Okay.  By the way, do you recall, was there

17   an individual author for this document or was it a

18   collective project?

19        A.  This would be collective.

20        Q.  Were you one of the people who worked on

21   creating it?

22        A.  I would have helped to create the content.

23        Q.  Who else, please?

24        A.  Who else would have created content for

25   this?

1                    ADAM PERRY KINCAID

2        Q.  Yes, please.

3        A.  The Patriot Program would have been -- I

4   think that was Liesl Hickey.  I believe so.  I think

5   that was her title then.  The Drive To 25, Drive To

6   30 pages would be political documents.  So someone

7   in the political department, but I don't know who.

8   I don't recall the name of the person who was in

9   charge of Young Guns at this time.  The maps on the

10  Young Gun pages would have been provided by me, as

11  would the election results and the media market

12  splits.

13       Q.  I'm sorry.  Those media market --

14       A.  The media market splits and the election

15  results would have been provided by me, but the

16  slide was put together by someone else.  The PVI's

17  also would have been provided by me.

18       Q.  Maybe we can locate on which slide the

19  PVI's are, the PVI's you're talking about.  Let's

20  take a little bit of time.  If you look at the --

21  okay.  So just before the -- at the beginning of the

22  second slide of the Young Guns section there's a

23  table that actually has the acronym "PVI" as the far

24  right column; do you see that?

25       A.  Yes.

1                    ADAM PERRY KINCAID

2         Q.   And there's a bunch of numbers, R plus 4

3    and D plus 2 and so forth; do you see that?

4         A.   Yes.

5         Q.   But there's a lot of other tables with R

6    plus numbers and D plus numbers throughout this

7    PowerPoint; do you see that?

8         A.   Yes.

9         Q.   Is it your understanding those are also PVI

10   numbers?

11             MR. SHEEHY:   Can you be specific which

12   slide you're talking about?

13   BY MR. FRAM:

14        Q.   Sure.  Let's take it one at a time.  On the

15   first page are there any -- are any of the numbers

16   on that page PVI numbers?

17        A.   No.

18        Q.   Okay.  On the second page do you see where

19   it says "R seats moved into play by redistricting";

20   do you see that?

21        A.   Yes.

22        Q.   Are any of those PVI numbers?

23        A.   Yes.

24        Q.   And did you provide those numbers?

25        A.   I don't have a date for when this was

1               ADAM PERRY KINCAID

2    created.  If this was before the Cook political

3    report released their official PVI's, then yes.  If

4    it was after, then no.  I don't know when this

5    document was created.  There's no date on it.

6         Q.  Well, that's a good point.  Let's talk

7    about that just a little bit.  If you go back to

8    that Young Guns section, you'll notice that I think

9    for every one of them it says when the -- at least

10   the first one, let's start with Jesse Kelly; do you

11   see that page?

12        A.  I do.

13        Q.  It tells when early voting is going to

14   begin; do you see that?

15        A.  I do.

16        Q.  Does it help refresh your recollection that

17   this was generated before May 17, 2012?

18        A.  That's certainly possible, yes.  I would

19   assume that's correct.

20        Q.  And similarly if you go on to -- each one

21   of these Young Guns will tell you the primary date;

22   do you see that?

23        A.  I do.

24        Q.  And those look like they're in June 2012,

25   right?

1              ADAM PERRY KINCAID

2        A.  Right.

3        Q.  Does it also help refresh your recollection

4   that this was created before June 2012?

5        A.  It tells me that this document was produced

6   before -- the earliest date we have here is May 17.

7   So it would be before May 17th.  What I would not be

8   able to tell you is when the Cook political report

9   released their PVI's.  I don't recall what that date

10  was.  That wouldn't be in here.

11       Q.  And if you go to the second page of the

12  document it says "R seats moved into play by

13  redistricting"; do you see that?

14       A.  I do.

15       Q.  Does it help refresh your recollection this

16  document was created after the redistricting maps

17  had been drawn in 2011?

18       A.  For those states, yes.

19       Q.  So is it your understanding that this

20  document was created sometime between the conclusion

21  of the drawing of the redistricting maps in 2011 and

22  May of 2012?

23       A.  I don't recall when the last state to

24  redistrict was, when that happened.  So I don't

25  think I could tell you that.  What I would say is

1              ADAM PERRY KINCAID

2      that it would be after these states on this page had

3      completed their redistricting.

4          Q.  Okay.

5          A.  Because they would not have appeared on

6      this sheet if they were not complete.

7          Q.  So I understand, as a functional matter

8      this PowerPoint was created after redistricting was

9      completed but before primaries took place; is that

10     right?

11         A.  In those states.  In these states here

12     specifically.

13         Q.  But in terms of putting a time frame around

14     it, I understand 2011 you're not sure about because

15     some of them might have gone into 2012; is that

16     right?

17         A.  Yes.  Some states would have been

18     redistricting into the summer of 2012, which would

19     be past your May 7th date.  So I couldn't tell you

20     what that date would be.

21         Q.  So sometime between the states here, okay,

22     you're saying that they could have been still

23     redistricting in the summer of 2012?

24         A.  No.  If they are on page 2 these states

25     would have been complete by that point.

1              ADAM PERRY KINCAID

2      Q.  Fair enough.  In any event, it's between --

3   this PowerPoint was created to reflect information

4   that existed between the end of redistricting and

5   the beginning of the primaries; is that right?

6           MR. SHEEHY:  Object to form.  Go ahead.

7   BY THE WITNESS:

8      A.  It's possible some of these were

9   pre-primary, some of them were post-primary.  I

10  don't think all -- just because it's on that page

11  doesn't mean it has anything to do with a primary

12  election.  There's a lot of moving pieces here.  So

13  it's not quite that clear.

14     Q.  Was this PowerPoint created at one

15  particular time?

16     A.  No.

17     Q.  It was created over -- okay.  Was it ever

18  presented to any group of people, this PowerPoint?

19          MR. SHEEHY:  Objection, foundation.

20  BY MR. FRAM:

21     Q.  Was this PowerPoint ever presented to

22  anybody?

23          MR. SHEEHY:  Same objection.

24  BY THE WITNESS:

25     A.  Yes.

1                    ADAM PERRY KINCAID

2         Q.  Who was it presented to?

3         A.  I don't know.

4         Q.  Did you ever present this PowerPoint to

5    anybody?

6         A.  No.

7         Q.  Do you recall anybody who did?

8         A.  Do I recall anybody presenting this

9    PowerPoint?

10        Q.  Yes.

11        A.  I don't recall being in a meeting where

12   this PowerPoint was presented.

13        Q.  Was it ever sent to anybody?

14             MR. SHEEHY:  Objection, foundation.

15             MR. FRAM:  I'm not sure where that

16   objection is coming.  Were any versions of this

17   PowerPoint ever sent to anybody?

18             MR. SHEEHY:  You can answer that

19   question.

20   BY THE WITNESS:

21        A.  I have no way of knowing.  I would not have

22   been in possession of this PowerPoint.  So I don't

23   know who it would or would not have been sent to.

24        Q.  Did you ever see this PowerPoint at any

25   time in 2012?

1                    ADAM PERRY KINCAID

2          A.  I saw so many PowerPoints in 2011 and 2012.

3    I couldn't tell you if I saw this PowerPoint or not.

4          Q.  All right.  Let's take a look at the second

5    page.  It says "R seats moved into play by

6    redistricting"; do you see that?

7          A.  Yes.

8          Q.  Did you have any input as regards the

9    content on that page?

10         A.  Yes.

11         Q.  And what was the input that you had,

12    please?

13         A.  I would have been responsible for looking

14    at the old PVI's of these districts and the new

15    PVI's and providing all this information on here and

16    then totaling it up.

17         Q.  In regards to the old PVI and the new

18    PVI's, what do you mean by that?  Difference between

19    redistricting and after?

20         A.  The PVI's in the districts in 2010, when

21    the 2010 elections occurred, versus the PVI's in the

22    upcoming elections for 2012 in the new districts.

23         Q.  And the differences appear in the numbers

24    in the parentheses on the page?  Do you see, for

25    example, for CA10-Denham it says "R plus 5" and then

1                    ADAM PERRY KINCAID

2     "(minus 4)"; do you see that?

3          A.   Yes.

4          Q.   So that minus 4 shows a difference between

5     the two PVI's?

6          A.   Yes.

7          Q.   And what does minus 4 refer to?

8          A.   It would mean that California 10 or more

9     specifically whatever seat Mr. Denham was in before,

10    I don't remember what district, he may have been

11    California 9 or 38 or whatever number it would be,

12    was an R plus 9 is what he was elected in.  Then the

13    new district that he would be running for

14    re-election in in 2012 would be R plus 5.

15         Q.   So minus 4 means a decrease in Republican

16    strength by 4; is that right?

17         A.   That's right.

18         Q.   And then I want to turn to the page that

19    says -- I believe it's the fifth slide in the set.

20    The heading is "R seats moved out of play"; do you

21    see that?

22         A.   I do.

23         Q.   All right.  Did you have any input on this

24    page?

25         A.   Yes.

1                    ADAM PERRY KINCAID

2          Q.   And if you go down to the bottom of the

3    first column you see "OH-12 Tiberi"; do you see

4    that?

5          A.   I do.

6          Q.   That refers to the Ohio 12th Congressional

7    District; is that right?

8          A.   That's correct.

9          Q.   And you see the number there says "R plus 8

10   (plus 9)"; do you see that?

11         A.   I do.

12         Q.   What does that mean, please?

13         A.   It means that Mr. Tiberi would have been

14   elected in a D plus 1 seat in 2010 and then in 2012

15   he was running for re-election in an R plus 8

16   district.

17         Q.   So was that as a result of the

18   redistricting there was a net gain of 9 points in

19   the PVI; is that right?

20              MR. SHEEHY:   Objection to form of that

21   question.

22   BY THE WITNESS:

23         A.   I would say Mr. Tiberi was in a district

24   that was an R plus 8 which was 9 points more

25   Republican than the district he was elected in in

1                    ADAM PERRY KINCAID

2    2010.

3         Q.  His new district was 9 points more

4    Republican?

5         A.  The district he would be running for

6    re-election in in 2012.

7         Q.  Which was the new district drawn in 2011,

8    correct?

9              MR. SHEEHY:  Objection, lack of foundation.

10   BY MR. FRAM:

11        Q.  Well, his district was drawn in 2011,

12   wasn't it?

13        A.  Yes.

14        Q.  And you were involved in the drawing of

15   that district?

16             MR. SHEEHY:  Objection to form and vague

17   and ambiguous.

18             MR. FRAM:  You can answer.  There's no

19   instructions.

20             MR. SHEEHY:  Well, I'll give an instruction

21   if answering the question would reveal the internal

22   communications and workings of the association on

23   the grounds of the First Amendment privilege.

24   BY THE WITNESS:

25        A.  I think you asked two different questions.

1                ADAM PERRY KINCAID

2    If you could --

3         Q.  Let's take them one at a time.  It's a

4    matter of public record, isn't it, that Ohio

5    District 12 was redrawn in 2011, correct?

6         A.  Yes.

7         Q.  And this plus 9 PVI number that appears on

8    this page reflects the difference between that new

9    district that was drawn in 2011 and the prior

10   district that existed before the redistricting,

11   correct?

12        A.  It represents a district between the

13   district Mr. Tiberi was elected in in 2010 and the

14   one he'd be running for re-election in in 2012,

15   yes.

16        Q.  And that one he'd be running for in 2012

17   was the new district that was drawn in 2011,

18   correct?

19             MR. SHEEHY:  Objection, asked and answered.

20             MR. FRAM:  Not yet.

21             MR. SHEEHY:  Same objection.

22   BY MR. FRAM:

23        Q.  It's a pretty simple question which is

24   maybe why -- sometimes questions are so simple you

25   think they're tricky.  They're not.  This one

1                    ADAM PERRY KINCAID

2     here -- sorry to editorialize, but all I'm saying is

3     the district he was running for in 2012 was the

4     district that was drawn in 2011, that's all?

5          A.  Yes.

6          Q.  Similarly going over to Ohio 1, Chabot, do

7     you see that in the second column?

8          A.  I do.

9          Q.  Did you have any input into the information

10    that appears next to -- just to the right of the

11    name Chabot?

12         A.  I did.

13         Q.  And what was your input there, please?

14         A.  It's the same as with the other ones.  I

15    would have provided the data for the slide.

16         Q.  And do you see there it says "R plus 6

17    (plus 7)"; do you see that?

18         A.  Yes.

19         Q.  What's that mean?

20         A.  It means that Mr. Chabot ran for election

21    in 2010 in a D plus 1 seat and would be run for

22    re-election in 2012 in an R plus 6 district.

23         Q.  And if we go to the next line down, "Ohio

24    15 Stivers"; do you see that?

25         A.  I do.

1                    ADAM PERRY KINCAID

2        Q.   And there's information directly to the

3    right of that "R plus 6 (plus 7)"; do you see that?

4        A.   Yes.

5        Q.   What's that mean, please?

6        A.   Would that mean Mr. Stivers was elected in

7    a D plus 1 district and was running for re-election

8    in 2012 in a R plus 6 district.

9        Q.   And you provided that data, correct?

10        A.   I did.

11        Q.   Taking them one at a time starting with

12    Ohio 12, do you know if any of the reasons why

13    Mr. Tiberi's district was now plus 9 for the

14    Republicans?

15              MR. SHEEHY:   Objection on the grounds of

16    the First Amendment privilege and instruct the

17    witness if you can answer the question without

18    revealing the internal communications of the

19    association, you may.

20    BY THE WITNESS:

21        A.   It was R plus 8, plus 9 is the change from

22    the previous district.

23        Q.   Right.

24        A.   And it would be -- Mr. Tiberi had portions

25    of Columbus in his district previously that he did

Page 122

1                    ADAM PERRY KINCAID

2    not have in his district after they were redrawn in

3    2011, which would be why the PVI had changed, a part

4    of why the PVI had changed.

5         Q.   Another part was -- was another part the

6    inclusion of some rural counties to the west of

7    Columbus in District 12?

8              MR. SHEEHY:  Same objection on the grounds

9    of the First Amendment privilege.  You may answer

10   the question without revealing any of the internal

11   communications of the association.

12   BY THE WITNESS:

13        A.   I'd have to look at an old and new map to

14   answer that question.

15        Q.   Fair enough.

16             What about Ohio District 1 where it's now a

17   plus 7, the district itself is R plus 6, do you

18   recall any reasons why that happened?

19             MR. SHEEHY:  Same objection on the grounds

20   of the First Amendment privilege.  You may answer

21   the question unless doing so would reveal the

22   internal associational communications.

23   BY THE WITNESS:

24        A.   Generally speaking, I know that Ohio 1

25   became 7 points more Republican because of the way

1                    ADAM PERRY KINCAID

2    that it was redrawn in 2011.

3         Q.   And did some of that redrawing include the

4    fact that Warren County was now included in District

5    1?

6              MR. SHEEHY:   Same objection and

7    instruction.

8    BY THE WITNESS:

9         A.   That would have been a part of it, yes.

10        Q.   Would another part of it have been the way

11   in which Hamilton County was drawn in 2011?   That's

12   a bad question.

13             Would part of that include the carving out

14   of certain portions of Hamilton County and taking

15   them out of District 1 in 2011?

16             MR. SHEEHY:   Objection on the grounds of

17   the First Amendment privilege.   You may answer the

18   question if doing so does not reveal the internal

19   communications of the association.

20   BY THE WITNESS:

21        A.   Yes, but I'd have to look at an old and new

22   map for specifics.

23        Q.   And let's look at Ohio District 15,

24   Stivers, do you recall any of the reasons why that

25   was now plus 7 in an R plus 6 district?

1                    ADAM PERRY KINCAID

2          MR. SHEEHY:  Same objection on the grounds

3    of the First Amendment privilege.  You may answer

4    unless in doing so reveals internal communications

5    within the association.

6    BY THE WITNESS:

7          A.  Ohio 15 would have become 7 points more

8    Republican for the same reason Ohio 12 became 9

9    points more Republican.  A new district was created

10   in Franklin County and because of that the other

11   districts no longer contained portions of Columbus

12   as they previously had.

13         Q.  And those were heavily Democratic portions

14   of Columbus; is that right?

15         A.  To the best of my recollection, yes.

16         Q.  One last question for you about this

17   document.  It says at the top of the page "R seats

18   moved out of play"; do you see that?

19         A.  I do.

20         Q.  What does that mean?

21         MR. SHEEHY:  Objection on the grounds of

22   the First Amendment privilege.  You can answer the

23   question if your answer does not reveal the internal

24   communications within the association.

25   BY THE WITNESS:

1                    ADAM PERRY KINCAID

2        A.  I think this was an editorial statement.  I

3   couldn't say any more to it than what is here.

4        Q.  Was there any cutoff point or criteria in

5   which a district was to be moved in or out of play?

