1          A. Kincaid - CONFIDENTIAL

2          UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF OHIO

4        Case No. 1:18-CV-00357-TSB-KNM-MHW

5    _____

6    OHIO A. PHILIP RANDOLPH                  )

7    INSTITUTE, et. al,                       )

8                   Plaintiffs,               )

9         v.                                  )

10   LARRY HOUSEHOLDER, Speaker of            )

11   the Ohio House of Representatives,       )

12   et al.,                                  )

13                   Defendants.              )

14   _____ )

15

16

17         DEPOSITION OF ADAM KINCAID

18                Volume Two

19              Washington, D.C.

20              January 31, 2019

21

22

23

24   Reported by: Mary Ann Payonk

25   Job No: 154708

1          A. Kincaid - CONFIDENTIAL

2

3

4

5                    January 31 2019

6                    8:30 a.m.

7

8        Deposition of ADAM KINCAID, Volume Two,

9   held at the law offices of Covington & Burling

10  LLP, 850 Tenth Street, Washington, D.C.,

11  pursuant to Notice before Mary Ann Payonk,

12  Shorthand Reporter and Notary Public of the

13  District of Columbia, Commonwealth of Virginia,

14  and State of New York.

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2    ON BEHALF OF PLAINTIFFS:

3         ROBERT FRAM, ESQUIRE

4         COVINGTON & BURLING

5         One Front Street

6         San Francisco, CA 94111

7

8    ON BEHALF OF THE WITNESS:

9         SHAWN SHEEHY, ESQUIRE

10         PHILLIP GORDON, ESQUIRE

11         HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC

12         45 North Hill Drive

13         Warrenton, VA 20186

14

15    ON BEHALF OF INTERVENORS:

16         KATHERINE McKNIGHT, ESQUIRE

17         BAKER HOSTETLER

18         1050 Connecticut Avenue Northwest

19         Washington, DC 22036

20

21    ON BEHALF OF LEGISLATIVE DEFENDANTS:

22         ALYSSA RIGGINS, ESQUIRE (By phone)

23         OGLETREE DEAKINS

24         4208 Six Forks Road

25         Raleigh, NC 27609

1                    A. Kincaid - CONFIDENTIAL

2    ADAM KINCAID,

3              called as a witness, having been duly

4              sworn, was examined and testified

5              further as follows:

6                    EXAMINATION (Cont'd.)

7    BY MR. FRAM:

8         Q.    Good morning, Mr. Kincaid.  We met

9    before your December 4 deposition.  I'm Robert

10   Fram.  I represent the plaintiffs in this case.

11                We are going to start per agreement

12   of counsel with exhibits that are going to

13   start with the numbering after the last one in

14   your December 4 deposition.  That was number

15   40, so we are going to start today with number

16   41, okay?

17        A.    Okay.

18                MR. SHEEHY:  This is Shawn Sheehy

19              on behalf of Mr. Kincaid.  We have

20              produced Mr. Kincaid today for this

21              deposition; however, we are going to

22              preserve our rights under the First

23              Amendment privilege to appeal that after

24              a final ruling from the District Court

25              to preserve our rights.

1           A. Kincaid - CONFIDENTIAL

2               I will be objecting to form to

3       questions that would include the First

4       Amendment privilege so any objections to

5       form will include objections under the

6       First Amendment privilege.

7               Given the District Court's order, I

8       will not be instructing Mr. Kincaid to

9       not answer questions unless those

10      questions would go to the District

11      Court's limitation of questions

12      pertaining only to Ohio.

13              And also, to put it in the record,

14      we will designate the transcript today

15      as CONFIDENTIAL pursuant to the Court's

16      confidentiality agreement.  Thank you.

17              MR. FRAM:  Thank you.

18  BY MR. FRAM:

19      Q.   Mr. Kincaid, you're aware you're

20  testifying here pursuant to a subpoena?

21      A.   Yes, sir.

22      Q.   And we went through deposition ground

23  rules the last time.  Those still apply here

24  but I just want to underscore again that you're

25  testifying here again under oath and under

```
 1              A. Kincaid - CONFIDENTIAL

 2    penalty of perjury.

 3              You understand that?

 4        A.   Yes, sir.

 5        Q.   Previously, your counsel provided

 6    documents responsive to a different subpoena,

 7    document subpoena, and of those 446 documents,

 8    you were listed as the custodian for many of

 9    them.

10              Do you recall collecting documents

11    for that subpoena?

12        A.   Yes.

13        Q.   Since that document collection effort

14    on your part, have you gone back and looked for

15    additional documents?

16        A.   No.

17        Q.   What did you do to prepare for

18    today's deposition, please?

19        A.   I met with my attorneys for a few

20    hours yesterday.

21        Q.   Anyone in the room who was not an

22    attorney?

23        A.   No.

24        Q.   Anybody who was an attorney but not

25    your attorney?
```

1          A. Kincaid - CONFIDENTIAL

2     A.   No.

3     Q.   Have you had the opportunity to

4  review the transcript of your December 4

5  deposition since that deposition?

6     A.   Yes.

7     Q.   And did you provide a list of errors,

8  if any, to your counsel?

9     A.   I did.

10          MR. SHEEHY:  And those corrections

11      were filed with the District Court.  It

12      was one of the filings where your team

13      filed the draft transcript and in our

14      response, we filed the completed

15      transcript, which included his

16      corrections.

17          MR. FRAM:  Okay.

18  BY MR. FRAM:

19     Q.   Have you reviewed the transcript

20  since that check for errors?

21     A.   I have not.

22     Q.   While you were at the NRCC in 2011,

23  did you draft any maps relating to

24  redistricting in Ohio?

25     A.   Yes.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Do you recall approximately how many

3    maps you drew?

4               MR. SHEEHY:  Objection to form.

5          A.   Can you be a little bit more specific

6    as far as maps, what you're referring to?  We

7    went through this last time obviously too.

8    There's a lot of ways you can define maps when

9    it comes to redistricting.

10         Q.   Let me see if I can break that apart

11   a little bit for you.  Let's go through the

12   different ways one can generate a map for

13   redistricting.

14              First of all, was the software tool

15   you would use to generate a map, was that

16   Maptitude?

17         A.   Yes.

18         Q.   And what are the different ways you

19   can generate a map using Maptitude for

20   Congressional redistricting?  And that, you did

21   in Ohio in 2011.

22              MR. SHEEHY:  Objection to form.

23         A.   Ways that you can generate a map

24   would include you can upload a map, meaning a

25   shapefile or a block assignment file into

1                    A. Kincaid - CONFIDENTIAL

2    Maptitude.  That would generate a map.

3                    You can use a -- what they would call

4    a Maptitude layer or a map layer within

5    Maptitude to move blocks and precincts from one

6    district to another or assigning map precincts

7    or blocks from district to district.

8                    So there's a lot of different ways

9    you can generate or upload maps.

10        Q.   Let's take those a little bit one at

11   a time.  For a block file, something called a

12   block equivalency file; is that right?

13        A.   There's a lot of different words for

14   it.  Yeah, I know what you're talking about.

15        Q.   That basically gives the information,

16   if I understand it correctly, of the

17   individual -- tells you which individual census

18   blocks are within specific proposed or final

19   Congressional districts; is that right?

20        A.   I would say districts because it

21   could be any kind of district.

22        Q.   I want to focus my questions on Ohio

23   and on Congressional districts.  So in regards

24   to Ohio Congressional district map generation

25   in 2011, did you generate block equivalency

1                    A. Kincaid - CONFIDENTIAL

2    files which you then loaded into Maptitude for

3    the purpose of generating district maps,

4    Congressional district maps?

5                    MR. SHEEHY:  Objection to form.

6        A.   I wouldn't have generated block files

7    for my own uploading to Maptitude.  I would

8    have -- if I was uploading a file into

9    Maptitude, it's because I received it from

10   somewhere else, not because I did it myself.

11       Q.   Did you ever move a block from one

12   district to another in Ohio as regards 2011

13   Congressional redistricting?

14                    MR. SHEEHY:  Objection to form.

15       A.   Yes.

16       Q.   So if I understand correctly, you

17   would receive a block equivalency file that

18   would have all the blocks for Ohio; is that

19   right?

20       A.   If I had received a block equivalency

21   file in Ohio it would have included districts

22   and blocks, yes.

23       Q.   Who was sending you the block

24   equivalency file if you were not generating it

25   yourself.

1          A. Kincaid - CONFIDENTIAL

2          MR. SHEEHY:  Objection to form.

3      A.   If I would --

4      Q.   And again, this is for Ohio in 2011.

5      A.   Yes.  If I was uploading a block

6   equivalency file in regards to Ohio

7   redistricting, specifically Congressional in

8   2011, that block file would have likely come

9   through Tom Whatman from Heather Mann and Ray

10  DiRossi.

11     Q.   Did you ever get block equivalency

12  files directly from Heather Mann or Ray

13  DiRossi?

14          MR. SHEEHY:  Objection to form.

15     A.   As for that email chain that we went

16  over the last time I had a deposition, yes, I

17  did receive a couple at the very end of the

18  redistricting process, yes.

19     Q.   Mid December?

20     A.   I think it was September-ish.

21     Q.   We will go back to that as to when

22  that happened.

23     A.   Yes.

24     Q.   But thank you.

25          So that's the block equivalency

1                    A. Kincaid - CONFIDENTIAL

2    files.  I'm talking about shapefiles.  Are your

3    answers the same as regards the shapefiles?

4         A.   I would not say the same because I

5    don't recall receiving any shapefiles for Ohio

6    in 2011.

7         Q.   So the record's clear, your

8    recollection is you received block equivalency

9    files for the entire state of Ohio for --

10   either directly from Ms. Mann or Mr. DiRossi or

11   through Mr. Whatman; is that right?

12        A.   That's correct.

13        Q.   You would then load that into

14   Maptitude; is that right?

15        A.   That's correct.

16        Q.   Then you would move a block from one

17   district to another; is that right?

18                  MR. SHEEHY:  Objection to form.

19        A.   If need be, yes.

20        Q.   Do you recall --

21        A.   Not always.

22        Q.   But there were occasions when you did

23   so?

24        A.   There would be occasions where I did

25   so, yes.

1              A. Kincaid - CONFIDENTIAL

2        Q.   Do you recall approximately how many

3   times you did that?

4        A.   Could you be more specific?

5        Q.   Do you recall how many times -- well,

6   do you recall how many times you engaged --

7   what I'm going to call what you just described,

8   I'm going to call it the process of revising an

9   Ohio Congressional district map.

10            Are you comfortable with that

11  phrasing?

12       A.   That will be fine.

13       Q.   Do you recall how many times you

14  engaged in the process of revising an Ohio

15  Congressional district map in 2011?

16            MR. SHEEHY:  Objection to form.

17       A.   Just for clarity's sake, let me break

18  it out from what you said.  You were -- you

19  teed it up as me receiving a file from Ray

20  DiRossi or Heather Mann and then me revising it

21  from that point.

22            I don't recall doing that more than a

23  couple times at the very end of the process,

24  like we talked about before.

25       Q.   Did you engage in any other process

```
 1              A. Kincaid - CONFIDENTIAL
```

 2   of either creating or revising a Congressional

 3   district map in Ohio in 2011 other than those

 4   couple of instances where you used block

 5   equivalency files?

 6        A.   Yes.

 7        Q.   And what do you recall about that,

 8   please?

```
 9            MR. SHEEHY:  Objection to form.
```

10        A.   Well, I think there's two different

11   processes that we're kind of intermingling here

12   that's worth breaking out.

13            There's me receiving block

14   equivalency files from Ray and Heather in Ohio

15   through Tom or some other -- more directly

16   versus what I was doing, which we have talked

17   about before, which is working with the members

18   of the Ohio delegation to create a proposal for

19   the state legislature in Ohio to consider which

20   was done with me working with people to create

21   that proposal and then sending a block

22   equivalency file, which would have been a

23   different process.

24            So those are two different things

25   that I think it's important to keep separate

1          A. Kincaid - CONFIDENTIAL

2   because they're --

3          Q.   Let's break it apart.   We were

4   talking about what you were doing directly with

5   either Ms. Mann or Mr. DiRossi or through

6   Mr. Whatman and not part of the -- what I'll

7   call the Congressional proposal process, not

8   part of that.

9               You say there was another way,

10  though, other than block equivalency files that

11  you could revise a map, and that is you could

12  actually look at a map and map to it and you

13  could then click on a block on the map itself

14  and then move it; is that right?

15         A.   Again, to go back to the process, a

16  block equivalency file is something you export

17  at the end of creating a map or a proposal or a

18  draft or whatever you want to call it.   It's

19  not something that you -- I suppose in the back

20  end, you are changing the block equivalency.

21  You're changing the way that blocks are

22  assigned.

23              But a block equivalency file itself

24  is not something you would manipulate.   It's

25  something you would upload into a software and

1                    A. Kincaid - CONFIDENTIAL

2   then export a block equivalency file back out

3   when you when finished with it.  So that to

4   itself is used to -- normally, you would use

5   maps to move precincts or VTBs, which are voter

6   tabulation districts, or blocks and assign them

7   from one district to another.

8        Q.   Right.  And to do that, would you --

9   to do that, would you do that like looking at a

10  map and clicking on a dot on a map or that dot

11  corresponding to a particular block, or what's

12  the mechanics of how you do that process?

13           MR. SHEEHY:  Objection to form.

14       A.   Within Maptitude what you would do is

15  you first choose the district that you are

16  assigning a piece of geography to so.  If you

17  want to put something in Ohio District 1, you

18  would make sure 1 is selected.  And then you,

19  you know, mouse over that spot and click on

20  that piece of geography and then another and

21  another and another, whatever you want to do.

22  And then you click a checkmark that assigns it

23  to that district.

24       Q.   Okay, so you could -- if I understand

25  correctly, taking your example of District 1,

1          A. Kincaid - CONFIDENTIAL

2   you'd scroll over District 1 and then you'd

3   click on a block.  That block would be

4   represented by a dot.  How would you know what

5   to be clicking on?  You say you'd scroll over

6   District 1; is that right?

7        A.   Well, I'd make sure District 1 was

8   selected.

9        Q.   Was selected, okay.  And then what

10  you would -- so all you'd be seeing would be

11  District 1 on the screen, or all of Ohio with

12  District 1?

13       A.   It depends on what you have up on the

14  screen when you're working.  You can zoom in

15  and out.  It's like working with Google Maps.

16  You could look at all of a state or you could

17  look at a county or a precinct or a block.  We

18  can zoom in as low as you want or zoom out as

19  much as you want to.

20       Q.   So you got the -- a visual of the

21  district whether zoomed in or not on the screen

22  and then you scroll over it to get to a

23  particular what you call geography; is that

24  right?

25       A.   A piece of census geography, yes.

1          A. Kincaid - CONFIDENTIAL

2          Q.    And that census geography could

3     include a census block; correct?

4          A.    Census geography includes everything

5     from census blocks to census tracts, VTDs,

6     which are voter tabulation districts, you know,

7     all the way up, you know, counties or

8     municipalities.

9          Q.    So just focusing on blocks for a

10    minute, you scroll over, and when you scroll

11    over the district, how would you see those

12    blocks?  Would you scroll over the block?

13    Would the block number appear, pop up, or how

14    would you know which block you were on?

15         A.    I mean, you see the block.

16    Typically, you don't -- in the course of

17    creating a draft map or whatever it might be

18    that you're working on, you don't really work

19    with blocks that much because blocks are very

20    small and it would take a very long, tedious

21    time to go through thousands and thousands of

22    blocks in a state.

23              You typically work at higher

24    geographies and then you would go down to a

25    block level when you're at the end of the

```
 1              A. Kincaid - CONFIDENTIAL
 2    process and you're trying to balance
 3    populations between districts.
 4        Q.   Did you -- in Ohio in 2011 did you
 5    work at the block level when you were revising
 6    maps or at a higher geography level?
 7              MR. SHEEHY:  Objection to form.
 8        A.   I would have done all of the above.
 9        Q.   Okay.  So let's take it at the block
10    levels that you did in Ohio in 2011 so we have
11    a clean record as to how this gets done.
12              You scroll over the district.  And
13    then when you're over a block, does the block
14    number appear for you?
15              How do you know what block you're on
16    is what I'm trying to get at?
17        A.   It depends on what the label is that
18    you have selected in Maptitude.  So if you want
19    to have a block number, you could have a block
20    number.  If you want to have a population, you
21    could have a population.  It would depend.
22              I mean, a block number's several
23    digits long so if you are going to have a block
24    number up on every single block, it's kind of
25    hard to see because there's a lot of numbers
```

1                  A. Kincaid - CONFIDENTIAL

2   and a lot of lines.

3                  So the easier thing is to have the

4   population of the block on the screen rather

5   than the specific number of a block.

6        Q.   Okay, fair enough.  So you scroll

7   over a block and a label would appear on the

8   screen; is that right?

9        A.   Yes, uh-huh.

10       Q.   As you were scrolling, different

11  labels would appear as you went over different

12  blocks; is that right?

13       A.   The labels appear across the screen,

14  you know, on all of the blocks or all of the

15  VTDs that would have appeared within, you know,

16  that image that you're looking at on the

17  monitor.

18       Q.   If all the labels are up there, how

19  do you know which label you are scrolled over?

20       A.   Well, the label would be in the

21  middle of the geography so you know what label

22  corresponds with what geography.

23       Q.   Okay.  But if you want to move a

24  particular block from one district to

25  another --

1                    A. Kincaid - CONFIDENTIAL

2          A.    Uh-huh.

3          Q.    -- and you scrolled over that

4    district and the labels are up on the screen,

5    how do you know how to manipulate it so you can

6    move that block from one district to another?

7                MR. SHEEHY:  Objection to form.

8          A.    I don't know how to do this with the

9    court reporter, the easiest way to do it, but

10   if you have a circle that's a census block and

11   you want to -- say I want to assign that

12   geography to a different district, right?

13         Q.    Uh-huh.

14         A.    And it has a number 5 on it because

15   maybe five people were tabulated by the Census

16   Bureau that live within that block.  I'd just

17   take my mouse and I'd click on that block and

18   then hit a checkmark and that would assign it

19   to that district, and that's how you would

20   assign a block to a district.

21         Q.    Now, in that label -- let me back up.

22   So that's a different way of revising a map

23   other than revising a block equivalency file;

24   correct?  It was the second technique I think

25   you described.

1                A. Kincaid - CONFIDENTIAL

2          A.   Again, I wouldn't call that revising
3    a block equivalency file.  I would say that
4    would be modifying a -- you know, making
5    modifications to a map.
6          Q.   Right.
7          A.   Like I said before, a block
8    equivalency file is something you import or
9    export, and maybe there's changes made on the
10   back end, but you're not --
11         Q.   I understand.  I'm not -- I --
12   actually, I think we're on the same page.  Let
13   me say it clearly for the record.  To revise a
14   map, as you did in Ohio in 2011, there are two
15   basic techniques, as I understand it.  One is
16   you can actually modify the block equivalency
17   file itself.  The other is you can modify --
18   you can go on screen, click on the geography,
19   designate the new district that you go into,
20   click, and then it's done.  And that will --
21   can result in a change in the block equivalency
22   file, those two different techniques.
23         A.   The second thing you described is
24   really the way it's done.  I've never known
25   anybody who would ever take the time to go into

1                    A. Kincaid - CONFIDENTIAL

2    a block equivalency file and assign every block

3    by a district with a district number.

4         Q.    So if I understand correctly, you

5    would receive the block equivalency file for

6    the whole state and directly from Heather Mann,

7    Ray DiRossi, or through Tom Whatman.  It would

8    be loaded into Maptitude.  And then if you want

9    to make revisions, then at least on a couple of

10   occasions, having loaded that into Maptitude,

11   you would then scroll over the district, find

12   the geography you wanted to reassign to a

13   different district, and click on it.

14             Do I have that process correct?

15             MR. SHEEHY:  Objection to form.

16        A.    That's the basic gist of it, yes.

17        Q.    Okay.  You say you did that, you can

18   recall doing that a couple of times; is that

19   right?

20             MR. SHEEHY:  Objection to form.

21        A.    When it came to me receiving a block

22   assignment file, that would have -- you know,

23   end in, you know, me making revisions to

24   something I received.  That happened a couple

25   times, maybe a few times.  I don't really

```
 1              A. Kincaid - CONFIDENTIAL

 2    recall.

 3         Q.   You said maybe a few, so more than

 4    five?

 5         A.   I honestly -- I don't remember how

 6    many times I would have received a block

 7    assignment file other than a couple times at

 8    the end where I remember receiving a block

 9    assignment file.

10         Q.   At least two, could have been more;

11    is that fair?

12         A.   Possibly, yes.

13         Q.   Do you recall -- I'll go back to the

14    Congressional proposal in a minute, but just in

15    terms of work that was done directly with

16    Mr. DiRossi and Ms. Mann or through Tom

17    Whatman, do you recall any other ways in which

18    you engaged in the process of revising

19    Congressional district maps in Ohio in 2011?

20              MR. SHEEHY:  Objection, form.

21         A.   The only way I would have been making

22    revision was within Maptitude.  There was no

23    other software or platform I would have been

24    using at the time.

25         Q.   Was there any other Maptitude
```

1                    A. Kincaid - CONFIDENTIAL

2    technique that you'd use other than the ones

3    you've already described?

4                    MR. SHEEHY:  Objection to form.

5         A.   The sense of selecting a -- one block

6    or one precinct or one county at a time, I

7    mean, you can select multiple at one time.  But

8    no, I mean, that's -- that's the basic way that

9    you would use Maptitude --

10        Q.   Okay.

11        A.   -- to assign geographies to

12   districts.

13        A.   Let's talk about the Congressional

14   proposal work you did also.

15        A.   Okay.

16        Q.   First of all, to have a clean record,

17   can you describe for me the Congressional -- I

18   mean, we had some testimony already but so we

19   are all in one place and don't have to go back

20   and forth between different deposition pages.

21   Can you please describe your deposition [sic]

22   proposal process, the work you did.

23                    MR. SHEEHY:  Objection to form.

24        A.   As the redistricting coordinator in

25   2011 and 2012, my job was to facilitate the

1                    A. Kincaid - CONFIDENTIAL

2    development of proposed maps with members of

3    Congress, specifically in Ohio, so that they

4    would have a proposal that they could bring

5    back to state legislators for their

6    consideration when they were -- since state

7    legislators were the ones responsible for

8    redistricting and passing maps into law.  So my

9    job was to facilitate the development of those

10   proposals in Ohio.

11        Q.   And what did you do to facilitate

12   those proposals?

13             MR. SHEEHY:  Objection to form.

14        A.   I meet with -- in Ohio, I met with

15   Tom Whatman a number of times.  I met with the

16   Republican members of Congress; some once, some

17   not at all, and a couple of them multiple times

18   to receive feedback from them and from others

19   via them on what to include or not include in a

20   proposal for the Ohio legislature.

21        Q.   And did that process take place

22   during August of 2011?

23             MR. SHEEHY:  Objection to form.

24        A.   As said in my last deposition, I

25   don't remember when that process began in 2011.

1          A. Kincaid - CONFIDENTIAL

2     But I'm sure in August and September is

3     probably when I was the busiest doing that, but

4     I don't recall when that began.

5          Q.   Do you recall when it ended?

6          A.   It would have ended whenever the

7     final map was -- well again, it ended with that

8     email exchange that you and I went over in the

9     last deposition.

10         Q.   So sometime around --

11         A.   Whatever the date was on that email

12    exchange.

13         Q.   But before the -- it ended before the

14    map went to -- before a map proposal went --

15    was considered by the Ohio General Assembly, so

16    that's certainly an end date; is that right?

17              MR. SHEEHY:  Objection to form.

18         A.   The proposal would have been sent

19    over before that point and then my involvement

20    in the process ended from a drafting

21    perspective with that final change, with

22    Mr. Whatman and Ray and Heather.

23         Q.   And that was on the evening of

24    September 12, 2011 --

25         A.   I -- I'm not --

1              A. Kincaid - CONFIDENTIAL

2         Q.   -- that those emails --

3         A.   I don't remember the date, but --

4         Q.   Yeah.  But the proposal would have

5    gone in before that email exchange; is that

6    right?

7         A.   Yes.

8         Q.   Okay.  Do you recall roughly how many

9    times they -- you provided your proposal before

10   the final email exchange?

11             MR. SHEEHY:  Objection to form.

12        A.   It could have been a week or two.  I

13   really don't recall.

14        Q.   Was that proposal -- do you recall

15   how it was transmitted?  Did you transmit it or

16   was it transmitted by Mr. Whatman?

17        A.   I don't have a specific recollection.

18        Q.   Do you recall who it was sent to?

19             Was it sent to Speaker Batchelder?

20             Do you recall?

21        A.   Speaker Batchelder would not have

22   been -- the only people that I know of that

23   received the maps from me or Tom that were

24   working for the Ohio legislature would be Ray

25   and Heather.

1              A. Kincaid - CONFIDENTIAL

2        Q.    Okay.   And in the process of working

3    on those, on the Congressional proposal map --

4        A.    I'm sorry, let me correct that real

5    quick.  The other person that would have been

6    working with the Ohio legislature was their

7    attorney, which was Mark Braden, who also would

8    have received files on a couple occasions.

9        Q.    Did you send him the Congressional

10   proposal?

11       A.    I did.

12       Q.    Did he ever make any revisions to the

13   Congressional proposal before it was sent?

14              MR. SHEEHY:  Objection to form.

15       A.    Did he make any revisions?

16       Q.    Right.   Before you sent the proposal

17   to the Ohio legislature, did Mr. Braden provide

18   any input on the proposal?

19              MR. SHEEHY:  Objection to form.

20       A.    In his role as counsel, I know that

21   he gave legal advice to the state legislature

22   on how that process should have been conducted,

23   and I would have received feedback on that

24   through Tom Whatman via the Ohio legislature.

25   But Mark was representing the Ohio legislature

1          A. Kincaid - CONFIDENTIAL

2    and I didn't receive any feedback from him

3    directly.

4       Q.   Did Mr. Whatman ever say to you that

5    Mr. Braden wanted you to move a geography from

6    one district to another --

7            MR. SHEEHY:  Objection.

8       Q.   -- while were you working on the

9    Congressional proposal?

10           MR. SHEEHY:  Objection to form.

11      A.   I never received any instructions to

12   that respect from Mark Braden via Tom or

13   anybody else.

14      Q.   What about Mr. Hofeller?  Did he

15   provide any input on the Congressional

16   proposal, the late Dr. Hofeller?

17           MR. SHEEHY:  Objection to form.

18      A.   Dr. Hofeller had been in touch with a

19   couple members as well through previous

20   relationships so I know that he -- I think he

21   advised a couple members separate from what I

22   was working on with Mr. Whatman, but his

23   specific guidance I couldn't speak to.

24      Q.   During the formulation of the

25   Congressional proposal did Dr. Hofeller ever

1          A. Kincaid - CONFIDENTIAL

2    provide an instruction to you as to which

3    districts certain geographies should be?

4          MR. SHEEHY:  Objection, form.

5      A.   No.

6      Q.   Do you know if he provided any to --

7    any instructions or input to Mr. Whatman who

8    then conveyed that to you?

9          MR. SHEEHY:  Objection to form.

10     A.   I couldn't tell you what Tom

11   received, what Tom Whatman received from

12   anybody else.  I don't know who, you know, was

13   giving -- I don't know if Hofeller gave Whatman

14   any specific instructions or feedback or not.

15     Q.   Well, let's talk about the work you

16   did on the Congressional proposal so we've got

17   that clear.

18          In this instance you were working

19   with Maptitude, did you also have a block

20   equivalency file that had been loaded into

21   Maptitude that you were working in?

22     A.   At the beginning of this process?

23     Q.   At any point while you were -- let me

24   back up.  The end product --

25     A.   Uh-huh.

1              A. Kincaid - CONFIDENTIAL

2        Q.   -- for the proposal, the

3    Congressional proposal, was that a map

4    generated in Maptitude?

5        A.   Yes.

6        Q.   And did that include a block

7    equivalency file also, the end product?

8        A.   The final proposal from the

9    delegation from Ohio would have been

10   transferred via a block equivalency file.

11       Q.   So you'd send that block equivalency

12   file over to Ms. Mann and Mr. DiRossi and then

13   they would load that into Maptitude so they

14   could see a rendering of the map; is that

15   right?

16             MR. SHEEHY:  Objection to form.

17       A.   Ray and Heather would have uploaded

18   that file into whatever software they were

19   using.

20       Q.   During the course of the work on the

21   Congressional proposal was the block

22   equivalency file amended over time indirectly

23   through clicking on Maptitude districts

24   themselves?

25             MR. SHEEHY:  Objection to form.

1          A. Kincaid - CONFIDENTIAL

2          A.   Redistricting is an iterative process
3    so there are always changes being made to any
4    draft proposal.  It's not static, especially in
5    Ohio.
6               Ohio came out of the, you know, 2010
7    census -- went into the 2010 census with 18
8    districts and left the 2010 census with 16
9    districts, so yes, there were changes made
10   between the map that existed and the new map.
11        Q.   And so when you -- your work on the
12   Congressional proposal, did you start with a
13   baseline block equivalency file which then
14   iterated?
15        A.   The baseline map I would have worked
16   off of was the existing Congressional map in
17   Ohio.
18        Q.   And how did you -- I'm assuming you
19   obtained a block equivalency file for the
20   existing, and that would have been the
21   18-district map; is that correct?
22        A.   That's correct.
23        Q.   Who did you receive that from?
24        A.   Maptitude.
25        Q.   Maptitude itself?

1                A. Kincaid - CONFIDENTIAL

2        A.    Maptitude provides the existing

3    geographies for the districts as part of the

4    package you would get with Maptitude.

5        Q.    Now, in the work on the Congressional

6    proposal did you also have election results

7    data loaded into Maptitude?

8                MR. SHEEHY:   Objection to form.

9        A.    Yes.

10       Q.    Do you recall what the source of that

11   election results data was, who it was?

12               MR. SHEEHY:   Objection to form.

13       A.    You're asking who I got the political

14   data from?

15       Q.    Yes, please.

16               MR. SHEEHY:   Same objection.

17       A.    The Ohio political data, some of it

18   came from a state university in Ohio I know

19   produced political data for the state, which is

20   one source of the political data.   Another

21   source was the Republican National Committee.

22       Q.    Okay.   Now, the Republican -- the

23   Ohio -- the Cleveland State University election

24   data, do you recall that was limited to the

25   2008 and 2010 election cycles?

1                    A. Kincaid - CONFIDENTIAL

2          A.   I don't recall what was in that set

3    of data.

4          Q.   Do you recall any differences between

5    what you got from the Republican National

6    Committee and the Cleveland State University

7    data?

8          A.   Yes.

9          Q.   What were the differences, please?

10         A.   The Republican National Committee

11   data was based off of the census blocks, and

12   the Cleveland state data was based off their

13   own geographies.

14         Q.   Okay.

15         A.   They split blocks and merged blocks

16   and --

17         Q.   Did you rely on one rather than the

18   other when you were doing your work on the

19   Congressional proposal?

20              MR. SHEEHY:  Objection to form.

21         A.   I tried to utilize both.

22         Q.   You said you tried.  In the end, did

23   you wind up relying more on one or the other?

24              MR. SHEEHY:  Objection to form.

25         A.   One was based off of the census data

1                A. Kincaid - CONFIDENTIAL

2      that was actually being used for redistricting,

3      and the other one was based off of census

4      geographies that didn't exist, so I used the

5      one based off of the actual census geographies,

6      which was the RNC data.

7         Q.   Okay.  Now, the RNC data, it was your

8      understanding, was that generated -- well, let

9      me back up.

10             Do you know whether Mr. Clark Benson

11     had something to do with generating the RNC,

12     what you're calling the RNC data?

13             MR. SHEEHY:  Objection to form.

14        A.   I'm not familiar with the contracts

15     of who did or did not contribute to what states

16     in -- with the data that was produced by the

17     RNC.

18        Q.   Do you know if The Magellan Group had

19     anything to do with generating those census

20     blocks?  That's a bad -- that political -- I'm

21     sorry, that's a terrible question.

22             Do you know whether The Magellan

23     Group had anything to do with generating the

24     election results for the census blocks that you

25     used in your work on the Congressional

1          A. Kincaid - CONFIDENTIAL

2    proposal?

3              MR. SHEEHY:  Objection to form.

4         A.   Again, I don't know who the

5    consultants or staff would have been that

6    generated the Ohio political data.

7         Q.   Do you recall whether Dr. Hofeller

8    provided you with the RNC -- what you call the

9    RNC data?

10              MR. SHEEHY:  Objection to form.

11         A.   I would not have received that data

12    from Tom Hofeller.  That data may have come

13    from Mike Wild.  That's the more likely source

14    for distributing that data.

15         Q.   Do you know if Tom Hofeller had

16    anything to do with any part of the process of

17    generating the RNC data?

18              MR. SHEEHY:  Objection to form.

19         A.   Tom was the resistor team director at

20    the RNC, and in that role I would assume that

21    he had some role over which consultants were

22    assigned to what states and what data was

23    generated.

24              But again, I couldn't speak to which

25    consultants were put on what states or how that

1                    A. Kincaid - CONFIDENTIAL

2      data was separated out for development

3      production.

4          Q.   As you were working on the

5      Congressional proposal, when you would scroll

6      over a district, did a label appear?  I think

7      you testified -- is that right?

8          A.   The label would be there, yes.  It

9      wouldn't just appear if I scrolled over it, but

10     yes, it would.

11         Q.   And do you recall, you said the label

12     could have population information in it.  Could

13     it also have election scorings in it?

14                   MR. SHEEHY:  Objection to form.

15         A.   The label is customizable within

16     Maptitude so it could be anything I wanted it

17     to be.

18         Q.   And did you, in fact, in Ohio working

19     on the Congressional proposal include PVI

20     scorings in the label?

21                   MR. SHEEHY:  Objection to form.

22         A.   At what geographies?  I think --

23         Q.   Oh, at any geography.  We will break

24     it down.

25         A.   Yes.

1                  A. Kincaid - CONFIDENTIAL

2          Q.    Which geographies?

3              MR. SHEEHY:  Objection to form.

4          A.    PVI scoring specifically I would have

5   had only at the Congressional district level.

6          Q.    Okay.  And when you would reassign or

7   iterate a geography from one district to the

8   other would that in real time change the PVI

9   scorings for the Congressional district?

10             MR. SHEEHY:  Objection to form.

11         A.    When you would -- when I would move a

12  geography from one district to another within,

13  you know, within Ohio, the software would

14  recalculate that, that index, yes, in real

15  time.

16         Q.    So you could immediately see the

17  change in the PVI scoring when you moved a

18  geography; correct?

19         A.    Yes.

20         Q.    And other than PVI scoring were there

21  any other election result information that

22  appeared in the labels?

23             MR. SHEEHY:  Objection to form.

24         A.    Yes.

25         Q.    What other election result

```
 1              A. Kincaid - CONFIDENTIAL
 2    information appeared in the labels?
 3              MR. SHEEHY:  Objection to form.
 4         A.   Again, it would just depend on what I
 5    was looking at at any point in time.  There
 6    were multiple elections that we had in the
 7    database that we were able to utilize.
 8         Q.   So just focus on Ohio in 2011.
 9         A.   Uh-huh.
10         Q.   Now focusing on the Congressional
11    proposal part of the process, that's -- for
12    then, do you recall what other election result
13    information appeared in the labels for the
14    Congressional districts?
15              MR. SHEEHY:  Objection to form.
16         A.   Sure.  In 2011, we were just coming
17    out of a very close race for governor in Ohio.
18    John Kasich had barely beaten Ted Strickland
19    and so that race was one of the ones I would
20    have looked at from time to time on how
21    districts were formed relative to the 2010
22    elections.
23              The McCain percentages and Obama
24    percentages from 2008 would have been something
25    we would have looked at.  Carrie Bush numbers
```

1                    A. Kincaid - CONFIDENTIAL

2     from 2004.  I think there was an '06 race or

3     two in there, probably auditor or Attorney

4     General or something like that.  So, I mean, it

5     really just depended from --

6          Q.   Did they all appear in the label, all

7     those individual elections for each district?

8               MR. SHEEHY:  Objection to form.

9          A.   I wouldn't have had all of them up on

10    the screen at one time because that would have

11    been a mess.

12         Q.   It's a lot to put into a label, I

13    understand.

14         A.   Yeah.

15         Q.   Rather than put it into a label, did

16    you ever put it into a table that would appear

17    on the side of the map?

18              MR. SHEEHY:  Objection to form.

19         A.   Maptitude gives you a -- a table that

20    exists that's there that is based off of any

21    data that you include in your base data for

22    drawing maps in Ohio.  So you would merge the

23    political data with census data that's matched

24    the block and then Maptitude takes that data

25    from the block level and rolls it up to the

1              A. Kincaid - CONFIDENTIAL

2    precinct level well, VTD, but just for ease of

3    use, precinct data and up to the county or

4    district or whatever it is you're looking at.

5         Q.   And is that sometimes -- was that

6    known as the Dataview 1 table?

7         A.   I don't know Dataview 1 or Dataview,

8    2 but it's Dataview something, yeah.

9         Q.   So we're clear, in the Dataview --

10   well, let's break it apart.  What's in the

11   label as opposed to being in the Dataview

12   table.

13        A.   Uh-huh.

14        Q.   So the label, there was at least PVI

15   scoring; is that right?

16        A.   No, not at least.  I mean, I didn't

17   always look at the PVI data for a district.

18        Q.   But you did look at the PVI data in

19   the label from time to time for a district; is

20   that right?

21             MR. SHEEHY:  Objection to form.

22        A.   Sometimes.

23        Q.   Did you ever have other election

24   result data in the label other than PVI?

25             MR. SHEEHY:  Objection to form.

1                A. Kincaid - CONFIDENTIAL

2          A.    Yes.

3          Q.    What would be in the -- what other

4    election result data did you at least on some

5    occasions have in the label?

6                MR. SHEEHY:  Objection to form.

7          A.    What I told you before.  Those

8    various races that I would have, you know,

9    switched them in and out depending on what I

10   was looking at.

11         Q.    Did you ever use any indices that

12   would average several different races, either

13   in the Dataview table or in the label?

14               MR. SHEEHY:  Objection to form.

15         A.    The PVI and -- is kind of an average

16   more of an index, and then the Ohio elections

17   average that we talked about the last time.

18         Q.    Right, the five elections that we

19   looked at the Excel function, if I recall.

20         A.    Yeah.

21         Q.    And that sometimes -- would that

22   index information appear sometimes in the

23   label?  Is that right?

24               MR. SHEEHY:  Objection to form.

25         A.    I don't recall ever having the Ohio

1                    A. Kincaid - CONFIDENTIAL

2    average in a label, but it's entirely possible

3    I could have at some point in time.  I just

4    don't recall having that in a label.

5        Q.    Did you have it in the Dataview

6    table?

7                    MR. SHEEHY:  Objection to form.

8        A.    I know I had the races that would

9    have made up that average in the Dataview

10   table, but I'm not sure I ever built that

11   average into -- because you have to customize a

12   formula within Maptitude.  You can't just --

13   you have to create that, and I'm not sure I

14   ever created that in Maptitude.

15       Q.    We saw you did it in Excel.

16       A.    I did it in Excel separately.

17       Q.    Right.

18       A.    But I'm not sure I ever did it within

19   Maptitude.

20       Q.    So you would export the election

21   results from Maptitude, is that right, to an

22   Excel form and then you copied it into a change

23   sheet, if I recall your testimony; is that

24   correct?

25       A.    That's basically it, yeah.

1                    A. Kincaid - CONFIDENTIAL

2          Q.   And so once you had the election

3    results exported from Maptitude you could then

4    use Excel to do the averaging for the

5    five-election index?

6          A.   Yeah, you could do the average within

7    Excel for that.

8          Q.   Well, let me ask you a question.  Did

9    you use the same elections for all the

10   districts or did you sometimes focus more on

11   some rather than the other, depending upon the

12   geography or location of the district?

13              MR. SHEEHY:  Objection to form.

14         A.   When you say did I use, what do you

15   mean by did I use?

16         Q.   Start with did you look at, sort

17   of -- and did you -- yeah, did you in any way

18   look at -- did you always look at the same

19   election results for all districts or did you

20   look at some elections for some districts or

21   other elections for other districts?

22              MR. SHEEHY:  Objection to form.

23         A.   When it came to just the basic

24   process that we've already talked about of

25   geographies from one place to another, that's

1                    A. Kincaid - CONFIDENTIAL

2    something where I would have used the same

3    elections across the state when I was looking

4    at different geographies.

5                    Later during the analysis process I

6    would have looked at different elections in

7    different areas of the state.

8        Q.    Let's talk about that a little bit.

9    We're talking still in the Congressional

10   proposal; is that right?    Are we talking about

11   now you've moved into -- beyond the

12   Congressional proposal?

13       A.    I would say that was the entire Ohio

14   redistricting process.    Whether it was a

15   proposal or whether it was a, you know, a

16   map-out of the Ohio legislature that was passed

17   or whatever, I would have -- I mean, the

18   analysis process would have applied for it.    It

19   would have applied to the entire analysis

20   process, whether it was a drafting of a map for

21   a proposal or whether it was an analysis of a

22   map from the Ohio legislature, so that.

23       Q.    You mentioned the Strickland 2010 --

24       A.    Uh-huh.

25       Q.    -- governor race.

1                A. Kincaid - CONFIDENTIAL

2        A.    Uh-huh.

3        Q.    Do you recall the part of the state

4   where Strickland came from, his home base was?

5        A.    I'm pretty sure Ted Stickland's home

6   base was pretty much Congressman's Johnson's

7   seat, which ran from -- along the West Virginia

8   border.

9        Q.    That would be District 6, if you

10  recall?

11       A.    Yeah.

12       Q.    Okay.   Would you rely upon -- did you

13  rely upon the 2010 election involving

14  Mr. Strickland when evaluating or considering

15  the election result information for District 6?

16              MR. SHEEHY:   Objection to form.

17       A.    It would have been a metric that

18  would have been included in -- you know,

19  obviously, since it was part of the Ohio

20  average, it would have showed up as a number in

21  an analysis sheet, a changes sheet, or whatever

22  you want to characterize it as.

23              For the actual redistricting of the

24  map, I don't think the -- for the proposal

25  itself, I don't think there was a specific

1                    A. Kincaid - CONFIDENTIAL

2    inflection point on the Strickland race.

3         Q.   I mean, if Strickland was not running

4    against Johnson --

5         A.   Right.

6         Q.   -- would considering the Strickland

7    result in some sense be inaccurate in terms of

8    understanding the political history of

9    District 6?

10                   MR. SHEEHY:  Objection to form.

11        A.   No, it certainly wouldn't be

12   irrelevant.  I mean, the fact that that

13   district had elected a Democrat previously and

14   could have elected a Democrat again was -- was

15   entirely relevant, but it's -- I mean, that

16   district was a Democrat seat that has trended

17   Republican over the last decade.  Just the

18   geography there, the counties have changed

19   their voting patterns.

20        Q.   What I'm trying to understand is

21   whether or not you considered, looking at these

22   historical -- these past elections whether or

23   not the home base, if you will, of the

24   individuals who were involved in the elections,

25   you just took the data as it was, if you will.

1                    A. Kincaid - CONFIDENTIAL

2                    MR. SHEEHY:  Objection to form.

3          Q.    In other words -- let me restate the

4    question.  Someone could say let's not look at

5    Strickland.  When we're trying to figure out

6    the political tilt of Johnson's district, let's

7    not consider how Strickland did because that's

8    a -- that's a unique case.  I mean,

9    Strickland's from that district and he's not in

10   this election.

11         A.    Uh-huh.

12         Q.    So let's put that aside.

13         A.    Okay.

14         Q.    Did you ever go through that kind of

15   filtering process?

16                    MR. SHEEHY:  Objection to form.

17         A.    I'm sure some people would.  I think

18   that's the exact opposite of what you should

19   consider.

20         Q.    Okay.  And why that is?

21         A.    If you are running for Congress,

22   you're probably from that district so I think

23   it would be entirely relevant whether

24   Mr. Strickland was from that district or not

25   and how he performed in that district.

1          A. Kincaid - CONFIDENTIAL

2          Q.    Okay.

3          A.    So whether -- Mr. Johnson's opponent,

4    you know, likely would come from that district

5    if he -- someone was running against him so I

6    think that would be relevant.

7          Q.    Well, you mentioned a couple times

8    analysis of the -- after the proposal's

9    submitted, there was an analysis of the Ohio

10   Congressional map; correct?

11             Is that right?

12         A.    The final passed map?  Is that what

13   you're asking about, or are you asking for

14   something different?

15         Q.    Did you analyze proposals as well as

16   final pass -- well, how many analyses did you

17   do?

18             MR. SHEEHY:  Objection to form.

19         A.    Anytime there was a proposal that was

20   in a final place in the sense of it was being

21   looked at by somebody, I would have had an

22   analysis sheet made up for it so the people

23   would know what the -- you know, how those

24   districts would have performed, what the

25   demographics were in those places.

```
1              A. Kincaid - CONFIDENTIAL
2                    So, I mean, I couldn't tell you how
3    many different iterative proposals were -- you
4    know, had analysis -- analyses made of them.
5    So I couldn't tell you a number.
6         Q.   Okay.
7         A.   But it would have happened in any
8    proposal in -- for a final map.
9         Q.   And so that was true for both HB 319,
10   the first map that passed, as well as HB 369,
11   the second map that passed; is that right?
12                   MR. SHEEHY:  Objection to form.
13        A.   In my role at the NRCC, my job was to
14   provide members of Congress and the members of
15   the NRCC at large with election data and
16   demographics on, you know, proposed and final
17   maps.  That was part of my job so that would
18   have been something I did.
19        Q.   You did it for both of those maps?
20        A.   Absolutely.
21        Q.   You also did it for the proposals for
22   those maps?
23                   MR. SHEEHY:  Objection to form.
24        A.   I created the sheets for the
25   proposals, yes.
```

1          A. Kincaid - CONFIDENTIAL

2          Q.   And just so we are using the same
3     language, I think you used the phrase "change
4     sheet" in your last deposition.  Is -- is that
5     the -- I want to use the language you were
6     comfortable with.
7          A.   I think there's a couple different
8     documents that we looked at last time with
9     different formats; right?  There was the
10    changes sheets that showed how the districts
11    were -- you know, the districts that incumbents
12    were in before and after the redistricting and
13    how they compared to each other.  That's what I
14    would have called a changes sheet.
15              Another thing would have been just a
16    simple spreadsheet showing the districts and
17    the way they performed based off of those
18    elections and demographics.  So those are two
19    different things.
20              But the changes sheets I think is
21    what you and I --
22         Q.   Okay.
23         A.   -- spent a lot of time on last time
24    going through.
25         Q.   Just so I understand, the changes

1          A. Kincaid - CONFIDENTIAL

2    sheets -- you called them the changes sheets.

3         A.   You can call them changes sheets.

4    That's fine.

5         Q.   Just in terms of what you actually --

6    you described two different kinds of sheets

7    now.  I just want to make sure we at least

8    substantively are on the same page.

9              So one is -- looks at the

10   different -- say it again.  What was the -- one

11   is the difference between?

12        A.   Well, the changes sheets that we

13   talked about last time would have shown how a

14   district changed from before the redistricting

15   to after the redistricting.

16        Q.   Okay.

17        A.   Or before the proposal to after the

18   proposal; right?

19        Q.   Okay.

20        A.   So other things I would have done was

21   just to create a simple Excel sheet of every

22   district under a proposal or a final map and

23   how they would have performed in previous

24   election cycles and those demographics

25   underlying them.

1          A. Kincaid - CONFIDENTIAL

2      Q.   Okay.

3      A.   So that way, you wouldn't have the

4  changes.  It would be simpler and easier to

5  look at.

6      Q.   Okay, you would just look in there.

7  So one case, you would just look at the

8  district, the second district, just look at the

9  district, look what election results were or

10  PVI scorings were for the district, full stop,

11  is one kind of --

12      A.   Yes.

13      Q.   -- approach.  And the other is to

14  compare a particular map or proposal to a prior

15  map or proposal to see how -- what the

16  differences were.  Do I have that right?

17          MR. SHEEHY:  Objection to form.

18      A.   Roughly, yeah.

19      Q.   When doing the analysis of the Ohio

20  map, did you do that -- let's go through the

21  mechanics of how that worked.

22          Did you receive a block equivalency

23  file and then load that into Maptitude?  Is

24  that the first step in your doing this

25  analysis?

1                A. Kincaid - CONFIDENTIAL

2                MR. SHEEHY:  Objection to form.

3          A.   For the final two maps, the -- the

4    two passed maps, the first one and the second

5    one, I would have taken a block assignment file

6    and uploaded that into Maptitude.  The election

7    data would have already been there and it would

8    have told me how those districts would have

9    performed.

10         Q.   And you said block assignment files.

11   I just want to make sure our reference is

12   clear.  Sometimes I have been using the phrase

13   the block equivalency file.  Block equivalency

14   file and block assignment file, are they the

15   same thing?

16         A.   They're interchangeable terms.

17         Q.   Okay.  And who did you get these

18   block assignment files from when you were doing

19   your analysis work?

20                MR. SHEEHY:  Objection to form.

21         A.   For the two passed maps, I think in

22   both cases I got them from Ray and Heather.

23         Q.   And do you recall how they sent --

24   would these be transferred to you as an email

25   attachment or are they too big for that and you

1              A. Kincaid - CONFIDENTIAL

2    had to have some sort of a sharing website?

3    How did that work?

4         A.   They're not too large to be attached

5    to an email, generally speaking.  Sometimes you

6    have to zip them, but they're typically not too

7    large to email.  In some states they are, but

8    not in Ohio.

9                   I can't remember if in Ohio after a

10   map was passed how quickly the equivalence or

11   assignment file was posted online because most

12   states typically post a block assignment file

13   online for public consumption at some point in

14   time.

15                  And there's a possibility I would

16   have gotten one or both of those final passed

17   maps from a website.  But if I hadn't gotten it

18   from there, I would have gotten it from Ray and

19   Heather.

20        Q.   And you also got proposals -- did you

21   get them from Ray and Heather or did you get

22   them from somebody else?

23                  MR. SHEEHY:  Objection to form.

24        Q.   The block equivalency files.

25                  MR. SHEEHY:  Objection to form.

1                A. Kincaid - CONFIDENTIAL

2          A.    Apart from the email exchange at the

3    very end that we talked about before, I don't

4    recall receiving block assignment files

5    directly from Ray and Heather.

6                I did receive a file or two from Tom

7    Whatman via -- well, from Ray and Heather via

8    Tom Whatman, but not directly from Ray and

9    Heather.

10         Q.    Did you ever get any from

11   Dr. Hofeller?

12               MR. SHEEHY:  Objection to form.

13         A.    I don't have a recollection of

14   receiving any block assignment files from Tom

15   Hofeller for Ohio redistricting.

16         Q.    Did you ever get any from Mark

17   Braden?

18               MR. SHEEHY:  Objection to form.

19         A.    I don't recall receiving any from

20   Mark Braden.

21         Q.    Do you recall ever sending any block

22   assignment files to Dr. Hofeller?

23               MR. SHEEHY:  Objection to form.

24         A.    I don't have any recollection of

25   sending block assignment files to Dr. Hofeller.

1           A. Kincaid - CONFIDENTIAL

2    I do know on a couple occasions he came down to

3    my office to look at maps just to see what was

4    going on in Ohio, but I don't recall giving him

5    a file at that time.

6         Q.   As he came down to your office, the

7    two of you were working in the same building;

8    is that right?

9         A.   That's correct.

10        Q.   That's over in Southeast?  It was in

11   Southeast here.

12        A.   It's still there.

13        Q.   Still there?  Sorry, I forgot the

14   address.  Was it Third, the address.

15        A.   310 First.

16        Q.   310 First?  I'm sorry, 310 First.

17   And were you on the same floor?

18        A.   No.

19        Q.   And Tom, Mr. Whatman, was also in the

20   same -- all three of you were in the same

21   building; is that right?

22        A.   Yes.

23        Q.   Mr. Wild also?

24        A.   Yes.

25        Q.   You say he came down to your office.

1                   A. Kincaid - CONFIDENTIAL

2      Literally came down a floor?  Were you on a

3      different floor than he was?

4            A.   Tom was on the third floor in 2011

5      and I was on the second floor.

6            Q.   Mr. Whatman, was he on the first

7      floor?

8            A.   Yes.

9            Q.   And do you recall how many times

10     regarding Ohio redistricting in 2011, whether

11     it was part of Congressional proposal or the

12     analysis, that Dr. Hofeller visited your

13     office?

14                   MR. SHEEHY:  Objection to form.

15           A.   I don't recall Tom coming by more

16     than five times.  It may have been two or three

17     but it was not often.  But I know there were a

18     couple of occasions where, you know, in his

19     role at the RNC it was kind of his job to kind

20     of know what was going on around country so he

21     would come down and looked at it.

22           Q.   And he looked at what was on the

23     computer screen; is that right?

24           A.   That's correct.

25           Q.   And on the screen, would you have one

```
 1              A. Kincaid - CONFIDENTIAL
 2   or more Congressional districts on the screen?
 3              MR. SHEEHY:  Objection to form.
 4        A.   It's most likely, yes.
 5        Q.   Do you recall him ever making a
 6   suggestion as to whether certain geographies
 7   should be within certain districts?
 8              MR. SHEEHY:  Objection to form.
 9        A.   You already asked me that question
10   once.  I said no, I really don't recall Tom
11   ever telling me that one geography should be in
12   one place, another in another district.  So I
13   really don't recall him giving much -- giving
14   any instruction in Ohio for him.
15              When he did come to my office for
16   Ohio, I recall it being a lot more of just
17   looking at what was going on and just you --
18   just kind of looking, going through the map.
19              I don't recall anything about him
20   instructing me that County A should be in
21   District 1 and County B should be in District 8
22   or whatever it is.
23        Q.   Do you recall, when he came down to
24   your office and looked at that computer screen,
25   were any of the labels up on the districts?
```

1          A. Kincaid - CONFIDENTIAL

2              MR. SHEEHY:  Objection to form.

3       A.   I'm sure there would have been.

4       Q.   Were those labels, in the ordinary

5   course, they included the PVI scorings; is that

6   right?

7              MR. SHEEHY:  Objection to form.

8       A.   I wouldn't call that the ordinary

9   course.

10      Q.   Okay.

11      A.   There were times when the PVI was up

12   on the screen.  There were times when a

13   Presidential election result was up on the

14   screen.  There were times when a governor's

15   race was up on the screen.  There wasn't -- I

16   wouldn't call anything normal course.

17      Q.   Do you recall him ever discussing any

18   election result information regarding any

19   district with you?

20              MR. SHEEHY:  Objection to form.

21      A.   I don't recall him asking a

22   specific -- what a specific race or index would

23   have been, but if I was sitting down with Tom,

24   he would have been asking me questions about

25   demographics and election results for various

1                A. Kincaid - CONFIDENTIAL

2    districts.  But I don't recall what -- you

3    know, a specific question of what's the X, you

4    know, percentage in that seat or that seat.

5    But he certainly would have asked those kinds

6    of questions.

7         Q.    And do you recall that these visits

8    take place during the Congressional proposal

9    process?

10               MR. SHEEHY:  Objection to form.

11        A.    Yes.

12        Q.    And they also take place during what

13   you described as the Ohio map analysis process?

14               MR. SHEEHY:  Objection to form.

15        A.    No, the Ohio map analysis process,

16   I -- you would have just gotten the final

17   passed map just like I would have from, you

18   know, online or somewhere else and uploaded it

19   himself.  I probably would have passed along

20   the final passed map to him, honestly, but not

21   any of the proposed maps.

22        Q.    For your analysis of the proposed

23   maps, who did you provide that information to?

24               MR. SHEEHY:  Objection to form.

25        A.    Like we talked about before, the

1                  A. Kincaid - CONFIDENTIAL

2      proposed maps would have been -- the analysis

3      of any proposed maps would have been given to

4      Tom Whatman.  They would have -- so Tom and

5      Tom.  To Tom Whatman, also to, you know, staff

6      at the NRCC, members of Congress if they had

7      asked for it, so those sorts of people.

8          Q.   Did Mr. Whatman convey that -- do you

9      know who Mr. Whatman conveyed that information

10     to after you provided it to him?

11              MR. SHEEHY:  Objection to form.

12         A.   It's my understanding he provided it

13     to Ray and Heather, but apart from that I'm not

14     sure who else he would have shared that with.

15         Q.   Do you recall ever getting any

16     feedback from Mr. Whatman concerning the

17     reaction of Mr. DiRossi or Ms. Mann to your

18     analyses?

19              MR. SHEEHY:  Objection to form.

20         A.   The analyses?

21         Q.   You said you did an analysis of

22     proposals; is that right?

23         A.   Sure.  Their reaction to that

24     analysis.

25         Q.   Yeah, I've got it right here.  You

1          A. Kincaid - CONFIDENTIAL

2   did analysis of some proposed maps and you

3   provided that to Mr. Whatman, among others.

4        A.   Uh-huh.

5        Q.   It's your understanding that he

6   provided that to --

7        A.   Ray and Heather.

8        Q.   -- Mr. DiRossi and Ms. Mann.

9        A.   Uh-huh.

10       Q.   Is that -- I got that right so far?

11       A.   Yes.

12       Q.   Okay.  My question is, after that was

13   done, did you ever -- was there ever any

14   feedback saying now, after that information was

15   given to them, so what their reaction was to

16   the analysis that had been shared with them?

17           MR. SHEEHY:  Objection to form.

18       A.   I know that Mr. Whatman found the

19   spreadsheets helpful, thought they were well

20   organized and clear so was able to look at it

21   and understand what was going on pretty easily.

22           I think Ray and Heather -- I believe

23   they gave the same feedback, that they thought

24   it was a helpful way to organize the

25   information.  But apart from that, nothing, no

1                    A. Kincaid - CONFIDENTIAL

2     other reaction to it that I recall.

3          Q.   Do you recall whether any changes

4     were made to the Ohio map after Mr. DiRossi and

5     Ms. Mann received your analyses?

6          A.   The analysis of the past maps, or --

7          Q.   During the proposal, while the

8     proposals were being formulated for a map and

9     during which time they received your analyses

10    through Mr. Whatman and received your

11    spreadsheets they thought were clear --

12         A.   Uh-huh.

13         Q.   -- do you recall whether or not they

14    then made any changes to the proposed map?

15                    MR. SHEEHY:  Objection to form.

16         A.   It was a collaborative process so I'm

17    sure they made -- I know they made edits on

18    there, and it wasn't just -- they didn't just

19    take our proposals, you know, and enact them.

20    It was a collaborative process between -- you

21    know, it was the members proposing a map and

22    the state legislature putting their feet back

23    in and Ray and Heather making those edits

24    there.  So no, it wasn't -- yes, they -- they

25    did make changes.

1          A. Kincaid - CONFIDENTIAL

2      Q.   Okay.

3      A.   But I don't know if it would be -- I

4  don't think I would characterize it as because

5  of my analysis sheets.  Those weren't -- the

6  analysis sheets weren't there to provide

7  advice; they were there to provide facts and

8  information.

9      Q.   They were part of the collaborative

10  process, as I understand.

11      A.   Sure, just an analytical document.

12          MR. SHEEHY:  Is now a good time to

13      stand up stretch our legs?

14          MR. FRAM:  Let me do a quick check.

15      This is a good time.

16      (Recess taken.)

17  BY MR. FRAM:

18      Q.   A couple of cleanup items.  Am I

19  right that you do not recall sending Mr. Braden

20  any block equivalency files in connection with

21  Ohio Congressional redistricting in 2011?  Do

22  youIf  that's what I said, that would be

23  incorrect.  I -- that's not what I said.

24      Q.   Please correct it.  I probably got it

25  wrong.

1                    A. Kincaid - CONFIDENTIAL

2          A.    At Mr. Whatman's instruction, I did

3    provide Mark Braden with block assignment files

4    on at least one occasion.

5          Q.    Do you recall when that was?

6                    MR. SHEEHY:  Objection to form.

7          A.    I don't.

8          Q.    Was it part of the Congressional

9    proposal process or part of what we have been

10   calling the analysis process?

11                   MR. SHEEHY:  Objection to form.

12         A.    I believe it during the proposal

13   process, but it could have been further on.  I

14   don't honestly don't remember at what time

15   during the process I did that.

16         Q.    And do you know if Mr. Braden -- the

17   block equivalency file, to make use of it, you

18   have to load it into Maptitude; is that right?

19         A.    You can use other software.  You

20   don't have to just use Maptitude.

21         Q.    Maptitude or some other map drawing

22   software; is that right?

23         A.    Some other GIS software.

24         Q.    Do you know if Mr. Braden had access

25   to either Maptitude or some other GIS software?

1           A. Kincaid - CONFIDENTIAL

2           MR. SHEEHY:  Objection to form.

3       A.  I have no idea.

4       Q.  Do you have any idea what he did with

5   the block equivalency file you provided to

6   him --

7           MR. SHEEHY:  Objection to form.

8       Q.  -- through Mr. Whatman?

9           MR. SHEEHY:  Same objection.

10      A.  What Mark did with it?

11      Q.  Uh-huh.

12      A.  I'm sure Mark, if he didn't have the

13  software himself, he would have found somebody

14  who had the software to look at it, but I --

15  I'm -- I don't know if -- I don't recall Mark

16  ever telling me what he did with the block

17  assignment files for Ohio.

18      Q.  Do you recall why you were asked to

19  send a block equivalency file to Mr. Braden?

20          MR. SHEEHY:  Objection to form.

21      A.  Mr. Braden was the attorney for the

22  Ohio state legislature and so in that role as

23  their attorney he would provide legal counsel

24  to the Ohio legislature.  And I'm sure this was

25  part of that request, they asked that Mark have

1              A. Kincaid - CONFIDENTIAL

2    a chance to look at the maps.

3         Q.   Do you know whether or not Mr. Braden

4    also had access to the RNC election results

5    data?

6              MR. SHEEHY:  Objection to form.

7         A.   Could you be clearer what you mean by

8    access to it?

9         Q.   Whether he had -- he had the block

10   equivalency file.  I'm just trying to find out

11   what other information was provided to him.

12             Did you know whether or not election

13   results data had been provided to him?

14             MR. SHEEHY:  Objection to form.

15        A.   I don't recall sending Mark a changes

16   sheet or an analysis sheet or anything.  The

17   only thing I recall sending Mark was a block

18   assignment file.

19             Whether the RNC provided him with

20   political data, that's not something I know.

21        Q.   So I'm clear, as regards

22   Dr. Hofeller, did you provide him with block

23   equivalency files as part of the Congressional

24   proposal or analysis process?

25             MR. SHEEHY:  Objection to form.

```
 1              A. Kincaid - CONFIDENTIAL
 2        A.   Like I said before, I don't recall
 3  sending Tom a block assignment file of the
 4  proposed maps.
 5              I know that as you and I talked about
 6  before, he came down to my office to look at
 7  the maps a couple times, but I don't recall
 8  sending Tom a block assignment file during the
 9  proposal process.  I could have, but I don't
10  recall doing so.
11              MR. FRAM:  I'd like to have marked
12        next as 42 a document that's got Bates
13        number REV_00023341.
14        (Exhibit No. 42 was marked for
15        identification.)
16  BY MR. FRAM:
17        Q.   I should say for the record that this
18  is an email string of two emails, both dated
19  December 15, 2011.  The earlier in time appears
20  to be at 9:26 in the morning, and it's from
21  Heather Mann to her Gmail address,
22  heathermann@gmail.com to Tom Whatman and Adam
23  Kincaid.  Subject, Equivalency and Shapefiles.
24              The second email is from Adam Kincaid
25  at akincaid@NRCC.org to Tom Hofeller  --
```

1                    A. Kincaid - CONFIDENTIAL

2    redistricting; Mike Wild - redistricting, and

3    that's it.  It appears to be at 2:28 p.m. on

4    the same date just forwarding the equivalency

5    and shapefiles per the subject line.

6              The first question is, do you

7    recognize either one of these emails?

8        A.   Yes.

9        Q.   Did you, in fact, receive this email

10   from Ms. Mann on or about December 15, 2011?

11       A.   It appears I did, yes.

12       Q.   That's the 9:26 a.m. email?

13       A.   Uh-huh.

14       Q.   Turning to the 2:28 p.m. email, do

15   you recall forwarding that email to

16   Mr. Hofeller -- Dr. Hofeller and Mr. Wild?

17       A.   Do I remember sending the email?  I

18   don't remember sending the email, but it's

19   clear I did send the email.

20       Q.   You have no reason to doubt you sent

21   it?

22       A.   No.

23       Q.   You forwarded it with the

24   attachments; is that right?

25       A.   Yes.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Those attachments included an

3    equivalency file as well as shapefile; is that

4    right?

5          A.   Yes.

6          Q.   So on this occasion, do you recall

7    forwarding equivalency files to Dr. Hofeller?

8          A.   Well again, I think it's important to

9    clarify.   As I said before, this is not during

10   the proposal process, this is at the end of the

11   process where it would have been a final map

12   that I, as I said before, I could have shared

13   it with Tom.   So yes, this is something I sent

14   to Tom.

15              MR. FRAM:  I just want to be clear.

16        I'll mark the next as 43 metadata for

17        this email.

18        (Exhibit No. 43 was marked for

19        identification.)

20   BY MR. FRAM:

21        Q.   Take a look.   You see that the

22   created date -- I'm sorry, the -- the date

23   sent, do you see 12-15-2011?   Do you see that?

24        A.   I do.

25        Q.   That matches with the date on the --

1                    A. Kincaid - CONFIDENTIAL

2    on Exhibit 42.  Do you see that?

3         A.    Yes.

4         Q.    Going down to the bottom, see where

5    it says from Adam Kincaid?  Do you see that?

6         A.    Yes.

7         Q.    Is that your email address?  Do you

8    see that there?

9         A.    That was my email address.

10        Q.    That was at the time at the NRCC;

11   correct?

12        A.    Yes.

13        Q.    And under it, it says to Mike Wild -

14   redistricting.  Do you see that?

15        A.    I do.

16        Q.    And under that there's an email

17   address for mmwild@RNCHQ.org.

18              Do you see that?

19        A.    I do.

20        Q.    Was that, as you recall, his address

21   in 2011?

22        A.    Seems to be, yes.

23        Q.    And under that, there's Tom Hofeller

24   - redistricting.

25              Do you see that?

```
1              A. Kincaid - CONFIDENTIAL

2         A.   Yes.

3         Q.   And there's a thofeller@RNCHQ.org.

4              Do you see that?

5         A.   Yes.

6         Q.   Was that, as you recall, his email

7   address in 2011?

8         A.   Yes.

9         Q.   And so that -- those are the email

10  addresses that you used when you forwarded the

11  equivalency and shapefiles on December 15,

12  2011; is that right?

13        A.   Yes.

14        Q.   Okay.  RNCHQ, was that an email

15  address used by the Republican National

16  Committee in 2011, RNCHQ?

17        A.   Yeah, yes.

18        Q.   Do you recall there being any

19  communications from either Mr. Wild or

20  Dr. Hofeller in -- after they received this

21  email and its attachments in December 2011?

22              MR. SHEEHY:  Objection to form.

23        A.   Any communications to me?

24        Q.   Yes.

25              MR. SHEEHY:  Same objection.
```

1           A. Kincaid - CONFIDENTIAL

2      A.   I don't remember an email back.  They

3  could have said thank you or something, but I

4  don't --

5      Q.   Did Dr. Hofeller come by your office

6  and talk with you about it?

7      A.   I don't recall.

8           MR. SHEEHY:  Objection to form.

9      Q.   Did Mr. Wild?

10          MR. SHEEHY:  Objection to form.

11     A.   Mike wouldn't have come to my office,

12  so no.

13     Q.   Do you recall communicating with

14  Ms. Mann after receiving this email from her

15  December 15, 2011 regarding the subject matter

16  of this email?

17          MR. SHEEHY:  Objection to form.

18     A.   I don't recall.  I could have said

19  thank you, but I don't know.

20     Q.   Do you recall performing any analysis

21  of the map as reflected in the block

22  equivalency and shapefiles after you received

23  it from Ms. Mann on or about December 15, 2011?

24     A.   I don't remember performing analysis,

25  but I would have because that was my job.

1           A. Kincaid - CONFIDENTIAL

2           Q.    That would have included generating a

3    changes sheet; is that right?

4           A.    Most likely, yes.

5           Q.    Do you recall anything about that

6    changes sheet?

7                 MR. SHEEHY:  Objection to form.

8           A.    Can you be more specific?

9           Q.    Do you recall any of the content of

10   the changes sheet?

11          A.    It would have been identical to all

12   the other changes sheets that we have gone over

13   just with the numbers for the last map.

14          Q.    Meaning you compared the HB 369 as

15   enacted to previous maps?

16                MR. SHEEHY:  Objection to form.

17          A.    Previous iterations and proposals, or

18   what do you mean by previous?

19          Q.    Well, let's take it one at a time.

20   Do you recall, did you prepare a comparison in

21   the changes sheet between HB 369 as enacted and

22   HB 319, the prior map, as enacted?

23                MR. SHEEHY:  Objection to form.

24          A.    I don't recall doing that analysis.

25          Q.    Do you recall comparing it to -- did

1                A. Kincaid - CONFIDENTIAL

2    you compare HB 369 as enacted to HB 369 as it

3    had been introduced in the Ohio legislature?

4                MR. SHEEHY:  Objection to form.

5         A.    I don't recall doing that either.

6         Q.    What analysis do you recall?

7                MR. SHEEHY:  Objection to form.

8         A.    The standard for the changes sheets

9    would have been doing the enacted map versus

10   the previously enacted map, meaning the one

11   that came out of the 2010 elections.  That was

12   used in the 2010 elections.

13        Q.    So you compared the HB 369 as against

14   the map where Ohio had had 18 --

15        A.    Yes --

16        Q.    -- districts?

17        A.    -- that's right.

18        Q.    I want to show you a document

19   introduced at your prior deposition.  It was

20   Exhibit 5.

21        A.    Okay.

22        Q.    So let's not make things confusing.

23   Let's stick with that.  I asked some questions

24   and there were instructions on it so I have to

25   go back to that.  That's the reason I'm doing

```
 1          A. Kincaid - CONFIDENTIAL

 2   it.

 3             MR. FRAM:  Just for the record, I'm

 4       trying to think how we should do that

 5       here because I want him to have it.  I

 6       guess we could put 5 back on, a label, a

 7       sticker on saying 5 again.

 8             MR. SHEEHY:  Whatever you want.

 9             MR. FRAM:  It's NRCC000012, four of

10       them.

11       (Exhibit No. 5, previously marked, was

12       referenced and indexed.)

13   BY MR. FRAM:

14       Q.   For the record, this is a spreadsheet

15   that's got the words "Ohio Changes" at the top

16   of it.  And at your last deposition, correct me

17   if I'm wrong, but the testimony was that you

18   created this document.  Is that correct?

19             MR. SHEEHY:  Objection to form.

20       A.   Yes.

21       Q.   And you created it on or about -- you

22   populated the document with data on or around

23   July 25; is that right?

24       A.   Seems to be the case, yes.

25       Q.   Okay.  Do you recall why you prepared
```

1           A. Kincaid - CONFIDENTIAL

2    this document around July 25?

3              MR. SHEEHY:  Objection to form.

4       A.    Somebody would have asked for it, but

5    I'm not sure who that would have been.

6       Q.    You provided it to Mr. Whatman?

7              MR. SHEEHY:  Objection to form.

8       A.    I don't recall.  It's likely, but I

9    don't recall.

10      Q.    Do you recall anybody else?

11             MR. SHEEHY:  Objection to form.

12      A.    I don't know who this document

13   specifically would have been shared with.

14      Q.    Now, this one on the left, you see

15   there are districts going up to 18.  Do you see

16   that?

17      A.    Yes.

18      Q.    And it's current with a bunch of

19   elections that come thereafter, the two

20   elections, an average, and a PVI.  Do you see

21   that?

22      A.    Yes.

23      Q.    Those were -- if I use the phrase and

24   say scorings for the districts under the prior

25   map, do you understand that question?

1          A. Kincaid - CONFIDENTIAL

2          A.   You're asking if I would call these

3     scorings, or what?

4          Q.   Yeah.   What would you call these

5     election results?   I just want to use the same

6     phrase you're comfortable with.

7          A.   Okay.   I'd say these are the -- well,

8     for the McCain and Bush percentages, those are

9     the results for those districts.   And then the

10    average is the average for those districts and

11    the PVI is the PVI for those districts.

12               I don't know that I'd call them

13    scores, but I would say those are the numbers

14    for those districts.

15         Q.   Okay.   And average, is that averaging

16    just -- well, the McCain and Bush results; is

17    that right?   I'm trying to know what you were

18    averaging in the average.

19         A.   You and I when we went through this

20    before, the average there is clearly the Ohio

21    GOP average, I believe.

22         Q.   So your understanding is that average

23    would include all -- not just those two

24    elections, but all five elections; is that

25    right?

1             A. Kincaid - CONFIDENTIAL

2        A.   It would have been whatever the five

3   elections were that were used in the Ohio GOP

4   average.

5        Q.   Okay, that's helpful.  I notice on

6   the right-hand, you see something that says

7   "Ohio GOP Average."

8             Do you see that?

9        A.   Uh-huh.

10        Q.   Is that the same thing?  I only ask

11   because on the left-hand column, left hand, it

12   just says the word "average" and on the

13   right-hand, it says Ohio GOP Average.  I'm just

14   making -- sometimes there's just more room in a

15   spreadsheet to use more words.

16        A.   It's the cell size.

17        Q.   If that's all it is, that's fine.  I

18   just want to make sure it's no difference.

19        A.   It's the same metric, the same

20   percentage.

21        Q.   And was this document prepared as

22   part of something called the Congressional

23   proposal process, this changes sheet?  First of

24   all, let me back up.  This is a changes sheet;

25   is that right?

```
 1            A. Kincaid - CONFIDENTIAL

 2       A.   Yes.

 3       Q.   And was this prepared as, this

 4  changes sheet, as part of your work in the

 5  Congressional proposal process?

 6            MR. SHEEHY:  Objection to form.

 7       A.   Yes.

 8       Q.   Do you recall whether it was

 9  communicated to members of Congress?

10            MR. SHEEHY:  Objection to form.

11       A.   I don't have any specific

12  recollection of sharing this with any members

13  of Congress.

14       Q.   In order to generate the as of

15  July 25 list, do you see that?

16       A.   Uh-huh, yes.

17       Q.   Now there, there's 16 districts that

18  are identified.  Do you see that?

19       A.   Yes.

20       Q.   They're not all in numerical order.

21  It's broken up a little; right?  It is 16, if

22  I've got the numbers right.  Is that true?

23       A.   Yes.

24       Q.   Do you recall the source of the

25  information for those 16 districts?
```

1          A. Kincaid - CONFIDENTIAL

2          A.   The source of the information?

3          Q.   Well, let's be clear here.  For

4   example, 9 says Kaptur/Kucinich.  Do you see

5   that?

6          A.   Yes.

7          Q.   Did someone inform that you that

8   under a proposed map as of July 25 that Kaptur

9   and Kucinich would be in the same district?

10          MR. SHEEHY:  Objection.

11          Q.   Proposed to be in the same district.

12          MR. SHEEHY:  Objection.

13          A.   Nobody informed me of that, no.

14          Q.   How were you able to include that

15   information in this changes sheet?

16               What was the source of your

17   information?

18               MR. SHEEHY:  Objection to form.

19          A.   We had created a layer within

20   Maptitude that had the addresses of the members

21   of Congress on it.  We were able to see where

22   they lived in Maptitude.

23          Q.   That required you to have a proposed

24   Congressional district map in order to see

25   where those addresses landed; right?

1              A. Kincaid - CONFIDENTIAL

2        A.   No.  I could have seen the addresses
3   on a blank Ohio map.

4        Q.   Then how did you know to put Kaptur
5   and Kucinich both within District 9?

6              MR. SHEEHY:  Objection to form.

7        A.   There would have been a map at that
8   point, some kind of a proposal draft that I
9   would have looked at to see that their two
10  addresses were in that district.

11       Q.   And who do you recall sending you
12  that proposed map as of about July 25, 2011?

13             MR. SHEEHY:  Objection to form.

14       A.   This is not a map I would have
15  received from anybody.

16       Q.   You say there would have been a
17  proposed map which you needed to use to know
18  where Kaptur and Kucinich lived; right?

19       A.   There would have been a draft of a
20  proposed map that would have had the addresses,
21  you know, mapped within, yes.

22       Q.   And how did you obtain that draft
23  proposed map?

24             MR. SHEEHY:  Objection to form.

25       A.   I would have created it myself.

1                    A. Kincaid - CONFIDENTIAL

2          Q.   So you created a map that put Kaptur

3   and Kucinich in the same district; is that

4   right?

5          A.   This would have been a draft that we

6   had been working on, you know, with -- yeah.

7          Q.   Similarly, you see there's a -- going

8   down to District 11, you got Fudge and Sutton

9   in the same district, proposed District 11.  Do

10  you see that?

11         A.   Yes.

12         Q.   That was also something you had

13  created to put them in the same district; is

14  that right?

15              MR. SHEEHY:  Objection to form.

16         A.   This would have told me that they

17  were in the same district in that draft map,

18  yes.

19         Q.   Which you had created?

20         A.   Yeah, sure.

21         Q.   And similarly, going down to the

22  bottom of the district list, there's 10-Open.

23              Do you see that?

24         A.   I do.

25         Q.   Is that a new district that was being

1                 A. Kincaid - CONFIDENTIAL

2    created?

3          A.    It was an open district so no member

4    of Congress lived within the borders of that

5    district.

6          Q.    But was that a new -- is that -- you

7    drafted that new district; is that right?

8                 MR. SHEEHY:  Objection, form.

9          A.    The map I would have been working off

10   of that July 25 would have been a map on my

11   computer that was -- that we were in the

12   process of drafting, so I -- yes, I think the

13   10th was probably something at that point in

14   time that I had at least started some sort of

15   process on.

16         Q.    And that District 10 draft on your

17   computer, is it your recollection that was

18   heavily centered around the center of the

19   state, Franklin County and the Columbus, Ohio

20   area?

21         A.    Yes.

22         Q.    And do you recall discussing that

23   proposed District 10 with Mr. Wild?

24                 MR. SHEEHY:  Objection to form.

25         A.    Yes.

1              A. Kincaid - CONFIDENTIAL

2        Q.   Do you recall discussing with him in

3   the July 25 approximate time frame?

4              MR. SHEEHY:  Objection to form.

5        A.   I don't have a specific recollection

6   of talking to him around July 25, but I have --

7   I remember talking with Tom Whatman about the

8   10th district at the time.  I think it became

9   the 3rd at the end of the process.  But yeah,

10  we had conversations about it.

11       Q.   Other than Mr. Whatman -- and these

12  conversations with Mr. Whatman, you don't

13  recall precisely July 25 but you recall talking

14  with him about it.

15       A.   Sure.

16       Q.   Generally in the July time frame; is

17  that correct?

18       A.   July, August, September, yes,

19  absolutely.  During the proposal process I

20  definitely talked to Tom Whatman about the 10th

21  district.

22       Q.   Had you talked with him about it

23  before you created this change sheet?

24              MR. SHEEHY:  Objection to form.

25       A.   Again, I don't recall the specific

1                    A. Kincaid - CONFIDENTIAL

2    time in which I talked to Tom about the 10th

3    district, whether it was before or after this

4    changes sheet was -- well, it definitely was

5    after because I know we talked about it in

6    August, but I don't recall whether we talked

7    about it before July 25 or not.

8        Q.   I'm just trying to pin down if we can

9    accurately the genesis of the idea of who

10   thought of it first.

11            Did you think of let's do a new

12   district around the Columbus Ohio area on your

13   own and then present it to Mr. Whatman, or did

14   he say why don't you give this a shot and then

15   you went off and drew a map?

16            MR. SHEEHY:   Objection to form.

17       A.   I don't recall who had the idea

18   first.

19       Q.   It was collaborative?

20       A.   It was a collaborative process, like

21   I said before.

22       Q.   During this time frame do you recall

23   any communications with Mr. DiRossi or Ms. Mann

24   about creating a new district in the Columbus,

25   Ohio area during the summer of 2011?

1          A. Kincaid - CONFIDENTIAL

2          MR. SHEEHY:  Objection to form.

3      A.    I don't recall any conversations with

4  Ray and Heather about that district in that

5  time period.

6      Q.    Do you recall any conversations with

7  any members of Congress during the summer of

8  2011 about the creation of a new district in

9  the Columbus, Ohio area?

10          MR. SHEEHY:  Objection to form.

11     A.    Yes.

12     Q.    Which members, please?

13          MR. SHEEHY:  Objection to form.

14     A.    Let's see here.  I remember having

15  conversations with Mr. Stivers and Mr. Tiberi

16  regarding that district since both of them had

17  districts that included parts of Franklin

18  County so I would have talked to them about

19  that district because it directly impacted

20  their own seats.

21     Q.    Let's take them one at a time.  What

22  do you recall about conversations with -- well,

23  let me back up.

24          These conversations would have been

25  during the proposal process; is that right?

1          A. Kincaid - CONFIDENTIAL

2          MR. SHEEHY:  Objection to form.

3      A.   That is correct.

4      Q.   So that would be during the summer of

5  2011; is that right?

6      A.   Yes.

7      Q.   Let's talk about your discussions

8  with Representative Stivers.

9          What do you recall about that, those

10  communications?

11          MR. SHEEHY:  Objection to form.

12      A.   Mr. Stivers would have come into my

13  office and we would have talked about Franklin

14  County generally, where the different lines

15  were with the districts within Franklin County.

16  Likely, however, his district was comprised

17  outside of Franklin County.

18          But specifically with District 10 we

19  would have probably just looked at the

20  boundaries between the 10th district, at that

21  time, the 10th and then -- and his, which was

22  the 15th.

23      Q.   And what do you recall about

24  discussions about the boundaries between the

25  proposed 10th and his district, the 15th?

1          A. Kincaid - CONFIDENTIAL

2          MR. SHEEHY:  Objection to form.

3      A.   One thing I recalled of Mr. Stivers

4   is that embarrassingly, we had his address

5   wrong.  I think he had moved at some point

6   during that process and so we had had his old

7   address and had not received his new address,

8   or something like that.  There was some mixup.

9   So we had him mapped at the wrong spot so that

10  was a bit of a conversation we had.

11      Q.   Anything else?

12          MR. SHEEHY:  Objection to form.

13          MR. FRAM:  I just want to say for

14      the record I'm so glad we got that

15      initially what objection to form means

16      because it's the first time in my career

17      the question "Anything else?" has gotten

18      a form objection.

19      Q.   Keep going.

20      A.   Other things, I -- with Mr. Stivers

21  specifically with that district, I recall him

22  talking about what communities were in his

23  district and which ones were not in his

24  district within Franklin County and outside of

25  Franklin County.

1            A. Kincaid - CONFIDENTIAL

2        Q.   What do you recall about those

3   conversations, please?

4            MR. SHEEHY:  Objection to form.

5        A.   It was really just identifying which

6   ones were or were not in his seat.  That's the

7   only thing I remember about it.

8        Q.   Do you recall any particular

9   communities that you thought were -- that you

10  two agreed should be in his district, should go

11  into 15?

12           MR. SHEEHY:  Objection to form.

13       A.   No, I don't.

14       Q.   Do you recall any conversation about

15  any communities within Franklin County that you

16  thought should not go into his district?

17           MR. SHEEHY:  Objection, form.

18       A.   Honestly, it was seven and a half

19  years ago so I don't remember specifically what

20  communities, you know, we did or, you know, we

21  talked about in that way.

22           I don't recall him saying -- you

23  know, I have no recollection of him telling me

24  that shouldn't be in my district or that should

25  be in my district.  It was more of just the two

1                    A. Kincaid - CONFIDENTIAL

2    of us sitting down and going through what

3    communities were or were not in the draft

4    iterations that we had at that time, which may

5    or may not have been before or after this

6    sheet.  It was sometime in that August time

7    frame.

8         Q.   When you had that conversation with

9    him, did you have any -- did that conversation

10   involve in any way any demographic information

11   about the communities you were discussing?

12              MR. SHEEHY:  Objection to form.

13        A.   No, I don't recall any demographic

14   conversations with Mr. Stivers about Franklin

15   County.

16        Q.   Do you recall any -- discussing any

17   election results, information about the

18   communities that you were discussing should be

19   in District 15 or not?

20              MR. SHEEHY:  Objection to form.

21        A.   No, I don't recall having any

22   conversations with Mr. Stivers about the

23   partisan makeup of one community or another.

24              Like I said before, the only thing I

25   recall is going through Franklin County and

1                    A. Kincaid - CONFIDENTIAL

2    telling him what county -- you know, what

3    communities were or were not, you know, in that

4    seat or which ones maybe -- I do remember a

5    couple streets that we talked about as the

6    borders that were between the districts, that

7    sort of thing.  But no, I don't recall any

8    about the partisan makeup of one community or

9    another that may have come up.

10       Q.   Did he say anything about which

11   streets should be the border or not?

12            MR. SHEEHY:  Objection to form.

13       A.   Not that I recall.  I just recall

14   saying your line goes up to this point in

15   downtown Columbus, and this would be the border

16   between the two seats, that sort of thing.

17       Q.   Did you recall, did he say anything

18   in response?

19            MR. SHEEHY:  Objection to form.

20       A.   No, I don't.  I don't think he said

21   anything really in response to that.

22       Q.   Do you recall, did he express any

23   preferences or ideas about which neighborhoods

24   or communities should be in his district?

25            MR. SHEEHY:  Objection to form.

1          A. Kincaid - CONFIDENTIAL

2     A.    The only thing I recall is again what

3 we talked about before, which was where he

4 lived and making sure we had the right address.

5 Apart from that, I don't recall.

6        I do not recall him saying, you know,

7 I want this community or I want that community.

8 I don't recall that being a part of our

9 conversation.

10     Q.    Do you recall him ever saying he did

11 not want a certain community to be part of his

12 district?

13       MR. SHEEHY:   Objection to form.

14     A.    No, I don't recall that either.

15     Q.    What about with Mr. -- Representative

16 Tiberi?   Do you recall those conversations you

17 had with him about the effect of creating a new

18 Franklin County Columbus district and that

19 effect on his district?

20       MR. SHEEHY:   Objection to form.

21     A.    My conversations with Mr. Tiberi were

22 similar to my ones with Mr. Stivers, apart from

23 the fact we had his address right.

24        I recall that there were several

25 communities within Franklin County that were I

1        A. Kincaid - CONFIDENTIAL

2  believe new to him and several that had -- that

3  were not new to him that were in the new 10th

4  district and so he was curious about what

5  communities were comprising the new 10th and

6  which communities -- I think he was picking

7  up -- he may have been picking up on the east

8  side of Franklin County.  That's pretty much

9  the gist of those conversations.

10       Q.   Did he -- did you share any election

11 result data with Mr. Tiberi regarding different

12 communities that would be included or not

13 included in his district?

14            MR. SHEEHY:  Objection to form.

15       A.   I don't have a specific recollection

16 about saying, you know, Franklin County

17 Township 5 performed X, you know, at this

18 percent for McCain and this percent for Bush.

19 I don't have any recollection of that.

20       Q.   Did these meetings with either

21 Mr. Tiberi or Mr. Stivers take place in your

22 office?

23       A.   Yes.

24       Q.   Was your computer on when you had

25 these meetings?

1          A. Kincaid - CONFIDENTIAL

2          A.   Yes.

3          Q.   Was the map of their district up on

4    your computer?

5               MR. SHEEHY:  Objection to form.

6          A.   It would have had to have been, yes.

7          Q.   Did they look at it?

8               MR. SHEEHY:  Objection to form.

9          A.   Yes.

10         Q.   And were there labels that appeared

11   over their districts --

12              MR. SHEEHY:  Objection.

13         Q.   -- when you were looking at them?

14              MR. SHEEHY:  Objection to form.

15         A.   The district number would have

16   appeared on there.  But again, I mean, meeting

17   to meeting varied as far as what label may or

18   may not have been appearing so I really don't

19   recall specifically with Mr. Tiberi, with

20   Mr. Stivers what number would have been up on

21   the label.

22         Q.   Let me back up.  Without recalling

23   what label you had up, were any labels up when

24   you showed them the map on your computer?

25              MR. SHEEHY:  Objection to form.

1                    A. Kincaid - CONFIDENTIAL

2          A.    The district number would have been

3    up.  Apart from that, I couldn't speak to what

4    was or was not up on the screen because I don't

5    recall.

6          Q.    Would the Dataview table have been

7    up?

8                MR. SHEEHY:  Objection to form.

9          A.    I don't recall if it would have been.

10   I'm trying to think if it had one monitor or

11   two, and I don't recall having two monitors and

12   so I probably would not have had it up on the

13   screen at that time while they were looking at

14   the map.

15        Q.    Was there any discussion of PVI

16   scorings for their district under the proposal

17   that you were talking with them about?

18                MR. SHEEHY:  Objection.

19        A.    My standard would be to tell them

20   what the draft PVI would have been for their --

21   for that district we were looking at.  That

22   would have been part of our conversation.

23        Q.    And the district you're looking at

24   would have included their district.  In the

25   case of Mr. Stivers, 15; and in the case of

1          A. Kincaid - CONFIDENTIAL

2     Mr. Tiberi, 12.  Is that right?

3               MR. SHEEHY:  Objection to form.

4          A.   That's correct.

5          Q.   Would you also have informed them

6     about the PVI scoring of proposed new

7     District 10?

8               MR. SHEEHY:  Objection to form.

9          A.   Not unless they'd asked, unless it

10    was relevant to our conversation.

11         Q.   You just don't remember whether or

12    not, in addition to discussing the PVI scoring

13    with them, they actually could see it on the

14    screen or not; is that right?

15              MR. SHEEHY:  Objection to form.

16         A.   Well, like I said before, I don't

17    recall what labels were or were not on the

18    screen because it was seven and a half years

19    ago.

20              So, I mean, they were sitting in a

21    meeting with me and their district number would

22    have been on there, but I don't know what other

23    labels would have appeared for them to see.

24         Q.   Did you have any hard copy of any

25    maps with you in the meetings with either

1                    A. Kincaid - CONFIDENTIAL

2     Mr. Stivers or Mr. Tiberi?

3               MR. SHEEHY:  Objection to form.

4         A.    That would not have been my practice,

5     no.

6         Q.    Did you have any changes sheet with

7     you during these meetings?

8               MR. SHEEHY:  Objection to form.

9         A.    I don't recall.

10        Q.    Did you have any spreadsheets just

11    regarding the data for their districts during

12    these meetings?

13              MR. SHEEHY:  Objection to form.

14        A.    That's likely.

15        Q.    Would that -- let's just call them

16    district-specific spreadsheets.  Are you

17    comfortable with it, my calling them that, the

18    district specific as opposed to a full map?

19        A.    Yeah, that'd be fine.

20        Q.    That district -- would those

21    district-specific spreadsheets include election

22    results data?

23              MR. SHEEHY:  Objection to form.

24        A.    Yes.

25        Q.    And that would include the Ohio

1                A. Kincaid - CONFIDENTIAL

2    average?

3                MR. SHEEHY:  Objection to form.

4        A.    I don't recall that.

5        Q.    Would it include the PVI score?

6                MR. SHEEHY:  Objection to form.

7        A.    Probably, yes.

8        Q.    Do you recall their asking any

9    questions about the election results data for

10   their proposed districts when you met with

11   them?

12               MR. SHEEHY:  Objection to form.

13       A.    "They," being Mr. Tiberi and

14   Mr. Stivers?

15       Q.    Either one of them, please.

16               MR. SHEEHY:  Same objection.

17       A.    I would have provided them with some

18   basic numbers, like the McCain percentage and

19   the Bush percentage and the Obama percentage

20   and the Carrie percentage.  And the PVI would

21   have been part of my standard practice for

22   these meetings, just to walk them through those

23   numbers.

24               Apart from that, I don't recall them

25   asking for any specific other elections than

1                A. Kincaid - CONFIDENTIAL

2    those.

3         Q.    Okay.   Do you recall anything about

4    the conversation about the election results

5    data?  Start with Mr. Stivers.

6              MR. SHEEHY:   Objection to form.

7         A.    No, I don't recall any conversations

8    about that.

9         Q.    What about with Mr. Tiberi?

10             MR. SHEEHY:   Objection to form.

11        A.    The meetings all kind of blurred

12   together, honestly.   They were all pretty much

13   the same.  We'd sit down, go over the maps.

14   I'd, you know, brief them on how the

15   districts -- you know, what their Presidential

16   performance were and their PVIs were.

17              There'd be some generic questions

18   back and forth, and I'd -- and that -- all of

19   those meetings kind of blurred together for the

20   most part with those numbers.

21              So I couldn't tell you specifically,

22   you know, whether, you know, Congressman A was

23   asking about, you know, these six races versus

24   Congressman B, who only cared about this race.

25   That's just -- it was seven and a half years

1              A. Kincaid - CONFIDENTIAL

2    ago.  I don't recall.

3         Q.   Okay.  We'll take them one at a time

4    to help refresh your recollection.

5         A.   Okay.

6         Q.   Looking at District 12 for

7    representative Tiberi --

8         A.   Uh-huh.

9         Q.   -- under the prior map, it was a --

10   actually, its PVI score that you see was a D+1.

11   Do you see that?

12        A.   Yes.

13        Q.   And your proposal all of a sudden is

14   an R+10 in the far right.  Do you see number

15   11?

16        A.   Yeah, I see that.

17        Q.   That's the delta between the proposal

18   here of R+10 and the prior map of D+1; is that

19   right?

20        A.   Yes.

21        Q.   And so when you showed Mr. Tiberi

22   you'd come up with a map that changed his

23   district from being a D+1 to an R+10, do you

24   recall him having any reaction to that?

25             MR. SHEEHY:  Objection to form.

1                 A. Kincaid - CONFIDENTIAL

2          A.    No, I don't actually recall

3    Mr. Tiberi's specific reaction to that.

4          Q.    Okay.  Do you recall whether

5    Mr. Stivers had any reaction to the fact that

6    his district had gone from a D+1 to an R+6, a

7    delta of 7?  Do you see that?

8               MR. SHEEHY:  Objection to form.

9          A.    I don't recall his reaction either.

10         Q.    Do you recall any conversations with

11   Mr. Whatman about the fact that your July 25

12   proposal would have resulted in Tiberi going

13   from a D+1 to an R+10?

14              MR. SHEEHY:  Objection to form.

15         A.    You're asking about specific

16   districts, and I -- no, I don't recall

17   Mr. Whatman's comments regarding whether, you

18   know, the fact that District 12 went from a D+1

19   to an R+10, I don't recall any comments.

20         Q.    Putting aside this -- I'll ask this

21   for completeness.  Do you recall any

22   conversations with Mr. Whatman about how

23   District 15 would go from a D+1 to an R+6?

24              MR. SHEEHY:  Objection to form.

25         A.    I don't remember any specific comment

1                    A. Kincaid - CONFIDENTIAL

2    from Mr. Whatman on that district.

3         Q.    Putting aside specific comments

4    regarding specific numbers, do you recall any

5    conversations with Mr. Whatman on a qualitative

6    level about improving Republican partisan

7    strength in District 12 or 15?

8                    MR. SHEEHY:  Objection to form.

9         A.    In broad strokes is what you're

10   asking basically, about whether I remember --

11   just trying to be clear about what you're

12   asking here.

13        Q.    The qualitative or broad stroke

14   matter.  Did you ever talk with Tom Whatman

15   about how your coming up with a proposal would

16   increase the Republican partisan strength in

17   Districts 12 and/or 15?

18                    MR. SHEEHY:  Objection to form.

19        A.    We would have talked about it

20   generally, like here's -- you know, these

21   seats, District 12 goes from D+1 to an R+10.

22   District 15 goes from a D+1 to an R+6.  I would

23   have viewed that as favorable.  Tom would have

24   viewed that as favorable.

25        Q.    Part of that change was due to the

1                    A. Kincaid - CONFIDENTIAL

2    creation of the new Franklin County district,

3    which put larger Democratic votes in this new

4    proposed District 10; isn't that right?

5              MR. SHEEHY:  Objection to form.

6        A.    Yes.

7        Q.    This was also in your December 4

8    deposition.  There was some questions I asked

9    that you were unable to answer at the time

10   because of instructions, so we can go back to

11   it.

12       A.    Okay.

13       Q.    And actually, let me --

14             MR. FRAM:  Maybe we can do two at

15       once.  This one has an attachment to the

16       other.  We had -- we should mark it

17       again and circle it.  It was Exhibit 7

18       last time, and that's got -- the first

19       page is an email string.  The first page

20       is Bates number LWVOH00018302.  So this

21       was 7.

22       (Exhibit No. 7, previously marked, was

23       referenced and indexed.)

24             MR. FRAM:  And then I think we had

25       8 last time, an attachment, and that's

1                A. Kincaid - CONFIDENTIAL

2           BRADEN001387.  It's a spreadsheet

3           entitled "Ohio Changes."

4           (Exhibit No. 8, previously marked, was

5           referenced and indexed.)

6    BY MR. FRAM:

7           Q.   We have already gone through the

8    foundation on it that you sent it.  There's a

9    lot of different emails, but the one I'm

10   focusing on is on September 2, 2011, you sent

11   an email to Mr. DiRossi, Ms. Mann, and

12   Mr. Whatman regarding new idea redraft, okay?

13   You did that at September 2 at 6:41.  Okay?

14           Do you recall that?

15         A.   Yes.

16         Q.   And you sent the screenshots and the

17   block file again on September 3, 2011 at

18   8:13 a.m.

19           Do you see that?

20         A.   Yes.

21         Q.   Okay.  And again, that goes to

22   DiRossi, Mann, and Whatman.  Do you see that?

23   Okay.

24           Now, at this point you were involved

25   in -- you were involved in what you call the

1                A. Kincaid - CONFIDENTIAL

2    Congressional proposal process at this time,

3    around September 3, 2011?

4                MR. SHEEHY:  Objection to form.

5        A.   This would have been still part of

6    the proposal process and the -- yeah, this is

7    a -- part of the proposal.  As you can see,

8    it's a collaborative promotes.

9        Q.   All right.  So the proposal process

10   was a collaborative process between yourself

11   and Ms. Mann, Mr. DiRossi, and Mr. Whatman.  Do

12   I have that right?

13               MR. SHEEHY:  Objection to form.

14       A.   Yeah, we were -- yes.

15       Q.   And one of the things you sent

16   them -- let's try and understand what you did

17   send them, okay?

18               Looking at the September 2, 6:45 p.m.

19   email on the second page of Exhibit 7, you sent

20   them some images of different districts.

21   That's what those JPEG attachments are; is that

22   right?

23       A.   They're either districts or counties

24   or regions, kind of a mixture of all three, for

25   the state.

1           A. Kincaid - CONFIDENTIAL

2           Q.   Now, you also sent them a zip file;

3    is that right?

4           A.   Yes.

5           Q.   That zip file, would that have

6    included a block equivalency file?

7                MR. SHEEHY:  Objection to form.

8           A.   From our previous conversation in

9    December, I think you showed me another

10   document that showed that it was the

11   shapefiles, so yes, or the block assignment

12   file, so yes.

13          Q.   And then there's a .xls.  Do you see

14   that, newidea.xls?

15          A.   Yes.

16          Q.   And that's a changes sheet; is that

17   right?

18          A.   Yes.

19          Q.   And then if we turn to what would

20   have been marked as 8, which is BRADEN001387,

21   do you see that?

22          A.   Yes.

23          Q.   And you created this; is that

24   correct?

25                MR. SHEEHY:  Objection to form.

1              A. Kincaid - CONFIDENTIAL

2        A.    Yes.

3        Q.    And this is the changes sheet you

4    sent to Mr. DiRossi and Ms. Mann and

5    Mr. Whatman on or around September 2, 2011; is

6    that correct?

7              MR. SHEEHY:   Objection to form.

8        A.    No, I don't think so.

9        Q.    You don't think so?

10       A.    It was my practice to name the

11   changes sheet whatever the file was, and this

12   is named differently than what the file is.

13       Q.    Okay.  Hold on one second.  Because

14   it says the name is Ohio changes rather than

15   new idea redraft?  Is that what you're saying?

16       A.    The file that's attached to the

17   8:13 a.m. email is Ohio Changes New Idea

18   Redraft.xls, and that is not what is reflected

19   in BRADEN001387, at least the title of it.

20       Q.    The title's different, but hold on.

21       A.    It could -- it -- I mean --

22       Q.    Hold on.  Here it is.  So what you're

23   saying is for it to be the attachment, the file

24   name would have to be New Idea Redraft.xls, is

25   that right, to be the attachment?

```
 1            A. Kincaid - CONFIDENTIAL

 2       A.   The attachment is named Ohio Changes

 3  New Idea Redraft.  That's not reflected here.

 4  So all I'm saying is it seems unlikely to me

 5  based off of how I typically name things --

 6       Q.   Sure.

 7       A.   -- that this spreadsheet is the one

 8  that was attached to that email.

 9            MR. FRAM:  Let's mark next as 44,

10       the metadata for BRADEN1387.

11       (Exhibit No. 44 was marked for

12       identification.)

13            MR. FRAM:  This is the metadata for

14       Braden 001387.

15            THE WITNESS:  Okay.

16            MR. SHEEHY:  I think in our

17       previous depositions we had

18       stipulated -- we said we wouldn't agree

19       that the metadata was necessarily

20       accurate.

21            MR. FRAM:  You don't have to agree

22       or -- okay, that may be your position.

23       I will point out to you that -- well, we

24       had a long conversation about case law

25       yesterday but we don't have to do that
```

1              A. Kincaid - CONFIDENTIAL

2          now.

3      BY MR. FRAM:

4          Q.   Let's talk about the words.  You see

5      the words Ohio changes - new idea redraft.xls

6      where it says file name?  Do you see that?

7          A.   I do.

8          Q.   That is the same file name that

9      appears as an attachment to your September 2,

10     2011 email; is that right?

11         A.   Uh-huh.

12         Q.   And that's the part that you said

13     would need to be the file name in order for a

14     document to be an attachment to that email.  Do

15     you recall that testimony?

16         A.   That would have been the file name

17     for the attached document, yes.

18         Q.   And so assuming this metadata

19     accurately is the metadata from BRADEN001387,

20     okay, then BRADEN001387 would, in fact, be the

21     attachment, because it's using your normal

22     naming conventions for your files?

23         A.   Yeah, that's the part I'm not clear

24     on.  Typically, that title at the top of the

25     right side of the sheet would have lined up

1          A. Kincaid - CONFIDENTIAL

2     with the name of the Excel file so it's

3     possible that that header was changed after I

4     said file, or it's possible that I didn't

5     follow my standard naming conventions.

6               But I couldn't tell you which one it

7     is.  It just doesn't line up with what I

8     usually do, because I like to keep things

9     organized and that doesn't -- that's not

10    organized.

11        Q.   So what you're telling me is you

12    don't have -- the words Ohio changes - new idea

13    redraft does not appear on the face of

14    BRADEN001387?

15        A.   That's -- it's not on the sheet is

16    all I'm saying.

17        Q.   Not on that document, which is

18    Exhibit 8; correct?

19        A.   That's right.

20        Q.   However, it does appear -- those

21    words appear on Exhibit 44 next to file name.

22    Do you see that?

23        A.   It does.

24        Q.   So if one assumes that the metadata

25    is, in fact, the metadata -- the metadata in

1          A. Kincaid - CONFIDENTIAL

2    Exhibit 44 is the metadata for Exhibit 8, one

3    assumes that then that would be consistent with

4    your practice that Exhibit 8 would be the

5    attachment that was included in the email in

6    Exhibit 7 that we have been discussing?

7          A.    The file name's the same, like we

8    talked about.  All I'm saying is that the

9    header here does not line up with the name of

10   the file, which is not in line with what I

11   typically would have done.

12              So the last author could be incorrect

13   based off the metadata, could have been edited

14   by somebody else, or I did this.  I don't know.

15   I'm just saying that I can't -- it's hard for

16   me to tell you this is -- I accept your -- the

17   metadata.  I'm just saying that this doesn't

18   line up with what I typically would have named

19   things so it seems odd.  It seems like a

20   one-off sort of thing for some reason.

21          Q.    Well, last time you did testify with

22   regards to Exhibit 8 that you created the

23   spreadsheet itself.

24          A.    I created the spreadsheet.

25          Q.    Right.

1            A. Kincaid - CONFIDENTIAL

2        A.    But if you remember from before with

3    a couple of the other documents you sent me, my

4    name showed up on the metadata but the format

5    of the file was completely different than

6    anything I would have created.

7        Q.    All right.   But in this case, you did

8    create Exhibit 8; correct?

9        A.    I would have created the original

10   version of this document, yes.    I just don't

11   know if the header of that is what I wrote or

12   not.

13       Q.    Okay.   Putting aside -- and the

14   header just being the words Ohio changes?

15       A.    No, the Franklin County sinkhole.

16   That's where I would have put the title.

17       Q.    I haven't asked about that yet.

18       A.    No, I'm just saying that that's the

19   part that gives me pause as to whether or not

20   the metadata's accurate, because I would have

21   typically put the name of -- the fact it's Ohio

22   changes, new idea redraft, new idea redraft

23   typically would have been what appeared on the

24   header there.

25       Q.    I understand.

1          A. Kincaid - CONFIDENTIAL

2          A.    That's all I'm saying.

3          Q.    New idea.  In the ordinary practice,

4    where the word Ohio changes are should have

5    been new Ohio redraft?  Is that what you're

6    saying?

7          A.    Typically, yes.

8          Q.    Okay.

9          A.    That's what would have been there.

10         Q.    In this instance, just so we're --

11   what does and doesn't line up, we can agree on.

12   You testified that -- your name does appear as

13   the last author for the -- for 1387, exhibit --

14   in the metadata 44.  Do you see that?

15         A.    I see that, yes.

16         Q.    Okay.  And you see the last modified

17   date of September 3, 2011?  Do you see that?

18         A.    I do.

19         Q.    Do you see your name is author again

20   also as Kincaid?

21         A.    Yes.

22         Q.    All right.  And so that's -- in that

23   sense, the metadata's consistent with your

24   recollection about Exhibit 8 that you were --

25   with the exception -- we will get to the

1                    A. Kincaid - CONFIDENTIAL

2    question of the words Franklin County sinkhole,

3    with the exception of those words, that you

4    authored this spreadsheet; is that right?

5         A.   Apart --

6              MR. SHEEHY:  Objection.

7         A.   Apart from that cell, it, yes, it

8    seems like something I would create, just that

9    part doesn't line up.

10        Q.   Those words, Franklin County --

11        A.   Yes.

12        Q.   -- sinkhole.

13        A.   Yes, doesn't line up with the name of

14   the file.  And they typically would have lined

15   up.  That's all I'm saying.

16        Q.   You're saying the words Franklin

17   County sinkhole should have appeared in the

18   file name, or the word Ohio changes should have

19   appeared in the file name?

20        A.   My typical naming convention for

21   these sheets would have been Ohio changes,

22   dash, whatever the map was nicknamed for that

23   purpose, whether it be new idea redraft or, you

24   know, HB 319 or whatever that, you know, would

25   have been final Ohio map typically would have

1                     A. Kincaid - CONFIDENTIAL

2     showed up in the name of the file as well as in

3     the top header for --

4          Q.   And that is the name that does appear

5     in the metadata, Ohio changes - new idea

6     redraft?

7          A.   Sure.

8          Q.   So that --

9          A.   It typically lined up is all I'm

10    saying.

11         Q.   So -- so --

12         A.   The header and the title of the file

13    typically lined up --

14         Q.   Okay.

15         A.   -- where they should have lined up.

16         Q.   Okay.  Just so I understand, looking

17    at Exhibit 44 in the metadata, the file name is

18    consistent with your naming convention; is that

19    right?

20         A.   File name is consistent with my

21    naming conventions.

22         Q.   And it's same file name that appears

23    as the attachment to the email that you sent on

24    September 2, 2011 to Mr. DiRossi, Ms. Mann, and

25    Mr. Whatman; correct?  The .xls attachment, the

1          A. Kincaid - CONFIDENTIAL

2    same file name?

3          A.   Yes, it's the same file name.

4          Q.   So if, in fact, the file name on 1387

5    is what the metadata says it is, that is

6    consistent with your naming convention;

7    correct?

8          A.   Yes.

9          Q.   And it's the same file name as the

10   attachment on the email?

11         A.   Yes.

12         Q.   Okay.  Now I just want to ask you a

13   question about -- you raised the question about

14   the Franklin County sinkhole words.

15         A.   Okay.

16         Q.   Is it your testimony you don't recall

17   writing those words?

18         A.   No, I don't have a specific

19   recollection of naming that.  I don't -- yeah.

20         Q.   The name for the file was, in fact,

21   Ohio Changes - New Idea Redraft.xls?

22         A.   Yes, that's the file name.

23         Q.   Not asking whether that was the name

24   of Exhibit 8.

25         A.   No, I know.  I know what you're

1                    A. Kincaid - CONFIDENTIAL

2    asking.  I'm just -- you asked me if I remember

3    writing these words.  I don't recall writing

4    those words.

5         Q.   Okay.  Do you have any reason to

6    think you did not write those words?

7         A.   The only thing that gives me pause is

8    the fact it doesn't line up with the file name

9    because typically, the file name, like I said,

10   would have lined up with whatever I put in that

11   top --

12        Q.   Okay.

13        A.   -- cell.

14        Q.   But on the left hand you got current

15   in the top cell.

16        A.   Yes.

17        Q.   With your naming convention, would

18   have included the word current in the --

19        A.   Yes.

20        Q.   -- name?

21        A.   Yes.

22        Q.   File name?

23        A.   Yes.

24        Q.   Okay.  I see "Ohio changes" though

25   appears above the whole spreadsheet.

1          A. Kincaid - CONFIDENTIAL

2          A.   Yes.

3          Q.   See that?  And that does appear in

4     the file name.

5          A.   Uh-huh.

6          Q.   So --

7          A.   Like I've told you, it all lines up.

8     That cell doesn't make sense.

9          Q.   The cell doesn't make sense because

10    you think in the ordinary course you would have

11    included that in the file name; is that right?

12         A.   Usually I would have included that in

13    the file name, yes.

14         Q.   Okay.  Do you recall ever using the

15    phrase "Franklin County sinkhole" during any of

16    your work in 2011 involving Congressional

17    redistricting in Ohio?

18              MR. SHEEHY:  Objection to form.

19         A.   I don't recall personally using that

20    phrase, no.

21         Q.   Do you recall anybody else using that

22    phrase?

23              MR. SHEEHY:  Objection to form.

24         A.   I don't have a -- I don't know -- I

25    don't have a specific memory of anybody saying

1               A. Kincaid - CONFIDENTIAL

2   that phrase out loud, no.  I don't recall that

3   being something we typically called that

4   district.

5               I do have a vague memory of hearing

6   that phrase, but I don't have a memory of one

7   person saying that.  Again, it was seven and a

8   half years ago.

9        Q.   Do you recall Mr. Whatman ever using

10  that phrase?

11              MR. SHEEHY:  Objection to form.

12        A.   I have a memory of that phrase being

13  used in a conversation with Mr. Whatman, but I

14  don't recall if there were other people in the

15  room or not and so I couldn't tell you if it

16  was Tom saying that.

17              I don't recall saying it myself

18  because it doesn't sound like something I would

19  say, but I don't remember Mr. Whatman saying

20  it.

21              I do remember hearing -- I have a

22  vague memory of the phrase coming up in the --

23  in the course of a conversation about the Ohio

24  map, but --

25        Q.   Do you recall --

1          A. Kincaid - CONFIDENTIAL

2          A.    -- it's just a vague recollection.

3          Q.    -- in that meeting, was that during

4    the Congressional proposal period?

5                MR. SHEEHY:  Objection to form.

6          A.    It would have been in the August or

7    early September time frame, so in the proposal

8    and collaboration period, yes.

9          Q.    Do you recall whether Dr. Hofeller

10   was in the room for that conversation?

11               MR. SHEEHY:  Objection to form.

12         A.    I have no recollection being in the

13   meeting with Dr. Hofeller and Tom Whatman at

14   the same time.

15         Q.    What about Mr. Wile?

16               MR. SHEEHY:  Objection to form.

17         A.    No.

18         Q.    What about Speaker Boehner?

19               MR. SHEEHY:  Objection to form.

20         A.    No.

21         Q.    Anybody else in the room?

22               MR. SHEEHY:  Objection to form.

23         A.    Again, I really -- I have a vague

24   recollection of people being in that meeting

25   but I don't recall who that was.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Was anybody on the phone, on

3    speakerphone?

4               MR. SHEEHY:   Objection to form.

5          A.   I don't recall having any

6    speakerphone meetings over Ohio.   Typically

7    when we had a meeting about Ohio, it was in

8    person.

9          Q.   Do you recall whether Mr. DiRossi was

10   ever at that meeting?

11              MR. SHEEHY:   Objection to form.

12         A.   I don't recall being on a conference

13   call with -- with Ray and Heather.

14         Q.   Did any of them ever come to

15   Washington to meet with you during the

16   Congressional proposal process?

17              MR. SHEEHY:   Objection to form.

18         A.   Not that I remember, no.

19         Q.   Did anybody else work with you in

20   creating these change sheets?

21         A.   I created the changes sheets myself.

22         Q.   So if one -- do you have any reason

23   to doubt the authenticity of this document?

24              MR. SHEEHY:   Objection to form.

25         A.   All I'm telling you, Mr. Fram, is I

1              A. Kincaid - CONFIDENTIAL

2    don't remember writing that phrase.  I mean,

3    you're asking me if I remember writing specific

4    words on a spreadsheet seven and a half years

5    ago.  I don't have a memory of typing those

6    words out.

7         Q.   I just want to know --

8         A.   The format of the document is

9    something that I would have produced.  This

10   lines up with all the other things you and I

11   have looked at that have changes sheets.  All

12   I've done here is I don't remember typing

13   "Franklin County sinkhole," enter, and putting

14   that on there.  That's all I'm telling you.

15        Q.   And I just want to be totally

16   transparent with you, but I just want to make

17   sure that you don't say, you know, no, no, I

18   didn't type it, somebody else typed it, or

19   something.  You just don't remember one way or

20   the other, if I understand correctly.

21        A.   Yes, that's --

22        Q.   Fair enough.  We're on the same page?

23        A.   Okay.

24        Q.   I just wanted to --

25        A.   Yeah, I mean, it was in the summer

1           A. Kincaid - CONFIDENTIAL

2    and fall of 2011 so it was a while ago.  Lots

3    has happened since then.

4        Q.   I understand.  All right, do you

5    recall the phrase "Franklin County sinkhole"

6    coming up as any part of the discussions with

7    Mr. DiRossi or Ms. Mann at any time?

8             MR. SHEEHY:  Objection to form.

9        A.   Like I told you before, just as a

10   blanket statement, I don't recall having a

11   conversation with Ray or Heather at all during

12   the process.  Our interactions were typically

13   through Tom Whatman, and then those emails that

14   you've seen.

15       Q.   Okay.  And just so we are clear, you

16   referenced that district in reference to

17   Franklin County sinkhole.  Would that have been

18   the 10-Open district, the one that's got the

19   D+16 PVI scoring at the bottom of Exhibit 8?

20       A.   On this sheet, it would have been the

21   10th district.  I think at the end of the

22   process it was the Third is what it was --

23   actually ended up being.  But yes, it was that

24   10th district.

25       Q.   Looking at the file name in the

1                    A. Kincaid - CONFIDENTIAL

2   metadata and on the -- on Exhibit 44 and also

3   on the attachment to the September 2 email,

4   Exhibit 7, this name Ohio changes - new idea

5   redraft, do you see that?

6        A.   Yes.

7        Q.   Do you have an understanding of what

8   the phrase "new idea" referred to?

9        A.   At some point in time during the

10  proposal and collaborative process we had a

11  file name.  I guess it was -- you know, you saw

12  the one that was as of July 25, and at some

13  point we had a new idea.  So it was a different

14  approach to how we were drafting the map.

15       Q.   And were there sequential iterations

16  of the map, new idea 1, new idea 2, new idea 3?

17       A.   I think so, yes.

18       Q.   Do you recall whether or not the

19  iteration of the Congressional proposal to

20  create a new district in Franklin County area,

21  that iteration took place in late August or

22  early September 2011?

23       A.   Could you ask it again?

24       Q.   Trying to find out when the new

25  Franklin County district idea was generated.

1          A. Kincaid - CONFIDENTIAL

2    So I'm trying to figure out, was it around the

3    time of the September 2 email?  Was it around

4    the time?  Was it some other time?  Was it

5    earlier than that?

6         A.    I don't know when the -- well, it

7    says the date last modified here is 9-3-2011 so

8    that would have been whenever I sent this file.

9    I don't know how many days before that or weeks

10   that new file name came into use.  I'm not

11   sure.

12        Q.    You said that the file name came into

13   use or the idea of creating the district?

14        A.    For me, that's one in the same.  The

15   new file name would have come into existence at

16   the same time as the new map was being -- you

17   know, a new iteration was being created.

18        Q.    We can put some boundaries on it.

19   Let's take a look.  So back, in fact, as early

20   as July, in Exhibit 5, as early as July 25,

21   2011 there was a new District 10 open in PVI of

22   D+15.  Do you see that?

23        A.    Just a second.  Okay.

24        Q.    Does refresh your recollection that

25   the fact of creating a new district around

1                A. Kincaid - CONFIDENTIAL

2    Franklin County, heavily Democratic, was

3    something you were working on as part of the

4    Congressional proposal as early as July 25,

5    2011?

6                MR. SHEEHY:  Objection to form.

7         A.    You know, I'm not entirely certain

8    that new idea refers to the 10th district at

9    all.  If you look at the McCain numbers for the

10   as of July 25 versus this, you know, Exhibit 5

11   versus Exhibit 8, you'll notice that the first

12   district is different, the second is different,

13   the third is different, the fourth is

14   different.  I mean, these are -- this is a

15   significantly different map across the entire

16   state.

17              And so without having a picture of

18   the as of July 25 map, I couldn't tell you

19   specifically what new idea's referring to.  It

20   could have been a new idea in regards to a

21   different part of the state.  It may not have

22   been the 10th district.

23        Q.    I'm not asking about the meaning of

24   the phrase "new idea."  I'll ask my question

25   more clearly this time.

1              A. Kincaid - CONFIDENTIAL

2         A.   Okay.

3         Q.   I'm saying whether or not an idea of

4    creating a new district --

5         A.   Uh-huh.

6         Q.   -- in the Franklin County area --

7         A.   Okay.

8         Q.   -- which was initially designated as

9    10 --

10        A.   Uh-huh.

11        Q.   -- whether or not that idea was

12   something you were working on as of July 25,

13   2011, consistent with Exhibit 5.

14        A.   I mean, clearly it was something we

15   were looking at as of July 25.

16        Q.   Right.  And that the -- as we said

17   before, that had certain effects on the PVI

18   scoring for 12 and 15; correct?

19        A.   Yes.

20        Q.   September 3, 2011, 11:54 a.m. email

21   in Exhibit 7.

22        A.   Exhibit 7?

23        Q.   Yeah.  It's a long email string.

24        A.   Let's see.

25        Q.   It's on page 4 of 8.

1                    A. Kincaid - CONFIDENTIAL

2          A.    Okay.

3          Q.    Mr. Whatman is emailing to you.  You
4    have no reason to doubt you received this
5    email; is that right?

6          A.    Where it says "Adam, did we tell you
7    we need the four-way split?"

8          Q.    Yeah.

9          A.    Yeah, I have no reason to doubt I
10   received that email.

11         Q.    Okay.  And that was also -- no reason
12   to doubt that Mr. DiRossi and Ms. Mann were
13   included in that email string; is that right?

14              MR. SHEEHY:  Objection to form.

15         A.    No.

16         Q.    Okay.  It's part of the
17   collaboration; is that right?

18         A.    Yeah, yes.

19         Q.    Do you have a recollection of what
20   the phrase "four-way split" meant?

21              MR. SHEEHY:  Objection to form.

22         A.    I didn't last time, but you and I,
23   when we went through the whole process and
24   looked at the screenshots, four-way split had
25   to do with four districts splitting up Franklin

```
 1              A. Kincaid - CONFIDENTIAL
 2   County.
 3        Q.   That was an alternative to creating a
 4   new district in Franklin County that would
 5   include most of Franklin County within it; is
 6   that right?
 7        A.   That's correct.
 8        Q.   Two different options, in other
 9   words.  One is create a whole new district
10   around Franklin County; the other is split it
11   up four ways.  Is that right?
12        A.   That's correct.
13             MR. SHEEHY:  Objection to form.
14        Q.   Those are two options that were being
15   considered around September 3, 2011; is that
16   right?
17             MR. SHEEHY:  Objection to form.
18        A.   I suppose so, yes.
19        Q.   And he said:  "Did we tell you we
20   needed the four-way split?"
21             Do you see what Mr. Whatman's saying
22   there?
23        A.   Yes.
24        Q.   Do you understand who "we" was in
25   that?  Talking about Mr. DiRossi and Ms. Mann?
```

1          A. Kincaid - CONFIDENTIAL

2          MR. SHEEHY:  Objection to form.

3     A.   That would have been my

4  understanding.

5     Q.   Do you recall a conference call with

6  them about this issue, about wanting to

7  discussion the option between the new district

8  in Franklin County versus the four-way split?

9          MR. SHEEHY:  Objection to form.

10    A.   Like I said before, I don't recall

11  having any conference calls with Ray or

12  Heather.

13         MR. FRAM:  Let's take a look then

14         at -- let's see.  This is a document

15         that was produced after your deposition.

16         This is OHCF0001438.

17         (Exhibit No. 45 was marked for

18         identification.)

19  BY MR. FRAM:

20    Q.   Mr. Kincaid, looking at this

21  document, this appears to be the exact same

22  format as the other change sheets we have been

23  looking at; isn't that right?

24    A.   Yes.

25    Q.   You created this, didn't you?

1          A. Kincaid - CONFIDENTIAL

2          MR. SHEEHY:  Objection, form.

3      A.  It seems likely that I did.

4      Q.  Do you see the title Four-Way Split

5  up there?

6      A.  I do.

7      Q.  Is this a change sheet that you

8  generated to show what the -- to depict

9  analysis of what the four-way split would look

10  like?  Is that right?

11          MR. SHEEHY:  Objection to form.

12      A.  This would have reflected the

13  partisan makeup of it, yes.

14      Q.  There's no open -- there's no 10-Open

15  district here; is that right?

16      A.  That's correct.

17      Q.  That's because the four-way split,

18  like you say, was dividing up Franklin County

19  four ways.  It wasn't creating a new district

20  centered in Franklin County; correct?

21      A.  That's right.

22          MR. FRAM:  Now, the metadata, let's

23  mark that as 46.

24          (Exhibit No. 46 was marked for

25          identification.)

1                    A. Kincaid - CONFIDENTIAL

2    BY MR. FRAM:

3          Q.   The metadata for this document --

4    refresh your recollection about the date.  Just

5    to point you down to the created date of

6    9-6-2011, do you see that?

7          A.   Yes.

8          Q.   And does that refresh your

9    recollection as to the approximate date you

10   were working generating a change sheet for the

11   four-way split?

12         A.   It says at the top, as you see here,

13   four-way split as of September 6, so it -- it

14   says at the top of the document four-way split

15   as of September 6 so it seems like it was as of

16   September 6.

17         Q.   Okay.  Once again, on the left hand,

18   current, that's under the pre-redistricting

19   map, the 18 districts; is that right?

20         A.   That would have been as of, yes,

21   January of 2011 before redistricting.

22         Q.   And you see there are six elections

23   that are indicated there?  Do you see those

24   columns?

25         A.   Yes.

1              A. Kincaid - CONFIDENTIAL

2          Q.   I think, as we indicated, when you
3     actually did the averaging you used a function.
4     You only used five of them; is that right?
5          A.   That's correct.
6          Q.   And same thing's true.  If you look
7     at the four-way split, you've got -- similarly,
8     you've got those six elections but you got the
9     Ohio GOP average.  That's just for the five; is
10    that right?
11         A.   Yes.
12         Q.   Okay.
13         A.   As we covered before.
14         Q.   And if we go down looking at the PVI
15    values under the four-way split on the far
16    right, do you see those?
17         A.   Yes.
18         Q.   And if I count correctly, 13
19    districts which have R+ PVI scores, do you see
20    that?
21         A.   I do.
22         Q.   And just for the record, I'll just
23    state it to make sure I'm reading this right.
24    So that means for the proposed District 1 would
25    be R+6; is that right?

1          A. Kincaid - CONFIDENTIAL

2     A.    No.

3     Q.    Proposed District --

4     A.    Proposed District 1, R+6, yes.

5     Q.    That's right.  And the same thing for

6     district 2.  It's an R+8; is that right?

7     A.    Yes.

8     Q.    And District 3, that's an R+4; is

9     that right?

10    A.    Yes.

11    Q.    And so on down that line until you

12    get to 13 of them; is that right?  Okay.

13          MR. FRAM:  I've put in front of you

14          what are Exhibit 8, BRADEN001387; and

15          Exhibit 45, OHCF001438.

16    A.    Okay.

17    Q.    Look for some of the differences

18    that -- in Exhibit 8 there was a pairing of

19    Turner and Austria.

20          Do you see that?

21    A.    Yes.

22    Q.    But in Exhibit 45, the four-way

23    split, they each have their own district; is

24    that right?

25    A.    Yes.

1                    A. Kincaid - CONFIDENTIAL

2          Q.   Kaptur and Kucinich, they're paired

3    in both of them; is that right?

4          A.   Yes.

5          Q.   And Renacci is paired with Sutton in

6    Exhibit 45, the four-way split.

7               Do you see that?

8          A.   Yes.

9          Q.   But not in -- not in Exhibit 8, not

10   in BRADEN001387, the ones with the word

11   Franklin County sinkhole.

12         A.   Yes.

13         Q.   Do you recall changing some of these

14   incumbent pairings between the -- what's

15   labeled as the Franklin County sinkhole

16   spread -- map and the four-way split?

17              MR. SHEEHY:   Objection to form.

18         A.   Do I recall changing them?

19         Q.   Well, let me back up for a minute.

20   If the metadata's correct, Exhibit 8 was sent

21   on or about September 2 or 3, 2011.

22         A.   Okay.

23         Q.   And if the metadata's correct and the

24   labeling is correct, Exhibit 45's within a few

25   days, September 6.

```
 1              A. Kincaid - CONFIDENTIAL
 2         A.    Okay.
 3         Q.    I'm saying in that three-day period
 4    do you remember changing the incumbent
 5    pairings?
 6              MR. SHEEHY:  Objection to form.
 7         A.    If you go back and look at Exhibit 7,
 8    it seems pretty clear from those emails that
 9    the four-way split map and the new idea map
10    were -- existed at the same time so I don't
11    think I changed the pairings.  I think they
12    were two different drafts.
13         Q.    Two different ideas were on the
14    table, and I --
15         A.    Two different ideas.  It's not that I
16    would change one from this to this, I think
17    they're just two simultaneous maps.
18         Q.    So but in the period generally
19    between -- in early September, the two ideas
20    were on the table, the four-way split idea and
21    this new district in Franklin County.  They
22    were both on the table at the same time; is
23    that right?
24         A.    That seems to be the case, yes.
25         Q.    And if you compare the PVI scorings
```

```
1              A. Kincaid - CONFIDENTIAL
```

2    in Exhibits 8 and 45 --

3         A.    Uh-huh.

4         Q.    -- it seems like for five of the

5    districts, the PVI scorings are the same.  That

6    would be Districts 1, they're both R+6; is that

7    right?

8         A.    Yes.

9         Q.    And District 6, they're both the same

10   at R+5; is that right?

11        A.    Yes.

12        Q.    And at District 8, they're both the

13   same --

14        A.    Yes.

15        Q.    -- at R+11?

16        A.    Uh-huh.

17        Q.    Okay.  And at District 14, it also

18   seems to be the same at R+3.  Do I have that

19   right?

20        A.    Yes.

21        Q.    Okay.

22        A.    District 7's also the same.

23        Q.    And District 7 also?  Okay.

24        A.    They're both R+5 seats.

25        Q.    But there's several districts where

1          A. Kincaid - CONFIDENTIAL

2     there's a lower R scoring in the four-way

3     split.  Do you see that in Exhibit 45?  And in

4     particular, District 2 went from an R+10 in

5     what I'll call the Franklin County sinkhole map

6     down to R+8 in the four-way split.

7              Do you see that?

8        A.   I see that.  I don't think I would

9     characterize it as it went down.  These are --

10    like we just talked about, these are two

11    simultaneous maps.

12       Q.   Okay.

13       A.   So it's not that one's changing to

14    the other one; they're different maps.

15       Q.   Okay.

16       A.   So the districts are going to be

17    different, significantly different.

18       Q.   Fair enough.  I didn't mean to create

19    a temporal suggestion in my question.  Let me

20    clean it up a little bit.

21              When one compares the two maps, there

22    are several districts where there's a lower R+

23    scoring under the PVI column; correct?

24       A.   Yes.  If you are comparing the two

25    maps simultaneously, the second would be more

1          A. Kincaid - CONFIDENTIAL

2    Republican than the other second, yes.

3          Q.    Second?

4          A.    The second in the --

5          Q.    CD 2?

6          A.    Yes.

7          Q.    CD 2, which is stronger Republican

8    strength in the --

9          A.    In the BRADEN001387.

10          Q.    137, which has the words "Franklin

11   County sinkhole" on it?

12          A.    Uh-huh.

13          Q.    Okay.  And similarly, CD 3, it goes

14   from R+6 in that the spreadsheet with the words

15   "Franklin County sinkhole" on it down to R+4 in

16   the four-way split spreadsheet; correct?

17          A.    Third?

18          Q.    CD 3.

19          A.    Yes.

20          Q.    And for CD 4, it goes from R+8 down

21   to an R+5 between the spreadsheet with the

22   words "Franklin County sinkhole" on it down to

23   the spreadsheet with the words "four-way

24   split"; is that right?

25          A.    Yes.

```
 1              A. Kincaid - CONFIDENTIAL
```

2      Q.   And similarly for CD 5, it goes down

3   from R+7 -- that's Latta's district -- down to

4   an R+4 between the spreadsheet with the words

5   "Franklin County sinkhole" on it and the

6   four-way split spreadsheet; is that right?

7      A.   Yes.

8      Q.   And then for Tiberi in District 12 it

9   goes down from an R+10 in the spreadsheet that

10   has "Franklin County sinkhole" on it down to

11   R+5 in the four-way split.

12          Do you see that?

13      A.   I do.

14      Q.   And for District 15, which is

15   Stivers, it goes down from an R+6 in the

16   spreadsheet that's got "Franklin County

17   sinkhole" on it down to R+5 in the four-way

18   split spreadsheet; is that right?

19      A.   Yes.

20      Q.   So as a general matter, the

21   spreadsheet that has the "Franklin County

22   sinkhole" words on it had stronger Republican

23   PVI scorings than did the four-way split

24   option; is that right?

```
25              MR. SHEEHY:  Objection to form.
```

```
 1              A. Kincaid - CONFIDENTIAL
```

2         A.   The Franklin County sinkhole map

3    had -- the districts that were Republican had

4    higher overall -- as a general statement had

5    higher R+ scores than the four-way split, I

6    guess.

7         Q.   Thank you.

8         A.   It also had another Democrat seat

9    than the other one did.

10        Q.   All right.  So the tradeoff would be

11   it was -- in one of them there were 13

12   Republican seats that had stronger Republican

13   PVI and the other only had 12; is that right?

```
14              MR. SHEEHY:  Objection to form.
```

15        A.   Yes.  I mean, the four-way split map

16   had 13 districts that could have sent a

17   Republican to Congress and three that sent a

18   Democrat, and the other one had, you know, 12

19   seats that were likely sending a Republican in

20   Congress, and four Democrats.

21        Q.   You say both options were on the

22   table.  Do you recall any conversation as to

23   which option was going to be proposed or

24   recommended?

```
25              MR. SHEEHY:  Objection to form.
```

1          A. Kincaid - CONFIDENTIAL

2          A.   Which option was going to be proposed

3     by whom?

4          Q.   First of all, do you recall any

5     conversation with anything you were considering

6     proposing to Mr. Whatman?  Take it each step.

7               MR. SHEEHY:  Objection to form.

8          A.   These are both drafts that we had

9     worked on with the delegation and, you know,

10    presented to -- with Mr. Whatman, you know,

11    over this -- the Ohio legislature, you know, to

12    bring in Heather and the Ohio legislature.

13         Q.   Do you recall any discussion as to

14    which way to go, whether to go for the 13-3 map

15    versus the 12-4 map?

16              MR. SHEEHY:  Objection to form.

17         A.   When you say R -- our proposal for

18    which one they should choose of the two?  Is

19    that what you're asking?

20         Q.   Basically, at a certain point you've

21    testified there were two options on the table.

22         A.   Yeah.

23         Q.   At the end of the day, you picked one

24    or the other; is that right?

25         A.   I didn't pick one or the other.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Somebody picked one or the other.

3    I'm trying to understand the process towards

4    getting to the result of picking one or the

5    other, like any conversations, any

6    communications, like which one to pick?

7               MR. SHEEHY:  Objection to form.

8          A.   You saw those emails before that

9    we've already have gone through.  They asked

10   for both maps.  Both options.  The Ohio

11   legislature looked at the two of them and made

12   a decision.  I wasn't part of that

13   conversation.

14         Q.   Okay, so who was -- the conversation

15   as you understand it involved Ms. Mann,

16   Mr. DiRossi, Mr. Whatman?

17         A.   No.

18              MR. SHEEHY:  Objection to form.

19         A.   No, it was -- Ray and Heather took

20   those maps and I think showed them to -- made

21   changes in various things and did things on

22   their end with the Ohio state legislature, and

23   somewhere with the Ohio state legislature

24   decided which way to go.

25         Q.   So they made the decision whether to

1          A. Kincaid - CONFIDENTIAL

2   go for 12-4 versus 13-3 is your understanding?

3          MR. SHEEHY:  Objection to form.

4      A.  I don't know who made that decision

5   or how that decision was made apart from that.

6   I do recall being told that the Democrats in

7   the Ohio legislature were willing to vote for

8   the new map if it created four Democrat seats

9   versus three.

10     Q.  And who told you that?

11     A.  Mr. Whatman.

12         MR. SHEEHY:  Objection.

13     Q.  Do you recall around when he told you

14  that?

15         MR. SHEEHY:  Objection to form.

16     A.  It would have been around the time

17  that the map was -- the final map was being

18  proposed and moving toward passage.

19     Q.  The final map, we're talking about

20  HB 319 or a later one, 369?

21     A.  319.

22     Q.  Okay.  Do you have an understanding

23  of how the Democrats voted on 319?

24     A.  From my recollection, several

25  Democrats voted for 319.  It was a bipartisan

1        A. Kincaid - CONFIDENTIAL

2    support of --

3        Q.   About three in the House.

4        A.   Okay.

5        Q.   The overwhelming majority of

6    Democrats voted against 319?

7        A.   I know that some did, though.

8        Q.   But a tiny minority?  Do you have a

9    memory?  Do you have a memory of the numbers?

10       A.   I don't remember the exact numbers.

11   I know that some Democrats were willing to vote

12   for that map and then voted more than voted for

13   the next one.

14       Q.   Okay.  But on this one, we trying to

15   figure out the 12-4.  I'm trying to figure out

16   whether you have any recollection of saying the

17   12-4 was being chosen because that's what the

18   Democrats wanted.

19            MR. SHEEHY:  Objection to form.

20       A.   I don't think it was why it was

21   chosen but I think it was a part of that

22   decision-making process.

23       Q.   Do you have any idea why it was

24   chosen?

25            MR. SHEEHY:  Objection to form.

1          A. Kincaid - CONFIDENTIAL

2     A.   I wasn't part of that conversation.

3     (Exhibit No. 47 was marked for

4     identification.)

5          MR. FRAM:  So we got up to

6     September 6.  I want to take us to

7     September 8.

8  BY MR. FRAM:

9     Q.   This is an email string.  The Bates

10  number, though, applies to all of them,

11  00023234.  And let me just start with the first

12  page with you.

13          September 8, 2011 email at 4 o'clock

14  in the afternoon from Tom Hofeller to Mark

15  Braden entitled New Idea 3.

16          Do you see that?

17     A.   I'm sorry, from Tom to Mark?

18     Q.   From Tom Hofeller.  I'm looking at

19  the second email.  Sorry about that.

20     A.   Yeah.

21     Q.   It's from Dr. Hofeller to Mr. Braden

22  on September 8, 2011 at 4 p.m.  Subject re: New

23  Idea 3.

24          Do you see that?

25     A.   Yes.

1          A. Kincaid - CONFIDENTIAL

2          Q.    I think you've already testified that

3     thofeller@RNCHQ.org, do you recognize that as

4     Mr. Hofeller's email address in 2011; correct?

5          A.    Yes, that was Tom Hofeller.

6          Q.    Hofeller.  I apologize.  Hofeller's

7     email address.  And I don't know if you

8     recognize Mr. Braden's email address or not.

9          A.    I don't.

10         Q.    Now, this title, New Idea 3, does it

11    ring a bell in terms of what New Idea 3 was?

12              MR. SHEEHY:  I'm just going to

13         object.  I don't see Adam being copied

14         on any of these emails.

15              MR. FRAM:  I just haven't asked him

16         that question.  We don't have to make

17         those statements.  There's no question

18         pending on that.

19         Q.   I'm just asking.  Just so we are

20    clear, I just want to know whether or not you

21    have any idea what New Idea 3 is.

22         A.    Not to be glib, but I'm assuming New

23    Idea 3 is the third iteration of the new idea

24    that we talked about before.

25         Q.    That was kind of my guess also.  Did

1                    A. Kincaid - CONFIDENTIAL

2    you come up with the -- you are very precise

3    about naming things.  Did you come up with a

4    New Idea 3?

5                    MR. SHEEHY:  Objection to form.

6         A.   I think it's likely I named a

7    iteration New Idea 3.

8         Q.   Okay.  Go back to the -- in Outlook,

9    the chronological order and spatial are

10   reversed so to get the earliest in time we have

11   to go to the end document.  So if you go to the

12   September 8, 2011 at 1:05 p.m., do you see

13   that?

14        A.   Yes.

15        Q.   You see that Dr. Hofeller is sending

16   Mr. Braden a DVF plan file.  Do you see that

17   reference?

18        A.   Yes.

19        Q.   Do you have an understanding of what

20   a DBF plan file is?

21        A.   A DBF plan file is a block

22   equivalency or block assignment file.

23        Q.   Okay.  Were you aware that such a

24   file was being sent to Mr. Braden?

25        A.   No, I don't remember this.

1          A. Kincaid - CONFIDENTIAL

2          Q.    Okay.  Do you see referencing that

3   Dr. Hofeller had put Hamilton back the way it

4   was except for five persons needed to reunite

5   three cities?

6              Do you see that?

7          A.    I do.

8          Q.    And it says:  "I gave the plan to

9   Adam as directed."

10         A.    I see that.

11         Q.    Do you recall Dr. Hofeller giving you

12   any plans in September 2011?

13             MR. SHEEHY:  Objection to form.

14         A.    No.  I mean, like I testified before,

15   I don't recall Tom giving me any block

16   assignment files, but he says he did so he may

17   have.  But I do not recall that.

18         Q.    Okay.  Do you recall any changes

19   being made to Hamilton County?

20             MR. SHEEHY:  Objection to form.

21         A.    There were lots of changes made to

22   Hamilton County over the course of the drafting

23   of the map, so yeah, I remember.

24         Q.    Do you recall Dr. Hofeller ever

25   suggesting to you to make changes in Hamilton

1          A. Kincaid - CONFIDENTIAL

2    County?

3              MR. SHEEHY:  Objection to form?

4        A.   No.  Like I testified before, I don't

5    recall Tom giving me any advice as to anything

6    to change anywhere in the map.  I don't recall

7    him sending me a file, but this email says that

8    he sent me a file, but it doesn't say he gave

9    me any direction on the Hamilton County map,

10   so --

11       Q.   It does say:  "I gave the plan to

12   Adam as directed."  Do you see that?

13       A.   Yeah.  I'm agreeing with you that it

14   says that, I just don't remember him giving me

15   the file, that's all.

16       Q.   Do you recall whether Mr. Braden was

17   giving directions to Dr. Hofeller about what to

18   include in different districts?

19              MR. SHEEHY:  Objection to form.

20       A.   I wasn't privy to Mark and Tom's

21   conversations so I don't know what they talked

22   about.

23       Q.   Then going to a little later in the

24   afternoon, around 2:25 in the afternoon, do you

25   see that email from Dr. Hofeller to Mr. Braden?

```
 1              A. Kincaid - CONFIDENTIAL

 2         A.   Yes.

 3         Q.   It says:  "Mike, Franklin won't work

 4    because of one of the cities I moved in the

 5    County has our incumbent in it."

 6              Do you see that?

 7         A.   Yes.

 8         Q.   Do you recall any conversations about

 9    Franklin County not working because an

10    incumbent was in the new Franklin County

11    district and should not have been?

12              MR. SHEEHY:  Objection to form.

13         A.   I don't recall a conversation with

14    Tom about it, but I recall a conversation with

15    Steve Stivers about it, so --

16         Q.   And if you go up a little bit higher

17    up in the chain --

18         A.   Mike, I mentioned before.

19         Q.   -- it's talking about Steve Stivers

20    as the person being referred to by

21    Dr. Hofeller.

22         A.   Uh-huh.

23         Q.   And the problem was whether or not

24    he -- someone had the right address?  Is that

25    what --
```

1              A. Kincaid - CONFIDENTIAL

2         A.    That's -- yes.

3         Q.    You remember that.  Okay.

4               And at one point, somebody thought he

5    lived at 1971 Concord Road.

6               Do you see that?

7         A.    Yeah, I see that in the email here.

8         Q.    Yeah.  But previously, that you had

9    thought he lived in Grandview Heights; is that

10   right?

11        A.    It looks like that's the case, yes.

12        Q.    And that Mr. Braden says he sent the

13   right address because Stivers had just bought

14   that house.  Do you see that going up in the

15   3:39 p.m.?

16        A.    Yes.

17        Q.    Do you recall whether -- so

18   Mr. Braden was the source of the correct

19   address for Representative Stivers --

20              MR. SHEEHY:  Objection to form.

21        Q.    -- as far as you know?

22              MR. SHEEHY:  Objection to form.

23        A.    Mark apparently sent that address to

24   Tom.  I didn't recall receiving that address

25   from Mark.  Tom probably told me I had the

1          A. Kincaid - CONFIDENTIAL

2    wrong address and then Mr. Stivers apparently,

3    you know, definitely told me that, so --

4        Q.   Okay.  Now looking at the 3:18 p.m.

5    email, read the whole thing if you can please

6    that's short.  One paragraph.

7        A.   Okay.

8        Q.   And you notice it says:  "The area

9    Adam has on his version included Grandview

10   Heights and some of the more downtown area."

11            Do you see that?

12       A.   Yes.

13       Q.   And then there's a reference where it

14   says:  "Which I took out of the map I sent."

15            Do you see that?

16       A.   I see that.

17       Q.   Do you recall Dr. Hofeller at any

18   point taking certain downtown areas out of the

19   Franklin County map?  Strike that.

20            Do you recall Dr. Hofeller at any

21   point taking any of the downtown area out of

22   the proposed District 15?

23            MR. SHEEHY:  Objection to form.

24       A.   Like I said before, I don't recall

25   receiving files from Tom so this is something

1          A. Kincaid - CONFIDENTIAL

2    that I don't have any memory of.  So I don't

3    have a memory of him removing anything from

4    downtown Franklin County -- Columbus.  So all I

5    can go off of is what Tom is saying here to

6    Mark in this email.  I don't have a memory of

7    him doing that.

8        Q.   Okay.  You don't remember him

9    affirmatively not doing it, you just don't

10   remember one way or the other?

11       A.   I have no memory of this.

12       Q.   Do you know whether Dr. Hofeller was

13   in direct communication with Mr. DiRossi or

14   Ms. Mann at any point?

15           MR. SHEEHY:  Objection to form.

16       A.   Not to my knowledge.

17       Q.   With Mr. Whatman?

18           MR. SHEEHY:  Objection to form.

19       A.   I'm sorry?

20       Q.   Was he in communication with

21   Mr. Whatman about changes to the map?

22       A.   Tom Hofeller?

23       Q.   Yes.

24           MR. SHEEHY:  Objection to form.

25       A.   Not to my knowledge, I don't know.

1          A. Kincaid - CONFIDENTIAL

2     Q.   Do you know whether or not -- what
3  would happen to any changes he made in the map
4  that he said that he was sending to Mr. Braden?

5          MR. SHEEHY:  Objection to form.

6     A.   Based off this email chain, Tom made
7  changes and gave those changes to me.  I don't
8  recall getting those changes from Tom.  So it
9  seems like Tom is referring to changes that he
10 made in -- at this 3:18 email that he gave to
11 me on September 8.

12    Q.   Now, there's a reference to,
13 quote-unquote, "dog meat voting" territory.

14         Do you recall -- do you see that?

15    A.   Yes.

16    Q.   Do you have any understanding of what
17 that means, dog meat voting?

18         MR. SHEEHY:  Objection to form.

19    A.   He calls it awful voting territory in
20 the next sentence, so that's what I'm --

21    Q.   What does awful voting territory
22 mean?

23         MR. SHEEHY:  Objection to form.

24    A.   I can only assume Tom meant by that
25 that it was not a friendly area to Republicans.

1          A. Kincaid - CONFIDENTIAL

2     Q.   So heavily Democratic area?

3     A.   That seems --

4          MR. SHEEHY:  Objection to form.

5     A.   That seems likely.

6     Q.   Is it your understanding that

7  downtown Columbus was a heavily Democratic

8  area?

9          MR. SHEEHY:  Objection to form.

10    A.   Yes.

11    Q.   So the dog meat voting territory was

12  heavily Democratic territory; is that right?

13         MR. SHEEHY:  Objection to form?

14    A.   Based off of these two sentences

15  here, I assume that's what he's saying.

16    Q.   Looking at the September 82011 email

17  at 3:42 p.m., again going later in the

18  afternoon.

19    A.   Okay.

20    Q.   Again, Dr. Hofeller to Mr. Braden.

21  Would you please read that short paragraph?

22    A.   Okay.

23    Q.   Then it says:  "Adam is changing the

24  NE-including the Black district."

25              Do you see that?

1                    A. Kincaid - CONFIDENTIAL

2          A.    I do.

3          Q.    Okay.  Do you recall any changes you

4    were making in northeast Ohio --

5                MR. SHEEHY:  Objection to form.

6          Q.    -- around that time?

7                MR. SHEEHY:  Objection to form.

8          A.    Apart from what's laid out above, I

9    don't have any other recollections about what

10   was being changed in northeast Ohio at that

11   time.

12         Q.    Was this district -- do you have an

13   understanding of what, quote-unquote, "the

14   Black district" was?

15         A.    That would have been Marsha Fudge's

16   district, which is 11.

17         Q.    Okay.  And it says:  "You are running

18   into some version control.  Maybe Adam should

19   have the controlling map, but you need to talk

20   with him directly about his changes in the NE."

21                Do you see that?

22         A.    I do.

23         Q.    Do you remember any discussions about

24   version control as you were working on the

25   proposed map?

```
 1            A. Kincaid - CONFIDENTIAL
 2            MR. SHEEHY:  Objection to form.
 3       A.   No, I don't recall any conversations
 4  about version control.
 5       Q.   You had a version of the map; right?
 6            MR. SHEEHY:  Objection to form.
 7       A.   Yes, definitely I had a version of
 8  the map.
 9       Q.   Did anybody else?
10       A.   It seemed like Tom had a version of
11  the map.  Ray and Heather would have had a
12  version of the map.  Since we were all working
13  separately and collaboratively, we would have
14  had different iterations of maps.
15            MR. FRAM:  I want to mark next as
16       48 an email string with Bates number
17       REV_00023184.
18       (Exhibit No. 48 was marked for
19       identification.)
20  BY MR. FRAM:
21       Q.   Turning to the second email in the
22  chain, Friday, September 9, 2011 at 1:06 p.m.
23  do you see that?
24       A.   I do.
25       Q.   Is that an email that you sent to
```

1                A. Kincaid - CONFIDENTIAL

2    Mr. Braden, Mr. -- and Mr. Whatman on

3    September 9, 2011?

4         A.    Yes.

5         Q.    And you say right above it -- you see

6    there Mr. Braden's forwarding it to

7    Dr. Hofeller.

8               Do you see that?

9         A.    I do see that.

10        Q.    Okay.  And that's at 5:24 p.m.  Do

11   you see it?

12        A.    I do.

13        Q.    Did you know that Mr. Braden was

14   forwarding your emails to Dr. Hofeller?

15        A.    I didn't know that, no.

16        Q.    Now, in your email it says that

17   you're attaching certain documents.

18               Do you see that?

19        A.    Yes.

20        Q.    And you're indicating that for

21   District 11, which you just testified before,

22   that the NHBVAP has now been adjusted.

23               Do you see that?

24        A.    Yes.

25        Q.    That stands for non-Hispanic Black

```
 1                A. Kincaid - CONFIDENTIAL
 2    voting age population; is that right?
 3          A.    That's correct.
 4          Q.    And in the -- the day before, in the
 5    September 8 email, Dr. Hofeller is telling
 6    Mr. Braden that you're going to be adjusting
 7    the Black district.
 8                Do you see that?
 9          A.    I see that.
10          Q.    Okay.   And then he -- you see in the
11    subsequent emails on Exhibit 47 there's a
12    question as to whether or not you'd be
13    increasing the Black voting age population in
14    District 11.
15                Do you see that?
16          A.    Yes.
17          Q.    And, in fact, just looking now at
18    Exhibit 48, does it refresh your recollection
19    that, in fact, you did increase the Black
20    voting age population in District 11 moving it
21    up from about 50.04 up to 50.90?
22          A.    I see that.
23                MR. SHEEHY:   Objection to form.
24          Q.    Okay.   Do you recall doing that?
25          A.    Yeah.
```

```
 1              A. Kincaid - CONFIDENTIAL

 2         Q.   Okay.  And do you recall doing that

 3    at Dr. Hofeller's request?

 4         A.   No, it was --

 5              MR. SHEEHY:  Objection to form.

 6         A.   -- definitely not at Tom Hofeller's

 7    request.

 8         Q.   Was that at Mr. Braden's request?

 9              MR. SHEEHY:  Objection to form.

10         A.   No.  This was -- this change was

11    made -- I didn't talk to Mark.  Mark had

12    advised Whatman, I believe, he was concerned

13    about some issues and so Tom had asked -- Tom

14    Whatman had asked me to make those changes.

15         Q.   Okay.  So you did it at Tom Whatman's

16    request?

17         A.   I did it at Mark Braden's request via

18    Tom Whatman.

19         Q.   Okay.

20         A.   It was definitely not Hofeller.

21              MR. FRAM:  Now looking at -- let's

22         mark next as 49 the metadata for

23         Exhibit 48.  We will mark it as 49.

24         (Exhibit No. 49 was marked for

25         identification.)
```

```
 1           A. Kincaid - CONFIDENTIAL
 2   BY MR. FRAM:
 3        Q.   Drawing your attention to the bottom
 4   of the document, it appears to have attachments
 5   that are listed there in the metadata.  Do you
 6   see that?  It says source/attached, and then
 7   it's got a bunch of REV numbers.
 8           Do you see that?
 9        A.   Yes.
10        Q.   Okay.  Those numbers, those REV
11   numbers, I believe those numbers were put on
12   by -- did you put those numbers, REV, an
13   abbreviation you used or is that something
14   your --
15        A.   I don't know what --
16        Q.   -- counsel put on?
17        A.   -- that refers to.
18        Q.   I'll state for the record these are
19   numbers that we received with the documents and
20   they were produced by your counsel so I don't
21   know who put them on, you or your counsel.
22   Those numbers line up with them, and I'll show
23   you one of them right now, in fact.  So you see
24   the reference to REV_00023188 and those
25   attachments?
```

1          A. Kincaid - CONFIDENTIAL

2          A.    Uh-huh.

3          (Exhibit No. 50 was marked for

4          identification.)

5     BY MR. FRAM:

6          Q.    Please take a look at Exhibit 50.

7     This is a document you created?

8          A.    It looks like all the other changes

9     sheets.

10         Q.    Right.   In fact, the number here,

11    00023188, does this refresh your recollection

12    that, in fact, this was attached on September 9

13    as the change sheet that you said you were

14    sending in your email?

15         A.    Which email?

16         Q.    In your email in Exhibit 48 you say

17    you're sending an updated changes spreadsheet.

18             Do you see that?

19         A.    Yes.

20         Q.    And the metadata for that email 48

21    includes 23188 as one of the attachments.

22         A.    Yes.

23         Q.    I'm just asking whether or not the

24    September 9 changes sheet, Exhibit 50, was, in

25    fact, the changes sheet you transmitted on or

1                A. Kincaid - CONFIDENTIAL

2    about September 9, 2011.

3          A.    Seems to be.  You'll notice from

4    before, map as of September 9 lines up with the

5    header like I was talking about before with the

6    naming --

7          Q.    Right.

8          A.    -- which is why I was skeptical of

9    the other one.

10          Q.    I understand.  Now, this one

11    architecture, if you will, of this map looks

12    like what we had previously -- the document

13    this had the phrase "Franklin County sinkhole"

14    on it, which was Exhibit 8.

15          A.    New Idea, yeah.

16          Q.    BRADEN001387.

17          A.    Uh-huh.

18          Q.    If you can put those two together,

19    the Exhibit 50 and Exhibit 8.

20          A.    Exhibit 50 and?

21          Q.    8.

22          A.    8?  Okay.

23          Q.    They both have this new

24    District 10-Open at the bottom.

25                Do you see that?

1           A. Kincaid - CONFIDENTIAL

2          A.    Yes.

3          Q.    And the PVI score for -- in each case

4    is D+16; is that right?

5          A.    Yes.

6          Q.    In Exhibit 50, the September 9 map,

7    if you look at the PVI scorings there and

8    compare that to the September 6 map, the

9    four-way split.

10         A.    Uh-huh.

11         Q.    Get that exhibit out.   That's

12   Exhibit 45.   Here we see certain Republican --

13   certain districts have increased Republican

14   strength, okay?   And in particular, Schmidt's

15   District 2 the PVI increased from 8 to 10.   Do

16   you see that?   Comparing 45 and 50.   You can

17   take your time.

18         A.    Again, this is two different -- they

19   didn't increase; these are two different

20   proposals that were existing simultaneously --

21         Q.    Okay.

22         A.    -- at the time of preparing them.

23         Q.    Fair enough.   If one compares the two

24   proposals as they existed contemporaneously,

25   simultaneously --

1          A. Kincaid - CONFIDENTIAL

2          A.    Uh-huh.

3          Q.    -- the -- in what I'll call the

4    September 9 map, okay, which is Exhibit 50.

5          A.    Yes.

6          Q.    All right, CD 2, which is Schmidt's

7    district, the PVI had increased from R+8 to

8    R+10; is that right?

9          A.    I wouldn't say it increased; I'd say

10   they're different.

11         Q.    Okay.

12         A.    The one in --

13         Q.    Yeah.

14         A.    -- the September 9 map is 2 -- is 2

15   points higher than the September 6 map.

16         Q.    Fair enough.

17         A.    But I wouldn't say it increased,

18   because it's two different maps.

19         Q.    In Jordan's district, which is

20   District 4 has a higher Republican PVI score.

21   It's 7 in the September 9 map, Exhibit 50, and

22   it was 5 in Exhibit 45, the four-way split map;

23   is that right?

24         A.    Yes.  They're different, yeah.

25         Q.    It's different in the way I said?

```
1              A. Kincaid - CONFIDENTIAL
```

2          A.    Uh-huh.

3          Q.    Okay.   And Latta's district, which

4    was district 5, the four-way split had an R+4

5    and the September 9, Exhibit 50, has a R+7; is

6    that right?

7          A.    Yes.

8          Q.    And gives -- also has a higher on

9    Republican PVI score in the September 9 map

10   that's 5 -- R+5 while it was only R+4 in the

11   four-way split map; is that right?

12         A.    Yes.

13         Q.    And similarly, Tiberi's -- Tiberi's

14   now is -- in the September 9 map is an R+10

15   while it was only R+5 in the four-way split

16   map, Exhibit 45; is that right?

17         A.    Yes.

18         Q.    Okay.   And Stivers in the September 9

19   map, Exhibit 50, is an R+ -- let's see, 7 while

20   in the four-way split map, let's see, it was

21   R+5.   Do I have that right?   Stivers, yeah.

22         A.    It was R5 and R7.

23         Q.    Yeah, so it gets -- it's higher by 2

24   points.   Okay, and finally, in Turner's

25   district, that's interesting.   Turner had his

1          A. Kincaid - CONFIDENTIAL

2    own district in the -- in Exhibit 45 that was

3    old District 3.

4               Do you see that?

5       A.    I do.

6       Q.    But in Exhibit 50, the September 9

7    map now it's a Turner/Austria pairing district.

8               Do you see that?

9       A.    Uh-huh, I see that.

10      Q.    Although the -- that district now has

11   a R+6 rating; is that right?

12      A.    Yes.

13      Q.    Okay.  And previously, Turner --

14   Turner district -- the district Turner had was

15   R+4 is that right?  Okay.

16              So do you recall whether or not --

17   was this a third option that was under

18   consideration in this collaborative effort with

19   Mr. DiRossi and Ms. Mann, Mr. Whatman and

20   yourself around September 9?

21      A.    Third option?

22      Q.    Well --

23      A.    I'm still only tracking 2.

24      Q.    That's what I'm trying to understand.

25   We had the -- that September 2 or 3 map, which

```
 1                A. Kincaid - CONFIDENTIAL

 2    was Exhibit -- let's go through the three

 3    different exhibits and see if that would be

 4    helpful to get it cleared up.  We have

 5    Exhibit 8.

 6         A.   Okay.

 7         Q.   The map -- the sheet that has the

 8    words "Franklin County sinkhole" on it.

 9         A.   Uh-huh, yes.

10         Q.   I believe we dated it around

11    September 2 or 3.  And then we have the --

12    simultaneously, we have the consideration the

13    four-way split, Exhibit 45, which we dated on

14    or about September 6.

15         A.   Okay.

16         Q.   And then we've got the September 9

17    map, Exhibit 50.

18         A.   Okay.

19         Q.   I'm trying to understand whether

20    there are three different options on the table

21    or two at the same time.

22              MR. SHEEHY:  Objection to form.

23         A.   Well, you said this is September 3.

24         Q.   That's when it seems to have been

25    transmitted.  Could have been September 2 but
```

1                A. Kincaid - CONFIDENTIAL

2    no later than September 3.

3         A.    I mean, this is -- the new map as of

4    September 9 is clearly an iteration of what had

5    been -- what I called New Idea that, you know,

6    it has "Franklin County sinkhole" on here so

7    there's still only -- there's only two.

8         Q.    So there's two basic architectures,

9    one that has the new district around Franklin

10   County and the other's the four-way split for

11   Franklin County?  Is that what you mean?

12        A.    Those would be the two maps that were

13   under consideration.

14        Q.    Okay.  So Exhibit 8 and Exhibit 50

15   are basically two different iterations of the

16   same basic idea.  There may be some details

17   that are different.

18        A.    Exhibit 8 is an earlier iteration of

19   Exhibit 50.

20        Q.    Understood.  Okay.  We will just call

21   that model, you haven't used the word, but the

22   new Franklin County district approach.

23        A.    It's new map as of September 9 is

24   what I would call it.

25        Q.    Oh, okay.  But that approach -- the

1          A. Kincaid - CONFIDENTIAL

2   reason why it's just an iteration of Exhibit 8

3   is because they both are based upon having a

4   new district in Franklin County.

5          MR. SHEEHY:  Objection to form.

6      A.   The architecture of new map is one

7   that creates a new Democrat seat in Franklin

8   County, yes.

9      Q.   Thank you.

10     (Recess taken.)

11          MR. FRAM:  So I'll mark next the

12     document with -- so as 51 a document

13     with Bates number REV_0023185.

14     (Exhibit No. 51 was marked for

15     identification.)

16          MR. FRAM:  While we're at it, the

17     metadata on it is marked 52.

18     (Exhibit No. 52 was marked for

19     identification.)

20  BY MR. FRAM:

21     Q.   I'd ask you to turn back to

22  Exhibit 49, which is the metadata on your

23  September 9 email.  You see where it says

24  attachments?  We already talked about 23184.

25  The next one down is 23185.

1                    A. Kincaid - CONFIDENTIAL

2                    Do you see that?

3         A.    Yes.

4         Q.    And in the email itself you talk

5    about providing screenshots of major -- of the

6    major counties in question.

7                    Do you see that?

8         A.    Yes.

9         Q.    And does 51, a colored map here,

10   appear to be a screenshot of Lucas County in

11   District 9?

12        A.    Yes.

13        Q.    And do you recall sending this to

14   Mr. Braden and Mr. Whatman on or around

15   September 9, 2011?

16              MR. SHEEHY:  Objection to form.

17        A.    I don't recall attaching this

18   document to an email and sending it, but I

19   recall the email overall.  I recall sending the

20   email to Tom and Mark at the time.

21        Q.    You recall saying were you going to

22   send -- you were sending them, saying there

23   were major counties in question.

24                    Do you see that?

25        A.    Yeah, I see.  I'm not disagreeing.

1           A. Kincaid - CONFIDENTIAL

2        Q.   You have no reason to think you

3   didn't send it.

4        A.   Yes.

5        Q.   You have no reason to think this was

6   not one of the attachments.

7        A.   No, I have no reason to think it's

8   not one of the attachments.

9        Q.   And my question for you is -- oh,

10  hold on a second.  In Exhibit 52 on the

11  metadata, you see there's a file name 9-9 Ohio

12  Map - Lucas County.jpg?

13       A.   Yes.

14       Q.   Would that be consistent with your

15  filing, your naming convention for a JPG

16  document?

17       A.   Yeah, it would be consistent with my

18  naming conventions.

19       Q.   You see in the metadata for

20  Exhibit 51 it indicates creation -- a date

21  modified and a date created of September 9,

22  2011?

23            Do you see that?

24       A.   Yes.

25       Q.   And that's the same date as your

```
 1              A. Kincaid - CONFIDENTIAL
 2    email saying you're sending -- attaching
 3    screenshots of major counties?
 4              Do you see that?
 5         A.   Uh-huh, yes.
 6         Q.   Do you have any recollection as to
 7    whether Lucas County was a major county?
 8              MR. SHEEHY:  Objection to form.
 9         Q.   Well, let me back up.  Do you have
10    any recollection what the phrase "major county"
11    meant in your email?
12              MR. SHEEHY:  Objection to form.
13         A.   I'd have to see the list of -- or, I
14    mean, I -- I'm assuming you have all of these
15    documents, so I -- yeah, I'm pretty sure I know
16    what major counties mean.
17         Q.   Okay.  What does it mean?
18         A.   It would mean the larger counties in
19    the state.
20         Q.   We will go through it.  I was going
21    to go through them one by one.  To keep the
22    record clear, let's talk about Lucas now.
23         A.   All right.
24         Q.   Do you have any recollection of why
25    Lucas was included on the list?
```

1          A. Kincaid - CONFIDENTIAL

2          A.   It's a major county.  It's one of the
3     larger counties in the state.

4          Q.   Just because it's larger?  Okay.

5          (Exhibit No. 53 was marked for
6          identification.)

7     BY MR. FRAM:

8          Q.   This is REV_00023186.  Again you can
9     see this is referenced as one of the
10    attachments in Exhibit 49, the metadata to your
11    September 9 email.

12         A.   Yes, I see that.

13              MR. FRAM:  Why don't we mark as
14         Exhibit 54 metadata for Exhibit 53.

15         (Exhibit No. 54 was marked for
16         identification.)

17    BY MR. FRAM:

18         Q.   And then under file name, it says 9-9
19    Ohio map - Stark County.jpg on Exhibit 54?

20         A.   Yes.

21         Q.   Is that consistent with your naming
22    convention?

23         A.   Yes.

24         Q.   And does this show a -- this is a map
25    that includes -- let me ask you a question.

1          A. Kincaid - CONFIDENTIAL

2    Which County's depicted on this one?  Is that

3    Stark County?

4          A.   The label says Stark County, yeah.

5    It's the city of Canton.

6          Q.   Right.  And Stark County was split up

7    between three districts?

8          A.   Yes, I see these three districts.

9          Q.   Do you recall conversations with

10   anyone about splitting up Stark County?

11             MR. SHEEHY:  Objection to form.

12        A.   Can you be more specific?

13        Q.   Let me ask you first, this was a map

14   you generated; correct?

15        A.   Yes.

16        Q.   Okay.  And when you generated it, one

17   of the things that happened was Stark County is

18   split between different districts.  I think

19   it's 7, 16 and 13.  Is that right?

20        A.   That seems to be the case, yes.

21        Q.   Do you recall any communications with

22   anyone at any time about splitting Stark County

23   between Districts 7, 13, and 16?

24             MR. SHEEHY:  Objection to form.

25        A.   The only specific conversation I

1                    A. Kincaid - CONFIDENTIAL

2    remember is the one that -- the one reflected

3    in the email chain that is not reflected in

4    this map regarding the headquarters, which was

5    in Stark County.  Apart from that, I don't have

6    any recollection about a specific conversation

7    regarding Stark County, splitting or otherwise.

8              MR. FRAM:  Okay, why don't we have

9         marked next as Exhibit 55 a map that's

10        REV_00023187 and its metadata.  So the

11        map will be 55 and then the metadata

12        will be 56.

13        (Exhibit No. 55 was marked for

14        identification.)

15        (Exhibit No. 56 was marked for

16        identification.)

17              MR. FRAM:  On 55, REV_00023187 is

18        the Bates number.

19    BY MR. FRAM:

20        Q.   Now, this looks like a map of Summit

21    County.  Do I have that right?

22        A.   Yes.

23        Q.   Do you recall any -- so we are clear,

24    the naming convention on this is the metadata

25    9-9 Ohio Map Summit County.jpg is consistent

1          A. Kincaid - CONFIDENTIAL

2    with your naming convention; correct?

3          A.    Yes.

4          Q.    Do you have any reason to doubt that

5    Exhibit 55 was one of the major counties that

6    you transmitted on or about September 9 as an

7    attachment to Exhibit 48?

8          A.    No.

9          Q.    I forgot to ask that question.  It's

10   the same answer as regarding Exhibit 53?

11         A.    I don't have any doubt that was one

12   of the maps, if that's what you're asking.

13         Q.    That's what I'm asking.

14         A.    Yeah.

15         Q.    Thank you.

16               Do you recall any conversations with

17   anyone about the map about Summit County, the

18   map in 55?

19               MR. SHEEHY:  Objection to form.

20         A.    The question's kind of vague.

21         Q.    Let me see if I can do better.  You

22   recall sending the major counties to Mr. Braden

23   and Mr. Whatman on or about September 9.  I'm

24   just asking whether or not after they got them

25   you recall any conversations about the maps you

1          A. Kincaid - CONFIDENTIAL

2    sent.

3          A.    Oh.

4                MR. SHEEHY:   Objection to form.

5          A.    No, I don't think there was any

6    conversation after I sent this to Mark and Tom.

7          Q.    Any emails about them?

8          A.    Not that I recall, no.

9                MR. FRAM:   Okay, let's mark as 57 a

10         map with REV_23190, a map of Hamilton

11         County.

12         (Exhibit No. 57 was marked for

13         identification.)

14                MR. FRAM:   And its metadata will

15         make 58.

16         (Exhibit No. 58 was marked for

17         identification.)

18    BY MR. FRAM:

19         Q.    What we see here is Hamilton County

20    with a little bit of Warren County up in the

21    right.   Do you see that on 57?

22         A.    Yes.

23         Q.    And I don't know if it's pink or

24    orange, light red.   It is all District 1.   Do

25    you see that?

1          A. Kincaid - CONFIDENTIAL

2          A.   Yes.

3          Q.   And all the blue's in District 2 and

4    1 was Chabot and 2 was Schmidt; right?

5          A.   That's correct.

6          Q.   You see Warren County is now included

7    in District 1.   Do you see that?

8          A.   Yes, it's included in District 1.

9          Q.   Do you recall any conversations with

10   anybody about that fact, that Warren County was

11   now going to be included in District 1?

12             MR. SHEEHY:  Objection to form.

13         A.   Anybody?

14         Q.   Anybody.   Ever talk to anybody about

15   it?

16         A.   I would have told --

17             MR. SHEEHY:  Objection to form.

18         A.   I would have told Congressman Chabot

19   that Warren County was in his district.

20         Q.   Did you ever talk with Mr. Whatman

21   about it?

22             MR. SHEEHY:  Objection to form.

23         A.   I don't have a specific memory of

24   talking to Mr. Whatman about it.

25         Q.   Any communication of any kind?

1            A. Kincaid - CONFIDENTIAL

2                MR. SHEEHY:  Objection to form.

3       Q.    Any specific memory of it whether it

4  was in a meeting, whether it was a subject, an

5  idea?

6                MR. SHEEHY:  Objection to form.

7       A.    I recall telling Mr. Chabot that

8  Warren County was going to be in his district.

9  But we went through, as we talked about before,

10  going through the contours of their seats.

11  Apart from that, I have no memory of a

12  conversation about Warren County.

13       Q.    Do you recall whose idea -- this

14  was -- you generated this map, Exhibit 57;

15  right?

16       A.    Yes.

17       Q.    Do you have any reason to doubt that

18  this was not one of the major county maps you

19  transmitted on or around September 9, 2011 --

20                MR. SHEEHY:  Objection to form.

21       Q.    -- that's referenced in Exhibit 48?

22       A.    No.

23       Q.    No reason to doubt it?

24       A.    Huh-uh.

25       Q.    Okay.  Do you have any recollection

1                 A. Kincaid - CONFIDENTIAL

2  as to whose idea it was to include Warren

3  County in District 1?

4                 MR. SHEEHY:  Objection to form.

5       A.    No.

6       Q.    Was that going back to July plans

7  that you were doing?  Was Warren County always

8  part of the plan --

9                 MR. SHEEHY:  Objection to form.

10      Q.    -- for District 1?

11      A.    I don't recall if it was always part

12  of the plan or not.

13      Q.    Do you know in this collaboration

14  from yourself and Mr. DiRossi and Ms. Mann or

15  Mr. Whatman where this idea generated,

16  including Warren County in District 1?

17                MR. SHEEHY:  Objection to form.

18      A.    I don't recall where the origin of

19  that idea came from.

20      Q.    And you were always -- the maps you

21  drew regarding District 1, they had Warren

22  County as part of District 1; is that right?

23                MR. SHEEHY:  Objection to form.

24      A.    I couldn't tell you that every

25  iteration of every map I drew had Warren County

         1              A. Kincaid - CONFIDENTIAL

         2    in District 1, because I don't remember, but

         3    this map had Warren County in District 1.

         4         Q.   Do you recall any iterations of

         5    District 1 you drew that did not have Warren

         6    County as part of District 1?

         7              MR. SHEEHY:  Objection to form.

         8         A.   I don't remember every iteration of

         9    every map I drew.

        10         Q.   Okay.   Of the ones you remember, do

        11    you remember any that did not have Warren

        12    County in District 1?

        13              MR. SHEEHY:  Objection to form.

        14         A.   I don't have a specific memory of a

        15    draft of the map that didn't have Warren County

        16    as part of District 1, so --

        17         Q.   In fact, if we look at your various

        18    changes sheets, they all show an increase in

        19    Republican strength in District 1 from the

        20    preexisting map; isn't that the case?

        21         A.   I'd have to look at it.

        22         Q.   We have them right here so we can go

        23    back to them.  So let's see, exhibits 8, 45,

        24    and 50, okay?  So just look at District 1 and

        25    start with 8 in order.

1                  A. Kincaid - CONFIDENTIAL

2                  So for 8, you got -- for District 1,

3     you see on the far right you see PVI and on the

4     far, far right you see the number 7?

5          A.    Yes.

6          Q.    And that's the increase in Republican

7     voting strength in District 1 as compared to

8     the pre-redistricting map where it had been a

9     D+1.  Do you see that?

10         A.    Yes.

11         Q.    Now it can be an R+6 under this

12    proposal.  Do you see that?

13         A.    I see that.

14         Q.    This is the -- Exhibit 8, of course,

15    is the changes sheet that has the words

16    "Franklin County sinkhole" on it.

17                Was one of the reasons for the

18    increased Republican strength in District 1 the

19    inclusion of Warren County in District 1 under

20    the proposal?

21                MR. SHEEHY:  Objection, form.

22         A.    It would have been one of the

23    reasons.

24         Q.    Would another reason be not including

25    certain portions of Cincinnati in District 1

```
 1                A. Kincaid - CONFIDENTIAL
 2    instead of putting them into District 2?
 3              MR. SHEEHY:  Objection to form.
 4       A.   Yes.
 5       Q.   So take those two factors together,
 6    less Democratic votes in Cincinnati on the one
 7    hand and more Republican votes in Warren County
 8    together resulted in increased Republican
 9    strength for District 1; is that right?
10              MR. SHEEHY:  Objection to form.
11       A.   I have to look at the old map of
12    District 1 to be able to tell you specifically
13    what did or did not change, yeah, the district
14    from D+1 to R+6.
15       Q.   One thing that did happen was Warren
16    County got added.
17       A.   Between the old map and the new map,
18    yes.
19       Q.   And that added Republicans to
20    District 1; is that right?
21              MR. SHEEHY:  Objection to form.
22       A.   It did.
23       Q.   Now if we look at Exhibit 45, the
24    four-way split, on the changes sheet,
25    Exhibit 45 --
```

1          A. Kincaid - CONFIDENTIAL

2          A.    Uh-huh.

3          Q.    -- once again, the same -- same PVI

4    doesn't change.  You got R+6 with a delta of 7.

5              Do you see that?

6          A.    Yes.

7          Q.    And it's the same reason that you got

8    Warren County adding Republicans into the

9    district and you've got a certain amount of

10   Democrats carved out of Cincinnati?

11             MR. SHEEHY:  Objection to form.

12         A.    I'd have to see a close-up of the map

13   for this one to be specific about what made

14   that PVI go up 7 points.

15         Q.    Part of it was adding Warren County;

16   is that right?

17             MR. SHEEHY:  Objection to form.

18         A.    Let's see if we have any pictures of

19   this four-way split anywhere.

20         Q.    Maybe we can make this easy.  If you

21   look at Exhibits 48, 45, and 50 --

22         A.    Uh-huh.

23         Q.    -- and you look at just District 1 --

24         A.    Okay.

25         Q.    -- PVI's the same for all three.

1              A. Kincaid - CONFIDENTIAL

2         A.    Okay.

3         Q.    It's R+6 with an increase of 7 points

4    for Republicans for all three.

5         A.    I see that.

6         Q.    So what do you remember about what

7    increased Republican strength in -- for all

8    these options, for CD 1 for all the options

9    Republican strength goes up 7 points under PVI.

10        A.    Okay.

11        Q.    So I'm just asking what you remember

12   about why that happened.

13             MR. SHEEHY:  Objection to form.

14        A.    I mean, from map to map, iteration to

15   iteration, it's hard to remember every

16   single --

17        Q.    Yeah.

18        A.    -- county arrangement or --

19        Q.    Uh-huh.

20        A.    -- and precinct arrangement for every

21   single --

22        Q.    Right.

23        A.    -- iteration of every map, so -- and

24   I don't have a picture of it.  It's harder to

25   tell you much more than it went up 7 points.

1                    A. Kincaid - CONFIDENTIAL

2     For the map that's reflected in 57, Warren

3     County's clearly part of District 1.

4          Q.    Right.    So it includes -- for all

5     three of them, do you have any -- before, you

6     said as far as -- you can't recall any maps

7     where Warren County was not in CD 1, so I was

8     just going to ask you, for all three wasn't one

9     of the reasons why Republican strength goes up

10    for CD 1 in all three iterations, all three

11    options, was because Republican votes for

12    Warren County were added?

13                    MR. SHEEHY:   Objection to form.

14         A.    And again, Mr. Fram, the only thing

15    I'm saying is I don't recall the county makeup

16    for the four-way split so I can't say yes to

17    all of them unless I saw a map for the four-way

18    split.

19         Q.    Okay.    So putting aside the four-way

20    split for the other two, for the other two we

21    will talk about the version for 8 and 50,

22    Exhibits 8 and 50 --

23         A.    Okay.

24         Q.    -- the Franklin County sinkhole and

25    the new map as of September 9, those two

```
 1              A. Kincaid - CONFIDENTIAL
 2    exhibits.
 3         A.    Okay.
 4         Q.    Was the inclusion of Warren County a
 5    reason why Republican strength increases in CD
 6    1?
 7         A.    Partly, yes.
 8              MR. SHEEHY:  Objection to form.
 9         A.    Partly, yes.
10              MR. FRAM:  Why don't we mark next
11    as 59 and 60.  59 will be a map,
12    REV_00023192.
13         (Exhibit No. 59 was marked for
14         identification.)
15              MR. FRAM:  And 60 will be the
16    metadata for that document.
17         (Exhibit No. 60 was marked for
18         identification.)
19    BY MR. FRAM:
20         Q.    Does this appear to be a county map
21    of Franklin County?  Do you see that?
22         A.    Yes.
23         Q.    Do you have any reason to doubt this
24    is included in your September 9 email that was
25    Exhibit 48?
```

```
 1              A. Kincaid - CONFIDENTIAL

 2         A.   No.

 3         Q.   Okay.  And looking at the 9-9 Ohio

 4    Map Franklin County.jpg under the file name in

 5    the metadata, that's consistent with your

 6    naming convention, is it not?

 7         A.   Yes, it is.

 8         Q.   The created date's also September 9,

 9    2011.

10              Do you see that?

11         A.   Yes.

12         Q.   Okay.  Is this a depiction of how

13    Franklin County would be divided up in -- for

14    the proposed new CD 10, new district?

15              MR. SHEEHY:  Objection to form.

16         A.   This is how Franklin County was laid

17    out as per the map that was sent over to Tom

18    and Mark.

19         Q.   That you sent over?

20         A.   Yes.

21         Q.   And I see there's certain areas that

22    are in CD 10 but certain are in 15.  For

23    example, you see Valleyview is in CD 15.

24              Do you see that?

25         A.   Okay.
```

```
 1              A. Kincaid - CONFIDENTIAL

 2        Q.    But Grandview Heights is in CD 10.

 3              Do you see that?

 4        A.    Yes.

 5        Q.    Was Grandview Heights part of the

 6   downtown area --

 7              MR. SHEEHY:  Objection to form.

 8        Q.    -- in Columbus?

 9              MR. SHEEHY:  Objection to form.

10        A.    From what I remember, Grandview

11   Heights is a bit north of downtown.

12        Q.    What about Valleyview?

13              MR. SHEEHY:  Objection to form.

14        A.    That would be west of downtown.

15        Q.    West of downtown?  What about this

16   portion that goes all the way in to the right

17   at sort of like -- it's over to the east of

18   where the word "Valleyview" appears.

19              Do you see that?

20        A.    Yes.

21        Q.    Is that getting closer to downtown or

22   not yet?

23              MR. SHEEHY:  Objection to form.

24        A.    From what I recall, that's mostly the

25   downtown area, yes.
```

1               A. Kincaid - CONFIDENTIAL

2          Q.   And at this particular point that was

3     included in CD 15; is that right?

4          A.   That appears to be the case.

5          Q.   Okay.  And then the rest of downtown

6     goes into CD 10; is that right?

7          A.   I don't have a map here that shows me

8     the definition of what downtown is.

9          Q.   So you don't know?

10         A.   I know parts of downtown were south

11    of the river that runs through Columbus, and

12    that would be the downtown proper area.  So I

13    couldn't tell you if all of downtown is in 15

14    or if it's split between 15 and 10.

15         Q.   All right.  Do you recall any

16    conversation with anybody about how much of

17    downtown to include in 15 and how much to

18    include in 10?

19              MR. SHEEHY:  Objection to form.

20         A.   Not in regards to how much, no.

21         Q.   Whether to have it at all?

22              MR. SHEEHY:  Objection to form.

23         A.   I don't recall that conversation

24    either.

25         Q.   Do you recall any conversation as to

1                   A. Kincaid - CONFIDENTIAL

2    why Valleyview should be in 15?

3                   MR. SHEEHY:  Objection to form.

4         A.   I don't recall any conversation

5    regarding Valleyview.

6         Q.   Do you recall any conversation

7    regarding Lincoln Village?

8                   MR. SHEEHY:  Objection to form.

9         A.   I do not.

10        Q.   Any conversation regarding Grandview

11   Heights?

12                  MR. SHEEHY:  Objection to form.

13        A.   I do not.

14        Q.   Do you have any explanation -- you

15   can see that there's a piece of Franklin County

16   that's cut out, sort of like this red part that

17   goes from Lincoln Village to Lincoln View and

18   then to the east.

19                  Do you see that?

20        A.   Yes, I see that.

21        Q.   Do you have any reason as to why that

22   piece was cut out that way?

23                  MR. SHEEHY:  Objection to form.

24        A.   No, I don't remember why that was

25   done.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Do you recall whether or not the

3     piece that's cut out, Lincoln Village and

4     Valleyview, are Republican or Democrat leaning?

5               Do you recall?

6               MR. SHEEHY:  Objection to form.

7          A.   I'd have to see a map with political

8     data to tell you for sure.  I don't recall.

9          Q.   At the time did you have that

10    political data?  At the time you drew the map?

11              MR. SHEEHY:  Objection to form.

12         A.   I believe we've already established I

13    had political data when the map was being

14    developed.

15         Q.   You had it for those particular

16    geographies?

17         A.   I had it for the state of Ohio.

18         Q.   Including those geographies?

19         A.   Yes.

20         Q.   What about Upper Arlington?

21              Do you see there's a piece of the

22    district that's Franklin County that looks like

23    Upper Arlington's not included in this version?

24    Do you recall any conversation about Upper

25    Arlington?

1          A. Kincaid - CONFIDENTIAL

2               MR. SHEEHY:  Objection to form.

3          A.   Only what we went through a few

4     minutes ago, what Mr. Stivers said about his

5     new house was in Upper Arlington.  That's the

6     only conversation I recall about Upper

7     Arlington.

8          Q.   What about Hillard?

9          A.   I don't recall any specific

10    conversations about Hilliard.

11         Q.   Hilliard, I'm sorry.  What about

12    Urbancrest?

13              MR. SHEEHY:  Objection to form.

14         A.   I don't recall any conversations

15    about Urbancrest.

16         Q.   Looking at it, there are a lot of

17    other geographies identified here.  I'll go

18    through each one if you want.  Blacklick

19    Estates I'm actually curious about.  Any

20    conversations about Blacklick Estates?

21              MR. SHEEHY:  Objection to form.

22         Q.   When I say conversations I mean

23    emails, communications of any kind.  Does that

24    change your answers?

25         A.   It would change none of my answers

1           A. Kincaid - CONFIDENTIAL

2    because I don't remember having any

3    conversations about any specific geographies in

4    Franklin County apart from Upper Arlington

5    because that was where Mr. Stivers's new house

6    was.  Apart from that, I don't recall any other

7    specific conversations.

8         Q.   In A previous iteration of the

9    division between CD 15 and CD 10, had you

10   included Grandview Heights in CD 15?

11             MR. SHEEHY:  Objection to form.

12        A.   I don't recall.

13        Q.   Had you included Valleyview -- strike

14   that.

15             Okay.  Do you recall any

16   conversations about this map with anyone at any

17   time?

18             MR. SHEEHY:  Objection to form.

19        Q.   After you sent it on September 9, I'm

20   curious if anybody talked to you about it.

21        A.   Like I said before, after I sent this

22   to Mark Braden and Tom Whatman, I don't recall

23   any further conversations about this draft of

24   the map.

25        Q.   Okay.  Did anybody at any time say

1                 A. Kincaid - CONFIDENTIAL

2     that the way the proposed Franklin County

3     district was drafted was insufficiently

4     compact?

5                 MR. SHEEHY:  Objection to form.

6         A.    Not to my recollection.

7         Q.    Do you recall anybody asking why the

8     shape had so many different -- well, was jagged

9     in so many different directions?   Anybody ever

10    ask you that question?

11                MR. SHEEHY:  Objection to form.

12        A.    Not in that specific form, no.

13        Q.    In any form, like something like

14    that, like --

15                MR. SHEEHY:  Objection to form.

16        A.    Whatman and I had a couple

17    conversations about the fact that Ohio has

18    noncontiguous municipalities, which means that

19    a city can have multiple pieces in multiple

20    places, and how there are a lot of irregular

21    borders in municipalities throughout the state

22    of Ohio, especially in Franklin County.   And so

23    some of those little odd nooks and crannies

24    that are along the border of 10 and 15 and 12

25    and 10 are because of the fact that -- like the

1          A. Kincaid - CONFIDENTIAL

2  Blacklick Estates boundary or Valleyview or

3  whatever it might be, there were little nooks

4  and things.

5              And in order to unite some of those,

6  you had to use zero population blocks to keep

7  those -- some of those municipal boundaries the

8  way they are.  That's why you see some of those

9  chunks in there, those dotted lines inside the

10 shading in 10.  In some cases that's because

11 there are noncontiguous municipal boundaries or

12 unincorporated areas within there.  So Tom and

13 I did have a couple conversations about that.

14      Q.   Did you ever consider including

15 Blacklick Estates within the new proposed CD

16 10?

17      A.   I don't recall.

18      Q.   Do you recall just as a simple

19 solution to the nooks and crannies, as you

20 described it, just including Valleyview in the

21 new CD 10?

22              MR. SHEEHY:  Objection to form.

23      A.   That wouldn't have resolved that

24 issue, but no, I don't recall a specific

25 conversation about including or not including

1                A. Kincaid - CONFIDENTIAL

2    Valleyview in the district.

3        Q.    What about Lincoln Village?

4            MR. SHEEHY:  Objection to form.

5        A.    My answer's going to be the same for

6    all of them.  I don't recall having any

7    conversations about any of these municipalities

8    apart from what I just told you about the

9    boundaries being irregular and Upper Arlington

10   with Mr. Stivers.  Those are the only

11   conversations I remember about Franklin County.

12       Q.    I was just asking whether as an

13   option to having the nooks and crannies

14   approach, you'd just consider including an

15   entire municipality within CD 10 as another

16   alternative to nooks and crannies.

17       A.    It wasn't -- I wasn't saying it as

18   anything other than a fact that Tom and I had

19   talked about, that that's why some of those

20   lines existed the way they did.

21       Q.    Did partisan leanings of different

22   municipalities play any role in your deciding

23   which ones to include in the proposed CD 10 or

24   not?

25            MR. SHEEHY:  Objection to form.

1                    A. Kincaid - CONFIDENTIAL

2          A.   While I was looking at Franklin

3    County I would have had political data

4    available, and that would have been part of the

5    consideration, yes.

6              MR. FRAM:   We'll go next to 61.   61

7          is a map, Bates number REV_00023191.

8          (Exhibit No. 61 was marked for

9          identification.)

10             MR. FRAM:   Then 62 will be the

11         metadata for that one.

12         (Exhibit No. 62 was marked for

13         identification.)

14   BY MR. FRAM:

15         Q.   The metadata is another one of the

16   attachments to the email, Exhibit 48,

17   REV_00023184, also with a creation date of

18   September 9, 2011, the date of the email.   Just

19   ask you, is that 9-9 Ohio Map-Cuyahoga

20   County.jpg consistent with your naming

21   conventions?

22         A.   Yes.

23         Q.   Do you have any reason to doubt this

24   is one of the maps you included as an

25   attachment to your September 9 email,

```
 1              A. Kincaid - CONFIDENTIAL
 2    Exhibit 48?
 3         A.   No.
 4         Q.   This appears to be a county map for
 5    Cuyahoga County; is that right?
 6         A.   Yes.
 7         Q.   Do you see under District 11, do you
 8    see the -- how it goes down from -- goes from
 9    north to south down from Cleveland down
10    through -- all the way down to Richfield?
11              Do you see that?
12         A.   Yes.
13         Q.   Do you recall any -- whose idea it
14    was to draw the map that way?
15              MR. SHEEHY:  Objection to form.
16         A.   Could you be more specific?
17         Q.   Do you recall whose idea it was?  Did
18    you get the suggestion to have that long
19    north-south corridor in District 11?
20              MR. SHEEHY:  Objection to form.
21         A.   It's my understanding from
22    Mr. Latourette that Congresswoman Fudge wanted
23    her district to run from Cleveland to Akron.
24         Q.   You were not in that conversation
25    with Congressperson Fudge; true?
```

1          A. Kincaid - CONFIDENTIAL

2          A.   I was not in that conversation.

3          Q.   It's just based on what Mr. Whatman

4     told you; is that right?

5          A.   I didn't say that.

6          Q.   I'm sorry.  Who was it based on?

7          A.   Mr. Latourette.

8          Q.   Latourette.  I'm sorry.

9     Mr Latourette.  Apologize.  He told you that --

10    did he say he heard that directly from

11    Congressperson Fudge or from somebody else?

12    Did he tell you the source?

13         A.   From what I recall, he said

14    Congresswoman Fudge's district needs to go from

15    Cleveland to Akron, but she had made that

16    request.

17         Q.   He said that she had made the request

18    but did he tell you whether she made the

19    request to him or through some third party, or

20    you don't recall?

21         A.   I don't recall.

22              MR. FRAM:  Just to round it out

23         with 63.

24         (Exhibit No. 63 was marked for

25         identification.)

1                A. Kincaid - CONFIDENTIAL

2                    MR. FRAM:  63 is a map of the state

3           of Ohio with all the districts on it,

4           REV_00023189.  And 64 is the metadata

5           for that one.

6           (Exhibit No. 64 was marked for

7           identification.)

8    BY MR. FRAM:

9           Q.  The metadata, again, this is one of

10   the attachments to the email, Exhibit 48, sent

11   on September 9.  The metadata has a create date

12   of September 9, 2011.  And the file name, if

13   you take a look at the file name in the

14   metadata, Ohio Congressional Map As Of 9-9.jpg.

15           Do you see that?

16       A.  Yes.

17       Q.  That's consistent with your naming

18   convention?

19       A.  Yes.

20       Q.  Do you have any reason to doubt that

21   this map wasn't sent as an attachment to your

22   email Exhibit 48?

23       A.  No.

24       Q.  As of September 9 I think you said

25   there's several different options around the

1                    A. Kincaid - CONFIDENTIAL

2    table, but this one has the District 10, that

3    Franklin County that we just saw separately in

4    Exhibit 59.

5                    Do you see that in the middle of

6    Exhibit 63?

7        A.    Yes.

8        Q.    Is this a rendering of the map for

9    which -- the map that corresponds to the

10   September 9 change sheet, Exhibit 50?  Take a

11   look at it.

12       A.    Yes.

13       Q.    Do you recall any communications,

14   conversations, emails of any kind from anyone

15   after you sent this map on September 9?

16                MR. SHEEHY:  Objection to form.

17                MR. FRAM:  Why don't we have marked

18           next as Exhibit 65 an email string with

19           REV_00023497.

20           (Exhibit No. 65 was marked for

21           identification.)

22   BY MR. FRAM:

23       Q.    The emails, there are two of them,

24   they're both dated -- I take it back.  The

25   earlier in time is September 14, 2011 at what

1              A. Kincaid - CONFIDENTIAL

2     appears to be 5:50 p.m.  And the other one is

3     the next day at September 15, 2011 at

4     12:46 p.m.  Start with the first one, earlier

5     in time one.  And this is an email, appears to

6     be from you to Dr. Hofeller.

7              Do you have any reason to doubt you

8     sent this email?

9         A.    No.

10        Q.    That's your email address, isn't it?

11        A.    Yes.

12        Q.    And it says, the subject is

13    "Awesome."

14              Do you see that?

15        A.    I do.

16        Q.    And would you please take a look at

17    the body of the email.  It's not long.  Okay?

18              Do you recall why you had the subject

19    of this email titled "Awesome"?

20              MR. SHEEHY:  Objection to form.

21        A.    Because I have a dry sense of humor.

22        Q.    Okay.  Illuminate.  Help me out here.

23    I'm always interested in learning new humorous

24    things.

25              MR. SHEEHY:  Objection.

1           A. Kincaid - CONFIDENTIAL

2           Q.   What did you mean when you were being

3    humorous?   What were you saying in a humorous

4    way?

5                MR. SHEEHY:   Objection to form.

6           A.   Just that it came in dead last.   It's

7    just me being me, just being -- having a dry

8    sense of humor and just sending it to Tom

9    because I knew he'd appreciate that, because he

10   also had a dry sense of humor.

11          Q.   What was last?   The fact that the

12   Ohio Campaign for Accountable Redistricting had

13   scored the new Congressional districts

14   introduced in the General Assembly by

15   Representative Huffman in HB 319, had scored

16   that as dead last?   That's what you were

17   commenting on?

18                MR. SHEEHY:   Objection to form.

19          Q.   In a humorous way?

20          A.   I think it was just the overall

21   article.   I wouldn't say it was just the dead

22   last part.   I think it was just the article was

23   amusing to me and it was interesting and I sent

24   it to Tom.   It's just what I put in the subject

25   line.

1           A. Kincaid - CONFIDENTIAL

2           Q.   Was the fact that it scored dead last

3    part of what was humorous?

4              MR. SHEEHY:   Objection to form.

5           A.   I'd have to read the entire article

6    to say for sure.

7           Q.   Do you recall whether or not -- let

8    me back up.  You did put an exclamation point

9    after the proposed -- let me back up.  The

10   words in this email, those are -- you wrote

11   those words?  The Ohio -- starting with "the

12   Ohio campaign"?

13          A.   No.  This isn't how I write or

14   punctuate things.  This would have been a copy

15   from that.  This isn't my own commentary here.

16          Q.   I see.  So this is a copy and paste

17   from the article?

18          A.   Uh-huh.

19          Q.   Your recollection?

20          A.   Yeah.

21          Q.   Okay.  But your recollection is that

22   there was an article saying that the -- that

23   HB 319 had scored dead last.

24              Do you recall that?

25          A.   This is a -- I copied and pasted this

1        A. Kincaid - CONFIDENTIAL

2    from the article and sent it to Tom but that's

3    what we found.

4        Q.   And you found the article in general

5    to be humorous?

6        A.   No, I just -- I think it was just me

7    being glib and sending Tom something that he

8    would also find interesting.  That's all.

9        Q.   Yeah.  You recall his response,

10   quote-unquote, "You should stand proud"?

11       A.   That would reflect Tom and I's sense

12   of humor at the time.

13       Q.   Okay.  You have no reason to doubt

14   that you received this from Dr. Hofeller on

15   September 15?

16       A.   No.

17       Q.   Or that you sent it on September 14?

18       A.   No.

19       Q.   Okay.

20           MR. FRAM:  This would be a decent

21   place -- time for a lunch break.

22   Changing the subject matter.

23           MR. SHEEHY:  All right.

24   (Recess taken.)

25           MR. FRAM:  We will mark the next as

1           A. Kincaid - CONFIDENTIAL

2           66.

3           (Exhibit No. 66 was marked for

4           identification.)

5                MR. FRAM:  That's a spreadsheet,

6           REV_000000 -- six 0s, followed by the

7           number 22.  And then what I'll mark as

8           67 is the metadata for that one.

9           (Exhibit No. 67 was marked for

10          identification.)

11               MS. RIGGINS:  And Rob, I'm sorry,

12          what was the prefix for that number?  I

13          didn't catch it.

14               MR. FRAM:  REV, six zeros, followed

15          by 22.

16               MS. RIGGINS:  There's no prefix?

17               MR. FRAM:  REV, REV.

18               MS. RIGGINS:  Okay.  Just wanted to

19          double-check.

20               MR. FRAM:  No problem.

21     BY MR. FRAM:

22          Q.  Mr. Kincaid, you created Exhibit 66,

23     didn't you?

24          A.  Yes.

25          Q.  One of your change sheets?

1          A. Kincaid - CONFIDENTIAL

2          A.   No.

3          Q.   What do you call these?

4     Spreadsheets?

5          A.   It's just a spreadsheet.

6          Q.   And that's because there's no changes

7     indicated, it's just the -- I'm learning.  It's

8     just the political scorings for a particular

9     map.

10                   MR. SHEEHY:  Objection to form.

11         Q.   Right?  Okay.  Now, if you look at

12    the metadata, okay, we have a created date of

13    early, back in May 2011, but I take it that's

14    when the shell was created, the parent

15    document, if you will, of the spreadsheet; is

16    that right?  It's not when the data was

17    populated into it?

18         A.   No, the data was not populated into

19    it.

20         Q.   Was it populated into on the date

21    modified around September 15, 2011?

22         A.   That would seem to be the case.

23         Q.   And by the way, the file name, Ohio

24    Statewide.xls, is that consistent with your

25    naming convention?

1                A. Kincaid - CONFIDENTIAL

2          A.    Yeah, roughly, yes.

3          Q.    All right.  And does this appear to

4    be a spreadsheet reflecting election result

5    information and PVI index information for

6    HB 319 as it was introduced in the General

7    Assembly?

8                MR. SHEEHY:  Objection to form.

9          A.    I'm not able to say that.  It says

10   Ohio statewide, the date's 9-15, but it

11   doesn't -- there's nothing on here that tells

12   me what map this is in regards to.

13         Q.    It would be Ohio statewide as of that

14   date; is that right?  Let me see if I

15   understand.  You created this -- when you

16   created this, do you know, in the ordinary

17   course would you have provided Mr. Whatman a

18   copy of this, of Exhibit 66?

19               MR. SHEEHY:  Objection to form.

20         A.    I'm not sure.  This is different than

21   the changes sheets, so I don't recall who I

22   would have sent this one to.

23         Q.    Would you have shared it with

24   Mr. Mann or Ms. DiRossi [sic]?

25               MR. SHEEHY:  Objection to form.

1            A. Kincaid - CONFIDENTIAL

2         A.    As you've seen before, I didn't share

3    much directly with Heather and Ray so I

4    don't -- if I don't remember sending it to Tom

5    Whatman, I wouldn't remember sending it to

6    Heather and Ray.

7         Q.    Okay.   This has the five elections on

8    it that were used in the Ohio average; is that

9    right?

10         A.    It does.   It has six elections, but

11   yeah, those five are included.

12         Q.    Has the six and has the five which --

13   then it also has PVI.

14              Do you recall ever talking to

15   Mr. DiRossi about whether to use PVI to score a

16   district or not?

17              MR. SHEEHY:   Objection to form.

18         A.    No.

19         Q.    Do you recall communicating with any

20   way that he thought PVI was a good idea or bad

21   idea?

22              MR. SHEEHY:   Objection to form.

23         A.    I have no recollection of any

24   conversation regarding PVI with Ray DiRossi.

25         Q.    No one ever told you it was a bad

1          A. Kincaid - CONFIDENTIAL

2    idea to use PVI data --

3            MR. SHEEHY:  Objection to form.

4        Q.   -- that you can remember?

5        A.   No.  I don't recall.

6        Q.   But one way or the other it's your

7    best recollection you created this document,

8    Exhibit 66, on or about September 15, 2011; is

9    that right?

10       A.   Yes.

11       Q.   I'll just say one more thing about

12   it.  If you look at Exhibit 66, go down to row

13   for the CD, Congressional District 3, do you

14   see that?

15       A.   Yes.

16       Q.   And that's 3-Open, do you see that?

17       A.   I do.

18       Q.   So by that point it appears that what

19   previously was discussed is Congressional

20   District 10 was now being numbered as 3; is

21   that right?

22       A.   That seems to be the case, yes.

23       Q.   And, in fact, in HB 319 there was a

24   new Congressional District 3 in Franklin

25   County, was there not?

          1          A. Kincaid - CONFIDENTIAL

     2          A.    Yes.

          3               MR. SHEEHY:  Objection to form.

     4          Q.    So this is that same heavily

     5     Democratic, D+16 district; is that right?

     6          A.    District 3 would have been the

     7     Franklin County seat, yes.

     8          Q.    And that was D+16?

     9          A.    And PVI for that was D+16.

    10          Q.    And I'm reading it right that

    11     District 15 is an R+7 with Mr. Stivers; is that

    12     right?

    13          A.    That's what this says, yes.

    14          Q.    And Mr. Tiberi's District 12 is an

    15     R+10; is that right?

    16          A.    That's what this says, yes.

    17               MR. FRAM:  I'd like to mark as 68

    18          an e-mail, Bates number REV_00023429,

    19          dated December 14, 2011, from Adam

    20          Kincaid to Mike Wild and Tom Hofeller,

    21          subject, New Ohio Map.

    22          (Exhibit No. 68 was marked for

    23          identification.)

    24               MR. FRAM:  And I'd like to mark as

    25          Exhibit 69 metadata for -- a metadata

```
 1              A. Kincaid - CONFIDENTIAL
 2         sheet for 23430.
 3         (Exhibit No. 69 was marked for
 4         identification.)
 5              MR. FRAM:  And I'd like to mark as
 6         Exhibit 70 a spreadsheet titled "HB 369
 7         Data," REV_00023430.
 8         (Exhibit No. 70 was marked for
 9         identification.)
10    BY MR. FRAM:
11         Q.   Why don't we start with 68.  That's
12    an email.
13              Do you see that?
14         A.   Yes.
15         Q.   And that's your email address?  It
16    was your email address back in 2011?
17         A.   Yes.
18         Q.   Do you have any reason to doubt you
19    sent this email on or about December 14, 2011
20    to Mr. Wild and Dr. Hofeller?
21              MR. SHEEHY:  Objection to form.
22         A.   No.
23         Q.   Now, if you turn to the metadata,
24    Exhibit 69, do you see -- well, date created
25    and modified are both December 14, 2011.
```

```
 1              A. Kincaid - CONFIDENTIAL

 2              Do you see that?

 3      A.   Yes.

 4      Q.   You go down to the source

 5  attachments, you see this, it says 23430

 6  appears to be an attachment to 23429, the email

 7  we just looked at?

 8      A.   Yes.

 9      Q.   Now if we look at 24 -- strike that.

10  23430, Exhibit 70, do you see that?

11      A.   Uh-huh, yes.

12      Q.   Okay.  Do you see -- looking at

13  Exhibit 69, do you see the naming convention

14  New Ohio Map Data.xls?

15      A.   Yes, I see that.

16      Q.   Is that your naming convention?

17      A.   Yeah.

18      Q.   Does this, in fact -- and you created

19  Exhibit 70?

20      A.   Yes.

21      Q.   And you attached -- you attached it

22  to the email that you sent to Mr. Wild and

23  Dr. Hofeller on December 14, 2011?

24              MR. SHEEHY:  Objection to form.

25      A.   Based off of the metadata, yeah, it
```

1                    A. Kincaid - CONFIDENTIAL

2    looks like this was attached to this email.

3         Q.   Do you recall -- I'll just make a

4    representation and you can include it, include

5    it in my question then.   HB 369 was passed on

6    December 14, 2011.

7         A.   Okay.

8         Q.   The date of the document.  Okay?  Do

9    you have any recollection of sending -- strike

10   that -- of creating this spreadsheet for the --

11   for HB 369 as enacted?

12        A.   I don't recall creating the

13   spreadsheet, no.

14        Q.   Did you create a spreadsheet after

15   HB 369 was enacted?

16             MR. SHEEHY:  Objection to form.

17        A.   It would have been part of my job, so

18   yes.

19        Q.   Do you recall any reason you would

20   send such a spreadsheet to Dr. Hofeller and

21   Mr. Wild?

22             MR. SHEEHY:  Objection to form.

23        A.   The reason I would have sent that?

24   That's what you're asking?  They were running

25   the redistricting shop at the RNC and were

Page 469

1                    A. Kincaid - CONFIDENTIAL

2    interested in how maps performed and what the

3    election results would have been for, you know,

4    demographics for past maps.  So it wasn't

5    uncommon for me to send them these sorts of

6    sheets when districts were enacted into law.

7    It's pretty standard practice.

8         Q.   And here again, if you turn to CD 3,

9    "District 3-open," do you see that?

10        A.   Say that again.

11        Q.   Go down to the row for district 3 on

12   the far left, which is 3-open, do you see that?

13        A.   Yes.

14             MR. SHEEHY:  This is Exhibit 70?

15             MR. FRAM:  Exhibit 70.  Yes,

16   please.  Thank you for that.

17        Q.   And if you look on over to the far

18   right to the PVI scoring, do you see that?

19        A.   I do.

20        Q.   So this is still a heavily -- this is

21   a heavily Democratic district in Franklin

22   County; is that right?

23             MR. SHEEHY:  Objection to form.

24        A.   Yes, District 3 is the Franklin

25   County seat.

1              A. Kincaid - CONFIDENTIAL

2         Q.   Do you recall any discussions of the

3    differences between the PVI scorings in HB 369

4    and 319?

5         A.   No, I don't.

6         Q.   You ever run an analysis comparing

7    the two?

8              MR. SHEEHY:  Objection to form.

9         A.   I don't recall.

10             MR. FRAM:  Why don't we have marked

11        next as Exhibit 71 and 72, 71's a map,

12        REV_00023432.

13        (Exhibit No. 71 was marked for

14        identification.)

15             MR. FRAM:  And 72 then would be the

16        metadata for that document.

17        (Exhibit No. 72 was marked for

18        identification.)

19    BY MR. FRAM:

20        Q.   Just looking at the metadata, you see

21    that this appears to be -- REV_00023432 appears

22    to be an attachment to your email of

23    December 14, REV_00023429.  You can look at

24    both the metadata on Exhibit 69 and 72 to

25    confirm that.

1              A. Kincaid - CONFIDENTIAL

2              Do you see that?

3      A.    Yeah.

4      Q.    Okay.  Was this, in fact -- was this

5    map also something you transmitted to

6    Dr. Hofeller and Mr. Wild on about December 14?

7              MR. SHEEHY:  Objection to form.

8      A.    It appears to be one of the

9    attachments on the email I sent, yes.

10     Q.    And it was the same reasons, part of

11   your job as redistricting coordinator for the

12   NRCC, is to do this?

13             MR. SHEEHY:  Objection to form.

14     A.    I would have produced this for the

15   NRCC, and would have been standard practice to

16   share it with Tom and Mike.

17     Q.    You were able to produce this because

18   someone sent you the block equivalency file for

19   HB 369 as enacted, or -- strike that -- for

20   HB 369 as of December 14?

21             MR. SHEEHY:  Objection to form.

22     A.    I don't recall if anyone sent it to

23   me or not.  I could have gotten it online.

24     Q.    As of December -- the day it was

25   passed it went online?

1                A. Kincaid - CONFIDENTIAL

2              A.   Possibly.  I don't know.  I don't

3       have a memory of how I got the file.

4                    MR. FRAM:  Okay.  I'm going to mark

5              as 73 and 74.  73 is going to be

6              REV_00023431, spreadsheet entitled "Ohio

7              changes."

8              (Exhibit No. 73 was marked for

9              identification.)

10                   MR. FRAM:  And 74 will be the

11             metadata for that document.

12             (Exhibit No. 74 was marked for

13             identification.)

14       BY MR. FRAM:

15             Q.   Drawing your attention on Exhibit 74

16       on the metadata, you've got a modifying --

17       modified date of December 14, 2011.

18                   Do you see that?

19             A.   Yes.

20             Q.   And looking down at the file name,

21       New Ohio Map Changes.xls, that's consistent

22       with your naming convention, isn't it?

23             A.   Yes.

24             Q.   And looking down at the source and

25       attachments, you see that REV_00023431 is

1                    A. Kincaid - CONFIDENTIAL

2    listed as an attachment to the source document

3    00023429?

4         A.    Yes.

5         Q.    Okay.  Do you have any -- you created

6    Exhibit 73, that's -- that spreadsheet, did you

7    not?

8                    MR. SHEEHY:  Objection to form.

9         A.    Yes.

10        Q.    And do you have any reason to doubt

11   that this is one of the attachments to your

12   December 14 email which we've marked as

13   Exhibit 68?

14        A.    No.

15        Q.    And you did so as part of your job as

16   redistricting coordinator at the NRCC; is that

17   right?

18        A.    Yes.

19        Q.    I take it this is a change sheet

20   because we have comparison of the map as it

21   existed on December 14 and the

22   pre-redistricting map; isn't that right?

23        A.    Yes.

24        Q.    That far right column shows the

25   increase or decrease in different PVI values in

1               A. Kincaid - CONFIDENTIAL

2    the map as it existed on December 14, 2011 and

3    the pre-redistricting map; correct?

4         A.   Yes.

5         Q.   There are 12 districts that indicate

6    with an R -- R+ values, is that right, on the

7    new Ohio map as it existed on December 14,

8    2011; is that right?

9         A.   Yes.

10        Q.   I'm sorry.  When I say R+ values I

11   mean R+ values in the PVI scoring.

12        A.   I knew what you mean.  Yes.

13        Q.   Did you also have a block assignment

14   files as of December 14 for the -- to generate

15   the map you needed a block assignment file from

16   somebody?

17        A.   I could have done it off of the

18   shapefile, so I'm not quite sure what the root

19   file was to create the map, to upload the map.

20             MR. FRAM:  Let me show you a

21        document.  We received a computer file

22        with map files, which I'm not going to

23        show you, but I will show you the

24        metadata on it.  I'm going to mark this

25        next as Exhibit 75.

1             A. Kincaid - CONFIDENTIAL

2             (Exhibit No. 75 was marked for

3             identification.)

4    BY MR. FRAM:

5        Q.    This is the metadata for

6    REV_00023343.  Okay?  You can see it's attached

7    to REV_00023341.  Okay?  It has a created date

8    of December 15, 2011.

9             My question to you is do you see the

10   name convention where it says HB 369 As

11   Passed.dbf?

12            Do you see that?

13       A.    I see that.

14       Q.    Is that your naming convention when

15   you would have a block -- for a dbf file, could

16   that be a shapefile or a block equivalency

17   file, or is it a block equivalency file?

18            MR. SHEEHY:  Objection to form.

19       A.    A dbf is a database file which is a

20   block equivalency file.

21       Q.    Sure.

22       A.    I don't recall naming a file "HB 369

23   as passed."

24       Q.    Okay.  So the question is do you

25   recall if you received HB 369 as passed from

1              A. Kincaid - CONFIDENTIAL

2      anybody?

3          A.   I don't.   I don't know what the root

4      email is here either, and all of the numbers

5      are missing off the right side of the

6      attachment list.  So 23341, which email was

7      that?  Do you know?

8          Q.   We'll get to that, hold on.  We'll

9      get to that.

10             I think we looked at it already.

11     I'll pull it up for you.  Hold on.

12         A.   Here we go.

13         Q.   You got it?

14         A.   Yeah.

15         Q.   Can you tell everybody which exhibit

16     it was?

17         A.   Sorry?

18         Q.   What exhibit do you have?

19         A.   42.

20         Q.   42.  Is that an email that -- I found

21     it.  So you received an email around

22     December 15 from Heather Mann; is that right?

23     We discussed that before?

24         A.   Yes, I see that here, yes.

25         Q.   She says she's attaching equivalency

1              A. Kincaid - CONFIDENTIAL

2    file for HB 369 as passed?

3          A.   Yes.

4          Q.   Now we're looking at the metadata.

5    Like I say, we have this computer file,

6    REV_000233343.  Okay?  Does it refresh your

7    recollection that if you didn't name it HB 369

8    as passed that this is -- this was a block

9    equivalency file you received from Heather Mann

10   around December 15?

11         A.   Yes, this seems to be the file that

12   was attached to this email.

13         Q.   So just to refresh your recollection,

14   in fact you got the block equivalency file

15   directly from Heather Mann and not by going on

16   a public website; is that right?

17              MR. SHEEHY:  Objection to form.

18         A.   I don't remember receiving the email

19   but it seems that I did get it from Heather

20   Mann.

21              MR. FRAM:  Why don't we have marked

22   next 76 -- mark a few together.  76 is

23   metadata for REV_00023344.

24         (Exhibit No. 76 was marked for

25         identification.)

1          A. Kincaid - CONFIDENTIAL

2              MR. FRAM:  And 77 is metadata for

3        REV_00023345.

4        (Exhibit No. 77 was marked for

5        identification.)

6              MR. FRAM:  And why don't we make 78

7        the metadata for REV_00023346.

8        (Exhibit No. 78 was marked for

9        identification.)

10              MR. FRAM:  And why don't we make 79

11        a map, REV_00023347.

12        (Exhibit No. 79 was marked for

13        identification.)

14              MR. FRAM:  And 80 would be the

15        metadata for that map, for REV_00023347.

16        (Exhibit No. 80 was marked for

17        identification.)

18      BY MR. FRAM:

19          Q.   Looking at 76, which is the metadata

20      for REV_00023344, see the file name HB 369 As

21      Passed.prj?

22          A.   Uh-huh.

23          Q.   Do you understand what .prj stands

24      for?

25          A.   It's a component of a shapefile.

1                  A. Kincaid - CONFIDENTIAL

2          Q.   Do you see under the source and

3    attachment that this appears to have been an

4    attachment to REV_00023341, which we've marked

5    as Exhibit 42 -- exhibit, yeah, 42?

6          A.   I see that.

7          Q.   Do you recall receiving shapefiles or

8    components of shapefiles from Heather Mann on

9    or about December 15, 2011?

10         A.   Like I said before, I don't recall

11   receiving the email, but the email subject line

12   says shapefile, so she clearly attached a

13   shapefile to the email.

14         Q.   Turning to Exhibit 77, the metadata

15   for REV_00023345, do you see that?

16         A.   I do.

17         Q.   Got a date created of December 15,

18   2011.

19              Do you see that?

20         A.   I do.

21         Q.   And go down to the file name HB 369

22   As Passed.shx.  Do you understand what the

23   suffix .shx means?

24         A.   It's also a component of a shapefile.

25         Q.   Same question.  Does this appear to

1          A. Kincaid - CONFIDENTIAL

2    be an attachment to the email that you received

3    from Heather Mann on or about December 15,

4    2011?

5          A.    It does.

6          Q.    And similarly, going to Exhibit 78,

7    metadata for REV_00023346, do you see that?

8          A.    I do.

9          Q.    And again, you've got a creation date

10   of December 15, 2011.

11              Do you see that?

12         A.    Yes.

13         Q.    Now, the file name here is HB 369 as

14   passed.shp.  Does .shp also stand for

15   shapefiles?

16         A.    Yes.

17         Q.    Does this also confirm that Heather

18   Mann sent you shapefiles on or about

19   December 15, 2011?

20         A.    Yes.

21         Q.    For HB 369 as passed?

22         A.    Seems to be the case, yes.

23         Q.    Turning to Exhibit 79, okay, it's

24   metadata Exhibit 80, REV_00023347, do you see

25   that?

1              A. Kincaid - CONFIDENTIAL

2          A.   I see that.

3          Q.   This also appears to be an attachment

4    to the source document REV_00023341, which is

5    the email we've marked as Exhibit 42; correct?

6          A.   The metadata's for a document that's

7    attached.   That seems to be the case, yes.

8          Q.   And that document we marked as

9    Exhibit 42.  Take a look at the Bates number on

10   Exhibit 42 -- I'm sorry -- yeah, Exhibit 42.

11         A.   What now?

12         Q.   Look at Exhibit 42, the Bates number

13   is REV_00023341, the email from --

14         A.   Yeah.

15         Q.   I'm just saying this appears to be an

16   attachment to Heather Mann's email?

17         A.   I'm saying Exhibit 80 is the metadata

18   for a file that's attached to 23341, yes.

19         Q.   I get it.   Thank you.   Thank you.

20   And Exhibit 79 would appear to be that

21   document?

22         A.   No.

23         Q.   No?

24         A.   This is not a DBF.   This is a

25   screenshot.   This should be as a JPG or --

1          A. Kincaid - CONFIDENTIAL

2          Q.   I see.

3          A.   That's a screenshot, that's not a DBF

4     file.

5          Q.   I see.   Interesting.   This is as

6     produced to us but let me see if I understand

7     correctly.   You would generate a map like this

8     using a DBF, but this itself is not of course

9     the DBF?

10         A.   The DBF would be loaded into

11    Maptitude to produce a map.

12         Q.   Then you would see a map such as

13    this?   Maybe not this but that's what you'd

14    see?

15         A.   You would load this into Maptitude

16    and you'd see something -- this is stylized by

17    whoever uploaded that to Maptitude.

18         Q.   I understand.

19         A.   This is a printed screen of

20    something.

21         Q.   Thank you.   Okay.   Does this refresh

22    your recollection that you received a block

23    equivalency file from Heather Mann on or around

24    December 15, 2011?

25              MR. SHEEHY:   Objection to form.

1              A. Kincaid - CONFIDENTIAL

2        A.   No, because this is a DBF.  This is a

3   separate file from the shapefile.  So this

4   would be a block equivalency file, yes, not the

5   shapefile.

6        Q.   Let me say the question right.  Does

7   this refresh your recollection that you

8   received a block equivalency file from Heather

9   Mann for HB 369 on or about December 15, 2011?

10       A.   It doesn't reflect -- it doesn't

11  refresh my recollection because I don't

12  remember receiving it, but the -- it clearly

13  shows that she sent this to me.  I just don't

14  remember receiving the email.

15       Q.   That's fine.  Thank you.

16            Turning back to Exhibit 42, your

17  email to -- looking at the email you sent to

18  Dr. Hofeller and Mr. Wild on December 15 at

19  2:28 p.m.

20            Do you see that?

21       A.   Yes.

22       Q.   It says you're forwarding equivalency

23  and shapefiles.

24            Do you see that?

25       A.   Yes.

1          A. Kincaid - CONFIDENTIAL

2          Q.    Do you have any doubt you sent this
3     email?

4          A.    No.

5          Q.    And you did so as part of your job as
6     redistricting coordinator for the NRCC; is that
7     right?

8          A.    Yes.

9          Q.    You mention a couple of tweaks.

10               Do you see that?

11         A.    I see that.

12         Q.    Do you recall what they were?

13         A.    I'm not sure what I was referring to
14    specifically.

15         Q.    But then you state, quote, "final,
16    final Ohio map is attached."

17               Do you see that?

18         A.    I do.

19         Q.    Was it your understanding that the
20    equivalency and shapefiles you were forwarding
21    was for the final Ohio map as enacted?

22         A.    That's literally what Heather put as
23    title as the file was HB 369 as passed, or
24    whoever named the file.  So yeah, my
25    understanding was that was the passed map that

```
 1              A. Kincaid - CONFIDENTIAL
 2      was the final, final map for Ohio.
 3          Q.   And just so I understand it, you
 4      have -- after -- at any time since December 15,
 5      2011, at no point have you ever gone and
 6      modified the block equivalency files regarding
 7      HB 369?
 8          A.   I'm sorry, I don't understand.
 9          Q.   At any time since December 15, 2011
10      have you ever gone in and modified the block
11      equivalency files for HB 369?
12              MR. SHEEHY:  Objection to form.
13          Q.   Let me clarify the question.  You had
14      the block equivalency files as of --
15          A.   Sure.
16          Q.   -- December 15, 2011; correct?
17          A.   Yes.
18          Q.   And they got produced to us in 2018.
19          A.   Okay.
20          Q.   I'm just trying to say between the
21      time you received them and the time we received
22      them, whether, as far as you know, any
23      modifications were made to those block
24      equivalency files, or what we received was in
25      fact what you got back then.
```

1                A. Kincaid - CONFIDENTIAL

2          A.   I wasn't the custodian of that

3     document, so I couldn't tell you if it's been

4     tweaked or not.  I personally have not made --

5     I mean, Ohio hasn't redistricted since 2011, so

6     it's kind of a hard question to answer because

7     it's not -- I mean --

8          Q.   During the course of your time when

9     you were the -- at the NRCC, did you modify

10    those files, the block equivalency file that --

11    after December 15, 2011?

12               MR. SHEEHY:  Objection to form.

13         A.   I don't recall revising HB 369 after

14    it was enacted into law.

15         Q.   That's all I was trying to get.

16         A.   But I was not the custodian of the

17    file that you have here.

18         Q.   For a period of time, though, when

19    you were -- after you received the block

20    equivalency file from Heather Mann in this

21    email, in the ordinary course of your job would

22    you have kept it in an NRCC computer?  Where

23    would you have kept the file after you received

24    it?

25         A.   Yeah, I would have kept it on an NRCC

1              A. Kincaid - CONFIDENTIAL

2    computer.

3         Q.   Then after you left the NRCC, it

4    would have stayed on an NRCC computer?  You

5    didn't take it with you?

6         A.   They would have had the file in their

7    database.

8         Q.   Okay.  Like you say, at that point

9    there would also be a public version of that

10   block equivalency file?

11        A.   Right.  They would have it on their

12   servers.

13        Q.   In the ordinary course of your job

14   duties as NRCC redistricting coordinator, I

15   take it you would not modify a block

16   equivalency file for already-enacted maps;

17   isn't that right?

18        A.   Right.  If a map was enacted, it was

19   enacted.

20        Q.   And you weren't going to modify the

21   block equivalency file?

22        A.   The NRCC would need the final file

23   for the purposes of winning elections.

24        Q.   Right.  So the NRCC tried to keep

25   accurate block equivalency files in its records

1              A. Kincaid - CONFIDENTIAL

2  for enacted maps?

3       A.    Absolutely.

4       Q.    Okay.

5              MR. FRAM:   This one may have been

6       marked in the previous deposition but

7       there are questions that need to be

8       asked so I'll just find it.  Let me get

9       the numbering right.  This was Exhibit 2

10      in your deposition on December 4 so we

11      can mark this as 2 again.

12      (Exhibit No. 2, previously marked, was

13      referenced and indexed.)

14 BY MR. FRAM:

15      Q.   Just going to ask you a couple of

16 questions that I didn't ask the last time or

17 you weren't able to answer because of

18 instructions.

19           If you turn to the slide that says --

20 by the way, the Bates number is NRCC000031 for

21 all -- the whole document.  There's many pages.

22 But the fifth slide has got the heading "R

23 seats moved out of play," quote-unquote.  Turn

24 your attention to that, that slide, and you'll

25 see where on that it indicates that Ohio 1 for

1            A. Kincaid - CONFIDENTIAL

2    Chabot, Ohio 12 for Tiberi, and Ohio 15 for

3    Stivers were quote-unquote moved out of play

4    due to redistricting.

5            Do you see that?

6       A.   I see that.

7       Q.   And I think you testified that you

8    created some of the content on this slide; is

9    that right?

10      A.   Yes.

11      Q.   Did you create the content regarding

12   those three Ohio districts?

13      A.   Yes.

14      Q.   And I'd like to ask you, did you

15   create the words "R seats moved out of play"?

16           MR. SHEEHY:  Objection to form.

17      A.   I don't recall whether I originated

18   that phrase or not.

19      Q.   Whether you originated it or not, did

20   you type it on this slide?

21      A.   As you can see, this slide's an NRCC

22   slide.  It's got lots of different subjects on

23   it.  This presentation predated my time

24   starting at the NRCC.  So they would have

25   started this up, in January of 2011, it would

1          A. Kincaid - CONFIDENTIAL

2    have been a fluid document.  So I don't recall

3    whether "R seats moved out of play" is

4    something that I typed here or not.  It could

5    have been someone else on staff who did that.

6          Q.   I see.  In other words, if I

7    understand what you're saying, there was a

8    document that preceded you --

9          A.   I was not the final custodian of this

10   PowerPoint presentation.

11         Q.   But you worked on this particular

12   slide, slide 5, whether -- but maybe not --

13   it's not clear that you typed in the words

14   "R seats moved out of play"; is that right?

15         A.   I would have provided the content for

16   the slides.  I don't recall providing the

17   header for the slide.

18         Q.   Did you select the three Ohio seats,

19   15, 12, and 1, to be included on this slide?

20              MR. SHEEHY:  Objection to form.

21         A.   I don't recall what the selection

22   process was for what slide -- what districts

23   were or were not included here.  We had a lot

24   of meetings at the NRCC, so I wouldn't -- I'm

25   not sure -- I don't remember what the criteria

A. Kincaid - CONFIDENTIAL

2  was that we set or how we decided what would or

3  would not be in each slide.

4  Q.  Well, who else besides you was

5  involved in the conversation about the three

6  Ohio districts and whether they should be

7  included on this slide?

8  MR. SHEEHY:  Objection to form.

9  A.  That's a conversation that could have

10  come up in one of a dozen meetings that I had

11  on a given day.  So I -- I couldn't tell you

12  what person would have made that decision,

13  but -- let me just say I don't remember.

14  Q.  Fair enough.  I'm not asking you to

15  say who actually made the decision.  I'm saying

16  if you remember who was in the collection of

17  people who were in the conversation, if you

18  could just name those names.

19  A.  I would have to speculate.  Every

20  meeting had a different group of people in it.

21  Q.  If I understand correctly your

22  testimony -- tell me if I got it wrong -- there

23  were meetings at the NRCC during which one of

24  the topics that was discussed was which

25  districts to include in this slide.

```
 1              A. Kincaid - CONFIDENTIAL
 2              MR. SHEEHY:  Objection to form.
 3         A.   That wouldn't have been a subject of
 4    the meeting, it would have been something that
 5    came up as part of a conversation.
 6         Q.   But in a conversation at the NRCC --
 7         A.   Right.
 8         Q.   -- with a group of people at the
 9    NRCC, the question would have come up as to
10    which districts should be included on this
11    slide.
12              MR. SHEEHY:  Objection to form.
13         A.   I think over the course of a
14    meeting -- well, let me say it a different way.
15    During meetings at the NRCC, someone could have
16    said, well, that seat seems like it's moved out
17    of play.  That's a standard sort of comment
18    that you would make in a -- you know, as you're
19    analyzing new districts, trying to figure out
20    what districts you're going to target in the
21    elections that coming fall.  So I think that
22    comment could have been made about a seat,
23    other people would have agreed, and then that
24    district would have been added to that page.
25              So it's not -- it wouldn't have been
```

1          A. Kincaid - CONFIDENTIAL

2    a specific decision made of you should add

3    these three seats to that slide page; it would

4    have been something that just organically came

5    up as a part of a wider conversation.

6        Q.    I'm not going to ask you about the

7    content of any of the other non-Ohio districts,

8    but I just want to understand this.  Other than

9    the Ohio three seats, did you create the

10   content for any of those districts that are on

11   this slide?  You said you did for the three

12   Ohios.  Any of the others?

13            MR. SHEEHY:  Objection to form.

14       A.    The content meaning what's on this

15   page here?

16       Q.    Yes, please.

17       A.    Sure.  That was part of my job.  But

18   like I told you before in the last deposition,

19   part of my job was to provide the content for

20   these slides.

21       Q.    I'm just focusing on this one slide

22   for now.  I know there's a lot of different

23   topics in this slide set.  So just focusing on

24   this slide.  So on this slide, did you create

25   the content for -- putting aside the words

1          A. Kincaid - CONFIDENTIAL

2    "R seats moved out of play," not looking at

3    those words, but did you provide the rest of

4    the content on this slide?

5              MR. SHEEHY:  Objection to form.

6         A.   I would have provided the PVIs and

7    the change numbers.  The district numbers and

8    the name of the incumbent is probably provided

9    by somebody else because I, one, wouldn't have

10   added a space between the H and the dash in

11   Ohio 1, and also I tended to put two digits for

12   the district number.  So I would have had AL-03

13   or VA-04, or OH-01.  So the way I would have

14   written this is different.  So the only thing I

15   can tell you for certain that I know I provided

16   the content for on this slide is the PVI and

17   the change number.

18        Q.   And do you recall disagreeing with

19   whether any of the Ohio districts should be on

20   this slide?

21             MR. SHEEHY:  Objection to form.

22        A.   It wouldn't have been my role to

23   disagree.  It was my job to provide content.

24   It was the job of other people to make that

25   decision at that time.

1          A. Kincaid - CONFIDENTIAL

2          Q.   And so I can ask you again, if other

3    people were making the decision, who were the

4    collection of people making the decision?

5               MR. SHEEHY:  Objection to form.

6          A.   That would have varied from meeting

7    to meeting.  I'd have to speculate about who

8    that might have been.

9          Q.   Were there people -- let me ask, in

10   these -- I understand it would vary from

11   meeting to meeting, but I'm asking who the

12   collection of possible persons were at the

13   different meetings who would be in a position

14   to make the decision.

15              MR. SHEEHY:  Objection to form.

16         A.   About whether to categorize a

17   district as moving in or out of play?

18         Q.   Correct.

19         A.   I'm really not sure who would have

20   made that decision.  Like I said before, it

21   would have come up organically meeting to

22   meeting, it might have been something that

23   people collectively agreed on over the course

24   of a conversation.  But there -- as I told you

25   before, there wasn't a meeting where we all sat

1              A. Kincaid - CONFIDENTIAL

2    down and said okay, what are the R seats that

3    moved out of play and the D seats that moved

4    out of play.  We would -- that wasn't really --

5    we didn't do meetings to update the PowerPoint

6    presentation; right?  That was just something

7    that whoever made this PowerPoint would have

8    done, and I would have provided the PVIs and

9    the --

10        Q.  So if I understand correctly, there

11   were meetings where the question of what

12   R seats were moved out of play was discussed?

13        A.  As I said before, as part of a

14   standard analysis of a map, there would be

15   conversations about what seats were more or

16   less competitive.  So yeah, that's --

17        Q.  Then someone would take those

18   conclusions and create the list for which seats

19   should be -- R seats should be on this slide,

20   and then you would just provide the PVI

21   numbers?  Is that how it worked?

22            MR. SHEEHY:  Objection to form.

23        A.  I'm really fuzzy on how the exact

24   list came to be, so that's why I'm hesitant to

25   say, because I really don't remember much more

1                    A. Kincaid - CONFIDENTIAL

2     than that.  I was tasked with providing the

3     PVIs and the change numbers for the -- for this

4     PowerPoint presentation.

5          Q.   At these meetings that you attended

6     where the question of were there R seats that

7     were moved out of play or not, do you recall

8     the names of individuals at those meetings who

9     were senior to you at the RNCC?

10                   MR. SHEEHY:  Objection.

11         A.   We've already gone through the list

12    of who the senior staff was at the NRCC in our

13    last deposition.  So that senior staff is still

14    the same senior staff that was there when I was

15    there last --

16         Q.   Did all of them participate in these

17    meetings?

18         A.   No, because, you know, people would

19    have other meetings they had to be at, so there

20    were people in and out depending on -- we would

21    have around-the-world meetings that had

22    everybody on staff in the same room talking

23    about this stuff.  There were other meetings

24    that had two or three people going through and

25    talking about the districts in their, you know,

1                A. Kincaid - CONFIDENTIAL

2    their tasked zone.

3                So no, I couldn't tell you that every

4    senior staff person was in every meeting

5    because that wasn't the case.

6        Q.    But the collection -- so the meetings

7    where a question of what R seats had been moved

8    out of play included some subset of the senior

9    staff of the RNC; is that right?

10               MR. SHEEHY:  Objection to form.

11       A.    No, I mean, like I told you before,

12   we didn't have a meeting about what R seats

13   were moved out of play.  We would talk about a

14   state, we'd go through that state, talk about

15   the districts in that state, you know, maybe

16   we'd say that district has, you know, became

17   more Republican over the course of

18   redistricting, or that one became more Democrat

19   over the course of redistricting.  But there

20   wasn't a meeting where we all sat down and said

21   all right, let's find all the R seats that

22   moved out of play.

23       Q.    Fair enough.  Let me just focus that

24   and ask you a question.  Were there certain

25   members of the senior staff of the NRCC that

1                    A. Kincaid - CONFIDENTIAL

2    were focused on Ohio --

3                    MR. SHEEHY:  Objection to form.

4         Q.    -- as opposed to other states?

5         A.    No.

6         Q.    So it didn't break down by geography?

7         A.    Senior staff of the RNC didn't break

8    down by geography, no.

9         Q.    Not RNC --

10        A.    NRCC.  Sorry.

11        Q.    So different senior staff of the NRCC

12   would have been attending these meetings

13   talking about the state of the Congressional

14   map after redistricting; is that right?

15                   MR. SHEEHY:  Objection to form.

16        A.    Different members of senior staff

17   would have been at different meetings talking

18   about any state, yes.

19        Q.    And as the output of that collective

20   set of meetings, the view would -- a view was

21   created as to which Republican seats had been

22   moved out of play, not necessarily a specific

23   meeting but as a result of that process?

24                   MR. SHEEHY:  Objection to form.

25        A.    Just like any other national

1          A. Kincaid - CONFIDENTIAL

2    committee, you're going to have meetings where

3    you target districts or states or whatever it

4    might be, and over the course of that

5    conversation you're going to decide some

6    districts are going to be targets and be

7    battleground districts and some aren't going to

8    be.  So yes, in that sense, yeah, there were

9    meetings to talk about where we would go and

10   win elections.  That's pretty much the standard

11   practice of the NRCC.

12       Q.   I understand.  And this slide

13   reflected the conclusions, the collective

14   conclusion of the NRCC regarding what

15   Republican seats had been moved out of play

16   following that discussion process?

17            MR. SHEEHY:  Objection to form.

18       A.   I would resist collective conclusion

19   because one thing about the NRCC is you have a

20   healthy amount of disagreement, you know,

21   people have different opinions on things.  So

22   this would have been a working assumption at

23   best.  I mean, Virginia 10 is a district we've

24   lost over the course of decades so it clearly

25   did not move out of play.  So its inclusion is

1          A. Kincaid - CONFIDENTIAL

2   something that was probably wrong.  Illinois 6

3   is the same.  New Jersey 7 is the same.

4   Virginia 4 no longer exists.  So these are --

5   it's an assumption at a point in time.  It's

6   not a collective conclusion.  So --

7          Q.   When I say collective conclusion, I

8   just meant what people's understanding was at

9   the time, not that it was infallible.  That

10  this reflected people's best thinking at the

11  time.

12         A.   I would say it reflected a working

13  assumption at the time.

14         Q.   Did anybody ever say, while you were

15  at the NRCC, that Ohio 1, Ohio 12 and Ohio 15

16  should not be on this slide?

17            MR. SHEEHY:  Objection to form.

18         A.   Did anyone at the NRCC at any time

19  say that these three districts should not be on

20  this slide?

21         Q.   Yes, that you recall.  Anybody saying

22  to you, I'm sorry, this is wrong, we should not

23  have these three districts on this slide?

24            MR. SHEEHY:  Same objection.

25         A.   I don't recall having that

1          A. Kincaid - CONFIDENTIAL

2     conversation about this specific slide, no.

3          Q.   Do you recall -- you were describing

4     some other districts where you thought the

5     slide was maybe somewhat questionable in terms

6     of its conclusion.

7               Do you recall at any time did anybody

8     say in substance or effect, I'm sorry, I don't

9     think Ohio 1 should be considered to be moved

10    out of play?

11              MR. SHEEHY:   Objection to form.

12         A.   Well, to be fair, what I was saying

13    before about it being questionable is just

14    simply that you said it was a collective

15    conclusion.  I was characterizing it as a

16    working assumption.  It wasn't to say that we

17    had, you know, great debates over this

18    PowerPoint presentation and wasted time on what

19    district should or should not be included in

20    it.  I mean, it's a PowerPoint presentation.

21    It's designed to simplify a lot of complex

22    facts and data; right?  So it's not an

23    infallible document.

24              And I don't recall having a lot of

25    knock-down, drag-out fights over any of the

1              A. Kincaid - CONFIDENTIAL

2    districts that were, were not included in this

3    presentation.  It was -- whether it be Ohio 1

4    or Alabama 3, I don't really recall that being

5    a particular point of contention one way or the

6    other.  I don't think most people really

7    worried too much about -- I just don't think it

8    was --

9         Q.   I'm not -- I'm just going to focus on

10   the Ohio districts for a minute.  I'm not

11   limiting it just to the technical question of

12   whether somebody said it shouldn't be on this

13   particular slide.  For Ohio 1, at any point

14   while you were at the NRCC, did somebody say

15   that we should not view Ohio 1 as being moved

16   out of play?

17             MR. SHEEHY:  Objection to form.

18        A.   I mean, I personally would have -- I

19   can't speak to anybody else because I don't

20   remember, you know, hearing the opinion from

21   one person or the other.  I would have

22   characterized Ohio 1 and Ohio 15 as lean

23   Republican, but not moved out of play.  So I

24   would have disagreed with this, their inclusion

25   on this slide.

1          A. Kincaid - CONFIDENTIAL

2     Q.   Did you ever say that to anybody?

3          MR. SHEEHY:  Objection to form.

4     A.   I don't recall whether I did or not.

5     Q.   Do you recall if anybody else -- you

6  didn't make the decision, like you say, to

7  include this.

8     A.   Right.

9     Q.   Include Ohio 1 and -- you didn't make

10  the decision to include Ohio 1 and 15 on this

11  slide?  That was not your decision?

12          MR. SHEEHY:  Objection to form.

13     Q.   Right?

14     A.   I don't recall -- as I said before, I

15  don't recall what the process was for deciding

16  what districts were or were not included in

17  this, apart from just coming up organically in

18  a conversation.

19     Q.   But I thought you testified before it

20  wasn't your decision as to --

21     A.   It wasn't my lone decision, is what I

22  was trying to say.  If I said my decision, it

23  would not have been something that I made the

24  choice on by myself that this seat did or did

25  not move out of play.

 1              A. Kincaid - CONFIDENTIAL

 2        Q.    Did anybody ever say the working

 3    assumption of considering Ohio 1, anybody ever

 4    say it -- let me back up.

 5              You said your personal view is Ohio 1

 6    and 15 should not have been on this slide, but

 7    you never communicated that to anybody if I

 8    understand correctly.

 9        A.    I didn't say that.  I said I don't

10    recall ever communicating that.

11        Q.    You don't recall communicating.

12              Do you recall if anybody else ever

13    communicated that?

14              MR. SHEEHY:  Objection to form.

15        A.    I have no recollection of it.

16        Q.    What about Ohio 12?

17        A.    My answer's the same for all three

18    Ohio districts, I don't recall it coming up.

19        Q.    Your personal view is you think they

20    should have been on lean Republican and not

21    moved out of play?  Or is that not true for

22    Ohio 12?

23        A.    My personal view is that -- and these

24    are my own thoughts obviously which I think

25    would fall under First Amendment; right?

```
 1                A. Kincaid - CONFIDENTIAL
 2              MR. SHEEHY:  Yeah.  Objection to
 3        form.
 4        A.   I mean, my own personal thoughts on
 5   this, anything below an R+10 is not moved out
 6   of play.  So --
 7        Q.   I see.  So -- thank you.  And so --
 8   thank you.  But somebody, or groups, more than
 9   one person, in thinking about what districts
10   should be on this slide, were applying a
11   different criteria; correct?  Because lots of
12   these are less than R+10; correct?
13              MR. SHEEHY:  Objection to form.
14        A.   Yes, a lot of these are less than
15   R+10, and we've either lost or almost lost most
16   of these over the course of the decade.
17        Q.   But the three Ohio seats Republicans
18   retained over the course of the decade;
19   correct?
20        A.   Ohio 12 is one of the ones that we
21   almost lost last year in a special election.
22        Q.   But still won?
23        A.   We still won.
24        Q.   And Ohio 1 and 15 is considered --
25   consistently voted Republican, correct, for the
```

                    A. Kincaid - CONFIDENTIAL

2    last four election cycles?

3         A.   '12, '14, '16 -- yes, it's been four

4    election cycles since the redistricting.  Yes,

5    but the state of Ohio's also moved further

6    right than it used to be too.  So the state as

7    a whole has trended more Republican.

8         Q.   It varies by election, but that's

9    another conversation.  We can have that one

10   offline.

11            I take it you don't remember the

12   criteria for the cutoff point for deciding

13   whether a district would be moved out of play

14   or not.

15        A.   I don't think there was a firm

16   criteria.

17        Q.   But the working assumption at the

18   time was that R+6 or even R+5 or more were

19   moved out of play?  In one case an R+4; is that

20   right?

21            MR. SHEEHY:  Objection to form.

22        A.   These are all on these slides for

23   different reasons, I'm sure.  Some of it was

24   probably based off of old saws, old

25   assumptions, whether an incumbent was running

1              A. Kincaid - CONFIDENTIAL

2    again, all sorts of things like that.

3        Q.   I see.

4        A.   So there was not one set of firm

5    criteria.  There are plenty of R+9 down to R+4

6    districts in the country that aren't on this

7    slide, so --

8        Q.   So this reflected the -- several

9    sources of information about these districts?

10       A.   It was -- yes.

11       Q.   Okay.  It was the NRCC's holistic

12   assessment of the districts that resulted in

13   the working assumption to have them on the

14   slide?

15            MR. SHEEHY:  Objection to form.

16       A.   I wouldn't say a holistic assessment.

17   The NRCC, I think it was probably -- again, I

18   don't really recall what they -- who made the

19   final decision on what districts were or were

20   not included on this, so I couldn't say.  But I

21   can tell you it wasn't a -- I wouldn't call it

22   a holistic NRCC decision.

23       Q.   Okay.

24       A.   Probably varied from district to

25   district and state to state.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Let me ask you a question.   To whom

3    was this PowerPoint shown?

4          A.   I have no idea.   I never gave this

5    presentation, so I don't know who gave it.

6          Q.   Okay.   Do you know whether it was

7    distributed to members of Congress?

8               MR. SHEEHY:   Objection to form.

9          A.   I have no idea.

10         Q.   Was this used by the NRCC in terms of

11   trying to figure out how to prioritize its

12   efforts in Congressional elections?

13              MR. SHEEHY:   Objection to form.

14         A.   No.   This isn't a targeting document;

15   this is a presentation document, so this is a

16   document that you would use for briefing

17   somebody or something, some group.

18         Q.   But you don't know who?

19         A.   I wasn't in the meetings of those

20   briefings so I don't know.

21         Q.   Okay.   Just so we're clear -- I think

22   we have covered this.   You've already said

23   these are authentic documents so we don't have

24   to go through that again.   Let me see.

25              MR. FRAM:   I'm going to mark next

1          A. Kincaid - CONFIDENTIAL

2          as 81 a document, another PowerPoint,

3          REV -- that's a lot of zeroes.  Okay,

4          REV_00000003.

5          (Exhibit No. 81 was marked for

6          identification.)

7               MR. FRAM:  It's a PowerPoint

8          entitled Redistricting.  And metadata

9          will be 82.

10          (Exhibit No. 82 was marked for

11          identification.)

12     BY MR. FRAM:

13          Q.   Now, this one, look at the metadata.

14     You appear to have been the custodian of this

15     document when it was -- as it's produced to us.

16          A.   Yes.

17          Q.   And do you recognize this document?

18          A.   Yes.

19          Q.   Did you create any of the content in

20     this document?

21          A.   As we talked about before, I would

22     have provided -- yeah, I would have provided a

23     lot of the content for this.

24          Q.   Was this also a presentation

25     document?

1          A. Kincaid - CONFIDENTIAL

2          A.   Yes.

3          Q.   Is it fair to say it's an authentic

4     document of the NRCC?

5          A.   Yes.

6          Q.   And the metadata has a date created

7     of January 12, 2012.

8               Do you see that?

9          A.   Yes.

10         Q.   And then modified in August 14, 2012?

11         A.   Yes.

12         Q.   Remind me, when did you leave the

13    NRCC?

14         A.   Not until 2013.

15         Q.   So you were still there during this

16    time?

17         A.   Uh-huh.

18         Q.   Okay.  Do you recall working on this

19    document while you were at the NRCC?

20         A.   Yes.

21         Q.   Turning to the slide third from the

22    end entitled "R seats moved out of play."

23               Do you see that?

24         A.   I see it.

25         Q.   Did you provide the PVI data in this

1                A. Kincaid - CONFIDENTIAL

2     slide?

3          A.    Yeah, PVI and the changes numbers.

4          Q.    And the changes are the ones in the

5     brackets; is that right?

6          A.    In the parentheses.

7          Q.    I'm sorry, in the parentheses.  Okay.

8     Do you recall there being any discussion about

9     this document in particular as distinct from

10    the other PowerPoint?

11                MR. SHEEHY:  Objection to form.

12          A.    It would have been the same content

13    in both of the presentations.  It's just easier

14    that way.

15          Q.    I understand.

16          A.    Yeah, the origins of this would have

17    been the exact same as the origins of the other

18    one.

19          Q.    Okay.  Turning to the fourth slide,

20    "Redistricting Highlights," it's partially

21    redacted but there was one line that wasn't,

22    that is:  "Ohio:  Republican map shored up

23    multiple seats for the decade."

24                Do you see that?

25          A.    I do.

1          A. Kincaid - CONFIDENTIAL

2          Q.   Did you contribute that input to this

3    slide?

4               MR. SHEEHY:  Objection to form.

5          A.   That would have been my analysis.

6               MR. FRAM:  I want to mark next

7          as -- Exhibit 82?  Hold on a second.  Is

8          that right?

9               MR. SHEEHY:  82 was the metadata on

10         81.

11              MR. FRAM:  Okay.  Now I'm getting

12         confused.  82 is the metadata --

13              MR. SHEEHY:  Yes.

14              MR. FRAM:  -- on 81?  You're right.

15              THE WITNESS:  You want to take a

16         five-minute bathroom break and come

17         back?

18         (Recess taken.)

19              MR. FRAM:  So let's mark up next --

20         I apologize, I lost my number.  83.

21         Bates number REV_0000021.  It's entitled

22         "Ohio Congressional District Data."

23         (Exhibit No. 83 was marked for

24         identification.)

25              MR. FRAM:  And then make 84 the

1                A. Kincaid - CONFIDENTIAL

2          metadata for that one.

3          (Exhibit No. 84 was marked for

4          identification - WITHDRAWN.)

5     BY MR. FRAM:

6          Q.   Mr. Kincaid, did you create

7     Exhibit 84 -- excuse me, Exhibit 83?

8          A.   Yes.

9          Q.   You did so as part of your ordinary

10    job duties as redistricting coordinator for the

11    NRCC?

12         A.   Yes.

13         Q.   And that's true of all the other

14    documents I asked you about where I asked you

15    if you created them and you said yes; is that

16    right?  Did you create any of them sort of on

17    your own, not as part of your job?

18             MR. SHEEHY:  Does this cause you

19         any concern?  Because that looks like

20         it's coming from an internal --

21             MR. FRAM:  Oh, let me see, hold on.

22             You're saying worried about waiving

23         work product on these?

24             MR. SHEEHY:  I saw a file name that

25         said "Kincaid depo prep."  That's where

1          A. Kincaid - CONFIDENTIAL

2          I got that.

3               MR. FRAM:  Oh, okay.  Let's

4          withdraw -- I don't think it's a

5          concern, but to be safe let's

6          withdraw -- which is this exhibit?  84?

7          No, hold a second, I've got a

8          different -- oh, it's the other side of

9          it.  I get it.

10               All right, let's withdraw

11          Exhibit 84.  We'll just withdraw it.

12          Thank you.

13               MR. SHEEHY:  You're welcome.

14               MR. FRAM:  I'm not real worried

15          about it, but why not?

16     BY MR. FRAM:

17          Q.   Anyway, you're checking to see if any

18     of these were created outside the scope of

19     doing your job.  The ones you said you --

20          A.   I'm just looking real quick.

21          Q.   Sure.  That's fine.

22          A.   I don't want to say yes --

23          Q.   I appreciate your being careful.

24          A.   -- if this is not accurate.

25          Q.   I appreciate your being careful.

1                   A. Kincaid - CONFIDENTIAL

2       A.   These all would have been produced

3   over the course of my normal work at the NRCC.

4   Or I would have contributed to them in the

5   sense of the PowerPoints as part of my normal

6   work at the NRCC.

7       Q.   So we're clear for the record, you're

8   reviewing all the exhibits that were marked

9   today.

10      A.   Yes.

11      Q.   Looking at Exhibit 83, do you have

12  any recollection as to why you created this

13  document?

14                  MR. SHEEHY:  Objection to form.

15      A.   It's a standard profile of the

16  districts in Ohio.  We would have had one of

17  these for every state.  It's just a standard

18  thing that we created.

19      Q.   Do you recall who if anyone you would

20  have communicated this to?

21                  MR. SHEEHY:  Objection to form.

22      A.   This would have been available to

23  anybody who was a member of the NRCC or staff

24  who requested it.

25      Q.   Do you recall any conversations about

```
 1              A. Kincaid - CONFIDENTIAL
 2    it with anyone?
 3              MR. SHEEHY:  Objection to form.
 4         A.   This would have been the document
 5    that everybody had in front of them for
 6    meetings about Ohio.  So I mean, any -- not any
 7    particular meeting about this specific
 8    document.  It's just a pretty standard profile
 9    of the districts in Ohio.
10              MR. FRAM:  I'm going to mark next
11         as -- this will now be Exhibit 84
12         because we withdrew the other one.  It's
13         REV_0000001 and it's entitled
14         "State-by-State Redistricting Summary."
15         (Exhibit No. 84 was marked for
16         identification.)
17              MR. FRAM:  And here as 85 are the
18         metadata for REV -- for that same
19         PowerPoint, REV_00000001.
20         (Exhibit No. 85 was marked for
21         identification.)
22    BY MR. FRAM:
23         Q.   Let me draw your attention to the
24    fourth page of the document.  And I should ask,
25    so do you recognize this?  I know a lot of it's
```

1                    A. Kincaid - CONFIDENTIAL

2    redacted, but do you recognize this, the part

3    here about Ohio that's on the page?

4         A.    Yes.

5         Q.    Did you create that content?

6         A.    Yes.

7         Q.    Did you do this as part of your

8    ordinary job duties as redistricting

9    coordinator of the NRCC?

10        A.    Yes.

11        Q.    And looking at the metadata,

12   Exhibit 85 indicates a date modified of

13   February 6, 2012.

14              Do you see that?

15        A.    Yes.

16        Q.    And it also indicates a date first

17   created, October 26, 2011.

18              Do you see that?

19        A.    I do.

20        Q.    So is it your recollection that you

21   wrote those words sometime after December 15,

22   2011 when Ohio redistricting was complete?

23        A.    That would likely have been the case,

24   yes.

25        Q.    And likely before February 6, 2012?

1                A. Kincaid - CONFIDENTIAL

2        A.    It would have been before February 6.

3        Q.    Okay.  You see the words "the new map

4   should be a 12-4 map"?

5              Do you see that?

6        A.    Yes.

7        Q.    Those were your words?

8        A.    Yes.

9        Q.    Do you recall if this document was

10  used internally at the NRCC for communications

11  amongst senior staff at the NRCC?

12             MR. SHEEHY:  Objection to form.

13       A.    It would have been a briefing

14  available to members and staff at the NRCC.

15       Q.    Okay.  Do you recall any discussion

16  about Ohio related to this document?

17             MR. SHEEHY:  Objection to form.

18       A.    I don't recall any discussion on this

19  document, no.

20       Q.    I'll ask you a few questions from the

21  previous deposition you weren't able to answer.

22  I believe you said that previously -- I asked

23  whether you sort of spoke with Guy Harrison

24  about redistricting in Ohio in 2011.  And then

25  I asked you what did you talk with about, and

1           A. Kincaid - CONFIDENTIAL

2    you were instructed not to answer, so now I'm

3    going to ask the question again.  What did you

4    talk with Mr. Harrison about as regards

5    redistricting in Ohio in 2011?

6              MR. SHEEHY:  Objection to form.

7         A.    He was the executive director at the

8    NRCC, so I would have talked to him about the

9    process, when a map was passed, my analysis of

10   any passed maps, how the proposal process was

11   coming along.  It was my job to keep him

12   briefed on what the overall redistricting

13   process was in the states.

14        Q.    Do you recall anything he had to say?

15             MR. SHEEHY:  Objection to form.

16        A.    No.

17        Q.    Did you talk to him during the time

18   when you were not just doing the Congressional

19   proposal but also doing the analysis of the

20   Ohio maps?

21             MR. SHEEHY:  Objection to form.

22        A.    Did I talk to him -- did I talk to

23   the executive director of the NRCC while

24   working on proposal maps for Ohio?

25        Q.    Not just -- start with that.

1          A. Kincaid - CONFIDENTIAL

2          A.    Of course.

3          Q.    What about after the proposal went to

4    the Ohio legislative leadership, did you talk

5    with him?

6               MR. SHEEHY:  Objection to form.

7          A.    Specifically about Ohio?

8          Q.    Yes.

9          A.    I don't recall talking to Guy about

10   Ohio after the proposal was -- you know, after

11   the map had been passed or anything, so --

12         Q.    I'm talking about between the time

13   the proposal went and the time HB 369 was

14   finally enacted.

15         A.    369 or 319?

16         Q.    369.  During that period, between the

17   time the proposal was provided and 369 was

18   enacted, do you recall any discussions with

19   Mr. Harrison about Ohio?

20         A.    We would have talked about 319.

21         Q.    Okay.  What do you recall about that?

22              MR. SHEEHY:  Objection to form.

23         A.    We would have a standard meeting

24   with -- as part of the meetings, we would go

25   through states that had completed

1                    A. Kincaid - CONFIDENTIAL

2    redistricting, we'd go through the districts

3    and talk about those in analytical documents

4    you've already gone through, and say hey, here

5    is the numbers on the new map, here's the

6    districts we should be targeting in the next

7    election, all that sort of stuff like we've

8    already talked about.  So Guy would have been

9    one of the people that I was talking to about

10   those maps after they'd been passed.

11       Q.   What about the 369?

12            MR. SHEEHY:  Objection to form.

13       A.   We would have had the same meeting

14   again.

15       Q.   Okay.  And you had discussions with

16   him during the time 369 was pending, after it

17   was introduced in the legislature before it was

18   passed?  Did you have any conversations with

19   him?

20            MR. SHEEHY:  Objection to form.

21       A.   I don't have any memory of that.

22       Q.   Do you recall any conversations with

23   anybody at NRCC senior staff regarding Ohio

24   during the time between when HB 369 was

25   introduced and the time it was enacted?

1                   A. Kincaid - CONFIDENTIAL

2                   MR. SHEEHY:  Objection to form.

3          A.   No, I don't recall any conversations

4   about 369 during that period.

5          Q.   Do you recall any conversations about

6   a referendum possibility on HB 319?

7                   MR. SHEEHY:  Objection to form.

8          A.   I know there was a referendum

9   possibility going on that would have come up as

10  something I would have briefed senior staff on

11  when we found out about it and while that was

12  developing, yes.

13         Q.   At some point, did you get any

14  information that the Democrats would be

15  unlikely to collect sufficient number of

16  signatures to get the referendum on the ballot?

17                  MR. SHEEHY:  Objection to form.

18         A.   I don't recall getting that

19  information or not.

20         Q.   Do you recall any information as to

21  whether or not the referendum was affecting one

22  way or the other negotiations regarding HB 369?

23                  MR. SHEEHY:  Objection to form.

24         A.   I may have received an email about

25  that, but I don't have a specific recollection

1                A. Kincaid - CONFIDENTIAL

2    of it.  What you just said sounds like

3    something I've heard before but I don't recall

4    when or where I would have heard that.

5         Q.   Do you remember Dr. Hofeller ever

6    raising that subject with you?

7               MR. SHEEHY:  Objection to form.

8         A.   It's entirely possible but I don't

9    have a specific recollection of it.

10        Q.   Did you talk with Jessica Furst -- I

11   believe her name is now Jessica Furst

12   Johnson -- regarding redistricting in Ohio in

13   2011?

14              MR. SHEEHY:  Objection.  I will

15         note that Jessica Furst Johnson was the

16         general counsel at the NRCC, so I'll

17         caution the witness not to reveal any

18         attorney-client communications.

19        A.   I definitely -- I spoke with Jessica.

20        Q.   Okay.  Did you share any of the

21   change sheets we've looked at in your

22   deposition with Jessica Furst?

23              MR. SHEEHY:  Same objection, and

24         same cautionary instruction.  If you

25         were sharing that information with her

1           A. Kincaid - CONFIDENTIAL

2           for purposes of obtaining legal advice,

3           I would caution you to not -- or

4           instruct you to not answer the question.

5       A.   After the map was passed she would

6   have received changes or district profiles if

7   she wanted them, but I don't recall whether I

8   gave it to her or not.

9       Q.   What about Mike Shields?  Did you

10  talk with him about redistricting in Ohio in

11  2011?

12           MR. SHEEHY:  Objection, form.

13      A.   Yes.

14      Q.   What do you recall about those

15  conversations?

16           MR. SHEEHY:  Objection to form.

17      A.   He was the political director at the

18  NRCC at the time, so my answer's going to be

19  the exact same as Guy's.  We would have talked

20  about redistricting in Ohio after 319, we would

21  have talked about it after 369, as part of our

22  standard processes at the NRCC to talk about

23  maps as they were created.

24      Q.   Would Mr. Shields as political

25  director have an interest in understanding

1                A. Kincaid - CONFIDENTIAL

2       which districts had moved out of play as a

3       result of redistricting?

4                MR. SHEEHY:  Objection to form.

5            A.   He would have had an interest in the

6       districts in Ohio, yes.  Which ones had

7       gotten -- had -- and how they had changed from

8       one redistricting to the other.

9        Q.   Did he ever say anything you can

10      recall about a district being moved out of play

11      or not?

12               MR. SHEEHY:  Objection to form.

13       A.   I have no specific recollection about

14      Mike saying something about that.

15       Q.   What about Mr. Harrison?

16               MR. SHEEHY:  Objection to form.

17       A.   Same answer.

18       Q.   What about Brock McCleary?  Did you

19      talk with him about Ohio in 2011, Congressional

20      redistricting?

21               MR. SHEEHY:  Objection to form.

22       A.   Also -- he was the deputy political

23      director.  Same conversations would have

24      happened with him as with Mike and Guy.  And

25      again, I don't remember any specific

1          A. Kincaid - CONFIDENTIAL

2     conversations.

3          Q.    What about Paul Lindsay?

4               MR. SHEEHY:  Objection to form.

5          A.    I give the exact same answer on Paul.

6          Q.    Did you have any communications with

7     Bob Bennett in Ohio about redistricting in Ohio

8     in 2011?

9          A.    No.

10          Q.    I want to ask you about conversations

11     with certain individual members of Congress

12     which you testified happened.  We discussed to

13     some degree Representative Tiberi.  Other than

14     what you've already testified about do you

15     recall any other conversations with

16     Representative Tiberi in 2011?

17               MR. SHEEHY:  Objection to form.

18          A.    Not in addition to what we already

19     spoke about.

20          Q.    Okay.

21               MR. FRAM:  Mark next as 85 -- I'm

22          sorry, 86, a document with Bates number

23          TIBERI000039.

24          (Exhibit No. 86 was marked for

25          identification.)

1          A. Kincaid - CONFIDENTIAL

2                    MR. FRAM:  Why don't we mark as 87

3          the metadata for that document.

4          (Exhibit No. 87 was marked for

5          identification.)

6    BY MR. FRAM:

7          Q.   Mr. Kincaid, do you recognize this

8    document, Exhibit 86?

9          A.   Yes.

10         Q.   You prepared it in the ordinary

11   course of your job duties at the NRCC; is that

12   right?

13         A.   Yes.

14         Q.   And did you present this to

15   Representative Tiberi?

16                   MR. SHEEHY:  Objection, form.

17         A.   I don't recall presenting this to

18   Mr. Tiberi, no.

19         Q.   Do you have any understanding as to

20   why he would have it in his files and produce

21   it to us?  You created it and -- do you recall

22   how he got it?

23                   MR. SHEEHY:  Objection to form.

24         A.   He was a member of Congress and

25   thereby a member of the NRCC.  He could have

1          A. Kincaid - CONFIDENTIAL

2    requested this from any number of members of

3    the staff at the NRCC because this file would

4    have been on the servers at the NRCC.

5          Q.   Got it.  This particular spreadsheet

6    just focuses only on Mr. Tiberi's district,

7    District 12; is that right?

8          A.   Yes.

9          Q.   And per the metadata it appears to

10   have been modified on December 14, 2011.  Is

11   that right?

12         A.   That's what this says, yes.

13         Q.   Okay.  Did you create

14   district-specific spreadsheets after HB 369 was

15   enacted?

16         A.   Yes.

17         Q.   And then they were posted on the

18   NRCC's website; is that right?

19         A.   No.  I said the server.

20         Q.   The server.  I'm sorry.  The server.

21   I apologize.  They were posted on NRCC's

22   server; is that right?

23         A.   Yes.

24         Q.   So you included the election results

25   data in the district-specific spreadsheets that

1          A. Kincaid - CONFIDENTIAL

2    you created after HB 369 was enacted and that

3    were posted on the NRCC server; correct?

4              MR. SHEEHY:  Object to form.

5         A.   I'm sorry.  I missed the first part.

6         Q.   You included election result data on

7    all of the district-specific spreadsheets for

8    Ohio after HB 369 was enacted and that were

9    then posted on the NRCC's server.

10        A.   Yes.

11             MR. SHEEHY:  Objection to form.

12        Q.   These are the same elections we have

13   seen in your other spreadsheets; correct?

14        A.   Yes.

15        Q.   And just for the record so we have a

16   clean record those are consistently, the 2010

17   governor race, the 2010 Attorney General race,

18   the 2008 Presidential race, the 2006 Attorney

19   General race, 2006 auditor race, and the 2004

20   President race; correct?

21        A.   Yes.

22        Q.   Okay.  You would always include also

23   the PVI scorings; correct?

24        A.   Yes.

25             MS. McKNIGHT:  Before we move on

1      A. Kincaid - CONFIDENTIAL

2   from this exhibit, I note that it does

3   not indicate CONFIDENTIAL on the face of

4   the exhibit.  This is Exhibit 86.

5       MR. FRAM:  Yeah.

6       MS. McKNIGHT:  I trust -- I believe

7   this was produced as confidential under

8   the protective order.  I'd just like to

9   note that for a clean record.

10      MR. FRAM:  That's fine.  I had -- I

11  thought only addresses were, but I'm

12  happy to -- let's do the following.  The

13  last piece -- let's slow down for a

14  minute.

15      MS. McKNIGHT:  I believe at the

16  beginning -- and pardon me, counsel.  I

17  have been thinking it through.  At the

18  beginning you addressed confidentiality,

19  and I understand Mr. Kincaid's counsel

20  will review the transcript.  I just want

21  to note that we as well, representing

22  interveners and other clients who

23  produced documents in this case, will

24  also need to review the transcript for

25  confidentiality.  As a preliminary

1          A. Kincaid - CONFIDENTIAL

2          matter, I will designate all testimony

3          about Exhibit 86 and Exhibit 87 as

4          confidential.

5               MR. FRAM:  Okay.  See how it goes.

6          Let's mark as Exhibit 88 REV_00000034,

7          another spreadsheet for District 12.

8          (Exhibit No. 88 was marked for

9          identification.)

10    BY MR. FRAM:

11         Q.   Comparing the two spreadsheets,

12    Exhibit 88 and 86, they appear to be identical,

13    do they not?

14         A.   Yes.

15         Q.   So your testimony regarding 86 would

16    apply to 88 also?

17         A.   Yes.

18         Q.   Okay.

19               MR. FRAM:  Kate and Shawn, I'll let

20          you-all work out between the two of you

21          if you still got -- who's got the ball

22          on the confidentiality question.  This

23          one seems to get around.

24          Why don't we mark next as 89

25          REV_0000030, a spreadsheet concerning

1                  A. Kincaid - CONFIDENTIAL

2          District 8.

3          (Exhibit No. 89 was marked for

4          identification.)

5                  MR. FRAM:  And let me take a look

6          here.

7    BY MR. FRAM:

8          Q.   Mr. Kincaid, do you recognize this

9    document?

10         A.   Yes.

11         Q.   You created it in the ordinary course

12   of your job duties as redistricting coordinator

13   at the NRCC; correct?

14                 MR. SHEEHY:  Objection to form.

15         A.   Yes.

16         Q.   You did so following the enactment of

17   HB 369; correct?

18         A.   No.

19         Q.   When did you do this?

20         A.   This is not HB 369.

21         Q.   What is this one?

22         A.   Since you gave me the sheet before,

23   it showed HB 369 with Mr. Boehner's seat at PVI

24   of R+14.

25         Q.   Okay.

1          A. Kincaid - CONFIDENTIAL

2          A.    So I don't know what this one is.

3          Q.    So that raises an important question.

4    So did you provide -- in addition to providing

5    district-specific spreadsheets after the full

6    enactment of HB 369, did you also provide

7    district-specific spreadsheets with election

8    results while -- prior to the final enactment

9    of HB 369?

10          MR. SHEEHY:  Objection to form.

11          A.    Clearly, I did.  This does not apply

12    to 369.  I'm not sure what plan this is.

13          Q.    Did you do -- did you only provide

14    district-specific spreadsheets after a plan was

15    actually enacted, in other words, 319 and 369,

16    or did you also do them for iterations that

17    were being considered?

18          MR. SHEEHY:  Objection to form.

19          A.    I think -- well, let me think about

20    that.  I would have produced district-specific

21    profiles when they had been requested.

22          Q.    Okay.

23          A.    So it may have been before 319, it

24    may have been after 319, it could have -- so --

25          Q.    And those -- but those profiles

1                A. Kincaid - CONFIDENTIAL

2    always included election result status;

3    correct?

4         A.   Absolutely.

5         Q.   For the last elections we have been

6    discussing previously; correct?

7         A.   Yes.

8         Q.   And it always included PVI data;

9    correct?

10         A.   Yes.  I'm going to note real quick

11    that the previous one we looked at -- I'm

12    trying to find it.

13              MR. SHEEHY:  Talking about Tiberi?

14              THE WITNESS:  Exhibit 89/88.  Well,

15         I guess Exhibit 88 and 86.

16              MR. SHEEHY:  I've got them here.

17              THE WITNESS:  I'm just looking at

18         something real quick.  Yeah, that's what

19         I thought.  The -- yeah, that Tiberi 12

20         is also not 369.  The numbers are

21         different.

22    BY MR. FRAM:

23         Q.   Okay.  So tell me if I understand

24    correctly.  You created district-specific

25    spreadsheets as requested.  They were posted on

1              A. Kincaid - CONFIDENTIAL

2    the NRCC's server.  Is that right?

3         A.   Yes.

4         Q.   It always included election data for

5    the six elections you've described; correct?

6         A.   Yes.

7         Q.   And PVI data; correct?

8         A.   Yes.

9         Q.   Okay.

10        A.   But that Tiberi 1, I may have

11   misspoken before.  I can't remember if you

12   asked me the question, but that Exhibit 87 --

13   86, 87, and 88 do not appear to be the profiles

14   for the current Ohio Congressional map.

15        Q.   Thank you for that.

16             In addition to posting it on the NRCC

17   website, was there any other way to --

18        A.   Not website.  Server.

19        Q.   Server.  I'm sorry.  I keep saying

20   it.  Other than the NRCC server was there any

21   other way that district-specific spreadsheets

22   were distributed?

23             MR. SHEEHY:  Objection to form.

24        A.   I would post on the server so the

25   staff had access to them.  And then I don't

```
 1              A. Kincaid - CONFIDENTIAL
```

2 have any specific recollection of sharing them

3 via email or anything else with anybody, but I

4 certainly could have emailed to it somebody,

5 but I don't have any recollection of doing

6 that.

7        Q.    Who had access to the NRCC server, if

8 anyone, other than NRCC staff?

9        A.    Only NRCC staff.

10       Q.    Okay.   Would RNC staff have had

11 access?

12              MR. SHEEHY:   Objection to form.

13       A.    No.

14              MR. FRAM:   Mark as 90 REV_00000026.

15       It says district-specific spreadsheet

16       for District 4.

17       (Exhibit No. 90 was marked for

18       identification.)

19 BY MR. FRAM:

20       Q.    Mr. Kincaid, do you recognize this

21 document?

22       A.    Yes.

23       Q.    You produced it.   You created it as

24 part of your ordinary job duties as

25 redistricting coordinator at the NRCC; correct?

1          A. Kincaid - CONFIDENTIAL

2          A.   Yes.

3          Q.   In connection with redistricting in

4    Ohio in 2011?

5          A.   Yes.

6          Q.   And after you did that, it was posted

7    on the NRCC server; is that right?

8          A.   Yes.

9          Q.   It contains the same elections, six

10   elections we've discussed previously as well as

11   the PVI data; correct?

12         A.   Yes.  I'll point out again, this

13   isn't 369.

14         Q.   Yeah, I didn't ask that, I just --

15   it's during the course of the redistricting

16   this information was generated and posted;

17   correct?

18         A.   Yes.

19         Q.   So NRCC staff and/or members of

20   Congress could access it; correct?

21         A.   Members of Congress would have had to

22   request it from somebody on staff.

23         Q.   Okay.  Do you recall any requests

24   from any members of Congress for it?

25         A.   Not --

```
 1              A. Kincaid - CONFIDENTIAL

 2              MR. SHEEHY:  Objection to form.

 3         A.   Not explicitly.

 4         Q.   Would the requests have come to you

 5   or would they have come through some other

 6   person?

 7              MR. SHEEHY:  Objection to form.

 8         A.   Members had access to anybody at the

 9   NRCC they wanted to ask.

10         Q.   Okay.

11              MR. FRAM:  Let's see if we can move

12         this faster on a batch basis because the

13         questions are going to be the same for

14         all these, okay?  We are up to 91,

15         right?

16              THE REPORTER:  Yes, sir.

17              MR. FRAM:  Why don't we mark as 91

18         REV_00000028 -- let's see, six zeroes

19         and 28, a district-specific spreadsheet

20         for District 6.

21         (Exhibit No. 91 was marked for

22         identification.)

23              MR. FRAM:  As 92, REV_00000024,

24         district-specific spreadsheet for

25         District 2.
```

1      A. Kincaid - CONFIDENTIAL

2      (Exhibit No. 92 was marked for

3      identification.)

4      (Exhibit No. 93 was marked for

5      identification.)

6          MR. FRAM:  As 93, REV_00000027, a

7      district-specific spreadsheet for

8      District 5.

9      (Exhibit No. 94 was marked for

10     identification.)

11         MR. FRAM:  As 94, REV_00000029, a

12     district-specific spreadsheet for

13     District 7.

14     (Exhibit No. 95 was marked for

15     identification.)

16         MR. FRAM:  And as 95, REV_00000023,

17     a district-specific spreadsheet for

18     District 1.

19     (Exhibit No. 96 was marked for

20     identification.)

21         MR. FRAM:  And then REV_96 I guess

22     we're up to, REV_00000037 a

23     district-specific spreadsheet for

24     District 15.

25     (Exhibit No. 97 was marked for

1          A. Kincaid - CONFIDENTIAL

2          identification.)

3               MR. FRAM:  97 is REV_00000032, a

4          district-specific spreadsheet for

5          District 10.

6          (Exhibit No. 98 was marked for

7          identification.)

8               MR. FRAM:  98 is REV_00000038, a

9          district-specific spreadsheet for

10          District 16.

11          (Exhibit No. 99 was marked for

12          identification.)

13               MR. FRAM:  And as 99, REV_00000036,

14          a district-specific spreadsheet for

15          District 14.

16     BY MR. FRAM:

17          Q.  My questions are going to be the same

18     for all these exhibits.  Hopefully it works.

19               For all these exhibits we're looking

20     at here, which start at 91 and go through 99,

21     why were all these -- did you create all of

22     these?

23          A.  Yes.

24          Q.  Did you do so as part of your

25     ordinary job duties at redistricting

```
 1              A. Kincaid - CONFIDENTIAL
 2   coordinator at the RNCC?
 3           A.    The NRCC.
 4           Q.    I'm sorry, the NRCC.
 5           A.    Yes.
 6           Q.    And did you do so in connection with
 7   redistricting in Ohio in 2011?
 8           A.    Yes.
 9           Q.    And in so doing, did you always
10   include -- you included the same six elections;
11   is that right?
12           A.    Yes.
13           Q.    And that's the 2010 governor, the
14   2010 Attorney General, the 2008 President, the
15   2006 Attorney General, the 2006 auditor, and
16   the 2004 President; correct?
17           A.    Yes.
18           Q.    And also, you included, consistently
19   included PVI on scoring information; correct?
20           A.    Yes.
21           Q.    And after you created these
22   district-specific spreadsheets, they were
23   posted on the NRCC server; correct?
24           A.    Yes.
25           Q.    Do you recall distributing these to
```

1           A. Kincaid - CONFIDENTIAL

2    anybody else?

3              MR. SHEEHY:  Objection to form.

4      A.   As I said before, I don't have any

5    specific recollection of distributing them.

6      Q.   Any general recollection?

7              MR. SHEEHY:  Objection to form.

8      A.   They would have been available if

9    anyone asked, but I don't have any general

10   recollection of having a standard process of

11   sending them out, no.

12     Q.   Do you recall anybody asking for

13   them?

14             MR. SHEEHY:  Objection to form.

15     A.   No.  Once they were on the server,

16   people could get them if they wanted them,

17   so --

18     Q.   Now, I think you previously testified

19   that you had meetings with individual members

20   of Congress during the redistricting process.

21   Is that right?

22     A.   I did.

23     Q.   And did you meet with them during the

24   time you were formulating the proposal for the

25   Ohio legislator -- legislature?

```
 1              A. Kincaid - CONFIDENTIAL

 2              MR. SHEEHY:  Objection to form.

 3         A.   Yes.

 4         Q.   Did you meet with them thereafter?

 5              MR. SHEEHY:  Objection to form.

 6         A.   Yes.

 7         Q.   And at the meetings you had with them

 8    did you ever show them the district-specific

 9    spreadsheets for their districts?

10              MR. SHEEHY:  Objection to form.

11         A.   Yes.

12         Q.   Did you show them on the computer

13    screen or in hard copy?

14              MR. SHEEHY:  Objection to form.

15         A.   Computer screen, probably.

16         Q.   Okay.  And these meetings continued

17    after HB 319 was enacted?

18              MR. SHEEHY:  Objection to form.

19         A.   Yes.

20         Q.   And they continued up until the time

21    when HB 369 was enacted?

22              MR. SHEEHY:  Objection to form.

23         A.   That would cover the same period of

24    time of what you just asked before, so after

25    319 and before 369, yes, meetings happened
```

1          A. Kincaid - CONFIDENTIAL

2    during that period of time.

3          Q.   Okay.   Do you recall any

4    conversations with any members of Congress

5    during the period of time after 319 was enacted

6    and before 369 was enacted?

7               MR. SHEEHY:   Objection to form.

8          A.   I don't recall meeting with specific

9    members, but I'm sure that we met to brief them

10   if they wanted to on the new -- on the

11   districts that had been passed with 319.

12         Q.   And did you brief them about

13   proposals for 369?

14              MR. SHEEHY:   Objection to form.

15         A.   Proposals for 369, which was the

16   second map.

17         Q.   Correct.

18         A.   I don't recall seeing proposals for

19   369 until after the legislature had enacted

20   that one.

21         Q.   Do you recall if -- any information

22   whatsoever about the districts for proposals

23   for 369 while it was pending?

24              MR. SHEEHY:   Objection to form.

25         A.   I don't have any specific

1              A. Kincaid - CONFIDENTIAL

2    recollection of getting maps or -- between 319

3    and 369.

4         Q.   When you received maps did you

5    receive any communications about 369 while it

6    was pending?

7              MR. SHEEHY:  Objection to form.

8         A.   I recall no specific information I

9    received regarding 369 while it was pending.

10        Q.   Do you recall of any conversations

11   with Mr. Whatman about 369 while it was

12   pending?

13             MR. SHEEHY:  Objection to form.

14        A.   I do not.

15        Q.   Did you ever have any communications

16   with Mr. DiRossi while it was pending?

17             MR. SHEEHY:  Objection to form.

18        A.   Not that I recall.

19        Q.   With Ms. Mann?

20        A.   Not that I recall.

21             MR. SHEEHY:  Objection to form.

22        A.   All this was seven years ago, so --

23        Q.   I understand.

24             I take it you're not saying that

25   there were no communications with Ms. Mann or

1              A. Kincaid - CONFIDENTIAL

2    Mr. DiRossi regarding the collaboration while

3    369 was pending, but you're saying because it

4    was seven years ago, as you sit here now, you

5    don't recall.

6              MR. SHEEHY:  Objection to form.

7         A.   I recall being a lot more involved in

8    the process in the run-up to 319.

9              The period of time between 319 and

10   316 while at the NRCC, I spent that time, if it

11   was dealing with Ohio, it was analyzing the 319

12   map because that was the map until something

13   else had been passed.

14              So I don't recall being involved,

15   definitely not as intensely with the drafting

16   of 369 as I had been with 319.

17        Q.   All right.

18        A.   And I don't recall any conversations

19   with Heather, Ray, or Tom regarding 369 while

20   it was being considered.

21        Q.   My question is -- there are two

22   different things.  One is whether you recall;

23   the other is whether you can say affirmatively

24   that communications did not happen.

25        A.   Again, I --

```
 1            A. Kincaid - CONFIDENTIAL
 2       Q.    They're different statements.
 3            MR. SHEEHY:  Objection to form.
 4       A.    Just to be -- okay, just because I
 5   don't remember it doesn't mean it didn't
 6   happen.  I don't remember.
 7       Q.    That's -- okay, thank you.
 8       A.    I don't recall.
 9       Q.    That's --
10       A.    I don't remember.
11       Q.    That's all I was trying -- okay.
12       A.    Yeah.
13            MR. FRAM:  Why don't we take a
14       quick break?  Actually, one more set of
15       documents we can do before a break, then
16       we can do the break and check notes and
17       thing.
18       Q.    In your last deposition, I'll show
19   you a bunch of exhibits that were marked there
20   and I'd asked you questions about that you
21   couldn't answer because of instructions.
22       A.    Okay.
23       Q.    These already have been marked so we
24   don't have to mark them again.  So first I want
25   to show you what was marked as Kincaid
```

1           A. Kincaid - CONFIDENTIAL

2    Exhibit 11.

3           (Exhibit No. 11, previously marked, was

4           referenced and indexed.)

5    BY MR. FRAM:

6       Q.   Mr. Kincaid, this is -- by the way,

7    it has BRADEN001388 as the Bates number.

8           Do you recognize this map?

9       A.   This?  Do I recognize the map?  Yeah,

10   I recognize it from the previous deposition,

11   yes.

12      Q.   All right.  And in fact, this is one

13   of the maps that you -- district maps that you

14   attached to your emails in September 2 and 3.

15      A.   Okay.

16      Q.   Do you recall that?  Okay.

17          Do you see the -- do you see in the

18   middle the number 09?

19          Do you see that?

20      A.   I do.

21      Q.   Is it your understanding that that's

22   for District 9; correct?

23      A.   Yes.

24      Q.   Okay.  And do you see under it,

25   there's a minus 13.48?

```
1              A. Kincaid - CONFIDENTIAL
2              Do you see that?
3       A.     Yes.
4       Q.     What's minus 13.48 stand for?
5              MR. SHEEHY:  Objection to form.
6       A.     That would be the PVI.
7       Q.     Okay.  Did you put that in there?
8              MR. SHEEHY:  Objection to form.
9       A.     Well, I created the label, yes.
10      Q.     Okay.  Then you communicated that to
11  to Mr. DiRossi and Ms. Mann in September of
12  2011 when you communicated this map attached to
13  your email?
14             MR. SHEEHY:  Objection to form.
15      A.     This is a Braden email?
16      Q.     No, it's not a Braden email, it's a
17  Braden-produced document.  He received a copy
18  of it.
19      A.     So I -- what's the trail on this one?
20  So I -- you're saying I sent this one to Ray
21  and Heather and then they sent it to Mark or I
22  sent it to Mark?
23      Q.     Let's find the email.  Hold on.  I
24  think I have the document here.  It's Exhibit 7
25  from your last deposition.
```

```
 1              A. Kincaid - CONFIDENTIAL

 2         A.    Okay.

 3         Q.    The email string with Bates number

 4   LWV_0800018302.

 5         A.    Okay.

 6         Q.    And what you see are thumbnails, if

 7   you will, of the maps as attachments to your

 8   September 2, 2011, 6:41 p.m. email.

 9         A.    Okay.

10         Q.    Which was sent to Mr. DiRossi,

11   Ms. Mann, and Tom Whatman.

12         A.    Uh-huh.

13         Q.    My question -- you can't make out the

14   label on this thumbnail but that's why we

15   provided this.

16         A.    Okay.

17         Q.    There's JPEG attachments, and later

18   we see that Mr. Braden received this and then

19   he produced them in discovery in this case.

20   That's why we have the larger rendering.

21         A.    Got it.

22         Q.    Okay?  And so now my question to you

23   is, you put in the PVI value of minus 13.48 for

24   CD 9; correct?

25         A.    Well, the computer would have
```

1              A. Kincaid - CONFIDENTIAL

2    generated that.  I created the formula that

3    would have created that number.

4         Q.   And then you communicated that to

5    Mr. DiRossi and Ms. Mann on or about

6    September 2, 2011; correct?

7         A.   Assuming that JPEG is the same as

8    this one, which I'm not -- I'm still a little

9    fuzzy on -- so Mark has created -- produced

10   this document?

11        Q.   Right.

12        A.   So I don't know where the chain is

13   that we've established that gets -- this email

14   I sent to Ray and Heather on September 2, I

15   don't know how that got to Mark so I don't

16   think I've seen that email.

17        Q.   Maybe I can help you out on that.  If

18   you look on Exhibit 7, page 7 of 8 --

19        A.   Okay.

20        Q.   -- from Heather Mann, September 3,

21   2011 at 8:50 in the morning to Clark Benson or

22   Mark Braden, do you see that?

23        A.   Oh, okay.  Yes, I see that.

24        Q.   At that point, forwarding your email

25   from September 3.

1              A. Kincaid - CONFIDENTIAL

2         A.   I see that.

3         Q.   So that's how the chain works,

4    getting it to Mr. Braden.

5         A.   Okay.

6         Q.   Okay?

7         A.   And just -- I mean, working off of a

8    really small thumbnail and for me to say

9    they're the same document without -- I'm

10   just --

11        Q.   I appreciate that.  That's why we

12   tried to do the work.

13        A.   Right, so -- okay.

14        Q.   To provide you the information.

15        A.   Uh-huh.

16        Q.   So again, you recall sending

17   district-specific maps to Mr. DiRossi and

18   Ms. Mann on or about September 3, 2011?

19        A.   September 2, yes.

20        Q.   September 2, 2011.  And those

21   district-specific maps included PVI values for

22   those districts; correct?

23        A.   It's a -- yes.  It's a screenshot, so

24   yes.

25              THE WITNESS:  Do I need to give

1                    A. Kincaid - CONFIDENTIAL

2            this back to you or put it in the stack?

3                    THE REPORTER:  Put it in the stack.

4                    MR. FRAM:  I want to show what you

5            was marked as Kincaid 13.

6            (Exhibit No. 13, previously marked, was

7            referenced and indexed.)

8    BY MR. FRAM:

9            Q.   This appears to be a

10   district-specific map for District 11; correct?

11           A.   Yes.

12           Q.   Computer generated the number minus

13   29.70 that appears under the number 11;

14   correct?

15           A.   Yes.

16           Q.   And that's the PVI value; correct?

17                    MR. SHEEHY:  Objection to form.

18           A.   Yes.

19           Q.   And you communicated that map with

20   that PVI value to Mr. DiRossi and Ms. Mann on

21   or about September 2, 2011; correct?

22           A.   Yes.

23                    MR. FRAM:  Okay, I'll show you

24           what's previously marked as Kincaid

25           Exhibit 15.

1          A. Kincaid - CONFIDENTIAL

2          (Exhibit No. 15, previously marked, was

3          referenced and indexed.)

4    BY MR. FRAM:

5          Q.   And this appears to be a

6    district-specific map of District 1; is that

7    right?  And also there's a piece of District 2

8    also.

9               Do you see that?

10         A.   Yes.

11         Q.   And the PVI values for both; correct?

12         A.   Yes.

13         Q.   And for District 1, it's 5.54.  Do

14   you see that?

15         A.   I do.

16         Q.   And for District 2, it's 10.01.

17              Do you see that?

18         A.   Yes.

19         Q.   And the computer generated those PVI

20   values and you included them in this map; is

21   that right?

22         A.   Yes.

23         Q.   And then you transmitted that to

24   Mr. DiRossi and Ms. Mann on or about

25   September 2, 2011?

1          A. Kincaid - CONFIDENTIAL

2          A.   Yes.

3               MR. FRAM:   And let's show what was

4     previously marked as Kincaid Exhibit 17.

5     I've marked Kincaid Exhibit 17

6     BRADEN001391.   It appears to be a

7     district-specific map for several

8     different districts, and I'll show it to

9     you.

10         (Exhibit No. 17, previously marked, was

11         referenced and indexed.)

12    BY MR. FRAM:

13         Q.   This map includes PVI information for

14    Districts 9, 11, 14, 13, 16; correct?

15         A.   And 6.

16         Q.   And 6, I'm sorry.   And 6; correct?

17         A.   Yes.

18         Q.   And the computer generated those PVI

19    values and then you inserted them into this

20    map; correct?

21         A.   I inserted -- I created a code

22    that -- within the label that inserted them,

23    yes.

24         Q.   Okay.   And then you transmitted it to

25    Mr. DiRossi and Ms. Mann on or about

1                    A. Kincaid - CONFIDENTIAL

2    September 2, 2011; correct?

3         A.   Yes.

4              MR. FRAM:   Then finally, Kincaid 19

5         is a map of Ohio as a whole that was

6         marked 19.

7         (Exhibit No. 19, previously marked, was

8         referenced and indexed.)

9    BY MR. FRAM:

10        Q.   This is a map that shows all the

11   Congressional districts in Ohio; correct?

12        A.   It -- yes.

13        Q.   And then there are PVI values under

14   each of the district numbers; correct?

15        A.   Yes.

16        Q.   And they appeared because you created

17   a label that enabled you to put PVI values

18   under a Congressional district; correct?

19        A.   Yes.

20        Q.   And that label would include a PVI

21   value?

22        A.   Yes.

23        Q.   Okay.  And this was communicated to

24   Mr. Mann and -- excuse me, Ms. Mann and

25   Mr. DiRossi on or about September 2, 2011;

1          A. Kincaid - CONFIDENTIAL

2     correct?

3          A.   Yes.

4          Q.   Okay.   And so we're clear, all of

5     these district-specific maps with the PVI

6     values that we have been discussing, Kincaid

7     11, 13, 15, 17, and 19 -- did I leave one

8     out? -- I'm going to ask whether or not they

9     were all -- you did that -- you did that work

10    as part of the ordinary course of your job

11    duties as redistricting coordinator at the

12    NRCC.

13         A.   Yes.

14             MR. FRAM:  Okay, now I think we are

15        at that let me take a break and let me

16        look at my notes spot.

17             MR. SHEEHY:   That's fine.

18        (Recess taken.)

19             MR. FRAM:  Exhibit 100 is a map

20        with the name -- with the Bates number

21        BLESSING0012635 [102611 Adam new map]

22        001.

23        (Exhibit No. 100 was marked for

24        identification.)

25    BY MR. FRAM:

1          A. Kincaid - CONFIDENTIAL

2          Q.    Now Heather Blessing -- now Heather

3    Blessing, formerly Heather Mann, and it's the

4    case, and my question is, does this refresh

5    your recollection at any time in October of

6    2011 providing any map to Ms. Blessing?

7          A.    No.

8                MR. SHEEHY:   Objection to form.

9          Q.    No?

10         A.    No.

11         Q.    Do any of these labels look familiar

12   to you?

13               MR. SHEEHY:   Objection to form.

14         A.    This isn't the format I would -- this

15   is a screenshot of something.   It's not the

16   labels I would have used.   I don't know what

17   that top percentage is.

18         Q.    Uh-huh.

19         A.    No, it doesn't reflect -- refresh my

20   recollection.

21               MR. FRAM:  I have no further

22         questions for you.   Thank you very much

23         for your time today.

24               THE WITNESS:  Okay.

25               MR. FRAM:  I should say subject, of

1          A. Kincaid - CONFIDENTIAL

2     course, to follow-up should any other

3     counsel have questions.

4          MR. SHEEHY:  Do you have questions?

5     Go ahead.

6                    EXAMINATION

7  BY MS. McKNIGHT:

8     Q.   Good afternoon, Mr. Kincaid.  I'm

9  Kate McKnight.  I'm here today on behalf of

10  intervenors in this matter.  I'm going to ask

11  you a few questions.

12     A.   Okay.

13     Q.   The first topic I'd like to ask you

14  about relates to Exhibits 2 and 81, if you

15  could put those in front of you.

16     A.   Okay.

17     Q.   You provided testimony earlier today

18  that these documents were briefing documents;

19  is that right?

20     A.   That's correct.

21     Q.   Could these documents have been used

22  for fundraising?

23          MR. SHEEHY:  Objection to form.

24     A.   Exhibit 2 could have been used as a

25  fundraising document.

1          A. Kincaid - CONFIDENTIAL

2      Q.   So the record is clear, looking at

3  Exhibit 2, could that have been used as a

4  fundraising document?

5          MR. SHEEHY:  Objection to form.

6      A.   Hypothetically, Exhibit 2 could be

7  used as a fundraising document, yes.

8          MR. FRAM:  Move to strike,

9      speculation.

10     Q.   Now going to the plan that was

11  enacted in 2011 for Ohio's Congressional

12  districts, are you familiar with how the

13  enacted plan for Ohio's Congressional districts

14  in 2011 relate to any maps you worked on for

15  Ohio's Congressional districts in 2011?

16     A.   When you're talking about enacted

17  maps, are you talking about 319, 369, or both?

18     Q.   I'm talking about 369, the one that

19  was enacted.

20     A.   And how the work I did impacted 369

21  or how it --

22     Q.   How it relates, how it compares.

23          MR. FRAM:  Objection, form.

24     A.   369 was definitely a further

25  iteration from 319.  As I testified earlier, I

1            A. Kincaid - CONFIDENTIAL

2    was definitely much more involved in the

3    process of 319 than I remembered being involved

4    in 369.

5            Like I told Mr. Fram earlier, I don't

6    recall being overly involved in the process of

7    369 so I would say 369 was an iteration from

8    319 that was developed in Ohio, predominantly.

9        Q.   I understood from your testimony

10   earlier today that you prepared proposed maps

11   for members so they could propose them to state

12   legislators.  Is that a fair description of

13   your testimony?

14       A.   That's exactly what my job was at the

15   NRCC.

16       Q.   Based on your familiarity with the

17   enacted map in Ohio for Congressional districts

18   in 2011, do you know if any of the maps you

19   prepared as proposed maps became HB 369?

20       A.   I don't recall a proposed map that I

21   produced that became HB 369.

22       Q.   The next set of questions I have for

23   you have to do with Exhibit 73.  Would you put

24   that in front of you?  My questions relate to

25   certain numbers in this chart and what they

1           A. Kincaid - CONFIDENTIAL

2    mean.  My next questions will relate to the

3    columns under the header New Ohio Map.

4        A.   Okay.

5        Q.   As I see it, there are six elections,

6    and under each election, there are two columns.

7             Do you see that?

8        A.   Yes.

9        Q.   And the way I see it, there is a

10   column on the left for each election, and it's

11   a percentage.  Could you tell us what that

12   percentage indicates in the left column for

13   each election?

14       A.   For the McCain column, that would be

15   the percentage that John McCain got based off

16   of our data in each of those draft districts.

17   The same would apply for Bush.  In 2004 for

18   President Bush; in 2004, his reelection.  In

19   2010 for governor, 2010 for Attorney General,

20   2006 for Attorney General, and 2006 for

21   auditor.  Those would be the Republican

22   nominees' percentage in each of those

23   districts.

24       Q.   So for each election, the percentage

25   on the left column is the percentage of votes

1          A. Kincaid - CONFIDENTIAL

2    cast for the Republican candidate; is that

3    right?

4          A.    Yes.

5          Q.    So in reviewing those percentages,

6    where that percentage is above 50 percent, does

7    that mean that the majority of votes cast in

8    the new district geography were cast for the

9    Republican candidate?

10          A.    Based off of our election data, yes.

11          Q.    And is the same true vice versa,

12    meaning where the percentage on the left-hand

13    column is lower than 50 percent, does that mean

14    that the Republican candidate in that election

15    did not garner a majority of votes in this new

16    district?

17          A.    It's not a two-party vote here.    This

18    is a multi-party vote.    So I'd have to look at

19    the Democrat percentages for Districts 10 and

20    Districts 14, but for the other ones, yes.    For

21    those two, I'm not sure if those are plurality

22    Republican percentages or if those are -- or if

23    the Democrat in those districts received more

24    of the vote.

25                So that would apply to the two 49s in

1                    A. Kincaid - CONFIDENTIAL

2    the McCain column as well as probably that --

3    that 49.89 in District 6 under the Attorney

4    General 2010.  Attorney General 2010 for

5    District 14.

6                    Based off of my experience, 15 would

7    probably mean a Democrat won that district but

8    I don't have that in front of me so I wouldn't

9    be able to say.

10                   District 16 under 2006 Attorney

11   General would be the other one I wouldn't be

12   sure about.  But in all the other ones, that

13   would be -- it's likely the case.

14        Q.   Okay.  And just so I make I'm sure

15   I'm using the right words here, where the

16   percentage in the left-hand column is lower

17   than 50 percent, that means that the Republican

18   candidate in that election did not garner a

19   majority of the votes.

20        A.   That's correct.

21        Q.   It's possible they garnered the

22   plurality, but you know for certain they did

23   not garner a majority; is that right?

24        A.   That is correct.

25        Q.   So to illustrate this, just so I

1           A. Kincaid - CONFIDENTIAL

2    understand, I'd like to look at the '06

3    Attorney General race.

4         A.   Okay.

5         Q.   And when I look at the left-hand

6    column for that race, by my count, it looks

7    like there are eight districts in which the

8    Republican candidate for 2006 Attorney General

9    did not garner a majority of the vote.  Is that

10   your count as well?

11        A.   That's correct.

12        Q.   And the reverse is also true in that

13   by my count, for the 2006 Attorney General

14   race, there are only eight districts in which a

15   Republican did garner a majority of the vote.

16   Is that right?

17        A.   2006 Attorney General race?

18        Q.   Yes.

19        A.   Yes, that's correct.

20        Q.   I'll ask you one more set of

21   questions, but I will understand that the same

22   count applies to these other elections.  I'm

23   looking now at the 2010 Attorney General race,

24   and by my count, in seven districts, the

25   Republican candidate did not garner a majority

1          A. Kincaid - CONFIDENTIAL

2    of the votes in that election; is that right?

3         A.   That is correct.

4         Q.   And the reverse is true as well,

5    which is to say in the nine remaining

6    districts, those are the only districts in the

7    2010 Attorney General race that garnered a

8    majority of votes for the Republican candidate;

9    is that right?

10        A.   That is correct.

11        Q.   Now I'd like to ask you a question

12   about the rows.  I've just been asking you

13   questions about the columns.

14        A.   Okay.

15        Q.   I'd like to draw your attention to

16   the row illustrating the New Ohio Map for

17   District 6.

18        A.   Okay.

19        Q.   And I'm still focused on the

20   percentages in the left-hand column.

21        A.   Okay.

22        Q.   By my count, it looks as though there

23   are four out of six of these elections where

24   the Republican candidate did not garner a

25   majority of the vote.  Is that your read as

1          A. Kincaid - CONFIDENTIAL

2    well?

3          A.    That is correct.

4          Q.    And in your prior deposition, you

5    already went over PVI and what it means, so I

6    have a very specific question about PVI --

7          A.    Uh-huh.

8          Q.    -- as it relates to these races.

9          A.    Okay.

10         Q.    As I'm reading this chart, it says

11   that the PVI is R+5 for District 6 for Johnson.

12   Is that right?

13         A.    Yes.

14         Q.    But I'm also reading this chart that

15   even though this says R+5 for PVI, four out of

16   the six elections studied showed that the

17   Republican candidate did not garner a majority

18   of the vote.   Is my read correct?

19         A.    That's correct.

20         Q.    Stepping back, Mr. Kincaid, in 2011,

21   who did you work for?

22         A.    The National Republican Congressional

23   Committee after February 1.

24         Q.    And before February 1?

25         A.    I was at the Republican Governors

1          A. Kincaid - CONFIDENTIAL

2     Association in January of 2011.

3          Q.    At any time in 2011 were you an

4     employee of the RNC?

5          A.    No, I was not.

6          Q.    Since 2011, have you ever worked for

7     the RNC?

8          A.    Yes.

9          Q.    When you worked for the RNC, what did

10    you understand of the relationship between the

11    RNC and members of Congress?

12         A.    The Republican National Committee

13    serves as the national party apparatus for the

14    Republican party and so the RNC through its

15    activities supports the election of Republican

16    candidates to Congress through typically field

17    operations and whatever else they would choose

18    to do in a district that meets the legal

19    requirements necessary.  So the RNC's directly

20    involved in electing Republicans to Congress.

21         Q.    In your work at the RNC was the

22    relationship between the RNC and Republicans

23    anything greater than member and organization?

24              MR. FRAM:  Objection, form.

25         A.    Anything greater than member and

1              A. Kincaid - CONFIDENTIAL

2    organization?  Could you clarify that question?

3         Q.    Sure.  Do I understand correctly that

4    the RNC was an organization?

5         A.    Yes.

6         Q.    And do I understand correctly that it

7    was an organization with members?

8         A.    Yes.

9         Q.    And were those members of a

10   particular political party?

11        A.    They're all Republicans.

12        Q.    So my question is about the

13   relationship between the RNC and its

14   membership.

15        A.    Okay.

16        Q.    I'm trying to get an understanding of

17   the relationship based on your work at the RNC.

18             Was the relationship between the RNC

19   and Republicans anything ever different than

20   just organization and member?

21        A.    Sure.  We referred to the -- the RNC

22   would refer to the NRCC as a sister committee.

23   They share a building.  The organizations work

24   together to elect Republicans to Congress.

25   They coordinate on communication strategies.

1          A. Kincaid - CONFIDENTIAL

2          I mean, they're sister organizations

3    in the sense that they -- not only do they

4    share a building and coordinate a lot of stuff,

5    they are -- they work in tandem as much as is

6    legally allowed.

7          So in a well-run national committee

8    structure, you're not going to -- you won't be

9    able to tell much of a difference between what

10   the NRCC or the RNC is doing in a particular

11   Congressional race because they'd be working

12   together.

13   Q.   Thank you.  That was helpful to

14   understand the relationship between the two

15   organizations.

16   A.   Uh-huh.

17   Q.   I have a question about the

18   relationship between the organizations and

19   their members.

20   A.   Uh-huh.

21   Q.   One example you could have is an

22   employment relationship.  And bear with me.

23   Did you understand that Republicans were

24   employees of the RNC?

25   A.   Yes.

1          A. Kincaid - CONFIDENTIAL

2     Q.    Okay.  And did you understand that

3  members of the RNC who did not work at the RNC

4  were employees of the RNC?

5     A.    No.  Members of the Republican

6  National Committee who didn't work as a part of

7  the RNC would not be considered employees of

8  the RNC.

9          Members could be defined as the 168

10  members of the Republican National Committee,

11  which would be the chairman and national

12  committeeman and national committee woman of

13  the Republican National Committee for each of

14  the states and territories in Washington, D.C.

15     Q.    And is the same true for the NRCC,

16  meaning members of the NRCC who did not work at

17  the NRCC, were they considered employees of the

18  NRCC?

19     A.    They were not.

20     Q.    Were they considered anything other

21  than members of the NRCC?

22     A.    The members of the NRCC were -- they

23  were members.  They fundraised for the

24  organization, but they would be the Republican

25  members of Congress that are members of the

1          A. Kincaid - CONFIDENTIAL

2     NRCC.

3          Q.    In your testimony you talked about

4     the loss of two Congressional seats in Ohio in

5     2011.

6          A.    That's correct.

7          Q.    I have a question about your

8     understanding of how the Ohio map drawers

9     wanted to handle that loss of two seats.

10         A.    Okay.

11         Q.    What was your understanding of how

12    the Ohio map drawers wanted to address the loss

13    of two Congressional seats as between

14    Republicans and Democrats?

15              MR. SHEEHY:  Objection to form.

16         A.    The objective was to -- was for both

17    parties to lose one member of Congress.

18         Q.    And do you know what the source of

19    that directive was?

20              MR. SHEEHY:  Objection to form.

21         A.    I do not recall the origin of that.

22         Q.    In your work in 2011 generating maps

23    of Ohio's Congressional districts, could you

24    have drawn a map that maximized the number of

25    seats that could be won by Republican

1          A. Kincaid - CONFIDENTIAL

2    candidates?

3          A.    Yes.

4          Q.    And in your work generating maps of

5    Ohio's Congressional districts in 2011, could

6    you have drawn a map that had more than 12

7    seats that could be won by Republican

8    candidates?

9          A.    Yes.

10         Q.    Based on your understanding of the

11   enacted map -- this is HB 369 -- do you view

12   HB 369 as a map that maximizes Republican

13   seats?

14              MR. FRAM:    Objection, form.

15         A.    No, I do not.

16         Q.    Now, I understand that your testimony

17   is that you could have drawn a map in Ohio in

18   2011 for the Congressional District that

19   maximized the number of seats that could have

20   been won by Republicans.    Did you provide any

21   such maps to the Ohio map drawers in 2011?

22              MR. SHEEHY:    Objection, form.

23         A.    I would classify the Franklin County

24   four-way split map that we covered earlier as

25   the closer thing to that, but even that map I

1              A. Kincaid - CONFIDENTIAL

2    don't think was a maximization map.

3        Q.    Other than that map, the Franklin

4    County four-way split map that you just

5    described, did you provide any maps to the Ohio

6    map drawers that maximized Republican seats?

7        A.    No.

8        Q.    What is a plan that is drawn to

9    protect incumbents?

10             MR. FRAM:   Objection, form.

11       A.    I would classify an incumbent

12   protection plan or plan to protect incumbents

13   as a plan that -- well, take Ohio.  Where you'd

14   have -- you had 18 incumbents in Ohio; right?

15   And the map that -- map protect as many of them

16   as possible without -- you know, even though

17   there were two seats lost.

18             So that would -- a typical imcumbent

19   protection plan is one where the incumbents

20   would all be drawn into districts -- okay, in a

21   state that doesn't gain or lose seats, it would

22   be, you know, every member has their own seat.

23   They are not double bunked with another member

24   of Congress.  And it would include their home

25   territory and predominantly areas they'd

1          A. Kincaid - CONFIDENTIAL

2    represented before.

3          Q.   So I want to make sure I understand

4    your answer.   Understanding the fact that Ohio

5    had to lose two Congressional seats, in other

6    words, some incumbents couldn't be protected,

7    did you view the map as an incumbent protection

8    plan for those remaining incumbents?

9          A.   The Ohio Congressional map, the 319

10   draft I would say for the most part was

11   definitely an incumbent protection plan.   You

12   can't have a perfect one when you're going from

13   18 to 16.

14              One of the big challenges that

15   Mr. Fram highlighted a couple different times

16   is that, you know, there were districts where

17   members were combined.

18              Ms. Sutton lived very close to three

19   or four boundaries for different districts.

20   Mr. Turner and Mr. Austria live very close

21   together.   And districts grow.   When a state

22   loses seats, districts have to expand to take

23   in more population, right?   That's just kind of

24   how the physics of redistricting works when you

25   drop the number of seats.

1              A. Kincaid - CONFIDENTIAL

2                    So, you know, Mr. Gibbs and

3   Mr. Johnson live close together and there was a

4   lot of speculation that they would have been

5   drawn together.

6                    So to the extent possible, the

7   members were drawn to districts where they had

8   an opportunity to be reelected and so that's

9   why you found after those maps were redacted

10  that 15 out of the 16 districts had an

11  incumbent in them.  So 15 out of the 18

12  incumbents did have a district to run for

13  reelection in in 2012.

14      Q.    Is your answer the same for

15  Democratic incumbents versus Republican

16  incumbents?

17      A.    Yes.  Two Democrats were drawn

18  together, two Republicans were drawn together,

19  and then a Democrat and a Republican were drawn

20  together.

21      Q.    A different topic.  I'd like to ask

22  you about the Voting Rights Act.

23      A.    Okay.

24      Q.    Did you have an understanding in 2011

25  of how the Voting Rights Act affected the

1              A. Kincaid - CONFIDENTIAL
2    drawing of the Ohio Congressional districts?
3        A.   The Voting Rights Act applied to --
4    my understanding was that it applied to Ohio
5    District 11 with Marsha Fudge's seat
6    specifically.
7        Q.   And I appreciate this assumption.
8    It's buried in the question I just asked about
9    the Voting Rights Act.  But did you understand
10   this requirement to be a legal one?
11           MR. FRAM:  Objection, foundation.
12       A.   Yes.
13       Q.   I'd like to ask you to turn to
14   Exhibit 87.
15           Do you see what's indicated by last
16   author?
17       A.   I do.
18       Q.   What is that word?
19       A.   It says "czeigler."
20       Q.   Is that you?
21       A.   That is not me.
22           MS. McKNIGHT:  Thank you,
23   Mr. Kincaid.  I have no further
24   questions.
25           THE WITNESS:  All right.

1           A. Kincaid - CONFIDENTIAL

2           MR. FRAM:  I have one follow-up.

3      Do you have a question first?

4           MR. SHEEHY:  No, but let's take

5      just a short break.

6      (Recess taken.)

7           MR. SHEEHY:  We don't have any

8      questions.

9           MR. FRAM:  I just have one.

10                EXAMINATION

11   BY MR. FRAM:

12      Q.   Ms. McKnight showed you Exhibit 73.

13   We were talking about incumbents.

14      A.   Uh-huh.

15      Q.   Take a look at the row for the new

16   map for District 16, Renacci/Sutton.

17           Do you see that?

18      A.   I'm not there.  Yes, I do.

19      Q.   You see on that one that's drawn, 16

20   is -- under PVR -- PVI is a R+5 district?

21           Do you see that?

22      A.   Yes, I see that.

23      Q.   Okay.  And so Ms. Sutton was a

24   Democrat; right?

25      A.   Yes.

1          A. Kincaid - CONFIDENTIAL

2        Q.   And she was now going to run against

3    Mr. Renacci in a -- in that R+5 district.

4             Do you see that?

5        A.   Yes, I see that.

6        Q.   And in fact, she lost, didn't she?

7        A.   She did.

8             MR. FRAM:  That's all I've got for

9        you.

10             THE REPORTER:  Off the record.

11

12        (Deposition adjourned at 5:54 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A. Kincaid - CONFIDENTIAL

2     C E R T I F I C A T E

3     DISTRICT OF COLUMBIA:

4              I, MARY ANN PAYONK, shorthand reporter,

5     do hereby certify that the witness whose

6     deposition is hereinbefore set forth was duly

7     sworn, and that such deposition is a true,

8     correct, and full record of the testimony

9     given.

10             I further certify that I am not related

11    to any of the parties to this action by blood

12    or by marriage, and that I am in no way

13    interested in the outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto set

15    my hand this 1st day of February, 2019.

16                     *Mary Ann Payonk*

17    _____

18    MARY ANN PAYONK, Shorthand Reporter

19

20

21

22

23

24

25

1          A. Kincaid - CONFIDENTIAL

2          - INDEX TO WITNESSES -

3    WITNESS                            PAGE

4    ADAM KINCAID

5          Examination by Mr. Fram      252, 579

6          Examination by Ms. McKnight      560

7

8          - INDEX TO EXHIBITS -

9    NO.              DESCRIPTION          MARKED

10   Exhibit No. 42  Email chain Bates      318

11        numbered REV_00023341

12   Exhibit No. 43  Metadata              320

13   Exhibit No. 44  Metadata for BRADEN1387   359

14   Exhibit No. 45  Change sheet Bates      381

15        stamped OHCF0001438

16   Exhibit No. 46  Metadata              382

17   Exhibit No. 47  Email chain Bates      397

18        stamped 00023234

19   Exhibit No. 48  Email chain Bates      409

20        numbered REV_00023184

21   Exhibit No. 49  Metadata for Ex. 48      412

22   Exhibit No. 50  Document Bates stamped   414

23        REV_00023188

24   Exhibit No. 51  Document Bates stamped   422

25        REV_0023185

1          A. Kincaid - CONFIDENTIAL

2   INDEX TO EXHIBITS (Cont'd.)

3   NO.          DESCRIPTION          MARKED

4   Exhibit No. 52  Metadata for Ex. 51     422

5   Exhibit No. 53  Document Bates stamped   426

6       REV_00023186

7   Exhibit No. 54  Metadata for Ex. 53     426

8   Exhibit No. 55  Map Bates stamped       428

9       REV_00023187

10  Exhibit No. 56  Metadata for Ex. 55     428

11  Exhibit No. 57  Map Bates stamped       430

12      REV_23190

13  Exhibit No. 58  Metadata for Ex. 57     430

14  Exhibit No. 59  Map Bates stamped       440

15      REV_00023192

16  Exhibit No. 60 Metadata for Ex. 59      440

17  Exhibit No. 61  Map Bates stamped       451

18      REV_00023191

19  Exhibit No. 62  Metadata for Ex. 61     451

20  Exhibit No. 63  Map Bates stamped       453

21      REV_00023189

22  Exhibit No. 64  Metadata for Ex. 63     454

23  Exhibit No. 65  Email string Bates      455

24      stamped REV_00023497

25

1          A. Kincaid - CONFIDENTIAL

2    INDEX TO EXHIBITS (Cont'd.)

3    NO.           DESCRIPTION                MARKED

4    Exhibit No. 66  Spreadsheet Bates         460

5         stamped REV_00000022

6    Exhibit No. 67  Metadata for Ex. 66       460

7    Exhibit No. 68  E-mail Bates stamped      465

8         REV_00023429

9    Exhibit No. 69  Metadata for Ex. 70       466

10   Exhibit No. 70 Spreadsheet Bates stamped  466

11        REV_00023430

12   Exhibit No. 71  Map Bates stamped         470

13        REV_00023432

14   Exhibit No. 72  Metadata for Ex. 71       470

15   Exhibit No. 73  Spreadsheet Bates         472

16        stamped REV_00023431

17   Exhibit No. 74  Metadata for Ex. 73       472

18   Exhibit No. 75  Metadata for              475

19        REV_00023343

20   Exhibit No. 76  Metadata for              477

21        REV_00023344

22   Exhibit No. 77  Metadata for              478

23        REV_00023345

24   Exhibit No. 78  Metadata for              478

25        REV_00023346

1          A. Kincaid - CONFIDENTIAL

2  INDEX TO EXHIBITS (Cont'd.)

3  NO.          DESCRIPTION          MARKED

4  Exhibit No. 79  Map Bates stamped       478

5      REV_00023347

6  Exhibit No. 80  Metadata for Ex. 79     478

7  Exhibit No. 81  PowerPoint Bates stamped  510

8      REV_00000003

9  Exhibit No. 82  Metadata for Ex. 81     510

10  Exhibit No. 83  Document Bates stamped   513

11     REV_0000021

12  Exhibit No. 84  PowerPoint, Bates       517

13     stamped REV_0000001

14  Exhibit No. 85  Metadata for Ex. 84     517

15  Exhibit No. 86  Spreadsheet Bates       527

16     stamped TIBERI000039

17  Exhibit No. 87  Metadata for Ex. 86     528

18  Exhibit No. 88  Spreadsheet Bates       532

19     stamped REV_00000034

20  Exhibit No. 89  Spreadsheet Bates       533

21     stamped REV_0000030

22  Exhibit No. 90  Spreadsheet Bates       537

23     stamped REV_00000026

24  Exhibit No. 91  Spreadsheet Bates       539

25     stamped REV_00000028

1          A. Kincaid - CONFIDENTIAL

2    INDEX TO EXHIBITS (Cont'd.)

3    NO.          DESCRIPTION                MARKED

4    Exhibit No. 92  Spreadsheet Bates       540

5         stamped REV_00000024

6    Exhibit No. 93  Spreadsheet Bates       540

7         stamped REV_00000027

8    Exhibit No. 94  Spreadsheet Bates       540

9         stamped REV_00000029

10   Exhibit No. 95  Spreadsheet Bates       540

11        stamped REV_00000023

12   Exhibit No. 96  Spreadsheet Bates       540

13        stamped REV_00000037

14   Exhibit No. 97  Spreadsheet Bates       540

15        stamped REV_00000032

16   Exhibit No. 98  Spreadsheet Bates       541

17        stamped REV_00000038

18   Exhibit No. 99  Spreadsheet Bates       541

19        stamped REV_00000036

20   Exhibit No. 100  Map Bates stamped      558

21        BLESSING0012635 [102611 Adam New

22        Map] 001

23

24

25

1          A. Kincaid - CONFIDENTIAL

2    INDEX (Cont'd.)

3        - INDEX TO REFERENCED EXHIBITS -

4    NO.          DESCRIPTION                MARKED

5    Exhibit No. 2 Document, prev. Ex. 2       488

6    Exhibit No. 5 Spreadsheet Bates stamped   326

7        NRCC000012

8    Exhibit No. 7 Email chain Bates numbered  354

9        LWVOH00018302

10   Exhibit No. 8 Spreadsheet, "Ohio          355

11       Changes" BRADEN001387

12   Exhibit No. 11 Map Bates stamped          549

13       BRADEN001388

14   Exhibit No. 13 Map                        554

15   Exhibit No. 15 Map                        555

16   Exhibit No. 17 Map Bates stamped          556

17       BRADEN001391

18   Exhibit No. 19 Map                        557

19

20              <<INDEX END>>

21

22

23

24

25

1  NAME OF CASE:

2  DATE OF DEPOSITION:

3  NAME OF WITNESS:

4  Reason Codes:

5      1.  To clarify the record.

6      2.  To conform to the facts.

7      3.  To correct transcription errors.

8  Page __264__ Line __5__ Reason __3__

9  From __VTB's__ to __VTD's__

10 Page __273__ Line __13__ Reason __1/3__

11 From __This was a question. Not an answer.__ to _____

12 Page __274__ Line __14__ Reason __3__

13 From __Meet__ to __Met__

14 Page __285__ Line __19__ Reason __3__

15 From __Resistor Team__ to __Redistricting__

16 Page __288__ Line __25__ Reason __3__

17 From __Carrie__ to __Kerry__

18 Page __313__ Line __22__ Reason __3__

19 From __Feet Back__ to __Feedback__

20 Page __314__ Line __21-22__ Reason __3__

21 From __youIf__ to __you (end of question) If (beginning of answer)__

22 Page __315__ Line __12__ Reason __3__

23 From __It during__ to __it was during__

24 _____

25

| | |
|---|---|
| OHIO V. PHILIP RANDOLPH INSTITUTE, et al., | |
| Plaintiffs, | Case No.: 1:18-cv-00357-TSB |
| vs. | Judge Timothy S. Black |
| | Circuit Judge Karen Nelson Moore |
| RYAN SMITH, Speaker of the Ohio House of Representatives, et al., | Judge Michael H. Watson |
| Defendants. | Magistrate Judge Karen L. Litkovitz |
| IN RE: SUBPOENAS SERVED ON REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, AND ADAM KINCAID | Transferred from the United States District Court for the District of Columbia, Civil Action No.: 1:18-mc-140 |

## ADDENDUM TO ADAM KINCAID'S CORRECTIONS TO JANUARY 31, 2019 DEPOSITION.

Below are Mr. Kincaid's additional corrections to his deposition transcript dated January 31, 2019. All of Mr. Kincaid's corrections are merely to fix transcription errors.

Page 321, line 17:  "mwild@RNCHQ.org" not "mmwild…"
Page 331, line 7:  "you that" not "that you that"
Page 334, line 23:  "Whatman" not "Wild"
Page 349, line 20:  "Kerry" not "Carrie"
Page 356, line 8:  "process" not "promotes"
Page 361, line 4:  "sent the" not "said"
Page 371, line 15:  "Wild" not "Wile"
Page 381, line 7:  "discuss" not "discussion"
Page 399, line 16:  "DBF" not "DVF"
Page 408, line 15:  "Marcia" not "Marsha"
Page 426, line 19:  "Ohio" not "0hio"
Page 497, line 9:  "NRCC" not "RNCC"
Page 500, line 24:  "the decade" not "decades"
Page 547, line 10:  "369" not "316"

Page 577, line 9:  "redistricted" not "redacted"

Read and signed:

_____

Adam Kincaid
February 18, 2019