CONFIDENTIAL

1

2              IN THE UNITED STATES DISTRICT COURT

3               FOR THE SOUTHERN DISTRICT OF OHIO

4      - - - - - - - - - - - - - - - - - - - - - - - - - - -

       OHIO A. PHILIP RANDOLPH INSTITUTE, )
5      et al.,                            )
                                          )
6                 Plaintiffs,             )
                                          )
7         vs.                             ) Case No.
                                          ) 1:18-CV-00357-TSB
8      RYAN SMITH, Speaker of the         ) -KNM-MHW
       Ohio House of Representatives,     )
9      et al.,                            )
                                          )
10                Defendants.             )
       - - - - - - - - - - - - - - - - - - - - - - - - - - -

11                    **  REVISED  **
               Wednesday, December 19, 2018
12                  Baker & Hostetler
                 200 Civic Center Drive
13               Columbus, Ohio  43215
14                 **  CONFIDENTIAL  **
               DEPOSITION OF STEVEN STIVERS
15

16     - - - - - - - - - - - - - - - - - - - - - - - - - - -

17                 Jackie Olexa White
18              Registered Merit Reporter
19     - - - - - - - - - - - - - - - - - - - - - - - - - - -

20

21

22

23

24

25    Job no. 149805

CONFIDENTIAL

Page 2

1

2                    A P P E A R A N C E S

3      REPRESENTING THE PLAINTIFFS, AMERICAN CIVIL LIBERTIES

       UNION FOUNDATION:

4                    T. THOMAS-LUNDBORG, Esq.

5                    125 Broad Street

6                    New York, New York, 10004

7

8      REPRESENTING THE DEFENDANTS:

9                    ANN YACKSHAW, Esq. (Via phone)

10                   Associate Assistant Attorney General

11                   Constitutional Offices

12                   30 East Broad Street

13                   Columbus, Ohio  43215

14

15

16     REPRESENTING STEVEN STIVERS:

17                   ROBERT TUCKER, ESQ.

18                   Baker & Hostetler

19                   200 Civic Center Drive

20                   Columbus, Ohio  43215

21

22

23

24

25

CONFIDENTIAL

Page 3

1
2                           INDEX
3      Examination by                              Page
4      Ms. Thomas                                   6
5      Mr. Tucker                                  128
6      Plaintiff's Exhibits                        Page
7      Exhibit 1 Amended Notice of Depo             10
8      Exhibit 2 First Request for Production of    12
             documents
9
       Exhibit 3 Email Dated 11/17/10              21
10
       Exhibit 4 Email dated 1/8/11                29
11
       Exhibit 5 Email dated 3/22/11               31
12
       Exhibit 6 Email dated 1/13/11               32
13
       Exhibit 7 Series of Emails                  35
14
       Exhibit 8 Email dated 6/1/11                39
15
       Exhibit 9 Email dated 8/15/11 with attachment  42
16
       Exhibit 10 Email dated 8/30/11              45
17
       Exhibit 11 Email dated 9/10/11              49
18
       Exhibit 12 Email dated 9/10/11 w/map attachments  58
19
       Exhibit 13 Email dated 9/17/11              62
20
       Exhibit 14 Email dated 10/02/11             64
21
       Exhibit 15 Email dated 11/02/11             67
22
       Exhibit 16 Email dated 12/07/11 w/attachments  69
23
       Exhibit 17 Email dated 12/12/11             71
24
       Exhibit 18 Email dated 3/02/12              73
25

CONFIDENTIAL

Page 4

1

2

Exhibit 20 Email dated 12/13/11 w/attachment       83

3
Exhibit 21 Columbus Dispatch article              86
4
Exhibit 22 2002-2012 Congressional Map            88
5
Exhibit 23 Color Map                              89
6
Exhibit 24 Color Map                              96
7
Exhibit 25 Color Map                              96
8
Exhibit 26 Color Map                              96
9
Exhibit 27 Color Map                              96
10
Exhibit 28 Motion                                101
11
Exhibit 29 Memorandum in support of motion       101
12
Exhibit 30 Reply in Further support of motion    101
13
Exhibit 31 LexisNexis document                   116
14
Exhibit 32 Three-page article                    116
15
                    – – –

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

1                    STEVEN STIVERS

2                         Wednesday Morning Session

3                         December 19, 2018

4                         9:00 a.m.

5                    - - - - -

6                    STIPULATIONS

7                    - - - - -

8            It is stipulated by and between counsel

9     for the respective parties that the deposition of

10    STEVEN STIVERS, a witness herein, called by the

11    plaintiff under the statute, may be taken at this

12    time and reduced to writing in stenotypy by the

13    Notary, whose notes may then after be transcribed out

14    of the presence of the witness; that proof of the

15    official character and qualification of the Notary is

16    waived; that the examination, reading and signature

17    of the said STEVEN STIVERS to the transcript of his

18    deposition are not waived by counsel and the witness.

19                    - - - - -

20

21

22

23

24

25

CONFIDENTIAL

Page 6

1                    STEVEN STIVERS

2                    STEVEN STIVERS

3       being first duly sworn, as hereinafter certified,

4       testifies and says as follows:

5                    CROSS-EXAMINATION

6       BY MS. THOMAS:

7       Q.          Good morning.  Could you please state your

8       full name for the record?

9       A.          My name is Steve, S T E V E, Stivers,

10      S T I V E R S.

11      Q.          Okay.  You understand you're under oath

12      today?

13      A.          I do.

14      Q.          My name is Alora Thomas, and I represent

15      the plaintiffs in this case.

16      A.          Good morning.

17                   MS. THOMAS:  Sorry.  Can we go off the

18      record.

19                       (Off the record.)

20                   MS. THOMAS:  So I'll have the attorney in

21      the room and the attorney on the phone introduce

22      themselves.

23                   MR. TUCKER:  Sure.  Rob Tucker, Baker

24      Hostetler on behalf of Representative Stivers.  I

25      just want to designate for the record Representative

CONFIDENTIAL

Page 7

1                    STEVEN STIVERS

2   Stivers' testimony today is confidential information

3   under the protective order that has been entered in

4   this case.

5              MS. THOMAS:  And our position as

6   plaintiffs is while some of Representative Stivers'

7   testimony may be confidential, all of his testimony

8   should not be.  And so we would like to reserve our

9   objection to the full testimony being marked

10  confidential, but we'll treat it as such until we

11  resolve that issue.

12             MR. TUCKER:  Okay.

13             MS. YACKSHAW:  On the phone is

14  Ann Yackshaw for the Ohio attorney general on behalf

15  of the defendants.

16             MR. TUCKER:  Has anybody else joined on

17  the phone?

18                  (No response.)

19  Q.        Okay.  Now that we have introductions out

20  of the way, have you ever been deposed before?

21  A.        I have not, Mrs. Thomas.  Is that how I

22  should refer to you?

23  Q.        You can just call me Alora.

24  A.        Okay, alora, yes, ma'am.

25  Q.        So I'm going to go over over some ground

CONFIDENTIAL

1                    STEVEN STIVERS

2     rules regarding depositions.  I think it's going to

3     be fairly clear.  So the record is clear, it's

4     important that you give an oral answer.

5     A.          Can't shake my head.

6     Q.          So no nodding of the head.  You need to

7     say yes or no.  No shaking heads.  Also, um-hum,

8     please say yes or no.

9     A.          Use words, got the it.

10    Q.          Use words that can be on the transcript.

11                If you don't understand a question or hear

12    a question, please ask me to repeat it.  I'm happy to

13    do so.  I can also rephrase a question if it's not

14    clear to you what the question is.

15    A.          Thank you.

16    Q.          Your attorney and possibly the attorney on

17    the phone will be making objections during the

18    deposition.  Unless you're instructed not to answer,

19    even if there is an objection, you're expected to

20    answer the question.  Is that understood?

21    A.          It is.

22    Q.          Great.  We'll be taking regular breaks.

23    A.          I don't need many breaks, I'm pretty good.

24    But whatever you want to do, I'm good.

25    Q.          If you need a break at any point, when I

CONFIDENTIAL

Page 9

STEVEN STIVERS

1

2    haven't called for a break, just feel free to let me

3    know.  The only rule is no breaks while a question is

4    pending.

5    A.          Got it.

6    Q.          You'll stay under oath throughout the day.

7    We'll go on break, we'll come back from the break,

8    and you'll still be under oath.  Is there any reason

9    why you can't testify truthfully today?

10   A.          No.

11   Q.          Are you taking any medications that would

12   affect your ability to testify?

13   A.          I did take Mucinex D, but I don't think

14   that should affect me.  I think I'm good.

15   Q.          Okay.  Great.  Throughout this deposition

16   I'm going to refer to the Ohio redistricting that

17   occurred in 2011.  Unless I specify otherwise, when I

18   refer to Ohio redistricting, I'm referring to the

19   2011 redistricting process.

20   A.          Yes.

21   Q.          Do you understand you're an intervenor in

22   this case?

23   A.          I do.

24   Q.          And as an intervenor you're a party to

25   this case; do you understand that?

CONFIDENTIAL

Page 10

                    STEVEN STIVERS

1

2    A.        I do, and I feel like I have an interest

3    in the case.

4    Q.        And you're here to be deposed today.  You

5    understand that?

6    A.        Yes, ma'am.

7              MS. THOMAS:  I'll just mark for the record

8    Exhibit Exhibit No. 1.

9         (Exhibit 1 was marked for identification.)

10   Q.        So for the record, I've handed you the

11   Notice of Deposition -- Amended Notice of Deposition

12   for your deposition.  And since you're a party,

13   you've been noticed for deposition rather than

14   subpoena.

15   A.        Yes, ma'am.

16   Q.        Okay.  Did you do anything to prepare for

17   today's deposition?

18   A.        I met with counsel.

19   Q.        Okay.  And when was that?

20   A.        Yesterday.

21   Q.        For how long?

22   A.        I don't know.  A couple hours.

23   Q.        Okay.  Was anyone else there?

24   A.        The attorneys from Baker & Hostetler.

25   Q.        Okay.  Have you reviewed the complaint in

CONFIDENTIAL

Page 11

1                          STEVEN STIVERS

2      this case?

3      A.          I've not read the whole complaint, but

4      I've been briefed on the complaint.

5      Q.          Okay.  And have you reviewed the papers to

6      intervene in this case?

7      A.          I know that we talked about it.  And I

8      didn't read every word, but I know we had a

9      conversation about why we had an interest in the

10     case, why we wanted to intervene.  And I said I

11     wanted to intervene.  So, yes, I'm familiar with it,

12     but it's not fair to say that I read every word.

13     Q.          Okay.  Fair enough.  Did you review the

14     documents subpoena in this case?

15                 MR. TUCKER:  Objection.

16                 MS. THOMAS:  Subpoena for his documents?

17                 MR. TUCKER:  I don't think there was a

18     subpoena for his documents.

19                 MS. THOMAS:  Sorry, the document request.

20     A.          Yes.  And I turned all my -- I did, yes.

21     Q.          Okay.  Before I actually get to that, when

22     you were meeting with counsel, did you review

23     documents?

24     A.          We looked at some documents, yes.

25     Q.          Which document did you look at?

CONFIDENTIAL

Page 12

1          STEVEN STIVERS

2          MR. TUCKER:  Hold on, Steve.  I'm going to

3     object and instruct the witness not to answer what

4     specific documents were reviewed during the

5     preparation meeting with counsel as protected by work

6     product.

7          MS. THOMAS:  Were any documents -- well,

8     we'll get to that.

9          (Exhibit 2 was marked for identification.)

10    Q.          I've just had marked as Exhibit 2 for the

11    record Plaintiff's First Request for Production of

12    Documents to intervenor Steve Stivers.  Have you seen

13    this document before?

14    A.          I have.

15    Q.          And in this document it requests documents

16    related to the Ohio redistricting and generally red

17    map.  What did you do to collect documents pursuant

18    to this document request?

19    A.          I gave all my email passwords to -- my two

20    emails to the attorneys, and they went through all

21    the emails themselves.  I didn't do it myself.  I let

22    them do it, because I wanted them to have total

23    access to look for anything they wanted to.  That way

24    they could certify it was done according to the

25    request and not just me self-certifying.  They did

CONFIDENTIAL

Page 13

1                      STEVEN STIVERS

2    all of it.  I gave them my passwords and then have

3    changed my passwords.

4    Q.        Fair enough.  You said you gave your two

5    email accounts, what are those?

6    A.        StiversS@AOL.com, which is an old email

7    that I don't use, and I don't even know if there was

8    anything that came out of that.  I just don't

9    remember, but I gave them that, because it was one

10   that I have used in the past.  But I transitioned to

11   an email account, which was SteveStivers1@Gmail, and

12   I transitioned to that in like 2009.  So that's my

13   personal email.  That is the only email account that

14   I use for correspondence.  It comes right to my

15   phone.

16   Q.        Do you have an account as an -- official

17   account as a U.S. representative?

18   A.        I do, and I don't use it.

19   Q.        Okay.  Do you know what the email address

20   is for that account?

21   A.        I can find out what it is.  It gets some

22   official notices from like security and other stuff,

23   but I've never -- I don't think I've ever sent

24   outgoing mails from it.  I don't use it for work.

25   Q.        Do you receive calendar invites on your

CONFIDENTIAL

Page 14

1                      STEVEN STIVERS

2     official account?

3     A.          No.  Let me say more clearly, not that I

4     know of.  I don't know how all that inner workings

5     happens.  My assistant, my scheduler, does all that.

6     Q.          Okay.

7     A.          I shouldn't say no definitively, because

8     the true answer is, I'm not sure, but I don't

9     schedule things on it.

10    Q.          Do you receive schedules on your G mail

11    account?

12    A.          Yes.

13    Q.          Do you have a practice for how long you

14    keep emails?

15    A.          Not on my personal account.  I think after

16    this suit is all the way through the process, I'll

17    create one.  But we have one in the office for

18    official emails, but I do not personally have a

19    system.  But I'm going to create one after this,

20    because I noticed i Have emails that go back to when

21    I created the account in 2009.  That's like a ton of

22    emails.

23    Q.          Fair enough.  So you mentioned that you do

24    receive emails on your G mail account -- I'm sorry,

25    you do receive calendar invites on your G mail

CONFIDENTIAL

Page 15

1                       STEVEN STIVERS

2    account?

3    A.          Yes.

4    Q.          Do you have a system for how you keep

5    calendars?

6    A.          My scheduler does all that.  When I want

7    to do something, I text or email my scheduler and say

8    set up a meeting, you know, that kind of thing.

9    Q.          Okay.  And you mentioned that you text

10   your scheduler?

11   A.          Sometimes.

12   Q.          Okay.  Do you ever text with other members

13   of your staff?

14   A.          Yes.

15   Q.          Do you know if your text messages were

16   searched?

17   A.          I do delete my text messages regularly

18   because it takes up memory on my phone.  The emails

19   are stored on a server somewhere.  The text messages

20   are stored on the phone.  I have a practice of

21   cleaning out my text messages every few months.  And

22   usually at the end of every quarter, I'll delete all

23   my text messages just because it takes up memory on

24   my phone.  And I don't have a big phone, so I figure

25   it's just better to clean it up and keep using it.

CONFIDENTIAL

Page 16

STEVEN STIVERS

1   Recycle.

2   Q.          Okay.  What type of paper files do you

3   keep?

4   A.          I don't keep a lot of paper files.  I'm

5   more digital.

6   Q.          Do you keep any handwritten notes?

7   A.          No.

8   Q.          Do you keep handouts or printouts?

9   A.          No.

10  Q.          Do you have written calendars or agendas?

11  A.          No.  I guess Brett Kavanaugh did.

12  Q.          I think everyone in the country knows

13  that.

14  A.          Sorry.

15  Q.          Unless you were hiding under a rock.

16              So I mentioned before that I'll primarily

17  be talking about the 2011 redistricting.

18  A.          Yes, ma'am.

19  Q.          Who were the members of your staff in

20  2011?

21  A.          In 2011, my chief of staff was Mary Beth

22  Carozza.  And my district director was Adam Kuhn.  In

23  Washington D.C., let's see, I had my legislative

24  director was Jessie Walls.  My scheduler was Monica

CONFIDENTIAL

Page 17

STEVEN STIVERS

1

2   Hueckel.  My legislative aides were Justin Barnes

3   and -- what is her name, what is her name.  I hate

4   when that happens.  We're going back seven years

5   here.  I'm forgetting a legislative aide.  And J.C.

6   guy, Jacqueline Guy, was also a legislative aide.

7            And then in Ohio -- oh, also in Washington

8   Courtney Whetstone was my communications director.

9   And in Ohio, I had Adam Slane as a case worker.  I

10  had Adam Rapien.  I think he didn't start until 2012.

11  Who was my first field person.

12            I can get you a list of everybody, but

13  those are -- the key staff are the scheduler,

14  legislative director, chief of staff.

15  Q.        Okay.  If we come across anyone today who

16  we haven't discussed, I may ask you who they are.

17  A.        No problem.  Sorry I couldn't name

18  everyone off the top of my head.  That was a long

19  time ago.

20  Q.        That is okay.  And I may throughout today

21  ask you to confirm who people are.

22  A.        No problem.

23  Q.        Do you keep a social media account?

24  A.        I don't do my own social media.

25  Q.        Okay.

CONFIDENTIAL

Page 18

STEVEN STIVERS

1

2  A.          But my communications staff does Facebook

3  and Twitter and Instagram, but I don't create my own.

4  Q.          Do you have a process regarding how things

5  get up on social media?

