# EXHIBIT Q

1          A. Kincaid - CONFIDENTIAL

2          UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF OHIO

4        Case No. 1:18-CV-00357-TSB-KNM-MHW

5    _____

6    OHIO A. PHILIP RANDOLPH                    )

7    INSTITUTE, et. al,                         )

8                    Plaintiffs,               )

9         v.                                    )

10   LARRY HOUSEHOLDER, Speaker of              )

11   the Ohio House of Representatives,         )

12   et al.,                                    )

13                   Defendants.                )

14   _____  )

15

16

17          DEPOSITION OF ADAM KINCAID

18                 Volume Two

19              Washington, D.C.

20              January 31, 2019

21

22

23

24   Reported by: Mary Ann Payonk

25   Job No: 154708

Page 250

```
1          A. Kincaid - CONFIDENTIAL
2
3
4
5              January 31 2019
6              8:30 a.m.
7
8       Deposition of ADAM KINCAID, Volume Two,
9   held at the law offices of Covington & Burling
10  LLP, 850 Tenth Street, Washington, D.C.,
11  pursuant to Notice before Mary Ann Payonk,
12  Shorthand Reporter and Notary Public of the
13  District of Columbia, Commonwealth of Virginia,
14  and State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 251

```
1   APPEARANCES:
2   ON BEHALF OF PLAINTIFFS:
3       ROBERT FRAM, ESQUIRE
4       COVINGTON & BURLING
5       One Front Street
6       San Francisco, CA 94111
7
8   ON BEHALF OF THE WITNESS:
9       SHAWN SHEEHY, ESQUIRE
10      PHILLIP GORDON, ESQUIRE
11      HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
12      45 North Hill Drive
13      Warrenton, VA 20186
14
15  ON BEHALF OF INTERVENORS:
16      KATHERINE McKNIGHT, ESQUIRE
17      BAKER HOSTETLER
18      1050 Connecticut Avenue Northwest
19      Washington, DC 22036
20
21  ON BEHALF OF LEGISLATIVE DEFENDANTS:
22      ALYSSA RIGGINS, ESQUIRE (By phone)
23      OGLETREE DEAKINS
24      4208 Six Forks Road
25      Raleigh, NC 27609
```

Page 252

```
1          A. Kincaid - CONFIDENTIAL
2   ADAM KINCAID,
3       called as a witness, having been duly
4       sworn, was examined and testified
5       further as follows:
6          EXAMINATION (Cont'd.)
7   BY MR. FRAM:
8       Q.  Good morning, Mr. Kincaid.  We met
9   before your December 4 deposition.  I'm Robert
10  Fram.  I represent the plaintiffs in this case.
11      We are going to start per agreement
12  of counsel with exhibits that are going to
13  start with the numbering after the last one in
14  your December 4 deposition.  That was number
15  40, so we are going to start today with number
16  41, okay?
17      A.  Okay.
18      MR. SHEEHY:  This is Shawn Sheehy
19  on behalf of Mr. Kincaid.  We have
20  produced Mr. Kincaid today for this
21  deposition; however, we are going to
22  preserve our rights under the First
23  Amendment privilege to appeal that after
24  a final ruling from the District Court
25  to preserve our rights.
```

Page 253

```
1          A. Kincaid - CONFIDENTIAL
2       I will be objecting to form to
3   questions that would include the First
4   Amendment privilege so any objections to
5   form will include objections under the
6   First Amendment privilege.
7       Given the District Court's order, I
8   will not be instructing Mr. Kincaid to
9   not answer questions unless those
10  questions would go to the District
11  Court's limitation of questions
12  pertaining only to Ohio.
13      And also, to put it in the record,
14  we will designate the transcript today
15  as CONFIDENTIAL pursuant to the Court's
16  confidentiality agreement.  Thank you.
17      MR. FRAM:  Thank you.
18  BY MR. FRAM:
19      Q.  Mr. Kincaid, you're aware you're
20  testifying here pursuant to a subpoena?
21      A.  Yes, sir.
22      Q.  And we went through deposition ground
23  rules the last time.  Those still apply here
24  but I just want to underscore again that you're
25  testifying here again under oath and under
```

2 (Pages 250 to 253)

Page 254

1           A. Kincaid - CONFIDENTIAL
2   penalty of perjury.
3           You understand that?
4       A.  Yes, sir.
5       Q.  Previously, your counsel provided
6   documents responsive to a different subpoena,
7   document subpoena, and of those 446 documents,
8   you were listed as the custodian for many of
9   them.
10          Do you recall collecting documents
11  for that subpoena?
12      A.  Yes.
13      Q.  Since that document collection effort
14  on your part, have you gone back and looked for
15  additional documents?
16      A.  No.
17      Q.  What did you do to prepare for
18  today's deposition, please?
19      A.  I met with my attorneys for a few
20  hours yesterday.
21      Q.  Anyone in the room who was not an
22  attorney?
23      A.  No.
24      Q.  Anybody who was an attorney but not
25  your attorney?

Page 255

1           A. Kincaid - CONFIDENTIAL
2       A.  No.
3       Q.  Have you had the opportunity to
4   review the transcript of your December 4
5   deposition since that deposition?
6       A.  Yes.
7       Q.  And did you provide a list of errors,
8   if any, to your counsel?
9       A.  I did.
10          MR. SHEEHY:  And those corrections
11  were filed with the District Court.  It
12  was one of the filings where your team
13  filed the draft transcript and in our
14  response, we filed the completed
15  transcript, which included his
16  corrections.
17          MR. FRAM:  Okay.
18  BY MR. FRAM:
19      Q.  Have you reviewed the transcript
20  since that check for errors?
21      A.  I have not.
22      Q.  While you were at the NRCC in 2011,
23  did you draft any maps relating to
24  redistricting in Ohio?
25      A.  Yes.

Page 256

1           A. Kincaid - CONFIDENTIAL
2       Q.  Do you recall approximately how many
3   maps you drew?
4           MR. SHEEHY:  Objection to form.
5       A.  Can you be a little bit more specific
6   as far as maps, what you're referring to?  We
7   went through this last time obviously too.
8   There's a lot of ways you can define maps when
9   it comes to redistricting.
10      Q.  Let me see if I can break that apart
11  a little bit for you.  Let's go through the
12  different ways one can generate a map for
13  redistricting.
14          First of all, was the software tool
15  you would use to generate a map, was that
16  Maptitude?
17      A.  Yes.
18      Q.  And what are the different ways you
19  can generate a map using Maptitude for
20  Congressional redistricting?  And that, you did
21  in Ohio in 2011.
22          MR. SHEEHY:  Objection to form.
23      A.  Ways that you can generate a map
24  would include you can upload a map, meaning a
25  shapefile or a block assignment file into

Page 257

1           A. Kincaid - CONFIDENTIAL
2   Maptitude.  That would generate a map.
3           You can use a -- what they would call
4   a Maptitude layer or a map layer within
5   Maptitude to move blocks and precincts from one
6   district to another or assigning map precincts
7   or blocks from district to district.
8           So there's a lot of different ways
9   you can generate or upload maps.
10      Q.  Let's take those a little bit one at
11  a time.  For a block file, something called a
12  block equivalency file; is that right?
13      A.  There's a lot of different words for
14  it.  Yeah, I know what you're talking about.
15      Q.  That basically gives the information,
16  if I understand it correctly, of the
17  individual -- tells you which individual census
18  blocks are within specific proposed or final
19  Congressional districts; is that right?
20      A.  I would say districts because it
21  could be any kind of district.
22      Q.  I want to focus my questions on Ohio
23  and on Congressional districts.  So in regards
24  to Ohio Congressional district map generation
25  in 2011, did you generate block equivalency

3 (Pages 254 to 257)

Page 258

1  A. Kincaid - CONFIDENTIAL
2  files which you then loaded into Maptitude for
3  the purpose of generating district maps,
4  Congressional district maps?
5      MR. SHEEHY:  Objection to form.
6      A.  I wouldn't have generated block files
7  for my own uploading to Maptitude.  I would
8  have -- if I was uploading a file into
9  Maptitude, it's because I received it from
10  somewhere else, not because I did it myself.
11     Q.  Did you ever move a block from one
12  district to another in Ohio as regards 2011
13  Congressional redistricting?
14         MR. SHEEHY:  Objection to form.
15     A.  Yes.
16     Q.  So if I understand correctly, you
17  would receive a block equivalency file that
18  would have all the blocks for Ohio; is that
19  right?
20     A.  If I had received a block equivalency
21  file in Ohio it would have included districts
22  and blocks, yes.
23     Q.  Who was sending you the block
24  equivalency file if you were not generating it
25  yourself.

Page 259

1  A. Kincaid - CONFIDENTIAL
2      MR. SHEEHY:  Objection to form.
3  A.  If I would --
4  Q.  And again, this is for Ohio in 2011.
5      A.  Yes.  If I was uploading a block
6  equivalency file in regards to Ohio
7  redistricting, specifically Congressional in
8  2011, that block file would have likely come
9  through Tom Whatman from Heather Mann and Ray
10  DiRossi.
11     Q.  Did you ever get block equivalency
12  files directly from Heather Mann or Ray
13  DiRossi?
14         MR. SHEEHY:  Objection to form.
15     A.  As for that email chain that we went
16  over the last time I had a deposition, yes, I
17  did receive a couple at the very end of the
18  redistricting process, yes.
19     Q.  Mid December?
20     A.  I think it was September-ish.
21     Q.  We will go back to that as to when
22  that happened.
23     A.  Yes.
24     Q.  But thank you.
25         So that's the block equivalency

Page 260

1  A. Kincaid - CONFIDENTIAL
2  files. I'm talking about shapefiles. Are your
3  answers the same as regards the shapefiles?
4      A.  I would not say the same because I
5  don't recall receiving any shapefiles for Ohio
6  in 2011.
7      Q.  So the record's clear, your
8  recollection is you received block equivalency
9  files for the entire state of Ohio for --
10  either directly from Ms. Mann or Mr. DiRossi or
11  through Mr. Whatman; is that right?
12     A.  That's correct.
13     Q.  You would then load that into
14  Maptitude; is that right?
15     A.  That's correct.
16     Q.  Then you would move a block from one
17  district to another; is that right?
18         MR. SHEEHY:  Objection to form.
19     A.  If need be, yes.
20     Q.  Do you recall --
21     A.  Not always.
22     Q.  But there were occasions when you did
23  so?
24     A.  There would be occasions where I did
25  so, yes.

Page 261

1  A. Kincaid - CONFIDENTIAL
2      Q.  Do you recall approximately how many
3  times you did that?
4      A.  Could you be more specific?
5      Q.  Do you recall how many times -- well,
6  do you recall how many times you engaged --
7  what I'm going to call what you just described,
8  I'm going to call it the process of revising an
9  Ohio Congressional district map.
10         Are you comfortable with that
11  phrasing?
12     A.  That will be fine.
13     Q.  Do you recall how many times you
14  engaged in the process of revising an Ohio
15  Congressional district map in 2011?
16         MR. SHEEHY:  Objection to form.
17     A.  Just for clarity's sake, let me break
18  it out from what you said.  You were -- you
19  teed it up as me receiving a file from Ray
20  DiRossi or Heather Mann and then me revising it
21  from that point.
22         I don't recall doing that more than a
23  couple times at the very end of the process,
24  like we talked about before.
25     Q.  Did you engage in any other process

Page 262

```
 1          A. Kincaid - CONFIDENTIAL
 2   of either creating or revising a Congressional
 3   district map in Ohio in 2011 other than those
 4   couple of instances where you used block
 5   equivalency files?
 6          A.  Yes.
 7          Q.  And what do you recall about that,
 8   please?
 9          MR. SHEEHY:  Objection to form.
10          A.  Well, I think there's two different
11   processes that we're kind of intermingling here
12   that's worth breaking out.
13          There's me receiving block
14   equivalency files from Ray and Heather in Ohio
15   through Tom or some other -- more directly
16   versus what I was doing, which we have talked
17   about before, which is working with the members
18   of the Ohio delegation to create a proposal for
19   the state legislature in Ohio to consider which
20   was done with me working with people to create
21   that proposal and then sending a block
22   equivalency file, which would have been a
23   different process.
24          So those are two different things
25   that I think it's important to keep separate
```

Page 263

```
 1          A. Kincaid - CONFIDENTIAL
 2   because they're --
 3          Q.  Let's break it apart.  We were
 4   talking about what you were doing directly with
 5   either Ms. Mann or Mr. DiRossi or through
 6   Mr. Whatman and not part of the -- what I'll
 7   call the Congressional proposal process, not
 8   part of that.
 9          You say there was another way,
10   though, other than block equivalency files that
11   you could revise a map, and that is you could
12   actually look at a map and map to it and you
13   could then click on a block on the map itself
14   and then move it; is that right?
15          A.  Again, to go back to the process, a
16   block equivalency file is something you export
17   at the end of creating a map or a proposal or a
18   draft or whatever you want to call it.  It's
19   not something that you -- I suppose in the back
20   end, you are changing the block equivalency.
21   You're changing the way that blocks are
22   assigned.
23          But a block equivalency file itself
24   is not something you would manipulate.  It's
25   something you would upload into a software and
```

Page 264

```
 1          A. Kincaid - CONFIDENTIAL
 2   then export a block equivalency file back out
 3   when you when finished with it.  So that to
 4   itself is used to -- normally, you would use
 5   maps to move precincts or VTBs, which are voter
 6   tabulation districts, or blocks and assign them
 7   from one district to another.
 8          Q.  Right.  And to do that, would you --
 9   to do that, would you do that like looking at a
10   map and clicking on a dot on a map or that dot
11   corresponding to a particular block, or what's
12   the mechanics of how you do that process?
13          MR. SHEEHY:  Objection to form.
14          A.  Within Maptitude what you would do is
15   you first choose the district that you are
16   assigning a piece of geography to so.  If you
17   want to put something in Ohio District 1, you
18   would make sure 1 is selected.  And then you,
19   you know, mouse over that spot and click on
20   that piece of geography and then another and
21   another and another, whatever you want to do.
22   And then you click a checkmark that assigns it
23   to that district.
24          Q.  Okay, so you could -- if I understand
25   correctly, taking your example of District 1,
```

Page 265

```
 1          A. Kincaid - CONFIDENTIAL
 2   you'd scroll over District 1 and then you'd
 3   click on a block.  That block would be
 4   represented by a dot.  How would you know what
 5   to be clicking on?  You say you'd scroll over
 6   District 1; is that right?
 7          A.  Well, I'd make sure District 1 was
 8   selected.
 9          Q.  Was selected, okay.  And then what
10   you would -- so all you'd be seeing would be
11   District 1 on the screen, or all of Ohio with
12   District 1?
13          A.  It depends on what you have up on the
14   screen when you're working.  You can zoom in
15   and out.  It's like working with Google Maps.
16   You could look at all of a state or you could
17   look at a county or a precinct or a block.  We
18   can zoom in as low as you want or zoom out as
19   much as you want to.
20          Q.  So you got the -- a visual of the
21   district whether zoomed in or not on the screen
22   and then you scroll over it to get to a
23   particular what you call geography; is that
24   right?
25          A.  A piece of census geography, yes.
```

TSG Reporting - Worldwide - 877-702-9580

Page 266

A. Kincaid - CONFIDENTIAL
Q. And that census geography could
include a census block; correct?
A. Census geography includes everything
from census blocks to census tracts, VTDs,
which are voter tabulation districts, you know,
all the way up, you know, counties or
municipalities.
Q. So just focusing on blocks for a
minute, you scroll over, and when you scroll
over the district, how would you see those
blocks? Would you scroll over the block?
Would the block number appear, pop up, or how
would you know which block you were on?
A. I mean, you see the block.
Typically, you don't -- in the course of
creating a draft map or whatever it might be
that you're working on, you don't really work
with blocks that much because blocks are very
small and it would take a very long, tedious
time to go through thousands and thousands of
blocks in a state.
You typically work at higher
geographies and then you would go down to a
block level when you're at the end of the

Page 267

A. Kincaid - CONFIDENTIAL
process and you're trying to balance
populations between districts.
Q. Did you -- in Ohio in 2011 did you
work at the block level when you were revising
maps or at a higher geography level?
MR. SHEEHY: Objection to form.
A. I would have done all of the above.
Q. Okay. So let's take it at the block
levels that you did in Ohio in 2011 so we have
a clean record as to how this gets done.
You scroll over the district. And
then when you're over a block, does the block
number appear for you?
How do you know what block you're on
is what I'm trying to get at?
A. It depends on what the label is that
you have selected in Maptitude. So if you want
to have a block number, you could have a block
number. If you want to have a population, you
could have a population. It would depend.
I mean, a block number's several
digits long so if you are going to have a block
number up on every single block, it's kind of
hard to see because there's a lot of numbers

Page 268

A. Kincaid - CONFIDENTIAL
and a lot of lines.
So the easier thing is to have the
population of the block on the screen rather
than the specific number of a block.
Q. Okay, fair enough. So you scroll
over a block and a label would appear on the
screen; is that right?
A. Yes, uh-huh.
Q. As you were scrolling, different
labels would appear as you went over different
blocks; is that right?
A. The labels appear across the screen,
you know, on all of the blocks or all of the
VTDs that would have appeared within, you know,
that image that you're looking at on the
monitor.
Q. If all the labels are up there, how
do you know which label you are scrolled over?
A. Well, the label would be in the
middle of the geography so you know what label
corresponds with what geography.
Q. Okay. But if you want to move a
particular block from one district to
another --

Page 269

A. Kincaid - CONFIDENTIAL
A. Uh-huh.
Q. -- and you scrolled over that
district and the labels are up on the screen,
how do you know how to manipulate it so you can
move that block from one district to another?
MR. SHEEHY: Objection to form.
A. I don't know how to do this with the
court reporter, the easiest way to do it, but
if you have a circle that's a census block and
you want to -- say I want to assign that
geography to a different district, right?
Q. Uh-huh.
A. And it has a number 5 on it because
maybe five people were tabulated by the Census
Bureau that live within that block. I'd just
take my mouse and I'd click on that block and
then hit a checkmark and that would assign it
to that district, and that's how you would
assign a block to a district.
Q. Now, in that label -- let me back up.
So that's a different way of revising a map
other than revising a block equivalency file;
correct? It was the second technique I think
you described.

Page 270

1          A. Kincaid - CONFIDENTIAL
2          A.   Again, I wouldn't call that revising
3   a block equivalency file.  I would say that
4   would be modifying a -- you know, making
5   modifications to a map.
6          Q.   Right.
7          A.   Like I said before, a block
8   equivalency file is something you import or
9   export, and maybe there's changes made on the
10  back end, but you're not --
11         Q.   I understand.  I'm not -- I --
12  actually, I think we're on the same page.  Let
13  me say it clearly for the record.  To revise a
14  map, as you did in Ohio in 2011, there are two
15  basic techniques, as I understand it.  One is
16  you can actually modify the block equivalency
17  file itself.  The other is you can modify --
18  you can go on screen, click on the geography,
19  designate the new district that you go into,
20  click, and then it's done.  And that will --
21  can result in a change in the block equivalency
22  file, those two different techniques.
23         A.   The second thing you described is
24  really the way it's done.  I've never known
25  anybody who would ever take the time to go into

Page 271

1          A. Kincaid - CONFIDENTIAL
2   a block equivalency file and assign every block
3   by a district with a district number.
4          Q.   So if I understand correctly, you
5   would receive the block equivalency file for
6   the whole state and directly from Heather Mann,
7   Ray DiRossi, or through Tom Whatman.  It would
8   be loaded into Maptitude.  And then if you want
9   to make revisions, then at least on a couple of
10  occasions, having loaded that into Maptitude,
11  you would then scroll over the district, find
12  the geography you wanted to reassign to a
13  different district, and click on it.
14         Do I have that process correct?
15         MR. SHEEHY:  Objection to form.
16         A.   That's the basic gist of it, yes.
17         Q.   Okay.  You say you did that, you can
18  recall doing that a couple of times; is that
19  right?
20         MR. SHEEHY:  Objection to form.
21         A.   When it came to me receiving a block
22  assignment file, that would have -- you know,
23  end in, you know, me making revisions to
24  something I received.  That happened a couple
25  times, maybe a few times.  I don't really

Page 272

1          A. Kincaid - CONFIDENTIAL
2   recall.
3          Q.   You said maybe a few, so more than
4   five?
5          A.   I honestly -- I don't remember how
6   many times I would have received a block
7   assignment file other than a couple times at
8   the end where I remember receiving a block
9   assignment file.
10         Q.   At least two, could have been more;
11  is that fair?
12         A.   Possibly, yes.
13         Q.   Do you recall -- I'll go back to the
14  Congressional proposal in a minute, but just in
15  terms of work that was done directly with
16  Mr. DiRossi and Ms. Mann or through Tom
17  Whatman, do you recall any other ways in which
18  you engaged in the process of revising
19  Congressional district maps in Ohio in 2011?
20         MR. SHEEHY:  Objection, form.
21         A.   The only way I would have been making
22  revision was within Maptitude.  There was no
23  other software or platform I would have been
24  using at the time.
25         Q.   Was there any other Maptitude

Page 273

1          A. Kincaid - CONFIDENTIAL
2   technique that you'd use other than the ones
3   you've already described?
4          MR. SHEEHY:  Objection to form.
5          A.   The sense of selecting a -- one block
6   or one precinct or one county at a time, I
7   mean, you can select multiple at one time.  But
8   no, I mean, that's -- that's the basic way that
9   you would use Maptitude --
10         Q.   Okay.
11         A.   -- to assign geographies to
12  districts.
13         A.   Let's talk about the Congressional
14  proposal work you did also.
15         A.   Okay.
16         Q.   First of all, to have a clean record,
17  can you describe for me the Congressional -- I
18  mean, we had some testimony already but so we
19  are all in one place and don't have to go back
20  and forth between different deposition pages.
21  Can you please describe your deposition [sic]
22  proposal process, the work you did.
23         MR. SHEEHY:  Objection to form.
24         A.   As the redistricting coordinator in
25  2011 and 2012, my job was to facilitate the

7 (Pages 270 to 273)

Page 274

A. Kincaid - CONFIDENTIAL

1        A. Kincaid - CONFIDENTIAL
2  development of proposed maps with members of
3  Congress, specifically in Ohio, so that they
4  would have a proposal that they could bring
5  back to state legislators for their
6  consideration when they were -- since state
7  legislators were the ones responsible for
8  redistricting and passing maps into law. So my
9  job was to facilitate the development of those
10  proposals in Ohio.
11     Q. And what did you do to facilitate
12  those proposals?
13     MR. SHEEHY: Objection to form.
14     A. I meet with -- in Ohio, I met with
15  Tom Whatman a number of times. I met with the
16  Republican members of Congress; some once, some
17  not at all, and a couple of them multiple times
18  to receive feedback from them and from others
19  via them on what to include or not include in a
20  proposal for the Ohio legislature.
21     Q. And did that process take place
22  during August of 2011?
23     MR. SHEEHY: Objection to form.
24     A. As said in my last deposition, I
25  don't remember when that process began in 2011.

Page 275

A. Kincaid - CONFIDENTIAL

1        A. Kincaid - CONFIDENTIAL
2  But I'm sure in August and September is
3  probably when I was the busiest doing that, but
4  I don't recall when that began.
5     Q. Do you recall when it ended?
6     A. It would have ended whenever the
7  final map was -- well again, it ended with that
8  email exchange that you and I went over in the
9  last deposition.
10     Q. So sometime around --
11     A. Whatever the date was on that email
12  exchange.
13     Q. But before the -- it ended before the
14  map went to -- before a map proposal went --
15  was considered by the Ohio General Assembly, so
16  that's certainly an end date; is that right?
17     MR. SHEEHY: Objection to form.
18     A. The proposal would have been sent
19  over before that point and then my involvement
20  in the process ended from a drafting
21  perspective with that final change, with
22  Mr. Whatman and Ray and Heather.
23     Q. And that was on the evening of
24  September 12, 2011 --
25     A. I -- I'm not --

Page 276

A. Kincaid - CONFIDENTIAL

1        A. Kincaid - CONFIDENTIAL
2     Q. -- that those emails --
3     A. I don't remember the date, but --
4     Q. Yeah. But the proposal would have
5  gone in before that email exchange; is that
6  right?
7     A. Yes.
8     Q. Okay. Do you recall roughly how many
9  times they -- you provided your proposal before
10  the final email exchange?
11     MR. SHEEHY: Objection to form.
12     A. It could have been a week or two. I
13  really don't recall.
14     Q. Was that proposal -- do you recall
15  how it was transmitted? Did you transmit it or
16  was it transmitted by Mr. Whatman?
17     A. I don't have a specific recollection.
18     Q. Do you recall who it was sent to?
19     Was it sent to Speaker Batchelder?
20     Do you recall?
21     A. Speaker Batchelder would not have
22  been -- the only people that I know of that
23  received the maps from me or Tom have been
24  working for the Ohio legislature would be Ray
25  and Heather.

Page 277

A. Kincaid - CONFIDENTIAL

1        A. Kincaid - CONFIDENTIAL
2     Q. Okay. And in the process of working
3  on those, on the Congressional proposal map --
4     A. I'm sorry, let me correct that real
5  quick. The other person that would have been
6  working with the Ohio legislature was their
7  attorney, which was Mark Braden, who also would
8  have received files on a couple occasions.
9     Q. Did you send him the Congressional
10  proposal?
11     A. I did.
12     Q. Did he ever make any revisions to the
13  Congressional proposal before it was sent?
14     MR. SHEEHY: Objection to form.
15     A. Did he make any revisions?
16     Q. Right. Before you sent the proposal
17  to the Ohio legislature, did Mr. Braden provide
18  any input on the proposal?
19     MR. SHEEHY: Objection to form.
20     A. In his role as counsel, I know that
21  he gave legal advice to the state legislature
22  on how that process should have been conducted,
23  and I would have received feedback on that
24  through Tom Whatman via the Ohio legislature.
25  But Mark was representing the Ohio legislature

Page 278

A. Kincaid - CONFIDENTIAL

1   and I didn't receive any feedback from him
2   directly.
3       Q.  Did Mr. Whatman ever say to you that
4   Mr. Braden wanted you to move a geography from
5   one district to another --
6           MR. SHEEHY:  Objection.
7       Q.  -- while were you working on the
8   Congressional proposal?
9           MR. SHEEHY:  Objection to form.
10      A.  I never received any instructions to
11  that respect from Mark Braden via Tom or
12  anybody else.
13      Q.  What about Mr. Hofeller?  Did he
14  provide any input on the Congressional
15  proposal, the late Dr. Hofeller?
16          MR. SHEEHY:  Objection to form.
17      A.  Dr. Hofeller had been in touch with a
18  couple members as well through previous
19  relationships so I know that he -- I think he
20  advised a couple members separate from what I
21  was working on with Mr. Whatman, but his
22  specific guidance I couldn't speak to.
23      Q.  During the formulation of the
24  Congressional proposal did Dr. Hofeller ever

Page 279

A. Kincaid - CONFIDENTIAL

1   provide an instruction to you as to which
2   districts certain geographies should be?
3           MR. SHEEHY:  Objection, form.
4       A.  No.
5       Q.  Do you know if he provided any to --
6   any instructions or input to Mr. Whatman who
7   then conveyed that to you?
8           MR. SHEEHY:  Objection to form.
9       A.  I couldn't tell you what Tom
10  received, what Tom Whatman received from
11  anybody else.  I don't know who, you know, was
12  giving -- I don't know if Hofeller gave Whatman
13  any specific instructions or feedback or not.
14      Q.  Well, let's talk about the work you
15  did on the Congressional proposal so we've got
16  that clear.
17          In this instance you were working
18  with Maptitude, did you also have a block
19  equivalency file that had been loaded into
20  Maptitude that you were working in?
21      A.  At the beginning of this process?
22      Q.  At any point while you were -- let me
23  back up.  The end product --
24      A.  Uh-huh.

Page 280

A. Kincaid - CONFIDENTIAL

1       Q.  -- for the proposal, the
2   Congressional proposal, was that a map
3   generated in Maptitude?
4       A.  Yes.
5       Q.  And did that include a block
6   equivalency file also, the end product?
7       A.  The final proposal from the
8   delegation from Ohio would have been
9   transferred via a block equivalency file.
10      Q.  So you'd send that block equivalency
11  file over to Ms. Mann and Mr. DiRossi and then
12  they would load that into Maptitude so they
13  could see a rendering of the map; is that
14  right?
15          MR. SHEEHY:  Objection to form.
16      A.  Ray and Heather would have uploaded
17  that file into whatever software they were
18  using.
19      Q.  During the course of the work on the
20  Congressional proposal was the block
21  equivalency file amended over time indirectly
22  through clicking on Maptitude districts
23  themselves?
24          MR. SHEEHY:  Objection to form.

Page 281

A. Kincaid - CONFIDENTIAL

1       A.  Redistricting is an iterative process
2   so there are always changes being made to any
3   draft proposal.  It's not static, especially in
4   Ohio.
5           Ohio came out of the, you know, 2010
6   census -- went into the 2010 census with 18
7   districts and left the 2010 census with 16
8   districts, so yes, there were changes made
9   between the map that existed and the new map.
10      Q.  And so when you -- your work on the
11  Congressional proposal, did you start with a
12  baseline block equivalency file which then
13  iterated?
14      A.  The baseline map I would have worked
15  off of was the existing Congressional map in
16  Ohio.
17      Q.  And how did you -- I'm assuming you
18  obtained a block equivalency file for the
19  existing, and that would have been the
20  18-district map; is that correct?
21      A.  That's correct.
22      Q.  Who did you receive that from?
23      A.  Maptitude.
24      Q.  Maptitude itself?

Page 282

1        A. Kincaid - CONFIDENTIAL
2     A.   Maptitude provides the existing
3 geographies for the districts as part of the
4 package you would get with Maptitude.
5     Q.   Now, in the work on the Congressional
6 proposal did you also have election results
7 data loaded into Maptitude?
8        MR. SHEEHY:  Objection to form.
9     A.   Yes.
10    Q.   Do you recall what the source of that
11 election results data was, who it was?
12       MR. SHEEHY:  Objection to form.
13    A.   You're asking who I got the political
14 data from?
15    Q.   Yes, please.
16       MR. SHEEHY:  Same objection.
17    A.   The Ohio political data, some of it
18 came from a state university in Ohio I know
19 produced political data for the state, which is
20 one source of the political data.  Another
21 source was the Republican National Committee.
22    Q.   Okay.  Now, the Republican -- the
23 Ohio -- the Cleveland State University election
24 data, do you recall that was limited to the
25 2008 and 2010 election cycles?

Page 283

1        A. Kincaid - CONFIDENTIAL
2     A.   I don't recall what was in that set
3 of data.
4    Q.   Do you recall any differences between
5 what you got from the Republican National
6 Committee and the Cleveland State University
7 data?
8     A.   Yes.
9    Q.   What were the differences, please?
10    A.   The Republican National Committee
11 data was based off of the census blocks, and
12 the Cleveland state data was based off their
13 own geographies.
14    Q.   Okay.
15    A.   They split blocks and merged blocks
16 and --
17    Q.   Did you rely on one rather than the
18 other when you were doing your work on the
19 Congressional proposal?
20       MR. SHEEHY:  Objection to form.
21    A.   I tried to utilize both.
22    Q.   You said you tried.  In the end, did
23 you wind up relying more on one or the other?
24       MR. SHEEHY:  Objection to form.
25    A.   One was based off of the census data

Page 284

1        A. Kincaid - CONFIDENTIAL
2 that was actually being used for redistricting,
3 and the other one was based off of census
4 geographies that didn't exist, so I used the
5 one based off of the actual census geographies,
6 which was the RNC data.
7    Q.   Okay.  Now, the RNC data, it was your
8 understanding, was that generated -- well, let
9 me back up.
10    Do you know whether Mr. Clark Benson
11 had something to do with generating the RNC,
12 what you're calling the RNC data?
13       MR. SHEEHY:  Objection to form.
14    A.   I'm not familiar with the contracts
15 of who did or did not contribute to what states
16 in -- with the data that was produced by the
17 RNC.
18    Q.   Do you know if The Magellan Group had
19 anything to do with generating those census
20 blocks?  That's a bad -- that political -- I'm
21 sorry, that's a terrible question.
22    Do you know whether The Magellan
23 Group had anything to do with generating the
24 election results for the census blocks that you
25 used in your work on the Congressional

Page 285

1        A. Kincaid - CONFIDENTIAL
2 proposal?
3       MR. SHEEHY:  Objection to form.
4    A.   Again, I don't know who the
5 consultants or staff would have been that
6 generated the Ohio political data.
7    Q.   Do you recall whether Dr. Hofeller
8 provided you with the RNC -- what you call the
9 RNC data?
10       MR. SHEEHY:  Objection to form.
11    A.   I would not have received that data
12 from Tom Hofeller.  That data may have come
13 from Mike Wild.  That's the more likely source
14 for distributing that data.
15    Q.   Do you know if Tom Hofeller had
16 anything to do with any part of the process of
17 generating the RNC data?
18       MR. SHEEHY:  Objection to form.
19    A.   Tom was the resistor team director at
20 the RNC, and in that role I would assume that
21 he had some role over which consultants were
22 assigned to what states and what data was
23 generated.
24    But again, I couldn't speak to which
25 consultants were put on what states or how that

Page 286

1      A. Kincaid - CONFIDENTIAL
2  data was separated out for development
3  production.
4      Q.  As you were working on the
5  Congressional proposal, when you would scroll
6  over a district, did a label appear?  I think
7  you testified -- is that right?
8      A.  The label would be there, yes.  It
9  wouldn't just appear if I scrolled over it, but
10  yes, it would.
11      Q.  And do you recall, you said the label
12  could have population information in it.  Could
13  it also have election scorings in it?
14      MR. SHEEHY:  Objection to form.
15      A.  The label is customizable within
16  Maptitude so it could be anything I wanted it
17  to be.
18      Q.  And did you, in fact, in Ohio working
19  on the Congressional proposal include PVI
20  scorings in the label?
21      MR. SHEEHY:  Objection to form.
22      A.  At what geographies?  I think --
23      Q.  Oh, at any geography.  We will break
24  it down.
25      A.  Yes.

Page 287

1      A. Kincaid - CONFIDENTIAL
2      Q.  Which geographies?
3      MR. SHEEHY:  Objection to form.
4      A.  PVI scoring specifically I would have
5  had only at the Congressional district level.
6      Q.  Okay.  And when you would reassign or
7  iterate a geography from one district to the
8  other would that in real time change the PVI
9  scorings for the Congressional district?
10      MR. SHEEHY:  Objection to form.
11      A.  When you would -- when I would move a
12  geography from one district to another within,
13  you know, within Ohio, the software would
14  recalculate that, that index, yes, in real
15  time.
16      Q.  So you could immediately see the
17  change in the PVI scoring when you moved a
18  geography; correct?
19      A.  Yes.
20      Q.  And other than PVI scoring were there
21  any other election result information that
22  appeared in the labels?
23      MR. SHEEHY:  Objection to form.
24      A.  Yes.
25      Q.  What other election result

Page 288

1      A. Kincaid - CONFIDENTIAL
2  information appeared in the labels?
3      MR. SHEEHY:  Objection to form.
4      A.  Again, it would just depend on what I
5  was looking at at any point in time.  There
6  were multiple elections that we had in the
7  database that we were able to utilize.
8      Q.  So just focus on Ohio in 2011.
9      A.  Uh-huh.
10      Q.  Now focusing on the Congressional
11  proposal part of the process, that's -- for
12  then, do you recall what other election result
13  information appeared in the labels for the
14  Congressional districts?
15      MR. SHEEHY:  Objection to form.
16      A.  Sure.  In 2011, we were just coming
17  out of a very close race for governor in Ohio.
18  John Kasich had barely beaten Ted Strickland
19  and so that race was one of the ones I would
20  have looked at from time to time on how
21  districts were formed relative to the 2010
22  elections.
23      The McCain percentages and Obama
24  percentages from 2008 would have been something
25  we would have looked at.  Carrie Bush numbers

Page 289

1      A. Kincaid - CONFIDENTIAL
2  from 2004.  I think there was an '06 race or
3  two in there, probably auditor or Attorney
4  General or something like that.  So, I mean, it
5  really just depended from --
6      Q.  Did they all appear in the label, all
7  those individual elections for each district?
8      MR. SHEEHY:  Objection to form.
9      A.  I wouldn't have had all of them up on
10  the screen at one time because that would have
11  been a mess.
12      Q.  It's a lot to put into a label, I
13  understand.
14      A.  Yeah.
15      Q.  Rather than put it into a label, did
16  you ever put it into a table that would appear
17  on the side of the map?
18      MR. SHEEHY:  Objection to form.
19      A.  Maptitude gives you a -- table that
20  exists that's there that is based off of any
21  data that you include in your base data for
22  drawing maps in Ohio.  So you would merge the
23  political data with census data that's matched
24  the block and then Maptitude takes that data
25  from the block level and rolls it up to the

Page 290

1    A. Kincaid - CONFIDENTIAL
2  precinct level well, VTD, but just for ease of
3  use, precinct data and up to the county or
4  district or whatever it is you're looking at.
5    Q.  And is that sometimes -- was that
6  known as the Dataview 1 table?
7    A.  I don't know Dataview 1 or Dataview,
8  2 but it's Dataview something, yeah.
9    Q.  So we're clear, in the Dataview --
10  well, let's break it apart.  What's in the
11  label as opposed to being in the Dataview
12  table.
13    A.  Uh-huh.
14    Q.  So the label, there was at least PVI
15  scoring; is that right?
16    A.  No, not at least.  I mean, I didn't
17  always look at the PVI data for a district.
18    Q.  But you did look at the PVI data in
19  the label from time to time for a district; is
20  that right?
21    MR. SHEEHY:  Objection to form.
22    A.  Sometimes.
23    Q.  Did you ever have other election
24  result data in the label other than PVI?
25    MR. SHEEHY:  Objection to form.

Page 291

1    A. Kincaid - CONFIDENTIAL
2    A.  Yes.
3    Q.  What would be in the -- what other
4  election result data did you at least on some
5  occasions have in the label?
6    MR. SHEEHY:  Objection to form.
7    A.  What I told you before.  Those
8  various races that I would have, you know,
9  switched them in and out depending on what I
10  was looking at.
11    Q.  Did you ever use any indices that
12  would average several different races, either
13  in the Dataview table or in the label?
14    MR. SHEEHY:  Objection to form.
15    A.  The PVI and -- is kind of an average
16  more of an index, and then the Ohio elections
17  average that we talked about the last time.
18    Q.  Right, the five elections that we
19  looked at the Excel function, if I recall.
20    A.  Yeah.
21    Q.  And that sometimes -- would that
22  index information appear sometimes in the
23  label?  Is that right?
24    MR. SHEEHY:  Objection to form.
25    A.  I don't recall ever having the Ohio

Page 292

1    A. Kincaid - CONFIDENTIAL
2  average in a label, but it's entirely possible
3  I could have at some point in time.  I just
4  don't recall having that in a label.
5    Q.  Did you have it in the Dataview
6  table?
7    MR. SHEEHY:  Objection to form.
8    A.  I know I had the races that would
9  have made up that average in the Dataview
10  table, but I'm not sure I ever built that
11  average into -- because you have to customize a
12  formula within Maptitude.  You can't just --
13  you have to create that, and I'm not sure I
14  ever created that in Maptitude.
15    Q.  We saw you did it in Excel.
16    A.  I did it in Excel separately.
17    Q.  Right.
18    A.  But I'm not sure I ever did it within
19  Maptitude.
20    Q.  So you would export the election
21  results from Maptitude, is that right, to an
22  Excel form and then you copied it into a change
23  sheet, if I recall your testimony; is that
24  correct?
25    A.  That's basically it, yeah.

Page 293

1    A. Kincaid - CONFIDENTIAL
2    Q.  And so once you had the election
3  results exported from Maptitude you could then
4  use Excel to do the averaging for the
5  five-election index?
6    A.  Yeah, you could do the average within
7  Excel for that.
8    Q.  Well, let me ask you a question.  Did
9  you use the same elections for all the
10  districts or did you sometimes focus more on
11  some rather than the other, depending upon the
12  geography or location of the district?
13    MR. SHEEHY:  Objection to form.
14    A.  When you say did I use, what do you
15  mean by did I use?
16    Q.  Start with did you look at, sort
17  of -- and did you -- yeah, did you in any way
18  look at -- did you always look at the same
19  election results for all districts or did you
20  look at some elections for some districts or
21  other elections for other districts?
22    MR. SHEEHY:  Objection to form.
23    A.  When it came to just the basic
24  process that we've already talked about of
25  geographies from one place to another, that's

12 (Pages 290 to 293)

Page 294

```
 1          A. Kincaid - CONFIDENTIAL
 2    something where I would have used the same
 3    elections across the state when I was looking
 4    at different geographies.
 5          Later during the analysis process I
 6    would have looked at different elections in
 7    different areas of the state.
 8       Q.  Let's talk about that a little bit.
 9    We're talking still in the Congressional
10    proposal; is that right?  Are we talking about
11    now you've moved into -- beyond the
12    Congressional proposal?
13       A.  I would say that was the entire Ohio
14    redistricting process.  Whether it was a
15    proposal or whether it was a, you know, a
16    map-out of the Ohio legislature that was passed
17    or whatever, I would have -- I mean, the
18    analysis process would have applied for it.  It
19    would have applied to the entire analysis
20    process, whether it was a drafting of a map for
21    a proposal or whether it was an analysis of a
22    map from the Ohio legislature, so that.
23       Q.  You mentioned the Strickland 2010 --
24       A.  Uh-huh.
25       Q.  -- governor race.
```

Page 295

```
 1          A. Kincaid - CONFIDENTIAL
 2       A.  Uh-huh.
 3       Q.  Do you recall the part of the state
 4    where Strickland came from, his home base was?
 5       A.  I'm pretty sure Ted Stickland's home
 6    base was pretty much Congressman's Johnson's
 7    seat, which ran from -- along the West Virginia
 8    border.
 9       Q.  That would be District 6, if you
10    recall?
11       A.  Yeah.
12       Q.  Okay.  Would you rely upon -- did you
13    rely upon the 2010 election involving
14    Mr. Strickland when evaluating or considering
15    the election result information for District 6?
16          MR. SHEEHY:  Objection to form.
17       A.  It would have been a metric that
18    would have been included in -- you know,
19    obviously, since it was part of the Ohio
20    average, it would have showed up as a number in
21    an analysis sheet, a changes sheet, or whatever
22    you want to characterize it as.
23          For the actual redistricting of the
24    map, I don't think the -- for the proposal
25    itself, I don't think there was a specific
```

Page 296

```
 1          A. Kincaid - CONFIDENTIAL
 2    inflection point on the Strickland race.
 3       Q.  I mean, if Strickland was not running
 4    against Johnson --
 5       A.  Right.
 6       Q.  -- would considering the Strickland
 7    result in some sense be inaccurate in terms of
 8    understanding the political history of
 9    District 6?
10          MR. SHEEHY:  Objection to form.
11       A.  No, it certainly wouldn't be
12    irrelevant.  I mean, the fact that that
13    district had elected a Democrat previously and
14    could have elected a Democrat again was -- was
15    entirely relevant, but it's -- I mean, that
16    district was a Democrat seat that has trended
17    Republican over the last decade.  Just the
18    geography there, the counties have changed
19    their voting patterns.
20       Q.  What I'm trying to understand is
21    whether or not you considered, looking at these
22    historical -- these past elections whether or
23    not the home base, if you will, of the
24    individuals who were involved in the elections,
25    you just took the data as it was, if you will.
```

Page 297

```
 1          A. Kincaid - CONFIDENTIAL
 2          MR. SHEEHY:  Objection to form.
 3       Q.  In other words -- let me restate the
 4    question.  Someone could say let's not look at
 5    Strickland.  When we're trying to figure out
 6    the political tilt of Johnson's district, let's
 7    not consider how Strickland did because that's
 8    a -- that's a unique case.  I mean,
 9    Strickland's from that district and he's not in
10    this election.
11       A.  Uh-huh.
12       Q.  So let's put that aside.
13       A.  Okay.
14       Q.  Did you ever go through that kind of
15    filtering process?
16          MR. SHEEHY:  Objection to form.
17       A.  I'm sure some people would.  I think
18    that's the exact opposite of what you should
19    consider.
20       Q.  Okay.  And why that is?
21       A.  If you are running for Congress,
22    you're probably from that district so I think
23    it would be entirely relevant whether
24    Mr. Strickland was from that district or not
25    and how he performed in that district.
```

13 (Pages 294 to 297)

Page 298

```
1              A. Kincaid - CONFIDENTIAL
2        Q.  Okay.
3        A.  So whether -- Mr. Johnson's opponent,
4   you know, likely would come from that district
5   if he -- someone was running against him so I
6   think that would be relevant.
7        Q.  Well, you mentioned a couple times
8   analysis of the -- after the proposal's
9   submitted, there was an analysis of the Ohio
10  Congressional map; correct?
11       Is that right?
12       A.  The final passed map?  Is that what
13  you're asking about, or are you asking for
14  something different?
15       Q.  Did you analyze proposals as well as
16  final pass -- well, how many analyses did you
17  do?
18       MR. SHEEHY:  Objection to form.
19       A.  Anytime there was a proposal that was
20  in a final place in the sense of it was being
21  looked at by somebody, I would have had an
22  analysis sheet made up for it so the people
23  would know what the -- you know, how those
24  districts would have performed, what the
25  demographics were in those places.
```

Page 299

```
1              A. Kincaid - CONFIDENTIAL
2        So, I mean, I couldn't tell you how
3   many different iterative proposals were -- you
4   know, had analysis -- analyses made of them.
5   So I couldn't tell you a number.
6        Q.  Okay.
7        A.  But it would have happened in any
8   proposal in -- for a final map.
9        Q.  And so that was true for both HB 319,
10  the first map that passed, as well as HB 369,
11  the second map that passed; is that right?
12       MR. SHEEHY:  Objection to form.
13       A.  In my role at the NRCC, my job was to
14  provide members of Congress and the members of
15  the NRCC at large with election data and
16  demographics on, you know, proposed and final
17  maps.  That was part of my job so that would
18  have been something I did.
19       Q.  You did it for both of those maps?
20       A.  Absolutely.
21       Q.  You also did it for the proposals for
22  those maps?
23       MR. SHEEHY:  Objection to form.
24       A.  I created the sheets for the
25  proposals, yes.
```

Page 300

```
1              A. Kincaid - CONFIDENTIAL
2        Q.  And just so we are using the same
3   language, I think you used the phrase "change
4   sheet" in your last deposition.  Is -- is that
5   the -- I want to use the language you were
6   comfortable with.
7        A.  I think there's a couple different
8   documents that we looked at last time with
9   different formats; right?  There was the
10  changes sheets that showed how the districts
11  were -- you know, the districts that incumbents
12  were in before and after the redistricting and
13  how they compared to each other.  That's what I
14  would have called a changes sheet.
15       Another thing would have been just a
16  simple spreadsheet showing the districts and
17  the way they performed based off of those
18  elections and demographics.  So those are two
19  different things.
20       But the changes sheets I think is
21  what you and I --
22       Q.  Okay.
23       A.  -- spent a lot of time on last time
24  going through.
25       Q.  Just so I understand, the changes
```

Page 301

```
1              A. Kincaid - CONFIDENTIAL
2   sheets -- you called them the changes sheets.
3        A.  You can call them changes sheets.
4   That's fine.
5        Q.  Just in terms of what you actually --
6   you described two different kinds of sheets
7   now.  I just want to make sure we at least
8   substantively are on the same page.
9        So one is -- looks at the
10  different -- say it again.  What was the -- one
11  is the difference between?
12       A.  Well, the changes sheets that we
13  talked about last time would have shown how a
14  district changed from before the redistricting
15  to after the redistricting.
16       Q.  Okay.
17       A.  Or before the proposal to after the
18  proposal; right?
19       Q.  Okay.
20       A.  So other things I would have done was
21  just to create a simple Excel sheet of every
22  district under a proposal or a final map and
23  how they would have performed in previous
24  election cycles and those demographics
25  underlying them.
```

Page 302

```
 1            A. Kincaid - CONFIDENTIAL
 2       Q.  Okay.
 3       A.  So that way, you wouldn't have the
 4   changes.  It would be simpler and easier to
 5   look at.
 6       Q.  Okay, you would just look in there.
 7   So one case, you would just look at the
 8   district, the second district, just look at the
 9   district, look what election results were or
10   PVI scorings were for the district, full stop,
11   is one kind of --
12       A.  Yes.
13       Q.  -- approach.  And the other is to
14   compare a particular map or proposal to a prior
15   map or proposal to see how -- what the
16   differences were.  Do I have that right?
17       MR. SHEEHY:  Objection to form.
18       A.  Roughly, yeah.
19       Q.  When doing the analysis of the Ohio
20   map, did you do that -- let's go through the
21   mechanics of how that worked.
22            Did you receive a block equivalency
23   file and then load that into Maptitude?  Is
24   that the first step in your doing this
25   analysis?
```

Page 303

```
 1            A. Kincaid - CONFIDENTIAL
 2       MR. SHEEHY:  Objection to form.
 3       A.  For the final two maps, the -- the
 4   two passed maps, the first one and the second
 5   one, I would have taken a block assignment file
 6   and uploaded that into Maptitude.  The election
 7   data would have already been there and it would
 8   have told me how those districts would have
 9   performed.
10       Q.  And you said block assignment files.
11   I just want to make sure our reference is
12   clear.  Sometimes I have been using the phrase
13   the block equivalency file.  Block equivalency
14   file and block assignment file, are they the
15   same thing?
16       A.  They're interchangeable terms.
17       Q.  Okay.  And who did you get these
18   block assignment files from when you were doing
19   your analysis work?
20       MR. SHEEHY:  Objection to form.
21       A.  For the two passed maps, I think in
22   both cases I got them from Ray and Heather.
23       Q.  And do you recall how they sent --
24   would these be transferred to you as an email
25   attachment or are they too big for that and you
```

Page 304

```
 1            A. Kincaid - CONFIDENTIAL
 2   had to have some sort of a sharing website?
 3   How did that work?
 4       A.  They're not too large to be attached
 5   to an email, generally speaking.  Sometimes you
 6   have to zip them, but they're typically not too
 7   large to email.  In some states they are, but
 8   not in Ohio.
 9            I can't remember if in Ohio after a
10   map was passed how quickly the equivalence or
11   assignment file was posted online because most
12   states typically post a block assignment file
13   online for public consumption at some point in
14   time.
15            And there's a possibility I would
16   have gotten one or both of those final passed
17   maps from a website.  But if I hadn't gotten it
18   from there, I would have gotten it from Ray and
19   Heather.
20       Q.  And you also got proposals -- did you
21   get them from Ray and Heather or did you get
22   them from somebody else?
23       MR. SHEEHY:  Objection to form.
24       Q.  The block equivalency files.
25       MR. SHEEHY:  Objection to form.
```

Page 305

```
 1            A. Kincaid - CONFIDENTIAL
 2       A.  Apart from the email exchange at the
 3   very end that we talked about before, I don't
 4   recall receiving block assignment files
 5   directly from Ray and Heather.
 6            I did receive a file or two from Tom
 7   Whatman via -- well, from Ray and Heather via
 8   Tom Whatman, but not directly from Ray and
 9   Heather.
10       Q.  Did you ever get any from
11   Dr. Hofeller?
12       MR. SHEEHY:  Objection to form.
13       A.  I don't have a recollection of
14   receiving any block assignment files from Tom
15   Hofeller for Ohio redistricting.
16       Q.  Did you ever get any from Mark
17   Braden?
18       MR. SHEEHY:  Objection to form.
19       A.  I don't recall receiving any from
20   Mark Braden.
21       Q.  Do you recall ever sending any block
22   assignment files to Dr. Hofeller?
23       MR. SHEEHY:  Objection to form.
24       A.  I don't have any recollection of
25   sending block assignment files to Dr. Hofeller.
```

15 (Pages 302 to 305)

Page 306

A. Kincaid - CONFIDENTIAL

1       I do know on a couple occasions he came down to
2    my office to look at maps just to see what was
3    going on in Ohio, but I don't recall giving him
4    a file at that time.
5       Q.  As he came down to your office, the
6    two of you were working in the same building;
7    is that right?
8       A.  That's correct.
9       Q.  That's over in Southeast?  It was in
10   Southeast here.
11      A.  It's still there.
12      Q.  Still there?  Sorry, I forgot the
13   address.  Was it Third, the address.
14      A.  310 First.
15      Q.  310 First?  I'm sorry, 310 First.
16   And were you on the same floor?
17      A.  No.
18      Q.  And Tom, Mr. Whatman, was also in the
19   same -- all three of you were in the same
20   building; is that right?
21      A.  Yes.
22      Q.  Mr. Wild also?
23      A.  Yes.
24      Q.  You say he came down to your office.

Page 306

1      A. Kincaid - CONFIDENTIAL
2   I do know on a couple occasions he came down to
3   my office to look at maps just to see what was
4   going on in Ohio, but I don't recall giving him
5   a file at that time.
6      Q.  As he came down to your office, the
7   two of you were working in the same building;
8   is that right?
9      A.  That's correct.
10      Q.  That's over in Southeast?  It was in
11   Southeast here.
12      A.  It's still there.
13      Q.  Still there?  Sorry, I forgot the
14   address.  Was it Third, the address.
15      A.  310 First.
16      Q.  310 First?  I'm sorry, 310 First.
17   And were you on the same floor?
18      A.  No.
19      Q.  And Tom, Mr. Whatman, was also in the
20   same -- all three of you were in the same
21   building; is that right?
22      A.  Yes.
23      Q.  Mr. Wild also?
24      A.  Yes.
25      Q.  You say he came down to your office.

Page 307

1      A. Kincaid - CONFIDENTIAL
2   Literally came down a floor?  Were you on a
3   different floor than he was?
4      A.  Tom was on the third floor in 2011
5   and I was on the second floor.
6      Q.  Mr. Whatman, was he on the first
7   floor?
8      A.  Yes.
9      Q.  And do you recall how many times
10  regarding Ohio redistricting in 2011, whether
11  it was part of Congressional proposal or the
12  analysis, that Dr. Hofeller visited your
13  office?
14      MR. SHEEHY:  Objection to form.
15      A.  I don't recall Tom coming by more
16  than five times.  It may have been two or three
17  but it was not often.  But I know there were a
18  couple of occasions where, you know, in his
19  role at the RNC it was kind of his job to kind
20  of know what was going on around country so he
21  would come down and looked at it.
22      Q.  And he looked at what was on the
23  computer screen; is that right?
24      A.  That's correct.
25      Q.  And on the screen, would you have one

Page 308

1      A. Kincaid - CONFIDENTIAL
2   or more Congressional districts on the screen?
3      MR. SHEEHY:  Objection to form.
4      A.  It's most likely, yes.
5      Q.  Do you recall him ever making a
6   suggestion as to whether certain geographies
7   should be within certain districts?
8      MR. SHEEHY:  Objection to form.
9      A.  You already asked me that question
10  once.  I said no, I really don't recall Tom
11  ever telling me that one geography should be in
12  one place, another in another district.  So I
13  really don't recall him giving much -- giving
14  any instruction in Ohio for him.
15      When he did come to my office for
16  Ohio, I recall it being a lot more of just
17  looking at what was going on and just you --
18  just kind of looking, going through the map.
19      I don't recall anything about him
20  instructing me that County A should be in
21  District 1 and County B should be in District 8
22  or whatever it is.
23      Q.  Do you recall, when he came down to
24  your office and looked at that computer screen,
25  were any of the labels up on the districts?

Page 309

1      A. Kincaid - CONFIDENTIAL
2      MR. SHEEHY:  Objection to form.
3      A.  I'm sure there would have been.
4      Q.  Were those labels, in the ordinary
5   course, they included the PVI scorings; is that
6   right?
7      MR. SHEEHY:  Objection to form.
8      A.  I wouldn't call that the ordinary
9   course.
10      Q.  Okay.
11      A.  There were times when the PVI was up
12  on the screen.  There were times when a
13  Presidential election result was up on the
14  screen.  There were times when a governor's
15  race was up on the screen.  There wasn't -- I
16  wouldn't call anything normal course.
17      Q.  Do you recall him ever discussing any
18  election result information regarding any
19  district with you?
20      MR. SHEEHY:  Objection to form.
21      A.  I don't recall him asking a
22  specific -- what a specific race or index would
23  have been, but if I was sitting down with Tom,
24  he would have been asking me questions about
25  demographics and election results for various

TSG Reporting - Worldwide - 877-702-9580

Page 310

```
1          A. Kincaid - CONFIDENTIAL
2   districts.  But I don't recall what -- you
3   know, a specific question of what's the X, you
4   know, percentage in that seat or that seat.
5   But he certainly would have asked those kinds
6   of questions.
7       Q.  And do you recall that these visits
8   take place during the Congressional proposal
9   process?
10          MR. SHEEHY:  Objection to form.
11      A.  Yes.
12      Q.  And they also take place during what
13  you described as the Ohio map analysis process?
14          MR. SHEEHY:  Objection to form.
15      A.  No, the Ohio map analysis process,
16  I -- you would have just gotten the final
17  passed map just like I would have from, you
18  know, online or somewhere else and uploaded it
19  himself.  I probably would have passed along
20  the final passed map to him, honestly, but not
21  any of the proposed maps.
22      Q.  For your analysis of the proposed
23  maps, who did you provide that information to?
24          MR. SHEEHY:  Objection to form.
25      A.  Like we talked about before, the
```

Page 311

```
1          A. Kincaid - CONFIDENTIAL
2   proposed maps would have been -- the analysis
3   of any proposed maps would have been given to
4   Tom Whatman.  They would have -- so Tom and
5   Tom.  To Tom Whatman, also to, you know, staff
6   at the NRCC, members of Congress if they had
7   asked for it, so those sorts of people.
8       Q.  Did Mr. Whatman convey that -- do you
9   know who Mr. Whatman conveyed that information
10  to after you provided it to him?
11          MR. SHEEHY:  Objection to form.
12      A.  It's my understanding he provided it
13  to Ray and Heather, but apart from that I'm not
14  sure who else he would have shared that with.
15      Q.  Do you recall ever getting any
16  feedback from Mr. Whatman concerning the
17  reaction of Mr. DiRossi or Ms. Mann to your
18  analyses?
19          MR. SHEEHY:  Objection to form.
20      A.  The analyses?
21      Q.  You said you did an analysis of
22  proposals; is that right?
23      A.  Sure.  Their reaction to that
24  analysis.
25      Q.  Yeah, I've got it right here.  You
```

Page 312

```
1          A. Kincaid - CONFIDENTIAL
2   did analysis of some proposed maps and you
3   provided that to Mr. Whatman, among others.
4       A.  Uh-huh.
5       Q.  It's your understanding that he
6   provided that to --
7       A.  Ray and Heather.
8       Q.  -- Mr. DiRossi and Ms. Mann.
9       A.  Uh-huh.
10      Q.  Is that -- I got that right so far?
11      A.  Yes.
12      Q.  Okay.  My question is, after that was
13  done, did you ever -- was there ever any
14  feedback saying now, after that information was
15  given to them, so what their reaction was to
16  the analysis that had been shared with them?
17          MR. SHEEHY:  Objection to form.
18      A.  I know that Mr. Whatman found the
19  spreadsheets helpful, thought they were well
20  organized and clear so was able to look at it
21  and understand what was going on pretty easily.
22          I think Ray and Heather -- I believe
23  they gave the same feedback, that they thought
24  it was a helpful way to organize the
25  information.  But apart from that, nothing, no
```

Page 313

```
1          A. Kincaid - CONFIDENTIAL
2   other reaction to it that I recall.
3       Q.  Do you recall whether any changes
4   were made to the Ohio map after Mr. DiRossi and
5   Ms. Mann received your analyses?
6       A.  The analysis of the past maps, or --
7       Q.  During the proposal, while the
8   proposals were being formulated for a map and
9   during which time they received your analyses
10  through Mr. Whatman and received your
11  spreadsheets they thought were clear --
12      A.  Uh-huh.
13      Q.  -- do you recall whether or not they
14  then made any changes to the proposed map?
15          MR. SHEEHY:  Objection to form.
16      A.  It was a collaborative process so I'm
17  sure they made -- I know they made edits on
18  there, and it wasn't just -- they didn't just
19  take our proposals, you know, and enact them.
20  It was a collaborative process between -- you
21  know, it was the members proposing a map and
22  the state legislature putting their feet back
23  in and Ray and Heather making those edits
24  there.  So no, it wasn't -- yes, they -- they
25  did make changes.
```

Page 314

1      A. Kincaid - CONFIDENTIAL
2      Q.  Okay.
3      A.  But I don't know if it would be -- I
4  don't think I would characterize it as because
5  of my analysis sheets.  Those weren't -- the
6  analysis sheets weren't there to provide
7  advice; they were there to provide facts and
8  information.
9      Q.  They were part of the collaborative
10  process, as I understand.
11      A.  Sure, just an analytical document.
12          MR. SHEEHY:  Is now a good time to
13      stand up stretch our legs?
14          MR. FRAM:  Let me do a quick check.
15      This is a good time.
16      (Recess taken.)
17  BY MR. FRAM:
18      Q.  A couple of cleanup items.  Am I
19  right that you do not recall sending Mr. Braden
20  any block equivalency files in connection with
21  Ohio Congressional redistricting in 2011?  Do
22  you If  that's what I said, that would be
23  incorrect.  I -- that's not what I said.
24      Q.  Please correct it.  I probably got it
25  wrong.

Page 315

1      A. Kincaid - CONFIDENTIAL
2      A.  At Mr. Whatman's instruction, I did
3  provide Mark Braden with block assignment files
4  on at least one occasion.
5      Q.  Do you recall when that was?
6          MR. SHEEHY:  Objection to form.
7      A.  I don't.
8      Q.  Was it part of the Congressional
9  proposal process or part of what we have been
10  calling the analysis process?
11          MR. SHEEHY:  Objection to form.
12      A.  I believe it during the proposal
13  process, but it could have been further on.  I
14  don't honestly remember at what time
15  during the process I did that.
16      Q.  And do you know if Mr. Braden -- the
17  block equivalency file, to make use of it, you
18  have to load it into Maptitude; is that right?
19      A.  You can use other software.  You
20  don't have to just use Maptitude.
21      Q.  Maptitude some other map drawing
22  software; is that right?
23      A.  Some other GIS software.
24      Q.  Do you know if Mr. Braden had access
25  to either Maptitude or some other GIS software?

Page 316

1      A. Kincaid - CONFIDENTIAL
2          MR. SHEEHY:  Objection to form.
3      A.  I have no idea.
4      Q.  Do you have any idea what he did with
5  the block equivalency file you provided to
6  him --
7          MR. SHEEHY:  Objection to form.
8      Q.  -- through Mr. Whatman?
9          MR. SHEEHY:  Same objection.
10      A.  What Mark did with it?
11      Q.  Uh-huh.
12      A.  I'm sure Mark, if he didn't have the
13  software himself, he would have found somebody
14  who had the software to look at it, but I --
15  I'm -- I don't know if -- I don't recall Mark
16  ever telling me what he did with the block
17  assignment files for Ohio.
18      Q.  Do you recall why you were asked to
19  send a block equivalency file to Mr. Braden?
20          MR. SHEEHY:  Objection to form.
21      A.  Mr. Braden was the attorney for the
22  Ohio state legislature and so in that role as
23  their attorney he would provide legal counsel
24  to the Ohio legislature.  And I'm sure this was
25  part of that request, they asked that Mark have

Page 317

1      A. Kincaid - CONFIDENTIAL
2  a chance to look at the maps.
3      Q.  Do you know whether or not Mr. Braden
4  also had access to the RNC election results
5  data?
6          MR. SHEEHY:  Objection to form.
7      A.  Could you be clearer what you mean by
8  access to it?
9      Q.  Whether he had -- he had the block
10  equivalency file.  I'm just trying to find out
11  what other information was provided to him.
12      Did you know whether or not election
13  results data had been provided to him?
14          MR. SHEEHY:  Objection to form.
15      A.  I don't recall sending Mark a changes
16  sheet or an analysis sheet or anything.  The
17  only thing I recall sending Mark was a block
18  assignment file.
19      Whether the RNC provided him with
20  political data, that's not something I know.
21      Q.  So I'm clear, as regards
22  Dr. Hofeller, did you provide him with block
23  equivalency files as part of the Congressional
24  proposal or analysis process?
25          MR. SHEEHY:  Objection to form.

Page 318

1     A. Kincaid - CONFIDENTIAL
2        A.  Like I said before, I don't recall
3  sending Tom a block assignment file of the
4  proposed maps.
5        I know that as you and I talked about
6  before, he came down to my office to look at
7  the maps a couple times, but I don't recall
8  sending Tom a block assignment file during the
9  proposal process.  I could have, but I don't
10  recall doing so.
11        MR. FRAM:  I'd like to have marked
12     next as 42 a document that's got Bates
13     number REV_00023341.
14     (Exhibit No. 42 was marked for
15     identification.)
16  BY MR. FRAM:
17     Q.  I should say for the record that this
18  is an email string of two emails, both dated
19  December 15, 2011.  The earlier in time appears
20  to be at 9:26 in the morning, and it's from
21  Heather Mann to her Gmail address,
22  heathermann@gmail.com to Tom Whatman and Adam
23  Kincaid.  Subject, Equivalency and Shapefiles.
24        The second email is from Adam Kincaid
25  at akincaid@NRCC.org to Tom Hofeller -

Page 319

1     A. Kincaid - CONFIDENTIAL
2  redistricting; Mike Wild - redistricting, and
3  that's it.  It appears to be at 2:28 p.m. on
4  the same date just forwarding the equivalency
5  and shapefiles per the subject line.
6        The first question is, do you
7  recognize either one of these emails?
8     A.  Yes.
9     Q.  Did you, in fact, receive this email
10  from Ms. Mann on or about December 15, 2011?
11     A.  It appears I did, yes.
12     Q.  That's the 9:26 a.m. email?
13     A.  Uh-huh.
14     Q.  Turning to the 2:28 p.m. email, do
15  you recall forwarding that email to
16  Mr. Hofeller -- Dr. Hofeller and Mr. Wild?
17     A.  Do I remember sending the email?  I
18  don't remember sending the email, but it's
19  clear I did send the email.
20     Q.  You have no reason to doubt you sent
21  it?
22     A.  No.
23     Q.  You forwarded it with the
24  attachments; is that right?
25     A.  Yes.

Page 320

1     A. Kincaid - CONFIDENTIAL
2     Q.  Those attachments included an
3  equivalency file as well as shapefile; is that
4  right?
5     A.  Yes.
6     Q.  So on this occasion, do you recall
7  forwarding equivalency files to Dr. Hofeller?
8     A.  Well again, I think it's important to
9  clarify.  As I said before, this is not during
10  the proposal process, this is at the end of the
11  process where it would have been a final map
12  that I, as I said before, I could have shared
13  it with Tom.  So yes, this is something I sent
14  to Tom.
15        MR. FRAM:  I just want to be clear.
16     I'll mark the next as 43 metadata for
17     this email.
18     (Exhibit No. 43 was marked for
19     identification.)
20  BY MR. FRAM:
21     Q.  Take a look.  You see that the
22  created date -- I'm sorry, the -- the date
23  sent, do you see 12-15-2011?  Do you see that?
24     A.  I do.
25     Q.  That matches with the date on the --

Page 321

1     A. Kincaid - CONFIDENTIAL
2  on Exhibit 42.  Do you see that?
3     A.  Yes.
4     Q.  Going down to the bottom, see where
5  it says from Adam Kincaid?  Do you see that?
6     A.  Yes.
7     Q.  Is that your email address?  Do you
8  see that there?
9     A.  That was my email address.
10     Q.  That was at the time at the NRCC;
11  correct?
12     A.  Yes.
13     Q.  And under it, it says to Mike Wild -
14  redistricting.  Do you see that?
15     A.  I do.
16     Q.  And under that there's an email
17  address for mmwild@RNCHQ.org.
18        Do you see that?
19     A.  I do.
20     Q.  Was that, as you recall, his address
21  in 2011?
22     A.  Seems to be, yes.
23     Q.  And under that, there's Tom Hofeller
24  - redistricting.
25        Do you see that?

Page 322

```
1              A. Kincaid - CONFIDENTIAL
2       A.  Yes.
3       Q.  And there's a thofeller@RNCHQ.org.
4          Do you see that?
5       A.  Yes.
6       Q.  Was that, as you recall, his email
7  address in 2011?
8       A.  Yes.
9       Q.  And so that -- those are the email
10 addresses that you used when you forwarded the
11 equivalency and shapefiles on December 15,
12 2011; is that right?
13      A.  Yes.
14      Q.  Okay.  RNCHQ, was that an email
15 address used by the Republican National
16 Committee in 2011, RNCHQ?
17      A.  Yeah, yes.
18      Q.  Do you recall there being any
19 communications from either Mr. Wild or
20 Dr. Hofeller in -- after they received this
21 email and its attachments in December 2011?
22          MR. SHEEHY:  Objection to form.
23      A.  Any communications to me?
24      Q.  Yes.
25          MR. SHEEHY:  Same objection.
```

Page 323

```
1              A. Kincaid - CONFIDENTIAL
2       A.  I don't remember an email back.  They
3  could have said thank you or something, but I
4  don't --
5       Q.  Did Dr. Hofeller come by your office
6  and talk with you about it?
7       A.  I don't recall.
8          MR. SHEEHY:  Objection to form.
9       Q.  Did Mr. Wild?
10          MR. SHEEHY:  Objection to form.
11      A.  Mike wouldn't have come to my office,
12 so no.
13      Q.  Do you recall communicating with
14 Ms. Mann after receiving this email from her
15 December 15, 2011 regarding the subject matter
16 of this email?
17          MR. SHEEHY:  Objection to form.
18      A.  I don't recall.  I could have said
19 thank you, but I don't know.
20      Q.  Do you recall performing any analysis
21 of the map as reflected in the block
22 equivalency and shapefiles after you received
23 it from Ms. Mann on or about December 15, 2011?
24      A.  I don't remember performing analysis,
25 but I would have because that was my job.
```

Page 324

```
1              A. Kincaid - CONFIDENTIAL
2       Q.  That would have included generating a
3  changes sheet; is that right?
4       A.  Most likely, yes.
5       Q.  Do you recall anything about that
6  changes sheet?
7          MR. SHEEHY:  Objection to form.
8       A.  Can you be more specific?
9       Q.  Do you recall any of the content of
10 the changes sheet?
11      A.  It would have been identical to all
12 the other changes sheets that we have gone over
13 just with the numbers for the last map.
14      Q.  Meaning you compared the HB 369 as
15 enacted to previous maps?
16          MR. SHEEHY:  Objection to form.
17      A.  Previous iterations and proposals, or
18 what do you mean by previous?
19      Q.  Well, let's take it one at a time.
20 Do you recall, did you prepare a comparison in
21 the changes sheet between HB 369 as enacted and
22 HB 319, the prior map, as enacted?
23          MR. SHEEHY:  Objection to form.
24      A.  I don't recall doing that analysis.
25      Q.  Do you recall comparing it to -- did
```

Page 325

```
1              A. Kincaid - CONFIDENTIAL
2  you compare HB 369 as enacted to HB 369 as it
3  had been introduced in the Ohio legislature?
4          MR. SHEEHY:  Objection to form.
5       A.  I don't recall doing that either.
6       Q.  What analysis do you recall?
7          MR. SHEEHY:  Objection to form.
8       A.  The standard for the changes sheets
9  would have been doing the enacted map versus
10 the previously enacted map, meaning the one
11 that came out of the 2010 elections.  That was
12 used in the 2010 elections.
13      Q.  So you compared the HB 369 as against
14 the map where Ohio had 18 --
15      A.  Yes --
16      Q.  -- districts?
17      A.  -- that's right.
18      Q.  I want to show you a document
19 introduced at your prior deposition.  It was
20 Exhibit 5.
21      A.  Okay.
22      Q.  So let's not make things confusing.
23 Let's stick with that.  I asked some questions
24 and there were instructions on it so I have to
25 go back to that.  That's the reason I'm doing
```

Page 326

```
 1        A. Kincaid - CONFIDENTIAL
 2   it.
 3        MR. FRAM:  Just for the record, I'm
 4   trying to think how we should do that
 5   here because I want him to have it.  I
 6   guess we could put 5 back on, a label, a
 7   sticker on saying 5 again.
 8        MR. SHEEHY:  Whatever you want.
 9        MR. FRAM:  It's NRCC000012, four of
10   them.
11   (Exhibit No. 5, previously marked, was
12        referenced and indexed.)
13   BY MR. FRAM:
14        Q.  For the record, this is a spreadsheet
15   that's got the words "Ohio Changes" at the top
16   of it.  And at your last deposition, correct me
17   if I'm wrong, but the testimony was that you
18   created this document.  Is that correct?
19        MR. SHEEHY:  Objection to form.
20        A.  Yes.
21        Q.  And you created it on or about -- you
22   populated the document with data on or around
23   July 25; is that right?
24        A.  Seems to be the case, yes.
25        Q.  Okay.  Do you recall why you prepared
```

Page 327

```
 1        A. Kincaid - CONFIDENTIAL
 2   this document around July 25?
 3        MR. SHEEHY:  Objection to form.
 4        A.  Somebody would have asked for it, but
 5   I'm not sure who that would have been.
 6        Q.  You provided it to Mr. Whatman?
 7        MR. SHEEHY:  Objection to form.
 8        A.  I don't recall.  It's likely, but I
 9   don't recall.
10        Q.  Do you recall anybody else?
11        MR. SHEEHY:  Objection to form.
12        A.  I don't know who this document
13   specifically would have been shared with.
14        Q.  Now, this one on the left, you see
15   there are districts going up to 18.  Do you see
16   that?
17        A.  Yes.
18        Q.  And it's current with a bunch of
19   elections that come thereafter, the two
20   elections, an average, and a PVI.  Do you see
21   that?
22        A.  Yes.
23        Q.  Those were -- if I use the phrase and
24   say scorings for the districts under the prior
25   map, do you understand that question?
```

Page 328

```
 1        A. Kincaid - CONFIDENTIAL
 2        A.  You're asking if I would call these
 3   scorings, or what?
 4        Q.  Yeah.  What would you call these
 5   election results?  I just want to use the same
 6   phrase you're comfortable with.
 7        A.  Okay.  I'd say these are the -- well,
 8   for the McCain and Bush percentages, those are
 9   the results for those districts.  And then the
10   average is the average for those districts and
11   the PVI is the PVI for those districts.
12        I don't know that I'd call them
13   scores, but I would say those are the numbers
14   for those districts.
15        Q.  Okay.  And average, is that averaging
16   just -- well, the McCain and Bush results; is
17   that right?  I'm trying to know what you were
18   averaging in the average.
19        A.  You and I when we went through this
20   before, the average there is clearly the Ohio
21   GOP average, I believe.
22        Q.  So your understanding is that average
23   would include all -- not just those two
24   elections, but all five elections; is that
25   right?
```

Page 329

```
 1        A. Kincaid - CONFIDENTIAL
 2        A.  It would have been whatever the five
 3   elections were that were used in the Ohio GOP
 4   average.
 5        Q.  Okay, that's helpful.  I notice on
 6   the right-hand, you see something that says
 7   "Ohio GOP Average."
 8        Do you see that?
 9        A.  Uh-huh.
10        Q.  Is that the same thing?  I only ask
11   because on the left-hand column, left hand, it
12   just says the word "average" and on the
13   right-hand, it says Ohio GOP Average.  I'm just
14   making -- sometimes there's just more room in a
15   spreadsheet to use more words.
16        A.  It's the cell size.
17        Q.  If that's all it is, that's fine.  I
18   just want to make sure it's no difference.
19        A.  It's the same metric, the same
20   percentage.
21        Q.  And was this document prepared as
22   part of something called the Congressional
23   proposal process, this changes sheet?  First of
24   all, let me back up.  This is a changes sheet;
25   is that right?
```

21 (Pages 326 to 329)

Page 330

```
 1              A. Kincaid - CONFIDENTIAL
 2         A.  Yes.
 3         Q.  And was this prepared as, this
 4    changes sheet, as part of your work in the
 5    Congressional proposal process?
 6              MR. SHEEHY: Objection to form.
 7         A.  Yes.
 8         Q.  Do you recall whether it was
 9    communicated to members of Congress?
10              MR. SHEEHY: Objection to form.
11         A.  I don't have any specific
12    recollection of sharing this with any members
13    of Congress.
14         Q.  In order to generate the as of
15    July 25 list, do you see that?
16         A.  Uh-huh, yes.
17         Q.  Now there, there's 16 districts that
18    are identified.  Do you see that?
19         A.  Yes.
20         Q.  They're not all in numerical order.
21    It's broken up a little; right?  It is 16, if
22    I've got the numbers right.  Is that true?
23         A.  Yes.
24         Q.  Do you recall the source of the
25    information for those 16 districts?
```

Page 331

```
 1              A. Kincaid - CONFIDENTIAL
 2         A.  The source of the information?
 3         Q.  Well, let's be clear here.  For
 4    example, 9 says Kaptur/Kucinich.  Do you see
 5    that?
 6         A.  Yes.
 7         Q.  Did someone inform that you that
 8    under a proposed map as of July 25 that Kaptur
 9    and Kucinich would be in the same district?
10              MR. SHEEHY: Objection.
11         Q.  Proposed to be in the same district.
12              MR. SHEEHY: Objection.
13         A.  Nobody informed me of that, no.
14         Q.  How were you able to include that
15    information in this changes sheet?
16              What was the source of your
17    information?
18              MR. SHEEHY: Objection to form.
19         A.  We had created a layer within
20    Maptitude that had the addresses of the members
21    of Congress on it.  We were able to see where
22    they lived in Maptitude.
23         Q.  That required you to have a proposed
24    Congressional district map in order to see
25    where those addresses landed; right?
```

Page 332

```
 1              A. Kincaid - CONFIDENTIAL
 2         A.  No.  I could have seen the addresses
 3    on a blank Ohio map.
 4         Q.  Then how did you know to put Kaptur
 5    and Kucinich both within District 9?
 6              MR. SHEEHY: Objection to form.
 7         A.  There would have been a map at that
 8    point, some kind of a proposal draft that I
 9    would have looked at to see that their two
10    addresses were in that district.
11         Q.  And who do you recall sending you
12    that proposed map as of about July 25, 2011?
13              MR. SHEEHY: Objection to form.
14         A.  This is not a map I would have
15    received from anybody.
16         Q.  You say there would have been a
17    proposed map which you needed to use to know
18    where Kaptur and Kucinich lived; right?
19         A.  There would have been a draft of a
20    proposed map that would have had the addresses,
21    you know, mapped within, yes.
22         Q.  And how did you obtain that draft
23    proposed map?
24              MR. SHEEHY: Objection to form.
25         A.  I would have created it myself.
```

Page 333

```
 1              A. Kincaid - CONFIDENTIAL
 2         Q.  So you created a map that put Kaptur
 3    and Kucinich in the same district; is that
 4    right?
 5         A.  This would have been a draft that we
 6    had been working on, you know, with -- yeah.
 7         Q.  Similarly, you see there's a -- going
 8    down to District 11, you got Fudge and Sutton
 9    in the same district, proposed District 11.  Do
10    you see that?
11         A.  Yes.
12         Q.  That was also something you had
13    created to put them in the same district; is
14    that right?
15              MR. SHEEHY: Objection to form.
16         A.  This would have told me that they
17    were in the same district in that draft map,
18    yes.
19         Q.  Which you had created?
20         A.  Yeah, sure.
21         Q.  And similarly, going down to the
22    bottom of the district list, there's 10-Open.
23              Do you see that?
24         A.  I do.
25         Q.  Is that a new district that was being
```

Page 334

1        A. Kincaid - CONFIDENTIAL
2 created?
3        A.  It was an open district so no member
4 of Congress lived within the borders of that
5 district.
6        Q.  But was that a new -- is that -- you
7 drafted that new district; is that right?
8        MR. SHEEHY:  Objection, form.
9        A.  The map I would have been working off
10 of that July 25 would have been a map on my
11 computer that was -- that we were in the
12 process of drafting, so I -- yes, I think the
13 10th was probably something at that point in
14 time that I had at least started some sort of
15 process on.
16        Q.  And that District 10 draft on your
17 computer, is it your recollection that was
18 heavily centered around the center of the
19 state, Franklin County and the Columbus, Ohio
20 area?
21        A.  Yes.
22        Q.  And do you recall discussing that
23 proposed District 10 with Mr. Wild?
24        MR. SHEEHY:  Objection to form.
25        A.  Yes.

Page 335

1        A. Kincaid - CONFIDENTIAL
2        Q.  Do you recall discussing with him in
3 the July 25 approximate time frame?
4        MR. SHEEHY:  Objection to form.
5        A.  I don't have a specific recollection
6 of talking to him around July 25, but I have --
7 I remember talking with Tom Whatman about the
8 10th district at the time.  I think it became
9 the 3rd at the end of the process.  But yeah,
10 we had conversations about it.
11        Q.  Other than Mr. Whatman -- and these
12 conversations with Mr. Whatman, you don't
13 recall precisely July 25 but you recall talking
14 with him about it.
15        A.  Sure.
16        Q.  Generally in the July time frame; is
17 that correct?
18        A.  July, August, September, yes,
19 absolutely.  During the proposal process I
20 definitely talked to Tom Whatman about the 10th
21 district.
22        Q.  Had you talked with him about it
23 before you created this change sheet?
24        MR. SHEEHY:  Objection to form.
25        A.  Again, I don't recall the specific

Page 336

1        A. Kincaid - CONFIDENTIAL
2 time in which I talked to Tom about the 10th
3 district, whether it was before or after this
4 changes sheet was -- well, it definitely was
5 after because I know we talked about it in
6 August, but I don't recall whether we talked
7 about it before July 25 or not.
8        Q.  I'm just trying to pin down if we can
9 accurately the genesis of the idea of who
10 thought of it first.
11        Did you think of let's do a new
12 district around the Columbus Ohio area on your
13 own and then present it to Mr. Whatman, or did
14 he say why don't you give this a shot and then
15 you went off and drew a map?
16        MR. SHEEHY:  Objection to form.
17        A.  I don't recall who had the idea
18 first.
19        Q.  It was collaborative?
20        A.  It was a collaborative process, like
21 I said before.
22        Q.  During this time frame do you recall
23 any communications with Mr. DiRossi or Ms. Mann
24 about creating a new district in the Columbus,
25 Ohio area during the summer of 2011?

Page 337

1        A. Kincaid - CONFIDENTIAL
2        MR. SHEEHY:  Objection to form.
3        A.  I don't recall any conversations with
4 Ray and Heather about that district in that
5 time period.
6        Q.  Do you recall any conversations with
7 any members of Congress during the summer of
8 2011 about the creation of a new district in
9 the Columbus, Ohio area?
10        MR. SHEEHY:  Objection to form.
11        A.  Yes.
12        Q.  Which members, please?
13        MR. SHEEHY:  Objection to form.
14        A.  Let's see here.  I remember having
15 conversations with Mr. Stivers and Mr. Tiberi
16 regarding that district since both of them had
17 districts that included parts of Franklin
18 County so I would have talked to them about
19 that district because it directly impacted
20 their own seats.
21        Q.  Let's take them one at a time.  What
22 do you recall about conversations with -- well,
23 let me back up.
24        These conversations would have been
25 during the proposal process; is that right?

Page 338

```
 1          A. Kincaid - CONFIDENTIAL
 2          MR. SHEEHY:  Objection to form.
 3      A.   That is correct.
 4      Q.   So that would be during the summer of
 5  2011; is that right?
 6      A.   Yes.
 7      Q.   Let's talk about your discussions
 8  with Representative Stivers.
 9          What do you recall about that, those
10  communications?
11          MR. SHEEHY:  Objection to form.
12      A.   Mr. Stivers would have come into my
13  office and we would have talked about Franklin
14  County generally, where the different lines
15  were with the districts within Franklin County.
16  Likely, however, his district was comprised
17  outside of Franklin County.
18          But specifically with District 10 we
19  would have probably just looked at the
20  boundaries between the 10th district, at that
21  time, the 10th and then -- and his, which was
22  the 15th.
23      Q.   And what do you recall about
24  discussions about the boundaries between the
25  proposed 10th and his district, the 15th?
```

Page 339

```
 1          A. Kincaid - CONFIDENTIAL
 2          MR. SHEEHY:  Objection to form.
 3      A.   One thing I recalled of Mr. Stivers
 4  is that embarrassingly, we had his address
 5  wrong.  I think he had moved at some point
 6  during that process and so we had had his old
 7  address and had not received his new address,
 8  or something like that.  There was some mixup.
 9  So we had him mapped at the wrong spot so that
10  was a bit of a conversation we had.
11      Q.   Anything else?
12          MR. SHEEHY:  Objection to form.
13          MR. FRAM:  I just want to say for
14  the record I'm so glad we got that
15  initially what objection to form means
16  because it's the first time in my career
17  the question "Anything else?" has gotten
18  a form objection.
19      Q.   Keep going.
20      A.   Other things, I -- with Mr. Stivers
21  specifically about that district, I recall him
22  talking about what communities were in his
23  district and which ones were not in his
24  district within Franklin County and outside of
25  Franklin County.
```

Page 340

```
 1          A. Kincaid - CONFIDENTIAL
 2      Q.   What do you recall about those
 3  conversations, please?
 4          MR. SHEEHY:  Objection to form.
 5      A.   It was really just identifying which
 6  ones were or were not in his seat.  That's the
 7  only thing I remember about it.
 8      Q.   Do you recall any particular
 9  communities that you thought were -- that you
10  two agreed should be in his district, should go
11  into 15?
12          MR. SHEEHY:  Objection to form.
13      A.   No, I don't.
14      Q.   Do you recall any conversation about
15  any communities within Franklin County that you
16  thought should not go into his district?
17          MR. SHEEHY:  Objection, form.
18      A.   Honestly, it was seven and a half
19  years ago so I don't remember specifically what
20  communities, you know, we did or, you know, we
21  talked about in that way.
22          I don't recall him saying -- you
23  know, I have no recollection of him telling me
24  that shouldn't be in my district or that should
25  be in my district.  It was more of just the two
```

Page 341

```
 1          A. Kincaid - CONFIDENTIAL
 2  of us sitting down and going through what
 3  communities were or were not in the draft
 4  iterations that we had at that time, which may
 5  or may not have been before or after this
 6  sheet.  It was sometime in that August time
 7  frame.
 8      Q.   When you had that conversation with
 9  him, did you have any -- did that conversation
10  involve in any way any demographic information
11  about the communities you were discussing?
12          MR. SHEEHY:  Objection to form.
13      A.   No, I don't recall any demographic
14  conversations with Mr. Stivers about Franklin
15  County.
16      Q.   Do you recall any -- discussing any
17  election results, information about the
18  communities that you were discussing should be
19  in District 15 or not?
20          MR. SHEEHY:  Objection to form.
21      A.   No, I don't recall having any
22  conversations with Mr. Stivers about the
23  partisan makeup of one community or another.
24          Like I said before, the only thing I
25  recall is going through Franklin County and
```

Page 342

A. Kincaid - CONFIDENTIAL

1       A. Kincaid - CONFIDENTIAL
2 telling him what county -- you know, what
3 communities were or were not, you know, in that
4 seat or which ones maybe -- I do remember a
5 couple streets that we talked about as the
6 borders that were between the districts, that
7 sort of thing. But no, I don't recall any
8 about the partisan makeup of one community or
9 another that may have come up.
10     Q. Did he say anything about which
11 streets should be the border or not?
12     MR. SHEEHY: Objection to form.
13     A. Not that I recall. I just recall
14 saying your line goes up to this point in
15 downtown Columbus, and this would be the border
16 between the two seats, that sort of thing.
17     Q. Did you recall, did he say anything
18 in response?
19     MR. SHEEHY: Objection to form.
20     A. No, I don't. I don't think he said
21 anything really in response to that.
22     Q. Do you recall, did he express any
23 preferences or ideas about which neighborhoods
24 or communities should be in his district?
25     MR. SHEEHY: Objection to form.

Page 343

1       A. Kincaid - CONFIDENTIAL
2     A. The only thing I recall is again what
3 we talked about before, which was where he
4 lived and making sure we had the right address.
5 Apart from that, I don't recall.
6     I do not recall him saying, you know,
7 I want this community or I want that community.
8 I don't recall that being a part of our
9 conversation.
10     Q. Do you recall him ever saying he did
11 not want a certain community to be part of his
12 district?
13     MR. SHEEHY: Objection to form.
14     A. No, I don't recall that either.
15     Q. What about with Mr. -- Representative
16 Tiberi? Do you recall those conversations you
17 had with him about the effect of creating a new
18 Franklin County Columbus district and that
19 effect on his district?
20     MR. SHEEHY: Objection to form.
21     A. My conversations with Mr. Tiberi were
22 similar to my ones with Mr. Stivers, apart from
23 the fact we had his address right.
24     I recall that there were several
25 communities within Franklin County that were I

Page 344

1       A. Kincaid - CONFIDENTIAL
2 believe new to him and several that had -- that
3 were not new to him that were in the new 10th
4 district and so he was curious about what
5 communities were comprising the new 10th and
6 which communities -- I think he was picking
7 up -- he may have been picking up on the east
8 side of Franklin County. That's pretty much
9 the gist of those conversations.
10     Q. Did he -- did you share any election
11 result data with Mr. Tiberi regarding different
12 communities that would be included or not
13 included in his district?
14     MR. SHEEHY: Objection to form.
15     A. I don't have a specific recollection
16 about saying, you know, Franklin County
17 Township 5 performed X, you know, at this
18 percent for McCain and this percent for Bush.
19 I don't have any recollection of that.
20     Q. Did these meetings with either
21 Mr. Tiberi or Mr. Stivers take place in your
22 office?
23     A. Yes.
24     Q. Was your computer on when you had
25 these meetings?

Page 345

1       A. Kincaid - CONFIDENTIAL
2     A. Yes.
3     Q. Was the map of their district up on
4 your computer?
5     MR. SHEEHY: Objection to form.
6     A. It would have had to have been, yes.
7     Q. Did they look at it?
8     MR. SHEEHY: Objection to form.
9     A. Yes.
10     Q. And were there labels that appeared
11 over their districts --
12     MR. SHEEHY: Objection.
13     Q. -- when you were looking at them?
14     MR. SHEEHY: Objection to form.
15     A. The district number would have
16 appeared on there. But again, I mean, meeting
17 to meeting varied as far as what label may or
18 may not have been appearing so I really don't
19 recall specifically with Mr. Tiberi, with
20 Mr. Stivers what number would have been up on
21 the label.
22     Q. Let me back up. Without recalling
23 what label you had up, were any labels up when
24 you showed them the map on your computer?
25     MR. SHEEHY: Objection to form.

Page 346

A. Kincaid - CONFIDENTIAL

1
2    A.  The district number would have been
3    up.  Apart from that, I couldn't speak to what
4    was or was not up on the screen because I don't
5    recall.
6    Q.  Would the Dataview table have been
7    up?
8        MR. SHEEHY:  Objection to form.
9    A.  I don't recall if it would have been.
10    I'm trying to think if it had one monitor or
11    two, and I don't recall having two monitors and
12    so I probably would not have had it up on the
13    screen at that time while they were looking at
14    the map.
15    Q.  Was there any discussion of PVI
16    scorings for their district under the proposal
17    that you were talking with them about?
18        MR. SHEEHY:  Objection.
19    A.  My standard would be to tell them
20    what the draft PVI would have been for their --
21    for that district we were looking at.  That
22    would have been part of our conversation.
23    Q.  And the district you're looking at
24    would have included their district.  In the
25    case of Mr. Stivers, 15; and in the case of

Page 347

A. Kincaid - CONFIDENTIAL

1
2    Mr. Tiberi, 12.  Is that right?
3        MR. SHEEHY:  Objection to form.
4    A.  That's correct.
5    Q.  Would you also have informed them
6    about the PVI scoring of proposed new
7    District 10?
8        MR. SHEEHY:  Objection to form.
9    A.  Not unless they'd asked, unless it
10    was relevant to our conversation.
11    Q.  You just don't remember whether or
12    not, in addition to discussing the PVI scoring
13    with them, they actually could see it on the
14    screen or not; is that right?
15        MR. SHEEHY:  Objection to form.
16    A.  Well, like I said before, I don't
17    recall what labels were or were not on the
18    screen because it was seven and a half years
19    ago.
20        So, I mean, they were sitting in a
21    meeting with me and their district number would
22    have been on there, but I don't know what other
23    labels would have appeared for them to see.
24    Q.  Did you have any hard copy of any
25    maps with you in the meetings with either

Page 348

A. Kincaid - CONFIDENTIAL

1
2    Mr. Stivers or Mr. Tiberi?
3        MR. SHEEHY:  Objection to form.
4    A.  That would not have been my practice,
5    no.
6    Q.  Did you have any changes sheet with
7    you during these meetings?
8        MR. SHEEHY:  Objection to form.
9    A.  I don't recall.
10    Q.  Did you have any spreadsheets just
11    regarding the data for their districts during
12    these meetings?
13        MR. SHEEHY:  Objection to form.
14    A.  That's likely.
15    Q.  Would that -- let's just call them
16    district-specific spreadsheets.  Are you
17    comfortable with it, my calling them that, the
18    district specific as opposed to a full map?
19    A.  Yeah, that'd be fine.
20    Q.  That district -- would those
21    district-specific spreadsheets include election
22    results data?
23        MR. SHEEHY:  Objection to form.
24    A.  Yes.
25    Q.  And that would include the Ohio

Page 349

A. Kincaid - CONFIDENTIAL

1
2    average?
3        MR. SHEEHY:  Objection to form.
4    A.  I don't recall that.
5    Q.  Would it include the PVI score?
6        MR. SHEEHY:  Objection to form.
7    A.  Probably, yes.
8    Q.  Do you recall their asking any
9    questions about the election results data for
10    their proposed districts when you met with
11    them?
12        MR. SHEEHY:  Objection to form.
13    A.  "They," being Mr. Tiberi and
14    Mr. Stivers?
15    Q.  Either one of them, please.
16        MR. SHEEHY:  Same objection.
17    A.  I would have provided them with some
18    basic numbers, like the McCain percentage and
19    the Bush percentage and the Obama percentage
20    and the Carrie percentage.  And the PVI would
21    have been part of my standard practice for
22    these meetings, just to walk them through those
23    numbers.
24        Apart from that, I don't recall them
25    asking for any specific other elections than

Page 350

```
 1            A. Kincaid - CONFIDENTIAL
 2   those.
 3       Q.  Okay.  Do you recall anything about
 4   the conversation about the election results
 5   data?  Start with Mr. Stivers.
 6       MR. SHEEHY:  Objection to form.
 7       A.  No, I don't recall any conversations
 8   about that.
 9       Q.  What about with Mr. Tiberi?
10       MR. SHEEHY:  Objection to form.
11       A.  The meetings all kind of blurred
12   together, honestly.  They were all pretty much
13   the same.  We'd sit down, go over the maps.
14   I'd, you know, brief them on how the
15   districts -- you know, what their Presidential
16   performance were and their PVIs were.
17           There'd be some generic questions
18   back and forth, and I'd -- and that -- all of
19   those meetings kind of blurred together for the
20   most part with those numbers.
21           So I couldn't tell you specifically,
22   you know, whether, you know, Congressman A was
23   asking about, you know, these six races versus
24   Congressman B, who only cared about this race.
25   That's just -- it was seven and a half years
```

Page 351

```
 1            A. Kincaid - CONFIDENTIAL
 2   ago.  I don't recall.
 3       Q.  Okay.  We'll take them one at a time
 4   to help refresh your recollection.
 5       A.  Okay.
 6       Q.  Looking at District 12 for
 7   representative Tiberi --
 8       A.  Uh-huh.
 9       Q.  -- under the prior map, it was a --
10   actually, its PVI score that you see was a D+1.
11   Do you see that?
12       A.  Yes.
13       Q.  And your proposal all of a sudden is
14   an R+10 in the far right.  Do you see number
15   11?
16       A.  Yeah, I see that.
17       Q.  That's the delta between the proposal
18   here of R+10 and the prior map of D+1; is that
19   right?
20       A.  Yes.
21       Q.  And so when you showed Mr. Tiberi
22   you'd come up with a map that changed his
23   district from being a D+1 to an R+10, do you
24   recall him having any reaction to that?
25       MR. SHEEHY:  Objection to form.
```

Page 352

```
 1            A. Kincaid - CONFIDENTIAL
 2       A.  No, I don't actually recall
 3   Mr. Tiberi's specific reaction to that.
 4       Q.  Okay.  Do you recall whether
 5   Mr. Stivers had any reaction to the fact that
 6   his district had gone from a D+1 to an R+6, a
 7   delta of 7?  Do you see that?
 8       MR. SHEEHY:  Objection to form.
 9       A.  I don't recall his reaction either.
10       Q.  Do you recall any conversations with
11   Mr. Whatman about the fact that your July 25
12   proposal would have resulted in Tiberi going
13   from a D+1 to an R+10?
14       MR. SHEEHY:  Objection to form.
15       A.  You're asking about specific
16   districts, and I -- no, I don't recall
17   Mr. Whatman's comments regarding whether, you
18   know, the fact that District 12 went from a D+1
19   to an R+10, I don't recall any comments.
20       Q.  Putting aside this -- I'll ask this
21   for completeness.  Do you recall any
22   conversations with Mr. Whatman about how
23   District 15 would go from a D+1 to an R+6?
24       MR. SHEEHY:  Objection to form.
25       A.  I don't remember any specific comment
```

Page 353

```
 1            A. Kincaid - CONFIDENTIAL
 2   from Mr. Whatman on that district.
 3       Q.  Putting aside specific comments
 4   regarding specific numbers, do you recall any
 5   conversations with Mr. Whatman on a qualitative
 6   level about improving Republican partisan
 7   strength in District 12 or 15?
 8       MR. SHEEHY:  Objection to form.
 9       A.  In broad strokes is what you're
10   asking basically, about whether I remember --
11   just trying to be clear about what you're
12   asking here.
13       Q.  The qualitative or broad stroke
14   matter.  Did you ever talk with Tom Whatman
15   about how your coming up with a proposal would
16   increase the Republican partisan strength in
17   Districts 12 and/or 15?
18       MR. SHEEHY:  Objection to form.
19       A.  We would have talked about it
20   generally, like here's -- you know, these
21   seats, District 12 goes from D+1 to an R+10.
22   District 15 goes from a D+1 to an R+6.  I would
23   have viewed that as favorable.  Tom would have
24   viewed that as favorable.
25       Q.  Part of that change was due to the
```

Page 354

```
1            A. Kincaid - CONFIDENTIAL
2    creation of the new Franklin County district,
3    which put larger Democratic votes in this new
4    proposed District 10; isn't that right?
5            MR. SHEEHY:  Objection to form.
6        A.  Yes.
7        Q.  This was also in your December 4
8    deposition.  There was some questions I asked
9    that you were unable to answer at the time
10   because of instructions, so we can go back to
11   it.
12       A.  Okay.
13       Q.  And actually, let me --
14           MR. FRAM:  Maybe we can do two at
15   once.  This one has an attachment to the
16   other.  We had -- we should mark it
17   again and circle it.  It was Exhibit 7
18   last time, and that's got -- the first
19   page is an email string.  The first page
20   is Bates number LWVOH00018302.  So this
21   was 7.
22   (Exhibit No. 7, previously marked, was
23   referenced and indexed.)
24           MR. FRAM:  And then I think we had
25   8 last time, an attachment, and that's
```

Page 355

```
1            A. Kincaid - CONFIDENTIAL
2    BRADEN001387.  It's a spreadsheet
3    entitled "Ohio Changes."
4    (Exhibit No. 8, previously marked, was
5    referenced and indexed.)
6    BY MR. FRAM:
7        Q.  We have already gone through the
8    foundation on it that you sent it.  There's a
9    lot of different emails, but the one I'm
10   focusing on is on September 2, 2011, you sent
11   an email to Mr. DiRossi, Ms. Mann, and
12   Mr. Whatman regarding new idea redraft, okay?
13   You did that at September 2 at 6:41.  Okay?
14           Do you recall that?
15       A.  Yes.
16       Q.  And you sent the screenshots and the
17   block file again on September 3, 2011 at
18   8:13 a.m.
19           Do you see that?
20       A.  Yes.
21       Q.  Okay.  And again, that goes to
22   DiRossi, Mann, and Whatman.  Do you see that?
23   Okay.
24           Now, at this point you were involved
25   in -- you were involved in what you call the
```

Page 356

```
1            A. Kincaid - CONFIDENTIAL
2    Congressional proposal process at this time,
3    around September 3, 2011?
4            MR. SHEEHY:  Objection to form.
5        A.  This would have been still part of
6    the proposal process and the -- yeah, this is
7    a -- part of the proposal.  As you can see,
8    it's a collaborative promotes.
9        Q.  All right.  So the proposal process
10   was a collaborative process between yourself
11   and Ms. Mann, Mr. DiRossi, and Mr. Whatman.  Do
12   I have that right?
13           MR. SHEEHY:  Objection to form.
14       A.  Yeah, we were -- yes.
15       Q.  And one of the things you sent
16   them -- let's try and understand what you did
17   send them, okay?
18           Looking at the September 2, 6:45 p.m.
19   email on the second page of Exhibit 7, you sent
20   them some images of different districts.
21   That's what those JPEG attachments are; is that
22   right?
23       A.  They're either districts or counties
24   or regions, kind of a mixture of all three, for
25   the state.
```

Page 357

```
1            A. Kincaid - CONFIDENTIAL
2        Q.  Now, you also sent them a zip file;
3    is that right?
4        A.  Yes.
5        Q.  That zip file, would that have
6    included a block equivalency file?
7            MR. SHEEHY:  Objection to form.
8        A.  From our previous conversation in
9    December, I think you showed me another
10   document that showed that it was the
11   shapefiles, so yes, or the block assignment
12   file, so yes.
13       Q.  And then there's a .xls.  Do you see
14   that, newidea.xls?
15       A.  Yes.
16       Q.  And that's a changes sheet; is that
17   right?
18       A.  Yes.
19       Q.  And then if we turn to what would
20   have been marked as 8, which is BRADEN001387,
21   do you see that?
22       A.  Yes.
23       Q.  And you created this; is that
24   correct?
25           MR. SHEEHY:  Objection to form.
```

Page 358

A. Kincaid - CONFIDENTIAL

1       A. Kincaid - CONFIDENTIAL
2      A.  Yes.
3      Q.  And this is the changes sheet you
4  sent to Mr. DiRossi and Ms. Mann and
5  Mr. Whatman on or around September 2, 2011; is
6  that correct?
7        MR. SHEEHY:  Objection to form.
8      A.  No, I don't think so.
9      Q.  You don't think so?
10     A.  It was my practice to name the
11  changes sheet whatever the file was, and this
12  is named differently than what the file is.
13     Q.  Okay.  Hold on one second.  Because
14  it says the name is Ohio changes rather than
15  new idea redraft?  Is that what you're saying?
16     A.  The file that's attached to the
17  8:13 a.m. email is Ohio Changes New Idea
18  Redraft.xls, and that is not what is reflected
19  in BRADEN001387, at least the title of it.
20     Q.  The title's different, but hold on.
21     A.  It could -- it -- I mean --
22     Q.  Hold on.  Here it is.  So what you're
23  saying is for it to be the attachment, the file
24  name would have to be New Idea Redraft.xls, is
25  that right, to be the attachment?

Page 359

A. Kincaid - CONFIDENTIAL

1       A. Kincaid - CONFIDENTIAL
2      A.  The attachment is named Ohio Changes
3  New Idea Redraft.  That's not reflected here.
4  So all I'm saying is it seems unlikely to me
5  based off of how I typically name things --
6     Q.  Sure.
7     A.  -- that this spreadsheet is the one
8  that was attached to that email.
9       MR. FRAM:  Let's mark next as 44,
10  the metadata for BRADEN1387.
11  (Exhibit No. 44 was marked for
12  identification.)
13       MR. FRAM:  This is the metadata for
14  Braden 001387.
15       THE WITNESS:  Okay.
16       MR. SHEEHY:  I think in our
17  previous depositions we had
18  stipulated -- we said we wouldn't agree
19  that the metadata was necessarily
20  accurate.
21       MR. FRAM:  You don't have to agree
22  or -- okay, that may be your position.
23  I will point out to you that -- well, we
24  had a long conversation about case law
25  yesterday but we don't have to do that

Page 360

A. Kincaid - CONFIDENTIAL

1       A. Kincaid - CONFIDENTIAL
2  now.
3  BY MR. FRAM:
4     Q.  Let's talk about the words.  You see
5  the words Ohio changes - new idea redraft.xls
6  where it says file name?  Do you see that?
7     A.  I do.
8     Q.  That is the same file name that
9  appears as an attachment to your September 2,
10  2011 email; is that right?
11     A.  Uh-huh.
12     Q.  And that's the part that you said
13  would need to be the file name in order for a
14  document to be an attachment to that email.  Do
15  you recall that testimony?
16     A.  That would have been the file name
17  for the attached document, yes.
18     Q.  And so assuming this metadata
19  accurately is the metadata from BRADEN001387,
20  okay, then BRADEN001387 would, in fact, be the
21  attachment, because it's using your normal
22  naming conventions for your files?
23     A.  Yeah, that's the part I'm not clear
24  on.  Typically, that title at the top of the
25  right side of the sheet would have lined up

Page 361

A. Kincaid - CONFIDENTIAL

1       A. Kincaid - CONFIDENTIAL
2  with the name of the Excel file so it's
3  possible that that header was changed after I
4  said file, or it's possible that I didn't
5  follow my standard naming conventions.
6       But I couldn't tell you which one it
7  is.  It just doesn't line up with what I
8  usually do, because I like to keep things
9  organized and that doesn't -- that's not
10  organized.
11     Q.  So what you're telling me is you
12  don't have -- the words Ohio changes - new idea
13  redraft does not appear on the face of
14  BRADEN001387?
15     A.  That's -- it's not on the sheet is
16  all I'm saying.
17     Q.  Not on that document, which is
18  Exhibit 8; correct?
19     A.  That's right.
20     Q.  However, it does appear -- those
21  words appear on Exhibit 44 next to file name.
22  Do you see that?
23     A.  It does.
24     Q.  So if one assumes that the metadata
25  is, in fact, the metadata -- the metadata in

Page 362

A. Kincaid - CONFIDENTIAL

Exhibit 44 is the metadata for Exhibit 8, one
assumes that then that would be consistent with
your practice that Exhibit 8 would be the
attachment that was included in the email in
Exhibit 7 that we have been discussing?

A. The file name's the same, like we
talked about. All I'm saying is that the
header here does not line up with the name of
the file, which is not in line with what I
typically would have done.

So the last author could be incorrect
based off the metadata, could have been edited
by somebody else, or I did this. I don't know.
I'm just saying that I can't -- it's hard for
me to tell you this is -- I accept your -- the
metadata. I'm just saying that this doesn't
line up with what I typically would have named
things so it seems odd. It seems like a
one-off sort of thing for some reason.

Q. Well, last time you did testify with
regards to Exhibit 8 that you created the
spreadsheet itself.

A. I created the spreadsheet.

Q. Right.

Page 363

A. Kincaid - CONFIDENTIAL

A. But if you remember from before with
a couple of the other documents you sent me, my
name showed up on the metadata but the format
of the file was completely different than
anything I would have created.

Q. All right. But in this case, you did
create Exhibit 8; correct?

A. I would have created the original
version of this document, yes. I just don't
know if the header of that is what I wrote or
not.

Q. Okay. Putting aside -- and the
header just being the words Ohio changes?

A. No, the Franklin County sinkhole.
That's where I would have put the title.

Q. I haven't asked about that yet.

A. No, I'm just saying that that's the
part that gives me pause as to whether or not
the metadata's accurate, because I would have
typically put the name of -- the fact it's Ohio
changes, new idea redraft, new idea redraft
typically would have been what appeared on the
header there.

Q. I understand.

Page 364

A. Kincaid - CONFIDENTIAL

A. That's all I'm saying.

Q. New idea. In the ordinary practice,
where the word Ohio changes are should have
been new Ohio redraft? Is that what you're
saying?

A. Typically, yes.

Q. Okay.

A. That's what would have been there.

Q. In this instance, just so we're --
what does and doesn't line up, we can agree on.
You testified that -- your name does appear as
the last author for the -- for 1387, exhibit --
in the metadata 44. Do you see that?

A. I see that, yes.

Q. Okay. And you see the last modified
date of September 3, 2011? Do you see that?

A. I do.

Q. Do you see your name is author again
also as Kincaid?

A. Yes.

Q. All right. And so that's -- in that
sense, the metadata's consistent with your
recollection about Exhibit 8 that you were --
with the exception -- we will get to the

Page 365

A. Kincaid - CONFIDENTIAL

question of the words Franklin County sinkhole,
with the exception of those words, that you
authored this spreadsheet; is that right?

A. Apart --

MR. SHEEHY: Objection.

A. Apart from that cell, it, yes, it
seems like something I would create, just that
part doesn't line up.

Q. Those words, Franklin County --

A. Yes.

Q. -- sinkhole.

A. Yes, doesn't line up with the name of
the file. And they typically would have lined
up. That's all I'm saying.

Q. You're saying the words Franklin
County sinkhole should have appeared in the
file name, or the word Ohio changes should have
appeared in the file name?

A. My typical naming convention for
these sheets would have been Ohio changes,
dash, whatever the map was nicknamed for that
purpose, whether it be new idea redraft or, you
know, HB 319 or whatever that, you know, would
have been final Ohio map typically would have

Page 366

1          A. Kincaid - CONFIDENTIAL
2     showed up in the name of the file as well as in
3     the top header for --
4          Q.   And that is the name that does appear
5     in the metadata, Ohio changes - new idea
6     redraft?
7          A.   Sure.
8          Q.   So that --
9          A.   It typically lined up is all I'm
10    saying.
11         Q.   So -- so --
12         A.   The header and the title of the file
13    typically lined up --
14         Q.   Okay.
15         A.   -- where they should have lined up.
16         Q.   Okay.  Just so I understand, looking
17    at Exhibit 44 in the metadata, the file name is
18    consistent with your naming convention; is that
19    right?
20         A.   File name is consistent with my
21    naming conventions.
22         Q.   And it's same file name that appears
23    as the attachment to the email that you sent on
24    September 2, 2011 to Mr. DiRossi, Ms. Mann, and
25    Mr. Whatman; correct?  The .xls attachment, the

Page 367

1          A. Kincaid - CONFIDENTIAL
2     same file name?
3          A.   Yes, it's the same file name.
4          Q.   So if, in fact, the file name on 1387
5     is what the metadata says it is, that is
6     consistent with your naming convention;
7     correct?
8          A.   Yes.
9          Q.   And it's the same file name as the
10    attachment on the email?
11         A.   Yes.
12         Q.   Okay.  Now I just want to ask you a
13    question about -- you raised the question about
14    the Franklin County sinkhole words.
15         A.   Okay.
16         Q.   Is it your testimony you don't recall
17    writing those words?
18         A.   No, I don't have a specific
19    recollection of naming that.  I don't -- yeah.
20         Q.   The name for the file was, in fact,
21    Ohio Changes - New Idea Redraft.xls?
22         A.   Yes, that's the file name.
23         Q.   Not asking whether that was the name
24    of Exhibit 8.
25         A.   No, I know.  I know what you're

Page 368

1          A. Kincaid - CONFIDENTIAL
2     asking.  I'm just -- you asked me if I remember
3     writing these words.  I don't recall writing
4     those words.
5          Q.   Okay.  Do you have any reason to
6     think you did not write those words?
7          A.   The only thing that gives me pause is
8     the fact it doesn't line up with the file name
9     because typically, the file name, like I said,
10    would have lined up with whatever I put in that
11    top --
12         Q.   Okay.
13         A.   -- cell.
14         Q.   But on the left hand you got current
15    in the top cell.
16         A.   Yes.
17         Q.   With your naming convention, would
18    have included the word current in the --
19         A.   Yes.
20         Q.   -- name?
21         A.   Yes.
22         Q.   File name?
23         A.   Yes.
24         Q.   Okay.  I see "Ohio changes" though
25    appears above the whole spreadsheet.

Page 369

1          A. Kincaid - CONFIDENTIAL
2          A.   Yes.
3          Q.   See that?  And that does appear in
4     the file name.
5          A.   Uh-huh.
6          Q.   So --
7          A.   Like I've told you, it all lines up.
8     That cell doesn't make sense.
9          Q.   The cell doesn't make sense because
10    you think in the ordinary course you would have
11    included that in the file name; is that right?
12         A.   Usually I would have included that in
13    the file name, yes.
14         Q.   Okay.  Do you recall ever using the
15    phrase "Franklin County sinkhole" during any of
16    your work in 2011 involving Congressional
17    redistricting in Ohio?
18         MR. SHEEHY:  Objection to form.
19         A.   I don't recall personally using that
20    phrase, no.
21         Q.   Do you recall anybody else using that
22    phrase?
23         MR. SHEEHY:  Objection to form.
24         A.   I don't have a -- I don't know -- I
25    don't have a specific memory of anybody saying

31 (Pages 366 to 369)

Page 370

```
1           A. Kincaid - CONFIDENTIAL
2    that phrase out loud, no. I don't recall that
3    being something we typically called that
4    district.
5           I do have a vague memory of hearing
6    that phrase, but I don't have a memory of one
7    person saying that. Again, it was seven and a
8    half years ago.
9           Q. Do you recall Mr. Whatman ever using
10   that phrase?
11          MR. SHEEHY: Objection to form.
12          A. I have a memory of that phrase being
13   used in a conversation with Mr. Whatman, but I
14   don't recall if there were other people in the
15   room or not and so I couldn't tell you if it
16   was Tom saying that.
17          I don't recall saying it myself
18   because it doesn't sound like something I would
19   say, but I don't remember Mr. Whatman saying
20   it.
21          I do remember hearing -- I have a
22   vague memory of the phrase coming up in the --
23   in the course of a conversation about the Ohio
24   map, but --
25          Q. Do you recall --
```

Page 371

```
1           A. Kincaid - CONFIDENTIAL
2           A. -- it's just a vague recollection.
3           Q. -- in that meeting, was that during
4    the Congressional proposal period?
5           MR. SHEEHY: Objection to form.
6           A. It would have been in the August or
7    early September time frame, so in the proposal
8    and collaboration period, yes.
9           Q. Do you recall whether Dr. Hofeller
10   was in the room for that conversation?
11          MR. SHEEHY: Objection to form.
12          A. I have no recollection being in the
13   meeting with Dr. Hofeller and Tom Whatman at
14   the same time.
15          Q. What about Mr. Wile?
16          MR. SHEEHY: Objection to form.
17   A. No.
18          Q. What about Speaker Boehner?
19          MR. SHEEHY: Objection to form.
20   A. No.
21          Q. Anybody else in the room?
22          MR. SHEEHY: Objection to form.
23          A. Again, I really -- I have a vague
24   recollection of people being in that meeting
25   but I don't recall who that was.
```

Page 372

```
1           A. Kincaid - CONFIDENTIAL
2           Q. Was anybody on the phone, on
3    speakerphone?
4           MR. SHEEHY: Objection to form.
5           A. I don't recall having any
6    speakerphone meetings over Ohio. Typically
7    when we had a meeting about Ohio, it was in
8    person.
9           Q. Do you recall whether Mr. DiRossi was
10   ever at that meeting?
11          MR. SHEEHY: Objection to form.
12          A. I don't recall being on a conference
13   call with -- with Ray and Heather.
14          Q. Did any of them ever come to
15   Washington to meet with you during the
16   Congressional proposal process?
17          MR. SHEEHY: Objection to form.
18          A. Not that I remember, no.
19          Q. Did anybody else work with you in
20   creating these change sheets?
21          A. I created the changes sheets myself.
22          Q. So if one -- do you have any reason
23   to doubt the authenticity of this document?
24          MR. SHEEHY: Objection to form.
25          A. All I'm telling you, Mr. Fram, is I
```

Page 373

```
1           A. Kincaid - CONFIDENTIAL
2    don't remember writing that phrase. I mean,
3    you're asking me if I remember writing specific
4    words on a spreadsheet seven and a half years
5    ago. I don't have a memory of typing those
6    words out.
7           Q. I just want to know --
8           A. The format of the document is
9    something that I would have produced. This
10   lines up with all the other things you and I
11   have looked at that have changes sheets. All
12   I've done here is I don't remember typing
13   "Franklin County sinkhole," enter, and putting
14   that on there. That's all I'm telling you.
15          Q. And I just want to be totally
16   transparent with you, but I just want to make
17   sure that you don't say, you know, no, no, I
18   didn't type it, somebody else typed it, or
19   something. You just don't remember one way or
20   the other, if I understand correctly.
21          A. Yes, that's --
22          Q. Fair enough. We're on the same page?
23          A. Okay.
24          Q. I just wanted to --
25          A. Yeah, I mean, it was in the summer
```

TSG Reporting - Worldwide - 877-702-9580

Page 374

A. Kincaid - CONFIDENTIAL

1                A. Kincaid - CONFIDENTIAL
2  and fall of 2011 so it was a while ago.  Lots
3  has happened since then.
4      Q.  I understand.  All right, do you
5  recall the phrase "Franklin County sinkhole"
6  coming up as any part of the discussions with
7  Mr. DiRossi or Ms. Mann at any time?
8        MR. SHEEHY:  Objection to form.
9      A.  Like I told you before, just as a
10  blanket statement, I don't recall having a
11  conversation with Ray or Heather at all during
12  the process.  Our interactions were typically
13  through Tom Whatman, and then those emails that
14  you've seen.
15      Q.  Okay.  And just so we are clear, you
16  referenced that district in reference to
17  Franklin County sinkhole.  Would that have been
18  the 10-Open district, the one that's got the
19  D+16 PVI scoring at the bottom of Exhibit 8?
20      A.  On this sheet, it would have been the
21  10th district.  I think at the end of the
22  process it was the Third is what it was --
23  actually ended up being.  But yes, it was that
24  10th district.
25      Q.  Looking at the file name in the

Page 375

1                A. Kincaid - CONFIDENTIAL
2  metadata and on the -- on Exhibit 44 and also
3  on the attachment to the September 2 email,
4  Exhibit 7, this name Ohio changes - new idea
5  redraft, do you see that?
6      A.  Yes.
7      Q.  Do you have an understanding of what
8  the phrase "new idea" referred to?
9      A.  At some point in time during the
10  proposal and collaborative process we had a
11  file name.  I guess it was -- you know, you saw
12  the one that was as of July 25, and at some
13  point we had a new idea.  So it was a different
14  approach to how we were drafting the map.
15      Q.  And were there sequential iterations
16  of the map, new idea 1, new idea 2, new idea 3?
17      A.  I think so, yes.
18      Q.  Do you recall whether or not the
19  iteration of the Congressional proposal to
20  create a new district in Franklin County area,
21  that iteration took place in late August or
22  early September 2011?
23      A.  Could you ask it again?
24      Q.  Trying to find out when the new
25  Franklin County district idea was generated.

Page 376

1                A. Kincaid - CONFIDENTIAL
2  So I'm trying to figure out, was it around the
3  time of the September 2 email?  Was it around
4  the time?  Was it some other time?  Was it
5  earlier than that?
6      A.  I don't know when the -- well, it
7  says the date last modified here is 9-3-2011 so
8  that would have been whenever I sent this file.
9  I don't know how many days before that or weeks
10  that new file name came into use.  I'm not
11  sure.
12      Q.  You said that the file name came into
13  use or the idea of creating the district?
14      A.  For me, that's one in the same.  The
15  new file name would have come into existence at
16  the same time as the new map was being -- you
17  know, a new iteration was being created.
18      Q.  We can put some boundaries on it.
19  Let's take a look.  So back, in fact, as early
20  as July, in Exhibit 5, as early as July 25,
21  2011 there was a new District 10 open in PVI of
22  D+15.  Do you see that?
23      A.  Just a second.  Okay.
24      Q.  Does refresh your recollection that
25  the fact of creating a new district around

Page 377

1                A. Kincaid - CONFIDENTIAL
2  Franklin County, heavily Democratic, was
3  something you were working on as part of the
4  Congressional proposal as early as July 25,
5  2011?
6        MR. SHEEHY:  Objection to form.
7      A.  You know, I'm not entirely certain
8  that new idea refers to the 10th district at
9  all.  If you look at the McCain numbers for the
10  as of July 25 versus this, you know, Exhibit 5
11  versus Exhibit 8, you'll notice that the first
12  district is different, the second is different,
13  the third is different, the fourth is
14  different.  I mean, these are -- this is a
15  significantly different map across the entire
16  state.
17       And so without having a picture of
18  the as of July 25 map, I couldn't tell you
19  specifically what new idea's referring to.  It
20  could have been a new idea in regards to a
21  different part of the state.  It may not have
22  been the 10th district.
23      Q.  I'm not asking about the meaning of
24  the phrase "new idea." I'll ask my question
25  more clearly this time.

Page 378

```
1            A. Kincaid - CONFIDENTIAL
2       A.  Okay.
3       Q.  I'm saying whether or not an idea of
4  creating a new district --
5       A.  Uh-huh.
6       Q.  -- in the Franklin County area --
7       A.  Okay.
8       Q.  -- which was initially designated as
9  10 --
10      A.  Uh-huh.
11      Q.  -- whether or not that idea was
12 something you were working on as of July 25,
13 2011, consistent with Exhibit 5.
14      A.  I mean, clearly it was something we
15 were looking at as of July 25.
16      Q.  Right.  And that the -- as we said
17 before, that had certain effects on the PVI
18 scoring for 12 and 15; correct?
19      A.  Yes.
20      Q.  September 3, 2011, 11:54 a.m. email
21 in Exhibit 7.
22      A.  Exhibit 7?
23      Q.  Yeah.  It's a long email string.
24      A.  Let's see.
25      Q.  It's on page 4 of 8.
```

Page 379

```
1            A. Kincaid - CONFIDENTIAL
2       A.  Okay.
3       Q.  Mr. Whatman is emailing to you.  You
4  have no reason to doubt you received this
5  email; is that right?
6       A.  Where it says "Adam, did we tell you
7  we need the four-way split?"
8       Q.  Yeah.
9       A.  Yeah, I have no reason to doubt I
10 received that email.
11      Q.  Okay.  And that was also -- no reason
12 to doubt that Mr. DiRossi and Ms. Mann were
13 included in that email string; is that right?
14      MR. SHEEHY:  Objection to form.
15      A.  No.
16      Q.  Okay.  It's part of the
17 collaboration; is that right?
18      A.  Yeah, yes.
19      Q.  Do you have a recollection of what
20 the phrase "four-way split" meant?
21      MR. SHEEHY:  Objection to form.
22      A.  I didn't last time, but you and I,
23 when we went through the whole process and
24 looked at the screenshots, four-way split had
25 to do with four districts splitting up Franklin
```

Page 380

```
1            A. Kincaid - CONFIDENTIAL
2  County.
3       Q.  That was an alternative to creating a
4  new district in Franklin County that would
5  include most of Franklin County within it; is
6  that right?
7       A.  That's correct.
8       Q.  Two different options, in other
9  words.  One is create a whole new district
10 around Franklin County; the other is split it
11 up four ways.  Is that right?
12      A.  That's correct.
13      MR. SHEEHY:  Objection to form.
14      Q.  Those are two options that were being
15 considered around September 3, 2011; is that
16 right?
17      MR. SHEEHY:  Objection to form.
18      A.  I suppose so, yes.
19      Q.  And he said:  "Did we tell you we
20 needed the four-way split?"
21      Do you see what Mr. Whatman's saying
22 there?
23      A.  Yes.
24      Q.  Do you understand who "we" was in
25 that?  Talking about Mr. DiRossi and Ms. Mann?
```

Page 381

```
1            A. Kincaid - CONFIDENTIAL
2       MR. SHEEHY:  Objection to form.
3       A.  That would have been my
4  understanding.
5       Q.  Do you recall a conference call with
6  them about this issue, about wanting to
7  discussion the option between the new district
8  in Franklin County versus the four-way split?
9       MR. SHEEHY:  Objection to form.
10      A.  Like I said before, I don't recall
11 having any conference calls with Ray or
12 Heather.
13      MR. FRAM:  Let's take a look then
14 at -- let's see.  This is a document
15 that was produced after your deposition.
16 This is OHCF0001438.
17 (Exhibit No. 45 was marked for
18 identification.)
19 BY MR. FRAM:
20      Q.  Mr. Kincaid, looking at this
21 document, this appears to be the exact same
22 format as the other change sheets we have been
23 looking at; isn't that right?
24      A.  Yes.
25      Q.  You created this, didn't you?
```

34 (Pages 378 to 381)

Page 382

1          A. Kincaid - CONFIDENTIAL
2          MR. SHEEHY:  Objection, form.
3      A.  It seems likely that I did.
4      Q.  Do you see the title Four-Way Split
5  up there?
6      A.  I do.
7      Q.  Is this a change sheet that you
8  generated to show what the -- to depict
9  analysis of what the four-way split would look
10  like?  Is that right?
11          MR. SHEEHY:  Objection to form.
12      A.  This would have reflected the
13  partisan makeup of it, yes.
14      Q.  There's no open -- there's no 10-Open
15  district here; is that right?
16      A.  That's correct.
17      Q.  That's because the four-way split,
18  like you say, was dividing up Franklin County
19  four ways.  It wasn't creating a new district
20  centered in Franklin County; correct?
21      A.  That's right.
22          MR. FRAM:  Now, the metadata, let's
23      mark that as 46.
24      (Exhibit No. 46 was marked for
25      identification.)

Page 383

1          A. Kincaid - CONFIDENTIAL
2  BY MR. FRAM:
3      Q.  The metadata for this document --
4  refresh your recollection about the date.  Just
5  to point you down to the created date of
6  9-6-2011, do you see that?
7      A.  Yes.
8      Q.  And does that refresh your
9  recollection as to the approximate date you
10  were working generating a change sheet for the
11  four-way split?
12      A.  It says at the top, as you see here,
13  four-way split as of September 6, so it -- it
14  says at the top of the document four-way split
15  as of September 6 so it seems like it was as of
16  September 6.
17      Q.  Okay.  Once again, on the left hand,
18  current, that's under the pre-redistricting
19  map, the 18 districts; is that right?
20      A.  That would have been as of, yes,
21  January of 2011 before redistricting.
22      Q.  And you see there are six elections
23  that are indicated there?  Do you see those
24  columns?
25      A.  Yes.

Page 384

1          A. Kincaid - CONFIDENTIAL
2      Q.  I think, as we indicated, when you
3  actually did the averaging you used a function.
4  You only used five of them; is that right?
5      A.  That's correct.
6      Q.  And same thing's true.  If you look
7  at the four-way split, you've got -- similarly,
8  you've got those six elections but you got the
9  Ohio GOP average.  That's just for the five; is
10  that right?
11      A.  Yes.
12      Q.  Okay.
13      A.  As we covered before.
14      Q.  And if we go down looking at the PVI
15  values under the four-way split on the far
16  right, do you see those?
17      A.  Yes.
18      Q.  And if I count correctly, 13
19  districts which have R+ PVI scores, do you see
20  that?
21      A.  I do.
22      Q.  And just for the record, I'll just
23  state it to make sure I'm reading this right.
24  So that means for the proposed District 1 would
25  be R+6; is that right?

Page 385

1          A. Kincaid - CONFIDENTIAL
2      A.  No.
3      Q.  Proposed District --
4      A.  Proposed District 1, R+6, yes.
5      Q.  That's right.  And the same thing for
6  district 2.  It's an R+8; is that right?
7      A.  Yes.
8      Q.  And District 3, that's an R+4; is
9  that right?
10      A.  Yes.
11      Q.  And so on down that line until you
12  get to 13 of them; is that right?  Okay.
13          MR. FRAM:  I've put in front of you
14      what are Exhibit 8, BRADEN001387; and
15      Exhibit 45, OHCF001438.
16      A.  Okay.
17      Q.  Look for some of the differences
18  that -- in Exhibit 8 there was a pairing of
19  Turner and Austria.
20          Do you see that?
21      A.  Yes.
22      Q.  But in Exhibit 45, the four-way
23  split, they each have their own district; is
24  that right?
25      A.  Yes.

Page 386

```
 1          A. Kincaid - CONFIDENTIAL
 2     Q.  Kaptur and Kucinich, they're paired
 3  in both of them; is that right?
 4     A.  Yes.
 5     Q.  And Renacci is paired with Sutton in
 6  Exhibit 45, the four-way split.
 7        Do you see that?
 8     A.  Yes.
 9     Q.  But not in -- not in Exhibit 8, not
10  in BRADEN001387, the ones with the word
11  Franklin County sinkhole.
12     A.  Yes.
13     Q.  Do you recall changing some of these
14  incumbent pairings between the -- what's
15  labeled as the Franklin County sinkhole
16  spread -- map and the four-way split?
17        MR. SHEEHY:  Objection to form.
18     A.  Do I recall changing them?
19     Q.  Well, let me back up for a minute.
20  If the metadata's correct, Exhibit 8 was sent
21  on or about September 2 or 3, 2011.
22     A.  Okay.
23     Q.  And if the metadata's correct and the
24  labeling is correct, Exhibit 45's within a few
25  days, September 6.
```

Page 387

```
 1          A. Kincaid - CONFIDENTIAL
 2     A.  Okay.
 3     Q.  I'm saying in that three-day period
 4  do you remember changing the incumbent
 5  pairings?
 6        MR. SHEEHY:  Objection to form.
 7     A.  If you go back and look at Exhibit 7,
 8  it seems pretty clear from those emails that
 9  the four-way split map and the new idea map
10  were -- existed at the same time so I don't
11  think I changed the pairings.  I think they
12  were two different drafts.
13     Q.  Two different ideas were on the
14  table, and I --
15     A.  Two different ideas.  It's not that I
16  would change one from this to this, I think
17  they're just two simultaneous maps.
18     Q.  So but in the period generally
19  between -- in early September, the two ideas
20  were on the table, the four-way split idea and
21  this new district in Franklin County.  They
22  were both on the table at the same time; is
23  that right?
24     A.  That seems to be the case, yes.
25     Q.  And if you compare the PVI scorings
```

Page 388

```
 1          A. Kincaid - CONFIDENTIAL
 2  in Exhibits 8 and 45 --
 3     A.  Uh-huh.
 4     Q.  -- it seems like for five of the
 5  districts, the PVI scorings are the same.  That
 6  would be Districts 1, they're both R+6; is that
 7  right?
 8     A.  Yes.
 9     Q.  And District 6, they're both the same
10  at R+5; is that right?
11     A.  Yes.
12     Q.  And at District 8, they're both the
13  same --
14     A.  Yes.
15     Q.  -- at R+11?
16     A.  Uh-huh.
17     Q.  Okay.  And at District 14, it also
18  seems to be the same at R+3.  Do I have that
19  right?
20     A.  Yes.
21     Q.  Okay.
22     A.  District 7's also the same.
23     Q.  And District 7 also?  Okay.
24     A.  They're both R+5 seats.
25     Q.  But there's several districts where
```

Page 389

```
 1          A. Kincaid - CONFIDENTIAL
 2  there's a lower R scoring in the four-way
 3  split.  Do you see that in Exhibit 45?  And in
 4  particular, District 2 went from an R+10 in
 5  what I'll call the Franklin County sinkhole map
 6  down to R+8 in the four-way split.
 7        Do you see that?
 8     A.  I see that.  I don't think I would
 9  characterize it as it went down.  These are --
10  like we just talked about, these are two
11  simultaneous maps.
12     Q.  Okay.
13     A.  So it's not that one's changing to
14  the other one; they're different maps.
15     Q.  Okay.
16     A.  So the districts are going to be
17  different, significantly different.
18     Q.  Fair enough.  I didn't mean to create
19  a temporal suggestion in my question.  Let me
20  clean it up a little bit.
21        When one compares the two maps, there
22  are several districts where there's a lower R+
23  scoring under the PVI column; correct?
24     A.  Yes.  If you are comparing the two
25  maps simultaneously, the second would be more
```

Page 390

```
1           A. Kincaid - CONFIDENTIAL
2    Republican than the other second, yes.
3        Q.  Second?
4        A.  The second in the --
5        Q.  CD 2?
6        A.  Yes.
7        Q.  CD 2, which is stronger Republican
8    strength in the --
9        A.  In the BRADEN001387.
10       Q.  137, which has the words "Franklin
11   County sinkhole" on it?
12       A.  Uh-huh.
13       Q.  Okay.  And similarly, CD 3, it goes
14   from R+6 in that the spreadsheet with the words
15   "Franklin County sinkhole" on it down to R+4 in
16   the four-way split spreadsheet; correct?
17       A.  Third?
18       Q.  CD 3.
19       A.  Yes.
20       Q.  And for CD 4, it goes from R+8 down
21   to an R+5 between the spreadsheet with the
22   words "Franklin County sinkhole" on it down to
23   the spreadsheet with the words "four-way
24   split"; is that right?
25       A.  Yes.
```

Page 391

```
1           A. Kincaid - CONFIDENTIAL
2        Q.  And similarly for CD 5, it goes down
3    from R+7 -- that's Latta's district -- down to
4    an R+4 between the spreadsheet with the words
5    "Franklin County sinkhole" on it and the
6    four-way split spreadsheet; is that right?
7        A.  Yes.
8        Q.  And then for Tiberi in District 12 it
9    goes down from an R+10 in the spreadsheet that
10   has "Franklin County sinkhole" on it down to
11   R+5 in the four-way split.
12           Do you see that?
13       A.  I do.
14       Q.  And for District 15, which is
15   Stivers, it goes down from an R+6 in the
16   spreadsheet that's got "Franklin County
17   sinkhole" on it down to R+5 in the four-way
18   split spreadsheet; is that right?
19       A.  Yes.
20       Q.  So as a general matter, the
21   spreadsheet that has the "Franklin County
22   sinkhole" words on it had stronger Republican
23   PVI scorings than did the four-way split
24   option; is that right?
25           MR. SHEEHY:  Objection to form.
```

Page 392

```
1           A. Kincaid - CONFIDENTIAL
2        A.  The Franklin County sinkhole map
3    had -- the districts that were Republican had
4    higher overall -- as a general statement had
5    higher R+ scores than the four-way split, I
6    guess.
7        Q.  Thank you.
8        A.  It also had another Democrat seat
9    than the other one did.
10       Q.  All right.  So the tradeoff would be
11   it was -- in one of them there were 13
12   Republican seats that had stronger Republican
13   PVI and the other only had 12; is that right?
14           MR. SHEEHY:  Objection to form.
15       A.  Yes.  I mean, the four-way split map
16   had 13 districts that could have sent a
17   Republican to Congress and three that sent a
18   Democrat, and the other one had, you know, 12
19   seats that were likely sending a Republican in
20   Congress, and four Democrats.
21       Q.  You say both options were on the
22   table.  Do you recall any conversation as to
23   which option was going to be proposed or
24   recommended?
25           MR. SHEEHY:  Objection to form.
```

Page 393

```
1           A. Kincaid - CONFIDENTIAL
2        A.  Which option was going to be proposed
3    by whom?
4        Q.  First of all, do you recall any
5    conversation with anything you were considering
6    proposing to Mr. Whatman?  Take it each step.
7            MR. SHEEHY:  Objection to form.
8        A.  These are both drafts that we had
9    worked on with the delegation and, you know,
10   presented to -- with Mr. Whatman, you know,
11   over this -- the Ohio legislature, you know, to
12   bring in Heather and the Ohio legislature.
13       Q.  Do you recall any discussion as to
14   which way to go, whether to go for the 13-3 map
15   versus the 12-4 map?
16           MR. SHEEHY:  Objection to form.
17       A.  When you say R -- our proposal for
18   which one they should choose of the two?  Is
19   that what you're asking?
20       Q.  Basically, at a certain point you've
21   testified there were two options on the table.
22       A.  Yeah.
23       Q.  At the end of the day, you picked one
24   or the other; is that right?
25       A.  I didn't pick one or the other.
```

Page 394

A. Kincaid - CONFIDENTIAL

1     A. Kincaid - CONFIDENTIAL
2        Q.   Somebody picked one or the other.
3     I'm trying to understand the process towards
4     getting to the result of picking one or the
5     other, like any conversations, any
6     communications, like which one to pick?
7           MR. SHEEHY:  Objection to form.
8        A.   You saw those emails before that
9     we've already have gone through.  They asked
10    for both maps.  Both options.  The Ohio
11    legislature looked at the two of them and made
12    a decision.  I wasn't part of that
13    conversation.
14       Q.   Okay, so who was -- the conversation
15    as you understand it involved Ms. Mann,
16    Mr. DiRossi, Mr. Whatman?
17       A.   No.
18          MR. SHEEHY:  Objection to form.
19       A.   No, it was -- Ray and Heather took
20    those maps and I think showed them to -- made
21    changes in various things and did things on
22    their end with the Ohio state legislature, and
23    somewhere with the Ohio state legislature
24    decided which way to go.
25       Q.   So they made the decision whether to

Page 395

1     A. Kincaid - CONFIDENTIAL
2     go for 12-4 versus 13-3 is your understanding?
3           MR. SHEEHY:  Objection to form.
4        A.   I don't know who made that decision
5     or how that decision was made apart from that.
6     I do recall being told that the Democrats in
7     the Ohio legislature were willing to vote for
8     the new map if it created four Democrat seats
9     versus three.
10       Q.   And who told you that?
11       A.   Mr. Whatman.
12          MR. SHEEHY:  Objection.
13       Q.   Do you recall around when he told you
14    that?
15          MR. SHEEHY:  Objection to form.
16       A.   It would have been around the time
17    that the map was -- the final map was being
18    proposed and moving toward passage.
19       Q.   The final map, we're talking about
20    HB 319 or a later one, 369?
21       A.   319.
22       Q.   Okay.  Do you have an understanding
23    of how the Democrats voted on 319?
24       A.   From my recollection, several
25    Democrats voted for 319.  It was a bipartisan

Page 396

1     A. Kincaid - CONFIDENTIAL
2     support of --
3        Q.   About three in the House.
4        A.   Okay.
5        Q.   The overwhelming majority of
6     Democrats voted against 319?
7        A.   I know that some did, though.
8        Q.   But a tiny minority?  Do you have a
9     memory?  Do you have a memory of the numbers?
10       A.   I don't remember the exact numbers.
11    I know that some Democrats were willing to vote
12    for that map and then voted more than voted for
13    the next one.
14       Q.   Okay.  But on this one, we trying to
15    figure out the 12-4.  I'm trying to figure out
16    whether you have any recollection of saying the
17    12-4 was being chosen because that's what the
18    Democrats wanted.
19          MR. SHEEHY:  Objection to form.
20       A.   I don't think it was why it was
21    chosen but I think it was a part of that
22    decision-making process.
23       Q.   Do you have any idea why it was
24    chosen?
25          MR. SHEEHY:  Objection to form.

Page 397

1     A. Kincaid - CONFIDENTIAL
2        A.   I wasn't part of that conversation.
3     (Exhibit No. 47 was marked for
4     identification.)
5           MR. FRAM:  So we got up to
6     September 6.  I want to take us to
7     September 8.
8     BY MR. FRAM:
9        Q.   This is an email string.  The Bates
10    number, though, applies to all of them,
11    00023234.  And let me just start with the first
12    page with you.
13          September 8, 2011 email at 4 o'clock
14    in the afternoon from Tom Hofeller to Mark
15    Braden entitled New Idea 3.
16          Do you see that?
17       A.   I'm sorry, from Tom to Mark?
18       Q.   From Tom Hofeller.  I'm looking at
19    the second email.  Sorry about that.
20       A.   Yeah.
21       Q.   It's from Dr. Hofeller to Mr. Braden
22    on September 8, 2011 at 4 p.m.  Subject re: New
23    Idea 3.
24          Do you see that?
25       A.   Yes.

38 (Pages 394 to 397)

Page 398

A. Kincaid - CONFIDENTIAL

1    A. Kincaid - CONFIDENTIAL
2    Q.  I think you've already testified that
3    thofeller@RNCHQ.org, do you recognize that as
4    Mr. Hofeller's email address in 2011; correct?
5    A.  Yes, that was Tom Hofeller.
6    Q.  Hofeller.  I apologize.  Hofeller's
7    email address.  And I don't know if you
8    recognize Mr. Braden's email address or not.
9    A.  I don't.
10   Q.  Now, this title, New Idea 3, does it
11   ring a bell in terms of what New Idea 3 was?
12        MR. SHEEHY:  I'm just going to
13        object.  I don't see Adam being copied
14        on any of these emails.
15        MR. FRAM:  I just haven't asked him
16        that question.  We don't have to make
17        those statements.  There's no question
18        pending on that.
19   Q.  I'm just asking.  Just so we are
20   clear, I just want to know whether or not you
21   have any idea what New Idea 3 is.
22   A.  Not to be glib, but I'm assuming New
23   Idea 3 is the third iteration of the new idea
24   that we talked about before.
25   Q.  That was kind of my guess also.  Did

Page 399

1    A. Kincaid - CONFIDENTIAL
2    you come up with the -- you are very precise
3    about naming things.  Did you come up with a
4    New Idea 3?
5        MR. SHEEHY:  Objection to form.
6        A.  I think it's likely I named a
7    iteration New Idea 3.
8    Q.  Okay.  Go back to the -- in Outlook,
9    the chronological order and spatial are
10   reversed so to get the earliest in time we have
11   to go to the end document.  So if you go to the
12   September 8, 2011 at 1:05 p.m., do you see
13   that?
14   A.  Yes.
15   Q.  You see that Dr. Hofeller is sending
16   Mr. Braden a DVF plan file.  Do you see that
17   reference?
18   A.  Yes.
19   Q.  Do you have an understanding of what
20   a DBF plan file is?
21   A.  A DBF plan file is a block
22   equivalency or block assignment file.
23   Q.  Okay.  Were you aware that such a
24   file was being sent to Mr. Braden?
25   A.  No, I don't remember this.

Page 400

1    A. Kincaid - CONFIDENTIAL
2    Q.  Okay.  Do you see referencing that
3    Dr. Hofeller had put Hamilton back the way it
4    was except for five persons needed to reunite
5    three cities?
6        Do you see that?
7    A.  I do.
8    Q.  And it says: "I gave the plan to
9    Adam as directed."
10   A.  I see that.
11   Q.  Do you recall Dr. Hofeller giving you
12   any plans in September 2011?
13        MR. SHEEHY:  Objection to form.
14        A.  No.  I mean, like I testified before,
15   I don't recall Tom giving me any block
16   assignment files, but he says he did so he may
17   have.  But I do not recall that.
18   Q.  Okay.  Do you recall any changes
19   being made to Hamilton County?
20        MR. SHEEHY:  Objection to form.
21        A.  There were lots of changes made to
22   Hamilton County over the course of the drafting
23   of the map, so yeah, I remember.
24   Q.  Do you recall Dr. Hofeller ever
25   suggesting to you to make changes in Hamilton

Page 401

1    A. Kincaid - CONFIDENTIAL
2    County?
3        MR. SHEEHY:  Objection to form?
4        A.  No.  Like I testified before, I don't
5    recall Tom giving me any advice as to anything
6    to change anywhere in the map.  I don't recall
7    him sending me a file, but this email says that
8    he sent me a file, but it doesn't say he gave
9    me any direction on the Hamilton County map,
10   so --
11   Q.  It does say: "I gave the plan to
12   Adam as directed."  Do you see that?
13   A.  Yeah.  I'm agreeing with you that it
14   says that, I just don't remember him giving me
15   the file, that's all.
16   Q.  Do you recall whether Mr. Braden was
17   giving directions to Dr. Hofeller about what to
18   include in different districts?
19        MR. SHEEHY:  Objection to form.
20        A.  I wasn't privy to Mark and Tom's
21   conversations so I don't know what they talked
22   about.
23   Q.  Then going to a little later in the
24   afternoon, around 2:25 in the afternoon, do you
25   see that email from Dr. Hofeller to Mr. Braden?

Page 402

1           A. Kincaid - CONFIDENTIAL
2       A.  Yes.
3       Q.  It says: "Mike, Franklin won't work
4   because of one of the cities I moved in the
5   County has our incumbent in it."
6           Do you see that?
7       A.  Yes.
8       Q.  Do you recall any conversations about
9   Franklin County not working because an
10  incumbent was in the new Franklin County
11  district and should not have been?
12          MR. SHEEHY:  Objection to form.
13      A.  I don't recall a conversation with
14  Tom about it, but I recall a conversation with
15  Steve Stivers about it, so --
16      Q.  And if you go up a little bit higher
17  up in the chain --
18      A.  Mike, I mentioned before.
19      Q.  -- it's talking about Steve Stivers
20  as the person being referred to by
21  Dr. Hofeller.
22      A.  Uh-huh.
23      Q.  And the problem was whether or not
24  he -- someone had the right address?  Is that
25  what --

Page 403

1           A. Kincaid - CONFIDENTIAL
2       A.  That's -- yes.
3       Q.  You remember that.  Okay.
4           And at one point, somebody thought he
5   lived at 1971 Concord Road.
6           Do you see that?
7       A.  Yeah, I see that in the email here.
8       Q.  Yeah.  But previously, that you had
9   thought he lived in Grandview Heights; is that
10  right?
11      A.  It looks like that's the case, yes.
12      Q.  And that Mr. Braden says he sent the
13  right address because Stivers had just bought
14  that house.  Do you see that going up in the
15  3:39 p.m.?
16      A.  Yes.
17      Q.  Do you recall whether -- so
18  Mr. Braden was the source of the correct
19  address for Representative Stivers --
20          MR. SHEEHY:  Objection to form.
21      Q.  -- as far as you know?
22          MR. SHEEHY:  Objection to form.
23      A.  Mark apparently sent that address to
24  Tom.  I didn't recall receiving that address
25  from Mark.  Tom probably told me I had the

Page 404

1           A. Kincaid - CONFIDENTIAL
2   wrong address and then Mr. Stivers apparently,
3   you know, definitely told me that, so --
4       Q.  Okay.  Now looking at the 3:18 p.m.
5   email, read the whole thing if you can please
6   that's short.  One paragraph.
7       A.  Okay.
8       Q.  And you notice it says:  "The area
9   Adam has on his version included Grandview
10  Heights and some of the more downtown area."
11          Do you see that?
12      A.  Yes.
13      Q.  And then there's a reference where it
14  says: "Which I took out of the map I sent."
15          Do you see that?
16      A.  I see that.
17      Q.  Do you recall Dr. Hofeller at any
18  point taking certain downtown areas out of the
19  Franklin County map?  Strike that.
20          Do you recall Dr. Hofeller at any
21  point taking any of the downtown area out of
22  the proposed District 15?
23          MR. SHEEHY:  Objection to form.
24      A.  Like I said before, I don't recall
25  receiving files from Tom so this is something

Page 405

1           A. Kincaid - CONFIDENTIAL
2   that I don't have any memory of.  So I don't
3   have a memory of him removing anything from
4   downtown Franklin County -- Columbus.  So all I
5   can go off of is what Tom is saying here to
6   Mark in this email.  I don't have a memory of
7   him doing that.
8       Q.  Okay.  You don't remember him
9   affirmatively not doing it, you just don't
10  remember one way or the other?
11      A.  I have no memory of this.
12      Q.  Do you know whether Dr. Hofeller was
13  in direct communication with Mr. DiRossi or
14  Ms. Mann at any point?
15          MR. SHEEHY:  Objection to form.
16      A.  Not to my knowledge.
17      Q.  With Mr. Whatman?
18          MR. SHEEHY:  Objection to form.
19      A.  I'm sorry?
20      Q.  Was he in communication with
21  Mr. Whatman about changes to the map?
22      A.  Tom Hofeller?
23      Q.  Yes.
24          MR. SHEEHY:  Objection to form.
25      A.  Not to my knowledge, I don't know.

Page 406

```
 1              A. Kincaid - CONFIDENTIAL
 2       Q.  Do you know whether or not -- what
 3   would happen to any changes he made in the map
 4   that he said that he was sending to Mr. Braden?
 5              MR. SHEEHY:  Objection to form.
 6       A.  Based off this email chain, Tom made
 7   changes and gave those changes to me.  I don't
 8   recall getting those changes from Tom.  So it
 9   seems like Tom is referring to changes that he
10   made in -- at this 3:18 email that he gave to
11   me on September 8.
12       Q.  Now, there's a reference to,
13   quote-unquote, "dog meat voting" territory.
14          Do you recall -- do you see that?
15       A.  Yes.
16       Q.  Do you have any understanding of what
17   that means, dog meat voting?
18              MR. SHEEHY:  Objection to form.
19       A.  He calls it awful voting territory in
20   the next sentence, so that's what I'm --
21       Q.  What does awful voting territory
22   mean?
23              MR. SHEEHY:  Objection to form.
24       A.  I can only assume Tom meant by that
25   that it was not a friendly area to Republicans.
```

Page 407

```
 1              A. Kincaid - CONFIDENTIAL
 2       Q.  So heavily Democratic area?
 3       A.  That seems --
 4              MR. SHEEHY:  Objection to form.
 5       A.  That seems likely.
 6       Q.  Is it your understanding that
 7   downtown Columbus was a heavily Democratic
 8   area?
 9              MR. SHEEHY:  Objection to form.
10       A.  Yes.
11       Q.  So the dog meat voting territory was
12   heavily Democratic territory; is that right?
13              MR. SHEEHY:  Objection to form?
14       A.  Based off of these two sentences
15   here, I assume that's what he's saying.
16       Q.  Looking at the September 82011 email
17   at 3:42 p.m., again going later in the
18   afternoon.
19       A.  Okay.
20       Q.  Again, Dr. Hofeller to Mr. Braden.
21   Would you please read that short paragraph?
22       A.  Okay.
23       Q.  Then it says:  "Adam is changing the
24   NE-including the Black district."
25          Do you see that?
```

Page 408

```
 1              A. Kincaid - CONFIDENTIAL
 2       A.  I do.
 3       Q.  Okay.  Do you recall any changes you
 4   were making in northeast Ohio --
 5              MR. SHEEHY:  Objection to form.
 6       Q.  -- around that time?
 7              MR. SHEEHY:  Objection to form.
 8       A.  Apart from what's laid out above, I
 9   don't have any other recollections about what
10   was being changed in northeast Ohio at that
11   time.
12       Q.  Was this district -- do you have an
13   understanding of what, quote-unquote, "the
14   Black district" was?
15       A.  That would have been Marsha Fudge's
16   district, which is 11.
17       Q.  Okay.  And it says:  "You are running
18   into some version control.  Maybe Adam should
19   have the controlling map, but you need to talk
20   with him directly about his changes in the NE."
21          Do you see that?
22       A.  I do.
23       Q.  Do you remember any discussions about
24   version control as you were working on the
25   proposed map?
```

Page 409

```
 1              A. Kincaid - CONFIDENTIAL
 2              MR. SHEEHY:  Objection to form.
 3       A.  No, I don't recall any conversations
 4   about version control.
 5       Q.  You had a version of the map; right?
 6              MR. SHEEHY:  Objection to form.
 7       A.  Yes, definitely I had a version of
 8   the map.
 9       Q.  Did anybody else?
10       A.  It seemed like Tom had a version of
11   the map.  Ray and Heather would have had a
12   version of the map.  Since we were all working
13   separately and collaboratively, we would have
14   had different iterations of maps.
15              MR. FRAM:  I want to mark next as
16   48 an email string with Bates number
17   REV_00023184.
18       (Exhibit No. 48 was marked for
19   identification.)
20   BY MR. FRAM:
21       Q.  Turning to the second email in the
22   chain, Friday, September 9, 2011 at 1:06 p.m.
23   do you see that?
24       A.  I do.
25       Q.  Is that an email that you sent to
```

Page 410

1        A. Kincaid - CONFIDENTIAL
2    Mr. Braden, Mr. -- and Mr. Whatman on
3    September 9, 2011?
4        A.  Yes.
5        Q.  And you say right above it -- you see
6    there Mr. Braden's forwarding it to
7    Dr. Hofeller.
8            Do you see that?
9        A.  I do see that.
10       Q.  Okay.  And that's at 5:24 p.m.  Do
11   you see it?
12       A.  I do.
13       Q.  Did you know that Mr. Braden was
14   forwarding your emails to Dr. Hofeller?
15       A.  I didn't know that, no.
16       Q.  Now, in your email it says that
17   you're attaching certain documents.
18           Do you see that?
19       A.  Yes.
20       Q.  And you're indicating that for
21   District 11, which you just testified before,
22   that the NHBVAP has now been adjusted.
23           Do you see that?
24       A.  Yes.
25       Q.  That stands for non-Hispanic Black

Page 411

1        A. Kincaid - CONFIDENTIAL
2    voting age population; is that right?
3        A.  That's correct.
4        Q.  And in the -- the day before, in the
5    September 8 email, Dr. Hofeller is telling
6    Mr. Braden that you're going to be adjusting
7    the Black district.
8            Do you see that?
9        A.  I see that.
10       Q.  Okay.  And then he -- you see in the
11   subsequent emails in Exhibit 47 there's a
12   question as to whether or not you'd be
13   increasing the Black voting age population in
14   District 11.
15           Do you see that?
16       A.  Yes.
17       Q.  And, in fact, just looking now at
18   Exhibit 48, does it refresh your recollection
19   that, in fact, you did increase the Black
20   voting age population in District 11 moving it
21   up from about 50.04 up to 50.90?
22       A.  I see that.
23           MR. SHEEHY:  Objection to form.
24       Q.  Okay.  Do you recall doing that?
25       A.  Yeah.

Page 412

1        A. Kincaid - CONFIDENTIAL
2        Q.  Okay.  And do you recall doing that
3    at Dr. Hofeller's request?
4        A.  No, it was --
5            MR. SHEEHY:  Objection to form.
6        A.  -- definitely not at Tom Hofeller's
7    request.
8        Q.  Was that at Mr. Braden's request?
9            MR. SHEEHY:  Objection to form.
10       A.  No.  This was -- this change was
11   made -- I didn't talk to Mark.  Mark had
12   advised Whatman, I believe, he was concerned
13   about some issues and so Tom had asked -- Tom
14   Whatman had asked me to make those changes.
15       Q.  Okay.  So you did it at Tom Whatman's
16   request?
17       A.  I did it at Mark Braden's request via
18   Tom Whatman.
19       Q.  Okay.
20       A.  It was definitely not Hofeller.
21           MR. FRAM:  Now looking at -- let's
22   mark next as 49 the metadata for
23   Exhibit 48.  We will mark it as 49.
24   (Exhibit No. 49 was marked for
25   identification.)

Page 413

1        A. Kincaid - CONFIDENTIAL
2    BY MR. FRAM:
3        Q.  Drawing your attention to the bottom
4    of the document, it appears to have attachments
5    that are listed there in the metadata.  Do you
6    see that?  It says source/attached, and then
7    it's got a bunch of REV numbers.
8            Do you see that?
9        A.  Yes.
10       Q.  Okay.  Those numbers, those REV
11   numbers, I believe those numbers were put on
12   by -- did you put those numbers, REV, an
13   abbreviation you used or is that something
14   your --
15       A.  I don't know what --
16       Q.  -- counsel put on?
17       A.  -- that refers to.
18       Q.  I'll state for the record these are
19   numbers that we received with the documents and
20   they were produced by your counsel so I don't
21   know who put them on, you or your counsel.
22   Those numbers line up with them, and I'll show
23   you one of them right now, in fact.  So you see
24   the reference to REV_00023188 and those
25   attachments?

Page 414

1           A. Kincaid - CONFIDENTIAL
2        A.  Uh-huh.
3        (Exhibit No. 50 was marked for
4        identification.)
5    BY MR. FRAM:
6        Q.  Please take a look at Exhibit 50.
7    This is a document you created?
8        A.  It looks like all the other changes
9    sheets.
10       Q.  Right.  In fact, the number here,
11   00023188, does this refresh your recollection
12   that, in fact, this was attached on September 9
13   as the change sheet that you said you were
14   sending in your email?
15       A.  Which email?
16       Q.  In your email in Exhibit 48 you say
17   you're sending an updated changes spreadsheet.
18       Do you see that?
19       A.  Yes.
20       Q.  And the metadata for that email 48
21   includes 23188 as one of the attachments.
22       A.  Yes.
23       Q.  I'm just asking whether or not the
24   September 9 changes sheet, Exhibit 50, was, in
25   fact, the changes sheet you transmitted on or

Page 415

1           A. Kincaid - CONFIDENTIAL
2    about September 9, 2011.
3        A.  Seems to be.  You'll notice from
4    before, map as of September 9 lines up with the
5    header like I was talking about before with the
6    naming --
7        Q.  Right.
8        A.  -- which is why I was skeptical of
9    the other one.
10       Q.  I understand.  Now, this one
11   architecture, if you will, of this map looks
12   like what we had previously -- the document
13   this had the phrase "Franklin County sinkhole"
14   on it, which was Exhibit 8.
15       A.  New Idea, yeah.
16       Q.  BRADEN001387.
17       A.  Uh-huh.
18       Q.  If you can put those two together,
19   the Exhibit 50 and Exhibit 8.
20       A.  Exhibit 50 and?
21       Q.  8.
22       A.  8?  Okay.
23       Q.  They both have this new
24   District 10-Open at the bottom.
25       Do you see that?

Page 416

1           A. Kincaid - CONFIDENTIAL
2        A.  Yes.
3        Q.  And the PVI score for -- in each case
4    is D+16; is that right?
5        A.  Yes.
6        Q.  In Exhibit 50, the September 9 map,
7    if you look at the PVI scorings there and
8    compare that to the September 6 map, the
9    four-way split.
10       A.  Uh-huh.
11       Q.  Get that exhibit out.  That's
12   Exhibit 45.  Here we see certain Republican --
13   certain districts have increased Republican
14   strength, okay?  And in particular, Schmidt's
15   District 2 the PVI increased from 8 to 10.  Do
16   you see that?  Comparing 45 and 50.  You can
17   take your time.
18       A.  Again, this is two different -- they
19   didn't increase; these are two different
20   proposals that were existing simultaneously --
21       Q.  Okay.
22       A.  -- at the time of preparing them.
23       Q.  Fair enough.  If one compares the two
24   proposals as they existed contemporaneously,
25   simultaneously --

Page 417

1           A. Kincaid - CONFIDENTIAL
2        A.  Uh-huh.
3        Q.  -- the -- in what I'll call the
4    September 9 map, okay, which is Exhibit 50.
5        A.  Yes.
6        Q.  All right, CD 2, which is Schmidt's
7    district, the PVI had increased from R+8 to
8    R+10; is that right?
9        A.  I wouldn't say it increased; I'd say
10   they're different.
11       Q.  Okay.
12       A.  The one in --
13       Q.  Yeah.
14       A.  -- the September 9 map is 2 -- is 2
15   points higher than the September 6 map.
16       Q.  Fair enough.
17       A.  But I wouldn't say it increased,
18   because it's two different maps.
19       Q.  In Jordan's district, which is
20   District 4 has a higher Republican PVI score.
21   It's 7 in the September 9 map, Exhibit 50, and
22   it was 5 in Exhibit 45, the four-way split map;
23   is that right?
24       A.  Yes.  They're different, yeah.
25       Q.  It's different in the way I said?

Page 418

```
 1            A. Kincaid - CONFIDENTIAL
 2       A.  Uh-huh.
 3       Q.  Okay.  And Latta's district, which
 4   was district 5, the four-way split had an R+4
 5   and the September 9, Exhibit 50, has a R+7; is
 6   that right?
 7       A.  Yes.
 8       Q.  And gives -- also has a higher on
 9   Republican PVI score in the September 9 map
10   that's 5 -- R+5 while it was only R+4 in the
11   four-way split map; is that right?
12       A.  Yes.
13       Q.  And similarly, Tiberi's -- Tiberi's
14   now is -- in the September 9 map is an R+10
15   while it was only R+5 in the four-way split
16   map, Exhibit 45; is that right?
17       A.  Yes.
18       Q.  Okay.  And Stivers in the September 9
19   map, Exhibit 50, is an R+ -- let's see, 7 while
20   in the four-way split map, let's see, it was
21   R+5.  Do I have that right?  Stivers, yeah.
22       A.  It was R5 and R7.
23       Q.  Yeah, so it gets -- it's higher by 2
24   points.  Okay, and finally, in Turner's
25   district, that's interesting.  Turner had his
```

Page 419

```
 1            A. Kincaid - CONFIDENTIAL
 2   own district in the -- in Exhibit 45 that was
 3   old District 3.
 4       Do you see that?
 5       A.  I do.
 6       Q.  But in Exhibit 50, the September 9
 7   map now it's a Turner/Austria pairing district.
 8       Do you see that?
 9       A.  Uh-huh, I see that.
10       Q.  Although the -- that district now has
11   a R+6 rating; is that right?
12       A.  Yes.
13       Q.  Okay.  And previously, Turner --
14   Turner district -- the district Turner had was
15   R+4 is that right?  Okay.
16       So do you recall whether or not --
17   was this a third option that was under
18   consideration in this collaborative effort with
19   Mr. DiRossi and Ms. Mann, Mr. Whatman and
20   yourself around September 9?
21       A.  Third option?
22       Q.  Well --
23       A.  I'm still only tracking 2.
24       Q.  That's what I'm trying to understand.
25   We had the -- that September 2 or 3 map, which
```

Page 420

```
 1            A. Kincaid - CONFIDENTIAL
 2   was Exhibit -- let's go through the three
 3   different exhibits and see if that would be
 4   helpful to get it cleared up.  We have
 5   Exhibit 8.
 6       A.  Okay.
 7       Q.  The map -- the sheet that has the
 8   words "Franklin County sinkhole" on it.
 9       A.  Uh-huh, yes.
10       Q.  I believe we dated it around
11   September 2 or 3.  And then we have the --
12   simultaneously, we have the consideration the
13   four-way split, Exhibit 45, which we dated on
14   or about September 6.
15       A.  Okay.
16       Q.  And then we've got the September 9
17   map, Exhibit 50.
18       A.  Okay.
19       Q.  I'm trying to understand whether
20   there are three different options on the table
21   or two at the same time.
22       MR. SHEEHY:  Objection to form.
23       A.  Well, you said this is September 3.
24       Q.  That's when it seems to have been
25   transmitted.  Could have been September 2 but
```

Page 421

```
 1            A. Kincaid - CONFIDENTIAL
 2   no later than September 3.
 3       A.  I mean, this is -- the new map as of
 4   September 9 is clearly an iteration of what had
 5   been -- what I called New Idea that, you know,
 6   it has "Franklin County sinkhole" on here so
 7   there's still only -- there's only two.
 8       Q.  So there's two basic architectures,
 9   one that has the new district around Franklin
10   County and the other's the four-way split for
11   Franklin County?  Is that what you mean?
12       A.  Those would be the two maps that were
13   under consideration.
14       Q.  Okay.  So Exhibit 8 and Exhibit 50
15   are basically two different iterations of the
16   same basic idea.  There may be some details
17   that are different.
18       A.  Exhibit 8 is an earlier iteration of
19   Exhibit 50.
20       Q.  Understood.  Okay.  We will just call
21   that model, you haven't used the word, but the
22   new Franklin County district approach.
23       A.  It's new map as of September 9 is
24   what I would call it.
25       Q.  Oh, okay.  But that approach -- the
```

44 (Pages 418 to 421)

Page 422

1      A. Kincaid - CONFIDENTIAL
2  reason why it's just an iteration of Exhibit 8
3  is because they both are based upon having a
4  new district in Franklin County.
5      MR. SHEEHY: Objection to form.
6      A.  The architecture of new map is one
7  that creates a new Democrat seat in Franklin
8  County, yes.
9      Q.  Thank you.
10     (Recess taken.)
11     MR. FRAM:  So I'll mark next the
12 document with -- so as 51 a document
13 with Bates number REV_0023185.
14     (Exhibit No. 51 was marked for
15 identification.)
16     MR. FRAM:  While we're at it, the
17 metadata on it is marked 52.
18     (Exhibit No. 52 was marked for
19 identification.)
20 BY MR. FRAM:
21     Q.  I'd ask you to turn back to
22 Exhibit 49, which is the metadata on your
23 September 9 email.  You see where it says
24 attachments?  We already talked about 23184.
25 The next one down is 23185.

Page 423

1      A. Kincaid - CONFIDENTIAL
2      Q.  Do you see that?
3      A.  Yes.
4      Q.  And in the email itself you talk
5  about providing screenshots of major -- of the
6  major counties in question.
7      Do you see that?
8      A.  Yes.
9      Q.  And does 51, a colored map here,
10 appear to be a screenshot of Lucas County in
11 District 9?
12     A.  Yes.
13     Q.  And do you recall sending this to
14 Mr. Braden and Mr. Whatman on or around
15 September 9, 2011?
16     MR. SHEEHY:  Objection to form.
17     A.  I don't recall attaching this
18 document to an email and sending it, but I
19 recall the email overall.  I recall sending the
20 email to Tom and Mark at the time.
21     Q.  You recall saying were you going to
22 send -- you were sending them, saying there
23 were major counties in question.
24     Do you see that?
25     A.  Yeah, I see.  I'm not disagreeing.

Page 424

1      A. Kincaid - CONFIDENTIAL
2      Q.  You have no reason to think you
3  didn't send it.
4      A.  Yes.
5      Q.  You have no reason to think this was
6  not one of the attachments.
7      A.  No, I have no reason to think it's
8  not one of the attachments.
9      Q.  And my question for you is -- oh,
10 hold on a second.  In Exhibit 52 on the
11 metadata, you see there's a file name 9-9 Ohio
12 Map - Lucas County.jpg?
13     A.  Yes.
14     Q.  Would that be consistent with your
15 filing, your naming convention for a JPG
16 document?
17     A.  Yeah, it would be consistent with my
18 naming conventions.
19     Q.  You see in the metadata for
20 Exhibit 51 it indicates creation -- a date
21 modified and a date created of September 9,
22 2011?
23     Do you see that?
24     A.  Yes.
25     Q.  And that's the same date as your

Page 425

1      A. Kincaid - CONFIDENTIAL
2  email saying you're sending -- attaching
3  screenshots of major counties?
4      Do you see that?
5      A.  Uh-huh, yes.
6      Q.  Do you have any recollection as to
7  whether Lucas County was a major county?
8      MR. SHEEHY:  Objection to form.
9      Q.  Well, let me back up.  Do you have
10 any recollection what the phrase "major county"
11 meant in your email?
12     MR. SHEEHY:  Objection to form.
13     A.  I'd have to see the list of -- or, I
14 mean, I -- I'm assuming you have all of these
15 documents, so I -- yeah, I'm pretty sure I know
16 what major counties mean.
17     Q.  Okay.  What does it mean?
18     A.  It would mean the larger counties in
19 the state.
20     Q.  We will go through it.  I was going
21 to go through them one by one.  To keep the
22 record clear, let's talk about Lucas now.
23     A.  All right.
24     Q.  Do you have any recollection of why
25 Lucas was included on the list?

Page 426

1      A. Kincaid - CONFIDENTIAL
2      A.  It's a major county. It's one of the
3  larger counties in the state.
4      Q.  Just because it's larger?  Okay.
5      (Exhibit No. 53 was marked for
6      identification.)
7  BY MR. FRAM:
8      Q.  This is REV_00023186.  Again you can
9  see this is referenced as one of the
10  attachments in Exhibit 49, the metadata to your
11  September 9 email.
12      A.  Yes, I see that.
13      MR. FRAM:  Why don't we mark as
14      Exhibit 54 metadata for Exhibit 53.
15      (Exhibit No. 54 was marked for
16      identification.)
17  BY MR. FRAM:
18      Q.  And then under file name, it says 9-9
19  0hio map - Stark County.jpg on Exhibit 54?
20      A.  Yes.
21      Q.  Is that consistent with your naming
22  convention?
23      A.  Yes.
24      Q.  And does this show a -- this is a map
25  that includes -- let me ask you a question.

Page 427

1      A. Kincaid - CONFIDENTIAL
2  Which county's depicted on this one?  Is that
3  Stark County?
4      A.  The label says Stark County, yeah.
5  It's the city of Canton.
6      Q.  Right.  And Stark County was split up
7  between three districts?
8      A.  Yes, I see these three districts.
9      Q.  Do you recall conversations with
10  anyone about splitting up Stark County?
11      MR. SHEEHY:  Objection to form.
12      A.  Can you be more specific?
13      Q.  Let me ask you first, this was a map
14  you generated; correct?
15      A.  Yes.
16      Q.  Okay.  And when you generated it, one
17  of the things that happened was Stark County is
18  split between different districts.  I think
19  it's 7, 16 and 13.  Is that right?
20      A.  That seems to be the case, yes.
21      Q.  Do you recall any communications with
22  anyone at any time about splitting Stark County
23  between Districts 7, 13, and 16?
24      MR. SHEEHY:  Objection to form.
25      A.  The only specific conversation I

Page 428

1      A. Kincaid - CONFIDENTIAL
2  remember is the one that -- the one reflected
3  in the email chain that is not reflected in
4  this map regarding the headquarters, which was
5  in Stark County.  Apart from that, I don't have
6  any recollection about a specific conversation
7  regarding Stark County, splitting or otherwise.
8      MR. FRAM:  Okay, why don't we have
9      marked next as Exhibit 55 a map that's
10      REV_00023187 and its metadata.  So the
11      map will be 55 and then the metadata
12      will be 56.
13      (Exhibit No. 55 was marked for
14      identification.)
15      (Exhibit No. 56 was marked for
16      identification.)
17      MR. FRAM:  On 55, REV_00023187 is
18      the Bates number.
19  BY MR. FRAM:
20      Q.  Now, this looks like a map of Summit
21  County.  Do I have that right?
22      A.  Yes.
23      Q.  Do you recall any -- so we are clear,
24  the naming convention on this is the metadata
25  9-9 Ohio Map Summit County.jpg is consistent

Page 429

1      A. Kincaid - CONFIDENTIAL
2  with your naming convention; correct?
3      A.  Yes.
4      Q.  Do you have any reason to doubt that
5  Exhibit 55 was one of the major counties that
6  you transmitted on or about September 9 as an
7  attachment to Exhibit 48?
8      A.  No.
9      Q.  I forgot to ask that question.  It's
10  the same answer as regarding Exhibit 53?
11      A.  I don't have any doubt that was one
12  of the maps, if that's what you're asking.
13      Q.  That's what I'm asking.
14      A.  Yeah.
15      Q.  Thank you.
16      Do you recall any conversations with
17  anyone about the map about Summit County, the
18  map in 55?
19      MR. SHEEHY:  Objection to form.
20      A.  The question's kind of vague.
21      Q.  Let me see if I can do better.  You
22  recall sending the major counties to Mr. Braden
23  and Mr. Whatman on or about September 9. I'm
24  just asking whether or not after they got them
25  you recall any conversations about the maps you

Page 430

1             A. Kincaid - CONFIDENTIAL
2     sent.
3             A.  Oh.
4             MR. SHEEHY:  Objection to form.
5             A.  No, I don't think there was any
6     conversation after I sent this to Mark and Tom.
7             Q.  Any emails about them?
8             A.  Not that I recall, no.
9             MR. FRAM:  Okay, let's mark as 57 a
10    map with REV_23190, a map of Hamilton
11    County.
12    (Exhibit No. 57 was marked for
13    identification.)
14            MR. FRAM:  And its metadata will
15    make 58.
16    (Exhibit No. 58 was marked for
17    identification.)
18    BY MR. FRAM:
19            Q.  What we see here is Hamilton County
20    with a little bit of Warren County up in the
21    right.  Do you see that on 57?
22            A.  Yes.
23            Q.  And I don't know if it's pink or
24    orange, light red.  It is all District 1.  Do
25    you see that?

Page 431

1             A. Kincaid - CONFIDENTIAL
2             A.  Yes.
3             Q.  And all the blue's in District 2 and
4     1 was Chabot and 2 was Schmidt; right?
5             A.  That's correct.
6             Q.  You see Warren County is now included
7     in District 1.  Do you see that?
8             A.  Yes, it's included in District 1.
9             Q.  Do you recall any conversations with
10    anybody about that fact, that Warren County was
11    now going to be included in District 1?
12            MR. SHEEHY:  Objection to form.
13            A.  Anybody?
14            Q.  Anybody.  Ever talk to anybody about
15    it?
16            A.  I would have told --
17            MR. SHEEHY:  Objection to form.
18            A.  I would have told Congressman Chabot
19    that Warren County was in his district.
20            Q.  Did you ever talk with Mr. Whatman
21    about it?
22            MR. SHEEHY:  Objection to form.
23            A.  I don't have a specific memory of
24    talking to Mr. Whatman about it.
25            Q.  Any communication of any kind?

Page 432

1             A. Kincaid - CONFIDENTIAL
2             MR. SHEEHY:  Objection to form.
3             Q.  Any specific memory of it whether it
4     was in a meeting, whether it was a subject, an
5     idea?
6             MR. SHEEHY:  Objection to form.
7             A.  I recall telling Mr. Chabot that
8     Warren County was going to be in his district.
9     But we went through, as we talked about before,
10    going through the contours of their seats.
11    Apart from that, I have no memory of a
12    conversation about Warren County.
13            Q.  Do you recall whose idea -- this
14    was -- you generated this map, Exhibit 57;
15    right?
16            A.  Yes.
17            Q.  Do you have any reason to doubt that
18    this was not one of the major county maps you
19    transmitted on or around September 9, 2011 --
20            MR. SHEEHY:  Objection to form.
21            Q.  -- that's referenced in Exhibit 48?
22            A.  No.
23            Q.  No reason to doubt it?
24            A.  Huh-uh.
25            Q.  Okay.  Do you have any recollection

Page 433

1             A. Kincaid - CONFIDENTIAL
2     as to whose idea it was to include Warren
3     County in District 1?
4             MR. SHEEHY:  Objection to form.
5             A.  No.
6             Q.  Was that going back to July plans
7     that you were doing?  Was Warren County always
8     part of the plan --
9             MR. SHEEHY:  Objection to form.
10            Q.  -- for District 1?
11            A.  I don't recall if it was always part
12    of the plan or not.
13            Q.  Do you know in this collaboration
14    from yourself and Mr. DiRossi and Ms. Mann or
15    Mr. Whatman where this idea generated,
16    including Warren County in District 1?
17            MR. SHEEHY:  Objection to form.
18            A.  I don't recall where the origin of
19    that idea came from.
20            Q.  And you were always -- the maps you
21    drew regarding District 1, they had Warren
22    County as part of District 1; is that right?
23            MR. SHEEHY:  Objection to form.
24            A.  I couldn't tell you that every
25    iteration of every map I drew had Warren County

Page 434

1          A. Kincaid - CONFIDENTIAL
2  in District 1, because I don't remember, but
3  this map had Warren County in District 1.
4          Q.  Do you recall any iterations of
5  District 1 you drew that did not have Warren
6  County as part of District 1?
7          MR. SHEEHY:  Objection to form.
8          A.  I don't remember every iteration of
9  every map I drew.
10         Q.  Okay.  Of the ones you remember, do
11 you remember any that did not have Warren
12 County in District 1?
13         MR. SHEEHY:  Objection to form.
14         A.  I don't have a specific memory of a
15 draft of the map that didn't have Warren County
16 as part of District 1, so --
17         Q.  In fact, if we look at your various
18 changes sheets, they all show an increase in
19 Republican strength in District 1 from the
20 preexisting map; isn't that the case?
21         A.  I'd have to look at it.
22         Q.  We have them right here so we can go
23 back to them.  So let's see, exhibits 8, 45,
24 and 50, okay?  So just look at District 1 and
25 start with 8 in order.

Page 435

1          A. Kincaid - CONFIDENTIAL
2          So for 8, you got -- for District 1,
3  you see on the far right you see PVI and on the
4  far, far right you see the number 7?
5          A.  Yes.
6          Q.  And that's the increase in Republican
7  voting strength in District 1 as compared to
8  the pre-redistricting map where it had been a
9  D+1.  Do you see that?
10         A.  Yes.
11         Q.  Now it can be an R+6 under this
12 proposal.  Do you see that?
13         A.  I see that.
14         Q.  This is the -- Exhibit 8, of course,
15 is the changes sheet that has the words
16 "Franklin County sinkhole" on it.
17         Was one of the reasons for the
18 increased Republican strength in District 1 the
19 inclusion of Warren County in District 1 under
20 the proposal?
21         MR. SHEEHY:  Objection, form.
22         A.  It would have been one of the
23 reasons.
24         Q.  Would another reason be not including
25 certain portions of Cincinnati in District 1

Page 436

1          A. Kincaid - CONFIDENTIAL
2  instead of putting them into District 2?
3          MR. SHEEHY:  Objection to form.
4          A.  Yes.
5          Q.  So take those two factors together,
6  less Democratic votes in Cincinnati on the one
7  hand and more Republican votes in Warren County
8  together resulted in increased Republican
9  strength for District 1; is that right?
10         MR. SHEEHY:  Objection to form.
11         A.  I have to look at the old map of
12 District 1 to be able to tell you specifically
13 what did or did not change, yeah, the district
14 from D+1 to R+6.
15         Q.  One thing that did happen was Warren
16 County got added.
17         A.  Between the old map and the new map,
18 yes.
19         Q.  And that added Republicans to
20 District 1; is that right?
21         MR. SHEEHY:  Objection to form.
22         A.  It did.
23         Q.  Now if we look at Exhibit 45, the
24 four-way split, on the changes sheet,
25 Exhibit 45 --

Page 437

1          A. Kincaid - CONFIDENTIAL
2          A.  Uh-huh.
3          Q.  -- once again, the same -- same PVI
4  doesn't change.  You got R+6 with a delta of 7.
5  Do you see that?
6          A.  Yes.
7          Q.  And it's the same reason that you got
8  Warren County adding Republicans into the
9  district and you've got a certain amount of
10 Democrats carved out of Cincinnati?
11         MR. SHEEHY:  Objection to form.
12         A.  I'd have to see a close-up of the map
13 for this one to be specific about what made
14 that PVI go up 7 points.
15         Q.  Part of it was adding Warren County;
16 is that right?
17         MR. SHEEHY:  Objection to form.
18         A.  Let's see if we have any pictures of
19 this four-way split anywhere.
20         Q.  Maybe we can make this easy.  If you
21 look at Exhibits 48, 45, and 50 --
22         A.  Uh-huh.
23         Q.  -- and you look at just District 1 --
24         A.  Okay.
25         Q.  -- PVI's the same for all three.

1         A. Kincaid - CONFIDENTIAL
2      A.   Okay.
3      Q.   It's R+6 with an increase of 7 points
4    for Republicans for all three.
5      A.   I see that.
6      Q.   So what do you remember about what
7    increased Republican strength in -- for all
8    these options, for CD 1 for all the options
9    Republican strength goes up 7 points under PVI.
10     A.   Okay.
11     Q.   So I'm just asking what you remember
12   about why that happened.
13        MR. SHEEHY:  Objection to form.
14     A.   I mean, from map to map, iteration to
15   iteration, it's hard to remember every
16   single --
17     Q.   Yeah.
18     A.   -- county arrangement or --
19     Q.   Uh-huh.
20     A.   -- and precinct arrangement for every
21   single --
22     Q.   Right.
23     A.   -- iteration of every map, so -- and
24   I don't have a picture of it.  It's harder to
25   tell you much more than it went up 7 points.

1         A. Kincaid - CONFIDENTIAL
2    For the map that's reflected in 57, Warren
3    County's clearly part of District 1.
4      Q.   Right.  So it includes -- for all
5    three of them, do you have any -- before, you
6    said as far as -- you can't recall any maps
7    where Warren County was not in CD 1, so I was
8    just going to ask you, for all three wasn't one
9    of the reasons why Republican strength goes up
10   for CD 1 in all three iterations, all three
11   options, was because Republican votes for
12   Warren County were added?
13        MR. SHEEHY:  Objection to form.
14     A.   And again, Mr. Fram, the only thing
15   I'm saying is I don't recall the county makeup
16   for the four-way split so I can't say yes to
17   all of them unless I saw a map for the four-way
18   split.
19     Q.   Okay.  So putting aside the four-way
20   split for the other two, for the other two we
21   will talk about the version for 8 and 50,
22   Exhibits 8 and 50 --
23     A.   Okay.
24     Q.   -- the Franklin County sinkhole and
25   the new map as of September 9, those two

1         A. Kincaid - CONFIDENTIAL
2    exhibits.
3      A.   Okay.
4      Q.   Was the inclusion of Warren County a
5    reason why Republican strength increases in CD
6    1?
7      A.   Partly, yes.
8         MR. SHEEHY:  Objection to form.
9      A.   Partly, yes.
10        MR. FRAM:  Why don't we mark next
11   as 59 and 60.  59 will be a map,
12   REV_00023192.
13   (Exhibit No. 59 was marked for
14   identification.)
15        MR. FRAM:  And 60 will be the
16   metadata for that document.
17   (Exhibit No. 60 was marked for
18   identification.)
19   BY MR. FRAM:
20     Q.   Does this appear to be a county map
21   of Franklin County?  Do you see that?
22     A.   Yes.
23     Q.   Do you have any reason to doubt this
24   is included in your September 9 email that was
25   Exhibit 48?

1         A. Kincaid - CONFIDENTIAL
2      A.   No.
3      Q.   Okay.  And looking at the 9-9 Ohio
4    Map Franklin County.jpg under the file name in
5    the metadata, that's consistent with your
6    naming convention, is it not?
7      A.   Yes, it is.
8      Q.   The created date's also September 9,
9    2011.
10        Do you see that?
11     A.   Yes.
12     Q.   Okay.  Is this a depiction of how
13   Franklin County would be divided up in -- for
14   the proposed new CD 10, new district?
15        MR. SHEEHY:  Objection to form.
16     A.   This is how Franklin County was laid
17   out as per the map that was sent over to Tom
18   and Mark.
19     Q.   That you sent over?
20     A.   Yes.
21     Q.   And I see there's certain areas that
22   are in CD 10 but certain are in 15.  For
23   example, you see Valleyview is in CD 15.
24        Do you see that?
25     A.   Okay.

Page 442

```
1        A. Kincaid - CONFIDENTIAL
2    Q.  But Grandview Heights is in CD 10.
3        Do you see that?
4    A.  Yes.
5    Q.  Was Grandview Heights part of the
6  downtown area --
7        MR. SHEEHY:  Objection to form.
8    Q.  -- in Columbus?
9        MR. SHEEHY:  Objection to form.
10   A.  From what I remember, Grandview
11 Heights is a bit north of downtown.
12   Q.  What about Valleyview?
13       MR. SHEEHY:  Objection to form.
14   A.  That would be west of downtown.
15   Q.  West of downtown?  What about this
16 portion that goes all the way in to the right
17 at sort of like -- it's over to the east of
18 where the word "Valleyview" appears.
19       Do you see that?
20   A.  Yes.
21   Q.  Is that getting closer to downtown or
22 not yet?
23       MR. SHEEHY:  Objection to form.
24   A.  From what I recall, that's mostly the
25 downtown area, yes.
```

Page 443

```
1        A. Kincaid - CONFIDENTIAL
2    Q.  And at this particular point that was
3  included in CD 15; is that right?
4    A.  That appears to be the case.
5    Q.  Okay.  And then the rest of downtown
6  goes into CD 10; is that right?
7    A.  I don't have a map here that shows me
8  the definition of what downtown is.
9    Q.  So you don't know?
10   A.  I know parts of downtown were south
11 of the river that runs through Columbus, and
12 that would be the downtown proper area.  So I
13 couldn't tell you if all of downtown is in 15
14 or if it's split between 15 and 10.
15   Q.  All right.  Do you recall any
16 conversation with anybody about how much of
17 downtown to include in 15 and how much to
18 include in 10?
19       MR. SHEEHY:  Objection to form.
20   A.  Not in regards to how much, no.
21   Q.  Whether to have it at all?
22       MR. SHEEHY:  Objection to form.
23   A.  I don't recall that conversation
24 either.
25   Q.  Do you recall any conversation as to
```

Page 444

```
1        A. Kincaid - CONFIDENTIAL
2  why Valleyview should be in 15?
3        MR. SHEEHY:  Objection to form.
4    A.  I don't recall any conversation
5  regarding Valleyview.
6    Q.  Do you recall any conversation
7  regarding Lincoln Village?
8        MR. SHEEHY:  Objection to form.
9    A.  I do not.
10   Q.  Any conversation regarding Grandview
11 Heights?
12       MR. SHEEHY:  Objection to form.
13   A.  I do not.
14   Q.  Do you have any explanation -- you
15 can see that there's a piece of Franklin County
16 that's cut out, sort of like this red part that
17 goes from Lincoln Village to Lincoln View and
18 then to the east.
19       Do you see that?
20   A.  Yes, I see that.
21   Q.  Do you have any reason as to why that
22 piece was cut out that way?
23       MR. SHEEHY:  Objection to form.
24   A.  No, I don't remember why that was
25 done.
```

Page 445

```
1        A. Kincaid - CONFIDENTIAL
2    Q.  Do you recall whether or not the
3  piece that's cut out, Lincoln Village and
4  Valleyview, are Republican or Democrat leaning?
5        Do you recall?
6        MR. SHEEHY:  Objection to form.
7    A.  I'd have to see a map with political
8  data to tell you for sure.  I don't recall.
9    Q.  At the time did you have that
10 political data?  At the time you drew the map?
11       MR. SHEEHY:  Objection to form.
12   A.  I believe we've already established I
13 had political data when the map was being
14 developed.
15   Q.  You had it for those particular
16 geographies?
17   A.  I had it for the state of Ohio.
18   Q.  Including those geographies?
19   A.  Yes.
20   Q.  What about Upper Arlington?
21       Do you see there's a piece of the
22 district that's Franklin County that looks like
23 Upper Arlington's not included in this version?
24 Do you recall any conversation about Upper
25 Arlington?
```

50 (Pages 442 to 445)

Page 446

```
1              A. Kincaid - CONFIDENTIAL
2         MR. SHEEHY:  Objection to form.
3         A.  Only what we went through a few
4   minutes ago, what Mr. Stivers said about his
5   new house was in Upper Arlington.  That's the
6   only conversation I recall about Upper
7   Arlington.
8         Q.  What about Hillard?
9         A.  I don't recall any specific
10  conversations about Hilliard.
11        Q.  Hilliard, I'm sorry.  What about
12  Urbancrest?
13        MR. SHEEHY:  Objection to form.
14        A.  I don't recall any conversations
15  about Urbancrest.
16        Q.  Looking at it, there are a lot of
17  other geographies identified here.  I'll go
18  through each one if you want.  Blacklick
19  Estates I'm actually curious about.  Any
20  conversations about Blacklick Estates?
21        MR. SHEEHY:  Objection to form.
22        Q.  When I say conversations I mean
23  emails, communications of any kind.  Does that
24  change your answers?
25        A.  It would change none of my answers
```

Page 447

```
1              A. Kincaid - CONFIDENTIAL
2   because I don't remember having any
3   conversations about any specific geographies in
4   Franklin County apart from Upper Arlington
5   because that was where Mr. Stivers's new house
6   was.  Apart from that, I don't recall any other
7   specific conversations.
8         Q.  In A previous iteration of the
9   division between CD 15 and CD 10, had you
10  included Grandview Heights in CD 15?
11        MR. SHEEHY:  Objection to form.
12        A.  I don't recall.
13        Q.  Had you included Valleyview -- strike
14  that.
15        Okay.  Do you recall any
16  conversations about this map with anyone at any
17  time?
18        MR. SHEEHY:  Objection to form.
19        Q.  After you sent it on September 9, I'm
20  curious if anybody talked to you about it.
21        A.  Like I said before, after I sent this
22  to Mark Braden and Tom Whatman, I don't recall
23  any further conversations about this draft of
24  the map.
25        Q.  Okay.  Did anybody at any time say
```

Page 448

```
1              A. Kincaid - CONFIDENTIAL
2   that the way the proposed Franklin County
3   district was drafted was insufficiently
4   compact?
5         MR. SHEEHY:  Objection to form.
6         A.  Not to my recollection.
7         Q.  Do you recall anybody asking why the
8   shape had so many different -- well, was jagged
9   in so many different directions?  Anybody ever
10  ask you that question?
11        MR. SHEEHY:  Objection to form.
12        A.  Not in that specific form, no.
13        Q.  In any form, like something like
14  that, like --
15        MR. SHEEHY:  Objection to form.
16        A.  Whatman and I had a couple
17  conversations about the fact that Ohio has
18  noncontiguous municipalities, which means that
19  a city can have multiple pieces in multiple
20  places, and how there are a lot of irregular
21  borders in municipalities throughout the state
22  of Ohio, especially in Franklin County.  And so
23  some of those little odd nooks and crannies
24  that are along the border of 10 and 15 and 12
25  and 10 are because of the fact that -- like the
```

Page 449

```
1              A. Kincaid - CONFIDENTIAL
2   Blacklick Estates boundary or Valleyview or
3   whatever it might be, there were little nooks
4   and things.
5         And in order to unite some of those,
6   you had to use zero population blocks to keep
7   those -- some of those municipal boundaries the
8   way they are.  That's why you see some of those
9   chunks in there, those dotted lines inside the
10  shading in 10.  In some cases that's because
11  there are noncontiguous municipal boundaries or
12  unincorporated areas within there.  So Tom and
13  I did have a couple conversations about that.
14        Q.  Did you ever consider including
15  Blacklick Estates within the new proposed CD
16  10?
17        A.  I don't recall.
18        Q.  Do you recall just as a simple
19  solution to the nooks and crannies, as you
20  described it, just including Valleyview in the
21  new CD 10?
22        MR. SHEEHY:  Objection to form.
23        A.  That wouldn't have resolved that
24  issue, but no, I don't recall a specific
25  conversation about including or not including
```

Page 450

1          A. Kincaid - CONFIDENTIAL
2    Valleyview in the district.
3          Q.  What about Lincoln Village?
4          MR. SHEEHY:  Objection to form.
5          A.  My answer's going to be the same for
6    all of them.  I don't recall having any
7    conversations about any of these municipalities
8    apart from what I just told you about the
9    boundaries being irregular and Upper Arlington
10   with Mr. Stivers.  Those are the only
11   conversations I remember about Franklin County.
12         Q.  I was just asking whether as an
13   option to having the nooks and crannies
14   approach, you'd just consider including an
15   entire municipality within CD 10 as another
16   alternative to nooks and crannies.
17         A.  It wasn't -- I wasn't saying it as
18   anything other than a fact that Tom and I had
19   talked about, that that's why some of those
20   lines existed the way they did.
21         Q.  Did partisan leanings of different
22   municipalities play any role in your deciding
23   which ones to include in the proposed CD 10 or
24   not?
25         MR. SHEEHY:  Objection to form.

Page 451

1          A. Kincaid - CONFIDENTIAL
2          A.  While I was looking at Franklin
3    County I would have had political data
4    available, and that would have been part of the
5    consideration, yes.
6          MR. FRAM:  We'll go next to 61.  61
7    is a map, Bates number REV_00023191.
8    (Exhibit No. 61 was marked for
9    identification.)
10         MR. FRAM:  Then 62 will be the
11   metadata for that one.
12   (Exhibit No. 62 was marked for
13   identification.)
14   BY MR. FRAM:
15         Q.  The metadata is another one of the
16   attachments to the email, Exhibit 48,
17   REV_00023184, also with a creation date of
18   September 9, 2011, the date of the email.  Just
19   ask you, is that 9-9 Ohio Map-Cuyahoga
20   County.jpg consistent with your naming
21   conventions?
22         A.  Yes.
23         Q.  Do you have any reason to doubt this
24   is one of the maps you included as an
25   attachment to your September 9 email,

Page 452

1          A. Kincaid - CONFIDENTIAL
2    Exhibit 48?
3          A.  No.
4          Q.  This appears to be a county map for
5    Cuyahoga County; is that right?
6          A.  Yes.
7          Q.  Do you see under District 11, do you
8    see -- how it goes down from -- goes from
9    north to south down from Cleveland down
10   through -- all the way down to Richfield?
11         Do you see that?
12         A.  Yes.
13         Q.  Do you recall any -- whose idea it
14   was to draw the map that way?
15         MR. SHEEHY:  Objection to form.
16         A.  Could you be more specific?
17         Q.  Do you recall whose idea it was?  Did
18   you get the suggestion to have that long
19   north-south corridor in District 11?
20         MR. SHEEHY:  Objection to form.
21         A.  It's my understanding from
22   Mr. Latourette that Congresswoman Fudge wanted
23   her district to run from Cleveland to Akron.
24         Q.  You were not in that conversation
25   with Congressperson Fudge; true?

Page 453

1          A. Kincaid - CONFIDENTIAL
2          A.  I was not in that conversation.
3          Q.  It's just based on what Mr. Whatman
4    told you; is that right?
5          A.  I didn't say that.
6          Q.  I'm sorry.  Who was it based on?
7          A.  Mr. Latourette.
8          Q.  Latourette.  I'm sorry.
9    Mr Latourette.  Apologize.  He told you that --
10   did he say he heard that directly from
11   Congressperson Fudge or from somebody else?
12   Did he tell you the source?
13         A.  From what I recall, he said
14   Congresswoman Fudge's district needs to go from
15   Cleveland to Akron, but she had made that
16   request.
17         Q.  He said that she had made the request
18   but did he tell you whether she made the
19   request to him or through some third party, or
20   you don't recall?
21         A.  I don't recall.
22         MR. FRAM:  Just to round it out
23   with 63.
24   (Exhibit No. 63 was marked for
25   identification.)

1          A. Kincaid - CONFIDENTIAL
2          MR. FRAM:  63 is a map of the state
3  of Ohio with all the districts on it,
4  REV_00023189.  And 64 is the metadata
5  for that one.
6      (Exhibit No. 64 was marked for
7      identification.)
8  BY MR. FRAM:
9      Q.  The metadata, again, this is one of
10 the attachments to the email, Exhibit 48, sent
11 on September 9.  The metadata has a create date
12 of September 9, 2011.  And the file name, if
13 you take a look at the file name in the
14 metadata, Ohio Congressional Map As Of 9-9.jpg.
15     Do you see that?
16     A.  Yes.
17     Q.  That's consistent with your naming
18 convention?
19     A.  Yes.
20     Q.  Do you have any reason to doubt that
21 this map wasn't sent as an attachment to your
22 email Exhibit 48?
23     A.  No.
24     Q.  As of September 9 I think you said
25 there's several different options around the

1          A. Kincaid - CONFIDENTIAL
2  table, but this one has the District 10, that
3  Franklin County that we just saw separately in
4  Exhibit 59.
5      Do you see that in the middle of
6  Exhibit 63?
7      A.  Yes.
8      Q.  Is this a rendering of the map for
9  which -- the map that corresponds to the
10 September 9 change sheet, Exhibit 50?  Take a
11 look at it.
12     A.  Yes.
13     Q.  Do you recall any communications,
14 conversations, emails of any kind from anyone
15 after you sent this map on September 9?
16         MR. SHEEHY:  Objection to form.
17         MR. FRAM:  Why don't we have marked
18 next as Exhibit 65 an email string with
19 REV_00023497.
20     (Exhibit No. 65 was marked for
21     identification.)
22 BY MR. FRAM:
23     Q.  The emails, there are two of them,
24 they're both dated -- I take it back.  The
25 earlier in time is September 14, 2011 at what

1          A. Kincaid - CONFIDENTIAL
2  appears to be 5:50 p.m.  And the other one is
3  the next day at September 15, 2011 at
4  12:46 p.m.  Start with the first one, earlier
5  in time one.  And this is an email, appears to
6  be from you to Dr. Hofeller.
7      Do you have any reason to doubt you
8  sent this email?
9      A.  No.
10     Q.  That's your email address, isn't it?
11     A.  Yes.
12     Q.  And it says, the subject is
13 "Awesome."
14     Do you see that?
15     A.  I do.
16     Q.  And would you please take a look at
17 the body of the email.  It's not long.  Okay?
18     Do you recall why you had the subject
19 of this email titled "Awesome"?
20         MR. SHEEHY:  Objection to form.
21     A.  Because I have a dry sense of humor.
22     Q.  Okay.  Illuminate.  Help me out here.
23 I'm always interested in learning new humorous
24 things.
25         MR. SHEEHY:  Objection.

1          A. Kincaid - CONFIDENTIAL
2      Q.  What did you mean when you were being
3  humorous?  What were you saying in a humorous
4  way?
5          MR. SHEEHY:  Objection to form.
6      A.  Just that it came in dead last.  It's
7  just me being me, just being -- having a dry
8  sense of humor and just sending it to Tom
9  because I knew he'd appreciate that, because he
10 also had a dry sense of humor.
11     Q.  What was last?  The fact that the
12 Ohio Campaign for Accountable Redistricting had
13 scored the new Congressional districts
14 introduced in the General Assembly by
15 Representative Huffman in HB 319, had scored
16 that as dead last?  That's what you were
17 commenting on?
18         MR. SHEEHY:  Objection to form.
19     Q.  In a humorous way?
20     A.  I think it was just the overall
21 article.  I wouldn't say it was just the dead
22 last part.  I think it was just the article was
23 amusing to me and it was interesting and I sent
24 it to Tom.  It's just what I put in the subject
25 line.

Page 458

```
1            A. Kincaid - CONFIDENTIAL
2        Q.   Was the fact that it scored dead last
3    part of what was humorous?
4            MR. SHEEHY:  Objection to form.
5        A.   I'd have to read the entire article
6    to say for sure.
7        Q.   Do you recall whether or not -- let
8    me back up.  You did put an exclamation point
9    after the proposed -- let me back up.  The
10   words in this email, those are -- you wrote
11   those words?  The Ohio -- starting with "the
12   Ohio campaign"?
13       A.   No.  This isn't how I write or
14   punctuate things.  This would have been a copy
15   from that.  This isn't my own commentary here.
16       Q.   I see.  So this is a copy and paste
17   from the article?
18       A.   Uh-huh.
19       Q.   Your recollection?
20       A.   Yeah.
21       Q.   Okay.  But your recollection is that
22   there was an article saying that the -- that
23   HB 319 had scored dead last.
24           Do you recall that?
25       A.   This is a -- I copied and pasted this
```

Page 459

```
1            A. Kincaid - CONFIDENTIAL
2    from the article and sent it to Tom but that's
3    what we found.
4        Q.   And you found the article in general
5    to be humorous?
6        A.   No, I just -- I think it was just me
7    being glib and sending Tom something that he
8    would also find interesting.  That's all.
9        Q.   Yeah.  You recall his response,
10   quote-unquote, "You should stand proud"?
11       A.   That would reflect Tom and I's sense
12   of humor at the time.
13       Q.   Okay.  You have no reason to doubt
14   that you received this from Dr. Hofeller on
15   September 15?
16       A.   No.
17       Q.   Or that you sent it on September 14?
18       A.   No.
19       Q.   Okay.
20           MR. FRAM:  This would be a decent
21   place -- time for a lunch break.
22   Changing the subject matter.
23           MR. SHEEHY:  All right.
24   (Recess taken.)
25           MR. FRAM:  We will mark the next as
```

Page 460

```
1            A. Kincaid - CONFIDENTIAL
2    66.
3    (Exhibit No. 66 was marked for
4    identification.)
5            MR. FRAM:  That's a spreadsheet,
6    REV_000000 -- six 0s, followed by the
7    number 22.  And then what I'll mark as
8    67 is the metadata for that one.
9    (Exhibit No. 67 was marked for
10   identification.)
11           MS. RIGGINS:  And Rob, I'm sorry,
12   what was the prefix for that number?  I
13   didn't catch it.
14           MR. FRAM:  REV, six zeros, followed
15   by 22.
16           MS. RIGGINS:  There's no prefix?
17           MR. FRAM:  REV, REV.
18           MS. RIGGINS:  Okay.  Just wanted to
19   double-check.
20           MR. FRAM:  No problem.
21   BY MR. FRAM:
22       Q.   Mr. Kincaid, you created Exhibit 66,
23   didn't you?
24       A.   Yes.
25       Q.   One of your change sheets?
```

Page 461

```
1            A. Kincaid - CONFIDENTIAL
2        A.   No.
3        Q.   What do you call these?
4    Spreadsheets?
5        A.   It's just a spreadsheet.
6        Q.   And that's because there's no changes
7    indicated, it's just the -- I'm learning.  It's
8    just the political scorings for a particular
9    map.
10           MR. SHEEHY:  Objection to form.
11       Q.   Right?  Okay.  Now, if you look at
12   the metadata, okay, we have a created date of
13   early, back in May 2011, but I take it that's
14   when the shell was created, the parent
15   document, if you will, of the spreadsheet; is
16   that right?  It's not when the data was
17   populated into it?
18       A.   No, the data was not populated into
19   it.
20       Q.   Was it populated into on the date
21   modified around September 15, 2011?
22       A.   That would seem to be the case.
23       Q.   And by the way, the file name, Ohio
24   Statewide.xls, is that consistent with your
25   naming convention?
```

Page 462

1           A. Kincaid - CONFIDENTIAL
2      A.  Yeah, roughly, yes.
3      Q.  All right.  And does this appear to
4  be a spreadsheet reflecting election result
5  information and PVI index information for
6  HB 319 as it was introduced in the General
7  Assembly?
8      MR. SHEEHY:  Objection to form.
9      A.  I'm not able to say that.  It says
10  Ohio statewide, the date's 9-15, but it
11  doesn't -- there's nothing on here that tells
12  me what map this is in regards to.
13      Q.  It would be Ohio statewide as of that
14  date; is that right?  Let me see if I
15  understand.  You created this -- when you
16  created this, do you know, in the ordinary
17  course would you have provided Mr. Whatman a
18  copy of this, of Exhibit 66?
19      MR. SHEEHY:  Objection to form.
20      A.  I'm not sure.  This is different than
21  the changes sheets, so I don't recall who I
22  would have sent this one to.
23      Q.  Would you have shared it with
24  Mr. Mann or Ms. DiRossi [sic]?
25      MR. SHEEHY:  Objection to form.

Page 463

1           A. Kincaid - CONFIDENTIAL
2      A.  As you've seen before, I didn't share
3  much directly with Heather and Ray so I
4  don't -- if I don't remember sending it to Tom
5  Whatman, I wouldn't remember sending it to
6  Heather and Ray.
7      Q.  Okay.  This has the five elections on
8  it that were used in the Ohio average; is that
9  right?
10      A.  It does.  It has six elections, but
11  yeah, those five are included.
12      Q.  Has the six and has the five which --
13  then it also has PVI.
14      Do you recall ever talking to
15  Mr. DiRossi about whether to use PVI to score a
16  district or not?
17      MR. SHEEHY:  Objection to form.
18      A.  No.
19      Q.  Do you recall communicating with any
20  way that he thought PVI was a good idea or bad
21  idea?
22      MR. SHEEHY:  Objection to form.
23      A.  I have no recollection of any
24  conversation regarding PVI with Ray DiRossi.
25      Q.  No one ever told you it was a bad

Page 464

1           A. Kincaid - CONFIDENTIAL
2  idea to use PVI data --
3      MR. SHEEHY:  Objection to form.
4      Q.  -- that you can remember?
5      A.  No.  I don't recall.
6      Q.  But one way or the other it's your
7  best recollection you created this document,
8  Exhibit 66, on or about September 15, 2011; is
9  that right?
10      A.  Yes.
11      Q.  I'll just say one more thing about
12  it.  If you look at Exhibit 66, go down to row
13  for the CD, Congressional District 3, do you
14  see that?
15      A.  Yes.
16      Q.  And that's 3-Open, do you see that?
17      A.  I do.
18      Q.  So by that point it appears that what
19  previously was discussed is Congressional
20  District 10 was now being numbered as 3; is
21  that right?
22      A.  That seems to be the case, yes.
23      Q.  And, in fact, in HB 319 there was a
24  new Congressional District 3 in Franklin
25  County, was there not?

Page 465

1           A. Kincaid - CONFIDENTIAL
2      A.  Yes.
3      MR. SHEEHY:  Objection to form.
4      Q.  So this is that same heavily
5  Democratic, D+16 district; is that right?
6      A.  District 3 would have been the
7  Franklin County seat, yes.
8      Q.  And that was D+16?
9      A.  And PVI for that was D+16.
10      Q.  And I'm reading it right that
11  District 15 is an R+7 with Mr. Stivers; is that
12  right?
13      A.  That's what this says, yes.
14      Q.  And Mr. Tiberi's District 12 is an
15  R+10; is that right?
16      A.  That's what this says, yes.
17      MR. FRAM:  I'd like to mark as 68
18  an e-mail, Bates number REV_00023429,
19  dated December 14, 2011, from Adam
20  Kincaid to Mike Wild and Tom Hofeller,
21  subject, New Ohio Map.
22      (Exhibit No. 68 was marked for
23  identification.)
24      MR. FRAM:  And I'd like to mark as
25  Exhibit 69 metadata for -- a metadata

55 (Pages 462 to 465)

Page 466

1          A. Kincaid - CONFIDENTIAL
2    sheet for 23430.
3          (Exhibit No. 69 was marked for
4    identification.)
5          MR. FRAM:  And I'd like to mark as
6    Exhibit 70 a spreadsheet titled "HB 369
7    Data," REV_00023430.
8          (Exhibit No. 70 was marked for
9    identification.)
10   BY MR. FRAM:
11         Q.  Why don't we start with 68.  That's
12   an email.
13         Do you see that?
14         A.  Yes.
15         Q.  And that's your email address?  It
16   was your email address back in 2011?
17         A.  Yes.
18         Q.  Do you have any reason to doubt you
19   sent this email on or about December 14, 2011
20   to Mr. Wild and Dr. Hofeller?
21         MR. SHEEHY:  Objection to form.
22         A.  No.
23         Q.  Now, if you turn to the metadata,
24   Exhibit 69, do you see -- well, date created
25   and modified are both December 14, 2011.

Page 467

1          A. Kincaid - CONFIDENTIAL
2          Do you see that?
3          A.  Yes.
4          Q.  You go down to the source
5    attachments, you see this, it says 23430
6    appears to be an attachment to 23429, the email
7    we just looked at?
8          A.  Yes.
9          Q.  Now if we look at 24 -- strike that.
10   23430, Exhibit 70, do you see that?
11         A.  Uh-huh, yes.
12         Q.  Okay.  Do you see -- looking at
13   Exhibit 69, do you see the naming convention
14   New Ohio Map Data.xls?
15         A.  Yes, I see that.
16         Q.  Is that your naming convention?
17         A.  Yeah.
18         Q.  Does this, in fact -- and you created
19   Exhibit 70?
20         A.  Yes.
21         Q.  And you attached -- you attached it
22   to the email that you sent to Mr. Wild and
23   Dr. Hofeller on December 14, 2011?
24         MR. SHEEHY:  Objection to form.
25         A.  Based off of the metadata, yeah, it

Page 468

1          A. Kincaid - CONFIDENTIAL
2    looks like this this attached to this email.
3          Q.  Do you recall -- I'll just make a
4    representation and you can include it, include
5    it in my question then.  HB 369 was passed on
6    December 14, 2011.
7          A.  Okay.
8          Q.  The date of the document.  Okay?  Do
9    you have any recollection of sending -- strike
10   that -- of creating this spreadsheet for the --
11   for HB 369 as enacted?
12         A.  I don't recall creating the
13   spreadsheet, no.
14         Q.  Did you create a spreadsheet after
15   HB 369 was enacted?
16         MR. SHEEHY:  Objection to form.
17         A.  It would have been part of my job, so
18   yes.
19         Q.  Do you recall any reason you would
20   send such a spreadsheet to Dr. Hofeller and
21   Mr. Wild?
22         MR. SHEEHY:  Objection to form.
23         A.  The reason I would have sent that?
24   That's what you're asking?  They were running
25   the redistricting shop at the RNC and were

Page 469

1          A. Kincaid - CONFIDENTIAL
2    interested in how maps performed and what the
3    election results would have been for, you know,
4    demographics for past maps.  So it wasn't
5    uncommon for me to send them these sorts of
6    sheets when districts were enacted into law.
7    It's pretty standard practice.
8          Q.  And here again, if you turn to CD 3,
9    "District 3-open," do you see that?
10         A.  Say that again.
11         Q.  Go down to the row for district 3 on
12   the far left, which is 3-open, do you see that?
13         A.  Yes.
14         MR. SHEEHY:  This is Exhibit 70?
15         MR. FRAM:  Exhibit 70.  Yes,
16   please.  Thank you for that.
17         Q.  And if you look on over to the far
18   right to the PVI scoring, do you see that?
19         A.  I do.
20         Q.  So this is still a heavily -- this is
21   a heavily Democratic district in Franklin
22   County; is that right?
23         MR. SHEEHY:  Objection to form.
24         A.  Yes, District 3 is the Franklin
25   County seat.

TSG Reporting - Worldwide - 877-702-9580

Page 470

1           A. Kincaid - CONFIDENTIAL
2      Q.  Do you recall any discussions of the
3  differences between the PVI scorings in HB 369
4  and 319?
5      A.  No, I don't.
6      Q.  You ever run an analysis comparing
7  the two?
8           MR. SHEEHY:  Objection to form.
9      A.  I don't recall.
10          MR. FRAM:  Why don't we have marked
11  next as Exhibit 71 and 72, 71's a map,
12  REV_00023432.
13  (Exhibit No. 71 was marked for
14  identification.)
15          MR. FRAM:  And 72 then would be the
16  metadata for that document.
17  (Exhibit No. 72 was marked for
18  identification.)
19  BY MR. FRAM:
20      Q.  Just looking at the metadata, you see
21  that this appears to be -- REV_00023432 appears
22  to be an attachment to your email of
23  December 14, REV_00023429.  You can look at
24  both the metadata on Exhibit 69 and 72 to
25  confirm that.

Page 471

1           A. Kincaid - CONFIDENTIAL
2      Do you see that?
3      A.  Yeah.
4      Q.  Okay.  Was this, in fact -- was this
5  map also something you transmitted to
6  Dr. Hofeller and Mr. Wild on about December 14?
7           MR. SHEEHY:  Objection to form.
8      A.  It appears to be one of the
9  attachments on the email I sent, yes.
10      Q.  And it was the same reasons, part of
11  your job as redistricting coordinator for the
12  NRCC, is to do this?
13          MR. SHEEHY:  Objection to form.
14      A.  I would have produced this for the
15  NRCC, and would have been standard practice to
16  share it with Tom and Mike.
17      Q.  You were able to produce this because
18  someone sent you the block equivalency file for
19  HB 369 as enacted, or -- strike that -- for
20  HB 369 as of December 14?
21          MR. SHEEHY:  Objection to form.
22      A.  I don't recall if anyone sent it to
23  me or not.  I could have gotten it online.
24      Q.  As of December -- the day it was
25  passed it went online?

Page 472

1           A. Kincaid - CONFIDENTIAL
2      A.  Possibly.  I don't know.  I don't
3  have a memory of how I got the file.
4           MR. FRAM:  Okay.  I'm going to mark
5  as 73 and 74.  73 is going to be
6  REV_00023431, spreadsheet entitled "Ohio
7  changes."
8  (Exhibit No. 73 was marked for
9  identification.)
10          MR. FRAM:  And 74 will be the
11  metadata for that document.
12  (Exhibit No. 74 was marked for
13  identification.)
14  BY MR. FRAM:
15      Q.  Drawing your attention on Exhibit 74
16  on the metadata, you've got a modifying --
17  modified date of December 14, 2011.
18      Do you see that?
19      A.  Yes.
20      Q.  And looking down at the file name,
21  New Ohio Map Changes.xls, that's consistent
22  with your naming convention, isn't it?
23      A.  Yes.
24      Q.  And looking down at the source and
25  attachments, you see that REV_00023431 is

Page 473

1           A. Kincaid - CONFIDENTIAL
2  listed as an attachment to the source document
3  00023429?
4      A.  Yes.
5      Q.  Okay.  Do you have any -- you created
6  Exhibit 73, that's -- that spreadsheet, did you
7  not?
8           MR. SHEEHY:  Objection to form.
9      A.  Yes.
10      Q.  And do you have any reason to doubt
11  that this is one of the attachments to your
12  December 14 email which we've marked as
13  Exhibit 68?
14      A.  No.
15      Q.  And you did so as part of your job as
16  redistricting coordinator at the NRCC; is that
17  right?
18      A.  Yes.
19      Q.  I take it this is a change sheet
20  because we have comparison of the map as it
21  existed on December 14 and the
22  pre-redistricting map; isn't that right?
23      A.  Yes.
24      Q.  That far right column shows the
25  increase or decrease in different PVI values in

A. Kincaid - CONFIDENTIAL
1    the map as it existed on December 14, 2011 and
2    the pre-redistricting map; correct?
3        A. Yes.
4        Q. There are 12 districts that indicate
5    with an R -- R+ values, is that right, on the
6    new Ohio map as it existed on December 14,
7    2011; is that right?
8        A. Yes.
9        Q. I'm sorry. When I say R+ values I
10   mean R+ values in the PVI scoring.
11       A. I knew what you mean. Yes.
12       Q. Did you also have a block assignment
13   files as of December 14 for the -- to generate
14   the map you needed a block assignment file from
15   somebody?
16       A. I could have done it off of the
17   shapefile, so I'm not quite sure what the root
18   file was to create the map, to upload the map.
19       MR. FRAM: Let me show you a
20   document. We received a computer file
21   with map files, which I'm not going to
22   show you, but I will show you the
23   metadata on it. I'm going to mark this
24   next as Exhibit 75.

A. Kincaid - CONFIDENTIAL
1    (Exhibit No. 75 was marked for
2    identification.)
3    BY MR. FRAM:
4        Q. This is the metadata for
5    REV_00023343. Okay? You can see it's attached
6    to REV_00023341. Okay? It has a created date
7    of December 15, 2011.
8        My question to you is do you see the
9    name convention where it says HB 369 As
10   Passed.dbf?
11       Do you see that?
12       A. I see that.
13       Q. Is that your naming convention when
14   you would have a block -- for a dbf file, could
15   that be a shapefile or a block equivalency
16   file, or is it a block equivalency file?
17       MR. SHEEHY: Objection to form.
18       A. A dbf is a database file which is a
19   block equivalency file.
20       Q. Sure.
21       A. I don't recall naming a file "HB 369
22   as passed."
23       Q. Okay. So the question is do you
24   recall if you received HB 369 as passed from

A. Kincaid - CONFIDENTIAL
1    anybody?
2        A. I don't. I don't know what the root
3    email is here either, and all of the numbers
4    are missing off the right side of the
5    attachment list. So 23341, which email was
6    that? Do you know?
7        Q. We'll get to that, hold on. We'll
8    get to that.
9        I think we looked at it already.
10   I'll pull it up for you. Hold on.
11       A. Here we go.
12       Q. You got it?
13       A. Yeah.
14       Q. Can you tell everybody which exhibit
15   it was?
16       A. Sorry?
17       Q. What exhibit do you have?
18       A. 42.
19       Q. 42. Is that an email that -- I found
20   it. So you received an email around
21   December 15 from Heather Mann; is that right?
22   We discussed that before?
23       A. Yes, I see that here, yes.
24       Q. She says she's attaching equivalency

A. Kincaid - CONFIDENTIAL
1    file for HB 369 as passed?
2        A. Yes.
3        Q. Now we're looking at the metadata.
4    Like I say, we have this computer file,
5    REV_000233343. Okay? Does it refresh your
6    recollection that if you didn't name it HB 369
7    as passed that this is -- this was a block
8    equivalency file you received from Heather Mann
9    around December 15?
10       A. Yes, this seems to be the file that
11   was attached to this email.
12       Q. So just to refresh your recollection,
13   in fact you got the block equivalency file
14   directly from Heather Mann and not by going on
15   a public website; is that right?
16       MR. SHEEHY: Objection to form.
17       A. I don't remember receiving the email
18   but it seems that I did get it from Heather
19   Mann.
20       MR. FRAM: Why don't we have marked
21   next 76 -- mark a few together. 76 is
22   metadata for REV_00023344.
23   (Exhibit No. 76 was marked for
24   identification.)

Page 478

```
 1          A. Kincaid - CONFIDENTIAL
 2          MR. FRAM:  And 77 is metadata for
 3   REV_00023345.
 4   (Exhibit No. 77 was marked for
 5   identification.)
 6          MR. FRAM:  And why don't we make 78
 7   the metadata for REV_00023346.
 8   (Exhibit No. 78 was marked for
 9   identification.)
10          MR. FRAM:  And why don't we make 79
11   a map, REV_00023347.
12   (Exhibit No. 79 was marked for
13   identification.)
14          MR. FRAM:  And 80 would be the
15   metadata for that map, for REV_00023347.
16   (Exhibit No. 80 was marked for
17   identification.)
18   BY MR. FRAM:
19       Q.  Looking at 76, which is the metadata
20   for REV_00023344, see the file name HB 369 As
21   Passed.prj.
22       A.  Uh-huh.
23       Q.  Do you understand what .prj stands
24   for?
25       A.  It's a component of a shapefile.
```

Page 479

```
 1          A. Kincaid - CONFIDENTIAL
 2       Q.  Do you see under the source and
 3   attachment that this appears to have been an
 4   attachment to REV_00023341, which we've marked
 5   as Exhibit 42 -- exhibit, yeah, 42?
 6       A.  I see that.
 7       Q.  Do you recall receiving shapefiles or
 8   components of shapefiles from Heather Mann on
 9   or about December 15, 2011?
10       A.  Like I said before, I don't recall
11   receiving the email, but the main subject line
12   says shapefile, so she clearly attached a
13   shapefile to the email.
14       Q.  Turning to Exhibit 77, the metadata
15   for REV_00023345, do you see that?
16       A.  I do.
17       Q.  Got a date created of December 15,
18   2011.
19          Do you see that?
20       A.  I do.
21       Q.  And go down to the file name HB 369
22   As Passed.shx.  Do you understand what the
23   suffix .shx means?
24       A.  It's also a component of a shapefile.
25       Q.  Same question.  Does this appear to
```

Page 480

```
 1          A. Kincaid - CONFIDENTIAL
 2   be an attachment to the email that you received
 3   from Heather Mann on or about December 15,
 4   2011?
 5       A.  It does.
 6       Q.  And similarly, going to Exhibit 78,
 7   metadata for REV_00023346, do you see that?
 8       A.  I do.
 9       Q.  And again, you've got a creation date
10   of December 15, 2011.
11          Do you see that?
12       A.  Yes.
13       Q.  Now, the file name here is HB 369 as
14   passed.shp.  Does .shp also stand for
15   shapefiles?
16       A.  Yes.
17       Q.  Does this also confirm that Heather
18   Mann sent you shapefiles on or about
19   December 15, 2011?
20       A.  Yes.
21       Q.  For HB 369 as passed?
22       A.  Seems to be the case, yes.
23       Q.  Turning to Exhibit 79, okay, it's
24   metadata Exhibit 80, REV_00023347, do you see
25   that?
```

Page 481

```
 1          A. Kincaid - CONFIDENTIAL
 2       A.  I see that.
 3       Q.  This also appears to be an attachment
 4   to the source document REV_00023341, which is
 5   the email we've marked as Exhibit 42; correct?
 6       A.  The metadata's for a document that's
 7   attached.  That seems to be the case, yes.
 8       Q.  And that document we marked as
 9   Exhibit 42.  Take a look at the Bates number on
10   Exhibit 42 -- I'm sorry -- yeah, Exhibit 42.
11       A.  What now?
12       Q.  Look at Exhibit 42, the Bates number
13   is REV_00023341, the email from --
14       A.  Yeah.
15       Q.  I'm just saying this appears to be an
16   attachment to Heather Mann's email?
17       A.  I'm saying Exhibit 80 is the metadata
18   for a file that's attached to 23341, yes.
19       Q.  I get it.  Thank you.  Thank you.
20   And Exhibit 79 would appear to be that
21   document?
22       A.  No.
23       Q.  No?
24       A.  This is not a DBF.  This is a
25   screenshot.  This should be as a JPG or --
```

Page 482

A. Kincaid - CONFIDENTIAL

1       A. Kincaid - CONFIDENTIAL
2       Q.  I see.
3       A.  That's a screenshot, that's not a DBF
4   file.
5       Q.  I see.  Interesting.  This is as
6   produced to us but let me see if I understand
7   correctly.  You would generate a map like this
8   using a DBF, but this itself is not of course
9   the DBF?
10      A.  The DBF would be loaded into
11  Maptitude to produce a map.
12      Q.  Then you would see a map such as
13  this?  Maybe not this but that's what you'd
14  see?
15      A.  You would load this into Maptitude
16  and you'd see something -- this is stylized by
17  whoever uploaded that to Maptitude.
18      Q.  I understand.
19      A.  This is a printed screen of
20  something.
21      Q.  Thank you.  Okay.  Does this refresh
22  your recollection that you received a block
23  equivalency file from Heather Mann on or around
24  December 15, 2011?
25          MR. SHEEHY:  Objection to form.

Page 483

1       A. Kincaid - CONFIDENTIAL
2       A.  No, because this is a DBF.  This is a
3   separate file from the shapefile.  So this
4   would be a block equivalency file, yes, not the
5   shapefile.
6       Q.  Let me say the question right.  Does
7   this refresh your recollection that you
8   received a block equivalency file from Heather
9   Mann for HB 369 on or about December 15, 2011?
10      A.  It doesn't reflect -- it doesn't
11  refresh my recollection because I don't
12  remember receiving it, but the -- it clearly
13  shows that she sent this to me.  I just don't
14  remember receiving the email.
15      Q.  That's fine.  Thank you.
16          Turning back to Exhibit 42, your
17  email to -- looking at the email you sent to
18  Dr. Hofeller and Mr. Wild on December 15 at
19  2:28 p.m.
20          Do you see that?
21      A.  Yes.
22      Q.  It says you're forwarding equivalency
23  and shapefiles.
24          Do you see that?
25      A.  Yes.

Page 484

1       A. Kincaid - CONFIDENTIAL
2       Q.  Do you have any doubt you sent this
3   email?
4       A.  No.
5       Q.  And you did so as part of your job as
6   redistricting coordinator for the NRCC; is that
7   right?
8       A.  Yes.
9       Q.  You mention a couple of tweaks.
10          Do you see that?
11      A.  I see that.
12      Q.  Do you recall what they were?
13      A.  I'm not sure what I was referring to
14  specifically.
15      Q.  But then you state, quote, "final,
16  final Ohio map is attached."
17          Do you see that?
18      A.  I do.
19      Q.  Was it your understanding that the
20  equivalency and shapefiles you were forwarding
21  was for the final Ohio map as enacted?
22      A.  That's literally what Heather put as
23  title as the file was HB 369 as passed, or
24  whoever named the file.  So yeah, my
25  understanding was that was the passed map that

Page 485

1       A. Kincaid - CONFIDENTIAL
2   was the final, final map for Ohio.
3       Q.  And just so I understand it, you
4   have -- after -- at any time since December 15,
5   2011, at no point have you ever gone and
6   modified the block equivalency files regarding
7   HB 369?
8       A.  I'm sorry, I don't understand.
9       Q.  At any time since December 15, 2011
10  have you ever gone in and modified the block
11  equivalency files for HB 369?
12          MR. SHEEHY:  Objection to form.
13      Q.  Let me clarify the question.  You had
14  the block equivalency files as of --
15      A.  Sure.
16      Q.  -- December 15, 2011; correct?
17      A.  Yes.
18      Q.  And they got produced to us in 2018.
19      A.  Okay.
20      Q.  I'm just trying to say between the
21  time you received them and the time we received
22  them, whether, as far as you know, any
23  modifications were made to those block
24  equivalency files, or what we received was in
25  fact what you got back then.

Page 486

```
1           A. Kincaid - CONFIDENTIAL
2        A.  I wasn't the custodian of that
3    document, so I couldn't tell you if it's been
4    tweaked or not.  I personally have not made --
5    I mean, Ohio hasn't redistricted since 2011, so
6    it's kind of a hard question to answer because
7    it's not -- I mean --
8        Q.  During the course of your time when
9    you were the -- at the NRCC, did you modify
10   those files, the block equivalency file that --
11   after December 15, 2011?
12          MR. SHEEHY:  Objection to form.
13       A.  I don't recall revising HB 369 after
14   it was enacted into law.
15       Q.  That's all I was trying to get.
16       A.  But I was not the custodian of the
17   file that you have here.
18       Q.  For a period of time, though, when
19   you were -- after you received the block
20   equivalency file from Heather Mann in this
21   email, in the ordinary course of your job would
22   you have kept it in an NRCC computer?  Where
23   would you have kept the file after you received
24   it?
25       A.  Yeah, I would have kept it on an NRCC
```

Page 487

```
1           A. Kincaid - CONFIDENTIAL
2    computer.
3        Q.  Then after you left the NRCC, it
4    would have stayed on an NRCC computer?  You
5    didn't take it with you?
6        A.  They would have had the file in their
7    database.
8        Q.  Okay.  Like you say, at that point
9    there would also be a public version of that
10   block equivalency file?
11       A.  Right.  They would have it on their
12   servers.
13       Q.  In the ordinary course of your job
14   duties as NRCC redistricting coordinator, I
15   take it you would not modify a block
16   equivalency file for already-enacted maps;
17   isn't that right?
18       A.  Right.  If a map was enacted, it was
19   enacted.
20       Q.  And you weren't going to modify the
21   block equivalency file?
22       A.  The NRCC would need the final file
23   for the purposes of winning elections.
24       Q.  Right.  So the NRCC tried to keep
25   accurate block equivalency files in its records
```

Page 488

```
1           A. Kincaid - CONFIDENTIAL
2    for enacted maps?
3        A.  Absolutely.
4        Q.  Okay.
5          MR. FRAM:  This one may have been
6    marked in the previous deposition but
7    there are questions that need to be
8    asked so I'll just find it.  Let me get
9    the numbering right.  This was Exhibit 2
10   in your deposition on December 4 so we
11   can mark this as 2 again.
12          (Exhibit No. 2, previously marked, was
13   referenced and indexed.)
14   BY MR. FRAM:
15       Q.  Just going to ask you a couple of
16   questions that I didn't ask the last time or
17   you weren't able to answer because of
18   instructions.
19          If you turn to the slide that says --
20   by the way, the Bates number is NRCC000031 for
21   all -- the whole document.  There's many pages.
22   But the fifth slide has got the heading "R
23   seats moved out of play," quote-unquote.  Turn
24   your attention to that, that slide, and you'll
25   see where on that it indicates that Ohio 1 for
```

Page 489

```
1           A. Kincaid - CONFIDENTIAL
2    Chabot, Ohio 12 for Tiberi, and Ohio 15 for
3    Stivers were quote-unquote moved out of play
4    due to redistricting.
5          Do you see that?
6        A.  I see that.
7        Q.  And I think you testified that you
8    created some of the content on this slide; is
9    that right?
10       A.  Yes.
11       Q.  Did you create the content regarding
12   those three Ohio districts?
13       A.  Yes.
14       Q.  And I'd like to ask you, did you
15   create the words "R seats moved out of play"?
16          MR. SHEEHY:  Objection to form.
17       A.  I don't recall whether I originated
18   that phrase or not.
19       Q.  Whether you originated it or not, did
20   you type it on this slide?
21       A.  As you can see, this slide's an NRCC
22   slide.  It's got lots of different subjects on
23   it.  This presentation predated my time
24   starting at the NRCC.  So they would have
25   started this up, in January of 2011, it would
```

Page 490

```
 1          A. Kincaid - CONFIDENTIAL
 2   have been a fluid document.  So I don't recall
 3   whether "R seats moved out of play" is
 4   something that I typed here or not.  It could
 5   have been someone else on staff who did that.
 6        Q.  I see.  In other words, if I
 7   understand what you're saying, there was a
 8   document that preceded you --
 9        A.  I was not the final custodian of this
10   PowerPoint presentation.
11        Q.  But you worked on this particular
12   slide, slide 5, whether -- but maybe not --
13   it's not clear that you typed in the words
14   "R seats moved out of play"; is that right?
15        A.  I would have provided the content for
16   the slides.  I don't recall providing the
17   header for the slide.
18        Q.  Did you select the three Ohio seats,
19   15, 12, and 1, to be included on this slide?
20        MR. SHEEHY:  Objection to form.
21        A.  I don't recall what the selection
22   process was for what slide -- what districts
23   were or were not included here.  We had a lot
24   of meetings at the NRCC, so I wouldn't -- I'm
25   not sure -- I don't remember what the criteria
```

Page 491

```
 1          A. Kincaid - CONFIDENTIAL
 2   was that we set or how we decided what would or
 3   would not be in each slide.
 4        Q.  Well, who else besides you was
 5   involved in the conversation about the three
 6   Ohio districts and whether they should be
 7   included on this slide?
 8        MR. SHEEHY:  Objection to form.
 9        A.  That's a conversation that could have
10   come up in one of a dozen meetings that I had
11   on a given day.  So I -- I couldn't tell you
12   what person would have made that decision,
13   but -- let me just say I don't remember.
14        Q.  Fair enough.  I'm not asking you to
15   say who actually made the decision.  I'm saying
16   if you remember who was in the collection of
17   people who were in the conversation, if you
18   could just name those names.
19        A.  I would have to speculate.  Every
20   meeting had a different group of people in it.
21        Q.  If I understand correctly your
22   testimony -- tell me if I got it wrong -- there
23   were meetings at the NRCC during which one of
24   the topics that was discussed was which
25   districts to include in this slide.
```

Page 492

```
 1          A. Kincaid - CONFIDENTIAL
 2        MR. SHEEHY:  Objection to form.
 3        A.  That wouldn't have been a subject of
 4   the meeting, it would have been something that
 5   came up as part of a conversation.
 6        Q.  But in a conversation at the NRCC --
 7        A.  Right.
 8        Q.  -- with a group of people at the
 9   NRCC, the question would have come up as to
10   which districts should be included on this
11   slide.
12        MR. SHEEHY:  Objection to form.
13        A.  I think over the course of a
14   meeting -- well, let me say it a different way.
15   During meetings at the NRCC, someone could have
16   said, well, that seat seems like it's moved out
17   of play.  That's a standard sort of comment
18   that you would make in a -- you know, as you're
19   analyzing new districts, trying to figure out
20   what districts you're going to target in the
21   elections that coming fall.  So I think that
22   comment could have been made about a seat,
23   other people would have agreed, and then that
24   district would have been added to that page.
25        So it's not -- it wouldn't have been
```

Page 493

```
 1          A. Kincaid - CONFIDENTIAL
 2   a specific decision made of you should add
 3   these three seats to that slide page; it would
 4   have been something that just organically came
 5   up as a part of a wider conversation.
 6        Q.  I'm not going to ask you about the
 7   content of any of the other non-Ohio districts,
 8   but I just want to understand this.  Other than
 9   the Ohio three seats, did you create the
10   content for any of those districts that are on
11   this slide?  You said you did for the three
12   Ohios.  Any of the others?
13        MR. SHEEHY:  Objection to form.
14        A.  The content meaning what's on this
15   page here?
16        Q.  Yes, please.
17        A.  Sure.  That was part of my job.  But
18   like I told you before in the last deposition,
19   part of my job was to provide the content for
20   these slides.
21        Q.  I'm just focusing on this one slide
22   for now.  I know there's a lot of different
23   topics in this slide set.  So just focusing on
24   this slide.  So on this slide, did you create
25   the content for -- putting aside the words
```

62 (Pages 490 to 493)

Page 494

1    A. Kincaid - CONFIDENTIAL
2  "R seats moved out of play," not looking at
3  those words, but did you provide the rest of
4  the content on this slide?
5         MR. SHEEHY: Objection to form.
6     A.  I would have provided the PVIs and
7  the change numbers.  The district numbers and
8  the name of the incumbent is probably provided
9  by somebody else because I, one, wouldn't have
10 added a space between the H and the dash in
11 Ohio 1, and also I tended to put two digits for
12 the district number.  So I would have had AL-03
13 or VA-04, or OH-01.  So the way I would have
14 written this is different.  So the only thing I
15 can tell you for certain that I know I provided
16 the content for on this slide is the PVI and
17 the change number.
18    Q.  And do you recall disagreeing with
19 whether any of the Ohio districts should be on
20 this slide?
21        MR. SHEEHY: Objection to form.
22    A.  It wouldn't have been my role to
23 disagree.  It was my job to provide content.
24 It was the job of other people to make that
25 decision at that time.

Page 495

1    A. Kincaid - CONFIDENTIAL
2     Q.  And so I can ask you again, if other
3  people were making the decision, who were the
4  collection of people making the decision?
5         MR. SHEEHY: Objection to form.
6     A.  That would have varied from meeting
7  to meeting.  I'd have to speculate about who
8  that might have been.
9     Q.  Were there people -- let me ask, in
10 these -- I understand it would vary from
11 meeting to meeting, but I'm asking who the
12 collection of possible persons were at the
13 different meetings who would be in a position
14 to make the decision.
15        MR. SHEEHY: Objection to form.
16    A.  About whether to categorize a
17 district as moving in or out of play?
18    Q.  Correct.
19    A.  I'm really not sure who would have
20 made that decision.  Like I said before, it
21 would have come up organically meeting to
22 meeting, it might have been something that
23 people collectively agreed on over the course
24 of a conversation.  But there -- as I told you
25 before, there wasn't a meeting where we all sat

Page 496

1    A. Kincaid - CONFIDENTIAL
2  down and said okay, what are the R seats that
3  moved out of play and the D seats that moved
4  out of play.  We would -- that wasn't really --
5  we didn't do meetings to update the PowerPoint
6  presentation; right?  That was just something
7  that whoever made this PowerPoint would have
8  done, and I would have provided the PVIs and
9  the --
10    Q.  So if I understand correctly, there
11 were meetings where the question of were
12 R seats were moved out of play was discussed?
13    A.  As I said before, as part of a
14 standard analysis of a map, there would be
15 conversations about what seats were more or
16 less competitive.  So yeah, that's --
17    Q.  Then someone would take those
18 conclusions and create the list for which seats
19 should be -- R seats should be on this slide,
20 and then you would just provide the PVI
21 numbers?  Is that how it worked?
22        MR. SHEEHY: Objection to form.
23    A.  I'm really fuzzy on how the exact
24 list came to be, so that's why I'm hesitant to
25 say, because I really don't remember much more

Page 497

1    A. Kincaid - CONFIDENTIAL
2  than that.  I was tasked with providing the
3  PVIs and the change numbers for the -- for this
4  PowerPoint presentation.
5     Q.  At these meetings that you attended
6  where the question of were there R seats that
7  were moved out of play or not, do you recall
8  the names of individuals at those meetings who
9  were senior to you at the RNCC?
10        MR. SHEEHY: Objection.
11    A.  We've already gone through the list
12 of who the senior staff was at the NRCC in our
13 last deposition.  So that senior staff is still
14 the same senior staff that was there when I was
15 there last --
16    Q.  Did all of them participate in these
17 meetings?
18    A.  No, because, you know, people would
19 have other meetings they had to be at, so there
20 were people in and out depending on -- we would
21 have around-the-world meetings that had
22 everybody on staff in the same room talking
23 about this stuff.  There were other meetings
24 that had two or three people going through and
25 talking about the districts in their, you know,

Page 498

1      A. Kincaid - CONFIDENTIAL
2  their tasked zone.
3      So no, I couldn't tell you that every
4  senior staff person was in every meeting
5  because that wasn't the case.
6      Q.  But the collection -- so the meetings
7  where a question of what R seats had been moved
8  out of play included some subset of the senior
9  staff of the RNC; is that right?
10     MR. SHEEHY:  Objection to form.
11     A.  No, I mean, like I told you before,
12 we didn't have a meeting about what R seats
13 were moved out of play.  We would talk about a
14 state, we'd go through that state, talk about
15 the districts in that state, you know, maybe
16 we'd say that district has, you know, became
17 more Republican over the course of
18 redistricting, or that one became more Democrat
19 over the course of redistricting.  But there
20 wasn't a meeting where we all sat down and said
21 all right, let's find all the R seats that
22 moved out of play.
23     Q.  Fair enough.  Let me just focus that
24 and ask you a question.  Were there certain
25 members of the senior staff of the NRCC that

Page 499

1      A. Kincaid - CONFIDENTIAL
2  were focused on Ohio --
3      MR. SHEEHY:  Objection to form.
4      Q.  -- as opposed to other states?
5      A.  No.
6      Q.  So it didn't break down by geography?
7      A.  Senior staff of the RNC didn't break
8  down by geography, no.
9      Q.  Not RNC --
10     A.  NRCC.  Sorry.
11     Q.  So different senior staff of the NRCC
12 would have been attending these meetings
13 talking about the state of the Congressional
14 map after redistricting; is that right?
15     MR. SHEEHY:  Objection to form.
16     A.  Different members of senior staff
17 would have been at different meetings talking
18 about any state, yes.
19     Q.  And as the output of that collective
20 set of meetings, the view would -- a view was
21 created as to which Republican seats had been
22 moved out of play, not necessarily a specific
23 meeting but as a result of that process?
24     MR. SHEEHY:  Objection to form.
25     A.  Just like any other national

Page 500

1      A. Kincaid - CONFIDENTIAL
2  committee, you're going to have meetings where
3  you target districts or states or whatever it
4  might be, and over the course of that
5  conversation you're going to decide some
6  districts are going to be targets and be
7  battleground districts and some aren't going to
8  be.  So yes, in that sense, yeah, there were
9  meetings to talk about where we would go and
10 win elections.  That's pretty much the standard
11 practice of the NRCC.
12     Q.  I understand.  And this slide
13 reflected the conclusions, the collective
14 conclusion of the NRCC regarding what
15 Republican seats had been moved out of play
16 following that discussion process?
17     MR. SHEEHY:  Objection to form.
18     A.  I would resist collective conclusion
19 because one thing about the NRCC is you have a
20 healthy amount of disagreement, you know,
21 people have different opinions on things.  So
22 this would have been a working assumption at
23 best.  I mean, Virginia 10 is a district we've
24 lost over the course of decades so it clearly
25 did not move out of play.  So its inclusion is

Page 501

1      A. Kincaid - CONFIDENTIAL
2  something that was probably wrong.  Illinois 6
3  is the same.  New Jersey 7 is the same.
4  Virginia 4 no longer exists.  So these are --
5  it's an assumption at a point in time.  It's
6  not a collective conclusion.  So --
7      Q.  When I say collective conclusion, I
8  just meant what people's understanding was at
9  the time, not that it was infallible.  That
10 this reflected people's best thinking at the
11 time.
12     A.  I would say it reflected a working
13 assumption at the time.
14     Q.  Did anybody ever say, while you were
15 at the NRCC, that Ohio 1, Ohio 12 and Ohio 15
16 should not be on this slide?
17     MR. SHEEHY:  Objection to form.
18     A.  Did anyone at the NRCC at any time
19 say that these three districts should not be on
20 this slide?
21     Q.  Yes, that you recall.  Anybody saying
22 to you, I'm sorry, this is wrong, we should not
23 have these three districts on this slide?
24     MR. SHEEHY:  Same objection.
25     A.  I don't recall having that

Page 502

1          A. Kincaid - CONFIDENTIAL
2     conversation about this specific slide, no.
3          Q.  Do you recall -- you were describing
4     some other districts where you thought the
5     slide was maybe somewhat questionable in terms
6     of its conclusion.
7          Do you recall at any time did anybody
8     say in substance or effect, I'm sorry, I don't
9     think Ohio 1 should be considered to be moved
10    out of play?
11         MR. SHEEHY: Objection to form.
12         A.  Well, to be fair, what I was saying
13    before about it being questionable is just
14    simply that you said it was a collective
15    conclusion.  I was characterizing it as a
16    working assumption.  It wasn't to say that we
17    had, you know, great debates over this
18    PowerPoint presentation and wasted time on what
19    district should or should not be included in
20    it.  I mean, it's a PowerPoint presentation.
21    It's designed to simplify a lot of complex
22    facts and data; right?  So it's not an
23    infallible document.
24         And I don't recall having a lot of
25    knock-down, drag-out fights over any of the

Page 503

1          A. Kincaid - CONFIDENTIAL
2     districts that were, were not included in this
3     presentation.  It was -- whether it be Ohio 1
4     or Alabama 3, I don't really recall that being
5     a particular point of contention one way or the
6     other.  I don't think most people really
7     worried too much about -- I just don't think it
8     was --
9          Q.  I'm not -- I'm just going to focus on
10    the Ohio districts for a minute.  I'm not
11    limiting it just to the technical question of
12    whether somebody said it shouldn't be on this
13    particular slide.  For Ohio 1, at any point
14    while you were at the NRCC, did somebody say
15    that we should not view Ohio 1 as being moved
16    out of play?
17         MR. SHEEHY: Objection to form.
18         A.  I mean, I personally would have -- I
19    can't speak to anybody else because I don't
20    remember, you know, hearing the opinion from
21    one person or the other.  I would have
22    characterized Ohio 1 and Ohio 15 as lean
23    Republican, but not moved out of play.  So I
24    would have disagreed with this, their inclusion
25    on this slide.

Page 504

1          A. Kincaid - CONFIDENTIAL
2          Q.  Did you ever say that to anybody?
3          MR. SHEEHY: Objection to form.
4          A.  I don't recall whether I did or not.
5          Q.  Do you recall if anybody else -- you
6     didn't make the decision, like you say, to
7     include this.
8          A.  Right.
9          Q.  Include Ohio 1 and -- you didn't make
10    the decision to include Ohio 1 and 15 on this
11    slide?  That was not your decision?
12         MR. SHEEHY: Objection to form.
13         Q.  Right?
14         A.  I don't recall -- as I said before, I
15    don't recall what the process was for deciding
16    what districts were or were not included in
17    this, apart from just coming up organically in
18    a conversation.
19         Q.  But I thought you testified before it
20    wasn't your decision as to --
21         A.  It wasn't my lone decision, is what I
22    was trying to say.  If I said my decision, it
23    would not have been something that I made the
24    choice on by myself that this seat did or did
25    not move out of play.

Page 505

1          A. Kincaid - CONFIDENTIAL
2          Q.  Did anybody ever say the working
3     assumption of considering Ohio 1, anybody ever
4     say it -- let me back up.
5          You said your personal view is Ohio 1
6     and 15 should not have been on this slide, but
7     you never communicated that to anybody if I
8     understand correctly.
9          A.  I didn't say that.  I said I don't
10    recall ever communicating that.
11         Q.  You don't recall communicating.
12         Do you recall if anybody else ever
13    communicated that?
14         MR. SHEEHY: Objection to form.
15         A.  I have no recollection of it.
16         Q.  What about Ohio 12?
17         A.  My answer's the same for all three
18    Ohio districts, I don't recall it coming up.
19         Q.  Your personal view is you think they
20    should have been on lean Republican and not
21    moved out of play?  Or is that not true for
22    Ohio 12?
23         A.  My personal view is that -- and these
24    are my own thoughts obviously which I think
25    would fall under First Amendment; right?

Page 506

1     A. Kincaid - CONFIDENTIAL
2         MR. SHEEHY:  Yeah.  Objection to
3     form.
4         A.  I mean, my own personal thoughts on
5     this, anything below an R+10 is not moved out
6     of play.  So --
7         Q.  I see.  So -- thank you.  And so --
8     thank you.  But somebody, or groups, more than
9     one person, in thinking about what districts
10    should be on this slide, were applying a
11    different criteria; correct?  Because lots of
12    these are less than R+10; correct?
13        MR. SHEEHY:  Objection to form.
14        A.  Yes, a lot of these are less than
15    R+10, and we've either lost or almost lost most
16    of these over the course of the decade.
17        Q.  But the three Ohio seats Republicans
18    retained over the course of the decade;
19    correct?
20        A.  Ohio 12 is one of the ones that we
21    almost lost last year in a special election.
22        Q.  But still won?
23        A.  We still won.
24        Q.  And Ohio 1 and 15 is considered --
25    consistently voted Republican, correct, for the

Page 507

1     A. Kincaid - CONFIDENTIAL
2     last four election cycles?
3         A.  '12, '14, '16 -- yes, it's been four
4     election cycles since the redistricting.  Yes,
5     but the state of Ohio's also moved further
6     right than it used to be too.  So the state as
7     a whole has trended more Republican.
8         Q.  It varies by election, but that's
9     another conversation.  We can have that one
10    offline.
11        I take it you don't remember the
12    criteria for the cutoff point for deciding
13    whether a district would be moved out of play
14    or not.
15        A.  I don't think there was a firm
16    criteria.
17        Q.  But the working assumption at the
18    time was that R+6 or even R+5 or more were
19    moved out of play?  In one case an R+4; is that
20    right?
21        MR. SHEEHY:  Objection to form.
22        A.  These are all on these slides for
23    different reasons, I'm sure.  Some of it was
24    probably based off of old saws, old
25    assumptions, whether an incumbent was running

Page 508

1     A. Kincaid - CONFIDENTIAL
2     again, all sorts of things like that.
3         Q.  I see.
4         A.  So there was not one set of firm
5     criteria.  There are plenty of R+9 down to R+4
6     districts in the country that aren't on this
7     slide, so --
8         Q.  So this reflected the -- several
9     sources of information about these districts?
10        A.  It was -- yes.
11        Q.  Okay.  It was the NRCC's holistic
12    assessment of the districts that resulted in
13    the working assumption to have them on the
14    slide?
15        MR. SHEEHY:  Objection to form.
16        A.  I wouldn't say a holistic assessment.
17    The NRCC, I think it was probably -- again, I
18    don't really recall what they -- who made the
19    final decision on what districts were or were
20    not included on this, so I couldn't say.  But I
21    can tell you it wasn't a -- I wouldn't call it
22    a holistic NRCC decision.
23        Q.  Okay.
24        A.  Probably varied from district to
25    district and state to state.

Page 509

1     A. Kincaid - CONFIDENTIAL
2         Q.  Let me ask you a question.  To whom
3     was this PowerPoint shown?
4         A.  I have no idea.  I never gave this
5     presentation, so I don't know who gave it.
6         Q.  Okay.  Do you know whether it was
7     distributed to members of Congress?
8         MR. SHEEHY:  Objection to form.
9         A.  I have no idea.
10        Q.  Was this used by the NRCC in terms of
11    trying to figure out how to prioritize its
12    efforts in Congressional elections?
13        MR. SHEEHY:  Objection to form.
14        A.  No.  This isn't a targeting document;
15    this is a presentation document, so this is a
16    document that you would use for briefing
17    somebody or something, some group.
18        Q.  But you don't know who?
19        A.  I wasn't in the meetings of those
20    briefings so I don't know.
21        Q.  Okay.  Just so we're clear -- I think
22    we have covered this.  You've already said
23    these are authentic documents so we don't have
24    to go through that again.  Let me see.
25        MR. FRAM:  I'm going to mark next

Page 510

```
1            A. Kincaid - CONFIDENTIAL
2   as 81 a document, another PowerPoint,
3   REV -- that's a lot of zeroes.  Okay,
4   REV_00000003.
5       (Exhibit No. 81 was marked for
6   identification.)
7       MR. FRAM:  It's a PowerPoint
8   entitled Redistricting.  And metadata
9   will be 82.
10      (Exhibit No. 82 was marked for
11  identification.)
12  BY MR. FRAM:
13      Q.  Now, this one, look at the metadata.
14  You appear to have been the custodian of this
15  document when it was -- as it's produced to us.
16      A.  Yes.
17      Q.  And do you recognize this document?
18      A.  Yes.
19      Q.  Did you create any of the content in
20  this document?
21      A.  As we talked about before, I would
22  have provided -- yeah, I would have provided a
23  lot of the content for this.
24      Q.  Was this also a presentation
25  document?
```

Page 511

```
1            A. Kincaid - CONFIDENTIAL
2       A.  Yes.
3       Q.  Is it fair to say it's an authentic
4   document of the NRCC?
5       A.  Yes.
6       Q.  And the metadata has a date created
7   of January 12, 2012.
8           Do you see that?
9       A.  Yes.
10      Q.  And then modified in August 14, 2012?
11      A.  Yes.
12      Q.  Remind me, when did you leave the
13  NRCC?
14      A.  Not until 2013.
15      Q.  So you were still there during this
16  time?
17      A.  Uh-huh.
18      Q.  Okay.  Do you recall working on this
19  document while you were at the NRCC?
20      A.  Yes.
21      Q.  Turning to the slide third from the
22  end entitled "R seats moved out of play."
23          Do you see that?
24      A.  I see it.
25      Q.  Did you provide the PVI data in this
```

Page 512

```
1            A. Kincaid - CONFIDENTIAL
2   slide?
3       A.  Yeah, PVI and the changes numbers.
4       Q.  And the changes are the ones in the
5   brackets; is that right?
6       A.  In the parentheses.
7       Q.  I'm sorry, in the parentheses.  Okay.
8   Do you recall there being any discussion about
9   this document in particular as distinct from
10  the other PowerPoint?
11      MR. SHEEHY:  Objection to form.
12      A.  It would have been the same content
13  in both of the presentations.  It's just easier
14  that way.
15      Q.  I understand.
16      A.  Yeah, the origins of this would have
17  been the exact same as the origins of the other
18  one.
19      Q.  Okay.  Turning to the fourth slide,
20  "Redistricting Highlights," it's partially
21  redacted but there was one line that wasn't,
22  that is:  "Ohio:  Republican map shored up
23  multiple seats for the decade."
24          Do you see that?
25      A.  I do.
```

Page 513

```
1            A. Kincaid - CONFIDENTIAL
2       Q.  Did you contribute that input to this
3   slide?
4       MR. SHEEHY:  Objection to form.
5       A.  That would have been my analysis.
6       MR. FRAM:  I want to mark next
7   as -- Exhibit 82?  Hold on a second.  Is
8   that right?
9       MR. SHEEHY:  82 was the metadata on
10  81.
11      MR. FRAM:  Okay.  Now I'm getting
12  confused.  82 is the metadata --
13      MR. SHEEHY:  Yes.
14      MR. FRAM:  -- on 81?  You're right.
15      THE WITNESS:  You want to take a
16  five-minute bathroom break and come
17  back?
18  (Recess taken.)
19      MR. FRAM:  So let's mark up next --
20  I apologize, I lost my number.  83.
21  Bates number REV_0000021.  It's entitled
22  "Ohio Congressional District Data."
23      (Exhibit No. 83 was marked for
24  identification.)
25      MR. FRAM:  And then make 84 the
```

67 (Pages 510 to 513)

Page 514

1     A. Kincaid - CONFIDENTIAL
2   metadata for that one.
3     (Exhibit No. 84 was marked for
4     identification - WITHDRAWN.)
5   BY MR. FRAM:
6     Q.  Mr. Kincaid, did you create
7   Exhibit 84 -- excuse me, Exhibit 83?
8     A.  Yes.
9     Q.  You did so as part of your ordinary
10  job duties as redistricting coordinator for the
11  NRCC?
12    A.  Yes.
13    Q.  And that's true of all the other
14  documents I asked you about where I asked you
15  if you created them and you said yes; is that
16  right?  Did you create any of them sort of on
17  your own, not as part of your job?
18        MR. SHEEHY:  Does this cause you
19    any concern?  Because that looks like
20    it's coming from an internal --
21        MR. FRAM:  Oh, let me see, hold on.
22    You're saying worried about waiving
23    work product on these?
24        MR. SHEEHY:  I saw a file name that
25    said "Kincaid depo prep."  That's where

Page 515

1     A. Kincaid - CONFIDENTIAL
2   I got that.
3         MR. FRAM:  Oh, okay.  Let's
4   withdraw -- I don't think it's a
5   concern, but to be safe let's
6   withdraw -- which is this exhibit?  84?
7   No, hold a second, I've got a
8   different -- oh, it's the other side of
9   it.  I get it.
10        All right, let's withdraw
11  Exhibit 84.  We'll just withdraw it.
12  Thank you.
13        MR. SHEEHY:  You're welcome.
14        MR. FRAM:  I'm not real worried
15    about it, but why not?
16  BY MR. FRAM:
17    Q.  Anyway, you're checking to see if any
18  of these were created outside the scope of
19  doing your job.  The ones you said you --
20    A.  I'm just looking real quick.
21    Q.  Sure.  That's fine.
22    A.  I don't want to say yes --
23    Q.  I appreciate your being careful.
24    A.  -- if this is not accurate.
25    Q.  I appreciate your being careful.

Page 516

1     A. Kincaid - CONFIDENTIAL
2     A.  These all would have been produced
3   over the course of my normal work at the NRCC.
4   Or I would have contributed to them in the
5   sense of the PowerPoints as part of my normal
6   work at the NRCC.
7     Q.  So we're clear for the record, you're
8   reviewing all the exhibits that were marked
9   today.
10    A.  Yes.
11    Q.  Looking at Exhibit 83, do you have
12  any recollection as to why you created this
13  document?
14        MR. SHEEHY:  Objection to form.
15    A.  It's a standard profile of the
16  districts in Ohio.  We would have had one of
17  these for every state.  It's just a standard
18  thing that we created.
19    Q.  Do you recall who if anyone you would
20  have communicated this to?
21        MR. SHEEHY:  Objection to form.
22    A.  This would have been available to
23  anybody who was a member of the NRCC or staff
24  who requested it.
25    Q.  Do you recall any conversations about

Page 517

1     A. Kincaid - CONFIDENTIAL
2   it with anyone?
3         MR. SHEEHY:  Objection to form.
4     A.  This would have been the document
5   that everybody had in front of them for
6   meetings about Ohio.  So I mean, any -- not any
7   particular meeting about this specific
8   document.  It's just a pretty standard profile
9   of the districts in Ohio.
10        MR. FRAM:  I'm going to mark next
11    as -- this will now be Exhibit 84
12    because we withdrew the other one.  It's
13    REV_0000001 and it's entitled
14    "State-by-State Redistricting Summary."
15    (Exhibit No. 84 was marked for
16    identification.)
17        MR. FRAM:  And here as 85 are the
18    metadata for REV -- for that same
19    PowerPoint, REV_00000001.
20    (Exhibit No. 85 was marked for
21    identification.)
22  BY MR. FRAM:
23    Q.  Let me draw your attention to the
24  fourth page of the document.  And I should ask,
25  so do you recognize this?  I know a lot of it's

68 (Pages 514 to 517)

Page 518

```
 1        A. Kincaid - CONFIDENTIAL
 2   redacted, but do you recognize this, the part
 3   here about Ohio that's on the page?
 4        A.  Yes.
 5        Q.  Did you create that content?
 6        A.  Yes.
 7        Q.  Did you do this as part of your
 8   ordinary job duties as redistricting
 9   coordinator of the NRCC?
10        A.  Yes.
11        Q.  And looking at the metadata,
12   Exhibit 85 indicates a date modified of
13   February 6, 2012.
14        Do you see that?
15        A.  Yes.
16        Q.  And it also indicates a date first
17   created, October 26, 2011.
18        Do you see that?
19        A.  I do.
20        Q.  So is it your recollection that you
21   wrote those words sometime after December 15,
22   2011 when Ohio redistricting was complete?
23        A.  That would likely have been the case,
24   yes.
25        Q.  And likely before February 6, 2012?
```

Page 519

```
 1        A. Kincaid - CONFIDENTIAL
 2        A.  It would have been before February 6.
 3        Q.  Okay.  You see the words "the new map
 4   should be a 12-4 map"?
 5        Do you see that?
 6        A.  Yes.
 7        Q.  Those were your words?
 8        A.  Yes.
 9        Q.  Do you recall if this document was
10   used internally at the NRCC for communications
11   amongst senior staff at the NRCC?
12        MR. SHEEHY: Objection to form.
13        A.  It would have been a briefing
14   available to members and staff at the NRCC.
15        Q.  Okay.  Do you recall any discussion
16   about Ohio related to this document?
17        MR. SHEEHY: Objection to form.
18        A.  I don't recall any discussion on this
19   document, no.
20        Q.  I'll ask you a few questions from the
21   previous deposition you weren't able to answer.
22   I believe you said that previously -- I asked
23   whether you sort of spoke with Guy Harrison
24   about redistricting in Ohio in 2011.  And then
25   I asked you what did you talk with about, and
```

Page 520

```
 1        A. Kincaid - CONFIDENTIAL
 2   you were instructed not to answer, so now I'm
 3   going to ask the question again.  What did you
 4   talk with Mr. Harrison about as regards
 5   redistricting in Ohio in 2011?
 6        MR. SHEEHY: Objection to form.
 7        A.  He was the executive director at the
 8   NRCC, so I would have talked to him about the
 9   process, when a map was passed, my analysis of
10   any passed maps, how the proposal process was
11   coming along.  It was my job to keep him
12   briefed on what the overall redistricting
13   process was in the states.
14        Q.  Do you recall anything he had to say?
15        MR. SHEEHY: Objection to form.
16        A.  No.
17        Q.  Did you talk to him during the time
18   when you were not just doing the Congressional
19   proposal but also doing the analysis of the
20   Ohio maps?
21        MR. SHEEHY: Objection to form.
22        A.  Did I talk to him -- did I talk to
23   the executive director of the NRCC while
24   working on proposal maps for Ohio?
25        Q.  Not just -- start with that.
```

Page 521

```
 1        A. Kincaid - CONFIDENTIAL
 2        A.  Of course.
 3        Q.  What about after the proposal went to
 4   the Ohio legislative leadership, did you talk
 5   with him?
 6        MR. SHEEHY: Objection to form.
 7        A.  Specifically about Ohio?
 8        Q.  Yes.
 9        A.  I don't recall talking to Guy about
10   Ohio after the proposal was -- you know, after
11   the map had been passed or anything, so --
12        Q.  I'm talking about between the time
13   the proposal went and the time HB 369 was
14   finally enacted.
15        A.  369 or 319?
16        Q.  369.  During that period, between the
17   time the proposal was provided and 369 was
18   enacted, do you recall any discussions with
19   Mr. Harrison about Ohio?
20        A.  We would have talked about 319.
21        Q.  Okay.  What do you recall about that?
22        MR. SHEEHY: Objection to form.
23        A.  We would have a standard meeting
24   with -- as part of the meetings, we would go
25   through states that had completed
```

Page 522

1       A. Kincaid - CONFIDENTIAL
2 redistricting, we'd go through the districts
3 and talk about those in analytical documents
4 you've already gone through, and say hey, here
5 is the numbers on the new map, here's the
6 districts we should be targeting in the next
7 election, all that sort of stuff like we've
8 already talked about. So Guy would have been
9 one of the people that I was talking to about
10 those maps after they'd been passed.
11     Q. What about the 369?
12       MR. SHEEHY: Objection to form.
13     A. We would have had the same meeting
14 again.
15     Q. Okay. And you had discussions with
16 him during the time 369 was pending, after it
17 was introduced in the legislature before it was
18 passed? Did you have any conversations with
19 him?
20       MR. SHEEHY: Objection to form.
21     A. I don't have any memory of that.
22     Q. Do you recall any conversations with
23 anybody at NRCC senior staff regarding Ohio
24 during the time between when HB 369 was
25 introduced and the time it was enacted?

Page 523

1       A. Kincaid - CONFIDENTIAL
2       MR. SHEEHY: Objection to form.
3     A. No, I don't recall any conversations
4 about 369 during that period.
5     Q. Do you recall any conversations about
6 a referendum possibility on HB 319?
7       MR. SHEEHY: Objection to form.
8     A. I know there was a referendum
9 possibility going on that would have come up as
10 something I would have briefed senior staff on
11 when we found out about it and while that was
12 developing, yes.
13     Q. At some point, did you get any
14 information that the Democrats would be
15 unlikely to collect sufficient number of
16 signatures to get the referendum on the ballot?
17       MR. SHEEHY: Objection to form.
18     A. I don't recall getting that
19 information or not.
20     Q. Do you recall any information as to
21 whether or not the referendum was affecting one
22 way or the other negotiations regarding HB 369?
23       MR. SHEEHY: Objection to form.
24     A. I may have received an email about
25 that, but I don't have a specific recollection

Page 524

1       A. Kincaid - CONFIDENTIAL
2 of it. What you just said sounds like
3 something I've heard before but I don't recall
4 when or where I would have heard that.
5     Q. Do you remember Dr. Hofeller ever
6 raising that subject with you?
7       MR. SHEEHY: Objection to form.
8     A. It's entirely possible but I don't
9 have a specific recollection of it.
10     Q. Did you talk with Jessica Furst -- I
11 believe her name is now Jessica Furst
12 Johnson -- regarding redistricting in Ohio in
13 2011?
14       MR. SHEEHY: Objection. I will
15     note that Jessica Furst Johnson was the
16     general counsel at the NRCC, so I'll
17     caution the witness not to reveal any
18     attorney-client communications.
19     A. I definitely -- I spoke with Jessica.
20     Q. Okay. Did you share any of the
21 change sheets we've looked at in your
22 deposition with Jessica Furst?
23       MR. SHEEHY: Same objection, and
24     same cautionary instruction. If you
25     were sharing that information with her

Page 525

1       A. Kincaid - CONFIDENTIAL
2 for purposes of obtaining legal advice,
3 I would caution you to not -- or
4 instruct you to not answer the question.
5     A. After the map was passed she would
6 have received changes or district profiles if
7 she wanted them, but I don't recall whether I
8 gave it to her or not.
9     Q. What about Mike Shields? Did you
10 talk with him about redistricting in Ohio in
11 2011?
12       MR. SHEEHY: Objection, form.
13     A. Yes.
14     Q. What do you recall about those
15 conversations?
16       MR. SHEEHY: Objection to form.
17     A. He was the political director at the
18 NRCC at the time, so my answer's going to be
19 the exact same as Guy's. We would have talked
20 about redistricting in Ohio after 319, we would
21 have talked about it after 369, as part of our
22 standard processes at the NRCC to talk about
23 maps as they were created.
24     Q. Would Mr. Shields as political
25 director have an interest in understanding

Page 526

1      A. Kincaid - CONFIDENTIAL
2   which districts had moved out of play as a
3   result of redistricting?
4        MR. SHEEHY: Objection to form.
5      A. He would have had an interest in the
6   districts in Ohio, yes. Which ones had
7   gotten -- had -- and how they had changed from
8   one redistricting to the other.
9      Q. Did he ever say anything you can
10  recall about a district being moved out of play
11  or not?
12       MR. SHEEHY: Objection to form.
13     A. I have no specific recollection about
14  Mike saying something about that.
15     Q. What about Mr. Harrison?
16       MR. SHEEHY: Objection to form.
17     A. Same answer.
18     Q. What about Brock McCleary? Did you
19  talk with him about Ohio in 2011, Congressional
20  redistricting?
21       MR. SHEEHY: Objection to form.
22     A. Also -- he was the deputy political
23  director. Same conversations would have
24  happened with him as with Mike and Guy. And
25  again, I don't remember any specific

Page 527

1      A. Kincaid - CONFIDENTIAL
2   conversations.
3      Q. What about Paul Lindsay?
4        MR. SHEEHY: Objection to form.
5      A. I give the exact same answer on Paul.
6      Q. Did you have any communications with
7   Bob Bennett in Ohio about redistricting in Ohio
8   in 2011?
9      A. No.
10     Q. I want to ask you about conversations
11  with certain individual members of Congress
12  which you testified happened. We discussed to
13  some degree Representative Tiberi. Other than
14  what you've already testified about do you
15  recall any other conversations with
16  Representative Tiberi in 2011?
17       MR. SHEEHY: Objection to form.
18     A. Not in addition to what we already
19  spoke about.
20     Q. Okay.
21       MR. FRAM: Mark next as 85 -- I'm
22  sorry, 86, a document with Bates number
23  TIBERI000039.
24  (Exhibit No. 86 was marked for
25  identification.)

Page 528

1      A. Kincaid - CONFIDENTIAL
2        MR. FRAM: Why don't we mark as 87
3   the metadata for that document.
4   (Exhibit No. 87 was marked for
5   identification.)
6   BY MR. FRAM:
7      Q. Mr. Kincaid, do you recognize this
8   document, Exhibit 86?
9      A. Yes.
10     Q. You prepared it in the ordinary
11  course of your job duties at the NRCC; is that
12  right?
13     A. Yes.
14     Q. And did you present this to
15  Representative Tiberi?
16       MR. SHEEHY: Objection, form.
17     A. I don't recall presenting this to
18  Mr. Tiberi, no.
19     Q. Do you have any understanding as to
20  why he would have it in his files and produce
21  it to us? You created it and -- do you recall
22  how he got it?
23       MR. SHEEHY: Objection to form.
24     A. He was a member of Congress and
25  thereby a member of the NRCC. He could have

Page 529

1      A. Kincaid - CONFIDENTIAL
2   requested this from any number of members of
3   the staff at the NRCC because this file would
4   have been on the servers at the NRCC.
5      Q. Got it. This particular spreadsheet
6   just focuses only on Mr. Tiberi's district,
7   District 12; is that right?
8      A. Yes.
9      Q. And per the metadata it appears to
10  have been modified on December 14, 2011. Is
11  that right?
12     A. That's what this says, yes.
13     Q. Okay. Did you create
14  district-specific spreadsheets after HB 369 was
15  enacted?
16     A. Yes.
17     Q. And then they were posted on the
18  NRCC's website; is that right?
19     A. No. I said the server.
20     Q. The server. Yes. I'm sorry. The server.
21  I apologize. They were posted on NRCC's
22  server; is that right?
23     A. Yes.
24     Q. So you included the election results
25  data in the district-specific spreadsheets that

Page 530

1    A. Kincaid - CONFIDENTIAL
2  you came after HB 369 was enacted and that
3  were posted on the NRCC server; correct?
4         MR. SHEEHY: Object to form.
5     A.  I'm sorry. I missed the first part.
6     Q.  You included election result data on
7  all of the district-specific spreadsheets for
8  Ohio after HB 369 was enacted and that were
9  then posted on the NRCC's server?
10    A.  Yes.
11        MR. SHEEHY: Objection to form.
12    Q.  These are the same elections we have
13  seen in your other spreadsheets; correct?
14    A.  Yes.
15    Q.  And just for the record so we have a
16  clean record those are consistently, the 2010
17  governor race, the 2010 Attorney General race,
18  the 2008 Presidential race, the 2006 Attorney
19  General race, 2006 auditor race, and the 2004
20  President race; correct?
21    A.  Yes.
22    Q.  Okay.  You would always include also
23  the PVI scorings; correct?
24    A.  Yes.
25        MS. McKNIGHT:  Before we move on

Page 531

1    A. Kincaid - CONFIDENTIAL
2  from this exhibit, I note that it does
3  not indicate CONFIDENTIAL on the face of
4  the exhibit.  This is Exhibit 86.
5        MR. FRAM:  Yeah.
6        MS. McKNIGHT:  I trust -- I believe
7  this was produced as confidential under
8  the protective order.  I'd just like to
9  note that for a clean record.
10        MR. FRAM:  That's fine.  I had -- I
11  thought only addresses were, but I'm
12  happy to -- let's do the following.  The
13  last piece -- let's slow down for a
14  minute.
15        MS. McKNIGHT:  I believe at the
16  beginning -- and pardon me, counsel.  I
17  have been thinking it through.  At the
18  beginning you addressed confidentiality,
19  and I understand Mr. Kincaid's counsel
20  will review the transcript.  I just want
21  to note that we as well, representing
22  interveners and other clients who
23  produced documents in this case, will
24  also need to review the transcript for
25  confidentiality.  As a preliminary

Page 532

1    A. Kincaid - CONFIDENTIAL
2  matter, I will designate all testimony
3  about Exhibit 86 and Exhibit 87 as
4  confidential.
5        MR. FRAM:  Okay.  See how it goes.
6  Let's mark as Exhibit 88 REV_00000034,
7  another spreadsheet for District 12.
8     (Exhibit No. 88 was marked for
9     identification.)
10  BY MR. FRAM:
11    Q.  Comparing the two spreadsheets,
12  Exhibit 88 and 86, they appear to be identical,
13  do they not?
14    A.  Yes.
15    Q.  So your testimony regarding 86 would
16  apply to 88 also?
17    A.  Yes.
18    Q.  Okay.
19        MR. FRAM:  Kate and Shawn, I'll let
20  you-all work out between the two of you
21  if you still got -- who's got the ball
22  on the confidentiality question.  This
23  one seems to get around.
24        Why don't we mark next as 89
25  REV_0000030, a spreadsheet concerning

Page 533

1    A. Kincaid - CONFIDENTIAL
2  District 8.
3     (Exhibit No. 89 was marked for
4     identification.)
5        MR. FRAM:  And let me take a look
6  here.
7  BY MR. FRAM:
8     Q.  Mr. Kincaid, do you recognize this
9  document?
10    A.  Yes.
11    Q.  You created it in the ordinary course
12  of your job duties as redistricting coordinator
13  at the NRCC; correct?
14        MR. SHEEHY: Objection to form.
15    A.  Yes.
16    Q.  You did so following the enactment of
17  HB 369; correct?
18    A.  No.
19    Q.  When did you do this?
20    A.  This is not HB 369.
21    Q.  What is this one?
22    A.  Since you gave me the sheet before,
23  it showed HB 369 with Mr. Boehner's seat at PVI
24  of R+14.
25    Q.  Okay.

Page 534

```
1         A. Kincaid - CONFIDENTIAL
2      A.  So I don't know what this one is.
3      Q.  So that raises an important question.
4   So did you provide -- in addition to providing
5   district-specific spreadsheets after the full
6   enactment of HB 369, did you also provide
7   district-specific spreadsheets with election
8   results while -- prior to the final enactment
9   of HB 369?
10         MR. SHEEHY:  Objection to form.
11      A.  Clearly, I did.  This does not apply
12   to 369.  I'm not sure what plan this is.
13      Q.  Did you do -- did you only provide
14   district-specific spreadsheets after a plan was
15   actually enacted, in other words, 319 and 369,
16   or did you also do them for iterations that
17   were being considered?
18         MR. SHEEHY:  Objection to form.
19      A.  I think -- well, let me think about
20   that.  I would have produced district-specific
21   profiles when they had been requested.
22      Q.  Okay.
23      A.  So it may have been before 319, it
24   may have been after 319, it could have -- so --
25      Q.  And those -- but those profiles
```

Page 535

```
1         A. Kincaid - CONFIDENTIAL
2   always included election result status;
3   correct?
4      A.  Absolutely.
5      Q.  For the last elections we have been
6   discussing previously; correct?
7      A.  Yes.
8      Q.  And it always included PVI data;
9   correct?
10      A.  Yes.  I'm going to note real quick
11   that the previous one we looked at -- I'm
12   trying to find it.
13         MR. SHEEHY:  Talking about Tiberi?
14         THE WITNESS:  Exhibit 89/88.  Well,
15   I guess Exhibit 88 and 86.
16         MR. SHEEHY:  I've got them here.
17         THE WITNESS:  I'm just looking at
18   something real quick.  Yeah, that's what
19   I thought.  The -- yeah, that Tiberi 12
20   is also not 369.  The numbers are
21   different.
22   BY MR. FRAM:
23      Q.  Okay.  So tell me if I understand
24   correctly.  You created district-specific
25   spreadsheets as requested.  They were posted on
```

Page 536

```
1         A. Kincaid - CONFIDENTIAL
2   the NRCC's server.  Is that right?
3      A.  Yes.
4      Q.  It always included election data for
5   the six elections you've described; correct?
6      A.  Yes.
7      Q.  And PVI data; correct?
8      A.  Yes.
9      Q.  Okay.
10      A.  But that Tiberi 1, I may have
11   misspoken before.  I can't remember if you
12   asked me the question, but Exhibit 87 --
13   86, 87, and 88 do not appear to be the profiles
14   for the current Ohio Congressional map.
15      Q.  Thank you for that.
16         In addition to posting it on the NRCC
17   website, was there any other way to --
18      A.  Not website.  Server.
19      Q.  Server.  I'm sorry.  I keep saying
20   it.  Other than the NRCC server was there any
21   other way that district-specific spreadsheets
22   were distributed?
23         MR. SHEEHY:  Objection to form.
24      A.  I would post on the server so the
25   staff had access to them.  And then I don't
```

Page 537

```
1         A. Kincaid - CONFIDENTIAL
2   have any specific recollection of sharing them
3   via email or anything else with anybody, but I
4   certainly could have emailed to it somebody,
5   but I don't have any recollection of doing
6   that.
7      Q.  Who had access to the NRCC server, if
8   anyone, other than NRCC staff?
9      A.  Only NRCC staff.
10      Q.  Okay.  Would RNC staff have had
11   access?
12         MR. SHEEHY:  Objection to form.
13      A.  No.
14         MR. FRAM:  Mark as 90 REV_00000026.
15   It says district-specific spreadsheet
16   for District 4.
17   (Exhibit No. 90 was marked for
18   identification.)
19   BY MR. FRAM:
20      Q.  Mr. Kincaid, do you recognize this
21   document?
22      A.  Yes.
23      Q.  You produced it.  You created it as
24   part of your ordinary job duties as
25   redistricting coordinator at the NRCC; correct?
```

73 (Pages 534 to 537)

Page 538

```
 1         A. Kincaid - CONFIDENTIAL
 2      A.  Yes.
 3      Q.  In connection with redistricting in
 4  Ohio in 2011?
 5      A.  Yes.
 6      Q.  And after you did that, it was posted
 7  on the NRCC server; is that right?
 8      A.  Yes.
 9      Q.  It contains the same elections, six
10  elections we've discussed previously as well as
11  the PVI data; correct?
12      A.  Yes.  I'll point out again, this
13  isn't 369.
14      Q.  Yeah, I didn't ask that, I just --
15  it's during the course of the redistricting
16  this information was generated and posted;
17  correct?
18      A.  Yes.
19      Q.  So NRCC staff and/or members of
20  Congress could access it; correct?
21      A.  Members of Congress would have had to
22  request it from somebody on staff.
23      Q.  Okay.  Do you recall any requests
24  from any members of Congress for it?
25      A.  Not --
```

Page 539

```
 1         A. Kincaid - CONFIDENTIAL
 2         MR. SHEEHY:  Objection to form.
 3      A.  Not explicitly.
 4      Q.  Would the requests have come to you
 5  or would they have come through some other
 6  person?
 7         MR. SHEEHY:  Objection to form.
 8      A.  Members had access to anybody at the
 9  NRCC they wanted to ask.
10      Q.  Okay.
11         MR. FRAM:  Let's see if we can move
12  this faster on a batch basis because the
13  questions are going to be the same for
14  all these, okay?  We are up to 91,
15  right?
16         THE REPORTER:  Yes, sir.
17         MR. FRAM:  Why don't we mark as 91
18  REV_00000028 -- let's see, six zeroes
19  and 28, a district-specific spreadsheet
20  for District 6.
21  (Exhibit No. 91 was marked for
22  identification.)
23         MR. FRAM:  As 92, REV_00000024,
24  district-specific spreadsheet for
25  District 2.
```

Page 540

```
 1         A. Kincaid - CONFIDENTIAL
 2  (Exhibit No. 92 was marked for
 3  identification.)
 4  (Exhibit No. 93 was marked for
 5  identification.)
 6         MR. FRAM:  As 93, REV_00000027, a
 7  district-specific spreadsheet for
 8  District 5.
 9  (Exhibit No. 94 was marked for
10  identification.)
11         MR. FRAM:  As 94, REV_00000029, a
12  district-specific spreadsheet for
13  District 7.
14  (Exhibit No. 95 was marked for
15  identification.)
16         MR. FRAM:  And as 95, REV_00000023,
17  a district-specific spreadsheet for
18  District 1.
19  (Exhibit No. 96 was marked for
20  identification.)
21         MR. FRAM:  And then REV_96 I guess
22  we're up to, REV_00000037 a
23  district-specific spreadsheet for
24  District 15.
25  (Exhibit No. 97 was marked for
```

Page 541

```
 1         A. Kincaid - CONFIDENTIAL
 2  identification.)
 3         MR. FRAM:  97 is REV_00000032, a
 4  district-specific spreadsheet for
 5  District 10.
 6  (Exhibit No. 98 was marked for
 7  identification.)
 8         MR. FRAM:  98 is REV_00000038, a
 9  district-specific spreadsheet for
10  District 16.
11  (Exhibit No. 99 was marked for
12  identification.)
13         MR. FRAM:  And as 99, REV_00000036,
14  a district-specific spreadsheet for
15  District 14.
16  BY MR. FRAM:
17      Q.  My questions are going to be the same
18  for all these exhibits.  Hopefully it works.
19         For all these exhibits we're looking
20  at here, which start at 91 and go through 99,
21  why were all these -- did you create all of
22  these?
23      A.  Yes.
24      Q.  Did you do so as part of your
25  ordinary job duties at redistricting
```

Page 542

```
1          A. Kincaid - CONFIDENTIAL
2   coordinator at the RNCC?
3        A.   The NRCC.
4        Q.   I'm sorry, the NRCC.
5        A.   Yes.
6        Q.   And did you do so in connection with
7   redistricting in Ohio in 2011?
8        A.   Yes.
9        Q.   And in so doing, did you always
10  include -- you included the same six elections;
11  is that right?
12       A.   Yes.
13       Q.   And that's the 2010 governor, the
14  2010 Attorney General, the 2008 President, the
15  2006 Attorney General, the 2006 auditor, and
16  the 2004 President; correct?
17       A.   Yes.
18       Q.   And also, you included, consistently
19  included PVI on scoring information; correct?
20       A.   Yes.
21       Q.   And after you created these
22  district-specific spreadsheets, they were
23  posted on the NRCC server; correct?
24       A.   Yes.
25       Q.   Do you recall distributing these to
```

Page 543

```
1          A. Kincaid - CONFIDENTIAL
2   anybody else?
3            MR. SHEEHY:  Objection to form.
4        A.   As I said before, I don't have any
5   specific recollection of distributing them.
6        Q.   Any general recollection?
7            MR. SHEEHY:  Objection to form.
8        A.   They would have been available if
9   anyone asked, but I don't have any general
10  recollection of having a standard process of
11  sending them out, no.
12       Q.   Do you recall anybody asking for
13  them?
14           MR. SHEEHY:  Objection to form.
15       A.   No.  Once they were on the server,
16  people could get them if they wanted them,
17  so --
18       Q.   Now, I think you previously testified
19  that you had meetings with individual members
20  of Congress during the redistricting process.
21  Is that right?
22       A.   I did.
23       Q.   And did you meet with them during the
24  time you were formulating the proposal for the
25  Ohio legislator -- legislature?
```

Page 544

```
1          A. Kincaid - CONFIDENTIAL
2            MR. SHEEHY:  Objection to form.
3        A.   Yes.
4        Q.   Did you meet with them thereafter?
5            MR. SHEEHY:  Objection to form.
6        A.   Yes.
7        Q.   And at the meetings you had with them
8   did you ever show them the district-specific
9   spreadsheets for their districts?
10           MR. SHEEHY:  Objection to form.
11       A.   Yes.
12       Q.   Did you show them on the computer
13  screen or in hard copy?
14           MR. SHEEHY:  Objection to form.
15       A.   Computer screen, probably.
16       Q.   Okay.  And these meetings continued
17  after HB 319 was enacted?
18           MR. SHEEHY:  Objection to form.
19       A.   Yes.
20       Q.   And they continued up until the time
21  when HB 369 was enacted?
22           MR. SHEEHY:  Objection to form.
23       A.   That would cover the same period of
24  time of what you just asked before, so after
25  319 and before 369, yes, meetings happened
```

Page 545

```
1          A. Kincaid - CONFIDENTIAL
2   during that period of time.
3        Q.   Okay.  Do you recall any
4   conversations with any members of Congress
5   during the period of time after 319 was enacted
6   and before 369 was enacted?
7            MR. SHEEHY:  Objection to form.
8        A.   I don't recall meeting with specific
9   members, but I'm sure that we met to brief them
10  if they wanted to on the new -- on the
11  districts that had been passed with 319.
12       Q.   And did you brief them about
13  proposals for 369?
14           MR. SHEEHY:  Objection to form.
15       A.   Proposals for 369, which was the
16  second map.
17       Q.   Correct.
18       A.   I don't recall seeing proposals for
19  369 until after the legislature had enacted
20  that one.
21       Q.   Do you recall if -- any information
22  whatsoever about the districts for proposals
23  for 369 while it was pending?
24           MR. SHEEHY:  Objection to form.
25       A.   I don't have any specific
```

Page 546

1    A. Kincaid - CONFIDENTIAL
2  recollection of getting maps or -- between 319
3  and 369.
4      Q.  When you received maps did you
5  receive any communications about 369 while it
6  was pending?
7      MR. SHEEHY:  Objection to form.
8      A.  I recall no specific information I
9  received regarding 369 while it was pending.
10     Q.  Do you recall of any conversations
11 with Mr. Whatman about 369 while it was
12 pending?
13     MR. SHEEHY:  Objection to form.
14     A.  I do not.
15     Q.  Did you ever have any communications
16 with Mr. DiRossi while it was pending?
17     MR. SHEEHY:  Objection to form.
18     A.  Not that I recall.
19     Q.  With Ms. Mann?
20     A.  Not that I recall.
21     MR. SHEEHY:  Objection to form.
22     A.  All this was seven years ago, so --
23     Q.  I understand.
24     I take it you're not saying that
25 there were no communications with Ms. Mann or

Page 547

1    A. Kincaid - CONFIDENTIAL
2  Mr. DiRossi regarding the collaboration while
3  369 was pending, but you're saying because it
4  was seven years ago, as you sit here now, you
5  don't recall.
6      MR. SHEEHY:  Objection to form.
7      A.  I recall being a lot more involved in
8  the process in the run-up to 319.
9      The period of time between 319 and
10 316 while at the NRCC, I spent that time, if it
11 was dealing with Ohio, it was analyzing the 319
12 map because that was the map until something
13 else had been passed.
14     So I don't recall being involved,
15 definitely not as intensely with the drafting
16 of 369 as I had been with 319.
17     Q.  All right.
18     A.  And I don't recall any conversations
19 with Heather, Ray, or Tom regarding 369 while
20 it was being considered.
21     Q.  My question is -- there are two
22 different things.  One is whether you recall;
23 the other is whether you can say affirmatively
24 that communications did not happen.
25     A.  Again, I --

Page 548

1    A. Kincaid - CONFIDENTIAL
2      Q.  They're different statements.
3      MR. SHEEHY:  Objection to form.
4      A.  Just to be -- okay, just because I
5  don't remember it doesn't mean it didn't
6  happen.  I don't remember.
7      Q.  That's -- okay, thank you.
8      A.  I don't recall.
9      Q.  That's --
10     A.  I don't remember.
11     Q.  That's all I was trying -- okay.
12     A.  Yeah.
13     MR. FRAM:  Why don't we take a
14     quick break?  Actually, one more set of
15     documents we can do before a break, then
16     we can do the break and check notes and
17     thing.
18     Q.  In your last deposition, I'll show
19 you a bunch of exhibits that were marked there
20 and I'd asked you questions about that you
21 couldn't answer because of instructions.
22     A.  Okay.
23     Q.  These already have been marked so we
24 don't have to mark them again.  So first I want
25 to show you what was marked as Kincaid

Page 549

1    A. Kincaid - CONFIDENTIAL
2  Exhibit 11.
3      (Exhibit No. 11, previously marked, was
4      referenced and indexed.)
5  BY MR. FRAM:
6      Q.  Mr. Kincaid, this is -- by the way,
7  it has BRADEN001388 as the Bates number.
8      Do you recognize this map?
9      A.  This?  Do I recognize the map?  Yeah,
10 I recognize it from the previous deposition,
11 yes.
12     Q.  All right.  And in fact, this is one
13 of the maps that you -- district maps that you
14 attached to your emails in September 2 and 3.
15     A.  Okay.
16     Q.  Do you recall that?  Okay.
17     Do you see the -- do you see in the
18 middle the number 09?
19     Do you see that?
20     A.  I do.
21     Q.  Is it your understanding that that's
22 for District 9; correct?
23     A.  Yes.
24     Q.  Okay.  And do you see under it,
25 there's a minus 13.48?

Page 550

```
 1          A. Kincaid - CONFIDENTIAL
 2      Do you see that?
 3      A.  Yes.
 4      Q.  What's minus 13.48 stand for?
 5          MR. SHEEHY:  Objection to form.
 6      A.  That would be the PVI.
 7      Q.  Okay.  Did you put that in there?
 8          MR. SHEEHY:  Objection to form.
 9      A.  Well, I created the label, yes.
10      Q.  Okay.  Then you communicated that to
11  to Mr. DiRossi and Ms. Mann in September of
12  2011 when you communicated this map attached to
13  your email?
14          MR. SHEEHY:  Objection to form.
15      A.  This is a Braden email?
16      Q.  No, it's not a Braden email, it's a
17  Braden-produced document.  He received a copy
18  of it.
19      A.  So I -- what's the trail on this one?
20  So I -- you're saying I sent this one to Ray
21  and Heather and then they sent it to Mark or I
22  sent it to Mark?
23      Q.  Let's find the email.  Hold on.  I
24  think I have the document here.  It's Exhibit 7
25  from your last deposition.
```

Page 551

```
 1          A. Kincaid - CONFIDENTIAL
 2      A.  Okay.
 3      Q.  The email string with Bates number
 4  LWV_0800018302.
 5      A.  Okay.
 6      Q.  And what you see are thumbnails, if
 7  you will, of the maps as attachments to your
 8  September 2, 2011, 6:41 p.m. email.
 9      A.  Okay.
10      Q.  Which was sent to Mr. DiRossi,
11  Ms. Mann, and Tom Whatman.
12      A.  Uh-huh.
13      Q.  My question -- you can't make out the
14  label on this thumbnail but that's why we
15  provided this.
16      A.  Okay.
17      Q.  There's JPEG attachments, and later
18  we see that Mr. Braden received this and then
19  he produced them in discovery in this case.
20  That's why we have the larger rendering.
21      A.  Got it.
22      Q.  Okay?  And so now my question to you
23  is, you put in the PVI value of minus 13.48 for
24  CD 9; correct?
25      A.  Well, the computer would have
```

Page 552

```
 1          A. Kincaid - CONFIDENTIAL
 2  generated that.  I created the formula that
 3  would have created that number.
 4      Q.  And then you communicated that to
 5  Mr. DiRossi and Ms. Mann on or about
 6  September 2, 2011; correct?
 7      A.  Assuming that JPEG is the same as
 8  this one, which I'm not -- I'm still a little
 9  fuzzy on -- so Mark has created -- produced
10  this document?
11      Q.  Right.
12      A.  So I don't know where the chain is
13  that we've established that gets -- this email
14  I sent to Ray and Heather on September 2, I
15  don't know how that got to Mark so I don't
16  think I've seen that email.
17      Q.  Maybe I can help you out on that.  If
18  you look on Exhibit 7, page 7 of 8 --
19      A.  Okay.
20      Q.  -- from Heather Mann, September 3,
21  2011 at 8:50 in the morning to Clark Benson or
22  Mark Braden, do you see that?
23      A.  Oh, okay.  Yes, I see that.
24      Q.  At that point, forwarding your email
25  from September 3.
```

Page 553

```
 1          A. Kincaid - CONFIDENTIAL
 2      A.  I see that.
 3      Q.  So that's how the chain works,
 4  getting it to Mr. Braden.
 5      A.  Okay.
 6      Q.  Okay?
 7      A.  And just -- I mean, working off of a
 8  really small thumbnail and for me to say
 9  they're the same document without -- I'm
10  just --
11      Q.  I appreciate that.  That's why we
12  tried to do the work.
13      A.  Right, so -- okay.
14      Q.  To provide you the information.
15      A.  Uh-huh.
16      Q.  So again, you recall sending
17  district-specific maps to Mr. DiRossi and
18  Ms. Mann on or about September 3, 2011?
19      A.  September 2, yes.
20      Q.  September 2, 2011.  And those
21  district-specific maps included PVI values for
22  those districts; correct?
23      A.  It's a -- yes.  It's a screenshot, so
24  yes.
25          THE WITNESS:  Do I need to give
```

Page 554

1    A. Kincaid - CONFIDENTIAL
2  this back to you or put it in the stack?
3        THE REPORTER:  Put it in the stack.
4        MR. FRAM:  I want to show what you
5  was marked as Kincaid 13.
6  (Exhibit No. 13, previously marked, was
7  referenced and indexed.)
8  BY MR. FRAM:
9        Q.  This appears to be a
10 district-specific map for District 11; correct?
11       A.  Yes.
12       Q.  Computer generated the number minus
13 29.70 that appears under the number 11;
14 correct?
15       A.  Yes.
16       Q.  And that's the PVI value; correct?
17       MR. SHEEHY:  Objection to form.
18       A.  Yes.
19       Q.  And you communicated that map with
20 that PVI value to Mr. DiRossi and Ms. Mann on
21 or about September 2, 2011; correct?
22       A.  Yes.
23       MR. FRAM:  Okay, I'll show you
24 what's previously marked as Kincaid
25 Exhibit 15.

Page 555

1    A. Kincaid - CONFIDENTIAL
2  (Exhibit No. 15, previously marked, was
3  referenced and indexed.)
4  BY MR. FRAM:
5        Q.  And this appears to be a
6  district-specific map of District 1; is that
7  right?  And also there's a piece of District 2
8  also.
9        Do you see that?
10       A.  Yes.
11       Q.  And the PVI values for both; correct?
12       A.  Yes.
13       Q.  And for District 1, it's 5.54.  Do
14 you see that?
15       A.  I do.
16       Q.  And for District 2, it's 10.01.
17       Do you see that?
18       A.  Yes.
19       Q.  And the computer generated those PVI
20 values and you included them in this map; is
21 that right?
22       A.  Yes.
23       Q.  And then you transmitted that to
24 Mr. DiRossi and Ms. Mann on or about
25 September 2, 2011?

Page 556

1    A. Kincaid - CONFIDENTIAL
2        A.  Yes.
3        MR. FRAM:  And let's show what was
4  previously marked as Kincaid Exhibit 17.
5  I've marked Kincaid Exhibit 17
6  BRADEN001391.  It appears to be a
7  district-specific map for several
8  different districts, and I'll show it to
9  you.
10 (Exhibit No. 17, previously marked, was
11 referenced and indexed.)
12 BY MR. FRAM:
13       Q.  This map includes PVI information for
14 Districts 9, 11, 14, 13, 16; correct?
15       A.  And 6.
16       Q.  And 6, I'm sorry.  And 6; correct?
17       A.  Yes.
18       Q.  And the computer generated those PVI
19 values and then you inserted them into this
20 map; correct?
21       A.  I inserted -- I created a code
22 that -- within the label that inserted them,
23 yes.
24       Q.  Okay.  And then you transmitted it to
25 Mr. DiRossi and Ms. Mann on or about

Page 557

1    A. Kincaid - CONFIDENTIAL
2  September 2, 2011; correct?
3        A.  Yes.
4        MR. FRAM:  Then finally, Kincaid 19
5  is a map of Ohio as a whole that was
6  marked 19.
7  (Exhibit No. 19, previously marked, was
8  referenced and indexed.)
9  BY MR. FRAM:
10       Q.  This is a map that shows all the
11 Congressional districts in Ohio; correct?
12       A.  It -- yes.
13       Q.  And then there are PVI values under
14 each of the district numbers; correct?
15       A.  Yes.
16       Q.  And they appeared because you created
17 a label that enabled you to put PVI values
18 under a Congressional district; correct?
19       A.  Yes.
20       Q.  And that label would include a PVI
21 value?
22       A.  Yes.
23       Q.  Okay.  And this was communicated to
24 Mr. Mann and -- excuse me, Ms. Mann and
25 Mr. DiRossi on or about September 2, 2011;

Page 558

```
 1          A. Kincaid - CONFIDENTIAL
 2   correct?
 3          A. Yes.
 4          Q. Okay. And so we're clear, all of
 5   these district-specific maps with the PVI
 6   values that we have been discussing, Kincaid
 7   11, 13, 15, 17, and 19 -- did I leave one
 8   out? -- I'm going to ask whether or not they
 9   were all -- you did that -- you did that work
10   as part of the ordinary course of your job
11   duties as redistricting coordinator at the
12   NRCC.
13          A. Yes.
14          MR. FRAM: Okay, now I think we are
15   at that let me take a break and let me
16   look at my notes spot.
17          MR. SHEEHY: That's fine.
18   (Recess taken.)
19          MR. FRAM: Exhibit 100 is a map
20   with the name -- with the Bates number
21   BLESSING0012635 [102611 Adam new map]
22   001.
23   (Exhibit No. 100 was marked for
24   identification.)
25   BY MR. FRAM:
```

Page 559

```
 1          A. Kincaid - CONFIDENTIAL
 2          Q. Now Heather Blessing -- now Heather
 3   Blessing, formerly Heather Mann, and it's the
 4   case, and my question is, does this refresh
 5   your recollection at any time in October of
 6   2011 providing any map to Ms. Blessing?
 7          A. No.
 8          MR. SHEEHY: Objection to form.
 9          Q. No?
10          A. No.
11          Q. Do any of these labels look familiar
12   to you?
13          MR. SHEEHY: Objection to form.
14          A. This isn't the format I would -- this
15   is a screenshot of something. It's not the
16   labels I would have used. I don't know what
17   that top percentage is.
18          Q. Uh-huh.
19          A. No, it doesn't reflect -- refresh my
20   recollection.
21          MR. FRAM: I have no further
22   questions for you. Thank you very much
23   for your time today.
24          THE WITNESS: Okay.
25          MR. FRAM: I should say subject, of
```

Page 560

```
 1          A. Kincaid - CONFIDENTIAL
 2   course, to follow-up should any other
 3   counsel have questions.
 4          MR. SHEEHY: Do you have questions?
 5   Go ahead.
 6          EXAMINATION
 7   BY MS. McKNIGHT:
 8          Q. Good afternoon, Mr. Kincaid. I'm
 9   Kate McKnight. I'm here today on behalf of
10   intervenors in this matter. I'm going to ask
11   you a few questions.
12          A. Okay.
13          Q. The first topic I'd like to ask you
14   about relates to Exhibits 2 and 81, if you
15   could put those in front of you.
16          A. Okay.
17          Q. You provided testimony earlier today
18   that these documents were briefing documents;
19   is that right?
20          A. That's correct.
21          Q. Could these documents have been used
22   for fundraising?
23          MR. SHEEHY: Objection to form.
24          A. Exhibit 2 could have been used as a
25   fundraising document.
```

Page 561

```
 1          A. Kincaid - CONFIDENTIAL
 2          Q. So the record is clear, looking at
 3   Exhibit 2, could that have been used as a
 4   fundraising document?
 5          MR. SHEEHY: Objection to form.
 6          A. Hypothetically, Exhibit 2 could be
 7   used as a fundraising document, yes.
 8          MR. FRAM: Move to strike,
 9   speculation.
10          Q. Now going to the plan that was
11   enacted in 2011 for Ohio's Congressional
12   districts, are you familiar with how the
13   enacted plan for Ohio's Congressional districts
14   in 2011 relate to any maps you worked on for
15   Ohio's Congressional districts in 2011?
16          A. When you're talking about enacted
17   maps, are you talking about 319, 369, or both?
18          Q. I'm talking about 369, the one that
19   was enacted.
20          A. And how the work I did impacted 369
21   or how it --
22          Q. How it relates, how it compares.
23          MR. SHEEHY: Objection, form.
24          A. 369 was definitely a further
25   iteration from 319. As I testified earlier, I
```

Page 562

```
 1          A. Kincaid - CONFIDENTIAL
 2   was definitely much more involved in the
 3   process of 319 than I remembered being involved
 4   in 369.
 5          Like I told Mr. Fram earlier, I don't
 6   recall being overly involved in the process of
 7   369 so I would say 369 was an iteration from
 8   319 that was developed in Ohio, predominantly.
 9      Q.  I understood from your testimony
10   earlier today that you prepared proposed maps
11   for members so they could propose them to state
12   legislators.  Is that a fair description of
13   your testimony?
14      A.  That's exactly what my job was at the
15   NRCC.
16      Q.  Based on your familiarity with the
17   enacted map in Ohio for Congressional districts
18   in 2011, do you know if any of the maps you
19   prepared as proposed maps became HB 369?
20      A.  I don't recall a proposed map that I
21   produced that became HB 369.
22      Q.  The next set of questions I have for
23   you have to do with Exhibit 73.  Would you put
24   that in front of you?  My questions relate to
25   certain numbers in this chart and what they
```

Page 563

```
 1          A. Kincaid - CONFIDENTIAL
 2   mean.  My next questions will relate to the
 3   columns under the header New Ohio Map.
 4      A.  Okay.
 5      Q.  As I see it, there are six elections,
 6   and under each election, there are two columns.
 7          Do you see that?
 8      A.  Yes.
 9      Q.  And the way I see it, there is a
10   column on the left for each election, and it's
11   a percentage.  Could you tell us what that
12   percentage indicates in the left column for
13   each election?
14      A.  For the McCain column, that would be
15   the percentage that John McCain got based off
16   of our data in each of those draft districts.
17   The same would apply for Bush.  In 2004 for
18   President Bush; in 2004, his reelection.  In
19   2010 for governor, 2010 for Attorney General,
20   2006 for Attorney General, and 2006 for
21   auditor.  Those would be the Republican
22   nominees' percentage in each of those
23   districts.
24      Q.  So for each election, the percentage
25   on the left column is the percentage of votes
```

Page 564

```
 1          A. Kincaid - CONFIDENTIAL
 2   cast for the Republican candidate; is that
 3   right?
 4      A.  Yes.
 5      Q.  So in reviewing those percentages,
 6   where that percentage is above 50 percent, does
 7   that mean that the majority of votes cast in
 8   the new district geography were cast for the
 9   Republican candidate?
10      A.  Based off of our election data, yes.
11      Q.  And is the same true vice versa,
12   meaning where the percentage on the left-hand
13   column is lower than 50 percent, does that mean
14   that the Republican candidate in that election
15   did not garner a majority of votes in this new
16   district?
17      A.  It's not a two-party vote here.  This
18   is a multi-party vote.  So I'd have to look at
19   the Democrat percentages for Districts 10 and
20   Districts 14, but for the other ones, yes.  For
21   those two, I'm not sure if those are plurality
22   Republican percentages or if those are -- or if
23   the Democrat in those districts received more
24   of the vote.
25          So that would apply to the two 49s in
```

Page 565

```
 1          A. Kincaid - CONFIDENTIAL
 2   the McCain column as well as probably that --
 3   that 49.89 in District 6 under the Attorney
 4   General 2010.  Attorney General 2010 for
 5   District 14.
 6          Based off of my experience, 15 would
 7   probably mean a Democrat won that district but
 8   I don't have that in front of me so I wouldn't
 9   be able to say.
10          District 16 under 2006 Attorney
11   General would be the other one I wouldn't be
12   sure about.  But in all the other ones, that
13   would be -- it's likely the case.
14      Q.  Okay.  And just so I make I'm sure
15   I'm using the right words here, where the
16   percentage in the left-hand column is lower
17   than 50 percent, that means that the Republican
18   candidate in that election did not garner a
19   majority of the votes.
20      A.  That's correct.
21      Q.  It's possible they garnered the
22   plurality, but you know for certain they did
23   not garner a majority; is that right?
24      A.  That is correct.
25      Q.  So to illustrate this, just so I
```

Page 566

1          A. Kincaid - CONFIDENTIAL
2    understand, I'd like to look at the '06
3    Attorney General race.
4          A.   Okay.
5          Q.   And when I look at the left-hand
6    column for that race, by my count, it looks
7    like there are eight districts in which the
8    Republican candidate for 2006 Attorney General
9    did not garner a majority of the vote.  Is that
10   your count as well?
11         A.   That's correct.
12         Q.   And the reverse is also true in that
13   by my count, for the 2006 Attorney General
14   race, there are only eight districts in which a
15   Republican did garner a majority of the vote.
16   Is that right?
17         A.   2006 Attorney General race?
18         Q.   Yes.
19         A.   Yes, that's correct.
20         Q.   I'll ask you one more set of
21   questions, but I will understand that the same
22   count applies to these other elections.  I'm
23   looking now at the 2010 Attorney General race,
24   and by my count, in seven districts, the
25   Republican candidate did not garner a majority

Page 567

1          A. Kincaid - CONFIDENTIAL
2    of the votes in that election; is that right?
3          A.   That is correct.
4          Q.   And the reverse is true as well,
5    which is to say in the nine remaining
6    districts, those are the only districts in the
7    2010 Attorney General race that garnered a
8    majority of votes for the Republican candidate;
9    is that right?
10         A.   That is correct.
11         Q.   Now I'd like to ask you a question
12   about the rows.  I've just been asking you
13   questions about the columns.
14         A.   Okay.
15         Q.   I'd like to draw your attention to
16   the row illustrating the New Ohio Map for
17   District 6.
18         A.   Okay.
19         Q.   And I'm still focused on the
20   percentages in the left-hand column.
21         A.   Okay.
22         Q.   By my count, it looks as though there
23   are four out of six of these elections where
24   the Republican candidate did not garner a
25   majority of the vote.  Is that your read as

Page 568

1          A. Kincaid - CONFIDENTIAL
2    well?
3          A.   That is correct.
4          Q.   And in your prior deposition, you
5    already went over PVI and what it means, so I
6    have a very specific question about PVI --
7          A.   Uh-huh.
8          Q.   -- as it relates to these races.
9          A.   Okay.
10         Q.   As I'm reading this chart, it says
11   that the PVI is R+5 for District 6 for Johnson.
12   Is that right?
13         A.   Yes.
14         Q.   But I'm also reading this chart that
15   even though this says R+5 for PVI, four out of
16   the six elections studied showed that the
17   Republican candidate did not garner a majority
18   of the vote.  Is my read correct?
19         A.   That's correct.
20         Q.   Stepping back, Mr. Kincaid, in 2011,
21   who did you work for?
22         A.   The National Republican Congressional
23   Committee after February 1.
24         Q.   And before February 1?
25         A.   I was at the Republican Governors

Page 569

1          A. Kincaid - CONFIDENTIAL
2    Association in January of 2011.
3          Q.   At any time in 2011 were you an
4    employee of the RNC?
5          A.   No, I was not.
6          Q.   Since 2011, have you ever worked for
7    the RNC?
8          A.   Yes.
9          Q.   When you worked for the RNC, what did
10   you understand of the relationship between the
11   RNC and members of Congress?
12         A.   The Republican National Committee
13   serves as the national party apparatus for the
14   Republican party and so the RNC through its
15   activities supports the election of Republican
16   candidates to Congress through typically field
17   operations and whatever else they would choose
18   to do in a district that meets the legal
19   requirements necessary.  So the RNC's directly
20   involved in electing Republicans to Congress.
21         Q.   In your work at the RNC was the
22   relationship between the RNC and Republicans
23   anything greater than member and organization?
24         MR. FRAM:  Objection, form.
25         A.   Anything greater than member and

Page 570

```
 1          A. Kincaid - CONFIDENTIAL
 2   organization?  Could you clarify that question?
 3       Q.   Sure.  Do I understand correctly that
 4   the RNC was an organization?
 5       A.   Yes.
 6       Q.   And do I understand correctly that it
 7   was an organization with members?
 8       A.   Yes.
 9       Q.   And were those members of a
10   particular political party?
11       A.   They're all Republicans.
12       Q.   So my question is about the
13   relationship between the RNC and its
14   membership.
15       A.   Okay.
16       Q.   I'm trying to get an understanding of
17   the relationship based on your work at the RNC.
18          Was the relationship between the RNC
19   and Republicans anything ever different than
20   just organization and member?
21       A.   Sure.  We referred to the -- RNC
22   would refer to the NRCC as a sister committee.
23   They share a building.  The organizations work
24   together to elect Republicans to Congress.
25   They coordinate on communication strategies.
```

Page 571

```
 1          A. Kincaid - CONFIDENTIAL
 2       I mean, they're sister organizations
 3   in the sense that they -- not only do they
 4   share a building and coordinate a lot of stuff,
 5   they are -- they work in tandem as much as is
 6   legally allowed.
 7          So in a well-run national committee
 8   structure, you're not going to -- you won't be
 9   able to tell much of a difference between what
10   the NRCC or the RNC is doing in a particular
11   Congressional race because they'd be working
12   together.
13       Q.   Thank you.  That was helpful to
14   understand the relationship between the two
15   organizations.
16       A.   Uh-huh.
17       Q.   I have a question about the
18   relationship between the organizations and
19   their members.
20       A.   Uh-huh.
21       Q.   One example you could have is an
22   employment relationship.  And bear with me.
23   Did you understand that Republicans were
24   employees of the RNC?
25       A.   Yes.
```

Page 572

```
 1          A. Kincaid - CONFIDENTIAL
 2       Q.   Okay.  And did you understand that
 3   members of the RNC who did not work at the RNC
 4   were employees of the RNC?
 5       A.   No.  Members of the Republican
 6   National Committee who didn't work as a part of
 7   the RNC would not be considered employees of
 8   the RNC.
 9          Members could be defined as the 168
10   members of the Republican National Committee,
11   which would be the chairman and national
12   committeeman and national committee woman of
13   the Republican National Committee for each of
14   the states and territories in Washington, D.C.
15       Q.   And is the same true for the NRCC,
16   meaning members of the NRCC who did not work at
17   the NRCC, were they considered employees of the
18   NRCC?
19       A.   They were not.
20       Q.   Were they considered anything other
21   than members of the NRCC?
22       A.   The members of the NRCC were -- they
23   were members.  They fundraised for the
24   organization, but they would be the Republican
25   members of Congress that are members of the
```

Page 573

```
 1          A. Kincaid - CONFIDENTIAL
 2   NRCC.
 3       Q.   In your testimony you talked about
 4   the loss of two Congressional seats in Ohio in
 5   2011.
 6       A.   That's correct.
 7       Q.   I have a question about your
 8   understanding of how the Ohio map drawers
 9   wanted to handle that loss of two seats.
10       A.   Okay.
11       Q.   What was your understanding of how
12   the Ohio map drawers wanted to address the loss
13   of two Congressional seats as between
14   Republicans and Democrats?
15          MR. SHEEHY:  Objection to form.
16       A.   The objective was to -- was for both
17   parties to lose one member of Congress.
18       Q.   And do you know what the source of
19   that directive was?
20          MR. SHEEHY:  Objection to form.
21       A.   I do not recall the origin of that.
22       Q.   In your work in 2011 generating maps
23   of Ohio's Congressional districts, could you
24   have drawn a map that maximized the number of
25   seats that could be won by Republican
```

Page 574

1           A. Kincaid - CONFIDENTIAL
2    candidates?
3           A.   Yes.
4           Q.   And in your work generating maps of
5    Ohio's Congressional districts in 2011, could
6    you have drawn a map that had more than 12
7    seats that could be won by Republican
8    candidates?
9           A.   Yes.
10          Q.   Based on your understanding of the
11   enacted map -- this is HB 369 -- do you view
12   HB 369 as a map that maximizes Republican
13   seats?
14          MR. FRAM:  Objection, form.
15          A.   No, I do not.
16          Q.   Now, I understand that your testimony
17   is that you have drawn a map in Ohio in
18   2011 for the Congressional District that
19   maximized the number of seats that could have
20   been won by Republicans.  Did you provide any
21   such maps to the Ohio map drawers in 2011?
22          MR. SHEEHY:  Objection, form.
23          A.   I would classify the Franklin County
24   four-way split map that we covered earlier as
25   the closer thing to that, but even that map I

Page 575

1           A. Kincaid - CONFIDENTIAL
2    don't think was a maximization map.
3           Q.   Other than that map, the Franklin
4    County four-way split map that you just
5    described, did you provide any maps to the Ohio
6    map drawers that maximized Republican seats?
7           A.   No.
8           Q.   What is a plan that is drawn to
9    protect incumbents?
10          MR. FRAM:  Objection, form.
11          A.   I would classify an incumbent
12   protection plan or plan to protect incumbents
13   as a plan that -- well, take Ohio.  Where you'd
14   have -- you had 18 incumbents in Ohio; right?
15   And the map that -- map protect as many of them
16   as possible without -- you know, even though
17   there were two seats lost.
18          So that would -- a typical imcumbent
19   protection plan is one where the incumbents
20   would all be drawn into districts -- okay, in a
21   state that doesn't gain or lose seats, it would
22   be, you know, every member has their own seat.
23   They are not double bunked with another member
24   of Congress.  And it would include their home
25   territory and predominantly areas they'd

Page 576

1           A. Kincaid - CONFIDENTIAL
2    represented before.
3           Q.   So I want to make sure I understand
4    your answer.  Understanding the fact that Ohio
5    had to lose two Congressional seats, in other
6    words, some incumbents couldn't be protected,
7    did you view the map as an incumbent protection
8    plan for those remaining incumbents?
9           A.   The Ohio Congressional map, the 319
10   draft I would say for the most part was
11   definitely an incumbent protection plan.  You
12   can't have a perfect one when you're going from
13   18 to 16.
14          One of the big challenges that
15   Mr. Fram highlighted a couple different times
16   is that, you know, there were districts where
17   members were combined.
18          Ms. Sutton lived very close to three
19   or four boundaries for different districts.
20   Mr. Turner and Mr. Austria live very close
21   together.  And districts grow.  When a state
22   loses seats, districts have to expand to take
23   in more population, right?  That's just kind of
24   how the physics of redistricting works when you
25   drop the number of seats.

Page 577

1           A. Kincaid - CONFIDENTIAL
2           So, you know, Mr. Gibbs and
3    Mr. Johnson live close together and there was a
4    lot of speculation that they would have been
5    drawn together.
6           So to the extent possible, the
7    members were drawn to districts where they had
8    an opportunity to be reelected and so that's
9    why you found after those maps were redacted
10   that 15 out of the 16 districts had an
11   incumbent in them.  So 15 out of the 18
12   incumbents did have a district to run for
13   reelection in in 2012.
14          Q.   Is your answer the same for
15   Democratic incumbents versus Republican
16   incumbents?
17          A.   Yes.  Two Democrats were drawn
18   together, two Republicans were drawn together,
19   and then a Democrat and a Republican were drawn
20   together.
21          Q.   A different topic.  I'd like to ask
22   you about the Voting Rights Act.
23          A.   Okay.
24          Q.   Did you have an understanding in 2011
25   of how the Voting Rights Act affected the

Page 578

1          A. Kincaid - CONFIDENTIAL
2    drawing of the Ohio Congressional districts?
3          A.  The Voting Rights Act applied to --
4    my understanding was that it applied to Ohio
5    District 11 with Marsha Fudge's seat
6    specifically.
7          Q.  And I appreciate this assumption.
8    It's buried in the question I just asked about
9    the Voting Rights Act.  But did you understand
10   this requirement to be a legal one?
11         MR. FRAM:  Objection, foundation.
12         A.  Yes.
13         Q.  I'd like to ask you to turn to
14   Exhibit 87.
15         Do you see what's indicated by last
16   author?
17         A.  I do.
18         Q.  What is that word?
19         A.  It says "czeigler."
20         Q.  Is that you?
21         A.  That is not me.
22         MS. McKNIGHT:  Thank you,
23   Mr. Kincaid.  I have no further
24   questions.
25         THE WITNESS:  All right.

Page 579

1          A. Kincaid - CONFIDENTIAL
2          MR. FRAM:  I have one follow-up.
3    Do you have a question first?
4          MR. SHEEHY:  No, but let's take
5    just a short break.
6    (Recess taken.)
7          MR. SHEEHY:  We don't have any
8    questions.
9          MR. FRAM:  I just have one.
10         EXAMINATION
11   BY MR. FRAM:
12         Q.  Ms. McKnight showed you Exhibit 73.
13   We were talking about incumbents.
14         A.  Uh-huh.
15         Q.  Take a look at the row for the new
16   map for District 16, Renacci/Sutton.
17         Do you see that?
18         A.  I'm not there.  Yes, I do.
19         Q.  You see on that one that's drawn, 16
20   is -- under PVR -- PVI is a R+5 district?
21         Do you see that?
22         A.  Yes, I see that.
23         Q.  Okay.  And so Ms. Sutton was a
24   Democrat; right?
25         A.  Yes.

Page 580

1          A. Kincaid - CONFIDENTIAL
2          Q.  And she was now going to run against
3    Mr. Renacci in a -- in that R+5 district.
4          Do you see that?
5          A.  Yes, I see that.
6          Q.  And in fact, she lost, didn't she?
7          A.  She did.
8          MR. FRAM:  That's all I've got for
9    you.
10         THE REPORTER:  Off the record.
11
12   (Deposition adjourned at 5:54 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 581

1          A. Kincaid - CONFIDENTIAL
2    C E R T I F I C A T E
3    DISTRICT OF COLUMBIA:
4          I, MARY ANN PAYONK, shorthand reporter,
5    do hereby certify that the witness whose
6    deposition is hereinbefore set forth was duly
7    sworn, and that such deposition is a true,
8    correct, and full record of the testimony
9    given.
10         I further certify that I am not related
11   to any of the parties to this action by blood
12   or by marriage, and that I am in no way
13   interested in the outcome of this matter.
14         IN WITNESS WHEREOF, I have hereunto set
15   my hand this 1st day of February, 2019.
16
17   _____
18         MARY ANN PAYONK, Shorthand Reporter
19
20
21
22
23
24
25

Page 582

1       A. Kincaid - CONFIDENTIAL
2       - INDEX TO WITNESSES -
3   WITNESS                             PAGE
4   ADAM KINCAID
5       Examination by Mr. Fram     252, 579
6       Examination by Ms. McKnight     560
7
8       - INDEX TO EXHIBITS -
9   NO.         DESCRIPTION         MARKED
10  Exhibit No. 42  Email chain Bates     318
11      numbered REV_00023341
12  Exhibit No. 43  Metadata     320
13  Exhibit No. 44  Metadata for BRADEN1387  359
14  Exhibit No. 45  Change sheet Bates     381
15      stamped OHCF0001438
16  Exhibit No. 46  Metadata     382
17  Exhibit No. 47  Email chain Bates     397
18      stamped 00023234
19  Exhibit No. 48  Email chain Bates     409
20      numbered REV_00023184
21  Exhibit No. 49  Metadata for Ex. 48     412
22  Exhibit No. 50  Document Bates stamped   414
23      REV_00023188
24  Exhibit No. 51  Document Bates stamped   422
25      REV_0023185

Page 583

1       A. Kincaid - CONFIDENTIAL
2   INDEX TO EXHIBITS (Cont'd.)
3   NO.         DESCRIPTION         MARKED
4   Exhibit No. 52  Metadata for Ex. 51     422
5   Exhibit No. 53  Document Bates stamped   426
6       REV_00023186
7   Exhibit No. 54  Metadata for Ex. 53     426
8   Exhibit No. 55  Map Bates stamped     428
9       REV_00023187
10  Exhibit No. 56  Metadata for Ex. 55     428
11  Exhibit No. 57  Map Bates stamped     430
12      REV_23190
13  Exhibit No. 58  Metadata for Ex. 57     430
14  Exhibit No. 59  Map Bates stamped     440
15      REV_00023192
16  Exhibit No. 60 Metadata for Ex. 59     440
17  Exhibit No. 61  Map Bates stamped     451
18      REV_00023191
19  Exhibit No. 62  Metadata for Ex. 61     451
20  Exhibit No. 63  Map Bates stamped     453
21      REV_00023189
22  Exhibit No. 64  Metadata for Ex. 63     454
23  Exhibit No. 65  Email string Bates     455
24      stamped REV_00023497
25

Page 584

1       A. Kincaid - CONFIDENTIAL
2   INDEX TO EXHIBITS (Cont'd.)
3   NO.         DESCRIPTION         MARKED
4   Exhibit No. 66  Spreadsheet Bates     460
5       stamped REV_00000022
6   Exhibit No. 67  Metadata for Ex. 66     460
7   Exhibit No. 68  E-mail Bates stamped     465
8       REV_00023429
9   Exhibit No. 69  Metadata for Ex. 70     466
10  Exhibit No. 70 Spreadsheet Bates stamped 466
11      REV_00023430
12  Exhibit No. 71  Map Bates stamped     470
13      REV_00023432
14  Exhibit No. 72  Metadata for Ex. 71     470
15  Exhibit No. 73  Spreadsheet Bates     472
16      stamped REV_00023431
17  Exhibit No. 74  Metadata for Ex. 73     472
18  Exhibit No. 75  Metadata for     475
19      REV_00023343
20  Exhibit No. 76  Metadata for     477
21      REV_00023344
22  Exhibit No. 77  Metadata for     478
23      REV_00023345
24  Exhibit No. 78  Metadata for     478
25      REV_00023346

Page 585

1       A. Kincaid - CONFIDENTIAL
2   INDEX TO EXHIBITS (Cont'd.)
3   NO.         DESCRIPTION         MARKED
4   Exhibit No. 79  Map Bates stamped     478
5       REV_00023347
6   Exhibit No. 80  Metadata for Ex. 79     478
7   Exhibit No. 81  PowerPoint Bates stamped 510
8       REV_00000003
9   Exhibit No. 82  Metadata for Ex. 81     510
10  Exhibit No. 83  Document Bates stamped   513
11      REV_0000021
12  Exhibit No. 84  PowerPoint, Bates     517
13      stamped REV_0000001
14  Exhibit No. 85  Metadata for Ex. 84     517
15  Exhibit No. 86  Spreadsheet Bates     527
16      stamped TIBERI000039
17  Exhibit No. 87  Metadata for Ex. 86     528
18  Exhibit No. 88  Spreadsheet Bates     532
19      stamped REV_00000034
20  Exhibit No. 89  Spreadsheet Bates     533
21      stamped REV_0000030
22  Exhibit No. 90  Spreadsheet Bates     537
23      stamped REV_00000026
24  Exhibit No. 91  Spreadsheet Bates     539
25      stamped REV_00000028

Page 586

1      A. Kincaid - CONFIDENTIAL
2   INDEX TO EXHIBITS (Cont'd.)
3   NO.        DESCRIPTION        MARKED
4   Exhibit No. 92  Spreadsheet Bates        540
5       stamped REV_00000024
6   Exhibit No. 93  Spreadsheet Bates        540
7       stamped REV_00000027
8   Exhibit No. 94  Spreadsheet Bates        540
9       stamped REV_00000029
10  Exhibit No. 95  Spreadsheet Bates        540
11      stamped REV_00000023
12  Exhibit No. 96  Spreadsheet Bates        540
13      stamped REV_00000037
14  Exhibit No. 97  Spreadsheet Bates        540
15      stamped REV_00000032
16  Exhibit No. 98  Spreadsheet Bates        541
17      stamped REV_00000038
18  Exhibit No. 99  Spreadsheet Bates        541
19      stamped REV_00000036
20  Exhibit No. 100  Map Bates stamped        558
21      BLESSING0012635 [102611 Adam New
22      Map] 001
23
24
25

Page 587

1      A. Kincaid - CONFIDENTIAL
2   INDEX (Cont'd.)
3      - INDEX TO REFERENCED EXHIBITS -
4   NO.        DESCRIPTION        MARKED
5   Exhibit No. 2 Document, prev. Ex. 2      488
6   Exhibit No. 5 Spreadsheet Bates stamped   326
7      NRCC000012
8   Exhibit No. 7 Email chain Bates numbered  354
9      LWVOH00018302
10  Exhibit No. 8 Spreadsheet, "Ohio        355
11      Changes" BRADEN001387
12  Exhibit No. 11 Map Bates stamped        549
13      BRADEN001388
14  Exhibit No. 13 Map        554
15  Exhibit No. 15 Map        555
16  Exhibit No. 17 Map Bates stamped        556
17      BRADEN001391
18  Exhibit No. 19 Map        557
19
20      <<INDEX END>>
21
22
23
24
25

Page 588

1   NAME OF CASE:
2   DATE OF DEPOSITION:
3   NAME OF WITNESS:
4   Reason Codes:
5      1. To clarify the record.
6      2. To conform to the facts.
7      3. To correct transcription errors.
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
       _____
25

TSG Reporting - Worldwide - 877-702-9580