UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

```
. . . . . . . . . . . . . . .
OHIO A. PHILIP RANDOLPH        .  Case No. 1:18-cv-357
INSTITUTE, et al.,            .
                              .  Day 1 of Bench Trial
        Plaintiffs,           .
                              .
        - v -                 .
                              .  Monday, March 4, 2019
LARRY HOUSEHOLDER, et al.,    .  8:59 AM
                              .
        Defendants.           .  Cincinnati, Ohio
. . . . . . . . . . . . . . .
```

- - -

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY S. BLACK, THE HONORABLE KAREN
NELSON MOORE AND THE HONORABLE MICHAEL H. WATSON, JUDGES

APPEARANCES:

For the Plaintiffs:

FREDA J. LEVENSON, ESQ.          T. ALORA THOMAS-LUNDBORG, ESQ.
DAVID J. CAREY, ESQ.             THERESA J. LEE, ESQ.
ELIZABETH M. BONHAM, ESQ.        EMILY R. ZHANG, ESQ.
American Civil Liberties Union   American Civil Liberties Union
  of Ohio Foundation               Foundation
4506 Chester Avenue              125 Broad Street, 18th Floor
Cleveland, Ohio  44103           New York, New York  10004-2400

ROBERT D. FRAM, ESQ.
JEREMY M. GOLDSTEIN, ESQ.
Covington & Burling LLP
One Front Street, 35th Floor
San Francisco, California  94111

For the Defendants:

                    STEVEN T. VOIGT, ESQ.
                    Ohio Attorney General's Office
                    Constitutional Offices Section
                    30 East Broad Street, 16th Floor
                    Columbus, Ohio  43215

*Proceedings recorded by stenotype; transcript
produced by computer-aided transcription.*

1 | <u>APPEARANCES</u> (Continued):

2 | For the Defendants Larry Householder and Larry Obhof:

3 |       PHILLIP J. STRACH, ESQ.
      MICHAEL D. McKNIGHT, ESQ.
4 |       ALYSSIA RIGGINS, ESQ.
      BRODIE ERWIN, ESQ.
5 |       Ogletree, Deakins, Nash, Smoak & Stewart,
       P.C.
6 |       4208 Six Forks Road, Suite 1100
      Raleigh, North Carolina  27609

7 |

8 | For the Intervenors Steve Chabot, Brad R. Wenstrup, Jim Jordan, Bob Latta, Bill Johnson, Bob Gibbs, Warren Davidson, Michael Turner, Dave Joyce, Steve Stivers, Robert F. Bodi, Charles

9 | Drake, Roy Palmer III, Nathan Aichele, Republican Party of Cuyahoga County and Franklin County Republican Party:

10 |

11 | PATRICK T. LEWIS, ESQ.    KATHERINE L. McKNIGHT, ESQ.
Baker & Hostetler LLP    E. MARK BRADEN, ESQ.
Key Tower        Baker & Hostetler LLP
12 | 127 Public Square, Suite 2000 1050 Connecticut Avenue, N.W.
Cleveland, Ohio  44114-1214  Suite 1100
13 |            Washington, DC  20036-5043

14 | ROBERT J. TUCKER, ESQ.
Baker & Hostetler LLP
15 | 200 Civic Center Drive
Suite 1200
16 | Columbus, Ohio  43215-4138

17 | Also present:    Stephen N. Najarian, Trial Consultant
        Forrest Williamson, Paralegal, Baker &
18 |          Hostetler

19 | Law Clerks:     Christopher D. deLaubenfels, Esq.
        Hannah Gelbort, Esq.
20 |         Adam Kleven, Esq.
        Caitlin Miller, Esq.
21 |         Madison R. Troyer, Esq.

22 | Courtroom Deputy:  Rebecca R. Santoro

23 | Court Reporter:   Luke T. Lavin, RDR, CRR
        Potter Stewart U.S. Courthouse
24 |         100 East Fifth Street, Room 103
        Cincinnati, Ohio  45202
25 |         Telephone:  (513) 564-7500

1          P R O C E E D I N G S

2      (In open court at 8:59 AM.)

3          JUDGE BLACK:  Please be seated.

4      Good morning, ladies and gentlemen.

5          MEMBERS OF THE AUDIENCE:  Good morning.

6          JUDGE BLACK:  We are in the open courtroom on the

7  record in the matter of *Ohio A. Philip Randolph Institute, et*

8  *al. versus Larry Householder, Speaker of the Ohio House of*

9  *Representatives, et al.*  We are here for trial.

10     I'm pleased to welcome to the bench Judge Moore, who has

11  come from Cleveland and the Sixth Circuit, Judge Watson who has

12  come from Columbus from the United States District Court, and I

13  welcome you to my hometown.  I'm Tim Black.

14     We're here for trial in a civil action which seeks

15  injunctive and declaratory relief challenging the Ohio

16  congressional map as an unconstitutional partisan gerrymander

17  in violation of the First Amendment, the Equal Protection

18  Clause of the Fourteenth Amendment of the right to vote

19  guaranteed by the First and Fourteenth Amendments and of

20  Article I, Section 4 of the Constitution.

21     The defendants deny the allegations.  It's set for trial.

22  This will be a timed trial.  The plaintiffs on the one hand and

23  the defendant intervenors on the other hand have 35 hours to

24  present their testimony and evidence.  They're to keep track of

25  their own time.

```
 1        Before we proceed to opening statements, I'd like the

 2   lawyers to enter their appearances for the record and to

 3   indicate whether parties are present with them.

 4        On behalf of the plaintiffs, Ms. Levenson perhaps.

 5             MS. LEVENSON:  Good morning, Your Honors.  Freda

 6   Levenson, ACLU of Ohio for the plaintiffs, and we do have a

 7   number of plaintiffs present this morning.

 8             JUDGE BLACK:  To the plaintiffs, good morning.

 9   Welcome to the federal court.  We're pleased to have you in our

10   presence.

11        The additional plaintiffs' lawyers will enter their

12   appearances, please.

13             MR. FRAM:  Robert Fram, Covington and Burling for the

14   plaintiffs, Your Honor.

15             JUDGE BLACK:  Good morning, Mr. Fram.

16             MS. THOMAS-LUNDBORG:  Alora Thomas from the ACLU, Your

17   Honor, for the plaintiffs.

18             JUDGE BLACK:  Good morning, Ms. Thomas.

19             MS. LEE:  Theresa Lee for the ACLU for the plaintiffs.

20             JUDGE BLACK:  Good morning.

21             MR. GOLDSTEIN:  Jeremy Goldstein, Covington and

22   Burling for plaintiffs.

23             JUDGE BLACK:  Good morning.

24        On behalf of the defendants?

25             MR. STRACH:  Good morning, Your Honor.  Phil Strach on
```

1  behalf of the defendants.  And with us today we have the chief

2  legal counsel for the Ohio Senate, Frank Strigarie.

3            JUDGE BLACK:  And where is he?

4            MR. STRACH:  He is on the --

5            JUDGE BLACK:  Good morning, sir.

6            MR. STRIGARI:  Good morning.

7            MR. McKNIGHT:  Good morning, Your Honor.  Michael

8  McKnight from Ogletree, Deakins on behalf of the defendants.

9            JUDGE BLACK:  Good morning.

10           MR. VOIGT:  Good morning, Your Honor.  Steven Voigt

11  with the Ohio Attorney General's office.  I represent the

12  Secretary of State and the General Assembly.

13           JUDGE BLACK:  Good morning.

14     On behalf of the intervenors?

15           MR. LEWIS:  Your Honor, good morning.  Patrick Lewis,

16  Baker Hostetler.

17           JUDGE BLACK:  Good morning.

18           MR. LEWIS:  And our clients are not present with us

19  today.

20           JUDGE BLACK:  Very well.

21           MR. BRADEN:  Mark Braden, at Baker and Hostetler, for

22  the defendant intervenors.

23           JUDGE BLACK:  Good morning.

24           MR. TUCKER:  Robert Tucker, Baker and Hostetler, on

25  behalf of the intervenors.  And we have two other colleagues, I

1  think, in the background here who will also enter their

2  appearance.

3       JUDGE BLACK:  Good morning.

4    Who do we have in the back?

5       MS. McKNIGHT:  Good morning, Your Honor.  Kate

6  McKnight from Baker and Hostetler, on behalf of the

7  intervenors.  I would also note that there is an additional

8  counsel at defendants' counsel table:  Alyssa Riggins.

9       JUDGE BLACK:  Good morning.

10       MS. RIGGINS:  Good morning.

11       JUDGE BLACK:  Did we get one more intervenor, counsel?

12       MR. ERWIN:  Good morning, Your Honor.  I'm actually

13  with -- Brodie Erwin from Ogletree, Deakins for the defendants.

14       JUDGE BLACK:  Very well.

15       MS. PROUTY:  Erika Prouty, Baker and Hostetler, on

16  behalf of the intervenors.

17       JUDGE BLACK:  Good morning.

18       MS. LEVENSON:  Your Honor, we also have additional

19  plaintiffs' lawyers here in the back who haven't identified

20  themselves.

21       JUDGE BLACK:  I'd just as soon have them introduced.

22       MS. LEVENSON:  Thank you.

23       MR. WOOD:  Your Honor, Isaac Wood from Covington and

24  Burling for the plaintiffs.

25       THE COURT:  Mr. Wood.

1          MR. JADE:  Your Honor, Robert Jade, Covington and
2    Burling, also for the plaintiffs.
3          JUDGE BLACK:  Good morning.
4          MR. RECHTER:  Good morning, Your Honor.  Peter
5    Rechter, Covington and Burling, for the plaintiffs.
6          JUDGE BLACK:  Good morning.
7          MS. BONHAM:  Your Honor, Elizabeth Bonham from the
8    ACLU of Ohio, for the plaintiffs.
9          JUDGE BLACK:  Good morning.
10         MS. ZHANG:  Emily Zhang from the ACLU for the
11   plaintiffs.
12         JUDGE BLACK:  Good morning.
13         MR. CAREY:  David Carey, ACLU of Ohio, for the
14   plaintiffs.
15         JUDGE BLACK:  Good morning.
16         MR. CANTOR:  Good morning.  Jacob Cantor, Covington
17   and Burling, for the plaintiffs.
18         JUDGE BLACK:  Good morning.
19         MR. COOKE:  Good morning, Your Honor.  Perrin Cooke,
20   Covington and Burling, also for the plaintiffs.
21         JUDGE BLACK:  Good morning.
22         MR. SUBHEDAR:  Good morning.  Nitin Subhedar,
23   Covington and Burling, also for the plaintiffs.
24         JUDGE BLACK:  Good morning.
25      It's a high honor.

```
 1        Yes?
 2             MR. VOIGT:  I apologize, Your Honor.  I neglected to
 3   mention that the Secretary of State's client representative is
 4   here:  Mr. Piccininni.
 5             JUDGE BLACK:  Good morning, sir.
 6             MR. PICCININNI:  Good morning.
 7             JUDGE BLACK:  Anybody else whose appearance needs to
 8   be entered?
 9             MS. YACKSHAW:  Good morning, Your Honor.  Ann Yackshaw
10   with the Ohio Attorney General for the Secretary of State and
11   the General Assembly.
12             JUDGE BLACK:  Good morning.
13             MS. KOPPITCH:  Good morning, Your Honor.  Nicole
14   Koppitch with the Ohio Attorney General on behalf of the
15   Secretary of State and the General Assembly.
16             JUDGE BLACK:  Good morning.
17        Anybody else whose appearance needs to be entered?
18        (No response.)
19             JUDGE BLACK:  It is a high honor and a great privilege
20   to sit with this meeting of the American Bar Association.
21        (Laughter.)
22             JUDGE BLACK:  The parties are apparently well
23   represented.
24        We are ready to go, but before we have a couple of
25   housekeeping matters.
```

1   There are two motions that I'm aware of.  Plaintiff has

2   moved for leave to submit its new exhibit list which reduces

3   exhibits and adds a few from the recent deposition.

4        Is there an objection to that from the defendants?

5            MR. STRACH:  Your Honor, there is, and we were going

6   to ask the Court for an opportunity to submit a brief on that

7   for the Court's consideration at the appropriate time.

8            JUDGE BLACK:  Really?

9            MR. STRACH:  Yes.

10           JUDGE BLACK:  Very well.  The intervenors wish to be

11  heard on it?

12           MR. TUCKER:  Intervenors join the defendants' request

13  to submit a brief on the issue.

14           JUDGE BLACK:  Very well.

15       Ms. Levenson, do you wish to be heard further?

16           MR. GOLDSTEIN:  No, Your Honor.

17           JUDGE BLACK:  Very well.

18       Second motion that we have seen is originally an oral

19  motion at the final pretrial conference from plaintiffs to

20  exclude witnesses.  We have a motion from the defense that

21  says, "Will you please permit the expert witnesses to attend."

22       I'd like to hear from plaintiffs on the defendants' request

23  that the expert witnesses be permitted to attend.  My

24  understanding was that experts are often called upon to review

25  testimony at trial and to opine on it.

1    Does the plaintiff wish to be heard on whether experts need
2    to be excluded?
3        MS. LEVENSON:  Yes, Judge.  Thank you.
4        We did request that all experts be -- that all witnesses be
5    excluded at the pretrial conference.  The defendants and the
6    intervenors expressed that they had no problem with that.  We
7    did request clarification to make sure that everyone was
8    excluded.
9        The Court ruled last Friday that, yes, indeed everyone is
10   excluded, all witnesses of all types.
11       Late last night we did receive this motion asking the Court
12   to unexclude the experts, and we are opposed to the motion,
13   Your Honor.  The expert reports were disclosed many months ago.
14   The testimony at trial will be -- will cover known territory.
15   They certainly cannot exceed the scope of what was disclosed in
16   the reports.  The defendants and the intervenors had ample
17   opportunity to explore and take discovery on that.
18       To allow this motion now, we feel would be unfair because
19   there's no reciprocity to it.  Obviously, the plaintiffs,
20   having the burden to go first, our experts go on first, it
21   would allow the defense experts an additional opportunity to
22   observe our experts.
23       It's unlikely that we would bring our experts back for
24   rebuttal to enjoy any reciprocity out of it.  It's very
25   difficult to schedule our experts and excruciatingly expensive.

1    So this would be a very one-way type of arrangement, and we are

2    opposed, Your Honor.

3          JUDGE BLACK:  What lay witnesses are you seeking to

4    exclude?  All the plaintiffs are parties.  They're permitted to

5    be in the courtroom.  What lay witnesses are you seeking to

6    exclude?

7          MS. LEVENSON:  We have lay witnesses who are not

8    parties who are excluded, they -- several of them.  And our

9    experts have indicated, personally, an interest in watching the

10   trial because they're interested in the trial, and we've

11   disappointed them by telling them that they're excluded.

12       Would you like the names of the lay witnesses?  Is that

13   what you're asking for?

14         JUDGE BLACK:  A sense.  I didn't see any lay witnesses

15   that were going to be excluded.

16         MS. LEVENSON:  For example, Senator Nina Turner would

17   like to watch the testimony that precedes her, just because she

18   has a great interest in the proceedings.  That's one.

19         JUDGE BLACK:  She's a lay witness of yours that you

20   think should be excluded?

21         MS. LEVENSON:  Well, she is a witness who is excluded

22   under the order.

23         JUDGE BLACK:  At your request; correct?

24         MS. LEVENSON:  Correct, because we think that --

25         JUDGE BLACK:  Who, other than your own witnesses, do

1    you seek to exclude?

2           MS. LEVENSON:  Well, we -- we don't think that any

3    witness should be in the courtroom prior to --

4           JUDGE BLACK:  Very well.

5        The last word from the defense?

6           MR. STRACH:  Thank you, Your Honor.  As the Court

7    pointed out, it's very common.  We did not understand the

8    request, to begin with, to include experts.  That's foreign to

9    the experience that I've had in these cases.

10       It's very common when our experts -- when their experts

11   testify, even though they've submitted reports, we don't know

12   exactly what they're going to say when they get on the stand.

13   So our experts have to be able to hear that or at least be able

14   to read the daily transcript in order to understand what

15   they're responding to.  Then the plaintiffs would have the

16   reciprocal opportunity to listen to our experts and provide

17   rebuttal through their experts.

18       If they're not going to provide rebuttal, that's their

19   decision, that's their choice.  But it would be a reciprocal

20   arrangement and it's very common, and we don't -- we don't know

21   how the experts are going to be able to testify if they don't

22   hear and know what they're responding to, other than what's in

23   the report.

24          JUDGE BLACK:  Very well.

25       Intervenors need to be heard further?

1          MR. TUCKER:  Only one additional point, Your Honor, is

2    we appreciate the plaintiffs' representation that their expert

3    testimony is going to be confined to the opinions in their

4    report, but, for example, during cross-examination there may be

5    testimony that's elicited that our experts need to see

6    admissions that may be made by their experts during

7    cross-examination that would be helpful to the rebuttal

8    opinions of our experts.  Thank you.

9          JUDGE BLACK:  Very well.  Ms. Santoro, white noise?

10     (White noise played.)

11         JUDGE BLACK:  Louder.

12     (Judges confer privately.)

13         JUDGE BLACK:  White noise off, please.

14     Between now and tomorrow, can you find some symphonic music

15   that's better than white noise?

16         COURTROOM DEPUTY:  Yes, Your Honor.

17     (Laughter.)

18         JUDGE BLACK:  Very well.

19     The panel has conferred.  It's unanimous:  There will be no

20   exclusion of witnesses.  All witnesses are permitted to attend.

21   It's a public trial.

22     I believe we're ready for opening statements.

23     Is there anything that requires the Court's attention

24   before we proceed to opening statement?  If there is, tell me.

25     From the plaintiffs?

 1          MR. FRAM:  Your Honor, Robert Fram for plaintiffs.

 2      There's one housekeeping matter regarding the way we're

 3  going to handle and process the issue of objections and

 4  responses.

 5      We've read the Court's pretrial order and note that the

 6  Court has provided the parties the option of making objections

 7  either in trial or after trial, and we appreciate that very

 8  much.

 9      The question arises as to when the responses to the

10  objections need to be made.  The plaintiffs' proposal is that

11  that also -- we can do that after trial.  There are

12  approximately 221, I think, of our trial exhibits that remain

13  subject to objections, and obviously arguing them all during

14  trial is a huge time consumption, would be contrary to what we

15  understood the Court to be saying in the pretrial order.  Also,

16  preparing for 221, not knowing whether the objections are going

17  to come in at trial or after, because the Court provides the

18  option, is enormous time consumption on our part.  So we think

19  the simplest thing to do for both sides is to be able to put in

20  their responses to objections post-trial.  That's our proposal,

21  Your Honor.

22          JUDGE BLACK:  And the defense wish to be heard?

23          MR. STRACH:  Thank you, Your Honor.

24      From the defendants' perspective, that sounds like a good

25  idea in theory.  We would like the opportunity to discuss it

1   further with the plaintiffs.

2       We have a few concerns such as, for instance, there are

3   some objections at trial that could be helpful to the Court;

4   for instance, foundation.  If somebody is not laying a correct

5   foundation and it could be cured, then we think that might be a

6   useful objection to have at trial and make sure the record is

7   clear.  There may be other objections like that.  For instance,

8   if an expert is exceeding the scope of their report, we think

9   such an objection might be helpful to the Court and, frankly,

10  not waste time on something that we shouldn't.

11      So we'd like an opportunity to discuss this, perhaps after

12  the openings, and maybe we could reach an accommodation with

13  the plaintiffs about which objections would be permissible to

14  be raised and, otherwise, all objections would be reserved.

15          JUDGE BLACK:  Intervenors incorporate what the

16  defendant said?

17          MR. LEWIS:  Yes, Your Honor, we think it would be

18  helpful maybe during the morning break if the parties could

19  caucus and try to reach an agreement.

20          JUDGE BLACK:  Very well.

21          MS. LEE:  Your Honor, we also have two additional

22  housekeeping items related to exhibits.

23      We discovered late last night that the version of Dr.

24  Warshaw's rebuttal report that's on both intervenors' and

25  plaintiffs' exhibit list P572 and I52 is just clipped off about

1    halfway, too.  So we brought the full replacement exhibit for

2    the binders that we had earlier provided to the Court.

3        And then, second, the parties exchanged demonstrative

4    exhibits, the schedule ordered at the pretrial conference, and

5    plaintiffs were just wondering if the Court would like us to

6    submit those in binders and electronically as we had done for

7    the other exhibits.

8            JUDGE BLACK:  The Court's comfortable with that.  This

9    is a timed trial.  This is not a trial to a jury.  It's a trial

10   to three experienced judges.  We're not going to stop and argue

11   objections.  The Court's been clear.  The parties shall state

12   their objections to the admission of any exhibit and any

13   witness' testimony either on the record, at trial, or in

14   post-trial briefing.  The Court will note those objections and,

15   as necessary, rule upon those objections after trial.

16       If the response to an objection needs to be stated, it

17   needs to be stated concisely, the exhibit's coming in.  We're

18   dealing with it after trial.  If you want to confer and figure

19   something else out, fine.

20       We're now down to 69 hours of trial.  Are we ready to --

21       That was a joke.

22       (Laughter.)

23           JUDGE BLACK:  Are we ready to proceed to opening

24   statements, plaintiffs?

25           MR. FRAM:  Yes, Your Honor.

```
1              JUDGE BLACK:  Defense?

2              MR. STRACH:  Yes, Your Honor.

3              JUDGE BLACK:  Intervenors?

4              MR. LEWIS:  Yes, Your Honor.

5              JUDGE BLACK:  The plaintiff will present its opening

6    statement.

7    OPENING STATEMENT OF PLAINTIFFS

8              MR. FRAM:  Let's see if I can make the TV screen turn

9    on here.  Let's see.

10             JUDGE BLACK:  We'll take a little time while we're

11   getting up to speed on the technology.

12             MR. FRAM:  Yeah.  Teach me to go high-tech.  There we

13   go.  All right.

14        May it please the Court, Robert Fram, Covington, Burling

15   for the plaintiffs Ohio A. Philip Randolph Institute, et al.

16        In 2010, the Republicans took full control of the Ohio

17   legislature, and with that they controlled all the levers and

18   power related to congressional redistricting.  We're here today

19   because of what they did with that power.

20        2010 was a high-water mark in Ohio for Republicans, winning

21   13 of the 18 congressional seats.  The map I put up here on the

22   screen tells the story.

23        There are eight districts colored red.  Those are the

24   districts the Republicans won in every congressional election

25   in 2002 through 2010.  There are five districts colored in
```

1    blue.  Those are the districts the Democrats won in all of

2    those elections.  And then there are the purple crosshatched

3    districts.  Those are the districts that went back and forth.

4         But in 2010, the Republicans swept all the purple ones and

5    all the red.  They had 13 districts, 13 seats.  That was an

6    eight-seat advantage.

7         Now, in 2010, per the census, Ohio was going to have its

8    congressional delegation shrunk down from 18 to 16, but the

9    Republicans wanted to maintain their eight-seat advantage.

10        Ohio House Speaker Batchelder had a goal, a 12-4 map that

11   maintains the eight-seat advantage.  In his deposition December

12   11, 2018:

13        Question:  "Earlier we talked about how a map that would

14   have given the Democrats a shot at five districts wasn't under

15   consideration; is that right?"

16        Answer:  "Correct."

17        It wasn't under consideration.

18        U.S. Speaker Boehner had a goal, a 12-4 map.  His goal, in

19   the words of his Executive Director, Team Boehner, Mr. Tom

20   Whatman was to, quote/unquote, lock down 12 Republican seats.

21   In an e-mail of September 7, 2011, from Mr. Whatman to Ohio

22   Senate President Niehaus, he stated quite clearly that they

23   were, quote/unquote, trying to lock down 12 Republican seats.

24   Plaintiff's Exhibit 407.

25        Senate President Niehaus e-mailed to Mr. Whatman on a

1  Sunday morning, September 11, 9:25 in the morning, and he said,

2  quote, "I am still committed to ending up with a map that

3  Speaker Boehner fully supports, clearly indicating how the Ohio

4  Republicans were deferring to the National Republicans." And

5  Speaker Batchelder's deposition testimony is the same.

6      The National Republicans signed off on specific district

7  lines. We can see this in an e-mail from -- I think it's

8  Senate President Niehaus -- September 12th, 2011, 7:44 in the

9  morning, he's e-mailing to Mr. Ray DiRossi, who is one of the

10 key map drawers of the Ohio maps, and he asks him at 7:44 in

11 the morning, he says, "Did Whatman sign off?" Whatman,

12 Executive Director of Team Boehner.

13     Answer -- twelve minutes later from Mr. DiRossi -- "Whatman

14 signed off."

15     How did they do it? How did they accomplish the 12-4 map?

16 They did it using secret partisan data briefings. They rented

17 a room at the DoubleTree Hotel, Room 601, in Columbus. They

18 took out the ordinary furniture and they put in some computers,

19 three of them, three computer screens and on those screens, any

20 time you looked at a map, you would see partisan electoral

21 scoring, partisan data. Batchelder and Niehaus were briefed on

22 the partisan scorings by their staffs. They received

23 spreadsheets at meetings.

24     Now, the centerpiece, physically, literally the centerpiece

25 of the 12-4 plan was the Franklin County sinkhole. The phrase

1  "Franklin County sinkhole" was used in meetings between Team

2  Boehner and the National Republican Congressional Committee,

3  NRCC.  See a picture of Mr. Whatman, again, from Team Boehner

4  on the left, and Mr. Adam Kincaid, the redistricting

5  coordinator of the NRCC, over up on the right.

6      The Franklin County sinkhole reflects the packing of

7  Democrats into a new Franklin County district.  And when you

8  suck those Democrats into that sinkhole, it makes the

9  neighboring districts, 12 and 15, safely Republican.  They

10  carefully calibrated the partisan metrics of the Franklin

11  County sinkhole.

12      This is a spreadsheet, Plaintiffs' Exhibit 77, created by

13  Mr. Kincaid.  There are six different elections where the

14  metrics are indicated for all 16 districts.  There's an average

15  that turns out to be an average of five of the six, and there's

16  something on the far right called the PVI, the partisan voter

17  index.  That was the favored metric by the National

18  Republicans, by Mr. Kincaid, to determine whether a district

19  was for the Republicans or the Democrats.

20      You can see at the bottom, in the blue, is that brand-new

21  open seat they're creating in Franklin County.  It's the new

22  packed Democratic district.  And you can see highlighted,

23  that's in blue and in red, you can see the metrics for 12 and

24  15 turning out safely Republican.

25      This wasn't just a fig. piece.  This was circulated to the

1    Ohio map drawers on September 2 and 3 to Ms. Mann, Mr. DiRossi,

2    and also to Mr. Whatman, per Plaintiffs' Exhibit 580.  And that

3    didn't just stop with them, because on September 6th, 2011, Dr.

4    Hofeller, who is the Republican National Committee former

5    coordinator and then consultant, received the Franklin County

6    sinkhole spreadsheet from Mark Braden, Plaintiffs' Exhibit 393

7    where he was admonished to keep it secret, keep the spreadsheet

8    secret, but he wants Dr. Hofeller's views because they're fine-

9    tuning the sinkhole.

10        And two days later, Dr. Hofeller, in Plaintiffs' Exhibit

11   394 responds.  He says -- I'll quote from his e-mail starting

12   with the second sentence -- "The area Adam" -- that would be

13   Adam Kincaid.  "The area Adam has on his version included

14   Grandview Heights and some more of the," quote/unquote,

15   "downtown area, which I took out of the map I sent - as it

16   was," quote, dog meat, quote, unquote, "voting territory.  I

17   guess then, unless there is some inexplicable reason they want

18   that awful voting territory in the 15th, the map I sent is OK."

19        Your Honors, as hard as it is to read those words, and I've

20   read them many times, it's even harder when I think about the

21   fact that the dog meat they're talking about here, those are

22   voters.  Those are citizens.  Those are folks whose rights were

23   being taken away through the secret partisan briefings and

24   through the focus on how to get the dog meat out of the

25   Republican districts.  Some of them are in the courtroom here

1  today.

2    There you have it.  That's the new Franklin County

3  district, the sinkhole.  It conveys more powerfully than any

4  words I could say here today how the dominant intent of the

5  Republicans in 2011 in drawing the congressional map was to

6  seek a partisan advantage.

7    Now, on September 21, 2011, the General Assembly passes the

8  first bill, the first map, HB 319.  The next day -- in an

9  internal Republican National Committee memo stated that that

10  map had created a 12 to 4 seat advantage to the GOP.  But after

11  that vote, the Democrats tried to challenge HB 319 and went to

12  court and got the right to get a referendum, and a new bill

13  gets introduced, HB 369.  But the Democrats could not collect

14  enough signatures for the referendum and so their leverage

15  collapsed.

16    On December 14, 2011, in an e-mail, again, from Dr.

17  Hofeller, he states, quote, "The word is that Ohio is going to

18  pass a new congressional compromise map with very little change

19  for us.  The Democrats know they're not going to gather enough

20  signatures for the referendum, so they're going for what little

21  they can get."  Plaintiffs' Exhibit 398.  And it remained a

22  12-4 map.

23    The numbers up on this screen in this table come from two

24  exhibits, one for the first bill, HB 319, and one for HB 369.

25  Those are partisan voter index scorings, the ones that were

1   favored by the National Republicans.  And, indeed, these

2   spreadsheets were from -- were created by Mr. Kincaid,

3   Plaintiffs' 333 for the first bill, HB 319, Plaintiffs' 498 for

4   the HB 369, and you can see it remains a 12-4 map.

5       Now, nothing justified the 12-4 map, not an actual

6   political geography, not chance, not compliance to the Voting

7   Rights Act, not the so-called bipartisan vote for HB 369.

8       When it comes to natural political geography, Dr. Cho will

9   come and testify about how she generated over 3 million maps

10  constrained only by traditional non-partisan districting

11  principles, and found that when you looked at her maps against

12  2008 and 2010 election data, the data available at the time the

13  maps were passed, that none of the maps produced the 12-4 seat

14  share.  In other words, you can't explain this just by the fact

15  that Democrats happen to live in cities.  That's what her

16  analysis demonstrates.

17      Dr. Niven will come testify, and he will talk about what

18  are the odds that these maps can be done by chance.  And he

19  already said in his deposition that the odds of this happening

20  by chance are far more remote than the odds of winning the

21  Powerball.

22      The Voting Rights Act doesn't justify the districts.  Dr.

23  Handley will testify she's done an analysis of how Democratic

24  voters were packed up in District 11, up in the Cleveland area.

25  It doesn't justify what they did in District 16.  And their

1   remedial map we are putting forward shows you don't have to

2   create that jagged-looking district around the Columbus area if

3   you want to create a minority opportunity district.

4       At the end of the day, there was nothing, quote/unquote,

5   bipartisan about the 12-4 map.  As Senate President Larry Obhof

6   candidly said in his April 26, 2018, remarks at the City Club

7   of Cleveland, quote, "While a lot of Democrats voted for the

8   current map -- frankly, quite a few of them did -- they didn't

9   really have a lot of negotiating power at that stage, because

10  there's always the opportunity, Hey, work with us and we'll do

11  a slightly better map, or we'll do what we want; we'll pass it

12  with 51 votes."

13      With that, Your Honor, I turn the podium over to my

14  colleague Ms. Thomas for the balance of our opening

15          JUDGE BLACK:  Very well.

16  OPENING STATEMENT OF PLAINTIFFS

17          MS. THOMAS-LUNDBORG:  May it please the Court, my name

18  is Alora Thomas, representing plaintiffs from the ACLU.

19      My colleague Mr. Fram talked a lot about how the map was

20  intentionally drawn to create a 12-4 Republican to democrat

21  advantage.  I would like to explain to the Court what the

22  effect of that intention has been.

23      While the map worked as expected, all of Ohio's elections

24  have been 12-4.  It has been 12-4 despite changes in vote

25  share, as the Court can see in the chart.

1    It has been 12-4 even in years where Democrats got nearly

2  50 percent of the vote.  Take, for example, 2018.  2018 is a

3  year considered by many to be a wave year for Democrats in the

4  U.S. House.  It is a year where Democrats got 47 percent of the

5  vote right here in Ohio, and, yet, they got only four of the 16

6  seats.

7    So, if Democrats cannot get an additional seat in a wave

8  year, when do they pick up an additional seat?  Plaintiffs'

9  expert Dr. Chris Warshaw did a responsiveness analysis to ask

10 and answer this very question.  And what he found is that

11 Democrats would not pick up any additional seats until they got

12 51 percent of the vote.  That's a majority of the vote.

13    But even with a majority of the vote, Democrats would still

14 get the minority of the seats.  They would pick up only six of

15 the 16 seats with 51 percent of the vote.

16    And Republicans were able to ensure that they would get

17 four seats consistently by cracking and packing Democrats in

18 Ohio's 16 districts.

19    "Cracking and packing" is a term used in gerrymandering

20 cases.  Packing is putting opposite party supporters in

21 districts so that they win those districts by overwhelming

22 majorities.  Cracking is putting opposite party supporters in

23 districts so that they do not have sufficient majority to win

24 those districts.

25    However, the map drawers here wanted to make sure that no

1    elections that were supposed to be won by Republicans would be

2    won by Democrats in our wave year.  So none of the elections

3    could be really competitive.  So out of 64 elections held since

4    the enactment of the map, only five have been competitive.  Put

5    another way, 59 elections in Ohio have been won by 55 percent

6    of the vote or more.

7         And because of the cracking and packing, you see that

8    Democrats and Republicans keep winning the exact same

9    districts.  And as my colleague Mr. Fram discussed, in the

10   previous elections -- in the previous redistricting cycle, you

11   saw districts move back and forth between Democrats.  As it

12   would in a truly responsive system, you would see at least some

13   districts flipping from Republicans to Democrats as voter

14   preferences and voter turnout changes.  You do not see that

15   here.

16        And, again, this is no accident.  Republicans intentionally

17   created a map that would be 12-4, and they celebrated and

18   bragged about that map.

19        We have a memo from the Republican state leadership

20   conference dated January 3rd, 2013, discussing the 2012

21   election.  This particular memo discussed several states,

22   including Ohio, and I'll read a portion of what it says about

23   Ohio.

24        "Republican redistricting resulted in a net gain for the

25   GOP State House caucus in 2012, and it allowed a 12-4

1  Republican majority to return to the U.S. House of

2  Representatives, despite voters casting only 52 percent of the

3  their vote for Republican congressional candidates."

4      Now, we know that Ohio's map is extreme, not only because

5  of the election results, but Dr. Warshaw did an analysis called

6  partisan bias analysis.  This analysis looks at a party's

7  ability to translate votes into seats in the legislature, and

8  he ran his analysis over a very large data set.  He looked at

9  all congressional elections where at least six seats were in

10  the delegation, and he went back to 1972.  His data set for

11  2012 included 512 elections.  Over these 512 elections, Ohio's

12  election was extreme and all five measures from 97 percent to a

13  hundred percent more extreme than any other elections in the

14  data set in 2012.

15      And this extremeness has persisted.  He ran the data for

16  2014, 2016 and 2018, and you have the 2018 numbers before you,

17  that Ohio's elections are still extreme in the partisan bias

18  metrics.

19      Now, what's happened in Ohio, it is not just numbers on a

20  page.  This is about real voters and real people, real people

21  right here in Cincinnati, for example.  Cincinnati is one of

22  those municipalities that has cracked Democrats.  It is a

23  Democratic city that is represented by two Republican members

24  of Congress.

25      And the Court will hear from some of the people right here

1   in Cincinnati who have been affected by the cracking.  The

2   Hamilton County Young Democrats is a plaintiff in this case.

3   The Court will hear from Nate Simon, the president, who said in

4   his deposition, "I feel like our votes are not meaningful, that

5   our votes do not, are not, equal to that of Republicans,

6   because the straight-drawn lines are stacked against

7   Democrats."

8        The Court will also hear from Doug Burks, another plaintiff

9   who lives in the Cincinnati area, who testified about the

10  system being rigged and that the person that he votes for has

11  the deck stacked against them.  But it's not just a problem

12  here in Cincinnati.  It's a problem all over Ohio.

13       The Court will hear from organizational plaintiffs, APRI

14  and League of Women Voters.  They're state-wide organizations

15  that devote considerable time to voter education and

16  registration.  Andre Washington, who is the president of APRI,

17  testified in his deposition, "Every third door I knock on

18  people are saying my vote doesn't count in this district.  It

19  doesn't matter.  The same person is going to get back into

20  office."

21       And Jen Miller, the president of League of Women Voters,

22  testified about and will testify about the resources that

23  League of Women Voters has had to use to explain to voters

24  where they should go to vote, because so many of their counties

25  and cities are cracked, and it's impossible to tell what

1  district they are in.

2      The Court will also hear from Mark Griffiths, who lives in

3  Lorain County.  Lorain County is the home of Oberlin College.

4  It's a county that leans Democratic, and yet he has been

5  cracked into a Republican district.  And he said at his

6  deposition, "And that" -- about his interactions with his

7  Congressperson -- "And that said to us that this guy really

8  doesn't care what we think or don't think, whether we vote or

9  not vote.  He is in a position, and is still in a position,

10  that he's going to get reelected.  So therefore, the issues

11  that we few Democrats might raise aren't really anything that

12  he needs to respond to."

13      The Ohio map, it harms not just the cracked Democrats but

14  also packed Democrats.  The Court will he hear from Elizabeth

15  Myer, who lives in a Democratic district, and she testified

16  that "My district is one of the most crazy things -- looking

17  things you've ever seen crawling across the map towards the

18  west and a little strip to pick up Akron, and, you know, people

19  in Akron, they don't have the same concerns as people in my

20  area."

21      In addition to Mr. Burks, Mr. Griffiths and Ms. Myer, the

22  Court will hear from additional individuals who have similar

23  stories to them about how the map has affected them.

24      Now, the map was intentionally drawn to advantage

25  Republicans and disadvantage Democrats, and it can be fixed.

1    Plaintiffs in this case have proposed a remedial map that fixes

2    many of the problems in the current map.  It cracks less

3    municipalities and counties, it complies with Issue 1, and,

4    most importantly, it's designed to respond to the will of the

5    Ohio voters.

6        And again, we need to look no further than Cincinnati.  As

7    I stated earlier, Cincinnati is currently cracked, represented

8    by two districts, District 1 and 2, and it's been done to pull

9    in a Republican county, Warren County.  The proposed map would

10   keep Cincinnati whole and undo the Democratic cracking.

