UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

. . . . . . . . . . . . . . . . .
OHIO A. PHILIP RANDOLPH        .  Case No. 1:18-cv-357
INSTITUTE, et al.,            .
                              .  *Day 2 of Bench Trial*
        Plaintiffs,           .
                              .
        - v -                 .
                              .  Tuesday, March 5, 2019
LARRY HOUSEHOLDER, et al.,    .  8:58 AM
                              .
        Defendants.           .  Cincinnati, Ohio
. . . . . . . . . . . . . . . . .

- - -

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY S. BLACK, THE HONORABLE KAREN
NELSON MOORE AND THE HONORABLE MICHAEL H. WATSON, JUDGES

APPEARANCES:

For the Plaintiffs:

FREDA J. LEVENSON, ESQ.          T. ALORA THOMAS-LUNDBORG, ESQ.
DAVID J. CAREY, ESQ.             THERESA J. LEE, ESQ.
ELIZABETH M. BONHAM, ESQ.        EMILY R. ZHANG, ESQ.
American Civil Liberties Union   American Civil Liberties Union
  of Ohio Foundation               Foundation
4506 Chester Avenue              125 Broad Street, 18th Floor
Cleveland, Ohio  44103           New York, New York  10004-2400

ROBERT D. FRAM, ESQ.
JEREMY M. GOLDSTEIN, ESQ.
Covington & Burling LLP
One Front Street, 35th Floor
San Francisco, California  94111

For the Defendants:

                STEVEN T. VOIGT, ESQ.
                ANN YACKSHAW, ESQ.
                Ohio Attorney General's Office
                Constitutional Offices Section
                30 East Broad Street, 16th Floor
                Columbus, Ohio  43215

*Proceedings recorded by stenotype; transcript
produced by computer-aided transcription.*

1 | <u>APPEARANCES (Continued)</u>:

2 | For the Defendants Larry Householder and Larry Obhof:

3 |                               PHILLIP J. STRACH, ESQ.
                              MICHAEL D. McKNIGHT, ESQ.

4 |                               ALYSSA RIGGINS, ESQ.
                              BRODIE ERWIN, ESQ.

5 |                               Ogletree, Deakins, Nash, Smoak & Stewart,
                                  P.C.

6 |                               4208 Six Forks Road, Suite 1100
                              Raleigh, North Carolina  27609

7 |

8 | For the Intervenors Steve Chabot, Brad R. Wenstrup, Jim Jordan, Bob Latta, Bill Johnson, Bob Gibbs, Warren Davidson, Michael Turner, Dave Joyce, Steve Stivers, Robert F. Bodi, Charles

9 | Drake, Roy Palmer III, Nathan Aichele, Republican Party of Cuyahoga County and Franklin County Republican Party:

10 |

11 | PATRICK T. LEWIS, ESQ.         KATHERINE L. McKNIGHT, ESQ.
Baker & Hostetler LLP         E. MARK BRADEN, ESQ.
Key Tower                      Baker & Hostetler LLP

12 | 127 Public Square, Suite 2000   1050 Connecticut Avenue, N.W.
Cleveland, Ohio  44114-1214    Suite 1100

13 |                                  Washington, DC  20036-5043

14 | ROBERT J. TUCKER, ESQ.
ERIKA DACKIN PROUTY, ESQ.

15 | Baker & Hostetler LLP
200 Civic Center Drive

16 | Suite 1200
Columbus, Ohio  43215-4138

17 |

18 | Also present:          Stephen N. Najarian, Trial Consultant
                      Forrest Williamson, Paralegal, Baker &
                        Hostetler

19 |

20 | Law Clerks:            Christopher D. deLaubenfels, Esq.
                      Hannah Gelbort, Esq.
                      Adam Kleven, Esq.

21 |                       Caitlin Miller, Esq.
                      Madison R. Troyer, Esq.

22 |

23 | Courtroom Deputy:     Rebecca R. Santoro

24 | Court Reporter:       Luke T. Lavin, RDR, CRR
                      Potter Stewart U.S. Courthouse
                      100 East Fifth Street, Room 103

25 |                       Cincinnati, Ohio  45202
                      Telephone:  (513) 564-7500

P R O C E E D I N G S

1    (In open court at 8:58 AM.)

2          JUDGE BLACK:  Good.  Morning, please be seated.  A

3    couple minutes of 9:00.

4          Back in trial on *APRI, et al. versus Householder, et al.*

5    Plaintiffs' counsel is here, defense counsel is here,

6    intervenors' counsel is here.  Got some plaintiffs in the jury

7    box.

8          Are we ready to proceed?

9          First, from the plaintiffs perspective?

10         MS. LEVENSON:  Yes, Your Honor.  Mr. Fram has

11   something he'd like to put on the record.

12         MR. FRAM:  Your Honor asked for us to confirm the time

13   from yesterday.  We've done so.  174 minutes for the plaintiff.

14   171 minutes for the defendant.

15         JUDGE BLACK:  As long as you all are agreed.

16         MR. FRAM:  We are.

17         JUDGE BLACK:  That's a good thing.  Good morning.

18         MR. STRACH:  Good morning, Your Honor.  Yes, Phil

19   Strach.  Lawyers overcomplicated a lot of things including the

20   passing of time, but we were able to work it out.

21         JUDGE BLACK:  Well, that's a credit to you.

22         MR. STRACH:  And we're ready to proceed.

23         JUDGE BLACK:  We want to reflect on the record that

24   you two agree; is that correct?

```
1              MR. FRAM:  Yes, Your Honor.

2              MR. STRACH:  That's correct.

3              JUDGE BLACK:  That's remarkable.  Very well.

4         So the plaintiff is ready to go.  Is defense ready?

5              MR. STRACH:  Yes, Your Honor.

6              JUDGE BLACK:  And the intervenors as well?

7              MS. McKNIGHT:  Yes, Your Honor.

8              JUDGE BLACK:  Very well.

9         Who does plaintiff call at this time?

10             MS. LEVENSON:  May it please the Court, plaintiffs

11    call Senator Nina Turner.

12             JUDGE BLACK:  If the senator would be willing to

13    approach.  Perhaps somebody should guide her so she -- well,

14    she hurdled the barrier.  Good morning.

15             THE WITNESS:  Good morning, Your Honor.

16             JUDGE BLACK:  If you'd be willing to pause where you

17    are and raise your right hand for the oath to tell the truth.

18    Do you solemnly swear or affirm that your testimony today will

19    be the truth subject to the penalty of perjury?

20             THE WITNESS:  Yes.

21             JUDGE BLACK:  Very well.  The seat tips back, so

22    you're aware.

23             THE WITNESS:  Okay.

24             JUDGE BLACK:  Take your time and get set for a moment.

25    We're going to want you close to that expensive federal
```

 1  microphone.

 2           THE WITNESS:  Okay.  Thank you.

 3                       NINA TURNER

 4  a witness herein, having been first sworn, testified as follows:

 5                   DIRECT EXAMINATION

 6  BY MS. LEVENSON:

 7  Q.  Good morning, Senator Turner.  I see you found the Kleenex.

 8  Sorry about your cold.  Thank you for coming despite being ill.

 9  A.  Thank you.

10  Q.  Senator Turner, can you please state your name and spell it

11  for the record.

12  A.  Nina Turner, N-i-n-a T-u-r-n-e-r.

13  Q.  Where did you grow up, Senator?

14  A.  I grew up in the city of Cleveland.

15  Q.  Can you share with us your educational background.

16  A.  Yes.  I am a first-generation college graduate.  I

17  graduated from Cuyahoga Community College first and then

18  matriculated to Cleveland State University where I earned my

19  bachelor's and my master's degree.

20  Q.  What's your political affiliation?

21  A.  I am a Democrat.

22  Q.  Briefly, what's your employment history?

23  A.  I worked for the mayor of the city of Cleveland.  Then I

24  worked for state senator Ryan McGlynn.  From there I became a

25  Cleveland city councilwoman.  And then I came to the Ohio

1   Senate in the latter part of 2008, appointed to that position

2   in 2008, and I ran for the seat for the first time in 2010.

3   Q.  Following your service on the state Senate, what did you

4   do?

5   A.  After that -- well, I'm also a -- I was a college professor

6   at Cuyahoga Community College in between all of those times,

7   so -- but, most recently, I was the president of Our

8   Revolution.

9   Q.  When you were senator, what district, geographically, did

10   you represent?

11   A.  I represented parts of Cuyahoga County, parts of Cleveland

12   was my district, and the greater Cleveland suburban communities

13   in the 25th Senate District.

14   Q.  What issues did you focus on during your service as Ohio

15   senator?

16   A.  Education was my major focus.  I did some criminal justice,

17   but education is always near and dear to my heart because I am

18   a first-generation college graduate, and I understand the power

19   of education to help people be able to transform their lives.

20   Q.  How long did you serve in the Ohio Senate?

21   A.  I served in the Ohio Senate for six years.

22   Q.  You testified a moment ago that you were president of Our

23   Revolution.  Are you still in that position?

24   A.  I most recently have taken a leave of absence.  I am a

25   co-chair of Senator Bernie Sanders' presidential campaign.

1   Q.   Can you briefly describe Our Revolution?

2   A.   Our Revolution engages in social justice work primarily

3   through the electoral process.  Our major focus is to get

4   progressives elected to all levels of government to serve the

5   people.  We also push for progressive issues, for example, the

6   Second Chance initiative that re-enfranchise ex-offenders, or

7   returning citizens, as we like to call them in Florida, and

8   then we try to push to help the Democratic party be more

9   accountable to the people.  We are an omni-partisan

10  organization.  We're not partisan.  We have endorsed candidates

11  from across the political spectrum.

12  Q.  So going back to the time when you served in the Ohio

13  Senate, can you describe your activities as a member of the

14  Democratic Senate caucus?

15  A.  As in our caucus work, all of us had committees.  I mean,

16  we were in the deep minority, but we had committees where you

17  were ranking members on those committees.  A lot of our work

18  had to do with the work of the General Assembly where we would

19  discuss our positions on different pieces of legislation that

20  was coming before the legislature, the Ohio Senate.  Before I

21  left the Senate, I was the lead of my -- minority whip of my

22  caucus.

23  Q.  So you say that the Democratic caucus was a deep minority.

24  How many members comprised the Senate and how many comprised

25  the Senate Democratic caucus in 2011?

```
 1  A.  In 2011 there were ten of us.

 2  Q.  Out of a total Senate of --

 3  A.  Of 33.  There are 33 senators in the great state of Ohio.

 4  Q.  And how many members of the Democratic caucus were

 5  African-American at that time?

 6  A.  There were five of us.

 7  Q.  What was the caucus meeting schedule, typically?

 8  A.  During Senate session, if we weren't dealing with the

 9  budget we typically met three day -- two to three days a week;

10  it depended on the Senate schedule.

11  Q.  And where would you meet?

12  A.  Each caucus has a special room in the Ohio Statehouse, so

13  we met in our caucus room in the statehouse.

14  Q.  And what was the business conducted by the caucus?

15  A.  Mainly to go over the business that was going to be before

16  the Senate that day.  We typically met maybe an hour and a half

17  before a session was to begin.

18  Q.  And as you know, this case is about Ohio's current

19  congressional map that was drawn in 2011.  Prior to the

20  legislation being introduced in the General Assembly, what

21  involvement did you have in creating the map?

22  A.  None.  I mean, as a member of the General Assembly,

23  certainly it is my duty to vote on the map, vote it up or vote

24  it down as I see fit.  But other than that, the fact that my

25  caucus was in a deep minority, the fact that Republicans could
```

1  hold business on the floor without really having Democrats

2  there.  So I had no personal dealings with drawing the map.  We

3  didn't have the power to draw the map.

4  Q.  What was the bill number, if you recall, of the first map

5  that was proposed?

6  A.  House Bill 319.

7  Q.  So when did you first have any actual knowledge of what

8  House Bill 319, the map, would look like?

9  A.  I recall leader Budish coming to one of our caucus

10 sessions, the Senate -- ours being the Senate caucus, and just

11 explaining to us in broad contours what the makeup of the map

12 would be.  He brought some of his staffers there.  I think

13 Chris Glassburn may have been there.  So senators were there,

14 our caucus staff were there, and the leader most likely brought

15 some of his people there.  And he just simply explained to us

16 that the map was a 12-4 map, 12 being to the benefit of the

17 Republicans, and four Democratic seats.

18 Q.  What was your reaction, personally?

19 A.  A total outrage.  I was really upset about that situation,

20 because it really showed quite clearly that it was not going to

21 be a reflection of the will of the people of this state, that

22 it was very much a one-sided map that really only reflected the

23 will of partisanship to guarantee that 12 seats would be

24 Republican seats and only four would be Democratic seats.  And

25 the impact that it would have to my community, the 11th

```
 1   Congressional District where I was born and raised, was just
 2   really outrageous, and it was just a sense of hopelessness
 3   and -- in the entire process.
 4   Q.  What was the reaction of the Senate caucus members?
 5   A.  Oh, similar.  People were outraged.
 6   Q.  So what, if anything, did the Senate Democratic caucus
 7   decide to do over the next few days before the bill was
 8   introduced?
 9   A.  I mean, Senator Sawyer -- and I might have my timing wrong,
10   but, you know, Senator Sawyer did introduce a bill, I believe
11   it was Senate Bill 225.  There was a contest that went on where
12   citizens attempted to draw fairer maps, people across the
13   country also participated in some ways, but to draw a fairer
14   map.  And so the Democrats did, in fact, try to introduce or
15   did introduce a map that was a fairer reflection of the will of
16   the people.
17   Q.  How do you recall that House Bill 319 fared when it was
18   introduced in the General Assembly?
19   A.  How it fared?
20   Q.  Yeah, how did it go?
21   A.  Yeah, well, I mean, it was passed.
22   Q.  How did you vote on it when it reached the Senate?
23   A.  I voted no.
24   Q.  Well, how did the Democratic senators vote?
25   A.  The majority of my caucus voted no on that bill.
```

1    Q.  How did the five black senators vote?

2    A.  In that particular one, the majority of the

3    African-American senators voted no on that bill, and for 319,

4    the majority of my caucus actually voted no.  I believe on that

5    vote, if my memory serves me correctly, there were only two

6    Democratic senators that voted in the affirmative for 319.  The

7    other Democrats voted no.

8         MS. LEVENSON:  I have a document that's been

9    identified as Joint Exhibit 3.  May I please approach the

10   witness with it?

11        JUDGE BLACK:  Yes.  Thank you.

12        MS. LEVENSON:  Thank you.

13   Q.  Senator Turner, I've handed you a document that's been

14   marked as Joint Exhibit 3.  Have you seen this before?

15   A.  Yes.

16   Q.  What is it?

17   A.  It is the transcripts from the Ohio Senate session on

18   September 21st of 2011.

19   Q.  Thank you.

20        MS. LEVENSON:  I move to enter Joint Exhibit 3 into

21   evidence, Your Honor?

22        JUDGE BLACK:  Joint Exhibit, no objection?

23        MS. McKNIGHT:  No objection, Your Honor.

24        JUDGE BLACK:  Very well.  It's admitted.

25        (Joint Exhibit 3 was admitted.)

1   Q.   So what was presented before the Ohio Senate at this

2   hearing?

3   A.   The redistricting map, House Bill 319.

4   Q.   What was the posture of the bill at that time?

5   A.   Well, the bill had obviously passed the House of

6   Representatives and now was on the floor to be debated in the

7   Ohio Senate.

8   Q.   What do you recall about that hearing?

9   A.   Well, that session, I certainly recall the Democratic

10  members, again, were not happy about that bill.  I gave a -- I

11  gave a floor speech about the impact that I believe that this

12  bill would have ten years down the road.

13       MS. LEVENSON:  Stephen, could you kindly display the

14  document, and then I'll ask you to navigate to certain pages,

15  starting on page 52, highlight lines 14 through 18.

16  Q.   Do you see that on your screen?

17  A.   Yes.

18  Q.   So at that time -- this is the transcript of your

19  testimony, as you've said.  Why do you say that it is an "irony

20  here that one of the strongest arguments being made for this

21  map is using the Voting Rights Act and using the residents in

22  the 11th Congressional District as the reason for doing this"?

23  A.   Really reacting to what my colleagues -- my Republican

24  colleagues argued for the rationale that this bill was a good

25  bill to use the Voting Rights Act to do it, and it is, you

1  know, very clear that -- Section 2 of the Voting Rights Act
2  makes it clear that minority voting power cannot be diluted.
3  But the irony of this is that this map hurt the voting prowess
4  of the folks and the influence that they would have through
5  representative democracy by stripping or combining portions of
6  the 11th Congressional District in ways that representatives
7  could not focus purely on Cleveland and/or Cuyahoga County.
8  And to use the Voting Rights Act, an act that was put in place
9  to give the opportunity for African-American voters in
10 particular who had been stripped historically of their voting
11 power, was really just a mockery of what my Republican
12 colleagues were doing.
13 Q.  Focusing still on the same language above, what do you mean
14 by "using the residents of the 11th"?
15 A.  I think part of the argument was that they were protecting
16 us in some way, when that district has only had two
17 congressmembers, one was Congressman Louis Stokes, currently
18 it's Congresswoman Marcia Fudge, and they've never had a
19 problem winning elections in that district.
20 Q.  And why do you consider the use of the Voting Rights Act --
21 or why did you say you considered the use of the Voting Rights
22 Act an irony here?
23 A.  Because it has the reverse effect.  I mean, using that as a
24 shield to do wrong was really not the purpose of the Voting
25 Rights Act.  What my Republican colleagues did was the

1   antithesis.  And to protect the mockery that they were making

2   of this, they used the Voting Rights Act as a shield to do

3   wrong.

4           MS. McKNIGHT:  Your Honor, I'd just note an objection.

5   Improper lay testimony.  Thank you.

6           JUDGE BLACK:  You need to keep your voice up, but the

7   objection is noted.  The witness can continue to answer

8   questions.

9   Q.  Turning now to lines 11 through 14 on the same page,

10  Senator, why did you say that the creation of a

11  majority-minority district out of parts of greater Cleveland

12  and parts of greater Akron is also unfair to both communities?

13  A.  In the 11th Congressional District, you know, Cuyahoga

14  County was it, and when you need representation, especially in

15  urban areas, especially in areas where there's struggle, the

16  citizens of those two areas deserve to have a representation

17  that can really focus in on their needs.

18      That was not the case after House Bill 319.  It took the

19  11th Congressional District and stretched it from, you know,

20  Cuyahoga County into Summit County, and in some cases, again,

21  if my memory serves me correctly, that was in 2011, but I

22  believe by way of example of Summit County that had three

23  congresspeople -- which doesn't make a whole lot of sense,

24  Summit County is smaller than Cuyahoga County -- and after this

25  map they ended up having four congresspeople.

1    It -- it dilutes the opportunity for the residents of those

2    districts, the voters of those areas, to have representatives

3    that can purely concentrate on their needs.  It was unfair to

4    the city of Cleveland.  Not just in the 11th district, but even

5    if I look at my -- the west side portions of Cleveland where

6    the district that was represented by Congressman Dennis

7    Kucinich was altered and now portions of the city of Cleveland

8    had to share a representative with our sisters and brothers in

9    Toledo.  And in some cases they're total water.  There's no way

10   even to get to one part of Cleveland all the way into Toledo.

11   So, again, it really does do a disservice to the residents of

12   those respective communities.

13        MS. LEVENSON:  Staying on page 52, Stephen, could you

14   please highlight lines nine through ten.

15   Q.  Why do you say that the splitting of 68 counties and 138

16   cities and townships is a travesty?

17   A.  Again, the point is that you really -- in order for people

18   to have representation in the Congress, you want to be able to

19   have that member or those members be able to focus in on the

20   economic, political and social needs of the people that they

21   represent.  When communities and -- neighborhoods and

22   communities are disjointed, those elected officials do not get

23   the opportunity to serve their residents in a way that benefits

24   those residents.  So, again, just a total disservice to the

25   citizens of the state to have them chopped up in that manner.

1          MS. LEVENSON:  On page 55, Steven, could you kindly

2    highlight line 25 and then continue on to page 56, line 1.

3    Q.  And, Senator, what did you mean by saying Ohioans have to

4    live with this map for the next ten years?

5    A.  Well, unfortunately, I turned out to be right.  I mean,

6    when politicians guarantee their seats and they neglect

7    service, that is really what happened in House Bill 319.  The

8    drawing of hyperpartisan districts, again, does not allow for

9    compromise to be had in the Congress on behalf of the residents

10   of the great state of Ohio.  And so this map is truly a

11   reflection of the will of politicians and did not take into

12   consideration at all the will of the people.  It hurt voters

13   who vote Democratic because it put into place permanently for

14   ten years 12 Republican seats as we know today -- I can say

15   that without fear of contradiction -- and four seats for

16   Democrats.

17          MS. LEVENSON:  Kindly, Stephen, on page 55, can you

18   highlight lines 5 through 8.

19   Q.  Senator Turner, can you explain why you said, "So why on

20   God's green earth, would any of us support a map that divides

21   cities and communities of interest?  Oh, I know why:  Seats

22   over service."

23      What did you mean by "seats over service"?

24   A.  I meant that if those maps were going to be drawn in the

25   fairest way possible -- and I do understand the politics of

1  this, so I'm not -- that's not lost on me, but the fairest way

2  possible would have been to look at the state and draw the map

3  based on what was in the best interests of the citizens of the

4  state and not the best interests of politicians.  So that's

5  what I mean by "seats over service."

6      My Republican colleagues in the General Assembly decided in

7  a very cynical manner to draw a map that guaranteed Republicans

8  12 seats, even though this state has sworn time and time again,

9  between presidential races and also gubinatorial races, to the

10  left and to the right, or to Republican and to Democrats.  And

11  so it was a disruption.  It was absolutely wrong in every way

12  to draw a map that guaranteed 12 for Republicans, four for

13  Democrats without regard for the political will of the people.

14  And so that's what I mean by choosing seats over what was in

15  the best interest, the service to the citizens of the state.

16  Q.  You mentioned that there was a map that was introduced by

17  your colleague Senator Tom Sawyer that was an alternative map.

18  What happened to that when it was proposed?

19  A.  That map did not -- yeah, the map did not get a hearing, as

20  I recall, and I believe that Senator Sawyer introduced it on

21  the floor as an amendment, and it was laid on the table.

22  "Laying on the table" means it's dead.  And the Republicans

23  voted to lay it on the table and Democrats voted not to.

24  Q.  So what, if anything, did the Democrats do about House Bill

25  319 after it passed?

1  A.  Sought referendum.  Fortunately, in the great state of

2  Ohio, the citizens have the right to overturn if they can get

3  enough signatures.  The will of the General Assembly and

4  Democrats sought to do that.

5  Q.  How did the referendum effort go?

6  A.  It didn't go well.  Democrats did not collect enough

7  signatures at the time to get the initiative on the ballot.

8  Q.  What were the Republicans doing at that time?

9  A.  At that time, working on another version of the same map

10  known as House Bill 369.

11  Q.  And what happened when it became clear that the referendum

12  was not going to be successful?

13  A.  Again, 369.  My Republican colleagues went straight to

14  House Bill 369.

15  Q.  What input, if any, did you have on House Bill 369?

16  A.  No input other than to vote.

17  Q.  So you've alluded to this, but if you could explain more.

18  What, if any, differences did you perceive between House Bill

19  319 and 369?

20  A.  Well, there were no differences in the outcome.  I mean, it

21  was still drawn in a way that would guarantee 12 Republican

22  seats and only four Democratic seats.

23  Q.  How did you vote on House Bill 369?

24  A.  I voted absolutely no.

25  Q.  How did the Democratic senators vote on House Bill 369?

1   A.  Again, the majority of the Democratic caucus in the Ohio

2   Senate voted no on that map.  And if I can add for a finer

3   point, there were five African-American senators in the Senate

4   at that time, and the majority, four of the five, voted against

5   that map.

6           MS. LEVENSON:  I have Joint Exhibit 5.  May I please

7   approach the witness with it, Your Honor?

8           JUDGE BLACK:  Yes.  Thank you.

9   Q.  Senator Turner, I'm handing you what's been marked as Joint

10  Exhibit 5.  Can you please tell us what that is?

11  A.  Yes.  This is a transcript of the Ohio Senate session

12  taking place on December 14th, 2011.

13          MS. LEVENSON:  I move to enter Joint Exhibit 5 into

14  evidence.

15          JUDGE BLACK:  It's a joint exhibit.  Any objection?

16          MS. McKNIGHT:  No objection, Your Honor.

17          JUDGE BLACK:  Thank you.  It's admitted.

18          MS. LEVENSON:  Thank you.

19      (Joint Exhibit 5 was admitted.)

20  Q.  Senator, what was presented before the Ohio senate at this

21  hearing?

22  A.  House Bill 369.

23  Q.  And the posture of the bill at that time?

24  A.  This bill had passed the Ohio House of Representatives and

25  now was being heard before the Ohio Senate, up for debate on

 1   the floor.

 2   Q.  And what do you recall about that hearing?

 3       Take your time.  I know you're sick.  Do you want a drink

 4   of water?

 5   A.  I did.  Thank you so much.

 6   Q.  Okay.

 7   A.  I remember, you know, the Senate session, a full debate on

 8   the bill, and I voted no.  I gave a floor speech similar to the

 9   speech that I gave before on 319.

10       MS. LEVENSON:  Stephen, can you please display the

11   document and navigate to page 23 at lines two to three.

12       I'm sorry.  Three to four.  Thank you.

13   Q.  Senator, why do you say, "To say that this map is

14   bipartisan is laughable"?

15   A.  Because my Republican colleagues delighted in having a few

16   Democrats vote for the bill in order for them to say that it

17   was bipartisan when the numbers don't lie.  For House Bill 319,

18   the same for House Bill 369, which we're talking about right

19   now, the majority of the Democrats in the Senate voted against

20   this bill, and just the mere fact that some Democrats, for

21   whatever reason, decided to vote for the bill does not make it

22   bipartisan.  It is very clear that the outcome of this bill had

23   a partisan effect, that it hurt Democrats, voters who vote

24   Democrat in the state of Ohio, and the majority of

25   African-Americans do vote Democrat.

 1   Q.   Senator, I'd like us all to look at page 23, lines 12 to

 2   20.

 3        MS. LEVENSON:   Stephen, if you could please highlight

 4   that.

 5   Q.   Why do you say here, "As recent information has revealed,

 6   the map was not created in the hearings held across this great

 7   state or even in a committee room in Columbus.  We now know

 8   that it was crafted in a hotel room down the street.

 9   Apparently, the General Assembly will do anything to please one

10   person, but is unable to come together for the benefit of the

11   11 million people who live in this state"?

12   A.   By that time news reports had come out to reveal that the

13   Republicans had a hotel room not far from the statehouse where

14   they paid people to really draw the lines that would be

15   presented to the General Assembly.  This is not the way the map

16   should be drawn.

17        MS. McKNIGHT:   Objection, Your Honor.  I'd just like

18   to note for the record, it's clear she lacks foundation to

19   provide this testimony.

20        JUDGE BLACK:   That's the objection.  You can lay a

21   foundation if need be.

22   Q.   Senator Turner, how -- how did you understand, come to

23   understand this information?

24   A.   By news reports, reading what was in the news, and there

25   are media reports that any citizen in the state of Ohio can

     1    read that noted that it was discovered that Republicans had a

     2    hotel room down the street from the statehouse, drawing the

     3    map.  That's not the way the map should be drawn.  The map

     4    should have been drawn and debated between Republican and

     5    Democrats and done so in the best interest of the citizens of

     6    the state, but that did not happen.

     7    Q.  Thank you, senator.  And the question that was pending is

     8    why did you say what you said in reaction to your knowledge of

     9    that information?

    10    A.  It was also noted in those, some of those news reports that

    11    Speaker Boehner had some influence on the way that the maps

    12    were drawn.

    13         MS. LEVENSON:  Stephen, if you could please turn to

    14    page 26, lines five through 12.

    15    Q.  Senator Turner, why did you say, "And the fact that some

    16    democrats have decided in the other chamber and will decide in

    17    this chamber to vote for this bill does not change the fact

    18    that it is rotten to the core"?

    19    A.  I said that because the cloak of bipartisanship was used in

    20    a sinister way and in the same way that the Voting Rights Act

    21    was used as a cloak to do wrong.  Just because a few Democrats,

    22    for whatever reason, voted for this map, did not make it a good

    23    map, did not change the fact that voters in the state of Ohio

    24    who vote Democrat would have their will suppressed because it

    25    was drawn in a way to guarantee 12 Republican seats and only

1    four Democratic seats.

2    Q.  You testified earlier to the effect that House Bill 319,

3    the use of House Bill 319 was a mockery of the Voting Rights

4    Act.  To what extent did House Bill 369 improve that problem?

5    A.  It didn't.  It didn't improve it at all.  It stayed the

6    same, materially.  The outcome between both of those bills

7    remained the same.

8    Q.  How did the African-American senators vote on House Bill

9    369?

10   A.  Again, there were five of us in the Ohio Senate, and the

11   majority of the African-American members of the Senate voted

12   no.

13       And if I may put a finer point on that, if this bill --

14   these maps were really in keeping with the Voting Rights Act,

15   it is safe to say that the African-American members of that

16   chamber, the majority, would have voted for it, but the

17   majority of the African-American members, and dare I say the

18   majority of the Democrats in that chamber, voted against that

19   bill.

20   Q.  You testified earlier that House Bill 319 disrespected the

21   cities of Cleveland, Toledo and Akron.  Did House Bill 369 fix

22   that problem?

23   A.  No, not at all.

24   Q.  How did the northeast Ohio senators vote on House Bill 369?

25   A.  Again, overall, the majority of northeast Ohio senators

1  voted no on the bill.

2  Q.  Senator Turner, I have just a few last questions.  At the

3  time that the 2011 map was enacted, was Joyce Beatty a United

4  States congressional representative?

5  A.  No.

6  Q.  The new map contained how many pairings of incumbent

7  Congress persons?

8  A.  There were three pairings.

9          MS. LEVENSON:  Thank you very much, Senator.

10          THE WITNESS:  Thank you.

11          JUDGE BLACK:  The attorneys for the other side have an

12  opportunity to ask questions.  For the intervenors?

13          MS. McKNIGHT:  Yes, Your Honor.

14          JUDGE BLACK:  Just setting the record.

15          MS. McKNIGHT:  Good morning, Your Honors.

16                      CROSS-EXAMINATION

17  BY MS. McKNIGHT:

18  Q.  Good morning, Senator Turner.  It's nice to meet you.

19  A.  Good morning.

20  Q.  I would like to start with the seemingly mundane, if you

21  can bear with me.

22      Have you ever used an e-mail address ninaturner7, the

23  number 7, @yahoo.com?

24  A.  Yes.

25  Q.  And is that the address you used in 2011?

1    A.  Most likely.

2    Q.  Okay.  Now, in 2011, you considered running against

3    Congresswoman Fudge in the 2012 congressional election; right?

4    A.  I did.

5    Q.  And one of the reasons you decided to drop out of that

6    race, according to a statement you made at the time, was

7    because you believed the redistricting process was manipulated

8    to allow incumbent politicians to guarantee their reelection;

9    isn't that right?

10   A.  I don't know what you're referring to.

11   Q.  Okay.  Do you recall making that statement?

12   A.  I do not.

13   Q.  Do you recall issuing a statement in December 2011, picked

14   up by various news outlets, regarding this position?

15   A.  I do not.

16   Q.  Would reading -- would a writing refresh your recollection?

17   A.  It may.

18       MS. McKNIGHT:  Can we put up the article, please.

19   Would Your Honors like paper copies of this document?

20       JUDGE BLACK:  If you have them.  Just don't mess with

21   my nameplate.

22   (Laughter.)

23       JUDGE BLACK:  Nicely done.

24   Q.  Senator Turner, would it help you to have a paper copy as

25   opposed to an electronic copy?

```
 1   A.  Yes.
 2          MS. McKNIGHT:  May I approach, Your Honors?
 3          JUDGE BLACK:  Yes.
 4   A.  Thank you.
 5   Q.  Sure.
 6       Senator Turner, have you had a chance to read that article?
 7   A.  Yes.
 8   Q.  And does it refresh your recollection that in December 2011
 9   you issued a statement that the redistricting process was
10   manipulated to allow incumbent politicians to guarantee their
11   reelection?
12   A.  Yes.
13   Q.  And so did you make that statement in December 2011?
14   A.  It appears so.
15   Q.  Do you have any reason to doubt that you did?
16   A.  It could have been taken out of context, but it appears so.
17   Q.  Thank you.  Senator Turner, do you believe that
18   Representative Fudge has not adequately represented the
19   citizens of Akron?
20   A.  You would have to ask the residents of the city of Akron.
21   Q.  Thank you.  And I don't have the opportunity to do that
22   today, and what matters is your testimony.  So do you believe
23   that Representative Fudge has not adequately represented the
24   citizens of Akron?
25   A.  My residence is Cleveland, so I'm not sure about how the
```

1    residents -- just as you can't ask, I can't ask the residents

2    of the city of Akron, either.

3    Q.  Thank you.  And by the same token, you can't say that

4    Representative Kaptur has not adequately represented all

5    citizens of her district, can you?

6    A.  No.

7    Q.  Now, Senator Turner, I heard you testify that you felt

8    excluded from the process for drawing the 2011 map; is that

9    right?

10   A.  Yes.

11   Q.  Okay.  Now, timing is important here, so my question is

12   related to the timing between the first map passing, that was

13   HB319, and the enacted map passing.  During that time period,

14   you worked with Democratic map drawers on proposed alternatives

15   to HB319; right?

16   A.  I don't recall that.

17   Q.  Do you recall that you received proposals from Democratic

18   map drawers which incorporated recommendations from Ohio House

19   and Senate Democrats, the Ohio Legislative Black Caucus and

20   congressional Democrats in Ohio?

21   A.  I don't know if you're making reference to some of the maps

22   that were drawn within the contest.  I mean, that might be

23   possible.

24   Q.  And those Democratic proposals included a 50 plus one

25   African-American district in northeast Ohio; right?

1    A.   Are you referring to the 11th Congressional District?

2    Q.   Yes.

3    A.   Well, that district existed before the map was drawn.

4    Q.   So those Democratic proposals in the fall included a 50

5    plus one African-American district in northeast Ohio, didn't

6    they?

7    A.   It did, with the caveat, again, that district existed

8    before the maps were drawn.

9    Q.   Okay.  I asked you two questions earlier, and it sounded

10   like you did not recollect something.  Would a writing refresh

11   your recollection?

12   A.   Maybe.

13        MS. McKNIGHT:  I'd ask to put up on the screen

14   Intervenors' Exhibit 96.

15   Q.   Now, as a preliminary question, Senator Turner, is that

16   your e-mail address in the two lines which reads

17   ninaturner7@yahoo.com?

18   A.   Yes.

19   Q.   And this is an e-mail dated November 3rd, 2011.  Is that

20   your read?

21   A.   Yes.

22   Q.   Now, could you take a moment to read this e-mail, and then

23   I'll ask you questions about whether it's refreshed your

24   recollection.

25        Are you ready to answer a question?

1    A.  Yes.

2    Q.  Now, Senator Turner, does reading this e-mail refresh your

3    recollection that you received proposals from Democratic map

4    drawers which incorporated recommendations from Ohio House,

5    Senate Democrats, the Ohio Legislative Black Caucus and

6    Congressional Democrats in Ohio?

7    A.  No.

8    Q.  Why not?

9    A.  I'm -- I can't guarantee whether or not I received that

10   e-mail or not, and it doesn't change the fact that the

11   Republicans were in full control of the Ohio legislature.

12   Q.  Thank you.  And let me just bring the document back up

13   again.

14        MS. McKNIGHT:  Could you put that document back up

15   again.

16   A.  Is it possible to get a paper copy of this?

17   Q.  Oh, yes.  You know, we can.

18   A.  Okay.

19        MS. McKNIGHT:  May I approach, Your Honor?

20        JUDGE BLACK:  Yes.  Thank you.

21   A.  Thank you.

22      (Ms. McKnight hands document to the witness.)

23   Q.  Senator Turner, I don't mean to interrupt you, but if you'd

24   just let me know when you're ready to answer questions.

25   A.  Thank you.

1     Okay.

2  Q.  So, Senator Turner, reviewing this e-mail, does it refresh

3  your recollection that you received, through your

4  ninaturner7@yahoo.com e-mail account, proposals from Democratic

5  map drawers which incorporated recommendations from Ohio House,

6  Senate Democrats, the Ohio Legislative Black Caucus and

7  congressional Democrats in Ohio?

8          MS. LEVENSON:  Objection, foundation.

9          JUDGE BLACK:  Very well.

10  A.  Certainly this document was sent to my e-mail.  It doesn't

11  really refresh my memory in any way, and it doesn't change the

12  fact that the map that was voted on both times didn't have any

13  of this in it.

14  Q.  And does it refresh your recollection, and here I'm looking

15  at paragraph 2, the third line down, "It provides for a 50 plus

16  one African-American district in northeast Ohio"?

