UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

. . . . . . . . . . . . . . . .
OHIO A. PHILIP RANDOLPH          .  Case No. 1:18-cv-357
INSTITUTE, et al.,              .
                                .  *Day 7 of Bench Trial*
          Plaintiffs,           .
                                .
          - v -                 .
                                .  Tuesday, March 12, 2019
LARRY HOUSEHOLDER, et al.,      .  8:59 AM
                                .
          Defendants.           .  Cincinnati, Ohio
. . . . . . . . . . . . . . . .

                         - - -

              TRANSCRIPT OF PROCEEDINGS
   BEFORE THE HONORABLE TIMOTHY S. BLACK, THE HONORABLE KAREN
    NELSON MOORE AND THE HONORABLE MICHAEL H. WATSON, JUDGES

<u>APPEARANCES</u>:

For the Plaintiffs:

FREDA J. LEVENSON, ESQ.          T. ALORA THOMAS-LUNDBORG, ESQ.
American Civil Liberties Union   THERESA J. LEE, ESQ.
  of Ohio Foundation             EMILY R. ZHANG, ESQ.
4506 Chester Avenue              American Civil Liberties Union
Cleveland, Ohio  44103             Foundation
                                 125 Broad Street, 18th Floor
                                 New York, New York  10004-2400


ROBERT D. FRAM, ESQ.
Covington & Burling LLP
One Front Street, 35th Floor
San Francisco, California  94111

For the Defendants:

                    ANN YACKSHAW, ESQ.
                    Ohio Attorney General's Office
                    Constitutional Offices Section
                    30 East Broad Street, 16th Floor
                    Columbus, Ohio  43215

*Proceedings recorded by stenotype; transcript
produced by computer-aided transcription.*

1    APPEARANCES (Continued):

2    For the Defendants Larry Householder and Larry Obhof:

3                        PHILLIP J. STRACH, ESQ.
                         MICHAEL D. McKNIGHT, ESQ.

4                        ALYSSA RIGGINS, ESQ.
                       Ogletree, Deakins, Nash, Smoak & Stewart,

5                          P.C.
                       4208 Six Forks Road, Suite 1100

6                        Raleigh, North Carolina  27609

7    For the Intervenors Steve Chabot, Brad R. Wenstrup, Jim Jordan,
   Bob Latta, Bill Johnson, Bob Gibbs, Warren Davidson, Michael

8    Turner, Dave Joyce, Steve Stivers, Robert F. Bodi, Charles
   Drake, Roy Palmer III, Nathan Aichele, Republican Party of

9    Cuyahoga County and Franklin County Republican Party:

10    PATRICK T. LEWIS, ESQ.           KATHERINE L. McKNIGHT, ESQ.
   Baker & Hostetler LLP            E. MARK BRADEN, ESQ.

11    Key Tower                            Baker & Hostetler LLP
   127 Public Square, Suite 2000    1050 Connecticut Avenue, N.W.

12    Cleveland, Ohio  44114-1214      Suite 1100
                                 Washington, DC  20036-5043

13

14    ERIKA DACKIN PROUTY, ESQ.
   Baker & Hostetler LLP

15    200 Civic Center Drive
   Suite 1200

16    Columbus, Ohio  43215-4138

17    Also present:              Stephen N. Najarian, Trial Consultant
                         Forrest Williamson, Paralegal, Baker &

18                             Hostetler

19    Law Clerks:                Christopher D. deLaubenfels, Esq.
                         Hannah Gelbort, Esq.
                         Adam Kleven, Esq.

20                          Caitlin Miller, Esq.
                         Madison R. Troyer, Esq.

21

22    Courtroom Deputy:       Rebecca R. Santoro

23    Court Reporter:         Luke T. Lavin, RDR, CRR
                         Potter Stewart U.S. Courthouse
                         100 East Fifth Street, Room 103

24                        Cincinnati, Ohio  45202
                         Telephone:  (513) 564-7500

25

```
 1                    P R O C E E D I N G S

 2        (In open court at 8:59 AM.)

 3        (Thomas Brunell resumes the witness stand.)

 4           JUDGE BLACK:  Good morning.  Please be seated.  It's a

 5   minute or two before 9:00.  We're back on the record in the

 6   open courtroom in Ohio A. Philip Randolph Institute, et al.

 7   versus Larry Householder, et al.  The plaintiffs' counsel is

 8   here.  Defense counsel is here.  Intervenors' counsel is here.

 9       Mr. Fram, do we have a report on time?

10           MR. FRAM:  We do, Your Honor.  However, this morning,

11   Mr. Strach's going to give you the report.

12           JUDGE BLACK:  Is that a bad development?

13           MR. FRAM:  No.

14           MR. STRACH:  We're rotating the honor of reporting the

15   time to the Court.

16           JUDGE BLACK:  Very well.

17           MR. FRAM:  Thanks.

18           MR. STRACH:  So we have the plaintiffs yesterday had

19   179 minutes, for a total of 1,126 minutes.  Defendants and

20   intervenors had a total of 140 minutes yesterday, for a total

21   of 961 minutes.

22           JUDGE BLACK:  Very well.

23       That's agreed; is that right?

24           MR. FRAM:  Yes, it is, Your Honor.

25           JUDGE BLACK:  Thank you.
```

1            MR. STRACH:  And, Your Honor?

2            JUDGE BLACK:  Yes.

3            MR. STRACH:  One more minor thing.

4            JUDGE BLACK:  Yes.

5            MR. STRACH:  Yesterday I agreed to chase down the

6    goose and the gander about the impeachment exhibits for Dr.

7    Thornton, and we agreed they can come in as substantive

8    evidence.

9            JUDGE BLACK:  Come in subject to what?

10           MR. STRACH:  As substantive evidence, as we did with

11   the Cho impeachment exhibits.

12           JUDGE BLACK:  Very well.  They're admitted as such, to

13   confirm yesterday.  Thank you for tracking that down.

14       Good morning, Ms. Levenson.

15           MS. LEVENSON:  Thank you, Judge.  Good morning.

16       It's become apparent to us that the defendants' case is

17   getting close to coming to a close, and so it will be time for

18   our rebuttal.  We do have a couple of rebuttal witnesses, and

19   one is a congressperson who is engaged in her duties with

20   committee hearings and votes.  And so we are going to have to

21   make a motion that she be permitted to testify via live video

22   conference.

23       By the same token, due to her really complicated schedule,

24   we want to make sure that we have an idea of the timing so that

25   we can make arrangements for her to go to the federal

1   courthouse and get all hooked up and be available for when it's

2   needed to happen within her schedule.

3      So we've requested a meet-and-confer with the other side

4   during lunch today.  We've asked that they disclose their

5   witnesses to us, the timing of their witnesses to us earlier

6   than our agreement would call for.  We've been operating with a

7   7:00 PM the night before disclosure.  And so we're going to try

8   to, hopefully, work out with the other side a time to make this

9   happen, if Your Honor grants the motion for live video

10   testimony.

11         JUDGE BLACK:  And who is the congressperson?

12         MS. LEVENSON:  Congresswoman Marcy Kaptur.

13         JUDGE BLACK:  Does the defense or the intervenors wish

14   to be heard orally on the motion to permit the congresswoman to

15   testify by video conference pursuant to the similar ruling by

16   the Court as to Congresswoman Fudge?

17         MR. STRACH:  My understanding is that the motion is a

18   to-be-made motion.  It hasn't been made yet.  So we just found

19   out about this.  We were hoping to have the opportunity to

20   think on this before -- before arguing the motion.

21         MS. LEVENSON:  Your Honor, if I didn't make it clear,

22   I am making the motion now orally.

23         JUDGE BLACK:  It's an oral motion.  Do you wish to be

24   heard in opposition?

25         MR. STRACH:  Well, in that case, Your Honor, yes.

1    Just for the record, this is a witness whose name has been

2    disclosed during discovery, throughout discovery.  It's a

3    witness that could have been put on the witness list.  This is

4    a witness that the plaintiffs could have brought to trial or

5    done a video conference as a witness in their case-in-chief.

6    So we don't believe it's a proper rebuttal witness to begin

7    with.

8        And we also believe that video conferencing is not

9    appropriate for many of the same reasons that, number one, she

10   could have been disclosed, she could have been deposed.  A lot

11   of this could have been handled before trial, and so we want to

12   note for the record that we oppose the motion.

13            JUDGE BLACK:  Do the intervenors wish to be heard

14   further?  Good morning, Mr. Lewis.

15            MR. LEWIS:  Good morning, Your Honors.

16            JUDGE BLACK:  You appear to be vertical.

17            MR. LEWIS:  I am.

18            JUDGE BLACK:  Very well.

19            MR. LEWIS:  Thank you.  You know, we join the

20   defendants in opposing the request for the video link on this

21   particular witness.  We are actually checking the trial

22   transcripts now, but we're not -- we may want to be heard

23   further after lunch, once we've had a chance to review

24   everything.  Again, this just got dropped on us about ten

25   minutes ago.  We are also not confident at all that

```
 1   Representative Kaptur would be a suitable rebuttal witness.
 2            JUDGE BLACK:  Very well.  Last word on the oral
 3   motion?
 4            MS. LEVENSON:  Yes, Your Honor.  We had no intention
 5   of calling Congresswoman Kaptur when we began our case, at that
 6   point in time, but it became apparent yesterday during
 7   testimony that there was evidence placed into the record that
 8   she needs to rebut.
 9            JUDGE BLACK:  Very well.  The Court takes the matter
10   under consideration.  We'll act expeditiously.  We're not going
11   to whisper at the bench.  Thank you.
12      I do have a question.  Have the twins been named?
13            MS. LEVENSON:  Oh, yes.  Thank you, Judge.  Ellery and
14   Jenna.  The big one is Ellery and the little one's Jenna.  No,
15   vice versa.  The big one's Jenna.
16            JUDGE BLACK:  That's a wonderful thing.
17            MS. LEVENSON:  Thank you.  Thank you, Judge.
18            JUDGE BLACK:  I was going to suggest Timothea, but,
19   the decision's been made.
20      Have we cleared the decks such that we can proceed to
21   continued direct examination?  Are we ready to go from the
22   plaintiffs' perspective?
23            MS. LEVENSON:  Yes, Your Honor.
24            JUDGE BLACK:  And the defense as well?
25            MR. STRACH:  Yes, Your Honor.
```

```
 1              JUDGE BLACK:  Good morning.

 2              MS. McKNIGHT:  Good morning, Your Honors.

 3              JUDGE BLACK:  The witness remains on the stand.  He's

 4    under oath.  He understands; correct?

 5              THE WITNESS:  I do, Your Honor.

 6              JUDGE BLACK:  You may commence when you're ready.

 7              MS. McKNIGHT:  Thank you, Your Honor.

 8         And before I do, one more point of administration.  There

 9    are two issues that are going to come up during my examination

10    today that I want you to be prepared for.  The first is that I

11    will likely ask that you take judicial notice of several facts,

12    namely, census data and maps and a map showing from the Board

13    of Elections.

14         I will be introducing that evidence or asking for you to

15    take judicial notice under Rule 201.  I just want you to be

16    prepared for that.

17              JUDGE BLACK:  It's good to have the heads-up.

18              MS. McKNIGHT:  The second issue is that, related to

19    new information we learned last week during trial, we have

20    prepared a demonstrative exhibit.  The parties were in an

21    agreement before trial about the exchange of demonstrative

22    exhibits.  That agreement was silent as to any new information

23    or so-called rebuttal demonstratives.  We understand that

24    plaintiffs would like to object, and we want to make sure you

25    note that for the record.  And we believe that the Court can
```

1  resolve this objection better in the context of Dr. Brunell's

2  testimony.  So I will alert you when we're getting to that

3  demonstrative.

4          JUDGE BLACK:  Very well.

5      Before you commence, and while we're talking about

6  administration, the Court is very interested in the progression

7  of the trial and would like an estimate after you've conferred

8  at lunch as to how much more time the defense intends to

9  utilize so that we can plan our calendars.

10     As to rebuttal witnesses, they need to be rebuttal

11 witnesses, and it is the Court's fond hope that we conclude

12 this matter this week.

13     I'm sorry.  Yes, ma'am.

14         MS. THOMAS-LUNDBORG:  Your Honor, I just want to make

15 clear that we do object to the new demonstrative, and I would

16 like time to be heard when counsel is intending to enter it

17 into the record.

18         JUDGE BLACK:  Very well.

19         MS. McKNIGHT:  And one final note on that.  There's

20 always one final note.  We did provide advance notice of not

21 only the demonstrative itself, but the underlying data, the

22 substance of it, to plaintiffs' counsel last evening about

23 8:24, so --

24         JUDGE BLACK:  Very well.

25         MS. McKNIGHT:  Your Honors, I would like to, candidly,

1    bring that issue to a head earlier rather than later, because

2    it is important.  So I'll start with some questions for

3    foundation with Dr. Brunell.

4           JUDGE BLACK:  Very well.

5                      THOMAS BRUNELL

6    a witness herein, having been previously duly sworn, testified

7    further as follows:

8                 DIRECT EXAMINATION (Continued)

9    BY MS. McKNIGHT:

10   Q.  Good morning, Dr. Brunell.

11   A.  Good morning.

12   Q.  For your work in this case did you review Dr. Handley's

13   report?

14   A.  I did.

15          MS. McKNIGHT:  Let's bring up PX 254.

16   Q.  This is Dr. Handley's report.  And I'd like to turn to page

17   38 in her list of academic articles.  So page 38, please.

18       Now, the very first article listed by Dr. Handley, do you

19   recognize it?

20   A.  Yes, I do.

21   Q.  And you were a co-author on that, weren't you?

22   A.  I was.

23          MS. McKNIGHT:  Let's bring up that article, I31.  And

24   I'll pass a copy to the Court for their reference.

25       Permission to approach, Your Honors?

1          JUDGE BLACK:  Yes.  Thank you.

2    Q.  Now, understanding that you were a co-author of this

3    particular article, could you tell the Court what the article

4    was about, in general.

5    A.  Sure.  We were interested in looking at the effects of the

6    Voting Rights Act in race-conscious redistricting, you know,

7    that started primarily in the -- in the 1980s, to see the

8    impact that it has had over time -- right? -- and we did this

9    just prior to the last round of redistricting.  So we gathered

10   all the census data, the racial and ethnic data for both state

11   legislative districts and congressional districts across the

12   country.  And then we matched that up with the race or

13   ethnicity of who was elected to the offices so we could sort of

14   empirically look at, you know, where are African-Americans,

15   what do districts look like that elect African-Americans, what

16   do districts look like that elect Latinos.  And we found that

17   the overwhelming majority of minority-elected representatives

18   come from districts that are majority minority.

19          MS. THOMAS-LUNDBORG:  Your Honor --

20          JUDGE BLACK:  Plaintiffs' counsel is standing.

21          MS. THOMAS-LUNDBORG:  Yes.  I object to this testimony

22   as undisclosed.  Lisa Handley has been a noticed witness since

23   October in this case.  Dr. Brunell did not cite this article as

24   work cited in his report.  He has a one-paragraph analysis of

25   the VRA on page 18 of his report, and he does not discuss any

 1   of the things that he is currently testifying before the Court.

 2           JUDGE BLACK:  And the quick response?

 3           MS. McKNIGHT:  Of course, Your Honor.  You will recall

 4   that this article was brought up by plaintiffs' counsel in the

 5   direct examination of Dr. Handley, in the redirect examination

 6   of Dr. Handley.  And at that point plaintiffs lodged a

 7   relevancy objection to the admission of this exhibit, which is

 8   surprising considering their use of it.  But we believe it's

 9   fair to examine a co-author of this article about the meaning

10   of it.

11           MS. THOMAS-LUNDBORG:  I'm clarifying the record.  This

12   first article was first brought up on cross by intervenors'

13   counsel and then by plaintiffs' counsel on redirect after the

14   cross-examination.

15           MS. McKNIGHT:  Your Honor, the record will be clear on

16   that.

17           JUDGE BLACK:  All right.  We're all going to take a

18   deep breath.

19           MS. McKNIGHT:  Yeah.

20           JUDGE BLACK:  All of us.  And the objection is noted

21   and you may proceed.

22           MS. McKNIGHT:  Thank you very much, Your Honor.

23   Q.  Dr. Brunell, if we were trying to get a sense of political

24   science thinking at the time of map drawing in 2011, is this

25   article a fair representation of that thinking?

1    A.  I think it is, yes.

2    Q.  Let's focus on Dr. Handley's own words in describing this

3    article during direct examination in this trial.

4         MS. McKNIGHT:  Could we put up trial Day Two

5    transcript at page 155.

6         Now, Dr. Brunell, this testimony is already in the record.

7    I don't expect you to read it aloud.  I just ask you to focus

8    on lines nine through 19, and then I'll have some questions for

9    you after you read it.

10   A.  Okay.

11   Q.  Do you understand from this testimony from Dr. Handley that

12   she thinks it is necessary to do a jurisdiction-specific

13   functional analysis where VRA maps are drawn?

14   A.  Yes.

15   Q.  Now, understanding that you've co-authored this article

16   with her, and you've been admitted as an expert in Voting

17   Rights Act, what do you understand her to mean when she says

18   "jurisdiction-specific functional analysis"?

19   A.  This is the idea that not all neighborhoods, not all

20   counties, not all states are the same.  So when you are looking

21   to draw a majority-minority district in a certain area, you

22   want to -- you want to take an intensely local appraisal, I

23   guess the Court said in one of the cases, and examine actual

24   data to see what the appropriate percentage of minority voting

25   age population would be in that district.  Because it does

```
 1   differ.  It depends on the differential rates of turnout
 2   between whites and African-Americans or Latinos, and it also
 3   relies on the percent of support that both the minority
 4   candidates give to each candidate -- right? -- the minority
 5   candidate, the minority-preferred candidate and the other
 6   preferred candidate and also the percent of white voters who
 7   are willing to cross over and vote for the candidate that the
 8   minorities prefer.
 9        So those variables all differ across the country.  And so
10   like Professor Handley says, you know, in some jurisdictions,
11   in order to draw a district that would give the -- that would
12   give the minority voters an equal opportunity to elect a
13   candidate of their choice, you might need 55-, 56-, 57 percent
14   voting age population in that jurisdiction.  And, in other
15   areas, other -- maybe in other areas in the state or maybe in
16   other areas of the country you might need significantly less
17   than that.
18   Q.  And I heard you say that those variables could differ
19   across the country.  Could those variables also differ across a
20   state?
21   A.  Absolutely.
22   Q.  And could those variables differ between counties within a
23   state?
24   A.  Sure.
25   Q.  All right.  Let's focus on Dr. Handley's report.
```

1          MS. McKNIGHT:  Could we pull up PX 254, please.

2    Q.  I'm going to identify for you two lines in Dr. Handley's

3    report, and then I'll ask you a question.

4          The first line I'd like to ask you about is the very first

5    line in her report, when it reads, "My analysis of

6    participation rates and voting patterns in the 11th

7    Congressional District of Ohio."  Do you see that?

8    A.  Yes.

9    Q.  Okay.  And now turning to page four, and the very first

10   line, "When the results of statewide elections within the

11   boundaries of the 11th Congressional District are examined."

12   Do you see that?

13   A.  I do.

14   Q.  Dr. Brunell, what did you understand these statements to

15   mean about where Dr. Handley's jurisdiction-specific functional

16   analysis was conducted?

17   A.  She looked at the 11th Congressional District,

18   specifically.

19   Q.  Okay.  Did you understand from these statements in Dr.

20   Handley's reports that she conducted a jurisdiction-specific

21   functional analysis outside of the 11th Congressional District?

22   A.  That -- I don't believe she did that, no.

23   Q.  Now piecing this together, let's turn to Plaintiffs'

24   Demonstrative 20.

25          MS. McKNIGHT:  And, Your Honors, I have a paper copy.

1     May I approach?

2          JUDGE BLACK:  Yes.

3  Q.  Dr. Brunell, do you have Plaintiffs' Demonstrative 20 in

4  front of you?

5  A.  I do.

6  Q.  Now, I'd like to focus you on the light blue portion of

7  this map.  Is it your understanding that that light blue

8  portion illustrates Congressional District 11?

9  A.  Yes.

10 Q.  And is it your understanding that it is that geography on

11 which Dr. Handley conducted her jurisdiction-specific

12 functional analysis?

13 A.  Yes.

14          MS. THOMAS-LUNDBORG:  Objection, Your Honor.

15          JUDGE BLACK:  Noted.

16 Q.  Okay.  Now, let's get to an understanding of where Dr. Cho

17 drew her Voting Rights Act maps.  Let's start with her own

18 words.

19          MS. McKNIGHT:  Could we turn to Plaintiffs' Exhibit

20 87, at page eight.

21 Q.  Dr. Brunell, I'd like to draw your attention to the section

22 "Minority Districts," and I'd like to focus your attention on

23 the second sentence where it reads, "Consistent with the

24 recommendation from Dr. Lisa Handley that a 45% BVAP is

25 sufficient to satisfy the Voting Rights Act in the vicinity of

1    District 11 in the challenged plan."  Do you see that?

2    A.  I do.

3    Q.  So going back in time, if we can, Dr. Brunell, to the first

4    time you read Dr. Cho's report, without knowing what her maps

5    looked like; is that right?

6    A.  Yes.

7    Q.  Did you have to rely on her words that her maps were drawn

8    in the vicinity of District 11?

9    A.  Yes.  Of course.

10   Q.  Now, Dr. Cho testified about how she defined "vicinity of

11   District 11."  Let's bring up the trial transcript from last

12   Friday.  This is trial transcript Day Five at page 72.

13       I'd ask you to read these lines to yourself, Dr. Brunell.

14   A.  Okay.

15   Q.  Testimony's already in the record.  I'd ask you to read

16   lines nine through 25, please.

17   A.  Okay.  I've finished.

18   Q.  Now, do you understand this testimony to mean that Dr. Cho

19   actually defined "vicinity of District 11" to mean Cuyahoga

20   County?

21   A.  That's what it sounds like.  She says that, "all you have

22   to do is check to see what county it is in."

23   Q.  And do you read this to mean that all 3 million of Dr.

24   Cho's simulated maps are drawn within the confines of Cuyahoga

25   County?

1   A.   That -- that would be the conclusion that I would draw,

2   yes.

3   Q.   And was this information from Dr. Cho, provided last

4   Friday, this definition, was that included in her report or was

5   it new, based on her trial testimony?

6   A.   I think it was new information.

7   Q.   Now, one more point from Dr. Cho's testimony on Friday.

8           MS. McKNIGHT:   Let's put up page 82.   And we'll look

9   at lines three through ten.

10  Q.   Dr. Brunell, would you let me know when you're done reading

11  that testimony.

12  A.   I'm done.

13  Q.   Okay.   Did you know, before Dr. Cho testified at trial,

14  that no district-specific functional analysis had been

15  conducted where Dr. Cho's maps had been drawn?

16  A.   No, I did not.

17  Q.   And did you know, before Dr. Cho testified on Friday, that

18  the location of her maps was not known to Dr. Handley when Dr.

19  Handley conducted her analysis for this case?

20  A.   No.

21          MS. McKNIGHT:   Let's put up Plaintiffs' Demonstrative

22  20 again.

23  Q.   I understood from your earlier testimony that Dr. Handley

24  conducted her jurisdiction-specific functional analysis on the

25  blue shaded area on this map.

1    A.   That's my understanding.

2    Q.   Now, can you describe where Cuyahoga County is in relation

3    to CD11 in this map?

4    A.   Yeah.   It's the -- the northern part of the district is in

5    Cuyahoga County, and then there's parts of the county around

6    the northern part of the district that are in Cuyahoga County,

7    but not in the district.

8    Q.   Now, we've had testimony in this case about the border of

9    Cuyahoga County.   For reference, I will ask my colleague to

10   draw a line around Cuyahoga County, and ask you if that -- if

11   that squares with your understanding of the lines.

12   A.   Yeah, that -- that looks right.

13   Q.   Now, understanding Dr. Handley's admonishment to conduct a

14   jurisdiction-specific functional analysis, and your testimony

15   that she conducted her jurisdiction-specific functional

16   analysis on CD11, the blue portion of the map, what is the

17   problem with Dr. Cho drawing all of her districts within the

18   confines of Cuyahoga County, using Dr. Handley's figures from

19   Congressional District 11?

20        JUDGE BLACK:   Excuse me.   Plaintiffs' counsel?

21        MS. THOMAS-LUNDBORG:   Yes, Your Honor.   Objection to

22   misstating the testimony of Dr. Handley.   We've been checking

23   it in real time.   I can do it on cross-examination to clarify

24   the point.   And also objection to the notion that any of this

25   evidence was unknown.   The tests that Dr. Handley ran would

1    include the surrounding areas, as Dr. Brunell is well aware.

2          THE COURT:  Objection's noted.  The witness can answer

3    the question, if you remember it.

4    A.  Yeah, I think my memory needs to be refreshed.

5    Q.  I'm happy to ask it again.

6        Now, understanding Dr. Handley's admonishment to conduct a

7    jurisdiction-specific functional analysis and your testimony

8    that she conducted her jurisdiction-specific functional

9    analysis on CD11, what is the problem with Dr. Cho drawing all

10   of her districts within the confines of Cuyahoga County, using

11   Dr. Handley's figure from CD11?

12   A.  Well, the -- the recommendation that Dr. Handley's able to

13   make with her report is district specific.  And so, therefore,

14   the -- if, then, Dr. Cho is going to use those numbers --

15   right? -- then she has to use the same district, because if the

16   district changes, then we have to do a different functional

17   analysis for the new district.  And so the -- the fact that it

18   appears -- again, we don't know for sure.  We haven't seen --

19   nobody's seen any of these maps.  This is why it would have

20   been useful to have maps in the first place, so we could kind

21   of see what -- what did this algorithm do.  So what did the VAR

22   look like in Dr. Cho's 3 million iterations?  We don't know.

23       It sounds like they were confined to Cuyahoga County, which

24   means parts of the district would be part of what Lisa Handley

25   looked at, but we would need a new functional analysis for the

1    areas that Dr. Cho looked at -- right? -- which includes part

2    of CD11, but it specifically does not include, you know, the

3    other half of the district.  Right?  And I think that the

4    population outside of Cuyahoga County is actually a majority of

5    CD11, lives outside of Cuyahoga County.

6        And so it's -- it's inappropriate because, again, the

7    number, the magic number that the functional analysis provides

8    could be different from District 11.  Right?  It could be

9    lower.  It could be higher.  It might be the same -- right? --

10   but we don't know.

11   Q.  Now, could Dr. Handley have conducted her

12   jurisdiction-specific functional analysis on Cuyahoga County?

13   A.  You can do it anywhere, sure.

14   Q.  Well, but she didn't in this case; is that right?

15   A.  That's correct.

16           MS. THOMAS-LUNDBORG:  Objection.  Misstates Dr.

17   Handley's analysis.

18           JUDGE BLACK:  Very well.

19           MS. McKNIGHT:  Your Honor, I'd be happy to have a

20   standing objection that eliciting his opinion about matters

21   somehow misstates testimony or analyses.

22           JUDGE BLACK:  Are you comfortable with that

23   stipulation and standing order objection?

24           MS. THOMAS-LUNDBORG:  Yes, Your Honor.

25           JUDGE BLACK:  Very well.  Thank you.

1   Q.  Now, in a minute I would like to zoom in on Cuyahoga County

2   and ask you some questions about that.  But could we take a

3   step back for a moment and discuss why this matters for

4   minority representation.  What is the risk of drawing a

5   formerly majority-minority district at a minority level of

6   BVAP?

7   A.  You're not talking about this district specifically?  Just

8   sort of generally?

9   Q.  In general.

10  A.  Right.  The risk is that it -- it's possible that -- and,

11  again, it all depends on -- on the -- the behavior of voters in

12  that area, but it's possible, as you reduce the percent of

13  minority voters in a district -- right? -- the odds of the

14  minority-preferred candidate losing, particularly at the

15  primary election, starts to increase.  Right?  So at some point

16  you're going to have more white Democrats in the district than

17  African-American Democrats.  And it could be the case then at

18  some point -- right? -- the white Democrats are going to carry

19  the election.  And so then that would mean, you know, even in

20  the general, you still might elect a Democrat -- right? -- but

21  that's not the preferred candidate of the minority voters.

22         MS. THOMAS-LUNDBORG:  Objection, Your Honor.

23  Plaintiffs disclosed in October that they were using a 45

24  percent BVAP, and this particular opinion was not disclosed as

25  part of Dr. Brunell's report.

1          JUDGE BLACK:  Very well.  The objection is noted.

2    Q.  And based on your experience and your expertise, as between

3    a white Democrat and a black Democrat, does the political

4    science community have a conclusion about which one of those

5    candidates are preferred by African-American communities?

6          MS. THOMAS-LUNDBORG:  The same objection.  And I'm

7    willing to have a standing objection for the evidence that it

8    seems counsel wants to disclose was not disclosed in his expert

9    report.

10          JUDGE BLACK:  Very well.  The Court notes the standing

11   objection.

12   A.  I -- can you repeat the question.  I'm sorry.

13   Q.  Absolutely.

14       Based on your experience and expertise, does the political

15   science community have a conclusion about which candidate,

16   between a white Democrat and a black Democrat, would be

17   preferred by an African-American community?

18   A.  Well, there's -- we can look at it empirically.  Right?  We

19   have ways to estimate these things.  And so it's not an opinion

20   -- right? -- but we can look at the data to see which candidate

21   is preferred and in a general.  Right?

22       When you have an African-American running against a

23   white -- well, there tends to be polarized voting, and so

24   typically the minority candidates prefer the minority

25   candidate -- I mean, the minority voters.

1    But, again, that differs from place to place and we have

2    data.  Right?  So we can look.  Right?  We can see what the

3    minority-preferred candidate is.

4    Q.  And based on Dr. Handley's analysis in this case, and

5    understanding this new information we had on Friday that all

6    Dr. Cho's maps were drawn within Cuyahoga County, can we be

7    sure that the African-American community in Cuyahoga County

8    will have an opportunity to elect its candidate of choice in a

9    district drawn at 45 percent BVAP?

10   A.  We don't.

11         MS. McKNIGHT:  Let's zoom in on Cuyahoga County.

12   Your Honors, I've reached my first point of judicial

13   notice.  I'd ask that the Court take judicial notice under Rule

14   201 of a map of Cuyahoga County's municipalities and wards.  I

15   can share that map with you now so you can see it.

16         JUDGE BLACK:  Very well.

17         MS. McKNIGHT:  And could we put it up on the screen,

18   please.

19   And this is the Cuyahoga County map of municipalities and

20   Cleveland wards published by the Board of Elections.

21   May I approach, Your Honor?

22         JUDGE BLACK:  Yes.  Thank you.

23         JUDGE WATSON:  Ms. McKnight, what are we calling this?

24         MS. McKNIGHT:  We call -- well, let me ask Your

25   Honors.  I would like to submit this as an exhibit, so could I

```
 1   identify it by the next exhibit number?  And we'll allow
 2   plaintiffs an opportunity to object, if they deem it necessary.
 3            JUDGE BLACK:  Yes.  What exhibit number do you
 4   propose?
 5            MS. McKNIGHT:  I would propose I132.
 6            JUDGE BLACK:  Very well.  Is there an objection from
 7   the plaintiffs as to the Court taking judicial notice of the
 8   lines of Cuyahoga County?
 9            MS. THOMAS-LUNDBORG:  No objection to taking judicial
10   notice.  There is an objection to what I think they are laying
11   the foundation for the demonstrative that I was shown last
12   night.
13            JUDGE BLACK:  Very well.  The Court exercises its
14   power of judicial notice and applies it to this map.
15            MS. McKNIGHT:  Thank you, Your Honor.
16   Q.  Now, Dr. Brunell, when you learned from Dr. Cho's trial
17   testimony that she represents that all of her districts were
18   drawn within Cuyahoga County, did you have any concerns about
19   drawing a 45 percent BVAP district or 3 million variations of
20   one within this county?
21   A.  Yes.
22   Q.  What were those concerns?
23   A.  Again, we don't know -- right? -- the whole point of the
24   Handley functional analysis is, then, to feed that in to what
25   Dr. Cho did.  And so since those things are mismatched --
```

1  right? -- we don't have the number -- right?  Like I said, the

2  number in Cuyahoga County could coincidentally be 45 percent.

3  It might -- we might need a higher black voting age percentage.

4  We might need a lower one.  We don't know.  Right?  That's the

5  problem is that we don't know.

6  Q.  And understanding your testimony earlier, could the BVAP

7  necessary for a VRA district drawn in the western half of

8  Cleveland be different than the BVAP necessary for a district

9  to be drawn in the eastern half of Cleveland?

10  A.  It could.

11  Q.  Now, between the time of Dr. Cho's testimony last Friday

12  and today, have you had time to conduct a complete analysis

13  under the Voting Rights Act to determine whether the

14  African-American community in Cuyahoga County would have an

15  opportunity to elect its candidate of choice?

16  A.  No.

17  Q.  Okay.  So we are clear that that is not what you have done,

18  what have you looked at since Friday?

19  A.  I looked at some election results from the -- from the 2016

20  presidential election for this, for Cuyahoga County.

21       MS. McKNIGHT:  Your Honors, for the record, political

22  data related to the 2016 presidential election is included in

23  Joint Exhibit J19.

24  Q.  Dr. Brunell, what did you find upon your review of

25  political data in Cuyahoga County?

1    A.   The -- obviously, the support for the two candidates for --

2    President Trump and Hillary Clinton differ widely across the

3    county.

4    Q.   Were there any municipalities or wards that voted for

5    Candidate Trump by 40 percent or more?

6    A.   Yes, there was quite a few.

7    Q.   And were some of those municipalities or wards showing

8    voting strength for Trump by 50 percent or more?

9    A.   Yes.

10   Q.   And were some of those municipalities and wards in Cuyahoga

11   County voting for Candidate Trump by 60 percent or more?

12   A.   There were.

13   Q.   Now, Dr. Brunell, is it safe to say that Candidate Trump

14   was not considered to be the preferred candidate of choice for

15   the African-American community?

16            JUDGE BLACK:  I'm sorry.  Objection?

17            MS. THOMAS-LUNDBORG:  Objection to the foundation of

18   whether President Trump was the preferred candidate of the

19   African-American community.

20            JUDGE BLACK:  Very well.  Noted.

21   A.   I haven't looked at the data.  Like I said, we could look

22   at the data, but, you know, from the polling numbers and from

23   the postmortems on the elections, I don't -- President Trump

24   didn't do particularly well with African-American voters.

25   Q.   Dr. Brunell, why does it matter that there was notable

1   Trump support in Cuyahoga County?

2   A.  Well, if you -- you know, some of those areas which were

3   not in CD11 then might be included in the VRA districts drawn

4   by Professor Cho's algorithm, and, therefore, that would lead

5   us to believe that the 45 number might very well be wrong.

