UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

. . . . . . . . . . . . . . . .
OHIO A. PHILIP RANDOLPH      .  Case No. 1:18-cv-357
INSTITUTE, et al.,          .
                            .  *Day 8 of Bench Trial*
        Plaintiffs,         .
                            .
    - v -                   .
                            .  Wednesday, March 13, 2019
LARRY HOUSEHOLDER, et al.,   .  9:01 AM
                            .
        Defendants.         .  Cincinnati, Ohio
. . . . . . . . . . . . . . . .

- - -

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY S. BLACK, THE HONORABLE KAREN
NELSON MOORE AND THE HONORABLE MICHAEL H. WATSON, JUDGES

<u>APPEARANCES</u>:

For the Plaintiffs:

FREDA J. LEVENSON, ESQ.             T. ALORA THOMAS-LUNDBORG, ESQ.
DAVID J. CAREY, ESQ.                THERESA J. LEE, ESQ.
American Civil Liberties Union      EMILY R. ZHANG, ESQ.
  of Ohio Foundation                American Civil Liberties Union
4506 Chester Avenue                   Foundation
Cleveland, Ohio  44103              125 Broad Street, 18
                                    125 Broad Street, 18th Floor
                                    New York, New York  10004-2400


ROBERT D. FRAM, ESQ.
Covington & Burling LLP
One Front Street, 35th Floor
San Francisco, California  94111

For the Defendants:

                    ANN YACKSHAW, ESQ.
                    Ohio Attorney General's Office
                    Constitutional Offices Section
                    30 East Broad Street, 16th Floor
                    Columbus, Ohio  43215

*Proceedings recorded by stenotype; transcript
produced by computer-aided transcription.*

1   <u>APPEARANCES (Continued)</u>:

2   For the Defendants Larry Householder and Larry Obhof:

3                         PHILLIP J. STRACH, ESQ.
                          MICHAEL D. McKNIGHT, ESQ.
4                         ALYSSA RIGGINS, ESQ.
                          Ogletree, Deakins, Nash, Smoak & Stewart,
5                            P.C.
                          4208 Six Forks Road, Suite 1100
6                         Raleigh, North Carolina  27609

7   For the Intervenors Steve Chabot, Brad R. Wenstrup, Jim Jordan,
    Bob Latta, Bill Johnson, Bob Gibbs, Warren Davidson, Michael
8   Turner, Dave Joyce, Steve Stivers, Robert F. Bodi, Charles
    Drake, Roy Palmer III, Nathan Aichele, Republican Party of
9   Cuyahoga County and Franklin County Republican Party:

10  PATRICK T. LEWIS, ESQ.            KATHERINE L. McKNIGHT, ESQ.
    Baker & Hostetler LLP             E. MARK BRADEN, ESQ.
11  Key Tower                         Baker & Hostetler LLP
    127 Public Square, Suite 2000     1050 Connecticut Avenue, N.W.
12  Cleveland, Ohio  44114-1214       Suite 1100
                                      Washington, DC  20036-5043
13
    ERIKA DACKIN PROUTY, ESQ.
14  Baker & Hostetler LLP
    200 Civic Center Drive
15  Suite 1200
    Columbus, Ohio  43215-4138
16
    Also present:          Stephen N. Najarian, Trial Consultant
17                         Forrest Williamson, Paralegal, Baker &
                             Hostetler
18
    Law Clerks:            Christopher D. deLaubenfels, Esq.
19                         Hannah Gelbort, Esq.
                           Adam Kleven, Esq.
20                         Caitlin Miller, Esq.
                           Madison R. Troyer, Esq.
21
    Courtroom Deputy:      Rebecca R. Santoro
22
    Court Reporter:        Luke T. Lavin, RDR, CRR
23                         Potter Stewart U.S. Courthouse
                           100 East Fifth Street, Room 103
24                         Cincinnati, Ohio  45202
                           Telephone:  (513) 564-7500
25

1                    P R O C E E D I N G S

2      (In open court at 9:01 AM.)

3            JUDGE BLACK:  Good morning.  Please be seated.

4      We're back in the open courtroom.  It's 9:00 o'clock, on

5  the record.  Plaintiffs' counsel is here.  Defense counsel is

6  here.  Intervenors' counsel is here.

7      Shall we touch base on any issues other than the taking of

8  testimony?  I was favored with an e-mail at 10:00 PM.

9            MR. FRAM:  Your Honor, we've got the morning time

10 report.

11           JUDGE BLACK:  Good.

12           MR. FRAM:  Yesterday, plaintiffs consumed another 168

13 minutes.  Our trial time to date is 1,294 minutes.

14           JUDGE BLACK:  Very well.

15           MR. FRAM:  Defendants and intervenors took up another

16 181 minutes, and their trial time to date is 1,142 minutes.

17           JUDGE BLACK:  Very well.

18           MR. STRACH:  Your Honor?

19           JUDGE BLACK:  Yes, sir.

20           MR. STRACH:  Let me explain the 10:00 o'clock e-mail.

21 We actually -- so we send the plaintiffs an e-mail around 7:00

22 o'clock or so.  I can't remember what time it was.  Mr.

23 McKnight actually sent an e-mail to the clerks.  Five minutes

24 thereafter, I think our VPN disconnected.  And so it, like, it

25 showed that it was sent, but it actually was held.  And then

1    when the VPN came back up at 10:00 o'clock, it sent the e-mail.

2    So our apologies for that technical snafu, but we did try to

3    send it at 7:00 o'clock.

4              JUDGE BLACK:  Very well.

5         And the thrust of the e-mail is that defense and

6    intervenors intend to rest after this witness?

7              MR. STRACH:  Yes.

8              JUDGE BLACK:  And plaintiff is prepared to proceed

9    thereafter?

10             MS. LEVENSON:  Yes, Your Honor.

11             JUDGE BLACK:  Very well.  Well, are we ready to

12   continue?

13        Yes.

14             MS. ZHANG:  Before I proceed, we have two issues

15   regarding exhibits.

16             JUDGE BLACK:  All right.  Will you speak right up,

17   please.

18             MS. ZHANG:  Yes.  The first issue is we'd like to

19   admit Dr. Brunell's deposition transcript.

20             JUDGE BLACK:  I'm going to really ask you to speak up.

21   I'm sorry.

22             MS. ZHANG:  Sorry.  We'd like to admit Dr. Brunell's

23   deposition transcript as an exhibit.

24             JUDGE BLACK:  Okay.  Is there an objection?

25             MS. McKNIGHT:  Yes, Your Honor, there is an objection.

1    It is not a proper impeachment exhibit.

2         JUDGE BLACK:  Will you speak up as well.  I'm sorry.

3         MS. McKNIGHT:  Sorry.  I thought I was close enough.

4    Good morning, Your Honor.

5         JUDGE BLACK:  Good morning.

6         MS. McKNIGHT:  We do have an objection; it was not a

7    proper impeachment exhibit.  Thank you.

8         MS. ZHANG:  All the depositions have not been marked

9    as impeachment exhibits but they have been used for impeachment

10   purposes, so we'd like for them to be admitted as an

11   impeachment exhibit.

12        JUDGE BLACK:  Well, the Court's going to conditionally

13   admit it, subject to the objection, which has been proffered.

14        MS. ZHANG:  There's A second issue, which is that we'd

15   like to raise our oral objections to the admissibility of the

16   expert reports of Mr. Trende and Dr. Johnson.  We learned as of

17   7:00 PM last night that they will not be testifying.

18       Ordinarily, expert reports are not admissible in court.

19   Pursuant to the stipulation of the parties, we allowed for the

20   admission of all the expert reports if the experts were going

21   to testify live.  In light of the representation from opposing

22   counsel that they will not be calling Mr. Trende or Dr.

23   Johnson, we'd like to raise our objection as to admissibility

24   of those reports.

25       They are -- based on the e-mail sent by Jeremy Goldstein

1  last Saturday, that's what's listed on Defendants' Exhibit list

2  as D22, 23 for the Johnson report and his resume, and also the

3  Trende report, which is D26, and Mr. Trende's CV, which is D27.

4         JUDGE BLACK:  And you object to their admission into

5  evidence; is that --

6         MS. ZHANG:  That's correct; that's correct.

7         JUDGE BLACK:  As to their expert report only?

8         MS. ZHANG:  And their CV, since they have not

9  testified.

10         JUDGE BLACK:  Yes.

11         MR. STRACH:  Sure.  I think that goes without saying.

12         JUDGE BLACK:  All right.  So the expert reports are

13  not being admitted, nor the CVs.  That's where we are from the

14  defendants' and intervenors' perspective as well; is that

15  right?

16         MR. STRACH:  That's right.

17         JUDGE BLACK:  All right.  So ordered.

18     Are we ready to proceed with the taking of additional

19  testimony?

20         MS. LEE:  Yes, Your Honor.

21         JUDGE BLACK:  If you would recall the gentleman.

22  Yeah, you appear to be the gentleman.

23     (M. V. Hood III resumes the witness stand.)

24         JUDGE BLACK:  And you understand you're still under

25  oath; correct, sir?

```
1          THE WITNESS:  Yes, sir.

2          THE COURT:  You may be seated, and, when ready, we

3   will proceed.

4          MS. LEE:  Thank you, Your Honors.

5                        M. V. HOOD III

6   a witness herein, having been previously duly sworn, testified

7   further as follows:

8                   CROSS-EXAMINATION (Continued)

9   BY MS. LEE:

10  Q.  Good morning, Dr. Hood.

11  A.  Good morning.

12  Q.  So at the end of yesterday we had just been turning to the

13  portion of your report, Defendants' 4, where you have presented

14  the amounts of money raised by candidates and what previous

15  offices they held.  Beginning on page -- I believe this begins

16  on page 16 of your analysis, with the tables beginning on page

17  18.

18      Is that a fair summation of the tables in this section?

19  A.  Yes.  I mean, there's some additional information about

20  incumbency and party and those kinds of things, but, yes.

21  Q.  Certainly.  Dr. Hood, you agree that how districts lines

22  are drawn can affect the behavior of political actors; correct?

23  A.  They can.

24  Q.  Well, I'd like to look at Table 18 on page 19 of your

25  report.  Do you recall testifying on direct to this table and
```

1    the surrounding information you've presented in your report?

2    A.  Yes.

3    Q.  You didn't provide any of the citations underlying the

4    content of Table 18; is that correct?

5    A.  That's correct.

6    Q.  Okay.  Do you also --

7            MS. LEE:  We can put that one down.

8        And could we please look at --

9    Q.  Yesterday, do you recall testifying on direct that in each

10   of the tables presenting the amount of money raised by both the

11   incumbents and challengers that if you've listed zero dollars,

12   it indicates that the challenger or the candidate for office

13   did not raise any money in that election cycle?

14   A.  Well, there was -- there was never a report filed.

15   Q.  Okay.

16           JUDGE WATSON:  Ms. Lee, are we talking about Table 18

17   or are we talking about Table 19?

18           MS. LEE:  Tables 19 through 21 for each of the

19   respective election years, Your Honor.

20           JUDGE WATSON:  All right.  Thank you.

21   Q.  And do you recall Judge Watson asking if zero dollars

22   indicated whether there was no candidate or there was no money

23   raised?

24   A.  Yes.

25   Q.  And on direct you testified that indicated there was no

1    money raised by a candidate who was in the race; is that

2    correct?

3    A.  To the best of my knowledge, yes.

4          MS. LEE:  Okay.  Could we please put up Table 20,

5    which is at page 21 of your report.

6    Q.  And looking at District 7 in 2014.

7       Dr. Hood, are you aware that Congressman Gibbs ran

8    unopposed in District 7 in 2014?

9    A.  No.

10   Q.  Okay.  Dr. Hood, you did not do anything to determine that

11   the district lines themselves did not cause the Democratic

12   challengers to fail to raise comparable funds; correct?

13   A.  No, I did not do that analysis.

14   Q.  And you agree that it's possible that where district lines

15   are drawn can themselves affect the ability of challengers to

16   raise comparable money; correct?

17   A.  Districts can affect challenger emergence and those types

18   of things.  I guess that's possible.  I can't think of any

19   research offhand that gets right at that question.

20   Q.  Sure.  But you do agree that it's possible that the lines

21   themselves affect the ability of challengers to raise

22   comparable funds; correct?

23   A.  I would agree it's possible.

24   Q.  Okay.  You did not do anything to assess whether the

25   district lines themselves prevented the recruitment of

1    experienced candidates; is that correct?

2    A.  I did not perform that analysis, no.

3    Q.  Well, and you agree it is possible that where the lines

4    were drawn themselves prevented the recruitment of experienced

5    candidates; is that correct?

6    A.  Again, hypothetically, that's possible.  I didn't perform

7    that analysis.

8    Q.  Okay.  Are you familiar with the phrase "omitted variable

9    bias"?

10   A.  Yes.

11   Q.  And what does that phrase mean?

12   A.  It means, in a statistical model, if something important's

13   left out, it could skew the results.

14   Q.  Okay.  And do you agree that if a district became more

15   competitive through a redistricting process, that could have an

16   impact on the type of person that might challenge an incumbent?

17   A.  It's possible.

18   Q.  And could that have an impact on the amount of spending

19   that would occur against an incumbent?

20   A.  In general, the more competitive an election is, the more

21   spending -- or the more contributions can be raised, that's

22   true.

23   Q.  Okay.  And the legislature can insulate an incumbent

24   against a challenge by making a district so lopsided in favor

25   of the incumbent's party that it would be very difficult for a

 1  challenger to raise money and mount a successful campaign

 2  against that incumbent; would you agree?

 3  A.  Well, again, hypothetically, it's possible.

 4  Q.  And you did not conduct any analysis in this case to

 5  determine that the lower amounts of money raised and the

 6  candidate quality was not caused by the district lines;

 7  correct?

 8  A.  Again, I didn't perform that analysis.

 9  Q.  Okay.  Thank you.

10      Did you testify as an expert in *Democratic National*

11  *Committee versus Reagan* in the district of Arizona in 2018?

12  A.  Yes.

13  Q.  And isn't it the case that in that litigation the Court

14  found that your opinion should be afforded little weight?

15  A.  If that's what the opinion says.

16          MS. LEE:  We ask the Court to take judicial notice of

17  *Democratic National Committee versus Reagan*, 329 F. Supp. 3d

18  824, pin cite to Dr. Hood's testimony, at 837.  It was

19  subsequently affirmed and is currently under en banc review.

20  None of the subsequent history is aimed at the Court's

21  assessment of Dr. Hood.

22          JUDGE BLACK:  Any objection?

23          MR. McKNIGHT:  No objection, Your Honor.

24          JUDGE BLACK:  The Court takes judicial notice of that

25  decision.

1   Q.  Dr. Hood, did you testify as an expert in *Northeast Ohio*

2   *Coalition for the Homeless versus Husted* here in the Southern

3   District of Ohio, a decision in 2016?

4   A.  Yes.

5   Q.  And isn't it the case that in *Northeast Ohio Coalition for*

6   *the Homeless v. Husted* that the Court found your testimony to

7   be irrelevant and that it reflected methodological errors?

8   A.  If that's what the judge said.

9   Q.  And isn't it the case that in that *Northeast Coalition for*

10  *the Homeless v. Husted* the Court also found that your opinions

11  were entitled to little to no weight?

12  A.  Again, I'm not arguing, if that's what the opinion said.

13          MS. LEE:  Okay.  Plaintiffs ask the Court to take

14  judicial notice of *Northeast Ohio Coalition for the Homeless v.*

15  *Husted*, Number 06-cv-896, Westlaw citation 2016 WL 3166251, pin

16  cite -- Westlaw pin cite at *23, Southern District of Ohio,

17  June 7th, 2016.

18      The decision of the district court was subsequently

19  affirmed in part and reversed in part.  None of the subsequent

20  history is aimed at that district court's assessment of Dr.

21  Hood.

22          JUDGE BLACK:  And the plaintiff moves the Court to

23  take judicial notice of it?

24          MS. LEE:  Yes, Your Honor.

25          JUDGE BLACK:  Is there any objection?

HOOD - CROSS

```
 1              MR. McKNIGHT:  No objection to taking judicial notice
 2      of the opinion itself.
 3              JUDGE BLACK:  Very well.  The Court so acts.
 4      Q.  Dr. Hood, did you testify as an expert in Veasey v. Perry?
 5      A.  Yes.
 6      Q.  And that's in the Southern District of Texas, decision in
 7      2014.  Isn't it the case that the Court in Veasey found your
 8      testimony and analysis unconvincing and gave it little weight?
 9      A.   Again, I'm not going to argue with -- if that's what the
10      opinion stated.
11              MS. LEE:  Okay.  We ask the Court to the please take
12      judicial notice of Veasey v. Perry, 71 F. Supp. 3d 627, pin
13      cite to the analysis of Dr. Hood's testimony at 663, Southern
14      District of Texas, 2014.
15          Veasey v. Perry was subsequently affirmed in part, reversed
16      in part and vacated in part.  None of the subsequent history is
17      aimed at the Court's assessment of Dr. Hood.  And we ask the
18      Court to take judicial notice.
19              JUDGE BLACK:  Any objection?
20              MR. McKNIGHT:  No objection to taking judicial notice
21      of the opinion.
22              JUDGE BLACK:  The Court so acts.
23      Q.  Dr. Hood did you testify in Frank v. Walker?
24      A.  Yes.
25      Q.  Isn't it the case that the Court in Frank found that your
```

1    use of data rendered your conclusions in that case suspect?

2    A.  I haven't looked at that opinion lately.  I'm not going to

3    argue if that's what the opinion states.

4    Q.  Okay.

5           MS. LEE:  We ask the Court to take judicial notice of

6    *Frank v. Walker*, which was subsequently affirmed in part,

7    reversed in part and vacated in part.  None of the subsequent

8    history is aimed at the Court's assessment of Dr. Hood.  The

9    citation is 17 F. Supp. 3d 837, pin cite 882, in the Eastern

10   District of Wisconsin.

11          JUDGE BLACK:  Any objection?

12          MR. McKNIGHT:  No objection to taking judicial notice

13   of the opinion.  I think we would note an objection to

14   relevance on these cases, to the extent they're not

15   redistricting cases.

16          JUDGE BLACK:  Very well.  The Court takes judicial

17   notice of them.

18   Q.  Dr. Hood, did you testify in *Florida v. United States*?

19   A.  Yes.

20   Q.  And isn't it the case that the Court in *Florida* rejected

21   your opinions because the analysis underlying your conclusions

22   suffered from a number of methodological flaws?

23   A.  Again, if that's what the opinion states, that's what it

24   states.

25          MS. LEE:  Okay.  We ask the Court to take judicial

 1  notice of *Florida versus United States*, 885 F. Supp. 2d 229,

 2  pin cite 324, the District of the District of Columbia, 2012.

 3          JUDGE BLACK:  Any objection?

 4          MR. McKNIGHT:  No objection to taking judicial notice

 5  of the opinion, but I note that that's not a redistricting

 6  decision.

 7          JUDGE BLACK:  The Court takes judicial notice of it.

 8  Q.  And, Dr. Hood, did you testify in *Common Cause/Georgia*

 9  *versus Billups*?

10  A.  Yes.

11  Q.  And isn't it the case that the Court in *Common*

12  *Cause/Georgia* found your analysis to be unreliable and so

13  excluded it?

14  A.  If that's -- well, that's true, yes.

15          MS. LEE:  Okay.

16      We ask the Court to take judicial notice of *Common*

17  *Cause/Georgia v. Billups*.  And I can give you the citation.

18  *Common Cause/Georgia v. Billups*, excuse me.  And the citation,

19  it's an unreported decision, Civil Action Number 05-cv-201,

20  2007, Northern District of Georgia, Westlaw citation 2007 WL

21  7600409, pin cite *14.

22          JUDGE BLACK:  Any objection?

23          MR. McKNIGHT:  No objection to taking judicial notice

24  of the decision.

25          JUDGE BLACK:  Very well.  The Court so acts.

1   Q.  And, Dr. Hood, each of cases I just asked you about are

2   voting rights cases; is that correct?

3   A.  I'm thinking.

4   Q.  Okay.  Okay.

5   A.  I believe so.

6           MS. LEE:  No further questions at this time, Your

7   Honor.

8           JUDGE BLACK:  Very well.

9           JUDGE WATSON:  Let the record reflect there's about a

10  thousand pages left untouched.

11          MS. LEE:  I was hoping I wouldn't --

12          JUDGE WATSON:  The Court thanks you for that.

13          MS. LEE:  Okay.  Thank you, Your Honor.

14          JUDGE BLACK:  Redirect?

15          MR. McKNIGHT:  Yes, Your Honor.

16                      REDIRECT EXAMINATION

17  BY MR. McKNIGHT:

18  Q.  Good morning, Dr. Hood.

19  A.  Good morning.

20  Q.  While it's still fresh in your mind, I know that counsel

21  just asked you about a series of cases in which courts provided

22  various -- which it was represented the courts provided various

23  opinions on your opinions.

24      Of the cases that were mentioned, were any of those

25  redistricting cases?

1 A. Not that I recall.

2 Q. All right. And one case that was mentioned at the end was

3 a case called *Common Cause versus Georgia*. Was that the first

4 case in which you served as an expert witness?

5 A. Yes. I think it's *Common Cause v. Billups*.

6 Q. Okay. And you were testifying in that case on behalf of

7 the Common Cause plaintiffs; is that right?

8 A. That's correct.

9 Q. Now, in all of those cases, with the exception of *Common*

10 *Cause versus Billups*, you were accepted as an expert witness;

11 is that right?

12 A. Yes.

13 Q. Dr. Hood, yesterday during cross-examination you were asked

14 about an academic article you wrote in which you described a

15 core retention rate of 68.7 percent as, quote, "greatly

16 altering the relationship between representatives and

17 constituents." And you responded that the redistricting

18 described in that article was a different redistricting in a

19 different state.

20    Do you recall that testimony?

21 A. Yes.

22 Q. Beyond the fact that this was a different redistricting in

23 a different state in the article, can you elaborate on how the

24 circumstances of the redistricting you discussed in that

25 article were different from the redistricting at issue in this

1   case?

2   A.  Well, it was a redistricting in Georgia that occurred.  It

3   was a mid-census redistricting that was going on.  And it was

4   also different from the current case under discussion in Ohio,

5   because, of course, since it was mid-census, Georgia wasn't

6   losing or gaining any congressional seats.

7   Q.  Well, all right.  Moving on to another topic.  In the

8   political science literature, are you aware of any universally

9   accepted method for measuring partisanship in redistricting?

10  A.  I'm not.

11  Q.  All right.  And in the political science literature, is

12  there any universally accepted agreement on how many races to

13  include in a partisan index that is used to evaluate a

14  districting plan?

15  A.  No.

16  Q.  And in the political science literature, is there any

17  universally accepted agreement on which races to include in a

18  partisan index that is used to evaluate a districting plan?

19  A.  No.

20          MR. McKNIGHT:  Thank you, Dr. Hood.  I have no further

21  questions.

