# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

_____

OHIO A. PHILIP RANDOLPH
INSTITUTE, *et al.*

      Plaintiffs,

v.

LARRY HOUSEHOLDER, Speaker of the
Ohio House of Representatives, *et al.*

      Defendants.
_____

No. 1:18-cv-00357-TSB-KNM-MHW

Judge Timothy S. Black
Judge Karen Nelson Moore
Judge Michael H. Watson
Magistrate Judge Karen L. Litkovitz

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW AND POST-TRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.     THE COURT CAN ADJUDICATE PLAINTIFFS' CLAIMS. ................................... 2

  A.  Five Three-Judge Panels, Including This One, Have Recently Held That Partisan Gerrymandering Claims Are Justiciable. ................................................................. 2

  B.  Plaintiffs' Claims Are Not Barred by Laches. .................................................... 4

II.    PLAINTIFFS HAVE PROVEN FACTS DEMONSTRATING STANDING FOR THEIR EQUAL PROTECTION, FIRST AMENDMENT, AND ARTICLE I CLAIMS. ........ 5

  A.  Individual Plaintiffs Have Standing to Pursue Their Fourteenth Amendment, First Amendment, and Article I Claims. ...................................................................... 6

     1.  Equal Protection Claims .......................................................................... 7

     2.  First Amendment Claims ........................................................................ 16

     3.  Article I ................................................................................................... 20

  B.  Organizational Plaintiffs Have Standing to Pursue Their Fourteenth Amendment, First Amendment, and Article I Claims. .......................................................... 20

     1.  Equal Protection Claims ......................................................................... 21

     2.  First Amendment Claims ........................................................................ 23

       a)  Organizational Plaintiffs have standing in their own right. ............... 23

       b)  Organizational Plaintiffs have associational standing on behalf of their members. ............................................................................... 28

III.   DEFENDANTS HAVE VIOLATED THE CONSTITUTION BY GERRYMANDERING OHIO'S CONGRESSIONAL MAP. ................................................. 29

  A.  Plaintiffs Have Suffered Discrimination on the Basis of Their Partisan Affiliation in Violation of the Equal Protection Clause. .......................................................... 29

     1.  Defendants acted with a discriminatory intent. ....................................... 31

       a)  The sequence of events shows discriminatory intent. ........................ 32

       b)  Contemporaneous statements show discriminatory intent. ................. 38

       c)  The map drawers' use of demographic data to achieve partisan goals shows discriminatory intent. ................................................................... 40

       d)  Expert evidence shows discriminatory intent .................................... 43

       e)  Intent to entrench a Republican majority was the predominant intent .............. 46

     2.  Ohio's congressional map has had a discriminatory effect. .................... 50

     3.  Defendants lacked justification for the map. .......................................... 56

  B.  Plaintiffs' Political Speech Has Been Burdened and Their Ability to Freely Associate Has Been Harmed in Violation of the First Amendment. .................................... 61

  C.  Plaintiffs' Vote Has Been Diluted in Violation of Their Right to Vote Under the Fourteenth Amendments. ................................................................................... 62

D.   Ohio's General Assembly Exceeded Its Power Under Article I When It Gerrymandered Ohio's U.S. Congressional Map. ........................................................................................ 65

IV.   PLAINTIFFS HAVE PROPOSED A MAP THAT WOULD REMEDY THE CONSTITUTIONAL VIOLATIONS ...................................................................................... 66

CONCLUSION ................................................................................................................... 72

Plaintiffs respectfully submit these proposed conclusions of law in support of their claims.

## INTRODUCTION

Ohio's congressional districts were drawn for the purpose of locking in a Republican majority impervious to normal electoral swings. The map has had precisely that effect: despite significant swings in the two major parties' statewide share of votes for U.S. Congress, a 12-4 Republican majority has remained frozen in place. In order to achieve this goal, the map drawers created a "geographic monstrosity," which cracks and packs Democratic voters all over Ohio. Plaintiffs' Proposed Findings of Fact ("PFOF") ¶ 938.

"A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office." *Stanson v. Mott*, 17 Cal. 3d 206, 217 (1976) (citing The Federalist Papers, Nos. 52, 53 (Madison), 10 Richardson, Messages and Papers of the Presidents 98-99 (1899) (President Jefferson)). This kind of partisan gerrymandering violates "the core principle of republican government . . . that the voters should choose their representatives, not the other way around." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (internal quotation marks omitted). Rather than reflecting voters' actual preferences, elections under gerrymandered systems, like Ohio's congressional map, systematically lock in candidates from the legislators' preferred party and discourage electoral competition. "Put differently, by intentionally seeking to entrench a favored party in power and make it difficult—if not impossible—for candidates of parties supporting disfavored viewpoints to prevail, partisan gerrymandering 'seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather

than persuasion.'" *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 800–01 (M.D.N.C. 2018) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994)).

Partisan gerrymandering violates several provisions of the Constitution. By entrenching the party in power and insulating it from meaningful accountability to the electorate, partisan gerrymandering substantially burdens voters' fundamental rights, including (1) the Fourteenth Amendment right to equal protection and treatment under the law, *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012); (2) the First Amendment right to associate for the advancement of political beliefs, to express political views, and to participate in the political process, *see Anderson v. Celebrezze*, 460 U.S. 780, 787, 792–94 (1983); and (3) the right to not have their vote diluted, *Burdick v. Takushi*, 504 U.S. 428, 445 (1992) (Kennedy, J., dissenting) (stating that citizens have the right to "cast a meaningful vote"). Not only does partisan gerrymandering violate citizens' rights under the Constitution, it also goes beyond the powers granted to states under Article I.

Plaintiffs have proven each of their four claims and the facts necessary to demonstrate standing. Defendants and Intervenors, by contrast, have entirely failed to justify the improper actions of the state.

## ARGUMENT

### I.     THE COURT CAN ADJUDICATE PLAINTIFFS' CLAIMS.

#### A. Five Three-Judge Panels, Including This One, Have Recently Held That Partisan Gerrymandering Claims Are Justiciable.

As this Court made clear, the "federal courts that have adjudicated partisan gerrymandering claims have converged considerably on common ground in establishing standards for determining whether a partisan gerrymander is unconstitutional." Order Denying Mot. for Summ. J. ("SJ Order") at 8-9, ECF No. 222; *see also League of Women Voters of*

*Michigan v. Johnson* ("*LWV-Michigan*"), 352 F. Supp. 3d 777, 802 (E.D. Mich. 2018); *Benisek v. Lamone*, 348 F. Supp. 3d 493, 498 (D. Md. 2018); *Rucho*, 318 F. Supp. 3d at 838; *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wisc. 2016), *rev'd on other grounds*, 138 S. Ct. 1916 (2018). This Court set out a clear path for the litigants heading into the trial, identifying the tests that apply for each claim and discussing the sorts of evidence that must be proven at trial. Plaintiffs must prove their district-specific equal protection claims "by showing (1) a discriminatory partisan intent in the drawing of each district and (2) a discriminatory partisan effect on those allegedly gerrymandered districts' voters." SJ Order at 10. The State then has "the opportunity to justify each district on other, legitimate legislative grounds." *Id.* For Plaintiffs' right to vote claims, the three-part test is similar, and this Court indicated that after trial, it will determine "how substantial the burden is on the Plaintiffs' right to vote." *Id.* at 13. As the Court stated, "partisan gerrymandering is a double-barreled constitutional issue," and the First Amendment analysis runs parallel to that under the Fourteenth Amendment. *Id.* at 15. The Court held that at trial, Plaintiffs are to prove their First Amendment claim "by showing '(1) that the challenged districting plan was intended to burden individuals or entities that support a disfavored candidate or political party, (2) that the districting plan in fact burdened the political speech or associational rights of such individuals or entities, and (3) that a causal relationship existed between the governmental actor's discriminatory motivation and the First Amendment burdens imposed by the districting plan.'" *Id.* (quoting *Rucho*, 318 F. Supp. 3d at 929). In addition to any district-specific dilution harm under the First Amendment, Plaintiffs deploy "statewide evidence and seek a statewide remedy" for their First Amendment associational harms. *Id.* at 16. Finally, this Court determined that the approach adopted by the *Rucho* court governs Plaintiffs' Article I claim. *Id.* at 17.

Both this Court, in its recent order denying summary judgment, and the courts in the recent *LWV-Michigan* and *Rucho* decisions found that the Supreme Court had not foreclosed partisan gerrymandering claims as non-justiciable.  As this Court already recognized, the judicially manageable standards sought are those legal standards by which the Court will adjudicate Plaintiffs' claims.  The social science and empirical metrics serve only as *evidence* to support Plaintiffs' claims.  SJ Order at 19–21; *LWV-Michigan*, 352 F. Supp. 3d at 805 ("Plaintiffs provide social science analyses as evidence to support their constitutional claims.").  As discussed below, at trial, Plaintiffs used these metrics along with ample district-specific and statewide evidence to prove each of their claims.

### B.  Plaintiffs' Claims Are Not Barred by Laches.

This Court should find "no merit in the defense of laches" where, as here, in "a suit for an injunction," the Defendants have been infringing the rights of the Plaintiffs "for years with impunity" and continue to do so.  *France Mfg. Co. v. Jefferson Elec. Co.*, 106 F.2d 605, 609 (6th Cir. 1939) (considering laches defense in patent suit where continuing violation at issue). Because laches is available only when plaintiffs delay bringing a claim unreasonably long *after* suffering the harm they seek to redress, laches should not be applied where plaintiffs seek to prevent an ongoing or future violation of their rights.  *See Lyons P'ship*, *L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) ("Inherently, [ongoing] conduct cannot be so remote in time as to justify the application of the doctrine of laches."); *cf. Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) (holding that a "law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it" earlier).

Plaintiffs here seek to prevent the ongoing constitutional violation of their rights, the harm suffered anew with each election held under the challenged map, and the continuing

consistent harm to their associational rights.  *See Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990) (in a case filed in 1988 regarding a 1981 redistricting, concluding that laches did not bar plaintiffs' apportionment claim because the "ongoing nature of the violation" meant that plaintiffs' injury "has been getting progressively worse" with each passing election cycle).

In *Concerned Citizens of Southern Ohio, Inc. v. Pine Creek Conservancy District*, the Supreme Court permitted an Equal Protection challenge to a local district to proceed nine years after the district's creation, 429 U.S. 651, 653 (1977), over the dissent's objection that the case should be barred by laches, *id.* at 656 (Rehnquist, J., dissenting).  And other courts considering redistricting cases have likewise found laches inapplicable due to the ongoing harm of a map. *See, e.g.*, *Garza*, 918 F.2d at 772; *Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1143–44 (E.D. Cal. 2018); *Smith v. Clinton*, 687 F. Supp. 1310, 1312–13 (E.D. Ark. 1988); *Dotson v. City of Indianola*, 514 F. Supp. 397, 401 (N.D. Miss. 1981).

Furthermore, Defendants have met neither required prong of the test for laches: (1) a lack of diligence by the party against whom laches is asserted, and (2) prejudice to the party asserting it.  *See, e.g.*, *Kansas v. Colorado*, 514 U.S. 673, 687 (1995); *see also* PFOF ¶¶ 1043-47.  The Court, therefore, is not barred from deciding the case by laches.

## II.     PLAINTIFFS HAVE PROVEN FACTS DEMONSTRATING STANDING FOR THEIR EQUAL PROTECTION, FIRST AMENDMENT, AND ARTICLE I CLAIMS.

Plaintiffs have proven facts demonstrating standing, that is, "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]"  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  To make this showing, Plaintiffs demonstrate an "injury in fact . . . fairly traceable to the challenged action of the

defendant" that "likely . . . will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal alterations, quotation marks, and citations omitted).

At trial, both individual and organizational Plaintiffs demonstrated standing to pursue each of their claims: discrimination on the basis of party affiliation under the Equal Protection Clause, vote dilution under the Equal Protection Clause, associational harm under the First Amendment, and violation of the State's power under Article I of the Constitution. Regarding their 14th Amendment claims, both individual Plaintiffs and members of organizational Plaintiffs demonstrated that their "own votes" have been burdened through their "placement in a 'cracked' or 'packed' district." SJ Order at 33 (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)). "In other words," at trial, both individual and organizational Plaintiffs established that they (or their members) "live in an alleged gerrymandered district just as in the racial gerrymandering context." *Id*. (citing *Gill*, 138 S. Ct. at 1930). In doing so, Plaintiffs also presented "statewide *evidence* in order to prove . . . gerrymandering in [each] particular district." *Id*. (citing *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015)) (emphasis in original). Regarding associational injuries under the First Amendment, both individual and organizational Plaintiffs satisfied "statewide standing principles." *Id*. at 34 (citing *Gill*, 138 S. Ct. at 1938–39) (Kagan, J., concurring).[1]

### A. Individual Plaintiffs Have Standing to Pursue Their Fourteenth Amendment, First Amendment, and Article I Claims.

At trial, each of the individual Plaintiffs established the three elements to satisfy standing for each of their claims: (1) injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury likely will be redressed by a favorable decision. SJ

---

[1] The standing analysis for Plaintiffs' Article I claim is the same as for its First Amendment claim. SJ Order at 44.

Order at 34 (citing *Lujan*, 504 U.S. at 560-61). Individual Plaintiffs proved these elements with

both "direct and circumstantial evidence that 'the particular composition of the voter's own

district . . . caus[ed] his [or her] vote—having been packed or cracked—to carry less weight than

it would carry in another, hypothetical district.'" *Rucho*, 318 F. Supp. 3d at 826–27 (citing *Gill*,

138 S. Ct. at 1931 (alteration in original)). Individual Plaintiffs also proved their association

with and activities supporting the Democratic Party and that the current congressional map

impeded their associational rights. *Gill*, 138 S. Ct. at 1938–39.

### 1. Equal Protection Claims

For the purposes of standing, the tests for Plaintiffs' Equal Protection claims—

discrimination on the basis of partisan affiliation and vote dilution—are the same. At trial,

individual Plaintiffs presented "individual lay and expert testimony, simulated maps, and a

Proposed Remedial Plan" demonstrating that "they live in packed or cracked districts in which

their votes are diluted." SJ Order at 35.

Individual Plaintiffs demonstrated that "they actually live in packed or cracked districts

and consequently, that they have suffered **injuries in fact**." *Id.* (emphasis added). As an initial

matter, there is "no dispute" that "individual Plaintiffs reside and vote" in each of the districts

they alleged to be cracked or packed. *Id.* The seventeen individual Plaintiffs in this case live in

each of the sixteen challenged congressional districts, with two in the 9th District and one in

each of the other districts. PFOF ¶¶ 307, 319, 332, 347, 361, 370, 383, 418, 429, 457, 476, 488,

500, 524, 543, 554, 566. Individual Plaintiffs challenge each of Ohio's congressional districts as

either packed or cracked.[2] Moreover, each individual Plaintiff voted in congressional elections

---

[2] As the Court noted in its Order Denying Defendants' and Intervenors' Motion for Summary Judgment,
Plaintiffs have not alleged that "their votes are not counted in a literal sense." SJ Order at 35. Rather,
they alleged—and have now demonstrated at trial—that "their votes count less than they should, or are

held under the challenged map.  *Id.* ¶¶ 308, 319, 333, 347, 362, 370, 388, 417, 430, 458, 477, 490, 506, 528, 544, 555, 572.  Their vote dilution injuries are not merely "generalized grievance[s] against governmental conduct of which [they do] not approve," SJ Order at 33 (citations omitted), but rather direct and concrete injuries that result from living and voting in cracked and packed congressional districts.

First, Dr. Cho's Plaintiff-specific analysis helps "determine whether and to what extent a particular [Plaintiff] is packed or cracked." *Gill*, 138 S. Ct. at 1930.  For each of Dr. Cho's simulated maps, she determined in which district each of the individual Plaintiffs would reside, and calculated the average Democratic Vote Share of that district.  PFOF ¶¶ 781–82.  The summary statistics of the Democratic Vote Share present the likely electoral environment of each individual Plaintiff's district if the congressional map were drawn without taking partisanship into account.

