**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

_____

OHIO A. PHILIP RANDOLPH
INSTITUTE, *et al.*

      Plaintiffs,

v.

LARRY HOUSEHOLDER, Speaker of the
Ohio House of Representatives, *et al.*

      Defendants.

_____

No. 1:18-cv-00357-TSB-KNM-MHW

Judge Timothy S. Black
Judge Karen Nelson Moore
Judge Michael H. Watson
Magistrate Judge Karen L. Litkovitz

**<u>PLAINTIFFS' BRIEF IN SUPPORT OF THEIR EVIDENTIARY OBJECTIONS</u>**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 1

   I.    DEFENDANTS' AND INTERVENORS' IMPROPER "IMPEACHMENT"
       EVIDENCE AND RELATED QUESTIONING SHOULD BE STRICKEN................ 1

     A.   Representative Marcia Fudge ........................................................................ 1

     B.   Senator Nina Turner.................................................................................... 3

     C.   Andre Washington ...................................................................................... 4

     D.   Dr. Wendy Tam Cho................................................................................... 6

  II.    DEFENDANTS AND INTERVENORS CANNOT RELY ON HEARSAY TO
       BOLSTER THEIR CLAIM THAT THE CHALLENGED MAP WAS JUSTIFIED
       BY BIPARTISANSHIP................................................................................... 9

     A.   Kaptur-Kucinich Pairing........................................................................... 10

     B.   Configuration of District 11...................................................................... 11

     C.   Configuration of District 3........................................................................ 12

 III.    LACK OF FOUNDATION AND MISCHARACTERIZATION OF TESTIMONY
       AS TO LACHES. ......................................................................................... 12

 IV.    TESTIMONY OF DR. BRUNELL SHOULD BE EXCLUDED. .............................. 14

CONCLUSION.............................................................................................................. 19

Plaintiffs respectfully submit this brief in support of their objections to Defendants' and Intervenors' evidence.

## INTRODUCTION

"Rules of evidence are designed in the interest of fair trials." *United States v. Augenblick*, 393 U.S. 348, 352 (1969). Defendants and Intervenors have flouted several provisions of the Rules of Evidence, including Federal Rule of Evidence 612 on refreshing witness recollection, Federal Rule of Evidence 613 on impeachment, and Federal Rules of Evidence 801 and 802 on hearsay testimony. Intervenors also failed to properly disclose expert witness testimony as required under Rule 26 of the Federal Rules of Civil Procedure. Allowing this evidence would be prejudicial to Plaintiffs, and it should be stricken by the Court.

## ARGUMENT

### I. DEFENDANTS' AND INTERVENORS' IMPROPER "IMPEACHMENT" EVIDENCE AND RELATED QUESTIONING SHOULD BE STRICKEN.

#### A. Representative Marcia Fudge

Plaintiffs object to Intervenors' attempts to "impeach" Representative Marcia Fudge's testimony by use of irrelevant, inadmissible evidence for which no foundation was laid, and which was offered as an improper attempt to refresh her recollection. *See Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 716 (6th Cir. 2005). In *Rush*, the Sixth Circuit explained that in order to use a writing to refresh a witness's memory under Federal Rule of Evidence 612, the examining counsel must establish that: (1) the witness's recollection is exhausted; and (2) the document would be of help in refreshing the witness's memory. *Id.* Further, "it would be error for the trial court to admit into evidence testimony about a matter included in the writing if the witness had no recollection of the matter after viewing the writing." *Id.* at 717 (quoting 4 Weinstein's Federal Evidence § 612.03[4][a][iii]).

Representative Fudge testified on direct examination that she was unaware in advance of how her home district, District 11, would be drawn under the new map in 2011. *See* Fudge, ECF No. 239 at 83:7–20. She further testified that she was surprised, and was not pleased at the time, by the map drawers' decision to include portions of Summit County in her district. *Id.* at 83:21–84:9. In a bizarre tangent, Intervenors responded by seeking to prove through Representative Fudge that George Forbes, a former Cleveland City Council president and Cleveland NAACP president, supported the shape of her district. *See generally id.* at 90:14–25.

The positions of a different political leader were well outside the scope of Rep. Fudge's testimony on direct. Indeed, Rep. Fudge testified that she was unaware of Mr. Forbes' position – and further, that no writing would refresh her recollection on something that she simply never knew. *Id.* at 91:20–92:3. Intervenors improperly offered a news article about Mr. Forbes anyway, which counsel advised the Court was being "used solely to refresh recollection," as it was not an exhibit. *Id.* at 92:4–23. Intervenors subsequently sought to have Rep. Fudge adopt the hearsay statements contained in the article, which she had already confirmed that she lacked a foundation to do. *See id.* at 91:20–92:3. Upon review of the article, she confirmed that she had not read it, that her recollection was not refreshed by it, and that she was not familiar with the truth of the matters that it asserted other than by simply reading the article itself. *Id.* at 93:3–94:15. This scenario is precisely what *Rush* describes as improper. 399 F.3d at 716–17.

