**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

_____
                                              )
OHIO A. PHILIP RANDOLPH                       )
INSTITUTE, *et al.*                           )
                                              )
          Plaintiffs,                         )       No. 1:18-cv-00357-TSB-KNM-MHW
                                              )
v.                                            )       Judge Timothy S. Black
                                              )       Judge Karen Nelson Moore
LARRY HOUSEHOLDER, Speaker of the             )       Judge Michael H. Watson
Ohio House of Representatives, *et al.*       )       Magistrate Judge Karen L. Litkovitz
                                              )
          Defendants.                         )
_____)


**<u>PLAINTIFFS' POST-TRIAL REPLY BRIEF</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 1

I.     PLAINTIFFS' CONSTITUTIONAL RIGHTS HAVE BEEN VIOLATED. ............... 1

    A.   There Is a Consensus Among the Lower Courts that Have Considered This Issue about the Constitutional Violations. ................................................ 3

    B.   There Is No Serious Question Regarding the Manageability of the Standards Identified by This Court and Others. ................................................... 5

    C.   Heightened Scrutiny is Appropriate Because Fundamental Rights Have Been Heavily Burdened. ................................................................. 6

    D.   This Court Expressly Adopted a Three-Part Test in Which the Burden Shifts to Defendants in the Final Step. ..................................................... 8

II.    PLAINTIFFS HAVE MET THE THREE-PART TEST IDENTIFIED BY THIS COURT. ............................................................................... 9

    A.   Plaintiffs Rely Upon Record Evidence, Unlike Defendants and Intervenors. ................ 9

    B.   The Evidence in the Record Clearly Established Discriminatory Intent to Gerrymander. .................................................................... 10

        1.   12-4 Map Was Not a Bi-partisan Compromise. ..................................... 10

        2.   The Challenged Map Is Not an Incumbency Protection Map. ........................ 15

        3.   Compliance with the Voting Rights Act Does Not Explain the Way the Lines Were Drawn. ..................................................... 17

        4.   Geography Does Not Explain the Way the Lines Were Drawn. ........................ 25

        5.   The Post Hoc "Requirements" Testified to By Defendants' Witness Do Not Explain the Way the Lines Were Drawn. ................................ 27

    C.   Ohio's Congressional Map Has Had a Discriminatory Effect. ........................... 30

        1.   Discriminatory Effect, Not Changing Voter Preferences, Explains Ohio's Election Results. ......................................................... 30

        2.   Plaintiffs Have Demonstrated Both Statewide and District-Specific Discriminatory Effect. ..................................................... 31

    D.   There Is No Justification for the Discriminatory Congressional Districts Implemented by the State. ................................................... 35

III.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS. ......................... 36

IV.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY LACHES. ................................. 38

CONCLUSION ................................................................................................ 40

Plaintiffs respectfully submit this post-trial reply brief in support of their claims and in reply to the post-trial brief of Defendants and Intervenors.

## INTRODUCTION

Ohio's congressional map has been unconstitutionally gerrymandered. Ohio's map is not just a gerrymander, but an extreme one constituting a "geographic monstrosity." Plaintiffs' Proposed Findings of Fact ("PFOF") ¶ 938, ECF No. 251-1. What happened in Ohio is the opposite of democracy in action. The plan was devised to create an impenetrable 12-4 Republican majority. It was drawn in secret rooms outside of the public eye by a handful of Republican operatives, many of whom had no official role in Ohio's government. "[I]t is unfortunate that . . . legislators have reached the point of declaring that, when it comes to apportionment: 'We are in the business of rigging elections.'" *Vieth v. Jubelirer*, 541 U.S. 267, 317 (2004) (Kennedy, J. concurring). Rigging of elections through partisan gerrymandering is not only unfortunate, it is also unconstitutional. *Davis v. Bandemer*, 478 U.S. 109, 113 (1986) (holding partisan gerrymandering unconstitutional). Because of the illegal partisan gerrymander, Plaintiffs and similarly situated Ohio voters have been constitutionally harmed. Plaintiffs have proven each of their four claims and the facts necessary to demonstrate standing. Defendants and Intervenors, by contrast, have entirely failed to justify the illegal actions of the state. This Court should, therefore, declare unconstitutional and enjoin Ohio's congressional map.

## ARGUMENT

### I.   PLAINTIFFS' CONSTITUTIONAL RIGHTS HAVE BEEN VIOLATED.

Apparently displeased with the current state of the law and the decisions of this Court, Defendants and Intervenors assert the law as they wish it were, rather than as it is. They barely engage with the most pertinent Supreme Court precedent in this area—that is, *Gill v. Whitford*, 138 S. Ct. 1916 (2018), *Vieth*, 541 U.S. 267, and *Bandemer*, 478 U.S. 109—and instead place an

inordinate amount of reliance on a narrow case which predates them all, *Gaffney v. Cummings*, 412 U.S. 735, 753–54 (1973). *Gaffney* considered population deviations between districts for the Connecticut General Assembly, and determined that the goal of "political fairness," that is "a rough scheme of proportional representation of the two major political parties" justified an average deviation of 0.45% for the Senate and 1.8% for the Assembly. *Id.* at 737–38. *Gaffney* did not sanction the use of political data deployed for discriminatory purposes, as has been demonstrated in the case before this Court. It held that the courts will not invalidate a state plan "because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State." *Id.* at 754. In that case, the Court did not find that a party drew a redistricting plan "to minimize . . . the political strength of any group or party," *id.*, as has been done in Ohio. Partisan gerrymandering claims are justiciable, as the central holding of *Bandemer* has not been overturned. 478 U.S. at 113; *Vieth*, 541 U.S. at 310 (Kennedy, concurring in the judgment) (*Bandemer* was "controlling precedent on the question of justiciability" and he was joined in this opinion by four other justices); *see id.* at 318 (Stevens, dissenting) ("we reaffirm the central holding of the Court in *Davis v. Bandemer*").

In addition to their selective acknowledgment of Supreme Court precedent, Defendants and Intervenors flatly ignore or reject this Court's decision regarding the constitutional provisions implicated and the applicable legal tests, in addition to the other three-judge panels that have similarly held. As Defendants and Intervenors demanded at the summary judgment stage, Plaintiffs identified the tests applicable to each of their constitutional claims, and, in its decision, this Court clearly indicated the legal tests that would apply. Order Denying Summ. J. ("SJ Order") at 9-19, ECF No. 222.

**A.  There Is a Consensus Among the Lower Courts that Have Considered This Issue about the Constitutional Violations.**

Defendants and Intervenors contort the law and the facts Plaintiffs have proven to assert there has been no constitutional harm.  Defs.' & Ints.' Post-Trial Br. ("D/I Br.") at 52-64, ECF No. 252.  In doing so, they flatly ignore the five three-judge panels that have considered partisan gerrymandering cases in the past several years.  These courts, including this one, have reached a clear consensus regarding the constitutional violations caused by a partisan gerrymander.  Partisan gerrymandering violates rights under the First and Fourteenth Amendments and exceeds the state's power under Article I.

Ohio has violated Plaintiffs' rights under the Fourteenth Amendment.  A partisan gerrymander violates the Equal Protection Clause as it "treats individuals who support candidates of one political party less favorably than individuals who support candidates of another party." *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 860–61 (M.D.N.C. 2018); SJ Order at 10.  The state favoring one segment of the population over another, here "disadvantag[ing] a politically weak segment of the community," is a textbook violation of "the constitutional guarantee of equal protection." *Karcher v. Daggett*, 462 U.S. 725, 748 (1983).  Plaintiffs have also made out another, narrower, violation of the Fourteenth Amendment—that is, under this claim, Plaintiffs' rights are violated when they are denied the opportunity to elect their candidates of choice and to influence elections.  The "right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot," *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969), and this is the case for Plaintiffs in the cracked districts.  Plaintiffs have proven, that in reconfigured districts, Democratic voters would have an opportunity to elect that they now lack in the 1st, 5th, 12th, and 16th Districts.

Defendants and Intervenors seem to think that because Plaintiffs are not barred outright from conducting activity protected by the First Amendment, there is no violation. This has never been the law. Rather, it is black letter law that burdening, penalizing, or retaliating against citizens "because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views" violates the First Amendment. *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring); *League of Women Voters of Mich. v. Johnson*, 352 F. Supp. 3d 777, 806–07 (E.D. Mich. 2018); *see also Benisek v. Lamone*, 348 F. Supp. 3d 493, 498 (D. Md. 2018); *Rucho*, 318 F. Supp. 3d at 929; *Whitford v. Gill*, 218 F. Supp. 3d 837, 884 (W.D. Wis. 2016), *rev'd on other grounds*, 138 S. Ct. 1916 (2018). The drawing of Ohio's congressional district boundaries was done to privilege the state's preferred political party and to burden the state's disfavored political party. Here, the disfavored party and its members were "deprived of their natural political strength by a partisan gerrymander," a violation of their First Amendment right to associate. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (citing *Anderson v. Celebrezze*, 460 U.S.780, 791–92 (1983)).

Finally, both this Court and the *Rucho* court clearly articulated the Article I violation caused by a partisan gerrymander. Plaintiffs' Article I claim "rests on a theory that the redistricting law, here H.B. 369, itself 'amounts to a successful effort by the [State] to 'disfavor a class of candidates' and 'dictate electoral outcomes.''" SJ Order at 17–18 (citing *Rucho*, 318 F. Supp. 3d at 940 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995))). Just as in *Rucho*, Plaintiffs proved that Ohio drew its congressional districts in an "effort to 'dictate electoral outcomes' and 'disfavor a class of candidates.'" 318 F. Supp. 3d at 937.

