# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

OHIO A. PHILIP RANDOLPH INSTITUTE, *et al.*

Plaintiffs,

v.

LARRY HOUSEHOLDER, Speaker of the Ohio House of Representatives, *et al.*

Defendants.

Case No. 1:18-cv-357

Judge Timothy S. Black
Judge Karen Nelson Moore
Judge Michael H. Watson
Magistrate Judge Karen L. Litkovitz

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' AND INTERVENORS' EVIDENTIARY OBJECTIONS

# Table of Contents

I.  The Legal Standard ............................................................................................ 1

II.  Defendants' and Intervenors' Hearsay Objections Are Baseless ...................................... 1

    A.  Defendants and Intervenors waived their hearsay objections by failing to comply with the Court's express directive to specify the basis for those objections before trial. ......................................................................... 1

    B.  The hearsay objections to Plaintiffs' intent evidence should be overruled, including evidence of the intent of the national Republicans. ............................... 3

    C.  Plaintiffs' exhibits are admissible pursuant to Rule 801(d)(2). ........................... 7

        1.  The statements made by Kincaid are admissible for their truth as agent admissions under Rule 801(d)(2)(D). ................................. 7

        2.  The statements made by Kincaid, Whatman, and Hofeller are admissible for their truth as co-conspirator admissions under Rule 801(d)(2)(E). ........................................................................ 8

        3.  Exhibits in the possession of a party, their agents, or co-conspirators that were acted upon constitute adopted admissions under Rule 801(d)(2)(B). ........................................................ 9

    D.  These principles, as applied, demonstrate why Defendants' hearsay objections should be overruled. ............................................................ 9

        1.  The hearsay objection to Trial Exhibit P393 ("Please Keep This Secret") should be overruled. ............................................... 9

        2.  The hearsay objection to Trial Exhibit P394 ("Dog Meat Voting Territory") should be overruled. ................................................ 11

        3.  The hearsay objection to Trial Exhibit P407 ("Lock Down 12 Republican Seats") should be overruled. .................................... 13

        4.  The hearsay objections to spreadsheets containing partisan scorings should be overruled. .................................................. 14

III.  Defendants' Authenticity and Foundation Objections Are Baseless. ............................... 16

    A.  Defendants offer nothing to rebut the presumption that trial exhibits produced in this litigation are authentic, and their objections to the contrary should be overruled. .............................................................. 16

    B.  Metadata establishes the authenticity and foundation for many of Plaintiffs' exhibits. ................................................................. 20

1.     Metadata can be used to authenticate a document even in the absence of extrinsic evidence (*e.g.*, witness testimony). ........................... 21

2.     For e-mails and documents produced in native format, metadata can provide both authentication and foundation. ....................................... 23

C.    Witness testimony is not required to provide foundation for all of Plaintiffs' exhibits. .................................................................................. 24

IV.   The Objections to the "Franklin County Sinkhole" Spreadsheets Should Be Overruled. ....................................................................................................... 26

A.    The authenticity and foundation objections to Trial Exhibit P077 should be overruled. .................................................................................................. 26

1.     No objection has been lodged against the authenticity and foundation of attachment 3 to P393—waiving any such objection to P077 as well. .................................................................................. 26

2.     Adam Kincaid's deposition testimony confirms his authorship of P077 and carefully details its content. ....................................................... 27

3.     The transmission of the spreadsheet among Ohio and national Republican map drawers with the words "Franklin County Sinkhole" at the top of the document has been clearly established. ......... 28

4.     Adam Kincaid's uncertainty regarding the file name of P077 does not provide a basis for an authentication or foundation objection. ........... 30

5.     Mark Braden's testimony does not provide a basis for an authenticity or foundation objection. ....................................................... 31

B.    The hearsay objections to Trial Exhibits P077 and P393 should be overruled. .................................................................................................. 32

1.     P077 and attachment 3 to P393 are admissible to establish intent. .......... 32

2.     P077 and P393 are also admissible for the truth under Rule 801(d)(2)(B) & (D). ................................................................................. 33

3.     P077 and P393 are admissible for the truth pursuant to Rule 803(6). ......................................................................................................... 35

V.    Defendants' Objections to Dr. David Niven's Testimony Should be Overruled. ............ 35

A.    Dr. Niven's census tract analysis ......................................................................... 35

1.     Census tracts are the appropriate unit for this study. ................................ 35

2.  Dr. Niven employed the research protocols of his profession in examining the pattern of division. ........................................................... 36

B.  Dr. Niven's Principal Study .................................................................................. 37

VI.  Defendants' Objections to Dr. Wendy K. Tam Cho's Testimony Should be Overruled. .................................................................................................................... 38

VII.  Conclusion ..................................................................................................................... 40

## I.    The Legal Standard

In a nonjury trial, district courts enjoy broad authority to admit and consider evidence in rendering a judgment.  A district court "can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence."  11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civ. § 2885 (3d ed. Nov. 2018).  On appeal, a "party who seeks a reversal on the basis of the erroneous admission of evidence in a bench trial has a heavy burden."  *Nw. Nat'l Cas. Co. v. Glob. Moving & Storage, Inc.*, 533 F.2d 320, 324 (6th Cir. 1976).  Even where evidence is admitted over an objection, a district court does not commit reversible error "unless all of the competent evidence is insufficient to support the judgment appealed from or unless it affirmatively appears from the record that the incompetent evidence complained of was relied upon by the trial court and induced the court to make an ***essential*** finding which would not otherwise have been made."  *Caldwell v. Craighead*, 432 F.2d 213, 219-20. (6th Cir. 1970) (citations omitted, emphasis added), *cert denied*, 402 U.S. 953 (1971).

## II.    Defendants' and Intervenors' Hearsay Objections Are Baseless

### A.    Defendants and Intervenors waived their hearsay objections by failing to comply with the Court's express directive to specify the basis for those objections before trial.

Defendants and Intervenors (together, "Defendants") failed to comply with the Court's February 11, 2019 Order to specify the bases of their hearsay objections.  As a result, they waived their hearsay objections.

On February 11, 2019, the Court directed (1) Plaintiffs to provide an updated exhibit list to Defendants and by February 15, 2019; (2) Defendants are to review Plaintiffs' revised exhibit list and respond with their objections, "including an explanation of the basis for each objection," by February 21, 2019; (3) Plaintiffs to respond to Defendants' objections by February 25, 2019; and (4) the parties to meet and confer in a good faith attempt to resolve any outstanding

objections immediately thereafter. *See* Pretrial Conference Tr., ECF No. 221 at 82:9-85:7; Notation Order (Feb. 20, 2019) (directing Defendants to "respond with their objections[— ]including an explanation of the basis for *each objection*") (emphasis added). The Court explained, "I need you to get to work on your specific objections to the specific exhibits, not 'I object based on authenticity, foundation and hearsay.' Those objections are not acceptable." Pretrial Conference Tr., ECF No. 221 at 78:4-7.

Pursuant to the Court's February 11, 2019 Order, Plaintiffs provided Defendants with a revised exhibit list on February 15, 2019. *See* Goldstein Decl. ¶ 3, Ex. A. On February 21, 2019, Defendants jointly provided Plaintiffs with the bases for their authentication and foundation objections, but provided no basis for their 137 hearsay objections. *See* Goldstein Decl. ¶ 4, Ex. B.

Defendants continued to refuse to specify the bases of their objections after Plaintiffs alerted them to their noncompliance on February 22, 2019. *See* Goldstein Decl. ¶¶ 5-6, Ex. C. Despite Defendants' noncompliance with the Court's Order, on February 25, 2019, Plaintiffs provided Defendants with a good faith articulation of the specifics of their responses to the still boilerplate hearsay objections. *See* Goldstein Decl. ¶ 7, Ex. D.

Defendants' hearsay objections should be stricken. They have engaged in the very conduct that the Court described as "not acceptable." *See* Pretrial Conference Tr., ECF No. 221 at 78:4-7. Defendants left Plaintiffs in the dark about the bases of their boilerplate hearsay objections for months, only now explaining what they seek to exclude after Plaintiffs finished presenting their case at trial and completed their opening post-trial brief.

2

**B.    The hearsay objections to Plaintiffs' intent evidence should be overruled, including evidence of the intent of the national Republicans.**

Defendants raise numerous hearsay objections to Plaintiffs' evidence of partisan intent. These objections are misplaced.[1]  In most instances, such evidence is not offered to establish that the statements contained therein are true.  They are offered to establish what the Ohio Republican map drawers ***thought to be true or what they sought to achieve***.  *See* Fed. R. Evid. 801(c)(2); *United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007) ("[T]he mere utterance of a statement, without regard to its truth, may circumstantially evidence the state of mind of the declarant, and, as such, does not constitute hearsay.") (internal quotation marks and citations omitted).[2]  In other cases, if the evidence is used for its truth, it falls into another hearsay carve-out such as a statement by a party opponent (or its agent or co-conspirator), Fed. R. Evid. 801(d)(2), or a statement describing the declarant's then-existing state of mind, Fed. R. Evid. 803(3).

Defendants contend that the intent of the national Republicans is "largely irrelevant."  *See* Joint Evidence Br., ECF No. 254 at 24, 26.  Putting aside that their concerns about such intent evidence really goes to its weight, not its admissibility (*i.e.*, they concede that national Republicans' intent has *some* relevance), the fact is that they are wrong.

---

[1] Plaintiffs specify on the accompanying spreadsheet, filed pursuant to this Court's March 14, 2019 Order, ECF No. 250, articulating with specificity the exhibits and portions of testimony to which the points set forth in this brief apply.  The exhibits discussed in this brief are exemplary and illustrative; they are not intended to be exhaustive.