6            MR. SHEEHY:  Objection, and I think on that

7   one I'm going to instruct the witness to not answer

8   the question because doing so would reveal internal

9   associational communications.

10  BY MR. FRAM:

11       Q.  Do you know who wrote the words "R seats

12  moved out of play"?

13       A.  I don't recall.

14       Q.  Did you review this slide before it was

15  finalized?

16       A.  Yes.

17       Q.  Do you recall telling anybody it wasn't

18  true what was set down in the slide, any of the

19  facts here were wrong?

20            MR. SHEEHY:  Objection on the grounds of

21  the First Amendment privilege.  You're asking for

22  internal associational communications.  I instruct

23  the witness not to answer the question.

24  BY MR. FRAM:

25       Q.  Did you think any of the information on

1              ADAM PERRY KINCAID

2    this slide was wrong when you saw it?  Let me back

3    up.  You did see this slide before it was finalized;

4    is that right?

5         A.  Yes.

6         Q.  You reviewed it for accuracy; is that

7    right?

8         A.  I did.

9         Q.  Did anything about it strike you as

10   inaccurate?

11             MR. SHEEHY:  Objection on the grounds of

12   the First Amendment privilege.  You're asking for

13   his mental impressions on how he would advise the

14   association.  So I'm going to instruct the witness

15   not to answer that question.

16   BY MR. FRAM:

17        Q.  Did you ever tell anybody that there was

18   anything inaccurate about this slide?

19             MR. SHEEHY:  Same objection on the grounds

20   of the First Amendment privilege and instruction.

21             MR. FRAM:  Off the record.

22                  (Whereupon, at 12:38 p.m., the

23                  deposition was recessed, to

24                  reconvene at 1:30 p.m., this

25                  same day.)

Page 127

1              ADAM PERRY KINCAID

2              AFTERNOON SESSION

3                              (1:42 p.m.)

4              ADAM PERRY KINCAID,

5    the witness at the time of recess, having been

6    previously duly sworn, was further examined and

7    testified as follows:

8                    EXAMINATION

9                    (Resumed)

10                   (Kincaid Exhibit 3 and

11                    Exhibit 4 were marked as

12                    requested.)

13   BY MR. FRAM:

14       Q.  We've marked as Exhibit 3 a document with

15   the Bates No. TIBERI-000039, and Exhibit 4 is a

16   document that's the same Bates number but with the

17   word "Metadata" after it.  I'll indicate that we

18   generated the metadata from the document that was

19   provided and we redacted certain work product items

20   in there.

21          MR. SHEEHY:  Mr. Fram, I'll state on the

22   record that we do not stipulate to the accuracy of

23   what is shown in the metadata.

24   BY MR. FRAM:

25       Q.  I'm going to start with -- Mr. Kincaid, the

1                    ADAM PERRY KINCAID

2    reason we're showing you this document is in the

3    metadata under the "Author" row your name appears?

4         A.   Uh-huh.

5         Q.   So I'm going to ask the question do you

6    recall authoring this document, Exhibit 3?  Metadata

7    Exhibit 4 has your name on it indicating --

8    suggesting that you were the author of

9    TIBERI-000039, Exhibit 3.  So my question is do you

10   recall authoring that document?

11        A.   I actually don't recall authoring this

12   document, no.

13        Q.   Do you recall working on the document at

14   all?

15             MR. SHEEHY:  What's the question?

16             MR. FRAM:  Working on it at all.

17   BY THE WITNESS:

18        A.   This specific document, no.  I mean, it's

19   the format that I would use.  I just don't recall

20   the specific document.

21        Q.   When you say "format," did you create

22   district-specific spreadsheets with the content

23   regarding election results?

24        A.   I likely would have.

25        Q.   Just so we're clear, the metadata also

1                    ADAM PERRY KINCAID

2   gives us different dates and it has a creation date

3   of May 19, 2011; do you see that?

4        A.   I do.

5        Q.   And then the last modified date I believe

6   of December 14.   Do you recall modifying these

7   district-specific spreadsheets while you were

8   working on redistricting related to Ohio in 2011?

9        A.   Modify as the process --

10       Q.   Yeah.

11       A.   No, I don't recall updating this as the

12  process went on.

13       Q.   You probably just did it one time and that

14  was it?

15       A.   Based off the format of this document, this

16  looks like something I would have produced at the

17  end of a process.

18       Q.   At the end?

19       A.   Uh-huh.

20       Q.   Okay.  Well, let's talk about -- a couple

21  questions I have about the document.  Do you

22  recall -- do you have any recollection of even

23  having seen this document at any point?

24       A.   You're asking me to go back seven years.

25  It's hard to remember every Excel sheet I looked at

Page 130

1                    ADAM PERRY KINCAID

2    seven years ago.  I don't have a specific memory

3    about this document.

4         Q.  Do you recall looking at district-specific

5    spreadsheets with information of -- with this type

6    of information back in 2011?

7         A.  Yes.

8         Q.  And when I say "this type of information,"

9    let me clarify that a little bit.  You see under

10   "Election results" you see there's six different

11   elections; do you see that?

12        A.  I do.

13        Q.  And do you recall including information

14   about the following elections in these spreadsheets

15   in 2011 regarding specific districts, the 2010

16   governors race; do you see that?

17        A.  I do.

18        Q.  Did you include that?

19        A.  I would have, yes.

20        Q.  And the 2010 attorney general race, would

21   you have included that information?

22        A.  In this document, yes, I did.

23        Q.  And in the 2008 presidential race?

24        A.  Yes.

25        Q.  And the 2006 attorney general race?

1              ADAM PERRY KINCAID

2        A.   Yes.

3        Q.   And the 2006 auditor race?

4        A.   Yes.

5        Q.   And the 2004 presidential election?

6        A.   I see that, yes.

7        Q.   And then you see PVI; do you see that's the

8   next column?

9        A.   I do.

10       Q.   Did you include the PVI information?

11       A.   This PVI is different than the Cook PVI.  I

12   think this is -- this PVI might be an index of these

13   six races, but I don't recall the calculation.  I

14   can tell you that's different than what was in the

15   PowerPoint presentation you showed me a while ago.

16       Q.   I understand that.  Was the reason because

17   you think it's a different index or a different

18   date?

19       A.   I think it's a different index.

20       Q.   Do you have any idea what this index is?

21       A.   Yes.

22       Q.   What is this?

23       A.   I think this would be --

24            MR. SHEEHY:  Objection on the grounds of

25   First Amendment privilege.  I instruct the witness

1                    ADAM PERRY KINCAID

2      you can answer the question so long as you're not

3      revealing any of the internal communications within

4      the association.

5      BY MR. FRAM:

6          Q.   Can you tell me what this PVI is if it's

7      different from the other PVI we talked about?

8          A.   This would be an Ohio-specific index.

9          Q.   What does that mean?

10         A.   It utilizes races from Ohio.  You wouldn't

11     use Ohio races to judge the congressional map in a

12     different state.

13         Q.   But which Ohio information was used for

14     this PVI index?

15         A.   The races here on the sheet.

16         Q.   Was that an average of those races?

17         A.   I don't know how this was calculated.

18         Q.   Let's take a look underneath that -- thank

19     you.  Underneath the "Election results" row there's

20     a small table that says "County" on the left and

21     "Population" and "Percent of district"; do you see

22     that?

23         A.   Yes.

24         Q.   Do you see Franklin there on the top row?

25         A.   Yes.

1                     ADAM PERRY KINCAID

2         Q.   With a population of 216,382; do you see

3    that?

4         A.   Yes.

5         Q.   And then it says "Percent of district

6    30.01 percent"; do you see that?

7         A.   Yes.

8         Q.   Does that mean that under some version of

9    District 12 Franklin County was 30.01 percent of the

10   district?

11        A.   Yes.

12        Q.   Was that your understanding of how it was

13   in the final?

14        A.   That would be my assumption.  I do not

15   know.  I mean, based off the date here, December 14,

16   2011, then it would -- that's my guess.  I don't

17   recall.  To answer your question from before, I

18   don't recall updating this over the course of the

19   process.

20        Q.   So some of Franklin -- okay.  Do you recall

21   whether some of Franklin County was still in

22   District 12 in the final?

23        A.   Yes.

24        Q.   Just less than they're used to be before

25   the redistricting?

```
1                    ADAM PERRY KINCAID

2        A.  I'd have looked at an old map and

3   percentages to answer that question.

4        Q.  I think you testified earlier that a reason

5   why the PVI changed for District 12 was a certain

6   number of votes, Democratic votes were put into a

7   new district?

8        A.  Correct.

9        Q.  And that new district was District 3; is

10  that right?

11       A.  I don't recall the number off the top of my

12  head.

13       Q.  It was around Columbus?

14       A.  Right.

15                      (Kincaid Exhibit 5 and

16                       Exhibit 6 were marked as

17                       requested.)

18  BY MR. FRAM:

19       Q.  We're going to mark as Exhibit 5 a document

20  with NRCC-000012 and Exhibit 6 the metadata for that

21  document with the same Bates number on the bottom as

22  an identifier.  First question for Exhibit 5 have

23  you seen this document before?

24       A.  Yes.

25       Q.  And, in fact, it says on Exhibit 6 once
```

1              ADAM PERRY KINCAID

2    again if you go to "Author" your name shows up; do

3    you see that?

4         A.  I do.

5         Q.  Did you create Exhibit 5?

6         A.  Yes.

7              MR. SHEEHY:  Again, we'll -- go ahead.

8    BY MR. FRAM:

9         Q.  Now, you see that in Exhibit 5 there's a --

10   on the right-hand side there's a set of columns

11   under the general heading of "As of July 25th"; do

12   you see that?

13        A.  I do.

14        Q.  Now, the metadata there's a creation date

15   of March 31, 2011; do you see that?

16        A.  I do.

17        Q.  Do you recall creating this document in the

18   March time frame of 2011 initially?

19        A.  I created the parent document of this in

20   March of 2011.

21        Q.  What do you mean by "the parent document"?

22        A.  Template.

23        Q.  And then you populated it with information

24   a little later; is that right?

25        A.  Yes.

1              ADAM PERRY KINCAID

2       Q.  In fact, you populated the information

3  after July 25 because you've got July 25 information

4  here; is that right?

5          MR. SHEEHY:  Objection to form.

6  BY MR. FRAM:

7       Q.  Do you have any idea when you populated the

8  information?

9       A.  This spreadsheet here says July 25th.  So I

10  would assume July 25th.

11      Q.  Or sometime shortly thereafter?

12      A.  Yeah.

13      Q.  Let's just walk through the document a

14  little bit.

15      A.  Okay.

16      Q.  By the way, anybody else work with you on

17  this document?

18      A.  I don't remember anyone else working with

19  me on this document.

20      Q.  Why did you prepare this document?

21          MR. SHEEHY:  Objection, and I'm going to

22  instruct the witness to not answer that question on

23  the grounds of the First Amendment privilege as that

24  will go to his mental impressions in aiding the

25  association and communications within the

1          ADAM PERRY KINCAID

2    association.

3    BY MR. FRAM:

4          Q.  Let's just take them -- go from right to

5    left, if we could, on the document.  By "the

6    document" I'm talking about Exhibit 5 here.

7               Do you see it says "Current" and there's a

8    bunch of columns under the heading "Current" on the

9    left-hand side; do you see that?

10         A.  I do.

11         Q.  That goes down to district 18 in the bottom

12    row?

13         A.  I do.

14         Q.  Ohio before the redistricting had 18

15    districts, right?

16         A.  It did.

17         Q.  So were these the 18 districts of Ohio

18    before the redistricting, the current?

19         A.  I believe so, yes.

20         Q.  And then you see these four different

21    headings under "McCain," "Bush," "Average," and

22    "PVI"; do you see that?

23         A.  I do.

24         Q.  What's the McCain column?  What are those

25    numbers in the McCain column for each district?

1                    ADAM PERRY KINCAID

2    What do they refer to?

3         A.   That would be the percent of the vote that

4    McCain got in that district in 2008.

5         Q.   And the same thing for the Bush column?

6         A.   2004.

7         Q.   2004, of course.

8              Now, "Average," is that the average of the

9    two?

10        A.   I don't know what the average here is.

11        Q.   What about the "PVI," which PVI are we

12   talking about here?

13        A.   Based off the PowerPoint presentation, this

14   looks like the Cook PVI.

15        Q.   All right.  That's because, for example,

16   Chabot down in Cincinnati, he was in a D plus 1

17   district under the old map, right?

18        A.   Based off the PowerPoint, yes.

19        Q.   And that's consistent with this?

20        A.   Yes.

21        Q.   That's just an example.

22             Then going over to the "As of July 25"

23   column; do you see those?

24        A.   I do.

25        Q.   Okay.  And then just taking the District 1

1                    ADAM PERRY KINCAID

2    row here for a minute to understand what this is

3    telling us, under McCain do you see there are two

4    different columns under McCain; do you see those?

5         A.  I do.

6         Q.  The first one says 52.57 percent.  What

7    does that mean?

8         A.  That would be the share of the vote that

9    John McCain would have gotten in 2008 in this

10   hypothetical District 1.

11        Q.  The as of July 25 District 1?

12        A.  Yes.

13        Q.  And 7.72 percent, what does that refer to?

14   That's the next column over for District 1.

15        A.  That would be the change from the current

16   map to the map as of July 25th.

17        Q.  So does that say that McCain's performance

18   would have been 7.72 percent better under the as of

19   July 25 map compared to what the then-current map

20   was; is that right?

21        A.  Yes.

22        Q.  Okay.  I assume the same points apply to

23   the Bush column; is that correct?

24        A.  Yes.

25        Q.  And to the GO -- you're not sure how the

1                    ADAM PERRY KINCAID

2    average was done, but for the Ohio GOP average the

3    same logic applies?

4         A.  I hadn't gone that far to the right.  Yeah,

5    that's the Ohio GOP average, same thing.

6         Q.  Finally PVI, are we talking about Cook PVI

7    here?

8         A.  This would be the Cook PVI.

9         Q.  So this shows that for CD1, Congressional

10   District 1, it instead of being a D plus 1 district

11   was now going to be an R plus 8 district; is that

12   right?

13        A.  That's what that says, yes.

14        Q.  And therefore in that final column on the

15   far right that's the net change, is that right, on

16   PVI?

17        A.  Yes.

18        Q.  So there's a net change or improvement for

19   the Republicans of 9 points on PVI in the as of July

20   25 congressional district proposed map as compared

21   to the then-current map; is that right?

22        A.  I'm sorry.  Can you ask that again?

23        Q.  Sure.  No. 9 in the far right column, what

24   that means is that the proposed map as of July 25,

25   2011 was 9 points more Republican than the PVI in

1                    ADAM PERRY KINCAID

2     the then-current map which was D plus 1?

3              MR. SHEEHY:  Objection as to which map are

4     we talking about, ambiguous.

5     BY MR. FRAM:

6          Q.  I'll start again.  Is it your understanding

7     there was some proposed map as of July 25, 2011?

8          A.  Yes.

9          Q.  And that's what these numbers refer to?

10         A.  Yes.

11         Q.  Okay.  So I'm going to be talking about

12    that one.

13         A.  Okay.

14         Q.  I'll call that the July 25 map.

15         A.  Okay.

16         Q.  Do we understand each other?

17         A.  Uh-huh.

18         Q.  So the July 25 map was 9 points more

19    Republican than the then-current map on the PVI

20    index; isn't that right?

21         A.  Yes.

22         Q.  And similarly if you go down to CD12,

23    Representative Tiberi, the PVI on the July 25 map on

24    the PVI index was 11 points more Republican than the

25    then-current map; is that right?

1                    ADAM PERRY KINCAID

2           A.   That's what this says, yes.

3           Q.   And if you go down to Congressional

4    District 15 the July 25 map was 7 points more in

5    favor of the Republicans than the then-current map;

6    is that right?

7           A.   Yes, that's what this says.

8           Q.   By the way, when you generated this

9    document did you use Maptitude in any way to help

10   you create it, "this document" being Exhibit 5?

11           MR. SHEEHY:   I think that question goes to

12   his methods in assisting the association and

13   furthering the interest of the association.  So I'm

14   going to instruct the witness not to answer the

15   question on the grounds of the First Amendment

16   privilege.

17   BY MR. FRAM:

18           Q.   Is Maptitude capable of creating -- let me

19   back up.

20           You said you had created a parent map and

21   then you had to populate it with data, right?

22           A.   Yes.

23           Q.   Is Maptitude capable of assisting in that

24   function?

25           A.   You could probably -- Maptitude has a

1                ADAM PERRY KINCAID

2    custom reporting function in it.  So you could

3    create custom reports if you wanted to.

4         Q.  Can custom reports have the information

5    such as that set forth in Exhibit 5?

6         A.  You could create a custom report that would

7    produce that, but not in that format.

8         Q.  Were there any other software tools other

9    than Maptitude that you were working with in 2011

10   that was capable of producing data in the form such

11   as we see in Exhibit 5?