6  A.          Yes.

7  Q.          What is that process?

8  A.          It is proposed by the staff, approved by

9  the communications director, and then approved by me

10  and then put on social media.

11  Q.          Do you approve every individual item that

12  ends up on your social media account?

13  A.          The intent is that I approve every item.

14  The practice is sometimes that if something is --

15  they feel like important or urgent and

16  noncontroversial, that I may not approve every

17  individual post.

18  Q.          But as a general practice you approve all

19  the posts?

20  A.          Yes, as a general practice, as a general

21  rule, that is fair to say.

22  Q.          Okay.  Could you give me a brief overview

23  of your educational background?

24  A.          Yes.  I grew up in a little town in

25  southern Ohio, Ripley, Ohio.  Went to primary and

CONFIDENTIAL

Page 19

1                    STEVEN STIVERS

2    secondary school there, graduated high school there,

3    moved to Columbus.  Attended The Ohio State

4    University, graduated with a bachelor's of arts

5    degree in '89.  Went back, got a master's in business

6    administration at The Ohio State University in 1996.

7    And in 2012, I got a master's in strategic studies

8    from the Army War College.

9    Q.          Do you hold any special licenses?

10   A.          In the past, I have been a Series 7

11   licensed securities broker, but that was before.

12   That has been a long time ago.  When I was at Bank

13   One I let that lapse in probably 2000 maybe.

14   Q.          What jobs have you held since your

15   graduation from Ohio State?

16   A.          My first job upon graduation was -- I

17   still kept working as an aide in the state senate for

18   a couple months.  Then after that, I worked on some

19   campaigns and did finance work for the Franklin

20   County republican party.  I was finance director

21   there for a couple years.

22            And then after that I worked at the Ohio

23   Company for six years as a vice president, and I was

24   working on their syndication desk.  In 1995, I went

25   to work for Bank One and worked there until 2004 --

CONFIDENTIAL

Page 20

STEVEN STIVERS

1

2       I'm sorry 2003.   In 2003, I was appointed to the

3       state senate and worked there from 2003, was elected

4       in 2004, and served until 2008.

5               I had a consulting business for a couple

6       years in 2008 to 2010.   Ran for congress in the 2008

7       and lost.   Ran for congress in 2010 and won.   So

8       since 2011, I've been employed as a U.S. congressman.

9               Also since 1985, I've been employed by the

10      Ohio State Guard, and deployed in 2004, 2005 to

11      Operation Iraqui Freedom.   I still serve as a member

12      of the Ohio National Guard.

13      Q.        I'm just going to ask you a few follow-up

14      questions, and please correct me if I get anything

15      wrong.   You mention that you were an aide in the

16      state senate.   Who were you an aide for and from what

17      dates?

18      A.        I started in the state senate while I was

19      in college working for a guy named Cooper Snyder, on

20      January of 1984.   And I stayed there until I shipped

21      to officer basic in various capacities.   I was

22      originally a page, and then a constituent aide and

23      and then an aide.

24              I stayed there until early -- or late

25      1989.  I think I shipped in September to officer

CONFIDENTIAL

Page 21

STEVEN STIVERS

1
2    basic course at Fort McClellan, Alabama.  So it was
3    almost all part-time work.  It was full-time for a
4    little bit after college for a few months.
5    Q.          Fair enough.  And then you mentioned that
6    you're a consultant from 2008 to 2010?
7    A.          Yes.
8    Q.          What kind of consulting work did you do?
9    A.          We did work with businesses that were
10   struggling.  I helped them.  I worked with an
11   accountant and a financial guy, and we helped
12   businesses restructure their business to make it more
13   profitable in a very difficult economy in 2009, early
14   2010.
15              And I think I became a full-time
16   candidate -- might have even been -- might have only
17   been 2009.  And in January, I may have become -- I
18   think I became a full-time candidate in January of
19   2010.
20   Q.          So I'll say at the outset, as we've
21   discussed, documents were produced pursuant to the
22   document request.  You may or may not have reviewed
23   these before.  I'm going to show you a series of
24   these documents.  They've all been marked
25   confidential by your counsel.  We reserve the right

CONFIDENTIAL

1                    STEVEN STIVERS

2    to object to any confidential designation by these

3    documents since we're currently reserving the right

4    to object to the deposition, whole deposition being

5    called confidential.  I just want to state that for

6    the record.  I don't think we need to particularly

7    mark testimony about any of these as confidential at

8    this time.

9              MR. TUCKER:  Well, again, we're

10   designating the entire transcript as confidential.

11             MS. THOMAS:  And we're reserving the right

12   to portions of the transcript being released as not

13   confidential.

14             MR. TUCKER:  I understand.

15             MS. THOMAS:  I'm going to have this marked

16   as Exhibit 3.

17         (Exhibit 3 was marked for identification.)

18   Q.         So marked as Exhibit 3 is an email that

19   was produced, again, pursuant to this case.  It's

20   from -- the top email is from November 17, 2010.

21   There is an Adam@StiversForCongress.com.  I think you

22   mentioned that there was an Adam Kuhna who was

23   district director?

24   A.         Kuhn.

25   Q.         Kuhn who was district director.  Is that

CONFIDENTIAL

Page 23

1                              STEVEN STIVERS

2        this Adam?

3        A.          That is correct.   And I just noticed

4        something I want to clear up.   There's a third email

5        that I forgot to mention, but it was searched and we

6        provided documents from it.   It's

7        Stivers.Steve@Gmail.com, which is a G mail we use for

8        scheduling purposes.   So I apologize, I didn't think

9        of that earlier.   But I want to go back to that

10       question, clean it up, add it now or however you do

11       that.

12       Q.          That is fine.

13       A.          But, obviously, we produced this.

14       Q.          And, for the record, Exhibit 3 bears

15       Bates numbers Stivers 7454.

16                   So I want to start with the email that is

17       at the bottom of the page from Dino DiSanto.   I don't

18       think we discussed Dino DiSanto.   Do you know who

19       that is?

20       A.          Yes, ma'am.

21       Q.          Who is Dino DiSanto?

22       A.          He was the chief of staff for Steve

23       LaTourette, who was the dean of the Ohio delegation

24       at the time, who has since passed away.

25       Q.          And then this email from Dino DiSanto is

CONFIDENTIAL

Page 24

1          STEVEN STIVERS

2    to a number of people including Adam Kuhn, who we've

3    discussed, and he forwards this email to you,

4    correct?

5    A.          Yes.

6    Q.          Okay.   The text of the forwarded email,

7    can you read the first sentence for me, please?

8    A.          (Reading) Mr. LaTourette has called a

9    delegation meeting for Thursday, November 18, at 4:00

10   p.m. in Mr. Boehner's leadership office, which is

11   H204, trying to get a map. (I'll forward to you when

12   I have it.)

13   Q.          And we can stop there.   I may have you

14   read another part of it.

15          So you've mentioned who Mr. LaTourette

16   was.   He was the dean of the Ohio delegation.

17   A.          Yes.

18   Q.          Did he have a practice of calling

19   delegation meetings?

20   A.          That is the job of the dean of the

21   delegation.

22   Q.          And how often would you have delegation

23   meetings?

24   A.          Whenever there was something to discuss.

25   Typically, a few times a year.

CONFIDENTIAL

Page 25

1                          STEVEN STIVERS

2     Q.           Would they typically happen in

3     Mr. Boehner's leadership office?

4     A.           They have moved around, but during that

5     time when John Boehner was just coming in as speaker,

6     they were typically in his office, yes.

7     Q.           And what types of things would you discuss

8     at the delegation meetings?

9     A.           Usually legislative issues that impact the

10    State of Ohio, or regional issues like the Great

11    Lakes and water quality.  And we'd talk about how we

12    could support each other's legislation, those type of

13    things, and occasionally political topics would come

14    up.

15    Q.           Now, this is a delegation meeting.  Would

16    the delegation include democrats and republicans or

17    is this a republican --

18    A.           It was a republican delegation meeting.

19    Q.           Did you ever have meetings with the full

20    Ohio delegation?

21    A.           Yes, ma'am, about once a year.

22    Q.           So your reading of these emails is that

23    it's for a republican delegation meeting?

24    A.           Yes, ma'am.

25    Q.           There's a list of agenda items.  And the

CONFIDENTIAL

Page 26

1                      STEVEN STIVERS

2    third item appears to be redistricting; is that

3    correct?

4    A.          That's what it says.

5    Q.          There's also a reference to a map in the

6    top line, is that correct, or in the second line of

7    the email text that you read?

8    A.          The way I read the map, it is a map to

9    John Boehner's office.  To put this in perspective --

10   Q.          Got it.

11   A.          -- we had been elected 11 days before

12   that.  None of us had even been sworn in yet.  We

13   didn't know the U.S. capital or where anything was.

14   That's the way I read what the map is for.

15   Q.          Okay.  And the redistricting in Item 3 of

16   the agenda, what's your understanding of what that

17   refers to?

18   A.          Well, it's probably just an initial -- I

19   don't recall this meeting, let me say first off.

20   But, obviously, Steve LaTourette was going to talk to

21   us about the fact that redistricting was coming up in

22   a couple years or a year.

23   Q.          And did you have republican delegation

24   meetings where you discussed redistricting?

25   A.          I believe so.  I don't remember specific

CONFIDENTIAL

Page 27

1                        STEVEN STIVERS

2    discussions, but I do believe it came up at some of

3    the delegation meetings.

4              It's a very sensitive subject for members

5    of congress when it comes up every decade, because

6    especially in a situation like we were in 2010, we

7    were going to lose two seats.  So it makes it a very

8    sensitive discussion.

9              So some discussions will happen, but it

10   won't be like a long meeting about redistricting

11   because that would get tense, could get tense.

12   Q.        Okay.  Now, you said that there were

13   sensitive discussions because Ohio was losing two

14   seats?

15   A.        No, I was saying sensitive feelings

16   because Ohio was losing two seats.  Some of the

17   members in that room as the delegation were probably

18   not coming back.

19   Q.        Okay.

20   A.        That's why it was sensitive.  That's what

21   I was trying to say.

22   Q.        Were there any discussions around the loss

23   of two seats?

24   A.        I don't remember.

25   Q.        Do you recall any discussions about the

CONFIDENTIAL

Page 28

1                    STEVEN STIVERS

2    pairing of incumbents?

3    A.          I do not remember any discussions of

4    pairing incumbents.  That would have been, as I just

5    eluded to, a very sensitive topic that would have

6    caused lots of problems and friction and would not be

7    something that would be discussed in that room.  And

8    I don't remember it ever being discussed in any

9    delegation meetings.

10   Q.          Outside of delegation meetings did you

11   have any discussions with other congress people about

12   pairing of incumbents in Ohio?

13   A.          So during the process of redistricting in

14   2011, as you know, the legislature passes a

15   redistricting law, passed by the house and senate,

16   signed by the governor.  There were a lot of rumors

17   that were in the popular press or people would hear

18   things, and there would be discussions.  And so I'm

19   sure there were discussions.

20              I don't remember any of them specifically,

21   but there were -- the one thing I remember about

22   redistricting is there were lots of rumors all the

23   way till the last day, because it changed until the

24   last day.  And none of us really knew what was going

25   to happen.  And there were changes happening up until

CONFIDENTIAL

Page 29

1                           STEVEN STIVERS

2      the last day in December of 2011.  And I don't

3      remember exactly when in December, but I remember it

4      was in December.

5      Q.          Okay.  Do you remember having any

6      discussions with anyone about the pairing of Turner

7      and Austria?

8      A.          I'm sure there was speculation about that,

9      but none of us knew who was going to be paired

10     together until we saw a map.

11     Q.          What about after the first map was to be

12     viewed, did you have any discussions with anyone?

13     A.          There was a lot of speculation at that

14     point about what would happen between the two of

15     them.  But I didn't have -- we talked about rumors we

16     had heard.  That is all I remember.  And I don't even

17     remember specifically what those were.

18                 But after the first map, it was viewed as

19     a fair fight between Austria and Turner by a lot of

20     people, because they both had about the same number

21     of constituents, the way I remember it.

22     Q.          Okay.  What about the pairing of Kucinich

23     and Kaptur?

24     A.          That never came up.  That was never

25     something that we talked about.

CONFIDENTIAL

Page 30

1                    STEVEN STIVERS

2    Q.         What about the pairing of Sutton and

3    Renacci?

4    A.         That didn't really come up until the end

5    when it happened.  I didn't know about it until the

6    end.  And I don't know when exactly I found out, but

7    toward the end is when I remember finding out.

8                    MS. THOMAS:  I'm going to have the next

9    document marked as Exhibit 4.

10        (Exhibit 4 was marked for identification.)

11    Q.         This is another email that was produced

12    for identification on the record.  It's Stivers 4894.

13                    This is an email chain that has been

14    produced January of 2011.  There is a -- the top

15    email is a KNEBT@aol.com.  Do you know whose email

16    that is?

17    A.         I do.

18    Q.         And who is that?

19    A.         That's my wife, Karen Stivers.

20    Q.         And this email is sent to your account,

21    correct?

22    A.         Yes.

23    Q.         Can you read the top line email?

24    A.         (Reading) Please don't forward to anyone,

25    just be aware of the redistricting paragraph.  Love

CONFIDENTIAL

Page 31

1                    STEVEN STIVERS

2       you, exclamation point, Karen.

3       Q.          And then below that is the forwarded email

4       chain.  It's from a Jon Husted, who is that?

5       A.          Jon Husted at the time was the Secretary

6       of State of Ohio, the new secretary of state.

7       Q.          Okay.  And it's to your wife, Karen

8       Stivers.  And then I don't think we need to read the

9       whole email.  But if you go one, two, three, four

10      lines down, there is a sentence that begins with

11      Please.

12      A.          Here it is.

13      Q.          (Reading) Please make sure...

14      A.          (Reading) Please make sure you guys stay

15      in touch with us on redistricting so we can get it

16      done in the right way.

17      Q.          Okay.  Did you have any conversations with

18      Jon Husted regarding redistricting?

19      A.          I did not.

20      Q.          Okay.

21      A.          And I don't believe he had any role in

22      redistricting.  He was very involved in

23      reapportionment of the state legislative seats, but I

24      don't believe he had an active role in the

25      redistricting.

CONFIDENTIAL

Page 32

STEVEN STIVERS

1   Q.          What is your understanding of why he would

2   want you guys to stay in touch regarding

3   redistricting?

4                   MR. TUCKER:  Objection, form.

5   A.          I would have to speculate to say that I

6   don't know what was in his mind at the time.  So I

7   don't know what he was thinking or saying in that

8   exactly.  Obviously, it was forwarded to me, and it's

9   not my text.  So I don't know exactly what he means

10  by that.

11                  (Exhibit 5 was marked for identification.)

12  Q.          Marked as Exhibit 5, for the record, is

13  Stivers 4042.  This is an email from Mary Beth

14  Carozza.  That was your chief of staff at the time?

15  A.          That's correct.

16  Q.          Okay.  And it's sent to you and to

17  Adam Kuhn, correct?

18  A.          That is correct.

19  Q.          And the subject is Checking In.  And in

20  the second line she states:  Jon Husted called about

21  a letter.  Do you see that?

22  A.          I see that.

23  Q.          Okay.  Then she goes on to describe a

24  conversation that she's had with him.  And then --

CONFIDENTIAL

Page 33

STEVEN STIVERS

1

2    I'm one, two, three, four, four up from the bottom,

3    there's a sentence that begins with "He also..."

4    A.          Yes.

5    Q.          Do you see that?

6    A.          I do.

7    Q.          Can you read that sentence?

8    A.          I will.

9                (Reading) He also brought up a 12 to 4

10   redistricting map scenario that he said we would

11   like.

12   Q.          Can you read the next sentence?

13   A.          (Reading) Will fill you in by phone.

14   Q.          Okay.  Do you recall having any

15   conversations with Mary Beth Carozza about a 12-4

16   map?

17   A.          I don't recall it.  That was seven years

18   ago.  I mean, I'm not disputing what this says, but I

19   don't recall the conversation.

20         (Exhibit 6 was marked for identification.)

21   Q.          For the record, Exhibit 6 is 3301, Stivers

22   3301.  The top email is an email from your address,

23   correct?

24   A.          It is.

25   Q.          And it's to Mary Beth, correct?

CONFIDENTIAL

Page 34

1                     STEVEN STIVERS

2    A.          Yes.

3    Q.          And Adam Kuhn, correct?

4    A.          Correct.

5    Q.          And then there is a Monica --

6    A.          Hueckel.

7    Q.          -- Hueckel.

8    A.          Yes, my scheduler.

9    Q.          That is your scheduler, right, we

10   discussed that.  And this is from January 13, 2011,

11   is that correct?

12   A.          Correct.

13   Q.          So I would actually like to focus on the

14   email that is further down in the chain.  It's

15   another email sent by you, and it starts with on

16   Thursday, January 13, 2011, do you see that?

17   A.          Yes.

18   Q.          Can you read the text of that email for

19   me?

20   A.          Yes, and I can put it in context, because

21   part of the top puts it in context.