11       A fundamental tenet of democracy is that voters pick their

12   representatives and not the other way around.  Correcting the

13   partisan gerrymandering of Ohio's map would give Ohio voters

14   the ability to decide who they want to send to Congress and not

15   have the decision made for them by a dozen Republican

16   operatives.  Thank you.

17          JUDGE BLACK:  Thank you, counsel.

18       On behalf of the defendants?

19   OPENING STATEMENT OF DEFENDANTS

20          MR. STRACH:  May it please the Court, Phil Strach on

21   behalf of defendants.

22       Your Honors, this case is indeed about democracy, but it is

23   about democracy in action.  And what produced the final 2011

24   congressional map was textbook democracy in action.  And when

25   democracy works, the federal courts should applaud it, not

1    overrule it.

2        Why was this democracy in action?  Because this is not a

3    typical case where one party with the vote simply outvotes and

4    overrules the minority party.  Here, dozens of democrats voted

5    for the bill providing super majority support.  Those votes

6    came after months of negotiating between Republicans and

7    Democrats.  Frankly, the ability to bring this case should have

8    ended with that super majority vote.

9        Make no doubt, this case is not about Republican district-

10   drawing decisions.  It's about Democrat legislators line

11   drawing compromises that the plaintiffs simply don't like.  The

12   plaintiffs want this Court to ignore those Democratic votes,

13   overrule those Democratic votes, or simply second-guess those

14   Democratic votes.  Why?  Because they think the Democrats made

15   a bad deal.  That's what the case boils down to.

16       But that is the essence of democracy.  Democracy is not

17   perfect and sometimes it's not pretty, but a Court overruling

18   those house -- those Democratic votes would be undermining

19   democracy and ultimately the independence of the federal

20   judiciary.

21       If the Court strikes down this map, it's going to have to

22   explain why it did so in light of the strong bipartisan vote.

23   A federal court can't do this by simply assessing the leverage,

24   so-called leverage, that legislators had when they raised their

25   hand to vote yes.  No one forced those Democrats to vote yes.

1      And if the Court second-guesses those votes, it's either

2  going to have to try to read the minds of those Democrats or

3  it's going to have to impose its will for the will of those

4  Democrats who voted for the bill.

5      And these Democrats voted overwhelming for the bill,

6  knowing that it was an incumbent protection map.  In 2010, Ohio

7  voters elected 13 Republicans and five Democrats under a map

8  that is not and has never been challenged as a partisan

9  gerrymander.  That was the baseline for the 2011 map.  The

10  voters elected those 13 Republicans and five Democrats.

11  Plaintiffs don't like that.  But that's democracy, and that's

12  what the baseline was for the 2011 map.

13      The evidence will show that because Ohio was losing two

14  congressional seats as a result of the census that Republicans

15  decided that one Republican incumbent should be drawn out of

16  the map and one Democratic incumbent.  That was a fair choice

17  in light of the baseline map.  Then they would draw districts

18  for the remaining Republican incumbents and Democratic

19  incumbents that were fair for those incumbents.  There is

20  nothing unusual about this, certainly nothing illegal about it.

21  Incumbency protection is itself democracy in action.

22      Seniority -- more seniority in Congress gets better

23  committee assignments, which give you more opportunities to

24  help the state -- the people of the state of Ohio.  One example

25  is that Ohio has one of the most significant military bases in

the country in Wright Patterson.  The evidence is going to show
that it was this kind of information that was taken into
account in order to draw the districts held by Republican
incumbents and Democratic incumbents.

     The Supreme Court has endorsed incumbency protection for
decades.  In the decades old case of *Gaffney v. Cummings*, the
legislature drew contorted districts for the incumbents, and
the Supreme Court said that was fine.  Later, many decades
later, in *Cronartie versus Easley*, the legislature did the same
thing.  The Supreme Court said that was fine.  Ohio's
incumbency protection map is no different.

     Now, the plaintiffs are going to say that this was an
effort to lock in 12 Republican seats.  I'm here to tell you
that's just pure poppycock.  It is not possible to draw 12
districts for 12 faceless, nameless Ohio Republicans.  It would
either take godlike omniscience or just pure dumb luck to do
that.  There's no evidence that anyone was engaged in a Don
Quixote-like effort to try to draw 12 districts that anyone
with an "R" beside their name could win.  The evidence is, in
fact, that under the current map, the Republicans in 2008 would
have only won nine seats.  So, so much for locking in 12 seats.

     And the evidence is, instead, that the districts were being
drawn for 12 Republican incumbents and four Democratic
incumbents.  Just because an incumbent has a chance to win a
district does not mean that some random person associated with

1    that party can win the same district.  The evidence will be

2    that many factors affect this, including the strength of the

3    incumbent, fundraising, the overall political environment and

4    many, many other factors.  The evidence will show that

5    incumbents have done particularly well this decade, including

6    Republican incumbents, because Ohio voters are voting for

7    Republicans this decade.  That's called democracy, not

8    gerrymandering.

9         Moreover, the bipartisanship that produced this map runs

10   throughout the map.  The evidence will be that the Republicans

11   who drew the map believed that there were good reasons that the

12   Democrats would go along with the bill, which they did.  For

13   instance, the evidence will be that Democrats supported the

14   district for Representative Fudge, Congressional District 11.

15   Former Speaker Batchelder will testify about African-American

16   Democratic support in northeastern Ohio for this district that

17   was drawn.

18        One of the map drawers, Ray DiRossi, will testify about his

19   understanding of Representative Fudge's support for the

20   district.  Tellingly, the evidence will be that in legislative

21   negotiations between Republicans and Democrats at the state

22   level, the Democrats never proposed a District 11 with a

23   materially different shape than the one proposed by the

24   Republicans.  This is probably because one of the leaders

25   within the Democratic caucus at the time has testified that he

1  talked to Representative Fudge, and she indicated to him that

2  she didn't want a materially different district than the one

3  drawn by the Republicans.

4      Democrats also supported the new minority-influence

5  district in Franklin County.  Speaker Batchelder and DiRossi

6  will testify about their understanding of Democratic support

7  for this district.  Again, in legislative negotiations,

8  Democrats maintain a minority-influence district in Franklin

9  County.  So if this Franklin County district was a so-called

10 sinkhole, then the legislative Democrats supported the

11 sinkhole.

12     The evidence will also be that the Democrats supported

13 pairing Representative Kaptur and Representative Kucinich in

14 Congressional District 9.  The evidence will be that the

15 Democrats later, in fact, asked the legislative Republicans to

16 put the thumb on the scale for Representative Kaptur in that

17 district by adding more of her territory into the final

18 district.  Those changes, the Court will see, significantly

19 narrowed the district and greatly affected the shape of the

20 district.

21     There are going to be many other changes that were

22 specifically requested by the Democrats that we're going to put

23 into evidence before this Court.  And the Court will see

24 evidence of how the changes requested by the Democrats ripple

25 throughout the map and created many of the issues that the

1    plaintiffs are now complaining about.

2        Then there's the issue of election data.  What I'm here to

3    tell you is that even the use of election data is bipartisan in

4    this state.  The legislative Republicans had a political index

5    called the unified index.  The legislative Democrats had a

6    political index.  The League of Women Voters, a party in this

7    case, had a political index.  OCAR, a purportedly non-partisan

8    non-profit had a political index, the National Republicans had

9    one, the National Democrats had one.  Everybody had an index.

10   And the thing about it is, all the indexes are different.  The

11   National Republicans and Democrats use an index that the state

12   legislative people didn't like, didn't think it was

13   particularly accurate.  The state legislative folks used an

14   index that the national people, they didn't like it and they

15   didn't think it was particularly accurate.  Why is this?  Why

16   is -- why the disagreement over the indexes?  It's because

17   there is no way to measure partisanship.

18       How do you do that?  Do you use all state-wide elections or

19   only state-wide elections?  If you do, do you use all of them?

20   Do you use a subset of them?  Do you only use congressional

21   elections?  Do you only use the presidential race?

22       The Republicans and the Democrats involved in this didn't

23   agree on any of this.  The experts in this case are not going

24   to agree on any of this.  There is no accepted measure for how

25   to define partisanship, and that is because it is an inherently

impossible concept to measure.  This Court cannot impose any
so-called standard on Ohio without adopting the right way to
measure partisanship, and we don't know how you're going to
impose a rule on partisan gerrymandering if you can't define
what's partisan.

Finally, the plaintiffs will claim that the challenged map
was drawn by political operatives in Washington, D.C.  Again, I
say poppycock.  First, the evidence will show that both
Republicans and Democrats were in contact with national party
resources.  This is not shocking.  This is called democracy in
action.  This is how democracy works.  Each party comes up with
their best ideas and then they hash it out in the legislative
process.

In fact, the Ohio legislative process is set up to
facilitate this.  The redistricting task force that the Court
will hear about does not draw or adopt districts.  Let me
repeat that.  The task force does not draw or adopt districts.
The only thing the task force does is fund both parties equally
so that each party can use whatever resources it wants to draw
maps and use them in the legislative process.  Basically, the
way it works is the task force funds the parties, they go to
their separate corners of the boxing ring, they use whatever
resources they need to draw maps, and then they come together
in the legislative process and they fight it out.  That's how
it works.  That is called democracy and that is what happened

1    here.

2        The evidence will show lots of people had ideas for

3    districts.  That certainly included national Republicans, which

4    makes sense, since the speaker of the U.S. House at the time

5    was from Ohio.  But it also involved Democratic legislators and

6    staff.  The map drawers exchanged ideas with both national

7    Republican people and with local Democratic legislators and

8    staff.  That is called democracy in action.

9        But at the end of the day, it was Republican and Democratic

10   Ohio legislators who had to provide enough votes for a map to

11   be enacted and implemented.  No national operative on either

12   side had a vote or a veto, and the Ohio Republicans only used

13   ideas from D.C. when they agreed with them and believed the

14   votes could be obtained to incorporate them.  The final map was

15   a political compromise between Ohio Republicans and Ohio

16   Democrats and had nothing to do with Washington, D.C.

17       In summation, here's the bottom line from our perspective.

18   Anyone who thinks that federal courts can fix political

19   polarization by injecting themselves into the most highly

20   political disputes in the nation is sadly mistaken.

21       The remedy is more democracy, not federal court

22   intervention, even when democracy in action is not pretty.  The

23   political engagement and back and forth that led to the final

24   2011 map is a model of democracy in action, and it should be

25   upheld.

```
 1        We thank the Court for its time.

 2             JUDGE BLACK:  Thank you.

 3             JUDGE WATSON:  I don't think any member of this panel

 4   filed this lawsuit, so I don't know that it's an accurate

 5   statement to say that this Court is injecting itself into

 6   anything.

 7             MR. STRACH:  Thank you, Your Honor.  I understand

 8   that.

 9             JUDGE BLACK:  On behalf of intervenors?

10   OPENING STATEMENT OF INTERVENORS

11             MR. BRADEN:  May it please the Court, Mark Braden on

12   behalf of the intervenors.  You're right, you have not injected

13   yourself into this.  You've been invited into the political

14   thicket by the plaintiffs.

15        The evidence will show a political process with all the

16   negotiations, you know, input from members of Congress on what

17   their district should look like going forward.  Legislation has

18   sometimes been described as a sausage-making process.  This is

19   a legislative process.  Sometimes sausage making is

20   unattractive.  You can pull out a word here or a word there and

21   try to imply it's not a process that you would like.  It is a

22   messy political process.

23        Shock of shock, the members of the Ohio legislature thought

24   it would be appropriate to talk to the single most powerful

25   member of Congress who happened to be from Ohio about the
```

1  process in Ohio.  I would suggest to you it would be

2  malpractice for the legislature not to be concerned about what

3  the Speaker of the House had in mind and thought should be the

4  delegation coming back from the State of Ohio.

5      The plan, this plan, was designed to preserve incumbent

6  members, Republicans and Democrats, as much as possible in

7  light of the population changes in Ohio.  That is a matter of

8  no genuine dispute in this courtroom.  That's what it was

9  designed to do, and to a large degree that's what it did.

10      The complaint is, in fact, simply a complaint that too few

11  Democrats have won congressional races.  So this Court is now,

12  in light of the fact that too few Democrats have won, this

13  Court is to toss out a plan drawn in the political process,

14  toss out a plan that was drawn pursuant to the U.S.

15  Constitution, the U.S. Constitution assigns it to the state

16  legislature, and Ohio law assigns it to the state legislature

17  and decide it should be thrown out because too few Democrats

18  have won.

19      The individualized harm we have for our plaintiffs here is

20  that they live in districts which have too many or,

21  alternatively, some of them have too few Democratic voters.  I

22  would suggest to you that is a Goldilocks claim, and what

23  they're asking you is to decide exactly what that number should

24  be, to insert yourself into the political thicket.

25      Now, every Court that's involved in redistricting since the

1     1960s has been in the political thicket.  So that's

2     unavoidable.  I would suggest to you that the litigation from

3     the '60s about population deviation pulled the Court into the

4     political thicket, but provided very clear paths through

5     population deviation, numbers that are easy to understand and

6     easy to articulate.

7          The other redistricting cases usually involve racial

8     consideration or ethic considerations under the Voting Rights

9     Act of the 15th Amendment, and that's an immutable

10    characteristic of voters, and dealing with, effectively the

11    original sin in the creation of a country, slavery and the

12    Civil War.  So it's easy to understand the role of the courts

13    in preserving rights under -- in the context of race and

14    ethnicity.

15         What they're asking you to do, though, is to impale

16    yourself on those political thorns, because they're asking you

17    to replace the political judgment, specifically the political

18    judgments that the Constitution specifically gave to a state

19    legislature, and make a decision how many Democrats in the

20    district versus how many Republicans is exactly the right

21    number.

22         Last month, Justice Roberts was speaking at a law school in

23    Nashville, and he made a couple of observations that I think

24    are important to consider.  He said, "We are not just another

25    part of the political process" -- obviously referring to not

1  just the Supreme Court but all courts -- "and people need to
2  know that we are not doing politics."

3     A couple months ago he made an observation in response to a
4  political statement that offended, probably, most lawyers and
5  most judges.  He made an observation, Justice Roberts, "We do
6  not have Obama judges or Trump judges or Bush judges or Clinton
7  judges."  I don't think any of the members of the bar in this
8  courtroom disagree with that statement whatsoever.  We all
9  firmly believe that, and we all firmly believe we have a
10 judiciary that's not partisan when they put on their robes.

11    But if the Court is going to decide how many Republicans
12 should be in each district or how many Democrats should, and
13 you're going to replace the judgment of the elected officials
14 by doing that, we may understand that you're not partisan
15 judges, but I don't think many members of the general public
16 are going to understand that.

17    Don't impale yourself on the political thorns in the
18 thicket.  Avoid this invitation into the thicket, into the
19 thorns.  Thank you, Your Honor.

20        JUDGE BLACK:  Thank you, counsel.

21    We have now had opening statements.  It's 10:00 o'clock.
22 Is the plaintiff prepared to call its first witness?

23        MS. LEVENSON:  Yes, we are, Your Honor.

24        JUDGE BLACK:  Who do you call?

25        MR. FRAM:  We call Mr. Andre Washington, president of

1   APRI.

2          JUDGE BLACK:  Very well.  If that gentleman would

3   approach the witness stand.

4      If you would pause where you are, sir, and raise your right

5   hand for the oath to tell the truth.  Do you solemnly swear or

6   affirm that your testimony today will be the truth subject to

7   the penalty of perjury?

8          THE WITNESS:  Yes.

9          JUDGE BLACK:  Very well.  You may be seated.  In the

10  spirit of full disclosure, the seat tips back.

11         THE WITNESS:  Okay.

12         JUDGE BLACK:  In addition to the seat tipping back, we

13  have a very expensive federal microphone that we would like you

14  to be close to.

15         THE WITNESS:  Okay.

16         JUDGE BLACK:  Very well.

17         THE WITNESS:  Thank you.

18                      ANDRE WASHINGTON

19  a witness herein, having been first sworn, testified as follows:

20                   DIRECT EXAMINATION

21  BY MS. LEVENSON:

22  Q.  Good morning, Mr. Washington.

23  A.  Good morning.

24  Q.  Would you please state your and spell your name for the

25  record.

1  A.  It's Andre Washington, A-n-d-r-e W-a-s-h-i-n-g-t-o-n.

2  Q.  Thank you.  What is your connection with the Ohio Chapter

3  of the A. Philip Randolph Institute?

4  A.  I am the proud state president.

5  Q.  From now on, to shorten the name, I'll refer to it as APRI.

6  Is that all right?

7  A.  Yes.

8  Q.  Thank you.  Mr. Washington, can you tell us briefly the

9  history of APRI.

10  A.  Yes.  And, Freda, could you please call me Andre.

11         JUDGE BLACK:  You're going to need to speak up for

12  this old man.

13         THE WITNESS:  I'm sorry.  Thank you very much, Your

14  Honor.

15  A.  Freda, could you please call me Andre.

16  Q.  Oh, if you wish.  Andre, yes.

17  A.  Thank you.  Could you repeat the question?

18  Q.  Certainly.  Andre, could you please tell us briefly the

19  history of APRI.

20  A.  Ohio A. Philip Randolph Institute is a civil legal rights

21  organization.  We were founded in 1965 by our founder Asa

22  Philip Randolph and our cofounder Bayer Ruston.  A. Philip

23  Randolph was a civil rights labor leader.  He organized the

24  1963 march on Washington, D.C. for jobs and freedom where Dr.

25  King gave, of all things, "I have a dream" speech.  And as I

1   said, he started the A. Philip Randolph Institute, where we do

2   voter empowerment, voter engagement, civil engage -- where Dr.

3   King gave, of all things "I have a dream" speech.  Our

4   organization was started by our founder Asa Philip Randolph --

5            JUDGE BLACK:  Slower.

6   A.  -- in 1965 --

7            THE WITNESS:  I apologize.  I'm a little nervous.  So

8   I --

9            JUDGE BLACK:  So am I.  Speak slowly.

10           THE WITNESS:  Okay.

11      (Laughter.)

12  A.  -- in 1965.  We do voter engagement, voter empowerment,

13  voter registration, civil engagement programs all over the

14  state -- we -- we're -- we're a non-partisan, but we're a civil

15  rights and we support labor issues.

16  Q.  Thank you.  And these things that you've listed, these are

17  the mission of the organization?

18  A.  Correct, yes.

19  Q.  How long have you been a member of APRI?

20  A.  For over ten years.

21  Q.  And how long have you been the president?

22  A.  For about eight years now.

23  Q.  What are the duties of the president?

24  A.  I'm the principal officer of the organization.  I preside

25  over our meetings.  I do -- I strategize to put together voter

1 registration drives, voter engagement programs, voter education

2 programs throughout the state.

3 Q.  As president, to what extent do you engage directly with

4 voters?

5 A.  I -- I do -- I'm a hands-on president.  I lead by example.

6 I go out, I knock on doors, I register people to vote.  I drive

7 up and down the highways and byways registering people,

8 educating them, engaging them and getting them to turn out to

9 vote on election.

10 Q.  Thank you.  Can you please describe your personal history

11 of political activism.

12 A.  Wow.  I've been politically active ever since I was a

13 puppy.  I -- I've been involved politically -- my first

14 organization that I belonged to was the NAACP.  My first

15 membership was when I was in the fifth grade, and I am a proud

16 life member of the NAACP today.  We -- as a kid, we would go

17 with my grandparents and we would drop off literature.  We

18 would lick stamps, do mailings.  Later in life I became active

19 in registering people to vote.  We were trained to always keep

20 a voter registration card with us at all times.  If I'm in the

21 grocery store, I talk about the ballgame, I talk about what's

22 going on in the community, I ask people, "Are you registered to

23 vote?"  I go out to my car, get a voter registration card, pull

24 it out, and register them to vote.  But lately I don't have to

25 run to my car no more.  We have this new app. now that I just

ANDRE WASHINGTON - DIRECT

```
 1   pull my phone out, then I go straight to the Secretary of
 2   State's Web site and I register people to vote, so that saves
 3   me a couple of steps.
 4   Q.  Well, terrific.  What are APRI's other officer positions?
 5   A.  We have a vice president, secretary, treasurer, sergeant of
 6   arms and three trustees.
 7   Q.  Is APRI affiliated with any national organization?
 8   A.  We're affiliated with our national A. Philip Randolph
 9   Institute, and we are the senior constituency group of the
10   AFL-CIO.
11   Q.  Can you describe the leadership structure of the APRI of
12   Ohio.
13   A.  Yeah, we're a bottom-up organization.  We have our local
14   leadership that has presidents and officers, and then we have
15   our state organization.
16   Q.  How frequently do the state leaders meet face to face?
17   A.  We meet four times a year and that includes our educational
18   conference.  We talk a lot doing conference calls throughout
19   the year.  It varies on what hot issues are going on.  Like
20   with the gerrymandering case that we're in right now, we talk
21   on the phone and forward phone conference calls quite often,
22   but we meet four times a year face to face, and that includes
23   our educational conference.
24   Q.  Who attends the quarterly in-person meetings?
25   A.  Our officers, our chapter presidents, their officers and
```

1   members attend.

2   Q.   So how many people generally attend these in-person

3   meetings?

4   A.   Somewhere around 30 people.

5   Q.   What kind of business do you conduct there?

6   A.   We -- we strategize and we put together voter registration

7   plans, we talk about hot issues that are going on in the state.

8   Q.   Where does APRI of Ohio have chapters?

9   A.   We have a chapter in Toledo, Cleveland, Warren, Youngstown,

10  Columbus, Akron-Canton, Cincinnati and Dayton.  But the Dayton

11  chapter is not active right now.  But I'm proud to say that we

12  just had a meeting last Saturday, two days ago, and it was an

13  informational meeting to get that chapter back up and going.

14  Q.   How does one become a member of APRI?

15  A.   Believe in the mission and pay your dues.

16  Q.   How much are dues?

17  A.   Well, I stated earlier that we're a bottom-up organization,

18  so our dues are not like the League of Women Voters or the

19  NAACP where the national sets the dues structure.  Each chapter

20  sets their own dues structure.  So they assess how much money

21  it takes to run the programs that they do in that -- in that

22  community.  So every chapter's dues structure is different, and

23  our founder, Asa Philip Randolph, he set it up that way years

24  ago so that the money that they take in for dues stays locally

25  to do the work locally, because all politics are local.

```
 1   Q.  Approximately how many members does APRI have living in
 2   state?
 3   A.  Well, because we are a bottom-up organization, we don't
 4   have a membership -- we, as a state, we don't keep a membership
 5   roster, but I would say somewhere between 150, 200 members.
 6   Q.  On what occasions do you interact with members of APRI?
 7   A.  Well, of course I interact with them when we have our four
 8   meetings a year.  And whenever they have voter registration
 9   drives or community forums, I go out and I support those
10   forums, and I interact with them, and I'm a hands-on president.
11   When they're knocking on doors, I knock on doors.
12   Q.  So where do these meetings take place?
13   A.  I'm all over the state.
14   Q.  Okay.  And how many of the members do you actually know?
15   A.  I'm proud to say I know all my members.  I interact with my
16   members.  I talk to my members.  I eat with my members.  The
17   last time I was at a -- at a community forum, afterwards, I
18   said I'm going to get something to eat, I'm going to run down
19   the street to Cracker Barrel.  And they were like, "No, you're
20   coming home with me to eat.  You're not going to eat that mess
21   over there."  So I eat with my members.  I go to their house.
22   I'm sorry, I know that's a long answer, but I interact with my
23   members.  And, yes, the short answer, I know my members.
24   Q.  That's a fine answer.  Thank you.
25       Where in the state of Ohio do APRI members reside?
```

1  A.  All over the state.

2  Q.  Well, in every area in the state?

3  A.  Every area of the state.  You know, one area that I have

4  not been to is the -- is the southern part of the state, the

5  Portsmouth area.  I don't think we have any members over there,

6  down in that area there, but as I go around the state, we have

7  members in almost every congressional district.

8  Q.  Now, you've stated that the state APRI does not have a

9  membership list that it maintains.  Does every chapter maintain

10  a current membership list?

11  A.  Yes.

12  Q.  Every chapter?

13  A.  Not every chapter.  Cincinnati doesn't maintain a list,

14  and, of course, Dayton, their list is old because they haven't

15  been functioning for some years now.

16      MS. LEVENSON:  Your Honors, I have a small collection

17  of membership lists for chapters.  In the interest of time,

18  shall I establish the foundation for them all as a packet or

19  would you like them done individually?

20      JUDGE BLACK:  The former.

21      MS. LEVENSON:  The former.  Okay.

22  May I approach the witness, please?

23      JUDGE BLACK:  At your own risk.

24      MS. LEVENSON:  Thank you.  I have just handed the

25  witness a packet of six exhibits marked for identification as

1    Plaintiffs' Exhibit 577, Plaintiffs' Exhibit 576, Columbus --

2    excuse me, Plaintiffs' Exhibit 573, Plaintiffs' Exhibit 578,

3    Plaintiffs' Exhibit 420 and Plaintiffs' Exhibit 575.

4    Q.  Mr. Washington, can you leaf through and tell me if you

5    recognize these documents.

6    A.  Yes, I do.

7    Q.  Thank you.  What are they, starting with the top one?  If

8    you don't mind taking them in alphabetical order.

9    A.  Yes.  The first one is the membership roster for

10   Akron-Canton.  Keep going?

11   Q.  Yes, please.

12   A.  Okay.  The second one is the membership roster for

13   Cleveland; the third one is the membership roster for Columbus;

14   the next one is the membership roster for Toledo; after that is

15   the membership roster for Trumbull County, which is the Warren

16   area; and the membership roster for Youngstown, Ohio.

17          MS. LEVENSON:  Your Honors, I move to let these

18   exhibits, the six of them, be admitted into evidence.

19          JUDGE BLACK:  Any objection?

20          MR. VOIGT:  No objection, Your Honor.

21          JUDGE BLACK:  Very well.  They're admitted.

22          MS. LEVENSON:  Thank you.

23     (Plaintiffs' Exhibits 420, 573, 575, 576, 577 and 578 were

24   admitted.)

25   Q.  Mr. Washington, how large is APRI's paid staff?

1  A.  Zero.  We have no paid staff.  We are all volunteers.

2  Q.  What do your volunteers do on behalf of the organization?

3  A.  We -- we register people to vote.  We encourage people to

4  vote.  We do civil engagement, voter empowerment within the

5  communities that we serve.

6  Q.  So how did APRI make the decision to file this lawsuit?

7  A.  We had a meeting and we met with our state officers, our

8  local officers, and representatives from each chapter, and we

9  voted unanimously to take part in this lawsuit.  We felt that

10  it was the right thing to do.

11  Q.  Why is APRI challenging the congressional map?

12  A.  Well, the current gerrymandering map works against us.  It

13  makes it harder for us to do the work that we do in the

14  communities that we serve.  People are confused.  People feel

15  apathetic about the process.  So the map actually works against

16  us and it's harder and it makes us use unnecessary resources,

17  and we have limited resources to start with.

18  Q.  So what do you mean that the map causes confusion?

19  A.  People don't know where -- where to vote.  Some counties

20  could be split up three different ways.  The lines are jagged.

21  People just don't know where -- who they vote -- who they're

22  voting for, who their congressional representative is.

23  Q.  Can you explain how the voter confusion that is caused by

24  the map makes APRI divert resources or have to work harder?

25  A.  Yeah.  We -- we have limit -- we have limited resources,

1  and we spend more time trying to unconfuse people about the
2  process versus registering them to vote.  And like I said
3  earlier, we're an educational organization and we're
4  non-partisan.  We don't tell you who to vote for, but we
5  educate you on the issues that are out there, and instead of
6  spending time with our limited resources and on volunteers and
7  register them to vote, giving them rights to the policies, we
8  spend more time trying to unconfuse them about who they're
9  voting for.
10      And people get upset.  They -- they -- not only do they not
11  know who they're voting for, what district they're in, people
12  feel like their vote doesn't count.  "It doesn't matter that
13  same person is going to get back in office.  My vote really
14  doesn't count, so why am I going to waste my time?"
15  Q.  So can you explain how this voter apathy makes APRI divert
16  resources?
17  A.  Because we spend too much time trying to convince people to
18  be part of the process, and instead of spending our limited
19  resources that we have to register them, and people just aren't
20  excited about the process if they know that -- if they feel
21  that their vote doesn't matter.
22  Q.  What, if any, effect does the congressional map have on the
23  democratic members of APRI?
24  A.  Most of our members are Democrats, and our members feel
25  like their vote doesn't count, especially when they're in

 1  cracked districts where no matter what they do, the Republican

 2  person will always get in office and always win.  And they feel

 3  that the Republican really doesn't have to hear their concerns,

 4  because no matter what happens, they're going to win, they're

 5  going to get back in, so they don't have to sit down, they

 6  don't have to listen to our Democratic members or me as a

 7  Democrat, because no matter what, all they have to do is listen

 8  to their base, because they're going to get reelected because

 9  we're in a sea of red.

10  Q.  What examples can you point to of specific members

11  suffering vote dilution?

12  A.  Well, I have -- one of our members from Toledo, she's going

13  to be testifying either today or tomorrow, Stephanie White,

14  she's in CD5 -- that's up by the Toledo area -- she's in a

15  cracked district.  I can use myself as an example.  I'm in

16  CD12, and my -- I'm in a district where my vote is diluted.  No

17  matter what happens, the Republican candidate will always win.

18  Even last year when we had the blue wave and Democrats were

19  winning all over the country, my district still, because of the

20  way it's cracked, still went Republican.

21  Q.  Well, let's talk about you.  We've spoken about APRI as an

22  organization, but now let's talk about you, Andre Washington,

23  as a member of APRI, and a voter yourself.  What is your

24  address?

25  A.  7 Village Gate Boulevard, Delaware, Ohio, 43015.

1   Q.  And you've stated that's the 12th district.

2   A.  Yes.

3   Q.  How long have you lived there?

4   A.  For nine years now.

5   Q.  Where did you live before that?

6   A.  Toledo.

7   Q.  For how long?

8   A.  Ten years.

9   Q.  And what congressional district was that?

10  A.  I believe that was 12.

11  Q.  This --

12  A.  No.  No, that was nine.  I'm in 12 now.

13  Q.  Who was your representative at that time, when you were in

14  the ninth?

15  A.  Marcy Kaptur.

16  Q.  And who is your current representative?

17  A.  Balderson, Troy Balderson.

18  Q.  How long has Mr. Balderson been your representative?

19  A.  He won in 2018, at the special election, and then he got

20  reelected in November at the general election.

21  Q.  What party is Mr. Balderson?

22  A.  Republican.

23  Q.  Who was the congressman representing your district before

24  Mr. Balderson?

25  A.  Tiberi?

ANDRE WASHINGTON - DIRECT

1   Q.   What party was Mr. Tiberi affiliated with?

2   A.   Republican.

3   Q.   Are you registered with a political party?

4   A.   Yes, I am.

5   Q.   And what party is that?

6   A.   I'm a Democrat.

7   Q.   And how long have you been a Democrat?

8   A.   All my life.

9   Q.   How often do you vote?

10  A.   I vote in every general election, every special election

11  and every primary.

12  Q.   Why do you make a point of voting so regularly?

13  A.   That's how I was raised.  I was raised that it is my --

14  that it's my responsibility to exercise my right to vote for an

15  issue and a candidate of my choice.  It's embedded in my DNA.

16  We were raised that way.  I have some southern grandparents

17  that said, "Hey, this is what we do," and they led by example,

18  and I lead by example with my children.

19  Q.   So why have you voted specifically in congressional

20  elections?

21  A.   That's my chance for my voice to be heard in Congress and

22  for my concerns to be represented.

23  Q.   And what political issues are important to you that are

24  before Congress?

25  A.   Well, I have a laundry list, but my two issues that are

1  very important to me would be the Affordable Care Act and

2  reauthorizing Section 5 of the Voting Rights Act.

3  Q.  Can you speak to why the Affordable Care Act is important

4  to you?

5  A.  Well, I believe that health care -- everyone should have

6  the opportunity to have affordable health care.  And I had a

7  cousin, her son had some mental issues, and if it wasn't for

8  the Affordable Care Act, he wouldn't have been able to get

9  the -- the care that he needed.

10 Q.  And Section 5 of the Voting Rights Act, why is it important

11 that it be reauthorized?

12 A.  Well, I mean, after Section 5 of the Voting Act -- after it

13 was struck down, so many states implemented what we call voter

14 suppression laws that disenfranchised communities of color, and

15 it discouraged people from voting.  And I believe that voting

16 should be easier to vote, it should be more convenient to vote,

17 so everybody can exercise their right.  So I take that

18 personally.

19 Q.  And does Troy Balderson represent you on the Affordable

20 Care Act?

21 A.  No.

22 Q.  Did you vote for Mr. Balderson?

23         JUDGE BLACK:  Excuse me.

24         MR. VOIGT:  Your Honor, the last question, I just

25 object to the answer as improper laid testimony.

```
 1              JUDGE BLACK:  Very well.
 2              MS. LEVENSON:  I'm sorry, I don't know which question
 3    that refers to.  Whether Balderson represents --
 4              MR. VOIGT:  No, it related to what's happening in
 5    other states.
 6              MS. LEVENSON:  Oh, that.  Okay.  Thank you.
 7    BY MS. LEVENSON:
 8    Q.  Does Troy Balderson represent you on the Affordable Care
 9    Act?
10    A.  No.
11    Q.  What position does he take?
12    A.  He said that he would repeal the Affordable Care Act.
13    Q.  Did you vote for Mr. Balderson?
14    A.  No.
15    Q.  Did your previous representative Pat Tiberi represent you
16    on the Affordable Care Act?
17    A.  No.
18    Q.  What position did he take?
19    A.  He voted to appeal it -- repeal it.
20    Q.  Did your previous representative Pat Tiberi represent you
21    with respect to the Voting Rights Act reauthorization?
22    A.  No.
23    Q.  What position did he take on that?
24    A.  He voted to -- he voted to support to not re-establish the
25    Voting Rights Act.
```

1    Q.  Did you vote for Mr. Tiberi?

2    A.  No, I did not.  I voted for his Democratic opponent.

3    Q.  What are your beliefs as your entitlement to a

4    representative who represents you on all of your points of

5    view?

6    A.  No, I don't feel like I'm entitled.  I do feel like I'm

7    entitled that my representative should at least listen to me.

8    I feel that they should at least hear my concerns.  That's all

9    I'm asking of my representative.

10        But because of the way these lines are drawn, the way

11   they're so gerrymandered, that they don't have to listen to me.

12   They don't have to listen to my concerns.  So I don't feel like

13   I'm entitled, but I do feel like I deserve at least to be

14   listened to.

15   Q.  Why do you say they don't have to listen to your concerns?

16   A.  Because my vote is diluted.  In the district that I live,

17   in the 12th district, no matter what happens, Balderson was

18   going to win, even when we had that big blue wave that I stated

19   earlier, that no matter what's going on in our country, the

20   Republican candidate will always win, and he doesn't have to

21   listen to any of my concerns.  He only has to listen to the

22   voters that put him in there, and the lines are not

23   competitive, so --

24   Q.  Thank you.

25            MS. LEVENSON:  Stephen, would you kindly display the

ANDRE WASHINGTON - DIRECT

```
 1   Plaintiffs' Demonstrative 16.
 2            JUDGE BLACK:  Yes.  I'm sorry.
 3            MR. VOIGT:  Your Honor, I object to the use of the
 4   phrase "vote dilution."  That's improper laid testimony.  It's
 5   a topic for expert testimony.
 6            JUDGE BLACK:  Very well.
 7   Q.  Mr. Washington, what do you mean when you say "vote
 8   dilution"?
 9   A.  My vote is diluted, that it doesn't matter, because no
10   matter -- no matter how many times I vote, my Democratic
11   candidate never has a chance to win.
12   Q.  Thank you.
13            MS. LEVENSON:  Stephen, would you kindly display
14   Plaintiffs' Demonstrative 16.  Thank you.
15       So who is able to view this right now?  Just me and the
16   witness?
17            JUDGE BLACK:  Everybody sees it; is that right?  It's
18   all around the room.
19            MS. LEVENSON:  Okay.  Thank you.  Thank you.
20   Q.  Mr. Washington, I direct your attention to the image that
21   has been displayed on your monitor.  Do you recognize what this
22   is?
23   A.  Yes.
24   Q.  What is it?
25   A.  It's my Congressional District 12.
```

```
 1   Q.  Using words, can you point out where you live on this map.
 2   A.  Yeah, I am right there in Delaware, the blue stick pin,
 3   push pin right there.  Yeah, that's me.
 4   Q.  Thank you.
 5        MS. LEVENSON:  Stephen, could you now put up
 6   Plaintiffs' Demonstrative 17.
 7   Q.  Mr. Washington, looking at this image, what is this?
 8   A.  This looks like the opposed district plan for my
 9   Congressional District 12, and that's where I live right there
10   in Delaware, the blue push pin.
11   Q.  And by proposed, proposed by whom?
12   A.  By our expert that draws the maps.  Not by me.
13   Q.  Thank you.  How does the current congressional map impact
14   you as a voter?
15   A.  The current map?
16   Q.  Yes.
17   A.  It -- it makes it harder.  When I'm going around knocking
18   on doors, going up and down the streets and the highways and
19   byways, people are not excited about voting.  They feel like
20   their vote doesn't matter or doesn't count.  And it makes my
21   job harder when I'm trying to do civil engagement and trying to
22   empower the people to get out and vote.
23   Q.  How many times have you met with people in the past three
24   or four years in your district who would not register?
25   A.  Hundreds of times.  It's like when I knock on the door,
```

```
 1   they're not excited about -- about the process.  They're --

 2   they're not excited, and they -- they just feel that their vote

 3   doesn't matter, and Why am I wasting my time when the same

 4   person's going to win?

 5   Q.  So despite the burden placed on you by the map, why do you

 6   continue to work so hard to engage other voters?

 7   A.  Well, it's -- it's part of my DNA.  I have always been

 8   involved and engaged.  I -- I remember as a kid, my

 9   grandparents would take us with them when they would

10   register -- when they would go to vote.  And not only did they

11   tell us how important it was to vote, they also showed us.

12       You know, I realize now, more so when I was a kid, that

13   kids learn more from what they see than what you actually tell

14   them.  And I -- I remember, you know -- and, again, my

15   grandparents was from the south, and they were just some proud

16   people.  And, you know, when we -- when we would -- and I'm

17   sorry if I get long-winded, but when we would go vote, when

18   they would take us to go vote, because they would take us with

19   them, my grandparents used to dress up.  You know, grandma

20   would put her dress on and she would put her big Sunday hat on

21   and they took pride in voting.  They didn't just show up.

22   They -- they -- they felt that this was an honor to vote.

23       And even today, the values that they instilled in me in

24   voting, I still use today.  When I go to the polls to vote, I

25   wear a suit jacket, not because they told me, because of what I
```

```
 1   saw from, you know, what they taught me.  You know, I will at
 2   least go to the polls dressed casual.  I won't wear a jogging
 3   suit, because they instilled in me the values to vote, and
 4   they -- they told us, you know, your vote counts, and they want
 5   your vote to count.
 6       So I take pride in voting because my the grandparents took
 7   pride in voting.  I instilled that in my kids, the pride in
 8   voting and the responsibility to vote.  So it's embedded in my
 9   DNA.  I vote in every general, special and primary election,
10   and I take my vote serious.
11   Q.  And, ultimately, what's the importance of your vote?
12   A.  So that my vote will count.
13         MS. LEVENSON:  Thank you.  No further questions, Mr.
14   Washington.
15         JUDGE BLACK:  Very well.  On behalf of defendants,
16   cross-examination.  Brace yourself.
17         MR. VOIGT:  Steven Voigt for the defendants, Your
18   Honor.
19                     CROSS-EXAMINATION
20   BY MR. VOIGT:
21   Q.  Mr. Washington, it's good to see you again.
22   A.  Good to see you.  And, Steve, Andre, please.
23   Q.  I'll try.
24   A.  All right.
25   Q.  And so APRI is a plaintiff in this litigation; is that
```

1   correct?