17  A.  I mean, that's what -- I guess I just need some

18  clarification.  Is that 50 plus one district different than the

19  11th Congressional District, or are you referring to the 11th

20  Congressional District?

21  Q.  Well, I'm simply asking you if this e-mail refreshes your

22  recollection that you received a Democratic proposal in the

23  fall of 2011 that included a district that was 50 plus one

24  African-American in northeast Ohio.

25          MS. LEVENSON:  Continuing objection.  Foundation.  The

```
 1  witness has testified that this document does not refresh her
 2  memory.
 3          MS. McKNIGHT:  Your Honor, if the objection is
 4  foundation, I have laid it.  She has identified this as her
 5  e-mail address, and she does not dispute that this did not go
 6  to her e-mail address.  If the question is --
 7          JUDGE BLACK:  The objection is duly noted.  You may
 8  proceed.
 9          MS. McKNIGHT:  Thank you, Your Honor.
10  A.  Can you repeat the question.
11          MS. McKNIGHT:  Your Honor, at this point, if you don't
12  mind, I would like to move for the admission of Intervenors'
13  Exhibit 96.  Plaintiffs have lodged no objections against the
14  introduction of this exhibit on the exhibit list.
15          MS. LEVENSON:  We object to foundation at this time.
16          JUDGE BLACK:  Very well.  The exhibit is conditionally
17  admitted.
18      (Intervenors' Exhibit 96 was conditionally admitted.)
19          MS. McKNIGHT:  Thank you.
20  Q.  Senator Turner, now going back to the questions I had for
21  you --
22  A.  Yes.
23  Q.  -- we already understand that in the fall of 2011 you were
24  using an e-mail address ninaturner7@yahoo.com; correct?
25  A.  Yes.
```

1  Q.  You've already testified that this e-mail went to that

2  address.

3  A.  I testified that that is my e-mail address.  I also

4  testified to the fact that I did not recall receiving this

5  e-mail.

6  Q.  Okay.  Nevertheless, this e-mail was sent to your e-mail

7  address?

8  A.  It's listed among the e-mail addresses, yes.

9  Q.  And this e-mail shows, am I reading this incorrectly, that

10  "The enclosed maps incorporate the following:  Recommendations

11  from House, Senate Democrats, OLBC members recommendations,

12  Those Congressional Democrats who provided input"; isn't that

13  right?

14  A.  That's what it says.

15  Q.  And there's an acronym in there "OLBC."  Is it your

16  understanding that that stands for Ohio Legislative Black

17  Caucus?

18  A.  It is.

19  Q.  Now reading further in the e-mail it indicates that these

20  proposals provide "for a 50 plus one African American district

21  in Northeast Ohio."  Isn't that what it says?

22  A.  It says that, but --

23  Q.  Thank you.

24  A.  -- unless there's a -- it's still the 11th Congressional

25  District that exists before the maps were drawn.

NINA TURNER - CROSS/REDIRECT

```
 1   Q.  And when you received this e-mail, did you reply to it,
 2   stating that this majority-minority district was a mockery of
 3   the Voting Rights Act?
 4   A.  I don't recall that.
 5        MS. McKNIGHT:  Thank you.  No further questions.
 6        JUDGE BLACK:  Very well.  Defense have questions of
 7   the witness?
 8        MR. STRACH:  None from us, Your Honor.
 9        JUDGE BLACK:  Redirect, if any?
10        MS. LEVENSON:  Yes.  Briefly, Your Honor.
11        JUDGE BLACK:  Umm-hmm.
12                    REDIRECT EXAMINATION
13   BY MS. LEVENSON:
14   Q.  Senator Turner, do you still have in front of you the
15   document that was used by the intervenors, the news article
16   "Senator Nina Turner Drops Congressional Primary Bid"?
17   A.  Yes, I do.
18   Q.  Let's look at paragraph 4 of that document.  When you were
19   asked about that by counsel, you testified that perhaps there
20   was more context to what was read to you.
21   A.  Yes.
22   Q.  Well, the full statement says, "She," meaning you,
23   "released a statement that said the redistricting process was
24   manipulated to allow incumbent politicians to guarantee their
25   reelection, and the March 6th primary date would give
```

1  challengers little time to wage competitive campaigns."

2      Is this the context you were seeking?

3  A.  According to this news article, yes.

4  Q.  Well, would an early primary date make it harder to have a

5  primary campaign against an incumbent?

6  A.  Absolutely.  For -- for anyone.  I mean, it's very clear

7  that House Bill 319 and 369 was incumbency protection.  I mean,

8  that is not -- it doesn't matter what political affiliation.

9  The maps that were drawn were drawn to the disadvantage of the

10 citizens of the state of Ohio and particularly Democrats.

11 Q.  And coupling incumbency with a primary that was coming up

12 soon would be an impediment to a new challenger?

13 A.  That's right, and it denies the voters a robust debate,

14 which is one of the cornerstones of our representative

15 democracy for people to be able to hear ideas and determine who

16 should best represent them.

17 Q.  Did you ever give Randall Routt authority to issue map

18 proposals on your behalf?

19 A.  No, I did not, as an individual senator, give him that

20 authority.

21 Q.  Did you provide any input to Randall Routt about the map?

22 A.  I don't recall that.

23 Q.  Do you recall providing any input on the map?

24 A.  I don't recall that.  I will say that certainly there was

25 robust debate, you know, in our caucus about the maps.

1  Certainly, the fact that Senator Sawyer did introduce an

2  alternative map shows that the Democrats did try, in the

3  Senate, to get a fair map voted upon by the members of the

4  General Assembly.  So yes, we debated those issues.

5  Q.  And, ultimately, your vote on the map, to what extent did

6  that reflect your thinking about the map?

7  A.  Ultimately, my vote, and also my floor speeches that

8  anybody can go back and listen to or read my floor speeches, I

9  did not change my position on either map.  I was vehemently

10 against both maps because those maps were drawn in a very

11 partisan way, in a way that disrupted the natural order of the

12 voting patterns in the state of Ohio to the detriment of voters

13 who vote Democrat, to the benefit of Republicans, and to the

14 benefit of those Republican officeholders.  And I made that

15 very clear in both --

16     Both of my votes and also both of my floor speeches back up

17 what I'm saying here today.  Those were partisan maps.

18          MS. LEVENSON:  Thank you, senator.

19          THE WITNESS:  Thank you.

20          MS. LEVENSON:  No further questions.

21          JUDGE BLACK:  Very well.  I didn't think we were going

22 back and forth.  I thought we talked about it at the pretrial.

23          MS. McKNIGHT:  Your Honor, counsel just raised the

24 issue of Randall Routt, and I heard testimony that is a new

25 issue about Randall Routt, and I heard testimony from Nina

     1    Turner that is likely impeached by written recordings.

     2              JUDGE BLACK:  You may proceed succinctly.

     3                         RECROSS-EXAMINATION

     4    BY MS. McKNIGHT:

     5    Q.  Senator Turner, I just heard you testify about your

     6    communications with Randall Routt in the fall of 2011.  Did I

     7    understand you correctly that you did not communicate with

     8    Randall Routt about the details of the 2011 map proposals in

     9    2011?

    10    A.  What I communicated was, is that I, as an individual

    11    senator, did not have impact on the maps.

    12    Q.  But you also communicated with him about the composition of

    13    Congressional District 11 during the map drawing process;

    14    didn't you?

    15              MS. LEVENSON:  Objection.  Foundation.

    16              JUDGE BLACK:  The objection's noted.

    17    A.  Certainly there was debate about the maps, as I said

    18    before.

    19    Q.  Okay.  But you e-mailed Randall Routt privately to obtain

    20    details about voting data in Congressional District 11 in the

    21    fall of 2011; didn't you?

    22    A.  Randall Routt worked for the Ohio Senate caucus.  He was an

    23    employee of our caucus and most likely on the team that was

    24    trying to help Senate Democrats be a -- have some influence on

    25    those maps.

1   Q.  So is the answer "Yes," Senator Turner?

2   A.  Did I e-mail -- I mean, I don't know if I e-mailed him or

3   not.

4   Q.  Did you see --

5   A.  He was on the team.

6   Q.  Okay.

7   A.  He was part of our caucus staff, and we did have debates

8   about the map, about the maps, yes.

9   Q.  And you were able to obtain data from him, political data

10  from him regarding the districts in 2011; right?

11  A.  I don't recall that.

12          MS. McKNIGHT:  Your Honors, may I approach the

13  witness?

14          JUDGE BLACK:  Yes.  Thank you.

15          THE WITNESS:  Thank you.

16          MS. McKNIGHT:  Your Honors, may I approach?

17          JUDGE BLACK:  Would you call for the marshal, please.

18      (Laughter.)

19          JUDGE WATSON:  Do you want one of these back?

20          MS. McKNIGHT:  Thank you.

21  Q.  Senator Turner, have you had a chance to review this

22  e-mail?

23  A.  Yes, briefly.

24  Q.  And doesn't it show that you were e-mailing privately with

25  Randall Routt in the fall of 2011 about the composition of

1  CD11, proposed CD11?

2  A.  It appears.

3  Q.  All right.  And doesn't this show that you were asking

4  questions of Randall Routt regarding the composition, the

5  racial composition of CD11?

6  A.  That's with a caveat to get a better understanding of the

7  impact that any map would have on the district that I live in

8  and portions of the district that I represent, and it is not in

9  contrast to my votes on both of those bills, which was no.

10         MS. McKNIGHT:  Thank you, Senator Turner.  I have no

11  further questions.

12         THE WITNESS:  Thank you.

13         JUDGE BLACK:  Senator Turner, thank you.  You are free

14  to go.

15         THE WITNESS:  Thank you, Your Honor.

16         JUDGE BLACK:  Thank you for your service to the

17  community and the country.

18         THE WITNESS:  Thank you.

19         JUDGE BLACK:  I hope you feel better.

20         THE WITNESS:  Thank you.

21      (Witness excused.)

22         JUDGE BLACK:  If you think you caught it from

23  intervenors' counsel, let me know.

24      Plaintiff ready to call another witness?

25         MS. BONHAM:  Yes, Your Honor.  The plaintiffs call

1  Mark Griffiths.

2          JUDGE BLACK:  If that gentleman would approach the

3  witness stand.  Would you raise your right hand for the oath,

4  sir.  Do you solemnly swear or affirm that the testimony you'll

5  give today is the truth, subject to the penalty of perjury?

6          THE WITNESS:  I do.

7          JUDGE BLACK:  Very well.  Be careful of the chair.  It

8  tips back.

9                    MARK GRIFFITHS

10  a witness herein, having been first sworn, testified as follows:

11                  DIRECT EXAMINATION

12  BY MS. BONHAM:

13  Q.  Good morning, Your Honors, Mr. Griffiths.

14  A.  Good morning.

15  Q.  Could you please state and spell your name for the record?

16  A.  Mark Griffiths, M-a-r-k G-r-i-f-f-i-t-h-s.

17  Q.  What do you do for a living, Mr. Griffiths?

18  A.  I'm retired.

19  Q.  How long have you been retired?

20  A.  About five years.

21  Q.  Where did you retire from?

22  A.  I had worked as director of human resources at Catholic

23  Charities of Cleveland.

24  Q.  Catholic Charities in Cleveland.  And how long did you hold

25  that job?

1  A.  Almost 16 years.

2  Q.  Okay.  What's your educational background?

3  A.  I have a Bachelor of Arts degree in history from Cleveland

4  State University.

5  Q.  Where do you live, Mr. Griffiths?

6  A.  I live at 33137 Hawks Nest Court in North Ridgeville, Ohio.

7  Q.  And how long have you been at that address?

8  A.  Almost 16 years.

9  Q.  Where did you live before the Hawks Nest address?

10  A.  In Parma, Ohio.

11  Q.  And about how far away is Parma from your current home?

12  A.  It's probably about 45 minutes.

13  Q.  Have you always lived in that particular area?

14  A.  Yes.  Generally west, southwestern part of Cleveland.

15  Q.  Okay.  Do you know what county the Hawks Nest address is in

16  that you currently live at?

17  A.  Lorain County.

18  Q.  Do you know what U.S. congressional district that's in?

19  A.  That's Congressional District 7.

20  Q.  Who is your congressional representative there?

21  A.  Bob Gibbs.

22  Q.  What party is Mr. Gibbs?

23  A.  Republican.

24  Q.  Are you registered with a political party?

25  A.  Yes, I'm a registered Democrat.

1  Q.  And can you tell us, what is your role in this case?

2  A.  I am a plaintiff.

3  Q.  And what capacity are you testifying in?

4  A.  My personal experience.

5  Q.  Sir, are you registered to vote in Ohio?

6  A.  Yes, I am.

7  Q.  When did you first register to vote here?

8  A.  1970.

9  Q.  How often do you vote?

10  A.  I vote always, whenever I can.

11  Q.  Whenever you can.  Why is that?

12  A.  I think voting is very important.  I think we need to

13  participate in the democracy, and I take that responsibility

14  very seriously.

15  Q.  And you testified too that you're a registered Democrat.

16  How long have you been a Democrat?

17  A.  As long as I've been voting, so my whole life.

18  Q.  What does that mean to you, being a Democrat?

19  A.  I think that Democratic party values align with mine in

20  terms of access to affordable healthcare, fair treatment of

21  people, equal opportunity for people, respect for dignity of

22  people, the role of government in people's lives, my personal

23  values line up with Democratic values on those things.

24  Q.  Does that mean you've always voted for a Democrat?

25  A.  I vote -- I can recall voting for a Republican one time.

1    That was -- I voted for Senator Rob Portman in 2016.  Other

2    than that, I think it's been all Democrats.

3    Q.  Okay.  And does that include only voting Democrat for the

4    United States Congress?

5    A.  Correct.

6    Q.  Well, besides voting, do you engage in any other political

7    activities?

8    A.  I have, since early 2017, I've been involved in a number of

9    political activist organizations.

10   Q.  Can I ask you to list these.

11   A.  Sure.  There's Lorain County Rising; another group called

12   Indivisible in Wellington, Ohio; the League of Women Voters in

13   Oberlin, as well as the state and the North Ridgeville

14   Democratic Club.

15   Q.  Okay.  I'm going to ask you a little bit about each of

16   these organizations.  Lorain County Rising, can you -- can you

17   explain briefly what that is?

18   A.  I would say it's a progressive activist organization, and

19   my role in that has been to participate in demonstrations,

20   essentially.  For example, they -- we had a candlelight vigil

21   following the Charlottesville matter, a march against gun

22   violence after Parkland, Florida, those kinds of things.

23   Q.  Okay.  Where is that group located?

24   A.  It's in Oberlin, Ohio.

25   Q.  So what congressional district does it operate in?

1    A.   District 4.

2    Q.   Have you done any voter specific work with that group,

3    voter registration?

4    A.   I've done some voter registration with them.  I was also

5    involved with them in circulating the redistricting petitions

6    that was sponsored by Fair Districts for Ohio.

7    Q.   Okay.  You also said you're a member of the League of Women

8    Voters of Ohio.

9    A.   Yes.

10   Q.   And the Oberlin chapter; is that right?

11   A.   That's correct.

12   Q.   And I know you've probably heard testimony as to this so

13   far, but can you briefly describe what that group is.

14   A.   It's a non-partisan group, and they are very much involved

15   in voter education, voter awareness, getting people registered

16   to vote, and certainly involved in supporting the ending of

17   gerrymandering in Ohio.

18   Q.   And can you give examples of the sorts of work you've done

19   with your league chapter?

20   A.   Once again, I participated in voter registration activities

21   and in circulating the gerrymandering petition and support for

22   Issue 1.

23   Q.   And the Oberlin club, is that -- what congressional

24   district do they do most of their work in?

25   A.   The Oberlin chapter of the league?

1    Q.   Yes.

2    A.   Primarily District 4.

3    Q.   Then you said you were a member of Indivisible Wellington.

4    Can you briefly describe that group?

5    A.   Yes, I was attracted to that group because they are -- they

6    are in Congressional District 7.  Again, it's a progressive

7    activist organization.  We work -- we worked on the

8    antigerrymandering effort.  We've tried to encourage the state

9    to adopt automatic voter registration.  I think that's

10   primarily the issues that we've dealt with there.

11   Q.   Okay.  And Congressional District 7 is your home district

12   right now?

13   A.   That's correct.

14   Q.   Indivisible Wellington and Lorain County Rising, are these

15   specifically Democratic groups?

16   A.   They're open to anyone.  I would say my guess is 99 percent

17   are probably Democrats, but it's not a requirement to -- to

18   participate.

19   Q.   And your work with those groups, does it ever support

20   Democratic campaigns or Democratic party issues?

21   A.   The Indivisible Wellington group did get very involved with

22   the Ken Harbaugh campaign.  He was the Democratic candidate

23   against Bob Gibbs in 2018.

24   Q.   Okay.  And can you tell me what sorts of things, if any,

25   did you do with the Ken Harbaugh campaign?

1   A.   I did a lot.  We did door-to-door canvassing for him, we

2   did phone banking, we did a Get Out the Vote effort with

3   postcards, we sponsored some meet-and-greet sessions so that he

4   could get to meet voters.  So all of those activities.

5   Q.   Okay.  And where was most of your work with the Harbaugh

6   campaign?

7   A.   Primarily in the city of North Ridgeville, also Avon.  Once

8   or twice I think we worked in Wellington, but primarily North

9   Ridgeville and Avon.

10  Q.   And are these towns in District 7 your home district?

11  A.   Yes, they are.

12  Q.   Finally, you mentioned the North Ridgeville Democratic

13  club.  Can you briefly explain what that is.

14  A.   That is a group of Democrats in North Ridgeville, and my

15  understanding is it existed and went out of existence for a

16  number of years.  And after the 2016 election, there were some

17  Democrats within the city that started to connect with each

18  other and decided we would try to reformulate that club.  And

19  it's been a long, slow process, but starting in, I think,

20  January of this year there's been conversations with the Lorain

21  County Democratic party to actually officially align with --

22  with the party.

23  Q.   And do you have a particular role or title in that club?

24  A.   No, I do not.

25  Q.   But you've been pretty involved with trying to get it off

1  the ground?

2  A.  Very involved with getting it off the ground.  We started,

3  I think, with about three people that would meet at a coffee

4  shop once a month, and just gradually we got word out through

5  newspaper advertisements.  Also, in our work with the Harbaugh

6  campaign, we connected with other North Ridgeville Democrats,

7  so we encouraged them to participate, and, slowly, over the

8  last 18 months, have built the numbers up of the group

9  somewhat.

10  Q.  I'm going to ask my colleague to put up what's been marked

11  Plaintiffs' Demonstrative 6.

12      Do you recognize this?

13  A.  Yes, I do.

14  Q.  What is it?

15  A.  This is our congressional district, District 7.

16  Q.  Okay.  And where are you referring to when you see District

17  7?  Can you describe it?  We all -- we all can see the map.

18  A.  District 7 is part of Lorain County, part of Medina County,

19  all of Holmes County, all of Ashland County, all of Coshocton

20  County, and there's more.  I think there's eight or nine

21  different counties and I, frankly, don't have them memorized.

22  Tuscarawas I know is one.  It is a long and meandering

23  county -- or district, I would say.

24  Q.  Okay.  So I'm going to submit to you that this is a partial

25  version of the current congressional map, and can you see

```
 1  the -- where your address is on this map?
 2  A.  Yes.  Yes, I can.  It's where the blue push pin is.
 3          MS. BONHAM:  Okay.  I'm going to ask, Stephen, if you
 4  could zoom in on that area.
 5      Okay.
 6  Q.  So you testified, Mr. Griffiths, that your congressperson
 7  in this district is Bob Gibbs, and he's a Republican; is that
 8  right?
 9  A.  That's correct.
10  Q.  Have you ever voted for Mr. Gibbs?
11  A.  No, I have not.
12  Q.  And the most recent congressional election in 2018, who did
13  you vote for?
14  A.  Ken Harbaugh.
15  Q.  And did Mr. Harbaugh win the election?
16  A.  He did not win the election.
17  Q.  In 2016, who did you vote for for Congress?
18  A.  The Democratic candidate, Roy Rich.
19  Q.  And what about in 2014?
20  A.  In 2014, Bob Gibbs was unopposed.  So while I voted in that
21  election, I did not vote for him that particular race.
22  Q.  Okay.  So you picked up a ballot, but you didn't vote in
23  the congressional one?
24  A.  Correct.
25  Q.  What about in 2012:  Who did you vote for for Congress?
```

1  A.  The Democratic candidate, whose name I'm sorry I don't

2  recall, but it was a Democratic candidate who ran against Bob

3  Gibbs.

4  Q.  What about prior to that?  Was your district different?

5  A.  The district was different.  I was represented -- I don't

6  remember the number, I'm sorry, but it was Betty Sutton, and

7  prior to Betty Sutton was Sherrod Brown in that same district.

8  Q.  And when did you learn and how that the district had

9  changed, that your district had changed?

10  A.  Well, going into the 2012 election, I really expected to be

11  voting between Marcy Kaptur and Dennis Kucinich.  It was not

12  really until the election that I realized that, in fact, that

13  was not the case.  Our district was not part of that pairing

14  but, in fact, had been included and put into Bob Gibbs'

15  district, District 7 that, again, stretched all the way down to

16  Holmes County, Coshocton County and all that.  So I was pretty

17  surprised to see that that was the district that we were placed

18  in.

19  Q.  You testified, now, that you've always voted against

20  Congressman Gibbs.  Are there specific issues that you feel he

21  doesn't represent you about?

22  A.  Yes, healthcare, certainly.  I've had the opportunity to

23  meet with him twice as -- as part of our Indivisible groups.

24  The first time I met with him was in Canton, at his district

25  office in Canton.  The second time was his office in Ashland,

1    Ohio.

2        When we met with him in Canton, my wife and I went down to

3    see him with a group, and we met with him individually first,

4    made a little smalltalk.  And he asked where we were from, and

5    I told him North Ridgeville, and he said, "Wow, you're the ones

6    that have come the furthest.  You've actually had to pay a toll

7    to come to this meeting."  And he actually announced that to

8    the group that that was the case.

9        It got me thinking about that, and afterwards, when I got

10   home, I looked to see, and that district office, as I recall,

11   was something like 60 miles from my home.  The other office

12   that he has in Ashland is about 45 miles, I believe, from my

13   home.  I did a search and I discovered that there were actually

14   five congressional district offices, five different

15   congressional representatives with offices closer to my home

16   than either of the two offices of Bob Gibbs.  And I thought

17   that remark and the research that I did was telling that, in

18   fact, this was not someone that was representing my community.

19   Q.  And so you mentioned that you did travel down to meet with

20   him with this group.  Can I ask you, how did that meeting go?

21   A.  The first meeting we really were -- my wife and I were more

22   observers than participants.  We were invited in to this

23   meeting by a different group.  The meeting was about healthcare

24   and people were giving different -- it was sort of a scripted

25   meeting, but people were giving different examples of how

1    healthcare issues were impacting their life.

2         He listened, but essentially was against the idea.  He

3    wanted to get rid of the Affordable Care Act and was very much

4    in favor of a free-market approach to healthcare.  And while

5    many of us offered countering arguments, I don't think it was

6    making much impact on him.

7    Q.  And why don't you think these arguments made an impact on

8    him?

9    A.  I'm not sure.  He just seemed to believe very strongly in

10   the -- what I would call the Republican position on this.

11        The second meeting, if I may, that we had was in Ashland,

12   and that was specifically about the healthcare issue, and the

13   timing of it was right after President Trump had made the

14   comment about "Who knew healthcare was so complicated?"  And as

15   we talked about various approaches to healthcare, and we all

16   were in agreement that it's a complicated subject, I offered to

17   Congressman Gibbs that I had over 40 years' experience in the

18   human resource field.  I knew this was a complicated issue, and

19   I offered to work with him, his office.  If they wanted to put

20   a study group together on a volunteer basis, I would do

21   whatever I could to help examine the issues and try to

22   formulate some kind of approach.

23        While I don't recall the exact specific words, the offer

24   was not accepted.  I would say it was not acknowledged and in

25   no way really responded to.  That gave me the message that my

1  view on this really did not matter to him.

2  Q.  And why don't you think that your views mattered to him?

3  A.  I think it's because of the shape of the makeup of the

4  district.  His strength of his support, his base, if you will,

5  is Holmes County, Tuscarawas County, Ashland County, and the

6  more northern part of the district that I'm in, Avon, North

7  Ridgeville, which may have more Democrats, really are not

8  anything that he needs to be concerned about.

9  Q.  You testified before about working to elect Democrat Ken

10  Harbaugh for that seat in 2018.

11  A.  Yes.

12  Q.  Did you face any challenges in that work?

13  A.  We did face challenges.  The biggest challenges, again, the

14  size of the district.  It was very difficult to try to have

15  volunteers, because the whole campaign staff was essentially

16  volunteers, working in those other -- the outlying areas of the

17  district and trying to get the message out.  I worked, again,

18  as I mentioned earlier, in Avon and North Ridgeville, and we

19  did a lot of work in those communities.  And, in fact, Ken

20  Harbaugh won those two communities which I would describe as

21  Republican communities, but I think because of the work that we

22  put into it, we were able to make that change.  Even with all

23  the work and the time and the effort that we put into it, we

24  were not able to overcome the makeup and the math of the map as

25  it exists in District 7.

1    Q.  So in the Harbaugh campaign and your work canvassing there

2    or canvassing for the petitions or any other work in this area,

3    have you perceived that the congressional map has any impact on

4    the folks you're trying to canvass?

5    A.  Yes.  We were faced with a lot of -- I would say as we

6    talked to people, there was a -- there was a politeness that

7    people had, but incredulous.  They were not interested in

8    voting.  They did not think that things would change.  They did

9    not understand what would be the point.  And while some of the

10   positions of Ken Harbaugh they would support, or they were

11   supportive or they were receptive to, they really did not think

12   that they were going to bother voting because What's the use?

13   was the feeling that we got.

14   Q.  Okay.  And you also testified that you've done some work in

15   nearby areas, but in areas that were in different congressional

16   districts.

17   A.  Yes.

18   Q.  So did you feel there was an impact on the people you

19   canvassed other than what you've already described?

20   A.  Not in canvassing.  I think the canvassing, the impact was

21   the same as what I've described in some of the other

22   communities that we're in.  But I would like to mention that I

23   also was involved in doing voter registration, and right now

24   I'm thinking specifically of voter registration efforts that we

25   undertook at Lorain County Community College.  And at that

 1   school you have people from a number of different congressional

 2   districts, you know, reside in different districts that go to

 3   that school.  People did not understand what district they were

 4   in.  We couldn't necessarily tell them.  We didn't know, when

 5   they told us where they lived.

 6       I had an app. on the phone from the Ohio Secretary of

 7   State's office that we could do voter lookup and address

 8   lookup, and in that manner try to determine what district they

 9   were in.  But it was amazing to me how people did not know or

10   understand which district they were in.

11   Q.  You also testified before about your work reviving your

12   local Democratic club.  Did you face challenges in that work?

13   A.  Yes.  Again, it was difficult to identify people that were

14   interested or would be interested in doing this.  And, again,

15   it was -- we heard from people, What is the point?  There was a

16   person that had been involved in the club for quite a while

17   and, actually, was fairly politically active, but he told me

18   that the club just kind of dropped off years ago because of a

19   lack of interest and people no longer wanted to be involved.

20   Q.  Besides in your political work, how, if at all, has the map

21   impacted you personally as a voter in Congressional District 7?

22   A.  I don't feel as though I'm being represented.  I think the

23   representative either doesn't care about my views or doesn't

24   need to care about my views.

25       I've contacted Congressman Gibbs, I would guess, at least

1    ten or 15 times -- either e-mail, phone calls, letters.  When

2    I've called the office, I maybe have talked to a staff person

3    six or eight times.  They've told me they'll pass the message

4    on to the congressman.  I've never heard anything back.

5         There's a couple of letters that I've received back from

6    Congressman Gibbs that were rather ineffective or did not

7    necessarily address the issue that I was raising.

8         Congressman Gibbs, I never knew of him being in North

9    Ridgeville until during this last election season.  I know of

10   two instances I think he met with the chamber of commerce and I

11   think he even met with a -- at a local business in North

12   Ridgeville.  Both were closed meetings, and I was not aware of

13   them until after the fact, and there was a brief story about it

14   in the local paper that he had been there.  Other than that, I

15   have no knowledge of Mr. Gibbs being in North Ridgeville.

16        In fact, when I mentioned to other Democrats in North

17   Ridgeville that I've actually been in two meetings with him,

18   they were shocked, because they did not know of anyone that had

19   ever met with him and, in fact, told me that he's often

20   referred to as a ghost because no one ever sees him.

21   Q.  I'm going to ask my colleague now to put up what's been

22   marked Plaintiffs' Demonstrative 7.  Have you seen this before,

23   Mr. Griffiths?

24   A.  Yes.

25   Q.  What is it?

```
 1   A.  I think this is -- it's the revised map.

 2   Q.  Where have you seen it before?

 3   A.  It's been shared with me by counsel.

 4   Q.  Yeah.  And also this is a cropped copy of the proposed

 5   remedial map.  Do you recognize the location of that thumbtack

 6   symbol now?

 7   A.  Yes, I do.

 8           MS. BONHAM:  And can I ask you, Stephen, to zoom in on

 9   this, too.

10       Thank you.  I have no further questions.

11           JUDGE BLACK:  Very well.  The other side gets a chance

12   to ask questions.

13                       CROSS-EXAMINATION

14   BY MS. YACKSHAW:

15   Q.  Good morning, Mr. Griffiths.

16   A.  Good morning.

17   Q.  It's good to see you again.  As a reminder, I'm Ann

18   Yackshaw with the Ohio Attorney General.

19   A.  Yes.

20   Q.  So, Mr. Griffiths, you just testified that you typically

21   vote for Democratic candidates; is that correct?

22   A.  Yes.

23   Q.  But you also just testified that you have voted for a

24   Republican candidate in the past?

25   A.  One time for Rob Portman.
```

1  Q.  And was that Rob Portman's race against Ted Strickland?

2  A.  That's correct.

3  Q.  And isn't it true that you voted for Rob Portman in that

4  race against Ted Strickland because you believed him to be the

5  better candidate?

6  A.  Yes.

7  Q.  And the candidate with more experience?

8  A.  Yes.

9  Q.  So it's true that under some circumstances you would vote

10 for a Republican if you believed the Republican to be a better

11 candidate; is that correct?

12 A.  Well, in that one circumstance, yes.

13 Q.  And so it's true that party affiliation isn't the sole

14 reason that you vote for a particular candidate?

15 A.  Correct.

16 Q.  And then isn't it also true that party affiliation isn't

17 the sole reason that you would vote for a congressional

18 candidate?

19 A.  Correct.

20 Q.  Thank you.  So, Mr. Griffiths, you've just testified that

21 you met with Representative Bob Gibbs on two occasions as a

22 part of the Indivisible group; is that correct?

23 A.  That's correct.

24 Q.  And isn't Indivisible a group that seeks to elect

25 Democrats?

1    A.  I'm sorry, I didn't hear that.

2    Q.  Isn't Indivisible a group that seeks to elect Democrats?

3    A.  Are you asking is that the purpose of Indivisible, to elect

4    Democrats?

5    Q.  Is it among the purposes --

6    A.  Yes, yes.

7    Q.  -- of Indivisible to elect Democrats?

8    A.  Yes.

9    Q.  Okay.  Thank you.  Including Ken Harbaugh, who was the

10   opponent of Representative Gibbs --

11   A.  Yes.

12   Q.  -- in the 2018 election?

13   A.  Correct.

14   Q.  So in sitting down to meet with the Indivisible group,

15   Representative Gibbs was specifically soliciting opposition

16   opinions; isn't that correct?

17   A.  He agree-- I don't know the circumstances around the

18   meeting, the first meeting that I was at.  I was sort of

19   invited to participate and I wasn't involved in the planning.

20   But I -- based upon his response and reaction, I'm not sure he

21   was soliciting.  I might describe it more as tolerating.

22   Q.  But he was agreeing to meet with his opposition?

23   A.  Yes.

24   Q.  Correct?

25   A.  Yes.

1  Q.   Okay.  And it's true that Indivisible was able to share its

2  views with Representative Gibbs during those meetings --

3  A.   Yes.

4  Q.   -- on healthcare and the Affordable Care Act, specifically?

5  A.   Correct.

6  Q.   And I believe you testified that Representative Gibbs

7  ultimately did not change his views on healthcare and the

8  Affordable Care Act as a result of those meetings?

9  A.   Correct.

10  Q.   Correct.  And is it true that because Representative Gibbs

11  did not change his opinions, you felt he was unresponsive to

12  you?

13  A.   Partially, but I really felt as though he were unresponsive

14  when a good faith offer was made to work on this issue, because

15  he agreed that it was complicated and there was more work

16  needed to be done, and that offer was not accepted,

17  acknowledged in any way.

18  Q.   Mr. Griffiths, you testified that you canvassed during the

19  2018 congressional election --

20  A.   Yes.

21  Q.   -- for Ken Harbaugh who was the Democratic candidate?

22  A.   Correct.

23  Q.   And isn't it true that you kept notes on your interactions

24  with voters?

25  A.   Yes.

1  Q.  And you classified them as, quite frankly, usually not

2  home?

3  A.  Yes, correct.

4  Q.  But when they were home, as persuadable was one option;

5  correct?

6  A.  Right.

7  Q.  And friendly --

8  A.  Uh-huh.

9  Q.  -- was another option?  And then adverse was another

10  option?

11  A.  I don't know if it was friendly.  I think it was

12  persuadable, aligned, neutral --

13  Q.  Okay.

14  A.  -- hostile, if memory serves me correctly.  I don't

15  remember friendly, but --

16  Q.  Okay.  "Aligned" then was an option.  And isn't it true

17  that when you canvassed for Democratic candidate Ken Harbaugh,

18  that you classified most of the voters that you were able to

19  speak to in District 7 as persuadable to vote for Mr. Harbaugh?

20  A.  I don't recall the breakdown, the percentages.  There were

21  some persuadable, there was also, I thought, a high number of

22  neutral.  I don't remember if it was more persuadable or

23  neutral, to be honest with you.

24  Q.  I have a set of your notes here.  Would it refresh your

25  recollection to look at your notes?

```
 1  A.  Sure.
 2          MS. YACKSHAW:  May I?
 3          JUDGE BLACK:  Yes.
 4      (Ms. Yackshaw hands documents to the witness.)
 5          JUDGE BLACK:  Would you give those to Judge Watson,
 6  please.
 7          MS. YACKSHAW:  I don't want to cause a ruckus.
 8      (Laughter.)
 9  Q.  And so, Mr. Griffiths, if you will review those notes and
10  let me know when you're ready.  And, for the record, they were
11  marked as Defendant's Exhibit D34.
12  A.  As you indicate, I just went through briefly, most people
13  were not home.  I think I counted five persuadable, two
14  neutral, maybe one aligned.  It's a quick look.  So, yeah, of
15  these sheets, probably the most were persuadable, of the people
16  we talked to.
17  Q.  And so most voters that you spoke to in District 7 hadn't
18  made up their mind who to vote for before the election?
19  A.  That is correct.
20  Q.  And they hadn't decided to vote for Representative Bob
21  Gibbs before the election?
22  A.  They had not, you said?
23  Q.  They had not yet decided?
24  A.  That's correct.
25          MS. YACKSHAW:  Thank you, Mr. Griffiths.  I have no
```

 1  further questions.

 2          JUDGE BLACK:  The intervenors have questions?

 3                         CROSS-EXAMINATION

 4  BY MR. TUCKER:

 5  Q.  I believe it was your testimony that Representative Gibbs

 6  does not appear in North Ridgeville; is that correct?

 7  A.  To my knowledge, yes.  I mentioned twice during this last

 8  election season that I'm aware that he was in North Ridgeville,

 9  but those are the only two times that I'm aware of.

10  Q.  Okay.  So you are aware that he has appeared in North

11  Ridgeville in October of 2017, for a forum on tax reform?

12  A.  No, I was not.

13  Q.  You were not aware of that?

14  A.  No.

15          MR. TUCKER:  Thank you.  No further questions.

16          JUDGE BLACK:  Redirect, if any, Ms. Bonham?

17          MS. BONHAM:  No, Your Honor.

18          JUDGE BLACK:  Very well.  Sir, you may step down.

19  Thank you.

20      (Witness excused.)

21          JUDGE BLACK:  We are going to take our mid-morning

22  break.  It's 10:30.  I would ask you to be back, ready to go,

23  at 10:45.  We'll recess for 15 minutes.

24          COURTROOM DEPUTY:  All rise.  This court is in recess

25  until 10:45.

1    (Recess taken:  10:28 AM - 10:45 AM.)

2        JUDGE BLACK:  Please be seated.  Thank you.  We've had

3  our mid-morning break.  We're back on the record.  It's quarter

4  of 11:00.  Plaintiffs' counsel's here.  Defense counsel is

5  here, intervenors' counsel is here.

6    Is the plaintiff prepared to call another witness at this

7  time?