6   Q.  As in too low?

7   A.  It could -- yes.  It could be too low, absolutely.  If the

8   white vote -- if there's more white voters in the areas in

9   Cuyahoga County that were not in Congressional District 11,

10  relative to the areas that were in Congressional District 11

11  that were not in Cuyahoga County -- right? -- that's the

12  difference -- the two different parts of what Handley did and

13  what Cho did -- right? -- then, the 45 -- if the -- if there is

14  less white crossover voting in Cuyahoga County -- right? --

15  that was not in CD11, then the 45 percent number is going to be

16  too low.

17          MS. McKNIGHT:  Your Honors, we are at a point where we

18  need to address the demonstrative issue I identified earlier.

19  I'll tell you what we plan to do with the demonstrative, and

20  then I would like to allow plaintiffs' counsel a chance to be

21  heard.

22      As you heard Dr. Brunell testify, we learned on Friday that

23  when Dr. Cho said "I drew maps in the vicinity of Congressional

24  District 11," what she, in fact, meant was that she drew

25  districts within the confines of Cuyahoga County.  Based on

1    that new information, Dr. Brunell had concerns, as he's just

2    described them.  He reviewed political data in Cuyahoga County

3    to better understand whether those concerns were sound.

4        He has just testified about the results of that review.  I

5    would like to put a map on the screen --

6        I can prepare you paper copies.  It is identical to what we

7    gave plaintiffs last night.

8        -- that shows the results of Dr. Brunell's review of

9    political data.

10               JUDGE BLACK:  And this is a demonstrative exhibit?

11               MS. McKNIGHT:  That's right, Your Honor.  We do not

12   intend to submit this as an exhibit in this case.

13               JUDGE BLACK:  Very well.

14       Plaintiff wish to be heard on its objections?

15               MS. THOMAS-LUNDBORG:  Yes, Your Honor.

16       We continue our objection that this is new information and

17   it is, in fact, rebuttal.  I think I've stated that several

18   times, related to the testimony that underlies one of our

19   objections to the demonstrative exhibit.

20       The second objection is that it's untimely.  Dr. Brunell

21   was set to testify yesterday.  Between today and yesterday,

22   counsel was not to talk to Dr. Brunell about his testimony so

23   this was, at a minimum, information that they knew on Sunday

24   night and did not disclose the demonstrative exhibit then.

25               JUDGE BLACK:  Very well.  The objection's of record.

THOMAS BRUNELL - DIRECT

 1  You may proceed.

 2          MS. McKNIGHT:  Thank you, Your Honor.  May I approach?

 3          JUDGE BLACK:  Yes.

 4      Is there some reason you won't hand it directly to me?

 5          MS. McKNIGHT:  No comment, Your Honor.

 6          JUDGE BLACK:  Very well.  Privileged.

 7  Q.  Dr. Brunell, have you had an opportunity to review this

 8  demonstrative exhibit?

 9  A.  Yes.

10  Q.  Does it accurately reflect your review of the political

11  data in Cuyahoga County?

12  A.  I believe it does.

13  Q.  And could you explain to the Court the color coding --

14  A.  Sure.

15  Q.  -- in the map?

16  A.  Sure.  So there's three different colors.  Well, the white

17  area are areas that we're not looking at, but the three colors

18  indicate an increasing support for President Trump in the 2016

19  election.  So the pink areas, like Fairview Park and Rocky

20  River, Trump won about between 40 and 50 percent of the vote in

21  those jurisdictions.

22      And then in the redder areas it was between, like, Parma

23  and Brook -- Brecksville and Broadview Heights, the support for

24  President Trump in those jurisdictions was between 50 and 60.

25  And then the darkest red areas, like Valley View, Cuyahoga

1  Heights and Independence, in particular, support there was more

2  than 60 percent for President Trump against Hillary Clinton.

3  Q.  Well, and I notice that some of the ward numbers are

4  partially colored with 40 percent.  Can you explain why that

5  is?

6  A.  I think those -- those wards were -- also were over 40

7  percent.

8  Q.  So there were parts of those wards that were over 40

9  percent?

10  A.  Right.

11  Q.  So considering what we've discussed this morning, what

12  conclusions did you draw based on this review of political data

13  in Cuyahoga County?

14  A.  Well, again, you know, when you kind of compare what CD11

15  looks like compared to this map, the most recent map that we're

16  looking at, you know, the -- you know, the darkest red areas

17  are left out of that particular district -- right? -- and they

18  might be included in Dr. Cho's districts.  So those -- these

19  were -- you know, we could maybe call these parts of the county

20  the Trump country -- right? -- for lack of a better term.  He

21  enjoys very high support in these areas.  And so if those

22  districts -- if those -- if that -- those parts of the county

23  are then included in the algorithmic maps made by Dr. Cho,

24  then, you know, this really calls into question whether 45

25  percent black voting age percentage may be enough.

1  Q.  Now, looking at the demonstrative -- and I have kept

2  intervenors' I132 on the screen in case there are legibility

3  issues with the demonstrative.

4      Looking at the demonstrative, can you know whether Dr.

5  Cho's maps included Parma but excluded Shaker Heights?

6  A.  No, I have no idea.

7  Q.  Can you know whether Dr. Cho's maps included so-called

8  Trump country but excluded Cleveland Heights or University

9  Heights?

10  A.  I have no idea.

11  Q.  Now, one more point on this demonstrative, Dr. Brunell.

12  Could I draw your attention to the district shaded for having

13  over 60 percent support for Trump on the eastern side, namely,

14  Cuyahoga Heights, Valley View, Independence and Walton Hills.

15  Do you see those municipalities?

16  A.  Where's Walton Hills?

17  Q.  It looks like it's the furthest east of the dark red

18  portion in the eastern side of the district -- of the county.

19  A.  I mean, I see the red areas.  I don't -- I can't locate

20  Walton Hills.

21  Q.  Dr. Brunell -- and, pardon me -- I've neglected to mention

22  we have I132 on the screen for you --

23  A.  Right.

24  Q.  -- if it's difficult to read the names of the

25  municipalities.

```
 1   A.  Okay.  Now that it's circled in red, I can locate it
 2   easily.
 3   Q.  Now, understanding that borderline of Trump support on the
 4   eastern side of Cuyahoga County --
 5            MS. McKNIGHT:  Let's bring up Plaintiffs'
 6   Demonstrative 20 again.
 7   Q.  That eastern border of Trump support we just described,
 8   where does it lie in PD20?  Is it within CD11 or outside of
 9   CD11?
10   A.  It's outside.
11   Q.  Dr. Brunell, the fullness of the record can be considered
12   in determining whether the map drawers had an interest in
13   protecting Congresswoman Fudge.  I don't expect you to know the
14   fullness of the record.
15       For now, in your expert opinion, is it possible that this
16   territory was excluded from Congresswoman Fudge's district in
17   order to protect her, as opposed to being included elsewhere
18   for improper partisan advantage?
19   A.  It's possible.
20   Q.  You can set this demonstrative to the side.  Thank you.
21       Dr. Brunell, were you hired in this case in order to
22   determine the appropriate way to address Voting Rights Act
23   districts in simulations like Dr. Cho's?
24   A.  No.
25   Q.  Does Dr. Handley's analysis tell you what you need to know
```

1   in order to draw a VRA district below 50 percent within

2   Cuyahoga County?

3   A.   No, it doesn't.

4   Q.   Simply put, can we rely on Dr. Handley's 45 percent BVAP

5   figure, based on CD11, to draw districts within Cuyahoga

6   County?

7   A.   I don't think so.

8   Q.   Dr. Brunell, last week Dr. Handley expressed some confusion

9   when I used the term "packing" in relation to Voting Rights Act

10  districts.   Do you know what "packing" means when used in the

11  context of Voting Rights Act districts?

12  A.   Yes.

13        MS. McKNIGHT:   Your Honors, I am at another point

14  where I would ask you to take judicial notice of census data.

15  This is census data for the 11th Congressional District at the

16  time it was drawn.   This is in the form of a P10 file from the

17  census, which is titled "Race for the Population 18 Years and

18  Over," and it is available publicly through the Census Bureau's

19  Web site.   I would like to submit it into evidence as I133 and

20  I can offer it to you now.

21        JUDGE BLACK:   Is there any objection to the Court

22  taking judicial notice of the census data?

23        MS. THOMAS-LUNDBORG:   I haven't seen the census data

24  that the Court is taking judicial notice of, but I have no

25  standing objection to census data.

1          JUDGE BLACK:  Very well.

2          MS. McKNIGHT:  May I approach, Your Honors?

3          JUDGE BLACK:  Yes.  Thank you.

4   Q.  Dr. Brunell, what does this document show?

5   A.  This is a printout from the American FactFinder, which is

6   kind of the easiest way for someone to access census data from

7   the bureau.  And so this is the -- the breakdown of the voting

8   age population of Ohio's 11th Congressional District using data

9   from the 2010 Census.

10  Q.  So can you use this data to calculate the black voting age

11  population in CD11 at the time the map was drawn?

12  A.  Yes.

13  Q.  And have you done that?

14  A.  I did.

15  Q.  And what was the black voting age population in CD11 at the

16  time the map was drawn?

17  A.  If you divide 281,774, which is the black or

18  African-American population, by the total population, 549,177,

19  you get approximately 51.3 percent.

20  Q.  And based on your experience and your expertise, by any

21  measure of political science, is 51.3 percent BVAP considered

22  to be packing in a traditional majority-minority district?

23  A.  No.  And 50's the magic number.  Right?  So you want to

24  have over 50 percent.  So that's just slightly over 50 percent.

25  So I wouldn't consider that packed.

1          MS. McKNIGHT:  Your Honors, I am about to move on to

2     another section of Dr. Brunell's report.  I want to offer that

3     for you, if you are considering a break, but also I have some

4     administrative exhibit items to clean up.

5          JUDGE BLACK:  Not ready for a break yet.

6          MS. McKNIGHT:  Okay.  So I'll keep going, but -- with

7     respect, Your Honor.

8       Right now intervenors would like to move for the admission

9     of the following exhibits, to the extent we have not already

10    done so based on Dr. Brunell's testimony yesterday and today.

11    First, we'd like to move for the admission of I60.  This is his

12    report that was discussed yesterday.

13          JUDGE BLACK:  Any objection?

14          MS. THOMAS-LUNDBORG:  We have a standing objection to

15    the reliability of the methodology both in his report and the

16    *sua sponte* analysis we've gotten here on the stand.

17          JUDGE BLACK:  Subject to those continuing objections

18    and the *Daubert* motion, the Court conditionally admits I60.

19       (Intervenors' Exhibit 60 was conditionally admitted.)

20          MS. McKNIGHT:  We would like to move for the admission

21    of I31.  This is his joint article published with Dr. Handley.

22          JUDGE BLACK:  Any objections?

23          MS. THOMAS-LUNDBORG:  No objection.

24          JUDGE BLACK:  It's admitted.

25       (Intervenors' Exhibit 31 was admitted.)

1          MS. McKNIGHT:  We would look to move for the admission

2    of I132.  This is the map of Cuyahoga County municipalities and

3    wards you took judicial notice of this morning.

4          JUDGE BLACK:  Any objection?

5          MS. THOMAS-LUNDBORG:  Yes, Your Honor, as untimely and

6    undisclosed.

7          JUDGE BLACK:  Conditionally admitted.

8      (Intervenors' Exhibit 132 was conditionally admitted.)

9          MS. McKNIGHT:  We would like to move for the admission

10   of I136.  This is the census data form P10 for CD11 as drawn

11   that you took judicial notice of this morning.

12         JUDGE BLACK:  Any objection?

13         MS. THOMAS-LUNDBORG:  Sorry.  I don't have the

14   numbers.  Are we talking about the Census Bureau exhibit or the

15   color-coded map?

16         MS. McKNIGHT:  Yes, counsel, we are talking about the

17   census data.

18         MS. THOMAS-LUNDBORG:  No objection.

19         JUDGE BLACK:  I'm sorry?

20         MS. THOMAS-LUNDBORG:  No objection to the Census

21   Bureau.

22         JUDGE BLACK:  And what exhibit is that, "I" what?

23         MS. McKNIGHT:  That is I133.

24         JUDGE BLACK:  It's admitted.  And for purposes of the

25   record, the Court takes judicial notice of it.

```
 1          (Intervenors' Exhibit 133 was admitted.)

 2              MS. McKNIGHT:  Thank you, Your Honor.

 3      I would like to put up Intervenors' Exhibit 60.

 4              JUDGE BLACK:  Very well.

 5              MS. McKNIGHT:  And we will go to page 12.

 6  Q.  Dr. Brunell, in your work in this case, did you review

 7  expert reports by Dr. Christopher Warshaw?

 8  A.  I did.

 9  Q.  And did you provide an opinion about those reports in your

10  own report?

11  A.  Yes.

12  Q.  I'd like to walk through your opinion, starting with

13  Instability of Estimates of Efficiency Gap.  Could you explain

14  to the Court, in your own words, what that is and what your

15  critique of it is.

16  A.  Sure.  Whenever we're doing, as political scientists, these

17  types of analyses, we're faced with all sorts of decisions, as

18  an analyst, about how to -- what kind of data we should use,

19  what's appropriate, what's -- what's more appropriate --

20  right? -- it's usually not appropriate or inappropriate.

21          So my criticism here is, I think at first blush you would

22  think it makes a lot of sense to use congressional elections

23  themselves since that's what we're talking about, but there are

24  problems when you're using data from congressional elections.

25  The most obvious one is that we have uncontested elections --
```

1    right? -- and so if we have need to have data broken down with

2    the vote share between the two candidates feeding into what

3    ends up being our metric, when we are faced with uncontested

4    elections, the analyst has a real problem -- right? -- and we

5    have to deal with that somehow.

6        Typically we will -- we might impute a value.  Right?  So

7    you just say, Well, if there were an opponent -- right? -- in

8    this case, then they wouldn't get zero percent of the vote.

9    But at the same time, the fact that there is an opponent also

10   indicates a lot of strength by the incumbent.  Right?  So we

11   have to kind of try to figure out what we put in there.

12       And, traditionally, we've just imputed 75 percent of the

13   vote to the winner and then 25 percent of the vote to the other

14   party that didn't have a candidate.  Right?

15       There are other different ways.  I know that Professor

16   Warshaw used a method, kind of a statistical regression model,

17   to predict what the vote would be, a little bit more

18   sophisticated than just sort of a direct imputation.  But,

19   still, these are -- these are -- these aren't real data.

20   Right?  I was trying to think of an appropriate way to say it.

21   And so I think understanding that part of the input to these

22   methods include guesses -- right? -- not actual election data.

23       The other major problem with using congressional elections

24   is that there's great variation, both between districts, but

25   also within districts over time, in terms of the quality of the

1    candidates.  Right?  Sometimes you -- an incumbent will attract

2    a very good candidate opponent, and then sometimes they will

3    scare everybody off, and there might be kind of a sacrificial

4    lamb candidate that runs.

5        Well, depending on the quality of that candidate, that's

6    going to affect the election outcome in that particular

7    district.  Right?  And so -- and those are idiosyncratic for

8    all of the individual districts, and then, again, like I said,

9    within a single district across time.  Right?  So things like

10   campaign finance, how much money candidates are able to raise,

11   you know, the quality of the campaign itself, how good the

12   candidates are.  Right?  All these factors are going to affect

13   the vote outcome.  Right?  And then that gets fed into -- so

14   these -- these factors all change over time and across the

15   districts, and then that affects your estimates.  Right?

16       And so that's why I recommend -- you know, I said it would

17   be better to use statewide elections, because we don't have

18   these same problems.  Right?  If we use a presidential

19   election, broken down by congressional district, which those

20   data are easily available, readily available, we don't have any

21   uncontested elections -- right? -- because presidents run in

22   every state -- right? -- and, of course, in every congressional

23   district, so we don't have the problem in uncontested

24   elections.

25       And then we also flatten out all these variables that I

1   talked about before.  Right?  We have the same two candidates

2   running across all of the districts, and, so, therefore, there

3   are no -- none of this variance is worked out.

4       So in my opinion, using statewide elections is far better

5   than using congressional elections, even though, you know, kind

6   of at first blush that seems to not make sense, you'd want to

7   use the congressional elections.  But there's so much

8   variability and there are uncontested elections that I think

9   statewide elections are preferred.

10  Q.  Turning to page 13 of your report, I see you identified an

11  issue with the efficiency gap as a new measure for an old

12  measure.  Can you explain that a little bit?

13  A.  Sure.  So the efficiency gap, you know, has -- was created

14  relatively recently.  Right?  This is in the last, you know,

15  five or six years or so by -- mainly by Eric McGhee, but he

16  also has a co-author on some of his articles.  I was going to

17  try to say his name, but I can't remember.  It's a long Greek

18  name.  I was going to say Stephanopoulos, but I don't think

19  that's it.

20      Anyhow, it's another measure of symmetry -- right? -- which

21  that's the main analytic technique that social -- particularly

22  political scientists rely on to describe whether or not a

23  particular map is fair.  And so this is just another -- another

24  sort of iteration of tapping into this notion of symmetry.

25  Right?  So it's a new measure of an old concept.

1  Q.  Now, turning to page 14 of your report, there's a section

2  titled "Inconsistent Definition of Wasted Votes."  Could you

3  tell the Court why this matters?

4  A.  Sure.  So the efficiency gap measures the relative ratio.

5  Right?  How many -- how many votes both parties waste.  Right?

6  And so that -- that kind of taps into this notion of whether

7  the map is fair or not.  Right?  Because if you are trying to

8  make a map -- if you waste more votes than the other party,

9  then that party's at a disadvantage.

10      And so -- but it's kind of strange, and I know that, you

11  know, this critique was brought -- I feel like the dissenting

12  opinion in the -- in the *Whitford v. Gill* case, I think the

13  judge in that case, in particular, kind of honed in on this

14  that it doesn't even -- you know, the efficiency gap doesn't

15  really measure wasted votes.  Right?  It says that it purports

16  to, but, for some reason, for the winning voter -- all right.

17  So let me step back really quick.

18      So all votes for the losing candidate are, quote/unquote,

19  wasted -- right? -- because their votes didn't have any impact

20  on who won.  Right?

21      But also there can be votes wasted for the winning

22  candidate as well.  And in -- in reality -- right? -- the

23  numbering of winning votes are however many votes the winning

24  candidate has that exceed that of the losing candidate.  Right?

25      So the way the efficiency gap works is it, instead of

1   comparing the winning vote margin to the losing vote margin, it

2   takes all of the winning votes over 50 percent plus one.

3   Right?  So it actually kind of undercounts the number of wasted

4   votes in a -- in an election.  Right?

5       So if somebody won an election a hundred thousand votes to

6   one vote -- right? -- the winning candidate really only needed

7   two votes to win.  Right?  So there would be 999,999 wasted

8   votes for the winning candidate.  But the way they calculated

9   it is that there was basically 50,000 wasted votes.  Right?

10  Half.  Fifty percent plus one.

11  Q.  So does this mean that estimates would change with a

12  different definition of wasted votes?

13  A.  It would.

14  Q.  Now, the next section, you address Illogical Equivalence in

15  Efficiency Gap.  What do you mean by that and why does it

16  matter.

17  A.  Well, the efficiency gap isn't a standard.  Right?  The

18  efficiency gap, like all these things, are metrics.  And so the

19  problem then becomes, for the Court, is how do we translate --

20  how do we take a metric and make a standard out of it.  Right?

21  And there's no -- there's no obvious way to do this.  Right?

22  It's difficult to do.

23      And so that's kind of the -- you know, whatever gets picked

24  -- right? -- is going to be at least partially arbitrary.

25  Right?

```
 1        I know that in the -- the plaintiffs in the Wisconsin case
 2   tried to develop an empirical justification for their -- they
 3   drew a bright line at seven -- right? -- an efficiency gap of
 4   seven.  Anything over that would be -- would be
 5   unconstitutional.
 6        I think we have an objection.
 7             JUDGE BLACK:  Yes.  Thank you.
 8             MS. THOMAS-LUNDBORG:  Objection to the relevance of
 9   what plaintiffs in other cases have proposed.
10             JUDGE BLACK:  Very well.
11   A.  So -- so that's kind of -- that's kind of part of the
12   problem.  Right?  And then another, you know, kind of -- when
13   you're looking at the data, the efficiency gap bounces around
14   quite a bit.  Right?  So it -- in Warshaw's estimates, in 2012,
15   the efficiency gap in Ohio was 22.4 percent.  But then in 2014
16   and 2016, they were nine percent and negative eight percent
17   respectively -- negative nine percent, if I didn't -- if I
18   didn't say negative.
19        And the latter two estimates fall into what Warshaw calls a
20   small efficiency gap range of under ten percent.  So it -- it's
21   going to bounce around a lot.  And that makes it harder to --
22   you know, if you're -- if you're constantly -- you would -- one
23   would feel that --
24        I think one would feel better about a metric if you kept
25   getting the same -- roughly the same answer.  Right?  And this
```

1    kind of goes to the whole thing that elections do change from

2    election to election.  And based on the quality of the

3    candidates and the state of the campaigns, you're going to have

4    different vote outcomes district to district, and that's going

5    to affect the efficiency gap.  Right?

6         So if that's the case -- right? -- you might feel less

7    comfortable with it as a metric.  Right?  I mean, if you were

8    taking your child's temperature over and over and over again

9    and you were getting 98 and 101 and 103, you know, every couple

10   of minutes -- right? -- maybe you don't trust the -- either

11   your child's temperature is, you know, bouncing about wildly,

12   or, perhaps, there's something wrong with the thermometer.

13   Q.  Thank you, Dr. Brunell.

14        Turning to page 15, at the top.  I notice you address

15   Professor Warshaw's argument that the districts are unsuitable

16   because of the lack of competitive general elections.

17        Could you explain your position to the Court.

18   A.  Yes.  So that's one of -- one of his main criticisms is

19   that the lack of general -- competitiveness at the general

20   election level.  Right?  And this kind of goes back to my

21   critique of what I discussed yesterday with my book --

22   right? -- that we don't need to have a competitive general

23   election in order to keep elected officials, you know,

24   responsive to what the people want.  That's the goal --

25   right? -- is we want them to be worried about their ability to

1   keep their jobs.  Right?  I mean, because elections are like

2   decisions:  Do we -- do we hire or fire this person?  Right?

3   That's kind of a good way to think about elections.  And we

4   want them to be worried -- right? -- that they may lose this

5   job.  Right?  And they are good jobs, and they're going to do

6   what it takes -- right? -- which would be representing

7   constituents, hopefully, in order to keep this thing.  Right?

8       And so we don't need -- I think we kind of jump the gun in

9   this country a lot thinking that the only way to do this --

10  right? -- and the key thing that we have to have are

11  competitive general elections.  And I think that's completely

12  wrong.  Right?

13      Like I mentioned yesterday, we have the primary election

14  system.  Right?  We have the two-step process.  So nobody's

15  truly safe.  Right?  Even if your district's a hundred percent

16  democratic -- right? -- we still have a primary where we can

17  get rid of the incumbent.  We'll replace them with another

18  Democrat, but we can get rid of them.  Right?

19      And, you know, when I look at outcomes like the -- in

20  Virginia -- I don't remember if this was in 2018 or 2016 --

21  there was a -- the -- the majority status of the Virginia state

22  legislature depended on the last right of the -- it came down

23  to the last election.  And it turned out that it was a tie.

24  Right?  And so this is like perfect competition and --

25          MS. McKNIGHT:  Your Honors, we have --

1      THE WITNESS:  We have an objection.

2      JUDGE BLACK:  Yes.

3      MS. THOMAS-LUNDBORG:  Objection as to the relevance of

4  what happened in Virginia.

5      JUDGE BLACK:  Very well.

6  A.  It's relevant because it's about competition.  Right?  And

7  so that election was decided by pulling a name out of a hat.

8  Right?  And, I mean, is that -- who is that satisfactory to?

9  Right?  I mean, do we celebrate that as this great competition?

10  And we end up sort of basically flipping a coin to figure out

11  who the representative is going to be.  Right?

12      And so the Republican's name happened to be selected from

13  the hat.  And so I -- particularly, I think, if you're a

14  Democrat -- right? -- are you happy about that outcome?  Like,

15  Oh, we were so close -- right? -- and we lost by just the flip

16  of a coin.  And that determined -- that also determined the

17  majority status in the state legislature.

18      And, to me, that's no way to run a country.  Right?  This

19  isn't, right? -- the pinnacle -- right? -- of democracy where

20  we end up drawing names out of hats to see who is going to be

21  the elected representative.

22      So I think if we take a step back and realize that there

23  are real downside costs to having competitive elections --

24  right? -- and I'm not here to argue we should get rid of all

25  competitive elections.  Right?  But I think if -- if I just can

1    convince the Court that there are downsides to competition as

2    well.  Right?  And it isn't necessary that we have competition

3    in the general election in order to keep democracy healthy, in

4    order to keep representatives responsive to what the people

5    want.

6    Q.  Thank you, Dr. Brunell.

7        I'd like to move on to your review of an expert report

8    prepared in this case by Professor David Niven.  Do I

9    understand correctly that you did that work in this case?

10    A.  I did.

11    Q.  Okay.  And let's turn to page 16 of your report.

12    A.  I'm there.

13    Q.  Great.  I see you take issue with Professor Niven's

14    argument that his evidence shows that Ohio's congressional

15    districts needlessly divide communities.

16    A.  That's correct.

17    Q.  Can you explain your position.

18    A.  Yes.  I think in reading Professor Niven's report, it

19    seemed like there was no boundary he'd ever come across that he

20    didn't dislike.  Right?  That there was objection to wherever

21    boundaries are drawn -- right? -- just sort of example after

22    example after example.  And the fact of the matter is that

23    these boundaries have to go somewhere.  Right?  And even if

24    they're straight and nice and neat and clean, they're going to

25    divide cities, they're going to divide counties, they're going

```
 1    to divide neighborhoods.  Right?  It's inevitable.  Right?
 2    Like I said, it's a fact of the single member district system.
 3        And so to sort of look at a map and criticize where all the
 4    lines are -- right? -- without appreciating the -- the -- the
 5    problem that mapmakers are -- are faced with when they're
 6    drawing these districts -- right? -- like equalizing the
 7    population down to a single person -- right? -- that's going to
 8    mean split counties, split cities, jagged edges, funny shapes.
 9    Right?  He particularly doesn't like funny-shaped districts,
10    but funny-shaped districts happen all the time.  Right?  And
11    we'd prefer to have them less funny looking than more funny
12    looking, but districts do look funny.  Right?
13        I mean, CD11 isn't a perfect square.  It looks funny.  But
14    it's solving a problem.  Right?  It's providing a -- the
15    minority voters in that part of Ohio an opportunity to elect
16    the candidate of their choice.
17        So that's kind of, at a broad level, what's going on.  But
18    then, kind of, when you focus on a lot of his examples -- so
19    for instance -- I can't remember off the top of my head, but I
20    remember him mentioning specific houses.
21        Like I know there was one on Renner Road.  I remember that
22    was one of them, because I actually lived near Renner Road,
23    too, in Texas.  And I think the other one was on North Bend
24    Road, where he kind of honed in, you know, down to the
25    individual household level and he was really offended that,
```

1    like, one house on this street was put in one district than the
2    rest of it, and like, Oh, this is ripping neighborhoods apart.
3    Well, it certainly --
4        So why was that house taken out?  Right?  I think that's
5    the question.  And it wasn't for political reasons.  Right?
6    That's for sure, it wasn't for political reasons because we
7    don't have data at the household level.  Right?  The data are
8    at the voting tabulation district level.  So there's
9    absolutely -- we don't know.  Right?  Unless the mapmaker knew,
10   Hey, my friends, you know, John and Sherry, live there, and
11   they're solid Republicans and let's put them in this district.
12   Right?
13       Absent that kind of information, this was not done for
14   political purposes.  It was almost certainly done to equalize
15   the population.  Right?
16       Because, again, for congressional districts, it's down to
17   the person.  Right?  And so that's what you have to do.  You
18   end up, you know, making these small little cuts to make sure
19   that we have equal population in every district.  All right?
20       And we've done that -- right? -- because the Supreme Court
21   demands it of us.  Right?  And that's the right -- it's good.
22   Right?  Those decisions equalize political power within a --
23   within a state across districts.  That was important.  They
24   solved a real problem there.
25       The other reason a house might be carved out is that,

1    oftentimes, incumbents have these, you know, for lack of a

2    better word, kind of vanity requests.  Right?  Like you would

3    like to have your mother in your congressional district or your

4    close friends in your congressional district or your -- your

5    lake house in your congressional district.

6         And these -- that sounds weird.  These sorts of requests

7    are made all the time.  All the time.  I know that in the last

8    round one of the local representatives in -- I saw on the

9    news -- asked for his grandkids preschool to be included in his

10   district.  Right?  This is just, you know -- I mean, they just

11   want to represent their family, in addition to other things.

12        And so that might have been -- that might have been the

13   request, too.  Perhaps that's happening.  But I suspect it's

14   probably the former, the one-person, one-vote requirement that

15   really was driving these sorts of things.

16   Q.  Thank you, Dr. Brunell.

17        I'd like to bring up an example from Professor Niven's

18   report.

19   A.  Okay.

20   Q.  Let's turn to Plaintiffs' Exhibit 524, page 18.

21        Now, Dr. Brunell, can you conclude that the line drawn in

22   the figure on page 18 was needlessly divided?

23   A.  No.

24   Q.  And why not?

25   A.  Well, we don't -- we can't jump into -- we don't know the

```
 1   problems that the mapmaker is solving by putting the districts
 2   here.  Right?  I mean, and this is not -- right?  These are all
 3   squarish lines.  Right?  This isn't a bunch of squiggly lines.
 4       And this one, in particular, he made a big deal out of the
 5   fact that it splits a truck assembly plant -- right? -- a Ford
 6   assembly plant in half.  And that was even -- splitting
 7   something that doesn't have any people living in it doesn't
 8   matter.  Right?  There's no political advantage, because
 9   there's no voters there.  Right?
10       So it's completely meaningless if you split, you know,
11   Cowboy Stadium, for instance, if we split that in half --
12   right? -- nobody lives there -- right? -- so it has absolutely
13   no effect politically in terms of elections.  Right?  So that's
14   true of a park?  Right?  I assume nobody lives in a Ford truck.
15   I could be wrong about that.  But I'm guessing nobody lives
16   there.  So it has no -- no political purpose.
17       You know, so why did they split it?  I don't know for sure.
18   But the line is straight, so maybe they wanted to keep the line
19   straight for compactness purposes.  Maybe both incumbents
20   wanted to have part of the plant in their district.  Right?
21   Hey, this would be good for me.  I have a good relationship
22   with Ford -- right? -- and I want to, you know, lay claim to
23   this relationship, and so let's split the -- the thing in half.
24       And, again, I'm just speculating.  I don't know.  But that
25   could be it.  Or more maybe even Ford Motor Company went and
```

1  said, "Hey, you know, we would like you to split our plant in

2  half and be in two different districts."  I don't -- I don't

3  know.  But to -- you know, there has no political purpose

4  whatsoever, you know, in terms of election outcomes and

5  splitting voters.

6  Q.  And why would the Ford assembly plant want to be split?

7  What could be some of the reasons why they would want to be

8  split in two districts?

9  A.  Why Ford, the company, would want to split?

10  Q.  Yes.

11  A.  Maybe they'd like both the incumbents --

12       JUDGE BLACK:  Excuse me.  There's an objection?

13       THE WITNESS:  There is.

14       MS. THOMAS-LUNDBORG:  Objection to counsel's question.

15  The witness has already testified that he's speculating about

16  why things may or may not have happened.

17       JUDGE BLACK:  It appears to be pure speculation.

18       MS. McKNIGHT:  I'll note that he is responding to

19  speculation in Professor Niven's report.

20       JUDGE BLACK:  It's like double hearsay.  Objection's

21  noted.

22  Q.  Dr. Brunell, is it your understanding that Dr. Niven used

23  census tracts to run his analysis?

24  A.  Yes, that was part of what he looked at was split census

25  tracts.

1    Q.  And what is your opinion about using census tracts for the

2    purpose of running that analysis?

3    A.  I mean, it's a -- I don't know what -- he -- he's treating

4    the census tracts as if these -- it's important to keep them

5    whole.  Right?  And so I think it's important to go back and

6    understand what census tracts --

7         We have an objection.

8              JUDGE BLACK:  Indeed.  Thank you for pointing it out.

9              MS. THOMAS-LUNDBORG:  Your Honor, I just want to be

10   clear that my standing objection to undisclosed testimony is

11   included in this part of his testimony, not just the Cho

12   testimony.

13             JUDGE BLACK:  So noted.  Thank you.

14   A.  So census tracts, these were created by the Census Bureau.

15   Right?  So this is an analytical tool that the Census Bureau

16   created.  Right?  They have these different levels of

17   hierarchy, blocks and block groups and census tracts, counties,

18   county areas -- right? -- and it's part of this hierarchy.

19        So there weren't intended, by the Census Bureau that, hey,

20   we're going to divide up the whole country into these -- these

21   things that we call a census tract.  And this should be used by

22   mapmakers -- right? -- to keep neighborhoods whole.  Right?

23   That wasn't the purpose of them.  Right?

24        So to -- so to assume -- right? -- that -- that these

25   census tracts mean anything to a mapmaker I think is wrong.

1     Right?  I don't -- I don't know what -- I actually looked -- I

2     had never looked at my census tract, and I did a few days ago,

3     over the weekend.  And it -- you know, it didn't make any --

4     you know, it's kind of a rectangular shape around my

5     neighborhood, but I don't know -- it didn't make any sense to

6     me.  Right?  And whether that census tract got split or not

7     wouldn't be particularly interesting -- right? -- in part,

8     because nobody -- who knows what census tract they live in --

9     right? -- first of all.  I'd fall into my chair -- right? -- if

10     I ran into somebody out on the street who could describe their

11     census tract.  So then to make it, like, this sacrosanct thing

12     that, oh, this is something that we really have to keep

13     together -- right? -- that's what doesn't make sense to me.

14         What's the utility of this?  Right?  I mean, maybe the FBI

15     has divided or has a secret map of all of the neighborhoods in

16     the area.  And if, then, somehow we learned about it, then do

17     we also -- and those are different from census tracts -- do we

18     also have to keep all those whole?  Right?

19         So mapmaking is really, really hard.  Right?  And sometimes

20     census -- most of the time census tracts are kept together, but

21     sometimes they're split.

22         JUDGE BLACK:  Counsel?

23         MS. THOMAS-LUNDBORG:  May I have a standing objection

24     to any speculative testimony by the witness?  I think he just

25     testified to the FBI maybe has census tract maps.

1           JUDGE BLACK:  I wasn't aware of that, but you may have

2  a standing objection.

3           MS. McKNIGHT:  That mischaracterizes that testimony,

4  but, Your Honor, I'm prepared to move on.

5       Thank you, Dr. Brunell.

6           MR. FRAM:  It's a credit to you.  How are you coming?

7           MS. McKNIGHT:  You know what, I think I have about 15

8  to 20 minutes left.