22          JUDGE BLACK:  Very well.

23      Dr. Hood, you appear to have survived.  You're free to go.

24  Thank you.

25          THE WITNESS:  Thank you, Your Honor.

```
 1            JUDGE BLACK:  Very well.

 2      (Witness excused.)

 3            JUDGE BLACK:  Defense wish to be heard on the record?

 4            MR. STRACH:  Yes, Your Honor.  Defendants have no

 5   further witnesses, and subject to -- I assume the intervenors

 6   will say the same thing.  I think we'll move in our exhibits

 7   and then rest our case.

 8            JUDGE BLACK:  Very well.

 9      Intervenors?

10            MR. LEWIS:  Intervenors intend to follow defendants'

11   suit.

12            JUDGE BLACK:  All right.  So you move to admit your

13   trial exhibits?

14            MR. STRACH:  Your Honor, with one little wrinkle.  We

15   move to admit all of the defendants' exhibits that were used at

16   trial or in deposition, which we believe the record will

17   reflect.  We're not moving in -- and we don't believe it's

18   appropriate for any party to move in exhibits that were not

19   used at trial or in a deposition.

20            JUDGE BLACK:  So tell me, again, what you're doing.

21            MR. STRACH:  We are moving in all of defendants'

22   exhibits that were used at trial or at deposition.

23            JUDGE BLACK:  All right.  Any objection?

24            MR. FRAM:  Your Honor, we, of course, reserve our

25   post-trial briefing objections.  And on the comment about
```

1   exhibits being used at trial or not, we have some that are

2   subject to stipulation.  There were some judicial notice, and

3   those are not subject to -- necessarily, to testimony, and so

4   we will have to hash that out, I think, in the post-trial

5   briefing.  There may be other exceptions, and we'll address

6   them.

7          JUDGE BLACK:  Very well.  They're going to address any

8   objections to the admission of exhibits, defendants' exhibits

9   used at trial or in deposition to post-trial briefing.

10      Mr. Lewis, do you need to be heard?

11          MR. LEWIS:  Yes, Your Honor.  Intervenors would also

12  move into evidence all the exhibits that we used at trial to

13  the extent not already admitted or that were used in

14  deposition.

15      Your Honor, we would also -- for clarity, we're

16  specifically referring to, in particular, with -- well, I'm

17  going to avoid that.

18      But the exhibits that we filed on the amended list, which

19  appears as ECF number 244-3, filed on March 9th, which covers

20  through the first week of trial, if the Court will recall, we

21  had two intervenors', 130, Intervenors' 131, two additional

22  exhibits that we moved in.  Subsequent to that, just as a

23  reminder, we did have Intervenors' Exhibit 132 to 136 that we

24  moved in.

25      And then in addition, Your Honor, we had three minor

```
 1  housekeeping matters.  First, and perhaps the plaintiffs have
 2  already done so --
 3          JUDGE BLACK:  I'm going to interrupt you, if I may.
 4  So you're moving into evidence any Intervenors' exhibits used
 5  at trial or referred to in depositions; is that right?
 6          MR. LEWIS:  Yes, Your Honor.
 7          JUDGE BLACK:  All right.  Do the plaintiffs wish to be
 8  heard on the record?
 9          MR. FRAM:  We're, again, reserving our post-trial
10  objections, Your Honor.
11          JUDGE BLACK:  All right.  They're admitted
12  conditionally, subject to post-trial briefing.
13          MR. LEWIS:  And then, Your Honor, we had just three
14  other housekeeping matters.  First, I think many of the parties
15  relied on Plaintiffs' Demonstrative Exhibit 20, and so we would
16  like to move that in as substantive evidence.
17          JUDGE BLACK:  Any objection?
18          MS. LEE:  No, Your Honor.  It's also -- the same image
19  is included in Plaintiffs' 454, which was already admitted into
20  evidence.
21          JUDGE BLACK:  Very well.  Well, Plaintiffs'
22  Demonstrative Exhibit 20, repetitive of Plaintiffs' 544 is
23  admitted.
24          MR. LEWIS:  And, Your Honor, we did have -- during the
25  cross-examination of Representative Fudge there was an article
```

1    titled "Former Rep. Louis Stokes Supports the New Look of the

2    11th District" from the *Cleveland Plain Dealer* on September

3    17th, 2011, copies of which were distributed, I believe, to the

4    Court and to counsel, although we have additional copies if we

5    need them.  And subsequent to a review of the record, we

6    believe that we've satisfied the requirements of Rule 613(b) to

7    have that admitted as an impeachment exhibit, and so we would

8    proffer that into evidence as Intervenors' Exhibit 137.

9          JUDGE BLACK:  Any objection?

10         MR. FRAM:  Your Honor,we don't have an objection to it

11   going in for impeachment, but we think the goose-gander rule

12   should apply.  In the -- we had impeachment exhibits, testimony

13   from Representative Batchelder, Speaker Batchelder.  There was

14   a newspaper article, there was the *House Journal*.  And if we're

15   going to be providing allowance for some late introduction of

16   and submission of impeachment of exhibits at this point, we'd

17   ask that the same courtesy be provided for those exhibits, and

18   that we would so move.

19         JUDGE BLACK:  Defense or intervenors wish to be heard?

20         MR. LEWIS:  Your Honor, from the intervenors'

21   perspective, plaintiffs have closed their case-in-chief.  They

22   moved for what they moved for.

23         MR. FRAM:  Your Honor, the witness is not on the stand

24   and they're making a late motion for the exhibits.  So it's on

25   that basis that we're asking for leave.

1    JUDGE BLACK:  Well, it's admitted conditionally,

2  subject to the objection and post-trial briefing.

3    Are there numbers on those documents?

4    MR. LEWIS:  Your Honor, we actually do have a labeled

5  version of what we have now offered as Intervenors' 137.  I can

6  distribute copies to the Court and counsel.

7    JUDGE BLACK:  I was referencing the plaintiffs.

8    MR. LEWIS:  Sorry.

9    MR. FRAM:  Your Honor, we'll provide them before the

10  end of the testimony today.  I don't have them right at my

11  fingertips.

12    JUDGE BLACK:  Very well.

13    MR. LEWIS:  And then, Your Honors, we had one

14  additional housekeeping item, and, that is, we do at this time

15  move into evidence the deposition designations offered by

16  defendants and intervenors.  That is found in the record at ECF

17  number 230-2, which is Appendix B.

18    Additionally, there were counterdesignations proposed by

19  defendants and intervenors to the plaintiffs' designated

20  deposition testimony.  That is found on ECF number 230-1.  And

21  then we would move for that as well.

22    JUDGE BLACK:  Any objection?

23    MR. STRACH:  We agree with that, Your Honor.  That was

24  going to be my next move.

25    JUDGE BLACK:  Okay.

1          MR. FRAM:  And our understanding is that the Court has

2    also provided for the post-trial briefing of those objections,

3    which have been, actually, already indicated in the parties'

4    pretrial designations on these objections for the deposition

5    testimony, and we look forward to that briefing, with the

6    Court's permission.

7          JUDGE BLACK:  Very well.  Admitted conditionally

8    subject to post-trial briefing.

9       Does that conclude intervenors?  The intervenors have been

10   heard?

11         MR. LEWIS:  We have, Your Honor.  Thank you.

12         JUDGE BLACK:  Yes.  Give me just a moment.

13      Plaintiffs' counsel is standing.

14         MS. LEE:  Your Honor, I just have a couple of

15   housekeeping items as well.  I'm seeking to admit the

16   plaintiffs' exhibits that underlay the demonstratives used with

17   the cross-examination of Dr. Hood, including P18, which is

18   subject to the Maptitude stipulation between the parties; P45

19   through 61, which is subject to the same stipulation; P261,

20   which may have been admitted yesterday, was discussed with the

21   witness, and there were no objections to that on intervenors'

22   and defendants' responses to plaintiffs exhibit list; and P266

23   and P268, similarly no objections.  And those were data

24   provided by Dr. Hood in the Rule 26 disclosures.

25         JUDGE BLACK:  Any objections?

1          MR. STRACH:  Well, again, we note that the plaintiffs'

2     case is closed, but we don't object to them coming in as

3     demonstratives.

4          JUDGE BLACK:  Is that what you're moving them in as?

5          MS. LEE:  No, Your Honor.  We sought to move in the

6     entire plaintiffs exhibit list.  And I was just making, at the

7     end of our case-in-chief, which would include all of these

8     exhibits, and I'm just making clear that these exhibits

9     underlay the demonstratives that were used specifically in the

10    cross-examination of Dr. Hood.

11         JUDGE BLACK:  And does the defense wish to be heard

12    further?

13         MR. STRACH:  So I guess I'm confused.  It sounds like

14    they're saying they've already moved these in.  So I don't know

15    why we would be moving them in again.  So if they've been moved

16    in, obviously, that's been done.  If they've not been moved in,

17    then we object, and we think they should only be admitted for

18    demonstrative purposes.

19         JUDGE BLACK:  All right.  Admitted conditionally,

20    subject to post-trial briefing.

21         MS. LEE:  And, Your Honor, we've also assigned an IM

22    number to Dr. Brunell's deposition transcript, which my

23    colleague mentioned at the start of the day, for reference,

24    that is IM84.

25         JUDGE BLACK:  Any objection?

1          MR. STRACH:  No, Your Honor.

2          JUDGE BLACK:  It's admitted.

3     And did the intervenors' need to be heard?  I'm sorry.

4          MR. LEWIS:  Your Honor, just one minor housekeeping

5    item I got passed to me.

6          JUDGE BLACK:  These housekeeping items, it's quite a

7    little term.

8          MR. LEWIS:  We're lawyers.  That's what we do.

9          JUDGE BLACK:  Very well.

10          MR. LEWIS:  Intervenors' 137, we had discussed.  I

11   believe the Court did not conditionally admit subject to

12   objection.

13          JUDGE BLACK:  Very well.  Say that again.

14   Intervenors' 137 we have discussed.  I believe the Court did

15   not conditionally admit subject to objection, and you're

16   suggesting that the Court should conditionally admit; is that

17   right?

18          MR. LEWIS:  Yes, Your Honor.

19          JUDGE BLACK:  Any objection?

20          MS. LEVENSON:  I think that plaintiffs stand on their

21   objections yesterday about that document.

22          JUDGE BLACK:  Very well.  It's admitted conditionally.

23          MR. FRAM:  And, Your Honor, if I might, I think this

24   really is housekeeping.

25          JUDGE BLACK:  Umm-hmm.

```
 1            MR. FRAM:  Our ever-efficient team, to whom I'm very
 2    grateful, wants me to inform the Court that it's IM66 and IM68
 3    are the two Batchelder impeachment exhibits to which I was
 4    previously referring.
 5            JUDGE BLACK:  And?
 6            MR. FRAM:  Those are the two IM -- those are the two
 7    documents that we are seeking for admission, subject to the
 8    Court's permission, if we are going to be moving in late, all
 9    parties are moving in late, impeachment exhibits.
10            JUDGE BLACK:  Very well.  Any objection to impeachment
11    Exhibits IM66 and 68?
12            MR. STRACH:  I think we'd stand on our prior
13    objections.
14            JUDGE BLACK:  Admitted conditionally, subject to
15    objection and post-trial briefing.
16        The intervenors' lawyer is standing.
17            MS. McKNIGHT:  Yes, Your Honor.  Thank you.
18        One point of clarity.  I understand that plaintiffs'
19    counsel just identified for the record the label IM84 for Dr.
20    Brunell's testimony yesterday.  There may have been some
21    confusion when the Court said it was admitted, without noting
22    that it is admitted conditionally.  That is Dr. Brunell's
23    testimony that they're providing as an impeachment exhibit.
24        We maintain in our objection that it is an improper
25    impeachment exhibit, and will look forward to briefing that
```

1  issue, but I wanted to make sure, for clarity, for the record,

2  that IM84, we do hold an objection to that, and we ask that it

3  be admitted conditionally, if at all.  Thank you.

4         JUDGE BLACK:  As a housekeeping matter, the Court

5  admits it conditionally.

6     Defendants' counsel is standing.

7         MR. STRACH:  I don't have a housekeeping matter.

8         JUDGE BLACK:  Very well.

9         MR. STRACH:  I think we're done.  Defense rests.

10        JUDGE BLACK:  Defense rests.

11 <u>DEFENDANTS REST</u>

12        JUDGE BLACK:  Where do we stand from intervenors'

13 perspective?

14        MR. LEWIS:  The intervenors rest as well.

15        JUDGE BLACK:  The intervenors rest.

16 <u>INTERVENORS REST</u>

17        JUDGE BLACK:  Does the plaintiff have rebuttal.

18        MS. LEE:  We do, Your Honor.

19        JUDGE BLACK:  You anticipate calling two witnesses?

20        MS. LEE:  Yes, Your Honor, that's correct.

21        JUDGE BLACK:  And you anticipate calling the

22 congresswoman on video conference at 10:30?

23        MS. LEE:  Yes, Your Honor, that is correct.

24        JUDGE BLACK:  And how long do you anticipate her

25 testimony will be?

1          MS. LEVENSON:  We don't anticipate that the direct

2     would take more than about ten minutes.

3          JUDGE BLACK:  Very well.  In the spirit of full

4     disclosure, we intend to recess at 11:30 this morning to attend

5     an event that requires our participation.  I think it's going

6     to work.

7        Are you ready to call your rebuttal witness first?

8          MS. LEE:  Yes, Your Honor, we are.

9          JUDGE BLACK:  You may do so.

10          MS. LEE:  Plaintiffs call William S. Cooper in

11     rebuttal.

12          JUDGE BLACK:  If Mr. Cooper would be willing to

13     approach.

14        You know where the witness stand is.

15          THE WITNESS:  Yes.

16          JUDGE BLACK:  Thank you.

17          JUDGE WATSON:  Bring any more maps with you?

18          THE WITNESS:  I believe there are some.

19          JUDGE BLACK:  Well, brace yourself.

20        Will you raise your right hand, please.  Do you solemnly

21     swear or affirm your testimony today will be the truth subject

22     to the penalty of perjury?

23          THE WITNESS:  Yes.

24          JUDGE BLACK:  Very well.  You may take the stand.

25        And without pressing you, do you have an estimate on this

 1    direct?

 2            MS. LEE:  Twenty minutes, Your Honor.

 3            JUDGE BLACK:  Okay.  I'm just trying to get a sense.

 4        The distinguished defendants' lawyer is standing.

 5            MR. STRACH:  Thank you, Your Honor.  We want to note

 6    our objection on the record.  We do not believe this is proper

 7    rebuttal testimony.

 8        The intervenors may have more to say on this, but,

 9    yesterday evening, we were provided with a new map and data by

10    which Mr. Cooper was going to apparently testify today.  We

11    want to note for the record it is a completely brand-new map.

12    It does not rebut -- it's been represented that this rebuts Mr.

13    DiRossi' testimony.

14        We would note, number one, typically, rebuttal by an expert

15    is to rebut another expert's testimony.  Mr. DiRossi was a fact

16    witness, not an expert.  And that, in any event, this testimony

17    is not going to, in fact, rebut Mr. DiRossi's testimony in any

18    meaningful way.  This is simply a way for the plaintiffs to get

19    a new remedial map into the court record on the last day of

20    trial at the last minute and essentially sandbag the defense

21    and the intervenors.  We are quite -- we are quite perplexed

22    and disappointed, and we don't believe this evidence should

23    come in.  We understand it's a Court of three experienced

24    judges, so we get that, but we want to make the point clear

25    that this is not rebuttal evidence and we do not believe the

1    Court should consider it at the end of the day.

2         JUDGE BLACK:  Very well.

3    Mr. Lewis?

4         MR. LEWIS:  Your Honor, we would point out that we

5    filed a motion *in limine* in this case precisely on this issue

6    regarding the submission of additional proposed remedial maps

7    and hypothetical alternative maps.  And on February 4th, this

8    Court entered an order that overruled our motion *in limine* with

9    respect to specific hypothetical alternative maps that Mr.

10   Cooper proposed in response to Dr. Hood.

11       In its order, this Court wrote, and I quote:  "Rebuttal

12   reports 'may not advance new arguments or new evidence outside

13   the scope of the opposing party's expert testimony.'"  I'm

14   quoting out of page five of ECF number 197.

15       Going on, this Court held that "a rebuttal expert may cite

16   new evidence and data so long as the new evidence or data is

17   offered to directly contradict or rebut the opposing party's

18   expert."

19       And in this case plaintiffs, by their own admission in the

20   e-mail they sent to this Court and to the parties, identify Mr.

21   Cooper's testimony as allegedly rebutting fact-witness

22   testimony offered by Mr. DiRossi concerning the reasons for

23   which he -- certain changes were made to HB 369 from HB 319.

24       As Mr. Strach indicated, Mr. DiRossi's not an expert in

25   this case.  He's not been qualified as an expert.  He's not

1   testified as an expert.

2       Secondarily, Mr. DiRossi was deposed in this case on

3   October 22nd, 2018, more than 30 days before Mr. Cooper

4   submitted his rebuttal report in this case.  During that

5   deposition, on multiple occasions, Mr. DiRossi testified about

6   changes to 369 from 319, brought about by negotiations.  And in

7   particular, he even referred to ripple effects, the very term

8   used in plaintiffs' e-mail.

9       Therefore, Mr. Cooper had more than 30 days' notice, if he

10  had intended to offer expert testimony to rebut fact-witness

11  testimony, which we're not even -- I'm not even conceding

12  that's proper.  But even if it was, he had an opportunity to do

13  it, and he didn't do so.

14      Your Honors, I would ask this Court to hold plaintiffs to

15  their word.  They assured the Court they would not attempt to

16  use at trial improperly and untimely disclosed expert analysis

17  of data.  They have done precisely that.  This Court should t

18  permit them to do so.  Thank you.

19          JUDGE BLACK:  Plaintiff wish to be heard in response?

20  The defendant is perplexed and disappointed.

21          MS. LEE:  We do, Your Honor.

22      As plaintiffs indicated in their response to intervenors'

23  motion *in limine*, and under clear Sixth Circuit precedent,

24  plaintiffs are entitled to put on evidence to rebut new

25  evidence or new theories proffered in the defendants'

1  case-in-chief.

2      Mr. DiRossi testified that the reasons that compelled the

3  Ohio's congressional map included at least three additional

4  reasons that he had not testified to at his deposition, that

5  the whole of Warren County needed to be included in District 1,

6  that at The Ohio State University campus needed to be drawn

7  into District 3, and that Franklin County needed to be divided

8  to ensure that it included districts represented by both

9  Republican and Democratic congresspersons.  That's at Mr.

10 DiRossi's Day Five trial testimony at 186, 15 to 22; 180, 4 to

11 9; 178, 23 to 179, 12; and at 288, 13 to 25.

12     These pieces of evidence individually amount to new

13 evidence that plaintiffs are entitled to rebut.  And, moreover,

14 because a map, as Mr. DiRossi testified, has ripple effects

15 upon it, even if plaintiffs offered -- responded to what Mr.

16 DiRossi had testified to at his deposition, it would not have

17 dealt with his testimony which qualifies as new evidence as a

18 whole, since all of the components need to be taken into

19 account in any map.

20     I'd also like to make very clear plaintiffs are not

21 offering anything in Mr. Cooper's rebuttal testimony as the

22 proposed remedial map in this case.  We simply are not.  Nor

23 are his hypothetical maps an offered proposed remedial map in

24 this case.

25          JUDGE BLACK:  Very well.

1    We'll permit the testimony, subject to the objections.

2  It's been made clear by counsel that we've got three

3  experienced judges, and we'll make the call.

4    I don't know what his testimony is going to be.  We'll hear

5  it, and if it's not rebuttal, we'll strike it, subject to

6  post-trial briefings.

7    You described the panel's experience, sir; is that right?

8         MR. STRACH:  That is absolutely correct.  I stand on

9  my words.

10        JUDGE BLACK:  Are there additional adjectives you want

11 to get in the record?

12    (Laughter.)

13        MR. STRACH:  I promised my co-counsel I wouldn't use

14 poppycock anymore.

15        JUDGE BLACK:  Very well.

16        MR. LEWIS:  The intervenors would add "learned."

17        JUDGE BLACK:  What did he say?  Thank you, sir.

18    All right.  See what you've caused?

19        THE WITNESS:  Not my call.

20        JUDGE BLACK:  Proceed with the testimony of the

21 witness.  I swore you; right?  You've done that?

22        THE WITNESS:  Yes.

23        JUDGE BLACK:  Okay.  Let's roll.

24        MS. LEE:  Thank you, Your Honor.

25 <u>PLAINTIFFS' EVIDENCE IN REBUTTAL</u>

1                    WILLIAM S. COOPER

2   a witness herein, having been first sworn, testified as follows:

3                   REBUTTAL DIRECT EXAMINATION

4   BY MS. LEE:

5   Q.  Mr. Cooper, thank you so much for driving back to

6   Cincinnati yesterday and for postponing your deposition in

7   Georgia that was scheduled for today.

8        You have put together a rebuttal congressional plan in this

9   case; is that correct?

10  A.  Yes.

11  Q.  When did I ask you about drawing a rebuttal congressional

12  plan?

13  A.  Late Sunday evening.  Saturday evening, excuse me.

14  Q.  And did you draw that plan between Saturday and yesterday?

15  A.  Yes.

16  Q.  To be clear, are you suggesting that this congressional

17  plan should be implemented?

18  A.  No, not at all.

19  Q.  And why not?

20  A.  Primarily, because it's problematic in terms of traditional

21  redistricting principles.  Some of the districts are not

22  compact.

23       Obviously, District 9, running from Toledo to Cleveland, is

24  problematic.

25       District 11, as drawn going into Summit County, is

1  problematic.  It's not necessary to create a minority

2  opportunity district in northeast Ohio by taking part of

3  Cleveland and Cuyahoga County district into Summit County, in

4  my opinion.

5      And, importantly, there's no reason to split Hamilton

6  County three ways and the city of Cincinnati three ways in

7  order to combine part of the city of Cincinnati with Warren

8  County.

9  Q.  And so is the purpose of this plan simply to demonstrate a

10  possibility?

11  A.  Yes.

12  Q.  Okay.  Could you please turn to tab 1 of the binder in

13  front of you.

14        MS. LEE:  And please put up P617.

15  Q.  Mr. Cooper, what is presented here?

16  A.  This is a map that I prepared at your request in order to

17  take into account some of the comments made in Mr. DiRossi's

18  testimony on Friday, last week, where he explained that he had

19  dealt with certain requests from officials and others back in

20  2011 as part of his background for producing the 2012 plan.

21  Q.  And do you recall reviewing portions of the trial testimony

22  of Ray DiRossi, one of the map drawers who testified in this

23  case?

24  A.  Yes, I reviewed that on Saturday evening.

25  Q.  What elements were included in this rebuttal plan based

     1    upon that trial testimony?

     2    A.  Well, there were several.  First, I made sure that I

     3    included Warren County with part of Cincinnati and Hamilton

     4    County in District 1.

     5         Secondarily, in north Ohio, I combined Toledo with

     6    Cleveland in a District 9, the so-called Snake on the Lake.

     7    That's a district I would never have drawn for a remedial plan.

     8    And, as I mentioned, I included -- Summit County was a minority

     9    opportunity district in the District 11 that extends from

    10    Cuyahoga into Summit County.

    11         I made other minor changes.  For example, I split Mercer

    12    County three ways in exactly the same fashion that it is split

    13    in the 2012 plan.  Apparently, there was an issue about

    14    including Mercer County -- parts of Mercer County so that St.

    15    Mary's Township, which is actually in Auglaize County, would be

    16    joined with the Grand Lake area, the state park that is also in

    17    Mercer County.

    18         So those are some of the things that I did.  I may not have

    19    mentioned them all.  I included -- for example, Timken

    20    Corporation in Stark County was put into District 16, as had

    21    been requested, according to Mr. DiRossi.