Dr. Cho's Plaintiff-specific analysis demonstrates injury-in-fact for standing because it compares each individual Plaintiffs' current district with a customized neutral baseline of alternative districts based on where that Plaintiff lives.  *See also LWV-Michigan*, 352 F. Supp. 3d at 795 (finding that Plaintiff-centered analysis similar to that provided by Dr. Cho "tend[ed] to establish the crucial link between gerrymandered districts . . . and the district-specific harm to each Plaintiff"); *Rucho*, 318 F. Supp. 3d at 821–22 (crediting evidence in a cracked district that "over 99 percent of the simulated districting plans," including a specific hypothetical plan "would have assigned" the plaintiff in challenged District 2 "to a more Democratic-leaning district").  For each Plaintiff, comparing the partisan composition of their current districts against the entire range of possible outcomes under the simulated maps helps identify which Plaintiffs

diluted, because of aggressive partisan efforts to configure district lines in a way that intentionally 'wastes' their votes." *Id*. (citations omitted).

live in cracked districts and which of them live in packed districts. Moreover, as Dr. Cho's

presents the entire distribution of the likely partisan composition of each Plaintiff's simulated

districts, this Court can make comparisons of the relative degree of cracking and packing for

each Plaintiff. The following summary table of the average Democratic Vote Share in each of

Plaintiffs' simulated districts facilitates such a comparison:

| District | Plaintiff | Average Democratic Vote Share in Simulated Districts (2018) | | | | Actual Democratic Vote Share in Current District (2018) |
|---|---|---|---|---|---|---|
| | | Min | Max | Mean | Median | |
| 1 | Goldenhar | 33.9% | 60.1% | 52.9% | 55.6% | 47.1% |
| 2 | Burks | 33.8% | 60.1% | 54.1% | 55.6% | 44.5% |
| 3 | Inskeep | 30.3% | 68.5% | 60.0% | 60.7% | 71.7% |
| 4 | Libster | 27.3% | 63.2% | 41.4% | 38.1% | 36.2% |
| 5 | Deitsch | 26.1% | 50.4% | 31.9% | 30.5% | 40.2% |
| 6 | Boothe | 35.4% | 49.7% | 41.6% | 39.3% | 35.7% |
| 7 | Griffiths | 38.0% | 79.7% | 50.5% | 52.3% | 39.8% |
| 8 | Nadler | 28.6% | 53.7% | 37.5% | 37.0% | 34.3% |
| 9 | Walker | 40.1% | 82.5% | 63.5% | 56.8% | 64.2% |
| 9 | Rader | 39.4% | 82.5% | 63.1% | 56.8% | 64.2% |
| 10 | Megnin | 29.1% | 50.0% | 43.5% | 43.7% | 47.6% |
| 11 | Harris | 48.1% | 82.5% | 78.7% | 79.4% | 82.0% |
| 12 | Dagres | 32.9% | 61.8% | 39.0% | 38.3% | 46.4% |
| 13 | Myer | 46.4% | 56.0% | 49.3% | 48.7% | 58.2% |
| 14 | Hutton | 46.5% | 80.3% | 49.5% | 48.9% | 47.7% |
| 15 | Thobaben | 27.3% | 51.8% | 37.3% | 36.7% | 45.8% |
| 16 | Rubin | 37.5% | 56.3% | 44.7% | 42.3% | 45.3% |

PFOF ¶ 785.[3]

For the individual Plaintiffs in packed districts (highlighted in gray), Dr. Cho's analysis

demonstrates that the high Democratic vote share in their challenged district is unusual—and in

some cases—unheard of in Dr. Cho's over 3 million simulated maps. For instance, in 2018,

while Plaintiff Inskeep's District actually voted 73.6% Democratic, the highest Democratic vote

---

[3] Dr. Cho also conducted the same Plaintiff-specific analysis in her initial report in this case based on 2008-2010 data. PFOF ¶ 784. As standing is determined based on injury that is "both real and immediate," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted), Plaintiffs only provide a numerical summary of the summary statistics from Dr. Cho's Plaintiff-specific analysis from 2018, the most recent federal election. An analogous table based on 2008-10 data can be constructed from PFOF ¶ 784; for specific summary statistics for each individual Plaintiff, *see id.* ¶¶ 317, 330, 343, 359, 368, 381, 414, 427, 455, 474, 486, 498, 522, 541, 552, 564, 580.

share in her would-be districts in Dr. Cho's simulations based on 2018 data was 68.5%. *Id.*
¶ 344. *See also id.* ¶ 785 (the same is true in Dr. Cho's simulations based on 2008-10 data).
District 3 "packs Democrats together more tightly than any" of the simulated districts. *See LWV-Michigan*, 352 F. Supp. 3d at 794.

Similarly, the summary table indicates which districts are cracked. For instance, the
cracking of Districts 1 and 2 is demonstrated clearly by the partisan composition of simulated
districts for both Plaintiffs Goldenhar (District 1) and Burks (District 2). For both Plaintiffs, the
mean and median Democratic vote share in Dr. Cho's simulated districts based on 2018 data
would have exceeded a majority. *See also* PFOF ¶ 784 (indicating that the mean and median
Democratic vote share in the simulations based on 2008-10 data would also have been close to or
exceeded 50%). Of course, none of this evidence presumes "that the Plaintiffs in these districts
have a right to elect a Democrat," rather, it "helps to show that a district is cracked." SJ Order
at 37.

Moreover, the summary table facilitates a comparison among the Plaintiffs who are in
packed and cracked districts. Compare, for instance, Plaintiff Griffiths in District 7 with Plaintiff
Nadler in District 8. Plaintiff Griffiths' simulated districts lean Democratic. *See also* PFOF
¶ 414 (the mean and median Democratic vote share in Plaintiff Griffiths' simulated districts
based on 2008-2010 data are 52.0% and 51.3% respectively). And yet in the four congressional
elections held under the current map, Democrats have won at most 43.6% of the vote in Plaintiff
Griffiths' current district. *Id.* ¶ 972. Plaintiff Hutton in District 14 is in a similar position; her
simulated districts are vitally competitive. *See also id.* ¶ 552 (the same is true for Plaintiff
Hutton's simulated districts evaluated with 2008-10 data). By contrast, the mean Democratic
vote share for Plaintiff Nadler's simulated district does not exceed 40%.

Second, Dr. Cho's analysis of partisan metrics of her simulated maps and Dr. Warshaw's analysis of the statewide partisan bias metrics of the challenged map both corroborate the Plaintiff-specific evidence of packing and cracking.  *See* SJ Order at 38 (finding that Dr. Cho's analysis of her simulated maps "supports the individual Plaintiffs' standing"); *id*. at 38–39 (noting that "Dr. Warshaw's analyses constitute statewide evidence that bolsters Dr. Cho's district-specific evidence").  That the districts were cracked and packed is evident from the fact that Dr. Cho's simulated maps exhibit far less partisan unfairness—however defined and measured—than the challenged map, PFOF ¶¶ 786–812, and that the challenged map scores poorly on partisan bias metrics meant to capture the effects of cracking of packing across the state as calculated by Dr. Warshaw, *id.* ¶¶ 722–49.

Third, Plaintiffs' Proposed Remedial Plan "lends further support to establishing the individual Plaintiffs' injuries in fact as well as the third requirement for standing—redressability."  SJ Order at 39.  While the Proposed Remedial Plan presents only one possible remedy, it "present[s] concrete examples of other possible districts in which the Plaintiffs' votes would carry more weight than they do under the current districts by unpacking and uncracking those voters."  *Id*. (citing *Gill*, 138 S. Ct. at 1931).  The Proposed Remedial Plan presents such concrete examples for Plaintiffs in both packed and cracked districts.  The following table summarizes, for each individual Plaintiff, the Democratic vote share in their current district, and the estimated Democratic vote share in their district in the Proposed Remedial Plan (the first column indicates the Plaintiffs' last name, as well as their current district ("CD") and their remedial district ("RD"); packed districts are shaded in gray):

| Plaintiff | 2012 | | 2014 | | 2016 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| | Current District | Remedial District | Current District | Remedial District | Current District | Remedial District | Current District | Remedial District |
| Goldenhar (CD1)-(RD1) | 39.5% | 48.6% | 36.7% | 44.3% | 40.7% | 48.3% | 47.8% | 57.2% |
| Burks (CD2)-( RD1) | 41.4% | 48.6% | 34.1% | 44.3% | 33.5% | 48.3% | 41.7% | 57.2% |
| Inskeep (CD3)-(RD3) | 71.4% | 67.6% | 63.6% | 58.4% | 68.2% | 63.1% | 73.6% | 68.3% |
| Libster (CD4)-(RD4) | 38.5% | 29.9% | 32.3% | 24.2% | 31.7% | 22.3% | 34.7% | 26.6% |
| Deitsch (CD5)-(RD4) | 40.6% | 29.9% | 30.4% | 24.2% | 28.8% | 22.3% | 36.1% | 26.6% |
| Boothe (CD6)-(RD6) | 46.8% | 44.4% | 39.8% | 36.6% | 29.4% | 28.6% | 30.8% | 33.0% |
| Griffiths (CD7)-(RD9) | 43.6% | 58.7% | 0.3% | 47.6% | 31.4% | 48.9% | 41.3% | 55.1% |
| Nadler (CD8)-(RD8) | 0.0% | 33.9% | 28.9% | 29.2% | 28.2% | 28.5% | 33.4% | 34.0% |
| Walker (CD9)-(RD9) | 76.0% | 58.7% | 67.7% | 47.6% | 68.6% | 48.9% | 67.8% | 55.1% |
| Rader (CD9)-(RD9) | 76.0% | 58.7% | 67.7% | 47.6% | 68.6% | 48.9% | 67.8% | 55.1% |
| Megnin (CD10)-(RD10) | 38.6% | 38.7% | 32.6% | 32.7% | 33.8% | 33.9% | 43.0% | 43.0% |
| Harris (CD11)-(RD11) | 99.7% | 85.4% | 79.2% | 81.5% | 80.3% | 81.7% | 82.3% | 83.5% |
| Dagres (CD12)-(RD12) | 36.6% | 39.0% | 29.0% | 33.2% | 31.7% | 38.4% | 47.9% | 54.3% |
| Myer (CD13)-(RD13) | 72.9% | 62.6% | 68.4% | 59.7% | 67.6% | 54.2% | 61.0% | 51.4% |
| Hutton (CD14)-(RD13) | 41.8% | 62.6% | 34.4% | 59.7% | 37.4% | 54.2% | 44.8% | 51.4% |
| Thobaben (CD15)-(RD2) | 38.6% | 30.6% | 34.1% | 25.3% | 33.7% | 25.0% | 40.5% | 31.1% |
| Rubin (CD16)-(RD14) | 48.0% | 48.8% | 36.2% | 41.5% | 35.2% | 37.5% | 43.3% | 43.8% |

PFOF ¶¶ 316, 329, 342, 367, 380, 413, 426, 454, 473, 485, 497, 521, 540, 551, 563, 579, 972.

For some of the Plaintiffs in cracked districts, the Proposed Remedial Plan would not only improve their chances of electing their candidates of choice, but would in fact likely result in the election of those candidates. For example, unifying the City of Cincinnati and keeping Hamilton County whole to the extent possible in Remedial District 1 would allow the votes of Plaintiffs Goldenhar and Burks to "carry more weight than they do under the current districts," SJ Order at 39 (citing *Gill*, 138 S. Ct. at 1931).

12

Unpacking the "Franklin County Sinkhole" not only changes the shape of District 3, but also surrounding Districts 12 and 15. Plaintiff Dagres lives in District 12 and would reside in Plaintiffs' Proposed Remedial District 12, which—due to the unpacking of neighboring District 3—would provide him with a significantly better opportunity to elect his candidates of choice.

Similarly, by disentangling the intertwined jigsaw-shaped districts in Northeast Ohio, Plaintiffs' Proposed Remedial Plan provides a concrete example of how districts that better satisfy traditional redistricting criteria also lend Plaintiffs a better opportunity to elect their candidates of choice. District 14, in which Plaintiff Hutton resides, contains slices of the two most split counties in the state (Cuyahoga and Summit) and has had a Democratic vote share between 34.4% and 44.8% of the vote. *Id.* ¶ 972. By contrast, Plaintiff Hutton's remedial district, Proposed Remedial District 13, which preserves three whole counties, would be a reliably Democratic district in which the Democratic candidate is estimated to receive between 51.4% and 62.6% of the vote.

Individual Plaintiffs have also established a **causal connection** between their concrete injuries based on the composition of their districts and the conduct complained of—the partisan drawing of congressional district lines.

Dr. Cho's simulated maps help establish causation between the district lines and the injuries Plaintiffs suffer at the district level due to discrimination on the basis of partisan affiliation, including vote dilution, as her maps are drawn explicitly without any partisan information. The outcomes occurring under her maps are those one might expect if the "conduct complained of"—partisan gerrymandering—were removed from the redistricting process. *Id.* ¶ 758. If, indeed, partisan gerrymandering had nothing to do with the sustained 12-4 outcome in the challenged map, the outcomes under Dr. Cho's maps should not be any different. Yet in fact,

they are drastically so.  A map producing a 12-4 seat share either does not occur or is exceedingly rare.  *Id.* ¶¶ 787–92.  The drastic difference in partisan composition between the challenged map and the simulations is reflected not only in each party's share of the seats, but also across a host of partisan bias metrics, including competitiveness.  *Id.* ¶¶ 793–812.  The simulations also demonstrate that the dilution of individual Plaintiffs' votes is not the result of where Plaintiffs live or the geography of the state, because all of Dr. Cho's maps are drawn based on the same demography and geography as the current map.  *Id.* ¶¶ 759–60.  Nor does any traditional redistricting criteria favored by the Ohio legislature explain individual Plaintiffs' plight, as Dr. Cho's simulations took into account the same traditional redistricting criteria to the same extent they were applied in the challenged map.  *Id.* ¶ 763.

Similarly, with regard to a single concrete example, the Proposed Remedial Plan provides further evidence that the partisan outcome of the challenged plan is a result of gerrymandering. As evidenced by the Proposed Remedial Plan, a map can be drawn in Ohio that splits fewer counties and better adheres to traditional redistricting principles than the challenged map, *id.* ¶¶ 934, 943–46, 948–52, 956–57, 972—while still yielding fairer outcomes, *id.* ¶ 937.

The test proposed by Dr. Warshaw and his conclusions based on that test further demonstrates that the challenged map has caused the constitutional injuries alleged by the Plaintiffs.  *See infra* Section III.A.1.d.  By examining not only partisan bias metrics, but also the partisan control of the redistricting process, Dr. Warshaw's test connects the conduct complained of—partisan manipulation of district lines—and the enduring partisan bias exhibited by the challenged map.

Individual Plaintiff also testified, at trial and via deposition testimony, to how the "particular composition of [their] own district" caused their votes to be diluted in packed and

cracked districts. *Gill*, 138 S. Ct. at 1931. For instance, Plaintiffs Goldenhar and Burks testified to being on different sides—literally—of the vote dilution in Hamilton County. For Plaintiff Goldenhar in District 1, her vote was diluted by "all of Warren County [mixing] with half of Hamilton Country" and portions of the city of Cincinnati. PFOF ¶ 311. Plaintiff Burks in District 2—across the "irregular" line dividing Hamilton County that looks as though it was drawn by "a third grader"—testified to the dilution of his vote through the combination of "very Democratic" portions of Hamilton County with "heavily, heavily Republican" counties to the east. *Id.* ¶ 323.[4]

Individual Plaintiffs have also demonstrated that their injuries are **redressable**. Plaintiffs seek injunctive relief that "prohibits the State from conducting future elections under the current map and, in its place, the implementation of a non-gerrymandered map that does not dilute their votes." SJ Order at 40. One such remedial map is Plaintiffs' Proposed Remedial Plan, which as described, *supra* at 11-13, improves the likelihood that Plaintiffs can elect their candidates of choice. *See* PFOF ¶ 972 (showing varying numbers of additional Democratic or competitive Democratic districts in 2012-2018 depending on the statewide vote share in those years); *see also Rucho*, 318 F. Supp. 3d at 825 (crediting evidence similar to Plaintiffs' Proposed Remedial Plan of hypothetical districts in which plaintiffs would have a better opportunity to elect their candidates of choice without violating traditional redistricting criteria and remedying the geographic division of certain counties). In addition to the Proposed Remedial Plan, millions of simulated maps generated by Dr. Cho would address the dilution of Plaintiffs' votes. *See supra* at 8-11.