A near-identical exchange occurred as to Senator Vernon Sykes, another prominent leader of the black community in northeast Ohio, whose purported opinions on District 11 were just as irrelevant and outside the scope of direct as were those of Mr. Forbes. *See id.* at 94:16–99:12. Again confronted with an article she had not read, which purported to state facts with which she had no familiarity, Rep. Fudge confirmed that the article did not refresh her memory

2

and that her only knowledge of the subject came from reading the article during her testimony. *Id.* at 97:13–99:12.

All testimony based on these improper impeachment materials should be stricken for a laundry list of reasons. The documents were not listed as trial exhibits, were not authenticated, and are inadmissible hearsay – indeed, they are double hearsay to the extent the out-of-court statements in the articles repeat out-of-court statements of interviewees. *See* Fed. R. Evid. 901; Fed. R. Evid. 802. They did not contradict any part of Rep. Fudge's testimony, and so were not properly offered for impeachment. No foundation was laid to show that she could discuss them; on the contrary, she confirmed that she could not. *See supra*; *see also* Fed. R. Evid. 602 (witness can only testify on personal knowledge). Nor were Intervenors able to establish that the writings could, or did, refresh her recollection. *See supra*; *Rush*, 399 F.3d at 716–17. Even had it been properly offered, any evidence of unrelated political figures' opinions about District 11's design is irrelevant and beyond the scope of direct. The entire exchange regarding Mr. Forbes' and Sen. Sykes' opinions, including Intervenors' belated attempt to admit Exhibit I-137, should be stricken.

### B. Senator Nina Turner

In the course of Senator Nina Turner's testimony, Intervenors similarly attempted to introduce inadmissible evidence under the guise of refreshing the witness's recollection. Specifically, Intervenors offered Sen. Turner their Exhibit I-96 to help her recall whether she had "received proposals from Democratic map drawers which incorporated recommendations from Ohio House and Senate Democrats, the Ohio Legislative Black Caucus and congressional Democrats in Ohio," Turner, ECF No. 240 at 27:17–20. Sen. Turner had testified that "I don't know . . . I mean, that might be possible." *Id.* at 27:21–23.

Presented with the document, Sen. Turner verified that the email address listed on the document matched hers, but repeatedly testified that she did not recall receiving such an email, and that the writing did not refresh her recollection. *Id.* at 28:9–29:11, 30:2–13. Her testimony on the matter should therefore be stricken. *See Rush*, 399 F.3d at 716–17.

Despite having represented that the document was being offered merely to refresh recollection, Intervenors next sought to move it into evidence in order to impeach. Plaintiffs objected. Turner, ECF No. 240 at 31:11–15. The document is not proper impeachment material, as it does not contradict Sen. Turner's statement that it "might be possible" that she received such a proposal, but simply did not recall. *See supra*. The document itself is also hearsay. *See generally* Fed. R. Evid. 802. She did not adopt or verify any of the statements in the document or authenticate it. As Intervenors failed to lay a proper foundation, the document is inadmissible and Intervenors' exchange with Senator Turner about it should be stricken. *See* Fed. R. Evid. 602.

Moreover, even if Intervenors had properly introduced the document, it would constitute extrinsic impeachment evidence on a collateral matter—whether Sen. Turner had received word of alternative map proposals that were never adopted—and so would be properly excluded. *See, e.g.*, *United States v. Quinn*, 230 F.3d 862, 867 (6th Cir. 2000).

### C. Andre Washington

On direct examination, Mr. Washington testified that the reauthorization of Section 5 of the Voting Rights Act was an issue of particular importance to him. *See* Washington, ECF No. 239 at 56:23–57:2. As the Court is surely aware, Section 5 of the Voting Rights Act was effectively rendered obsolete by the Supreme Court in 2013. *See Shelby Cty. v. Holder*, 570 U.S. 529, 557 (2013) (striking down the coverage formula of Section 4(b) of the Voting Rights Act, effectively rendering Section 5 meaningless until "Congress may draft another formula based on

4

current conditions"). Prior to that decision, the Act was last reauthorized in 2006, just prior to its scheduled sunset. *Id.* at 529; *see also Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226–27 (1959) (courts may take judicial notice of legislative history); *Ohio Coal Ass'n v. Perez*, No. 2:14-cv-2646, 2017 WL 4900165, at *7 (S.D. Ohio Feb. 27, 2017) (same). Mr. Washington went on to testify that his prior congressional representative, Pat Tiberi, did not support the movement to "re-establish" Section 5. ECF No. 239 at 58:20–25.