**B. There Is No Serious Question Regarding the Manageability of the Standards Identified by This Court and Others.**

Whether a standard is "judicially manageable" depends on whether it can be managed by the courts. The "federal courts that have adjudicated partisan gerrymandering claims have converged considerably on common ground in establishing standards for determining whether a partisan gerrymander is unconstitutional." SJ Order at 8–9; *see also LWV-Michigan*, 352 F. Supp. 3d at 802; *Benisek*, 348 F. Supp. 3d at 498; *Rucho*, 318 F. Supp. 3d at 838; *Whitford*, 218 F. Supp. 3d 837. Defendants and Intervenors might resist these decisions and the clear direction of this Court heading into trial, but that does not mean that the courts have not identified the legal standards and the sort of evidence needed to prove an unconstitutional partisan gerrymander.

The Supreme Court has not foreclosed these claims as non-justiciable, and as this Court has recognized, the standards sought are those legal standards by which the Court will adjudicate Plaintiffs' claims. The social science and empirical metrics serve only as *evidence* to support Plaintiffs' claims. SJ Order at 19–21; *LWV-Michigan*, 352 F. Supp. 3d at 805 ("Plaintiffs provide social science analyses as evidence to support their constitutional claims."). As discussed more fully in their opening post-trial brief, Plaintiffs used these metrics along with ample district-specific and statewide evidence to prove each of their claims. Plaintiffs' Conclusions of Law and Post Trial Brief ("Pls.' Br."), ECF No. 251; *see also infra* Section II.C. Further, these metrics do not measure proportionality in the translation of seats to votes. Rather, they measure fairness in the translation of seats to votes. One of the easiest ways to see how the fairness principle works is to look at the asymmetry measure for Ohio. Rebuttal PFOF ¶ 32. It illustrates that when Democrats win 55% of the vote in Ohio they are projected to win just 37.5% of the seats; by contrast, when Republicans win 55% of the vote, they capture 75% of the seats.

*Id.* It is this unfairness or disadvantage to Democrats in the translation of seats to votes that all of the partisan bias measures capture and not proportionality.

Similarly, Dr. Cho's simulated maps are agnostic as to proportionality between vote share and seat share. Dr. Cho simply calculates the partisan composition of the simulated maps that are generated by applying neutral, non-partisan redistricting criteria to the geography and demography of Ohio. PFOF ¶ 758. Dr. Cho makes no effort to enforce how votes translate into seats in her simulated maps. *Id.* ¶ 763. Hence, when comparing the challenged map to the entire distribution of partisan compositions of Dr. Cho's simulated maps, one is not using proportional representation or any rule of proportionality as a benchmark.[1] *Id.* ¶ 837. Instead, one is simply comparing the challenged map against the range of outcomes the state could have produced through redistricting pursuant to neutral, non-partisan traditional redistricting criteria. *Id.*

### C. Heightened Scrutiny is Appropriate Because Fundamental Rights Have Been Heavily Burdened.

The rights to vote and to associate are fundamental political rights. *See Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968). Before they "can be restricted," the Court must engage in "close constitutional scrutiny" of the restriction. *Evans v. Cornman*, 398 U.S. 419, 422 (1970).

Plaintiffs agree that they are not physically prevented from accessing the ballot box. Defendants and Intervenors seem to believe this is enough to indicate there is no violation of Plaintiffs' right to vote. Such a conclusion is at odds with ample, long standing case law. "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush v. Gore*, 531 U.S. 98, 104-05 (2000)). Nor does that case

---

[1] Indeed, the only expert witness in this case who proposed a test based on proportional representation is Dr. Thornton, who concocted a test of statistical significance based on the difference in the number of seats actually won by Republicans and the number of seats one "would predict based on the Republican representation among the voters" statewide under a system of proportional representation. PFOF ¶ 828.

law suggest that any reason put forward by the state is sufficient to justify laws that burden the right to vote. *See* D/I Br. at 55. Rather, the "Equal Protection Clause applies when a state either classifies voters in disparate ways or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (citations omitted). Here, the state has classified voters based upon their previous voting history. When, as in the instant case, "a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters," courts "review the claim using the 'flexible standard' outlined in *Anderson v. Celebrezze* and *Burdick v. Takushi*." *Id.* at 429 (internal citations omitted). Under this standard, a court "must weigh 'the character and magnitude of the asserted injury' against the 'precise interests put forward by the State . . . taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 433 (citing *Burdick*, 504 U.S. 428, 434 (1992)).

Plaintiffs have proven a substantial burden on their right to vote. Plaintiffs, and other Democratic voters, were intentionally singled out by the state based on "their voting history, their association with a political party, or their expression of political views." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment). The district lines have made it so that Plaintiffs in cracked districts are unable to ever elect their candidate of choice or have an opportunity to genuinely influence the election of their congressional representative. This burden based upon Plaintiffs' voting history is not necessary to vindicate the interests put forward by the state, were this Court to even credit them. PFOF ¶¶ 981–93. As the state's supposed interests can be met *without* burdening Plaintiffs' right to vote, they cannot be used to justify this substantial burden. There is a substantial burden on the right to vote and the Constitution is violated where the state "pick[s] and choose[s] among groups of similarly situated voters to dole out special voting privileges." *Obama for Am.*, 697 F.3d at 435–36. Ohio here has chosen to allow voters of their

favored party to control the election of congressional representatives in the vast majority of the districts.  This sorting of voters substantially burdens Plaintiffs' right to vote and must be subjected to heightened scrutiny.

Plaintiffs' First Amendment rights have also been heavily burdened.  The Supreme Court has found a substantial burden on freedom of association where the legislature hampered voters' ability to band together with "like-minded voters to gather in pursuit of common political ends . . . [and] to express their . . . political preferences."  *Norman v. Reed*, 502 U.S. 279, 288–89 (1992).  "'[T]he entrenchment of one or a few parties to the exclusion of others' . . . 'is a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government.'"  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 70 (1990) (citation omitted); *Benisek*, 348 F. Supp. 3d at 498  (holding that partisan gerrymandering "violates the First Amendment by burdening both the plaintiffs' representational rights and associational rights based on their party affiliation and voting history").

### D.  This Court Expressly Adopted a Three-Part Test in Which the Burden Shifts to Defendants in the Final Step.

In its Order denying summary judgment, this Court expressly adopted a three-part test, which, at the final step, shifts the burden to Defendants and Intervenors.  SJ Order at 10, 13–14, 15.  Plaintiffs proposed a test in which the burden shifts to the state in their Opposition to the motion for summary judgment.  Pls.' Br. in Opp. Summ. J. at 9, ECF No. 177-1.  And prior to the summary judgment briefing in this case, numerous other federal courts had already identified a test in which the burden shifts to the state.  *See, e.g.*, *LWV-Michigan*, 352 F. Supp. 3d at 803–05; *Rucho*, 318 F. Supp. 3d at 868, 935.  Neither Defendants nor Intervenors, in their multiple briefs in support of their motion for summary judgment, suggested that such a burden shift is

improper.  *See* ECF No. 136, 140-1, 189, 190.  Defendants and Intervenors now resist this burden, not because it is an improper application of the law, but because they cannot meet it.

## II.        PLAINTIFFS HAVE MET THE THREE-PART TEST IDENTIFIED BY THIS COURT.

### A. Plaintiffs Rely Upon Record Evidence, Unlike Defendants and Intervenors.

Defendants and Intervenors cannot meet their burden of demonstrating that their actions were justified.  To prove their case, Plaintiffs have relied on documentary evidence authored by the relevant parties, which are either exempt from the definition of hearsay or fall squarely within an exception, deposition testimony of the declarants, trial testimony of the declarants, and expert testimony.  Defendants and Intervenors have failed to provide sufficiently reliable evidence to support their claims that Ohio's congressional map is not a partisan gerrymander.  Defendants and Intervenors flagrantly flout the Rules of Evidence and instead rely on either inadmissible hearsay testimony or, in many instances, no evidence in the record at all.  *See*, *e.g.*, D/I Br. at 8 (relying on inadmissible hearsay testimony in discussing the Kaptur/Kucinich pairing); *id.* at 9 (failing to cite to evidence in the record and misstating evidence in the record to support the discussion of the 3rd and 16th Districts), *id.* at 10–11 (relying on inadmissible testimony in discussing the 3rd District); *id.* at 18 (no citation to the record to support the statement that "[t]he Ohio legislature rejected that idea out of hand—listening to their Democratic colleagues over national Republicans—and national Republicans had no recourse to disagree"); *id.* at 23 (citing inadmissible hearsay testimony to support the notion that the map was meant to comply with the Voting Rights Act).  "Rules of evidence are designed in the interest of fair trials."  *United States v. Augenblick*, 393 U.S. 348, 352 (1969).  As in the drawing of Ohio's map, Defendants and Intervenors have failed to abide by the established rules.

The weight of the evidence is on the side of Plaintiffs, who consistently rely on admissible evidence in the record to prove their case.  Because Plaintiffs have proffered sufficient admissible evidence to meet the three-part test established by this Court, the Court should rule in their favor.

### B. The Evidence in the Record Clearly Established Discriminatory Intent to Gerrymander.

All of the types of evidence courts consider in determining whether the map was drawn with the intent to gerrymander are present in this case.  As with other forms of intent, the intent to entrench can be established through direct and circumstantial evidence.  *See Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see also Reno v. Bossier Parish Sch. Bd*., 520 U.S. 471, 488-89 (1997) (discussing the Court's use of *Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252 (1977), in racial gerrymandering cases).  Inferences of improper intent can be drawn from the sequence of events leading to the map, contemporaneous statements, excessive reliance on political data to disfavor one party's supporters, and expert evidence.  *See Cooper v. Harris*, 137 S. Ct. 1455, 1468–69, 1475–75 (2017); *Rucho*, 318 F. Supp. 3d at 850–51, 861–64; *see also Vieth*, 541 U.S. at 321-323 (Stevens, J., dissenting); *City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found*., 538 U.S. 188, 196–97 (2003).  These are tools that courts commonly use to discern intent for discriminatory actions.  All four types of evidence indicate that Ohio's map was drawn with intent to partisan gerrymander.