[2] Defendants argue at length that Plaintiffs cannot rely on certain evidence for the non-hearsay purpose of showing its effect on the listener.  *See* Joint Evidence Br., ECF No. 254 at 19-29.  As discussed below, certain of Plaintiffs' evidence fits squarely within the effect-on-the-listener doctrine.  Defendants, however, ignore the many other non-hearsay uses of evidence, including to circumstantially demonstrate the declarants' state of mind. *See id.*; *Ira Green, Inc. v. Military Sales & Serv. Co.*, 775 F.3d 12, 19 (1st Cir. 2014) ("[A]n out-of-court statement is not hearsay if it is relevant regardless of its truth (say, to show state of mind).") (citation omitted).

As the Court has noted, "[t]he 'state government' would not be excused from potential constitutional violations simply because it asked the national Republicans to take care of the heavy lifting." Order, ECF No. 188 at 13 (denying Adam Kincaid's request for a protective order). The evidence at trial demonstrated that in 2011 national Republicans were engaged in both the strategic decision-making and the micromanaging of Ohio's map drawing process. The intent of the national Republican map drawers—Tom Whatman, Adam Kincaid, Tom Hofeller, and Mark Braden—is therefore highly relevant to Plaintiffs' claims. *Cf. id.*; Order, ECF No. 128 (the "December 21 Order") (granting Plaintiffs' motion to compel and rejecting national Republicans' assertion of the First Amendment privilege); *Ohio A. Philip Randolph Inst. v. RNC*, No. 18-4258 (6th Cir. Jan. 18, 2019) (ECF No. 31-2). Defendants' hearsay objections based on the strained contention that national Republicans' intent is "largely irrelevant" should be overruled.

*Boehner, Whatman, and Kincaid.* On September 11, 2011, just days before the passage of H.B. 319, President of the Ohio Senate Tom Niehaus wrote to Whatman, the Executive Director of Team Boehner, that he was "committed to ending up with a map that Speaker Boehner fully supports." Plaintiffs' Proposed Findings of Fact ("PFOF"), ECF No. 251-1, ¶ 169. In living up to this commitment, Ohio legislative staffers took directions from and collaborated with Republican operatives based in Washington, D.C. *See, e.g.*, PFOF ¶¶ 10-52, 122, 151, 170-78, 181, 184-94, 195-96.

For example, Whatman was the first to conceive of the idea to create a new district in Franklin County, PFOF ¶ 122, which became known as the Franklin County Sinkhole and provided the central architecture of the new map, *see* PFOF ¶ 151 (quoting Kincaid's deposition: "[t]he architecture of [the] new map is one that creates a new Democrat seat in Franklin

County"). Defendants' objections to the relevance of national Republican intent cannot stand given that a national Republican operative designed the basic architecture of the challenged plan.

Moreover, on the same day that President Niehaus pledged his commitment to Speaker Boehner on redistricting, Ray DiRossi, one of the two primary Ohio legislative map drawers, exchanged a series of emails with Whatman regarding proposed changes to the map. *See* PFOF ¶¶ 170-78 (regarding proposed changes to Clark and Mercer Counties). In addition, between September 11 and 12, 2011, (a) DiRossi ran shifts in political scorings of less than one percentage point past Whatman, PFOF ¶¶ 184-94; (b) DiRossi ensured President Niehaus that "Whatman signed off" on changes to the map, PFOF ¶ 181; and (c) Whatman emailed DiRossi, Kincaid, and Mann requesting that the Timken headquarters be moved into the 16th District to benefit a Republican incumbent, PFOF ¶¶ 195-196.

In response to Whatman's Timken request, Adam Kincaid responded at 9:36 p.m., "Yeah, sure, no problem. Ray/Heather, do you want me to do it and send the file over, or will y'all do it?" PFOF ¶ 197. To which DiRossi responded minutes later, "***You do and get equivalence file to us asap.***" PFOF ¶ 198 (emphasis added). Kincaid did as DiRossi instructed and sent the updated map files at 10:46 p.m. that evening. PFOF ¶ 202. This last-minute change is one of many examples in which Kincaid had the pen in drawing Ohio's congressional map. *See also* PFOF ¶ 126 (Kincaid sending map files to DiRossi and Mann); PFOF ¶ 128 (same); PFOF ¶ 146 (Kincaid describing "an iteration" he created of his earlier maps); PFOF ¶ 149 (Kincaid acknowledging that he created at least two more proposed maps last modified on September 10, 2011); PFOF ¶ 119 (Kincaid describing a map labeled "4-way split," which he sent to DiRossi, Mann, and Whatman on September 3, 2011, *see* Trial Ex. P119 at LWVOH_00018302); Trial Ex. P394 at REV-00023234 (Hofeller emailing Braden edits to a

5

map, stating, "Adam is changing the NE . . . You are running into some 'version' control. Maybe Adam should have the controlling map").

*Hofeller and Braden* were similarly involved in the strategic decision-making and micromanaging of Ohio's map drawing in 2011.  Indeed, Braden often served as a conduit between the Ohio General Assembly (his client at the time), PFOF ¶ 37, and other national Republicans.  For example, after receiving the "Franklin County Sinkhole" spreadsheet from Mann on September 3, 2011, Braden forwarded the spreadsheet on September 6, 2011 to Hofeller, with the admonishment to "please keep this secret."  PFOF ¶¶ 138-39.  Two days later, Hofeller wrote to Braden, "Mark: Here is the DBF Plan File.  I put Hamilton back the way it was except for 5 persons needed to reunite three cities.  I gave the plan to Adam as directed."  PFOF ¶¶ 140-41.  Thus, the emails make clear that Hofeller was drawing maps (or directing Kincaid to do so) and transmitting the results back to Braden.

Despite relatively few changes affecting the map between H.B. 319 and H.B. 369, PFOF ¶¶ 269-71, national Republicans remained involved through the passage of H.B. 369.  *See* PFOF ¶ 267, Trial Ex. P398 (Hofeller emailing on December 14, 2011 that "Ohio is going to pass a new congressional compromise map with very little change for us"); PFOF ¶ 267, Trial Ex. P399 (Hofeller emailing on December 14, 2011 that "it looks unlikely that the Democrats will be able to gather sufficient signatures to delay the implementation of the [H.B. 369] map"); PFOF ¶ 160, Trial Exs. P497, P498, P499 (Kincaid created a changes sheet reflecting the partisan scoring of H.B. 369 as passed and emailed them to Hofeller on December 14, 2011); *see also* Plaintiffs' Proposed Rebuttal Findings of Facts ("Rebuttal PFOF") ¶ 7 (citing Trial Ex. P409, in which Mann emails Kincaid "the zipped shape files and equivalency file for HB 369 as Passed," and

Kincaid forwarded it to Hofeller, noting "They made a couple tweaks. Final, final Ohio map is attached").

National Republicans' intent is therefore relevant from the beginning of their involvement in early 2011, PFOF ¶ 167, to the moment their involvement culminated in the passage of H.B. 369. In his deposition, Kincaid repeatedly (and aptly) described the map drawing process as a "collaborative" effort between national Republicans and Ohio map drawers. PFOF ¶ 68. It was.

**C.    Plaintiffs' exhibits are admissible pursuant to Rule 801(d)(2).**

**1.    The statements made by Kincaid are admissible for their truth as agent admissions under Rule 801(d)(2)(D).**

In 2011, Kincaid worked as an agent of Representatives Chabot, Latta, Jordan, Johnson, Turner, Stivers, and Gibbs (who were members of Congress and the NRCC at the time). Kincaid's statements therefore satisfy the hearsay carve-out for agents of party opponents. Fed. R. Evid. 801(d)(2)(D).

The mission of the NRCC is to serve the political needs of the Republican members of Congress. *See* Kincaid Suppl. Aff., ECF No. 165-1, ¶ 10. In his role as the NRCC's National Redistricting Coordinator, Kincaid "provide[d] beneficial assistance to congressional members," which included "analyses of draft redistricting maps and final redistricting maps." *Id.* ¶ 14. Indeed, Kincaid "had a significant number of conversations with Ohio congressional . . . members in 2011." *Id.* ¶ 19. Kincaid has testified that he met in-person with at least five of the Intervenors in 2011 to discuss how redistricting would affect the contours of their districts. *See* Rebuttal PFOF ¶¶ 2-3. In the ordinary course of his duties at the NRCC, Kincaid created district-specific spreadsheets consisting of partisan scorings for each of these Intervenors. Rebuttal PFOF ¶¶ 1, 4-5. Given Kincaid's work for the Congressmen, Kincaid qualifies as an

agent of party opponents Representatives Chabot, Latta, Jordan, Johnson, Turner, Stivers, and Gibbs.

> ### 2.    The statements made by Kincaid, Whatman, and Hofeller are admissible for their truth as co-conspirator admissions under Rule 801(d)(2)(E).

Every statement made by Kincaid, Whatman, and Hofeller is admissible for its truth under Rule 801(d)(2)(E), which provides that out-of-court statements offered by an opposing party's co-conspirator are not hearsay.  *See* Fed. R. Evid. 801(d)(2)(E).  A co-conspirator's statement is admissible as non-hearsay if Plaintiffs "show by a preponderance of the evidence that: (1) a conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy."  *DRFP L.L.C. v. Republica Bolivariana de Venezuela*, No. 2:04-cv-0793, 2016 WL 3996719, at *30 (S.D. Ohio July 22, 2016) (quoting *United States v. Benson*, 591 F.3d 491, 501-02 (6th Cir. 2010)), *aff'd*, 706 F. App'x 269 (6th Cir. 2017).

Importantly, a conspiracy can exist for purposes of Rule 801(d)(2)(E) merely by establishing that there was "teamwork" toward achieving a common objective.  No criminal intent is required.  *See* 30B Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure Evid. § 6778 (2018 ed.) ("Rule 801(d)(2)(E) uses the familiar term 'conspiracy,' but it is intended to reach more broadly than criminal conspiracy law. . . . Rule 801(d)(2)(E) . . . addresses teamwork more generally.").  All that is required is some evidence of teamwork between the declarant and party separate from the document itself.  *See* Fed. R. Evid. 801(d)(2) ("The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under (E).").