12            MR. SHEEHY:  You can answer.

13   BY THE WITNESS:

14        A.  The data itself, no.  The formatting would

15   have been Microsoft Excel.

16        Q.  In terms of the data itself, was there any

17   software that would be useful in generating that?

18        A.  Just Maptitude.

19        Q.  I think we talked about this.  Maptitude in

20   2011 had an export function that you could export

21   data into Excel?

22        A.  Yes.

23        Q.  Did you ever do that?

24            MR. SHEEHY:  Again, I think that's going to

25   his mental impressions in furthering -- and methods

1                    ADAM PERRY KINCAID

2    in furthering the association.  Objection on First

3    Amendment privilege privilege and instruct the

4    witness not to answer.

5                         (Kincaid Exhibit 7 was marked

6                          as requested.)

7

8    BY MR. FRAM:

9         Q.   7 is an e-mail string, Gmail string.  The

10   overall title of the Gmail is "New idea redraft,"

11   the Bates numbers are LWVOH-000018302, and the

12   earliest in time Gmail at the top of the first page

13   is at Friday September 2, 2011 at 6:41 p.m., an

14   e-mail from you -- well, appears to be from you, it

15   has your name, to Ray DiRossi, Heather Mann, and Tom

16   Whatman.  Take a second to take a look at this

17   e-mail string and I'll ask you a few questions about

18   it.

19              MR. SHEEHY:  The specific question is on

20   18303?

21              MR. FRAM:  Well, I'm sorry, did I say

22   18303?  Let's start with 18302.  I apologize if I

23   misspoke.  I'm going to start with 18302.

24              MR. SHEEHY:  Okay.

25              MR. FRAM:  It starts with 18302 and goes

Page 145

1                    ADAM PERRY KINCAID

2    all the way to 18308.

3                         (Witness reviewing document.)

4    BY THE WITNESS:

5        A.   Okay.

6        Q.   So let's start with the first e-mail that I

7    mentioned, September 2, 2011 at 6:41 p.m.  Now,

8    right after your name there's an e-mail address,

9    akincaid@nrcc.org; do you see that?

10       A.   I do.

11       Q.   Was that your work address in 2011?

12       A.   Yes.

13       Q.   Do you have any reason to doubt that you

14   sent this e-mail to Mr. DiRossi, Ms. Mann, and

15   Mr. Whatman?

16       A.   No.

17       Q.   Do you recall sending it?

18       A.   No.

19       Q.   Do you see Mr. Whatman had an address at

20   teamboehner.com; do you see that?

21       A.   I see that.

22       Q.   Do you recall sending him e-mails to that

23   address?

24       A.   I didn't recall his e-mail address until

25   just now when I read it, but clearly I did.

1                    ADAM PERRY KINCAID

2         Q.  Do you see Ms. Mann and Mr. DiRossi the

3    e-mail was sent to their Gmail accounts; do you see

4    that?

5         A.  I see that.

6         Q.  Do you recall corresponding with them on

7    their Gmail accounts back in 2011 on redistricting

8    in Ohio?

9         A.  Not until you put this in front of me, no.

10        Q.  Do you have any reason to think you didn't

11   send them?

12        A.  No.

13             MR. SHEEHY:  Objection, vague.

14             MR. FRAM:  You're right.

15             Do you recall any reason to think you

16   didn't them e-mails to those e-mail accounts?  Thank

17   you, Counsel.

18             MR. SHEEHY:  Objection.  This e-mail or --

19             MR. FRAM:  In general, the general

20   practice.  Not this particular e-mail, but the

21   general practice, do you have any reason to think

22   that you would not be sending them e-mails about

23   Ohio redistricting to their Gmail accounts?

24             MR. SHEEHY:  Objection, lack of foundation,

25   Objection to form.

1                    ADAM PERRY KINCAID

2    BY THE WITNESS:

3         A.  Based off this e-mail, I clearly sent it to

4    their Gmail address.

5         Q.  Do you have any recollection of what the

6    phrase "new idea redraft" refers to?

7         A.  Having looked at the document, it refers to

8    the map that's outlined here.

9         Q.  Was that your new idea or someone else's

10   new idea?  Whose new idea was it?

11        A.  I don't recall.

12        Q.  The next e-mail you can see there's an

13   attachment you're sending in that e-mail on Friday,

14   September 2, 2011; do you see that?

15        A.  Yes.

16        Q.  And that's a zip file; is that right?

17        A.  That's right.

18        Q.  Do you have any idea what sorts of

19   information you were including in zip files at that

20   time regarding Ohio redistricting in 2011?

21             MR. SHEEHY:  I'll issue a cautionary

22   instruction.  You can answer the question unless in

23   answering you would be revealing the internal

24   communications within the association.

25   BY THE WITNESS:

```
 1                    ADAM PERRY KINCAID

 2        A.  Yes.

 3        Q.  What kind of information were you sending?

 4             MR. SHEEHY:  Same objection and instruction

 5   on the First Amendment privilege.

 6   BY MR. FRAM:

 7        Q.  Are you going to answer the question or are

 8   you not going to answer the question?

 9             MR. SHEEHY:  Your question was in general

10   what types of information?

11             MR. FRAM:  I'll start with in general, but

12   also if you remember in this particular one if you

13   remember what you were sending.

14             MR. SHEEHY:  So that's the question --

15   BY MR. FRAM:

16        Q.  I'll take it either way.  In general were

17   you sending your zip files and do you remember what

18   you were doing on this?  We'll take one at a time if

19   you want.  Let's do this one.  Do you remember what

20   you were sending on this one?

21        A.  I don't recall sending the e-mail until

22   just now.  So I don't recall specifically what this

23   file would be.  I would go back to my affidavit,

24   though, when it comes to what I would be

25   communicating, which would be the contours of
```

1                    ADAM PERRY KINCAID

2     districts.

3          Q.   Maybe I can help you out.   The e-mail

4     itself may help you out a little bit.   If you go a

5     little further down, the next morning, Saturday,

6     September 3, 2011, 8:13 in the morning; do you see

7     that?

8          A.   Yes.

9          Q.   It starts at the bottom of 18302, goes over

10    to 18303; do you see that?

11         A.   Okay.   Yep.

12         Q.   Do you see where it says "Attached are

13    screenshots and a spreadsheet for the block file I

14    sent last night.   I've re-included the block file

15    here as well."   Do you see that?

16         A.   I do.

17         Q.   Does that help you remember that you sent

18    block files in that zip file?

19         A.   Yes, that must be what I sent in the zip

20    file.

21         Q.   This also references you sending a

22    spreadsheet; do you see that?

23         A.   Yes.

24         Q.   And if you look through the attachment --

25    do you see the various little thumbnails of JPG

Page 150

1                    ADAM PERRY KINCAID

2    files; do you see those?

3         A.  Yes.

4         Q.  And then if you go all the way over to

5    18304, after the JPG files there's something called

6    "Ohio changes-new idea redraft.xls"; do you see

7    that?

8         A.  Yes.

9         Q.  And .xls that's an Excel identifier; isn't

10   that right?

11        A.  Yes.

12        Q.  And that would be a spreadsheet?

13        A.  Yes.

14        Q.  Do you recall any reason why you were

15   sending block files and JPG's of maps -- I should

16   back up for a minute.  Do you know what a JPG is?

17        A.  Uh-huh.

18        Q.  What is JPG?

19        A.  It's an image file.

20        Q.  And these are image files of different

21   districts; is that right?

22        A.  These three pictures here and those two,

23   yes, on pages 18303 and 18304 are JPEG images of

24   districts in the Ohio map statewide.

25        Q.  Right.  That last one that says "Ohio new

                        ADAM PERRY KINCAID

1

2       idea redraft.jpg," that's the Ohio statewide image?

3            A.   That's a map of Ohio statewide, yes.

4            Q.   Do you have any reason why you were sending

5       that information to Mr. DiRossi, Ms. Mann, and

6       Mr. Whatman in early September 2011?

7            MR. SHEEHY:  I'll just issue a cautionary

8       instruction.  You can answer the question unless

9       doing so violates the First Amendment privilege by

10      revealing internal associational communications.

11      BY THE WITNESS:

12           A.   Yes.

13           Q.   Why?

14           MR. SHEEHY:  Same objection and

15      instruction.

16           MS. RIGGINS:  Can we take a break for a few

17      minutes?  There are some things in the back of this

18      document that I want to discuss with co-counsel.

19           MR. FRAM:  Of course.

20                (A short break was had.)

21           MR. SHEEHY:  Mr. Fram, I believe a question

22      was pending when we walked out and I just want to

23      put it on the record that neither myself nor

24      Mr. Gordon talked with the witness about your

25      question.  We didn't talk to him about the question.

1                    ADAM PERRY KINCAID

2           MR. FRAM:  Okay.

3           MR. SHEEHY:  Please go ahead and ask your

4    question.

5    BY MR. FRAM:

6        Q.  We were talking about this Excel sheet,

7    "New idea redraft.xls.:

8           MR. SHEEHY:  What page was that?

9           MR. FRAM:  That was on 18304.

10                  (Kincaid Exhibit 8 and

11                   Exhibit 9 were marked as

12                   requested.)

13   BY MR. FRAM:

14       Q.  I'm going to mark next as 8 a document that

15   also has the Ohio changes.  The Excel we were

16   looking at was "Ohio changes - new idea

17   redraft.xls."  This is an Excel spreadsheet also

18   entitled "Ohio changes," but it has Bates

19   No. BRADEN-001387 and we also have some metadata.

20   We'll do that as 8 and then the metadata is 9.

21           I'm going to start with the metadata, which

22   has your name listed as the author of the document,

23   it has a last modified date of September 3, 2011; do

24   you see that?

25       A.  Yes.

1                    ADAM PERRY KINCAID

2          Q.  Do you recall -- have you ever seen this

3    document, Exhibit 8, before?

4          A.  Yes.

5          Q.  Did you create it?

6          A.  Yes.

7          Q.  And, again, you had the parent document

8    that you created back in March, right?

9          A.  That's right.

10         Q.  And then you populated it with data after

11   that, right?

12         A.  Yes.

13         Q.  And do you recall creating it in September

14   2011?

15         A.  That's the date on it, but I don't recall

16   creating it in September 2011.

17         Q.  Now, do you see -- looking at this now

18   together with reference to the .xls attachment back

19   in Exhibit 7, okay, page 18304; do you see that?

20         A.  Yes.

21         Q.  Is this spreadsheet, Exhibit 8, the

22   attachment that we see referenced on Exhibit 7?

23             MR. SHEEHY:  Objection, form.

24   BY THE WITNESS:

25         A.  I couldn't say with certainty unless I saw

1          ADAM PERRY KINCAID

2    the file size.  Same title, though.  So likely.

3          Q.  Look at the heading on the right -- let's

4    go left to right on Exhibit 8.  Once again, we've

5    got "Current"; do you see that?

6          A.  Yes.

7          Q.  And we've got the 18 districts under the

8    old map, right?

9          A.  Yes.

10          Q.  Okay.  And then you go across the top going

11    to the right, okay, there's something called

12    "Franklin County sink hole"; do you see that?

13          A.  I do.

14          Q.  I think you said you created this document?

15          A.  Uh-huh.

16          Q.  What does "Franklin County sink hole" refer

17    to, please?

18              MR. SHEEHY:  I'm going to object on the

19    grounds of the First Amendment privilege and

20    instruct the witness not to answer the question as

21    it would reveal internal communications within the

22    association.

23    BY MR. FRAM:

24          Q.  Does "Franklin County sink hole" refer to

25    the effect of creating a new district in Franklin

1                    ADAM PERRY KINCAID

2    County?

3              MR. SHEEHY:  Same objection, same

4    instruction.

5    BY MR. FRAM:

6         Q.  You testified before that a reason why

7    District 12 had an increased Republican PVI score

8    was because a new district was created in Franklin

9    County.  Do you recall that testimony?

10        A.  Yes.

11             MR. SHEEHY:  Objection, form.

12   BY MR. FRAM:

13        Q.  Does this spreadsheet, in fact, show us

14   just how that new district in Franklin County would

15   increase Republican strength in certain districts?

16             MR. SHEEHY:  Same objection under the First

17   Amendment privilege and instruct the witness not to

18   answer the question on the grounds that it would

19   reveal internal associational communications and

20   mental impressions.

21   BY MR. FRAM:

22        Q.  Did you communicate a spreadsheet at any

23   point to Mr. Braden -- take that back.  Do you know

24   if Mr. Braden received a spreadsheet at any point

25   that indicated the effect of creating the new

1                    ADAM PERRY KINCAID

2     district around Columbus?

3          A.  Do I know if Mr. Braden received a

4     spreadsheet?

5          Q.  Uh-huh.

6          MR. SHEEHY:  Objection.  I think an answer

7     to that question would reveal internal

8     communications within the association.  So objection

9     under the First Amendment privilege and instruct the

10    witness not to answer the question.

11    BY MR. FRAM:

12         Q.  If you look over on -- back on Exhibit 7,

13    pages 18307 through 08, do you see there's an e-mail

14    exchange there from Heather Mann to Mark Braden; do

15    you see that?

16         A.  Yes.

17         Q.  In one of them she's forwarding one of your

18    e-mails; do you see that?

19         A.  I'm sorry.  Who's forwarding my e-mail?

20         Q.  Looks like -- well, looks like Heather Mann

21    is forwarding your new idea redraft e-mail --

22         MR. SHEEHY:  Where are you?

23    BY MR. FRAM:

24         Q.  -- 18308, on September 3, 2011 at 8:15 in

25    the morning; do you see that?

1                      ADAM PERRY KINCAID

2          A.  Yes.

3          Q.  And there's a forward of new idea redraft;

4   do you see that?

5          A.  Yes.

6          Q.  And what's being forwarded is your e-mail

7   of September 3, 2011.  It looks like it was at 8:13

8   in the morning, a couple minutes earlier; do you see

9   that?

10         A.  Yes.

11         Q.  That's the e-mail we've just been

12  discussing back on pages 1803 through 04, is that

13  right, the same text where you say -- where it says

14  here "Attached are screen images and a spreadsheet

15  for the block file I sent last night"; do you see

16  that?

17         A.  Yes.

18         Q.  That's the same e-mail we've been

19  discussing before that had the "Ohio changes-new

20  idea redraft.xls" back on 18304?

21         A.  Yes.  The time stamp is throwing me off.

22  It's a UHC time stamp.

23         Q.  Rather than the American -- you sent it at

24  8:13 in the morning and at 8:15 she sends it over to

25  Mr. Braden and Mr. Braden gave it to us here.

1                    ADAM PERRY KINCAID

2        A.  Okay.

3        Q.  At any time do you recall discussing the

4   Ohio changes spreadsheet with Mr. Braden?

5            MR. SHEEHY:  Objection on the grounds of

6   the First Amendment privilege in that answering the

7   question would reveal internal associational

8   communications protected under the First Amendment

9   and instruct the witness not to answer.

10  BY MR. FRAM:

11       Q.  Do you recall discussing the Franklin

12  County sink hole with anyone at any time?

13           MR. SHEEHY:  Same objection and same

14  instruction.

15  BY MR. FRAM:

16       Q.  Looking down in Exhibit 8 that you created,

17  do you see that last row in the middle "10-open"; do

18  you see that?

19       A.  Yes.

20       Q.  Was that the new district around Columbus

21  that was being proposed?

22       A.  I believe so, yes.

23       Q.  That was going to be a heavily Democratic

24  district, you can tell that by the numbers, can't

25  you?

```
 1                    ADAM PERRY KINCAID

 2         A.  Yes.

 3         Q.  Because you've got numbers here where you

 4  say, for example, McCain only got 29.46 percent of

 5  the vote?

 6         A.  Yes.

 7         Q.  And the PVI looking over at the right has a

 8  D plus 16, right?

 9         A.  Yes.

10         Q.  Now, you know how in Excel you can look at

11  a cell in Excel and there's a way of finding out

12  what the formula is that's used to calculate that;

13  are you familiar with that functionality?

14         A.  Yes.

15                    (Kincaid Exhibit 10 was marked

16                     as requested.)

17  BY MR. FRAM:

18         Q.  Now, we have here a screenshot of this

19  Excel sheet that we were just looking at, Exhibit 8,

20  part of it, just the part that has the Franklin

21  County sink hole part of it, not even all the way to

22  the end.

23         A.  Okay.

24         Q.  Because we got it in native form we were

25  able to extract this and there's a formula at the
```

1              ADAM PERRY KINCAID

2    top that I want to draw your attention to.  It says

3    "Equal average (K3, M3, O3, S3, U3)"; do you see

4    that?

5         A.  Yes.

6         Q.  Like I say, you created this spreadsheet.

7    I'm just wondering if that refreshes your

8    recollection as to what was being averaged in the

9    Ohio GOP average, which columns were being averaged

10   looking at the Excel notations?