22               It says, three people I should go see.

23   Especially Huffman.  But then after that, Mary Beth

24   said:  Got it, adding Monica.  And my top email,

25   which says, I don't want to just call or set up

CONFIDENTIAL

Page 35

STEVEN STIVERS

1
2 meetings, I want to be thoughtful in the approach is
3 meant to slow them down, because it's January of
4 2011, and I don't want to do stuff I shouldn't do,
5 don't want to just set up meetings or call people if
6 that's not appropriate. So I wanted to slow down
7 what looked like Mary Beth trying to set up those
8 meetings, because I wasn't sure I wanted to actually
9 set up those meetings. And I don't believe any of
10 those meetings actually occurred.
11 Q.        Okay.  Who is the Huffman being referred
12 to here?
13 A.        I believe it is Matt Huffman, who was
14 either a state representative or state senator at the
15 time.  He was in the legislature a long time, but he
16 was either a state representative or state rep.
17 Q.        Do you know what role he played in
18 redistricting?
19 A.        Off the top of my head, I do not, because
20 I decided not to engage personally on this.  The top
21 part of the email is meant to slow down, because I
22 knew it was early, and I didn't want to get out in
23 front of my skis and looking like I was trying to,
24 you know, maneuver for myself in place of my
25 colleagues.  Like I talked about the sensitive nature

CONFIDENTIAL

Page 36

1                    STEVEN STIVERS

2      of redistricting.  So you don't want to -- there's

3      important relationships you have to keep at the same

4      time, and you don't want to be seen as being very cut

5      throat and hurt other people and help yourself.

6      Q.        Did you know Matt Huffman at the time?

7      A.        I had met him.  We weren't particularly

8      close.

9      Q.        Did you ever talk to Matt Huffman

10     regarding redistricting in Ohio?

11     A.        I don't believe I did.

12     Q.        Do you know Keith Faber?

13     A.        I know Keith Faber better, yes.

14     Q.        Who is Keith Faber?

15     A.        Keith Faber was a state senator at the

16     time.  He might have been senate president.  No, I

17     don't think he was yet.  He was just a state senator

18     at the time.

19     Q.        Okay.

20     A.        But he and I served together.  Matt

21     Huffman and I did not.

22     Q.        And when you say serve together you

23     mean --

24     A.        In the legislature.

25     Q.        And do you know what role Keith Faber

CONFIDENTIAL

Page 37

1                      STEVEN STIVERS

2       played in redistricting?

3       A.          I do not, and I do not believe I talked to

4       him about redistricting.

5            (Exhibit 7 was marked for identification.)

6       Q.          Exhibit 7 is -- begins with Bates number

7       4523 for the record.

8                   And it is another email that you produced

9       in this case.  This one is from April 5, 2011, and

10      it's an email from your email address, correct?

11      A.          That's correct.

12      Q.          And it's to a Lara, and I will not be able

13      to pronounce --

14      A.          Lara Lashutka crotty is her name, and she

15      is my fundraiser.  And everybody else on the email

16      is -- you know who they are.  The CC's, if you like,

17      I can identify them.

18      Q.          Okay.  Just for the record, it's Adam Kuhn

19      and Mary Beth, again?

20      A.          Correct.

21      Q.          And then who are the CC's?

22      A.          Jennifer Bogart and Emma Heydlauff were my

23      Washington based fundraisers.  And Lara Lashutka is

24      my Ohio based fundraiser and finance director and

25      does all the Stivers for Congress fundraising.

CONFIDENTIAL

Page 38

STEVEN STIVERS

1    Q.          So I'm going to start with the email

2    that's right below the email that you sent from Lara.

3    Can you read the text of that email.  It begins with

4    Dirossi.

5    A.          Yes.  (Reading) Dirossi was just in my

6    office asking when we were going to get the $10,000,

7    10K, with a smily face.

8    Q.          Do you know who Dirossi is that is being

9    referenced?

10   A.          I do.

11   Q.          Who is that?

12   A.          Ray Dirossi at the time was the fundraiser

13   for the state senate campaign committee.

14   Q.          How do you know Ray Dirossi?

15   A.          I've known Ray off and on for ten years in

16   various political positions.  I knew him at that

17   point because he was asking us for money.  And

18   because I was a former state sensor, I had a practice

19   of always giving 10,000 to the max out, which I was

20   think was $17,500 at the time to the state senate

21   caucus every two years.

22              I did it in 2008.  I did it in 2010.  I've

23   done it in 2012, 2014, 2016 and 2018.  So it's not

24   just something I do occasionally.  It's something I

CONFIDENTIAL

Page 39

STEVEN STIVERS

1

2    do as a matter of practice.  I support my former

3    colleagues and friends in the state senate.

4    Q.          Okay.  Do you know if Mr. Dirossi had any

5    role in the Ohio redistricting?

6    A.          I believe he did later, yes.

7    Q.          What was that role?

8    A.          I don't know what it was.  But I know I've

9    seen his name in documents, which is your complaint,

10   the lawsuit.  That's why I believe he had a role, but

11   I don't know his exact role.

12   Q.          Did you ever talk to Mr. Dirossi about

13   redistricting?

14   A.          Because we're friends, I talk to Ray

15   Dirossi periodically.  It's possible I talked to him

16   about redistricting, but I don't remember any

17   specific conversation about redistricting with him.

18   Q.          Just so the record is clear, could you

19   read the email at the top that you're sending.  I

20   think you've described the context.

21   A.          I described the context and content, but

22   it says:  I want to give the Republican Senate

23   Campaign Committee, which is the campaign arm for the

24   republican state senate and the Ohio house republican

25   organizational committee, which is the campaign arm

CONFIDENTIAL

Page 40

STEVEN STIVERS

1  for the house republicans $10,000 ASAP.  I would like

2  to give them another $7,500 after July 1st, which

3  would take me to the maximum at the time which I

4  believe was $17,500.

5  Q.          Okay.  That was your personal funds that

6  you were giving?

7  A.          That was from Stivers For Congress.  I

8  wish I had that much personal money.  You obviously

9  deposed Jim Renacci.  He is rich.  That was a joke.

10      (Exhibit 8 was marked for identification.)

11  Q.          This is an email from Courtney Whetstone.

12  A.          Whetstone, yes, ma'am.

13  Q.          Whetstone to yourself, Mary Beth and Adam.

14  A.          Yes.

15  Q.          Who is Courtney Whetstone?

16  A.          Courtney Whetstone was my communications

17  director.

18  Q.          Okay.  And this is an email -- oh, I don't

19  know if I've identified it for the record.  It's

20  Stivers 2589.  And this is an email with the subject

21  Redistricting, is that correct?

22  A.          That is correct.

23  Q.          And it's from June 1st, 2011, is that

24  correct?

CONFIDENTIAL

Page 41

1                        STEVEN STIVERS

2      A.            That is correct at 2:56 p.m.

3      Q.            Could you read the first sentences for me

4      or the first sentence, I guess?

5      A.            (Reading) Mike Smullen emailed me to let

6      me know they are hearing a redistricting plan that

7      creates a Columbus D District protecting Stivers and

8      Tiberi by taking the eastern half of Austria's... and

9      then making Austria and Turner run against each

10     other.  If Mike is hearing this, then I'm sure you

11     all are hearing it as well.  I just wanted to pass

12     along what people are sending to me...

13     Q.            Who is Mike Smullen?

14     A.            Mike Smullen is Bill Johnson's chief of

15     staff.

16     Q.            Okay.

17     A.            And we were hearing lots of rumors around

18     that time.  And this would have just been like any

19     other rumor for me at the time.  I didn't put too

20     much stock in any of the rumors because a lot of them

21     turned out to be false, and some of them turned out

22     to be true.

23     Q.            Fair enough.  What was your understanding

24     of what Columbus D District meant?

25                        MR. TUCKER:  Objection to form.

CONFIDENTIAL

Page 42

1                    STEVEN STIVERS

2    Q.          Just your understanding?

3    A.          I would have to speculate.  I don't know

4    what that means exactly.  Mike Smullen -- that is

5    Mike Smullen's term or Courtney's term.

6    Q.          Okay.  And Stivers is your name?

7    A.          That is me, yes, ma'am.

8    Q.          And then do you know who Tiberi is?

9    A.          Tiberi is Pat Tiberi who was a congressman

10   from Ohio's 12th district.

11   Q.          Okay.  And we've mentioned Austria before,

12   but I don't think we've identified him for the

13   record.

14   A.          Steve Austria was the congressman from

15   Ohio's 7th Congressional District.

16   Q.          And then --

17   A.          Would you like me to identify Turner?

18   Q.          Yes, please.

19   A.          Mike Turner is the congressman -- they've

20   renumbered all the districts now.  I think he was the

21   3rd congressional district at the time.  But now he

22   has a new number, and I should know what it is, but I

23   don't.  But it was the 3rd at the time as I recall.

24   Q.          Okay.  Here the speculation is that you

25   may inherit part of Austria's district.  Did you end

CONFIDENTIAL

Page 43

STEVEN STIVERS

2  up inheriting any of Austria's district?

3  A.        Yes, ma'am.

4  Q.        And what portions?

5  A.        I'll have to remember exactly what was

6  his.  But I got, as I recall, I got stuff from Mike

7  Turner, John Boehner, Bill Johnson and Steve Austria

8  in redistricting.  I got a lot of new territory, but

9  I believe the Steve Austria territory that I got was

10  half of Fayette County, which only has about two or

11  three thousand voters.  It's more cows than voters.

12  I got Pickaway County, all of Pickaway County.

13        I ultimately got all of Fairfield County

14  from him and all of Perry County.  I believe those

15  were the counties he had.  I may have gotten

16  something else from him, but that's what I remember.

17  Q.        Okay.

18  A.        I don't believe he had Morgan.  I don't

19  believe he had Vinton.  I don't believe he had

20  Athens.  I don't believe he had Ross.  So I don't

21  think I got anything else from him.

22        As I said, some of the rumors were false

23  that we were hearing in that time frame.  Some truned

24  out to be ultimately true.  If you hear enough

25  rumors, some of them are going to be true.

CONFIDENTIAL

Page 44

1                    STEVEN STIVERS

2          (Exhibit 9 was marked for identification.)

3     Q.          Exhibit 9, for the record, is Stivers 3.

4     And it's another email that was produced from August

5     15, 2011.  And the email is from Lara, your

6     fundraiser, is that correct?

7     A.          That's correct.

8     Q.          And it's to you, Mary Beth and Adam.  And

9     the subject is for approval Fin Com Agenda?

10    A.          Yes, that is what it says.

11    Q.          Do you know what Fin Com Agenda is?

12    A.          I do.

13    Q.          What is that?

14    A.          Finance committee.  That would be the

15    group of folks that helps me raise money.

16    Q.          Okay.  And did you have meetings with your

17    finance committee?

18    A.          Yes.

19    Q.          What types of things were discussed in

20    those meetings?

21    A.          Usually it was a general update of what

22    was going on politically and what I was working on in

23    Washington.

24    Q.          And how frequently would you have those

25    meetings?

CONFIDENTIAL

Page 45

1                          STEVEN STIVERS

2        A.              A couple times a year, maybe.

3        Q.              So we are going to skip a lot of sections,

4        but if you could read the section that begins with

5        Adam?

6        A.              Yes.  (Reading) Adam, in the political

7        update I suggest we share a broad outline of

8        redistricting, talk about the timing of the process,

9        per Whatman's suggestion, the central Ohio D

10       district, and potential upcoming primary or general

11       opponents.

12       Q.              Do you know who Whatman is here?

13       A.              I believe I do.

14       Q.              And who is that?

15       A.              I believe it's Tom Whatman.

16       Q.              Who is Tom whatman?

17       A.              Tom Whatman is a political person that

18       worked for John Boehner at the time.

19       Q.              Do you know what role he had with

20       John Boehner?

21       A.              I don't know exactly, but I know he worked

22       with John Boehner on political items.

23       Q.              Do you know if Tom Whatman worked on

24       redistricting at all?

25       A.              I don't know that off the top of my head.

CONFIDENTIAL

Page 46

1                          STEVEN STIVERS

2      I don't remember seeing him in your documents, but I

3      might have missed it.  Maybe I missed it.  But I

4      don't know if he worked on redistricting off the top

5      of my head.

6      Q.        Okay.  Now, this email that you just read

7      suggests that Tom Whatman has given some suggestion

8      about a central D district; do you see that?

9      A.        I see that, yes.

10     Q.        Okay.

11     A.        Those are Lara's words.

12     Q.        Understood.  But do you recall any

13     discussions with Tom Whatman or anyone in Boehner's

14     office about a democratic district in central Ohio?

15     A.        Obviously, Lara or somebody had a

16     discussion it looks like here, but I don't recall

17     having a discussion with him.  And I would talk to

18     Tom Whatman frequently because he did all of

19     John Boehner's political work.  So I would probably

20     talk to him once a month.

21     Q.        Did you ever talk to Tom Whatman about

22     redistricting?

23     A.        I may have.  I don't recall specific

24     conversations.

25     Q.        I think we can take a quick break, ten

CONFIDENTIAL

Page 47

                              STEVEN STIVERS

1

2    minutes.

3    A.        Great.   To the extent -- I'll clarify

4    quickly -- to the extent I talked to Tom Whatman, it

5    was probably asking what he had heard, kind of

6    getting the rumor mill of what's out there, because

7    he was plugged in.  So that was -- but I don't

8    remember any specific conversations.

9                    (Recess taken.)

10        (Exhibit 10 was marked for identification.)

11   Q.        For the record, I have marked as Exhibit

12   10 Stivers 1.  And this is an email from Mary Beth

13   from August 30th, 2011 to yourself, is that correct?

14   A.        Yes.

15   Q.        And the subject is DLH; do you see that?

16   A.        I do.

17   Q.        Do you know what DLH is?

18   A.        I believe I do.

19   Q.        What do you believe it is?

20   A.        I believe it to be David L. Hobson.

21   Q.        Who is that?

22   A.        He is a former member of congress.  He

23   represented Ohio 7th district.

24   Q.        Can you read the email for me, please?

25   A.        Yes.  (Reading) Beer will circle back and

CONFIDENTIAL

Page 48

1                    STEVEN STIVERS

2    send soft message to Uncle Dave on ways he can help

3    SA without hurting us or PT.  We know DHL gets

4    emotional about redistricting but wouldn't hurt his

5    friends.

6    Q.          Is the Uncle Dave in here a reference to

7    David L. Hobson?

8    A.          I believe it is.

9    Q.          Okay.  Did you have a practice of

10   referring to him as Uncle Dave?

11   A.          Mary Beth, who had known him for sometime,

12   had a practice of referring to him as Uncle Dave.

13   Q.          Did anyone else on your team call him

14   Uncle Dave?

15   A.          I'm not sure.  I don't think so.  But if

16   Mary Beth would have called him Uncle Dave, somebody

17   might have returned an email calling him Uncle Dave

18   because she did.

19   Q.          Okay.  Do you know who SA is in this

20   email?

21   A.          I believe I do.

22   Q.          Who do you believe it is?

23   A.          I believe it to be Steve Austria.

24   Q.          And do you know who PT is?

25   A.          I believe I do.

CONFIDENTIAL

1          STEVEN STIVERS

2     Q.          Who do you believe PT is?

3     A.          I believe PT to be Pat Tiberi.

4     Q.          Do you have any recollection of

5     David Hobson being involved in redistricting

6     conversations at this time?

7     A.          I have some vague recollection about some

8     big context of how he was involved, yes.

9     Q.          And what is that?

10    A.          Dave Hobson who had represented the 7th

11    district was trying to do everything he could to

12    preserve Steve Austria who had taken his place, and

13    Steve Austria's chance to stay in congress as part of

14    redistricting.

15    Q.          Okay.  And you said he was trying to do

16    everything that he could to try to preserve Steve

17    Austria, what do you mean by that?

18    A.          I think he was talking to people,

19    encouraging people to make lines that he felt would

20    be favorable to Steve Austria either in a primary

21    against Mike Turner.  This is August.  I don't

22    believe there had been any maps out yet, but there

23    were rumors of Steve Austria and Mike Turner maybe

24    running against each other.  And he wanted as

25    favorable a map for Steve Austria as he could get.

CONFIDENTIAL

Page 50

STEVEN STIVERS

2        And that caused some tension later on,

3    because many times it was doing things that affected

4    other districts potentially.  And it was all rumors

5    usually that we dealt with, because we never knew

6    what was actually going on.  And we would hear Dave

7    Hobson is doing this or this is going on, and you may

8    see some of those documents.  I haven't reviewed

9    every document we gave you, but you may see some

10    documents that talk about that.

11    Q.        Okay.  And what was your reaction to the

12    rumors of Dave Hobson's involvement?

13    A.        I consider Dave a friend, but I also know

14    that he was closer to Steve Austria than he was me.

15    He was like a father figure to Steve Austria, and I

16    felt like he was doing everything he could to help

17    Steve Austria period.

18    Q.        Did you have any discussions with

19    Dave Hobson regarding redistricting?

20    A.        I did not.  I didn't feel like those would

21    be productive because he was already focused on

22    something, and I wasn't going to be able to dissuade

23    him of that and didn't talk to him.

24    Q.        You said Mary Beth knew David Hobson

25    longer than you did.

CONFIDENTIAL

Page 51

1                    STEVEN STIVERS

2    A.          Yes, ma'am.

3    Q.          Are you aware of any conversations she had

4    with David Hobson?

5    A.          I have a general recollection that she

6    would talk to Dave Hobson about many issues probably

7    every month or so.  And I'm sure she talked to him

8    about redistricting.

9    Q.          Okay.  Did she talk to you about any

10   conversations she had with Dave Hobson on

11   redistricting?

12   A.          It was like emails where she would give me

13   an update and say I'm hearing Dave is doing this or

14   that, and you probably have those.

15        (Exhibit 11 was marked for identification.)