2   A.  Yes.

3   Q.  And this lawsuit involves congressional district lines that

4   Ohio drew in about 2011; is that correct?

5   A.  Yes.

6   Q.  Is it correct that APRI has been concerned about Ohio's

7   congressional district lines since 2011?

8   A.  Yes, it's safe to say that.  Yeah.

9   Q.  When Ohio was drawing its congressional lines in 2011, is

10  it correct that APRI did not provide any input to the state

11  about those lines?

12  A.  The short answer is yes, but that's right around the time

13  when I became state president, so I was just feeling my way

14  through.  As the new president, I just don't go out gung ho,

15  but the short answer, yes.

16  Q.  The answer is "Yes"?

17  A.  Yeah.

18  Q.  Thank you.  Aside from filing this lawsuit, has APRI ever

19  notified any official in Ohio that it opposes the current

20  congressional map?

21  A.  No.

22  Q.  Does APRI take a position on some public policy issues?

23  A.  Yes.  Yes, I'm sorry.

24  Q.  And to be a member of APRI, does a person need to agree

25  with all of APRI's public policy positions?

1    A.   No.

2    Q.   Does APRI have a mission statement?

3    A.   Yes.

4    Q.   Is it true that APRI's mission statement does not include

5    anything related to Ohio's congressional district lines?

6    A.   I don't have the written mission statement in front of me

7    right now, but our mission statement is voter education, voter

8    empowerment, voter education, and I believe that covers a

9    wide -- variable things, and that could be under our mission

10   statement if it's voting rights.

11   Q.   Is it true that APRI has never published a position

12   statement for its members related to Ohio's congressional

13   district lines?

14   A.   When you say "published" --

15   Q.   Provided a statement to all of its members related to its

16   position in this litigation.

17   A.   Maybe not a statement in writing.

18   Q.   In any other form?

19   A.   We could have talked about it verbally, but I don't have

20   any of that in front of me.

21   Q.   Okay.  But there's nothing that you sent to all of the

22   members of APRI notifying them of APRI's position in this

23   litigation?

24   A.   I could, yeah, I send out information to them all the time.

25   Q.   And did that -- did that information specifically include

```
 1    APRI's position in this litigation?
 2    A.   Our position was that we voted unanimously to engage in
 3    this litigation.
 4    Q.   Is it correct that APRI has never taken a poll of all of
 5    its members to determine their particular opinions with respect
 6    to Ohio's congressional district lines?
 7    A.   If you're asking if we sit around and we ask each
 8    individual member what -- how do they feel on this, the answer
 9    is no.  We have -- when we have our meetings, we have
10    representatives that show up that tell us the concerns in their
11    community, and that's how we vote.
12    Q.   And so the answer would be "No"?
13    A.   Do we ask individual members?
14    Q.   Yes, sir.
15    A.   I didn't go around and ask each individual member.
16    Q.   And, again, individual members are permitted to disagree
17    with APRI's position statement?
18    A.   Of course, yes.
19    Q.   I believe you mentioned this earlier, but for how many
20    years has APRI been in existence?
21    A.   We've been around since 1965.
22    Q.   And has APRI's membership grown over that time?
23    A.   Yes.
24    Q.   Well, and it has also grown over the past few years?
25    A.   Yes.
```

```
1    Q.  And do you recall our deposition?

2    A.  Yes, I do.  But if you remember, Steve, that was right

3    around the time my mother passed away and my emotions were

4    really high at the time.  I even had to take a break.  So, yes,

5    I do remember that, but if my memory gets fuzzy, charge it to

6    my mind and then my heart.

7    Q.  And, again, my condolences for your mother's passing.

8    A.  Thank you.

9    Q.  But we talked a little bit about what APRI does, and Ms.

10   Levenson also touched on that as well, but is it fair to say

11   that APRI engages in voter education, Get Out the Vote, and

12   voter registration?

13   A.  Yes.

14   Q.  And those three topics, voter education, Get Out the Vote,

15   and voter registration, are those APRI's primary areas of work

16   with respect to voting?

17   A.  Yes, because we're an educational organization.

18   Q.  Okay.  And is it correct that APRI is effective in its

19   voter education efforts?

20   A.  We believe we are, yes.

21   Q.  Is it correct that APRI is effective in its Get Out the

22   Vote efforts?

23   A.  We believe effective as long as we can use our limited

24   resources in doing what we're charged to do, not fighting

25   confusion and apathy, yes.
```

1    Q.   Okay.  Is it correct that APRI's effective in its voter

2    registration efforts?

3    A.   We believe we are, yes.  Under my leadership, I believe we

4    are.

5    Q.   At the deposition we talked a little bit about how

6    congressional lines are drawn.  And I don't know if you

7    remember that or not, but APRI does not have experience drawing

8    congressional lines; is that fair to say?

9    A.   That's fair, yes.

10   Q.   And is it your opinion that what constitutes fair lines is

11   a question that is really suited for individuals experienced

12   with drawing lines?

13   A.   Yes.

14   Q.   And that experts are best suited to decide whether or not

15   congressional lines are properly drawn?

16   A.   Yes.

17   Q.   Are you generally familiar with the recent ballot issue

18   that changed the way Ohio will draw lines in the future?

19   A.   Somewhat, yes, I'm familiar with it.  It was called ballot,

20   yes.

21   Q.   I think it was called Issue 1?

22   A.   Yes.

23   Q.   And was APRI in support of that ballot issue?

24   A.   Yes.

25   Q.   APRI does not keep track of whether its voters -- I'm

```
 1   sorry -- strike that.
 2       APRI does not keep track of whether its members vote in
 3   congressional elections; is that correct?
 4   A.  Correct.
 5   Q.  And APRI agrees that a person's political positions are not
 6   necessarily defined by simply looking at his or her party
 7   affiliation; is that correct?
 8   A.  Say that one more time.
 9   Q.  APRI agrees that a person's political positions are not
10   necessarily defined by simply looking at that person's party
11   affiliation; is that correct?
12   A.  Yes.
13   Q.  And Ms. Levenson asked you some questions about the
14   additional resources and time that you say you need to devote
15   related to the -- your efforts.  APRI has never calculated the
16   additional resource that it has incurred based on Ohio's
17   congressional district lines; is that correct?
18   A.  See, we've never calculated, but, you know, if I got ten
19   dollars in the bank and five people to feed, I don't need to
20   calculate what I need.  I know my limited resources.  So, you
21   know, we -- we -- we can say that we spend more resources
22   registering -- I mean, trying to get rid of confusion versus
23   registering people, and with our limited resources we have
24   limited -- we have volunteers.  Our resources are limited, like
25   I stated earlier.  But our volunteers are what's precious to
```

```
 1    us.  And if our volunteers spend more time trying to fight the
 2    confusion versus doing what we're charging them to do when
 3    we're out there, then it makes our job harder.
 4    Q.  Okay.  But no matter how the lines are drawn, do you agree
 5    that individuals do need to be educated about what district in
 6    which they live?
 7    A.  People need to know what district they're in so they know
 8    who to vote for.
 9    Q.  Okay.  And so there would be time and resources put into
10    these efforts no matter how the lines are drawn?
11    A.  No.  See, if we use our resources to sit there and try to
12    break up the confusion versus educating them, then the answer
13    is no, Steve.
14    Q.  I'm not sure you understood my question.
15    A.  Well, maybe I didn't.
16    Q.  Well, no matter how the lines are drawn, don't you agree
17    that someone -- there -- could have confusion about where
18    they -- what district they live in, and that question is almost
19    always going to come up or often may come up when you're
20    talking to a particular voter?
21    A.  Steve, you said someone.  The answer is yes.  There's
22    always going to be someone out there.  But like I testified
23    earlier, hundreds -- I have knocked on hundreds of doors and
24    people are confused.  So if we can cut that confusion down --
25    I'm not going to say it's going to be perfect.  Life isn't
```

```
 1    perfect.  But if we can cut that confusion down, that will save
 2    us on our resources and our volunteers.
 3    Q.  APRI is able to go out and talk to people to encourage them
 4    to vote; is that -- is that right?
 5    A.  Yes.
 6    Q.  APRI has never sent a survey to test the political
 7    enthusiasm of its members; is that correct?
 8    A.  Steve, we're a bottom-up organization.  We're not -- I'm
 9    just going to keep it real with you.  We're not high tech like
10    that.  We just know what we see and we know what we're doing
11    and -- long answer, no.
12    Q.  But you would say your members are enthusiastic?
13    A.  My -- my members are, yes.
14    Q.  Okay.  Do you agree that people can be motivated to vote
15    based on reasons other than whoever is running for Congress?
16    A.  There's all type of reasons why people vote.
17    Q.  And is it true that voters can be apathetic based on
18    reasons unrelated to congressional races?
19    A.  There's all type of reasons why people are apathetic.
20    Q.  Well, Ms. Levenson asked you about your interactions with
21    your congressman, your congressperson.  Is anything preventing
22    you from reaching out to your congressperson and communicating
23    your viewpoints?
24    A.  No.  The last time I tried to reach out to him, I tried
25    several times to meet with -- with my congressperson, and I can
```

ANDRE WASHINGTON - CROSS

1    only meet with the help.  And sometimes it's, you know, when

2    they're busy, it's okay to meet with help.  But at that

3    particular time, I didn't want to meet with the help.  I wanted

4    to meet with my congressperson.

5    Q.  I understand, but there's nothing preventing you from

6    communicating, sending e-mails, letters, expressing your

7    viewpoint to your congressperson?

8    A.  There's nothing preventing me from doing that, but he --

9    the congress -- there's nothing preventing me from sending

10   that.

11          MR. VOIGT:  Okay.  No further questions at this time.

12          JUDGE BLACK:  All right.

13      Intervenors wish to inquire?

14          MR. BRADEN:  Yes, Your Honor.  I'll be very brief.

15          JUDGE BLACK:  That's what they all say.

16          MR. BRADEN:  You know better than to trust these trial

17   lawyers.

18                       CROSS-EXAMINATION

19   BY MR. BRADEN:

20   Q.  Good morning, sir.

21   A.  Good morning.

22   Q.  Did I understand at the beginning of your testimony that

23   there were two principal issues on which you were concerned

24   that your representative wasn't representing you, and one was

25   the health care -- Obamacare?

```
1    A.   Affordable Care Act yes.

2    Q.   Affordable Care Act, yes.

3    A.   Yes.

4    Q.   And the Voting Rights Act, renewal of the Voting Rights

5    Act?

6    A.   Yes.   Section 5.

7    Q.   Section 5.   Did you know that the Republicans controlled

8    Congress last time the Voting Rights Act was renewed?

9    A.   I believe -- I'm not sure, but, yes.

10   Q.   Did you know that in the last renewal that every Republican

11   member in Ohio voted to renew the Voting Rights Act?

12   A.   Say that one more time.

13   Q.   That every Republican member of Congress from Ohio voted to

14   renew the Voting Rights Act?

15   A.   Prior to them getting rid of the Section 5.

16   Q.   The most recent renewal.

17   A.   But did that include Section 5, sir?

18   Q.   Yes.

19   A.   No.

20   Q.   Did you know that the Republican president George Bush

21   signed the renewal of the Voting Rights Act?

22   A.   Oh, sir, I apologize.   You're talking about previous, every

23   year voting to reauthorize it?

24   Q.   I was talking about the most recent renewal of the Voting

25   Rights Act, every Republican member in the state of Ohio voted
```

1    for its renewal.  Were you aware of that fact?

2    A.  I believe I was.  But I'm -- I don't want you to confuse

3    me.  I want to make sure I'm clear on my answer.  Are we

4    talking about -- because what I'm concerned about is Section 5,

5    reauthorizing Section 5.  So is that the question you're asking

6    me?

7    Q.  Yes.

8    A.  I'm not -- I'm not sure that they all voted to --

9         Are you telling me yes, they did?  Because the answer is I

10   don't know then.

11   Q.  And the last time that the Voting Rights Act was renewed in

12   President Bush, a Republican, wasn't, I believe you were

13   represented then by Representative Tiberi?

14   A.  Correct, yes.

15   Q.  And did you know Representative Tiberi voted to renew the

16   Voting Rights Act and Section 5 of the Voting Rights Act the

17   last time it was on the floor of the House of Representatives?

18   A.  He could have at that time, but I'm talking about

19   currently.  If -- did they vote currently to re-establish --

20   reauthorize Section 5.  That's what I'm concerned about

21   currently today.  So --

22   Q.  Are you aware --

23   A.  Oh, I'm sorry.

24   Q.  Okay.  So are you aware of there being any Republican votes

25   against renewal of the Voting Rights Act since it was renewed

```
 1   the last time on the floor of the House?
 2   A.  I believe Tiberi was not in support of re-establishing
 3   Section 5, reauthorizing Section 5.
 4   Q.  But, in fact, the last time it came to the floor of the
 5   House he voted for it; correct?
 6   A.  I don't believe so.
 7   Q.  If you were wrong, though, presumably that would change
 8   your mind as to whether he could adequately represent you on
 9   that issue?
10   A.  Well, Tiberi is not in office right now, but if I'm wrong
11   I'll be the first one to admit that I'm wrong, and I don't have
12   a problem with it, because I am not always right.
13   Q.  So if he, in fact, voted to reauthorize it, at that time
14   that he represented you, he was representing you with your
15   same -- the same position you had; correct?
16   A.  It would be for that one issue, yes.
17   Q.  One of the two issues you pointed out to the Court that you
18   felt you were not being represented on?
19   A.  Those were my two pet peeves, but I did have a laundry
20   list, yes.
21   Q.  So we're down to one pet peeve, if I described the
22   situation correctly at that time?
23   A.  If you described the situation correctly.  But you've got
24   to remember that Balderson is my representative now, and he has
25   said publicly he's not in support, so yes.
```

```
 1              MR. BRADEN:  No further questions, Your Honor.

 2              JUDGE BLACK:  Very well.

 3         Redirect, if any?

 4                      REDIRECT EXAMINATION

 5    BY MS. LEVENSON:

 6    Q.  To clarify, Mr. Washington, you were concerned about the

 7    reauthorization of Section 5 of the Voting Rights Act; is that

 8    correct?

 9    A.  Yes.

10              MS. LEVENSON:  Thank you.

11              JUDGE BLACK:  Very well.

12         You may step down.  Thank you.

13              THE WITNESS:  Thank you.

14         (Witness excused.)

15              JUDGE BLACK:  It's quarter of 11:00.  We are going to

16    take a 15-minute midafternoon -- or mid-morning break.  During

17    the break, take a break, and I would ask that you all be back

18    timely.  The Court is prepared to adjourn for 15 minutes.

19              COURTROOM DEPUTY:  All rise.  This court is in recess

20    for 15 minutes.

21         (Recess taken:  10:46 AM - 11:05 AM.)

22              JUDGE BLACK:  Please be seated.  It's 11:05, we're

23    back on the record having taken the mid-morning break.

24         Is the plaintiff prepared to call another witness at this

25    time?
```

1          MS. LEVENSON:  Yes, we are, Your Honor.

2          JUDGE BLACK:  Excuse me?

3          MR. STRACH:  I'm sorry, Your Honor.  May I interrupt?

4          JUDGE BLACK:  Yes.

5          MR. STRACH:  The plaintiffs and defendants and

6  intervenors were discussing the Court's -- the way the Court's

7  handling objections, and we just wanted to make sure we all

8  understand it the right way before we get too many witnesses

9  into it, if that's okay.

10          JUDGE BLACK:  Yes.

11          MR. STRACH:  So our understanding is that the parties

12  can note objections live in trial if they want, but they don't

13  have to, that objections can also be made in the post-trial

14  briefing.  And we've been discussing this, and we think it

15  would be appropriate in the post-trial briefing, perhaps a

16  separate brief, where the parties could respond to each other's

17  objections that end up getting raised either at trial or after

18  trial pursuant to the ten-day deadline that the Court has set

19  for the other brief.  That's our understanding, and we just

20  want to make sure we are correct.

21          JUDGE BLACK:  What's the plaintiff make of this?

22          MR. FRAM:  We have the same view, Your Honor.

23  Post-trial briefing should be everyone has reserved to offer

24  objections and responses subject to the ten-day limit.

25          JUDGE BLACK:  Very well.  We will proceed in that way.

1        MR. STRACH:  Thank you, Your Honor.

2        JUDGE BLACK:  The plaintiff calls whom?

3        MS. LEVENSON:  Your Honor, plaintiff calls

4   Congresswoman Marcia Fudge.

5        JUDGE BLACK:  Very well.  And you call her by video

6   conference?

7        MS. LEVENSON:  Yes, Judge.

8        JUDGE BLACK:  And she's on the screen.  I see her.  Is

9   she tuned in, Mr. IT?  The congresswoman is present.

10      Good morning.  Can you hear me, Congresswoman?

11       THE WITNESS:  Yes, sir.  Good morning.

12       JUDGE BLACK:  United States District Judge Timothy

13  Black of Cincinnati.  I'm joined on my left by Judge Karen

14  Nelson Moore of the Sixth Circuit and on my right by Judge

15  Michael Watson.  The trial is to us.  The courtroom is filled

16  with lawyers and spectators.

17      I'm going to administer the oath to tell the truth.  Would

18  you be willing to raise your right hand.

19       THE WITNESS:  (Complies with request.)

20       JUDGE BLACK:  Do you solemnly swear or affirm that

21  your testimony today will be the truth subject to the penalty

22  of perjury?

23       THE WITNESS:  I do.

24       JUDGE BLACK:  Thank you.  Please be seated.

25      The lawyer for the plaintiffs, the parties bringing the

MARCIA FUDGE - DIRECT

1    lawsuit, will begin with some questions of you.

2        Ms. Levenson?

3            MS. LEVENSON:  Thank you, Judge.

4                        MARCIA FUDGE

5    a witness herein, having been first sworn, testified as follows:

6                      DIRECT EXAMINATION

7    BY MS. LEVENSON:

8    Q.  Good morning, Congresswoman Fudge.  Can you hear me okay?

9    A.  Yes, ma'am.

10   Q.  Thank you.  Can you kindly state your name and spell it for

11   the record.

12   A.  Marcia Fudge, M-a-r-c-i-a F-u-d-g-e.

13   Q.  Thank you.  Can you kindly tell us briefly about your

14   history in public service.

15   A.  I worked for the county prosecutor's office as the chief of

16   staff under Stephanie Tubbs Jones, I was elected mayor of

17   Warrensville, and now am a member of Congress.

18   Q.  What district do you represent?

19   A.  The 11th Congressional District.

20   Q.  How long has District 11 been in existence?

21   A.  Well, that's kind of really a little tricky.  It became the

22   11th district after the 1990 census, but the district itself

23   has been around since 1969 when Lou Stokes was first elected to

24   represent what was then the 21st district.

25   Q.  And how long has the district been titled District 11?

1    A.  Since 1992.

2    Q.  Focusing on District 11, since 1992, how many U.S.

3    representatives have served the district during that time?

4    A.  Three.  There was Congressman Stokes, then Stephanie Tubbs

5    Jones, and myself.

6    Q.  How long have you been the U.S. Representative for District

7    11?

8    A.  Ten years.

9    Q.  Can you describe the district that your territory covered

10   when you took office in 2008.

11   A.  Yes.  It was primarily a little better than two-thirds of

12   the city of Cleveland and most of the southeast suburbs --

13   Q.  What county?

14   A.  -- of Cuyahoga County.

15   Q.  I'm sorry.  Thank you.  I'm sorry, I just spoke over you.

16   What did you say about Cuyahoga County?

17   A.  I said the southeastern suburbs of Cuyahoga County.

18   Q.  What county was the district in?

19   A.  Cuyahoga County.

20   Q.  Entirely?

21   A.  Correct.

22   Q.  When did your predecessor Stephanie Tubbs Jones take

23   office?

24   A.  1999.

25   Q.  What was your position on her staff at that time?

1    A.  I was her chief of staff.

2    Q.  At that time, what was the territory of District 11?

3    A.  Primarily the city of Cleveland or most of the city of

4    Cleveland, the lower west side all the way to the east and the

5    southeast suburbs of Cuyahoga County.

6    Q.  Again, entirely in Cuyahoga County?

7    A.  Yes.

8    Q.  To what extent do you recall the territory covered by

9    District 11 at the time that Congressman Lou Stokes first

10   represented it?

11   A.  It's pretty much the same.  It was primarily the lower west

12   side, east side of Cleveland and the southern southeast

13   suburbs.  Pretty much the same.

14   Q.  Again, entirely in Cuyahoga County?

15   A.  Yes.

16        MS. LEVENSON:  Stephen, I'd like to ask you to please

17   display Plaintiffs' Demonstrative 19.

18   Q.  Congresswoman Fudge, can you see a map before you?

19   A.  Yes.

20   Q.  Can you please just identify what this map portrays?

21   A.  This was the map of when Stephanie was in Congress and

22   towards the latter end of Congressman Stokes as well.  It's

23   basically the city or at least lower west side through the

24   southeast suburbs.

25   Q.  So are you describing your district as it existed before

1   the 2011 redistricting?

2   A.  Yes.

3   Q.  Can you describe it in words?

4   A.  It -- again, it was pretty much from the river, a little --

5   a little west of the river, all the way the rest of the city.

6   It took into consideration -- I mean, in East Cleveland,

7   Euclid, South Euclid, Shaker Heights, University Heights,

8   Beachwood, Warrensville, Warrensville Heights -- I mean,

9   Warrensville Heights, Bedford, Bedford Heights.  It was that

10  southeastern area.  Cleveland Heights, Lyndhurst.

11          MS. LEVENSON:  Thank you, Congresswoman.

12      Stephen, may I ask you to please put up Plaintiffs

13  Demonstrative 20.

14  Q.  Is that visible to you, Congresswoman?

15  A.  Yes.

16  Q.  Can you please tell us what this map shows.

17  A.  It's the district I now have.

18  Q.  Can you please describe the major differences between the

19  district you now have and the one as previously drawn.

20  A.  Well, the first major difference is that I go from Cuyahoga

21  County down to Summit County, which before I was only in

22  Cuyahoga County.  And if you look at the map, it looks as

23  though I come -- like there's a narrow strip where I come down

24  77, so now I pick up Richfield, Bath, Fairlawn and then into --

25  into Akron.

1   Q.  To your knowledge, had any part of Summit County or Akron

2   ever been part of District 11?

3   A.  Oh, absolutely not.

4   Q.  Congresswoman, what is your understanding of how

5   congressional districts are drawn in the state of Ohio?

6   A.  At the state legislature.

7   Q.  Going back to the year 2011, during the time that the

8   current congressional map was being developed, what was your

9   role, if any, in the drawing?

10  A.  I didn't have one.  I didn't have any role.

11  Q.  When did you first have any inkling that District 11, under

12  the new map, would be drawn to extend down into Summit County

13  and include Akron?

14  A.  Armand Budish showed me the map, I think pretty much so I

15  wouldn't get caught off guard.  He was just basically showing

16  me what the map would look like.  That was when I first saw the

17  map.

18  Q.  When was that?

19  A.  I can't tell you the exact date, but it was around the time

20  that the map was made public.

21  Q.  What was your reaction when you saw it?

22  A.  Surprise, obviously.  I had no idea that I would ever go

23  down into Summit County.  I mean, I knew there would be

24  changes, obviously, there was a census, things change, and

25  there were a lot of changes going on throughout the state, but

1    I had no idea that it would be that map.

2    Q.  Were you pleased?

3    A.  No.  Let -- let me -- let me just say this up front.  I

4    don't -- I don't want anyone to believe that I am not happy

5    with people I represent.  Certainly, I would not have chosen

6    it, and I was not happy about it, but I am honored to represent

7    the people of Summit County that I represent.  I don't want

8    them to think that I had anything to do with this or I'm

9    displeased.

10   Q.  Correct.

11   A.  It is the map that was given to me and it is the map that

12   I'm working with.  I would not have chosen it.

13   Q.  Putting apart the --

14        Well, why would you not have chosen it?

15   A.  Well, I don't know anything about Summit County, or at

16   least at the time I didn't.  I looked at the numbers as I

17   looked at the map, and I realized that Richfield and Bath, in

18   particular, never voted Democratic.  The ballots of that area

19   coming down into Fairlawn, most of them are registered as

20   independents.  I had no idea what kind of support I could get

21   out of Summit County, and I knew no one in Summit County.  It

22   was just an area that was unfamiliar, and it was an

23   uncomfortable place to be.

24   Q.  And why do you say "uncomfortable"?

25   A.  Well, because I didn't -- you know, this is -- I'm an

1  elected official.  We deal with politicians.  I didn't know any
2  of the elected officials there, I didn't know the territory, I
3  didn't know the voters, and so it was uncomfortable to come
4  into a situation where you know no one and have to try to find
5  a way to get elected in a new district.
6  Q.  As you said, you were aware that Ohio would be losing two
7  seats, so, of course, there would be a new map.  Had you
8  thought at all about what the new map might look like?
9  A.  Well, I thought probably they would give me all of the city
10  of Cleveland which, to me, would have made more sense, and
11  continue to let me have the southeast suburbs that I'd always
12  represented.
13  Q.  So what, if anything, did you do about this, given the way
14  you felt?
15  A.  There was nothing to do about it.  They gave me the map.
16  This is your map.  I mean, I don't know what there was I could
17  have done.
18  Q.  To what extent did you register any complaint or
19  disappointment to anyone?
20  A.  Well, I mean, the only complaint I had was that I knew that
21  taking Summit County or that portion of Akron away from Betty
22  Sutton would make it seem -- would make it almost impossible
23  for her to win her district.  So the only action I took was to
24  sit with Betty and with Marcy, as a matter of fact, to call
25  Armand and ask him was there any way to give Betty back Akron

1   so she would have a fighting chance at keeping her seat.

2   Q.  Was Congresswoman Beatty an incumbent in 2011, at the time

3   the map was drawn?

4   A.  No.  Congresswoman Beatty was elected as a result of the

5   new maps, because they created a new third district, which now

6   Congresswoman Beatty now is -- is the Congresswoman there, but

7   it's a new district.

8   Q.  How many sets of incumbents were paired in the 2011 map?

9   A.  There were three.  There was Mike Turner's district down

10  near Dayton, Marcy Kaptur and Dennis Kucinich north, and then

11  Betty and Jim Renacci.

12  Q.  And you said two seats were lost?

13  A.  Yes.

14  Q.  And three sets of incumbents paired?

15  A.  Correct.

16        MS. LEVENSON:  Thank you, Congresswoman.

17     I have no more questions.

18        JUDGE BLACK:  Very well.

19     The attorneys for the defendants have an opportunity to ask

20  questions.

21        MR. STRACH:  Your Honor, throughout the trial, to make

22  this as efficient as possible, sometimes intervenors will take

23  the lead on a witness, sometimes we will, and on Congresswoman

24  Fudge, it will be the intervenors.

25        JUDGE BLACK:  Very well.  The Court does not object to

1  efficiency.

2      On behalf of the intervenors.

3          MS. McKNIGHT:  Good morning, Your Honors.

4                   CROSS-EXAMINATION

5  BY MS. McKNIGHT:

6  Q.  Good morning, Congresswoman Fudge.  Can you see me?

7  A.  I can.  Yes, I can now.  Good morning.

8  Q.  Wave at the camera for you.  It's nice to meet you in this

9  way.

10  A.  My pleasure.

11  Q.  In fact, it's an honor to meet you, but I will try to be

12  brief today.

13  A.  Okay.

14  Q.  As a preliminary note, I noticed you have some papers with

15  you.  What are they?

16  A.  They're the copy of my map, my current district and the

17  district before.

18  Q.  And who gave those to you?

19  A.  Well, two of them came from my office.

20  Q.  Are there any others that did not come from your office?

21  A.  There is one.

22  Q.  And where did that one come from?

23  A.  That is a proposed map of what I believe the ACLU is

24  recommending.

25  Q.  And where did you receive that map from?

1   A.   From the ACLU.

2   Q.   Thank you.   I would like to begin with some questions about

3   the late and Honorable Louis Stokes.   Who was he?

4   A.   What do you mean "Who was he"?

5   Q.   Could you give a brief description of who Louis Stokes was.

6   And pardon me, I appreciate it feels like a dim question, but I

7   just want to get an understanding on the record that you know

8   who he was.

9   A.   He was a congressman for this -- he was a congressman for

10  30 years.   I actually knew him for a very long time.   His

11  daughter and I went to school together.   He was my congressman

12  almost my entire life.   As I said, there have only been three

13  congresspeople in that district.   He served 30 years.

14  Stephanie ten and now me ten.   He was probably one of the most

15  well-respected congressmen anywhere.   I'm not sure what else

16  you're asking me.

17  Q.   That's fair for now.   I appreciate your -- your answering

18  that.

19       And -- we heard testimony earlier, is it correct, that he

20  represented your district in its former iteration,

21  Congressional District 21; is that right?

22  A.   Correct, uh-huh.

23  Q.   And I heard you say that you understood he represented that

24  district from about 1969; is that right?

25  A.   Yes.

1    Q.  And since that time, which is now about 50 years ago, the

2    congressional district you represent has been a majority-

3    minority district; is that right?

4    A.  Yes.

5    Q.  Now, we have evidence in the record showing that during a

6    debate over the plans in the House, Ohio House of

7    Representatives, an Ohio Representative from Cleveland stated

8    that "Congressman Stokes is still revered with the highest

9    respect."

10       Do you have any reason to disagree with that?

11   A.  Absolutely not.

12   Q.  If Louis Stokes spoke on an issue of import to the people

13   of Ohio, did people listen?

14   A.  Yeah.  Absolutely, I would say so, depending if it was

15   important to them, but absolutely.

16   Q.  And in 2011, Louis Stokes approved of the way that your

17   district is currently drawn; isn't that right?

18   A.  Not that I'm aware of.

19   Q.  Okay.  We'll get back to that later, Congresswoman Fudge.

20       Let me step back and ask you a few questions about

21   Cleveland, your hometown.  Now, you live in a suburb of

22   Cleveland called Warrensville Heights; is that right?

23   A.  Yes.

24   Q.  And the city of Euclid is nearby and in your district; is

25   that right?

1  A.  Yes.

2  Q.  And in Cleveland is the *Cleveland Plain Dealer* considered

3  to be a newspaper of record?

4  A.  It is a newspaper.

5  Q.  Do you read it?

6  A.  I do not.

7  Q.  Okay.  Have you spoken with reporters from the *Cleveland*

8  *Plain Dealer* in the past?

9  A.  Oh, absolutely.

10  Q.  And is it safe to assume that you were aware of press

11  coverage about the redrawing of your district in 2011?

12  A.  When you say press coverage, I'm not -- that it was being

13  redrawn, yes.

14  Q.  Do you know who George Forbes is?

15  A.  Oh, absolutely.  Yes.  I'm sorry, I say "absolutely."  Yes,

16  I know who George Forbes is.

17  Q.  And like my question before -- bear with me; this is just

18  for the record, Congresswoman Fudge.  And who is George Forbes?

19  A.  George Forbes is the former president of city council; he

20  ran for mayor of the city and he's a friend.

21  Q.  He was president of the Cleveland City Council for a number

22  of years from about 1974 to about 1989.  Is that your

23  understanding?

24  A.  Well, I don't know the years, but he was for a number of

25  years, yes.

MARCIA FUDGE - CROSS

1  Q.  And he was also president of the Cleveland NAACP starting
2  in 1992; is that right?
3  A.  I don't know what year, but yes, he was president of the
4  NAACP.
5  Q.  And are you aware that Mr. Forbes received the NAACP's
6  highest award for meritorious service in 2009?
7  A.  No, I'm not.
8  Q.  Is it fair to say that Mr. Forbes is a prominent leader in
9  the black community in Cleveland?
10  A.  Not just the black community.
11  Q.  Thank you.
12  A.  The community.
13  Q.  Please, I didn't mean to interrupt you.
14  A.  No.  I said the community, not just the black community.
15  Q.  Thank you.  So is it fair to say that you respect him?
16  A.  Yes.
17  Q.  And that if he spoke on an issue of import to you, you
18  would listen?
19  A.  Yes, I would listen.
20  Q.  Now, George Forbes supported the shape of your district as
21  it was drawn in 2011; didn't he?
22  A.  I don't know that.
23  Q.  Would seeing a writing refresh your recollection about
24  whether he supported the drawing of your district in 2011?
25  A.  It wouldn't refresh my recollection, but I'd love to see

1  it.

2  Q.  Okay.

3  A.  Unless he wrote it to me, I don't know.

4       MS. McKNIGHT:  I'd ask that we put up document number

5  4.

6  Q.  Congresswoman Fudge --

7       JUDGE BLACK:  I'm sorry.  I'm sorry.

8       MS. LEVENSON:  I can't see it.  I don't know whether

9  others can.

10      JUDGE BLACK:  Ms. Levenson, I didn't hear you.  I'm

11  sorry.

12      MS. LEVENSON:  I'm sorry, Judge.  We can't see it.  I

13  don't know whether others can.

14      JUDGE BLACK:  All right.  Bear with it.  It's up on

15  the screen.

16      THE WITNESS:  I can see it.  I can see part of it.

17      JUDGE BLACK:  The witness can see it.  Can the

18  plaintiffs see it?

19      MS. LEVENSON:  Now, yes, Judge.  Thank you.

20      JUDGE BLACK:  All right.  Now are these intervenor

21  exhibits?

22      MS. McKNIGHT:  These are not.  They are used solely to

23  refresh recollection.

24      JUDGE BLACK:  The intervenors' exhibits are not

25  numbered.  We're going to need to deal with that, but you may

```
 1   proceed now.

 2   BY MS. McKNIGHT:

 3   Q.  Congresswoman Fudge, we have at the ready in your courtroom

 4   paper copies of these articles, if it would be easier for you

 5   to read that way.  I'd just like you to read the article, and

 6   then I'll have a few questions about whether it refreshes your

 7   recollection.

 8   A.  Okay.  But, again, I don't read the Plain Dealer.  I don't

 9   take it.  So if it was in the Plain Dealer, the odds are I did

10   not read it, but I'm happy to read it if you have a copy.  I

11   can see part of it, but not all of it --

12   Q.  Okay.

13   A.  -- on the screen.

14   Q.  Have you read the first page?

15   A.  I can read down to "Everything the blacks asked for

16   Republicans gave them.  So I kind of surprised to hear."

17   That's as far as I can see on that page.

18       It's really difficult to read it because it's not clear.

19   If you have it in writing, that would be better.  It's not

20   clear on the screen.

21       No, that's clearer.  That's better.  That's better.

22   Q.  And, Congresswoman Fudge, I don't mean to interrupt you,

23   but if you wouldn't mind just letting me know when you're ready

24   for the next page and when you're ready to answer questions --

25   A.  Okay.  All right.
```

```
 1        Okay, I'm down to the bottom of this page I see.
 2        Okay.  Okay.
 3   Q.   Thank you, Congresswoman Fudge.
 4        Does that writing refresh your recollection that George
 5   Forbes supported the shape of your district as it was drawn in
 6   2011?
 7   A.   It doesn't refresh my recollection, but it clearly says he
 8   supports it.
 9   Q.   So you do not have -- do you have any reason to believe
10   that he did not support the shape of your district in 2011?
11   A.   No.  I'm reading it.  Obviously, he did.
12   Q.   Just to be sure, George Forbes never came to you and said
13   that he disagreed with the shape of your district in 2011; is
14   that right?
15   A.   That's correct.
16   Q.   Moving on, I'd like to ask you questions about Vernon
17   Sykes.  Do you know who Vernon Sykes is?
18   A.   I do.
19   Q.   And who --
20   A.   Is this -- I can't see -- okay.  Got it.  All right.
21   Q.   And who is Vernon Sykes?
22   A.   He's a state senator.
23   Q.   And he's a Democratic state senator in Ohio; is that right?
24   A.   Yes.
25   Q.   And he represents a Senate district that includes Akron; is
```

 1  that right?

 2  A.  Yes.

 3  Q.  And he lives in your congressional district; right?

 4  A.  Yes.

 5  Q.  And before he was elected to the Senate, he was a

 6  representative in the Ohio House of Representatives; right?