8        MS. LEE:  We are, Your Honor.  Plaintiffs call

9  Nathaniel Simon.

10        JUDGE BLACK:  Very well.  If that gentleman would

11  approach the witness stand.  Do you solemnly swear or affirm

12  that your testimony today will be the truth subject to the

13  penalty of perjury.

14        THE WITNESS:  I do.

15        JUDGE BLACK:  Very well.  Thank you.

16                    NATHANIEL SIMON

17  a witness herein, having been first sworn, testified as follows:

18                    DIRECT EXAMINATION

19  BY MS. LEE:

20  Q.  Good morning.  Would you please state your name for the

21  record.

22  A.  Nathaniel Simon.

23  Q.  And, now, Nate, I know most 25-year-olds have not testified

24  in federal court, so I understand if you're nervous, okay?

25  A.  Yes.  Thank you.

1  Q.  Okay.  Good.  What was your address?

2  A.  My address is 3740 Ault, A-u-l-t, Park Avenue.  It's in

3  Cincinnati, Ohio 45208.

4  Q.  What congressional district is that in?

5  A.  It's in the 2nd Congressional District.

6  Q.  Who is your congressperson?

7  A.  Brad Wenstrup.

8  Q.  And what party is he from?

9  A.  He's a Republican.

10  Q.  Are you a registered voter?

11  A.  Yes, I am.

12  Q.  And how long have you been registered to vote?

13  A.  Since I was 18.

14  Q.  Okay.

15       MS. LEE:  Could you please put up Plaintiffs'

16  Demonstrative PD014.

17  Q.  Can you see what's on the screen?

18  A.  Yes, I can.

19  Q.  Okay.  And what is depicted here?

20  A.  This is the current congressional district map for Hamilton

21  County with Congressional District 1 and Congressional District

22  2 wrapping around each other.  Most notably, city of Cincinnati

23  is split between the two districts.

24       JUDGE BLACK:  Mr. Simon, will you keep your voice up,

25  please.

```
 1              THE WITNESS:  Yes.
 2              JUDGE BLACK:  When you get to be my age, you'll
 3   understand.
 4   A.  My house is noted by the blue pin.
 5   Q.  Okay.  Thank you.
 6              MS. LEE:  And could you please put up Plaintiffs'
 7   Demonstrative PD015.
 8   Q.  And, Nate, what is depicted here, if you know?
 9   A.  This is the proposed remedial map for Congressional
10   Districts 1 and 2 in Hamilton County.  Again, there's my house
11   with the blue pin, and, notably, city of Cincinnati is kept
12   whole.
13   Q.  Okay.  And, Nate, what is your relationship to this case?
14   A.  I'm the outgoing president of Hamilton County Young
15   Democrats, which is a plaintiff in this case.
16   Q.  When were you president of the Hamilton County Young
17   Democrats?
18   A.  I restarted the organization in 2017, and I stepped down as
19   president in 2018, December.
20   Q.  Okay.  And are you testifying here today on behalf of the
21   Hamilton County Young Democrats?
22   A.  Yes, I am.
23   Q.  Does the Hamilton County Young Democrats have members?
24   A.  Yes, we do.  We're a membership organization.
25   Q.  And even though you're not on the board anymore, are you
```

```
 1   still a member of the Hamilton County Young Democrats?
 2   A.   Yes, I am.
 3   Q.   Approximately how many members does your organization have?
 4   A.   I haven't seen the most recent numbers, but to my
 5   knowledge, we're about a hundred, a hundred and 50 members.
 6   Q.   How does someone become a member of the Hamilton County
 7   Young Democrats?
 8   A.   Somebody becomes a member if they're interested in
 9   Democratic politics.  They can register with the organization
10   and pay a fee.  That's when you become a member.
11   Q.   Does the Hamilton County Young Democrats have a governing
12   document?
13   A.   Yes, we have a charter that aligns our purpose as well as
14   governing structure of the organization.
15   Q.   What is the structure of the leadership of the Hamilton
16   County Young Democrats?
17   A.   The leadership is governed by the executive board which is
18   made up of president, vice president, secretary and treasurer,
19   and we actually had elections in December for the current
20   board's terms.
21   Q.   How many paid employees does the Hamilton County Young
22   Democrats have?
23   A.   We don't have any.  It's entirely volunteer.
24   Q.   How did the Hamilton County Young Democrats decide to
25   become a part of this case?
```

```
 1    A.   The members of the executive board discussed the case and

 2    the harms of the current congressional district map, and we

 3    felt that it was extremely important to become part of the

 4    case.  We unanimously agreed to become part of the case.

 5    Q.   After the board decided to join the case, did the board

 6    report to the general membership about becoming a party?

 7    A.   Yes, we did.

 8    Q.   Did any of the members of the Hamilton County Young

 9    Democrats voice an opinion about that decision?

10    A.   Everything we heard was favorable.  Everyone was extremely

11    excited that we were going to be a part of the case.

12    Q.   What does the Hamilton County Young Democrats do?

13    A.   So we are an organization that is devoted to getting young

14    people involved and educated about politics.  We hold a number

15    of events, both educational and engagements.  We do partner

16    events with candidates, meet and greets, we do canvassing for

17    candidates as well, especially Congress, and we also do voter

18    registration drives, among other activities.

19    Q.   Is the work of the organization only in Hamilton County?

20    A.   It's primarily in Hamilton County, but we do also partner

21    with organizations, other Young Democratic chapters throughout

22    the state.

23    Q.   How often does the Hamilton County Young Democrats meet?

24    A.   So the executive board meets about once a month, and we

25    hold at least a general membership meet -- event each month.
```

```
 1    Last year we held over a hundred events.
 2    Q.  And at those events do you speak with and engage with your
 3    members?
 4    A.  Always.
 5    Q.  And, to your knowledge, are other members of Hamilton
 6    County Young Democrats Democratic voters?
 7    A.  Yes.
 8    Q.  Why do you think that to be the case?
 9    A.  I think that to be the case because we're an all-volunteer
10    organization.  We're mostly made up of young professionals, and
11    these are people who donate their time and money, oftentimes,
12    so it would be hard for me to believe that they wouldn't be
13    Democrats supporting Democratic candidates and working within
14    organization to further our cause.
15    Q.  And are you personally a Democratic voter?
16    A.  I am.
17    Q.  Have you voted for a Democrat for Congress under the
18    current Ohio congressional map?
19    A.  Yes, I have.
20    Q.  Where do your members live?
21    A.  So I live in the 2nd Congressional District, and my members
22    also live in the 1st Congressional District within Hamilton
23    County.  All within Hamilton County.
24    Q.  Have the Hamilton County Young Democrats been impacted by
25    the congressional lines?
```

1  A.  Absolutely.

2  Q.  How so?

3  A.  So it has made our votes less meaningful.  My vote as a

4  Democrat is not equal to my neighbor's vote if they are

5  Republican, and this is because with the current lines, the

6  outcome is predetermined.  It also causes a lot of confusion,

7  and this causes us to spend extra time and energy educating our

8  members and public about which district they live in.  We also

9  have to hold duplicative events and just volunteer, outreach --

10  it really complicates our efforts, especially as an

11  all-volunteer organization.

12  Q.  Earlier you had mentioned that the Hamilton County

13  Democrats undertakes canvassing activities.  In your experience

14  canvassing, have you observed this voter apathy or confusion?

15  A.  Yes.  So, I engaged in canvassing for several of our

16  candidates, especially Aftab Pureval and Jill Schiller.  And,

17  knocking on doors, of course people will not be favorable to

18  your candidate, but it was really common that people would just

19  refuse to engage in politics because they felt like there was

20  no point, just being that a Republican is always going to win

21  with the way the lines are drawn.

22  Q.  Okay.  And just to clarify, you just mentioned Aftab

23  Pureval and Jill Schiller.  Who are each of those individuals?

24  A.  Aftab Pureval was the Democratic candidate for the 1st

25  Congressional District and Jill Schiller was the Democratic

1  candidate for the 2nd Congressional District.

2  Q.  In addition to your own experience canvassing, have you

3  observed an impact of voter apathy upon your volunteers?

4  A.  Absolutely.  So volunteers would come back from these

5  canvassing drives and they would definitely be demoralized and

6  frustrated because just people would respond back that there's

7  no point.  There's no --

8       MR. ERWIN:  Objection, Your Honor.  I'm going to note

9  a continuing objection to hearsay for this line of questioning.

10      JUDGE BLACK:  Very well.

11  A.  People we interacted with refused to get involved because

12  of how the district lines were drawn, knowing that the map

13  favors Republicans and disfavors Democrats.

14  Q.  And have you personally observed people decline to stay

15  involved in Hamilton County Young Democrats because of the way

16  lines have been drawn?

17  A.  Yes.  So we have new people come to our events all the

18  time, but it's really hard to retain them, especially just with

19  the apathy and confusion regarding the lines and how there is

20  no opportunity to get somebody that reflects our views elected

21  to Congress.

22  Q.  Have the Hamilton County Young Democrats been burdened by

23  the congressional plan with respect to voter education?

24  A.  Absolutely.  I can think of a specific time where I was

25  working at a poll in Silverton, and many people who came out of

1    the polling booth asked why wasn't Aftab Pureval on my ballot.

2    And this -- I had to explain to them that they are in the 2nd

3    Congressional District, but to the east and west of Silverton

4    is the 1st Congressional District.  Also, in my neighborhood,

5    which is in the 2nd Congressional District, there were Aftab

6    Pureval signs, and he is the candidate for the 1st district.

7    It is just widespread confusion.

8    Q.  Have the congressional lines made it more difficult for

9    Hamilton County Young Democrats to advocate for its positions?

10   A.  Yes.  I feel strongly that there's strength in numbers, and

11   with it being tougher to attract and retain members, it makes

12   it tougher to advocate for our positions and for our candidates

13   due to the lines.

14   Q.  Do you think the Hamilton County Young Democrats are

15   represented by their, in this case, congressman?

16   A.  No, I do not.  I can -- there's an event that we held

17   following the Parkland shooting and it was regarding gun

18   violence.  Two main things that came from the event was people

19   were confused about which district they lived in, so we had to

20   look up their district for each individual person.  There was

21   no clear way to say, "You live in Cincinnati, you're in the

22   first Congressional District."

23       The second thing was there's no opportunity to engage our

24   representatives on this important issue because they are, with

25   the gun lobby, both of the congressmen who make up or represent

1  Hamilton County are not aligned with us on that issue.  I feel
2  like they don't need to be responsive because they are safe.
3  Q.  Have you or other members of Hamilton County Young
4  Democrats, to your knowledge, contacted their congressman?
5  A.  Yes, and I have myself.
6  Q.  Okay.  And what was your experience in contacting
7  Congressman Chabot or Wenstrup, such as your experience was?
8  A.  So, previously, I was a legislative aide for an Ohio House
9  of Representative, Democratic Ohio House of Representative, and
10  I currently work at the county level for a Democrat,
11  Democratic-elected official.  In both roles, constituent case
12  work is a large part of my job, and just trying to help
13  constituents solve their issues, I have tried to contact both
14  offices; oftentimes never receiving a reply, not even from a
15  staffer.
16      So it was extremely frustrating, just because that's my job
17  to help our constituents regardless of partisan affiliation,
18  and to not even receive a response is quite insulting.  And I
19  strongly feel that it's because the way the lines are drawn,
20  these representatives do not need to be responsive to their
21  constituents because their reelection is guaranteed.
22  Q.  And in addition to your work as a staffer to
23  Democratic-elected officials, have you contacted your
24  congressman in your personal capacity?
25  A.  Yes, I have.

```
 1   Q.  And did you receive any response from that contact?
 2   A.  No.
 3   Q.  Have you observed anything in particular about
 4   Congressional District 1 and 2 themselves that makes you think
 5   the outcomes are locked in here due to the district lines?
 6   A.  So prior to the current map that's in place, a Democrat was
 7   able to get elected, and this was in 2008 with Steve Driehaus.
 8   But since the lines have been redrawn, no Democrat has been
 9   elected, and this is despite a county that has grown more blue.
10   For instance, for the first time in Hamilton County's history,
11   the Board of Commissioners is all Democrats.  That has never
12   happened before.  Also, on election night I watched the news
13   and there was an interview with Steve Chabot, and he said he
14   knew he would have trouble getting votes in urban areas and in
15   Cincinnati --
16           MR. ERWIN:  Objection, Your Honor, to hearsay again.
17           JUDGE BLACK:  The objection's noted.
18           MS. LEE:  It's a statement against party interest,
19   Your Honor.
20   A.  So Steve Chabot said that he knew he would have trouble
21   getting votes in urban areas and in the city of Cincinnati, but
22   he knew he would win because he had Warren County.  That just
23   speaks to the lines and how it guarantees the outcome of a
24   Republican winning.
25   Q.  Did you have any opportunity to look at the vote totals for
```

1  the congressional races in Hamilton County?

2  A.  Yes.  So just looking to Hamilton County, residents voted

3  outnumbering Republicans, and with the remedial map I think

4  that a Democrat could win.  I think there's the actual

5  possibility.

6  Q.  Do you think that as an advocacy organization it is

7  Hamilton County Young Democrats' role to have to do work to

8  engage people?

9  A.  Yes, but with the way the lines are currently drawn, we

10  have to spend extra time educating people, extra resources

11  doing events.  It's just more than what is normal.

12  Q.  Do you think a redrawn congressional map --

13        MS. LEE:  And I'll ask Stephen to please put up --

14  there he has it -- Plaintiffs Demonstrative PD015.

15  Q.  -- would alleviate some of the burdens you've described in

16  your testimony that face Hamilton County Young Democrats?

17  A.  Absolutely.  Looking at the map, it clears up a lot of

18  confusion on where people reside, in which district.  I can say

19  looking at this map that if you live in the city of Cincinnati

20  or if you live to the west of I-71, excluding Symmes Township,

21  you live in the 1st Congressional District.  That clears up a

22  lot of confusion.

23      Also, I think there is actual opportunity with this map for

24  somebody other than a Republican to get elected.

25        MS. LEE:  Thank you so much, Nate.

```
 1        No further questions at this time, Your Honor.

 2             JUDGE BLACK:  Very well.

 3             MR. ERWIN:  Good morning, Your Honors.

 4             JUDGE BLACK:  Good morning.  On behalf of defendants

 5   or intervenors?

 6             MR. ERWIN:  On behalf of the defendants, Your Honor.

 7             JUDGE BLACK:  Are you the gentleman that knocked over

 8   my nameplate yesterday?

 9             MR. ERWIN:  It's a guy that looks like me.  He will be

10   up here later this afternoon.

11             JUDGE BLACK:  You'll be pleased to know somebody else

12   did it this morning, but she's left.  Go ahead.

13        (Laughter.)

14             MR. ERWIN:  I heard you ran her out of the courtroom,

15   Your Honor.

16             JUDGE BLACK:  Indeed.  Please proceed.  You're using

17   up your time.

18                         CROSS-EXAMINATION

19   BY MR. ERWIN:

20   Q.  Good morning, Mr. Simon.  My name is Brodie Erwin.  I'm

21   here on behalf of the defendants today.  It's good to be with

22   you again.  We met at your deposition.

23        Did I hear you correctly you said that you restarted the

24   Hamilton County Young Democrats in 2017?

25   A.  Yes.  Prior to that, the chapter went dormant, and I
```

1    restarted the organization in 2017.

2    Q.   Okay.  And since 2017, you've managed to gain 150 people,

3    approximately, as members?

4    A.   That's correct.

5    Q.   And that's in spite of the problems you say you're having

6    as an organization with the 2012 plan?

7    A.   Yes.

8    Q.   And you also said that, I guess from what I was hearing

9    from your discussion with counsel a moment ago, the main

10   problem you feel like you have with an organization is the

11   confusion you say is -- that occurs with voters about where

12   they should vote because of the way the lines are drawn; is

13   that accurate?

14            JUDGE BLACK:  Excuse me.

15            MS. LEE:  Objection, Your Honor.  Misstates his

16   testimony as to the main issue.

17            JUDGE BLACK:  Well, it's sustained as to form.

18   A.   So --

19            JUDGE BLACK:  Excuse me.  She's going to restate it.

20   He.  Sorry.

21            MR. ERWIN:  Thank you, Your Honor.

22   Q.   Is one of the main harms that you're saying you are

23   experiencing as an organization the fact that you're

24   experiencing confusion among your members about where they

25   should vote based on where they live?

1  A.  Absolutely.  So for our members we have to look up their

2  own individual address to determine which district they live

3  in.  There is absolutely no clear way to say you live in the

4  city of Cincinnati, you live in Congressional District 1.

5      I have members who live on one side of the street and

6  they're in Congressional District 1 and on the exact opposite

7  side they live in Congressional District 2.  It is extremely

8  confusing, especially how they wrap around each other.

9  Q.  But in your time as president of the organization, you

10 never experienced one instance where you were unable to, in

11 fact, look up and tell a member where they were supposed to go

12 vote?

13 A.  No, but it's just extra work on our part.  And like I said

14 previously, with the remedial map, I could say very easily that

15 if you live in the city of Cincinnati or west of I-71,

16 excluding Symmes Township, you live in Congressional District

17 1.  I wouldn't even have to look up somebody's address.

18 Q.  Now, do you know -- and was another problem that you said

19 you've had, because of the 2012 plan, the fact that you're

20 having to hold additional events; is that what I heard you say?

21 A.  Yes.

22 Q.  Okay.  But you weren't involved with the Hamilton County

23 Young Democrats prior to when the 2012 plan was enacted; were

24 you?

25 A.  No, I was in high school.

1   Q.  You don't know how much time they put into hosting events
2   before the 2012 plan was enacted?
3   A.  No, I don't.
4   Q.  And you don't know how much time the organization had to
5   expend educating members on where they should go vote before
6   the 2012 plan was enacted?
7   A.  No, not to my knowledge.
8   Q.  Okay.  So you haven't, actually, as an organization, been
9   able to quantify how much extra time, or to use your words,
10  extra burden the organization has incurred because of the
11  enactment of the 2012 plan?
12  A.  I can't quantify it, but I can tell you from my experience
13  trying to fundraise that people refuse because they have said
14  that there's no opportunity or chance to get a Democrat
15  elected, and also volunteers that come back from canvassing,
16  they're frustrated, and they don't want to canvass because
17  what's the point?
18  Q.  But you don't know if canvassers for the Hamilton County
19  Young Democrats were frustrated before the enactment of the
20  2012 plan; correct?
21  A.  I can't speak to that.
22  Q.  Okay.  And you mentioned something about fundraising.  Is
23  it your testimony that the 2012 plan has negatively burdened
24  your efforts to fundraise as well?
25  A.  Yes, because the lines have predetermined the outcome, and

1  so people respond that there's no reason to give to this effort

2  because there's no chance.

3  Q.  But you don't know how much money the organization was able

4  to raise through fundraising prior to 2012?

5  A.  I do not.

6  Q.  And you talked a little bit about apathetic voters and

7  people you encountered in your canvassing as an organization.

8  But you do admit that your job as an advocacy organization is

9  to encourage and engage with these apathetic voters?

10  A.  Absolutely.  But many of the responses are just not even

11  with respect to our candidate.  It's Why get involved at all?

12  Because the outcome is determined.  There's no chance to get

13  somebody elected other than a Republican.

14  Q.  But nothing about the 2012 plan has prevented you and your

15  members from engaging with potential voter or potential

16  members; correct?

17  A.  No, but it's made voters apathetic and it's caused a lot of

18  confusion.

19  Q.  And nothing about the 2012 plan has prevented you, as an

20  organization, from holding Get Out the Vote activities or other

21  registration activities?

22  A.  No, but I think it's caused us extra effort and time to

23  engage with people about it.

24  Q.  And nothing about the 2012 plan has kept you from hosting

25  voter education forums or things of that nature?

```
 1   A.  No.
 2          MR. ERWIN:  No further questions.
 3          JUDGE BLACK:  Intervenors have some questions?
 4          MR. TUCKER:  Yes, Your Honor.
 5          JUDGE BLACK:  Very well.
 6                     CROSS-EXAMINATION
 7   BY MR. TUCKER:
 8   Q.  Good morning, Mr. Simon.  Rob Tucker.  I represent the
 9   intervenors in this case.
10   A.  Good morning.
11   Q.  Now, I believe you testified that your organization doesn't
12   have the opportunity to engage your representatives.  Do you
13   recall that?
14   A.  I don't think I said I don't have the opportunity to
15   engage, but I feel like or it's my experience that they do not
16   have to respond or they're not responsive to us as an
17   organization or to our members because their reelection is
18   secure.
19   Q.  And would that include Congressman Chabot?
20   A.  Yes.
21   Q.  One of the issues you stated was very important to you and
22   your organization was the Parkland shooting; is that correct?
23   A.  That's correct.
24   Q.  And in the broader issue from the Parkland shooting is
25   safety in schools; correct?
```

1    A.  Correct.

2    Q.  And I believe you said that you were not aligned with

3    Congressman Chabot on this issue; correct?

4    A.  Correct.

5    Q.  Were you aware, Mr. Simon, that following the Parkland

6    shooting that Congressman Chabot introduced a bill in Congress

7    to address safety in schools?

8    A.  To my knowledge, that was not a gun control bill, and he

9    has an A rating with the NRA.

10   Q.  Are you aware of what that bill did?

11   A.  Not in particular.

12   Q.  Are you aware that that bill provided federal funding,

13   additional federal funding for schools?

14   A.  To do what?

15   Q.  Well, in particular, are you aware that the bill provided

16   federal funding for training for teachers and guidance

17   counselors to help recognize warning signs, mental issues in

18   certain students?

19   A.  That's great, but that doesn't have to do specifically with

20   guns.

21   Q.  But you weren't aware of that?

22   A.  To a degree I was.  I'm not extremely well versed in the

23   ins and outs of the bill.

24   Q.  Were you aware that bill also provided funding for

25   additional equipment and metal detectors in schools?

1   A.  No.

2   Q.  Were you aware that that bill also provided additional

3   funding for retired police officers to come to schools?

4   A.  No.

5   Q.  But you would agree that all of these things would help

6   protect the safety of students in schools; correct?

7   A.  Not necessarily.  I think universal background checks and

8   our gun violence prevention policy would be more effective.

9   Q.  But you don't believe that funding for additional training

10  for teachers, funding for additional equipment and metal

11  detectors, funding for potential off-duty police officers in

12  schools, that's not going to do anything to help protect safety

13  and gun violence in schools?

14  A.  It may, but if you remember Parkland did have a resource

15  officer on the campus who was armed, and we all saw the outcome

16  of that.

17  Q.  Now, were you familiar with the Chabot-Pureval race in

18  2011?

19  A.  Yes.

20  Q.  Or, I'm sorry, in 2018.

21  A.  Yes.  Sorry.

22  Q.  Now, there are lots of things that can impact a

23  congressional race; correct?

24  A.  Yes.

25  Q.  In particular, if there's a scandal involving one of the

```
 1   candidates or one of their staffers, that's something that can

 2   impact a congressional race; correct?

 3   A.  Yes.

 4   Q.  What if one of the key staffers for a particular candidate

 5   resigns shortly before the election is that something you think

 6   could impact a race?

 7   A.  Potentially.

 8   Q.  Are you aware that Representative Pureval's campaign

 9   manager resigned less than a month before the election?

10   A.  I am.

11          MR. TUCKER:  No further questions.  Thank you.

12          JUDGE BLACK:  Very well.

13      Redirect, if any?

14          MS. LEE:  None, Your Honor.

15          JUDGE BLACK:  Very well.

16      You may step down.  Thank you, sir.

17          THE WITNESS:  Thank you, Your Honor.

18      (Witness excused.)

19          JUDGE BLACK:  Plaintiffs prepared to call another

20   witness?

21          MS. LEVENSON:  Yes, Your Honor.

22          JUDGE BLACK:  Very well.  Who do you call?

23          MS. LEVENSON:  Plaintiffs call Aaron Dagres.

24          JUDGE BLACK:  If that gentleman would be willing to

25   approach the witness stand.  Do you solemnly swear or affirm
```

1    that your testimony today will be the truth subject to the

2    penalty of perjury?

3              THE WITNESS:  I do.

4              JUDGE BLACK:  Thank you.  You know about the chair.

5              THE WITNESS:  Yeah, I've heard rumors.

6         (Laughter.)

7              JUDGE BLACK:  Check it out.

8              MS. LEVENSON:  Freda Levenson appearing again on

9    behalf of plaintiffs.

10             JUDGE BLACK:  Yes.

11                        AARON J. DAGRES

12   a witness herein, having been first sworn, testified as follows:

13                      DIRECT EXAMINATION

14   BY MS. LEVENSON:

15   Q.  Good morning, Mr. Dagres.  Can you please state and spell

16   your name for the record?

17   A.  Yes.  Aaron James Dagres.  That's A-a-r-o-n J-a-m-e-s

18   D-a-g-r-e-s.

19   Q.  Can you please tell us what you do for a living?

20   A.  I'm currently an adjunct professor of political science at

21   Indiana University.  I teach remotely there.

22   Q.  Previously, what did you do?

23   A.  Previously, I've done multiple things throughout my career.

24   Directly previously to that, while I was finishing up my

25   education, I traveled the state of Ohio working for Bradford

1  School out of Columbus where I would speak in over 200

2  communities throughout the state giving seminars and lectures

3  to high school students.  Before that, I spent an extended

4  period of time in the restaurant industry managing and opening

5  restaurants.  And prior to that, I also did a little traveling

6  and speaking for Bradford School, but I was in the United

7  States Air Force.

8  Q.  What is your educational background?

9  A.  My educational background is I have a bachelor's degree in

10  political science from Indiana University, and I have a

11  master's in public affairs from Indiana University as well.

12  Q.  Mr. Dagres, what is your role in this case?

13  A.  My role in this case -- and I don't want anyone to be

14  confused by my education.  I'm not here as an expert on maps,

15  on map drawing.  I'm not one by any stretch of the imagination.

16  What I am, though, is I'm a plaintiff who I feel has really

17  been damaged throughout the creation of this 12-4 map, and I'm

18  here as a damaged voter because of that map.  And, amongst

19  other things, I'm very politically active and a political

20  activist within my community.

21  Q.  Thank you.  Where do you live, Mr. Dagres?

22  A.  I reside at 536 Keller Lane, and that is in Newark, Ohio.

23  Q.  What county is that?

24  A.  That is Licking County.

25  Q.  And what Congressional District?

1    A.   That is the 12th congressional district.

2    Q.   How long have you lived there?

3    A.   I have lived there approximately eight years.

4    Q.   Where did you live just before that?

5    A.   At 10A Daniel Drive, that's also in Newark about a mile

6    from my current residence, and I lived there for approximately

7    two to five years.

8    Q.   What congressional district was that?

9    A.   That was also the 12th Congressional District.

10   Q.   Are you registered with a political party?

11   A.   I'm a registered Democrat.

12   Q.   Have you consistently voted Democrat?

13   A.   I have voted Democrat my entire voting life with one

14   exception.   In 2012, I pulled a Republican party primary ballot

15   voting for a Republican candidate in the presidential primary

16   because there was no contested presidential primary on the

17   Democratic side.   I regret that decision to this day, but made

18   it anyway.

19   Q.   What was your thinking at the time?

20   A.   My thinking at the time was that because there was no

21   contested presidential primary on our side, that by voting for

22   an underdog it might extend the process on the Republican side.

23   Q.   Mr. Dagres, have you ever missed an election?

24   A.   I have, sadly.   Working in the restaurant business, opening

25   restaurants from 2013 to 2015, I got consumed in work and

1 working, you know, 65 to 80 hours a week. I sadly missed a few

2 elections, one congressional election in 2014 and, I believe,

3 2013 and 2015's general.

4 Q. In addition to voting, what sorts of political activities

5 do you engage in?

6 A. I just stepped down as the elected president of the Licking

7 County Democratic Club PAC, or political action committee, in

8 Licking County. I was also appointed to Licking County Central

9 and Executive Committee, which these have all expired in

10 January. And I volunteered on multiple campaigns and done

11 things of that nature throughout my community.

12 Q. To what extent have you been involved as a candidate in

13 politics?

14 A. Oh, that's correct. In 2008, I also ran in the Democratic

15 primary in the 12th congressional race as a candidate in that

16 Democratic primary.

17 Q. And you say that was in 2008, so that was before the

18 current map?

19 A. Correct. That was on the previous edition of the 12th

20 congressional map.

21 Q. So going back to that list, that robust list of political

22 activities that you've just given, what sort of activities have

23 you engaged in as president of the Licking Democrat Club PAC?

24 A. A multitude of activities, including membership drives,

25 direct voter contact, engaging with voters, registering voters,

1    recruiting candidates, as well as fundraising for local

2    candidates.

3    Q.   What sort of activities have you engaged in as Central and

4    Executive Committee member of the Licking County Democratic

5    PAC?

6    A.   Between the two there's obviously a lot of overlap in those

7    activities.   When it comes to my role in the Executive

8    committee and Central committee, it was a little more focused

9    on assisting candidates with voter outreach, Get Out the Vote

10   events, direct contacts through things like phone banks,

11   mailings, especially to my precinct, direct mailings to voters,

12   and engaging voters on door-to-door canvasses, things of that

13   nature.

14   Q.   What activities do you conduct with respect to voter

15   registration?

16   A.   For voter registration, whether in the PAC role or in the

17   role within the official Democratic party in Licking County, we

18   would do voter registration events at fairs, festivals, things

19   of that nature.   We also have a physical office where we would

20   register voters if they were to come in.

21   Q.   In which district do you conduct these activities?

22   A.   In the 12th Congressional District.

23        MS. LEVENSON:   Stephen, would you kindly put up

24   Plaintiffs' Demonstrative 4.

25   Q.   Mr. Dagres, do you recognize this image?

1  A.  Yes, I do.

2  Q.  What is it?

3  A.  This is -- oh, I'm sorry.  This is an image of the current

4  12th Congressional District.  It's kind of a synopsis of a

5  larger scale there, but in pink is the 12th Congressional

6  District.

7  Q.  Can you point out where you live in this district?

8  A.  Correct, as Stephen has already highlighted there, I am the

9  blue thumbtack.

10  Q.  How many counties or parts of counties comprise your

11  district?

12  A.  It is currently comprised of seven counties, four of which

13  are split.  Those counties run as far north as Richland County

14  through the entirety of Morrow County, a section of Marion

15  County, all of Delaware County, all of Licking County, and as

16  well as a portion, just a portion of Muskingum County and a

17  small sliver there, as you can tell if you look at Franklin

18  County, and it's all divided up.

19  Q.  What was your prior district under the prior congressional

20  map?

21  A.  The previous map that I ran under in '08 was a lot more

22  condensed, it was a lot more rectangular.  It involved just

23  three counties:  Delaware, Licking and parts of Franklin.

24  Q.  And what district was that?

25  A.  That was Congressional District 12.

1   Q.  So how do you perceive the current map changed that?

2   A.  Physically, the current map, what it did is it actually

3   removed a large urban population of Franklin County that used

4   to exist within the 12th Congressional District and then spread

5   it out in multiple directions, including those rural sections

6   of Marion, Morrow County, Richland County, and Muskingum

7   County, really taking that urban center out of the district and

8   spreading it out through rural communities, even dividing up

9   multiple communities like Mansfield, Zanesville, Maysville

10  area.  Maysville, sorry.

11          MS. LEVENSON:  Steven, would you please put up

12  Plaintiffs' Demonstrative 5.

13  Q.  Mr. Dagres, do you recognize this map?

14  A.  I do.  I believe this is the remedial map that our experts

15  have put together and submitted to the Court.

16  Q.  Can you identify where you live on this map?

17  A.  Yes.  Again, as Stephen has highlighted here, I'm the blue

18  thumbtack in Licking County.

19  Q.  How many counties or parts of counties are in this new

20  version of District 12?

21  A.  Three compared to seven on the current map.

22  Q.  Putting the maps aside now --

23          MS. LEVENSON:  Thank you, Stephen.

24  Q.  -- who is your congressperson, currently, Mr. Dagres?

25  A.  My current congressman is Troy Balderson, Republican.

1   Q.   When was he elected?

2   A.   Troy Balderson was elected on August 7th, special election

3   of 2018.

4   Q.   Why was there a vacancy and special election?

5   A.   My previous congressman representative, Republican

6   representative Pat Tiberi, resigned in January of 2018 to lead

7   the Ohio Business Council, or something of that nature.

8   Q.   Was Mr. Balderson subsequently elected to -- in a general

9   election?

10   A.   Correct.  After that August 7 special election we had an

11   immediate turnaround in November's general election, and

12   Representative Balderson was reelected to that position and

13   currently serves as our elected representative.

14   Q.   Was Congressman Tiberi, his predecessor, a Democrat or

15   Republican?

16   A.   He was also a Republican.

17   Q.   Who was Congressman Balderson's Democratic opponent in the

18   special election?

19   A.   In the special election it was Democrat Danny O'Connor.

20   Q.   Who did you vote for in the special election?

21   A.   I voted for Danny O'Connor in the special election.

22   Q.   And, as you've said, Balderson won.  Then who was

23   Balderson's Democratic opponent in the 2018 general election?

24   A.   It, again, was Danny O'Connor.

25   Q.   Who did you vote for in that general election?

1    A.   I once again voted for Danny O'Connor.

2    Q.   What about in 2016, the previous general election:  Who ran

3    for Congress in the 12th District?

4    A.   In 2016, it was a matchup between the Republican Pat Tiberi

5    and Ed Albertson, the Democrat.

6    Q.   Who did you vote for in that election?

7    A.   I voted for Ed Albertson, the Democrat.

8    Q.   I'm sorry.

9    A.   Yes.   The democratic.

10   Q.   And who won?

11   A.   Pat Tiberi, the Republican.

12   Q.   Which party was Mr. Tiberi affiliated with?

13   A.   The Republican party.

14   Q.   And in 2012, who did you vote for for Congress?

15   A.   In 2012, I believe it was Jim Reese, the Democrat.

16   Q.   Thank you.   Who won that election?

17   A.   That election was also won by Pat Tiberi.

18   Q.   And at that time, was Pat Tiberi also a Republican?

19   A.   Yes.

20   Q.   Why do you vote in congressional elections?

21   A.   For the same reason I try to vote in every single election.

22   As a veteran, I feel it's my civic duty and my civic

23   responsibility.   When we vote in those elections, it's an

24   opportunity at times to be able to speak our voice, and it's

25   very important because these elected representatives, they make

1    decisions every single day that impact everyone's life on very

2    important issues to me, and it should be to everyone else.

3    Q.  So what are some of the very important issues to you?

4    A.  Honestly, there's a laundry list of things that I'm very

5    passionate about, but right now I'd say at the top of my list

6    are things like the Affordable Care Act, ensuring that there's

7    medical access for all, and gun control, gun reform and

8    legislation.

9    Q.  Can you explain why the ACA is important to you?

10   A.  Absolutely.  I really believe that healthcare is a

11   fundamental human right, that everybody should have access to

12   healthcare regardless of economic status, regardless of race or

13   ethnicity, that everybody should have equal, fair access to

14   healthcare, that it shouldn't make them bankrupt.  And

15   especially with somebody with a preexisting condition who has

16   been dealing with that since leaving the military, it really

17   hits home.  That combined with the fact that I'm a father of

18   three, I think it's extraordinarily important that everyone has

19   that fundamental human right.

20   Q.  And why is gun control such an important issue for you?

21   A.  Sure.  Gun control is an issue that really has hit me hard

22   especially post-February 14th of 2018 and the Parkland

23   shooting.  I've come around -- I grew up -- I'm a veteran.  I

24   grew up as a hunter, always a gun owner, until those recent

25   events.  As I previously noted, I'm an educator, and with my

1　job traveling to over 200 communities, I've spoke in high

2　schools throughout the state.  And seeing and being in the

3　classroom after the Parkland shooting and having gone through

4　dozens of lockdown drills throughout my life, it was -- it just

5　really, really hit me hard to see fear on the face of the

6　children in the classroom post that Parkland shooting every

7　time there was a fire drill pulled.

8　　　 And that really hit me hard, and I realized at that point

9　in time that my past was my past on this issue, and that moving

10　forward, that gun control and gun reform was essential to the

11　safety of our children, to the safety of my children.  And at

12　that point I even took measures where I got rid of all of the

13　firearms within my own home.  I had the shotgun destroyed by

14　the county sheriff's and donated a war relic that was my

15　grandfather's from World War II to Mott's Military Museum,

16　because I just wanted to make sure never in my home would

17　anything occur even accidentally.

18　Q.  Does Congressman Balderson represent your issue on the ACA?

19　A.  No, he does not.  As a matter of fact, Congressman

20　Balderson voted for the tax reform bill shortly after taking

21　office in November that actually removed the mandate for the

22　Affordable Care Act, and prior to that one, when he was a

23　stated representative, he voted against Medicaid expansion.

24　Q.  Does Congressman Balderson represent your position on gun

25　control?

1  A.  I wish, but, unfortunately, February 27th, just Wednesday

2  of last week, he voted against the gun reform bill that just

3  passed the House of Representatives and has a continual A

4  rating with the NRA.

5  Q.  Did previous Representative Tiberi represent you on the

6  ACA?

7  A.  No, he did not.  Previous Representative Tiberi actually

8  voted eight times to repeal the Affordable Care Act.