9           JUDGE BLACK:  Well, we've reached our mid-morning

10  break.  Is this an adequate time to break?

11          MS. McKNIGHT:  Yes, Your Honor, I'm happy to break

12  now.

13          JUDGE BLACK:  All right.  We'll break for 20 minutes

14  till a quarter of.  We're in recess until that time.  The

15  witness shall not discuss his testimony.  Understood?

16          THE WITNESS:  Yes, sir.

17          JUDGE BLACK:  Very well.  Enjoy the break.

18          COURTROOM DEPUTY:  All rise.  This court is in recess.

19      (Witness temporarily excused.)

20      (Recess taken:  10:27 AM - 10:48 AM.)

21          JUDGE BLACK:  Please be seated.  Thank you.

22      What did you do to the witness?

23          MS. McKNIGHT:  You told me not to talk to him.  I

24  haven't.

25          JUDGE BLACK:  Indeed.  We're back from our break.

```
 1    We're gathering the witness.
 2        You're not late for class, are you?
 3            THE WITNESS:  I feel terrible.  I'm sorry.  I was
 4    waiting for somebody to -- I should have just come back down on
 5    my own.
 6            JUDGE BLACK:  No.  You're doing just fine.
 7            THE WITNESS:  All right.
 8            JUDGE BLACK:  We're back in the open courtroom, on the
 9    record.  Counsel is going to proceed with her direct.
10            JUDGE WATSON:  Nice work, Erika.
11            JUDGE BLACK:  You remain under oath.  You understand?
12            THE WITNESS:  Of course.
13        (Thomas Brunell resumes the witness stand.)
14            JUDGE BLACK:  Okay.
15            MS. McKNIGHT:  Your Honors, I would ask the Court to
16    take judicial notice of a 2010 Census block map for Springfield
17    Township, Ohio.  I will distribute that map now.  May I have
18    permission to approach?
19            JUDGE BLACK:  Yes.  Thank you.
20    Q.  Dr. Brunell, I understood from your testimony earlier and
21    your report that you thought there could be many reasons why a
22    district could have a funny shape.  Do you recall testifying to
23    that point?
24    A.  I do.
25    Q.  Okay.  Let's turn to page ten of Dr. Niven's report.  That
```

1    is PX 524, page ten.

2        Now, I recall you testifying about the North Bend Road

3    division.

4    A.  Yes.

5    Q.  Understanding that this display is in Dr. Niven's report,

6    do you remember reviewing this split identified by Dr. Niven?

7    A.  Yes.

8    Q.  And now turning to census block map Spring --

9        MS. McKNIGHT:  Actually, pardon me, Your Honor,

10   please.  Let me take a step back.

11   Q.  Do you see here in this map where there is the intersection

12   between Argus Road and West North Bend Road?

13   A.  I don't see Argus on my map -- on this map.  I see North

14   Bend.

15   Q.  Okay.

16       MS. THOMAS-LUNDBORG:  Your Honors, I just wanted to

17   make sure the record is clear that we object to the use of this

18   demonstrative.  It was not previously disclosed.  The testimony

19   that the witness is rendering was not disclosed.  The testimony

20   for which it's being elicited was disclosed in October.

21       JUDGE BLACK:  Very well.  Objection's noted.

22       MS. McKNIGHT:  Thank you, Your Honor.  And for all

23   these objections, we're happy to brief them later.  We believe

24   there's support in the record for his testimony.

25       JUDGE BLACK:  Very well.

1    A.  I do see Argus at the -- near the bottom of the screen.

2    Q.  And I'm just identifying these streets so that we can

3    identify this location in another map.  So understanding that

4    this is the intersection around Argus Road and North Bend Road;

5    is that fair?

6    A.  Sure.

7    Q.  Now, turning to the 2010 Census block map for Springfield

8    Township, Ohio.  I would ask my colleague to zoom in on a

9    portion of this map for legibility.  So on your screen you will

10   see a zoomed-in version, but in your hands you have the

11   complete map version.

12       Now, reviewing the complete map version, is it your

13   understanding that the yellow shading has meaning to the map?

14   A.  Yes.

15   Q.  And what is that meaning?

16   A.  I think that's the district lines.

17   Q.  And by the key, it describes it as an incorporated place.

18   Can we agree it's an incorporated place of some sort?

19   A.  Are you asking me?

20   Q.  Yes.

21   A.  Okay.  Sure.

22   Q.  Now zooming in, if you look on your screen, there's a

23   zoomed-in version of this place.  Can you find the intersection

24   of Argus Road and West North Bend Road?

25   A.  Yes, I believe I can.

1    Q.  And at that intersection do you see a shape --

2    A.  Yes.

3    Q.  -- of an incorporated place that is similar to what was in

4    Dr. Niven's report?

5    A.  Yes.

6    Q.  Dr. Brunell, when you were talking about different reasons

7    why districts are funny, is one reason based on geography and

8    whether geography is a known place, city, county, incorporated

9    place?

10   A.  Yes.  Sometimes cities and municipalities take on funny

11   shapes of their own, and then if the city is kept whole, or

12   parts of the city are kept whole, then that will then translate

13   into a district that also appears funny.

14   Q.  Is it your understanding from Dr. Niven's report that he

15   identified this line drawing at the intersection of Argus Road

16   and North Bend Road as being related to improper partisan

17   purpose?

18   A.  I know he objected -- he was making a case -- he observed

19   to the oddly shaped -- the cutout -- right? -- in that

20   particular district.

21   Q.  And is it possible that that cutout had nothing to do with

22   partisan -- improper partisan intent?

23   A.  Absolutely.

24   Q.  And why is that?

25   A.  Because that's the -- the same cutout is part of the

 1  township that is in the district itself.

 2          MS. McKNIGHT:  Your Honors, I would move to admit as

 3  Exhibit I134 the census block map for Springfield Township,

 4  Ohio.

 5          JUDGE BLACK:  Any objection?

 6          MS. THOMAS-LUNDBORG:  The same objection that was

 7  stated earlier, that this is undisclosed and untimely.

 8          JUDGE BLACK:  Conditionally admitted.  The Court takes

 9  judicial notice of the census block map.

10     (Intervenors' Exhibit 134 was conditionally admitted.)

11          MS. McKNIGHT:  Your Honor, I have two more maps and

12  then I'll move on to some final sets of questions.

13     I would ask the Court to take judicial notice of two census

14  maps.  For the record, these are Ohio E17, Franklin County, and

15  Ohio E19, Hamilton County.

16     Do I have permission to approach?

17          JUDGE BLACK:  Yes.  Thank you.

18  Q.  Dr. Brunell, you have before you census maps for the

19  counties, county subdivisions and places for Franklin and

20  Hamilton.  Do you see that?

21  A.  Yes.

22  Q.  Now, you testified and you've put in your report opinions

23  about the funny shapes of districts and the reasons why

24  districts can be quote/unquote funny shaped.

25     What do the shapes of Franklin and Hamilton County tell you

1    about funny-shaped electoral districts drawn in these areas?

2    A.   Like I said, for the previous map when you -- mapmakers, as

3    often as they can, try to keep municipal and county and natural

4    political boundaries whole to the extent that they possibly

5    can.   And if that municipality or township or county has its

6    own funny shape, and then they follow those lines, then the

7    district itself is going to look funny.   And so that -- but,

8    again, it's the funny shape -- there's a reason for the funny

9    shape.   So, sometimes, funny shapes have legitimate reasons for

10   them.   I think that's the key -- the key point here.   That's

11   the takeaway.

12            MS. McKNIGHT:   Thank you, Dr. Brunell.

13       I would like to move for the admission of the census maps

14   for Franklin County and Hamilton County.   First, the census

15   map, E17 for Franklin County, at I135.

16            JUDGE BLACK:   Any objection?

17            MS. THOMAS-LUNDBORG:   Yes, Your Honor.   This was not

18   disclosed, not last night, not any time prior to just now.

19            JUDGE BLACK:   Very well.   It's conditionally admitted.

20   The Court takes judicial notice of the map.

21            MS. McKNIGHT:   Thank you, Your Honor.

22       (Intervenors' Exhibit 135 was conditionally admitted.)

23            MS. McKNIGHT:   The second map is Ohio E19 for Hamilton

24   County for Exhibit number I136.

25            JUDGE BLACK:   Any objection?

```
 1              MS. THOMAS-LUNDBORG:  Yes.  The same objection.

 2              JUDGE BLACK:  Very well.  It's noted.  Conditionally

 3   admitted.  The Court takes judicial notice of the census map.

 4         (Intervenors' Exhibit 136 was admitted.)

 5   Q.  Dr. Brunell, I'd like to turn to page 17 of your report,

 6   I60.

 7   A.  Okay.

 8   Q.  Well, so on the bottom of page 17, you discuss the issue of

 9   representation.  And I'd like to ask you a few questions about

10   that.

11   A.  Sure.

12   Q.  Now, have you studied representation within our government?

13   A.  Yes.  Like I said, that's kind of the fundamental question

14   of my intellectual curiosity.  That's really what I've kind of

15   done my entire career.  I think it surrounds -- it's about

16   notions of representation.

17   Q.  Now, do you believe that a voter goes unrepresented if the

18   candidate they vote for does not win?

19   A.  No.

20   Q.  And why not?

21   A.  Well, I think rather than thinking about whether a voter is

22   represented or not represented -- right? -- it's not this --

23   it's not black and white.  It's not a dyadic relationship like

24   that.  Or there's going to be some range, some continuum of

25   representativeness.  Right?  And so depending on what the
```

voter -- right?  And so we've split ourselves into these two groups, Democrats and Republicans.  And that gives us some leverage about knowing what the ideological foundation and the policy preferences are.

Of course, not all -- Democrats don't agree with each other on all issues and neither do Republicans.  And if we only look at the elite level -- right? -- I think we would be -- we would get the wrong impression.  Right?  Because voters do differ from elected elite.  So at the moment it seems like Democrats and Republicans never agree on anything.  But the fact of the matter is, there -- at the lower levels -- right? -- there's a far greater deal of overlap.  And they're not -- voters aren't as polarized as the elites are.

And so I think it's better to think about how well somebody is represented, not if they are or if they're not.  And so if you're a Democrat and you vote for the Democratic candidate and she happens to lose -- right? -- and you have a Republican in office, you still have a relationship with that representative. You're probably going to be less well represented by the Republican, this voter is, but not unrepresented.  Right?

And it's not just about policy issues, of course.  The government -- one of the many things that members, both at the state legislative level and the congressional level, do is that they help their constituents navigate the vast bureaucracies of state and federal governments.  And so people call on their

1    elected officials all the time.  You know, if a social security

2    check is late or -- you know, if you have a problem with an

3    agency and you don't know who to turn to, oftentimes people

4    will call their elected official.

5        And this is what -- I think I use a quote from Bruce Cain,

6    John Ferejohn and Mo Fiorina.  They define constituency service

7    as "the nonpartisan, nonprogrammatic effort to help individual

8    constituents in their dealings with the larger government."

9    And this is done on a nonpartisan basis.  Right?  Because you

10   don't want to -- because the members are generating goodwill.

11   This is one of the things that they can do -- right? -- to

12   help -- or they know this can't hurt me.  Right?

13       When they take a position -- right? -- it's going to help

14   them with some voters and hurt them with others.  But when you

15   a help a person out -- right? -- out of a bind, that can only

16   help you.  Right?  Even if the person -- if you don't agree

17   with them politically.  Right?  Doing that kind of constituency

18   service creates goodwill, and that can only help the -- which

19   is why they do it.  Right?  That's why they go through these

20   efforts.

21   Q.  And, in your opinion, can you still be well represented as

22   a voter if you voted for a Democrat in an election but you are

23   represented by a Republican?

24   A.  It's possible.  Right?  It all depends on what the

25   Democrat -- what the voter prefers and what the -- what the

1    member -- how the member votes.

2    Q.  And is it your opinion that representation is limited to

3    how a member votes?

4    A.  No.

5    Q.  Now, Dr. Brunell, if you were a Court trying to decide the

6    line to be drawn between being represented and not being

7    represented, has that line been drawn in political science

8    research?

9    A.  Not that I'm aware of.

10   Q.  And if you were a Court trying to decide the line between

11   being represented and not represented, has that line been

12   identified in this case?

13   A.  I don't think so, no.

14   Q.  Dr. Brunell, understanding -- and please correct me if I'm

15   wrong.  Understanding from your earlier testimony that it was

16   news to you last Friday that Dr. Cho drew all of her maps

17   within Cuyahoga County -- so your opinion filed last fall could

18   not have addressed that unknown issue.  In your report, did you

19   still identify a concern about variations in BVAP needs within

20   CD11?

21   A.  I assume I did.

22   Q.  We can turn to page 18 of your report.

23   A.  Okay.

24       I'm there.

25   Q.  Okay.  So in your report did you identify any concern about

1  variations in BVAP needs within CD11?

2  A.  Yes.  The one thing that I said in my report about

3  Handley's report was that I noted that she had previously

4  worked on a case in the area in which the magic number for

5  that -- for Euclid, Ohio was over 60 percent.

6  Q.  Now, Dr. Brunell, assuming for the moment that you thought

7  Dr. Handley's analysis was perfectly executed in CD11, even if

8  you thought that, can you apply the results of her analysis in

9  CD11 to maps being drawn within Cuyahoga County?

10  A.  No.

11  Q.  Dr. Brunell, I just have a few more questions related to a

12  *Daubert* motion filed in this matter against your opinion.

13  A.  Okay.

14  Q.  Regarding your work on Dr. Cho's report, in your expert

15  opinion do you need to be able to program in C++ or have run an

16  analysis similar to Dr. Cho's analysis in order to offer this

17  Court insight about Dr. Cho's analysis?

18  A.  Absolutely not.

19  Q.  Regarding your report criticizing Dr. Cho -- Dr. Warshaw's

20  analysis, in your expert opinion do you need to conduct an

21  independent analysis of partisan bias in order to offer this

22  Court insight and expertise on that matter?

23  A.  Absolutely not.

24  Q.  Regarding your work related to Dr. Handley's report in this

25  matter, in your expert opinion and in your experience do you

1    need to conduct an independent, racially polarized voting

2    analysis in order to offer insight and expertise to this Court

3    on that matter?

4    A.    Absolutely not.

5    Q.    And, finally, on Dr. Niven's report and your work related

6    to that report, plaintiffs have asserted in their *Daubert*

7    motion that you did not understand Niven's data and you did not

8    analyze whether the divisions or splits in Ohio were necessary.

9         In your expert opinion, was that necessary in order for you

10   to offer this Court insight on that topic?

11   A.    Oh, disagree.  I disagree with what they said completely.

12   I understood what he was doing and I understood what he was

13   trying to do with the maps.

14   Q.    Did you believe you misunderstood his data?

15   A.    I couldn't figure out what he was doing, but that's not my

16   problem.  Right?  He didn't explain it well, what he was doing.

17   So that's their problem.  That's not my problem.

18        So, in part, they're right:  I didn't understand what he

19   was doing, but that's because he wasn't very clear.  Right?

20   When he was doing his correlations and he had those really

21   long -- you know, those 400 zeros, I couldn't figure out what

22   he was doing.  Honestly, I didn't know what was going on.  And,

23   like I said, that's not -- that's not my problem.

24        But I understood, when he was talking about the maps and

25   the splits, I knew what he was talking about and I knew the --

 1   where he was making mistakes -- right? -- where I think he was

 2   making mistakes.  And so I think that I'm perfectly reasonable

 3   to offer my opinion, my rebuttal expert opinion to what he's

 4   done here.

 5           MS. McKNIGHT:  Thank you, Dr. Brunell.

 6           THE WITNESS:  Sure.

 7           MS. McKNIGHT:  No further questions for now.

 8           JUDGE BLACK:  Plaintiffs' counsel has a chance to ask

 9   questions.  Cross-examination.

10           MS. THOMAS-LUNDBORG:  Yes, Your Honor.  May it please

11   the Court, I have a number of documents.

12           JUDGE BLACK:  Very well.

13           MS. THOMAS-LUNDBORG:  May it please the Court, Alora

14   Thomas representing plaintiffs.  I think it's still morning.

15                       CROSS-EXAMINATION

16   BY MS. THOMAS-LUNDBORG:

17   Q.  Good morning, Dr. Brunell.

18   A.  Good morning.

19   Q.  Do you recall that we met at your deposition?

20   A.  I do.

21   Q.  So I'd, actually, like to turn to that deposition now.

22           MS. THOMAS-LUNDBORG:  May I approach?

23           JUDGE BLACK:  Yes.

24       Intervenors' counsel is standing.

25           MS. McKNIGHT:  Yes, Your Honor.  We would just note

```
 1   the objection that this is an improper use of deposition
 2   testimony.
 3            JUDGE BLACK:  Very well.
 4            MS. THOMAS-LUNDBORG:  I haven't used it yet.
 5            JUDGE BLACK:  I was going to say that, but I decided
 6   not to.
 7   Q.  All right.  Dr. Brunell --
 8   A.  Yes.
 9   Q.  -- do you recall that you were deposed on December 14th,
10   2018?
11   A.  That sounds right.
12   Q.  Okay.  And that date postdated the October 5th, 2018
13   plaintiffs' expert date of exchange?
14   A.  Yes.
15   Q.  That date also postdated the rebuttal reports by
16   plaintiffs, which was November 26, 2018.  Do you recall that?
17   A.  I don't recall that, but if you're telling me that, I
18   believe it.
19   Q.  Do you recall that in your deposition I asked you whether
20   you had either disclosed in your expert report or at deposition
21   all opinions that you intended to render in this case?
22   A.  I don't recall that specific question.
23   Q.  Well, let's refresh your recollection.
24            MS. THOMAS-LUNDBORG:  If we could turn to page 183.
25   I'm at line 10.  And I'm going down to line 18.
```

1  Q.  I asked you, and I quote:

2     "And we discussed some of your opinions today; is that

3  right?

4     "Answer:  We have.

5     "Question:  Do you intend to render any other opinions

6  either not in your report or opinions that we have not

7  discussed today?

8     "Answer:  I don't know.  Like I said, there may be another

9  report, but there's nothing -- right now there's nothing

10  planned."

11     Do you recall that now?  Does that --

12  A.  Yes.

13  Q.  Did you ever supplement your expert report?

14  A.  I did not write another report.

15  Q.  Well, you were shown by counsel a number of census data

16  that we'll get into.  Is it your testimony today that that

17  census data, under -- that you relied on any of that census

18  data in writing your expert report?

19  A.  I think you'll have to be very specific with me here.  I'm

20  not sure exactly what you're talking about.

21  Q.  Okay.  You were shown, for example -- I think you still

22  have them in front of you --

23  A.  I do indeed.

24  Q.  -- what was marked Intervenors' Demonstrative Exhibit 135,

25  which is a picture of Franklin County.

1  A.  Yes.

2  Q.  Did you rely on this demonstrative in rendering your expert

3  opinion?

4  A.  In the report, you mean?

5  Q.  Yes.

6  A.  I did not.

7  Q.  You were also shown Intervenors' Demonstrative 136,

8  Hamilton County.  Did you rely on this demonstrative in

9  rendering your expert opinion in your report?

10  A.  I mean, in terms of the funny shapes -- not this one,

11  specifically, but in terms of funny shapes, generally, yes.

12           JUDGE BLACK:  A point of clarification.  Were these

13  demonstrative exhibits from the intervenors' perspective?

14           MS. McKNIGHT:  They were a matter of judicial notice.

15           JUDGE BLACK:  Very well.

16           MS. THOMAS-LUNDBORG:  I'll stop referring to them as

17  demonstratives.

18  Q.  You were also shown Intervenors' Exhibit 134, which is the

19  census block map of Springfield Township.  Did you rely on this

20  data in rendering your expert report?

21  A.  In a way, yes, because part of it was in Dr. Niven's

22  report.

23  Q.  Did you turn over this particular document when you turned

24  over data related to your expert report?

25  A.  No.

1    Q.  We also saw Intervenors' 132.  That is the Board of

2    Elections, municipalities and Cleveland wards of Cuyahoga

3    County of Ohio.  Did you rely on this data when you rendered

4    your expert report?

5    A.  No, that was in response to the -- the testimony that was

6    given last week.

7    Q.  Did you turn over any data or underlying analysis with your

8    expert report?

9    A.  I relied on your expert's data.  So the data that I

10   analyzed, you guys gave to me.  So I didn't re-turn it over.

11   Q.  You didn't turn over any additional data with your expert

12   report; that's your testimony?

13   A.  That's correct.

14   Q.  Now, you only cited four works in your expert report; is

15   that correct?

16   A.  That is correct.

17   Q.  Well, and at the time of your deposition, you didn't recall

18   relying on any other works; is that correct?

19   A.  I don't recall that, that question and that answer.

20        MS. THOMAS-LUNDBORG:  If we could look at page 22 of

21   Brunell's deposition.  I'm starting at line 8 and going to line

22   21.

23   Q.  "Question:  If you go to page -- if you go to what would be

24   page 20 of Exhibit 1, which is your expert report --"

25        "Yes.

 1      "Are you there?

 2      "Yes.

 3      "Here you cited four works; is that correct?

 4      "Answer:  Yes.

 5      "Question:  Are these the only articles that you consulted

 6   in preparation for your expert report?

 7      "Answer:  I mean, in looking at these articles, I may have

 8   looked for other articles, but I don't know if I could even

 9   tell you what they were."

10      Did I read that correctly?

11   A.  Right.  I mean, but it's -- I think the answer was correct

12   there.  Those are the four articles that I cited -- right? --

13   but I've been reading about redistricting for 30 years, and I'm

14   not going to list everything in there.  So my expertise comes

15   from 20 or 30 years of reading and study.

16   Q.  So you couldn't recall at your deposition what else you may

17   have consulted that went into your expert report; is that

18   correct?

19   A.  I didn't cite any other papers in my expert report.

20   Q.  And at your deposition you couldn't name any other articles

21   that went into your expert report; is that right?

22   A.  Right.  Because you're sort of -- it's a bad question.

23   You're asking me -- you know, I'm not going to list everything

24   that I've ever read with respect to redistricting -- right? --

25   over the last 25 years.

1    Q.  I think it's a yes-or-no question.  Did you or did you not

2    recall at your deposition what else may have gone into your

3    expert report?

4    A.  I said I may have looked at other articles, but I don't

5    know.

6    Q.  And you didn't have a process for deciding what to cite in

7    your expert report; is that right?

8    A.  I cite things when I quote them from them directly.

9    Q.  And none of the articles that you cited as part of your

10   expert report discuss the efficiency gap; is that right?

11   A.  That is correct.

12   Q.  Okay.  You reviewed Dr. Niven's initial report prior to

13   writing your report; is that correct?

14   A.  Of course.

15   Q.  You also reviewed the rebuttal report of Dr. Niven prior to

16   your deposition; is that correct?

17   A.  I think that that's correct.

18   Q.  You not only read Dr. Niven's report, but you looked at his

19   underlying data; is that correct?

20   A.  Correct.

21   Q.  And you also discussed Dr. Niven's data with a person named

22   Clark Bensen; is that correct?

23   A.  That's right.

24   Q.  And you know that Clark Bensen is a fact witness in this

25   case?

1    A.  Yes.

2    Q.  Now, at your deposition you testified that you looked at

3    Dr. Niven's data, but you couldn't really figure out what he

4    was doing in his report; is that right?  And I think you just

5    said that also on your direct.

6    A.  Correct.

7    Q.  Okay.  Now, I believe on direct testimony you were asked a

8    number of questions regarding Dr. Niven's report.

9         MS. THOMAS-LUNDBORG:  If we could first go to page 18

10   of Plaintiffs' Exhibit 524.

11   Q.  Do you recall being asked questions on direct testimony

12   about this figure and Dr. Niven's analysis?

13   A.  I do.

14   Q.  Did you render any opinions about this particular figure in

15   your expert report?

16   A.  I didn't -- I may not have mentioned the Ford truck plant

17   specifically, but I was talking about -- I brought up some of

18   the -- the examples that he used, but I didn't go through every

19   single example that he used.

20   Q.  Was this an example that you used in your expert report?

21   A.  It was in my report, but not specifically.  Right?  There

22   was general criticisms of all of his criticisms, and this is

23   one of them.  But I don't mention the Ford truck plant,

24   specifically, in my report.

25   Q.  Okay.  Now, you did not conduct any independent analysis on

 1   communities of interest in Ohio; right?

 2   A.  What do you mean?

 3   Q.  I mean, you did not conduct -- okay.  I'll ask that in a

 4   different way.

 5       Preservations of communities of interest is a traditional

 6   redistricting criteria; correct?

 7   A.  It is.

 8   Q.  And you would agree, as a redistricting expert, that

 9   maintaining counties intact protects communities of interest?

10   A.  It's one of the ways that people conceive of what a

11   community of interest is, is by using county and municipal

12   lines.  Because it's kind of a fuzzy concept -- right? -- what

13   constitutes a community of interest.  It could cut across other

14   things, but that's kind of an easy way to do it.

15   Q.  You've testified in the past that maintaining counties

16   intact protects communities of interest; correct?

17   A.  That's -- like I said, that is one of the ways that we

18   conceptualize a community of interest as a county, and keeping

19   them whole is keeping a community of interest whole.

20   Q.  And you've given testimony to that effect; correct?

21   A.  I believe that I have, yes.

22   Q.  Now, you have not done an independent analysis of splits of

23   Ohio's districts; isn't that correct?

24   A.  Of all of them?

25   Q.  Of any of them.

```
 1   A.   I mean, in some sense, I did.  If I'm critiquing Niven --
 2   right? -- he's talking about splits and then I'm talking about
 3   splits.
 4   Q.   If we could turn to page 180 of the deposition transcript.
 5   And I'm at line 3 through line 12.
 6        "Question:  Have you done any analysis of the splits of
 7   Ohio's counties?
 8        "Answer:  For this case?
 9        "Question:  Yes.
10        "Answer:  I don't recall doing that, no.
11        "Question:  Have you done any analysis of the splits of
12   Ohio's municipalities?
13        "Answer:  For this case?
14        "Question:  For this case.
15        "Answer:  I don't recall doing that."
16        Did I read that correctly?
17   A.   You did.  I mean, I think that the problem here is in
18   the -- you know, the -- the questions themselves, "Have you
19   done any analysis?"  Right?  I think at the time, you know, I'm
20   thinking -- you know, I haven't analyzed splits myself --
21   right? -- but I have criticized Niven's splits.  So, in a
22   sense, you know, I have.  Right?  And so it's about -- you
23   know, there's a lot of uncertainty about what is meant by the
24   question, both then and now.
25   Q.   In your report you didn't list a number of municipal splits
```

1   in Ohio; is that correct?

2   A.   That's correct.

3   Q.   And at your deposition you didn't know the number of

4   municipal splits in Ohio; is that correct?

5   A.   I believe that that is correct.

6   Q.   In your report you didn't list the number of county splits

7   in Ohio; is that correct?

8   A.   Yes.

9   Q.   And at your deposition you didn't know how many county

10  splits there are in Ohio; is that correct?

11  A.   I assume that it's in here, so I'll say yes.

12  Q.   Do you agree that it's possible to draw a map with less

13  splits for Ohio?

14  A.   Theoretically?   Is that what you mean?

15  Q.   I'm going to stand on my question as it is.   You can answer

16  as you see fit.

17  A.   Could you restate it?

18  Q.   Do you agree that it's possible to draw a map in Ohio with

19  less splits?

20  A.   Less county --

21  Q.   Less county splits.

22  A.   I mean, again, the question -- are you talking about a

23  legitimate constitutional redistricting map that abides by all

24  the other things?   Is that what you mean?   Or are you talking

25  about any map?

1   Q.  Again, I'm asking you, do you agree that it's possible to

2   draw a map in Ohio with less county splits?

3   A.  I mean, you could draw a map in Ohio with one line across

4   the -- across the -- across the entire state and that would

5   have fewer splits.  So if that's your question, then the answer

6   is yes.

7   Q.  You don't know if it's necessary to split Cuyahoga County

8   four ways; is that right?

9   A.  It's necessary to split it at least two ways.

10  Q.  Do you know if it's necessary to split it four ways?

11  A.  I don't.

12  Q.  What about Summit County?

13  A.  Is it necessary to split it four ways?  Is that --

14  Q.  Yes, that is the question.

15  A.  Okay.  I don't know if that's necessary.

16  Q.  Do you know if it's necessary to split Lorain County three

17  ways?

18  A.  I don't.

19  Q.  Do you know if it's necessary to split Franklin County

20  three ways?

21  A.  I don't.

22  Q.  I think in your direct testimony you gave an example of a

23  house that may have been drawn out of a district.  You don't

24  know, as you sit here today, why that house was drawn out of a

25  district?

1    A.  Correct.

2    Q.  Now, I think on your direct testimony you testified that

3    you hadn't seen any of Dr. Cho's maps.  You did review the

4    expert report of Mr. Cooper; correct?

5    A.  Yes, I did.

6    Q.  And Mr. Cooper provided alternative maps as part of his

7    reports; correct?

8    A.  I recall, like, at least one map that he -- I don't know if

9    he provided multiple maps.  I don't recall.

10   Q.  You saw, at least, a picture of one map in your review of

11   Mr. Cooper's report?

12   A.  Right.  Are you saying that that's one of Professor Cho's

13   maps?

14   Q.  I'm asking if you've seen maps proposed by plaintiffs and

15   whether you saw Mr. Cooper's map.

16   A.  I did see Mr. Cooper's map, but it's not my understanding

17   that had anything to do with what Dr. Cho did.

18   Q.  In your report you make only two points about the remedial

19   map proposed by plaintiffs.  The first is that it's not clear

20   whether it would meet the policy preferences of the

21   legislature; is that right?

22   A.  Right.  It isn't clear why the policy decisions made by Mr.

23   Cooper would be better for the citizens of Ohio than the

24   preferences of the state legislators.

25   Q.  Do you know if Mr. Cooper's map -- Mr. Cooper's map had the

```
1   traditional redistricting criteria that you've discussed at --

2   during your direct examination?

3   A.  I don't recall the specifics of the map.

4   Q.  Now, your second critique was that he pairs more of the

5   2010 incumbents than the enacted map; is that right?

6   A.  Yes.

7   Q.  And at your deposition you testified that you had the

8   rebuttal report of Mr. Cooper; is that right?

9   A.  I assume that that's correct.

10  Q.  And in that report he pairs the same number of 2010

11  incumbents as the enacted map?

12  A.  I don't recall.

13  Q.  Now, we spent a lot of time today discussing the expert

14  report of Dr. Handley.

15           MS. THOMAS-LUNDBORG:  And I, actually, would like to

16  start with P524.

17       Oh, I'm sorry.  Actually, can I start with P254?

18  Q.  Okay.  This is Plaintiffs' Exhibit 254.  Do you see that

19  the date of this report is October 5th, 2018?

20  A.  Yes.

21  Q.  And this is the report where she disclosed that she was

22  using a 45 percent BVAP?  Do you recall that?

23  A.  I do.

24  Q.  Okay.

25           MS. THOMAS-LUNDBORG:  If we could go to P87, page
```

1    eight.  And I'm in the paragraph Minority Districts.

2    Q.  Okay.  This is Dr. Cho's report.  If you could read the

3    second -- the second sentence in this report beginning with

4    "Consistent."

5    A.  "Consistent with the recommendation from Dr. Lisa Handley

6    that a 45% BVAP is sufficient to satisfy the Voting Rights Act

7    in the vicinity of District 11 in the challenged plan, I have

8    integrated this 45% BVAP requirement in the drawing of my

9    maps."

10   Q.  Okay.  And I believe you were shown a number of times

11   Plaintiffs' Demonstrative Exhibit 20.  If we could go to that.

12   And this is an exhibit of the current District 11; is that

13   right?

14   A.  Correct.

15   Q.  And that includes parts of Cuyahoga County?

16   A.  It includes parts.

17   Q.  And it includes Cleveland?

18   A.  Parts of it, yeah.

19        MS. THOMAS-LUNDBORG:  So this is a copy of Dr. Cho's

20   testimony.  I will hand it to the witness and the panel.

21   Unfortunately, I only have one copy to share -- or, I have no

22   copies to share with opposing counsel, but opposing counsel

23   used it and they are trial transcripts that have gone to

24   everyone.

25        JUDGE BLACK:  Very well.

```
 1          MS. THOMAS-LUNDBORG:  Okay.  I'm in the trial
 2   transcript for this case from Friday, March 8, 2019.  And if we
 3   could go to page --
 4       Sorry.  I'm trying to see what this page number is.
 5          JUDGE WATSON:  It's 175.
 6          MS. THOMAS-LUNDBORG:  I believe that this is page 72
 7   of 291, and I'm at line 9 through line 15.  This is fine.
 8   Q.  Dr. Cho testified on Friday, when asked:
 9       "Now, yesterday you testified that you checked to confirm
10   that the VRA district in each of your maps was drawn within the
11   Cleveland area.  Do you recall that?"
12       "Answer:  Yes."
13       Is it your testimony today that this testimony by Dr. Cho
14   is inconsistent with what she said about her map in her expert
15   report?
16   A.  It's unclear.  Right?  Again, there's no specificity about
17   where the district is.  Right?  Either before -- right?
18       When you talk about the Cleveland vicinity, what does that
19   mean.  Right?  And here -- right? -- the Cleveland area, is it
20   fully contained in Cuyahoga County or is it not?  And, again,
21   all these problems would have been solved if we saw even one of
22   the maps of the 3 million that she produced.
23   Q.  My question is, is what Dr. Cho testified at trial
24   inconsistent with what is in her expert report?
25   A.  It's slightly different.
```

1  Q.  Is it inconsistent with what is in her expert report?

2  A.  It's slightly different.

3  Q.  Do you recall at your deposition I asked you if you

4  intended to offer any opinions on -- of Dr. Handley's report

5  that are not in your expert report?

6  A.  I don't recall it, but I assume that you did.

7  Q.  And do you recall asserting that you did not intend to

8  offer any opinions of Dr. Handley's report that were not in

9  your expert report?

10  A.  I don't recall specifically what I said.

11  Q.  Okay.  Then let's go to that page of your deposition.

12  A.  Yes.

13       MS. THOMAS-LUNDBORG:  If we could go to page 82.  And

14  I'm starting at line 6 through line 15.

15  Q.  So I asked the question and you asked if there was a

16  rebuttal report, and then this question came after that:

17     "Okay.  She did not write a rebuttal report, and since

18  there is no rebuttal report, what opinions of her original

19  report do you intend to offer that are not in your rebuttal

20  report?

21     "Answer:  I don't have anything planned at the moment.

22     "Question:  You understand that the purpose of your report

23  was to disclose your opinions in this case?

24     "Answer:  Yes."

25       MS. THOMAS-LUNDBORG:  If we could go to the disclosed

1    opinions in this case, which are Intervenors' Exhibit 60.   And

2    just bear with me while I get the page number.   Page 18.

3    Q.   Do you recognize this as your critique of Dr. Handley in

4    your expert report?