    22         And I also -- compared to the remedial -- proposed remedial

    23    plan for Franklin County, I extended District 3 so that it

    24    encompassed more of Ohio State University.  In this plan I

    25    don't think it takes into all of Ohio State University

1   boundaries, but it does include 14,000 dormitory students in

2   the district.  So it's got to take the bulk of that part of the

3   campus.

4   Q.  Okay.  And I'd like to ask you whether some other specific

5   elements are included in this rebuttal plan.  Does this plan

6   pair 2011 incumbents Representatives Kucinich and Kaptur?

7   A.  Yes.

8   Q.  And does it pair Representatives Turner and Austria?

9   A.  Yes.

10   Q.  And does it pair Representatives Sutton and Renacci?

11   A.  Yes.

12   Q.  And does it place the whole of Loveland into District 2?

13   A.  It does.

14   Q.  Okay.  And in this rebuttal plan, based on the 2011

15   incumbents, does this create a District 3 in Franklin County

16   that did not include a 2011 incumbent?

17   A.  That is correct.  There was an address mentioned, I think,

18   in Mr. DiRossi' testimony, and so I placed that address in

19   District 15.

20   Q.  There were a couple addresses mentioned, and I'll -- and

21   that was one of them.  And then there was an additional address

22   which, based on Mr. DiRossi' testimony, was of the now-

23   representative, now-congresswoman Joyce Beatty.  And is that

24   included in District 3 in your plan?

25   A.  Yes, as it has been in all of the plans I've produced.

1    Q.  And does this plan, also like the proposed remedial plan,

2    keep Montgomery County whole?

3    A.  It does.

4    Q.  And based on Mr. DiRossi's testimony, it keeps Clark County

5    whole?

6    A.  Yes.

7    Q.  And based on Mr. DiRossi's testimony, is the NASA Glenn

8    Brook -- excuse me -- the NASA Glenn Research Center placed

9    into District 9?

10   A.  Yes.

11   Q.  And is the NASA Plum Brook location placed into District 9?

12   A.  Yes.  I believe that's in Erie County, and I've put all of

13   Erie County in District 9.

14   Q.  Okay.  And does this rebuttal plan ensure that District 9

15   has, quote, "much more of the Toledo area than the west

16   Cleveland area"?

17   A.  Yes.  I think it's a little bit over 60 percent.  There's

18   an exhibit in this booklet that identifies exactly what

19   percentage of Representative Kaptur's district in the 2002 plan

20   is in the District 9 for the rebuttal plan.

21   Q.  And does this plan ensure that Congresswoman Fudge is not

22   paired?

23   A.  Yes.

24   Q.  And all of these items that we've just discussed were

25   presented in the trial testimony of Ray DiRossi; correct?

1    A.  Yes, as far as I know.

2    Q.  Okay.  Did you notice anything about the 2012 plan itself

3    that appeared to be at odds with any of the items that Mr.

4    DiRossi testified to as important in creating -- as required in

5    creating his 2012 plan?

6    A.  Well, it was mentioned that the Plum Brook NASA facility

7    should be in District 9.  And in the 2012 plan, Erie County is

8    split.  And if I look at the map for Erie County using Google

9    Maps, it appears that the Plum Brook facility is not in

10   District 9, but, rather, is in District 4, in the 2012 plan.

11   Q.  But because it was in Mr. DiRossi's trial testimony, you

12   were able to include it in this rebuttal plan with the other

13   features?

14   A.  Yes.

15   Q.  If, for example, I had not requested that you include the

16   whole of Warren County in District 1, would this rebuttal map

17   look quite different?

18   A.  Yes, it would look different.  There would be a ripple

19   effect.  It would, you know, probably effect at least a half

20   dozen districts before I could have held constant the rest of

21   the plan.

22   Q.  And if Warren County, the whole of Warren County, had not

23   been included in District 1, could you have drawn a District 1,

24   wholly within Hamilton County as you did in the proposed

25   remedial plan?

1   A.   Yes.   There's no reason to draw a District 1 that would go

2   outside the jurisdictional boundaries of Hamilton County,

3   because it's over the population size of a congressional

4   district.

5   Q.   And for smaller requests that affect smaller populations,

6   such as including a particular address, does it -- would it

7   alter the map in a way as significant as something like not

8   including Warren County in District 1?

9   A.   It would not be as significant.

10  Q.   If I later, or someone later, requested an additional

11  element other than those testified to by Mr. DiRossi, would it

12  be possible, as a map drawer, in your experience, to later

13  implement that?

14  A.   Yes.

15  Q.   Would it depend on, sort of, what the request would be?

16  A.   Well, yes.   If it's a relatively minor request, it could

17  probably be accommodated without major changes to the plan.

18  Q.   Okay.   If you can please turn to tab 2 of your binder.

19           MS. LEE:   And can we put up P618.

20      What's depicted here, Mr. Cooper?

21  A.   This is simply the population by district under the

22  rebuttal plan, showing that all districts have plus or minus

23  one person.   So it's zero deviation, equipopulated.   And it

24  shows the total population, and the over-18 population with a

25  breakout by absolute count for 18 and over, any part black; and

 1  18 and over, non-Hispanic whites; and then the percentage

 2  calculations for those categories.

 3  Q.  Okay.  And what is the BVAP in Rebuttal District 1?

 4  A.  It is 26.26 percent for the any part black population, over

 5  18.

 6  Q.  And is that BVAP similar to that of the proposed remedial

 7  plan, because most of Cincinnati is kept together in District

 8  1?

 9  A.  Yes.

10  Q.  And what's the BVAP for Rebuttal District 3?

11  A.  It is 29.54 percent.

12  Q.  And is that similar to the BVAP for the proposed remedial

13  plan and the 2012 plan?

14  A.  Yes.  It's less than a percentage point difference.

15  Q.  Okay.  And for District 11, what is the BVAP here?

16  A.  50.72 percent.

17  Q.  And so that is an over-50-percent BVAP, as Mr. DiRossi had

18  testified to; is that correct?

19  A.  Correct.

20  Q.  Okay.  Please turn to tab 3 of your binder.

21        MS. LEE:  And if we can put up P619.

22  Q.  What is presented here, Mr. Cooper?

23  A.  This shows the counties that were split in the rebuttal

24  plan.  So there were 18 counties that are split, and then

25  there's a line-by-line breakout identifying what portion in

 1  each county was allocated to a particular district.

 2  Q.  And what's the total number of counties split under this

 3  rebuttal plan?

 4  A.  Eighteen.

 5  Q.  If you'd please turn to tab 4 of your binder.

 6          MS. LEE:  And we can put up P620.

 7  Q.  And what is depicted here?

 8  A.  This shows the county splits, which is identical to what we

 9  just saw in the previous exhibit, as well as the townships, or

10  what are called metropolitan civil divisions in Census Bureau

11  parlance.  And this identifies those townships that are split

12  between districts in the rebuttal plan.

13  Q.  And how many municipal splits are there in this rebuttal

14  plan?

15  A.  There are 49, but ten have no population.  So the real

16  impact would be on 39 splits.

17  Q.  Okay.  Let's please turn to tab 5 of your binder.

18          MS. LEE:  And please put up P621.

19  Q.  What is presented here, Mr. Cooper?

20  A.  This just reports the compactness scores for all of the

21  districts.  It's a table that's similar to what was discussed

22  in my original declaration and supplemental declarations, so

23  that the --

24  Q.  And what does that -- sorry.  What is the mean Reock score?

25  A.  The mean Reock score is .39.

1   Q.  Okay.  Thank you.

2       Let's please turn to tab 6 of your binder.

3           MS. LEE:  And put up P622.

4   Q.  What is presented here, Mr. Cooper?

5   A.  The same district-by-district breakout for the rebuttal

6   plan showing the Polsby-Popper score, the other compactness

7   measure that I discussed previously.

8   Q.  And what is the mean Polsby-Popper for the rebuttal plan?

9   A.  .29.

10  Q.  Let's please turn to tab 7 of your binder.

11          MS. LEE:  And please put up P623.

12  Q.  What is presented here?

13  A.  This shows the 2011 incumbents who were in office at the

14  time the 2012 plan was adopted, and it identifies what portion

15  of each one of the rebuttal districts a particular incumbent

16  would have in his new district under what would be the rebuttal

17  plan.

18  Q.  And did you calculate this in the same fashion as you did

19  for the similar tables in your supplemental declarations?

20  A.  Yes.

21  Q.  And is this, to your understanding, the same methodology

22  used by Dr. Hood in calculating core retention?

23  A.  I believe so.

24  Q.  Okay.  And if we look on page two, for District 9, which is

25  the second district down on page two, is it fair to say that

1   Representative Kaptur has, quote, "much more of her previous

2   district than does Representative Kucinich"?

3   A.   Yes.  She has 61.7 percent and Representative Kucinich has

4   25 percent.

5   Q.   Okay.  Let's please turn to tab 8 of your binder.

6        MS. LEE:  And please put up P624.

7   Q.   And what is presented here?

8   A.   This just summarizes the core retention percentage for the

9   incumbents in all of the districts.  District 3, of course,

10  comes out to zero percent, because no incumbent was placed in

11  District 3.  And in the case of District 9 and District 10 and

12  District 16, where there were paired incumbents, I used the

13  highest percentage of core retention to calculate an overall

14  mean average score.  I think this is the same methodology that

15  Dr. Hood used for his initial report.

16  Q.   Okay.  Please turn to tab 9 of your binder.

17       MS. LEE:  And put up P26 -- excuse me, 625.

18  Q.   And, Mr. Cooper, what is presented here?

19  A.   This is exactly the same format and presentation as I had

20  produced in my final third supplemental declaration where I

21  added in the 2018 election statistics under the proposed

22  remedial plan and the hypothetical plans, too, I believe.  So I

23  chose the Democratic percentage under the rebuttal plan across

24  all districts and across the four elections.

25  Q.   Are these percentages computed in the same way as in the

1   other declarations you've submitted in this case?

2   A.  Yes.

3   Q.  And as you indicate here in the footnote and in your

4   earlier reports, do uncontested elections in the table cause it

5   to understate the percentage where -- for the opposing party

6   where a candidate was unopposed?  So, for example, if a

7   Democrat didn't run, it would overstate the Republican

8   percentage in the same area of the state?

9   A.  Yes.

10  Q.  Okay.  Based on your footnote here, do you recall which

11  districts were unopposed?

12  A.  In 2014, there was no incumbent in Congressional District

13  7, and in 2012, there was no Democratic candidate in

14  Congressional District 8, and no Republican in Congressional

15  District 11.

16  Q.  Sorry.  Just to clarify, with respect to 2014, you had said

17  there was no incumbent.  Did you mean there was no opposing

18  candidate?

19  A.  Right.  There was no Democratic candidate --

20  Q.  Okay.

21  A.  -- in District 7.

22  Q.  So, for example, then, in 2014, under the rebuttal plan,

23  the Democratic percentage, would the Democratic percentage be

24  understated for any district that contained portions of current

25  District 7?

WILLIAM COOPER - REBUTTAL DIRECT

1  A.  Yes, it would.

2       MS. LEE:  Okay.  And so if we could put up next to

3  this P454 at 24.

4  Q.  And, Mr. Cooper, this is from your original appendix.  Is

5  the second -- and to the side, is that the depiction of the

6  2012 plan?

7  A.  Yes.

8  Q.  And so District 7 in the 2012 plan contains a number of

9  counties, parts of -- is it fair to say it contains parts of

10  Richland, Lorain, Medina, Stark, Huron, Tuscarawas, and all of

11  Holmes, Ashland, Coshocton and Knox County?

12  A.  Yes.  It's all over the map.

13  Q.  So would the location of District 7 have an impact on the

14  percentage Democratic vote share in Rebuttal District 13?

15  A.  Yes, it would, because a significant portion of District 7

16  is actually in highly populated or densely populated Stark

17  County.  And so that would affect District 13, which I have

18  placed, I believe, entirely in District 13 under the proposed

19  remedial plan.

20  Q.  Okay.  And looking at this table here in tab 9, is it fair

21  to say the number of Democratic districts changed across the

22  years, Democratic over-50-percent districts?

23  A.  Yes.

24  Q.  Okay.  And in 2012, 2016 and 2018, are there more

25  Democratic districts than under the 2012 plan?

1  A.  Certainly in 2018 there is.  I'm not -- I don't have that

2  number of districts in the 2016 plan.  It may not be --

3  Q.  Okay.

4  A.  -- that many more in 2016, but clearly in 2018.

5  Q.  And in these years are there additional districts that are

6  close to 50 percent vote share?

7  A.  Oh, yes, there are a number of competitive districts.

8  That's an important point.

9  Q.  Let's please turn to tab 10 of your binder.

10          MS. LEE:  And please put up P626.

11  Q.  What's depicted here, Mr. Cooper?

12  A.  This is another Google map that I produced that overlays

13  the rebuttal plan onto the residences of the incumbents who

14  were in office in 2011 when the 2012 plan was adopted or what

15  became the current plan, 2012 plan.

16  Q.  And so if we had a live link here as opposed to a screen

17  shot, we could look up a certain address or landmark and see

18  what district it landed in; is that right?

19  A.  Yes.

20  Q.  Okay.  Is it the case that in drawing this rebuttal plan,

21  which complies with the requests that Mr. DiRossi testified to

22  as requiring his drawing of the plan, you were still able to

23  meet or better the features of the 2012 plan?

24  A.  Well, yes.  I split just 18 counties, and, at least, a

25  couple of the splits were forced errors, so to speak, because

1    there's really no reason that I can see to split Mercer County.

2    I'm still baffled why that was done.  Because in the proposed

3    remedial plan, Mercer County was left whole, and it was joined

4    with Auglaize County.  So that there's no question that

5    whatever the issue is relating to St. Mary's, the township of

6    St. Mary's, and Grand Lake and the state park -- that was

7    already accommodated in the proposed remedial plan.  I don't

8    know why it was necessary to split Mercer County three ways.  I

9    went ahead and did that.  That meant that I had an unnecessary

10   18th district split.

11   Q.  And just, in general, even with these unnecessary splits,

12   the rebuttal plan still splits fewer counties than the 2012

13   plan; is that right?

14   A.  Right.  It splits 18 versus 23.

15   Q.  Okay.

16   A.  And there are fewer discrete splits or multiple pieces in a

17   single county.

18   Q.  All right.  I'd like to look at a number of demonstratives

19   of plaintiffs based on the searchable version of the rebuttal

20   plan, which was disclosed yesterday.

21        MS. LEE:  Could you please put up PD113.

22   Q.  And so this is not in the book, Mr. Cooper, but you can see

23   on the screen in front of you.  What is depicted here?

24   A.  This shows District 1 and District 2 and District 8 with

25   the respective residences of the incumbents.

1  Q.  And the light reddish, is that Rebuttal District 1?

2  A.  Yes.

3  Q.  Okay.  And in this demonstrative we can -- is it fair to

4  say, that the whole of Warren County is included in this

5  district?

6  A.  All of Warren County is in District 1.  If this were a live

7  Google map, you could click on these icons and you would get

8  the name of the incumbent and the district number.

9  Q.  Okay.  And in this Rebuttal District 1, is the bulk of

10  Cincinnati kept whole?

11  A.  In District 1?

12  Q.  Yes.  Is most of the city of Cincinnati kept whole just in

13  this Rebuttal District 1?

14  A.  Most of it is.

15  Q.  Okay.

16  A.  There's a small part in District 2 and a very tiny piece in

17  District 8.

18  Q.  And by keeping the bulk of Cincinnati in this one district,

19  is that what leads to the higher BVAP, similar to that under

20  the proposed remedial plan, as we saw under tab 2?

21  A.  Yes.  It's very obvious.  If you start splitting

22  Cincinnati, then the African-American black voting age

23  population will begin to decline.

24          MS. LEE:  Okay.  Let's put up --

25          JUDGE BLACK:  Could I ask a question, please?

 1          MS. LEE:  Yes, of course, Your Honor.

 2          JUDGE BLACK:  Why do you carve out small pieces of

 3   Cincinnati?

 4          THE WITNESS:  In this instance, in order to combine

 5   Warren County with Cincinnati and Hamilton County, it was

 6   necessary to cut out part of northeast Cincinnati, I believe.

 7      In the case of District 8, I -- I, actually, put a tiny

 8   part of District 8 into Cincinnati in order to make the map

 9   look a little better.  Because there's a piece of Cincinnati

10   which, given the way it's configured, would have led to a long,

11   stringy tail to the river portion of District 8.  So it was

12   like 400-and-some people that went into District 8.

13      That, actually, could have been avoided somehow or another.

14   I could have avoided that.

15          JUDGE BLACK:  So it's possible to draw a district that

16   includes the entire city of Cincinnati and the entirety of

17   Warren County?

18          THE WITNESS:  No, it's not.

19   Q.  And, Mr. Cooper, if we just flip back to tab 4 in your

20   binder, in the -- excuse me -- third page there, does this

21   provide the population breakdown in the city of Cincinnati

22   about halfway down the page, under this rebuttal plan?

23   A.  Yes.

24   Q.  Okay.

25          MS. LEE:  If we could put up P620, page three.

1   Q.  And so is it fair to say in this rebuttal plan, the vast

2   majority of the city of Cincinnati is kept whole?

3   A.  Well, yes, it is possible to keep it mostly whole, for

4   sure, as we did in the proposed remedial plan.

5           JUDGE BLACK:  Well, here, you carve out 1400 people

6   from Cincinnati?

7           THE WITNESS:  Yes.  I think it had to do with

8   contiguity.  There were pieces of Cincinnati, I believe, that

9   were not contiguous, and so I was forced to place about a

10  thousand people into District 2.  It would have been possible

11  to have left Cincinnati entirely in District 1 and 2 and just

12  have an odd shape to exclude District 8.

13  Q.  For those 432 folks in District 8?

14  A.  Yes.

15  Q.  And in the proposed remedial plan, because you're not

16  needing to get all of Warren County, you're able to overcome

17  the non-contiguous portions, because you'll just -- is it fair

18  that you include the townships that are sort of breaking up the

19  contiguity of Cincinnati just also in District 1 in the

20  proposed remedial plan?

21  A.  Yes.

22  Q.  Like Norwood, for example, if you remember?  If you don't,

23  that's okay.

24  A.  I'm sorry.  What --

25  Q.  Do you recall if one of those was Norwood, Ohio?

1   A.  Not off the top of my head, but -- it was placed in

2   District 1, right?

3   Q.  Yes.

4   A.  Yeah.

5   Q.  That's no problem.

6          MS. LEE:  And so let's put up Plaintiffs'

7   Demonstrative 114.

8   Q.  And what's depicted here?

9   A.  This shows the Loveland area in Hamilton County and in

10  Clermont County.  There was a request to make sure that

11  Loveland stayed entirely in District 2, both parts, the

12  Hamilton County part as well as the Clermont County part.

13  Q.  And in the proposed remedial plan, Loveland is also

14  entirely in District 2; is that right?

15  A.  Yes.

16         MS. LEE:  Let's put up Plaintiffs' Demonstrative 115.

17  Q.  And do you recall what's depicted here at the blue pin?

18  A.  Yes.  That is Representative Beatty's residence.

19  Q.  Okay.

20         MS. LEE:  Let's put up PD --

21  Q.  And she is not marked with one of these standing incumbent

22  features, because she just wasn't a 2011 incumbent yet; is that

23  right?

24  A.  That's correct.  Those little pin marks identify areas that

25  were located by Google Maps as you search for an address --

1    Q.  Okay.

2    A.  -- or a landmark.

3         MS. LEE:  And so let's put up Plaintiffs'

4    Demonstrative 116.

5    Q.  And what is depicted here?

6    A.  This shows District 3 and zooms in on the OSU campus, as

7    well as surrounding communities, with the Google pin centered

8    on Ohio, Ohio State.

9         MS. LEE:  Okay.  Let's put up --

10   Q.  And Ohio State University, here, you can see that the Ohio

11   Union and the bulk of the campus is included in District 3; is

12   that right?

13   A.  Yes.

14        MS. LEE:  So let's look at Plaintiffs' Demonstrative

15   117.

16   Q.  What is depicted here, if you recall?

17   A.  From the transcript testimony last Friday, it was indicated

18   that that address should not be in District 3.  So it was

19   placed in District 15 in this particular plan, although, I also

20   think that in the remedial plan it's in District 15.

21   Q.  Well, in the -- excuse me.  The proposed remedial plan,

22   this same address is outside of District 3 as well?

23   A.  It's outside District 3, right.

24   Q.  And both this address and the address for Joyce Beatty,

25   were those provided to you by counsel?

1    A.  Yes.

2    Q.  Okay.  And that's --

3    A.  Although this particular address was not provided until

4    Friday -- or Saturday, I guess.

5    Q.  Right.  Correct.

6        But based on the testimony of Mr. DiRossi that a certain

7    individual needed to be kept out of District 3; is that right?

8    A.  Yes.

9            MS. LEE:  Let's put up Plaintiffs' Demonstrative 118.

10   Q.  What's depicted here, Mr. Cooper, if you recall.

11   A.  Well, this is the curious division of Mercer County.  And

12   it's my understanding that the town of St. Mary's, which is

13   actually in Auglaize County and the Grand Lake State Park area

14   shall be in one district, which it is in the proposed remedial

15   plan and all the hypothetical plans, and in the proposed

16   remedial plan that was corrected, because there was a little

17   tiny piece in the original proposed remedial plan that was in

18   the southwest corner of Mercer County that was actually in

19   District 8, I think, just to meet one-person, one-vote

20   requirements.  But for whatever reason, this is what the

21   division of the Mercer County boundaries are under the rebuttal

22   plan as well as the proposed -- as well as the 2012 plan.

23   Q.  Okay.

24   A.  And it does appear to me that this still splits part of St.

25   Mary's and Grand Lake between Districts 4 and District 5.

1  Q.  And based on the trial testimony, do you recall, was it

2  clear what the specific request for Mercer County was that Mr.

3  DiRossi was implementing?

4  A.  Not exactly, other than that -- I mean, there was a desire

5  to keep St. Mary's and Grand Lake together, but I'm not

6  entirely convinced that it would do that in this rebuttal plan,

7  although, I know for a fact that it could have been kept whole

8  in the rebuttal plan with very little ripple effect, and it

9  would have reduced the number of county splits from 18 to 17,

10  as I had indicated earlier today.

11  Q.  So since the request was not entirely clear in the rebuttal

12  plan, did you -- excuse me -- in the trial testimony, did you

13  keep the split in Mercer County the same, because whatever the

14  desire behind that request had been, had apparently been met in

15  the 2012 plan?

16  A.  Yes.  Just to ensure that whatever it was, was met, I made

17  this plan divide Mercer County in the same way that the 2012

18  plan does.

19  Q.  Okay.  Great.

20          MS. LEE:  Let's put up Plaintiffs' Demonstrative 120.

21  Q.  And what is depicted here?

22  A.  This shows the location of the NASA Glenn Research Center

23  in Cuyahoga County, and it was placed in District 9.

24  Q.  Okay.  Great.

25          MS. LEE:  Can we please put up Plaintiffs'

 1  Demonstrative 121.

 2  A.  And this shows the Plum Branch (verbatim) station --

 3  facility, NASA, in Erie County, and it's, obviously, in

 4  District 9.  If you do the same search on the 2012 plan, it

 5  will not be in District 9, which seems to conflict with some of

 6  Mr. DiRossi's testimony on Friday.

 7  Q.  Sure.  But there was, in creating this plan that betters

 8  the 2012 plan, there was no difficulty in meeting this

 9  purported -- purported requirement in the drawing of the plan;

10  is that fair?