---

[4] Additional testimony of district-specific injury from Plaintiffs abound. For the sake of brevity, *see also* PFOF ¶¶ 338, 349, 365, 379, 409–12, 418, 422, 447, 467, 476, 491, 500, 533-35, 537–39, 550, 560, 567.

### 2.  *First Amendment Claims*

There are at least two distinct First Amendment injuries caused by partisan gerrymandering.  First, it "*purposefully* dilut[es] the weight of certain citizens' votes to make it more difficult for them to achieve electoral success *because of* the political views they have expressed through their voting histories and party affiliations."  *Shapiro v. McManus*, 203 F. Supp. 3d 579, 595 (D. Md. 2016); *see also Rucho*, 318 F. Supp. 3d at 829; *Benisek*, 348 F. Supp. 3d at 514.  As detailed above, at least one Plaintiff in each District has adequately alleged such dilutionary injuries and adduced facts demonstrating their standing for this sort of claim.  *See* SJ Order at 41.

The individual Plaintiffs have also demonstrated standing to pursue their "distinct," non-dilutionary First Amendment injuries.  *Gill*, 138 S. Ct. at 1939; *Rucho*, 318 F. Supp. 3d at 829; *see also* SJ Order at 41.  This distinct associational injury occurs where "the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects."  *Gill*, 138 S. Ct. at 1939.  Plaintiffs establish standing for this claim by (1) pointing to "evidence of their membership in and activities supporting the Democratic Party" and by (2) demonstrating that the challenged congressional map "weakened their party's ability to carry out its core functions and purposes."  SJ Order at 41.

Each of the individual Plaintiffs self-identifies as a Democrat or a Democratic voter, and votes to support Democrats for Congress, as well as for other elective offices.  PFOF ¶¶ 308–09, 319, 333, 348, 362, 372, 384, 387-88, 417, 431, 477, 490, 506, 528, 539, 544, 555, 572.  The gerrymander in Ohio has thus "ravaged the party [they] work to support."  *Gill*, 138 S. Ct. at 1938.  Plaintiffs have demonstrated that the gerrymandered congressional districts have weakened their ability to carry out the "core functions and purposes" of the Democratic Party.

Plaintiffs, as "[m]embers of the 'disfavored party' in the State," have been "deprived of their natural political strength by a partisan gerrymander," as tangibly demonstrated by the specific burdens on their associational rights, including "difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Id.*

The individual Plaintiffs testified to "numerous examples" of how the challenged map burdens their "ability to engage in a variety of political activities—from voter apathy disrupting the party's mobilization and candidate recruitment efforts, to decreased fundraising, to both a general decline in political activity in districts (such as candidates not appearing at forums) and an inability to meaningfully influence representatives because the election results are essentially predetermined." SJ Order at 42; PFOF ¶¶ 312, 324–27, 339–41, 351–54, 356, 364–65, 374–76, 398–99, 405–09, 421–25, 450–53, 479, 481–83, 496, 512–19, 529–32, 534–36, 547, 550, 557–59, 573–76. Many of the individual Plaintiffs canvass on behalf of Democratic candidates and their ability to mobilize voters and potential supporters is severely burdened by the congressional map. *See generally* PFOF ¶¶ 307–578. For example, Plaintiff Burks testified to his experience canvassing and the frustration of encountering people who would not even vote: even those who seemed to support the Democratic candidate would not get involved. *Id.* ¶ 325. Plaintiffs' ability to engage other Ohio citizens, including ones who would otherwise support Democratic candidates, is impaired because the congressional map caused such individuals to think that their vote did not matter. In District 3, for example, the congressional map has caused there to be "less political activity and investment" in the District, and Plaintiff Inskeep has encountered apathetic voters in her electoral activities who will not get involved. *Id.* ¶¶ 339, 341. In District 8, through his personal experience canvassing, Plaintiff Nadler's efforts at gaining support are

stymied as people "feel that it's not worth their time" because "it's not going to make any difference." *Id.* ¶ 421.  Due to the congressional district lines, individual Plaintiffs have faced difficulty attracting others to their cause and generating support from potential voters.  *Gill*, 138 S. Ct. at 1938.  Plaintiffs across each of the districts testified about the way in which the map impairs their ability to attract support to their party and candidates.  *See, e.g.*, PFOF ¶ 364 (Plaintiff Deitsch testifying that when she knocks on doors, voters believe "it doesn't make any difference who I vote for, they're not going to win or I'm not going to give you money because they're not going to win"); *see also, e.g.*, *id.* ¶¶ 312 (Goldenhar); 324-26 (Burks); 339–40 (Inskeep); 351-53 (Libster); 364-65 (Deitsch); 374 (Boothe); 406-08 (Griffiths); 421–22 (Nadler); 450–453 (Rader); 468, 470-72 (Walker); 479 (Megnin); 496 (Harris); 516–17 (Dagres); 531–32 (Myer); 550 (Hutton); 558–59 (Thobaben); 574–75 (Rubin).

Difficulty "recruiting candidates to run for office" is yet another cognizable First Amendment associational injury borne by members of the "disfavored party," *Gill*, 138 S. Ct. at 1938, experienced by Plaintiffs.  PFOF ¶¶ 480, 518–19, 576.  For example, the way the districts are constructed under the challenged plan has been a "huge hindrance" to Plaintiff Dagres's efforts to recruit candidates to run for Congress as a Democrat.  *Id.* ¶ 519.  He testified that he has tried to recruit candidates to run for office, but "when a map is so designed for a predetermined outcome, it's very difficult to get somebody to say, Yeah, I'm willing to do that, to sacrifice my time from my career, my time from my family, my own personal money, knowing that I am not going to win."  *Id.*

Likewise, "difficulties fundraising" caused by the gerrymandered map is yet another burden on Plaintiffs' associational rights.  *Gill*, 138 S. Ct. at 1938.  Here, the map has inhibited individual Plaintiffs' ability to raise money for Democratic candidates.  PFOF ¶¶ 351–52, 452,

518, 576.  For example, Plaintiff Rader testified to the difficulty of raising funds for Democratic congressional candidate Keith Mundy in the 16th District.  *Id.* ¶ 452.

All of these non-dilutionary harms constitute cognizable First Amendment injuries.  *See Gill*, 138 S. Ct. at 1938-39; *Anderson*, 460 U.S. at 792–94.  And each of the Plaintiffs has consistently testified to the fact that the design of the congressional map and the specific district lines at issue caused the burden on their constitutional rights.  *See, e.g.*, PFOF ¶¶ 312, 323–34, 339, 341, 351–54, 364, 374, 408–12, 421, 425, 448–52, 468–71, 478–79, 491, 495–96, 516–18, 527, 537, 550, 557–59, 574.  As such, each of the individual Plaintiffs has demonstrated a cognizable First Amendment injury fairly traceable to the challenged congressional map, both for the dilutionary harm at the district level and for the other non-dilutionary harms locally and statewide.

Plaintiffs' First Amendment injury is redressable because "a judicial decree can provide 'prospective relief' that will 'remove the harm.'"  *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018).  "Redress is sought *through* the court, but *from* the defendant."  *Id.* (citation omitted). Plaintiffs do not only seek a judgment, but also the entry of a new congressional map for the 2020 elections.  If this Court orders a new congressional map, this will clearly redress the injuries suffered by the Plaintiffs.  *See* SJ Order at 40–43.

Plaintiffs, of course, are not guaranteed a particular outcome when they cast their votes or try to associate with likeminded voters.  And this is not the redress Plaintiffs now seek.  Where, as here, "the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the [disadvantaged] group . . . need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The 'injury in fact' in an equal protection case [or a First Amendment case]

. . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of AGC of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993). Likewise, the relief sought is not the guarantee of obtaining the benefit, it is the equal treatment resulting from removing the improper barrier.

### 3. Article I

This Court has now twice applied the same standing analysis to Plaintiffs' Article I claim as to Plaintiffs' First Amendment claim. *See* SJ Order at 44; *Ohio A. Philip Randolph Inst. v. Smith*, 335 F. Supp. 3d 988, 1001 (S.D. Ohio 2018). As Plaintiffs have established standing for their First Amendment claims as detailed above in Section II.A.2 for the individual Plaintiffs, and below in Section II.B.2 for the organizational Plaintiffs, Plaintiffs do not restate those arguments with respect to their Article I claim.

### B. Organizational Plaintiffs Have Standing to Pursue Their Fourteenth Amendment, First Amendment, and Article I Claims.

An organization has standing in its own right when it proves the same facts as an individual: "(1) an injury in fact; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) that the requested relief will redress the injury." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013). An organization suffers an injury in fact when its mission is "perceptibly impaired" by the challenged action, which it may show through a "demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 462 (6th Cir. 2014). And an organization has standing on behalf of its members when: "(1) the organization's 'members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither

20

the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 967 (6th Cir. 2009) (citation omitted).

### 1. Equal Protection Claims

Organizational Plaintiffs have demonstrated associational standing for their vote dilution claim. Each of the organizational Plaintiffs has members who have standing in their own right to challenge the district in which they reside. The Ohio A. Philip Randolph Institute ("APRI") has members living in nearly every congressional district throughout the state, PFOF ¶ 584, and the League of Women Voters of Ohio ("the League") has members who live in all 16 of Ohio's congressional districts, *id.* ¶ 621. And the Hamilton County Young Democrats ("HCYD"), the Northeast Ohio Young Black Democrats ("NEOYBD"),and The Ohio State University College Democrats ("OSU College Democrats") have members living in each of the congressional districts in the areas where they are based. *Id.* ¶ 655 (HCYD's members are in Districts 1 and 2); *id.* ¶ 674 (NEOYBD's members are in Districts 9, 11, 13, and14); *id.* ¶ 690 (OSU College Democrats' members are in Districts 3, 12 and 15).

The district-specific injuries experienced by the members of the organizational Plaintiffs resemble those already articulated for Individual Plaintiffs. *See supra* Section II.A.1; *see also* PFOF ¶¶ 600–01 (testimony of Mr. Washington, President of APRI, that his vote is diluted in his district, District 12); *compare id.* ¶¶ 665–69 *with id.* ¶¶ 322–23 (Mr. Simon, outgoing president of the HCYD, lives in the District 2 side of Hamilton County, articulating similar vote dilution injuries as Plaintiff Burks, who also resides on the same side of the dividing line cutting through Hamilton County). The standing analysis, as detailed above for individual Plaintiffs above, likewise applies to the organizational plaintiffs.

In addition to demonstrating that APRI and the League have identified members in every congressional district experiencing harm, an additional member from each organization respectively—Stephanie White and John Fitzpatrick—personally demonstrated standing in their districts.  Ms. White resides in District 5 and has voted in every congressional election held under the map.  *Id.* ¶ 604.  She resides close to Toledo and is the vice president of APRI's Toledo chapter—but does not share a district with Toledo, which is in District 9.  *Id.* ¶ 603. Instead, the "predominantly Democratic" area where she resides in Lucas County is placed alongside "parts of the Fulton County, Defiance, Williams County area, which is predominantly [a] Republican area."  *Id.* ¶ 608.  The composition of Ms. White's Proposed Remedial District highlights her standing to challenge her current district: Proposed Remedial District 5 includes the entirety of Lucas County, bringing her into the same district as Toledo, along with the adjoining counties, which are kept whole to the extent possible.  *Id.* ¶¶ 616, 935.  After undoing the Snake on the Lake, Proposed Remedial District 5 finally provides Ms. White with an opportunity to elect her candidate of choice.  *Id.* ¶ 972.

Mr. Fitzpatrick resides in District 14 and has voted in every congressional election held under the map.  *Id.* ¶¶ 633, 639.  He resides in a suburb of Akron—and is the treasurer for and a member of the Akron Area Chapter of the League—but does not share a district with Akron, which is split across Districts 11, 13, and 16.  *Id.* at ¶ 642.  Indeed, his county (Summit) is split across 4 congressional districts.  *Id.*  The composition of Mr. Fitzpatrick's Proposed Remedial District most starkly demonstrates his standing to challenge his district: the entirety of Summit County is the core of Proposed Remedial District 16, in which Mr. Fitzpatrick would vote along with his neighbors in Akron and the rest of his county.  *Id.* ¶¶ 650, 935, 941.  Keeping Summit

22

County whole, as opposed to fracturing it four ways, results in a district that reliably leans Democratic. *Id.* ¶ 972.

Finally, members of HCYD, NEOYBD, and OSU College Democrats have voted for Democratic candidates in congressional elections under the challenged map. *Id.* ¶¶ 655, 674, 688–90. The same standing analysis detailed above for individual Plaintiffs who live in the same districts as members of HCYD, NEOYBD, and OSU College Democrats applies for these organizations' associational standing. *See, e.g.*, *supra* at 12 (noting that Remedial District 1, encompassing the entirety of Cincinnati and the vast majority of Hamilton County, would give Plaintiffs Goldenhar and Burks—and members of HCYD—a consistent opportunity to elect their candidates of choice); *id.* at 12–13 (noting that Remedial District 12 is estimated to give Plaintiff Dagres—and OSU College Democrats living in the same area—a robust chance of electing their candidate of choice based on 2018 data); *id.* 12–13, 20 (noting that Remedial Districts 13 and 16 in Northeast Ohio would give Plaintiffs Hutton and Mr. Fitzpatrick—and members of NEOYBD—a consistent opportunity to elect their candidates of choice).

### 2. *First Amendment Claims*[5]

#### a) Organizational Plaintiffs have standing in their own right.

Plaintiff organizations APRI, LWVO, NEOYBD, OSU College Democrats, and HCYD each suffer associational injuries attributable to the challenged congressional map. The President or Executive Director of each organization testified to the particular burdens on their organization caused by the congressional map. Considering the testimony of each organization in turn demonstrates that they all have proven that the congressional map burdens their

---

[5] Plaintiffs do not restate their Article I standing arguments with respect to the organizational Plaintiffs for the reasons already discussed. *See supra* Section II.A.3.

associational rights by making it more difficult to engage voters, requiring the organizations to use additional resources, and impairing the efficacy of their work.

APRI engages in voter education, voter registration, civic engagement, voter outreach, and encouraging people to vote. PFOF ¶ 587. The congressional map impedes APRI's work and requires it to divert resources from its other efforts by making it more difficult to engage voters through its education, registration, and outreach efforts, and by deterring and discouraging its members and other Ohio voters from engaging in the political process. *Id.* ¶ 588. The President of APRI, Andre Washington, testified that the gerrymandered congressional map causes APRI to divert resources by causing it to "spend too much time trying to convince people to be part of the process, and instead of spending our limited resources that we have to register them." *Id.* ¶ 591. The congressional map also causes voter confusion and apathy, requiring APRI to spend time and resources to address these issues, diverting resources from voter registration activities. *Id.* ¶¶ 593–94. Accordingly, APRI has established that the challenged map burdens its own mission. *See Rucho*, 318 F. Supp. 3d at 831.

The League's mission is to "empower voters and . . . defend democracy," in other words, "working to ensure that democracy works for every Ohio voter." PFOF ¶ 618. The challenged map diverts the League's resources by making the organization "work a lot harder to do what [it] need[s] to do, to meet [its] mission." *Id.* ¶ 628. If the League didn't "have to spend so much time" working against the confusion and apathy the map produces, it could "be in more schools" educating students," "do more forums," "improve [its] voter guide," and fulfill its mission by "making sure that voters are not just . . . participating, but are participating in a fully informed and engaged way." *Id.* ¶ 632.