In a deeply confusing exchange with Intervenors' counsel on cross-examination, Mr. Washington was asked several times if he was aware that "every Republican member of Congress from Ohio voted to renew the Voting Rights Act[.]" *Id.* at 73:4–19. In the context of Mr. Washington's prior testimony, counsel's question conflated the 2006 *renewal* of the entire Voting Rights Act with Mr. Washington's desire for an effective *reestablishment* of Section 5 post-*Shelby County*. Mr. Washington attempted several times to clarify that he was aware of votes to reauthorize the Voting Rights Act prior to *Shelby County*— "[p]rior to them getting rid of the Section 5," *id.* at 73:15—and that "what I'm concerned about is Section 5, reauthorizing Section 5," *id.* at 74:2–6. When the timing of the renewal that Intervenors' counsel was referencing became clear, Mr. Washington explicitly indicated that the renewal counsel referenced was not what he was talking about and sought clarification. *Id.* at 73:20-74:6. Pushing through Mr. Washington's attempt to disentangle the matter, counsel continued to conflate the two concepts, ultimately representing that "Representative Tiberi voted to renew the Voting Rights Act and Section 5 of the Voting Rights Act the last time it was on the floor of the House of Representatives[,]" *id.* at 74:15–17, and asking Mr. Washington to agree that if that was true, then "he was representing you with your same – the same position you had," *id.* at 75:13–15. Mr. Washington ultimately agreed to what, in context, he understood to be a counter-

factual scenario: that *if* Rep. Tiberi had voted to reauthorize Section 5 post-*Shelby County*, then Mr. Washington would be in agreement with Rep. Tiberi's hypothetical position. *See id.* at 75:7–16. On redirect, Mr. Washington again testified that the *reauthorization* of Section 5 was his concern, not simply the VRA's renewal. *Id.* at 76:6–9.

Intervenors' questions to Mr. Washington "lifted the prior testimony out of context and were misleading and confusing." *United States v. Poindexter*, 942 F.2d 354, 358 (6th Cir. 1991); *see also Salters v. Burt*, No. 17-2426, 2018 WL 2341746, at *4 (6th Cir. May 23, 2018) (confusing questions objectionable at court's discretion). Such a tactic is an inappropriate avenue of impeachment, and Plaintiffs accordingly object. The entire exchange, ECF No. 239 at 73:7–75:25, should be stricken.

### D. Dr. Wendy Tam Cho

At trial, Intervenors sought to admit two documents from a prior case in Pennsylvania as impeachment exhibits following their cross-examination of Dr. Cho: an expert report authored by Dr. Cho (I-130) and a transcript of her trial testimony (I-131).[1] Cho, ECF No. 243 at 121:12–122:14. Intervenors cited Federal Rule of Evidence 613(b) as the basis for the admission of these documents. *Id.* at 122:4–7. This Rule states: "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). Critically, this rule applies to a witness's prior *inconsistent* statement; absent an inconsistency, the rule is inapplicable. The hearsay exception

---

[1] Neither document is cited in Defendants' and Intervenors' Joint Proposed Findings of Facts. Even if they no longer seek to have these documents admitted into evidence, and no longer wish to rely on them, these same arguments apply to the trial testimony elicited with respect to both documents. ECF No. 243 at 27:25-38:7, 41:11-45:25. That trial testimony, and in particular Intervenors' counsel reading into the record of these documents from the Pennsylvania case, should be stricken. In addition to being irrelevant, it consists of inadmissible hearsay and impermissible extrinsic evidence of statements that are not inconsistent with trial testimony.

for such statements is similarly limited to a declarant-witness's prior statement that "is *inconsistent* with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." Fed. R. Evid. 801(d)(1)(A) (emphasis added). Again, absent an inconsistency, the exception is inapplicable and the statement is inadmissible hearsay.

Neither of the documents Intervenors sought to admit as impeachment evidence against Dr. Cho contain statements inconsistent with Dr. Cho's trial testimony in this case. Her expert report from Pennsylvania criticizes an expert in that case, Dr. Pegden, for assuming that the partisan effect he calculated going from 2% population deviation to 1% population would mirror that of going from 1% to 0%. Dr. Cho, as she stated in her expert report in Pennsylvania and in her testimony in this case, found that argument "logically flawed." Cho, ECF No. 243 at 33:1–5. In this case, Dr. Cho relied on a "completely different argument" for why her population deviation constraint was reasonable, explaining that "any map that is within 1% on population deviation can be brought to population equality at the census block level without compromising any of the other traditional redistricting principles." Trial Ex. P087, Cho Initial Report at 9; *see also* Cho, ECF No. 243 at 33:9–14. Dr. Cho did not extrapolate what would happen from 1% to zero based on what happened from 2% to 1% analysis. Rather, she explained that other redistricting principles would not need to be additionally compromised when going down to 1%: no more counties or cities need be split as one could simply choose to split the ones that are already split. ECF No. 242 at 165:18–167:4. And the partisan composition of the 0% deviation buddy maps would have a "slim to none" chance of being different from the max 1% deviation map: for a maximum deviation of 3500 people to affect the partisan composition, they would all have to be eligible voters voting for the same party in a district where the elections are extremely

close. *Id*. at 167:5–168:12. Dr. Cho's criticism of a "completely different" argument made by another expert in prior case is not inconsistent with her testimony in this case. Her expert report from that prior case is therefore not admissible as extrinsic evidence of a prior inconsistent statement, and indeed is inadmissible hearsay.