#### 1.  12-4 Map Was Not a Bi-partisan Compromise.

In their conclusions of law, Defendants and Intervenors concede that the goal was to have a 12-4 map.  D/I Br. at 8 (conceding that the "goal" was a 12-4 map).  Therefore, the only question left for this Court is whether a 12-4 map represented a compromise between Democrats and Republicans.  Plaintiffs submit that the record evidence demonstrates that the 12-4 map was

not a compromise, but an unconstitutional attempt to entrench a Republican majority by local and national Republican operatives.

The evidence in the record is clear that these Republican actors decided to make Ohio's congressional map a "12-4" map long before H.B. 319 was introduced.  PFOF ¶¶ 239–41.  This was entirely a Republican decision.  *Id.*  As early as March 2011, there were emails between local and national Republicans about a "12-4" map.  *Id.* ¶ 108.  In early March 2011, for instance, newly-elected Ohio Secretary of State Jon Husted discussed with staff to newly-elected Representative Steve Stivers of the 15th District a "12-4 redistricting map scenario that . . . [Stivers and his staff] would like."  *Id.*  By July 2011, Republicans were already sharing internal spreadsheets scoring proposed districts that reflected 12 Republican districts.  *Id.* ¶ 111.

Internal Republican communications in early September, before H.B. 319 was introduced or ever seen by a Democrat, also reflected a Republican desire to create a 12-4 map.  For instance, on September 7, 2011, Tom Whatman of Team Boehner sent an email with the subject line "Talking Points" to Ohio Senate President Tom Niehaus.  PFOF ¶ 112.  The email stated:

> We have to recognize that we currently have five Republicans in southwest Ohio.  In losing two seats, and ***trying to lock down 12 Republicans seats*** it is unrealistic to think southwest Ohio can remain the way it is.  Having the Speaker from the region more than makes up for this loss.

*Id*.  Two days later, Whatman forwarded this email to Troy Judy, who worked for Speaker Bill Batchelder.  *Id.* ¶ 113.  Judy soon after sent it to Ohio Republican map drawer Heather Mann and asked if she could print a copy for Speaker Batchelder.  *Id.*  None of the individuals included in this exchange were Democrats.

The reason that Republicans wanted a 12-4 map and not a 13-3 map was clear in another set of talking points circulated just a few days later.  On September 13, Mann sent to Mike Lenzo, the counsel to the Republican caucus in the Senate, more talking points reiterating that

the goal was to "lock down 12 Republican seats," as stated in the Whatman talking points.[2]  *Id.*

¶ 114.  This document explained that 12-4 was preferable to 13-3.  It stated:

> This map is one that Speaker Boehner's team has asked our caucus to support because it bolsters districts that were vulnerable going into a Presidential year with an incumbent Democrat at the top of the ticket.[3]

> Population loss has consequences for Ohio.  Given the fact that the overall index for the State of Ohio is 49.5% on a measure of five recent races, it is a tall order to draw 13 "safe" seats.  Speaker Boehner's team worked on several concepts, but **this map is the one they felt put the most number of seats in the safety zone** given the political geography of the state, our media markets, and how best to allocate caucus resources.

*Id.* ¶ 120 (emphasis added).  This document makes several things clear.  First, the request came from national Republicans to local Republicans to support a 12-4 map.  *Id.*  Second, the goal of "locking down" 12 Republican seats was embraced by the Ohio Republicans.  *Id*. ¶ 114.  Third, Republicans thought they were vulnerable to Democrats and did not see the state becoming more favorable to them as alluded to in Defendants' and Intervenors' brief.  *Id.* ¶ 120.  Third, since Republicans did consider themselves vulnerable, the goal was to get as many seats as possible in the "safety zone," *id*., *i.e.*, strongly Republican, to withstand years like 2012, when Barack Obama was at the top of the Democratic ticket and won the state, and years like 2018, when Democrats won 47% of the congressional votes.  *Id.* ¶¶ 120, 714–17; Rebuttal PFOF¶ 22.

Republicans conducted an analysis of a 13-3 map, particularly one scenario where Franklin County would have been split four instead of three ways, but that plan was rejected because it would leave too many districts competitive and open to Democrats possibly taking the

---

[2] Defendants and Intervenors have asserted no objections whatsoever to the talking points document, which is Trial Exhibit P385.

[3] The incumbent Democratic candidate that year was Barack Obama.  According to Dr. Handley's racially polarized voting analysis, Obama was the minority-preferred candidate in Ohio's 11th District in 2008.  Trial Ex. P254, Handley Report at 4.  The fact that the Republicans wanted a map to try and deal with Obama on the ballot is just another piece of evidence that calls into question whether map drawers were concerned about minority representation.  Rather, the fear of Obama on the ballot suggests that the motive was to both contain Democratic and minority voters.

seats in a good year.  PFOF ¶¶ 117–20.  The 13-3 plan was rejected not to appease Democrats in the state, but because it did not put enough Republican seats in the "safety zone."  *Id.* ¶ 120.

It was in this early secretive phase when Republicans designed the Franklin County "sinkhole strategy."  *Id.* ¶¶ 122, 124.  Again, there can be no doubt that the idea originated with the Republicans and not the Democrats.  *Id.*  Whatman has taken credit for being the architect of the idea.  *Id.*  There is also no dispute that having a Democratic district centered in Franklin County made the surrounding districts more Republican.  *Id.* ¶¶ 121–62.

Thus, all the cornerstones of Ohio's map were already in place before very limited negotiations with the Democrats began after H.B. 319 had been passed.  *Id.* ¶¶ 239–41, *see also id*. ¶¶ 251–56.  Throughout the negotiations, Republicans were explicit that the 12-4 allocation of seats would not change.  *Id.* ¶ 116.  The record reflects that Democrats did attempt to get the seat allocation to change, including a proposal that would include six Democratic seats, but were unsuccessful.  *Id.* ¶¶ 253–56, 263–64.  Whatever limited negotiating power the Democrats might have had due to the referendum effort collapsed as Democrats were not able to get the required signatures, a fact known by both Democrats and Republicans.  *Id.* ¶ 266.

Defendants and Intervenors have argued that Democrats were able to get important carve-outs for Representative Fudge, Representative Kaptur, and Representative Beatty in negotiations.  But again, the record evidence is the contrary.  The shape of the 11th District remained the same from introduction of H.B. 319 through the passage of H.B. 369.  Rebuttal PFOF ¶ 18.  Representative Fudge gave sworn testimony that she did not ask for the shape of her district nor was she happy with its downward extension and was surprised to find out that Akron and portions of Summit County had been included in her district.   PFOF ¶¶ 301–03.  Similarly, Representative Kaptur testified that she did not want her district to extend into Cleveland, *id.*

¶¶ 304–05, and there has been no evidence produced by either Defendants or Intervenors why her district had to expand into Cleveland rather than capturing counties closer to Toledo, Representative Kaptur's home base.  Representative Kaptur testified that she had represented these Republican-leaning counties in the past and would be happy to represent them again. Rebuttal PFOF ¶ 8.  The only inference that can be made based on record evidence is that her district was drawn into Cleveland to pack Democrats into just four districts rather than create the potential of more competitive or Democratic-leaning districts.  In fact, Mr. Cooper's hypothetical maps, which do not pair Representative Kaptur with Representative Kucinich illustrate that more competitive districts are exactly the result when the snake on the lake is dismantled, and further, that such a result could have been accomplished without pairing Representative Fudge and Representative Kucinich.  PFOF ¶¶ 976–77.  As for Representative Beatty, a few facts are worth noting: she was not an incumbent congresswoman at the time, so any supposed concessions on her behalf were not a function of incumbency protection.  Rebuttal PFOF ¶ 9.  Also, the 3rd District was strongly Democratic when H.B. 319 was introduced.  *Id.* ¶ 14, *see also* PFOF ¶ 161. It was created prior to any negotiations with Democrats, and as discussed above, it was part of a Republican plan to shore up the neighboring districts.

Thus, the rationale that can best explain the Democratic votes in favor of H.B. 369 is not some grand compromise on a 12-4 map that has entrenched a Republican 75% seat share, but the pairing of H.B. 369 with $15 million in savings by eliminating the dual primary.  *Id.* ¶¶ 251–52. The 12-4 seat allocation remained constant throughout the redistricting bill process.[4]  *Id.* ¶¶ 271– 89.  As a result, both of the Republican redistricting bills—H.B. 319 and H.B. 369—when introduced and passed, reflected a 12-4 seat allocation.  *Id.*

---

[4] Multiple pieces of evidence in the record support a finding that Democrats viewed H.B. 369 as a 12-4 map and did not consider districts like the 16th District to be competitive.  PFOF ¶¶ 272, 284–89.

### 2. *The Challenged Map Is Not an Incumbency Protection Map.*

Merely invoking potentially non-partisan redistricting criteria is insufficient to insulate the challenged map. As the Supreme Court and this Court have both made clear, "traditional districting objectives [must] be applied in a 'nondiscriminatory' manner." SJ Order at 14 (quoting *Karcher*, 462 U.S. at 740–41). Courts do not simply accept the invocation of a certain traditional redistricting criterion as a talismanic protection insulating a redistricting plan from challenge. Rather, they analyze "the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests." *Karcher*, 462 U.S. at 741.

Here, Defendants and Intervenors insist that incumbency protection compelled the challenged plan. D/I Br. at 5–20. However, the record evidence simply does not bear that out. This was not a map compelled by incumbency protection. Contemporaneous statements from the legislature identify the protection of incumbents as "subservient," PFOF ¶ 1028, and the rest of the record demonstrates that this was so. In his floor speech, the sponsor of the enacting legislation stated: "Nobody has a district. Every two years, there's an election, and that's how it works. That's how the system works. There's nobody that owns a piece of land in Congress. People elect them." *Id.* He went on to disclaim any intention of achieving the particular three incumbent pairings, saying, "Now, that isn't necessarily the way it was intended to be. It could've been different, but that's the way it ended up." *Id.*; *see also id.* ¶ 773.