Moreover, the declarant's statements may be admissible even when the party opponent does not know the declarant's identity.  *United States v. Christopher*, 923 F.2d 1545, 1551 n.3

(11th Cir. 1991) ("statements of a declarant [may] be admissible under rule 801(d)(2)(E) where, although the witness did not know the precise identity of the declarant, it was clear from the testimony and context of the out-of-court statements" that the elements of Rule 801(d)(2)(E) are met).

### 3. Exhibits in the possession of a party, their agents, or co-conspirators that were acted upon constitute adopted admissions under Rule 801(d)(2)(B).

"Just as silence in the face of an accusation may constitute an admission to its truth, possession of a written statement becomes an adoption of its contents." *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981); *see also United States v. Paulino*, 13 F.3d 20, 24 (1st Cir. 1994) ("[C]ourts frequently have construed possession of a written statement as an adoption of what its contents reveal."). "Such adoptive admissions are not hearsay and are properly admitted into evidence." *United States v. Merritt*, Nos. 94-4149, 96-4177, 96-4196, 1998 WL 196614, at *1 (4th Cir. 1998). Thus, if a party (or its agent or co-conspirator) possesses a document and additional circumstances tie that individual to the document then it is admissible as an adopted admission. *See id.* ("So long as the surrounding circumstances tie the possessor and the document together in some meaningful way, the possessor may be found to have adopted the writing and embraced its contents.") (quoting *Paulino*, 13 F.3d at 24).

### D. These principles, as applied, demonstrate why Defendants' hearsay objections should be overruled.

### 1. The hearsay objection to Trial Exhibit P393 ("Please Keep This Secret") should be overruled.

The "dog meat voting territory" conversation between Braden and Hofeller began with an email from Braden sent to Hofeller on September 6, 2011. Trial Ex. P393; *see* PFOF ¶¶ 139-143. In this email, Braden transmitted the "Franklin County Sinkhole" spreadsheet with the

admonition "please keep this secret."[3]  Defendants' sole objection to Trial Exhibit P393 is hearsay.

*First*, Braden's admonition is not hearsay.  *See United States v. Diaz*, 670 F.3d 332, 346 (1st Cir. 2012) ("Out-of-court statements providing directions from one individual to another do not constitute hearsay.") (citation omitted).  His "command is not hearsay because it is not an assertion of fact."  *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011).  Braden's admonishment supports the showing that the map drawers believed that their process ought to be shielded from public light.

*Second*, Braden's statements are those of the agent of a party opponent and therefore are admissible under Rule 801(d)(2)(D).  Defendants do not dispute that point, *see* Joint Evidence Br., ECF No. 254 at 32, and for good reason.  In Ohio in 2011, Braden communicated with and provided strategic advice to Speaker Batchelder and President Niehaus' map drawers, which included DiRossi and Mann.  Trial Exhibit P119 represents Braden's communications with Mann regarding map proposals, as it shows Mann sending Braden a draft map, and Braden responding with requests for more information regarding the map.  *See* Trial Ex. P119 at LWVOH_00018307-08.  Similarly, Braden admitted at his deposition to communicating with DiRossi in 2011 regarding draft maps.  Braden Dep., ECF No. 230-7 at 20:10-24.  He also admitted to speaking with both the Speaker of the House and the President of the Senate about drawing congressional maps in 2011.  *Id*. at 19:3-17.  Significantly, Braden visited the bunker to view draft maps and associated political data.  *See* PFOF ¶ 88.

---

[3] Trial Exhibit P393 has several attachments (all of which are included in P393 following the cover email).  The hearsay objection to the third attachment—the "Franklin County Sinkhole" spreadsheet—is addressed in Part IV, *infra*.  Here, Plaintiffs address the hearsay objection to Braden's cover email.

**2.      The hearsay objection to Trial Exhibit P394 ("Dog Meat Voting Territory") should be overruled.**

Trial Exhibit P394 is the September 8, 2011 email exchange (two days after the exchange in P393) between Hofeller and Braden regarding revisions to one of the last draft maps before H.B. 319 was introduced.  This is the email where Hofeller writes to Braden that "[t]he area Adam has on his version [of the map] included Grandview Heights and some more of the 'downtown' area, which I took out of the map I sent—as it was 'dog meat' voting territory." Trial Ex. P394 at 2; PFOF ¶ 142.  Plaintiffs offer the document to establish partisan intent.  *See* PFOF ¶¶ 141-144.

Defendants object to P394 as hearsay; they argue that Plaintiffs offer the exhibit "to prove that Democratic voters were moved out of the 12th and 15th Congressional Districts and into the 3rd Congressional District in order to ensure a 12-4 map."  Joint Evidence Br., ECF No. 254 at 22-23.  Plaintiffs make no such contention, in PFOF ¶ 143 or elsewhere.[4]  Indeed, Plaintiffs do not ask the Court to decide whether Grandview Heights is in fact home to primarily Democratic voters, much less whether it is actually "dog meat" under some definition of that term.  *See* PFOF ¶ 142 (noting that "Hofeller described his revisions to the map in revealing terms," and quoting the "dog meat" email to demonstrate Hofeller's intent).  Plaintiffs offer this statement to show the state of mind of those individuals who were actively drawing Ohio's 2011 redistricting plan.  What matters is that Hofeller thought the territory was "dog meat."  Further,

---

[4] Defendants later concede that Plaintiffs rely on P394 "as evidence of partisan intent."  Joint Trial Br., ECF No. 254 at 28.

Hofeller described these voting areas as undesirable to convince Braden and others to accept his proposed changes to the district lines.[5]

Finally, Braden's statements in the emails are those of a party's agent and a party's co-conspirator within Rule 801(d)(2)(D) & (E). Hofeller's statements are admissible pursuant to Rule 801(d)(2)(E) because they represent the shared objective of Braden, Hofeller, and the other Ohio and national Republican map drawers to draw and enact a map that favors Republicans.

Lastly, Plaintiffs are compelled to respond to Defendants' assertion that "to the extent Plaintiffs point to the fact that Mr. Braden was on the email chain with Mr. Hofeller referring to 'dog meat,' Plaintiffs obtained no testimony from Mr. Braden or any other witness about it." Joint Evidence Br., ECF No. 254 at 29. First, the contention is wrong: Plaintiffs obtained testimony from Adam Kincaid about the "dog meat" email chain. *See* PFOF ¶ 144 (Kincaid explained that "dog meat voting territory" "was not friendly area to Republicans."). Second, any failure to obtain discovery regarding the document during the discovery period is hardly the fault of Plaintiffs. The Republican National Committee produced Trial Exhibit P394 from Hofeller's custodial files on January 4, 2019, *see* Goldstein Decl. ¶ 24, well after the close of discovery and following drawn-out motion practice resulting from the RNC's (erroneous) First Amendment privilege assertion.

Indeed, if anyone is responsible for the lack of additional witness testimony regarding P394, Braden is. Based on Braden's privilege log, it appears that Braden withheld the "dog meat" email chain as attorney work product. *See* Goldstein Decl. ¶¶ 9-11; *id.* Ex. E (Braden's privilege log included four entries describing emails between Braden and Hofeller on September

---

[5] Alternatively, even assuming these statements qualify as hearsay, they are admissible as evidence of Hofeller's then-existing state of mind—namely, his intent to remove Democratic voters from the 15th District. Fed. R. Evid. 803(3).

8, 2011 about redistricting in Ohio). Defendants' argument that Plaintiffs should have obtained testimony from Braden about his improperly-withheld document is, at the very least, audacious.

### 3. The hearsay objection to Trial Exhibit P407 ("Lock Down 12 Republican Seats") should be overruled.

Trial Exhibit P407 contains an early September 2011 email exchange between Whatman, Senate President Niehaus, Judy, and Mann. The email exchange, which contains the subject line "Talking Points," encourages Republicans to support adoption of "The Map" less than a week before H.B. 319 was introduced in the Ohio House of Representatives. It emphasizes, among other things, that "[i]n losing two seats and trying to lock down 12 Republican seats it is unrealistic to think southwest Ohio can remain the way it is." Trial Ex. P407 at LWVOH_0052431. In a subsequent email, Judy forwards Whatman's email to Mann, writing: "Can u print these for WGB?"

Defendants' only object on the basis of hearsay. Plaintiffs, however, offer P407 as probative evidence of Ohio Republicans' intent to enact a map that would guarantee Republicans 12 congressional seats, as well as their belief that an alternative 13-3 map would create fewer safe Republican districts. *See* PFOF ¶ 109 (citing P407 as evidence that Republicans coalesced around the idea of enacting a 12-4 map); PFOF ¶¶ 112-13 (citing P407 as evidence of Republicans' desire to enact a 12-4 map); PFOF ¶ 1038 (citing P407 as evidence of Republicans' belief that a 13-3 map would create less safe Republicans districts). The email may also properly be used to show that Whatman, Niehaus, Judy, and Mann knew or subjectively believed at that time that a 13-3 map would create fewer safe Republican seats than a 12-4 map.

However, if the Court decides to consider the document for its truth, it may do so under the hearsay exception for "statement[s] of the declarant's then-existing state of mind," Fed. R.

Evid. Rule 803(3), to show that in September 2011, Whatman, Niehaus, Judy, and Mann were "***trying*** to lock down 12 Republican seats" in Ohio.  Trial Ex. P407 at LWVOH_0052431.

The statements from Whatman are also admissible for the truth as adopted admissions by Judy as an agent of a party opponent pursuant to Rule 801(d)(2)(D) & (B).  *See* Part II.C.3, *supra*; Joint Evidence Br., ECF No. 254 at 30 (conceding Judy was an agent of Defendants).  As the face of the document makes plain, Whatman emailed the talking points to Judy, and Judy forwarded the talking points to Mann asking Mann, "Can u print these for WGB?" (Speaker Batchelder's initials).  Trial Ex. P407 at LWVOH_0052431.  Judy's request that Mann print the talking points for Speaker Batchelder are circumstances that indicate not only that Judy possessed the talking points, but that he aligned himself with the assertions therein.  Far from denouncing the truth of the talking points, Judy considered the talking points as worthy of elevating to the Speaker of the Ohio General Assembly.