11        A.  Yes.

12        Q.  Was it, in fact, the case that what was

13   being averaged was the McCain percentage

14   51.25 percent in column K and then the Bush

15   percentage of 56.24 percent in column M and then it

16   was the 2010 governor rate 55.32 percent in column O

17   and then it was the -- it did not include the 2010

18   attorney general race in column Q, as far as I can

19   see.  It skipped over then to the attorney general

20   race in 2006 55.52 percent in column S and finally

21   the 2006 auditor race of 59.63 percent in column U.

22   Am I reading the Excel right?

23        A.  That's what that average would be.

24        Q.  That was averaging five elections, is that

25   right, not six even though six are shown on the

1                    ADAM PERRY KINCAID

2    chart?

3         A.   That seems to be the case, yes.

4         Q.   And the five are the five I just

5    identified.   Does that refresh your recollection

6    that those were the five races that -- five

7    elections that were used as part of what we call the

8    unified index in 2011 in Ohio?

9         A.   Again, I don't remember it being called the

10   unified index, I don't know where that term comes

11   from, but it does seem to be the average that was

12   used to create the Ohio GOP average as per what it

13   says here.

14        Q.   Thank you.   What you did, that's what the

15   five were?

16        A.   Uh-huh.

17        Q.   Thank you.   Appreciate that.

18                       (Kincaid Exhibit 11 and

19                        Exhibit 12 were marked as

20                        requested.)

21   BY MR. FRAM:

22        Q.   Now, if you look at in Exhibit 7 -- in

23   Exhibit 7 we've got here on 18303 the attachment

24   under "Ohio-new idea redraft-9th District.jpg."

25   It's one of the attachments that you transmitted on

Page 162

1                    ADAM PERRY KINCAID

2    or about Friday, September 2 at 6:41 p.m.

3                    By the way, do you have any doubt you sent

4    these JPEG's?

5        A.   No.

6                    MR. SHEEHY:   Objection, just vague,

7    "these."

8                    MR. FRAM:   The ones identified on that

9    e-mail that's on page 18303 through 04.   Thank you.

10   Appreciate that.

11   BY MR. FRAM:

12       Q.   So looking here at Exhibit 11, which by the

13   way, has Bates No. BRADEN-001388, Mr. Braden

14   produced these to us, does this appear to be the

15   JPEG document that you transmitted?

16                   MR. SHEEHY:   Objection, calls for the

17   witness to speculate.

18   BY MR. FRAM:

19       Q.   If it helps on the metadata, Exhibit 12,

20   you've got the file name "Ohio-new idea redraft-9th

21   District.jpg."   Back on your e-mail of September 2,

22   2011 the title is "Ohio-new idea redraft-9th

23   District.jpg?

24                   MR. SHEEHY:   I'll reiterate the same

25   objection, calls for the witness to speculate.

1                    ADAM PERRY KINCAID

2    BY THE WITNESS:

3         A.  The image isn't necessarily clear.  The

4    only thing throwing me off is the created date here

5    is November 19, 2018 according to the metadata.

6         Q.  Well, that's an interesting story on this

7    2018 dates that we see in some of these metadatas.

8    Everybody is producing documents, searching for

9    documents, and you know how metadata works, the last

10   time somebody messed with the file is the date that

11   shows up, when you printed it, opened it, whatever.

12   If you put aside that for a second --

13        A.  They appear to be the same districts.

14        MR. SHEEHY:  I'll just maintain my

15   objection for the record.

16   BY MR. FRAM:

17        Q.  Now, District 9 you see in the middle in

18   Exhibit 11 it says 09 and underneath that it says

19   "minus 13.48"; do you see that?

20        A.  I see that.

21        Q.  What does "minus 13.48" refer to, if you

22   know?

23        MR. SHEEHY:  I'll issue a cautionary

24   instruction you can answer the question unless doing

25   so would reveal internal communications within the

Page 164

```
 1              ADAM PERRY KINCAID

 2   association.  Objection on the basis of the First

 3   Amendment privilege.

 4   BY THE WITNESS:

 5       A.  Yes.

 6       Q.  What does that mean?

 7           MR. SHEEHY:  I'm going to instruct the

 8   witness to not answer the question as that would

 9   reveal internal associational communications under

10   the First Amendment privilege.

11   BY MR. FRAM:

12       Q.  Did you ever communicate 09 -- excuse me --

13   District 9 had a minus 13.48 scoring.  Did you ever

14   communicate that to anybody?

15           MR. SHEEHY:  You can answer that precise

16   question.

17   BY THE WITNESS:

18       A.  Yes.

19       Q.  Who did you communicate it to?

20       A.  To Ray DiRossi, Heather Mann, and Tom

21   Whatman.

22       Q.  Why?

23           MR. SHEEHY:  Objection.  I'm going to

24   instruct the witness to not answer the question on

25   the grounds of First Amendment privilege.
```

```
1                    ADAM PERRY KINCAID

2    BY MR. FRAM:

3         Q.  Did you do so on or about September 2,

4    2011?

5              MR. SHEEHY:  Objection, vague.  Can you

6    rephrase the question?

7              MR. FRAM:  I'm just asking whether or

8    not -- he said who he sent it to.  I'm just trying

9    to find out -- just reconfirming when he sent it.

10   That's all I asked.

11             MR. SHEEHY:  Okay.  That's fine.

12   BY THE WITNESS:

13        A.  Yes.

14        Q.  Now, District 9 it's kind of got a long

15   shape to it, doesn't it?  It goes all the way out

16   from Toledo all the way over to Cleveland, close to

17   it?

18        A.  Yes.

19        Q.  Do you recall ever talking with anybody

20   about that?  Let me ask you a question.  You've done

21   a lot of redistricting work.  Are you familiar with

22   the concept of compactness?

23        A.  Yes.

24        Q.  Are you familiar with Reock scores and

25   Polsby-Popper scores?
```

1                    ADAM PERRY KINCAID

2          A.  Yes.

3          Q.  Those are different ways of measuring

4    what's called compactness; are you familiar with

5    that?

6          A.  Yes.

7          Q.  Have you ever talked to anybody about

8    whether or not District 9 was sufficiently compact

9    under anybody's idea of compactness?

10             MR. SHEEHY:  You can answer the precise

11   question.

12   BY THE WITNESS:

13         A.  I don't recall.

14         Q.  Have you ever heard the term "snake on the

15   lake"?

16         A.  I have heard the term "snake on the lake."

17         Q.  And that refers to District 9, didn't it?

18         A.  Yes.

19         Q.  Did you ever use the phrase "snake on the

20   lake"?

21         A.  I don't recall using the phrase "snake on

22   the lake."  I might have been quoting someone else

23   saying that, but I don't recall using that term

24   myself.

25         Q.  Do you recall who else might have called

Page 167

1              ADAM PERRY KINCAID

2    District 9 snake on the lake?

3              MR. SHEEHY:  You can answer the question so

4    long as you're not revealing internal communications

5    within the association.

6    BY THE WITNESS:

7         A.  I don't have any recollection of who would

8    have called it snake on the lake.

9         Q.  Do you recall ever looking at any

10   compactness scores for District 9?

11             MR. SHEEHY:  You can answer the precise

12   question.

13   BY THE WITNESS:

14        A.  No.

15        Q.  Did you look at the compactness scores at

16   all when you were doing redistricting work in Ohio

17   in 2011?

18             MR. SHEEHY:  I'm going to object on the

19   grounds that that's going to his mental impressions

20   in providing assistance within the association on

21   the grounds of the First Amendment privilege.

22             MR. FRAM:  That's an instruction?

23             MR. SHEEHY:  Yes, it is.

24                      (Kincaid Exhibit 13 and

25                       Exhibit 14 were marked as

Page 168

1                 ADAM PERRY KINCAID

2                 requested.)

3    BY MR. FRAM:

4       Q.  Why don't we mark next as 13 and 14 Bates

5    No. BRADEN-001389 and then same Bates number but

6    with the word "Metadata" attached.  The metadata is

7    No. 14.

8               MS. RIGGINS:  It just appears that the

9    author has maybe inadvertently been redacted on this

10   and maybe Exhibit 12.

11              MR. FRAM:  No, I don't think that's --

12              MS. RIGGINS:  Or wasn't included.

13              MR. FRAM:  Believe me, if I had the author

14   I would have been delighted to provide it.

15              MS. RIGGINS:  I wanted to make sure because

16   there's no way to verify the author on these.

17              MR. FRAM:  I haven't asked any questions

18   about it.

19              MS. RIGGINS:  I just wanted to be sure

20   because this was produced by Mr. Braden who is an

21   attorney.

22              MR. FRAM:  Right.  The metadata documents,

23   as I understand it, that we have here did not -- not

24   all metadata has author information.  Sometimes you

25   get it, sometimes you don't.

1                    ADAM PERRY KINCAID

2              MS. RIGGINS:  I just wanted to make sure.

3              MR. FRAM:  That's not what we redacted.

4              MS. RIGGINS:  I just wanted to make sure.

5              MR. FRAM:  Okay.  Thank you.

6    BY MR. FRAM:

7         Q.  What we're looking at here on 13, do you

8    recognize what district we're looking at on 13 here?

9         A.  Yes.

10        Q.  Which one is that?

11        A.  It would be Marcia Fudge's district.

12        Q.  That would be 11?

13        A.  11.

14        Q.  There's a number under it "Minus 29.70."

15   Do you know what that means?

16        A.  Yes.

17        Q.  What's that mean?

18             MR. SHEEHY:  I'm going to instruct the

19   witness to not -- if you can answer the question

20   without revealing internal associational

21   communications, you may answer.  Otherwise I

22   instruct you to not answer the question and that's

23   on First Amendment privilege.

24   BY THE WITNESS:

25        A.  I'll just leave that as is.

1                    ADAM PERRY KINCAID

2        Q.   You're not going to answer that one.  Okay.

3             Is this the JPEG that you transmitted on or

4   about September 2, 2011 to Mr. DiRossi, Mr. Whatman,

5   and Ms. Mann looking at the title of the 11th

6   District JPEG?

7             MR. SHEEHY:  I'll just object to lack of

8   foundation, calls for the witness to speculate.

9   BY THE WITNESS:

10       A.   It appears to be.

11                       (Kincaid Exhibit 15 and

12                        Exhibit 16 were marked as

13                        requested.)

14  BY MR. FRAM:

15       Q.   For 15 it's BRADEN-001390 and for 16 it's

16  the same Bates number but with the word "Metadata."

17  Do you see back on Exhibit 7 the next JPEG on 18303

18  is entitled "Ohio-new idea redraft-Hamilton

19  County.jpeg"; do you see that?

20       A.   Yes.

21       Q.   And then looking over at Exhibit 15, does

22  this appear to be a JPEG that depicts Hamilton

23  County?

24            MR. SHEEHY:  Objection, calls for the

25  witness to speculate.

1                    ADAM PERRY KINCAID

2       BY THE WITNESS:

3            A.   It appears to be.

4            Q.   And you see the title in the metadata is

5       "Ohio-new idea redraft-Hamilton County.jpeg"; do you

6       see that?

7            A.   Yes.

8            Q.   And that's the same title as appears on

9       your -- as one of the attachments in your September

10      2011 6:41 p.m. e-mail?

11           A.   Yes.

12           Q.   Which is in Exhibit 7.   Do you have any

13      reason to doubt that you sent this JPEG to

14      Mr. DiRossi, Ms. Mann, and Mr. Whatman on around

15      September 2, 2011?

16              MR. SHEEHY:   Objection, vague as to "this

17      document."

18              MR. FRAM:   I'm sorry.   That you sent the

19      JPEG that appears in BRADEN-001390.

20      BY THE WITNESS:

21           A.   You asked do I have any reason to doubt?

22      No, I do not.

23                      (Kincaid Exhibit 17 and

24                       Exhibit 18 were marked as

25                       requested.)

Page 172

```
 1                    ADAM PERRY KINCAID

 2    BY MR. FRAM:

 3         Q.  17 is BRADEN-001391 and 18 is the same

 4    number with the word "Metadata" attached, and the

 5    title from the metadata is "Ohio-new idea

 6    redraft-Northeast.jpeg."  I'd like to ask you to

 7    please compare that to the last thumb name on page

 8    18303 in Exhibit 7, your September 2, 2011,

 9    6:41 p.m. e-mail.

10         A.  Yes.

11         Q.  And looking at Exhibit 17, is that, in

12    fact, an image of districts in northeast Ohio?

13            MR. SHEEHY:  Objection to form.

14    BY THE WITNESS:

15         A.  Could you repeat the question?

16         Q.  Are we looking here in Exhibit 17 at images

17    of the district in northeast Ohio?

18         A.  Yes.

19         Q.  You've got 14, that was LaTourette, right?

20         A.  Yes.

21         Q.  And 13 that was Ryan?

22         A.  Yes.

23         Q.  And, of course, you see 11, we talked about

24    Marcia Fudge there and just the beginning of the

25    snake on the lake at 9; do you see that?
```

1                    ADAM PERRY KINCAID

2           MR. SHEEHY:  Object to the

3  characterization.

4  BY MR. FRAM:

5       Q.  When I say "snake on the lake," you know

6  what I'm talking about?

7       A.  You're referring to the 9th District.

8       Q.  We know what we're talking about.  Do you

9  have any reason to doubt that you sent the JPEG set

10  forth in BRADEN-001391 to Mr. DiRossi, Ms. Mann,

11  Mr. Whatman on about September 2, 2011?

12       A.  No.

13                    (Kincaid Exhibit 19 and

14                     Exhibit 20 were marked as

15                     requested.)

16  BY MR. FRAM:

17       Q.  For 19 BRADEN-001392 and for 20 it's the

18  same document but with the word "Metadata" attached.

19  On the metadata, which is Exhibit 20, do you see the

20  title under file name is "Ohio-new idea

21  redraft.jpeg."  I'd ask you to please compare that

22  to page 18304 in Exhibit 7 the title of the JPEG

23  that's "Ohio-new idea redraft.jpeg.  Same title,

24  right?

25       A.  Yes.

Page 174

ADAM PERRY KINCAID

1

2    Q.  In fact, in Exhibit 19 is that a JPEG shot
3    of the entire Ohio map; is that right?
4    A.  Can you clarify the entire Ohio map?
5    Q.  All the districts in the state.
6    A.  According to this version?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Right.  In other words, as of September --
10   was that the version as of September 2?
11        MR. SHEEHY:  Objection, form.
12   BY MR. FRAM:
13   Q.  Let me back up.  Do you have any reason to
14   doubt you sent this JPEG to Mr. Whatman,
15   Mr. DiRossi, and Ms. Mann on or about September 2,
16   2011?
17   A.  No.
18   Q.  So was this the depiction of the map as
19   proposed as of that date?
20        MR. SHEEHY:  Objection, form and vague just
21   as to "proposed."
22   BY MR. FRAM:
23   Q.  Was this the map that you sent as of that
24   date, as of September 2?
25        MR. SHEEHY:  Objection to form, lack of

Page 175

```
 1              ADAM PERRY KINCAID

 2   foundation.

 3   BY THE WITNESS:

 4        A.  This appears to be the map that I sent in

 5   the e-mail.

 6        Q.  Let me ask you a question or two just about

 7   Exhibit 19, the map.  The various numbers that

 8   appear on the map, do you see those?

 9        A.  Yes.

10        Q.  And there's a number like starting -- well,

11   District 9 we've already looked at, 09; do you see

12   that?

13        A.  Yes.

14        Q.  And under that there's another number,

15   right?

16        A.  Yes.

17        Q.  Do you have any understanding what that

18   other number is -- so the top number, is that the

19   district number in each instance?

20        A.  Yes.

21        Q.  And there's a second number, do you see

22   that?

23        A.  Yes, there's a second number.

24        Q.  And do you have an understanding what that

25   second number is?
```

1                  ADAM PERRY KINCAID

2        A.  Yes.

3        Q.  And what is that?

4            MR. SHEEHY:  I'm going to object on the

5    grounds of First Amendment privilege and instruct

6    the witness to not answer the question as doing so

7    would reveal internal communications within the

8    association.

9    BY MR. FRAM:

10       Q.  Just at a general level, a generic level do

11   you understand what those numbers -- those second

12   numbers are showing without telling me anything

13   about their content as to particular districts?

14       A.  Yes.

15       Q.  What is that?

16           MR. SHEEHY:  I'm going to instruct the

17   witness not to answer the question as that would

18   reveal internal communications within the

19   association.

20   BY MR. FRAM:

21       Q.  Did you -- you created this JPEG, "Ohio-new

22   idea redraft"?

23           MR. SHEEHY:  Objection, vague as to which

24   JPEG.

25   BY MR. FRAM:

1          ADAM PERRY KINCAID

2     Q.  Well, Exhibit 19, you created that?

3     A.  Yes.

4     Q.  And did you generate the numbers that

5   appear on -- let me back up.  And therefore you

6   created the numbers that appear under the districts,

7   correct?

8     A.  Can you clarify what you mean by "created"?

9     Q.  Well, I asked you if you created Exhibit 19

10   and you said yes.  What did you do to create it?