16   Q.          So for the record 11 is Stivers 766.  And

17   it is an email from Adam, who we've already

18   identified, to Mary Beth and copying yourself.  Do

19   you see that?

20   A.          I do.

21   Q.          And it's from September 10th, 2011?

22   A.          Yes.

23   Q.          So this is a series of emails.  And why

24   don't we go in chronological order, which would

25   actually require us to start at the bottom?

CONFIDENTIAL

Page 52

1                    STEVEN STIVERS

2    A.          At the bottom, okay.

3    Q.          And the bottom email is an email from

4    yourself, correct?

5    A.          No, I believe that is from Mary Beth

6    Carozza to me.  On the bottom --

7    Q.          Oh, sorry.

8    A.          On the bottom of the other page.

9    Q.          We can actually skip this one.  I don't

10   think it has that much different context.

11   A.          It has some context, which I would like to

12   make sure that we can include if you would like.

13   Q.          Okay.  Why don't we include the context

14   that you would like to with Mary Beth's email.

15   A.          As we said in the last question, Mary Beth

16   would sometimes tell me what she was hearing from

17   people including Dave Hobson.  As you can see, she

18   referred to him as Uncle Dave.  And she was in this

19   telling me that -- she was saying Dave Hobson was

20   advocating for me to pick up Clark County.

21   Q.          Okay.  And where is Clark County?

22   A.          Clark County is just west of my district.

23   My district stops at the border of Madison County.

24   So Franklin County where we're sitting is Columbus.

25   Madison County is like London and West Jefferson.

CONFIDENTIAL

Page 53

STEVEN STIVERS

1   And just west of that is Clark County, which includes

2   Springfield and those cities.

3   Q.          And what was your understanding of the

4   advocacy around Clark County?

5              MR. TUCKER:  Objection to form.

6   A.          It would cause me to speculate, but I know

7   that Dave Hobson wanted me to have Clark County, and

8   I could -- I suppose I could speculate why, but I

9   don't want to give -- I don't know that I know

10  exactly why, but --

11  Q.          Okay.  So let's go to the email that you

12  sent.

13  A.          Okay.  Thank you.

14  Q.          Can you read the text for me?

15  A.          Yes.  (Reading) It says:  Thanks.  Uncle

16  Dave -- because she referred to him as Uncle Dave, I

17  did -- is making a major push to -- and I think this

18  is a little ineloquent -- to him me get all of Clark

19  County.  I think that is supposed to say have me get,

20  and sometimes --

21  Q.          I do that often, yep.

22  A.          I believe that's what that means.

23  Q.          There's absolutely no judgment here.  I do

24  that very often.

CONFIDENTIAL

Page 54

1                      STEVEN STIVERS

2       A.          And it says:  If that happens, Whatman

3    tells me my index will go to about 52 unless I lose

4    something else.  The problem is that my district

5    would become the most competitive district in the

6    state.  (LaTourette has about a 53 percent index).

7       Q.          Now you refer to Whatman in this email,

8    correct?

9       A.          And then, by the way, it says:  We will

10   see what happens.

11      Q.          Thank you.  You refer to Whatman in this

12   email, correct?

13      A.          I do.

14      Q.          And is that Tom Whatman?

15      A.          I believe it is, yes.

16      Q.          Okay.  And you refer to an index in your

17   email, correct?

18      A.          It does, yes, ma'am.

19      Q.          Do you know what that index is?

20      A.          Yes, ma'am.

21      Q.          What is it?

22      A.          I believe it refers to a PVI, partisan

23   voting index, which --

24      Q.          You can continue.

25      A.          -- which tells you how republican or

CONFIDENTIAL

Page 55

1                    STEVEN STIVERS

2    democrat a district is.   In this case, it's

3    52 percent.

4    Q.          And is it 52 percent republican?

5    A.          That is correct.

6    Q.          Okay.   Do you recall having conversations

7    with Tom Whatman about indices as described here?

8    A.          I don't remember, but I don't dispute it.

9    I see it here.

10   Q.          Okay.   And then you say that your district

11   would become the most competitive district in the

12   state, is that correct?

13   A.          That's what it says, yes, ma'am.

14   Q.          What did you mean by the most competitive

15   district in the state?

16   A.          It probably means the seat with the lowest

17   republican index.

18   Q.          And then you mention LaTourette's district

19   at 53?

20   A.          That's what it says, yes, ma'am.

21   Q.          Do you recall seeing index numbers for

22   other congress persons' districts?

23   A.          No, ma'am.   My guess is that was his

24   current index before 2011.

25   Q.          And why were you emailing your team about

CONFIDENTIAL

Page 56

1                    STEVEN STIVERS

2    your index numbers?

3    A.           I was probably just keeping them informed.

4    As you can see, later in the email, Adam says, don't

5    let them use your good nature against you, because

6    it's not -- I'm not making a value judgment, you

7    know, or saying that I'm going to do anything about

8    it.  I'm just telling them what the number would be.

9    Q.           Okay.  The next email up is an email from

10   Adam, correct?

11   A.           It is.

12   Q.           And that is responding to your email,

13   correct?

14   A.           It is.

15   Q.           Can you read the email from Adam, please?

16   A.           Yes, and I would like to put it in

17   context.  The team gets very upset about things and

18   so that he will try to push me to get me to be a

19   little more hard core on this stuff.

20               I'll read it from Adam.  (Reading) Having

21   Clark County is our worst case scenario and clearly

22   not good for Team Stivers.  Uncle Dave has

23   potentially taken our district from a 6.5 index to a

24   2.  That's not looking out for Steve Stivers.  We

25   will be a swing district and we will get the worst

CONFIDENTIAL

Page 57

STEVEN STIVERS

1

2    deal out of everyone in the state.  Johnson is a 5.

3    Gibbs and Renacci are both 4.5.

4    Q.          Thank you.  Do you have an understanding

5    of what a 6.5 index is?

6    A.          I believe that you would win by 6.5.  I

7    think he miscalculated here.  Because if we were a

8    52, you win by four, because it's 52 to 48.  It's not

9    a two, it's a four.

10   Q.          Do you agree with his characterization

11   that you would become a swing district?

12   A.          I don't think there's any such thing as a

13   safe district.  I think every district is a swing

14   district.  And we saw that in 2018, Pat Tiberi's in

15   2011 was made much more republican than mine.

16              Pat Tiberi retired.  And in the special

17   election, that district almost went democratic, and

18   it's a ten point index.  So districts can swing

19   wildly based on a lot of factors, including

20   incumbency, how active the member works, how much the

21   member fund raises, how hard the member campaigns,

22   and the competition.  So there are a lot of things

23   that go into making a district competitive, not just

24   the index.

25   Q.          Do you agree with his characterization

CONFIDENTIAL

Page 58

STEVEN STIVERS

1

2    that having Clark County would not be a good scenario

3    for you?

4    A.          I don't agree with that.

5    Q.          Why not?

6    A.          Because I don't think -- I don't think one

7    geography is better or worse for me.  And I don't

8    know the people of Clark County, I've never

9    represented them, but I'm sure they are nice people.

10   Q.          Did other members of your team, as far as

11   you're aware, share this view of Clark County?

12   A.          It was a big fight between Adam Kuhn and

13   Mary Beth who more agreed with Dave Hobson, I

14   believe.

15   Q.          Okay.  Can you read the email above from

16   Mary Beth, please.

17   A.          Mary Beth.  And I may misremember what

18   their positions were, but that's the way I remember

19   it.

20               (Reading) Whatman says we need to tell

21   Weidner and Hobson point blank we don't want Clark

22   County in the strongest possible terms.  I'm prepared

23   to go further with Dave and let him know his meddling

24   is not only hurting Austria, but you, too.  I will

25   make it personal.  Dave is hearing what he wants to

CONFIDENTIAL

Page 59

STEVEN STIVERS

2    hear and we need to set him straight.

3    Q.         And is your understanding that the whatman

4    discussed here is Tom Whatman?

5    A.         I would believe so.

6    Q.         And the Dave and Hobson are David Hobson

7    who we've discussed?

8    A.         That's correct.

9    Q.         And who is Weidner?

10   A.         Chris Weidner was a state senator.

11   Q.         And do you know what his role was in

12   redistricting?

13   A.         I don't know what his role was in

14   redistricting.

15   Q.         And the subject of this response is also

16   Clark County, correct?

17   A.         Yes, ma'am.

18   Q.         And this email is discussing relaying a

19   desire not to have Clark County in your district?

20   A.         That is correct.

21   Q.         Do you know if those conversations

22   occurred?

23   A.         I believe I slowed my team down on that.

24   Q.         What do you mean?

25   A.         I didn't want to look like I was looking

CONFIDENTIAL

Page 60

1              STEVEN STIVERS

2    out for myself at the expense of my colleagues or

3    Steve Austria.  And I believe I told my team to slow

4    down on that.  Now, I don't know -- that's my

5    recollection at this time.

6    Q.          Does slow down mean no conversations

7    happened?

8    A.          It means don't be -- like, you read -- I

9    read this email to you.  They want to be very

10   aggressive on this.  And I know I told them I did not

11   want them to be very aggressive because I did not

12   want to be seen as predatory among my colleagues and

13   friends who are also members of congress.

14   Q.          Okay.  So you didn't want to be seen to be

15   very aggressive, does that mean that no one could

16   have any conversations about Clark County or you

17   didn't want to have an aggressive message about Clark

18   County?

19             MR. TUCKER:  Object to form.

20   A.          I don't remember exactly.  What I do know

21   is I slowed the team -- they wanted to be very -- I

22   read the email to you -- they wanted to be very

23   forceful.  And I remember after that, slowing them

24   down and saying, I don't want to get in the middle of

25   this.  It will work out one way or the other.  That

CONFIDENTIAL

Page 61

1                     STEVEN STIVERS

2    is what I remember.

3         (Exhibit 12 was marked for identification.)

4    Q.          All right.  For the record, I've just had

5    marked as Exhibit 12 Stivers 2987.  And this is an

6    email chain -- similar email chain to the one that we

7    reviewed before, but not exactly the same, and it's

8    from September 10th, 2011.

9    A.          Is this after the other one?

10   Q.          I have -- I think it's just there are a

11   couple of emails.

12   A.          It is after, yes, ma'am.  It is after.

13   Q.          There is one at 10:00.  These are supposed

14   to be chronological.

15   A.          I wanted to make sure I understand the

16   context, because I don't recall this, but I'm reading

17   through it.

18   Q.          So I think you will see that two emails on

19   the bottom are emails that we've already discussed.

20   An email from Mary Beth, and then your response to

21   Mary Beth about Clark County.  And now there is a new

22   email from Adam Kuhn to Mary Beth and yourself.  Do

23   you see that?

24   A.          I see it.

25   Q.          Okay.  And can you read the text of

CONFIDENTIAL

Page 62

1          STEVEN STIVERS

2     Mr. Kuhn's email?

3     A.         (Reading) Attached are some maps that I

4     drew today to give you a range of indexes.

5     Q.         And then the attachments are stapled as

6     one exhibit?

7     A.         That is correct.  There appears to be

8     three.

9     Q.         Do you recall receiving this email?

10    A.         I do not recall receiving this email.

11    Q.         Do you recall ever receiving any maps with

12    the various partisan makeups of a potential district?

13    A.         I do not.  I mean, I see that I got these

14    maps, but I don't believe -- I don't believe I got a

15    lot of maps, and I don't remember getting these maps.

16              In looking at them, they look nothing like

17    what my district ultimately ended up like in the

18    first or second map.  So I don't know where they came

19    from.  Obviously, they came from Adam.  I don't know

20    how he did them, but I didn't -- I never made any

21    maps, and I don't remember getting maps, but I got

22    obviously these.

23    Q.         Okay.  If we could go to just the first

24    map, I want to see if we can identify what we're

25    looking at here.

CONFIDENTIAL

Page 63

1                    STEVEN STIVERS

2       A.          Yes, ma'am.

3       Q.          So there is a legend with Field and Value,

4  do you see that?

5       A.          I do see that.

6       Q.          And there is District, do you see that?

7       A.          I see it.

8       Q.          Then Population?

9       A.          Yep.

10      Q.          Then Deviation?

11      A.          Yep.

12      Q.          Then Percentage Deviation, and then

13  Percentage R Index?

14      A.          I see that, yes.

15      Q.          Do you know what Percentage R Index is?

16                  MR. TUCKER:   Objection.

17      A.          It would cause me to speculate.

18      Q.          Okay.

19      A.          Capital R underline I N D E X.

20      Q.          Do you know what USH 10 8 R is?

21      A.          I do not know what that is.

22      Q.          Do you know what D Index is?

23      A.          I don't know.  It would be speculation on

24  my part.

25      Q.          Do you know what USH 10 08 D is?

CONFIDENTIAL

Page 64

STEVEN STIVERS

1

2    A.          I have no idea what that is.  I have no
3    idea what either one of those are.

4    Q.          Okay.

5    A.          I can see in these maps that none of them
6    include all of Clark County.  It looks like Adam sent
7    me this after the initial discussion to see what it
8    would look like if we didn't get all of Clark County.
9    And none of those include all of Clark County as you
10   can see.

11              But my district never looked anything like
12   either one of these maps, because Union County is in
13   all three of these maps.  We never got Union County.
14   We lost it in redistricting.  We had it before.
15   Logan County is in here.  We never got that.  That's
16   in two of the maps.  And a lot of Fairfield and
17   Pickaway that we ended up picking up in the second
18   map are not in here.

19   Q.          Okay.

20   A.          So it looks just like something he tried
21   to attempt.

22       (Exhibit 13 was marked for identification.)

23   Q.          All right.  I've just handed you what has
24   been marked as Exhibit 13.  It's Stivers 775 for the
25   record.

CONFIDENTIAL

1          STEVEN STIVERS

2          And this is -- the top line is an email

3    from Adam to Jennifer Bogart who we've identified as

4    one of your fundraisers?

5    A.          Correct.

6    Q.          And to yourself?

7    A.          Correct.

8    Q.          And it's copying Lara who is also a

9    fundraiser, correct?

10   A.          Um-hum.

11   Q.          And the email is Quick Question -- or the

12   subject is Quick Question.  And it's an email from

13   September 17, 2011?

14   A.          That is correct.

15   Q.          Okay.  Can you read the email for me,

16   please?

17   A.          Where would you like me to start, at the

18   initial bottom part and then read up?  There is two

19   parts.

20   Q.          No, I think we can just focus on the email

21   from Adam, yes.

22   A.          (Reading) She is running in the newly

23   created democrat seat in Franklin County through

24   redistricting.  We're still in the 15th District.

25   Kilroy is running in the 3rd District.

CONFIDENTIAL

Page 66

1                    STEVEN STIVERS

2      Q.         And for the context, the earlier email is

3   referring to Mary Jo, which I assume is Mary

4   Jo Kilroy?

5      A.         Who ran against me in 2008 and '10, yes.

6   And just as a little more context.  This is

7   September 17th after the map was public.  So the map

8   was introduced in the legislature in September, and I

9   believe the map was public at this time, and that's

10  why he knows that.

11     Q.         When the map was public, do you recall

12  there being a democratic leaning seat in Franklin

13  County?

14     A.         There was a  new seat in Franklin County

15  that has a lot of the City of Columbus and had a more

16  democratic benY, yes.

17     Q.         And then the speculation was that Mary Jo

18  Kilroy was going to run in that district?

19     A.         I believe she had filed Federal Elections

20  Commission paperwork that said she was running in

21  that district, so it's not speculation.

22     Q.         In the new map you were left in the 15th

23  District?

24     A.         Yes, ma'am.

25         (Exhibit 14 was marked for identification.)

CONFIDENTIAL

1                        STEVEN STIVERS

2      Q.          This email bears Bates number 3782

3      Stivers.  This is an email from yourself, correct?

4      A.          Yes, it is.

5      Q.          It's to Courtney Whetstone?

6      A.          Courtney Whetstone, my communications

7      director, yes.

8      Q.          I'm sorry.  I'm going to have to tell

9      myself, pretend the H isn't there, the silent H.

10                And you're forwarding a news article,

11     correct?

12     A.          Yes, I am.

13     Q.          Looking at the text that is included, do

14     you recall what the news article was about?

15     A.          It just talks about the new redistricting

16     process, and I believe it talked about -- although

17     it's not in your highlighted text -- it talked about

18     how Steve Austria might run against me.

19     Q.          Okay.

20     A.          And that was the context of this email.

21     Q.          And then you ask Courtney Whetstone to

22     email -- to call you after reading it?

23     A.          Yes, ma'am.

24     Q.          Do you recall whether she called you?

25     A.          I'm sure she did.

CONFIDENTIAL

Page 68

STEVEN STIVERS

1

2     Q.          And why did you want her to call you?

3     A.          Because I think this was the beginning --

4     and you can actually pull this article and look at it

5     and double check me -- I think this was the first

6     time we saw something that said Steve Austria might

7     run against me in print, like in the press.

8     Q.          And then did you want to respond to that

9     in the press?

10    A.          I wanted her to know it was coming and

11    know how to talk through how she would advise

12    handling it.

13    Q.          And did you come up with a strategy for

14    dealing with that?

15    A.          We decided to mostly ignore it, yes,

16    publicly and in the press.

17    Q.          Okay.

18    A.          And work behind the scenes to see if we

19    could discourage him from running against me.

20    Q.          Did you work behind the scenes to try to

21    discourage him?

22    A.          We did.

23    Q.          What did you do?

24    A.          He is a friend.  I talked to him and

25    stayed close to him the whole time, and encouraged

CONFIDENTIAL

Page 69

1                         STEVEN STIVERS

2      him to not run against me.