 7  A.  Yes.

 8  Q.  Would it surprise you to know that he began his tenure in

 9  the Ohio House of Representatives in 1983?

10  A.  It would not surprise me, no.

11  Q.  Is it safe to say that Vernon Sykes is a prominent member

12  of the black community in northeast Ohio?

13  A.  In Akron, yes.

14  Q.  And did you know Vernon Sykes in 2011?

15  A.  Probably, yes.

16  Q.  And during the map-drawing process, Senator Sykes, now

17  Senator Sykes, publicly supported the drawing of Congressional

18  District 11 into Akron; isn't that right?

19  A.  I don't know.

20  Q.  Vernon Sykes, in 2011, was considering running against you

21  in a primary in the new congressional district; isn't that

22  right?

23  A.  Not that I'm aware of.

24  Q.  Do you recall Vernon Sykes' position that drawing

25  Congressional District 11 to include Akron gave Akron's black

```
 1   politicians a shot at winning a congressional seat?

 2   A.  I do not.

 3   Q.  Would a writing refresh your recollection?

 4   A.  It -- it may, but I do not recall that.

 5        MS. McKNIGHT:  Could we put up document 3, please.

 6   And if we can put the whole page so she can read it.

 7   Q.  And, Congresswoman Fudge --

 8        JUDGE BLACK:  Excuse me.  Ms. Levenson.

 9        MS. LEVENSON:  Thank you, Judge.  We are failing to

10   see how this could refresh someone's recollection if she

11   doesn't read the Plain Dealer.

12        JUDGE BLACK:  The Court agrees.

13        MS. McKNIGHT:  Your Honor, under Rule 612, any writing

14   may be used to refresh the recollection of a witness.

15        JUDGE BLACK:  Go ahead.

16        THE WITNESS:  I can't read it.  It's too small.

17   Q.  So I might ask that the paper copy be provided to you in

18   the courtroom, and here in our courtroom, if people would like,

19   we can read along on the screen.

20        The same issue with the first article, Congresswoman Fudge.

21   If you don't mind letting us know when you've completed reading

22   the document.

23        JUDGE WATSON:  Can we blow it up a little bit?

24        And can we go to the next page?

25        So to this point this is about Congressman Stokes?
```

 1          MS. McKNIGHT:  Correct, Your Honor.  The questions I

 2    will have relate to page five.  So I'm happy to go to that

 3    page, but I want to make sure everyone has the opportunity to

 4    see it if they'd like.

 5          THE WITNESS:  To page five?

 6          MS. McKNIGHT:  Yes.

 7          MS. LEVENSON:  May we request hard copies so we can

 8    actually read the documents?

 9          MS. McKNIGHT:  We don't have hard copies with us.

10          THE WITNESS:  I'm reading it.  Yes, I'm with you.

11          JUDGE BLACK:  We'll have to do the best we can.

12    A.  Okay.

13    Q.  Congresswoman Fudge, have you completed your reading of the

14    article?

15    A.  Yes.  Yes, I have.

16    Q.  Oh, okay.  Now, after finishing reading that article, does

17    it refresh your recollection that Senator Sykes publicly

18    supported the drawing of District 11 into Akron?

19    A.  It does not refresh my recollection.  It says that he did.

20    Q.  Does it refresh your recollection that his position was

21    that drawing Congressional District 11 to include Akron gave

22    Akron's black politicians a shot at winning a congressional

23    seat?

24    A.  This is an article I've never read before, so I can't say

25    that he didn't.  If that's what he believes, he said that.

1    That's right.

2    Q.  And going back to an earlier question I asked you about the

3    Honorable Louis Stokes, does it refresh your recollection that

4    Louis Stokes supported the shape of your district as drawn in

5    2011?

6    A.  It does not refresh it.  Again, I say he said it, and I

7    believe that.

8    Q.  And, Congresswoman Fudge, would it surprise you to know

9    that three black representatives of the Ohio House of

10   Representatives from Cleveland voted for the plan in 2011?

11   A.  It would not surprise me, no.

12   Q.  And I heard you testify earlier with plaintiffs' counsel

13   that you were not pleased with the map when you saw it.  But,

14   in fact, in 2011, you said you were not upset about how your

15   district had been drawn; isn't that right?

16   A.  It is, but do you know how many times I have been

17   misquoted?  Secondly -- secondly, let me just say this.  I am

18   an elected official.  I would never insult the people that I'm

19   going to represent by saying, "I don't want to represent you.

20   I don't want to represent these people."  It's ridiculous.

21   Q.  Thank you.

22   A.  It further says I can adapt, which I have adapted.

23   Q.  Do you believe you were misquoted in this newspaper when it

24   said that you were not upset about how your district had been

25   drawn?

```
1   A.  It wouldn't be the first time.  I absolutely do.

2   Q.  Pardon me.  You believe you were misquoted?

3   A.  I do.

4   Q.  Was the redrawing of your district in 2011 important to you

5   in your office?

6   A.  Of course.

7   Q.  And when you are misquoted on a topic of public import and

8   of import to you, what does your office do about that?

9   A.  It depends on what it is.  I mean, the one thing we know is

10  that, as the old saying goes, you don't get into a fight with

11  people who buy ink and paper by the truckload.  Sometimes it's

12  just not worth it.

13  Q.  Do you know John Boehner?

14  A.  Yes.

15  Q.  And you were both members of the Ohio Congressional

16  Delegation in 2011, weren't you?

17  A.  Yes.

18  Q.  Do you respect John Boehner?

19  A.  Yes.  Very much.

20  Q.  Did you talk with John Boehner in 2011 about the

21  redistricting of CD11?

22  A.  I may have.  In passing.  I mean, not a sit-down

23  conversation.

24  Q.  And what do you recall about that conversation?

25  A.  Nothing.  I mean, we just talk in passing.
```

1  Q.  And did you get the sense that John Boehner listened when

2  you talked with him?

3  A.  No, but what I got the sense of is that he would be sure

4  that no one mistreated me.

5  Q.  Who did you talk to in 2011 about the shape of your

6  district?

7  A.  Lots of people.  After I got the map from Armand I talked

8  to Steve LaTourette, because I think Steve was kind of the

9  point person for John Boehner.  So I talked to Steve off and

10  on, you know.  As we would fly, we would talk, or Steve would

11  call and say, you know, What do you think about this, What do

12  you think about that?

13       But afterwards, let's see, probably I talked with maybe --

14  well, I know I talked to George Forbes after the lines were

15  drawn.  I talked with Betty Sutton, obviously, my colleagues,

16  Dennis, most of the delegation from northeast Ohio.

17  Q.  And what did you share with them about the shape of your

18  district?

19  A.  Well, as I said earlier, I tried to see if we could get it

20  changed because we wanted to try to see if we could help

21  protect Betty.  We couldn't.  And so, basically, I told them

22  what I thought about it.  I don't think that's a conversation

23  that I need to share with you.  I made sure they knew I was not

24  pleased.

25  Q.  Did you tell any of those people who you spoke with in 2011

1    about the shape of your district, that you did not want your

2    district to be drawn as a majority-minority district?

3    A.   Repeat it.

4    Q.   Sure.  Did you tell any of those people who you spoke with

5    in 2011 about the drawing of your map that you did not want

6    your district to be drawn as a majority-minority district?

7    A.   No, unh-unh.  I didn't tell them anything else, either.

8    Q.   During the 2011 redrawing, Ohio was experiencing a loss of

9    two congressional seats; isn't that right?

10   A.   Yes.

11   Q.   So was pairing of incumbents a concern?

12   A.   A concern to me?

13   Q.   Yes.

14   A.   No.

15   Q.   Was it a concern to other representatives?

16   A.   Oh, yes.

17   Q.   And why wasn't it a concern to you?

18   A.   Because I felt if they were to pair me with somebody, I

19   felt that I was strong enough to win.

20   Q.   And during the 2011 redrawing, northeast Ohio was the area

21   of the state with the least population growth.  Is that your

22   recollection as well?

23   A.   I don't know.

24   Q.   Was it your understanding that northeast Ohio had suffered

25   from population loss at the 2010 Census?

```
 1    A.   That's the same question.   I don't know.

 2    Q.   Do you know where Congressman Kucinich lived in 2011?

 3    A.   No.   But if I had to guess, I'd say lower west side.

 4    That's the area that he represented.   Not lower, but west side.

 5    Q.   And about how far away is that from your own residence?

 6    A.   Oh, I have no idea.

 7    Q.   Fifty miles?

 8    A.   I doubt that.

 9    Q.   Twenty miles?

10    A.   I don't know where he lived, so I couldn't tell you how far

11    it is.   I can tell you how far it is to the west side.

12    Q.   How far is it to the west side?

13    A.   I'm guessing probably no more than ten miles or so; maybe

14    15, max.

15    Q.   Did you express -- did you express concern to anyone about

16    being paired with Congressman Kucinich?

17    A.   No.

18    Q.   So you didn't have any opinion about whether you'd be

19    paired with Congressman Kucinich?

20    A.   No.

21    Q.   In 2011, did you advocate for a congressional district that

22    had a lower level of black voting age population than 50

23    percent?

24    A.   No.

25    Q.   And based on your perception at the time in 2011, and based
```

1    on your experience, did you view the drawing of your district

2    in 2011 as a violation of the Voting Rights Act?

3              MS. LEVENSON:  Objection.  Legal conclusion.

4              MS. McKNIGHT:  Your Honor, this is permissible under

5    Rule 701, opinion of a lay witness.

6              JUDGE BLACK:  It's not going to be a legal conclusion.

7    She can answer the question.

8    A.  No.

9    Q.  Congressman Fudge, thank you for your time.  I have a

10   handful more questions.  I will try to consolidate them as much

11   as possible.

12   A.  That's fine.

13   Q.  Thank you.

14        Stepping back, do you believe that you represent everyone

15   in your district regardless of their political affiliation?

16   A.  Yes.

17   Q.  Do you believe that you are responsive to all of your

18   constituents and not just some?

19   A.  Yes.

20   Q.  Do you have constituents in your district who do not vote

21   for you?

22   A.  Many.

23   Q.  And do you still represent them?

24   A.  Yes.

25   Q.  Do you only represent Democrats?

```
 1   A.  No.
 2   Q.  So you also represent Republican constituents; is that
 3   right?
 4   A.  And independents as well, yes.
 5   Q.  I'd like to ask you some questions about your positions on
 6   political issues.  These are based on evidence in the record.
 7       Do you consider yourself to be to the far left of moderate
 8   Democrats?
 9   A.  No.
10   Q.  Are you opposed to free trade?
11   A.  No.
12   Q.  Are you pro business?
13   A.  Yes.  You forget I was a mayor of a city.
14   Q.  You've done a lot of hard work for all of us, so thank you.
15       Are you from a far more liberal wing of the party that does
16   not reflect local values in your district?
17   A.  No.
18   Q.  Do you need to be, quote/unquote, forced to engage with
19   moderate Democrats in your district?
20   A.  No.
21   Q.  For example, would you need a primary opponent in order to
22   be forced to engage with constituents?
23   A.  No.  I have had a primary every time I've run.
24   Q.  Now, the plaintiff in this case, who is your constituent,
25   provided testimony in this case.  He is a Democrat, but
```

```
 1   disagrees with you on every point I just described.  Would you
 2   agree that there is variation within the Democratic party?
 3   A.  Oh, yes.
 4   Q.  Finally, I would like to ask you a few questions about your
 5   fellow members of the Ohio Congressional Delegation.  Have you
 6   worked alongside Representative Steve Stivers in your
 7   congressional work?
 8   A.  Yes.
 9   Q.  And do you believe that Congressman Stivers, a Republican
10   congressman, only represents his constituents who are
11   Republicans?
12   A.  No.
13   Q.  And do you have anything negative to say about Congressman
14   Stivers' ability to represent his constituents?
15   A.  No.  I don't know what Steve does in his area, but no, I
16   think he's -- I think he's a very good congressman.
17   Q.  And if I asked you that same question about any of Ohio's
18   congressional delegation, any of the members of the Ohio
19   congressional delegation, about their ability to represent
20   their constituents, would you have anything negative to say
21   about them?
22   A.  Probably not, because I'm not one of their constituents so
23   I don't know what they do in their districts.
24        MS. McKNIGHT:  Thank you very much for your time,
25   Congresswoman Fudge.  I really appreciate it.
```

1          THE WITNESS:  My pleasure.  Thank you.

2          JUDGE BLACK:  Counsel for the defense wish to inquire?

3          MR. STRACH:  We have no questions, Your Honor.

4          JUDGE BLACK:  Very well.

5      Redirect, if any?

6          MS. LEVENSON:  No redirect.  Thank you, Congresswoman.

7          JUDGE BLACK:  Congressman Fudge, thank you for your

8  testimony today.  Thank you for your service to the community

9  and to the nation.  I don't get a chance to say it often, but

10  you're free to go.

11          THE WITNESS:  Thank you, Your Honor.

12          JUDGE BLACK:  Very well.

13      (Witness excused.)

14          JUDGE BLACK:  It's five minutes of 12:00.  I'd be

15  inclined to break for lunch, unless somebody thinks that's

16  inappropriate.  Plaintiff okay with our lunch break five

17  minutes early?

18          MS. LEVENSON:  Yes, Your Honor.  Thank you.

19          JUDGE BLACK:  Defense?

20          MR. STRACH:  The same here, Your Honor.

21          JUDGE BLACK:  And the intervenors?

22          MS. McKNIGHT:  The same here, Your Honor.  Thank you.

23          JUDGE BLACK:  We've got a bunch of hungry lawyers.

24  It's five of 12:00.  We're going to recess until 1:00 o'clock.

25  I'd like you to be in the room so we can start at 1:00.

1    The Court prepares to recess.

2         COURTROOM DEPUTY:  All rise.  This court is in recess

3    until 1:00 o'clock.

4    (At 11:55 AM, a luncheon recess was taken.)

5                          - - -

6                    AFTERNOON SESSION

7    (In open court at 12:59 PM.)

8         JUDGE BLACK:  Please be seated.  It got very quiet in

9    here.  It's 12:59.  We're ready to go.

10   Is the plaintiff prepared to call another witness at this

11   time?

12        MS. LEVENSON:  Yes, Your Honor, we are, and my

13   colleague will.  We just would like to ask that one thing be

14   put on the record first.

15   During the lunch break, plaintiffs and defense and

16   intervenors have agreed that when we are using a paper copy of

17   a document to impeach or refresh memory, rather than just

18   relying on the screen, at that point we'll distribute paper

19   amongst each other, and we've agreed to do that.

20        JUDGE BLACK:  Magnificent.

21        MS. LEVENSON:  Thank you.

22        JUDGE BLACK:  Did you need something, sir?

23        MR. LEWIS:  Your Honor, Patrick Lewis for the

24   intervenors.  Just a very quick point of order.  Your Honor

25   mentioned this morning that the intervenor exhibits were not

 1    numbered, and we're just bringing to the Court's attention that

 2    on February 8th, we filed an amended exhibit list with the

 3    Court that had all of our exhibits numbered, and all the copies

 4    presented to the Court are numbered.

 5              JUDGE BLACK:  Very well.  I'm just trying to cause you

 6    a little angst.

 7        Somebody else standing?

 8        All right.  The plaintiff will call its next witness,

 9    please.

10              MR. CAREY:  Good afternoon, Your Honor, David Carey

11    with the ACLU of Ohio representing the plaintiffs.  The

12    plaintiffs call Stephanie White.

13              THE COURT:  Ma'am, if you'd pause where you are for

14    the oath to tell the truth.  Do you solemnly swear or affirm

15    that your testimony today will be the truth, subject to the

16    penalty of perjury?

17              THE WITNESS:  I do.

18              JUDGE BLACK:  Very well.  The seat tips back.

19                          STEPHANIE WHITE

20    a witness herein, having been first sworn, testified as follows:

21                        DIRECT EXAMINATION

22    BY MR. CAREY:

23    Q.  Good afternoon, Ms. White.  Could you please state and

24    spell your full name.

25    A.  Stephanie White, S-t-e-p-h-a-n-i-e W-h-i-t-e.

```
1    Q.   What do you do for a living?

2    A.   I am -- work for an auto supply company called IAC.

3    Q.   How long have you been at IAC?

4    A.   17 years.

5    Q.   What's your educational background?

6    A.   I have an associate's from NorthWest Business College and I

7    also have several types of training from the union and the UAW.

8    Q.   And, I'm sorry, you said you're a union member?

9    A.   Yes, I'm a proud UAW member.

10   Q.   What is your home address?

11   A.   8529 Manci Drive, Sylvania, Ohio.

12   Q.   For the record, could you spell Manci?

13   A.   M-a-n-c-i.

14   Q.   And Sylvania?

15   A.   S-y-l-v-a-n-i-a.

16   Q.   What county is that in?

17   A.   Lucas County.

18   Q.   What U.S. congressional district is that in?

19   A.   District 5.

20   Q.   How long have you lived at your Manci Drive address?

21   A.   Approximately seven years.

22   Q.   And where did you live before Manci Drive?

23   A.   I lived on Blossman Road.

24   Q.   Do you recall the exact address?

25   A.   No.
```

1  Q.  Could you spell Blossman for us?

2  A.  B-l-o-s-s-m-a-n.

3  Q.  And what congressional district were you in when you lived

4  on Blossman?

5  A.  That was District 5, also.

6  Q.  What county was that?

7  A.  Lucas County.

8  Q.  And how long did you live at your Blossman Road address?

9  A.  About three years.

10  Q.  Who is your current congressional representative?

11  A.  Bob Latta.

12  Q.  What is Congressman Latta's political party?

13  A.  He's Republican.

14  Q.  And how long has he been your congressperson?

15  A.  For the ten years I've lived in Lucas County.

16  Q.  Has he been a Republican that entire time?

17  A.  Yes.

18  Q.  Have you ever voted for him?

19  A.  No.

20  Q.  Ms. White, are you familiar with the Ohio A. Philip

21  Randolph Institute or APRI?

22  A.  Yes.

23  Q.  What is APRI?

24  A.  It's a non-partisan constituency group that works with

25  trade unionists.

```
 1   Q.  And how would you describe APRI's purpose, generally?

 2   A.  To stress the positivity in voting, to get out to vote, to

 3   get to the polls, to make sure that people are aware of the

 4   issues going on.

 5   Q.  Do you have any involvement with APRI?

 6   A.  Yes.  I'm currently the vice president of the Toledo

 7   chapter of APRI.

 8   Q.  Are you also a member?

 9   A.  Yes.

10   Q.  How long have you been the vice president of the Toledo

11   chapter?

12   A.  Since 2017.

13   Q.  Did you hold any position with APRI before that?

14   A.  Yes.  From 2016 to 2017, I was the secretary, and then from

15   2015 to 2016, I was the treasurer.

16   Q.  And how long have you been a member of APRI?

17   A.  Since 2015.

18   Q.  What does being the vice president of the Toledo chapter of

19   APRI involve?

20   A.  I fill in for any duties for the president that he needs me

21   to fill in to.  I also organize photo registration drives and

22   fundraising activities and also participate in the -- any of

23   the get-out-to-vote activities we do.

24   Q.  All right.  Ms. White, what are you here to testify about

25   today?
```

1    A.   Testify about my experience in my Congressional District 5
2    and the issues with voting.
3    Q.   And you said that APRI is non-partisan, but do you have any
4    personal political affiliation?
5    A.   Yes.   Personally, I'm a Democrat.
6    Q.   Are you registered as a Democrat?
7    A.   Yes.
8    Q.   How long have you been registered as a Democrat?
9    A.   Since 1994.
10   Q.   Do you vote?
11   A.   Yes.
12   Q.   How often?
13   A.   Pretty much every election.
14   Q.   And why do you vote in pretty much every election?
15   A.   I feel like it's important to exercise my right to vote, to
16   have my vote count in all the elections.
17   Q.   Did you vote in the 2018 congressional election?
18   A.   Yes.
19   Q.   2016?
20   A.   Yes.
21   Q.   2014?
22   A.   Yes.
23   Q.   And 2012?
24   A.   Yes.
25   Q.   Do you usually vote for congressional candidates of one

1  particular party?

2  A.  Yes, I usually vote Democratic.

3  Q.  Have you ever voted for a candidate for U.S. Congress who

4  was not a Democrat?

5  A.  No.

6  Q.  Are there any particular issues that are especially

7  important to you in congressional elections?

8  A.  Healthcare reform, immigration and unions.

9  Q.  Why are unions important to you?

10  A.  Because I'm a UAW member, and I feel like we bargain good

11  contracts for the people, the companies we work for, and our

12  employees get fair wages and fair benefits.

13  Q.  Do you believe that one particular party represents your

14  interests with regard to unions?

15  A.  Yes.  Democrats.

16  Q.  In what respects do they best represent your interests?

17  A.  They support the growing and the way unions bargain

18  contracts.

19  Q.  Does Congressman Latta represent your interest with regard

20  to unions?

21  A.  I don't think so.

22  Q.  Why not?

23  A.  Because he's Right to Work, pleasing Right to Work, which

24  is totally against what unions are about.

25  Q.  Does he represent your interests with regard to

1    immigration?

2    A.  No.

3    Q.  Why not?

4    A.  Because he believes in -- he believes in not finding a fair

5    pathway for citizenship for people that have currently been

6    here since they've been a young age and brought here by their

7    parents.

8    Q.  And what about healthcare:  Does he represent your

9    interests?

10   A.  No.

11   Q.  Why not?

12   A.  Because he repealed the Affordable Care Act and doesn't

13   believe in insurance for everybody.

14   Q.  I'd like to put up Plaintiffs' Demonstrative Exhibit PD10.

15   Can you see the exhibit?

16   A.  Yes.

17   Q.  Do you recognize it?

18   A.  Yes.  It's the current 2012 congressional districting map.

19   Q.  When was Ohio's current congressional map put in place, to

20   your knowledge?

21   A.  In 2012.

22   Q.  Can you tell us where your congressional district, District

23   5, is on this map?

24   A.  It is the tan area to the top left side in the middle

25   section of the map.

```
 1   Q.   Where do you live within that area?
 2   A.   Where the blue push pin is.
 3   Q.   Can you describe your district, generally.
 4   A.   I'm on the other side of Toledo, which is Lucas County.  My
 5   area is not part of the Lucas County community.  Obviously,
 6   it's part of the Fulton County, Defiance, Williams County area,
 7   which is predominantly Republican area.
 8   Q.   When you say that your area is not part of the Lucas County
 9   community, you mean your district?
10   A.   Yeah, District 5.
11   Q.   Well, based on your experiences as a voter in District 5,
12   how would you characterize the chances of a candidate that you
13   support being elected to Congress from that district?
14   A.   Very unlikely.
15   Q.   Why do you say that?
16   A.   Because most of the area, District 5 area, is predominantly
17   Republican.
18   Q.   Is Lucas County predominantly Republican, in your
19   experience?
20   A.   No.  I feel like it's predominantly Lucas or -- Lucas
21   County is predominantly Democratic as a whole because it's a
22   union area.  We have several UAW union affiliates in that area
23   that vote predominantly Republican -- or, I mean, Democratic,
24   sorry.
25   Q.   Does the design of Congressional District 5 have any impact
```

1  on you as a voter?

2  A.  Yes.  I feel like my vote is overshadowed, and it doesn't

3  really count in that area.

4  Q.  Are you contending that you're always entitled to have a

5  representative from your political party?

6  A.  No.  But I feel like my vote should count.

7  Q.  Does Congressman Latta have an office close by to you?

8  A.  No.

9  Q.  Where is his closest office to you?

10  A.  In Bowling Green.

11  Q.  How could you characterize Congressman Latta's level of

12  presence in your area of District 5?

13  A.  I don't -- I think it's non-existent.  I've never

14  personally met the man or seen him at any rallies or events

15  while he's campaigning.  So I really have never met or received

16  any type of literature or anything on the man at all.

17  Q.  Have you met many elected officials?

18  A.  Yes.  In my work in District 9, I go to all the rallies and

19  meet most of the Democratic candidates running for office.

20  Q.  Have you ever seen anyone going door to door for

21  Congressman Latta in your area?

22  A.  No.

23  Q.  Are you aware of Congressman Latta hosting any town halls

24  ever since the current district map was created?

25  A.  Nope.  And if he did, I'm sure I would have attended one of

1    them.

2    Q.  Are there any other congressional districts in which you

3    spend a significant amount of time aside from District 5?

4    A.  I spend most of my time in Congressional District 9 with my

5    APRI work and my UAW work.  That's the area that represents

6    both of them.

7            MR. CAREY:  Can we bring back the Exhibit PD10.

8    Q.  Could you point out where District 9 is on this map?

9    A.  It's the purplish-pink area at the top, from the middle of

10   Toledo all the way down to Cleveland, along the lakes.

11   Q.  How would you characterize the amount of time you spend in

12   District 9?

13   A.  I would say I spend all of my time in District 9.

14   Q.  And who is the congressional representative for District 9?

15   A.  Marcy Kaptur.

16   Q.  What party is Congresswoman Kaptur?

17   A.  She's Democratic.

18   Q.  How long has she represented District 9?

19   A.  Over 20 years.

20   Q.  Does she have an office close by to you?

21   A.  Yes.  In Toledo, Lucas County.

22   Q.  In your experience in District 9, is Congresswoman Kaptur

23   engaged in the Toledo area?

24   A.  I don't think she's engaged enough, because she has to

25   spread her time between the Toledo area and all the area up to

1    Cleveland.

2    Q.  Ms. White, do you do anything to support Democratic

3    candidates other than voting for them?

4    A.  Yes.  I -- I obviously work with APRI and UAW.  I do

5    door-to-door canvassing, phone banking, we do get out to vote,

6    voter registration drives.

7    Q.  What Democratic candidates have you canvassed for?

8    A.  I've canvassed for Cordray and Sutton, for Galbraith, James

9    Neu.  In a presidential election I canvassed for Clinton and

10   Sherrod Brown.

11   Q.  You mentioned Mr. Galbraith.  Who is that?

12   A.  He ran in 2018, in the congressional fifth district against

13   Bob Latta.

14   Q.  Did he win?

15   A.  No.

16   Q.  And you mentioned James Neu.  Who is that?

17   A.  He ran in 2016 against Bob Latta for the fifth district.

18   Q.  And I presume he did not win?

19   A.  No.

20   Q.  Have you handed out any literature for Mr. Galbraith or Mr.

21   Neu within District 5?

22   A.  Yes.  My work is in District 5, so I've handed out some

23   literature at work to some of the people I work with for both

24   of those candidates.

25   Q.  And you've also engaged in canvassing activity in District

```
1   9?
2   A.  Yes.
3   Q.  Has the current district map had any impact on how
4   effective your canvassing is?
5   A.  Yes.  I think it's made it more time-consuming and harder,
6   because we spend more of our effort trying to convince people
7   to vote and where their districts are, rather than just
8   encourage them to register and getting them to the polls.
9   Q.  And when you say "we," are you referring to APRI or UAW or
10  both?
11  A.  Both.
12  Q.  What Democratic candidates have you phone banked for?
13  A.  Sherrod Brown, Cordray-Sutton, Clinton, Marcy Kaptur.
14  Q.  Has the district map had any impact on the effectiveness of
15  your phone banking?
16  A.  Yes.  A lot of the phone banking we do hits the union
17  people in that area and they can't vote for those candidates,
18  so we're kind of wasting some of our time trying to get people
19  to vote for people that are not in their district.
20  Q.  Why do you continue to do these activities if they're made
21  so difficult?
22  A.  Because I still think it's positive to get people to vote,
23  whether -- if I just reach 10 people or a hundred people, they
24  still need to know that it's important that they express your
25  opinion on everything that goes on in your area.
```

1  Q.  And you mentioned that you do voter registration drives for

2  APRI.  Where do you do that?

3  A.  In District 9.

4  Q.  Has the current district map had any impact on the

5  effectiveness of your voter registration activity for APRI?

6  A.  Yeah, it's made it more difficult.  It's been more

7  time-consuming.  If people are in that district and they don't

8  know where the district is because they're confused, it's

9  harder to have to spend that time trying to make sure they're

10  in the right area than it is to focus on them voting and them

11  registering to vote and focusing on the issues going on.

12  Q.  Have you encountered a lot of voters who are confused about

13  where their district is?

14  A.  Yes.

15  Q.  In what way?

16  A.  They've always voted for certain candidates, so when the

17  district lines were changed, they didn't realize that that

18  candidate was no longer in their area to vote for.

19  Q.  Ms. White, what are you hoping that APRI gets out of this

20  lawsuit?

21  A.  To see fair districting lines and to make sure everybody's

22  vote counts.

23        MR. CAREY:  I'd like to bring up demonstrative Exhibit

24  PD11.

25  Q.  Ms. White, do you recognize this picture?

```
 1   A.   Yes.   It's our expert's proposed congressional map.
 2   Q.   Are you familiar with it?
 3   A.   A little bit.
 4   Q.   Can you indicate where you live on the map?
 5   A.   The blue push pin.
 6   Q.   Based on what you can see about this map, what effect would
 7   you expect it to have on you and your community?
 8   A.   I think it would make our work a lot easier, because Toledo
 9   and Lucas County comes back together as a whole and we'll
10   continue to be working together as a community in that area.
11        MR. CAREY:   No further questions.
12        JUDGE BLACK:   Very well.   Counsel for the defendants
13   has an opportunity to ask questions.
14        MR. VOIGT:   May it please the Court, Steven Voigt on
15   behalf of the defendants.
16                         CROSS-EXAMINATION
17   BY MR. VOIGT:
18   Q.   Ms. White, do you agree that voters can be apathetic for a
19   number of different reasons about voting?
20   A.   Yes, they can be discouraged about voting.
21   Q.   For a number of different reasons?
22   A.   Yeah.
23   Q.   And perhaps some voters could be apathetic because they
24   think politics in America, overall, will never change to fit
25   their personal perspective?
```

```
 1   A.   They can be, yes.
 2   Q.   All right.  Do you agree that some people can be apathetic
 3   because they are busy with their jobs and day-to-day affairs?
 4   A.   I don't think that's a reason they would be discouraged to
 5   vote or to continue to vote, no.
 6   Q.   Do you agree that some voters could be apathetic because of
 7   the quality of the candidates who are running?
 8   A.   They can be, but I think it's our job to make sure that
 9   they are informed correctly on all the issues they're worried
10   about.
11   Q.   And do you agree that voter apathy has been a problem in
12   America for quite some time?
13   A.   It has been, and that's why we continue to do what we do.
14   Q.   Do you agree that voter apathy has existed in America since
15   before 2011?
16   A.   I -- I wasn't canvassing back then, so I can't -- I can't
17   speak on that.
18   Q.   Do you have any reason to believe that voter apathy hasn't
19   existed for decades?
20   A.   No, I don't.
21   Q.   Before -- you mentioned that you worked with APRI.
22   A.   Yes.
23   Q.   Before 2011, how much money did APRI spend on Get Out the
24   Vote efforts in Congressional District 9?
25   A.   I don't know that because I wasn't part of APRI then.
```

1   Q.  Okay.  And so you can't compare the amount of money that

2   APRI spent before 2011 versus what it spends now?

3   A.  No.

4   Q.  Okay.  You mentioned a little bit in your direct about

5   Congressman Latta.  Do you recall that?

6   A.  Yes.

7   Q.  And he is your current congressman?

8   A.  Yes.

9   Q.  Have you ever written a letter to Congressman Latta?

10  A.  No.

11  Q.  Have you ever tried to communicate with Congressman Latta?

12  A.  No.

13  Q.  Have you ever invited Congressman Latta to do a town hall

14  in your area?

15  A.  No, because I don't focus my stuff in that area.  I'm more

16  in District 9.

17  Q.  Okay.  And who is the -- who is the congressman or -woman

18  in District 9, again?

19  A.  Marcy Kaptur.

20  Q.  Okay.  Ohio's congressional lines do not prevent you from

21  communicating your viewpoints with any congressman; is that

22  correct?

23  A.  That's correct.

24  Q.  Have you ever done any volunteer work for any Republican

25  candidate?

1    A.  No.

2    Q.  You mentioned -- you talked a bit about confusion, voter

3    confusion about in what district voters are in.

4    A.  Yes.

5    Q.  No matter how district lines are drawn, isn't this an issue

6    that would arise no matter what?

7    A.  It could be, but I just -- I mean, the way it's been moved

8    up since 2012, people have become more -- I feel like have been

9    more confused, with my experience of talking to people.

10   Q.  But you weren't working with APRI before 2012, so you don't

11   know --

12   A.  No.  Previous to 2015, no.

13   Q.  Right.  But -- so prior to the current map, you don't know

14   how confused individuals were.  Fair to say?

15   A.  True.

16   Q.  And you are in Congressional District 5?

17   A.  Yes.

18   Q.  Despite the congressional lines that currently exist in

19   District 5, that has not stopped you from voting in elections;

20   is that right?

21   A.  No.

22   Q.  And I think you already answered this on direct, but you

23   don't believe that you have a right to have a congressperson

24   who agrees with you on every -- every single issue?

25   A.  In what aspect?  Legally?

1   Q.  You mentioned a lot of things that you feel are important
2   to you.  Do you feel that you have a constitutional right to
3   have a congressperson agree with you on all of the issues --
4   A.  No.
5   Q.  -- that you mentioned?  No?
6   A.  No, I don't.  No.
7   Q.  You said that you attended -- that you sometimes attend
8   Democratic rallies.
9   A.  Yes.
10  Q.  And you run into Democratic candidates at those rallies?
11  A.  Yes.
12  Q.  Would you expect a Republican candidate to attend a
13  Democratic rally?
14  A.  They're not always put out there as Democratic rallies.
15  They're rallies to get to know the candidates in general
16  sometimes, and I have never, at any of the rallies I've
17  attended, which is several, never have I seen -- I've seen a
18  few Republican candidates address themselves, but I've never
19  met my Congressional District 5 Bob Latta.
20  Q.  Okay.  But you have seen -- so you have seen --
21  A.  I've seen a few Republicans at some of the rallies that are
22  just get to meet the candidates, meet the candidates rallies,
23  not democratic specifically.
24  Q.  Then you have see Republican congressman and congresswomen
25  at particular rallies?

1    A.   Yes.

2    Q.   Have you ever done any volunteer work for any Republican

3    candidate?

4    A.   No.

5              MR. CAREY:   No further questions at this time.

6              JUDGE BLACK:   Intervenors?

7              MR. LEWIS:   No questions, Your Honor.

8              JUDGE BLACK:   Redirect?

9              MR. CAREY:   Briefly, Your Honor.

10             JUDGE BLACK:   Umm hmm.

11                        REDIRECT EXAMINATION

12   BY MR. CAREY:

13   Q.   Ms. White, based on your experience canvassing, phone

14   banking and conducting voter registration drives, do you

15   believe the voters are discouraged or rendered apathetic as a

16   result of the current district map?

17   A.   Yes, because I feel like they're confused by where the

18   lines are.

19   Q.   Is Lucas County divided by the current district map?

20   A.   Yes, it is.

21   Q.   Is Toledo, the Toledo area, divided by the district map?

22   A.   Yes, it is.

23   Q.   Do you believe that voters in Lucas County expect to vote

24   together as a community?

25   A.   Yeah, I think we represent Lucas County as one community,

1   and this kind of affects that.

2          MR. VOIGT:  Objection.  Lay testimony.

3          JUDGE BLACK:  Very well.

4   Q.  You testified earlier that you're not stopped from voting.

5   But is the value or weight of your vote affected by the current

6   district map?

7   A.  Yeah.  I feel like my vote isn't counted.

8   Q.  You testified earlier that you didn't campaign in District

9   5 prior to the current district map being enacted.  Do you find

10  that the current voter confusion relates to this map?

11  A.  Yes.  I think since the district lines have changed, people

12  are still confused, even though it's been seven years.

13         MR. CAREY:  No further questions.

14         JUDGE BLACK:  Very well.  We're done with this

15  witness; correct?

16         MR. STRACH:  We don't have any further cross.

17         MR. VOIGT:  Yes, we're done.

18         JUDGE BLACK:  You may step down.  You appear to have

19  survived.

20         THE WITNESS:  Thank you.

21     (Witness excused.)

22         JUDGE BLACK:  Who does the plaintiff call at this

23  point?

24         MS. LEVENSON:  Thank you, Judge.  We call Jen Miller.

25         JUDGE BLACK:  Do you solemnly swear or affirm that the

```
 1   testimony you give today will be the truth subject to the
 2   penalty of perjury?
 3            THE WITNESS:  I do.
 4            JUDGE BLACK:  You may be seated.
 5            THE WITNESS:  Thank you.
 6            JUDGE BLACK:  Are you aware that the seats tip back?
 7            THE WITNESS:  You know, I am klutzy, so I'm glad you
 8   reminded me again.
 9            JUDGE BLACK:  Let the record reflect what the record
10   reflects.  You're doing fine.
11            MS. LEVENSON:  May it please the Court, this is Freda
12   Levenson back again to question our plaintiffs' witness Jen
13   Miller.
14            JUDGE BLACK:  Very well.
15                       JENNIFER MILLER
16   a witness herein, having been first sworn, testified as follows:
17                      DIRECT EXAMINATION
18   BY MS. LEVENSON:
19   Q.  Good afternoon, Ms. Miller, can you kindly state and spell
20   your name for the record.
21   A.  Yeah, my formal name is Jennifer Miller.  So that's
22   J-e-n-n-i-f-e-r M-i-l-l-e-r.
23   Q.  Where do you live?
24   A.  I live in north campus on Ohio State University, 131 East
25   Blake Avenue in Columbus.
```

1  Q.  And where are you currently employed?

2  A.  At the League of Women Voters of Ohio.

3  Q.  What is your position there?

4  A.  I'm the executive director.

5  Q.  And why are you here today?

6  A.  I'm not here for myself; I'm here on behalf of our members

7  and on behalf of the League of Women Voters of Ohio.  We seek a

8  fair map before the 2020 election, one that will allow voters

9  to elect their officials rather than have their officials

10  select them.

11  Q.  Ms. Miller, in the interest of time, may I refer to the

12  League of Women Voters of Ohio as "the League"?

13  A.  Yep.  We do that too.

14  Q.  Thank you.  Can you please give us an overview of the

15  history of the League in Ohio.