9  Q.  Did Representative Tiberi represent your current position

10  on gun control?

11  A.  No.  Throughout his career Pat Tiberi maintained an A

12  rating with the NRA.

13  Q.  What was candidate Danny O'Connor's position on these

14  issues?

15  A.  Candidate Danny O'Connor reflected my views a lot more

16  accurately.  Danny O'Connor was in favor of an assault weapons

17  ban and in favor of universal background checks closing some of

18  the background check loopholes that are currently in existence.

19  Q.  What is your view as to a person's entitlement to a

20  representative who represents them on all of their points of

21  view?

22  A.  I feel there is absolutely no right to an entitlement.

23  What we should have a right to in our elected realm and within

24  the realm of interactions with our elected official is to have

25  our voices heard.  Our current map has undercut that.  There is

1    very little reason for an elected official to ever hear the

2    voices of, sadly, what becomes, in my mind, a majority of the

3    community, because their only threat to losing their position

4    in that incumbency status comes from within their own party's

5    primary, which eliminates a large majority of voters within a

6    district, and therefore there is no incentive for elected

7    officials to hear the voice.

8         So I don't feel that I'm entitled to have any

9    representative who represents all of my ideals.  As a matter of

10   fact, I believe someone once said that if you're looking for a

11   candidate that represents you a hundred percent of the time,

12   then you're the candidate that needs to be running, because

13   nobody ever represents 100 percent.  But having that access,

14   that dialogue, I think is an extraordinarily important part of

15   the process, and that's what is missing because of this map.

16   Q.  So how else has the map impacted you as a voter?

17   A.  So as a voter, I mean, it's impacted me through activities

18   and things of that nature, because a voter, really, when you

19   look at this district map what has happened in the change with

20   the 2011 map where my district, as far as, you know, my

21   opinions go, was cracked in that large urban section was taken

22   out and spread throughout the rural counties.  What that did

23   is, it really diluted our voice.  It took that collective voice

24   that an organization, that a group of individuals, or that an

25   individual voter could have and undermined it, diluting it

1  throughout that process, creating, from engagement purposes, an

2  overwhelming sense of apathy when you look at a map and realize

3  absolutely no way for a change to happen for the swing to go

4  from a Republican to a Democrat or vice versa.

5  Q.  Well, you've mentioned a lack of opportunity to engage with

6  your representative.  Can you give any examples of your

7  congressman's failure to engage with the community?

8  A.  Sure.  I don't have any wonderful examples of Balderson

9  because he's so new in office with my activities.  But 2017 was

10  a huge year, especially with the Affordable Care Act.  And in

11  2017, Representative Pat Tiberi at the time refused to partake

12  in public forums and town halls on the issue of the Affordable

13  Care Act, so much so that organizations were holding events and

14  inviting him to these town halls, which he did not attend those

15  public forums or town halls.  And in the place of his presence,

16  the organizations actually designed a cardboard cutout of Pat

17  Tiberi that we referred to as Flat Pat, who would stand in for

18  him at these town halls.

19  Q.  Where did these Flat Pat town halls take place?

20  A.  To my knowledge, there were multiple ones throughout the

21  Congressional District 12, including the First Unitarian

22  Church, I believe, in Columbus, Ohio, who held an event there,

23  I believe it was February 22nd of 2017, and then again April

24  23rd of 2017, and I believe the Unitarian Church of Granville

25  also held an event.  And actually, when Pat Tiberi resigned in

1  January of 2018, they held a final event retiring Flat Pat on,

2  I believe, January 30th.

3  Q.  So we've discussed the impact of the 2011 map on your

4  personal political activities as a voter.  Let's look now at

5  your political associational activities and how the map has

6  affected those.

7       As the president of Licking County Democratic Club PAC and

8  as a member of the Central and Executive Committee of the

9  official Democratic party within Licking County, how has the

10  2011 congressional map impacted your Get Out the Vote

11  activities?

12  A.  It has substantially impacted the Get Out the Vote because

13  the voter apathy has been so high.  When people look at result

14  after result and realize that there is absolutely no

15  opportunity for victory because of this map, it discourages

16  them from partaking in what is such an important part of our

17  American democracy and that is using their right to vote.

18  Q.  As the president of Licking County Democratic Club PAC and

19  a member of the Central and Executive Committee of the official

20  Democratic party within Licking County, how has the 2011

21  congressional map impacted your ability to fundraise?

22  A.  That has been substantial.  You know, not everybody's very

23  well off.  We have limited amount of resources and income as

24  individuals in life.  And when you are asking somebody to

25  donate to a candidate that they know they cannot win, it

1  prohibits us from being able to successfully raise funds.

2      If you go back to before the map, our 2010 candidate, when

3  the map was more competitive, actually raised $1.5 million.  It

4  was just below, I believe, $1.5 million.  Since that race and

5  up until the special election, we had not had a Democratic

6  candidate for Congress raise over $30,000.

7      And to put some perspective on that, in 2016 Ed Albertson

8  raised approximately $28,000 for the congressional race and Pat

9  Tiberi, I believe, raised $4.5 million for that same race.

10 Q.  Wow.  Again, as president of Licking County Democratic Club

11 PAC and as a member of the Central and Executive Committee of

12 the official Democratic party within Licking County, how has

13 the 2011 congressional map impacted your ability to recruit

14 candidates?

15 A.  So this coincides with the ability to fundraise.  When you

16 are looking for a candidate, when anyone's considering running

17 for office, it is a substantial commitment.  You are the taking

18 time away from your career, from your profession, from your

19 family, and you're investing in not just your own time but your

20 own money.  So when a map is so designed for a predetermined

21 outcome, it's very difficult to get somebody to say, Yeah, I'm

22 willing to do that, to sacrifice my time from my career, my

23 time from my family, my own personal money, knowing that I am

24 not going to win.  So it has been a huge hindrance when it

25 comes to recruiting candidates.

1    Q.  In your work on the 2018 special election between Danny

2    O'Connor and Troy Balderson, to what extent did you consider

3    fundraising and candidate recruitment to be the reasons for the

4    Democratic loss?

5    A.  They were not in any way, shape or form the reasons for

6    loss in that special election.  I think what is very important

7    to understand is that it was a special election.  The eyes of

8    the entire nation were on us.  It was the only election on that

9    day.  There had been, you know, special elections throughout

10   the year, and the focus of the national media was on the race.

11   So it was -- you could not turn on your television and not know

12   that we were having a special election in Ohio's 12th

13   Congressional District.

14         And what that allowed Danny O'Connor to do was raise, for

15   the first time, substantial money.  I believe he brought in

16   about $8.5 million in that race from donors across the country

17   because of that national spotlight on that single race, which

18   was an anomaly compared to Troy Balderson.  His opponent, I

19   believe, brought in 2.5 million.

20         So as Democrats, we actually had an advantage in

21   fundraising and a substantial advantage in that special

22   election.  Even with voter turnout being higher than 2014's

23   general election, we still could not win because the map was

24   designed for him to stay.

25              MS. KOPPITCH:  Your Honors, I'd like to note an

 1  objection for the record at this time.  Mr. Dagres' testimony

 2  is getting into improper lay testimony.

 3            JUDGE BLACK:  The objection's noted.  Thank you.

 4            MS. KOPPITCH:  Thank you.

 5            MS. LEVENSON:  Mr. Dagres, I think you might have

 6  spoken over.  Could the court reporter please read back the

 7  last few sentences.

 8      (Partial answer read.)

 9            MS. LEVENSON:  Thank you.

10  Q.  Were you finished with your answer?

11  A.  Sure.  The real emphasis there is, even with all of those

12  advantages that we had in that special election, whether it was

13  fundraising, voter turnout, having an amazing candidate in

14  Franklin County Recorder Danny O'Connor running in that race,

15  we could not overcome the restrictions of that map that was

16  preordained to keep a Republican in the 12th Congressional

17  District.

18            MS. LEVENSON:  Thank you very much, Mr. Dagres.

19            THE WITNESS:  Thank you.

20            THE COURT:  Counsel for the other side has a chance to

21  ask questions.

22            MS. KOPPITCH:  Yes.  Thank you, Your Honor.

23      Good morning, Your Honors.

24                      CROSS-EXAMINATION

25

```
 1  BY MS. KOPPITCH:
 2  Q.  Good morning, Mr. Dagres.  Nicole Koppitch on behalf of the
 3  defendants.  I will try to be brief this morning.  I realize
 4  I'm running up against the lunch hour.  And I apologize if I
 5  jump around a little bit, but I do have a few questions for
 6  you.
 7      And I want to start with the August 2018 special election
 8  in Congressional District 12.  That race was competitive.
 9  Would you agree?
10  A.  Define "competitive."
11  Q.  Well, and so let me back up.  Congressman Balderson won by
12  a pretty tight margin; correct?
13  A.  Correct.
14  Q.  And, in fact, subsequently in the general election there
15  was still a pretty tight margin; correct?
16  A.  There was a substantial difference between the special
17  election and the general election.
18  Q.  Are you aware of what that difference was?
19  A.  I believe it was over 50,000 votes.
20  Q.  If I told you that Congressman Balderson took 51 percent of
21  the votes and Danny O'Connor took 47 percent of the votes,
22  would you agree with me that that's a pretty tight race?
23  A.  I would not agree that those numbers are accurate.  I
24  believe the percentages are split, that it wasn't an even 47 or
25  51.  And, no, I would not agree that that's necessarily a tight
```

```
 1  race.
 2  Q.  What would you call a tight race?
 3  A.  I think that varies.
 4  Q.  Do you recall giving deposition testimony?
 5  A.  Yes.
 6  Q.  Okay.  And do you recall at that time you gave testimony
 7  under oath; correct?
 8  A.  Correct.
 9  Q.  As you are doing here today.  And do you recall defining a
10  tight margin as or a competitive district as being around five
11  percent?
12          MS. LEVENSON:  Objection.  Relevance, and Mr. Dagres
13  is not an expert.
14          JUDGE BLACK:  The objection is noted.
15      You can answer the question.
16  A.  I do not, but if you provide me with the deposition, it may
17  remind me what I said.  The deposition was multiple hours long.
18  I do not remember word for word everything I said throughout
19  that deposition.
20  Q.  Sure.  That's fair.
21  A.  I do remember a back-and-forth where the counsel was
22  throwing percentages repeatedly at me and -- but I don't
23  remember what the end result of that deposition was or my
24  precise words.
25  Q.  You're not testifying today that you would have a right to
```

1    elect the congressperson of your choice; correct?

2    A.   No.

3    Q.   Okay.

4    A.   Not a right, but we should have an opportunity to elect a

5    congressperson of our choice.

6    Q.   Right.  And based on the outcome or the outcome of the

7    August 2018 special election, Democrats had a competitive

8    election.  Wouldn't you agree?

9    A.   No.  I believed the election was never winnable even with

10   the extreme circumstances of a special election.  I never felt

11   that that election was winnable.

12   Q.   What would have made that election winnable?

13   A.   Not this map.

14   Q.   Would the election have been winnable under the previous

15   map?

16   A.   I do not know.  I did not break down results in any way,

17   shape or form to look at what the previous map would or would

18   not have done.  That's not something that I have done.

19   Q.   And, in fact, under the previous map a Democrat hadn't been

20   elected in a number of years; is that correct?

21   A.   That is correct.  But I am not here challenging the

22   previous map.  And just because we are looking at this map

23   doesn't mean that gerrymandering hasn't existed since 1812 when

24   the Massachusetts mayor actually did that first map.  That's

25   taught in textbooks.

```
 1        So gerrymandering has been around.  That doesn't mean the
 2   previous map -- that's not what we're challenging here.  I'm
 3   looking at this current map.
 4   Q.  You talked about voter apathy.  You'd agree with me that
 5   voter apathy or folks not coming out to the polls can be for a
 6   number of reasons and not just redistricting; correct?
 7   A.  As I just mentioned, gerrymandering is nothing new, so
 8   voter apathy is historically there.
 9   Q.  But there are other reasons individuals might not come out
10   to vote; is that correct?
11   A.  There are absolutely reasons that people may make personal
12   choices to vote or not to vote, but this map, this 12-4 map
13   makes it substantially worse.
14   Q.  But, in fact, Mr. Dagres, I believe you testified earlier
15   today that in 2013, 2014 and 2015 you didn't come out to vote;
16   correct?
17   A.  That is correct.
18   Q.  And those reasons were personal; correct?
19   A.  Yes.  They were personal reasons, and I regret that I did
20   not take that opportunity to vote.
21   Q.  But just like you didn't have the -- you chose not to vote
22   or had other circumstances that prevented you from voting,
23   other voters may have other reasons why they don't come out to
24   vote other than the district lines; correct?
25        MS. LEVENSON:  Asked and answered.
```

1          JUDGE BLACK:  You can answer it again.

2          THE WITNESS:  Sure.

3  A.  And as I mentioned, when it comes to relating your question

4  back to the original question and apathy, like I said, there

5  are multiple reasons, but this 12-4 map increases that and

6  makes the situation worse.

7  Q.  But you have not done anything to quantify which voters

8  didn't vote because of the district lines and which voters

9  might have had other reasons not to come out and vote; correct?

10  A.  Can you ask the question again?

11  Q.  Sure.  You have not taken any steps to identify why, for

12  example, Democratic voters may not have come out to vote

13  because of the district lines versus why they may not have come

14  out to vote, similar to you in 2014, because they had other

15  obligations; is that correct?

16  A.  As a voter in this district, as a plaintiff in this case

17  representing a voter in the district, I surveyed myself.  What

18  are you expecting?

19  Q.  You haven't taken any other steps, you don't know why a

20  voter may or may not choose to vote in a particular election;

21  is that correct?

22  A.  All I know is based off of personal experience,

23  door-to-door canvassing, things of that nature, and the

24  feedback that I've testified through those interactions is to

25  the overall voter apathy or confusion with where they might

1    even live.

2        But, no, I have not conducted a personal survey of all the

3    voters in the 12th Congressional District.

4    Q.  So there are other reasons voters in the 12th Congressional

5    District may not have come out to vote?

6    A.  I can neither confirm nor deny that, but I would assume

7    that personal choices are made by individuals at times.

8    Q.  You testified earlier that Congressman, former Congressman

9    Tiberi, refused to participate in town halls in 2017.  Did I

10   get that right?

11   A.  I did get that right.  You did get that right.

12   Q.  Did you ever make any efforts to reach out to Congressman

13   Tiberi to determine why he didn't participate in town hall

14   meetings?

15   A.  Congressman Tiberi made it very public.  He would go on the

16   news and actually make statements about why he wouldn't

17   participate.

18   Q.  And what were those reasons that you recall?

19   A.  To the best of my recollection, from a 10 TV News

20   interview, he said that he felt that they were not productive

21   and it's not him really hearing from his public.

22   Q.  In 2018 did Congressman Troy Balderson participate in

23   public forums?

24   A.  As I noted earlier, I do not believe so, but I have not

25   interacted much with Congressman Balderson since his election.

AARON J. DAGRES - CROSS

1   And it's now, what, the first of March.  So in the last 60 days
2   I am not aware that he has, but I do not know firsthand.
3   Q.  And you have not made any efforts to reach out to
4   Congressman Balderson to address any issues that you may have
5   at this time?
6   A.  Not since his election.  I did speak with him prior to his
7   election, but not since his election.
8   Q.  Were you able to speak with him at that time?
9   A.  Yes.  We were both marching in the Johnstown Street parade,
10  me and -- me and, at the time, candidate Troy Balderson.  We
11  were actually walking within feet of each other and had cordial
12  conversation even though I was there supporting his opponent.
13  Q.  So it's fair to say that Congressman Balderson as a
14  candidate was responsive to you?
15  A.  I don't think he had a choice.  We were walking side by
16  side in a parade, to be honest.
17  Q.  Mr. Dagres, earlier you were shown a picture of the current
18  map and those lines; correct?
19  A.  Yes.
20  Q.  And you live in Licking County; correct?
21  A.  Yes.
22  Q.  And under the current map Licking County is all in
23  Congressional District 12; correct?
24  A.  Yes.
25  Q.  And thereafter Ms. Levenson showed you a picture of the

1    what I believe is plaintiffs' proposed remedial map; correct?

2    A.  Yes, I believe so.

3    Q.  And under that remedial map, Licking County is split into

4    two; is that correct?

5    A.  I believe so.  If you bring it back up in front of me, I

6    believe I can even explain where that split was.  I think it

7    was along I-70.

8    Q.  I don't have a copy of it, but I just want to confirm that

9    your understanding is under the proposed remedial map Licking

10   County would be split between Congressional District 12 and

11   Congressional District 6.  Is that your understanding?

12   A.  Yes.  The new map would break out and split only two

13   counties compared to the four-county split in the current map.

14   And due to population density, there's no way not to split

15   Franklin County because of the requirements for federal

16   district population numbers.

17   Q.  Well, again, and I note you're not providing expert

18   testimony -- correct? -- on the maps, so I'm just asking what

19   your understanding is of the split between Licking County.  And

20   as noted, your county would -- your home county would be

21   divided into two different districts?

22   A.  That is correct.  We would go from two counties that are

23   split or we would go from the existing four-county split down

24   to two-county split.

25   Q.  But your personal county would get split?

```
 1   A.  Yes.
 2        MS. KOPPITCH:  And hopefully staying true to my word,
 3   those are all the questions I have for you.  Thank you.
 4        THE WITNESS:  Thank you.
 5        JUDGE BLACK:  Intervenors have the opportunity to
 6   examine.
 7        MR. BRADEN:  I will be very brief, understanding I'm
 8   between this Court and lunch.
 9        JUDGE BLACK:  Indeed.  What are you going to have for
10   lunch?
11        MR. BRADEN:  Probably something from Jimmy John's.
12        JUDGE BLACK:  Very well.
13        MR. BRADEN:  It won't be good for me.
14                      CROSS-EXAMINATION
15   BY MR. BRADEN:
16   Q.  Sir, Mark Braden.  I represent the defendant intervenors.
17   I will be very brief.
18      I did understand correctly you're one of the leaders of the
19   Democratic party in Licking County?
20   A.  I was, correct.  I am not currently filling those roles.
21   Q.  And so in the last election were the Democrats in Licking
22   County excited about Sherrod Brown's race?
23   A.  Absolutely.
24   Q.  And excited about the gubinatorial candidate?
25   A.  For the most part.
```

1    Q.   Yeah.   And so excited to turn out to vote in those races?

2    A.   I -- I would assume.

3    Q.   And everyone who showed up to vote for Sherrod Brown would

4    also be showing up and would receive the congressional

5    candidate's name to vote on the ballot too; correct?

6    A.   Depending on what district you lived in.

7    Q.   Aren't all the Licking County people in one district?

8    A.   Oh, I'm sorry.   I misunderstood your question was

9    specifically for Licking County.

10   Q.   I said Licking County.

11   A.   Sure.

12   Q.   Everyone in Licking County who went to vote for Sherrod

13   Brown would also have the opportunity to vote in the

14   congressional race; yes?

15   A.   Every single voter in Licking County --

16   Q.   Thank you.

17   A.   -- has an opportunity to vote on every race on the ballot.

18        JUDGE BLACK:   Counsel, I would prefer that you not

19   turn your back on a witness while he's answering the question.

20   Redirect, if any?

21        MS. LEVENSON:   Thank you, Judge.

22                        REDIRECT EXAMINATION

23   BY MS. LEVENSON:

24   Q.   Even with a large turnout for Sherrod Brown, was that

25   sufficient for the Democrats to win in District 12 in the third

1    congressional race in 2018?

2    A.   The results showed me it was not.

3             MS. LEVENSON:   Thank you.   Thank you very much.

4             JUDGE BLACK:   Very well.   We are going to -- thank

5    you, sir.   You may step down.

6             THE WITNESS:   Thank you, Your Honor.

7        (Witness excused.)

8             JUDGE BLACK:   We're going to break for lunch.   We'll

9    break until 1:00 o'clock.   We'll see you at that time.

10       The Court prepares to recess.

11            COURTROOM DEPUTY:   All rise.   This court is in recess

12   until 1:00 o'clock.

13       (At 11:51 AM, a luncheon recess was taken.)

14                            - - -

15                      AFTERNOON SESSION

16       (In open court at 12:59 PM.)

17            JUDGE BLACK:   Thank you.   Please be seated.   It's

18   12:59.   Most of the plaintiffs' lawyers are here, defense

19   lawyers are here, and intervenors' lawyers are here.

20       Are we ready to proceed, from the plaintiffs' perspective?

21            MS. BONHAM:   Yes, Your Honor.

22            JUDGE BLACK:   And the defense?

23            MR. STRACH:   Yes, Your Honor.

24            JUDGE BLACK:   And the intervenors'?

25            MS. YACKSHAW:   Yes, Your Honor.

```
 1              JUDGE BLACK:  Very well.  It's 12:59.  Let's -- it's

 2    1:00 o'clock.  Would you call your next witness, please.

 3              MS. BONHAM:  Thank you, Your Honor.  The plaintiffs

 4    call Elizabeth Myer.

 5              JUDGE BLACK:  Ms. Myer, do you solemnly swear or

 6    affirm that the testimony you're going to give today is the

 7    truth subject to the penalty of perjury?

 8              THE WITNESS:  Yes, I do.

 9              JUDGE BLACK:  Thank you.  Please be careful --

10              THE WITNESS:  Yes.

11              JUDGE BLACK:  -- getting seated.  Get acclimated, get

12    near that fine federal microphone.

13         You can proceed when you're ready.

14              MS. BONHAM:  Thanks, Your Honor.

15                           ELIZABETH MYER

16    a witness herein, having been first sworn, testified as follows:

17                         DIRECT EXAMINATION

18    BY MS. BONHAM:

19    Q.   Good afternoon.  Can you please state and spell your name

20    for the record?

21    A.   Elizabeth Myer, E-l-i-z-a-b-e-t-h M-y-e-r.

22    Q.   What's your address, Dr. Myer?

23    A.   82 Oriole Drive, O-r-i-o-l-e, Youngstown.

24    Q.   And what county is that in?

25    A.   That's Trumbull County.
```

```
 1   Q.  Do you know what United States Congressional District that
 2   is?
 3   A.  Thirteen.
 4   Q.  Thirteen.  About how long have you lived at the Oriole
 5   Drive address?
 6   A.  A little over 20 years.
 7   Q.  Twenty years.  Where did you live before that?
 8   A.  In Boardman, Ohio, which is in Mahoning County.
 9   Q.  Is that nearby to where you live now?
10   A.  That's a south suburb of Youngstown, maybe 20 minutes from
11   where I live now.
12   Q.  Okay.  What do you do for a living?
13   A.  I'm a physician.
14   Q.  Okay.  Do you have a specialty?
15   A.  Neurology.
16   Q.  And where do you typically practice now?
17   A.  The hospital which was right down the street from me where
18   I used to work in Youngstown closed in September, so now I
19   drive to Canton to work.
20   Q.  Okay.  About how far away is Canton?
21   A.  Over a little over an hour, and then sometimes I work in
22   Portsmouth or Lima, where I cover when they're short staffed.
23   Q.  Who is your congressional representative where you live?
24   A.  Tim Ryan.
25   Q.  What party is Tim Ryan?
```

1  A.  Democrat.

2  Q.  And are you registered with a political party?

3  A.  Democrat.

4  Q.  Democrat, too.  What's your role in this case, Dr. Myer?

5  A.  I'm here to discuss how the redistricting has personally

6  affected me as a voter in District 13.

7  Q.  And on what basis are you providing this testimony?

8  A.  Just my own personal experiences.

9  Q.  I'm going to ask my colleague to put up an exhibit,

10  Plaintiffs' Demonstrative 8.

11      Do you recognize this?

12  A.  Yes, that's the current congressional map.

13  Q.  And do you see your congressional district in there?

14  A.  Yeah, District 13, the green one across the middle.

15  Q.  Do you recognize the location of that blue thumbtack

16  symbol?

17  A.  Yeah, the push pin's on my house.

18  Q.  Okay.  Can you describe your region to me, your home

19  region.

20  A.  Well, where I live is called the Mahoning Valley, and it

21  involves two small cities, Youngstown and Warren, with

22  seriously declining populations, high unemployment rate.  There

23  is working class industrial area, and the surrounding area

24  is -- there's some countryside, but it's pretty much small

25  businesses and industries that feed into the region with, like,

1  small steel mills, a GM plant which is now closing, last shift

2  on Friday.  And then that's my community, Youngstown, is my

3  community where I shop, where I work -- well, was working --

4  where I have friends, you know, where I go to activities, and

5  Warren as well.

6      And then my district extends across countryside, tiny

7  towns, across Portage County, and cuts into Akron and extends

8  up into the north Akron suburbs.

9  Q.  Okay.  Thank you.  You testified that your current

10  congressperson is Tim Ryan, a Democrat, and that you're also a

11  Democrat.  Do you vote for Jim Ryan?

12  A.  Yes.

13  Q.  And how often do you vote, in general?

14  A.  I always vote, with rare exception.  Maybe once or twice in

15  my 40-plus years of voting have I missed an election.

16  Q.  Okay.  And have you always, in U.S. congressional

17  elections, have you always voted for Tim Ryan?

18  A.  Well, for the Democrat, but, yes, since it's been Tim Ryan,

19  yes.

20  Q.  What about primaries:  Do you vote in primary elections

21  too?

22  A.  Yes.

23  Q.  Okay.  And have you voted for Tim Ryan in the primaries?

24  A.  I always mark for Tim Ryan, but he often is -- I think he's

25  been unopposed on some occasions.  He really doesn't have a lot

1    of competition.

2    Q.  In your experience, have there been primary challengers to

3    Ryan?

4    A.  I really can't remember, because there hasn't really been a

5    viable challenger.

6    Q.  Do you feel Congressman Ryan represents your interests as a

7    voter?

8    A.  I think Congressman Ryan's interests and concerns are very

9    similar to mine.

10   Q.  Okay.  And does he represent your interests completely?

11   A.  Well, I think he has the same philosophical values as mine,

12   but I don't know that he always addresses the concerns of my

13   community as well as my -- he might.

14   Q.  What do you mean by that?

15   A.  Well, he doesn't have to do anything to really get elected.

16   He doesn't even seriously campaign anymore.  He's going to be

17   elected regardless.  You know, because it's such a strong

18   Democrat area, that he may not always be as concerned about

19   some of our issues as he might be otherwise, besides which he's

20   also spread kind of thin at this point.  It used to be my

21   district was really concentrated around the Mahoning Valley.

22   Now it extends over and involves Akron and those surrounding

23   areas, so he has to really spread his -- his time across a wide

24   area of -- of our two different communities.  It's really two

25   completely separate communities with different needs.

1  Q.  Can you talk about any specific examples of where you've

2  seen this?

3  A.  Well, I think one of the really obvious things is the

4  closing of this GM plant which is causing thousands and

5  thousands of people to become unemployed.  And I saw Sherrod

6  Brown in the news, Sherrod Brown frequently addressing this

7  issue, and I did not see as much of Tim Ryan as I would have

8  thought I might have.

9  Q.  Do you want Tim Ryan to represent you?

10 A.  I like Tim Ryan.  There's nothing wrong with Tim Ryan as a

11 person.

12 Q.  Okay.  And so where do you think this comes from, these

13 inadequacies that you discussed?

14 A.  Well, I feel like, for one, he doesn't have to worry about

15 being reelected, he doesn't have to really be out there

16 addressing our needs, because people in my area are going to

17 vote for him no matter what.  He really doesn't get any viable

18 competition.

19     The other thing is, again, he has two completely separate

20 communities to deal with.  You know, the Youngstown Mahoning

21 Valley area has a lot of big needs, but then Akron has other

22 needs, which not being my community, I can't really tell you

23 what their concerns are, but they're a completely different set

24 of concerns.  It's a completely different community.

25 Q.  So before you testified that you're a registered Democrat,

1    that you vote frequently and always Democrat in the U.S.

2    congressional elections?

3    A.  Yes.

4    Q.  Have there been times when you haven't voted Democrat?

5    A.  Certainly for local issues, you know, like a school board

6    or something like that, and for judges, I don't look at party.

7    I did -- when Al Gore had the Democratic nomination already

8    wrapped up in the primary, I took a Republican ballot, because

9    at that time one did not have to declare allegiance to a party.

10   They just offered you whichever ballot you wanted.  So I took

11   the Republican ballot in order to try to make a difference in

12   their primary, since my Democratic candidate was already sewed

13   up.

14   Q.  In any other instances you can think of?

15   A.  When I had just turned 18 and voted my first presidential

16   election I voted for Gerry Ford.

17   Q.  All right.  And you testified previously, too, that you --

18   that you vote so often, that this is important to you.  Besides

19   voting, do you engage in any other political activities to

20   support the Democratic party?

21   A.  Yes.  I've made phone calls, I've done canvassing, I've

22   worked at rallies as a volunteer.  I have, of course, given

23   money and gone to fundraisers and worked as a poll monitor.

24   Q.  Can you identify any specific candidates or campaigns that

25   you've done work for?

1    A.   The ones that come to mind are Hillary Clinton both times,

2    Barack Obama both times, and Sherrod Brown.

3    Q.   And let me ask you about these more specifically.   What did

4    you do for the Clinton general campaign, for example?

5    A.   Made phone calls, went door-to-door canvassing, and

6    volunteered at a rally.

7    Q.   And where did you do most of that work?

8    A.   In the city of Youngstown itself and in -- and in Niles,

9    which is a suburb kind of between Youngstown and Warren.

10   Q.   So would you say this is a similar -- in a similar

11   geographic region?

12   A.   Oh, yes, it's right close to my house within, you know, 20

13   minutes of my house either way.

14   Q.   The Youngstown area?

15   A.   Yes.

16   Q.   Are there any other examples you can identify of political

17   work you've done for the Democratic party?

18   A.   No.   I think that's pretty much it:   Canvassing, phone

19   calls, that type of thing.

20   Q.   What was your objective when you were engaging in these of

21   activities?

22   A.   Most of it was Get Out the Vote.

23   Q.   Okay.

24   A.   I went and for -- for I think phone calls, too, but also

25   for -- certainly for door to door.   It was to go to likely

1    Democrat voters and try to get them to vote.

2    Q.  Okay.  So you've said that Youngstown is really your

3    community or the Mahoning Valley?

4    A.  Yes.

5    Q.  Do you know what other communities your congressional

6    district covers?

7    A.  It goes across.  From that Youngstown-Warren area, it goes

8    across Portage County through small towns like Ravenna and Kent

9    and into, I think it's more the northeast corner of Akron, but

10   up into the Akron suburbs, I think Cuyahoga Falls, maybe part

11   of Stow, mostly Akron suburbs.

12   Q.  And you've indicated that this is a real spread across

13   communities.  Has this created any challenges with your work on

14   Democratic issues?

15   A.  Well, I don't know how much is contributing to this, but

16   certainly people are very apathetic and don't really even care

17   to vote that I've encountered.

18   Q.  Where do you think that comes from?

19   A.  Well, I think there's some -- to some degree there's some

20   confusion.  I know where I go to church is on -- a south suburb

21   of Youngstown, and I know people are confused even in what

22   district they're in and who their representative might be at

23   times.  And then when I go door to door and people tell me, "My

24   vote's not making a difference, it doesn't count."  I

25   frequently heard the exact words of the system being rigged,

1    "The system is rigged, my vote's not going to make any

2    difference, it doesn't matter what I do," you know, "it's

3    already set up."

4    Q.  Okay.  And does this have an impact on your ability to Get

5    Out the Vote?

6    A.  Oh, absolutely.  People just tell me they're not going to

7    vote.  And even when I try to persuade people of the importance

8    of voting, they don't think it's going to make any difference

9    so they don't vote, in which case my candidate is not getting

10   those Democratic voters out to get that vote.  So, yeah, I

11   think it does make a difference.

12   Q.  Okay.  You've discussed now some impacts that the map has

13   had on your work.  How, if at all, has the congressional map

14   harmed you as a voter in your district?

15   A.  Well, my vote is not -- not that it's not counted, I know

16   they count the ballot, but it's not making any difference,

17   because when it comes to the House of Representatives, my guy's

18   going to win -- you know, Tim Ryan's going to win whether I

19   vote or not.  I could sit home or just skip that little box on

20   the ballot and it's not going to change the outcome.  He's

21   going to be my representative no matter what.

22          MS. BONHAM:  I'm going to ask my colleague to put up

23   Plaintiffs' Demonstrative 9.

24   Q.  Now, have you seen this before?

25   A.  Yes, I have.  That's the proposed -- one of the proposed

1   possibilities for a new map.

2   Q.  Okay.  And do you recognize the location of that thumbtack

3   symbol?

4   A.  Yep, that's my house.

5   Q.  That's your house.

6          MS. BONHAM:  Okay.  I have no further questions.

7   Thank you.

8          JUDGE BLACK:  Counsel for the other side wish to

9   inquire?

10         MS. PROUTY:  Yes, Your Honor.

11         JUDGE BLACK:  Very well.

12                        CROSS-EXAMINATION

13  BY MS. PROUTY:

14  Q.  Good afternoon, Dr. Myer.

15  A.  Hello.

16  Q.  My name's Erika Prouty.  I represent the intervenors in

17  this case.  I'm just going to ask you a few questions about

18  your testimony today.

19      Now, you just talked about the types of political

20  activities you engage in; correct?

21  A.  Yes.

22  Q.  And you canvass for political candidates; correct?

23  A.  Yes.

24  Q.  And you participate in voter registration drives; correct?

25  A.  I'm pretty sure I did once.

```
1   Q.  Well, you register people to vote?

2   A.  I think I did do that one time, yes.

3   Q.  And you participate in phone banks --

4   A.  Yes.

5   Q.  -- on behalf of the Democratic party?

6   A.  Yes.

7   Q.  And since 2011, you've been able to continue to participate

8   in these types of activities; correct?

9   A.  Yes.

10  Q.  And you belong to some political organizations as well;

11  correct?

12  A.  I give money to organizations.  I don't know if that makes

13  me -- I'm not sure what makes you a member or not.

14  Q.  Are you a member of the Sierra Club?

15  A.  Yes.

16  Q.  Are you a member of the Human Rights Campaign?

17  A.  Yes.

18  Q.  And as you just said, you donate money to organizations?

19  A.  Yes.

20  Q.  Such as the ACLU?

21  A.  Yes.

22  Q.  And since 2011, you've been able to continue to belong to

23  those organizations?

24  A.  Yes.

25  Q.  And to contribute money to the ACLU?
```

1    A.   Yes.

2    Q.   And you also contribute money to political candidates;

3    correct?

4    A.   Yes.

5    Q.   Such as Sherrod Brown?

6    A.   Yes.

7    Q.   And Hillary Clinton?

8    A.   Yes.

9    Q.   And you're able to contribute money to political

10   organizations as well?

11   A.   Yes.

12   Q.   And since 2011, you've been able to continue to donate

13   money to those organizations and candidates?

14   A.   Yes.

15           MS. BONHAM:   Your Honor, I object to relevance.

16           JUDGE BLACK:   Objection's noted.

17   Q.   And so you testified that you live in the 13th

18   Congressional District; correct?

19   A.   Correct.

20   Q.   And before it was the 13th Congressional District it was

21   the 17th Congressional District; is that right?

22   A.   That sounds right, but I really don't remember.

23   Q.   And so you lived in this district for 20 or more years;

24   correct?

25   A.   Yes.

1   Q.  And your district is a majority Democratic district;

2   correct.

3   A.  Yes, it is.

4   Q.  And you believe your district has been a majority

5   Democratic district for as long as you can remember; correct?

6   A.  Yes.

7   Q.  And your representative is Tim Ryan; correct?

8   A.  Yes.

9   Q.  And he's a Democrat?

10  A.  Yes.

11  Q.  And you told your counsel about one of the ways you feel

12  that you've been harmed by the current congressional map is

13  that Tim Ryan doesn't have to pay attention to local issues or

14  local concerns; correct?

15  A.  Yes.

16  Q.  And he's been your representative for 16 years?

17  A.  That sounds right.

18  Q.  And before Tim Ryan was your representative, Jim Traficant

19  was your representative; correct?

20  A.  Yes.

21  Q.  And he represented the 16th Congressional District for a

22  couple of decades?

23  A.  Yes.

24  Q.  Does that sound right?

25  A.  Yes.

1   Q.  So is it your testimony that you would like Congressman

2   Ryan to be more concerned about local issues?

3   A.  Yes.

4   Q.  And you wish he would focus attention more at home in your

5   area?

6   A.  Yes.

7   Q.  And your area is the Youngstown area; correct?

8   A.  Yes.

9   Q.  And one of the recent local issues affecting that area is

10  the closure of the GM plant in Lordstown; correct?

11  A.  Yes.

12  Q.  This is a very important issue to you?

13  A.  Absolutely.

14  Q.  And to your community?

15  A.  Definitely.

16  Q.  And you testified it could result in a significant amount

17  of jobs lost in your community?

18  A.  Yes.

19  Q.  And Tim Ryan has spoken out against this closure; hasn't

20  he?

21  A.  Yes.

22  Q.  And he's spoken on the floor of the U.S. House on this

23  issue; correct?