5    A.   Yes.

6    Q.   Could you read what you said?

7    A.   Sure.

8        "Dr. Handley recommends the majority African-American

9    district be at least with 45 percent black voting age

10   percentage in Ohio.   It is interesting to note that Dr. Handley

11   recommended a majority African-American district of over 61

12   percent BVAP in a recent lawsuit in Euclid, Ohio, which is in

13   Cuyahoga County," and then I cite the case.

14   Q.   And this was the extent of your expert opinion on Dr.

15   Handley's report in your report; correct?

16   A.   That's what was in my report, yep.

17   Q.   Now, in addition to reviewing Dr. Handley's initial report,

18   you had Dr. Handley's data; is that correct?

19   A.   I believe that's correct.

20   Q.   And you looked at that data?

21   A.   I think that I did.

22   Q.   And you also discussed Dr. Handley's data with Mr. Clark

23   Bensen?

24   A.   I believe that we did.

25   Q.   Now, you've testified in the past as an expert witness in

```
1   voting rights cases; is that correct?
2   A.  That's correct.
3   Q.  And as part of your testimony you conducted racially
4   polarized voting analysis; is that correct?
5   A.  I have.
6   Q.  And there are three tests to determine if there is racially
7   polarized voting; is that right?
8   A.  Well, there's various tests.
9   Q.  Okay.  Are you familiar with the homogeneous precinct
10  analysis?
11  A.  Yes.
12  Q.  And is that one of the tests to determine if there's
13  racially polarized voting?
14  A.  Yes.
15  Q.  And are you familiar with ecological regression?
16  A.  Yes.
17  Q.  Is that one of the tests to determine if there's racially
18  polarized voting?
19  A.  Yes.
20  Q.  Are you familiar with ecological inference?
21  A.  Yes.
22  Q.  Is that one of the tests used to determine if there's
23  racially polarized voting?
24  A.  Yes.
25  Q.  And Dr. Handley conducted all three tests?
```

```
 1   A.  I believe that's correct.

 2   Q.  Have you conducted any of the tests for this case?

 3   A.  Any -- I have done no voting -- racial bloc voting analysis

 4   on my own for this case.

 5           MS. THOMAS-LUNDBORG:  If we could go to what was

 6   marked as Intervenors' 132, which is the map of the Board of

 7   Elections municipalities.  I have one -- if we could actually

 8   look at the color-coded one.

 9   Q.  Okay.  Looking at this map, do you know what the racial

10   breakdown is of the counties in red?

11   A.  They aren't counties.  The parts of the county?  I don't

12   know the racial breakdown for each one of those.

13   Q.  Do you know what the racial breakdown is of the areas in

14   white?

15   A.  No, not specifically.

16   Q.  Are you aware that, based on census data, the red areas

17   have a black voting age population of 1.7 percent?

18           MS. McKNIGHT:  Objection, Your Honor.

19           JUDGE BLACK:  Basis?

20           MS. McKNIGHT:  This assumes facts not in the record.

21   Thank you.

22           JUDGE BLACK:  The objection's noted.

23   Q.  Are you aware --

24   A.  Could you repeat it again?

25   Q.  Are you aware that the red areas have census -- the census
```

1   data says that these red areas have a black voting age

2   population of 1.7 percent?

3   A.   I don't know if that's true or not.

4   Q.   Are you aware that Huntington Valley (verbatim), which is

5   in this map, has two percent black voters?

6   A.   I'm not aware of that.

7   Q.   Well, what about Valley View:  Do you know what the

8   African-American voter percentage is in Valley View?

9   A.   I don't.

10  Q.   Bentleyville, which is also in this map?

11  A.   Not specifically, no.

12          MS. McKNIGHT:  Your Honor, I don't mean to interrupt,

13  just I'd like to note a standing objection to facts not in the

14  record.

15          JUDGE BLACK:  Very well.

16          MS. McKNIGHT:  Thank you.

17          MS. THOMAS-LUNDBORG:  And my only response is I'm

18  trying to understand the nature of this newly-disclosed exhibit

19  and what the witness knows about it.

20          JUDGE BLACK:  Very well.

21  Q.   What are the populations of the red areas?  Do you know

22  what that is?

23  A.   What do you mean, the populations?

24  Q.   What's the population number?

25  A.   Oh.  What's the total population?

1  Q.  In red.

2  A.  In the red areas?

3  Q.  Yes.

4  A.  I don't know a specific number.

5  Q.  Do you know a relative number?

6  A.  No.

7  Q.  Do you know what the population number is of the areas in

8  white?

9  A.  No, not specifically.

10  Q.  Do you know if more people live in the areas in white than

11  in the areas in red?

12  A.  I don't.

13  Q.  Now, getting back to your work on Dr. Handley's data.  You

14  reviewed Dr. Handley's data, and you found no errors in her

15  data?

16  A.  I don't recall saying that.  I assume that's in the

17  deposition, but if we want to review that --

18  Q.  Okay.

19  A.  -- you could show me where it is.

20        MS. THOMAS-LUNDBORG:  If we could go to page 88 of Dr.

21  Brunell's deposition.

22  Q.  Starting at line 17, down to 25.

23  A.  Right.

24  Q.  "Okay, and we've discussed" --

25        "Question:  Okay, and we've discussed you received Dr.

1    Handley's data, correct?

2         "Answer:  Yes.

3         "Question:  You reviewed her data, correct?

4         "Answer:  I looked at it.

5         "Question:  Did you find any error in her data?

6         "Answer:  None that I found, no."

7              MS. THOMAS-LUNDBORG:  And then if we could move on to

8    the next page.

9    Q.  "Question," which starts at line 24 on the previous page:

10   "Did you find any errors in her calculations?

11        "Answer:  I didn't find any, no."

12   A.  Correct.

13   Q.  Did I read that correctly?

14   A.  Yes, ma'am.

15   Q.  You testified at your deposition that you did not conduct

16   any racially polarized voting analysis because you weren't

17   asked to; is that right?

18   A.  I don't recall.

19   Q.  You don't recall whether you were asked to or whether that

20   was your testimony?

21   A.  Whether that was my testimony.

22   Q.  Do you recall whether you were asked to?

23   A.  Yeah, I wasn't asked to.

24   Q.  Now, at your deposition you couldn't tell me the black

25   voting age population needed to meet VRA requirements in Ohio's

1  congressional district in Cuyahoga County; is that right?

2  A.  Correct.

3  Q.  Do you recall being asked by intervenors' counsel about

4  packing?

5  A.  Earlier today, yes.

6  Q.  Yes.  And do you recall testifying that over 50 percent,

7  close to 50 percent was not packing?

8  A.  Correct.

9  Q.  Are you familiar with *Cooper v. Harris* in the Supreme Court

10 in 2017?

11 A.  Not specifically.

12 Q.  Are you aware that the Supreme Court there found that a

13 district with 50.7 percent BVAP was an unconstitutional racial

14 gerrymander?

15      MS. McKNIGHT:  Your Honor, I would object on two

16 points:  Asks for a legal conclusion and, also, relevance.  She

17 is identifying a 2017 case.  I was asking Dr. Brunell about

18 what was going on in 2011.

19      JUDGE BLACK:  The objections are noted.

20      MS. McKNIGHT:  Thank you.

21      MS. THOMAS-LUNDBORG:  Your Honor, we would ask that

22 the Court take judicial notice of the Supreme Court decision in

23 *Cooper v. Harris*.

24      JUDGE BLACK:  Yeah, it's a Supreme Court decision.

25      MS. THOMAS-LUNDBORG:  Okay.

1  Q.  Now, I'd like to touch on your expert report and its

2  discussion of Euclid.  Do you recall that?

3  A.  Yes.

4  Q.  Do you know what portion of Cuyahoga County is Euclid?

5  A.  I believe it's, like, the north part of Cuyahoga County.

6  Q.  Okay.  Do you know how big Euclid is?

7  A.  In terms of square miles or people?

8  Q.  In terms of population.

9  A.  No.

10  Q.  Do you know how the population of Euclid compares to the

11  population of, for example, Cleveland?

12  A.  In terms of, like, racial and ethnic backgrounds?

13  Q.  In terms of racial and ethnic background, but also just

14  total population.

15  A.  The -- I mean, the county, obviously, had more people than

16  Euclid.

17  Q.  My question is, is Cleveland bigger than Euclid?

18  A.  Cleveland's bigger.

19  Q.  Now, you referred to Dr. Handley's analysis in the Euclid

20  case in this case.  Would you agree that minorities in cities

21  do not necessarily vote the same?

22  A.  As each other?

23  Q.  Yes.

24  A.  Yes, I would agree.

25  Q.  And you would agree that the voting patterns in Euclid do

1  not necessarily reflect the vote patterns in Cleveland?

2  A.  Absolutely.

3  Q.  Sure.  Do you know what election was at issue in the Euclid

4  case?

5  A.  I believe it was, like, school board elections.

6  Q.  And do you know if those elections were partisan elections?

7  A.  I don't.  If I -- if I had to guess, I'd say they weren't,

8  but I don't know for sure.

9  Q.  Are congressional elections partisan elections?

10 A.  Yes, they are.

11 Q.  If you were doing a racially polarized analysis for a

12 congressional election, you would look at partisan election

13 outcomes?

14 A.  Yes.

15 Q.  Are you aware if it's possible to draw a map -- to draw a

16 district in Ohio with 45 percent BVAP in any other area than in

17 the Cuyahoga County area?

18 A.  I'm not sure.

19        MS. THOMAS-LUNDBORG:  And excuse me if this has been

20 asked and answered.  I will withdraw it if so.

21 Q.  As you sit here today, can you tell me what the before BVAP

22 should be to meet VRA requirements in the congressional

23 district in Ohio that encompasses Cuyahoga County?

24 A.  Well, based on Handley's report, it's 45 percent.

25 Q.  And is that your testimony --

1     My question is, can you tell me what the BVAP should be?

2  A.  In the Congressional District 11?

3  Q.  Yes.

4  A.  Not in Cuyahoga County by itself?

5  Q.  In the current District 11, in the area of Cuyahoga County,

6  do you have any opinion as to what the BVAP should be?

7  A.  For current District 11, I think that Dr. Handley's advice

8  of 45 percent is correct, but that's just -- that's district-

9  specific.  That's not for Cuyahoga County.  That's for

10  Congressional District 11.

11  Q.  Now, a minute ago, we discussed the three different

12  analyses that can be run for racially polarized voting.  Do you

13  recall that?

14  A.  I do.

15  Q.  Do you recall that one of those analyses is Gary King's

16  ecological inference?

17  A.  That's correct.

18  Q.  And do you recall that that particular analysis looks not

19  just at the district, but at borrowed strength from neighboring

20  districts?

21  A.  It does.

22  Q.  Now, we've talked a little bit about Dr. Cho's report.  You

23  read Dr. Cho's report; is that correct?

24  A.  That is correct.

25  Q.  And you also read Dr. Cho's rebuttal report; is that

1  correct?

2  A.  I did.

3  Q.  And that was prior to your deposition?

4  A.  I believe that it was.

5  Q.  And you not only read her report, but you, at least, had

6  some of the underlying data?

7  A.  Yes, I did have some of the -- well, not some of the

8  underlying -- well, some of the data that was produced about

9  the maps that she produced, yes.

10  Q.  Okay.  And you reviewed that?

11  A.  I did.

12  Q.  And you reviewed that with Clark Bensen?

13  A.  On my own and some I probably talked with Clark about it

14  too.

15  Q.  Okay.  Do you consider one of your areas of expertise to be

16  operations research?

17  A.  No.

18  Q.  Do you consider one of your areas of expertise to be

19  computer science?

20  A.  No.

21  Q.  Now, you were asked some questions by counsel about C and

22  C++.  Do you know what the difference is between C and C++?

23  A.  I don't --

24     Was I asked that here or in the deposition?

25  Q.  I've asked you in your deposition whether you know the

```
 1  difference between C and C++.
 2  A.  Right.  I think you did.
 3      I don't recall what I said.  I don't -- I'm not versed in
 4  C++, and so I don't know the difference between the two of
 5  them.
 6  Q.  And Dr. Cho's code is in C++; is that right?
 7  A.  That's what she's said, yes.
 8  Q.  And you can't program in C++?
 9  A.  I don't program in C++.
10  Q.  And you can sort of read C++ but you're not fluent; is that
11  right?
12  A.  That's what I testified to, that's correct.
13  Q.  So you couldn't -- so you couldn't tell whether the code
14  delineates how maps are generated in her model; right?
15  A.  I can't tell from C++ code what she's done with maps.
16  Q.  Now, you described Dr. Cho's analysis in your report as
17  using complicated algorithms to generate hypothetical
18  congressional districts for Ohio; is that right?
19  A.  That sounds right.
20  Q.  Did you run any algorithms to generate hypothetical
21  districts for Ohio?
22  A.  No.
23  Q.  Have you ever generated a set of hypothetical congressional
24  districts using a complicated algorithm such as Dr. Cho?
25  A.  I haven't.
```

1   Q.  Do you understand that the purpose of Dr. Cho's analysis is

2   to determine whether or not the enacted map is an outlier in

3   the universe of possible maps?

4   A.  That's what she says, yes.

5   Q.  You have not run any outlier analysis for Ohio; right?

6   A.  I looked at her analysis.

7   Q.  Have you run your own analysis for Ohio?

8   A.  I did not.  I was critiquing what she did.

9   Q.  Have you run an outlier analysis like Dr. Cho in any other

10  context?

11  A.  In -- I mean, you do outlier analysis all the time, but not

12  with respect to, like, a redistricting case.  If that's what

13  she meant specifically, no.

14  Q.  You haven't done any independent analysis of Ohio's

15  political geography; right?

16  A.  I don't know.  That's kind of a big, encompassing question.

17  I don't -- I don't know if I could say that I haven't.

18  Q.  If we could look at page 99 of your deposition.

19  A.  Sure.

20  Q.  I'm on line 4 through line 24.  And, actually, I won't

21  extrapolate, because it was long, but the context is there for

22  the Court.

23      I asked at line 4:

24      "Have you done any analysis of Ohio's geography?

25      "Answer:  No."

THOMAS BRUNELL - CROSS

1     MS. McKNIGHT:  Your Honor, I would just note for the

2  record there was an objection at the time, likely to the form

3  of the question.

4     JUDGE BLACK:  Very well.

5  Q.  Now, I think you testified in your direct testimony that

6  Dr. Cho failed to include a number of criteria that you thought

7  were important; right?

8  A.  Right.

9  Q.  One was incumbency protection -- not in necessarily the

10 order you gave it, but incumbency protection?

11 A.  That was one.

12 Q.  Equal population?

13 A.  Right.

14 Q.  And then core retention?

15 A.  Right.

16 Q.  And those were the main three that you discussed; is that

17 right?

18 A.  And then the Voting Rights Act since that time.

19 Q.  And the Voting Rights Act.  I think we've discussed the

20 Voting Rights Act.

21 A.  Right, we have.

22 Q.  We may get back to it, but focusing on --

23 A.  On those three.

24 Q.  Okay.  Were there any others that I left out?

25 A.  I think that's it.

1    Q.   Okay.   Is incumbency protection legally required?

2    A.   It's not.

3    Q.   Is core retention legally required?

4    A.   No.

5    Q.   What is your basis for saying that incumbency protection

6    should have been included in Dr. Cho's map?

7    A.   Because it could have been one of the most important

8    factors that the legislature was trying to use when it was

9    redrawing its map.   So in order to make the basis of comparison

10   -- right? -- you have to have -- you have to be drawing similar

11   maps -- right? -- to the -- to the enacted map in order to do

12   an outlier analysis.   And so to the extent that she used

13   different factors, different criteria in her programming, that

14   calls into question the utility of making these comparisons.

15   Q.   Do you know what role incumbency protection played in the

16   legislative decision here?

17   A.   I mean, it's hard to quantify.   I think it played a role.

18   Q.   And what's the basis for your opinion?

19   A.   I think there might have been some testimony early on about

20   that, but I don't -- I don't recall specifically.

21   Q.   Okay.   Are you aware that the legislator paired three

22   instead of two incumbents?

23   A.   I don't know what you mean.

24   Q.   Three sets of incumbents instead of two sets of incumbents.

25   Were you aware of that?

```
 1    A.   I think I've seen that in the testimony, yes.

 2    Q.   And that was more incumbents than necessary?

 3    A.   The -- the bare minimum was pairing two, and three is more

 4    than two.

 5              THE COURT:  Will you tell me when a good time is to

 6    break?

 7              MS. THOMAS-LUNDBORG:  We could break now.

 8              JUDGE BLACK:  How much more do you think you have?

 9              MS. THOMAS-LUNDBORG:  I'm about halfway done.

10              JUDGE BLACK:  I think we should take our lunch break

11    now.  It's high noon, a couple of minutes after.  I'd like to

12    break until 1:05.

13         During the period of the break, the witness is not to

14    discuss his testimony.

15         And he understands; correct?

16              THE WITNESS:  I do.  I do, Your Honor.

17              JUDGE BLACK:  All right.  Lunch break.

18              COURTROOM DEPUTY:  All rise.  This court is in recess

19    until 1:05.

20         (Witness temporarily excused.)

21         (At 12:04 PM, a luncheon recess was taken.)

22                              -  -  -

23                         AFTERNOON SESSION

24         (Thomas Brunell resumes the witness stand.)

25         (In open court at 1:04 PM.)
```

1        JUDGE BLACK:  Thank you.  Please be seated.

2     We're back on the record in the open courtroom.  It's 1:05.

3  The plaintiffs' lawyers are here, the defense lawyers are here,

4  the intervenors' lawyers are here.  The witness is on the

5  stand.

6     You remain under oath.  You understand, sir?

7        THE WITNESS:  Yes, Your Honor.

8        JUDGE BLACK:  Very well.  Counsel, you may proceed

9  when you're ready.

10       MS. THOMAS-LUNDBORG:  Thank you, Your Honor.

11             CROSS-EXAMINATION (Continued)

12  BY MS. THOMAS-LUNDBORG:

13  Q.  Good afternoon, Dr. Brunell.

14  A.  Good afternoon.

15  Q.  When we went on lunch break we were discussing the

16  traditional redistricting criteria that you said Dr. Cho did

17  not consider in her simulation.  And just by way of reminder,

18  we had listed incumbency protection, core retention, equal

19  population, and then VRA.  So I think we've now discussed

20  incumbency, so I will move on to the other ones.

21  A.  Sure.

22  Q.  Now, I believe I asked you right before break, but just a

23  refresher of everyone's recollection, is retention of cores a

24  legally required criteria?

25  A.  It is not.

1   Q.  Now, we discussed -- during your direct you discussed a

2   book that you published; is that right?

3   A.  I did.

4           MS. THOMAS-LUNDBORG:  And if I could go to Impeachment

5   Exhibit 34.  And if we could go to chapter four.  Yes.  Just

6   the very first page of chapter four.  We're going to do some

7   scrolling through.

8   Q.  I also have paper copies if that would be helpful to you.

9   A.  If you blow up things, that -- that works, yeah.

10  Q.  Okay.  Great.

11      So this chapter in your book is titled "Traditional

12  Redistricting Principles," right?

13  A.  It is.

14  Q.  And within this chapter you highlight some traditional

15  redistricting principles; right?

16  A.  That's correct.

17  Q.  Okay.  On page 51, the first one is "single-member

18  districts"; is that right?

19  A.  Yes.

20  Q.  And then we can just quickly move on to the next one, if

21  you flip.  Page 52, "equal population" is another one; is that

22  right?

23  A.  Yes.

24  Q.  Okay.  And then on page 58, "contiguity" is one?

25  A.  Right.

1    Q.  And then on page 59, "compactness" is one?

2    A.  Yes.

3    Q.  And then on page 66, "preserve communities of interest" is

4    one; right?

5    A.  Correct.

6    Q.  And then on page 68, the "protecting incumbents"?

7    A.  Correct.

8    Q.  And then on page 70, "VRA"?

9    A.  Yes.

10   Q.  And I'll represent that there are no other subheadings in

11   your book.

12   A.  Okay.

13   Q.  Number of these subheadings were preservation of cores;

14   correct?

15   A.  They were not.

16   Q.  Do you know how the map drawers operationalized

17   preservation of cores for Ohio's map?

18   A.  No, I don't.

19   Q.  How would you recommend that a simulations expert

20   operationalize preservations of core?

21   A.  Well, you would -- what you could do is you take the

22   benchmark district -- right? -- the districts before

23   redistricting, and then you take the new districts that were

24   drawn, and then you could measure the extent to which they

25   overlap.  Right?  And you would do it by population, not by

1   square miles.  Right?  It's how many people are in the same

2   district.  And then that would give you a measure of core

3   retention.

4       And then she could put that -- an additional parameter in

5   her model, like she did with lots of other parameters, to say

6   core retention has to be at least .5, half, something like

7   that.  So that's how she could do it.

8   Q.  And have you ever done something like that for a

9   simulation?

10  A.  I have not.

11  Q.  Okay.  Just quickly, we discussed a bit, or a lot, the

12  Voting Rights Act; correct?

13  A.  Yes.

14  Q.  Have you ever created a VRA district as part of a

15  districting simulation?

16  A.  Have I ever drawn --

17  Q.  As part of a simulation, have you ever had to create a VRA

18  district in the simulation context?

19  A.  No.

20  Q.  And you don't have a recommendation for how simulations

21  should treat VRA districts; right?

22  A.  No -- I think I might.  I've seen in other cases where

23  plaintiffs' experts do simulations similar to those that

24  Professor Cho did.  And what they do is, they just lock in the

25  VRA district.  Right?  And then -- all the other -- so that

 1    district or those districts, depending on the state, the VRA

 2    districts are just locked in and they don't change.  And then

 3    the rest of the map, the simulations change around those

 4    locked-in districts.  So that's another approach that could be

 5    taken.

 6    Q.   And that's an approach that you have criticized; correct?

 7    A.   Yes.

 8    Q.   And you criticized Dr. Chen for that approach in Michigan;

 9    correct?

10    A.   I believe that I did.

11    Q.   Okay.  And when I asked you at your deposition whether you

12    had a recommendation for how simulations should be drawn, you

13    did not have a recommendation at that time?

14    A.   Okay.

15    Q.   Is that a yes?

16    A.   I believe you, if that's what you're saying.  I don't

17    recall the specific question and answer.

18    Q.   Would it help to refresh your recollection by looking at

19    your deposition transcript?

20    A.   If you would like me to, I'm happy to do it.

21         MS. THOMAS-LUNDBORG:  Okay.  If we could pull up page

22    116 of Dr. Brunell's deposition.  And I'm on line 19, and it's

23    going to spill over to the other page, to line 3 on the other

24    page.

25    Q.   "Question:  I have -- putting aside your question about

```
 1  looking at the actual maps, do you have a recommendation for
 2  how simulations should treat VRA districts?
 3      "Answer:  I haven't -- I've never done it, so I wouldn't --
 4  I would have to give that some thought.  I don't have some rote
 5  answer off the top of my head for you."
 6      Does that refresh your recollection that that was your
 7  testimony at that time?
 8  A.  Yes.
 9  Q.  Okay.  The other traditional redistricting criteria that
10  you criticized Dr. Cho for is equal population; is that right?
11  A.  Correct.
12  Q.  And you would agree that election outcomes are not
13  available at the census block level; right?
14  A.  They're available at the voting tabulation district level.
15  Q.  Are they available at the census block level?
16  A.  I honestly don't know if you could aggregate two census
17  block levels from voting tabulation district levels.
18  Q.  You've criticized experts in the past for using voting
19  results at the below-the-census-block level; correct?
20  A.  I don't know.
21  Q.  Well, you don't know.  Okay.
22  A.  I don't recall.
23         MS. THOMAS-LUNDBORG:  If we could look at Impeachment
24  Exhibit 33.  And if we could go to, actually --
25  Q.  This is your deposition testimony in the case of *Ohio State*
```

1  Conference for the National Association of the Advancement of

2  Colored People versus Husted, and the deposition was taken on

3  July 30th, 2014.

4      If we could go to page 138.  And I'm starting in the

5  line -- on line 15.

6      "Question.  But you claim that there are problems as well

7  in using this smaller unit.  What do you claim are the

8  problems?

9      "Answer:  Well, I mean, first, I've never seen anybody use

10  census block data."

11      Did I read that correctly?

12  A.  That looks correct.

13  Q.  And Dr. Cho constructs her maps at the precinct level and

14  not the census block level; is that right?

15  A.  I believe that's the case.

16  Q.  And you would need to use census blocks in order to

17  equalize population; is that right?

18  A.  Not necessarily.  I don't think so.

19  Q.  I believe -- okay.  Well, I think we can look at the direct

20  testimony.

21      Now, just so we're clear, you believe using equal

22  population is important; is that right?

23  A.  Correct.

24  Q.  And that started with Baker v. Carr in 1972; is that right?

25  A.  Right.

1    Q.  Okay.  Now, one of your other critiques of Dr. Cho is her

2    use of responsiveness; is that right?

3    A.  Yes, I believe I talked about responsiveness.

4    Q.  And you look at responsiveness --

5            MS. THOMAS-LUNDBORG:  Actually, if we could go to

6    Intervenors' Exhibit 60, page seven.

7    Q.  And I believe this is where you start your analysis of

8    responsiveness.

9        And one of the things that you do is you compare Dr. Cho's

10   analysis to Tufte; is that right?

11   A.  Tufte.

12   Q.  Tufte.

13   A.  No problem.

14   Q.  Sorry.  I didn't get it at deposition and I did not get it

15   today.  Okay.  Tufte.

16       And according to your report, Tufte looks at all

17   jurisdictions that predate *Baker v. Carr*; right?

18   A.  No, I don't think so.

19   Q.  Does he have any jurisdictions that post-date 1970 in his

20   data set?

21   A.  I think *Baker v. Carr* was in the '60s.

22   Q.  1972, I believe, is what we just said.

23   A.  Is that right?

24   Q.  Yes.

25           MS. McKNIGHT:  Your Honor, we don't mean to interrupt.

1    We'd just like to enter our objection assuming either erroneous

2    facts or facts not in the record.  Thank you.

3          JUDGE BLACK:  Very well.

4    Q.  I believe, and I'll find the direct -- Dr. Brunell states

5    what the data set is for Tufte, so I will find it for everyone.

6    A.  I mean, the dates are listed for what Tufte uses.  And

7    they -- the latest -- he published this piece in, I believe,

8    1973.  And the data --

9          So this is responsiveness.  It doesn't have anything to do

10   with one person, one vote.  Those are two completely different

11   things.  So it wouldn't have any impact -- *Baker v. Carr*

12   wouldn't affect it.  But the dates all end -- the latest data

13   in the table is 1970.

14   Q.  And just so I can clearly understand what your critique of

15   Dr. Cho was, is that you can't compare maps that have equal

16   population versus maps that don't; is that right?

17   A.  I don't think that was my testimony.

18   Q.  What is your critique of Dr. Cho's use of or not use of

19   equal population?

20   A.  Oh, oh.  No, maybe you did -- you might have characterized

21   that correctly.

22         So she doesn't draw maps that are equally populous, which

23   is required for congressional elections, and, therefore, they

24   aren't suitable substitutes for the enacted map.  And then they

25   might -- they're not good comparisons.

1    Q.  If we could go back to your report, it was Intervenors'

2    Exhibit -- Intervenors' Exhibit 7.  I'm sorry, 60.  Page seven.

3    And the line that begins with, "Three is actually" -- yeah.

4    "Three is actually quite responsive to voters," kind of midway

5    down.  Yes.

6    A.  I see it.

7    Q.  And this is your discussion of responsiveness; is that

8    right?

9    A.  Yes, this is part of it.

10   Q.  And if you could read that first sentence.  I just want to

11   discuss it a little bit to make sure I understand it correctly.

12   A.  Starting with the word "Maps" or --

13   Q.  "Three is actually," the highlighted.

14   A.  Okay.  "Three is actually quite responsive to voters" --

15   that's the level.  Three is the level of the swing ratio.

16   "Three is actually quite responsive to voters, indicating that

17   for every additional one percent of the vote, a party can

18   expect to get an additional three percent of the seats."

19   Q.  Okay.  And if you could go on.

20   A.  "So if the party gets 54 percent of the seats with 51

21   percent of the vote, if their vote share increases to 52

22   percent, we would expect their share of the seats to increase

23   to 57 percent."

24        MS. THOMAS-LUNDBORG:  Okay.  If we could move this

25   particular language off to the side and then open Plaintiffs'

1    Exhibit 571.  And page 16, Figure 2.  Okay.

2    Q.  Dr. Warshaw also ran a responsiveness analysis; correct?

3    A.  I believe that's correct.

4    Q.  And that's what is represented here in Figure 2; is that

5    correct?

6    A.  Yes.

7    Q.  Okay.  And so you use the example of what would be the

8    expectation of seats moving in a responsiveness curve to find

9    that Ohio is responsive; is that right?

10   A.  Yes.

11   Q.  Okay.  According to Dr. -- I'm sorry -- Dr. Warshaw's

12   analysis, how many seats would a Democrat get with 20 -- with

13   30 percent of the vote?  Let's do something easy.

14   A.  It looks like between 20 -- it looks like it's between 20

15   and 30 percent of the seats.

16   Q.  And with 40 percent of the vote?

17   A.  The same.

18   Q.  And with 50 percent of the vote?

19   A.  The same.

20   Q.  And so according to the S curve drawn by Dr. Warshaw,

21   there's no change in the seat share between 30 and 50 percent

22   at a minimum in Ohio?

23   A.  That's correct.  Although, in the -- on the lower bounds we

24   don't expect a lot of action.  It's really kind of in the

25   competitive region.  But your statement is correct.

1    Q.  Now turning to Dr. Warshaw's report.  I think we can remove

2    your report.

3         You had the expert report of Dr. Warshaw before you wrote

4    your report, at least his initial report?

5    A.  Yes.

6    Q.  And you had his rebuttal report before your deposition; is

7    that right?

8    A.  I believe that that's true.

9    Q.  And you not only read Dr. Warshaw's report, but you read

10   the underlying data accompanying it; is that right?

11   A.  I -- I read the data?

12   Q.  You reviewed the data?

13   A.  I had the data, for sure.

14   Q.  And you reviewed the data?

15   A.  To what extent I did, I don't recall, but I'm pretty sure I

16   looked at it.

17   Q.  Okay.  And when you reviewed his data, you didn't find any

18   errors in Dr. Warshaw's data?

19   A.  I don't recall reporting any, no.

20   Q.  Now, in Dr. Warshaw's report he writes about partisan bias;

21   is that right?

22   A.  Yes.

23   Q.  And you've written about prior partisan bias in the past;

24   is that right?

25   A.  That's correct.

1    Q.  And there are multiple ways of calculating partisan bias;

2    is that right?

3    A.  There is.

4    Q.  And you're familiar with those methods of calculating

5    partisan bias?

6    A.  Yes.

7    Q.  Now, in your report you only provide a critique of the

8    efficiency gap; is that right?

9    A.  For Warshaw?

10   Q.  Yes.

11   A.  I know that's what I concentrated on.  I don't know if I

12   mentioned any of the -- any of the other ones or not, but I

13   know that the efficiency gap was really the concentration.

14   Q.  Did you critique any of the other measures in your report?

15   A.  I would have to look really quickly.

16       In his section, the efficiency gap is the only one of the

17   metrics that he uses that I mention.

18   Q.  Okay.  Now, one of your critiques of Dr. Warshaw is his use

19   of congressional election data; is that right?

20   A.  Correct.

21   Q.  And we talked about the fact that you've calculated

22   partisan bias measures in the past.  Have you calculated

23   partisan bias measures as part of cases in the past, as part of

24   your expert testimony in the past?

25   A.  I believe I have.

1  Q.  Okay.  And one of those cases was *Vieth*; is that right?

2  A.  Yes.

3  Q.  And in *Vieth* you calculated hypothetical swing; right?

4  A.  Right.  I do remember doing uniform partisan swing in that

5  case.

6  Q.  And when you calculated partisan uniform swing, you used

7  congressional election data; is that right?

8  A.  I don't recall.  That was 20 years ago.

9          MS. THOMAS-LUNDBORG:  Okay.  If we could go to

10  Impeachment Exhibit 65.  This is from Westlaw.

11  Q.  The citation is here, and it states that it is your partial

12  testimony from February 26, 2002.

13          MS. THOMAS-LUNDBORG:  And if we could move to the

14  question on page two -- or the answer on page two.

15  Q.  And I will read your answer:

16      "Again, with hypothetical swing, the other method I would

17  use is congressional election data.  I can't think of any

18  others off the top of my head that you'd use statewide election

19  data to get an estimate of partisan bias, a point estimate."

20      So at least you testified that congressional election data

21  could be used?

22  A.  Right.  That's the other method.  Presumably, I used

23  statewide elections in this testimony.  I don't know, but it

24  sounds like that's what I'm saying, that you could also use

25  congressional election data.

1  Q.  Okay.  You would agree that statewide elections ultimately

2  do not, in fact, elect any legislators?

3  A.  I do.

4  Q.  And you would, therefore, agree that congressional election

5  data should be used instead of statewide election data?

6  A.  No.  I disagree.

7             MS. THOMAS-LUNDBORG:  Okay.  Could we look at

8  Impeachment Exhibit 37.

9  Q.  This is your expert testimony in the Michigan case; is that

10  right?

11  A.  I don't know.

12  Q.  Would you like to have a paper copy?

13  A.  Sure.

14     (Ms. Thomas-Lundborg hands document to the witness.)

15             THE WITNESS:  Thank you.

16             MS. McKNIGHT:  Your Honor, we don't mean to interrupt.

17  I would like to lodge a standing objection to the propriety of

18  use of what are termed impeachment exhibits.  An example,

19  earlier, it was not an impeachment exhibit.  It was used to

20  refresh recollection.  We have other examples where the

21  testimony is consistent, so it is not a proper impeachment

22  exhibit.  I will note the standing objection now.  We can deal

23  with this later during briefing on exhibits and testimony.

24             JUDGE BLACK:  Thank you.  Noted.

25  Q.  On page six of your report, you critique Dr. Jowei Chen; is

1   that right?

2   A.  It looks like it, yes.

3   Q.  Do you recall this?

4   A.  I mean, I wrote the report and -- I don't recall all the

5   specifics of it, but this is the report that I wrote for that

6   case, yes.

7   Q.  And do you recall critiquing Dr. Chen's use of statewide

8   data instead of congressional election data?

9   A.  It looks like that's what is going on on this page, yes.

10  Q.  Okay.  And you state on page six, as part of your critique

11  of Dr. Chen's use of statewide data and not congressional data,

12  that statewide elections ultimately do not, in fact, elect any

13  legislators; is that right?

14  A.  Where is that?

15  Q.  I believe -- and I gave away my copy to counsel, but I

16  believe it's on page six.  Yes.  It's underlined.  It's at the

17  top.  So it's not in the -- actually, if we could.  And it's

18  the last sentence in the top paragraph:  "Statewide elections

19  ultimately do not, in fact, elect any legislators."