11  A.  There was no problem, right.

12  Q.  Okay.

13  A.  And it's quite possible that part of Plum Brook is in

14  District 9, even under the current plan, because I think it

15  does extend, you know, beyond just the single point.  I mean,

16  you can see another point on the Google map that shows it a

17  little bit north of where the pin went there.

18  Q.  Okay.  Thank you.

19         MS. LEE:  And if you would please put up Plaintiffs'

20  Demonstrative 124.

21  Q.  Mr. Cooper, what's depicted here?

22  A.  This shows the northeast part of Ohio, specifically zooming

23  in on the District 11 area and surrounding counties.

24  Q.  And is it fair to say this District 11, this Rebuttal

25  District 11, comes down into Summit County?

1    A.  It does.  It actually goes down into Summit County

2    following the -- really, the boundaries that one has in the

3    2012 plan --

4    Q.  Okay.

5    A.  -- and then goes deeper into the city of Akron, but does

6    not include as much of the population in Akron as the 2012

7    plan.

8    Q.  Okay.

9          MS. LEE:  And can we please put up next to this 454 at

10   page 24.  And so if we could zoom in on the same top corner.

11   Q.  Did the need to bring District 11 into Akron -- excuse

12   me -- down into Summit County in the rebuttal plan compel the

13   way the districts are wrapped around each other in the 2012

14   plan?

15   A.  Yes.  I will point out that the colors are somewhat muted

16   in this particular map, so you don't really see the full impact

17   of how the boundaries are drawn between 11 and 13, in

18   particular, where there are quite bizarre zigs and zags.  You

19   can see it better on the larger maps that are individual maps

20   in my first declaration.

21   Q.  In the appendix?

22   A.  Yeah.

23   Q.  And so in the rebuttal plan, is it fair to say that Summit

24   County is split three ways in the rebuttal plan?

25   A.  It is split three ways, but four ways in the 2012 plan.

1  Q.  And in the 2012 plan it's split four ways.  So before you

2  had said yes, that it compelled the same features in northeast

3  Ohio, I think you -- but now you've just said that only --

4  there are only three splits in Summit County.  So certainly the

5  four splits in Summit County were not compelled; is that true?

6  A.  That's true.

7  Q.  And the way in which the city of Akron is split up in the

8  2012 plan is not compelled by District 11 coming down; correct?

9  A.  No.

10        MS. LEE:  Can we please put up Plaintiffs'

11  Demonstrative 123.

12  Q.  And what's depicted here?

13  A.  This pin shows the location of the Timken Corporation in

14  Stark County.  The black line there is Summit County.  So it's

15  just over the county line.  That's another county split --

16  another split of Stark County, which would not have been

17  necessary had that request not been made.

18  Q.  Not been made or not just been implemented?

19  A.  Or had -- implemented, you're right.

20  Q.  Mr. Cooper, in your work in this case you have looked at

21  demographic information in the state of Ohio?

22  A.  Yes.

23  Q.  And have you looked at demographic information for Cuyahoga

24  County?

25  A.  Yes, of course.

1    Q.  And to get over 45 percent BVAP district in Cuyahoga

2    County, do you need to include most of Cleveland and the

3    municipalities immediately to the east of the city of

4    Cleveland?

5    A.  Yes.

6    Q.  Is there anywhere else in the state of Ohio where you can

7    draw a 45-and-over percent BVAP district other than in the area

8    of eastern Cleveland -- other than including the area of

9    eastern Cleveland and the municipalities immediately to its

10   east?

11   A.  No, other than going to Summit County, which is

12   problematic.

13   Q.  Okay.

14   A.  No other place in the state.

15   Q.  And are the portions of the city of Cleveland and the

16   municipalities immediately to its east that we've just

17   discussed as needing to be included to get to a 45 percent BVAP

18   district part of the 2002 District 11?

19   A.  Yes.

20   Q.  And are the portions of the city of Cleveland and the

21   municipalities immediately to its east in Cuyahoga County that

22   we've discussed part of the 2012 District 11?

23   A.  Yes.

24   Q.  Okay.  If you leave out a significant portion of Cleveland

25   or the municipalities immediately to its east in Cuyahoga

```
 1    County, are you able to get up to a district with a black
 2    voting age population over 45 percent?
 3    A.   It would be not possible.
 4           MS. LEE:  Okay.  No further questions at this time.
 5           JUDGE BLACK:  Very well.
 6        Cross by the defendants?
 7           MR. McKNIGHT:  Yes, Your Honor.
 8           JUDGE BLACK:  How much do you anticipate?
 9           MR. McKNIGHT:  I think more than five minutes.  It
10    will take us past 10:30.
11           JUDGE BLACK:  So shall we simply proceed from the
12    plaintiffs' perspective, get this witness on and off?
13           MS. LEVENSON:  That's fine, Your Honor.  She can
14    remain available past 10:30.
15           JUDGE BLACK:  Very well.
16        Cross away.
17           MR. McKNIGHT:  All right.
18                    REBUTTAL CROSS-EXAMINATION
19    BY MR. McKNIGHT:
20    Q.   Good morning, Doctor -- or Mr. Cooper.
21    A.   Good morning.
22    Q.   Well, Mr. Cooper, what was your starting point for drawing
23    the rebuttal plan?
24    A.   I'm not sure what you mean by the "starting point," but I
25    believe, if my recollection is correct, that I initially worked
```

1    on the Cincinnati area and just added in Warren County and then

2    went from there.

3    Q.  All right.  So you didn't start with your proposed remedial

4    plan, did you?

5    A.  I was looking at both the proposed remedial plan and the

6    2012 plan in making changes.  Both were overlaid on the map.

7    Q.  All right.  But you didn't start with the 2012 plan, then?

8    A.  I did not start with the 2012 plan.

9    Q.  Okay.

10   A.  But I had the boundaries overlaying -- I think, overlaying

11   the remedial plan, but it could have been one of the

12   hypothetical plans, because I was looking at 2011 incumbent

13   counts.

14   Q.  All right.  So that means you also would not have started

15   with the map that was enacted in House Bill 319; right?

16   A.  That's correct.

17   Q.  So you can't testify about the ripple effects of converting

18   the map in House Bill 319 to the map in House Bill 369, can

19   you?

20   A.  I could, but I'm not prepared to do so today, because I

21   haven't analyzed that question.

22   Q.  Okay.  But you agree, don't you, that your version of

23   Congressional District 9 in the rebuttal plan is not the same

24   as the version of Congressional District 9 that appears in

25   House Bill 369; is that right?

1  A.  That is correct.

2  Q.  For example, you would include all of Ottawa and Erie

3  counties?

4  A.  Correct.

5  Q.  All right.  Now, you would also agree, then, that

6  Congressional District 11 in your rebuttal plan is not drawn

7  the same as it is in House Bill 369?

8  A.  That is correct.  I would argue that in House district --

9  in House Bill 369, black population was packed into District 1.

10  You can just go down to the block level and see how the plan

11  drawer was reaching out to pick up every possible significant

12  African-American precinct in Summit County.

13  Q.  Okay.  Well, let's --

14      Speaking of population numbers, let's --

15          MR. McKNIGHT:  Can we put up on the screen Plaintiffs'

16  Exhibit 454, and I want to look at Exhibit D-2.

17  Q.  And, also, Mr. Cooper, I want to have you turn in your

18  notebook there to tab number 2.  Could you do that for me?

19  A.  Yes.

20  Q.  Now, in 454, we're looking for D-2, which is, I think,

21  pages, maybe, 25 or 26, something like that.  That's great.

22  Yep.

23      So, Mr. Cooper, in looking -- well, number one, let me ask

24  you this question.  How did you create this document that's on

25  the screen and the -- how did you create these population

 1  summary reports, both the one that appears in tab 2 and the one

 2  that appears on the screen from Plaintiffs' Exhibit 454?

 3  A.  These are just exported from the Maptitude dataview file

 4  and then reformatted.  The numbers are straight from Maptitude.

 5  Q.  Okay.  So do you know whether the numbers are current as of

 6  the 2010 Census, or is it -- do the numbers come from some

 7  other source?

 8  A.  It's the 2010 Census.

 9  Q.  Okay.  Now, in looking at the population numbers here --

10  now -- so -- and I'm looking at the top of the -- the top tabs

11  here for both of these exhibits.

12      So you're saying that for the numbers that appear under the

13  columns 18+ Population through %18+ Non-Hispanic White at the

14  top, all of those columns, all of the information there comes

15  from Maptitude; is that right?

16  A.  Correct.  I used a block equivalency file that I got from

17  the -- plaintiffs' attorneys to recreate the 2012 plan.

18  Q.  All right.  And you're saying that you believe that all of

19  those numbers that are in Maptitude also come from the 2010

20  Census; is that right?

21  A.  Yes.

22  Q.  Okay.  And you calculate it the same way for both of these

23  charts, both in Plaintiffs' Exhibit 454 and in tab 2 in your

24  notebook there?

25  A.  Umm --

1   Q.  You used the same information, in other words?

2   A.  Yes.

3   Q.  Okay.  All right.

4       Now, looking at the numbers for the 2012 plan, and that

5   is -- that's going to be on the left-hand side of the screen

6   here.

7       Looking at the numbers for the 2012 plan, I see it reports

8   the black voting age population in the enacted plan is 52.37

9   percent for District 11; is that right?

10  A.  That's correct.

11  Q.  All right.  And are you aware that the Court took judicial

12  notice yesterday of census data from 2010 showing that this

13  figure was actually 51.3 percent?

14  A.  I'm not aware of that.  I suspect that's because you were

15  using either non-Hispanic black voting age population, single

16  race, or single race, black, which would include Hispanic

17  blacks.  But, as you know, being from the North Carolina --

18  well, I'm sorry, you're from North Carolina.  I'm thinking of

19  the Georgia case, *Georgia v. Ashcroft*, where it was determined

20  by the Supreme Court that one should use the any part black

21  voting age population in voting cases, specifically in Section

22  2 cases, that lawsuit was decided by the Supreme Court, I

23  believe, in 2004, maybe 2003.

24  Q.  Well, you're just speculating about what the difference in

25  the numbers could be; you don't actually know, do you?

```
 1              JUDGE BLACK:  There is an objection, perhaps?
 2              MS. LEE:  Your Honor, Mr. Cooper has indicated this is
 3    the any part black population, and I believe that the judicial
 4    notice was not taken of the any part black population from the
 5    2010 Census.
 6              JUDGE BLACK:  The objection, if it's an objection, is
 7    noted.  And you may answer the question.  And then I want to
 8    pause and figure out what we're doing this morning.
 9         So get an answer to your question if you didn't.
10    A.  Well, I don't have the single race black voting age
11    population percentage in front of me right now, but I would not
12    be -- I mean, it's going to be less than 52.37 percent, because
13    we are not counting persons who are part African-American in
14    that percentage.  So you're saying it's 51 dot X percent, so
15    that's probably right, but I don't know the number right off
16    the top of my head.
17              MR. McKNIGHT:  Okay.  Thank you.  We'll pause.
18              JUDGE BLACK:  Would you object to standing down and
19    letting the congresswoman come on as scheduled, and then after
20    her, you would be entitled to continue the cross-examination
21    and the intervenors could cross as well?
22              MR. McKNIGHT:  That would be fine, Your Honor.
23              JUDGE BLACK:  Are we ready for the congresswoman?
24              MS. LEVENSON:  Yes, we are, Your Honor.  Thank you
25    very much.
```

1          JUDGE BLACK:  All right.

2      (Witness temporarily excused.)

3          JUDGE BLACK:  All right.  I'd like to get her on and

4  off before we break.  So how do we do this?  IT is here.

5      The plaintiffs call as a witness, whom?

6          MR. CAREY:  Plaintiffs call Congresswoman Marcy

7  Kaptur.

8          JUDGE BLACK:  And the congresswoman has appeared on

9  the screen.

10     Good morning, Congresswoman.

11         THE WITNESS:  Good morning, Judge.

12         JUDGE BLACK:  I'm Judge Timothy Black, District Court,

13 Cincinnati.  I have on my right Judge Watson, District Court in

14 Columbus; and I have on my left Circuit Judge Moore from

15 Cleveland.  We three are hearing the case, and the courtroom is

16 filled with lawyers.  Thank you for appearing.

17         THE WITNESS:  Thank you.

18         JUDGE BLACK:  I need to administer the oath to tell

19 the truth.  Would you raise your right hand.

20     Do you solemnly swear or affirm that the testimony you're

21 going to give this morning will be the truth, subject to the

22 penalty of perjury?

23         THE WITNESS:  I do.

24         JUDGE BLACK:  Very well.

25     Are you able to hear us?

MARCIA C. KAPTUR - REBUTTAL DIRECT

```
 1              THE WITNESS:  Very well.  Thank you.
 2              JUDGE BLACK:  You may be seated.
 3        The lawyers for the people bringing the lawsuit are going
 4   to begin with some questions of you.
 5        Sir, please proceed.
 6                       MARCIA C. KAPTUR
 7   a witness herein, having been first sworn, testified as follows:
 8                   REBUTTAL DIRECT EXAMINATION
 9   BY MR. CAREY:
10   Q.  Good morning, Congresswoman Kaptur.  This is David Carey of
11   the ACLU of Ohio representing the plaintiffs.
12        Can you hear me all right?
13   A.  Very well.  Thank you.
14   Q.  Excellent.  Could you please state your name for the
15   record.
16   A.  All right.  My legal name is Marcia, Marcy, Carolyn,
17   Kaptur, K-a-p-t-u-r.
18   Q.  Congresswoman Kaptur, I know you have a long history of
19   public service.  Could you summarize it for the Court briefly.
20   A.  Well, I entered public service --
21        You mean elected public service?
22   Q.  Yes.  Let's start with that.
23   A.  I was elected to Congress in November of 1982, sworn in
24   January 3rd, 1982 from the 9th Congressional District of Ohio,
25   and I have served the beautiful people of that district to
```

1  date.

2  Q.  So have you held that seat continuously between 1982 and

3  today?

4  A.  I have.

5  Q.  And you still represent the Ohio 9th District; is that

6  correct?

7  A.  Correct.  They did not change the number.

8  Q.  As of 2011, were you the most senior member of the Ohio

9  Congressional Delegation?

10  A.  I know I am now.  I can't recall if in 2011 -- I probably

11  was.

12  Q.  All right.  Could you briefly describe the territory that

13  your district covered immediately prior to the redistricting

14  that occurred in Ohio in 2011?

15  A.  Well, I have had four different geographies over my decades

16  of service.  And prior to the new redraw, we basically

17  represented the -- Lucas County, which had always been the

18  heart of the 9th Congressional District, portions of that,

19  large portions of that; Ottawa County, which was next door;

20  then Erie County; and then the southern half of Lorain County.

21  Q.  Now, I would like to ask you a few questions just about

22  House Bill 319, the 2011 redistricting bill.  Do you recall

23  that piece of legislation?

24  A.  I do, but I -- I don't know that I knew the number.

25  Q.  Sure.  Did you take any part in creating the map that was

1    originally submitted as House Bill 319?

2    A.  I wish I had.

3          JUDGE BLACK:  Did you?

4          THE WITNESS:  No.

5          JUDGE BLACK:  Very well.

6    A.  There was a --

7    Q.  Did you first find -- I'm sorry?

8    A.  I made one phone call, but I don't remember -- I made one

9    phone call, when I saw one iteration of that district, down to

10   Columbus to Governor Kasich's office, but I don't recall

11   exactly when I did that.

12   Q.  When did you first find out what your new district would

13   look like?  Was it before or after the map became public?

14   A.  It was in a newspaper.  It was in some kind of a report.  I

15   don't -- I don't remember what paper.  Probably the *Plain*

16   *Dealer* or one of the Columbus papers.

17   Q.  What was your reaction when you first saw the design of

18   your new district?

19   A.  Astonishment.

20   Q.  And why were you astonished?

21   A.  Because the district was hacked apart.  Every county --

22   just as a little background, you will find in the records

23   somewhere in the federal courts back in 2005, in a case called

24   *Stewart versus Blackwell*, in the prior redistricting, I had

25   fought very hard for home rule in Ohio and to stop the cracking

1    of community and of counties.  So I was very upset at what

2    happened in the prior redraw.

3         And then when I saw this, it was even worse.  And they

4    cracked every single county that I had ever represented.  And

5    they were hacking towns apart like Parma.  Parma was cracked.

6    And I -- Cleveland was cracked, my home community was cracked.

7    I couldn't believe that a state that is dedicated to home rule

8    and the importance of community, because it's hard to build

9    community, that it was just thrown to the wind.  I couldn't see

10   how that was legal in Ohio.

11   Q.  So you mentioned that your district was, I believe you

12   said, hacked apart.  Could you describe, generally, the

13   territory that was covered by your district as it was redrawn.

14   A.  They took a portion of the city of Toledo, I would say

15   the -- in Lucas County, the northeastern quadrant of the city,

16   and they left that in the district.  They took away the

17   southern part of the city, they took away the western part of

18   the city, they took away the whole county, the rest of the

19   county.  They moved us east.  They took the Ottawa County next

20   door, and they took the top of it.  They didn't take the bottom

21   of it.  We'd worked so hard to save companies like Brush-

22   Wellman, now called Materion, in that county.  They cut that

23   out.

24        They went over to Erie County.  They did the same thing.

25   And then in Ottawa County where we worked so hard to build the

1    Ottawa National Wildlife Refuge, they cut the visitors center

2    that we brought the money in to build it and worked so hard for

3    years and years and years to expand tourism, they cut that out,

4    the visitors center itself.

5        Then they went over to Lorain County and they flipped the

6    map.  So everything we had represented, the southern two-thirds

7    of the county, then they just gave us what was along the water.

8    And then they connected into Cleveland.  And then in Cleveland

9    they just made a mishmash of the west side of Cleveland.

10        And so I couldn't believe what I was looking at.  It had

11    never happened before.  Nothing like this had ever happened in

12    Ohio across the north.

13        There was no respect for counties.  There was no respect

14    for communities.  And it was actually sinister.  If you looked

15    at some of the things that were done in the way the line was

16    drawn -- I don't want to say which member came to see me, but

17    it was not a member of my own party.  But right before this all

18    happened, this person came to my office, and had never done

19    that before, and there was -- my district was on the wall, the

20    old district, and this person took his finger and went up the

21    boundary of Ottawa County where it goes out into the lake and

22    said, "Why" -- "Why is this boundary where it is?"  And I said,

23    "What?"  I didn't really understand what this person was asking

24    me.

25        And later on I figured out what was going on was they were

```
 1  thinking about drawing the district into the lake, so that this
 2  particular member would have continued access to the shooting
 3  range at Camp Perry.  And I had been working to bring money to
 4  Camp Perry to modernize Camp Perry and all, but it was all
 5  about, you know, where does the line for county actually exist?
 6  It's something I never thought about.  It was preposterous.
 7  You can't draw a district through the water, but that's what
 8  they were trying to do.  I thought, "This is the most crazy
 9  thing I've seen in my life."
10  Q.  Just to clarify, you mentioned that this member who spoke
11  with you is not a member of your party.  What party are you?
12  A.  I'm a Democratic party member.
13  Q.  The changes that you described to District 9, did any of
14  them relate to or affect you personally?
15  A.  That was the call to Governor Kasich, with whom I had
16  served here in the house.  And I saw a drawing where -- they
17  must have been using computers.  But they drew a line around my
18  house in Lucas County and a line around Dennis Kucinich's house
19  in Cleveland, on the west side of Cleveland.  And then they cut
20  out my church -- okay? -- and the cemetery where my family is
21  buried.  That did it.  And I said, "I am so outraged."  There
22  are no voters at the church but for the priest, and there's no
23  voters in the cemetery.  Why are they doing this?
24      And I called down there.  It was later in the afternoon or
25  early evening.  The phone was answered, and then they switched
```

1   me somewhere.  And a man got on the phone, and I just said,

2   "Hey, look, I'm Congresswoman Kaptur.  I've got no power in

3   this deal, but I'm telling you, what was just done was very

4   hurtful to me personally, because I think it was done

5   purposefully.  And I'm just letting you know how offended I am

6   that you cut out my church and you cut out the cemetery where

7   my family is buried.  How would you even know that?  How would

8   you even know that?"

9        And all I remember is the laughter, the laughter on the

10  phone.  And they hung up.  I don't even know who I talked to.

11  Q.  And to be clear, you said that you placed this call after

12  you learned of the map, obviously; is that correct?

13  A.  Yes.

14  Q.  Ever since you were first elected to represent District 9,

15  has that District ever covered part of Cuyahoga County prior to

16  the 2011 --

17  A.  Never, never.  Maybe when the state was first established,

18  because there weren't that many congressional districts and it

19  was all open territory.  But in modern history, I mean, never

20  would anybody from the western basin be allowed to set foot in

21  Cuyahoga County.  It just didn't happen.

22  Q.  I'm sorry.  Could you repeat that last part?

23  A.  I said it just wouldn't happen.

24  Q.  How would you describe your degree of familiarity with that

25  area of Cuyahoga County that was added to your district prior

1    to the redistricting?

2    A.  I had very little familiarity.  I had some friends in the

3    Cleveland area.  I obviously have been involved in politics a

4    long time.  I would go to meetings in Cleveland and so forth.

5    But Cleveland is its own constellation, and it was like

6    injecting a foreign object into the politics of the region.  It

7    was -- and, frankly, if you look at the way that the district

8    was drawn, my district and Congresswoman Fudge's district and

9    other pieces of Cuyahoga that were -- it was shattered.

10   Cuyahoga County was shattered.

11       One could make an argument, I think, based on race in the

12   way that this was done.  You'd have to really get a lot of

13   numbers together, but it was -- I found it offensive, and I --

14   I didn't really care for what was done.

15       Also, I have to say that in the way that I do politics,

16   people really matter to me, and it's how I judge who to

17   believe.  Right?  So if I'm in a district I'm familiar with

18   where I know the people and we're talking about an issue and I

19   know that their father went to such-and-such a high school and

20   where the mother works or I know something about the family, I

21   can ask advice and I can have confidence that what I'm hearing

22   is really valuable information to me.

23       If I go into a place where I don't have that rootedness, it

24   makes it much more difficult to make good decisions for the

25   people, to work with them.  First of all, you have to get to

 1  know the people.  Then you have to get to know who to trust.

 2      You might remember, back then, after 2011, what was going

 3  on in Cuyahoga County.  There were prosecutions of huge numbers

 4  of people who ended up in jail.  Right?  So we were entering a

 5  system where how do you know who to trust when all this is

 6  overlaid on top of this new district?

 7      And so it was a very difficult time for me, because I had

 8  to make decisions without the grounding that I'd had in my

 9  prior service.  Also, I have to say, Congressman Kucinich and I

10  had worked together in the Congress, and to run against a

11  colleague in your own party is something that was really awful

12  to have to do.

13  Q.  Did the 2011 proposed map, HB 319, place you in the same

14  district as any other incumbent congressional representatives?

15  A.  Yes.  Congressman Dennis Kucinich.

16  Q.  What party is Congressman Kucinich?

17  A.  The mayor of Cleveland.  He had been mayor of Cleveland and

18  had served in the state legislature, and he had quite a

19  following.