The confusion and apathy caused by the challenged congressional map burdens the League's key mission. *Id.* ¶ 629–31. The voter apathy caused when people feel that their votes do not count makes it harder for the League to perform its work getting out the vote. *Id.* ¶ 631. And because candidates are secure in their prospect of re-election, they do not appear at League forums, thus further stymieing the League's ability to offer voters the opportunity to interact with candidates for office. *Id.* ¶¶ 356, 547. Nearly identical injuries were found to establish standing for the League of Women Voters of North Carolina following trial, *Rucho*, 318 F. Supp. 3d at 381, and so too here, the LWVO has established that the Ohio congressional map burdens its own mission.

The three other organizational Plaintiffs are expressly Democratic organizations. These "related organizations" feel the associational injuries that impact individual Democrats "triply," *Gill*, 138 S. Ct. at 1938, thus the standing analysis, as detailed for individual Plaintiffs above, likewise applies to these related Democratic Party organizations. NEOYBD is burdened by the congressional map which makes it more difficult to get out the vote and to keep Democratic voters engaged. PFOF ¶ 680. President of NEOYBD, Gabrielle Jackson, testified about the organization's difficulty in engaging and turning out voters in Lake County. *Id.* Ms. Jackson also testified that the voter apathy caused by the map makes it more difficult for NEOYBD to fundraise and to get members actively involved with the organization. *Id.* ¶¶ 682–83.

So too, the OSU College Democrats' own associational rights are burdened by the congressional map. The area containing OSU's campus and surrounding off campus housing is split among three congressional districts. The way the lines are drawn burdens OSU College Democrats and its members by creating confusion regarding in which district someone lives. *Id.* ¶ 698. This voter confusion causes young voters to become frustrated and less likely to be or

remain engaged with the OSU College Democrats.  *Id.* ¶ 699.  This was illustrated in the summer of 2018 during the Special Election in District 12.  Many individuals who engage with OSU College Democrats were confused about whether they were supposed to vote in the Special Election, and OSU College Democrats had to expend volunteer resources to engage with these voters, instead of on Get Out the Vote activity directed only at the Twelfth District.  *Id.* ¶ 700.  The locked-up nature of the congressional map causes members of the OSU community to believe that their votes do not matter and to become apathetic.  *Id.* ¶ 701.  In 2018, OSU College Democrats focused their resources on the Danny O'Connor campaign, in both the Special Election and the November 2018 General Election.  *Id.* ¶ 704.  Mr. O'Connor did not win the November 2018 election despite a huge shift for the Democratic candidate.  *Id.* ¶ 705.  Their efforts could not overcome the map.  *Cf. id.* ¶ 520.

Finally, in the experience of HCYD, the way the lines are drawn causes young voters to be apathetic about voting and confused about their district.  Mr. Simon testified that the congressional district lines cause "a lot of confusion," which causes HCYD to have "to spend extra time and energy educating [its] members and public about which district they live in."  *Id.* ¶ 658.  Specifically, the confusion caused by "Congressional District 1 and Congressional District 2 wrapping around each other," and the "city of Cincinnati [being] split between the two districts," has burdened HCYD with respect to voter education.  *Id.* ¶ 662.  Furthermore, people that HCYD "interacted with refused to get involved because of how the district lines were drawn, knowing that the map favors Republicans and disfavors Democrats."  *Id.* ¶ 660.  Mr. Simon testified regarding the burdens caused by the congressional map as related to volunteer recruitment, member and supporter engagement, fundraising, diversion of the organization's

resources, and their "inability meaningfully to influence representatives because the election results are essentially predetermined," SJ Order at 42.  PFOF ¶¶ 658–64, 668.

Each of the organizational Plaintiffs testified to the way their particular injuries flow from the challenged congressional map. *Id.* ¶¶ 588, 591–95, 628–30, 658–64, 666–68, 680, 682, 695–99.  While the injuries to each organization are different in their details, they are all traceable to the congressional map.  For example, NEOYBD, OSU College Democrats, and HCYD all work in different parts of the state, but each testified to how the particular district lines in the areas in which they operate burden that organization's associational rights. *Id.* ¶¶ 659, 662–63, 666–68, 680, 682, 684, 695–99.  As APRI and LWVO are statewide organizations, they were able to testify to the overarching impacts of the congressional plan, including widespread voter confusion caused by the district lines and resource diversion to overcome the map's impacts. *Id.* ¶¶ 593–94, 630.

As with the individual Plaintiffs, the organizational Plaintiffs have identified numerous injuries that would be redressed if a new congressional map is ordered.  For example, the rational, voter friendly lines of Plaintiffs' Proposed Remedial Plan would directly redress the harms caused by widespread voter confusion as testified to by each of the organizational Plaintiffs. *See id.* ¶¶ 593–95, 630, 658, 662–63, 683–84, 698–700.  Where, as here, there is a "drain on an organization's resources," this is a concrete injury, fairly traceable to the challenged conduct. *Miami Valley*, 725 F.3d at 576–77.  Each of the Plaintiff organizations has testified to how the congressional map itself caused such a drain and therefore, if a new map is ordered, so too will this diversion be relieved.

        b) Organizational Plaintiffs have associational standing on behalf of their members.

Each of the organizational Plaintiffs is a membership organization. PFOF ¶¶ 584, 621, 651, 653, 674, 688. And each of the organizational Plaintiffs has members who are Democrats. *Id.* ¶¶ 596, 628, 655, 674, 687. As amply detailed above, Democratic voters throughout Ohio have their First Amendment associational rights burdened by the congressional map, and have standing in their own right to pursue these claims. *See supra* Section II.A.2. The interests of Democratic voters as Democrats are central to the missions of NEOYBD, OSU College Democrats, and HCYD. *Id.* ¶¶ 651, 655, 673, 686. And the interest in voter engagement and fair district lines is central to the missions of APRI and LWVO. *Id.* ¶¶ 587, 618. Finally, the claims asserted and the relief requested does not require the participation of individual members in the present lawsuit, and Defendants and Intervenors have never attempted to argue otherwise.

For example, as President of APRI, Mr. Washington is also a member of the organization. He testified that when he is knocking doors in his home District 12, "people are not excited about voting. They feel like their vote doesn't matter or doesn't count. And it makes my job harder when I'm trying to do civil engagement and trying to empower the people to get out and vote." *Id.* ¶ 592. This voter apathy impairs Mr. Washington's personal ability to associate with voters in Ohio. *See also id.* ¶¶ 613–15 (APRI member encountering difficulties in carrying out voter engagement activities both on behalf of APRI and her union); *id.* ¶¶ 647–49 (League member Mr. Fitzpatrick encountering voter confusion, apathy and frustration in his voter engagement work); *id.* ¶¶ 658–62, 666–68 (Mr. Simon, a member of HCYD, observing the same in Districts 1 and 2 and testifying to efforts to seek constituent services for residents of Hamilton County that are routinely ignored by Congressmen Chabot and Wenstrup); *id.* ¶¶ 680,

684 (President of NEOYBD, Ms. Jackson, experiencing similar burdens on her associational rights); *id*. ¶¶ 700–02 (same for the members of OSU College Democrats).

The injuries experienced by the members of the Plaintiff organizations are precisely the type of non-dilutionary cognizable First Amendment injuries recognized by the Supreme Court. *Anderson*, 460 U.S. at 792. Just as for the individual Plaintiffs, *see supra* Section II.A.2, these injuries to the individual members of the organizational Plaintiffs would be remedied by this Court ordering a new congressional map. These associational interests lie at the heart of the mission of each of the Plaintiff organizations. PFOF ¶¶ 586–87, 618, 651, 672, 686. And the claims asserted and the relief requested does not require the participation of individual members in the present lawsuit, and Defendants and Intervenors have never attempted to argue otherwise. For all of these reasons, each of the organizational Plaintiffs has associational standing to pursue their claims in this case.

### III. DEFENDANTS HAVE VIOLATED THE CONSTITUTION BY GERRYMANDERING OHIO'S CONGRESSIONAL MAP.

#### A. Plaintiffs Have Suffered Discrimination on the Basis of Their Partisan Affiliation in Violation of the Equal Protection Clause.

Ohio has violated Plaintiffs' rights under the Equal Protection Clause. Courts have long held that a "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Obama for Am.*, 697 F.3d at 428 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). "If [district lines] serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection." *Karcher v. Daggett*, 462 U.S. 725, 748 (1983). "Partisan gerrymandering runs afoul of the Equal Protection Clause because, by seeking to diminish the electoral power of supporters of a disfavored party, a

partisan gerrymander treats individuals who support candidates of one political party less favorably than individuals who support candidates of another party." *Rucho*, 318 F. Supp. 3d at 860–61.

Plaintiffs have established that Defendants' actions violated the three-prong test for Equal Protection violations identified by this Court and applied by other federal courts in reviewing partisan gerrymandering claims.  SJ Order at 10; *LWV-Michigan*, 352 F. Supp. 3d at 803–04 (describing the three-part test for partisan gerrymandering claims under the Equal Protection Clause); *see also Rucho*, 318 F. Supp. 3d at 838 (discussing justiciability and equal protection claims); *Whitford*, 218 F. Supp. 3d at 884 (finding that plaintiffs could bring a partisan gerrymandering claim under the Equal Protection Clause).  First, the Defendants acted with an improper *intent* to discriminate in favor of their preferred political party by securing partisan advantage on its behalf.  The intent to discriminate was a predominant factor[6] in the drawing of the challenged map.  Second, Plaintiffs have shown that the resulting map had an impermissible *effect* of entrenching Republican partisan advantage against likely changes in voter preference. The evidence supports a finding of discriminatory intent and discriminatory effect at both a district and statewide level.[7]  Defendants have not met their burden of establishing that the map was necessary to achieve legitimate nondiscriminatory interests.

---

[6] For reasons presented in their Opposition to the Motion for Summary Judgment at 9-20, ECF No. 177, Plaintiffs do not advocate that a predominant purpose standard be adopted by this Court; instead, Plaintiffs advocate for a motivating factor standard.  Nevertheless, consistent with the Court's direction in its order denying summary judgment, SJ Order at 10, Plaintiffs have proven that "partisanship was the predominant factor considered when the districts were drawn" which likewise meets the motivating factor test.  *See also infra* note 8.

[7] As a threshold matter, this Court has already held that both district-specific and statewide evidence are relevant to Plaintiffs' Fourteenth Amendment claims and that statewide evidence can be brought to bear to "support a district-specific harm."  SJ Order at 20-21.  This is wholly consistent with the other courts that have considered partisan gerrymandering cases, *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 868 (M.D.N.C. 2018) ("Plaintiffs can—and do—rely on statewide evidence to prove their partisan vote dilution claims"), and with Supreme Court precedent in other areas where courts use statewide evidence

### 1. *Defendants acted with a discriminatory intent.*

At trial, Plaintiffs proved that Defendants acted with discriminatory intent. Defendants'

actions meet both the motivating factor test and the predominance test.[8] The intent to secure

partisan advantage can be established through direct and circumstantial evidence. There are

several types of evidence that courts typically examine when determining whether defendants

have acted with discriminatory purpose. These types of evidence include but are not limited to:

contemporaneous statements, use of demographic data, sequence of events leading up to the

challenged decision, and expert evidence suggesting discriminatory intent. *See* SJ Order at 21–

25. The evidence proffered by Plaintiffs at trial proves that Ohio's congressional map was drawn

with an intent to entrench a Republican majority.

---

to support district specific claims, *see, e.g.*, *Ala. Leg. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) ("Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district."). This finding also is consistent with Justice Kagan's opinion in *Gill*. *Gill v. Whitford*, 138 S. Ct. 1916, 1937 (2018) (Kagan, J., concurring) (stating that the district court "can consider statewide (as well as local) evidence" in deciding the equal protection claim).

[8] Following this Court's direction in its Order denying summary judgment, Plaintiffs have proven facts sufficient to meet both the motivating factor and predominant purpose tests for judging discriminatory intent. In *LWV-Michigan* and *Rucho*, the courts adopted the predominant purpose test for the intent prong. *League of Women Voters of Michigan v. Johnson*, 352 F. Supp. 3d 777, 804 (E.D. Mich. 2018) (quoting *Rucho*, 318 F. Supp. 3d at 852). As the court in *Rucho* noted, there are precedential reasons not to adopt the predominance test. The Supreme Court in *Bandemer* did not require predominant purpose to establish a partisan gerrymandering case. *Rucho*, 318 F. Supp. 3d at 863 (noting that in *Bandemer*, the Supreme Court "required proof of 'intentional discrimination against an identifiable political group'" and not predominance (quoting *Davis v. Bandemer*, 478 U.S. 109, 127 (1986))). Also, predominance is not required under the *Arlington Heights*-line of equal protection cases. *Id.* ("[T]he Supreme Court held that a plaintiff generally need not prove that a legislature took a challenged action with the 'sole,' 'dominant,' or 'primary' purpose of discriminating against an identifiable group" (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66) (1977)). Last, the predominance standard comes from racial gerrymandering cases and the Supreme Court has found these cases to be analytically distinct from vote dilution claims. *Id.* ("[T]he Supreme Court expressly has characterized *Shaw*-type racial gerrymandering claims as 'analytically [distinct]' from a vote dilution claim." (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). For these reasons, Plaintiffs continue to assert that predominance should not be required.

a) The sequence of events shows discriminatory intent.

"'The specific sequence of events leading up to the challenged decision . . . may shed some light on the decisionmaker's purposes,' including whether the legislative process involved '[d]epartures from the normal procedural sequence.'" *Rucho*, 318 F. Supp. 3d at 862 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Cooper v. Harris*, 137 S. Ct. 1455, 1469 (2017) (relying on evidence of procedural irregularities in affirming the district court's conclusion regarding the mapmaker's intent—specifically, that the mapmaker "deviated from the districting practices he otherwise would have followed" to carry out legislators' instructions).

The sequence of events leading up to the enactment of H.B. 369 suggests that the intent was to entrench a Republican majority. Work began on Ohio's map early and long before it became public. The work was done by a combination of in-state Republican operatives and national Republican actors, despite there being no official role for national Republicans in the districting process in Ohio.

Even prior to winning the majority in Ohio's House of Representatives in 2010, Ohio Republicans began planning for the redistricting cycle. In May 2010, Michael Lenzo, the Chief Counsel to the Republican caucus in the Ohio House of Representatives attended a Republican National Committee ("RNC") conference. PFOF ¶¶ 22–32. There, he and other Ohio Republicans, including Troy Judy, Chief of Staff to Speaker of the Ohio House, connected with the key national Republican experts who later collaborated on Ohio's congressional map. *Id.* ¶ 24. These experts included Mark Braden, former General Counsel of the RNC, Thomas Hofeller, the RNC's redistricting specialist, and John Morgan, a Republican map-drawing expert. *Id.* Lenzo attended a presentation given by Morgan where he received guidance on keeping the map drawing process from outside scrutiny. *Id.* ¶ 25. The first substantive slide of that

presentation advised map drawers to "keep it secret, keep it safe." *Id*. The presentation described specific steps to achieve this goal, such as "controlled access to [the map-drawing] location (a door with a key)" and password protected machines. *Id*. ¶ 26. Morgan was then brought to Ohio to give the presentation to individuals who would later be involved in Ohio's map drawing process. *Id*. ¶ 27. Hofeller was also brought to Ohio to give guidance to the map drawers, and he remained involved throughout the Ohio map drawing process. *Id*. ¶ 30–32.