The same is true for Dr. Cho's trial testimony from the Pennsylvania case: none of it on Dr. Pegden's population deviation assumption is inconsistent with her testimony in this case. Intervenors' counsel quoted from the Pennsylvania transcript, noting that Dr. Cho said that Dr. Pegden "didn't preserve equal population at the same level that the current map preserves it at," and then quoting Dr. Cho's rhetorical question, "do you get some partisan effect from that . . . ?" ECF No. 243 at 30:1–17. When asked if that was her testimony in the Pennsylvania case, Dr. Cho agreed that it was and noted "if you read the rest of it you'll see that I was explaining exactly what I explained to you just now, his argument was two percent to one percent, it's the same as one percent to zero, and that's just not true." *Id.* at 30:18–22. Again, just as was the case with Dr. Cho's Pennsylvania expert report, her Pennsylvania trial testimony on population equality was not inconsistent with Dr. Cho's testimony in this case, because she was critiquing a "logically flawed" argument made by Dr. Pegden in the Pennsylvania case and Dr. Cho made a "completely different" argument about population equality in this case.

Intervenors' counsel also sought to impeach Dr. Cho with her testimony from the Pennsylvania case on incumbency protection. *See id.* at 41:11–45:25. The asserted inconsistency was that Dr. Cho in her Pennsylvania testimony was "inferring that incumbency protection was one of the goals of the Pennsylvania legislature because there was only one pairing" of incumbents, *id*. at 37:8–10, which was the minimum number possible given the loss of one seat in redistricting, while Dr. Cho "here refused to make the same inference simply

8

because the state paired three sets of incumbents when only two were required," *id.* at 37:20–22. As an initial matter, even if this were an accurate characterization of Dr. Cho's opinions in each case, they would not be inconsistent because of the acknowledged difference in facts. As Dr. Cho explained, there is no inconsistency because the facts were simply different in the two states and in the two cases. This is even clearer when taking into account "the whole picture," including the legislative history statements from Ohio expressly disclaiming incumbency protection, as well as the fact that the enacted map in Ohio unnecessarily paired incumbents. *Id.* at 37:23–38:7. In Pennsylvania, by contrast, "the plaintiffs asserted that incumbency protection was at play" and the legislature enacted a map with "the minimum number of pairings that they could possibly have done." *Id.* at 45:4–8.

Simply put, the facts of the two cases are inconsistent, not Dr. Cho's statements. Dr. Cho's expert report and trial testimony from the prior case are therefore not admissible as impeachment evidence.

## II. DEFENDANTS AND INTERVENORS CANNOT RELY ON HEARSAY TO BOLSTER THEIR CLAIM THAT THE CHALLENGED MAP WAS JUSTIFIED BY BIPARTISANSHIP.

To portray Republicans' dogged pursuit of maximum partisan advantage as a benign bipartisan compromise, Defendants and Intervenors rely on inadmissible hearsay evidence throughout their joint trial brief and proposed findings of facts to assert that alterations to proposed districts made by Republican map drawers reflected the views and preferences of Democrats in Ohio and Congress. But as the Court well knows, Federal Rule of Evidence 802 prohibits the admission into evidence of out-of-court statements to prove the truth of the matter asserted. Fed. R. Evid. 802, 801(c). For this very reason, at trial, counsel for Defendants expressly disclaimed his reliance on testimony regarding out-of-court statements by Democratic lawmakers about the 2011 redistricting process for their truth. ECF No. 243 at 161:20–24. To

the extent it is constructed on inadmissible hearsay, Defendants' and Intervenors' *post-hoc* rationale for Defendants' adoption of an unconstitutional partisan gerrymander must be rejected.

### A. Kaptur-Kucinich Pairing

Defendants and Intervenors assure the Court that Ohio Democrats *chose* to pair Representatives Marcy Kaptur and Dennis Kucinich in H.B. 319 and later advocated for drawing the district to favor Representative Kaptur.  *See, e.g.,* Defs.-Ints.' Post-Trial Brief, ECF No. 252 ("D/I Br.") at 8 ("[The shape of congressional district 9] was a choice by Democratic officials to favor one incumbent over another."); *id.* at 28 ("District 9 was carefully worked at the request of Democratic legislators to favor Kaptur over Kucinich in the ensuing and inevitable race between incumbents.").  But, as Defendants and Intervenors acknowledge, these assurances are based on statements purportedly made by Democrats to the former Chairman of the Ohio Republican Party, Bob Bennett, and subsequently communicated to Republican map drawer Ray DiRossi.  *See, e.g.*, *id.* at 8–9 (citing DiRossi, ECF No. 243 at 159:3–6, 160:5–19, 159:10–12, 161:15–16, 162:19–163:13, 162:17–20; Judy, ECF No. at 246 77:24–78:3)).  Such statements cannot be relied upon to establish that Democrats did in fact support pairing Representatives Kaptur and Kucinich and drawing a district to favor Representative Kaptur.