Moreover, the structure of the map itself bears out that it is not an incumbency-protection plan. It paired three sets of incumbents, instead of two. *Id.* ¶¶ 961–62, 1030–32. Despite Defendants' and Intervenors' claims of the importance of seniority in Congress motivating the state, the map drawers paired the most senior member of Ohio's congressional delegation,

Representative Marcy Kaptur, a member of the U.S. House Appropriations Committee.[5] *Id.*

¶¶ 305, 1035. Defendants and Intervenors also incorrectly assert that both parties bore the

pairing of incumbents equally. Again, the record proves them wrong. The pairing of

Representatives Sutton and Renacci in the 16th District was done in a way to favor the

Republican incumbent, a point agreed to by Defendants' own expert. *Id.* ¶¶ 998, 1033. A new

district was created without any incumbent. Rebuttal PFOF ¶ 9. Contrary to Defendants' and

Intervenors' insistence, the record is clear that this District was not created at the behest of

Democrats, but in order to ensure that the large Democratic population, in a region of the state

that was growing, did not imperil the electoral prospects of the Republicans in the 12th and 15th

Districts. PFOF ¶¶ 121–62; Defendants' and Intervenors' Joint Proposed Findings of Fact

("DIFOF") ¶ 241, ECF No. 253. And, in light of Intervenors' counsel's illusions to the contrary,

ECF No. 242 at 111:21–24, 112:9–12, to be clear, incumbency has no part in the splitting of

Cincinnati. Jean Schmidt, resident of Clermont County, whose requests regarding her district

were implemented by the mapdrawers, represented the 2nd District at the time of redistricting.

Rebuttal PFOF ¶ 10. There is no incumbency-related reason that Cincinnati is split.

Additionally, Plaintiffs have made clear that there were numerous available "alternatives

that might substantially vindicate" the asserted interests. *Karcher*, 462 U.S. at 741. Mr.

Cooper's hypothetical plans paired incumbents based on party in exactly the same manner as did

the challenged plan, but bettered the map on all traditional redistricting criteria and on

Democratic voters having the opportunity to elect their candidates of choice. PFOF ¶¶ 940, 947,

950, 963–64, 967, 969, 976–77. Even to the extent the Court would credit Defendants' and

---

[5] Representative Kaptur was first elected in 1982, and began her tenure in the 98th Congress on January 3, 1983. At the time of the redistricting, she was the most senior member of the Ohio congressional delegation by 8 years. The Court can take judicial notice of these facts as they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Intervenors' insistence that the composition of the 3rd District was at the behest of Democrats, despite no grounding in the record to support such a contention, these hypothetical plans each contain a district in Franklin County that would have had a nearly identical BVAP to the challenged plan, in which a Democrat would have a majority of the two-party vote share.  *Id.* ¶¶ 976–77; Trial Ex. P093 at Ex. J-2 & M-2.  Mr. Cooper also drafted a rebuttal plan which paired the same exact incumbents and left open District in 3 in Franklin County (in addition to complying with a variety of other post-hoc rationalizations) and, yet again, was able to better the challenged plan on all traditional redistricting criteria and on Democratic voters having the opportunity to elect their candidates of choice.  PFOF ¶¶ 982–93.

> 3.  *Compliance with the Voting Rights Act Does Not Explain the Way the Lines Were Drawn.*

Plaintiffs agree that the interest of protecting minority voting strengths is important in redistricting; Plaintiffs contend that the record evidence does not bear out that minority interests were actually considered in drawing the challenged map.  Concerns for minority interests do not account for the shape of the districts as drawn, specifically Districts 11 and District 3.  Defendants' and Intervenors' reading of guiding case law is selective and flawed.  Nothing in the guiding authority excuses Defendants for failing to conduct a district-specific analysis of racial bloc voting, one that Dr. Handley conducted in this case, Dr. Hofeller advised Defendants to conduct prior to redistricting, and Dr. Brunell would have advised Defendants to conduct to comply with the Voting Rights Act ("VRA").

> a)  *Cooper v. Harris* controls the inquiry of whether VRA compliance was a mere pretext.

Evaluating Defendants' decision to draw an arm out of a historically Cuyahoga County-based district into Akron, all supposedly in the name of the VRA, requires no excursion into employment discrimination case-law.  *See* D/I Br. at 22.  *Cooper v. Harris*, 137 S. Ct. 1455, a

Supreme Court decision striking down districts that were purportedly drawn to comply with the VRA in the 2011 redistricting cycle amply makes clear that the VRA was employed as a mere pretext in this case.

The districts in *Cooper* were drawn in a remarkably similar manner to District 11: they were districts that historically elected minority preferred candidates, *id*. at 1465–66, and had their BVAPs increased to above 50% in the 2011 redistricting cycle, *id*. at 1466.  In one of the districts, achieving the higher BVAP by including "heavily black areas of Durham" required "a finger-like extension of the district's western line."  *Compare id*. at 1466, *with* Second Am. Compl. ¶ 94, ECF No. 37 (describing District 11 as a detached shoulder blade with a robotic arm that reaches out from Cleveland into Akron).

To be sure, the *Cooper* Plaintiffs raised a racial not partisan gerrymandering claim, arguing that race predominated over the redistricting process there.  *Id*. at 1463.  But it is controlling precedent for interrogating VRA compliance as a pretext in redistricting.  When the state, as it does in this case, repeatedly exhorts that it needed to create a district with a certain percentage BVAP in order to comply with the VRA, *id*. at 1468–69, to the point of disrespecting county or precinct lines, *id*. at 1469, the Supreme Court's interrogation of whether the "State had 'good reasons' for thinking that the Act demanded" the BVAP, *id*., is instructive—and directly applicable here.  That *Cooper* was only decided in 2017 does nothing to detract from its authority before this Court for assessing, as the *Cooper* Court did, Defendants' intent or lack thereof to comply with the VRA in 2011.

As an initial matter, the Supreme Court in *Cooper* determined that "[f]or most of the twenty years prior to the new plan's adoption, . . . the district's BVAP usually hovered between 46% and 48%," and "throughout those two decades," the district in question "was an

extraordinarily safe district for African-American preferred candidates" in which the African-American preferred candidate won "59% of the total vote" in "the *closest* election during that period." *Id*. at 1470 (emphasis in original). These facts are remarkably similar to those that Defendants had before it when redistricting. *See* PFOF ¶¶ 860–64 (noting that the closest election prior to 2011 in the 11th District was one in which the African-American preferred candidate won 60.3% of the vote). In *Cooper*, and in this case, "experience gave the State no reason to think that the VRA required it to ramp up [the] District[]'s BVAP." *Id*. at 1470.

More importantly, North Carolina—and Ohio—"can point to no meaningful legislative inquiry into" whether a "new, enlarged" district could lead to Section 2 liability. *Id*. at 1471. That the District had to increase its population in the 2011 redistricting "only raises—it does not answer—the question whether § 2 requires deliberate measures to augment the district's BVAP." *Id*. at 1471. "To have a strong basis in evidence to conclude that § 2" demands a certain BVAP, especially if it must be contrivedly drawn, "the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting." *Id*. In other words, the State should have conducted a district-specific, functional analysis. Yet there is "nothing in the legislative record that fits that description." *Id*.

    b) *Bartlett* cannot be read to impose a majority-minority requirement.

Instead of coming to terms with *Cooper*, Defendants and Intervenors proffer that *Bartlett v. Strickland*, 556 U.S. 1 (2009),[6] imposed a "'majority-minority requirement' for Section 2 districts," regardless of what an analysis of racial-bloc voting might show. D/I Br. at 39-40. Yet this is a reading of *Strickland* that the Supreme Court rejected as "at war with our § 2

---

[6] *Strickland* is not implicated by any of Plaintiffs' claims in this case. The Court held in *Strickland* that Section 2 of the Voting Rights does not require that state officials draw lines "to allow a racial minority to join with other voters to elect the minority's candidate of choice [when] the racial minority is less than 50 percent of the voting-age population in the district to be drawn." *Bartlett v. Strickland*, 556 U.S. 1, 6, 23 (2009).

jurisprudence—*Strickland* included."[7] *Cooper*, 137 S. Ct. at 1472. Indeed, as explained by the Supreme Court, the *Strickland* Court "underscored the necessity of demonstrating," for Section 2 liability, racial bloc voting. *Id*. North Carolina—and Ohio's—belief that it was "compelled" to redraw successful crossover districts as majority-minority "rested not on 'strong basis in evidence,' but instead on a pure error of law." *Id*.

        c)   *Harris* confirms the importance of a racial-bloc voting analysis.

Defendants and Intervenors rely on *Harris v. Arizona Independent Redistricting Commission*, 136 S. Ct. 1301 (2016), in their attempt to support the legitimacy of Defendants' motives in this case as in compliance with the VRA. *See* D/I Br. at 20, 24-25, 38. But if anything, contrasting what the Commission did in *Harris* to comply with the VRA—which the Supreme Court accepted as a bona fide attempt to comply with the VRA—with what Defendants did not do only illustrates the flaws of Defendants' and Intervenors' position. There, the Commission determined that the State needed to obtain preclearance from DOJ on Section 2 compliance "[a]fter consulting with their Voting Rights Act expert, their mapping consultant, and their statisticians." *Harris*, 136 S. Ct. at 1308; *see also id*. at 1310 (noting again that the Commission "may have relied on data from its statisticians and Voting Rights Act expert to create districts tailored to achieve preclearance"). Indeed, it was only "[a]s a result of the statistician's report," *id*. at 1308, that the Commission became concerned about some of its district boundaries and adjusted them in order to ensure that minorities had opportunities to elect their candidates of choice, *id*. at 1308-09.