Lastly, Whatman's statements within P407 fall within the hearsay exception for statements by a co-conspirator.  *See* Part II.C.2, *supra*; Fed. R. Evid. 801(d)(2)(E).

### 4. The hearsay objections to spreadsheets containing partisan scorings should be overruled.

*The law does not require specifying the identity of an individual declarant to be admissible intent evidence.*  Defendants contend that certain spreadsheets relied on by Plaintiffs in their proposed findings are inadmissible hearsay.  Joint Evidence Br., ECF No. 254 at 20, 23-24.  This contention is based largely on their unsupported claim that Plaintiffs "must first identify the declarant" in order to rely on these exhibits to demonstrate the Republican map drawers' intent.  *Id.* at 18-19, 23-24.  Defendants' failure to cite to a single case for this proposition is unsurprising, because it is not the law.  All that is required is that the declarant be part of the group of persons engaged in Ohio's congressional redistricting in 2011.

"[T]o bar hearsay from unidentified declarants [is] something the evidence rules decline to do."  30B Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure Evid. § 7053 (2018 ed.).  This is because  "[k]nowing the specific identity of the declarant will not make the statements more trustworthy evidence of the declarants' . . . states of mind," when a statement's relevance depends not on the declarant's specific identity, but on the declarant's membership in a particular class—in this case, Republicans involved in the Ohio map-drawing process in 2011.[6]  *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 n.11 (3d Cir. 1999); *see id.* ("The relevance of their statements depends only on the fact that they were the plaintiffs' customers, not their particular identities."); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 205 (2d Cir. 2015); *see also Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 447 (S.D.N.Y. 2007).  It is abundantly clear from the faces of the spreadsheets, their metadata, Defendants' admissions, deposition testimony, and other supporting evidence that the authors and modifiers of these spreadsheets were members of this particular class.

The objected-to spreadsheets unquestionably bear upon the Republican map drawers' contemporaneous intent and are therefore not hearsay.  *See* Fed. R. Evid. 801(c)(2).  They reflect how the map drawers viewed the partisan leanings of districts as drawn in various map proposals based on political index scorings, regardless of whether those scorings were objectively "true".  They evidence the map drawers' subjective understandings of the district-specific "differences" between competing map proposals, irrespective of whether those deltas were, in fact, true; and they go to the map drawers' states of mind—demonstrating their intense focus on calculating and assessing the partisan makeup of each district—during their mission to draw a 12-4 map.  These

---

[6] And as detailed in the accompanying spreadsheet, Plaintiffs have set forth ample evidence identifying the authors and modifiers of the spreadsheets to which Defendants and Intervenors object, including Trial Exhibits P041, P042, P077, P078, P135, and P329.

are the purposes for which Plaintiffs rely on these spreadsheets, *see, e.g.*, PFOF ¶¶ 95, 111, 117-119, 124, 149-150, 160, 208, 219, 286, 1037-1038, not for the truth of any assertions made therein. They are therefore not hearsay under Rule 801(c)(2).

*The spreadsheets are admissible for the truth under Rule 801(d)(2)(B).* In the alternative, Plaintiffs are able to rely on these spreadsheets for their truth as an adopted admission. Fed. R. Evid. 801(d)(2)(B). *See* Part II.C.3, *supra.* It is undisputed that Defendants' agents possessed and produced a number of spreadsheets in this case, including Trial Exhibits P041 and P042 (Mann), P077 and P078 (Braden), and P135 (DiRossi). *See* Joint Evidence Br., ECF No. 254 at 30 (conceding Mann, Braden, and DiRossi were agents of the Defendants). Additionally, as detailed in the accompanying spreadsheet, the "surrounding circumstances" of each exhibit ties its possessor to the document in a meaningful way.

## III. Defendants' Authenticity and Foundation Objections Are Baseless.

### A. Defendants offer nothing to rebut the presumption that trial exhibits produced in this litigation are authentic, and their objections to the contrary should be overruled.

Following trial, Defendants continue to contest the authenticity of numerous documents produced in response to compulsory discovery requests in connection with this litigation. These unsupported objections ignore the Court's plainly articulated views on these materials and should be overruled.

At the February 11, 2019 final pretrial conference, the Court made its views on the authenticity of documents produced in this action clear:

> Judge Black: "I think the statement of the law in plaintiffs' motion is accurate that a document that was produced in discovery creates a rebuttable inference that the document is authentic." Pretrial Conference Tr., ECF No. 221 at 68:9-14.

> Judge Watson: "My view is if it was produced in discovery, there should be no question." *Id.* at 69:1-2.

Judge Moore: "And I agree." *Id.* at 69:7.

This unambiguous admonition notwithstanding, Defendants challenge the authenticity of seven trial exhibits produced in response to subpoenas issued by this Court to individuals who served in official capacities as agents of Defendants and their predecessors.[7]  Defendants challenge the authenticity of other documents, including two produced by the Republican National Committee in response to a subpoena in this case: Trial Exhibits P400 and P589.

As Plaintiffs have previously noted, courts in the Sixth Circuit have repeatedly held that documents produced in discovery—whether by a party-opponent or third-parties—are presumed authentic absent evidence that they are not what they purport to be.  *See Churches of Christ in Christian Union v. Evangelical Benefit Tr.*, No. 2:07-cv-1186, 2009 WL 2146095, at *5 (S.D. Ohio July 15, 2009) ("Where a document is produced in discovery, 'there is sufficient circumstantial evidence to support its authenticity' at trial.") (quoting *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991)); *see also United States v. Cinergy Corp.*, 495 F. Supp. 2d 909, 914 (S.D. Ind. 2007) ("[I]t is disingenuous for [a party] to object to copies of documents that it produced to [an opponent] pursuant discovery requests").

As an initial matter, the premise that the Republican National Committee is a third party, unrelated to Defendants or Intervenors, is inaccurate.  As explained in Part II.B, *supra*, the connection between national Republicans and Defendants was close and continuous.  They were far from unrelated parties.

---

[7] Specifically, authenticity objections were lodged against documents produced by Mann (P041, P042), DiRossi (P135), and Braden (P077, P078, P316, P318).  As noted, Defendants concede that each of these individuals were "agents" of the Ohio General Assembly.  Joint Evidence Br., ECF No. 254 at 30.  Each exhibit is noted and discussed in the accompanying spreadsheet. Plaintiffs again note that counsel for Defendants also represent many of these individuals and that one of these individuals served as counsel for Intervenors at trial; they presumably have reviewed and not altered any of these documents before producing them to Plaintiffs.

In any event, courts in the Sixth Circuit have applied the same presumption of authenticity to documents produced by a third party in response to a subpoena.  *See, e.g.*, *Welch v. Bissell*, No. 1:12CV3108, 2013 WL 6504679, at *4 (N.D. Ohio Dec. 11, 2013); *see also Denison*, 941 F.2d at 1423.  Defendants have not cited any case to the contrary.  *See* Joint Evidence Br., ECF No. 254 at 9.  Instead, they cite cases in which the particular documents held to be presumptively authentic were produced by a party-opponent, as if those cases logically require that the presumption cannot apply outside those circumstances.  Reading those cases, however, reveals that those courts recognized that the presumption applied more broadly, as confirmed by cases like *Welch* in which the presumption was applied to third-party produced documents.

In maintaining their authenticity objections to these exhibits, Defendants suggest that certain documents for which Plaintiffs failed to obtain authenticating witness testimony must be excluded as inauthentic.  As this Court has recognized, however, the mere fact that these exhibits were produced in response to compulsory discovery in this matter is sufficient to establish their presumptive authenticity.  *See* Pretrial Conference Tr., ECF No. 221 at 68:8-14, 69:1-2, 69:7; *see also Churches of Christ in Christian Union*, 2009 WL 2146095, at *5.  As such, Plaintiffs' failure to obtain *additional* evidence demonstrating the authenticity of these exhibits is immaterial.  Rather, the burden falls on Defendants to put forward evidence that these exhibits are not what they purport to be.  *Welch*, 2013 WL 6504679, at *4; *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) ("Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence.") (citations omitted); *see also* 5 Weinstein's Federal Evidence § 901.02[3].

For much the same reason, Defendants' reliance on witnesses' testimony failing to positively identify certain exhibits is insufficient to rebut the presumption that those exhibits are authentic. Federal Rule of Evidence 901(b) states clearly that "Testimony of a Witness with Knowledge" is just one of many possible ways that evidence can be authenticated. As the cases cited above illustrate, evidence can also be authenticated based on the circumstances of its production, even in the absence of corroborating testimony.

Despite Defendants' innuendo, there is, in fact, no testimony calling into question the authenticity of any of the exhibits to which they object. *Trial Exhibit P288* was shown to Chris Jankowski, former President of the RSLC, who was asked if he had ever seen it before and responded affirmatively: "A long time ago, yes." Jankowski Dep., ECF No. 230-23 at 133:22-23. He further testified that "I know that a letter like this went out," *id.* at 134:2-3, and that he remembered its "substance" and "subject matter," *id.* at 134:11-12. Ignoring Jankowski's testimony corroborating the authenticity of the document, Defendants instead highlight various ancillary questions to which he answered that he did not remember or did not know. Joint Evidence Br., ECF No. 254 at 11-12. Jankowski could not remember the date the letter was sent. Jankowski Dep., ECF No. 230-23 at 134:3. He "couldn't say unless [he] had the actual letter," whether the final version and the draft were substantially the same; however, he clarified that he remembered the "substance" and "subject matter" of the letter as presented. *Id.* at 134:7-12. Finally, he could not recall the list of individuals who received the letter, although he testified that it was of "legislative leaders." *Id.* at 134:13-18.