11          MR. SHEEHY:  I'm going to object on the

12   grounds of First Amendment privilege.  If the answer

13   would reveal the internal communications within the

14   association, those communications are protected

15   under the First Amendment privilege.

16          THE WITNESS:  Let me confer for just a

17   second.

18          MR. SHEEHY:  Off the record.

19               (Whereupon a discussion was had

20                off the record.)

21          MR. FRAM:  So we have a question you were

22   thinking about answering.

23          MR. SHEEHY:  I'm going to maintain my

24   instruction to not answer the question on the

25   grounds of First Amendment privilege.

1                    ADAM PERRY KINCAID

2              MR. FRAM:  Okay.

3   BY MR. FRAM:

4         Q.  The second numbers, are they PVI numbers?

5              MR. SHEEHY:  Same objection, same

6   instruction.

7   BY MR. FRAM:

8         Q.  I'd like to compare, if you could, please,

9   that second number for District 10 right around

10  Franklin County; do you see that?

11        A.  Yes.

12        Q.  It says 15.73; do you see that?

13        A.  Yes.

14        Q.  If you go back to Exhibit 8 and you look at

15  the PVI column.

16        A.  Exhibit 8?

17        Q.  Yes, please.

18        A.  Okay.

19        Q.  Where it says "D plus 16" for that open

20  District 10; do you see that?

21        A.  Yes.

22        Q.  Does that refresh your recollection, in

23  fact, the minus 15.73 basically if you rounded it

24  was the PVI -- it would be basically minus 15.73 for

25  Republicans, but plus 16 for Democrats?

Page 179

1            ADAM PERRY KINCAID

2       A.  I never said I didn't recall answering your

3   question that yes, I did know, and then I was

4   instructed not to answer.

5       Q.  Thank you.  I appreciate that.  So you

6   don't need me to refresh your recollection.  You

7   know what it means.  You've just been told not to

8   answer?

9       A.  Yes.

10      Q.  Okay.  That's fine.

11          MR. SHEEHY:  Can we take a break?

12          MR. FRAM:  Sure.

13                  (A short break was had.)

14  BY MR. FRAM:

15      Q.  I've got another question back on

16  Exhibit 7, those e-mails.  There's one or two we

17  didn't finish up.  On page 18304 there's an e-mail

18  from Mr. Whatman to you and Mr. DiRossi and Ms. Mann

19  on September 3, 2011 at 9:16 in the morning.

20      A.  Uh-huh.

21      Q.  By the way, I should mention, there's a lot

22  of Friday night, Saturday morning e-mails going on

23  here.  Do you guys do that normally?  Is that like a

24  normal work week for you or is there something going

25  on here?

1              ADAM PERRY KINCAID

2        A.  It's not uncommon to work on a Saturday

3    morning in politics.

4        Q.  Sunday night too?

5        A.  On occasion.

6        Q.  But on occasion.  Was there an occasion

7    here?  Was there a reason to be working on the

8    weekend?

9        A.  I'd have to look at the dates to be sure.

10   I'd only be speculating.  I don't have a clear

11   recollection of why we'd be working that Saturday

12   morning and Sunday evening.

13       Q.  Let me just ask you a question, then, about

14   the e-mail itself.  Mr. Whatman says "Adam, all

15   looks good on the surface"; do you see that?

16       A.  I do.

17       Q.  Do you recall what he was referring to,

18   "Looks good on the surface"?

19           MR. SHEEHY:  Objection.  You can answer the

20   precise question.

21   BY THE WITNESS:

22       A.  "All looks good on the surface" would refer

23   to the map, this draft, the new map idea redraft.

24       Q.  It says "Key is whether we can improve CD1

25   and CD14 at block level while keeping concepts

```
 1                ADAM PERRY KINCAID

 2    intact"; do you see that?

 3         A.  I do.

 4         Q.  Do you recall what he's referring to about

 5    improving CD1?

 6            MR. SHEEHY:  Objection.  I'm going to

 7    instruct the witness to not answer the question as

 8    that would be revealing internal associational

 9    communications under the First Amendment privilege.

10    BY MR. FRAM:

11         Q.  What about do you recall what he was

12    referring to when he talked about improving CD14?

13            MR. SHEEHY:  You can answer the precise

14    question.

15    BY THE WITNESS:

16         A.  Do I recall what he was referring to?

17         Q.  Do you recall any -- do you recall anything

18    about the need to improve CD14?

19         A.  Yes.

20         Q.  What do you recall?

21            MR. SHEEHY:  Same instruction, same

22    objection on the grounds of the First Amendment

23    privilege.

24    BY MR. FRAM:

25         Q.  Do you see he says he wants to see these
```

Page 182

1                    ADAM PERRY KINCAID

2     improvements, but he says "While keeping concepts

3     intact"; do you see that?

4          A.   I do.

5          Q.   Do you know what concepts he was talking

6     about?

7              MR. SHEEHY:   You can answer the precise

8     question.

9     BY THE WITNESS:

10         A.   I don't have a specific recollection of

11    what those concepts would be.   I'd have to speculate

12    about what specifically he means by that.

13         Q.   Do you have any general idea of what the

14    concepts were?

15             MR. SHEEHY:   You can answer the precise

16    question.

17    BY THE WITNESS:

18         A.   Yes.

19         Q.   What were they?

20             MR. SHEEHY:   I'll instruct you to not

21    answer the question as that would reveal internal

22    associational communications protected under the

23    First Amendment.

24    BY MR. FRAM:

25         Q.   Now, it appears that, going down that same

1                    ADAM PERRY KINCAID

2     page on September 3, 2011 at 10:14 in the morning,

3     less than an hour later you responded to

4     Mr. Whatman; do you see that?

5          A.  I do.

6          Q.  And in that e-mail it says here "Revised

7     screenshots attached"; do you see that?

8          A.  I do.

9          Q.  Do you have any doubt that you sent that

10    e-mail?

11         A.  No.

12         Q.  Do you recall what your revisions were?

13         A.  Let me turn the page.  Not specifically.  I

14    can see that there are two screenshots there, but

15    I'd have to look at them more closely.

16         Q.  What about the revisions in the Hamilton

17    County area; do you see that?

18         A.  I do.

19         Q.  That would have been relevant to

20    improvements in CD1, correct?

21         A.  Yes.

22         Q.  So did you seek to try to implement

23    improvements in CD1 and 14 as Mr. Whatman had

24    suggested?

25              MR. SHEEHY:  There I will instruct the

1               ADAM PERRY KINCAID

2    witness not to answer the question on the grounds of

3    the First Amendment privilege as doing so would

4    reveal internal communications.

5    BY MR. FRAM:

6         Q.  Now, going to the next e-mail, Saturday,

7    September 3, 2011 at 11:54 in the morning from

8    Mr. Whatman to yourself, Mr. DiRossi, and Ms. Mann;

9    do you see that?

10        A.  I do.

11        Q.  It says "Adam, did we tell you we needed

12   the four-way split with the changes also"; do you

13   see that?

14        A.  Yes.

15        Q.  Do you have any reason to doubt you

16   received this e-mail?

17        A.  No.

18        Q.  Do you have any recollection of what the,

19   quote/unquote, four-way split was?

20        A.  I don't have a recollection what the four-

21   way split was.

22        Q.  Do you recall whether the four-way split

23   concerned the manner in which Columbus would be

24   split?

25             MR. SHEEHY:  You can answer the precise

1          ADAM PERRY KINCAID

2    question asked, but also I'm going to pose an

3    objection to form.

4    BY THE WITNESS:

5          A.   I don't have a clear recollection of what

6    the four-way split referred to.  To answer your

7    question it's possible it referred to that, but I

8    don't have a clear recollection of whether or not

9    that's the case.

10         Q.   If you go over to 18306, do you see an

11   e-mail from you September 3, 2011 at 11:55 in the

12   morning?

13         A.   Yes.

14         Q.   It says "Note attached"; do you see that?

15         A.   Yes.

16         Q.   Do you have any doubt you sent that e-mail?

17         A.   No.

18         Q.   Do you see it has some attachments to that

19   e-mail; do you see that?

20         A.   Yes.

21         Q.   And if you go to 18307, do see them?

22         A.   Yes.

23         Q.   And you see that the attachments are the

24   following, it says "four-way split.jpg"; do you see

25   that?

Page 186

```
 1                ADAM PERRY KINCAID

 2          A.  Yes.

 3          Q.  "Ohio changes four-way split.xls"; do you

 4   see that?

 5          A.  Yes.

 6          Q.  And then "four-way split.zip"; do you see

 7   that?

 8          A.  Yes.

 9          Q.  Would the zip file contain the block files

10   for the four-way split?

11          A.  I have to speculate based off of the

12   previous e-mail that you sent that you brought up

13   that said dot zip which did contain block files.  I

14   would have to speculate on whether or not because it

15   doesn't look like there's anything in this e-mail

16   chain to specifically what's in that zip file.

17               THE REPORTER:  I need to go off the record.

18                         (A short break was had.)

19                         (Kincaid Exhibit 21 was marked

20                          as requested.)

21   BY MR. FRAM:

22          Q.  I'd like to mark next as Exhibit 21

23   LWVOH-00018333, a spreadsheet.

24               MS. RIGGINS:  We're going to object on work

25   client privilege.  This has work client product of
```

Page 187

ADAM PERRY KINCAID

1                    ADAM PERRY KINCAID

2     Mark Braden on here.

3              MR. FRAM:  Sorry.  This one here?

4              MS. RIGGINS:  On Exhibit 21.

5              THE WITNESS:  The second column in from the

6     right.

7              MS. RIGGINS:  If he, in fact, did that

8     revision.

9              MR. FRAM:  Yeah.  As we have briefed to the

10     Court, I think, that's been disclosed since the --

11     this is a document I can indicate was provided to

12     public records request some years ago from -- you

13     can see 09 is the appendix number from that public

14     records request.  It's been in the public domain for

15     about seven years.  So if there's a work product,

16     it's long been waived.

17              MS. RIGGINS:  Okay.  This is produced from

18     the League of Women Voters.  Thank you.

19              MR. FRAM:  And produced by the League of

20     Women Voters.

21     BY MR. FRAM:

22         Q.  All right.  So have you ever seen this

23     document before?

24         A.  No.

25         Q.  Do you see where it says "four-way split

1          ADAM PERRY KINCAID

2     '08 presidential" in the middle?

3          A.  Yes.

4          Q.  And do you see going down to the fourth row

5     from the bottom where it says "Attempted GOP seats";

6     do you see that?

7          A.  Yes.

8          Q.  And do you see there it says 13?

9          A.  Yes.

10         Q.  Do you recall there ever being an attempt

11    to -- strike that.

12              Do you recall there ever being an attempt

13    to secure 13 GOP seats?

14              MR. SHEEHY:  Objection and instruct the

15    witness to not answer the question as that would

16    reveal internal communications within the

17    association under the First Amendment.

18              MR. FRAM:  And just so we're clear, the

19    witness has said he's never seen it before.  So I'm

20    trying to understand how it's going to reveal

21    communications within the association.

22              MR. SHEEHY:  You asked him if there were

23    any communications about an effort.  So that to me

24    reveals internal communications.

25    BY MR. FRAM:

1                ADAM PERRY KINCAID

2       Q.  Was there ever an attempt to secure 12

3  Republican seats in the redistricting?

4        MR. SHEEHY:  Same objection, same

5  instruction.

6  BY MR. FRAM:

7       Q.  Do you see that the only -- the only column

8  where attempted 13 seats exists is for the four-way

9  split; do you see that?

10      A.  Yes.

11      Q.  And all the others are 12; do you see that?

12      A.  Yes.

13      Q.  Does that help refresh your recollection as

14  to what the four-way split was about?

15       MR. SHEEHY:  You can answer the precise

16  question.

17  BY THE WITNESS:

18      A.  This does not, that picture does

19  (indicating).

20      Q.  And what is that -- the pictures on

21  Exhibit 7; is that right?

22      A.  Yes.

23      Q.  And let's get our Bates numbers in a row

24  there.  That's on 18307, correct?

25      A.  Yes.

Page 190

1                    ADAM PERRY KINCAID

2          Q.   What's that refresh your recollection

3    about?

4              MR. SHEEHY:  I'll issue a cautionary

5    instruction if in answering the question you reveal

6    internal communications within the association I

7    would instruct you to not answer the question under

8    the First Amendment.

9    BY THE WITNESS:

10         A.   The difference between the previous map and

11   this map looks to be that Columbus is split four

12   ways in the Ohio changes four-way split map -- or

13   the four-way split map I should say.  So...

14         Q.   Thank you.

15              Do you have any recollection as to whether

16   splitting Columbus four ways would secure 13

17   Republican seats?

18              MR. SHEEHY:  Same cautionary instruction.

19   If you can answer the question without revealing

20   internal communications within the association, you

21   may.

22   BY THE WITNESS:

23         A.   Would you mind just repeating the question.

24         Q.   Do you recall whether splitting Columbus

25   four ways would have secured 13 Republican seats?

1                   ADAM PERRY KINCAID

2           MR. SHEEHY:  I'm going to go ahead and

3    actually just instruct the witness to not answer the

4    question on the grounds of the First Amendment

5    privilege, that answering the question in any way

6    would reveal internal communications within the

7    association.

8    BY MR. FRAM:

9           Q.  Just so I understand how you understand the

10   association, Mr. Kincaid, that included Ohio State

11   elected officials, Republicans?

12          A.  Yes.

13              MR. SHEEHY:  Objection, calls for a legal

14   conclusion.

15   BY MR. FRAM:

16          Q.  You understand.  Okay.

17              So when you were communicating with

18   Mr. DiRossi or Ms. Mann is it your understanding you

19   were communicating with members of the association?

20              MR. SHEEHY:  Objection, calling for a legal

21   conclusion, but you may answer.

22   BY THE WITNESS:

23          A.  Yes.

24                   (Kincaid Exhibit 22 and

25                    Exhibit 23 were marked as

1               ADAM PERRY KINCAID

2                     requested.)

3    BY MR. FRAM:

4        Q.  First, 22 is a spreadsheet LWVOH-00018480

5    and 23 is the same Bates number but with the word

6    "Metadata" attached.  Do you see under "Author" on

7    23 there's your name, "Adam Kincaid"; do you see

8    that?

9        A.  I do.

10       Q.  If you look back, did you create

11   Exhibit 22, the spreadsheet entitled "Ohio changes"?

12       A.  I believe so, yes.

13       Q.  Do you recall approximately when you

14   created it?

15           MR. SHEEHY:  Objection to form.

16   BY THE WITNESS:

17       A.  I don't have a specific recollection of

18   when I created this document.

19       Q.  Do you see there's a reference in this

20   document where it says "New plan No. 1"; do you see

21   that?

22       A.  Yes.

23       Q.  Do you have a recollection of what that

24   means?

25       A.  I have no specific recollection of what

1                    ADAM PERRY KINCAID

2    that refers to.

3         Q.  Looking at Exhibit 8, which was the

4    Franklin County sink hole spreadsheet; do you see

5    that?

6         A.  Exhibit 8?

7         Q.  Yes, please.

8         A.  Okay.

9         Q.  Compare that to Exhibit 22.

10        A.  Okay.

11        Q.  Can you tell us whether or not -- which

12   came first, Exhibit 8 or Exhibit 22, both of which

13   you created?

14             MR. SHEEHY:  Objection to form.

15                  (Witness reviewing document.)

16   BY THE WITNESS:

17        A.  I have an assumption, but I don't have a

18   specific memory of which would have come first.

19        Q.  What's your assumption?

20             MR. SHEEHY:  Objection, calls for the

21   witness to speculate.

22   BY MR. FRAM:

23        Q.  What do you think?

24             MR. SHEEHY:  Same objection.

25   BY THE WITNESS:

Page 194

ADAM PERRY KINCAID

1

2     A.  I would -- new plan No. 1 likely came

3  second.

4     Q.  Why do you think that?

5     A.  In the final enacted map I believe

6  Congresswoman Sutton was drawn in with Congressman

7  Renacci and that's what's indicated in new plan

8  No. 1 and that's not indicated in the Franklin sink

9  hole.

10     Q.  Do you recall why that was done?

11     A.  I do not.

12                    (Kincaid Exhibit 24 and

13                     Exhibit 25 were marked as

14                     requested.)

15  BY MR. FRAM:

16     Q.  24 is LWVOH-00018481, 25 is the same Bates

17  number with the word "Metadata."  Look under

18  metadata and you see you're listed as the author; do

19  you see that, Exhibit 25?

20     A.  Yes.

21     Q.  Did you create Exhibit 24?

22     A.  Yes.

23     Q.  Notice this is entitled -- this is "Ohio

24  changes" but it's new plan No. 2; do you see that?

25     A.  Yes.

1                    ADAM PERRY KINCAID

2        Q.   Did new plan No. 2 come after new plan

3   No. 1?

4        A.   I believe so, yes.

5        Q.   Actually, a serious question.  Were they

6   both created at the same time as two options or was

7   one actually created after the other?