3      Q.            And did those conversations start in

4      October 2011, or at some other point?

5      A.            I don't know exactly when, but this was

6      the first time we saw it publicly.  I remember a lot

7      of issues around this in November --

8      Q.            Okay.

9      A.            -- and December.

10                   And I believe we had to pull petitions in

11     December of that year.  It was a presidential year,

12     right?  Yes, 2012.

13     Q.            2012, it was a presidential year.

14     A.            It was a presidential year, yes, so that

15     means the primary was in -- originally scheduled for

16     March of 2012, which means petitions would actually

17     be pulled potentially in December of 2011, to put it

18     in context.

19         (Exhibit 15 was marked for identification.)

20     Q.            And for the record, this is 6266 Stivers.

21     This is an email from Adam Kuhn to

22     Courtney Whetstone, yourself.  And that is your

23     wife's address, correct?

24     A.            I believe so.

25     Q.            Okay.  And it's from November 2nd, 2011,

CONFIDENTIAL

1                        STEVEN STIVERS

2      and it's following up on a story in the Dispatch.

3      I'm not going to address the story.  If you want to

4      look at it to just get the context, that is fine.

5      A.          I'm looking at it right now.  I got it.

6      Yes, I believe that is the second map coming out.

7      Q.          Okay.  So I want to only ask you about a

8      portion of the email at the top from Adam to the

9      people that we've named including yourself.

10     A.          Yes.

11     Q.          Can you read the sentences and the line

12     that begins with House Thinks?

13     A.          (Reading) House thinks they have the

14     votes.  Martin was the holdout, apparently.  Boehner

15     had to call him personally today.

16     Q.          Okay.  Do you know who Martin is that is

17     being referred to here?

18     A.          I don't.  I assume he's a state rep, but I

19     don't know who that is.

20     Q.          And is the Boehner John Boehner, the then

21     speaker of the house?

22     A.          I believe that to be John Boehner.

23     Q.          Do you know whether John Boehner talked to

24     anyone about redistricting in Ohio?

25     A.          I do not.  And I don't know whether Adam

CONFIDENTIAL

Page 71

                         STEVEN STIVERS

1

2      actually knows about a call or told us a rumor.  So,

3      you know, it sounds like a fact in this email, but

4      I'm not sure it's a fact.

5      Q.          Okay.

6      A.          I take it as a rumor, because I know how

7      things were going at that point, and people were

8      saying things that when you read them sound like a

9      fact, that are a rumor.

10     Q.          Were there rumors going around at the time

11     that John Boehner had been calling people in the Ohio

12     legislature?

13     A.          Not that I remember.  And that is why I

14     consider this to be a rumor.  I have a hard time

15     thinking the speaker of the house would have called a

16     state representative on this.

17     Q.          Did you ever discuss redistricting with

18     Speaker Boehner?

19     A.          I don't believe I did.

20          (Exhibit 16 was marked for identification.)

21     Q.          I've just handed you Exhibit 16.  It is

22     marked Stivers 330.  And this an email from Lara --

23     A.          Lashutka.

24     Q.          I was just going to say who did

25     fundraising -- to yourself.

CONFIDENTIAL

Page 72

1                          STEVEN STIVERS

2    A.              Yes.

3    Q.              And the subject is Calls Today Ingram

4    Tracker.  Do you see that?

5    A.              Yes.

6    Q.              Okay.  Just sticking on the subject, do

7    you understand what the subject of this email means?

8    A.              I do.

9    Q.              What is that?

10   A.              It means that I had an event coming up

11   with the Ingram family at their home, and I was

12   calling to ask people to support that event.

13   Q.              Okay.  And then there are talking points

14   for the calls?

15   A.              Yes, I see them.

16   Q.              And were those -- were those talking

17   points that you were going to use?

18   A.              Those were talking points that Lara put

19   together.  She always puts together talking points.

20   I don't always feel compelled to use those talking

21   points.  So those are her words, not mine, and not

22   necessarily the way I would phrase things when I

23   would call people, but they give me a point of

24   reference that I look at and then decide what I'm

25   going to say.  So I have a reputation for not always

CONFIDENTIAL

Page 73

1                        STEVEN STIVERS

2       using the talking points my staff gives me.

3       Q.          Okay.   If you could look at the third

4       bullet --

5       A.          Yes.

6       Q.          -- of talking points and read that to me?

7       A.          (Reading) Just yesterday the house was

8       talking about a compromise on a map that potentially

9       puts you in a district with 70 percent of new voters

10      and potentially a competitive primary.

11      Q.          And the purpose of this talking point was

12      something that you could potentially use on your

13      calls?

14      A.          That's correct.   I believe that is what

15      Lara wanted me to say.

16      Q.          Do you recall this particular talking

17      point and its context?

18      A.          I believe around that time was when the

19      Steve Austria primary talk was heating up, and the

20      fact that there was a new compromise conversation,

21      and we knew the map was, you know, influx, that gave

22      people that supported me to want to continue to

23      support me because they want to help keep me elected

24      to congress.   I don't know whether I used that ing

25      talking point specifically, but it was presented to

CONFIDENTIAL

Page 74

1                    STEVEN STIVERS

2       me.

3          (Exhibit 17 was marked for identification.)

4       Q.          I've just had marked as Exhibit 17 Stivers

5       2306.  And this is an email from Adam Kuhn to

6       yourself, looks like your wife, to Courtney

7       Whetstone, looks like Lara's email is here, and then

8       to a new person, Mike Culp; do you see that

9       A.          Yes, I do.

10      Q.          Do you know who Mike Culp is?

11      A.          He is a friend and was in my wedding, and

12      he's a trusted friend.

13      Q.          Does he have any official position, either

14      fundraising for you or working in the campaign?

15      A.          He has never earned a salary from me in

16      any capacity.  He's an advisor and a friend.

17      Q.          And this email is from December 12th,

18      2011.  Do you see that?

19      A.          I see it.

20      Q.          And the subject is Redistricting Report?

21      A.          Um-hum.

22      Q.          Ohio Campaign for Accountable

23      Redistricting.

24                  And if you could look at one, two, three,

25      fourth line, which starts with Requests.

CONFIDENTIAL

1                        STEVEN STIVERS

2      A.          Yes.

3      Q.          If you could read that for me, please?

4      A.          And I want to put this in context.  This

5      report is not something I agree with or believe is

6      fact.  This was something that Adam sent to all of us

7      so we would know what might be in the popular press,

8      because it was an outside group trying to tell a

9      story; not that it was fact.

10     Q.          Fair enough.

11     A.          (Reading) Requests by State Senator

12     Chris Weidner to keep Clark County in one

13     congressional district were ignored because this

14     would hurt the political index for Congressman Steve

15     Stivers' district.

16     Q.          Okay.  Do you recall discussions in the

17     press at the time about Clark County?

18     A.          I do not.  I think this is the only thing

19     I remember in the -- it wasn't a press.  This is an

20     outside group trying to get press, and I don't

21     remember it getting a lot of press.

22     Q.          What was your reaction?

23     A.          But we were talking about it because we

24     wanted to be able to respond, because we did not take

25     as active a role in that, as I said, because I didn't

CONFIDENTIAL

Page 76

1                    STEVEN STIVERS

2      want to be seen as a problem among my colleagues.

3      Q.          Okay.  Did you do anything to respond to

4      this news?

5      A.          Not that I recall.  I think our point was

6      to know that it was out there and be ready to respond

7      if it was in the press.  And I don't remember this

8      ever getting out, so we didn't, you know -- when

9      something is not news, you don't want to make it

10     news.

11          (Exhibit 18 was marked for identification.)

12     Q.          I just had marked for the record Stivers

13     18, and it's Stivers 7519.  So to get everything in

14     context, I would like to go to the first email in

15     this chain.

16     A.          Yep.

17     Q.          It's an email dated March 2nd, 2012, from

18     Aaron Blake, who has the address

19     Aaron.Blake@washpost.com; do you see that?

20     A.          Yes, I do.

21     Q.          And it's to yourself at your AOL address,

22     right?

23     A.          Correct.

24     Q.          And the subject is Redistricting?

25     A.          Yes.

CONFIDENTIAL

Page 77

1                    STEVEN STIVERS

2    Q.          Can you read -- and I think for context it

3    would be helpful to read the full email from Aaron

4    Blake.

5    A.          Sure.  (Reading) Hey, Congressman, Chris

6    passed along your email address.  I'm looking for

7    some voice from the Ohio delegation about how much

8    republican members feel redistricting has helped them

9    this year.  I know your district got quite a bit

10   safer, and I wondered if you might offer some quick

11   thoughts, going in to primary -- the primary on

12   Tuesday.  The question would be this:  Are you

13   feeling a lot safer?  And why?  Any chance I could

14   get a quick response.

15   Q.          Okay.  So let's just pause here for a

16   second.  Do you recall getting this email?

17   A.          I recall it in general terms, yes.

18   Q.          Okay.  What is your recollection?

19   A.          Obviously, he wanted -- he was writing a

20   story for the Washington Post and wanted to talk

21   about the impact of redistricting.

22   Q.          Okay.  And then above it looks like you

23   forwarded this email to Courtney Whetstone, correct?

24   A.          Yes.

25   Q.          And then you start off with:  Here is what

CONFIDENTIAL

Page 78

1                        STEVEN STIVERS

2      I thought I would say?

3      A.          Yes, and I would frequently send Courtney

4      some ideas, and then she would make it much more

5      eloquent and take out the stupid things I might want

6      to say.  That's her job.

7      Q.          The record won't reflect your great laugh.

8      A.          It's too bad.

9      Q.          Why don't you read your email to Courtney

10     for us, please.

11     A.          (Reading) Here is what I thought I would

12     say:  Aaron:  Happy to help.  The redistricting in

13     Ohio did shore up some of the toss-up districts.  For

14     example, Ohio one went from a D plus 2 to a R plus

15     10.  He probably won't have a close race for the next

16     decade.

17                 New bullet point.  Ohio 6 improved from a

18     R plus 2 to an R plus 5 district.  This will give

19     Bill Johnson the advantage against Charlie Wilson in

20     their rematch.

21                 The next one:  My district went from a D

22     plus 1 to a R plus 5.  While I don't take anything

23     for granted, there are a lot more republicans in my

24     district.  In the end Ohio, like a lot of states, has

25     less competitive races after redistricting.  In fact,

CONFIDENTIAL

Page 79

1                    STEVEN STIVERS

2    there were six or seven top tier races in 2010, the

3    1st, the 6th, the 12th, the 13th, the 15th, 16th and

4    the 18th districts, and there might be two in 2012,

5    the 6th and the 16th.  And republicans have the

6    numeric advantage in both, Renacci and Johnson should

7    win.

8    Q.        So let's pause on some of the parts of

9    that email.  And the top line -- not the top line,

10   the top bullet where you're discussing Ohio 1, that's

11   the 1st Congressional District in Ohio?

12   A.        That's correct.

13   Q.        And you say it went from D plus 2 to R

14   plus 10; is that right?

15   A.        That is what I said -- it says there, yes.

16   Q.        And what is that a reference to?

17   A.        The political -- the partisan voting

18   index.

19   Q.        What index are you using?

20   A.        The PVI.  Probably the current PVI, if it

21   was out or some district that i Had seen in the

22   popular press.  Some index I had seen somewhere.

23   Q.        And was your view at the time that the

24   congressperson from that district probably wouldn't

25   have a close race for the next decade?

CONFIDENTIAL

Page 80

1                    STEVEN STIVERS

2    A.           That's what -- so these are the points

3    that I drafted for Courtney.  We turned that into a

4    much more eloquent statement and didn't ultimately

5    use any of these bullet points.  And it turned out to

6    be false.  Because Steve Chabot just had a close race

7    in the 1st District in 2018.  So to the extent I

8    thought that it was false.

9    Q.           Do you recall whether that was your

10   opinion at the time?

11   A.           I don't know.  I see the text here.  And,

12   obviously, Courtney helped me clean it up.  So we

13   didn't end up saying any of the things that you just

14   had me read.  Those were inner thoughts, not anything

15   that I expressed to anyone.

16   Q.           But these were your inner thoughts?

17   A.           Potentiallyly.  They were ideas for

18   conversation.

19   Q.           And then in the sixth, you talk about it

20   went from R plus 2 to R plus 5, is that right?

21   A.           Yes, that is what it says.

22   Q.           And is that has reference to the PVI?

23   A.           I believe it is.

24   Q.           And who is Charlie Wilson?

25   A.           He was a former congressman from the Ohio

CONFIDENTIAL

Page 81

1                    STEVEN STIVERS

2    6th District.  Bill Johnson beat him in 2010.

3    Q.          And then you discuss your district,

4    correct?

5    A.          Correct.

6    Q.          And you said it went from a D plus 1 to a

7    R plus 5?

8    A.          Yes, it did.

9    Q.          Is that also the PVI?

10   A.          Yes, I believe it is.

11   Q.          And then you state:  While I don't take

12   anything for granted, there are a lot more

13   republicans in my district?

14   A.          That is correct.  And I think the point

15   there in context is, as I said before, a lot of

16   things make districts competitive or not competitive,

17   whether somebody is an incumbent, how well they serve

18   their people, how hard they work on campaigns, how

19   much they fundraise, what their index is.  And all

20   those things go into this, even though I only

21   reference the index in this, but it's all those

22   things that matter.

23   Q.          Okay.

24   A.          That's why I say I take nothing for

25   granted.  Because just this last year, Mia Love lost

CONFIDENTIAL

Page 82

1                    STEVEN STIVERS

2    an index that was an R plus 15.  You know, the index

3    is not the sole determinant of an outcome at all.

4              The 12th district that we've talked about,

5    which is a R plus 8 index now, it was a 10.  It's now

6    an 8, but it ended up being a less than one point

7    race in the special election in August, because the

8    index isn't sole determinant.

9              But once Troy Balderson was an incumbent

10   in the fall, it became a much more comfortable

11   district for him because he got the advantages of

12   incumbency that most incumbents get.

13             And that's all the other stuff when you

14   think a district is competitive or not, you have to

15   think about retirements, how hard people work,

16   whether they fundraise whether they campaign, whether

17   they represent their people, all those things build

18   in to whether a district is ultimately competitive.

19   Q.        We've referenced the revisions that

20   Courtney did to your initial thoughts?

21   A.        Yes.

22   Q.        Can you read that for me?

23   A.        Yes.  (Reading) While Ohio's 15th

24   Congressional District was made less competitive

25   through the redistricting process, I'm not taking

CONFIDENTIAL

Page 83

STEVEN STIVERS

1

2    anything for granted.  This is my first reelection

3    campaign, and I'm taking this race seriously as I did

4    in 2008 and 2010 when the district was one of the

5    most competitive in the nation.

6    Q.          Okay.  Did you agree with the statement

7    that your district became less competitive after

8    redistricting?

9    A.          I think it became less competitive after

10   redistricting, but redistricting wasn't the only

11   reason.  It was because I was the incumbent now, and

12   because I, you know, raised a lot of money and work

13   hard politically, and because I have a professional

14   political operation, and because I respond to my

15   constituents in a timely way and get democrats to

16   support me.  In fact, democrats have supported me

17   from 2008, to '10, to '12, to '14, to '16, and now in

18   2018, because of the way I work in a bipartisan

19   fashion.

20            So I think there are a lot of reasons.

21   Even though it says after redistricting,

22   redistricting is not the only sole determinant, but

23   it's a point in time after redistricting.

24   Q.          Okay.  Now, we've looked at some emails

25   that reference the process of the map getting passed

CONFIDENTIAL

Page 84

1                     STEVEN STIVERS

2      in the Ohio legislature?

3      A.          Yes.

4      Q.          How closely were you following that

5      process?

6      A.          In the press, we sent a lot of articles

7      around.  That's really what it was.  I didn't attend

8      any hearings.  I didn't send anybody attending

9      hearings, but I read the popular press about it.

10     Q.          Did you or did anyone in your office have

11     conversations with people in the Ohio legislature?

12     A.          I don't believe they did.

13     Q.          Did you know about anything that was

14     happening regarding negotiations over the map that

15     weren't publicly available?

16     A.          No.  What I knew at the end was -- and it

17     was a bipartisan map, because they brought in the

18     congressional -- or the legislative black caucus and

19     made a deal with them and changed some lines around

20     the state.  And it became ultimately a bipartisan map

21     as a result of that and got, you know, a super

22     majority, and it was a bipartisan super majority.

23     Q.          And that understanding is based on the

24     public record?

25     A.          That's correct, and what was written at

CONFIDENTIAL

Page 85

STEVEN STIVERS

1  the time.  But it's a fact that it was a bipartisan

2  map.

3  (Exhibit 19 was marked for identification.)

4  Q.       So this is Exhibit 19.  It's Stivers 4406

5  for the record.  We're going to take two things out

6  of chron order.  And I don't think anything else is

7  going to be in chronological order.  So I think this

8  is actually the break where we're no longer going in

9  chronological order.

10  A.       Okay.  No problem.

11  Q.       This is a similar email chain that we saw

12  earlier, but the top email is a different email, one

13  that we haven't seen in the past.  And it's from

14  Mary Beth to Adam and yourself.  Do you see that?

15  A.       I do.

16  Q.       And that is from September 11, 2011; do

17  you see that?

18  A.       Yes.

19  Q.       Okay.  Can you read that email from

20  Mary Beth?

21  A.       It says:  Adam, Whatman would not let that

22  happen, and Hobson does not have that kind of sway as

23  a former member.