16  A.  Yeah.  So we were formerly the Ohio Women's Suffrage

17  Association.  We were formed actually in 1885 working to secure

18  the rights to vote for all women.

19      We became the League of Women Voters in May 1920.  Our

20  intent was we expected the 19th Amendment to be ratified, and

21  this newly enfranchised population would need help.  They would

22  need to know the mechanics of voting, so the where and the how,

23  as well as become informed voters about the issues and the

24  candidates.

25      We quickly began working on a wide range of democracy

1    reforms as early as the 1920s, ballot structure and many

2    things.  And so we have a long history and we are right at our

3    100th anniversary, and we see this case as critical to the work

4    that we do, because it's not enough to have the right to vote;

5    we need to make sure that our votes are equal in their weight

6    when it comes time to count the results.

7    Q.  And speaking of the work that you do and what brought you

8    here today, what is the mission of the League?

9    A.  We empower voters and we defend democracy.  So that

10   essentially means that we are working to ensure that democracy

11   works for every Ohio voter.

12   Q.  What does that mean to make democracy work for every Ohio

13   voter?

14   A.  I think every Ohio voter is an important piece here.  We

15   see the constituents as being every voter in the state of Ohio,

16   and we see our membership and our mission as being serving

17   them, and so that comes in a wide range of tasks.  It can mean

18   public education forums where we have candidates or public

19   education forums about how government works.  It can be

20   publications like *Know Your Ohio Government*, which we have

21   published since 1964, as well as publications on different

22   processes which we have published on redistricting.  It can

23   mean voter registration.  We do a lot of voter registration.

24       We're one of the only organizations that's welcome in most

25   high schools.  We're trusted as being non-partisan.  And so we

 1   actually serve a critical role of educating high school

 2   students on civics, which has been reduced, that curriculum has

 3   been significantly reduced.  We preregister them informally.

 4   We take a card if they're not old enough that says yeah, remind

 5   me, and then we follow up with them when they're 18.  We do

 6   something similar with college kids just to make sure that

 7   they're registered.  And there's really no aspect of how this

 8   democracy functions that we aren't playing a role, really a

 9   non-partisan role, to make sure that our government -- it works

10   for the people of Ohio.

11   Q.   Does your work also include registering adults and getting

12   out the vote among adults --

13   A.   Yeah.

14   Q.   -- for past school age?

15   A.   Absolutely.  So that would include, we have a major

16   partnership with Ohio where we send our volunteers to homeless

17   shelters and social service agencies to assist with voter

18   registration and understanding overall logistics of voting.  On

19   voter registration day, which is a national celebration in

20   September, we have volunteers at hundreds of locations across

21   the state that could include Y's and supermarkets and so forth.

22   Q.   Where is the League's office?

23   A.   We are catty-corner from the Ohio Statehouse at 100 East

24   Broad on the 13th floor.

25   Q.   And as executive director, what does your job involve?

1   A.  Well, I have a lot of -- I wear a lot of different hats.
2   Of course, I lead the organization in partnership with the
3   League of Women Voters of Ohio board.  I certainly am tasked
4   with tracking election results, voter trends, election -- just
5   overall election operations, reviewing all of the different
6   policy briefs and analysis on these issues, and I do a lot of
7   work on reforming Ohio's democracy, so a lot of work on how we
8   can improve Ohio's democracy.
9        And then, finally, I interact with the public myself a lot
10  in public speaking engagements and sometimes actually doing the
11  registering myself.
12  Q.  How long have you been executive director of the league?
13  A.  Since May 1st, 2018.
14  Q.  What did you do previously?
15  A.  So I have kind of a long career of doing many different
16  things.  Most previously, I was the executive director of the
17  Sierra Club Ohio chapter, which is the oldest and largest
18  environmental organization in the state and in the country.
19       Before that, I actually had a university fellowship where I
20  got a full ride to study public policy.  It was actually a
21  joint degree, arts, administration and policy, but I had enough
22  for an MPA out of the Glenn school at Ohio state.
23       And then before that, I was in the arts.  And I used the
24  arts to really educate the public on issues that might interest
25  them that actually included engaging in democracy.

1    Q.   How many members does the League have today?

2    A.   About 2800.

3    Q.   How does one become a member?

4    A.   Pay dues.

5    Q.   How much are dues?

6    A.   It depends on the local league, so it's a little bit like

7    APRI where the dues are set by the local league.  When one

8    joins the local league, they automatically become a member of

9    the state and the national league.  Those dues range between 50

10   to a hundred dollars.

11   Q.   How many local leagues do you have?

12   A.   We have 33 local leagues and we have three at-large units,

13   and those will likely become local leagues.  But basically we

14   have a presence in 36 local communities across the state.  And

15   the geographic scope for each one of them can be different, so

16   we can cover large metropolitan areas like greater Cleveland or

17   metropolitan Columbus, entire counties like Licking County or

18   Knox County, as well as small towns like Bowling Green and

19   Oxford and Oberlin and Tiffin.

20   Q.   In which congressional districts do you have leagues?

21   A.   All 16.

22   Q.   If it hasn't become clear yet, what, if any, partisan

23   leaning does the organization have?

24   A.   We are fiercely non-partisan.

25   Q.   How many employees does the League have?

1   A.   We have three on payroll, and I'm one of those.

2   Q.   With only three employees, how does the League carry out

3   all of this tremendous volume of work?

4   A.   A great question.  Our members, our volunteers, are our

5   lifeblood.  They're everything about our organization, and

6   that's been the case for our entire 100 years.  And so they

7   carry out the mission.  They conduct candidate forums, they

8   register voters, they produce a lot of our documents or voter

9   education materials.  They do every aspect of our mission.

10  Q.   All right.  To what extent do you have familiarity with

11  your members throughout the state?

12  A.   I need to know them.  It's my job to know them, and that's

13  why when I started, I took an extensive listening tour around

14  the state of Ohio.  I have visited nearly every local league,

15  and I certainly have visited our members in all 16

16  congressional districts.

17  Q.   To what extent do you know where your members live?

18  A.   Again, so I don't necessarily know personally every address

19  of the 2800, but it is my job to know where my members live.  I

20  have to work with them in implementing our mission.  I work

21  with those local leagues to help them with programs and to

22  train their volunteers.  In addition, we may call on our

23  members to have them actually call their elected officials on

24  policies we care about, which means I need to know which

25  districts they're in.  So there's many reasons why I need to

1    know where they are.

2    Q.  Does the League maintain a membership list?

3    A.  Yes.

4          MS. LEVENSON:  I have a document marked Plaintiffs'

5    Exhibit 417 for identification.  May I approach the witness

6    with it?

7          JUDGE BLACK:  Yes.  Thank you.

8    A.  Thank you.

9    Q.  You're welcome.

10      Ms. Miller, I've just handed you a document marked

11   Plaintiffs' Exhibit 417 for identification.  Can you please

12   look through it and let me know whether you recognize it.

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  This is our membership list for the League of Women Voters

16   of Ohio.

17   Q.  For what year?

18   A.  This was 2018.

19   Q.  And what information does this version of the list contain?

20   A.  This version has, you know, some -- some numbers that

21   probably don't matter for us, but membership numbers:  First

22   name, last name, the type of membership they have, their

23   address -- and their address, their street address.

24   Q.  And the name of the member?

25   A.  Yep, first name and last name of the member.  Yep.

```
1              MS. LEVENSON:  I move to enter this list into

2     evidence.

3              JUDGE BLACK:  Any objection?

4              MR. VOIGT:  No objection.

5              JUDGE BLACK:  It's admitted.

6              MS. LEVENSON:  Thank you, Your Honor.

7          (Plaintiffs' Exhibit 417 was admitted.)

8     Q.  Have you had a chance to look through this list and become

9     slightly familiar with it?

10    A.  Yes, absolutely.

11    Q.  Can you tell me in which U.S. congressional districts your

12    members live?

13    A.  All 16.

14             MS. LEVENSON:  Stephen, will you kindly display

15    Plaintiffs' Demonstrative 18.  Thank you.

16    Q.  Ms. Miller, you've got it on your screen?

17    A.  Yes.

18    Q.  Thanks.  Have you seen this graphic before?

19    A.  I have.

20    Q.  Could you explain what it is.

21    A.  This is a map of Ohio with the current congressional

22    districts, and the dots are our members, which shows that we

23    have members in all 16 congressional districts.

24    Q.  Thank you.

25             MS. LEVENSON:  Thank you, Stephen.
```

1  Q.  What is the Ohio League's governing structure?

2  A.  We're governed by a board.  The board members are all

3  dues-paying members.  The nominating committee brings a slate

4  of board members to the full membership at our biennial

5  convention and they are voted in.  Occasionally, there may be

6  someone nominated to the board as well.

7  Q.  How does the League determine what its priority issues are

8  going to be?

9  A.  Well, we study everything first.  So first we need to

10  study, in great detail, then we need to debate and have

11  dialogue with one another.  Then we take a position on it, and

12  that position is -- goes to the convention floor to take that

13  position and voted on by the members.  And then we also have

14  priorities that can go to the convention floor.  And in -- at

15  our 2017 biennial convention, ending congressional

16  gerrymandering was at the top of our membership's priorities

17  that they voted on.

18  Q.  All right.  So earlier when I asked you why you were here,

19  you used the term fair maps.  What do you mean by fair maps?

20  A.  Yeah.  Fair maps or fair districts means non-gerrymandered

21  districts.  It means we want to see maps that are drawn by good

22  public policy objectives, neutral criteria, and that are not --

23  that are not designed to guarantee a 12-4 outcome, or any

24  outcome for that matter.  And we know that these mapmakers were

25  intending on having a 12-4 map, and we have seen that those

1  results have remained consistent throughout these elections --

2  through each election.

3  Q.  How long has the issue of fair districts or fair maps

4  been --

5          JUDGE BLACK:  I'm sorry?

6          MR. VOIGT:  Your Honor, objection to expressing the

7  intent of the drafters.  No personal knowledge.  It's

8  speculation.

9          JUDGE BLACK:  Very well.

10  Q.  How long has the issue of fair districts or fair maps been

11  a priority for the League of Women Voters?

12  A.  As I said, we always do our homework first.  We started

13  looking at the concept of districting and fairness in the

14  1940s.  We started doing our homework on this just a couple of

15  decades after starting.  We began our advocacy in the '60s and

16  '70s, and have worked on fair districting all through till

17  today.

18  Q.  Maybe we have to concede laches.  No, just kidding.

19      What has the League done to advance this fair district

20  priority issue?

21  A.  So many, many campaigns over the years.  We've worked for

22  decades trying to get reform through the legislature.  We've

23  circulated and gotten ballot initiatives on the ballot.

24  Sometimes we won and sometimes we haven't.  We've had a

25  speakers bureau where we trained our volunteers to go speak to

1   community members about how maps are made and why they matter.

2   We have done a number of reports like Elephant in the Room or

3   predictable results that show a wide range of findings, and

4   this lawsuit, absolutely.

5   Q.  So let's talk about this ballot issue, Ballot Issue 1.

6   What is it?

7   A.  So Ballot Issue put forth -- so Ballot Issue 1 was on the

8   May 2018 ballot, and it was really to establish some better

9   process -- some process improvements for future congressional

10  mapmaking.

11  Q.  What was the League's role in bringing it to the ballot?

12  A.  So we were doing what's considered impossible in Ohio, or

13  most would consider impossible, in that we had an entirely or

14  nearly entirely volunteer-run campaign to get this ballot -- to

15  get this initiative on the ballot.  When it became clear to the

16  General Assembly that we were going to get an issue on the

17  ballot, they decided to -- they ended up working with us to get

18  Issue 1 on the ballot.  And, again, it does address some but

19  not all of our concerns.

20  Q.  When will it come into effect?

21  A.  It does not come into effect until 2022, so voters are --

22  would have to wait.  Many voters overwhelmingly supported Issue

23  1, nearly 75 percent of voters in all 88 counties, but those

24  voters will not see redress for still some time, because

25  they'll have to -- unless -- well, currently they would have to

1   endure an unfair map in 2020.

2   Q.  So to what extent does the League regard Ballot Issue 1 as

3   the solution to partisan gerrymandering of congressional

4   districts in Ohio?

5   A.  Right.  So we think it's a step in the right direction,

6   it's absolutely a step in the right direction, and we are

7   really proud of what we did in Issue 1.  First and foremost, it

8   deals with some of the process issues.

9       So it means it has to be more transparent.  In 2011, the

10  map was made in a secret bunker, as our research has shown.

11  Also, we didn't -- the public didn't have the data that we

12  needed to review the maps in a timely manner.  We didn't even

13  actually have maps to comment on when the public hearings were

14  happening, so it was just egregious in terms of public

15  participation and transparency.

16      So our hope is that it will help with some of those process

17  issues.  It also has a common-sense cap on county splits, but

18  beyond that, there's still problems.  Number one, we still have

19  an unfair map in 2020.  We still have voters going to vote on

20  an unfair map.  So that's number one.

21      And number two, I think there's so much more that could be

22  done in terms of objective criteria that we didn't necessarily

23  get out of Issue 1.

24  Q.  Who made the decision that the League join this lawsuit?

25  A.  The League of Women Voters board on behalf of its members.

1  Q.  And why did the League decide to challenge this map?

2  A.  Yeah.  Well, again, we've been working on redistricting for

3  decades.  We were absolutely part of the process of advocating

4  in 2011, and saw how egregious the process was and how

5  powerless community groups were and good governance groups like

6  ours were in influencing the map.  And we knew that we needed

7  to -- we've always wanted to maximize every opportunity we

8  could to fight gerrymandering, and that's why we joined this

9  lawsuit:  To bring a fair map to the people of Ohio by 2020.

10  Q.  For what reasons did the League decide it wanted to

11  challenge this particular map?

12  A.  There's a couple reasons.  One is it diverts our resources.

13  It means we have to work a lot harder to do what we need to do,

14  to meet our mission.  And then the second is that -- wow, I

15  just lost my train of thought.  I'm so sorry.  Would you repeat

16  the question?

17  Q.  Sure.  I asked you why the League decided to challenge this

18  particular map.  You answered that it makes you divert your

19  resources.

20  A.  Oh, yes.  And then in addition, we do come here

21  representing our members who are Democrats whose votes are

22  diluted and wasted.

23  Q.  Thank you.

24      Well, let's talk about the dilution of resources that you

25  first mentioned.  How does the gerrymandered map make the

1    League have to divert resources?

2    A.  Right.  So there's a couple different ways.  One has to do

3    with the fact that the map is so confusing, and it absolutely

4    splits communities in counties in very willy-nilly ways, and

5    that creates a lot of confusion among voters.  The second is

6    about this predetermined results, those preordained results,

7    and the way that that impacts the way voters respond, as well

8    as the way candidates respond.

9    Q.  Well, let's examine those two reasons.  How did the

10   confusing borders make the League divert resources?

11   A.  Right.  So we actually do so much on voter registration, so

12   much on voter education.  We helped run the 866-OUR-VOTE, which

13   is the non-partisan election protection phone line.  We operate

14   our own phones.  We always have someone, between the hours of

15   9:30 and 4:30, answering the phone, unless something happens

16   where someone's sick.

17         But in all of those cases, the number one question we get

18   has to do with who their representatives are.  And I think I

19   can give one really good example, which is in the August

20   special election in Congressional District 12, which is in

21   Columbus.  This was one of those times where a lot of the other

22   services for voters might not have been up, because it was a

23   special election, and our phone was ringing off the hook with

24   folks who thought that they were in 12, but they weren't, or

25   folks who were told they were in 12, but they didn't think they

```
1    were.  And this is that Franklin County sinkhole, to be quite
2    frank.
3        There is a section of Clintonville in Congressional
4    District 12 where you can go a couple blocks one way and you're
5    in one district; a couple blocks another, you're in other
6    district; a couple blocks in another, and you're in another
7    district.  So that's a great example of how it wasn't common
8    sense.  We should have been able to say, you know, these
9    counties or these communities as a whole are part of
10   Congressional District 12.  And we spent -- we basically had to
11   pause everything we were doing to answer questions.  And I'll
12   even note that it was so confusing that the Franklin County
13   Board of Election, the board of election itself, wrongly put
14   some voters in one district rather than another because of how
15   confusing these lines are.
16           MR. VOIGT:  Objection.  No personal knowledge.
17   Speculation.
18           JUDGE BLACK:  Very well.
19           THE WITNESS:  Am I allowed to respond to that?
20           JUDGE BLACK:  I'm sorry?
21           THE WITNESS:  Am I allowed to respond to an objection?
22           JUDGE BLACK:  No, no, no.
23           THE WITNESS:  Okay.
24           JUDGE BLACK:  Thank you, though.  We'll take care of
25   it.
```

1  Q.  So what would the League have been doing during the special

2  election instead if it didn't have to be untangling this

3  confusion?

4  A.  Right.  So we end up having to spend so much time just

5  dealing with confusion that we don't even get to the

6  transformative parts of our work.  We see ourselves as not just

7  getting folks excited about voting, which is what we have to

8  do, we have to -- we have to spend so much time helping them

9  understand who their representatives are, so much time helping

10  them understand that part of the logistics because of the

11  confusing map that we aren't able to spend as many volunteer

12  hours at our other pieces.

13      We would be in more schools.  We have a program with the

14  Girl Scouts called Voter Girl, where the girls get to actually

15  vote on machines.  We have so many different publications and

16  public education programs.  We could improve our voter guide.

17  We could do more forums.  All of these things are more

18  transformative, because they're about the meat and potatoes of

19  our democracy and our elections and making sure that voters are

20  not just, you know, participating, but are participating in a

21  fully informed and engaged way.

22  Q.  Specifically, on the day of the District 12 special

23  election, what would you have done with your volunteers if they

24  weren't answering phones?

25  A.  Oh, yes.  So we were actually trying to get ourselves ready

1    for a new pilot with the coalition on homelessness and housing

2    in Ohio where we were going to be helping -- our members were

3    going to be deployed to homeless shelters and to social service

4    agencies to give rides.  And a lot of times, especially -- both

5    during early voting and on Election Day.  And so we actually

6    had to table several of those meetings and a lot of that work.

7    Q.  And to what extent does the League work itself at the polls

8    on Election Day?

9    A.  Yes.  So we have -- we focus a lot on poll workers.

10   There's always poll-worker shortages.  And so we do recruit

11   poll workers.  This last Election Day we actually had a pilot,

12   actually, with the Franklin County Board of Elections and

13   several partners trying to get bi-- multilingual poll workers

14   into the precincts where those languages would likely be

15   spoken.

16       Additionally, we work with disability communities to

17   encourage persons with disabilities to be poll workers.  But we

18   also, again, have an entirely different piece in addition to

19   that, which is the poll monitoring, which is the 866-OUR-VOTE

20   where folks can call if they feel as though they've had a

21   question about their rights or there has been a challenge at

22   the polling location.

23   Q.  So given the number of volunteers you have, to what extent

24   are you able to deploy volunteers in all those directions at

25   once?

1    A.   Right.   So there are not unlimited resources.   Right?   We

2    don't have a cloning program at the League of Women Voters, so

3    we can only put volunteers in certain places.   And that's why I

4    say this map, one of the things it does is it creates so many

5    problems at such a basic fundamental level that we can't even

6    do some of the more transformative work.

7    Q.   So you mentioned two reasons the League has to divert its

8    resources, and one is because of the confusion engendered by

9    the map, the other is what you called preordained election

10   results.   How do those make the League divert resources?

11   A.   Right.   So these results, we've had a 12-4 map no matter

12   what.   No matter how many people show up to vote, we have that.

13   And so that means that a lot of voters know that.   They know

14   that it doesn't matter if I show up because the such-and-such

15   candidate for this party is going to win.   That's what happens.

16   It happens every time.   It creates an apathy.   That's hard.

17   How do you encourage voters to raise -- to get to the polls

18   when they don't feel as though their vote matters?

19        And then secondly, I think it's important to mention that

20   it changes the behaviors of candidates --

21            JUDGE BLACK:   I'm sorry.   We've got defense standing.

22   You can go "uh-huh," if you need to.

23            MR. VOIGT:   Thank you, Your Honor.   Objection.   No

24   personal knowledge as to why individual voters are --

25            JUDGE BLACK:   Very well.

```
 1              MR. VOIGT:  -- voting or not voting.
 2              MS. LEVENSON:  I assume that you don't want the
 3    plaintiffs to respond at this point and that it comes up in the
 4    briefing later, or would you like a response?
 5              JUDGE BLACK:  That's what we're going to do.
 6    Everything is coming in --
 7              MS. LEVENSON:  Okay.
 8              JUDGE BLACK:  -- and the judges will determine whether
 9    or not it's admissible post-trial.
10    Q.  So, Ms. Miller, you don't need to worry about that.
11    A.  Okay.
12              JUDGE BLACK:  Is she going to talk about the
13    objections again?
14              THE WITNESS:  Yeah.
15         (Laughter.)
16              JUDGE BLACK:  Please proceed.
17              MS. LEVENSON:  Mr. Reporter, could you kindly read
18    back what the witness was saying just before the objection.
19    Thank you.  I'm sorry to bug you.
20         (Record read.)
21              MS. LEVENSON:  Thank you very much.
22              JUDGE BLACK:  That's extraordinary, sir.
23    Q.  So, Ms. Miller, you were about to say how it changes the
24    behavior of candidates.
25    A.  Absolutely.  So what we see is that candidates really stick
```

1    more to their comfort zone, to their own rallies, to their own

2    fundraisers.  They don't necessarily feel as though they need

3    to be in the general public or addressing all of the

4    constituents in the district that they're running.  And so time

5    and time again, we see this when we are trying to run forums

6    with congressional district candidates, where those candidates,

7    you know -- we reach out, we spend so many hours, we give

8    different times, we -- that could possibly work.  We start

9    months in advance trying to get these candidates to attend the

10   hearings.  And on a regular basis, they don't even return our

11   phone calls, let alone say that they can't attend.

12        And what happens then is that we hold space for -- to have

13   this congressional forum for this -- for a long time we'll have

14   the other party ready to go.  The minority party -- it's

15   usually in these Republican areas -- we'll have the minority

16   party ready to participate in this forum, but we can't have a

17   forum that only has one party.  And so we end up doing all of

18   this planning, all of this effort, and then a congressional

19   candidate, like Jordan or Stivers -- Joyce has done it in the

20   past -- just doesn't end up showing, and therefore the citizens

21   don't end up hearing directly from who is running in their

22   districts, and we end up wasting so much time and effort among

23   our volunteers.

24   Q.  And when you say you cannot have a forum if only one side

25   shows up, does that mean it's not a good forum or that you

1  literally cannot have a forum?

2  A.  We cannot have a forum.  Like we cannot do empty-chair

3  debates.  We cannot.  So if we have -- let's say we have a

4  Democrat who has said yes, but the Republican is not getting

5  back to us, we cannot have a forum on that race.  So -- so that

6  opportunity is lost.

7  Q.  And the reason that you cannot is because?

8  A.  Of federal election law and also our own legal advisement

9  from the League of Women Voters of U.S.

10  Q.  Can you please explain to what extent the League's

11  allocation of financial resources is spent on redistricting

12  reform effort.

13  A.  Right.  So we have a pretty tiny budget but a mighty

14  mission, and most of that is met through volunteers, but we do

15  end up spending an inordinate amount of our funds on dealing

16  with gerrymandering over the years.

17       MS. LEVENSON:  Thank you.  And with that, Your Honor,

18  I would like to approach the witness with a document.

19       JUDGE BLACK:  Yes.

20       MS. LEVENSON:  Plaintiffs' Exhibit 418.

21       JUDGE BLACK:  Very well.

22       MS. LEVENSON:  Thank you.

23       MR. VOIGT:  Your Honor, we object to Exhibit 418 on

24  the basis of hearsay.

25       JUDGE BLACK:  Very well.

```
 1  BY MS. LEVENSON:

 2  Q.  So, Ms. Miller, I have handed you a document marked as

 3  Plaintiffs' Exhibit 418 for identification.  You've looked

 4  through it and you recognize it.  What is it?

 5  A.  This is our balance sheet from June 30th, 2018.

 6  Q.  What type of information does it reflect?

 7  A.  It -- so it has our assets and our equity.  It has our

 8  various sources of funds, and I'm just still -- and -- yeah,

 9  and it shows or actuals versus our budget for various expense

10  line items.

11  Q.  Do you know who has the responsibility for preparing this

12  financial record for the League?

13  A.  Our accountant.  His name is Jeff Keith.

14  Q.  Was it Mr. Keith's regular job to create the balance sheet

15  and statement of equity for the League?

16  A.  Yes.

17  Q.  Did he have knowledge of the information contained in it

18  when he made it?

19  A.  Yes.

20  Q.  When did he create this record?

21  A.  This would have been created right -- yeah, this would have

22  been created after June 30th.  This is the end of our fiscal

23  year, so once we got all that wrapped up.

24  Q.  Is making this record a regular practice of the League?

25  A.  Yes.
```

1   Q.  Was this record kept in the course of the League's

2   regularly conducted business activity?

3   A.  Yes.

4         MS. LEVENSON:  I move to enter the balance sheet and

5   statements of equity into evidence.

6         JUDGE BLACK:  It's admitted conditionally.  We're

7   going to review in the post-trial phase.

8     (Plaintiffs' Exhibit 418 was admitted conditionally.)

9         MS. LEVENSON:  May I take it that we have permission

10  to display it?

11        JUDGE BLACK:  Yes.

12        MS. LEVENSON:  Thank you, Judge.

13        MS. LEVENSON:  Stephen, can you please display

14  Plaintiffs' Exhibit 418.  Thank you.

15  Q.  Ms. Miller, what's the League's largest grant?

16  A.  The Joyce Foundation.

17        MS. LEVENSON:  Stephen, please go to page eight of the

18  exhibit to the center of the page just under Restrictive

19  Revenue/Designated Gifts.  Thank you.  And you're showing the

20  Joyce grant.

21  Q.  Ms. Miller, how much was the Joyce grant in 2018?

22  A.  $80,000.

23        MS. LEVENSON:  David, can we turn to page nine now,

24  please, near the top, Total Revenues.

25      Thank you.

1  Q.  Ms. Miller, what were the total revenues of the League in
2  2018?
3  A.  Just over $300,000.  $310,959.
4  Q.  I don't want to make you compute on the fly, but
5  approximately what portion of the total revenues does the Joyce
6  grant account for?
7  A.  Yeah, it's significant.  And usually I can commute --
8  compute on the fly, but I'm feeling a little fuzzy.  So, you
9  know -- you know, about a quarter.
10 Q.  My math says you're right.  In fact, what is the Joyce
11 grant permitted, by its terms, to be used on?
12 A.  Right.  It can be used for any of our democracy work.  It
13 can be used for -- for working with underserved voters who
14 maybe have language needs or disability challenges or youth.
15 It can be used for public education.  It can be used for
16 improving voting rights and voting access, voter education.  So
17 it can be used for a wide range of issues, as well as our fair
18 district's work.
19 Q.  In fact, what did you spend it on in 2018?
20 A.  We spent a large portion of our Joyce grant in 2018 on
21 redistricting and fair districting reform.
22 Q.  How long has the League been receiving the Joyce grant?
23 A.  Since 2006.
24 Q.  Has it been typically about the same amount?
25 A.  It's about the same.  I think it's down a little.

1  Q.  Over the years, what proportion of it has been used on

2  trying to achieve fair districts?

3  A.  So most years we've had to divert funds from our other core

4  democracy issues in the Joyce -- from the Joyce Foundation to

5  work on fair districts.

6  Q.  And the Joyce grant itself, what does that typically --

7  what proportion of it is typically used on fair district's

8  work?

9  A.  Those years when we've diverted funds, it's been a large

10 majority of the dollars.

11 Q.  Can you please describe whatever types of projects the

12 League engaged in in the past year to accomplish redistricting

13 reform?

14 A.  Sure.  We had our speakers bureau, which is where

15 volunteers speak to community groups across the state, PTAs,

16 churches, you know, rotaries.  We also collected petitions for

17 Issue 1 -- well, before it was Issue 1, we collected petitions,

18 so we negotiated at the General Assembly and then worked to get

19 Issue 1 passed.

20 Q.  If the League didn't have to use or divert the Joyce grant

21 to try to achieve fair districts, what would these funds go

22 towards?

23 A.  Again, it would go towards our more transformative efforts

24 within our mission, really engaging everyday Ohioans in the

25 process, so that includes demystifying government, how

1    government works, what even different roles are.  We find that

2    the general public likes to learn about the different roles.

3    What does the Secretary of State do?  What does -- what do

4    judges do, which is our Judicial Votes Count program.

5         So we would be doing a lot of different kinds of

6    transformative work, again, working with Girl Scouts, working

7    with college kids and high school kids and underserved voters.

8    And not just getting them registered but getting them excited

9    about it, getting them informed, showing them how they can

10   decide who they want to vote for.  We never tell them who.  And

11   then going even beyond that to, you know, what are these folks'

12   jobs once they're in office and how can you lobby them.

13            MS. LEVENSON:  I would like to approach the witness,

14   please, Judge, with another exhibit.  This is Plaintiffs'

15   Exhibit 359, also marked as Defendants' 38.

16            JUDGE BLACK:  Very well.

17            MS. LEVENSON:  Thank you, Judge.

18            THE WITNESS:  Thank you.

19   Q.  Ms. Miller, I've just handed you Plaintiffs' Exhibit 359

20   for identification.  Do you recognize this document?

21   A.  I do.

22   Q.  What is it?

23   A.  This is our Ohio Redistricting Transparency Report.  It's

24   The Elephant in the Room, and it really highlights how not

25   transparent the process was in 2011.  It talks about the secret

 1  bunker and goes through the very -- the egregious process that

 2  really made it difficult for the public to have any input or

 3  even knowledge of what was going on in the mapmaking process.

 4  Q.  Thank you.

 5          MS. LEVENSON:  Before we go further with it, may I

 6  move the Court to enter it into evidence?

 7          JUDGE BLACK:  Yes.  So moved.  Objections?

 8          MR. VOIGT:  No objection, Your Honor.

 9          JUDGE BLACK:  It's admitted.

10     (Plaintiffs' Exhibit 359 was admitted.)

11          MS. LEVENSON:  Thank you.

12  Q.  Ms. Miller, can you explain briefly what the purpose was

13  when this report was made?

14  A.  Yes.  So it became clear as we were participating in the

15  redistricting process in 2011 that this was an unfair process

16  and that the public and good governance groups like ours had no

17  real ability to influence the outcome of the maps and to ensure

18  that they were truly neutral.  It became clear that this was --

19  that there was a partisan intent, and so the purpose of this

20  report was to have the documents requests, to -- and to really

21  produce the research to show that.

22          JUDGE BLACK:  The defendants' counsel is up on his

23  feet.

24          MR. VOIGT:  Objection.  Unfair characterization.  Lack

25  of personal knowledge.

```
 1          JUDGE BLACK:  Very well.  The record will reflect the
 2   objection.
 3   Q.  Can you please explain the financial and other efforts that
 4   the League expended in making this report.
 5   A.  Absolutely.  So, you know, we needed to do a lot of
 6   research.  You know, a records request can take a long time.
 7   We had a contractor that we hired -- Jim Slagle -- to do those
 8   records requests, to do that research.  Simply because
 9   everything had happened behind closed doors, we needed to have
10   a better understanding of what was going on.  So it was quite
11   intensive.
12   Q.  What was your source of funding for the Elephant in the
13   Room report?
14   A.  The Joyce Foundation.
15   Q.  I have Defendants' Exhibit 48, and, if I could handle two
16   at the same time for efficiency, defendant's' 46.  May I please
17   present them both to the witness and approach her?
18          JUDGE BLACK:  Yes.
19          MS. LEVENSON:  Thank you, Judge.
20          THE WITNESS:  Thank you.
21   Q.  Ms. Miller, first looking at the Ohio Redistricting
22   Competition Rules, exhibit marked Defendant's 48 for
23   identification.  Do you recognize it?
24   A.  Yes.
25   Q.  Briefly, what is it?
```

1   A.   These are the rules for the OCAR competition, which is the

2   Ohio Campaign for Accountable Redistricting.   And this is where

3   we had a competition in 2011 where everyday Ohioans -- and they

4   didn't actually have to live in Ohio -- could submit maps.   And

5   the goal was really severalfold, but the main point was to help

6   everyone understand that we could create neutral, objective,

7   measurable goals, and then we could create a map based on those

8   that would be fair.

9   Q.   And relatedly, I handed you another exhibit, 48, for

10  identification, Defendants' Exhibit 48 -- excuse me, 46, for

11  identification, which is a -- appears to be a PowerPoint

12  presentation.   Have you seen that before?

13  A.   Yes.

14  Q.   Can you tell us very briefly what that is.

15  A.   This is the PowerPoint about the OCAR mapmaking contest in

16  2011.

17  Q.   Thank you.

18         MS. LEVENSON:   Judge, I move both exhibits into

19  evidence.

20         JUDGE BLACK:   Any objection?

21         MR. VOIGT:   No objection, Your Honor.

22         JUDGE BLACK:   They're admitted.

23      (Plaintiffs' Exhibits 46 and 48 were admitted.)

24         MS. LEVENSON:   Thank you.

25  Q.   Ms. Miller, you've spoken briefly about this project.   Can

1  you tell us the efforts that went into it?

2  A.  Absolutely.  This was a very intensive effort, but I'm

3  going to back up this a little bit.  This project really

4  started in 2009.  It was the brainchild of former Republican

5  Ohio Senator Joan Lawrence, and she recruited her friend Vern

6  Sykes, who is a political scientist out of Kent State

7  University and a Democrat in the General Assembly, and they

8  worked together to really pilot this concept of creating a map

9  in 2009 based on neutral criteria.  That was run out of the

10  Secretary of State's office.  That was Jennifer Brunner at the

11  time.

12      We used the lessons learned there in the 2011 mapmaking

13  process.  And -- I'm sorry, the map competition, and so we just

14  really improved that.  But the mapmaking contest in 2011 was

15  run out of the League of Women Voters, you know, organization

16  in partnership with Ohio Citizen Action.  Super intensive.

17      We also had a number of volunteer academics who were

18  helping us think about, you know, which data should be used or

19  how -- how the metrics should be designed, so super intensive,

20  and it was most of our Joyce Foundation money.

21  Q.  Thank you.  Ms. Miller, you've testified earlier that the

22  League brought this lawsuit for two reasons.  One was a

23  diversion of the League's resources and the other is the impact

24  on its members.  So turning to that, what knowledge do you have

25  as to how individual league members, those who are Democrats,

1    fare under the map?

2    A.  Absolutely.  So we have democrats in all 16 congressional

3    districts, and they are not -- faring well.  Their votes are

4    either wasted or they are weakened because they're either in

5    packed or cracked districts.

6          MR. VOIGT:  Objection.  Lay testimony on an expert

7    issue.

8          JUDGE BLACK:  Very well.

9    Q.  What do you mean by "packed or cracked districts"?

10   A.  Right.  So packed and cracked.  So packed means putting as

11   many of the minority voters into one district so that it

12   overwhelmingly goes Democratic, and then, of course, cracked

13   means taking some Democratic voters and putting them into a

14   significantly majority party district so that their votes

15   really -- it doesn't matter how many of those Democrats would

16   show up, it's not going to really swing the election.

17         MR. VOIGT:  The same objection.

18         JUDGE BLACK:  Very well.

19   Q.  Can you name any members, in particular, who have been

20   harmed in this way?

21   A.  Yeah.  I -- yeah, absolutely.  In fact, we have five of our

22   members here today -- well, five members participating in this

23   lawsuit either testifying or as plaintiffs, individual

24   plaintiffs.

25   Q.  Can you name them?

```
 1   A.  I might -- I bet you I'll remember many of them.  So, of
 2   course, we Chitra; we have John, who I had lunch with; Connie.
 3   Let me see, there's a few more.  I'm just not remembering them
 4   all right now.
 5   Q.  Okay.  It would be helpful --
 6           JUDGE BLACK:  Excuse me.  Yes, sir.
 7           MR. VOIGT:  Yeah, Your Honor.  Lack of personal
 8   knowledge.  If the other witnesses could speak to their own
 9   personal experiences.
10           JUDGE BLACK:  Objection's noted.  Executive director
11   is doing fine.
12       Please proceed.
13           MS. LEVENSON:  Okay.  The executive director is going
14   to establish foundation for her knowledge of who her members
15   who are bringing this lawsuit.
16   Q.  I believe you testified that you can't quite remember and
17   also we can use some last names.  Would it refresh your memory
18   of all the first and last names if I were to hand you the
19   caption from this lawsuit?
20   A.  Great.  Thanks.  Yes.
21           MS. LEVENSON:  Again, permission to approach.
22           JUDGE BLACK:  Yes.  Thank you.
23   A.  Oh, I think I remember.  Beth Hutton and Griffiths, yeah.
24   Q.  Okay.  We need the last names too.
25   A.  Okay.  All right.  Do the whole thing.
```

1    Q.  Please take a look.

2    A.  All right.  And we also have a lot of member-- I just will

3    say we have a lot of members here in this courtroom as well.

4        So John Griffiths --

5    Q.  I'm afraid I'm going to have to ask you to testify from

6    your own knowledge.  So after you've refreshed your memory, if

7    you could just lie it down, and if that isn't good enough, then

8    you can pick it up and we can do it again.

9    A.  Okay.

10   Q.  Okay.  What are the names of the members who are plaintiffs

11   or witnesses in this lawsuit?

12   A.  So Mark John Griffiths, John Fitzpatrick, Connie Rubin,

13   Beth Hutton and Chitra Walker.

14   Q.  A+.

15   A.  Thank you.

16           MS. LEVENSON:  Would you like to see the document I

17   used to refresh her memory?

18           MR. VOIGT:  No, that's fine.

19           MS. LEVENSON:  Thank you.

20   Q.  Ms. Miller, what relief is the League requesting from the

21   Court?

22   A.  A fair map by 2020.

23           MS. LEVENSON:  Thank you.

24       No further questions.  Stay there.

25           THE WITNESS:  Yep, I'm staying.

1          JUDGE BLACK:  The counsel for the defendants has an

2     opportunity to ask questions.  It's called cross-examination.