24  A.  I don't know for sure, but he -- yes.  I'm not trying to

25  say he ignored the issue.

1   Q.  Are you aware that he met with the GM CEO in December?

2   A.  Yes.

3   Q.  Are you aware that he invited the president of the United

4   Auto Workers union at the Lordstown plant to be his guest at

5   the State of the Union?

6   A.  No, I didn't know that.

7   Q.  Are human rights issues also important to you?

8   A.  Very much so.

9   Q.  And immigration is an important issue to you?

10  A.  Yes.

11  Q.  And Tim Ryan has helped people in your community with

12  immigration issues before; hasn't he?

13  A.  Yes.

14  Q.  And just last year, Tim Ryan postponed the deportation of a

15  Youngstown businessman; correct?

16  A.  Yes; unfortunately, just temporarily.

17  Q.  But Mr. Ryan actually attended this man's deportation

18  hearing with ICE; didn't he?

19  A.  Yes.

20  Q.  And he sponsored a bill to -- that would make this man a

21  permanent resident; correct?

22  A.  I know he did some type of effort with the bill.  I don't

23  know that -- specifically what the bill entailed.

24  Q.  And Mr. Ryan continued to speak out against this man's

25  deportation after he was deported; correct?

```
 1   A.  Yes.
 2   Q.  And you agreed with Tim Ryan's speaking out against that
 3   deportation; correct?
 4   A.  Yes.
 5   Q.  All right.  I think another way that you described the harm
 6   that you've experienced because of the current congressional
 7   map is that there are people in your district who maybe don't
 8   share the same local concerns as you do?
 9           MS. BONHAM:  Objection.  Mischaracterizes testimony.
10   Sorry.
11           JUDGE BLACK:  Overruled.
12       Go ahead.
13   Q.  So you identified that your district includes the city of
14   Akron?
15   A.  Yes.  Part of it.
16   Q.  And you've testified that you think Congressman Ryan is
17   spread too thin because he has to pay attention to different
18   communities with different interests; correct?
19   A.  Yes.
20   Q.  And so you've characterized the area where you live as
21   urban or industrial; correct?
22   A.  Yes.  Well, no, it extends outwards a little bit from that.
23   Q.  And Akron is also an urban area; correct?
24   A.  Yes, but with very different needs from my area.
25   Q.  And so we talked about the remedial map that the plaintiffs
```

ELIZABETH MYER - CROSS

1    are proposing in this case; correct?

2    A.   Yes.

3    Q.   And you prefer that map; correct?

4    A.   Yes.

5         MS. PROUTY:   Can we pull up Plaintiffs' Demonstrative

6    9, please.

7    Q.   So under this remedial map, there are two new counties in

8    your district; correct?

9    A.   Yes.

10   Q.   Lake County; correct?

11   A.   Yes.

12   Q.   And Ashtabula County?

13   A.   Yes.

14   Q.   And those are different communities from your community;

15   correct?

16   A.   I'm not as familiar with the Lake County area, but I can

17   tell you that the Ashtabula County area has a lot of small

18   industries that feed into that GM plant, for example.  So

19   that -- there's an economic connection between Ashtabula County

20   and Trumbull County.

21   Q.   Do you think there's an economic connection between Summit

22   County and Trumbull County?

23   A.   Not nearly so much, though I'm not an economic expert.  But

24   not nearly so much, I would say.

25   Q.   Are you aware that the GM plant is about 60 miles away from

1  the city of Ashtabula?

2  A.  That sounds about right.

3  Q.  And it's about 50 miles away from Painesville in Lake

4  County?

5  A.  I believe that.

6  Q.  And the GM plant is about 41 miles away from the city of

7  Akron?

8  A.  Yeah, but that's not -- that's not what makes an economic

9  connection.  Distance is not the only thing.

10 Q.  But couldn't there be people who live in Akron and Summit

11 County who also work at the GM factory?

12 A.  There may be some.  I wouldn't be surprised.

13 Q.  And they would also be impacted by the closure?

14 A.  Sure.

15 Q.  Now, you like living in a majority Democratic district;

16 correct?

17 A.  Yes.

18 Q.  And you're happy currently being represented by a Democrat?

19 A.  Yes.

20 Q.  And you want to continue to be represented by a Democrat?

21 A.  I would like that.

22      MS. PROUTY:  Thank you.  No further questions.

23      JUDGE BLACK:  Very well.  Defense have any questions?

24      MR. STRACH:  No, Your Honor.

25      JUDGE BLACK:  Very well.

1    Redirect, if any?

2         MS. BONHAM:  No, Your Honor.

3         JUDGE BLACK:  Very well.  Doctor, you may step down.

4         THE WITNESS:  Thank you.

5         JUDGE BLACK:  Thank you very much.

6    (Witness excused.)

7         JUDGE BLACK:  Plaintiffs have another witness to call

8    at this time?

9         MS. ZHANG:  Yes, Your Honor.  Plaintiffs call Dr. Lisa

10   Handley.

11        JUDGE BLACK:  If that person would be willing to

12   approach.  If you'd be willing to pause for the oath to tell

13   the truth.  Will you solemnly affirm or swear the testimony

14   you're going to give today is the truth subject to the penalty

15   of perjury?

16        THE WITNESS:  Yes.

17        JUDGE BLACK:  Very well.  Thank you.  The chair tips

18   back.

19                        LISA HANDLEY

20   a witness herein, having been first sworn, testified as follows:

21                     DIRECT EXAMINATION

22   BY MS. ZHANG:

23   Q.  All right.  Dr. Handley, can you please state your name and

24   spell your last name for the record.

25   A.  My name is Lisa Handley.  My last name is spelled

1   H-a-n-d-l-e-y.

2           MS. ZHANG:  Your Honors, may I approach the witness?

3           JUDGE BLACK:  Yes.  Thank you.

4           MS. ZHANG:  I have three courtesy copies for the Court

5   as well (handing document).

6           JUDGE BLACK:  Thank you.

7   Q.  Dr. Handley, I've just handed you a document that's been

8   marked as Plaintiffs' Exhibit 254, and I've provided courtesy

9   copies for the Court and for opposing counsel.  What is this

10  document?

11  A.  This is the expert report I prepared for this case.

12          JUDGE BLACK:  Can you get that microphone in front of

13  you, please.

14  A.  This is the expert report I've prepared for this case.

15          JUDGE BLACK:  Thank you.

16  Q.  Could you please turn to page 34 of your report.  What does

17  this show?

18  A.  This is the beginning of my CV.

19  Q.  What is your educational background?

20  A.  I have a Ph.D. in political science from George Washington

21  University.  I have a bachelor's and a master's degree from

22  Kent State, Ohio.

23  Q.  And what is your occupation?

24  A.  I'm an election consultant.  I do consulting here in the

25  U.S. on voting rights and redistricting and internationally on

1   redistricting more generally.  I'm also a visiting academic at

2   Oxford Brooks University in the UK.

3   Q.  And have you done any teaching in your areas of expertise?

4   A.  I have.  I used to teach a graduate seminar at George

5   Washington University on representation and redistricting.  I

6   teach research methods now at Oxford Brooks.

7   Q.  Have you done any guest lecturing?

8   A.  I have.  I've also guest lectured on the subjects of voting

9   rights and redistricting, places like, in the U.S., Harvard Law

10  School, Princeton graduate school, Georgetown.  I've also guest

11  lectured at Oxford University.

12  Q.  Can you please turn to page 37.  What are your publications

13  on redistricting and voting rights?

14  A.  I have a number of publications, a couple of books, about

15  20 academic articles, and another -- maybe about 20 academic

16  articles and articles in edited volumes, most of which have to

17  do with the Voting Rights Act and redistricting.

18  Q.  And can you identify for the Court which two of the books

19  you identified were related to redistricting and voting?

20  A.  So "Minority Representation and the Quest for Voting

21  Equality," which was published in *Cambridge University Press*,

22  was based mostly on my dissertation; and "Comparative

23  Redistricting in Perspective" is an edited volume which I was

24  the first editor and I also produced a couple of the chapters

25  in the volume.

1  Q.  Now I'd like for you to turn to page 33.  And I'll ask

2  Steven to put this up on the screen as well.

3      What does page 35 show?

4  A.  That's a list of my U.S. clients since 2000.

5  Q.  Now, in this, some of the jurisdictions are listed as you

6  serving as a redistricting consultant and in others you're

7  offering expert witness testimony.

8      What do you mean when you say you served as a redistricting

9  consultant?

10 A.  I'm typically brought in either before the line-drawing

11 process begins or while it's going on to assist the line

12 drawers usually, with regard to the Voting Rights Act and

13 producing plans that comply with the Voting Rights Act.

14 Q.  Can you give us some examples of that?

15 A.  Most recently, New York City, Virginia, State of Virginia.

16 Well, most of these here, Alaska, State of New York, Kansas,

17 those are all examples of being brought in during the

18 line-drawing process.  There are more.

19 Q.  And what do you mean when you say you've provided expert

20 witness testimony?

21 A.  I am brought in by both plaintiffs and defendants in cases

22 usually related to Section 2 of the Voting Rights Act to do a

23 racial bloc voting analysis and determine if plaintiffs meet

24 the three preconditions set by *Thornburg v. Gingles*, a U.S.

25 Supreme Court case.

```
 1   Q.  Have you ever served as an expert for the Department of

 2   Justice in bringing cases under the Voting Rights Act?

 3   A.  On several occasions, I have been hired by the Department

 4   of Justice, yes.

 5   Q.  How many times have you served as an expert for the

 6   Department of Justice, since 2005?

 7   A.  Five.

 8   Q.  Now, throughout your career, in how many cases have you

 9   provided expert witness testimony?

10   A.  More than 20.

11   Q.  And have you ever been excluded as a witness?

12   A.  I have not.

13   Q.  And have courts ever adopted your findings on racially

14   polarized voting?

15   A.  Indeed.

16        MS. ZHANG:  Your Honor, the plaintiffs offer Dr.

17   Handley as an expert in the Voting Rights Act including in

18   racially polarized voting and conducting analyses of voting

19   patterns.

20        JUDGE BLACK:  The other side wish to be heard?

21        MS. McKNIGHT:  Your Honor, only objection is we note

22   that we have a standing *Daubert* motion against certain of her

23   analysis.

24        JUDGE BLACK:  I'm having trouble hearing you.  I'm

25   sorry.
```

```
 1            MS. McKNIGHT:  Pardon me.  I forgot the microphone.
 2   Your Honor, we do not have an objection other than we reserve
 3   our objection in our Daubert motion to certain portions of Dr.
 4   Handley's analysis in this case.
 5            JUDGE BLACK:  Fair enough.  Thank you.
 6            MS. McKNIGHT:  Thank you.
 7            JUDGE BLACK:  Did the defense want to chime in?
 8            MR. STRACH:  Just to say we agree with that.
 9            JUDGE BLACK:  Very well.
10   Q.  Dr. Handley, can you turn back to the first page of your
11   report.  Now, does this report accurately represent your
12   analysis in this case?
13   A.  It does.
14   Q.  And does it accurately represent the analysis you conducted
15   in forming your opinions in this case?
16   A.  It does.
17   Q.  And does it accurately reflect your opinions in this case?
18   A.  It does.
19            MS. ZHANG:  Your Honor, we'd like to offer Plaintiffs'
20   Exhibit 246 into evidence -- 254 into evidence.
21            JUDGE BLACK:  254.  Any objection?
22            MS. McKNIGHT:  No objection other than the noted
23   Daubert motion, Your Honor.
24            JUDGE BLACK:  Very well.  Defense chimes in.
25            MR. STRACH:  The same for defendants.
```

1      JUDGE BLACK:  Very well.

2  Q.  In broad terms, Dr. Handley, what were you asked to do in

3  this case?

4  A.  I was asked to conduct a district-specific functional

5  analysis to determine the black voting age population needed to

6  provide black voters with a realistic opportunity to elect

7  candidates of choice in the vicinity of the 11th Congressional

8  District.

9  Q.  Has anyone besides you used this term "district-specific

10 functional analysis?"

11 A.  Certainly.  My coauthors, but also the courts, the

12 Department of Justice, have all used this term.

13 Q.  And why is it necessary to conduct a district-specific

14 functional analysis?

15 A.  Because a single target number, percent black VAP, is not

16 sufficient.  It varies depending on the jurisdiction that

17 you're in, the kind of office that you're talking about,

18 whether it's local or a federal office.  The percentage

19 minority needed is very jurisdiction specific, and you want to

20 keep that in mind when you're drawing districts, because you

21 don't want to draw a district that, for example, fails to

22 provide minorities with an opportunity to elect, nor do you

23 want to draw a district that overly concentrates or packs

24 minorities in a district.

25 Q.  How does this analysis relate to the Voting Rights Act?

1    A.   Components of it are based on the same kind of analysis

2    that I do in a Voting Rights Act case, that is, an analysis of

3    voting patterns and participation rates by race.

4    Q.   Have you conducted a district-specific functional analysis

5    before?

6    A.   Many times.  I've done it both as a redistricting

7    consultant in cases I think I've already mentioned like Alaska

8    and New York City, Virginia; I've done it also in the context

9    of voting rights litigation, Section 2 litigation and Section 5

10   litigation.

11   Q.   Now I'd like you to turn to page two of your report.

12   There's a section here entitled with the Roman numeral IV

13   Success Rates of Black-Preferred Candidates in the 11th

14   Congressional District.  What do you discuss in this section of

15   your report?

16   A.   This section of the report looks at the actual percentage

17   of votes that black-preferred candidates received in the

18   Congressional District 11 vote prior to it being redrawn in

19   2011 and after it was redrawn.

20   Q.   And has Congressional District 11 successfully elected

21   African-American congressional candidates before this last

22   round of redistricting?

23   A.   African-Americans have been elected to represent the

24   district since it was first drawn in 1968 as a majority black

25   district.  It has always elected African-Americans to office.

1  Q.  And I turn your attention now to page three, Table 1.  Can

2  you tell us what Table 1 shows?

3  A.  This is the election results for the African-American

4  candidate that was black preferred in all instances from 2002

5  to 2016.  It doesn't include 2018, because this was -- this

6  report was done before the 2018 election, but Marcia Fudge also

7  ran and won in 2018 with something akin to 82 percent of the

8  vote.

9  Q.  Now looking at Table 1, what was the lowest percentage of

10  the vote that a black-preferred congressional candidate

11  received in Congressional District 11?

12  A.  In 2002, Stephanie Tubbs Jones received 76.3 percent of the

13  vote.  That's the lowest percentage of the vote.

14  Q.  Did you have to conduct any statistical analyses to get to

15  the numbers that are in the third column of Table 1?

16  A.  No, no.  These -- this is readily available.  This I got

17  online, but I'm sure it was reported by local newspapers after

18  the elections.  Easily obtainable.

19  Q.  Now I'd like to turn your attention to page four, Table 2.

20  What does Table 2 show?

21  A.  This lists African-Americans who have ran in Congressional

22  District 11 either for statewide or federal office.  You can

23  see that there are three candidates considered.  This is the

24  sum total of all who have run statewide or in federal elections

25  since 2008.

1    Q.   And what is the lowest percentage of the vote that

2    African-American candidates had received in general elections

3    based on Table 2?

4    A.   This would have been in 2010, and the percentage is 74.9.

5    Q.   Now I'd like to turn your attention to Table 3, which is on

6    page five.   What does Table 3 show?

7    A.   Based on my racial bloc voting analysis, these are the

8    black-preferred candidates in a host of contests that did not

9    include an African-American.   So these are white candidates.   I

10   think there are, I'm not sure, maybe about 18 contests here in

11   which we look at the percentage of votes that the

12   black-preferred candidate received.

13   Q.   And what was the lowest percentage of the vote received by

14   white candidates who were preferred by black voters based on

15   this table?

16   A.   60.3 percent in the 2014 gubernatorial contest.

17   Q.   Now, that's after the map was redrawn; is that right?

18   A.   That's correct.

19   Q.   So looking only at the elections that predated

20   redistricting, what was the lowest percentage of the vote

21   received by black candidates that were preferred by black

22   voters in recent general elections in the 11th Congressional

23   District?

24   A.   It looks like it's 74.9 percent in 2010.

25   Q.   And which race is that?

1    A.   The state treasurer.

2    Q.   Can we now turn to the other table that's on the same page,

3    page five.   What does Table 4 show?

4    A.   This looks at Democratic primaries in the 11th

5    Congressional District, Democratic primaries that included

6    African-American candidates, and there were four in total.

7    Q.   And what was the lowest percentage of the vote received by

8    the black-preferred candidate in Democratic primaries, as

9    indicated in this table?

10   A.   65.5 percent in 2016, the senatorial race.

11   Q.   Now, what about prior to the 2011 redistricting?

12   A.   It would have been 69 percent in the U.S. president's race.

13   Q.   Now I'd like to take a step back and take all the tables we

14   just looked at in total and ask you, what do you conclude about

15   the success rate of minority-preferred candidates in

16   Congressional District 11 prior to the 2011 redistricting?

17   A.   Black-preferred candidates were winning by overwhelmingly

18   high percentages in all of the statewide and federal contests

19   that I examined, which was, in fact, all of them.

20   Q.   Now I'd like you to turn to page six of your report.

21   There's a section here that's entitled, with Roman numeral V,

22   Percentage Black Voting Age Population Needed to Elect

23   Black-Preferred Candidate.   What do you discuss in this section

24   of your report?

25   A.   This portion of my report hypothesizes different

1    percentages, other than the actual percentage that was in

2    Congressional District 11 at the time of the election, and

3    estimates what the percentage of vote the black-preferred

4    candidate would have gotten if the district was 55 percent, 50

5    percent, 45 and 40 percent black based on the turnout rates of

6    blacks and whites and the voting patterns of blacks and whites,

7    that is, how cohesive black voters are supporting their

8    black-preferred candidate and how much white "crossover" vote

9    black candidates -- or black-preferred candidates could expect

10   consistent with white "crossover" votes.

11   Q.   What methodology did you use to determine black and white

12   turnout rates and black and white support for candidates?

13   A.   I'm sorry, repeat the question.

14   Q.   What methodology did you use to determine black and white

15   turnout rates and black and white support for candidates?

16   A.   Of course, this information isn't available on the ballot.

17   We don't know the race of the person casting the ballot, so I

18   used the three standard statistical techniques that are used in

19   these kinds of cases to produce these estimates, and they're

20   called homogeneous precinct analysis, ecological regression

21   analysis, and ecological inference analysis.

22   Q.   Where do these techniques come from?

23   A.   The first two techniques were used by the expert -- by an

24   expert, there may be more than one expert -- in the -- in the

25   *Thornburg v. Gingles* case, the first case to consider the

1    amendments to Section 2 of the Voting Rights Act.

2        The third technique I mentioned, ecological inference, was

3    developed after *Thornburg* was decided, and it was developed in

4    part because of the problem of what are called out-of-bounds

5    estimates that can be produced by ecological regression.  You

6    can get estimates in ecological regression that are less than

7    zero percent or, say, 101, 102 percent, and ecological

8    inference does not do that.

9    Q.  Do you report any measures of statistical uncertainty for

10   your estimates?

11   A.  I do.  The, I think it's Appendix B, includes the standard

12   errors for all of my ecological inference estimates.

13   Q.  What are standard errors?

14   A.  Standard errors -- so an ecological inference estimate is a

15   point estimate on a distribution, and the standard error

16   indicates the amount of variability around that point estimate.

17   So if there's a lot of variability, then the standard error

18   would be higher and there would be more statistical uncertainty

19   associated with the estimate that you produced.  Likewise, if

20   the variability was very small, you'd have a smaller standard

21   error, and more certainty in your point estimate.

22   Q.  Are standard errors related in any way to what are called

23   confidence intervals?

24   A.  Yes.  A standard error is used to produce confidence

25   intervals.  So, typically, you have a formula, depending on the

1   percentage competence that you are looking for, and you use the

2   standard error to produce a range around your point estimate in

3   which you are saying 90 or 95 percent certain the actual value

4   appears.  The problem is that it requires what's called a

5   normal distribution.  Your simulated values have to produce a

6   bell-shaped normal curve, and with EI that is not the case.

7   You have a truncated normal distribution, so you can't use

8   standard errors to produce confidence intervals.

9   Q.  Have other experts reported confidence intervals for their

10  EI estimates?

11  A.  They have, but they've either used the standard error

12  incorrectly because they should not have used it to produce

13  this range, because, again, the values are not normally

14  distributed, or what they're actually reporting are called

15  percentiles, they are looking at the distribution and

16  reporting, for example, the value at the five percent and the

17  95 percent points, and they have not calculated these

18  confidence intervals using the standard error.

19  Q.  Now, did you report any confidence intervals, however

20  computed, in your report in this case?

21  A.  I did not.

22  Q.  Have you ever submitted expert reports involving EI

23  estimates without confidence intervals?

24  A.  Routinely.

25  Q.  And have those expert reports been admitted despite the

1    lack of confidence intervals?

2    A.  Yes.

3    Q.  Now, before we get to your conclusions in this case, I'd

4    like you to take a look at page eight, the section here

5    entitled A., Equalizing Turnout.  What do you describe in this

6    section of the report?

7    A.  This is the first step in producing the estimate of the

8    black voting age population needed to produce an effective

9    district for minorities, and that is to look at any

10   differential in turnout and account for that in creating a

11   district.

12       So if, for example, whites turn out at a higher rate than

13   black voters, then you would need to create a district that

14   recognizes that and compensates for it.

15   Q.  Now I'd like you to turn to page 11 of your report.  That

16   section is entitled B., Incorporating Minority Cohesion and

17   White Crossover Voting.  What do you describe in this section

18   of the report?

19   A.  So this is the second step.  Not only do you want to take

20   into account any differences in turnout, but you want to take

21   into account how cohesive the minority voters are in support of

22   their minority candidate and how much white "crossover" vote

23   you can expect in support of the black-preferred candidate.

24       So this section takes into account all three of those

25   factors -- that's turnout, cohesion and crossover voting -- to

1    produce estimates of the percentage of vote that the

2    black-preferred candidate would get under different scenarios.

3    Q.  Are you aware the defendants and intervenors have hired

4    experts to respond to plaintiffs' expert reports in this case?

5    A.  Am I aware that they have?

6    Q.  (Nods head up and down.)

7    A.  I'm not aware that they have.

8    Q.  And are you aware of any opposing expert report from the

9    other side that takes issue with the analysis you've conducted

10   in these two sections of your report?

11   A.  No, I haven't seen anything like that.

12   Q.  Now I'd like to jump to the conclusions you reached in this

13   case.  Could you please turn to page 17 of the report.  There's

14   a section here entitled Roman numeral VI., Conclusion.  And

15   there the last sentence reads, "As Tables 10 and 11

16   demonstrate, a 45% black VAP district offers black voters a

17   realistic opportunity to elect their candidates of choice to

18   represent the 11th Congressional District."

19        Could you please take a look at pages 15 and 16 of your

20   report.  Sorry.  16 and 17 of your report.  Are these the

21   Tables 10 and 11 that you refer to in your conclusion?

22   A.  Yes, they are.

23   Q.  Now, let's, at a high level, just ask you what is the

24   information that's presented in Tables 10 and 11?

25   A.  So I mentioned four different scenarios.  This produces the

1  results for the four different scenarios.  What is the

2  percentage of vote the black-preferred candidate would get if

3  the district were in the last four columns, 55 percent, 50

4  percent, 45 percent and 40 percent black VAP.

5  Q.  And is there a difference between the information that's

6  presented in Table 10 and in Table 11?

7  A.  Yes.  Table 10 looks at general elections and Table 11

8  looks at Democratic primaries.

9  Q.  Why is it important to look at primary elections?

10  A.  Because we have a two-stage election process in the United

11  States, and you have to win the primary before you can go on

12  and win the general election.  So I looked at primaries as

13  well.

14  Q.  And which primaries did you look at?

15  A.  I looked at Democratic primaries because the vast majority

16  of black voters in Ohio participate in the Democratic primary.

17  Q.  Now I'd like to drill into Table 10.  Now I'd like us to

18  start looking at this table horizontally.  What is in each of

19  the rows in this table?

20  A.  Each row represents a particular election that I examined.

21  As I said, I looked at all statewide and federal elections that

22  occurred between 2008 and 2016, with the exception of some

23  judicial elections, and this is all of the elections that I

24  looked at.  So each one is a different election, each row is a

25  different election.

1  Q.  Now I'd like to have us look at this table vertically and

2  ask you to tell us what each of the columns mean.

3  A.  So the first column lists the actual election.  And the

4  second column indicates whether the black-preferred candidate

5  was an African-American.  The third column looks at the actual

6  percentage of the vote the candidate received in Congressional

7  District 11 as configured at the time of the election.  Then

8  the next six columns provide estimates based on my racial bloc

9  voting analysis of, in column four, the percentage of black

10  voting age population that cast a vote for this particular

11  contest, and then in column five the percentage of those voters

12  who cast a vote for the black-preferred candidate, and then in

13  the next column the percentage of voters, black voters who

14  voted for the other candidates.  And then you have the same

15  information in the next three rows for the white voters, that

16  is, the percentage of whites of voting age who turned out, who

17  voted for the black-preferred candidate and then who voted for

18  the other candidates.

19      And then the last four columns indicate the percentage of

20  the vote the black-preferred candidate would have received

21  under these four conditions, that is, instead of the actual

22  percentage of vote, the actual percentage of black VAP in the

23  11th Congressional District at the time of the election, what

24  if it had been 55 percent, 50 percent, 45 percent, and then the

25  final column, 40 percent.

1  Q.  Did you reach any conclusions after reviewing this table?

2  A.  Yes.  As you can see, under all conditions, even 40 percent

3  black VAP, the black-preferred candidate would have carried the

4  11th Congressional District.

5      However, I note that in one contest it's the 2014

6  gubernatorial contest, the black-preferred candidate would have

7  received only 50.6 percent of the vote, which was very close.

8  And this is why I said that -- this is why I conclude that 45

9  percent black VAP would provide a comfortable margin for the

10  black-preferred candidate in all of these contests.

11  Q.  And did your conclusion change after considering what's in

12  Table 11?

13  A.  No.  As you can see from Table 11, even at 40 percent, the

14  black-preferred candidate easily wins the Democratic primary.

15  Q.  Now just to be clear, the numbers that are presented in

16  Table 10 and in Table 11, these are just estimates; is that

17  right?

18  A.  Yes and no.  The -- the last four columns are estimates

19  because they're based on estimates in the columns before that.

20  However, the information in column three are not estimates.

21  This is how those candidates actually did in the 11th

22  Congressional District.

23  Q.  Now, how confident are you about your conclusion that a 45

24  percent black VAP district will provide black voters with a

25  realistic opportunity to elect their candidates of choice to

1  Congress?

2  A.  I am very confident and I'm very confident for a number of

3  reasons.  Number one, my estimates of turnout and voting

4  patterns are based on three different statistical techniques,

5  not just one, and all three produced very similar results.

6      Number two, I didn't look at just one or two contests.  I

7  looked at all statewide and federal contests since 2008.

8      And number three, if you look at the third column, you can

9  see how the black-preferred candidate actually performed in the

10  11th Congressional District.  And you can see that the

11  black-preferred candidate won by, in most cases, overwhelmingly

12  high percentages.

13  Q.  Now I want to step back and ask you a little bit the

14  election years that are included in these tables.  Do both

15  Table 10 and 11 also include races from before the 2011

16  redistricting?

17  A.  Yes.  The tables include elections from 2008 to 2016, and

18  so about half of the contests occurred before the 2011

19  redistricting.

20  Q.  So if one were interested in what percentage of votes a

21  black-preferred candidate would receive based only on elections

22  predating 2011, is that something someone can learn from your

23  tables?

24  A.  Certainly.  You would just look at the top half of Table 10

25  and the top half of Table 11, and that is the contest that

1    occurred in 2008 and 2010.

2    Q.  Now, could the legislature have had this information

3    available to it when drawing the districts?

4    A.  Well, I'm sure they had column three available to them, and

5    they certainly could have hired a consultant, if they didn't,

6    to produce estimates similar to those in the final four

7    columns.

8    Q.  Now, I would just like us to turn back to Table 10 and ask

9    you -- let's focus only on the election races predating 2011.

10   Would a district in the Cleveland area with a 45 percent VAP

11   provide minority voters with an opportunity to elect their

12   candidates of choice to Congress based on the data that you

13   have here predating 2011?

14   A.  Yes.  As you can see, the percentages in all instances are

15   high.  The black-preferred candidate would have carried the

16   district in all of the scenarios that I considered.

17   Q.  Now, could the legislature have sought the analysis you

18   conducted in Tables 10 and 11 when drawing the districts?

19   A.  They could have, and I think they should have, especially

20   given that they decided to take a historically Cuyahoga

21   County-based district and drop it down into Summit County,

22   picking up black voters as they went and producing a very oddly

23   shaped district.  I think they probably should have hired a

24   consultant to see if this was necessary in order to provide

25   minorities with an effective opportunity to elect candidates of

1    choice.

2    Q.  Now I want to step back from the reports -- the report you

3    wrote in this case and ask you about some questions outside of

4    the context of this case.

5        Have you ever conducted any other analysis of voting

6    districts in the Cleveland area?

7    A.  Yes.  I was hired by the Department of Justice in two

8    cases, two Section 2 challenges to the city council and the

9    school board in Euclid, Ohio.

10   Q.  And just to be clear, what were the districts that were at

11   issue in those litigations?

12   A.  In the first case it was the city council mixed system.

13   They had some districts and some council representatives

14   elected at large.  In the second instance, it was school board,

15   and the school board was elected at-large.

16   Q.  And in the analysis you conducted in those cases, which

17   elections did you analyze?

18   A.  I analyzed what are called endogenous elections, that is,

19   the elections for the offices at issue; in this case, the city

20   council contests and school board contests.

21   Q.  Did you analyze any statewide or congressional races for

22   those analyses?

23   A.  I did not.  As I mentioned, I looked at the endogenous

24   contest the probative contests for the jurisdiction at issue.

25   Q.  And in your report that you authored in this case, did you

1    analyze any city council or school board races?

2    A.  I did not.  Again, I looked at the relevant contest, that

3    is, the contest that would tell me more about congressional

4    voting and not local voting.

5    Q.  Well, did any of the analyses you conducted in the Euclid

6    cases affect your conclusion in this case?

7    A.  No.  It had no impact one way or the other, and the reason

8    is that what was at issue in Euclid was local elections.  They

9    were non-partisan elections.  They were held off-election

10   cycle.  In other words, they were held on odd number years,

11   1999, 2001, so these were not even held at the same time as

12   federal elections.

13       Furthermore, white turnout in these local elections was

14   three to four times greater than black turnout, and whites

15   rarely cast a vote for the black candidate or the

16   black-preferred candidate in Euclid City Council or school

17   contests, and a black-preferred candidate or a black candidate

18   had never actually won a city council or a school board

19   election.

20       In this case, we're talking about something very different.

21   We're talking about on-cycle elections.  We're talking about

22   partisan elections.  We're talking about elections in which

23   blacks and whites turn out at comparable rates.  And we're

24   talking about an area of the state in which blacks have

25   consistently been able to elect their preferred candidate to

1    office.

2    Q.   Now I'd like to take one step further from the analysis you

3    conducted in this case and ask you generally whether you've

4    conducted any academic research on the Voting Rights Act?

5    A.   A lot of my research has centered on or been relevant to

6    the Voting Rights Act.

7    Q.   Can you please turn to page 30 -- sorry, 38 of your report.

8    This is into the publications section of your CV.  And the

9    first paper that's listed on this page is something called "Has

10   the Voting Rights Act Outlived Its Usefulness?  In a Word,

11   'No.'"  Do you see that?

12   A.   I do.

13   Q.   What was that paper about?

14   A.   In that paper my co-authors and I collected information on

15   congressional and state legislative districts nationally, and

16   we looked at the composition, the minority composition of those

17   districts, and the race of -- or ethnicity of the

18   representatives who were elected to represent them in 1992 and

19   2007.

20   Q.   And what did you find?

21   A.   That the vast majority of minority elected officials,

22   legislators, were elected from majority black or majority

23   Hispanic districts.

24   Q.   And does this paper focus on a particular jurisdiction?

25   A.   No, no.  This was a national survey.

1  Q.  And was the purpose of the paper to provide advice to

2  jurisdictions drawing districts after the 2010 Census that they

3  have to have a certain percentage of black VAP in order to

4  comply with the Voting Rights Act?

5  A.  No.  I think that my other writing -- and this writing as

6  well -- note that a jurisdiction-specific analysis is important

7  to determine what percentage is needed in any given

8  jurisdiction.

9  Q.  And would you use the findings of this paper to advise a

10  jurisdiction of the black VAP they should designate in their

11  redistricting efforts after the 2010 Census?

12  A.  No.  Again, it would be important to do a

13  jurisdiction-specific analysis.  Sometimes 50 percent is not

14  enough.  I've been in jurisdictions in which you've had to draw

15  districts that were 55 or 56 percent black VAP to provide an

16  opportunity for blacks to elect their preferred candidates.

17  I've also been in instances where less than 50 percent was

18  necessary.  It's very important to do a jurisdiction-specific

19  functional analysis in each case.

20          MS. ZHANG:  Nothing further, Your Honors.

21          JUDGE BLACK:  Very well.

22                      CROSS-EXAMINATION

23  BY MS. McKNIGHT:

24  Q.  Good afternoon, Dr. Handley.  It's nice to see you.

25  A.  Good afternoon.

1    Q.  Dr. Handley, I'd like to start with a few questions about

2    what you were tasked with doing in this case.  Now, there is

3    nothing in your report about partisan intent; is that right?

4    A.  That's correct.

5    Q.  And you have no opinion to offer the Court about the intent

6    of the map drawers in 2011 in Ohio.  That's right?

7    A.  That's correct.

8    Q.  And when you prepared your report, you did not take into

9    account support for the majority-minority district from the

10   black caucus in Ohio, did you?

11   A.  I did not.

12   Q.  So your report did not take into account input from the

13   late Honorable Representative Stokes?

14   A.  No.  My report focused on just voting patterns.  It's just

15   numbers, statistical.

16   Q.  Thank you.  So if I were to ask if your report took in

17   input from the Honorable George Forbes or from Congresswoman

18   Fudge, your answer would be the same, that it did not take

19   their input regarding a majority-minority district?

20   A.  That's correct.  This was a district-specific functional

21   analysis based on data alone.

22   Q.  I'd like to ask that we put up Plaintiffs' Exhibit 254.

23   This is the report that's right in front of you, Dr. Handley.

24   The report you submitted in this case.

25        And can we turn to page 26.

1          JUDGE WATSON:  26?

2          MS. McKNIGHT:  Yes, Your Honor.  Pardon me.  Page 26.

3   Q.  And now on this page begins an Appendix B.  Do I understand

4   correctly that this Appendix B includes the totality of the

5   elections you studied in order to prepare your report?

6   A.  Yes.

7   Q.  And now by my read of Appendix B, you have analyzed

8   elections from five different election years.  Those are 2008,

9   2010, 2012, 2014 and 2016; is that right?

10  A.  That's correct.

11  Q.  So am I also correct that most of these election years

12  post-date 2011?

13  A.  Half of the elections are prior to 2011 and half are after.

14  I think it's ten before and 11 after.

15  Q.  Thank you.  Now, you would agree that it would -- it would

16  not be a bad idea for legislatures drawing maps to consider

17  recent litigation under Section 2, either in the area of the

18  district they're drawing or in the state of the district;

19  right?

20  A.  It's not something I would consider.  I -- you might want

21  to ask a lawyer that question, but that's not something that I

22  consider in doing my analysis.

23  Q.  Okay.  So do you remember giving a deposition in this case?

24  A.  I do.

25  Q.  Okay.  And do you remember me asking you a question about

 1  whether legislatures should consider recent litigation under

 2  Section 2?

 3  A.  I'm sorry.  Was your question whether legislatures should

 4  or whether I should?  I'm sorry.  My -- did you ask me whether

 5  legislatures should?

 6  Q.  That's fine.  Let me reask the question.

 7  A.  Okay.

 8  Q.  You agree that it wouldn't be a bad idea for legislatures

 9  drawing maps to consider recent litigation under Section 2

10  either in the area of the district they are drawing or in the

11  state of the district; right?

12  A.  It's not something I would consider.  It wouldn't be a bad

13  idea if legislators took lots of information, including that

14  kind of information, into account in drawing districts.

15  Q.  Thank you.  So let's look at the kind of information that

16  was available to map drawers in 2011.

17      And let's start with litigation under Section 2 that would

18  have been recent to the Ohio legislature drawing its maps in

19  the fall of 2011.  This leads us to two cases in Euclid city.

20  I heard your testimony earlier.  Just for the record, I'd like

21  to name those two cases and confirm that it's your

22  understanding those are the two cases you provided expert

23  reports.

24      The first was a case *United States v. City of Euclid*, and

25  the second is a case *United States v. Euclid City School*

1    *District Board of Education.*

2         Did you act as an expert in those cases?

3    A.  I'm going to assume that you have the citations correct and

4    say yes.