20  A.  That's correct.

21  Q.  Okay.  Now, I'd like to get to data sources used by Dr.

22  Warshaw.  He uses surveys as one source of data.

23  A.  Okay.

24  Q.  Are you aware of that?

25  A.  I think I recall him using the CCES in part of his report.

```
1   Q.  Okay.  And you've used surveys in the past?

2   A.  I have.

3   Q.  And you're familiar with the CCES?

4   A.  Yes.

5   Q.  And the survey has -- among one of its authors is

6   Ansolabehere.  Is that right?

7   A.  I believe that's true.

8           MS. THOMAS-LUNDBORG:  I will give you the spelling.

9   Ansolabehere is the name for the record, but difficult to

10  spell.

11  Q.  And you've cited Ansolabehere's work in your peer-reviewed

12  work; right?

13  A.  I'm sure I have.

14  Q.  Now, we talked a little bit about partisan bias metrics.

15  Did you do any analysis of the durability of the efficiency gap

16  in Ohio?

17  A.  No.

18  Q.  Did you do any analysis of the durability of the other

19  partisan bias metrics in Ohio?

20  A.  I did not.

21  Q.  And Dr. Warshaw conducted a durability analysis on all of

22  the partisan bias metrics in his report?

23  A.  I don't know.  Are you telling me that he did?

24  Q.  I'm asking you if you are aware of that.

25  A.  I don't recall.
```

1   Q.   Okay.   One of your criticisms that I think you said on

2   direct and in your report of the efficiency gap is its use of

3   wasted votes; is that right?

4   A.   Yes.

5   Q.   And you've used a term "wasted votes" in your writing in

6   the past?

7   A.   I have.

8   Q.   And you've defined "wasted votes" as votes for the losing

9   candidate in your prior work?

10  A.   I think that's what I said in the book, yes.

11  Q.   And you've also referred to wasted votes as votes in excess

12  of what is needed to win for the winning candidate, in your

13  prior work; is that right?

14  A.   Maybe, yeah.

15  Q.   Is that a yes?

16  A.   I don't know.   I mean, I don't -- I can't remember

17  everything that I've written, I'm afraid.

18          MS. THOMAS-LUNDBORG:   Okay.   If we could look at IM22,

19  page 474.   And it is in the middle -- oop.   Sorry.   No.   It's

20  the first -- I think we have to remove what we currently have.

21  Yes, the first full paragraph.

22  Q.   I'm in the middle of the sentence where you state, "One

23  party wastes more of its votes by winning with much greater

24  average margins than does the other party"; is that right?

25  A.   Correct.

1  Q.  Okay.  So here you're using "wasted votes" as votes for the

2  winning party; is that right?

3  A.  Yes.

4  Q.  So your only quibble with the efficiency gap is the way in

5  which winning votes are calculated when it comes to wasted

6  votes?

7  A.  Yes, that's right, when it comes to wasted votes.

8  Q.  Now, I understood that one of your critiques of Dr. Warshaw

9  was his use of imputations, going back to the data source that

10  he used; is that right?

11  A.  Imputation and -- what -- what he has to do with

12  uncontested elections.

13  Q.  Okay.  And he imputed uncontested elections using a

14  regression model; is that right?

15  A.  I believe that's true.

16  Q.  And that regression model includes a value or a way to

17  conceptualize incumbency; is that right?

18  A.  I believe that that's true.

19  Q.  Okay.  You agree that polarization has increased in

20  Congress; is that right?

21  A.  Yes.

22  Q.  And you would agree that increased party polarization is,

23  arguably, the most important phenomenon of the modern U.S.

24  Congress; is that right?

25  A.  I think it's becoming -- in political science, everybody

 1   that studies Congress is studying polarization.  So, yes, it's

 2   becoming sort of the -- the dominant paradigm for the way that

 3   we study Congress.

 4   Q.  And when you have studied polarization in the past, you've

 5   used the DW-Nominate score?

 6   A.  Yes.

 7   Q.  And that's the same score that Dr. Warshaw uses?

 8   A.  I believe that that's correct.

 9   Q.  And you would agree that a change in a party that

10   represents a given district currently generates a huge

11   difference in the voting behavior of the representative?

12   A.  It can, since the parties are polarized.  Right?  When a

13   district swings from Democrat to Republican, since there's not

14   as much overlap between the parties as there used to be, the

15   change could be big.  But it's going to differ from -- you

16   know, it depends.  It depends on what the incumbent looked

17   like -- not what they looked like, but how they voted, what

18   their ideology was, and with the new person, how they vote.

19   Q.  And you would agree that when voters' preferred candidate

20   loses, this means the government is less likely to enact the

21   kinds of policies that those voters prefer?

22   A.  Yes.  Again, the -- you know, in terms of responsiveness

23   and representation, if you vote for the losing candidate --

24   right? -- on average you're going to be less well represented

25   then if you voted for the winning candidate.  But -- you're

 1   probably not going to be completely unrepresented.  Right?

 2   It's a continuum.  It's not yes or no, but it's to what degree

 3   are you represented.

 4   Q.  Okay.  Given your statement now and statements that you

 5   made on direct --

 6          MS. THOMAS-LUNDBORG:  I would like to show Impeachment

 7   Exhibit 34, which is your book, and I'm going to actually move

 8   that into evidence after I'm done with this question.

 9       If we could go to page 78.  Okay.  And it will take me a

10   minute to find this on the page.

11       It is in the first paragraph, middle of the paragraph.

12   Q.  This is from your book.  And you state -- the sentence

13   beginning with "One".

14       "One of the downsides of single-member district electoral

15   systems is that, inevitably, there will be a significant

16   proportion of the voting electorate whose votes are wasted

17   (i.e., they vote for a losing candidate and end up with no

18   representation)."

19       Did I read that correctly?

20   A.  You did.  That was a little bit -- I should have been a

21   little bit more careful with my -- with my words there at the

22   end, but that is what it says.

23   Q.  You found in the past that voters whose preferred candidate

24   wins the election are much more likely to be well represented

25   in Congress and more likely to have positive attitudes towards

1  the government; is that right?

2  A.  That is true.

3  Q.  All right.  You also believe that we should substantively

4  care about attitudes that Americans have toward the government

5  because dissatisfaction and cynicism can lead to less trust in

6  government?

7  A.  It sounds like you're reading from the book, and that seems

8  like a reasonable thing.  So I'm -- I'm sure that I -- that I

9  wrote that.  That sounds right.

10 Q.  You also believe that the less people trust in government,

11 the less likely they are to feel efficacious and participate in

12 the political system through traditional avenues such as

13 voting?

14 A.  Yes, I think that that's right.

15 Q.  And you've demonstrated through your own work that winning

16 voters are systematically happier with their member of Congress

17 in addition to being more satisfied with Congress as an

18 institution?

19 A.  That's true.

20 Q.  Now, earlier you gave some testimony about your support of

21 uncompetitive elections.  That's not an endorsement of

22 gerrymandering; is that right?

23 A.  Well, I don't think that it is.  Quite the opposite.  You

24 might mean something different by gerrymandering than I do,

25 but -- that's an absolute -- I don't -- it's not an endorsement

1  of gerrymandering.

2  Q.  And you would agree that partisan gerrymandering is a huge

3  problem in modern redistricting?

4  A.  It is.

5  Q.  And you would agree that partisan gerrymandering distorts

6  how voter preferences get translated into public policy?

7  A.  It can.

8        MS. THOMAS-LUNDBORG:  I have no further questions.

9        JUDGE BLACK:  Very well.

10       MS. THOMAS-LUNDBORG:  Oh, I'm sorry.  I would like to

11  move in Impeachment Exhibit 34.

12       JUDGE BLACK:  Any objection?

13       MS. McKNIGHT:  We'll note our objection on the grounds

14  of Rule 612 and 613, and we'll prepare to brief them later.

15       JUDGE BLACK:  Noted.  Thank you.

16                    REDIRECT EXAMINATION

17  BY MS. McKNIGHT:

18  Q.  Good afternoon, Dr. Brunell.  I have just a few topics I'd

19  like to discuss with you.

20  A.  Okay.

21  Q.  The first thing is I'd like to bring up Intervenors'

22  Exhibit 60, which is your report.

23  A.  Okay.

24  Q.  Page nine, Dr. Brunell.

25  A.  Yes.

1    Q.  Do you recall plaintiffs' counsel's question about your

2    table regarding the Tufte analysis shown here on page nine?

3    A.  I do.

4    Q.  And during her questions, her premise was that *Baker v.*

5    *Carr* was decided after Tufte's analysis.  Do you recall that

6    line of questioning?

7    A.  I do remember that.

8    Q.  Okay.  And I understood her questioning to mean that,

9    therefore, this analysis would not show the effects of *Baker*

10   *versus Carr*.  Was that your understanding, too?

11   A.  I think so.  I think that's where it was from.

12   Q.  I will offer you a different premise that happens to be

13   true.  *Baker versus Carr* was decided in 1962.

14        Now, looking at your table, do I read this correctly that

15   all but two of the jurisdictions studied by Tufte included data

16   post-dating *Carr*, and those are Great Britain, New Zealand,

17   U.S., all three U.S. jurisdictions, and then the last two

18   jurisdictions on the chart?

19   A.  I believe that's correct.

20   Q.  And maybe Michigan data did too, we just don't know from

21   this table; is that fair?

22   A.  Yeah, that is fair.  We don't know what -- what the years

23   are there.

24        MS. McKNIGHT:  Thank you.  You can take that down.

25   Q.  Now, I heard some confusion between questions and answers

 1  during your cross-examination, and I want to be sure that your

 2  testimony on this point is clear.

 3      First, is it your understanding that Dr. Handley's analysis

 4  in this case included election data post-dating 2011?

 5  A.  I believe some of it was.

 6  Q.  Now, is it your opinion in this case that in 2011,

 7  Congressional District 11 should have been drawn at 45 percent

 8  or some other percentage below majority minority?

 9  A.  No.

10          MS. THOMAS-LUNDBORG:  Just objection to the

11  characterization of Dr. Handley's data source.

12          JUDGE BLACK:  Very well.

13          MS. McKNIGHT:  I'll let the record speak for that,

14  Your Honor.

15  Q.  Now, I heard plaintiffs' counsel describe a gentleman named

16  Clark Bensen as a fact witness in this case.  Do you recall

17  those questions?

18  A.  I do.

19          MS. McKNIGHT:  Now, the lawyers can quibble over the

20  meaning of a fact witness in a case like this, and, for the

21  record, we object to that characterization.

22  Q.  But, for now, I'd like to get a sense from you, who is

23  Clark Bensen?

24  A.  Clark is -- Clark Bensen is the -- he owns a data -- an

25  election data company called POLIDATA.  And he's been around --

1  I've known Clark for over 20 years, and he is involved in cases

2  like this, but lots of other things too.  I mean, he creates --

3  he's one of the people that takes presidential election data

4  and then disaggregates it into congressional districts, which

5  is one of the, you know, data sources that we use, quote a lot.

6      So he kind of plays a role where he creates data and then

7  sells it, but then he also does play a role, oftentimes, in

8  litigation helping experts like me and other people.  And

9  sometimes he testifies, sometimes he doesn't, but that --

10 that's Clark.

11 Q.  And do you know that Mr. Bensen provides the political data

12 for *Cook Political Report*?

13 A.  Yeah, that's right.  That was the presidential election by

14 congressional district.

15 Q.  What is the *Cook Political Report*?

16 A.  That's a report by Charlie Cook, who's a Washington -- you

17 know, he's a political -- a guy in Washington, D.C., that is an

18 expert, basically, about congressional elections.  And he puts

19 out this report about this -- about elections.  You know, do we

20 expect them to be competitive, where are we likely to see maybe

21 changes, flips between Democrats and Republicans or visa versa.

22 And so that's what Charlie Cook does.

23 Q.  And do people rely on the *Cook Political Report* in your

24 field of work?

25 A.  Yeah, sometimes.

1  Q.  Now, in this case, do I understand correctly that you had

2  one month to prepare your rebuttal report?

3  A.  That sounds about right.

4  Q.  And am I also correct that your report reviewed four

5  different expert reports prepared by plaintiffs?

6  A.  That's right.

7  Q.  And did those reports include complex data issues?

8  A.  Yes, they did.

9  Q.  So in this case, why would you talk with Clark Bensen in

10 preparing your report?

11 A.  To get -- because there simply wasn't enough time for me to

12 do all of the data work, and Clark is better at data management

13 than I.  He's faster, you know, using data -- database

14 management software systems.  All right?  I can put together

15 the data, but he's much better at it.  So it's very often the

16 case that in -- in a case, it's very often the case that in a

17 case Clark is helping me with the data.

18 Q.  One question I forgot to ask you about the *Cook Political*

19 *Report*.  Is that considered to be a partisan report or a

20 nonpartisan report?

21 A.  Yeah, I think people generally think of it as nonpartisan.

22 Q.  Now, Dr. Brunell, the record shows -- and, for the record

23 here, day five transcript, page 272, lines eight through 16,

24 that in 2011 -- the state of Ohio hired Mr. Bensen because the

25 map drawer believed he was, quote, "very reliable and very

1    useful in making the data more workable."

2        Hearing that, did you work with him for similar reasons?

3    A.   Yes.   That's absolutely the reason.

4    Q.   Now, based on your experience, can map drawers draw maps

5    without workable data?

6    A.   No.

7        MS. THOMAS-LUNDBORG:   Just objection.   I don't think

8    they've laid the foundation that he's worked with map drawers

9    on drawing maps.

10       JUDGE BLACK:   Very well.

11   Q.   Could you have offered your opinion in this case without

12   workable data?

13   A.   No.

14   Q.   Did Clark prepare any of the substance of your opinion?

15   A.   No.

16       MS. McKNIGHT:   I'd like to pull up the rebuttal

17   demonstrative again.

18   Q.   Dr. Brunell, do you still have a paper copy of the rebuttal

19   demonstrative in front of you?

20   A.   You'll have to tell me what the rebuttal demonstrative is.

21       MS. McKNIGHT:   Your Honors, pardon me.   This is the

22   demonstrative showing the board of elections, Cuyahoga County,

23   Ohio, with shading based on Trump election results.

24       THE WITNESS:   I have it.

25   Q.   Now, during cross-examination, I heard plaintiffs' counsel

1  ask you questions about BVAP in certain municipalities on this

2  map.  Do you recall that?

3  A.  Yes, I do.

4  Q.  And I also heard her ask you questions about population in

5  certain municipalities within Cuyahoga County.  Do you remember

6  that?

7  A.  I do.

8  Q.  In your -- in your opinion, is it possible to conduct a

9  jurisdiction-specific functional analysis on the fly in a

10 courtroom?

11 A.  No.

12 Q.  And so when plaintiffs' counsel asked you about BVAP and

13 population in different spots in Cuyahoga County, is that

14 sufficient for a jurisdiction-specific function analysis?

15 A.  No.

16 Q.  Is it your position that you, Dr. Brunell, have the answer

17 for the appropriate level BVAP in Cuyahoga County?

18 A.  Absolutely not.

19 Q.  Is it your position that you have the answer for the

20 appropriate level of BVAP in any portion of Cuyahoga County?

21 A.  No.

22 Q.  Based on your work in this matter, have any of the experts

23 in this matter, on any side -- plaintiffs, defendants,

24 intervenors -- identified the appropriate level of BVAP in

25 Cuyahoga County to ensure that the minority community has an

1  opportunity to elect its candidates of choice?

2  A.  Not that I'm aware of.

3  Q.  And considering plaintiffs' counsel's questions and

4  considering the political performance of a good portion of

5  Cuyahoga County in favor of candidates who are not preferred

6  candidates, is it your understanding that a district-specific

7  functional analysis needs to be conducted on whatever district

8  is drawn within Cuyahoga County?

9         JUDGE BLACK:  Objection?

10        MS. THOMAS-LUNDBORG:  Yes.  Continuing objection that

11  no foundation was laid that Trump was or was not the preferred

12  the candidate of these voters.

13        MS. McKNIGHT:  I'll let the record speak for itself.

14  Q.  You can answer.

15  A.  You'll have to quickly repeat the question.

16  Q.  Sure.

17        MS. McKNIGHT:  Pardon me.  Would you mind repeating

18  the question?

19     (Question read.)

20  A.  I would say so, yes.

21  Q.  And I heard plaintiffs' objection.  Have you seen any -- is

22  there a type of analysis that can be done to identify a

23  preferred candidate for a minority community?

24  A.  Yes.

25  Q.  And did Dr. Handley conduct that analysis for the minority

1    community in Cuyahoga County in this case?

2    A.  Cuyahoga County only?

3    Q.  Yes.

4    A.  I don't think so.  She did -- again, she did CD11.  So she

5    didn't do all of Cuyahoga County.  She did part of it.  And her

6    analysis also includes parts that are outside Cuyahoga County.

7    Q.  Okay.  Is it your opinion that all the figures needed to

8    determine whether a district could perform drawn anywhere

9    within Cuyahoga County, that that data is available to be

10   analyzed?

11   A.  Sure.

12   Q.  And I understand it's also your opinion that it has not

13   been analyzed here; is that right?

14   A.  I don't believe that it has.

15   Q.  I heard plaintiffs' counsel ask about Mr. Cooper's proposed

16   maps.

17   A.  I remember that.

18   Q.  Now, based on the premise that I will offer that his maps

19   are drawn within Cuyahoga County, do we have the

20   jurisdictional-specific functional analysis we need to ensure

21   that his district will perform?

22   A.  I don't believe that we do.

23   Q.  Maybe it's been done, but we haven't seen it; is that

24   right?

25   A.  That's correct.

```
 1          MS. THOMAS-LUNDBORG:  I'd just like to have a standing
 2   objection to what Dr. Handley has done, the characterization of
 3   that.
 4          JUDGE BLACK:  Very well.
 5   Q.  Did anything in Dr. Cho's analysis consider where within
 6   Cuyahoga County her 3 million maps had been drawn?
 7   A.  I'm sorry.  Could you repeat that one again?
 8   Q.  Absolutely.
 9          Did anything in Dr. Cho's analysis consider where within
10   Cuyahoga County her 3 million maps had been drawn?
11   A.  I don't -- I don't know.  I don't -- the question -- I'm
12   not sure I understand what you mean by the question.
13   Q.  Okay.  Let me reask it then, so I'm clear.
14   A.  Yeah.
15   Q.  Based on your review of Dr. Cho's work, were you able to
16   determine where in Cuyahoga County her three million maps were
17   drawn?
18   A.  No.  No, we don't know.  Again, we haven't seen any maps.
19   So it's hard to -- nobody knows.
20   Q.  So we don't know which portion of Cuyahoga County her maps
21   capture; isn't that right?
22   A.  Absolutely not.  That's correct.
23   Q.  And my last question, I promise.  Has a
24   jurisdiction-specific functional analysis been conducted on any
25   one of Dr. Cho's 3 million maps?
```

```
 1   A.  Not that I'm aware of.
 2           MS. McKNIGHT:  Thank you, Dr. Brunell.  I have no
 3   further questions.
 4       Thank you, Your Honor.
 5           JUDGE BLACK:  Sir, you may step down.  You are free to
 6   go.
 7           THE WITNESS:  Thank you, sir.
 8           JUDGE BLACK:  Thank you.
 9       (Witness excused.)
10           JUDGE BLACK:  So who is the next witness?
11           MR. McKNIGHT:  Your Honors, the defendants call Dr.
12   Trey Hood next.
13           JUDGE BLACK:  If the Doctor would be willing to
14   approach.  We're going to put you in the witness stand over
15   here.
16       If you'd pause.  Do you solemnly swear or affirm that the
17   testimony you're going to give today is the truth, subject to
18   the penalty of perjury?
19           THE WITNESS:  I do.
20           JUDGE BLACK:  Very well.  The seat tips back.  Get
21   acclimated.  We're going to need you near the microphone.
22       Let's go ahead.
23                            M.V. HOOD III
24   a witness herein, having been first sworn, testified as follows:
25                         DIRECT EXAMINATION
```

```
1   BY MR. McKNIGHT:
2   Q.  Good afternoon, Dr. Hood.
3   A.  Good Afternoon.
4   Q.  Could you please state your full name.
5   A.  M.V. Hood III.
6   Q.  Please describe your educational background for the Court.
7   A.  I have three degrees in political science.  I have an
8   undergraduate degree from Texas A&M, a master's degree from
9   Baylor and a Ph.D. from Texas Tech University.
10  Q.  And what is your present occupation?
11  A.  I'm a professor of political science at the University of
12  Georgia.
13  Q.  And how long have you been a professor of political science
14  at the University of Georgia?
15  A.  I've been at UGA for 20 years now, almost 20 years.
16  Q.  And are you a full professor?
17  A.  Yes.
18  Q.  Are you tenured?
19  A.  Yes.
20  Q.  How long have you been tenured?
21  A.  I believe since 2006.
22  Q.  All right.  And what are your job duties as a professor of
23  political science?
24  A.  Well, I teach courses and I perform research.  More
25  recently, I've had some administrative duties I've been
```

```
 1   performing at the university.  About three years ago, three and
 2   a half years ago, I was tasked with starting a survey research
 3   center from scratch.  And I did that, and we've been in
 4   operation for about a year and a half.  So I've been directing
 5   that survey research center for about a year and a half now in
 6   full operation.  So some of my duties are directed towards --
 7   towards that administrative job.
 8   Q.  And could you give us some examples of entities for whom
 9   the research center performs surveys or research?
10   A.  We do surveys for quite a few different types of entities.
11   We do academic research surveys.  We do surveys for state and
12   local governments sometimes.  We do surveys for non-profits and
13   corporations.  We don't specifically survey for campaigns,
14   candidates or political parties.  We're trying to be sort of a
15   neutral, nonpartisan organization.
16       We do a lot of surveys in conjunction with Cox
17   Communications, which owns the *Atlanta Journal-Constitution*,
18   which is the, I guess, state paper of record, so to speak, in
19   the state of Georgia.
20       So we -- we do all the political polling for the AJC
21   recently.
22   Q.  Thank you.  And what kind of courses have you taught?
23   A.  Well, I've taught a variety of courses over the years.
24   Every spring I teach a class in Southern politics, and we have
25   a heavy dosage in that class of -- of voting rights and
```

1    redistricting, actually.  I've taught courses in American

2    politics, research methods, legislative process.  So quite a

3    few different classes over the course.

4        I've also taught a course at the graduate level in election

5    administration a couple of times.

6    Q.  What types of research methodology courses have you taught?

7    A.  Well, in the past I've taught our, sort of, main

8    undergraduate research methods course that we offer for

9    undergraduate students.

10   Q.  And do you have any research specialties?

11   A.  Well, I would say, generally, I -- I perform research in

12   the area of American politics and policy.  I'm specifically,

13   more specifically, racial politics, Southern politics,

14   electoral politics, election administration, which would also

15   include some emphasis on redistricting under that heading.

16   Q.  And have you published articles on redistricting in

17   peer-reviewed journals?

18   A.  Yes.

19   Q.  How many?

20   A.  I believe four directly related to redistricting in one way

21   or another.

22   Q.  And how many times has your work appeared in peer-reviewed

23   journals?

24   A.  I'm -- I'm not sure.  Between 40 and 50 times.

25   Q.  Okay.  Do you serve on the board of -- I'm sorry.  Do you

HOOD - DIRECT

```
1   serve on the editorial board of any peer-reviewed journals?
2   A.   Currently, two journals:  Social Science Quarterly and
3   Election Law Journal.  So -- and Election Law Journal
4   specializes, specifically, in issues of election
5   administration.
6   Q.   All right.  I'd like to ask you now to turn to Exhibit D4
7   in your notebook.  And I need to get you a notebook, don't I?
8   A.   I think so.
9   Q.   So let me do that.
10         MR. McKNIGHT:  May I approach, Your Honors?
11         JUDGE BLACK:  Yes.
12         THE WITNESS:  Thank you.
13         MR. McKNIGHT:  I'm not touching you.
14         JUDGE NELSON MOORE:  Thank you.
15     (Mr. McKnight distributed binder.)
16         MR. McKNIGHT:  All right.  I believe everybody has a
17   notebook now, and I think Exhibit D4 is also on our screen.
18   Q.   Dr. Hood, do you recognize Exhibit D4?
19   A.   Yes.
20   Q.   What is it?
21   A.   It's an expert report I wrote for this case.
22   Q.   All right.  I'd like to ask you to turn to the back of your
23   report, past the maps.
24   A.   Okay.
25   Q.   And what is this document that's reflected on your screen
```

1    in the back of the report?

2    A.  It's a copy of my vitae that's been appended to the report.

3    Q.  Okay.  And is that copy current through the date that you

4    submitted your report?

5    A.  It's dated October 2018, so, yes.

6    Q.  Okay.

7    A.  Current through that date.

8    Q.  Okay.  And have there been any significant changes since

9    then?

10   A.  Not super significant.  I've -- I think I've added a

11   publication since then and maybe a few other things.

12   Q.  Okay.  Do you recall the name of that publication?

13   A.  The first part of it, "Palmetto Postmortem."

14   Q.  Okay.  Briefly, what's that about?

15   A.  That was an article that was examining South Carolina's

16   voter ID statute.

17   Q.  All right.  And where was that published?

18   A.  It's going to be coming out in *Political Research*

19   *Quarterly*.

20   Q.  Okay.  Now, before this case, have you testified in any

21   other case where your testimony was accepted as an expert

22   witness?

23   A.  Yes.

24   Q.  How many?

25   A.  Well, on page one of the expert report, I've listed a

```
 1   number of cases, more recently, that I've testified in, so --
 2   Q.  Okay.  And that's under the heading "Introduction and
 3   Background"; is that right?
 4   A.  Yes.
 5   Q.  And you're referring to the third paragraph?
 6   A.  Yes.
 7           MR. McKNIGHT:  If we could turn to that on the screen
 8   I think that would be -- thank you.
 9   Q.  And among the cases listed in this paragraph on page one,
10   how many involve redistricting?
11   A.  The *Bethune-Hill* case did*, Covington* in North Carolina did*,
12   *Vesilind* in Virginia did, and *Common Cause v. Rucho* in North
13   Carolina.
14           JUDGE BLACK:  Will you keep your voice up, please.
15           THE WITNESS:  Yes, sir.  Sorry.
16   Q.  Okay.  How about *Rios-Andino*?
17   A.  There are a couple of Section 2 cases in here.  So to the
18   extent to which most Section 2 cases involve some type of
19   districting issue.
20       Yes, the *Rios-Andino* case from Florida.
21   Q.  And are there any cases not listed here?
22   A.  There's another case more recently *Harding v. Dallas County*
23   *Commissioners Court*, which is also a Section 2 case in Dallas
24   County, Texas.
25   Q.  And that's pending in state court in Dallas County?
```

```
1    A.  Well, I don't think it's pending anymore.

2    Q.  Okay.  All right.

3    A.  I'm unsure.  I think there was a decision.  I'm unsure of

4    what's going on with the case at this point.

5    Q.  Okay.  Fair enough.

6        Among the cases in which you have been accepted as an

7    expert, how many have been in the state of Ohio?

8    A.  Well, there are at least -- at least two here listed: Ohio

9    Democratic Party v. Husted and The Northeast Ohio Coalition v.

10   Husted.

11   Q.  All right.  Now, those cases didn't involve redistricting;

12   is that right?

13   A.  That's correct.

14   Q.  Now, have you been retained to testify on behalf of

15   redistricting plans enacted by both Republicans and Democrats?

16   A.  Yes.

17        MS. McKNIGHT:  At this time, Your Honors, we would

18   move to tender Dr. M.V. Hood III as an expert in American

19   politics and policy, quantitative political analysis and

20   election administration, including redistricting.

21        JUDGE BLACK:  And the plaintiff will stand on its

22   Daubert memorandum?

23        MS. LEE:  Yes, we will, Your Honor.

24        JUDGE BLACK:  All right.  Conditionally certify.

25   Q.  All right.  Dr. Hood, turning back to your report that is
```

1    marked as Exhibit D4, could you please briefly describe what

2    you were asked to do in your report.

3    A.   I was asked by the defendants in this case to perform an

4    analysis of Ohio's current congressional redistricting plan.

5    And in doing so, I also responded to various components of some

6    of the plaintiffs' expert witness reports, including Professor

7    Cho and Professor Warshaw and Mr. Cooper.

8    Q.   So I want you to turn first to page three of your report.

9    And the title at the top is "The Enacted Plan".   What does this

10   section of your report discuss?

11   A.   This section of my report looks at the current

12   congressional redistricting plan in Ohio.   Sometimes I refer to

13   it as the enacted plan.   It examines the plan in light of

14   traditional redistricting criteria.

15   Q.   And what were the traditional redistricting criteria that

16   you looked at?

17   A.   I looked at a number of things, including population

18   deviation, contiguity, compactness, incumbency protection, core

19   retention, and maintaining communities of interest.

20   Q.   Okay.   And looking, first, briefly, at Table 1, which is on

21   page three, what does Table 1 show?

22   A.   Table 1 shows that the plan achieves the goal of zero

23   population deviation between the 16 congressional districts in

24   Ohio that were implemented in 2012.

25   Q.   All right.   Then turning to the next page, page four, I

1  want to direct your attention to Table 2.  What does Table 2

2  show?

3  A.   Table 2 is a comparison between the previous plan --

4  sometimes I refer to it as the benchmark plan that was

5  implemented in 2002 -- compared to the enacted plan, the

6  current plan that was implemented in 2012, on two measures of

7  district compactness:  Reock and Polsby-Popper.  Which are two

8  of the more commonly used -- I would say two of the most

9  commonly used measures of compactness by map drawers and other

10 experts in these types of cases.

11 Q.   And what sorts of factors affect compactness scores of

12 districts?

13 A.   Well, I read an article once where I think there are close

14 to 50 different measures of compactness, and so they're all

15 measuring slightly different things.  And so, for instance,

16 with Reock, an elongated district, a very long rectangle would

17 be penalized to some degree because you're fitting that

18 rectangle -- you're always fitting the district inside of a

19 circle.  And so you're comparing the area of a circle in that

20 case to the area of the district.  So certain shapes would be

21 penalized.

22      The Polsby-Popper, you would be penalized on the

23 compactness measure.  If you had a very jagged parameter, for

24 instance, like it was following a river boundary, an ocean,

25 those kinds of things, or other kinds of jagged boundaries.

1    So in this case, as the measures go toward -- they go from

2    zero to one, both these measures do.  And so as they go towards

3    one, those are increasing levels of compactness.  Towards zero,

4    less compact.

5    Q.  All right.  Now, in your report I believe you write that

6    the 2012 plan is on par with the 2002 plan in terms of

7    compactness.  What do you mean by that?

8    A.  Well, they're about the same.  So if you look -- I've

9    summarized it as looking at the mean statistic down at the

10   bottom here.

11       So, for instance, in 2002, the mean Reock score across

12   those 18 districts was .35.  And in 2012, across the 16

13   districts now, the mean Reock score is .35.  So those are

14   exactly the same.

15       The Polsby-Popper measures are close.  It's -- it decreases

16   slightly in 2012, but -- but not by much:  .23 compared to

17   .119.

18   Q.  Okay.  Now, you've testified earlier that incumbency

19   protection was one of the traditional redistricting criteria on

20   which you evaluated the 2012 plan.  I want to direct your

21   attention to Table 3 on page five of your report.  What does

22   Table 3 show?

23   A.  Table 3 shows the incumbents that were paired going into

24   the 2012 plan.  So there are three sets, or six incumbents,

25   that are paired.  Two Democrats, two Republicans were paired

1  against each other and then a Republican and a Democrat.

2  Q.  All right.  And was incumbent-pairing necessary in the 2012

3  plan?

4  A.  Well, almost certainly, since Ohio's moving from 18 to 16

5  districts.  So some incumbents are probably going to be

6  squeezed, by definition.

7  Q.  Okay.  Looking at Table 4 on page six, I think this follows

8  along the line of incumbency protection.  What does Table 4

9  show?

10  A.  Table 4 looks at core retention, which is another measure

11  besides incumbent pairing.  It's sort of getting at the idea of

12  incumbency protection.  So the way to think about this is what

13  percentage of a member's constituents were carried over from

14  their previous district.  So how many -- how many -- what

15  percentage of the member's new district was comprised of their

16  former district?

17  Q.  All right.

18  A.  So this is based on population, not area, for instance.

19  Q.  Okay.  And what was your finding in this table?

20  A.  Well, that the mean core retention level was 55.7 percent

21  across the 16 districts.

22  Q.  And how did you make the calculations that appear in this

23  table?

24  A.  Well, I knew which block went into the 2012 plan and I knew

25  which blocks went into the 2002 plan.  So I just made a

1  comparison of where the blocks in 2002 were moved to in 2012,

2  following the incumbents across the redistricting cycle or not.

3  Q.  All right.  And what did you ultimately conclude in your

4  report with respect to incumbency protection and the 2012 plan?

5  A.  Well, I -- I concluded that, you know, based on this

6  finding in Table 4, on core retention, and the number of

7  incumbents that were paired, that at least some weight was

8  given in the plan to the -- to the criteria protecting

9  incumbents to the extent possible.

10  Q.  All right.  Looking next at Table 5 at the bottom of page

11  six, what does Table 5 show?

12  A.  Table 5 looks at communities of interest.  Here, we're

13  looking at county splits, so the number of counties that are

14  split between congressional districts.  So there's -- there's a

15  correction I'd like to make to the 2002 plan number.  I now

16  believe that there were 21 counties split in the 2002 plan, not

17  25.

18  Q.  Okay.  And how were you able to determine that?

19  A.  Well, it was the way that the map program was counting some

20  water blocks, for one thing.  And then there were some other

21  issues with some blocks that were incorrectly assigned.  So

22  going back and looking at things in more detail.

23  Q.  And does this change in numbers have any effect on your

24  ultimate analysis or a comparison between county splits in the

25  2002 plan and the 2012 plan?

1  A.  Well, there were -- there were 21 counties split in 2002

2  versus 23 in 2012, so we can't say the 2012 plan improved upon

3  that, but, again, that's still what I would call what's on par

4  with the previous benchmark plan.

5  Q.  All right.  Dr. Hood, I'd like you to turn to page seven of

6  your report now.  I'd like to focus on Table 6, which is at the

7  top of that page.  Why did you include Table 6 in your report?

8  A.  Here, I'm looking at municipalities, and municipalities

9  that are split across congressional districts.  And that's

10  another type of community of interest.  And to the extent

11  possible, it's not the most overriding criteria.  Obviously it

12  isn't.  Trump, for instance, population.  But trying to keep,

13  you know, other communities of interest like municipalities

14  whole is, again, a traditional redistricting criteria.

15  Q.  And what did your analysis find with respect to that

16  criteria?

17  A.  Well, it's almost the same.  4.3 percent of these

18  communities were split in the 2002 plan versus 4.5 percent.  So

19  across both of these plans, the benchmark and the enacted plan,

20  more than 95 percent of municipalities were kept whole.