20  Q.  What party is he?

21  A.  He was in the Democratic party.

22  Q.  Did you want to be paired with Congressman Kucinich?

23  A.  Absolutely not.  He'd run for president.  I was a gal from

24  western Ohio.

25      MR. CAREY:  I have no further questions.  Thank you,

 1  Congresswoman.

 2          JUDGE BLACK:  Very well.  The attorneys for the other

 3  side have a chance to ask questions.

 4      Counsel for the intervenors?

 5          MR. BRADEN:  Good morning, Congresswoman.  My name is

 6  Mark Braden.

 7          THE WITNESS:  Good morning.  Hello, Mark.

 8          MR. BRADEN:  Good morning.  And thank you for taking

 9  the time off.  I know you're busy, and I'll try to be short.

10  You've got the people's business.

11      I represent a number of your colleagues, Republican members

12  of Congress in the state of Ohio, so I will try to be quick.

13                  REUBUTTAL CROSS-EXAMINATION

14  BY MR. BRADEN:

15  Q.  Do you remember that Ohio was losing two congressional

16  seats following the census?

17  A.  Yes.

18  Q.  So would that mean that two members of Congress would have

19  at least -- four members of Congress would have to be paired in

20  districts?

21  A.  Possibly, or some people might retire.

22  Q.  Do you know if any members retired following the census?

23  A.  I'd have to go back and look.  We had Deborah Pryce leave.

24  I don't remember the year she left.  And we had Steve

25  LaTourette left.  I'd have to go back and look at the year.

1    I'd have to do a little homework there.

2    Q.  Would it be safe to assume that there probably are no

3    members that wanted to be paired with anybody else if they were

4    running again?

5    A.  I'll tell you, I do not wish on anyone to have to run

6    against a colleague.

7    Q.  But sometimes the numbers in the apportionment process

8    might actually require that; correct?

9    A.  Correct.

10   Q.  Is it safe to say that your area of the state, in most of

11   the northern part of Ohio, has either lost population or it's

12   not growing as fast as the central part of the state?

13   A.  Well, we live in an era where our capital cities are

14   growing.  I could go into a long speech about that.  But the

15   rural areas of Ohio and -- well, actually, all of Ohio isn't

16   growing as fast as the other states; that is correct.

17   Q.  And do you remember --

18       I looked at some numbers.  I believe your district was down

19   by about a hundred and two thousand-plus people from the

20   Constitution requirement of equal population, about 15 percent.

21   Does that number sound correct?

22   A.  I don't have those numbers, but I have no reason to dispute

23   them at this point.

24   Q.  And do you remember whether Lucas County actually lost

25   population in that census period?

1  A.  I know it spread, that the population from Lucas County

2  spread out, but I don't know whether the whole county lost the

3  amount you're talking about.

4  Q.  And do you know whether Toledo lost population, too?

5  A.  Oh, Toledo -- Toledo lost population.  And as -- and we had

6  the migration into the larger metropolitan area for most of

7  Ohio cities.

8  Q.  So since your district had lost, let's say, roughly 15

9  percent of the needed, there was no question that your district

10  would have to expand geographically; correct?

11  A.  Correct.  And I was hoping it would be in the economic

12  region that I represented.  So, for example, we had represented

13  Fulton County in the past, we represented Wood County.

14      And I'll make a little political comment here.  I was the

15  first Democrat to carry Fulton County since Franklin Roosevelt.

16  And so I think what the other party did was, they said, "Oh,

17  well, we don't want her because she's winning."  So what they

18  did was, over a period of time, they took away the natural

19  region, the western basin of Lake Erie, the mud flats, and they

20  kept hacking away at that and moving me east along the lake.

21  And I think it was done purposefully.

22  Q.  Would you know, Congressman, what the fastest growing areas

23  were in Ohio?  Would it be around Franklin County and Columbus?

24  A.  I would guess that.

25  Q.  Would you be surprised if I told you Delaware County had

1    grown by 60 percent?

2    A.   I -- I wouldn't doubt that.

3    Q.   So would it seem to you then that it would be likely that

4    if you had to draw equal population districts, one of them

5    might move to the Franklin County area?

6    A.   It might move.  And I would hope that the people that were

7    drawing the lines would recognize that Ohio's a swing state,

8    and that when they get the math done down there, that when the

9    state votes both for Barack Obama twice and for President

10   Trump, that when you have 16 congressional districts, that it's

11   half and half, or at least close to it, they got 12 and four,

12   they got a good deal out of it.

13   Q.   And let me talk a little bit about the process.  Do you

14   know what the process is for drawing legislative lines?  Is it

15   a legislative process?  I mean drawing congressional lines in

16   Ohio.

17   A.   Oh, absolutely.  The state legislature does it.

18   Q.   Okay.  And during that process, let me represent to you

19   that there were a series of hearings around the state about the

20   redrawing of both the congressional lines and the legislative

21   lines.

22        Did you make any comments at those hearings, or did anybody

23   come and testify at those hearings from your office, or did you

24   send any comments?

25   A.   My only comments related to the prior redraw when I

 1  submitted the Friend of the Court opinion about the *Stewart-*
 2  *Blackwell* case; again, enforcing home rule.  Don't crack
 3  communities.  Don't --
 4      I will run against any Republican in any county anywhere in
 5  Ohio; just don't hack the county up.  Try to keep it whole.
 6  It's so much -- then we can serve in such a more reasonable way
 7  rather than having all these fragments that are out there.  You
 8  don't serve the public well that way.
 9  Q.  Do you remember that you and your office received a request
10  for documents on the 2011 redistricting for this case?
11  A.  Documents for this case?
12  Q.  Yes.  We made a document request.
13  A.  Vaguely.
14  Q.  And do you know if you produced any documents?
15  A.  Oh, boy.  I don't -- I don't think we had any documents.
16  Q.  Yeah.  Let me represent to you that we didn't receive any
17  documents in response to our request.  Does that mean that
18  there are no written documents from you or anyone working for
19  you in your official staff or political staff to anybody in the
20  legislature or any political leaders in regards to this process
21  during the process?
22  A.  Well, during the process I worked with our state
23  legislators, particularly Michael Ashford, trying to -- he's
24  from Lucas County and from the city of Toledo -- trying to save
25  our city.  Because what originally happened was, one of the

1  redraws, they drew out the whole city, the center part of the

2  city.  And what's interesting, they even drew out -- I remember

3  this -- this center for community gardening that I've worked so

4  hard on to serve the needy regions of our city, they even drew

5  that out.

6      And so I was calling down there to say, "Hey, what are you

7  guys doing?"  I remember the conversations.  There are

8  conversations I had with Representative Ashford, who was very

9  active in the redraw, and I was trying to piece my city back

10  together.

11  Q.  So you specifically had conversations after the release of

12  the original plan that passed legislature with some of the

13  members of your legislative delegation?

14  A.  Right.

15  Q.  All right.  Prior to the release of that plan, did you

16  personally contact any members of the legislature regarding the

17  drafting of the plan?

18  A.  You know, I don't think so.

19  Q.  Did you -- did you talk to Speaker Batchelder?

20  A.  No.

21  Q.  Did you speak to the president of the Senate?

22  A.  No.  I couldn't even tell you who it was.  Sorry.

23  Q.  But those are the folks who were going to be drawing the

24  plan and likely designing your district, so you wouldn't even

25  know -- remember what their names were; correct?

```
 1   A.  No.  No, I worked with our northwest Ohio delegation.
 2   Q.  And did I understand your testimony --
 3   A.  State -- state delegation.
 4   Q.  All right.  I didn't mean to interrupt.  My apologies.
 5       And do I understand correctly that those contacts began
 6   after the release or passage of --
 7       The first bill that passed, let me represent to you, was
 8   319.
 9       Am I correct -- do I understand your testimony correctly
10   that your communications began after the passage of the initial
11   bill?
12   A.  Yes, when we had something to look at.
13   Q.  Okay.  And that began a negotiation procession where you
14   tried to influence it to improve the district from your
15   viewpoint?
16   A.  We tried.
17   Q.  You're a very experienced member of the legislature.  So
18   this was sort of your, kind of, standard political
19   negotiations, legislative process.  I've heard some people call
20   it sausage-making process.  I think that might be a little
21   insulting in some people's mind, but you probably have heard
22   that phrase before, am I correct --
23   A.  Yes.
24   Q.  So you were attempting to get involved in that political
25   process and improve your district a little bit from your
```

1   perspective?

2   A.  At least to make our views known.  It was a shocking -- it

3   was a shocking redraw.

4   Q.  And do you believe that the second plan that passed that

5   you had input on, it did contain some suggestions from you?

6   A.  If there was much incorporated in it, I think our church

7   and the cemetery ended up back in the -- in the district.

8   Q.  Let me --

9   A.  And what was -- so impressed me was that they would

10  actually have the computer-mapping capability to do that.  I

11  thought, who have they hired?  This can't be just from Ohio.

12  And, actually, I know what happened.

13      I mean, that's why Congress is so uneven now, because

14  you've got these gerrymandered states that are unrepresentative

15  of the people who live there.  And Ohio's 12 to four in a state

16  that votes 50-50.  I mean, think about it.

17      You know, we know they're going to fiddle around down there

18  in Columbus.  You know, you know it's not going to be honest,

19  completely honest.  We know that.  But, I mean, nine and seven?

20  Yeah, okay.  But 12 and four, this is a radical gerrymander.

21  This isn't just a gerrymander.  This is a radical gerrymander.

22  Q.  Let me ask you some specific questions.  You were called as

23  a rebuttal witness, and so let me bring up some testimony we've

24  heard.  And let me frame it first by -- I understand you are

25  now the most senior member of Congress.  Do you remember

 1  whether you were the most senior member of Congress in Ohio in

 2  2011?

 3  A.  You asked me that before.  I'm thinking of Ralph Regula.  I

 4  can't remember the year that Ralph left.

 5  Q.  I think Ralph may have left before then.  But I think it's

 6  safe to characterize you as a very senior member of Congress at

 7  that time?

 8  A.  That's true; that's true.

 9  Q.  Yeah.  And I don't know that you would be aware of this,

10  but Speaker Batchelder testified earlier this week about the

11  21 -- 2011 congressional map.  So let me bring up some

12  testimony and see if you're in agreement with him.  I think he

13  had some testimony in which you might share that view.

14         MR. BRADEN:  So if we could bring up Speaker

15  Batchelder's trial testimony on Day Six on page 39, line 24, to

16  line 40 (verbatim).

17  Q.  So we have a little bit of technology here that will come

18  up.  That's definitely too small for me to read, so I'll read

19  the copy I have here.

20      Can you see the -- there we go.

21      Congresswoman, are you able see that at your location, the

22  pages of transcript?

23  A.  If I'm allowed to stand, I can go up to -- oh, there.

24  Okay.  Okay.

25      -- "what he was looking for, didn't you?"

1      "I don't -- I don't know that I would say that.  For

2   example, at one -- we had a number of very important

3   congressmen, and we had two members who were regarded as

4   bishops on the appropriations committee who were Republicans

5   and -- obviously, that may mean something to you.  We had a

6   Democrat member of the appropriations" --

7      That's a typo.

8      -- "Democratic" member of the appropriations committee as

9   well as from Toledo.  So, to some extent, I -- I had a sense of

10  where he was on that.  I think he appointed the members of

11  committees.  He was Speaker of the House."

12  Q.  Yep.  And so --

13          THE COURT:  Excuse me.  Plaintiffs' counsel is

14  standing.

15          MR. CAREY:  Your Honor, I would just like the record

16  to reflect that the Congresswoman was reading from the

17  testimony.

18          JUDGE BLACK:  Very well.

19  Q.  And I appreciate you doing that.  You probably did a better

20  job at it than I would have.

21      But let me just ask you a question.  Is it safe to assume

22  that that reference by Speaker Batchelder is to you:  "We had a

23  Democratic member"?

24  A.  I'm from Toledo.

25  Q.  And let me go into --

1  A.  But may I just say that it says on there, "I think he

2  appointed the members of the committees."  The Republican

3  Speaker does not appoint me as a Democratic member of the

4  appropriations committee.  My party appoints me to that.

5  Q.  Yes.  And I believe that I share your view that Speaker

6  Batchelder was confused.  Probably the difference between the

7  rules of the state legislature and the rules of Congress.

8          JUDGE BLACK:  Excuse me.

9      Plaintiffs' counsel is standing.

10         MR. CAREY:  I'd like to object to this line on the

11  basis of foundation.

12         JUDGE BLACK:  Very well.  The objection's noted.

13  Q.  Then we can go to page 43, lines 22 to 25.  And this is --

14  I'll represent to you there's a good deal of earlier testimony,

15  but this is in response to a question about how incumbents

16  would be paired in the 2011 congressional plan.  And Speaker

17  Batchelder said:

18      "We had a very important appropriations committee member

19  who was a Democrat from Lucas County, and it was important

20  that, to my mind, understanding the bishop system, that that

21  lady's seat be respected."

22      Do you agree with Speaker Batchelder's statement?

23         JUDGE BLACK:  Excuse me.  Go ahead.

24         MR. CAREY:  The same objection, Your Honor.

25  Foundation.

```
 1              JUDGE BLACK:  Noted.
 2        You can answer the question, if you remember it.
 3        What was the question?
 4   Q.  I was asking the question of whether she agreed with that
 5   there was a Democrat from Lucas County that was important and
 6   that your seat should be respected?
 7   A.  Well -- well, if they -- they didn't respect the seat.
 8   They didn't.
 9   Q.  Do you share Speaker Batchelder's view?  We can go through
10   a whole variety of different segments.  Speaker Batchelder, I
11   will represent to you, repeatedly testified that he thought
12   your seat on the apportionment committee was important to the
13   state of Ohio.  Do you share that view?
14   A.  I view that it is important, but they didn't treat it that
15   way.
16   Q.  And in the changes --
17   A.  In fact, I mean, they put me -- I had to run against
18   someone.
19   Q.  But your seat was adjusted --
20   A.  And they changed the entire district.  I mean, they changed
21   the entire district.  He might say it, but tell me how does
22   what he says, how did that actually materialize in the map that
23   they drew?
24   Q.  And in the adjustment from 319 through -- to the enacted
25   plan, did that district not become significantly more favorable
```

```
 1   to you than Congressman Kucinich?
 2   A.  Actually not, because the bulk of the votes were on the
 3   other side of the district.
 4   Q.  Between --
 5   A.  So it was a barbell -- it was a barbell district, and his
 6   side had a lot more weight than our side.
 7   Q.  Between the originally proposed 319 district and the actual
 8   enacted district, did not the percentage of voters from your
 9   district, your original district, increase markedly and those
10   in Dennis Kucinich's district decrease?
11   A.  Sir, I wouldn't bet my life on that, because we were able
12   to defeat him.  But it was because the voters who were in the
13   districts that I had traditionally represented fiercely voted
14   for me.
15   Q.  So is it your testimony that you did -- that during this
16   period when you were having input into the process, that
17   input -- you were not seeking additional voters in Lucas
18   County?
19           MR. CAREY:  Objection.  Asked and answered.
20           JUDGE BLACK:  You can answer it.  Objection's noted.
21   A.  Okay.  I want all the voters in Lucas County.  It's my home
22   county.  I don't like the cracking of community.  I don't like
23   it.
24       And I don't know why the Republicans -- why does the
25   Republican party not carry forth Ohio law?  Why -- and the
```

1    reason is, because they listen to people from Texas and other

2    places who did this around the country, and they violated the

3    traditions of their own state for partisan reasons.

4        And that's why Congress is in such a mess, too.  Because

5    when you have states that are unrepresented, you have people

6    being elected from sort of secure districts.  Right?  And they

7    don't have to deal with the entire group of people that you

8    would in a normal community that makes your views broader and

9    you develop better understanding of how people think, and they

10   created these false places from a computer, and it's harmed our

11   entire country and Ohio's a part of that.

12       So I'm not on the judicial side, I don't have to maintain a

13   very stern demeanor and -- but I want to say this has hurt

14   America.  It is one of the reasons we cannot get compromise in

15   this Congress, because when you do this in two dozen states --

16   right? -- you make people think that they're God in their

17   district.  And, fortunately, in my life, I've had to represent

18   Republican counties.  I have had to listen to people that I

19   wouldn't have normally had to listen to.

20   Q.  Let me stop you there.

21   A.  I think it's made me a better lawmaker.  And I just think

22   that this case is a very important case, and I hope that Ohio

23   will help us form a better future for representation in our

24   state.

25   Q.  Congresswoman, I heard you say something, and I wanted to

```
1   ask you a couple of questions about it.  Am I correct -- from
2   the sound of it, I think you said that you represent both
3   Republicans and Democrats in your district?
4   A.  Yes.
5   Q.  Yeah.  And then the --
6   A.  And in the past -- and I've represented Republican counties
7   like Fulton County, Wood County, the Republicans in Lucas
8   County, for heaven's sake, Ottawa County.  I mean, look, they
9   gave me the Republican portion of Lorain County, we carried it.
10  We carried it, because we serve the people.
11  Q.  So if an individual who lived in your district sought help
12  on, say, a social security issue, getting a check, it wouldn't
13  make any difference to you as to whether they were Republican
14  or Democrat; right?
15  A.  Right.  And what's amazing, sir, is that we -- we don't get
16  these calls anymore, but at the beginning, the Republicans were
17  shocked that we would help them.  They said, "Well, we want to
18  apologize, we're Republican, but, you know, we have this
19  problem."  We said, "We don't care.  We'll serve you."  That's
20  our job.
21  Q.  So case work is totally nonpartisan; correct?
22  A.  Correct.
23  Q.  Do you have any reason to believe that your other
24  colleagues, many of whom I represent in this case -- do you
25  have any reason to believe that they view case work as anything
```

1    different than you, that it's a nonpartisan requirement of a

2    member of Congress?

3    A.  Well, let me just say I served in Congress a long time, and

4    some people give better service than others.

5    Q.  Okay.  So do you have any reason -- do you know Congressman

6    Chabot?

7    A.  Yes.

8    Q.  And do you have any reason to believe that congressman

9    would not help a Democrat or a Republican if they needed help

10   in getting their social security check or a veteran's benefit?

11   A.  Well, I wouldn't want to comment on any member, but I will

12   say Congressman Chabot is a friend.  He's the dean on the

13   Republican side of the aisle.  We work together.

14   Q.  And that's the reason why I picked him, because he was one

15   of the most experienced congressmen.

16       So have you -- have you served on the state legislature?

17   A.  No, never did that.

18   Q.  So you never personally have been involved in the actual

19   creation of a legislative plan?

20   A.  No.

21           MR. BRADEN:  No further questions, Your Honor.

22           JUDGE BLACK:  Thank you.

23           THE WITNESS:  Thank you.

24           MR. BRADEN:  Thank you.

25           JUDGE BLACK:  The plaintiffs' lawyer may have some

```
 1   follow-up questions.  Redirect, if any?

 2           MR. CAREY:  One question, Your Honor.

 3           JUDGE BLACK:  Umm-hmm.

 4                 REBUTTAL REDIRECT EXAMINATION

 5   BY MR. CAREY:

 6   Q.  Congresswoman, you were asked a few questions about changes

 7   that were made in between HB 319, the first proposed map in

 8   2011, and HB 369.  Did any of those changes undo what you

 9   describe as a gerrymander?

10   A.  No.

11           MR. CAREY:  Thank you.

12   A.  It is a very gerrymandered map.

13           MR. CAREY:  Thank you.

14           JUDGE BLACK:  Congresswoman, the lawyers are through

15   with their questions of you.  The Court and the community

16   appreciate you making yourself available on short notice.  And

17   on behalf --

18           THE WITNESS:  Thank you, Judge.

19           JUDGE BLACK:  On behalf of the Court --

20           THE WITNESS:  Judge, may I make one other comment?

21           JUDGE BLACK:  Yeah, but we might strike it.  Go ahead.

22           THE WITNESS:  No.  All I want to say, for the public

23   good --

24           JUDGE BLACK:  You know, Senator -- excuse me,

25   Congresswoman.  I'm sorry to interrupt.  And questions have
```

1    been asked, and I think we're probably done.  You know, we've

2    got rules and regulations out the wazoo.  That's a legal term.

3        (Laughter.)

4            JUDGE BLACK:  And we have heard your full testimony,

5    and are grateful to you for presenting it, and I think we're

6    done.

7            THE WITNESS:  Thank you.

8            JUDGE BLACK:  On behalf of the --

9            THE WITNESS:  Thank you.

10           JUDGE BLACK:  -- Court and the community, thank you

11   for your work on behalf of the state of Ohio over this long

12   period of time.

13       You are completed, finished.  I don't often get a chance to

14   say it, but you're free to go.  Thank you.

15           THE WITNESS:  Thank you, Judge.  Thank the Court.

16           JUDGE BLACK:  Very well.

17       (Witness excused.)

18           JUDGE BLACK:  That witness is on and off.  Are we

19   ready to proceed on your interrupted cross-examination?

20           MR. McKNIGHT:  We can, Your Honor.

21           JUDGE BLACK:  Very well.  So we recall to the stand

22   Dr. Cooper.  Mr. Cooper.  Cooper.

23       (Laughter.)

24           MS. LEE:  Bill, Your Honor.

25       (William S. Cooper resumes the witness stand.)

 1          JUDGE BLACK:  You're back again.  Sit down.  You're

 2  under oath.  You know that?

 3          THE WITNESS:  Right.

 4          JUDGE BLACK:  Thank you.

 5          REBUTTAL CROSS-EXAMINATION (Continued)

 6  BY MR. McKNIGHT:

 7  Q.  All right.  Mr. Cooper, before we took that break in your

 8  testimony we were talking about the black voting age

 9  percentages between the 2012 plan, the current plan, and the

10  percentages reported for your proposed rebuttal plan.

11          MR. McKNIGHT:  And if we could get those back on the

12  screen again, I think that would be helpful in restarting our

13  conversation.

14  Q.  So that was Plaintiffs' Exhibit 454, and I think you were

15  looking at tab 2 in the your notebook.

16  A.  Yes.

17  Q.  Now, Mr. Cooper, I think you testified earlier that the

18  information reported for the population summary reports that

19  you produced in this case came from Maptitude.  And so I want

20  to be clear about this.  You just relied upon the data you

21  received from Maptitude -- right? -- for those reports?

22  A.  Well, I was using Maptitude.  I actually relied on the U.S.

23  Census 2010 P.L. 94-171 file.

24  Q.  And did you do anything to independently verify the

25  information in that file?

1   A.  The P.L. 94-171 file?

2   Q.  Yes, sir.

3   A.  Well, it's the official census file released by the Census

4   Bureau for purposes of redistricting.  So I did not do anything

5   further, no.

6   Q.  All right.  So you just imported the information from that

7   file to these reports entitled "Population Summary Report";

8   right?

9   A.  Right.  Although, I think, as I mentioned in my testimony

10  last week, there was a question about whether or not a

11  seven-person block in Knox County was in or out of District 12

12  under the 2002 plan.  So I did actually go back and look in the

13  errata portion of the Census Bureau's Web site describing

14  issues with the P.L. 94-171 file, and did not see any reference

15  as to that peculiarity.