Following the 2010 election, Republicans won control of a majority of seats in the Ohio House of Representatives, a supermajority of seats in the Ohio Senate, and the Ohio governorship. *Id.* ¶ 19. This meant that Republicans had complete control of the redistricting process, and they exercised it. *Id.* ¶¶ 20–21. Almost immediately after the release of the 2010 Census data in March 2011, Republicans began discussing options for preserving their gains from the 2010 election. *Id.* ¶ 108. National Republicans and Ohio Republicans coalesced around the idea of creating a map that would guarantee Republicans 12 congressional seats (a "12-4" map). *Id.* ¶ 109. Under a 12-4 map, one Republican incumbent and one Democrat incumbent would lose their seats, but Republicans' eight-seat advantage would be preserved. *Id.*

The collaborative nature of the map drawing process, in which national Republicans regularly took the pen from the state map drawers, highlights the irregular sequence of events leading up to Ohio's 2011 congressional map. National Republicans began working on redistricting in Ohio in early 2011, well before the state legislative process began. *Id.* ¶ 67. The state legislative work on the map began in earnest in summer 2011. Work was conducted by Ray DiRossi and Heather Mann. DiRossi and Mann were private consultants, with a long history in Ohio's Republican politics, hired to prepare draft maps specifically for the Republican caucus. *Id.* ¶¶ 77, 79. However, they did not work on the map by themselves. In addition to getting

input from Republicans in Ohio's General Assembly, they received advice, assistance, and direction from national Republican operatives, including Morgan, Adam Kincaid, and Hofeller. *Id.* ¶¶ 88, 163–203. Also, then-Speaker of the U.S. House of Representatives John Boehner and his designee Tom Whatman, communicated their specific objectives to Mann, DiRossi, and the leadership of the Ohio legislature. *Id.* ¶¶ 59, 64-68.

DiRossi and Mann began actively planning for congressional redistricting, including renting a hotel room to conduct their work, in the summer 2011, prior to the commencement of their consultancy agreements. *Id.* ¶ 78. Beginning in July 2011, the redistricting operations were based out of a rented hotel room at the DoubleTree Hotel in Columbus, Ohio. *Id.* ¶ 75. The room was nicknamed "the bunker" by the map drawers, and access was restricted to Mann, DiRossi, Judy, and their Republican invitees. *Id.* ¶¶ 75–76, 84, 86. It is in the "bunker" where the first version of the map, passed as H.B. 319 was drawn.[9] *Id.* ¶ 87. Throughout the map-drawing process, Republican lawmakers were invited to come to the bunker to attend meetings where drafts of the map and the accompanying political data were shared. *Id.* ¶¶ 88–95.

Draft proposals for a 12-4 map were already circulating among the Republicans in July 2011. *Id.* ¶¶ 121-24. By July 2011, national Republican operative Kincaid had already drafted spread sheets that analyzed the political leanings of congressional districts. *Id.* ¶ 111. The proposal showed twelve Republican districts. *Id.* One of the key components of the proposals circulated was the "Franklin County Sinkhole." *Id.* ¶ 124. Whatman was the first to conceive of the proposal, and Kincaid implemented it in Maptitude. *Id.* ¶¶ 122, 124. In other words, the centerpiece of the map was conceived of and designed by national Republicans. Whatman began

---

[9] The bunker was only used in the drawing of H.B. 319. However, since there were only minor changes from H.B. 319 to H.B. 369, PFOF ¶ 262–70, the lion's share of Ohio's enacted map was drawn in the bunker.

drafting the plan with Kincaid no later than July 2011. *Id*. ¶ 124. The plan involved creating a new, packed Democratic district in Franklin County, which would result in the adjacent 12th and 15th Districts becoming reliably more Republican. *Id*. ¶¶ 121–162. The partisan effect of the Franklin County Sinkhole was meticulously poured over in a series of emails and spreadsheets. *Id*. ¶¶ 121–162.

Although there were five public hearings held by Ohio's Senate Select Committee on Redistricting and Ohio's House Committee on Redistricting, none of them addressed the substance of the maps that the Republicans were drawing. *Id*. ¶ 226. These hearings were held in July and August 2011, after work on draft maps had begun in the bunker. *Id*. No maps were considered at these public hearings. *Id*. Nor were any maps or indices even available at the hearings. *Id*. Further, the committees had no duties beyond taking testimony at these hearings. *Id*.

Draft maps and proposals continued to be circulated among the Republicans in early September 2011, prior to the introduction of H.B. 319. Kincaid, Whatman, DiRossi, Mann, and Hofeller were all involved with either drafting proposals or making suggestions that were incorporated into proposals. *Id*. ¶¶ 125–136, 138–152, 154. Draft maps were consistently accompanied by spreadsheets with the partisan scorings or indices for the proposals. *Id*.

A series of emails exchanged among national Republicans (including Whatman and Kincaid) and those state legislators and staff members who were involved in the map drawing process in Ohio (including DiRossi, Mann, Ohio Senate President Thomas Niehaus, and other leaders of the Ohio Senate and House) in the days leading up to the introduction of H.B. 319 are especially strong evidence of the overriding power national Republicans held in drawing the challenged map. *Id*. ¶¶ 163–203. In those emails, the national Republicans were asked to

approve or disapprove of last-minute proposed changes to the map.  *Id.*  It was clear that national

Republicans held power in the drafting process.  For example, DiRossi emailed Senator Keith

Faber, President pro tempore of the Ohio Senate, on September 10, 2011, after Faber attempted

to make changes to the map that "DC is increasingly pushing to put the lid on this."  *Id.* ¶¶ 165–

66.  By writing that "DC is increasingly pushing to put the lid on this," DiRossi meant to convey

pressure "to get a map proposed and enacted."  *Id.* ¶ 167.  On September 11, 2011, President

Niehaus wrote to Whatman and DiRossi that he was "still committed to ending up with a map

that Speaker Boehner fully supports, with or without the votes from two members of leadership."

*Id.* ¶ 169.  There can be no doubt based on the email correspondence that national Republicans

held enormous power in the shape of Ohio's congressional map.  Whatman requested and

obtained changes to the map as late as the night before the map was to be introduced to the

General Assembly.  *Id.* ¶¶ 195–203.

Indeed, throughout the process, the national Republicans did not merely delegate the

implementation of their wishes to the Ohio Republicans.  *Id.* ¶ 163–203.  Sometimes, they seized

the pen, redrafted maps themselves, and made changes that were then adopted by the Ohio map

drawers.  *Id.*

Consideration of the effect of any changes on political scorings was central to the

consideration of any and all proposed changes.  *Id.* ¶ 163.  Changes of even less than one percent

were run past the national Republicans for their sign off.  *Id.* ¶ 163.  For example, DiRossi was

careful to share with Whatman changes to the political indices of the 15th and 2nd Districts that

shifted less than one percentage point.  *Id.* ¶ 192.

Drafts of the map were held "in the can" and not made public until September 13, 2011.

*Id.* ¶ 238.  Members of the General Assembly—even Republican members—were largely kept in

the dark about the content of the maps until the end of the process. *Id.* ¶¶ 240–42. The proposed map was not shared with the Democrats until it was introduced in committee. *Id.* ¶ 238. There were no negotiations between Democrats and Republicans regarding H.B. 319. *Id.* ¶ 239. The Democratic Minority Leader in the Ohio House, Armond Budish stated that "the map was drawn by Republicans in secret behind closed doors with no meaningful input whatsoever from members of the public, and now the map is being rammed through the House in just a couple of days in order to prevent any meaningful input from anyone else. . . ." *Id.* ¶ 240. Other Democrats also complained about how the map was introduced, with a vote scheduled only two days after the map was introduced. *Id.* ¶ 241.

The creation and passage of H.B. 369 shared many of the same procedural irregularities as H.B. 319. *Id.* ¶¶ 266–70. Like H.B. 319, H.B. 369 was drawn by DiRossi and Mann on behalf of the Republicans. *Id.* ¶¶ 95–96. While there were some limited negotiations with Democrats over H.B. 369, these negotiations did not result in material changes to the partisan breakdown of H.B. 369. *See id.* ¶ 270. H.B. 369 was a 12-4 map when it was introduced into General Assembly and when it was passed by the General Assembly. *Id.* ¶¶ 266–70. Democrats were hampered in negotiations because they did not have sufficient votes to defeat the map nor signatures to get a referendum passed. *Id.* ¶¶ 266-67. Accordingly, during the course of the negotiations, the Republicans made clear that the 12-4 split was non-negotiable. *Id.* ¶¶ 267–70. Further, Democrats spoke out against the map, including Representative Ron Gerberry, the ranking Democrat on the House State Government and Elections Committee, who complained that more people should have been involved in the map drawing process. *Id.* ¶ 272 ("Speaker John Boehner had more to do with this map than anyone sitting in this room. That's the truth.

37

That's wrong."). The facts support a finding that Ohio's congressional map was drawn with intent to advantage and entrench the Republican majority.

In January 2013, shortly after the first election held under the map, the Republican State Leadership Committee ("RSLC") sent around a letter boasting of Republicans' success, holding up Ohio as a paradigmatic example of their redistricting success. *Id.* ¶¶ 12, 18.

The facts support a finding that irregular process that led to Ohio's congressional map demonstrates that the map was drawn with intent to advantage and entrench the Republican majority.

> b) Contemporaneous statements show discriminatory intent.

Contemporaneous statements by decision makers have been recognized by the Supreme Court as evidence of an improper purpose. *See Cooper*, 137 S. Ct. at 1468–69, 1475–75; *see also City v. Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196–97 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative."); *Rucho*, 318 F. Supp. 3d at 862 ("[T]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports.") (quoting *Arlington Heights*, 429 U.S. at 268).

Contemporaneous statements in the record support a finding that Ohio's map was drawn with the intent to entrench a Republican majority in Ohio's congressional delegation.  As early as March 2011, well before the congressional map was drawn, Republicans were emailing each other about a "12-4 redistricting map scenario."  PFOF ¶ 108.  A 12-4 scenario is one that would ensure 12 safely Republican seats and four Democratic seats in Ohio's congressional delegation. *Id.* ¶ 109.  On September 7, 2011, prior to the introduction of Ohio's first congressional map,

Whatman, a senior member of "Team Boehner," sent talking points to Senate President Niehaus, stating that Republicans were seeking to "lock down 12 Republican seats," and these talking points were circulated among other Ohio legislators and staffers as well.  *Id.* ¶¶ 58, 112–114. Speaker of the Ohio House, William Batchelder, testified that the Ohio Republicans never considered changes to the districting map that would deny Republicans 12 seats.  *Id.* ¶ 116.

Having Democratic voters in "Republican districts" was clearly considered undesirable by Ohio Republican map drawers and the national Republican operatives working with them.  In early September 2011, prior to the introduction of the first redistricting bill, H.B. 319, Hofeller wrote to Braden about a proposed plan.  *Id.* ¶¶ 138–144.  He stated:

> The area Adam [Kincaid] has on his version included Grandview Heights and some more of the 'downtown' area, which I took out of the map I sent – as it was 'dog meat' voting territory.  I guess then, unless there is some inexplicable reason they want that awful-voting territory in the 15th, the map I sent is OK.

*Id.* ¶ 142.  Referring to urban Democratic areas of the state as "dog meat" and "awful" is emblematic of the discriminatory way in which the Republican map drawers viewed Democratic voters.  *See id.* ¶ 144 (Adam Kincaid acknowledged in his sworn testimony that "dog meat" and "awful" voting territory means voting territory that "was not friendly area to Republicans.").

Because of floor speeches given prior to the vote in favor of H.B. 369, every legislator who voted in favor of the Ohio's map was aware that it could and would entrench a 12-4 majority.  Democratic legislators gave speeches on the floor of the General Assembly in which they noted that the map would entrench a 12-4 advantage for Republicans and complained that the lines had been drawn in a manner that divided heavily minority communities, including Cuyahoga and Lorain counties.  *Id.* ¶ 272.  These members were concerned with both the splits of these counties and the partisan tilt of the map as a whole.  *Id.*  Democrats in the Ohio Senate

similarly spoke out against H.B. 369 when it was introduced in the Senate on December 14, 2011. *Id.*

> c) The map drawers' use of demographic data to achieve partisan goals shows discriminatory intent.

The use of demographic data, including partisanship data, may be probative of partisan intent. *See Vieth v. Jubelirer*, 541 U.S. 267, 322 (2204) (Stevens, J., dissenting) (noting that "excessive weight on data concerning party voting trends" during the redistricting process can be evidence of discriminatory intent); *cf. Bush v. Vera*, 517 U.S. 952, 970–72 (1996) (relying on the legislature's use of detailed racial data in the districting process to affirm a finding of discriminatory intent). And while data can be used for permissible purposes, it may not be used for the "purpose of diminishing or minimizing the voting strength of supporters" of the disfavored party, *Rucho*, 318 F. Supp. 3d at 850–51, as it was here. As Plaintiffs demonstrated at trial, the Republican map drawers' particular use of partisan data suggests an intent to entrench the Republican majority in the enactment of the challenged map.

Significant resources were used to procure the partisan data and train the map drawers on how to use it. Morgan, a national Republican map-drawing expert, trained Ohio's map drawers on the mechanics of generating congressional maps, including how to view political data using map drawing software, called Maptitude. PFOF ¶¶ 39–41. National Republican operative, Clark Bensen, was hired to help Ohio's Republican map drawers. *Id.* ¶¶ 42–52. He provided the map drawers with a dataset that was generated by an outside group working on behalf of the RNC. *Id.* ¶ 44. This RNC-led group oversaw the conversion of precinct-level election results estimated down to the smaller census-block level. Having the election results at the census block level allowed map drawers to build maps knowing the past election outcomes at the most granular geographic level. *Id.* ¶ 47. This data was uploaded to Maptitude. *Id.* ¶ 46. The data could be

viewed on both census block and congressional district levels. *Id.* ¶¶ 47–52. The data was used

by the map drawers to "score" the maps. *Id.* ¶¶ 98–107; *see also, e.g.*, *id.* ¶¶ 111, 115, 118–19.

The map drawers were able to see the specific scorings of sub-portions of a draft district, as well

as its relative Republican or Democratic strength, as the districts were being drawn. *Id.* ¶¶ 211–

219. As Republicans made changes to draft maps in Maptitude, they could see, in real time,

scoring of the proposed districts and share the scoring widely among both national and Ohio

Republicans. *Id.*

The goal was to ensure the best possible Republican map for Ohio. Contemporaneous

records show that political data was used to gauge that a 12-4 map was the best option:

> Given the fact that the overall index for the State of Ohio is 49.5% on a measure
> of five recent races, it is a tall order to draw 13 'safe' seats." Speaker Boehner's
> team worked on several concepts, but this map is the one they felt put the most
> number of seats in the safety zone given the political geography of the state, our
> media markets, and how best to allocate caucus resources.

*Id.* ¶ 120; *see also id.* ¶¶ 115, 118–19.

In scoring the maps, the Republican map drawers used several Democratic leaning

indices. Although they were provided with all of the statewide election data available from 2002

through 2010, they were selective in the races they chose. Map drawers chose to include in the

indices elections where Democrats outperformed to help ensure that districts would not switch

over to Democratic control during a year that favored Democratic candidates. *See, e.g.*, *id.*

¶¶ 98–107; *see also id.* ¶ 1001.

The most skewed index used was called the Unified Index. *Id.* ¶¶ 98–107. It was

composed of results from the following five races: 2004 President, 2006 Auditor, 2006 Attorney

General, 2008 President, and 2010 Governor. *Id.* ¶ 99. This particular selection of races tilted

more Democratic than the complete set of elections that took place over the full decade

preceding the redistricting. *Id.* ¶¶ 101–07. In particular, the Unified Index did not include any 2002 statewide elections, which were good elections for Republicans. *Id.* ¶ 101. It also only included a single 2010 election —one in which the Republican had received under 50% of the vote. *Id.* ¶ 102. On average, the Unified Index understated the Republican percentage of a district by 3.2 percentage points. *Id.* ¶ 107.

In addition to the Unified Index, the McCain '08 election results in Ohio were used as an index. *Id.* ¶ 208; *see also id.* ¶¶ 96, 177, 1037. Since these results were based on President Obama's defeat of John McCain in 2008, the McCain '08 index also reflected a strong Democratic outcome. *Id.* ¶ 208. Hofeller referred to the 2008 general election as "a low-water election" for Republicans. *Id.* ¶ 32.

National Republicans favored the use of the Partisan Vote Index ("PVI") to score districts. *Id.* ¶ 209. The PVI score would be either Republican leaning (R+) or Democratic leaning (D+), with a corresponding point score denoting the strength of the partisan lean. *Id.* ¶ 111. Kincaid, one of the national Republican operatives working on the redistricting effort, would use PVI to score all of the iterations of H.B. 319 and H.B. 369. *See, e.g. id.* ¶¶ 111, 115, 124, 129, 146–47, 150-54, 156, 158–59, 160–61, 191. For example, on a spreadsheet analyzing the proposal "as of July 25," twelve districts fell between PVI scores of R+3 and R+10, indicating that they were all expected to be reliably Republican leaning districts. *Id.* ¶ 111.