Moreover, Defendants and Intervenors' support for these assertions is vague and unverifiable.  They initially point to trial testimony in which Representative Kaptur merely acknowledges that portions of Ohio saw declining population in the 2010 census.  *See id.* at 8 (citing Kaptur, ECF No. 249 at 78:18–23, 79:4–11).  From there, they rely on testimony from Mr. DiRossi to posit that unnamed "Democratic members" communicated their preference for the pairing to Mr. Bennett.  *See id.*; *see also* DiRossi, ECF No. 243 at 159:3–12 (testifying over a standing hearsay objection that "there was a lot . . . of conversations that were happening, [and] it was clear that the Democrats wanted Dennis Kucinich to be the one that was out").  Such

conclusory testimony regarding purported out-of-court statements by unnamed Democrats cannot be offered as evidence of the actual preferences of Ohio Democrats.

### B.  Configuration of District 11

Similarly, Defendants and Intervenors rely on inadmissible hearsay to assert that Representative Marcia Fudge "herself reviewed and approved" the configuration of the redrawn 11th Congressional District.  D/I Br. at 23.  Again, they point to trial testimony from Republican map drawers Ray DiRossi and Troy Judy recounting reports of Representative Fudge's supposed preferences regarding the shape of her district, which had been conveyed to Mr. Bennett.[2]  *Id.* (citing DiRossi, ECF No. 243 at 171:19–172:17, 173:2–10; Judy, ECF No. 246 at 74:3–7, 76:1–15).  But Defendants and Intervenors cannot offer this hearsay-within-hearsay as affirmative evidence that Representative Fudge *in fact* reviewed these proposals and conveyed her preferred alternative to the Republican map drawers.  Moreover, the vague, out-of-court statements are flatly contradicted by Representative Fudge herself, who testified, under oath, that she did not review drafts of the proposed map before H.B. 319 was introduced and "[c]ertainly . . . would not have chosen [the configuration included in H.B. 319], and . . . was not happy about" the shape of the 11th District.[3]  *See* Pls.' Findings of Fact ("Pls.' PFOF"), ECF No. 251-1 at ¶¶ 301–02.

Relatedly, Defendants and Intervenors assert that three prominent Ohio Democrats—former Congressman Louis Stokes, George Forbes, and Vernon Sykes—all supported the configuration of District 11.  D/I Br. at 23 (citing Fudge, ECF No. 239 at 91:20–94:15, 95:16–

---

[2] Defendants and Intervenors separately rely on portions of the deposition of Matt Szollosi in support of this assertion.  D/I Br. at 23.  Curiously, however, the cited testimony addresses neither the composition of the 11th District nor Representative Fudge's purported views on the subject.  *See* Szollosi Dep., ECF No. 230-47 at 60:5-9, 61:24-62:15.

[3] Indeed, DiRossi acknowledged at trial that he did not know, "as a fact," that Representative Fudge preferred the shape of her district.  He testified that he took Mr. Bennett's "word for it."  DiRossi, ECF No. 243 at 172:9-13.

97:25, and 98:2–7; Judy, ECF No. 246 at 70:12–16, 71:5–11, 72:4–8). But each of these contentions are supported solely by newspaper accounts shown to Representative Fudge in Intervenors' failed attempt to refresh her recollection at trial and by purported out-of-court conversations with these individuals. *See supra.* This testimony may not be offered as evidence that Messrs. Stokes, Forbes, and Sykes actually supported the configuration of District 11.

### C. Configuration of District 3

Defendants and Intervenors also claim that District 3 "was drawn with extensive input from Joyce Beatty" and reflected her preferences. D/I Br. at 11, 24; *see also* Defs.-Ints.' Findings of Fact, ECF No. 253 ("DIFOF") ¶ 140 ("Congresswoman Beatty also requested that certain property of Ohio State University, her former employer, be included in the district."). But this, too, is based on out-of-court statements purportedly made by Representative Beatty to Mr. Bennett that cannot be cited as affirmative evidence of Representative Beatty's preferences. *See* DiRossi, ECF No. 243 at 178:7–12.

These and other second- and third-hand accounts of the views purportedly expressed by Democrats stand as quintessential examples of the sort of unreliable, unsubstantiated evidence that the hearsay rule is designed to exclude. As Defendants and Intervenors themselves conceded, such hearsay may not be admitted for its truth. ECF No. 243 at 161:20–24. Accordingly, the Court should exclude this testimony and disregard Defendants' and Intervenors' unsupported assertions regarding Democrats' true preferences in connection with the 2011 redistricting process.