By contrast, Defendants ignored the advice of their own retained expert, Dr. Hofeller, who, early in the redistricting process, directed the Ohio Republicans to gather data on primary election results because they are "required for racial or ethnic block voting analyses." PFOF

---

[7] The State of North Carolina's counsel in *Cooper v. Harris* was the law firm of Ogletree Deakins.

¶ 1015.  Not only was the analysis never conducted, primary election data was never gathered. *Id*.  The only election data Ohio and national Republicans gathered and used to draw the challenged map were those of general elections presenting the relative vote share of Democrats and Republicans.  *Id*.

> d)  The record evidence is clear that District 11 was not drawn to comply with VRA.

To date, the only actual analysis guided by the requirements of VRA was conducted by Plaintiffs' expert, Dr. Lisa Handley, who concluded that a district with 45% BVAP is sufficient to elect Black-preferred candidates in the vicinity of the 11th District.  PFOF ¶ 865.  Neither Defendants nor Intervenors have challenged the validity of Dr. Handley's analysis of voting patterns in the vicinity of District 11, which considered ten elections prior to the 2011 redistricting.  Rebuttal PFOF ¶ 41.

Instead, Defendants and Intervenors rely on Dr. Handley's jurisdiction and election-specific analyses contained in her expert reports in the twin cases challenging the city of Euclid's City Council and School Board districts.  D/I Br. at 38-39.  After describing the Euclid cases in their Brief, Defendants and Intervenors claim that "Speaker Batchelder and other leaders met with representatives of the African American community in northeast Ohio and met with legislators representing the area to discuss this district, and they conducted a functional analysis of the district to conclude that a 50% target was appropriate."  *Id*.  This statement is not supported by any citations, nor is the provenance of any "functional analysis" traceable to any of Defendants' and Intervenors' Joint Proposed Findings of Fact.

Moreover, Dr. Handley testified that her analyses in the Euclid cases were irrelevant to her district-specific, functional analysis of the 11th District: those analyses were of entirely local, non-partisan elections that were held on off-years, in which White turnout outnumbered Black

turnout three to four times over, Whites rarely voted for Black-preferred candidates, and Black-preferred candidates had *never* won a city council or school board elections. Rebuttal PFOF ¶ 43. Her analysis of voting patterns in the vicinity of District 11, both before and after redistricting, by contrast, showed vastly different results: in the partisan, on-cycle elections she analyzed, Blacks and Whites turned out at comparable rates, Whites frequently voted for the Black-preferred candidate, and minority voters had consistently been able to elect their preferred candidate to office. *Id*.

Dr. Handley's view is based on the doctrinal emphasis in Section 2 cases on the "intensely local appraisal" of the challenged district. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (quotations omitted); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437 (2006). Defendants' decision not to conduct an actual analysis of the districts and elections implicated, and instead rely on that conducted on entirely inapposite districts, also constitutes a "pure error of law." *Cooper*, 137 S. Ct. at 1472. Dr. Brunell, who has published many articles on redistricting and the Voting Rights Act, DIFOF ¶ 931, and served as an expert in Voting Rights Act-related litigation in the past, *id*. ¶ 935, would agree. "[N]ot all neighborhoods, not all counties, not all states are the same . . . when you are looking to draw a majority-minority district in a certain area, you want to . . . take an intensely local appraisal . . . and examine actual data to see what the appropriate percentage of minority voting age population would be in that district. Because it does differ." *Id*. ¶ 991. In a jurisdiction like Euclid city council or school board elections, "you might need 55, 56, [or] 57 percent voting age population in that jurisdiction." *Id*. ¶ 993. In an overlapping but larger area, involving an entirely different district and elections,

"you might need significantly less than that."  *Id.*; *see also id.* ¶ 994 (noting that the appropriate BVAP depends on the same factors Dr. Handley analyzed).[8]

Defendants and Intervenors rely principally on hearsay evidence from deceased members of the African-American community, as well as hearsay evidence from Ohio Republicans to plead that they "honestly believed" that over 50% BVAP was required.  D/I Br. at 22. Regardless of whether such evidence actually aids in compliance with the Voting Rights Act, the record evidence of live, admissible witness testimony negates any such inference of good faith. Defendants and Intervenors claim that Representative Fudge reviewed and approved the configurations of her district, D/I Br. at 23 (citing testimony of DiRossi, Judy, and Szollosi), but the Court heard from Representative Fudge herself, who testified credibly that she did not even *know*, let alone approve of the shape of her district.  PFOF ¶ 301.  She only found out about her new district around the time H.B. 319 was made public.  *Id.*  There is simply no credible evidence that Defendants cared enough about VRA compliance to ask the sitting congressperson who had that district about how it should be drawn.  That Representative Fudge, after the district was drawn without her input, accepted the composition of her district, D/I Br. at 24, does not speak to whether the Defendants genuinely attempted to take her views—which opposed including Akron in the district, PFOF ¶ 301—into account in deference to the VRA.

Defendants and Intervenors also claim that "Democratic officials had a voice in the process, and they too proposed majority-minority districts in northeast Ohio, including configurations not materially different from the one selected."  D/I Br. at 23.  The citation for

---

[8] For the same reason, any reliance on the academic literature surveying the kinds of districts electing minority representatives would contravene the "intensely local appraisal" that Dr. Brunell insists is required when redistricting in compliance with the VRA.  Dr. Handley and Dr. Brunell wrote such an article seeking to understand the kinds of districts that elect minority representatives on a nationwide basis and across different types of districts (state legislative and congressional).  Rebuttal PFOF ¶ 46.  In the article, the authors explicitly made clear that for any individual jurisdiction determining what BVAP is needed in a district, a district-specific, functional analysis is required.  *Id.*

this proposition is from Troy Judy, and inexplicably, portions of Nina Turner's testimony about her email address. *Id*. (citing Turner's testimony, ECF No. 240 at 24:22–24). If Defendants and Intervenors intended to refer to Democratic proposals of changes to H.B. 319, those were offered not *during* the closed-door redistricting process of drawing H.B. 319, but *after* the highly lopsided map had already been rammed through the legislative process and enacted into law, when Democrats were in damage-control mode. The purpose of these proposals was to "provide a reasonable alternative to the majority" that "does not overwhelming[ly] favor one political party." PFOF ¶ 255. Moreover, Democrats' eleventh hour attempts to suggest palatable alternatives to Defendants do not suggest that the 11th District had to be drawn with over 50% BVAP. They proposed a district with over 50% BVAP because Defendants had indicated that "[t]hey had to have a 50 plus 1 district in northeastern Ohio. So we wanted to accommodate that, even though legal people questioned whether 50 plus 1 was the proper standard . . . to be an acceptable map." Routt Dep., ECF No. 230-41 at 86:10-87:3. To claim that "Democratic officials had a voice in the process" when Ohio Democrats were forced to only suggest minimal alterations to H.B. 319 to make districts more competitive is to blind oneself to the *realpolitik* of being in the minority party. PFOF ¶ 291. And to imply that Democrats had proposed a majority-minority district because they believed it necessary to comply with the Voting Rights Act is to ignore the non-negotiable constraints imposed by Defendants.

       e)  District 3 was not drawn to improve minority opportunity to elect.

As for District 3, Defendants have never explained why creating a minority opportunity district in Franklin County necessitated the snowflake configuration of District 3. Indeed, Mr. Cooper's Proposed Remedial District 3 clearly demonstrates that the same BVAP can be achieved with a different configuration that also better respects traditional redistricting criteria. PFOF ¶¶ 956-57. Record evidence reflects, at best, lip-service paid to minority opportunity in

Franklin County: a spreadsheet that purported to "Draw new minority opportunity district Franklin County – CD03" contained nothing but the usual estimations of Republican success in that district based on election indices.  PFOF ¶ 1023.  Evidently, no one involved in the map-drawing process was interested in seeing any evidence of just how good of an opportunity minorities would have in electing their candidate of choice in the newly configured 3rd District. *Id*. ¶ 1025.  The record demonstrates that their interest was not in minority opportunity to elect, but in partisan performance.

> f)  No concern was given to minority opportunity to elect in the Cincinnati area.

Finally, the geographic selectivity of Defendants' averred concern for minority rights speaks volumes: there has never been any mention of the significant minority population in the Cincinnati area.  *See* PFOF ¶¶ 958-59 (indicating that BVAP could have been increased in a Cincinnati-based district, and that simply by keeping Cincinnati whole, Mr. Cooper produced a Proposed Remedial District 1 that has a BVAP of 26.74% compared to current District 1, which has 21.3% BVAP).  This might be because while increasing the BVAP in the 3rd and 11th Districts and helps obscure the packing of Democrats in those regions, doing so in the Cincinnati area would run directly counter to the cracking strategy employed in the 1st and 2nd Districts 1.

> 4.  *Geography Does Not Explain the Way the Lines Were Drawn.*

Again, despite the insistence of Defendants and Intervenors, D/I Br. at 1; DIFOF ¶ 1115, the geography of the state of Ohio does not explain the partisan valance of the district lines. Plaintiffs have proven through numerous, distinct pieces of evidence that geography does not explain these lines.  Dr. Cho's simulations work from the very same geographic baseline as the challenged plan, yet consistently produce options that do not "diminish[] or minimiz[e] the voting strength of supporters" of the state's disfavored party, *Rucho*, 318 F. Supp. 3d at 850–51.