Defendants similarly distort the testimony with respect to *Trial Exhibit P589*. This collection of maps, with small data tables printed on each map, was shown to Whatman, who testified that "I recognize them somewhat from what I produced, yes." Whatman Dep., ECF No.

230-52 at 172:16-17.  While Defendants cite to undesignated deposition testimony to show that Whatman was "not sure" what one column (% 10Gov_08Pres_R_%) meant, *id.* at 173:13-174:8, Whatman was able to confirm (in testimony that was properly designated) the meaning of the two other columns he was asked about, *id.* at 174:9-17 (% PRES_2008_R_%), *id.* at 175:5-20 (% PRES_2008_R_%).  At no time did Whatman assert that the exhibit was inauthentic and none of his testimony suggests that possibility.[8]

Plaintiffs do not argue that "mere production of a document is sufficient to *prove* authentication."  Joint Evidence Br., ECF No. 254 at 5 (emphasis added).  Plaintiffs' view is the same as that expressed by the Court at the pre-trial conference:  "a document that was produced in discovery creates a rebuttable inference that the document is authentic."  Pretrial Conference Tr., ECF No. 221 at 68:8-14 (Black, J.).  The absence of additional evidence cannot rebut that inference; only actual evidence of inauthenticity can.  Defendants introduced no such evidence.  Thus, their authenticity objections should be rejected.

### B.  Metadata establishes the authenticity and foundation for many of Plaintiffs' exhibits.

Metadata provides further evidence of authenticity and lays foundation for many of the exhibits that are the subject of Defendants' objections.  Metadata is data that is created automatically by a computer when a document is created or saved.  *See generally* The Sedona Conference, *The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing*

---

[8] Defendants cite to additional undesignated deposition testimony that Whatman did not recognize handwriting on certain pages of P589.  Joint Evidence Brief, ECF No. 254 at 12.  The handwriting at issue is a notation of "#1" through "#8" at the top of certain pages.  Trial Ex. P589 at 3-10.  Whatman was asked if he had "any idea" who wrote those handwritten notations and "Would that be yours?"  Whatman Dep., ECF No. 230-52 at 176:12-18.  The fact that Whatman could not identify handwriting from eight page numbers is unsurprising and does not suggest in any way that the document itself, which was produced from Whatman's own files and that he testified to recognizing, is inauthentic.

*Information & Records in the Electronics Age*, 28-29 (2d ed. 2007).  Metadata can establish both authenticity and foundation for a document by providing evidence of (among other things): the date the document was created, the author of the document, the custodian of the document, the filename of the document, and the email address of the sender or recipient of the document.  *See id.* at 29.

> **1.**  **Metadata can be used to authenticate a document even in the absence of extrinsic evidence (*e.g.*, witness testimony).**

Courts have accepted the use of metadata to overcome evidentiary objections.  Under the Federal Rules, evidence of a document's "distinctive characteristics," including its "appearance, contents, substance, [or] internal patterns," suffices to authenticate a document.  Fed. R. Evid. 901(b)(4).  One "way in which electronic evidence may be authenticated under Rule 901(b)(4) is by examining the metadata for the evidence."  *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547 (D. Md. 2007).  "Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."  *Id.* at 547-48.

This Court recognized as much at the pretrial conference, noting first that the "[b]urden of proof of authentication is slight," Pretrial Conference Tr., ECF No. 221 at 78:21-22, and the "[u]ltimate question of authenticity is for the jury," *id.* at 78:22-23, or in the case of a bench trial, as here, it is for "the panel to decide," *id.* at 79:2-3.  The Court further explained that the "[p]roponent may authenticate evidence by offering evidence of the appearance, content, substance, internal patterns or other distinct characteristics of the item taken together with all the circumstances."  *Id*. at 78:23-79:1; *see also* Fed. R. Evid. 901(b)(4).  Finally, the Court specifically addressed metadata, noting how metadata is typically sufficient to establish the

authenticity of e-mails and other documents, such as Excel spreadsheets.  Pretrial Conference Tr., ECF No. 221 at 79:5-19.

When relying on metadata to authenticate documents, courts have not required extrinsic evidence or expert testimony for corroboration.  *See, e.g.*, *Hubbard v. Jefferson Cty. Bd. of Cty. Comm'rs*, No. 16-cv-2444-JWL, 2018 WL 1626376, at *3 (D. Kan. Apr. 4, 2018).  Absent actual evidence of tampering—not mere conclusory or speculative allegation—courts will consider metadata for purposes of authenticating and identifying a document.  *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 224-25 (E.D.N.Y. 2009) (citing 5-900 Weinstein's Federal Evidence § 900.07[1][a]); *cf. United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir. 1988) ("The fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness.").

The case law cited by Plaintiffs is unrebutted by Defendants who do not cite a single case in their discussion on metadata.  *See* Joint Evidence Br., ECF No. 254 at 12-14.  Instead, Defendants mischaracterize Plaintiffs' argument.  Plaintiffs do not contend that metadata, by itself, provides dispositive proof of a document's authenticity that cannot be rebutted by other evidence.  Rather, Plaintiffs' view is that, consistent with the cited cases, metadata can provide evidence sufficient to authenticate a document absent actual evidence of inauthenticity.  *See Lorraine*, 241 F.R.D. at 547.  Corroborating extrinsic evidence, such as witness testimony, is not required to establish authenticity, *Hubbard*, 2018 WL 1626376, at *3, and specific evidence of inauthenticity—not abstract or speculative assertions—is required to rebut it, *CA, Inc.*, 780 F. Supp. 2d at 224-25.  Having again adduced no such evidence of inauthenticity, Defendants' objections must be overruled.

## 2.    For e-mails and documents produced in native format, metadata can provide both authentication and foundation.

At the Pretrial Conference this Court stated:  "As to, specifically, e-mails display, header information, sender, recipient, date sent, subject line, such header information is typically in and of itself sufficient for the Court's preliminary finding regarding authentication."  Pretrial Conference Tr., ECF No. 221 at 79:5-8.  Once such information is established as authentic, then the key points for the foundation for such a document have been laid.

Defendants have objected to one e-mail on the grounds of authenticity and foundation:  Trial Exhibit P400.  This document is an e-mail that contains metadata with header information indicating its sender, recipient, date and time sent, and subject line.  As this Court noted, this information is "in and of itself sufficient for the Court's preliminary finding regarding authentication," and the objection to its authenticity should be overruled.  Pretrial Conference Tr., ECF No. 221 at 79:5-8.  Similarly, this metadata, coupled with the content of the e-mail itself, provides sufficient foundation (namely, the sender, date, and subject of the e-mail) for the admission of the e-mail into evidence.  For P400, the metadata shows that Hofeller sent the e-mail from his RNC e-mail address on October 27, 2011 at 9:27 PM with the subject line "Article," and the content of the attached article includes a discussion of redistricting in general and in Ohio specifically, noting in particular the threat to Republicans from the Democratic referendum petition.  *See* Goldstein Decl., Ex. H ("Oldham Aff.").  From this information, there is sufficient foundation for the exhibit's admission.

In addition to e-mails, metadata can be used to authenticate and provide foundation for documents that were produced in so-called "native" format, such as an Excel spreadsheet produced as a ".xls" or ".xlsx" file (as opposed to a printout or image of the spreadsheet).  As this Court noted at the pretrial conference:  "a metadata summary contains a file name consistent

with the document's content as a file extension and application identifying it as belonging to an Excel file.  It typically includes a company, a date created, a last print date and a file path.  In other words, it has the appearance, content, substance and other distinctive characteristics of metadata for Excel spreadsheets."  Pretrial Conference Tr., ECF No. 221 at 79:11-17.

Defendants have maintained authenticity and foundation objections to five exhibits that are native Excel files (Trial Exs. P041, P042, P077, P135, P316), and one other exhibit (Trial Ex. P318) that is a screenshot of a native file.  To take one example, P135 is an Excel spreadsheet produced by DiRossi.  For P135, metadata establishes the document's filename ("heather Plan Comparison.xlsx"), the document's creation date (November 5, 2011), the document's last printed date (November 10, 2011), the document's last modified date (November 10, 2011), and the name of the person to last modify the document ("raydirossi").  In fact, Defendants stipulated to the information contained in this metadata.  Trial Ex. P615 at 3-4.  This metadata provides the "distinctive characteristics" cited by this Court as providing sufficient authentication for the document's admission, as is the case for each of the documents listed above.  Similarly, the metadata provides ample foundation (including the author of the document, the file name of the document, and the date the document was created) to admit the document, especially when considered in conjunction with the content of the document itself.

### C.  Witness testimony is not required to provide foundation for all of Plaintiffs' exhibits.

Defendants argue that seven of Plaintiffs' exhibits should be excluded because "no witness has testified to lay an appropriate foundation for the relevance and admissibility of the documents."  Joint Evidence Br., ECF No. 254 at 14.  They cite no case in support of the assertion that witness testimony is required to admit an exhibit.  In fact, this is not the law.

As an initial matter, three of the seven exhibits Defendants object to on these grounds (Trial Exs. P398, P401, P496) are the subject of an affidavit by the Republican National Committee's designee. *See* Goldstein Decl. Ex. H ("Oldham Aff."). Defendants have indicated that they do not object to its use in lieu of a deposition to the same effect. Goldstein Decl. Ex. I.