8        A.   A good question I don't have an answer for.

9        Q.   Okay.

10           Do you recall the difference between new

11  plans 1 and 2?

12           MR. SHEEHY:  You can answer the precise

13  question.

14  BY THE WITNESS:

15       A.   I don't have a specific recollection of

16  differences between new plan No. 1 and new plan

17  No. 2.

18       Q.   Any general recollection?

19           MR. SHEEHY:  Same instruction.

20           MR. FRAM:  You're not Instructing here,

21  you're only objecting?

22           MR. SHEEHY:  I told him you can answer the

23  precise question.  That's What I said.

24           MR. FRAM:  Fair enough.  You got me

25  confused there.

1              ADAM PERRY KINCAID

2    BY THE WITNESS:

3         A.  There appears to be differences between

4    Districts 4 and 5.

5         Q.  What's the differences you can see?

6         A.  In new plan No. 2 the 4th District is more

7    Republican than it is in new plan No. 1, and in new

8    plan No. 2 the 5th District is less Republican than

9    the 5th District in new plan No. 1.

10        Q.  Do you recall any reasons why that

11   happened?

12        A.  I have no recollection of why that was the

13   case.

14        Q.  Did somebody ask you to create new plan 1?

15        MR. SHEEHY:  You may answer the precise

16   question.

17   BY THE WITNESS:

18        A.  I do not recall.

19        Q.  Or new plan 2?

20        A.  I do not recall.

21        Q.  Do you have any idea what you were creating

22   new plan 1 and 2?

23        MR. SHEEHY:  Same, you may answer the

24   precise question.

25   BY THE WITNESS:

```
1                    ADAM PERRY KINCAID

2         A.  I don't have a clear memory about whether

3    new plan No. 1 is the same as new idea or not.  So I

4    couldn't answer the question as to whether -- why I

5    would be redrafting different versions.

6         Q.  By the way, do you see Ohio GOP average

7    appears in new plan 1 and 2; do you see that?

8         A.  Yes.

9         Q.  Is that the same average that we saw

10   before, the same five elections?

11             MR. SHEEHY:  Can you ask that again?

12   Sorry.

13   BY MR. FRAM:

14        Q.  Before we walked through what the

15   average -- the GOP average was and we determined

16   they were the average of five elections based upon

17   the Excel function.  So I'm just asking whether or

18   not the Ohio GOP average in Exhibits 22 and 24, new

19   plans 1 and 2 is the same GOP average?

20        A.  The same formula?

21        Q.  The same formula.

22        A.  The formula would not have changed from

23   spreadsheet to spreadsheet.  The formula would have

24   stayed the same.

25        Q.  Thank you.  That spares us one more
```

1                    ADAM PERRY KINCAID

2    exhibit.  We can move on.

3              I will ask you this question about plans 1

4    and 2.  Two Congresspersons --

5         A.  Sorry.  Just to clarify, new plan No. 1 and

6    new plan No. 2?

7         Q.  Yeah.

8              The two congresspersons at issue there were

9    Latta and Jordan.  Was Jordan 4 and Latta 5?

10             MR. SHEEHY:  Objection, form.

11   BY THE WITNESS:

12        A.  The two districts --

13        Q.  Yeah.

14        A.  -- that are different in new plan No. 1 and

15   new plan No. 2 are 4 and 5.

16        Q.  Right.  And the Congresspersons at issue in

17   those districts were Latta and Jordan, I think; is

18   that right?

19             MR. SHEEHY:  Objection, form.

20   BY THE WITNESS:

21        A.  Those are the two members that would have

22   lived in those districts.

23        Q.  So 4 became a little more Republican

24   benefiting Jordan a little bit; is that right?

25        A.  I think that assumes that No. 2 was created

1           ADAM PERRY KINCAID

2   after No. 1.  Based off our conversation, they were

3   drawn at the same time and show two different

4   options.

5        Q.  But as between the two there was -- Jordan

6   was getting some benefit and Latta was getting some

7   detriment; isn't that right?

8        A.  I think between the two districts new plan

9   No. 2 definitely had a stronger Republican district

10  than Mr. Jordan would live in than new plan No. 1.

11       Q.  Does that help refresh your recollection as

12  to why the changes were being proposed between 1 and

13  2 in terms of favoring Latta and Jordan?

14       A.  No.

15                  (Kincaid Exhibit 26 was marked

16                   as requested.)

17  BY MR. FRAM:

18       Q.  So an e-mail, Bates No. LWVOH-00018322

19  through 25.  Gmail, so, again, earliest in time

20  starts at the top.  The top one is Ray DiRossi,

21  September 12, 2011 at 1:02 p.m. to you.  I think

22  we've established that's your e-mail address,

23  correct?

24       A.  Yes.

25       Q.  Copying Heather Mann and Tom Whatman; do

1                    ADAM PERRY KINCAID

2    you see that?

3         A.   Yes.

4         Q.   Have you seen this e-mail string before?

5         A.   I don't recall seeing the e-mails up until

6    the Monday at 9:28 p.m.  I don't recall seeing those

7    first two, but I do recall seeing the others.

8         Q.   Do you have any doubt that you received or

9    sent the -- any of these e-mails where your name

10   appears?

11        A.   Where my name appears as the sender I have

12   no doubt that I sent those e-mails.

13        Q.   What about when your name appears as a

14   recipient, do you have any doubt that you received

15   them?

16        A.   No.

17        Q.   Looking at the Monday, September 12, 2011

18   e-mail from Ray DiRossi; do you see that?

19        A.   Yes.

20        Q.   Where it says "We are working to get

21   sign-ups from Speaker Batchelder and President

22   Niehaus on the Stivers edit and then we will be

23   done"; do you see that?

24        A.   Yes.

25        Q.   Do you recall any process of retaining

1               ADAM PERRY KINCAID

2    sign-ups from Speaker Batchelder and President

3    Niehuas?

4         A.  That would have been something happening in

5    Ohio.  That's not something that I would have been

6    involved with.

7         Q.  Okay.  Do you recall what the Stivers edit

8    was?

9         A.  No.

10        Q.  So you see the attachment, "LSC draft

11   3.zip"; do you see that?

12        A.  Yes.

13        Q.  Do you know what LSC stands for?

14        A.  I can only speculate.

15        Q.  Have you ever heard of Legislative Services

16   Commission in Ohio?

17        A.  That would be what I would speculate.

18        Q.  Were they responsible for creating the map

19   in the form that could be included in a bill

20   submitted to the General Assembly?

21            MR. SHEEHY:  Objection, form.

22   BY MR. FRAM:

23        Q.  You nodded.  You have to answer audibly.

24        A.  Could you repeat the question?

25        Q.  Was LSC responsible for taking a map and

```
 1                    ADAM PERRY KINCAID
 2     putting it into bill form?
 3              MR. SHEEHY:  Objection, form.
 4     BY THE WITNESS:
 5          A.  That was my understanding.
 6          Q.  And were you provided copies of the LSC
 7     versions of the maps?  Let me back up.  You were
 8     provided versions of something called LSC draft 3;
 9     do you see that?
10          A.  I see that.
11          Q.  Were you provided earlier versions of LSC
12     drafts?
13          A.  I don't have any recollection of receiving
14     previous LSC draft maps.
15          Q.  Did you receive any other LSC drafts?
16              MR. SHEEHY:  Objection, form, asked and
17     answered.
18     BY THE WITNESS:
19          A.  I don't have any recollection of any
20     other -- of receiving any other LSC drafts than this
21     specific one right here (indicating).
22          Q.  Did you review it?
23          A.  Could you --
24          Q.  Did you review the LSC draft when you
25     received it?
```

Page 203

ADAM PERRY KINCAID

1

2      A.  Could you be more specific about what you

3  mean by "review"?

4      Q.  Did you open the file, open the attachment?

5      A.  Yes.

6      Q.  Did you load it -- when you opened it was

7  there a map that you could immediately see or did

8  you have to load it into Maptitude to make it

9  beautiful?

10     A.  Based off of the next e-mail, I would have

11  had to have loaded it into Maptitude to create the

12  changes sheet for it.

13     Q.  Got it.  Thank you.

14          Then that next e-mail, just for the record,

15  that's the one Monday, September 12, 2011 at

16  1:30 p.m.; is that right?

17     A.  Yes.

18     Q.  At this point in the map drawing process

19  were you creating changes sheets for Ray DiRossi?

20  Let me back up.  In this e-mail here you say you're

21  giving him a changes sheet, correct?

22     A.  I'm sending a changes sheet to Heather

23  Mann, Ray DiRossi, and Tom Whatman.

24     Q.  Fair enough.  What's a changes sheet?

25          MR. SHEEHY:  I'm going to object to the

1              ADAM PERRY KINCAID

2    question on the grounds of the First Amendment

3    privilege as that would reveal internal

4    associational communications and instruct the

5    witness not to answer the question.

6    BY MR. FRAM:

7        Q.  I understand you've been instructed, but

8    I'm going to ask you did you provide any other

9    changes sheets other than the one on September 12,

10   2011 at 1:30 p.m. as indicated at Bates No. 18322 in

11   Exhibit 26?

12           MR. SHEEHY:  Same objection and same

13   instruction.

14   BY MR. FRAM:

15       Q.  Turning to the next page -- hold on one

16   second.

17               (A short break was had.)

18   BY MR. FRAM:

19       Q.  The next thing I want to talk about the

20   next e-mail.  Let me say one more thing before I go

21   to the one I know you've been waiting for.  We've

22   got this e-mail which you send on September 12, 2011

23   at 1:30 in the afternoon and you send it over to

24   DiRossi and Mann and Whatman, and I believe that

25   is -- if I'm reading the Gmail correctly, you're the

1                    ADAM PERRY KINCAID

2   one attaching what's called the -- if you go over to

3   page 18323 and you look at the "Draft bill No.

4   3.jpg"; do you see that?

5        A.  Yes.

6        Q.  And "Ohio changes-LSC draft bill

7   No. 3.xls"; do you see that?

8        A.  Yes.

9        Q.  That came from you, right?

10       A.  Yes.

11       Q.  You were sending JPEG's and Excel

12  spreadsheets over to DiRossi, Whatman, and Mann

13  Monday, September 12, 2011; is that right?

14       A.  Yes.  That would have been based off of the

15  zip file that Ray sent me at 1:00.

16       Q.  Right.  You made a few changes and sent it

17  back to him?

18       A.  No, I didn't make any changes.  "Here's the

19  changes sheet" means that I created that changes

20  Excel sheet.

21       Q.  And then here's the changes -- LSC could

22  use the changes sheet to create the final map?

23       A.  No.  It's just a -- that would have been

24  one of these changes sheets.  That would have been a

25  draft of the Ohio changes sheet like in Exhibit

1               ADAM PERRY KINCAID

2   No. 24.  That's what I would have sent back, not

3   changes to the map itself.

4        Q.  Let me see if I understand for a clean

5   record.  A changes sheet is what we've been calling

6   these spreadsheets and the examples are Exhibits 22

7   and 24; is that right?

8        A.  Yes.

9        Q.  Then after you sent the changes sheet over

10  do you know how that was turned into an actual map a

11  person could look at?

12       A.  It was not changed into an actual map.

13       Q.  Would an actual map be amended to reflect

14  what was in the changes?

15       A.  No.

16       Q.  I'm trying to understand how the changes

17  sheet fits in the map creation process?

18       A.  The e-mail chain here Ray sent LSC draft 3,

19  which based off of the changes sheet that I'm

20  talking about in the next e-mail and the JPEG that's

21  here as well indicates that this was a block

22  assignment file that Ray sent over, LSC draft No. 3.

23  I would have created a changes sheet and this image

24  and that's what I sent back.

25       Q.  Okay.  And to create the image would you

1                    ADAM PERRY KINCAID

2    take the block assignment file and load it into

3    Maptitude in order to generate the image?

4         A.   Yes.

5         Q.   And to generate the changes sheet would

6    that also be generated in Maptitude?

7         A.   No.

8         Q.   How would you generate the changes sheet?

9         A.   The changes sheet would be generated by

10   exporting the demographic or political data from

11   Maptitude and copying and pasting it into an Excel

12   file.

13        Q.   I see.  So you did -- you did your own copy

14   and paste.  You didn't use an export function within

15   Maptitude to create this spreadsheet?

16        A.   Right.

17        Q.   Now, was one of your jobs in the Ohio

18   congressional district redistricting work in 2011 to

19   generate the changes sheets?

20             MR. SHEEHY:  I'm going to object on that

21   precise question and instruct the witness not to

22   answer the question as that would reveal the

23   internal workings of the association.

24   BY MR. FRAM:

25        Q.   Let me ask the question a slightly

1                  ADAM PERRY KINCAID

2     different way.  We see that you generated certain

3     changes sheets.  Did anybody else do so in

4     connection with Ohio redistricting for Congress in

5     2011?

6                  MR. SHEEHY:  Objection.

7                  MR. FRAM:  To your knowledge.

8     BY THE WITNESS:

9          A.  To answer that question I'd need you to --

10    I don't know where it is in here anymore.  Just to

11    try to get some clarification on your question,

12    would -- Exhibit 21, is that something you would

13    consider a changes sheet?

14         Q.  I'm using your phrase changes sheet.

15         A.  Okay.

16         Q.  So it's not what I consider what matters.

17         A.  Okay.

18         Q.  I'm just trying to work with what you

19    understood -- the language you use.  We've

20    identified I believe 22 and 24 as examples of

21    changes sheets you created.

22         A.  Yes.

23         Q.  So my question is did anybody else -- as

24    you understood what changes sheets were, did anybody

25    else create them?

```
 1                  ADAM PERRY KINCAID

 2         A.   Not to my knowledge.

 3         Q.   When you created them we've seen this

 4   example -- let me back up.   When you created them

 5   you provided them to Mr. Whatman, Mr. DiRossi, and

 6   Ms. Mann, correct?

 7         A.   In these instances, yes.

 8         Q.   Did you ever provide them to anybody else?

 9         A.   Yes.

10         Q.   Who, please?

11              MR. SHEEHY:   And there I think I'm going to

12   pose the instruction not to answer the question on

13   the grounds of the First Amendment privilege as it

14   goes to the internal workings of the association as

15   well as the identities.

16   BY MR. FRAM:

17         Q.   Did you ever provide them to any Ohio

18   elected officials?

19              MR. SHEEHY:   You can answer.

20   BY THE WITNESS:

21         A.   Yes.

22         Q.   Who, please?

23         A.   The Ohio changes documents would be things

24   I would have provided to members of Congress.

25         Q.   What about to Ohio state elected officials,
```

1                    ADAM PERRY KINCAID

2    did you provide them to them at any time?

3         A.  I have no recollection of sending Ohio

4    changes documents directly to Ohio elected

5    officials.

6         Q.  And you used the word "directly."  Do you

7    know whether or not Mr. DiRossi or Ms. Mann ever

8    provided any of your changes sheets to Ohio state

9    elected officials?

10        A.  I do not know.

11        Q.  Do you know if they were indirectly

12   provided any anyone to Ohio state elected officials?

13        A.  I don't know if they were were not.

14        Q.  Now I'll turn to Monday, September 12, 2011

15   at 9:28 p.m.  Now, that's an interesting evening.

16   Do you recall the next day HB319 was to be

17   introduced in the Ohio General Assembly?

18        A.  Okay.

19        Q.  So this is Monday night.

20        A.  Okay.

21        Q.  At 9:28 in the evening you got an e-mail

22   from Mr. Whatman; do you see that?

23        A.  Yes.

24        Q.  And I take it this is the e-mail that you

25   said you looked at recently?

1                    ADAM PERRY KINCAID

2        A.   Yes.   I saw that e-mail recently, yes.

3        Q.   And the night -- just the night before the

4    bill's going to be introduced Mr. Whatman is asking

5    for one last change; do you see that?

6        A.   Yes.

7        Q.   Do you remember him doing that?

8        A.   Yes.

9        Q.   And the change was to put the Timken

10   headquarters in the 16th Congressional District; do

11   you recall that?

12       A.   Yes.

13       Q.   Do you recall why he wanted that change

14   made?

15       A.   Only what's listed here in the e-mail.

16       Q.   And how do you understand what the e-mail

17   is saying?

18       A.   The Monday, 9:41 p.m. e-mail says "Very

19   important to someone, important to us all."

20       Q.   Who is that someone?

21       A.   I don't know.

22       Q.   Do you know why they were important to

23   everybody?

24       A.   I could only speculate.   I don't know who

25   specifically he's talking to -- talking about.

1                    ADAM PERRY KINCAID

2          Q.  But you nonetheless -- you were the person

3    who said they could make that change; is that right?

4          A.  Yes.

5          Q.  You said that on September 12, 2011 at

6    9:36 p.m.; is that right?

7          A.  Yes.

8          Q.  And that was that e-mail.  Again, every

9    time you're listed here as an author you have no

10   doubt you sent these e-mails that are in Exhibit 26?