24  Q.       And the email below is an email about

CONFIDENTIAL

Page 86

1          STEVEN STIVERS

2    having Clark County in your district, is that

3    correct?

4    A.          The same email we referred to before, and

5    it's just a different top of the chain.  It's the

6    same email as in Exhibit -- Well, mostly Exhibit 11

7    it appears is actually a direct -- I'm looking --

8    it's a direct response to the email in Exhibit 11.

9    Q.          Okay.

10   A.          Before --

11   Q.          Exhibit 12?

12   A.          -- Exhibit 12.

13   Q.          So looking at this email, Exhibit 19, do

14   you understand Whatman to be Tom Whatman?

15   A.          Yes.

16   Q.          Do you have any understanding of why there

17   would be a discussion about Tom Whatman letting or

18   not letting something happen?

19   A.          I don't know.  That would be speculation

20   on my part.  I don't believe -- I'm not -- yeah, I

21   am.  This is from Mary Beth to Adam and I, but mostly

22   a response to Adam.  And it's Mary Beth's opinion, so

23   I can't speak to her state of mind or what she

24   thought there or why she thought somebody could or

25   couldn't do something.

CONFIDENTIAL

Page 87

1          STEVEN STIVERS

2      (Exhibit 20 was marked for identification.)

3    Q.          I've just handed you Exhibit 20 for the

4    record.  It's Stivers 3283.  And it's an email from

5    Adam Kuhn to yourself and Courtney Whetstone and

6    appears your wife's email?

7    A.          Correct.

8    Q.          And the subject is Re: redistricting?

9    A.          Yes.

10   Q.          Can you read that email for me?

11   A.          (Reading) Yes, ma'am.  Well, the

12   background was this whole Clark County came from

13   Hobson.  He floated it with Mary Beth who called me

14   after their conversation and thought Clark for

15   Fairfield was a fair trade.  I told her it was a

16   terrible idea.  It was.  And I know Steve told her

17   the same, and we killed the idea from this end.  And

18   I think Hobson went the Weidner route.

19   Q.          And then there is one more line?

20   A.          Well, he can run against Jim Jordan now.

21   Smiley face.

22   Q.          So in this email Adam is responding to an

23   email from your wife, is that correct?

24   A.          That is correct.

25   Q.          And it's about this question of Clark

CONFIDENTIAL

Page 88

STEVEN STIVERS

1

2  County being a part of your district, is that

3  correct?

4  A.          That's correct.

5  Q.          And Adam is relaying that he believed the

6  idea came from Hobson, but do you understand that to

7  be David Hobson who we've discussed?

8  A.          Yes, yes.

9  Q.          And that there was a conversation between

10  David Hobson and Mary Beth that we've discussed?

11  A.          Yes.

12  Q.          Okay.  And Adam is saying that he told

13  Mary Beth he thought it was a bad idea, and that

14  Steve told her the same.  Is that a references to

15  yourself?

16  A.          I believe that is a reference to me, and I

17  don't believe that is an accurate statement, but it

18  is a reference to me.

19  Q.          Okay.  Did you respond to this email

20  correcting Adam?

21  A.          I don't know if I did or did not.  But the

22  way I remember it is that, you know, we didn't get

23  actively involved in the Clark County thing.  I know

24  I didn't get actively involved in the Clark County

25  thing.

CONFIDENTIAL

Page 89

STEVEN STIVERS

1

2          I mean, you saw the emails from me on

3    Clark County earlier.  And I think that's what he's

4    referring to, but I believe he's misinterpreting what

5    I'm saying.  And we're talking about December 13th,

6    so this is already -- it's already a fait accompli

7    that lines have been drawn in context.  So it wasn't

8    something that I felt that we needed to go back and

9    relive more drama between my staff, probably which is

10   why I didn't respond.

11        (Exhibit 21 was marked for identification.)

12   Q.          I've just handed you what I have had

13   marked as Exhibit 21.  For the record, this is a

14   article from the Columbus Dispatch, and it's from

15   September 21st, 2011.  It's by a person named

16   Jim Siegel.  And the title of the article is His Car

17   Can Handle the Miles of a Redrawn District, says

18   Stivers?

19   A.          Yes.

20   Q.          Okay.  Do you recall being interviewed by

21   anyone at the Columbus Dispatch around this time?

22   A.          This article is refreshing my memory, but

23   I didn't recall it until you put this in front of me.

24   Q.          Okay.  Now, that you see this article, do

25   you recall having been interviewed?

CONFIDENTIAL

Page 90

1                    STEVEN STIVERS

2    A.          I recall it, yes.

3    Q.          Okay.  You can look at the article to get

4    the context, but I'm just going to point you to some

5    specific statements.

6    A.          Okay.

7    Q.          One, two, three, four, five down, there is

8    a quote from you saying I would.

9    A.          Yes.

10   Q.          Can you read that?

11   A.          (Reading) I would Love to represent a more

12   compact district, but, frankly, my car works pretty

13   well so I'm not scared to get in it and drive,

14   Stivers said.

15   Q.          Do you have any reason to doubt that you

16   were properly quoted here?

17   A.          I have no reason to doubt I was properly

18   quoted.

19   Q.          Okay.  And then can you go on.  This

20   appears to be a continuation of the quote.

21   A.          (Reading) Even though a lot has been

22   written about how weirdly shaped the district is, it

23   would be a very extraordinary circumstance if you

24   were going from Richwood in northern Union County to

25   Athens.

CONFIDENTIAL

Page 91

1                          STEVEN STIVERS

2      Q.          Do you have any reason to doubt that

3      this -- do you have any reason to believe this quote

4      is inaccurate?

5      A.          I have no reason to believe it's

6      inaccurate.

7      Q.          Okay.

8      A.          And the only context I would add is

9      somebody has to represent everybody.  The state of

10     Ohio is a fixed size state, and so if my district

11     gets more compact, somebody else's gets bigger, and

12     still somebody is going to end up driving in their

13     car.  It's just a fact of life.  And would I like to

14     be the guy who didn't drive at that time, apparently,

15     yeah.  But it doesn't change the size and shape of

16     the State of Ohio, and somebody has to drive to

17     represent those small less populous counties that are

18     further away.

19                 So, you know, selfishly would I have liked

20     to have a more competitive district, yes, but,

21     somebody has to represent those folks, and I'm happy

22     to do it.

23         (Exhibit 22 was marked for identification.)

24     Q.          So my apologies for poor quality.  This

25     was a color map printed in black and white, which

CONFIDENTIAL

Page 92

1                      STEVEN STIVERS

2    makes something that was hard to read already --

3    A.           I could see it.

4    Q.           -- harder to read.  But it's merely a

5    demonstrative.  And this is the map of Ohio's

6    Congressional Districts from 2002 to 2012.  I just

7    want to -- I think you said it before --

8    A.           It's not correct.

9    Q.           Okay.  In what way?

10   A.           This is the wrong map.

11   Q.           What counties did you have in the 2002 to

12   2012 district?

13   A.           Oh, maybe -- oh, it is.  It is right.

14   Union, Madison and Franklin, got it.

15   Q.           Yes.

16   A.           I thought it had Clark in mine, and I

17   never had Clark County.  You're right.

18   Q.           It's the poor quality.

19   A.           You're right, it's the poor quality.  that

20   is indeed the map that I was elected to in -- under

21   in 2010, yes.

22   Q.           And that's the only thing I wanted to

23   establish on the record was what your prior district

24   included.

25   A.           That's it, Union, Madison, and the western

CONFIDENTIAL

Page 93

1                    STEVEN STIVERS

2      half of Franklin, excluding Dublin.

3           (Exhibit 23 was marked for identification.)

4                THE WITNESS:  We get color now.

5      Q.           Yes.

6      A.           You sprung for color.

7      Q.           This is what gets to happen when you print

8      them at your office versus printing at the hotel.

9                So I've handed to you a demonstrative that

10     we have created of the current Ohio map, and it has

11     your district --

12     A.           Indeed.

13     Q.           -- and an arrow pointing to where you

14     live --

15     A.           That is correct.

16     Q.           -- in Franklin County in the 15th?

17     A.           Yes.

18     Q.           Okay.  So we're just going to use this

19     kind of as a reference point for the set of questions

20     about your current district.

21     A.           Okay.  No problem.

22     Q.           Now, you currently live in Upper

23     Arlington, is that right?

24     A.           I do.  We moved to Upper Arlington in

25     2011.

CONFIDENTIAL

Page 94

1          STEVEN STIVERS

2     Q.          And that's in Franklin County?

3     A.          It is.

4     Q.          And how often generally do you get home to

5  Ohio?

6     A.          Every weekend.  So I'm here as soon as our

7  last vote happens.  I hop on a plane and I'm here.

8  And I'm here with my constituents and doing meetings

9  and seeing people until I take off.  Like today, I'm

10  leaving today on the 2 55 flight.  Then I'll be back

11  as soon as we're done with last votes.

12     Q.          What's the largest population centers in

13  your current district?

14     A.          Franklin County is the largest county.

15  Fairfield county is the second largest.  Franklin

16  County has -- let me see if I can remember -- about

17  180,000 or 200,000 people.  And Fairfield County has

18  175,000 people.  The rest of the counties are about

19  50,000 or 60,000.  Athens is 60,000.  Pickaway is

20  50,000.  Clinton is 50,000.  Madison is 50,000.

21  Perry is 40,000.  Morgan is about 10,000.  Vinton is

22  about 10,000.  Hocking, I think, is about 30,000.

23  Try those and add them up.  2,000 people in Fayette

24  County.  What did I miss?  I don't know my exact

25  number.  Maybe about 10,000 thousand people in Ross

CONFIDENTIAL

Page 95

1                    STEVEN STIVERS

2    County.  Those are close.  So that's my recollection

3    at this point of about how many people live in each

4    county.  And they are close.  They are probably

5    rounding.

6    Q.          Okay.

7    A.          Might be a little heavier in Franklin.

8    Q.          I'm sorry, how many people did you say

9    were in Hocking?

10   A.          I think it's about 40,000 in Hocking,

11   30,000 or 40,000.

12   Q.          Okay.  And I'm not going to hold you to

13   these numbers exactly correct.

14   A.          But it gives you context.

15               MR. TUCKER:  Off the record for one

16   second.

17               THE WITNESS:  I could use a rest room

18   break.

19               MS. THOMAS:  We can stop now.  Let's take

20   a break now.

21               THE WITNESS:  Can we do a quick break?

22               MS. THOMAS:  Let's take a ten minute

23   break.

24                    (Recess taken.)

25   Q.          So we're back on the record discussing 23

CONFIDENTIAL

Page 96

1                    STEVEN STIVERS

2    generally, but it's really about your current

3    district.

4    A.          Yes.

5    Q.          So I don't believe I asked you this

6    question.

7    A.          I checked, by the way.  Hocking County,

8    has 30,000 people.  29,860, so we'll call it 30,000.

9    I was close.

10   Q.          So your district has eight whole counties,

11   is that correct?

12   A.          And four partial counties.

13   Q.          And four partial counties, that was my

14   next question.

15   A.          Sorry.  I'm going to wait on your

16   questions, try not to jump the gun.

17   Q.          Where are your offices in Ohio?

18   A.          I have an office in Clinton County, down

19   at the bottom left, in Wilmington.  I have an office

20   in Hilliard, in Franklin County; and I have an office

21   in Fairfield County in Lancaster.  But we also do

22   mobile offices in every county about once a year.

23               And we travel to -- I get to every county

24   frequently.  And my staff gets to every county even

25   more frequently than I do.  There's somebody in every

CONFIDENTIAL

Page 97

1                    STEVEN STIVERS

2    county from my staff every week.

3    Q.          You said there's someone from your staff

4    in every county once a week.  And how often are you

5    in every county?

6    A.          A little less than once a month, but, you

7    know, in that range.  I've probably have only been to

8    Athens County the furthest county in my district

9    about seven times this year, so it's not fair to say

10   once a month.  But that is the furthest away and just

11   the hardest to get to sometimes.

12   Q.          You said you do mobile offices once a

13   year, is that correct?

14   A.          It's based on need or what we're seeing in

15   the mail flow or the constituent case flow.  Some

16   we'll do more often, some less often.  But usually

17   that's the counties that don't have a physical

18   office.

19            So we don't do that in Franklin, Fairfield

20   or Clinton Counties, because they have a standing

21   structure that's there everyday, 365 days a year,

22   that is an office that is staffed everyday that

23   people can come in to.

24   Q.          Okay.

25   A.          So I want to be clear what that is.  It's

CONFIDENTIAL

Page 98

STEVEN STIVERS

2    not in all 12.  It's in the ones that don't have a
3    physical office.

4    Q.        And so it's in nine of the --

5    A.        Is that the right math?  Yes, that is
6    correct.

7    Q.        You have 12 counties.  I'm not great at
8    math.

9    A.        I did not know there was going to be math
10   involved.

11   Q.        I could do 12 minus three.

12             How did you decide where to place your
13   offices, your permanent offices?

14   A.        So when I inherited parts of my district,
15   Steve Austria had an office in Lancaster, and we took
16   that office.  And Mike Turner had an office in
17   Wilmington that he ran part-time, that we run
18   full-time, that we took over.  So it was mostly the
19   fact that there were existing offices there.  There
20   were people that were used to having offices there.
21   And when you shut those down, it becomes traumatic
22   for those communities.  So that's how we made the
23   decision.

24   Q.        And is there an office that you consider
25   your main office?

CONFIDENTIAL

Page 99

1          STEVEN STIVERS

2    A.          We still consider Hilliard our main

3    office, but the staffing, we have three people in

4    Hilliard, we have three people in Lancaster, and one

5    person in Wilmington.  So we have seven district

6    staffers.  So sometimes somebody will go down and

7    help out Sherry Stuckart in Wilmington, because she

8    is only one person.  But she has Wilmington College

9    there.  So we frequently have college interns there

10   as well.  And we're in the municipal building.

11              The city has been kind enough to let us be

12   in there space so that we have a dedicated office

13   inside city hall.  That way there is security, there

14   is cameras, there is deputies and all that so Sherry

15   is not there alone.

16   Q.          Okay.  And are all of the offices open

17   five days a week for normal business hours?

18   A.          All of them are full-time offices open

19   five days a week.

20   Q.          Okay.  How much time do you spend in each

21   of your main offices -- each of your permanent

22   offices?

23   A.          I'll take meetings in all of my permanent

24   offices.  And I travel to the counties.  So, like I

25   said, I'm out in the counties.  So I don't just sit

CONFIDENTIAL

Page 100

1                    STEVEN STIVERS

2       in my office and wait for people to come to me.

3                    The only time I'm in one of those three

4       offices is when I have a meeting scheduled.  So when

5       I don't have a meeting scheduled, I'm traveling,

6       doing tours, doing meetings in lunches with

7       constituents and officials, and doing events in all

8       the counties, too.  So even when we're not in an

9       office, that I'm still out and around in the 12

10      counties.

11      Q.          Okay.  And do you drive to all these

12      different counties?

13      A.          I do.  It's just roads.

14                  MS. THOMAS:  I'm going to enter four

15      exhibits at one time.

16         (Exhibits 24-27 were marked for identification.)

17      Q.          So I've just had marked four exhibits, and

18      they are very similar.  And I'll stipulate to you

19      that your district stays the same in all of them,

20      which is why we're talking about them at once.

21      A.          Okay.  Got it.

22      Q.          But other districts change around them.

23      A.          Okay.

24      Q.          So 24 is the first proposed remedial map

25      by the plaintiffs in this case.  25 is an errata map.

Page 101

STEVEN STIVERS

1

2    A.        What is an errata map?

3    Q.        That makes changes to other districts, but

4    not your district.

5    A.        Got it.

6    Q.        And 26 is a hypothetical plan that was

7    included in one of plaintiffs' expert reports.

8    Again, the district that you have in this first

9    hypothetical is the same as the other version.  And

10   then 27 is another hypothetical map that was entered

11   by plaintiffs' expert.

12   A.        Okay.

13   Q.        I've entered all of them for completeness.

14   But I think for the purposes of the question, since

15   your district stays the same, it's probably easiest

16   to look at 25.  It's the easiest one to see where you

17   would be situated with Congresswoman Beatty.

18   A.        Right.

19             MS. THOMAS:  Whose district also looks the

20   same in all the maps, however, it does change

21   district numbers because of some of the other

22   districts changing.

23             MR. TUCKER:  I'll put an objection on the

24   record to lack of foundation for Exhibits 24 to 27.

25             MS. THOMAS:  And I will will assert that

CONFIDENTIAL

Page 102

1                        STEVEN STIVERS

2      all of these exhibits have been shared with your

3      counsel as part of expert reports.

4      Q.          So 25, again, this is a proposed remedial

5      map.  And I'm talking about the district that you

6      would represent here.  It has you in Franklin County.

7      A.          Is this drawn under the 2011 population

8      numbers or the current population numbers?  It looks

9      like it's drawn under the 2011 population numbers,

10     which seems to violate one man, one vote, because

11     today the districts have changed seven years' worth

12     of population.

13     Q.          This is not drawn under the 2011

14     population.  This is drawn under the -- the current

15     population number.

16     A.          It is, okay.

17                 MS. THOMAS:  Yes, it is.

18                 MR. TUCKER:  Again, objection to

19     foundation.  Go ahead.

20     Q.          Okay.  And so this is drawn under the

21     current population numbers, and really the only

22     difference between this map and the other map is some

23     of the maps match incumbents in different ways.  But

24     your matching of incumbency hasn't changed, which is

25     why your district doesn't change.