3          THE WITNESS:  Thank you.

4          MR. VOIGT:  May it please the Court, Steven Voigt on

5     behalf of the defendants.

6                         CROSS-EXAMINATION

7     BY MR. VOIGT:

8     Q.  Good morning, Ms. Miller.

9     A.  Hi.  I think it's afternoon, Mr. Voigt.

10    Q.  You're correct.  Time flies.

11    A.  It does.

12    Q.  Prior to suing in this litigation, the Ohio league -- I

13    guess I'll just use the same terminology that Ms. Levenson

14    used, the League.  Prior to suing, the League did not notify

15    its members that it would sue; is that correct?

16    A.  We did not notify members that we would sue, that's

17    correct.  We did -- we have been in regular communication with

18    our members since, and they are thrilled.  I hear nothing but

19    positive response from our members.

20    Q.  Have you spoken with each and every member of the league to

21    ask their personal opinion of this lawsuit?

22    A.  I have not spoken to every single member of our 2800

23    members, but, again, I've done an extensive listening tour.

24    I've been all over the state.  Most of those visits, if not

25    all, I think even all of those visits were after we filed the

1   lawsuit, and so it's been a topic of that discussion.  We also

2   have all-member calls where we've discussed the lawsuit in

3   great detail, including having Ms. Levenson join.

4   Q.  During your direct you mentioned a concern that Congressman

5   Stivers and Congressman Jordan did not appear for a particular

6   candidate forum.  Do you recall?

7   A.  Oh, yes.  It's very common and it's not just those two and

8   it's not just one time.

9   Q.  Okay.  Let's start with Congressman Stivers.  So did the

10  League specifically invite Congressman Stivers to appear?

11  A.  Oh, yes, including offering multiple dates and starting

12  very far in advance, and the Congressman didn't even return

13  those phone calls or e-mails.

14  Q.  Did you ask the Congressman whether he had a conflict?

15  A.  So, again, that's why you started really far out and you

16  offer multiple dates, so that if there is a conflict, that the

17  League would do anything it could to work around that conflict.

18  But you can't ask if the individual doesn't even feel as though

19  they need to return the phone call.

20  Q.  Well, you don't know -- I mean, you never --

21  A.  The individual did not return the phone call.  So I

22  can't -- we cannot ask a question if they're not -- if they

23  don't even feel as though they need to respond.

24  Q.  Well, did you ever ask Representative Stivers why he did

25  not attend the forum?

1    A.   So, again, it's not one forum, it's been multiple forums,

2    and multiple dates provided for each of those forums, and he

3    has not responded or attended.

4    Q.   Okay.  And so the answer -- again, the question is did you

5    ever ask Representative Stivers why he did not attend the

6    particular fora, I guess, that the League handled -- that the

7    League put together?

8    A.   First, I want you to compliment you on fora.  I didn't know

9    that that was a plural of forum.  I would say we have not been

10   able to ask that question, but if someone is worried about

11   winning their election, they're going to take the opportunity

12   to present their side to constituents.

13   Q.   Okay.  And, that's speculation on your part.  But you did

14   not -- really all I'm asking you is, did you ask Representative

15   Stivers why he did not attend the fora?

16   A.   Right.  And I'm saying he did not return our phone calls,

17   so we have to speculate.  But it makes common sense that if you

18   know that the districts are going to go your way, that you

19   don't need to show in front of the public.

20   Q.   Okay.  And so the answer is no, you did not ask?

21   A.   I guess that's what my answer is.

22   Q.   Okay.  And so Representative Jordan, did you ask

23   Representative Jordan why he did not attend the fora?

24   A.   The same -- the same scenario.  Multiple times, multiple

25   elections, forward -- you know, working far out to try to deal

JENNIFER MILLER - CROSS

```
 1  with scheduling.  The same challenge and almost identical and
 2  also -- and many other congressional districts too.
 3  Q.  And you know that congressmen and women are very busy.  In
 4  fact, we had a congresswoman testify --
 5            JUDGE BLACK:  Questions for the witness.  Questions
 6  for the witness.
 7            MR. VOIGT:  Yes, Your Honor.
 8  Q.  So you do not know whether Congressman Jordan had a
 9  conflict?
10  A.  Again, when we offer multiple dates, that's to do
11  everything we can to avoid the conflict.  And we start in
12  advance, and we say -- we even, in these messages and these
13  e-mails, we ask for time frames that might work better, and
14  with absolutely no cooperative response on the other side.
15  Q.  Okay.  Is attending a town hall the only way a
16  congressperson can be responsive to their constituents?
17  A.  Of course not.  But what we're saying is, one of the things
18  the League wants to do is allow voters to hear from the
19  candidates directly.  So, for example, our Vote411.org, which
20  is our non-partisan voter guide, we don't edit those responses
21  at all, because it's our job to make that possible that
22  constituents can hear directly from candidates or voters can
23  hear directly from candidates.  It is really important that
24  voters hear from congressional candidates, not in the moments
25  of their comfort, which is a rally or a forum that they've
```

JENNIFER MILLER - CROSS

```
 1   planned, but actually an equal playing field with the
 2   individual -- you know, with the individual or individuals
 3   they're running against also there.
 4   Q.  Does the League publish a voter guide?
 5   A.  Yes.
 6   Q.  Is it true that the League's voter guide is an effective
 7   tool for voter education?
 8   A.  We absolutely hope so.  We have been running this voter
 9   guide -- actually, I think it started in 1920, but it was in
10   the 1920s in Ohio.  It's now a celebrated part of every
11   league's efforts across the country, and we really pride
12   ourselves in making that voter guide accessible and fair.
13   Q.  And you talked a little bit earlier about your volunteers.
14   Is it true that the League, compared with other organizations
15   in Ohio, has a lot of volunteers who participate in the
16   election process?
17   A.  Yeah.  I mean, the League has always had volunteers.  They
18   are our lifeblood.
19   Q.  And is it your opinion that the League is one of the most
20   effective non-partisan organizations in Ohio in encouraging
21   participation in the political process?
22   A.  Absolutely.  I would caveat, though, that efforts at
23   dealing with confusing and unfair maps makes it hard to do that
24   work as well as we could.
25   Q.  Is the League's membership roll higher today than it was
```

1  ten years ago?

2  A.  You know, you asked me this in the deposition.  I don't

3  have our membership numbers in front of us.  We've had a recent

4  little bump, but we are not at the height of our membership.

5          MR. VOIGT:  Could we pull up D49, please.

6  Q.  And I'm just showing this just to you, Ms. Miller, just to

7  perhaps refresh your recollection.  And if you could just read

8  just the first sentence, that's really all -- or the first

9  couple of sentences, that's all I need.

10  A.  "In recent months, interest in joining" --

11  Q.  Oh --

12  A.  Is that what you mean?

13  Q.  You didn't actually need to read it out loud.  You just

14  have to read it.

15  A.  Oh, yeah, because everyone can see it.  I forgot.  I

16  thought I was in the class.  Yes, Teacher Voigt.

17          Yeah.  Of course.

18  Q.  Okay.  So would that refresh your recollection that the

19  League's membership has increased in recent years?

20  A.  Your question was about ten years ago, and I am not sure

21  about that, because our highest membership, I think, was

22  probably in the '90s.  We are not at the highest membership

23  we've ever been.  We have had a recent bump, an increase in

24  membership.

25  Q.  I see.  Okay.  So it's fair to say that in the last couple

1   of years that the League's membership has been increasing?

2   A.  Yes.

3   Q.  Okay.  Is it true that the members of the League are not

4   required to agree with the League's position on all public

5   policy issues?

6   A.  Of course it is.  Again, though, everything about the

7   League is debate and dialogue, and so it's very clear where our

8   members stand on things.

9   Q.  Is it true that the members of the League do not need to

10   agree with the League's position with respect to congressional

11   district lines?

12   A.  That's true.  However, our members overwhelmingly support

13   our gerrymandering work, our antigerrymanderring work as

14   evidenced in the votes that have come from the floor at our

15   biennial convention, at evidenced in all the work that we did

16   in Issue 1, and as evidenced in the participation that we're

17   seeing here in the courtroom from our members.  Our members

18   support this work.

19   Q.  And the League supported Issue 1; is that correct?

20   A.  Yes.

21   Q.  Do you agree that the League's members by and large are

22   politically enthusiastic?

23   A.  Well, we are the League of Women Voters of Ohio, so I would

24   say, yes, enthusiastic about democracy.

25   Q.  Has the League ever surveyed its members to ascertain

1    whether they agree with the League's position with respect to

2    Ohio's congressional district lines?

3    A.  So I think the question survey is an interesting question,

4    because I think you're meaning did we send out a form, yes, no,

5    that kind of thing.

6    Q.  Yes, ma'am.

7    A.  So we do send out questionnaires to local leagues when

8    we're doing our strategic planning and to our members when we

9    do strategic planning in that in recent years they've said that

10   our redistricting work, overwhelmingly, number one answer has

11   said that our redistricting work is most important.  And then,

12   in addition, our organization is set up for continual feedback

13   from our members and continual direction by our members as

14   evidenced in how, for example, our biennial conventions run,

15   which is -- there's entire plenary sessions that are designed

16   to bring issues to the floor and the members to vote on them.

17   In fact, in 2017, ending congressional gerrymandering was the

18   number one issue that arose from that.

19   Q.  Okay.  And so what you're saying is something was sent out

20   to the members and they returned it?

21   A.  I'm saying multi -- actually, I'm sorry.  I'm saying we do

22   so many different things that it -- you couldn't just call it

23   one thing.  So one piece, during strategic plans, we sent out

24   to all of our members and to our local leagues:  Hey, how are

25   we doing?  What should the League do?  What are you most proud

JENNIFER MILLER - CROSS

 1  of?  Those questions -- and I actually did that survey myself.

 2  Q.  Yeah.

 3  A.  Those questions, the number one answer in that

 4  questionnaire, before our most strategic -- our most recent

 5  strategic planning session was gerrymandering.  We're so proud

 6  of it; we think it's important.  So that's one piece.

 7      Other pieces, before each convention there is a very

 8  intensive process called program planning where we get input

 9  from local leagues on the issues and priorities that we need,

10  and those -- for example, for this convention -- were just due.

11  And the board reviews all of those and that's how we help

12  structure our convention.

13      And then, third, at the convention itself, these priorities

14  come to the floor.  So in 2017, during program planning, which

15  is preconvention, and the 2017 convention, fighting against

16  congressional gerrymandering was the top priority for our

17  members.

18  Q.  And the paper that you mentioned that you sent out to

19  members and you said that the -- I think, and I may be

20  mischaracterizing what you said, but you said the number one

21  response was gerrymandering?

22  A.  Yeah.  So the question -- so it was a survey.

23  Q.  Right.

24  A.  So that was the first thing we talked about and it was

25  before the strategic plan.  It was like a Survey Monkey.  It

 1   was an online survey.

 2   Q.  Right.

 3   A.  And one of the questions was what do you think is our most

 4   important work and what are you most proud of.  For both of

 5   those questions we had strong response -- they were open-ended

 6   and we had strong, strong responses about our redistricting

 7   work.

 8   Q.  Okay.  Did all of the members respond?

 9   A.  No.

10   Q.  Okay.  What percentage of the members responded?

11   A.  I don't have that on top of me.

12   Q.  And what percentage of the members had a different

13   priority, other than what you've described as gerrymandering?

14   A.  I don't have that in front of me, but I will, again, just

15   say it was the number one answer.  And that's not the end of

16   the conversation.  We have all of these ways that we get

17   feedback and then engage with our members.

18   Q.  Are you aware of any document that you produced in this

19   litigation describing that?

20   A.  Nope, I don't -- I don't know.  I mean, we have a couple

21   binders, I think, so I don't know.

22   Q.  Are the League's concerns with Ohio's congressional maps

23   today the same as the concerns that it had in 2011?

24   A.  Far more -- we are far more concerned.  So in 2011 we were

25   concerned that it would cement in this partisan advantage of

1  12-4, and what we have seen is that those results have been

2  durable across the election cycles.

3  Q.  You talked a little bit about how you view elections as --

4  congressional elections as preordained or predetermined.  Do

5  you recall?

6  A.  Yes, sir.

7  Q.  And so it's -- it's your view that elections in Ohio are --

8  congressional district elections in Ohio are preordained?

9  A.  Yes, sir.

10  Q.  Okay.  You would also agree, however, that Get Out the Vote

11  is important to winning elections; is that correct?

12  A.  Sure.

13  Q.  Is it true that the positions of the candidate are also

14  important when it comes to winning elections?

15  A.  When it comes to congressional districts in Ohio, the

16  positions of the candidate and the Get Out the Vote" campaigns

17  really don't matter because of the way the map is drawn.

18  Q.  Okay.  So it's your opinion that the position of a

19  candidate in a congressional election does not matter?

20  A.  What we have seen is that these results are durable

21  regardless of how much turnout there is or what the candidate

22  says or does.

23  Q.  Okay.  With all due respect, I'm just -- I'm trying to get

24  an answer to this question.

25      So is it your position that a -- the positions of the

1    candidates who are running in congressional elections are not

2    important when it comes to the outcome of the election?

3    A.   In terms of the congressional district map, the -- and this

4    transparency report has a lot of that in there as well.  There

5    was an intention to create a 12-4 map, and that has been

6    secure, and that's why we're here, because democracy means that

7    there -- that districts should be responsive to voters'

8    concerns, that districts should be responsive to voter turnout,

9    that candidates should have to really work on their messaging

10   to ensure that it's reaching the constituents.  But what is

11   happening here is there is a map that has guaranteed this

12   partisan advantage, that continues to guarantee that partisan

13   advantage, and until we get a different map, these other issues

14   don't -- aren't going to be more than a blip on the radar

15   screen.

16   Q.   Okay.  And when you talk about intent, the intent of the

17   map, that's just your personal opinion?

18   A.   No.  We had -- we did a whole bunch of documents requests

19   and those documents requests showed the intent.

20        MR. VOIGT:  Okay.  And I move to strike that, those

21   answers, because it's lack of personal knowledge.

22        JUDGE BLACK:  Objection is noted.

23   Q.   Ms. Miller, I'll just ask it one more time and then I'll

24   move on, but I would just like to know if your particular

25   viewpoint is that the positions of congressional district

1  candidates matter in winning elections.

2  A.  I think that they absolutely matter in winning elections,

3  but in Ohio the map matters more.

4  Q.  Is it true that a candidate's personal history can also

5  affect whether people vote for him or her?

6  A.  Absolutely, and the map matters more.

7  Q.  Is it true that fundraising is also an important part of an

8  effective campaign for office?

9  A.  Yes, and a gerrymandered map matters more.

10  Q.  Is it true from your experience that incumbents sometimes

11  have an advantage over challengers?

12  A.  Yes, sometimes that is true.

13  Q.  Is it fair to say that sometimes individuals may vote for

14  Republicans, but also vote for Democrats on the same ballot?

15  A.  Sure.

16  Q.  And is it true that a person's political opinions are not

17  necessarily defined by simply looking at his or her party

18  affiliation?

19  A.  Sure.

20  Q.  When Ms. Levenson asked you some questions about your

21  viewpoint related to the fairness of the maps and you provided

22  some answers about why you believe the maps are unfair, when

23  considering how the League hopes to have districts in the

24  future, assuming you would win this lawsuit, does the League

25  want congressional districts that are evenly split 50 percent

1    of the voters being Republican and 50 percent of the voters

2    being Democrat?

3    A.   No.

4    Q.   Is that what you mean by fairness?

5    A.   No.  There's many characteristics of fairness.  Of course,

6    first and foremost, let's keep communities, counties as whole

7    as possible.  Of course, let's make them more responsive, as we

8    just went through that litany of questions.

9         This map is not responsive to those other areas like

10   fundraising and the candidate's history.  So we want to see

11   them be more responsive, more competitive.  There's a number of

12   measures.  But what's most important is we want a map that is

13   drawn on neutral criteria, not by design to guarantee a

14   partisan advantage.

15   Q.   Okay.  Well, is the percentage of Republican voter -- is

16   the percentage of individuals who identify themselves as

17   Republicans and the percentage of individuals who identify

18   themselves as Democrats relevant to your consideration of what

19   is a fair district?

20   A.   I think it's relevant, but there is many measures that need

21   to be balanced together.

22   Q.   Okay.  So because you feel it's relevant, would a five

23   percent difference between Republicans and Democrats in any

24   district be too high, in your opinion?

25        MS. LEVENSON:  Objection to relevance.

```
 1              JUDGE BLACK:  Objection's noted.  Please answer the
 2    question.
 3              THE WITNESS:  Please answer the question?  Okay.
 4    A.  I would say that's a, really, hypothetical.  You know as
 5    well as I do that we would need to look at the maps and at the
 6    data to decide if that makes sense or not.  I'm not going to
 7    sit here and answer hypothetical questions.
 8    Q.  Okay.  Well, is a ten percent difference between
 9    Republicans and Democrats too high?
10    A.  I need more data than that.
11    Q.  Okay.  So is it true that the League has not identified any
12    specific percentage difference between Republicans and
13    Democrats in congressional districts that it views as too high?
14    A.  What's true is that we see multiple priorities need to be
15    balanced together, and what is also true is we are very
16    supportive of the remedial map.
17    Q.  So you can't identify the League -- sitting here as the
18    representative for the League, you're not able to identify the
19    percentage difference between Republicans and Democrats in a
20    district that the League views as unacceptable?
21              MS. LEVENSON:  Continuing objection to the line of
22    questions as to what the League's view is as to what is
23    acceptable.
24              JUDGE BLACK:  Very well.
25              MR. VOIGT:  I will note, Your Honor, she testified as
```

```
 1   the 30(b)(6) representative.
 2           JUDGE BLACK:  Very well.  She can answer the question.
 3           THE WITNESS:  Okay.  Thank you.
 4           JUDGE BLACK:  We're going to deal with the objections.
 5   Don't you worry.
 6           THE WITNESS:  Thank you, Your Honor.
 7   A.  I want to say that there is not one measure in a vacuum
 8   that we will stand up and hold like that.  So we don't have any
 9   data.  I don't have any -- I have nothing in front of me.
10   You're just picking something out of thin air, and we do not
11   have arbitrary numbers behind what we stand on.  We look at all
12   of the data together.  And, actually, the OCAR competition
13   should be something that, I think, helps explain that where we
14   were looking at several different neutral measures and then
15   seeing how these maps performed.  And so it took a lot of data
16   and a lot of analysis to look at fairness.
17       I'm not going to give you an easy answer here, because it's
18   not an easy answer.  In a vacuum, I can't answer that question.
19   Q.  Okay.  So you can't give me a percentage?
20   A.  No, sir.
21   Q.  Is it true that the League has never quantified the extra
22   time that is purportedly required to encourage voting based on
23   what you've described as voter apathy related to the
24   congressional district lines?
25   A.  I think it's fair.
```

1    Q.  Aside from the OCAR competition that you referred to, has

2    the League ever quantified any costs associated with

3    encouraging voting based on what you've described as voting

4    apathy based on the congressional district lines?

5    A.  We spend a lot of our Joyce grant working on

6    gerrymandering, but, no, not specifically that voter apathy

7    piece, no.

8    Q.  Do you agree that voter apathy can exist for many reasons?

9    A.  Absolutely.  But what matters here is that some reasons for

10   voter apathy should be completely avoided.  And a map that is

11   designed to guarantee a 12-4 outcome is not a justifiable

12   reason for voter apathy, and it's not an appropriate way that

13   the government should run.

14           MR. VOIGT:  Your Honor, if I could just put a

15   continuing objection on to the intent of the drawers.

16           JUDGE BLACK:  Very well.

17           MR. VOIGT:  Thank you.

18           JUDGE BLACK:  Keep asking the questions.

19           MR. VOIGT:  Thank you.

20   Q.  Has the League in any way quantified that voter apathy

21   exists in Ohio based on the congressional lines as opposed to

22   some other reason?

23   A.  Voters are so frustrated about the congressional lines.  I

24   don't know what you mean by "quantified."

25   Q.  Have you ever -- quantified.  Have you ever run the

1   numbers, done a study?

2   A.   So my job is actually to review studies, so Pew Research or

3   Akron Bliss Center or Brennan Center, all those.  But my job

4   is -- the League does not typically run those kinds of studies

5   ourselves.

6   Q.   And so the League has not?

7   A.   No, sir.

8   Q.   Thank you.  In last fall's election, did Republicans win

9   the majority of statewide offices?

10  A.   Yes.

11  Q.   And also in last fall's election, Sherrod Brown, who is a

12  Democrat, also won; is that right?

13  A.   Yes.

14  Q.   So is it fair to say that some individuals may vote for

15  Republicans on the same ballot as they vote for a Democrat?

16  A.   Yes.

17  Q.   Because Senator Brown won in an election when so many

18  Republicans won, isn't it true that winning elections involves

19  a lot more than just looking at a candidate's party

20  affiliation?

21  A.   That is true, but with this congressional map, the party

22  affiliation is shown to be durable.  Those outcomes are shown

23  to be durable.  We have a 12-4 map that continues to be that,

24  regardless as to what happens with voter turnout.

25  Q.   Is it true that the League has not polled its members about

1  how they have voted in congressional elections?

2  A.  That's true.

3  Q.  Has the League polled its members to determine whether they

4  have voted in congressional elections?

5  A.  Our members vote in congressional elections.  This is what

6  we do.  We're elections people.  We're voting evangelists.

7  This is what we do.

8  Q.  Okay.

9  A.  A poll would be unnecessary.

10  Q.  So despite the lines as they exist, your members continue

11  to vote?

12  A.  Oh, yes.

13  Q.  And I objected to something earlier, but earlier you

14  mentioned vote dilution.  You weren't saying that a vote is not

15  physically tabulated when you referred to that; right?

16  A.  Correct.

17  Q.  Okay.

18  A.  What I'm saying is that it doesn't have this -- votes do

19  not have the same weight in an egregiously partisan

20  gerrymandered map.

21  Q.  Okay.  I have my continuing objection to that.

22     I just wanted to clarify that you weren't saying that votes

23  aren't count -- that someone is not actually taking a vote and

24  not recording it.

25     Was voter education a key part of the League's mission

1    prior to 2011?

2    A.   Voter education was our mission in May 1920.

3    Q.   Has voter education about a voter's residential district

4    been a key part of the League's mission since before 2011?

5    A.   Absolutely.

6    Q.   And so fair to say that individuals have probably been

7    calling the League and asking about where they -- in which

8    district they reside since before 2011?

9    A.   Yes, but it is far more complicated than it needs to be

10   because of how these confusing lines are drawn.  And so it does

11   take a lot more time and it does create a lot more confusion

12   than is necessary if we were keeping counties and communities

13   as whole as possible.

14   Q.   Did the League make a public records request in 2011

15   related to redistricting?

16   A.   Yes.  It's for the Elephant in the Room report.  We made

17   several.

18   Q.   And is the League relying on documents from those public

19   records requests to support its claims?

20   A.   Yes.

21   Q.   Are you familiar with an individual named Ms. Ann Henkener?

22   A.   Yes.

23   Q.   Is she a longstanding volunteer with the League?

24   A.   Yes.

25   Q.   Are you aware that Ms. Henkener testified that ten to 15

```
 1    boxes of documents were produced in response to the public
 2    records requests?
 3    A.  I was not.
 4           MR. VOIGT:  Can we put Henkener 22 up on the screen,
 5    please.
 6    Q.  I'll represent to you that this is a page from Ms.
 7    Henkener's deposition.  And --
 8           MR. VOIGT:  Well, actually, can you put up the prior
 9    page and then this page, because it spills over from the --
10    yeah.
11    Q.  Okay.  So at the very bottom she's saying, "Jim would know
12    much better than I know how many boxes there were.  There were,
13    I don't know, ten, 15."
14           MR. VOIGT:  And then can you move it up a little bit.
15    Q.  "That's absolutely a guess."
16       Do you have any reason to disagree with what Ms. Henkener
17    testified to?
18    A.  No.  She's saying it's a guess, and I trust that she's
19    doing her best to guess correctly.
20    Q.  Do you personally know how many boxes were produced in
21    response to the public records request?
22    A.  No, sir.
23    Q.  Do you have any guess as to the number?
24    A.  No.  I see that we have a guess of ten to 15.
25    Q.  Okay.  The League didn't produce all ten to 15 boxes of
```

1  documents in this litigation; is that correct?

2  A.  I don't know.

3  Q.  Why don't you know?

4  A.  I am going to be honest with you that I don't know

5  everything that you have and where all that came from.  When

6  the discovery -- let me just explain how the discovery process

7  worked in terms of the documents.

8     Our lawyers gave a list of key terms to our staff.  When

9  this was happening, these documents requests were being

10 fulfilled, I was actually traveling on my listening tour and

11 talking to our members across the state.  And so I was not in

12 the office, but I know that we did our due diligence to comply

13 with those search terms.  The lawyers from the ACLU spent a lot

14 of time in our office, Ann Henkener was there, and so we

15 produced what we were told to produce.  Some of those boxes we

16 just may not have them anymore.  We did just move in December.

17 Q.  Where would the documents be if you don't have them?

18 A.  We might have -- probably shredded them.

19 Q.  Could they be at an entity called the Ohio Citizen Action

20 offices?

21 A.  They were our partner in this research.  Yes, they could

22 be.

23     MR. VOIGT:  Could we put up Slagle 28, please.

24 Q.  This is a -- this is a page from Mr. Slagle's deposition,

25 and he was talking about the documents that were received

```
 1   through the public records request.  And toward the bottom of
 2   the page there's a question:
 3       "After the Ohio Redistricting Transparency Report was
 4   finished, what happened to the documents?"
 5       And then he answered, "The documents remained at Ohio
 6   Citizen Action."
 7       Do you see that?
 8   A.  Yeah.
 9       And to clarify as to why that would be is because, even
10   though we hired Jim and he reported to Ann, he -- we didn't
11   have room in our office, so he worked out of the Ohio Citizen
12   Action office.  And they have been -- Catherine Turcer,
13   T-u-r-c-e-r, has been our long-term partner.  So it doesn't
14   surprise me that those documents could be at Ohio Citizen
15   Action.
16   Q.  Are you aware that Ms. Henkener testified that she brought
17   a couple of boxes from Ohio Citizen Action from those -- from
18   that office over to the League's office?
19   A.  I was not aware that she testified to that.
20   Q.  What efforts did you undertake to look for all of the
21   documents -- all of the boxes, the ten to 15 boxes of documents
22   that you received from public records requests in 2011?
23   A.  So first off, I think we should mention that I don't know
24   what size boxes these are.  Right?  Are they banana boxes?  Are
25   they the little boxes you get at Kinko's?  You know, what are
```

JENNIFER MILLER - CROSS

1    they?

2        But I will say a couple of things.  First, we had our

3    lawyers in our space.  They went through all of our physical

4    files, they went through all of our computer files, and we did

5    our due diligence to deliver to you what we had that had to do

6    with redistricting.

7    Q.  Okay.  And for the boxes that you did not produce, that you

8    obtained in 2011, can you tell the Court whether those boxes of

9    public record documents support or hurt your case?

10   A.  I can't -- well, again, I haven't seen these boxes.  I

11   don't know -- obviously, they wouldn't have just continued to

12   be individual boxes.  They would have -- a lot of this would

13   have gone into our files, so I don't -- I don't have any way of

14   responding to that question.

15   Q.  Do you know why Ms. Henkener only chose two boxes to take

16   to the League's offices?

17   A.  Probably were the most helpful ones.  We have a -- we have

18   a -- I don't know.

19   Q.  And so it's possible the other boxes may not have been

20   helpful to your case?

21   A.  You know, when you do these records requests, a lot of

22   times there's a lot of innocuous -- nothing really in there.

23   It's a lot of -- you know, you're looking for things.  And a

24   lot of e-mails, you know, are -- you know, especially like all

25   the forms.  So then you have -- it turns into a very long

```
 1    e-mail list or things like that, but it doesn't have any

 2    substance.  My assumption would be that these items didn't have

 3    much substance, that she took the pieces of substance.

 4         (Defendant's counsel confer privately.)

 5    Q.  But in responding to --

 6              JUDGE BLACK:  Is this a discovery dispute?

 7              MR. VOIGT:  Your Honor, it relates to our -- the

 8    significant issue in this case, which is the fact that the

 9    documents, many of the documents at issue and the witnesses and

10    the relevant events that transpired occurred in 2011.  Many of

11    those documents are now gone and, in fact, now we have learned

12    that numerous boxes that once existed --

13              JUDGE BLACK:  Is this a discovery dispute?

14              MR. VOIGT:  No, Your Honor.  It goes to the substance

15    of the case.

16              JUDGE BLACK:  I'm sure you'll get to it.  You may

17    proceed.

18    BY MR. VOIGT:

19    Q.  In responding to a -- in responding to a litigation request

20    to produce documents that are responsive to what the defendants

21    have asked the plaintiffs to produce, do you believe that it's

22    your authority to decide what is substantive or appropriate to

23    produce?

24    A.  No.  We gave full access to the lawyers to do the search,

25    and they took everything of substance or everything within
```

```
 1    that -- that -- those search terms.
 2            MR. STRACH:  Your Honor, if I may, it goes to our
 3    laches defense, so that's part of the case.
 4            MR. VOIGT:  I was -- I said that in different words.
 5            JUDGE BLACK:  Good thing he's here, huh?
 6       (Laughter.)
 7            JUDGE BLACK:  Are you done?
 8            MR. VOIGT:  Yes, Your Honor.
 9            JUDGE BLACK:  Questions from the intervenors --
10            MR. TUCKER:  Yes, Your Honor.
11            JUDGE BLACK:  -- that are not duplicative?
12            MR. TUCKER:  They will not be, Your Honor.
13            JUDGE BLACK:  Very well.
14                          CROSS-EXAMINATION
15    BY MR. TUCKER:
16    Q.  Good afternoon, Ms. Miller.  I'm Rob Tucker.  We met at
17    your deposition.  I represent the intervenors --
18            JUDGE BLACK:  You're going to need to keep your voice
19    up and slow down.
20    Q.  I represent the intervenors in this case.  You testified
21    earlier that the map drawing process lacked transparency.  Do
22    you recall that?
23    A.  Yes.
24    Q.  And you further testified that part of that lack of
25    transparency is that the League didn't have access to the data
```

 1    that the Ohio legislature was considering when drawing the map.

 2    Do you recall that?

 3    A.  Right.

 4    Q.  When you were referring to the Ohio legislature not having

 5    the -- or the League not having access to the data that the

 6    Ohio legislature was considering, were you referring to the

 7    Republicans or the Democrats or both?

 8    A.  Well, when I said the Ohio legislature, I met the

 9    Republicans, because they were the ones running the show.  They

10    are in power.

11    Q.  Well, are you aware that the Democrats in the Ohio

12    legislature had political data that they were using during the

13    redistricting process?

14    A.  So the point is we should have a conversation about what

15    political data is used, and then when maps are released, we

16    should know what political data they're based on, and neither

17    of those were the case, and so -- in the 2011 process.

18    Q.  But were you aware that the Democrats in the Ohio

19    legislature likewise had political data that they were using

20    and considering during the redistricting process?

21    A.  I'm not sure it matters.  What matters is that the folks

22    who were in power, and we need to know what assumptions they're

23    using, what data they're using, why they're using that data.

24    This is the kind of transparency and good governance that

25    should go along with any decision, especially one as important

 1    as drawing a congressional map.

 2            JUDGE WATSON:  It seems to me that these questions

 3    should elicit a yes or a no response.

 4            MR. TUCKER:  Thank you, Your Honor.

 5    Q.  It's a simple question.  Were you aware or was the League

 6    aware that the Democrats in the Ohio legislature also had

 7    political data that they were using during the political

 8    process?

 9    A.  Yes, but that wasn't my complaint.

10    Q.  And are you aware that the Democrats had a political index

11    specifically called the LWV Partisan Index?

12    A.  No.  But, again, that's not my complaint.

13    Q.  But you were not aware of that?

14    A.  I don't think so, no.

15    Q.  And it's common that the League is sometimes also referred

16    to by the letters LWV; is that correct?

17    A.  Correct.

18    Q.  And you're aware whether the Democrats in the Ohio

19    legislature were relying upon this LWV Partisan Index in

20    evaluating maps during the 2011 redistricting process?

21    A.  Not that I know of.

22    Q.  You talked a little bit earlier about certain members of

23    Congress not participating in candidate forums.  Do you recall

24    that?

25    A.  Yes.

1   Q.  Now, your organization is not the only organization that
2   puts on candidate forums; correct?
3   A.  We're one of the foremost.  We do more than -- than most.
4   We're probably one of the only organizations that does them in
5   all 16 congressional districts.
6   Q.  But you're not the only organization in the state that puts
7   on bipartisan or non-partisan candidate forums, are you?
8   A.  Correct, but there are many communities where if the League
9   doesn't do it, it doesn't happen.
10  Q.  All right.  So some of these Republican members that you
11  suggested didn't attend or haven't attended your forums, they
12  could have attended forums put on by other organizations;
13  correct?
14  A.  In many of those instances those communities never heard
15  from those candidates except for in their predetermined -- you
16  know, like the -- on their turf, you know, so their Republican
17  campaign events.
18  Q.  Well, are you aware of whether Representative Stivers
19  participated in any bipartisan forums in the 2018 election?
20  A.  He may have, but there are communities that I know he
21  didn't hit because he didn't do the League's.
22  Q.  Which communities do you believe he did not hit?
23  A.  One, for example, would be Athens.
24  Q.  You're saying he didn't hit Athens.
25  A.  What's that?

1  Q.  Your testimony is that he did not hit Athens?

2  A.  I do not believe he did Athens.

3  Q.  Are you aware that Representative Stivers testified in this

4  case that he participated in a bipartisan forum at Ohio

5  University?

6  A.  Oh, I do remember this now.  Thank you for correcting my

7  memory.  Actually, that was after he was getting flak for not

8  attending the League forum, I'm pretty sure.

9  Q.  Are you aware of any other bipartisan or non-partisan

10  forums that Representative Stivers participated in in the 2018

11  election?

12  A.  Not off the top of my head.

13  Q.  Are you aware of whether he participated in one in

14  Columbus?

15  A.  Not off the top of my head.

16  Q.  You're not aware that he participated in one at the city

17  Metropolitan Club in Columbus then?

18  A.  Again, not off the top of my head.

19  Q.  Now, you also testified about the public's lack of

20  involvement in the map-drawing process in 2011.  Do you recall

21  that?

22  A.  Yes, sir.

23  Q.  And you mentioned about the OCAR map-drawing competition

24  that your organization helped sponsor; correct?

25  A.  Yes, sir.

1    Q.  And that was a way for the public to participate in the

2    process; wasn't it?

3    A.  Well, not necessarily.  It was a way of participating in a

4    mapmaking process.  It was not a way of participating in the

5    mapmaking process by the folks in power who were ultimately

6    going to adopt the map.

7    Q.  That competition was headed up by Mr. Jim Slagle; correct?

8    A.  It was actually -- it's to -- the League of Women Voters

9    hired Jim Slagle.  Ann Henkener oversaw Jim Slagle.

10   Q.  Are you aware that Mr. Slagle was communicating with

11   Democrats in the Ohio legislature about using one or more of

12   the OCAR competition maps to submit as a potential map in the

13   General Assembly?

14   A.  We did -- we were hoping that we could use -- we would find

15   some good maps based on neutral criteria that would be adopted

16   by the legislature.  And so it does not -- it is not surprising

17   to me that we were lobbying legislators to try to get them to

18   take some of our OCAR maps.  But that's different than the

19   legislature saying, Yes, we want to consider OCAR maps.  That

20   didn't occur.  But we did work with individual legislators to

21   bring forth possible maps.

22   Q.  And there were certain OCAR competition maps that were also

23   submitted to Republicans in the legislature; weren't there?

24   A.  Right.  So, again, that would have worked by just Lobbying

25   101; right?  So we would have taken our maps to different

```
1   legislators, and if they were interested in introducing one, we
2   would have asked them to do that.  But I don't know the
3   specifics in terms of which Republicans or which Democrats or
4   any of those issues.
5   Q.  Now, you testified earlier that many of your members' votes
6   in the 2018 election were wasted.  Do you recall that?
7   A.  Uh-huh.
8   Q.  And I'm assuming these votes that you're referring to were
9   votes for Democratic candidates when that Democratic candidate
10  did not win?
11  A.  Right.  Well, not just not win, but what I -- we were
12  talking about how we have really two pieces of standing, and
13  one is on behalf of our Democratic members and how this map
14  really does unfairly weaken the weight associated with Democrat
15  votes.
16  Q.  Is it likely that some of these same Democratic members
17  also voted for the Democratic candidate for the statewide
18  offices in 2018?
19  A.  I would think so.
20  Q.  So if that particular member also voted for the Democratic
21  candidate for governor, for example, would that vote have been
22  wasted?
23  A.  Well, that's a situation where every vote has equal weight.
24  In this map, what we see is not every vote has equal weight,
25  and so that's an apple and an orange.
```

1   Q.  The same would be true if somebody voted for the Democratic

2   candidate for attorney general, would their vote be wasted?

3   A.  Apple and orange.  We're comparing two different systems

4   here?

5   Q.  So you don't consider those votes wasted.

6   A.  Correct.

7   Q.  Only the votes for the losing congressional candidates are

8   wasted?

9   A.  No.  I'm saying Democrats who vote in congressional races,

10  their votes are wasted either way.  They're either wasted

11  because they're in a packed district or they're wasted because

12  they're in a cracked district.

13  Q.  So according to you, all Democratic votes in the state of

14  Ohio are wasted, because they're either in a packed or cracked

15  district; correct?

16  A.  For congressional districts we see that this map unfairly

17  weights Republican votes more than Democrat votes.  We see it

18  in the results.  It's not my claim.

19          MR. TUCKER:  Thank you.  No further questions.

20          JUDGE BLACK:  Very well.

21      Redirect, if any.

22          MS. LEVENSON:  No.  Thank you, Judge.

23          JUDGE BLACK:  Ms. Miller, you may step down.  Thank

24  you.