5    Q.  And I understood earlier that in both of those cases you

6    had been hired by the Department of Justice; is that right?

7    A.  Yes.

8    Q.  And both of those cases related to violations of the Voting

9    Rights Act; is that right?

10   A.  That the Department of Justice challenged those districts

11   under Section 2 of the Voting Rights Act, that's correct.

12             MS. McKNIGHT:  I would like to put up on the screen

13   Intervenors' Exhibit 25.

14   Q.  Now, Dr. Handley, looking at this document, does this

15   appear to you to be the expert report you prepared in the case

16   *U.S. v. City of Euclid*?

17   A.  I think you handed me a series of them.  I think this is

18   one of them, yes.

19   Q.  And was this report dated February 1, 2007?

20   A.  It is.

21   Q.  And it notes here that you were retained by the U.S.

22   Department of Justice to prepare this report; is that right?

23   A.  Yes.

24   Q.  And by the header it seems to indicate that this was filed

25   publicly.  Whether you can affirm that or not, I'd ask.

1    A.  I can't confirm or deny it.

2    Q.  Let me ask you this way.  Do you have any reason to doubt

3    that this is what it says it is?

4    A.  I have no reason to doubt that.

5    Q.  Thank you.  Now, we have testimony on the record that

6    Euclid is located within the boundaries of Congressional

7    District 11.  This is Congresswoman Fudge's district.  Is that

8    your understanding as well?

9    A.  I think so.

10   Q.  And this 2007 report analyzed racial voting patterns for a

11   Voting Rights Act claim; right?

12   A.  It looked at voting patterns in city council and school

13   board elections.

14          MS. McKNIGHT:  Your Honors, I would like to move for

15   the admission of I25.

16          JUDGE BLACK:  Any objection?

17          MS. ZHANG:  Yes, on relevance grounds.

18          JUDGE BLACK:  The objection is noted.

19          MS. McKNIGHT:  Thank you, Your Honor.

20   Q.  Now, so we have a sense of timing, your initial report in

21   *U.S. v. City of Euclid* was submitted in February of 2007.  Does

22   it sound right to you that the decision in that case, or one of

23   them, was issued in 2008?

24   A.  I don't know.

25   Q.  Now I'd like to put before you -- if you don't mind we'll

```
 1  set this one to the side electronically.  I'd like to put
 2  before you I27.  Dr. Handley, this indicates that it is an
 3  expert report for U.S. v. Euclid City School District Board of
 4  Education by Dr. Lisa Handley.  Do you see that?
 5  A.   I do.
 6  Q.   And do you agree that it is what it appears to be?
 7  A.   I have no reason to believe it's not.
 8  Q.   Thank you.  And this report was dated March 2009; is that
 9  right?
10  A.   That's correct.
11  Q.   Now, do you have a recollection that this case, U.S. v.
12  Euclid City School District Board of Education, had a long
13  remedial phase where you submitted multiple expert reports?
14  A.   That -- I think that might be correct.  I think so, but
15  I'm -- I don't know how long.
16  Q.   So thank you for looking at that.  I'll have another
17  question about that.  I wanted to make sure we were talking
18  about the same time frame.
19       This is roughly 2007, 2009 and some years after that; is
20  that fair?
21  A.   Yes.
22  Q.   Now turning back to I25 and your expert work in the City of
23  Euclid.  And now on page one of this exhibit, it shows that you
24  concluded that there were polarized voting patterns in recent
25  Euclid City Council elections.  Do you see that?  I'll guide
```

1  you to the text.  The second full paragraph under Summary

2  Conclusions.

3  A.  Okay.

4      Yes.

5  Q.  And in the middle of that second full paragraph you state,

6  "More significantly, when the black-preferred candidate for

7  city council is African American, voting is, quote, 'quite

8  polarized,' with black voters cohesive in their support for the

9  African American candidate and whites voting as a bloc to

10  successfully defeat the candidate."

11     Do you see that?

12  A.  I do.

13  Q.  And those were your conclusions in your report?

14  A.  That's correct.

15  Q.  That was your expert opinion in this case?

16  A.  That's correct.

17  Q.  Do you have any reason to doubt the truth of those

18  statements at the time you made them?

19  A.  I do not.

20  Q.  I'd like to go back to I27.  Dr. Handley, I27 is your

21  report in the *U.S. v. Euclid City School District Board of*

22  *Education*.  Do you remember talking about this at your

23  deposition?

24  A.  Vaguely, yes.

25  Q.  I'd like to turn to page three of this document, please.

1  Now, in the first full paragraph under "Determining the

2  Effectiveness of the Proposed Minority District" it indicates

3  that you were relying on a directive from the Court that "a

4  district gives minorities a reasonable opportunity to elect

5  candidates of choice where it has a 'sufficient cushion' of

6  approximately 60% of the voting-age population."

7       Do you see that?

8  A.  I do.  I assume this is a quote from the decision in the

9  Euclid City Council contest -- litigation.

10  Q.  Okay.  And you relied on that decision by the Court to

11  perform your analysis; is that right?

12  A.  I'm not sure what you mean by perform my analysis.

13  Q.  That's a fair point, Dr. Handley.  You incorporated the

14  Court's line of 60 percent voting-age population, minority

15  voting-age population, you incorporated that into your report;

16  didn't you?

17  A.  Yes.  I mention it here, yes.

18  Q.  Do you recall disagreeing with that level at the time?

19  A.  No.

20          MS. McKNIGHT:  Your Honors, I would like to move for

21  the admission of I27.

22          JUDGE BLACK:  Any objection.

23          MS. ZHANG:  The same objection.

24          JUDGE BLACK:  There is an objection on relevancy.

25  It's noted.  You may continue.

1   Q.  I'd like to consider other information that was available

2   to map drawers back in 2011.  I'd like to start by asking you

3   about some of your positions back in 2009.

4       Now, I heard plaintiffs' counsel ask you about an article

5   regarding a national survey where you looked at congressional

6   and legislative districts.  Do you remember giving that

7   testimony?

8   A.  I do.

9   Q.  Okay.  And wasn't it your position in 2009 that "A closer

10  examination of the majority-nonblack districts that elected

11  black legislators to office offers little hope of a dramatic

12  change in the share of African American legislators elected

13  from majority-white districts"?

14  A.  It could be.  You'll have to show it to me.  I actually

15  didn't memorize the article.  It could be you're reading from

16  that article.

17        MS. McKNIGHT:  Sure.  We could we put up Intervenors'

18  Exhibit 31, please, at page 535.

19  Q.  Now, here I'm looking at the second full paragraph, the

20  first sentence.  Could you review that and I'll ask you the

21  question again, Dr. Handley.

22  A.  Can you --

23        MS. McKNIGHT:  So the second full paragraph.

24  A.  Is that the first or the second?

25      I have reread that sentence.

1  Q.  Okay.  And so would you agree that it was your position in
2  2009 that "A closer examination of the majority-nonblack
3  districts that elected black legislators to office offers
4  little hope of a dramatic change in the share of African
5  American legislators elected from majority-white districts"?
6  A.  I would say that's what we wrote based on the numbers, that
7  that was certainly correct at that time.
8  Q.  Thank you.  I'd like to turn to page 532 in this same
9  article.  Let me ask you this question first, Dr. Handley.  Was
10  it not your position in 2009 that the number of
11  majority-nonblack districts electing African American
12  legislators has also increased slightly since 1992, but it
13  remained quite low in 2007?
14  A.  Again, this is describing the numbers from the tables.
15  I'm -- this is what we found in the tables.
16  Q.  So is the answer to my question yes, Dr. Handley?
17  A.  Well, it means -- it means --
18  Q.  And, I'm sorry --
19  A.  When you say when you -- "this is your position that," I
20  would say, well, this is what we found here.  But my position
21  is much broader than that, and, that is, the relevance of a
22  national survey to this case, my position would be this is not
23  relevant.  You need to do a jurisdiction-specific analysis.  So
24  I agree that that's what I wrote.  That is what I found with
25  regard to those numbers.

1  Q.  All right.  And thank you, and we'll get to who requested

2  those types of analyses in a minute.

3      But for now, I wanted to confirm that your position, as

4  published in 2009, was that the number of majority-nonblack

5  districts electing African American legislators has also

6  increased slightly since 1992, but it remained quite low in

7  2007.  Is that right?

8  A.  No.  Again, I don't like the word "position."  I found

9  that.  This is just fact here.  I found that.  It's not a

10  position.

11  Q.  I see.  And thank you.  I didn't understand what issue

12  there was with my language.  So now I understand that you saw

13  this as fact in 2009; is that right?

14  A.  That's correct.

15  Q.  Thank you.  Dr. Handley, in this case you are not offering

16  an opinion that black voters were, quote/unquote, "packed into

17  Congressional District 11"; right?

18  A.  I would say it depends on your definition of "packed."  I

19  would say, yes, that --

20  Q.  Well, Dr. Handley, let me hold on one moment --

21  A.  Okay.

22  Q.  -- because my question was whether you provided an opinion

23  that black voters were packed in Congressional District 11.  If

24  your answer is yes, please point to it in your report.

25  A.  I don't know if I say that there is -- that the black VAP

```
 1   is unnecessarily high.  I could sit and reread my report if you
 2   want, but my opinion is that the black VAP was unnecessarily
 3   high as drawn in 2011.
 4   Q.  But you did not include that opinion in your report, did
 5   you?
 6   A.  I don't know that I didn't.  I could --
 7   Q.  Please take the time to read it.
 8   A.  Okay.
 9   Q.  Well, I can tell you, Dr. Handley, to assist, that when you
10   search for the word "pack" and all its iterations in your
11   report, it shows up in one page, on page six in a background
12   section, if that can help you with your review.
13   A.  So are you looking for the actual word "packed" or
14   unnecessarily high VAP?
15   Q.  My question is, you are not offering an opinion that black
16   voters were, quote/unquote, "packed in CD11."
17   A.  I believe that black voters were packed in CD11, whether
18   the word "packed" appears or not.  However, if your quibble is
19   the word "packed" doesn't appear, then you could be correct.
20   The word "packed" might not -- might not occur.
21   Q.  Why don't you take a moment and look in your report, if you
22   believe that you conducted a packing analysis in Congressional
23   District 11 but did not use the word "pack" or "packing."
24   A.  What do you mean by "packed" analysis?  I did an analysis
25   to determine the percentage black VAP necessary, and the black
```

1    VAP necessary was lower than the black VAP that was actually

2    used when the district was drawn.  I've never heard of

3    something called a "packed" analysis.  If you want to tell me

4    what that is, I could tell you if I did it.

5    Q.  I'd be happy to and I may use your own words here, Dr.

6    Handley, for a moment, because there's an issue with this.

7         You are an expert in Voting Rights Act analyses; right?

8    A.  Yes.

9    Q.  Okay.  And do you appreciate that in the realm of analyzing

10   Voting Rights Act claims, the word "pack" or "packing" is a

11   term of art?

12   A.  What do you mean by "term of art"?  I'm really not sure

13   what you're trying to get at here.

14   Q.  Okay.

15   A.  Do you mean that there's not a specific, well-recognized

16   definition?

17   Q.  No.  I mean that it has a very specific definition and

18   meaning in the realm of Voting Rights Act claims.  Would you

19   agree with that?

20   A.  I would not.

21   Q.  Okay.  When you conducted your analysis in this case, you

22   did not address all factors of *Gingles*, did you?

23   A.  I did an analysis that's relevant to the second and third

24   prongs, so I did a racial black voting analysis.  I did not do

25   it to determine if voting was polarized.  I did it to determine

```
 1   what the voting patterns were.  I never considered the first

 2   prong.

 3   Q.  So in your analysis is it your understanding that

 4   plaintiffs in this case brought a Voting Rights Act packing

 5   claim?

 6   A.  I think not, but I -- I'm not sure.  I don't think so.

 7   Q.  You would be correct that they have not brought a Voting

 8   Rights Act packing claim, and, in fact, you didn't -- you

 9   understood that at the time you were preparing your report that

10   this is not a Voting Rights Act case; right?

11   A.  I'm not -- I can tell you what I was asked to do.  I can't

12   really tell you -- I don't remember what they told me about the

13   case.

14   Q.  You said before that you did not address Gingles because

15   this is not a voting rights case, didn't you?

16   A.  I did not -- I was not asked to look at any of the Gingles

17   prongs.  I was asked to do a district-specific functional

18   analysis that employs some of the analysis that's used in a

19   Gingles case, but I certainly haven't prepared this as if it

20   were a Gingles case.

21   Q.  So you have stated before that your report does not address

22   Gingles because this is not a Voting Rights Act case; right?

23   A.  It's my understanding that this is not a voting rights

24   case.

25   Q.  Thank you.  What does "packing voters" mean to you?
```

1    A.   Packing more -- in this context, putting more black voters

2    in the district than would be necessary to elect the candidates

3    of choice, but it's used in different contexts.   You could pack

4    a district with, for example, far more Democrats.   You could

5    take all of the Democrats and pack them in a district and

6    produce an 80, 85 percent Democratic district.   That would be

7    another way of defining packing.

8    Q.   Okay.   I'd like to turn to page six of your report, and

9    this would be Plaintiffs' Exhibit 254.   And we'll look at page

10   six.

11        Now, in the first full paragraph in section V, in the last

12   sentence, you describe "Drawing minority districts informed by

13   this percentage avoids creating districts that either, on the

14   one hand, fail to provide minorities with the opportunity to

15   elect their candidates of choice, or, on the other hand, that

16   pack minority voters into a district unnecessarily."

17        Do you see that?

18   A.   I do.

19   Q.   Okay.   So where else in your report do you state that

20   voters have been packed unnecessarily into a district?

21   A.   In my report, I don't know.   I think you said this is the

22   only place that the word "pack" or "packed" appears, but I

23   could look at it again.   I'll take your word for it.

24        I will tell you that I found that 45 percent is the

25   percentage that provides minorities with an effective district

1    and that the district was drawn with far more than 45 percent.

2    Q.  Could we go to page one of your report, and the scope of

3    your project.  Considering the fact that you included data

4    post-dating 2011 and the fact that you did not conduct all the

5    *Gingles* analyses in order to determine Voting Rights Act

6    liability, would you agree that the scope of your project was

7    focused on preparing a remedial plan in this case?

8    A.  No.  My -- my job was to conduct a district-specific

9    functional analysis.  That's what I was asked to do, and that's

10   what I did.

11   Q.  And did you understand that that analysis was going to be

12   used to determine liability in a Voting Rights Act case here?

13            MS. ZHANG:  Objection.  It calls for a legal

14   conclusion.

15            JUDGE BLACK:  She can answer if it's not a legal

16   conclusion.

17   A.  I think the answer's no, but repeat the question.  I'm

18   sorry.

19            MS. McKNIGHT:  Sure.

20       Could you repeat the question.

21       (Question read.)

22   A.  So I did -- I did not understand that it would be used for

23   that purpose.

24   Q.  Thank you.  We heard testimony from Congresswoman Fudge

25   that her district, Congressional District 11, has been a

```
 1  majority-minority district for 50 years.  You're not providing
 2  an opinion that it was in bad faith to maintain this
 3  longstanding majority-minority district; right?
 4  A.  I am not talking or thinking about or offering an opinion
 5  on intent.
 6  Q.  We also have evidence in the record that long-revered
 7  leaders of the African-American community liked that this
 8  district, known as the Stokes district, was drawn as a
 9  majority-minority district.  You're not providing an opinion
10  that it was in bad faith for these leaders to want a majority-
11  minority district; right?
12  A.  I'm not commenting.  I have no opinion on intent.
13  Q.  And you're not providing an opinion that it was in bad
14  faith for Republican map drawers to honor that request; right?
15  A.  I have no opinion on intent.
16  Q.  Could we turn to page -- in this same exhibit, Plaintiffs'
17  Exhibit 254 -- page 35.  Now, I notice in this list of U.S.
18  Clients Since 2000 that you have an entry for "Ohio:  State
19  Democratic Party."
20      In 2011, were you asked by the Ohio State Democrats to
21  conduct a district-specific functional analysis of
22  Congressional District 11 during the congressional
23  redistricting?
24  A.  No.  I think this is much older than that.
25  Q.  Okay.  So if we have evidence on the record that Democrats
```

```
 1   in 2011 proposed a majority-minority district for District 11
 2   but we have no evidence that they conducted any
 3   district-specific functional analysis to support that district,
 4   you are not here to opine that they were acting in bad faith in
 5   doing so, are you?
 6   A.  I have no opinion on anybody's intent.
 7   Q.  I heard your testimony earlier with relation to the map
 8   drawers in 2011.  You thought that they should have done that;
 9   is that right?
10   A.  My opinion in that case is that if I were going to drop
11   down into Summit County and draw a district that targeted black
12   voters, given recent litigation, at least, I would have been
13   very sure that I needed to do that.
14   Q.  I would like to move to --
15        MS. McKNIGHT:  And, Your Honors, so you have a sense
16   of timing, I expect to take approximately eight to ten more
17   minutes.
18        JUDGE BLACK:  Go.
19   Q.  I'd like to turn to Table 11 of your report.  It's on page
20   17.  And, Dr. Handley, I appreciate you've done a good job of
21   making this a clear chart, but it can be overwhelming for
22   people looking at it for the first time.
23     I'm focusing on one number on this chart.  It looks to me
24   like the results of your analysis show an estimate in the 2008
25   U.S. presidential primary that most white voters in
```

1  Congressional District 11 voted against the black-preferred
2  candidate.
3       Do you see that figure?
4  A.  Yes.  So the EI estimate shows that 64 percent of the
5  society, white voters voted for somebody other than Barack
6  Obama in 2008.
7  Q.  And I heard your testimony earlier that primary elections,
8  Democratic primary elections, are particularly useful in
9  analyzing elections for -- in order to determine the percentage
10 minority vote necessary to elect candidates of choice; is that
11 right?
12 A.  Yeah.  You didn't -- I did not say particularly useful.  I
13 said they were useful.
14 Q.  Thank you.  Now, I'd like to understand this 64 estimate a
15 little better by turning to page 32 of your report and the data
16 underlying this table.
17      Now, the data for this table is at the bottom of page 32
18 under "2008 Democratic Primary"; correct?
19 A.  Yes.
20 Q.  And am I right in reading that for that 64 figure you had
21 in Table 11, the data in the second set of numbers on row
22 three, is that where you're getting the 64 figure?
23 A.  No.
24 Q.  Okay.  Where are you getting it from?
25 A.  It's candidate two plus candidate three, so it's all

1    candidates other than candidate one.

2    Q.  Okay.  And so when I'm looking at that figure in line 3,

3    there's an entry just below it, and that entry says "se."  Does

4    that stand for standard error?

5    A.  That's correct.

6    Q.  And is that figure over seven?

7    A.  That figure is 7.3.

8    Q.  And I heard you talk earlier about how standard error

9    provides a range around a number.

10   A.  If you have a normal distribution, which you do not have

11   here.

12   Q.  Okay.  So how would this standard error inform or adjust or

13   inform -- pardon me.  Strike that.

14       Let me be very clear.  How would this standard error number

15   of 7.3 help the Court understand the figure, the 64 figure you

16   have in your table?

17   A.  It indicates that there is, for example, variation around

18   that point.  So that point, if you compare it to, say, the 11th

19   congressional races above that where you have a standard error

20   of 4.9 or 4.7, the standard error in this case is higher.  So

21   there's more uncertainty attached to this estimate than to the

22   estimate above that for the U.S. congressional district.

23       However, I have to caution, you can't just look at the

24   number.  You have to look at the size of the estimate.  So if

25   you had an estimate of ten percent and the standard error was

1    seven, it would be more uncertainty attached to that than a

2    standard error of seven with an estimate of 62 percent.  An

3    estimate of 62 percent, a standard error of seven is --

4    attaches less uncertainty than it would to a smaller point

5    testament.

6    Q.  Thank you.  So it's possible that that 64 number is

7    actually higher?

8    A.  Or lower.

9    Q.  Yes.  Thank you.  Dr. Handley, you would agree that

10   incumbency protection is a traditional districting criteria,

11   wouldn't you?

12   A.  Here in the United States, yes.

13   Q.  And core retention is also a traditional districting

14   criteria?

15   A.  Yes, I think so.

16          MS. McKNIGHT:  Thank you very much, Dr. Handley.  No

17   further questions.

18          JUDGE BLACK:  That was six minutes.

19      Further questions?

20          MR. STRACH:  No, Your Honor.

21          JUDGE BLACK:  Redirect?

22          MS. ZHANG:  Very brief.  I promise.

23                        REDIRECT EXAMINATION

24   BY MS. ZHANG:

25   Q.  Dr. Handley, can you turn to your report in this case.  Do

1    you still have a copy of that?

2    A.  I do.

3    Q.  Can you read the second sentence that's on page one of your

4    report.

5    A.  The second sentence on page one.  "The district need not be

6    majority black in composition in this area of the State."

7    Q.  Now can I have you turn to page 17 of your report.  Can you

8    please read the first sentence after the header "Conclusion"?

9    A.  "Based on my analysis of participation rates and voting

10   patterns in the general area of the 11th Congressional District

11   of Ohio, I have determined that a district need not be majority

12   black in composition in this area of the State to provide black

13   voters with an opportunity to elect candidates of their choice

14   to Congress."

15          MS. ZHANG:  Your Honors, may I approach the witness?

16          JUDGE BLACK:  Yes.

17     (Ms. Zhang hands document to the witness.)

18   Q.  Dr. Handley, I've just given you a copy of the article that

19   we had discussed in your direct in which you were asked about

20   again in your cross-examination.  Can you identify what this

21   document is just so we know what it is and it's clear for the

22   record?

23   A.  This is an article entitled "Has the Voting Rights Act

24   Outlived its Usefulness?  In a word, 'No.'"  It's co-authored

25   by David Lublin, Thomas Brunell and Bernard Grofman.

1  Q.  Can you turn to page 549 of the article.  This is in the

2  footnotes section.  Can you read what's in footnote nine.

3  A.  "Of course, this relationship may vary across the country,

4  and courts -- correctly, in our view -- prefer

5  jurisdiction-specific analysis in litigation."

6  Q.  Now can you turn to page 532.  If you'll look at the first

7  paragraph, it's on top of the page, you'll see where Footnote 9

8  was.  Do you see that?

9  A.  Yes.

10  Q.  And can you read the sentence that follows Footnote 9?

11  A.  Yes.  "After all, minorities may win outside of districts

12  in which their group forms a majority, if they can reliably

13  attract sufficient crossover support."

14         MS. ZHANG:  Nothing further, Your Honors.

15         MS. McKNIGHT:  Your Honors, I don't have any further

16  questions, but I would move for the admission of I31

17  considering its use during both the direct and the redirect

18  examination and during my examination.

19         JUDGE BLACK:  Any objection?

20         MS. ZHANG:  Relevance.

21         JUDGE BLACK:  I'm sorry?

22         MS. ZHANG:  Relevance.

23         JUDGE BLACK:  Relevance?

24         MS. ZHANG:  (Nods head up and down.)

25         JUDGE BLACK:  The objection's noted.

1          So you're concluded with the Doctor; is that right?

2              MS. ZHANG:  Yes, Your Honor.

3              JUDGE BLACK:  You may step down.  Thank you.

4          Our midafternoon break has been delayed by three minutes.

5          (Witness excused.)

6              MS. ZHANG:  My apologies.

7              JUDGE BLACK:  And we are going to break for 15

8      minutes, until five after 3:00.  We're in recess until that

9      time.

10             COURTROOM DEPUTY:  All rise.  This court is in recess

11     until 3:00.

12         (Recess taken:  2:48 PM - 3:06 PM.)

13             JUDGE BLACK:  Please be seated.  We're back.  We are

14     on the record in session and prepared to ask the plaintiff if

15     you're prepared to call another witness at this time.

16             MS. THOMAS-LUNDBORG:  Yes, we are, Your Honor.

17     Plaintiffs call Dr. Christopher Warshaw.

18             JUDGE BLACK:  Dr. Warshaw, if you'd be willing to

19     approach.  We're going to put you over here on the witness

20     stand.

21         And if you will pause where you are for the oath to tell

22     the truth.  You've raised your right hand.  Do you solemnly

23     swear or affirm that your testimony today will be the truth

24     subject to the penalty of perjury?

25             THE WITNESS:  I do, sir.

```
 1              JUDGE BLACK:  Thank you.  You may be seated.  The
 2    chair tips back, so figure it out.
 3              THE WITNESS:  Thank you, Your Honor.
 4              JUDGE BLACK:  And just to make you thoroughly
 5    uncomfortable, your collar is up.
 6         (Laughter.)
 7              JUDGE BLACK:  Very well.
 8         Counsel, you can commence when you're ready.
 9              MS. THOMAS-LUNDBORG:  Thank you, Your Honor.
10                    CHRISTOPHER WARSHAW
11    a witness herein, having been first sworn, testified as follows:
12                    DIRECT EXAMINATION
13    BY MS. THOMAS-LUNDBORG:
14    Q.  Dr. Warshaw, can you please state and spell your name for
15    the record.
16    A.  It's Christopher Warshaw.  My last name is W-a-r-s-h-a-w.
17    Q.  And where do you live?
18    A.  I live in Bethesda, Maryland, right outside Washington,
19    D.C.
20    Q.  And what is your address?
21    A.  4531 Middleton Lane, Bethesda, Maryland.
22              MS. THOMAS-LUNDBORG:  Your Honor, may I approach the
23    witness?
24              JUDGE BLACK:  Yes.  Thank you.
25              MS. THOMAS-LUNDBORG:  There's a copy there.
```

```
 1        (Ms. Thomas-Lundborg distributes a binder.)

 2           MS. THOMAS-LUNDBORG:  For the record, the witness has

 3   a binder, the judges have binders, and I have passed out

 4   binders to intervenors and defendants.

 5           JUDGE BLACK:  Full of binders.

 6   Q.  Dr. Warshaw, you have a binder in front of you with three

 7   tabs.  Those three tabs are the three expert reports that you

 8   have submitted in this case and we'll be referring to them.

 9        Where do you work?

10   A.  I work at George Washington University in Washington, D.C.

11   Q.  Can you briefly describe your educational background.

12   A.  I have bachelor's degree from Williams College in

13   Williamstown, Massachusetts, a law degree from Stanford Law

14   School, and Ph.D. in political science from Stanford

15   University.

16   Q.  Did you receive any honors in your undergrad degree?

17   A.  I did.  I graduated magna cum laude with highest honors in

18   economics.

19   Q.  Now, you mentioned that you have a Ph.D.; is that correct?

20   A.  Yes.

21   Q.  Did you write a dissertation as part of your Ph.D.?

22   A.  I did.

23   Q.  And what was the topic?

24   A.  It was on issue representation in the United States

25   Congress.
```

1  Q.  Did you conduct any other research as part of your Ph.D.

2  program?

3  A.  I did.  I conducted projects on the political economy of

4  the energy of the international energy sector and on public

5  opinion in the United States.

6  Q.  Did you conduct any statistical analysis as part of your

7  Ph.D. research?

8  A.  I did.

9  Q.  Now, you said you have a JD.  Have you ever practiced law?

10 A.  No.

11 Q.  Why do you have a JD?

12 A.  When I was doing my Ph.D., I thought that maybe I would

13 want to do law academia, so I decided to get a law degree both

14 because I was interested in the subject matter and because I

15 thought maybe I would teach in a law school someday.

16 Q.  Are you here to render a legal opinion?

17 A.  No.

18 Q.  Can you describe your work history since graduating with

19 your Ph.D.?

20 A.  I worked as a tenure-track professor at the Massachusetts

21 Institute of Technology from 2012 to 2017, that was in

22 Cambridge, Massachusetts, and since 2017 I have worked as a

23 tenure-track professor at George Washington University.

24 Q.  And why did you leave MIT to go to George Washington?

25 A.  Primarily, because my wife got a job in Washington, D.C.

CHRISTOPHER WARSHAW - DIRECT 183

1  Q.  And you mentioned that you're tenure track at George

2  Washington?

3  A.  Yes.

4  Q.  Blue tenure track at MIT?

5  A.  Yes.

6  Q.  When are you up for tenure?

7  A.  I'll submit my package for tenure in a few months.

8  Q.  What are your current work responsibilities?

9  A.  I'm conducting research, teaching undergraduate and

10 graduate classes, advising students on their research, and

11 participating in university service activities of various

12 sorts.

13 Q.  You mentioned that you teach.  What courses do you teach?

14 A.  I teach undergraduate classes on elections and public

15 opinion, and I teach graduate classes on statistical

16 methodology and on political representation.

17 Q.  Are you currently teaching courses this semester?

18 A.  I am.

19 Q.  And what courses are you teaching?

20 A.  I'm teaching an undergraduate class on elections and a

21 graduate class on political representation.

22 Q.  What are your current topics of research?

23 A.  Broadly speaking, my research focuses on political

24 representation, which is the link between elections and public

25 opinion and the policies that the government produces and other

 1   outcomes such as roll call voting.  Currently, I'm primarily

 2   focused on a project on state politics looking at

 3   representation over the last 75 years in the American states.

 4   Also doing work on gerrymandering and on county government.

 5   Q.  Has your research ever been published?

 6   A.  Yes.

 7   Q.  If you turn to tab 1, which is Plaintiffs' Exhibit 571,

 8   which is your initial expert report in this case, I believe in

 9   the back of that document --

10        MS. THOMAS-LUNDBORG:  And if we could publish 571,

11   page 57.  I think it's 50 -- a couple of pages ahead.  Yes.

12   Thank you.

13   Q.  I'll give -- unfortunately, it's not numbered in the paper

14   version.  Okay.  I believe we're all there.  Do you recognize

15   this document?

16   A.  Yes, I do.

17   Q.  And is this a copy of your résumé?

18   A.  Yes, it is.

19   Q.  Okay.  Now, you mentioned that you have published

20   research -- yes.  Thank you.

21        How many articles have you published?

22   A.  I think, as of when I submitted my report, I published 18

23   articles in peer-reviewed journals and an additional six

24   articles in edited books or law reviews that are peer reviewed.

25   Q.  And you've mentioned peer-reviewed journals.  What is a

CHRISTOPHER WARSHAW - DIRECT

 1   peer-reviewed journal?

 2   A.  A peer-reviewed journal is a journal where the article has

 3   been reviewed by their political scientists who are usually

 4   professors, and they decided that the article meets the

 5   appropriate standards of scientific rigor and contributes to

 6   the academic literature.

 7   Q.  And you said when you turned in this résumé you had

 8   published 18 peer-reviewed articles?

 9   A.  Yeah.

10   Q.  Have you since published additional peer-reviewed articles?

11   A.  Yes.  Since I submitted my report I've published two more

12   peer-reviewed articles.

13   Q.  And have you updated your résumé?

14   A.  I have.

15   Q.  And did you provide that to counsel?

16   A.  I did.

17   Q.  And is it your understanding that that's been provided to

18   opposing counsel?

19   A.  Yes.

20   Q.  Is there a ranking of peer-reviewed journals?

21   A.  I think in -- essentially in American politics there's

22   three journals there are considered the top three journals in

23   political science.

24   Q.  And what are those journals?

25   A.  The *American Political Science Review*, the *American Journal*

1    *of Political Science*, and the *Journal of Politics*.

2    Q.  Have you published in those journals?

3    A.  Yes.  I think I published 11 articles in those three

4    journals.

5    Q.  Has your work ever been cited by other academics?

6    A.  Yes.

7    Q.  How many times?

8    A.  It's been cited a little over a thousand times by other

9    academics.

10   Q.  Have you ever published peer-reviewed articles on partisan

11   gerrymandering?

12   A.  Yes.

13   Q.  And what article or articles is that?

14   A.  Article 10 on my CV, which is "Partisan Gerrymandering and

15   the Political Process:  Effects on Roll-Call Voting and State

16   Policies."  That was published in the *Election Law Journal* in

17   2017.

18   Q.  Did you use any of the same methodology in the article in

19   ten on your résumé as you did in your report here?

20   A.  Yes.  I performed many of the same types of analyses that I

21   performed -- that I conducted for my report in that article.

22   Q.  Are you conducting any current research on partisan

23   gerrymandering?

24   A.  Yes.

25   Q.  And what is that?

1  A.  I'm working on evaluating the impact of partisan

2  gerrymandering on political parties looking at things like

3  fundraising and candidate quality.

4  Q.  Okay.  And has that research been published?

5  A.  No.  It's currently under review in a peer-reviewed

6  journal, though.

7  Q.  Have you published any peer-reviewed articles on

8  polarization?

9  A.  Yes, I published a number of articles on polarization.

10  Q.  And which are those?

11  A.  Starting from the top of my CV, "The Idealogical

12  Nationalization of Party Constituencies in the American States"

13  focuses on polarization in the American public.

14     "On the Representativeness of Primary Electorate," this is

15  about the polarization of primary electorates --

16  Q.  Sorry.  If I could stop you for one second.  Which number?

17  A.  I'm sorry, I'll start at the top.  So number 15.  Number

18  14, which is "On the Representativeness of Primary

19  Electorates."  Article 13 on "Geography, Uncertainty, and

20  Polarization."  Article 11 on the idealogical proximity between

21  candidates and voters in U.S. House elections.  Article 10 on

22  gerrymandering touches on polarization.  And then Article 9 on

23  incremental democracy is largely about polarization.

24  Q.  All right.  Have any of your peer-reviewed articles looked

25  at public opinion and legislative roll call votes?

1   A.   Yes.  Most of my -- or many of my published articles look

2   at public opinion.  So just starting there, articles one, two,

3   three, four, eight, 11, 12, 13, 14, 15, 16 and 17 all focus on

4   public opinion.  And then in the link between public opinion

5   and roll call voting, Article 13 focuses squarely on that as

6   well as Article 10.

7   Q.   Have any of your peer-reviewed articles included regression

8   analysis?

9   A.   Yes.  I believe that all of my peer-reviewed articles,

10  maybe with one or two exceptions, have regressions of various

11  sorts.

12  Q.   Do you present your research at conferences?

13  A.   Yes.

14  Q.   Have you received any awards for your work in political

15  science?

16  A.   Yes.

17  Q.   What awards have you received?

18  A.   The article on "The Dynamics of State Policy Liberalism"

19  won the award for the best article published on state politics

20  by the American Political Science Association in 2016.  And the

21  article on "Policy Preferences and Policy Change," which is

22  number 12, won the article for the best -- won the award for

23  the best article presented on state politics at the annual

24  conference in 2015.

25  Q.   Now, you mentioned you've been published in peer-reviewed

1    journals.  Have you served as a peer reviewer in any of these
2    journals?
3    A.  Yes.  I typically serve as -- I typically review anywhere
4    between 20 and 40 articles a year for several dozen different
5    journals.
6    Q.  And have you been on the editorial board of any academic
7    journals?
8    A.  Yes.  I was on the editorial board of the *Journal of*
9    *Politics*, which is why we consider it the second or third top
10   journal in political science from 2007 to '18.
11   Q.  Have you --
12   A.  It was a two-year term.
13   Q.  Thank you.  I'm sorry for speaking over you.
14        Have you been on the board of any professional
15   organizations related to political science?
16   A.  Yes, I have.
17   Q.  And what is that?
18   A.  I was on the executive board of the Urban Politics
19   Association of the American Political Science Association from
20   2015 to '17.
21   Q.  And what is the American Political Science Association?
22   A.  That's the national professional organization for political
23   scientists, not just in the United States, but actually around
24   the world.  So it's somewhat analogous to the American Bar
25   Association.

1  Q.  Have you served as an expert witness in any other cases?

2  A.  Yes.

3  Q.  And which cases are those?

4  A.  I served as an expert witness in two other partisan

5  gerrymandering cases, one in state court in Pennsylvania, and

6  one in, recently, in federal court in Michigan.  And then I was

7  also -- served as an expert in that case about the United

8  States census that was heard in a federal court in New York

9  City.

10  Q.  Has your opinion been credited in any court opinions?

11  A.  Yes.  Both in the Pennsylvania case and the census case,

12  the judge explicitly found my testimony credible, and I think

13  the judges relied upon it or talked about it a lot in their

14  opinions.  The Michigan partisan gerrymandering case hasn't

15  rendered its opinion yet.

16       MS. THOMAS-LUNDBORG:  Your Honors, I would like to

17  move to have Dr. Christopher Warshaw qualified as an expert

18  witness in the fields of elections, partisan gerrymandering,

19  polarization and representation.

20       JUDGE BLACK:  Any objection from the defense, the

21  intervenors?

22       MR. LEWIS:  Your Honor, no objection from the

23  intervenors.