21  Q.  All right.  And were the items that we just discussed all

22  of the traditional redistricting criteria under which you

23  evaluated the 2012 plan?

24  A.  Yes.

25  Q.  And what were your overall conclusions with respect to

```
1   traditional redistricting criteria and the 2012 plan?

2   A.  Well, overall, my conclusion is that the -- the enacted

3   plan, the 2012 plan, is on par with the 2002 benchmark plan on

4   these criteria.

5   Q.  All right.  And what next did you look at in your report?

6   A.  I looked at -- I did the same type of comparison between

7   the benchmark plan and the plaintiffs' proposed remedial plan.

8   So I performed the same type of analysis that I did -- that we

9   just discussed.

10  Q.  Okay.  So let's look at Table 7 on page eight.  What does

11  Table 7 show?

12  A.  Again, this is looking at two measures of compactness,

13  Reock and Polsby-Popper, between the enacted plan -- or, excuse

14  me, between the benchmark plan in 2002 and the plaintiffs'

15  proposed remedial plan.

16      The Reock score, the mean Reock score is slightly higher,

17  .41, as compared to .35.  And the Polsby-Popper score is

18  slightly higher for the remedial plan, .35 as compared to .23.

19  Q.  All right.  Then turning next to Table 8, which is at the

20  bottom of the same page, on page eight.  What does Table 8

21  show?

22  A.  Again, these are county splits.  These are looking at

23  communities of interest.  Again, we think -- or I think the

24  2002 plan now had 21 county splits.  So with that caveat there,

25  the proposed plan, the proposed remedial plan splits 14
```

1    counties compared to 21 in the 2002 plan.

2    Q.  All right.  And then turning to Table 9 on page nine, what

3    did you look at there?

4    A.  Again, these are municipalities that are split between the

5    two plans.  4.3 percent of municipalities are split in the

6    benchmark plan compared to 1.7 percent in the proposed remedial

7    plan.

8    Q.  All right.  And looking down that page, what is the next of

9    the traditional redistricting criteria that you evaluated the

10   proposed remedial plan on?

11   A.  So, again, these are the incumbent pairings that would have

12   occurred under the plan's proposed remedial plan.  So there are

13   six incumbents that are paired under the proposed remedial

14   plan.

15   Q.  Okay.  And that pairing included the Speaker of the House;

16   is that right?

17   A.  Yes, John Boehner's paired there.

18   Q.  Okay.

19   A.  He was Speaker of the House at that time, yes.

20   Q.  Now, looking at Table 10, what was the partisan breakdown

21   of the incumbency pairs under the original proposed remedial

22   plan?

23   A.  Well, it looks like there are four sets of Republican

24   incumbents that are paired, one set of Democratic incumbents

25   and another set that's one Democrat and one Republican.

1  Q. All right. And are you aware that Mr. Cooper created a

2  corrected proposed remedial plan after you pointed out these

3  incumbent pairing issues in your report?

4  A. Yes.

5  Q. Okay. Do you know what effect any changes Mr. Cooper made

6  to his corrected proposed remedial plan had on the incumbent

7  pairing listed in your chart?

8  A. It's my understanding that it reduced it by one, so that

9  the Boehner-Jordan pairing was undone. And I believe the other

10  pairings were still in place.

11  Q. All right. And let's look at Table 11, then, on page ten.

12  What does Table 11 show?

13  A. So, again, these are the core retention calculations. So

14  this is -- under the plaintiffs' remedial plan, how much of a

15  member's former district that's in the enacted plan were

16  carried over to the new district that they were located in. So

17  that the mean figure here is 39.5 percent.

18  Q. Okay. And you calculated that figure the same way in which

19  you calculated Table 4 for the 2012 plan; is that right?

20  A. Yes.

21  Q. Okay. Now, practically speaking, what does a mean 39.5

22  percent core retention result in?

23  A. Well, that's an average figure. So it would say less than

24  half. In this case, just under 40 percent of an incumbent

25  member's constituents were with them in the old district that

```
 1    they were in.  So they were carried across the redistricting
 2    cycle to the new district with the incumbent.  Again, that's on
 3    average.
 4    Q.  All right.  The next heading in your report is entitled
 5    "Ohio's Political Geography," and that begins on page ten.
 6    What is the purpose of this section?
 7    A.  Well, there are a couple of purposes.  I'm trying to get an
 8    idea here -- present a set of maps that demonstrate the spatial
 9    distribution of partisans in Ohio.  That's one thing.
10        And I'm doing a couple of tests here to see if there's what
11    we call spatial clustering or not.  And so this gets to the
12    idea that's been suggested of natural packing and whether or
13    not natural packing may be an issue that affects redistricting
14    in Ohio.
15    Q.  And how did you go about conducting your analysis for this
16    section of your report?
17    A.  Well, I used VTD-level data, and I created a vote index.
18    So I'm looking at partisanship through the lens of a vote
19    index.
20    Q.  All right.  And so let's turn to Table 12 on page 12.  What
21    is shown in Table 12?
22    A.  So these are the statewide contested races that I used to
23    create the vote index that's presented for this part of the
24    analysis.
25    Q.  All right.
```

1    A.   You see, there's four election cycles -- and, again, these

2    are all temporally prior to the 2012 redistricting plan.   And

3    there are 15 elections here, I think, being used.

4    Q.   All right.   And how did you calculate your partisan vote

5    index?

6    A.   So this is just the two-party share of the vote.   So third

7    party and other votes were eliminated.   So we're just looking

8    at the Republican and Democratic vote as the total of the

9    two-party vote share.   Actually, it's, technically, calculated

10   here as the Republican vote as a proportion of the two-party

11   vote share.   So it goes from zero to a hundred percent.   Zero

12   would be zero percent Republican and a hundred percent would be

13   a hundred percent Republican.

14        And so for the maps -- again, it's a continuous variable.

15   But for the maps I divided things up into quartiles.   So zero

16   to 24.9 percent would be strong Democratic.   25 percent to 49.9

17   percent would be Democratic.   50 percent to 74.9 percent would

18   be Republican, and 75 to 100 percent would be strong

19   Republican.

20        And I used sort of the traditional color coding that we see

21   a lot of times now with dark blue, light blue, light red and

22   dark red to denote those -- those different categories on the

23   maps.

24   Q.   All right.   And we'll take a look at the maps in a moment.

25   But, first, how did you decide which elections to include in

1   your partisan vote index?

2   A.  Well, again, I want -- these are all statewide contested

3   elections.  So that was one criteria.  I needed to pick -- or I

4   wanted to pick elections that were happening temporally prior

5   to the redistricting plan that was put in place.  And it was my

6   judgment that using four election cycles, which included 15

7   contested elections, was certainly enough data to sort of get a

8   fix on things, so to speak.

9           MR. McKNIGHT:  All right.  And speaking of the maps,

10  could we pull up Figure 1, which is located in the back of the

11  report.  And if you're in the notebook, it will be at the end

12  of the report.

13  Q.  All right.  Dr. Hood, I think we already reviewed the

14  legend at the bottom of Figure 1; correct?

15  A.  Yes.  That's what I was going over orally just a second

16  ago.

17  Q.  All right.  And could you just briefly describe for us what

18  this map shows.

19  A.  Well, obviously, this is the state of Ohio.  These are VTDs

20  which are shaded based on their partisan characteristic, as I

21  just described it.

22  Q.  Okay.  And what did you find in doing this map?

23  A.  Well, one can see with the eye -- it's more difficult to

24  see the urban areas, and I provided some -- some enlarged shots

25  of the major urban areas.  But, just in general, again, there's

1    a much larger Republican footprint outside of urban areas.

2    Much of the Democratic footprint during this time is inside

3    urban areas, like Cleveland and Columbus, Cincinnati.  There's

4    some Democratic shaded VTDs, the lighter shading running up the

5    Ohio River Valley there as well.  So --

6    Q.  All right.  And how much larger of a geographic footprint

7    do Republicans have in Ohio as compared to Democrats?

8    A.  Well, I calculated it on page 12 of my report.  And, again,

9    this is land area.  This is not population at this point, based

10   on these figures that about 78.5 percent of Ohio's land area,

11   in square miles, is comprised of Republican-leaning VTDs.

12   Q.  As compared to how much for the Democrats?

13   A.  About 21.5 percent.

14   Q.  All right.  And so I think you indicated that you had some

15   enlarged versions of some areas of the map.  Let's -- let's

16   first turn to Figure 2, which is right behind Figure 1 in your

17   notebook.  What does Figure 2 show?

18   A.  So Figure 2 is exactly the same as Figure 1, except it has

19   the current congressional district boundaries superimposed on

20   the map for reference.

21   Q.  All right.  And then let's turn, then, to Figure 3.

22   A.  Okay.  So this is an enlargement.  Again, it's the same

23   map, it's just an enlargement of the Columbus area.

24   Q.  All right.  And let's look, then, at Figure 4.

25   A.  Okay.  Figure 4 is, again, the same map, just an

1    enlargement of the Cincinnati-Dayton area.

2    Q.   And finally, Figure 5?

3    A.   Okay.  Figure 5 is an enlargement of the Cleveland area.

4    Q.   Now, did you perform any kind of analysis or testing

5    related to the partisan distribution of Ohio voters?

6    A.   Yes.  I did some further subsequent statistical testing.  I

7    ran a statistic called Moran's I to determine if there was --

8    if the presence of spatial autocorrelation was there -- or

9    spatial clustering, geographic clustering.  So the idea is do

10   VTDs in this case with similar levels of partisanship tend to

11   geographically cluster next to one another.

12   Q.   All right.  So let's look at page 13 of your report, and

13   Table 13, specifically.

14   A.   So this is where I report Moran's I.  And, again, the top

15   part of the table has Moran's I from the data we just looked

16   at, from 2004 to 2010.  So it's statistically significant and

17   nearing one.  It's not at one, obviously.  One is the maximum

18   level.  It's .699.  So there is spatial autocorrelation or

19   clustering present in the partisan distribution of Ohio, and

20   it's statistically significant, and it's a fairly strong

21   relationship.

22        So in -- in plain English, the Republican VTDs tend to be

23   located proximate to other Republican VTDs, and Democratic VTDs

24   tend to be located proximate to other Democratic VTDs in the

25   state.

1  Q.  All right.  And along those same lines, let's look at Table

2  14 on page 14 of your report.

3  A.  Okay.  This was a second test I conducted based on looking

4  at VTDs using population density, so the population of the VTD

5  over square miles.  And I'm looking at what the relationship

6  between population density of VTDs is and partisanship.

7       Now, in this case, I've reversed things.  So nearing 100

8  would be a hundred percent Democratic now.  So higher levels

9  are -- are more Democratic.  So I've just -- I've just

10  reverse-coded the dependent variable here.

11      But what this -- what this table shows us is that as

12  population density increases -- and that's my proxy for urban

13  areas -- as population density increases, Democratic

14  partisanship and the VTD level also increases.

15  Q.  All right.  And, practically speaking, what does that mean?

16  A.  Well, in plain English, again, Democratic VTDs are more

17  likely to be located in urban areas compared to Republican

18  VTDs.

19  Q.  Looking, then, at page 14, you begin a new section of your

20  report entitled "The 2012 Plan and Partisanship."  So I want to

21  turn then to Table 15 on page 15.  What does Table 15 show?

22  A.  Okay.  This is, again, using the partisan index we

23  discussed that I calculated based on those elections in Table

24  12.  I had these data at the block level, so I reconstituted

25  the partisan index from the block level up into the current

 1    congressional districts, and then made some classifications

 2    based on where the partisan index stood for each district.  So

 3    for instance -- and, again, sort of color coded them.

 4    Competitive districts are white here, safe Democratic districts

 5    are blue and safe Republican districts are red.

 6        So, again, going back and using a standard definition from

 7    political science, usually competitive districts are plus or

 8    minus five percent from -- from 50 percent.  So anything 55

 9    percent or greater in this case would be classified as a safe

10    Republican district.  Anything less than 45 percent would be

11    classified as a safe Democratic district.  Anything between 45

12    and 50 percent is competitive but Democratic leaning.  And

13    anything between 50 and 55 percent is competitive but

14    Republican leaning.

15    Q.  Now, I believe you said that your definition of

16    competitiveness comes from the world of political science; is

17    that right?

18    A.  Yes.  It's a commonly accepted definition.

19    Q.  Okay.  And do other political scientists sometimes use

20    other definitions of competitiveness?

21    A.  Well, this is a more conservative measure, if you will.

22    Some people have used plus or minus ten percent to define

23    what's competitive and what's safe.

24    Q.  Now, when you say a seat is safe for one party or another,

25    does that guarantee that any person who wins that party's

1    nomination can win the seat?

2    A.   No.  Again, it's just based on the partisan index here and

3    the use of the partisan index and trying to classify it in that

4    regard.  Of course, we do, as we'll talk a little bit later,

5    actually have elections at some point.  So that's another

6    factor that's involved outside of redistricting.

7    Q.   Okay.  And why do you use statewide data in your partisan

8    indices as opposed to data from other races like congressional

9    races?

10   A.   Well, there are a couple of reasons.  And one reason is

11   there are no missing data.  So there's a statewide contest,

12   it's everyone in the state's able to vote for those contests.

13   So that's one reason.

14        Second, if you use something like congressional elections,

15   you know, congressional elections can be impacted by national

16   forces.  That's true.  But, also, each congressional election

17   can be at some microcosm as well, even with inside the state.

18   And so I just think statewide races are a better gauge.  And,

19   again, not just one race, because you want to use multiple

20   races -- that's when you're creating an index -- to sort of

21   smooth out any election-specific events that may be there with

22   even a given election cycle or a given -- an election within an

23   election cycle.  So those are some of the reasons I rely on

24   using statewide races and placing them in an index to try to --

25   to try to use it as a proxy for partisanship.

1  Q.  All right.  And looking then at Table 16, which is also on

2  page 16, this table looks similar to the last one we looked at.

3  What does this table show?

4  A.  So this is the plaintiffs remedial plan, again, where I've,

5  again, sort of reconstituted things using my partisan vote

6  index to categorize the districts in the remedial plan.

7  Q.  All right.  And we talked earlier about the fact that Mr.

8  Cooper created a proposed -- a corrected proposed remedial plan

9  after you submitted your report in this matter.  Do you

10  remember that?

11  A.  Yes.

12  Q.  And I will represent to you that it's in the record that

13  Mr. Cooper testified that he only made changes between the

14  proposed remedial plan and the corrected proposed remedial plan

15  in Districts 4 and 8.  If you knew that, do you think that any

16  of the changes that Mr. Cooper made and incorporated into his

17  corrected proposed remedial plan would affect your analysis

18  here?

19  A.  It shouldn't, because both 4 and 8 are classified here,

20  even in the first remedial plan, as safely Republican.  So if

21  you're just sort of moving territory between those two

22  districts, you're probably not changing the partisan

23  classification, according to this vote index.

24  Q.  Okay.  And what were the differences that you noticed

25  between the proposed remedial plan and the enacted plan?

1   A.  Well, there's one -- comparing the enacted plan to the

2   proposed remedial plan, it looks like there's once less safe

3   Republican district and one additional competitive district

4   leaning Democratic --

5   Q.  Okay.

6   A.  -- compared to the enacted plan.

7   Q.  All right.  Now, on page 16, below this chart, you have,

8   again, a new section of your report entitled "Election

9   Analysis," and I think you were alluding to this earlier.

10  Based upon your academic work, other than the partisan makeup

11  of a district, what types of factors have you found influence

12  the outcome of congressional races?

13  A.  Well, again, the fact that we need to, for one, factor in

14  the fact that we have elections.  And so candidates and

15  campaigns and everything involved with the electoral process

16  can also matter, obviously, in who's getting elected in a

17  particular district.

18  Q.  Okay.

19  A.  Fundraising, media attention, name recognition, incumbency,

20  many different factors that are related to election-specific

21  effects.

22  Q.  Now, you just mentioned incumbency.  Do incumbents enjoy an

23  advantage in congressional races?

24  A.  Yes.  So this is another part of the, sort of, political

25  science literature.  The incumbent reelection rate post-World

```
 1   War II in the U.S. House of Representatives -- again, this is a
 2   nationwide figure -- is 90-plus percent.  So most of the time
 3   incumbents are being returned to office.  And that's sort of a
 4   well-recognized and documented fact in political science.
 5   Q.  All right.  And let's turn now to Table 17 on page 18 of
 6   your report.  And we'll take a closer look at that.  But before
 7   we do, was it your observation that congressional incumbents
 8   had an advantage in the election cycles in Ohio after the 2012
 9   plan was in place?
10   A.  Well, the incumbent that ran, except for the ones that were
11   paired, in that case some incumbent's going to lose, but, of
12   course, another incumbent's going to win.  But from my memory,
13   I believe all of the incumbents that ran in 2012 were returned
14   to office.
15   Q.  Okay.
16   A.  Unless there was a pairing again.  Sorry.
17   Q.  And other than where incumbents were paired, what was the
18   success rate of incumbents under the 2012 plan, from the 2012
19   election through the 2018 election, if you recall?
20   A.  I think it's a hundred percent.
21   Q.  And looking at Table 17, what is Table 17 designed to show?
22   A.  This just shows where the presence of incumbents were in
23   2012, 2014 and 2016, in those election cycles.
24   Q.  Okay.  And if I'm reading this correctly, there were no
25   open seats in the 2014 and 2016 election cycles; is that
```

1    correct?

2    A.   Correct.

3    Q.   And three open seats in the 2012 cycle?

4    A.   Correct.

5    Q.   Okay.  Now, were Democrats able to prevail in any of the

6    seats in the 2012 cycle that were open?

7    A.   Not to my memory, no.

8    Q.   Okay.  Now turning, then, to Table 18 on page 19.  Why did

9    you include Table 18 in your report?

10   A.   Well, this is another factor related to why incumbents

11   typically win election.  And so this is looking at what's

12   called challenger quality.  And challenger quality in this

13   case, and in many other cases in political science, is

14   preliminarily being measured by the presence of a challenger

15   that's held prior elective office.  So they have some prior

16   officeholding experience at any level, state, local,

17   congressional, state legislative, et cetera.

18   Q.   All right.  And how did you go about making the

19   determinations about who had prior officeholding experience

20   that are included in this chart?

21   A.   A lot of -- a lot of Internet searching, looking at

22   newspapers and other election Web sites, and to the extent to

23   which they were still available, archives, campaign Web sites

24   that were put out by these candidates.

25   Q.   And what was your overall conclusion based upon your review

1   of the prior officeholding experience of individuals who

2   challenged incumbents in Ohio from 2012 through 2016?

3   A.  Typically, more often than not, the challengers were what

4   we would call political novices.  They did not have prior

5   officeholding experience.  And, again, the cases where someone

6   did are listed in Table 18 here for these three election

7   cycles.  So you can see a lot of no's on the table, which would

8   indicate no prior officeholding experience.

9       And, again, it's not -- it's certainly not easy to unseat

10  an incumbent.  Even someone with prior officeholding experience

11  probably is not going to unseat an incumbent, but it's a factor

12  that would increase the probability that that might happen.

13  Q.  Okay.  And if there are dashes in the chart, for example,

14  as there are under the 2012 cycle, what does that indicate?

15  A.  I think those are open seats from the previous chart, Table

16  17.  Those were looked to be open seats.

17  Q.  Okay.  And then, of course, District 16 where there were

18  two incumbents paired?

19  A.  Correct.  There was a --

20  Q.  Okay.  Looking, then, at Table 19, which is on page 20.

21  What does Table 19 show?

22  A.  This is looking at the amount of campaign contributions

23  that were collected by the Republican and the Democrat in each

24  one of these elections.  And, of course, there's an indicator

25  for who is in the incumbent party position there.  So this is

1  the two-year reporting cycle with the FEC for direct

2  contributions.

3      Again, this is another factor related to winning elections,

4  obviously, and to potentially being able to unseat an

5  incumbent.  The challengers typically need to really outraise

6  incumbents in order to have a shot at things.  It still doesn't

7  mean that they're going to win, but it's going to increase the

8  probability that, for one, they can get their message out, for

9  instance.

10 Q.  All right.  And in looking at the bottom of your chart

11 here, what was your ultimate conclusion after charting these

12 numbers?

13 A.  Well, there's an average figure down here at the bottom

14 which says, basically, that incumbents outraise challengers by

15 about $1.2 million, on average.

16 Q.  All right.  Now, you didn't include any races in this chart

17 where there were open seats where the race was uncontested; is

18 that right?

19 A.  Right.

20 Q.  All right.  Why did you look at money raised versus money

21 spent in this chart?

22 A.  Well, you could have looked at money spent.  They're very

23 close proxies.  But this gives you, I think, a better idea or a

24 more inclusive idea of the amount of money or resources that

25 were available whether it was all spent or not.

1  Q.  All right.  Turning, then, to Table 20 on page 21.  What is

2  20 designed to show?

3  A.  So 19 was the 2012 election cycle.  This is campaign

4  contributions totaled up for the 2014 election cycle.  And,

5  again, what we see at the bottom here is just sort of a sort of

6  handy tabulation.  What that says is that the -- on average,

7  the incumbent outraised the challenger by about $1.3 million.

8  Q.  All right.  Now, I do see sort of an anomaly in here where

9  there's a -- there's a difference between what the incumbent

10  raised and what the challenger raised of $17 million in

11  Congressional District 8.  Do you see that?

12  A.  Right.  So that was Speaker Boehner.  And I did not

13  include -- I thought that would be unfair to include in this

14  average figure, because it would have pulled the measure way

15  over to one side.  So I didn't include that $17 million in this

16  average.

17  Q.  And you've included that, a notation on that, in Footnote

18  28; is that right?

19  A.  Yes.

20  Q.  Okay.  All right.  Let's next look at Table 21, which is

21  on -- at the top of page 22.  What does Table 21 show?

22  A.  This is the same table, except now we're looking at the

23  2016 election cycle, and then the difference between funds

24  raised by challengers and funds raised by incumbents.  And,

25  again, on average the incumbents outraised the challengers by

1    about 1.5, if you round off, $1.45 million on average.

2    Q.  All right.  And I see this -- this may be an obvious

3    question, but I see on both this chart and the last chart there

4    are some zeros there.  What do those represent?

5    A.  That would simply mean there were no campaign contributions

6    reported for that candidate.

7    Q.  Okay.

8            JUDGE WATSON:  Or there was no candidate.

9            THE WITNESS:  There was a candidate, Your Honor.

10   They -- they just didn't report any campaign contributions.

11   Q.  Because in races where there was no candidate, you would

12   have entered dashes; correct?

13   A.  Correct.  So in this election cycle, from my memory, all

14   the incumbents were being challenged by someone.

15   Q.  All right.  And looking back then at Table 19.  You handled

16   instances in which there was no candidate, consistently, across

17   your charts, didn't you, as you did in Table 19?

18   A.  Okay.

19   Q.  Okay.  With the dashes.

20        The next section of your report I wanted to focus on really

21   begins with Figure 6, and that is on page 25 of your report.

22   All right.  What does Figure 6 in your report show?

23   A.  So here I'm looking at the efficiency gap measure for Ohio

24   from 1992 to 2016, plotted against the seat share of the

25   congressional delegation.  So that's along the horizontal axis

1    there.

2         And what we see are these points line up, not perfectly,

3    but close to a straight line.  So I fit that straight line

4    using an equation, an OLS regression equation, which is located

5    up in Table 23.

6         So what this is saying, in plainer English, is that

7    value -- we can see it in the plot here -- that values for the

8    efficiency gap are closer to zero as the seat share is more

9    evenly balanced.  And as the seat share tilts one way or the

10   other, the efficiency gap measure grows.

11        And so what the equation here says is that -- in this case,

12   I'm using percentage GOP seat share.  You could reverse it and

13   be Democratic seat share and it would be the same.  It would

14   just be negative.  But I'm using percentage GOP seat share, and

15   it shows that it's positively and statistically related to the

16   efficiency gap measure, the value for the efficiency gap.  In

17   fact, this equation also tells us -- this very simple equation

18   tells us that 50 percent of the variance in the efficiency gap

19   is being explained by the seat share variable.

20   Q.  All right.  And based upon this, are there any analytical

21   issues with the use of the efficiency gap measure?

22   A.  Well, again, you're going to get an efficiency gap measure

23   that's more within what's been termed "acceptable ranges" as

24   the seat share within a state is more evenly balanced.  So it's

25   just something to keep in mind.

```
 1   Q.  All right.  Looking at page 26 of your report, you begin a
 2   discussion of the shifting partisanship in Ohio.  Could you
 3   give us an overview of your findings in that regard.
 4   A.  Sure.  I wanted to look at what had happened in Ohio on
 5   partisan terms post this redistricting cycle, so from 2012
 6   forward.
 7       So initially I'm looking at some elections from 2012, 2014,
 8   and 2016.  And, again, I draw another VTD level map.
 9   Q.  And, Dr. Hood, I'll stop you there.
10   A.  Okay.
11       MR. McKNIGHT:  And ask that we put up Figure 7.
12   Q.  And Figure 7, if you're in the notebook, is located behind
13   Figure 5 in the map section.
14       Dr. Hood, you just mentioned drawing another VTD-level map.
15   Could you, again, describe for us how you did that here and
16   what this map shows.
17   A.  The same way.  I created a partisan index using, you know,
18   2012, 2014 and 2016 elections in this case.  And so you can
19   compare Figure 7, if you'd like, to Figure 1, just for
20   reference.  It's the same VTD-level map.  And you can see the
21   areas that were present in the -- in the previous map of
22   lightly shaded blue, especially in the Ohio River Valley, have
23   greatly diminished.  You still see areas of Democratic strength
24   in the urban areas.  The stronger Republican VTDs or the higher
25   level Republican VTDs have also increased in the western part
```

1   of the state, moving into the central part of the state.

2   Q.  All right.  And along those lines, I believe you created

3   another figure showing this information from a county-level

4   perspective; is that right?

5   A.  Right.  So I can get all the elections I wanted to using

6   county-level data, and county-level data is very easy to access

7   and utilize.  So I looked at, again, all of these -- all -- all

8   available statewide contested races comparing the index from

9   2004 to 2010 and then the index from 2012 to 2016.

10  Q.  And, Dr. Hood, let me stop you, again, right there, and we

11  can put up Figure 8 so that everyone can follow along with what

12  you're talking about.

13  A.  Okay.

14  Q.  So before we go further, what does Figure 8 show?

15  A.  Figure 8 shows where there have been increases, just,

16  literally, a numeric increase in the percentage Republican in

17  these counties across those two time periods.  So -- and,

18  again, I've created a set of categories, zero to plus 4.9, five

19  to 9.9 and ten to 16 percent, which was the highest value.

20      So these are just the differences or shifts that you see

21  from the, sort of, pre-districting vote index to the

22  post-redistricting vote index across those two time periods.

23  Q.  Okay.  And you were starting on this earlier.  Could you,

24  again, explain the difference between the data you used to

25  create Figure 7, which is the VTD-level map, and this Figure 8,

1   which is the county-level map, based upon the data available to

2   you.

3   A.   Right.   So in Footnote 39 on page 27, I detail the

4   elections I -- I had available at the VTD level to utilize for

5   the post-redistricting VTD-level vote index.   Again, using

6   counties, I was able to add to that and include even more

7   statewide races.

8   Q.   Okay.   And --

9   A.   And that is in Footnote 40, I believe.

10   Q.   Okay.   And I believe at the bottom of page 27 you provide a

11   numerical breakdown of the various increases of -- in the

12   Republican partisanship across Ohio's 88 counties.   Could you

13   review that for us.

14   A.   Okay.   Well, I'll just read this out lot.   "Eleven counties

15   (12.5%) were in the 0 to +4.9 percent range; fifty counties

16   (56.8%) were in the +5.0 to 9.9 range; and twenty-seven (30.7%)

17   were in the +10 to 16.4 range."

18   Q.   And so is it accurate to say that all 88 counties saw an

19   increase in Republican partisan strength during this time

20   period?

21   A.   Based on this -- on this analysis, yes.

22   Q.   Now, the last section of your report is entitled

23   "Plaintiffs and Standing"; is that correct?

24   A.   Yes.

25   Q.   Now, you were not asked to opine on whether any of the

```
 1  plaintiffs in this case had legal standing, were you?

 2  A.  Correct.

 3  Q.  All right.  Now, what was the purpose of this particular

 4  section?

 5  A.  Well, the purpose of this section was to look at the

 6  individual plaintiffs in the case and see if their situation,

 7  in partisan terms, would be better or worse off moving from the

 8  current enacted map to the remedial map.  Again, we're making

 9  use of the partisan index that we've talked about previously.

10  And this information is -- is summarized in Table 24.

11  Q.  All right.  So let's look at Table 24, which appears at the

12  top of page 30.  What is illustrated in Table 24?

13  A.  Okay.  So this is the plaintiffs in the case in their

14  current district, and then the categorization of the district

15  based on the vote index we discussed, and then their new

16  district in the remedial plan, and the partisan categorization

17  of that district using the same vote index we discussed.  And

18  the last column just shows the difference in partisan makeup

19  between the two districts.  So did their situation improve,

20  stay the same, or possibly get worse?

21  Q.  And what did you conclude in that regard?

22  A.  Well, of the -- of the -- I think there are 17 plaintiffs

23  here.  My conclusion is that of the 17 candidates, really, only

24  two -- only two of these plaintiffs -- excuse me.  Not

25  "candidates," plaintiffs.  Only two of these plaintiffs would
```

```
 1    have their situation improved in terms of being able to have a
 2    better chance at electing a Democratic member of Congress.
 3    Q.  And which two plaintiffs are those?
 4    A.  Griffiths in CD7 and Hutton in CD14.
 5    Q.  All right.  And, now, assuming that Mr. Cooper's corrected
 6    proposed remedial plan only made changes in districts four and
 7    eight, do you think anything about the corrected proposed
 8    remedial plan would change the analysis that you presented
 9    here?
10    A.  No.  Again, for the same reason that I stated earlier, if
11    you're -- if these are both, you know, classified as safe
12    Republican seats, and if you're just switching some territory
13    between those two, it's probably not going to have an effect on
14    the way we classify the district overall.
15            MR. McKNIGHT:  All right.  And, Your Honors, I see
16    we're nearing 3:00 o'clock.  I'm about to move to the
17    supplemental report at this point.  This would probably be an
18    okay time for a break, unless you'd like me to continue.
19            JUDGE BLACK:  Very well.  We will break until 3:20.
20        During the break, the witness is not to discuss his
21    testimony with anyone.  He understands that; correct?
22            THE WITNESS:  Yes.  Yes, sir.
23            JUDGE BLACK:  Very well.  Enjoy the break.  3:20.
24            COURTROOM DEPUTY:  All right.  This court is in recess
25    until 3:20.
```

1    (Witness temporarily excused.)

2    (Recess taken:  2:59 PM - 3:21 PM.)

3         JUDGE BLACK:  Thank you.  You may be seated.

4    The witness may re-take the stand.

5    (M. V. Hood III resumes the witness stand.)

6         JUDGE BLACK:  Before we proceed to the continuation of

7    direct, the Court has conferred, and the Court grants the

8    plaintiffs' oral motion to present the testimony of

9    Congresswoman Kaptur by videoconference for the same reasons

10   articulated in the decision as to Congresswoman Fudge.  So

11   you'll get on with that, and I'm not sure when to schedule it

12   yet.  I'm going to talk to you at the end of the day as to

13   where we are and where we think we are and where we think we're

14   going.  So I wanted that decision conveyed so you could get to

15   work on it, if that's appropriate.

16        MS. LEVENSON:  Thank you very much, Your Honor.

17        JUDGE BLACK:  Very well.

18        MS. LEVENSON:  Can I put our technical people in touch

19   with the Court's technical people?

20        JUDGE BLACK:  Yes.

21        MS. LEVENSON:  Okay.  Thank you so much.

22        JUDGE BLACK:  Thank you.

23   Yes, sir?

24        MR. STRACH:  Your Honor, we respect the ruling of the

25   Court.  We just want to note our exception to it for the

1    record.

2           JUDGE BLACK:  Absolutely.

3           MR. LEWIS:  Your Honor, we'd also like to know what

4    courthouse or location Representative Kaptur intends to testify

5    from.

6           JUDGE BLACK:  Do you know that yet?

7           MS. LEVENSON:  She's in Washington, D.C.  So it would

8    have to be from the federal courthouse there, unless it's

9    possible for her to testify from the Rayburn Building that has

10   a recording studio.  I don't know if that's technically

11   feasible or not.

12          JUDGE BLACK:  I think they'll get back to you as soon

13   as they can.  It sounds like she's in D.C.  Is that responsive

14   to your inquiry at this point?

15          MR. LEWIS:  It is, Your Honor.  We'll do our very

16   best.

17      We had an issue with Representative Fudge with

18   cross-examination exhibits.  She was unable to see many of

19   them.  And it was only by sheer luck we were able to have

20   somebody run over to the courthouse to be able to have paper

21   copies.  I don't know that we're going to be able to do that

22   while we're in the midst of a trial, but we'll do our best.

23          JUDGE BLACK:  Very well.

24      Are you ready to continue direct?

25          MR. McKNIGHT:  I am, Your Honor.

```
 1              JUDGE BLACK:  Do you have an approximation?

 2              MR. McKNIGHT:  I hope 15 to 20 minutes, maybe better.

 3              JUDGE BLACK:  I've started the clock.

 4              MR. McKNIGHT:  Okay.  See how I do.

 5   Q.  All right.  Dr. Hood, would you please turn with me to

 6   Exhibit D5.  And it's also up on the screen.

 7        Dr. Hood, do you recognize Exhibit D5?

 8   A.  Yes.

 9   Q.  And what is it?

10   A.  It's a supplemental report I produced for this case.

11   Q.  All right.  And if you will, please, sir, turn with me to

12   Table 1.  And that is found on page three.

13        What does Table 1 on page three show?

14   A.  This is just a table.  The purpose of this supplemental

15   report was to update my original report to include what

16   happened in the 28 election -- 2018 election cycle.  So this is

17   just a rendering of the results of the statewide contest in

18   Ohio in 2018, found in Table 1.

19   Q.  All right.  Turn with me, then, to Table 2.  And that's on

20   page four.  What does Table 2 show?

21   A.  Okay.  Table 2 or this section of the report updates the

22   same factors that I looked at previously:  Incumbency, campaign

23   contributions and challenger equality for the 2018 selection

24   cycle.  So Table 2 is just recording where there was an

25   incumbent or not in the 2018 election cycle.
```

MW\Doc #: 247-1 Filed: 03/12/19 DIRECT

1    Q.  And what does Table 2 say about the incumbent reelection

2    rate in Ohio during the 2018 cycle?

3    A.  One seat was open, and that was 16, but for the other 15,

4    the incumbent was reelected.

5    Q.  And how does that pattern square with the pattern that you

6    saw during the 2012 to 2016 time frame?

7    A.  Well, that continues the pattern that we saw previously

8    where the incumbent is being elected, again, at a hundred

9    percent rate.