16  Q.  Okay.  Well, thank you for updating us on that point.

17  A.  Well, I updated you last week, but --

18  Q.  Okay.  All right.  All right.

19      So we talked about the fact earlier that earlier this week

20  the Court had taken judicial notice of the fact that the census

21  data from 2010 showed that the black voting age figure was 51.3

22  percent, which is a percentage point different from what you

23  reported with respect to the 2012 plan in your population

24  summary report; is that fair to say?

25          JUDGE BLACK:  Counsel is standing.

1          MS. LEE:  Objection on the same grounds as before, as

2    to what was included in the statistics for which judicial

3    notice were taken.

4          JUDGE BLACK:  The objection's noted.  You may proceed.

5    I thought we'd been through this.  Go ahead.

6    Q.  Okay.  Well, so looking at the numbers for your rebuttal

7    plan, I see that the black voting age figure for Congressional

8    District 11 is reported as 50.72 percent in that plan; is that

9    right?

10   A.  Yes, 50.72 percent, any part black.  So if we had used

11   single race black, that percentage would have been lower than

12   50.72 percent.  I'm following the guidance of the Supreme Court

13   in *Ashcroft v. Georgia* from 2003.

14   Q.  All right.  Well, now, if it is true, though, that your

15   figure for reported black voting age population in the 2002

16   plan is off by over one percent, isn't it also possible that

17   the figure you reported for your rebuttal plan could be off by

18   over one percent?

19         JUDGE BLACK:  Excuse me.  An objection?

20         MS. LEE:  Objection.  Mischaracterizes the testimony.

21         JUDGE BLACK:  Very well.  Noted.

22   A.  It's not off at all.  I'm reporting one set of numbers

23   based on the any-part-black category.  Had I reported also in a

24   simultaneous column here in --

25   Q.  I understand.

1    A.  -- in tab 2, it would have been lower, right.

2    Q.  I understand, Mr. Cooper.  My question was, if it is off,

3    because the numbers that we just looked at were one percentage

4    point off, if it is off, isn't it possible that the figure you

5    reported could also be off by the same amount?

6    A.  What figure?

7    Q.  The figure you reported for black voting age population

8    under the rebuttal plan.  Isn't it possible that that 50.72

9    percent figure could be lower?

10   A.  Well, let's clarify so it's not --

11           JUDGE BLACK:  Is there an objection perhaps?

12           MS. LEE:  Your Honor, I'd be happy just to have a

13   standing objection to the characterization of these census

14   statistics.

15           JUDGE BLACK:  You may have a seat.  You have a

16   standing objection to that matter.

17   A.  Well, let me just say there is no discrepancy, and it's not

18   off.  I am reporting the any-part-black category, which

19   includes persons who were multirace, some part black, as

20   accepted by the Supreme Court in 2003 or 2004.

21       Had I also included another column showing single race

22   black or non-Hispanic single race black then, obviously, the

23   percentage would be lower.  So I'm not saying that the number

24   you're reporting is wrong.  You're just reporting another

25   category.

1  Q.  Okay.  So how can you be sure, though, that in your

2  rebuttal plan there is, in fact, included a majority-minority

3  district in District 11?

4  A.  Because it's 50.72 percent any part black.

5  Q.  So your numbers have to be right for that to be true;

6  right?

7  A.  Not necessarily.  I suppose there could be some sort of an

8  error.

9  Q.  Okay.

10  A.  But I am reporting the any-part-black category.  It is

11  conceivable that non-Hispanic black voting age population is

12  under 50 percent.  But it is my understanding that the

13  appropriate category to use in Section 2 litigation is the

14  any-part-black category, particularly in areas where there are

15  very few Hispanics.

16  Q.  Okay.  All right.  So one more question then on

17  Congressional District 11 and we can move on from that.

18      I believe I heard you testify earlier that the rebuttal

19  plan doesn't contain the same population from the city of Akron

20  as the current plan does; is that right?

21  A.  It does not, which I will point out even further that if

22  there is some issue about whether or not I should have created

23  a District 11 that was over 50 percent non-Hispanic black

24  voting age, I simply could have added another precinct or two

25  to get the percentage above 50 percent.

1  Q.  Okay.  But that would have affected the population figures

2  in surrounding districts; right?

3  A.  It would have, but, again, it would have been a very minor

4  adjustment and would have not changed the rebuttal map as I

5  presented.  But the rebuttal map that I presented, which has a

6  50.72 percent any part black voting age population, in any

7  Section 2 case would have been accepted as is as a majority

8  black district.

9  Q.  All right.  Let's think about Congressional District 3.

10  You would agree with me that Congressional District 3 in the

11  rebuttal plan is not the same as Congressional District 3 under

12  the map in House Bill 369; is that right?

13  A.  That's true, because I left just two districts in Franklin

14  County, District 3 and District 15.  So there were some

15  modifications.  Because the 2012 plan has 15, 3, and the north

16  end of Franklin County is actually in District 12.

17  Q.  Now, did you review testimony from the record earlier, I

18  believe it was the end of last week, where the legislature

19  wanted Franklin County to have three congressional

20  representatives?

21  A.  I may have seen some reference to that.

22  Q.  But, as you just testified, you didn't do that in your

23  rebuttal plan, did you?

24  A.  But I could have.

25  Q.  But you didn't, did you?

1    A.  Well, I was trying to minimize splits.  I was trying to

2    minimize splits.

3    Q.  But you didn't produce a plan that did that, did you?

4    A.  For the purposes of this rebuttal testimony, no, but

5    certainly it could be done.  It would be very easy to move, you

6    know, a single precinct into 2012 with no -- into District 12

7    with no real impact on the overall look of the map, from

8    satellite orbit anyway, just as I added 400 people from

9    Cincinnati into Congressman Boehner's district, District 8.

10   Q.  Well, moving one precinct into District 3 would sort of

11   defeat the purpose of Franklin County having three

12   representatives, wouldn't it?

13   A.  Not really.  There would be three representatives in

14   Franklin County.

15   Q.  So you think that having just the one precinct in there

16   would get that third representative interest?

17   A.  It's possible.

18   Q.  Okay.  Mr. Cooper, you could have drawn a map that froze

19   Congressional Districts 3, 9 and 11 from House Bill 369 in

20   place, right?

21   A.  I -- I could have.  Of course, I would argue that District

22   11, as drawn in the 2012 plan, is not compliant with

23   traditional redistricting principles.

24   Q.  Well, notwithstanding your opinion about any of those

25   districts, it's fair to say that you could have drawn a

 1  rebuttal plan that froze Districts 3, 9 and 11 in place as they

 2  are in the current map; right?

 3  A.  I could have drawn a plan.

 4  Q.  All right.  And you could have attempted to show a

 5  different ripple effect resulting from those districts, could

 6  you not have?

 7  A.  I could have.  There's so many different scenarios one

 8  could conjure up that, yes, I could have done any number of

 9  different versions.

10  Q.  But you didn't do that, did you?

11  A.  I don't think the Court would want to be bored with a

12  multiple number of rebuttal plans today, but --

13          JUDGE WATSON:  Who said we'd be bored by it?

14          THE WITNESS:  Pardon?

15          JUDGE WATSON:  Who said we'd be bored by it?

16          THE WITNESS:  Who knows?

17  Q.  So there you go.  All right.

18      So we cannot know the ripple effect that those exact

19  districts have except from Ray DiRossi's testimony, can we?

20  A.  I'm not familiar with -- well, I reviewed that testimony.

21  Could you question -- could you --

22  Q.  You can't opine on the ripple effect from those exact

23  districts because you didn't freeze them in place when you drew

24  your map; right?

25  A.  I did not, in part, because Summit County is just sliced

1  and diced, so that it's -- it would be problematic for me to

2  present that to the Court as a viable rebuttal plan, even if --

3  even if -- this rebuttal plan itself is somewhat problematic,

4  but the 2012 plan is off the charts.

5  Q.  Isn't it true, Mr. Cooper, that District 6 in the eastern

6  part of the state didn't change between the maps and House Bill

7  319 and House Bill 369?

8  A.  I do not know that for a fact.  I think that, obviously,

9  it's very similar, but I don't know for a fact that there were

10 no changes.

11 Q.  Okay.  But it's fair to say that your rebuttal plan changes

12 something about every district that was included in the map and

13 House Bill 319; is that right?

14 A.  I believe it would, yes.  There are changes.

15 Q.  It also changes something about every district that was

16 included in the map and House Bill 369, the current plan;

17 right?

18 A.  Yes.

19 Q.  So rather than start with the map and House Bill 319, you

20 decided to draw a new map, didn't you?  And you started in the

21 Cincinnati area; right?

22 A.  It is different than the House Bill 369 map, yes.  And I

23 started in Cincinnati, if memory serves.

24 Q.  Okay.  Now, along with your rebuttal plan, you prepared a

25 chart comparing house election results for 2012 through the

1    2018 election cycles; right?

2    A.  Yes.

3    Q.  And is that chart found in tab 19 of your notebook?

4    A.  Tab 19?

5    Q.  I'm sorry.  Tab 9.

6    A.  Yes.

7    Q.  All right.  Now, in looking at that chart on tab 9, I want

8    to start by looking at the 2012 election results under your

9    rebuttal plan.

10       Looking at the 2012 election cycle, I believe that your

11   chart shows that Democrats received a majority of the vote

12   share in Districts 3, 9, 11, 13 and 16; is that right?

13   A.  That's correct.

14           MR. McKNIGHT:  Would it be possible to highlight those

15   as we go through them on the screen.

16   Q.  Okay.  And that's a total of five districts under the 2012

17   cycle under which Democrats would have a majority of the vote

18   share; is that right?

19   A.  Yes.  Plus a very competitive District 1, 48.8 percent

20   versus a non-competitive, 39.5 percent under the 2012 plan, and

21   a more competitive District 7 at 47.1 percent versus 43.6

22   percent.

23   Q.  All right.  Well, let's look next, then, at the 2014

24   election cycle.  Under that election cycle your chart shows

25   that Democrats would have received a majority of the vote share

1  of Districts 3, 9, and 11; is that right?

2  A.  That's correct.

3  Q.  Okay.  So that's a total of three districts; is that right?

4  A.  That's correct.  But there is a very competitive District

5  16 at 48.4 percent and District 13 is 46.8 percent.  But as we

6  discussed earlier today, a big chunk of Stark County is in

7  District 13, and Stark County, in 2014, was in District 7,

8  which did not have a congressional candidate on the Democratic

9  side.  So that underestimates what would have been a Democratic

10 percentage for that district.  As you can see, it's been a very

11 strong Democratic district in the other years in this

12 four-election cycle chart:  64.5 in 2012, it was 68.4 in -- I'm

13 sorry, 54.2 in 2016, 52.9 in 2018.

14     I also think I may have misspoken earlier this morning when

15 I said that District 13 in the 2012 remedial plan had also

16 contained a part of Stark County, and that is incorrect.  In

17 the proposed remedial plan, Stark County is not part of

18 District 13.

19 Q.  Okay.  But you don't -- you don't know how much difference

20 having Stark County in one district versus another would make,

21 do you?  You didn't perform that calculation here, did you?

22 A.  I did not, but we know that -- we can look at my exhibit --

23 wait here while I find the exhibit.  Almost there.

24     If we look at District 13 in the rebuttal plan,

25 Representative Renacci had 44.8 percent of that district.  And

1    much of that was, of course, in Stark County.

2    Q.  But that calculation doesn't tell us what the precise

3    effect of having Stark County in that district would be; right?

4    A.  No, but we can assume it's higher.  So it would have been a

5    very competitive district, for sure.

6            MR. McKNIGHT:  Now, Your Honors, I see that the time

7    is 11:30, and, unfortunately, I have a few more questions.  So

8    I don't know where that leaves us.

9            JUDGE BLACK:  How do you define "a few"?

10           MR. McKNIGHT:  I try to do good estimates on my time.

11           JUDGE BLACK:  You're a very good estimator.

12           MR. McKNIGHT:  Okay.  Well, I'm thinking 15 or 20

13   minutes.

14           JUDGE BLACK:  Okay.  We need to recess.

15       We told you we were going to have to recess at 11:30.

16   We're in good shape.  We, in fact, are going to recess until

17   1:30.

18       During the extended break, I want you to be sure that

19   you're all clear on what exhibits have been admitted.

20       And during the break, sir, please do not discuss your

21   testimony.

22       We'll come back at 1:30 and conclude this witness'

23   testimony.  Is there anything that requires the Court's

24   attention before we recess for a couple hours?

25       From the plaintiff?

```
1              MS. LEVENSON:  No.  Thank you, Judge.

2              JUDGE BLACK:  Defense?

3              MR. STRACH:  No, Your Honor.

4              JUDGE BLACK:  Intervenors?

5              MR. LEWIS:  No, Your Honor.

6              JUDGE BLACK:  We're in recess till 1:30.

7              COURTROOM DEPUTY:  All rise.  This court is in recess

8     until 1:30.

9         (Witness temporarily excused.)

10        (At 11:32 AM, a luncheon recess was taken.)

11                          - - -

12                      AFTERNOON SESSION

13        (In open court at 1:39 PM.)

14             JUDGE BLACK:  Thank you.  Please be seated.

15        All right.  We're back in the courtroom.  Sorry to keep you

16    waiting.  Are we ready to continue with taking of testimony?

17             MR. McKNIGHT:  We are, Your Honor.

18             JUDGE BLACK:  All right.  If the witness could re-take

19    the stand.

20        You remain under oath, sir.  You understand; correct?

21             THE WITNESS:  Yes, sir.

22             JUDGE BLACK:  Very well.  Counsel, you may proceed.

23        (William S. Cooper resumes the witness stand.)

24                  RECROSS-EXAMINATION (Continued)

25
```

BY MR. McKNIGHT:

Q.  All right.  Mr. Cooper, before we took a lunch break we were looking at the chart, which you have behind tab 9 in your notebook.

MR. McKNIGHT:  And if we could get that on the screen, I'd appreciate that.

Q.  All right.  And so, Mr. Cooper, we were talking about the election results under the 2014 election cycle.  And I think we had established that under the 2014 election results that you have listed in your chart here, the Democrats would have received a majority of the vote share in three of the districts, and those districts were three, nine and 11; is that right?

A.  That is correct.  And then I began to explain why District 13 is 46.8 percent, which underestimates the percentage.  And I next turned to a set of tables that actually did not give the answer, so I won't go back there.

The way to explain it best is to look at a map of the current plan.  And you can see, if we have a map of the current plan around somewhere, that District 7 includes part of Stark County, and Stark County composes a large piece of rebuttal plan District 13.  And it's also in District 7, under the current plan.  Most of Stark County is under -- is in District 7.  And that was the district that did not have a Democratic challenger in 2014.  So because of that, the percentage of

1    Democratic vote in District 13, under the rebuttal plan, is

2    artificially low.

3    Q.  Okay.  But I think we also established before we left that

4    you couldn't say how artificially low that number might be; is

5    that right?

6    A.  I think it's a safe bet that it's approaching 50 percent.

7    Q.  But you --

8    A.  Simply because Stark County is a big county.  So it

9    composes most of the population in present day District 7.

10   Q.  Okay.  Well, Mr. Cooper, you have not included that

11   analysis in your report, have you?

12   A.  Well, you asked me about it, so I have to respond.

13   Q.  Yeah.  Well --

14           JUDGE BLACK:  Okay.

15   Q.  What I'm asking you now is that you didn't include that

16   particular analysis in your report, did you?

17   A.  No.  I could obtain it.

18   Q.  All right.

19   A.  But I can't do it off the top of my head.

20   Q.  Okay.  All right.

21       So I think you also talked about competitive districts in

22   your testimony earlier.  And it's fair to say that if these

23   were actual election results, it wouldn't matter if, for

24   example, a candidate got 46.8 percent of the vote; they still

25   would lose if they got 46.8 percent of the vote, right?

 1   A.   Well, that's true, but that's not what these tables are

 2   intended to prove one way or the other.   They just show which

 3   way the districts would trend.   There would be many other

 4   factors that would come into play in an actual election,

 5   obviously.

 6   Q.   And the problems that you testified about earlier with

 7   respect to uncontested election, that is a problem with using

 8   congressional election results as opposed to another index that

 9   might use statewide results, for example; right?

10   A.   It is where there are no challengers, but that's really a

11   limited set of districts across the four election cycles.

12   Q.   Okay.   Well, continuing our look at the chart under tab 9,

13   I was looking at the 2016 election cycle.   And it looks like to

14   me that Democrats would have a majority of the vote share in

15   Districts 3, 9, 11, and 13; is that correct?

16   A.   That is correct, with competitive districts in 1, where

17   it's 47.9 percent; and 49.8 percent, pretty much a 50-50

18   district in District 16.

19   Q.   Okay.   But the districts in which the Democrats have an

20   actual majority of the vote share are the same under both your

21   rebuttal plan and the enacted plan; is that right?

22   A.   Yes, but there's a huge difference in the level of

23   competitiveness in District 16, 49.8 percent versus 35.2

24   percent.   And in District 1 there's nearly an eight-point --

25   well, it's over a seven-point percentage spread, 47.9 to 40.7.

1   Q.   Okay.  And then turning to the 2018 election cycle.

2   Democrats would have received a majority of the vote share in

3   Districts 1, 3, 9, 11, 13, and 16, under your rebuttal plan;

4   right?

5   A.   Correct.

6   Q.   All right.

7   A.   Which would be six plus a very competitive District 15,

8   49.4 percent.

9   Q.   Okay.  Well, looking across this chart, then, is it correct

10  that the Democrats received a majority of the vote share in all

11  election cycles contained in this chart involving Districts 3,

12  9 and 11, and that's true both under your rebuttal plan and the

13  2002 plan?  Is that right?

14  A.   Yes, and three out of four elections in District 14, which

15  I've explained --

16  Q.   Okay.

17  A.   -- why that is -- or 13, rather -- why it is artificially

18  low in 2014, particularly when you look at the results for

19  2012, where it was 64.5 percent.  Sixty-eight-point -- I'm

20  sorry, 54.2 percent in 2016 and 52.9 percent in 2018.

21  Q.   And when looking at the results for both the rebuttal plan

22  and the 2012 plan, the district you drew in the rebuttal plan

23  is the only one that didn't have a majority Democrat vote share

24  for 2014; is that right?

25  A.   I'm sorry.  I didn't exact --

1    Q.  Yeah.  So looking at -- looking at the results for District

2    13 across the chart here, the only time District 13 did not

3    have a majority vote share under any election cycle featured in

4    your chart is when it's the rebuttal plan in 2014; right?

5    A.  Yes.

6    Q.  Okay.  All right.

7        Now, I want to ask if we could pull up a map that we have

8    created that compares your map, your rebuttal plan, with the

9    enacted plan.

10       MR. McKNIGHT:  Can we put that on the screen.

11   Q.  All right.  And what I'll represent to you, Mr. Cooper, is

12   that this is your map with the counties colored.  Does that

13   appear accurate?

14   A.  It would seem to be.  I can't say with certainty, but there

15   are certain features that appear in that shot.

16   Q.  And the enacted districts are in sort of a striped black

17   and green or outlined with black with green stripes, for lack

18   of a better description.  Do you see that?

19   A.  Yes.  It's a little hard to distinguish, but I can see

20   that.

21   Q.  Okay.  Do those districts appear to be roughly accurate,

22   from what you can see?

23   A.  I'll take your word for it.  I have to go back and compare

24   and contrast with another themed map --

25   Q.  Okay.  Well, I --

1    A.  -- one of the other exhibits, but I will take your word for

2    it.

3    Q.  Okay.  Well, I just have a few questions about some

4    specific areas.  I think you'll probably agree with me on

5    these.

6         So we noticed that in your map you took Clark County, which

7    was a whole county that was in District 8 under the 2012 plan,

8    and you moved Clark County from District 8 to District 4,

9    didn't you?  Do you see Clark County?  It's kind of in the

10   southwest corner of the state.

11   A.  Yeah.

12   Q.  So you moved that from Congressional District 8 where it

13   was --

14   A.  Right.

15   Q.  -- under the 2012 plan --

16   A.  Right.

17   Q.  -- to Congressional District 4 under your plan; right?

18   A.  Right.

19   Q.  All right.  And then I see Miami County.  I see that you

20   moved part of Miami County from District 8 under the enacted

21   plan to District 4 under your plan; right?

22   A.  Right.

23   Q.  And when you did that, those changes had the effect of

24   reducing the population in Congressional District 8, didn't it?

25   A.  It did.

1   Q.  All right.  And so those changes then rippled into Hamilton

2   County, which required you to put population from Hamilton

3   County into District 8; is that right?

4   A.  That's correct.

5   Q.  Okay.  And then you kept Warren County whole.  And Warren

6   County is in the far southwestern corner.  Do you see that?

7   A.  Yes.

8   Q.  So you kept Warren County whole because of Ray DiRossi's

9   testimony that the Ohio Legislature wanted to keep it whole,

10  didn't you?

11  A.  Yes.

12  Q.  All right.  But by keeping Warren County whole, you then

13  had to split Hamilton County two more ways, didn't you?

14  A.  Frankly, I did not have to split it two more ways.  I could

15  have simply eliminated the 432-person allocation to District 8

16  and left it entirely in District 1.  I made that minor change

17  just so there wouldn't be a long tail of District 8 kind of

18  following the river.

19  Q.  But that's not what you did here; right?

20  A.  No, I didn't, but I'm just saying it would have been very

21  easy to avoid that.

22  Q.  And eliminating that tail would improve your compactness

23  scores; is that why you did that?

24  A.  Not exactly.  It just made it visually a little better if

25  you're zooming in on the map to see a district that doesn't

1   have a long tail along the river.  But it's only 432 people, so

2   it would have been very easy to leave that in and make another

3   modification somewhere else.

4   Q.  But it's true that doing that would improve the compactness

5   score of those districts; right?

6   A.  It may or may not have.

7   Q.  Okay.

8   A.  It would have been probably pretty minimal improvement.  It

9   just was more of a visual assessment than trying to play

10  against a compactness score.  I didn't check the compactness

11  scores.

12  Q.  All right.  Now, when you drew the rebuttal plan, you had

13  access to several things, right?  You had access to data that

14  was from four completed election cycles in this decade; is that

15  right?

16  A.  That's correct.  I had the 2018 data.

17  Q.  And you had access to election results from 2012; is that

18  right?

19  A.  Yes.

20  Q.  You had access to election results from 2014?

21  A.  Yes.

22  Q.  From 2016?

23  A.  Yes.

24  Q.  From 2018?

25  A.  Yes.

1    Q.  Okay.  You had access to testimony of Ray DiRossi at trial,

2    didn't you?

3    A.  Yes.

4    Q.  And you had access to testimony of Ray DiRossi in his

5    deposition, didn't you?

6    A.  No.

7    Q.  Well, you had access to it?  You could have looked at it;

8    right?

9    A.  Maybe.  I did not know about his deposition, but --

10   Q.  Okay.

11   A.  I perhaps could have.  When was the deposition?

12   Q.  Last year.

13   A.  Okay.

14   Q.  Parts of it have been designated in the record as well.

15   A.  Okay.  I have not seen his deposition.

16   Q.  All right.  Now, you had access, though, to Troy Judy's

17   testimony here at trial; right?

18   A.  Troy?

19   Q.  Judy.

20   A.  No.

21   Q.  You don't know who that is?

22   A.  No.

23   Q.  Do you know who Heather Blessing is?

24   A.  I believe I've seen her name mentioned as someone who's

25   involved in the plan drawing, but I haven't seen any of her

1   testimony.