Political indices were shared with local Ohio Republicans and national Republicans, including Republican incumbents from Ohio's U.S. congressional districts. Political data was shared for both the initial Ohio congressional map (H.B. 319) and the final Ohio congressional map (H.B. 369). *Id.* ¶¶ 88–97; *see also id.* ¶¶ 226–272 (for a discussion of the history of the enactment of Ohio's map from H.B. 319 to H.B. 369). For example, political indices data was

shared with Speaker Batchelder, Senate President Niehaus, and Senator Faber as H.B. 319 was being drawn. *Id.* ¶¶ 88–97. Following the enactment of H.B. 319, Republicans continued to share political data among themselves as they worked on H.B. 369. *Id.* ¶ 95. In particular, Judy reviewed "comparison spreadsheets" that included Unified Index scorings for each district. *Id.* ¶ 95. The ultimate goal of the map drawers was to "come [up with] districts that were friendly" and indices were used as a tool for determining what districts would be "friendly." *Id.* ¶ 97.

Spreadsheets and charts were also created that reflected the scoring of draft congressional districts using the various indices. *Id.* ¶ 219. Political scoring for the draft maps was provided to local Ohio Republicans and to national Republicans. *Id.* ¶¶ 88–107, 115. Prior to the enactment of H.B. 369, Republicans shared comparisons of H.B. 319 and H.B. 369. *Id.* ¶¶ 95, 115. The analysis assured them that, like H.B. 319, H.B. 369 would be a 12-4 map. *Id.*

The use of partisanship data here is probative of a finding of discriminatory intent.

### d) Expert evidence shows discriminatory intent.

Courts have recognized that expert analysis can constitute circumstantial evidence of discriminatory intent. For example, changes in partisan bias before and after redistricting can be evidence of discriminatory intent. *See, e.g.*, *Rucho*, 318 F. Supp. 3d at 895 (discussing Dr. Simon Jackman's finding that the "efficiency gaps" under the new redistricting plan "were significantly higher than those exhibited" by the old plan). Computer simulations, which demonstrate that the enacted plan is an outlier compared to nonpartisan plans, and thus likely resulted from an intent to advantage a particular political party, also have been found to be evidence of discriminatory intent. *Id.* at 852–53 (agreeing with plaintiffs that expert analysis showing that the enacted plan is an "extreme statistical outlier" with regard to the degree to which it disfavored Democratic voters helps prove that the legislature "intended to burden voters

who supported non-Republican candidates").  Here, multiple pieces of expert evidence support a finding of discriminatory intent.

Dr. Niven's analysis illustrates that Republicans mapmakers split political subdivisions and communities of interest to crack and pack Democratic voters to optimize Republican seats in Congress.  PFOF ¶¶ 875–87.  His analysis shows that there is a 59% increase in the number of census tracts split by congressional district lines over the previous map.  *Id.* ¶ 881.  His analysis also shows that there was a specific pattern to the splitting of Democratic-leaning cities, neighborhoods, and counties and incorporating the pieces in the creation of Republican congressional districts.  *Id.* ¶¶ 882–83.

Dr. Warshaw's analysis further supports a finding of partisan intent.  *Id.* ¶ 718.  Dr. Warshaw has described a four-part test to help identify when a partisan gerrymander has occurred.  *Id.* ¶ 718.  The first part asks if one party controlled the process.  This part is met since Republicans controlled the governorship and both houses of Ohio's General Assembly.  *Id.* ¶ 721.  Dr. Warshaw next looks at five different partisan bias metrics.  *Id.* ¶¶ 719–21.  He then asks if these metrics indicate that the same party that was in control was advantaged, if the map is an outlier according to these metrics, and if all of the metrics point in the same direction.  Ohio meets all three of metric-based parts of Dr. Warshaw's test.  Dr. Warshaw found that five different partisan bias metrics all became significantly more pro-Republican in 2012 after H.B. 369 went into effect.  *Id.* ¶¶ 722–44.  Furthermore, Ohio was extremely pro-Republican on average across all five metrics.  *See infra* Section III.A.2.  Last, all five metrics show a pro-Republican advantage.



Plaintiff Demonstrative Exhibit PD075.

Comparing the challenged map against the distribution of partisan composition of Dr.

Cho's millions of simulated maps demonstrates that a map reflecting as much extreme partisan

unfairness as the challenged map could not have been produced unintentionally.  SJ Order at 25;

*see* PFOF ¶¶ 786–816.  According to each partisan fairness metric that Dr. Cho analyzed,

including of the share of seats won by each party, the current map's partisan performance was an

outlier— indeed, in some cases, 12 Republican seats never occurred in any of her simulated

maps.  *Id*. ¶ 786–812; *see, e.g. id*. ¶¶ 805 (using Dr. Cho's method of calculating competitiveness

that combines both the number of competitive seats and which party competitive districts favor,

none of her simulated maps are as uncompetitive as the challenged map); 811 (the challenged

map exhibits more biasedness than any of Dr. Cho's simulated maps).

Even if it were theoretically possible that purely non-partisan motivations pushed the

challenged map into a 12-4 configuration, the evidence presented by Dr. Cho refutes such a

hypothesis.  *Id*. ¶ 816.  While any particular non-partisan consideration could have a partisan

effect, in aggregate, they should not tilt systematically in favor of only one party.  *Id*.  And if

there is a systematic and large bias in favor of one party as is the case with the challenged map, it is "suspicious" whether the highly unusual partisan outcome was in fact a result of only non-partisan considerations, and whether those supposed non-partisan considerations were in fact, non-partisan considerations to begin with.  *Id*.  Embracing Dr. Cho's coin toss analogy for her simulated maps, it would be like a purportedly fair coin coming up heads each time.  *Id*. ¶¶ 816, 758.  While such an outcome is theoretically possible, it fails the smell test as to whether the coin is, in fact, fair.

           e)  Intent to entrench a Republican majority was the predominant intent.

The evidence presented is sufficient to find that the predominant purpose of the Ohio congressional plan was to intentionally advantage Republicans and disadvantage Democrats. The record is replete with evidence that the Republicans wanted a 12-4 map and subordinated other interests in order to meet this goal.  The record is also full of evidence that this Republican intent predominated the process and that the bill was not a reflection of bipartisan intent or privileging other legitimate goals.

Intent to entrench a Republican majority predominated over all other legitimate goals of the redistricting process.  For example, partisan intent was more important goal than incumbency protection.  Since Ohio was losing two congressional seats only two sets of incumbents had to be paired.  PFOF ¶ 110.  The plan, however, paired three sets of incumbents instead of two.  *Id.*  A key to ensuring Republican control and a 12-4 map was the creation of the "Franklin County Sinkhole."  *Id*. ¶¶ 121–162.  A new Democratic district without an incumbent was created in Franklin County.  *Id.* ¶¶ 121, 131–33.  This was done to increase the Republican lean of neighboring districts, thus ensuring that those districts did not become competitive.  *Id.* ¶¶ 142–43.  The Democratic parts of the County from which this new district was made were referred to by one of the Republican operatives drafting and consulting on Ohio's map as "dog meat"

territory.  *Id.*  With the creation of a new district with no incumbent in Franklin County, three sets of incumbents rather than two sets of incumbents had to be paired.  Thus, the H.B. 369 map paired one set of Democratic incumbents in the 9th District, one set of Republican incumbents in the 10th District, and a Republican and Democratic incumbent in the 16th District, constructed to be more favorable to the Republican.  *Id.* ¶ 1032.  The Franklin County Sinkhole is just one example of how the partisan goal of entrenching a 12-4 majority predominated over other criteria.

Moreover, the challenged map cannot be attributed to bipartisanship.  Republicans' intent to advantage Republicans and disadvantage Democrats was the predominant intent of the map.  The 12-4 Republican majority reflected in Ohio's final map actualizes the intent to "lock-down" 12-4 majority expressed by Republicans in early 2011.  *See id.* ¶ 112.

Democrats had no power in the determining the partisan breakdown of the new map—the issue of utmost importance to the Republicans.  Republicans controlled the Senate and the House of Representatives.  Democrats were in the "deep minority" in the Ohio Senate, with only ten members compared to twenty-three Republicans.  *Id.* ¶ 291.  Republicans had a 59-40 advantage in the Ohio House of Representatives, and needed only seven votes to pass legislation with a supermajority.  *Id.* ¶ 292.

The referendum attempt did not result in any ultimate power being conferred on the Democrats.  The attempt to get a redistricting bill on the ballot never got off the ground.  Democrats were given just over two months to get 6% of Ohio's electors to sign the referendum, and it became clear in November that they could not get the signatures.  *Id.* ¶¶ 245, 266.  The Republican majority was sufficiently large that the Republicans could bring to the floor and pass a new redistricting bill without any support from the Democrats.  *Id.* ¶¶ 292–95.  In such a

situation, the expectation is that "some minority members [will] vote for it, either for

idiosyncratic reasons because the bill was packaged with other bills, or for reasons of trying to

carve out something in their own district." *Id.* ¶ 719.

Here, there can be no dispute that the final redistricting bill, H.B. 369 was packaged with

a change to the primary system that would save Ohio approximately $15 million. *Id*. ¶¶ 248–

251. On September 28, 2011, two days after Governor John Kasich signed H.B. 319 into law, a

group of Ohio citizens filed a writ of mandamus in the Supreme Court of Ohio seeking an order

declaring that H.B. 319 is subject to a citizen referendum. *Id*. ¶ 243. On October 14, 2011, the

Ohio Supreme Court granted petitioners' writ of mandamus, thereby subjecting H.B. 319 to a

possible citizen referendum. *Id*. ¶ 244. Following the Ohio Supreme Court's decision,

Republican legislators passed H.B. 318, which moved the primaries for U.S. Presidential and

House candidates to June 12, 2012, while maintaining the primaries for local, state, and U.S.

Senate races on March 6, 2012. *Id*. ¶ 248. H.B. 318 passed without a single Democratic vote.

*Id*. ¶ 250. Nevertheless, following the passage of H.B. 318, Ohio legislators came under

increasing public pressure to avoid the cost and confusion related to holding two primaries in

2012. *Id*. ¶ 251. By mid-December 2011, Republicans knew that they could pass a map "with

very little change" from H.B. 319, and that Democrats would have no choice but to "go[] for

what little they can get." *Id*. ¶ 267. H.B. 369 combined the primaries, thus, resulting in a $15

million savings. *Id*. ¶ 248 (Senate clerk stating that H.B. 369 would: "eliminate the requirement

[in H.B. 318] that Ohio would [conduct] [sic] two primary elections in 2012, . . . [and] establish a

single primary election on March 6, 2012 for the purposes of nominating all candidates for

election in 2012"); *id.* ¶ 249. This fact alone was sufficient incentive to garner Democratic

votes.

However, even with incentive for some Democrats to vote in favor of the redistricting bill, it never received full Democratic support. For example, the majority of Ohio Senate Democrats voted against H.B. 369. *Id*. ¶ 296. Even in the Ohio House, where a majority of Democrats did vote for H.B. 369, their support did not reflect a substantively bipartisan result. *Id*. ¶ 298. Recalling the negotiations preceding passage of H.B. 369, Defendant Larry Obhof explained: "While a lot of Democrats voted for the current map, they really didn't have a lot of negotiating power at that stage, because there was always the opportunity to say hey work with us and we'll do a slightly better map, or we'll do what we want and pass it with 51% of the vote." *Id*.

At trial, Defendants argued that Democrats were given certain concessions for Representative Marcia Fudge's, Representative Marcy Kaptur's, and now-Representative Joyce Beatty's[10] districts. The record at trial belies Defendants' assertion and illustrates that the ultimate goal of the map remained the same: a lasting 12-4 Republican majority in Ohio's congressional delegation. Notably, Representative Fudge explicitly denied that she made any requests about the shape of her district and testified to her surprise and displeasure with the final shape. *Id.* ¶¶ 301–03 (Regarding the inclusion of portions of Summit County in the 11th District, Representative Fudge testified that she "[c]ertainly . . . would not have chosen it, and [she] was not happy about it."). Representative Kaptur also testified that she was ultimately unhappy with the shape of her final district and did not think the extension into Cleveland was prudent. *Id*. ¶ 304. Most importantly, despite the small revisions from H.B. 319 to H.B. 369 as introduced and H.B. 369 as passed, the partisan make-up of the map remained the same throughout: it remained a 12-4 map. *Id.* ¶¶ 269–72.

---

[10] Congresswoman Beatty was not an incumbent representative at the time of redistricting.

2. *Ohio's congressional map has had a discriminatory effect.*

Plaintiffs have offered ample evidence of discriminatory effects. Under this prong, Plaintiffs must establish that map had the effect of entrenching Republican partisan advantage against likely changes in voter preferences. Put another way, Plaintiffs must show that the intended disadvantage to Democrats has in fact been achieved. Plaintiffs presented multiple types of evidence to illustrate that Republicans were effective in achieving and entrenching their intended 12-4 majority.

First, the actual election results are probative evidence of discriminatory effects, as demonstrated by the maintenance of a 12-4 Republican to Democrat seat share, despite changes in the overall statewide vote received by each party.

Republicans seat share consistently has been 75%, despite winning far less than 75% of Ohio's congressional vote. PFOF ¶¶ 710–717. The following table illustrates that, despite fluctuations in the statewide vote share between the parties,[11] Republicans consistently retained 75% (12 out of 16) of the seats in all three congressional election cycles held under the map:

| Year | Statewide vote share | | Seat share | |
|------|-----------|-------------|-----------|-------------|
|      | **Democrats** | **Republicans** | **Democrats** | **Republicans** |
| **2012** | 47% | 51% | 25% | 75% |
| **2014** | 39% | 59% | 25% | 75% |
| **2016** | 41% | 57% | 25% | 75% |
| **2018** | 47% | 52% | 25% | 75% |

Plaintiff Demonstrative Exhibit PD073; PFOF ¶¶ 710–17.

Packing of Democrats—concentrating Democratic voters into just four districts to reduce their power throughout the rest of the state—is evident from the large winning margins in each of the four Democratic districts. The following table presents the percentage of the vote won by the

---

[11] The percentage of the statewide vote share in this table includes two uncontested elections (District 8 and 11) in 2012, and one uncontested election (District 7) in 2014. Such elections overstate the support the party with an unopposed candidate would receive if there had been a contested election.

Democratic candidate in each of the four packed Democratic districts across the 2012-2016 elections:

| District | Percentage of votes of winning Democratic candidate | | | |
|---|---|---|---|---|
| | 2012 | 2014 | 2016 | 2018 |
| District 3 | 68.29% | 64.06% | 68.57% | 73.61% |
| District 9 | 73.04% | 67.74% | 68.69% | 67.79% |
| District 11 | (uncontested) | 79.45% | 80.25% | 82.24% |
| District 13 | 72.77% | 68.49% | 67.73% | 60.99% |

Plaintiff Demonstrative Exhibit PD072 at 3; PFOF ¶ 1041. Thus, in a total of 15 contested elections held in the four Democratic districts, a Democratic candidate only received less than 65% of the vote twice, and none of the Democratic candidates ever received less than 60% of the vote. *Id.* Not only did the statewide seat split between the parties remain constant: Republicans and Democrats maintained the same seats, in the same districts, throughout all four election cycles. *Id.*

Second, an array of partisan bias metrics also shows discriminatory effects. The five measures commonly used by political scientists to detect and measure the effects of partisan gerrymandering are the efficiency gap, the mean-median difference, the asymmetry measure, the 50-50 asymmetry measure, and declination. PFOF ¶ 722. These measures are used to determine when one party is systematically advantaged in the translation of votes to seats. Plaintiffs' expert Dr. Warshaw compared Ohio's partisan bias metrics in 2012, 2014, 2016, and 2018 to a universe that included over 500 elections. *Id.* ¶¶ 722–724. These measures uniformly indicate that Ohio's Republicans have been systematically advantaged in their ability to translate Republican votes into seats in the U.S. Congress.