### III. LACK OF FOUNDATION AND MISCHARACTERIZATION OF TESTIMONY AS TO LACHES.

Defendants and Intervenors rely in part upon the trial testimony of Jennifer Miller in support of their claim of laches; specifically, they point to Ms. Miller's testimony as to the

ultimate fate of certain documents that other witnesses testified were obtained by the Ohio

Campaign for Accountable Redistricting, but were not in LWVO's possession to be produced in

this litigation.  *See* DIFOF ¶¶ 1507–08.  Plaintiffs object to this testimony for lack of foundation,

speculation, and for mischaracterizing prior testimony.

Defendants' failure to lay foundation was clear from the outset of their line of

questioning.  Ms. Miller testified that she was unaware of Ann Henkener's prior testimony as to

the documents, *see* Miller, ECF No. 239 at 181:25–182:3, and that aside from reading off the

page of Ms. Henkener's testimony as counsel presented it to her, she was unaware of how many

documents were obtained, what sizes the boxes were, or where the documents were kept.  *Id.* at

182:15–186:3.  She had already testified that she had begun her employment with LWVO on

May 1, 2018, which explains her lack of personal knowledge of events that occurred years

earlier.  *See id.* at 132:12–25.  Defendants argue that Ms. Miller's testimony is evidence that

documents "were shredded as late as the end of 2017," but this testimony is based on what Ms.

Miller clarified was a guess.  *See id.* at 183:18 (testifying that LWVO "might have" shredded the

documents).  Indeed, any reliance on Ms. Miller's testimony on this subject is inappropriate,

given Defendants' failure to lay a foundation.

Defendants also rely upon Ms. Miller's testimony regarding how Ms. Henkener selected

boxes to retain.  *See* DIFOF ¶¶ 1507–08.  Yet this testimony arose from Defendants' questions

that both mischaracterized prior deposition testimony and called for speculation, specifically in

asking Ms. Miller whether it is LWVO's "authority to decide what is substantive or appropriate

to produce" in discovery or suggesting that "the other boxes may not have been helpful to your

case."  Miller, ECF No. 239 at 185:19–187:1.  Ms. Henkener, a LWVO volunteer, testified that

the boxes in question were hardly a treasure trove of unique and irreplaceable information.

Many of the documents were "redundant," such that "[t]here were any number of boxes but not a lot of different information. You'd get the same e-mail over and over and over again, and then you'd get the response to the e-mail plus the e-mail over and over again. So it was – it was a lot of paper to go through with less information than one would have thought that many boxes of information could have provided." Henkener, ECF No. 230-18 at 11:23–12:14.

Jim Slagle, the sole employee of OCAR who later served as a Common Pleas judge, *see* Slagle Dep,, ECF No. 230-45 at 16:2–3, 18:9–18, testified similarly, and clarified that OCAR—a nonpartisan organization, despite Defendants' unfounded insinuations to the contrary—was highly transparent about its selection of documents. Judge Slagle personally completed the public records requests, reviewed each one of the documents, and wrote OCAR's report based on the most significant and relevant ones. *Id.* at 22:21–23:8, 25:22–26:15. He further testified that OCAR reported the sources of those records in its reports. *Id.* at 18:19–19:10, 20:8–22:20. Moreover, "the whole purpose [of] the report was to accurately document . . . what we had done in terms of trying to obtain records, what we had obtained, and to try to discuss some of the more significant records to help shine a light on the whole process." *Id.* at 22:9–20. Defendants' questioning of Ms. Miller at trial presupposes that Judge Slagle and Ms. Henkener selected only those documents favorable to Plaintiffs' case; that presumption has no basis in the record.

Accordingly, Ms. Miller's trial testimony as to OCAR's documents should be stricken in its entirety for lack of foundation and mischaracterization of prior testimony.

## IV. TESTIMONY OF DR. BRUNELL SHOULD BE EXCLUDED.

Plaintiffs renew their motion to exclude the testimony of Dr. Brunell as an expert under Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), pursuant to which expert testimony must be

qualified, reliable, and relevant to be admissible.[4]  Plaintiffs further move to strike portions of Dr. Brunell's testimony pursuant to Federal Rules of Civil Procedure 37(c)(1), since it was not properly disclosed as required by Federal Rules of Civil Procedure 26(a)(2).

Expert opinions must be both be disclosed and when disclosed must meet the rigor required by *Daubert*.  Federal Rules of Civil Procedure 26(a) govern the rules of disclosure and require "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. Pro 26(a)(2)(B)(i); *see also R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 270 (6th Cir. 2010).  The disclosure requirement requires more than cursory conclusions of the expert's findings.  *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520–21 (6th Cir. 2014) ("As we stated in *R.C. Olmstead*, '[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.'" (quoting *R.C. Olmstead*, 606 F.3d at 271)).  "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."  *R.C. Olmstead, Inc.*, 606 F.3d at 270–71 (citing *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005)).  Experts must also disclose the underlying data considered by the expert.  *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 537 (N.D. Ohio 2008) ("Materials reviewed or generated by an expert must be disclosed, 'regardless of whether the expert[ ] actually rel[ies] on the material as a basis for [his or her] opinions.'") (citations omitted) (alterations in the original).