*See* PFOF ¶¶ 758–60.  Likewise, each of the maps drawn by Mr. Cooper is based on the same geography and applies the same traditional redistricting criteria as the challenged map.  *Id.* ¶¶ 932–60.  Once again, geography is no constraint on creating a districting plan in which Democrats have a better opportunity to elect their candidates of choice (particularly in the 1st, 5th, 12th, and 16th Districts).  *Id.* ¶¶ 972, 976–77.  Notably, reducing the number of districts and losing population should reduce the number of county splits, but the challenged map does just the opposite, increasing the number of county splits from the 2002 Plan.  *Id*. ¶ 946.  If the challenged plan were compelled by population loss and two fewer districts in Northeast Ohio, as Defendants and Intervenors insist, there should have been fewer split counties in Northeast Ohio than there were under the 2002 Plan.  There were more.  Rebuttal PFOF ¶ 11.

Dr. Niven's work further demonstrates that the district lines did not just happen to gather Democratic voters together because of their spatial proximity.  Rather, an analysis of the communities that the district lines split systematically split apart Democratic communities at a rate disproportionate to Republican communities.  PFOF ¶¶ 880–86.  Defendants' own expert's opinion was consistent with this determination.  Dr. Hood agreed that he did not assess whether Democrats were differentially clustered than Republicans, and admitted to being unfamiliar with the political science literature that indicated that spatial clustering was insufficient to explain the partisan composition of certain districting plans, including Ohio's.  *Id.* ¶ 999.  Dr. Hood agreed that the term "natural packing" indicates that a cluster of partisans wind up in the same congressional district, but the lines between the 1st and 2nd Districts cut through a cluster of Democratic VTDs in Hamilton County due to Defendants drawing the districts that way.  *Id.* ¶ 1000.  It is not the geography of the State that explains the partisan composition of the congressional plan, but the particular choices made by the map drawers.

The record also contradicts Defendants' and Intervenors' assertion that changes in Ohio's political geography explains the partisan composition of the map. Dr. Warshaw's analysis demonstrates that the challenged map is an outlier, judged against Ohio's own baseline. Each of the partisan bias metrics calculated by Dr. Warshaw demonstrates a huge jump from 2010, immediately before the redistricting, to 2012, immediately after. *Id.* ¶¶ 728, 731, 735; Trial Ex. P571 at 22–27. Defendants and Intervenors cannot credibly claim that there was a seismic shift in Ohio's political geography in a pro-Republican direction in between 2010 and 2012, particularly in the face of President Obama winning the state in 2012. Trial Ex. J17. It is not Ohio's geography, but the redrawn district lines that explain extreme partisan bias in Ohio's congressional map.

### 5. The Post Hoc "Requirements" Testified to By Defendants' Witness Do Not Explain the Way the Lines Were Drawn.

As described above, in assessing a challenged redistricting plan, courts must interrogate "the importance of the State's [asserted] interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests." *Karcher*, 462 U.S. at 741. Defendants' key fact witness, Ray DiRossi, asserted that a number of purportedly non-partisan interests compelled the drawing of the congressional district lines. *See* PFOF ¶¶ 981–94. Both at trial and in their post-trial filings, Defendants and Intervenors have attempted to obscure DiRossi's explanations, endeavoring to frame the features as the changes Democrats purportedly requested in the revised H.B. 369. *See* D/I Br. at 27–30; DIFOF ¶¶ 351–99. Once again, the actual record betrays them.

Under H.B. 319, the same three sets of incumbents were paired; Warren County was wholly in District 1; Loveland was wholly in District 2; Mercer County was split as requested by Senator Faber; NASA Glenn Research Center was in District 9; the Timken Headquarters was in

the 16th District; the 3rd District in Franklin County had a BVAP around 30%, contained no incumbent, and contained the OSU campus; Franklin County would be represented by both a Democratic and a Republican congressperson, and the 11th District had a BVAP over 50% and extended into Summit County, which was perversely split four ways.  Rebuttal PFOF ¶¶ 12–20. The only features which Mr. DiRossi testified to that were changes between H.B. 319 and H.B. 369 were including more of the Toledo area in the 9th District,[9] swapping small populations in Franklin County into and out of the 3rd District, making Clark County whole, and making Montgomery County whole.  *Compare* Trial Exs. P45-61, *with* Trial Exs. P544–45.  At trial, DiRossi did not describe what was done only to make the changes resulting in H.B. 369, but to elements that supposedly played into the creation of Ohio's congressional map as a whole.  His described features begin in the drawing of H.B. 319, anchored by the Franklin County Sinkhole and the locking down of a 12-4 Republican seat share.  PFOF ¶¶ 75–203.

Defendants and Intervenors demand that Plaintiffs blindly accept the partisan way in which the state achieved the "required" features of H.B. 319 about which DiRossi testified, as if the decisions going into H.B. 319 itself were immaterial.  *See* DIFOF ¶¶ 896–97.  In rebuttal, Plaintiffs certainly do not accept the perverse, partisan lines of H.B. 319 as a legitimate starting point for alternative maps that still meet the same claimed goals.  As such, Mr. Cooper's rebuttal plan takes all of these features into account and demonstrates there is at least one available alternative that substantially vindicates these same interests while not burdening voters who support the state's disfavored party.  PFOF ¶¶ 981–94.

Additionally, though DiRossi failed to acknowledge the clear partisan implication of the testified-to features, it is plain that many are imbued with partisan intent and effect.  DiRossi's

---

[9] Mr. DiRossi also testified to including NASA Plum Brook in District 9, ECF No. 243:10–13, but it is located in the 4th District under the challenged plan, Cooper, ECF No. 249 at 40:2–10.

explanation of the reason for including Warren County in the 1st District is laughable, content-less, and unsupported by the record. DiRossi simply described that the 1st District contained the whole of Warren County without providing any rational reason why. Slicing up the third largest city in Ohio and appending those two portions of the city to much more rural portions of the State, even if they are whole counties, does not amount to compliance with traditional redistricting criteria. Keeping cities whole is also a traditional redistricting criterion. PFOF ¶ 1040. Further, Warren County is kept whole in every alternative map Mr. Cooper drew in this case, Trial Exs. P090 at 13, fig.6; P091 at 2, fig.1; P092 at 3, fig.2 & 11, fig.7; P093 at 4, fig.2 & 12, fig.7; P617; this is not a distinctive feature of H.B. 319 and H.B. 369.

It strains credulity that Defendants and Intervenors now claim the composition of the 1st District is driven by traditional redistricting criteria. D/I Br. at 29. Rather, the record evidence demonstrates that the decision to include Warren County in the 1st District was to prevent a Democrat from prevailing under the new map, as Steve Driehaus did over then-incumbent Rep. Chabot in 2008. Trial Ex. J15. Rep. Chabot himself acknowledged that, even with the tough challenge of Aftab Pureval in 2018, he knew he would win because of Warren County. PFOF ¶ 668. After the inclusion of Warren County in the 1st District, Rep. Chabot's colleague, Rep. Stivers likewise acknowledged that Chabot "won't have a close race for the next decade." *Id.* ¶ 283. The inclusion of Warren County was not about traditional redistricting criteria, but about moving the 1st District "out of play." *Id.* ¶ 276.

Likewise, the record reflects that the composition of the 3rd District in Franklin County was entirely compelled by partisanship. *Id.* ¶¶ 121–203. So too, the way in which incumbents were paired. *See supra* Section II.B.2. That DiRossi now describes each of these features

without reference to their partisan aims does not overcome the evidence in the record that proves the partisan motives underlying each of these features.

### C. Ohio's Congressional Map Has Had a Discriminatory Effect.

#### 1. *Discriminatory Effect, Not Changing Voter Preferences, Explains Ohio's Election Results.*

Defendants and Intervenors allude to Democrats losing pull in the state multiple times, but the evidence does not bear that out. The work of Dr. Chris Warshaw illustrates that Democrats losing sway over Ohio's voters cannot explain what has happened under Ohio's map. He ran five partisan bias measures over all congressional maps of states with over six seats, and what his analysis shows is a significant increase in the partisan bias in favor of Republicans starting with the 2012 map. PFOF ¶¶ 722, 724. In the case of Ohio, across all five measures, there was a significant jump in partisan bias from 2010 to 2012. *Id.* ¶¶ 728, 731, 735, 741, 742. The state's geography did not radically change in those two years, nor did the Democratic message in the state. Rather, the only change between 2010 and 2012 was the map.

Moreover, Dr. Warshaw's seats-votes curve directly refutes Defendants' and Intervenors' hypothesis that "the current 12-4 split is, if nothing else, attributable to the Democratic Party's gradual loss of popularity in Ohio." D/I Br. at 34. The curve clearly shows that even if voter preferences fluctuate across a wide range of possibilities, the seat outcome that Republicans so secretively and painstakingly crafted would hold strong. Rebuttal PFOF ¶ 33.

The actual election results themselves illustrate that it is not a linear story of Democrats losing popularity in the state. Democrats received different shares of the total congressional vote in Ohio in 2012 (47% of the vote), 2014 (39% of the vote), 2016 (41% of the vote), and 2018 (47% of the vote). PFOF ¶¶ 714-717. If anything, the evidence in the record illustrates that Democratic popularity in the State has ebbed and flowed. *See* Rebuttal PFOF ¶ 38. Some years,

Democrats had captured more votes than other years, and yet the seat share has remained exactly the same. *Id.* ¶ 39.  This is exactly the problem of which Plaintiffs complain.  They are not seeking a guaranteed allocation of seats, but rather that the seats reflect the will of Ohio's voters.  A map that does so is reflected in Plaintiffs' Proposed Remedial Plan.  Democrats capture different seat shares, as reflected in their overall popularity in the congressional vote share: six seats in 2012, five seats in 2014, five seats in 2016, and eight seats in 2018.  PFOF ¶ 972.