*For Trial Exhibit P401* (REV_00023321), the RNC's designee attested to the date the document was created, its title, its file name, and the fact that the RNC possessed and produced it without alternation. Oldham Aff. ¶ 3. Moreover, the affidavit explains that "Dr. Hofeller, who was an independent contractor at the RNC, was known to have created or reviewed Redistricting Hot Spot memos and shared them with the RSLC and other organization." *Id.*

*For Trial Exhibit P496* (REV_00023377), the affidavit confirms that the document is "a memo drafted by the RNC Counsel's Office to Chairman Reince Priebus and Chief of Staff Jeff Larson," and attests to both the date on the face of the memo ("September 22, 2011") and its subject line ("Redistricting Status"), as well as the file name of the document. *Id.* ¶ 6. The RNC's designee further attests that the document was produced by the RNC from files under its control and was not altered. *Id.*

*For Trial Exhibit P398* (REV_00023479), the RNC's designee attested that the document is "an email from Tom Hofeller to Matt Walter, Lindsay Fisher, and Jennifer Cusato" and further attested to who was carbon-copied and blind-copied on the e-mail, as well as the date it was sent (December 14, 2011) and its subject line ("Ohio Update"). *Id.* ¶ 7. Finally, the affidavit states that the document was produced by the RNC from files under its control and was not altered. *Id.*

For the four other exhibits that are subject to this objection, there is ample foundation for admission from the face of the document, even without extrinsic testimony, as explained in the accompanying spreadsheet. For example, P376 is an e-mail exchange between Representative

25

Renacci and James Slepian on November 13, 2011.  The document itself establishes who made each statement in the e-mail exchange, when those statements were made, and that the context of the exchange was a discussion of negotiations over the Ohio congressional map.  Trial Ex. P376.

## IV.    The Objections to the "Franklin County Sinkhole" Spreadsheets Should Be Overruled.

Trial Exhibit P077 and the third attachment to P393 (bates labeled REV_00023179, found at page 5 of P393) are Kincaid's Franklin County Sinkhole spreadsheet.  They are identical documents (collectively "the Sinkhole Spreadsheet").  Plaintiffs rely on the Sinkhole Spreadsheet to prove the intent of the Ohio and national Republican map drawers.  *See* PFOF ¶¶ 125-137.  The spreadsheet shows how they sought to achieve their 12-4 map goal: by relying on political indices to achieve what they believed to be the packing of Democrats in a new district that envelops Franklin County.  The document has been the subject of extensive testimony, clearly establishing its authenticity and answering all questions as to foundation.  And there is no basis for any objection based on hearsay.

### A.    The authenticity and foundation objections to Trial Exhibit P077 should be overruled.

#### 1.    No objection has been lodged against the authenticity and foundation of attachment 3 to P393—waiving any such objection to P077 as well.

Defendants raise no authentication or foundation objections to P393, which includes Attachment 3, the Sinkhole spreadsheet.  They only object to P393 as hearsay.[9]  Defendants fully acknowledge that Attachment 3 to P393 is the same document as P077.  *See* Joint Evidence Spreadsheet, ECF No. 254-1 at P393 (col. "Hearsay Objection") (where Defendants describe

---

[9] This is no mere oversight.  Defendants initially did object to the authenticity and foundation of P393, along with objecting to the document as hearsay.  Goldstein Decl. ¶ 5.  But they withdrew these objections on February 21, 2019.  *Id.*

"[t]he attached spreadsheet (REV_00023179)" as a spreadsheet with the title "Franklin County

Sinkhole," and cite to P077 as the same document).  The Court should therefore impute this

withdrawal of the foundation and authentication objections to P077 .

### 2. Adam Kincaid's deposition testimony confirms his authorship of P077 and carefully details its content.

Kincaid clearly testified at both of his deposition that he created P077.  *See* PFOF ¶ 129.

BRADEN1387—which is the bates number for P077—was put in front of Kincaid and marked

as Deposition Exhibit 8.  He testified as follows as regards that specific document:

> Q: And then if we turn to what has been marked as [Deposition Exhibit] 8, which is
> BRADEN1387 do you see that?
> A: Yes.
> Q: ***And you created this;*** is that correct?
> [*Objection to form*][10]
> A: Yes.

Kincaid Dep. Vol. II, ECF No. 230-28 at 357:19-358:2 (emphasis added).  The question and

answer were unambiguous.  Kincaid created this specific document—P077.

Mr. Kincaid further testified regarding the process whereby he created P077 as follows:

> Q: Do you recall – have you ever seen this document, Exhibit 8 [the Sinkhole
> spreadsheet], before?
> A: Yes.
> Q: Did you create it?
> A: Yes.
> Q: And, again, you had the parent document that you created back in March, right?
> A: That's right.
> Q: And then you populated it with data after that, right?
> A: Yes.

Kincaid Dep. Vol. I, ECF No. 230-27 at 153:2-12.   In short, Mr. Kincaid testified both that he

was responsible for creating the final document and the process whereby he created it.

---

[10] "Form" objections at the Kincaid deposition were a term of art; they were lodged throughout
the second session of the deposition to preserve the First Amendment privilege issue for appeal.
*See* Kincaid Dep. Vol. II, ECF No. 230-28 at 253:2-12.

Mr. Kincaid's testimony further laid the foundation for the document:

- Kincaid admitted, in a conversation where Tom Whatman was present in August or early September, 2011, that someone described a new Franklin County district as the "Franklin County sinkhole."  PFOF ¶ 129, Kincaid Dep. Vol. II, ECF No. 230-28 at 369:9-371:8.

- Kincaid described the content of every column in the spreadsheet, explaining the election data at issue and what it represented.  *See* PFOF ¶ 129.  He also testified to how he created an Excel formula to average five of the six elections set forth on the spreadsheet and how that average appeared in column W of the spreadsheet. *Id.*; *see also* Trial Ex. P318.

- Kincaid admitted that he created P077 during the course of his ordinary duties as the NRCC's Redistricting Coordinator.  Kincaid Dep. Vol. II, ECF No. 230-28 at 516:2-10.

This testimony was hardly surprising, as the metadata for P077 states that he is the spreadsheet's author.  *See* Goldstein Decl. ¶ 13.  Indeed, the spreadsheet is formatted the same as Kincaid's other "changes sheets."  *See e.g.*, PFOF ¶¶ 130, 191; Kincaid Dep. Vol II, ECF No. 230-28 at 300:2-14.

### 3. The transmission of the spreadsheet among Ohio and national Republican map drawers with the words "Franklin County Sinkhole" at the top of the document has been clearly established.

On September 3, 2011 Kincaid transmitted a spreadsheet with the filename "Ohio Changes - New Idea Redraft.xls" to Heather Mann and Ray DiRossi.  Trial Ex. P119, at LWVOH_00018303.  Mann then forwarded that email and its attachments, including the

spreadsheet, to Braden within minutes.  *Id*. at LWVOH_00018308.  Three days later, Braden

transmitted the email's attachments, including the spreadsheet, to Hofeller.  *See* Trial Ex. P393.

Defendants dispute whether the Franklin County Spreadsheet was the spreadsheet that

was transmitted to Mann on September 3, 2011, forwarded by Mann to Braden on that date, and

then forwarded by Braden to Hofeller on September 6, 2011.  Joint Evidence Br., ECF No. 254

at 7.  The evidence firmly establishes that they are wrong.  *See* Goldstein Decl. ¶¶ 12-32 (setting

forth the metadata for P077 and related trial exhibits).

*First,* the time stamp for P119 (the transmission email) and the metadata for P077 itself

clearly indicates that P077 was attached to P119.  *See id*.  The metadata for P077 establishes that

it was last modified by Adam Kincaid at 8:10 am on September 3, 2011.  Goldstein Decl. ¶ 13.

This was three minutes before Kincaid sent an Excel spreadsheet to Mann and DiRossi.  Trial

Ex. P119 at LWVOH_00018303.

*Second*, the filename set forth in the metadata for P077 is the same as the filename set

forth for the thumbnail image of the attachment to P119 at LWVOH_00018303: "Ohio Changes

- New Idea Redraft.xls."  *See* Goldstein Decl. ¶¶ 20, 27.

*Third,* two minutes after receiving Kincaid's email, at 8:15 a.m., Mann forwarded the

email and all of its attachments to Braden, including "Ohio Changes - New Idea Redraft.xls."

*See* Trial Ex. P119 at LWVOH_00018308.[11]

*Fourth,* the spreadsheet that Braden transmitted to Hofeller on September 6, 2011, P393

at REV_00023179 ("Attachment 3 to P393"), also bears the filename "Ohio Changes - New Idea

Redraft.xls."  *See* Goldstein Decl. ¶ 27.  And Braden's transmittal email, P393 at

---

[11] The files attached to P119—which include P077 and five image files depicting maps of
Ohio—consistently traveled as a package. *See* Goldstein Decl. ¶¶ 14-18, 26-32.

REV_00023176, clearly indicates that he is forwarding an email he received (the subject line is prefaced with "FW: New Idea Redraft"—the same subject line reflected in P119 at LWVOH_00018302-8).

*Fifth,* the metadata for both P077 and Attachment 3 to P393 both state that their filename is the same as the file transmitted by Kincaid to Mann, Mann to Braden, and Braden to Hofeller: "Ohio Changes - New Idea Redraft.xls." *See* Goldstein Decl. ¶¶ 20, 27.

*Sixth,* and critically: P077 and Attachment 3 to P393 both clearly include the words "Franklin County Sinkhole." They do so in the same conspicuous place: the center column at the top of the page. Those words unquestionably appeared on the attachment to the spreadsheet with the same filename that was transmitted by Kincaid on September 3, 2011. And all of the partisan scorings match exactly. *Compare* Trial Ex. P077 *with* Attachment 3 to Trial Ex. P393.

Thus, the evidence firmly establishes that Kincaid transmitted the Sinkhole Spreadsheet on February 3, 2011 to Mann and DiRossi. Those Ohio map drawers then promptly circulated that spreadsheet to Braden, making sure it was placed in Hofeller's hands.

### 4. Adam Kincaid's uncertainty regarding the file name of P077 does not provide a basis for an authentication or foundation objection.

Defendants suggest that none of this evidence matters. Instead, they dispute the spreadsheet's authenticity and foundation because Kincaid's normal practice would be to label the header differently, and because he does not remember typing the phrase "Franklin County Sinkhole," giving him "pause" as to the metadata's accuracy. *See* Joint Evidence Br., ECF No. 254 at 7-8; Kincaid Dep. Vol. II, ECF No. 230-28 at 368:5-13.