11         A.  I have no doubt.

12         Q.  And every time you're listed as a recipient

13   you have no doubt that you received them; is that

14   right?

15         A.  That's correct.

16         Q.  And then after you said at 9:36 you could

17   do this Mr. DiRossi at 9:36 p.m. that evening,

18   almost the exact same moment, asks whether -- it

19   says "You do and get equivalence file to us ASAP";

20   do you see that?

21         A.  I do.

22         Q.  Does that equivalence mean the block files?

23         A.  Yes.  It's a term for a block --

24   equivalence file or block assignment file.

25         Q.  And they needed that so that they could

1                    ADAM PERRY KINCAID

2    create the file map; isn't that right?

3         A.  Yes.

4         Q.  Because that would tell you which census

5    blocks were in each district, correct?

6         A.  Let me back up here just a bit.  They would

7    need that to, you know, load the map back in.  I

8    don't know if it was the final map or not.  They

9    could have made further iterations after that point.

10        Q.  Fair enough, but to make the change he was

11   asking for here, which was to move the Timken

12   headquarters into the 16th Congressional District,

13   they needed to have the block equivalence files,

14   correct?

15        A.  Yes.

16        Q.  And they would take those block equivalence

17   files and load them into Maptitude to generate the

18   new boundaries of the district, correct?

19        A.  I don't know what software they were using

20   in Ohio.  So I couldn't say yes to Maptitude, but

21   they would have needed the block assignment file of

22   those changes.

23        Q.  And you would load the block assignment

24   files into whatever software you were using in order

25   to create the new district lines, correct?

1                    ADAM PERRY KINCAID

2          A.  You would need the block assignment file to

3   create any reports or legislative language, yes.

4          Q.  And what about to create the contour of the

5   district?

6          A.  Yes.

7          Q.  On September 12, 2011 at 10:42 p.m. when

8   you e-mail back and say "File exporting now, you all

9   should have it in five minutes"; do you see that?

10         A.  Yes.

11         Q.  Are you talking about the block equivalency

12  file?

13         A.  Yes.

14         Q.  And then at 10:46 p.m. you say "Attached

15  are the screenshots of the statewide map, the Stark

16  County edit, and the .DBF block file"; do you see

17  that?

18         A.  Yes.

19         Q.  What's a DBF block file -- .DBF block file?

20         A.  .DBF is simply a database file is what that

21  literally means.  It's a form of block assignment

22  file that you would export from Maptitude.

23         Q.  So we're talking about the same thing which

24  is the equivalency file, the block file, the .DBF

25  files, that's what you were sending over?

1          ADAM PERRY KINCAID

2          A.  Block files are exported in CSV or DBF

3   typically.  So that's why I was sending that over in

4   a DBF.

5          Q.  Could you be more specific as to how the

6   block files were being -- strike that.

7              Can you be more specific as to the kind of

8   block files you were sending over?  You were sending

9   over .DBF block files?

10         A.  For whatever reason I told them I was

11  sending them a .DBF block file.

12         Q.  .DBF files are used by Maptitude?

13         A.  Yes.

14         Q.  There's a reference to a "Stark County

15  edit"; do you see that?

16         A.  Yes.

17         Q.  Do you recall what that was?

18         A.  Yes.

19         Q.  What was that, please?

20             MR. SHEEHY:  I'll issue a cautionary

21  instruction if you can answer the question without

22  revealing internal associational communications you

23  may.  Otherwise I instruct you to not answer the

24  question on the grounds of the First Amendment

25  privilege.

1                    ADAM PERRY KINCAID

2          THE WITNESS:  I need to confer for just a

3     second.

4                         (Whereupon a discussion was had

5                          off the record.)

6     BY THE WITNESS:

7          A.  The "Stark County edit" refers to the

8     Timken headquarters change.

9          Q.  Thank you.

10              And then at 10:55 p.m., looking at page

11    18325, you send over the, quote/unquote, changes

12    file; do you see that?

13         A.  Yes.

14         Q.  Is that the same thing as these -- what we

15    were referring to before as changes sheets?

16         A.  That would be referring to the same thing,

17    yes.

18                         (Kincaid Exhibit 27 and

19                          Exhibit 28 were marked as

20                          requested.)

21    BY MR. FRAM:

22         Q.  Let's have marked next 27 and 28.  27's

23    going to be NRCC-000013, and then 28 is going to be

24    the same number with the word "Metadata" attached.

25    The title on the document is "Ohio changes."

1                    ADAM PERRY KINCAID

2       Exhibit 27 is another version -- another changes

3       sheet that you created?

4            A.   Yes.

5            Q.   And the metadata suggests that -- it

6       doesn't tell us really.  Do you recall -- it

7       indicates Tom Whatman is the custodian; do you see

8       that in the metadata?

9            A.   Yes.

10           Q.   So you sent this over to Tom Whatman?

11               MR. SHEEHY:   Objection to form.

12      BY MR. FRAM:

13           Q.   Do you recall sending Exhibit 27 to Tom

14      Whatman?

15           A.   I don't recall sending it to Tom.

16           Q.   Was it your ordinary practice to send him

17      the changes sheets in the Ohio 2011 redistricting?

18               MR. SHEEHY:   I'm going to object to that

19      question on the grounds of the associational

20      privilege under the First Amendment that it would

21      reveal internal communications of the association.

22      BY MR. FRAM:

23           Q.   We've seen several other changes sheets you

24      sent to Tom Whatman.  Do you recall whether you sent

25      him this one?

1              ADAM PERRY KINCAID

2         MR. SHEEHY:  Objection, asked and answered.

3    BY THE WITNESS:

4         A.  I don't recall sending him this document.

5         Q.  But you do recall that you created

6    Exhibit 27; is that right?

7         A.  Yes, this is a document I would have

8    created.  I just don't recall specifically sending

9    this document to Tom Whatman.

10        Q.  Do you recall any reason why you created

11   this document, Exhibit 27?

12        MR. SHEEHY:  You may answer the precise

13   question.

14   BY THE WITNESS:

15        A.  Yes.

16        Q.  Why did you do so?

17        MR. SHEEHY:  I'll instruct the witness not

18   to answer the question on the grounds of the First

19   Amendment privilege.

20   BY MR. FRAM:

21        Q.  And is the Ohio GOP average here the same

22   five-election average we've been talking about

23   before, the formula?

24        A.  It should be the same, yes.

25        Q.  And do you see the PVI scorings in the far

1                    ADAM PERRY KINCAID

2    right column?

3         A.  Yes.

4         Q.  Before you said there were different kinds

5    of PVI scorings.  Do you know which one this is?

6         A.  This is a Cook PVI here.

7         Q.  You followed the same process here as for

8    the other changes sheets, you exported the data from

9    Maptitude and then cut and pasted it into Excel; is

10   that right?

11        A.  It would have been made the same way as the

12   other ones.

13        Q.  Do you recall if this document was created

14   before or after -- strike that.  Never mind.  I take

15   that back.

16            Is it your understanding this was a changes

17   sheet for the final version of HB319?

18        A.  It would have to have been because I didn't

19   know it would be named HB319 until after it was

20   HB319.

21        Q.  So in the final version of HB319 for

22   District 1 there was a Republican PVI net gain of 7;

23   is that right?

24        A.  Yes, that's what this indicates.

25        Q.  And for District 12 there was a Republican

1                    ADAM PERRY KINCAID

2    net gain of 11 in PVI scoring; is that right?

3         A.   That's what this indicates.

4         Q.   And for 15 there was a net gain of 8; is

5    that right?

6         A.   That's what this indicates.

7         Q.   So that means that -- okay.

8              In the final Franklin County, Columbus

9    district that was actually numbered No. 3; is that

10   right?

11        A.   That's correct.

12        Q.   For the final HB319 a significant reason

13   for the Republican gains in Districts 12 and 15 was

14   the fact that many Democratic votes were now in new

15   District 3; is that right?

16             MR. SHEEHY:   Objection, lack of foundation.

17             MR. FRAM:   You've already testified on the

18   prior drafts.   I'm just doing it for the final.

19             MR. SHEEHY:   Same objection.

20   BY THE WITNESS:

21        A.   Districts 12 and 15 you're asking how they

22   improved?

23        Q.   No.   I'm saying they -- the Republican

24   strength improved in Districts 12 and 15, right?

25        A.   From the previous map?

1                    ADAM PERRY KINCAID

2          Q.  Correct.

3          A.  Okay.  From the current map here to HB319.

4          Q.  Right.  And current was the pre-

5     redistricting map?

6          A.  The 2010 congressional map, yes.

7          Q.  So between the 2010 congressional map and

8     HB319 Republican strength improved in Districts 12

9     and 15, correct?

10         A.  That's what this indicates, yes.

11         Q.  And a significant reason for that was the

12    fact that many Democratic votes were now in new

13    District 3, correct?

14             MR. SHEEHY:  Objection, calls for the

15    witness to speculate.

16    BY MR. FRAM:

17         Q.  I believe you already testified about the

18    PowerPoint the same issue.  All right.  So for

19    319 -- before you testified about the reasons for

20    the changes in 369, the final.

21         A.  Okay.

22         Q.  Here we're talking about 319.

23         A.  Okay.

24         Q.  And there we talked about the effect of

25    Democrats in Columbus being taken out of 12 and 15;

```
 1                    ADAM PERRY KINCAID
 2    do you recall that?
 3             MR. SHEEHY:  Objection to form.
 4    BY THE WITNESS:
 5         A.  I recall a district being created in
 6    Franklin County, District 3.
 7         Q.  And did that improve Republican strength in
 8    the final HB319 in 12 and 15?
 9             MR. SHEEHY:  Objection to form.
10    BY THE WITNESS:
11         A.  Districts 12 and 15 became more Republican,
12    yes.
13         Q.  And part of the reason they became more
14    Republican was because many Democratic votes were
15    now in new District 3, correct?
16             MR. SHEEHY:  Objection, form and lack of
17    foundation.
18    BY THE WITNESS:
19         A.  District 12 and 15 became more Republican
20    as a result of the drafting of 319 as compared to
21    the current map, that's what I would say.
22         Q.  And in that drafting a new district was
23    created in Columbus, correct?
24         A.  Yes.
25         Q.  And that district was heavily Democrat,
```

1                    ADAM PERRY KINCAID

2    correct?

3                MR. SHEEHY:  Objection, lack of foundation.

4    BY MR. FRAM:

5         Q.  If you look right here on this sheet here

6    you see "3-open"; do you see that?

7         A.  Yes.

8         Q.  And it provides scorings for the district.

9    If you go over to the PVI, it's D plus 16, correct?

10        A.  Yes.

11        Q.  So that's a heavily Democratic district, is

12   it not?

13        A.  It's a Democrat district, yes.

14        Q.  So that new district was a heavily

15   Democratic district and 12 and 15 are on either side

16   of it, correct?

17        A.  They're in a proximate location to District

18   3.

19        Q.  Right.  And the votes that used to be in

20   what was now District 3 used to be in Districts 12

21   and 15, correct?

22                MR. SHEEHY:  Objection, lack of foundation.

23   BY THE WITNESS:

24        A.  Districts 12 and 15 became more Republican

25   in part because of the way 3 was created, but also

1                    ADAM PERRY KINCAID

2    for other reasons as well.

3        Q.  So some additional Republican areas were

4    also added, for example, some rural counties were

5    added to 12, right?

6            MR. SHEEHY:  Objection to form.

7    BY THE WITNESS:

8        A.  I'd have to see an old map and compare it

9    to the new map and tell you specifically what the

10   changes were for 12 and 15.

11       Q.  But one of the reasons at least was the way

12   in which new District 3 was created helped make

13   Districts 12 and 15 more Republican; is that right?

14           MR. SHEEHY:  Objection, form, lack of

15   foundation.

16   BY THE WITNESS:

17       A.  I don't know how else to answer the

18   question.

19       Q.  Well, it's simple math.  You have Columbus

20   used to be in 12 and 15, right?

21           MR. SHEEHY:  Objection to form.

22   BY THE WITNESS:

23       A.  I think Columbus was split more than just

24   12 and 15 in the 2010 map, but I have to go back and

25   look.

Page 225

1                    ADAM PERRY KINCAID

2        Q.  At least parts of -- parts of Columbus were

3   in 12 and 15, correct?

4        A.  That is true.

5        Q.  And then after -- after the finalizing of

6   319 a large portion of Columbus was taken out of 12

7   and 15 and put into new District 3, correct?

8        A.  I would say that parts of 12 and -- well,

9   parts of Columbus were put into District 3.

10       Q.  Parts of Columbus were put into District 3,

11  fair enough, and then as a result of that there were

12  fewer Democrat votes in Districts 12 and 15,

13  correct?

14            MR. SHEEHY:  Objection to form.

15  BY THE WITNESS:

16       A.  Districts 12 and 15 remained in Franklin

17  County.  They did not move out of Franklin County.

18  They just had different parts of Franklin County

19  than they previously had had.

20       Q.  And parts of what they didn't have before

21  were parts that were heavily Democratic, correct?

22            MR. SHEEHY:  Objection to form.

23  BY THE WITNESS:

24       A.  Yes.  They would have had different parts

25  of Franklin County than they previously had had.

Page 226

1                    ADAM PERRY KINCAID

2        Q.   And the parts they didn't have after the

3   redistricting were heavily Democratic parts,

4   correct?

5            MR. SHEEHY:   Object to form, lack of

6   foundation.

7   BY THE WITNESS:

8        A.   I answered you already that, yes, they had

9   different parts of Franklin County than they

10   previously had.

11       Q.   Not only different parts.   I'm saying

12   qualitatively parts that they did not have were

13   heavily Democratic parts?

14            MR. SHEEHY:   Same objections.

15   BY THE WITNESS:

16       A.   District 3 was made up of areas within the

17   city of Columbus.   So it was -- District 3 has more

18   heavily Democrat parts of Franklin County than the

19   parts that were in 12 and 15.

20       Q.   Thank you.

21                          (Kincaid Exhibit 29 and

22                           Exhibit 30 were marked as

23                           requested.)

24   BY MR. FRAM:

25       Q.   29 is DiROSSI-000010, and then the same

Page 227

1               ADAM PERRY KINCAID

2    document with "Metadata" at the end after the number

3    that's 30.

4               MR. SHEEHY:  Have you sent around copies?

5               MR. FRAM:  I should have.  Did we send

6    around copies?

7               MR. SHEEHY:  Oh, yeah.  Sorry.

8    BY MR. FRAM:

9        Q.  Let's start with the metadata.  On the

10   metadata, Exhibit 30, it says here you're the

11   author; do you see that?

12       A.  I do.

13       Q.  It says it was modified -- created and

14   modified on October 3, 2011; do you see that?

15       A.  Yes.

16       Q.  Looking at 29, did you, in fact, create

17   Exhibit 29?

18       A.  No.

19       Q.  Who did?

20       A.  I don't know.

21       Q.  It says you're the author, but you did not

22   create this?

23       A.  I did not create this document.

24       Q.  Okay.  Have you seen it before?

25       A.  No.

1            ADAM PERRY KINCAID

2       Q.  Do you see where it says under -- at the

3  very bottom where it says "R plus five is likely

4  Republican, number of districts R plus 5, 11"; do

5  you see that?

6       A.  I do.

7       Q.  Do you recall any discussion with anybody

8  as to whether or not 319 created 11 Republican

9  districts -- more than likely Republican districts?

10           MR. SHEEHY:  We'll issue a cautionary

11  instruction.  You can answer the question so long as

12  it does not reveal internal associational

13  communications that are protected under the First

14  Amendment.

15  BY THE WITNESS:

16       A.  That was not my analysis.

17       Q.  Fair enough.

18                  (Kincaid Exhibit 31 was marked

19                    as requested.)

20  BY MR. FRAM:

21       Q.  31 is a map that has the Bates

22  No. BLESSING-0012635 and then at the bottom it says

23  "10/27/11 Adam new map_001."  To be clear, that

24  information came off the computer file that we got

25  from Ms. Blessing, it was not in the hard copy she

1          ADAM PERRY KINCAID

2    provided.  We added the number from the computer

3    file to the hard copy for identification purposes

4    for the deposition.

5         A.  Got it.

6         Q.  But I'll say this, the word "Adam new map"

7    was in the file she gave us.

8         A.  Uh-huh.

9         Q.  A couple questions for you.  First of all,

10   have you ever seen this document before?

11        A.  No.

12        Q.  Did you ever create something called "Adam

13   new map"?

14        A.  No.

15        Q.  Do you see those little squares that are

16   over various districts; do you see that?

17        A.  Rectangles?

18        Q.  Rectangles with numbers in them.

19        A.  Yes.

20        Q.  Are you familiar with the term "labels" in

21   Maptitude?

22        A.  Yes.

23        Q.  Are those labels?

24        A.  Yes.

25        Q.  Can you customize labels so you can have

Page 230

1                    ADAM PERRY KINCAID

2    different information about a district appear, hover

3    over a map?