CONFIDENTIAL

Page 103

STEVEN STIVERS

2      A.         Yep.

3      Q.         In this proposed map, you would get the

4   upper part of Franklin County, Delaware County and

5   parts of Licking County?

6      A.         I do see that, yes.

7      Q.         You currently represent parts of Franklin

8   County, this would give you different parts, is that

9   correct?

10     A.         That's correct.

11     Q.         Have you represented parts of this county

12  in the past?

13     A.         Only parts of it.  You have changed about

14  90 percent of my district, because you took Upper

15  Arlington, Hilliard, and the west side that I

16  currently represent, and put it with Delaware,

17  Licking, Westerville, New Albany, Worthington, and

18  Dublin, that I do not represent in Franklin County,

19  and all of Delaware and most of Licking that I do not

20  represent.

21              MR. TUCKER:  I guess, can I take a pause,

22  I'm sorry.  Maybe I misunderstood.  Is the red dot

23  where he lives supposed to be in the pink area of the

24  12th District, or the yellow area in the 3rd

25  District.

CONFIDENTIAL

Page 104

1          STEVEN STIVERS

2          MS. THOMAS:  The pink area in the 12th

3     District.  The blue dot is in the yellow area which

4     is Beatty.

5          MR. TUCKER:  Okay.  Thank you.

6     Q.          And the relationship, like I said, between

7     you two stays the same in all of these maps.  It's

8     really things changing around you.

9     A.          Okay.

10     Q.          And my question to you is:  As you sit

11     here today can you think of any reasons why you

12     couldn't represent Delaware County?

13     A.          I see no reason why I couldn't represent

14     any of these.  The only thing I would say is that

15     something like this imposed by judges would violate

16     the constitutional way we create districts and would

17     also disenfranchise voters who have a vested interest

18     in me having been their congressman, and thinking I

19     have a chance to be their congressman for the next

20     four years, and the relationship that I have built up

21     with those constituents, which is normally a ten-year

22     relationship.

23          So, you know, I can represent anybody.

24     The people in Delaware County or Licking County are

25     great folks.  I just think it would impair some

CONFIDENTIAL

1          STEVEN STIVERS

2     voters who have built the relationship with me as

3     their congressman.

4             While not 100 percent of my voters voted

5     for me.  59 percent of the voters did, and they want

6     me to be their congressman.  And I think they would

7     be harmed by that.  Interesting districts, though.

8             MR. TUCKER:  There's no question pending.

9             THE WITNESS:  So the plaintiffs drew those

10    maps?

11            MS. THOMAS:  Yes.

12      (Exhibits 28-30 were marked for identification.)

13    Q.       I've just had marked for the record

14    Exhibit 28, 29 and 30.

15    A.       Yes.

16    Q.       And I'll state what they each are.  28 is

17    the motion of Republican Congressional Delegation,

18    Ohio Voters and Republican Party Organizations to

19    intervene.  29 is the memorandum in support of that

20    motion.  And 30 is a reply brief further in support

21    of the motion to intervene.  So I think you can put

22    28 for now to the side, and we'll start with 29.

23    A.       Okay.

24    Q.       Which is the memorandum in support of the

25    motion to intervene.

CONFIDENTIAL

Page 106

1                   STEVEN STIVERS

2      A.          Okay.

3      Q.          Have you seen this document before?

4      A.          I have been briefed on this document.

5  I've not read the thing word for word.

6      Q.          Do you understand that your attorneys

7  filed this document on your behalf?

8      A.          I do, and I asked them to.

9      Q.          Okay.  And you understand that in this

10  document your attorneys make statements on your

11  behalf?

12     A.          Yes, I do.

13     Q.          Okay.  If you turn to Page 3.

14     A.          Yep.

15     Q.          I'm in the section titled The Proposed

16  Intervenors.  Do you see that?

17     A.          On Page 3?  Oh, yes, I see it, yep.

18     Q.          Okay.  And the first sentence -- well,

19  actually, could you read that first sentence for me.

20     A.          (Reading) The intervenor applicants

21  represent a diverse coalition of registered voters,

22  county political parties, and congressional

23  representatives, all whose interests will be directly

24  impacted by the relief plaintiffs are pursuing in

25  this action.

CONFIDENTIAL

Page 107

STEVEN STIVERS

1

2  Q.        Okay.  Do you understand that according to
3  this definition that you just read, you were an
4  intervenor applicant?
5  A.        I believe, yes, I've asked to be, and I am
6  an intervenor applicant.
7  Q.        Okay.  We're just kind of getting
8  terminology set before I ask questions.
9            Then the next section refers to Member
10 Intervenor applicants.
11 A.        Yes, I've read it, the whole paragraph.
12 Q.        Okay.  It lists the incumbent
13 representatives of Ohio and lists a number of
14 districts including your district?
15 A.        That is correct.
16 Q.        Do you understand that you're, in addition
17 to being an intervenor applicant, you're a member
18 intervenor applicant?
19 A.        I do.
20 Q.        And then if you turn to Page 4 --
21 A.        Yes.
22 Q.        -- you're specifically named --
23 A.        Bottom of the first paragraph.
24 Q.        -- at the bottom of the first paragraph
25 discussing the member applicants, do you see that?

CONFIDENTIAL

Page 108

1                    STEVEN STIVERS

2     A.          I do.

3     Q.          Okay.  If you could go back to Page 3,

4     please.

5     A.          Yes.

6     Q.          I am in the second paragraph in the

7     section of Proposed Intervenors.

8     A.          Yes.

9     Q.          Can you read the second sentence, They

10    are?

11    A.          (Reading) They are all members of the

12    republican party, all registered voters in the

13    district, and all intend to run for election as

14    representative of those districts in 2018 and 2020.

15    Q.          Is this statement true?

16    A.          It is.  I ran and won in 2018, and I'm

17    already working for 2020.

18    Q.          Okay.  And I just want to be clear when I

19    ask you questions about statements being true, I'm

20    only asking as they pertain to you and am not asking

21    you to speak on any of the other intervenors.

22    A.          Thank you.  I can't speak for anybody

23    else.

24                MR. TUCKER:  I was just going to ask you

25    the same thing.  Thank you for clarifying.

CONFIDENTIAL

Page 109

1                    STEVEN STIVERS

2      Q.          If you could turn to Page 9.

3      A.          Yes.

4      Q.          I'm at the bottom of that page.  There is

5      a sentence that begins As Numerous Courts?

6      A.          Yes.

7      Q.          And there is a legal sentence here, but

8      there are underlying facts to that sentence.  So I

9      want to ask you about those underlying facts.

10     A.          Okay.

11     Q.          Can you read the sentence with the caveat

12     that I'm not going to ask you anything about the

13     legality of what is said in here?

14     A.          Great, because I'm not a lawyer.

15     Q.          Great.

16     A.          (Reading) As numerous courts have

17     recognized, elected members from a challenged

18     district may intervene as a matter of right under

19     Rule 24 due to, inter alia, there "personal interest"

20     in their office, their interests in the timing and

21     form of relief, and their continued incumbency.

22     Q.          And the only amendment I would make is I

23     think it says their continued --

24     A.          Did I say -- okay, sorry.

25     Q.          That's fine.  So I think earlier you

CONFIDENTIAL

Page 110

1                    STEVEN STIVERS

2    mentioned your interest in this case.  Do you

3    consider yourself to have a personal interest in your

4    district?

5    A.          I am personally vested in the people I

6    represent.  I work hard everyday to provide

7    constituent service, to correspond and communicate

8    with my constituents.  I've done 24 telephone town

9    hall meetings over these last two years, about one a

10   month.  And I go to my district every week and meet

11   with people.  And they are my constituents, and I

12   consider myself a servant leader, and I want to

13   continue to serve them.

14           And if somebody is going to break the

15   social contract that we all live under that says

16   these are ten-year districts, I feel like I have a

17   personal interest in that, because I want to

18   represent the people that I've been representing.

19   And, you know, obviously, they get a chance every two

20   years to vote me in or vote me out, but I enjoy

21   representing them, and I believe I have a personal

22   interest in this case because I want to continue to

23   represent them.

24   Q.          Do you consider yourself to have a

25   personal interest in your continued incumbency?

CONFIDENTIAL

1            STEVEN STIVERS

2      A.        Yes.

3      Q.        Is that an interest that you considered

4   yourself to have in 2011?

5      A.        I believe so, yes.

6      Q.        The difference was in 2011, there was a

7   constitutional requirement to change the districts.

8      Q.        If you could turn to Page 11, please.

9      A.        Okay.

10     Q.        I am in the full first sentence, if you

11   could read that, beginning with in addition.

12     A.        (Reading) In addition to those traditional

13   reasons to prevent congressional intervention in

14   redistricting cases, the member intervenor applicants

15   have invested considerable time and money building

16   coalitions of supporters in their districts, learning

17   their districts, serving the needs of their

18   constituents, raising and spending money on

19   electioneering activities, among other activities.

20     Q.        Do you agree that you've invested

21   considerable time and money building coalitions of

22   supporters in your district?

23     A.        I do.

24     Q.        Can you describe some of those activities?

25     A.        I have over the last seven years, eight

CONFIDENTIAL

1                    STEVEN STIVERS

2       years -- let me think here -- I spent about

3       $11 million electioneering.   I've worked to -- you

4       know, worked on coalitions of faith-based folks.

5       I've worked on coalitions of folks that are veterans

6       and military.   I've worked on and with coalitions of

7       folks that care about bipartisanship and getting

8       things done.   I've worked on civility with Joyce

9       Beatty, but built a coalition of people that care

10      deeply about that in my district.

11              I've worked with folks on various issues

12      that are important to this district, like, Buckeye

13      Lake; like getting a grocery store in Vinton County

14      that for four years had no grocery store in the whole

15      county; like getting the water situation at Caesar's

16      Lake in Clinton County worked out; like getting the

17      Wayne National Forest down in Hocking and Athens

18      County and Perry County to be more friendly to

19      recreation.

20              All those issues are important to me.

21      I've worked on them, and they are important to the

22      people.   And if this district gets broken up, we'll

23      lose momentum on making things happen for those

24      folks.

25              It's not like the new representative might

CONFIDENTIAL

1          STEVEN STIVERS

2    not take up those causes to help people, but people

3    are counting on me to help solve those problems large

4    and small for them.  And I take it very seriously and

5    have a vested interest in doing that and continuing

6    to do that.  And if there is no requirement that

7    there is a new district, that's the difference

8    between now and 2011 or 2022 or '21.

9    Q.          You've mentioned you've been involved in

10   bipartisan activities.  Can you describe some of

11   those?

12   A.          Whether it's going to forums -- I don't go

13   to every one, but I go to the ones I can.  And

14   scheduling is very hard.  We have a big district with

15   12 counties.  Whether it's going to -- you know, just

16   meetings with democrat and republican elected

17   officials in every county, which I do elected

18   official lunches in every county as frequently as I

19   can.  So we get together and talk about what matters

20   to them.

21            And we do issues like the opioid crisis,

22   which I've had -- the last eight years I've had a

23   round table every year on that and pursued

24   legislative action, which was bipartisan based on

25   that.  Almost every issue I've worked on, every

CONFIDENTIAL

1              STEVEN STIVERS

2    bill -- I've passed five bills in the last two years,

3    every single one has been bipartisan.

4              So almost every issue I've worked on, if

5    it wasn't bipartisan, I worked to make it bipartisan

6    so it can be, because that's important to me, and I

7    think it's important to my constituents.

8              And I think I'm ranked the 37th most

9    bipartisan member of congress by the Lugar Institute,

10   named after Senator Lugar from Indiana.

11   Q.        Have you ever been -- do you know -- have

12   you ever been invited to a League of Women Voters

13   Forum?

14   A.        I have.

15   Q.        Have you ever attended a League --

16   A.        Sometimes I do, sometimes I don't, it

17   depends on the schedule.

18   Q.        When was the last one that you attended?

19   A.        I don't know off the top of my head.  I

20   can get back to you on that.

21   Q.        Do you know which was the last one you

22   were invited to?

23   A.        I don't know that either.  But we did two

24   bipartisan debates in my district in the last

25   election.  They were not hosted by the League of

CONFIDENTIAL

Page 115

STEVEN STIVERS

2  Women Voters.  They were hosted -- one in Athens

3  County, the far reach in my district that I said is

4  sometimes hard to get to.  We did a debate there on

5  purpose, because it's harder to get there with my

6  opponent, by democratic opponent, hosted by Ohio

7  University.  That was a bipartisan event.

8           And we did one hosted in Columbus by the

9  Columbus Metropolitan Club.  Again, not the League of

10 Women Voters, but a bipartisan group.  And it was

11 both my opponent and I at those, and we did two

12 debates in the 2018 cycle.

13 Q.        Do you know if you were invited to a

14 League of Women Voters in 2018?

15 A.        I don't know off the top of my head.

16 Q.        Did you attend a League of Women Voters in

17 2018?

18 A.        I don't know off the top of my head.  I've

19 attended a lot of events.

20           MR. TUCKER:  You have to try to let her

21 finish her question for our court reporter's sake.

22           THE WITNESS:  Okay, sorry.

23 Q.        You mentioned that you spent $11 million

24 electioneering.  Can you describe some of your

25 electioneering activities?

CONFIDENTIAL

Page 116

1                   STEVEN STIVERS

2    A.           We do a lot of things.  We do rallies.  We

3    do paid advertising in newspapers, in on-line

4    advertising, digital advertising, and radio and TV.

5    And we pay for door-to-door literature.  We hire

6    canvassers and have volunteers.  And I go door to

7    door.  I've gone door to door every -- you know, not

8    every time somebody has gone door to door, but almost

9    every time.

10           Like I'm going door to door for my

11    campaign -- I did it in 2018, probably 20 different

12    times door to door.  2016, probably 20 or 30

13    different times.  And almost every cycle, you know,

14    I'll go door to door frequently in the summer and

15    fall like multiple days a week.  And, of course, that

16    figure was cumulative over 2012 to 2018.  I just want

17    to be clear.

18    Q.          Fair enough.  If you could read the

19    sentence in that same paragraph, but it begins with

20    in addition.  I'm on Page 11.

21    A.          Of which one?

22    Q.          We're in Exhibit 29.

23    A.          29, Page 11.  Sorry.  Which paragraph?

24    Q.          I'm in the first paragraph.  I guess it's

25    the last sentence in that first paragraph.  It begins

CONFIDENTIAL

Page 117

1                          STEVEN STIVERS

2      with in addition.

3      A.          Every sentence begins with in addition.

4      Q.          In addition, there is a possibility

5      that...

6      A.          (Reading) In addition, there is a

7      possibility that, if a remedial plan is ordered in

8      this case, the remedial plan could pair two or more

9      of the members -- member intervenor applicants in the

10     same district, which would impede their ability to

11     run for their seats.

12     Q.          Okay.  Do you agree with that statement?

13     A.          I believe that it is a big imposition if

14     you end up having an incumbent on an incumbent race.

15     Q.          Did you hold that opinion in 2011?

16     A.          I did.  The difference was it was required

17     by every ten years decennial -- is that how you say

18     that -- census and reapportionment and redistricting

19     that is required.  The difference is it doesn't need

20     to happen now.

21     Q.          Okay.  You can put 29 to the side and

22     we're going to go to 30.

23     A.          Um-hum.

24     Q.          If you could go to Page 7 of 30.

25     A.          Okay.

CONFIDENTIAL

Page 118

1                    STEVEN STIVERS

2      Q.         Could you read the first two full

3   sentences on Page 7.

4      A.         First two full sentences starting with

5   these fund raising or doing?

6      Q.         Yes.

7      A.         (Reading) Doing their job well requires

8   unrelenting fundraising efforts that begin the day

9   they are elected to office and continuing until they

10  step down or are voted out.  These fundraising

11  efforts would be wasted if district lines were

12  changed and a member was paired with another

13  incumbent or moved from a favorable to an unfavorable

14  district.

15     Q.         Do you agree with the first sentence that

16  you read?

17     A.         I mean, I raised money.  I don't know

18  about unrelenting fundraising.  I raise money -- I'm

19  always working on it.  Unrelenting makes it sound

20  like that's all I do.  It's a small part of what I

21  do, but an important part of what I do, and I work

22  hard at it.

23                 I don't know if I like the word

24  unrelenting.  But, generally, it's true, I just don't

25  like the connotation of unrelenting.

CONFIDENTIAL

Page 119

STEVEN STIVERS

1

2    Q.        And the next sentence that you read, do

3    you agree with that sentence?

4    A.        I think that that is true, yes.

5    Q.        Sorry.  I have one more thing I want to

6    ask you about 30.

7    A.        Okay.

8    Q.        All right.  I'm on Page 10.

9    A.        Page 10, okay.

10   Q.        I'm in the second full paragraph.

11   A.        Second full paragraph.

12   Q.        And if you could read the second sentence

13   in that second full paragraph.

14   A.        Is that the one that starts but

15   plaintiffs?

16   Q.        Yes.

17   A.        (Reading) But plaintiffs ignore the

18   reality that redistricting is a zero-sum game.

19   Q.        Do you agree that redistricting is

20   zero-sum game?

21            MR. TUCKER:  Objection.

22   A.        I don't know -- it causes some

23   speculation.  I mean, you can't create new seats if

24   that's what it means.  I'm not sure I understand what

25   a zero-sum game means.  If you want to rephrase it.

CONFIDENTIAL

Page 120

STEVEN STIVERS

1

2 Q.        I'm just asking what was presented by your

3 attorneys on your behalf, and whether you agree with

4 their statement on your behalf.