25          THE WITNESS:  Thank you.

```
 1        (Witness excused.)

 2             JUDGE BLACK:  Ladies and gentlemen, we're going to

 3   take a midafternoon break.  3:05.  We'll be back in session at

 4   3:20.

 5        The Court prepares to recess.

 6             COURTROOM DEPUTY:  All rise.  This court is in recess

 7   until 3:20.

 8        (Recess taken:  3:06 PM -  3:21 PM.)

 9             JUDGE BLACK:  Please be seated.  We're back on the

10   record.  We've had our midafternoon break.  We hope to break at

11   5:00.

12        Does the plaintiff have another witness to call at this

13   time?

14             MS. BONHAM:  Yes, Your Honor.  We'll call -- I'm

15   sorry.  Is it on?

16             JUDGE BLACK:  If the witness would be willing to

17   approach.  Go ahead.

18             MS. BONHAM:  Okay.  We'll call John Fitzpatrick.

19             JUDGE BLACK:  Turn that one on, too, while you're

20   there.  If you'd pause and raise your right hand for the oath.

21   Do you solemnly swear or affirm that your testimony today will

22   be the truth, subject to penalty of perjury?

23             THE WITNESS:  I do.

24             JUDGE BLACK:  Thank you.  You know the seat tips back.

25             THE WITNESS:  Yes.  Thank you.
```

1              JOHN FITZPATRICK

2    a witness herein, having been first sworn, testified as follows:

3                DIRECT EXAMINATION

4    BY MS. BONHAM:

5    Q.  Is this mike on?  Yeah.

6        Can you please state and spell your name for the record?

7    A.  My name is John Fitzpatrick.  J-o-h-n

8    F-i-t-z-p-a-t-r-i-c-k.

9    Q.  What do you do for a living, Mr. Fitzpatrick?

10   A.  I'm an IT manager at the Sherwin-Williams Company.

11   Q.  And how long have you had that job?

12   A.  I am in my fourth week.

13   Q.  Okay.  So what did you do before that?

14   A.  I was an IT manager at the Goodyear Tire and Rubber Company

15   previous eight years.

16   Q.  Okay.  And where do you work?  Where is the

17   Sherwin-Williams location?

18   A.  It is in downtown Cleveland.

19   Q.  What about the Goodyear tire location from your past job?

20   A.  They are located in east Akron.

21   Q.  Okay.  What's your educational background?

22   A.  I have an MBA from Kent State University, I got my

23   undergraduate degree in advertising from there as well, and I

24   have a master's from Eastern Michigan.

25   Q.  So do you practice in those fields now?

```
 1   A.   I'm a manager, so I guess I use the MBA.

 2   Q.   Okay.  What's your main field that you practice?

 3   A.   I work in information technology.

 4   Q.   Okay.  Where did you grow up, Mr. Fitzpatrick?

 5   A.   I grew up in Elyria, Ohio.

 6   Q.   And where do you live now?

 7   A.   I currently reside in Stow, Ohio.

 8   Q.   Where about is Stow?

 9   A.   It is just north of Akron, maybe ten minutes from downtown

10   Akron.

11   Q.   Can you give me your street address there?

12   A.   Yes.  It's 3536 Homewood, which is all one word, Avenue.

13   Q.   Okay.  And what county is that in?

14   A.   That is in the county of Summit.

15   Q.   Do you know what U.S. congressional district the Homewood

16   Avenue address is in?

17   A.   I am in the Ohio 14th.

18   Q.   And who is your U.S. congressional representative there?

19   A.   David Joyce.

20   Q.   What party is David Joyce?

21   A.   David Joyce is a Republican.

22   Q.   Are you registered with a political party?

23   A.   I am.  I am a registered Democrat.

24   Q.   Okay.  And why are you here today?

25   A.   I am here, first, as a concerned citizen and active member
```

```
 1   of the League of Women Voters and someone who lives in a
 2   neighborhood that's been cleaved off to another district that
 3   is predominantly Republican.
 4   Q.   And in what capacity are you testifying?
 5   A.   Mostly as a concerned citizen and a member of the League of
 6   Women Voters, and someone who, you know, spends a lot of effort
 7   on getting people out to vote, educating them about voting.
 8   Q.   So when you say "the League of Women Voters," is that the
 9   League of Women Voters of Ohio?
10   A.   I'm a member of the local League of Women Voters of the
11   Akron area.  There are a couple league clubs in Summit County.
12   The Akron club is the one that's closest to where I reside, and
13   since I spend most of my time in Akron, it's the most logical
14   club for me to participate in.
15   Q.   Okay.  And so just to be clear, if you are a League of
16   Women Voters of the Akron area, are you also a member, then, of
17   the state chapter, or how does that work?
18   A.   Yes.  Since I'm a dues-paying member of the local club, a
19   portion of my dues goes towards the state and national
20   organizations as well.
21   Q.   Okay.  And you said that you identify with the Akron area.
22   Why is that?
23   A.   It's where my wife and I spend most of our time.  It's
24   where we recreate.  It's where I'm involved in the community.
25   I'm on a non-profit arts board that's based in Akron.  It's
```

1    just -- it's where we live.

2    Q.  When did you get involved with the League?

3    A.  I have been involved with the local chapter for three

4    years.

5    Q.  Okay.  And what's your role with the League?

6    A.  I am the club treasurer.

7    Q.  Okay.  What do you do as the club treasurer?

8    A.  In addition to general board responsibilities, I maintain

9    the books.  I pay all the bills, I keep track of memberships as

10   they renew, I submit our dues to the state and national

11   organizations, and I participate in programs as a board member

12   as they come up.

13   Q.  Why did you get involved with the League in the first

14   place?

15   A.  My wife was involved, and she thought it would be a good

16   idea for us to do this together.  And I was also looking to get

17   more involved in my community and make a difference in -- in

18   how we all live in Akron and Summit County.

19   Q.  And what does the League do that you care about?

20   A.  Well, as it's been stated, they're a non-partisan

21   organization committed to -- so the League is a non-partisan

22   organization that is dedicated towards voter rights and voter

23   education.

24   Q.  And these are things that you identify with, is your

25   testimony?

1  A.   These are things that are important to me, yes.

2  Q.   So what do you do outside of your duties as treasurer, if

3  anything, with the League, in general?

4  A.   Sure.  I help support the programs that they do, whether it

5  be candidate nights or putting out the voter guide or putting

6  on programs about issues and candidates, and like we did a

7  really informative program a couple of months ago about what we

8  learned from the last election.  We've done things on local

9  issues relating to the Cuyahoga River, for example, that would

10  help facilitate.  I also, as we went through the process for

11  gathering signatures, participated in several educational

12  sessions about the issue of gerrymandering and how to gather

13  valid petitions.

14  Q.   When you talk about gathering petitions with the League,

15  can you tell us specifically what was that a part of?

16  A.   Sure.  That was part of -- ultimately became the effort of

17  Issue 1, and, you know, we spent the better part of the last

18  couple of years going about and educating people about

19  gerrymandering and how to gather effective signatures to get it

20  on the ballot.

21  Q.   Where did you do most of that work?

22  A.   I did most of it in the Akron area.  You know, we get

23  everything from churches, where we held our monthly meetings at

24  the behest of the church, to people's living rooms, just a

25  little bit north of Akron to, you know, other non-profit

```
 1   organizations who wanted to educate their members about the
 2   issue.
 3   Q.  I'd like to ask you, personally, are you registered to vote
 4   if Ohio?
 5   A.  I am.
 6   Q.  When did you first register here?
 7   A.  I registered as soon as I was able to, I believe, in 1987.
 8   Q.  How often do you vote?
 9   A.  I vote, with a possible few exceptions, every chance I get.
10   Q.  You do?  Why do you vote so often?
11   A.  It's important to participate in our democracy.  I think we
12   get what we earn in terms of our elected representatives, and
13   if we're not willing to put ourselves out there and vote and
14   support ideas we believe in, we don't get the democracy that we
15   deserve.
16   Q.  So earlier you testified that although the League is a
17   non-partisan organization, you personally identify as a
18   Democrat; is that right?
19   A.  That is correct.
20   Q.  How long have you been a Democrat?
21   A.  Pretty much since high school.
22   Q.  And what does that mean to you to be a Democrat?
23   A.  They are the party most closely allied with my values of
24   social justice, fair taxes, affordable healthcare and some
25   other issues.
```

1   Q.  Did that mean that you always vote Democrat in every

2   election?

3   A.  No.  I have voted for Republicans in the past.  Most

4   recently, you attend some of the Meet the Candidates nights,

5   and there are local judgeships and other local offices where I

6   think the Republican does do a better job, so I voted for those

7   folks.

8   Q.  So for local office.  What about for federal office, do you

9   always vote Democrat?

10  A.  I pretty consistently vote Democratic on the federal level.

11  Q.  And what about for United States Congress:  Have you ever

12  voted non-Democrat for United States Congress?

13  A.  Not that I can recall.

14  Q.  I'd like to ask my colleague to put up what's been labeled

15  Plaintiffs' Demonstrative 12.  Do you recognize this?

16  A.  I do.

17  Q.  What is it?

18  A.  It is a map of northeast Ohio with my residence underneath

19  the blue pin.

20  Q.  Okay.  That blue thumbtack --

21          MS. BONHAM:  Stephen, can we zoom in on it?

22  Q.  Okay.  So that blue thumbtack represents your home?

23  A.  Yes.

24  Q.  So you testified that your current representative is David

25  Joyce, a Republican.  In the most recent congressional

```
 1   election, 2018, did you vote for Mr. Joyce?

 2   A.   I did not.   I voted for Betty Rader -- Betsy Rader.

 3   Q.   Okay.   And what party is Betsy Rader?

 4   A.   She is a Democrat.

 5   Q.   What about in 2016:   Do you remember who you voted for?

 6   A.   I also voted for the Democrat.

 7   Q.   And what about 2014?

 8   A.   Also for the Democrat.

 9   Q.   And in 2012?

10   A.   Pretty sure I voted for the Democrat.

11   Q.   Did you do anything else besides voting to support these

12   particular candidates in any of these elections?

13   A.   I contributed to Ms. Rader's campaign.

14   Q.   Okay.   Anything else?

15   A.   In those elections for the congressional district, no.   I

16   certainly, you know, am always talking to my friends and

17   colleagues about politics and the like, so there's a lot of

18   informal conversations that go on in order to encourage people

19   to get out and vote and sometimes vote in the way I want them

20   to.   But in those elections it was mostly financial.   I have

21   participated in other presidential elections where I've

22   canvassed and done some phone banking.

23   Q.   So you said you contributed to the Rader campaign.   What

24   about Betsy Rader made you want to elect her over David Joyce?

25   A.   A couple things.   I had the good fortune of meeting her for
```

1    probably a year before the election.  I had a very nice

2    conversation.  I think our -- what was important to her in

3    terms, again, you know, protecting healthcare, having a fair

4    tax rate, and some of those things, we were in alignment on.

5    And just as the campaign went on, I think I -- she more closely

6    reflected my values.

7    Q.  And are there issues that Congressman Joyce does not

8    represent you on?

9    A.  There are many.

10   Q.  Can you give me an example?

11   A.  Sure.  I wasn't particularly fond of the stance he took

12   during the recent shutdown.  I'm not a big fan of some of his

13   trade policies nor his stance on immigration.  Nor on

14   healthcare.

15   Q.  And these are issues that are important to you?

16   A.  Yes.

17   Q.  Do you claim that you're entitled to a candidate who does

18   represent you on these issues?

19   A.  Certainly not.  I would -- I'm not entitled to a candidate

20   that necessarily agrees with me on all of the issues or even

21   any of the issues, but nor do I think that I should be -- live

22   in a district where the candidate's almost guaranteed not to

23   share some of the views of the issues that are important to me.

24   Q.  So earlier you said that you identify with the community in

25   Akron.  Does Congressman Joyce represent that community?

```
1    A.  As you can kind of see on the map, there's a little sliver

2    of northern Summit County that is part of his district.  It's

3    not my opinion that he necessarily represents the view of

4    Summit County or certainly not Akron.  A lot of his policies I

5    think are probably detrimental to our area.  And I think he's

6    much more focused on the rest of his district where a many

7    number of his voters reside.

8    Q.  So what does your congressperson do or not do to indicate

9    that to you?

10   A.  It's in -- it's reflected in the statements that he makes

11   and the votes that he takes.  He just reflects the conservative

12   nature of the rest of the district outside of Summit County

13   anyways.

14   Q.  Does your congressman -- do you interact with him?

15   A.  I've never personally interacted with him.  I have called

16   his office on more than a few occasions to express an opinion

17   and there have been a couple of times where I have gotten a

18   call from his office back.

19   Q.  Do you see your congressman in your area?

20   A.  I do not.

21   Q.  Ever?

22   A.  Not that I recall, no.

23   Q.  And why do you think that is?

24   A.  I honestly don't think it's in his interest to do so.  We

25   are obviously at the edge of the district.  Again, the -- my
```

1 community does not necessarily have the same issues and value

2 the same things as the rest of the district does.  So it's

3 really not in his self-interest to come and appear in my

4 community.

5 Q.  So you testified a few minutes ago that you have, beyond

6 voting, done some other work to support Democratic candidates.

7 Can you be specific about what that's been?

8 A.  Sure.  I've, like I said, done quite a few things with the

9 League in terms of supporting their programs, a lot of work

10 around speaking to groups about Issue 1.  I spent a good amount

11 of time at that.  Working to educate voters.  Like I said, in

12 some -- in addition to financial contributions to the

13 candidates I support, I've also gone out and canvassed and

14 encouraged others to do so, and vote.

15     And I tried to be an active participant in our democracy.

16 Like I said, I've called David Joyce, I've called other folks

17 that are elected representatives in order to make my voice

18 heard.

19 Q.  So can you describe in detail -- one of the things you've

20 stated you've done is some work around the petitions for the

21 League's fair elections campaign.  Can you describe in detail

22 what you've done there?

23 A.  I certainly can.  I think I did at least about a half dozen

24 events where we went out and spoke and went in great detail

25 about the history of gerrymandering, how the issue presents

1    itself in Ohio, some of the concerns about it.  We talked about

2    packing, we talked about cracking, we talked about, you know,

3    wasted votes, which is essentially anything that is more than

4    the margin that you require to win.  So there are certainly

5    wasted votes in heavily Democratic areas, too.  Right?  If

6    you're getting an 80 percent margin of victory, 30 percent of

7    that is a wasted vote.

8        So we really talked about a lot about the issue as well as

9    how to go out and gather valid petitions in order to get it on

10   the ballot most recently.  And again, all of these efforts kind

11   of rolled into Issue 1.

12       Like I stated earlier, we did these in people's living

13   rooms, in churches.  We did something with Restore, which is

14   just south of Akron, which is affiliated with Habitat for

15   Humanity and kind of was part of their educational services for

16   the constituencies they service.

17   Q.  How much of your time as a League member would you estimate

18   you spent on this kind of activity?

19   A.  I would say, you know, right up until the runup probably at

20   a year and a half previous to Issue 1 passing it was the

21   primary activity of our League.  We certainly, you know, did

22   other things as well.  But we spent, gosh, 80 percent of our

23   time doing that, just off the top of my head, really focusing

24   on that.

25   Q.  And why were you in the League doing this work around the

1  fair maps issue?

2  A.  I think it's important.  I know in conversations that I've

3  had not only in registering voters but with just League board

4  members -- I was in a meeting this weekend where there were

5  four of us who met at a library, none of us traveled more than

6  ten minutes, and we had three different congresspeople

7  represent us in Congress.  I passed through three congressional

8  districts on my way in to work every day both when I worked at

9  Akron and now into Cleveland.  And in talking, again, not only

10 to people who are registering to voting but just talking to my

11 friends and neighbors, there's a lots of confusion as to,

12 number one, who represents them, and frustration with why

13 should I really get out and work to support a candidate that

14 really doesn't have much of a chance to win.

15     Another little anecdote here.  I was kind of refreshing

16 myself on what this map looked like this weekend, and I was

17 trying to look at different maps, and this map is really hard

18 to look at and make sense of when you get down to the granular

19 level.  I certainly know if I walk across the street from my

20 house I'm in a different congressional district, but it's a

21 little hard to tell how many I crossed when I was either

22 driving to Goodyear or to Sherwin.  So I used the congressional

23 house finder on the House of Representatives and I typed in my

24 zip code, and even there I got two choices.  So it's not even

25 sure which district I live in.

1  Q.  Has this confusion that you're discussing had an impact on

2  your work with the League or your work with Democratic

3  campaigns?

4  A.  Certainly.  It makes everything just that much harder.

5  People generally -- especially in Akron.  I mean, I know Summit

6  County is the best county in Ohio, but the fact that there's

7  four congressional districts in it I think gives it a little

8  bit of undue weight, and it's really confusing in Summit County

9  on who represents you.

10     I know before I got super-involved in my district, there

11  was more than a few times when I had to look it up because I

12  had a hard time just remembering exactly which district I was

13  in.

14  Q.  And the apathy that you discussed, too, this feeling that

15  people don't care, do you feel that that has an impact on the

16  work that you do with the League or with Democratic campaigns?

17  A.  Yeah.  I wouldn't necessarily call it apathy.  And, again,

18  these are my conversations with people as I get out in the

19  community and talk about these issues.  It's more frustration

20  with, Hey, we can get out and we can rally for Rader, but the

21  numbers and the way the district is drawn is so far weighted

22  the other way that our get out the votes efforts really don't

23  matter, and whatever her message is really kind of gets lost in

24  the fact of the sheer numbers and the demographics of the

25  district.

1    So it really leads to people, I think, not participating as

2    much in the system as they would otherwise.  They still

3    oftentimes come out and vote, but I don't know that they're

4    necessarily as passionate and encouraging others to vote.

5    Q.  And this idea that you've testified to that you live on the

6    edge of this district, that you're cracked in this district,

7    how has that impacted you as a voter?

8    A.  Personally it's frustrating, because really I -- and I'm

9    going to always continue to vote in these elections, and I'm

10    always going to encourage everyone I know to vote as well.  But

11    I know that by doing that I'm not going to influence my local

12    House seat, that just all our efforts are generally for naught,

13    and that has an influence.

14    I also think it has the effect of -- I mean, David Joyce is

15    a smart man.  He knows this.  There's no reason for him to

16    moderate hisself in order to even begin to appeal to my vote,

17    because, honestly, if there was a Republican in the House that

18    I thought would do a better job than the Democrat, I'd vote for

19    that person in a heartbeat.  But there's no reason in these

20    heavily gerrymandered districts for people to moderate at all,

21    to move towards the center, to try to reach out to the other

22    side, because the numbers don't make sense for that to have

23    happened.

24    MS. BONHAM:  I'm going to ask my colleague to put up a

25    second exhibit now, Plaintiffs' Demonstrative 13.

1   Q.  Have you seen this before?

2   A.  I have.

3   Q.  And what is it?

4   A.  It's an alternative proposed map for the reapportionment in

5   congressional districts in Ohio.

6   Q.  And where did you see it before?

7   A.  You showed it to me.

8   Q.  So this is a plaintiffs' proposed remedial map.  And can

9   you tell where your address is on this map?

10  A.  I certainly can.  Once again, I'm underneath the blue push

11  pin.  And even without the blue push pin, I can spot it easily

12  enough on the map.

13          MS. BONHAM:  Thanks, Mr. Fitzpatrick.  I have no

14  further questions.

15          THE WITNESS:  Thank you.

16                          CROSS-EXAMINATION

17  BY MS. McKNIGHT:

18  Q.  Good afternoon, Mr. Fitzpatrick.

19  A.  Good afternoon.

20  Q.  Can I start by asking you if you were active in

21  congressional campaigns in Ohio prior to 2011?

22  A.  No, I was not, because I lived in Michigan.

23  Q.  Now, I heard plaintiffs' counsel ask you a few questions

24  about voter apathy.

25  A.  Yes.

```
 1   Q.  I'd like to ask you if it's your opinion that voters in
 2   your area are apathetic about local elections.
 3   A.  It's my opinion, in having conversations, they're actually
 4   less apathetic about local elections.
 5   Q.  How so?
 6   A.  Well, it's not a big community, so oftentimes we know the
 7   local folks.  Right?  I know many of the people who serve in
 8   Summit County elections as well as serve in Stow.  So we see
 9   those folks, and I think there's greater connections to some of
10   those people.
11   Q.  So how do you measure apathy?
12   A.  I don't attempt to measure apathy.  In my humble opinion,
13   it's less about apathy and more about voter engagement.  Even
14   folks who are apathetic sometimes vote and engaged voters
15   sometimes do not.  So it's really about going out there and
16   feeling like you have a voice in democracy and that your
17   representative is encouraged and systematically encouraged to
18   engage with you and respond to their voting public.
19   Q.  And would you agree that there are different causes for
20   voter apathy?
21   A.  There certainly are, yes.
22   Q.  And sitting here today, you don't have a sense of how much
23   voter apathy in your district is due to redistricting and how
24   much is due to something else; right?
25   A.  It is certainly not something I can quantify.
```

1    Q.   And in this case do you remember attaching or completing a

2    declaration for your lawyers to support a brief in this case?

3    A.   Yes.

4    Q.   I'm going to have some questions for you about the content

5    of that declaration.  If at any time you need to look at it to

6    refresh your recollection, please let me know.

7    A.   Thank you.

8    Q.   I understood from that declaration that you believe that

9    the 2012 map burdens the League's mission by forcing it to

10   divert more resources than it otherwise would to support voter

11   engagement in fair elections; is that right?

12   A.   That is correct.

13   Q.   Okay.  And my question is, how much is diverted?

14   A.   Again, it's hard for me to quantify because I haven't done

15   a time study on how the League spends its activities, but I can

16   tell you anecdotally for a good 18 months it was our number one

17   priority, and it was the main focus of just about everything we

18   did at the local League level.

19        In addition to that, it makes your everyday activity --

20   again, registering voters is really complicated, compounded by

21   the fact that now Ohio is, you know, dropping people off the

22   voter rolls and that stuff.  So it's becoming increasingly more

23   complicated to, number one, making sure that people are

24   registered and then discovering and helping them find their way

25   to which congressional area they're in.

1  Q.  And I'm so sorry.  I don't mean to interrupt you.

2  A.  That's fine.

3  Q.  We are on a timed trial, and we've already been admonished

4  from the Court.  If your counsel would like to elicit any of

5  this testimony during their time, they are welcome to.  So

6  thank you for your answer.  I'm going to move on now.

7  A.  Certainly.

8  Q.  So to confirm, sitting here today you cannot quantify how

9  much of the League's resources have been diverted due to the

10  2012 map drawing; is that right?

11  A.  I could certainly take a stab.  I know that we are probably

12  spending 50 percent less time on it as a League than we were

13  prior to the passing of Issue 1.

14  Q.  Okay.  Let's get to Issue 1.  I had understood from your

15  first answer to my question that you couldn't necessarily

16  quantify it, but that you knew that you spent a lot of time on

17  Issue 1.  Is that right?

18  A.  Yes.

19  Q.  Okay.  And so on Ballot Issue 1, I understood that that

20  ballot issue was addressed at changing the process by which

21  maps were drawn in Ohio; is that right?

22  A.  That is correct.

23  Q.  In other words, the efforts in Ballot Issue 1 were not

24  directed at changing the 2011 map; is that right?

25  A.  That is correct.  It was to change the process going

1    forward.

2    Q.   So presumably, and correct me if I'm wrong, presumably even

3    if the League liked the resulting map in 2011, if it still

4    believed the process was flawed in the same way it believes

5    Ohio's process was flawed in 2011, it would have spent the same

6    amount of resources to change that process.  Isn't that right?

7    A.   I believe that to be the case.

8    Q.   Thank you.  Speaking of fund-raising, do I understand

9    correctly that it is your position that the way congressional

10   lines were drawn in 2011 makes it more difficult for the League

11   to fund-raise?

12   A.   I don't believe I've stated that.

13   Q.   Do you believe that the League's ability to fund-raise has

14   been harmed by the way the map was drawn in 2011?

15   A.   I would have no knowledge of that.

16   Q.   Do you know how much the League of Women Voters raised in

17   funds in 2018 in Ohio?

18   A.   I have no insight into that.

19   Q.   On another topic, responsiveness, I understand it is your

20   position that Representative Joyce is not responsive to you

21   because, in part, you have never seen him at a public forum

22   near you.  Is that right?

23   A.   To clarify -- and thank you for giving me the opportunity

24   to clarify this -- it's my position that he is not responsive

25   to my particular concerns and that of the people who are of

```
 1   similar mindset because it is not in his interest to be so.
 2   We, again, we are not his core constituency.  We are on the
 3   fringe of his district.  The things that I think my community
 4   cares about don't necessarily reflect it in the rest of the
 5   district, so it's really not in his -- it's really not in his
 6   interest to be responsive.  Not so much because he's not
 7   necessarily present, though he's not, but more so because it's
 8   just structurally designed for him not to have an interest.
 9   Q.  So have you ever had a discussion with Representative Joyce
10   about what is in his interest?
11   A.  I have not.
12   Q.  Okay.
13   A.  But I would love to, given the opportunity.
14   Q.  Let's get to that.  We have sworn testimony in the record
15   from plaintiff Beth Hutton that Representative Joyce attended a
16   League forum last year and spoke and answered questions.  Were
17   you aware of that?
18   A.  Now, which League forum was this?
19   Q.  Well, we can pull up the deposition testimony.  It's from
20   your fellow plaintiff, representative Beth -- I mean, pardon
21   me, Beth Hutton.  She testified that he attended a League forum
22   last year and spoke and answered question.
23       I believe your answer is you were not aware of that; is
24   that right?
25   A.  I was not aware of that.  And which League, local League
```

```
 1   was this?  There are several in Summit County.
 2              JUDGE BLACK:  Actually, she gets to ask the questions.
 3              THE WITNESS:  Okay.  Sorry.
 4   Q.  So understanding that, you did not know that that forum was
 5   going on --
 6   A.  Uh-huh.
 7   Q.  -- do I understand correctly you did not attend that forum
 8   with Representative Joyce hosted by the League of Women Voters
 9   last year?
10   A.  That would be correct.
11   Q.  Okay.  And have you ever invited Representative Joyce to a
12   public forum?
13   A.  I have personally not.  I know it is our standard practice
14   among our local club to represent (verbatim) all the
15   representatives that represent Summit County to our candidate
16   forums.
17   Q.  Well, going back to your declaration -- pardon me.  I see
18   in your declaration that it's your position that there is
19   nothing you can do to even move Representative Joyce's
20   positions from the right toward the center because he does not
21   feel any pressure from our voting base to keep his seat.  Does
22   that sound right?
23   A.  That sounds correct.
24   Q.  Okay.  Have you sought to build coalitions with moderate
25   Republicans and Democrats on issues of import you share?
```

1   A.   In my personal life, yes, I actually do.  I try to bring a

2   level of civility to political discourse, and I am interested

3   in what the other side has to offer and thinks about things.

4   Q.   That's rare, and I'm grateful to hear it.  We should all

5   work for that.

6      Let me ask, in your role as a member of the League of Women

7   Voters and as the treasurer in Akron, has the League in Akron

8   sought to build coalitions with moderate Republicans and

9   Democrats on issues of import you share?

10   A.   I believe that's in the mission of what we do.  We have,

11   you know, non-partisan candidate nights.  We have discussions

12   in which we invite members from both parties.  And as was

13   stated previous, if we don't get someone from both parties, we

14   generally don't have those discussions.  So we really do

15   encourage that type of discourse.

16   Q.   And to put a finer point on it, I understand you've had

17   conversations and dialogue.  Have you sought to build

18   coalitions across the aisle in order to move positions of

19   candidates in your district?

20   A.   I have not.

21   Q.   Do I understand correctly that you believe your vote is

22   diluted?

23   A.   Yes.

24   Q.   What does that mean to you?

25   A.   It means to me that the net impact of me voting in my House

```
 1    congressional district is non-consequential.  So whether I vote
 2    in it and pretty much all the Democrats who normally vote in my
 3    House district -- I think we saw this most recently where we
 4    had a very energized, passionate Democratic turnout this last
 5    time around -- it's not going to overturn the way the district
 6    is drawn in favor of the Republicans in that district.
 7    Q.  And you're not saying that your vote isn't actually
 8    counted; right?
 9    A.  I am certainly not stating that.  In fact, I have validated
10    that that indeed happened.
11    Q.  Well, now, at what point would you believe that your vote
12    was not diluted?
13    A.  When there's competitive districts, when candidates -- and
14    the districts are drawn to keep communities together and not
15    drawn strictly to get one member of a party -- whether it be a
16    Democrat or Republican -- elected from that district and
17    there's a marketplace of ideas and the people running have to
18    respond to their constituents' needs and opinions and thoughts
19    do I believe that we will have a fair map and a fair district.
20    Q.  So meaning could your chosen candidate always lose but your
21    vote still not be diluted?
22    A.  Certainly.  I think votes are diluted because of packing or
23    cracking.  Right?  As I stated earlier, if I was in a district
24    that was, you know, where my vote was packed instead of
25    cracked, my vote would still be wasted.  It's less about the
```

 1   outcome and more about voting efficiency, in my mind, that

 2   makes a fair map.

 3   Q.  And just so I understand your reference to wasted votes, is

 4   your vote always wasted if it's not the one that tips the

 5   ballot box?

 6   A.  No.

 7   Q.  Why not?

 8   A.  In my mind, the concept of wasted votes are a percentage.

 9   So in our state, you know, Sherrod Brown won by a good margin

10   and the Democrats lost the statewide races.  My vote was not

11   wasted in that case.  Right?  Because it wasn't designed in

12   such a way to minimize the impact of my vote by the state.  I

13   mean, we only have one state.  If you could make the case

14   that -- maybe I'm getting off track here, but wasted votes are

15   wasted votes because of the way the districts are drawn.

16   Q.  So do I understand that your belief of what is wasted and

17   not wasted is based on your understanding of the intent of the

18   map drawers?

19   A.  My concept of wasted votes has more to do with, number one,

20   intent.  But also if you aggregate, I think, across several

21   districts the -- how the representative balance is in

22   proportion to the votes that are cast, I think is where you

23   come with a large number of wasted votes.  Right?  Ohio is not

24   a 25 percent Democratic voting state, but we are 25 percent

25   representative by Democrat state.

1   Q.  Now, you don't believe that you have a constitutional right

2   to have a congressperson agree with you personally on every

3   issue; right?

4   A.  As stated before, I do not believe that to be the case.

5   Q.  I heard you earlier say you don't always vote for

6   Democratic candidates; right?

7   A.  Correct.

8   Q.  And you're not here to tell us today that someone who votes

9   for a Democrat in one election necessarily also votes for a

10  Democratic candidate in all elections; right?

11  A.  That is not necessarily true, correct.

12  Q.  So sometimes a Democratic voter could vote for a

13  Republican; right?

14  A.  Yes.

15  Q.  And vice versa; right?

16  A.  It's the exception, not the rule, but it can happen.

17  Q.  Have you done studies on it being an exception?

18  A.  I have not, but studies have been done.

19          JUDGE BLACK:  Excuse me?

20          MS. BONHAM:  Your Honor, I'd like to object to these

21  questions to the extent they call for expert testimony.

22          JUDGE BLACK:  Objection's noted.

23  Q.  Now, would you also agree that sometimes a Republican can

24  represent the interests of someone who voted for a Democrat?

25  A.  Certainly.  For example, I agree with Representative

```
 1    Joyce's stand on Great Lakes protections.  I think that's

 2    something everyone in this district shares.  So, yeah, the

 3    potential is certainly there.

 4           MS. McKNIGHT:  Thank you so much for your time today.

 5    I have no further questions.

 6           JUDGE BLACK:  Mr. Voigt?

 7           MR. VOIGT:  No questions from the defense, Your Honor.

 8           JUDGE BLACK:  Very well.

 9        Redirect?

10           MS. BONHAM:  Briefly, Your Honor.

11           JUDGE BLACK:  Umm-hmm.

12                         REDIRECT EXAMINATION

13    BY MS. BONHAM:

14    Q.  Mr. Fitzpatrick, are you testifying as an expert in this

15    case?

16    A.  I am not.

17           MS. BONHAM:  That's all, Your Honor.

18           JUDGE BLACK:  Very well.

19        Sir, you may step down.  Thank you.

20           THE WITNESS:  Thank you.

21        (Witness excused.)

22           JUDGE WATSON:  May we have more redirect like that.

23        (Laughter.)

24           JUDGE BLACK:  If any.  Who does the plaintiff call at

25    this time?
```

```
 1              MS. ZHANG:  Your Honors, this is Emily Zhang with the
 2   ACLU for the plaintiffs.  We'd like to call Dr. Douglas Burks.
 3              JUDGE BLACK:  If the Doctor would approach the stand.
 4      Would you raise your right hand for the oath.  Do you
 5   solemnly swear or affirm that your testimony will be the truth,
 6   subject to the penalty of perjury?
 7              THE WITNESS:  I affirm.
 8              JUDGE BLACK:  Very well.  You know about the chair;
 9   right?  It tips back.
10              THE WITNESS:  Okay.  So be careful?
11              JUDGE BLACK:  Exactly.  What kind of doctor are you?
12      Get used to it so you feel it tip back.
13              THE WITNESS:  Wow.  Okay.
14              JUDGE BLACK:  Now if you'd get close to that fancy
15   federal microphone.
16      You may proceed, counsel.
17              MS. ZHANG:  All right.
18                          DOUGLAS J. BURKS
19   a witness herein, having affirmed, testified as follows:
20                          DIRECT EXAMINATION
21   BY MS. ZHANG:
22   Q.  Dr. Burks, can you please state your full name and spell it
23   for the record.
24   A.  Douglas John Burks, B-u-r-k-s.
25   Q.  And how do you prefer to be addressed?
```

1    A.   I prefer to be addressed as either Douglas or Doug.   I am a

2    member of the Religious Society of Friends, and I do not prefer

3    to use titles.

4    Q.   What is your role in this lawsuit?

5    A.   I am a plaintiff.

6    Q.   And why are you bringing this lawsuit?

7    A.   I am bringing this lawsuit for two reasons.   I feel that

8    the district map in total for the state of Ohio is not a fair

9    map and that my individual district map is not in that -- go

10   ahead.

11   Q.   And why do you believe that the map isn't fair?

12   A.   I believe that it's not fair because it was drawn to

13   apportion districts based upon population upon party, so that

14   those who were drawing the map were drawing a map that would be

15   favorable for one party and unfavorable for the other party --

16   in this case, the Republicans making a map unfavorable for

17   other parties -- that in doing that, that that would dilute the

18   vote, making the vote of those in those other parties not as

19   effective, not to carry the full weight of their vote.

20   Q.   Let's take those in parts.   Let's start with your political

21   affiliation.   What party do you identify with?

22   A.   I identify with the Democratic party.

23   Q.   And why is that?

24   A.   The party's platform is more aligned with my view of role

25   of government and what I believe a good nation does.   So things

1  such as when we take a look at the nondiscretionary spending in

2  our budget, Social Security, Medicare, Medicaid, taking care of

3  individuals, when you take a look at medical care, providing

4  medical care that cannot afford it through private means,

5  private employment, that they have the basic medical care that

6  all individuals should have, that is social justice issues.  It

7  would include also government supplementing food, shelter for

8  those who cannot afford it.  Also, I like that they share views

9  towards the environment that I have.

10 Q.  How long have you identified as a Democrat?

11 A.  Since the election of Ronald Reagan.

12 Q.  Now I'd like to ask you about your congressional district.

13 What congressional district do you reside in?

14 A.  I reside in District 2.

15 Q.  And what's your address?

16 A.  4770 Ashland Avenue, Norwood, Ohio.

17 Q.  Have you voted in your district since the challenged map

18 was passed?

19 A.  Yes, each and every election.

20 Q.  And what party did you vote for in the congressional

21 elections?

22 A.  The Democratic party.

23 Q.  And which party's representatives won in those elections?

24 A.  The Republican candidate:  Brad Wenstrup.

25 Q.  Now I'd like to have you take a look at this demonstrative.

```
 1              MS. ZHANG:  Stephen, can you please pull up
 2   Plaintiffs' Demonstrative 001.
 3   Q.  Doug, can you start by describing the geographic area
 4   that's shown in this demonstrative.
 5   A.  Yes.  This is southwest Ohio where we are today.  It is
 6   predominantly looking at Hamilton County.
 7   Q.  And do you live in this geographic area?
 8   A.  Yes, I do.  You can see my residence in with the blue push
 9   pin.
10   Q.  What does the area that's shown in this demonstrative mean
11   to you?
12   A.  This is my community.  I live in Norwood, Ohio.  Norwood is
13   completely surrounded by the city of Cincinnati.  My community
14   really is that urban Cincinnati area.  Much of what I do is
15   within Cincinnati.  My Friends meeting is in Cincinnati.  The
16   charitable work that I do with the homeless I do in downtown
17   Cincinnati in Over-the-Rhine.  Where I go to get my cup of
18   coffee in the morning is over the line in Cincinnati right by
19   Xavier.  We participate fully in the entertainment, the arts,
20   and so that is my community.
21        The other thing is that that urban community shares
22   infrastructure, and so that whole area is based in the same
23   water and sewer district, and we share the same mass transit.
24   Q.  What congressional district does Hamilton County belong to?
25   A.  It belongs to two districts.  You can see, in the pink,
```

```
 1  District 1 and, in the green, District 2.
 2  Q.  And where do you live relative to the boundary between
 3  District 1 and District 2?
 4  A.  As you can see, I sit right on the boundary on the west
 5  side between District 1 and District 2.
 6  Q.  Now, how long have you lived at your current address?
 7  A.  I have lived at that address since 1979.
 8  Q.  And has your address always been in Congressional District
 9  2?
10  A.  No.  My address has been both in District 1 and in District
11  2 on some different occasions.
12  Q.  How do you make sense of the boundary that you see between
13  District 1 and District 2?
14  A.  It's interesting when you take a look at it.  District 2
15  starts in the north south corner, and as it goes into the
16  county, it doesn't go straight up.  It goes northwest.  And as
17  you get to that Norwood area, the line becomes very irregular.
18  It almost looks like a third grader drew it.
19  Q.  Now, based on your knowledge living in this area, what do
20  you know about the parts of Hamilton County that are in
21  District 2?
22  A.  Those areas, most of it, is a very Democratic area.
23  Q.  And what proportion of your district does this
24  demonstrative show?
25  A.  It shows a very small amount of my district.
```

```
 1              MS. ZHANG:  Let's take a look at another
 2   demonstrative.  Stephen, could we please pull up Plaintiffs'
 3   Demonstrative 002.
 4   Q.  Doug, can you tell the Court what this demonstrative shows?
 5   A.  This shows Hamilton County again in the upper left corner,
 6   and then as you go east, it shows the rest of District 2.  That
 7   encompasses several counties.
 8   Q.  Are there any differences between the part of District 2
 9   that's in Hamilton County and the parts of the district that
10   are in the other counties?
11   A.  As I have said, when you take a look at my residence,
12   Norwood is completely surrounded by the city of Cincinnati.  As
13   you're going into that northwest area, that area of the
14   district is urban, and so much of District 2 is urban or near
15   suburban.
16        As you go east, you start to go into suburban, exburb areas
17   and predominantly rural areas.
18   Q.  And based --
19   A.  Go ahead.
20   Q.  And based on your knowledge in your district, is there any
21   difference between the partisan makeup of your district that's
22   in Hamilton County and the parts that are in the other
23   counties?
24   A.  The predominant part of District 2 in Hamilton County is
25   Democratic.  As you go into the exburbs and into all of that
```

1    rural area, it is heavily, heavily Republican.