24       JUDGE BLACK:  Thank you.

25       MR. STRACH:  None here, Your Honor.

```
 1              JUDGE BLACK:  Welcome to this courtroom as an expert.
 2              THE WITNESS:  Thank you, Your Honor.
 3   Q.  All right.  Dr. Warshaw, I'd like to take some time to talk
 4   about the work that you were asked to do in this case and your
 5   understanding of this case.
 6         When you were retained, what did you understand the nature
 7   of plaintiffs' claims in this action to be?
 8   A.  I understood it to be a partisan gerrymandering case.
 9   Q.  And how do you define partisan gerrymandering?
10   A.  It's when the party that controls the redistricting process
11   attempts to convert the votes that they receive into seats in
12   the legislature as efficiently as possible.
13              MS. THOMAS-LUNDBORG:  Okay.  If we could publish
14   Plaintiff Demonstrative Exhibit 75.
15   Q.  Do you recognize this exhibit?
16   A.  Yes.
17   Q.  And what does it show?
18   A.  It shows some of the factors that I looked to in evaluating
19   whether a particular redistricting plan is a partisan
20   gerrymander.
21   Q.  Okay.  If we could go through those factors.  What's the
22   first factor that you look at?
23   A.  Whether one -- whether a single party controlled the
24   redistricting process.
25   Q.  And what is the next factor?
```

```
 1   A.  Whether the partisan bias metrics that I look at indicate
 2   the same party that controlled the redistricting process was
 3   actually advantaged in the translation of votes to seats.
 4   Q.  And what is the next factor?
 5   A.  That looking at the complete corpus of historical elections
 6   over the last 45 years, that the map is an outlier looking
 7   across the partisan bias metrics that I use.
 8   Q.  And what is the last factor?
 9   A.  That all of the partisan bias metrics point in the same
10   direction.
11   Q.  And did you discuss these factors in your expert reports?
12   A.  Yes.
13   Q.  Now I'm going to take some of these factors in turn, we'll
14   take some of them immediately, and some later in your
15   testimony.  The first factor I'd like to deal with is the first
16   factor, one party controlled the government.  Why do you
17   consider this factor?
18   A.  Well, I think that gerrymandering is, in part, about the
19   intent of the party that controlled the redistricting process.
20   So in order for it to be a partisan gerrymander, we have to be
21   able to say that one party intended to maximize their seat
22   share.
23   Q.  And when you say "intent," are you speaking about a legal
24   conclusion of intent?
25   A.  No.  It's just speaking as a political scientist.  It's --
```

1   a very simple metric of intent is whether one party controlled

2   the process.

3           MS. THOMAS-LUNDBORG:  If we could publish Plaintiffs'

4   Exhibit 571, which is also tab 1 if people would like to follow

5   along in paper.

6   Q.  It is your October report.  And if we could look at page

7   17, Figure 3.  What does Figure 3 show?

8   A.  So this figure graphically shows the relationship between

9   partisan control of the redistricting process during the 2011

10  redistricting and changes in the efficiency gap, which are

11  shown on the X axis.  And the efficiency gap, I'm sure that

12  we'll talk more about as we go, but that's one of the metrics I

13  use to evaluate partisan advantage in a districting plan.

14  Q.  And what does this figure indicate happens when one party

15  controls the process?

16  A.  Well, what it indicates is the parties are generally

17  successful in shifting the map in their favor.  So if you look

18  at the top line, the dots here show all of the states where

19  Republicans -- all the states, I should say, with more than six

20  congressional seats where Republicans controlled the

21  redistricting process in 2011.  And what it indicates is that

22  in all of those cases, the efficiency gap shifted in a pro

23  Republican direction between 2010 and '12.  And on average the

24  efficiency gap shifted about 11 percent in favor of Republicans

25  when the new maps went into place.

1   Q.   Would you consider a state gerrymander where a partisan

2   bias metric indicated that one party was favored but the map

3   was actually drawn by another party?

4   A.   No.

5   Q.   Are you familiar with the term "roll call vote"?

6   A.   Yes.

7   Q.   What is a roll call vote?

8   A.   That's when members of a legislature vote on a bill to

9   decide whether it will become law.

10  Q.   Does the roll call votes in favor of a redistricting bill

11  matter in your definition of gerrymandering?

12  A.   No.

13  Q.   And why not?

14  A.   Because usually we look for -- to evaluate whether a plan

15  has intent to favor a particular party, we look at which party

16  controlled the government, because that party has the power to

17  pass a plan, regardless of whether minority legislators support

18  it.

19       So there's any number of idiosyncratic reasons why some of

20  the minority party might support a particular redistricting

21  plan.  For instance, the bill could be packaged with other

22  bills, there could be multiple things, essentially, they're

23  voting on at once, or there could be reasons to protect their

24  personal district to make it safe for them personally.

25  Q.   Are you aware of any political scientists that look at roll

```
 1   call votes when considering whether a state has been
 2   gerrymandered?
 3   A.  No.
 4   Q.  Briefly, can you describe what you were asked to do in this
 5   case.
 6   A.  I was asked to examine the Ohio's districting plan and
 7   quantify whether there was any partisan advantage for either
 8   party in the Ohio plan and compare it to all of the
 9   congressional elections over the past 45 years from 1972 to
10   2016, to put any result, any partisan advantage that I did
11   detect into the long-term historical perspective.
12        I was also asked to examine the durability of any partisan
13   advantage I found as well as the map's responsiveness to
14   changes in voters' preferences.
15   Q.  Okay.
16   A.  And, lastly, I was asked to examine polarization and the
17   consequence of the polarization.
18   Q.  Now, in describing the work that you were asked to do in
19   this case, you've used a lot of terms and I would at least like
20   to define some of those terms so that we're all working out of
21   the same book.
22        You used the term "partisan bias."  What is partisan bias?
23   A.  Partisan bias is simply the idea of trying to quantify
24   whether one party or another has an advantage in the
25   translation of votes to seats.  And there's no perfect way to
```

CHRISTOPHER WARSHAW - DIRECT

1    do so, so I use a number of different metrics to try to

2    quantify that.

3    Q.  And is partisan bias discussed in the political science

4    literature?

5    A.  Yes.  This is a longstanding source of study in the

6    scholarship in the political science literature, because if one

7    party does have a translation -- or, sorry, have an advantage

8    in the translation of votes to seats, that probably has

9    significant political consequences because it would give them

10   an advantage in the legislature and, of course, we know that

11   the legislature passes the laws that become policy.

12   Q.  What is the relationship between partisan bias and

13   gerrymandering?

14   A.  Well, partisan bias usually is caused by gerrymandering,

15   but it could be caused by other factors as well.  So that's why

16   I determine whether a particular plan is the consequence of a

17   gerrymander.  I look to both the metrics of partisan bias as

18   well as what -- to look at whether there was unified control of

19   government.

20   Q.  How is partisan bias measured in political science

21   literature?

22   A.  Well, as I said before, there's no one metric that

23   political scientists used, because I think that no metric is

24   perfect.  Over the last 20 years, the predominant metric that

25   has dominated the literature has been the symmetry metric

1  developed by a political scientist named Gary King and a number

2  of coauthors in the late 1980s and early '90s.  More recently,

3  a number of other metrics have been developed including ones

4  like the efficiency gap, the mean-median difference in the

5  declination.

6  Q.  Did you use these measures in your reports?

7  A.  I did.

8  Q.  And why?

9  A.  Well, I think that looking at a suite of different metrics,

10 all of which I should say we'll probably talk about later, are

11 closely related both theoretically and empirically, but

12 nonetheless, there's small differences between them, and I

13 think that looking at a suite of different metrics in concert

14 gives us greater confidence in any conclusion that we were to

15 draw.

16 Q.  What data did you use to calculate the partisan bias

17 metrics?

18 A.  Primarily I used the corpus of congressional election

19 results from 1972 to 2018, which primarily came from an

20 organization called the Constituency Level Election Archive,

21 the CLEA.  More recently, I used the -- their data, at least

22 when I wrote my report, only went to 2014, so I augmented it

23 with data from the MIT election lab for 2016 and the Cook

24 political report for 2018.

25 Q.  All right.  I'd like to ask you some questions about the

1    data that you used in this case.  Why did you use congressional

2    election data?

3    A.  Well, the object of a gerrymander is to maximize the number

4    of congressional seats that the advantaged party wins given the

5    votes that they receive.  So given that the target of a

6    gerrymander is congressional elections in this case, I think it

7    makes the most theoretical sense to focus on congressional

8    election results rather than some other election.

9         However, in the modern era especially, voters typically

10   vote similarly in congressional elections and presidential

11   elections.  So while I chose to focus on congressional

12   elections, it would have made little difference empirically if

13   I had used some other statewide election result.

14   Q.  And did you use any statewide data in your calculations of

15   partisan bias?

16   A.  I used presidential voting patterns to impute the -- to

17   help me impute the congressional election results in

18   uncontested districts where one of the major parties didn't

19   field a candidate.  But I also, I believe, used presidential

20   voting results as one of the ways that I evaluated the remedial

21   plan developed by the plaintiffs.

22   Q.  Now, you mentioned that you started your data set in 1972.

23   Why did you start your data set in 1972?

24   A.  Well, this was the first election cycle where all states

25   used equal populous districts that were mandated by the *Baker*

1  *v. Carr* family of Supreme Court decisions.  Prior to that, many

2  states used malapportioned congressional districts, which I

3  think are directly comparable for evaluating gerrymandering

4  with modern equal populous districts.

5  Q.  Did you turn over the election data that you used to make

6  your calculations?

7  A.  Yes.

8  Q.  Did you cite the data sources that you used to make your

9  calculations?

10  A.  Yes.

11  Q.  In addition to turning over the data that you used to make

12  your calculations, is the data publicly available?

13  A.  Yes, it is.

14  Q.  As part of your data set, did you have data for election

15  results for Ohio?

16  A.  Yes.

17  Q.  Did you have data for election results in Ohio in 2010?

18  A.  Yes.

19  Q.  In 2012?

20  A.  Yes.

21  Q.  And 2014?

22  A.  Yes.

23  Q.  2016?

24  A.  Yes.

25  Q.  2018?

CHRISTOPHER WARSHAW - DIRECT

1    A.   Yes.

2    Q.   And in your data, could you tell the partisan breakdown of

3    elections?

4    A.   Yes.

5             MS. THOMAS-LUNDBORG:   I would like to publish

6    Plaintiff Demonstrative Exhibit 73.

7    Q.   Do you recognize this exhibit?

8    A.   Yes, I do.

9    Q.   And what is this exhibit?

10   A.   Well, this exhibit shows the results of congressional

11   elections over the past four election cycles in Ohio.  The left

12   panel shows the statewide vote shares of each party and the

13   right panel shows the statewide seat shares.

14   Q.   And is this demonstrative exhibit an accurate reflection of

15   the statewide vote share in the elections that you studied as

16   part of your report?

17   A.   Yes.

18   Q.   Now, you mentioned that you conducted partisan bias

19   metrics.  Did you run calculations over your data in order to

20   do that?

21   A.   Yes.

22   Q.   And how did you run your calculations?

23   A.   I used a software program called R, which is an open-source

24   statistical software program that's widely used by political

25   scientists as well as other scientists across the spectrum of

1   the academy and increasingly in the industry.

2   Q.  And did you have to program any code in order to run your

3   calculations?

4   A.  Yes.

5   Q.  And did you turn that code over to the other side?

6   A.  Yes.

7   Q.  When someone has your code, can they rerun your

8   calculations?

9   A.  Yes.  I think that most professional political scientists

10  or other social scientists could open my code, easily modify it

11  or run it.

12          MS. THOMAS-LUNDBORG:  I think we can get down the

13  published --

14  Q.  Now, I'd like to go back to some definitions.  We've spent

15  some type talking about partisan bias.  Another term you used

16  was "responsiveness."  What is responsiveness?

17  A.  Well, it's just trying to capture how insulated a plan is

18  from changes in voter preferences.  Usually when mapmakers

19  design a plan, what they worry about is that a swing in voter

20  preferences could undo the gerrymander.  So "responsiveness" is

21  trying to capture theoretically how likely the election results

22  are to change due to changes in voter preferences.

23  Q.  Okay.  And is responsiveness studied in the political

24  science literature?

25  A.  Yes.  I think it's a little bit less widely studied than

CHRISTOPHER WARSHAW - DIRECT

 1  partisan advantage in the redistricting process, but it's also

 2  fairly widely studied.

 3  Q.  And how is responsiveness measured?

 4  A.  Well, it's another case where there's no one perfect

 5  metric.  But I use two metrics that are widely -- even widely

 6  used by previously literature.  So the simplest way to look at

 7  responsiveness is to simply examine how many competitive seats

 8  there are in each election.  If there's no competitive seats

 9  then, indeed, there's no seats that really can change hands in

10  response to changes in voter preferences.

11       The second metric I use is aptly called the responsiveness

12  metric, and this was developed by Gary King and Andrew Gelman

13  in the early '90s.  And essentially what this metric does is,

14  you're taking -- it takes actual election results, and then it

15  applies a uniform swing in the election results across all

16  districts such that the vote share, the statewide vote share

17  varies across some range of results.

18  Q.  What is a uniform swing?

19  A.  Where you simply add a particular percentage to the results

20  across the entire state.  So a one percent uniform swing, say,

21  toward democrats would be to simply increase the Democratic

22  vote share in each district by one percent.

23  Q.  Okay.  And did you look at responsiveness in your report?

24  A.  I did.

25  Q.  And what data source did you use to calculate the

CHRISTOPHER WARSHAW - DIRECT

1    responsiveness metrics?

2    A.   I used the same data sources that I used elsewhere in my

3    report, primarily this corpus of previous election results.

4    But then I calculated the uniform swing necessary to estimate

5    it for those elections.

6    Q.   And going back to your data source that you said went back

7    to 1972, roughly how many elections were part of that data

8    source?

9    A.   Well, it's over 500 elections at the level of state years,

10   which is what I analyzed in the bulk of my report.

11   Q.   Now, your report also has a section on polarization; is

12   that right?

13   A.   That's correct.

14   Q.   Can you define polarization for us, please?

15   A.   Typically, political scientists define partisan

16   polarization as the distance between the average preferences of

17   members of the two parties.  So, for instance, looking at

18   Congress, typically political scientists quantify polarization

19   in Congress based on how far apart -- how far apart the average

20   ideology is of Democrats and Republicans in Congress, so in

21   other words, how liberal or conservative they are on roll call

22   votes.

23   Q.   And why do political scientists study polarization?

24   A.   Well, polarization is enormously important for -- in a wide

25   body of questions in political science, but in particularly for

1    determining the kinds of policies likely to pass the

2    legislature and the type of representation that citizens are

3    likely to receive as well as for thinking about the

4    consequences of elections.  In other words, how much does it

5    matter whether a Democrat or a Republican is elected to

6    Congress.

7    Q.  And why did you include a study of polarization in your

8    report?

9    A.  Well, for me, one of the reasons why I studied political

10   science more generally, but here gerrymandering specifically,

11   is thinking about the consequences of elections for the

12   composition of government and for the types of policies

13   government passes.  And I think when you're examining the

14   consequences of gerrymandering, it's really important to be

15   cognizant of the growing polarization that we know is present

16   both in Congress as well as other legislative bodies in the

17   U.S., because this could magnify the consequences of

18   gerrymandering for representation.

19   Q.  And how is polarization measured?

20   A.  Here?  Well, as I talked about a second ago, I quantify

21   polarization based on the difference between a variety of

22   different metrics of the ideology of members of Congress.

23   Q.  Are you familiar with a score called DW-Nominate?

24   A.  Yes.  This is the most widely used metric of the ideology

25   or roll call voting behavior of members of Congress over the

 1   last, you know, 200 years.  It goes back all the way to the

 2   dawn of the republic.  So it was developed by political

 3   scientists named Howard Rosenthal and Keith Poole.  And it

 4   quantifies on a one- or two-dimensional spectrum how liberal or

 5   conservative members of Congress are.

 6   Q.  And did you use DW-Nominate in your report?

 7   A.  Yes.

 8   Q.  Did you have data on congressional roll call votes?

 9   A.  Yes.

10   Q.  And what was that data?

11   A.  I had data on the roll call voting behavior on a bill to

12   repeal the Affordable Care Act.

13   Q.  And was that data cited in your report?

14   A.  Yes.

15   Q.  And was that turned over?

16   A.  Yes.

17   Q.  Did you have data on information about public trust?

18   A.  Yes.  I had information from a large-scale survey of the

19   American public in 2014 called the Cooperative Congressional

20   Election Study which was a survey of over 50,000 Americans.

21   Q.  And was that cited in your report?

22   A.  Yes.

23   Q.  How many reports did you submit in this case?

24   A.  Three.

25   Q.  And if you could generally describe the difference between

1    your three reports.

2    A.   The first report examined the questions that we talked

3    about earlier focusing on the period between 1972 and 2016,

4    because I wrote that report before the 2018 election, of

5    course.  The second report was a rebuttal report to their -- to

6    the defendants' experts in this case.  And then the final, the

7    third and final report I submitted updated the analysis from my

8    initial report using the 2018 election results.

9    Q.   If you could look at the binder that you have in front of

10   you and turn to tab 1, which is Plaintiffs' Exhibit 571.  Do

11   you recognize this document?

12   A.   Yes.

13   Q.   Is this a true and accurate copy of the initial report that

14   you submitted in this case?

15   A.   Yes.

16        MS. THOMAS-LUNDBORG:  Plaintiffs move to have 571 in

17   evidence.

18        JUDGE BLACK:  Any objection?

19        MR. LEWIS:  Your Honor, no objections from the

20   intervenors.  We'd just note that I believe the parties had an

21   agreement where all expert reports from everyone would just

22   come in.

23        JUDGE BLACK:  The Court's comfortable with that.  Is

24   that the agreement?

25        MS. THOMAS-LUNDBORG:  I think the agreement was they

 1  came in they testified, so I'm fine not going through the

 2  motions of moving.

 3          JUDGE BLACK:  I believe the gentleman is testifying.

 4          MR. LEWIS:  Yes.

 5          MS. THOMAS-LUNDBORG:  That is correct.  Okay.  So I

 6  would like to move 571, 572, 476 in and it sounds like they are

 7  in.

 8          JUDGE BLACK:  Give me the numbers again.

 9          MS. THOMAS-LUNDBORG:  Okay.  571, which is the initial

10  report; 572 is rebuttal report; and 476 is the 2018 supplement.

11          JUDGE BLACK:  They're admitted.

12      (Plaintiffs' Exhibits 476, 571 and 572 were admitted.)

13  Q.  Now, we looked at a figure earlier that you said included

14  the efficiency gap.  Do you recall that?

15  A.  Yes.

16  Q.  What is the efficiency gap?

17  A.  So the efficiency gap is a way to mathematically capture

18  the packing and cracking that is the heart of gerrymandering.

19  So when a party gerrymanders, usually the way they accomplish

20  the gerrymander is by packing as many as possible of the

21  disadvantaged party's supporters into a small number of

22  districts and then cracking the remaining voters across a large

23  number of districts.

24      So when you win a district by an overwhelming majority, the

25  excess votes over and above the ones you needed to win are

1  wasted for the purpose of winning the election.  And then when

2  you lose a district, so in those cracked districts, the

3  disadvantaged party would waste all of the votes in districts

4  they lose.

5      So what this implies is that the party that's disadvantaged

6  in their districting process is going to waste more votes than

7  the party that controls the redistricting process.  So the

8  efficiency gap simply quantifies these wasted votes.

9  Q.  All right.  So there were several terms that you used, and

10  I want to make sure that we all understand them.  One term you

11  used is "cracking."  Is cracking used in the political science

12  literature?

13  A.  Yes.

14  Q.  And what is that?

15  A.  Cracking is when the party that controls the redistricting

16  process constructs the district so that their supporters

17  constitute a narrow majority in a large number of districts and

18  the disadvantaged party supporters constitute a narrow

19  minority.

20  Q.  And you used the term called "packing."  Is that used in

21  the political science literature?

22  A.  Yes.

23  Q.  And what is that?

24  A.  So it's a term that indicates that the majority party's

25  or -- sorry, the disadvantaged party, the party that doesn't

 1   control the redistricting process, many of their supporters

 2   would be packed into a very small number of districts.  So they

 3   win those districts by overwhelming majorities, say with 80

 4   percent of the vote.

 5   Q.  And then you used the term "wasted votes."  What is a

 6   wasted vote?

 7   A.  Well, in order to convert your vote share, your votes into

 8   seats as efficiently as possible, a party wants all of their

 9   voters or as many as possible to be necessary in order to win

10   the seats that they win and they don't want to deploy voters in

11   districts where they're either going to lose or they're going

12   to win by overwhelming margins.

13   Q.  Okay.  Can the term "wasted votes" refer to votes of a

14   losing party?

15   A.  Yes.

16   Q.  And which number of votes of a losing party would be

17   wasted?

18   A.  So when you lose, all of your votes are wasted for purposes

19   of trying to win the election.

20   Q.  Can the term wasted votes be used for a winning party?

21   A.  Yes.  When you win the election, all of the votes in excess

22   of what you actually needed to win the election are wasted.

23   Q.  And is the term "wasted votes" used in political science

24   literature?

25   A.  Yes.

1        MS. THOMAS-LUNDBORG:  If we could publish Plaintiffs'

2   Exhibit 571, page seven, and then if we could look at Table 1.

3   Q.  What does this table show?

4   A.  So this table shows an illustrative example of the

5   efficiency gap in a state with three districts.  So in the

6   first district the Democrat wins by an overwhelming margin, 75

7   to 25.  In the other two districts the Republican more narrowly

8   wins the election.  So across all three of these seats, the

9   Democrats win a majority of the statewide vote, here 52

10  percent, while winning only one out of the three seats.

11      And what we can see is that in the first district the

12  Democrats waste 24 votes, because there's 24 votes that were

13  unnecessary to win that election.  In the second two districts,

14  the Democrats waste 40 votes.  So across those three districts

15  the Democrats have wasted 104 votes.

16      Well, the Republicans waste all 25 votes in the first

17  district because they lose that election, but only notice --

18  they only waste nine votes in the other two districts because

19  they win those elections by narrow margins.  So across all

20  three of these districts the Republicans only waste 43 votes.

21  Q.  What are some of the benefits of the efficiency gap?

22  A.  Well, as I said earlier, I think it captures the intuition

23  or the mechanism that it's the heart of gerrymandering, which

24  is packing and cracking.

25      Moreover, it can be calculated for the entire range of

1    elections, both competitive and uncompetitive ones, and we can

2    use primarily observed election results to calculate it.  We

3    don't need to do a uniform swing of some sort.

4    Q.  Are you familiar with criticisms of the efficiency gap?

5    A.  Yes.

6    Q.  And what are some of the criticisms of the efficiency gap?

7    A.  Well, I think the two most salient criticisms are that,

8    first of all, it tends to be a little bit volatile, and that's

9    because it's, in part, based on the number of seats that each

10   party actually wins, which -- and, of course, the results of

11   elections can sometimes be a little bit volatile, particularly

12   in states with a small number of seats.

13        So I think that leads to the second criticism of the

14   efficiency gap, which is that it's most well suited for states

15   with larger numbers of seats and, in particular, states with

16   more than six congressional seats.

17   Q.  How many congressional seats does Ohio have?

18   A.  Sixteen.

19   Q.  Why did you decide to use the efficiency gap?

20   A.  Because I think it captures, as I said, theoretically at

21   least, the mechanism that it's at the heart of gerrymandering.

22   And I think especially when taken in concert with other

23   metrics, it gives -- it provides a really important and useful

24   indicator of whether a partisan gerrymander is taking place.

25   Q.  Can the efficiency gap tell you which party, political

1  party, has been advantaged?

2  A.  Yes.

3  Q.  And when looking at the efficiency gap number, how can you

4  tell which political party has been advantaged?

5  A.  Well, the way I orient the numbers, which I think is the

6  convention in the political science literature, although it's

7  an arbitrary one, is that positive numbers indicate a

8  Democratic advantage and negative numbers indicate a Republican

9  advantage.

10  Q.  When an efficiency gap is referred to as pro Republican,

11  what does that mean?

12  A.  It means Republicans have an advantage in the translation

13  of votes to seats because they waste fewer votes than

14  Democrats.

15  Q.  And when the efficiency gap is referred to as pro

16  Democratic, what does that mean?

17  A.  It means Democrats have an advantage in the translation of

18  votes to seats because they in turn waste fewer votes than

19  Republicans.

20  Q.  Are you familiar with thresholds used by academics for the

21  efficiency gap?

22  A.  Yes.

23  Q.  And what are those?

24  A.  Well, I believe that in a Law Review article that wasn't

25  peer reviewed, Nick Stephanopoulos and Eric McGhee proposed a

1   threshold of some sort for the efficiency gap, and in various

2   expert reports a professor named Simon Jackman also proposed a

3   threshold.

4   Q.  Do you use a threshold in your report?

5   A.  No.

6   Q.  Why not?

7   A.  Well, I think there's any number of idiosyncratic factors

8   that could effect the efficiency gap, though as I said, I think

9   the predominant factor is intentional gerrymandering.

10      But in my view, beyond -- we shouldn't focus on a threshold

11  for just one metric.  We should look holistically across

12  metrics and look to whether a state is an outlier in terms of

13  the partisan -- the advantage for the party that controlled the

14  redistricting process looking holistically across multiple

15  metrics.

16  Q.  And how do you define "outlier"?

17  A.  Whether it was more extreme than the vast majority of plans

18  over the last 45 years.

19  Q.  Have you calculated the efficiency gap in the past?

20  A.  Yes.

21  Q.  And when was that?

22  A.  I calculated it for other litigation in Pennsylvania and

23  Michigan.

24  Q.  Did you use your efficiency gap calculations in those cases

25  in your report here?

1   A.   Yes.  I used the same -- the underlying data was the same.

2   Q.   And did that data include calculations for Ohio's

3   efficiency gap?

4   A.   Yes.

5   Q.   And what years did you calculate Ohio's efficiency gap?

6   A.   1972 to 2018.

7   Q.   If we could look at Plaintiff Demonstrative Exhibit 74.  Do

8   you recognize this exhibit?

9   A.   Yes.

10  Q.   What is it?

11  A.   This shows all of the metrics of partisan bias and

12  responsiveness that I used in my analysis for Ohio over the

13  last five election cycles.

14  Q.   So we're going to take these at different periods.  For

15  now, I'd like to focus on the efficiency gap.  What was Ohio's

16  efficiency gap in 2010?

17  A.   The efficiency gap in 2010 was negative .1.

18  Q.   And what happened to Ohio's efficiency gap in 2012?

19  A.   It increased from a ten percent, from the negative .1

20  advantage for Republicans to a negative .2 or 22 percent

21  advantage for Republicans.  So it increased quite dramatically.

22  Q.   And what did this increase indicate to you?

23  A.   Well, this increase to me, which was a larger change from

24  what we had observed in the previous decade, indicated that

25  when the new plan kicked in, that it advantaged Republicans

1    more than the previous plan had.

2    Q.  What was the efficiency gap in 2014?

3    A.  It decreased to negative .09.

4    Q.  And 2016?

5    A.  It stayed at negative .09.

6    Q.  And how does this decrease affect your analysis?

7    A.  It doesn't.  I think that one of the explanatory factors

8    here -- there was that the Republicans increased their vote

9    share in Ohio while the seat share didn't change, so that led,

10   particularly the efficiency gap, to show a little bit less

11   advantage for Republicans.  But if you look holistically across

12   the decade, we see a quite large advantage for Republicans.

13   Q.  What was the efficiency gap in 2018 in Ohio?

14   A.  It was negative .2.  So almost -- almost exactly the same

15   as what it was at the beginning of the decade in 2012.

16   Q.  And how does the 2018 efficiency gap affect your analysis?

17   A.  Well, I think it indicates how durable this -- the partisan

18   advantage from 2012 has been over the course of this decade.

19   Q.  Now, you mentioned before that the 2012 and 2014 numbers

20   reflect good years for Republicans.  What does the 2018 number

21   reflect?

22   A.  Well, 2018 was clearly a good year for Democrats,

23   particularly in House elections.

24   Q.  Are you familiar with the term "wave election"?

25   A.  Yes.

1   Q.  What is a wave election?

2   A.  Well, I think there's no one definition in the political

3   science literature.  A wave election is a term that's used more

4   often, sort of a journalistic account to elections.  But I

5   think the way I would characterize a wave election is twofold:

6   First, there's typically a large swing toward a particular

7   party, and second, that party does, in fact, win a majority of

8   the votes across the country, usually a large majority.

9   Q.  Would you consider 2018 a wave election?

10  A.  Yes.

11  Q.  And in what context was it a wave election?

12  A.  Well, particularly in House elections, the House popular

13  vote swung -- I think Democrats won the popular vote in the

14  House by eight percent or nine percent, whereas they, I think,

15  narrowly lost it in 2016.  So that was quite a large swing in

16  favor of Democrats.  And, of course, as we all know, the House

17  swung from being controlled by Republicans to controlled by

18  Democrats.

19      I think other elections showed a little bit less of an

20  indication of a wave.  But even in like Senate and governor's

21  elections, they actually swung quite a lot toward Democrats.

22  It was just, on the Senate map, there were a lot of pro

23  Republican seats up this year.

24          MS. THOMAS-LUNDBORG:  Your Honors, I think I have at

25  least two hours more.  We can break here or I can continue to

1  go.

2        JUDGE BLACK:  I think we should continue to go.  Thank

3  you for asking.  We're going to recess at five.

4        MS. THOMAS-LUNDBORG:  Oh, I'm sorry.  I was reading it

5  as 5:00.  It's 4:00.

6        JUDGE WATSON:  So was I.

7        MS. THOMAS-LUNDBORG:  Thank you.  This is what happens

8  when you wake up at 3:30 in the morning.

9        JUDGE BLACK:  Indeed.  Go ahead.

10  Q.  Did you compare Ohio's efficiency gap and the current map

11  to previous years?

12  A.  I'm sorry.  Can you repeat the question.

13  Q.  Did you compare Ohio's efficiency gap in the current map to

14  previous years?

15  A.  Yes, I did.

16  Q.  And did you compare Ohio's efficiency gap to other states?

17  A.  Yes, I did.

18  Q.  And I believe in Exhibit 571 on page 23 you discuss the

19  comparison of the 2012 efficiency gap.  And what did you find

20  about the 2012 efficiency gap?

21  A.  Well, I found that it was more extreme than 98 percent

22  previous elections in states with more than six seats from 1972

23  to 2012, and it was more Republican-leaning than 99 percent of

24  previous elections.

25  Q.  So when you say that it was more extreme than 98 percent of

1   the plans, is that looking at both pro Republican and pro

2   Democratic plans?

3   A.   Exactly.

4   Q.   And then you said it was 99 percent more pro Republican

5   than other plans.

6   A.   Yes, that's correct.

7   Q.   And that's over the same data set?

8   A.   Correct.  From 1972 to 2012, looking across more than 500

9   elections.

10  Q.   Did you compare the 2018 efficiency gap to other elections?

11  A.   Yes.

12  Q.   So I believe if you look at Exhibit 476 -- and I believe

13  you report your results on page three -- what did you find

14  about the 2018 efficiency gap?

15  A.   Well, it's more extreme than 96 percent of previous plans

16  in states with more than six congressional seats, and it was

17  more pro Republican than 98 percent of previous election

18  results over the past 45 years.

19          JUDGE BLACK:  Where is that found?  I'm sorry.

20          MS. THOMAS-LUNDBORG:  I believe he's reading from the

21  paragraph that -- it's at the top.

22          JUDGE NELSON MOORE:  It's tab 3.

23          JUDGE BLACK:  Tab 3.

24          MS. THOMAS-LUNDBORG:  Sorry.  It's also on your

25  screen.

1      JUDGE BLACK:  Very well.  Judge Moore has found it.
2  Just give me a moment.
3      JUDGE NELSON MOORE:  It's at the top of the page.
4      JUDGE BLACK:  She's got me focused.  The top of the
5  page.  Go ahead.
6  Q.  So if you could please repeat what was your finding about
7  the 2018 efficiency gap?
8  A.  The 2018 efficiency gap in Ohio was more extreme than 96
9  percent of previous elections in states with more than six
10 seats and more pro Republican than 98 percent of previous
11 elections.
12 Q.  Now, if we could look at Figure 3 on page six of the
13 exhibit that we're currently in.  What does this figure show?
14 A.  Well, this figure graphically shows the efficiency gap that
15 I calculated for every state with more than six seats from 1972
16 to 2018.  The dots represent the efficiency gaps in particular
17 states, and Ohio is, of course, labeled using its state
18 abbreviation.
19 Q.  And what can be seen in this figure regarding Ohio's
20 efficiency gap?
21 A.  Well, I should say I neglected to say a second ago the X
22 axis here at the bottom shows the magnitude of the efficiency
23 gap.  So on the left side of the figure are pro Republican
24 efficiency gaps, and on the right side are pro Democratic ones.
25      I'm sorry.  Can you repeat your --

1   Q.  What can be seen regarding Ohio's efficiency gap in this

2   figure?

3   A.  Great.  So what you can see is the extremity of the

4   efficiency gap in Ohio, particularly in 2012 and '18, compared

5   to previous elections over the past 45 years.  And you can

6   visually see the dots for Ohio are more extreme than almost any

7   other -- certainly were more pro Republican than almost any

8   other election except for perhaps, you know, a dot in 1994 and

9   another one in 1996.  You can also visually see the jump in the

10  extremity between 2010 and 2012.

11  Q.  Okay.  One second.

12  A.  I guess the last thing this shows is that historically the

13  efficiency gap in Ohio has generally lied close to zero.  It

14  hasn't favored one party or another with anything close to the

15  extremity that we observed recently.

16  Q.  If we could go back to tab 1, which is Exhibit 571, and go

17  to page 20, please.  And I'd like to go back to the 2012

18  election for a second.

19      What does Figure 4 show?

20  A.  Well, this shows -- do you want to show the 2018 version of

21  this that shows both 2012 and '18?

22  Q.  Give me one second and we will find the 2018 version.

23  A.  I think it's Figure 1 in my 2018 report.

24  Q.  If we could go to Exhibit 476, and I will give you the page

25  number.  Page four.  It's Figure 1.

1          JUDGE BLACK:   Found it.

2    A.   So this graph, this graph shows -- it's called a kernel

3    density of all of the efficiency gaps in every state with more

4    than six seats from 1972 to 2018.   And again, the X axis shows

5    the extremity of the efficiency gap, so that pro Republican

6    efficiency gaps are oriented on the left and pro Democratic

7    ones on the right.

8          And this indicates a couple of salient features.   One, just

9    looking at the graph as a whole, the average efficiency gap

10   over the last 45 years, or almost 50 years now, is slightly pro

11   Democratic leaning.   So the efficiency gap certainly doesn't

12   always favor Republicans historically.

13         And then secondarily, most efficiency gaps lie close to

14   zero.   In fact, the vast majority lie between negative ten

15   percent and ten percent.   Only about four percent of efficiency

16   gaps over the last 45 or so years are more extreme than 20

17   percent in either direction.

18   Q.   And how many elections are represented by Figure 1?

19   A.   Over 500.

20         So then turning to Ohio, the lines on the left of the plot

21   slow the efficiency gaps in Ohio in 2012 and 2018, which, of

22   course, are the first and most recent years of the current

23   redistricting period.   And it shows that -- you can graphically

24   see again that in both cases these are historical outliers

25   according to the efficiency gap.

1    Q.  So I would now like to turn away from the efficiency gap to

2    another measure that you calculated as part of your report.

3    You mentioned earlier that you calculated the mean-median

4    difference; is that correct?

5    A.  Yes.

6    Q.  And what is the mean-median difference?

7    A.  Well, it captures the intuition that if a party wins more

8    votes in the median district than in the mean district, than

9    their average vote share across all the districts, then, again,

10   they have an advantage in the translation of votes to seats,

11   because, indeed, the median district is the vote share you need

12   in order to win a majority of the legislature.

13   Q.  So let's look at a depiction of what you're discussing.  If

14   we could go to Exhibit 571, which is tab 1.  And I'm sorry.

15   We'll be moving back and forth quite a bit.  And if we could go

16   to page nine, Table 2.

17        What does this table show?

18   A.  This chart shows the Democratic vote share in each district

19   in the 2012 election in Ohio.  And what you can see is that

20   many Democratic voters were packed into the four districts at

21   the bottom of the table where Democrats won by overwhelming

22   margins, whereas there's a large number of districts where

23   Republicans got between 40 and 50 percent, which is Districts 5

24   through 16.

25        So that the Democrats' average vote share across all of

1    these districts is 48 and a half percent, so just a little bit

2    shy of 50 percent, whereas their median vote share was only

3    41.6 percent.

4    Q.   Thank you.  What are some of the advantages of the

5    mean-median difference?

6    A.   Well, the mean-median difference is helpful because it's

7    less reliant -- it's less affected by who wins or loses close

8    elections.  And it also relies on, I think, a bedrock principle

9    of statistics, which is we can evaluate a distribution based on

10   its skew.

11   Q.   And what are some of the disadvantages of the mean-median

12   difference?

13   A.   Well, I think it can be sensitive to the outcome in the

14   median district.  So obviously, the median district is just one

15   district.  So it's not as sensitive to close election results,

16   but it is sensitive to the result in the median district.

17        And then also it lacks an obvious interpretation in terms

18   of the number of seats that a party actually gains through

19   gerrymandering.

20   Q.   Can you interpret the mean-median difference?

21   A.   I mean, you can look at the -- you can array the districts

22   as I did here and calculate the number of seats that likely

23   would have flipped if the mean and median were the same.