10   Q.  All right.  And I apologize, but for Table 1, I don't

11   believe I asked you how you calculated the percentages in that

12   table.  If we could turn back there for just a moment.

13        How were the percentages in Table 1 calculated?

14   A.  So this is just out of the two-party -- major two-party

15   vote share.  So, for instance, the D vote is the democratic

16   vote out of the two-party vote share, and the Republican vote

17   is the Republican vote out of the two-party vote share.

18   Q.  All right.  Turning then to Table 3, which is on page five.

19   What does Table 3 on page five show?

20   A.  Table 3, again, looks at challenger quality, which

21   challengers in these incumbent races had prior officeholding

22   experience.  And of the 15 incumbents challenged, it looks like

23   three faced a challenger with some type of prior officeholding

24   or elective experience.

25   Q.  All right.  And then turning to Table 4, what does Table 4

1    show?

2    A.   Table 4, again, is a rendering of campaign contributions

3    for the 2018 election cycle.  It makes the same comparisons as

4    we did previously.

5    Q.   Okay.  And what did you conclude after you constructed

6    Table 4, with respect to the fundraising efforts of incumbents

7    and the challengers in Ohio?

8    A.   Well, in this particular election cycle, 12 of the 15

9    incumbents outraised the challenger.  There were three cases

10   where the challenger actually outraised the incumbent.  Those

11   were in CD1, 7 and 12.  But for the 15 incumbent races where

12   the incumbent outraised the challenger, it was by an average of

13   about $1.03 million, which is on the previous page.

14   Q.   Okay.  And how about with respect to the open seat?  I

15   believe that you did include fundraising totals for the open

16   seat in Congressional District 16.  How -- by how much did the

17   Republican outraise the Democrat in that race?

18   A.   It looks like about $1.555 million or $1.6 million, if you

19   round it off.

20   Q.   And do you know who prevailed in that particular contest?

21   A.   I --

22   Q.   Let me ask it, do you know whether the Republican or the

23   Democrat prevailed?

24   A.   The Republican prevailed.  I can't remember his name.

25   Q.   Yeah.  I didn't intend to ask you his name.  Turning, then,

1    to Table 5 on page seven.  What does Table 5 show?

2    A.  So, here, I'm able to update the partisan indices I was

3    using for the county comparisons to include 2018.  So now

4    the -- now we have four election cycles prior to the

5    redistricting, 2004, '6, '8 and '10, and four

6    post-redistricting, which are '12, '14, '16 and '18.  And,

7    again, using these same contested statewide races that we

8    talked about earlier, I was just able to add the 2018 numbers

9    back in.  Not back in.  At this point I was able to add them in

10   because the election had occurred.

11   Q.  All right.  So there's also a map that is attached to your

12   supplemental report that is identified as Figure 1.

13            MR. McKNIGHT:  Could we turn to that now.

14   Q.  All right.  Dr. Hood, could you explain how you constructed

15   Figure 1 and what it shows.

16   A.  So this is the same thing that I was discussing earlier.

17   Again, I've just been able to add the 2018 data on to this and

18   created a number of categories to show the either increase or

19   decrease in Republican vote strength using these indices across

20   these two time periods.  So this is just literally the

21   difference between time period one, pre-districting, and time

22   period two, post-redistricting.

23       So, again, there's some changes from the previous map that

24   only included up to 2016, but there's still -- still counties

25   picking up Republican strength, especially in the Ohio River

1    Valley, on the eastern part of the state as well as counties in

2    the central part of the state and the western part of the

3    state.

4    Q.  All right.  Now, were there any areas where Democrats had

5    gains?

6    A.  Well, I have it in four counties:  Hamilton, Warren,

7    Delaware and Franklin.

8    Q.  Okay.  And do you have a summary in your report of the

9    various changes, what percentages of the -- of Ohio's counties

10   changed during this time frame?

11   A.  Yes.  That would be in Table 6.

12   Q.  And that's on page eight?

13   A.  Yes.

14   Q.  All right.  So what does Table 6 show?

15   A.  Again, the lion's share of counties in Ohio across these

16   two time periods are becoming, in a nutshell, more Republican,

17   not less Republican.

18   Q.  All right.  And, again, to construct the map in Figure 1,

19   what races did you use to do that?

20   A.  Again, I used all contested statewide races, the first time

21   period from 2004 to 2010, and then all contested statewide

22   races in the second time period from 2012 to 2018 now.

23          MR. McKNIGHT:  Okay.  Your Honors, with that, I have

24   no further questions of Dr. Hood at this time.  And I would

25   like to move Exhibits D4 and D5 into evidence in accordance

1   with the parties' agreement that reports of experts who testify

2   at trial be admitted.

3           JUDGE BLACK:  What were the exhibit numbers?  I'm

4   sorry.

5           MR. McKNIGHT:  It's Exhibits D4 and D5.

6           JUDGE BLACK:  Any objection to their admission?

7           MS. LEE:  No, Your Honor.

8           JUDGE BLACK:  They're admitted.

9       (Defendants' Exhibits 4 and 5 were admitted.)

10          MR. McKNIGHT:  And, Your Honor, I believe I've met my

11  time parameters and had some to spare.  I'll note that for the

12  record.

13          JUDGE BLACK:  Do you want some award or something?

14      (Laughter.)

15          MR. McKNIGHT:  Whatever you can think of.

16          JUDGE BLACK:  I appreciate it.  It's a credit to you.

17  You're a fine lawyer.

18      What are all of those files?

19          JUDGE WATSON:  Yeah.  What are you going to do with

20  those?

21          MS. LEE:  It remains to be seen whether they're

22  needed, Your Honors.

23          JUDGE BLACK:  Very well.  Cross when you're ready.

24          MS. LEE:  Thank you.

25                          CROSS-EXAMINATION

1    BY MS. LEE:

2    Q.  Good afternoon, Dr. Hood.

3    A.  Good afternoon.

4    Q.  Do you recall we met at your deposition on December 17th of

5    last year?

6    A.  Yes.

7    Q.  Okay.  Dr. Hood, is it fair to say that your standard

8    definition of partisan gerrymandering is drawing district

9    boundary lines to gain a political advantage?

10   A.  Well, that's my standard definition I've been using with

11   undergraduate students for quite some time.  That's sort of how

12   I introduce the issue to these undergraduates.  And, again, we

13   spend about, in my Southern politics course, about three

14   weeks --

15          JUDGE BLACK:  Okay.  I'm going to encourage you to

16   answer yes or no, and then explain it.  Okay?  The question

17   was:  Is this -- is your standard definition of partisan

18   gerrymandering drawing district boundary lines to gain a

19   political advantage.

20          THE WITNESS:  Yes, Your Honor.

21          JUDGE BLACK:  Very well.

22   Q.  And that's the definition you've relied on for years;

23   correct?

24   A.  Well, again, that's the definition I use in classes with

25   undergraduates to sort of get the discussion started, yes,

1    certainly.  I think even the undergraduates, after a few weeks

2    of tutelage, quickly become aware that redistricting is a very

3    complicated process.  And, you know, this is not -- that's not

4    a -- I'm not trying to produce a legal opinion, certainly.

5    That's more of a classroom opinion there, or use for in the

6    classroom.  And, you know, redistricting is very complicated.

7    I don't know that, currently, there is any agreed-upon

8    definition for what -- what would be an illegal or

9    unconstitutional partisan gerrymander, per se.

10   Q.   Certainly, I'm not asking you for your legal opinion on the

11   definition.  Do you recall at your deposition you testified

12   that that's the definition you relied on for years without

13   qualifying it with respect to undergraduate students?

14   A.   That's probably what I said, yes.

15   Q.   Okay.  And, Professor Hood, you also agree that just

16   because in some instances efforts to secure seats for the party

17   in control of the redistricting process failed to do so, this

18   does not mean that no gerrymanders are successful in securing

19   such an advantage for the party in control; correct?

20   A.   So would it be fair to say that your question is just

21   because sometimes it doesn't work doesn't mean that it's not a

22   partisan gerrymander?

23   Q.   For the general category, partisan gerrymanders -- perhaps

24   this will be an easier way to do it.

25        Have you heard of the phrase "dummymander"?

```
 1   A.   Yes.

 2   Q.   And what does that mean?

 3   A.   It's an attempted partisan gerrymander that doesn't turn

 4   out as the people instigating the gerrymander want it to.

 5   Q.   Okay.  And so the instance of such dummymanders does not

 6   mean that no gerrymanders are successful in securing a partisan

 7   advantage to the party in control of redistricting; correct?

 8   A.   Yes.

 9   Q.   The Republicans were in the majority in the Ohio House in

10   2011; correct?

11   A.   Yes.

12   Q.   And the Republicans were in the majority in the Ohio Senate

13   in 2011; correct?

14   A.   Yes.

15   Q.   And the governor in 2011, of Ohio, was a Republican;

16   correct?

17   A.   Yes.

18   Q.   And so the Republicans had complete control over the

19   legislative process for the enactment of the congressional map

20   in 2011; correct?

21   A.   Well, they were -- they were in majority party control,

22   yes.

23   Q.   And so would it be accurate, then, to say that the

24   Republican party had control over the legislative process in

25   2011, in Ohio?
```

1    A.  Well, yes and no.  I mean, the -- the bill passed, the

2    redistricting bill passed with some bipartisan support.

3    Q.  So, again, I was not asking about the vote totals on the

4    bill, but whether because of the Ohio Republican party being in

5    control of the Ohio House in 2011, the Ohio Senate in 2011, and

6    the governorship in 2011, would it be accurate to say that the

7    Republican party had control over the legislative process in

8    2011, in Ohio?

9    A.  Yes.

10   Q.  Isn't it the case that beyond the mid-decade congressional

11   redistricting in Georgia that you've studied, you are unable to

12   cite a single case where a political party had complete control

13   of redistricting and elevated a self-imposed constraint above

14   the goal of defeating the opposition?

15   A.  Well, that's certainly an example that comes to my mind, or

16   one that I can remember.

17   Q.  Are you able to cite a single case other than the

18   mid-decade Georgia congressional redistricting?

19   A.  Well, I know of other dummymanders that are recorded, to

20   use that term again.  But you added the qualifier "where other

21   constraints were imposed above picking up seats," right?  So

22   that's the one I can think of in that case.

23   Q.  Sure.  And so this is a little bit different than a

24   dummymander.  This is an intentional choice, as you've

25   described it, where a political party had complete control of

1  redistricting and elevated a self-imposed constraint above the

2  goal of defeating the opposition.  Is that a fair description

3  of the mid-decade congressional redistricting in Georgia?

4  A.  Well, I think that's how I described it, yes.

5  Q.  I think so.  And are you able to cite any other cases other

6  than the mid-decade congressional redistricting in Georgia

7  where a political party, in complete control of redistricting,

8  elevated a self-imposed constraint above the goal of defeating

9  the opposition?

10 A.  No.

11 Q.  Okay.  In your work in this case you reviewed the original

12 report of plaintiffs' expert Wendy Cho before you wrote your

13 report; correct?

14 A.  Correct.

15 Q.  And you reviewed the supplemental report of plaintiffs'

16 expert Wendy Cho before your deposition; correct?

17 A.  I believe so.  Yes.

18 Q.  You reviewed the original report of plaintiffs' expert

19 Christopher Warshaw before you wrote your report; correct?

20 A.  Correct.

21 Q.  You reviewed the supplemental report of plaintiffs' expert

22 Christopher Warshaw before your deposition correct?

23 A.  I believe that's correct, yes.

24 Q.  You reviewed the original declaration of plaintiffs' expert

25 William Cooper before you wrote your report; correct?

```
1    A.  Correct.

2    Q.  And you reviewed the two supplemental declarations of

3    plaintiffs' expert William Cooper before your deposition;

4    correct?

5    A.  At some point, yes.

6    Q.  Okay.  And at your deposition you clearly remembered

7    reviewing those reports, but not the errata report of William

8    Cooper; is that correct?

9    A.  I believe so.  If that's what I said at my deposition.

10   There were quite a few reports submitted by Mr. Cooper.  I

11   was --

12   Q.  Certainly.  But you, as you've testified on direct, have

13   clearly reviewed it since?

14   A.  At some point, yes.

15   Q.  Okay.  You also reviewed the report of plaintiffs' expert

16   David Niven; is that correct?

17   A.  I've looked at it, yes.

18   Q.  And you've reviewed the report of plaintiffs' expert Lisa

19   Handley; is that correct?

20   A.  I've looked at the report, yes.

21   Q.  And you did not do any analysis regarding the matters

22   discussed in Dr. Handley's report; is that correct?

23   A.  That is correct.

24   Q.  And the same is true for Dr. Niven's report; is that

25   correct?
```

1   A.  That is correct.

2   Q.  You also reviewed some data provided by plaintiffs'

3   experts; correct?

4   A.  Yes.

5   Q.  And it is also the case that you did not independently run

6   any of the analysis on that data as did the plaintiffs'

7   experts; is that correct?

8   A.  I don't exactly understand the question.

9   Q.  Well, did you run any of the analysis conducted by

10  plaintiffs' experts yourself?

11  A.  Did I try to replicate their analyses?  Is that fair?

12  Q.  That's fair.

13  A.  No.

14  Q.  Okay.  You did not compute any measures of partisan bias;

15  is that correct?

16  A.  That's correct.

17  Q.  Is it your opinion in this case that particular requests

18  from legislators necessarily led to the outcomes under the

19  congressional map?

20  A.  I -- I don't think I have the knowledge to answer that

21  question.

22  Q.  Okay.  So then it's not an opinion you're offering?

23  A.  Okay.  State it one more time, please.

24  Q.  Sure.  Is it your opinion that particular requests from

25  legislators during the redistricting process necessarily led to

1    the partisan outcomes under the congressional map?

2    A.  I didn't look at that directly, no.

3    Q.  You did not run any simulations of possible congressional

4    maps for Ohio; is that correct?

5    A.  That's correct.

6    Q.  And you did not run any simulations of the likely

7    congressional maps for Ohio; is that correct?

8    A.  I didn't run any simulations at all.

9    Q.  Okay.  And so that would include for any likely

10   congressional maps?

11   A.  Correct.

12   Q.  Well, is it fair to say that you don't know what

13   congressional maps are possible for the state of Ohio?

14   A.  Well, there are quite a few possibilities.  I mean, I don't

15   know that anyone knows what all the possibilities might be.

16   Q.  So from the analysis you've done in this case, do you have

17   an idea of what possible congressional maps there are for the

18   state of Ohio?

19   A.  Well, I've looked at the actual maps and hypothetical maps.

20   I mean, those are possibilities.  But those wouldn't be all the

21   possibilities.

22   Q.  Okay.  And so beyond the maps you've reviewed in this case,

23   are you aware of the particulars of any other possibilities for

24   the congressional map?

25   A.  No.  Besides the fact that there are other possibilities,

1    obviously.

2    Q.   Certainly.   I don't think anyone would dispute that.

3    A.   Okay.

4    Q.   In conducting your work in this case you received data from

5    counsel for defendants; correct?

6    A.   Correct.

7    Q.   You received data from which you could calculate the core

8    retention metric for each of the incumbents; is that correct?

9    A.   Correct.

10   Q.   And you received data at the block level that you could use

11   to create your partisan index; correct?

12   A.   Correct.

13   Q.   Okay.   And you received summary statistics that appeared to

14   be printouts from Maptitude from counsel for defendants

15   regarding the 2012 plan and the plaintiffs' proposed remedial

16   plan; correct?

17   A.   Yes.   I requested those reports.

18   Q.   Okay.   And you did not calculate the compactness measures

19   under the proposed remedial plan, the 2012 plan, or the 2002

20   plan; is that correct?

21   A.   Correct.   I requested that they be calculated, that those

22   reports be run.

23   Q.   And you, in your report, reproduced the summaries received

24   from counsel; correct?

25   A.   Correct.

1    Q.  Okay.  And, similarly, is it correct that you just reported

2    the summaries of which incumbents were paired under any of the

3    maps and did not independently analyze this?

4    A.  Those were from the reports I requested, again, yes.

5    Q.  So from those summary statistics, as you called them at

6    your deposition?

7    A.  Well, the reports that were run from Maptitude that I

8    requested, yes.

9    Q.  Okay.  And you agree that counties and municipal

10   subdivisions are the most commonly used metrics for defining

11   communities of interest in redistricting; is that correct?

12   A.  Yes.  I mean, there can be many others, but those are --

13   those are two important communities of interest in Ohio,

14   certainly.

15   Q.  Sure.  And are those the more common of the various

16   definitions for communities of interest in redistricting?

17   A.  I would say -- yeah, I would say counties, by far, are the

18   most common.

19   Q.  And are municipalities, along with counties, the more

20   common?

21   A.  It's also common to see that, yes.

22   Q.  Okay.  So you earlier testified on direct that the summary

23   split report you received incorrectly indicated the number of

24   split counties under the 2002 plan; is that correct?

25   A.  Yes.

1    Q.   Okay.  And so if we could look, please, at page seven of
2    your report, which is D4, PDF page eight.  Page seven of the
3    report, PDF page eight, please.
4         And in the paragraph "Summary", which is directly below
5    Table 6, based on your direct testimony, you would agree that
6    your -- the last sentence of your summary would need to remove
7    the phrase "or made slight improvements over" what you call the
8    benchmark plan; is that correct?
9    A.   Yes.  I think I need -- as I stated here in court today, I
10   amended that to say the plans are on par with one another --
11   Q.   And so just --
12   A.   -- is how I would phrase it now.
13   Q.   Apologies for speaking over you.
14   A.   That's okay.
15   Q.   And so just to be clear, in your conclusion of assessing
16   the 2012 plan, the only improvements you had pointed to on
17   standard redistricting criteria were the county split that you
18   considered to be improvements?
19   A.   That's what I was pointing to, yes.
20   Q.   Okay.  Great.  Thank you.
21        After the 2010 census Ohio lost two congressional seats; is
22   that correct?
23   A.   That's correct.
24   Q.   And this meant that if all of the incumbents who were in
25   office under the 2010 -- under the 2002 plan, in 2010, if they

1    all intended to still run for office under the new map, at

2    least two of those incumbents could not remain incumbents;

3    correct?

4    A.   I would agree with that, yes.

5    Q.   And so if the legislature wanted to pair the fewest number

6    of incumbents in enacting the 2012 plan, that would have been

7    two sets of incumbents for four total congressional

8    representatives; correct?

9    A.   Yes.

10   Q.   Okay.  Professor Hood, do you have any knowledge that the

11   legislature in 2012 was actually concerned with incumbency

12   protection in drawing the congressional map?

13   A.   No.  I'm making that inference.

14   Q.   Okay.  And so if we look at Defendants' Exhibit 4, which is

15   your report, at PDF page 24, if we look at the "Summary"

16   paragraph, so the third -- the fourth sentence here:  "Ohio's

17   congressional map in 2012 certainly included an emphasis on

18   incumbency protection, in terms of both minimizing the pairing

19   of incumbents as well as maintaining cores from the incumbent's

20   previous district," do you see that sentence?

21   A.   Yes.

22   Q.   Would you agree that three pairs of incumbents is not the

23   minimum number of incumbents that needed to be paired under the

24   2012 plan?

25   A.   It's not the minimum, no.

1    Q.  Well, are you aware that the sponsor of the legislation

2    implementing the 2012 plan identified incumbency as subservient

3    to other interests?

4    A.  I'm not aware of that, no.

5    Q.  Okay.  During your direct testimony, and presented in your

6    report, you discuss core retention; correct?

7    A.  Correct.

8    Q.  You agree that there is no agreed-upon standard for what

9    levels of core retention indicates that the goal of a

10   districting map is to protect incumbents?

11   A.  That's correct.

12   Q.  And you have never personally identified such a standard?

13   A.  I have not, no.

14   Q.  And in previous work you have asserted that a core

15   retention level of 68.7 percent greatly altered the

16   relationship between representatives and constituents; correct?

17   A.  In that particular academic article, yes.  It was a

18   different redistricting in a different state, but yes.

19   Q.  Certainly, it's a different example.  I'm not disputing you

20   there.  But you described a core retention rate of 68.7 percent

21   as greatly altering the relationship between representatives

22   and constituents; is that correct?

23   A.  I think that's accurate, according to what the article

24   said, yes.

25   Q.  Okay.  You agree that the characteristics of the voters

1   retained in the core of a district can have an impact on

2   whether the retained core is protective of an incumbent;

3   correct?

4   A.   It's possible, yes.

5   Q.   Okay.  And you did no such analysis regarding the

6   characteristics of the retained voters in the core retention in

7   this case; correct?

8   A.   No, I didn't do anything beyond what was presented in the

9   report.

10  Q.   Okay.  Now, Professor Hood, you agree that for all of the

11  paired 2011 incumbents under Ohio's congressional map, the

12  incumbent with the higher core retention rate is favored by the

13  map as compared to the other paired incumbents?

14  A.   I mean, is that a -- is that a statement or --

15  Q.   Is that correct?  Do you agree?

16  A.   I would agree that someone that retained more of their --

17  or more of their constituents from their previous district

18  probably had an advantage over the other incumbent, yes.

19  Q.   And for the incumbent who retained more of their

20  constituents as compared to the other incumbent with whom they

21  were paired, that first incumbent is more favored by the map;

22  is that correct?

23  A.   Yes.  I mean, based on what we know about the relationship

24  between maintaining cores and incumbency protection and having

25  the same constituents move with you to a new district, yes.

1  Q.  Okay.  And so you agree that Representative Renacci was

2  favored under the congressional map over Representative Sutton

3  as he retained double the core of his voters, as compared to

4  Representative Sutton; is that correct?

5  A.  Well, if the numbers you're representing to me are --

6  Q.  Well, we can go ahead and take a look at them.

7  A.  Okay.

8       MS. LEE:  If I could please put up Defendants' 4, PDF

9  page 18, which will correspond to page 17 of the pin cited

10  report, Footnote 22.

11  Q.  Do you see that?

12  A.  Yes.  Yes, I do.  I do.

13  Q.  And so is it correct that you then agree that

14  Representative Renacci was favored under the congressional map

15  over Representative Sutton in their pairing?

16  A.  Yes, on that metric, yes.

17  Q.  Okay.  And on what metric was he not favored over her with

18  respect to their pairing in this district?

19  A.  Well, I don't know.  I'm just saying, on that metric, I

20  agree with that.

21  Q.  Okay.  You reviewed the November 27th supplemental

22  declaration of William Cooper; is that correct?

23  A.  I believe so, yes.

24  Q.  And you agree that under each of the hypotheticals in Mr.

25  Cooper's declaration, the 2011 incumbents are paired in the

1    same manner, meaning two Democrats are paired in one district,

2    two Republicans are paired in one district, and one pairing is

3    one Democrat and one Republican; is that correct?

4    A.   From what I remember, yes.  Now, they're not the exact same

5    pairings, but the -- the characteristics of the pairings are

6    the same, from what I remember.

7    Q.   Yes.  And that's the characteristics of the pairings as you

8    describe them in your -- in your report; correct?

9    A.   That's correct.

10   Q.   Okay.  And do you further agree that the core retention

11   rates in Mr. Cooper's hypotheticals are highly similar to those

12   under the enacted plan?

13   A.   I don't remember that just sitting here.

14   Q.   Okay.  And so would seeing the supplemental declaration of

15   Mr. Cooper that you looked at at your deposition help refresh

16   your recollection?

17   A.   It certainly wouldn't hurt.

18            MS. LEE:  Okay.  May I approach, Your Honor?

19            JUDGE BLACK:  Yes.

20       (Ms. Lee distributes document.)

21            THE WITNESS:  Thank you.

22   Q.   And so Mr. Cooper's second supplemental declaration is in

23   evidence at P93.  I've provided you with the specific scanned

24   version of the same document that was used at your deposition

25   so you can see that it's Exhibit 7 to your deposition of

1  December 17th, 2018.  I can direct you to page seven at Figure

2  4, and page 14 at Figure 9.

3  A.  Okay.

4  Q.  And so do you agree that the core retention rates in Mr.

5  Cooper's hypothetical are highly similar to those under the

6  enacted plan?

7  A.  Yes, they're similar.

8  Q.  Are they highly similar?

9  A.  They are pretty close.

10  Q.  Do you recall agreeing that the core retention figures

11  between Mr. Cooper's hypotheticals and the enacted plan were

12  highly similar at your deposition of December 17th, 2018?

13  A.  Do I recall testifying to that fact?

14  Q.  Yes.

15  A.  Not specifically.  I'm not saying I didn't.

16  Q.  Okay.

17  A.  I mean, we have the document right here, though, so --

18  Q.  Sure.  I'm just wondering about why you're defining it as a

19  different level of similarity than you testified to at your

20  deposition.

21  A.  Pretty darn close.  Is that -- they're not quite identical,

22  but --

23  Q.  Sure.  Are the core retention figures in Mr. Cooper's

24  hypotheticals highly similar to those of the enacted plan?

25  A.  Yes, I would say so.

1  Q.  Okay.  And do you agree that Mr. Cooper's hypothetical maps

2  have higher compactness scores than the enacted plan?

3  A.  Well, the remedial map does.

4  Q.  Sure.  And I'm talking about the hypothetical maps that are

5  in the second supplemental declaration, which you have before

6  you.  And if you'd like some -- some roadmapping to refresh

7  your recollection, you could look at Figure 5 on page eight

8  with paragraphs 19 and 20, and Figure 10 on page 15 at

9  paragraphs 39 and 40.

10 A.  So looking at Figure 5, I guess, yes, the compactness

11 scores in the Hypothetical 1A plan are higher than the

12 compactness scores in the enacted plan.

13 Q.  Okay.  And for Figure 10, are the compactness scores for

14 the Hypothetical 2A plan, you also agree that they are higher

15 compactness scores than the 2012 plan?

16 A.  Yes.

17 Q.  And you also agree that Mr. Cooper's hypothetical maps

18 split fewer counties and MCDs than the enacted plan, is that

19 correct?

20 A.  Okay.  Can you direct me to --

21 Q.  Sure.  Page nine, paragraphs 22 to 24; page 16, paragraphs

22 42 and 43.

23 A.  Yeah.  There are fewer county splits, yes.

24 Q.  And, further, subcounty municipal civil division splits; is

25 that correct?

1    A.  Yes.

2    Q.  Do you agree that a remedy is presented to the Court for

3    future use?  Correct?

4    A.  That's correct.

5    Q.  And you further agree that it makes sense to consider where

6    incumbents are presently located when offering a remedial plan

7    to be imposed today; correct?

8    A.  You can do that.  But to the extent to which Mr. Cooper was

9    making comparisons to the benchmark plan, I think we should

10   include all the comparisons, so --

11   Q.  And do you agree that it makes sense to consider where

12   incumbents are presently located when offering a remedial plan

13   to be imposed today?

14   A.  Well, if you get to that point, yes.

15   Q.  Okay.  You agree, Dr. Hood, that the Moran I coefficient

16   that you present in your report simply indicates that Democrats

17   live near Democrats and Republicans live near Republicans;

18   correct?

19   A.  In plain English, yes.

20   Q.  Okay.

21   A.  I mean, that's what it's designed to do.

22   Q.  Okay.

23   A.  That's what that statistic is designed to do, is to detect

24   spatial clustering.

25   Q.  And you agree that the Moran's I coefficient does not

1   indicate that Democrats are differentially clustered than

2   Republicans; correct?

3   A.   It's not designed to do that, nor -- nor am I aware of a

4   particular spatial statistic that could tell us that, to be

5   honest with you.

6   Q.   You did not look at the measure K-Nearest Neighbor;

7   correct?

8   A.   No.

9   Q.   Are you familiar with the political science literature that

10  indicates that spatial efficiency of partisans does not explain

11  the Republican seat share advantage in congressional

12  delegations including Ohio?

13  A.   I'm not aware of that article.

14            JUDGE BLACK:   Objection?

15            MR. McKNIGHT:   Objection, Your Honor.   Lack of

16  foundation.

17            JUDGE BLACK:   Very well.   Noted.

18  A.   I've not read that article.

19  Q.   Okay.   And as you've testified to on direct, you're a

20  tenured professor in political science?

21  A.   Yes.

22  Q.   And you generally have experience reading political science

23  literature; correct?

24  A.   Yes.   I do do other things, though, so --

25  Q.   Understood.   Isn't it the case that you did not do any

1  independent analysis to confirm that the political geography of

2  where Democrats are situated in Ohio makes it so that they

3  should only win four of the 16 congressional districts?

4  A.   I didn't perform that analysis, no.

5  Q.   Okay.  In your report, Defendants' 4, PDF page 11 through

6  12, which is pin cites three and four, pages ten and 11, you

7  stated that the "Presence of partisan clustering can lead to a

8  phenomenon known as natural packing"; is that correct?

9  A.   Yes.

10 Q.   Well, do you agree that the phrase "natural packing"

11 implies that where a cluster of Democrats want -- implies that

12 a cluster of Democrats wind up in the same congressional

13 district; correct?

14 A.   Well, it doesn't have to be Democrats.  A cluster of

15 partisans --

16 Q.   Okay.

17 A.   -- period.

18 Q.   And so it implies that a cluster of partisans will wind up

19 in the same congressional district; correct?

20 A.   It's possible, yes.

21 Q.   And do you agree that the use of that term implies that to

22 be the case?

23 A.   Yes, sir.  This is -- natural packing is talking about the

24 geographic footprint of partisans, right.

25 Q.   Yes.  And with respect to redistricting, the idea that this

1  clustering will lead them to be in the same district; correct?

2  A.  There's a higher probability, yes.

3  Q.  Okay.  And you testified on direct, and you mention also in

4  your report, that Democrats tend to live in urban areas in the

5  state of Ohio; is that correct?

6  A.  There's not -- not every Democrat.  There's evidence of a

7  relationship there.

8  Q.  Understood.  And so Cincinnati is one of the urban areas in

9  the state of Ohio; is that correct?

10  A.  Correct.

11  Q.  Okay.  Let's look at Figure 4 of your report, which is D4,

12  PDF page 38.  The VTD coloring in this figure, as I believe was

13  established on direct, is based on your partisan index; is that

14  correct?

15  A.  That's correct.

16  Q.  Okay.  And if we look to the city of Cincinnati, which is

17  in the lower left-hand corner of the figure as it's in the

18  lower left-hand corner of the state, isn't it correct here that

19  the district lines split the Democratic VTDs in Hamilton County

20  between District 1 and District 2?

21  A.  Well, there's -- there's a line drawn through Hamilton

22  County, yes.  And there has to be, because Hamilton County is

23  larger than the ideal district size.

24      I can't exactly make out the city -- the city boundaries

25  are not plotted here, nor are the county boundaries

1    necessarily, but, yes, there's a line through Hamilton County.

2    There has to be.

3    Q.   And do you agree, looking at this Figure 4 in your report,

4    that that district line runs through a clustering of blue or

5    Democratic VTDs in Hamilton County?

6    A.   Yes.

7    Q.   Okay.  And that line didn't show up there accidentally;

8    correct?

9    A.   Someone has to draw the line.

10   Q.   Right.  And the legislature drew this line that breaks up

11   the cluster of Democratic VTDs in Hamilton County; correct?

12   A.   Not completely, but, yes, there's a line running through

13   there.

14   Q.   Okay.  And the legislature drew that line?

15   A.   The legislature drew that line, yes.

16   Q.   And so while these blue VTDs here in the Cincinnati region

17   are in spatial proximity to each other, they are split apart by

18   a district line; correct?

19   A.   Well, they are split.  Again, there's a heavy concentration

20   of dark blue VTDs to the west there that are retained.  Again,

21   I don't know exactly where the city and/or county boundary is

22   on this map because it's not plotted.  But, yes, there's a line

23   through Hamilton County.

24   Q.   And on both sides of that line, though, I'll grant you,

25   more of the dark blue are to the left side of the line, but

```
 1   both sides of the line there are dark blue VTDs split between

 2   District 1 and District 2; correct?

 3   A.   There are some on both sides, yes.

 4   Q.   Cleveland is another urban area in the state; correct?

 5   A.   Correct.

 6   Q.   Let's look at Figure 5 of your report, which is just on the

 7   next page.  And you agree that you have a concentration of dark

 8   blue VTDs surrounded by light blue VTDs, which are then bounded

 9   on the south by pink Republican VTDs; is that correct?

10   A.   Yes.

11   Q.   And so the Democratic VTDs in District 11 are not only

12   clustered together in the Cleveland area, but further ones are

13   picked up on the other side of the Republican VTDs that are

14   visible here in your Figure 5; is that correct?

15   A.   From my memory, yes.  District 11 is running down south

16   there.

17   Q.   Yes.  Okay.

18   A.   Yes.

19   Q.   You testified on direct that you created a partisan index

20   in this case; correct?

21   A.   That's correct.

22   Q.   And on page 11 of your report, D4, PDF page 12, in the last

23   paragraph, in the first sentence you indicate that your index

24   is based on the statewide contested elections for the decade

25   preceding the 2010 redistricting cycle; is that correct?
```

1    A.  Yes.

2    Q.  And you further indicate that these would have been the

3    same data that the Ohio Legislature would have had at its

4    disposal when drawing a new congressional districting plan

5    prior to 2012; correct?

6    A.  Correct.

7    Q.  Okay.  And, Professor Hood, you agree that there were five

8    statewide races in 2002 included in the decade preceding the

9    2010 redistricting cycle; is that correct?

10   A.  Yes.

11          MS. LEE:  And we can put up Plaintiffs' Demonstrative

12   88.

13   Q.  And the 2002 data would have been available to you at the

14   time of your report; is that correct?

15   A.  Certainly.

16   Q.  Okay.

17   A.  I mean, it was prior -- prior to writing the report,

18   obviously, so --

19   Q.  Certainly.  I'd like to just look at your data for a little

20   bit, just so we can identify what your data stands for in terms

21   of the elections that were available to you in creating your

22   partisan index.

23          MS. LEE:  Could we put up P266.

24          MR. NAJARIAN:  Give me just a moment.

25      Thank you.

1   Q.  Okay.  And, so, Professor, this is the data plaintiffs

2   received from defendants' counsel along with your expert

3   report.

4           MS. LEE:  Plaintiffs move for admission of P266, which

5   has no objections, from what we received from defendants.

6           JUDGE BLACK:  Any objection to P266?

7           MR. McKNIGHT:  We don't have any objection to this as

8   demonstrative, no.

9           JUDGE BLACK:  Are you moving this in as a

10  demonstrative?

11          MS. LEE:  I'm moving this in as an exhibit.  This is

12  not from plaintiffs' demonstrative exhibits.  This is from

13  plaintiffs' exhibits which were exchanged earlier in the

14  pretrial proceedings.

15          JUDGE BLACK:  Right.  And so you're moving the

16  admission of P266, and you're representing there are no

17  objections on the objection list?

18          MS. LEE:  Yes, Your Honor.

19          JUDGE BLACK:  Is there any objection from the defense?

20          MR. McKNIGHT:  No objection, subject to any that might

21  appear on the list.