2   Q.  Okay.  Now, you also had access to Speaker Batchelder's

3   testimony at trial; right?

4   A.  I -- I was not given that information.

5   Q.  Okay.

6   A.  Whether I have access to it or not, I don't know.

7   Q.  Have you ever read his testimony?

8   A.  No.

9   Q.  And you're also aware that there was tens of thousands of

10  pages of documents that were exchanged in this case; is that

11  right?

12  A.  I don't know how many documents were exchanged, but it

13  wouldn't surprise me if it was tens of thousands.

14  Q.  Okay.  But you would have had access to them if you would

15  have wanted them; right?

16  A.  Well, some of them it would have been a guessing game as to

17  what would be pertinent.

18  Q.  Okay.  Now, the individuals involved in drawing and

19  enacting the current plan, they didn't have access to any of

20  those things, did they, in 2011?

21  A.  Well, they did in a way.  They were communicating with one

22  another.

23  Q.  Okay.  But they didn't have access to any of the things I

24  just talked about, did they?

25  A.  Maybe not the depositions or trial testimony, but they

1    might have had realtime conversations with some of the

2    individuals you just mentioned.

3    Q.  Okay.  Now, is it fair to say that the map drawers had to

4    balance many competing considerations in 2011?

5    A.  It's fair to say they were balancing competing

6    considerations, but it's also fair to say that the map that

7    they produced was a geographic monstrosity.

8    Q.  Okay.  Well, as an example, a congresswoman could ask to

9    have her family church and cemetery included in her district,

10   couldn't she?

11   A.  She could.

12   Q.  Okay.

13   A.  I wouldn't laugh at her, though, for not complying with

14   that request.

15   Q.  Okay.  And you can't possibly quantify all the requests

16   that might have been received or asked of the map drawers, can

17   you?

18   A.  I could not, nor could anyone else.  Because, I guess

19   different requests were coming in from different places.

20   Q.  So you're not here to tell the Court that the only

21   competing considerations were those you've testified about

22   earlier today; is that right?

23   A.  I am not -- I'm sorry, I missed the --

24   Q.  Yeah.  So you are not here to tell the Court that the only

25   competing considerations were those that you testified about

1    earlier today; is that right?

2    A.   That the only competing considerations?

3    Q.   Yeah, that the map drawers had, were those that you

4    testified earlier about today.

5    A.   Oh, yeah, I -- you know, presumably they had others.  I

6    don't know.

7    Q.   Okay.

8    A.   But also, presumably, they could develop a plan that was

9    more voter friendly and was adhering to traditional

10   redistricting principles.

11        MR. McKNIGHT:  All right.  Thank you, sir.  I have no

12   further questions.

13        JUDGE BLACK:  Questions from the intervenors, perhaps?

14        MR. BRADEN:  Your Honor.

15                     RECROSS-EXAMINATION

16   BY MR. BRADEN:

17   Q.   Mr. Cooper, Mark Braden.  I represent the intervenors and I

18   will be mercifully short.

19   A.   Excellent.

20   Q.   Of course, you actually share in that activity with me.

21   I'm originally from Virginia.  Did I understand you're from

22   Virginia, too?

23   A.   Yes.  Originally from Bristol.

24   Q.   Oh.  So we're both a long way from home; right?

25   A.   Well, actually, it's closer to Cincinnati where I live now

1   in Virginia than it is to Richmond.

2   Q.   So intervening West Virginia gets in your way; right?

3   A.   Yeah, except I just go down Highway 58 to Cumberland Gap,

4   so I never really enter into West Virginia.   I just go through

5   the extreme southwest corner of Virginia and then up through

6   Kentucky.

7   Q.   I was born in Ohio and lived here for a while.   Have you

8   ever lived in the state of Ohio?

9   A.   No.

10  Q.   Have you ever worked with the Ohio legislature?

11  A.   No.

12  Q.   I heard some testimony, some of which I didn't actually

13  understand, so let me see if you can help me on it.

14       I heard some testimony from an expert witness --

15       Actually, there were a couple of expert witnesses, one for

16  the plaintiffs and, I think, maybe one for our side too.

17       -- trying to quantify the number of possible plans.   I

18  think one of the quantifications was that there were more

19  possible plans in the state than there were molecules in the

20  universe.

21       Do you know what that number would be?   I can't, for the

22  life of me -- what that reference meant.   Do you have a notion

23  how many possible maps there are in the state of Ohio?

24  A.   I -- I don't.   But one could imagine that there are

25  millions upon millions, if you looked at every possibility.

1  Q.  I think the expert for your side said that there were

2  billions.  Would you agree that there might be billions?

3  A.  It would not surprise me.

4  Q.  So -- and you've drawn -- if I'm correct, I think you've

5  drawn four plans for this Court that you've presented to us;

6  correct?

7  A.  That is correct.

8  Q.  Yeah.  So we have one additional plan.  So let me -- the

9  newest plan that you presented to the Court this morning is a

10  ripple rebuttal plan.  Is that what I understand might be a way

11  to describe it?

12  A.  Well, it is a plan that takes into account the concerns

13  that Mr. DiRossi explained in court on Friday.  I reviewed his

14  testimony and attempted to take some of those concerns that he

15  specifically mentioned into account in the rebuttal plan.

16  Q.  And I heard you talk, and I think you picked the language

17  up from him about it being a ripple effect.  Am I correct?  Am

18  I using the right word?

19  A.  I didn't pick that term up from him.  That's a pretty

20  common term --

21  Q.  Oh, okay.

22  A.  -- if you're referring to changes that one makes in a map.

23  Q.  I think I've heard that a good number of times myself.

24  When I think of that, I sort of have this image of a lake or,

25  you know, a stream or something and I throw a rock into it and

1    ripples come out from that.  Is that the image you have in your

2    head, or does that make sense?

3    A.   That would be one image I would have of a ripple effect.  I

4    think that's exactly what ripple effect is.

5    Q.   Yeah.  And so when I throw that rock into the pond, but

6    that pond has rocks in it and islands in it, the ripples have

7    to move around those rocks and islands; correct?

8    A.   It depends how big the rock is that you throw in that

9    creates the ripple.

10   Q.   You know, that's quite true.  Actually, there are certain

11   ripples that will move rocks and certain ripples that won't

12   move rocks?

13   A.   Right.  Like Warren County is a pretty big rock, so it has

14   a pretty big ripple effect.

15   Q.   And so did I understand that your changes, your perception

16   of these ripples, or the changes we were talking about here

17   came from Ray's direct testimony to this Court?

18   A.   In -- yeah.  Some of it.  I mean, some of it I was aware of

19   previously.  Like I'd already, in my deposition, come to some

20   understanding that there was an issue in Mercer County with

21   Grand Lake.  And at the time I didn't realize it, but,

22   actually, St. Mary's is not in Mercer, it's in Auglaize County.

23   But that never really worried me, because Mercer County was

24   whole in the corrected remedial plan and only had a tiny piece

25   in District 8 for purposes of one person, one vote and zero

 1    deviation, in the original remedial plan.

 2    Q.  Sure.  Sure.  Okay.

 3        So that one little detail of Mercer that you sort of knew

 4    about.  But am I correct, or -- I understood your -- was

 5    rebuttal testimony and you're rebutting the testimony of Ray in

 6    this courtroom.  Isn't that what you did, rebutted his

 7    testimony?  Isn't that what you're doing?  Or am I mistaken?

 8    A.  Well, what I'm doing is showing that all of his concerns

 9    could have been taken into account and drawn into the map,

10    while, at the same time, I created a map that was -- did not

11    have the partisan imbalance you see in the 2012 plan --

12    Q.  Sure.

13    A.  -- and dealt with some of the issues he raised.  Not -- not

14    that I agree with --

15    Q.  Sure.

16    A.  -- necessarily that these changes needed to be made such

17    that this plan would be superior to the proposed remedial plan.

18    It's just an example of how he could have drawn the plan that

19    would have been more fair to voters in Ohio and certainly split

20    fewer counties and fewer political subdivisions.  And it could

21    have been done in a day.

22    Q.  Yeah.  Okay.  And let me make sure I understand.

23        So you took his testimony and some other understandings you

24    had and tried to create a plan that you -- would look better on

25    political science metrics or you believed were better under

 1   your theory of representation than the one that was enacted by

 2   the legislature; right?

 3          JUDGE BLACK:  Excuse me.  Plaintiffs' counsel is

 4   standing.

 5          MS. LEE:  Objection.  Mischaracterizes his testimony.

 6          JUDGE BLACK:  The objection is noted.

 7   A.  Yeah.  I don't have a theory of representation.  I just

 8   wanted to draw a plan that complied with traditional

 9   redistricting principles, unlike the 2012 plan, which I think

10   is pretty evidently not in compliance.

11   Q.  Sure.  Sure.  So did you examine the deposition testimony

12   of Heather Mann?

13   A.  No, I did not.  I just told you that.

14   Q.  And you know she was the representative of the Senate

15   helping to draw the plan; correct?

16   A.  I did not know that until this moment.  I think I've seen

17   her name, but --

18   Q.  Did you talk to any member --

19          JUDGE BLACK:  Excuse me.  Plaintiffs counsel is

20   standing.

21          MS. LEE:  Objection.  Question misstates the record.

22          JUDGE BLACK:  Very well.  Noted.

23   Q.  Did you talk to any member of the Ohio House of

24   Representatives?

25   A.  No.

1   Q.  Have you read any deposition testimony of any member of the

2   House of Representatives?

3   A.  I have not.  I've testified in at least 40 voting rights

4   trials, primarily Section 2 cases.

5   Q.  I'm sorry.

6   A.  It's extremely rare that --

7   Q.  I'm hoping that we can sort of --

8           JUDGE BLACK:  All right.  I will interject myself here

9   and ask that you answer the question specifically.

10      Do we need to reread the question, counsel?

11          THE WITNESS:  Yes, that would be of assistance.  Thank

12  you.

13          JUDGE BLACK:  Hang on.  "Have you read any deposition

14  testimony of any member of the House of Representatives?

15      "I have not.  I've testified in at least 40 voting rights

16  trials, primarily Section 2 cases."

17      So the question was:

18      "Have you read any deposition testimony of any member of

19  the House of Representatives?"

20      And your one-word answer is?

21          THE WITNESS:  No.

22          JUDGE BLACK:  Thank you.

23  Q.  Have you read any testimony of any members of the Ohio

24  Senate?

25  A.  No.

1    Q.  Have you read any deposition testimony of any employee of

2    the Ohio Senate or House?

3    A.  Well, I believe Mister -- I mean, I -- just for point of

4    clarification, I read trial testimony from Mister --

5    Q.  DiRossi?

6    A.  -- DiRossi.  He was an employee, so --

7    Q.  So that would be the single person, to the best of your

8    recollection?

9    A.  Yes.

10   Q.  And, again, maybe I've already asked this question.  My

11   memory fades fast sometimes.

12       And you haven't talked to any member of the legislature,

13   period, in regards to this?

14           JUDGE BLACK:  Objection?

15           MS. LEE:  Asked and answered, Your Honor.

16           JUDGE BLACK:  He can answer it again.

17   A.  No.

18   Q.  For the state of Ohio to enact a legislative plan, it would

19   need to pass --

20       I'm asking you this question, if you understand it

21   correctly, if you understand the process.

22       For the state of Ohio to enact a plan, it would have to

23   pass both the House and the Senate and be signed by the

24   governor; correct?

25           JUDGE BLACK:  Plaintiff have an objection?

```
 1          MS. LEE:  Objection.  Outside the scope and outside
 2    the area of this expert's testimony and all opinions in this
 3    case.
 4          JUDGE BLACK:  The objection's noted.  And you may
 5    proceed.
 6    A.  I believe you are correct.  It does vary from state to
 7    state, but I think -- it is my understanding it has to be
 8    passed by the House and Senate and signed by the governor.
 9    Q.  And the plan you drew, the rebuttal plan, doesn't
10    contain -- you can't point to any input, I don't believe, from
11    the --
12          From the limits that you placed upon your knowledge, am I
13    safe to assume you don't have any knowledge of what concerns
14    might have been on the Senate side regarding the ripple effect
15    of the plan?
16          JUDGE BLACK:  Objection?
17          MS. LEE:  Objection.  Misstates what he's relied upon.
18          JUDGE BLACK:  Very well.  Noted.
19    A.  Regarding the rebuttal plan?
20    Q.  Yeah.
21    A.  Yeah.  This was drawn as a rebuttal to points raised by Mr.
22    DiRossi in his testimony on Friday.
23    Q.  So it's a rebuttal plan?
24    A.  That's what it's called.
25    Q.  Okay.  And if I understand correctly, you're testifying
```

```
 1   that your rebuttal plan is better on a variety of political
 2   science metrics or your opinion than the plan that was adopted
 3   by the legislature?
 4            JUDGE BLACK:  Excuse me.  Objection?
 5            MS. LEE:  Objection.  Mischaracterizes the metrics the
 6   plan was passed under and asked and answered.
 7            JUDGE BLACK:  Very well.  He can answer the question.
 8   A.  First, I'm not a political scientist, so I'm not going to
 9   talk about political science metrics.
10       What I will say is that in terms of adhering to traditional
11   redistricting principles, as bad as the rebuttal plan is, it is
12   clearly superior to the 2012 plan.  It splits many fewer
13   counties, many fewer political subdivisions.  Higher
14   compactness scores.
15   Q.  When you work for a legislature and you have to draft a
16   plan that's adopted by the legislature, it gets a majority vote
17   in both Houses, we've agreed on that, and signed by the
18   governor.  So you're sort of standing in the middle of the
19   political thicket, aren't you?
20            JUDGE BLACK:  Objection, perhaps?
21            MS. LEE:  Yes, Your Honor.  Foundation.
22            JUDGE BLACK:  Very well.
23   A.  No, I'm not.  This is a proposed -- I've drawn a proposed
24   remedial plan and some other hypothetical plans and this
25   rebuttal plan.  I understand that if a Court were to order a
```

```
 1  remedial plan in this case, it wouldn't necessarily have to be
 2  the proposed remedial plan.  These are demonstrative plans.
 3  Q.  But I guess I'm really getting to the question.  You drew a
 4  plan without having any of the political considerations that
 5  might be involved in passing the plan in the legislative body?
 6          JUDGE BLACK:  Objection?
 7          MS. LEE:  Objection.  Asked and answered, repeatedly,
 8  and outside the scope.
 9          JUDGE BLACK:  You can answer the question.
10  A.  Yes, I am not a member of the legislature, nor do I work
11  for the legislature, nor did I read the depositions.  So the
12  political factor did not enter into the equation I was drawing.
13  Q.  So you don't have any theory or notion or speculation of
14  how that plan, your remedial plan, would have been dealt with
15  by a political body?
16          JUDGE BLACK:  Objection?
17          MS. LEE:  Objection, Your Honor.  Explicitly calls for
18  speculation.
19          MR. BRADEN:  I'll strike the word.  I apologize for
20  the speculation.
21  Q.  Do you have a plan on how this would have passed the Ohio
22  legislature?
23  A.  No one can tell at this juncture.  Put it up for a vote.
24  How can I say?
25  Q.  The members of the legislature, though, probably would know
```

```
 1   whether it could pass or not, or their staff?  They might be in
 2   a better position than you are; right?
 3   A.  They have not had a chance to vote on the proposed new
 4   plan.
 5              JUDGE BLACK:  Objection?
 6              MS. LEE:  Objection, Your Honor.  Calls for
 7   speculation.  Asked and answered.  Even if he drops the word
 8   speculation, his entire line of questioning calls for
 9   speculation, is outside the scope of this witness' testimony.
10   Q.  So is your plan more than just a contestant --
11              JUDGE BLACK:  Noted.
12   Q.  -- in a theoretical beauty contest, or is it a serious plan
13   that could have been politically passed by Ohio legislature?
14              JUDGE BLACK:  There's an objection?
15              MS. LEE:  The same objection, Your Honor.
16              JUDGE BLACK:  All right.  It's noted.
17   A.  It's more than a beauty contest.  And I -- you know,
18   obviously it would have received serious consideration, because
19   the voters in Ohio have --
20   Q.  How did it get serious consideration if you have no idea of
21   the position of people in one of the two chambers that were
22   going to vote on it?  How can you possibly think somebody would
23   seriously consider a plan when you haven't talked to any people
24   in that chamber or haven't read any of their testimony or know
25   anything about where their rocks are that you have to ripple
```

1   around?

2   A.  Well, I --

3           JUDGE BLACK:  Objection?

4           MS. LEE:  Your Honor, he is both badgering the witness

5   on something that has been asked and answered repeatedly and

6   this is outside the scope and it calls for speculation.

7           JUDGE BLACK:  The Court finds it argumentative.

8           MR. BRADEN:  Thank you, Your Honor.

9           JUDGE BLACK:  Are you done?

10          MR. BRADEN:  Thank you.

11          JUDGE BLACK:  Very well.  Redirect.

12          MS. LEE:  I have a brief redirect, Your Honor.

13          JUDGE BLACK:  Very well.

14          MS. LEE:  Your Honors, I'd like to start with the

15  American FactFinder data.  I don't have the same exact version

16  that intervenors presented yesterday, though I believe this is

17  the version.

18      Stephen, can you put up Brunell testimony, 34, at 16

19  through 18.  And so what I have here is the same as described

20  by Ms. McKnight yesterday, the P10 race for the population, 18

21  years and over, for the 11th Congressional District in the

22  Ohio.

23      May I --

24          JUDGE BLACK:  Yes.

25          MS. LEE:  -- provide it to the intervenors, Your

```
 1    Honors?

 2              JUDGE BLACK:  Yes.

 3                     REDIRECT EXAMINATION

 4    BY MS. LEE:

 5    Q.  So, Mr. Cooper, do you recall that Dr. Brunell, an expert

 6    for intervenors, gave trial testimony yesterday about the

 7    potential BVAP in District 11 or Cuyahoga County?

 8    A.  I am aware that he testified yesterday, yes.

 9    Q.  Well --

10    A.  Just recently.

11    Q.  More specifically, do you recall that on cross, that as

12    part of Dr. Brunell's testimony, the Court was asked to take

13    judicial notice of certain 2010 census data which you were just

14    asked about today?

15    A.  Oh, yes.

16    Q.  Okay.  And so you were asked about that data without being

17    shown a copy of it, so I have just handed out copies for

18    everyone.  And so you had previously indicated that you had

19    used the any part black voting -- any black -- any part black

20    voting age population; correct?

21    A.  Yes.

22    Q.  Okay.  And, here, looking at this U.S. Census Bureau

23    FactFinder P10 document, what would be -- where on this

24    document is the single part black voting age population

25    indicated?
```

1    A.  At the very top, the fourth road -- row -- or, actually,

2    third under total, black or A -- black or African American

3    alone.

4    Q.  Okay.

5    A.  This is the statewide total.

6    Q.  And then in the second column, is that the total for single

7    race black voting age population in District 11?

8    A.  Yes.

9    Q.  Okay.  And what number is there?

10   A.  281,774.

11   Q.  Okay.  And so from that number you could then calculate the

12   single race black voting age population; is that right?

13   A.  Single race, yes.

14   Q.  Right?

15   A.  If you're using block-level data for any combination of

16   districts you could calculate the single race black voting age

17   population.

18           MS. LEE:  Okay.  And if we could put up -- gosh, where

19   are we? -- P454 at page 25ish.  There we go.

20   Q.  And so here, Mr. Cooper, if you look at District 11, the

21   any part black total number.  Do you see that?

22   A.  Yes.

23   Q.  And so it's clear -- is it clear to you that you were using

24   the any part black voting age population like you have

25   previously testified to?

1  A.  Yes.

2  Q.  Okay.  And do you recall on direct I had asked you if you

3  leave out a significant portion of Cleveland or the

4  municipalities immediately to its east in Cuyahoga County, is

5  it possible to get a district up to a black voting age

6  population over 45 percent?

7  A.  Yes, I do recall that.

8  Q.  Okay.  And so just given the confusion on cross over single

9  part -- or single race black voting age population and any part

10  black voting age population, if we were talking about single

11  part -- excuse me -- single race black voting age population,

12  would that at all change your answer to the question I asked

13  you earlier?

14  A.  Which?

15  Q.  Regarding whether if you leave out a significant portion of

16  Cleveland or the municipalities to its east in Cuyahoga County,

17  is it possible to get up to a district of black voting page

18  population over 45 percent?

19  A.  No, it would not change my answer.

20  Q.  Okay.

21  A.  I would point out, in my declaration, I do spell out the

22  statewide totals of black and any part black for both the year

23  2000 and 2010, as well as non-Hispanic black and single race

24  black.  So I'm not ignoring that data.  I just understand that

25  in voting cases, when you're looking at minority-majority

 1    districts, the metric to use nowadays is any part black, unless
 2    for some reason there is a significant minority population that
 3    is Latino or Asian-American or American Indian, and in this
 4    case, that's not the case.
 5    Q.  Okay.  And in your experience, after you have drawn
 6    illustrative or remedial maps in the VRA cases in which you are
 7    an expert -- in which you've been accepted as an expert, does
 8    the statistician or other political scientists in those cases
 9    run yet another district-specific functional analysis on those
10    maps after you've drawn them?
11    A.  I'm not aware that that has ever happened.
12    Q.  Okay.
13    A.  It would be highly unusual, and if it has happened, it
14    probably wasn't relayed to me.
15    Q.  Okay.
16    A.  Because we're kind of at a Chinese wall situation between
17    myself and other experts.
18         MS. LEE:  So, Your Honor, I have no further questions,
19    but we would like to ask the Court to take judicial notice of
20    *Georgia v. Ashcroft* at 593 U.S. 465, pin cite 47273, note one,
21    which speaks to what Mr. Cooper had testified earlier about
22    what the Supreme Court says about using any part black voting
23    age population.  And I had some time with Westlaw on our long
24    break, and if you follow the citing references, you can see
25    many Courts have used it, cited it for those purposes, and

1    we're happy to brief it further if it arises again.

2            JUDGE BLACK:  Any objection to the Court taking

3    judicial notice of *Georgia versus Ashcroft*?

4            MR. McKNIGHT:  No objection to the Court taking

5    judicial notice of that case.

6            JUDGE BLACK:  The Court so acts.

7            MS. LEE:  And, Your Honor, plaintiffs seek to admit

8    P617 through P626, which are the documents that are in the

9    binders that we handed out to the Court and to the witnesses

10   and opposing counsel at the start of Mr. Cooper's rebuttal

11   testimony.

12           JUDGE BLACK:  Objections?

13           MR. McKNIGHT:  Yes, Your Honor, we object to this for

14   the reasons that Mr. Strach stated earlier, the reasons that

15   intervenors stated earlier with respect to the untimeliness of

16   this information.

17           JUDGE BLACK:  Very well.  The Court admits them

18   conditionally and anticipates post-trial brief.

19           MS. LEE:  Thank you, Your Honor.  I have nothing

20   further.

21           JUDGE BLACK:  Very well.

22           MR. McKNIGHT:  One additional item, Your Honor.  We'd

23   like to move to admit the map that we showed, the comparison

24   map, as a demonstrative.