The first measure, the efficiency gap, is "a way to mathematically capture the packing and cracking that is the heart of gerrymandering," by comparing the discrepancy between each parties' wasted votes. *Id.* ¶ 726. Wasted votes are both those votes for the losing party and those

for the winning party in excess of 50%.  Ohio had a pro-Republican efficiency gap in every election held under the map.  *Id.* ¶ 728.  Ohio's pro-Republican efficiency gap was -22.4% in 2012, -9% in 2014, -8.7% in 2016, and -20% in 2018.  *Id.* ¶ 728.  Compared to plans in states with more than six seats over the past 45 years, including plans that are pro-Republican and pro-Democrat, the 2012 efficiency gap in Ohio was more extreme than 98% of them and was more Republican-leaning than 99% of them.  *Id.* ¶ 729.  The 2018 efficiency gap in Ohio was -20%.  *Id.*  Compared to plans in states with more than six seats over the past 45 years, including plans that are pro-Republican and pro-Democrat, Ohio's 2018 plan was more extreme than 96% of previous plans in states with more than six seats over the past 45 years and was more Republican-leaning than 98% of them.  *Id.*

The second measure, the mean-median difference, shows whether a party has an advantage in the translation of votes to seats by quantifying to what degree a party wins more votes in the median district than in the average district.  Ohio had a mean-median difference that advantaged Republicans in all four congressional election cycles.  *Id.* ¶ 731.  Ohio's mean-median gap in 2012 was 7.8%.  *Id.*  The mean-median difference in 2012 was larger than in 83% of previous elections and more pro-Republican than the mean-median difference in 92% of previous congressional elections.  *Id.*  Ohio's 2012 mean-median gap of 7.8% was a sharp increase from Ohio's mean-median gap in 2010, which was 1.7%.  *Id.*  Ohio had a gap between the mean and median district of 5.0% in 2018, which was more extreme than the mean-median difference in 62% of previous elections and more pro-Republican than the mean-median difference in 81% of previous elections.  *Id.*

The third and fourth metrics, asymmetry and 50-50 asymmetry, capture whether each party receives the same share of seats for identical shares of votes.  *Id.* ¶¶ 738–744.  Asymmetry

is measured using counter-factual election results in a range of statewide vote shares between 45% and 55%. *Id.*¶ 739 Across this range of vote shares, each party should receive the same number of seats when they obtain the same vote share. *Id.* 50-50 asymmetry is measured based on the seat share that each party receives when they split the statewide vote 50-50. In an unbiased system, each party should receive 50% of the seats in a tied statewide election. *Id.* Plaintiffs' expert Dr. Warshaw computed both asymmetry and 50-50 asymmetry based on the vote-seat curve. *Id.* ¶¶ 738–744.

The asymmetry between Democrats and Republicans was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 741. Ohio's 2018 elections were more asymmetric than 92% of previous elections and more pro-Republican than 94% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 743.

Based on 50-50 asymmetry, the level of bias in Ohio's 2012 election was more extreme than 96% of previous elections and more pro-Republican than 97% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 742. The level of bias in 2018 was more extreme than 95% of previous elections and more pro-Republican than 96% of previous U.S. congressional elections over the past 45 years. *Id.* ¶ 744.

The fifth metric, declination, treats asymmetry in the vote distribution as indicative of partisan bias in a redistricting plan. *Id.* ¶ 732. It does this by lining up all the districts in the plan from the least Democratic to the most Democratic to determine if the mid-point of the line formed by one party's seats is as far from the 50 percent threshold for victory on average as for the other party's seats. *Id.* The declination metrics in the last four election cycles show a pro-Republican advantage. *Id.* ¶ 734. The 2012 congressional election in Ohio had a more extreme

declination than 99% of previous elections and a more pro-Republican declination than any previous U.S. congressional election over the past 45 years.  *Id.* ¶ 736.  Ohio's 2018 congressional election had a declination score of -0.69.  *Id.* ¶ 737.  This was more extreme than 98% of previous elections and more pro-Republican than 99% of previous U.S. congressional elections.  *Id.*

The fact that Ohio's partisan bias measures sharply increased in 2012 and have remained pro-Republican throughout the redistricting cycle further supports the conclusion that Ohio's map in effect has been gerrymandered.  As a result, Democrats have been less able to translate their votes into representation.

There is also evidence that the effect of partisan advantage for Republicans has been durable as the Republicans have successfully entrenched their majority.  Ohio's congressional elections grew less competitive after the 2011 plan went into place.  *Id.* ¶ 748.  None of Ohio's congressional elections were competitive in 2014 and 2016, meaning no candidate won their election by less than 55%.  *Id.*  Out of 64 elections held under the map, only five have been competitive.  *Id.*  In 2018, Ohio had only two competitive elections.  *Id.*

The map also became less responsive after 2011.  *Id.* ¶¶ 746–49.  An unresponsive map ensures that the bias in a districting plan toward the advantaged party is insulated against changes in voters' preferences, and thus is durable across multiple election cycles.  Political scientists Drs. Gelman and King propose a technique that measures responsiveness based on uniform swings in two parties' counterfactual vote shares.  *Id.* ¶ 749.  Ohio's post-2011 districting plans had some of the least responsive election results in the country.  *Id.*  Performing a uniform swing analysis based on the 2018 election results, Republicans win 75% of the seats across most of the range of plausible election swings.  *Id.*

Third, the simulations by Dr. Cho show the discriminatory effects of Ohio's congressional plan, not only for the state of Ohio as a whole, *id.* ¶¶ 786-812, but also for each of the individual Plaintiffs, *id.* ¶¶ 780–85. *See also LWV-Michigan*, 352 F. Supp. 3d at 805 (crediting simulated maps in finding discriminatory effect).  The partisan effect that Dr. Cho finds by comparing the challenged map against her simulated ones is distinct from any effect caused by other factors like political geography, traditional redistricting criteria or even chance. Dr. Cho drew her simulated maps based on the same underlying geography and demography of the state of Ohio, and applied the same traditional redistricting criteria and to the same extent as did the Legislature.  PFOF ¶ 758.  She also analyzed the challenged map for partisan effects along a host of different metrics, including the raw seat share, *id.* ¶¶ 787–92, three different ways of assessing competitiveness, *id.* ¶¶ 793-806, and well-established metrics based on the seats-votes curve, *id.* ¶¶ 807-11.

While Dr. Cho does not propose any cutoff for "'how much partisan dominance is too much,'" *Gill*, 138 S. Ct. at 1028 (citing *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 420 (2006)), she provided the entire distribution of partisan outcomes in her simulated maps to aid the Court in applying any legal standard it chooses for deciding whether partisan dominance was excessive in this case.  And regardless of what that standard might be, Dr. Cho's analysis unequivocally supports a finding that the 12-4 outcome in the challenged map exhibits excessive partisan domination.  The 12-4 seat distribution is such an outlier in Dr. Cho's simulated maps such that it did not even occur in the over 3 million maps she drew based on 2008-2010 and 2012-14 data.  PFOF ¶ 790.  And when it did occur in her maps drawn based on 2018 data, it only did so in only 0.046% of those maps.  *Id.*; *see also id.* ¶ 797-98 (Dr. Cho's simulated maps had between 5 and 9 competitive districts while the challenged map had only an

average of 1 competitive district per election); *id.* ¶¶ 799–805 (while the few competitive districts in the challenged map all leaned Republican, the simulated maps produced more competitive districts and those districts lean roughly equally in favor of each party); *id.* ¶ 805–06 (according to a measure of competitiveness devised by Dr. Cho that takes into account the margin of victory and which party competitive districts favor, the challenged map is less competitive than every single one of Dr. Cho's over 3 million simulated maps); *id.* ¶ 808–09 (the challenged map is less responsive than almost all of Dr. Cho's 3 million simulated maps); *id.* ¶ 810–11 (the challenged map exhibits more biasedness than every single one of Dr. Cho's over 3 million simulated maps).

"[W]hen a variety of different pieces of evidence, empirical or otherwise, all point to the same conclusion—as is the case here—courts have greater confidence in the correctness of the conclusion because even if one piece of evidence is subsequently found infirm other probative evidence remains." *Rucho*, 318 F. Supp. 3d at 858. Here, the overwhelming evidence illustrates that Ohio's congressional map has had the effect of advantaging Republicans over Democrats and entrenching a Republican majority against electoral changes.

### 3. Defendants lacked justification for the map.

Because Plaintiffs have established discriminatory partisan intent and discriminatory partisan effects, the burden shifts to the state to establish that the redistricting plan was necessary to meet legitimate state interests. SJ Order at 10; *see also Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979) ("[A] State may not choose means that unnecessarily restrict constitutionally protected liberty.") (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58–59 (1973)); *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring) (partisan gerrymandering may violate the Constitution when political classifications are "applied in an invidious manner or in a way unrelated to any legitimate legislative objective"). Defendants cannot meet their burden.

The Supreme Court has identified a set of legitimate interests in the redistricting context, including "traditional districting principles such as compactness and contiguity," "maintaining the integrity of political subdivisions," or maintaining "the competitive balance among political parties."[12] *Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1306 (2016) (citations and internal quotation marks omitted); *see also Rucho*, 318 F. Supp. 3d at 850–51 (discussing legitimate interests in redistricting). Furthermore, complying with the Voting Rights Act ("VRA") is a legitimate government interest. *Cf. Harris*, 136 S. Ct. at 1306. No legitimate purpose supports the drawing of Ohio's map and Defendants cannot meet the justification prong.

Courts have found that traditional redistricting criteria include compactness, contiguity, and maintaining integrity of political subdivisions. *Id.* There is no evidence that any of these criteria were considered by Ohio's map drawers. According to the testimony of one of the primary map drawers, they merely eye-balled compactness and did not do any analysis of districts to make sure they were compact. PFOF ¶ 1039. The work of Plaintiffs' experts Dr. Niven and Mr. Cooper illustrates that communities of interest are not kept intact with the map. *Id.* ¶¶ 880, 939, 941–43. Communities of interest are often analyzed by the number of municipal and county splits. *Id.* ¶¶ 939, 1040. H.B. 369 unnecessarily splits counties and municipalities.

As the work of Mr. Cooper illustrates, it is and was possible to create maps that better adhere to traditional redistricting criteria. For example, Mr. Cooper was able to draw multiple maps with the same number of incumbents paired, but which split only 14 counties; the current map splits 23 counties. *Id.* ¶¶ 940, 969. In addition to the Remedial Plan, which split 27 municipal civil divisions, Mr. Cooper also created two hypothetical maps: one such that splits 36

---

[12] Notably, bi-partisanship is not one of the legitimate criteria that would allow the state to otherwise discriminate against voters on the basis of partisan affiliation, which is why Plaintiffs do not discuss any alleged bipartisan nature of the map in this section, but in the section on discriminatory intent.

municipal civil divisions, and another splits 34 municipal civil divisions; the Ohio congressional map splits 73. *Id.* ¶¶ 943, 947. Both of these hypothetical maps are more compact than the Ohio congressional map. *Id.* ¶ 950.

Incumbency protection can also be a legitimate criterion, but it does not explain Ohio's current map. Representative Huffman, the sponsor of H.B. 319 and H.B. 369, gave testimony in support of each map. *Id.* ¶¶ 231, 1028. In his testimony, he discussed the traditional redistricting criteria, and stated that protection of incumbents was "subservient" to the other criteria. *Id.* As discussed above in Section III.A.1.e, only two sets of incumbents had to be paired to account for the loss of two seats, and yet H.B. 369 pairs three sets of incumbents. *Id.* ¶¶ 961, 1030–32. Not only were more incumbents paired than necessary, but the most senior incumbent member of Ohio's delegation, Representative Kaptur, was paired. *Id.* ¶¶ 1032, 1034–35.

The work of Mr. Cooper illustrates that incumbency protection could not have been the primary goal of the map drawers. Mr. Cooper was able to draw congressional plans that pair the same number of incumbents with the same match-up of political parties as under the Ohio congressional map. *Id.* ¶ 963. These maps are still better than the Ohio congressional map on traditional redistricting criteria and partisan bias. *Id.* ¶¶ 961–70. Mr. Cooper's hypothetical maps also illustrate that there were *at least* two alternatives to pairing Representative Kaptur with any other incumbent: one alternative would pair Representatives Kucinich and Fudge and the other would pair Representatives Kucinich and Sutton. *Id.* ¶ 963. The reasonable explanation for the pairing of both Representative Kaptur and an additional set of incumbents was these pairings included in Ohio's map is that it was the pairing that best ensured a 12-4

58

outcome.  At a minimum, the number of pairings illustrate that incumbency protection was not the map drawers' primary goal.  *Id.* ¶¶ 1034–35.

While compliance with the VRA is certainly a legitimate government interest, the evidence adduced in this case makes clear that the VRA was invoked as a mere pretext for packing Democratic voters in Northeast Ohio (District 11) and Franklin County (District 3) to render the surrounding districts more safely Republican.  *See, e.g.*, *Rucho*, 318 F. Supp. 3d at 804 (rejecting claim that one reason for the map was that districts had to be drawn to comply with the VRA and finding instead that the map "further concentrate[d] black voters, who are more likely to vote for Democratic candidates, into" two districts, as part of a larger plan to "concentrate Democratic voting strength").

In order to determine the minority voting age population necessary to create a district in which minorities have the opportunity to elect a candidate of choice, racially polarized voting analysis, also known as racial bloc voting analysis, must be conducted.  *See* PFOF ¶ 1014.  This analysis requires more than looking at the minority voting age population in isolation but analyzing voting patterns of the relevant minority group.  *Id.* ¶¶ 858, 865–70.  And the "experience" of elections in the 11th District "gave the State no reason to think that the VRA required," *Cooper*, 137 S. Ct. at 1470, the District to be drawn with over 50% black voting age population ("BVAP") without having done that required analysis.  *See id.* ¶¶ 860–864. Defendants never conducted any analysis of racial voting patterns in that, or any other, area of the state—against the advice of veteran RNC line-drawer Dr. Hofeller.  *Id.* ¶ 1015.  Indeed, Defendants did not even gather the data required—primary elections data—to conduct such an analysis.  *Id.*

Without any basis in previous election results or analyses of voting patterns, Defendants drew an arm out of a historically Cuyahoga County-based district down to Summit County, resulting in a very oddly shaped district. *Id*. ¶ 870. The Summit County Republican Party Chair understood exactly what this configuration accomplished: drawing "mostly black Democrats" in Akron into District 11 "helped other districts in Summit County be more Republican." *Id*. ¶ 1017.

Plaintiffs' expert Dr. Lisa Handley performed a racial bloc voting analysis. This analysis is also known as a district-specific, functional analysis—including of Democratic primaries as exhorted by Dr. Hofeller. *Id*. ¶ 865. The analysis conducted by Dr. Handley clearly establishes that a 45% BVAP district in the vicinity of District 11—both before and after redistricting— offers Black voters a realistic opportunity to elect their candidates of choice. *Id*. ¶¶ 867–68. As drawn, the above 50% BVAP in the current 11th District exceeds what is necessary for minority voters to elect their candidate of choice. *Id*. ¶ 867. The evidence clearly shows that the shape of District 11 is not the result of any intention to comply with the VRA, nor is it mandated by that same law.

Further, the record evidence supports a finding that the 3rd District was designed to pack Democratic voters into the district, not to create a "minority opportunity district." As discussed above in Section III.A.1, the Franklin County Sinkhole was the centerpiece of the 12-4 strategy. Even though spreadsheets of the proposed districts paid lip service to a "new minority opportunity district" in Franklin County, all the data conveyed on the spreadsheets were of the partisan scoring of the districts, rather than the demographic breakdowns of those districts or any analysis performed of racial voting patterns in the area. PFOF ¶¶ 1022–25. Any post-hoc attempt to assert that District 3 was drawn to provide minority voters with an opportunity-to-

60

elect is belied by the fact that the contemporaneous email correspondence among National Republicans involved in the Ohio redistricting process clearly show that the district was configured to siphon the "dog meat" voting territory in downtown Columbus away from the 15th District. *Id.* ¶¶ 138–44.