---

[4] Plaintiffs rely on the argument presented in their *Daubert* motion for why all of Dr. Brunell's opinions should be excluded as unreliable and/or accorded little weight.  ECF No. 153.  Plaintiffs, therefore, focus on why Dr. Brunell's testimony should also be excluded because he failed to disclose them in his expert report.

Plaintiffs also rely on the arguments presented in their *Daubert* motions seeking to exclude the testimony of Dr. Thornton, ECF No. 155, and of Dr. Hood, ECF No. 150, for why their opinions should be excluded as unreliable and/or accorded little weight.

If a party fails to make sufficient disclosure, Rule 37(c)(1) mandates that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. Pro 37(c)(1); *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land In Tenn.*, 821 F.3d 742, 752 (6th Cir. 2016) ("Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'"); *Vance, by & Through Hammons v. United States*, 182 F.3d 920 (Table), 1999 WL 455435, at *6 (6th Cir. June 25, 1999) ("After Rule 37(c)(1)'s passage in 1993, the test is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless.").  "[T]he burden is on the potentially sanctioned party to show harmlessness." *U.S. ex rel. Tenn. Valley Auth.*, 821 F.3d at 752.

Dr. Brunell's testimony included many previously undisclosed opinions, which could have easily been disclosed prior to his testimony.  The majority of his undisclosed opinions centered on the Voting Rights Act.[5]  On October 5, 2018, Plaintiffs disclosed five experts with accompanying expert reports, including Dr. Lisa Handley and Dr. Wendy Tam Cho.  As part of their reports, they disclosed their prior writing and opinions in this case.  Dr. Handley performed a racial bloc voting analysis, also known as a district-specific, functional analysis.  Dr. Handley clearly established that a 45% black voting age population ("BVAP") district in the vicinity of District 11—both before and after redistricting—offers Black voters a realistic opportunity to

---

[5] While the omission of Dr. Brunell's testimony concerning the Voting Rights Act was the most flagrant omission of opinions that should have been disclosed pursuant to Rule 26, Dr. Brunell also failed to disclose certain opinions and documents related to his critique of Dr. David Niven.  As with Dr. Brunell's work as it relates to the Voting Rights Act, Dr. Brunell was asked if he intended to render any other opinions of Dr. Niven's work and gave sworn testimony that he did not.  Brunell Dep., ECF No. 153-3 at 184:15–22.

elect their candidates of choice.  Trial Ex. P254.  Dr. Cho then used Dr. Handley's analysis in

constructing her simulated maps.  Dr. Cho disclosed that her analysis was based on Dr.

Handley's work and the general location of the black opportunity district both in her report and

in her deposition.  Trial Ex. P87 at 8 ("Consistent with the recommendation from Dr. Lisa

Handley that a 45% BVAP is sufficient to satisfy the Voting Rights Act in the vicinity of District

11 in the challenged plan, I have integrated this 45% BVAP requirement in the drawing of my

maps."); Ex. A, Cho Dep. at 180:18–186:25 (discussing the fact that her minority opportunity

district was "in the Cleveland area" and "Cuyahoga County").  Dr. Cho was asked nearly

identical questions at trial as in her deposition and her testimony was the same in both instances.

*Compare* Ex. A, Cho Dep. at 180:18–186:25, *with* Cho, ECF No. 242 at 158:20–160:3.  She

testified at trial as she had in her deposition that her maps drew a district with at least 45%

BVAP in the Cleveland area and that Cleveland was in Cuyahoga County.   Cho, ECF No. 242 at

158:20–160:3 (discussing the fact that her minority opportunity district was "in the Cleveland

area"); Cho, ECF No. 243 at 72:9–75:2 (same).  Counsel surely was not surprised by the answers

it received during cross at trial from Dr. Cho, as her answers had been the same in her

deposition.  It is, therefore, disingenuous to state that her testimony at trial was "new" or "newly

disclosed."

Prior to his testimony, Dr. Brunell disclosed a very limited opinion on the Voting Rights

Act as it relates to this case.  First, he argued that the distribution of Dr. Cho's BVAP in her

simulated maps was problematic.  Trial Ex. I-60, Brunell Report at 3–4.  Second, he noted Dr.

Handley had recommended a different BVAP in a case involving the school district in the

Euclid, Ohio.  *Id*. at 18.  These two, extremely limited in scope opinions were the sum total of his

opinions related to Voting Rights Act analysis disclosed in his report.  He was deposed on

17

December 14, 2018, after Dr. Cho had submitted her rebuttal report and after the depositions of

Dr. Cho and Dr. Handley (which occurred on December 7, 2018 and December 12, 2018), and

he was asked repeatedly if he intended to supplement any of his opinions from his report and he

gave sworn testimony that he did not. Brunell Dep., ECF No. 153-3 at 26:11–18; 81:21–82:17;

183:3–185:3.