> 2.  *Plaintiffs Have Demonstrated Both Statewide and District-Specific Discriminatory Effect.*

Moreover, Plaintiffs have demonstrated the significant and enduring statewide and district-specific discriminatory effect the challenged map has on Democratic voters.  The partisan symmetry metrics analyzed by Dr. Warshaw clearly refute Defendants' and Intervenors' claim that any "incumbency-protection motive," if it did in fact drive the map drawing process, was "bi-partisan" in any way, D/I Br. at 35—all the partisan symmetry metrics find an enduring and strong effect in favor of the Republican party.  *See* PFOF ¶¶ 726-49.  Indeed, notwithstanding the minor variations in partisan symmetry metrics from year to year, over time and across a variety of metrics, they demonstrate an enduring, significant, and outlier partisan effect in favor of Republicans.  *See id.*[10]

Defendants and Intervenors also fail to grapple with the significance of Dr. Cho's findings of partisan effect in the challenged map, and instead make the unremarkable observation that Dr. Cho applied a uniform principle for excluding highly uncompetitive elections and faced resource and time constraints in analyzing her simulated maps with election data from 2016.  D/I

---

[10] To be clear, Dr. Warshaw's calculations do, contrary to Defendants' and Intervenors' allegations, "measure actual election results."  D/I Br. at 36.  It is only when actual elections involve uncontested races that Dr. Warshaw uses other actual elections such as presidential election vote shares to impute what contested vote shares in those elections would have been.  PFOF ¶ 972; Rebuttal PFOF ¶ 27.  In addition, and contrary to Defendants' and Intervenors' allegations, D/I Br. at 36, Dr. Warshaw's calculations in fact "control[] for voter turnout variations between districts," Rebuttal PFOF ¶ 31.

Br. at 36.  As Dr. Cho explained, the purpose of analyzing simulated maps with previous election

data is to estimate the underlying partisanship of those districts; including highly uncompetitive

elections in which one candidate swept the election muddles estimates of partisanship with

factors that "are not partisanship *per se*."  PFOF ¶ 777.  In any event, Dr. Cho's simulations were

assessed against a host of elections, including the two elections most proximate to when the map

was drawn prior to redistricting (2008, 2010), the two elections most proximate to after the map

was drawn (2012, 2014), as well as the most recent election held under the map (2018).  *See Id.*

¶¶ 778-79.  Defendants and Intervenors nowhere address Dr. Cho's findings on any of those

analyses: that the challenged map exhibited a highly unusual partisan effect, isolated from any

partisan effect that might result from Ohio's geography or Defendants' decisions on adherence to

traditional redistricting criteria.  Pls.' Br. at 55-56.

     Contrary to Defendants' and Intervenors' representation, Plaintiffs have adduced

voluminous evidence on "district-specific partisan effect."  D/I Br. at 35.  Plaintiffs have done so

with testimony from Plaintiffs and expert evidence from: Dr. Niven, who analyzed the Ohio map

by region and how the packing and cracking in various districts were effectuated, Dr. Cho,

whose Plaintiff-specific analysis offers a neutral baseline against which to measure the partisan

effect of cracking and packing in the challenged plan, and Mr. Cooper, whose Proposed

Remedial Plan provides a concrete and visible basis for comparison to the challenged map and

the partisan effect it has produced.  Plaintiffs summarize such evidence on a regional basis:

     Republicans have effectuated a discriminatory partisan effect in the cracking of Hamilton

County in Districts 1 and 2.  *See* PFOF ¶ 1041 (winning both districts in every election,

including 2018), *id*. ¶ 890 (Dr. Niven's testimony of the negation of Democratic votes in

Hamilton County with the "overwhelmingly Republican" Warren County); *id.* ¶ 893 (District 2

effectuates an "outnumber[ing]" of the Democratic voters in Hamilton County with Republican voters from the other counties); *see also id*. ¶¶ 331, 323, 655, 668 (testimony of Plaintiffs).

Cracking Hamilton County has produced a large and sustained partisan effect in favor of Republicans that would not have occurred under alternative districting configurations. *See* Pls.' Br. at 9. This effect is also clear when comparing the one-sided electoral outcomes under the current districts against the highly competitive elections occurring in Proposed Remedial District 1, which includes most of Hamilton County and keeps Cincinnati whole. *Id*. at 12.

Plaintiffs have also demonstrated discriminatory partisan effect in the Franklin County area through the packing of Democratic voters in District 3 and the cracking of Democratic voters in Districts 12 and 15. PFOF ¶¶ 900, 906, 909-10 (Niven); *id*. ¶¶ 338, 500-02, 694 (Plaintiffs). The strong packing effect in District 3 is immediately obvious when comparing Plaintiff Inskeep's current district and those under Dr. Cho's simulated maps: none of Plaintiff Inskeep's districts are as packed as is her current district. Pls.' Br. at 9; *see also id*. at 12 (Proposed Remedial District 3, containing the majority of Franklin County, is also less Democratic than current District 3). Comparing District 12 with Proposed Remedial District 12 also reveals cracking: splitting Franklin County only two ways, which is all that is required to comply with population equality requirements, would have dissolved the partisan effect in favor of Republicans as exhibited in current District 12. *Id*. at 12.

Plaintiffs have demonstrated discriminatory partisan effect in District 9, the Snake on the Lake, through packing Democratic voters in it, and cracking Democratic voters in the surrounding districts. PFOF ¶¶ 897-98 (Niven); *id*. ¶¶ 429, 457, 684, 412 (Plaintiffs). The Democratic vote share in District 9 is higher than what Plaintiffs Rader and Walker would encounter in Dr. Cho's simulated districts. Pls.' Br. at 9. The cracking of Democratic votes

around the Snake on the Lake, especially the fracturing of Democratic voters in Lorain County, is especially clear when considering Plaintiff Griffiths's simulated districts. *Id.*, *see also id.* at 12 (uncracking Lorain County in Plaintiff Griffiths's Proposed Remedial District removes the discriminatory partisan effect in his current district). The situation of Stephanie White, a member of APRI living on the outskirts of Toledo, similarly demonstrates a district-specific cracking effect around that part of the state. *See* PFOF ¶¶ 603, 616, 972, 1041.

Last but not least, Plaintiffs have demonstrated the entrenched partisan effect Republicans achieved in northeast Ohio through concentrating disparate Democratic voters in District 11 and 13, and splitting and diluting Democratic voting strength in Cuyahoga and Summit Counties across Districts 14 and 16. *Id.* ¶ 918; *id.* ¶¶ 491, 527, 537, 550, 567, 680 (Plaintiffs). Dr. Cho's Plaintiff-specific analysis bears out the partisan effect in each of these packed and cracked districts; so too, does Mr. Cooper's Proposed Remedial Plan. That Districts 11 and 13 are packed is clear when considering that Plaintiffs Harris and Myer would expect to be in less packed districts in Dr. Cho's simulated maps. Pls.' Br. at 9; *see also id.* at 12 (Plaintiff Myer's Proposed Remedial District also reduces the effect of packing). The Plaintiff-specific analysis for Plaintiff Hutton also demonstrates the cracked effect of the challenged map: the partisan effect of cracking in District 14 disappears in Plaintiff Hutton's simulated districts. *Id.* at 9; *see also id.* at 12.

That cracking Summit County has produced a partisan effect in favor of Republicans is plain as day when comparing the current and proposed remedial district for John Fitzpatrick, a member of the League of Women Voters. PFOF ¶ 633. Summit County is small enough to fit entirely within a single congressional district, and if joined with any contiguous county, would be a Democratic district. *Id.* ¶¶ 916–17. Keeping Summit County whole in Proposed Remedial

District 16 highlights the strong, district-specific effect that has resulted by splitting Summit County: instead of living in a district that has not elected a Democratic candidate, Summit County voters like Mr. Fitzpatrick would live in a district that leans Democratic.  *Id.* ¶ 972.

### D.  There Is No Justification for the Discriminatory Congressional Districts Implemented by the State.

Plaintiffs agree with Defendants and Intervenors that Defendants and Intervenors have "not satisfied" the "absence-of-justification element."  D/I Br. at 37 (heading C).  And Defendants and Intervenors are free to register their "respectful[] disagree[ment]" with this Court's Order denying summary judgment by waiving their opportunity, noted by this Court, to "justify each district on other, legitimate legislative grounds."  SJ Order at 10.  But Plaintiffs "respectfully disagree" that they have shifted any of their burden of proof of partisan intent and effect onto Defendants or Intervenors.  No map, and certainly not "droves for decades," D/I Br. at 37, can be struck down without plaintiffs putting forth evidence—as Plaintiffs did in this case—of the overriding, unrelenting 12-4 partisan goal driving the entire redistricting process, which then manifested itself in the map that was drawn, producing the intended partisan spoils in every election held under it.  Pls.' Br. at 29–56.

This Court was clear in its Order that the justifications the State may proffer in defense of its districts are limited to those that are "legitimate legislative grounds."  SJ Order at 10.  None of those "legitimate legislative grounds" justify the 2012 Plan.  Plaintiffs have demonstrated that there is no "basis in evidence" for concluding that either incumbency protection or VRA compliance accounted for the way in which any, let alone each, of the challenged district was drawn in this case.  *See supra* Sections II.B.2–3.  And Intervenors and Defendants do not even attempt to defend the map based on other redistricting criteria, beyond giving passing citation to "retention of district cores."  D/I Br. at 5.  As all of the maps drawn by Mr. Cooper make

painfully clear: the "geographic monstrosity" produced by the challenged plan was not a function of necessity, but a result of deliberate choices to singlehandedly pursue a 12-4 outcome, exacting any and all costs to traditional redistricting principles.  *See* PFOF ¶¶ 938–70, 981–92.

### III.        PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS.

Defendants and Intervenors ignore the variety of evidence Plaintiffs demonstrated at trial and laid out in their post-trial brief regarding Plaintiffs' standing to pursue each claim, following the guidance of this Court's detailed Order denying summary judgment, and relying on the Supreme Court's majority opinion in *Gill*, and the decisions in *Rucho* and *LWV-Michigan*.