But Kincaid never testified that he did not write the phrase "Franklin County Sinkhole." To the contrary, he admitted that "it's possible I didn't follow my standard naming convention." Kincaid Dep. at Vol. II, ECF No. 230-28 at 361:4-5. Moreover, Kincaid admitted—for a third

time—to creating this spreadsheet after specifically being shown the phrase "Franklin County

Sinkhole" at the top of the document:

> Q: And then you go across the top going to the right, okay, there's
> something called "Franklin County sink hole"; do you see that?
> A: I do.
> Q: I think you said you created this document?
> A: Uh-huh."

Kincaid Dep. at Vol. I, ECF No. 230-27 at 154:10-15 (while discussing P077).

### 5. Mark Braden's testimony does not provide a basis for an authenticity or foundation objection.

Defendants also cite to the testimony of Braden to support their authenticity and/or

foundation objection.  In particular, they state that "Mr. Braden testified that he did not recognize

this document or any specific communications regarding this document" or using the phrase

Franklin County Sinkhole.  Joint Evidence Spreadsheet, ECF No. 254-1 at P077 (col.

"Foundation/ Authenticity Objection").  But a careful review of the evidence indicates that

Braden's testimony is not probative of the authenticity of or foundation for P077 or Attachment

3 to P393.

Braden produced P077 pursuant to a subpoena.  *See* Goldstein Decl. ¶ 12.  This means

the spreadsheet is presumptively authentic.  But Mr. Braden did ***not*** produce the cover email that

is the first page of P393, the document that specifically ties him to the Sinkhole Spreadsheet, *i.e.*,

the document where Braden admonishes Hofeller to "keep this secret" while asking for

Hofeller's views of the attached materials.  Instead, that document was apparently withheld on

the basis of work product.  *See* Braden Privilege Log at 8, ECF No. 119-1 at 8 (entry for Control

No. 1434, describing a September 6, 2011 email chain with attachments from Braden to Hofeller

withheld as attorney work product).  It was under these circumstances that Braden then testified

that he does not recognize the Sinkhole spreadsheet and could not recall communications about it.  Joint Evidence Br., ECF No. 254 at 7.

Fortunately, discovery did not stop there.  As the Court is well aware, Plaintiffs sought documents from the Republican National Committee in early October.  Plaintiffs, however, only received P393 and other documents after Braden's deposition, and as a result of  substantial motions practice  *See Ohio A. Philip Randolph Inst. v. RNC*, No. 18-4258 (6th Cir. Jan. 18, 2019) (ECF No. 31-2).

Plaintiffs therefore only learned that Braden sent Hofeller the Franklin County Sinkhole spreadsheet on September 6, 2011 after the opportunity to confront Braden with this material at his deposition had passed.  There was no opportunity to refresh Braden's recollection by using his own transmission email, P393.  Braden's lack of recollection at his deposition in no way casts doubt on the authenticity or foundation for the document (including the fact that he transmitted it to Hofeller).

**B.      The hearsay objections to Trial Exhibits P077 and P393 should be overruled.**

**1.      P077 and attachment 3 to P393 are admissible to establish intent.**

Plaintiffs offer P077 to establish the intent of the Ohio and national Republican map drawers.  *See* PFOF ¶¶ 121-157.  The hearsay objection therefore fails under Rule 801(c)(2). The spreadsheet establishes that the map drawers created and exchanged partisan scorings, which supports a finding that political data drove the setting of the district boundaries (regardless of whether the data is true or accurate).  The phrase "Franklin County Sinkhole" evidences the map drawers' intent to pack Democrats into the 3rd District.  This is probative of the intent of the map

drawers regardless of whether Democratic voters in fact largely comprise the new 3rd District in Franklin County or whether it was true that the new district was in fact a "sinkhole."[12]

The PVI and other political indices reflected in the spreadsheet support a finding that the map drawers intended to enact a map that heavily favored Republicans. The Court could make such a finding regardless of whether, for example, the proposed 1st District's PVI score was in fact R+6. Thus, the partisan scorings are not hearsay. Setting aside the phrase "Franklin County Sinkhole," the partisan scorings reflected in P077 provide all the necessary support for the proposed findings in which Plaintiffs cite P077: the map drawers' awareness of those scorings provides a basis for the straightforward inference that the map drawers believed and intended to draw a map that heavily favored Republicans. None of those findings rely on P077 for any truth of the assertions in the Sinkhole spreadsheet.

### 2. P077 and P393 are also admissible for the truth under Rule 801(d)(2)(B) & (D).

The Sinkhole spreadsheet is also admissible for the truth because Mann and Braden adopted the admissions therein as party opponents. As Defendants recognize, Mann and Braden are agents of the Ohio legislature and therefore qualify as party opponents. Joint Evidence Br., ECF No. 254 at 30.

Mann adopted the admissions in P077 when she received it from Kincaid and forwarded the document to Braden and Clark Bensen on September 3, 2011. *See* Trial Ex. P119 at LWVOH_00018308; Part II.C.2, *supra* (discussing adopted admissions). Rather than distance

---

[12] In the alternative, the phrase "Franklin County Sinkhole" satisfies Rule 803(3) as a description of the map drawers' then-existing state of mind. The declarants' intended assertion in writing the phrase "Franklin County Sinkhole" was to describe the intent to pack Democrats into a new district in Franklin County, which provided the architecture for the remaining map to lock down a strong Republican advantage. In this framing of the issue, the Court may consider the phrase "Franklin County Sinkhole" for its truth.

herself from it, Mann forwarded the spreadsheet to a national Republican and a data expert

(Bensen) for their analysis. These are "surrounding circumstances [that] tie the possessor and

the document together in some meaningful way," and thus, satisfy Rule 801(d)(2)(D). *Merritt*,

1998 WL 196614, at *1 (quoting *Paulino*, 13 F.3d at 24).

Likewise, Braden adopted P077's admissions when he forwarded the document to

Hofeller with the admonishment "please keep this secret," and noted that he would like

Hofeller's and Dale Oldham's views on the proposal. *See* Trial Ex. P393 at 1. Braden knew the

proposal was not only worth keeping "secret," but that the proposal was worthy of being

submitted to two of the top national Republicans involved in redistricting for input. Braden

therefore adopted the admissions in the Sinkhole spreadsheet for purposes of Rule 801(d)(2)(B).

In addition, for the reasons discussed in Part II.C.1 *supra*, P077 and P393 reflect

statements that Kincaid made as an agent of the Intervenors who were members of Congress in

2011. This provides yet another avenue for the Court to rely on the spreadsheet for its truth.

The documents are also admissible for the truth pursuant to Rule 801(d)(2)(E).

Significant record evidence demonstrates that the map drawers worked together as a team. The

Sinkhole spreadsheet's prompt transmittal—first from Kincaid to Mann, DiRossi, and Whatman

(at 8:13 a.m. on September 3, 2011), *see* Trial Ex. P119 at LWVOH_00018304, then from Mann

to Braden (at 8:15 a.m. on September 3, 2011), *see* Trial Ex. P119 at LWVOH_00018308, and

then finally from Braden to Hofeller (at 1:45 p.m. on September 6, 2011), *see* Trial Ex. P393 at

1—demonstrates the team's efficient cohesion and how they shared an objective to draw a

congressional map that locks in 12 Republican seats. *See* Trial Exs. P119, P393. The Sinkhole

spreadsheet therefore satisfies Rule 801(d)(2)(E). *See* Part II.C.2, *supra* (setting forth legal

framework for the co-conspirator exception).

### 3. P077 and P393 are admissible for the truth pursuant to Rule 803(6).

Finally, the spreadsheet is also admissible for its truth as a record of a regularly-conducted activity.  Kincaid testified that he created this spreadsheet while he was working as the National Republican Congressional Committee's Redistricting Coordinator, and that he made this document in the course of his regular work on Ohio redistricting.  *See* Kincaid Dep. Vol. II, ECF No. 230-28 at 516:2-10 ("A: These all would have been produced over the course of my normal work at the NRCC. . . . Q: So we're clear for the record, you're reviewing all the exhibits that were marked today. A: Yes.").  He stated on numerous occasions that creating this and similar changes sheets was his job at the NRCC, *see* Kincaid Dep. Vol. II, ECF No. 230-28 at 298:15-299:25, and he showed knowledge about how the NRCC would store its congressional redistricting files.  *See* Kincaid Dep. Vol. II, ECF No. 230-28 at 529:13-23; 536:19-537:9.

## V. Defendants' Objections to Dr. David Niven's Testimony Should be Overruled.

### A. Dr. Niven's census tract analysis

Dr. Niven determined that the current congressional map splits census tracts between congressional districts 59% more frequently than under the previous map, and that Democratic-oriented tracts are 46.8 percent more likely than Republican-oriented tracts to be split.  Niven, ECF No. 242 at 22:18-23, 19:3-4; Trial Ex. P524, Niven Report at 2, 5.  Defendants object to (1) the use of census tracts as the geographical unit employed to analyze this statewide pattern of division, and (2) the fact that Dr. Niven did not detail in his report every protocol that he performed to validate this pattern.  Joint Evidence Br., ECF No. 254 at 36-37.  These objections are without merit.

### 1. Census tracts are the appropriate unit for this study.

To study the splitting of political subdivisions, communities of interest, and neighborhoods, Dr. Niven chose census tracts as the most appropriate unit for analysis.  He did

so because these divisions—that were created by the United States Census for research and analysis purposes—are designed to be stable and reliable indicators, permitting researchers to study patterns over time.  Niven, ECF No. 242 at 13:24-14:9, 18:11-15; Trial Ex. P524, Niven Report at 4-6.