4         A.  Yes.

5         Q.  And did you do that in your work in the

6    redistricting in Ohio in 2011?

7              MR. SHEEHY:  You're asking if he did

8    labels?

9    BY MR. FRAM:

10        Q.  Let me back up.  There's a label

11   functionality in Maptitude, right?

12        A.  Yes.

13        Q.  I think it's one of the icons on the far

14   left.  Do you see that whole list of them -- that

15   whole set of them going down the left-hand column?

16        A.  Those aren't the label functions.

17        Q.  How do you get the labels to appear?

18        A.  I'd have to have Maptitude open to show you

19   how to do that.

20        Q.  But there's not an icon on the left that

21   you click on, back then there wasn't?

22        A.  I would not have used any of these icons to

23   do that.  I see there's some label buttons there

24   I've never used.  That's not how I would go about

25   creating labels in Maptitude.

1                    ADAM PERRY KINCAID

2        Q.  How did you go about creating labels?

3        A.  There's just a different functionality

4    within Maptitude I would use.  It's under a

5    different -- one of the top -- I think it's under

6    map or data view.  I can't remember off the top of

7    my head.  It's more instinctive.

8        Q.  I see.

9            MR. SHEEHY:  On the top left corner it says

10   "Licensed to Brian Crater."  That's someone with

11   your firm?

12           MR. FRAM:  Right.  We got computer files --

13   just to make the record clear, we've said this in

14   other depositions, it's the same statement, which is

15   we received computer files, Maptitude computer files

16   from Blessing and others, but you've got to open

17   them somehow.  It's like if you get a Word file or

18   Excel file you've got to use Excel or Word and to do

19   that you need a license.  So we got a license and

20   that's how we opened it.

21           MR. SHEEHY:  And that would have been with

22   2018 --

23           MR. FRAM:  That's 2018, right, not 2011.

24   BY MR. FRAM:

25       Q.  There was a label function in 2011, I take

1               ADAM PERRY KINCAID

2     it?

3          A.  Yes.  It's actually under display manager.

4     When I see over here on the left, it would be there,

5     that's where you would create the label.  Display

6     manager is something you can move around on the

7     screen.  It's not always there in Maptitude.

8          Q.  Even though this is a 2018 version, this

9     functionality, these labels existed in 2011?

10         A.  The ability to create labels existed in

11    Maptitude in 2011.

12         Q.  In 2011 did you ever create labels that had

13    various election results in the label?

14              MR. SHEEHY:  I'll issue a cautionary

15    instruction.  You can answer the question so long as

16    it's not revealing internal associational

17    communications that are protected under the First

18    Amendment.

19              THE WITNESS:  I think my methods would

20    be --

21              MR. SHEEHY:  Covered.  Okay.  Then I

22    instruct the witness not to answer the question.

23    BY MR. FRAM:

24         Q.  Just looking at District 1 for a minute and

25    you look at the bottom two numbers in the label.

1                    ADAM PERRY KINCAID

2          A.  Yes.

3          Q.  56.59 and 51.77.

4          A.  Yes.

5          Q.  Do you know if they would refer to

6     different indices or political election results?

7               MR. SHEEHY:  Objection to form.

8     BY THE WITNESS:

9          A.  I didn't create this map, this image, or

10    this file and I didn't create the labels.  So I

11    don't know what these labels represent.

12         Q.  I got it.  So "Adam new map" is not

13    something you created?

14         A.  This screenshot with these labels is not

15    something I created.  I'm not telling you I didn't

16    create whatever the block assignment file is

17    underneath that, I don't remember, but this specific

18    image with these labels I did not create.

19         Q.  So someone else could have taken a block

20    assignment file you created, loaded it into

21    Maptitude, and generated this image?

22         A.  That's correct.

23         Q.  I understand.  And then they could have

24    used the display manager function in Maptitude to

25    create the labels that we see here?

1                    ADAM PERRY KINCAID

2        A.   That's correct.

3              MR. SHEEHY:  Objection to form.

4                   Mr. Fram, are we getting close to a

5   good breaking spot?

6              MR. FRAM:  I'm kind of in the middle of

7   something, but it won't go forever.

8              MR. SHEEHY:  That's reassuring.

9              MR. FRAM:  I'll try and do my best.  Here's

10  what I suggest, that we go through this exhibit --

11  yeah, let's go through this exhibit and then let's

12  see where we are, but we can take a little break

13  after this.

14             MR. SHEEHY:  That's fine.

15             MR. FRAM:  Is that all right?

16             MR. SHEEHY:  That's fine.

17                        (Kincaid Exhibit 32 and

18                         Exhibit 33 were marked as

19                         requested.)

20  BY MR. FRAM:

21      Q.   32 is a document with Bates

22  No. DiROSSI-0000525 and 33 is the same with

23  "Metadata" at the bottom.  In the metadata you're

24  indicated as the author; do you see that?

25      A.   That's what it says.

```
 1                    ADAM PERRY KINCAID

 2        Q.  Did you create Exhibit 32?

 3        A.  No.

 4        Q.  Do you have any idea who did?

 5        A.  I only have an idea based off of the other

 6   name that's on here, but other than that, no.

 7        Q.  That's Ray DiRossi?

 8        A.  That's what it says, yes.

 9        Q.  Do you recall creating any changes sheets

10   in -- on or around November 2, 2011?

11        A.  I have no specific recollection of creating

12   changes sheets for Ohio redistricting in November of

13   2011.

14        Q.  Do you have any recollection at all of

15   creating any changes sheets in Ohio for Ohio

16   redistricting in either October or November of 2011?

17            MR. SHEEHY:  Objection, form.  You can

18   answer the precise question.

19   BY THE WITNESS:

20        A.  I don't have any recollection of creating

21   changes sheets in October, November of 2011 for Ohio

22   redistricting.  That doesn't mean I didn't.  I just

23   don't remember.

24                        (Kincaid Exhibit 34 and

25                         Exhibit 35 were marked as
```

 1                     ADAM PERRY KINCAID

 2                         requested.)

 3   BY MR. FRAM:

 4        Q.  34 and 35.  34 is BLESSING-0013212 and 35

 5   is the same Bates number with the word "Metadata."

 6   The title of the document in the metadata is "Plan

 7   comparison revised 12/14/11.xlxs."  It has a created

 8   date of 11/5/2011.

 9            My question for you, Mr. Kincaid, is have

10   you ever seen this document before?

11        A.  No.

12            MR. FRAM:  Why don't we take our break now.

13            MR. SHEEHY:  Thank you.

14                    (A short break was had.)

15                    (Kincaid Exhibit 36 and

16                     Exhibit 37 were marked as

17                     requested.)

18   BY MR. FRAM:

19        Q.  We have two more exhibits, 36 and 37.  36

20   is Bates No. NRCC-000014, and then 37 is the same

21   Bates number with the word "Metadata."  Mr. Kincaid,

22   on the metadata you're identified as the author of

23   this spreadsheet, Exhibit 36.  So I'm going to ask

24   you to take a look at it and see if you recognize it

25   and if you're, in fact, the author.

1          ADAM PERRY KINCAID

2              (Witness reviewing document.)

3  BY THE WITNESS:

4          A.  Could be.  The font and format's a little

5  weird for what I would have created.  So I couldn't

6  say with the same amount of certainty as with the

7  other documents that we've looked at.

8          Q.  Is this a changes sheet?

9          A.  No.

10         Q.  What is this?

11         A.  It's a demographic and political profile of

12  the districts -- the HB319 Ohio districts.

13         Q.  And there's a date here on the metadata of

14  October 19, 2011; do you see that?

15         A.  Yes.

16         Q.  Do you have any recollection -- does this

17  help refresh your recollection of creating any

18  analysis of HB319 in October of 2011?

19         A.  I believe you asked me before about changes

20  sheets.  This is not a changes sheet based off of

21  the definition we've been using, but -- again, the

22  font is weird for something I would have generated,

23  but given that the metadata says I'm the author and

24  that's the date it was created, then it's entirely

25  possible that I created this.

1          ADAM PERRY KINCAID

2      Q.  Look at the "PVI" column on the far right

3  on Exhibit 36; do you see that?

4      A.  Yes.

5      Q.  Do you have an understanding of what that

6  information is in that column?

7      A.  Yes.

8      Q.  And what kind of PVI data is that, please?

9      A.  That would be a Cook PVI.

10     Q.  And do you see "OH GOP average"; do you see

11  that?

12     A.  Yes.

13     Q.  Is that the Ohio GOP average that we've

14  been discussing previously?

15          MR. SHEEHY:  Objection, form.

16          MR. FRAM:  If you know.

17  BY THE WITNESS:

18     A.  Without seeing the formula that would be my

19  assumption given that this is a different formatted

20  document than the other ones that we've looked at.

21                  (Kincaid Exhibit 38 was marked

22                   as requested.)

23  BY MR. FRAM:

24     Q.  It just so happens we can mark as

25  Exhibit 38 the document that has the formula.  I'll

1                    ADAM PERRY KINCAID

2    represent to you what we did here is we went to

3    Excel and we made it so the formula could exist up

4    at the top bar on Exhibit 38; do you see that?

5         A.  Yes.

6         Q.  And you'll see here it doesn't use average,

7    it use "/5"; do you see that?

8         A.  Uh-huh.

9         Q.  That's another way of averaging those five

10   elections; is that right?

11        A.  That's correct.

12        Q.  That's something you, in fact, did using --

13   strike that.

14            That is something you, in fact, did using

15   Excel in your work in Ohio redistricting in 2011,

16   correct?

17            MR. SHEEHY:  Objection, form.

18   BY THE WITNESS:

19        A.  You're asking if I calculated the OH GOP

20   average in 2011?

21        Q.  I'm saying you used the slash 5 approach

22   rather than the average in terms of creating

23   functions in Excel?

24        A.  It seems like I would have, yes.

25        Q.  You see there are five variables in the

1                     ADAM PERRY KINCAID

2    function; do you see that?

3          A.  Yes.

4          Q.  And they correspond to the different -- the

5    letters correspond to the different columns in the

6    Excel spreadsheet, correct?

7          A.  Yes.

8          Q.  And, again, these are the same five

9    elections that we saw in the previous formula,

10   correct?

11         A.  Yes.

12         Q.  Namely, the 2008 presidential, the 2004

13   presidential, the 2010 governor, the 2006 attorney

14   general, the 2006 auditor, correct?

15         A.  Yes.

16         Q.  And not the 2010 attorney general, correct?

17         A.  That's correct.

18         Q.  So it's the same formula that appeared in

19   the exhibit that we previously saw that you said you

20   used, correct?

21              MR. SHEEHY:  Object to form.

22   BY THE WITNESS:

23         A.  Yes.

24         Q.  Does this help refresh your recollection

25   that you, in fact, created Exhibit 36?

1                    ADAM PERRY KINCAID

2        A.  Again, I couldn't tell you -- based off the

3   metadata it appears that I created this.  The format

4   is odd for something I would have created.  So...

5        Q.  And also the formula's the same?

6        A.  Yes.  I mean, I don't have an IP claim to

7   averaging five races together.  So someone else

8   definitely could have done that.

9        Q.  I didn't say there was a property rights

10  violation here.

11       A.  I'm saying it wasn't exclusive to me to

12  average five races.

13       Q.  Do you know if anybody else was using Excel

14  to average those five races?

15       A.  I have no idea.  I was just saying.

16       Q.  Do you recall communicating the information

17  in Exhibit 36, whether in this font or some other

18  font, to anyone in 2011?

19            MR. SHEEHY:  I'm sorry.  I missed the

20  question.  Could you repeat the question.

21  BY MR. FRAM:

22       Q.  You said the font might not have been your

23  font.  My question is putting the font aside, the

24  content of the document, do you recall communicating

25  it to anyone in 2011?

1              ADAM PERRY KINCAID

2         A.  I don't explicitly remember communicating

3    this document to anybody else in 2011, but I do

4    recall communicating this data to other people in

5    2011.

6         Q.  "This data" being which data, please?

7         A.  The data represented on the spreadsheet.

8         Q.  And to whom did you communicate it, please?

9         MR. SHEEHY:  I'm going to instruct the

10   witness to not answer the question if in answering

11   the question you're revealing internal

12   communications within the association under the

13   First Amendment privilege.

14   BY THE WITNESS:

15        A.  I would have communicated it within the

16   association.  So...

17        Q.  Did that include communications to --

18   within your definition of association that

19   included -- as of October 2011 that included Ray

20   DiRossi?

21        MR. SHEEHY:  Same objection with the

22   instruction you can answer the question if it

23   doesn't reveal internal associational

24   communications.

25   BY THE WITNESS:

Page 243

1                    ADAM PERRY KINCAID

2        A.  Can you repeat the question?

3        Q.  When you said you communicated within the

4   association I just wanted to be specific.  Did that

5   include communication to Ray DiRossi?

6        A.  You're asking if I would include Ray

7   DiRossi in the definition of the association?

8        Q.  Yes, as you understood it.

9        A.  Yes.  I think I testified to that already.

10       Q.  And Heather Mann?

11       A.  Yes.

12       Q.  And Tom Whatman?

13       A.  Yes.

14       Q.  Okay then.

15            Is it your understanding that the

16   information in Exhibit 36 concerned HB319 as

17   enacted?

18       A.  Based off of the date this was created and

19   the label of HB319, then my expectation would be

20   that this is based off of 319 as enacted, yes.

21                      (Kincaid Exhibit 39 and

22                       Exhibit 40 were marked as

23                       requested.)

24   BY MR. FRAM:

25       Q.  So for 39 it's DiROSSI-0000142 and for 40

1          ADAM PERRY KINCAID

2    it's same Bates number with the word "Metadata."  On

3    the metadata you're listed as the author?

4         A.   That's what it says.

5         Q.   Have you ever seen 39 before?

6         A.   I've never seen this document.

7         Q.   You didn't create 39?

8         A.   Exhibit 39, no, I did not create this

9    document.

10        Q.   That's not your analysis?

11        A.   This is not my analysis.

12        Q.   Okay.  Fine.

13             MR. FRAM:  No further questions.  Thank you

14   for your time.  Subject to the following, I should

15   add.  Number one, maybe there will be a little

16   redirect here now, in which case I'll have some

17   follow-up questions to that and, of course, I

18   wouldn't be surprised if there's some further

19   discussion among the lawyers and the Court about the

20   First Amendment privilege which could result in our

21   needing to question you again.  So concluding at

22   this time is, of course, without waiver our right to

23   come back and ask you more questions if all the

24   instructions around the First Amendment privilege

25   are resolved in a way that results in further

1                    ADAM PERRY KINCAID

2    discovery.

3              MR. SHEEHY:  Understood.  We'll deal with

4    that when it comes, if it comes.

5              Can we go off the record and take a few

6    minutes to see if we want to ask any redirect?

7              MR. FRAM:  Sure.

8                        (A short break was had.)

9              MR. SHEEHY:  We don't have any questions.

10   On behalf of Mr. Kincaid, we don't have any

11   questions.

12             MS. RIGGINS:  Nothing.

13             MS. McKNIGHT:  No questions.

14                        (Whereupon, at 5:51 p.m. the

15                         taking of the instant deposition

16                         ceased.)

17

18

19

20

21

22

23

24

25

Page 246

1                        ADAM PERRY KINCAID

2                    ACKNOWLEDGEMENT OF DEPONENT

3           I, ADAM PERRY KINCAID, being first duly

4    sworn, on oath say that I am the deponent in the

5    aforesaid deposition taken on the 4th day of

6    December, 2018; that I have read the foregoing

7    transcript of my deposition consisting of pages 1

8    through 247, inclusive, and affix my signature to

9    same.

10

11

12
     ADAM PERRY KINCAID
13

14
     _____
15   DATE

16

17

18

19

20

21

22

23

24

25

Page 247

1                    ADAM PERRY KINCAID

2      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

3             I, TINA M. ALFARO, Registered Professional

4      Reporter, Certified Realtime Reporter, and Notary

5      Public, the officer before whom the foregoing

6      deposition was taken, do hereby certify that the

7      foregoing transcript is a true and correct record of

8      the testimony given; that said testimony was taken

9      by me stenographically and thereafter reduced to

10     typewriting under my direction; that reading and

11     signing was requested; and that I am neither counsel

12     for, related to, nor employed by any of the parties

13     to this case and have no interest, financial or

14     otherwise, in its outcome.

15            IN WITNESS WHEREOF, I have hereunto set my

16     hand and affixed my notarial seal this 11th day of

17     December, 2018.

18

19     My Commission expires October 31, 2020.

20

21

22     _____

23     NOTARY PUBLIC IN AND FOR THE

24     DISTRICT OF COLUMBIA

25

Page 248

1   NAME OF CASE:

2   DATE OF DEPOSITION:

3   NAME OF WITNESS:

4   Reason Codes:

5          1.  To clarify the record.

6          2.  To conform to the facts.

7          3.  To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

                              _____

25