5 A.        I agree that you can't create extra seats.

6 Like you can't just say, oh, we want to have 17

7 members of congress.  We're going to create an extra

8 seat.  Is that is what it means, a zero-sum game,

9 then yeah.

10 Q.        Before I hand this exhibit --

11 A.        I will say I think our attorneys are

12 representing our interests.  And I don't have any

13 concerns with my representation whatsoever.  So

14 whether I agree with every word or get to edit it

15 personally, doesn't matter.  I think they are

16 representing our interests.

17         MS. THOMAS:  Before I mark this, I'll have

18 two more exhibits, and I'm going to ask just some

19 background questions.

20 Q.        Did you recently have a position with the

21 NRCC?

22 A.        Yes.

23 Q.        Okay.  And what is the NRCC?

24 A.        It's the National Republican Congressional

25 Committee.

CONFIDENTIAL

1                    STEVEN STIVERS

2      Q.         What do they do?

3      A.         They attempt to elect more republican

4      members of congress.

5      Q.         And what was your position?

6      A.         I was chairman.

7      Q.         How long did you have that position?

8      A.         For two years, from January of 2017 until

9      December of 2018.

10     Q.         Did you make statements in your position

11     as chairman of the NRCC?

12     A.         Yes.

13     (Exhibits 31 and 32 were marked for identification.)

14     Q.         I have just handed you what is Plaintiff's

15     Exhibit 31.  This is a document that we downloaded

16     from LexisNexis.  I'll say for the record LexisNexis

17     is a data base that attorneys use to get documents,

18     including news articles.  This is an article that we

19     pulled from LexisNexis that originally appeared in

20     the Huffington Post.  It is dated January 30th, 2018.

21     And the headline is Top Republican Admits

22     Gerrymandering Could Help GOP Keep Control of the

23     House.

24                So according to the article, you gave an

25     interview with Politco's Off Message podcast.  Do you

CONFIDENTIAL

Page 122

1                    STEVEN STIVERS

2    recall giving an interview with the Off Message

3    podcast?

4    A.          I kind of remember it.  I want to be

5    clear.  I never spoke to Sam Levine.  And I take a

6    lot of exception with things that are in this

7    article.  I never spoke to this reporter whatsoever.

8    And he takes a lot of my information either out of

9    context or absolutely just says it wrong.

10   Q.          Okay.  Fair enough.  I'm going to ask you

11   just one statement that he purports to quote directly

12   from the podcast, and you can tell me if it's an

13   incorrect quote.  It's the highlighted text that I

14   have highlighted just for the ease of reference.  If

15   you could read that statement for me.

16   A.          (Reading) After the redistricting in 2011,

17   a lot of districts were shored up substantially and

18   that makes a difference.  It doesn't change the

19   number of your majority, but changes the composition

20   of each district and gets people a little bit more

21   comfortable, stivers said.

22   Q.          Okay.  Do you dispute that this was a

23   statement that you made?

24   A.          I don't dispute --

25              MR. TUCKER:  Just let me object to

CONFIDENTIAL

Page 123

1                    STEVEN STIVERS

2      foundation.  Go ahead.

3      A.           I don't dispute that I said something

4      close to this.  I think I'm literally misquoted in

5      here.  But I think they added a lot of context that

6      is just not fair.

7                    It is true, as I've said to you earlier in

8      the deposition, that the indexes of a district

9      matter.  But what also matters is how many incumbents

10     do you have versus retirements, how much do people

11     fundraise, do the democrats raise more, do the

12     republicans raise more, how hard do people work on

13     that, how hard do they work their district, how hard

14     do they build coalitions.

15                   There are a lot of things that go into

16     competitiveness, and redistricting is one factor that

17     that I mentioned in the podcast, and it was taken by

18     this reporter and a couple other reporters and made

19     to seem like it was the only thing I was saying.

20                   So I think it's really important to

21     context around there are a lot of things that make

22     districts competitive.  And, yes, the partisan voting

23     index is one of them, but it's one of five or six or

24     ten factors that matter.  It's not a sole

25     determinant.

CONFIDENTIAL

Page 124

1                    STEVEN STIVERS

2            If it was a sole determinant, Mia Love

3    wouldn't have lost an R plus 15 this year, you know,

4    because the average republican wins by 15 points.

5    That's a great example of, you know, a district like

6    that.  There's R plus 13 in Oklahoma that Steve

7    Russell lost.  And why did he lose it?  Well, it

8    wasn't because of the index.  It was because of other

9    factors.

10           So there's always other factors that are

11   important.  And you can't just take one factor out of

12   context and say it's the sole determinant of

13   elections.

14      (Exhibit 32 was marked for identification.)

15   Q.          For the record, 32 is an article from

16   Breitbart News.  And it's titled Exclusive-New NRCC

17   Chairman Representative Steve Stivers Shares a Plan

18   to Win Again in 2018 and 2020; do you see that?

19   A.          Yes.

20   Q.          Do you know Breitbart News?

21   A.          I know who they are.  I don't know if I

22   actually -- I remember this running, and I was

23   surprised they called it an exclusive, because I

24   don't know that I actually talked to this reporter.

25   I think he got things from other places, and then

CONFIDENTIAL

Page 125

1                    STEVEN STIVERS

2      called it an exclusive.

3      Q.          Okay.  At the time --

4      A.          But I remember the article.

5      Q.          You remember the article.  Did you do

6      anything to dispute the article when it came out?

7      A.          No, no.  I don't think he directly

8      misquoted me, but the fact that he called it an

9      exclusive was kind of weird.

10     Q.          All right.  I'm on the last page?

11     A.          Okay.

12     Q.          It seems as though you remember the

13     article --

14     A.          I'm looking at it, yep.

15     Q.          I'm only going to ask you questions about

16     the very end.

17     A.          Okay.  I've looked at it.

18     Q.          Okay.  If you could read the second to

19     last paragraph.

20     A.          The Stivers Plan?

21     Q.          Yes.

22     A.          (Reading) The Stivers plan includes a

23     special patriot program for supporting members in

24     primaries, creating a National Finance Committee to

25     lift the burden of fundraising off the members,

CONFIDENTIAL

1       STEVEN STIVERS

2   recruiting a network of volunteers to staff campaigns

3   and looking forward to the redistricting in states to

4   make sure republicans are not manipulated into

5   majority democratic districts, he said.

6       Q.          And the only amendment I would make to

7   that is I think it's supporting incumbents in

8   primaries.

9       A.          Yes, incumbents.  Did I say -- it's only

10  incumbents, sorry.  It should be incumbents in

11  primaries.  Sorry.

12      Q.          This particular paragraph does not purport

13  to directly quote you.

14      A.          Okay.

15      Q.          Do you agree with the statement in this

16  paragraph?

17              MR. TUCKER:  Objection, lack of

18  foundation.

19      A.          I don't know -- some of those things are

20  certainly things I talked a lot about during my

21  campaign to become the chairman of the National

22  Republican Congressional Committee.

23      Q.          Was one of the things you talked a lot

24  about supporting incumbents in primaries?

25      A.          Yes.

CONFIDENTIAL

Page 127

STEVEN STIVERS

1

2    Q.          Was another thing that you talked about

3    looking forward to redistricting in states?

4    A.          You know, I probably said we needed to

5    make sure we didn't get left behind.  Because there

6    were a lot of efforts on the democratic side, Eric

7    Holder and others raising millions of dollars on

8    redistricting efforts in the states, yes.  I'm sure I

9    mentioned it as one of the things.

10   Q.          If you could read that next paragraph,

11   please.

12   A.          (Reading) We have the 2018 and '20 cycles

13   to win state legislatures and hold some state

14   legislatures to make sure that the map that is drawn

15   in 2021 is as good as it can be for us, the

16   congressman said.  Frankly, that important shaping of

17   the battlefield has to start now.

18   Q.          Putting aside whether this was a direct

19   quote to you or not, do you agree with this

20   statement?

21   A.          I think that who wins state legislative

22   seats ahead of reapportionment in states where the

23   state legislatures draw the lines matters, yes.  Some

24   states use a commission form, some states do other

25   line drawing systems.  But the majority of the states

CONFIDENTIAL

Page 128

1                    STEVEN STIVERS

2  have state legislatures drawing the lines as the

3  constitution states.

4       Q.          And as you look at this statement that

5  purports to be a quote, do you doubt that it's a

6  quote to you?

7       A.          I don't doubt it's a quote.

8                   MR. TUCKER:  Objection, lack of

9  foundation.

10      A.          I don't know if it's a quote or not.  Let

11 me say that.  I don't know if it's a quote.  I'm not

12 sure.

13      Q.          Okay.

14      A.          I don't remember talking to the reporter,

15 which is why I think -- that's why I don't see how he

16 could get a direct quote that I quoted it to him.

17 I'm not saying he didn't find it somewhere else, like

18 the other article you showed me.  I never talked to

19 that reporter at all, but he pulled quotes out of a

20 podcast.  So I don't know where this guy got the

21 stuff.  But he could.  I'm not sure.

22      Q.          Okay.  If you could look back at Exhibit

23 18.

24      A.          18, yeah.  Okay.

25      Q.          In Exhibit 18, you're asked for a quote,

CONFIDENTIAL

Page 129

STEVEN STIVERS

1

2    and you work on a quote with Courtney Whetstone.

3    A.          Whetstone, um-hum.

4    Q.          Whetstone.  Sorry.  Does she ever send

5    quotes to reporters on your behalf?

6    A.          She does sometimes, and I would approve

7    those.

8    Q.          Okay.  I'm just going to ask you some

9    questions about people not tied to any documents, and

10   then I'll be done, I think, for the day.

11   A.          Okay.

12   Q.          Do you know Tom Niehaus?

13   A.          I do.

14   Q.          Who is Tom Niehaus?

15   A.          Tom Niehaus is a former state senator, a

16   former president of the senate and has been a family

17   friend for 20 years or 30 years.

18   Q.          Do you know what role he played in

19   redistricting?

20   A.          He was president of the state senate at

21   the time.

22   Q.          Did you talk to him at the time about

23   redistricting?

24   A.          Tom Niehaus is a family friend and the

25   leader of the state senate, and I talk to him about a

CONFIDENTIAL

Page 130

STEVEN STIVERS

1

2    lot of different things.  It's possible I talked to

3    him about redistricting, but I don't remember.

4    Q.        Okay.

5    A.        But I talk to him a lot about a lot of

6    things.

7    Q.        Okay.  Do you know Bill Batchelder?

8    A.        Bill Batchelder, yes, I do.

9    Q.        Who is he?

10   A.        He was the speaker of the house at the

11   time of redistricting and a long time state

12   representative.

13   Q.        How do you know him?

14   A.        We served together.  He was in the house

15   when I was in the senate.

16   Q.        And did you ever talk to him about

17   redistricting?

18   A.        I don't believe so.

19   Q.        Did you know Bob Bennett?

20   A.        I did know Bob Bennett.

21   Q.        Who is Bob Bennett?

22   A.        He was former chairman of the Ohio

23   Republican Party.

24   Q.        And how did you know Bob Bennett?

25   A.        As the chairman of the State Republican

CONFIDENTIAL

Page 131

1                   STEVEN STIVERS

2   Party.

3   Q.          Do you know if he had any involvement in

4   Ohio's redistricting?

5   A.          I don't know if he had any involvement in

6   Ohio's redistricting.

7   Q.          Did you have any conversations with him

8   about Ohio's redistricting?

9   A.          I don't believe I had conversations with

10  him, no.

11  Q.          Do you know Heather Blessing who at the

12  time was Heather Mann?

13  A.          I know who she is vaguely.  She was a

14  house staffer.

15  Q.          Okay.  Did you -- do you know if she had

16  any involvement in redistricting?

17  A.          I don't know what her -- I've seen her in

18  your pleadings, but I don't know what her involvement

19  is.  I don't know her very well, so I don't know what

20  her involvement was.

21  Q.          Did you know Tom Hofeller?

22  A.          I don't even know who is that is.  Can you

23  spell it.

24  Q.          H O F E L L E R.

25  A.          Nope, I don't know who that is.  Sorry.

CONFIDENTIAL

Page 132

1                       STEVEN STIVERS

2    No, I don't know who that is.

3    Q.          Do you know Mark Braden?

4    A.          I do.

5    Q.          Who is that?

6    A.          Mark is one of the attorneys in this case.

7    He's also been my campaign attorney on other matters

8    on and off whenever I need a campaign attorney.

9    Q.          Do you know if he had any involvement in

10   the redistricting process?

11   A.          I do not know what his involvement in

12   redistricting was.

13   Q.          Do you know John Morgan?;

14   A.          I don't think I do.

15   Q.          Okay.  Do you know Adam Kinkaid?

16   A.          I know who Adam Kinkaid is.

17   Q.          Who is he?

18   A.          He was a staffer at the National

19   Republican Congressional Committee.

20   Q.          Okay.  Did you know him at the time?

21   A.          I knew who he was at the time.  I'm not

22   like friendly with him, but I know who he is.

23   Q.          Do you know if he had any involvement in

24   redistricting?

25   A.          I don't know what his involvement in

CONFIDENTIAL

Page 133

1                     STEVEN STIVERS

2      redistricting was.

3      Q.          Did you have any conversations with him

4      about redistricting?

5      A.          I did not.

6      Q.          Do you know Ed Gillespie?

7      A.          I know who Ed Gillespie is, but we're

8      not -- we don't like -- I only know from like seeing

9      press reports of him running for governor and senator

10     in Virginia and being the former chairman of the

11     National Republican -- National Republican Committee,

12     but I don't know him personally.

13     Q.          Okay.  In 2011, had you ever heard of

14     Project Red Map?

15     A.          No.

16                 MS. THOMAS:  I have no further questions

17     at this time reserving in case --

18                 MR. TUCKER:  Sure.

19                 Thank you, Congressman.  I have just a

20     couple follow-up questions for you.

21                           - - -

22                      EXAMINATION

23     BY MR. TUCKER:

24     Q.          We talked a little bit about the

25     constituency services that you provide in your

CONFIDENTIAL

Page 134

1                    STEVEN STIVERS

2      district.  Does that also include responding to

3      questions, inquiries or demands from constituents?

4      A.          Yes.  Over the last few years, we've

5      responded to 300,000 letters and emails that have

6      come to our office.  We've had serviced about 4,200

7      constituent claims, like a passport or a veteran's

8      administration case or Social Security or Medicare or

9      health care or anything involving the greater

10     government umbrella that people might have issues

11     with.

12     Q.          So sometimes you receive inquiries or

13     questions from constituents by email?

14     A.          Everyday.

15     Q.          And --

16     A.          The vast majority of those 300,000

17     correspondence

18               MR. TUCKER:  I don't have any further

19     questions.

20               MS. THOMAS:  I don't have any further

21     questions.

22               (Signature not waived.)

23                    -  -  -

24          DEPOSITION CONCLUDED AT 12:50 P.M.

25                    -  -  -

CONFIDENTIAL

<u>ERRATA SHEET</u>

<u>PLEASE DO NOT WRITE ON THE TRANSCRIPT</u>

Any changes to the transcript in form or substance should be entered upon this errata sheet.

Case Name:

Deposition Date:

Deponent:

| PAGE | LINE | CORRECTION | REASON |
|------|------|-----------|--------|
| Page 8 | Line 9 | Remove the word "the" | |
| Page 20 | Line 6 | Remove the word "the" | |
| Page 25 | Line 16 | Change "rep" to "senator" | |
| Page 38 | Line 19 | Change "sensor" to "senator" | |
| Page 73 | Line 24 | Remove the word "ing" | |
| Page 80 | Line 17 | "Potentionallyly" should be "Potentially" | |
| Page 88 | Line 14 | Change "references" to "reference" | |
| Page 91 | Line 20 | Change "competitive" to "compact" | |
| Page 99 | Line 12 | Change "there" to "their" | |
| Page 111 | Lines 6-7 | This should be changed from a question to an answer | |
| Page 115 | Line 6 | Change "by" to "my" | |

Date: _JAN 23, 2019_                    Signature: _____
                                                        Steven Stivers

Subscribed and sworn before me this __23rd__ day of __January__,
2019.



_____
Michael J. Orrick, Notary Public
Notary Public, District of Columbia
My Commission Expires 4/30/2023

My Commission Expires: _____

4814-0274-7781.1

CONFIDENTIAL

Page 136

1                        STEVEN STIVERS

2                          CERTIFICATE

3      State of Ohio        :

                            SS:

4      County of Franklin:

5              I, Jackie Olexa White, Notary Public in

6      and for the State of Ohio, duly commissioned and

7      qualified, certify that the within named STEVEN

8      STIVERS was by me duly sworn to testify to the whole

9      truth in the cause aforesaid; that the testimony was

10     taken down by me in stenotypy in the presence of said

11     witness, afterwards transcribed upon a computer; that

12     the foregoing is a true and correct transcript of the

13     testimony given by said witness taken at the time and

14     place in the foregoing caption specified.

15             I certify that I am not a relative,

16     employee, or attorney of any of the parties hereto,

17     or of any attorney or counsel employed by the

18     parties, or financially interested in the action.

19             IN WITNESS WHEREOF, I have set my hand and

20     affixed my seal of office at Columbus, Ohio, on this

21     31st day of December, 2018.

22

                       _____

23                     JACKIE OLEXA WHITE, Notary Public

                       in and for the State of Ohio

24                     and RPR-CM.

25     My Commission expires January 21, 2019.