2    Q.  You testified earlier that you're claiming a vote dilution

3    injury.  I'd like to ask you a little more about this.  Is the

4    injury you're claiming connected with the way in which your

5    district is drawn and depicted in this demonstrative?

6    A.  Yes.  I believe that when you take a look at it and you

7    take a look at population in the different areas, that the map

8    clearly dilutes votes of individuals living in that Hamilton

9    County area.

10          MR. ERWIN:  Your Honor, I'm just going to object to

11   that as impermissible lay testimony.

12          JUDGE BLACK:  Noted.

13   A.  So when you take a look at it, it dilutes Democratic votes

14   in the very western part and that there is many more

15   Republicans in the rest of that district so it leads to a

16   dilution, and that that leads to a harm because votes of those

17   Democrats are not as effective, they don't count as much, and

18   it was determined by those who drew the map.  So I am being put

19   at a disadvantage in my vote by those who drew the map,

20   something that I think is unconstitutional.

21   Q.  Well, now, in your experience living and voting in District

22   2, what have you observed about the expectations of

23   congressional elections in your district?

24   A.  When you take a look at District 2 in the Hamilton County

25   area, I think the expectation is that a Democrat or a member of

 1   another political party other than the Republican party has

 2   little chance to win, that that dilution is large enough that,

 3   by how numbers have been distributed mathematically, it is not

 4   very probable, very low odds.

 5       I might use an analogy that some people in this area would

 6   recognize.  It would be about the chance of the Little Sisters

 7   of the Poor beating Ohio State Buckeyes in football.  They are

 8   long odds.

 9            MR. ERWIN:  I'm going to renew the objection, Your

10   Honor.  Thank you.

11            THE WITNESS:  Okay.

12            MS. ZHANG:  What was the basis of the objection?

13            MR. ERWIN:  He's giving impermissible lay testimony

14   and without you laying any foundation for what the numbers are

15   in any of these areas that he's saying has diluted his vote.

16            JUDGE BLACK:  You weren't objecting to the Little

17   People of the Poor?

18            MR. ERWIN:  I'm bowing down.

19   Q.  Now, we've talked a little bit about your voting under the

20   current map and I'd like to ask you about your political

21   activities more generally under the challenged map.

22   A.  Sure.

23   Q.  Doug, have you volunteered in any of the congressional

24   campaigns under the challenged map?

25   A.  Yes.  This past year I retired, and so I had time.  I

1    participated in Jill Schiller's campaign, and she was running

2    as a Democrat for District 2.

3    Q.   What did you do for Schiller's campaign?

4    A.   I did canvassing.

5    Q.   And what was --

6    A.   If you look at the map, you'll see my blue push pin in

7    Norwood.   And I canvassed in the area that is called Pleasant

8    Ridge, which is just north and east of Norwood, kind of right

9    in here.   Well, yeah, to the northeast there.   It's part of

10   Cincinnati.

11   Q.   And what was your experience canvassing for Schiller's

12   campaign like?

13   A.   It was frustrating.   When I talked to many people, you ask

14   them about what their concerns are.   Then you talk about -- I

15   talked about Jill and in what areas she supported their views.

16   And then you ask, "Are they going to vote?" and a number of

17   people said that they were not going to vote.

18          MR. ERWIN:   Objection to hearsay, Your Honor.

19          JUDGE BLACK:   Very well.

20   A.   And even if I asked, "Well, you seem to support Jill.

21   Would you put up a yard sign that we'll put up and we will

22   remove?" they said no.

23   Q.   Did you donate any money to Schiller's campaign?

24   A.   Yes, I did.

25   Q.   Was her campaign well funded?

1  A.  No, it was not.

2  Q.  Why?

3  A.  Jill did not have strong support at either the national or

4  state level.  The Democratic party put more money into other

5  campaigns, both in Ohio and nationally for Congress, because

6  they saw that as a no-win district.

7  Q.  And how did the Schiller campaign fare?

8  A.  They lost the election.

9  Q.  What was your understanding of the strategy of the campaign

10  in terms of getting out the vote?

11  A.  The strategy was very simple.  With the dilution, it was

12  going to be extremely difficult.  To win, the vote had to be

13  strong in Hamilton County.  Almost every Democrat in Hamilton

14  County would have to vote for Jill, and she would need more

15  support in those other areas and get some votes there.  But

16  that voter turnout was very important in Hamilton County for

17  Jill to win.

18  Q.  I would like to ask you about some other activities you may

19  have taken.  Have you engaged in any lobbying since 2012?

20  A.  Yes, I have.  I do lobby.

21  Q.  And do you lobby individually or do you lobby as a part of

22  a group?

23  A.  I lobby as part of a group.  I lobby with Friends Committee

24  on National Legislation, and most of the lobbying that I have

25  done has been for their local advocacy group.  That's the

DOUGLAS - BURKE - DIRECT

1    Cincinnati/Northern Kentucky group.  About half of our group

2    live in Cincinnati.  About half are in District 1, about half

3    live in District 2.

4    Q.  And who do you lobby?

5    A.  We lobby -- I have lobbied with FCNL, Brigid Kelly, Steve

6    Chabot, Brad Wenstrup, Sherrod Brown, Rob Portman.

7    Q.  So I think I heard in that list the name Brad Wenstrup, the

8    representative for your district, the one that you didn't vote

9    for.  Can you tell us a bit about your evaluation of your

10   likelihood of success on the occasions in which you lobbied

11   him?

12   A.  Yes.  First I want to point out that the Friends Committee

13   on National Legislation is a non-partisan lobby group.

14        I felt that in our lobbying Representative Wenstrup we

15   always were enabled to do our petitioning.  We went in and we

16   talked about many issues, we were listened to in a courteous,

17   attentive way, but that it was made clear that what we were

18   lobbying for was not going to be considered.

19        I can give an example.  We had been lobbying for the repeal

20   of the AUMF.  Part of that appeal has been how we spend our

21   money, and the representative made it very clear that no matter

22   what we said, that he was opposed to just the nondiscretionary

23   spending and that we should not talk about cutting the military

24   and things like that.

25        On all of the resolutions that we have discussed, he has

1   never co-sponsored or voted for any of the things that we have

2   advocated for.

3   Q.   Just to clarify for the record, what does AUMF stand for?

4   A.   Authorization of Use of Military Force.

5   Q.   Now, you also, I think, mentioned Sherrod Brown as one of

6   the people you've lobbied.  Who is Sherrod Brown?

7   A.   Sherrod Brown is a senator for the U.S., a Democratic

8   senator.

9   Q.   And how does your experience lobbying Sherrod Brown differ

10  from your experience lobbying Representative Wenstrup?

11  A.   I feel that our lobbying of Senator Brown has been more

12  effective.  There have been several things that we had proposed

13  that he support, and he has done that, both co-sponsoring and

14  voting for some bills.

15  Q.   Now I want to take all of your political activities as a

16  whole.  And you've mentioned voting, you've mentioned

17  canvassing, donating money to a political campaign, and also

18  lobbying.  Is there anything about the way in which District 2

19  is drawn that's prohibited you from engaging in any of these

20  activities?

21  A.   No.

22  Q.   Well, then why are you challenging the map?

23  A.   I'm challenging the map really for two reasons.  The one

24  we've talked about, which is my vote is diluted.  It doesn't

25  count as fully as other votes.

1    The other is, is that in my work as a citizen to be engaged

2  in making a better country, it has been more difficult in the

3  particular area where I live.  And I am not an expert, but many

4  of my friends, they ask me why I vote and why I work so hard on

5  doing this.  And my answer has been I believe it's a duty of a

6  citizen.  When I have looked at the Constitution and the Bill

7  of Rights, I look at the First Amendment, it not only tells me

8  what my rights are, my right of free speech, my right to

9  petition the government, but I think it also infers a duty of

10  citizens to do that, to be active, to try to make change and

11  make our country better.  And I also think it makes it more

12  difficult when people are disengaged and apathetic, and I think

13  gerrymandering contributes to that.

14    I also think that it makes it more difficult for getting

15  good candidates from parties if they feel like there's no hope.

16  So it makes the whole process more difficult.

17  Q.  Now I'd like to step back from your political activities

18  and return to the lawsuit.  What remedy are you seeking, Doug?

19  A.  I want districts drawn fairly.  And what I mean by fairly

20  is, not to have government officials who have a political

21  affiliation drawing a map to advantage a political party.  I

22  want a map that is drawn neutrally and not based upon party

23  affiliation.

24  Q.  I'd like to --

25  A.  And the chips fall where they may.

1    Q.  I'd like to show you another demonstrative.

2    A.  Sure.

3          MS. ZHANG:  Peter, can you -- sorry.  Stephen, can you

4    please put up Plaintiffs' Demonstrative 003.  I'm very sorry

5    that mistake is in the record.

6    Q.  Can you show us -- can you tell us what this demonstrative

7    depicts?

8    A.  This again depicts Hamilton County.

9    Q.  And what are the boundaries of the district that are

10   depicted in this demonstrative?

11   A.  This is showing a map in which District 1 is predominantly

12   in Hamilton County with part of District 2 on the eastern edge.

13        As you take a look at it and how the line is drawn, one of

14   the things that you will notice is that the urban areas of

15   Cincinnati, which would include the city of Cincinnati proper,

16   Norwood and St. Bernard, which are two cities completely

17   surrounded by the city of Cincinnati in District 1, making it

18   that people who live in a community that have shared concerns

19   are in one district.

20        As you go to the east, the parts that are District 2 are

21   suburban and exburban.  You can see my residence in Norwood in

22   the blue push pin.

23   Q.  Now, just to be clear about what this depicts, who drew

24   these lines that are depicted in this demonstrative?

25   A.  It was my understanding that our lawyers on our behalf had

1   an expert draw a remedial map that would not include

2   distribution by party.

3   Q.  And under the plaintiffs' proposed remedial plan, which

4   congressional district would you be in?

5   A.  I would be in District 1.  I have been in District 1

6   before.  I remember Steve Chabot -- Norwood has a parade every

7   year, and politicians march by.  I remember meeting Steve

8   Chabot.  And so Norwood has been in District 1 and District 2

9   varying over the several decades.

10  Q.  Now I'd just like to put this side by side by the first

11  demonstrative that I showed you.

12  A.  Okay.

13      MS. ZHANG:  Thank you, Stephen.

14  Q.  Can you tell us the differences between the way in which

15  your district would be drawn under these two different plans?

16  A.  Yes.  And as I said earlier, when you take a look at the

17  current one, it splits what I consider my community, which is

18  the urban area of Cincinnati.  You know, you can see in that

19  District 1 that it goes north and then it goes -- as it goes

20  east, it goes back down in that Hamilton County.  You can see

21  that peninsula or how irregular it is.  When you take a look at

22  the remedial map, you see that it includes the urban area of

23  Cincinnati and the map isn't as squiggly.  And as, you know, I

24  have said before, from my perception, when you take a look at

25  that, that peninsula is splitting or diluting the Democratic

```
 1    vote both in District 2 and, I would say, in District 1.
 2              MS. ZHANG:  Nothing further, Your Honors.
 3              JUDGE BLACK:  Very well.
 4         What in heaven's name is that?
 5         (Laughter.)
 6              MR. ERWIN:  Your Honor, Brodie Erwin from Ogletree,
 7    Deakins on behalf of the defendants.  And I may look a little
 8    young, but I am old school too like Mr. Strach here.  I've got
 9    some exhibit notebooks that I feel like will make it easier for
10    everybody to follow along as Mr. Burks and I have a
11    conversation.
12              THE WITNESS:  Douglas, please.
13              JUDGE BLACK:  Go ahead.
14              MR. ERWIN:  Douglas, I'm sorry.
15                        CROSS-EXAMINATION
16    BY MR. ERWIN:
17    Q.  Now, Douglas, you said a couple of times there when you
18    were talking to Ms. Zhang that you had lived in District 1 and
19    District 2 over the life of your time there in the Hamilton
20    County area; is that correct?
21    A.  Yes, since 1979.
22    Q.  Okay.  But you haven't actually -- the Norwood area hasn't
23    actually -- has not been in District 1 since around the 1980s
24    or the 1990s; is that correct?
25    A.  No.  It's been there later.
```

DOUGLAS J. BURKS - CROSS

```
 1   Q.  When was the last time the Norwood area was in District 1?
 2   A.  I believe 2000.
 3   Q.  Okay.  The year 2000?
 4   A.  Uh-huh.  And I think the last cycle, but the line bisected
 5   parts of Norwood in the last cycle.
 6   Q.  But you personally haven't been in District 1 since 2000;
 7   is that correct?
 8   A.  No, I have.  As I said, Steve Chabot came over to politick
 9   in my district.
10   Q.  Okay.  And District 2 where you currently reside, that's
11   been a Republican district for a good number of years; correct?
12   A.  I don't know.  I think the Democrats had fared fairly well
13   in the city.
14   Q.  When was the last time you were represented by a Democrat
15   in District 2, do you know?
16   A.  Oh, in Congress?
17   Q.  That's right.
18   A.  Never.
19   Q.  Okay.  Now, under the current plan you told Ms. Zhang that
20   you were able to go out and canvass and hand out campaign
21   literature for a candidate, Jill Schiller.  Is that correct?
22   A.  That is correct.
23   Q.  Okay.  And she was the Democratic candidate for District 2
24   under the 2012 plan; is that correct?
25   A.  Yes, she was.
```

1   Q.   Okay.  Now, you also told Ms. Zhang that the current map,

2   the 2012 plan had prevented areas like yours from being able to

3   draw in good candidates; is that correct?  Did I understand

4   that to be correct?

5   A.   That is my perception.

6   Q.   Okay.

7   A.   That's a personal perception.

8   Q.   But you're not saying, though, that Jill Schiller wasn't a

9   good candidate for United States Congress, are you?

10  A.   I voted for her.

11  Q.   Okay.  But are you saying she's a bad candidate?

12  A.   No.

13  Q.   Okay.  And again nothing about the 2012 plan and the way

14  the lines were drawn prevented you from going out and engaging

15  with her campaign and handing out literature; is that correct?

16  A.   No.

17  Q.   Okay.

18  A.   What I would say is that by that area being diluted, it

19  made it much more difficult, and I felt like I was at a

20  disadvantage in doing my work.

21  Q.   All right.  And you talked to Ms. Zhang a little bit about

22  your lobbying efforts on the Friends Committee.  Is that -- am

23  I recalling the name of that organization correctly?

24  A.   Yes.

25           MR. ERWIN:  Your Honor, may I approach?

DOUGLAS J. BURKS - CROSS

```
 1              JUDGE BLACK:  Who?

 2              MR. ERWIN:  May I approach the witness, Your Honor?

 3              JUDGE BLACK:  Yes.

 4              MR. ERWIN:  May I approach the bench, Your Honor?

 5              JUDGE BLACK:  At your own risk.

 6         (Mr. Erwin distributes a binder.)

 7              MR. ERWIN:  I do realize that I'm tempting fate here.

 8    Q.  Mr. Burks, I just handed you a notebook, and it's got some

 9    exhibits in there that you may recognize from when we met in

10    November at your deposition.  If you'll turn with me to the tab

11    in there that's marked D14.  And just let me know when you get

12    there.

13    A.  Let me get my glasses on.

14    Q.  Sure.  So with the Friends Committee on National

15    Legislation you lobbied your representative, Representative

16    Wenstrup; is that correct?

17    A.  That is correct.

18    Q.  Okay.  And do you recall about how many meetings you had

19    with him on behalf of the Friends?

20    A.  Up until this date, I would want to say at least four,

21    maybe five.

22    Q.  And if you'll look with me there on tab D14, this has been

23    marked as Defendants' Exhibit 14 --

24    A.  Uh-huh.

25    Q.  -- for identification, do you recognize what that document
```

1   is there?

2   A.  Yes.  That looks like one of our reports on a visit.

3   Q.  And this would have been an actual report that you put

4   together for the Friends.  Would that be correct?

5   A.  Yes.  I, many times, take the notes and do the summary of a

6   meeting.

7   Q.  Okay.  And this particular document shows that on March 7th

8   of 2018 you met with Jeff Groenke, who is the district director

9   for Representative Wenstrup; is that correct?

10   A.  Yes.  Groenke (pronouncing).

11   Q.  And you also met with Alex Scharfetter there, the deputy

12   district director?

13   A.  Yes, yes.

14   Q.  Okay.  And if you'll look below where those business cards

15   are photocopied there, the next paragraph you note that you had

16   a good discussion with these individuals; is that correct?

17   A.  Yes, and I think I stated that before.  All of our visits

18   had been cordial, civil, and people were attentive on both

19   sides.

20   Q.  Okay.  But you said -- I think you told Ms. Zhang that

21   while everything was civil, you were basically -- I can't

22   remember what exactly what you said, but in my words, it

23   sounded like they said -- they told you to kind of like get

24   lost.  Is that an accurate representation of what you said?

25   A.  I don't think they told us to get lost.

1   Q.  Sure.

2   A.  They conveyed to us that they had no -- they were not going

3   to support or have an interest in what we were lobbying for.

4   Q.  Okay.  Will you flip to the second page of D14 and look at

5   that top paragraph for me.

6   A.  Uh-huh.

7   Q.  Do you see that last sentence there, and correct me if I'm

8   reading this wrong, but doesn't it say "Wenstrup's aides seemed

9   receptive to both of the concerns presented and voiced some

10  support of congressional prerogative"?

11  A.  Yes, while they maintained that they were not going to

12  support what we were proposing.

13  Q.  Okay.  But in the --

14  A.  But it was an interesting discussion.  And when one talks

15  about a complex issue, one generally is not either/or.  They're

16  nuanced issues, I believe.  And so, you know, receptive in that

17  they listened attentively and were polite, you know, that they

18  didn't call me stupid.  Yes --

19  Q.  But this sentence --

20  A.  -- receptive in that way.

21  Q.  This sentence that you wrote in an internal memo to your

22  organization doesn't stop with receptive, though, does it?  It

23  talks about them actually voicing some support for the concerns

24  that you brought to them?

25  A.  What they supported was in general Article 1 in the War

 1   Powers Act and that Congress has a role in, but they are the
 2   source of declaring and ending wars.  They did not show support
 3   for the legislation to make a direct statement to the executive
 4   that the executive did not have the authority of the Congress
 5   to undertake either nuclear or boots-on-the-ground military
 6   action in North Korea.
 7   Q.   Okay.  If you'll look at that next paragraph down, the
 8   second-to-last sentence in that paragraph, you say, "Again, the
 9   aides to Wenstrup seemed supportive of this."  Did I read that
10   correctly?
11   A.   Supportive that the War Powers Act is something that needs
12   to be looked at, yes.
13   Q.   Okay.
14   A.   I agree 100 percent with that statement.
15   Q.   Now, you didn't put anything in this memo, did you, that
16   reflects that they told you that they weren't interested in
17   what you guys had to say or that they would take into
18   consideration the lobbying effort that you made that day in
19   that meeting?
20   A.   In that meeting, no.  Other meetings, yes.
21   Q.   And in the last paragraph, if you'll look with me on that
22   second page, you again say there was a good exchange?
23   A.   Yes.  We tried to be polite.  We tried to build a
24   relationship.  We tried to work in a non-partisan way.  And I
25   think what I was trying to convey is that Representative

```
 1   Wenstrup's office gave us those same courtesies.
 2           MR. ERWIN:  Your Honors, at this point I'd like to
 3   move in Defendants' Exhibit 14 into evidence.
 4           JUDGE BLACK:  Any objection?
 5       (No response.)
 6           JUDGE BLACK:  It's admitted.
 7       (Defendants' Exhibit 14 was admitted.)
 8   Q.  Douglas, if you'll turn with me to the next tab for D15,
 9   and let me know when you get there.
10   A.  Yes.
11   Q.  So this again is marked as Defendants' Exhibit 15 for
12   identification.
13   A.  Uh-huh.
14   Q.  Do you recognize what this document is?
15   A.  Yes.
16   Q.  And what is it?
17   A.  It's a thank-you note for allowing us to visit.
18   Q.  Okay.  So this is an e-mail from your account, Douglas
19   Burks, to Representative Brad Wenstrup's office, his house.gov
20   e-mail; is that correct?
21   A.  That is correct.
22   Q.  And the subject of the e-mail is "Constituent Inbox:
23   Civility in politics.  "Did I read that correctly?
24   A.  Uh-huh.
25   Q.  And in that e-mail you told Representative Wenstrup that
```

1    "thank you and your staff for always being willing to meet with

2    our FCNL group and for the civil and respectful conversations."

3    Is that what that says there?

4    A.  Yes, it does.

5    Q.  Okay.  And then you also say, "I look forward to seeing you

6    in a week."  Why did you say that?

7    A.  Because we are a very active lobbying group, and so as you

8    asked earlier, and I answered, I -- in the past year we have

9    lobbied Representative Wenstrup on several occasions.

10   Q.  Okay.  So even after the May 7th meeting, Representative

11   Wenstrup's office was inviting you back to sit down with them

12   again?

13   A.  Upon our request.

14   Q.  Okay.  But they agreed to your request; correct?

15   A.  I think I have made it clear over and over again when asked

16   the question, Brad Wenstrup has respected my First Amendment

17   rights to petition the government.

18   Q.  Okay.

19   A.  That our meetings have been cordial, polite, but had little

20   impact on outcome.  Lobbying is a long-term process where you

21   try to persuade people, but I have never gone into that office

22   with the delusion that we were going to be successful.

23   Q.  Okay.  Do you believe that you have a constitutional right

24   to have your representative agree with you on the issues that

25   you feel are important?

DOUGLAS - CROSS

1    A.  Oh, heavens, no.

2    Q.  Do you feel like you have a constitutional right to have

3    your representative vote the way you want him to specifically

4    vote on certain pieces of legislation?

5    A.  Heavens, no.  What I'm contesting here is that someone

6    other than me is drawing a district line that impacts my vote

7    and my activity in an unconstitutional, unfair way.

8    Q.  Okay.

9    A.  I do not think that if I have a fair district that I have a

10   constitutional right for who gets elected or how they vote.  I

11   want a fair playing field.

12   Q.  But nothing about the way the 2012 plan drew the lines

13   prevented you from going in and meeting with Representative

14   Wenstrup and his staff; correct?

15   A.  Oh, heavens, no.  It just stacked the deck against me.

16          MR. ERWIN:  Your Honor, at this time I'd like to move

17   Defendants' Exhibit 15 into evidence.

18          JUDGE BLACK:  Any objection?

19          MS. ZHANG:  Not at this time.

20          JUDGE BLACK:  It's admitted.

21      (Defendants' Exhibit 15 was admitted.)

22   Q.  Douglas, if you'll turn with me to the tab marked D12.

23   A.  D12?

24   Q.  Yes.  And let me know --

25   A.  So you're going back.

1   Q.  When you get there, let me know.

2   A.  Yes.

3   Q.  Okay.  What is this document marked Defendants' Exhibit 12

4   for identification?

5   A.  Not only have I lobbied, but even before 2012 I have always

6   contacted my representatives.  This looks like a reply from

7   Congressperson Brad Wenstrup.

8   Q.  Okay.  And in this letter that he wrote back to you he

9   thanked you for contacting him about your priorities for the

10  115th session of Congress.  Is that accurate?

11  A.  That is correct.

12  Q.  And did he tell you that your thoughts were important to

13  him?

14  A.  Yes.

15  Q.  And did he tell you that he wanted to work to effectively

16  represent you in our nation's capital?

17  A.  He stated that.

18  Q.  Okay.  And then if you'll look down there at that second

19  paragraph, in that last sentence did he tell you that -- he

20  again thanked you for sharing thoughts; correct?

21  A.  Yes, he did.

22  Q.  And then he wrote, "I look forward to our continued

23  correspondence throughout the 115th session of Congress."  Is

24  that accurate?

25  A.  That is correct.

1    Q.   So Congressman Wenstrup was inviting you to continue a

2    dialogue with him about issues that you felt were important to

3    you; correct?

4    A.   Yes.  He was fulfilling his constitutional duty.

5    Q.   Okay.  But in this letter specifically he is inviting you

6    to continue a dialogue with him about issues you find

7    important?

8    A.   Yes, that's what the letter says.

9            MR. ERWIN:  Your Honors, at this time I'd like to move

10   Defendants' Exhibit 12 into evidence.

11           JUDGE BLACK:  Any objection?

12           MS. ZHANG:  Not at this time.

13           JUDGE BLACK:  It's admitted.

14      (Defendants' Exhibit 12 was admitted.)

15   Q.   And as part of the Friends Committee on National

16   Legislation, did you also visit Senator Portman's office?

17   A.   Yes.

18   Q.   And Senator Portman, is he the junior senator from the

19   state of Ohio?

20   A.   He's a senator from Ohio.  I don't know whether he's junior

21   or senior.

22   Q.   Do you know whether he's a Republican or Democrat?

23   A.   Portman is a Republican.

24   Q.   Okay.  And do you remember after meeting with him you sent

25   an e-mail to an individual named Nan Cahall?

```
 1   A.  Yes, I have.
 2   Q.  And do you remember telling her that your meeting with
 3   Republican Senator Portman, quote, renewed your faith in the
 4   Democratic process?
 5   A.  Yes, because I was allowed to petition my officially
 6   elected representative.
 7   Q.  Okay.  And when you were talking with Ms. Zhang earlier,
 8   you also said that you had voted for Republicans in the past;
 9   is that correct?
10   A.  Yes, I have.
11   Q.  Okay.  So you would --
12   A.  Not in a deposition.
13   Q.  So you have voted for Republican candidates for national
14   office in the past?
15   A.  Yes, but not since Ronald Reagan.
16   Q.  Sure.
17   A.  I have voted straight party line since Ronald Reagan.
18   Q.  But you would agree with me, then, that people can
19   certainly change their partisan ideologies or their voter
20   preferences over time?
21   A.  Oh, yes.  I did, so that's obvious.
22   Q.  Right.  So if someone is a Republican for years, that
23   doesn't necessarily mean they'll be a Republican for the rest
24   of their life or even in the next election.  Is that accurate?
25   A.  No.  That is correct.  But I think if you would look at the
```

1    last three elections in District 2, in this cycle that the

2    split of Republican-Democrat numbers were very similar in each

3    of the three elections.

4    Q.  Douglas, if you'll look back at that notebook that I gave

5    you.

6    A.  Uh-huh.

7    Q.  If you'll turn to the tab that's marked D18.

8    A.  Okay.

9    Q.  Let me know when you get there.

10   A.  Yes.

11   Q.  Okay.  And do you recognize what this document is?

12   A.  Yes.  This is a document of a correspondence with my

13   brother.

14   Q.  Okay.  And in the top portion of that first page of D18 is

15   that an e-mail from you to your brother?  Is your brother

16   Steve?

17   A.  Yes, my brother is Steve.

18   Q.  And can you read into the record for me what you said in

19   that e-mail?

20   A.  Yes.  Basically he asked me, well, if only the lawyers win

21   and I don't get any monetary compensation, why would I do this?

22   And my answer was because if we win, then it is a good win,

23   because my vote is being split.  And when you take a look at

24   the Congress and the Senate, that the Congress, it's very

25   important for representation on much legislation that impacts

1    me.  And so that it has not only a statewide impact, I believe,

2    if we don't have gerrymandered districts, but that nationally

3    it makes a difference.

4    Q.  Okay.

5    A.  Because, again, it's a math issue.  And that is, I hope

6    that in my work that what I support gets enacted, and you need

7    a whole bunch of votes for that occur.

8        Is that a good summary?

9    Q.  And so this e-mail to Steve, your brother, when you're, in

10   your words, laying out why you got involved with the lawsuit,

11   you told him "If we win, we get new districts," plural.  Did I

12   read that correctly?

13   A.  Yes.  And my concern was not only District 2.  I think I've

14   stated over and over again that it also is the total map in

15   Ohio and what it does to the split and the dilution in other

16   districts and the ratio of party representatives that result.

17   Q.  So again, in that e-mail you said, "The state is 51-49

18   Republican" to "Democrat but the congressional split is 80

19   percent Republican.  When you look at the district map, it's

20   obvious why."

21       So is this you telling your brother that you're challenging

22   in the lawsuit the map as a whole, that's why you got involved

23   with the lawsuit?

24   A.  As I stated before, that was one component.  But the other

25   component is, is that I have been directly harmed in the

     1  district that I vote in.

     2  Q.  Okay.

     3  A.  Both are important to me.  I'm a citizen of Ohio.

     4  Q.  So is the main harm to you is that you don't think that

     5  there's enough Democrats in the Ohio congressional legislation

     6  that can vote on things that you have stated and testified here

     7  today are important to you, things like health care, welfare,

     8  Social Security, Medicaid, Medicare, economic disparity?  Is

     9  that the harm that you are seeking to remedy here in this

    10  lawsuit?

    11          JUDGE BLACK:  Excuse me.

    12          MS. ZHANG:  I'm objecting to the extent that the

    13  question mischaracterizes Doug's testimony about the main

    14  reason why he's bringing this case.

    15          JUDGE BLACK:  Sustained as to form.

    16  Q.  Will you clarify for me, Mr. Burks, that that's what you're

    17  really challenging here in this lawsuit?

    18  A.  Clearly I believe that, because the map is drawn unfairly,

    19  that I would benefit from who is elected.  I have had

    20  discussions what the major reason is, is that I think

    21  gerrymandering is unconstitutional.  This is what is being

    22  argued; this is what the justices are going to decide.  That

    23  when a government person draws district lines to advantage

    24  their party, I am at a disadvantage.

    25      I would state, and on the record, that in a Democratic

1    state I would hope that Republicans who are being disadvantaged

2    would file a suit.  What I and why I am filing this Complaint

3    is, I want fair districts.  The House of Representatives is the

4    only branch of government, not even the Senate, that we in the

5    Constitution, in the original one, were given the direct vote.

6    We are a constitutional republic, and I believe that right to

7    vote and the Congress is very important, and I believe that

8    fair districts adds to our government being legitimate.  I

9    think that people feel disenfranchised when they see unfair

10   districts based upon party affiliation.  I don't know how I can

11   say that more strongly.

12   Q.  Sure.  And I'm going to ask, if you could, a yes-or-no

13   answer to --

14   A.  Sure.

15   Q.  -- do you think that you are constitutionally harmed by the

16   way the lines are drawn for districts other than your district,

17   District 2?

18        MS. ZHANG:  Objection.  Asked and answered.

19   A.  I'll say yes.  In Ohio, I think that there's more than one

20   district being gerrymandered.

21        MR. ERWIN:  Your Honors, at this time I'd like to move

22   Defendants' Exhibit 18 into evidence.

23        JUDGE BLACK:  Any objection?

24        MS. ZHANG:  No objection.

25      (Defendants' Exhibit 18 was admitted.)

```
 1              JUDGE BLACK:  It's admitted.  Starting to push 5:00
 2   clock.
 3              MR. ERWIN:  I don't have any further questions, Your
 4   Honors.
 5              JUDGE BLACK:  There we go.
 6       (Laughter.)
 7              MR. ERWIN:  I can take a hint.
 8              JUDGE BLACK:  Do the defendants or the intervenors
 9   have further questions?
10              MS. McKNIGHT:  No, Your Honor.  Thank you.
11              JUDGE BLACK:  Redirect?
12              MS. ZHANG:  Unfortunately, I'm going to have to push
13   my luck just a little bit.
14              JUDGE BLACK:  All right.  You're the only thing that
15   stands between me and a break.
16                         REDIRECT EXAMINATION
17   BY MS. ZHANG:
18   Q.  All right.  Just quickly, Doug, will you turn in --
19              JUDGE BLACK:  You can slow down and do a thorough
20   redirect.
21              MS. ZHANG:  All right.
22              JUDGE BLACK:  You have a full seven minutes.
23              MS. ZHANG:  All right.
24   Q.  Doug, will you turn to Defendants' Exhibit 14.
25   A.  Okay.
```

```
1    Q.  You were asked some questions about your lobbying efforts

2    of lobbying Representative Wenstrup about this exhibit.  Do you

3    recall that?

4    A.  Yes.

5    Q.  Now, was this lobbying effort related to the passage of any

6    particular House bill?

7    A.  Yes.  It was a bill to prohibit the executive branch from

8    committing either nuclear attack or military attack on North

9    Korea.

10   Q.  And what was the best-case scenario for you walking out of

11   that meeting to get from Representative Wenstrup or his aides?

12   A.  That he would both co-sponsor and vote for the bill.

13   Q.  Did he end up cosponsoring or voting for the bill?

14   A.  No, he did not.

15   Q.  Can I have you now turn to Defendants' Exhibit 12.  This is

16   the first one that you were shown.

17   A.  Yes.

18   Q.  Do you recall Mr. Brodie asking you questions about how

19   Representative Wenstrup wanted to have a dialogue with you

20   based on this exhibit?

21   A.  Yes.

22   Q.  Will you please read the e-mail address that this e-mail is

23   sent from.

24   A.  Wenstrup-no-reply@mail.house.gov.

25          MS. ZHANG:  Nothing further, Your Honors.
```

```
 1        (Laughter.)

 2             JUDGE BLACK:  I don't know what you all are laughing

 3   about.

 4      Okay.  We have reached the end of the day.  The lawyers

 5   have done a good job keeping this moving along.  Momentarily

 6   we're going to break for the day.  We'll be back tomorrow.

 7   We'd like to get the first witness on the stand at 9:00

 8   o'clock.  And during the break and over the evening, our best

 9   wishes go out to you.

10      Is there anything that's required from the plaintiff before

11   we adjourn for the day?

12             MS. LEVENSON:  Nothing from the plaintiffs, Your

13   Honor.

14             JUDGE BLACK:  Does the defendant dare?

15             MR. STRACH:  No, Your Honor.

16             JUDGE BLACK:  Intervenors?

17             MS. McKNIGHT:  No, Your Honor.

18             JUDGE BLACK:  The Court prepares to recess for the

19   day.

20             COURTROOM DEPUTY:  All rise.  This court is now in

21   recess.

22      (At 4:56 PM, the trial was recessed, to be continued on

23   Tuesday, March 5, 2019, at 9:00 AM.)

24                              - - -

25
```

1                          MISCELLANEOUS

2      Opening Statement of Plaintiffs ................   17
       Opening Statement of Defendants ................   30
3      Opening Statement of Intervenors ...............   39

4                            - - -


5              I N D E X   O F   W I T N E S S E S

6      PLAINTIFFS' WITNESSES:                         PAGE

7      ANDRE WASHINGTON
       Direct Examination by Ms. Levenson .............   43
8      Cross-Examination by Mr. Voigt .................   63
       Cross-Examination by Mr. Braden ................   72
9      Redirect Examination by Ms. Levenson ...........   76

10     MARCIA FUDGE
       Direct Examination by Ms. Levenson .............   79
11     Cross-Examination By Ms. McKnight ..............   87

12     STEPHANIE WHITE
       Direct Examination by Mr. Carey ................  108
13     Cross-Examination by Mr. Voigt .................  121
       Redirect Examination by Mr. Carey ..............  126
14
       JENNIFER MILLER
15     Direct Examination by Ms. Levenson .............  128
       Cross-Examination by Mr. Voigt .................  162
16     Cross-Examination by Mr. Tucker ................  187

17     JOHN FITZPATRICK
       Direct Examination by Ms. Bonham ...............  196
18     Cross-Examination by Ms. McKnight ..............  211
       Redirect Examination by Ms. Bonham .............  222
19
       DOUGLAS J. BURKS
20     Direct Examination by Ms. Zhang ................  223
       Cross-Examination by Mr. Erwin .................  238
21     Redirect Examination By Ms. Zhang ..............  255

22                           - - -

23

24

25

```
 1                            E X H I B I T S

 2    EXHIBIT NUMBER:                              ADMITTED

 3
      Plaintiffs' Exhibit 46 ..........................   157
 4    Plaintiffs' Exhibit 48 ..........................   157
      Plaintiffs' Exhibit 359.........................    155
 5    Plaintiffs' Exhibit 417 ........................    136
      Plaintiffs' Exhibit 418 ........................    151
 6    Plaintiffs' Exhibit 420 ........................     51
      Plaintiffs' Exhibit 573 ........................     51
 7    Plaintiffs' Exhibit 575 ........................     51
      Plaintiffs' Exhibit 576 ........................     51
 8    Plaintiffs' Exhibit 577 ........................     51
      Plaintiffs' Exhibit 578 ........................     51
 9
      Defendants' Exhibit 12 ..........................   249
10    Defendants' Exhibit 14 ..........................   245
      Defendants' Exhibit 15 ..........................   247
11    Defendants' Exhibit 18 ..........................   254

12                            - - -

13

14                      C E R T I F I C A T E

15           I, Luke T. Lavin, RDR, CRR, the undersigned, certify

16    that the foregoing is a correct transcript from the record of

17    proceedings in the above-entitled matter.

18

19                              s/Luke T. Lavin
                                _____
20                              Luke T. Lavin
                                Official Court Reporter
21
                                   - - -
22

23

24

25
```