24   Q.   And did you do that here?

25   A.   I did.  So here I calculated the Democrats likely lost at

CHRISTOPHER WARSHAW - DIRECT

 1   least three districts that they would have won if the mean and

 2   median were the same, which is basically -- what I did to do

 3   that is I just shifted all the districts up by the difference

 4   between the mean and the median.  And if you do that, then

 5   three districts flip from Democrat to Republican.

 6   Q.  And why did you include the mean median in your report?

 7   A.  Well, it's another increasingly widely used metric of

 8   partisan advantage in the redistributing process that scholars

 9   are using to analyze gerrymandering.  So I think, again, that

10   taken, especially looking at it as part of the suite of

11   different metrics, it just provides another indication of

12   whether a partisan gerrymander has taken place.

13   Q.  So I'd like to go back to something that you just said.

14   You said that you were able to calculate the seats by taking

15   the mean and then shifting it up.

16   A.  Uh-huh.

17   Q.  So what is the mean here?

18   A.  It's 48 and a half, 48.4 percent.

19   Q.  And which districts would shift up given the mean?

20   A.  Well, the 7th, 6th and 16th districts would likely have

21   flipped in 2012 if the mean and median were the same.

22   Q.  Did you include a threshold for the mean-median difference

23   in your report?

24   A.  No.

25   Q.  Why not?

1    A.  Well, I think, once again, my view is that there's no

2    single bright line that we should look to, but instead we

3    should look at -- across a suite of different metrics try to

4    evaluate holistically whether a particular plan is a

5    historically extreme level of partisan bias.

6    Q.  And have you calculated the mean-median measure difference

7    in the past?

8    A.  Yes.

9    Q.  And when was that?

10   A.  I calculated it for a partisan gerrymandering case in

11   Michigan.

12   Q.  And did you calculate the mean-median difference for Ohio?

13   A.  Yes.

14   Q.  And did you include those numbers in your report?

15   A.  Yes.

16   Q.  If we could go back to Plaintiff Demonstrative Exhibit 74.

17   So we've looked at this exhibit before.  I'd now like to focus

18   on the "Mean Median" column.

19       What was Ohio's mean median in 2010?

20   A.  It was about negative .02, which is a very modest

21   mean-median difference.

22   Q.  I think you have to get closer.

23   A.  Sorry.  It was about a negative two percent, which is pro

24   Republican, but I think a very modest mean-median difference.

25   Q.  And what was the mean median in 2012?

```
 1   A.  It was almost eight percent.

 2   Q.  And what was the mean median in 2014?

 3   A.  It was also about eight percent in favor of Republicans.

 4   Q.  And what was the mean median in 2016?

 5   A.  It was about eight and a half percent pro Republican.

 6   Q.  And what was the mean median in 2018?

 7   A.  It was about five percent in favor of Republicans.

 8   Q.  And what is your understanding of why the mean median may

 9   have dropped in 2018?

10   A.  Well, it's hard to say exactly, but it's -- I think that

11   the most likely explanation is that 2018 was an unusual

12   election year.  That was a wave for Democrats.  In addition,

13   the most competitive districts look to have been a little bit

14   closer in 2018.

15   Q.  So to clarify, what's your understanding of what happened

16   to the mean as it relates to the median in 2018?

17   A.  Sorry.  It got a little bit smaller.  It got a little bit

18   closer.

19   Q.  And did you compare the mean-median difference in Ohio's

20   map to Ohio's previous plans?

21   A.  I did.

22   Q.  And did you compare the mean-median difference in Ohio's

23   map to other states?

24   A.  Yes, I did.

25   Q.  So if we could go back --
```

1   A.  One thing I'd just note here is, just like on the

2   efficiency gap, what you can see visually here is the jump in

3   the mean median between 2010 and '12.  So it went from negative

4   two percent to negative eight percent when the new

5   redistricting plan kicked in.

6   Q.  And what does that indicate to you?

7   A.  Well, it's just more indication that the 2011 redistricting

8   plan was a partisan gerrymander because it shifted the results,

9   the advantage, toward Republicans so dramatically relative to

10  what we'd seen in the last redistricting period.

11  Q.  So if we could go back to your initial report, which is

12  Exhibit 571, behind tab 1 for those of us following along with

13  paper, on page 24 you discuss your findings as they relate to

14  the 2012 election and the mean-median difference.  What did you

15  find?

16  A.  Well, I found the mean-median difference in 2012 was more

17  extreme than in 83 percent of prior elections looking across

18  the last 46 years from 1972 to 2016, and it's more pro

19  Republican than 92 percent of previous elections.

20  Q.  Did you compare Ohio's 2018 mean-median difference to other

21  plans?

22  A.  Yes, I did.

23  Q.  And did you compare Ohio's 2018 mean-median difference to

24  other states?

25  A.  Yes.

1  Q.  If we can go to Exhibit 476, which is tab 3, and I believe

2  you report your findings on page three.

3  A.  Yes, I do.

4  Q.  And what did you find?

5  A.  I found that the mean-median difference in 2018 was more

6  extreme than in 62 percent of previous elections and more pro

7  Republican than in 81 percent of previous elections.

8  Q.  If we could look at Figure 4 on page seven of this report.

9  What does this figure show?

10  A.  So this once again shows the mean-median differences in

11  every state with more than six congressional seats between 1972

12  and 2018, and the dots for Ohio are labeled.

13  Q.  And what does this figure indicate to you?

14  A.  Again, it graphically shows the extremity in the most

15  recent redistricting period in Ohio, particularly in 2012

16  through '16.

17  Q.  Now, you mentioned that in addition to the mean-median

18  difference and the efficiency gap, you used a measure called

19  the declination measure.  What is that?

20  A.  So the declination is a newer measure, and essentially what

21  the declination does is it looks at each party's average vote

22  share, and basically it says that each party's average vote

23  share should be about the same distance from 50 percent.

24  However, if one party is engaging in intentional

25  gerrymandering, then the 50 percent line will be treated

 1    differently than other arbitrary thresholds.  And what you'll

 2    see is that the advantaged party's vote shares will all be much

 3    closer to 50 percent than the disadvantaged party.

 4    Q.  And if we could go to Exhibit 571, which is tab 1, on page

 5    13, Figure 1.  What does this figure show?

 6    A.  Well, this figure graphically shows the declination metric

 7    for Ohio's 2012 congressional election.  So it shows the Y axis

 8    here is every -- the vote, the Democratic vote share in every

 9    seat in Ohio.  And what you can see, similar to what we saw

10    when we were looking at the mean median, is that the Democratic

11    seats, all the Democrats won them by enormous margins in 2012,

12    whereas the Republican seats are all arrayed much closer to 50

13    percent.  Which of course we talked about earlier indicates

14    that Republicans had an advantage, and in this case a

15    substantial one, in the translation of votes to seats.

16    Q.  Has the declination measure been used in any peer-reviewed

17    literature?

18    A.  Yes.

19    Q.  And what is that?

20    A.  Its creator, a mathematician at the University of Vermont,

21    published a peer-reviewed article describing it in the *Election

22    Law Journal*.

23    Q.  Where are some of the advantages of the declination

24    measure?

25    A.  Well, I think it's less influenced by either the median

CHRISTOPHER WARSHAW - VOIR DIRE

 1   district compared to the mean median or by, you know, a small

 2   number of close elections compared to the efficiency gap.  And

 3   so arguably it could be more stable than either of those

 4   metrics.

 5   Q.  And what are some of the disadvantages of the declination

 6   measure?

 7   A.  Well, I think it is less stable when a party has a very

 8   small number of seats, because it's based on the average vote

 9   share of each party in the legislature.  So if a party had a

10   small number of seats, that could bounce around.  And if a

11   party controls no seats in the legislature -- so, for instance,

12   in Massachusetts in recent elections -- then you can't actually

13   calculate the declination.  And I also think, just from a

14   pragmatic point of view, another disadvantage is it's a little

15   bit harder to understand the declination compared to the other

16   metrics.

17   Q.  Why did you include the declination measure in your report?

18   A.  Well, I think it's, as I said, another just metric that's

19   been developed and peer reviewed that I think does capture some

20   of the intuition of gerrymandering.  And it's closely both

21   theoretically and empirically related to the other measures I

22   look at.  So I think when used as part of a suite of different

23   metrics, again, it can bolster our confidence in a conclusion

24   about whether there's a partisan gerrymander.

25   Q.  Did you include a threshold for the declination measure?

```
 1   A.  No.

 2   Q.  Why not?

 3   A.  Because, once again, I think that any strict -- any

 4   threshold based on one particular metric is likely to be a

 5   little bit arbitrary.  So, instead, it makes sense to look at a

 6   suite of different metrics to try to evaluate whether a

 7   particular plan is an historical outlier.

 8   Q.  And have you calculated the declination measure in the

 9   past?

10   A.  Yes.

11   Q.  When?

12   A.  For the partisan gerrymandering case in Michigan.

13   Q.  And which declination measures have you calculated?

14   A.  Well, the creator of the declination develops two tightly-

15   related versions of the declination, and I calculated both of

16   them, but I used -- as I discuss in my report, I used the

17   second version of the declination, which is what he recommends

18   using.

19   Q.  And did you calculate the declination measure for Ohio?

20   A.  Yes.

21   Q.  And did you include those numbers in your report here?

22   A.  Yes.

23   Q.  And let's look back at Plaintiff Demonstrative Exhibit 74,

24   and if we could look at the declination column.  What was

25   Ohio's declination measure in 2010?
```

1  A.  About negative .4.

2  Q.  And what was Ohio's declination measure in 2012?

3  A.  Negative .77.

4  Q.  And what does the change from Ohio's declination in 2010 to

5  2012 indicate to you?

6  A.  Just like the other measures, you can see that when the new

7  redistricting plan went into place, the metric became much more

8  pro Republican.

9  Q.  I think --

10  A.  Sorry.  Just like the other metrics, what you can see is

11  when the new -- the 2011 redistricting plan went into place,

12  the declination became much more pro Republican.

13  Q.  Okay.  What happened to the declination measure in 2014?

14  A.  It got a little bit smaller but still reflects a large pro

15  Republican advantage.

16  Q.  And what happened to the declination measure in 2018?

17  A.  It became larger.  It became almost as large as it was in

18  2016.  So it's one of -- it's just like in -- or, sorry, almost

19  as large as it was in 2012.  I apologize.

20     So just like in 2012, it's one of the largest outliers on

21  the declination history.

22  Q.  And did you compare the declination measure in Ohio to

23  other states?

24  A.  Yes.

25  Q.  And did you compare the declination measure in Ohio's

1    current plan to Ohio's previous plans?

2    A.   Yes.

3    Q.   And I believe you discuss the results on page 571 -- oh,

4    sorry, Exhibit 571 on page 26.  No.  That's the wrong page.

5    A.   It's on page 25.

6    Q.   Page 25.  Thank you.  And what did you find?

7    A.   Well, the declination, looking across the 2012 to '18

8    elections -- and I think this only shows through 2016, but my

9    other report shows the 2018 result -- the declinations in Ohio

10   were historically extreme, relative both to previous results in

11   Ohio as well as to other results across the country.  And you

12   can again see this graphically here, because the abbreviations

13   for Ohio are farther to the left, essentially, than almost any

14   other election in history.

15   Q.   So if we could, in addition to looking at the figure, look

16   at what you found about how Ohio's 2012 declination measure

17   compared to other states.  And what did you find?

18   A.   So what I found is that the declination score in Ohio for

19   2012 was more extreme than 99 percent of previous elections.

20   And in fact, it was more pro Republican than any previous

21   congressional election over the past 45 years.

22   Q.   So when you say it was more pro Republican than any

23   congressional election in the past 45 years, what's the

24   universe that you're looking at?

25   A.   So again, all states with more than six congressional

1    seats, which is over 500 elections.

2    Q.  Now, you said in your supplemental report you also compared

3    the 2018 declination measure to other states and prior Ohio

4    maps; is that correct?

5    A.  Yes.

6    Q.  Okay.  I believe you report your results on page three.

7    What did you find?

8    A.  I found that Ohio's 2018 election had a declination that

9    was more extreme than 98 percent of previous elections and more

10   pro Republican than 99 percent of previous elections.

11   Q.  And if we could look at Figure 5 in Exhibit 476, which is

12   on page seven.

13         MS. THOMAS-LUNDBORG:  476.  Thank you.

14   Q.  What does this figure show?

15   A.  So this is the chart that I was starting to talk about

16   earlier, and I think I was looking at the wrong part of the

17   page.  But this again shows the declination in Ohio as well as

18   every other -- all these other 500 elections, 500-plus

19   elections that I looked at over the last, well, almost 48 years

20   now, 48 from 1972 to 2018.

21         And it indicates -- you can again graphically see the

22   extremity of Ohio's plan in the last four elections and how it

23   was larger than we'd seen in previous elections in Ohio.

24   Q.  Okay.  And I believe the last measure that you said you

25   calculated was the asymmetry measure.  What is the asymmetry

1    measure?

2    A.   Well, the asymmetry measure is the most widely-used measure

3    in political science to capture partisan advantage.   As I said

4    before, it was proposed by Gary King and co-authors and in the

5    late 1980s.

6        And essentially the idea of the symmetry measure is that in

7    a fair electoral system both parties should receive the same

8    number of seats for a particular vote share.   So if Democrats

9    get 55 percent of the votes, they should receive the same

10   number of seats as Republicans do when they win 55 percent of

11   the votes.   Moreover, when the two parties split the vote

12   50-50, they should get the same number of seats, which is they

13   should split the seats 50-50 as well.

14   Q.   And in your report you describe there are two ways to

15   calculate the asymmetry measure.   If you could briefly describe

16   those.

17   A.   Yes.   So along these lines, the first way they describe to

18   do it is to analyze a range of plausible election results,

19   usually between 45 and 55 percent of -- we're imagining a

20   scenario or essentially doing a counter-factual scenario where

21   Democrats win -- each party wins between 45 and 55 percent of

22   the statewide vote and then calculating how many seats each

23   party would win across that range of vote shares.   And again,

24   in a symmetrical system, each party should win the same number

25   of seats across that range of vote shares.

1    The second way to calculate it, which I started to describe

2  a second ago, is to do a uniform swing such that each party

3  gets half of the statewide vote.  And if each party gets half

4  of the statewide vote, they should also each get half of the

5  seats.

6  Q.  For clarity in moving forward, I will refer to the second

7  measure as asymmetry 50-50 and the first calculation as

8  asymmetry, and I believe that some of the documents do that as

9  well.

10  A.  Great.

11  Q.  I also heard the -- sorry.  Strike that.

12    Are you familiar with the asymmetry measure also being

13  referred to as partisan bias?

14  A.  Yes.  In some of the original papers Gary King and

15  co-authors refer to, particularly the version of it at 50-50,

16  as partisan bias.  But in my view, partisan bias is better used

17  to describe the general concept of partisan advantage in the

18  districting process rather than this one particular metric, and

19  that's how I use it.

20        MS. THOMAS-LUNDBORG:  If we could look at and publish

21  Exhibit 571, page 11, Table 3.

22  Q.  What does this table show?

23  A.  So this table shows my calculations for the symmetry metric

24  across a range of vote shares, between 45 and 55 percent for

25  each party.  So looking at the left-hand column, what it shows

1    is that -- based on --

2        And I should say this is based on the 2012 congressional

3    election.

4        So if Democrats win 45 percent of the statewide vote, they

5    get 25 percent of the seats.  If Democrats win 49 percent of

6    the votes, they still get 25 percent of the seats.  And indeed,

7    if Democrats get 51 percent of the statewide vote, they still

8    only receive 25 percent of the seats.

9        Even if Democrats win 55 percent of the statewide vote,

10   which of course would be a large majority of the vote, they

11   would still only receive a minority of the seats:  37.5

12   percent.

13       Whereas for Republicans, if they win just 45 percent of the

14   vote, three receive 62.5 percent of the seats.  And if they

15   receive 55 percent of the vote, they would win three-quarters

16   of the seats.  And on average, looking across this range of

17   different counter-factual vote shares, Democrats only get 29

18   percent of the seats, whereas Republicans win 71 percent of the

19   seats, and I think -- so this reflects a bias.  So it indicates

20   a bias of 21 percent in favor of Republicans.  And these seat

21   shares are almost exactly what we've actually observed from the

22   actual elections over the past several cycles.

23   Q.  And did this seat share change when you ran the analysis

24   for 2018?

25   A.  It changed on the margin, but nothing substantially

1    changed.   And in particular, the 2018 analysis revealed that

2    for vote shares between 45 and 50 percent, which is the most

3    likely range of vote shares that we've observed in --

4    particularly in 2018 and 2012, Democrats still only win a

5    quarter of the seats.

6    Q.   What is the benefit of the asymmetry measure?

7    A.   Well, I think it captures just the intuition that -- and

8    when you have partisan gerrymandering, part of what

9    gerrymandering is doing is it's creating an unfair distribution

10   of votes and seats such that one party has an asymmetrical

11   benefit in the translation of votes to seats.

12       Moreover, as I said earlier, it's been widely used over the

13   last 20 years, so it has a lot of history on its side.

14   Q.   And what are some of the disadvantages of the measure?

15   A.   Well, I think that when parties are conducting a

16   gerrymander, typically they're not thinking about the symmetry

17   between the parties.   They're simply trying to win as many

18   seats as they can as efficiently as they can.   So I think while

19   from an abstract point of view it's a useful indicator of

20   gerrymandering, I think it's a little bit more divorced from

21   what parties are trying to do when they gerrymander.

22       Moreover, in order to calculate it, it requires you to

23   calculate sort of counter-factual statewide uniform swings,

24   which I think, while plausible, certainly isn't perfect.

25   Q.   And why did you include the asymmetry measure?

CHRISTOPHER WARSHAW - DIRECT

```
1   A.   First, as I said, because it's the most widely used metric
2   that political scientists have used over the past several
3   decades.   And I think that, in combination with other metrics,
4   it provides another useful indicator.
5        And another advantage, I should say, of the symmetry metric
6   compared to other metrics is because it's based on the entire
7   vote seat curve, or a large portion of the vote seat curve,
8   it's extremely stable relative to -- particularly relative to
9   the other metrics.   And that's exactly what we see in Ohio over
10  the last couple of cycles.   It's been extremely stable.
11  Q.   Okay.   If we could look at Plaintiffs' Demonstrative
12  Exhibit 74.   So let's start with the first symmetry metric.
13  What was Ohio's symmetry metric in 2010?
14  A.   It's about a negative six percent in favor of Republicans,
15  which is a small asymmetry in favor of Republicans.
16  Q.   And what was it in 2012?
17  A.   It had a large jump to being a negative 22 percent
18  advantage for Republicans.
19  Q.   And what does the jump from 2010 to 2012 indicate to you?
20  A.   Well, just like on the other metrics, that kind of jump I
21  think is unlikely to occur by chance, and particularly looking
22  across all these different metrics.   And so I think this is
23  indicative of the partisan gerrymander coming into place.
24  Q.   To pause on the jump from 2010 to 2012 across metrics,
25  would it be affected by Ohio losing two congressional seats?
```

1   A.  No.

2   Q.  Why not?

3   A.  Well, all of these metrics are using the relationship

4   between votes and seats, and there's no reason that a drop from

5   18 to 16 seats would necessarily affect any of the metrics.

6   Q.  Let's look at the symmetry 50-50 measure.   What was Ohio's

7   symmetry 50-50 number in 2010?

8   A.  Negative 11 percent.

9   Q.  And what happened in 2012?

10  A.  Once again you saw a large jump or it jumped.  So it jumped

11  from negative 11 percent to negative 25 percent, and there it

12  stayed for the next three cycles.

13  Q.  And why would this particular measure stay the same for

14  four years?

15  A.  Well, I think this reflects the durability of this

16  gerrymander.

17  Q.  And did you compare the symmetry measures to other states?

18  A.  I did.

19  Q.  And did you compare the symmetry measures to Ohio's prior

20  elections?

21  A.  Yes.

22          MS. THOMAS-LUNDBORG:  If we could publish Exhibit 571

23  and go to page 27.

24  Q.  What does this figure show?

25  A.  This figure shows my calculations for the symmetry metric

1   in Ohio as well as every other state with more than six

2   congressional districts over the past 45 years.

3   Q.  And what does it indicate happened to Ohio's symmetry

4   metric?

5   A.  Once again, we can see visually how much it jumped between

6   2010 and '12, and that it stayed at that higher plateau over

7   the next few cycles.

8   Q.  And in the text of your report you discuss what 2012's

9   percentage was as compared to other states.  What did you find?

10  A.  I found that it was more extreme than -- I'm just making

11  sure I'm looking at the right metric here.

12      Oh.  I found that it was more extreme than 96 percent of

13  previous elections and more pro Republican than 97 percent of

14  previous elections.

15  Q.  And then if we could go to page 26 of your report.  What

16  does this measure show or this figure show?

17  A.  So this is showing the symmetry in these 50-50 tied

18  elections, and it shows very similar results to the previous

19  figure.  You can see graphically how much the asymmetry in

20  favor of Republicans increased when the 2011 redistricting plan

21  went into place in 2012.  And you can see that this asymmetry

22  was larger both than previous election results in Ohio as well

23  as then almost any other election in history.

24  Q.  And in the text you compared Ohio's asymmetry to other

25  states in 2012.  What did you find?

1    A.  I found that it was more extreme than 96 percent of
2    previous elections and more pro Republican than 97 percent of
3    ones.
4    Q.  Okay.  And did you update this analysis for 2018?
5    A.  Yes, I did.
6          MS. THOMAS-LUNDBORG:  If we could go to Plaintiffs'
7    Exhibit 476.  And if we could go to page eight, Figure 6.
8    Actually, if we could, instead of Figure 6, if we could publish
9    Figure 7 first.
10   Q.  What does Figure 7 show?
11   A.  This is the same as one of the figures that we just saw,
12   but it's updated through 2018.  So the dots are every election
13   and the Ohio results are labeled.
14   Q.  And then what does Figure 6 on that same page show?
15   A.  This is showing the bias in the symmetry metric in
16   counter-factual tied elections, so in 50-50 elections where
17   each party -- in a fair election, each party should receive the
18   same share of the seats, which is 50-50.
19   Q.  And I believe in the text on page four you describe the
20   2018 election as it compares to other states.  What did you
21   find?
22   A.  There was more asymmetric than 92 percent of previous
23   elections and more pro Republican than 94 percent of previous
24   elections.
25   Q.  And just to clarify, which symmetry metric was that?

1   A.   This is the 45 to 55 percent symmetry metric.

2   Q.   And what was the result for the 50-50 symmetry metric?

3   A.   It was more extreme than 95 percent of previous elections

4   and more pro Republican than 96 percent of previous elections.

5   Q.   What is the relationship between the partisan bias metrics

6   that we have just discussed?

7   A.   Well, as I said before, they're not identical, but they are

8   tightly related both theoretically and empirically, and I think

9   they're all -- one could view them as all slightly noisy

10  measures of the underlying partisan bias or advantage in the

11  districting plan.

12       And what I found when I examined them and the relationship

13  between this empirically is that in states with competitive

14  statewide elections where the statewide vote share is between

15  40 and 60 percent, all of these metrics are relatively highly

16  correlated.

17            MS. THOMAS-LUNDBORG:  If we could publish Exhibit 571

18  and look at page 14, Table 4.

19  Q.   What does this table show?

20  A.   Well, this shows visually what I was just talking about,

21  which is that all of these metrics are highly correlated with

22  each other.  So, for instance, the efficiency -- the

23  correlation between the efficiency gap and the declination is

24  .94, which means that the efficiency gap explains roughly 80

25  percent or more of the variation in the declination.  And all

1  of the other metrics are highly correlated with each other as

2  well.

3      So what I found is that most of the variation of these

4  metrics lies around along one underlying dimension, which is

5  what I term the theoretical concept of partisan bias or

6  advantage.

7  Q.  Does this table represent just Ohio's results or all

8  results?

9  A.  This is looking across these metrics for all of the

10  500-plus elections that I examined over the last 45 or so

11  years.

12  Q.  If we could go back to Plaintiff Demonstrative --

13  A.  I'm sorry.  In the states with competitive statewide

14  elections.

15          MS. THOMAS-LUNDBORG:  If we could go back to Plaintiff

16  Demonstrative Exhibit 74.

17  Q.  As we discussed, this demonstrative exhibit represents

18  Ohio's numbers?

19  A.  Yes, it does.

20  Q.  And would you consider these the numbers for the efficiency

21  gap, mean median, declination, and the two symmetry metrics

22  related here?

23  A.  Yes.  What you can see across all of them is that they all

24  went from being relatively small or a very small pro Republican

25  advantage in 2010 to being a much larger pro Republican

1    advantage when the new map went into place.  And that's true

2    across the different metrics, and all of the metrics were

3    either very stable across the next four election cycles or

4    fairly stable.

5    Q.  What's your opinion of situations where the partisan bias

6    metrics are not correlated or do not point in the same

7    direction?

8    A.  Well, I think if different metrics didn't point in the same

9    direction, that I wouldn't conclude that it was -- a particular

10   plan was a partisan gerrymander.

11           MS. THOMAS-LUNDBORG:  And if we could go back to

12   Plaintiff Demonstrative Exhibit 75.

13   Q.  So is that the second factor in this chart here?

14   A.  That's correct.

15   Q.  Does Ohio meet the test of all partisan bias -- oh, I'm

16   sorry.  Is that the fourth factor?

17   A.  Yes.

18   Q.  Does Ohio's plan meet this fourth factor?

19   A.  Yes.

20   Q.  Would Ohio's plan in fact meet all four factors?

21   A.  Yes, it would.

22   Q.  Okay.  Have you read the expert report of Sean Trende for

23   the defendants?

24   A.  Yes, I have.

25   Q.  Are you familiar with the examples Mr. Trende uses in his

1   report?

2   A.  Yes.

3   Q.  Did you receive the underlying data for Mr. Trende's

4   report?

5   A.  Yes.

6   Q.  Did you review that data?

7   A.  Yes.

8   Q.  Did that data include efficiency gap numbers?

9   A.  Yes.  I believe it included efficiency gap numbers that

10  were based on Professor Jackman's report for another case.

11  Q.  And did that data also include a column labeled "Partisan

12  Bias"?

13  A.  Yes.

14  Q.  And did that data also include a column labeled "Bias"?

15  A.  Yes.

16  Q.  And you conducted your own analysis, as we've discussed, on

17  five different metrics?

18  A.  Yes.

19          MS. THOMAS-LUNDBORG:  I would like to publish

20  Plaintiffs' Demonstrative Exhibit 66.

21          MR. NAJARIAN:  I'm sorry.  Six-six?

22          MS. THOMAS-LUNDBORG:  Six-six.

23          MR. NAJARIAN:  Thank you.

24  Q.  What is this demonstrative exhibit?

25  A.  Well, this is a comparison of Mr. Trende's metrics and my

1   metrics for a number of different elections in Alabama.

2   Q.  Okay.  In Mr. Trende's -- let me strike that.

3       Looking at the first column, Alabama in 1972, under your

4   test would you consider Alabama in 1972 gerrymandered?

5   A.  No.

6   Q.  Would you consider Alabama in 1992 gerrymandered?

7   A.  No.

8   Q.  Would you consider Alabama in 1996 gerrymandered?

9   A.  No.

10  Q.  Would you consider Alabama in 2010 gerrymandered?

11  A.  No.

12  Q.  And why is that for these examples that we just went

13  through?

14  A.  Well, at a basic level, the metrics don't all point in the

15  same direction.

16           MS. THOMAS-LUNDBORG:  If we could look on page three

17  of this same demonstrative exhibit.

18  Q.  Would you consider California in 2006 gerrymandered?  Oh,

19  I'm sorry.  California.  Yes, California in 2006.

20  A.  No.

21  Q.  Would you consider California in 2008 gerrymandered?

22  A.  No.

23  Q.  If we could look at Kentucky on page seven.  Would you

24  consider Kentucky gerrymandered?

25  A.  No.

 1   Q.  If we could look at Indiana in 2002.  I'm sorry.  And that

 2   is on page six.  Would you consider Indiana in 2002

 3   gerrymandered?

 4   A.  No.

 5   Q.  If we could look at New Jersey on page nine.  Would you

 6   consider New Jersey gerrymandered?

 7   A.  No.

 8            JUDGE WATSON:  Can we just guess that the answer is

 9   going to be no to all these?

10            MS. THOMAS-LUNDBORG:  That was actually my last

11   example.

12            JUDGE WATSON:  Okay.

13   Q.  If we could look at Plaintiffs' Exhibit 572, page ten,

14   Table 1.  And that is the second tab, for folks following along

15   on paper.

16       And this is your rebuttal report?

17   A.  Yes.

18   Q.  What does this table show?

19   A.  Well, in this table I average each of the metrics across

20   different decades, which is another way to approach evaluating

21   the partisan bias in any particular plan, is to average across

22   all of the data that we have when the plan was in existence.

23       So what this indicates is similarly to what we saw before,

24   is that in each of the metrics the partisan bias shifted in

25   favor of Republicans when the 2011 map went into place.  And I

 1    don't quantify the level of extremity here, but I can say that

 2    the extremity of each of these maps is quite large.  So that,

 3    for instance, each of these are more pro Republican than at

 4    least 90 percent of previous plans, and I think 95 percent of

 5    previous plans.

 6    Q.  And to clarify, this is just looking at Ohio data; is that

 7    correct?

 8    A.  Exactly.  I'm just showing the Ohio data here.  But of

 9    course, I also calculated these for other states as well.

10    Q.  And I only see one symmetry metric in the column.  Do you

11    know which one that is?

12    A.  Yes.  Just for simplicity, I only used the one going

13    from -- doing uniform swings from 45 to 55 percent.

14    Q.  And why was it important to you to average the metrics

15    across decades?

16    A.  Well, I think it enables you to see the increase in

17    extremity across particularly the 2000s to the 2010s, which is

18    why I did it here, because I think in his report Professor Hood

19    essentially argued that there were the same levels of partisan

20    bias in the most recent redistricting period as we had seen in

21    the last one, and, of course, that's not supported by the

22    facts.

23         But then, secondarily, we can use this to put in, again,

24    the historical context of how extreme the Ohio plan is compared

25    to other plans over the past 45-plus years.

1  Q.  And you just referenced Professor Hood.  Is that Dr. Trey

2  Hood?

3  A.  Yes.

4  Q.  And is that in the report that he submitted on behalf of

5  defendants?

6  A.  Yes.

7  Q.  Now, we discussed responsiveness a bit in your earlier

8  testimony.  Do you recall that?

9  A.  Yes, I do.

10  Q.  And in your report you have two ways to look at

11  responsiveness; is that right?

12  A.  Yes, I do.

13  Q.  And the first way is looking at competitiveness?

14  A.  Yes.  And again, I think both of these are trying to

15  capture how insulated a plan is from shifts in voters'

16  preferences.  So the first is competitiveness.

17  Q.  And why did you look at competitiveness?

18  A.  Well, competitiveness is, I think, a very simple way to

19  understand elections, so how close the elections are.  And an

20  unresponsive electoral system will generally have a large

21  number of uncompetitive elections, which means that those seats

22  won't shift regardless of how voter preferences change, so

23  whether it's a wave election for one party or another, which is

24  exactly what we saw in Ohio, the seats didn't change even

25  though we had wave elections that favored one party or another.

1        MS. THOMAS-LUNDBORG:  If we could look at Plaintiff

2   Demonstrative Exhibit 72.  And, sorry, if we could turn to page

3   three.

4   Q.   What does this exhibit show?

5   A.   So this shows the winning party's seat share in each of

6   Ohio's congressional elections between 2012 and '18.

7   Q.   And I believe you testified that 55 percent or less,

8   between 45 and 55 is where you would find an election

9   competitive?

10  A.   Yeah, that's the convention typically used.

11  Q.   Okay.  Taking these one by one, if we start in 2012, what

12  is the first election that would be competitive?

13  A.   The 6th district where the winning candidate got about 53

14  percent of the vote.

15  Q.   And then what's the next election that would be

16  competitive?

17  A.   The 14th district.

18  Q.   And what is the next election that would be competitive?

19  A.   Well, there weren't any competitive elections in 2014 or

20  two --

21  Q.   I'm sorry.  Still in 2012.

22  A.   Oh, I'm sorry.  In the 16th congressional district.

23  Q.   Now moving on to 2014, are there any competitive elections

24  in 2014?

25  A.   No.

1    Q.   Are there any competitive elections in 2016?

2    A.   No.

3    Q.   What, if any, elections are competitive in 2018?

4    A.   Well, the 1st Congressional District, the winning

5    Republican candidate got about 51 percent of the vote.

6    Likewise, in the 12th Congressional District, the winning

7    candidate got about 51 percent of the vote.

8    Q.   Are these all the elections that were competitive in

9    Ohio's -- in the 64 elections represented here?

10   A.   Yes.

11   Q.   Is that five of 64 elections?

12   A.   That's correct.

13          MS. THOMAS-LUNDBORG:  You mentioned the seat vote

14   curve.  I'd like to walk through the seat vote curve if we

15   could.

16      I could also stop here.

17          JUDGE BLACK:  Can you sprint through it, or you have

18   to walk through it?

19          MS. THOMAS-LUNDBORG:  I cannot sprint through it.

20          JUDGE BLACK:  Very well.  Is this a good break point?

21          MS. THOMAS-LUNDBORG:  This is a fine break point.

22          JUDGE BLACK:  So you're going to prepare a bunch of

23   questions tonight?

24      (Laughter.)

25          MS. THOMAS-LUNDBORG:  I will have additional direct

```
 1    tomorrow.

 2            JUDGE BLACK:  Do you want to approximate it?  You

 3    don't have to.

 4            MS. THOMAS-LUNDBORG:  I --

 5            JUDGE BLACK:  You're on the clock.

 6            MS. THOMAS-LUNDBORG:  I will be done, I think, before

 7    our morning break.

 8            JUDGE BLACK:  Very well.

 9        We have reached the day's break.  It's five of 5:00.

10    During the break I hope you enjoy the break.

11        Sir, during the recess please do not discuss your testimony

12    with anyone.  Understood?

13            THE WITNESS:  I understand, sir.  Your Honor.

14            JUDGE BLACK:  Thank you for being present.

15        Is there anything required from the parties before we

16    recess?

17        From the plaintiffs?

18            MS. LEVENSON:  No, Your Honor.

19            JUDGE BLACK:  The defendants?

20            MR. STRACH:  No, Your Honor.

21            JUDGE BLACK:  The intervenors?

22            MR. LEWIS:  No, Your Honor.

23            JUDGE BLACK:  We're on break.  The Court prepares to

24    recess, adjourn for the day.

25            COURTROOM DEPUTY:  All rise.  This court is now in
```

1    recess.

2           THE COURT:  Adjourned.

3           COURTROOM DEPUTY:  Adjourned.

4       (Witness temporarily excused.)

5       (At 4:55 PM, the trial was recessed, to be continued on

6    Wednesday, March 6, 2019, at 9:00 AM.)

7                          - - -

8              I N D E X   O F   W I T N E S S E S

9    PLAINTIFFS' WITNESSES:                        PAGE

10   NINA TURNER
     Direct Examination by Ms. Levenson ...............   5
11   Cross-Examination by Ms. McKnight ................  24
     Redirect Examination By Ms. Levenson .............  33
12   Recross-Examination by Ms. McKnight ..............  36

13   MARK GRIFFITHS
     Direct Examination by Ms. Bonham .................  39
14   Cross-Examination by Ms. Yackshaw ................  55
     Cross-Examination by Mr. Tucker ..................  61
15
     NATHANIEL SIMON
16   Direct Examination by Ms. Lee ....................  62
     Cross-Examination by Mr. Erwin  ..................  74
17   Cross-Examination by Mr. Tucker ..................  79

18   AARON J. DAGRES
     Direct Examination by Ms. Levenson ..............  83
19   Cross-Examination by Ms. Koppitch ...............  101
     Cross-Examination by Mr. Braden .................  109
20   Redirect Examination by Ms. Levenson ...........  110

21   ELIZABETH MYER
     Direct Examination by Ms. Bonham ...............  112
22   Cross-Examination by Ms. Prouty ................  122

23   LISA HANDLEY
     Direct Examination by Ms. Zhang ................  131
24   Cross-Examination by Ms. McKnight ..............  155
     Redirect Examination by Ms. Zhang ..............  176

25

<u>Index Of Witnesses</u> (Continued)

CHRISTOPHER WARSHAW
Direct Examination by Ms. Thomas-Lundborg ....... 180

- - -

<u>E X H I B I T S</u>

<u>EXHIBIT NUMBER:</u>                               <u>ADMITTED</u>

Joint Exhibit 3 ................................   11
Joint Exhibit 5 ................................   19

Plaintiffs' Exhibit 476 ........................  207
Plaintiffs' Exhibit 571 ........................  207
Plaintiffs' Exhibit 572 ........................  207

Intervenors' Exhibit 96 ........................   31

- - -

C E R T I F I C A T E

     I, Luke T. Lavin, RDR, CRR, the undersigned, certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


                                s/Luke T. Lavin
                                Luke T. Lavin
                                Official Court Reporter

- - -