22          JUDGE BLACK:  I'm sorry.  You sound like a lawyer.

23  What?

24          MR. McKNIGHT:  I don't believe there are any on the

25  list.  I just haven't had a chance to check it.  But I don't --

```
 1    if there are none on the list, we don't have any objection now.
 2              JUDGE BLACK:  It's admitted.
 3        (Plaintiffs' Exhibit 266 was admitted.)
 4    Q.  Professor, if you look at the row one, column F, do you
 5    know what G02G, underscore, DV stands for?
 6    A.  Well, from memory, it should be governor, zero two,
 7    Democratic Vote, general election.
 8    Q.  Okay.  Perfect.  And the same G02G, underscore, RV is for
 9    Republican vote for that same election; correct?
10    A.  Yes.
11    Q.  Okay.  And looking at column I, G02A, underscore, DV, do
12    you recall what that is?
13    A.  I believe that's the attorney general, Democratic vote,
14    2002, general election.
15    Q.  Okay.  And to not have to go through it for each one, for
16    any one where we're considering the race for the election year
17    for Democratic vote, all RV does is give us the Republican
18    vote; correct?
19    A.  Right.
20    Q.  Okay.
21    A.  DV, Democratic vote; RV, Republican vote.
22    Q.  Do you recall what G02I, underscore, DV stands for?
23    A.  Well, from what I remember, auditor, state auditor.
24    Q.  And what does G02T, underscore, DV stand for, if you
25    recall?
```

1   A.  I -- I want to say Secretary of State, if I'm remembering

2   the coding correctly.  I mean, I don't have that in front of me

3   right here.

4   Q.  Sure.  That sounds correct to me as well.

5       What does G02J, underscore, DV stand for?

6   A.  Treasurer, I believe, state treasurer.

7   Q.  Okay.

8           JUDGE WATSON:  Is there a key to this somewhere?

9           MS. LEE:  There's not.  That's why I'm establishing it

10  here, Your Honors.

11  Q.  And column U, G04P, underscore, DV, do you recall what that

12  stands for?

13  A.  Presidential election, 2004, Democratic Vote.

14  Q.  Okay.  Great.  And then column X, G04S, underscore, DV, do

15  you recall what that stands for?

16  A.  General Election, U.S. Senate, 2004, Democratic Vote.

17  Q.  Okay.  And throughout your data, including for the other

18  years that were not the ones we discussed, does the two-digit

19  number after the G stand for the election year, '06, '08, '10?

20  A.  Yes.

21  Q.  Okay.

22  A.  It should.

23  Q.  Okay.  And is it also the case that the abbreviation for

24  each office, G for governor, and so on that we've just

25  discussed, is the same for each election year in which those

```
 1    races might appear?

 2    A.  The abbreviations should not change.

 3    Q.  Okay.  Great.  Thank you.

 4        And the 2002 data was, in addition to being available to

 5    you at the time of your report, was also available to the

 6    legislature at the time of the 2010 redistricting; is that

 7    correct?

 8    A.  Well, I would assume so.  I can only -- only assume.  I

 9    mean, the election had been held.

10    Q.  Okay.  Do you agree that the inclusion of certain elections

11    can impact the level of partisanship that an index shows;

12    correct?

13    A.  Certainly.

14    Q.  And you agree that leaving out certain elections may impact

15    the level of partisanship an index shows; correct?

16    A.  The choice of which elections to include or exclude, yes.

17    Q.  Okay.  So let's look at Defendants' 4, PDF page 12, which

18    is page 11, Footnote 16.  This is how you computed your

19    partisan index; is that correct?

20    A.  That is correct.

21    Q.  Okay.  And it's your opinion that this is a correct way to

22    compute a partisan vote index that one could rely upon;

23    correct?

24    A.  Well, this is a standard formula I've used.  The

25    computation is, yes.
```

1          MS. LEE:  Okay.  I'd like to put up Plaintiffs'

2     Demonstrative 90, which is another Excel or database file, so

3     there may be a bit of a delay.  This presents election data

4     produced in discovery to plaintiffs, which is at Plaintiffs'

5     Exhibit 45 to 61, which were agreed upon, subject to the

6     Maptitude stipulation, between the parties.  And on this first

7     tab that includes P45 to 61, could we scroll across to column

8     AP.  AP as in Peter.

9          MR. NAJARIAN:  Thank you.

10    Q.  And this data from the time appears to have the same type

11    of headers on the data that you used in computing your index;

12    is that correct?

13    A.  Yes.

14          MS. LEE:  Okay.  Could we go to the last tab at the

15    bottom, Computation.  And can we key to cell V2.  V2, please.

16    Just up one cell, please.

17          MR. NAJARIAN:  Thank you.

18    Q.  Okay.  And you can see in cell V2 that the formula is the

19    two-party vote share for each of these races in each district

20    summed and divided by 15.  So this is the computational formula

21    for the formula laid out in your Footnote 16.  Does that make

22    sense?

23    A.  Yes.  I didn't make these computations.

24    Q.  Oh, I understand that.

25    A.  Okay.

1   Q.  Just, plaintiffs' demonstrative exhibit, based on the data

2   we've received in this case.

3   A.  Okay.

4   Q.  And I'm just trying to provide some background for the

5   numbers we're going to look at in the demonstratives.  Okay?

6   A.  Okay.

7   Q.  Okay.  Great.

8         MS. LEE:  And if we then -- please, could you key to

9   X2.

10  Q.  And so this is a longer sum.  It includes the first five

11  columns that were not included under the summation for the Hood

12  index, which is the 2002 races.  And then it's just the same

13  formula with five additional races divided by 20 instead of

14  divided by 15.

15      Is that the correct way to compute a partisan index that

16  includes those additional five 2002 races?

17  A.  Yes, as long as the computations made before them were

18  correct.

19  Q.  Sure.  We can look at those if you want to.

20  A.  Well, I'm just making that statement.

21  Q.  Okay.

22  A.  I mean, that's just a summary computation at that point,

23  so --

24  Q.  Yes.  And the computations for that is included at the

25  second tab of this demonstrative Index Races, but I will try

1   and not belabor the Court with that, if we're all in agreement

2   on the addition of the two-party -- the Republican presented or

3   the two-party vote share for each of the races added together,

4   and then divided by the total number of races, correct?

5   A.   Okay.   Yes.

6   Q.   Okay.   And we've discussed that your index does not include

7   the full set of elections based on the statewide contested

8   elections for the decade preceding the 2011 redistricting cycle

9   as it does not include these five 2002 statewide races; is that

10  correct?

11  A.   That is correct.

12        MS. LEE:   Okay.   I'd like to put up PD89.

13  Q.   And this is just following on the formula that you used for

14  the 2004 to 2010 races.   Do you agree that this is the correct

15  way to compute the partisan index, including the 2002 races in

16  that period as well?

17  A.   It looks like it, yes.

18        MS. LEE:   All right.   I'd like to put up PD92.

19  Q.   Professor Hood, this is the same table included in your

20  report at page 15, but updated to include the 2002 statewide

21  races that we've been discussing, which were available at the

22  time of redistricting.

23      You agree that with the index applied with the full set of

24  statewide-contested elections in the decade preceding the 2011

25  redistricting cycle applied, there are no districts that lean

1    Democratic; correct?

2    A.  You mean that are competitive but Democratic leaning; is

3    that fair.

4    Q.  Yes.  Following along the same categorization that you use

5    in your report, that's what this table does here, your 45 to 55

6    percent being what you've classified as competitive, and

7    leaning in the direction of one party or another.  And, here,

8    there are no competitive leans-Democratic districts when you

9    use the full set of races; correct?

10   A.  It doesn't look like it.

11   Q.  Okay.  And you also agree that there are far fewer

12   districts in your 45 to 55 competitive range than when using an

13   index that leaves out the 2002 statewide races; correct?

14   A.  You mean that includes the 2002?

15   Q.  There are far fewer districts here with an index that

16   includes 2002 than when you use the index of 2004 to 2010; is

17   that correct?

18   A.  Yes.

19   Q.  Okay.  Regarding competitive districts, you testified on

20   direct of the -- of using a -- I believe what you called

21   standard 45 to 55 percent range for competitiveness; is that

22   correct?

23   A.  That's correct.

24   Q.  Okay.  I'd like to look at your report, D4.  I believe it's

25   PDF page 39, your Figure 7.

```
1        So in your partisanship key in the bottom corner for all of
2   these maps -- District 7 may not be the mean -- I mean, Figure
3   7 may not be the specific one we're looking at.  The coloring
4   that you use in these maps, there's no way to tell the VTDs
5   that fall in your so-called -- in the competitive range from
6   ones that fall either between 25 and 44.9 or 55.1 to 74.9;
7   correct?
8   A.  That's correct.
9   Q.  Okay.  And that would also be the case if we looked at the
10  larger banded competitive range that you referenced in your
11  direct testimony of the plus or minus ten percent, so that
12  would be even more so-called competitive VTDs that couldn't be
13  identified as competitive in these figure distributions;
14  correct?
15  A.  That's -- that's -- I mean, this really wasn't the purpose
16  of this map.
17  Q.  Sure.
18  A.  I just had to create some categories that one could see
19  with the eye, clearly.
20  Q.  Okay.  Understood.  Just trying to understand the
21  relationship of competitiveness to the percentages that you've
22  included as the key for each of these figures you presented.
23       With respect to districts being competitive, you agree that
24  none of the congressional districts in Ohio has flipped back
25  and forth between the two major political parties under the
```

1   current congressional map; is that correct?

2   A.  I believe that's correct, from memory, yes.

3   Q.  And you agree that a national wave can have the impact of

4   making districts more competitive; is that correct?

5   A.  It can.  There are a lot of factors involved in elections,

6   and that's one of them.

7   Q.  Okay.  And at the time of your deposition you had not done

8   any analysis demonstrating that in 2018 there was no wave

9   election in Ohio versus there being a wave election constrained

10  by the partisan districting; is that correct?

11  A.  Correct.

12  Q.  Okay.  And since then you have not done any analysis

13  demonstrating that there was no wave in Ohio in 2018 versus

14  that there was a wave election constrained by the partisan

15  redistricting; correct?

16  A.  Well, the analysis I presented on 2018 is contained in my

17  supplemental report.

18  Q.  Sure.  And does it include any analysis demonstrating that

19  there was no wave in Ohio in 2018 versus a wave being

20  constrained by the partisan redistricting?

21  A.  I would say so, yes.

22  Q.  And in what way?

23  A.  Well, the first table that's there, the summary statistics

24  of the statewide races, demonstrate that, if anything, there's

25  less of a wave in Ohio compared to some other states where

1   congressional seats were flipping.

2   Q.  And your analysis does not consider the congressional

3   outcomes in Ohio; correct?

4   A.  Well, I -- I list those.

5   Q.  Okay.  Does your analysis --

6   A.  I'm making -- I'm making an inference, I guess is what I'm

7   saying.

8   Q.  Okay.  Does your analysis consider the percentage Democrat

9   and Republican vote for Congress in the congressional districts

10  in Ohio in 2018?

11  A.  I don't have the vote totals, no.  I do have the winners

12  listed.

13  Q.  Okay.  And you don't have the percentages of the vote total

14  either; is that correct?

15  A.  For Congress?

16  Q.  For Congress.

17  A.  No, not in the report.

18  Q.  Okay.  You agree that your index understates the Republican

19  percentage as compared to the index of the full set of

20  elections based on the statewide contested elections for the

21  decade preceding the 2010 redistricting cycle, including 2002;

22  is that correct?

23  A.  I wouldn't exactly put it in those terms.

24  Q.  Does your index state a lower Republican percentage as

25  compared to the index that -- of the full set of elections

1  based on the statewide contested elections for the decade

2  preceding the 2010 redistricting cycle, including 2002?

3  A.  Yes, that's true.

4  Q.  Okay.

5  A.  Things do change or can change over time.

6  Q.  Sure.

7        MS. LEE:  Let's put up Plaintiffs' Demonstrative

8  PD097.

9  Q.  Okay.  And this demonstrative shows that your index, which

10 is in the middle column, states a lower Republican percentage

11 as compared to the index that uses the full set of elections

12 based on the statewide contested elections for the decade

13 preceding the 2010 redistricting cycle, including 2002, by an

14 average of 2.6 percent; is that correct?

15 A.  Well, if all of this is added up correctly and calculated

16 correctly, then, yes.

17 Q.  Okay.  And for each district, it's not just the average,

18 but for each district, your partisan index states a lower

19 Republican percentage as compared to the index of the full set

20 of elections based on the statewide contested elections for the

21 decade preceding the 2010 redistricting cycle, including 2002;

22 is that correct?

23 A.  Yes.

24 Q.  Okay.  You agree that the 2010 congressional election

25 results would have been known to the legislature at the time of

```
 1   redistricting; correct?

 2   A.   Correct.

 3   Q.   You agree that those results would have been available to

 4   you at the time of your report; correct?

 5   A.   2010?

 6   Q.   Yes.

 7   A.   Yes.

 8          MS. LEE:   Okay.   Let's put up Plaintiffs'

 9   Demonstrative 94.

10   Q.   This demonstrative reflects your index, the index that

11   includes the full set of elections based on the statewide

12   contested elections for the decade preceding 2010 redistricting

13   cycle including the 2002 and also the actual 2010 congressional

14   results.

15   A.   Okay.

16   Q.   Do you --

17   A.   Okay.

18   Q.   Okay.   Do you agree that the index with the 2002 races

19   included, that middle column, is closer to reflecting the

20   outcome calculated using congressional elections than is your

21   partisan index?

22   A.   In most cases, yes.

23   Q.   And, overall, you would agree that using the 2010

24   congressional results there's no competitive races, as you've

25   defined them, at all; is that correct?
```

1    A.  It doesn't look like it.

2    Q.  Okay.  And would you agree that's more similar to an index

3    that only indicates two competitive races versus an index that

4    indicates six competitive races?

5    A.  Okay.  Could you repeat the question?

6    Q.  Sure.  And so the 2002 -- using the 2002 congressional

7    election results, you agree that there are no competitive

8    districts; correct?

9    A.  Not -- not looking at the congressional election results,

10   no.

11   Q.  Okay.  And is 16 districts with no competitive districts

12   more similar to an index using statewide races that indicates

13   there are two competitive districts versus an index using

14   statewide races that indicates there are six competitive

15   districts?

16   A.  Well, in this particular example, yes.

17   Q.  Okay.  So you agree that by leaving out the 2002 races it

18   makes the enacted plan appear to have more competitive

19   districts than the data available at the time would suggest;

20   correct?

21   A.  Well, I wouldn't exactly phrase it that way.  I made a

22   decision about which election cycles I was going to use, and I

23   moved forward with that.  I didn't leave out 2002, per se.

24   Q.  But two thousand and --

25   A.  Using the 2004 to 2010 vote index, there are more

 1    competitive seats, yes.

 2         MS. LEE:  All right.  And if we could please put up

 3    Plaintiffs' Demonstrative PD095.

 4    Q.  This demonstrative reflects your index, the index of the

 5    full set of elections based on statewide contested elections

 6    for the decade preceding the 2010 redistricting cycle,

 7    including 2002, and the congressional results that would have

 8    been available to you at the time of your report, 2010, 2012,

 9    2014 and 2016 congressional election results.

10         Do you agree that the index that includes the full set of

11    elections, based on statewide contested elections for the

12    decade preceding the 2010 redistricting cycle, including 2002,

13    is closer to the outcome of the actual two-party vote share for

14    the congressional elections in these districts across these

15    election years?

16    A.  Let me ask you a question, if I can --

17    Q.  Sure.

18    A.  -- since I didn't create this.

19         In the 2010 column, are these the 2010 elections

20    reconstituted into the current districts?

21    Q.  Yes.

22    A.  Okay.  I was a little confused about that.

23         So in the other congressional election totals are the

24    actual totals since there are 16 districts for 2012, 2014 and

25    2016; is that fair?

1    Q.  Yes, as you would not reconstitute them since they are

2    coming out of those same districts.

3    A.  Well, I'm just asking for clarification.  Yes.

4    Q.  Understood.

5    A.  Okay.  So your question was, is the index using the 2002

6    races closer to the congressional election outcomes than my

7    index?

8    Q.  Yes.

9    A.  Is that fair?

10   Q.  Yes, that's fair.

11   A.  Typically.

12   Q.  Okay.

13   A.  I mean, in terms of the sheer number, typically.

14   Q.  So you agree that applying the full set of statewide races

15   from the decade preceding the redistricting reflects -- more

16   closely reflects the outcomes under the actual congressional

17   map following the redistricting?

18   A.  Well, the levels are closer than under my index.

19   Q.  And the comparison of the number of competitive races

20   compared to the number -- excuse me -- competitive districts

21   compared to the number of safe districts is more similar; would

22   you agree?

23   A.  Well, I mean, yes.  But, you know, for instance, in

24   District 6, I've got that as competitive.  The next column has

25   it as competitive.  For instance, in 2012 it's competitive.

1    Q.  Sure.

2    A.  So that's at least on par.

3    Q.  Okay.  And would you agree that you have it as competitive,

4    leaning Democratic -- District 6 we're referring to -- the full

5    set of elections based on the statewide contested elections for

6    the decade preceding the 2010 redistricting cycle, including

7    2002, has it as competitive, leans Republican, according to

8    your classification system, and in 2012 Congress, that would

9    also classify as competitive, leans Republican, and is actually

10   the outcome of a Republican winning that district?

11   A.  Yes, that's correct.

12   Q.  Okay.  Do you recall at your deposition we discussed the

13   so-called unified index?

14   A.  I remember you bringing that up, yes.

15   Q.  Okay.  Do you recall that the unified index was made up of

16   five elections:  the 2004 president; the 2006 attorney general;

17   the 2006 auditor; the 2008 presidential, and the 2010

18   governor's race?

19   A.  I wouldn't have recalled that from memory, no.

20   Q.  Okay.  Would it refresh your recollection to see

21   Plaintiffs' Exhibit which was used as Exhibit 14 at your

22   deposition?

23   A.  Sure.

24   Q.  Okay.

25   A.  Thank you.

```
1              MS. LEE:  Sure.

2         Could we please put up Plaintiffs' 261, and please go to

3    page six of the PDF.

4    Q.  And in the fourth bullet down from the top it indicates "In

5    the five races we used," and then indicates two yielded losses

6    for Republicans, two yielded wins, and one yielded a plurality

7    which would also be a win.

8         And you see here we see those five races in parentheses

9    that I just asked you about?  Do you see that?

10   A.  Yes.

11   Q.  And does that refresh your recollection of the composition

12   of the unified index?

13   A.  Yes.

14             MS. LEE:  Okay.  Let's put up Plaintiffs'

15   Demonstrative 96, please.

16   Q.  This demonstrative reflects this so-called unified index

17   that we just discussed, your index in middle column, and the

18   index that includes the full set of elections based on

19   statewide contested elections for the decade preceding the 2010

20   redistricting cycle, including 2002.

21        Do you agree that, like your index, the unified index

22   causes the districts to appear more competitive across the

23   districts than does the index that includes the full set of

24   elections based on statewide contested elections for the decade

25   preceding the 2010 redistricting cycle, including 2002?
```

1  A.  Well, the way I would phrase it is there are more

2  competitive districts under the unified index.

3        MS. LEE:  Okay.  Let's put up Plaintiffs'

4  Demonstrative 99, please.

5  Q.  In this demonstrative, similar to the one we looked at

6  comparing your index and the index based on the statewide

7  contested elections for the decade preceding the 2010

8  redistricting cycle, including 2002, shows that on average the

9  Republican percentage is understated by 3.2 percent.  Do you

10  agree with that?

11  A.  Well, again, if all the computations have been done

12  correctly, the average is about 3.2 percent less for the

13  unified index, yes.

14  Q.  Okay.  And across each of the districts the unified index

15  indicates a lower Republican percentage than for each of the

16  districts based on the index including the 2002 through 2010

17  statewide races; correct?

18  A.  Yes.

19  Q.  Okay.  So do you agree, then, that both the unified index

20  and your index state a lower Republican composition for each of

21  the districts under the 2012 plan than could have been known at

22  the time of redistricting?

23  A.  Well, it's lower than the index you created, that's

24  correct.

25  Q.  And --

1  A.  I mean, again, there's decisions that are made about what

2  to include in an index and what not to include.

3  Q.  And it's correct in your report that you described your

4  index as -- let's find it.  Page 11, I believe it is.

5      You described your index as based on the statewide

6  contested elections for the decade preceding the 2010

7  redistricting cycle; correct?

8  A.  That's correct.

9  Q.  And you agree with me that the 2002 statewide elections are

10 statewide contested elections for the decade preceding the 2010

11 redistricting cycle; correct?

12 A.  Correct.

13 Q.  Okay.  If we look, please, at Figure 8 in your report,

14 which is the last of the maps before your CV, PDF page 41, it

15 is correct that in this map you are comparing the period 2004

16 to 2010 with the period 2012 to 2016; is that correct?

17 A.  In Figure 8, yes.

18 Q.  Yes, okay.  And you've agreed that the 2002 races were

19 available to you when you were doing your work in this case,

20 and we've looked at your data at P266; correct?

21 A.  Yes.

22 Q.  Okay.  And you agree that the 2002 results were certainly

23 part of the partisanship in Ohio at the county level in the

24 decade preceding the redistricting; correct?

25 A.  Yes.

1          MS. LEE:  I'd like to put up Plaintiffs' Demonstrative
2     PD104.
3     Q.  So in this demonstrative the yellow highlighting shows the
4     counties which would have fallen in a lower Republican
5     percentage category if the 2002 races had been used.
6          Do you agree that this demonstrative shows that in 40
7     counties, not including the full set of the statewide contested
8     elections from the decade preceding the 2010 redistricting
9     cycle, the shift from pre-redistricting to post-redistricting
10    is overstated in 40 counties?  Do you agree with that?
11    A.  Well, according to this -- this figure.  I guess my
12    question is:  by how much?  I mean, in other words, are these
13    counties still trending Republican or not, just by not as much?
14         Are you -- are you basing this off of the categories I
15    created?
16    Q.  Yes.  I'm just following along with the categories you
17    created as that's the way you presented the information to the
18    Court and to plaintiffs.
19    A.  So I think it's possible that they may have trended less
20    Republican.  But still most of these counties are probably
21    trending Republican across these two time periods.
22         I'm going to take your word that there are 40 yellow
23    counties, I guess, so --
24    Q.  Sure.  You agree that by failing to include 2002 in your
25    pre-redistricting index, this understated the Republican

1  composition of Ohio in the decade preceding the 2010

2  redistricting cycle; correct?

3  A.  Well, again, I made a decision of which election cycles and

4  which races to include, and that's what I moved forward with.

5       To answer your question, if you include 2002, the

6  percentage for the Republican vote index is higher than under

7  my vote index.

8  Q.  Right.  And in your report, your reference to Figure 8 was

9  about a shift over time pre- and post-redistricting; correct?

10 A.  Yes.

11 Q.  Okay.  Let's look again at your report, Table 12 on page 12

12 of D4, which is page 13 of the PDF.  And you used these results

13 to generate your Figure 1, correct, these races?

14 A.  Yes.

15 Q.  Okay.  And continuing on in your report, let's please turn

16 to page 27.  And in the first full paragraph you indicate that

17 you -- "To begin this inquiry, I created another map analogous

18 to that presented in Figure 1 using a vote index to shade VTDs

19 in Ohio based on their partisan composition;" correct?

20 A.  Correct.

21 Q.  And in Footnote 39 on this page, I believe you testified on

22 direct, you indicated which races you used to generate Figure

23 7; correct?

24 A.  That's correct.

25           MS. LEE:  Okay.  For ease of reference, let's please

1    put up PD100.

2    Q.  And these are those two pages from your report put side to

3    side.  Does this depict the comparison of the races you used

4    for your, quote, analogous Figures 1 and 7?

5    A.  Yes, that's accurate.

6    Q.  Okay.  And you agree that the races indicated in Footnote

7    39 are not all of the 2012 to 2016 statewide races; correct?

8    A.  No, that's correct.  I made use of the data I had available

9    during that time period at the VTD level.

10            MS. LEE:  Okay.  So let's put up Plaintiffs'

11   Demonstrative 102.

12   Q.  And so this is based on the official statewide election

13   results which have been entered into evidence as Joint Exhibit

14   18.  This demonstrative indicates the Republican two-party vote

15   share for each of the 2014 statewide races.

16       You agree that the three races you did not include in your

17   index for Figure 7 for 2014 are attorney general, auditor and

18   treasurer?

19   A.  Yes, just in Figure 7.

20   Q.  Yes.  Understood.

21   A.  When I switched back to -- that's one of the reasons I

22   switched back to using counties, because I had complete data I

23   could rely on at that point.

24   Q.  Sure.  And you presented Figure 7 in your report as

25   analogous to Figure; 1 correct?

1    A.  Well, it's analogous from the standpoint I'm drawing a

2    picture of the partisanship of Ohio at the VTD level.  That's

3    what I'm saying.

4    Q.  You agree that the races that you included in your Figure 7

5    were the two most Republican of the five statewide races in

6    2014; is that correct?

7    A.  Well, according to this demonstrative, yes.

8    Q.  And you agree that leaving out those races from 2014 would

9    make the state look more Republican than it otherwise would

10   with them included?

11   A.  Well, I didn't have -- again, I didn't have those other

12   races at the VTD level to look at, so I never plotted it.

13   Q.  I understand that.  But adding races that have, additional

14   races that have a lower Republican percentage would overall

15   make the index a lower Republican percentage than it currently

16   is; correct?

17   A.  Probably so.

18   Q.  Okay.  Professor Hood, we discussed you reviewed Dr.

19   Warshaw's reports in this case; correct?

20   A.  Yes.

21   Q.  And you were aware that Dr. Warshaw used a number of

22   different metrics in his report in addition to the efficiency

23   gap; correct?

24   A.  That's correct.

25   Q.  And you did not offer any analysis of the other metrics

```
 1    considered in Dr. Warshaw's report other than the EG; correct?

 2    A.  That is correct.

 3    Q.  And in your report, D4, page 26 at Footnote 38 --

 4         MS. LEE:  Page 26, Footnote 38.

 5    Q.  -- you flagged the question of unequal turnout impacting

 6    the efficiency gap; correct?

 7    A.  I'm citing that article, yes.

 8    Q.  Yeah.  Are you aware that Dr. Warshaw controlled for uneven

 9    turnout in his report?

10    A.  I was uncertain about that.

11    Q.  Okay.  And you did not do any analysis regarding the

12    question of uneven turnout in the efficiency gap; correct?

13    A.  No, not specifically.

14    Q.  Okay.  In your report you present the amounts of money

15    raised --

16         MS. LEE:  I'm sorry.  I'm just trying to see how much

17    longer, Your Honors.  Not much longer, but not in the next two

18    minutes either.

19         JUDGE BLACK:  What does "not much longer" mean?  The

20    other gentleman predicted accurately.

21         MS. LEE:  Yes.

22      (Laughter.)

23         JUDGE BLACK:  He's a good lawyer.

24         JUDGE WATSON:  Aww, that's not fair.

25         JUDGE BLACK:  No offense to her.  I'm just continuing
```

```
 1   to pimp him.

 2            JUDGE WATSON:  That wasn't fair.

 3            JUDGE BLACK:  You're a good lawyer too.  How long do

 4   you estimate?

 5            MS. LEE:  20 to 25 minutes at the outside.

 6            JUDGE BLACK:  And redirect?

 7            MR. McKNIGHT:  Right now just a couple of questions,

 8   Your Honor.

 9            JUDGE BLACK:  All right.

10       (Judges confer privately.)

11            MS. LEE:  I can try and speed it up if that helps.

12            JUDGE BLACK:  No.  You're doing fine.  We've been

13   sitting up here a long time, and the Court would appreciate the

14   opportunity to break for the day.

15            MS. LEE:  Okay.  Understood.

16            JUDGE BLACK:  So we'll break.

17       It's five of 5:00.  I'd like to have this conversation with

18   you all about your predictions as to who is calling who, when.

19       What's the defense -- how many more you got, and when do

20   you think you're going to be through it now that we're going to

21   have to carry this one over?

22            MR. STRACH:  Yes, Your Honor.

23       So we have three witnesses left on the list.  We're

24   evaluating the extent to which we need to call maybe all of

25   them.  You know, we may eliminate some.
```

1    We're going to get our list for tomorrow to the plaintiffs

2  by 7:00 PM tonight, per our agreement.  So I think once we've

3  had a little bit of time out of court to confer, evaluate,

4  we'll have a very good idea of --

5    If we call all three, this would go into Thursday.  If we

6  eliminate all three, we'd be done tomorrow.  If we call some

7  but not all, it would be somewhere in the middle.

8         JUDGE WATSON:  Would you share that with our clerks,

9  where you are by 7:00 o'clock tonight?

10        MR. STRACH:  Yes, sir, absolutely.

11        JUDGE WATSON:  That would be lovely.

12        JUDGE BLACK:  And if the defense rests tomorrow, will

13  the plaintiff be prepared to call its rebuttal witnesses?

14        MS. LEVENSON:  Yes, Your Honor, at least one.

15    We have one rebuttal witness that is set to go for

16  tomorrow.  We're trying to work out with the congresswoman --

17  we didn't know that we would begin rebuttal tomorrow.  We're

18  trying to see -- if you've noticed me texting, I've noticed

19  that things have been going fast and trying to determine

20  whether she can be available tomorrow.

21    She certainly is available Thursday morning, but it doesn't

22  seem that we're necessarily going into Thursday morning.

23        JUDGE BLACK:  If you're able to get your witnesses on

24  tomorrow if they rest, the Court would be very grateful.  We've

25  pushed the defense and the intervenors hard not to make us take

1   a day off.  So perhaps additional texting.  We'll look for the

2   7:00 o'clock notification and see where we are.

3       Mr. Lewis, did you need to be heard?

4           MR. LEWIS:  Yes, Your Honor.

5       I guess the one question we would have returns to the

6   subject of Representative Kaptur.  It's been offered that she's

7   going to be a rebuttal witness, and I think we would just like

8   a proffer from plaintiffs as to precisely what she will be

9   rebutting.

10          JUDGE BLACK:  I don't object to that.

11      Do you?  Why is she a rebuttal witness?  What is she going

12  to rebut?

13          MS. LEVENSON:  Your Honor, yesterday we heard from

14  Troy Judy, who testified that the Democrats requested that

15  Kucinich and Kaptur be paired and that that request resulted in

16  the district being configured in the way that it is.  Mr. Judy

17  testified that the Republicans couldn't have dreamed up a

18  district that looked like that on their own and that they did

19  it based on information that was relayed to them by the

20  Democrat leaders of the state.  That's what we'll be

21  addressing.

22          JUDGE BLACK:  Is that responsive to your inquiry, Mr.

23  Lewis?

24          MR. LEWIS:  It is, Your Honor.  And I think it

25  demonstrates why Representative Kaptur is not an appropriate

1    witness.  I don't know how --

2        First of all, the testimony from Mr. Judy on Monday, I have

3    his transcript up here on my screen, was referring

4    predominantly to discussions with a Mr. Ruvolo, not with Ms.

5    Kaptur.  And I'm not really sure how Ms. Kaptur is going to be

6    able to rebut the clear impression created amongst this case

7    and that predated even the first day of trial, as material

8    comes up in depositions and other places, that Democrats had

9    input on the map, you know, regardless of what that may or may

10   not be.

11        JUDGE BLACK:  The Court determines that she's an

12   appropriate rebuttal witness, and we want her available when

13   the time comes.  And I recognize that that's a challenge.

14        MS. LEVENSON:  Thank you, Your Honor.

15   (Judges confer privately.)

16        JUDGE BLACK:  Both judges are telling me, yeah, she's

17   a rebuttal witness based on what Batchelder described her role

18   as.

19        In any case, the Court has ruled.  We anticipate her

20   testimony by video conference, and we are not eager to lose an

21   afternoon or lose a day.  And just as we leaned on the

22   defendants and the intervenors not to cause that hole to show

23   up, one more time:  more texting.

24        MS. LEVENSON:  Yes, Your Honor.

25        JUDGE BLACK:  Is there more we need to discuss before

```
 1   we adjourn for the day?
 2       From the defense?
 3            MR. STRACH:  Not from us, Your Honor.
 4            JUDGE BLACK:  From the intervenors?
 5            MR. LEWIS:  Nothing, Your Honor.
 6            JUDGE BLACK:  From the plaintiffs?
 7            MR. FRAM:  Nothing, Your Honor.
 8            JUDGE WATSON:  I think we need to see pictures of the
 9   new babies, too.
10            MS. LEVENSON:  Yes, Your Honor.
11            JUDGE BLACK:  Demonstrative.
12       (Laughter.)
13            JUDGE BLACK:  Sir?
14            THE WITNESS:  Yes, sir.
15            JUDGE BLACK:  During the break between now and
16   tomorrow, please do not discuss your testimony with anyone.
17   Understood?
18            THE WITNESS:  Yes, sir.
19            JUDGE BLACK:  And you're kind of pleased you get to
20   spend the night here, aren't you?
21            THE WITNESS:  Certainly.
22            JUDGE BLACK:  Very well.
23       (Laughter.)
24            JUDGE BLACK:  We are prepared to recess for the day.
25   You may step down, sir.  Thank you.
```

```
 1        (Witness temporarily excused.)

 2              COURTROOM DEPUTY:  All rise.  This court is in recess.

 3        (At 5:00 PM, the trial was recessed, to be continues on

 4   Wednesday, March 13, 2019, at 9:00 AM.)

 5                               -  -  -

 6               I N D E X    O F    W I T N E S S E S

 7   DEFENDANTS' WITNESSES:                          PAGE

 8   THOMAS BRUNELL
     Direct Examination (Continued) by Ms. McKnight ...  10
 9   Cross-Examination by Ms. Thomas-Lundborg .........  69
     Redirect Examination by Ms. McKnight ............. 124
10
     M.V. HOOD III
11   Direct Examination by Mr. McKnight .............. 135
     Cross-Examination By Ms. Lee .................... 181
12
                               -  -  -
13
                       E X H I B I T S
14
     EXHIBIT NUMBER:                               ADMITTED
15
     Plaintiffs' Exhibit 266 ........................  207
16
     Defendants' Exhibit 4 ..........................  180
17   Defendants' Exhibit 5 ..........................  180

18   Intervenors' Exhibit 31 ........................   36
     Intervenors' Exhibit 60 ........................   36
19   Intervenors' Exhibit 132 .......................   37
     Intervenors' Exhibit 133 .......................   38
20   Intervenors' Exhibit 134 .......................   61
     Intervenors' Exhibit 135 .......................   62
21   Intervenors' Exhibit 136 .......................   63

22                               -  -  -

23

24

25
```

1                    C E R T I F I C A T E

2          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

3  that the foregoing is a correct transcript from the record of

4  proceedings in the above-entitled matter.

5

6                              s/Luke T. Lavin
                               _____
                               Luke T. Lavin
7                              Official Court Reporter

8                         -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25