25           JUDGE BLACK:  Do you want to put a number on it?

1          MR. McKNIGHT:  We'll call it DD1, Defendants'

2    Demonstrative 1.

3          JUDGE BLACK:  Any objection?

4          MS. LEE:  We have no objection, Your Honor.

5          JUDGE BLACK:  It's admitted.

6       Where do we --

7       Yes, sir?

8          MR. STRACH:  Your Honor, just so the record's clear,

9    we want to renew or emphasize our motion to strike this

10   testimony.  We've now heard the testimony.  We move, pursuant

11   to the Court's inherent authority, and pursuant to Rule

12   37(c)(1), to strike the witness and the testimony and the

13   exhibits associated therewith, because we do not believe in any

14   way it's rebuttal testimony.  Of course, we will brief that for

15   the Court.

16         JUDGE BLACK:  And the experienced and learned panel

17   will take that under consideration.

18         MR. STRACH:  Thank you, Your Honor.

19         JUDGE BLACK:  Very well.

20      Where do we stand from the plaintiffs' perspective?

21         MS. LEE:  Could we excuse Mr. Cooper, please, Your

22   Honor?

23         JUDGE BLACK:  You want to leave?

24         THE WITNESS:  No.  Go right ahead.  Party on.

25         JUDGE BLACK:  You may step down, sir.  Do so quickly,

1  before they come up with more questions.  You're free to go or

2  stay.

3          THE WITNESS:  I'll sit out in the gallery.

4          JUDGE BLACK:  All right.

5      (Witness excused.)

6          JUDGE BLACK:  No tweeting.

7          MS. LEVENSON:  Your Honor, plaintiffs' rest.

8          JUDGE BLACK:  All right.  The plaintiffs have rested.

9  The evidence is closed.

10  <u>PLAINTIFFS REST</u>

11          JUDGE BLACK:  We have an order regarding pretrial --

12  post-trial briefing that I'd like to distribute to the lawyers

13  now, if we could.  And we will sit here quietly while you read

14  it, and then I have a couple of clarification statements and

15  will address whatever you choose to.

16      (Courtroom deputy distributes document to all counsel.)

17          JUDGE BLACK:  The order has not yet been docketed, but

18  as soon as we break, the Court anticipates docketing it.  It

19  would be difficult to try and docket it from the bench.  That

20  part was a joke.

21      (Pause in proceedings.)

22          JUDGE BLACK:  Okay.  I've been watching the lawyers'

23  eyes and seeing you conferring.  I believe you've had a chance

24  to read the order.

25      With due respect, this order regarding post-trial briefing

 1    is what the Court believes it needs.  And I'm not offering this

 2    up for negotiation, but in the exercise of our discretion,

 3    establishing a post-trial briefing order that is responsive to

 4    the Court's needs.

 5        I have a couple of clarifying items to hit, but if you wish

 6    to be heard before I clarify this and docket it, this would be

 7    your moment.

 8        Does plaintiff wish to be heard?

 9            MR. FRAM:  Your Honor, we appreciate the schedule and

10    the structure set forth by the Court, and we appreciate the

11    need to present the objections on the evidence and the

12    responses in an economical manner, as set forth in the

13    spreadsheet.

14        I wanted to state for the record, however, that there are a

15    few documents, not too many, where putting it in spreadsheet

16    form might be a little cumbersome, a little long in the column,

17    and it might be more readable if we were permitted, in certain

18    select basis, just on the evidentiary objections, to put forth

19    the responses in a more conventional form of a short statement

20    about those documents.  I can imagine there being no --

21    certainly not more than a dozen such instances.

22        There are also a couple of cross-cutting issues that have

23    come up, raised by both sides about evidentiary issues about

24    whether or not it's appropriate to talk about a certain

25    document given where it was -- in testimony, for example,

1  raised twice today.  And there is other -- we've talked in the

2  past about documents produced pursuant to subpoenas, we talked

3  about metadata.  There are certain general evidentiary issues

4  that have come up in the past where we appreciate the

5  opportunity to put forward our views.

6          JUDGE BLACK:  What we're trying to accomplish is that

7  the Court is able to go to one document and there it all is.

8  Not -- we don't have to go over here and get this one and then

9  get this one.  We want it all there.

10     I mean, can you have a couple of extra pages on the

11  spreadsheet that develops what you need to develop more than

12  you can stuff in the column?

13          MR. FRAM:  If the Court's -- if the Court finds it

14  more convenient and efficient to view it within a column, we're

15  happy to put the words in a column.  Sometimes the column will

16  get a little long.  That's all.

17          JUDGE BLACK:  We're prepared to deal with long

18  columns.

19          MR. FRAM:  Thank you, Your Honor.  We can it handle

20  it, then.

21          MR. STRACH:  Your Honor?

22          JUDGE BLACK:  Yes.

23          MR. STRACH:  If I may, on that point.

24          JUDGE BLACK:  Yes.

25          MR. STRACH:  We probably actually are on the same

1  wavelength here.  On this particular issue, one idea we were

2  tossing around is on the spreadsheet we can put a code in there

3  for the Court -- because a lot of the issues are going to be

4  overlapping amongst many documents, we could put a code in the

5  spreadsheet which would refer the Court back to a brief on

6  objections where we would reference all those and brief all

7  similarly-situated objections at the same time.  And then where

8  ones require individual attention, we could either put those in

9  the column or put a code.

10      So it would take two documents.  It would be the

11  spreadsheet and then the brief, but it would be a way to

12  reference here and have a more conventional read for the Court

13  in looking at the text of the objections.  The prose, the

14  argument.

15          JUDGE BLACK:  Run that by me one more time.

16          MR. STRACH:  So we would have the spreadsheet as the

17  Court wants, but where certain objections are common to many

18  documents, we could have a code --

19          JUDGE BLACK:  Okay.

20          MR. STRACH:  -- for those.  And then that would refer

21  the Court to our brief.  And then we would brief all common

22  objections and exhibits under that code in the brief.  We would

23  clearly reference it in the brief.  So all the Court would have

24  to do is say C1 in the spreadsheet, come to the brief, briefing

25  on objections labeled C1, and then read the arguments regarding

```
 1    those objections.
 2            JUDGE BLACK:  I'm looking over there, because we're
 3    going to be --
 4            JUDGE WATSON:  Our clerks object.
 5            MR. FRAM:  I'm just --
 6            JUDGE BLACK:  Why don't you come confer with your
 7    Judge.
 8         You've stirred them up.
 9            MR. STRACH:  We certainly want to make it as easy on
10    the clerks as possible.
11            JUDGE BLACK:  That's what we're working on.
12         (Pause in proceedings.)
13            JUDGE WATSON:  There seems to be an awful lot of
14    objections that present a one word with not any further
15    explanation of the objection.  We want to get away from a rote
16    analysis.
17         What we envisioned was a document that would say a sentence
18    or two explaining your objection in context in each case.  All
19    right?
20         To the extent that we have it in columns and so forth, then
21    we've got to go back and refer to whatever document you -- you
22    know, the number of times it was raised, we're trying to get
23    away from that.
24            MR. FRAM:  Your Honor --
25            JUDGE BLACK:  Did you wish to be heard, sir?
```

1          MR. FRAM:  Yeah, I'm amenable to whatever the Court

2     and the Court's clerks would prefer.  A reason why I think Mr.

3     Strach and I are on similar pages, we've had, perhaps, a little

4     too much experience with the spreadsheets, and maybe our older

5     eyes get weary with long columns.  And we're more used to an

6     old -- different form.  But that's really an implementation

7     detail at the end of the day.

8          There are some document-specific issues.  They'll say,

9     "So-and-so didn't really draft it."  And we'll say, "But, hey,

10    look at this piece of the testimony here, Exhibit 77.  He said,

11    well, maybe he used that naming convention, maybe he didn't.

12    You've got to look at the" --

13         So some of it's generic, some of the conversation is

14    document specific.  It can all be in a column if that's what

15    folks are comfortable with.  It's really for the ease and

16    efficiency of the people doing the reading.  And we're just

17    here to make that work.  We happen to operate maybe in a

18    different old-school approach on what's easier for us to read,

19    but that's not really relevant.

20         JUDGE BLACK:  Yes?

21         MR. STRACH:  Maybe -- I also want to make sure that

22    we're clear on when we are responding -- when we are lodging

23    objections on the spreadsheet and responding with the -- to

24    objections, will we also be able to submit a brief regarding

25    the objections?

1          MR. FRAM:  In a case in point, we have a contention,

2    for example, that the -- and we've had this out some with the

3    other side, just a cordial disagreement, that the prior failure

4    to specify hearsay objections, as the Court required, as we

5    read the pretrial conference order, impairs their ability to

6    raise hearsay and conclusory form at a later date.  And

7    defendants and intervenors disagree with our view on that.

8       I don't know if one puts that in a spreadsheet or in a

9    separate brief, but we have issues of that type.

10      (Judges confer privately.)

11         JUDGE WATSON:  How long do you need on objections if

12   you were to do a brief?

13         JUDGE BLACK:  In terms of page length.  And don't you

14   say a hundred pages.

15         MR. STRACH:  I saw you nixed my hundred already.

16      You know, I'm thinking 40, like double the normal length of

17   a brief.

18         JUDGE BLACK:  Can the plaintiff live with that?

19         MR. FRAM:  40 in addition to the spreadsheet, Your

20   Honor?

21         JUDGE BLACK:  Yes.

22         MR. FRAM:  I think we can work that out.  40 in

23   addition to the spreadsheet.

24         JUDGE BLACK:  And the defense and intervenors are okay

25   with that?

1          MS. McKNIGHT:  Yes, Your Honor.

2          JUDGE BLACK:  Thank you.

3      All right.  You've made one modification.

4      On the spreadsheet, as the one you filed previously, there

5  are a bunch of objections, many of which have been withdrawn.

6  When we get to the final spreadsheet, I hope you're able to

7  remove those.

8          MR. FRAM:  Yes, Your Honor.

9          JUDGE BLACK:  Agreed?

10          MR. STRACH:  Absolutely.

11          JUDGE BLACK:  Very well.

12          MR. STRACH:  I have one more when the Court's ready.

13          JUDGE BLACK:  Okay.

14          MR. STRACH:  Test my luck here.

15          JUDGE BLACK:  Will you speak right up, please.

16          MR. STRACH:  I will.  Sorry, Your Honor.

17          JUDGE BLACK:  And after we're done listening to you,

18  we're going to take a break, come back, and have some

19  going-away comments.

20          MR. STRACH:  Okay.  I will look forward to that.

21      (Laughter.)

22          JUDGE WATSON:  Going away.

23          MR. STRACH:  I think I have a plane to catch,

24  actually.

25      Your Honor, one suggestion.  The Court has allowed the

1  plaintiffs to include as rebuttal additional proposed findings

2  of fact in their filing of April 2nd, 2019.  We are a little

3  concerned that there may be a disagreement about what rebuttal

4  means, and that could -- if they have a broad definition of

5  rebuttal and we believe that they've included a lot of findings

6  of fact that should have been previously disclosed, we would

7  like to have an opportunity, we can do it quickly, to respond

8  to any such findings of fact that we believe are not really

9  rebuttal.

10         JUDGE BLACK:  I hear the request.

11     Did you have a comment, sir?

12         MR. FRAM:  We're both careful lawyers here, and Mr.

13  Strach's worried about that we might overread what rebuttal is,

14  and I'm, of course, a little concerned exactly how he'd read

15  his opportunity to respond and we'd have essentially a surreply

16  on the evidence.

17     If there's a motion to strike some of our rebuttal facts as

18  outside proper rebuttal, I would ask that could be stated, but

19  without introducing additional facts.  In other words, if he

20  thinks that we have transgressed the Court's order, he can say

21  so.  I have no problem with that.  I don't want to open the

22  door to him coming back and saying "And here's why" and "Here's

23  a narrative of additional facts as to why."  Essentially that

24  gives them the last word on what the facts are, which, as I

25  think I previously argued, we view as improper.

1          MR. STRACH:  Your Honor.

2          JUDGE BLACK:  Yes?

3          MR. STRACH:  I think that if the Court were to tell us

4     that we would be permitted to file a motion to strike any such

5     findings that we thought exceeded the scope of rebuttal,

6     normally I would be hesitant to file such a motion because I'd

7     be worried the Court didn't authorize it in advance, but if the

8     Court authorizes it in advance, I think we could live with

9     that.

10          JUDGE BLACK:  And why can't you address it in your

11     objections?

12          MR. STRACH:  In what objections?

13          JUDGE BLACK:  Whatever objections you're going to

14     make.

15          MR. FRAM:  I think the --

16          MR. STRACH:  Well, so the 7th, we file responses to

17     evidentiary objections, so that doesn't include any findings

18     that they filed on the 2nd that we believe exceed the scope of

19     rebuttal.  Now, we could include that, but then that kind of

20     butts up on Mr. Fram's concern.

21          JUDGE BLACK:  Well, we're going to adjourn and prepare

22     our going-away remarks.  We're going to caucus with our team

23     and try and make sure we're all on the same page and proceed as

24     such.  But just to further muddy the waters, I have some

25     clarifications to offer.

```
 1        You understand that when we talk about the conclusions of

 2   law, that's the post-trial brief.

 3        Plaintiff understands that?

 4             MR. FRAM:  Yes, Your Honor.

 5             JUDGE BLACK:  And the defense as well?

 6             MR. STRACH:  Let me make sure I understand, because I

 7   have not done it that way before.

 8             JUDGE BLACK:  Welcome to the heartland of America.

 9             MR. STRACH:  Exactly.

10        So we would file a document called proposed findings of

11   fact that's a separate document, and then we would file

12   proposed conclusions of law and post-trial brief, or are you

13   saying that the conclusions of law in our proposed findings and

14   conclusions equals the post-trial brief?

15             JUDGE BLACK:  Correct, the latter.

16             MR. STRACH:  Okay.

17             JUDGE BLACK:  Let's look at the first paragraph that

18   deals with the plaintiffs.  They're going to file one document

19   which is proposed findings of fact and one document that is

20   proposed conclusions of law in a post-trial brief format.

21             JUDGE WATSON:  Which is why we have the page

22   limitations.

23             MR. STRACH:  Okay.

24             JUDGE WATSON:  And there are no page limitations for

25   the proposed findings of fact.
```

1          MR. STRACH:  All right.  We understand that.

2          JUDGE BLACK:  All right.

3     My second clarification we will take under advisement, but

4     that is:  There will be no surreply.  But we're going to talk

5     about what you've just raised.

6     And all objections should be contained within the

7     spreadsheets and/or I think we signed off on a brief regarding

8     that.

9          JUDGE WATSON:  Ms. Thomas?

10         MS. THOMAS-LUNDBORG:  I just have a question for

11    clarification.  In the post-trial conclusions of law, do we

12    need to follow the local rule with the table of contents with a

13    summary of all the arguments?

14    (Judges confer privately.)

15         JUDGE BLACK:  I'm glad you asked.  We're going to

16    waive that local rule.  We're capable of reading it without a

17    summary.  Thank you for bringing it to the Court's attention.

18    So you get to write long briefs and you don't have to do a

19    table of authorities and a summary of the argument and all that

20    other stuff that the local rules reflect before I came on the

21    court.

22    (Laughter.)

23         JUDGE BLACK:  I think we're ready to step down.  Will

24    you give us ten minutes exactly, and we'll come back with our

25    going-away remarks and our clarifications.

1    We're in recess for ten minutes.

2         COURTROOM DEPUTY:  All rise.  This court is in recess

3    for ten minutes.

4    (Recess taken:  2:40 PM - 2:54 PM.)

5         THE COURT:  Thank you.  Please be seated.

6    Thank you for giving us a chance to converse.

7    It's my understanding that none of the law clerks are

8    leaving.  Correct?

9    (Laughter.)

10        JUDGE BLACK:  We're going to put on this order,

11   updated, not immediately but soon.  If you would look at page

12   two, what we're really focused on is dealing with these

13   objections in a way that helps us.  "All evidentiary objections

14   shall be submitted via Excel spreadsheets."  That means all.

15   So those are the only objections we're looking at.  So get them

16   all on the spreadsheet.

17       In an extraordinary act of generosity, we are prepared to

18   give you the opportunity to file up to a 40-page objection

19   brief that comes in with your spreadsheet, and the local rules

20   don't apply to that 40-page document, although it's more than

21   20 pages.

22       So all objections -- so the only ones we're going to deal

23   with -- so it's objections that you raised at trial, it's

24   objections you raised, get them all on the spreadsheet, and

25   then you're welcome to give us a 40-page brief that discusses

1    it further.

2        We're worried about this coding deal, that that's going to

3    end up giving us not a sufficient explanation.  "Hearsay.

4    These are all that one," we want it all on the spreadsheet and

5    supplemented with the brief.  Beyond that, I don't think

6    there's going to be any change to the order regarding

7    post-trial briefing.

8        Now, you can do what you like before I give my speech.

9            MR. FRAM:  Just one question, Your Honor.

10       You mentioned a 40-page objection brief.  Does that also

11   apply to responses to the objections where they'd need to be

12   explained?  Someone's coming in with 40 pages talking about

13   their objections, I -- before, the example I gave had to do

14   with responses, the objections where some explanation could be

15   in order and might be helpful.

16       (Judges confer privately.)

17           JUDGE BLACK:  It's legit.  We need a brief on

18   objections, and it probably needs to come after there have been

19   responses to the objections.

20       Is that what you're getting to?

21           MR. FRAM:  What I'm getting at, Your Honor, is they're

22   going to put out -- well, each side will put forward their

23   objections, and we understand they have to be explained.  Where

24   we were seeing the actual additional words being useful, if a

25   party had to, in their response, it's possible there could be

1  need for some additional words in the initial articulation of

2  the objections.  There's some of that as well.  But we

3  particularly saw a need in the response.  The examples I gave

4  before had to do with whether or not there was a waiver of an

5  objection.

6        JUDGE BLACK:  So what do you propose?

7        MR. FRAM:  What I would propose would be something on

8  the order of 40 each, up to 40 if you need further explanation

9  of your objections, and up to 40 if you need to explain your

10 responses.

11       JUDGE BLACK:  Two 40-page briefs?

12       MR. FRAM:  Two 40.

13       JUDGE BLACK:  Times two.

14       MR. FRAM:  Well, I've been inspired by opposing

15 counsel of asking for a reasonable number.  But if the Court is

16 more comfortable, maybe, with a smaller number to explain the

17 objections, maybe 20, 25, something in the order of 40 on the

18 response.  There's no magic in these numbers.

19    (Judges confer privately.)

20       JUDGE BLACK:  Do you like his idea?

21       MR. STRACH:  We'll take it, Your Honor, if you're

22 willing to do it.

23       JUDGE BLACK:  Sold.

24    Yes?

25       MS. THOMAS-LUNDBORG:  I just had a question related to

1  the Excel.  Is it possible to use tabs since we'll be objecting

2  to three different types of evidence?  There will be designated

3  testimony, trial testimony, and then exhibits.  So a tab for

4  each.

5          JUDGE BLACK:  Yes.  I had a bunch of thumbs up.  I

6  don't need to know -- well, all right.

7          MR. STRACH:  Your Honor, you said that there would be

8  no other changes to the order.  Would we be permitted to file a

9  motion to strike any rebuttal findings of fact that we believe

10 were not truly rebuttal?

11         JUDGE BLACK:  And that won't be reflected in your two

12 40-page briefs on objections?

13         MR. STRACH:  We won't be able to, because that comes

14 last.

15         JUDGE BLACK:  Yes.

16         MR. STRACH:  All right.  Thank you, Your Honor.

17         JUDGE BLACK:  You understand how well received it will

18 be.

19         MR. STRACH:  We will keep that in mind.

20         JUDGE BLACK:  Very well.

21    Is there more we need to clarify before we tell you to go

22 away?

23    From the plaintiff?

24         MR. FRAM:  Nothing from plaintiffs, Your Honor.

25         JUDGE BLACK:  The defense?

1          MR. STRACH:  Not here, Your Honor.

2          JUDGE BLACK:  The intervenors?

3          MR. LEWIS:  Not here, Your Honor.

4          JUDGE BLACK:  Very well.

5     Well, let me speak for myself alone.  You all have done an

6  extraordinary job as professionals in presenting a complex set

7  of evidence, testimony on difficult issues, and I am remarkably

8  impressed by each and every lawyer who participated in this

9  trial.  It's a credit to you.  I'd almost invite you back

10  anytime you wish.

11     (Laughter.)

12          JUDGE BLACK:  Do you wish to make any closing

13  comments?

14          JUDGE NELSON MOORE:  I agree with Judge Black.  You've

15  done a very fine job, all of you, and it's been excellent to

16  see each of you in your performance of your duties.

17          JUDGE BLACK:  Judge Watson?

18          JUDGE WATSON:  This has been an exceptionally well-

19  lawyered case.  In a very compressed period of time you have

20  put together a phenomenal amount of information.  You've tried

21  to dumb it down for the Court.  We appreciate that.  This is

22  not easy material to wrestle with.  These are not easy issues

23  to wrestle with.

24     There is a commission coming down the road, and I suppose

25  that commission's going to be just as difficult as the process

```
 1   we currently have.  But in any event, I've enjoyed this very

 2   much.  I look forward to never having to do it again.

 3        (Laughter.)

 4            JUDGE WATSON:  And I hope that -- I wish you all well,

 5   travel safely, and it's been a pleasure.

 6            JUDGE BLACK:  I concur with those remarks.  If you've

 7   been listening carefully, you probably know what I'm going to

 8   say.  I don't often get a chance to say it, but you are free to

 9   go.  Thank you.

10            MS. LEE:  Thank you, Your Honor.

11            JUDGE BLACK:  We're in recess.

12            COURTROOM DEPUTY:  All rise.  This court is now in

13   recess.

14            JUDGE BLACK:  Actually, adjourned.

15            COURTROOM DEPUTY:  Court is now adjourned.

16            JUDGE BLACK:  Safe travels.

17        (Proceedings concluded at 3:03 PM.)

18                            - - -

19                        MISCELLANEOUS

20   Defendants Rest ..................................   28
     Intervenors Rest .................................   28
21   Plaintiffs' Evidence in Rebuttal .................   35
     Plaintiffs Rest .................................. 138
22                            - - -

23

24

25
```

1                I N D E X     O F     W I T N E S S E S

2   DEFENDANTS' WITNESSES:                                    PAGE

3   M. V. HOOD III
    Cross-Examination (Cont'd) by Ms. Lee ...........   7
4   Redirect Examination by Mr. McKnight ............  16

5   PLAINTIFFS' REBUTTAL WITNESSES:                          PAGE

6   WILLIAM S. COOPER
    Rebuttal Direct Examination by Ms. Lee ..........  35
7   Rebuttal Cross-Examination by Mr. McKnight ......  61
    Rebuttal Cross-Examination (Cont'd) by Mr. McKnight 95
8   Rebuttal Cross-Examination (Cont'd) by Mr. McKnight108
    Rebuttal Cross-Examination by Mr. Braden ........ 119
9   Rebuttal Redirect Examination by Ms. Lee ........ 132

10  MARCIA C. KAPTUR
    Rebuttal Direct Examination by Mr. Carey ........  68
11  Rebuttal Cross-Examination by Mr. Braden ........  77
    Rebuttal Redirect Examination by Mr. Carey ......  93
12  Rebuttal Cross-Examination (Cont'd) By Mr. McKnight 95

13                           - - -

14                   C E R T I F I C A T E

15          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

16  that the foregoing is a correct transcript from the record of

17  proceedings in the above-entitled matter.

18

19                           s/Luke T. Lavin
                             _____
20                           Luke T. Lavin
                             Official Court Reporter

21

22

23

24

25