### B. Plaintiffs' Political Speech Has Been Burdened and Their Ability to Freely Associate Has Been Harmed in Violation of the First Amendment.

The First Amendment, which protects the rights of voters to associate with and advocate for a political party, to vote for their candidate of choice, to express their political views, and to participate in the political process, "has its fullest and most urgent application . . . to the conduct of campaigns for political office," *McCutcheon v. F.E.C.*, 572 U.S. 185, 191–92 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). These rights constitute the "core of those activities protected by the First Amendment" without which a representative democracy cannot function. *Elrod v. Burns*, 427 U.S. 347, 356 (1976). Burdening, penalizing, or retaliating against citizens "because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views" is highly disfavored. *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring). Partisan gerrymandering burdens Plaintiffs First Amendment rights.

In its order denying summary judgment, this Court identified the test applied in *Rucho* as applicable to Plaintiffs' First Amendment claims at trial and concluded that it "essentially mirrors the intent, effect, and lack-of-justification test that applies to the equal protection claim." SJ Order at 14–15.[13] As discussed previously in Section III.A, Plaintiffs have met the

---

[13] Plaintiffs continue to propose the particular test offered in their Opposition to the Motion for Summary Judgment at 30–31, ECF No. 177, but recognize that the Court has held that the Equal Protection and First Amendment tests are "essentially" the same, SJ Order at 15. The same evidence supports both of these claims, as the partisan gerrymander is a "double-barreled constitutional issue." *Id.*

requirements for such a three-part test. The drawing of Ohio's congressional district boundaries was done to privilege the state's preferred political party, and to burden the state's disfavored political party. The party and its members were "deprived of their natural political strength by a partisan gerrymander," a violation of their First Amendment right to associate. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (citing *Anderson*, 460 U.S. at 791–92). Consistent with this Court's order, Plaintiffs have also proven evidence making out their First Amendment associational harm. *See supra* Sections II.A.2 and II.B.2.

### C. Plaintiffs' Vote Has Been Diluted in Violation of Their Right to Vote Under the Fourteenth Amendments.

Plaintiffs have also proven that their fundamental right to vote has been denied in violation of the Fourteenth Amendment, in the form of an unconstitutional dilution of their voting rights. This claim, while also a district-specific one, is narrower than Plaintiffs' claim that they have been discriminated against in violation of the Equal Protection Clause. *See supra* Section III.A. Under this claim, Plaintiffs' rights have only been violated when they are denied the opportunity to elect the candidates of their choice and to influence elections. Put another way, Plaintiffs' vote dilution claim in violation of Plaintiffs' right to vote, as opposed to Plaintiffs' broader Equal Protection claim, only applies to Plaintiffs whose districts have been cracked.

The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "However slight [the] burden" imposed on the right to vote "may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (internal quotation marks omitted). Critically, the right to vote encompasses not only the right to cast a ballot, but to cast a *meaningful* one: The right of "qualified voters,

regardless of their political persuasion, to cast their votes effectively . . . rank[s] among our most precious" rights. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also Anderson*, 460 U.S. at 787 (finding the right to cast a meaningful vote to be fundamental). Citizens have an "inalienable right to full and effective participation in the political process[ ] . . . ." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). That right "can be denied by a debasement . . . of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. Indeed, the "right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969). The Court must engage in "close constitutional scrutiny" of the map and the infringement on the right to vote triggers heightened scrutiny. *Evans v. Cornman*, 398 U.S. 419, 422 (1970); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 581–82 (2000); *Norman v. Reed*, 502 U.S. 279, 288–89 (1992); *Anderson*, 460 U.S. at 789.

Here, Plaintiffs' right to vote has been unconstitutionally diluted by virtue of their placement in particular districts in Ohio's congressional map. Similar to Plaintiffs' Equal Protection and First Amendment claims, *see supra* Sections III.A-B, Plaintiffs' vote dilution claims should be evaluated under a three-part test. The critical distinction for this claim, however, is that the Court should assess not whether the government has treated Plaintiffs differently because of their political affiliation, but whether Plaintiffs have been denied an opportunity to elect their preferred candidates or exert any meaningful influence on elections in these districts. Plaintiffs are denied the ability to elect their preferred candidates when their votes are cracked. In Ohio, cracked Democratic voters have been unsuccessful in electing their preferred candidates for as long as the current map has been in effect. *Cf. Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (minority voters who have been "submerg[ed]" into an electoral

arrangement with a "white majority" have been "den[ied] . . . an opportunity to elect a candidate of their choice.").

But this does not have to be the case. For example, as described below, Plaintiffs' Proposed Remedial Plan would provide greater opportunity to elect candidates of Plaintiffs' choice. In the map, four reconfigured districts could afford Democratic voters an opportunity to elect their preferred candidates: the 1st, 5th, 12th, and 16th (with a consistent opportunity to elect in the 5th and 16th, and a reasonable chance to elect in the 1st and 12th). There is a "special significance, in the democratic process, of a majority," such that "it is a special wrong when a minority group" that "could constitute a compact voting majority . . . is not put into a district." *Id*. at 19. The Remedial Plan illustrates that Ohio's districts could be reconfigured.

The Proposed Remedial Plan does not only affect these four districts; Democratic candidates' vote shares would generally be higher in eight districts, affording Democratic voters greater influence in elections in those particular districts. The Supreme Court has defined "influence" as the ability to "exert a significant—if not decisive—force in the election process." *Georgia v. Ashcroft*, 539 U.S. 461, 461 (2003), superseded by statute 52 U.S.C. 10304(b). And, overall, the Proposed Remedial Plan provides Democratic voters with greater influence throughout numerous districts and thus statewide. As noted above, Democratic voters have been packed into four districts where they can elect their preferred candidates, but have little influence elsewhere; Plaintiffs' proposed map remedies that. *Cf. id.* at 499 (noting that reducing the percentage of a group in a particular district "may have positive or negative consequences for the [group's] statewide electoral strength").

### D.  Ohio's General Assembly Exceeded Its Power Under Article I When It Gerrymandered Ohio's U.S. Congressional Map.

This Court also determined that certain variations of Plaintiffs' Article I claim are not distinct from their claims under the First and Fourteenth Amendments.  SJ Order at 17–18.  However, agreeing with the court in *Rucho*, this Court held that the Article I claim "rests on a theory that the redistricting law, here H.B. 369, itself 'amounts to a successful effort by the [State] to 'disfavor a class of candidates' and 'dictate electoral outcomes.''" *Id.* (citing *Rucho*, 318 F. Supp. 3d at 940 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995))).  The Court found this test to echo the intent and effect prongs of the previously described tests, but it proceeds on a statewide basis.  SJ Order at 18–19.  Plaintiffs' evidence, as described above, *see supra* Section III.A, demonstrates the way in which the map drawers' intent implicated both certain individual districts, but also the way in which those districts fit into the whole.  Just as in *Rucho*, Ohio drew its congressional districts in an "effort to 'dictate electoral outcomes' and 'disfavor a class of candidates.'"  318 F. Supp. 3d at 937.

States are given limited power to regulate federal elections.  Specifically, the Elections Clause, Article I, section 4, clause 1, confines states' power to the regulation of the time, place, and manner of elections.  U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations.").  The power granted under Article I has been interpreted by courts to limit states to the enactment of neutral procedural regulations.  *See Cook v. Gralike*, 531 U.S. 510, 532 (2001) (Thomas, J., concurring); *Thornton*, 514 U.S. at 808–10; *Rucho*, 318 F. Supp. 3d at 936–37.  Courts have held that "the Elections Clause does not 'immunize state congressional apportionment laws which debase a citizen's right to vote.'"  *Rucho*, 318 F. Supp. 3d at 937 (quoting *Wesberry v. Sanders*, 376 U.S.

1, 7 (1964)); *see also Benisek*, 248 F. Supp. 3d at 512 (citing *Wesberry*, 376 U.S. at 6–7). And the actions of the state should not be immunized here.

## IV.     PLAINTIFFS HAVE PROPOSED A MAP THAT WOULD REMEDY THE CONSTITUTIONAL VIOLATIONS

Plaintiffs have offered a Proposed Remedial Plan that complies with traditional redistricting criteria while at the same time offering Democratic voters a better opportunity to elect their candidates of choice. PFOF ¶¶ 938, 972–73. The Proposed Remedial Plan is vastly more rational and voter-friendly than the challenged map. The Plan splits fewer counties and fewer municipal civil divisions than does the challenged map, thus preserving the most common communities of interest in the redistricting context. *Id.* ¶¶ 939, 941, 1040. The Plan is more compact than the challenged plan upon visual inspection and under each of the most common compactness measurements. *Id.* ¶¶ 948–49. Unlike the challenged map, the Proposed Remedial Plan is responsive to changes in voter preferences and turnout with the number of Democratic majority districts changing across election cycles. *Id.* ¶ 973.

The regions of the current congressional map that are the most irrational and confusing to voters are those in Hamilton County, Franklin County, and Northeast Ohio. *Id.* ¶¶ 914, 935. Comparing the proposed district maps in each of these regions with the current district map demonstrates the vast differences between the plans:

Hamilton County:



As Plaintiffs' expert Mr. Cooper testified, the comparison between District 1 in the challenged plan and in Plaintiffs' Proposed Remedial Plan is stark. *Id.* ¶ 935. Particularly notable is that Cincinnati is kept whole and the districts no longer wrap around one another.

Franklin County:



Similarly, Proposed Remedial District 3 is "much more regularly shaped." *Id.*

67

"Snake on the Lake":



Undoing the Snake on the Lake reunifies Toledo and Lucas County in Proposed District 5

and Western Cuyahoga and Lorain County in Proposed District 9.  *Id.*

Northeast Ohio:



The entirety of Northeast Ohio is intertwined in irrational ways that are not compelled by

traditional criteria, or by any identifiable criteria other than partisan outcome. The maps

reproduced above show three of the four districts making inroads on Summit County and

splitting Akron in "bizarre ways."  *Id.*  Under the Proposed Remedial Plan, consistent with Dr.

Handley's racially polarized voting analysis, District 11 has a BVAP of 47.48%, is kept wholly

within Cuyahoga County, and the City of Cleveland is not split.  *Id.* ¶¶ 935, 952.  Also notable is

the Proposed Remedial Plan's treatment of Summit County and the City of Akron: the City and

County are kept whole in Proposed Remedial District 16 (last image on the right), whereas

Akron is split into three district (11, 13, 16) and Summit County into 4 (11, 13, 14, 16) in the

challenged plan (images of current Districts 11, 13, 16 on the left).  *Id.* ¶ 935.

Plaintiffs' Proposed Remedial Plan splits 14 counties to the current map's 23, and 27

municipal subdivisions to the current map's 73.  *Id.* ¶¶ 941, 943.  The Plan is notably more

compact than the current congressional plan.  *Id.* ¶ 948.  And the compactness score for the

Snake on the Lake is artificially inflated because it includes the water blocks that extend out into

Lake Erie, making it appear to have a moderate compactness score as opposed to its true score,

which is among the five lowest across the country.  *Id.*  Thus, the Proposed Plan is even more

compact than the current plan than comparing the compactness scores on their face would

indicate.  The Proposed Plan also complies with Issue 1, which mirrors traditional redistricting

criteria, *id.* ¶ 960, and with the correction to the Proposed Plan, does not pair any incumbents

except Representatives Chabot and Wenstrup who both live in Cincinnati (and thus consistent

with Issue 1, in the same Proposed District), *id.* ¶ 965.

Plaintiffs' Proposed Remedial Plan also takes compliance with the Voting Rights Act

seriously.  Unlike the current congressional plan, where there is no evidence that the map

drawers undertook any analysis of the necessary BVAP to create a district where minority voters

would have the opportunity to elect their candidates of choice, Plaintiffs' Voting Rights Act

expert, Dr. Lisa Handley undertook that district-specific functional analysis by conducting a

racially polarized voting analysis that looked at the vicinity of District 11.  *Id.* ¶ 860, 865–67.

Once armed with this information, Mr. Cooper then undertook drawing District 11 in the

Proposed Remedial Plan.  *Id.* ¶ 952.  As Mr. Cooper testified, there is nowhere else in Ohio

where a district with a 45% BVAP can be created due to the demography of the state.  *Id.* ¶ 954.

Moreover, it is impossible to draw a congressional district with a BVAP above 45% without

including the parts of Cleveland and its immediately eastward municipalities that were part of

both the 2002 and 2012 District 11.  *Id.*

Finally, Plaintiffs' Proposed Remedial Plan offers a better opportunity for Democratic

voters to elect their candidates of choice.  The challenged congressional plan guaranteed

Republican wins in the same twelve districts across the life of the map relegating Democratic

wins to just four districts.  The data known to the legislature at the time of the redistricting made

clear this would be the result.  *Id.* ¶¶ 1002–03.  When the election results for these same four

election cycles are applied to Plaintiffs' Proposed Remedial Plan, however, there are more

districts in which a Democratic candidate garners over 50% of the vote and the number of

districts in which Democrats attain this majority (and vice versa for Republicans) changes across

election cycles.  *Id.* ¶¶ 972–73.  There are also far more districts that are competitive under

Plaintiffs' Proposed Remedial Plan (13 compared to the current map's 5).  *Id.* ¶¶ 748, 972.

Plaintiffs' Proposed Remedial Plan also performs better on all of the partisan bias metrics

computed by Dr. Warshaw demonstrating that, unlike the challenged plan, the Proposed Plan

does not advantage one party in the translation from votes to seats.  *Id.* ¶¶ 745, 937.  Moreover, a

symmetric map does not require that the map drawers calculate these partisan metrics as they

draw their map.  Rather, by drawing a map that does not privilege partisan ends and follows

traditional redistricting principles, Mr. Cooper created a map that was determined to be unbiased after the fact.  *Id.* ¶ 936.

## CONCLUSION

Plaintiffs have established that Ohio's current United States congressional redistricting plan and each of its component districts is an unconstitutional partisan gerrymander that violates the First Amendment, the Fourteenth Amendment, and Article I of the United States Constitution.  Plaintiffs respectfully request that this Court makes a declaration in accordance with these findings and permanently enjoin elections under the map.  Defendants should be ordered to immediately establish a congressional districting plan that complies with the United States Constitution and enjoined from any further gerrymandering.

March 23, 2019                                        Respectfully submitted,

                                                     */s/ Freda J. Levenson*, trial attorney
T. Alora Thomas-Lundborg                             Freda J. Levenson (0045916)
Theresa J. Lee                                       Elizabeth Bonham (0093733)
Emily Rong Zhang                                     American Civil Liberties Union of Ohio Fdtn.
Dale E. Ho                                           4506 Chester Avenue
American Civil Liberties Union Foundation            Cleveland, OH 44103
125 Broad Street, 18th Floor                         Tel.: (216) 472-2220
New York, NY 10004                                   Facsimile: (216) 472-2210
Tel.: (212) 549-2500                                 flevenson@acluohio.org
athomas@aclu.org                                     ebonham@acluohio.org
tlee@aclu.org
erzhang@aclu.org                                     David Carey (0088787)
dho@aclu.org                                         American Civil Liberties Union of Ohio Fdtn.
                                                     1108 City Park Avenue
Robert Fram                                          Columbus, OH 43206
Nitin Subhedar                                       Tel.: (614) 586-1972
Jeremy Goldstein                                     dcarey@acluohio.org
Covington & Burling LLP
One Front Street                                     Michael Baker
San Francisco, CA 94111                              Perrin Cooke
Tel.: (415) 591-6000                                 Peter J. Rechter
rfram@cov.com                                        Robert S. Day
nsubhedar@cov.com                                    Jacob Canter
jgoldstein@cov.com                                   Isaac Wood

Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
rday@cov.com
jcanter@cov.com
iwood@cov.com

## CERTIFICATE OF SERVICE

I, Freda J. Levenson, hereby certify that the foregoing document was served upon all counsel of record in this case via ECF.

*/s/ Freda J. Levenson* _____
Counsel for Plaintiffs