At trial and for the first time, Dr. Brunell gave new testimony completely outside of the

scope of his disclosed opinions. After 8:00 p.m. on Monday, March 11, 2019, Plaintiffs received

notice of a new "demonstrative" that Intervenors intended to use with Dr. Brunell and the

underlying data accompanying the demonstrative.[6] *See* Ex. B, E-mail from K. McKnight. The

next day, Dr. Brunell's second day on the stand, he rendered opinions concerning what may or

may not have been the opinions of political scientists in 2011 about the requirements of the

Voting Rights Act concerning the ability to draw a minority opportunity district in Cuyahoga

County. *See generally* Brunell, ECF No. 247 at 10:16–35:25. At trial, Intervenors claimed that

Dr. Brunell's previously undisclosed opinion was the result of newly disclosed evidence from

Plaintiffs' expert Dr. Wendy Tam Cho, *see, e.g.*, *id.* at 17:18–18:12, however, the record is

clearly to the contrary. As discussed above, Dr. Cho's testimony at trial were entirely consistent

with her expert report and deposition testimony.

Here, the omission was not harmless and caused prejudice to the Plaintiffs. The lack of

notice of Dr. Brunell's opinion, both in his report and at his deposition, rendered it impossible

for Plaintiffs' experts to rebut his opinion. Dr. Brunell was the second to last witness in

---

[6] The time of the disclosure is noteworthy not only because it postdates all of the disclosure deadlines, including for expert witness reports (November 12, 2018), exhibits (January 18, 2019), and demonstrative exhibits (February 22, 2018), but also because the Court had instructed Dr. Brunell not to talk to counsel on Monday night since he was already sworn witness and was in the middle of his testimony. Brunell, ECF No. 246 at 222:20-21 ("As to the witness, you're not to discuss your testimony with anyone during the break.").

Defendants' and Intervenors' case.  Further, his new opinions were not disclosed prior to his taking the stand on Monday, March 11, 2019 and were only disclosed after he had already begun testifying at trial.  While Plaintiffs were able to have Mr. Cooper return to Ohio to offer rebuttal testimony, Plaintiffs were only able to do so because they had notice as of Friday March 8, 2019 of the testimony of Mr. DiRossi.  By the time Dr. Brunell offered his new and previously undisclosed testimony, it was impossible for Plaintiffs to recall their expert witnesses who could most aptly rebut his testimony, Dr. Handley and Dr. Cho.  Even more importantly, had Dr. Brunell's Voting Rights Act opinions been properly disclosed as part of his rebuttal expert report on November 12, 2018, Dr. Handley could have written a rebuttal report to properly address his criticisms of her work and Dr. Cho's rebuttal report could have addressed his criticisms.  Given the lack of disclosure of Dr. Brunell's opinion as required by Rule 26, it should be stricken from the record as a Rule 37 sanction.  *See U.S. ex rel. Tenn. Valley Auth.*, 821 F.3d at 751 (upholding a Rule 37 sanction since the expert report was not "a complete statement of all opinions the witness will express and the basis and reasons for them" (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)).

## CONCLUSION

For the foregoing reasons, Plaintiffs move that the aforementioned testimony and exhibits be stricken from the record.

April 2, 2019                                    Respectfully submitted,

                                                 */s/ Freda J. Levenson*, trial attorney
T. Alora Thomas-Lundborg                         Freda J. Levenson (0045916)
Theresa J. Lee                                   Elizabeth Bonham (0093733)
Emily Rong Zhang                                 American Civil Liberties Union of Ohio Fdtn.
Dale E. Ho                                       4506 Chester Avenue
American Civil Liberties Union Foundation        Cleveland, OH 44103
125 Broad Street, 18th Floor                     Tel.: (216) 472-2220
New York, NY 10004                               Facsimile: (216) 472-2210
Tel.: (212) 549-2500                             flevenson@acluohio.org

athomas@aclu.org
tlee@aclu.org
erzhang@aclu.org
dho@aclu.org

Robert Fram
Nitin Subhedar
Jeremy Goldstein
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel.: (415) 591-6000
rfram@cov.com
nsubhedar@cov.com
jgoldstein@cov.com

ebonham@acluohio.org

David Carey (0088787)
American Civil Liberties Union of Ohio Fdtn.
1108 City Park Avenue
Columbus, OH 43206
Tel.: (614) 586-1972
dcarey@acluohio.org

Michael Baker
Perrin Cooke
Peter J. Rechter
Robert S. Day
Jacob Canter
Isaac Wood
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
rday@cov.com
jcanter@cov.com
iwood@cov.com

## CERTIFICATE OF SERVICE

I, Freda J. Levenson, hereby certify that the foregoing document was served upon all counsel of record in this case via ECF.

*/s/ Freda J. Levenson*
Counsel for Plaintiffs