Defendants and Intervenors claim that the Supreme Court never defined "cracking" and "packing" in the context of partisan gerrymandering claims and proceed to regale the Court with what those terms mean in other redistricting contexts.  D/I Br. at 66-68.  Yet while the opinion in *Gill* did not set out a standard for resolving vote dilution claims for partisan gerrymandering on the merits, it did make clear the standards for demonstrating injury under the vote dilution theory and what it meant by "packing" and "cracking" in the context of the case.  *See Gill*, 138 S. Ct. at 1919 (in the syllabus of the decision, providing a definition for "cracking" as splitting Democratic voters "among different districts in which those voters fail to achieve electoral majorities" and "packing" as concentrating Democratic voters "in a few districts in which Democratic candidates in by large margins"); *id.* at 1924 (quoting Plaintiffs' definition of packing and cracking); *id.* at 1930 (describing cracking and packing in the context of Plaintiffs' alleged harm of vote dilution); *id.* at 1932 (describing packing and cracking as having been sufficiently described as a particularized injury, just not proven in that case).

Moreover, *Gill* gave meaning to "[t]he concept of vote 'dilution'" in the partisan gerrymandering context, even if it might mean something different in the malapportionment context.  *See* D/I Br. at 68–69.  Defendants and Intervenors barely respond to any of the evidence

Plaintiffs adduced to demonstrate how Plaintiffs' votes were diluted according to the theory described by the majority opinion in *Gill*. *See, e.g.*, Pls.' Br. at 7–10 (Dr. Cho's Plaintiff-specific analysis not only showing which Plaintiffs lived in packed versus cracked districts, but also "to what extent a particular Plaintiff is packed or cracked") (quoting *Gill*, 138 S. Ct. at 1930).

Ignoring the vast majority of the evidence adduced by Plaintiffs, Defendants and Intervenors fixate on the fact that there remain districts in Mr. Cooper's Proposed Remedial Plan that will be "majority-Republican." D/I Br. at 70. As an initial matter, that should come as no surprise as Plaintiffs do not seek a locked-in, entrenched map in Democrats' favor. As Mr. Cooper's table of estimated Democratic vote share in his Proposed Remedial Plan shows and as Dr. Warshaw's calculations of partisan bias for the Proposed Remedial Plan confirms, the number of seats each party is estimated to receive fluctuates depending on the parties' performance. PFOF ¶ 972 (compare, for instance, 2014 with 2018); *id.* ¶ 937.

Moreover, Mr. Cooper's estimates of Democratic vote share in his Proposed Remedial Plan are nothing more than what he has claimed they are: estimates. PFOF ¶ 974. In fact, they are estimates based on vote share of actual congressional elections conducted under the challenged map. *Id.* ¶ 971. As numerous witnesses have testified in this case, how the lines were drawn in the challenged map affects turnout and voter interest. *See, e.g.*, *id.* ¶ 592 (President of APRI, Andre Washington, describing how hard it is to encourage Democratic voters to turn out in District 12 because of the way the district is drawn). Indeed, Defendants' expert Dr. Hood agrees that the district lines themselves could also affect what kinds of candidates choose to run in the districts and how much money they can raise. *Id.* ¶ 1005. Plaintiffs do not rely on Mr. Cooper's estimates to definitively guarantee that Plaintiffs would have lived and voted in Democratic districts under all circumstances in the Proposed Remedial Plan. The estimates

clearly demonstrate that Plaintiffs' injuries are redress*able*.  Proposed Remedial District 1, for instance, has an estimated Democratic vote share based on the congressional elections that have occurred under the challenged plan that fluctuates between 44.3% and 57.2%, and would significantly improve the opportunity to elect candidates of choice for Plaintiffs Goldenhar and Burks and for the members of Plaintiff Hamilton County Young Democrats.  *See* Pls.' Br. at 12. Similarly, Plaintiffs have demonstrated through Dr. Cho's Plaintiff-specific analysis that several Plaintiffs would not only live in significantly more competitive districts in the simulated maps, but in districts that have a fighting—if not good—chance at electing their candidates of choice. *See id*. at 10 (describing Plaintiffs Griffiths, Hutton, Goldenhar, and Burks).

## IV.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY LACHES.

In asserting laches, a mere showing of lapse in time is insufficient; Defendants must show "changed circumstances" that "make it more difficult to defend against the claim." *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (internal citation omitted). Critically, the requisite showing of prejudice cannot rest on speculation.  *See, e.g.*, *United States v. Weintraub*, 613 F.2d 612, 619 (6th Cir. 1979) ("the prejudice appellant argues he has suffered is speculative, at best, and certainly was no greater than the prejudice to the government in trying its case") (citing *Costello v. United States*, 365 U.S.265, 282–83(1961)); *United States v. Marsten Apartments, Inc.*, 175 F.R.D. 257, 264 (E.D. Mich. 1997) ("The mere possibility of prejudice . . . is not tantamount to an affirmative showing of prejudice.") (internal citation omitted); *Lofgren v. Canada*, No. 2:13-cv-13622, 2016 WL 25977, at *13 (E.D. Mich. Jan. 4, 2016) (where defendant "proved no prejudice attributable to his reliance or [plaintiff's] delay," finding "speculation is not a valid basis" for a conclusion of prejudice).

Defendants make much of some of OCAR's documents being unavailable.  *See* DIFOF ¶¶ 1487–1508; D/I Br. at 73.  Yet speculation—at times, even contrary to the record—is all that Defendants offer here to suggest prejudice as to those documents.

First, Defendants speculate that the documents in question were substantive at all.  Ann Henkener, a LWVO volunteer, testified that many documents obtained by OCAR were "redundant," and included numerous copies of the same email chain, such that ultimately "it was a lot of paper to go through with less information than one would have thought that many boxes of information could have provided."  Henkener Dep., ECF No. 230-18 at 11:23-12:14.  The two boxes of documents that Ms. Henkener transferred from OCAR to LWVO were produced in this action.  Defendants have no evidence that the remaining sets had any value at all, much less that they—unlike most, if not all, of the produced documents—would have *helped* Defendants' case.  Defendants have not identified a single document that the map drawers recall but to which they no longer have access.

Second, live witness testimony is available to Defendants to ascertain the unavailable documents' content.  Judge Jim Slagle, who was then the sole employee of OCAR, testified that he reviewed each one of the documents that OCAR obtained and used.  Slagle Dep., ECF No. 230-45 at 22:21-23:8, 25:22-26:15.  Defendants certainly have not established that Judge Slagle's memory is faulty, and so could simply have asked him about the documents' content at deposition, had they wanted to know.  Tellingly, Judge Slagle testified that "the whole purpose [of] the report was to accurately document . . . what we had done in terms of trying to obtain records, what we had obtained, and to try to discuss some of the more significant records to help shine a light on the whole process."  *Id.* at 22:9-20.  The most relevant documents, in other words, were already summarized and described in OCAR's report.  To imply that there ever

were others of import is simply further speculation.  And beyond this, to imply that there were others that were of import, that were not summarized, and that would have contradicted the ones that were summarized, is total speculation.  This cannot be a basis for a finding of laches.

Defendants' and Intervenors' invocation of a number of dead and ancillary individuals to the redistricting process is similarly unavailing.  Notably, of the individuals that Defendants and Intervenors claim to have been harmed by their passing, none were members of the Ohio General Assembly at the time.  *See* D/I Br. at 73 (citing to the death of Representative LaTourette, Tom Hofeller, Louis Stokes, Mike Wild, and Bob Bennet).  All the principal map drawers and legislators are still available, and many have been witnesses in this case, including DiRossi, Mann, Batchelder, Niehaus, Judy, Whatman, Kincaid, Speaker Boehner, Morgan, Huffman, and Faber.  PFOF ¶ 1043.  Additionally, each of the Congresswomen on whom Defendants and Intervenors now rest their excuses for the map are alive, still in office, and Plaintiffs offered two at trial.  Representative Beatty was included on Defendants' and Intervenors' witness list, but they apparently made no effort to call her at trial.

## CONCLUSION

Plaintiffs have satisfied the Court's test for violation of the First Amendment, the Fourteenth Amendment, and Article I of the United States Constitution.  Therefore, Defendants should be ordered to immediately establish a congressional districting plan that complies with the United States Constitution and enjoined from any further gerrymandering.

April 2, 2019                                    Respectfully submitted,

                                                */s/ Freda J. Levenson*, trial attorney
T. Alora Thomas-Lundborg              Freda J. Levenson (0045916)
Theresa J. Lee                                Elizabeth Bonham (0093733)
Emily Rong Zhang                            American Civil Liberties Union of Ohio Fdtn.

Dale E. Ho
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
athomas@aclu.org
tlee@aclu.org
erzhang@aclu.org
dho@aclu.org

Robert Fram
Nitin Subhedar
Jeremy Goldstein
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel.: (415) 591-6000
rfram@cov.com
nsubhedar@cov.com
jgoldstein@cov.com

4506 Chester Avenue
Cleveland, OH 44103
Tel.: (216) 472-2220
Facsimile: (216) 472-2210
flevenson@acluohio.org
ebonham@acluohio.org

David Carey (0088787)
American Civil Liberties Union of Ohio Fdtn.
1108 City Park Avenue
Columbus, OH 43206
Tel.: (614) 586-1972
dcarey@acluohio.org

Michael Baker
Perrin Cooke
Peter J. Rechter
Robert S. Day
Jacob Canter
Isaac Wood
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
rday@cov.com
jcanter@cov.com
iwood@cov.com

## CERTIFICATE OF SERVICE

I, Freda J. Levenson, hereby certify that the foregoing document was served upon all counsel of record in this case via ECF.

/s/ Freda J. Levenson
Counsel for Plaintiffs