### 2. Dr. Niven employed the research protocols of his profession in examining the pattern of division.

Defendants claim that Dr. Niven did not "use the same protocols to test for reliability and statistical significance that he would have used in his academic work."  Joint Evidence Br., ECF No. 254 at 37.  This is untrue.  Dr. Niven *did* calculate the statistical significance and strength of the relationships that he found, but did not include that level of detail in his report.  When asked by opposing counsel at trial, Dr. Niven affirmed this, and explained, "If this were an academic paper, I would have included a lot more in the way of footnotes and statistical documentation.  I was attempting, for the purposes of economy and to be understood by a wider audience, not to get too far into the weeds of statistics in the report."  Niven, ECF No. 242 at 80:8-82:18.

Defendants likewise complain that Dr. Niven's report did not include analysis of other possible explanations for the differences in the map's treatment of Republican- and Democratic-oriented census tracts.  But, as Dr. Niven explained at trial, "I did go back after our lovely chat during the deposition and use what was available within the OCURD data, so I controlled for population size and the partisan effect maintained even when controlling for population size."  After soliciting this information from Dr. Niven at trial, opposing counsel moved to strike his answer, objecting that it was not included in his report.  Niven, ECF No. 242 at 82:8-21.  The gravamen of these objections is thus *not* that Dr. Niven's analysis is unreliable, but that his report did not contain the elaborations that Defendants elicited in court.  Dr. Niven supplied the

explanation when requested; but defense moved to strike.  Dr. Niven's answers should stand, however:

Federal Rule of Civil Procedure 26(a)(2)(B) "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.,* 470 F.3d 1201, 1203 (6th Cir. 2006); *id.* (Expert could testify to "generally accepted accounting principles" although not covered in his report, because "it may be assumed" that experts base their opinions on the "normal general standards of their profession".)  The rule "does not limit an expert's testimony simply to reading his report."  *Id.*; *see also In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 650, 660-62 (S.D. Ohio 2016).  Experts are permitted to "supplement, elaborate upon, [and] explain" their reports."  *du Pont*, 348 F. Supp. 3d at 662.  An obvious purpose of the rule is to prevent surprise, and in *du Pont*, like here, Defendants did "not claim to be surprised by the scope" of the expert's testimony.  *Id.* at 663.  This is far different from a situation in which an expert first offers a new opinion at trial.

### B.     Dr. Niven's Principal Study

Dr. Niven took "two main approaches" in his work.  (1) The first, discussed above, was to look at statewide patterns as revealed through the assignment of census tracts to congressional districts across the state, and to look at congressional office locations.  (2) The preponderance of his analysis, however, consisted of "a deeper look at particular districts and the way they were created and who was included in them and who was excluded from them across several . . . critical areas in the state."  Niven, ECF No. 242 at 13:1-11.  This deeper look—which examined the construction of districts 1, 2, 3, 12, 15, 9, 11, 13, 14, and 16—accounted for 30 of the 35 pages of his report, as well as the bulk of his trial testimony.  *Id.* at 26:20- 68:16.  Defendants do not lodge any objection to Dr. Niven's district-by-district study, which found a pattern of

strategic sorting of voters throughout the map.  Niven, ECF No. 242 at 68:2-16; Trial Ex. P524, Niven Report at 33.

## VI.     Defendants' Objections to Dr. Wendy K. Tam Cho's Testimony Should be Overruled.

Dr. Cho compared Ohio's enacted congressional district map against a sample of simulated maps that served as a baseline for understanding the typical partisan effect of an Ohio congressional map produced by a nonpartisan redistricting process.  PFOF ¶ 764.  To serve as such a baseline, all of the simulated maps account for the applicable legal requirements (contiguity, population equality, and the Voting Rights Act), and are consistent with recognized, nonpartisan traditional districting criteria to the extent those optional criteria were actually applied by the Ohio legislature in enacting the current map.  PFOF ¶ 763.

Defendants contend that Dr. Cho's simulated maps "have nothing to do with the Ohio General Assembly's goals" and instead achieve "different goals."  Joint Evidence Br., ECF No. 254 at 38.  Dr. Cho did not make up her own "goals" for her simulated maps to achieve.  Rather, she applied two sets of constraints:  the applicable legal requirements and nonpartisan traditional districting criteria to the extent applied by the Ohio legislature.  PFOF ¶ 763.

Defendants take issue with three specific aspects of Dr. Cho's implementation of these constraints: incumbency protection, population equality, and Voting Rights Act compliance.  Joint Evidence Br., ECF No. 254 at 38.  None of these are valid critiques.  Dr. Cho explained each of these aspects and why she was assured that the simulated maps were a valid baseline for comparison of partisan effect.  On incumbency protection, Dr. Cho cited evidence that it was not a motivation of the Ohio legislature, noting the unnecessary pairing of incumbents and express disavowal of the goal of incumbency protection.  PFOF ¶ 773.  Similarly, she provided a detailed and reasoned analysis, not contradicted by any other expert, as to why her conclusions were not

affected by the particular population equality constraint she employed.  PFOF ¶ 767.  Finally, Dr. Cho applied the actual legal constraint of the Voting Rights Act, as established by the undisputed testimony of Dr. Handley that a 45% BVAP district in the Cleveland area was required.[13]  PFOF ¶ 766.

Defendants also contend, in passing, that Dr. Cho's three million maps "are a drop in the proverbial bucket of possible redistricting maps."  Joint Evidence Br., ECF No. 254 at 38.  The crucial question is not *how many* maps Dr. Cho produced, but rather whether her three million maps are a *representative sample* of the universe of possible maps.  As Dr. Cho showed in her peer reviewed work, PFOF ¶ 764, and explained in her expert reports and trial testimony in this case, *id.* ¶¶ 757-62, her methodology produces a representative sample.  The representativeness of Dr. Cho's sample is uncontested; no evidence or expert testimony has been adduced to the contrary.

Finally, Defendants argue that Dr. Cho's algorithm "has not been adequately peer reviewed or vetted by anyone."  Joint Evidence Br., ECF No. 254 at 38.  This is false.  The algorithm Dr. Cho utilized in her analysis in this case was presented at the premier computer science conference after acceptance through an especially rigorous peer review process.  Pls.' Opp. to Mot. to Exclude Dr. Cho, ECF No. 176 at 11-12.  Notwithstanding Defendants' intimations, conference publications are in fact the *preferred* method of peer review in this field.  ECF No. 176 at 10-11.  Dr. Cho tested her algorithm on a small geographic area in which all the possible maps are known and reported, in the same conference publication, that the sample her algorithm produced has the same distribution as the true universe of possible maps.  PFOF ¶ 757.

---

[13] To the extent Defendants chose to consider only maps with a district with BVAP above 50%, Dr. Cho's analysis helpfully reveals the partisan effects of that choice, just as it does for all the other choices Defendants made in crafting the enacted map.  PFOF ¶ 775.

Moreover, this algorithm builds off Dr. Cho's prior work, which has also been the subject of peer review. PFOF ¶ 756. While Dr. Cho's code was not itself submitted for peer review, that is the standard practice in the field because the code is only the implementation of the ideas that have been the subject of peer review. Cho, ECF No. 243 at 99:8-12; *see also id.* at 127:3-7.

Defendants were of course entitled to review Dr. Cho's methodology and code in the context of this case, and to retain experts to assist them in that effort. Yet, they never took Plaintiffs' counsel up on an offer to provide Dr. Cho's code in native format. PFOF ¶ 756. And the experts they chose to retain lacked expertise in the relevant computer code, *id.* ¶¶ 822, 825, and algorithms, *id.* ¶ 826. The academic community has vetted Dr. Cho's methodology. If Defendants have not, that is the result of their own choices.

Dr. Cho's testimony and expert reports are not only admissible, they are deserving of significant weight in the Court's consideration. Dr. Cho possesses sterling qualifications in precisely the fields of analysis she applied in this case. PFOF ¶¶ 752-53. Dr. Cho employed a methodology that she had subjected to peer review through multiple publications. PFOF ¶ 756. Dr. Cho's expert opinions quantify the partisan effect of the enacted map while controlling for political geography, legal districting requirements, and nonpartisan districting principles. *Id.* ¶ 760. Dr. Cho's analysis will assist the Court in reaching conclusions about that partisan effect and the degree to which partisan intent influenced the enacted map. *Id.*

## VII.  Conclusion

For all of the foregoing reasons, and the reasons detailed in Plaintiffs' responsive spreadsheet addressing Defendants' and Intervenors' objections, their objections should be overruled and Plaintiffs' evidence admitted.

April 2, 2019

Respectfully submitted,

_/s/ Freda J. Levenson_, trial attorney

T. Alora Thomas-Lundborg
Theresa J. Lee
Emily Rong Zhang
Dale E. Ho
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
athomas@aclu.org
tlee@aclu.org
erzhang@aclu.org
dho@aclu.org

Robert Fram
Nitin Subhedar
Jeremy Goldstein
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel.: (415) 591-6000
rfram@cov.com
nsubhedar@cov.com
jgoldstein@cov.com

Freda J. Levenson (0045916)
Elizabeth Bonham (0093733)
American Civil Liberties Union of Ohio Fdtn.
4506 Chester Avenue
Cleveland, OH 44103
Tel.: (216) 472-2220
Facsimile: (216) 472-2210
flevenson@acluohio.org
ebonham@acluohio.org

David Carey (0088787)
American Civil Liberties Union of Ohio Fdtn.
1108 City Park Avenue
Columbus, OH 43206
Tel.: (614) 586-1972
dcarey@acluohio.org

Michael Baker
Perrin Cooke
Peter J. Rechter
Robert S. Day
Jacob Canter
Isaac Wood
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
mbaker@cov.com
pcooke@cov.com
prechter@cov.com
rday@cov.com
jcanter@cov.com
iwood@cov.com

41

## CERTIFICATE OF SERVICE

I, Freda J. Levenson, hereby certify that the foregoing document was served upon all counsel of record in this case via ECF.

*/s/ Freda J. Levenson*
Counsel for Plaintiffs

42